Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' WITNESS AND EXHIBIT LIST FOR MARCH 2, 2023, HEARING

The above-captioned debtors and debtors in possession (collectively, the "Debtors")
respectfully file their Witness and Exhibit List for the hearing to be held on **March 2, 2023, at
10:00 a.m. (prevailing Eastern Time)** (the "Hearing") as follows:

### WITNESS LIST

The Debtors expect to call the following witnesses at the Hearing:

1.     Mark A. Renzi, Managing Director, Berkeley Research Group

2.     Brian Tichenor, Managing Director, Moelis & Company

3.     Timothy Pohl, Independent Director of Voyager Digital, LLC

4.     Leticia Sanchez, Director, Stretto

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC
(8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY
10003.

## EXHIBIT LIST

| Ex. | Docket No. | Date | Description |
|---|---|---|---|
| 1. | Dkt. 1119 | 2/28/23 | Declaration of Mark A. Renzi in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code |
| 2. | Dkt. 1113 | 2/28/23 | Declaration of Brian Tichenor in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code |
| 3. | Dkt. 1111 | 2/28/23 | Declaration of Timothy Pohl in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code |
| 4. | Dkt. 1127 | 3/01/23 | Amended Declaration of Leticia Sanchez Regarding the Solicitation and Tabulation of Votes on the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code |
| 5. | Dkt. 1117 | 2/28/23 | Notice of Filing of Third Amended Joint Plan of Voyager Digital Holdings, Inc., and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code |
| 6. | Dkt. 248 | 8/05/22 | Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation and (V) Granting Related Relief |
| 7. | Dkt. 748 | 12/19/22 | Statement / Notice of Successful Bidder |

| Ex. | Docket No. | Date | Description |
|-----|-----------|------|-------------|
| 8. | Dkt. 775 | 12/21/22 | Asset Purchase Agreement dated as of December 18, 2022, by and between Bam Trading Services Inc. d/b/a Binance.US, as purchaser, and Voyager Digital, LLC, as seller |
| 9. | Dkt. 835 | 1/08/23 | First Amendment to Asset Purchase Agreement |
| 10. | Dkt. 836 | 1/09/23 | Declaration of Brian Tichenor in Support of the Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Binance US Purchase Agreement, and (II) Granting Related Relief |
| 11. | Dkt. 860 | 1/13/23 | Order (I) Authorizing Entry Into The Binance US Purchase Agreement and (II) Granting Related Relief |
| 12. | Dkt. 861 | 1/13/23 | Order (I) Scheduling A Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors" Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections |
| 13. | Dkt. 863 | 1/13/23 | Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code |
| 14. | Dkt. 926 | 1/30/23 | Affidavit of Service of Leticia Sanchez |
| 15. | Dkt. 943 | 2/01/23 | Plan Supplement |
| 16. | Dkt. 951 | 2/02/23 | Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases |
| 17. | Dkt. 954 | 2/03/23 | Affidavit of Publication in The New York Times re Notice of Hearing to Consider (I) Adequacy of the Second Amended Disclosure Statement and (II) Confirmation of the Third Amended Joint Chapter 11 Plan Filed by the Debtors and Related Voting and Objection Deadlines |

| Ex. | Docket No. | Date | Description |
|-----|-----------|------|-------------|
| 18. | Dkt. 955 | 2/03/23 | Affidavit of Publication in The Financial Times re Notice of Hearing to Consider (I) Adequacy of the Second Amended Disclosure Statement and (II) Confirmation of the Third Amended Joint Chapter 11 Plan Filed by the Debtors and Related Voting and Objection Deadlines |
| 19. | Dkt. 1074 at p. 16-55 | 2/23/23 | Voyager Customer Agreement |
| 20. | Dkt. 986 | 2/08/23 | First Amended Plan Supplement |
| 21. | Dkt. 1006 | 2/15/23 | Second Amended Plan Supplement |
| 22. | Dkt. 1035 | 2/21/23 | Third Amended Plan Supplement |
| 23. | Dkt. 1115 | 2/28/23 | Fourth Amended Plan Supplement |
| 24. | Dkt. 1074 at p. 56 | 2/23/23 | Cardano Spreadsheet |

## RESERVATION OF RIGHTS

If necessary, the Debtors reserve the right to supplement this list prior to or at the Hearing.

Dated: March 1, 2023          */s/ Joshua A. Sussberg*
New York, New York           **KIRKLAND & ELLIS LLP**
                             **KIRKLAND & ELLIS INTERNATIONAL LLP**
                             Joshua A. Sussberg, P.C.
                             Christopher Marcus, P.C.
                             Christine A. Okike, P.C.
                             Allyson B. Smith (admitted *pro hac vice*)
                             601 Lexington Avenue
                             New York, New York 10022
                             Telephone:    (212) 446-4800
                             Facsimile:    (212) 446-4900
                             Email:        jsussberg@kirkland.com
                                           cmarcus@kirkland.com
                                           christine.okike@kirkland.com
                                           allyson.smith@kirkland.com

                             *Counsel to the Debtors and Debtors in Possession*

# Exhibit 1

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DECLARATION OF MARK A. RENZI
## IN SUPPORT OF CONFIRMATION OF THE THIRD
## AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS
## DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

Debtors
Ex-1

I, Mark. A. Renzi, hereby declare under penalty of perjury, as follows:

1.      I submit this Declaration in support of confirmation of the *Third Amended Joint Chapter 11 Plan of Voyager Digital Holdings, Inc., and Its Debtor Affiliates* [Docket No. 852] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"), and the *Debtors' Memorandum of Law In Support of (I) Final Approval of the Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and (II) an Order Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Confirmation Brief")[2], filed contemporaneously herewith.  I am a Managing Director with Berkeley Research Group, LLC ("BRG") and have served as a financial advisor to Voyager Digital Holdings, Inc. since July 5, 2022.

2.      The statements in this declaration are, except where specifically noted, based on (a) my personal knowledge or opinion of the Debtors' operations and finances, (b) my personal knowledge, belief, or opinion, (c) information I have received from the Debtors' employees or advisors and/or other employees of BRG, or (d) from the Debtors' records maintained in the ordinary course of their business.  If called to testify, I could and would testify competently to the facts set forth herein.

3.      I am not being specifically compensated for this testimony other than through payments that may be received by BRG as a professional retained by the Debtors.

---

[2] Capitalized terms used but not defined herein shall have the meanings given to such terms in the Plan or Confirmation Brief, as applicable.

2

I. **Qualifications**

4. I am a Managing Director and the Head of the Corporate Finance Financial Institutions Group for BRG, the financial advisor to the Debtors.

5. BRG's corporate finance practice consists of senior financial, management consulting, accounting, and other professionals who specialize in providing financial, business, and strategic assistance typically in distressed business settings. BRG has a wealth of experience in providing financial advisory services in in- and out-of-court restructuring, sale, and wind down scenarios, and enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States. BRG professionals have significant restructuring and industry experience assisting distressed companies with financial and operational challenges and working with management teams and boards of directors of large companies facing financial challenges similar to those of the Debtors. BRG regularly assists large and complex businesses similar to the Debtors.

6. BRG has acted as financial advisor, crisis manager, and corporate officer in middle market to large multinational companies in crisis or those in need of performance improvement in specific financial and operational areas across a wide array of industries. Moreover, the professionals at BRG have assisted and advised debtors, creditors, creditors' committees, bondholders, investors, and others in numerous bankruptcy cases, including the bankruptcy cases of *Intelsat S.A.; Liberty Power Holdings, LLC; The Collected Group, LLC; CBL & Associates Properties, Inc.; Hospital Acquisition LLC (d/b/a LifeCare); rue21, inc.; Sports Authority Holdings, Inc.*; *Specialty Retail Shops Holding Corp. (a.k.a. Shopko); Brookstone Holding Corp.; American Apparel LLC; Rentpath Holdings, Inc.; MF Global Holdings, Ltd.; Le Tote, Inc.; Chrysler (a.k.a. Old Carco LLC); Southern Foods Group; Speedcast International Limited; The*

3

Hertz Corporation, LLC; Borden Dairy Company; Nine West Holdings, Inc.; Verity Health System
of California, Inc.; Real Industry, Inc.; M & G USA Corporation; Peabody Energy Corporation;
Sabine Oil & Gas Corporation; Molycorp Inc.; Refco, Inc.; Spiegel Inc.; W.R. Grace; Penson
Worldwide; Dynegy Holdings, LLC; Calpine Generating Company; and Nortel Networks Inc.[3]
Currently, in addition to serving as financial advisor to the Debtors in these chapter 11 cases, I am
the Chief Restructuring Officer of BlockFi and its related debtors and debtors in possession,[4] and
I am one of the leaders of the team advising the Official Committee of Unsecured Creditors in the
Genesis Global HoldCo, LLC, chapter 11 proceedings.[5]

7.      I am a member of the Association of Insolvency and Restructuring Advisors, as
well as the Turnaround Management Association. I have more than twenty-five (25) years of
business experience, with approximately twenty (20) years of financial consulting experience,
including liquidity and capital structure assessment, debt and equity restructuring advice, and
identification of reorganization alternatives. During the course of my career, I have personally
provided restructuring services on more than thirty-five (35) engagements in both out-of-court
workout situations and in-court reorganizations.  Further, I have served in interim management
positions and advised distressed companies with day-to-day management activities, including
development of pro forma financials, cash flow management, cost rationalization, and
identification of liquidity enhancing activities. In addition to operational turnarounds, I have
assisted in financial restructurings, including refinancings, recapitalizations, debt-for-equity
swaps, and strategic mergers and acquisitions.

---

[3] The professionals were employed in certain of these engagements prior to joining BRG.

[4] In re BlockFi Inc., No. 22-19361 (MBK), U.S.B.C., D.N.J.

[5] In re Genesis General HoldCo LLC, No. 23-10063 (SHL), U.S.B.C., S.D.N.Y.

4

8.      Prior to joining BRG, I was a Senior Managing Director at a global business advisory firm with a 15-year tenure. I also worked at a boutique money management firm in New York evaluating equity and commodity derivative portfolios, and held various positions in FP&A, business plan development, treasury, and global cash management. I received a B.A. in Economics from Washington College and an M.S. in Finance from Boston College.

9.      Since the Debtors engaged BRG in July 2022, I have worked closely with the Debtors' management and other professionals on the Debtors' restructuring efforts, including assisting the Debtors in preparing cash flow projects, budgets, and other reports, as well as assisting with strategic operations including, most recently, the rebalancing of the Debtors' cryptocurrency portfolio and preparation for execution on the proposed Plan, whether that ultimately be through a Sale Transaction with Binance.US or the Liquidation Transaction.  I lead the BRG team advising the Debtors.  In this capacity I have become well-acquainted with the Debtors' restructuring efforts. I am also familiar with the terms and provisions of the Plan, as well as all previously submitted plans—I participated directly in the due diligence, discussions, and analysis related to the Plan, as well as all previously submitted plans.

10.     The Debtors requested that I address for the Court and parties-in-interest, among other things described in more detail below: (1) the purpose of the Plan; (2) the ability of the Plan, including the Sale Transaction or the Liquidation Transaction to satisfy the "best interests test" as defined in section 1129(a)(7) of the bankruptcy code; (3) the feasibility of the Plan, including the Sale Transaction or the Liquidation Transaction as applicable, under section 1129(a)(11) of the bankruptcy code; (4) the need for key Debtor employees to continue providing services to the Debtors (and the Wind-Down Estate) in order to successfully effectuate the Plan, including the

5

Sale Transaction or the Liquidation Transaction; and (5) whether or not appointment of a trustee in these chapter 11 cases is warranted under the circumstances.

## II.    Background

11.    To understand why I reach the opinions described below, it is necessary to understand Voyager's operational history as well as the history of these chapter 11 cases.

### A. Operations

12.    Voyager's primary operations consist of (i) brokerage services, (ii) custodial services through which customers earn interest and other rewards, and (iii) lending programs.  All of Voyager's services are accessible through a mobile application that users can download on their smartphones and other smart devices.

13.    **Brokerage Services**. Voyager operates as a cryptocurrency "agency broker," matching its customers with counterparties who can facilitate the customers' desired trades. The Company's platform surveys approximately a dozen exchanges and liquidity providers and executes trades through a proprietary algorithm that evaluates the price, certainty of execution, reliability of the trading venue, and speed of execution.

14.    **Custodial Services.**  Customers store their digital assets on the Voyager platform and, unless they "opted out" of the rewards program (which all customers had the opportunity to do), earned interests on deposits which, prior to the Petition Date, were primarily paid in three ways: (i) PIK Interest; (ii) through VGX and the Voyager Loyalty Program; and (iii) through "staking" programs. Customers could also sign up for a Voyager Debit Card.

15.    **Lending Program.** As part of providing customers with PIK Interest, Voyager lent cryptocurrency deposited on its platform to third parties, sometimes on a collateralized basis but often on an uncollateralized basis.  Customers were advised of this through clear language in the

6

Customer Agreement. Such third parties paid Voyager a pre-negotiated interest rate that is payable in either cash or payment-in-kind (*i.e.*, a Bitcoin loan accrues interest payable in Bitcoin). Voyager's lending program was an integral part of its business and necessary to provide customers with a meaningful return on their assets. Loans made by the Company that were outstanding as of the Petition Date were as follows:

| Loan Counterparty | Borrowing Rates | Amount Outstanding (in thousands) |
|---|---|---|
| Alameda Research Ltd. | 1% - 11.5% | $376,784 |
| Three Arrows Capital | 3% - 10% | $654,195 |
| Genesis Global Capital, LLC | 4% - 13.5% | $17,556 |
| Wintermute Trading Ltd | 1% - 14% | $27,342 |
| Galaxy Digital LLC | 1% - 30% | $34,427 |
| Tai Mo Shan Limited | 10% | $13,770 |
| Other | 4% - 8% | $751 |
| **Total Loan Obligations** | | **$1,124,825** |

### B. The Market Crashes and Voyager Seeks Chapter 11 Protection

16.     Cryptocurrency is inherently volatile, and prices vacillate by the second due to constant trading occurring 24 hours a day, seven days a week. 2022 saw historic levels of volatility in the markets generally, and the cryptocurrency markets were not immune. Bitcoin slumped over 65% from January 1, 2022 to year-end:



17.    Crypto's 2022 pullback began with the collapse of LUNA, a cryptocurrency issued by Terra, an open-source blockchain protocol. Terra issued LUNA to execute transactions on the Terra blockchain. In early May 2022, LUNA was trading at $86 per token and had a market capitalization of approximately $14 billion. Along with LUNA, Terra issued TerraUSD ("UST"), an algorithmic stablecoin that was pegged at $1.

18.    On May 7, 2022, $2 billion of UST was unstaked and immediately sold. This dropped UST's price to $0.91. UST holders saw the "de-peg" and rushed to unstake and sell their coins.

19.    Traders redeemed UST for LUNA and sold their LUNA, leading to a significant decrease in its price. Simultaneously, other traders attempted to repeg LUNA to UST by burning UST to create LUNA, which in turn created an oversupply of LUNA and further exacerbated its price decline. In one week, LUNA's price fell from $82.55 to $0.000001 per token, eliminating $18 billion of value in the cryptocurrency sector.

8

20.     Many cryptocurrency-focused hedge funds, and other cryptocurrency companies, owned LUNA. Some were unable to sell their LUNA under staking agreements and were forced to incur up to a 99% loss on their investment. And in mid-June, reportedly due in part to the collapse of LUNA, Three Arrows Capital ("3AC"), a major player in the space, collapsed.

21.     On June 15, 2022, 3AC confirmed that it had suffered at least some loss from the LUNA collapse and that it had hired legal and financial advisors to explore potential liquidity solutions. Shortly thereafter, on June 27, 2022, 3AC was ordered by a court in the British Virgin Islands to commence liquidation proceedings.

22.     Voyager was a victim of 3AC's collapse. As stated above and as disclosed to customers, to provide customers with a yield on the assets they store with Voyager, Voyager loans out a portion of its cryptocurrency reserves to third parties. One such loan was to 3AC. In March 2022, the Company entered into a master loan agreement with 3AC (the "3AC Loan"). Pursuant to the 3AC Loan, the Company agreed to lend 15,250 Bitcoins and 350 million USDC to 3AC. The 3AC Loan was callable at any time by the Company. 3AC fully drew down on the 15,250 Bitcoins and 350 million USDC.

23.     After the LUNA crash in 2022, Voyager began to assess 3AC's downside exposure and the likelihood of repayment under the 3AC Loan. Voyager then made an initial request for a repayment by 3AC of $25 million of USDC by June 24, 2022, and subsequently requested repayment of the entire outstanding balance of Bitcoin and USDC by June 27, 2022. 3AC did not repay either requested amount. Accordingly, on June 27, 2022, Voyager issued a notice of default to 3AC for failure to make the required payments under the 3AC Loan.

24.     Once it became clear that 3AC had significant exposure to the crash, Voyager's management team swiftly took action to identify potential sources of liquidity to stabilize

9

Voyager's business and remain adequately capitalized, and it ultimately became necessary that Voyager begin marketing its business and enter these chapter 11 proceedings.

**C. Voyager Markets a Sale, AlamedaFTX Implodes**

25.     Beginning on or about June 20, 2022, the Debtors commenced a marketing process to solicit interest in a sale to a third-party investor. However, discussions with interested parties revealed that an in-court process for the Debtors' assets would be necessary to consummate the most value-maximizing transaction for stakeholders. Accordingly, the Debtors commenced these chapter 11 cases on July 5, 2022 (the "Petition Date"), and continued their marketing efforts.

26.     As discussed in greater detail in the *Declaration of Brian Tichenor in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed contemporaneously herewith (the "Moelis Declaration"), the Debtors' multi-month marketing process culminated in an auction process on September 13, 2022, to identify the highest and best bid from interested parties. The Debtors' financial advisor, Moelis, scrutinized the bids along with me and my team at BRG, the Debtors' legal advisors, and the Debtors' management team, Board of Directors, and independent directors, and ultimately concluded AlamedaFTX was the best option because all believed—based on what is now known to be fraud—that AlamedaFTX could timely close and effectuate the sales process and had the wherewithal to do so. The Court approved the Debtors' entry into a purchase agreement with AlamedaFTX on October 20, 2022.  Confirmation was originally set for December 8, 2022.

27.     On November 2, 2022, public reports began to circulate citing leaked, internal financial statements and questioning the health and liquidity of both FTX and Alameda Research

LLC (and their various affiliates, none of which appear to have operated independently). That and other public reporting began a death spiral for AlamedaFTX.

28.     On November 8, 2022, FTX's CEO stated publicly that FTX was experiencing a "liquidity crunch" due to user withdrawals.[6]  The Debtors and their advisors inquired with FTX and its advisors, who either could not or would not share any material information about what was happening.  On November 11, 2022, AlamedaFTX began the process of filing for bankruptcy.[7] The counterparty to the APA with the Debtors, West Realm Shires d/b/a FTX US, did not file until November 14, 2022.

**D. Voyager Markets a Sale Again, Reaches Agreement with Binance.US**

29.     On November 10, 2022, the day before AlamedaFTX publicly filed for bankruptcy, AlamedaFTX agreed to waive the "no shop" provision of the AlamedaFTX Purchase Agreement. The Debtors promptly restarted their sales process, and engaged in extensive negotiations with the interested parties over the course of approximately one month.

30.     Ultimately, on December 18, 2022, Debtor Voyager Digital, LLC (the "Seller") executed an asset purchase agreement (the "Asset Purchase Agreement") with BAM Trading Services Inc. ("Binance.US" or "Purchaser" and the transaction, "Sale Transaction"). The Asset Purchase Agreement provided that the Sale Transaction would be consummated through the Plan.

31.     The Debtors value the Sale Transaction at approximately $1.022 billion, comprising (a) the value of cryptocurrency on the Voyager platform as of a date to be determined, which as of December 18, 2022, is estimated to be $1.002 billion, plus (b) additional consideration, which is estimated to provide at least $20 million of incremental value. The Sale Transaction

---

[6] @SBF_FTX, Twitter (Nov. 8, 2022).

[7] @SBF_FTX, Twitter (Nov 11, 2022).

includes reimbursement by Binance.US of up to $15 million of Seller's expenses, and provides a $10 million reverse termination fee payable to the Seller by Binance.US to compensate the Debtors' estates in the event that Binance.US cannot consummate the transaction.

32.     The Plan also allows the Debtors to toggle to either a higher and better third-party bid (should one emerge) or to a self-liquidation if the Debtors determine, in their business judgment, that the Sale Transaction is no longer the best path forward for the Debtors' creditors (the "Liquidation Transaction").  The Plan was negotiated heavily between many parties, including the Debtors and the Official Committee of Unsecured Creditors (the "Committee").  Thousands of hours have been invested in creating as good of an outcome for creditors as is possible under the circumstances and the Plan (if confirmed) does exactly that.

## III.    The Plan Satisfies the Confirmation Requirements

33.     For the reasons detailed below, I believe that the Plan satisfies the applicable bankruptcy code requirements for confirmation of a plan of reorganization.  I set forth the reasons for such belief below, except where such compliance is apparent on the face of the Plan, the Plan Supplement, and the related documents or where it will be the subject of other evidence introduced at the Combined Hearing.

### A.  The Plan Fully Complies with the Applicable Provisions of the Bankruptcy Code — § 1129(a)(1).

34.     I understand that section 1129(a)(1) of the bankruptcy code requires a chapter 11 plan to comply with all applicable provisions of the bankruptcy code.

#### 1.  Proper Classification of Claims and Interests — § 1122 and § 1123(a)(1).

35.     I understand that sections 1122 and 1123(a)(1) of the bankruptcy code govern the manner in which a debtor may classify claims and interests.  I believe that the Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the bankruptcy code because

12

the Plan places Claims and Interests into eleven separate Classes, with the Claims and Interests in each Class differing from the Claims and Interests in each other Class in a legal or factual nature or based on other relevant criteria.

36.     I believe that valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.  In particular, I understand that general unsecured claims are broken into three classes, OpCo General Unsecured Claims, HoldCo General Unsecured Claims, and TopCo General Unsecured Claims to comport with certain requirements of the bankruptcy code and to account for the fact that Holders of such claims have legal recourse against only specific Debtors.  Holders of Account Holder Claims are classified separately from Holders of other General Unsecured Claims due to the unique nature and basis for the Account Holder Claims, which are made up of claims held by customers on the Voyager platform.  Further, Alameda Loan Facility Claims are properly classified separately as such Claims are asserted against multiple Debtor entities and are Claims on account of an unsecured loan.

### 2.  Specification of Unimpaired Classes — § 1123(a)(2).

37.     I understand that Article III.B of the Plan identifies each Class that is Unimpaired.

### 3.  Treatment of Impaired Classes — § 1123(a)(3).

38.     I understand that Article III.B of the Plan identifies each Class that is Impaired and describes the treatment thereof.

### 4.  Equal Treatment of Similarly Situated Claims and Interests — § 1123(a)(4).

39.     I understand that section 1123(a)(4) of the bankruptcy code requires that the Plan provide the same rights and treatment to each holder of claims or interests as other holders of

13

allowed claims or interests within such holders' respective class. I believe that the Plan satisfies

this requirement, as all Holders of Allowed Claims or Interests will receive the same rights and

treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class.

In particular, all Account Holder Claims will be "dollarized" as of the Petition Date, and the

Holders thereof will receive recoveries proportional to the "dollarized" value of their account

holdings relative to the aggregate dollarized value of all customer accounts. The form such

distributions take will be a function of the laws and regulations of jurisdictions in which Account

Holders reside.

### 5. Adequate Means for Implementation — § 1123(a)(5).

40.    I understand that section 1123(a)(5) of the bankruptcy code requires that a chapter

11 plan provide adequate means for a plan's implementation. I believe that the Plan provides

adequate means for implementation as required under section 1123(a)(5) of the bankruptcy code.

Among other things, Article IV of the Plan:

i.   constitutes a good faith compromise and settlement of all Claims, Interests, Causes
     of Action and controversies released, settled, compromised, or otherwise resolved
     pursuant to the Plan;

ii.  authorizes the applicable Debtors to take all actions necessary or appropriate to
     effectuate the Plan, including those actions necessary to effectuate the Restructuring
     Transactions, as set forth in the Plan Supplement, as the same may be modified or
     amended (in accordance with the terms of the Plan) from time to time prior to the
     Effective Date;

iii. authorizes the Debtors to consummate the Restructuring Transactions, including (i)
     all transactions necessary to provide for the purchase of the Acquired Assets by

14

Purchaser under the Asset Purchase Agreement, if applicable, (ii) the distribution of Cryptocurrency or Cash pursuant to the Asset Purchase Agreement, as applicable; (iii) the execution of the Plan Administrator Agreement and any transactions necessary or appropriate to form the Wind-Down Debtor; and (iv) the transfer of the Wind-Down Debtor assets to the Wind-Down Debtor;

    iv.    provides for consummation of the Sale Transaction or the Liquidation Transaction, as applicable;

    v.    effectuates the Employee Transition Plan;

    vi.    provides for the retention of certain Non-Released D&O Claims to be pursued, settled, or resolved by the Wind-Down Debtor;

    vii.    implements the D&O Settlement;

    viii.    creates the Wind-Down Debtor and appoints the Plan Administrator and Wind-Down Debtor Oversight Committee;

    ix.    provides sources of consideration for Plan distributions;

    x.    effectuates the cancellation of certain notes, instruments, certificates and other documents; and

    xi.    preserves certain Vested Causes of Action.

41.    On the Effective Date, the Wind-Down Debtor Assets shall, subject to the Plan Administer Agreement, be transferred to and vest in the Wind-Down Debtor. The Wind-Down Debtor will be charged with winding down the Debtors' estates and will be the successor-in-interest to the Debtors, and a successor to the Debtors' rights, title and interest to the Wind-Down Debtor Assets. The Wind-Down Debtor will be managed by the Plan Administrator and will be subject to a Wind-Down Debtor Oversight Committee.

### 6. Prohibition of Issuance of Non-Voting Stock — § 1123(a)(6).

42.    I understand that section 1123(a)(6) of the bankruptcy code requires that a debtor's organizational documents prohibit the issuance of nonvoting equity securities.  The Debtors are winding down, and there will not be any issuance of nonvoting equity securities or preferred stock. Accordingly, I believe section 1123(a)(6) of the bankruptcy code is inapplicable to the Plan.

### 7. Selection of Officers and Directors — § 1123(a)(7).

43.    I understand that section 1123(a)(7) of the bankruptcy code requires that any provisions in the Plan with respect to the manner of selection of any director, officer, or trustee be consistent with the interests of creditors, equity holders, and public policy.  I believe that the Plan satisfies this requirement by providing that, on the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Debtors will be deemed to have resigned, solely in their capacities as such, and the Plan Administrator will be appointed by the Debtors as the sole director and the sole officer of the Wind-Down Debtor and will succeed to the powers of the Debtors' directors and officers.  The Debtors filed the Plan Administrator Agreement with the Plan Supplement, which provides the identity of the Plan Administrator and Wind-Down Oversight Committee.

### 8. Discretionary Contents of the Plan — § 1123(b).

44.    I understand that section 1123(b) of the bankruptcy code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  I understand that pursuant to section 1123(b) of the bankruptcy code, among other things, a plan may: (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts or unexpired leases not previously rejected; (c) provide for the settlement or adjustment

16

of any claim or interest belonging to a debtor; or (d) include any other provision not inconsistent with applicable provisions of chapter 11.

45.    I believe that the Plan is consistent with section 1123(b) of the bankruptcy code. **First,** the treatment of Classes under the Plan renders such Classes either Impaired or Unimpaired. Class 1 (Secured Tax Claims) and Class 2 (Other Priority Claims) are Unimpaired, and Class 3 (Account Holder Claims), Class 4A (OpCo General Unsecured Claims), Class 4B (HoldCo General Unsecured Claims), Class 4C (TopCo General Unsecured Claims), Class 5 (Alameda Loan Facility Claims), Class 6 (Section 510(b) Claims), and Class 9 (Existing Equity Interests) are Impaired under the Plan.  Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests) may be Impaired or Unimpaired under the Plan.  **Second,** Article V of the Plan satisfies section 1123(b)(2) because it provides that, on the Effective Date, all Executory Contracts and Unexpired Leases, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, that, as of the Effective Date, were not previously rejected, assumed, or assumed and assigned, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the bankruptcy code, except to the extent set forth in the plan. **Third,** for the reasons set forth in Section II below, I believe that the Plan's release, exculpation, and injunction provisions are consistent with section 1123(b) of the bankruptcy code. **Finally,** the Plan also effectuates the Sale Transaction contemplated by the Asset Purchase Agreement or the Liquidation Transaction as applicable.

46.    I submit that each of these provisions are appropriate because, among other things, they are (a) the product of arm's-length negotiations, (b) given for valuable consideration, (c) fair and equitable and in the best interests of the Debtors, their estates, and these chapter 11 cases, and

17

(d) consistent with the relevant provisions of the bankruptcy code and Second Circuit law as explained to me.

### 9. The Debtors Will Cure Monetary Defaults of Any Assumed Executory Contracts or Unexpired Leases — § 1123(d).

47.     I understand that section 1123(d) of the bankruptcy code requires that cure amounts be determined in accordance with the underlying agreement and nonbankruptcy law.

48.     I believe that the Plan complies with section 1123(d) of the bankruptcy code.  The Plan provides for the satisfaction of cure costs under each Executory Contract and Unexpired Lease to be assumed under the Plan on the Effective Date or in the ordinary course of business, subject to the limitations described in Article V of the Plan, and that the Wind-Down Debtor or the Purchaser, as applicable, shall pay any Cure Amounts on the Effective Date.

### 10. The Debtors Complied with the Solicitation Requirements of the Bankruptcy Code — § 1129(a)(2).

49.     I understand that section 1129(a)(2) of the bankruptcy code requires that plan proponents comply with the applicable provisions of the bankruptcy code and, in that regard, is specifically intended to ensure compliance with the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the bankruptcy code.  Based on my review of information provided by the Debtors and their advisors, along with the Voting Report, I believe that the Debtors have complied with sections 1125 and 1126 of the bankruptcy code.

### 11. The Debtors Proposed the Plan in Good Faith — § 1129(a)(3).

50.     I understand that section 1129(a)(3) of the bankruptcy code requires that a chapter 11 plan be proposed in good faith and not by any means forbidden by law.  Here, there is no question in my mind that section 1129(a)(3) has been satisfied.  The Plan was proposed by the Debtors with honesty, good intentions, and a desire to maximize stakeholder recoveries under extraordinarily challenging circumstances.  That is particularly so after the historic FTX collapse

18

derailed the prior proposed plan, when the Debtors, their employees, their advisors, and the Committee and its advisors, worked together to find another transaction partner and pivot to the current Plan—which includes flexibility to toggle to the Liquidation Transaction if necessary—quickly. Moreover, the Sale Transaction effectuated by the Plan is the product of extensive, arm's-length negotiations with numerous written and verbal proposals and counterproposals exchanged among sophisticated parties over the course of several months. Further, the Liquidation Transaction contemplated under the Plan ensures that Holders of Claims can receive the highest recoveries available on the shortest timeline in the event that the Sale Transaction is not ultimately consummated.

### 12. Payment of Professional Fees and Expenses Are Subject to Court Approval — § 1129(a)(4).

51.    I understand that section 1129(a)(4) of the bankruptcy code requires a Court to approve certain fees and expenses that either a plan proponent, debtor, or person receiving property distributions under the plan has paid as reasonable. I can confirm that Professional Fee Claims and corresponding payments are subject to prior Bankruptcy Court approval and the reasonableness requirements under sections 328 or 330 of the bankruptcy code. Article II.B of the Plan, moreover, provides that Professionals shall file all final requests for payment of Professional Fee Claims no later than 45 days after the Effective Date, thereby providing an adequate period of time for interested parties' to review such Professional Fee Claims.

### 13. The Governance Disclosure Requirements Do Not Apply to the Debtors or Are Satisfied — § 1129(a)(5).

52.    I understand that section 1129(a)(5) of the bankruptcy code requires (a) that a plan proponent disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor, or a successor thereto, under a chapter 11 plan, (b) that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity

19

security holders and with public policy, and (c) that a plan proponent disclose the identities or

affiliations of insiders to be employed or retained by the reorganized debtors as directors and

officers and the nature of any compensation for such insider.  Because the Plan provides for the

vesting of the Debtors' remaining assets in the Wind-Down Debtor and the subsequent dissolution

of the Debtors, I understand that section 1129(a)(5) of the bankruptcy code is not applicable to

these chapter 11 cases.   Nevertheless, I believe that Article IV.H of the Plan and the Plan

Supplement satisfy the requirements of section 1129(a)(5) of the bankruptcy code, to the extent

applicable, as the Debtors disclosed the method of selection, compensation, and affiliations of the

Plan Administrator and the Wind-Down Oversight Committee.

### 14. The Plan Does Not Require the Government to Approve Rate Changes — § 1129(a)(6).

53.     I have been advised that the Debtors are not subject to regulations that would invoke

section 1129(a)(6)'s requirement that they seek regulatory approval for rate changes provided for

under the Plan.  The Plan does not propose any rate changes.  As such, I do not believe that section

1129(a)(6) is applicable to the Plan.

### 15. The Plan Satisfies the Best Interests Test — § 1129(a)(7).

54.     As fulsomely discussed in Section IV, *infra*, I understand that section 1129(a)(7)

of the bankruptcy code requires that any chapter 11 plan must satisfy the "best interests of

creditors" test, which provides that holders of claims or interests in impaired, non-accepting classes

must receive under a chapter 11 plan at least as much as they would in a liquidation.  It is my

opinion that it does.

### 16. Acceptance by Impaired Classes — § 1129(a)(8).

55.     I understand that the bankruptcy code generally requires that each class of claims

or interests must either accept the plan or be unimpaired under the plan.  I further understand that

20

if any class of claims or interests rejects the plan, the plan must satisfy the "cram down" requirements with respect to the claims or interests in that class. I understand that Class 3 (Account Holder Claims), Class 4B (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims) voted to accept the Plan and the voting has been overwhelmingly in favor of the Plan. I understand that no holders of OpCo General Unsecured Claims voted on the Plan. However, I understand that because certain Classes are or may be deemed to reject the Plan, the Debtors do not satisfy section 1129(a)(8) of the bankruptcy code. However, even though certain Classes are or may be deemed to reject the Plan, I understand that the Debtors still satisfy section 1129(b) as at least one Impaired Class voted to accept the Plan.

### 17. Priority Cash Payments — § 1129(a)(9).

56.     I understand that the bankruptcy code generally requires that claims entitled to administrative priority must be repaid in full in cash on the effective date or receive certain other specified treatment that the Holder of such claim has agreed to. I understand that the Plan provides that each Holder of an Allowed Administrative Claim allowed on or prior to the Effective Date will receive payment in full in Cash no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter. Article II.A of the Plan generally provides that each Holder of Allowed Administrative Claims shall receive payment in full in Cash or such other treatment as to render such holders unimpaired. Finally, I understand that Allowed Priority Tax Claims will be treated in accordance with the requirements of the bankruptcy code. Accordingly, I believe that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(9) of the bankruptcy code.

### 18. At Least One Impaired Class Voted to Accept the Plan — § 1129(a)(10).

57.    I understand that the bankruptcy code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the bankruptcy code that each class of claims or interests must either accept the plan or be unimpaired under the plan.  I understand that the following Impaired Classes of Claims entitled to vote on the Plan—Classes 3, 4B, and 4C—voted to accept the Plan, independent of any insiders' votes.

### 19. The Plan is Feasible — § 1129(a)(11).

58.    As fulsomely discussed in Section V, *infra*, I understand that section 1129(a)(11) of the bankruptcy code requires a court to determine that a chapter 11 plan is feasible and that confirmation of such plan is not likely to be followed by the liquidation or further financial reorganization of the Debtors (or any successors thereto) unless such liquidation or reorganization is proposed in the Plan.  Provided that the Plan is confirmed as proposed, without material changes, I believe that consummation of either the Sale Transaction or the Liquidation Transaction is feasible, and I believe the Plan satisfies the feasibility requirements of section 1129(a)(11).

### 20. The Plan Provides for Payment of All Fees — § 1129(a)(12).

59.    I understand that section 1129(a)(12) of the bankruptcy code requires the payment of all fees payable under 28 U.S.C. § 1930.  Article XII.C of the Plan includes an express provision requiring payment of all fees in compliance with the bankruptcy code.  Accordingly, I believe the Plan satisfies the requirements of section 1129(a)(12) of the bankruptcy code.

### 21. The Plan Complies with Section 1129(a)(13) of the Bankruptcy Code.

60.    It is my understanding that section 1129(a)(13) of the bankruptcy code requires that any applicable retiree benefits will continue to be paid post effective date at the level established

22

by agreement or by court order pursuant to section 1114 of the bankruptcy code at any time prior to confirmation of the Plan, for the duration of the period which the debtor has obligated itself. I do not believe retiree benefits as defined by section 1129(a)(13) are implicated by the Plan.

**22. Sections 1129(a)(14) through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.**

61.     Based on my knowledge of the Debtors' business and information provided by the Debtors' advisors, I believe that sections 1129(a)(14) through 1129(a)(16) of the bankruptcy code do not apply to the Plan because the Debtors are not subject to domestic support obligations, are not "individuals," and are not nonprofit corporations.

**23. The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code.**

**i. The Cram Down Provisions are Appropriate — § 1129(b).**

62.     I understand that if all applicable requirements of section 1129(a) of the bankruptcy code are satisfied, other than section 1129(a)(8), a plan may still be confirmed so long as the requirements set forth in section 1129(b) are satisfied. I believe that the Debtors satisfied all applicable requirements of section 1129(b) of the bankruptcy code as Impaired Classes 3, 4B, and 4C voted to accept the Plan, thus permitting the Debtors to "cram down" the Plan pursuant to section 1129(b) on any Class deemed to reject the Plan.

**ii. Only One Plan Is Eligible to Be Confirmed — § 1129(c).**

63.     I understand that section 1129(c) of the bankruptcy code prohibits the confirmation of multiple plans. Section 1129(c) of the bankruptcy code is not implicated here because there is only one proposed plan of reorganization.

**iii. The Principal Purpose of the Plan Is Not the Avoidance of Taxes as Required Under Section 1129(d) of the Bankruptcy Code.**

23

64.     The Plan was not filed for the purpose of avoidance of taxes or the application of section 5 of the Securities Act of 1933, as amended.  Rather, the Debtors filed the Plan to accomplish their objective of efficiently and responsibly effectuating distributions to creditors in the face of unprecedented economic circumstances in a developing market and consummating the most value-maximizing transaction available.  Moreover, I understand that no party that is a governmental unit, or any other entity, requested that the Bankruptcy Court decline to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933.  Accordingly, I believe that the Debtors satisfied the requirements of section 1129(d) of the bankruptcy code.

### iv. Section 1129(e) of the Bankruptcy Code Is Inapplicable.

65.     Lastly, I understand that section 1129(e) of the bankruptcy code does not apply to the Plan because none of the Debtors' chapter 11 cases is a "small business case" within the meaning of the bankruptcy code.

## IV.     Liquidation Analysis

66.     I performed the Liquidation Analysis to address the ability of the Sale Transaction or Liquidation Transaction to satisfy the "best interests of creditors" test as defined in section 1129(a)(7) of the bankruptcy code, which provides that holders of claims or interests in impaired, non-accepting classes must receive under a chapter 11 plan at least as much as they would in a liquidation.[8]

---

[8] The results of my Liquidation Analysis along with a summary of my assumptions were set forth as <u>Exhibit B</u> to the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates* [Docket No. 863]. In this Declaration, I discuss the Liquidation Analysis in detail.

24

67.     To prepare this Liquidation Analysis, and working with my team at BRG, the Debtors, and the Debtors' other advisors, along with the advisors to the Committee, I estimated proceeds, costs, and resulting recoveries in three separate scenarios: (1) consummation of the Sale Transaction; (2) consummation of the Liquidation Transaction; and (3) a chapter 7 liquidation. For the chapter 7 liquidation scenario, I estimated both a "high case" and a "low case." As discussed below, the primary difference between the high case and the low case is the estimated proceeds from liquidation of the coin portfolio, which is difficult to estimate given the nature of the cryptocurrency market but which will clearly be more challenging and less successful in the hypothetical chapter 7 scenario.

68.     With respect to the chapter 7 liquidation scenario, I assumed the Debtors would convert their current chapter 11 cases to cases under chapter 7 of the bankruptcy code on or about April 18, 2023 (the "Conversion Date"), absent confirmation of the Plan. I assumed that on the Conversion Date, the Bankruptcy Court would appoint a chapter 7 trustee ("Trustee"), and that the Trustee would immediately sell or surrender all of the Debtors' assets and the cash proceeds of those sales, net of the liquidation-related costs, would then be distributed to creditors in accordance with the applicable law.

69.     More specifically, in order to estimate the creditor recoveries in each scenario, I performed the following four steps:

(i)     **Step 1 - Estimated Gross Proceeds**

70.     For the chapter 7 liquidation scenario, I estimated the cash proceeds that the Trustee would generate if the Debtor's chapter 11 case were converted to a chapter 7 case and the assets of the Debtor's bankruptcy estate were liquidated.

71.    For the Sale Transaction and Liquidation Transaction scenarios, I estimated the proceeds that would be generated if each transaction were consummated. For the Sale Transaction scenario, I assumed the Plan would be confirmed on the same date as the hypothetical Conversion Date. I assumed the Liquidation Transaction would be consummated on a later schedule, with a date of June 18, 2023. This is because the Liquidation Transaction assumes that the parties to the Sale Transaction would work to close that deal until April 18, 2023, and the Debtors would toggle to the Liquidation Transaction only after they determined during the course of that process that the Sale Transaction would not produce the highest and best outcome for creditors. After that pivot, the Debtors would need additional time to ramp up vendors, internal infrastructure, and third-party developers necessary to support trading activity (as costs were reduced to the extent possible over the course of the case) and to sell unsupported coins into U.S. dollars in order to effectuate the self-liquidation contemplated in the Liquidation Transaction.

72.    The Debtors consist of three corporate entities, Voyager Digital Ltd. ("TopCo"); Voyager Digital Holdings, Inc. ("HoldCo"); and Voyager Digital, LLC ("OpCo"). The specific assets and claims discussed here originate from one of the three specific entities, which my analysis takes into account.   However, for purposes of this discussion, I describe the analysis on a consolidated basis, referring to assets and liabilities belonging to the Debtors more generally.

73.    I calculated the Estimated Gross Proceeds based on the value of assets at each entity as of October 31, 2022[9]—the date of the most recent unaudited financial statements that were available for my analysis. The specific sources of proceeds I estimated are as follows:

74.    *Cash and Cash Equivalents.* I estimated Cash and Cash Equivalents by using the level of cash balance on hand on December 30, 2022, and projecting to the Conversion Date.  I

---

[9] With the exception of Cash/Cash Equivalents and Coin Liquidation Value, discussed later.

26

assumed starting cash and cash equivalents to be the same under the chapter 7 liquidation, Sale

Transaction, and Liquidation Transaction scenarios.

75.     *Coin Portfolio Liquidation.*  The vast majority of the assets held by the Debtors,

from which the majority of proceeds would be generated, are in Voyager's coin portfolio.  That

coin portfolio comprises 106 different types of cryptocurrencies.  I valued each cryptocurrency at

its December 18, 2022, spot price. I then estimated how that spot price would be discounted due

to certain risks discussed below. Given the volatility and ever-changing nature of the cryptocurrency market, the December 18, 2022, spot price is only illustrative, but it is instructive because it can be used to compare how any given spot price would move in a chapter 7 liquidation scenario, versus an organized and Debtor-led sale.



76.     The main reason why the spot price would be discounted under the Sale Transaction, Liquidation Transaction, or chapter 7 liquidation scenarios (but more so in the chapter 7 liquidation, as I discuss below) involves what I

refer to as "market-depth constraints." A market-depth constraint refers to the fact that, where a

particular token is subject to fewer transactions in the market, a mass sale of that cryptocurrency

would "move the market"—that is, would result in a depreciation in cryptocurrency valuation at

the time of that sale.  During a hypothetical liquidation, tokens with highly liquid markets, such as

Bitcoin or Ethereum, would see less (but still some) market-depth constraint.  On the other hand,

tokens in illiquid markets are anticipated to have greater market-depth constraints—that is, a mass

sale would move the market more significantly.

27

77.    In addition to market-depth constraints, numerous other risk factors, which I detail below, could also cause a discount against spot pricing.

78.    *Headline Risk.* Headline Risk refers to how the value of a coin can be influenced by news and social media.  Given the youth of the cryptocurrency market, coin valuation can be diminished by even unsubstantiated statements, including commentary regarding planned trades.

79.    *Black Swan Events*. Black Swan Events refer to unpredictable market events that have severe downward consequences on cryptocurrency values.  Recent examples include the AlamedaFTX collapse and the LUNA collapse.

80.    *Conditions of Cryptomarket/Volatility*. The cryptomarket itself has recently been strained, both by mass liquidation events and the numerous cryptofirm bankruptcies.  These events have removed liquidity from the market and created general uncertainty, exposing any cryptocurrency sale to greater down-market risk.

81.    *Block Trading*. When engaging in block trades in less regulated markets, such as cryptocurrencies, there are several risks including, but not limited to, the risk that a bad actor can front-run a large trade and affect its outcome.

82.    *Number of Supporting Exchanges*.  Unlike more mature trade exchanges, cryptocurrency platforms offer only discrete trading paths for particular coins.  This limits exchange options, increasing the risk that a less favorable exchange will occur.

83.    *Asymmetric Information Issues*. Depending on what information is made publicly available, individual traders could ascertain the Debtors' portfolio position.  If a position is ascertained during the liquidation process, that trader could potentially drive pricing up or down on particular coins to the Debtors' disadvantage.

28

84.    *Conversion Factors*. In a liquidation event, all trades would be a particular coin for U.S. dollars.  This conversion factor can be less favorable than other forms of exchanges (*e.g.*, exchanging of one token for another), and thus, could result in lower returns.

85.    *Execution Capabilities*. The company and its experts better know the portfolio than a less familiar liquidator.  Lack of expertise could result in sales that do not maximize trade value and result in price impairment.

86.    I estimated the discounts from spot prices realistically but conservatively, both with respect to the discount arising from market-depth constraints and the discounts arising from the additional risk factors discussed above.  Through discussions with Voyager management and trading experts, my team and I engaged in a multi-step empirical analysis and adopted a largely rules-based approach to estimating the discounts to apply to each of the 106 coin types and in each of the Sale Transaction, Liquidation Transaction, and chapter 7 liquidation scenarios.

87.    Our analysis started with an empirical study to understand the market-depth constraints for each coin type.  To estimate the discounts for each coin type, we collected historical trade volume data by coin for discreet periods (monthly, weekly, and daily) and compared that liquidity to the notional value of the coins held in Voyager's portfolio.  Using a market-based set of rules,[10] I then bucketed coins into distinct categories of liquidity and applied discounts to those categories.  I compared my findings against third-party portfolio bid data. Voyager, Moelis, and the Debtors' other advisors also reviewed the resulting analysis for reasonableness; any feedback was taken into consideration and integrated into the analysis where appropriate.

---

[10] Key statistics included: daily volume weighted average coin price; daily $ volume; daily coin volume; monthly average $ volume; monthly average coin volume; daily volatility in $ coin prices; monthly average volatility in $ coin pricing; average volume by coin.

29

88.    In the chapter 7 liquidation high-case, I concluded that the coin portfolio would be liquidated at an approximately 20% discount, with average trading fees of 2%.  In the chapter 7 liquidation low-case, I concluded that the coin portfolio would be liquidated at an approximately 26% discount, with the same average trading fees of 2%.  As stated, it is my opinion that both these estimates are conversative discounts.

89.    Because a chapter 7 liquidation would impose mass-sale conditions that could be avoided by both the Sale Transaction and Liquidation Transaction scenarios, these discounts are estimated to be materially greater than discounts under the Sale Transaction or Liquidation Transaction.

90.    *Sale Proceeds*. I estimated the sale proceeds of $20 million to occur only under the Sale Transaction, and not under the Liquidation Transaction or the chapter 7 liquidation scenario.

91.    *Other Assets and Investments*. I assumed that during the liquidation period, the Debtors would continue to consume certain prepaid expenses such as professional fee retainers, licenses, engineering, software, marketing, and other similar contractual obligations. I also assumed that Debtors would sell their equity investments in other private and public companies, and I assumed recovery rates from 0% to 100% across these positions depending on the liquidity of that particular investment.  Recoveries on other assets and investments are identical in the high and low cases, approximating $1.8 million.

92.    *3AC Claims*. The Debtors have a claim against 3AC related to the cryptocurrency loan of 15,250 BTC and 350 million USDC made in 2022.  For purposes of this analysis, I did not make an assumption regarding recovery of this claim and thus it is reflected as 0% recovery in all scenarios.  For the avoidance of doubt, the Debtors and creditors are highly likely to see some 3AC recovery (although the magnitude is unclear at this point).  That recovery will likely be either the

30

same or lower in the hypothetical liquidation scenario (due to the need to take a discount in that scenario reflecting monetizing that asset earlier, paying fees to do so, or both).

93.    *Intangible Assets*. In the chapter 7 liquidation scenario, I assumed no recovery value for the Debtors' intellectual property, which comprises goodwill, favorable leasehold interests, trademarks, patents, license agreements, and e-commerce registered domain names.

94.    *Litigation Claims*. I excluded litigation claims, which (in a best-case scenario) would be the same under the Sale Transaction, Liquidation Transaction, and chapter 7 liquidation, and thus are not valuable for comparative purposes.   In all likelihood litigation claims would produce a lower recovery in a chapter 7 liquidation given the challenges in financing any such litigation and the likelihood that some litigation would not be pursued at all by a chapter 7 trustee.

(ii)    **Step 2 - Wind-Down Costs**

95.    I next analyzed the estimated costs of the liquidation or wind-down process.   I estimated these costs as follows.

96.    *Professional Fees.* I estimated professional fees, including costs for financial advisors, attorneys, and other professionals retained by the Debtors (in the Sale Transaction or Liquidation Transaction scenario) or the Trustee (in the chapter 7 liquidation scenario). I estimated these fees based on input from the Debtor's retained professionals and analysis of wind-down professional fees from comparable cases. Based on this analysis and previous experience, I estimated lower professional fees in the liquidation scenario (the same in high and low cases) because the Trustee team would be primarily responsible for execution of the wind down. However, given the novelty and complexity of the Debtor's business and the strong likelihood that the Trustee may have minimal cryptocurrency experience, I view this estimate of professional fees as conservative.

31

97.    *Chapter 7 Trustee Fees*.  In the chapter 7 liquidation scenario, I assumed the Trustee would recover a fee equaling 3% of the proceeds of sales excluding recoveries relating to cash and cash equivalents.  In the high case, this would result in an estimated $23.9 million fee; in the low case, $ 21.8 million.

98.    *Wind-Down Operating Costs*.  Winding down the business would require that the Debtors continue to employ key personnel and incur platform operating costs. I determined estimated wind-down operating costs based on discussions with management and analysis of historical operating costs. In the chapter 7 liquidation scenario, these costs would be the same in the high and low cases.

99.    *Other Costs.* The wind-down process would incur other miscellaneous expenses including insurance, document/data retention services, and third-party processing fees for the liquidation of accounts, all of which are assumed to be the same amounts in the Sale Transaction, Liquidation Transaction, and chapter 7 liquidation (high and low) scenarios. The Sale Transaction and Liquidation Transaction scenarios include additional costs in this category, including cure costs for outstanding contract obligations, and a wind-down reserve for unforeseen additional costs.

100.    In sum, for the purposes of this analysis, I estimated total wind down expenses of $75.6 million for the Sale Transaction and Liquidation Transaction and $51.7 million for the chapter 7 high and low scenarios (net of estimated U.S. Trustee fees).

(iii)    **Step 3 - Net Proceeds**

101.    I calculated the Net Proceeds available for distribution by subtracting the Wind-Down Costs from the Estimated Gross Proceeds for each of the scenarios.

(iv)    **Step 4 - Distribution of Net Proceeds**

32

102.     Finally, I estimated the recoveries to creditors at each of the Debtors by running the

Net Proceeds and estimated claims as of the Petition Date through a waterfall recovery model,

which pays claims based on priority until fulfilled, and then "waterfalls" to the next lower priority

claim, until all proceeds are depleted. The distributions to creditors in my analysis reflects

bankruptcy code section 1129's "absolute priority rule" that no junior creditor at a given entity

would receive any distribution until all senior creditors are paid in full at that entity, and no equity

holder would receive any distribution until all creditors at such entity are paid in full.

103.     More specifically, the Net Proceeds would be distributed as follows:

(a)     *Secured Tax Claims*.  Based on the December 6, 2022 claims register, there

are no identified Secured Tax Claims.  My analysis thus assumes zero

payment.  That said, if any are later revealed, a 100% recovery is expected.

(b)     *Administrative, Priority Tax Claims and other Priority Claims*.

(i)     *Administrative Claims*.  Administrative Claims include unpaid-post-

petition accounts payable, accrued operating expenses, unpaid post-petition

taxes, and chapter 11 professional fees incurred through the Conversion

Date. On the Conversion Date, these are anticipated to be approximately

$39.1 million and are the same in the Sale Transaction, Liquidation

Transaction, and chapter 7 liquidation scenarios.

(ii)     *Priority Tax Claims*.  Federal and state tax claims are estimated to

be $3.0 million in all three scenarios.

(iii)     *Other Priority Claims*. Other Priority Claims, namely potential

claims by government agencies, are estimated to be $1.0 million in all three

scenarios.

33

(c)    *Unsecured Claims: Account Holder Claims and General Unsecured Claims.*

(i)    Account Holder Claims are estimated to be approximately $1.764 billion as of the Conversion Date in all three scenarios based on the number of customer coins and coin prices as of the Petition Date.

(ii)    Based on the December 6, 2022 claims register, General Unsecured Claims are estimated to total approximately $25.3 million on the Conversion Date, in all three scenarios.

(iii)    The remainder of the Debtors' funds would be distributed pro rata across the Account Holder Claims and General Unsecured Claims, as illustrated below.[11]

| | Claims All Scenarios 4/18/2023 | Binance Plan 4/18/2023 | Recovery | Toggle Plan 6/18/2023 | Recovery | High Case Liquidation 4/18/2023 | Recovery | Low Case Liquidation 4/18/2023 | Recovery |
|---|---|---|---|---|---|---|---|---|---|
| **Voyager Digital Consolidated** | | | | | | | | | |
| **TOTAL ESTIMATED PROCEEDS (NET)** | | 935.7 | | 841.6 | | 726.2 | | 661.4 | |
| Administrative Claims | 39.1 | 39.1 | 100% | 39.1 | 100% | 39.1 | 100% | 39.1 | 100% |
| Priority Tax Claims | 3.0 | 3.0 | 100% | 3.0 | 100% | 1.1 | 36% | 1.0 | 35% |
| Secured Tax Claims | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Other Priority Claims | 1.0 | 1.0 | 100% | 1.0 | 100% | 1.0 | 99% | 1.0 | 99% |
| Account Holder Claims | 1,763.8 | 883.0 | 50% | 789.5 | 45% | 678.1 | 38% | 613.8 | 35% |
| OpCo General Unsecured Claims | 14.0 | 7.0 | 50% | 6.3 | 45% | 5.4 | 38% | 4.9 | 35% |
| HoldCo General Unsecured Claims | 8.3 | 0.9 | 11% | 0.9 | 11% | - | 0% | - | 0% |
| TopCo General Unsecured Claims | 3.0 | 1.7 | 58% | 1.7 | 58% | 1.6 | 53% | 1.6 | 52% |
| Alameda Loan Facility Claims | 75.1 | - | 0% | - | 0% | - | 0% | - | 0% |
| Section 510(b) Claims | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Intercompany Claims | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Intercompany Interests | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Existing Equity Interests | - | - | 0% | - | 0% | - | 0% | - | 0% |
| **TOTAL RECOVERIES** | 1,907.3 | 935.7 | 49% | 841.6 | 44% | 726.2 | 38% | 661.4 | 35% |

---

[11] Recoveries in Table reflect updated estimates for wind down costs in all scenarios, including costs for the shuttering of foreign entities, additional severance and incremental operating costs, for a total of $8.2M in incremental costs, as reflected in the *Second Amended Plan Supplement* [Docket No. 1006], filed after my Liquidation Analysis provided as Exhibit B to the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates* [Docket No. 863]. Any litigation fund reserves are assumed to recover at minimum the funds utilized to pursue the recoveries.

(d)    *Alameda Loan Facility Claims*.    Alameda Loan Facility Claims are
estimated to be approximately $75.1 million as of the Conversion Date. The
analysis assumes that such claims would be equitably subordinated.
Because there would be no remaining funds after distributing funds for
Account Holder Claims and General Unsecured Claims, the Alameda Loan
Facility Claims Holder would recover nothing.

104.    Based on the above steps, and as illustrated in the chart above, under both the high
and low case, a chapter 7 liquidation results in lower recoveries than either the Sale Transaction
or Liquidation Transaction.  A chapter 7 liquidation would result in inferior recoveries for holders
of Other Priority Claims, Account Holder Claims, and General Unsecured Claims. Taking all
creditor claims together, the Sale Transaction and Liquidation Transaction scenarios provide
higher blended recovery rates than a chapter 7 liquidation.

105.    Accordingly, it is my opinion that confirmation of the Sale Transaction or
Liquidation Transaction will provide creditors with a recovery that is greater than or equal to what
they would otherwise receive in connection with a liquidation of the Debtors under chapter 7 of
the bankruptcy code. Moreover, I believe creditors will receive more value under confirmation of
the Plan, including either the Sale Transaction or Liquidation Transaction, as compared to under a
chapter 7 liquidation for additional reasons. First, I understand that conversion to a chapter 7
liquidation would require entry of a new bar date. Accordingly, the amount of Claims ultimately
filed and allowed against the Debtors could materially increase, thereby further reducing creditor
recoveries versus those available under the Sale Transaction or Liquidation Transaction. Second,
and relatedly, I understand that conversion to a chapter 7 liquidation will result in significantly

delayed recoveries to creditors, versus under confirmation of the Plan, where the Debtors stand

ready to consummate a value-maximizing transaction and return cryptocurrency in the near term.

## V.      Plan Feasibility

106.    I understand that section 1129(a)(11) of the bankruptcy code requires a court to

determine that a chapter 11 plan is feasible and that confirmation of such plan is not likely to be

followed by the liquidation or further financial reorganization of the Debtors (or any successors

thereto) unless such liquidation or reorganization is proposed in the plan.

107.    For the reasons outlined below, it is my professional opinion that the Plan is feasible

and is not likely to be followed by liquidation or further financial reorganization as contemplated

by the Plan.

108.    The Sale Transaction is the culmination of a multi-month marketing process to

identify the best possible path forward for the Debtors' creditors.  I was intimately involved, along

with the Debtors' other advisors and the management team and working closely with the

Committee, in the Debtors' marketing process and the negotiations that, ultimately, led to

execution of the Asset Purchase Agreement and development of the Plan.  The Plan maximizes

the value of the Debtors' estates, and the proceeds obtained from the Sale Transaction will allow

the Debtors to satisfy all Priority and Administrative Claims under the Plan in full.  Further, as the

Sale Transaction contemplates a sale of substantially all assets of the Debtors to Binance.US and

the subsequent wind-down of the Debtors' estates, I do not believe that consummation of the Sale

Transaction will be followed by a liquidation or further reorganization of the Debtors.

109.    As demonstrated in my Liquidation Analysis, the Sale Transaction maximizes the

value of the Debtors' estate and will allow the Debtors to satisfy their obligations under the Plan,

including satisfying all Priority and Administrative Claims under the Plan in full, and maximizing

36

recovery to remaining creditors. In addition, the Plan provides customers the most tax efficient route forward as Binance.US supports (or will support) 100% of the cryptocurrency coins on the Debtors' platform.

110.    Moreover, if the Sale Transaction cannot be consummated or if the Debtors conclude in their good faith judgment that the Sale Transaction will not produce a value-maximizing outcome for creditors, the Debtors will pursue the Liquidation Transaction and consummate a self-liquidation.  I believe that provided the Plan is confirmed without material changes and the strategy set forth in the Plan is pursued in full by the Wind Down Trustee, the Liquidation Transaction is feasible, and that the Debtors will be able to distribute their cryptocurrency assets to customers (i) on a faster timeline than a chapter 7 liquidation and (ii) on a much more cost-effective basis, as the Debtors will not incur the additional administrative costs associated with a chapter 7 liquidation and subsequent distribution or the price leakage associated with a mass-sale event that I describe in my Liquidation Analysis. As I demonstrate in the Liquidation Analysis, in the event that the Debtors' pursue the Liquidation Transaction, I believe that the Debtors will be able to pay all Administrative and Priority Claims in full and satisfy all other obligations under the bankruptcy code.

111.    To do this, however, it is necessary that the Debtors maintain the staffing levels and internal expertise necessary to execute both the Sale Transaction and the Liquidation Transaction. The Binance.US Asset Purchase Agreement imposes a number of obligations on the Debtors that will require the services of employees in operations, customer service, engineering, security, finance, and data to fulfill these obligations. Specifically, after the Binance.US Transaction closes, the Debtors retain obligations related to: (a) making regulatory filings and cooperating with regulators; (b) maintaining and transferring data securely; (c) developing and implementing a user

migration plan involving modifications to Voyager's web interface and mobile app, and an electronic process facilitating the acceptance of certain terms and conditions on the Binance.US Platform; (d) being available for a period following close of the Sale Transaction to provide assistance reasonably requested by the Purchaser in connection with the opening of user accounts and transfer of information and Cryptocurrency; (e) rebalancing the Cryptocurrency on the Debtors' platform to prepare for closing of the Sale Transaction on a timely basis; (f) "unstaking" certain coins and ensuring they are freely transferable and not subject to restrictions, and (g) making available technical IT staff to assist Binance.US during the transaction.[12]

112.    The Debtors also must have certain expertise present (as a practical matter) only within certain existing employees in the event the Debtors need to pivot to the Liquidation Transaction. The Liquidation Transaction would require the Debtors to, among other tasks, rebalance the Cryptocurrency in their possession, complete anti-money laundering and know-your-customer compliances and reopen the Debtors' platform for a period of time to permit customers to withdraw Cryptocurrency, while making sure that these transactions can all occur safely, securely and efficiently, with minimum value leakage and risk given the highly sensitive nature of these transactions. This exercise will be challenging and, without certain key employees who are currently working for the Debtors, likely cannot be done without assuming materially greater risk than we would recommend the Debtors taking.

113.    It is for that reason that a key component of the Debtors' proposed Plan, which was created with input from the Committee, is the Employee Transition Plan, which is described in the Plan Supplement and is accounted for in the Wind-Down Budget. The personnel responsible for executing the proposed Plan have no incentives to remain associated with the company and

---

[12] Asset Purchase Agreement §§ 6.4, 6.6, 6.10, 6.11, 6.15, 6.16.

complete this work following confirmation given that the Debtors will not exist at the end of the process and they will need to find other jobs. The Employee Transition Plan was created (and approved by the Committee) to ensure the expertise needed to execute the Sale Transaction and the Liquidation Transaction stays with the enterprise in order to complete the process of returning cryptocurrency to customers in the most efficient way possible. Without the employees, however, the Debtors would be unable to honor their obligations in the Sale Transaction and would not be able to do the work needed to consummate the Liquidation Transaction and the likely only option would be conversion to a full liquidation under chapter 7 of the bankruptcy code, which as discussed above in the Liquidation Analysis, would materially reduce and delay customer recoveries. In other words, my opinions with respect to feasibility are informed in part by the fact that the Debtors have taken steps to ensure that the experience and expertise necessary to execute the Sale Transaction and/or the Liquidation Transaction will remain in place until the process runs its course, and the Committee and its advisors have recognized the necessity of the Employee Transition Plan for that to happen.

## VI.    The Releases and Exculpations In the Plan Are Reasonable and Appropriate.

114.    It is my understanding that the Plan contemplates releases of the Debtors' potential claims, subject to the terms of the D&O Settlement, of their directors, officers, and employees who have worked during the course of these chapter 11 cases. For the avoidance of doubt, these debtor releases are of potential *Debtor* claims, and do not have any impact on any direct claims that any customer or other third party may have (if any) against any of the directors, officers, and employees.

115.    Given my close involvement with these individuals, I have a firsthand understanding of their involvement and "sweat equity" contributions made to the Debtors and their

estates during the entirety of these chapter 11 cases. I also know full well the contributions that we will need those individuals to continue to make as we Wind-Down the estate and return funds to customers. It would be massively value-destructive and not helpful to the process, and would ultimately lead to less value to creditors, if the Debtors and/or the Wind-Down Estate were to spend capital pursuing such claims that are covered by the Debtor releases. And it is critical to the delicate process envisioned by the Plan for those Debtor releases to go into effect. Again, this has no impact whatsoever on any direct claims creditors and parties-in-interest may have against Released Parties, but as far as the Debtors' releases go, I believe such releases are appropriate.

## VII. Appointment of a Trustee Is Not Warranted In These Chapter 11 Cases.

116. I understand that certain creditors have sought to appoint a trustee in these chapter 11 cases. As an industry professional for over 25 years, I can state with certainty that appointment of a trustee would be an unmitigated disaster. There is no benefit at all to appointing a trustee and unwinding the significant work and progress made to date by the Debtors in these chapter 11 cases. As described herein, my team and I have worked intimately with the Debtors and their management team, as well as the Debtors' advisors and the advisors to the UCC, and all appear aware of the significant progress and achievements obtained during these chapter 11 cases to date. No trustee could realistically displace management and execute on any of the transactions contemplated by the Plan (or any comparable transaction), and the only realistic outcome from a trustee's appointment would be a chapter 7 liquidation in which creditor recoveries would be materially reduced and materially delayed. It is my professional opinion that appointing a trustee at this time would be wholly inappropriate given that the Debtors have completed solicitation and are already before the Court seeking confirmation of the Plan to move forward with the transactions contemplated thereunder that provide distributions to Holders of Claims.

**VIII.    The Plan Provides Recovery Options for Creditors in Unsupported Jurisdictions.**

117.    I am aware that Binance.US does not yet have the requisite money transmitter licensing approvals, authorizations, or exemptions (as applicable) in Hawaii, New York, Texas, and Vermont (the "Unsupported Jurisdictions") and understand that, as a result, it will be unable to make cash or cryptocurrency distributions to creditors in those states on the Effective Date of the Plan unless some or all of the Unsupported Jurisdictions choose to follow the lead of the other 46 states and permit Binance.US to make such distributions.  Due to the legal, operational, and technical limitations, set forth below, if the Binance.US Transaction is approved, the Debtors will not be able to distribute cryptocurrency themselves to creditors in Unsupported Jurisdictions.

118.    *First*, the Voyager platform that would be required to facilitate in-kind distributions to creditors is being sold to Binance.US in connection with the transaction.  This means that any in-kind distributions to creditors in Unsupported Jurisdictions would need to be done manually on a transaction-by-transaction basis for approximately 120,000 creditors.  My understanding is that not only would manual distributions outside the Voyager platform be extremely complex, but the Debtors do not have the necessary infrastructure or personnel to accomplish this in a safe and secure manner.

119.    *Second*, my understanding is that there are risks associated with the Debtors' distribution of cryptocurrency to individual creditor wallets as opposed to effectuating such distributions through the Binance.US platform.  The Debtors must comply with AML/KYC laws when sending cryptocurrency to individual wallets.  Historically, the Debtors used Chainanalysis for automated verification of certain user generated cryptocurrency transfer requests.  However, Chainanalysis does not support all of the tokens listed on the Voyager platform.  I have been advised that AML/KYC compliance is straightforward when transferring cryptocurrency to

41

Binance.US wallets, but it poses substantial risk to the Debtors as it relates to the manual transfer of cryptocurrency to individual wallets for approximately 120,000 creditors. Binance.US has represented to the Debtors that it has existing infrastructure in place that would allow it to perform AML/KYC compliance checks in connection with transferring all cryptocurrency to customer accounts on its platform. Unlike ACH transfers that can be reversed, cryptocurrency sent to the wrong wallet cannot, which is why parties will often send a small "test" transaction to a wallet address prior to initiating a large transfer.

120.     *Third*, there are technical limitations that would prevent the Debtors from making in-kind distributions of certain types of cryptocurrency on the Debtors' platform. There are 35 cryptocurrency tokens (approximately 17% of the Debtors' cryptocurrency portfolio based on equivalent USD value) on the Debtors' platform that cannot be transferred directly to individual wallets due to technical limitations associated with the Debtors' platform. Users can, however, withdraw these tokens using certain third-party exchanges (such as Binance.US). Historically, users of the Debtors' platform have exited from their positions in such tokens by selling such tokens for cash, transactions that previously required close interaction with market makers to effectuate. The only way for the Debtors to distribute the value associated with these non-transferable tokens to creditors in Unsupported Jurisdictions other than through the Binance.US transaction is to liquidate the tokens and distribute the resulting cash.

121.     *Finally*, the Debtors would need to significantly increase the engineering, regulatory, compliance, and other operational staff contemplated under the Plan to facilitate manual transfers to individual customer wallets that they otherwise would not have to do if transfers to customers were made through the Binance.US platform or the Voyager platform (which is being sold to Binance). The Debtors would also need to revive certain dormant contracts

with third-party vendors to process distributions to creditors in this manner. This would result in increased administrative costs as compared to the costs of liquidating the cryptocurrency associated with creditors in Unsupported Jurisdictions and distributing the equivalent value in cash.

122.    In light of these challenges, for creditors in the Unsupported Jurisdictions, the Debtors will retain custody of the cryptocurrency that would be distributed to those creditors until Binance.US obtains the necessary approvals. In the event that Binance.US is unable to obtain those necessary approvals to make distributions to creditors in Unsupported Jurisdictions within six months following the closing (*i.e.*, an incremental three months following distributions to creditors in other jurisdictions), it is my understanding that the Plan calls for the Debtors to convert the cryptocurrency attributable to such creditors to cash and distribute the equivalent realized cash value associated with such liquidations to such creditors. It is my understanding that Binance.US shall have the opportunity to execute in such conversion transactions subject to the agreed-upon protocol between the Debtors and Binance.US set forth in the Binance.US Purchase Agreement. If, however, Binance.US is able to obtain the necessary approvals within that six-month period, Binance.US would make in kind distributions to the creditors in newly approved jurisdictions.

123.    It is also my understanding that the Unsupported Jurisdictions can provide temporary solutions to allow Binance.US to make distributions in kind to creditors. The Debtors do not believe it would be appropriate to jeopardize the Binance.US Transaction—which is in the best interests of their estates as a whole—or take on significant additional risks and costs to endeavor to give in-kind distributions to creditors in Unsupported Jurisdictions if the state banking departments choose not to provide such temporary solutions.

## IX.    The Plan Modifications Are Reasonable, Do Not Require Resolicitation, and Should Be Approved.

124.    I understand that section 1127(a) of the bankruptcy code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the bankruptcy code.  I have also been advised that under section 1125 of the bankruptcy code, a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated, unless such affected creditors consent to the treatment.

## X.    Conclusion

125.    In summary, it is my opinion that the Plan satisfies the standards for confirmation applicable under the bankruptcy code.   Among other things, the Sale Transaction or the Liquidation Transaction will provide all holders of claims and interests with a recovery (if any) that is not less than what such holders would receive pursuant to a hypothetical liquidation of the Debtors under chapter 7 of the bankruptcy code.  And given the optionality created by the Plan, it is my opinion that the Plan (provided it is confirmed without material changes and is executed as anticipated) is feasible and will not result in additional liquidation or financial restructuring beyond that contemplated in the Plan.   Finally, as described above, appointment of a trustee in these chapter 11 cases is not warranted.

*[Remainder of page intentionally left blank]*

44

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge, information, and belief.


Dated: February 28, 2023                    /s/ Mark A. Renzi
Boston, Massachusetts                       Mark A. Renzi
                                            Managing Director
                                            Berkley Research Group, LLC

# Exhibit 2

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DECLARATION OF BRIAN TICHENOR
## IN SUPPORT OF CONFIRMATION OF THE THIRD AMENDED
## JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR
## AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

I, Brian Tichenor, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

1.      I am a Managing Director in the Financial Institutions Group at Moelis & Company LLC ("Moelis") and have served as an investment banker to the Debtors since June 2022.

2.      I submit this declaration in support of confirmation of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

Debtors
Ex-2

*Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan")[2] [Docket No. 852] and the *Debtors' Memorandum of Law in Support of (I) Final Approval of the Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and (II) an Order Confirming the Debtors' Third Amended Joint Chapter 11 Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (the "Confirmation Brief"), filed contemporaneously herewith.

3.    The statements in this declaration are, except where specifically noted, based on (a) my personal knowledge or opinion of the Debtors' operations and finances, (b) my personal knowledge, belief, or opinion, (c) information I have received from the Debtors' employees or advisors and/or other employees of Moelis, or (d) from the Debtors' records maintained in the ordinary course of their business.  If called to testify, I could and would testify competently to the facts set forth herein.

## QUALIFICATIONS

4.    Moelis is an investment banking firm with its principal office located in New York, New York.  Moelis is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority.  Moelis was founded in 2007 and is a wholly-owned subsidiary of Moelis & Company Group LP.  Moelis & Company Group LP, together with its subsidiaries, has approximately 1,000 employees in offices in North

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, the Asset Purchase Agreement, the Confirmation Brief, or Confirmation Order as applicable.

America, South America, Europe, the Middle East, and Asia. Moelis & Company Group LP is a

subsidiary of Moelis & Company, a public company listed on the New York Stock Exchange.

5.       Moelis provides a broad range of financial advisory and investment banking

services to its clients, including: (a) general corporate finance; (b) mergers, acquisitions, and

divestitures; (c) corporate restructurings; (d) special committee assignments; and (e) capital

raising. Moelis and its senior professionals have extensive experience in the reorganization and

restructuring of distressed companies, both out-of-court and in chapter 11 cases. Moelis' business

reorganization professionals have served as financial advisors and/or investment bankers in

numerous cases, including: *In re Knotel, Inc.*, No. 21-10146 (MFW) (Bankr. D. Del. Mar. 12,

2021); *In re CBL & Assocs. Props., Inc.*, No. 20-35226 (DRJ) (Bankr. S.D. Tex. Dec. 30, 2020);

*In re Energy Alloys Holdings, LLC*, No. 20-12088 (MFW) (Bankr. D. Del. Nov. 23, 2020); *In re

Jason Indus., Inc.*, No. 20-22766 (RDD) (Bankr. S.D.N.Y. Aug. 27, 2020); *In re The Hertz Corp.*,

No. 20-11218 (MFW) (Bankr. D. Del. July 30, 2020); *In re Extraction Oil & Gas, Inc.*, No. 20-

11548 (CSS) (Bankr. D. Del. Aug. 11, 2020); *In re The McClatchy Co.*, No. 20-10418 (MEW)

(Bankr. S.D.N.Y. May 18, 2020); *In re Internap Technology Solutions Inc.*, No. 20-22393 (RDD)

(Bankr. S.D.N.Y. May 5, 2020); *In re Rentpath Holdings, Inc.*, No. 20-10312 (BLS) (Bankr. D.

Del. Mar. 10, 2020); *In re Sanchez Energy Corp.*, No. 19-34508 (MI) (Bankr. S.D. Tex. Oct. 21,

2019); *In re Monitronics Int'l, Inc.*, No. 19-33650 (DRJ) (Bankr. S. D. Tex. Aug. 1, 2019); *In re

Aegerion Pharmaceuticals, Inc.*, No. 19-11632 (MG) (Bankr. S.D.N.Y. July 10, 2019); *In re

Joerns WoundCo Holdings, Inc.*, No. 19-11401 (JTD) (Bankr. D. Del. July 25, 2019); *In re FTD

Cos.*, No. 19-11240 (LSS) (Bankr. D. Del. July 2, 2019); *In re Hexion Holdings LLC*, No. 19-

10684 (KG) (Bankr. D. Del. May 15, 2019); *In re Parker Drilling Company, Inc.*, No. 18-36958

(MI) (Bankr. S.D. Tex. Jan. 15, 2019); *In re Aralez Pharmaceuticals US Inc.*, No. 18-12425 (MG)

3

(Bankr. S.D.N.Y. Oct. 31, 2018); *In re iHeartMedia, Inc.*, No. 18-31274 (MI) (Bankr. S.D. Tex. July 24, 2018); *In re Global A&T Electronics Ltd.*, No. 17-23931 (RDD) (Bankr. S.D.N.Y. Feb. 26, 2018); *In re Toys "R" US, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Nov. 21, 2017); *In re TK Holdings, Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Aug. 30, 2017); *In re Basic Energy Services, Inc.*, No. 16-12320 (KJC) (Bankr. D. Del. Nov. 17, 2016); *In re UCI International, LLC*, No. 16-11354 (MFW) (Bankr. D. Del. July 12, 2016); *In re AOG Ent., Inc.*, No. 16-11090 (SMB) (Bankr. S.D.N.Y. June 8, 2016); *In re SFX Entertainment, Inc.*, No. 16-10238 (MFW) (Bankr. D. Del. Mar. 21, 2016); *In re American Apparel, Inc.*, No. 15-12055 (BLS) (Bankr. D. Del. Nov. 30, 2015); *In re Allied Nevada Gold Corp.*, No. 15-10503 (MFW) (Bankr. D. Del. Apr. 15, 2015); *In re GSE Envt'l, Inc.*, No. 14-11126 (MFW) (Bankr. D. Del. May 30, 2014); *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Apr. 11, 2014); *In re MPM Silicones, LLC*, No. 14-22503 (RDD) (Bankr. S.D.N.Y. May 16, 2014).

6.    I have over 10 years of investment banking experience advising companies, equity investors, financial vehicles, and creditors across a broad range of industries and geographies in a full suite of corporate transactions.  Prior to joining Moelis, I was in the corporate and investment banking group at Citigroup Inc. where I focused on investment banking advisory transactions in the Financial Institutions Group.  I hold a Bachelor of Science degrees in finance and computer science from Boston College and have a Master of Business Administration degree from Georgetown University.

7.    I have been involved in several notable chapter 11 cases and restructuring assignments, including as advisor to the ad hoc group of senior unsecured noteholders in Walter Investment Management Corporation's $4.1 billion restructuring; and as advisor to New Residential Investment Corporation's $1.2 billion acquisition of select assets from Ditech Holding

Corporation pursuant to a section 363 asset sale.  I have also been involved in numerous restructuring transactions outside of the chapter 11 context, including advising New Residential Investment Corporation in its $600 million recapitalization and restructuring, Ambac Financial Group in its $18 billion restructuring of Puerto Rico's sales tax financing corporation (COFINA), Syncora Guarantee Inc. in its $13.5 billion reinsurance of financial guarantee policies to Assured Guarantee Corporation and other liability management including the sale of its operating business to GoldenTree Asset Management, Ambac Financial Group on its $557 million exchange offer of its Auction Market Preferred Shares, Ambac Financial Group on its $538 million exchange of Corolla Trust obligations and Junior Surplus Notes, an approximately $10 billion ad hoc group of non-litigating preferred shareholders in a proposed $6.9 trillion restructuring of Fannie Mae and Freddie Mac, secured lenders of AG Mortgage Investment Trust in its $3.0 billion restructuring of its repurchase agreement portfolio, and secured lenders of MFA Financial, Inc. in its $5.8 billion restructuring of its repurchase agreement portfolio.  And in addition to these chapter 11 cases, I am currently part of the Moelis teams serving as investment bankers to the debtors and debtors-in-possession in *In re BlockFi Inc.,* No. 22-19361 (MBK) (Bankr. D. N.J.) and *In re Genesis General HoldCo LLC*, No. 23-10063 (SHL) (Bankr. S.D.N.Y.).

8.      In June 2022, Moelis was engaged to advise the Debtors as to strategic alternatives in light of the Debtors' efforts to navigate the challenges then impacting the cryptocurrency industry.  I have been involved as a senior member of the Moelis team throughout our engagement, including participating in the Debtors' sales and auction processes in these chapter 11 cases.

## EVENTS LEADING UP TO CONFIRMATION

9.      Prior to these chapter 11 cases, Voyager operated a cryptocurrency trading platform that allowed customers to buy, sell, and store cryptocurrency on an easy-to-use and "accessible-to-all" platform.  Voyager's primary operations consisted of (i) brokerage services, (ii) custodial

5

services through which customers earned interest and other rewards on stored cryptocurrency assets, and (iii) lending programs.  All of Voyager's services were accessible through a mobile application that users could download on their smartphones and other smart devices.  Voyager's mobile application was downloaded millions of times and had over 1.1 million active users as of the Petition Date.  In 2021, Voyager was one of the top ten most downloaded cryptocurrency mobile applications in the world.

10.    Cryptocurrency has been volatile, and prices vacillate by the second due to constant trading occurring 24 hours a day, seven days a week globally.  2022 saw historic levels of volatility in the markets at large, and the cryptocurrency markets were not immune.  Bitcoin and Ethereum slumped by over 65% and 68%, respectively, from January 1, 2022 to year-end:[3]



11.    In June 2022, the Debtors engaged Moelis to advise the Debtors as to strategic alternatives in light of this market volatility and the broader challenges plaguing the

---

3    CoinDesk; February 18, 2023, 6:03 p.m. ET.

cryptocurrency sector.  Beginning on or about June 20, 2022, Moelis initiated a process to solicit interest in possible deal structures.  By early-July 2022, and after evaluating market support for an out-of-court restructuring, the Debtors determined that filing for chapter 11 would improve their chances of effectuating a transaction to help stabilize the Debtors' business and preserve the value of the Debtors' enterprise, in the best interests of the Debtors and their estates as well as the Debtors' creditors, customers, employees, and all other parties in interest.

12.     On July 5, 2022, the Debtors filed these chapter 11 cases.  Soon thereafter, on July 21, 2022, the Debtors commenced a formal sale process led by Moelis and filed the *Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines With Respect To the Debtors' Sale, and (III) Granting Related Relief* [Docket No. 126].

13.     On September 13, 2022, the Debtors commenced a two-week auction (the "Auction").  The Auction included multiple rounds of bidding and featured extensive arm's-length negotiations with each participating bidder. I was one of the people at Moelis responsible for and participating in the Auction.

14.     The Debtors, in coordination with the Official Committee of Unsecured Creditors (the "Committee"), ultimately selected the bid from West Realm Shires Inc. ("FTX US," and along with its parent entity and affiliates, "FTX") and closed the Auction.  On September 27, 2022, the Debtors and FTX US executed an asset purchase agreement (as amended, the "FTX Purchase Agreement") memorializing the terms of the FTX US bid.  Following the conclusion of the Auction, the Debtors sought, and obtained, this Court's approval to enter into the FTX Purchase Agreement.  The Debtors then proceeded to commence solicitation of votes on a prior version of the Plan that contemplated the effectuation of the FTX Purchase Agreement.

15.     A few weeks after this Court approved the Debtors' entry into the FTX Purchase Agreement, FTX and its affiliates unexpectedly collapsed.  On November 11, 2022, certain FTX US affiliates commenced chapter 11 proceedings.  Three days later, FTX US did the same.  The Debtors restarted their sale process effectively simultaneously with the FTX collapse.

16.     Cryptocurrency market headwinds only grew stronger in the fall of 2022 and the market was thrown into further turmoil due to FTX's historic collapse.  While the Debtors leveraged the groundwork and interest from their first sales process, given the significant market decline, the Debtors were left with fewer opportunities.

17.     As part of the second sales process, the Debtors engaged in extensive month-long negotiations with interested parties that included parties that had previously participated in the Auction as well as new parties that emerged.  Moelis, along with the Debtors' other advisors and the Debtors' management team, evaluated each proposal, and pushed bidders to improve the economic and other terms of their bids.  When analyzing proposals received from interested parties, the Debtors and their advisors considered both the viability and risk factors associated with each proposed transaction, including but not limited to, timing considerations, third-party financing requirements, ability to consummate, cybersecurity risks, regulatory and licensing status, and counterparty risk based on the counterparty due diligence conducted by the Debtors during the first and second sales processes.

18.     Throughout the negotiations, the Debtors, in consultation with the Committee, also considered pursuing a transaction that would allow the Debtors to pivot and distribute cryptocurrency or cash to creditors on their own (the "Liquidation Transaction"), without pivoting to a chapter 7 liquidation.  The Debtors and their advisors ultimately used the Liquidation Transaction as a floor against which to compare third-party bids.  Ultimately, the Debtors

8

determined that pursuing a sale transaction with a third party could, depending on the structure of the transaction, provide the potential for the best recovery currently available to creditors under the circumstances while also reducing the risk surrounding execution of the transaction and reducing the likely value leakage that would occur in the Liquidation Transaction. Accordingly, the Debtors, in their business judgment, determined to reengage with third parties to identify an alternative transaction partner.

19.    After negotiation and deliberation, on December 18, 2022, Debtor Voyager Digital, LLC (the "Seller") executed that certain asset purchase agreement (the "Asset Purchase Agreement") with BAM Trading Services Inc. ("Binance.US" or "Purchaser," and such transaction thereunder, the "Sale Transaction"). The Court approved the Debtors' entry into the Asset Purchase Agreement on January 13, 2022 [Docket No. 860].

## THE DEBTORS' PLAN SHOULD BE CONFIRMED

### I.    THE PLAN PROVIDES THE HIGHEST AVAILABLE VALUE TO CREDITORS UNDER THE CIRCUMSTANCES.

20.    The Debtors value the Sale Transaction at approximately $1.022 billion, comprising (a) the value of cryptocurrency on the Voyager platform as of a date to be determined, which as of December 16, 2022 at 0:00 UTC, is estimated to be $1.002 billion, plus (b) additional consideration, which is estimated to provide at least $20 million of incremental value. Pursuant to the Asset Purchase Agreement, under the terms and conditions of the Plan and subject to the Debtors' ongoing assessment that the Sale Transaction is higher and better than the Liquidation Transaction, Binance.US will acquire and distribute substantially all of the Debtors' assets to creditors. Either the transaction contemplated by the Asset Purchase Agreement or, if the Debtors toggle, the Liquidation Transaction, will be effectuated through the Plan.

21.    Based on information in the Debtors' possession to date, the Sale Transaction
(a) is the only transaction currently available to the Debtors that did not contemplate requiring the
Debtors to liquidate cryptocurrency for working capital purposes in the first instance, (b) includes
reimbursement by Binance.US of up to $15 million of Seller's expenses under certain
circumstances set forth in the Asset Purchase Agreement, and (c) provides a $10 million reverse
termination fee payable to the Seller by Binance.US to compensate the Debtors' estates in the
event that Binance.US cannot consummate the transaction under certain circumstances set forth in
the Asset Purchase Agreement.

22.    In addition, the Debtors, the Committee, and their respective advisors negotiated
certain provisions designed to safeguard the Debtors' cryptocurrency in advance of distributions
being made to creditors.  Specifically, the Asset Purchase Agreement provides that, up until the
transfer of cryptocurrency to Binance.US, the Debtors will maintain control of all of the Debtors'
cryptocurrency, including during the rebalancing of the Debtors' cryptocurrency portfolio (that
may include the use of third parties and third-party exchanges to execute the rebalancing
transactions), which is a prerequisite to closing and effectuating distributions to creditors.  I believe
that allowing the Debtors to retain control of all of the Debtors' cryptocurrency until closing is
critical to minimizing risk given the increased volatility in the crypto space.

23.    Further, in connection with the evaluation of the Binance.US proposal, the Debtors
conducted certain financial and business counterparty due diligence on Binance.US.  This due
diligence included reviews of certain documentation provided by Binance.US and discussions with
senior management at Binance.US relating to, among other things: audited financial statements,
interim unaudited financial statements, available liquidity, related party services agreements,
wallet infrastructure, anti-money laundering laws ("AML") and "know your customer" ("KYC")

10

procedures, money transmitter licensing status, and business plans submitted to selected state regulators in connection with the issuance of money transmitter licenses. Such due diligence was based on information provided to the Debtors' and the Committee's financial and legal advisors by Binance.US and representations made by Binance.US senior management. As outlined in Moelis's engagement letter, while Moelis was involved in such discussions and diligence reviews, Moelis is not a technical expert on matters relating to the appropriateness of information security or other custody protocols. *See Application of Debtors and Debtors in Possession For Entry Of An Order Authorizing the Employment and Retention Of Moelis & Company Llc As Investment Banker, Capital Markets Advisor, And Financial Advisor Effective As Of The Petition Date* [Docket No. 117].

24.     Moreover, I have been informed by the Debtors' legal advisors that Section 6.12 of the Asset Purchase Agreement provides that the Seller (prior to the transfer of cryptocurrency to Binance.US) and each transferred creditor (from and after the transfer of cryptocurrency to Binance.US) will retain all right, title, and interest in and to the cryptocurrency allocated to it in accordance with the Binance.US Asset Purchase Agreement through and including such time as such cryptocurrency is returned to Seller or distributed to such transferred creditor. It is my understanding that under the Asset Purchase Agreement, the cryptocurrency will be held by Binance.US solely for the benefit of the Seller or transferred creditor, as applicable, until such distributions are made.

25.     In addition, under the Asset Purchase Agreement, the Debtors' claims against Three Arrows Capital and other parties will will vest in the Wind-Down Debtor and any recovery thereon will be distributed to creditors.

11

26.     Finally, and most importantly, the Asset Purchase Agreement allows the Debtors to react to changing market conditions.  If the Debtors otherwise determine that the Asset Purchase Agreement is not the highest and best available option for creditors under the circumstances and exercise their "fiduciary out," or the Sale Transaction is otherwise not effectuated by the Outside Date, then the Debtors may pivot to the Liquidation Transaction and pursue self-liquidation.  This feature of the Asset Purchase Agreement, in my view, is protective of creditors in a volatile market, and provides a more certain timeline for recovery and resolution of Claims.  The Debtors will toggle to the Liquidation Transaction if they conclude in their good faith judgment that the Sale Transaction no longer is the highest or otherwise best option for creditors available under the circumstances.

27.     For all the reasons set forth in this Section I, I believe that the Plan is the compilation of months of long, hard-fought negotiations whereby the Debtors worked to negotiate a Plan that provides for distributions to creditors on an expeditious timeline, and it provides the highest value available to creditors under the circumstances.

## II.     THE PLAN IS UNLIKELY TO BE FOLLOWED BY A LIQUIDATION OR FURTHER REORGANZIATION

28.     I understand that Section 1129(a)(5) of the Bankruptcy Codes requires the Court to determine, in relevant part, whether the Plan provides adequate means for implementation.  I also understand that Section 1129(a)(11) of the Bankruptcy Code requires the Court determine, in relevant part, that confirmation is not likely to be followed by the liquidation or further financial reorganization of the Debtors (or any successor thereto), unless such liquidation or reorganization is proposed in the Plan.

29.     *First*, I believe that the Sale Transaction, which has an implied value of $1.022 billion, will allow the Debtors to satisfy their obligations under the Plan.  The Sale Transaction

provides the highest value currently available under the circumstances to the Debtors' creditors.  I understand that the value created by the Sale Transaction will be sufficient to satisfy all Allowed Priority Claims and Allowed Administrative Claims under the Plan, including all Allowed Professional Fee Claims, in full.  As such, the Debtors have a demonstrated ability to fund distributions required under the Plan, including to taxing authorities, administrative claimants, and other Unimpaired Classes of Claims.

30.    Further, Binance.US has represented to the Debtor and its advisors that it has the legal, operational, financial, and technical capacity to distribute cryptocurrency in-kind to Holders of Allowed Account Holder Claims, including the necessary money transmitter licensing approvals required to facilitate in-kind distributions.  Binance.US has agreed to hold the cryptocurrency solely for the benefit of the Seller or transferred creditor, as applicable, until such distributions are made.  In the Unsupported Jurisdictions,[4] the Debtors will retain custody of the cryptocurrency that would be distributed to those creditors.  In the event that Binance.US is not able to obtain the necessary approvals to make distributions to creditors in Unsupported Jurisdictions within six months following the closing (*i.e.*, an incremental 3 months following distributions to creditors in other jurisdictions), the Debtors would convert the cryptocurrency attributable to such creditors to cash and the Debtors would then distribute the equivalent realized cash value associated with such liquidations to such creditors under the chapter 11 plan.  If

---

[4]    "Unsupported Jurisdictions" refers to Hawaii, New York, Texas, and Vermont, in which Binance.US does not yet have the requisite money transmitter licensing approvals, authorizations, or exemptions (as applicable).

13

Binance.US is able to obtain the necessary money transmitter licensing approvals within that six-month period, Binance.US would make in-kind distributions to those creditors.

31.      *Second*, Binance.US has represented that it has sufficient cash and other consideration, as applicable, to pay the Purchase Price.  The Debtors requested and received proof satisfactory to them of funds to substantiate that representation.  Pursuant to the Asset Purchase Agreement, I understand the Debtors negotiated additional assurances and value for the benefit of their estates under the Asset Purchase Agreement, including (a) reimbursement by Binance.US of up to $15 million of Seller's expenses in certain circumstances, (b) a $10 million good-faith deposit paid by Binance.US to the Seller, and (c) a $10 million reverse termination fee payable to the Seller by Binance.US, in each case, subject to the terms and conditions set forth in the Asset Purchase Agreement.  I understand, based on Binance.US's representations that Binance.US will have the ability to pay the expense reimbursement and reverse termination fee if and when they become due.  Binance.US paid the $10 million good faith deposit to the Seller, pursuant to the Asset Purchase Agreement, which the Seller shall be entitled to keep, in full, in the event of a Purchaser Default Termination.

32.      *Third*, in response to recent media reports that Binance.US allegedly transferred more than $400 million to Merit Peak Ltd., a trading firm managed by Binance CEO Changpeng Zhao, the Debtors have been engaged in an ongoing review of additional supplemental diligence into Binance.US.[5] The Debtor's supplemental diligence is examining the relationship between Binance.US, Merit Peak Ltd., an additional third-party market maker, and Zhao, as well as Binance.US's financial controls, including review of audit results testing the sufficiency of

---

[5]      *See Crypto giant Binance moved $400 million from U.S. partner to firm managed by CEO Zhao*, REUTERS.COM (Feb. 16, 2023), *available at* https://www.reuters.com/technology/crypto-giant-binance-moved-400-million-us-partner-firm-managed-by-ceo-zhao-2023-02-16/

Binance.US's Information Security Management System and Privacy Information Management System.  The documents are being provided by Binance.US with the intention of demonstrating Binance.US's ability to consummate the Asset Purchase Agreement, to which the Debtors are conducting an ongoing review.  To the extent undisclosed information uncovered during the Debtors' ongoing review reveals Binance.US is unable to consummate the Asset Purchase Agreement, as discussed elsewhere in this Declaration, the Debtors will promptly pivot to the Liquidation Transaction.

33.    *Fourth*, I am aware that, pursuant to the Plan, on the Effective Date, all property constituting Wind-Down Debtor Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, transferred, or discharged pursuant to the Plan), will vest in the Wind-Down Debtor.  It is my understanding that any proceeds acquired from pursuit of the Vested Causes of Action (if any) will inure to the benefit of the Debtors' creditors.

34.    Based on the foregoing, it is unlikely that confirmation of the Plan will be followed by a liquidation or the need for further reorganization except for that disclosed in the Plan.

### III.    The Liquidation Transaction Provides an Alternative Transaction That Will Obviate the Need for Further Reorganization or Chapter 7 Liquidation.

35.    Based on the diligence the Debtors have performed to date, and as discussed above, I believe the Sale Transaction is the highest and best option currently available under the circumstances.  But the cryptocurrency industry remains volatile, even for an already volatile business, and Moelis and the Debtors' other advisors continue to closely monitor developments.  To that end, the Asset Purchase Agreement permits the Debtors to pivot to a higher and better third-party bid (should one emerge) or the Liquidation Transaction if the Debtors exercise their "fiduciary out" or the Sale Transaction is not effectuated by the outside date included thereunder,

subject to expense reimbursement of Binance.US in certain circumstances set forth in the Asset Purchase Agreement.

36.     Pursuing the Liquidation Transaction would, however, impose costs of its own on the Debtors, take time, and present its own risks.  Among other things, the Liquidation Transaction would involve the Debtors "rebalancing" their cryptocurrency holdings to prepare for distributions to creditors, and then reopening the Voyager platform for approximately a month to allow customers to withdraw their *pro rata* share of cryptocurrency, to the extent it can be withdrawn. The Liquidation Transaction, among other things, would likely lead to incremental value leakage (*e.g.*, the Debtors would likely be forced to realize a discount due to liquidation of sizable positions in the marketplace), over and above that in a third-party transaction, thereby resulting in diminished creditor recoveries, and/or require the Debtors to liquidate additional cryptocurrency to fund working capital requirements to complete the work required (including AML/KYC compliance).  The Debtors and their other advisors have also indicated that the Liquidation Transaction may create additional security risks (particularly if the Debtors are unable to retain critical personnel necessary to perform the Liquidation Transaction), be less tax efficient for customers than a third-party transaction,  strand some coins, which can be withdrawn by customers from certain third-party exchanges (like Binance.US) but not from Voyager, and may severely damage the value of the VGX token, the native token of the Voyager platform.

37.     In light of these risks, the Asset Purchase Agreement provides that in the event Debtors pivot to the Liquidation Transaction, Binance.US will provide certain services to facilitate the Liquidation Transaction to ensure that the Debtors can rely on the Binance.US platform to minimize leakage with, and cybersecurity risks when, returning cryptocurrency to creditors. In addition, the work to prepare to consummate and execute on the Asset Purchase Agreement will

better prepare the Debtors to address the aforementioned self-liquidation challenges and complete the Liquidation Transaction if necessary.

38.    My understanding, based on my work with the Debtors, is that the Debtors have a plan in place to pivot to and implement the Liquidation Transaction, if necessary.  As a result, in the event the Sale Transaction fails to close, the Debtors have the infrastructure and capability (and, due to the other protections provided in the Plan, including the Employee Transition Plan, the personnel) to proceed with a self-liquidation.  The ability to perform this self-liquidation pursuant to the Liquidation Transaction makes it unlikely that Debtors will need to undergo a court-supervised liquidation or pursue further reorganization other than that provided in the Plan.

## IV.    THE PLAN WAS PROPOSED IN GOOD FAITH

39.    I understand that Section 1129(a)(3) requires that the Plan be proposed in good faith.  I and the other members of the Moelis team, along with the Debtors' other advisors, were intimately involved in the negotiation and execution of the Asset Purchase Agreement and the development of the Plan.  The Plan and Asset Purchase Agreement followed extensive arm's-length negotiations among sophisticated, well-represented parties, including the Debtors, the Committee, and interested counterparties, ensuring that the Debtors' stakeholders realize the highest possible recoveries under the circumstances.[6]

40.    I believe that the Debtors' marketing process with respect to the Sale Transaction afforded a reasonable opportunity for any party to make a higher or otherwise better offer. Following FTX's bankruptcy, no other party or parties offered to purchase the Acquired Assets for greater overall value to the Debtors' estates than Binance.US.  Based on our analysis to date, I

---

[6]    For the avoidance of doubt, Binance.US is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stakeholders exist between the Purchaser and the Debtors.

believe the Asset Purchase Agreement will provide a greater recovery for the Debtors than would

be provided by any other currently available alternative and, if the Debtors ultimately determine

that another third-party option (if one emerges) or the Liquidation Transaction will deliver greater

value to creditors, they will toggle to that transaction.

41.    In my opinion the consideration provided by Binance.US pursuant to the Asset

Purchase Agreement constitutes the best offer for the Acquired Assets that is currently available.

42.    I am not aware of any side deals or other arrangements that would evidence a lack

of good faith.  Further, while I recognize that Binance.US has been cooperating with a variety of

regulatory bodies internationally, I have no knowledge of Binance.US engaging in any improper

action or inaction, which would cause or permit the Asset Purchase Agreement or the Sale

Transaction to be avoided or impose any costs or damages.  All that said, I am not an authorized

representative of Binance.US nor am I in a position to "vouch" for the bona fides of Binance.US.

And if events since May 2022 have taught us anything, it is that the benefits of having a

decentralized and largely unregulated cryptocurrency business are counterbalanced by the

challenges in identifying and preventing fraud.

## **CONCLUSION**

43.    The Plan and the Sale Transaction will provide the greatest currently available

recovery to creditors, allow the Debtors to facilitate an efficient resolution of these chapter 11

cases, and give customers the opportunity to migrate to Binance.US's market-leading trading

platform to trade and store cryptocurrency upon consummation of the Sale Transaction.  Further,

in the event that the Debtors determine that the Sale Transaction is not the highest and best option

available for their stakeholders under the circumstances, they have the right to, and will, toggle to

Liquidation Transaction provided under the Plan to quickly and efficiently return cryptocurrency

to creditors and facilitate the expedient resolution of these chapter 11 cases.

44.     For these reasons, I support confirmation of the Debtors' Plan.


*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: February 28, 2023                    Respectfully submitted,


                                            */s/ Brian Tichenor*
                                            Brian Tichenor
                                            Managing Director
                                            Moelis & Company LLC

                                            *Investment Banker for the Debtors*

# Exhibit 3

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                                  :
In re:                                            :     Chapter 11
                                                  :
VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1]      :     Case No. 22-10943 (MEW)
                                                  :
                    Debtors.                      :     (Jointly Administered)
                                                  :
---------------------------------------------------------------x

### DECLARATION OF TIMOTHY R. POHL, INDEPENDENT DIRECTOR AND MEMBER OF THE SPECIAL COMMITTEE OF THE BOARD OF DIRECTORS OF VOYAGER DIGITAL, LLC, IN SUPPORT OF CONFIRMATION OF THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Voyager Digital Holdings, Inc.'s and Voyager Digital Ltd.'s principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.  Voyager Digital, LLC's principal place of business is 701 S Miami Ave, 8th Floor, Miami, FL 33131.

Debtors
Ex-3

I, Timothy R. Pohl, hereby declare under penalty of perjury to the best of my knowledge, information, and belief as follows:

1.      I submit this declaration in conjunction with the Debtors' memorandum of law in support of confirmation of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as the same may be supplemented, amended, or modified from time to time, the "Plan") filed contemporaneously herewith.[2]

2.      Except as otherwise noted, I have personal knowledge of the matters set forth herein.

## Professional Experience and Background

3.      My professional experience helped me to fulfill my role as  an independent director and member of the board of directors of Voyager Digital, LLC ("Board"), and informed my business judgment with respect to the D&O Settlement (defined below).

4.      My experience as a corporate restructuring professional spans the last 30 years. After graduating with a J.D. from the University of Chicago Law School in 1991, I was an associate at the law firm of Jones Day in the firm's business restructuring & reorganization group until 1999. From 1999 to 2008, I was an attorney at the law firm of Skadden, Arps, Slate, Meagher & Flom LLP where I ultimately was a partner and served as the co-head of the corporate restructuring practice.  In 2009, I joined the Restructuring and Capital Solutions Group at Lazard Freres & Co. LLC, where I was a Managing Director until I retired in 2019.  In 2019, I founded TRP Advisors, LLC, where I provide strategic advice to a number of companies, financial institutions, and private

---

[2]      Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

2

equity firms with respect to distressed situations, troubled portfolio companies, and acquisition opportunities.

5.      I have also served as an independent director for a number of entities, including: GT USA Wilmington, LLC (The Port of Wilmington) (Chair); Libbey Inc.; Forma Brands (f/k/a Morphe Cosmetics); K&N Engineering, Inc.; Dunn Paper Holdings, Inc.; Petrochoice Holdings, Inc.; Genera Energy, Inc.; Unical Aviation, Inc.; Steak 'n Shake Company; Hawkwood Energy LLC; Delonex Energy Limited; CorePower Yoga, LLC; and Qapital, Inc.

6.      I have no connection with any potential party that was within the Special Committee's mandate to investigate, as further described below.

**Appointment to Special Committee**

7.      On July 5, 2022, the Board of Voyager Digital, LLC ("Voyager LLC") appointed Jill Frizzley and me to serve as independent directors ("Independent Directors") of the Board and to serve as initial members of the special committee of the Board (the "Special Committee"), pursuant to unanimous written consent.  I had not previously worked with Ms. Frizzley, but observed her capabilities and qualifications while serving as an Independent Director.  It is my understanding that she was formerly a restructuring attorney at Weil Gotshal & Manges, LLP and has diverse experiences from mine in various governance, investigations, and restructuring situations.  I believe Ms. Frizzley's independent experience and training enhanced the proper functioning of the Special Committee.

8.      The Special Committee was vested with the authority to, among other things, conduct an independent investigation (the "Investigation") with respect to any potential estate claims and causes of action against insiders, including any claims arising from loans made to Three Arrow Capital Ltd. ("3AC").  The Special Committee was also vested with sole authority to

3

prosecute, settle, or extinguish any and all claims and causes of action arising from the historical transactions investigated by the Special Committee.

9.    Ms. Frizzley and I retained Quinn Emanuel Urquhart & Sullivan LLP ("Quinn Emanuel") to provide independent advice to, and at act at the exclusive direction of, the Special Committee in connection with the Special Committee's mandate.  We believe Quinn Emanuel's experience made them an appropriate choice for this role.

### Special Committee Investigation

10.    At the Special Committee's direction, Quinn Emanuel conducted a thorough investigation, appropriate to the size and complexity of this case.  I understand that, consistent with the mandate of Special Committee, Quinn Emanuel requested and received information relating to, among other things:  Voyager LLC's loans to third parties, with a particular focus on the troubled loans to 3AC (the "3AC Loans"); the diligence performed in connection with those loans; the formation and function of Voyager LLC's Risk Committee; Voyager LLC's staking of customer cryptocurrency assets; Voyager LLC's regulatory compliance; Voyager LLC's communications with the public; Voyager LLC's pre-petition payments to insiders and certain third parties; and other aspects of Voyager LLC's business.

11.    It was reported to me that Voyager LLC collected and provided to the Special Committee's counsel responsive documents from its internal hard copy and electronic files, from its outside counsel, and from various third parties (*e.g.*, cryptocurrency custodians and exchanges). Among other things, the productions included emails, Slack communications, and, in certain cases, Telegram and cell phone data from Voyager LLC's employees, including Voyager LLC's most senior officers and others.  It is my understanding that no information was withheld from the Special Committee on privilege grounds.

12.     Early in the Investigation, Quinn Emanuel, on the Special Committee's behalf, proposed and negotiated a common interest confidentiality agreement and protective order (the "Protective Order") with primary bankruptcy counsel for the Debtors, Kirkland & Ellis, LLP, and McDermott Will & Emery ("MWE"), the law firm representing the Official Committee of Unsecured Creditors (the "UCC").  The Protective Order, which was entered by the Court, enabled Voyager LLC to make the same productions to MWE as it did to Quinn Emanuel while protecting the estate against any waivers of privilege.  At the direction of the Special Committee, Quinn Emanuel cooperated and coordinated with MWE throughout the course of the Investigation.

13.     In addition to document and information review, Quinn Emanuel conducted interviews of twelve members of Voyager LLC management, including Stephen Ehrlich (CEO), Evan Psaropoulos (COO and former CFO), David Brosgol (General Counsel), Gerard Hanshe (COO), Ashwin Prithipaul (then-CFO), Pamela Cramer (Chief Marketing Officer), Marshall Jensen (Head of Corporate Development), Ryan Whooley (Treasury Director), Jon Brosnahan (Treasurer), Brian Silard (member of Treasury team), David Brill (Deputy General Counsel), and Manisha Lalwani (in-house regulatory counsel).  It was reported to me that lawyers from MWE also attended and asked questions at these interviews.

14.     The Debtors' financial advisor, Berkely Research Group, LLC ("BRG") provided assistance and information to Quinn Emanuel and the Special Committee throughout the Investigation.

15.     Throughout the course of the Investigation, Quinn Emanuel provided regular updates to Ms. Frizzley and me on the status of the Investigation, including facts learned, impressions obtained, and relevant legal theories and conclusions, both through formal videoconference meetings and emails.  During these videoconference meetings, Ms. Frizzley and

5

I were engaged and asked questions based on our respective experience regarding the facts being developed and potentially applicable legal theories.  The Special Committee's meetings were in addition to Ms. Frizzley's and my participation in several Board meetings concerning the Debtors' general business and case trajectory.

### Investigation Report and Special Committee's Conclusions

16.    The Investigation culminated in a more than 60-page single-spaced report (the "Investigation Report") provided by Quinn Emanuel to Ms. Frizzley and me on October 7, 2022, which detailed the factual findings uncovered in the Investigation and contained attorney impressions and advice concerning, among other things, applicable fiduciary duty and other legal standards, the exculpation provisions in Voyager LLC's operating agreement, the availability of director and officer ("D&O") insurance, and issues relating to the potential costs of litigation, potential enforcement matters if litigation was brought and was successful, and other relevant issues.  In connection with confirmation of the Plan, certain parties in interest requested to see a public version of the Investigation Report.  The Special Committee agreed to voluntarily disclose a public version of the Investigation Report, redacted to protect privileged and other material protected by the Protective Order, and that version was filed on the Court's docket on February 14, 2023, and can be found at docket number 1000 in the above-captioned case.

17.    On October 10, 2022 the Special Committee held a videoconference meeting with Quinn Emanuel to discuss the findings, conclusions, and recommendations in the Investigation Report, as well as to update the Special Committee on potential additional matters that were the subject of ongoing review.  The Special Committee determined that the estate has colorable claims against Voyager LLC's CEO, Stephen Ehrlich, and former CFO (now CCO), Evan Psaropoulos, for breach of fiduciary duty relating to their decision to make the 3AC Loans (the "Potential Claims").  Because Messrs. Ehrlich and Psaropoulos were the two potential ultimate decision-

6

makers with respect to the 3AC Loans (including the amounts and terms on which to lend), the Special Committee concluded that the estate does not have viable claims against other insiders with respect to the 3AC Loans. Other than the Potential Claims, the Special Committee concluded that the estate does not have any other viable claims against insiders. For example, the Investigation did not uncover evidence that would lead the Special Committee to conclude that there was any conflict of interest or motives other than the success of the company.

18.     Based on our respective experience, Ms. Frizzley and I also realized that, while the estate may have colorable claims against Messrs. Ehrlich and Psaropoulos, the standard for successfully prosecuting the Potential Claims would be difficult to meet, and any judgment would be difficult to collect. With respect to the former, while I do not believe Messrs. Ehrlich and Psaropoulos conducted sufficient due diligence when making the 3AC Loans, there are several additional determinations that would need to be established in connection with litigation—including, for example, the applicability of Voyager LLC operating agreement's exculpation provision to the alleged acts/omissions, whether their actions rise to the level of "gross" negligence, and whether their negligence, even if "gross," was the cause of losses to the estate—each of which is uncertain and likely to be hotly contested. Important to my judgment is that there was no theft or fraud, nor was there any evidence to suggest that Messrs. Ehrlich and Psaropoulos had any motive to take improper risks with the company's assets, other than wanting the company to generate revenues and succeed.

19.     With respect to collection risks, and as noted in more detail below, my understanding was that neither Mr. Ehrlich nor Mr. Psaropoulos had significant personal assets available to satisfy any potential judgment even if the claims were successfully prosecuted.

Therefore, I believe that the best source of recoveries from any litigation against them (if pursued) would be from the available D&O insurance coverage.

20.    For these reasons, the Special Committee sought to negotiate a settlement whereby the estate would not release the Potential Claims, obtain what it could consensually from Messrs. Ehrlich and Psaropoulos's personal assets, and preserve as much of the D&O insurance as possible to enable the Wind-Down Entity, on behalf of the estate to pursue litigation and/or settlement from the policy limits.

21.    In addition to the Potential Claims, I learned that one of the policies (the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd.) was obtained on the eve of the Debtors' bankruptcy filing (the "Side-A Policy").  While I understood the Side-A Policy was obtained in furtherance of the Debtors' efforts to bolster protections for its directors and officers and as part of a broader D&O insurance transaction involving a series of interrelated amendments for which an aggregate $15.6 million was paid, the documentation for the Side-A Policy indicates that it a $10 million premium was paid for that $10 million in coverage.  I accordingly instructed Quinn Emanuel to preserve any estate claims against the insurer for potential avoidance actions and return of the premium paid by the Debtors.  However, I did not believe that the purchase of the Side-A Policy gave rise to estate claims against insiders because, among other reasons, it was purchased with the guidance of counsel in connection with the negotiation of, and agreement to, important enhancements to the existing D&O policies that resulted in material improvements to coverage terms as well as run-off coverage to go effective upon the company's emergence from bankruptcy.

## D&O Settlement

22.    In light the foregoing considerations, the Special Committee authorized Quinn Emanuel to explore a settlement of the Potential Claims which would maximize the estate's access

8

to the D&O insurance proceeds and potentially, depending on the financial wherewithal of Mr.

Ehrlich and Mr. Psaropoulos, some amount beyond that.  With respect to the latter, Quinn Emanuel

requested, and received, a sworn accounting of each of Mr. Ehrlich's and Mr. Psaropoulos's assets,

including joint marital assets (the "Financial Statements").

23.      Quinn Emanuel, on the Special Committee's behalf, engaged in independent

negotiations with each of Mr. Ehrlich's legal counsel and Mr. Psaropoulos's legal counsel.  The

parties exchanged multiple settlement offers the last of which was the following:

| | |
|---|---|
| **Debtors Retain Rights of Recourse to D&O Insurance** | Upon receipt of personal financial contributions, described below, the Debtors will retain the right to pursue claims against the Messrs. Ehrlich and Psaropoulos up to the maximum recovery under the Debtors' D&O Liability Insurance Policies, without further recourse to the individuals' other assets. |
| **Releases and Waivers by the Officers against the Debtors** | Mr. Ehrlich agrees to subordinate any Claims (including any indemnification claims) he holds against the Debtors until all other Holders of Claims are paid in full. |
| | Mr. Psaropoulos agrees to subordinate 50% of any Claims he holds other than indemnification claims (and 100% of any indemnification claims) against the Debtors until all other Holders of Claims are paid in full.[3] |
| | Messrs. Ehrlich and Psaropoulos will be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Entity and retain the right to assert claims for advancement and indemnification up to the limits of any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to Mr. Ehrlich and/or Mr. Psaropoulos based upon or arising out of the lack of a formal claim for indemnification; *provided, however*, that any such indemnification or advancement claims will be subordinated in full unless and until all other Holders of Claims |

---

[3]  In the event the D&O Carriers deny coverage to Mr. Ehrlich or Mr. Psaropoulos under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by Mr. Ehrlich or Mr. Psaropoulos will not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

are paid in full; *provided*, *further*, that in the event that any of the D&O Carriers deny coverage to Mr. Ehrlich or Mr. Psaropoulos under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by Mr. Ehrlich or Mr. Psaropoulos will not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

Messrs. Ehrlich and Psaropoulos further agree to subordinate any and all rights and entitlements under the Side A Policy to any recovery by the Debtors and/or the Wind Down Entity on account of the Debtors' and/or Wind Down Estate's claims for the avoidance of the premium paid for the policy. For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), Messrs. Ehrlich and/or Psaropoulos shall be entitled to seek coverage under the Side-A Policy.

| | |
|---|---|
| **Reversal of Insider Bonus Payment** | Mr. Ehrlich agrees to the avoidance/unwinding of the transfer of $1,900,000 that Mr. Ehrlich received from the Debtors on or around February 28, 2022, with Mr. Ehrlich paying $1,125,000 to the Debtors in cash and assigning the right, if any, to any tax refund for the balance. |
| **Commitment to Cooperate** | Messrs. Ehrlich and Psaropoulos agree to remain at, and continue performing the responsibilities of, their position(s) with the Debtors and assist with the Debtors' transition for at least 30 days from entry of the Confirmation Order; *provided* that the Mr. Psaropoulos will have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the Mr. Ehrlich will have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided, further*, that both Mr. Ehrlich and Mr. Psaropoulos will be available to the Debtors and/or the Wind-Down Entity for a maximum of five hours per month for the one year following the Effective Date. |

24.     After reviewing and analyzing the foregoing settlement terms and conditions, I concluded that the proposal was in the estate's best interest, and we approved the settlement (the "D&O Settlement"). This conclusion was reached after careful consideration of the issues explained above, including the relative strength of the Potential Claims, the challenges involved in litigating loss causation, the costs of litigating the claims, and the financial wherewithal of

Messrs. Ehrlich and Psaropoulos to satisfy any judgment.  And as I note below, I took into account the UCC's support for the D&O Settlement.

25.    In sum, subject to the terms and conditions above (concerning personal contributions and subordination of rights in exchange for limitation on further recourse to personal assets), any claims and causes of action held by the Debtors or their respective estates against Mr. Ehrlich and/or Mr. Psaropoulos that are expressly related to the approval of the 3AC Loans are not being released (the "Non-Released D&O Claims").  Pursuant to the Plan, the Non-Released D&O Claims are being assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved.[4]  In addition, any avoidance actions relating to the Side-A Policy (the "Non-Released Insurance Claims"), will also be assigned and transferred to the Wind-Down Entity to be pursued, settled or resolved.[5]  Moreover, Messrs. Ehrlich and Psaropoulos agreed to subordinate any of their rights and entitlements to the Side-A Policy to any recovery by the Debtors and/or the Wind-Down Entity on account of the Non-Released Insurance Claims.

26.    And while Financial Statements confirmed that Mr. Ehrlich and Mr. Psaropoulos do not have assets sufficient to satisfy any significant judgment against them, the D&O Settlement does provide for some financial recovery from both Mr. Ehrlich and Mr. Psaropoulos.

---

[4]  Pursuant to the Plan, the Debtors and the Wind-Down Debtors also expressly reserve claims for aiding and abetting breach of fiduciary duties against third parties unaffiliated with the Debtors who are not "Released Parties" as defined in the Plan.

[5]  Pursuant to the Plan, the Debtors are reserving all causes of action against the D&O insurance carriers based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtor or Wind-Down Debtor is a party or pursuant to which any Debtor or Wind-Down Debtor has any rights whatsoever, including causes of action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters. These causes of action include, without limitation, the Non-Released D&O Claims and the Non-Released Insurance Claims.

11

27.     As noted above, the UCC's advisors had participated in the Investigation, and Quinn Emanuel promptly informed them of the proposed terms of the D&O Settlement.  The UCC ultimately supported the D&O Settlement and encouraged all unsecured creditors to vote in favor of the Plan.  *See Letter of the Official Committee of Unsecured Creditors in Support of Joint Chapter 11 Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (Dkt. No 566).

28.     The D&O Settlement was expressly conditioned on the accuracy of the Financial Statements.  To help ensure the accuracy of those Financial Statements, MWE and Quinn Emanuel requested, received, and reviewed documents from Mr. Ehrlich and Mr. Psaropoulos.  Mr. Psaropoulos was deposed on February 17, 2023, at which he answered questions relating to his Financial Report and testified that it was accurate.  Mr. Ehrlich was deposed today, February 28, 2023, and did the same.  If I learned of any material inaccuracies in the Financial Statements, I would revisit the terms of the D&O Settlement.

29.     As a result of the D&O Settlement, the estates will receive approximately $1.2 million of Mr. Ehrlich's and Mr. Psaropoulos's personal assets and a potential tax refund, plus recourse to (and preservation of) the available D&O insurance, among other benefits.

30.     The Plan also provides for the Debtors' release of their officers, directors, and employees who continued to hold such position after the Petition Date.  These individuals enabled the Debtors to continue to operate post-petition during the sale processes and ultimately wind-down their businesses.  Because the Investigation led the Special Committee to conclude that the estate does not have any cognizable claims against any of these individuals other than Messrs. Ehrlich and Psaropoulos, I believe, in my business judgment, that the releases contained in the Plan are appropriate.  Notably, the Plan does ***not*** purport to release claims against former officers, directors, and employees who did not hold such position at any time post-petition, or any claims

against insiders held by third-parties (including customers and regulatory agencies) without such third-party's affirmative consent.

31.     Based on the work that I, my fellow Independent Director, Ms. Frizzley, and Quinn Emanuel have undertaken, the Special Committee submits that the D&O Settlement contained in the Plan was negotiated at arm's-length by independent parties, represented by independent counsel, and is fair, reasonable, and in the best interests of Voyager LLC and its stakeholders.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
         February 28, 2023

_____
Timothy R. Pohl

13

# Exhibit 4

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### AMENDED DECLARATION OF LETICIA SANCHEZ REGARDING THE SOLICITATION AND TABULATION OF VOTES ON THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

I, Leticia Sanchez, pursuant to 28 U.S.C. § 1746, hereby declare under the penalty of

perjury as follows:

1.     I am a Director at Stretto, which has offices located at 410 Exchange, Suite 100,

Irvine, California 92602.  I am over the age of eighteen years.  I do not have a direct interest in

the chapter 11 cases and should be considered an impartial party.  I am duly authorized to submit

this declaration (this "<u>Declaration</u>") on behalf of Stretto.

2.     On July 13, 2022, the United States Bankruptcy Court for the Southern District of

New York (the "<u>Court</u>") entered the *Order (I) Authorizing and Approving the Appointment of*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

*Stretto, Inc. As Claims and Noticing Agent and (II) Granting Related Relief* [Docket No. 67]

(the "Stretto Retention Order").  The Stretto Retention Order authorizes Stretto to assist the

Debtors with, among other things, the service of solicitation materials and tabulation of votes cast

to accept or reject the Plan, distributing required notices to parties in interest, and receiving,

maintaining, docketing, and otherwise administering the proofs of claim filed in the Debtors'

chapter 11 cases.

3.    I submit this amended declaration (this "Declaration") with respect to the

solicitation of votes and the tabulation of Ballots cast on the *Third Amended Joint Plan of Voyager*

*Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*

[Docket No. 852]*, dated January 10, 2023 (as may be amended, supplemented, or modified from

time to time, the "Plan").[2]  Except as otherwise noted, all facts set forth herein are based on my

personal knowledge, knowledge that I acquired from individuals under my supervision, and my

review of relevant documents.  I am authorized to submit this Declaration on behalf of Stretto.  If

I were called to testify, I could and would testify competently as to the facts set forth herein.

### Background

4.    On January 13, 2023, the Court entered the *Order (I) Scheduling a Combined*

*Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the*

*Adequacy of the Disclosure Statement, (III) Approving (A) Solicitation and Notice Procedures,*

*(B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures*

*for Objections* [Docket No. 861] (the "Conditional Disclosure Statement Order") establishing,

among other things, procedures to solicit votes from and tabulate ballots submitted by holders

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
*Second  Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings,*
*Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement").

entitled to vote on the Plan (the "Solicitation and Voting Procedures").  Stretto adhered to the Solicitation and Voting Procedures outlined in the Conditional Disclosure Statement Order and the ballots, which were distributed to parties entitled to vote on the Plan.  I supervised the solicitation and tabulation performed by Stretto's employees.

5.      Pursuant to the Conditional Disclosure Statement Order, and in accordance with the solicitation procedures and the tabulation rules set forth therein (collectively, the "Solicitation Procedures and Tabulation Rules"), Stretto worked with the Debtors to solicit votes for the Plan and tabulate ballots of creditors entitled to vote on the Plan.  The Plan designates Claims in Class 3 (Account Holder Claims), Class 4A (OpCo General Unsecured Claims), Class 4B (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims) (collectively, the "Voting Classes") as Impaired and entitled the Holders of such Claims to vote on the Plan.  The Conditional Disclosure Statement Order established January 10, 2023, as the Voting Record Date for determining which Holders of Claims or Interests were entitled to receive Solicitation Packages and, where applicable, vote on the Plan.

6.      Pursuant to and in accordance with the Conditional Disclosure Statement Order, Stretto served the Solicitation Packages (including the Ballots) on Holders of Claims entitled to vote on the Plan by January 25, 2023.  A certificate of service evidencing Stretto's service of the foregoing was filed with the Court on January 30, 2023 [Docket No. 926].  Subsequent Solicitation Packages were periodically served on Holders of Claims entitled to vote on the Plan on account of (a) additional timely-filed claims filed after the Voting Record Date, (b) forwarding instructions included on Solicitation Packages returned as undeliverable, and (c) at the request of interested parties.  This additional service is evidenced by certificates of service filed with the Court [Docket Nos. 927, 999, 1016, 1090, and 1091].

3

7.     In addition to serving the Solicitation Packages on all voting parties, Stretto timely (a) served opt in forms on Holders of Administrative Claims, Holders of Priority Tax Claims, and all members of Class 1 (Secured Tax Claims), Class 2 (Other Priority Claims), Class 5 (Alameda Loan Facility Claims), Class 6 (Section 510(b) Claims), and Class 9 (Existing Equity Interests) (collectively, the "Non-Voting Classes"); and (b) served the Combined Hearing Notice on all parties in interest (collectively, the "Non-Voting Packages").  This service is evidenced by certificates of service filed with the Court [Docket No. 926].  Subsequent Non-Voting Packages were periodically served on the Non-Voting Classes on account of (a) forwarding instructions included on Non-Voting Packages returned as undeliverable and (b) at the request of interested parties.  This additional service is evidenced by certificates of service filed with the Court [Docket Nos. 999, 1016, and 1091].  Furthermore, free copies of the Disclosure Statement, the Plan, and all other documents filed in these cases are available on the internet at https://cases.stretto.com/Voyager/.

8.     The Conditional Disclosure Statement Order established February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) as the deadline by which all Ballots were to have been received by Stretto in order to be counted as a valid vote to accept or reject the Plan (the "Voting Deadline").

9.     Stretto received and tabulated the Ballots as follows:

a.   With respect to hard copy Ballots:

i.   Each returned Ballot was opened and/or inspected at Stretto's offices; and

ii.   Ballots were date-stamped upon receipt.

b.   With respect to Ballots submitted through the online portal:

i.   Encrypted ballot data, date-stamp, and audit trail were created upon

4

submittal; and

    ii.  Electronic images of Ballots were created using the submitted ballot data.

    c.  All Ballots received were then tabulated in accordance with the Solicitation and Voting Procedures approved by the Conditional Disclosure Statement Order.

10.    On March 1, 2023, after the Voting Deadline passed, Stretto became aware of four timely filed Class 4A Ballots that were not included in Stretto's initial tabulation (the "Additional Class 4A Ballots").  The Additional Class 4A Ballots were each submitted twice and, accordingly, were flagged as duplicates and unintentionally omitted from the initial tabulation.  Stretto immediately notified the Debtors and their advisors of the Additional Class 4A Ballots and revised the tabulation accordingly.  Additionally, after identifying that such Ballots were unintentionally classified as duplicates and not initially included, Stretto confirmed that the Additional Class 4A Ballots were the only Ballots miscategorized and not included in the initial tabulation.

11.    For a Ballot to be counted as valid, the Ballot was required to have complied with the Solicitation and Voting Procedures, including the requirement that the Ballot be properly completed, executed by the Holder of the Claim (or such Holder's authorized representative), be submitted by an entity entitled to vote, and received by Stretto on or before the Voting Deadline. Ballots that did not comply with the Solicitation Procedures were not counted.  Except as set forth herein or in the attached exhibits, (a) all Ballots that complied with the Solicitation and Voting Procedures were tabulated in accordance with these tabulation rules, which were not modified in any respect, (b) there were no defects or irregularities with any of the Ballots, and (c) no votes were changed or modified after they were cast without the express written consent to do so by the Holder of the Claim (or such Holder's authorized representative) pursuant to the Conditional Disclosure Statement Order.

12.     Stretto examined each valid ballot to determine which creditors affirmatively opted in to the Third-Party Release provided in Article VIII.B of the Plan (the "Release Opt-In"). Based on this review, 65% (40,112) of Holders of Claims in the Voting Classes affirmatively selected the Release Opt-In.  Furthermore, 85% (726) of Holders of Claims or Interests in the Non-Voting Classes affirmatively selected the Release Opt-In.  Stretto also examined each ballot to determine which creditors elected to contribute their third-party claims.  Based on this review, 52% (31,878) of Holders of Claims in the Voting Classes affirmatively contributed their third-party claims.  Furthermore, 90% (765) of Holders of Claims or Interests in the Non-Voting Classes affirmatively contributed their third-party claims.

13.     I hereby certify that the results of the voting by Holders of Claims in the Voting Classes are as set forth in **Exhibit A** to this Declaration, which is a true and correct copy of the final tabulation of votes, cast by timely and properly completed Ballots received by Stretto.

14.     As reflected on **Exhibit B** attached hereto, I hereby certify that there are six (6) abstaining Ballots submitted to Stretto as of the filing of this Declaration.

15.     I hereby certify that attached hereto as **Exhibit C** is a detailed voting report of all non-tabulated Ballots submitted to Stretto as of the filing of this Declaration.

*[Remainder of page intentionally left blank]*

6

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.


Dated:  March 1, 2023              /s/ *Leticia Sanchez*
                                   _____
                                   Leticia Sanchez
                                   Director
                                   Stretto, Inc.

# Exhibit 5

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF FILING OF THIRD AMENDED JOINT
PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR
AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that on July 6, 2022, the above-captioned debtors and debtors

in possession (collectively, the "Debtors") filed the *Joint Plan of Reorganization of Voyager*

*Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*

(the "Initial Plan") [Docket No. 17].

**PLEASE TAKE FURTHER NOTICE** that on August 12, 2022, the Debtors filed the

*First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor*

*Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 287].

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

Debtors
Ex-5

**PLEASE TAKE FURTHER NOTICE** that on October 5, 2022, the Debtors filed the *Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 496].

**PLEASE TAKE FURTHER NOTICE** that on October 17, 2022, the Debtors filed the *Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 539].

**PLEASE TAKE FURTHER NOTICE** that on October 19, 2022, the Debtors filed the *Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 564].

**PLEASE TAKE FURTHER NOTICE** that on October 20, 2022, the Debtors filed the *Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 584].

**PLEASE TAKE FURTHER NOTICE** that on October 24, 2022, the Debtors filed the *Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 590].

**PLEASE TAKE FURTHER NOTICE** that on December 22, 2022, the Debtors filed the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code [Docket No. 777].

**PLEASE TAKE FURTHER NOTICE** that on January 8, 2023, the Debtors filed the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 829].

PLEASE TAKE FURTHER NOTICE that on January 10, 2023, the Debtors filed the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 852] (the "Revised Plan").

PLEASE TAKE FURTHER NOTICE that the Debtors hereby file the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, attached hereto as **Exhibit A** (the "Second Revised Plan").

PLEASE TAKE FURTHER NOTICE THAT a comparison between the Revised Plan and the Second Amended Plan, is attached hereto as **Exhibit B**.

PLEASE TAKE FURTHER NOTICE that copies of the Initial Plan, the Second Revised Plan, and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at http://www.cases.stretto.com/Voyager.  You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated:  February 28, 2023
New York, New York

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    jsussberg@kirkland.com
         cmarcus@kirkland.com
         christine.okike@kirkland.com
         allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Second Revised Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

> **NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS. THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital, LTD. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

# TABLE OF CONTENTS

Page

Introduction ..................................................................................................................1

**Article I. Defined Terms, Rules of Interpretation, Computation of Time, Governing Law, and Other References**....................................................................................1

A.    Defined Terms ............................................................................................1
B.    Rules of Interpretation ............................................................................17
C.    Computation of Time................................................................................17
D.    Governing Law .........................................................................................18
E.    Reference to Monetary Figures................................................................18
F.    Reference to the Debtors or the Wind-Down Debtor ............................18
G.    Nonconsolidated Plan ..............................................................................18

**Article II. Administrative and Priority Claims** ........................................................18

A.    Administrative Claims ..............................................................................18
B.    Professional Fee Claims ...........................................................................19
C.    Priority Tax Claims...................................................................................20

**Article III. Classification, Treatment, and Voting of Claims and Interests** ...........21

A.    Classification of Claims and Interests .....................................................21
B.    Summary of Classification........................................................................21
C.    Treatment of Classes of Claims and Interests.........................................22
D.    Special Provision Governing Unimpaired Claims....................................28
E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes ..28
F.    Subordinated Claims.................................................................................28
G.    Intercompany Interests.............................................................................28
H.    Controversy Concerning Impairment ......................................................29
I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ..........................................................................................................29

**Article IV. Provisions for Implementation of the Plan**............................................29

A.    General Settlement of Claims and Interests.............................................29
B.    Restructuring Transactions ......................................................................29
C.    The Sale Transaction ................................................................................30
D.    The Liquidation Transaction....................................................................30
E.    Employee Transition Plan ........................................................................31
F.    Non-Released D&O Claims.......................................................................32
G.    The D&O Settlement ................................................................................32
H.    The Wind-Down Debtor ...........................................................................34
I.    Sources of Consideration for Plan Distributions ....................................41
J.    Corporate Existence and Dissolution.......................................................41
K.    Corporate Action......................................................................................42
L.    Vesting of Assets in the Wind-Down Debtor ...........................................43
M.    Cancellation of Notes, Instruments, Certificates, and Other Documents ............43
N.    Effectuating Documents; Further Transactions ......................................43
O.    Section 1146(a) Exemption ......................................................................44

| P. | Preservation of Rights of Action | .................................................... | 44 |
|---|---|---|---|
| Q. | Election to Contribute Third-Party Claims | ........................................ | 45 |
| R. | Contribution of Contributed Third-Party Claims | ............................... | 45 |
| S. | Closing the Chapter 11 Cases | ......................................................... | 45 |

**Article V. Treatment of Executory Contracts and Unexpired Leases ...................................46**

| A. | Assumption and Rejection of Executory Contracts and Unexpired Leases ........46 |
|---|---|
| B. | Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.............................................................................................................46 |
| C. | Claims Based on Rejection of Executory Contracts or Unexpired Leases...........46 |
| D. | Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.......47 |
| E. | Insurance Policies .............................................................................................48 |
| F. | Reservation of Rights........................................................................................49 |
| G. | Nonoccurrence of Effective Date .....................................................................49 |
| H. | Contracts and Leases Entered into After the Petition Date ................................49 |

**Article VI. Provisions Governing Distributions .........................................................................49**

| A. | Timing and Calculation of Amounts to Be Distributed.......................................49 |
|---|---|
| B. | Rights and Powers of Distribution Agent ..........................................................50 |
| C. | Delivery of Distributions and Undeliverable or Unclaimed Distributions ...........50 |
| D. | Compliance Matters...........................................................................................52 |
| E. | Foreign Currency Exchange Rate ......................................................................52 |
| F. | Claims Paid or Payable by Third Parties ...........................................................53 |
| G. | Setoffs and Recoupment ...................................................................................53 |
| H. | Allocation between Principal and Accrued Interest ...........................................54 |

**Article VII. Procedures for Resolving Disputed, Contingent, and Unliquidated Claims and Interests.........................................................................................................................................54**

| A. | Disputed Claims Process ...................................................................................54 |
|---|---|
| B. | Objections to Claims or Interests.......................................................................55 |
| C. | Estimation of Claims .........................................................................................55 |
| D. | No Distributions Pending Allowance .................................................................56 |
| E. | Distributions After Allowance...........................................................................56 |
| F. | No Interest.........................................................................................................56 |
| G. | Adjustment to Claims and Interests without Objection ......................................56 |
| H. | Time to File Objections to Claims .....................................................................56 |
| I. | Disallowance of Claims or Interests...................................................................57 |
| J. | Amendments to Proofs of Claim .......................................................................57 |

**Article VIII. Effect of Confirmation of the Plan ........................................................................57**

| A. | Releases by the Debtors.....................................................................................57 |
|---|---|
| B. | Releases by Holders of Claims and Interests......................................................58 |
| C. | Exculpation .......................................................................................................59 |
| D. | Injunction ..........................................................................................................59 |
| E. | Release of Liens ................................................................................................60 |
| F. | OSC and SEC....................................................................................................60 |
| G. | Protection against Discriminatory Treatment ....................................................60 |
| H. | Document Retention ..........................................................................................60 |
| I. | Reimbursement or Contribution ........................................................................61 |

ii

J.      Term of Injunctions or Stays ..................................................................61

**Article IX. Conditions Precedent to the Effective Date** ...........................................**61**

A.      Conditions Precedent to the Effective Date .......................................61
B.      Waiver of Conditions Precedent .........................................................62
C.      Effect of Non-Occurrence of Conditions to Consummation ..............62

**Article X. Modification, Revocation, or Withdrawal of the Plan** ...........................**62**

A.      Modification of Plan ...........................................................................62
B.      Effect of Confirmation on Modifications ...........................................63
C.      Revocation or Withdrawal of Plan......................................................63

**Article XI. Retention of Jurisdiction** ........................................................................**63**

**Article XII. Miscellaneous Provisions** .......................................................................**65**

A.      Immediate Binding Effect...................................................................65
B.      Additional Documents ........................................................................65
C.      Payment of Statutory Fees ..................................................................65
D.      Dissolution of Statutory Committees..................................................66
E.      Reservation of Rights..........................................................................66
F.      Successors and Assigns .......................................................................66
G.      Service of Documents .........................................................................66
H.      Entire Agreement; Controlling Document...........................................67
I.      Plan Supplement .................................................................................67
J.      Non-Severability .................................................................................67
K.      Votes Solicited in Good Faith.............................................................67
L.      Waiver or Estoppel .............................................................................68

## INTRODUCTION

Voyager Digital Holdings, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors") propose this third amended joint plan (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

### A.    Defined Terms

Capitalized terms used in this Plan have the meanings ascribed to them below.

1.    "*3AC*" means Three Arrows Capital, Ltd and any of its Affiliates or subsidiaries.

2.    "*3AC Claims*" means the claims or causes of action asserted or assertable by the Debtors against 3AC, whether in the 3AC Liquidation Proceeding or otherwise.

3.    "*3AC Liquidation Proceeding*" means that certain liquidation proceeding captioned *In the Matter of Three Arrows Capital Ltd. and in the Matter of Sections 159(1) and 162(1)(a) and (b) of the Insolvency Act 2003*, Claim No. BVIHC(COM)2022/0119 before the Eastern Caribbean Supreme Court in the High Court of Justice in the British Virgin Islands and the chapter 15 foreign recognition proceeding captioned *In re Three Arrows Capital, Ltd.*, No. 22-10920 (Bankr. S.D.N.Y. Jul. 1, 2022).

4.    "*3AC Loan*" means that loan of 15,250 Bitcoins and 350 million USDC to 3AC pursuant to that certain master loan agreement dated March 4, 2022 by and between 3AC, as borrower, and OpCo and HTC Trading, Inc., as lenders.

5.    "*3AC Recovery*" means the recovery, if any, of the Debtors from 3AC on account of the 3AC Claims.

6.    "*Account*" means any account at OpCo held by an Account Holder relating to Cryptocurrency, which Account is identified in the Debtors' books and records as holding Cryptocurrency as of the Petition Date.

7.      "*Account Holder*" means any Person or Entity who holds an Account with OpCo as of the Petition Date.

8.      "*Account Holder Claim*" means any Claim against the Debtors that is held by an Account Holder on account of such Holder's Account.

9.      "*Acquired Assets*" has the meaning ascribed to it in the Asset Purchase Agreement.

10.     "*Acquired Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

11.     "*Acquired Coins Value*" has the meaning ascribed to it in the Asset Purchase Agreement.

12.     "*Additional Bankruptcy Distribution*" has the meaning ascribed to it in the Asset Purchase Agreement.

13.     "*Administrative Claim*" means a Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims.

14.     "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), which:  (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five days after the Effective Date.

15.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

16.     "*Alameda*" means Alameda Ventures Ltd., along with its Affiliates and subsidiaries.

17.     "*Alameda Claims*" means the claims or causes of action asserted or assertable by the Debtors against Alameda, whether in the FTX Bankruptcy Proceeding or otherwise.

18.     "*Alameda Loan Agreement*" means that certain unsecured loan agreement, dated as of June 21, 2022, as amended, restated, amended and restated, modified, or supplemented from time to time, by and among HoldCo, as the borrower, TopCo, as the guarantor, and Alameda, as the lender thereto.

19.     "*Alameda Loan Facility*" means that certain unsecured loan facility provided for under the Alameda Loan Agreement.

20.     "*Alameda Loan Facility Claims*" means any Claim against any Debtor derived from, based upon, or arising under the Alameda Loan Agreement and any fees, costs, and expenses that are reimbursable by any Debtor pursuant to the Alameda Loan Agreement.

21.     "*Alameda Recovery*" means the recovery, if any, of the Debtors from Alameda on account of the Alameda Claims.

22.    "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein:  (a) a Claim or Interest that is evidenced by a Proof of Claim timely Filed by the Bar Date or a request for payment of Administrative Claim timely Filed by the Administrative Claims Bar Date (or for which Claim or Interest under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim or a request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; (c) a Claim or Interest Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court, or (d) a Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; *provided* that, with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim or Interest shall have been Allowed by a Final Order.  Any Claim or Interest that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. A Proof of Claim Filed after and subject to the Bar Date or a request for payment of an Administrative Claim Filed after and subject to the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

23.    "*Asset Purchase Agreement*" means that certain asset purchase agreement dated as of December 18, 2022 by and between BAM Trading Services Inc. (d/b/a Binance.US) as Purchaser and Voyager Digital, LLC as Seller.

24.    "*Assumed Liabilities*" has the meaning ascribed to it in the Asset Purchase Agreement.

25.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

26.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the Southern District of New York.

27.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

28.    "*Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

29.    "*Bar Date Order*" means the *Order (I) Setting Deadlines for Submitting Proofs of Claims, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 218].

30. "*Binance.US Platform*" has the meaning ascribed to it in the Asset Purchase Agreement.

31. "*Binance US*" means BAM Trading Services Inc. (d/b/a Binance.US).

32. "*Binance US Account*" means a customer account opened with the Purchaser by an Account Holder or a Holder of an Allowed OpCo General Unsecured Claim.

33. "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

34. "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

35. "*Causes of Action*" mean any action, Claim, cross-claim, third-party claim, damage, judgment, cause of action, controversy, demand, right, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, interest, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law in accordance with applicable law. For the avoidance of doubt, "Causes of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim arising from any contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

36. "*CCO*" means Evan Psaropoulos.

37. "*CEO*" means Stephen Ehrlich.

38. "*Certificate*" means any instrument evidencing a Claim or an Interest.

39. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated cases filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

40. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

41. "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) (i) with respect to Administrative Claims (other than Professional Fee Claims and Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), sixty days after the Administrative Claims Bar Date or (ii) with respect to all other Claims (other than Professional Fee Claims), 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Wind-Down Debtor, as applicable, as approved by an order of the Bankruptcy Court for objecting to such Claims.

42.     "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Clerk of the Bankruptcy Court or the Claims, Noticing, and Solicitation Agent.

43.     "*Claims, Noticing, and Solicitation Agent*" means Bankruptcy Management Solutions, Inc. d/b/a Stretto, in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

44.     "*Class*" means a class of Claims against or Interests in the Debtors as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

45.     "*Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

46.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

47.     "*Confirmation Date*" means the date on which Confirmation occurs.

48.     "*Confirmation Hearing*" means the hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code at which the Debtors will seek Confirmation of the Plan.

49.     "*Confirmation Order*" has the meaning ascribed to it in the Asset Purchase Agreement.

50.     "*Consummation*" means the occurrence of the Effective Date.

51.     "*Contributed Third-Party Claims*" means all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform; (b) all Causes of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) all Causes of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided*, *however*, that Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors; (ii) any direct claims against the Released Parties; (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties; or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the currently filed complaint, dated as of July 6, 2022, in the Ontario Superior Court of Justice by Francine De Sousa, against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.

52.     "*Contributing Claimants*" means any Holders of Claims or Interests that elect on their ballots or opt-in forms to contribute their Contributed Third-Party Claims to the Wind-Down Debtor.

53.     "*Cryptocurrency*" means a digital currency or crypto asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a centralized authority, including stablecoins, digital coins and tokens, such as security tokens, utility tokens and governance tokens.

5

54.    "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

55.    "*Customer Onboarding Protocol*" means the protocol describing the process of onboarding Account Holders and Holders of OpCo General Unsecured Claims onto the Binance.US Platform, the form of which shall be included in the Plan Supplement and filed no later than by February 8, 2023, and which shall be in a form acceptable to the Purchaser.

56.    "*D&O Carriers*" means the insurance carriers of the D&O Liability Insurance Policies.

57.    "*D&O Liability Insurance Policies*" means all unexpired insurance policies maintained by the Debtors, the Wind-Down Debtor, or the Estates as of the Effective Date that have been issued (or provide coverage) regarding directors', managers', officers', members', and trustees' liability (including any "tail policy"), including but not limited to the Management Liability Policy, the Excess Policies, and the Side-A Policy, and all agreements, documents, or instruments relating thereto.

58.    "*D&O Settlement*" means the settlement between the Debtors and CEO and CCO as set forth in Article IV.G of the Plan.

59.    "*Debtors*" means, collectively, each of the following:  Voyager Digital Holdings, Inc.; Voyager Digital Ltd.; and Voyager Digital, LLC.

60.    "*Definitive Documents*" means:  (a) the Plan (and any and all exhibits, annexes, and schedules thereto); (b) the Confirmation Order; (c) the Disclosure Statement and the other Solicitation Materials; (d) the Disclosure Statement Order; (e) all pleadings filed by the Debtors in connection with the Chapter 11 Cases (or related orders); (f) the Plan Supplement; (g) the Employee Transition Plan; (h) any new material employment, consulting, or similar agreements entered into between the Wind-Down Debtor and any of the Debtors' employees, if any; (i) the Asset Purchase Agreement; (j) the Customer Onboarding Protocol; and (k) any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments or other documents reasonably desired or necessary to consummate and document the transactions contemplated by the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements made from time to time thereto).

61.    "*Disclosure Statement*" means the *Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, as may be amended, supplemented, or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan.

62.    "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement.

63.    "*Disputed*" means a Claim or an Interest or any portion thereof:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order; and (c) with respect to which a party in interest has Filed a Proof of Claim, a Proof of Interest, or otherwise made a written request to a Debtor for payment.

64.    "*Disputed Claims Reserve*" means an appropriate reserve in an amount to be determined by the Wind-Down Debtor for distributions on account of Disputed Claims that are subsequently Allowed after the Effective Date, in accordance with Article VII.D hereof.

65.    "*Distributable Cryptocurrency*" means all Cryptocurrency held on the Voyager platform or that is otherwise property of any Debtor on the Effective Date after payment in full of, or reserve for, all Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims.

66.    "*Distributable HoldCo Cash*" means HoldCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at HoldCo in full; and (y) to fund HoldCo's Pro Rata share of the Wind-Down Budget.

67.    "*Distributable OpCo Cash*" means OpCo's Cash, including the Purchase Price Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at OpCo in full; and (y) to fund OpCo's Pro Rata share of the Wind-Down Budget.

68.    "*Distributable TopCo Cash*" means TopCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at TopCo in full; and (y) to fund TopCo's Pro Rata share of the Wind-Down Budget.

69.    "*Distribution Agent*" means, as applicable, the Purchaser, the Debtors, the Wind-Down Debtor or any Entity or Entities designated by the Purchaser, the Debtors, or the Wind-Down Debtor to make or to facilitate distributions that are to be made pursuant to the Plan, Definitive Documents, and Asset Purchase Agreement.

70.    "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Wind-Down Debtor, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims or Allowed Interests entitled to receive distributions under the Plan.

71.    "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims and Interests against the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date, or such other date as is determined by the Debtors or designated by an order of the Bankruptcy Court.

72.    "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.

73.    "*Employee Transition Plan*" has the meaning set forth in Article IV.E of the Plan, and which shall be in form and substance reasonably acceptable to the Committee.

74.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

75.    "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

76.    "*Excess Policies*" means, collectively, the Excess Insurance Policy, No. EFI1203041-01, issued by Euclid Financial on behalf of Certain Underwriters of Lloyd's, London, the Excess Insurance Policy, No. RILEDOA3392022, issued by Relm Insurance Ltd., both for the February 22, 2022 to

7

February 22, 2023 period, and the Excess Policy, No. ELU184180-23, issued by XL Specialty Insurance Company, for the February 22, 2022 to July 1, 2023 period.

77.    "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) the Committee, and each of the members thereof, solely in their capacity as such; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; and (e) the Distribution Agent.

78.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

79.    "*Existing Equity Interests*" means any Interest in TopCo existing immediately prior to the occurrence of the Effective Date.

80.    "*Extended Outside Date*" has the meaning set forth in the Asset Purchase Agreement.

81.    "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

82.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing, respectively, in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee, or, with respect to the filing of a Proof of Claim or Proof of Interest, file, filed, or filing, respectively, with the Claims, Noticing, and Solicitation Agent.

83.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

84.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal that has been or may be taken or any petition for certiorari or any motion for a new trial, reargument, reconsideration, or rehearing that has been or may be made or filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the motion for a new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order (if any such motion has been or may be granted), or have otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

85.    "*FTX*" means FTX Trading, Ltd. and any of its Affiliates or subsidiaries, including West Realm Shires Inc (d/b/a "FTX.US").

86.    "*FTX Bankruptcy Proceeding*" means that certain chapter 11 proceeding captioned *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

87.    "*FTX Claims*" means the claims or causes of action asserted or assertable by the Debtors against FTX, whether in the FTX Bankruptcy Proceeding or otherwise.

88.    "*FTX Recovery*" means the recovery, if any, of the Debtors from FTX on account of the FTX Claims.

89.    "*FTX Settlement*" means the settlement between the Debtors, the Committee, FTX, Alameda, and the official committee of unsecured creditors in the FTX Bankruptcy Proceeding, pursuant to the terms set forth in the *Debtors' Motion for Entry of an Order Approving the Joint Stipulation and Agreed Order Between the Voyager Debtors, the FTX Debtors, and Their Respective Official Committees of Unsecured Creditors* [Docket No. 1106].

90.    "*General Unsecured Claim*" means, collectively, any HoldCo General Unsecured Claim, OpCo General Unsecured Claim, or TopCo General Unsecured Claim.

91.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

92.    "*Government Bar Date*" means the applicable deadline by which Proofs of Claim by a Governmental Unit must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

93.    "*HoldCo*" means Voyager Digital Holdings, Inc.

94.    "*HoldCo General Unsecured Claim*" means any Claim against HoldCo that is not Secured and is not:  (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; or (h) an Intercompany Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, against HoldCo are HoldCo General Unsecured Claims.

95.    "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

96.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

97.    "*Insurance Policies*" means any and all insurance policies entered into by the Debtors, including the D&O Insurance Policies.

98.    "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor.

99.    "*Intercompany Interest*" means, other than an Interest in Voyager, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

100.    "*Interest*" means any equity security (as such term is defined in section 101(16) of the Bankruptcy Code) including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in an Entity whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, and including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

101.    "*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Docket No. 236].

102.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001 and the rules and regulations promulgated thereunder, as applicable to the Chapter 11 Cases.

103.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

104.    "*Liquidation Procedures*" means, in the event the Sale Transaction is not consummated by the Outside Date, such procedures filed by the Wind-Down Debtor identifying the mechanics and procedures to effectuate the Liquidation Transaction.

105.    "*Liquidation Transaction*" means, in the event the Sale Transaction is not consummated by the Outside Date, the distribution of the Debtors' Cryptocurrency, Cash and other assets pursuant to Article IV.D of this Plan.

106.    "*Management Liability Policy*" means the Executive and Corporate Securities Liability Insurance Policy, No. ELU181214-22, issued by XL Specialty Insurance Company for the February 22, 2022 to February 22, 2023 period.

107.    "*Money Transmitter License*" means any consent, license, certificate, franchise, permission, variance, clearance, registration, qualification, authorization, waiver, exemption or other permit issued, granted, given or otherwise made available by or under the authority of any Governmental Unit pursuant to state money transmission or similar laws.

108.    "*Net Owed Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

109.    "*Non-Released D&O Claims*" has the meaning set forth in Article IV.F of the Plan.

110.    "*Non-Released D&O Claim Budget*" means the amount allocated to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims, which amount shall be agreed upon between the Debtors and the Committee prior to the Confirmation Hearing.

111.    "*Non-Released Insurance Claims*" has the meaning set forth in Article IV.F of the Plan.

112.    "*OpCo*" means Voyager Digital, LLC.

113.    "*OpCo General Unsecured Claim*" means any Claim against OpCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Account Holder Claim; or (h) an Intercompany Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation against OpCo are OpCo General Unsecured Claims.

114.    "*OSC*" means the Ontario Securities Commission.

115.    "*Other Priority Claim*" means any Claim against a Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

116.    "*Outside Date*" has the meaning set forth in the Asset Purchase Agreement.  All references herein to the "Outside Date" shall be deemed to include the "Extended Outside Date" to the extent the Outside Date is extended in accordance with Section 8.1(c) of the Asset Purchase Agreement.

117.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

118.    "*Petition Date*" means July 5, 2022.

119.    "*Plan*" means this joint chapter 11 plan and all exhibits, supplements, appendices, and schedules hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with Article X.A hereof, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

120.    "*Plan Administrator*" means the Person or Persons selected by the Committee, after consultation with the Debtors, subject to the approval of the Bankruptcy Court and identified in the Plan Supplement, to serve as the administrator(s) of the Wind-Down Debtor, and any successor thereto, appointed pursuant to the Plan Administrator Agreement.

121.    "*Plan Administrator Agreement*" means that certain agreement by and among the Debtors, the Committee, the Plan Administrator and the Wind-Down Debtor, which shall be included in the Plan Supplement in a form reasonably acceptable to the Committee.

122.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may thereafter be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Plan, the Bankruptcy Code, the Bankruptcy Rules, and applicable law), to be Filed by the Debtors no later than seven days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.  The Plan Supplement may include the following, as applicable:  (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Retained Causes of Action; (c) the Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases; (d) the Customer Onboarding Protocol; (e) the Restructuring Transactions Memorandum; (f) the Plan Administrator Agreement; (g)  the Employee Transition Plan; and (h) any additional documents necessary to effectuate or that is contemplated by the Plan, including any compensation program for any of the Debtors' employees to be established as contemplated in the Plan and the Definitive Documents to facilitate the transfer of Acquired Assets pursuant to the Asset Purchase Agreement and the wind-down of the Debtors' Estates; *provided* that the Schedule of Retained Causes of Action shall be filed no later than 14 days before the Voting Deadline.  The Plan Supplement (and the contents thereof) shall be (x) subject to Purchaser's consent rights solely to the extent set forth under the Asset Purchase Agreement (and shall otherwise be consistent with the Asset Purchase Agreement) and (y) reasonably acceptable to the Committee.

123.    "*Priority Tax Claim*" means any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

124.    "*Pro Rata*" means the proportion that (i) an Allowed Claim or an Allowed Interest in a particular Class bears to (ii) the aggregate amount of Allowed Claims or Allowed Interests in that Class and, solely with respect to Claims in Classes 3 and 4(a), the proportion that an Allowed Claim in either such Class bears to the aggregate amount of Allowed Claims in Classes 3 and 4(a) in the aggregate, unless otherwise indicated.  For purposes of calculating Pro Rata distributions if the Sale Transaction is consummated by the Outside Date, the Pro Rata shares of all Holders of Allowed Claims or Allowed

Interests shall be calculated taking into account the Acquired Coins Value of the Net Owed Coins distributed to each of the Account Holders.

125.    "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

126.    "*Professional Fee Claim*" means any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

127.    "*Professional Fee Escrow Account*" means an escrow account funded by the Debtors with Cash no later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

128.    "*Professional Fee Escrow Amount*" means the aggregate amount of quarterly U.S. Trustee fees, Professional Fee Claims, and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, which shall be estimated pursuant to the method set forth in Article II.B of the Plan.

129.    "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

130.    "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

131.    "*Purchase Price Cash*" means the Cash paid by the Purchaser to OpCo pursuant to the Asset Purchase Agreement.

132.    "*Purchaser*" means Binance US.

133.    "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

134.    "*Related Party*" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

135.    "*Released Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Committee, and each of the members thereof; (c) each of the Released Professionals; (d) Purchaser and each of its Related Parties; and (e) each of the Released Voyager Employees (subject to

the limitations contained in Article IV.F and Article IV.G of the Plan); *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

136.    "*Released Professionals*" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable):  (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Fasken Martineau DuMoulin LLP; (vii) Campbells Legal (BVI); (viii) McDermott Will & Emery LLP; (ix) FTI Consulting, Inc.; (x) Epiq Corporate Restructuring, LLC; (xi) Cassels, Brock & Blackwell LLP; (xii) Paul Hastings LLP; (xiii) Harney Westwood & Riegels LP (BVI); (xiv) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xv) Jenner & Block LLP; (xvi) Seyfarth Shaw LLP; (xvii) Alvarez & Marsal Canada Inc.; (xviii) Blake, Cassels & Graydon LLP; (xix) Jaffe Raitt Heuer & Weiss; (xx) Latham & Watkins LLP; (xxi) Lowenstein Sandler LLP; (xxii) Kramer Levin LLP; and (xxiii) Acura Law Firm; *provided* that if the Asset Purchase Agreement is terminated, Latham & Watkins LLP shall not be a "Released Professional" under the Plan.

137.    "*Released Voyager Employees*" means all directors, officers, and Persons employed by each of the Debtors and their Affiliates serving in such capacity on or after the Petition Date but before the Effective Date (subject to the limitations contained in Article IV.F and Article IV.G of the Plan).

138.    "*Releasing Parties*" means, collectively, in each case in its capacity as such:  (a) the Debtors; (b) the Committee, and each of the members thereof; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; (e) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (f) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (g) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (h) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

139.    " *Restructuring Transactions* " means those mergers, amalgamations, consolidations, reorganizations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Committee jointly determine to be necessary to implement the transactions described in this Plan, as described in more detail in Article IV.B herein and the Restructuring Transactions Memorandum.

140.    "*Restructuring Transactions Memorandum*" means that certain memorandum as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the Restructuring Transactions, the form of which shall be included in the Plan Supplement, and which shall be in a form reasonably acceptable to the Committee.

141.    "*Robertson Class Action*" means that certain putative class action litigation filed in the United States District Court for the Southern District of Florida, captioned *Robertson, et al. v. Cuban, et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022).

142.    "*Sale Transaction*" means the sale of certain of the Debtors' assets and all other transactions pursuant to the Asset Purchase Agreement.

143.    "*Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance acceptable to the Purchaser and in all respects consistent with the terms of the Asset Purchase Agreement, of certain

Executory Contracts and Unexpired Leases to be assumed by the Debtors and assigned to the Purchaser pursuant to the Plan and Asset Purchase Agreement, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Debtor, as applicable, in accordance with the Plan.

144.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance reasonably acceptable to the Committee, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Debtor, as applicable, in accordance with the Plan.

145.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, settled, compromised, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors and/or the Wind-Down Debtor, which shall be included in the Plan Supplement.  For the avoidance of doubt, any failure to specifically list any Causes of Action on the Schedule of Retained Causes of Action shall not be deemed a waiver or admission that any such Cause of Action does not constitute Vested Causes of Action.

146.    "*Schedules*" means, collectively, the schedules of assets and liabilities, Schedule of Assumed Executory Contracts and Unexpired Leases, Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may have been or may be amended, modified, or supplemented from time to time.

147.    "*SEC*" means the United States Securities and Exchange Commission.

148.    "*Section 510(b) Claim*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code.

149.    "*Secured*" means, when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a secured Claim.

150.    "*Secured Tax Claim*" means any Secured Claim against a Debtor that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

151.    "*Securities Act*" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

152.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

153.    "*Side-A Policy*" means the Cornerstone A-Side Management Liability Policy, ELU184179-22, issued by XL Specialty Insurance Company, for the July 1, 2022 to July 1, 2023 period.

154.    "*Solicitation Materials*" means all solicitation materials with respect to the Plan.

155.    "*Special Committee*" means the special committee established at OpCo, comprised of two independent directors, to conduct the Special Committee Investigation.

156.    "*Special Committee Investigation*" means that certain investigation undertaken by the Special Committee into certain historical transactions, as more fully described in the Disclosure Statement.

157.    "*Supported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

158.    "*TopCo*" means Voyager Digital Ltd., a Canadian corporation that is publicly traded on the Toronto Stock Exchange.

159.    "*TopCo General Unsecured Claim*" means any Claim against TopCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; (h) an Intercompany Claim; or (i) a Section 510(b) Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, other than 510(b) Claims, against TopCo are TopCo General Unsecured Claims.

160.    "*Transferred Creditors*" means Account Holders and Holders of Allowed OpCo General Unsecured Claims who have completed all documentation and "KYC" processes reasonably required by Purchaser in the ordinary course of Purchaser's business with respect to similarly situated clients and who have opened a Binance US Account as of the date that is three (3) months following the later of the Closing Date (as defined in the Asset Purchase Agreement) or such later date as may be specified in the Customer Onboarding Protocol, and the successors and assigns of such Holders.

161.    "*Transferred Cryptocurrency Value*" means the aggregate VWAP of any Cryptocurrency that is the subject of an Additional Bankruptcy Distribution as of the date that is two Business Days prior to such Additional Bankruptcy Distribution.

162.    "*U.S. Trustee*" means the Office of the United States Trustee for Region 2.

163.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that, after the expiration of six months after the Effective Date, has not:  (a) accepted a distribution, (b) given notice to the Wind-Down Debtor of an intent to accept a particular distribution, (c) responded to the Debtors' or Wind-Down Debtor's requests for information necessary to facilitate a particular distribution, or (d) taken any other action necessary to facilitate such distribution.

164.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

165.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

166.    "*Unsupported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

167.    "*Unsupported Jurisdiction Approval*" has the meaning ascribed to it in the Asset Purchase Agreement.

168.    "*Vested Causes of Action*" means the Causes of Action vesting in the Wind-Down Debtor pursuant to Article IV.L of the Plan, including, but not limited to, those Causes of Action enumerated on the Schedule of Retained Causes of Action, which shall be included in the Plan Supplement and in all respects consistent with the terms of the Asset Purchase Agreement.

169.    "*VGX*" means Voyager Token, that certain Cryptocurrency issued by the Debtors.

170.    "*Voting Deadline*" means February 22, 2023.

171.    "*Voyager*" means Voyager Digital Ltd. and its direct and indirect Affiliates.

172.    "*VWAP*" means, with respect to any type of Cryptocurrency and as of any date of determination, an amount equal to the volume weighted average price in U.S. dollars for such type of Cryptocurrency for the consecutive 24-hour period immediately prior to 8:00 a.m. New York Time on such date of determination, as reported on https://coinmarketcap.com.

173.    "*Wind-Down Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, and as described in Article IV.H to, among other things, effectuate the wind-down of the Debtors and the Wind-Down Debtor, commence, litigate and settle the Vested Causes of Action that are not released, waived, settled, compromised, or transferred under the Plan and make distributions pursuant to the terms of the Plan and the Plan Administrator Agreement; *provided* that, for the avoidance of doubt, the Wind-Down Debtor shall not conduct any business operations or continue the Debtors' business operations after the Effective Date.

174.    "*Wind-Down Debtor Assets*" means any assets of the Debtors transferred to, and vesting in, the Wind-Down Debtor pursuant to the Plan Administrator Agreement, which, in the event the Sale Transaction is consummated, shall exclude the Acquired Assets, and which shall include, without limitation but only to the extent the following are not Acquired Assets, (a) the Wind-Down Reserve, (b) the Net-Owed Coins to be distributed to Account Holders in Supported Jurisdictions until such Account Holders complete the Purchaser's onboarding requirements in accordance with the Asset Purchase Agreement, (c) the Net-Owed Coins to be distributed to Account Holders in Unsupported Jurisdictions to the extent the Purchaser has not obtained the applicable Unsupported Jurisdiction Approval in accordance with Section 6.12 of the Asset Purchase Agreement, (d) any distributions to Account Holders or Holders of OpCo General Unsecured Claims that are returned to the Wind-Down Debtor pursuant to Section 6.12(e) of the Asset Purchase Agreement, (e) 3AC Claims and 3AC Recovery, (f) FTX Claims and FTX Recovery, (g) Alameda Claims and Alameda Recovery, (h) the Non-Released D&O Claims, and (i) the Vested Causes of Action.

175.    "*Wind-Down Debtor Beneficiaries*" means the Holders of Allowed Claims or Allowed Interests that are entitled to receive distributions pursuant to the terms of the Plan, whether or not such Claims or Interests are Allowed as of the Effective Date.

176.    "*Wind-Down Debtor Expenses*" means all actual and necessary costs and expenses incurred by the Wind-Down Debtor or Plan Administrator in connection with carrying out the obligations of the Wind-Down Debtor pursuant to the terms of the Plan and the Plan Administrator Agreement.

177.    "*Wind-Down Debtor Oversight Committee*" means the oversight committee tasked with overseeing the Wind-Down Debtor in accordance with the Plan and the Plan Administrator Agreement.

178.    "*Wind-Down Budget*" means the budget to fund the Wind-Down Debtor, which will be included in the Plan Supplement.

179.    "*Wind-Down Reserve*" means the amount set forth in the Wind-Down Budget to fund the Wind-Down Debtor.

## B.    Rules of Interpretation

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (3) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (4) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter have been or may thereafter be validly amended, amended and restated, supplemented, or otherwise modified; (5) unless otherwise specified, any reference to an Entity as a Holder of a Claim or Interest, includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) unless otherwise specified, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases; (14) any effectuating provisions may be interpreted by the Debtors or the Wind-Down Debtor in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (15) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (16) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (18) the use of "include" or "including" is without limitation unless otherwise stated.

## C.    Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## D.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving

effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control); *provided* that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Wind-Down Debtor, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

**E.      Reference to Monetary Figures**

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

**F.      Reference to the Debtors or the Wind-Down Debtor**

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Wind-Down Debtor mean the Debtors and the Wind-Down Debtor, as applicable, to the extent the context requires.

**G.      Nonconsolidated Plan**

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

# ARTICLE II.

## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

**A.      Administrative Claims**

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), unless previously Filed, requests for payment of Allowed Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code) must be Filed and served on the Wind-Down Debtor pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied as of the Effective Date without the need for any objection from the Wind-Down Debtor or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Objections to such requests, if any, must be Filed and served on the Wind-Down Debtor and the requesting party by the Claims Objection Bar Date for Administrative Claims. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive an amount of Cash equal to the amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down Debtor, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court. Any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned to the sender in full.

Objections to requests for payment of such Administrative Claims, if any, must be Filed with the Bankruptcy Court and served on the Wind-Down Debtor and the requesting Holder no later than the Claims Objection Bar Date for Administrative Claims. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

**B.    Professional Fee Claims**

1.    Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than sixty (60) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules. The Wind-Down Debtor shall pay Professional Fee Claims in Cash to such Professionals in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Debtor's obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

2.    Professional Fee Escrow Account

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and the U.S. Trustee and for no other Entities until all quarterly U.S. Trustee fees and all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the U.S. Trustee or to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Wind-Down Debtor. When all

Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, and all U.S. Trustee quarterly fees plus statutory interest, if any, have been paid in full, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Wind-Down Debtor without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

        3.       <u>Professional Fee Escrow Amount</u>

The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided* that the Wind-Down Debtor shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

        4.       <u>Post-Confirmation Date Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors and/or the Wind-Down Debtor, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Wind-Down Debtor. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtor may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

For the avoidance of doubt, no Administrative Claims, Professional Fee Claims, or any other post-confirmation fees and expenses shall be paid prior to payment of any quarterly fees due and outstanding to the U.S. Trustee.

**C.**      **Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.

## CLASSIFICATION, TREATMENT,
## AND VOTING OF CLAIMS AND INTERESTS

**A.      Classification of Claims and Interests**

          Except for the Claims addressed in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

**B.      Summary of Classification**

          A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is set forth in the following chart.  The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below applies separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.E hereof.  Voting tabulations for recording acceptances or rejections of the Plan will be conducted on a Debtor-by-Debtor basis as set forth above.[1]

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| 4A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

---

[1]      The Debtors reserve the right to separately classify Claims or Interests to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**C.    Treatment of Classes of Claims and Interests**

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or Wind-Down Debtor, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable.  In no event shall any Holder of a Claim receive more than such Holder's Allowed amount on account of such Claim.

1.    <u>Class 1 —Secured Tax Claims</u>

(a)    *Classification*:  Class 1 consists of all Secured Tax Claims.

(b)    *Treatment*:  Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down Debtor, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired.

(c)    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Secured Tax Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Secured Tax Claims are not entitled to vote to accept or reject the Plan.

2.    <u>Class 2 — Other Priority Claims</u>

(a)    *Classification*:  Class 2 consists of all Other Priority Claims.

(b)    *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

(c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f)

of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.     Class 3 — Account Holder Claims

(a)     *Classification*:  Class 3 consists of all Account Holder Claims.

(b)     *Allowance*: Account Holder Claims shall be conclusively Allowed in the amount listed on OpCos's *Amended Schedules of Assets and Liabilities* (Case No. 22-10945) [Docket No. 18]; *provided* that the rights of any Holder of an Account Holder Claim to object to the scheduled amount shall be preserved.  To the extent an Account Holder Claim is Allowed in a greater amount than the scheduled amount of such Account Holder Claim, such Holder shall be entitled to a subsequent distribution such that it will receive its Pro Rata share of recoveries to Holders of Allowed Account Holder Claims.  Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

(c)     *Treatment*:  Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim:

(i)     If the Sale Transaction is consummated by the Outside Date:

A.     its Net Owed Coins, as provided in and subject to the requirements of Sections 6.10 and 6.12 of the Asset Purchase Agreement; *provided* that for Account Holders in Supported Jurisdictions who do not complete the Purchaser's onboarding requirements within three (3) months following the Closing Date and Account Holders in Unsupported Jurisdictions and only to the extent that the Purchaser does not obtain the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides within 6 months following the Closing Date (as defined in the Asset Purchase Agreement), such Account Holders shall receive, after expiration of such time period, value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated;

B.     its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

C.     its Pro Rata share of Distributable OpCo Cash; and

D.     to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed

Secured Tax Claims, and Allowed Other Priority Claims at OpCo;

*provided* that distributions made to any Account Holder pursuant to clauses (B), (C), and (D) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder; or

(ii)    If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

A.    its Pro Rata share of Distributable OpCo Cash;

B.    its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and

C.    to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo.

(d)    *Voting:* Class 3 is Impaired under the Plan. Holders of Allowed Account Holder Claims are entitled to vote to accept or reject the Plan.

4.    <u>Class 4A — OpCo General Unsecured Claims</u>

(a)    *Classification*: Class 4A consists of all OpCo General Unsecured Claims.

(b)    *Treatment*: Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:

(i)    If the Sale Transaction is consummated by the Outside Date:

A.    its Pro Rata share of Distributable Cryptocurrency in Cash;

B.    its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

C.    its Pro Rata share of Distributable OpCo Cash; and

D.    to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo; or

(ii)    If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

A.    its Pro Rata share of Distributable Cryptocurrency in Cash;

B.    its Pro Rata share of Distributable OpCo Cash; and

C.    to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo.

(c)    *Voting*: Class 4A is Impaired under the Plan. Holders of Allowed OpCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.    <u>Class 4B — HoldCo General Unsecured Claims</u>

(a)    *Classification*: Class 4B consists of all HoldCo General Unsecured Claims.

(b)    *Treatment*: Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim:

(i)    its Pro Rata share of Distributable HoldCo Cash; and

(ii)    to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to HoldCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to HoldCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at HoldCo.

(c)     *Voting*:  Class 4B is Impaired under the Plan.  Holders of Allowed HoldCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

6.     <u>Class 4C — TopCo General Unsecured Claims</u>

(a)     *Classification*:  Class 4C consists of all TopCo General Unsecured Claims.

(b)     *Treatment*:  Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim:

(i)     its Pro Rata share of Distributable TopCo Cash; and

(ii)    to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable at TopCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at TopCo.

(c)     *Voting*:  Class 4C is Impaired under the Plan.  Holders of Allowed TopCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

7.     <u>Class 5 — Alameda Loan Facility Claims</u>

(a)     *Classification*:  Class 5 consists of all Alameda Loan Facility Claims.

(b)     *Treatment*:  If the FTX Settlement becomes effective, each Holder of an Allowed Alameda Loan Facility Claim shall, at the election of the Debtors with the consent of the Committee, in their sole discretion, following written notice to counsel to FTX, Alameda and to the official committee of unsecured creditors in the FTX Bankruptcy Proceeding of such election, which written notice shall be given no later than the date that is thirty (30) days after the Confirmation Hearing, (a) withdraw its Alameda Loan Facility Claims in their entirety, with prejudice to FTX or any other party reasserting such claims, or (b) contribute the Alameda Loan Facility Claims to OpCo.  If the FTX Settlement does not become effective, the Alameda Loan Facility Claims shall be subordinated to all Allowed Claims at OpCo, HoldCo, and TopCo, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, Allowed OpCo General Unsecured Claims, Allowed HoldCo General Unsecured Claims, and Allowed TopCo General Unsecured Claims; *provided, however*, if the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity.

(c)     *Voting*:  Class 5 is Impaired under the Plan.  Holders of Allowed Alameda Loan Facility Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Alameda Loan Facility Claims are not entitled to vote to accept or reject the Plan.

8.   <u>Class 6 — Section 510(b) Claims</u>

 (a) *Classification*:  Class 6 consists of all Section 510(b) Claims against TopCo.

 (b) *Allowance*:  Notwithstanding anything to the contrary herein, a Section 510(b) Claim against TopCo, if any such Section 510(b) Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

 (c) *Treatment*:  Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to TopCo shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims at TopCo.

 (d) *Voting*:  Class 6 is Impaired under the Plan.  Holders (if any) of Allowed Section 510(b) Claims against TopCo are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders (if any) of Allowed Section 510(b) Claims against TopCo are not entitled to vote to accept or reject the Plan.

9.   <u>Class 7 — Intercompany Claims</u>

 (a) *Classification*:  Class 7 consists of all Intercompany Claims.

 (b) *Treatment*:  Each Intercompany Claim shall receive the treatment for such Intercompany Claim as determined by the Bankruptcy Court.

 (c) *Voting*:  Holders of Intercompany Claims are either Unimpaired or Impaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

10.   <u>Class 8 — Intercompany Interests</u>

 (a) *Classification*:  Class 8 consists of all Intercompany Interests.

 (b) *Treatment*:  On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum.

 (c) *Voting*:  Holders of Intercompany Interests are either Unimpaired or Impaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

11. <u>Class 9 — Existing Equity Interests</u>

(a)    *Classification*:  Class 9 consists of all Existing Equity Interests.

(b)    *Treatment*:  Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Debtor Assets attributable at TopCo shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims at TopCo.

(c)    *Voting*:  Class 9 is Impaired under the Plan.  Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

**D.    Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Wind-Down Debtor's rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**F.    Subordinated Claims**

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Debtor reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**G.    Intercompany Interests**

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure given the existing intercompany systems connecting the Debtors and their Affiliates, and in exchange for the Debtors' and Wind-Down Debtor's agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

### H.    Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims or Interests. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE IV.

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

### A.    General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

### B.    Restructuring Transactions

On or before the Effective Date, the applicable Debtors will take any action as may be necessary or advisable to effectuate the Restructuring Transactions described in the Plan, the Restructuring Transactions Memorandum, and the Customer Onboarding Protocol, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) the transfer or distribution of any Cryptocurrency or Cash pursuant to the Asset Purchase Agreement, or the Liquidation Procedures, as applicable; (5) the execution and delivery of the Plan Administrator Agreement; (6) any transactions necessary or appropriate to form or convert into

29

the Wind-Down Debtor; (7) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (8) all transactions necessary to provide for the purchase of the Acquired Assets by Purchaser under the Asset Purchase Agreement; and (9) all other actions that the applicable Entities determine to be necessary or appropriate, or that are reasonably requested by the Purchaser in accordance with the Asset Purchase Agreement, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

## C.    The Sale Transaction

If the Sale Transaction is consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the following terms shall govern:

On or prior to the Effective Date, the Debtors shall have consummated the Sale Transaction, and, among other things, the Acquired Assets and Assumed Liabilities shall have transferred to the Purchaser free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and the Purchaser shall pay to the Debtors or Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims, as applicable, the proceeds from the Sale Transaction, as and to the extent provided for in the Asset Purchase Agreement, and this Plan.  The Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down Debtor, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Asset Purchase Agreement the Customer Onboarding Protocol, and this Plan.  The Debtors shall be authorized to sell any Cryptocurrency to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.  On and after the Effective Date, except as otherwise provided in the Plan and the Plan Administrator Agreement, the Wind-Down Debtor, or the Purchaser, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

Notwithstanding anything contained in this Plan and any Definitive Documents, if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, all provisions contained in this Plan and the Definitive Documents governing the Sale Transaction shall have no further force and effect, and the provisions governing the Liquidation Transaction shall govern.  The rights and remedies of the Seller and Purchaser under the Asset Purchase Agreement and any related orders of the Bankruptcy Court shall be expressly preserved.

## D.    The Liquidation Transaction

If the Sale Transaction is not consummated by the Outside Date, pursuant to the Asset Purchase Agreement, then the following terms shall govern:

1.       *The Liquidation Transaction*

On or after the Outside Date, the Debtors will pursue the Liquidation Transaction in accordance with the Liquidation Procedures. Pursuant to the Liquidation Transaction, the Debtors, the Wind-Down Debtor, or the Plan Administrator, as applicable, will distribute certain of the Cryptocurrency in-kind to Holders of Account Holder Claims in accordance with Article III.C of the Plan, transfer all Wind-Down Debtor Assets to the Wind-Down Debtor, liquidate certain of the Cryptocurrency, distribute Cash to Holders of Claims, wind down and dissolve the Debtors, and pursue final administration of the Debtors' Estates pursuant to the Bankruptcy Code.

The Debtors, or the Wind-Down Debtor, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Liquidation Transaction pursuant to this Plan. On or before the date that is twenty-one days prior to the anticipated commencement of the Liquidation Transaction, the Debtors, or the Wind-Down Debtor, as applicable, shall file the Liquidation Procedures with the Bankruptcy Court. Parties in interest shall have ten days to object to the Liquidation Procedures, and if no objections are timely filed, the Liquidation Procedures shall be approved. In the event of a timely objection, the Bankruptcy Court shall adjudicate any objection to the Liquidation Procedures.

On and after the Effective Date, except as otherwise provided in the Plan, the Plan Administrator Agreement, and the Liquidation Procedures, the Debtors or the Wind-Down Debtor, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

2.       *Cryptocurrency Rebalancing*

Prior to the Effective Date the Debtors shall, in consultation with the Committee, be authorized to rebalance their Cryptocurrency portfolio to ensure that the Debtors can effectuate *pro rata* in-kind distributions of the Distributable Cryptocurrency according to Article III.C.3(c) of this Plan, *provided* that such rebalancing shall be in accordance with the Asset Purchase Agreement (if the Asset Purchase Agreement has not been terminated). The Debtors may effectuate such rebalancing by (i) selling such Cryptocurrency that cannot be distributed to Account Holders, (ii) purchasing Cryptocurrency supported by Voyager's or Purchaser's platform (as provided by the Asset Purchase Agreement) that shall be distributed to Account Holders, and (iii) engaging in any other transaction, including the execution of trades of Cryptocurrency, necessary or appropriate to effectuate distributions of the Distributable Cryptocurrency to Holders of Allowed Account Holder Claims.

**E.      Employee Transition Plan**

The Debtors shall be authorized to implement the Employee Transition Plan, the terms of which shall be reasonably acceptable to Purchaser and the Committee and included in the Plan Supplement. The Employee Transition Plan shall help ensure that employees are available to provide transition services to the Debtors and/or the Wind-Down Debtor to effectuate the Sale Transaction and to wind down the Debtors' Estates.

### F. Non-Released D&O Claims

Any Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' CEO and/or CCO (regardless of any fiduciary capacity in which such individuals were acting) that are expressly related to approval of the 3AC Loan are not released pursuant to the Plan (collectively, the "Non-Released D&O Claims"), and shall be assigned and transferred to the Wind-Down Debtor to be pursued, settled, or resolved by the Wind-Down Debtor in accordance with the terms of Article IV.G of this Plan and subject to the Wind-Down Budget. Any claims against the D&O Carriers that the Debtors' insurance transactions within the 90 days prior to the Petition Date are avoidable under the Bankruptcy Code, applicable state law, or both (the "Non-Released Insurance Claims") shall be assigned and transferred to the Wind-Down Debtor to be pursued, settled, or resolved solely by the Wind-Down Debtor in accordance with the terms of Article IV.G of this Plan. The Wind-Down Debtor shall be a successor to the Debtors' rights, title, and interest in any Non-Released D&O Claims and Non-Released Insurance Claims, and the Wind-Down Debtor shall have standing to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims in accordance with the terms of Article IV.G of this Plan; *provided* that: (i) any recovery by the Wind-Down Debtor (and the beneficiaries thereof) on account of any Non-Released D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O Liability Insurance Policies (and/or from the D&O Carriers directly) after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims; (ii) any party, including any trustee or any beneficiary of the Wind-Down Debtor, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the Non-Released D&O Claims shall do so solely upon available insurance coverage from the Debtors' available D&O Liability Insurance Policies; and (iii) no party shall (a) record any judgment against the CEO or CCO, or (b) otherwise attempt to collect, directly or indirectly, from the personal assets of the CEO or CCO with respect to the Non-Released D&O Claims. For the avoidance of doubt, this provision does not enjoin, limit, or impair direct claims held by third parties against the Debtors' CEO or CCO (if any) other than any direct claims held by Holders of Claims or Interests that opt into the third-party release in Article VIII.B of this Plan. Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the Non-Released D&O Claims; (y) final resolution of any coverage claims asserted against the Debtors' available D&O Liability Insurance Policies on account of the Non-Released D&O Claims; or (z) exhaustion of the available insurance coverage under the D&O Liability Insurance Policies, the Non-Released D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order. For the avoidance of doubt, any release of the Non-Released D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.

### G. The D&O Settlement

On the Effective Date, the terms of the D&O Settlement shall be effectuated as provided in this Article IV.G.

Pursuant to the D&O Settlement, CEO shall repay the $1,900,000 received from the Debtors on or around February 28, 2022, by paying the after-tax amount of such transfer (approximately $1,125,000) to OpCo in cash and assigning the right, if any, to any tax refund for the balance to the Wind-Down Debtor. CEO shall subordinate any Claims (including any indemnification claims asserted under this Art. IV.F) he holds against the Debtors until all other Holders of Claims are paid in full. CCO shall subordinate 50 percent of any Claims he holds other than indemnification claims (and 100% of any indemnification claims asserted under this Art. IV.F) against the Debtors until all other Holders of Claims are paid in full; *provided*, *however*, that in the event the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO, each as insureds, under the D&O Liability Insurance Policies agree:  (i) not to draw down on the Side-A Policy; *provided*, *however*, that should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Debtor's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise) such officer shall be entitled to seek coverage under the Side-A Policy to the extent any such coverage remains; and (ii) not to object to any settlement by the Debtors or Wind Down Entity of avoidance claims under the Side-A Policy, even if such settlement results in termination of benefits under the Side-A Policy.  For the avoidance of doubt, this agreement is not intended to and shall not alter or amend each of the insureds' duties under the D&O Liability Insurance Policies.  In the event that any insurer under the D&O Liability Insurance Policies denies coverage for any reason, the Wind-Down Debtor shall have the right to bring a coverage claim against the insurer(s) in the name of the insured, the insureds shall reasonably cooperate with respect to any such claim, and the insured may participate at their election (and at their sole cost).  For the avoidance of doubt, nothing contained in this Plan is intended as a waiver or release of the Debtors' and/or Wind-Down Debtor's right to assert any Non-Released D&O Claim, but rather limits such recovery in the manner set forth above.

CEO and CCO shall be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Debtor and retain the right to assert claims for advancement and indemnification up to the limits of any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to CEO and/or CCO based upon or arising out of the lack of a formal claim for indemnification; *provided*, *however*, that any such indemnification or advancement claims shall be subordinated in full unless and until all other Holders of Claims are paid in full; *provided*, *further*, that in the event that any of the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO shall subordinate any and all rights and entitlements under the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd., Policy Number ELU184179-22, to any recovery by the Debtors and/or the Wind-Down Debtor on account of the Debtors' and/or Wind-Down Debtor's claims for the avoidance of the premium paid for the policy.  For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Debtor's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), CEO and/or CCO shall be entitled to seek coverage under the Side-A Policy. CEO and CCO shall remain at, and continue performing the responsibilities of, their respective position(s) with the Debtors and assist with the Debtors' transition for at least 30 days from entry of the Confirmation Order; *provided* that CCO shall have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the CEO shall have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided*, *further*, that both the CEO and CCO shall be available to the Debtors and/or the Wind-Down Debtor for a maximum of five hours per month for the one year following the Effective Date.

In the event that the sworn financial disclosure statements under penalty of perjury provided to the Debtors, the Special Committee and the Committee by CEO and CCO are later determined at any time by Final Order of the Bankruptcy Court or other court of competent jurisdiction to be materially inaccurate, (a) the limitations on recovery by the Wind-Down Debtor under this Article IV.G shall no longer apply, (b) any and all release, exculpation and injunction provisions in Article VIII of this Plan with respect to CEO and/or CCO (as applicable) shall be deemed null and void, (c) all Releasing Parties' rights with respect to the CEO and/or CCO (as applicable) shall be fully intact and preserved, (d) amounts paid by CEO shall not be repaid by the Wind-Down Debtor, and (e) any applicable statute of limitations shall be deemed tolled

33

from the Petition Date to the date of entry of the order referenced above.  The Wind-Down Debtor, as successor to the Debtors, shall have standing to bring a motion seeking relief pursuant to this Article IV.G.

Entry of the Confirmation Order shall be deemed approval of the D&O Settlement and, to the extent not already approved by the Bankruptcy Court, the Debtors or the Wind-Down Debtor, as applicable, are authorized to negotiate, execute, and deliver those documents necessary or appropriate to effectuate the D&O Settlement, without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors, the Wind-Down Debtor, the Committee, and the Special Committee may deem to be necessary to effectuate the D&O Settlement.

## H.    The Wind-Down Debtor

On the Effective Date, the Wind-Down Debtor shall be formed or converted into for the benefit of the Wind-Down Debtor Beneficiaries and each of the Debtors shall transfer the Wind-Down Debtor Assets for distribution in accordance with the terms of the Plan.  The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

### 1.    Establishment of a Wind-Down Debtor

Pursuant to the Plan Administrator Agreement, the Wind-Down Debtor will be established, formed, merged, or converted.  The Wind-Down Debtor shall be the successor-in-interest to the Debtors, and the Wind-Down Debtor shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Debtor Assets.  The Wind-Down Debtor will conduct no business operations and will be charged with winding down the Debtors' Estates.  The Wind-Down Debtor shall be managed by the Plan Administrator and shall be subject to the Wind-Down Debtor Oversight Committee.  The Wind-Down Debtor shall be administered in accordance with the terms of the Plan Administrator Agreement and shall be subject to the Wind-Down Budget and the Non-Released D&O Claim Budget.  For the avoidance of doubt, the Wind-Down Debtor shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset.  The Wind-Down Debtor shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Debtor Assets shall, subject to the Plan Administrator Agreement, be transferred to and vest in the Wind-Down Debtor.  For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Debtor specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.F and Article IV.G.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Debtor and the Plan Administrator shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Plan Administrator Agreement, compromise or settle any Wind-Down Debtor Assets transferred to the Wind-Down Debtor.  On and after the Effective Date, the Wind-Down Debtor and the Plan Administrator may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Debtor Assets transferred to the Wind-Down Debtor or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Debtor and the Plan Administrator on or after the Effective Date, except as otherwise expressly

provided herein and in the Plan Administrator Agreement.  All of the Wind-Down Debtor's activities shall be subject to the Wind-Down Budget and the Non-Released D&O Claim Budget.  The Wind-Down Debtor shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

The Wind-Down Debtor shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors and the Committee, as applicable, in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Debtor Asset without the need for filing any motion for such relief.  On the Effective Date, the Debtors and the Plan Administrator shall execute the Plan Administrator Agreement and shall have established the Wind-Down Debtor pursuant hereto.  In the event of any conflict between the terms of this Article IV.H and the terms of the Plan Administrator Agreement, the terms of the Plan Administrator Agreement shall control.

2.    Wind-Down Debtor Assets

Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional Wind-Down Debtor Assets become available, the Debtors shall be deemed, subject to the Plan Administrator Agreement, to have automatically transferred to the applicable Wind-Down Debtor all of their right, title, and interest in and to all of the Wind-Down Debtor Assets, in accordance with section 1141 of the Bankruptcy Code.  All such assets shall automatically vest in the Wind-Down Debtor free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Interests as set forth herein and the expenses of the Wind-Down Debtor as set forth herein and in the Plan Administrator Agreement.  Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Debtor Assets or the Wind-Down Debtor.

3.    Treatment of Wind-Down Debtor for Federal Income Tax Purposes; No Successor-in-Interest

The Wind-Down Debtor shall be established for the primary purpose of liquidating and distributing the Wind-Down Debtor Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind-Down Debtor.  Accordingly, the Plan Administrator may, in an expeditious but orderly manner, liquidate the Wind-Down Debtor Assets, make timely distributions to the Wind-Down Debtor Beneficiaries and not unduly prolong its duration.  The Wind-Down Debtor shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Wind-Down Debtor Agreement.  The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Wind-Down Debtor expressly for such purpose.

The Wind-Down Debtor is intended to qualify as a "grantor trust" for federal income tax purposes to the extent reasonably practicable, with the Wind-Down Debtor Beneficiaries treated as grantors and owners of the Wind-Down Debtor.  However, with respect to any of the assets of the Wind-Down Debtor that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

35

4.      Appointment of Plan Administrator

The Plan Administrator shall be selected by the Committee, in consultation with the Debtors, and shall be identified in the Plan Supplement.  The appointment of the Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date. The Plan Administrator shall administer the distributions to the Wind-Down Debtor Beneficiaries and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Vested Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan, including Article IV.F and Article IV.G.

In accordance with the Plan Administrator Agreement, the Plan Administrator shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Debtor is dissolved in accordance with the Plan Administrator Agreement, and (ii) the date on which a Plan Administrator resigns, is terminated, or is otherwise unable to serve; *provided*, *however*, that, in the event that a Plan Administrator resigns, is terminated, or is otherwise unable to serve, the Wind-Down Debtor Oversight Committee shall appoint a successor to serve as a Plan Administrator in accordance with the Plan Administrator Agreement.  If the Wind-Down Debtor Oversight Committee does not appoint a successor within the time periods specified in the Plan Administrator Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Debtor, shall approve a successor to serve as a Plan Administrator.

5.      Responsibilities of Plan Administrator

Responsibilities of the Plan Administrator shall be as identified in the Plan Administrator Agreement and shall include, but are not limited to:

(a)      implementing the Wind-Down Debtor, and making distributions contemplated by the Plan;

(b)      marshalling, marketing for sale, and winding down any of the Debtors' assets constituting Wind-Down Debtor Assets;

(c)      appointing an independent director at each Debtor to act as a fiduciary for such Debtor entity in connection with the resolution of the Intercompany Claims;

(d)      overseeing the accounts of the Debtors and the Wind-Down Debtor and the wind down and dissolution of the Debtors and the Wind-Down Debtor, including effectuating the transactions described in the Restructuring Transactions Memorandum;

(e)      receiving, maintaining, conserving, supervising, prosecuting, collecting, settling, managing, investing, protecting, and where appropriate, causing the Wind-Down Debtor to abandon the Wind-Down Debtor Assets, including causing the Wind-Down Debtor to invest any moneys held as Wind-Down Debtor Assets;

(f)      opening and maintaining bank accounts on behalf of or in the name of the Debtors or the Wind-Down Debtor, including, in the Plan Administrator's discretion, separating bank accounts for each of the Debtors;

(g)     entering into any agreement or executing any document or instrument required by or consistent with the Plan, the Confirmation Order, or the Plan Administrator Agreement, and to perform all obligations thereunder;

(h)     collecting and liquidating all Wind-Down Debtor Assets, including the sale of any Wind-Down Debtor Assets;

(i)     protecting and enforcing the rights to the Wind-Down Debtor Assets (including any Vested Causes of Action and Contributed Third-Party Claims) vested in the Wind-Down Debtor and Plan Administrator by the Plan Administrator Agreement by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

(j)     investigating any Wind-Down Debtor Assets, and any other potential Vested Causes of Action and Contributed Third-Party Claims;

(k)     reviewing, reconciling, compromising, settling, objecting, or prosecuting Claims or Interests of any kind;

(l)     seeking the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004;

(m)     retaining professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to the Plan Administrator Agreement and paying the reasonable compensation thereof;

(n)     paying all lawful expenses, debts, charges, taxes, and other liabilities, and making all other payments relating to the Wind-Down Debtor Assets, solely out of Wind-Down Debtor Assets;

(o)     prosecuting and settling the Vested Causes of Action, including, without limitation, the 3AC Claims, FTX Claims, Alameda Claims, Contributed Third-Party Claims, and any causes of action not included in the Asset Purchase Agreement or released under the Plan;

(p)     reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Vested Causes of Action and Contributed Third-Party Claims;

(q)     acquiring litigation and other claims related to the Debtors, and prosecuting such claims;

(r)     reviewing and compelling turnover of the Debtors or the Wind-Down Debtor's property;

(s)     calculating and making all Distributions to the holders of Allowed Claims against each Debtor and, solely to the extent of payment in full of Allowed Claims, to holders of Allowed Interests, as provided for in, or contemplated by, the Plan and the Plan Administrator Agreement; *provided* that because the Plan does not substantively consolidate the Debtors' Estates, the Plan Administrator shall make

Distributions from the Wind-Down Debtor Assets to the holders of Claims and Interests (if applicable) against that specific Debtor;

(t)     establishing, administering, adjusting, and maintaining the Wind-Down Reserve and the Disputed Claims Reserve;

(u)     withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Plan Administrator has determined, based upon the advice of his agents or professionals, may be required to be withheld from such Distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

(v)     in reliance upon the Debtors' Schedules, the official Claims Register maintained in the Chapter 11 Cases and the Debtors' filed lists of equity security holders, reviewing, and where appropriate, allowing or objecting to Claims and (if applicable) Interests, and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and (if applicable) Disputed Interests required to be administered by the Wind-Down Debtor;

(w)     making all tax withholdings, filing tax information returns, filing and prosecuting tax refunds claims, making tax elections by and on behalf of the Debtors or the Wind-Down Debtor, and filing tax returns for the Debtors or the Wind-Down Debtor pursuant to and in accordance with the Plan, and paying taxes, if any, payable for and on behalf of the Debtors or the Wind-Down Debtor, as applicable; *provided, however*, that notwithstanding any other provision of the Plan Administrator Agreement, the Plan Administrator shall not have any responsibility or personal liability in any capacity whatsoever for the signing or accuracy of the Debtors' income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto;

(x)     abandoning or donating to a charitable organization qualifying under IRC section 501(c)(3) any Wind-Down Debtor Assets that the Plan Administrator determines to be too impractical to distribute or of inconsequential value;

(y)     seeking a determination of tax liability or refund under Bankruptcy Code section 505;

(z)     establishing reserves for taxes, assessments, and other expenses of administration of the Debtors or the Wind-Down Debtor as may be necessary and appropriate for the proper operation of matters incident to the Debtors or the Wind-Down Debtor;

(aa)    paying Wind-Down Debtor Expenses;

(bb)    if the Plan Administrator deems appropriate in the Plan Administrator's sole discretion, seeking to establish a bar date for filing proofs of Interest in any Debtor or otherwise to determine the holders and extent of Allowed Interests in any Debtor;

(cc)    purchasing and carrying all insurance policies that the Plan Administrator deems reasonably necessary or advisable and paying all associated insurance premiums and costs;

(dd)    undertaking all administrative functions remaining in the Chapter 11 Cases to the extent necessary to carry out the Debtors', the Wind-Down Debtor's, or the Plan Administrator's duties under the Plan, including reporting and making required payments of fees to the U.S. Trustee and overseeing the closing of the Chapter 11 Cases;

(ee)    retaining, terminating, appointing, hiring, or otherwise employees, personnel, management, and directors at any of the Debtors to the extent necessary to carry out the purposes of the Plan Administrator Agreement and the Plan, including, without limitation, to address any disputes between the Debtors;

(ff)    exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and the Plan Administrator Agreement; and

(gg)    taking all other actions consistent with the provisions of the Plan and the Plan Administrator Agreement that the Plan Administrator deems reasonably necessary or desirable to administer the Debtors and the Wind-Down Debtor.

6.    The Wind-Down Debtor Oversight Committee

The Wind-Down Debtor Oversight Committee shall consist of those parties selected by the Committee and identified in the Plan Supplement, and which, at no time shall consist of greater than seven members.

The Wind-Down Debtor Oversight Committee shall have the responsibility to review and advise the Plan Administrator with respect to the liquidation and distribution of the Wind-Down Debtor Assets transferred to the Wind-Down Debtor in accordance herewith and the Plan Administrator Agreement. For the avoidance of doubt, in advising the Plan Administrator, the Wind-Down Debtor Oversight Committee shall maintain the same fiduciary responsibilities as the Plan Administrator. Vacancies on the Wind-Down Debtor Oversight Committee shall be filled by a Person designated by the Plan Administrator, subject to the unanimous consent of the remaining member or members of the Wind-Down Debtor Oversight Committee. The Plan Administrator shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down Debtor Oversight Committee for cause.

7.    Expenses of Wind-Down Debtor

The Wind-Down Debtor Expenses shall be paid from the Wind-Down Debtor Assets subject to the Wind-Down Budget and the Non-Released D&O Claim Budget.

8.    Insurance; Bond

The Plan Administrator may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the Plan Administrator and the Wind-Down Debtor Oversight Committee under the Plan Administrator Agreement. Unless otherwise agreed to by the Wind-Down Debtor Oversight Committee, the Plan Administrator shall serve with a bond, the terms

of which shall be agreed to by the Wind-Down Debtor Oversight Committee, and the cost and expense of which shall be paid by the Wind-Down Debtor.

9.    Fiduciary Duties of the Plan Administrator

Pursuant hereto and the Plan Administrator Agreement, the Plan Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.

10.    Termination of the Wind-Down Debtor

The Wind-Down Debtor will terminate on the earlier of:  (a) (i) the final liquidation, administration and distribution of the Wind-Down Debtor Assets in accordance with the terms of the Plan Administrator Agreement and the Plan, and its full performance of all other duties and functions as set forth herein or in the Plan Administrator Agreement and (ii) the Chapter 11 Cases of the Debtors have been closed; or (b) the Plan Administrator determines in its reasonable judgment that the Wind-Down Debtor lacks sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him or her under the Plan, the Confirmation Order and/or the Plan Administrator Agreement. After (x) the final distributions pursuant hereto, (y) the Filing by or on behalf of the Wind-Down Debtor of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the Plan Administrator, the Wind-Down Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions.

11.    Liability of Plan Administrator; Indemnification

Neither the Plan Administrator, the Wind-Down Debtor Oversight Committee, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, a "Wind-Down Debtor Party" and collectively, the "Wind-Down Debtor Parties") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Wind-Down Debtor or for the act or omission of any other Wind-Down Debtor Party, nor shall the Wind-Down Debtor Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Plan Administrator Agreement or the Plan other than for specific acts or omissions resulting from such Wind-Down Debtor Party's willful misconduct, gross negligence or actual fraud.  Subject to the Plan Administrator Agreement, the Plan Administrator shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee, and the Wind-Down Debtor Oversight Committee shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors.  The Plan Administrator or the Wind-Down Debtor Oversight Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing.  Notwithstanding such authority, neither the Plan Administrator nor the Wind-Down Debtor Oversight Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Plan Administrator, the Wind-Down Debtor Oversight Committee, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud.  The Wind-Down Debtor shall indemnify and hold harmless the Wind-Down Debtor Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out

of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Wind-Down Debtor or the Plan or the discharge of their duties hereunder; *provided*, *however*, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual fraud. Persons dealing or having any relationship with the Plan Administrator shall have recourse only to the Wind-Down Debtor Assets and shall look only to the Wind-Down Debtor Assets to satisfy any liability or other obligations incurred by the Wind-Down Debtor or the Wind-Down Debtor Oversight Committee to such Person in carrying out the terms of the Plan Administrator Agreement, and neither the Plan Administrator nor the Wind-Down Debtor Oversight Committee, shall have any personal obligation to satisfy any such liability. The Plan Administrator and/or the Wind-Down Debtor Oversight Committee members shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Plan Administrator Agreement against any of them. The Wind-Down Debtor shall promptly pay expenses reasonably incurred by any Wind-Down Debtor Party in defending, participating in, or settling any action, proceeding or investigation in which such Wind-Down Debtor Party is a party or is threatened to be made a party or otherwise is participating in connection with the Plan Administrator Agreement or the duties, acts or omissions of the Plan Administrator or otherwise in connection with the affairs of the Wind-Down Debtor, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Wind-Down Debtor Party hereby undertakes, and the Wind-Down Debtor hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such exculpated party is not entitled to be indemnified therefor under the Plan Administrator Agreement. The foregoing indemnity in respect of any Wind-Down Debtor Party shall survive the termination of such Wind-Down Debtor Party from the capacity for which they are indemnified.

12.    No Liability of the Wind-Down Debtor

On and after the Effective Date, the Wind-Down Debtor shall have no liability on account of any Claims or Interests except as set forth herein and in the Plan Administrator Agreement. All payments and all distributions made by the Plan Administrator hereunder shall be in exchange for all Claims or Interests against the Debtors.

**I.    Sources of Consideration for Plan Distributions**

Distributions under the Plan shall be funded by (i) the proceeds of Purchaser's payment obligations under Sections 2.1 and 2.2 of the Asset Purchase Agreement and distributions of Acquired Coins pursuant to Sections 6.12, and 6.14 of the Asset Purchase Agreement, (ii) the Wind-Down Debtor from the Wind-Down Debtor Assets; *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance. The Wind-Down Debtor Assets shall be used to pay the Wind-Down Debtor Expenses (including the compensation of the Plan Administrator and any professionals retained by the Wind-Down Debtor), and to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

**J.    Corporate Existence and Dissolution**

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) in effect

41

prior to the Effective Date, except to the extent such certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) are amended pursuant to the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings under applicable state or federal law).

On and after the Effective Date, the Wind-Down Debtor will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Debtor shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all of its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtor shall be deemed to be dissolved without any further action by the Debtors or the Wind-Down Debtor, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtor are formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Debtors or the Wind-Down Debtor in and withdraw the Wind-Down Debtor from applicable states.

As soon as practicable after the Effective Date, the Wind-Down Debtor shall take such actions as the Wind-Down Debtor may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Wind-Down Debtor on behalf of any Wind-Down Debtor without need for any action or approval by the shareholders or board of directors or managers of such Debtor. On and after the Effective Date, the Debtors or the Wind-Down Debtor (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Pursuant to the terms of this Plan, any Money Transmitter Licenses that have not been terminated shall be deemed withdrawn and no further action is required to be taken by the Debtors or the Wind-Down Debtor to effectuate such withdrawal; *provided* that, following the Effective Date, the Debtors or the Wind-Down Debtor, as applicable, shall use commercially reasonable efforts to comply with all state banking department requirements for the surrender of a Money Transmitter License. Nothing in this Plan shall be construed to limit the rights of creditors, Debtors, the Wind-Down Debtor, or regulators to pursue recoveries against surety bonds maintained by the Debtors in connection with this Money Transmitter Licenses. Notwithstanding such Debtors' dissolution, such Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

## K.    Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, Definitive Documents, and Asset Purchase Agreement shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, managing-members, limited or general partners, or officers of the Debtors, the Wind-Down Debtor or any other Entity, including: (1) appointment of the directors, managers, members, and officers for the Wind-Down Debtor as provided herein; (2) the issuances, transfer, and distribution of the Wind-Down Debtor Assets; (3) the formation of the Wind-Down Debtor and appointment of the Plan Administrator and Wind-Down Debtor Oversight Committee; (4) the formation of any entities pursuant to and the implementation of the Plan and performance of all actions and transactions contemplated hereby

42

and thereby; (5) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (6) all other acts or actions contemplated by the Plan, Definitive Documents, and Asset Purchase Agreement or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions (including effectuating the Restructuring Transactions Memorandum and the Customer Onboarding Protocol) (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan, Definitive Documents, and Asset Purchase Agreement involving the corporate structure of the Debtors or the Wind-Down Debtor, as applicable, and any corporate action required by the Debtors or the Wind-Down Debtor, as applicable, in connection with the Plan shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Wind-Down Debtor, as applicable. On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtor, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, Securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtor, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.K shall be effective notwithstanding any requirements under non-bankruptcy law.

**L.      Vesting of Assets in the Wind-Down Debtor**

Except as otherwise provided in the Plan, or in any agreement, instrument, or other document incorporated in the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting Wind-Down Debtor Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, transferred, or discharged pursuant to the Plan), and any property acquired by any of the Debtors under the Plan shall vest in the Wind-Down Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.

**M.      Cancellation of Notes, Instruments, Certificates, and Other Documents**

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions (including, without limitation, the Definitive Documents and the Asset Purchase Agreement), all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

**N.      Effectuating Documents; Further Transactions**

On and after the Effective Date, the Debtors, and its directors, managers, partners, officers, authorized persons, and members thereof, and the Wind-Down Debtor and Plan Administrator are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Definitive Documents,

43

and Asset Purchase Agreement, in the name of and on behalf of the Debtors and Wind-Down Debtor, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

**O.      Section 1146(a) Exemption**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor, the Purchaser, or to any other Entity) of property under the Plan, Definitive Documents, and Asset Purchase Agreement or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtor; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Asset Purchase Agreement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**P.      Preservation of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtor shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred.  Such rights shall be preserved by the Debtors and Wind-Down Debtor and shall vest in the Wind-Down Debtor, with the Wind-Down Debtor's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and Wind-Down Debtor as of the Effective Date.

The Wind-Down Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the beneficiaries of the Wind-Down Debtor and in accordance with the Plan Administrator Agreement and the Plan.  **No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtor, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Wind-Down Debtor, on behalf of the Debtors and the Wind-Down Debtor, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the**

**Plan.**  Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Debtor, on behalf of the Debtors and Wind-Down Debtor and in accordance with the Plan Administrator Agreement, expressly reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Wind-Down Debtor, on behalf of the Debtors, reserves and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtor, except as otherwise provided in the Plan, including Article VIII of the Plan.  The Wind-Down Debtor, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Wind-Down Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan.

**Q.**      **Election to Contribute Third-Party Claims**

Because aggregating all Contributed Third-Party Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Wind-Down Debtor.  By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Debtor, it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind-Down Debtor, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Debtor to memorialize and effectuate such contribution.

**R.**      **Contribution of Contributed Third-Party Claims**

On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Wind-Down Debtor and shall thereafter be Wind-Down Debtor Assets for all purposes.  No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Plan Administrator Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down Debtor will or will not pursue any and all available Contributed Third-Party Claims against such Person.  The Wind-Down Debtor shall have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date.  For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

**S.**      **Closing the Chapter 11 Cases**

On and after the Effective Date, the Wind-Down Debtor shall be permitted to classify all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, as closed, and all contested matters relating to any of the Debtors, including objections to Claims or Interests and any adversary proceedings, may be administered and heard

in the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, irrespective of whether such Claims or Interests were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

## ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy other than the Side-A Policy. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

### B.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtor, as applicable, under such Executory Contract or Unexpired Lease. Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors and Wind-Down Debtor expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

### C.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Counterparties to Executory Contracts or Unexpired Leases listed subject to rejection under the Plan shall be served with a notice of rejection of Executory Contracts and Unexpired Leases with the Plan Supplement. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims, Noticing, and Solicitation Agent and served on the Debtors or Wind-Down Debtor, as applicable, no later than thirty days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, or the Wind-Down Debtor, the Estates, or their property without the need for any objection by the Wind-Down Debtor or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the**

46

rejection of the Executory Contract or Unexpired Lease shall be deemed released, and be subject to the permanent injunction set forth in Article VIII.D of the Plan, including any Claims against any Debtor listed on the Debtors' schedules as unliquidated, contingent, or disputed. All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims in accordance with Article III.C of the Plan.

**D.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed**

The Debtors, the Wind-Down Debtor, or the Purchaser, as applicable pursuant to the Asset Purchase Agreement, shall pay Cures, if any, on the Effective Date. The Debtors shall provide notice of the amount and timing of payment of any such Cure to the parties to the applicable assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors, the Wind-Down Debtor, or the Purchaser shall be dealt with in the ordinary course of business and, if needed, shall be Filed with the Claims, Noticing, and Solicitation Agent on or before thirty days after the Effective Date. **If any counterparty to an Executory Contract or Unexpired Lease does not receive a notice of assumption and applicable cure amount, such counterparty shall have until on or before thirty days after the Effective Date to bring forth and File a request for payment of Cure.** Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or the Wind-Down Debtor, without the need for any objection by the Wind-Down Debtor or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied and released upon payment by the Debtors or the Wind-Down Debtor or the Purchaser of the Cure in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty); *provided*, *however*, that nothing herein shall prevent the Wind-Down Debtor or the Purchaser, as applicable, from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure. The Wind-Down Debtor or the Purchaser may also settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' first scheduled omnibus hearing for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

In the event of a dispute regarding: (1) the amount of any Cure Claim, (2) the ability of the Debtors, the Wind-Down Debtor, Purchaser, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed (or assumed and assigned, as applicable), or (3) any other matter pertaining to assumption or assignment, then any disputed Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made as soon as reasonably practicable following, and in accordance with, the entry of a Final Order of the Bankruptcy Court resolving such dispute or as may be agreed upon by the Debtors, the Wind-Down Debtor, or Purchaser, as applicable, and the counterparty to the Executory Contract or Unexpired Lease, and any such unresolved dispute shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise or assignment of any Executory Contract or Unexpired Lease to the Purchaser and full payment of any applicable Cure pursuant to this Article V.D, or upon and in accordance with any resolution of a Cure

dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assumed and assigned in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.D, in the amount and at the time in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and applicable proposed Cure amount, and disputes the Debtors' proposed Cure amount, such party shall not be required to File a Proof of Claim with respect to such dispute.  Any counterparty to an Executory Contract or Unexpired Lease that does not receive a notice or applicable proposed Cure amount, and believes a Cure amount is owed, shall have thirty days after the Effective Date to File a Proof of Claim with respect to such alleged Cure amount, which Claim shall not be expunged until such Cure dispute is resolved.**

**E.      Insurance Policies**

Each D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) other than the Side-A Policy shall be assumed, in their entirety, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to sections 105 and 365 of the Bankruptcy Code with the Wind-Down Debtor being authorized to pursue any proceeds thereof on behalf of the Debtors or the Wind-Down Debtor.  The Side-A Policy shall ride through these Chapter 11 Cases with the Debtors, and the Wind-Down Debtor preserves all avoidance and other actions in connection with the premium paid thereunder. All beneficiaries under the D&O Insurance Policies reserve their rights under such D&O Insurance Policies subject to the limitations set forth in this Plan.

The Debtors or the Wind-Down Debtor, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date, and any current and former directors, officers, managers, and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Debtor shall retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or Wind-Down Debtor may deem necessary, subject to the prior written consent of the Wind-Down Debtor.  Notwithstanding anything to the contrary contained in the Plan, the Wind-Down Debtor shall be entitled to pursue avoidance of the premium paid for the XL Specialty Insurance Company Cornerstone A-Side Management Liability Insurance Policy No. ELU184179-22, and nothing in this Plan shall be deemed a waiver or abrogation of any such rights.

The Debtors shall continue to satisfy their obligations under their insurance policies in full and continue such policies in the ordinary course of business.  Each of the Debtors' insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan.  On the Effective Date: (a) the Debtors shall be deemed to have assumed all such insurance policies

and any agreements, documents, and instruments relating thereto in their entirety; and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the applicable Debtors or the Wind-Down Debtor unaltered.

**F.    Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement (unless otherwise explicitly provided) shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or the Wind-Down Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Debtor, as applicable, shall have forty-five days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease effective as of the Confirmation Date.

**G.    Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**H.    Contracts and Leases Entered into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Wind-Down Debtor liable thereunder in the ordinary course of its business.  Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

<div align="center">

**ARTICLE VI.**

**PROVISIONS GOVERNING DISTRIBUTIONS**

</div>

**A.    Timing and Calculation of Amounts to Be Distributed**

Except (1) as otherwise provided herein, (2) upon a Final Order, or (3) as otherwise agreed to by the Debtors, the Purchaser, or the Wind-Down Debtor, as the case may be, and the Holder of the applicable Claim, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the next Distribution Date after such Claim becomes, as applicable, an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of distributions that the Plan provides for Allowed Claims in the applicable Class from the Distribution Agent.  In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

## B.    Rights and Powers of Distribution Agent

### 1.    Powers of the Distribution Agent

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities and powers; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

### 2.    Expenses Incurred on or after the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including reasonable attorney and/or other professional fees and expenses) made by such Distribution Agent shall be paid in Cash by the Wind-Down Debtor.

## C.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

### 1.    Distributions Generally

Except as otherwise provided in the Plan (including in paragraph 8 below), the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.

### 2.    Distributions on Account of Obligations of Multiple Debtors

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan.  Any such Claims shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.

### 3.    Record Date of Distributions

On the Distribution Record Date, the various transfer registers for each Class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims or Interests.  The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

### 4.    Special Rules for Distributions to Holders of Disputed Claims and Interests

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Wind-Down Debtor, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand, or

as set forth in a Final Order, no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all of the Disputed Claim or Interest has become an Allowed Claim or Interest or has otherwise been resolved by settlement or Final Order; *provided* that, if the Wind-Down Debtor does not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim or Interest, the Distribution Agent may make a partial distribution on account of that portion of such Claim or Interest that is not Disputed at the time and in the manner that the Distribution Agent makes distributions to similarly situated Holders of Allowed Claims or Interests pursuant to the Plan.  Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

     5.     <u>De Minimis Distributions; Minimum Distributions</u>

The Distribution Agent shall not make any Cash distributions to any Holder of an Allowed Claim or Interest pursuant to Article III.C.1-11 of this Plan on account of such Allowed Claim or Interest if such distribution is valued, in the reasonable discretion of the Distribution Agent, at less than $1.00, and each Holder of an Allowed Claim or Interest to which this limitation applies shall not be entitled to any distributions under the Plan.  Notwithstanding anything to the contrary in this Plan, there shall be no minimum distribution threshold on account of distributions of any Cryptocurrency to Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims.

     6.     <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that either (a) a distribution to any Holder is returned as undeliverable or (b) the Holder of an Allowed Claim or Interest does not respond to a request by the Debtors or the Distribution Agent for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Wind-Down Debtor automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall not be entitled to any distributions under the Plan.

     7.     <u>Manner of Payment Pursuant to the Plan</u>

At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check, wire transfer, automated clearing house, credit card, or as otherwise provided in applicable agreements.

     8.     <u>Distributions of Net Owed Coins; Additional Bankruptcy Distributions</u>

As a general matter, the Purchaser will allocate each Account Holder's Net Owed Coins to its account on the Binance.US Platform, and each Holder of OpCo General Unsecured Claim's Pro Rata share of the Distributable Cryptocurrency (in Cash) to its account on the Binance.US Platform in accordance with, and subject to, the provisions of Section 6.12 of the Asset Purchase Agreement.

Subject to the terms of the Asset Purchase Agreement, the Purchaser may make Additional Bankruptcy Distributions to Transferred Creditors, including Distributable OpCo Cash and/or other Wind-Down Debtor Assets, corresponding to their Pro Rata shares of such Additional Bankruptcy Distribution (if such Additional Bankruptcy Distribution is in Cryptocurrency, based on the Transferred Cryptocurrency Value of the Cryptocurrency included in such Additional Bankruptcy Distribution), all in accordance with any applicable Post-Bankruptcy Statement (as defined in the Asset Purchase Agreement).

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim does not become a Transferred Creditor prior to the date that is three (3) months following the later of the Closing Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept (as provided in the Customer Onboarding Protocol), then Purchaser shall convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with this Plan and the Customer Onboarding Protocol.

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim is located in an Unsupported Jurisdiction (as defined in the Asset Purchase Agreement), then the Net Owed Coins, Distributable Cryptocurrency (in Cash) and Additional Bankruptcy Distributions, if applicable, allocable to such Person shall be handled pursuant to Section 6.12(b) or, if applicable, Section 6.14(d) of the Asset Purchase Agreement.

Purchaser shall have no responsibility to make any distributions other than as contemplated by Sections 6.12 and 6.14 of the Asset Purchase Agreement.

## D.    Compliance Matters

In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Debtor, any Distribution Agent, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including wind-down a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the Wind-Down Debtor and the Distribution Agent, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond.  The Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

## E.    Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim, asserted in government issued currency (for the avoidance of doubt, not including any Cryptocurrency) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using

the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

**F.    Claims Paid or Payable by Third Parties**

      1.    <u>Claims Paid by Third Parties</u>

The Debtors or the Wind-Down Debtor, as applicable, shall reduce a Claim or Interest, and such Claim or Interest (or portion thereof) shall be disallowed without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim or Interest receives a payment on account of such Claim or Interest from a party that is not a Debtor or Wind-Down Debtor (or other Distribution Agent), as applicable, including any payments made in connection with the Sale Transaction.  To the extent a Holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not a Debtor or a Wind-Down Debtor (or other Distribution Agent), including payments made in connection with the Sale Transaction, as applicable, on account of such Claim or Interest, such Holder shall, within ten Business Days of receipt thereof, repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Wind-Down Debtor to the extent the Holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay, return, or deliver such distribution shall result in the Holder owing the applicable Wind-Down Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the ten-Business Day grace period specified above until the amount is repaid.

      2.    <u>Claims Payable by Third Parties</u>

No distributions under the Plan shall be made on account of an Allowed Claim or Interest that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim or Interest has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim or Interest (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such payment, such Claim or Interest may be expunged or reduced on the Claims Register by the Claims, Noticing, and Solicitation Agent to the extent of any such payment without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

      3.    <u>Applicability of Insurance Policies</u>

Except as otherwise provided herein, payments to Holders of Claims or Interests shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any rights, defenses, or Cause of Action that the Debtors, the Wind-Down Debtor or any other Entity may hold against any other Entity, including insurers, under any policies of insurance, agreements related thereto, or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the applicable insurance policies, agreements related thereto, and applicable non-bankruptcy law.

**G.    Setoffs and Recoupment**

Except as otherwise expressly provided for herein, each Debtor, the Wind-Down Debtor, or such Entity's designee as instructed by such Debtor, the Wind-Down Debtor, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as

may be agreed to by the Holder of a Claim, set off against or recoup from an Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature whatsoever that the Debtor or the Wind-Down Debtor, as applicable, may have against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise).  Notwithstanding the foregoing, except as expressly stated in Article VIII of this Plan, neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors or the Wind-Down Debtor of any such Claims, rights, or Causes of Action the Debtors or the Wind-Down Debtor may possess against such Holder.

H.    **Allocation between Principal and Accrued Interest**

Except as otherwise provided herein, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Claims, to the remaining portion of such Allowed Claim if any.

## ARTICLE VII.

## PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS

A.    **Disputed Claims Process**

After the Effective Date, the Debtors, the Wind-Down Debtor, and any party-in-interest, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest.  If a Holder of a Claim or Interest in Class disputes the amount of their Claim or Interest as listed in the Schedules, the Holder should notify the Debtors or the Wind-Down Debtor of such dispute.  If the Debtors and the Holder agree to an amended Claim amount prior to the Effective Date, the Debtors shall file amended Schedules prior to the Effective Date.  If between the Confirmation Date and the Effective Date, the dispute cannot be consensually resolved, the Holder may seek (by letter to the Court) to have the claim or interest dispute resolved before the Bankruptcy Court (and, with the consent of the Debtors, before any other court or tribunal with jurisdiction over the parties).  After the Effective Date, the creditor may seek to have the claim dispute resolved before the Bankruptcy Court or any other court or tribunal with jurisdiction over the parties.

Notwithstanding anything in this Plan to the contrary: (1) all Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease; (2) Claims filed to dispute the amount of any proposed Cure pursuant to section 365 of the Bankruptcy Code; and (3) Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court, if not otherwise resolved through settlement with the applicable claimant.

On the Effective Date, the Debtors or Plan Administrator, as applicable, may establish one or more accounts or funds to hold and dispose of certain assets, pursue certain litigation (including the Causes of Action preserved under the Plan or otherwise vesting in the Wind-Down Debtor), and/or satisfy certain

Claims (including Claims that are contingent or have not yet been Allowed).  For any such account or fund, the Debtors or the Plan Administrator, as applicable, may take the position that grantor trust treatment applies in whole or in part.  To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations.  Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9.  If such rules apply, such assets would be subject to entity-level taxation, and the Debtors and the Wind-Down Debtor would be required to comply with the relevant rules.

## B.    Objections to Claims or Interests

Except as otherwise specifically provided in the Plan, after the Effective Date, the Wind-Down Debtor shall have the sole authority on behalf of the Debtors to:  (1) File, withdraw, or litigate to judgment, any objections to Claims or Interests; and (2) settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Wind-Down Debtor shall have and retain any and all rights and defenses each such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.P of the Plan.

Any objections to Claims or Interests shall be Filed on or before the Claims Objection Bar Date. For the avoidance of doubt, any party may object to any Claims or Interests prior to the Claims Objection Bar Date.  Further, the Bankruptcy Court may extend the time period to object to Claims or Interests set forth in this paragraph at any time, including before or after the expiration of one hundred eighty days after the Effective Date, in its discretion or upon request by the Debtors or any party in interest.

## C.    Estimation of Claims

Before or after the Effective Date, the Debtors or the Wind-Down Debtor, as applicable, may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Disputed Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim or Interest, including during the litigation of any objection to any Disputed Claim or Interest or during the pendency of any appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Disputed Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Debtors or the Wind-Down Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Disputed Claim or Interest is estimated.

**D.     No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only a portion of a Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

**E.     Distributions After Allowance**

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Allowed Claim or Interest unless required under applicable bankruptcy law.

**F.     No Interest**

Unless otherwise specifically provided for herein or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**G.     Adjustment to Claims and Interests without Objection**

Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Debtor without the Wind-Down Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.  Additionally, any Claim or Interest that is duplicative or redundant with another Claim or Interest against the same Debtor may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Debtor without the Wind-Down Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

**H.     Time to File Objections to Claims**

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

**I.     Disallowance of Claims or Interests**

Any Claims or Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have

been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Wind-Down Debtor, as applicable.

**Except as otherwise provided herein or as agreed to by the Debtors or the Wind-Down Debtor, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date subject to the approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

**J.      Amendments to Proofs of Claim**

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Proof of Claim or Proof of Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Wind-Down Debtor, and any such new or amended Proof of Claim or Proof of Interest Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

## ARTICLE VIII.

## EFFECT OF CONFIRMATION OF THE PLAN

**A.      Releases by the Debtors**

**Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtor, and their Estates, and in each case on behalf of themselves and their respective successors, assigns, and representatives, who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in**

this Article VIII.A by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.A is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtor or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Notwithstanding anything to the contrary contained herein, nothing in this Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement or the Definitive Documents and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of this Plan.

**B.**     **Releases by Holders of Claims and Interests**

Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in this Article VIII.B shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.B, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.B is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to

the extent contemplated by Article IV.F and Article IV.G of the Plan, a bar to any of the Releasing Parties or the Debtors or the Wind-Down Debtor or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

C.      Exculpation

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan

D.      Injunction

The assets of the Debtors and of the Wind-Down Debtor shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in this Plan and shall not be available for any other purpose. All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Debtor, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of this Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by this Plan.

## E.     Release of Liens

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Debtor or the Wind-Down Debtor, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as requested by the Debtors or Wind-Down Debtor to evidence the release of such Lien, including the execution, delivery, and filing or recording of such documents evidencing such releases.  The presentation or filing of the Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

## F.     OSC and SEC

Notwithstanding any language to the contrary herein, no provision shall (a) preclude the OSC or the SEC from enforcing its police or regulatory powers; or (b) enjoin, limit, impair or delay the OSC or SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any non-Debtor person or non-Debtor entity in any forum.

## G.     Protection against Discriminatory Treatment

As provided by section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Entity, including Governmental Units, shall discriminate against any Debtor or the Wind-Down Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, any Debtor or the Wind-Down Debtor, or any Entity with which a Debtor or the Wind-Down Debtor has been or is associated, solely because such Debtor or the Wind-Down Debtor was a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## H.     Document Retention

Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Wind-Down Debtor, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently in the Debtors' possession.  The Wind-Down Debtor shall not destroy or otherwise abandon any such documents or records without providing advance notice to the U.S. Securities and Exchange Commission (c/o Therese Scheuer, U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, ScheuerT@SEC.GOV) and seeking further authorization from this Bankruptcy Court.  Nothing in this Plan or the Confirmation Order shall affect the obligations of the pre-Effective Date Debtors, the Wind-Down Debtor, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

## I.        Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## J.        Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  **All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

## ARTICLE IX.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

## A.        Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1.  The Bankruptcy Court shall have entered the Confirmation Order, which shall be in a form and substance reasonably satisfactory to the Debtors and the Committee, and subject to the consent rights of Purchaser under the Asset Purchase Agreement, and such order shall be a Final Order and in full force and effect.

2.  The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, Definitive Documents, and the Asset Purchase Agreement.

3.  Each Definitive Document and each other document contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all respects with the Plan, and subject to the Purchaser's consent rights under the Asset Purchase Agreement, and shall not have been modified in a manner inconsistent therewith;

4.  The Professional Fee Escrow Account shall have been established and funded with Cash in accordance with Article II.B.2 of the Plan.

5.  The Wind-Down Reserve shall have been established and funded with Cash in accordance with the Plan.

6.  If prior to the Outside Date, the Asset Purchase Agreement shall be in full force and effect and the Sale Transaction shall have been consummated.

7.  The Restructuring Transactions shall have been consummated or shall be anticipated to be consummated concurrently with the occurrence of the Effective Date in a manner consistent with the Plan, the Customer Onboarding Protocol, the other Definitive Documents, and the Asset Purchase Agreement, and the Plan shall have been substantially consummated or shall be anticipated to be substantially consummated concurrently with the occurrence of the Effective Date.

## B.      Waiver of Conditions Precedent

The Debtors, with the consent of the Committee and, solely to the extent related to the Asset Purchase Agreement and the Sale Transaction, prior to the Outside Date, the consent of Purchaser, may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

## C.      Effect of Non-Occurrence of Conditions to Consummation

If the Effective Date does not occur within 120 days after the Confirmation Date, then the Plan will be null and void in all respects, any and all compromises or settlements not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including with respect to the fixing, limiting, or treatment of any Claim or Interest, including, without limitation, the Alameda Loan Facility Claims), shall be deemed null and void, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action held by any Debtor or any other Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity in any respect.

## ARTICLE X.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

## A.      Modification of Plan

Subject to the limitations and terms contained in the Plan and Purchaser's consent rights under the Asset Purchase Agreement, the Debtors, with the consent of the Committee, reserve the right to (1) amend or modify the Plan before the entry of the Confirmation Order, in accordance with the Bankruptcy Code and the Bankruptcy Rules and (2) after the entry of the Confirmation Order, the Debtors or the Wind-Down Debtor, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, to remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

## B.      Effect of Confirmation on Modifications

Entry of the Confirmation Order shall constitute approval of all modifications or amendments to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.        **Revocation or Withdrawal of Plan**

The Debtors reserve the right, with the consent of the Committee, to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Classes of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.        Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.        decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.        resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims or other Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.        ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.        adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6.        enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts,

63

instruments, releases, and other agreements or documents created in connection with the Plan; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court;

       7.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

       8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

       9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

       10.      hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including:  (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) anything that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan and the Confirmation Order; or (d) related to section 1141 of the Bankruptcy Code;

       11.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

       12.      adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

       13.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

       14.      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Entity's rights arising from or obligations incurred in connection with the Plan;

       15.      hear and determine matters concerning local, state, federal, and foreign taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

       16.      enter an order or Final Decree concluding or closing the Chapter 11 Cases;

       17.      enforce all orders previously entered by the Bankruptcy Court; and

       18.      hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or the Judicial Code.

       Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, or the Disclosure Statement, without regard to whether the controversy with respect to which such

interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

### A.    Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtor, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

### B.    Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Wind-Down Debtor, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### C.    Payment of Statutory Fees

All fees and applicable interest payable pursuant to section 1930 of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Debtors or the Wind-Down Debtor (or the Distribution Agent on behalf of the Wind-Down Debtor) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

### D.    Dissolution of Statutory Committees

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related

to, the Chapter 11 Cases; *provided*, however, that such committees will remain in existence for the limited purposes of (a) pursuing, supporting, or otherwise participating in, any outstanding appeals in the Chapter 11 Cases; and (b) filing, objecting, or otherwise participating in, any final fee applications of Professionals.

**E.       Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests, unless and until the Effective Date has occurred.

**F.       Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Entity.

**G.       Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Wind-Down Debtor shall be served on:

|  |  |
|---|---|
| Debtors | **Voyager Digital Holdings, Inc.**<br>33 Irving Place<br>New York, New York 10003<br>Attention:  David Brosgol<br>General Counsel,<br>E-mail address:  dbrosgol@investvoyager.com<br><br>with copies for information only (which shall not constitute notice) to: |
| Counsel to the Debtors | **Kirkland & Ellis LLP**<br>**Kirkland & Ellis International LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention:  Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., and Allyson B. Smith |
| Counsel to the Committee | **McDermott Will & Emery LLP**<br>One Vanderbilt Avenue<br>New York, New York 10017<br>Attention: Darren Azman |

**H.       Entire Agreement; Controlling Document**

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan;

*provided, however*, that notwithstanding the foregoing or anything to the contrary herein, to the extent there is any conflict between the Plan and the Confirmation Order, on the one hand, and the Asset Purchase Agreement, on the other hand, the Asset Purchase Agreement shall govern solely in the event the Sale Transaction is consummated.  Except as set forth in the Plan, in the event that any provision of the Disclosure Statement, the Plan Supplement, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## I.      Plan Supplement

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Claims, Noticing, and Solicitation Agent at https://cases.stretto.com/Voyager or the Bankruptcy Court's website at http://www.nysb.uscourts.gov.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

## J.      Non-Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the Purchaser's consent rights under the Asset Purchase Agreement prior to the Outside Date, shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

## K.      Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties nor individuals or the Debtors or the Wind-Down Debtor will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

**L.**     **Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation Date.

Dated:  February 28, 2023

VOYAGER DIGITAL HOLDINGS, INC.
on behalf of itself and all other Debtors

_/s/ Stephen Ehrlich_

Stephen Ehrlich
Co-Founder and Chief Executive Officer
Voyager Digital Holdings, Inc.

## Exhibit B

**Redline**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND
ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

---

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE,
COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY
OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE
BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS.  THIS PLAN IS NOT AN
OFFER WITH RESPECT TO ANY SECURITIES.**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital, LTD. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **Introduction** | | **1** |
| **Article I. Defined Terms, Rules of Interpretation, Computation of Time, Governing Law, and Other References** | | **1** |
| A. | Defined Terms | 1 |
| B. | Rules of Interpretation | 17 |
| C. | Computation of Time | 17 |
| D. | Governing Law | 1~~7~~8 |
| E. | Reference to Monetary Figures | 18 |
| F. | Reference to the Debtors or the Wind-Down Debtor~~s~~ | 18 |
| G. | Nonconsolidated Plan | 18 |
| **Article II. Administrative and Priority Claims** | | **18** |
| A. | Administrative Claims | 18 |
| B. | Professional Fee Claims | 19 |
| C. | Priority Tax Claims | 20 |
| **Article III. Classification, Treatment, and Voting of Claims and Interests** | | **2~~0~~1** |
| A. | Classification of Claims and Interests | 2~~0~~1 |
| B. | Summary of Classification | 21 |
| C. | Treatment of Classes of Claims and Interests | 22 |
| D. | Special Provision Governing Unimpaired Claims | 28 |
| E. | Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes | 28 |
| F. | Subordinated Claims | 28 |
| G. | Intercompany Interests | 28 |
| H. | Controversy Concerning Impairment | 29 |
| I. | Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code | 29 |
| **Article IV. Provisions for Implementation of the Plan** | | **29** |
| A. | General Settlement of Claims and Interests | 29 |
| B. | Restructuring Transactions | 29 |
| C. | The Sale Transaction | 30 |
| D. | The Liquidation Transaction | 3~~1~~0 |
| E. | ~~Management and~~ Employee Transition Plan~~s~~ | 31 |
| F. | Non-Released D&O Claims | 32 |
| G. | The D&O Settlement | 32 |
| H. | The Wind-Down ~~Trust~~Debtor | 34 |
| I. | Sources of Consideration for Plan Distributions | ~~39~~41 |
| J. | Corporate Existence and Dissolution | ~~39~~41 |
| K. | Corporate Action | 4~~0~~2 |
| L. | Vesting of Assets in the Wind-Down ~~Entity~~Debtor | 4~~1~~3 |
| M. | Cancellation of Notes, Instruments, Certificates, and Other Documents | 4~~1~~3 |
| N. | Effectuating Documents; Further Transactions | 4~~1~~3 |
| O. | Section 1146(a) Exemption | 4~~1~~4 |

P.      Preservation of Rights of Action ................................................................. 424

Q.      Election to Contribute Third-Party Claims ................................................. 435

R.      Contribution of Contributed Third-Party Claims ....................................... 435

S.      Closing the Chapter 11 Cases ..................................................................... 435

**Article V. Treatment of Executory Contracts and Unexpired Leases** ................. 446

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases ........ 446

B.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases ........................................................ 446

C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases ........ 446

D.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ...... 457

E.      Insurance Policies and Surety Bonds ....................................................... 468

F.      Reservation of Rights ................................................................................ 479

G.      Nonoccurrence of Effective Date ............................................................... 479

H.      Contracts and Leases Entered into After the Petition Date ....................... 479

**Article VI. Provisions Governing Distributions** ........................................... 479

A.      Timing and Calculation of Amounts to Be Distributed ............................. 479

B.      Rights and Powers of Distribution Agent .................................................. 4850

C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions ...... 4850

D.      Compliance Matters ................................................................................... 502

E.      Foreign Currency Exchange Rate ............................................................... 502

F.      Claims Paid or Payable by Third Parties .................................................... 513

G.      Setoffs and Recoupment ............................................................................ 513

H.      Allocation between Principal and Accrued Interest ................................... 524

**Article VII. Procedures for Resolving Disputed, Contingent, and Unliquidated Claims and Interests** ......................................... 524

A.      Disputed Claims Process ........................................................................... 524

B.      Objections to Claims or Interests .............................................................. 535

C.      Estimation of Claims ................................................................................. 535

D.      No Distributions Pending Allowance ........................................................ 546

E.      Distributions After Allowance ................................................................... 546

F.      No Interest ................................................................................................. 546

G.      Adjustment to Claims and Interests without Objection ............................. 546

H.      Time to File Objections to Claims ............................................................. 556

I.      Disallowance of Claims or Interests ......................................................... 557

J.      Amendments to Proofs of Claim .............................................................. 557

**Article VIII. Effect of Confirmation of the Plan** ........................................... 557

A.      Releases by the Debtors ............................................................................. 557

B.      Releases by Holders of Claims and Interests ............................................. 568

C.      Exculpation ................................................................................................ 579

D.      Injunction .................................................................................................. 589

E.      Release of Liens ........................................................................................ 5860

F.      OSC and SEC ............................................................................................ 5860

G.      Protection against Discriminatory Treatment ........................................... 5860

H.      Document Retention .................................................................................. 5960

I.      Reimbursement or Contribution ................................................................ 5961

J.        Term of Injunctions or Stays .......................................................................... 5961

**Article IX. Conditions Precedent to the Effective Date** ..................................................... 5961

A.        Conditions Precedent to the Effective Date ................................................... 5961
B.        Waiver of Conditions Precedent .................................................................... 602
C.        Effect of Non-Occurrence of Conditions to Consummation ........................... 602

**Article X. Modification, Revocation, or Withdrawal of the Plan** ....................................... 612

A.        Modification of Plan ....................................................................................... 612
B.        Effect of Confirmation on Modifications ....................................................... 613
C.        Revocation or Withdrawal of Plan ................................................................. 613

**Article XI. Retention of Jurisdiction** ................................................................................. 613

**Article XII. Miscellaneous Provisions** ............................................................................... 635

A.        Immediate Binding Effect .............................................................................. 635
B.        Additional Documents ................................................................................... 645
C.        Payment of Statutory Fees ............................................................................. 645
D.        Dissolution of Statutory Committees ............................................................. 646
E.        Reservation of Rights ..................................................................................... 646
F.        Successors and Assigns .................................................................................. 646
G.        Service of Documents ..................................................................................... 646
H.        Entire Agreement; Controlling Document ...................................................... 657
I.        Plan Supplement ............................................................................................ 657
J.        Non-Severability ............................................................................................ 667
K.        Votes Solicited in Good Faith ......................................................................... 667
L.        Waiver or Estoppel ........................................................................................ 668

iii

<u>**INTRODUCTION**</u>

Voyager Digital Holdings, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>") propose this third amended joint plan (the "<u>Plan</u>") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**

**DEFINED TERMS, RULES OF INTERPRETATION,
COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

**A.    Defined Terms**

Capitalized terms used in this Plan have the meanings ascribed to them below.

1.    "*3AC*" means Three Arrows Capital, Ltd and any of its Affiliates or subsidiaries.

2.    "*3AC Claims*" means the claims or causes of action asserted or assertable by the Debtors against 3AC, whether in the 3AC Liquidation Proceeding or otherwise.

3.    "*3AC Liquidation Proceeding*" means that certain liquidation proceeding captioned *In the Matter of Three Arrows Capital Ltd. and in the Matter of Sections 159(1) and 162(1)(a) and (b) of the Insolvency Act 2003*, Claim No. BVIHC(COM)2022/0119 before the Eastern Caribbean Supreme Court in the High Court of Justice in the British Virgin Islands and the chapter 15 foreign recognition proceeding captioned *In re Three Arrows Capital, Ltd.*, No. 22-10920 (Bankr. S.D.N.Y. Jul. 1, 2022).

4.    "*3AC Loan*" means that loan of 15,250 Bitcoins and 350 million USDC to 3AC pursuant to that certain master loan agreement dated March 4, 2022 by and between 3AC, as borrower, and OpCo and HTC Trading, Inc., as lenders.

5.    "*3AC Recovery*" means the recovery, if any, of the Debtors from 3AC on account of the 3AC Claims.

6.    "*Account*" means any account at OpCo held by an Account Holder relating to Cryptocurrency, which Account is identified in the Debtors' books and records as holding Cryptocurrency as of the Petition Date.

7.      "*Account Holder*" means any Person or Entity who holds an Account with OpCo as of the Petition Date.

8.      "*Account Holder Claim*" means any Claim against the Debtors that is held by an Account Holder on account of such Holder's Account.

9.      "*Acquired Assets*" has the meaning ascribed to it in the Asset Purchase Agreement.

10.     "*Acquired Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

11.     "*Acquired Coins Value*" has the meaning ascribed to it in the Asset Purchase Agreement.

12.     "*Additional Bankruptcy Distribution*" has the meaning ascribed to it in the Asset Purchase Agreement.

13.     "*Administrative Claim*" means a Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims.

14.     "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five days after the Effective Date.

15.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

16.     "*Alameda*" means Alameda Ventures Ltd., along with its Affiliates and subsidiaries.

17.     "*Alameda Claims*" means the claims or causes of action asserted or assertable by the Debtors against Alameda, whether in the FTX Bankruptcy Proceeding or otherwise.

18.     "*Alameda Loan Agreement*" means that certain unsecured loan agreement, dated as of June 21, 2022, as amended, restated, amended and restated, modified, or supplemented from time to time, by and among HoldCo, as the borrower, TopCo, as the guarantor, and Alameda, as the lender thereto.

19.     "*Alameda Loan Facility*" means that certain unsecured loan facility provided for under the Alameda Loan Agreement.

20.     "*Alameda Loan Facility Claims*" means any Claim against any Debtor derived from, based upon, or arising under the Alameda Loan Agreement and any fees, costs, and expenses that are reimbursable by any Debtor pursuant to the Alameda Loan Agreement.

21.     "*Alameda Recovery*" means the recovery, if any, of the Debtors from Alameda on account of the Alameda Claims.

22.      "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein:  (a) a Claim or Interest that is evidenced by a Proof of Claim timely Filed by the Bar Date or a request for payment of Administrative Claim timely Filed by the Administrative Claims Bar Date (or for which Claim or Interest under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim or a request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; (c) a Claim or Interest Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court, or (d) a Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; *provided* that, with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim or Interest shall have been Allowed by a Final Order.  Any Claim or Interest that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes.  A Proof of Claim Filed after and subject to the Bar Date or a request for payment of an Administrative Claim Filed after and subject to the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

23.      "*Asset Purchase Agreement*" means that certain asset purchase agreement dated as of December 18, 2022 by and between BAM Trading Services Inc. (d/b/a Binance.US) as Purchaser and Voyager Digital, LLC as Seller.

24.      "*Assumed Liabilities*" has the meaning ascribed to it in the Asset Purchase Agreement.

25.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

26.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the Southern District of New York.

27.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

28.      "*Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

29.      "*Bar Date Order*" means the *Order (I) Setting Deadlines for Submitting Proofs of Claims, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 218].

30.     "*Binance.US Platform*" has the meaning ascribed to it in the Asset Purchase Agreement.

31.     "*Binance US*" means BAM Trading Services Inc. (d/b/a Binance.US).

32.     "*Binance US Account*" means a customer account opened with the Purchaser by an Account Holder or a Holder of an Allowed OpCo General Unsecured Claim.

33.     "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

34.     "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

35.     "*Causes of Action*" mean any action, Claim, cross-claim, third-party claim, damage, judgment, cause of action, controversy, demand, right, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, interest, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law ~~or otherwise~~in accordance with applicable law. For the avoidance of doubt, "Causes of Action" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim arising from any contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

36.     "*CCO*" means Evan Psaropoulos.

37.     "*CEO*" means Stephen Ehrlich.

38.     "*Certificate*" means any instrument evidencing a Claim or an Interest.

39.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated cases filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

40.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

41.     "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) (i) with respect to Administrative Claims (other than Professional Fee Claims and Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), sixty days after the Administrative Claims Bar Date or (ii) with respect to all other Claims (other than Professional Fee Claims), 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Wind-Down ~~Trust~~Debtor, as applicable, as approved by an order of the Bankruptcy Court for objecting to such Claims.

42.     "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Clerk of the Bankruptcy Court or the Claims, Noticing, and Solicitation Agent.

43.     "*Claims, Noticing, and Solicitation Agent*" means Bankruptcy Management Solutions, Inc. d/b/a Stretto, in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

44.     "*Class*" means a class of Claims against or Interests in the Debtors as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

45.     "*Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

46.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

47.     "*Confirmation Date*" means the date on which Confirmation occurs.

48.     "*Confirmation Hearing*" means the hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code at which the Debtors will seek Confirmation of the Plan.

49.     "*Confirmation Order*" has the meaning ascribed to it in the Asset Purchase Agreement.

50.     "*Consummation*" means the occurrence of the Effective Date.

51.     "*Contributed Third-Party Claims*" means all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform; (b) all Causes of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) all Causes of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided*, *however*, that Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors; (ii) any direct claims against the Released Parties; (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties; or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the currently filed complaint, dated as of July 6, 2022, in the Ontario Superior Court of Justice by Francine De Sousa, against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.

52.     "*Contributing Claimants*" means any Holders of Claims or Interests that elect on their ballots or opt-in forms to contribute their Contributed Third-Party Claims to the Wind-Down ~~Entity~~Debtor.

53.     "*Cryptocurrency*" means a digital currency or crypto asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a

centralized authority, including stablecoins, digital coins and tokens, such as security tokens, utility tokens and governance tokens.

54. "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

55. "*Customer Onboarding Protocol*" means the protocol describing the process of onboarding Account Holders and Holders of OpCo General Unsecured Claims onto the Binance.US Platform, the form of which shall be included in the Plan Supplement and filed no later than by February 8, 2023, and which shall be in a form acceptable to the Purchaser.

56. "*D&O Carriers*" means the insurance carriers of the D&O Liability Insurance Policies.

57. "*D&O Liability Insurance Policies*" means all unexpired insurance policies maintained by the Debtors, the Wind-Down Debtors, or the Estates as of the Effective Date that have been issued (or provide coverage) regarding directors', managers', officers', members', and trustees' liability (including any "tail policy"), including but not limited to the Management Liability Policy, the Excess Policies, and the Side-A Policy, and all agreements, documents, or instruments relating thereto.

58. "*D&O Settlement*" means the settlement between the Debtors and CEO and CCO as set forth in Article IV.G of the Plan.

59. "*Debtors*" means, collectively, each of the following:  Voyager Digital Holdings, Inc.; Voyager Digital Ltd.; and Voyager Digital, LLC.

60. "*Definitive Documents*" means:  (a) the Plan (and any and all exhibits, annexes, and schedules thereto); (b) the Confirmation Order; (c) the Disclosure Statement and the other Solicitation Materials; (d) the Disclosure Statement Order; (e) all pleadings filed by the Debtors in connection with the Chapter 11 Cases (or related orders); (f) the Plan Supplement; (g) the ~~Management~~Employee Transition Plan; (h) any new material employment, consulting, or similar agreements entered into between the Wind-Down ~~Trust~~Debtor and any of the Debtors' employees, if any; (i) the Asset Purchase Agreement; (j) the Customer Onboarding Protocol; and (k) any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments or other documents reasonably desired or necessary to consummate and document the transactions contemplated by the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements made from time to time thereto).

61. "*Disclosure Statement*" means the *Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, as may be amended, supplemented, or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan.

62. "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement.

63. "*Disputed*" means a Claim or an Interest or any portion thereof:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order; and (c) with respect to which a party in interest has Filed a Proof of Claim, a Proof of Interest, or otherwise made a written request to a Debtor for payment.

64.     "*Disputed Claims Reserve*" means an appropriate reserve in an amount to be determined by the Wind-Down ~~Trust~~Debtor for distributions on account of Disputed Claims that are subsequently Allowed after the Effective Date, in accordance with Article VII.D hereof.

65.     "*Distributable Cryptocurrency*" means all Cryptocurrency held on the Voyager platform or that is otherwise property of any Debtor on the Effective Date after payment in full of, or reserve for, all Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims.

66.     "*Distributable HoldCo Cash*" means HoldCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at HoldCo in full; and (y) to fund HoldCo's Pro Rata share of the Wind-Down ~~Reserve~~Budget.

67.     "*Distributable OpCo Cash*" means OpCo's Cash, including the Purchase Price Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at OpCo in full; and (y) to fund OpCo's Pro Rata share of the Wind-Down ~~Reserve~~Budget.

68.     "*Distributable TopCo Cash*" means TopCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at TopCo in full; and (y) to fund TopCo's Pro Rata share of the Wind-Down ~~Reserve~~Budget.

69.     "*Distribution Agent*" means, as applicable, the Purchaser, ~~Wind-Down~~the Debtors, ~~Wind-Down  Trust~~the Wind-Down Debtor or any Entity or Entities designated by the Purchaser, ~~Wind-Down~~the Debtors, or the ~~Wind-Down  Trust (as applicable)~~Wind-Down Debtor to make or to facilitate distributions that are to be made pursuant to the Plan, Definitive Documents, and Asset Purchase Agreement.

70.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Wind-Down ~~Trust~~Debtor, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims or Allowed Interests entitled to receive distributions under the Plan.

71.     "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims and Interests against the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date, or such other date as is determined by the Debtors or designated by an order of the Bankruptcy Court.

72.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.

73.     "*Employee Transition Plan*" has the meaning set forth in Article IV.E of the Plan, and which shall be in form and substance reasonably acceptable to the Committee.

74.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

75.     "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

76.    "*Excess Policies*" means, collectively, the Excess Insurance Policy, No. EFI1203041-01, issued by Euclid Financial on behalf of Certain Underwriters of Lloyd's, London, the Excess Insurance Policy, No. RILEDOA3392022, issued by Relm Insurance Ltd., both for the February 22, 2022 to February 22, 2023 period, and the Excess Policy, No. ELU184180-23, issued by XL Specialty Insurance Company, for the February 22, 2022 to July 1, 2023 period.

77.    "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) the Committee, and each of the members thereof, solely in their capacity as such; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; and (e) the Distribution Agent.

78.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

79.    "*Existing Equity Interests*" means any Interest in TopCo existing immediately prior to the occurrence of the Effective Date.

80.    "*Extended Outside Date*" has the meaning set forth in the Asset Purchase Agreement.

81.    "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

82.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing, respectively, in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee, or, with respect to the filing of a Proof of Claim or Proof of Interest, file, filed, or filing, respectively, with the Claims, Noticing, and Solicitation Agent.

83.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

84.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal that has been or may be taken or any petition for certiorari or any motion for a new trial, reargument, reconsideration, or rehearing that has been or may be made or filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the motion for a new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order (if any such motion has been or may be granted), or have otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

85.    "*FTX*" means FTX Trading, Ltd. and any of its Affiliates or subsidiaries, including West Realm Shires Inc (d/b/a "FTX.US").

86.    "*FTX Bankruptcy Proceeding*" means that certain chapter 11 proceeding captioned *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

87.    "*FTX Claims*" means the claims or causes of action asserted or assertable by the Debtors against FTX, whether in the FTX Bankruptcy Proceeding or otherwise.

88.    "*FTX Recovery*" means the recovery, if any, of the Debtors from FTX on account of the FTX Claims.

89.    "*FTX Settlement*" means the settlement between the Debtors, the Committee, FTX, Alameda, and the official committee of unsecured creditors in the FTX Bankruptcy Proceeding, pursuant to the terms set forth in the *Debtors' Motion for Entry of an Order Approving the Joint Stipulation and Agreed Order Between the Voyager Debtors, the FTX Debtors, and Their Respective Official Committees of Unsecured Creditors* [Docket No. 1106].

90.    89.  "*General Unsecured Claim*" means, collectively, any HoldCo General Unsecured Claim, OpCo General Unsecured Claim, or TopCo General Unsecured Claim.

91.    90.  "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

92.    91.  "*Government Bar Date*" means the applicable deadline by which Proofs of Claim by a Governmental Unit must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

93.    92.  "*HoldCo*" means Voyager Digital Holdings, Inc.

94.    93.  "*HoldCo General Unsecured Claim*" means any Claim against HoldCo that is not Secured and is not:  (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; or (h) an Intercompany Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, against HoldCo are HoldCo General Unsecured Claims.

95.    94.  "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

96.    95.  "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

97.    96.  "*Insurance Policies*" means any and all insurance policies entered into by the Debtors, including the D&O Insurance Policies.

98.    97.  "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor.

99.    98.  "*Intercompany Interest*" means, other than an Interest in Voyager, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

100.    99.  "*Interest*" means any equity security (as such term is defined in section 101(16) of the Bankruptcy Code) including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in an Entity whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, and

including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

101.    ~~100.~~ "*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Docket No. 236].

102.    ~~101.~~ "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001 and the rules and regulations promulgated thereunder, as applicable to the Chapter 11 Cases.

103.    ~~102.~~ "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

104.    ~~103.~~ "*Liquidation Procedures*" means, in the event the Sale Transaction is not consummated by the Outside Date, such procedures filed by the Wind-Down ~~Entity~~Debtor identifying the mechanics and procedures to effectuate the Liquidation Transaction.

105.    ~~104.~~ "*Liquidation Transaction*" means, in the event the Sale Transaction is not consummated by the Outside Date, the distribution of the Debtors' Cryptocurrency, Cash and other assets pursuant to Article IV.D of this Plan.

106.    ~~105.~~ "*Management Liability Policy*" means the Executive and Corporate Securities Liability Insurance Policy, No. ELU181214-22, issued by XL Specialty Insurance Company for the February 22, 2022 to February 22, 2023 period.

~~106. "Management Transition Plan" has the meaning set forth in Article IV.E of the Plan, and which shall be in form and substance reasonably acceptable to the Committee.~~

107.    "*Money Transmitter License*" means any consent, license, certificate, franchise, permission, variance, clearance, registration, qualification, authorization, waiver, exemption or other permit issued, granted, given or otherwise made available by or under the authority of any Governmental Unit pursuant to state money transmission or similar laws.

108.    ~~107.~~ "*Net Owed Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

109.    ~~108.~~ "*Non-Released D&O Claims*" has the meaning set forth in Article IV.F of the Plan.

110.    ~~109.~~ "*Non-Released D&O Claim Budget*" means the amount allocated to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims, which amount shall be agreed upon between the Debtors and the Committee prior to the Confirmation Hearing.

111.    ~~110.~~ "*Non-Released Insurance Claims*" has the meaning set forth in Article IV.F of the Plan.

112.    ~~111.~~ "*OpCo*" means Voyager Digital, LLC.

113.    ~~112.~~ "*OpCo General Unsecured Claim*" means any Claim against OpCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Account Holder Claim; or (h) an Intercompany Claim. For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and

Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation against OpCo are OpCo General Unsecured Claims.

114.    113. "*OSC*" means the Ontario Securities Commission.

115.    114.  "*Other Priority Claim*" means any Claim against a Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

116.    115. "*Outside Date*" has the meaning set forth in the Asset Purchase Agreement.  All references herein to the "Outside Date" shall be deemed to include the "Extended Outside Date" to the extent the Outside Date is extended in accordance with Section 8.1(c) of the Asset Purchase Agreement.

117.    116. "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

118.    117. "*Petition Date*" means July 5, 2022.

119.    118. "*Plan*" means this joint chapter 11 plan and all exhibits, supplements, appendices, and schedules hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with Article X.A hereof, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

120.    "*Plan Administrator*" means the Person or Persons selected by the Committee, after consultation with the Debtors, subject to the approval of the Bankruptcy Court and identified in the Plan Supplement, to serve as the administrator(s) of the Wind-Down Debtor, and any successor thereto, appointed pursuant to the Plan Administrator Agreement.

121.    "*Plan Administrator Agreement*" means that certain agreement by and among the Debtors, the Committee, the Plan Administrator and the Wind-Down Debtor, which shall be included in the Plan Supplement in a form reasonably acceptable to the Committee.

122.    119. "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may thereafter be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Plan, the Bankruptcy Code, the Bankruptcy Rules, and applicable law), to be Filed by the Debtors no later than seven days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.  The Plan Supplement may include the following, as applicable:  (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Retained Causes of Action; (c) the Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases; (d) the Customer Onboarding Protocol; (e) the Restructuring Transactions Memorandum; (f) the Wind-Down TrustPlan Administrator Agreement; and (g) the Employee Transition Plan; and (h) any additional documents necessary to effectuate or that is contemplated by the Plan, including any compensation program for any of the Debtors' employees to be established as contemplated in the Plan and the Definitive Documents to facilitate the transfer of Acquired Assets pursuant to the Asset Purchase Agreement and the wind-down of the Debtors' Estates; *provided* that the Schedule of Retained Causes of Action shall be filed no later than 14 days before the Voting Deadline.  The Plan Supplement (and the contents thereof) shall be (x) subject to Purchaser's consent rights solely to the extent set forth under the Asset Purchase Agreement

(and shall otherwise be consistent with the Asset Purchase Agreement) and (y) reasonably acceptable to the Committee.

123. ~~120.~~ "*Priority Tax Claim*" means any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

124. ~~121.~~ "*Pro Rata*" means the proportion that (i) an Allowed Claim or an Allowed Interest in a particular Class bears to (ii) the aggregate amount of Allowed Claims or Allowed Interests in that Class and, solely with respect to Claims in Classes 3 and 4(a), the proportion that an Allowed Claim in either such Class bears to the aggregate amount of Allowed Claims in Classes 3 and 4(a) in the aggregate, unless otherwise indicated.  For purposes of calculating Pro Rata distributions if the Sale Transaction is consummated by the Outside Date, the Pro Rata shares of all Holders of Allowed Claims or Allowed Interests shall be calculated taking into account the Acquired Coins Value of the Net Owed Coins distributed to each of the Account Holders.

125. ~~122.~~ "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

126. ~~123.~~ "*Professional Fee Claim*" means any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

127. ~~124.~~ "*Professional Fee Escrow Account*" means an escrow account funded by the Debtors with Cash no later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

128. ~~125.~~ "*Professional Fee Escrow Amount*" means the aggregate amount of quarterly U.S. Trustee fees, Professional Fee Claims, and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, which shall be estimated pursuant to the method set forth in Article II.B of the Plan.

129. ~~126.~~ "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

130. ~~127.~~ "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

131. ~~128.~~ "*Purchase Price Cash*" means the Cash paid by the Purchaser to OpCo pursuant to the Asset Purchase Agreement.

132. ~~129.~~ "*Purchaser*" means Binance US.

12

133.     130. "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

134.     131. "*Related Party*" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

135.     132. "*Released Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (dc) each of the Released Professionals; (ed) Purchaser and each of its Related Parties; and (fe) each of the Released Voyager Employees (subject to the limitations contained in Article IV.F and Article IV.G of the Plan); *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

136.     133. "*Released Professionals*" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable):  (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Fasken Martineau DuMoulin LLP; (vii) Campbells Legal (BVI); (viii) McDermott Will & Emery LLP; (ix) FTI Consulting, Inc.; (x) Epiq Corporate Restructuring, LLC; (xi) Cassels, Brock & Blackwell LLP; (xii) Paul Hastings LLP; (xiii) Harney Westwood & Riegels LP (BVI); (xiv) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xv) Jenner & Block LLP; (xvi) Seyfarth Shaw LLP; (xvii) Alvarez & Marsal Canada Inc.; (xviii) Blake, Cassels & Graydon LLP; (xix) Jaffe Raitt Heuer & Weiss; (xx) Latham & Watkins LLP; (xxi) Lowenstein Sandler LLP; (xxii) Kramer Levin LLP; and (xxiii) Acura Law Firm; *provided* that if the Asset Purchase Agreement is terminated, Latham & Watkins LLP shall not be a "Released Professional" under the Plan.

137.     134. "*Released Voyager Employees*" means all directors, officers, and Persons employed by each of the Debtors and their Affiliates serving in such capacity on or after the Petition Date but before the Effective Date (subject to the limitations contained in Article IV.F and Article IV.G of the Plan).

138.     135. "*Releasing Parties*" means, collectively, in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (dc) each of the Released Professionals; (ed) each of the Released Voyager Employees; (fe) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (gf) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (hg) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (ih) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

139.     136.    "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, reorganizations, arrangements, continuances, restructurings, transfers, conversions,

dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Committee jointly determine to be necessary to implement the transactions described in this Plan, as described in more detail in Article IV.B herein and the Restructuring Transactions Memorandum.

140.    137. "*Restructuring Transactions Memorandum*" means that certain memorandum as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the Restructuring Transactions, the form of which shall be included in the Plan Supplement, and which shall be in a form reasonably acceptable to the Committee.

141.    138. "*Robertson Class Action*" means that certain putative class action litigation filed in the United States District Court for the Southern District of Florida, captioned *Robertson, et al. v. Cuban, et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022).

142.    139. "*Sale Transaction*" means the sale of certain of the Debtors' assets and all other transactions pursuant to the Asset Purchase Agreement.

143.    140. "*Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance acceptable to the Purchaser and in all respects consistent with the terms of the Asset Purchase Agreement, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors and assigned to the Purchaser pursuant to the Plan and Asset Purchase Agreement, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Trust Debtor, as applicable, in accordance with the Plan.

144.    141. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance reasonably acceptable to the Committee, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Trust Debtor, as applicable, in accordance with the Plan.

145.    142. "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, settled, compromised, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors and/or the Wind-Down Entity Debtor, which shall be included in the Plan Supplement. For the avoidance of doubt, any failure to specifically list any Causes of Action on the Schedule of Retained Causes of Action shall not be deemed a waiver or admission that any such Cause of Action does not constitute Vested Causes of Action.

146.    143. "*Schedules*" means, collectively, the schedules of assets and liabilities, Schedule of Assumed Executory Contracts and Unexpired Leases, Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may have been or may be amended, modified, or supplemented from time to time.

147.    144. "*SEC*" means the United States Securities and Exchange Commission.

148.    145. "*Section 510(b) Claim*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code.

149.    146. "*Secured*" means, when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to

applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a secured Claim.

150. 147. "*Secured Tax Claim*" means any Secured Claim against a Debtor that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

151. 148. "*Securities Act*" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

152. 149. "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

153. 150. "*Side-A Policy*" means the Cornerstone A-Side Management Liability Policy, ELU184179-22, issued by XL Specialty Insurance Company, for the July 1, 2022 to July 1, 2023 period.

154. 151. "*Solicitation Materials*" means all solicitation materials with respect to the Plan.

155. 152. "*Special Committee*" means the special committee established at OpCo, comprised of two independent directors, to conduct the Special Committee Investigation.

156. 153. "*Special Committee Investigation*" means that certain investigation undertaken by the Special Committee into certain historical transactions, as more fully described in the Disclosure Statement.

157. 154. "*Supported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

158. 155. "*TopCo*" means Voyager Digital Ltd., a Canadian corporation that is publicly traded on the Toronto Stock Exchange.

159. 156. "*TopCo General Unsecured Claim*" means any Claim against TopCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; (h) an Intercompany Claim; or (i) a Section 510(b) Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, other than 510(b) Claims, against TopCo are TopCo General Unsecured Claims.

160. 157. "*Transferred Creditors*" means Account Holders and Holders of Allowed OpCo General Unsecured Claims who have completed all documentation and "KYC" processes reasonably required by Purchaser in the ordinary course of Purchaser's business with respect to similarly situated clients and who have opened a Binance US Account as of the date that is three (3) months following the later of the Closing Date (as defined in the Asset Purchase Agreement) or such later date as may be specified in the Customer Onboarding Protocol, and the successors and assigns of such Holders.

161.    158.—"*Transferred Cryptocurrency Value*" means the aggregate VWAP of any Cryptocurrency that is the subject of an Additional Bankruptcy Distribution as of the date that is two Business Days prior to such Additional Bankruptcy Distribution.

162.    159.—"*U.S. Trustee*" means the Office of the United States Trustee for Region 2.

163.    160.—"*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that, after the expiration of six months after the Effective Date, has not:  (a) accepted a distribution, (b) given notice to the Wind-Down ~~Trust~~Debtor of an intent to accept a particular distribution, (c) responded to the Debtors' or Wind-Down ~~Trust's~~Debtor's requests for information necessary to facilitate a particular distribution, or (d) taken any other action necessary to facilitate such distribution.

164.    161.—"*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

165.    162.—"*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

166.    163.—"*Unsupported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

167.    164.—"*Unsupported Jurisdiction Approval*" has the meaning ascribed to it in the Asset Purchase Agreement.

168.    165.—"*Vested Causes of Action*" means the Causes of Action vesting in the Wind-Down ~~Entity~~Debtor pursuant to Article IV.L of the Plan, including, but not limited to, those Causes of Action enumerated on the Schedule of Retained Causes of Action, which shall be included in the Plan Supplement and in all respects consistent with the terms of the Asset Purchase Agreement.

169.    166.—"*VGX*" means Voyager Token, that certain Cryptocurrency issued by the Debtors.

170.    167.—"*Voting Deadline*" means February 22, 2023.

171.    168.—"*Voyager*" means Voyager Digital Ltd. and its direct and indirect Affiliates.

172.    169.—"*VWAP*" means, with respect to any type of Cryptocurrency and as of any date of determination, an amount equal to the volume weighted average price in U.S. dollars for such type of Cryptocurrency for the consecutive 24-hour period immediately prior to 8:00 a.m. New York Time on such date of determination, as reported on https://coinmarketcap.com.

173.    170.—"*Wind-Down Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date~~.~~

~~171.~~, and as "*Wind-Down Entity*" means the Wind-Down Debtor or the Wind-Down Trust, as applicable, pursuant to the Restructuring Transactions Memorandum.

~~172. "Wind-Down Entity Assets" means the Wind-Down Trust Assets or any assets transferred to the Wind-Down Debtor, as applicable.~~

16

~~173. "*Wind-Down Reserve*" means an amount, which shall be agreed upon between the Debtors and the Committee prior to the Confirmation Hearing.~~

~~174.~~ "*Wind-Down Trust*" means the trust ~~established on the Effective Date and~~ described in Article IV.H to ~~be established under Delaware trust law that~~, among other things, ~~shall~~ effectuate the wind-down of the ~~Wind-Down~~ Debtors and the Wind-Down Debtor, commence, litigate and settle the Vested Causes of Action that are not released, waived, settled, compromised, or transferred under the Plan and make distributions pursuant to the terms of the Plan and the ~~Wind-Down Trust~~Plan Administrator Agreement; *provided* that, for the avoidance of doubt, the Wind-Down ~~Trust~~Debtor shall not conduct any business operations or continue the Debtors' business operations after the Effective Date.

~~175. "*Wind-Down Trust Agreement*" means that certain trust agreement by and among the Debtors, the Committee, and the Wind-Down Trust, which shall be included in the Plan Supplement in a form reasonably acceptable to the Committee.~~

174. ~~176.~~ "*Wind-Down ~~Trust~~Debtor Assets*" means ~~all~~any assets of the Debtors~~' assets~~ transferred to, and vesting in, the Wind-Down ~~Trust~~Debtor pursuant to the ~~Wind-Down Trust~~Plan Administrator Agreement, which, in the event the Sale Transaction is consummated, shall exclude the Acquired Assets, and which shall include, without limitation but only to the extent the following are not Acquired Assets, (a) the Wind-Down Reserve, (b) the Net-Owed Coins to be distributed to Account Holders in Supported Jurisdictions until such Account Holders complete the Purchaser's onboarding requirements in accordance with the Asset Purchase Agreement, (c) the Net-Owed Coins to be distributed to Account Holders in Unsupported Jurisdictions to the extent the Purchaser has not obtained the applicable Unsupported Jurisdiction Approval in accordance with Section 6.12 of the Asset Purchase Agreement, (c~~d~~) any distributions to Account Holders or Holders of OpCo General Unsecured Claims that are returned to the Wind-Down ~~Entity~~Debtor pursuant to Section 6.12(e) of the Asset Purchase Agreement, (d~~e~~) 3AC Claims and 3AC Recovery, (e~~f~~) FTX Claims and FTX Recovery, (f~~g~~) Alameda Claims and Alameda Recovery, (g~~h~~) the Non-Released D&O Claims, and (h~~i~~) the Vested Causes of Action.

175. ~~177.~~ "*Wind-Down ~~Trust~~Debtor Beneficiaries*" means the Holders of Allowed Claims or Allowed Interests that are entitled to receive distributions pursuant to the terms of the Plan, whether or not such Claims or Interests are Allowed as of the Effective Date.

176. ~~178.~~ "*Wind-Down ~~Trust~~Debtor Expenses*" means all actual and necessary costs and expenses incurred by the Wind-Down ~~Trustee~~Debtor or Plan Administrator in connection with carrying out the obligations of the Wind-Down ~~Trustee~~Debtor pursuant to the terms of the Plan and the ~~Wind-Down Trust~~Plan Administrator Agreement.

177. ~~179.~~ "*Wind-Down ~~Trust~~Debtor Oversight Committee*" means the oversight committee tasked with overseeing the Wind-Down ~~Trust~~Debtor in accordance with the Plan and the ~~Wind-Down Trust~~Plan Administrator Agreement.

178. ~~180.~~ "*Wind-Down ~~Trust Units~~*" ~~means the beneficial interests in the Wind-Down Trust as more fully set forth in the Wind-Down Trust Agreement~~*Budget*" means the budget to fund the Wind-Down Debtor, which will be included in the Plan Supplement.

179. ~~181.~~ "*Wind-Down ~~Trustee~~*" ~~means the Person or Persons selected by the Committee, after consultation with the Debtors, subject to the approval of the Bankruptcy Court and identified in the Plan Supplement, to serve as the trustee(s) of the Wind-Down Trust, and any successor thereto,~~

17

appointed pursuant to*Reserve*" means the amount set forth in the Wind-Down Budget to fund the Wind-Down ~~Trust Agreement~~Debtor.

## B.    Rules of Interpretation

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (3) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (4) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter have been or may thereafter be validly amended, amended and restated, supplemented, or otherwise modified; (5) unless otherwise specified, any reference to an Entity as a Holder of a Claim or Interest, includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) unless otherwise specified, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases; (14) any effectuating provisions may be interpreted by the Debtors or the Wind-Down ~~Trust~~Debtor in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (15) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (16) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (18) the use of "include" or "including" is without limitation unless otherwise stated.

## C.    Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      **Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control); *provided* that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Wind-Down Debtors, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

E.      **Reference to Monetary Figures**

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

F.      **Reference to the Debtors or the Wind-Down Debtors**

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Wind-Down Debtors mean the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

G.      **Nonconsolidated Plan**

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

## ARTICLE II.

## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A.      **Administrative Claims**

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), unless previously Filed, requests for payment of Allowed Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code) must be Filed and served on the Wind-Down ~~Entity~~Debtor pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied as of the Effective Date without the need for any objection from the Wind-Down ~~Entity~~Debtor or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  Objections to such requests, if any, must be Filed and served on the Wind-Down ~~Entity~~Debtor and the requesting party by the Claims

Objection Bar Date for Administrative Claims. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive an amount of Cash equal to the amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down ~~Entity~~Debtor, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court. Any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned to the sender in full.

Objections to requests for payment of such Administrative Claims, if any, must be Filed with the Bankruptcy Court and served on the Wind-Down ~~Entity~~Debtor and the requesting Holder no later than the Claims Objection Bar Date for Administrative Claims. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

**B.**     **Professional Fee Claims**

1.     Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than ~~forty-five~~sixty (~~45~~60) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules. The Wind-Down ~~Entity~~Debtor shall pay Professional Fee Claims in Cash to such Professionals in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down ~~Entity's~~Debtor's obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

2.     Professional Fee Escrow Account

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and the U.S. Trustee and for no other

20

Entities until all quarterly U.S. Trustee fees and all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the U.S. Trustee or to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Wind-Down ~~Entity~~Debtor. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, and all U.S. Trustee quarterly fees plus statutory interest, if any, have been paid in full, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Wind-Down ~~Entity~~Debtor without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

3.      Professional Fee Escrow Amount

The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided* that the Wind-Down ~~Entity~~Debtor shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4.      Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors and/or the Wind-Down ~~Entity~~Debtor, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Wind-Down ~~Entity~~Debtor. Upon the ~~Effective~~Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down ~~Entity~~Debtor may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

For the avoidance of doubt, no Administrative Claims, Professional Fee Claims, or any other post-confirmation fees and expenses shall be paid prior to payment of any quarterly fees due and outstanding to the U.S. Trustee.

C.      **Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release, and in exchange for, each

Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

**A.    Classification of Claims and Interests**

Except for the Claims addressed in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

**B.    Summary of Classification**

A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is set forth in the following chart.  The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below applies separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.E hereof.  Voting tabulations for recording acceptances or rejections of the Plan will be conducted on a Debtor-by-Debtor basis as set forth above.[1]

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| 4A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |

---

[1]    The Debtors reserve the right to separately classify Claims or Interests to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 4C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**C.      Treatment of Classes of Claims and Interests**

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or Wind-Down ~~Entity~~Debtor, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable.  In no event shall any Holder of a Claim receive more than such Holder's Allowed amount on account of such Claim.

1.      <u>Class 1 —Secured Tax Claims</u>

(a)      *Classification*: Class 1 consists of all Secured Tax Claims.

(b)      *Treatment*: Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down ~~Entity~~Debtor, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired.

(c)      *Voting*: Class 1 is Unimpaired under the Plan.  Holders of Allowed Secured Tax Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Secured Tax Claims are not entitled to vote to accept or reject the Plan.

2.      <u>Class 2 — Other Priority Claims</u>

(a)      *Classification*: Class 2 consists of all Other Priority Claims.

(b)      *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other

Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

(c)  *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.  Class 3 — Account Holder Claims

(a)  *Classification*:  Class 3 consists of all Account Holder Claims.

(a)  (b) *Allowance*: Account Holder Claims shall be conclusively Allowed in the amount listed on OpCos's *Amended Schedules of Assets and Liabilities* (Case No. 22-10945) [Docket No. 18]; *provided* that the rights of any Holder of an Account Holder Claim to object to the scheduled amount shall be preserved. To the extent an Account Holder Claim is Allowed in a greater amount than the scheduled amount of such Account Holder Claim, such Holder shall be entitled to a subsequent distribution such that it will receive its Pro Rata share of recoveries to Holders of Allowed Account Holder Claims.  Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

(b)  (c) *Treatment*:  Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim:

(i)  If the Sale Transaction is consummated by the Outside Date:

A.  its Net Owed Coins, as provided in and subject to the requirements of Sections 6.10 and 6.12 of the Asset Purchase Agreement; *provided* that for Account Holders in Supported Jurisdictions who do not complete the Purchaser's onboarding requirements within three (3) months following the Closing Date and Account Holders in Unsupported Jurisdictions and only to the extent that the Purchaser does not obtain the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides within 6 months following the Closing Date (as defined in the Asset Purchase Agreement), such Account Holders shall receive, after expiration of such time period, value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated;

B.  its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

C.  its Pro Rata share of Distributable OpCo Cash; and

24

D.   to effectuate distributions from the Wind-Down ~~Entity~~Debtor, its Pro Rata share of the Wind-Down ~~Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust~~Debtor Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down ~~Entity Assets or Wind-Down Trust Units (if applicable)~~Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo;

*provided* that distributions made to any Account Holder pursuant to clauses (B), (C), and (D) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder; or

(ii)   If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

A.   its Pro Rata share of Distributable OpCo Cash;

B.   its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and

C.   to effectuate distributions from the Wind-Down ~~Entity~~Debtor, its Pro Rata share of the Wind-Down ~~Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable)~~Debtor Assets attributable to OpCo; *provided* that any distributions on account of Wind-Down ~~Entity Assets or Wind-Down Trust Units (if applicable)~~Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo.

(c)    (d) *Voting:*  Class 3 is Impaired under the Plan.  Holders of Allowed Account Holder Claims are entitled to vote to accept or reject the Plan.

4.    Class 4A — OpCo General Unsecured Claims

(a)    *Classification*:  Class 4A consists of all OpCo General Unsecured Claims.

(b)    (b) *Treatment*:  Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:

    (i)    If the Sale Transaction is consummated by the Outside Date:

        A.    its Pro Rata share of Distributable Cryptocurrency in Cash;

        B.    its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

        C.    its Pro Rata share of Distributable OpCo Cash; and

        D.    to effectuate distributions from the Wind-Down ~~Entity~~Debtor, its Pro Rata share of the Wind-Down ~~Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust~~Debtor Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down ~~Entity Assets or Wind-Down Trust Units (if applicable)~~Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo; or

    (ii)    If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

        A.    its Pro Rata share of Distributable Cryptocurrency in Cash;

        A.    B. its Pro Rata share of Distributable OpCo Cash; and

        B.    C. to effectuate distributions from the Wind-Down ~~Entity~~Debtor, its Pro Rata share of the Wind-Down ~~Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable)~~Debtor Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down ~~Entity Assets or Wind-Down Trust Units (if applicable)~~Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo.

26

(c)    ~~(c)~~ *Voting*:  Class 4A is Impaired under the Plan.  Holders of Allowed OpCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.    <u>Class 4B — HoldCo General Unsecured Claims</u>

(a)    *Classification*:  Class 4B consists of all HoldCo General Unsecured Claims.

(b)    ~~(b)~~ *Treatment*:  Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim:

(i)    its Pro Rata share of Distributable HoldCo Cash; and

(ii)    to effectuate distributions from the Wind-Down ~~Entity~~<u>Debtor</u>, its Pro Rata share of the Wind-Down ~~Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable)~~<u>Debtor Assets</u> attributable to HoldCo; *provided* that any distributions on account of the Wind-Down ~~Entity Assets or Wind-Down Trust Units (if applicable)~~<u>Debtor Assets attributable to HoldCo</u> shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims <u>at HoldCo</u>.

(c)    ~~(c)~~ *Voting*:  Class 4B is Impaired under the Plan.  Holders of Allowed HoldCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

6.    <u>Class 4C — TopCo General Unsecured Claims</u>

(a)    *Classification*:  Class 4C consists of all TopCo General Unsecured Claims.

(b)    ~~(b)~~ *Treatment*:  Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim:

(i)    its Pro Rata share of Distributable TopCo Cash; and

(ii)    to effectuate distributions from the Wind-Down ~~Entity~~<u>Debtor</u>, its Pro Rata share of the Wind-Down ~~Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust~~<u>Debtor</u> Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down ~~Entity Assets or the Wind-Down Trust Units (if applicable)~~<u>Debtor Assets attributable at TopCo</u> shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims <u>at TopCo</u>.

(c)    ~~(c)~~ *Voting*:  Class 4C is Impaired under the Plan.  Holders of Allowed TopCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

7.    <u>Class 5 — Alameda Loan Facility Claims</u>

(a)    *Classification*:  Class 5 consists of all Alameda Loan Facility Claims.

(b)    *Treatment*:  If the FTX Settlement becomes effective, Eeach Holder of an Allowed Alameda Loan Facility Claim ~~will receive in exchange for such Allowed Alameda Loan Facility Claim to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets; *provided* that any distributions on account of Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for,~~shall, at the election of the Debtors with the consent of the Committee, in their sole discretion, following written notice to counsel to FTX, Alameda and to the official committee of unsecured creditors in the FTX Bankruptcy Proceeding of such election, which written notice shall be given no later than the date that is thirty (30) days after the Confirmation Hearing, (a) withdraw its Alameda Loan Facility Claims in their entirety, with prejudice to FTX or any other party reasserting such claims, or (b) contribute the Alameda Loan Facility Claims to OpCo.  If the FTX Settlement does not become effective, the Alameda Loan Facility Claims shall be subordinated to all Allowed Claims at OpCo, HoldCo, and TopCo, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, Allowed OpCo General Unsecured Claims, Allowed HoldCo General Unsecured Claims, and Allowed TopCo General Unsecured Claims; *provided, however*, if the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity.

(c)    *Voting*: Class 5 is Impaired under the Plan.  Holders of Allowed Alameda Loan Facility Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Alameda Loan Facility Claims are not entitled to vote to accept or reject the Plan.

8.    Class 6 — Section 510(b) Claims

(a)    *Classification*: Class 6 consists of all Section 510(b) Claims against TopCo.

(b)    *Allowance*:  Notwithstanding anything to the contrary herein, a Section 510(b) Claim against TopCo, if any such Section 510(b) Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

(c)    *Treatment*:  Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down ~~Entity~~Debtor, its Pro Rata share of the Wind-Down ~~Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable)~~Debtor Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down ~~Entity Assets or Wind-Down Trust Units (if applicable)~~Debtor Assets attributable to TopCo shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims at TopCo.

(d)    *Voting*: Class 6 is Impaired under the Plan.  Holders (if any) of Allowed Section 510(b) Claims against TopCo are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders (if any) of

Allowed Section 510(b) Claims against TopCo are not entitled to vote to accept or reject the Plan.

9.    Class 7 — Intercompany Claims

    (a)    *Classification*:  Class 7 consists of all Intercompany Claims.

    (b)    *Treatment*:  ~~On the Effective Date, all~~Each Intercompany Claim~~s~~ shall ~~be, at the option of the Debtors, either (a) Reinstated or (b) converted to equity, otherwise set off, settled, distributed, contributed, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum.~~receive the treatment for such Intercompany Claim as determined by the Bankruptcy Court.

    (c)    *Voting*:  Holders of Intercompany Claims are either Unimpaired or Impaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

10.    Class 8 — Intercompany Interests

    (a)    *Classification*:  Class 8 consists of all Intercompany Interests.

    (b)    *Treatment*:  On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum.

    (c)    *Voting*:  Holders of Intercompany Interests are either Unimpaired or Impaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

11.    Class 9 — Existing Equity Interests

    (a)    *Classification*:  Class 9 consists of all Existing Equity Interests.

    (b)    *Treatment*:  Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the Wind-Down ~~Entity~~Debtor, its Pro Rata share of the Wind-Down ~~Trust Units (if applicable) on account of any recovery of Wind-Down  Trust~~Debtor Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down ~~Trust Units~~Debtor Assets attributable at TopCo shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims at TopCo.

    (c)    *Voting*:  Class 9 is Impaired under the Plan.  Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the

Bankruptcy Code. Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

**D.      Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Wind-Down ~~Entity's~~Debtor's rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**E.      Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**F.      Subordinated Claims**

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down ~~Entity~~Debtor reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**G.      Intercompany Interests**

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure given the existing intercompany systems connecting the Debtors and their Affiliates, and in exchange for the Debtors' and Wind-Down ~~Entity's~~Debtor's agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

**H.      Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**I.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims or Interests.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of

30

Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE IV.

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

### A.    General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

### B.    Restructuring Transactions

On or before the Effective Date, the applicable Debtors will take any action as may be necessary or advisable to effectuate the Restructuring Transactions described in the Plan, the Restructuring Transactions Memorandum, and the Customer Onboarding Protocol, including:  (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) the transfer or distribution of any Cryptocurrency or Cash pursuant to the Asset Purchase Agreement, or the Liquidation Procedures, as applicable; (5) the execution and delivery of the ~~Wind-Down Trust~~Plan Administrator Agreement; (6) any transactions necessary or appropriate to form <u>or convert into</u> the Wind-Down ~~Entity~~Debtor; (7) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (8) all transactions necessary to provide for the purchase of the Acquired Assets by Purchaser under the Asset Purchase Agreement; and (9) all other actions that the applicable Entities determine to be necessary or appropriate, or that are reasonably requested by the Purchaser in accordance with the Asset Purchase Agreement, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect

any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

**C.      The Sale Transaction**

If the Sale Transaction is consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the following terms shall govern:

On or prior to the Effective Date, the Debtors shall have consummated the Sale Transaction, and, among other things, the Acquired Assets and Assumed Liabilities shall have transferred to the Purchaser free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and the Purchaser shall pay to the Debtors or Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims, as applicable, the proceeds from the Sale Transaction, as and to the extent provided for in the Asset Purchase Agreement, and this Plan.  The Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down ~~Entity~~Debtor, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Asset Purchase Agreement the Customer Onboarding Protocol, and this Plan.  The Debtors shall be authorized to sell any Cryptocurrency to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.  On and after the Effective Date, except as otherwise provided in the Plan and the ~~Wind-Down Trust~~Plan Administrator Agreement, the Wind-Down Debtor~~s, the Wind-Down Entity~~, or the Purchaser, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

Notwithstanding anything contained in this Plan and any Definitive Documents, if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, all provisions contained in this Plan and the Definitive Documents governing the Sale Transaction shall have no further force and effect, and the provisions governing the Liquidation Transaction shall govern. The rights and remedies of the Seller and Purchaser under the Asset Purchase Agreement and any related orders of the Bankruptcy Court shall be expressly preserved.

**D.      The Liquidation Transaction**

If the Sale Transaction is not consummated by the Outside Date, pursuant to the Asset Purchase Agreement, then the following terms shall govern:

1.      *The Liquidation Transaction*

On or after the Outside Date, the Debtors will pursue the Liquidation Transaction in accordance with the Liquidation Procedures.  Pursuant to the Liquidation Transaction, the Debtors, the Wind-Down ~~Entity~~Debtor, or the ~~Wind Down Trustee~~Plan Administrator, as applicable, will distribute certain of the Cryptocurrency in-kind to Holders of Account Holder Claims in accordance with Article III.C of the Plan, transfer all Wind-Down ~~Entity Assets or Wind-Down Trust~~Debtor Assets to the Wind-Down ~~Reserve~~Debtor, liquidate certain of the Cryptocurrency, distribute Cash to Holders of Claims, wind down

and dissolve the Debtors, and pursue final administration of the Debtors' Estates pursuant to the Bankruptcy Code.

The Debtors, or the Wind-Down ~~Entity~~Debtor, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Liquidation Transaction pursuant to this Plan. On or before the date that is twenty-one days prior to the anticipated commencement of the Liquidation Transaction, the Debtors, or the Wind-Down ~~Entity~~Debtor, as applicable, shall file the Liquidation Procedures with the Bankruptcy Court. Parties in interest shall have ten days to object to the Liquidation Procedures, and if no objections are timely filed, the Liquidation Procedures shall be approved. In the event of a timely objection, the Bankruptcy Court shall adjudicate any objection to the Liquidation Procedures.

On and after the Effective Date, except as otherwise provided in the Plan, the ~~Wind-Down Trust~~Plan Administrator Agreement, and the Liquidation Procedures, the ~~Wind-Down~~ Debtors or the Wind-Down ~~Entity~~Debtor, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

2.      *Cryptocurrency Rebalancing*

Prior to the Effective Date the Debtors shall, in consultation with the Committee, be authorized to rebalance their Cryptocurrency portfolio to ensure that the Debtors can effectuate *pro rata* in-kind distributions of the Distributable Cryptocurrency according to Article III.C.3(c) of this Plan, *provided* that such rebalancing shall be in accordance with the Asset Purchase Agreement (if the Asset Purchase Agreement has not been terminated). The Debtors may effectuate such rebalancing by (i) selling such Cryptocurrency that cannot be distributed to Account Holders, (ii) purchasing Cryptocurrency supported by Voyager's or Purchaser's platform (as provided by the Asset Purchase Agreement) that shall be distributed to Account Holders, and (iii) engaging in any other transaction, including the execution of trades of Cryptocurrency, necessary or appropriate to effectuate distributions of the Distributable Cryptocurrency to Holders of Allowed Account Holder Claims.

**E.      ~~Management and~~ Employee Transition Plan~~s~~**

The Debtors shall be authorized to implement the ~~Management Transition Plan and~~ Employee Transition Plan, the terms of which shall be reasonably acceptable to Purchaser and the Committee and included in the Plan Supplement. The ~~Management Transition Plan and~~ Employee Transition Plan shall help ensure that employees are available to provide transition services to the Debtors and/or the Wind-Down ~~Entity~~Debtor to effectuate the Sale Transaction and to wind down the Debtors' Estates.

**F.      Non-Released D&O Claims**

Any Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' CEO and/or CCO (regardless of any fiduciary capacity in which such individuals were acting) that are expressly related to approval of the 3AC Loan are not released pursuant to the Plan (collectively, the "Non-Released D&O Claims"), and shall be assigned and transferred to the Wind-Down ~~Entity~~Debtor to be pursued, settled, or resolved by the Wind-Down ~~Entity~~Debtor in accordance with the terms of Article IV.G of this Plan and subject to the Wind-Down ~~Reserve~~Budget. Any claims against the D&O Carriers that the Debtors' insurance transactions within the 90 days prior to the Petition Date are avoidable under the Bankruptcy Code, applicable state law, or both (the "Non-Released Insurance

Claims") shall be assigned and transferred to the Wind-Down ~~Entity~~Debtor to be pursued, settled, or resolved solely by the Wind-Down ~~Entity~~Debtor in accordance with the terms of Article IV.G of this Plan. The Wind-Down ~~Entity~~Debtor shall be a successor to the Debtors' rights, title, and interest in any Non-Released D&O Claims and Non-Released Insurance Claims, and the Wind-Down ~~Entity~~Debtor shall have standing to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims in accordance with the terms of Article IV.G of this Plan; *provided* that: (i) any recovery by the Wind-Down ~~Entity~~Debtor (and the beneficiaries thereof) on account of any Non-Released D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O Liability Insurance Policies (and/or from the D&O Carriers directly) after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims; (ii) any party, including any trustee or any beneficiary of the Wind-Down ~~Entity~~Debtor, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the Non-Released D&O Claims shall do so solely upon available insurance coverage from the Debtors' available D&O Liability Insurance Policies; and (iii) no party shall (a) record any judgment against the CEO or CCO, or (b) otherwise attempt to collect, directly or indirectly, from the personal assets of the CEO or CCO with respect to the Non-Released D&O Claims. For the avoidance of doubt, this provision does not enjoin, limit, or impair direct claims held by third parties against the Debtors' CEO or CCO (if any) other than any direct claims held by Holders of Claims or Interests that opt into the ~~third party~~third-party release in Article VIII.B of this Plan. Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the Non-Released D&O Claims; (y) final resolution of any coverage claims asserted against the Debtors' available D&O Liability Insurance Policies on account of the Non-Released D&O Claims; or (z) exhaustion of the available insurance coverage under the D&O Liability Insurance Policies, the Non-Released D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order. For the avoidance of doubt, any release of the Non-Released D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.

## G.    The D&O Settlement

On the Effective Date, the terms of the D&O Settlement shall be effectuated as provided in this Article IV.G.

Pursuant to the D&O Settlement, CEO shall repay the $1,900,000 received from the Debtors on or around February 28, 2022, by paying the after-tax amount of such transfer (approximately $1,125,000) to OpCo in cash and assigning the right, if any, to any tax refund for the balance to the Wind-Down ~~Entity~~Debtor. CEO shall subordinate any Claims (including any indemnification claims asserted under this Art. IV.F) he holds against the Debtors until all other Holders of Claims are paid in full. CCO shall subordinate 50 percent of any Claims he holds other than indemnification claims (and 100% of any indemnification claims asserted under this Art. IV.F) against the Debtors until all other Holders of Claims are paid in full; *provided*, *however*, that in the event the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO, each as insureds, under the D&O Liability Insurance Policies agree: (i) not to draw down on the Side-A Policy; *provided*, *however*, that should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down ~~Entity's~~Debtor's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise) such officer shall be entitled to seek coverage under the Side-A Policy to the extent any such coverage remains; and (ii) not to object to any settlement by the Debtors or Wind Down Entity of avoidance claims

34

under the Side-A Policy, even if such settlement results in termination of benefits under the Side-A Policy. For the avoidance of doubt, this agreement is not intended to and shall not alter or amend each of the insureds' duties under the D&O Liability Insurance Policies. In the event that any insurer under the D&O Liability Insurance Policies denies coverage for any reason, the Wind-Down ~~Entity~~Debtor shall have the right to bring a coverage claim against the insurer(s) in the name of the insured, the insureds shall reasonably cooperate with respect to any such claim, and the insured may participate at their election (and at their sole cost). For the avoidance of doubt, nothing contained in this Plan is intended as a waiver or release of the Debtors' and/or Wind-Down ~~Entity's~~Debtor's right to assert any Non-Released D&O Claim, but rather limits such recovery in the manner set forth above.

CEO and CCO shall be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down ~~Entity~~Debtor and retain the right to assert claims for advancement and indemnification up to the limits of any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to CEO and/or CCO based upon or arising out of the lack of a formal claim for indemnification; *provided*, *however*, that any such indemnification or advancement claims shall be subordinated in full unless and until all other Holders of Claims are paid in full; *provided*, *further*, that in the event that any of the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO shall subordinate any and all rights and entitlements under the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd., Policy Number ELU184179-22, to any recovery by the Debtors and/or the Wind-Down ~~Entity~~Debtor on account of the Debtors' and/or Wind-Down ~~Entity's~~Debtor's claims for the avoidance of the premium paid for the policy. For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down ~~Entity's~~Debtor's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), CEO and/or CCO shall be entitled to seek coverage under the Side-A Policy. CEO and CCO shall remain at, and continue performing the responsibilities of, their respective position(s) with the Debtors and assist with the Debtors' transition for at least 30 days from entry of the Confirmation Order; *provided* that CCO shall have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the CEO shall have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided*, *further*, that both the CEO and CCO shall be available to the Debtors and/or the Wind-Down ~~Entity~~Debtor for a maximum of five hours per month for the one year following the Effective Date.

In the event that the sworn financial disclosure statements under penalty of perjury provided to the Debtors, the Special Committee and the Committee by CEO and CCO are later determined at any time by Final Order of the Bankruptcy Court or other court of competent jurisdiction to be materially inaccurate, (a) the limitations on recovery by the Wind-Down ~~Entity~~Debtor under this Article IV.G shall no longer apply, (b) any and all release, exculpation and injunction provisions in Article VIII of this Plan with respect to CEO and/or CCO (as applicable) shall be deemed null and void, (c) all Releasing Parties' rights with respect to the CEO and/or CCO (as applicable) shall be fully intact and preserved, (d) amounts paid by CEO shall not be repaid by the Wind-Down ~~Entity~~Debtor, and (e) any applicable statute of limitations shall be deemed tolled from the Petition Date to the date of entry of the order referenced above. The Wind-Down ~~Trust~~Debtor, as successor to the Debtors, shall have standing to bring a motion seeking relief pursuant to this Article IV.G.

Entry of the Confirmation Order shall be deemed approval of the D&O Settlement and, to the extent not already approved by the Bankruptcy Court, the Debtors or the Wind-Down Debtor~~s~~, as

applicable, are authorized to negotiate, execute, and deliver those documents necessary or appropriate to effectuate the D&O Settlement, without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors, the Wind-Down Debtors, the Committee, and the Special Committee may deem to be necessary to effectuate the D&O Settlement.

**H.    The Wind-Down ~~Trust~~Debtor**

On the Effective Date, the Wind-Down ~~Trust~~Debtor shall be formed or converted into for the benefit of the Wind-Down ~~Trust~~Debtor Beneficiaries and each of the Debtors shall transfer the Wind-Down ~~Trust~~Debtor Assets for distribution in accordance with the terms of the Plan.  The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

1.    Establishment of a Wind-Down ~~Trust~~Debtor

Pursuant to the ~~Wind-Down Trust~~Plan Administrator Agreement, the Wind-Down ~~Trust~~Debtor will be established, formed, merged, or converted.  The Wind-Down ~~Trust~~Debtor shall be the successor-in-interest to the Debtors, and the Wind-Down ~~Trust~~Debtor shall be a successor to the Debtors' rights, title, and interest to the Wind-Down ~~Trust~~Debtor Assets.  The Wind-Down ~~Trust~~Debtor will conduct no business operations and will be charged with winding down the Debtors' Estates.  The Wind-Down ~~Trust~~Debtor shall be managed by the ~~Wind-Down Trustee and shall be subject to a Wind-Down Trust Oversight Committee. For the avoidance of doubt, in the event that the Restructuring Transactions Memorandum specifies that the Wind-Down Debtors will be the Wind-Down Entity, the Wind-Down Debtors shall be managed by the Wind-Down Trustee~~Plan Administrator and shall be subject to the Wind-Down ~~Trust~~Debtor Oversight Committee ~~in the same manner as if the Wind-Down Entity is the Wind-Down Trust~~.  The Wind-Down ~~Trust~~Debtor shall be administered in accordance with the terms of the ~~Wind-Down Trust~~Plan Administrator Agreement and shall be subject to the Wind-Down ~~Reserve~~Budget and the Non-Released D&O Claim Budget.  For the avoidance of doubt, the Wind-Down ~~Trust~~Debtor shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset.  The Wind-Down ~~Trust~~Debtor shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down ~~Trust~~Debtor Assets shall, subject to the ~~Wind-Down Trust~~Plan Administrator Agreement, be transferred to and vest in the Wind-Down ~~Trust or the Wind-Down~~ Debtors~~, as applicable~~.  For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down ~~Entity~~Debtor specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.F and Article IV.G.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down ~~Trust and the Wind-Down Trustee~~Debtor and the Plan Administrator shall have the right to pursue or not to pursue, or, subject to the terms hereof and the ~~Wind-Down Trust~~Plan Administrator Agreement, compromise or settle any Wind-Down ~~Trust~~Debtor Assets transferred to the Wind-Down ~~Trust~~Debtor.  On and after the Effective Date, the ~~Wind-Down Trust~~Wind-Down Debtor and the ~~Wind-Down Trustee~~Plan Administrator may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down ~~Trust~~Debtor Assets transferred to the

Wind-Down ~~Trust~~Debtor or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down ~~Trust or the Wind-Down Trustee~~Debtor and the Plan Administrator on or after the Effective Date, except as otherwise expressly provided herein and in the ~~Wind-Down Trust~~Plan Administrator Agreement. All of the Wind-Down ~~Trust's~~Debtor's activities shall be subject to the Wind-Down ~~Reserve~~Budget and the Non-Released D&O Claim Budget. The Wind-Down ~~Trust~~Debtor shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

The Wind-Down ~~Trustee~~Debtor shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors and the Committee, as applicable, in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down ~~Trust~~Debtor Asset without the need for filing any motion for such relief. On the Effective Date, the Debtors and the ~~Wind-Down Trustee~~Plan Administrator shall execute the ~~Wind-Down Trust~~Plan Administrator Agreement and shall have established the Wind-Down ~~Trust~~Debtor pursuant hereto. In the event of any conflict between the terms of this Article IV.H and the terms of the ~~Wind-Down Trust~~Plan Administrator Agreement, the terms of the ~~Wind-Down Trust~~Plan Administrator Agreement shall control.

2.    Wind-Down ~~Entity~~Debtor Assets

Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional Wind-Down ~~Entity~~Debtor Assets become available, the Debtors shall be deemed, subject to the ~~Wind-Down Trust~~Plan Administrator Agreement, to have automatically transferred to the applicable Wind-Down ~~Entity~~Debtor all of their right, title, and interest in and to all of the Wind-Down ~~Trust~~Debtor Assets, in accordance with section 1141 of the Bankruptcy Code. All such assets shall automatically vest in the Wind-Down ~~Entity~~Debtor free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Interests as set forth herein and the expenses of the Wind-Down ~~Trust~~Debtor as set forth herein and in the ~~Wind-Down Trust~~Plan Administrator Agreement. Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down ~~Entity~~Debtor Assets or the Wind-Down ~~Trust~~Debtor.

3.    Treatment of Wind-Down ~~Trust~~Debtor for Federal Income Tax Purposes; No Successor-in-Interest

The Wind-Down ~~Trust~~Debtor shall be established for the primary purpose of liquidating and distributing the Wind-Down ~~Trust~~Debtor Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind-Down ~~Trust~~Debtor. Accordingly, the ~~Wind-Down Trustee~~Plan Administrator may, in an expeditious but orderly manner, liquidate the Wind-Down ~~Trust~~Debtor Assets, make timely distributions to the Wind-Down ~~Trust~~Debtor Beneficiaries and not unduly prolong its duration. The Wind-Down ~~Trust~~Debtor shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Wind-Down ~~Trust~~Debtor Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Wind-Down ~~Trustee~~Debtor expressly for such purpose.

The Wind-Down ~~Trust~~Debtor is intended to qualify as a "grantor trust" for federal income tax purposes to the extent reasonably practicable, with the Wind-Down ~~Trust~~Debtor Beneficiaries treated as grantors and owners of the Wind-Down ~~Trust~~Debtor. However, with respect to any of the assets of the Wind-Down ~~Trust~~Debtor that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors

37

anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

4.      Appointment of ~~Wind-Down Trustee~~Plan Administrator

The ~~Wind-Down Trustee~~Plan Administrator shall be selected by the Committee, in consultation with the Debtors, and shall be identified in the Plan Supplement.  The appointment of the ~~Wind-Down Trustee~~Plan Administrator shall be approved in the Confirmation Order, and the ~~Wind-Down Trustee's~~Plan Administrator's duties shall commence as of the Effective Date.  The ~~Wind-Down Trustee~~Plan Administrator shall administer the distributions to the Wind-Down ~~Trust~~Debtor Beneficiaries and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Vested Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan, including Article IV.F and Article IV.G.

In accordance with the ~~Wind-Down Trust~~Plan Administrator Agreement, the ~~Wind-Down Trustee~~Plan Administrator shall serve in such capacity through the earlier of (i) the date on which the Wind-Down ~~Trust~~Debtor is dissolved in accordance with the ~~Wind-Down Trust~~Plan Administrator Agreement, and (ii) the date on which a ~~Wind-Down Trustee~~Plan Administrator resigns, is terminated, or is otherwise unable to serve; *provided*, *however*, that, in the event that a ~~Wind-Down Trustee~~Plan Administrator resigns, is terminated, or is otherwise unable to serve, the Wind-Down ~~Trust~~Debtor Oversight Committee shall appoint a successor to serve as a ~~Wind-Down Trustee~~Plan Administrator in accordance with the ~~Wind-Down Trust~~Plan Administrator Agreement.  If the Wind-Down ~~Trust~~Debtor Oversight Committee does not appoint a successor within the time periods specified in the ~~Wind-Down Trust~~Plan Administrator Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Wind-Down ~~Trust~~Debtor, shall approve a successor to serve as a ~~Wind-Down Trustee~~Plan Administrator.

5.      Responsibilities of ~~Wind-Down Trustee~~Plan Administrator

Responsibilities of the ~~Wind-Down Trustee~~Plan Administrator shall be as identified in the ~~Wind-Down Trust~~Plan Administrator Agreement and shall include, but are not limited to:

(a)      ~~I~~implementing the Wind-Down ~~Trust~~Debtor, and making ~~the~~ distributions contemplated by the Plan;

(b)      ~~M~~marshalling, marketing for sale, and ~~wind-down of~~winding down any of the Debtors' assets constituting Wind-Down ~~Trust~~Debtor Assets;

(c)      ~~Filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan  hereof;~~ appointing an independent director at each Debtor to act as a fiduciary for such Debtor entity in connection with the resolution of the Intercompany Claims;

38

(d)    overseeing the accounts of the Debtors and the Wind-Down Debtor and the wind down and dissolution of the Debtors and the Wind-Down Debtor, including effectuating the transactions described in the Restructuring Transactions Memorandum;

(e)    receiving, maintaining, conserving, supervising, prosecuting, collecting, settling, managing, investing, protecting, and where appropriate, causing the Wind-Down Debtor to abandon the Wind-Down Debtor Assets, including causing the Wind-Down Debtor to invest any moneys held as Wind-Down Debtor Assets;

(f)    opening and maintaining bank accounts on behalf of or in the name of the Debtors or the Wind-Down Debtor, including, in the Plan Administrator's discretion, separating bank accounts for each of the Debtors;

(g)    entering into any agreement or executing any document or instrument required by or consistent with the Plan, the Confirmation Order, or the Plan Administrator Agreement, and to perform all obligations thereunder;

(h)    collecting and liquidating all Wind-Down Debtor Assets, including the sale of any Wind-Down Debtor Assets;

(i)    protecting and enforcing the rights to the Wind-Down Debtor Assets (including any Vested Causes of Action and Contributed Third-Party Claims) vested in the Wind-Down Debtor and Plan Administrator by the Plan Administrator Agreement by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

(j)    (d)  Commencing, prosecuting, or settling claims and investigating any Wind-Down Debtor Assets, and any other potential Vested Causes of Action and Contributed Third-Party Claims;

(k)    reviewing, reconciling, compromising, settling, objecting, or prosecuting Claims or Interests of any kind;

(l)    seeking the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004;

(m)    retaining professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to the Plan Administrator Agreement and paying the reasonable compensation thereof;

(n)    paying all lawful expenses, debts, charges, taxes, and other liabilities, and making all other payments relating to the Wind-Down Debtor Assets, solely out of Wind-Down Debtor Assets;

(o)    prosecuting and settling the Vested Causes of Action, including, without limitation, the 3AC Claims, FTX Claims, Alameda Claims, Contributed Third-Party Claims, and any causes of action not included in the Asset Purchase Agreement or released under the Plan;

(p)    reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or

electing not to pursue all Vested Causes of Action and Contributed Third-Party Claims;

(q)    acquiring litigation and other claims related to the Debtors, and prosecuting such claims;

(r)    (e) Recovering reviewing and compelling turnover of the Debtors' or the Wind-Down Debtor's property;

(s)    calculating and making all Distributions to the holders of Allowed Claims against each Debtor and, solely to the extent of payment in full of Allowed Claims, to holders of Allowed Interests, as provided for in, or contemplated by, the Plan and the Plan Administrator Agreement; *provided* that because the Plan does not substantively consolidate the Debtors' Estates, the Plan Administrator shall make Distributions from the Wind-Down Debtor Assets to the holders of Claims and Interests (if applicable) against that specific Debtor;

(t)    (f) Prosecuting and settling the 3AC Claims, FTX Claims, and Alameda establishing, administering, adjusting, and maintaining the Wind-Down Reserve and the Disputed Claims Reserve;

(u)    withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Plan Administrator has determined, based upon the advice of his agents or professionals, may be required to be withheld from such Distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

(v)    in reliance upon the Debtors' Schedules, the official Claims Register maintained in the Chapter 11 Cases and the Debtors' filed lists of equity security holders, reviewing, and where appropriate, allowing or objecting to Claims and (if applicable) Interests, and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and (if applicable) Disputed Interests required to be administered by the Wind-Down Debtor;

(w)    making all tax withholdings, filing tax information returns, filing and prosecuting tax refunds claims, making tax elections by and on behalf of the Debtors or the Wind-Down Debtor, and filing tax returns for the Debtors or the Wind-Down Debtor pursuant to and in accordance with the Plan, and paying taxes, if any, payable for and on behalf of the Debtors or the Wind-Down Debtor, as applicable; *provided, however,* that notwithstanding any other provision of the Plan Administrator Agreement, the Plan Administrator shall not have any responsibility or personal liability in any capacity whatsoever for the signing or accuracy of the Debtors' income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto;

(x)    abandoning or donating to a charitable organization qualifying under IRC section 501(c)(3) any Wind-Down Debtor Assets that the Plan Administrator determines to be too impractical to distribute or of inconsequential value;

(y)    seeking a determination of tax liability or refund under Bankruptcy Code section 505;

(z)    establishing reserves for taxes, assessments, and other expenses of administration of the Debtors or the Wind-Down Debtor as may be necessary and appropriate for the proper operation of matters incident to the Debtors or the Wind-Down Debtor;

(aa)   (g) Ppaying Wind-Down ~~Trust~~Debtor Expenses;

~~(h) Abandoning any Debtor assets that cannot be sold or otherwise disposed of for value and where a distribution to Holders of Allowed Claims or Interests would not be feasible or cost-effective in the Wind-Down Trustee's reasonable judgment;~~

~~(i) Preparing and filing post-Effective Date operating reports (including the month in which the Effective Date occurs);~~

~~(j) Filing appropriate tax returns in the exercise of the Wind-Down Trustee's fiduciary obligations;~~

~~(k) Retaining such Professionals as are necessary and appropriate in furtherance of the Wind-Down Trustee's fiduciary obligations; and~~

~~(l) Taking such actions as are necessary and reasonable to carry out the purposes of the Wind-Down Trust, including winding down the Debtors' business affairs.~~

(bb)   if the Plan Administrator deems appropriate in the Plan Administrator's sole discretion, seeking to establish a bar date for filing proofs of Interest in any Debtor or otherwise to determine the holders and extent of Allowed Interests in any Debtor;

(cc)   purchasing and carrying all insurance policies that the Plan Administrator deems reasonably necessary or advisable and paying all associated insurance premiums and costs;

(dd)   undertaking all administrative functions remaining in the Chapter 11 Cases to the extent necessary to carry out the Debtors', the Wind-Down Debtor's, or the Plan Administrator's duties under the Plan, including reporting and making required payments of fees to the U.S. Trustee and overseeing the closing of the Chapter 11 Cases;

(ee)   retaining, terminating, appointing, hiring, or otherwise employees, personnel, management, and directors at any of the Debtors to the extent necessary to carry out the purposes of the Plan Administrator Agreement and the Plan, including, without limitation, to address any disputes between the Debtors;

(ff)   exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and the Plan Administrator Agreement; and

(gg)    taking all other actions consistent with the provisions of the Plan and the Plan Administrator Agreement that the Plan Administrator deems reasonably necessary or desirable to administer the Debtors and the Wind-Down Debtor.

6.    The Wind-Down ~~Trust~~Debtor Oversight Committee

The Wind-Down ~~Trust~~Debtor Oversight Committee shall consist of those parties selected by the Committee and identified in the Plan Supplement, and which, at no time shall consist of greater than seven members.

The Wind-Down ~~Trust~~Debtor Oversight Committee shall have the responsibility to review and advise the ~~Wind-Down Trustee~~Plan Administrator with respect to the liquidation and distribution of the Wind-Down ~~Entity~~Debtor Assets transferred to the Wind-Down ~~Trust~~Debtor in accordance herewith and the ~~Wind-Down Trust~~Plan Administrator Agreement. For the avoidance of doubt, in advising the ~~Wind-Down Trustee~~Plan Administrator, the Wind-Down ~~Trust~~Debtor Oversight Committee shall maintain the same fiduciary responsibilities as the ~~Wind-Down Trustee~~Plan Administrator. Vacancies on the Wind-Down ~~Trust~~Debtor Oversight Committee shall be filled by a Person designated by the Plan Administrator, subject to the unanimous consent of the remaining member or members of the Wind-Down ~~Trust~~Debtor Oversight Committee ~~from among the Holders of Account Holder Claims. The Wind-Down Trustee~~. The Plan Administrator shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down ~~Trust~~Debtor Oversight Committee for cause.

7.    Expenses of Wind-Down ~~Trustee~~Debtor

The Wind-Down ~~Trust~~Debtor Expenses shall be paid from the Wind-Down ~~Trust~~Debtor Assets subject to the Wind-Down ~~Reserve~~Budget and the Non-Released D&O Claim Budget.

8.    Insurance; Bond

The ~~Wind-Down Trustee~~Plan Administrator may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the ~~Wind-Down Trustee~~Plan Administrator and the Wind-Down ~~Trust~~Debtor Oversight Committee under the ~~Wind-Down Trust~~Plan Administrator Agreement. Unless otherwise agreed to by the Wind-Down ~~Trust~~Debtor Oversight Committee, the ~~Wind-Down Trustee~~Plan Administrator shall serve with a bond, the terms of which shall be agreed to by the Wind-Down ~~Trust~~Debtor Oversight Committee, and the cost and expense of which shall be paid by the Wind-Down ~~Trust~~Debtor.

9.    Fiduciary Duties of the ~~Wind-Down Trustee~~Plan Administrator

Pursuant hereto and the ~~Wind-Down Trust~~Plan Administrator Agreement ~~and~~, the ~~Wind-Down Trustee~~Plan Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.

10.    Termination of the Wind-Down ~~Trust~~Debtor

The Wind-Down ~~Trust~~Debtor will terminate on the earlier of: (a) (i) the final liquidation, administration and distribution of the Wind-Down ~~Trust~~Debtor Assets in accordance with the terms of the ~~Wind-Down Trust~~Plan Administrator Agreement and the Plan, and its full performance of all other duties and functions as set forth herein or in the ~~Wind-Down Trust~~Plan Administrator Agreement and (ii) the Chapter 11 Cases of the Debtors have been closed; or (b) the ~~Wind-Down Trustee~~Plan Administrator

determines in its reasonable judgment that the Wind-Down ~~Trust~~Debtor lacks sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him or her under the Plan, the Confirmation Order and/or the ~~Wind-Down Trust~~Plan Administrator Agreement.  After (x) the final distributions pursuant hereto, (y) the Filing by or on behalf of the Wind-Down ~~Trust~~Debtor of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the ~~Wind-Down Trustee~~Plan Administrator, the Wind-Down ~~Trust~~Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions.

11.    Liability of ~~Wind-Down Trustee~~Plan Administrator; Indemnification

Neither the ~~Wind-Down Trustee~~Plan Administrator, the Wind-Down ~~Trust~~Debtor Oversight Committee, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, a "Wind-Down ~~Trust~~Debtor Party" and collectively, the "Wind-Down ~~Trust~~Debtor Parties") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Wind-Down ~~Trust~~Debtor or for the act or omission of any other Wind-Down ~~Trust~~Debtor Party, nor shall the Wind-Down ~~Trust~~Debtor Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the ~~Wind-Down Trust~~Plan Administrator Agreement or the Plan other than for specific acts or omissions resulting from such Wind-Down ~~Trust~~Debtor Party's willful misconduct, gross negligence or actual fraud.  Subject to the ~~Wind-Down Trust~~Plan Administrator Agreement, the ~~Wind-Down Trustee~~Plan Administrator shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee, and the Wind-Down ~~Trust~~Debtor Oversight Committee shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors.  The ~~Wind-Down Trustee~~Plan Administrator or the Wind-Down ~~Trust~~Debtor Oversight Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing.  Notwithstanding such authority, neither the ~~Wind-Down Trustee~~Plan Administrator nor the Wind-Down ~~Trust~~Debtor Oversight Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the ~~Wind-Down Trustee~~Plan Administrator, the Wind-Down ~~Trust~~Debtor Oversight Committee, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud.  The Wind-Down ~~Trust~~Debtor shall indemnify and hold harmless the Wind-Down ~~Trust~~Debtor Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Wind-Down ~~Trust~~Debtor or the Plan or the discharge of their duties hereunder; *provided*, *however*, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual fraud.  Persons dealing or having any relationship with the ~~Wind-Down Trustee~~Plan Administrator shall have recourse only to the Wind-Down ~~Trust~~Debtor Assets and shall look only to the Wind-Down ~~Trust~~Debtor Assets to satisfy any liability or other obligations incurred by the Wind-Down ~~Trustee~~Debtor or the Wind-Down ~~Trust~~Debtor Oversight Committee to such Person in carrying out the terms of the ~~Wind-Down Trust~~Plan Administrator Agreement, and neither the ~~Wind-Down Trustee~~Plan Administrator nor the Wind-Down ~~Trust~~Debtor Oversight Committee, shall have any personal obligation to satisfy any such liability.  The ~~Wind-Down Trustee~~Plan Administrator and/or the Wind-Down ~~Trust~~Debtor Oversight Committee members shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied

43

covenants or obligations shall be read into the ~~Wind-Down Trust~~Plan Administrator Agreement against any of them.  The Wind-Down ~~Trust~~Debtor shall promptly pay expenses reasonably incurred by any Wind-Down ~~Trust~~Debtor Party in defending, participating in, or settling any action, proceeding or investigation in which such Wind-Down ~~Trust~~Debtor Party is a party or is threatened to be made a party or otherwise is participating in connection with the ~~Wind-Down Trust~~Plan Administrator Agreement or the duties, acts or omissions of the ~~Wind-Down Trustee~~Plan Administrator or otherwise in connection with the affairs of the Wind-Down ~~Trust~~Debtor, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise.  Each Wind-Down ~~Trust~~Debtor Party hereby undertakes, and the Wind-Down ~~Trust~~Debtor hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such exculpated party is not entitled to be indemnified therefor under the ~~Wind-Down Trust~~Plan Administrator Agreement.  The foregoing indemnity in respect of any Wind-Down ~~Trust~~Debtor Party shall survive the termination of such Wind-Down ~~Trust~~Debtor Party from the capacity for which they are indemnified.

12.    No Liability of the Wind-Down ~~Trust~~.Debtor

On and after the Effective Date, the Wind-Down ~~Trust~~Debtor shall have no liability on account of any Claims or Interests except as set forth herein and in the ~~Wind-Down Trust~~Plan Administrator Agreement.  All payments and all distributions made by the ~~Wind-Down Trustee~~Plan Administrator hereunder shall be in exchange for all Claims or Interests against the Debtors.

**I.    Sources of Consideration for Plan Distributions**

Distributions under the Plan shall be funded by (i) the proceeds of Purchaser's payment obligations under Sections 2.1 and 2.2 of the Asset Purchase Agreement and distributions of Acquired Coins pursuant to Sections 6.12, and 6.14 of the Asset Purchase Agreement, (ii) the Wind-Down ~~Entity or Wind-Down Trust (as applicable)~~Debtor from the Wind-Down ~~Entity~~Debtor Assets ~~or Wind-Down Trust Assets (as applicable)~~; *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance.  The Wind-Down ~~Entity Assets or Wind-Down Trust Assets (as applicable)~~Debtor Assets shall be used to pay the Wind-Down ~~Entity~~Debtor Expenses (including the compensation of the ~~Wind-Down Trustee~~Plan Administrator and any professionals retained by the Wind-Down ~~Trust~~Debtor), and to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

**J.    Corporate Existence and Dissolution**

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) in effect prior to the Effective Date, except to the extent such certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) are amended pursuant to the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings under applicable state or federal law).

On and after the Effective Date, the Wind-Down ~~Entity~~Debtor will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down ~~Entity~~Debtor shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

Upon a certification to be Filed with the Bankruptcy Court by the ~~Wind-Down Trustee~~Plan Administrator of all distributions having been made and completion of all of its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtor~~s~~ shall be deemed to be dissolved without any further action by the ~~Wind-Down~~ Debtors or the Wind-Down Debtor, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtor~~s~~ are formed or any other jurisdiction. The ~~Wind-Down Trustee~~Plan Administrator, however, shall have authority to take all necessary actions to dissolve the ~~Wind-Down~~ Debtors or the Wind-Down Debtor in and withdraw the Wind-Down Debtor~~s~~ from applicable states.

As soon as practicable after the Effective Date, the Wind-Down ~~Entity~~Debtor shall take such actions as the Wind-Down ~~Entity~~Debtor may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Wind-Down ~~Entity~~Debtor on behalf of any Wind-Down Debtor without need for any action or approval by the shareholders or board of directors or managers of such Debtor. On and after the Effective Date, the Debtors or the Wind-Down Debtor~~s~~ (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Pursuant to the terms of this Plan, any Money Transmitter Licenses that have not been terminated shall be deemed withdrawn and no further action is required to be taken by the Debtors or the Wind-Down Debtor to effectuate such withdrawal; *provided* that, following the Effective Date, the Debtors or the Wind-Down Debtor, as applicable, shall use commercially reasonable efforts to comply with all state banking department requirements for the surrender of a Money Transmitter License. Nothing in this Plan shall be construed to limit the rights of creditors, Debtors, the Wind-Down Debtor, or regulators to pursue recoveries against surety bonds maintained by the Debtors in connection with this Money Transmitter Licenses. Notwithstanding such Debtors' dissolution, such Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

## K.    Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, Definitive Documents, and Asset Purchase Agreement shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, managing-members, limited or general partners, or officers of the Debtors, the Wind-Down Debtor~~s, the Wind-Down Trust~~ or any other Entity, including: (1) appointment of the directors, managers, members, and officers for the Wind-Down Debtor~~s~~ as provided herein; (2) the issuances, transfer, and distribution of the Wind-Down ~~Trust Units~~Debtor Assets; (3) the formation of the Wind-Down ~~Trust~~Debtor and appointment of the ~~Wind-Down Trustee~~Plan Administrator and Wind-Down ~~Trust~~Debtor Oversight Committee; (4) the formation of any entities pursuant to and the implementation of the Plan and performance of all actions and transactions contemplated hereby and thereby; (5) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (6) all other acts or actions contemplated by the Plan, Definitive Documents, and Asset Purchase Agreement or reasonably necessary or

appropriate to promptly consummate the Restructuring Transactions (including effectuating the Restructuring Transactions Memorandum and the Customer Onboarding Protocol) (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan, Definitive Documents, and Asset Purchase Agreement involving the corporate structure of the Debtors or the Wind-Down Debtors, as applicable, and any corporate action required by the Debtors or the Wind-Down Debtors, as applicable, in connection with the Plan shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Wind-Down Debtors, as applicable. On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtors or the Wind-Down Trust, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, Securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.K shall be effective notwithstanding any requirements under non-bankruptcy law.

**L.      Vesting of Assets in the Wind-Down ~~Entity~~Debtor**

Except as otherwise provided in the Plan, or in any agreement, instrument, or other document incorporated in the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting Wind-Down ~~Trust~~Debtor Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, transferred, or discharged pursuant to the Plan), and any property acquired by any of the Debtors under the Plan shall vest in the Wind-Down ~~Entity~~Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.

**M.      Cancellation of Notes, Instruments, Certificates, and Other Documents**

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions (including, without limitation, the Definitive Documents and the Asset Purchase Agreement), all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

**N.      Effectuating Documents; Further Transactions**

On and after the Effective Date, the ~~Wind-Down~~ Debtors, and its directors, managers, partners, officers, authorized persons, and members thereof, and the Wind-Down ~~Trust and Wind-Down Trustee~~Debtor and Plan Administrator are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Definitive Documents, and Asset Purchase Agreement, in the name of and on

behalf of the ~~Wind-Down~~ Debtors and Wind-Down Debtor, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

**O.      Section 1146(a) Exemption**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor~~, the Wind-Down Trust~~, the Purchaser, or to any other Entity) of property under the Plan, Definitive Documents, and Asset Purchase Agreement or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtor~~s~~; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Asset Purchase Agreement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**P.      Preservation of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down ~~Entity~~Debtor shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred.  Such rights shall be preserved by the Debtors and Wind-Down Debtor~~s~~ and shall vest in the Wind-Down ~~Entity~~Debtor, with the Wind-Down ~~Entity's~~Debtor's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and Wind-Down Debtor~~s~~ as of the Effective Date.

The Wind-Down ~~Trust~~Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the beneficiaries of the Wind-Down ~~Trust~~Debtor and in accordance with the ~~Wind-Down Trust~~Plan Administrator Agreement and the Plan.  **No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors~~, the Wind-Down Debtors~~ or the Wind-Down ~~Trust~~Debtor, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Wind-Down ~~Trust~~Debtor, on behalf of the Debtors and the Wind-Down Debtor~~s~~, expressly reserves all rights to prosecute any and all Causes of Action against**

47

**any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan.** Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down ~~Trust~~Debtor, on behalf of the Debtors and Wind-Down Debtor~~s~~ and in accordance with the ~~Wind-Down Trust~~Plan Administrator Agreement, expressly reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Wind-Down ~~Trust~~Debtor, on behalf of the Debtors ~~and Wind-Down Debtors~~, reserves and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-Down ~~Trust~~Debtor, except as otherwise provided in the Plan, including Article VIII of the Plan. The Wind-Down ~~Trust~~Debtor, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down ~~Trust~~Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan.

**Q.    Election to Contribute Third-Party Claims**

Because aggregating all Contributed Third-Party Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Wind-Down ~~Entity~~Debtor.  By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Wind-Down ~~Entity~~Debtor, it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind-Down ~~Entity~~Debtor, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down ~~Entity~~Debtor to memorialize and effectuate such contribution.

**R.    Contribution of Contributed Third-Party Claims**

On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Wind-Down ~~Entity~~Debtor and shall thereafter be Wind-Down ~~Trust~~Debtor Assets for all purposes.  No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the ~~Wind-Down Trust~~Plan Administrator Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down ~~Trust~~Debtor will or will not pursue any and all available Contributed Third-Party Claims against such Person.  The Wind-Down ~~Trust~~Debtor shall have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date.  For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

**S.    Closing the Chapter 11 Cases**

On and after the Effective Date, the Wind-Down ~~Entity~~Debtor shall be permitted to classify all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, as closed, and all contested matters relating to any of the Debtors, including objections to Claims or Interests and any adversary proceedings, may be administered and heard in the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, irrespective of whether such Claims or Interests were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

<div align="center">

**ARTICLE V.**

**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

</div>

**A.    Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy other than the Side-A Policy. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

**B.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtors, as applicable, under such Executory Contract or Unexpired Lease. Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors and Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

**C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Counterparties to Executory Contracts or Unexpired Leases listed subject to rejection under the Plan shall be served with a notice of rejection of Executory Contracts and Unexpired Leases with the Plan Supplement. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims, Noticing, and Solicitation Agent and served on the Debtors or Wind-Down ~~Entity~~Debtor, as applicable, no later than thirty days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, or the Wind-Down ~~Entity~~Debtor, the Estates, or their property without the need for any objection by the Wind-Down ~~Entity~~Debtor or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed released, and be subject to the permanent injunction set forth in Article VIII.D of the Plan, including any Claims against any Debtor listed on the Debtors' schedules as unliquidated, contingent, or disputed.** All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims in accordance with Article III.C of the Plan.

**D.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed**

The Debtors, the Wind-Down ~~Entity~~Debtor, or the Purchaser, as applicable pursuant to the Asset Purchase Agreement, shall pay Cures, if any, on the Effective Date. The Debtors shall provide notice of

the amount and timing of payment of any such Cure to the parties to the applicable assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors, the Wind-Down ~~Entity~~Debtor, or the Purchaser shall be dealt with in the ordinary course of business and, if needed, shall be Filed with the Claims, Noticing, and Solicitation Agent on or before thirty days after the Effective Date. **If any counterparty to an Executory Contract or Unexpired Lease does not receive a notice of assumption and applicable cure amount, such counterparty shall have until on or before thirty days after the Effective Date to bring forth and File a request for payment of Cure.** Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any ~~Wind-Down~~ Debtor or the Wind-Down ~~Entity~~Debtor, without the need for any objection by the Wind-Down ~~Entity~~Debtor or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied and released upon payment by the Debtors or the Wind-Down ~~Entity~~Debtor or the Purchaser of the Cure in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty); *provided*, *however*, that nothing herein shall prevent the Wind-Down ~~Entity~~Debtor or the Purchaser, as applicable, from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure. The Wind-Down ~~Entity~~Debtor or the Purchaser may also settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' first scheduled omnibus hearing for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

In the event of a dispute regarding: (1) the amount of any Cure Claim, (2) the ability of the Debtors, the Wind-Down Debtor~~s~~, Purchaser, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed (or assumed and assigned, as applicable), or (3) any other matter pertaining to assumption or assignment, then any disputed Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made as soon as reasonably practicable following, and in accordance with, the entry of a Final Order of the Bankruptcy Court resolving such dispute or as may be agreed upon by the Debtors, the Wind-Down ~~Entity~~Debtor, or Purchaser, as applicable, and the counterparty to the Executory Contract or Unexpired Lease, and any such unresolved dispute shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise or assignment of any Executory Contract or Unexpired Lease to the Purchaser and full payment of any applicable Cure pursuant to this Article V.D, or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assumed and assigned in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.D, in the amount and at the time in the ordinary course of business or upon and in accordance with**

51

any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and applicable proposed Cure amount, and disputes the Debtors' proposed Cure amount, such party shall not be required to File a Proof of Claim with respect to such dispute.  Any counterparty to an Executory Contract or Unexpired Lease that does not receive a notice or applicable proposed Cure amount, and believes a Cure amount is owed, shall have thirty days after the Effective Date to File a Proof of Claim with respect to such alleged Cure amount, which Claim shall not be expunged until such Cure dispute is resolved.

**E.**   **Insurance Policies ~~and Surety Bonds~~**

Each D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) other than the Side-A Policy shall be assumed, in their entirety, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to sections 105 and 365 of the Bankruptcy Code with the Wind-Down ~~Entity~~Debtor being authorized to pursue any proceeds thereof on behalf of the Debtors or the Wind-Down ~~Entity~~Debtor.  The Side-A Policy shall ride through these Chapter 11 Cases with the Debtors, and the Wind-Down ~~Entity~~Debtor preserves all avoidance and other actions in connection with the premium paid thereunder.  All beneficiaries under the D&O Insurance Policies reserve their rights under such D&O Insurance Policies subject to the limitations set forth in this Plan.

The Debtors or the Wind-Down ~~Entity~~Debtor, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date, and any current and former directors, officers, managers, and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down ~~Entity~~Debtor shall retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or Wind-Down ~~Entity~~Debtor may deem necessary, subject to the prior written consent of the Wind-Down ~~Entity~~Debtor. Notwithstanding anything to the contrary contained in the Plan, the Wind-Down ~~Trust~~Debtor shall be entitled to pursue avoidance of the premium paid for the XL Specialty Insurance Company Cornerstone A-Side Management Liability Insurance Policy No. ELU184179-22, and nothing in this Plan shall be deemed a waiver or abrogation of any such rights.

The Debtors shall continue to satisfy their obligations under their ~~surety bonds and~~ insurance policies in full and continue such ~~programs~~policies in the ordinary course of business.  Each of the Debtors' ~~surety bonds and~~ insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan.  On the Effective Date:  (a) the Debtors shall be deemed to have assumed all such ~~surety bonds and~~ insurance policies and any agreements, documents, and instruments relating thereto in their entirety; *~~provided~~* that the Debtors have assumed all ~~indemnity agreements and cash collateral agreements related to the surety bonds~~ and (b) such ~~surety bonds and~~ insurance policies and any agreements, documents, or instruments relating thereto shall revest in the applicable Debtors or the Wind-Down Debtor~~(s)~~ unaltered.

### F.      Reservation of Rights

Nothing contained in the Plan or the Plan Supplement (unless otherwise explicitly provided) shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any ~~Debtor or the~~ Wind-Down Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down ~~Entity~~Debtor, as applicable, shall have forty-five days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease effective as of the Confirmation Date.

### G.      Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### H.      Contracts and Leases Entered into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Wind-Down Debtor liable thereunder in the ordinary course of its business. Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

### A.      Timing and Calculation of Amounts to Be Distributed

Except (1) as otherwise provided herein, (2) upon a Final Order, or (3) as otherwise agreed to by the Debtors, the Purchaser, or the Wind-Down ~~Entity~~Debtor, as the case may be, and the Holder of the applicable Claim, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the next Distribution Date after such Claim becomes, as applicable, an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of distributions that the Plan provides for Allowed Claims in the applicable Class from the Distribution Agent.  In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### B.      Rights and Powers of Distribution Agent

1.      Powers of the Distribution Agent

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities and powers; and (d) exercise such other powers as may be vested in the

Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

> 2. <u>Expenses Incurred on or after the Effective Date</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including reasonable attorney and/or other professional fees and expenses) made by such Distribution Agent shall be paid in Cash by the Wind-Down ~~Entity~~Debtor.

## C.    **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

> 1. <u>Distributions Generally</u>

Except as otherwise provided in the Plan (including in paragraph 8 below), the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.

> 2. <u>Distributions on Account of Obligations of Multiple Debtors</u>

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan.  Any such Claims shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.

> 3. <u>Record Date of Distributions</u>

On the Distribution Record Date, the various transfer registers for each Class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims or Interests.  The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.  In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

> 4. <u>Special Rules for Distributions to Holders of Disputed Claims and Interests</u>

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Wind-Down ~~Entity~~Debtor, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand, or as set forth in a Final Order, no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all of the Disputed Claim or Interest has become an Allowed Claim or Interest or has otherwise been resolved by settlement or Final Order; *provided* that, if the Wind-Down ~~Entity~~Debtor does not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim or Interest, the Distribution Agent may make a partial distribution on account of that portion of such Claim or Interest that is not Disputed at the time and in the manner that the Distribution

Agent makes distributions to similarly situated Holders of Allowed Claims or Interests pursuant to the Plan.  Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

     5.      De Minimis Distributions; Minimum Distributions

The Distribution Agent shall not make any Cash distributions to any Holder of an Allowed Claim or Interest pursuant to Article III.C.1-11 of this Plan on account of such Allowed Claim or Interest if such distribution is valued, in the reasonable discretion of the Distribution Agent, at less than $1.00, and each Holder of an Allowed Claim or Interest to which this limitation applies shall not be entitled to any distributions under the Plan.  Notwithstanding anything to the contrary in this Plan, there shall be no minimum distribution threshold on account of distributions of any Cryptocurrency to Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims.

     6.      Undeliverable Distributions and Unclaimed Property

In the event that either (a) a distribution to any Holder is returned as undeliverable or (b) the Holder of an Allowed Claim or Interest does not respond to a request by the Debtors or the Distribution Agent for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Wind-Down ~~Entity~~Debtor automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall not be entitled to any distributions under the Plan.

     7.      Manner of Payment Pursuant to the Plan

At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check, wire transfer, automated clearing house, credit card, or as otherwise provided in applicable agreements.

     8.      Distributions of Net Owed Coins; Additional Bankruptcy Distributions

As a general matter, the Purchaser will allocate each Account Holder's Net Owed Coins to its account on the Binance.US Platform, and each Holder of OpCo General Unsecured Claim's Pro Rata share of the Distributable Cryptocurrency (in Cash) to its account on the Binance.US Platform in accordance with, and subject to, the provisions of Section 6.12 of the Asset Purchase Agreement.

~~As a general matter, the Customer Onboarding Protocol will provide that~~Subject to the terms of the Asset Purchase Agreement, the Purchaser ~~will~~may make Additional Bankruptcy Distributions to Transferred Creditors, including Distributable OpCo Cash and/or other Wind-Down Debtor Assets, corresponding to their Pro Rata shares of such Additional Bankruptcy Distribution (if such Additional Bankruptcy Distribution is in Cryptocurrency, based on the Transferred Cryptocurrency Value of the

Cryptocurrency included in such Additional Bankruptcy Distribution), all in accordance with any applicable Post-Bankruptcy Statement (as defined in the Asset Purchase Agreement).

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim does not become a Transferred Creditor prior to the date that is three (3) months following the later of the Closing Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept (as provided in the Customer Onboarding Protocol), then Purchaser shall convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with this Plan and the Customer Onboarding Protocol.

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim is located in an Unsupported Jurisdiction (as defined in the Asset Purchase Agreement), then the Net Owed Coins, ~~if applicable,~~ Distributable Cryptocurrency (in Cash) and Additional Bankruptcy Distributions, if applicable, allocable to such Person shall be handled pursuant to Section 6.12(b) or, if applicable, Section 6.14(d) of the Asset Purchase Agreement.

Purchaser shall have no responsibility to make any distributions other than as contemplated by Sections 6.12 and 6.14 of the Asset Purchase Agreement.

## D.    Compliance Matters

In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down ~~Entity~~Debtor, any Distribution Agent, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Wind-Down ~~Entity~~Debtor, the Distribution Agent, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including wind-down a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the Wind-Down ~~Entity~~Debtor and the Distribution Agent, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond.  The Debtors, the Wind-Down ~~Entity~~Debtor, the Distribution Agent, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

E.      **Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim, asserted in government issued currency (for the avoidance of doubt, not including any Cryptocurrency) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

F.      **Claims Paid or Payable by Third Parties**

1.      <u>Claims Paid by Third Parties</u>

The Debtors or the Wind-Down ~~Entity~~Debtor, as applicable, shall reduce a Claim or Interest, and such Claim or Interest (or portion thereof) shall be disallowed without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim or Interest receives a payment on account of such Claim or Interest from a party that is not a Debtor or Wind-Down Debtor (or other Distribution Agent), as applicable, including any payments made in connection with the Sale Transaction.  To the extent a Holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not a Debtor or a Wind-Down Debtor (or other Distribution Agent), including payments made in connection with the Sale Transaction, as applicable, on account of such Claim or Interest, such Holder shall, within ten Business Days of receipt thereof, repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Wind-Down Debtor to the extent the Holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay, return, or deliver such distribution shall result in the Holder owing the applicable Wind-Down Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the ten-Business Day grace period specified above until the amount is repaid.

2.      <u>Claims Payable by Third Parties</u>

No distributions under the Plan shall be made on account of an Allowed Claim or Interest that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim or Interest has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim or Interest (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such payment, such Claim or Interest may be expunged or reduced on the Claims Register by the Claims, Noticing, and Solicitation Agent to the extent of any such payment without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

    3.      <u>Applicability of Insurance Policies</u>

Except as otherwise provided herein, payments to Holders of Claims or Interests shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any rights, defenses, or Cause of Action that the Debtors, the Wind-Down ~~Entity~~<u>Debtor</u> or any other Entity may hold against any other Entity, including insurers, under any policies of insurance, agreements related thereto, or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the applicable insurance policies, agreements related thereto, and applicable non-bankruptcy law.

**G.    Setoffs and Recoupment**

Except as otherwise expressly provided for herein, each Debtor, <u>the</u> Wind-Down Debtor, ~~the Wind-Down Entity,~~ or such Entity's designee as instructed by such Debtor, <u>the</u> Wind-Down ~~Entity~~<u>Debtor</u>, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, set off against or recoup from an Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature whatsoever that the Debtor~~, or the~~ Wind-Down Debtor ~~or Wind-Down Entity~~, as applicable, may have against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise). Notwithstanding the foregoing, except as expressly stated in Article VIII of this Plan, neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors or the Wind-Down ~~Entity~~<u>Debtor</u> of any such Claims, rights, or Causes of Action the Debtors or the Wind-Down ~~Entity~~<u>Debtor</u> may possess against such Holder.

**H.    Allocation between Principal and Accrued Interest**

Except as otherwise provided herein, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Claims, to the remaining portion of such Allowed Claim if any.

<div align="center">

**ARTICLE VII.**

**PROCEDURES FOR RESOLVING DISPUTED,
CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS**

</div>

**A.    Disputed Claims Process**

After the Effective Date, the <u>Debtors, the</u> Wind-Down ~~Entity~~<u>Debtor</u>, and any party-in-interest, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest. If a Holder of a Claim or Interest in Class disputes the amount of their Claim or Interest as listed in the Schedules, the Holder should notify the Debtors or the Wind-Down

~~Entity~~Debtor of such dispute.  If the Debtors and the Holder agree to an amended Claim amount prior to the Effective Date, the Debtors shall file amended Schedules prior to the Effective Date.  If between the Confirmation Date and the Effective Date, the dispute cannot be consensually resolved, the Holder may seek (by letter to the Court) to have the claim or interest dispute resolved before the Bankruptcy Court (and, with the consent of the Debtors, before any other court or tribunal with jurisdiction over the parties).  After the Effective Date, the creditor may seek to have the claim dispute resolved before the Bankruptcy Court or any other court or tribunal with jurisdiction over the parties.

~~Unless relating to a Claim or Interest expressly Allowed pursuant to the Plan, all Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Proofs of Claim filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below.~~  Notwithstanding anything in this Plan to the contrary: (1) all Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease; (2) Claims filed to dispute the amount of any proposed Cure pursuant to section 365 of the Bankruptcy Code; and (3) Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court, if not otherwise resolved through settlement with the applicable claimant.

~~Notwithstanding any provision herein to the contrary, nothing in the Disclosure Statement, Plan, or Confirmation Order grants the Bankruptcy Court with jurisdiction over any police and regulatory actions by the SEC, and the SEC shall retain the power and authority to commence and continue any such actions against any person or entity, including without limitation, the Debtors, in any forum with jurisdiction, provided, however, that enforcement of any money judgment against the Debtors must be in accordance with the Plan.  In addition, the SEC may file any proof of claim by the Government Bar Date or such later date as ordered by the Bankruptcy Court and amend its proof of claim upon determination of liability on its claims.  Any objection to such claim shall be in accordance with Bankruptcy Rule 3007, and such claim shall not automatically be deemed objected to, withdrawn, or expunged.~~

On the Effective Date, the Debtors or ~~Wind-Down Trustee~~Plan Administrator, as applicable, may establish one or more accounts or funds to hold and dispose of certain assets, pursue certain litigation (including the Causes of Action preserved under the Plan or otherwise vesting in the Wind-Down ~~Trust~~Debtor), and/or satisfy certain Claims (including Claims that are contingent or have not yet been Allowed).  For any such account or fund, the Debtors or the ~~Wind-Down Trustee~~Plan Administrator, as applicable, may take the position that grantor trust treatment applies in whole or in part.  To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations.  Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9.  If such rules apply, such assets would be subject to entity-level taxation, and the Debtors and the Wind-Down ~~Trustee~~Debtor would be required to comply with the relevant rules.

**B.      Objections to Claims or Interests**

Except as otherwise specifically provided in the Plan, after the Effective Date, the Wind-Down ~~Entity~~Debtor shall have the sole authority on behalf of the Debtors to:  (1) File, withdraw, or litigate to judgment, any objections to Claims or Interests; and (2) settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Wind-Down ~~Entity~~Debtor shall have and retain any and all rights and defenses each such Debtor had

immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.P of the Plan.

Any objections to Claims or Interests shall be Filed on or before the Claims Objection Bar Date. For the avoidance of doubt, any party may object to any Claims or Interests prior to the Claims Objection Bar Date. Further, the Bankruptcy Court may extend the time period to object to Claims or Interests set forth in this paragraph at any time, including before or after the expiration of one hundred eighty days after the Effective Date, in its discretion or upon request by the Debtors or any party in interest.

## C.    Estimation of Claims

Before or after the Effective Date, the Debtors or the Wind-Down ~~Entity~~Debtor, as applicable, may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Disputed Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim or Interest, including during the litigation of any objection to any Disputed Claim or Interest or during the pendency of any appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Disputed Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Debtors or the Wind-Down ~~Entity~~Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Disputed Claim or Interest is estimated.

## D.    No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only a portion of a Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

## E.    Distributions After Allowance

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or

accruals to be paid on account of such Allowed Claim or Interest unless required under applicable bankruptcy law.

**F.      No Interest**

Unless otherwise specifically provided for herein or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**G.      Adjustment to Claims and Interests without Objection**

Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged on the Claims Register at the direction of the Wind-Down ~~Entity~~Debtor without the Wind-Down ~~Entity~~Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court. Additionally, any Claim or Interest that is duplicative or redundant with another Claim or Interest against the same Debtor may be adjusted or expunged on the Claims Register at the direction of the Wind-Down ~~Entity~~Debtor without the Wind-Down ~~Entity~~Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

**H.      Time to File Objections to Claims**

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

**I.      Disallowance of Claims or Interests**

Any Claims or Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Wind-Down ~~Entity~~Debtor, as applicable.

Except as otherwise provided herein or as agreed to by the Debtors or the Wind-Down ~~Entity~~**Debtor, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date** ~~without any further notice to, or action, order, or~~**subject to the approval of**~~,~~ **the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

**J.      Amendments to Proofs of Claim**

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Proof of Claim or Proof of Interest may not be Filed or amended without the prior authorization of the

61

Bankruptcy Court or the Wind-Down ~~Entity~~Debtor, and any such new or amended Proof of Claim or Proof of Interest Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

## ARTICLE VIII.

## EFFECT OF CONFIRMATION OF THE PLAN

**A.     Releases by the Debtors**

**Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, ~~the Wind-Down Entity,~~ and in each case on behalf of themselves and their respective successors, assigns, and representatives, ~~and any and all other Entities~~ who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in this Article VIII.A by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.A is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtors or their respective Estates ~~or Wind-Down Entity~~ asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

**Notwithstanding anything to the contrary contained herein, nothing in this Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the**

Asset Purchase Agreement or the Definitive Documents and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of this Plan.

**B.      Releases by Holders of Claims and Interests**

**Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in this Article VIII.B shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.B, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.B is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.F and Article IV.G of the Plan, a bar to any of the Releasing Parties or the Debtors or the Wind-Down Debtors or their respective Estates ~~or Wind-Down Entity~~ asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

**C.      Exculpation**

**Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the**

formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan

D.    **Injunction**

The assets of the Debtors and of the Wind-Down ~~Entity~~**Debtor** shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in this Plan and shall not be available for any other purpose.  All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down ~~Entity~~**Debtor**, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of this Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by this Plan.

E.    **Release of Liens**

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property

of the Debtors shall automatically revert to the applicable Debtor or the Wind-Down Debtor, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as requested by the Debtors or Wind-Down ~~Entity~~Debtor to evidence the release of such Lien, including the execution, delivery, and filing or recording of such documents evidencing such releases. The presentation or filing of the Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

**F.    OSC and SEC**

Notwithstanding any language to the contrary herein, no provision shall (a) preclude the OSC or the SEC from enforcing its police or regulatory powers; or (b) enjoin, limit, impair or delay the OSC or SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any non-Debtor person or non-Debtor entity in any forum.

**G.    Protection against Discriminatory Treatment**

As provided by section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Entity, including Governmental Units, shall discriminate against any Debtor or the Wind-Down Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, any Debtor or the Wind-Down Debtor, or any Entity with which a Debtor or the Wind-Down Debtor has been or is associated, solely because such Debtor or the Wind-Down Debtor was a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**H.    Document Retention**

Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Wind-Down ~~Entity~~Debtor, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently in the Debtors' possession. The Wind-Down ~~Trust~~Debtor shall not destroy or otherwise abandon any such documents or records without providing advance notice to the U.S. Securities and Exchange Commission (c/o Therese Scheuer, U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, ScheuerT@SEC.GOV) and seeking further authorization from this Bankruptcy Court. Nothing in this Plan or the Confirmation Order shall affect the obligations of the pre-Effective Date Debtors, the Wind-Down ~~Entity~~Debtor, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

**I.    Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such

Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**J.       Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  **All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

## ARTICLE IX.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**A.       Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1.   The Bankruptcy Court shall have entered the Confirmation Order, which shall be in a form and substance reasonably satisfactory to the Debtors and the Committee, and subject to the consent rights of Purchaser under the Asset Purchase Agreement, and such order shall be a Final Order and in full force and effect.

2.   The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, Definitive Documents, and the Asset Purchase Agreement.

3.   Each Definitive Document and each other document contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all respects with the Plan, and subject to the Purchaser's consent rights under the Asset Purchase Agreement, and shall not have been modified in a manner inconsistent therewith;

4.   The Professional Fee Escrow Account shall have been established and funded with Cash in accordance with Article II.B.2 of the Plan.

5.   The Wind-Down Reserve shall have been established and funded with Cash in accordance with the Plan.

6.   If prior to the Outside Date, the Asset Purchase Agreement shall be in full force and effect and the Sale Transaction shall have been consummated.

7.   The Restructuring Transactions shall have been consummated or shall be anticipated to be consummated concurrently with the occurrence of the Effective Date in a manner consistent with the Plan, the Customer Onboarding Protocol, the other Definitive Documents, and the Asset Purchase Agreement, and the Plan shall have been substantially consummated or shall

be anticipated to be substantially consummated concurrently with the occurrence of the Effective Date.

**B.      Waiver of Conditions Precedent**

The Debtors, with the consent of the Committee and, solely to the extent related to the Asset Purchase Agreement and the Sale Transaction, prior to the Outside Date, the consent of Purchaser, may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

**C.      Effect of Non-Occurrence of Conditions to Consummation**

If the Effective Date does not occur within 120 days after the Confirmation Date, then the Plan will be null and void in all respects, any and all compromises or settlements not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including with respect to the fixing, limiting, or treatment of any Claim or Interest, including, without limitation, the Alameda Loan Facility Claims), shall be deemed null and void, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action held by any Debtor or any other Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity in any respect.

## ARTICLE X.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**A.      Modification of Plan**

Subject to the limitations and terms contained in the Plan and Purchaser's consent rights under the Asset Purchase Agreement, the Debtors, with the consent of the Committee, reserve the right to (1) amend or modify the Plan before the entry of the Confirmation Order, in accordance with the Bankruptcy Code and the Bankruptcy Rules and (2) after the entry of the Confirmation Order, the Debtors or the Wind-Down ~~Entity~~Debtor, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, to remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

**B.      Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications or amendments to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**C.      Revocation or Withdrawal of Plan**

The Debtors reserve the right, with the consent of the Committee, to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:

(1) the Plan will be null and void in all respects; (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Classes of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims or other Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.      ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court;

7.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.      hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including:  (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) anything that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan and the Confirmation Order; or (d) related to section 1141 of the Bankruptcy Code;

11.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.      adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

13.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

14.      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Entity's rights arising from or obligations incurred in connection with the Plan;

15.      hear and determine matters concerning local, state, federal, and foreign taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

16.      enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.      enforce all orders previously entered by the Bankruptcy Court; and

18.      hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or the Judicial Code.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11

Cases, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

### A.    Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down ~~Entity~~Debtor, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

### B.    Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Wind-Down ~~Entity~~Debtor, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### C.    Payment of Statutory Fees

All fees and applicable interest payable pursuant to section 1930 of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the ~~Wind-Down~~ Debtors or the Wind-Down Debtor (or the Distribution Agent on behalf of the Wind-Down ~~Entity~~Debtor) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

### D.    Dissolution of Statutory Committees

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, however, that such committees will remain in existence for the limited purposes of (a) pursuing, supporting, or otherwise participating in, any outstanding appeals in the Chapter 11 Cases; and (b) filing, objecting, or otherwise participating in, any final fee applications of Professionals.

## E.    Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests, unless and until the Effective Date has occurred.

## F.    Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Entity.

## G.    Service of Documents

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the ~~Wind-Down~~ Debtors or the Wind-Down Debtor shall be served on:

| ~~Wind-Down~~ Debtors | **Voyager Digital Holdings, Inc.**<br>33 Irving Place<br>New York, New York 10003<br>Attention:  David Brosgol<br>General Counsel,<br>E-mail address:  dbrosgol@investvoyager.com<br><br>with copies for information only (which shall not constitute notice) to: |
| Counsel to the Debtors | **Kirkland & Ellis LLP**<br>**Kirkland & Ellis International LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention:  Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., and Allyson B. Smith |
| Counsel to the Committee | **McDermott Will & Emery LLP**<br>One Vanderbilt Avenue<br>New York, New York 10017<br>Attention: Darren Azman |

## H.    Entire Agreement; Controlling Document

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan; *provided, however*, that notwithstanding the foregoing or anything to the contrary herein, to the extent there is any conflict between the Plan and the Confirmation Order, on the one hand, and the Asset Purchase Agreement, on the other hand, the Asset Purchase Agreement shall govern solely in the event

the Sale Transaction is consummated. Except as set forth in the Plan, in the event that any provision of the Disclosure Statement, the Plan Supplement, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## I.      Plan Supplement

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Claims, Noticing, and Solicitation Agent at https://cases.stretto.com/Voyager or the Bankruptcy Court's website at http://www.nysb.uscourts.gov. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

## J.      Non-Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the Purchaser's consent rights under the Asset Purchase Agreement prior to the Outside Date, shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

## K.      Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties nor individuals or the ~~Wind-Down~~ Debtors or the Wind-Down Debtor will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

L.        **Waiver or Estoppel**

        Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any
argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in
a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their
counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement,
or papers Filed prior to the Confirmation Date.

Dated: ~~January 10,~~ <u>February 28,</u> 2023   VOYAGER DIGITAL HOLDINGS, INC.
                on behalf of itself and all other Debtors


                */s/ Stephen Ehrlich*

                Stephen Ehrlich
                Co-Founder and Chief Executive Officer
                Voyager Digital Holdings, Inc.

# Exhibit 6

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### ORDER (I) APPROVING THE BIDDING PROCEDURES, (II) SCHEDULING THE BID DEADLINES AND THE AUCTION, (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (IV) SCHEDULING HEARINGS AND OBJECTION DEADLINES WITH RESPECT TO THE DEBTORS' SALE, DISCLOSURE STATEMENT, AND PLAN CONFIRMATION AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion") of the above captioned debtors and debtors in possession (the "Debtors") for the entry of an order (this "Order"), (a) authorizing and approving the bidding procedures attached hereto as **Exhibit 1** (the "Bidding Procedures")[2] in connection with the sale of the Assets, (b) approving the Bid Protections, (c) establishing certain dates and deadlines, including the Bid Deadline, and the date of the Auction, if any, (d) approving the manner of notice of the Auction, if any, (e) scheduling dates and deadlines in connection with approval of a Sale, Disclosure Statement, and confirmation of a Plan, and (f) granting related relief, as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital, Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]    Capitalized terms used but not defined herein have the meanings given to them in the Bidding Procedures.

Debtors
Ex-6

and 1409; and this Court having found that the relief requested in the Motion is in the best interests

of the Debtors' estates, their creditors, and other parties in interest; and this Court having found

that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were

appropriate and no other notice need be provided; and this Court having reviewed the Motion and

having heard the statements in support of the relief requested therein at a hearing before this Court

(the "Hearing"); and this Court having determined that the legal and factual bases set forth in the

Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the

proceedings had before this Court; and after due deliberation and sufficient cause appearing

therefor,

**THE COURT HEREBY FINDS THAT:**

A.     The Debtors have articulated good and sufficient reasons for authorizing and

approving the Bidding Procedures, which are fair, reasonable, and appropriate under the

circumstances and designed to maximize the recovery on, and realizable value of the Debtors'

enterprise, including with respect to the proposed procedures for providing Bid Protections as

determined by the Debtors in an exercise of their business judgment, subject to, and in accordance

with, the procedures contained in this Order and the Bidding Procedures.

B.     The findings and conclusions set forth herein constitute the Court's findings of fact

and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding

pursuant to Bankruptcy Rule 9014.  To the extent that any of the preceding findings of fact

constitute conclusions of law, they are adopted as such.  To the extent any of the preceding

conclusions of law constitute findings of fact, they are adopted as such.

C.     The Debtors' proposed notice of the Motion, the Bidding Procedures, the Hearing

and the proposed entry of this Order is (i) appropriate and reasonably calculated to provide all

interested parties with timely and proper notice, (ii) in compliance with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and (iii) adequate and sufficient under the circumstances of these chapter 11 cases, and no other or further notice is required. A reasonable opportunity to object or be heard regarding the relief granted by this Order has been afforded to the following parties and/or their respective counsel, as applicable: (a) the U.S. Trustee; (b) the Committee; (c) the lender under the Debtors' prepetition loan facility; (d) the United States Attorney's Office for the Southern District of New York; (e) the Internal Revenue Service; (f) the Toronto Stock Exchange; (g) the attorneys general in the states where the Debtors conduct their business operations; (h) the Committee; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.

D.       The Bid Procedures comply with the requirements of Local Rule 6004-1.

**IT IS HEREBY ORDERED THAT:**

1.   The Motion is granted as set forth herein.

2.   All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled prior to or at the Hearing are overruled.

**I.       <u>Important Dates and Deadlines</u>**.

3.   **<u>Final Bid Deadline</u>**.  August 26, 2022, at 12:00 p.m., prevailing Eastern Time, is the deadline by which all Qualified Bids must be **<u>actually</u> <u>received</u>** by the parties specified in the Bidding Procedures.

4.   **<u>Auction</u>**.  August 29, 2022 at 10:00 prevailing Eastern Time is the date and time the Auction, if one is needed, will be held at the offices of proposed counsel to the Debtors identified below or, at the election of the Debtors, virtually via Zoom or similar means:  Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York, 10022.  The Debtors shall send written notice of the date, time, and place of the Auction to the Qualified Bidders no later than two business days

3

before such Auction, and will post notice of the date, time, and place of the Auction no later than

two business days before such Auction on the website of the Debtors' notice, claims, and

solicitation agent, Stretto, Inc., at www.cases.stretto.com/Voyager.  For the avoidance of doubt,

the Debtors, after consultation with the Committee, may also conduct more than one Auction with

respect to non-overlapping material portions of the Debtors' Assets.

5.    **Sale Objection Deadline**.  September 6, 2022, at 4:00 p.m., prevailing Eastern

Time, is the deadline by which objections to the Sale must be filed with the Court and served so

as to be actually received by the appropriate notice parties; *provided*, *however*, objections relating

to the conduct, manner, or results of the Auction, the selection of the Winning Bidder, or any other

objections that relate to, or arise from, the Auction must be filed no later than 72 hours following

the close of the Auction.

6.    **Sale Hearing**.  September 8, 2022, at 11:00 a.m., prevailing Eastern Time, is the date

and time for the hearing for the Court to consider the Successful Bid or Successful Bids, if needed.

II.    **Auction, Bidding Procedures, Transaction Notice, and Related Relief**.

7.    The Bidding Procedures, as attached hereto as **Exhibit 1**, are incorporated herein

and are hereby approved in their entirety, and the Bidding Procedures shall govern the submission,

receipt, and analysis of all Bids relating to any proposed Sale.  Any party desiring to submit a Bid

shall comply with the Bidding Procedures and this Order.  The Debtors are authorized to take any

and all actions necessary to implement the Bidding Procedures; *provided*, *however*, that any

modifications to the Bidding Procedures (including the deadlines in this Order) shall not be

effective without consent of the Committee or further order of this Court.

8.    To the extent the Debtors, in an exercise of their business judgment and following

consultation with the Committee, seek to:  (a) select one or more Acceptable Bidders to act as

stalking horse bidders in connection with the Auction (each, a "Stalking Horse Bidder"); and (b) in connection with any stalking horse agreement with a Stalking Horse Bidder (i) provide a breakup fee (the "Breakup Fee"), and/or (ii) agree to reimburse reasonable and documented out-of-pocket fees and expenses (the "Expense Reimbursement," and together with the Breakup Fee, the "Bid Protections"), the Debtors will file a notice on the docket (a "Stalking Horse Notice") identifying the Stalking Horse Bidder, the material terms of the Stalking Horse Bid (including the purchase price, the Assets subject to such Stalking Horse Bid, and the treatment of Account Holder Claims), and the amount and terms of any Bid Protections proposed to be offered to the Stalking Horse Bidder, and setting a hearing before the Court for a date that is after three (3) business days after the filing of the Stalking Horse Notice (the "Stalking Horse Hearing"). All parties-in-interest will have the opportunity to object to the Stalking Horse Bidder and/or the Bid Protections at the Stalking Horse Hearing.

9.      No person or entity, other than a Stalking Horse Bidder granted Bid Protections in accordance with paragraph 9 of this Order and section C of the Bidding Procedures, shall be entitled to any expense reimbursement, break-up fees, "topping," termination, or other similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any fee of any nature, whether by virtue of Bankruptcy Code section 503(b) or otherwise.

10.     Any deposit provided by a Stalking Horse Bidder or other Qualified Bidder shall be held in escrow by the Debtors or their agent, and shall not become property of the Debtors' bankruptcy estates unless and until released from escrow to the Debtors pursuant to the terms of the applicable escrow agreement or order of this Court.

11.     The Transaction Notice, substantially in the form attached hereto as **Exhibit 2**, is hereby approved.  As soon as reasonably practicable following the entry of this Order, the Debtors will cause the Transaction Notice to be served upon (a) the United States Attorney's Office for the Southern District of New York, (b) the Committee, (c) the Internal Revenue Service, (d) the attorneys general for the states in which the Debtors operate, (e) any parties known or reasonably believed to have expressed an interest in the Debtors' assets, and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002.

### III.    **Miscellaneous**.

12.     The Court, at the request of the Debtors and subject to its availability, may modify the dates of and adjourn any hearing set by this Order without further Order of this Court, *provided* that the Debtors will serve notice to all requisite parties informing them of such modification.

13.     The failure to include or reference a particular provision of the Bidding Procedures specifically in this Order shall not diminish or impair the effectiveness or enforceability of such a provision.

14.     In the event of any inconsistencies between this Order and the Motion and/or the Bidding Procedures, this Order shall govern in all respects.

15.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

16.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

17.     The requirements set forth in Local Rule 9013-1(a) are satisfied.

18.     Notwithstanding anything to the contrary in this Order or the Bidding Procedures, any party that believes the Bidding Procedures are being improperly implemented, or otherwise

seeks relief from the Bidding Procedures, may apply to the Court for a resolution of that dispute.

19.     Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the Hearing, nothing in the Motion, this Order, or announced at the Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis is expressly reserved.

20.     Nothing contained in this Order or the Bidding Procedures shall impair, abrogate, or otherwise be deemed a waiver of the any party-in-interest's rights to object to the selection of the Winning Bidder, the Sale, the Disclosure Statement, the Plan, or otherwise, and the rights of any party-in-interest are fully preserved.

21.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

22.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

23.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

24.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: New York, New York
        August 5, 2022

                                        /s/ **Michael E. Wiles**
                                        THE HONORABLE MICHAEL E. WILES
                                        UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

**Bidding Procedures**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## BIDDING PROCEDURES FOR THE SUBMISSION, RECEIPT, AND
## ANALYSIS OF BIDS IN CONNECTION WITH THE SALE OF THE DEBTORS

On July 5, 2022, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

On [●], 2022, the Bankruptcy Court entered an order [Docket No. [●]] (the "Bidding Procedures Order") approving, among other things, these bidding procedures (the "Bidding Procedures"). These Bidding Procedures set forth the process by which the Debtors are authorized to solicit the highest or otherwise best bids (each, a "Bid") and conduct an auction (the "Auction") for the sale (the "Sale") of 100% of the Debtors' equity or some or all of their assets (the "Assets").

The Sale will be implemented pursuant to section 363 of the Bankruptcy Code or a chapter 11 plan of reorganization (as modified, amended, or supplemented from time to time, the "Plan").

> Copies of the Bidding Procedures Order or any other documents in the Debtors' chapter 11 cases are available upon request to Stretto. Inc., by calling (855) 473-8665 (Toll-Free) or (949) 271-6507 (International), or by visiting www.cases.stretto.com/Voyager/.

### A.    Participation Requirements.

To participate in the bidding process or otherwise be considered for any purpose hereunder, a person interested in submitting a Bid (a "Potential Bidder") must deliver (unless previously delivered) to each of (i) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C. (jsussberg@kirkland.com), Christopher Marcus, P.C. (cmarcus@kirkland.com), Christine A. Okike, P.C. (christine.okike@kirkland.com), and Allyson B. Smith (allyson.smith@kirkland.com); (ii) the Debtors' proposed financial advisor and investment banker to the Debtors, Moelis & Company

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

LLC, 399 Park Avenue, 4th Floor, New York, New York 10022, Attn.: Jared Dermont (jared.dermont@moelis.com), Barak Klein (barak.klein@moelis.com), Mike DiYanni (michael.diyanni@moelis.com), and Brian Tichenor (brian.tichenor@moelis.com); and (iii) proposed counsel to the Committee, McDermott Will & Emery LLP, One Vanderbilt Avenue, New York, New York 10017, Attn: Darren Azman (dazman@mwe.com) (collectively, the "Notice Parties"):

(i)     a written disclosure of the identity of each entity that will be bidding for 100% of the Debtors' equity or Assets[2] or otherwise participating in connection with such Bid;

(ii)     an executed confidentiality agreement on terms reasonably acceptable to the Debtors (the "Confidentiality Agreement"), to the extent not already executed;

(iii)     a non-binding description of the Assets in which such Potential Bidder may be interested in placing a Bid and a non-binding estimate of the purchase price to be paid, with reasonable specificity, including treatment for the Account Holder Claims;[3] and

(iv)     documents provided by the Potential Bidder evidencing its financial capacity to close a proposed transaction, which may include, without limitation, current unaudited or verified financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors and their advisors, in their reasonable discretion and in consultation with the Committee and their advisors ((i) through (iv), collectively, the "Bid Documents").

As promptly as practicable, but in no event later than three (3) business days after a Potential Bidder delivers the Bid Documents, the Debtors will determine in their reasonable business judgment, after consultation with the Committee, whether such Potential Bidder has submitted acceptable Bid Documents (any such Potential Bidder being referred to as an "Acceptable Bidder"), and the Debtors will inform such Potential Bidder regarding whether such Potential Bidder is an Acceptable Bidder. In the event that the Debtors deem that a Potential Bidder has not met the requirements for being deemed an Acceptable Bidder, the Debtors must promptly inform the Committee of such determination (and the reasons therefor).

---

[2]    Capitalized terms used but not defined herein have the meanings given to them in the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126].

[3]    "Account Holder Claims" shall have the meaning ascribed to such term in the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17].

**B.    Due Diligence.**

(i)      <u>**Access to Due Diligence.**</u>

Only Acceptable Bidders will be eligible to receive due diligence and access to additional non-public information regarding the Assets and the Debtors.  The Debtors will provide to each Acceptable Bidder reasonable due diligence information concerning those Assets that are the subject of such Acceptable Bidder's Bid (or such other Assets if the list provided in accordance with A.iii above is amended or modified), as requested by such Acceptable Bidder in writing, as soon as reasonably practicable after such request, but shall only extend to those Assets (or such other Assets if the list provided in accordance with A.iii above is amended or modified) that are the subject of such Acceptable Bidder's Bid.  The Debtors will post substantially all written due diligence provided to any Acceptable Bidder to the Debtors' electronic data room.  The due diligence period will end on the Bid Deadline (as defined herein), after which the Debtors will have no obligation to furnish any due diligence information, unless otherwise deemed reasonably appropriate by the Debtors after consultation with the Committee.

In connection with the provision of due diligence information to Acceptable Bidders, the Debtors will not furnish any confidential information relating to the Debtors, the Debtors' Assets or liabilities, or the Sale to any person other than an Acceptable Bidder or such Acceptable Bidder's duly-authorized representatives, in each case, to the extent provided in the applicable Confidentiality Agreement and only to the extent of the Assets that are the subject of such Acceptable Bidder's Bid.

The Debtors and their financial advisors will coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders; *provided* that the Debtors may decline to provide such information to Acceptable Bidders who, in the Debtors' reasonable business judgment and after consultation with the Committee, have not established that such Acceptable Bidders intend in good faith to, or have the capacity to, consummate their Bid. No conditions relating to the completion of due diligence will be permitted to exist after the Bid Deadline (as defined herein).

The Debtors also reserve the right in their reasonable business judgment, after consultation with the Committee, to withhold any diligence materials that the Debtors reasonably determine are sensitive, proprietary, or otherwise not appropriate for disclosure to an Acceptable Bidder who the Debtors reasonably determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors.  Neither the Debtors nor their representatives will be obligated to furnish information of any kind whatsoever to any person that is not determined to be an Acceptable Bidder.

Each Acceptable Bidder will be deemed to acknowledge and represent that it:  (a) has had an opportunity to conduct any and all due diligence regarding the Debtors' Assets and liabilities that are the subject of the Auction to the extent of the Assets and liabilities that are the subject of their Bid prior to making any such Bids; (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise regarding the Debtors'

Assets or liabilities, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures.  Neither the Debtors nor any of their employees, officers, directors, affiliates, subsidiaries, representatives, agents, advisors, or professionals are responsible for, and will bear no liability with respect to, any information obtained by Acceptable Bidders in connection with the Sale.

> The Debtors have designated Moelis & Company LLC, 399 Park Avenue, 4th Floor, New York, New York 10022, Attn: Jared Dermont (jared.dermont@moelis.com), Mike DiYanni (michael.diyanni@moelis.com), Barak Klein (barak.klein@moelis.com, Brian Tichenor (brian.tichenor@moelis.com), Mike Mestayer (michael.mestayer@moelis.com) or Cullen Murphy (cullen.murphy@moelis.com), to coordinate all reasonable requests for additional information and due diligence access.

      (ii)    **No Communications Among Acceptable Bidders.**

There must be no communications between and amongst Acceptable Bidders, unless the Debtors, after consultation with the Committee, have previously authorized such communication in writing.  The Debtors reserve the right, in their reasonable business judgment, after consultation with the Committee, to disqualify any Acceptable Bidders that have communications between and amongst themselves; *provided* that if any Acceptable Bidder that believes it has been wrongfully disqualified hereunder may file an emergency motion with the Bankruptcy Court seeking the reversal of such disqualification.

**C.**    **Stalking Horse Bidders and Bid Protections.**

To the extent the Debtors, in an exercise of their business judgment and following consultation with the Committee, seek to:  (a) select one or more Acceptable Bidders to act as stalking horse bidders in connection with the Auction (each, a "Stalking Horse Bidder"); and (b) in connection with any stalking horse agreement with a Stalking Horse Bidder (i) provide a breakup fee (the "Breakup Fee"), and/or (ii) agree to reimburse reasonable and documented out-of-pocket fees and expenses (the "Expense Reimbursement," and together with the Breakup Fee, the "Bid Protections"), the Debtors will file a notice on the docket (a "Stalking Horse Notice") identifying the Stalking Horse Bidder, the material terms of the Stalking Horse Bid (including the purchase price, the Assets subject to such Stalking Horse Bid, and the treatment of Account Holder Claims), and the amount and terms of any Bid Protections proposed to be offered to the Stalking Horse Bidder, and setting a hearing before the Court for a date that is after three (3) business days after the filing of the Stalking Horse Notice (the "Stalking Horse Hearing").  All parties-in-interest will have the opportunity to object to the Stalking Horse Bidder and/or the Bid Protections at the Stalking Horse Hearing.

**D.**    **Bid Requirements.**

To be eligible to participate in the Auction, an Acceptable Bidder must deliver to the Debtors and their advisors, a written, irrevocable offer that must be determined by the Debtors, in their business judgment, after consultation with the Committee, to satisfy each of the following conditions (collectively, the "Bid Requirements"):

(i)     **Purpose**.  Each Acceptable Bidder must (a) state that the Bid includes an offer by the Acceptable Bidder to acquire the Debtors' equity and/or some or all of the Assets and identify such Assets with reasonable specificity and (b) if the Acceptable Bidder proposes to consummate the transaction through a Plan, include a Plan that provides for the treatment of claims against the Debtors and the means for implementation of the Plan.

(ii)    **Transaction Structure and Purchase Price**.  Each Bid that includes an offer by the Acceptable Bidder to acquire the Debtors' equity and/or some or all of the Assets must: (a) clearly set forth the purchase price to be paid for the Assets (the "Purchase Price") and must indicate the source of consideration, including funding commitments, and confirm that such consideration is not subject to any contingencies and (b) include a detailed sources and uses schedule.  Each Bid shall also provide for appropriate treatment for the Account Holder Claims as provided in the Plan.

(iii)   **Bid Deposit**.  Each Bid contemplating an acquisition of Assets, or Plan that contemplates additional capital, must be accompanied by a cash deposit equal to the greater of $5,000,000.00 and ten percent (10%) of non-coin related value in cash (the "Good Faith Deposit"), which will be held in an escrow account to be identified and established pursuant to the authority granted by the order authorizing the Debtors to maintain and operate their bank accounts, by wire transfer or certified or cashier's check.

(iv)    **Committed Financing**.  To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Sale or Plan transaction(s) set forth in its Bid with cash on hand, each Bid must include committed financing documented to the Debtors' satisfaction, after consultation with the Committee, that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's Purchase Price and/or other obligations under its Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors in their sole discretion, after consultation with the Committee.

(v)     **Good Faith Offer**.  Each Bid must constitute a good faith, bona fide offer to purchase all or substantially all the Debtors' equity or Assets and in the case of a Plan, provide for the treatment of claims against the Debtors and the means for implementation of the Plan. Bids may be submitted for less than substantially all assets, and the Debtors may consider partial bids in their reasonable business judgment (including if multiple bids taken together would result in a sale of substantially all the Debtors' assets) following consultation with the Committee.

(vi)    **Marked Agreement**.  Each Bid must be accompanied by clean and duly executed transaction documents including, at a minimum, a chapter 11 plan or a draft asset purchase agreement, the form of which will be provided to any Acceptable Bidder

5

prior to the Bid Deadline (as defined herein), including the exhibits and schedules related thereto and any related material documents integral to such Bid pursuant to which the Acceptable Bidder proposes to effectuate the Sale, along with copies that are marked to reflect any amendments and modifications from the form chapter 11 plan or asset purchase agreement provided, which amendments and modifications may not be materially more burdensome or otherwise materially inconsistent with these Bidding Procedures. The Debtors, in their reasonable business judgment following consultation with the Committee, will determine whether any such amendments and modifications are materially more burdensome.

(vii) **No Contingencies**. A Bid must include confirmation that such Bid is not conditioned on any contingency, including, among others, on obtaining any of the following (a) financing, (b) shareholder, board of directors, or other approval, and/or (c) the outcome or completion of a due diligence review by the Acceptable Bidder.

(viii) **Binding and Irrevocable**. An Acceptable Bidder's Bid must include confirmation that the Bid is irrevocable unless and until the Debtors accept a higher Bid and such Acceptable Bidder is not selected as the Back-Up Bidder (as defined herein).

(ix) **Joint Bids**. The Debtors will be authorized to approve joint Bids in their reasonable discretion, after consultation with the Committee, on a case-by-case basis.

(x) **Adequate Assurance Information**. Each Bid must be accompanied by sufficient and adequate financial and other information (the "Adequate Assurance Information") to demonstrate, to the reasonable satisfaction of the Debtors after consultation with the Committee, that such Acceptable Bidder (a) has the financial wherewithal and ability to consummate the acquisition of the Assets and/or other transactions contemplated by the Bid (the "Closing"), and (b) can provide adequate assurance of future performance in connection with the proposed transaction. The Bid must also identify a contact person that parties may contact to obtain additional Adequate Assurance Information.

(xi) **Identity & Corporate Authority**. Each Bid must fully disclose the identity of each entity that will be participating in connection with such Bid (including any equity owners or sponsors, if the purchaser is an entity formed for the purpose of consummating the acquisition of the Assets), and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties. A Bid must also fully disclose any connections or agreements with the Debtors, any known, potential, prospective bidder or Qualified Bidder (as defined herein), or any officer, director, equity security holder, or other insider or affiliate of the Debtors.

(xii) **Authorization**. Each Bid must contain evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or a comparable governing body reasonably acceptable to the Debtors) with respect to the

6

submission of its Bid and the consummation of the transactions contemplated in such Bid.

(xiii) **No Fees**.  Each Acceptable Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code; *provided* that the Debtors are authorized in their discretion, after consultation with the Committee, to provide the Bid Protections to one or more Stalking Horse Bidders solely in accordance with these Bidding Procedures.

(xiv) **Adherence to Bidding Procedures**.  By submitting its Bid, each Acceptable Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

(xv) **Regulatory Approvals and Covenants**.  A Bid must set forth each regulatory and third-party approval required for the Acceptable Bidder to consummate the applicable Sale, if any, and the time period within which the Acceptable Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the Plan and/or asset purchase agreement, those actions the Acceptable Bidder will take to ensure receipt of such approvals as promptly as possible).

(xvi) **As-Is, Where-Is**.  Each Bid must include a written acknowledgement and representation that the Acceptable Bidder (a) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Acceptable Bidder's proposed purchase and sale agreement for the Assets.

(xvii) **Time Frame for Closing**.  A Bid by an Acceptable Bidder must identify a likely date (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid (as defined herein), within a time frame reasonably acceptable to the Debtors after consultation with the Committee.

(xviii) **Consent to Jurisdiction**.  The Acceptable Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Plan, the Sale documents, and the Closing, as applicable.

The Debtors shall promptly (but in no event later than 24 hours following receipt) deliver any and all bids received to the Committee's advisors. Bids fulfilling all of the preceding requirements, as determined by the Debtors and their advisors, after consultation with the Committee and its advisors, will be deemed to be "<u>Qualified Bids</u>," and those parties submitting Qualified Bids will be deemed to be "<u>Qualified Bidders</u>." The Debtors reserve the right, after consultation with the Committee, to work with any Acceptable Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid. The Debtors may accept a single Qualified Bid or multiple Bids for non-overlapping material portions of the Debtors' Assets such that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid (in which event those multiple bidders will be treated as a single Qualified Bidder for purposes of the Auction; *provided* that the Debtors also reserve the right, after consultation with the Committee, to conduct more than one Auction with respect to non-overlapping material portions of the Debtors' Assets).

Within two (2) business days after the Bid Deadline (as defined herein), the Debtors and their advisors, after consultation with the Committee and its advisors, will determine in their reasonable business judgment, which Acceptable Bidders are Qualified Bidders and will notify the Acceptable Bidders whether Bids submitted constitute, alone or together with other Bids, Qualified Bids so as to enable such Qualified Bidders to bid at the Auction. Any Bid that is not deemed a Qualified Bid will not be considered by the Debtors. For the avoidance of doubt, any Acceptable Bidders designated as Stalking Horse Bidders by the Debtors and in accordance with these Bidding Procedures will be deemed to be Qualified Bidders, and any stalking horse plan and/or asset purchase agreement submitted by such Stalking Horse Bidders will be deemed Qualified Bids, which qualify such Stalking Horse Bidders to participate in the Auction as Qualified Bidders.

**Bids must be sent to the Notice Parties so as to be <u>actually received</u> no later than August 26, 2022, at 12:00 p.m., prevailing Eastern Time (the "<u>Bid Deadline</u>").**

**E.    Evaluation of Qualified Bids.**

Prior to the Auction, the Debtors and their advisors, with consultation of the Committee and its advisors, will evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' reasonable business judgment, after consultation with the Committee, the highest or otherwise best Bid (the "<u>Initial Minimum Overbid</u>"). For the avoidance of doubt, the Debtors may select more than one Qualified Bid to collectively serve as the Initial Minimum Overbid if each such Qualified Bid contemplates the purchase of different Assets. In making such determination, the Debtors will take into account, among other things, (i) the amount of the Qualified Bid, (ii) the impact on customers, vendors, and employees, (iii) the certainty of a Qualified Bid leading to a confirmed plan, (iv) the timing associated with consummating such Qualified Bid, (v) the ability of the Qualified Bidder to obtain appropriate regulatory approvals, (vi) the execution risk attendant to any submitted Bids, and (vii) any other factors deemed relevant by the Debtors, after consultation with the Committee. Within 24 hours of such determination, but in no event later than the start of

the Auction, the Debtors will distribute copies of the Initial Minimum Overbid to each Qualified Bidder who has submitted a Qualified Bid.

If any Bid is determined by the Debtors not to be a Qualified Bid, the Debtors will refund such Acceptable Bidder's Good Faith Deposit and all accumulated interest thereon on or within five (5) business days after the Bid Deadline.

**F.    No Qualified Bids.**

If no Qualified Bids are received by the Bid Deadline, then the Debtors will promptly file a notice on the docket canceling the Auction.

**G.    Auction.**

If one or more Qualified Bids is received by the Bid Deadline, the Debtors will conduct the Auction with respect to the Debtors' Assets.  For the avoidance of doubt, the Debtors, after consultation with the Committee, may also conduct more than one Auction with respect to non-overlapping material portions of the Debtors' Assets.  The Auction will commence on August 29, 2022, at 10:00 a.m., prevailing Eastern Time, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or such later time or other place (including virtually) as the Debtors will timely notify any Stalking Horse Bidders and all other Qualified Bidders.

The Auction will be conducted in accordance with the following procedures (the "<u>Auction Procedures</u>"):

(i)    the Auction will be conducted openly;

(ii)    only the Qualified Bidders, including any Stalking Horse Bidders, will be entitled to bid at the Auction;

(iii)    the Qualified Bidders, including any Stalking Horse Bidders, must appear in person or through duly-authorized representatives at the Auction (except to the extent that the Auction is held virtually, in which case such Qualified Bidders must appear virtually);

(iv)    except to the extent agreed upon by the Debtors, after consultation with the Committee, only such authorized representatives of each of the Qualified Bidders (including any Stalking Horse Bidders), the Debtors, the Committee, and their respective advisors will be permitted to attend the Auction;

(v)    bidding at the Auction will begin at the Initial Minimum Overbid;

(vi)    subsequent Bids at the Auction, including any Bids by any Stalking Horse Bidder, must be made in minimum increments (which may include cash or non-cash consideration) in an amount that the Debtors determine in their reasonable business judgment after consultation with the Committee (and in amounts as announced to all Qualified Bidders prior to the commencement of the Auction), after payment of

9

the Bid Protections to any Stalking Horse Bidders, if applicable; the Debtors will estimate the value of non-cash consideration offered, if applicable, in their business judgment, after consultation with the Committee;

(vii)    each Qualified Bidder will be informed of the terms of the previous Bids;

(viii)   the bidding will be transcribed to ensure an accurate recording of the bidding at the Auction;

(ix)    each Qualified Bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the Sale;

(x)     the Auction will not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an overbid at the Auction to the then prevailing highest Bid, subject to the Debtors' right, after consultation with the Committee, to require last and final Bids to be submitted on a "blind" basis;

(xi)    the Debtors reserve the right, in their reasonable business judgment, after consultation with the Committee, to adjourn the Auction one or more times to, among other things, (a) facilitate discussions between the Debtors and Qualified Bidders, (b) allow Qualified Bidders to consider how they wish to proceed, and (c) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount; and

(xii)   the Auction will be governed by such other Auction Procedures as may be announced by the Debtors and their advisors, after consultation with the Committee, from time to time on the record at the Auction; *provided* that such other Auction Procedures are (a) not inconsistent with the Bidding Procedures Order, these Bidding Procedures, the Bankruptcy Code, or any other order of the Bankruptcy Court, (b) disclosed orally or in writing to all Qualified Bidders, and (c) reasonably determined by the Debtors, in good faith, to further the goal of attaining the highest or otherwise best offer.

For the avoidance of doubt, nothing in the Auction Procedures will prevent the Debtors from exercising their respective fiduciary duties under applicable law (as reasonably determined in good faith by the Debtors, after consultation with the Committee).

## H.    Acceptance of the Successful Bid or Successful Bids.

Upon the conclusion of the Auction (if such Auction is conducted), the Debtors, in the exercise of their reasonable, good-faith business judgment, after consultation with the Committee, will identify the highest or otherwise best Qualified Bid or Qualified Bids (each, a "Successful Bid"), which will be determined by considering, among other things, (a) the type and amount of Assets sought to be purchased in the Bid or Bids, (b) the total expected consideration to be received by the Debtors, (c) the likelihood of the Qualified Bidder or Qualified Bidders' ability to close a

transaction and the timing thereof (including any anticipated delays to Closing and the cost to the Debtors of such delays), (d) the expected net benefit to the estates, including treatment of the Account Holder Claims (e) the impact on vendors, customers, and employees, and (f) any other criteria as may be considered by the Debtors and the Committee in their reasonable, good-faith business judgment. For the avoidance of doubt, the Debtors, after consultation with the Committee, may select more than one Qualified Bid to collectively serve as a Successful Bid if each such Qualified Bid contemplates the purchase of different Assets. The Qualified Bidder or Qualified Bidders having submitted the Successful Bid or Successful Bids will be deemed the "Winning Bidder" or "Winning Bidders," as applicable. The Winning Bidder or Winning Bidders and the Debtors must, as soon as commercially reasonably practicable, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which such Successful Bid or Successful Bids were made.

The Debtors will present the results of the Auction to the Bankruptcy Court at the Sale Hearing or Confirmation Hearing (each as defined herein), at which certain findings will be sought from the Bankruptcy Court regarding the Auction, including, among other things, that (a) the Auction was conducted, and the Winning Bidder or Winning Bidders were selected, in accordance with these Bidding Procedures, (b) the Auction was fair in substance and procedure, and (c) consummation of the Successful Bid or Successful Bids will provide the highest or otherwise best value for the Debtors' Assets and is in the best interests of the Debtors' estates.

If an Auction is held, the Debtors will be deemed to have accepted a Qualified Bid only when (a) such Qualified Bid is declared a Successful Bid at the Auction, and (b) definitive documentation has been executed in respect thereof. Such acceptance is conditioned upon approval by the Bankruptcy Court of the Successful Bid or Successful Bids and entry of an order approving such Successful Bid or Successful Bids (in the case of a sale under section 363 of the Bankruptcy Code, the "Sale Order" or in the case of a sale under a chapter 11 plan, the "Confirmation Order").

**I.   Sale Hearing.**

In the event a transaction is consummated pursuant to section 363 of the Bankruptcy Code, a hearing before the Bankruptcy Court to consider approval of the Successful Bid or Successful Bids (the "Sale Hearing"), pursuant to which the Debtors and the Winning Bidder or Winning Bidders will consummate the Sale, will be held on September 8, 2022, at 11:00 a.m., prevailing Eastern Time, before the Honorable Michael E. Wiles, United States Bankruptcy Judge for the Bankruptcy Court for the Southern District of New York at One Bowling Green, New York, New York 10004.

**The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party.**

At the Sale Hearing, the Debtors will present the Successful Bid or Successful Bids to the Bankruptcy Court for approval.

J.      **Disclosure Statement Hearing.**

The Debtors intend to file a Disclosure Statement on or before August 12, 2022 and will seek a hearing before the Bankruptcy Court to consider approval of the adequacy of the Disclosure Statement, solicitation materials, and scheduling of dates related to confirmation of a Plan (the "Disclosure Statement Hearing") on September 16, 2022, before the Honorable Michael E. Wiles, United States Bankruptcy Judge for the Bankruptcy Court for the Southern District of New York, or otherwise in accordance with any scheduling orders entered by the Bankruptcy Court relating to confirmation of the Plan or approval of any disclosure statement related thereto. The order approving the Disclosure Statement will include the objection and voting deadlines with respect to approval of the Disclosure Statement and confirmation of the Plan.

**The Disclosure Statement Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Disclosure Statement Hearing. No further notice of any such continuance will be required to be provided to any party.**

K.      **Confirmation Hearing.**

The Debtors will seek a hearing before the Bankruptcy Court to consider confirmation of the Plan (the "Confirmation Hearing") on October 31, 2022, before the Honorable Michael E. Wiles, United States Bankruptcy Judge for the Bankruptcy Court for the Southern District of New York, or otherwise in accordance with any scheduling orders entered by the Bankruptcy Court relating to confirmation of the Plan.

**The Confirmation Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Confirmation Hearing. No further notice of any such continuance will be required to be provided to any party.**

At the Confirmation Hearing, the Debtors will present the Plan, which will incorporate the terms of the Successful Bid or Successful Bids, to the Bankruptcy Court for confirmation.

L.      **Designation of Back-Up Bidder or Back-Up Bidders.**

If for any reason the Winning Bidder or Winning Bidders fail to consummate the Qualified Bid or Qualified Bids within the time permitted after the entry of the Sale Order approving the Sale to the Winning Bidder or Winning Bidders, then the Qualified Bidder or Qualified Bidders with the next-highest or otherwise second-best Bid or Bids (each, a "Back-Up Bidder"), as determined by the Debtors after consultation with their advisors and the Committee and its advisors, at the conclusion of the Auction and announced at that time to all the Qualified Bidders participating therein, will automatically be deemed to have submitted the highest or otherwise best Bid or Bids (each, a "Back-Up Bid"), and the Debtors will be authorized, but not required, to consummate the transaction pursuant to the Back-Up Bid or Back-Up Bids as soon as is commercially reasonable without further order of the Bankruptcy Court upon at least 24 hours advance notice, which notice will be filed with the Bankruptcy Court. Upon designation of the Back-Up Bidder or Back-Up Bidders at the Auction, the Back-Up Bid or Back-Up Bids must remain open until the Closing of the Successful Bid or Successful Bids, as applicable,

notwithstanding any outside date set forth in such Back-Up Bidder or Back-Up Bidders' proposed purchase agreement or chapter 11 plan.

**M.     Return of Good Faith Deposit to Qualified Bidders that Submit Qualified Bids.**

The Good Faith Deposit of the Winning Bidder or Winning Bidders will, upon consummation of the Successful Bid or Successful Bids, become property of the Debtors' estates and be credited to the portion of the Purchase Price.  If the Winning Bidder or Winning Bidders (or Back-Up Bidder or Back-Up Bidders, if applicable) fails to consummate the Successful Bid or Successful Bids (or Back-Up Bid or Back-Up Bids, if applicable), then the Good Faith Deposit of such Winning Bidder or Winning Bidders (or Back-Up Bidder or Back-Up Bidders, if applicable) will be irrevocably forfeited to the Debtors and may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors.

The Good Faith Deposit of any unsuccessful Qualified Bidders (except for the Back-Up Bidder or Back-Up Bidders and any Stalking Horse Bidders) will be returned within five (5) business days after consummation of the Sale or upon the permanent withdrawal of the proposed Sale.  The Good Faith Deposit of the Back-Up Bidder or Back-Up Bidders, if any, will be returned to such Back-Up Bidder or Back-Up Bidders no later than five (5) business days after the Closing with the Winning Bidder or Winning Bidders.  The return of any Good Faith Deposit of any Stalking Horse Bidders will be subject to the terms of such Stalking Horse Bidders' chapter 11 plan or asset purchase agreement, as applicable.

All deposits shall be held in escrow and at no time shall be deemed property of the Debtors' estates absent further order of the Bankruptcy Court.

**N.     Reservation of Rights.**

Subject to prior written consent of the Committee or further order of the Bankruptcy Court, the Debtors, reserve their rights to modify these Bidding Procedures (including the deadlines in these Bidding Procedures and the Bidding Procedures Order) in good faith, to further the goal of attaining the highest or otherwise best offer, or impose, at or prior to the Auction, additional terms and conditions on the Sale.  The Debtors shall provide notice of any such modification to any Qualified Bidder, including any Stalking Horse Bidders.  Notwithstanding anything to the contrary herein, the Debtors, after consultation with the Committee, may elect to consummate the Sale under section 363(f) of the Bankruptcy Code as opposed to pursuant to the Plan with the Winning Bidder or Winning Bidders, but, for the avoidance of doubt, the Debtors prefer that the Sale be accomplished through the Plan.

**O.     Consent to Jurisdiction.**

All Qualified Bidders at the Auction will be deemed to have consented to the jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Sale, the Auction, the construction and enforcement of these Bidding Procedures, the Bid Requirements, and/or the Bid Documents, as applicable.

Any parties raising a dispute relating to these Bidding Procedures must request that such dispute be heard by the Bankruptcy Court on an expedited basis.

**P.     Fiduciary Out.**

Nothing in these Bidding Procedures will require the board of directors, board of managers, or such similar governing body of a Debtor or non-debtor affiliate to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body reasonably determines in good faith, after consultation with the Committee, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

**Q.     Sale Is As Is/Where Is.**

The Assets sold pursuant to these Bidding Procedures will be conveyed at the Closing in their then-present condition, "**as is, with all faults, and without any warranty whatsoever, express or implied.**"

\* \* \* \* \*

**<u>Exhibit 2</u>**

**Transaction Notice**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE OF BIDDING PROCEDURES,**
**POTENTIAL AUCTION, AND SALE HEARING**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on July 5, 2022 (the "Petition Date").

**PLEASE TAKE FURTHER NOTICE** that on July 21, 2022, the Debtors filed a motion [Docket No. 126] (the "Motion") seeking, among other things, the entry of an order approving (a) bidding procedures (the "Bidding Procedures") in connection with the proposed auction (the "Auction") and sale (the "Sale") of the Debtors' equity or some or all of their (the "Assets") to one or more successful bidders, (b) the selection of a Stalking Horse Bidder and the payment of Bid Protections, in certain instances as set forth in the Bidding Procedures, and (c) scheduling dates and deadlines in connection with approval of the Sale (the "Sale Schedule").

**PLEASE TAKE FURTHER NOTICE** that on [●], 2022, the Bankruptcy Court entered an order [Docket No. [●]] (the "Bidding Procedures Order") granting certain of the relief sought

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]   Capitalized terms used in this notice and not immediately defined have the meanings given to such terms in the Bidding Procedures (as defined herein).

in the Motion, including, among other things, approving the Bidding Procedures and the Sale/Confirmation Schedule.

### Contact Persons for Parties Interested in Submitting a Bid

The Bidding Procedures set forth in detail the requirements for submitting Qualified Bids, and any person interested in making an offer to purchase the Debtors' equity and/or Assets **must** comply strictly with the Bidding Procedures. **Only Qualified Bids that are submitted in accordance with the Bidding Procedures will be considered by the Debtors**. Any persons interested in making an offer to purchase the Debtors' equity and/or Assets should contact:

| Proposed Financial Advisor and Investment Banker to the Debtors | Proposed Counsel to the Debtors |
|---|---|
| Moelis & Company LLC<br>399 Park Avenue, 3rd Floor<br>New York, New York 10022<br>Attn: Jared Dermont (jared.dermont@moelis.com)<br>Barak Klein (barak.klein@moelis.com)<br>Michael DiYanni (michael.diyanni@moelis.com)<br>Brian Tichenor (brian.tichenor@moelis.com) | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn: Joshua A. Sussberg, P.C. (jsussberg@kirkland.com)<br>Christopher Marcus, P.C. (cmarcus@kirkland.com)<br>Christine A. Okike, P.C. (christine.okike@kirkland.com)<br>Allyson B. Smith (allyson.smith@kirkland.com) |
| **Proposed Financial Advisor to the Committee** | **Proposed Counsel to the Committee** |
| FTI Consulting<br>1166 Avenue of the Americas<br>New York, NY 10036<br>Attn: Steven Simms (Steven.Simms@FTIConsulting.com)<br>Marshall Eisler (Marshall.Eisler@fticonsulting.com) | McDermott Will & Emery LLP<br>One Vanderbilt Avenue<br>New York, New York 10017<br>Attn: Darren Azman (dazman@mwe.com)<br>Charles Gibbs (crgibbs@mwe.com)<br>Gregg Steinman (gsteinman@mwe.com) |

### Obtaining Information

Copies of the Bidding Procedures Order, the Bidding Procedures, and any other related documents are available upon request to Stretto, Inc., the Debtors' notice and claims agent, by calling 855.473.8665 (Toll-Free) or 949.271.6507 (International) or by visiting www.cases.stretto.com/Voyager/.

### The Sale/Confirmation Schedule

1.    The deadline to submit a Qualified Bid (the "Bid Deadline") is **August 26, 2022, at 12:00 p.m., prevailing Eastern Time**.

2.    The Auction for the Debtors' equity and/or or Assets, if one is necessary, will commence on **August 29, 2022, at 10:00 a.m., prevailing Eastern Time**, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or at such later time or other place as the Debtors will timely notify any Stalking Horse Bidders and all other Qualified Bidders.

3.    The deadline to file an objection with the Bankruptcy Court to the Sale is **September 6, 2022, at 4:00 p.m., prevailing Eastern Time** (the "Sale Objection Deadline").

4.      A hearing to consider a Sale pursuant to section 363 of the Bankruptcy Code will be held before the Honorable Michael E. Wiles of the Bankruptcy Court on **September 8, 2022, at 11:00 a.m., prevailing Eastern Time**, or such other date as determined by the Bankruptcy Court.

5.      The Debtors will seek to file a Disclosure Statement on or by **August 12, 2022**.

6.      The Debtors will seek to establish **September 9, 2022, at 4:00 p.m., prevailing Eastern Time** as the deadline to file an objection with the Bankruptcy Court to the Disclosure Statement (the "Disclosure Statement Objection Deadline"). The notice of a hearing seeking approval of the Disclosure Statement will include the Disclosure Statement Objection Deadline.

7.      The Debtors will seek to schedule a hearing to consider the adequacy of the Disclosure Statement, solicitation materials, and scheduling of dates related to confirmation of a Plan before the Honorable Michael E. Wiles of the Bankruptcy Court on **September 16, 2022, at [●:00 a/p.m.], prevailing Eastern Time**, or such other date as determined by the Bankruptcy Court. The order approving the Disclosure Statement will include the objection and voting deadlines with respect to confirmation of the Plan.

8.      The Debtors will seek to establish **October 24, 2022, at 4:00 p.m., prevailing Eastern Time** as the deadline to vote to accept or reject the Plan (the "Voting Deadline") and file an objection with the Bankruptcy Court to confirmation of the Plan (the "Plan Objection Deadline"). The order approving the Disclosure Statement will include the Voting Deadline and the Plan Objection Deadline.

9.      The Debtors will seek to schedule a hearing to consider confirmation of the Plan before the Honorable Michael E. Wiles of the Bankruptcy Court on **October 31, 2022, at [●:00 a/p.m.], prevailing Eastern Time**, or such other date as determined by the Bankruptcy Court.

### **Filing Objections to the Sale, the Disclosure Statement, or the Plan**

Any objection to the Sale must (a) be in writing, (b) state with specificity the nature of such objection, (c) comply with the applicable provisions of the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and any case management order entered by the Bankruptcy Court, and (d) be filed with the Bankruptcy Court and served upon, so as to be **actually received** on or prior to the Sale Objection Deadline, Disclosure Statement Objection Deadline, or Plan Objection Deadline, as applicable, by the following parties (i) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C. (jsussberg@kirkland.com), Christopher Marcus, P.C. (cmarcus@kirkland.com), Christine A. Okike, P.C. (christine.okike@kirkland.com), and Allyson B. Smith (allyson.smith@kirkland.com); (ii) the Debtors' proposed financial advisor and investment banker to the Debtors, Moelis & Company LLC, 399 Park Avenue, 4th Floor, New York, New York 10022, Attn.: Jared Dermont (jared.dermont@moelis.com), Barak Klein (barak.klein@moelis.com), Mike DiYanni (michael.diyanni@moelis.com), and Brian Tichenor

(brian.tichenor@moelis.com); (iii) proposed counsel to the Committee, McDermott Will & Emery LLP, One Vanderbilt Avenue, New York, New York 10017, Attn: Darren Azman (dazman@mwe.com), and Charles Gibbs (crgibbs@mwe.com); and (iv) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, New York 10014, Attn: Richard Morrissey and Mark Bruh.

## Consequences of Failing to Timely File an Objection

**Any party or entity who fails to timely file an objection to the Sale, Disclosure Statement, or Plan on or before the Sale Objection Deadline, Disclosure Statement Objection Deadline or Plan Objection Deadline, as applicable, in accordance with the Bidding Procedures, shall be forever barred from asserting any objection to the Sale, Disclosure Statement, or Plan.**

\*    \*    \*    \*    \*

4

# Exhibit 7

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF SUCCESSFUL BIDDER

      **PLEASE TAKE NOTICE** that on August 5, 2022, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered the *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation and (V) Granting Related Relief* [Docket No. 248] (the "Bidding Procedures Order").[2]

      **PLEASE TAKE FURTHER NOTICE** that on August 22, 2022, the Debtors filed the *Modified Bidding Procedures for the Submission, Receipt, and Analysis of Bids in connection with the Sale of the Debtors* [Docket No. 328] (the "Bid Procedures").

      **PLEASE TAKE FURTHER NOTICE** that the Debtors, in the exercise of their business judgement, selected BAM Trading Services Inc. d/b/a Binance.US ("Binance US") as the Successful Bidder with respect to the Acquired Assets (as defined in the Asset Purchase Agreement).

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]   Capitalized terms used but not defined herein shall have the meanings set forth in the Bidding Procedures Order or the Asset Purchase Agreement (as defined herein), as applicable.

| Debtors |
|---|
| Ex-7 |

PLEASE TAKE FURTHER NOTICE that on December 18, 2022, Debtor Voyager Digital, LLC, as seller, and Binance US, as purchaser, entered into that certain asset purchase agreement memorializing the Successful Bid (the "Asset Purchase Agreement") attached hereto as **Exhibit A**.

PLEASE TAKE FURTHER NOTICE that a hearing on the Debtors' entry into the Asset Purchase Agreement is scheduled to be heard before the Honorable Michael E. Wiles in the United States Bankruptcy Court on **Thursday, January 5, 2023, at 1:00 p.m. (prevailing Eastern Time)** (the "Hearing"). Objections to the entry into the Asset Purchase Agreement are due **Friday, December 30, 2022, at 4:00 p.m. (prevailing Eastern Time)**.

PLEASE TAKE FURTHER NOTICE that this Notice of Successful Bidder is subject to the terms and conditions of the Bidding Procedures Order.

PLEASE TAKE FURTHER NOTICE that copies of the Asset Purchase Agreement, and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/Voyager. You may also obtain copies of the Asset Purchase Agreement and other pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

[*Remainder of the page left blank.*]

2

Dated:  December 19, 2022
New York, New York

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          jsussberg@kirkland.com
                cmarcus@kirkland.com
                christine.okike@kirkland.com
                allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## Exhibit A

## Asset Purchase Agreement

**Execution Verion**

---

## ASSET PURCHASE AGREEMENT

## DATED AS OF DECEMBER 18, 2022

## BY AND BETWEEN

## BAM TRADING SERVICES INC. D/B/A BINANCE.US, AS PURCHASER,

## AND

## VOYAGER DIGITAL, LLC, AS SELLER.

---

# TABLE OF CONTENTS

Page

**ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES** ..................................................................................1

1.1   Purchase and Sale of the Acquired Assets ...............................1
1.2   Excluded Assets .........................................................................3
1.3   Assumption of Certain Liabilities ..............................................5
1.4   Excluded Liabilities ...................................................................6
1.5   Assumption/Rejection of Certain Contracts .............................6

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING** .............................8

2.1   Consideration; Payment ............................................................8
2.2   Deposit .......................................................................................9
2.3   Closing .......................................................................................9
2.4   Closing Deliveries by Seller ...................................................10
2.5   Closing Deliveries by Purchaser .............................................10
2.6   Withholding .............................................................................11

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER** .....................11

3.1   Organization and Qualification ...............................................11
3.2   Authorization of Agreement ...................................................12
3.3   Conflicts; Consents .................................................................12
3.4   Financial Statements ...............................................................13
3.5   Cryptocurrency; Loans; Customer Accounts ..........................13
3.6   Title to Acquired Assets; Staked Coins; Exclusive Ownership; Sufficiency of Assets .........................................................14
3.7   Title to Properties ...................................................................14
3.8   Contracts ..................................................................................15
3.9   Permits; Compliance with Laws .............................................16
3.10  Environmental Matters ...........................................................18
3.11  Intellectual Property; Data Privacy ........................................18
3.12  Tax Matters .............................................................................19
3.13  Affiliate Transactions .............................................................20
3.14  Brokers ....................................................................................21
3.15  Litigation .................................................................................21
3.16  Absence of Changes ...............................................................21
3.17  No Other Representations or Warranties .................................21
3.18  No Outside Reliance ...............................................................21

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** .............22

4.1   Organization and Qualification ...............................................22
4.2   Authorization of Agreement ...................................................22
4.3   Conflicts; Consents .................................................................22
4.4   Financing ..................................................................................23
4.5   Permits .....................................................................................23
4.6   Brokers ....................................................................................23
4.7   No Litigation ...........................................................................23

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 4.8 | Certain Arrangements | 24 |
| 4.9 | Solvency | 24 |
| 4.10 | No Additional Representations or Warranties | 24 |
| 4.11 | No Outside Reliance | 24 |

**ARTICLE V BANKRUPTCY COURT MATTERS** .................................................. **25**

| | | |
|---|---|---|
| 5.1 | Selection of Successful Bid and Winning Bidder and Sale Approval | 25 |
| 5.2 | No-Shop | 26 |
| 5.3 | Bankruptcy Actions | 27 |
| 5.4 | Cure Costs | 29 |
| 5.5 | Approval | 29 |
| 5.6 | No Successor Liability | 29 |
| 5.7 | Filings | 29 |
| 5.8 | Waiver of Conflicts | 29 |

**ARTICLE VI COVENANTS AND AGREEMENTS** .............................................. **30**

| | | |
|---|---|---|
| 6.1 | Conduct of Seller | 30 |
| 6.2 | Access to Information | 32 |
| 6.3 | Employee Matters | 34 |
| 6.4 | Regulatory Matters | 36 |
| 6.5 | Reasonable Best Efforts; Cooperation | 38 |
| 6.6 | Data Transfer Matters | 38 |
| 6.7 | Use of Name | 39 |
| 6.8 | Further Assurances | 40 |
| 6.9 | Insurance Matters | 40 |
| 6.10 | User Migration | 41 |
| 6.11 | Rebalancing Exercise; Seller Statement | 43 |
| 6.12 | Crediting of Accounts; Unsupported Jurisdictions, Transfer of Coins to Seller; Liquidations or Distributions by Seller | 45 |
| 6.13 | VGX Token Listing Review Process | 48 |
| 6.14 | Additional Bankruptcy Distributions | 48 |
| 6.15 | Unstaking | 49 |
| 6.16 | Receipt of Misdirected Assets; Liabilities | 50 |
| 6.17 | Acknowledgment by Purchaser | 50 |
| 6.18 | IT Migration | 52 |
| 6.19 | Confidentiality | 52 |
| 6.20 | Acquired Assets Owned by Non-Debtors | 53 |
| 6.21 | Seller Expenses | 53 |
| 6.22 | Purchaser Expenses | 54 |

**ARTICLE VII CONDITIONS TO CLOSING** ..................................................... **55**

| | | |
|---|---|---|
| 7.1 | Conditions Precedent to the Obligations of Purchaser and Seller | 55 |
| 7.2 | Conditions Precedent to the Obligations of Purchaser | 55 |
| 7.3 | Conditions Precedent to the Obligations of Seller | 56 |
| 7.4 | Waiver of Conditions | 56 |

# TABLE OF CONTENTS

**Page**

**ARTICLE VIII TERMINATION** ....................................................................**57**

8.1  Termination of Agreement....................................................57
8.2  Effect of Termination............................................................59
8.3  Reverse Termination Fee ......................................................60
8.4  Further Effect of Termination ..............................................60

**ARTICLE IX TAXES** ....................................................................................**61**

9.1  Transfer Taxes ......................................................................61
9.2  Cooperation ..........................................................................61
9.3  Preparation of Tax Returns and Payment of Taxes .............62

**ARTICLE X MISCELLANEOUS** ..................................................................**63**

10.1  Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers.............................................................................63
10.2  Expenses ..............................................................................63
10.3  Notices .................................................................................64
10.4  Binding Effect; Assignment.................................................65
10.5  Amendment and Waiver .......................................................65
10.6  Third Party Beneficiaries .....................................................65
10.7  Non-Recourse .......................................................................66
10.8  Severability ..........................................................................66
10.9  Construction .........................................................................66
10.10 Schedules ..............................................................................66
10.11 Complete Agreement ............................................................67
10.12 Specific Performance ...........................................................67
10.13 Jurisdiction and Exclusive Venue ........................................67
10.14 Governing Law; Waiver of Jury Trial ..................................68
10.15 No Right of Set-Off ..............................................................69
10.16 Counterparts and PDF ..........................................................69
10.17 Publicity ...............................................................................69
10.18 Bulk Sales Laws...................................................................70
10.19 Fiduciary Obligations...........................................................70
10.20 No Solicitation .....................................................................70
10.21 Acknowledgment .................................................................70

**ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS** ..........**70**

11.1  Certain Definitions...............................................................70
11.2  Index of Defined Terms .......................................................85
11.3  Rules of Interpretation .........................................................86

**INDEX OF EXHIBITS**

EXHIBIT A     FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
              AGREEMENT

EXHIBIT B     FORM OF TRADEMARK AND DOMAIN NAME ASSIGNMENT
              AGREEMENT

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of December 18, 2022, is made by and between BAM Trading Services Inc. d/b/a Binance.us, a Delaware corporation ("Purchaser"), and Voyager Digital, LLC, a Delaware limited liability company ("Seller"). Purchaser and Seller are each referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

WHEREAS, on July 5, 2022 (the "Petition Date"), Seller, together with Voyager Digital Ltd., a Canadian corporation and Seller's indirect equityholder ("Parent"), and Voyager Digital Holdings, Inc., a Delaware corporation and Seller's direct equityholder ("Holdings" and, collectively with Seller and Parent, the "Debtors"), filed voluntary petitions for relief (collectively, the "Petitions") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), to be jointly administered for procedural purposes (collectively, the "Bankruptcy Case"); and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement, the Agreement Order, the Plan and the Confirmation Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchaser and Seller hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1    Purchase and Sale of the Acquired Assets. Pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Agreement Order, the Plan and the Confirmation Order, at the Closing, Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Post-Closing Liens; provided, in respect of the Acquired Coins, Purchaser shall acquire all of Seller's right, title and interest in and to the Acquired Coins free and clear of all Encumbrances (including Encumbrances implemented through "smart contracts" or other technological means), except that with respect to any ETH Coins that are Staked Coins as of the date hereof and cannot be unstaked as of the Closing, such ETH Coins shall be subject to such staking. "Acquired Assets" means all of the properties, rights and interests in and to only the following assets of Seller as of the Closing, wherever located and

whether or not required to be reflected on a balance sheet prepared in accordance with IFRS, including any such properties, rights and interests in any assets of the following types acquired by Seller after the date hereof and prior to the Closing:

(a)    all Acquired Coins, together with all information regarding the underlying networks and smart contracts to which such Acquired Coins are subject;

(b)    to the extent permissible under applicable Law, (1) all (i) information and Personal Information (including, for the avoidance of doubt, names, account numbers, social security numbers, passports (including passport numbers), drivers licenses (including driver license numbers), "liveness check" selfies, email addresses, mailing addresses, phone numbers, contact information, usernames, user IDs, passwords, and any Personal Information collected for purposes of KYC Procedures) related to (A) all active and inactive accounts of Users ("Voyager User Accounts") and (B) any other consumers located or having a home address in the United States from whom Personal Information was collected by Seller; (ii) information that has been anonymized, pseudonymized, or otherwise de-identified; (iii) data contained in the Seller Statement or the Post-Bankruptcy Statement; (iv) information relating to Voyager User Accounts that must be obtained and retained by Purchaser or any of its Affiliates for regulatory or legal purposes; and (v) any encryption key, passcode or cypher required to access any of the foregoing (collectively, the "Acquired User Data"), and (2) all other information and data relating to the other categories of Acquired Assets, the Voyager Platform, other than Acquired User Data (clauses (1) and (2), collectively, "Acquired Information");

(c)    all rights, causes of action, claims (including, for the avoidance of doubt, any claims and causes of action arising under Chapter 5 of the Bankruptcy Code), counterclaims, defenses, credits, rebates, demands, allowances, refunds (other than Tax refunds or Tax attributes, in each case, to the extent enumerated in Section 1.2(i)), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities of any kind, in each case that Seller may have against any User located or having a home address in the United States solely to the extent that such claim or cause of action is against a User in such Person's capacity as a User (in each case, excluding (i) Retained Avoidance Actions, (ii) claims, causes of action or other rights against Seller or any of its Affiliates, or (iii) any of the foregoing to the extent relating to any Credit Matter) (collectively, "Acquired Voyager Claims");

(d)    other than VGX Token Smart Contracts, all Intellectual Property owned by Seller or otherwise used or held for use by or on behalf of Seller in connection with the operation of its businesses, including all Business Software (in source code and object code form), any Bedrock source code and other IT Systems owned by Seller and required to operate the Voyager Platform, all Business Accounts (provided that Purchaser may elect, by written notice to Seller until two (2) Business Days prior to the Closing Date, to designate any Business Account(s) as Excluded Asset(s)), all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights, claims and causes of action to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world;

2

(e)    all rights to continue the customer relationships with customers of Seller and its Affiliates to the extent pertaining to savings and trading services related to Cryptocurrency;

(f)    all Contracts listed on <u>Schedule 1.1(f)</u> (the "<u>Assigned Contracts</u>") (for the avoidance of doubt, not including the 3AC Loan); and

(g)    other than the Excluded Documents, all Documents, goodwill, payment intangibles and general intangible assets and rights of or otherwise used or held for use by or on behalf of Seller and its Affiliates, in each case in connection with or related to any of the foregoing categories of Acquired Assets; <u>provided</u> that Seller shall be entitled to retain copies of Documents (subject to <u>Section 6.19</u>).

1.2    <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, in no event shall Seller be deemed to sell, transfer, assign, convey or deliver, and Seller shall retain all right, title and interest to all other properties, rights, interests and other assets of Seller that are not Acquired Assets, including the following (collectively, the "<u>Excluded Assets</u>"):

(a)    all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by Seller, and any retainers or similar amounts paid to Advisors or other professional service providers, in each case, other than the Acquired Coins;

(b)    all Contracts of Seller other than the Assigned Contracts, including the Contracts listed on <u>Schedule 1.2(b)</u> (the "<u>Excluded Contracts</u>");

(c)    all Documents, in each case, (i) to the extent they are primarily used in, or primarily relate to, any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of Seller, other than Voyager User Accounts), (ii) to the extent that such Documents constitute Seller's financial accounting Documents, all minute books, organizational documents, stock registers and such other books and records of Seller to the extent pertaining to the ownership, organization or existence of Seller, Tax Returns (and any related work papers), corporate seals, checkbooks, and canceled checks, in each case to the extent not primarily relating to the Acquired Assets or Assumed Liabilities or (iii) that Seller is required by Law to retain; <u>provided</u> that, to the extent not prohibited by applicable Law, Purchaser shall have the right to make copies of any portions of such Documents;

(d)    all Documents to the extent prepared or received by Seller or any of its Affiliates in connection with the sale of the Acquired Assets, this Agreement, or the Transactions, including (i) all records and reports prepared or received by Seller or any of its Affiliates or Advisors in connection with the sale of the Acquired Assets and the Transactions, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received in connection therewith, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of Seller's business or assets, and (iii) all privileged materials, documents and records of Seller or any of its Affiliates (together with the Documents specified in <u>Sections 1.2(c)</u> and <u>1.2(h)</u>, the "<u>Excluded Documents</u>");

US-DOCS\137411268.27

(e)     all current and prior insurance policies of Seller, including for the avoidance or doubt all director and officer insurance policies, and all rights and benefits of any nature of Seller with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, other than Acquired Voyager Claims;

(f)     all membership interests or other equity interests of Seller or any of its Affiliates or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests;

(g)     (i) all Retained Avoidance Actions, (ii) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law, (iii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of Seller or any of its Affiliates, in each case, either (A) arising out of or relating to events occurring on or prior to the Closing Date, except as set forth in Section 1.1, or (B) related to any Credit Matter, and (iv) all claims that Seller or any of its Affiliates may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities, in each case other than Acquired Voyager Claims;

(h)     Seller's claims or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between Seller and Purchaser or their respective Affiliates in connection with the Transactions, or any other agreement between Seller and Purchaser or their respective Affiliates entered into on or after the date hereof;

(i)     (x) all Tax attributes of Seller or its Affiliates (including refunds of income Taxes of Seller or its Affiliates, but excluding any Tax refunds or Tax attributes with respect to Taxes in respect of the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date allocable to Purchaser in accordance with Section 9.3(d) or with respect to Transfer Taxes), (y) all Tax refunds and Tax attributes with respect to Taxes in respect of the Acquired Assets (i) for any Pre-Closing Tax Period or (ii) that are Excluded Liabilities, and (z) all Tax refunds and Tax attributes with respect to Taxes in respect of the Excluded Assets;

(j)     every asset of Seller that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) at the direction of the Bankruptcy Court or (ii) as otherwise permitted under Section 6.1(b);

(k)     all demands, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date, in each case other than Acquired Voyager Claims;

(l)     the properties, rights, interests, equity and assets of Coinify ApS and its direct and indirect subsidiaries;

4

(m)     all Money Transmitter Licenses;

(n)     Seller's accounts receivable, and other amounts or Liabilities owing, from its Affiliates;

(o)     (i) all Seller Plans and assets of all Seller Plans that do not constitute Acquired Coins and (ii) personnel records relating to employees of Seller and Holdings;

(p)     all information and Personal Information related to individual consumers that is not Acquired User Data, including any Personal Information that is subject to the GDPR or collected from natural persons with addresses outside of the United States;

(q)     the 3AC Loan;

(r)     all VGX Token Smart Contracts; and

(s)     the properties, rights, interests and assets set forth on Schedule 1.2(s).

1.3     <u>Assumption of Certain Liabilities</u>. On the terms and subject to the conditions set forth herein and in the Agreement Order, the Plan and the Confirmation Order, effective as of the Closing, in addition to the other components of the Purchase Price described in <u>Section 2.1(a)</u>, Purchaser shall irrevocably assume from Seller (or with respect to Taxes, if applicable, from Seller's applicable Affiliate) (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Seller shall (or with respect to Taxes, if applicable, cause Seller's applicable Affiliate to) irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "<u>Assumed Liabilities</u>"):

(a)     all Liabilities and obligations of Seller under the Assigned Contracts to the extent such Liabilities arise from and after the Closing or relate to events, facts and circumstances first existing after the Closing;

(b)     all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "<u>Cure Costs</u>");

(c)     all Liabilities arising out of the conduct of the business or the ownership of the Acquired Assets, in each case, solely by Purchaser from and after the Closing Date and to the extent such Liabilities arise from events, facts and circumstances first existing after the Closing Date;

(d)     all Liabilities for Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date allocable to Purchaser in accordance with <u>Section 9.3(d)</u>;

(e)     all Liabilities relating to all Transfer Taxes; and

(f)     all Liabilities set forth on Schedule 1.3(f);

provided, however, that whether or not any Liability for Taxes is an Assumed Liability shall be governed solely by Section 1.3(d) and Section 1.3(e).

1.4    Excluded Liabilities. Notwithstanding anything herein to the contrary, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Seller or any of its Affiliates or relating to the Acquired Assets, the Excluded Assets or the business and operations of Seller and its Affiliates, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on or prior to the Closing Date or arising thereafter, including as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"). For the avoidance of doubt, and without limiting the foregoing, Purchaser shall not be obligated to assume, and does not assume, and hereby disclaims, all of the following Liabilities of Seller and its Affiliates (each of which shall constitute an Excluded Liability hereunder):

(a)    all Liabilities (i) existing prior to the filing of the Bankruptcy Case that are subject to compromise under the Bankruptcy Code and (ii) to the extent not otherwise expressly assumed herein (including in the Commercial Covenants), incurred subsequent to the filing of the Bankruptcy Case and prior to the Closing;

(b)    all Liabilities related to (i) customer accounts of Seller or its Affiliates (including Voyager User Accounts), except for those obligations of Purchaser expressly set forth in the Commercial Covenants and (ii) commercial payables or amounts owing by Seller or its Affiliates, including to any software vendors;

(c)    all Liabilities for Taxes (i) with respect to the Acquired Assets for any Pre-Closing Tax Period allocable to Seller in accordance with Section 9.3(d); (ii) of Seller and their Affiliates for any taxable period; or (iii) arising from or in connection with an Excluded Asset; and

(d)    all Liabilities resulting from Seller's or any of its Affiliates' breach of, violation of, or non-compliance with the provisions of any Laws relating to the ownership or operation of their respective businesses, the Acquired Assets and the Excluded Assets or the Transactions, including any bulk transfer Laws or similar Laws of any jurisdiction in connection with the Transactions; and

(e)    all Successor Liabilities, including with respect to any investigation or other Action against, concerning or otherwise with respect to Seller, its business or its assets.

1.5    Assumption/Rejection of Certain Contracts.

(a)    Assumption and Assignment of Executory Contracts. Seller shall, and shall cause its Affiliates to, provide timely and proper written notice of the Seller's request for entry of the Confirmation Order to all parties to any executory Contracts or unexpired leases to which Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Seller and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing. The

6

Confirmation Order shall provide that as of and conditioned on the occurrence of the Closing, Seller shall assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included on an exhibit attached to either the Plan Supplement, a notice filed in connection with the motion for approval of the Confirmation Order or a separate motion for authority to assume and assign such Assigned Contracts. Such exhibit shall also set forth Seller's good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Seller based on Seller's books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Seller shall, pursuant to the Agreement Order, the Confirmation Order and the Assignment and Assumption Agreement(s), assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to Section 1.5(b). At the Closing, Purchaser shall (i) pay all Cure Costs and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.

(b)      Excluding or Adding Assigned Contracts Prior to Closing. Purchaser shall have the right to notify Seller in writing of any Assigned Contract that it does not wish to assume or a Contract to which Seller is a party that Purchaser wishes to add as an Assigned Contract up to five (5) Business Days prior to the Closing Date, and (i) any such previously considered Assigned Contract that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed to be an Excluded Contract, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract that Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by Seller to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price. Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing. No Contract set forth on Schedule 1.2(s) shall be subject to the terms of this Section 1.5(b).

(c)      Non-Assignment.

(i)      Notwithstanding anything to the contrary in this Agreement but subject to Section 6.1, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by Seller or terminated by Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption; provided that Seller shall obtain Purchaser's consent prior to seeking to reject or terminate, or rejecting or terminating, any Assigned Contract or any Contract assumed by Purchaser pursuant to Section 1.5(a) or Section 1.5(b) from and after the date of this Agreement.

(ii)      Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than,

7

and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of Seller's rights over such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as it is to be transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. In the event that any Acquired Asset is deemed not to be assigned pursuant to this <u>clause (ii)</u>, the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and the closing of the Bankruptcy Case, Seller and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) enter into a commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without materially infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs actually incurred by Seller or its Affiliates or any direct reasonable and documented out-of-pocket costs actually incurred by Seller or its Affiliates resulting from the retention and maintenance by Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2) Purchaser shall assume any related burden and obligation with respect to such Acquired Asset to the extent such burden and obligation would constitute an Assumed Liability if such Acquired Asset was transferred at Closing. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement, the Agreement Order, the Plan and Confirmation Order, and the Bankruptcy Code. Notwithstanding anything herein to the contrary, the provisions of this <u>Section 1.5(c)</u> shall not apply to any consent or approval that is not required to be obtained by operation of the Bankruptcy Code (including section 365(f)).

## ARTICLE II

## CONSIDERATION; PAYMENT; CLOSING

2.1     <u>Consideration; Payment</u>.

(a)     Subject to the terms and conditions herein, the aggregate consideration (collectively, the "<u>Purchase Price</u>") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) (A) the assumption of Assumed Liabilities, (B) a cash payment of $20,000,000 (the "<u>Cash Payment</u>"), (C) the Seller Expenses, if any, payable pursuant to <u>Section 6.21</u>, and (D) Purchaser's obligations to make the payments set forth in <u>Section 6.12</u> and <u>Section 6.14</u>.

(b)     Subject to the terms and conditions herein, at the Closing, Purchaser shall deliver, or cause to be delivered, to Seller (i) the Cash Payment, <u>plus</u> (ii) the Seller Expenses, if any, payable pursuant to <u>Section 6.21</u>, <u>less</u> (iii) the Deposit, together with all received investment income, if any (the "<u>Closing Date Payment</u>"). Any payment required to be made pursuant to this Agreement in cash (including the Closing Date Payment) shall be made by wire transfer of

immediately available funds to such bank account as shall be designated in writing by the applicable Party to the other Party at least two (2) Business Days prior to the date such payment is to be made.

(c)    Upon reasonable advance written notice to Purchaser (in any event delivered to Purchaser no less than five Business Days prior to the Closing Date) Seller shall be entitled to withhold such portion of the Seller Held Coins as is necessary to satisfy Seller's obligations under the Plan (the "Withheld Coins"), and Seller shall distribute, or take such other action with respect to, the Withheld Coins only in accordance with the Plan and the provisions of this Agreement. To the extent there are any Withheld Coins, the provisions of this Agreement shall be read accordingly to give effect to the withholding and subsequent transfer, distribution or other action with respect to any such Withheld Coins, *mutatis mutandis*.

2.2    Deposit.

(a)    Purchaser has made, on the date hereof or will make on the first Business Day following the date hereof, an earnest money deposit with Acquiom Clearing House LLC (the "Escrow Agent") in the amount equal to $10,000,000 (the "Deposit"), by wire transfer of immediately available funds for deposit into an escrow account (the "Escrow Account"). Subject to Section 2.2(b) and Section 2.2(c), the Deposit and any received investment income, if any, shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date. Seller hereby acknowledges and agrees that the Deposit qualifies as the deposit required pursuant to the Bidding Procedures Order.

(b)    If this Agreement has been validly terminated (i) by Seller pursuant to Section 8.1(d) or Section 8.1(f), (ii) by Purchaser pursuant to Section 8.1(c), in circumstances where Seller would be entitled to terminate this Agreement pursuant to Section 8.1(d) or Section 8.1(f), or (iii) by Seller pursuant to Section 8.1(g) in connection with and following any Purchaser Development and not in connection with a Higher and Better Offer (each of (i), (ii), and (iii), a "Purchaser Default Termination"), then within three (3) Business Days after the date of such termination, the Parties shall execute any instructions necessary to permit the Escrow Agent to disburse the Deposit together with all received investment income, if any, to Seller.

(c)    If this Agreement has been validly terminated by either Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within three (3) Business Days after such termination, and, at Purchaser's request, Seller shall execute any instructions necessary to permit the Escrow Agent to disburse the Deposit together with all received investment income, if any, to Purchaser.

(d)    If the Closing occurs, the Deposit shall be transferred to Seller.

2.3    Closing. Subject to the terms and on the conditions set forth in this Agreement, the closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement at and in connection with such closing (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to

9

hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on the third (3rd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs in accordance with the provisions hereof is referred to herein as the "Closing Date."

2.4    Closing Deliveries by Seller. At the Closing, Seller shall deliver to Purchaser:

(a)    a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by Seller;

(b)    each of the Acquired Coins to the wallet address designated by Purchaser for the relevant Acquired Coins of such type; and prior to transferring any Acquired Coins in full, Seller shall send a test transaction of a *de minimis* amount and shall immediately deliver the remainder of the relevant Acquired Coins, following Purchaser's confirmation that the *de minimis* amount was properly delivered; provided that such transfers of the Acquired Coins shall be deemed complete when each transfer is publicly confirmed on the blockchain for the related Coin at least the number of times set forth on https://support.kraken.com/hc/en-us/articles/203325283-Cryptocurrency-deposit-processing-times (or a successor site agreed by Seller and Purchaser); provided further that (i) for Acquired Coins held on the Binance.US Platform as of the Closing Date, such Acquired Coins shall be transferred to the Binance.US Platform account designated by Purchaser and (ii) in the case of ETH Coins that are Staked Coins as of the date hereof, such staked ETH Coins shall be delivered pursuant to the means mutually agreed between Purchaser and Seller acting reasonably;

(c)    a short-form trademark and domain name assignment agreement substantially in the form of Exhibit B (the "Trademark and Domain Name Assignment Agreement"), duly executed by Seller;

(d)    an IRS Form W-9 properly completed and duly executed by Seller or Seller's regarded owner for U.S. federal income Tax purposes;

(e)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Seller certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied; and

(f)    the Seller Statement pursuant to Section 6.11(c).

2.5    Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver to (or at the direction of) Seller:

(a)    without duplication, the Closing Date Payment pursuant to Section 2.1(b);

(b)    the Assignment and Assumption Agreement, duly executed by Purchaser;

US-DOCS\137411268.27

(c)    the Trademark and Domain Name Assignment Agreement, duly executed by Purchaser; and

(d)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied.

2.6    Withholding. Purchaser and its Affiliates shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement such amounts as are required to be deducted or withheld under applicable tax Law. Prior to making any such deduction or withholding, Purchaser or its applicable Affiliate shall use reasonable best efforts to (x) notify the person in respect of which such withholding or deduction is proposed to be made of such deduction or withholding and (y) give such person a reasonable amount of time to demonstrate that no or reduced withholding is required under applicable tax Law. To the extent that amounts are so deducted or withheld and paid to the appropriate Governmental Body, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as (i) disclosed in the forms, reports, schedules, statements, exhibits and other documents filed with (or furnished to) the Canadian Securities Administrators ("CSA") by Parent in respect of Seller and its business during the two-year period prior to the date hereof to the extent publicly available at least one (1) Business Day prior to the date hereof on the CSA's System for Electronic Document Analysis and Retrieval, excluding (x) any disclosures set forth or referred to in any risk factor or similar section that do not constitute statements of fact, (y) any disclosures in any forward-looking statements disclaimer, and (z) any other disclosures that are generally cautionary, predictive or forward-looking in nature (the "Filed CSA Documents") (it being acknowledged that nothing disclosed in the Filed CSA Documents will be deemed to modify or qualify the Fundamental Representations), (ii) disclosed in any forms, statements or other documents filed by any of the Debtors with the Bankruptcy Court in the Bankruptcy Case as of one (1) Business Day prior to the date hereof, or (iii) set forth in the Schedules delivered by Seller concurrently herewith and subject to Section 10.10, Seller represents and warrants to Purchaser as follows as of the date hereof and as of the Closing Date:

3.1    Organization and Qualification.

(a)    Except as set forth on Schedule 3.1, Seller is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has all requisite limited liability company power and authority necessary to own, lease and operate its properties and assets and to carry on its business as it is now being conducted, except (other than with respect to Seller's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

11

(b)     Except as set forth on <u>Schedule 3.1</u>, Seller is duly qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned, leased or operated by it makes such qualification necessary, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.2     <u>Authorization of Agreement</u>. Subject to requisite Bankruptcy Court approvals:

(a)     Seller has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions;

(b)     the execution, delivery and performance by Seller of this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement to which it is a party or to be executed by it in connection with the consummation of the Transactions (the "<u>Seller Documents</u>"), and the consummation by Seller of the Transactions, have been duly authorized by all requisite limited liability company action and no other limited liability company proceedings on its part are necessary to authorize the execution, delivery and performance by Seller of this Agreement and the Seller Documents and the consummation by it of the Transactions; and

(c)     this Agreement has been, and the Seller Documents will be, when delivered pursuant to the terms hereof, duly executed and delivered by Seller and, assuming due authorization, execution and delivery hereof by the other Party, constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except that such enforceability (i) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (ii) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "<u>Enforceability Exceptions</u>").

3.3     <u>Conflicts; Consents</u>.

(a)     Assuming that (x) requisite Bankruptcy Court approvals are obtained, and (y) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 3.3(a)</u> are made, given or obtained (as applicable), neither the execution and delivery by Seller of this Agreement, nor the consummation by Seller of the Transactions, nor performance or compliance by Seller with any of the terms or provisions hereof, will (i) conflict with or violate any provision of Seller's certificate of formation or limited liability company agreement, (ii) violate any Law or Order applicable to Seller, the Acquired Assets or the Assumed Liabilities, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancellation of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate Seller's obligations under any such Material Contract, (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Seller or (v) violate, contravene or conflict with, result in termination or lapse of, or in any way affect any permit, except, in the case of <u>clauses</u>

12

(ii) through (v), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)       Except as set forth on Schedule 3.3(a), Seller is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Seller of this Agreement or the consummation by Seller of the Transactions, except (i) any requisite Bankruptcy Court approvals, or (ii) where failure to file, seek or obtain such notice, authorization, approval, Order, permit or consent would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4       Financial Statements. Attached to Schedule 3.4 are Parent's unaudited statements of financial position as of June 30, 2022 (the "Balance Sheet Date") and audited statements of financial position as of June 30, 2021, and the related statements of loss and cash flows for each fiscal year then ended, in each case (collectively, the "Financial Statements"). Except as set forth on Schedule 3.4, the Financial Statements have been prepared, in each case, in conformity in all material respects with IFRS consistently applied, except for the absence of footnote disclosure and any customary year-end adjustments and except, in the case of the unaudited statements as of June 30, 2020 or the fiscal year then ended, with respect to any Tax matters or any impact or effect thereof. The Financial Statements are prepared based on the books and records of Parent and its Subsidiaries and present fairly in all material respects, in accordance with IFRS consistently applied, the consolidated financial condition and results of operations of Parent as of the dates and for the periods referred to therein, except as may be indicated in the notes thereto.

3.5       Cryptocurrency; Loans; Customer Accounts.

(a)       Schedule 3.5(a) sets forth a list of all Cryptocurrency held by Seller as of a date within three (3) Business Days of the date hereof, the means through which Seller as of such date controls such Cryptocurrency (e.g., "private keys," custody agreements or agreements with parties performing validation services), whether or not such Cryptocurrency is attributable to User accounts on the Voyager Platform, and whether such Cryptocurrency constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan), which Schedule 3.5(a) shall be provided to Purchaser no later than December 18, 2022. Seller has the exclusive ability to control, including by use of "private keys" or other equivalent means or through custody arrangements or other equivalent means, all such Cryptocurrency set forth on Schedule 3.5(a) (other than, solely to the extent of any staking contract, Staked Coins), and owns such Cryptocurrency (other than Cryptocurrency that constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan) and, solely to the extent of any staking contract, Staked Coins) free and clear of all Encumbrances (other than Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan); provided that such ownership and exclusive ability to control Cryptocurrency is subject to the continued existence, validity, legality, governance and public availability of the relevant blockchains.

(b)       Schedule 3.5(b) sets forth a true, correct and complete list of all amounts (including any principal, interest, fees, expenses or penalties) outstanding or unpaid under any Loan.

(c)      Schedule 3.5(c) sets forth a list of all Users (excluding Users with addresses in the United Kingdom, European Union or European Economic Area) as of the Petition Date and a date within three (3) Business Days of the date hereof and the account position (including type and amount of Cryptocurrency) that such User held as of immediately prior to the Petition Date and as of the date hereof, which Schedule 3.5(c) shall be provided to Purchaser no later than December 18, 2022.

(d)      Seller has implemented procedures and controls regarding management of authentication credentials such as private keys and means for instructing third party custodians ("Authentication Credentials") for Cryptocurrencies, including limitation of access to Authentication Credentials to employees who need to have such access and requiring multiple individuals to sign off on transactions. Where Authentication Credentials are not held by employees of Seller, such Authentication Credentials are held by reputable third-party custodians or wallet providers whose security procedures have been evaluated by Seller and found to be fit for purpose.

(e)      Schedule 3.5(e) sets forth a true, correct and complete list of the number and type of Post-Petition Coins, on a User-by-User basis, which Schedule 3.5(e) shall be provided to Purchaser no later than December 18, 2022.

3.6      Title to Acquired Assets; Staked Coins; Exclusive Ownership; Sufficiency of Assets.

(a)      Seller has good and valid title to all Acquired Assets (other than Coins pledged by a borrower as collateral in respect of any Loans and, solely to the extent of any staking contract, Staked Coins), free and clear of all Encumbrances (other than Permitted Encumbrances) and, at the Closing, subject to Section 1.5(c), Purchaser will be vested with good and valid title to all such Acquired Assets, free and clear of all Encumbrances (other than Permitted Post-Closing Liens) and Excluded Liabilities, to the fullest extent permissible under Law, including section 363(f) of the Bankruptcy Code; provided, in respect of the Acquired Coins, Purchaser will be vested with good and valid title thereto free and clear of all Encumbrances (including Encumbrances implemented through "smart contracts" or other technological means), except that with respect to any staked ETH Coins that cannot be unstaked as of the Closing, such ETH Coins shall be subject to such staking. Schedule 3.6(a) sets forth a true, correct and complete list of all Seller Held Coins that are subject to staking ("Staked Coins").

(b)      Seller is the sole owner of all Coins relating to the exchange and custody business of the Voyager Platform and has good and valid title to such Coins, free and clear of all Encumbrances (except to the extent such Coin constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan) and, solely to the extent of any staking contract, Staked Coins).

3.7      Title to Properties.

(a)      Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller has a good and valid leasehold interest to all

14

real property leased by Seller (the "Leased Real Property"), free and clear of all Encumbrances (other than Permitted Encumbrances). Seller does not own any real property.

(b)     Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, Seller holds good title to, or holds a valid leasehold interest in, all of the material tangible property necessary in the conduct of its business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to Seller.

3.8     Contracts.

(a)     Schedule 3.8 sets forth a list of each Material Contract as of the date of this Agreement. For purposes of this Agreement, "Material Contract" means (x) any Assigned Contract, and (y) any other Contract to which Seller is a party or by which it is bound (in each case, excluding any Seller Plan) that in the case of this clause (y):

(i)     relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement, other than for the avoidance of doubt, marketing and licensing Contracts entered into in the Ordinary Course;

(ii)     provides for indebtedness for borrowed money of Seller having an outstanding or committed amount in excess of $1,000,000, other than letters of credit;

(iii)     relates to the acquisition or disposition of any material business (whether by merger, sale of stock, sale of assets or otherwise) pursuant to which any earn-out or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments by or to Seller of more than $1,000,000 after the date hereof (in each case, excluding for the avoidance of doubt, acquisitions or dispositions of Equipment, Cryptocurrency, properties or other assets in the Ordinary Course or of Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the business of Seller);

(iv)     involves the license of material Seller Intellectual Property to third parties (other than (x) Contracts with end users of Seller's products and services entered into in the ordinary course of business or (y) non-exclusive licenses granted to service providers, suppliers and other third parties in connection with the provision of goods or services to Seller; provided such licenses are ancillary to, and not the primary purpose of, such Contract);

(v)     is a Contract (other than purchase orders or Contracts with respect to the acquisition of Cryptocurrency in the Ordinary Course) for the purchase of materials, supplies, goods, services, Equipment, or other assets pursuant to which Seller would reasonably be expected to make payments of more than $3,000,000 during any fiscal year;

(vi)     contains any provision (A) limiting, in any material respect, the right of Seller to engage in any business, make use of any Seller Intellectual Property that is

US-DOCS\137411268.27

material to Seller, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of (A) and (B), other than (x) a Contract that can be terminated on ninety (90) days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or obligations or the payment of any penalty under, such Contract, (y) customer Contracts entered into in the Ordinary Course granting exclusive rights to certain of Seller's services or containing "most favored nation" provisions with respect to certain of Seller's products or (z) any provision in any license agreements for third party Intellectual Property being licensed to Seller that limits Seller's use of such licensed Intellectual Property to specified fields of use or specified territories;

(vii)    evidences or relates to a Loan, including security or collateral agreements;

(viii)    is a custody agreement or agreement with any Person performing validation or staking services with respect to any Cryptocurrency;

(ix)    each Contract evidencing or governing financial or commodity hedging or similar trading activities (including with respect to Cryptocurrency), including any master agreements or confirmations governing swaps, options or other derivatives, or futures account agreements and/or brokerage statements or similar Contract; and

(x)    any Contracts with any Governmental Body, regulatory service providers or self-regulatory organizations in connection with Seller's business or the Voyager Platform.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs) and except (i) as a result of the commencement of the Bankruptcy Case and (ii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced, (A) each Material Contract is valid and binding on Seller and, to the Knowledge of Seller, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) Seller, and, to the Knowledge of Seller, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, (C) Seller has not received a written notice of the existence of any breach or default on the part of Seller under any Material Contract, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of Seller, or to the Knowledge of Seller, any counterparty under such Material Contract and (E) to the Knowledge of Seller, Seller has not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except in each case of (A) through (E), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.9    Permits; Compliance with Laws.

(a)    Except as set forth on Schedule 3.9, (i) Seller is not in violation of any Laws, Orders or any Money Transmitter Requirement, applicable to the Acquired Assets and (ii) Seller holds, and is in compliance with, all licenses, permits, registrations and authorizations, including

16

Money Transmitter Licenses, necessary for the lawful ownership and operation of the Acquired Assets and Seller's business, except in each case as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     Seller and each of its directors, officers and employees acting in such capacity are and have in the past three (3) years been in compliance with the Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"), and any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, and Seller is not, to the Knowledge of Seller, being investigated by any Governmental Body with respect to, or been given notice in writing by a Governmental Body of, any violation by Seller of the FCPA or any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, in each case, except to the extent such non-compliance, investigation or notice of violation would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) neither Seller nor any director or officer of Seller, or any employee, agent or representative or other Person who performs or has performed services on behalf of Seller in the past three (3) years, is a Person that is the subject or target of economic sanctions administered by the Office of Foreign Assets Control of the United States Department of Treasury ("OFAC") (including the designation as a "Specially Designated National or Blocked Person" thereunder), the United Nations Security Council, His Majesty's Treasury, the European Union, the Bureau of Industry Security of the U.S. Department of Commerce, the U.S. Department of State, or any sanctions measures under the U.S. International Emergency Economic Powers Act, the U.S. Trading with the Enemy Act, the U.S. Iran Sanctions Act, the U.S. Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010, the U.S. Iran Threat Reduction and Syria Human Rights Act of 2012, the U.S. National Defense Authorization Act of 2012 or the U.S. National Defense Authorization Act of 2013, or any executive order, directive or regulation pursuant to the authority of any of the foregoing, including the regulations of the United States Department of the Treasury set forth under 31 CFR, Subtitle B, Chapter V, or any orders or licenses issued thereunder (collectively, "Sanctions"), nor any Sanctioned Person; (ii) to the Knowledge of Seller, the Acquired Assets are not the property or interests in property of a Sanctioned Person, and are not otherwise the subject or target of Sanctions; and (iii) Seller has not in the past three (3) years been in violation of applicable Sanctions.

(d)     Seller and each of its directors, officers and employees acting in such capacity are and have in the past three (3) years been in compliance with all anti-money laundering and financial recordkeeping and reporting Laws to which it is subject, including the related rules, regulations or guidelines issued, administered or enforced by any Governmental Body (collectively, the "Anti-Money Laundering Laws"), and no Action by or before any Governmental Body involving Seller (or, in respect of the dealings of Seller, involving any of Seller's directors, officers or employees) with respect to the Anti-Money Laundering Laws is pending, or, to the Knowledge of Seller, threatened, in each case, except to the extent such non-compliance or Action would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(e)     Seller does not (i) have assets located outside the United States, or (ii) derive revenue from users located outside the United States.

US-DOCS\137411268.27

(f)     Seller does not engage in (a) the design, fabrication, development, testing, production, or manufacture of one or more "critical technologies" within the meaning of Section 721 of the Defense Production Act of 1950, as amended, including all implementing regulations thereof (the "DPA"), or (b) the ownership, operation, maintenance, supply, manufacture, or servicing of "covered investment critical infrastructure" within the meaning of the DPA (where such activities are covered by column 2 of Appendix A to 31 C.F.R. Part 800).

3.10     Environmental Matters. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) Seller is, and has been since January 1, 2021, in compliance with all applicable Environmental Laws, (b) since January 1, 2021, Seller has not received any written notice alleging that Seller is in violation of or liable under, any Environmental Law that is unresolved, (c) Seller possesses and is in compliance with all permits required under Environmental Laws for the operation of its business as currently conducted ("Environmental Permits"), (d) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Seller, threatened in writing against Seller, (e) Seller is not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of Seller and (f) Seller has not released any Hazardous Substances at the Leased Real Property in quantities or concentrations that currently require Seller to conduct remedial activities, or that have given rise to any Action against Seller, under Environmental Laws.

3.11     Intellectual Property; Data Privacy.

(a)     Schedule 3.11(a)(i) sets forth as of the date hereof a true, correct and complete list of all registrations and applications included in the Seller Intellectual Property (the "Seller Registered IP"), indicating for each item the owner, registration or application number, registration or application date and the applicable filing jurisdiction or domain name registrar, as applicable. Except as otherwise indicated on Schedule 3.11(a), all Seller Registered IP is owned exclusively by Seller, and is subsisting, and to the Knowledge of Seller, valid and enforceable. There is no outstanding Action or Order challenging or adversely affecting the validity or enforceability of any material Seller Registered IP, or Seller's ownership of or rights in any material Seller Intellectual Property.

(b)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller owns all of the rights, title and interest in and to the Seller Intellectual Property (other than Intellectual Property licensed to Seller), free and clear of all Encumbrances (other than Permitted Encumbrances). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all of the Seller Intellectual Property (other than Intellectual Property licensed to Seller) is subsisting, valid and enforceable.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) Seller owns or has legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the business of Seller as currently conducted free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) Seller has taken commercially reasonable steps in accordance with industry practice to maintain the confidentiality of non-public Intellectual Property; provided that nothing in this

18

Section 3.11(c) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of Section 3.11(e).

(d)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Actions are pending or, to the Knowledge of Seller, threatened against Seller, and since January 1, 2021, Seller has not received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by Seller of any Intellectual Property owned by or exclusively licensed to Seller or (ii) alleging that Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any Person.

(e)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since January 1, 2021, (i) no Person has infringed, misappropriated or otherwise violated the rights of Seller with respect to any Intellectual Property owned by or exclusively licensed to Seller and (ii) the operation of the business of Seller has not violated, misappropriated or infringed the Intellectual Property of any other Person.

(f)     The consummation of the Transactions will not result in the grant of any right or license to any third party of any material Seller Intellectual Property (other than Intellectual Property licensed to Seller).

(g)     Seller has complied in the past three (3) years in all material respects with all applicable Privacy Laws, privacy policies and notices, and contractual commitments related to the Processing of Personal Information (collectively, "Privacy Requirements"), and the consummation of the Transactions will not cause Seller to breach, in any material respect, any Privacy Requirements.

(h)     Seller has established and implemented and maintains a written information security program that contains commercially reasonable safeguards designed to protect Personal Information and against any Security Incident.

(i)     Except as would not, individually or in the aggregate, reasonably be expected to have a material impact on the Acquired Assets, taken as a whole, there have been no Security Incidents involving Personal Information in Seller's custody, possession or control or for which Seller is otherwise responsible. Except as set forth on Schedule 3.11(i), Seller has not in the past three (3) years: (i) notified or been legally required to notify any affected individuals, Governmental Body or other parties in connection with any Security Incident pursuant to Privacy Requirements; (ii) been the subject of any Action with respect to any unauthorized Processing of Personal Information or violation of any Privacy Laws by any Person; (iii) received any written inquiry, notice, request, claim, complaint, correspondence, or other communication from any Governmental Body or other Person relating to any Security Incident or alleged violation of any Privacy Laws; or (iv) made any ransomware or similar payment in connection with any Security Incident.

3.12     Tax Matters.

(a)     To the Knowledge of Seller, except with respect to income Tax and information Tax Returns, Seller has prepared (or caused to be prepared) and duly and timely filed

(taking into account valid extensions of time within which to file) all material Tax Returns in respect of the Acquired Assets or otherwise required to be filed by it, and all such Tax Returns (taking into account all amendments filed in respect thereto) are true, correct and complete in all material respects.

(b)      To the Knowledge of Seller, all material Taxes in respect of the Acquired Assets, other than income Taxes or Taxes attributable to information Tax Returns, or otherwise required to be paid by Seller (whether or not shown on any Tax Return) have been duly and timely paid.

(c)      To the Knowledge of Seller, there are no Encumbrances for Taxes on the Acquired Assets or any other assets of Seller other than for Taxes not yet due or payable.

(d)      Seller has not, within the past five (5) years, been a member of an affiliated group of corporations filing a consolidated federal income Tax Return (other than a group the common parent of which is Parent or one of its Subsidiaries).

(e)      Seller has not waived any statute of limitations in respect of material Taxes or agreed to any extension of time with respect to an assessment or deficiency for material Taxes (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course), including, for the avoidance of doubt, with respect to Taxes in respect of the Acquired Assets.

(f)      Seller has not participated in any "listed transaction" within the meaning of U.S. Treasury Regulation Section 1.6011-4(b)(2).

(g)      Except as set forth on Schedule 3.12(g), solely as of the date hereof, (x) Seller has not received a written notice from a Governmental Body of any proposed adjustment, deficiency or underpayment of material amounts of Taxes with respect to the Acquired Assets, and (y) there are no pending or threatened audits or other Actions for or relating to any Liability for Taxes with respect to the Acquired Assets, except for, in each case of clause (x) and (y), those that have been fully satisfied, resolved or finally withdrawn.

(h)      Seller has not received a claim from a Governmental Body that Tax Returns are required to be filed in relation to the Acquired Assets or the Assumed Liabilities in a jurisdiction where no such Tax Returns have been filed or are currently filed.

(i)      Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this Section 3.12 shall constitute the sole representations and warranties with respect to Taxes and no representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

3.13   Affiliate Transactions. Except as set forth on Schedule 3.13 or in the "Interest Of Management And Others In Material Transactions" disclosure in the Filed CSA Documents or customer accounts of officers or directors, to the Knowledge of Seller, no Affiliate of Seller, or any officer or director of Parent or Seller, (a) is a party to any agreement that constitutes an Acquired Asset having a potential or actual value or a contingent or actual Liability exceeding $500,000, other than (i) loans and other extensions of credit to directors and officers of Seller for

US-DOCS\137411268.27

travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans or (b) has any material interest in any Acquired Asset.

3.14   <u>Brokers</u>. Except for Moelis, the fees and expenses of which will be paid by Seller, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Seller or any of its Affiliates for which Purchaser or its Affiliates shall be liable.

3.15   <u>Litigation</u>. Except for the general pendency of the Bankruptcy Case, Actions that would not reasonably be expected to have a Material Adverse Effect or as set forth <u>Schedule 3.15</u>, there are no filed actions, claims, complains, summons, suits, litigations, arbitrations pending or threatened in writing against Seller.

3.16   <u>Absence of Changes</u>. Since the Balance Sheet Date, (a) there has not been any Material Adverse Effect and (b) no action has been taken with respect to the Acquired Assets that would have required the consent of Purchaser under <u>Section 6.1</u> if undertaken after the date hereof.

3.17   <u>No Other Representations or Warranties</u>. Except for the representations and warranties expressly contained in this <u>Article III</u> (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the certificate to be delivered pursuant to <u>Section 2.4(e)</u> (the "<u>Express Seller Representations</u>") (<u>it</u> <u>being</u> <u>understood</u> that Purchaser has relied only on the Express Seller Representations), Purchaser acknowledges and agrees that neither Seller nor any other Person on behalf of Seller makes, and Purchaser has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to Seller, the Acquired Assets or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Moelis) (the "<u>Information Presentation</u>") or in that certain datasite administered by Datasite (the "<u>Dataroom</u>") or elsewhere to Purchaser or any of its Affiliates or their respective Advisors by or on behalf of Seller or any of its Affiliates. Without limiting the foregoing, except for the Express Seller Representations, neither Seller nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or their respective Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise in expectation of the Transactions or any discussions with respect to any of the foregoing information.

3.18   <u>No Outside Reliance</u>. Notwithstanding anything contained in this <u>Article III</u> or any other provision of this Agreement to the contrary, Seller acknowledges and agrees that the Express Purchaser Representations are the sole and exclusive representations, warranties and statements of any kind made to Seller and on which Seller may rely in connection with the Transactions. Seller acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including the

completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Purchaser Representations), including in any meetings, calls or correspondence with management of Purchaser or any other Person on behalf of Purchaser or any of its Affiliates or Advisors, are, in each case, specifically disclaimed by Purchaser and that Seller has not relied on any such representations, warranties or statements.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as set forth in the Schedules delivered by Purchaser concurrently herewith and subject to Section 10.10, Purchaser represents and warrants to Seller as follows as of the date hereof and as of the Closing Date.

4.1    Organization and Qualification. Purchaser is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due incorporation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is duly licensed or qualified to do business and is in good standing (or its equivalent) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions.

4.2    Authorization of Agreement. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Party, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3    Conflicts; Consents.

(a)    Except for the consents, licenses, waivers, exemptions, authorizations, approvals, filings, notifications or registrations required under any Money Transmitter Requirements in any Unsupported Jurisdiction applicable to Purchaser and the Binance.US Platform (the "Unsupported Jurisdiction Approvals"), assuming that (i) requisite Bankruptcy Court approvals are obtained, and (ii) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 4.3 are made, given or obtained (as applicable), neither the

execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (A) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (B) violate any Law or Order applicable to Purchaser, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of <u>clauses (B)</u> through <u>(D)</u>, as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions.

(b)     Except for the Unsupported Jurisdiction Approvals, Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions.

4.4     <u>Financing</u>. Purchaser has, as of the date hereof, and will have at the Closing, sufficient funds in cash in an aggregate amount necessary to (a) pay the Closing Date Payment pursuant to <u>Section 2.1(b)</u> and any Seller Expenses to the extent payable by Purchaser pursuant to <u>Section 6.21</u>, and (b) pay all fees and expenses of Purchaser in connection with the Closing. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5     <u>Permits</u>. Purchaser has Money Transmitter Licenses in all States of the United States of America, other than the Unsupported Jurisdictions and any States in which the operation of Purchaser's business does not require a Money Transmitter License. Assuming the accuracy in all material respects of the representations and warranties set forth on <u>Sections 3.9(a)</u>, <u>3.9(d)</u> and <u>3.9(e)</u> (in each case, as qualified by the Schedules) and Seller's compliance in all material respects with the covenants set forth in <u>Sections 6.4</u>, <u>6.6</u>, <u>6.10</u> and the other Commercial Covenants, except for the Unsupported Jurisdiction Approvals, Purchaser holds all licenses, franchises, permits, certificates, approvals, and authorizations from Governmental Bodies necessary for the ownership and use of the Acquired Assets.

4.6     <u>Brokers</u>. There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transactions.

4.7     <u>No Litigation</u>. There are no Actions pending or, to the Knowledge of Purchaser, threatened against or affecting Purchaser that will materially and adversely affect Purchaser's performance under this Agreement or Purchaser's ability to consummate the Transactions.

4.8     Certain Arrangements. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of Seller or its board of managers (or applicable governing body of any Affiliate of Seller), any holder of equity or debt securities of Seller, or any lender or creditor of Seller or any of its Affiliates, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the Transactions or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of Seller or any of its Affiliates to entertain, negotiate or participate in any of the Transactions.

4.9     Solvency. As of the date hereof Purchaser is and, assuming (x) that the representations and warranties made by Seller herein are true and connect, (y) Seller has complied in all material respects with its covenants and other agreements hereunder, and (z) the conditions set forth in Section 7.1 and Section 7.2 have been satisfied, then immediately after giving effect to the transactions contemplated hereby Purchaser shall be, Solvent. "Solvent" means, with respect to any Person, such Person (a) is able to pay its debts as they become due; (b) owns property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent liabilities) and (c) has adequate capital to carry on its business. In connection with the Transactions, Purchaser is not incurring, has not incurred, and does not plan to incur, debts beyond its ability to pay as they become absolute and matured.

4.10    No Additional Representations or Warranties. Except for the representations and warranties expressly contained in this Article IV (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the certificate to be delivered pursuant to Section 2.5(d) (the "Express Purchaser Representations") (it being understood that Seller has relied only on the Express Purchaser Representations), Seller acknowledges and agrees that neither Purchaser nor any other Person on behalf of Purchaser makes, and Seller has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to Purchaser or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person to Seller or any of its Affiliates or their respective Advisors on behalf of Purchaser. Without limiting the foregoing, except for the Express Purchaser Representations, neither Purchaser nor any other Person will have or be subject to any Liability whatsoever to Seller, or any other Person, resulting from the distribution to Seller, its Affiliates or their respective Advisors, or Seller's, its Affiliates' or their respective Advisors' use of or reliance on, any such information, statements, disclosures, documents, projections, forecasts or other material made available to them in expectation of the Transactions or any discussions with respect to any of the foregoing information.

4.11    No Outside Reliance. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees that the Express Seller Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser and on which Purchaser may rely in connection with the Transactions. Purchaser acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Seller Representations), including in the Information Presentation, the Dataroom, any projections or in

24

any meetings, calls or correspondence with management of Seller or any other Person on behalf of Seller or any of its Affiliates or Advisors and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of Seller's assets, are, in each case specifically disclaimed by Seller and Purchaser has not relied on any such representations, warranties or statements. Purchaser acknowledges that it has conducted to its full satisfaction an independent investigation and verification of the business including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, and, in making its determination to proceed with the Transactions, Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, Seller, the Information Presentation, any projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or Seller or any of its Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Express Seller Representations (it being understood that Purchaser has relied only on the Express Seller Representations).

## ARTICLE V

## BANKRUPTCY COURT MATTERS

5.1     <u>Selection of Successful Bid and Winning Bidder and Sale Approval</u>.

(a)     Pursuant to the Bidding Procedures Order, by execution and delivery of its counterpart signature page hereto, Seller hereby confirms that Purchaser has made the highest or otherwise best bid pursuant to the Bidding Procedures Order and has selected the Transactions as the Successful Bid and Purchaser as the Winning Bidder (each, as defined in the Bidding Procedures Order).

(b)     (i) Promptly, and in any event no later than December 21, 2022 (subject to Bankruptcy Court approval where indicated), Seller shall: publicly announce that the Transactions have been selected as the Successful Bid and Purchaser has been selected as the Winning Bidder; and (ii) promptly, and in any event no later than December 21, 2022 (subject to Bankruptcy Court approval where indicated), Seller shall file a motion with the Bankruptcy Court attaching the form of an order approving the execution, delivery and performance of this Agreement by Seller (including payment of the Purchaser Expenses pursuant to <u>Section 6.21(b)</u> and the provisions of this <u>Article V</u> contemplating certain performance by Seller prior to Closing), other than the performance of those obligations to be performed at or after the Closing (the "<u>Agreement Order</u>"), which Agreement Order shall be in form and substance acceptable to Purchaser. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Agreement Order.

5.2    <u>No-Shop</u>.

(a)    From and following the execution and delivery of this Agreement by Seller, Seller and its Affiliates shall not, and shall not permit their respective Advisors or Affiliates to, (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than Purchaser, its Affiliates and its and their respective Advisors) with respect to an Alternative Transaction, (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction, (iii) enter into any confidentiality agreement with respect to, or provide any non-public information or data to any Person relating to, any Alternative Transaction, or (iv) otherwise agree, authorize or commit to do any of the foregoing; <u>provided</u> that, notwithstanding the foregoing, from and after entry of the Agreement Order, Seller may take the actions set forth in clauses (ii) and (iii) above if (A) Seller has received a written, bona fide offer, proposal or indication of interest to engage in an Alternative Transaction (an "<u>Acquisition Proposal</u>") from any Person after the date of this Agreement that did not result from Seller's breach of this <u>Section 5.2(a)</u>, and (B) the board of directors (or similar governing body) of Seller determines in good faith, after consultation with its financial advisor and outside legal counsel, that such Acquisition Proposal constitutes or is reasonably likely to lead to a Higher and Better Offer and that failure to take such actions would violate the directors' fiduciary duties under applicable Law; <u>provided</u> <u>further</u> that if the Closing has not occurred prior to the Outside Date unless the failure of the Closing to have occurred by the Outside Date was caused by Seller's failure to perform any of its obligations under this Agreement, and there is no Back-up Bidder (as defined in the Bidding Procedures Order) or the agreement with the Back-up Bidder has terminated in accordance with its terms, then this <u>Section 5.2(a)</u> shall automatically terminate and be of no further force and effect as of such date. Until entry of the Agreement Order, Seller shall promptly (but in any event within twenty-four (24) hours) provide written notice to Purchaser of any breach of this <u>Section 5.2(a)</u>.

(b)    Seller shall promptly (but in any event within twenty-four (24) hours) give written notice to Purchaser if (i) any inquiries, proposals or offers with respect to an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction are received, (ii) any non-public information or data concerning Seller or its Affiliates or access to Seller's or its Affiliates' properties, books or records in connection with any Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction is requested, or (iii) any discussions or negotiations relating to an Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction are sought to be engaged in or continued by, from or with Seller, its Affiliates or any of its or their respective Advisors, as the case may be. Such notice shall set forth the name of the applicable Person making such inquiry, the material terms and conditions of any proposed Alternative Transaction (including, if applicable, correct and complete copies of any proposed agreements, inquiries, proposals or offers or, where no such copies are available, a reasonably detailed written description thereof) and the status of any such discussions or negotiations. Seller shall thereafter keep Purchaser reasonably informed, on a reasonably prompt basis, of the status of any discussions or negotiations with respect thereto. Until entry of the Agreement Order, Seller shall promptly (but in any event within twenty-four (24) hours) provide written notice to Purchaser of any breach of this <u>Section 5.2(b)</u>.

26

(c)    Seller (i) shall promptly (and in any event within twenty-four (24) hours) give notice to Purchaser upon a determination by Seller or its board of directors (or comparable governing body) that any Acquisition Proposal received from any Person after the date of this Agreement that did not result from Seller's breach of <u>Section 5.2(a)</u> constitutes a Higher and Better Offer (a "<u>Higher Offer Determination Notice</u>") and (ii) may cause or permit Seller or any of the other Debtors to enter into a definitive agreement with respect to such Acquisition Proposal; provided that (A) Seller and its board of directors (or comparable governing body) may only make such determination described in clause (i) of this <u>Section 5.2(c)</u> if, prior to the determination that such Acquisition Proposal constitutes a Higher and Better Offer, Seller negotiates, and causes its representatives to negotiate, with Purchaser in good faith (to the extent Purchaser and its representatives desire to negotiate) during such three (3) Business Day period to amend the terms and conditions of this Agreement and, no earlier than the end of such three (3) Business Day period, the board of directors (or comparable governing body) of Seller determines in good faith (after consultation with its financial advisor(s) and outside legal counsel), after giving effect to such proposed amendments to the terms and conditions of this Agreement, that such Acquisition Proposal still constitutes a Higher and Better Offer (<u>provided</u> <u>further</u> that if any material amendment is made to such Acquisition Proposal, such Acquisition Proposal shall be subject again (but only once again) to the foregoing, except that references to three (3) Business Days shall be deemed to be two (2) Business Days, and whatever the result of the second instance of the foregoing, Seller shall not be required to undertake the foregoing again before making a determination that such Acquisition Proposal constitutes a Higher and Better Offer and, if applicable, terminating this Agreement), and (B) Seller and its board of directors (or comparable governing body) may only take such action described in clause (ii) of this <u>Section 5.2(c)</u> if the board of directors (or comparable governing body) of Seller determines in good faith (after consultation with its outside legal counsel) that the failure to take such action would violate with its fiduciary duties under applicable Law.

5.3    <u>Bankruptcy Actions</u>.

(a)    No later than December 21, 2022, Seller shall file with the Bankruptcy Court an amended Disclosure Statement (the "<u>Amended Disclosure Statement</u>" ) containing such amendments as may be necessary or appropriate to reflect the Seller's entry into this Agreement and pursuit of the Transactions, which, solely with respect to matters relating to this Agreement and the Transactions, shall be in a form and substance reasonably acceptable to Purchaser. Concurrently with the filing of such Amended Disclosure Statement (*i.e.*, no later than December 21, 2022), Seller shall file the Plan Solicitation Motion which, solely with respect to matters relating to this Agreement and the Transactions, shall be in form and substance reasonably acceptable to Purchaser; provided that Seller may modify the Plan Solicitation Motion, the Plan, and the Confirmation Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest, in each case, with the consent of Purchaser solely as it pertains to matters relating to this Agreement and Transactions (such consent not to be unreasonably withheld, conditioned or delayed).

(b)    From the date hereof until the earlier of (i) the termination of this Agreement in accordance with <u>Article VIII</u> and (ii) the Closing Date, Seller shall use reasonable best efforts to obtain entry by the Bankruptcy Court of the Agreement Order and the Confirmation Order.

US-DOCS\137411268.27

(c)     The Parties shall use their respective reasonable best efforts to (i) obtain entry by the Bankruptcy Court of the Agreement Order, (ii) obtain entry by the Bankruptcy Court of the Plan Solicitation Order, (iii) commence solicitation of the Plan, and (iv) (A) facilitate the solicitation, confirmation, and consummation of the Plan and the transactions contemplated thereby and hereby, (B) obtain entry of the Confirmation Order, and (C) and consummate the Plan and the Transactions on the timeline set forth in the Plan Solicitation Motion and in any case prior to the Outside Date.

(d)     Purchaser shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Agreement Order, the Plan Solicitation Order, the Confirmation Order, and any other Order reasonably necessary in connection with the Transactions as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates reasonably available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by Purchaser under this Agreement, and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e)     Any documents filed by Seller with the Bankruptcy Court in connection with obtaining approval of effectuating the Closing shall be reasonably acceptable to Purchaser.

(f)     Each of Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and the Plan solely with respect to matters relating to this Agreement and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement and the Plan solely as it pertains to matters relating to this Agreement and Transactions, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court with respect to the Transactions or the Plan solely as it pertains to matters relating to this Agreement and Transactions.

(g)     Seller and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval. Purchaser acknowledges that Seller and the other Debtors must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of the Debtors and other interested parties, providing information about Seller to prospective bidders, entertaining higher and better offers from such prospective bidders.

(h)     Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors reasonably available to testify before the Bankruptcy Court.

5.4     Cure Costs. Subject to entry of the Agreement Order and the Confirmation Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.5     Approval. Seller's and Purchaser's obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Agreement Order and the Confirmation Order). Nothing in this Agreement shall require Seller or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

5.6     No Successor Liability. The Parties intend that upon the Closing the Purchaser Group shall not and shall not be deemed to: (a) be a successor (or other such similarly situated party), or otherwise be deemed a successor, to Seller, including, a "successor employer" for the purposes of the Code, ERISA, or other applicable Laws; (b) have Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity (including under applicable Money Transmitter Requirements or securities Laws of any Governmental Body); (c) have, de facto or otherwise, merged with or into Seller; (d) be an alter ego or a mere continuation or substantial continuation of any of Seller (and there is no continuity of enterprise between Purchaser and Seller), including, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, COBRA, Tax, labor, employment, environmental, or other Law, rule or regulation (including filing requirements under any such Laws, rules or regulations), or under any products liability Law or doctrine with respect to Seller's Liability under such Law, rule or regulation or doctrine; or (e) be holding itself out to the public as a continuation of Seller or its estate (the foregoing clauses (a) through (e), collectively, "Successor Liabilities").

5.7     Filings. Seller shall, and shall cause the other Debtors to, give Purchaser reasonable advance notice of, and opportunity to review and approve, any motions, pleadings, notices and other documents to be filed during the Bankruptcy Case that would reasonably be expected to be material and adverse to the Transactions (such approval not to be unreasonably withheld, conditioned or delayed, provided that Purchaser may withhold their approval in their sole discretion to the extent such motions, pleadings, notices and other documents would be inconsistent with the consummation of the Transactions in accordance herewith).

5.8     Waiver of Conflicts. Notwithstanding anything to the contrary herein or otherwise, Seller acknowledges that Paul Hastings LLP ("Paul Hastings" ) may have represented and may currently represent the Purchaser or one or more of its Affiliates in connection with the Transactions (including the negotiation, preparation, execution and delivery of this Agreement and related agreements, and the consummation of the Transactions) as well as other past and ongoing regulatory matters generally (the "Covered Matters" ). Accordingly, Seller hereby irrevocably consents and agrees, on its behalf and on behalf of its Affiliates, to Paul Hastings representing the

29

Purchaser and its Affiliates from and after the Closing in connection with any matter arising out of or related to the Covered Matters. Seller (i) hereby irrevocably waives and will not assert, and will cause each of its Affiliates to waive and not assert, any actual or potential conflict of interest which has or may arise as a result of Paul Hasting's representation of the Purchaser or one or more of its Affiliates, including in any Action, in a Covered Matter, (ii) hereby consents, and will cause each of its Affiliates to consent to, any such representation, even though, in each case, (x) the interests of the Purchaser or such Affiliates may be directly adverse to Seller or its Affiliates, (y) Paul Hastings may have represented Seller or its Affiliates in a substantially related matter, or (z) Paul Hastings may be handling other ongoing matters for Seller or its Affiliates, and (iii) shall cooperate, and shall cause each of its Affiliates to cooperate, with the Purchaser in effectuating the foregoing waiver (including with respect to any objections raised by or before the Bankruptcy Court or the United States Trustee assigned to the Bankruptcy Case in respect of such waiver or representation).

## ARTICLE VI

## COVENANTS AND AGREEMENTS

6.1     Conduct of Seller.

(a)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii) as expressly contemplated or required by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing, Seller shall use its reasonable best efforts to carry on its business in the Ordinary Course in all material respects; provided that no action by Seller with respect to matters specifically addressed by Section 6.1(b) shall be deemed to be a breach of this Section 6.1(a) unless such action would constitute a breach of Section 6.1(b).

(b)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing, Seller shall not:

(i)     (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or warrants or other rights to acquire any debt securities of Seller, guarantee any such indebtedness or any debt securities of another Person or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "Indebtedness"), except (1) for letters of credit, bank guarantees, security or performance bonds or similar credit support instruments, overdraft facilities or cash management programs, in each case issued, made or entered into in the Ordinary Course, (2) for Indebtedness incurred under existing

30

arrangements (including in respect of letters of credit) in an amount not to exceed $5,000,000 in the aggregate outstanding at any time and (3) Indebtedness incurred in connection with the refinancing of any Indebtedness existing on the date of this Agreement or permitted to be incurred, assumed or otherwise entered into hereunder; provided that no such refinancing Indebtedness shall have a principal amount greater than the principal amount of the Indebtedness being refinanced (plus any applicable premiums, defeasance costs, accrued interest, fees and expenses) and shall not include any greater prepayment premiums or restrictions on prepayment than the Indebtedness being refinanced, in each case of this clause (A), other than Excluded Liabilities, (B) enter into any swap or hedging transaction or other derivative agreements or (C) make any loans, capital contributions or advances to, or investments in, any Person;

(ii)    sell or transfer to any Person, in a single transaction or series of related transactions, any of the Acquired Assets, other than the sale or transfer of Withheld Coins;

(iii)    perform or offer to perform any staking that is not unstaked prior to the Rebalancing Date;

(iv)    enter into referral agreements with a third party with respect to Users and any Documents with respect to Users or account information with respect thereto;

(v)    make any changes in financial accounting methods, principles or practices affecting the consolidated assets, Liabilities or results of operations of Seller, except (x) insofar as may be required (A) by IFRS (or any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the International Accounting Standards Board or any similar organization) or (y) as necessary or desirable to accommodate reasonable tax positions, to the extent such tax positions would not adversely affect the Acquired Assets or Purchaser in a taxable period (or portion thereof) beginning after the Closing Date;

(vi)    (x) grant any Encumbrance (other than Permitted Encumbrances) on any of its material Acquired Assets (other than Acquired Coins, which, for the avoidance of doubt, are addressed in subclause (y) of this item (vi)) other than to secure Indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms), or (y) grant any Encumbrance (other than any Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan) on Acquired Coins, including by submitting any Cryptocurrency to any staking contract or otherwise causing any Seller Held Coins that are not currently Staked Coins to become Staked Coins;

(vii)    except, in each case, with respect to income Taxes or information Tax Returns: make, change or revoke any material Tax election; change an annual accounting period for material Taxes; adopt or change any material accounting method with respect to material Taxes; file any amended material Tax Return; enter into any closing agreement for material Taxes; settle or compromise any material Tax claim or assessment; or consent to any extension or waiver of the limitation period applicable to any

31

claim or assessment with respect to material Taxes; in each case to the extent such action would adversely affect the Acquired Assets or Purchaser in a taxable period (or portion thereof) beginning after the Closing Date;

(viii)    waive, release, assign, settle or compromise any pending or threatened Action against Seller to the extent that such wavier, release, assignment, settlement or compromise would (A) result in an Assumed Liability in an amount in excess of $1,000,000, individually or in the aggregate, or (B) waive or release any material rights or claims that would constitute Acquired Assets;

(ix)    enter into any referral agreement with a third party with respect to Users;

(x)    terminate or transfer any Business Accounts (other than any such Business Accounts that are not necessary to the operation of the Voyager Platform, with the Parties to cooperate in good faith to determine which Business Accounts are not necessary and may be terminated or transferred);

(xi)    lend any Cryptocurrency to any Person, or engage in purchases or sales of any Cryptocurrency (other than Withheld Coins) other than in connection with the Rebalancing Exercise; or

(xii)    authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)    Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct Seller's operations or business prior to the Closing, and nothing contained in this Agreement is intended to give Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Notwithstanding anything to the contrary contained herein, (i) any action taken, or omitted to be taken, by Seller pursuant to any Law, Order, directive, pronouncement or guideline issued by any Governmental Body or industry group providing for business closures, "sheltering-in-place" or other restrictions that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall in no event be deemed to constitute a breach of this Section 6.1 and (ii) any action taken, or omitted to be taken, by Seller to protect the business of Seller that is responsive to any pandemic, epidemic or disease outbreak, as determined by Seller in its reasonable discretion, shall in no event be deemed to constitute a breach of this Section 6.1.

6.2    Access to Information.

(a)    From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to Article VIII), Seller will (x) provide Purchaser and its authorized Advisors with reasonable access to, upon reasonable advance notice and during regular business hours, Seller's officers, employees, Advisors, properties, systems, offices, and data, documents, and information of the Seller Parties regarding the Acquired Assets, the Assumed Liabilities, the Users, Voyager User Accounts and the Voyager Platform (including, for the avoidance of doubt any of the foregoing that constitutes Acquired Information), including such financial, operating and other data and information related to the Transactions, the Acquired Assets, the Assumed Liabilities, the

Users, Voyager User Accounts, or the Voyager Platform (including, for the avoidance of doubt any of the foregoing that constitutes Acquired Information) as Purchaser or any of its representatives may reasonably request and (y) instruct the representatives of Seller to cooperate to provide such access; provided that (i) such access will occur in such a manner reasonably appropriate to protect the confidentiality of the Transactions, (ii) all requests for access will be directed to Moelis or such other Person(s) as Seller may designate in writing from time to time and (iii) nothing herein will require Seller to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A)  would waive any legal privilege or (B) would be in violation of applicable Laws or would violate any fiduciary duty under applicable Law with respect to Seller; provided that, in the event that Seller withholds access or information in reliance on the foregoing clause (A) or (B), Seller shall provide (to the extent possible without waiving or violating the applicable agreement, legal privilege, Law or fiduciary duty under applicable Law with respect to Seller) notice to Purchaser that such access or information is being so withheld and shall use reasonable best efforts to provide such access or information in a way that would not risk waiver of such legal privilege, applicable Law, or fiduciary duty.

(b)     The information provided pursuant to this Section 6.2 will be governed by the Confidentiality Agreement and the confidentiality provisions in Section 6.19. Each Party will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to such Party or any of its Advisors. Neither Party makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and the other Party may not rely on the accuracy of any such information, in each case, other than, with respect to Purchaser, the Express Seller Representations and, with respect to Seller, the Express Purchaser Representations.

(c)     From and after the Closing for a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Case), Purchaser will, following Seller's good faith written request, and solely to the extent necessary for Seller to (i) comply with Tax reporting obligations, (ii) consummate the closing of the Bankruptcy Case, (iii) prepare annual audited financial statements, (iv) submit a filing pursuant to applicable securities laws and regulations or (v) conduct the wind down of the estate (including reconciliation, investigation, and pursuit of claims) and dissolution of Seller and its Affiliates, provide Seller and its Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records in Purchaser's custody or control, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying), in each case to the extent relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser, in each case at no cost or expense to Purchaser; provided that (i) such access does not unreasonably interfere with the normal operations of Purchaser and (ii) nothing herein will require Purchaser to provide access to, or to disclose any information to, Seller or its Advisors if such access or disclosure (A) would waive any legal privilege or (B) would be in violation of applicable Laws or would violate any fiduciary duty; provided that, in the event that Purchaser withholds access or information in reliance on the foregoing clause (A) or (B), Purchaser shall provide (to the extent possible without waiving or violating the applicable agreement, legal privilege, Law or fiduciary duty) notice to Seller that such access or information is being so withheld and shall use reasonable

33

best efforts to provide such access or information in a way that would not risk waiver of such legal privilege, applicable Law, or fiduciary duty. Unless otherwise consented to in writing by Seller, Purchaser will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Seller such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of.

(d)     Except as expressly contemplated by this Agreement (including in connection with the Commercial Covenants, <u>Section 6.3, Section 6.10(b)</u> and <u>Section 6.18</u>), Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of Seller prior to the Closing with respect to Seller, their business or the Transactions without the prior written consent of Seller for each such contact.

6.3     <u>Employee Matters</u>.

(a)     From and after the date hereof (and, if applicable, following the Closing until the winddown or dissolution of Seller), subject to applicable Laws, Seller shall deliver to Purchaser such information and documents regarding employees of Holdings (the "<u>Seller Employees</u>") and independent contractors of Seller or Holdings (the "<u>Seller Contractors</u>"), in each case, as Purchaser shall reasonably request. Prior to the date hereof, Seller has provided Purchaser a true, correct and complete list of the Seller Employees and Seller Contractors identified by name, if applicable, department, and (subject to applicable Laws) true, correct and complete copies of all talent assessment reports for each such Seller Employee and Seller Contractor. From and after the date hereof (and, if applicable, following the Closing until the winddown or dissolution of Seller), Seller shall use reasonable best efforts to make such Seller Employees who remain employed by Holdings and Seller Contractors who remain engaged by Seller or Holdings, in each case, reasonably available to Purchaser or its Affiliates and Purchaser will work in good faith with Seller to identify top performing Seller Employees and Seller Contractors and will determine whether to make offers of employment or other services to any such Seller Employee or Seller Contractors (including by prioritizing review of Seller Employees for applicable open positions of Purchaser and its Affiliates, if any). Purchaser (or an Affiliate of Purchaser) may, in its sole discretion, make offers of employment, consulting or other services to such Seller Employees or Seller Contractors (if any) as Purchaser shall determine, on such terms and conditions as Purchaser shall determine in its sole and absolute discretion. In the event that Purchaser (or an Affiliate of Purchaser) makes such an offer of employment or services and such Seller Employee or Seller Contractor accepts, Seller hereby agrees not to enforce against Purchaser (or its Affiliate) or such Seller Employee or independent contractor the terms and conditions of any agreement to refrain from competing, directly or indirectly, with the business of Seller or any of its Affiliates or to refrain from soliciting employees, customers or suppliers of Seller or any of its Affiliates that may be applicable to such Seller Employee or Seller Contractor. Seller shall not take any action that would reasonably be expected to materially and adversely affect Purchaser's hiring or engagement of such Seller Employee(s) or Seller Contractor(s) in accordance with this <u>Section 6.3</u>; <u>provided</u> that the announcement and implementation of any Seller Plans (including any retention programs or post-Closing treatment of Seller Employees), in each case, in a manner consistent with the provisions of this Agreement, shall not be deemed to be a breach of this sentence. Notwithstanding anything

34

to the contrary herein or otherwise, nothing herein shall require or obligate Purchaser or any of its Affiliates to employ or make offers of employment to any Person, or make any such offers of employment on any particular terms, each of which decisions shall be made in Purchaser's sole discretion.

(b)      Prior to and following the Closing Date, Seller, Holdings and each of their Affiliates shall not communicate, and shall ensure that no representative of Seller, Holdings or their respective Affiliates communicates, with any Seller Employee or other service provider of Seller regarding post-Closing employment matters (including post-Closing employee benefit plans and compensation) with Purchaser without the prior written consent of Purchaser; provided that Seller, Holdings, and their Affiliates shall be permitted to communicate regarding their employment and termination plans and related matters.

(c)      Purchaser shall not assume any Seller Plans or any Liability to or in respect of any employees or former employees of Holdings and Seller and which relates to such employees' employment with Holdings or Seller, including (i) any employment agreement, whether or not written, between Seller and any person, (ii) any Liability under any Seller Plan, or (iii) Liability arising out of any claim of an unfair labor practice, or any claim under any state unemployment compensation or worker's compensation law or regulation or under any federal or state employment discrimination law or regulation as a result of an action taken by Seller or Holdings, and all such Liabilities shall be Excluded Liabilities hereunder.

(d)      Seller will, or will cause its Affiliates to, comply in all material respects with the Worker Adjustment and Retraining Notification Act of 1988 or any similar Laws ("WARN Act") with respect to any "plant closing" or "mass layoff" or group termination or similar event under the WARN Act affecting employees of Debtors (including as a result of the consummation of Transactions) whether occurring prior to or on the Closing. Subject to the terms of this Agreement, Seller and its Affiliates (including Holdings) reserve the right to (i) terminate any of their employees at any time, and otherwise reduce employee work hours, benefits and compensation, and (ii) issue termination and/or WARN Act notices relating to their employees at any time.

(e)      For any employees who are principally based outside the United States, the provisions of this Section 6.3 shall apply to such employees mutatis mutandis to the maximum extent permitted by applicable Law.

(f)      The provisions of this Section 6.3 are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any employees of Seller or Holdings), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this Section 6.3, alter or limit Purchaser's, Seller's or Holdings' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to an offer of employment or service, employment or continued employment

US-DOCS\137411268.27

or service for any period of time by reason of this Agreement, or any right to a particular term or condition of employment or service.

6.4     <u>Regulatory Matters</u>.

(a)     From time to time from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), subject to the other provisions of this <u>Section 6.4</u>, Seller will, and will cause its Affiliates and its and their respective employees, representatives, advisors and agents to, (i) make or cause to be made all filings and submissions to the extent required to be made by Seller or any of its Affiliates under any applicable Laws for the consummation of the Transactions, if any, (ii) cooperate with Purchaser, its Affiliates and its and their respective representatives in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any filings or submissions to be made by any member of the Purchaser Group under any applicable Laws in connection with the Transactions, (iii) supply promptly any additional information and documentary material that may be requested in connection with such filings or submissions and (iv) use reasonable best efforts to take any actions necessary to obtain all approvals or clearances from any relevant Governmental Body that are required to be obtained by Seller or its Affiliates under applicable Law for the consummation of the Transactions.

(b)     From time to time from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), subject to the other provisions of this <u>Section 6.4</u>, Purchaser will, and will cause its respective employees, representatives, advisors and agents to, (i) make or cause to be made all filings and submissions to the extent required to be made by Purchaser under any applicable Laws for the consummation of the Transactions, if any, (ii) cooperate with Seller, its Affiliates and its and their respective representatives in exchanging such information and providing such assistance as Seller may reasonably request in connection with any filings or submissions to be made by Seller or any of its Affiliates under any applicable Laws in connection with the Transactions, (iii) supply promptly any additional information and documentary material that may be requested in connection with such filings or submissions, and (iv) use reasonable best efforts to take any actions necessary to obtain all approvals or clearances from any relevant Governmental Body that are required to be obtained by Purchaser under applicable Law for the consummation of the Transactions.

(c)     From time to time from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), the Parties commit to instruct their respective counsel to cooperate with each other to respond to any reasonable inquiries and use reasonable best efforts to seek to resolve any objections raised by any Governmental Body as promptly as practicable and for greater certainty, each Party and its respective counsel undertake to (i) promptly notify the other Party or its counsel of, and, if in writing, furnish such other Party or its counsel with copies of (or, in the case of oral communications, advise such other Party or its counsel of the contents of), any substantive communication received by such Person from a Governmental Body and (ii) keep the other Party or its counsel informed with respect to the status of any applicable submissions and filings to or inquiries by any Governmental Body in connection with this Agreement and the Transactions and any developments, meetings or discussions with any Governmental Body in respect thereof, including with respect to (A) the commencement or proposed or threatened commencement of any investigation or other Action, and (B) the nature

and status of any inquiries or objections raised or proposed or threatened to be raised by any Governmental Body with respect to this Agreement and the Transactions. From and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), none of Seller or any of its Affiliates, on the one hand, or Purchaser, on the other hand, will participate in any substantive meeting or discussion with any Governmental Body with respect of any such filings, applications, investigation or other inquiry without giving the other Party reasonable prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Body, a reasonable opportunity to attend and participate in such meeting or discussion, and each Party will have a reasonable opportunity to review and provide comments (which shall be considered in good faith by the other Party) on the content of any filing, submission or other written communication (and any analyses, memoranda, presentations, white papers, correspondence or other written materials submitted therewith) to be submitted by the other Party or any of its Affiliates to any Governmental Body in advance of any such submission. Each Party acknowledges that, with respect to any non-public information provided by a Party to the other under this Section 6.4, each Party may (1) designate such material as restricted to "outside counsel only" and any such material shall not be shared with employees, officers or directors or their equivalents of the receiving Party without approval of the disclosing Party and (2) make appropriately limited redactions necessary to satisfy contractual confidentiality obligations, preserve attorney-client privilege or protect material relating to the valuation of the Acquired Assets. Notwithstanding anything to the contrary herein or otherwise, Purchaser will control and have final decision making authority on all regulatory strategy, submissions and procedures, after considering in good faith any reasonable advice provided by Seller in good faith.

(d)     Notwithstanding anything to the contrary in this Agreement, nothing shall require or be construed to require any member of the Purchaser Group to (i) oppose any motion or Action for a temporary, preliminary or permanent Order against, or preventing or delaying, the consummation of the Transactions, or exhaust all avenues of appeal, including any proper appeal of any adverse decision or Order by any Governmental Body, (ii) enter into a consent decree, consent agreement, settlement or other agreement or arrangement (including any ancillary agreements) to hold separate, license, sell, transfer, dispose or divest (pursuant to such terms as may be required by any Governmental Body) any asset (whether tangible or intangible), (iii) agree to the termination, modification, or assignment of any relationships, joint ventures, contracts, assets, liabilities or obligations, (iv) agree to any limitations on governance, conduct, or actions of members of the Purchaser Group or operations of their respective businesses or with respect to the Acquired Assets or Assumed Liabilities, or (v) enter into any national security agreement, letter of assurance, or other mitigation agreement with the Committee on Foreign Investment in the United States or any member agency thereof acting in that capacity.

(e)     From and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), Seller will not, and will not permit any of its Affiliates to, knowingly take any action, engage in any conduct or enter into any transaction that would reasonably be expected to (i) materially increase the risk of any Governmental Body entering an Order prohibiting or materially delaying the consummation of the Transactions or (ii) materially delay the consummation of the Transactions.

(f)     Subject to Section 6.4(d), from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), each Party will

US-DOCS\137411268.27

use reasonable best efforts to (i) cooperate with and (ii) seek to secure approvals or authorizations from, any relevant Governmental Body, including state banking departments enforcing money transmission laws, in order to permit consummation of the Transactions in a timely manner in compliance with applicable Laws.

6.5     <u>Reasonable Best Efforts; Cooperation</u>.

(a)     Subject to the other terms of this Agreement, and without limiting, affecting or modifying the Parties' obligations under <u>Section 6.4</u>, or any of the Commercial Covenants, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable and the closing conditions set forth in <u>Article VII</u> to be satisfied, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with the other Party, its Affiliates and its and their respective Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of Seller will not require Seller or any of its Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forgo any right, remedy or condition hereunder. Notwithstanding anything to the contrary herein, in the event of a conflict between this <u>Section 6.5(a)</u> and <u>Section 6.4</u>, the provisions of <u>Section 6.4</u> shall control with respect to such conflict.

(b)     The obligations of Seller and Purchaser pursuant to this Agreement, including this <u>Section 6.5</u>, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), Seller's debtor-in-possession financing, if any, and Seller's obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order, the Agreement Order, and the Confirmation Order) and Seller's duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.6     <u>Data Transfer Matters</u>.

(a)     Seller shall, and shall cause its Affiliates to, (i) within 30 days (with the Parties using their reasonable best efforts to do so within five (5) Business Days) following the later of the date hereof and the date Purchaser provides the form of such notification, distribute an initial email notification, in the form provided by Purchaser, to all Users and any other consumers located or having a home address in the United States from whom Seller has collected Personal Information regarding the Transactions (including the Rebalancing Exercise) and the transfer of such individuals' Personal Information or accounts (including the ability to opt in to a pre-Closing transfer of such User's Acquired User Data to Purchaser), and prominently post a notice, in the form provided by Purchaser, to Seller's and its Affiliates' (as applicable) primary customer-facing website regarding the same; (ii) on a weekly basis, upon the expiration of any opt in period provided in the email notification distributed by Seller, but no earlier than the later of January 3, 2023 and entry of the Agreement Order, deliver to Purchaser the respective Acquired User Data for Users who have opted into the pre-Closing data transfer pursuant to the foregoing item (i) and whose Acquired User Data has not previously been transferred (the "<u>Pre-Closing Data Transfer</u>");

38

(iii) following the date of the initial email notification until the Closing Date, continue distributing additional email notifications, in the form provided by Purchaser, to such individuals, as Purchaser reasonably requires; and (iv) on the Closing Date, deliver to Purchaser all other Acquired User Data. All notifications contemplated by the foregoing shall be subject to Purchaser's consideration of any comments thereto proposed in good faith by Seller or counsel to the committee of unsecured creditors in the Bankruptcy Case and subject to applicable Law.

(b)     From and after the date hereof and through and following the Closing, Seller shall, and shall cause its Affiliates to, maintain or maintain with a third party data management and retention firm, for the entirety of the applicable retention period and at least ninety (90) days thereafter, all information required to be maintained pursuant to, or to comply with, applicable Money Transmitter Requirements or Laws related to Sanctions.

(c)     Seller shall, and shall cause its Affiliates to, use reasonable best efforts to procure that all information and documentation requested in connection with the KYC Procedures meets the standards set forth in such KYC Procedures (including moving files located in storage repositories (*e.g.*, Google Drive or Box) to the appropriate files associated with the applicable User and associating such information and documentation with the applicable User), as determined by Purchaser in its reasonable discretion, prior to the User Asset Migration Date, but in each case in no event prior to the applicable timing contemplated by clauses (i) through (iv) of Section 6.6(a).

6.7     Use of Name.

(a)     Seller agrees that: (i) within ninety (90) days from the Closing Date, Seller shall (and shall cause its Affiliates to) cause an amendment to the governing documents of Seller and its Affiliates (as applicable) to be filed with the appropriate Governmental Body and shall take all other reasonable actions necessary to change Seller's and such Affiliate's legal, name to a name or names not containing "Voyager," any other trade mark or trade name set forth in Schedule 6.7(a) or any name confusingly similar to the foregoing; (ii) after the Closing Date neither Seller nor any of its Affiliates shall have any ownership rights in or to the name "Voyager," any other trade mark or trade name set forth in Schedule 6.7(a) or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing or comprising the foregoing, including any name or mark confusingly similar thereto (collectively, the "Seller Marks"); and (iii) except as set forth in Section 6.7(a), Seller and its Affiliates shall, within ninety (90) days of the Closing Date, cease to make any use of the Seller Marks, including in any corporate or other legal name.

(b)     Notwithstanding Section 6.7(a), for a period of ninety (90) days after the closing of the Bankruptcy Case, unless extended by mutual agreement of Purchaser and Seller, Purchaser hereby grants to Seller and its Affiliates (including, for the avoidance of doubt, any wind-down or similar administrator in the Bankruptcy Case or under the Plan) a non-exclusive, limited, non-transferable, non-sublicensable and revocable license to use the Seller Marks for the sole purposes of unwinding Seller's businesses and assisting Purchaser with all migrations, integrations and Transactions.

6.8   Further Assurances.

(a)   From time to time from and after the date hereof through and following the Closing (in the case of Seller, until the winddown or dissolution of Seller), as and when requested by either Party, the other Party will execute and deliver, or cause to be executed and delivered, all such further conveyances, notices, assumptions, assignments, documents and other instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions (including for the avoidance of doubt, the transfer and conveyance of any Acquired Assets that may be in the possession of Seller's Affiliates to Purchaser); provided that nothing in this Section 6.8 shall require Purchaser or the Purchaser Group to assume any Liabilities of Seller or any of its Affiliates other than the Assumed Liabilities or Seller or any of its Affiliates to transfer any assets other than Acquired Assets. In addition, from time to time following the Closing Date (in the case of Seller, until the winddown or dissolution of Seller), each Party shall, and shall cause its Affiliates to, promptly execute, acknowledge and deliver such further documents and perform such further acts as are reasonably requested by the other Party and as may be reasonably necessary to transfer and convey to Purchaser, or make available to Purchaser the Acquired Assets or the Assumed Liabilities pursuant to this Section 6.8.

(b)   Without limiting Section 6.8(a), Seller will use reasonable best efforts to evidence and effectuate the transfer and conveyance of all Seller Held Coins (solely for purposes of this Section 6.8(b)), deeming the phrase "who are Debtors" in the definition of Seller Held Coins to instead read as "who are not Debtors" in accordance with Section 6.8(a), *mutatis mutandis*.

6.9   Insurance Matters. Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to Seller and the Acquired Assets that is maintained by Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies; provided that to the extent such insurance coverage is available with respect to any Acquired Assets or Assumed Liabilities, after the Closing, (a) Seller shall, and shall cause its applicable Affiliates to, use reasonable best efforts to report in good faith to the applicable third-party insurance provider, if applicable, all events, acts, errors, accidents, omissions, incidents, injuries or other forms of occurrences to the extent relating to any Acquired Assets or Assumed Liabilities that, in each case, occurred at or prior to the Closing as reasonably requested by Purchaser to be so reported the extent covered by an occurrence-based insurance policy, (b) Purchaser shall use its reasonable best efforts to comply with the terms of any such insurance policy and (c) Seller shall, and shall cause its applicable Affiliates to, (i) use reasonable best efforts to obtain the benefit of the applicable insurance coverage under any such insurance policy and (ii) pay such benefit to Purchaser, net of (A) any deductibles, co-payment or self-insured amounts payable by Seller or any of its Affiliates or other out-of-pocket costs and expenses (including reasonable legal fees and expenses, if any) actually and reasonably incurred by Seller or any of its Affiliates in seeking such insurance proceeds and (B) any Taxes imposed on Seller or any of its Affiliates in respect of the receipt or accrual of such insurance proceeds.

6.10   <u>User Migration</u>.

(a)   Following the date hereof, Seller shall, and shall cause its Affiliates to cooperate with Purchaser to, develop (and each Party shall use reasonable best efforts to develop within 15 Business Days following the date hereof) a mutually agreed upon integration plan that sets forth all technology integrations that Purchaser deems reasonably necessary to enable all migrations of User accounts on the Voyager Platform to the Binance.US Platform as contemplated by this Agreement (the "<u>Integration Plan</u>"). The Integration Plan will include among other things: (i) directing customers on the Voyager Platform (including through links on the home screen for the web interface and mobile app for the Voyager Platform) to the Binance.US Platform log-in webpage or mobile app, (ii) migrating all Acquired User Data (subject to <u>Section 6.6(a)</u>) reasonably necessary for Purchaser to validate whether Users qualify as Existing Users and (iii) developing a process whereby any User that is not an Existing User can affirmatively accept terms and conditions to provide such User with access to their Net Owed Coins in a new Binance.US Platform account from directly within the Voyager Platform and related app in accordance with the provisions of this Agreement. Each Party shall, and shall cause its Affiliates and its and their respective employees and representatives to, comply with and implement the Integration Plan. From and after the date hereof (and following the Closing, if applicable, until the date that is six (6) months following the Closing Date), Seller shall, and shall cause its Affiliates and its and their respective employees and representatives to provide to Purchaser, its Affiliates and its and their respective employees and representatives (x) any assistance reasonably requested or required by Purchaser, its Affiliates and its and their respective employees and representatives in connection with the opening of User accounts on the Binance.US Platform, the transfer of information and Net Owed Coins from the Voyager Platform to the Binance.US Platform (including in connection with customer queries and troubleshooting with respect thereto), and the actions contemplated by this <u>Section 6.10</u> and the Integration Plan and (y) subject to <u>Section 6.6</u> and applicable Law, all necessary Acquired User Data in Seller's or its Affiliates' possession required to effectuate the Integration Plan. Purchaser shall bear the reasonable and documented out-of-pocket expenses incurred by Seller in connection with the provision of such assistance following the Closing pursuant to the immediately preceding sentence.

(b)   Notwithstanding the provisions of <u>Section 6.2(c)</u> or <u>Section 10.17</u>, following entry of the Agreement Order, Purchaser and its Affiliates shall, at their sole cost and expense, be entitled to issue communications directed to Users on the Binance.US Platform and through other means of Purchaser's choosing in connection with the Transactions or the opening of accounts on the Binance.US Platform; <u>provided</u> that such communications are consistent with this Agreement and applicable Law; <u>provided</u> that Purchaser shall not issue any such communications prior to the Closing Date without Seller's prior written consent (which shall not be unreasonably withheld, conditioned or delayed) and subject to reasonable consultation with counsel to the committee of unsecured creditors in the Bankruptcy Case. Except as required by <u>Section 6.11(d)</u>, Seller shall not, and Seller shall cause its Affiliates not to, issue any communication to Users, whether on the Voyager Platform or otherwise, except to the extent the form and substance of such communication has been previously approved by Purchaser or is required by applicable Law; <u>provided</u> that the foregoing shall not prohibit Seller from responding on an individual basis to technical support queries from Users or answering questions related to the amount of Coins such User has deposited on the Voyager Platform or communicating with customers regarding withdrawal of cash from the "for benefit of" customer accounts at

41

Metropolitan Commercial Bank; provided further that Seller shall, and shall cause its Affiliates to, provide Purchaser and counsel to the committee of unsecured creditors in the Bankruptcy Case with regular updates on the timing and content of such communications and shall cooperate with Purchaser in addressing any concerns related thereto. The Parties will work in good faith to (i) develop a set of talking points or FAQs for Users and Eligible Creditors with respect to the Transactions, the Bankruptcy Cases, and related matters and (ii) continue to review and revise such talking points or FAQs as other inquiries from Users and Eligible Creditors or other circumstances arise.

(c)     Subject to Seller's providing the Acquired User Data in accordance with Section 6.6, and such Acquired User Data meeting the standards set forth in the KYC Procedures, as determined by Purchaser in its reasonable discretion, Purchaser shall cause an account to be opened for each User on the Binance.US Platform on or before the User Asset Migration Date. In addition to the foregoing, if Seller has not provided or does not have Acquired User Data meeting such standards with respect to a particular User, if such User provides such information and documentation meeting the standards set forth in such KYC Procedures, as determined by Purchaser in its reasonable discretion, Purchaser shall cause an account to be opened for such User in accordance with its standard account opening procedures following its receipt of such information and documentation.

(d)     Seller and Purchaser shall offer (i) each eligible creditor pursuant to the Plan that is not a User (each, an "Eligible Creditor" ) and (ii) each User the opportunity, subject to the consummation of the Closing and such User and Eligible Creditor meeting the requirements of the KYC Procedures and accepting the terms and conditions of the Binance.US Platform, to receive its Net Owed Coins or other Plan distribution through the Binance.US Platform in accordance with Section 6.12 and the Plan. Within three (3) Business Days following the request of Purchaser (which request for the sake of clarity may be offered multiple times), Seller shall send to each User and Eligible Creditor a communication in the form provided by Purchaser notifying them of such offer.

(e)     For the sake of clarity and notwithstanding anything to the contrary herein or otherwise, (i) none of Purchaser or any of its Affiliates shall be required to (A) activate an account or pay or credit any amount, whether in Coins, cash or otherwise, to any User or Eligible Creditor (or its account) that does not meet the requirements of the KYC Procedures and accept the terms and conditions of the Binance.US Platform, (B) pay or credit any amount, whether in Coins, cash or otherwise, to any User or Eligible Creditor or its account except in accordance with the Plan, or (C) credit the account of any User or Eligible Creditor with respect to Coins that have not actually been delivered to Purchaser in accordance with the provisions of Section 2.4(b), (ii) neither Purchaser nor any of its Affiliates is assuming any Liabilities of Seller or any of its Affiliates with respect to Users' accounts on the Voyager Platform or any Eligible Creditor, all of which Liabilities shall constitute Excluded Liabilities, and (iii) neither Purchaser nor any of its Affiliates shall be required to provide trading services on the Binance.US Platform or otherwise in respect of any Unsupported Coins.

US-DOCS\137411268.27

6.11    Rebalancing Exercise; Seller Statement.

(a)     Following the date hereof and prior to the Closing (or the earlier termination of this Agreement pursuant to Article VIII), (i) Seller shall purchase and sell Cryptocurrency through one or more transactions such that, following the completion of such transactions, the number of Acquired Coins of each type is equal to the aggregate number of Deposited Coins of such type multiplied by the Rebalancing Ratio (subject to a Rebalancing Exercise Delta with respect to each Acquired Coin of no more than five percent (5%) or, if after conducting such transactions and using reasonable best efforts to meet the Rebalancing Exercise Delta of five percent (5%), Seller reasonably and in good faith determines that it will not be able to meet such Rebalancing Exercise Delta, then such other amount as Purchaser and Seller consent to, such consent not to be unreasonably withheld, conditioned or delayed), the purpose of which transactions the Parties acknowledge and agree is to ensure that there are sufficient Acquired Coins of each type to pay to each User's account on the Binance.US Platform a number of Post-Rebalancing Coins of such type in accordance with the provisions of this Agreement (such transactions, the "Rebalancing Exercise"), and (ii) Seller shall, and shall cause its employees, accountants, advisors and representatives to, consult with, and keep reasonably informed, Purchaser, its Affiliates and their respective employees, accountants, advisors and representatives with respect to the Rebalancing Exercise and all actions taken in connection therewith, including by providing Purchaser with regular updates regarding the status of the Rebalancing Exercise. For the sake of clarity, the Parties agree that for purposes of the Rebalancing Exercise, if ETH Coins that are Staked Coins cannot be unstaked by the Rebalancing Date, or if there are Coins that Seller is otherwise unable to access due to such Coins being custodied with providers that have entered insolvency proceedings prior to the date hereof, then the Parties will agree on appropriate modifications to the Rebalancing Exercise and the process for distributing Net Owed Coins to Users in light of the foregoing. The Parties agree that the Rebalancing Exercise shall be completed in accordance with the provisions of this Agreement by no later than the date that is one (1) Business Day prior to the Closing Date (such date, the "Rebalancing Date").

(b)     In order to facilitate the Rebalancing Exercise, Seller shall, promptly following the date hereof, to the extent not already created prior to the date hereof, create an institutional account in Seller's name on the Binance.US Platform, and Seller may, but shall not be required to, transfer any or all Seller Held Coins to such institutional account in order to facilitate the Rebalancing Exercise (and, for the avoidance of doubt, the Binance.US Platform shall serve merely as an exchange agent in connection with the Rebalancing Exercise). Prior to engaging in any Subject Transaction outside the Binance.US Platform, Seller shall provide Purchaser with a written notice describing the parameters of such Subject Transaction, including the proposed number of Seller Held Coins of each type to be transferred in connection with such Subject Transaction (each, a "Transaction Notice") and Purchaser shall be entitled to make, by written notice (each, a "Transaction Offer Notice") to Seller within three (3) Business Days following receipt of such Transaction Notice, an offer to conduct such Subject Transaction on the Binance.US Platform, including a description of the estimated numbers of Acquired Coins that would result from the consummation of such Subject Transaction. If Seller receives any proposal to conduct such Subject Transaction from any third party which would result in a number of Acquired Coins in excess of that set forth in the Transaction Notice, Seller shall inform Purchaser of the same, and Seller shall not conduct such Subject Transaction with or through other Person(s) unless Seller provides written notice to Purchaser that Seller has determined in good faith that the

terms offered by such other Person(s) with respect to such Subject Transaction (which such terms shall be set forth in such notice) are more favorable (in terms of the best interests of Seller and its estate) than the terms set forth in the Transaction Offer Notice and Purchaser does not provide an updated Transaction Offer Notice within one (1) Business Day following receipt of such notice from Seller with terms as or more favorable (in terms of the best interests of Seller and its estate) than those set forth in Seller's notice. If Purchaser does so provide such an updated Transaction Offer Notice, Seller conduct such applicable Subject Transaction on the Binance.US Platform in accordance with such updated Transaction Offer Notice. In addition to the foregoing, Seller may request that Purchaser facilitate all or part of the Rebalancing Exercise, in which case all or such portion of the Rebalancing Exercise shall be conducted on the Binance.US Platform. Seller's use of the Binance.US Platform for the Rebalancing Exercise shall be subject in all respects to the standard terms and conditions of the Binance.US Platform (including applicable fees, spreads, costs and expenses except as set forth in the applicable Transaction Offer Notice). For the sake of clarity, Seller may withdraw any Coins from the Binance.US Platform prior to the Closing and Seller shall not be required to maintain Coins on the Binance.US Platform in connection with the Rebalancing Exercise or otherwise (except as otherwise expressly contemplated hereunder from and after the Closing and acknowledging that this sentence is not intended to and shall not preclude transactions in the Rebalancing Exercise being undertaken on the Binance.US Platform in accordance with the provisions hereof).

(c)    At least one (1) Business Day prior to the Closing Date and following completion of the Rebalancing Exercise in accordance with <u>Section 6.11(a)</u>, Seller will deliver to Purchaser a ledger in a form reasonably specified by Purchaser as far in advance of the Rebalancing Date as is reasonably practicable (the "<u>Seller Statement</u>") setting forth in reasonable detail, in each case as of the Rebalancing Date and following the completion of the Rebalancing Exercise in accordance with <u>Section 6.11(a)</u>, (i) each User's user identification number, (ii) the Rebalancing Ratio and the calculation thereof, (iii) the number of each User's Deposited Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Deposited Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject), (iv) the number of each User's Post-Rebalancing Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Post-Rebalancing Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject), (v) the total number of Seller Held Coins and Acquired Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Seller Held Coins and Acquired Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject), (vi) the total amount of gas fees that Seller will pay in connection with the transfer of each type of Acquired Coin to Purchaser in accordance with <u>Section 2.4</u>, and (vii) the amount of cash, Coins or other property (including the name and relevant ticker symbol used on the Voyager Platform for such Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject) payable to each Eligible Creditor, after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring such Coins to Purchaser, and any identifying information and information required to make such payments to such Eligible Creditor under the Plan, in each case together with reasonably detailed supporting information and documentation and prepared by Seller based on Seller's and its Affiliates' books and records. Notwithstanding anything to the contrary herein, Seller hereby acknowledges and agrees that (A) Purchaser and its Affiliates shall be entitled to fully rely on the Seller Statement

and any data, information or calculation set forth therein for purposes of <u>Section 6.11(d)</u>, and (B) in no event shall Purchaser of any of its Affiliates be responsible (x) to any Person for the Seller Statement, any data, information or calculation set forth therein or any error or inaccuracy with respect thereto or (y) for any losses, liabilities or damages in respect thereof, in each case, to the extent Purchaser takes any action in reliance thereon.

(d)     Promptly following the completion of the Rebalancing Exercise, Seller shall send to each User a communication notifying such User of the Rebalancing Exercise, such User's Deposited Coins, and the Net Owed Coins attributable to such User's account on the Voyager Platform following the Rebalancing Exercise and any gas fees incurred in connection with the transfer of Coins to Purchaser pursuant to <u>Section 2.4</u>. Seller will, upon Purchaser's request, deliver to each Eligible Creditor a communication relating to the Transactions, any payments to be made by Purchaser or any of its Affiliates to such Eligible Creditor and any matters relating to opening an account on the Binance.US Platform, in each case that is in form and substance reasonably acceptable to Purchaser.

6.12    <u>Crediting of Accounts; Unsupported Jurisdictions, Transfer of Coins to Seller; Liquidations or Distributions by Seller</u>.

(a)     Subject to the provisions of <u>Section 6.10</u>, on the User Asset Migration Date, Purchaser shall credit, or cause to be credited, (i) to the Binance.US Platform account of each User, such User's Net Owed Coins and (ii) to the Binance.US Platform account of each Eligible Creditor, the applicable amount payable to such Eligible Creditor as set forth in the Seller Statement. For the avoidance of doubt, Coins credited to any User's or Eligible Creditor's accounts on the Binance.US Platform may be made from any Coins held by or on behalf of Purchaser or any of its Affiliates. As a condition precedent to any User or Eligible Creditor accessing its account or Coins on the Binance.US Platform, such User or Eligible Creditor must satisfy the requirements set forth in <u>Section 6.10</u>. Following such User's or Eligible Creditor's satisfaction of such requirements, Purchaser shall allow such User or Eligible Creditor, as applicable, to access trading services with respect to its Coins subject to the Binance.US Platform's customary terms and conditions (including any transaction fees, spreads, costs and expenses). Notwithstanding anything to the contrary herein, with respect to any User or Eligible Creditor that does not satisfy such requirements prior to the date that is three (3) months following the later of the Closing Date or the date on which such terms and conditions are made available for such User or Eligible Creditor to accept, then Purchaser shall convert any Acquired Coins with respect to such Users or Eligible Creditors into United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such United States Dollars, together with any cash or others assets in respect of such Users or Eligible Creditors to Seller within five (5) Business Days, for further distribution by Seller in accordance with the Plan.

(b)     Notwithstanding anything to the contrary herein or otherwise, for any Person (including any User or Eligible Creditor) that is located in Hawaii, New York, Texas or Vermont, to the extent that Purchaser does not have a Money Transmitter License or similar license in such jurisdiction or in any other jurisdiction where the applicable Governmental Body asserts after the date of this Agreement that Purchaser or any of its Affiliates requires a Money Transmitter License or similar license in order to consummate the Transactions or perform its obligations hereunder (each, an "<u>Unsupported Jurisdiction</u>"), Purchaser and its Affiliates shall not be required

45

to (i) credit or make any payment (with any Coins, cash or otherwise) to any account of such Person (including any User or Eligible Creditor) on the Binance.US Platform, or (ii) permit any such Person or account of such Person on the Binance.US Platform to be active or conduct any trading or investing in Coins. Notwithstanding anything herein to the contrary, prior to the Closing, Seller have the option to elect (upon consultation with professionals representing the committee of unsecured creditors in the Bankruptcy Case) that either (i) Seller shall not deliver to Purchaser any Coins, cash, or other asset with respect to any User or Eligible Creditor located in an Unsupported Jurisdiction or (ii) Seller shall deliver such Coins to Purchaser at Closing. Upon receipt by Purchaser of any Unsupported Jurisdiction Approvals with respect to any Unsupported Jurisdiction(s), which Unsupported Jurisdiction Approvals permit Purchaser to perform its obligations under Section 6.12(a) in such Unsupported Jurisdiction, then Purchaser shall promptly notify Seller of receipt of such Unsupported Jurisdiction Approval and, if Seller has not previously delivered applicable Coins, cash, or other asset with respect to any User or Eligible Creditor located in such Unsupported Jurisdiction then Seller shall so deliver such assets to Purchaser within five (5) Business Days of such notification, and Purchaser shall (following receipt of any applicable assets if required) consummate the actions in such Unsupported Jurisdiction that were restricted by this Section 6.12(b); provided that to the extent Purchaser does not receive such Unsupported Jurisdiction Approval(s) with respect to any Unsupported Jurisdiction prior to the date that is six (6) months following the Closing Date, then to the extent Purchaser is holding any Acquired Coins with respect to Users or Eligible Creditors in such Unsupported Jurisdictions, Purchaser shall convert such Acquired Coins into United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such United States Dollars, together with any cash or others assets in respect of such Users or Eligible Creditors to Seller within five (5) Business Days, for further distribution by Seller in accordance with the Plan.

(c)     From and after the Closing, or if this Agreement is terminated in accordance with its terms (other than in connection with a Purchaser Default Termination), then from and after such termination, if Seller or any of its Affiliates intends to consummate a transaction or series of related transactions pursuant to which it will purchase, sell or liquidate any Coins or distribute the proceeds thereof to any User or Eligible Creditor, in each case other than any Additional Bankruptcy Distributions (but including any purchase, sale or liquidation of any Coins prior to making any Additional Bankruptcy Distributions) or any of the transactions provided for in the preceding provisions of this Section 6.12 then (i) Seller may, but shall not be required to, utilize the Binance.US Platform, or other service offerings of Purchaser or its Affiliates, to consummate such transaction or series of related transactions (including any purchase, sale, liquidation or distribution described above) on Purchaser's and its Affiliates' standard terms and conditions (including any transaction fees, spreads, costs and expenses) and (ii) if this Agreement is terminated in accordance with its terms (other than in connection with a Purchaser Default Termination), then Seller may, but shall not be required to, elect that Purchaser and Seller will (and Seller will cause its Affiliates and any other Person with whom Seller or its Affiliates is consummating any such transaction or transactions to) cooperate in good faith to develop and facilitate any transaction similar to the Rebalancing Exercise required by Seller, any of its Affiliates, and any other Person with whom Seller or its Affiliates is consummating any such transaction or transactions, in order to consummate any such transaction or series of related transactions; provided that in no event will Purchaser or any of its Affiliates be required to make any distribution or facilitate or consummate any transaction under this Section 6.12(c) with respect

46

to any User located in an Unsupported Jurisdiction. In connection with any distribution made by Purchaser or its Affiliates pursuant to this <u>Section 6.12(c)</u>, all right, title and interest in and to any property so distributed (including any Coins) shall be made or transferred to Purchaser or its Affiliates free and clear of any Encumbrances prior to any such distribution by Purchaser or its Affiliates and such distributions will be made on Purchaser's and its Affiliates' standard terms and conditions (including any transaction fees, spreads, costs and expenses).

(d)     The provisions of <u>Sections 6.10</u>, <u>6.11</u>, <u>6.12</u>, and <u>6.14</u> shall be subject to such protocols, if any, as the Parties may agree in writing after the date hereof with respect to the transfer of information, migration of users, migration or transfer of Coins, and any matters related to the foregoing or such Sections.

(e)     Notwithstanding anything to the contrary herein, but subject to the last sentence of this <u>Section 6.12(e)</u>, (i) Seller (prior to the Closing) and each User and Eligible Creditor (from and after the Closing) shall retain all right, title, and interest in and to Coins allocated to it in accordance with this Agreement on the Binance.US Platform (notwithstanding any terms and conditions of the Binance.US Platform) through and including such time as such Coins are returned or distributed to Seller or such User and Eligible Creditor, as applicable, hereunder, and such Coins shall be held by Purchaser solely in a custodial capacity in trust and solely for the benefit of Seller or the applicable User or Eligible Creditor; <u>provided</u> that in the case of Coins allocable to Users or Eligible Creditors located in Unsupported Jurisdictions, to the extent, if any, that such Coins are transferred to Purchaser pursuant to <u>Section 6.12(b)</u>, from and after the Closing until the applicable Unsupported Jurisdiction Approval is obtained or such Coins are liquidated in accordance with <u>Section 6.12(b)</u> hereunder, such Coins shall be held by Purchaser in a custodial capacity on behalf of Seller and not the applicable User or Eligible Creditor; (ii) any and all cash or cash equivalents to be transferred at any time to Purchaser hereunder for further distribution to Seller or any User or Eligible Creditor (and not for Purchaser's own account (*e.g.*, Purchaser Expenses)) shall at all times (until transferred by Purchaser to Seller or the applicable User or Eligible Creditor, as applicable, hereunder) be held solely in a third party bank account of a FDIC-insured financial institution solely for the benefit of or "fbo" Seller or such User or Eligible Creditor, as applicable; (iii) Purchaser shall not, after the date hereof, introduce any further conditions to the withdrawal of cash from accounts on the Binance.US Platform that are not in effect as of the date hereof that would apply to any User's or Eligible Creditor's account on the Binance.US Platform; (iv) Purchaser shall not at any time halt (temporarily or permanently) withdrawals of cash or such Coins from any User's or Eligible Creditor's account on the Binance.US Platform; (v) Purchaser shall not halt trading of such Coins on the Binance.US Platform at any point during the 30 days following any distribution to any User's or Eligible Creditor's account on the Binance.US Platform hereunder, except, in the case of each of the foregoing clauses (iii), (iv) and (v), (A) as required by applicable Law or any Order or Governmental Body, (B) as may be permitted pursuant to Purchaser's terms and conditions in effect on the Closing Date (including for purposes of halting fraud or illegal activity), (C) as necessary to complete any system, account, wallet, security or exchange maintenance, patching, repair, upgrade or to the extent any withdrawal or trading is unable to be processed due to any act or omission by, or any Event related to, any third party (*e.g.*, a bank closure or a third party ceasing to support any Cryptocurrency), (D) in order to avoid any legal, compliance or regulatory issue or in order to ensure market stability, or (E) in order to avoid any information security risk; (vi) Purchaser shall not take, permit to be taken, or omit to take any action that would reasonably

47

be expected to (A) result in the insolvency of Purchaser or (B) prevent or materially impair or materially delay the ability of Purchaser to perform the Commercial Covenants in accordance herewith; (vii) Purchaser shall comply in all material respects with all provisions of the Plan applicable to Purchaser or the Distribution Agent (as defined in the Plan) to the extent Purchaser is acting as a distribution agent in connection with the Plan; and (viii) Purchaser shall not pledge, repledge, hypothecate, rehypothecate, sell, lend, stake, arrange for staking, or otherwise transfer or use any amount of such Coins, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining a like amount of Coins, or invest such Coins (except as otherwise directed by Seller or any User or Eligible Creditor, as applicable). Notwithstanding the foregoing, Purchaser's obligations under this Section 6.12(e) shall terminate and be of no further force or effect on the earlier of (x) the date that Purchaser's obligations under Section 6.10, Section 6.11, Section 6.12, and Section 6.14 have been performed in full or Purchaser otherwise ceases to have any obligations thereunder, and (y) the date on which this Agreement is terminated in accordance with is terms.

      6.13    <u>VGX Token Listing Review Process</u>. Following the entry of the Agreement Order, Purchaser will initiate and undertake consistent with its policies and past practices an internal review process to determine whether VGX tokens can be listed for trading on the Binance.US Platform, which review process will include submitting the VGX token to Purchaser's listing committee for consideration consistent with its policies and past practices.

      6.14    <u>Additional Bankruptcy Distributions</u>. The provisions of this <u>Section 6.14</u> shall cease to apply and be of no further force and effect upon the soonest to occur of (a) Purchaser ceasing to provide the services necessary to comply with this <u>Section 6.14</u>, (b) Purchaser's bankruptcy or insolvency, (c) the issuance of a final, non-appealable Order by a Governmental Body prohibiting the consummation of the transactions contemplated by this <u>Section 6.14</u>, (d) any Purchaser Development (disregarding for the purposes of this <u>Section 6.14</u> the language "prior to the Closing"), and (e) Purchaser's material breach of <u>Section 6.12(e)</u> or this <u>Section 6.14</u> which remains uncured for 30 days following Purchaser's receipt of Seller's written notice of such material breach.

      (a)    Any Additional Bankruptcy Distributions made on account of Users' or Eligible Creditors' claims against the Debtors and all right, title and interest therein and thereto shall be made or transferred to Purchaser free and clear of any Encumbrances. Any such transfers in Coins shall be deemed complete when each transfer is publicly confirmed on the blockchain for the related Coin at least the number of times set forth on https://support.kraken.com/hc/en-us/articles/203325283-Cryptocurrency-deposit-processing-times (or a successor site mutually agreed by Seller and Purchaser), or, for any Coins held in Seller's account on the Binance.US Platform, transferred to the Binance.US Platform account designated by Purchaser, or in the case of staked ETH Coins, such staked ETH Coins shall be delivered pursuant to the means reasonably specified by Purchaser.

      (b)    Upon the Bankruptcy Court's approval of any Additional Bankruptcy Distributions (including through the Confirmation Order), Seller shall deliver to Purchaser a statement setting forth (i) the amount of Additional Bankruptcy Distributions to be made to each User or Eligible Creditor, as applicable, as approved by the Bankruptcy Court in Coins (including the name and relevant ticker symbol used on the Voyager Platform for such Coins, together with

48

all information regarding the underlying networks and smart contracts to which such Coins are subject) after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring such Coins to Purchaser in accordance with this <u>Section 6.14</u>, (ii) the amount of Additional Bankruptcy Distributions to be made to each User or Eligible Creditor, as applicable, as approved by the Bankruptcy Court in cash, and (iii) the user identification number of each such User or other identifying or account information of any Eligible Creditor, as applicable (such statement, the "<u>Post-Bankruptcy Statement</u>"). The provisions set forth in the last sentence of <u>Section 6.11(a)</u> shall apply to the Post-Bankruptcy Statement, *mutatis mutandis*.

(c)     Promptly following Purchaser's receipt of any Additional Bankruptcy Distributions (but no later than five (5) Business Days following receipt of any Additional Bankruptcy Distributions), Purchaser shall credit such Additional Bankruptcy Distributions to each User's and Eligible Creditor's accounts, if any, on the Binance.US Platform in such amounts set forth on, and in accordance with, the Post-Bankruptcy Statement. The Additional Bankruptcy Distributions credited to each User and Eligible Creditor in accordance with this <u>Section 6.14(a)</u> are referred to herein as "<u>Credited Additional Bankruptcy Distributions</u>".

(d)     If any Additional Bankruptcy Distribution is to be received by Purchaser pursuant to <u>Section 6.14(a)</u>, prior to the crediting of the applicable Credited Additional Bankruptcy Distribution pursuant to <u>Section 6.14(a)</u>, Seller shall reduce such Credited Additional Bankruptcy Distribution by and shall retain (i) the number of Coins allocated in the applicable Post-Bankruptcy Statement to each User or Eligible Creditor located in an Unsupported Jurisdiction in which Purchaser or its applicable Affiliate(s) have not received the necessary Money Transmitter License, and (ii) the amount of cash allocated in the applicable Post-Bankruptcy Statement to each User or Eligible Creditor located in an Unsupported Jurisdiction in which Purchaser or its applicable Affiliate(s) have not received the necessary Money Transmitter License, and, in either case, such amounts shall be distributed by Seller in accordance with the Plan.

(e)     There shall be no transaction fees, spreads, costs or expenses charged to or payable by Seller, any User, or any Eligible Creditor with respect to any Additional Bankruptcy Distributions to the account of Seller, such User or such Eligible Creditor, as applicable, on the Binance.US Platform contemplated by this <u>Section 6.14</u>.  With respect to any User or Eligible Creditor that does not meet the requirements of the KYC Procedures and accept the terms and conditions of the Binance.US Platform (or otherwise is not or no longer is a user with an active account on the Binance.US Platform) as of or prior to the date of such Post-Bankruptcy Statement, Purchaser shall convert all Coins allocable to such User or Eligible Creditor in such Additional Bankruptcy Distribution into United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such United States Dollars, together with any cash or others assets in respect of such Users or Eligible Creditors, to Seller within five (5) Business Days, for further distribution by Seller in accordance with the Plan.

6.15     <u>Unstaking</u>. Promptly following the date hereof (until the Closing or the earlier termination of this Agreement pursuant to <u>Article VIII</u>) but without limiting what is permitted by <u>Section 6.1(b)(iii)</u>, Seller shall, and shall cause its Affiliates to, (a) ensure that all Seller Held Coins (other than ETH Coins that are Staked Coins as of the date hereof) are freely transferable and not subject to any restrictions on transfer (including restrictions on transfer implemented through

49

"smart contracts" or other technological means), (b) without limiting the foregoing, ensure that all Seller Held Coins (other than ETH Coins as of the date hereof) that are Staked Coins as of the date hereof) are unstaked prior to the Rebalancing Date, and (c) consult with Purchaser and its representatives, keep Purchaser and its representatives reasonably informed, and provide Purchaser and its representatives with draft documents reasonably in advance of execution or delivery thereof and incorporate any comments therein proposed in good faith by Purchaser or its representatives, in each case, in connection with any of the foregoing.

6.16    <u>Receipt of Misdirected Assets; Liabilities</u>. From and after the Closing, if Purchaser or Seller becomes aware that Seller or any of its Affiliates is in possession of any right, property or asset that is an Acquired Asset, such Party shall promptly inform the other Party of that fact. Thereafter, at the request of Purchaser, Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser or any other entities nominated by Purchaser for no consideration, and such asset will be deemed the property of Purchaser of any such nominees held in trust by Seller for Purchaser or any such nominees until so transferred. From and after the Closing, if Purchaser or Seller becomes aware that Purchaser or any of its Affiliates is in possession of any right, property or asset that is an Excluded Asset, such Party shall promptly inform the other Party of that fact. Thereafter, at the request of Seller, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Seller or any other entities nominated by Seller for no consideration, and such asset will be deemed the property of Seller of any such nominees held in trust by Purchaser for Seller or any such nominees until so transferred; <u>provided</u> that if Purchaser discovers any items (or portions thereof) that would be Documents but for the fact that they relate to Excluded Assets, Purchaser shall use reasonable best efforts to destroy such items. Notwithstanding anything to the contrary herein or otherwise, if any amount (including any principal, interest, fees, expenses or penalties) is outstanding or unpaid under any Loan from or after the Closing, then such Loan, any agreements or documents entered into in connection therewith and any collateral posted in respect thereof shall be deemed Acquired Assets for all purposes under this Agreement and any other agreements or documents entered into in connection herewith, and Seller shall, and shall cause its Affiliates to, sell, transfer, assign, convey and deliver to Purchaser all of its and their right, title and interest in and to the foregoing, free and clear of all Encumbrances in the same manner as the other Acquired Assets under <u>Section 1.1</u>, *mutatis mutandis*, for no additional consideration and at no cost or expense to Purchaser or its Affiliates.

6.17    <u>Acknowledgment by Purchaser</u>.

(a)    Purchaser acknowledges and agrees that it has conducted to its full satisfaction an independent investigation and verification of the business, including its financial condition, results of operations, assets, Liabilities, properties, Contracts, regulatory compliance, business risks and prospects of Seller and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the Transactions, Purchaser and the Purchaser Group have relied solely on the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, Seller, any information, statements, disclosures, documents, Projections, forecasts or other material made available to Purchaser or any of its Affiliates or their respective Advisors in the Dataroom, the Information

50

Presentation, or the Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Seller Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Seller Representations). Purchaser acknowledges and agrees that (i) the Express Seller Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the Transactions and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Seller Representations) including in the Dataroom, Information Presentation, Projections, meetings, calls or correspondence with management of Seller, any of the Seller Parties or any other Person on behalf of Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of Seller's assets, are, in each case, specifically disclaimed by Seller, on its behalf and on behalf of the Seller Parties. Purchaser: (x) disclaims reliance on the items in <u>clause (ii)</u> in the immediately preceding sentence (which, for the avoidance of doubt, do not include any Express Seller Representations); and (y) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in <u>clause (i)</u> in the immediately preceding sentence. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees that neither Seller or any other Person (including the Seller Parties), has made, is making or is authorized to make, any representations or warranties, whether in written, electronic or oral form, express or implied with respect to, (1) any potentially material information regarding Seller or any of its assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (2) as to the quality, merchantability, fitness for a particular purpose, or condition of Seller's business, operations, assets, Liabilities, Contracts, regulatory compliance, business risks and prospects or any portion thereof, except, in each case, solely to the extent set forth in the Express Seller Representations.

       (b)    Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of Seller, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of Seller, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "<u>Projections</u>"). Purchaser acknowledges and agrees that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Seller, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

    6.18   <u>IT Migration</u>. From and after the date hereof until one hundred twenty (120) days after the Closing Date, upon Purchaser's request, Seller shall, and shall cause its Affiliates to, use reasonable best efforts to make available all relevant technical staff, employees and representatives

US-DOCS\137411268.27

of Seller and its Affiliates, including the Chief Technology Officer of Seller and its Affiliates, to Purchaser and its Affiliates, to (a) assist Purchaser and its Affiliates in understanding all Business Software and Business Accounts, (b) assist with the Integration Plan, (c) transition of all accounts with third party sites necessary to support the Voyager Platform and its associated mobile applications, (d) address the logistics of transferring the Business Software and Business Accounts to Purchaser, including providing Purchaser with access to all credentials to GitHub accounts and other repositories for storage of source code for the Business Software, and (e) any other technical assistance that Purchaser or any of its Affiliates deems reasonably necessary to enable all migrations, integrations and Transactions. Purchaser hereby grants Seller a limited, non-exclusive, non-transferable, non-sublicensable and revocable license to access and use the Business Software for the sole purpose of providing the support to Purchaser as contemplated in this <u>Section 6.18</u>. Seller and its Affiliates may not use, modify, share, disclose or revise such Business Software for any other purpose. Seller shall bear all costs and expenses associated with the provision of such services on or prior to the Closing Date pursuant to this <u>Section 6.18</u>. Purchaser shall bear the reasonable and documented costs and expenses incurred by Seller in connection with the provision of such services during the 120-day period after the Closing Date pursuant to this <u>Section 6.18</u>. Seller can provide no assurance that Seller 's employees will elect to remain employed by Seller prior to or following the Closing and Seller will not be required to replace any such resigning employees.

6.19   <u>Confidentiality</u>.

(a)   Each Party acknowledges that Confidential Information has been, and in the future will be, provided to it in connection with this Agreement and the Transactions, including under <u>Section 6.2</u>.

(b)   Seller acknowledges that from and after the Closing, all non-public information relating to the Acquired Assets and the Assumed Liabilities will be valuable and proprietary to Purchaser and its Affiliates. Seller agrees that, from and after the Closing, Seller will not, and will cause their Affiliates and Advisors not to, directly or indirectly, without the prior consent of Purchaser, disclose to any Person any Confidential Information relating to Purchaser and its Affiliates, the Acquired Assets or the Assumed Liabilities.

(c)   Notwithstanding anything to the contrary herein, the provisions of this <u>Section 6.19</u> will not prohibit any disclosure (i) required by applicable Law, Order or the rules of a securities exchange to which it is subject, (ii) in connection with a regulatory inquiry by a Governmental Body or self-regulatory organization, (iii) as necessary in connection with Seller's bankruptcy process or (iv) to each Party's Advisors who have been informed of the confidential nature of the information and have been instructed to keep such information confidential. Purchaser acknowledges and understands that this Agreement may be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders and that, except as prohibited herein, such disclosure will not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement or otherwise. Each Party agrees that such Party will be responsible for any breach or violation of the provisions of this <u>Section 6.19</u> by any of such Party's Affiliates. Each Party acknowledges and agrees that the remedies at law for any breach or threatened breach of this <u>Section 6.19</u> by Seller or Purchaser are inadequate to protect Purchaser or Seller and its Affiliates, as applicable, and that the damages resulting from any such

US-DOCS\137411268.27

breach are not readily susceptible to being measured in monetary terms. Accordingly, without prejudice to any other rights or remedies otherwise available to either Party or its Affiliates, each Party acknowledges and agrees that upon any breach or threatened breach by a Party of the terms and conditions of this <u>Section 6.19</u>, the other Party and its Affiliates, as applicable will be entitled to immediate injunctive relief and to seek an order restraining any threatened or future breach from any court of competent jurisdiction without proof of actual damages or posting of any bond in connection with any such remedy. The provisions of this <u>Section 6.19</u> will survive the Closing and terminate two (2) years after the Closing Date.

6.20  <u>Acquired Assets Owned by Non-Debtors</u>. To the extent any item set forth in <u>Schedule 6.20</u> or any other asset used in or relating to the Cryptocurrency custody and trading business of Seller constitutes property of Voyager IP, LLC, and, but for this <u>Section 6.20</u>, is of a type that would constitute an Acquired Asset (disregarding solely for this purpose any reference to "of Seller" or other reference indicating ownership, licensing, holding, leasing or use of any type of Acquired Asset by Seller), Seller shall cause Voyager IP, LLC's right, title and interest in and to such item or asset to be transferred (for no additional consideration) to Purchaser reasonably promptly after Closing as an Acquired Asset as if transferred at the Closing in accordance with the other provisions of this Agreement, including by designating Voyager IP, LLC as an additional assignor under the Trademark and Domain Name Assignment Agreement.

6.21  <u>Seller Expenses</u>.

(a)  Purchaser shall (i) at the Closing bear as a component of the Purchase Price pursuant to <u>Section 2.1(a)</u>, without duplication, the Seller Expenses or (ii) if this Agreement is validly terminated in accordance with its terms, pay to Seller, within three (3) Business Days following such termination, cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Seller in an amount equal to the Seller Expenses; <u>provided</u> that notwithstanding anything to the contrary herein, (A) in no event shall the aggregate amount of Seller Expenses payable by Purchaser hereunder exceed the Seller Expense Cap, (B) any fees and expenses (including reasonable and documented out-of-pocket financial advisor and legal fees, expenses and disbursements) incurred by Seller or any of its Affiliates, or otherwise relating to the activities or operations of Seller or any of its Affiliates, on or prior to the Seller Expense Start Date shall not constitute Seller Expenses, and (C) (x) if the Closing or the termination of this Agreement occurs on or prior to the Seller Expense Start Date, (y) if this Agreement is terminated pursuant to (1) <u>Section 8.1(b)</u> or <u>Section 8.1(c)</u> by Purchaser, or by Seller in circumstances where Purchaser would be entitled to terminate this Agreement pursuant to <u>Section 8.1(e)</u>, or (2) <u>Section 8.1(e)</u>, <u>Section 8.1(g)</u>, <u>Section 8.1(h)</u> or <u>Section 8.1(i)</u>, or (z) the Closing does not occur on or prior to the Seller Expense Start Date due to any act or omission by Seller or any of its Affiliates or any material breach of this Agreement by Seller, then in each case the Seller Expenses shall be zero (0).

(b)  For purposes of this Agreement, "<u>Seller Expenses</u>" means all reasonable and documented costs, fees, and expenses (including reasonable and documented out-of-pocket financial advisor and legal fees, expenses and disbursements) incurred by or behalf of any Debtor during the period beginning on the Seller Expense Start Date and ending on the earlier of (i) the Closing Date and (ii) the date on which this Agreement is validly terminated in accordance with its terms, in each case (A) solely in connection with maintaining its operations in the Ordinary

53

Course or by professionals in connection with the Bankruptcy Case, (B) that Seller would not have otherwise incurred if the Closing had occurred on or prior to the Seller Expense Start Date, and (C) which fees and expenses of such professional are approved by the Bankruptcy Court.

6.22    Purchaser Expenses.

(a)    If this Agreement is terminated (i) by Seller pursuant to <u>Section 8.1(c)</u>, in circumstances where Purchaser would be entitled to terminate this Agreement pursuant to <u>Section 8.1(e)</u>, or (ii) pursuant to <u>Section 8.1(e)</u>, <u>Section 8.1(g)</u>, <u>Section 8.1(h)</u> or <u>Section 8.1(i)(ix)</u>, then Seller shall pay to Purchaser, within three (3) Business Days following such termination, cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Purchaser in an amount equal to the Purchaser Expenses; <u>provided</u> that notwithstanding anything to the contrary herein, in no event shall the aggregate amount of Purchaser Expenses payable by Seller hereunder exceed $5,000,000; <u>provided further</u> that if this Agreement is validly terminated by Seller pursuant to <u>Section 8.1(g)</u> (x) in order for Seller to pursue a Liquidation as a result of and following any Effect with respect to Purchaser's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, or any Effect with respect to Purchaser's Affiliates that has an Effect on Purchaser's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, that, individually or in the aggregate with all other such Effects, would reasonably be expected to (1) prevent or materially impair or materially delay the ability of Purchaser to consummate the Transactions in accordance herewith or (2) materially and adversely affect the Users, Eligible Creditors, or the Acquired Coins on the Binance.US Platform, including following the Closing, as compared to users and Coins on the Binance.US Platform as of the date hereof, and (y) such termination was not effected (1) in connection with a Higher and Better Offer or (2) because the estimated proceeds from such Liquidation are or would reasonably be expected to be greater than the Closing Date Payment (plus the fair market value of any Acquired Coins or any proceeds therefrom, in each case, as determined at the time Seller commences such Liquidation), then no Purchaser Expenses shall be payable.

(b)    For purposes of this Agreement, "<u>Liquidation</u>" means any combination of one or more of the following: (i) a plan under chapter 11 of the Bankruptcy Code that provides for sales or liquidation of the Debtors' assets through a transaction (other than a sale of substantially all of the Debtors' assets to one purchaser on a going concern basis), including the Plan, (ii) one or more sales of assets pursuant to section 363 of the Bankruptcy Code other than a sale of substantially all of the Debtors' assets to one purchaser on a going concern basis, (iii) conversion of the Bankruptcy Case to cases under chapter 7 of the Bankruptcy Code, (iv) foreclosure or other exercise of remedies (including a deed in lieu of foreclosure) by or in favor of one or more creditors, (v) abandonment of the Debtors' assets to a creditor, or (vi) a dismissal of the Bankruptcy Cases.

(c)    For the purposes of this Agreement, "<u>Purchaser Expenses</u>" means all reasonable and documented fees and expenses (including reasonable and documented out-of-pocket legal fees, expenses and disbursements) incurred by Purchaser since August 5, 2022, in connection with, arising from or related to efforts to purchase the Acquired Assets (as defined in the Bidding Procedures Order), which, for the avoidance of doubt, includes its evaluation,

negotiation and pursuit of the Transactions, this Agreement and the other documents and agreements contemplated hereby (the "Purchaser Bid Process").

(d)     All amounts payable to Purchaser pursuant to Section 6.22(a) upon termination of this Agreement shall be payable in cash by wire transfer of immediately available funds to such bank account as shall be designated by Purchaser in writing, and without the requirement of any notice or demand from Purchaser or any application to or order of the Bankruptcy Court other than the Agreement Order.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1     <u>Conditions Precedent to the Obligations of Purchaser and Seller</u>. The respective obligations of each Party to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)     there shall be no Law or Order (including any temporary restraining order or preliminary or permanent injunction) in effect restraining, enjoining, making illegal or otherwise prohibiting the Transactions;

(b)     the Bankruptcy Court shall have entered the Agreement Order, which Agreement Order shall (i) be in form and substance reasonably acceptable to Purchaser, (ii) comply in all respects with Section 5.1(b), and (iii) be a Final Order; and

(c)     the Bankruptcy Court shall have entered the Confirmation Order, in form and substance, solely with respect to matters relating to this Agreement or the Transactions, reasonably acceptable to Purchaser, confirming a Plan in form and substance, solely with respect to matters relating to this Agreement or the Transactions, reasonably acceptable to Purchaser, and the Confirmation Order shall be a Final Order.

7.2     <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     (i) the representations and warranties of Seller set forth in Article III (in each case, other than the Fundamental Representations and the representations and warranties set forth in Section 3.16(a)) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be so true and correct only as of such date and (y) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; <u>provided</u> that for purposes of the immediately preceding clause (i), the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect; (ii) the representations and warranties set forth in Section 3.1(a) (*Organization and Qualification*), Section 3.2 (*Authorization of Agreement*), Section 3.3(a)(i) (*Conflicts; Consents*), Section 3.6(a) (*Exclusive Ownership*), and Section 3.14 (*Brokers*) (collectively, the

"Fundamental Representations") shall be true and correct in all but *de minimis* respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all but *de minimis* respects only as of such date; and (iii) the representations and warranties set forth in Section 3.16(a) shall be true and correct in all respects as of the date hereof and as of the Closing Date as though made on and as of the Closing Date;

(b)       Seller shall not have materially breached any of the covenants required to be performed or complied with by Seller under this Agreement on or prior to the Closing; provided that notwithstanding the foregoing, Seller shall have performed or caused to be performed, in all respects, all of the obligations and covenants required by Section 6.15(a) and (b); and

(c)       Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.4.

7.3       Conditions Precedent to the Obligations of Seller. The obligations of Seller to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)       the representations and warranties made by Purchaser in Article IV shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be so true and correct only as of such date and (y) where the failure of such representations or warranties to be so true and correct has not and would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions; provided that for purposes of this Section 7.3(a), the qualifications as to materiality, material adverse effect and words of similar import contained in such representations and warranties shall not be given effect;

(b)       Purchaser shall not have materially breached any of the covenants required to be performed or complied with by Purchaser under this Agreement on or prior to the Closing; and

(c)       Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 2.5.

7.4       Waiver of Conditions.  Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. Neither Purchaser nor Seller may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's material breach of any covenant, representation or warranty hereunder.

US-DOCS\137411268.27

# ARTICLE VIII

# TERMINATION

8.1     <u>Termination of Agreement</u>. This Agreement may be terminated only in accordance with this <u>Section 8.1</u>. This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Seller and Purchaser;

(b)     by written notice of either Purchaser or Seller, upon the issuance of an Order by a Governmental Body restraining, enjoining or otherwise prohibiting the consummation of the Transactions or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; <u>provided</u> that no termination may be made by a Party under this <u>Section 8.1(b)</u> if the issuance of such Order was caused by such Party's material breach of any of its representation, warranties, covenants or agreements hereunder;

(c)     by written notice of either Purchaser or Seller, if the Closing shall not have occurred on or before the date that is four (4) months following the date hereof (the "<u>Outside Date</u>"); <u>provided</u> that Purchaser may, at its election and upon written notice to Seller, elect to extend the Outside Date for an additional thirty (30) days (such extended date, the "<u>Extended Outside Date</u>" ); <u>provided</u> <u>further</u> that a Party shall not be permitted to terminate this Agreement, or extend the Outside Date, pursuant to this <u>Section 8.1(c)</u> if the failure of the Closing to have occurred by the Outside Date or Extended Outside Date, as applicable, was caused by such Party's material breach of any of its representation, warranties, covenants or agreements;

(d)     by written notice from Seller to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser is or will have become untrue, in each case, such that the conditions set forth in <u>Section 7.1</u> or <u>Section 7.3</u> would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; <u>provided</u> that (i) if such breach is curable by Purchaser then Seller may not terminate this Agreement under this <u>Section 8.1(d)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date or Extended Outside Date, if any, and (B) thirty (30) days after Seller notifies Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(d)</u> will not be available to Seller at any time that Seller is in material breach of, any covenant, representation or warranty hereunder;

(e)     by written notice from Purchaser to Seller, upon a breach of any covenant or agreement on the part of Seller, or if any representation or warranty of Seller is or will have become untrue, in each case, such that the conditions set forth in <u>Section 7.2(a)</u> or <u>Section 7.2(b)</u> would not be satisfied; <u>provided</u> that (i) if such breach is curable by Seller then Purchaser may not terminate this Agreement under this <u>Section 8.1(e)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date or Extended Outside Date, if any, and (B) thirty (30) days after Purchaser notifies Seller of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(e)</u> will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

57

(f)     by written notice from Seller to Purchaser, if (A) all of the conditions set forth in <u>Sections 7.1</u> and <u>7.2</u> have been and continue to be satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived, (B) Seller has confirmed in writing to Purchaser that all of the conditions set forth in <u>Sections 7.1</u> and <u>7.2</u> have been and continue to be satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Seller stands ready, willing and able to consummate the Closing so, and (C) Purchaser fails to consummate the Closing within three (3) Business Days of its receipt of such written notice from Seller;

(g)     by written notice from Seller to Purchaser, which may be revocable in the sole discretion of Seller by written notice from Seller to Purchaser within five (5) Business Days, if Seller or the board of directors (or similar governing body) of Seller determine, in good faith and after consultation with its legal and other advisors, that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties; <u>provided</u> that if such determination is in connection with an Acquisition Proposal, Seller may only terminate this Agreement pursuant to this <u>Section 8.1(g)</u> upon compliance with the provisions set forth in <u>Section 5.2(c)</u>;

(h)     by written notice from Purchaser to Seller, if (A) Seller seeks or otherwise take material steps in furtherance of, or do not use reasonable best efforts to oppose any other Person in seeking, an order of the Bankruptcy Court dismissing the Bankruptcy Case or converting the Bankruptcy Case to a petition for relief under Chapter 7 of the Bankruptcy Code, (B) the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Seller is appointed in the Bankruptcy Case or (C) the Bankruptcy Court enters an order pursuant to section 362 of the Bankruptcy Code lifting the automatic stay with respect to any Acquired Assets; or

(i)     by written notice from Purchaser to Seller, if:

(i)     the Agreement Order is not entered by January 6, 2023;

(ii)     the Plan Solicitation Motion and the Amended Disclosure Statement are not filed with the Bankruptcy Court by December 21, 2022;

(iii)     the Plan Solicitation Order is not entered by January 6, 2023;

(iv)     the Confirmation Order is not entered by March 1, 2023;

(v)     Seller or any of the other Debtors file any motions, pleadings, notices or other documents with the Bankruptcy Court in material breach of <u>Section 5.7</u>;

(vi)     Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser, or the Bankruptcy Court approves an Alternative Transaction other than with Purchaser;

US-DOCS\137411268.27

(vii)    Seller has delivered a Higher Offer Determination Notice to Purchaser;

(viii)    Seller or its Affiliates or Advisors have committed a breach of Section 5.1(a); or

(ix)    Seller or its Affiliates or Advisors have committed a breach of, Section 5.2; provided that (without modifying Purchaser's rights to terminate this Agreement under any other Section of this Agreement) Purchaser shall not be entitled to terminate this Agreement pursuant to this Section 8.1(i)(ix) following entry of the Agreement Order by the Bankruptcy Court.

8.2    Effect of Termination.

(a)    In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and there shall be no Liability on the part of either Party or any of its partners, officers, directors or shareholders; provided that Section 2.2, Section 6.2(b), Section 6.12(c), Section 6.19, Section 6.21, Section 6.22, this Section 8.2, Section 8.3, Section 8.4 and Article X (other than Section 10.12 with respect to the availability of an injunction or injunctions, specific performance or other equitable relief to cause the Closing to occur, which shall terminate upon any termination of this Agreement) and the definitions referenced in such Sections and Articles, even if not included in such Sections and Articles, and, for the avoidance of doubt, the Confidentiality Agreement, shall survive any such termination; provided further that, subject to Section 8.3, no termination will relieve either Party from any Liability for damages (including damages based on the loss of the economic benefits of the Transactions, including the Purchase Price, to Seller), losses, costs, or expenses (including reasonable legal fees and expenses) resulting from any willful breach of this Agreement by such Party prior to any such termination or Fraud by such Party. For purposes of this Agreement, "willful breach" means with respect to any breaches or failures to perform any of the covenants or other agreements contained herein, a material breach that is a consequence of an act or failure to act undertaken by the breaching Person with actual knowledge (which shall not be deemed to include knowledge of facts that a Person acting reasonably should have, based on reasonable due inquiry) that such Person's act or failure to act would, or would reasonably be expected to, result in or constitute a material breach of this Agreement.

(b)    If this Agreement is terminated prior to the Closing, at any time following such termination, promptly following the written request of Seller, Purchaser shall, as soon as practicable, return, destroy or permanently erase (on all forms of physical and electronic media) all Acquired User Data transferred to Purchaser prior to the Closing in accordance with Section 6.6(a) or otherwise in connection with the KYC Procedures and permanently close and remove any account established with or with reference to any Acquired User Data, and, upon written request from Seller following any destruction or erasure of data, provide an officer's certificate certifying as to such destruction or erasure. Such destruction or erasure shall be in accordance with all Laws regarding data disposal, and the eradication and destruction technique used will be appropriate for the storage medium and format. Notwithstanding the foregoing, Purchaser shall have the right to retain a copy of the Acquired User Data to the extent required for legal, regulatory or compliance purposes, so long as such Acquired User Data is kept confidential

59

as required under this Agreement and the Confidentiality Agreement and is used for no other purpose.

8.3    <u>Reverse Termination Fee</u>. In the event that (a) the conditions set forth in <u>Sections 7.1(b)</u>, <u>7.1(c)</u>, and <u>7.2</u> have been satisfied or duly waived and (b) (i) this Agreement is validly terminated in accordance with <u>Section 8.1(b)</u> or <u>Section 8.1(c)</u>, (ii) Purchaser fails to consummate the Closing by the Outside Date or the Extended Outside Date, as applicable, as a result of the failure of the conditions set forth in <u>Section 7.1(a)</u>, or (iii) this Agreement is terminated pursuant to <u>Section 8.1(g)</u> in connection with and following a Purchaser Development and not in connection with a Higher and Better Offer, then, in any such case, within three (3) Business Days following such valid termination the Deposit (including all received investment income, if any) shall be released to Seller (such release, which, for the avoidance of doubt, shall be equal to and shall not exceed $10,000,000 in the aggregate, the "<u>Reverse Termination Fee</u>").

8.4    <u>Further Effect of Termination</u>. Notwithstanding anything to the contrary in this Agreement, the Confidentiality Agreement or any other document or instrument delivered by either Party in connection with the Transactions, but subject in all respects to the other provisions of this <u>Section 8.4</u>:

(a)    Seller, on behalf of itself and the Seller Parties, acknowledges and agrees that any disbursement of the Deposit to Seller pursuant to <u>Section 2.2(b)</u>, payment of any Seller Expenses to Seller pursuant to <u>Section 6.21</u> or payment of the Reverse Termination Fee pursuant to <u>Section 8.3</u> shall be deemed liquidated damages and shall be the sole and exclusive recourse of Seller and the Seller Parties against Purchaser and the Purchaser Group for any loss or damage suffered in connection with, relating to or arising out of this Agreement or the Transactions (including circumstances giving rise to any termination of this Agreement) and including losses or damages suffered as a result of any breach of this Agreement or any representation, warranty, covenant or agreement contained herein by Purchaser or the failure of the Transactions to be consummated (whether or not for intentional, unintentional or willful breach or otherwise), except in the event Seller is entitled to elect specific performance of Purchaser's obligations (including to consummate the Transactions) pursuant to <u>Section 10.12</u>.

(b)    In the event of a valid termination of this Agreement pursuant to <u>Section 8.1</u>, if Seller is entitled to receive the Deposit pursuant to <u>Section 2.2</u>, payment of any Seller Expenses pursuant to <u>Section 6.21</u>, or payment of the Reverse Termination Fee pursuant to <u>Section 8.3</u>, then, upon release of the Deposit to Seller in accordance with <u>Section 2.2(b)</u>, payment of such Seller Expenses pursuant to <u>Section 6.21</u> or payment of the Reverse Termination Fee pursuant to <u>Section 8.3</u>, as applicable, (i) Purchaser and the Purchaser Group shall not have any further liability or obligation relating to or arising out of this Agreement or the Transactions (including any liability or obligation for monetary damages) and (ii) neither Seller nor any of the Seller Parties will have any right of recovery, whether arising under contract Law, tort Law or any other theory of Law, against, and no personal liability shall attach to Purchaser or any other member of the Purchaser Group, whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil, by the enforcement of any assessment or by any legal or equitable Action, by virtue of any statute, regulation or applicable Law, or otherwise.

60

(c)      (i) The maximum aggregate liability of Purchaser and the Purchaser Group in connection with this Agreement and the Transactions shall be limited to the sum of (x) (1) solely where and to the extent the Deposit is forfeited by Purchaser in accordance with <u>Section 2.2(b)</u>, the Deposit or (2) without duplication of any forfeiture of the Deposit pursuant to <u>Section 2.2(b)</u> and solely where and to the extent the Reverse Termination Fee is payable in accordance with <u>Section 8.3</u>, the Reverse Termination Fee, <u>plus</u> (y)  solely where and to extent the Seller Expenses are payable in accordance with <u>Section 6.21</u>, the Seller Expenses; (ii) in no event shall Purchaser be obligated to pay any of the Deposit, the Seller Expenses or the Reverse Termination Fee on more than one occasion and (iii) under no circumstances will any of Seller or any of the Seller Parties seek, obtain or accept, monetary damages or losses of any kind (including damages for the loss of the benefit of the bargain, opportunity cost, loss of premium, time value of money or otherwise, or any consequential, special, expectancy, indirect or punitive damages or any losses or damages based on a multiple or multiplier) in connection with, relating to or arising out of the termination of this Agreement in excess of the sum of (A) (1) solely where and to the extent the Deposit is forfeited in accordance with <u>Section 2.2(b)</u>, the Deposit or (2) without duplication of any forfeiture of the Deposit pursuant to <u>Section 2.2(b)</u> and solely where and to the extent the Reverse Termination Fee is payable in accordance with <u>Section 8.3</u>, the Reverse Termination Fee, <u>plus</u> (B) solely where and to the extent the Seller Expenses are payable in accordance with <u>Section 6.21</u>, the Seller Expenses; <u>provided</u>, <u>however</u>, that the foregoing shall not been interpreted to limit in any way Seller's right to require specific performance of Purchaser's obligations (including to consummate the Transactions) pursuant to <u>Section 10.12</u> in the event this Agreement has not been terminated and to the extent such specific performance is available to Seller under <u>Section 10.12</u>.  Notwithstanding anything to the contrary herein or otherwise, in no event shall Seller be entitled to receive both (1) the forfeiture of the Deposit together with all received investment income, if any, pursuant to <u>Section 2.2(b)</u> and (2) the payment of the Reverse Termination Fee pursuant to <u>Section 8.3</u> (it being acknowledged that the payment of the Reverse Termination Fee pursuant to <u>Section 8.3</u> includes forfeiture of the Deposit together with all received investment income, if any).

(d)      Seller may seek both payment of monetary damages (including the Reverse Termination Fee, the Deposit or the Seller Expenses) in accordance with this Agreement, on the one hand, and specific performance of Purchaser's obligation to consummate the Closing pursuant to <u>Section 10.12</u>; provided that in no event shall Seller be entitled to receive both (1) payment of monetary damages (including the Reverse Termination Fee, the Deposit or the Seller Expenses) in accordance with this Agreement (and for the avoidance of doubt, subject to the other limitations thereon set forth in this <u>Section 8.4</u>) and (2) such specific performance pursuant to <u>Section 10.12</u>.

## ARTICLE IX

## TAXES

9.1      <u>Transfer Taxes</u>. Any sales, use, purchase, transfer, deed, stamp, documentary or other similar Taxes and recording charges (but excluding any such Taxes or charges that are based in whole or in part upon income, profits or gains) payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "<u>Transfer Taxes</u>") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes.

US-DOCS\137411268.27

9.2    Cooperation. Purchaser and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes. In furtherance thereof, Purchaser and Seller shall reasonably cooperate in good faith to determine and agree to the tax treatment to each of them and to the Users of the Transactions, provided that agreeing on consistent tax treatment shall not be a closing condition and neither Party shall have any liability under this Agreement if the Parties are unable to so agree.

9.3    Preparation of Tax Returns and Payment of Taxes.

(a)    Except as otherwise provided by Section 9.1, Seller shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets for any Tax period ending on or before the Closing Date and (ii) all Tax Returns of Seller (including, for the avoidance of doubt, for any Straddle Period, but not including, for the avoidance of doubt, information returns). With respect to any such Tax Return that reflects any Tax that is an Assumed Liability (not including, for the avoidance of doubt, any income Tax Return of Seller or Seller's Affiliates for any tax period and not including any information Tax Return), Seller shall use reasonable best efforts to (x) prepare such Tax Returns consistent with past practice, except as otherwise required by applicable Law, (y) provide Purchaser with a draft of such Tax Returns at least ten (10) days prior to the filing of any such Tax Return, and (z) incorporate any changes reasonably requested by Purchaser with respect to such Tax Returns prior to filing. Except to the extent any Tax reflected on a return required to be prepared and filed by Seller pursuant to this Section 9.3 constitutes an Assumed Liability, Seller shall be responsible for paying any Taxes reflected on any Tax Return that Seller is obligated to prepare and file under this Section 9.3(a). Notwithstanding anything herein to the contrary: (i) nothing in this Agreement shall give Purchaser or its Affiliates any rights with respect to or control over any income Tax Return of Seller or Seller's Affiliates for any tax period (any such Tax Return, a "Seller Income Tax Return"), and (ii) if any Governmental Body approaches (including by way of initiating any audit, investigation, or other proceeding) either Party with respect to the income Tax characterization of the Transactions (any such action, a "Transaction-Related Action"), then the Party in receipt of such notice shall reasonably promptly inform the other Party of such Transaction-Related Action.

(b)    Purchaser shall prepare and timely file all Tax Returns with respect to the Acquired Assets that are not addressed by Section 9.3(a) (including, for the avoidance of doubt, all Tax Returns with respect to the Acquired Assets for any taxable period beginning after the Closing Date). With respect to any such Tax Return for any Straddle Period that reflects any Tax that is an Excluded Liability (each, a "Relevant Tax Return"), Purchaser shall prepare such Relevant Tax Returns and shall provide Seller with a draft of such Relevant Tax Returns at least ten (10) days prior to the filing of any such Tax Return. Purchaser shall incorporate any changes reasonably requested by Seller with respect to such Tax Returns. Seller shall be responsible for paying any Taxes reflected on any Tax Return that Purchaser is obligated to prepare and file under this Section 9.3(b) to the extent such Taxes constitute Excluded Liabilities.

(c)    Purchaser shall not file any amendment to any previously filed Tax Return with respect to the Acquired Assets for any Pre-Closing Tax Period that would have the effect of increasing any Tax due for a Pre-Closing Tax Period or portion of a Straddle Period ending on the Closing Date, in each case, that is an Excluded Liability, unless Purchaser receives an opinion

US-DOCS\137411268.27

from a nationally recognized accounting firm or law firm that there is no adequate "reporting position" with respect to any previously-asserted position with respect to Taxes. Upon such determination, Purchaser shall provide no less than forty-five (45) days' notice of such position before filing any such Tax Return. In the event Seller disagrees with such Tax position, and the dispute cannot be resolved between the Parties, such dispute shall be submitted to an independent national accounting firm or law firm for resolution, with the costs of such resolution to be evenly split by Purchaser and Seller. The determination of such independent national accounting firm or law firm shall be binding on both Parties and any Tax Return shall be filed consistently with such resolution.

(d)     For all purposes under this Agreement, in respect of any Straddle Period, the portion of Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date will be: (i) in the case of any Taxes other than those described in clause (ii) below, deemed to include the amount that would be payable if the relevant Straddle Period ended on and included the Closing Date; and (ii) in the case of any property Taxes and other similar Taxes, deemed to include the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the number of days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

(e)     Notwithstanding anything herein to the contrary, prior to the Closing, Seller and its Affiliates may contribute, assign or otherwise transfer the 3AC Loan to any third-party purchaser, trust or other entity.

## ARTICLE X

## MISCELLANEOUS

10.1   <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years and (b) are an integral part of the Transactions and that, without the agreements set forth in this <u>Section 10.1</u>, neither of the Parties would enter into this Agreement.

63

10.2    Expenses. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, Section 8.2), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that all Transfer Taxes will be allocated pursuant to Section 9.1 and (c) all Cure Costs will be allocated pursuant to Section 5.4.

10.3    Notices. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

> Notices to Purchaser:
>
> BAM Trading Services, Inc. d/b/a Binance.us
> 611 Cowper Street, Suite 400
> Palo Alto, CA 94301
> Attention:    Norman Reed, General Counsel
> Email:    norman.reed@binance.us;
>     legal@binance.us
>
> with a copy to (which shall not constitute notice):
>
> Latham & Watkins LLP
> 1271 Avenue of the Americas
> New York, NY 10020
> Attention:    Robert M. Katz
>     Daniel Mun
>     Adam J. Goldberg
>     Andrew D. Sorkin
> Email:    Robert.Katz@lw.com
>     Daniel.Mun@lw.com
>     Adam.Goldberg@lw.com
>     Andrew.Sorkin@lw.com

US-DOCS\137411268.27

Notices to Seller:

Voyager Digital, LLC
33 Irving Place, 3rd Floor
New York, NY 10003

Attention:      Stephen Ehrlich
                David Brosgol
Email:          sehrlich@investvoyager.com
                dbrosgol@investvoyager.com

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022

Attention:      Joshua A. Sussberg, P.C.
                Christine A. Okike, P.C.
                Christopher Marcus, P.C.
                Jonathan L. Davis, P.C.
                Steve Toth
                Eduardo M. Leal
                Allyson B. Smith
Email:          joshua.sussberg@kirkland.com
                christine.okike@kirkland.com
                cmarcus@kirkland.com
                jonathan.davis@kirkland.com
                steve.toth@kirkland.com
                eduardo.leal@kirkland.com
                allyson.smith@kirkland.com

10.4    Binding Effect; Assignment. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Agreement Order, the Plan and the Confirmation Order, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Seller, and any attempted assignment or delegation without such prior written consent shall be null and void; provided further that Purchaser shall be entitled to assign or delegate this Agreement or all or any part of its rights or obligations hereunder to any of its Affiliates; provided further that in each case no such assignment or delegation shall relieve Purchaser of any of its obligations hereunder.

10.5    Amendment and Waiver. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Seller or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any

65

way any other provision or prior or subsequent breach or default. Except where a specific period for action or inaction is provided herein, no delay on the part of either Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

10.6    Third Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement is intended or will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    Non-Recourse. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future direct or indirect equityholder, shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of either Party will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8    Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction. To the extent permitted by applicable Law, each Party waives any provision of Law that renders any provision of this Agreement invalid or unenforceable in any respect.

10.9    Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The table of contents and headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    Schedules. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; however, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, to the extent it is readily apparent on its face without the need for a cross-reference. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and neither Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or

US-DOCS\137411268.27

included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by either Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11 <u>Complete Agreement</u>. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements between the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12 <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if either of the Parties fails to take any action required of it hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Seller nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that either Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order. Except as limited by <u>Section 8.4(d)</u>, (i) the remedies available to Seller pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and (ii) the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit Seller from seeking to collect or collecting damages. If, prior to the Outside Date or Extended Outside Date, if any, either Party brings any action, in each case in accordance with <u>Section 10.13</u>, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date or Extended Outside Date, if any, will automatically be extended

67

(y) for the period during which such action is pending, plus ten (10) Business Days or (z) by such other time period established by the court presiding over such action, as the case may be.

      10.13    Jurisdiction and Exclusive Venue. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the Transactions brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) ((a) and (b), the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the Transactions. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of either Party to serve process in any other manner permitted by Law.

      10.14    Governing Law; Waiver of Jury Trial.

      (a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the Transactions will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

      (b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE

US-DOCS\137411268.27

AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15   <u>No Right of Set-Off</u>. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

10.16   <u>Counterparts and PDF</u>. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17   <u>Publicity</u>. The initial press release regarding this Agreement and the Transactions (the "<u>Press Release</u>") shall be made promptly following the execution and delivery of this Agreement and shall be in such form as the Parties mutually agree. Except as contemplated by the Commercial Covenants, and subject in all respects to <u>Section 10.19</u>, none of Seller and the Seller Parties shall issue any press release or public announcement (directly or indirectly) concerning this Agreement, the Transactions, the Acquired Assets, the Assumed Liabilities, the Purchaser Bid Process or any other matters related thereto or arising in connection therewith without obtaining the prior written approval of Purchaser (which approval will not be unreasonably withheld, conditioned or delayed) unless, (a) in the reasonable judgment of Seller after consultation with counsel (who may be in-house counsel), disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or the Plan or (b) to correct any misstatement of fact made by Purchaser in any communication pursuant to the immediate next sentence; <u>provided</u> that Seller shall use its

69

reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with Purchaser with respect to the disclosure thereof. Following the publication of the Press Release, Purchaser shall be permitted to make one or more public statements or issue one or more press releases, in each case, regarding the Acquired Assets and the Assumed Liabilities, this Agreement, the Transactions and the Purchaser Bid Process or any other matter related thereto or arising therefrom or otherwise in connection therewith to the extent not in violation of the Confidentiality Agreement and not in disparagement of Seller or any Seller Party; provided that Purchaser shall use its reasonable best efforts (considered in light of the circumstances in which such disclosure is to be made) to consult in good faith with Seller prior to making any such disclosure.

10.18   Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Confirmation Order. In furtherance of the foregoing, to the extent permitted by applicable Laws, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

10.19   Fiduciary Obligations. Nothing in this Agreement, or any document related to the Transactions, will require Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations; provided, however, that no such action or inaction shall be deemed to prevent Purchaser from exercising any termination rights it may have hereunder as a result of such action or inaction.

10.20   No Solicitation. This Agreement, the Plan and the transactions contemplated herein and therein are the product of negotiations between the Parties. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, (a) a solicitation of votes for the acceptance of the Plan or any other plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act or the Exchange Act and Seller will not solicit acceptances of the Plan from any party until such party has been provided with copies of a disclosure statement containing adequate information as required by section 1125 of the Bankruptcy Code.

10.21   Acknowledgment. Notwithstanding anything in this Agreement to the contrary (including Section 3.17, Section 3.18, Section 4.10, Section 4.11, Section 6.17 and Section 10.1), nothing herein shall relieve any Person from any Liability on account of Fraud.

70

# ARTICLE XI

# ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1    Certain Definitions.

(a)    "3AC Loan" means that certain Master Loan Agreement, dated March 4, 2022, by and between Three Arrows Capital, Ltd., as borrower, and Seller and HTC Trading, Inc., as lenders, and Seller in its capacity as administrative agent for the lenders.

(b)    "Acquired Coins" means, collectively, all Seller Held Coins (other than Withheld Coins) as of the Rebalancing Date and following the completion of the Rebalancing Exercise in accordance with this Agreement, and after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring such Coins to Purchaser in accordance with Section 2.4(b).

(c)    "Acquired Coins Value" means, with respect to any Acquired Coin of any type, the VWAP of such Coin determined as of two Business Days prior to the Rebalancing Date.

(d)    "Action" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination, assessment, notice of violation, citation or investigation, of any kind whatsoever (civil, criminal, administrative, regulatory, investigative, appellate or otherwise), regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

(e)    "Additional Bankruptcy Distributions" means any distributions proposed to be made by the Debtors or any successor thereto to Users or Eligible Creditors after the Closing Date, whether made pursuant to the Plan (including distributions in cash or Coins) or otherwise.

(f)    "Advisors" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(g)    "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(h)    "Alternative Transaction" means any transaction (or series of transactions), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition of Seller or any of its Affiliates or any

71

portion of the equity interests or any material portion of the assets thereof (in any form of transaction, whether by merger, sale of assets or equity or otherwise).

(i)     "Bidding Procedures Order" means the *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation and (V) Granting Related Relief* [Docket No. 248].

(j)     "Binance.US Platform" means Purchaser's and its Affiliates' Binance.US Cryptocurrency savings and trading platform or any successor platform thereto.

(k)     "Business Accounts" means any and all accounts or registries that Seller owns, maintains or controls with third party vendors, software providers, service providers and other similar third parties that is related to the businesses of Seller.

(l)     "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(m)     "Business Software" means any and all proprietary Software owned by (or purported to be owned by) Seller that is related to the businesses of Seller, other than the VGX Token Smart Contracts.

(n)     "Cash and Cash Equivalents" means all of Seller's cash (including deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, or any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(o)     "Code" means the United States Internal Revenue Code of 1986.

(p)     "Coin" means, with respect to any type of Cryptocurrency, one coin or token or full unit of such Cryptocurrency (*e.g.*, one (1) Bitcoin); provided that, notwithstanding anything to the contrary herein, for purposes of this Agreement, (i) references to "Coins" shall mean more than one Coin and may include fractional Coins in excess of one (1) Coin, and (ii) as the context requires, "Coin" may refer to a fraction of one (1) Coin.

(q)     "Commercial Covenants" means, collectively, Sections 6.6, 6.10, 6.11, 6.12, 6.13, 6.14 and 6.15.

(r)     "Confidential Information" means any information relating to the business, financial or other affairs (including future plans and targets) of either Party or any of its Affiliates; provided, however, that "Confidential Information" will not include any information that (i) is or becomes (other than as a result of disclosure by either Party or any of its Affiliates in violation of this Agreement) generally available to, or known by, the public, (ii) is independently developed by a Party or any of its Affiliates without use of or reference to information that would be "Confidential Information" but for the exclusions set forth in this proviso or (iii) is received by a

US-DOCS\137411268.27

Party or any of its Affiliates from a third party not known by such receiving Party or any of its Affiliates after reasonable inquiry to be bound by a duty of confidentiality to such other Party or any of its Affiliates with respect to such information.

(s)    "<u>Confidentiality Agreement</u>" means that certain letter agreement, dated as of August 2, 2022, by and between Parent and BAM Management US Holdings, Inc.

(t)    "<u>Confirmation Order</u>" means an Order of the Bankruptcy Court reasonably acceptable to the Parties pursuant to section 1129 of the Bankruptcy Code, which Order shall, among other things and without limitation, (A) confirm the Plan in a form reasonably acceptable to, solely to the extent related to this Agreement and the Transactions (but not with respect to the matters contemplated by <u>Section 6.11(c)</u>), Purchaser and Seller, as may have been amended, supplemented or otherwise modified, solely to the extent related to this Agreement and the Transactions (but not with respect to the matters contemplated by <u>Section 6.11(c)</u>), with the consent of Purchaser (such consent not to be unreasonably withheld, delayed or conditioned), (B) approve, pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Seller of its obligations under this Agreement, (C) authorize and empower Seller to assume and assign to Purchaser the Assigned Contracts, (D) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (E) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity (including under applicable Money Transmitter Requirements or any securities or commodities Laws of any Governmental Body), (F) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts, (G) find that Purchaser shall have no Liability for any Excluded Liability, and (H) find that Seller has title to, and the ability to sell, transfer and assign, Acquired Coins and Additional Bankruptcy Distributions, in each case, in accordance with the terms and conditions hereof.

(u)    "<u>Consent</u>" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(v)    "<u>Contract</u>" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than a purchase order, service order, sales order or Money Transmitter License.

(w)    "<u>Credit Matter</u>" means any loan or other type of credit exposure or loan-like instrument.

(x)     "Cryptocurrency" means a digital or crypto currency, asset, token or coin in which transactions are verified and records are maintained by a decentralized system using cryptography, rather than by a centralized authority.

(y)     "Deposited Coins" means, with respect to each User as of the Petition Date, the total number of Coins of each type owed to such User with respect to such User's deposits on the Voyager Platform as of the Petition Date, as set forth on the Seller Statement.

(z)     "Deposited Coins Value" means, with respect to any Deposited Coin of any type, the VWAP of such Coin determined as of the Petition Date.

(aa)    "Disclosure Statement" means the disclosure statement for the Plan approved by the Bankruptcy Court pursuant to the Plan Solicitation Order (including all exhibits and schedules thereto).

(bb)    "Documents" means all of Seller's written files, documents, instruments, papers, books, reports, records, accounts, accounting records, financial statements, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(cc)    "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, servitudes, restrictive covenants, rights of way, rights of use or possession, rights of first offer or first refusal, third party interest, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(dd)    "Environmental Laws" means all applicable Laws concerning pollution or protection of the environment.

(ee)    "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

(ff)    "ERISA" means the Employee Retirement Income Security Act of 1974.

(gg)    "ETH Coins" means Ether Coins, being the native Cryptocurrency of the Ethereum Network (symbol: ETH).

(hh)    "Existing User" means as of a particular date any User for which Seller has provided on or prior to such date all data and information reasonably necessary for Purchaser to

74

validate that such User or any Affiliate of such User has a Cryptocurrency account on the Binance.US Platform.

(ii)    "Exchange Act" means the Exchange Act of 1934 and the rules and regulations promulgated thereunder.

(jj)    "Final Order" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending; or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

(kk)    "Fraud" means an act committed by (a) Seller, in the making to Purchaser of the Express Seller Representations and (b) Purchaser, in the making to Seller of the Express Purchaser Representations, in any such case, with intent to (x) deceive the other Party or (y) induce such other party hereto to enter into this Agreement and requires (i) a false representation or warranty of material fact made in such representation; (ii) with knowledge that such representation or warranty is false; (iii) with an intention to induce the party to whom such representation or warranty is made to act or refrain from acting in reliance upon it; (iv) causing that party, in justifiable reliance upon such false representation or warranty, to take or refrain from taking action; and (v) causing such party to suffer damage by reason of such reliance, which together constitutes common law fraud under Delaware Law (and does not include any fraud claim based on constructive knowledge, negligent misrepresentation, recklessness or a similar theory).

(ll)    "GDPR" means the EU General Data Protection Regulation (and any European Union member states' laws and regulations implementing it), and the EU General Data Protection Regulation as it forms part of the United Kingdom ("UK") law by virtue of section 3 of the European Union (Withdrawal) Act 2018 and any applicable implementing or supplementary legislation of the UK (including the UK Data Protection Act 2018).

(mm)  "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

US-DOCS\137411268.27

(nn)    "<u>Governmental Body</u>" means any government, quasi-governmental entity, or other governmental or regulatory body, commission, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(oo)    "<u>Hazardous Substance</u>" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

(pp)    "<u>Higher and Better Offer</u>" means a bona fide, written Acquisition Proposal that did not result from Seller's breach of <u>Section 5.1(a)</u> for an Alternative Transaction on terms that the board of directors (or comparable governing body) of Seller determines in good faith, after consultation with its financial advisor and outside legal counsel, (i) constitutes a higher and otherwise better offer for the Debtors' assets and (ii) is reasonably likely to be consummated in accordance with its terms.

(qq)    "<u>IFRS</u>" means the International Financial Reporting Standards.

(rr)    "<u>Intellectual Property</u>" means all intellectual property rights in any jurisdiction throughout the world, including all: (i) patents and patent applications and patent disclosures (including any provisional applications, patents of addition, continuations, continuations-in-part, substitutions, additions, divisionals, confirmations, re-examinations, reissues, revisions and extensions); (ii) trademarks, service marks, trade dress, logos, brand names, corporate names, social media handles, Internet domain names and other indicia of origin, together with all goodwill associated with each of the foregoing; (iii) copyrights and mask works, whether or not registered; (iv) registrations and applications for any of the foregoing; (v) trade secrets; (vi) Software; (vii) drawings, schematics and other technical plans; (viii) rights in data, data collections and databases; (ix) all other intellectual property; and (x) all legal rights arising from items (i) through (ix), including the right to prosecute, enforce and perfect such interests and rights to sue, oppose, cancel, interfere, enjoin and collect damages based upon such interests.

(ss)    "<u>IT Systems</u>" means all of the computer systems, servers, hardware, firmware, middleware, networks, workstations, routers, hubs, switches, circuits, servers, data communications lines and all other information technology equipment, and all associated documentation, in each case, only as necessary to use or operate the Voyager Platform.

(tt)    "<u>Knowledge of Seller</u>" means the actual knowledge without independent verification (and which in no event encompasses constructive, imputed or similar concepts of knowledge) of Stephen Ehrlich, Gerard Hanashe, and Rakesh Gidwani, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

(uu)    "<u>Knowledge of Purchaser</u>" means the actual knowledge without independent verification (and which in no event encompasses constructive, imputed or similar concepts of knowledge) of Brian Shroder, Krishna Juvvadi and Abhishek Baid, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

(vv)    "<u>KYC Procedures</u>" means the "know your customer" and "Customer Identification Program" policies, procedures and processes of Purchaser and its Affiliates as in effect from time to time and any equivalent procedures required under, or to comply with, applicable Law, in each case, including with respect to FCPA and any other applicable U.S. or foreign Law concerning anti-corruption, anti-bribery or anti-money laundering and consistent with the same applicable to other customers and users of Binance.US Platform.

(ww)    "<u>Law</u>" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(xx)    "<u>Liability</u>" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, perfected or unperfected, determined or determinable, disputed or undisputed, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, at law or in equity or otherwise, including any claims or liability based on successor liability theories or otherwise under any theory of Law or equity, and including all costs and expenses related thereto.

(yy)    "<u>Loan</u>" means any loan made by Seller in the form of Cryptocurrency to counterparties in the cryptocurrency sector; <u>provided</u> that, the 3AC Loan shall not be deemed a Loan.

(zz)    "<u>Loan Documents</u>" means all agreements and documents relating to Loans and the 3AC Loan, including security agreements, pledge or collateral agreements, loan agreements, loan policies and manuals.

(aaa)    "<u>Material Adverse Effect</u>" means any matter, event, change, development, occurrence, circumstance, condition, occurrence or effect (each, an "<u>Effect</u>") that, individually or in the aggregate with all other Effects, (x) has had or would reasonably be expected to have a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole or (y) has had or would reasonably be expected to have a material adverse effect on the ability of Seller to perform its obligations under this Agreement or any of the Seller Documents or to consummate the Transactions; <u>provided</u> that with respect to clause (x) none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) Effects in, arising from or relating to general business or economic conditions affecting the industry in which Seller and its Affiliates operate; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any

other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from or relating to financial, banking, securities or Cryptocurrency markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, Cryptocurrency or index and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (v) Effects in, arising from or relating to changes in, IFRS or the interpretation thereof; (vi) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body; (vii) Effects in, arising from or relating to (A) the taking of any action contemplated by this Agreement or at the written request of Purchaser or its Affiliates, (B) the failure to take any action if such action is expressly prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1, (D) the negotiation, announcement or pendency of this Agreement or the Transactions, the identity, nature or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (viii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect); (ix) the Effect of any action taken by Purchaser or its Affiliates with respect to the Transactions or any breach by Purchaser of this Agreement or the matters set forth on Schedule 11.1(aaa); or (x)(A) the commencement or pendency of the Bankruptcy Case, (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions or thereby, (2) the Agreement Order, the Confirmation Order, the Plan, or the reorganization of Seller, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Assigned Contract, or (C) any Order of the Bankruptcy Court or any actions or omissions of Seller in compliance therewith; except in the case of clauses (i), (ii), (iii), (iv), (v) and (vi), to the extent such Effects have a materially disproportionate impact on the Acquired Assets and Assumed Liabilities, taken as a whole, as compared to other participants engaged in the business in which Seller operates.

(bbb)   "Moelis" means Moelis & Company LLC, a Delaware limited liability company.

(ccc)   "Money Transmitter License" means any consent, license, certificate, franchise, permission, variance, clearance, registration, qualification, authorization, waiver, exemption or other permit issued, granted, given or otherwise made available by or under the authority of any Governmental Body pursuant to state money transmission or similar Laws.

78

(ddd)    "Money Transmitter Requirements" shall mean any and all Law or Contract with a Governmental Body relating or pertaining to the business of transmitting or remitting money, monetary value or virtual currency, electronic funds transfers, remittances, issuing or selling stored value, prepaid access or the like, issuing or selling payment instruments, the custody, transfer or exchange of money, monetary value or virtual currency, or any similar payment or money services, including those related to money, monetary value, or Cryptocurrency.

(eee)    "Net Owed Coins" means, with respect to each User and each type of such User's Post-Rebalancing Coins, a number of Coins of such type equal to the total number of such User's Post-Rebalancing Coins of such type. For the avoidance of doubt, except as the context may otherwise require, references to Net Owed Coins in this Agreement relating to payments to any User or credits thereof to any User shall be deemed to be the sum of all Net Owed Coins with respect to each type of Post-Rebalancing Coin of such User. Notwithstanding the foregoing, in the event that there is a Rebalancing Exercise Delta for any type of Coin, then (i) Purchaser shall convert any excess Acquired Coins of any type into USDC or United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform, and (ii) Purchaser shall distribute the amounts resulting from such conversions to User accounts with respect to Net Owed Coins where the aggregate number of Net Owed Coins exceeds the number of Acquired Coins, pro rata based on the then-prevailing prices (including applicable fees, spreads, costs and expenses) for all such Net Owed Coins on the Binance.US Platform owed to any such User.

(fff)    "Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, whether preliminary, interim, temporary or final, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Confirmation Order) or any other court.

(ggg)    "Ordinary Course" means the ordinary and usual course of operations of the business of Seller consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Case.

(hhh)    "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) customary easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the use, ownership or operation of the Acquired Assets, (iii) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, being contested in good faith, (iv) licenses granted on a non-exclusive basis, (v) such other Encumbrances or title exceptions which do not, individually or in the aggregate, materially affect the operation, value or condition of the Acquired Assets, (vi) any Encumbrances set forth on Schedule 11.1(hhh), or (viii) any Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan.

(iii)    "Permitted Post-Closing Lien" means, with respect to the Acquired Assets (a) Encumbrances described in clause (ii) in the definition of "Permitted Encumbrances" and any non-monetary encumbrances not in fact released upon Closing pursuant to Confirmation Order or

US-DOCS\137411268.27

Plan, as applicable; <u>provided</u> that with respect to all Encumbrances that are "Permitted Post-Closing Liens" pursuant to this clause (a), such Encumbrances do not materially detract from the use or value of the applicable property as it is currently being used, and (b) other Permitted Encumbrances described in clauses (i), (iii), (iv) and (v) in the definition of "Permitted Encumbrances" securing monetary obligations which, individually or in the aggregate with all other Permitted Encumbrances treated as Permitted Post-Closing Liens pursuant to this clause (b), do not exceed $10,000.

   (jjj) "<u>Person</u>" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

   (kkk) "<u>Personal Information</u>" means information, in any form, that identifies, relates to, describes, could be used to locate or contact, is capable of being associated with, or could be linked, directly or indirectly, to, a natural Person, device or household, or is otherwise considered "personally identifiable information," "personal information," "personal data," "nonpublic personal information," or any similar term by any applicable Laws or Privacy Law.

   (lll) "<u>Plan</u>" means a plan of reorganization prepared by Seller and solely to the extent related to this Agreement (but not with respect to the matters contemplated by <u>Section 6.11(c)</u>) and the Transactions, approved by Purchaser in its reasonable discretion, and attached as an Exhibit to this Agreement by amendment hereto as promptly as practicable, implementing the Transactions.

   (mmm)"<u>Plan Solicitation Motion</u>" means Seller's motion for an Order (which solely with respect to matters relating to this Agreement and the Transactions, shall be in form and substance reasonably acceptable to Purchaser), (i) approving the Disclosure Statement (including approving the Disclosure Statement as containing "adequate information" (as that term is used by section 1125 of the Bankruptcy Code)), (ii) establishing a voting record date for the Plan, (iii) approving solicitation packages and procedures for the distribution thereof, (iv) approving the forms of ballots, (v) establishing procedures for voting on the Plan, (vi) establishing notice and objection procedures for the confirmation of the Plan and (vii) establishing procedures for the assumption or assignment of executory contracts and unexpired leases under the Plan.

   (nnn) "<u>Plan Solicitation Order</u>" means an Order entered by the Bankruptcy Court, substantially in the form attached to the Plan Solicitation Motion, which Order shall, among other things, (A) be in form and substance reasonably acceptable to Purchaser (solely with respect to matters relating to this Agreement and the Transaction), and (B) approve the relief sought in the Plan Solicitation Motion, including approving of (i) the Disclosure Statement on a conditional basis and (ii) the procedures for solicitation of votes to accept or reject the Plan.

   (ooo) "<u>Plan Supplement</u>" has the meaning set forth in the Plan.

   (ppp) "<u>Post-Petition Coins</u>" means Coins that were deposited with the Debtors following the Petition Date.

   (qqq) "<u>Post-Rebalancing Coins</u>" means, with respect to each User as of the Rebalancing Date and each type of such User's Deposited Coins, (i) the total number of such

US-DOCS\137411268.27

User's Deposited Coins of such type, <u>multiplied</u> by (ii) the Rebalancing Ratio, as set forth on the Seller Statement.

(rrr)    "<u>Pre-Closing Tax Period</u>" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

(sss)    "<u>Privacy Laws</u>" means all applicable Laws and legally binding self-regulatory guidelines or standards, in each case as amended, consolidated, re-enacted or replaced from time to time, relating to the privacy, security, or Processing of Personal Information, data breach notification, website and mobile application privacy policies and practices, Processing and security of payment card information, and email, text message, or telephone communications, including (to the extent applicable to the business of Seller): the Federal Trade Commission Act; the Gramm-Leach-Bliley Act; the Telephone Consumer Protection Act; the Telemarketing and Consumer Fraud and Abuse Prevention Act; the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003; the California Consumer Privacy Act; the Computer Fraud and Abuse Act; the Payment Card Industry Data Security Standards; the GDPR; and the EU e-Privacy Directive 2002/58/EC as amended by Directive 2009/136/EC (and any European Union member states' laws and regulations implementing it).

(ttt)    "<u>Process</u>", "<u>Processed</u>" or "<u>Processing</u>" means any operation or set of operations which is performed on Personal Information, such as the use, collection, processing, storage, recording, organization, adaption, alteration, transfer, retrieval, consultation, disclosure, dissemination or combination of such Personal Information, or is otherwise considering "processing" by any applicable Privacy Laws.

(uuu)    "<u>Purchaser Development</u>" means any of the following, first occurring after the date hereof and prior to the Closing:  (i) the filing of a criminal complaint against, or indictment of, Purchaser or any of its executive officers or "C-suite" officers (including any chief risk officer or chief compliance officer) by the United States Department of Justice, (ii) the filing of a criminal complaint against, or indictment of, any of Purchaser's Affiliates or any of their executive officers or "C-suite" officers (including any chief risk officer or chief compliance officer) by the United States Department of Justice or (iii) the commencement of any criminal or regulatory (including at the appellate level) suit, litigation, legal proceeding or prosecution by the United States Department of Justice against any of the Persons described in clauses (i) and (ii), (A) in each case of clauses (i), (ii) and (iii) that relate to the operation of the Binance.US platform and wallet custody business of Purchaser and its Subsidiaries or the business of such Affiliate or the ability of such Affiliate to provide Purchaser and its Subsidiaries with the licensed software and support services necessary to operate the Binance.US Platform; and (B) in each case of clauses (ii) and (iii), that, individually or in the aggregate, would reasonably be expected to (1) prevent or materially impair or materially delay the ability of Purchaser to consummate the Transactions in accordance herewith or (2) materially and adversely affect the Users, Eligible Creditors or the Acquired Coins, in each case in a manner that would prevent Purchaser from performing its obligations under <u>Section 6.12</u> or otherwise following the Closing.

(vvv)    "<u>Purchaser Group</u>" means Purchaser, any former, current or future Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

81

(www) "Rebalancing Exercise Delta" means, with respect to any Acquired Coin, the percentage by which the number of Acquired Coins is higher or lower than the number of Acquired Coins which would be required to cause the number of Acquired Coins to be in full compliance with the Rebalancing Ratio.

(xxx)   "Rebalancing Ratio" means, with respect to any type of Acquired Coin, a fraction, expressed as a percentage, (i) the numerator of which is the Total Acquired Coins Value, and (ii) the denominator of which is the Total Deposited Coins Value; provided that in no event will the Rebalancing Ratio be greater than 100% and for the avoidance of doubt, the Rebalancing Ratio shall be calculated following the completion of the Rebalancing Exercise and after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring Coins to Purchaser in accordance with Section 2.4(b).

(yyy)   "Retained Avoidance Action" means any preference or avoidance claim, right or cause of action under Chapter 5 of the Bankruptcy Code or any analogous state law claim against (i) Three Arrows Capital, Ltd. or any of its Affiliates, (ii) any insider as defined in the Bankruptcy Code, (iii) any other such claim, right or cause of action that Purchaser agrees in writing prior to the Closing may be retained by the Debtors, (iv) any person for an actual fraudulent transfer, and (v) West Realm Shires Inc., Alameda Ventures Ltd., or any of their Affiliates.

(zzz)   "Sanctioned Person" means any Person that is the target of Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the OFAC or the U.S. Department of State, the United Nations Security Council, the European Union, any Member State of the European Union, or the United Kingdom (irrespective of its status vis-à-vis the European Union); (b) any Person operating, organized, or resident in a country or territory that is itself the target of comprehensive Sanctions (as of the date of this Agreement, Cuba, Iran, North Korea, Syria, the Crimea region of Ukraine, the so-called Donetsk People's Republic, and the so-called Luhansk People's Republic) ("Sanctioned Country"); (c) the government of a Sanctioned Country or the Government of Venezuela; or (d) any Person 50% or more owned or controlled by any such Person or Persons or acting for or on behalf of such Person or Persons.

(aaaa) "Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

(bbbb) "Security Incident" means any actual or suspected unauthorized access to, or acquisition, modification, use, destruction, loss or disclosure of any Personal Information maintained by or on behalf of Seller or its Affiliates.

(cccc) "Seller Expense Cap" means an amount equal to either (a) if Purchaser elects to extend the Outside Date to the Extended Outside Date pursuant to Section 8.1(c), $15,000,000 or (b) if Purchaser does not so elect to extend the Outside Date, $10,000,000.

(dddd) "Seller Expense Start Date" means the date that is three months following the date of this Agreement.

(eeee) "Seller Held Coins" means, without duplication, as of any date of determination, all Coins that are directly or indirectly owned or held by, or attributable to, Seller

82

or any of its Affiliates who are Debtors (including, for the avoidance of doubt, all Coins repaid to Seller or any of its Affiliates who are Debtors at or prior to the Closing in respect of Loans (including in respect of any principal, interest, fees, expenses and penalties thereunder and including for this purpose, the 3AC Loan), including all Coins held by or on behalf of Seller or any of its Affiliates who are Debtors in respect of User accounts on the Voyager Platform), except for any Coins constituting collateral under the 3AC Loan and except any Post-Petition Coins, which for the avoidance of doubt, shall not be included in the Rebalancing Exercise or any other Transactions.

(ffff) "Seller Intellectual Property" means all Intellectual Property owned or purported to be owned by Seller that is an Acquired Asset.

(gggg) "Seller Parties" means Seller, its former, current, or future Affiliates and the former, current or future officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns of the foregoing.

(hhhh) "Seller Plan" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Seller or Holdings or to which Seller or Holdings is obligated to contribute or with respect to which Seller or Holdings has any Liability.

(iiii) "Software" means any and all computer programs and other software in any form or format, including firmware, middleware, software implementations of algorithms, models and methodologies, whether in source code, object code or other form, including libraries, frameworks, software development kits (SDKs), application programming interfaces (APIs), subroutines, toolsets, procedures, and other components thereof.

(jjjj) "Straddle Period" means any taxable period that includes but does not end on the Closing Date.

(kkkk) "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(llll)    "Subject Transaction" means (a) a transaction or series of transactions with respect to the Rebalancing Exercise that involves a series of transactions or other actions that are (or are to be) executed with a Person or group of coordinated Persons that are intended to effectuate the Rebalancing Exercise or (b) the planning or negotiation of such transaction or series of transactions, or consulting with respect thereto and, for the avoidance of doubt, does not include individual trades of Coins by Seller that are not intended to effectuate the Rebalancing Exercise or that are components of Subject Transactions that are the subject of a Transaction Notice or any such transactions with respect to Coins that do not trade on the Binance.US Platform as of the date of the proposed Subject Transaction.

(mmmm)    "Tax" or "Taxes" means any federal, state, local, foreign or other taxes, charges, fees or other assessments, including income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, escheat and unclaimed property, ad valorem, personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative or add-on minimum or estimated tax, charge or assessment of any kind in the nature of (or similar to) taxes, including any interest, penalty or addition thereto, whether disputed or not.

(nnnn) "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes filed or required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(oooo) "Total Acquired Coins Value" means the aggregate Acquired Coins Value with respect to all Acquired Coins of each type (excluding Withheld Coins).

(pppp) "Total Deposited Coins Value" means the aggregate Deposited Coins Value with respect to all Deposited Coins of each type.

(qqqq) "Transactions" means the transactions contemplated by this Agreement or the Plan, as applicable.

(rrrr)    "Unsupported Coin" means any Coin, for which Purchaser or its Affiliates does not provide trading services on the Binance.US Platform.

(ssss)    "User" means any Person located and having a home address in the United States that had a Cryptocurrency account on the Voyager Platform as of the Petition Date; provided that, if a Person has multiple Cryptocurrency accounts on the Voyager Platform, such Person shall constitute a single User and all accounts of such User shall be aggregated for purposes of this Agreement.

(tttt)    "User Migration Preparation" means, collectively, (i) the completion of the transfer of all Acquired User Data (including, for the avoidance of doubt, any "know your customer" information of the Users) and integration thereof on Purchaser's and its Affiliates' information technology systems and the Binance.US Platform, and (ii) the completion of the other items identified in the Integration Plan as being required for accounts to be opened for Users on the Binance.US Platform.

84

(uuuu) "User Asset Migration Date" means the date that is four (4) weeks following the date of completion of the User Migration Preparation; provided that the completion of the User Migration Preparation shall not occur prior to the Closing Date.

(vvvv) "VGX Token Smart Contracts" means any "smart contracts" related to the VGX token, together with any private keys related solely to such "smart contracts."

(wwww)    "Voyager Platform" means Seller's proprietary Cryptocurrency savings and trading platform (including any website or desktop or mobile application with respect thereto).

(xxxx) "VWAP" means, with respect to any type of Coin and as of any date of determination, an amount equal to the volume weighted average price in U.S. dollars for such type of Coin for the consecutive 24-hour period immediately prior to 8:00 a.m. New York Time on such date of determination, as reported on https://coinmarketcap.com.

11.2    Index of Defined Terms.

| | |
|---|---|
| Acquired Assets ...........................................1 | Debtors..........................................................1 |
| Acquired Information ...................................2 | Deposit .........................................................9 |
| Acquired User Data ......................................2 | DPA .............................................................18 |
| Acquired Voyager Claims ............................2 | Eligible Creditor ........................................42 |
| Acquisition Proposal...................................26 | Enforceability Exceptions...........................12 |
| Agreement.....................................................1 | Environmental Permits ...............................18 |
| Agreement Order .........................................25 | Escrow Account............................................9 |
| Amended Disclosure Statement...................27 | Escrow Agent................................................9 |
| Anti-Money Laundering Laws .................17 | Excluded Assets............................................3 |
| Assigned Contracts .......................................3 | Excluded Contracts.......................................3 |
| Assignment and Assumption | Excluded Documents.....................................3 |
| Agreement...............................................10 | Excluded Liabilities......................................6 |
| Assumed Liabilities ......................................5 | Express Purchaser Representations ...........24 |
| Authentication Credentials .........................14 | Express Seller Representations.................21 |
| Balance Sheet Date .....................................13 | Extended Outside Date ...............................57 |
| Bankruptcy Case ...........................................1 | FCPA...........................................................17 |
| Bankruptcy Code ..........................................1 | Filed CSA Documents ................................11 |
| Bankruptcy Court..........................................1 | Financial Statements...................................13 |
| Cash Payment ...............................................8 | Fundamental Representations.....................56 |
| Chosen Courts..............................................68 | Higher Offer Determination Notice...........27 |
| Closing ..........................................................9 | Holdings.........................................................1 |
| Closing Date ...............................................10 | Indebtedness ...............................................30 |
| Closing Date Payment .................................8 | Information Presentation ............................21 |
| Covered Matters...........................................29 | Integration Plan..........................................41 |
| Credited Additional Bankruptcy | Leased Real Property...................................15 |
| Distributions...........................................49 | Liquidation ..................................................54 |
| CSA..............................................................11 | Material Contract ........................................15 |
| Cure Costs .....................................................5 | OFAC............................................................17 |
| Dataroom .....................................................21 | Outside Date ...............................................57 |

US-DOCS\137411268.27

Parent ...........................................................1
Parties ..........................................................1
Party .............................................................1
Paul Hastings ............................................29
Petition Date ...............................................1
Petitions ......................................................1
Post-Bankruptcy Statement ........................49
Pre-Closing Data Transfer .........................38
Press Release ..............................................69
Privacy Requirements.................................19
Projections .................................................51
Purchase Price..............................................8
Purchaser......................................................1
Purchaser Bid Process................................55
Purchaser Default Termination....................9
Purchaser Expenses ....................................54
Rebalancing Date........................................43
Rebalancing Exercise..................................43
Relevant Tax Return ...................................62
Reverse Termination Fee ............................60
Sanctions....................................................17
Seller ............................................................1
Seller Contractors ......................................34
Seller Documents........................................12
Seller Employees ........................................34
Seller Expenses...........................................53
Seller Income Tax Return ...........................62
Seller Marks................................................39
Seller Registered IP ...................................18
Seller Statement .........................................44
Solvent .......................................................24
Staked Coins...............................................14
Successor Liabilities ...................................29
Trademark and Domain Name
    Assignment Agreement..........................10
Transaction Notice......................................43
Transaction Offer Notice ............................43
Transaction-Related Action ........................62
Transfer Taxes ............................................61
Unsupported Jurisdiction ...........................45
Unsupported Jurisdiction Approvals .........22
Voyager User Accounts...............................2
WARN Act ................................................35
Withheld Coins ............................................9

US-DOCS\137411268.27

11.3    <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    Accounting terms which are used but not otherwise defined in this Agreement have the respective meanings given to them under IFRS as in effect on the date hereof or for the period with respect to which such principles are applied, consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under IFRS, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)    The words "to the extent" shall mean "the degree by which" and not "if."

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)    Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)    The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)    All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)    All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)    Any document or item will be deemed "delivered," "provided" or "made available" by Seller, within the meaning of this Agreement, if such document or item is included in the Dataroom at least one (1) Business Day prior to the date hereof.

(k)    Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

   (l)  Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; <u>provided</u> that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

   (m)  A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

<p align="center">(<em>Signature pages follow.</em>)</p>

US-DOCS\137411268.27

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**BAM TRADING SERVICES INC. D/B/A BINANCE.US**

By: _Brian Shroder_ _____
DocuSigned by:
ACA2F0AF79BC412...

Name: Brian Shroder
Title: Chief Executive Officer

*Signature Page to Asset Purchase Agreement*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**VOYAGER DIGITAL, LLC**

By: _Stephen Ehrlich_ _____
Name: Stephen Ehrlich
Title:   Chief Executive Officer

# **EXHIBIT A**

## **FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

(See attached.)

A

## BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

This BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into as of [●], by and between BAM Trading Services Inc. d/b/a Binance.us, a Delaware corporation ("Purchaser") and Voyager Digital, LLC, a Delaware limited liability company ("Seller").

WHEREAS, Seller and Purchaser have entered into that certain Asset Purchase Agreement, dated as of December 18, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), providing for, among other things, the sale and assignment by Seller to Purchaser of the Acquired Assets and the assumption by Purchaser of the Assumed Liabilities;

WHEREAS, Seller desires to sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, pursuant to the terms of, and in consummation of the transactions contemplated by, the Purchase Agreement;

WHEREAS, the execution and delivery of this Agreement is required by Sections 2.4(a) and 2.5(b) of the Purchase Agreement; and

WHEREAS, this Agreement, as duly executed by Seller and Purchaser, is being delivered as of the date hereof by each party hereto to the other party effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and intending to be legally bound hereby, Seller and the Purchaser hereby agree as follows:

1.      Definitions.  Capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement.

2.      Transfer of Acquired Assets.  Subject to the terms and conditions of the Purchase Agreement and the Agreement Order, the Plan and the Confirmation Order, Seller does hereby sell, transfer, assign, convey and deliver to Purchaser, and Purchaser does hereby purchase, acquire and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).

3.      Assignment and Assumption.  Subject to the terms and conditions of the Purchase Agreement and the Agreement Order, the Plan and the Confirmation Order, Purchaser does hereby irrevocably assume from Seller, and Seller shall irrevocably transfer, assign, convey, and deliver to Purchaser, and Purchaser does hereby take assignment of, all of Seller's right, title and interest in and to, as of the Closing, the Assigned Contracts free and clear of all Encumbrances (other than Permitted Encumbrances). Subject to the terms and conditions of the Purchase Agreement and the Agreement Order, the Plan and the Confirmation Order, Purchaser does hereby assume the Assumed Liabilities.

4.      Excluded Assets.  Notwithstanding anything to the contrary in this Agreement or in the Purchase Agreement, Seller shall not and does not hereby sell, transfer, assign, convey or

deliver to Purchaser, and Seller shall retain all right, title and interest to, and Purchaser shall not and does not hereby purchase, acquire or accept, or take assignment of, any of the Excluded Assets.

5.    Excluded Liabilities.  Notwithstanding anything to the contrary in this Agreement or in the Purchase Agreement, Purchaser shall not assume, be deemed to have assumed or be obligated to pay, perform or otherwise discharge or otherwise be liable in respect of or be responsible for, and hereby disclaims, any of the Excluded Liabilities.

6.    Terms of the Purchase Agreement.  This Agreement is executed and delivered pursuant to the Purchase Agreement.  In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail in all respects to the extent of such conflict.  Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall this Agreement be construed to, extend, amplify, modify, limit or otherwise alter in any way the terms and conditions of the Purchase Agreement (including, without limitation, any representation, warranty, covenant or obligation contained in the Purchase Agreement).

7.    Governing Law.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

8.    Successors and Assigns. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Agreement Order, the Plan and the Confirmation Order, Seller, and shall inure to the benefit of and be so binding on the parties hereto and their respective successors and permitted assigns under the Purchase Agreement.

9.    Counterparts.  For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

10.    Additional Provisions. The provisions contained in Sections 6.8 (*Further Assurances*), 10.5 (*Amendment and Waiver*), 10.6 (*Third Party Beneficiaries*), 10.8 (*Severability*), 10.9 (*Construction*), 10.13 (*Jurisdiction and Exclusive Venue*) and 10.14(b) (*Waiver of Jury Trial*) of the Purchase Agreement are hereby incorporated by reference into this Agreement, *mutatis mutandis*, and made a part of this Agreement as if set forth fully herein.

*[The remainder of this page is intentionally left blank.]*

 

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<u>**SELLER**</u>**:**

**VOYAGER DIGITAL, LLC**

_____
Name:
Title:

**PURCHASER:**

**BAM TRADING SERVICES INC. D/B/A BINANCE.US**


By:_____
Name:
Title:

## EXHIBIT B

**FORM OF TRADEMARK AND DOMAIN NAME ASSIGNMENT AGREEMENT**

(See attached.)

*Final Version*

# TRADEMARK AND DOMAIN NAME ASSIGNMENT

This TRADEMARK AND DOMAIN NAME ASSIGNMENT (this "<u>Assignment</u>"), effective as of [●] (the "Effective Date"), is made by Voyager Digital, LLC, a Delaware limited liability company ("<u>Voyager Digital</u>") and Voyager IP, LLC (f/k/a CryptoTrading IP LLC), a Delaware limited liability company ("<u>Voyager IP</u>," each of Voyager Digital and Voyager IP individually, an "<u>Assignor</u>," and together, the "<u>Assignors</u>"), to BAM Trading Services Inc. d/b/a Binance.us, a Delaware corporation ("<u>Assignee</u>"). Assignors and Assignee are each referred to individually as a "Party" and together as the "Parties."

**WHEREAS**, Voyager Digital and Assignee have executed an Asset Purchase Agreement, effective as of December 18, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Purchase Agreement</u>"), pursuant to which Voyager Digital has agreed to sell, transfer, assign and convey and to cause Voyager IP to sell, transfer, assign and convey to Assignee, and Assignee has agreed to purchase, acquire and accept from Assignors, all of such Assignor's right, title and interest in and to certain intellectual property assets to Assignee;

**WHEREAS**, the assets assigned pursuant to the Purchase Agreement include the intellectual property listed in <u>Exhibit A</u> attached hereto (the "<u>Assigned IP</u>");

**WHEREAS**, Assignee is a successor to that part of Assignors' business to which the Assigned IP pertain, and that business is ongoing and existing; and

**WHEREAS**, pursuant to the Purchase Agreement, Voyager Digital has agreed to execute this Assignment and to cause Voyager IP to execute this Assignment in order to effectuate, evidence and record such Assignor's assignment of the Assigned IP to Assignee in the United States Patent and Trademark Office and corresponding offices in other applicable jurisdictions.

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties do hereby agree as follows:

**SECTION 1.** <u>Assignment</u>. Assignors hereby irrevocably conveys, assigns, transfers and delivers to Assignee and its successors and assigns, free and clear of all liens, all of such Assignor's right, title and interest in and to the Assigned IP, including all rights of priority and goodwill associated with any of the foregoing and any and all common law rights in and to any of the foregoing, all rights in and to any of the foregoing provided by applicable law of any jurisdiction, by international treaties or conventions, all rights, interests, and claims of such Assignor or any of its affiliates, all rights to collect royalties and proceeds in connection with the foregoing from and after the Effective Date, all rights to sue or otherwise recover for any past, present, or future infringement, dilution or other violations of the foregoing and all corresponding rights that, now or hereafter, may be secured throughout the world, including any deposits or prepayments with respect to any of the foregoing.

**SECTION 2.**   Recordation. Assignors hereby authorize: (i) the Commissioner for Trademarks in the United States Patent and Trademark Office, and the officials of corresponding entities or agencies in any applicable jurisdictions to record this Assignment upon request by Assignee, and (ii) the registrar of the domain names identified as such in Exhibit A to effectuate the transfers to Assignee of such domain names.

**SECTION 3.**   Further Assurances.   From and after the Effective Date, upon Assignee's request, Assignors shall (and shall cause such Assignor's Affiliates to) cooperate with and use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable on such Assignor's part under applicable law to effect and validate the assignment of the Assigned IP to Assignee.

**SECTION 4.**   Definitions.   Capitalized terms used but not defined in this Assignment have the meanings given to such terms in the Purchase Agreement.

**SECTION 5.**   Purchase Agreement.   This Assignment is executed and delivered pursuant to the Purchase Agreement. In the event of a conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail in all respects to the extent of such conflict. Notwithstanding anything to the contrary in this Assignment, nothing herein is intended to, nor shall this Assignment be construed to, extend, amplify, modify, limit or otherwise alter in any way the terms and conditions of the Purchase Agreement (including, without limitation, any representation, warranty, covenant or obligation contained in the Purchase Agreement).

**SECTION 6.**   Governing Law.   Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Assignment, and any Action that may be based upon, arising out of or related to this Assignment or the negotiation, execution or performance of this Assignment or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

**SECTION 7.**   Counterparts and PDF. This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Assignment or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original. At the request of either Party, the other Party hereto will re-execute original forms of this Assignment and deliver it to the other Party. No Party will raise the use of a facsimile machine, .PDF or other electronic transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine, .PDF or other electronic transmission as a defense to the formation of a contract and each Party forever waives any such defense.

*[Signature Page Follows]*

A-2

*Final Version*

**IN WITNESS WHEREOF**, Assignors and Assignee have caused this Assignment to be executed by its duly authorized representative as of the Effective Date.

**VOYAGER DIGITAL, LLC**

By: _____
Name:
Title:

**VOYAGER IP, LLC**

By: _____
Name:
Title:

**BAM TRADING SERVICES INC. D/B/A BINANCE.US**

By: _____
Name:
Title:

[Signature Page to Trademark and Domain Name Assignment]

# Exhibit 8

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) |
| | ) |
| Debtors. | ) |
| | ) |

Chapter 11

Case No. 22-10943 (MEW)

(Jointly Administered)

**NOTICE OF HEARING ON DEBTORS' MOTION
FOR ENTRY OF AN ORDER (I) AUTHORIZING ENTRY INTO THE
BINANCE US PURCHASE AGREEMENT AND (II) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that a hearing on the *Debtors' Motion for Entry of An Order*

*(I) Authorizing Entry Into the Binance US Purchase Agreement and (II) Granting Related Relief*

(the "Motion,") will be held on **January 5, 2023, at 1:00 p.m., prevailing Eastern Time**

(the "Hearing").  In accordance with General Order M-543 dated March 20, 2020, the Hearing will

be conducted telephonically.   Any parties wishing to participate must do so by making

arrangements through CourtSolutions by visiting https://www.court-solutions.com.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief

requested in the Motion shall:  (a) be in writing; (b) conform to the Federal Rules of Bankruptcy

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC
(8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY
10003.

Debtors
Ex-8

Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (c) be filed electronically with the Court on the docket of *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (d) be served so as to be actually received by **December 30, 2022, at 4:00 p.m., prevailing Eastern Time**, by (i) the entities on the Master Service List available on the case website of the above-captioned debtors and debtors in possession (the "Debtors") at https://cases.stretto.com/Voyager and (ii) any person or entity with a particularized interest in the subject matter of the Motion.

**PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed, served, and received will be considered at the Hearing. Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Debtors.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/Voyager. You may also obtain copies of the Motion and other pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

2

Dated:  December 21, 2022          /s/ Joshua A. Sussberg
New York, New York                 **KIRKLAND & ELLIS LLP**
                                   **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                   Joshua A. Sussberg, P.C.
                                   Christopher Marcus, P.C.
                                   Christine A. Okike, P.C.
                                   Allyson B. Smith (admitted *pro hac vice*)
                                   601 Lexington Avenue
                                   New York, New York 10022
                                   Telephone:     (212) 446-4800
                                   Facsimile:     (212) 446-4900
                                   Email:         jsussberg@kirkland.com
                                                  cmarcus@kirkland.com
                                                  christine.okike@kirkland.com
                                                  allyson.smith@kirkland.com

                                   *Counsel to the Debtors and Debtors in Possession*

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' MOTION FOR
## ENTRY OF AN ORDER (I) AUTHORIZING ENTRY INTO THE
## BINANCE US PURCHASE AGREEMENT AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") respectfully state the following in support of this motion (this "<u>Motion</u>"):[2]

### Preliminary Statement

1.     For the better part of the past year, the cryptocurrency industry experienced (and continues to experience) unprecedented turmoil.  The Debtors commenced these chapter 11 cases with the objective of consummating the most value-maximizing transaction for their customers and other creditors on an expedited timeline.  Following a thorough and extensive marketing

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]    Capitalized terms used by not defined herein shall have the meaning given to them in the Binance US Purchase Agreement or the Bidding Procedures (each as defined below), as applicable.

process, the Debtors believed they accomplished that goal with the proposed sale transaction with West Realm Shires Inc. ("WRSI" and, along with affiliates, "FTX," and the sale transaction thereunder, the "FTX Transaction"). However, and as discussed in more detail herein, the shocking collapse of FTX gutted any possibility of closing the FTX Transaction. The Debtors quickly pivoted to reengaging with alternative bidders and on December 18, 2022 executed that certain asset purchase agreement (the "Binance US Purchase Agreement") with BAM Trading Services Inc. d/b/a Binance.US ("Binance US" and the sale transaction thereunder, the "Binance US Transaction"). Importantly, the contemplated Binance US Transaction includes a "toggle" to a transaction whereby the Debtors will return cryptocurrency to creditors should they conclude that option to be in creditors' best interests and exercise their "Fiduciary Out," or should the Binance US Transaction not close by a date certain to ensure an outside date (the "Toggle Transaction").

2.       The Debtors value Binance US's bid at approximately $1.022 billion, comprised of (a) the value of cryptocurrency on the Voyager platform as of a date to be determined, which as of December 19, 2022 at 0:00 UTC, is estimated to be $1.002 billion, plus (b) additional consideration, which is estimated to provide at least $20 million of incremental value. The Debtors intend to move swiftly towards confirmation and resolution of these chapter 11 cases in order to mitigate any further delay in distributing recoveries to their creditors.

**I.       The Initial Marketing Process and Proposed Sale to FTX.**

3.       Before the Petition Date, and as discussed in the *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration"), the Debtors commenced a marketing process for an investment in, or a sale of the Debtors' business to, a third-party purchaser. Discussions with

2

interested parties, however, revealed that an in-court process would be necessary to yield the most value-maximizing transaction available to the Debtors. Accordingly, the Debtors commenced these chapter 11 cases and continued their marketing efforts postpetition.

4.      The Debtors and their advisors left no stone unturned. Over the past six months, Moelis & Company LLC ("Moelis"), the Debtors' investment banker, reached out to 96 strategic investors and financial sponsors, many of which had significant experience in the cryptocurrency industry. 60 parties executed non-disclosure agreements and were provided with access to a virtual data room with comprehensive information regarding the Debtors' business operations and financial position. The virtual data room was robust, supplemented throughout the marketing process, and contained thousands of diligence items. Moelis also held virtual diligence sessions with the Debtors and multiple interested parties.

5.      On the first day of these chapter 11 cases, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17] (as amended and restated from time to time, the "Standalone Plan"). The Standalone Plan served as a floor for the marketing process. Shortly thereafter, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126] (the "Bidding Procedures Motion," and the bidding procedures established therein, the "Bidding Procedures"),[3] which set a timeline for interested

---

[3]     The Court approved the Bidding Procedures Motion on August 5, 2022. See *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (V) Granting Related Relief* [Docket No. 248] (the "Bidding Procedures Order").

parties to submit bids for an acquisition of the Debtors' assets and procedures for conducting an auction if multiple bids were received.

6.      The Debtors' marketing process proved fruitful and yielded bids from numerous strategic investors.  Accordingly, on September 13, 2022, the Debtors commenced an auction (the "Auction") to determine the winning bid.  The two-week Auction consisted of hard-fought, arm's-length negotiations with each participating bidder.  At the conclusion of the Auction, WRSI was announced as the Successful Bidder.

7.      This court entered an *Order Authorizing Entry into the Asset Purchase Agreement* [Docket No. 581] (the FTX Purchase Agreement") on October 20, 2022.  Details of the FTX Transaction were set forth in the Debtors' *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 498] (the "FTX Disclosure Statement") and contemplated to be effectuated pursuant to the *Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 590] (the "FTX Plan").  The Court entered an order approving the adequacy of the FTX Disclosure Statement on October 21, 2022 [Docket No. 586], and solicitation for acceptance or rejection of the FTX Plan commenced shortly thereafter.  A confirmation hearing was scheduled for December 8, 2022.  However, a mere two weeks after solicitation commenced, it quickly became evident that any transaction with FTX would be unattainable.

**II.     The FTX Collapse.**

8.      Shortly after public reports emerged drawing concern around FTX and the legitimacy of its operations, on November 11, 2022, 101 FTX entities commenced filing for voluntary relief under chapter 11 in the United States Bankruptcy Court for the District of

4

Delaware (the "FTX Bankruptcy Proceeding").[4]  WRSI, the contemplated purchaser under the FTX Transaction, filed for chapter 11 on November 14, 2022.

9.      While the FTX Bankruptcy Proceeding is still unfolding, early indications are that the former Chief Executive Officer of FTX, Sam Bankman-Fried, and FTX were carrying on one of the largest financial frauds in history.  Mr. John Ray III, who was appointed Chief Executive Officer of FTX following the resignation of Mr. Bankman-Fried and who previously oversaw the restructuring of Enron, commented in an early filing in the FTX Bankruptcy Proceeding that "[n]ever in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information."[5]  On December 12, 2022, Mr. Bankman-Fried was arrested by the Bahamian Police and is currently being held at the Fox Hill Prison in Nassau, Bahamas without bail.  The full extent of the injury caused by FTX's apparent fraud will likely take years to uncover.

## III.    Continuation of the Marketing Process.

10.      As FTX appeared to be collapsing, but before its chapter 11 filing, on November 10, 2022, the Debtors requested that FTX waive the "No-Shop" provision (Section 5.2) of the FTX Purchase Agreement.  FTX, through its counsel, acquiesced.  On December 9, 2022, the Debtors filed with this Court the *Joint Stipulation and Agreed Order Between the Debtors and FTX US* seeking to terminate the FTX Purchase Agreement [Docket No. 717] (the "Stipulation").  The Debtors and FTX intend to seek approval of the Stipulation by the court overseeing the FTX Bankruptcy Proceeding as well.

---

[4]     *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

[5]     *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 24], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 17, 2022); *see also United States of America v. Samuel Bankman-Fried*, 22-crim-673 (S.D.N.Y. December 9, 2022); *Securities and Exchange Commission v. Samuel Bankman-Fried*, Civil Action. No. 22-cv-10501 (S.D.N.Y. Dec. 13, 2022).

11.     While the Debtors were shocked and dismayed by FTX's cataclysmic collapse, they swiftly reengaged in negotiations with other potential counterparties to evaluate alternative transactions that would maximize value for the Debtors and their creditors.

12.     As disclosed throughout the entirety of these cases, the Debtors had already conducted a comprehensive marketing process that resulted in a two-week Auction and leveraged those prior efforts to move quickly towards agreement with an alternative bidder. While many of the parties that the Debtors engaged with following the FTX collapse were previously involved in the marketing process, several new parties expressed interest and engaged in discussions with the Debtors. When analyzing proposals received from interested parties, the Debtors and their advisors considered both the viability and risk factors associated with each proposed transaction, including but not limited to, timing considerations, third-party financing requirements, ability to consummate, cybersecurity risks, regulatory and licensing status, and counterparty risk based on the Debtors' counterparty due diligence conducted during the one-month negotiation period.

13.     Notably, the Debtors and their advisors contemplated pursuing the Toggle Transaction. The Debtors and their advisors determined that pursuing the Toggle Transaction would impose costs of its own on the Debtors, would take time, and would present its own risks. Among other things, the Toggle Transaction would involve the Debtors "rebalancing" their cryptocurrency holdings to prepare for distributions to creditors, and then reopening the Voyager platform for approximately a month to allow customers to withdraw their pro rata share of cryptocurrency, to the extent it can be withdrawn. While a viable option, the Toggle Transaction, among other things, would likely (a) be less tax efficient for customers than a third party transaction; (b) lead to incremental value leakage over and above that in a third party transaction; (c) create additional security risks (particularly if the Debtors are unable to retain critical personnel

6

necessary to perform the Toggle Transaction); (d) require the Debtors to liquidate additional cryptocurrency as working capital to complete the work required; (e) strand certain cryptocurrency, which can be withdrawn by customers from certain third party exchanges (like Binance US) but not from Voyager; and (f) severely damage the value of the VGX token, which is the native token of the Voyager platform.

## IV.     The Proposed Sale to Binance US.

14.     Following good-faith, arm's length negotiations with several alternative transaction parties, the Debtors determined that based on the information they have to date, the transaction proposed by Binance US was the highest or otherwise best offer available for the Debtors' assets. The Debtors value the Binance US Transaction at approximately $1.022 billion, comprising (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which as of December 19, 2022 at 0:00 UTC, is estimated to be $1.002 billion, plus (ii) additional consideration, which is estimated to provide at least $20 million of incremental value. The Binance US Transaction also includes additional benefits, such as it (i) provides the most tax efficient route forward as Binance US supports 100% of the cryptocurrency coins on the Debtors' platform, (ii) it is the only transaction available to the Debtors that did not require the Debtors to liquidate cryptocurrency for working capital purposes, (iii) includes reimbursement by Binance US of up to $15 million of Seller's expenses, (iv) provides a $10 million reverse termination fee payable to the Seller by Binance US to compensate the Debtors' estates in the event that Binance US cannot consummate the transaction, and (v) in the event that the Debtors pivot to the Toggle Transaction, provides that Binance US will provide certain services to facilitate such transaction to ensure that the Debtors can rely on the Binance US platform to minimize leakage with and cybersecurity risks when returning cryptocurrency to creditors.

7

15.    It was (and is) well known that the Debtors' assets were once again for sale following the very public FTX collapse.  The Debtors believed (and continue to believe) that time is of the essence to enter into a transaction that can be consummated expeditiously to reduce the administrative costs of these chapter 11 cases, maximize stakeholder recoveries, and minimize uncertainty while the cryptocurrency environment continues to fluctuate.  Nonetheless, as described in the Tichenor Declaration, the most recent marketing process was thorough, public, fair, and produced the most value-maximizing transaction upon culmination of further negotiations with several interested parties.

16.    The Debtors will seek to effectuate the Binance US Transaction through the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"), filed substantially contemporaneously herewith, whereby the Debtors' customers and other creditors will be able to vote to accept or reject the Plan and ultimately the Binance US Transaction included therein.  The Debtors do not seek approval of the Binance US Transaction through this Motion.

17.    However, by this Motion, the Debtors do seek the Court's approval to enter into the Binance US Purchase Agreement.  The Binance US Purchase Agreement provides a viable path for the Debtors to exit from these chapter 11 cases in an industry experiencing significant volatility during the continued "Crypto Winter."  Prior to approval of this Motion, the Debtors are subject to a strict "No Shop" under the Binance US Purchase Agreement.  The "No Shop" was important to Binance US during the interim period between the filing of the Binance US Purchase Agreement and the hearing on this Motion during which Binance US would not have the protection of payment of the Purchaser Expenses (as defined below) in the event the Debtors determined to proceed with a higher and/or better offer.  Upon approval of this Motion, the "No Shop" provision will revert to

8

the formulation approved by the Court in connection with the FTX Transaction, which (if approved) would prohibit the Seller from initiating contact with, or soliciting, an alternative transaction. However, the "No Shop" provision does not prohibit any other party from coming forward with a higher and better offer.

18.    Importantly, the Binance US Purchase Agreement contains a "Fiduciary Out", which provides that the Seller may terminate the Binance US Purchase Agreement at any time in the event that not doing so would be inconsistent with the Seller's fiduciary duties. Moreover, the structure of the proposed transaction, including its "Fiduciary Out," permits the Debtors to toggle *either* to a higher and better third-party bid (should one emerge) *or* to the Toggle Transaction, if the Debtors determine in their business judgment between now and closing that the Binance US Transaction is no longer the highest and best option for any reason. Based on the diligence the Debtors have performed to date on their proposed counterparty, they believe the Binance US Transaction is the highest and best option. But the Debtors recognize that the cryptocurrency industry is experiencing an extremely volatile period for an already volatile business, and the Debtors continue to monitor what seem to be daily developments in the sector. Not only does the structure of the proposed transaction permit the Debtors to pivot to the Toggle Transaction if they conclude the Binance US Purchase Agreement is no longer higher and better due to a development along the way, but also the work to prepare to consummate and execute on the Binance US Purchase Agreement will better prepare the Debtors to complete the Toggle Transaction if the toggle becomes necessary.

19.    The Binance US Purchase Agreement includes an expense reimbursement provision whereby the Seller would be responsible to reimburse Binance US for its reasonable and documented out-of-pocket expenses of up to $5 million in the event the Binance US Purchase

Agreement is terminated (a) by the Seller if the closing has not occurred by the Outside Date or

extended Outside Date, as applicable, in circumstances where Binance US would be entitled to

terminate the Binance US Purchase Agreement for breach of the Binance US Purchase Agreement

by the Seller, or (b) pursuant to Section 8.1(e) (Seller breach), Section 8.1(g) (Seller exercise of

the fiduciary out), Section 8.1(h) (dismissal or conversion of the chapter 11 cases to chapter 7, or

if the automatic stay is lifted with respect to any Acquired Assets), or Section 8.1(i)(ix) (Seller

breach of the "No Shop"); *provided* that if the Binance US Purchase Agreement is validly

terminated by Seller pursuant to Section 8.1(g) (Seller exercise of the fiduciary out) (x) in order

for Seller to pursue the Toggle Transaction as a result of and following any Effect with respect to

Binance US's business, financial condition, operations, assets, management, employees,

compliance, or liabilities, taken as a whole, or any Effect with respect to Binance US's Affiliates

that has an Effect thereon that would reasonably be expected to (i) prevent or materially impair or

materially delay the ability of Binance US to consummate the Binance US Transaction or

(ii) materially and adversely affect the customers, creditors, or the acquired cryptocurrency on the

Binance US platform, and (y) such termination was not caused by (i) the Debtors determination to

pursue a higher and better offer from a third party or (ii) because the estimated proceeds from the

Toggle Transaction are or would reasonably be expected to be greater than the consideration under

the Binance US Transaction, then no Purchaser Expenses shall be payable (the "Purchaser

Expenses").[6] *See* Binance US Purchase Agreement, Section 6.22.  The Purchaser Expenses were

negotiated at arm's length and insisted on by Binance US as a required condition to entering into

the Binance US Purchase Agreement.  However, the Purchaser Expenses are narrow.  The Debtors

---

[6]   This summary of the circumstances that can trigger the Purchaser Expenses is entirely qualified by the Binance
US Purchase Agreement (including Sections 6.22 and 8.1 thereof).  In the event that there is a conflict between
this summary and Binance US Purchase Agreement, the Binance US Purchase Agreement shall govern.

believe that the Purchaser Expenses, which are only triggered in the limited circumstances noted above, are a small price to pay to lock in a transaction that will provide meaningful recoveries to creditors in these chapter 11 cases.

20.     Further, the Debtors successfully negotiated additional assurances and value for the benefit of their estates under the Binance US Purchase Agreement, including (i) reimbursement by Binance US of up to $15 million of Seller's expenses, (ii) a $10 million good faith deposit paid by Binance US to the Seller, and (iii) a $10 million reverse termination fee payable to the Seller by Binance US, in each case, subject to the terms and conditions set forth in the Binance US Purchase Agreement.

21.     In light of the foregoing, the Debtors believe that entry into the Binance US Purchase Agreement is in the best interests of the Debtors' estates.

## Relief Requested

22.     The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), (i) authorizing entry into the Binance US Purchase Agreement and (ii) granting related relief.  In support of the Debtors' request for entry of the Order, the Debtors submit the Tichenor Declaration, filed substantially contemporaneously herewith.[7]

## Jurisdiction and Venue

23.     The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012.  The Debtors confirm their consent to the Court

---

[7]     *See Declaration of Brian Tichenor in Support of the Debtors' Motion for Entry of An Order (I) Authorizing Entry Into the Binance US Purchase Agreement and (II) Granting Related Relief* (the "Tichenor Declaration"), filed substantially contemporaneously herewith.

entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

24.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

25.     The bases for the relief requested herein are sections 105(a), 363, 1107, and 1108 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), rule 2002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 2002-1 and 9006-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), and the *Sale Guidelines for the Conduct of Asset Sales Established and Adopted by the United States Bankruptcy Court for the Southern District of New York Pursuant to General Order M-383* (the "Sale Guidelines").

### Background

26.     On July 5, 2022 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the First Day Declaration, incorporated by reference herein.

27.     The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 18].  On July 19, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 102] (the "Committee").

## Summary of the Key Terms of the Binance US Purchase Agreement

28.     As described herein, the Debtors executed the Binance US Purchase Agreement following a robust and extensive marketing process and multiple rounds of bidding at the Auction over the course of two weeks and then further engagement with interested third parties following the FTX collapse.  The following chart summarizes the principal terms of the Binance US Purchase Agreement.

| Agreement Provision | Summary Description[8] |
|---|---|
| **Parties** | <u>Seller</u>:  Voyager Digital, LLC<br><br><u>Purchaser</u>:  BAM Trading Services Inc. d/b/a Binance US |
| **Purchase Price** | • The Purchase Price to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) (A) the assumption of Assumed Liabilities, (B) a cash payment of $20,000,000, (C) the Seller Expenses, if any, payable pursuant to Section 6.21, and (D) Purchaser's obligations to make the payments set forth in Section 6.12 and Section 6.14.<br><br>*See* **Binance US Purchase Agreement, § 2.1.** |
| **Acquired Assets** | • all Acquired Coins, together with all information regarding the underlying networks and smart contracts to which such Acquired Coins are subject;<br><br>• to the extent permissible under applicable Law, (1) all (i) information and Personal Information (including, for the avoidance of doubt, names, account numbers, social security numbers, passports (including passport numbers), drivers licenses (including driver license numbers), "liveness check" selfies, email addresses, mailing addresses, phone numbers, contact information, usernames, user IDs, passwords, and any Personal Information collected for purposes of KYC Procedures) related to (A) all active and inactive accounts of Users ("Voyager User Accounts") and (B) any other consumers located or having a home address in the United States from whom Personal Information was collected by Seller; (ii) information that has been anonymized, pseudonymized, or otherwise de-identified; (iii) data contained in the Seller Statement or the Post-Bankruptcy Statement; (iv) information relating to Voyager User Accounts that must be obtained and retained by Purchaser or any of its Affiliates for regulatory or legal purposes; and (v) any encryption key, passcode or cypher required to access any of the foregoing (collectively, the "Acquired User Data"), and (2) all other information and data relating to the other categories of Acquired Assets, the Voyager Platform, other than Acquired User Data (clauses (1) and (2), collectively, "Acquired Information");<br><br>• all rights, causes of action, claims (including, for the avoidance of doubt, |

---

[8]   This summary is qualified in its entirety by the Binance US Purchase Agreement. In the event that there is a conflict between this summary and the Binance US Purchase Agreement, the Binance US Purchase Agreement shall govern.

| Agreement Provision | Summary Description[8] |
|---|---|
| | any claims and causes of action arising under Chapter 5 of the Bankruptcy Code), counterclaims, defenses, credits, rebates, demands, allowances, refunds (other than Tax refunds or Tax attributes, in each case, to the extent enumerated in Section 1.2(i)), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities of any kind, in each case that Seller may have against any User located or having a home address in the United States solely to the extent that such claim or cause of action is against a User in such Person's capacity as a User (in each case, excluding (i) Retained Avoidance Actions, (ii) claims, causes of action or other rights against Seller or any of its Affiliates, or (iii) any of the foregoing to the extent relating to any Credit Matter) (collectively, "Acquired Voyager Claims"); |
| | • other than VGX Token Smart Contracts, all Intellectual Property owned by Seller or otherwise used or held for use by or on behalf of Seller in connection with the operation of its businesses, including all Business Software (in source code and object code form), any Bedrock source code and other IT Systems owned by Seller and required to operate the Voyager Platform, all Business Accounts (provided that Purchaser may elect, by written notice to Seller until two (2) Business Days prior to the Closing Date, to designate any Business Account(s) as Excluded Asset(s)), all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights, claims and causes of action to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world; |
| | • all rights to continue the customer relationships with customers of Seller and its Affiliates to the extent pertaining to savings and trading services related to Cryptocurrency; |
| | • all Contracts listed on Schedule 1.1(f) (the "Assigned Contracts") (for the avoidance of doubt, not including the 3AC Loan); and |
| | • other than the Excluded Documents, all Documents, goodwill, payment intangibles and general intangible assets and rights of or otherwise used or held for use by or on behalf of Seller and its Affiliates, in each case in connection with or related to any of the foregoing categories of Acquired Assets; provided that Seller shall be entitled to retain copies of Documents (subject to Section 6.19). |
| | *See* **Binance US Purchase Agreement, § 1.1.** |
| **Excluded Assets** | All other properties, rights, interests and other assets of Seller that are not Acquired Assets, including the following: |
| | • all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by Seller, and any retainers or similar amounts paid to Advisors or other professional service providers, in each case, other than the Acquired Coins; |
| | • all Contracts of Seller other than the Assigned Contracts, including the |

| Agreement Provision | Summary Description[8] |
|---|---|
| | Contracts listed on Schedule 1.2(b) (the "Excluded Contracts");<br><br>• all Documents, in each case, (i) to the extent they are primarily used in, or primarily relate to, any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of Seller, other than Voyager User Accounts), (ii) to the extent that such Documents constitute Seller's financial accounting Documents, all minute books, organizational documents, stock registers and such other books and records of Seller to the extent pertaining to the ownership, organization or existence of Seller, Tax Returns (and any related work papers), corporate seals, checkbooks, and canceled checks, in each case to the extent not primarily relating to the Acquired Assets or Assumed Liabilities or (iii) that Seller is required by Law to retain; provided that, to the extent not prohibited by applicable Law, Purchaser shall have the right to make copies of any portions of such Documents;<br><br>• all Documents to the extent prepared or received by Seller or any of its Affiliates in connection with the sale of the Acquired Assets, the Agreement, or the Transactions, including (i) all records and reports prepared or received by Seller or any of its Affiliates or Advisors in connection with the sale of the Acquired Assets and the Transactions, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received in connection therewith, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of Seller's business or assets, and (iii) all privileged materials, documents and records of Seller or any of its Affiliates (together with the Documents specified in Sections 1.2(c) and 1.2(h), the "Excluded Documents");<br><br>• all current and prior insurance policies of Seller, including for the avoidance or doubt all director and officer insurance policies, and all rights and benefits of any nature of Seller with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, other than Acquired Voyager Claims;<br><br>• all membership interests or other equity interests of Seller or any of its Affiliates or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests;<br><br>• (i) all Retained Avoidance Actions, (ii) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law, (iii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of Seller or any of its Affiliates, in each case, either (A) arising out of or relating to events occurring on or prior to the Closing Date, except as set forth in Section 1.1, or (B) related to any Credit Matter, and (iv) all claims that Seller or any of its Affiliates may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities, in each case other than Acquired Voyager Claims;<br><br>• Seller's claims or other rights under the Agreement, including the Purchase Price, or any agreement, certificate, instrument, or other document executed and delivered between Seller and Purchaser or their respective Affiliates in connection with the Transactions, or any other agreement between Seller and Purchaser or their respective Affiliates |

| Agreement Provision | Summary Description[8] |
|---|---|
| | entered into on or after the date hereof; |
| | • (x) all Tax attributes of Seller or its Affiliates (including refunds of income Taxes of Seller or its Affiliates, but excluding any Tax refunds or Tax attributes with respect to Taxes in respect of the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date allocable to Purchaser in accordance with Section 9.3(d) or with respect to Transfer Taxes), (y) all Tax refunds and Tax attributes with respect to Taxes in respect of the Acquired Assets (i) for any Pre-Closing Tax Period or (ii) that are Excluded Liabilities, and (z) all Tax refunds and Tax attributes with respect to Taxes in respect of the Excluded Assets; |
| | • every asset of Seller that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) at the direction of the Bankruptcy Court or (ii) as otherwise permitted under Section 6.1(b); |
| | • all demands, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date, in each case other than Acquired Voyager Claims; |
| | • the properties, rights, interests, equity and assets of Coinify ApS and its direct and indirect subsidiaries; |
| | • all Money Transmitter Licenses; |
| | • Seller's accounts receivable, and other amounts or Liabilities owing, from its Affiliates; |
| | • (i) all Seller Plans and assets of all Seller Plans that do not constitute Acquired Coins and (ii) personnel records relating to employees of Seller and Holdings; |
| | • all information and Personal Information related to individual consumers that is not Acquired User Data, including any Personal Information that is subject to the GDPR or collected from natural persons with addresses outside of the United States; |
| | • the 3AC Loan; |
| | • all VGX Token Smart Contracts; and |
| | • the properties, rights, interests and assets set forth on Schedule 1.2(s). |
| | *See* **Binance US Purchase Agreement, § 1.2.** |
| **Assumed Liabilities** | • all Liabilities and obligations of Seller under the Assigned Contracts to the extent such Liabilities arise from and after the Closing or relate to events, facts and circumstances first existing after the Closing; |
| | • all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned |

| Agreement Provision | Summary Description[8] |
|---|---|
| | Contracts (the "Cure Costs"); |
| | • all Liabilities arising out of the conduct of the business or the ownership of the Acquired Assets, in each case, solely by Purchaser from and after the Closing Date and to the extent such Liabilities arise from events, facts and circumstances first existing after the Closing Date; |
| | • all Liabilities for Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date allocable to Purchaser in accordance with Section 9.3(d); |
| | • all Liabilities relating to all Transfer Taxes; and |
| | • all Liabilities set forth on Schedule 1.3(f); |
| | provided, however, that whether or not any Liability for Taxes is an Assumed Liability shall be governed solely by Section 1.3(d) and Section 1.3(e). |
| | ***See*** **Binance US Purchase Agreement, § 1.3.** |
| **Excluded Liabilities** | Any Liabilities of, or Action against, Seller or any of its Affiliates or relating to the Acquired Assets, the Excluded Assets or the business and operations of Seller and its Affiliates, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on or prior to the Closing Date or arising thereafter, including as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities, including the following: |
| | • all Liabilities (i) existing prior to the filing of the Bankruptcy Case that are subject to compromise under the Bankruptcy Code and (ii) to the extent not otherwise expressly assumed herein (including in the Commercial Covenants), incurred subsequent to the filing of the Bankruptcy Case and prior to the Closing; |
| | • all Liabilities related to (i) customer accounts of Seller or its Affiliates (including Voyager User Accounts), except for those obligations of Purchaser expressly set forth in the Commercial Covenants and (ii) commercial payables or amounts owing by Seller or its Affiliates, including to any software vendors; |
| | • all Liabilities for Taxes (i) with respect to the Acquired Assets for any Pre-Closing Tax Period allocable to Seller in accordance with Section 9.3(d); (ii) of Seller and their Affiliates for any taxable period; or (iii) arising from or in connection with an Excluded Asset; and |
| | • all Liabilities resulting from Seller's or any of its Affiliates' breach of, violation of, or non-compliance with the provisions of any Laws relating to the ownership or operation of their respective businesses, the Acquired Assets and the Excluded Assets or the Transactions, including any bulk transfer Laws or similar Laws of any jurisdiction in connection with the Transactions; and |
| | • all Successor Liabilities, including with respect to any investigation or other Action against, concerning or otherwise with respect to Seller, its business or its assets. |

| Agreement Provision | Summary Description[8] |
|---|---|
| | *See* **Binance US Purchase Agreement, § 1.4.** |
| **Conditions Precedent to Obligations of Purchaser and Seller** | • there shall be no Law or Order (including any temporary restraining order or preliminary or permanent injunction) in effect restraining, enjoining, making illegal or otherwise prohibiting the Transactions;<br><br>• the Bankruptcy Court shall have entered the Agreement Order, which Agreement Order shall (i) be in form and substance reasonably acceptable to Purchaser, (ii) comply in all respects with Section 5.1(b), and (iii) be a Final Order; and<br><br>• the Bankruptcy Court shall have entered the Confirmation Order, in form and substance, solely with respect to matters relating to the Agreement or the Transactions, reasonably acceptable to Purchaser, confirming a Plan in form and substance, solely with respect to matters relating to the Agreement or the Transactions, reasonably acceptable to Purchaser, and the Confirmation Order shall be a Final Order. |
| | *See* **Binance US Purchase Agreement, § 7.1.** |
| **Conditions Precedent to Obligations of Purchaser** | • (i) the representations and warranties of Seller set forth in Article III (in each case, other than the Fundamental Representations and the representations and warranties set forth in Section 3.16(a)) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be so true and correct only as of such date and (y) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; provided that for purposes of the immediately preceding clause (i), the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect; (ii) the representations and warranties set forth in Section 3.1(a) (Organization and Qualification), Section 3.2 (Authorization of Agreement), Section 3.3(a)(i) (Conflicts; Consents), Section 3.6(a) (Exclusive Ownership), and Section 3.14 (Brokers) (collectively, the "Fundamental Representations") shall be true and correct in all but de minimis respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all but de minimis respects only as of such date; and (iii) the representations and warranties set forth in Section 3.16(a) shall be true and correct in all respects as of the date hereof and as of the Closing Date as though made on and as of the Closing Date;<br><br>• Seller shall not have materially breached any of the covenants required to be performed or complied with by Seller under the Agreement on or prior to the Closing; provided that notwithstanding the foregoing, Seller shall have performed or caused to be performed, in all respects, all of the obligations and covenants required by Section 6.15(a) and (b); and<br><br>• Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.4. |
| | *See* **Binance US Purchase Agreement, § 7.2.** |
| **Conditions Precedent to** | • the representations and warranties made by Purchaser in Article IV shall |

| Agreement Provision | Summary Description[8] |
|---|---|
| **Obligations of Seller** | be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be so true and correct only as of such date and (y) where the failure of such representations or warranties to be so true and correct has not and would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions; provided that for purposes of Section 7.3(a), the qualifications as to materiality, material adverse effect and words of similar import contained in such representations and warranties shall not be given effect;<br><br>• Purchaser shall not have materially breached any of the covenants required to be performed or complied with by Purchaser under the Agreement on or prior to the Closing; and<br><br>• Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 2.5.<br><br>*See* **Binance US Purchase Agreement, § 7.3.** |
| **Means of Implementation** | • The Binance US Transaction shall be implemented and effectuated through a chapter 11 plan.<br><br>*See* **Binance US Purchase Agreement, §§ 5.3, 5.5.** |
| **Milestones** | The Agreement may be terminated at any time prior to the Closing by written notice from the Purchaser to the Seller if, among other things:<br><br>• the Agreement Order is not entered by January 6, 2023;<br><br>• the Plan Solicitation Motion and the Amended Disclosure Statement are not filed with the Bankruptcy Court by December 21, 2022;<br><br>• the Plan Solicitation Order is not entered by January 6, 2023;<br><br>• the Confirmation Order is not entered by March 1, 2023;<br><br>• Seller or any of the other Debtors file any motions, pleadings, notices or other documents with the Bankruptcy Court in material breach of Section 5.7;<br><br>• Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser, or the Bankruptcy Court approves an Alternative Transaction other than with Purchaser;<br><br>• Seller has delivered a Higher Offer Determination Notice to Purchaser;<br><br>• Seller or its Affiliates or Advisors have committed a breach of Section 5.1(a); or<br><br>• Seller or its Affiliates or Advisors have committed a breach of, Section 5.2; provided that (without modifying Purchaser's rights to terminate the Agreement under any other Section of the Agreement) Purchaser shall not be entitled to terminate the Agreement pursuant to Section 8.1(i)(ix) following entry of the Agreement Order by the Bankruptcy Court.<br><br>*See* **Binance US Purchase Agreement, §§ 5.3 and 8.1.** |
| **No-Shop** | • From and following the execution and delivery of the Agreement by Seller, Seller and its Affiliates shall not, and shall not permit their respective Advisors or Affiliates to, (i) initiate contact with, or solicit or encourage |

| Agreement Provision | Summary Description[8] |
| --- | --- |
| | submission of any inquiries, proposals or offers by, any Person (other than Purchaser, its Affiliates and its and their respective Advisors) with respect to an Alternative Transaction, (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction, (iii) enter into any confidentiality agreement with respect to, or provide any non-public information or data to any Person relating to, any Alternative Transaction, or (iv) otherwise agree, authorize or commit to do any of the foregoing; provided that, notwithstanding the foregoing, from and after entry of the Agreement Order, Seller may take the actions set forth in clauses (ii) and (iii) above if (A) Seller has received a written, bona fide offer, proposal or indication of interest to engage in an Alternative Transaction (an "Acquisition Proposal") from any Person after the date of the Agreement that did not result from Seller's breach of Section 5.2(a), and (B) the board of directors (or similar governing body) of Seller determines in good faith, after consultation with its financial advisor and outside legal counsel, that such Acquisition Proposal constitutes or is reasonably likely to lead to a Higher and Better Offer and that failure to take such actions would violate the directors' fiduciary duties under applicable Law; provided further that if the Closing has not occurred prior to the Outside Date unless the failure of the Closing to have occurred by the Outside Date was caused by Seller's failure to perform any of its obligations under the Agreement, and there is no Back-up Bidder (as defined in the Bidding Procedures Order) or the agreement with the Back-up Bidder has terminated in accordance with its terms, then Section 5.2(a) shall automatically terminate and be of no further force and effect as of such date. Until entry of the Agreement Order, Seller shall promptly (but in any event within twenty-four (24) hours) provide written notice to Purchaser of any breach of Section 5.2(a).<br><br>• Seller shall promptly (but in any event within twenty-four (24) hours) give written notice to Purchaser if (i) any inquiries, proposals or offers with respect to an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction are received, (ii) any non-public information or data concerning Seller or its Affiliates or access to Seller's or its Affiliates' properties, books or records in connection with any Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction is requested, or (iii) any discussions or negotiations relating to an Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction are sought to be engaged in or continued by, from or with Seller, its Affiliates or any of its or their respective Advisors, as the case may be. Such notice shall set forth the name of the applicable Person making such inquiry, the material terms and conditions of any proposed Alternative Transaction (including, if applicable, correct and complete copies of any proposed agreements, inquiries, proposals or offers or, where no such copies are available, a reasonably detailed written description thereof) and the status of any such discussions or negotiations. Seller shall thereafter keep Purchaser reasonably informed, on a reasonably prompt basis, of the status of any discussions or negotiations with respect thereto. Until entry of the Agreement Order, Seller shall promptly (but in any event within twenty- |

| Agreement Provision | Summary Description[8] |
|---|---|
| | four (24) hours) provide written notice to Purchaser of any breach of Section 5.2(b). |
| | • Seller (i) shall promptly (and in any event within twenty-four (24) hours) give notice to Purchaser upon a determination by Seller or its board of directors (or comparable governing body) that any Acquisition Proposal received from any Person after the date of the Agreement that did not result from Seller's breach of Section 5.2(a) constitutes a Higher and Better Offer (a "Higher Offer Determination Notice") and (ii) may cause or permit Seller or any of the other Debtors to enter into a definitive agreement with respect to such Acquisition Proposal; provided that (A) Seller and its board of directors (or comparable governing body) may only make such determination described in clause (i) of Section 5.2(c) if, prior to the determination that such Acquisition Proposal constitutes a Higher and Better Offer, Seller negotiates, and causes its representatives to negotiate, with Purchaser in good faith (to the extent Purchaser and its representatives desire to negotiate) during such three (3) Business Day period to amend the terms and conditions of the Agreement and, no earlier than the end of such three (3) Business Day period, the board of directors (or comparable governing body) of Seller determines in good faith (after consultation with its financial advisor(s) and outside legal counsel), after giving effect to such proposed amendments to the terms and conditions of the Agreement, that such Acquisition Proposal still constitutes a Higher and Better Offer (provided further that if any material amendment is made to such Acquisition Proposal, such Acquisition Proposal shall be subject again (but only once again) to the foregoing, except that references to three (3) Business Days shall be deemed to be two (2) Business Days, and whatever the result of the second instance of the foregoing, Seller shall not be required to undertake the foregoing again before making a determination that such Acquisition Proposal constitutes a Higher and Better Offer and, if applicable, terminating the Agreement), and (B) Seller and its board of directors (or comparable governing body) may only take such action described in clause (ii) of Section 5.2(c) if the board of directors (or comparable governing body) of Seller determines in good faith (after consultation with its outside legal counsel) that the failure to take such action would violate with its fiduciary duties under applicable Law. |
| | *See* **Binance US Purchase Agreement, § 5.2.** |
| **Good-Faith Deposit** | • Purchaser has made, on the date thereof, or will make on the first Business Day following the date thereof, an earnest money deposit in the amount equal to $10,000,000.00 by wire transfer of immediately available funds for deposit into an escrow account. Subject to Section 2.2(b) and Section 2.2(c), the Deposit and any received investment income, if any, shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date. Seller hereby acknowledges and agrees that the Deposit qualifies as the deposit required pursuant to the Bidding Procedures Order. |
| | • If the Agreement has been validly terminated (i) by Seller pursuant to Section 8.1(d) or Section 8.1(f), (ii) by Purchaser pursuant to Section 8.1(c), in circumstances where Seller would be entitled to terminate the Agreement pursuant to Section 8.1(d) or Section 8.1(f), or (iii) by Seller |

| Agreement Provision | Summary Description[8] |
|---|---|
| | pursuant to Section 8.1(g) in connection with and following any Purchaser Development and not in connection with a Higher and Better Offer (each of (i), (ii), and (iii), a "Purchaser Default Termination"), then within three (3) Business Days after the date of such termination, the Parties shall execute any instructions necessary to permit the Escrow Agent to disburse the Deposit together with all received investment income, if any, to Seller.<br><br>• If the Agreement has been validly terminated by either Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within three (3) Business Days after such termination, and, at Purchaser's request, Seller shall execute any instructions necessary to permit the Escrow Agent to disburse the Deposit together with all received investment income, if any, to Purchaser.<br><br>• If the Closing occurs, the Deposit shall be transferred to Seller.<br><br>*See* **Binance US Purchase Agreement, § 2.2.** |
| **Reverse Termination Fee** | In the event that (a) the conditions set forth in Sections 7.1(b), 7.1(c), and 7.2 have been satisfied or duly waived and (b) (i) the Agreement is validly terminated in accordance with Section 8.1(b) or Section 8.1(c), (ii) Purchaser fails to consummate the Closing by the Outside Date or the Extended Outside Date, as applicable, as a result of the failure of the conditions set forth in Section 7.1(a), or (iii) the Agreement is terminated pursuant to Section 8.1(g) in connection with and following a Purchaser Development and not in connection with a Higher and Better Offer, then, in any such case, within three (3) Business Days following such valid termination the Deposit (including all received investment income, if any) shall be released to Seller (such release, which, for the avoidance of doubt, shall be equal to and shall not exceed $10,000,000 in the aggregate, the "Reverse Termination Fee").<br><br>*See* **Binance US Purchase Agreement, § 8.3.** |
| **Expense Reimbursement by Purchaser to Seller** | Purchaser shall (i) at the Closing bear as a component of the Purchase Price pursuant to Section 2.1(a), without duplication, the Seller Expenses or (ii) if the Agreement is validly terminated in accordance with its terms, pay to Seller, within three (3) Business Days following such termination, cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Seller in an amount equal to the Seller Expenses; provided that notwithstanding anything to the contrary herein, (A) in no event shall the aggregate amount of Seller Expenses payable by Purchaser exceed the Seller Expense Cap, (B) any fees and expenses (including reasonable and documented out-of-pocket financial advisor and legal fees, expenses and disbursements) incurred by Seller or any of its Affiliates, or otherwise relating to the activities or operations of Seller or any of its Affiliates, on or prior to the Seller Expense Start Date shall not constitute Seller Expenses, and (C) (x) if the Closing or the termination of the Agreement occurs on or prior to the Seller Expense Start Date, (y) if the Agreement is terminated pursuant to (1) Section 8.1(b) or Section 8.1(c) by Purchaser, or by Seller in circumstances where Purchaser would be entitled to terminate the Agreement pursuant to Section 8.1(e), or (2) Section 8.1(e), Section 8.1(g), Section 8.1(h) or Section 8.1(i), or (z) the Closing does not occur on or prior to the Seller Expense Start Date due to any act or omission by Seller or any of its Affiliates or any material breach of the Agreement by Seller, then in each case the Seller Expenses shall be zero (0).<br><br>*See* **Binance US Purchase Agreement, §§ 6.21, 8.1.** |

| Agreement Provision | Summary Description[8] |
|---|---|
| Expense Reimbursement by Seller to Purchaser | If the Agreement is terminated (i) by Seller pursuant to Section 8.1(c), in circumstances where Purchaser would be entitled to terminate the Agreement pursuant to Section 8.1(e), or (ii) pursuant to Section 8.1(e), Section 8.1(g), Section 8.1(h) or Section 8.1(i)(ix), then Seller shall pay to Purchaser, within three (3) Business Days following such termination, cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Purchaser in an amount equal to the Purchaser Expenses; provided that notwithstanding anything to the contrary herein, in no event shall the aggregate amount of Purchaser Expenses payable by Seller hereunder exceed $5,000,000; provided further that if the Agreement is validly terminated by Seller pursuant to Section 8.1(g) (x) in order for Seller to pursue a Liquidation as a result of and following any Effect with respect to Purchaser's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, or any Effect with respect to Purchaser's Affiliates that has an Effect on Purchaser's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, that, individually or in the aggregate with all other such Effects, would reasonably be expected to (1) prevent or materially impair or materially delay the ability of Purchaser to consummate the Transactions in accordance herewith or (2) materially and adversely affect the Users, Eligible Creditors, or the Acquired Coins on the Binance.US Platform, including following the Closing, as compared to users and Coins on the Binance.US Platform as of the date hereof, and (y) such termination was not effected (1) in connection with a Higher and Better Offer or (2) because the estimated proceeds from such Liquidation are or would reasonably be expected to be greater than the Closing Date Payment (plus the fair market value of any Acquired Coins or any proceeds therefrom, in each case, as determined at the time Seller commences such Liquidation), then no Purchaser Expenses shall be payable. <br><br> *See* **Binance US Purchase Agreement, §§ 6.22, 8.1.** |
| Fiduciary Out | Nothing in the Agreement, or any document related to the Transactions, will require Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations; provided, however, that no such action or inaction shall be deemed to prevent Purchaser from exercising any termination rights it may have as a result of such action or inaction. <br><br> *See* **Binance US Purchase Agreement, § 10.19.** |

## III.     Rebalancing of the Debtors' Cryptocurrency.

29.     The Debtors hold a significant amount of cryptocurrency across a diverse portfolio of coins.  To effectuate the Binance US Transaction or the Toggle Transaction, the Debtors will need to "rebalance" their cryptocurrency portfolio (*i.e.*, execute trades of various types of cryptocurrency to ensure that the proper types of coins are available for distribution to each customer) on the Debtors' platform.  Accordingly, the Debtors seek authority to execute any

rebalancing to effectuate the Binance US Transaction or the Toggle Transaction pursuant to the terms of the Binance US Purchase Agreement.

<div align="center"><u>**Basis for Relief**</u></div>

**I.    The Debtors' Entry into the Binance US Purchase Agreement Should Be Approved as an Exercise of Sound Business Judgment.**

30.    The Court may authorize the Debtors to enter into the Binance US Purchase Agreement pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.  Pursuant to section 363(b) of the Bankruptcy Code, the Debtors need only show a legitimate business justification to enter into the Binance US Purchase Agreement.  *See, e.g.*, *Comm. Of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts generally will not entertain objections to the debtor's conduct."). When a valid business justification exists, the law vests the debtor's decision with a strong presumption "'that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *In re GSC, Inc.*, 453 B.R. 132, 174 (Bankr. S.D.N.Y. 2011) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Accordingly, parties challenging a debtor's decision must make a showing of "bad faith, self-interest or gross negligence." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations omitted).

31.    In addition, the Court may also authorize the entry into the Binance US Purchase Agreement based on section 105(a) of the Bankruptcy Code.  Section 105(a) codifies the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate

to carry out the provisions of this title." Under section 105(a), courts may authorize actions that are essential to the continued operation of a debtor's business. *See In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996).

32.    The relief requested by this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under sections 105(a) and 363(b) of the Bankruptcy Code. The Binance US Purchase Agreement represents the most efficient and appropriate means of maximizing recoveries to stakeholders on an expedited timeline in light of the extraordinary circumstances in these cases.

**A.    A Sound Business Purpose Exists for Entry into the Binance US Purchase Agreement.**

33.    The Debtors have concluded that entry into the Binance US Purchase Agreement, which outlines and governs the terms of the Binance US Transaction, is in the best interest of their chapter 11 estates and is supported by a number of sound business reasons.

- *First*, the Debtors believe that the Binance US Transaction will maximize the value of the Debtors' assets because the Purchase Price offers significantly more value and less risk than the Acquired Assets would have on a stand-alone basis or through any other bids received by the Debtors.

- *Second*, the Debtors believe that, as a result of the marketing efforts that have been undertaken, the highest and best offer has been obtained and will provide maximum value to the Debtors under the current circumstances.

- *Third*, the Sale was subject to a public and competitive process, enhancing the Debtors' ability to receive the highest or otherwise best value for their assets. Consequently, the Sale has been subject to a "market check" that, in the Debtors' reasonable business judgment, was the best means for establishing whether a fair and reasonable price is being paid. *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326 at *4 (Bankr. D. Del. 2001) (although a "section 363(b) sale transaction does not require an auction procedure," "[t]he auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

- *Fourth*, the Seller engaged in hard-fought, arm's length negotiations with Binance US over the terms of the Binance US Purchase Agreement, which includes protections for the Seller including (i) a $10 million good faith deposit

25

paid by Binance US to the Seller (section 2.2 of the Binance US Purchase Agreement), (ii) reimbursement by Binance US to the Seller of up to $15 million in expenses subject to the terms of the Binance US Purchase Agreement (section 6.21 of the Binance US Purchase Agreement) and (iii) a $10 million Reverse Termination Fee owed by Binance US to the Seller, subject to the terms of the Binance US Purchase Agreement (section 8.3 of the Binance US Purchase Agreement).

- ***Fifth***, entry into the Binance US Purchase Agreement allows the Debtors to lock in the terms of the Binance US Transaction now, subject to confirmation of the Plan, which is particularly important given the continued volatility of cryptocurrency markets.

34.     The Debtors submit that the Binance US Transaction contemplated under the Binance US Purchase Agreement constitutes the highest or otherwise best offer for the Acquired Assets and will provide the Debtors the best path forward to maximizing value for their estates and, ultimately, providing a recovery to creditors on an efficient timeline.  As such, the Debtors believe that entry into the Binance US Purchase Agreement is a valid and sound exercise of the Debtors' business judgment.

**B.      Adequate and Reasonable Notice of Entry Into the Binance US Purchase Agreement Has Been Provided.**

35.     Although the Debtors do not seek approval of the Binance US Transaction by this Motion, notice of entry into the Binance US Purchase Agreement was adequate and reasonable. Further, the Debtors' marketing process and the notice provided through this Motion constitute adequate and reasonable notice of the Binance US Transaction.  The Debtors undertook a very public and lengthy Auction that spanned multiple weeks and received late interest from parties. The Debtors' creditors and parties-in-interest were apprised of the marketing process throughout these chapter 11 cases.  Creditors and parties-in-interest were also aware of the very public FTX collapse and the Debtors' need to pursue an alternative transaction immediately.  Further, parties-in-interest will have the opportunity to vote on and/or object to the Binance US Transaction through the Plan solicitation and confirmation process.

C.    **The Purchase Price Contemplated in the Binance US Purchase Agreement Reflects a Fair Value Transaction.**

36.    It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold as the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also Trans World Airlines*, 2001 WL 1820326 at *4. As discussed herein, the Debtors and their advisors conducted a thorough and extensive marketing process. Among other things, the Debtors have engaged in significant discussions with 90 interested parties, provided potential bidders with virtual data room access, including thousands of pages of business and financial diligence, hosted meetings with the Debtors' management team, held numerous conference calls and meetings with interested parties, considered alternative transaction structures, and otherwise taken all appropriate efforts to increase transaction value. The Debtors respectfully submit that this process maximized the number of bidders that participated in a competitive Auction process and subsequent thorough and robust negotiations following the FTX collapse, and, accordingly, provided the Debtors and their stakeholders with the best possible transaction.

II.    **A Sound Business Purpose Exists for The Seller to Agree to the Purchaser Expenses Provision under the Binance US Purchase Agreement.**

37.    Binance US insisted on the Purchaser Expenses provision as a condition to entering into the Binance US Purchase Agreement. However, the Purchaser Expenses are narrow and the Seller is only responsible to reimburse Binance US for its reasonable and documented out-of-pocket expenses of up to $5 million in the event the Binance US Purchase Agreement is terminated (a) by the Seller if the closing has not occurred by the Outside Date or extended Outside Date, as applicable, in circumstances where Binance US would be entitled to terminate the Binance US Purchase Agreement for breach of the Binance US Purchase Agreement by the Seller, or

27

(b) pursuant to Section 8.1(e) (Seller breach), Section 8.1(g) (Seller exercise of the fiduciary out), Section 8.1(h) (dismissal or conversion of the chapter 11 cases to chapter 7, or if the automatic stay is lifted with respect to any Acquired Assets), or Section 8.1(i)(ix) (Seller breach of the "No Shop"); *provided* that if the Binance US Purchase Agreement is validly terminated by Seller pursuant to Section 8.1(g) (Seller exercise of the fiduciary out) (x) in order for Seller to pursue the Toggle Transaction as a result of and following any Effect with respect to Binance US's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, or any Effect with respect to Binance US's Affiliates that has an Effect thereon that would reasonably be expected to (i) prevent or materially impair or materially delay the ability of Binance US to consummate the Binance US Transaction or (ii) materially and adversely affect the customers, creditors, or the acquired cryptocurrency on the Binance US platform, and (y) such termination was not caused by (i) the Debtors determination to pursue a higher and better offer from a third party or (ii) because the estimated proceeds from the Toggle Transaction are or would reasonably be expected to be greater than the consideration under the Binance US Transaction, then no Purchaser Expenses shall be payable. *See* Binance US Purchase Agreement, Section 6.22.

38.     The potential for the Debtors to potentially be responsible for Purchaser Expenses was already contemplated by this Court's Bidding Procedures Order. Moreover, bankruptcy courts routinely approve asset purchase agreements that contain similar bid protections that provide a benefit to the estates. *See, e.g.*, *In re WorldSpace, Inc.*, 2010 WL 4739929, at *4–5 (Bankr. D. Del. June 2, 2010) (approving the break-up fee in an asset purchase agreement for a variety of reasons, including that the break-up fee was reasonable and appropriate, essential to induce the buyer to enter the agreement, and entered into under the debtors' compelling and sound business justification); *see also In re Genco Shipping & Trading Limited*, 509 B.R. 455, 465 (Bankr.

S.D.N.Y 2014) (citing *In re Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009); *see also In re Integrated Res., Inc.*, 147 B.R. at 657–58 (to evaluate bid protections, courts should employ the business judgment rule, which proscribes judicial second-guessing of the corporate debtor's actions taken in good faith, absent self-dealing and in the exercise of honest judgment); *In re Fin. News Network, Inc.*, 980 F.2d 165 (2d Cir. 1992); *Integrated Res., Inc.*, 147 B.R. at 659–60 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be ***necessary*** to discharge [such] duties to maximize value." (emphasis added)); *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999).

39. Further, the Purchaser Expenses under the Binance US Purchase Agreement. constitute "actual and necessary costs and expenses of preserving the estate" entitled to administrative expense status and payment under sections 503(b) and 507(a)(2) of the Bankruptcy Code. 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(2). Courts in this district have often granted relief similar to the relief requested herein. *See, e.g.*, *In re Garrett Motion, Inc.*, Case No. 20-12212 (Bankr. S.D.N.Y. Mar. 12, 2021) (approving administrative expense priority to backstop fees and expenses); *In re SunEdison, Inc.*, Case No. 16-10992 (Bankr. S.D.N.Y. June 6, 2017) (same); *In re Roust Corp.*, Case No. 16-23786 (Bankr. S.D.N.Y. Jan. 10, 2017) (same); *In re In re K-V Discovery Solutions Inc.*, Case No. 12-13346 (Bankr. S.D.N.Y. June 7, 2013) (same). The facts and circumstances here warrant similar treatment.

40. The Court should rely on the business judgment standard when determining the appropriateness of the Purchaser Expenses. The Seller exhibited a sound exercise of its business judgment in agreeing to the Purchaser Expenses because Binance US is unwilling to enter into the Binance US Purchase Agreement and have its transaction subject to higher and better offers

29

without the protection of reimbursement of the expenses it incurred in setting a floor for other potential bidders. The risk of losing the Binance US Transaction due to the Seller's refusal to agree to the Purchaser Expenses significantly outweighs the cost associated with the Purchaser Expenses that are triggered under very limited circumstances.

41. In short, the proposed Purchaser Expenses are fair and reasonable under the circumstances because they constitute a "fair and reasonable percentage of the proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the prospective purchaser." *In re Intergrated Res., Inc.*, 147 B.R. at 662 (quoting *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989)). Approval of the Purchaser Expenses is necessary for Binance US to enter into the Binance US Purchase Agreement and remain committed through the Debtors' plan solicitation and confirmation process, all during which the Debtors have the ability to exercise their fiduciary out should a higher or otherwise better offer be proposed. Accordingly, the Purchaser Expenses are an appropriate and crucial component of the Binance US Purchase Agreement and a prudent exercise of the Debtors' business judgment consistent with the legal standards this Court and other courts in this jurisdiction have established and recognized.

## **Reservation of Rights**

42. Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code,

30

(f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### Motion Practice

43.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

### Notice

44.     The Debtors will provide notice of this Motion to the following parties and/or their respective counsel, as applicable:  (a) the U.S. Trustee; (b) the Committee; (c) the lender under the Debtors' prepetition loan facility; (d) the United States Attorney's Office for the Southern District of New York; (e) the Internal Revenue Service; (f) the Toronto Stock Exchange; (g) the attorneys general in the states where the Debtors conduct their business operations; (h) all parties who have expressed a written interest in the Acquired Assets; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

45.     No prior request for the relief sought in this Motion has been made to this or any other court.

31

WHEREFORE, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Dated: December 21, 2022          */s/ Joshua A. Sussberg*
New York, New York                **KIRKLAND & ELLIS LLP**
                                  **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                  Joshua A. Sussberg, P.C.
                                  Christopher Marcus, P.C.
                                  Christine A. Okike, P.C.
                                  Allyson B. Smith (admitted *pro hac vice*)
                                  601 Lexington Avenue
                                  New York, New York 10022
                                  Telephone:     (212) 446-4800
                                  Facsimile:     (212) 446-4900
                                  Email:         jsussberg@kirkland.com
                                                 cmarcus@kirkland.com
                                                 christine.okike@kirkland.com
                                                 allyson.smith@kirkland.com

                                  *Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Proposed Form of Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|   |   |   |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

_____

## ORDER (I) AUTHORIZING ENTRY INTO THE
## BINANCE US PURCHASE AGREEMENT AND (II) GRANTING RELATED RELIEF

Upon the Motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"):  (i) authorizing entry into the Binance US Purchase Agreement and (ii) granting related relief; and the Debtors having determined, after an extensive marketing process, that BAM Trading Services Inc. d/b/a Binance.US ("Binance US" or the "Purchaser") has submitted the highest or otherwise best bid for the Acquired Assets; and the Debtors having selected Binance US as the Winning Bidder pursuant to the Bidding Procedures Order; and upon adequate and sufficient notice of the Motion, all as more fully set forth in the Motion; and upon the First Day Declaration and the Tichenor Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

§§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND DETERMINED THAT:

A.     The Debtors and the Purchaser negotiated the Binance US Purchase Agreement at arm's length and in good faith, without collusion, all within the meaning of section 363(m) of the Bankruptcy Code.

B.     The Purchaser Expenses, as set forth in the Binance US Purchase Agreement, are: (1) commensurate to the real and substantial benefits conferred upon the Debtors' estates by the Purchaser; (2) reasonable and appropriate in light of the size and nature of the proposed sale contemplated by the Binance US Purchase Agreement, the commitments that have been made by the Purchaser, and the efforts that have been and will be expended by the Purchaser; and (3) necessary to induce the Purchaser to continue to pursue such sale and continue to be bound by the Binance US Purchase Agreement. The Purchaser Expenses are an essential inducement to, and condition of, the Purchaser's entry into, and continuing obligations under, the Binance US Purchase Agreement. Unless it is assured that the Purchaser Expenses will be available, the Purchaser is unwilling to be bound to the terms of the Binance US Purchase Agreement (including the obligation to maintain its committed offer in accordance with the terms of the Binance US

Purchase Agreement while such offer is subject to higher or otherwise better bids as contemplated by the Bidding Procedures). The Purchaser has provided a material benefit to the Debtors and their creditors by providing a baseline value, thereby increasing the likelihood that the value of the Acquired Assets will be maximized through the Debtors' sale process.

**C.** Accordingly, the Purchaser Expenses are (1) fair, reasonable and appropriate and designed to maximize value for the benefit of the Debtors' estates; and (2) an actual and necessary cost of preserving the Debtors' estates within the meanings of sections 503(b) and 507(a) of the Bankruptcy Code.

IT IS HEREBY ORDERED THAT:

**I.    Notice of the Motion.**

1.    Notice of the Hearing, the Motion, and the Debtors' entry into the Binance US Purchase Agreement, was timely, proper, and reasonably calculated to provide interested parties with timely and proper notice thereof, and no other or further notice of the Motion and the Hearing is, or shall be, required. The requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice. A reasonable opportunity to object and be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities.

**II.    Highest or Otherwise Best Offer.**

2.    The Debtors' pre- and postpetition marketing process with respect to the Acquired Assets afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets. The transactions contemplated by the Binance US Purchase Agreement constitute the highest or otherwise best offer for the Acquired Assets, and the Debtors' determination that the terms of the Binance US Purchase Agreement constitute the highest or otherwise best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment; *provided* that nothing in this Order shall limit or

3

otherwise restrict in any way the Seller's rights and obligations under section 5.2 of the Binance US Purchase Agreement. Entry of this Order, including approval of the Seller's entry into, and performance under, the Binance US Purchase Agreement, is in the best interests of the Debtors, their estates, creditors, and all other parties in interest.

## III. General Provisions.

3. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these chapter 11 cases pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

4. All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Hearing or by stipulation filed with the Court, and all reservations of rights included in such objections or otherwise, are hereby denied and overruled on the merits with prejudice.

5. The Motion is granted as set forth herein.

6. Voyager Digital, LLC, as seller under the Binance US Purchase Agreement, is authorized, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, to enter into the Binance US Purchase Agreement and perform its obligations under the Binance US Purchase Agreement other than those obligations to be performed at or after the consummation of the Sale, which obligations the Debtors will seek approval of in connection with confirmation of a chapter 11 plan. The Seller and Purchaser are granted all rights and remedies provided to them under the Binance US Purchase Agreement.

7. The Binance US Purchase Agreement shall be binding and specifically enforceable against the parties thereto in accordance with its terms, including, without limitation, Section 5.2

(the "No-Shop" provision) and, as applicable, those additional obligations set forth in Article V (Bankruptcy Court Matters) and Article VI (Covenants and Agreements) of the Binance US Purchase Agreement.

8.     The Debtors are authorized, but not directed, to enter into non-material amendments to the Binance US Purchase Agreement from time to time as necessary, subject to the terms and conditions set forth in the Binance US Purchase Agreement, and without further order of the Court.

9.     The Seller is authorized to satisfy the Purchaser Expenses pursuant to the terms and conditions set forth in the Binance US Purchase Agreement, and the Purchaser Expenses, as set forth in the Binance US Purchase Agreement, are approved in their entirety.  The Purchaser Expenses provisions in the Binance US Purchase Agreement and this Order shall be binding on the Seller, its successors and assigns, and shall survive the termination of the Binance US Purchase Agreement, appointment of a chapter 11 trustee or similar fiduciary, and dismissal or conversion of the chapter 11 cases; *provided, however*, that the obligation to pay or honor the Purchaser Expenses shall be subject to the terms and conditions of the Binance US Purchase Agreement.  The Purchaser Expenses shall be entitled to administrative expense status under sections 503(b) and 507(a)(2) of the Bankruptcy Code.

10.     The Purchaser is obligated to satisfy the terms and conditions of the Binance US Purchase Agreement in its entirety, including Section 2.2 (Good Faith Deposit), Section 6.21 (Seller Expenses), and Section 8.3 (the Reverse Termination Fee).

11.     To the extent the automatic stay provisions of section 362 of the Bankruptcy Code would otherwise apply, such provisions are vacated and modified to the extent necessary to permit the parties to the Binance US Purchase Agreement to exercise their termination rights thereunder in accordance with its terms, and deliver any notice contemplated thereunder, in each case, without

further order of the Court.

12.    The Debtors are authorized to rebalance their cryptocurrency portfolio subject to the terms of the Binance US Purchase Agreement.

13.    Nothing in this Order, the Binance US Purchase Agreement, the Plan, or any order confirming the Plan discharges, releases, impairs or otherwise precludes: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" within the meaning section 101(5) of the Bankruptcy Code; (ii) any claim of any Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of the closing of the Sale; or (iii) any liability to a Governmental Unit on the part of any Person other than the Debtors. Nor shall anything in this Order or related documents enjoin or otherwise bar a Governmental Unit from asserting or enforcing any liability described in the preceding sentence.  Notwithstanding anything to the contrary, nothing in this paragraph 13 shall be construed as a determination as to any liability or claim owing to a Governmental Unit or whether any Governmental Unit is subject to the automatic stay under section 362 of the Bankruptcy Code or limits, lifts or otherwise modifies the automatic stay under section 362 of the Bankruptcy Code.

14.    Further, nothing in this Order, the Binance US Purchase Agreement, the Plan, or any order confirming the Plan authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.  Nothing in this Order, the Binance US Purchase Agreement, the Plan, or any order confirming the Plan shall relieve any entity from any otherwise applicable obligation to address or comply with information requests or inquiries from any

6

Governmental Unit. Nothing in this Order, the Binance US Purchase Agreement, the Plan, or any order confirming the Plan shall affect any valid setoff or recoupment rights of any Governmental Unit. Nothing in this Order, the Binance US Purchase Agreement, the Plan, or any order confirming the Plan divests any state tribunal of any otherwise applicable jurisdiction it may have under police or regulatory law. Nothing in this Order, the Binance US Purchase Agreement, the Plan, or any order confirming the Plan, shall be construed as a determination of whether the automatic stay applies to this paragraph 14 or limits, lifts or otherwise modifies the automatic stay under section 362 of the Bankruptcy Code.

15.    Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed: (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. Any payment made pursuant to this Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

16.    The Debtors shall maintain copies of their books and records as set forth in the Plan. Nothing in this Order shall affect the obligations of the Debtors and/or any transferee or

custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

17.     Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the Hearing, nothing in the Motion, this Order, or announced at the Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis is expressly reserved.

18.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

19.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

20.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

21.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

22.     The failure to specifically include any particular provision of the Binance US Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that entry into the Binance US Purchase Agreement be authorized and approved in its entirety.

23.     The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Binance US Purchase Agreement, all amendments thereto and any waivers and consents thereunder, and to adjudicate,

if necessary, any and all disputes concerning or relating in any way to interpretation,

implementation, or enforcement of the Binance US Purchase Agreement, including, but not limited

to, any matter, claim, or dispute arising from or relating to the Binance US Purchase Agreement,

and any purported termination of the Binance US Purchase Agreement pursuant to paragraph 11

of this Order.

24.    To the extent that this Order is inconsistent with the Motion, the terms of this Order

shall govern.


Dated: _____, 2022                    _____
New York, New York                         THE HONORABLE MICHAEL E WILES
                                           UNITED STATES BANKRUPTCY JUDGE

# Exhibit B

**Binance US Purchase Agreement**

**Execution Verion**

---

### ASSET PURCHASE AGREEMENT

### DATED AS OF DECEMBER 18, 2022

### BY AND BETWEEN

### BAM TRADING SERVICES INC. D/B/A BINANCE.US, AS PURCHASER,

### AND

### VOYAGER DIGITAL, LLC, AS SELLER.

---

# TABLE OF CONTENTS

Page

**ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES** ...............................................................................................1

1.1   Purchase and Sale of the Acquired Assets ................................................1
1.2   Excluded Assets ........................................................................................3
1.3   Assumption of Certain Liabilities .............................................................5
1.4   Excluded Liabilities ..................................................................................6
1.5   Assumption/Rejection of Certain Contracts .............................................6

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING** ...........................................8

2.1   Consideration; Payment ............................................................................8
2.2   Deposit ......................................................................................................9
2.3   Closing ......................................................................................................9
2.4   Closing Deliveries by Seller ...................................................................10
2.5   Closing Deliveries by Purchaser .............................................................10
2.6   Withholding .............................................................................................11

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER** ....................11

3.1   Organization and Qualification ...............................................................11
3.2   Authorization of Agreement ...................................................................12
3.3   Conflicts; Consents .................................................................................12
3.4   Financial Statements ...............................................................................13
3.5   Cryptocurrency; Loans; Customer Accounts ..........................................13
3.6   Title to Acquired Assets; Staked Coins; Exclusive Ownership; Sufficiency of Assets ................................................................................................14
3.7   Title to Properties ...................................................................................14
3.8   Contracts .................................................................................................15
3.9   Permits; Compliance with Laws .............................................................16
3.10  Environmental Matters ............................................................................18
3.11  Intellectual Property; Data Privacy ........................................................18
3.12  Tax Matters .............................................................................................19
3.13  Affiliate Transactions .............................................................................20
3.14  Brokers ....................................................................................................21
3.15  Litigation .................................................................................................21
3.16  Absence of Changes ................................................................................21
3.17  No Other Representations or Warranties .................................................21
3.18  No Outside Reliance ................................................................................21

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** ..............22

4.1   Organization and Qualification ...............................................................22
4.2   Authorization of Agreement ...................................................................22
4.3   Conflicts; Consents .................................................................................22
4.4   Financing .................................................................................................23
4.5   Permits .....................................................................................................23
4.6   Brokers ....................................................................................................23
4.7   No Litigation ...........................................................................................23

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 4.8 | Certain Arrangements | 24 |
| 4.9 | Solvency | 24 |
| 4.10 | No Additional Representations or Warranties | 24 |
| 4.11 | No Outside Reliance | 24 |

**ARTICLE V BANKRUPTCY COURT MATTERS** .................................................**25**

| | | |
|---|---|---|
| 5.1 | Selection of Successful Bid and Winning Bidder and Sale Approval | 25 |
| 5.2 | No-Shop | 26 |
| 5.3 | Bankruptcy Actions | 27 |
| 5.4 | Cure Costs | 29 |
| 5.5 | Approval | 29 |
| 5.6 | No Successor Liability | 29 |
| 5.7 | Filings | 29 |
| 5.8 | Waiver of Conflicts | 29 |

**ARTICLE VI COVENANTS AND AGREEMENTS** .................................................**30**

| | | |
|---|---|---|
| 6.1 | Conduct of Seller | 30 |
| 6.2 | Access to Information | 32 |
| 6.3 | Employee Matters | 34 |
| 6.4 | Regulatory Matters | 36 |
| 6.5 | Reasonable Best Efforts; Cooperation | 38 |
| 6.6 | Data Transfer Matters | 38 |
| 6.7 | Use of Name | 39 |
| 6.8 | Further Assurances | 40 |
| 6.9 | Insurance Matters | 40 |
| 6.10 | User Migration | 41 |
| 6.11 | Rebalancing Exercise; Seller Statement | 43 |
| 6.12 | Crediting of Accounts; Unsupported Jurisdictions, Transfer of Coins to Seller; Liquidations or Distributions by Seller | 45 |
| 6.13 | VGX Token Listing Review Process | 48 |
| 6.14 | Additional Bankruptcy Distributions | 48 |
| 6.15 | Unstaking | 49 |
| 6.16 | Receipt of Misdirected Assets; Liabilities | 50 |
| 6.17 | Acknowledgment by Purchaser | 50 |
| 6.18 | IT Migration | 52 |
| 6.19 | Confidentiality | 52 |
| 6.20 | Acquired Assets Owned by Non-Debtors | 53 |
| 6.21 | Seller Expenses | 53 |
| 6.22 | Purchaser Expenses | 54 |

**ARTICLE VII CONDITIONS TO CLOSING** ..........................................................**55**

| | | |
|---|---|---|
| 7.1 | Conditions Precedent to the Obligations of Purchaser and Seller | 55 |
| 7.2 | Conditions Precedent to the Obligations of Purchaser | 55 |
| 7.3 | Conditions Precedent to the Obligations of Seller | 56 |
| 7.4 | Waiver of Conditions | 56 |

# TABLE OF CONTENTS

<div align="right">Page</div>

**ARTICLE VIII  TERMINATION** ........................................................................................**57**

    8.1    Termination of Agreement..........................................................57

    8.2    Effect of Termination................................................................59

    8.3    Reverse Termination Fee ...........................................................60

    8.4    Further Effect of Termination ....................................................60

**ARTICLE IX  TAXES** .......................................................................................................**61**

    9.1    Transfer Taxes .........................................................................61

    9.2    Cooperation..............................................................................61

    9.3    Preparation of Tax Returns and Payment of Taxes ...................62

**ARTICLE X  MISCELLANEOUS** .......................................................................................**63**

    10.1    Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers..................................................................................63

    10.2    Expenses ..................................................................................63

    10.3    Notices .....................................................................................64

    10.4    Binding Effect; Assignment......................................................65

    10.5    Amendment and Waiver ............................................................65

    10.6    Third Party Beneficiaries ..........................................................65

    10.7    Non-Recourse ..........................................................................66

    10.8    Severability ..............................................................................66

    10.9    Construction.............................................................................66

    10.10    Schedules .................................................................................66

    10.11    Complete Agreement ................................................................67

    10.12    Specific Performance ...............................................................67

    10.13    Jurisdiction and Exclusive Venue .............................................67

    10.14    Governing Law; Waiver of Jury Trial ........................................68

    10.15    No Right of Set-Off ..................................................................69

    10.16    Counterparts and PDF ..............................................................69

    10.17    Publicity ..................................................................................69

    10.18    Bulk Sales Laws.......................................................................70

    10.19    Fiduciary Obligations...............................................................70

    10.20    No Solicitation .........................................................................70

    10.21    Acknowledgment ......................................................................70

**ARTICLE XI  ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS** ..........................**70**

    11.1    Certain Definitions...................................................................70

    11.2    Index of Defined Terms ............................................................85

    11.3    Rules of Interpretation .............................................................86

**INDEX OF EXHIBITS**

EXHIBIT A    FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
AGREEMENT

EXHIBIT B    FORM OF TRADEMARK AND DOMAIN NAME ASSIGNMENT
AGREEMENT

US-DOCS\137411268.27

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of December 18, 2022, is made by and between BAM Trading Services Inc. d/b/a Binance.us, a Delaware corporation ("Purchaser"), and Voyager Digital, LLC, a Delaware limited liability company ("Seller"). Purchaser and Seller are each referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

WHEREAS, on July 5, 2022 (the "Petition Date"), Seller, together with Voyager Digital Ltd., a Canadian corporation and Seller's indirect equityholder ("Parent"), and Voyager Digital Holdings, Inc., a Delaware corporation and Seller's direct equityholder ("Holdings" and, collectively with Seller and Parent, the "Debtors"), filed voluntary petitions for relief (collectively, the "Petitions") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), to be jointly administered for procedural purposes (collectively, the "Bankruptcy Case"); and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement, the Agreement Order, the Plan and the Confirmation Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchaser and Seller hereby agree as follows.

## ARTICLE I

## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1     Purchase and Sale of the Acquired Assets. Pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Agreement Order, the Plan and the Confirmation Order, at the Closing, Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Post-Closing Liens; provided, in respect of the Acquired Coins, Purchaser shall acquire all of Seller's right, title and interest in and to the Acquired Coins free and clear of all Encumbrances (including Encumbrances implemented through "smart contracts" or other technological means), except that with respect to any ETH Coins that are Staked Coins as of the date hereof and cannot be unstaked as of the Closing, such ETH Coins shall be subject to such staking. "Acquired Assets" means all of the properties, rights and interests in and to only the following assets of Seller as of the Closing, wherever located and

whether or not required to be reflected on a balance sheet prepared in accordance with IFRS, including any such properties, rights and interests in any assets of the following types acquired by Seller after the date hereof and prior to the Closing:

(a)    all Acquired Coins, together with all information regarding the underlying networks and smart contracts to which such Acquired Coins are subject;

(b)    to the extent permissible under applicable Law, (1) all (i) information and Personal Information (including, for the avoidance of doubt, names, account numbers, social security numbers, passports (including passport numbers), drivers licenses (including driver license numbers), "liveness check" selfies, email addresses, mailing addresses, phone numbers, contact information, usernames, user IDs, passwords, and any Personal Information collected for purposes of KYC Procedures) related to (A) all active and inactive accounts of Users ("Voyager User Accounts") and (B) any other consumers located or having a home address in the United States from whom Personal Information was collected by Seller; (ii) information that has been anonymized, pseudonymized, or otherwise de-identified; (iii) data contained in the Seller Statement or the Post-Bankruptcy Statement; (iv) information relating to Voyager User Accounts that must be obtained and retained by Purchaser or any of its Affiliates for regulatory or legal purposes; and (v) any encryption key, passcode or cypher required to access any of the foregoing (collectively, the "Acquired User Data"), and (2) all other information and data relating to the other categories of Acquired Assets, the Voyager Platform, other than Acquired User Data (clauses (1) and (2), collectively, "Acquired Information");

(c)    all rights, causes of action, claims (including, for the avoidance of doubt, any claims and causes of action arising under Chapter 5 of the Bankruptcy Code), counterclaims, defenses, credits, rebates, demands, allowances, refunds (other than Tax refunds or Tax attributes, in each case, to the extent enumerated in Section 1.2(i)), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities of any kind, in each case that Seller may have against any User located or having a home address in the United States to the extent that such claim or cause of action is against a User in such Person's capacity as a User (in each case, excluding (i) Retained Avoidance Actions, (ii) claims, causes of action or other rights against Seller or any of its Affiliates, or (iii) any of the foregoing to the extent relating to any Credit Matter) (collectively, "Acquired Voyager Claims");

(d)    other than VGX Token Smart Contracts, all Intellectual Property owned by Seller or otherwise used or held for use by or on behalf of Seller in connection with the operation of its businesses, including all Business Software (in source code and object code form), any Bedrock source code and other IT Systems owned by Seller and required to operate the Voyager Platform, all Business Accounts (provided that Purchaser may elect, by written notice to Seller until two (2) Business Days prior to the Closing Date, to designate any Business Account(s) as Excluded Asset(s)), all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights, claims and causes of action to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world;

2

(e)    all rights to continue the customer relationships with customers of Seller and its Affiliates to the extent pertaining to savings and trading services related to Cryptocurrency;

(f)    all Contracts listed on <u>Schedule 1.1(f)</u> (the "<u>Assigned Contracts</u>") (for the avoidance of doubt, not including the 3AC Loan); and

(g)    other than the Excluded Documents, all Documents, goodwill, payment intangibles and general intangible assets and rights of or otherwise used or held for use by or on behalf of Seller and its Affiliates, in each case in connection with or related to any of the foregoing categories of Acquired Assets; <u>provided</u> that Seller shall be entitled to retain copies of Documents (subject to <u>Section 6.19</u>).

1.2    <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, in no event shall Seller be deemed to sell, transfer, assign, convey or deliver, and Seller shall retain all right, title and interest to all other properties, rights, interests and other assets of Seller that are not Acquired Assets, including the following (collectively, the "<u>Excluded Assets</u>"):

(a)    all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by Seller, and any retainers or similar amounts paid to Advisors or other professional service providers, in each case, other than the Acquired Coins;

(b)    all Contracts of Seller other than the Assigned Contracts, including the Contracts listed on <u>Schedule 1.2(b)</u> (the "<u>Excluded Contracts</u>");

(c)    all Documents, in each case, (i) to the extent they are primarily used in, or primarily relate to, any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of Seller, other than Voyager User Accounts), (ii) to the extent that such Documents constitute Seller's financial accounting Documents, all minute books, organizational documents, stock registers and such other books and records of Seller to the extent pertaining to the ownership, organization or existence of Seller, Tax Returns (and any related work papers), corporate seals, checkbooks, and canceled checks, in each case to the extent not primarily relating to the Acquired Assets or Assumed Liabilities or (iii) that Seller is required by Law to retain; <u>provided</u> that, to the extent not prohibited by applicable Law, Purchaser shall have the right to make copies of any portions of such Documents;

(d)    all Documents to the extent prepared or received by Seller or any of its Affiliates in connection with the sale of the Acquired Assets, this Agreement, or the Transactions, including (i) all records and reports prepared or received by Seller or any of its Affiliates or Advisors in connection with the sale of the Acquired Assets and the Transactions, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received in connection therewith, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of Seller's business or assets, and (iii) all privileged materials, documents and records of Seller or any of its Affiliates (together with the Documents specified in <u>Sections 1.2(c)</u> and <u>1.2(h)</u>, the "<u>Excluded Documents</u>");

3

(e)    all current and prior insurance policies of Seller, including for the avoidance or doubt all director and officer insurance policies, and all rights and benefits of any nature of Seller with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, other than Acquired Voyager Claims;

(f)    all membership interests or other equity interests of Seller or any of its Affiliates or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests;

(g)    (i) all Retained Avoidance Actions, (ii) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law, (iii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of Seller or any of its Affiliates, in each case, either (A) arising out of or relating to events occurring on or prior to the Closing Date, except as set forth in Section 1.1, or (B) related to any Credit Matter, and (iv) all claims that Seller or any of its Affiliates may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities, in each case other than Acquired Voyager Claims;

(h)    Seller's claims or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between Seller and Purchaser or their respective Affiliates in connection with the Transactions, or any other agreement between Seller and Purchaser or their respective Affiliates entered into on or after the date hereof;

(i)    (x) all Tax attributes of Seller or its Affiliates (including refunds of income Taxes of Seller or its Affiliates, but excluding any Tax refunds or Tax attributes with respect to Taxes in respect of the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date allocable to Purchaser in accordance with Section 9.3(d) or with respect to Transfer Taxes), (y) all Tax refunds and Tax attributes with respect to Taxes in respect of the Acquired Assets (i) for any Pre-Closing Tax Period or (ii) that are Excluded Liabilities, and (z) all Tax refunds and Tax attributes with respect to Taxes in respect of the Excluded Assets;

(j)    every asset of Seller that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) at the direction of the Bankruptcy Court or (ii) as otherwise permitted under Section 6.1(b);

(k)    all demands, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date, in each case other than Acquired Voyager Claims;

(l)    the properties, rights, interests, equity and assets of Coinify ApS and its direct and indirect subsidiaries;

4

(m)    all Money Transmitter Licenses;

(n)    Seller's accounts receivable, and other amounts or Liabilities owing, from its Affiliates;

(o)    (i) all Seller Plans and assets of all Seller Plans that do not constitute Acquired Coins and (ii) personnel records relating to employees of Seller and Holdings;

(p)    all information and Personal Information related to individual consumers that is not Acquired User Data, including any Personal Information that is subject to the GDPR or collected from natural persons with addresses outside of the United States;

(q)    the 3AC Loan;

(r)    all VGX Token Smart Contracts; and

(s)    the properties, rights, interests and assets set forth on Schedule 1.2(s).

1.3    Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and in the Agreement Order, the Plan and the Confirmation Order, effective as of the Closing, in addition to the other components of the Purchase Price described in Section 2.1(a), Purchaser shall irrevocably assume from Seller (or with respect to Taxes, if applicable, from Seller's applicable Affiliate) (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Seller shall (or with respect to Taxes, if applicable, cause Seller's applicable Affiliate to) irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities"):

(a)    all Liabilities and obligations of Seller under the Assigned Contracts to the extent such Liabilities arise from and after the Closing or relate to events, facts and circumstances first existing after the Closing;

(b)    all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs");

(c)    all Liabilities arising out of the conduct of the business or the ownership of the Acquired Assets, in each case, solely by Purchaser from and after the Closing Date and to the extent such Liabilities arise from events, facts and circumstances first existing after the Closing Date;

(d)    all Liabilities for Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date allocable to Purchaser in accordance with Section 9.3(d);

(e)    all Liabilities relating to all Transfer Taxes; and

(f)    all Liabilities set forth on Schedule 1.3(f);

5

provided, however, that whether or not any Liability for Taxes is an Assumed Liability shall be governed solely by Section 1.3(d) and Section 1.3(e).

1.4     Excluded Liabilities. Notwithstanding anything herein to the contrary, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Seller or any of its Affiliates or relating to the Acquired Assets, the Excluded Assets or the business and operations of Seller and its Affiliates, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on or prior to the Closing Date or arising thereafter, including as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"). For the avoidance of doubt, and without limiting the foregoing, Purchaser shall not be obligated to assume, and does not assume, and hereby disclaims, all of the following Liabilities of Seller and its Affiliates (each of which shall constitute an Excluded Liability hereunder):

(a)     all Liabilities (i) existing prior to the filing of the Bankruptcy Case that are subject to compromise under the Bankruptcy Code and (ii) to the extent not otherwise expressly assumed herein (including in the Commercial Covenants), incurred subsequent to the filing of the Bankruptcy Case and prior to the Closing;

(b)     all Liabilities related to (i) customer accounts of Seller or its Affiliates (including Voyager User Accounts), except for those obligations of Purchaser expressly set forth in the Commercial Covenants and (ii) commercial payables or amounts owing by Seller or its Affiliates, including to any software vendors;

(c)     all Liabilities for Taxes (i) with respect to the Acquired Assets for any Pre-Closing Tax Period allocable to Seller in accordance with Section 9.3(d); (ii) of Seller and their Affiliates for any taxable period; or (iii) arising from or in connection with an Excluded Asset; and

(d)     all Liabilities resulting from Seller's or any of its Affiliates' breach of, violation of, or non-compliance with the provisions of any Laws relating to the ownership or operation of their respective businesses, the Acquired Assets and the Excluded Assets or the Transactions, including any bulk transfer Laws or similar Laws of any jurisdiction in connection with the Transactions; and

(e)     all Successor Liabilities, including with respect to any investigation or other Action against, concerning or otherwise with respect to Seller, its business or its assets.

1.5     Assumption/Rejection of Certain Contracts.

(a)     Assumption and Assignment of Executory Contracts. Seller shall, and shall cause its Affiliates to, provide timely and proper written notice of the Seller's request for entry of the Confirmation Order to all parties to any executory Contracts or unexpired leases to which Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Seller and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing. The

6

Confirmation Order shall provide that as of and conditioned on the occurrence of the Closing, Seller shall assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included on an exhibit attached to either the Plan Supplement, a notice filed in connection with the motion for approval of the Confirmation Order or a separate motion for authority to assume and assign such Assigned Contracts. Such exhibit shall also set forth Seller's good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Seller based on Seller's books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Seller shall, pursuant to the Agreement Order, the Confirmation Order and the Assignment and Assumption Agreement(s), assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to <u>Section 1.5(b)</u>. At the Closing, Purchaser shall (i) pay all Cure Costs and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.

(b)     <u>Excluding or Adding Assigned Contracts Prior to Closing</u>. Purchaser shall have the right to notify Seller in writing of any Assigned Contract that it does not wish to assume or a Contract to which Seller is a party that Purchaser wishes to add as an Assigned Contract up to five (5) Business Days prior to the Closing Date, and (i) any such previously considered Assigned Contract that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed to be an Excluded Contract, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract that Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by Seller to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price. Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing. No Contract set forth on <u>Schedule 1.2(s)</u> shall be subject to the terms of this <u>Section 1.5(b)</u>.

(c)     <u>Non-Assignment</u>.

(i)     Notwithstanding anything to the contrary in this Agreement but subject to <u>Section 6.1</u>, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by Seller or terminated by Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption; <u>provided</u> that Seller shall obtain Purchaser's consent prior to seeking to reject or terminate, or rejecting or terminating, any Assigned Contract or any Contract assumed by Purchaser pursuant to <u>Section 1.5(a)</u> or <u>Section 1.5(b)</u> from and after the date of this Agreement.

(ii)     Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than,

7

and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of Seller's rights over such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as it is to be transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. In the event that any Acquired Asset is deemed not to be assigned pursuant to this clause (ii), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and the closing of the Bankruptcy Case, Seller and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) enter into a commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without materially infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs actually incurred by Seller or its Affiliates or any direct reasonable and documented out-of-pocket costs actually incurred by Seller or its Affiliates resulting from the retention and maintenance by Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2) Purchaser shall assume any related burden and obligation with respect to such Acquired Asset to the extent such burden and obligation would constitute an Assumed Liability if such Acquired Asset was transferred at Closing. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement, the Agreement Order, the Plan and Confirmation Order, and the Bankruptcy Code. Notwithstanding anything herein to the contrary, the provisions of this Section 1.5(c) shall not apply to any consent or approval that is not required to be obtained by operation of the Bankruptcy Code (including section 365(f)).

## ARTICLE II

## CONSIDERATION; PAYMENT; CLOSING

2.1    Consideration; Payment.

(a)    Subject to the terms and conditions herein, the aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) (A) the assumption of Assumed Liabilities, (B) a cash payment of $20,000,000 (the "Cash Payment"), (C) the Seller Expenses, if any, payable pursuant to Section 6.21, and (D) Purchaser's obligations to make the payments set forth in Section 6.12 and Section 6.14.

(b)    Subject to the terms and conditions herein, at the Closing, Purchaser shall deliver, or cause to be delivered, to Seller (i) the Cash Payment, plus (ii) the Seller Expenses, if any, payable pursuant to Section 6.21, less (iii) the Deposit, together with all received investment income, if any (the "Closing Date Payment"). Any payment required to be made pursuant to this Agreement in cash (including the Closing Date Payment) shall be made by wire transfer of

8

immediately available funds to such bank account as shall be designated in writing by the applicable Party to the other Party at least two (2) Business Days prior to the date such payment is to be made.

(c)    Upon reasonable advance written notice to Purchaser (in any event delivered to Purchaser no less than five Business Days prior to the Closing Date) Seller shall be entitled to withhold such portion of the Seller Held Coins as is necessary to satisfy Seller's obligations under the Plan (the "Withheld Coins"), and Seller shall distribute, or take such other action with respect to, the Withheld Coins only in accordance with the Plan and the provisions of this Agreement. To the extent there are any Withheld Coins, the provisions of this Agreement shall be read accordingly to give effect to the withholding and subsequent transfer, distribution or other action with respect to any such Withheld Coins, *mutatis mutandis*.

2.2    Deposit.

(a)    Purchaser has made, on the date hereof or will make on the first Business Day following the date hereof, an earnest money deposit with Acquiom Clearing House LLC (the "Escrow Agent") in the amount equal to $10,000,000 (the "Deposit"), by wire transfer of immediately available funds for deposit into an escrow account (the "Escrow Account"). Subject to Section 2.2(b) and Section 2.2(c), the Deposit and any received investment income, if any, shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date. Seller hereby acknowledges and agrees that the Deposit qualifies as the deposit required pursuant to the Bidding Procedures Order.

(b)    If this Agreement has been validly terminated (i) by Seller pursuant to Section 8.1(d) or Section 8.1(f), (ii) by Purchaser pursuant to Section 8.1(c), in circumstances where Seller would be entitled to terminate this Agreement pursuant to Section 8.1(d) or Section 8.1(f), or (iii) by Seller pursuant to Section 8.1(g) in connection with and following any Purchaser Development and not in connection with a Higher and Better Offer (each of (i), (ii), and (iii), a "Purchaser Default Termination"), then within three (3) Business Days after the date of such termination, the Parties shall execute any instructions necessary to permit the Escrow Agent to disburse the Deposit together with all received investment income, if any, to Seller.

(c)    If this Agreement has been validly terminated by either Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within three (3) Business Days after such termination, and, at Purchaser's request, Seller shall execute any instructions necessary to permit the Escrow Agent to disburse the Deposit together with all received investment income, if any, to Purchaser.

(d)    If the Closing occurs, the Deposit shall be transferred to Seller.

2.3    Closing. Subject to the terms and on the conditions set forth in this Agreement, the closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement at and in connection with such closing (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to

9

hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on the third (3rd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs in accordance with the provisions hereof is referred to herein as the "Closing Date."

2.4    Closing Deliveries by Seller. At the Closing, Seller shall deliver to Purchaser:

(a)    a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by Seller;

(b)    each of the Acquired Coins to the wallet address designated by Purchaser for the relevant Acquired Coins of such type; and prior to transferring any Acquired Coins in full, Seller shall send a test transaction of a *de minimis* amount and shall immediately deliver the remainder of the relevant Acquired Coins, following Purchaser's confirmation that the *de minimis* amount was properly delivered; provided that such transfers of the Acquired Coins shall be deemed complete when each transfer is publicly confirmed on the blockchain for the related Coin at least the number of times set forth on https://support.kraken.com/hc/en-us/articles/203325283-Cryptocurrency-deposit-processing-times (or a successor site agreed by Seller and Purchaser); provided further that (i) for Acquired Coins held on the Binance.US Platform as of the Closing Date, such Acquired Coins shall be transferred to the Binance.US Platform account designated by Purchaser and (ii) in the case of ETH Coins that are Staked Coins as of the date hereof, such staked ETH Coins shall be delivered pursuant to the means mutually agreed between Purchaser and Seller acting reasonably;

(c)    a short-form trademark and domain name assignment agreement substantially in the form of Exhibit B (the "Trademark and Domain Name Assignment Agreement"), duly executed by Seller;

(d)    an IRS Form W-9 properly completed and duly executed by Seller or Seller's regarded owner for U.S. federal income Tax purposes;

(e)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Seller certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied; and

(f)    the Seller Statement pursuant to Section 6.11(c).

2.5    Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver to (or at the direction of) Seller:

(a)    without duplication, the Closing Date Payment pursuant to Section 2.1(b);

(b)    the Assignment and Assumption Agreement, duly executed by Purchaser;

10

(c)     the Trademark and Domain Name Assignment Agreement, duly executed by Purchaser; and

(d)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in <u>Sections 7.3(a)</u> and <u>7.3(b)</u> have been satisfied.

2.6     <u>Withholding</u>. Purchaser and its Affiliates shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement such amounts as are required to be deducted or withheld under applicable tax Law. Prior to making any such deduction or withholding, Purchaser or its applicable Affiliate shall use reasonable best efforts to (x) notify the person in respect of which such withholding or deduction is proposed to be made of such deduction or withholding and (y) give such person a reasonable amount of time to demonstrate that no or reduced withholding is required under applicable tax Law. To the extent that amounts are so deducted or withheld and paid to the appropriate Governmental Body, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

# ARTICLE III

# REPRESENTATIONS AND WARRANTIES OF SELLER

Except as (i) disclosed in the forms, reports, schedules, statements, exhibits and other documents filed with (or furnished to) the Canadian Securities Administrators ("<u>CSA</u>") by Parent in respect of Seller and its business during the two-year period prior to the date hereof to the extent publicly available at least one (1) Business Day prior to the date hereof on the CSA's System for Electronic Document Analysis and Retrieval, excluding (x) any disclosures set forth or referred to in any risk factor or similar section that do not constitute statements of fact, (y) any disclosures in any forward-looking statements disclaimer, and (z) any other disclosures that are generally cautionary, predictive or forward-looking in nature (the "<u>Filed CSA Documents</u>") (it being acknowledged that nothing disclosed in the Filed CSA Documents will be deemed to modify or qualify the Fundamental Representations), (ii) disclosed in any forms, statements or other documents filed by any of the Debtors with the Bankruptcy Court in the Bankruptcy Case as of one (1) Business Day prior to the date hereof, or (iii) set forth in the Schedules delivered by Seller concurrently herewith and subject to <u>Section 10.10</u>, Seller represents and warrants to Purchaser as follows as of the date hereof and as of the Closing Date:

3.1     <u>Organization and Qualification</u>.

(a)     Except as set forth on <u>Schedule 3.1</u>, Seller is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has all requisite limited liability company power and authority necessary to own, lease and operate its properties and assets and to carry on its business as it is now being conducted, except (other than with respect to Seller's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as set forth on <u>Schedule 3.1</u>, Seller is duly qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned, leased or operated by it makes such qualification necessary, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.2    <u>Authorization of Agreement</u>. Subject to requisite Bankruptcy Court approvals:

(a)    Seller has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions;

(b)    the execution, delivery and performance by Seller of this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement to which it is a party or to be executed by it in connection with the consummation of the Transactions (the "<u>Seller Documents</u>"), and the consummation by Seller of the Transactions, have been duly authorized by all requisite limited liability company action and no other limited liability company proceedings on its part are necessary to authorize the execution, delivery and performance by Seller of this Agreement and the Seller Documents and the consummation by it of the Transactions; and

(c)    this Agreement has been, and the Seller Documents will be, when delivered pursuant to the terms hereof, duly executed and delivered by Seller and, assuming due authorization, execution and delivery hereof by the other Party, constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except that such enforceability (i) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (ii) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "<u>Enforceability Exceptions</u>").

3.3    <u>Conflicts; Consents</u>.

(a)    Assuming that (x) requisite Bankruptcy Court approvals are obtained, and (y) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 3.3(a)</u> are made, given or obtained (as applicable), neither the execution and delivery by Seller of this Agreement, nor the consummation by Seller of the Transactions, nor performance or compliance by Seller with any of the terms or provisions hereof, will (i) conflict with or violate any provision of Seller's certificate of formation or limited liability company agreement, (ii) violate any Law or Order applicable to Seller, the Acquired Assets or the Assumed Liabilities, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancellation of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate Seller's obligations under any such Material Contract, (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Seller or (v) violate, contravene or conflict with, result in termination or lapse of, or in any way affect any permit, except, in the case of <u>clauses</u>

12

(ii) through (v), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     Except as set forth on Schedule 3.3(a), Seller is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Seller of this Agreement or the consummation by Seller of the Transactions, except (i) any requisite Bankruptcy Court approvals, or (ii) where failure to file, seek or obtain such notice, authorization, approval, Order, permit or consent would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4     Financial Statements. Attached to Schedule 3.4 are Parent's unaudited statements of financial position as of June 30, 2022 (the "Balance Sheet Date") and audited statements of financial position as of June 30, 2021, and the related statements of loss and cash flows for each fiscal year then ended, in each case (collectively, the "Financial Statements"). Except as set forth on Schedule 3.4, the Financial Statements have been prepared, in each case, in conformity in all material respects with IFRS consistently applied, except for the absence of footnote disclosure and any customary year-end adjustments and except, in the case of the unaudited statements as of June 30, 2020 or the fiscal year then ended, with respect to any Tax matters or any impact or effect thereof. The Financial Statements are prepared based on the books and records of Parent and its Subsidiaries and present fairly in all material respects, in accordance with IFRS consistently applied, the consolidated financial condition and results of operations of Parent as of the dates and for the periods referred to therein, except as may be indicated in the notes thereto.

3.5     Cryptocurrency; Loans; Customer Accounts.

(a)     Schedule 3.5(a) sets forth a list of all Cryptocurrency held by Seller as of a date within three (3) Business Days of the date hereof, the means through which Seller as of such date controls such Cryptocurrency (e.g., "private keys," custody agreements or agreements with parties performing validation services), whether or not such Cryptocurrency is attributable to User accounts on the Voyager Platform, and whether such Cryptocurrency constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan), which Schedule 3.5(a) shall be provided to Purchaser no later than December 18, 2022. Seller has the exclusive ability to control, including by use of "private keys" or other equivalent means or through custody arrangements or other equivalent means, all such Cryptocurrency set forth on Schedule 3.5(a) (other than, solely to the extent of any staking contract, Staked Coins), and owns such Cryptocurrency (other than Cryptocurrency that constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan) and, solely to the extent of any staking contract, Staked Coins) free and clear of all Encumbrances (other than Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan); provided that such ownership and exclusive ability to control Cryptocurrency is subject to the continued existence, validity, legality, governance and public availability of the relevant blockchains.

(b)     Schedule 3.5(b) sets forth a true, correct and complete list of all amounts (including any principal, interest, fees, expenses or penalties) outstanding or unpaid under any Loan.

13

(c)     Schedule 3.5(c) sets forth a list of all Users (excluding Users with addresses in the United Kingdom, European Union or European Economic Area) as of the Petition Date and a date within three (3) Business Days of the date hereof and the account position (including type and amount of Cryptocurrency) that such User held as of immediately prior to the Petition Date and as of the date hereof, which Schedule 3.5(c) shall be provided to Purchaser no later than December 18, 2022.

(d)     Seller has implemented procedures and controls regarding management of authentication credentials such as private keys and means for instructing third party custodians ("Authentication Credentials") for Cryptocurrencies, including limitation of access to Authentication Credentials to employees who need to have such access and requiring multiple individuals to sign off on transactions. Where Authentication Credentials are not held by employees of Seller, such Authentication Credentials are held by reputable third-party custodians or wallet providers whose security procedures have been evaluated by Seller and found to be fit for purpose.

(e)     Schedule 3.5(e) sets forth a true, correct and complete list of the number and type of Post-Petition Coins, on a User-by-User basis, which Schedule 3.5(e) shall be provided to Purchaser no later than December 18, 2022.

3.6     Title to Acquired Assets; Staked Coins; Exclusive Ownership; Sufficiency of Assets.

(a)     Seller has good and valid title to all Acquired Assets (other than Coins pledged by a borrower as collateral in respect of any Loans and, solely to the extent of any staking contract, Staked Coins), free and clear of all Encumbrances (other than Permitted Encumbrances) and, at the Closing, subject to Section 1.5(c), Purchaser will be vested with good and valid title to all such Acquired Assets, free and clear of all Encumbrances (other than Permitted Post-Closing Liens) and Excluded Liabilities, to the fullest extent permissible under Law, including section 363(f) of the Bankruptcy Code; provided, in respect of the Acquired Coins, Purchaser will be vested with good and valid title thereto free and clear of all Encumbrances (including Encumbrances implemented through "smart contracts" or other technological means), except that with respect to any staked ETH Coins that cannot be unstaked as of the Closing, such ETH Coins shall be subject to such staking. Schedule 3.6(a) sets forth a true, correct and complete list of all Seller Held Coins that are subject to staking ("Staked Coins").

(b)     Seller is the sole owner of all Coins relating to the exchange and custody business of the Voyager Platform and has good and valid title to such Coins, free and clear of all Encumbrances (except to the extent such Coin constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan) and, solely to the extent of any staking contract, Staked Coins).

3.7     Title to Properties.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller has a good and valid leasehold interest to all

14

real property leased by Seller (the "Leased Real Property"), free and clear of all Encumbrances (other than Permitted Encumbrances). Seller does not own any real property.

(b)     Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, Seller holds good title to, or holds a valid leasehold interest in, all of the material tangible property necessary in the conduct of its business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to Seller.

3.8     Contracts.

(a)     Schedule 3.8 sets forth a list of each Material Contract as of the date of this Agreement. For purposes of this Agreement, "Material Contract" means (x) any Assigned Contract, and (y) any other Contract to which Seller is a party or by which it is bound (in each case, excluding any Seller Plan) that in the case of this clause (y):

(i)     relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement, other than for the avoidance of doubt, marketing and licensing Contracts entered into in the Ordinary Course;

(ii)     provides for indebtedness for borrowed money of Seller having an outstanding or committed amount in excess of $1,000,000, other than letters of credit;

(iii)     relates to the acquisition or disposition of any material business (whether by merger, sale of stock, sale of assets or otherwise) pursuant to which any earn-out or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments by or to Seller of more than $1,000,000 after the date hereof (in each case, excluding for the avoidance of doubt, acquisitions or dispositions of Equipment, Cryptocurrency, properties or other assets in the Ordinary Course or of Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the business of Seller);

(iv)     involves the license of material Seller Intellectual Property to third parties (other than (x) Contracts with end users of Seller's products and services entered into in the ordinary course of business or (y) non-exclusive licenses granted to service providers, suppliers and other third parties in connection with the provision of goods or services to Seller; provided such licenses are ancillary to, and not the primary purpose of, such Contract);

(v)     is a Contract (other than purchase orders or Contracts with respect to the acquisition of Cryptocurrency in the Ordinary Course) for the purchase of materials, supplies, goods, services, Equipment, or other assets pursuant to which Seller would reasonably be expected to make payments of more than $3,000,000 during any fiscal year;

(vi)     contains any provision (A) limiting, in any material respect, the right of Seller to engage in any business, make use of any Seller Intellectual Property that is

15

material to Seller, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of (A) and (B), other than (x) a Contract that can be terminated on ninety (90) days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or obligations or the payment of any penalty under, such Contract, (y) customer Contracts entered into in the Ordinary Course granting exclusive rights to certain of Seller's services or containing "most favored nation" provisions with respect to certain of Seller's products or (z) any provision in any license agreements for third party Intellectual Property being licensed to Seller that limits Seller's use of such licensed Intellectual Property to specified fields of use or specified territories;

(vii)    evidences or relates to a Loan, including security or collateral agreements;

(viii)    is a custody agreement or agreement with any Person performing validation or staking services with respect to any Cryptocurrency;

(ix)    each Contract evidencing or governing financial or commodity hedging or similar trading activities (including with respect to Cryptocurrency), including any master agreements or confirmations governing swaps, options or other derivatives, or futures account agreements and/or brokerage statements or similar Contract; and

(x)    any Contracts with any Governmental Body, regulatory service providers or self-regulatory organizations in connection with Seller's business or the Voyager Platform.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs) and except (i) as a result of the commencement of the Bankruptcy Case and (ii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced, (A) each Material Contract is valid and binding on Seller and, to the Knowledge of Seller, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) Seller, and, to the Knowledge of Seller, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, (C) Seller has not received a written notice of the existence of any breach or default on the part of Seller under any Material Contract, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of Seller, or to the Knowledge of Seller, any counterparty under such Material Contract and (E) to the Knowledge of Seller, Seller has not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except in each case of (A) through (E), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.9    Permits; Compliance with Laws.

(a)    Except as set forth on Schedule 3.9, (i) Seller is not in violation of any Laws, Orders or any Money Transmitter Requirement, applicable to the Acquired Assets and (ii) Seller holds, and is in compliance with, all licenses, permits, registrations and authorizations, including

16

Money Transmitter Licenses, necessary for the lawful ownership and operation of the Acquired Assets and Seller's business, except in each case as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     Seller and each of its directors, officers and employees acting in such capacity are and have in the past three (3) years been in compliance with the Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"), and any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, and Seller is not, to the Knowledge of Seller, being investigated by any Governmental Body with respect to, or been given notice in writing by a Governmental Body of, any violation by Seller of the FCPA or any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, in each case, except to the extent such non-compliance, investigation or notice of violation would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) neither Seller nor any director or officer of Seller, or any employee, agent or representative or other Person who performs or has performed services on behalf of Seller in the past three (3) years, is a Person that is the subject or target of economic sanctions administered by the Office of Foreign Assets Control of the United States Department of Treasury ("OFAC") (including the designation as a "Specially Designated National or Blocked Person" thereunder), the United Nations Security Council, His Majesty's Treasury, the European Union, the Bureau of Industry Security of the U.S. Department of Commerce, the U.S. Department of State, or any sanctions measures under the U.S. International Emergency Economic Powers Act, the U.S. Trading with the Enemy Act, the U.S. Iran Sanctions Act, the U.S. Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010, the U.S. Iran Threat Reduction and Syria Human Rights Act of 2012, the U.S. National Defense Authorization Act of 2012 or the U.S. National Defense Authorization Act of 2013, or any executive order, directive or regulation pursuant to the authority of any of the foregoing, including the regulations of the United States Department of the Treasury set forth under 31 CFR, Subtitle B, Chapter V, or any orders or licenses issued thereunder (collectively, "Sanctions"), nor any Sanctioned Person; (ii) to the Knowledge of Seller, the Acquired Assets are not the property or interests in property of a Sanctioned Person, and are not otherwise the subject or target of Sanctions; and (iii) Seller has not in the past three (3) years been in violation of applicable Sanctions.

(d)     Seller and each of its directors, officers and employees acting in such capacity are and have in the past three (3) years been in compliance with all anti-money laundering and financial recordkeeping and reporting Laws to which it is subject, including the related rules, regulations or guidelines issued, administered or enforced by any Governmental Body (collectively, the "Anti-Money Laundering Laws"), and no Action by or before any Governmental Body involving Seller (or, in respect of the dealings of Seller, involving any of Seller's directors, officers or employees) with respect to the Anti-Money Laundering Laws is pending, or, to the Knowledge of Seller, threatened, in each case, except to the extent such non-compliance or Action would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(e)     Seller does not (i) have assets located outside the United States, or (ii) derive revenue from users located outside the United States.

17

(f)     Seller does not engage in (a) the design, fabrication, development, testing, production, or manufacture of one or more "critical technologies" within the meaning of Section 721 of the Defense Production Act of 1950, as amended, including all implementing regulations thereof (the "DPA"), or (b) the ownership, operation, maintenance, supply, manufacture, or servicing of "covered investment critical infrastructure" within the meaning of the DPA (where such activities are covered by column 2 of Appendix A to 31 C.F.R. Part 800).

3.10     Environmental Matters. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) Seller is, and has been since January 1, 2021, in compliance with all applicable Environmental Laws, (b) since January 1, 2021, Seller has not received any written notice alleging that Seller is in violation of or liable under, any Environmental Law that is unresolved, (c) Seller possesses and is in compliance with all permits required under Environmental Laws for the operation of its business as currently conducted ("Environmental Permits"), (d) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Seller, threatened in writing against Seller, (e) Seller is not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of Seller and (f) Seller has not released any Hazardous Substances at the Leased Real Property in quantities or concentrations that currently require Seller to conduct remedial activities, or that have given rise to any Action against Seller, under Environmental Laws.

3.11     Intellectual Property; Data Privacy.

(a)     Schedule 3.11(a)(i) sets forth as of the date hereof a true, correct and complete list of all registrations and applications included in the Seller Intellectual Property (the "Seller Registered IP"), indicating for each item the owner, registration or application number, registration or application date and the applicable filing jurisdiction or domain name registrar, as applicable. Except as otherwise indicated on Schedule 3.11(a), all Seller Registered IP is owned exclusively by Seller, and is subsisting, and to the Knowledge of Seller, valid and enforceable. There is no outstanding Action or Order challenging or adversely affecting the validity or enforceability of any material Seller Registered IP, or Seller's ownership of or rights in any material Seller Intellectual Property.

(b)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller owns all of the rights, title and interest in and to the Seller Intellectual Property (other than Intellectual Property licensed to Seller), free and clear of all Encumbrances (other than Permitted Encumbrances). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all of the Seller Intellectual Property (other than Intellectual Property licensed to Seller) is subsisting, valid and enforceable.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) Seller owns or has legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the business of Seller as currently conducted free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) Seller has taken commercially reasonable steps in accordance with industry practice to maintain the confidentiality of non-public Intellectual Property; provided that nothing in this

18

Section 3.11(c) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of Section 3.11(e).

(d)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Actions are pending or, to the Knowledge of Seller, threatened against Seller, and since January 1, 2021, Seller has not received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by Seller of any Intellectual Property owned by or exclusively licensed to Seller or (ii) alleging that Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any Person.

(e)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since January 1, 2021, (i) no Person has infringed, misappropriated or otherwise violated the rights of Seller with respect to any Intellectual Property owned by or exclusively licensed to Seller and (ii) the operation of the business of Seller has not violated, misappropriated or infringed the Intellectual Property of any other Person.

(f)     The consummation of the Transactions will not result in the grant of any right or license to any third party of any material Seller Intellectual Property (other than Intellectual Property licensed to Seller).

(g)     Seller has complied in the past three (3) years in all material respects with all applicable Privacy Laws, privacy policies and notices, and contractual commitments related to the Processing of Personal Information (collectively, "Privacy Requirements"), and the consummation of the Transactions will not cause Seller to breach, in any material respect, any Privacy Requirements.

(h)     Seller has established and implemented and maintains a written information security program that contains commercially reasonable safeguards designed to protect Personal Information and against any Security Incident.

(i)     Except as would not, individually or in the aggregate, reasonably be expected to have a material impact on the Acquired Assets, taken as a whole, there have been no Security Incidents involving Personal Information in Seller's custody, possession or control or for which Seller is otherwise responsible. Except as set forth on Schedule 3.11(i), Seller has not in the past three (3) years: (i) notified or been legally required to notify any affected individuals, Governmental Body or other parties in connection with any Security Incident pursuant to Privacy Requirements; (ii) been the subject of any Action with respect to any unauthorized Processing of Personal Information or violation of any Privacy Laws by any Person; (iii) received any written inquiry, notice, request, claim, complaint, correspondence, or other communication from any Governmental Body or other Person relating to any Security Incident or alleged violation of any Privacy Laws; or (iv) made any ransomware or similar payment in connection with any Security Incident.

3.12    Tax Matters.

(a)     To the Knowledge of Seller, except with respect to income Tax and information Tax Returns, Seller has prepared (or caused to be prepared) and duly and timely filed

19

(taking into account valid extensions of time within which to file) all material Tax Returns in respect of the Acquired Assets or otherwise required to be filed by it, and all such Tax Returns (taking into account all amendments filed in respect thereto) are true, correct and complete in all material respects.

(b)      To the Knowledge of Seller, all material Taxes in respect of the Acquired Assets, other than income Taxes or Taxes attributable to information Tax Returns, or otherwise required to be paid by Seller (whether or not shown on any Tax Return) have been duly and timely paid.

(c)      To the Knowledge of Seller, there are no Encumbrances for Taxes on the Acquired Assets or any other assets of Seller other than for Taxes not yet due or payable.

(d)      Seller has not, within the past five (5) years, been a member of an affiliated group of corporations filing a consolidated federal income Tax Return (other than a group the common parent of which is Parent or one of its Subsidiaries).

(e)      Seller has not waived any statute of limitations in respect of material Taxes or agreed to any extension of time with respect to an assessment or deficiency for material Taxes (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course), including, for the avoidance of doubt, with respect to Taxes in respect of the Acquired Assets.

(f)      Seller has not participated in any "listed transaction" within the meaning of U.S. Treasury Regulation Section 1.6011-4(b)(2).

(g)      Except as set forth on Schedule 3.12(g), solely as of the date hereof, (x) Seller has not received a written notice from a Governmental Body of any proposed adjustment, deficiency or underpayment of material amounts of Taxes with respect to the Acquired Assets, and (y) there are no pending or threatened audits or other Actions for or relating to any Liability for Taxes with respect to the Acquired Assets, except for, in each case of clause (x) and (y), those that have been fully satisfied, resolved or finally withdrawn.

(h)      Seller has not received a claim from a Governmental Body that Tax Returns are required to be filed in relation to the Acquired Assets or the Assumed Liabilities in a jurisdiction where no such Tax Returns have been filed or are currently filed.

(i)      Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this Section 3.12 shall constitute the sole representations and warranties with respect to Taxes and no representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

3.13    Affiliate Transactions. Except as set forth on Schedule 3.13 or in the "Interest Of Management And Others In Material Transactions" disclosure in the Filed CSA Documents or customer accounts of officers or directors, to the Knowledge of Seller, no Affiliate of Seller, or any officer or director of Parent or Seller, (a) is a party to any agreement that constitutes an Acquired Asset having a potential or actual value or a contingent or actual Liability exceeding $500,000, other than (i) loans and other extensions of credit to directors and officers of Seller for

travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans or (b) has any material interest in any Acquired Asset.

3.14    <u>Brokers</u>. Except for Moelis, the fees and expenses of which will be paid by Seller, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Seller or any of its Affiliates for which Purchaser or its Affiliates shall be liable.

3.15    <u>Litigation</u>. Except for the general pendency of the Bankruptcy Case, Actions that would not reasonably be expected to have a Material Adverse Effect or as set forth <u>Schedule 3.15</u>, there are no filed actions, claims, complains, summons, suits, litigations, arbitrations pending or threatened in writing against Seller.

3.16    <u>Absence of Changes</u>. Since the Balance Sheet Date, (a) there has not been any Material Adverse Effect and (b) no action has been taken with respect to the Acquired Assets that would have required the consent of Purchaser under <u>Section 6.1</u> if undertaken after the date hereof.

3.17    <u>No Other Representations or Warranties</u>. Except for the representations and warranties expressly contained in this <u>Article III</u> (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the certificate to be delivered pursuant to <u>Section 2.4(e)</u> (the "<u>Express Seller Representations</u>") (<u>it being understood</u> that Purchaser has relied only on the Express Seller Representations), Purchaser acknowledges and agrees that neither Seller nor any other Person on behalf of Seller makes, and Purchaser has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to Seller, the Acquired Assets or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Moelis) (the "<u>Information Presentation</u>") or in that certain datasite administered by Datasite (the "<u>Dataroom</u>") or elsewhere to Purchaser or any of its Affiliates or their respective Advisors by or on behalf of Seller or any of its Affiliates. Without limiting the foregoing, except for the Express Seller Representations, neither Seller nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or their respective Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise in expectation of the Transactions or any discussions with respect to any of the foregoing information.

3.18    <u>No Outside Reliance</u>. Notwithstanding anything contained in this <u>Article III</u> or any other provision of this Agreement to the contrary, Seller acknowledges and agrees that the Express Purchaser Representations are the sole and exclusive representations, warranties and statements of any kind made to Seller and on which Seller may rely in connection with the Transactions. Seller acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including the

21

completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Purchaser Representations), including in any meetings, calls or correspondence with management of Purchaser or any other Person on behalf of Purchaser or any of its Affiliates or Advisors, are, in each case, specifically disclaimed by Purchaser and that Seller has not relied on any such representations, warranties or statements.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as set forth in the Schedules delivered by Purchaser concurrently herewith and subject to Section 10.10, Purchaser represents and warrants to Seller as follows as of the date hereof and as of the Closing Date.

4.1     Organization and Qualification. Purchaser is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due incorporation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is duly licensed or qualified to do business and is in good standing (or its equivalent) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions.

4.2     Authorization of Agreement. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Party, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3     Conflicts; Consents.

(a)     Except for the consents, licenses, waivers, exemptions, authorizations, approvals, filings, notifications or registrations required under any Money Transmitter Requirements in any Unsupported Jurisdiction applicable to Purchaser and the Binance.US Platform (the "Unsupported Jurisdiction Approvals"), assuming that (i) requisite Bankruptcy Court approvals are obtained, and (ii) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 4.3 are made, given or obtained (as applicable), neither the

execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (A) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (B) violate any Law or Order applicable to Purchaser, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of <u>clauses (B)</u> through <u>(D)</u>, as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions.

(b)　　Except for the Unsupported Jurisdiction Approvals, Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions.

4.4　　<u>Financing</u>. Purchaser has, as of the date hereof, and will have at the Closing, sufficient funds in cash in an aggregate amount necessary to (a) pay the Closing Date Payment pursuant to <u>Section 2.1(b)</u> and any Seller Expenses to the extent payable by Purchaser pursuant to <u>Section 6.21</u>, and (b) pay all fees and expenses of Purchaser in connection with the Closing. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5　　<u>Permits</u>. Purchaser has Money Transmitter Licenses in all States of the United States of America, other than the Unsupported Jurisdictions and any States in which the operation of Purchaser's business does not require a Money Transmitter License. Assuming the accuracy in all material respects of the representations and warranties set forth on <u>Sections 3.9(a)</u>, <u>3.9(d)</u> and <u>3.9(e)</u> (in each case, as qualified by the Schedules) and Seller's compliance in all material respects with the covenants set forth in <u>Sections 6.4</u>, <u>6.6</u>, <u>6.10</u> and the other Commercial Covenants, except for the Unsupported Jurisdiction Approvals, Purchaser holds all licenses, franchises, permits, certificates, approvals, and authorizations from Governmental Bodies necessary for the ownership and use of the Acquired Assets.

4.6　　<u>Brokers</u>. There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transactions.

4.7　　<u>No Litigation</u>. There are no Actions pending or, to the Knowledge of Purchaser, threatened against or affecting Purchaser that will materially and adversely affect Purchaser's performance under this Agreement or Purchaser's ability to consummate the Transactions.

23

4.8    Certain Arrangements. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of Seller or its board of managers (or applicable governing body of any Affiliate of Seller), any holder of equity or debt securities of Seller, or any lender or creditor of Seller or any of its Affiliates, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the Transactions or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of Seller or any of its Affiliates to entertain, negotiate or participate in any of the Transactions.

4.9    Solvency. As of the date hereof Purchaser is and, assuming (x) that the representations and warranties made by Seller herein are true and connect, (y) Seller has complied in all material respects with its covenants and other agreements hereunder, and (z) the conditions set forth in Section 7.1 and Section 7.2 have been satisfied, then immediately after giving effect to the transactions contemplated hereby Purchaser shall be, Solvent. "Solvent" means, with respect to any Person, such Person (a) is able to pay its debts as they become due; (b) owns property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent liabilities) and (c) has adequate capital to carry on its business. In connection with the Transactions, Purchaser is not incurring, has not incurred, and does not plan to incur, debts beyond its ability to pay as they become absolute and matured.

4.10    No Additional Representations or Warranties. Except for the representations and warranties expressly contained in this Article IV (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the certificate to be delivered pursuant to Section 2.5(d) (the "Express Purchaser Representations") (it being understood that Seller has relied only on the Express Purchaser Representations), Seller acknowledges and agrees that neither Purchaser nor any other Person on behalf of Purchaser makes, and Seller has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to Purchaser or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person to Seller or any of its Affiliates or their respective Advisors on behalf of Purchaser. Without limiting the foregoing, except for the Express Purchaser Representations, neither Purchaser nor any other Person will have or be subject to any Liability whatsoever to Seller, or any other Person, resulting from the distribution to Seller, its Affiliates or their respective Advisors, or Seller's, its Affiliates' or their respective Advisors' use of or reliance on, any such information, statements, disclosures, documents, projections, forecasts or other material made available to them in expectation of the Transactions or any discussions with respect to any of the foregoing information.

4.11    No Outside Reliance. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees that the Express Seller Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser and on which Purchaser may rely in connection with the Transactions. Purchaser acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Seller Representations), including in the Information Presentation, the Dataroom, any projections or in

24

any meetings, calls or correspondence with management of Seller or any other Person on behalf of Seller or any of its Affiliates or Advisors and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of Seller's assets, are, in each case specifically disclaimed by Seller and Purchaser has not relied on any such representations, warranties or statements. Purchaser acknowledges that it has conducted to its full satisfaction an independent investigation and verification of the business including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, and, in making its determination to proceed with the Transactions, Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, Seller, the Information Presentation, any projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or Seller or any of its Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Express Seller Representations (it being understood that Purchaser has relied only on the Express Seller Representations).

## ARTICLE V

## BANKRUPTCY COURT MATTERS

5.1    <u>Selection of Successful Bid and Winning Bidder and Sale Approval</u>.

(a)    Pursuant to the Bidding Procedures Order, by execution and delivery of its counterpart signature page hereto, Seller hereby confirms that Purchaser has made the highest or otherwise best bid pursuant to the Bidding Procedures Order and has selected the Transactions as the Successful Bid and Purchaser as the Winning Bidder (each, as defined in the Bidding Procedures Order).

(b)    (i) Promptly, and in any event no later than December 21, 2022 (subject to Bankruptcy Court approval where indicated), Seller shall: publicly announce that the Transactions have been selected as the Successful Bid and Purchaser has been selected as the Winning Bidder; and (ii) promptly, and in any event no later than December 21, 2022 (subject to Bankruptcy Court approval where indicated), Seller shall file a motion with the Bankruptcy Court attaching the form of an order approving the execution, delivery and performance of this Agreement by Seller (including payment of the Purchaser Expenses pursuant to <u>Section 6.21(b)</u> and the provisions of this <u>Article V</u> contemplating certain performance by Seller prior to Closing), other than the performance of those obligations to be performed at or after the Closing (the "<u>Agreement Order</u>"), which Agreement Order shall be in form and substance acceptable to Purchaser. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Agreement Order.

5.2    <u>No-Shop</u>.

(a)    From and following the execution and delivery of this Agreement by Seller, Seller and its Affiliates shall not, and shall not permit their respective Advisors or Affiliates to, (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than Purchaser, its Affiliates and its and their respective Advisors) with respect to an Alternative Transaction, (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction, (iii) enter into any confidentiality agreement with respect to, or provide any non-public information or data to any Person relating to, any Alternative Transaction, or (iv) otherwise agree, authorize or commit to do any of the foregoing; <u>provided</u> that, notwithstanding the foregoing, from and after entry of the Agreement Order, Seller may take the actions set forth in clauses (ii) and (iii) above if (A) Seller has received a written, bona fide offer, proposal or indication of interest to engage in an Alternative Transaction (an "<u>Acquisition Proposal</u>") from any Person after the date of this Agreement that did not result from Seller's breach of this <u>Section 5.2(a)</u>, and (B) the board of directors (or similar governing body) of Seller determines in good faith, after consultation with its financial advisor and outside legal counsel, that such Acquisition Proposal constitutes or is reasonably likely to lead to a Higher and Better Offer and that failure to take such actions would violate the directors' fiduciary duties under applicable Law; <u>provided</u> <u>further</u> that if the Closing has not occurred prior to the Outside Date unless the failure of the Closing to have occurred by the Outside Date was caused by Seller's failure to perform any of its obligations under this Agreement, and there is no Back-up Bidder (as defined in the Bidding Procedures Order) or the agreement with the Back-up Bidder has terminated in accordance with its terms, then this <u>Section 5.2(a)</u> shall automatically terminate and be of no further force and effect as of such date. Until entry of the Agreement Order, Seller shall promptly (but in any event within twenty-four (24) hours) provide written notice to Purchaser of any breach of this <u>Section 5.2(a)</u>.

(b)    Seller shall promptly (but in any event within twenty-four (24) hours) give written notice to Purchaser if (i) any inquiries, proposals or offers with respect to an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction are received, (ii) any non-public information or data concerning Seller or its Affiliates or access to Seller's or its Affiliates' properties, books or records in connection with any Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction is requested, or (iii) any discussions or negotiations relating to an Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction are sought to be engaged in or continued by, from or with Seller, its Affiliates or any of its or their respective Advisors, as the case may be. Such notice shall set forth the name of the applicable Person making such inquiry, the material terms and conditions of any proposed Alternative Transaction (including, if applicable, correct and complete copies of any proposed agreements, inquiries, proposals or offers or, where no such copies are available, a reasonably detailed written description thereof) and the status of any such discussions or negotiations. Seller shall thereafter keep Purchaser reasonably informed, on a reasonably prompt basis, of the status of any discussions or negotiations with respect thereto. Until entry of the Agreement Order, Seller shall promptly (but in any event within twenty-four (24) hours) provide written notice to Purchaser of any breach of this <u>Section 5.2(b)</u>.

26

(c)     Seller (i) shall promptly (and in any event within twenty-four (24) hours) give notice to Purchaser upon a determination by Seller or its board of directors (or comparable governing body) that any Acquisition Proposal received from any Person after the date of this Agreement that did not result from Seller's breach of <u>Section 5.2(a)</u> constitutes a Higher and Better Offer (a "<u>Higher Offer Determination Notice</u>") and (ii) may cause or permit Seller or any of the other Debtors to enter into a definitive agreement with respect to such Acquisition Proposal; provided that (A) Seller and its board of directors (or comparable governing body) may only make such determination described in clause (i) of this <u>Section 5.2(c)</u> if, prior to the determination that such Acquisition Proposal constitutes a Higher and Better Offer, Seller negotiates, and causes its representatives to negotiate, with Purchaser in good faith (to the extent Purchaser and its representatives desire to negotiate) during such three (3) Business Day period to amend the terms and conditions of this Agreement and, no earlier than the end of such three (3) Business Day period, the board of directors (or comparable governing body) of Seller determines in good faith (after consultation with its financial advisor(s) and outside legal counsel), after giving effect to such proposed amendments to the terms and conditions of this Agreement, that such Acquisition Proposal still constitutes a Higher and Better Offer (<u>provided</u> <u>further</u> that if any material amendment is made to such Acquisition Proposal, such Acquisition Proposal shall be subject again (but only once again) to the foregoing, except that references to three (3) Business Days shall be deemed to be two (2) Business Days, and whatever the result of the second instance of the foregoing, Seller shall not be required to undertake the foregoing again before making a determination that such Acquisition Proposal constitutes a Higher and Better Offer and, if applicable, terminating this Agreement), and (B) Seller and its board of directors (or comparable governing body) may only take such action described in clause (ii) of this <u>Section 5.2(c)</u> if the board of directors (or comparable governing body) of Seller determines in good faith (after consultation with its outside legal counsel) that the failure to take such action would violate with its fiduciary duties under applicable Law.

5.3     <u>Bankruptcy Actions</u>.

(a)     No later than December 21, 2022, Seller shall file with the Bankruptcy Court an amended Disclosure Statement (the "<u>Amended Disclosure Statement</u>" ) containing such amendments as may be necessary or appropriate to reflect the Seller's entry into this Agreement and pursuit of the Transactions, which, solely with respect to matters relating to this Agreement and the Transactions, shall be in a form and substance reasonably acceptable to Purchaser. Concurrently with the filing of such Amended Disclosure Statement (*i.e.*, no later than December 21, 2022), Seller shall file the Plan Solicitation Motion which, solely with respect to matters relating to this Agreement and the Transactions, shall be in form and substance reasonably acceptable to Purchaser; provided that Seller may modify the Plan Solicitation Motion, the Plan, and the Confirmation Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest, in each case, with the consent of Purchaser solely as it pertains to matters relating to this Agreement and Transactions (such consent not to be unreasonably withheld, conditioned or delayed).

(b)     From the date hereof until the earlier of (i) the termination of this Agreement in accordance with <u>Article VIII</u> and (ii) the Closing Date, Seller shall use reasonable best efforts to obtain entry by the Bankruptcy Court of the Agreement Order and the Confirmation Order.

US-DOCS\137411268.27

(c)     The Parties shall use their respective reasonable best efforts to (i) obtain entry by the Bankruptcy Court of the Agreement Order, (ii) obtain entry by the Bankruptcy Court of the Plan Solicitation Order, (iii) commence solicitation of the Plan, and (iv) (A) facilitate the solicitation, confirmation, and consummation of the Plan and the transactions contemplated thereby and hereby, (B) obtain entry of the Confirmation Order, and (C) and consummate the Plan and the Transactions on the timeline set forth in the Plan Solicitation Motion and in any case prior to the Outside Date.

(d)     Purchaser shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Agreement Order, the Plan Solicitation Order, the Confirmation Order, and any other Order reasonably necessary in connection with the Transactions as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates reasonably available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by Purchaser under this Agreement, and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e)     Any documents filed by Seller with the Bankruptcy Court in connection with obtaining approval of effectuating the Closing shall be reasonably acceptable to Purchaser.

(f)     Each of Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and the Plan solely with respect to matters relating to this Agreement and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement and the Plan solely as it pertains to matters relating to this Agreement and Transactions, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court with respect to the Transactions or the Plan solely as it pertains to matters relating to this Agreement and Transactions.

(g)     Seller and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval. Purchaser acknowledges that Seller and the other Debtors must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of the Debtors and other interested parties, providing information about Seller to prospective bidders, entertaining higher and better offers from such prospective bidders.

(h)     Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors reasonably available to testify before the Bankruptcy Court.

28

5.4     Cure Costs. Subject to entry of the Agreement Order and the Confirmation Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.5     Approval. Seller's and Purchaser's obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Agreement Order and the Confirmation Order). Nothing in this Agreement shall require Seller or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

5.6     No Successor Liability. The Parties intend that upon the Closing the Purchaser Group shall not and shall not be deemed to: (a) be a successor (or other such similarly situated party), or otherwise be deemed a successor, to Seller, including, a "successor employer" for the purposes of the Code, ERISA, or other applicable Laws; (b) have Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity (including under applicable Money Transmitter Requirements or securities Laws of any Governmental Body); (c) have, de facto or otherwise, merged with or into Seller; (d) be an alter ego or a mere continuation or substantial continuation of any of Seller (and there is no continuity of enterprise between Purchaser and Seller), including, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, COBRA, Tax, labor, employment, environmental, or other Law, rule or regulation (including filing requirements under any such Laws, rules or regulations), or under any products liability Law or doctrine with respect to Seller's Liability under such Law, rule or regulation or doctrine; or (e) be holding itself out to the public as a continuation of Seller or its estate (the foregoing clauses (a) through (e), collectively, "Successor Liabilities").

5.7     Filings. Seller shall, and shall cause the other Debtors to, give Purchaser reasonable advance notice of, and opportunity to review and approve, any motions, pleadings, notices and other documents to be filed during the Bankruptcy Case that would reasonably be expected to be material and adverse to the Transactions (such approval not to be unreasonably withheld, conditioned or delayed, provided that Purchaser may withhold their approval in their sole discretion to the extent such motions, pleadings, notices and other documents would be inconsistent with the consummation of the Transactions in accordance herewith).

5.8     Waiver of Conflicts. Notwithstanding anything to the contrary herein or otherwise, Seller acknowledges that Paul Hastings LLP ("Paul Hastings" ) may have represented and may currently represent the Purchaser or one or more of its Affiliates in connection with the Transactions (including the negotiation, preparation, execution and delivery of this Agreement and related agreements, and the consummation of the Transactions) as well as other past and ongoing regulatory matters generally (the "Covered Matters" ). Accordingly, Seller hereby irrevocably consents and agrees, on its behalf and on behalf of its Affiliates, to Paul Hastings representing the

29

Purchaser and its Affiliates from and after the Closing in connection with any matter arising out of or related to the Covered Matters. Seller (i) hereby irrevocably waives and will not assert, and will cause each of its Affiliates to waive and not assert, any actual or potential conflict of interest which has or may arise as a result of Paul Hasting's representation of the Purchaser or one or more of its Affiliates, including in any Action, in a Covered Matter, (ii) hereby consents, and will cause each of its Affiliates to consent to, any such representation, even though, in each case, (x) the interests of the Purchaser or such Affiliates may be directly adverse to Seller or its Affiliates, (y) Paul Hastings may have represented Seller or its Affiliates in a substantially related matter, or (z) Paul Hastings may be handling other ongoing matters for Seller or its Affiliates, and (iii) shall cooperate, and shall cause each of its Affiliates to cooperate, with the Purchaser in effectuating the foregoing waiver (including with respect to any objections raised by or before the Bankruptcy Court or the United States Trustee assigned to the Bankruptcy Case in respect of such waiver or representation).

## ARTICLE VI

## COVENANTS AND AGREEMENTS

6.1    Conduct of Seller.

(a)    Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii) as expressly contemplated or required by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing, Seller shall use its reasonable best efforts to carry on its business in the Ordinary Course in all material respects; provided that no action by Seller with respect to matters specifically addressed by Section 6.1(b) shall be deemed to be a breach of this Section 6.1(a) unless such action would constitute a breach of Section 6.1(b).

(b)    Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing, Seller shall not:

(i)    (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or warrants or other rights to acquire any debt securities of Seller, guarantee any such indebtedness or any debt securities of another Person or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "Indebtedness"), except (1) for letters of credit, bank guarantees, security or performance bonds or similar credit support instruments, overdraft facilities or cash management programs, in each case issued, made or entered into in the Ordinary Course, (2) for Indebtedness incurred under existing

30

arrangements (including in respect of letters of credit) in an amount not to exceed $5,000,000 in the aggregate outstanding at any time and (3) Indebtedness incurred in connection with the refinancing of any Indebtedness existing on the date of this Agreement or permitted to be incurred, assumed or otherwise entered into hereunder; <u>provided</u> that no such refinancing Indebtedness shall have a principal amount greater than the principal amount of the Indebtedness being refinanced (plus any applicable premiums, defeasance costs, accrued interest, fees and expenses) and shall not include any greater prepayment premiums or restrictions on prepayment than the Indebtedness being refinanced, in each case of this <u>clause (A)</u>, other than Excluded Liabilities, (B) enter into any swap or hedging transaction or other derivative agreements or (C) make any loans, capital contributions or advances to, or investments in, any Person;

(ii)     sell or transfer to any Person, in a single transaction or series of related transactions, any of the Acquired Assets, other than the sale or transfer of Withheld Coins;

(iii)     perform or offer to perform any staking that is not unstaked prior to the Rebalancing Date;

(iv)     enter into referral agreements with a third party with respect to Users and any Documents with respect to Users or account information with respect thereto;

(v)     make any changes in financial accounting methods, principles or practices affecting the consolidated assets, Liabilities or results of operations of Seller, except (x) insofar as may be required (A) by IFRS (or any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the International Accounting Standards Board or any similar organization) or (y) as necessary or desirable to accommodate reasonable tax positions, to the extent such tax positions would not adversely affect the Acquired Assets or Purchaser in a taxable period (or portion thereof) beginning after the Closing Date;

(vi)     (x) grant any Encumbrance (other than Permitted Encumbrances) on any of its material Acquired Assets (other than Acquired Coins, which, for the avoidance of doubt, are addressed in subclause (y) of this item (vi)) other than to secure Indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms), or (y) grant any Encumbrance (other than any Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan) on Acquired Coins, including by submitting any Cryptocurrency to any staking contract or otherwise causing any Seller Held Coins that are not currently Staked Coins to become Staked Coins;

(vii)     except, in each case, with respect to income Taxes or information Tax Returns: make, change or revoke any material Tax election; change an annual accounting period for material Taxes; adopt or change any material accounting method with respect to material Taxes; file any amended material Tax Return; enter into any closing agreement for material Taxes; settle or compromise any material Tax claim or assessment; or consent to any extension or waiver of the limitation period applicable to any

31

claim or assessment with respect to material Taxes; in each case to the extent such action would adversely affect the Acquired Assets or Purchaser in a taxable period (or portion thereof) beginning after the Closing Date;

(viii)   waive, release, assign, settle or compromise any pending or threatened Action against Seller to the extent that such wavier, release, assignment, settlement or compromise would (A) result in an Assumed Liability in an amount in excess of $1,000,000, individually or in the aggregate, or (B) waive or release any material rights or claims that would constitute Acquired Assets;

(ix)   enter into any referral agreement with a third party with respect to Users;

(x)   terminate or transfer any Business Accounts (other than any such Business Accounts that are not necessary to the operation of the Voyager Platform, with the Parties to cooperate in good faith to determine which Business Accounts are not necessary and may be terminated or transferred);

(xi)   lend any Cryptocurrency to any Person, or engage in purchases or sales of any Cryptocurrency (other than Withheld Coins) other than in connection with the Rebalancing Exercise; or

(xii)   authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)   Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct Seller's operations or business prior to the Closing, and nothing contained in this Agreement is intended to give Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Notwithstanding anything to the contrary contained herein, (i) any action taken, or omitted to be taken, by Seller pursuant to any Law, Order, directive, pronouncement or guideline issued by any Governmental Body or industry group providing for business closures, "sheltering-in-place" or other restrictions that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall in no event be deemed to constitute a breach of this Section 6.1 and (ii) any action taken, or omitted to be taken, by Seller to protect the business of Seller that is responsive to any pandemic, epidemic or disease outbreak, as determined by Seller in its reasonable discretion, shall in no event be deemed to constitute a breach of this Section 6.1.

6.2   Access to Information.

(a)   From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to Article VIII), Seller will (x) provide Purchaser and its authorized Advisors with reasonable access to, upon reasonable advance notice and during regular business hours, Seller's officers, employees, Advisors, properties, systems, offices, and data, documents, and information of the Seller Parties regarding the Acquired Assets, the Assumed Liabilities, the Users, Voyager User Accounts and the Voyager Platform (including, for the avoidance of doubt any of the foregoing that constitutes Acquired Information), including such financial, operating and other data and information related to the Transactions, the Acquired Assets, the Assumed Liabilities, the

32

Users, Voyager User Accounts, or the Voyager Platform (including, for the avoidance of doubt any of the foregoing that constitutes Acquired Information) as Purchaser or any of its representatives may reasonably request and (y) instruct the representatives of Seller to cooperate to provide such access; provided that (i) such access will occur in such a manner reasonably appropriate to protect the confidentiality of the Transactions, (ii) all requests for access will be directed to Moelis or such other Person(s) as Seller may designate in writing from time to time and (iii) nothing herein will require Seller to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would waive any legal privilege or (B) would be in violation of applicable Laws or would violate any fiduciary duty under applicable Law with respect to Seller; provided that, in the event that Seller withholds access or information in reliance on the foregoing clause (A) or (B), Seller shall provide (to the extent possible without waiving or violating the applicable agreement, legal privilege, Law or fiduciary duty under applicable Law with respect to Seller) notice to Purchaser that such access or information is being so withheld and shall use reasonable best efforts to provide such access or information in a way that would not risk waiver of such legal privilege, applicable Law, or fiduciary duty.

(b)     The information provided pursuant to this Section 6.2 will be governed by the Confidentiality Agreement and the confidentiality provisions in Section 6.19. Each Party will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to such Party or any of its Advisors. Neither Party makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and the other Party may not rely on the accuracy of any such information, in each case, other than, with respect to Purchaser, the Express Seller Representations and, with respect to Seller, the Express Purchaser Representations.

(c)     From and after the Closing for a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Case), Purchaser will, following Seller's good faith written request, and solely to the extent necessary for Seller to (i) comply with Tax reporting obligations, (ii) consummate the closing of the Bankruptcy Case, (iii) prepare annual audited financial statements, (iv) submit a filing pursuant to applicable securities laws and regulations or (v) conduct the wind down of the estate (including reconciliation, investigation, and pursuit of claims) and dissolution of Seller and its Affiliates, provide Seller and its Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records in Purchaser's custody or control, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying), in each case to the extent relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser, in each case at no cost or expense to Purchaser; provided that (i) such access does not unreasonably interfere with the normal operations of Purchaser and (ii) nothing herein will require Purchaser to provide access to, or to disclose any information to, Seller or its Advisors if such access or disclosure (A) would waive any legal privilege or (B) would be in violation of applicable Laws or would violate any fiduciary duty; provided that, in the event that Purchaser withholds access or information in reliance on the foregoing clause (A) or (B), Purchaser shall provide (to the extent possible without waiving or violating the applicable agreement, legal privilege, Law or fiduciary duty) notice to Seller that such access or information is being so withheld and shall use reasonable

33

best efforts to provide such access or information in a way that would not risk waiver of such legal privilege, applicable Law, or fiduciary duty. Unless otherwise consented to in writing by Seller, Purchaser will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Seller such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of.

      (d)     Except as expressly contemplated by this Agreement (including in connection with the Commercial Covenants, <u>Section 6.3</u>, <u>Section 6.10(b)</u> and <u>Section 6.18</u>), Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of Seller prior to the Closing with respect to Seller, their business or the Transactions without the prior written consent of Seller for each such contact.

     6.3     <u>Employee Matters</u>.

      (a)     From and after the date hereof (and, if applicable, following the Closing until the winddown or dissolution of Seller), subject to applicable Laws, Seller shall deliver to Purchaser such information and documents regarding employees of Holdings (the "<u>Seller Employees</u>") and independent contractors of Seller or Holdings (the "<u>Seller Contractors</u>"), in each case, as Purchaser shall reasonably request. Prior to the date hereof, Seller has provided Purchaser a true, correct and complete list of the Seller Employees and Seller Contractors identified by name, if applicable, department, and (subject to applicable Laws) true, correct and complete copies of all talent assessment reports for each such Seller Employee and Seller Contractor. From and after the date hereof (and, if applicable, following the Closing until the winddown or dissolution of Seller), Seller shall use reasonable best efforts to make such Seller Employees who remain employed by Holdings and Seller Contractors who remain engaged by Seller or Holdings, in each case, reasonably available to Purchaser or its Affiliates and Purchaser will work in good faith with Seller to identify top performing Seller Employees and Seller Contractors and will determine whether to make offers of employment or other services to any such Seller Employee or Seller Contractors (including by prioritizing review of Seller Employees for applicable open positions of Purchaser and its Affiliates, if any). Purchaser (or an Affiliate of Purchaser) may, in its sole discretion, make offers of employment, consulting or other services to such Seller Employees or Seller Contractors (if any) as Purchaser shall determine, on such terms and conditions as Purchaser shall determine in its sole and absolute discretion. In the event that Purchaser (or an Affiliate of Purchaser) makes such an offer of employment or services and such Seller Employee or Seller Contractor accepts, Seller hereby agrees not to enforce against Purchaser (or its Affiliate) or such Seller Employee or independent contractor the terms and conditions of any agreement to refrain from competing, directly or indirectly, with the business of Seller or any of its Affiliates or to refrain from soliciting employees, customers or suppliers of Seller or any of its Affiliates that may be applicable to such Seller Employee or Seller Contractor. Seller shall not take any action that would reasonably be expected to materially and adversely affect Purchaser's hiring or engagement of such Seller Employee(s) or Seller Contractor(s) in accordance with this <u>Section 6.3</u>; <u>provided</u> that the announcement and implementation of any Seller Plans (including any retention programs or post-Closing treatment of Seller Employees), in each case, in a manner consistent with the provisions of this Agreement, shall not be deemed to be a breach of this sentence. Notwithstanding anything

to the contrary herein or otherwise, nothing herein shall require or obligate Purchaser or any of its Affiliates to employ or make offers of employment to any Person, or make any such offers of employment on any particular terms, each of which decisions shall be made in Purchaser's sole discretion.

(b)     Prior to and following the Closing Date, Seller, Holdings and each of their Affiliates shall not communicate, and shall ensure that no representative of Seller, Holdings or their respective Affiliates communicates, with any Seller Employee or other service provider of Seller regarding post-Closing employment matters (including post-Closing employee benefit plans and compensation) with Purchaser without the prior written consent of Purchaser; provided that Seller, Holdings, and their Affiliates shall be permitted to communicate regarding their employment and termination plans and related matters.

(c)     Purchaser shall not assume any Seller Plans or any Liability to or in respect of any employees or former employees of Holdings and Seller and which relates to such employees' employment with Holdings or Seller, including (i) any employment agreement, whether or not written, between Seller and any person, (ii) any Liability under any Seller Plan, or (iii) Liability arising out of any claim of an unfair labor practice, or any claim under any state unemployment compensation or worker's compensation law or regulation or under any federal or state employment discrimination law or regulation as a result of an action taken by Seller or Holdings, and all such Liabilities shall be Excluded Liabilities hereunder.

(d)     Seller will, or will cause its Affiliates to, comply in all material respects with the Worker Adjustment and Retraining Notification Act of 1988 or any similar Laws ("WARN Act") with respect to any "plant closing" or "mass layoff" or group termination or similar event under the WARN Act affecting employees of Debtors (including as a result of the consummation of Transactions) whether occurring prior to or on the Closing. Subject to the terms of this Agreement, Seller and its Affiliates (including Holdings) reserve the right to (i) terminate any of their employees at any time, and otherwise reduce employee work hours, benefits and compensation, and (ii) issue termination and/or WARN Act notices relating to their employees at any time.

(e)     For any employees who are principally based outside the United States, the provisions of this Section 6.3 shall apply to such employees mutatis mutandis to the maximum extent permitted by applicable Law.

(f)     The provisions of this Section 6.3 are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any employees of Seller or Holdings), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this Section 6.3, alter or limit Purchaser's, Seller's or Holdings' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to an offer of employment or service, employment or continued employment

35

or service for any period of time by reason of this Agreement, or any right to a particular term or condition of employment or service.

6.4    <u>Regulatory Matters</u>.

(a)    From time to time from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), subject to the other provisions of this <u>Section 6.4</u>, Seller will, and will cause its Affiliates and its and their respective employees, representatives, advisors and agents to, (i) make or cause to be made all filings and submissions to the extent required to be made by Seller or any of its Affiliates under any applicable Laws for the consummation of the Transactions, if any, (ii) cooperate with Purchaser, its Affiliates and its and their respective representatives in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any filings or submissions to be made by any member of the Purchaser Group under any applicable Laws in connection with the Transactions, (iii) supply promptly any additional information and documentary material that may be requested in connection with such filings or submissions and (iv) use reasonable best efforts to take any actions necessary to obtain all approvals or clearances from any relevant Governmental Body that are required to be obtained by Seller or its Affiliates under applicable Law for the consummation of the Transactions.

(b)    From time to time from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), subject to the other provisions of this <u>Section 6.4</u>, Purchaser will, and will cause its respective employees, representatives, advisors and agents to, (i) make or cause to be made all filings and submissions to the extent required to be made by Purchaser under any applicable Laws for the consummation of the Transactions, if any, (ii) cooperate with Seller, its Affiliates and its and their respective representatives in exchanging such information and providing such assistance as Seller may reasonably request in connection with any filings or submissions to be made by Seller or any of its Affiliates under any applicable Laws in connection with the Transactions, (iii) supply promptly any additional information and documentary material that may be requested in connection with such filings or submissions, and (iv) use reasonable best efforts to take any actions necessary to obtain all approvals or clearances from any relevant Governmental Body that are required to be obtained by Purchaser under applicable Law for the consummation of the Transactions.

(c)    From time to time from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), the Parties commit to instruct their respective counsel to cooperate with each other to respond to any reasonable inquiries and use reasonable best efforts to seek to resolve any objections raised by any Governmental Body as promptly as practicable and for greater certainty, each Party and its respective counsel undertake to (i) promptly notify the other Party or its counsel of, and, if in writing, furnish such other Party or its counsel with copies of (or, in the case of oral communications, advise such other Party or its counsel of the contents of), any substantive communication received by such Person from a Governmental Body and (ii) keep the other Party or its counsel informed with respect to the status of any applicable submissions and filings to or inquiries by any Governmental Body in connection with this Agreement and the Transactions and any developments, meetings or discussions with any Governmental Body in respect thereof, including with respect to (A) the commencement or proposed or threatened commencement of any investigation or other Action, and (B) the nature

36

and status of any inquiries or objections raised or proposed or threatened to be raised by any Governmental Body with respect to this Agreement and the Transactions. From and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), none of Seller or any of its Affiliates, on the one hand, or Purchaser, on the other hand, will participate in any substantive meeting or discussion with any Governmental Body with respect of any such filings, applications, investigation or other inquiry without giving the other Party reasonable prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Body, a reasonable opportunity to attend and participate in such meeting or discussion, and each Party will have a reasonable opportunity to review and provide comments (which shall be considered in good faith by the other Party) on the content of any filing, submission or other written communication (and any analyses, memoranda, presentations, white papers, correspondence or other written materials submitted therewith) to be submitted by the other Party or any of its Affiliates to any Governmental Body in advance of any such submission. Each Party acknowledges that, with respect to any non-public information provided by a Party to the other under this Section 6.4, each Party may (1) designate such material as restricted to "outside counsel only" and any such material shall not be shared with employees, officers or directors or their equivalents of the receiving Party without approval of the disclosing Party and (2) make appropriately limited redactions necessary to satisfy contractual confidentiality obligations, preserve attorney-client privilege or protect material relating to the valuation of the Acquired Assets. Notwithstanding anything to the contrary herein or otherwise, Purchaser will control and have final decision making authority on all regulatory strategy, submissions and procedures, after considering in good faith any reasonable advice provided by Seller in good faith.

(d)     Notwithstanding anything to the contrary in this Agreement, nothing shall require or be construed to require any member of the Purchaser Group to (i) oppose any motion or Action for a temporary, preliminary or permanent Order against, or preventing or delaying, the consummation of the Transactions, or exhaust all avenues of appeal, including any proper appeal of any adverse decision or Order by any Governmental Body, (ii) enter into a consent decree, consent agreement, settlement or other agreement or arrangement (including any ancillary agreements) to hold separate, license, sell, transfer, dispose or divest (pursuant to such terms as may be required by any Governmental Body) any asset (whether tangible or intangible), (iii) agree to the termination, modification, or assignment of any relationships, joint ventures, contracts, assets, liabilities or obligations, (iv) agree to any limitations on governance, conduct, or actions of members of the Purchaser Group or operations of their respective businesses or with respect to the Acquired Assets or Assumed Liabilities, or (v) enter into any national security agreement, letter of assurance, or other mitigation agreement with the Committee on Foreign Investment in the United States or any member agency thereof acting in that capacity.

(e)     From and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), Seller will not, and will not permit any of its Affiliates to, knowingly take any action, engage in any conduct or enter into any transaction that would reasonably be expected to (i) materially increase the risk of any Governmental Body entering an Order prohibiting or materially delaying the consummation of the Transactions or (ii) materially delay the consummation of the Transactions.

(f)     Subject to Section 6.4(d), from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), each Party will

37

use reasonable best efforts to (i) cooperate with and (ii) seek to secure approvals or authorizations from, any relevant Governmental Body, including state banking departments enforcing money transmission laws, in order to permit consummation of the Transactions in a timely manner in compliance with applicable Laws.

6.5     Reasonable Best Efforts; Cooperation.

(a)     Subject to the other terms of this Agreement, and without limiting, affecting or modifying the Parties' obligations under Section 6.4, or any of the Commercial Covenants, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable and the closing conditions set forth in Article VII to be satisfied, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with the other Party, its Affiliates and its and their respective Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of Seller will not require Seller or any of its Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forgo any right, remedy or condition hereunder. Notwithstanding anything to the contrary herein, in the event of a conflict between this Section 6.5(a) and Section 6.4, the provisions of Section 6.4 shall control with respect to such conflict.

(b)     The obligations of Seller and Purchaser pursuant to this Agreement, including this Section 6.5, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), Seller's debtor-in-possession financing, if any, and Seller's obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order, the Agreement Order, and the Confirmation Order) and Seller's duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.6     Data Transfer Matters.

(a)     Seller shall, and shall cause its Affiliates to, (i) within 30 days (with the Parties using their reasonable best efforts to do so within five (5) Business Days) following the later of the date hereof and the date Purchaser provides the form of such notification, distribute an initial email notification, in the form provided by Purchaser, to all Users and any other consumers located or having a home address in the United States from whom Seller has collected Personal Information regarding the Transactions (including the Rebalancing Exercise) and the transfer of such individuals' Personal Information or accounts (including the ability to opt in to a pre-Closing transfer of such User's Acquired User Data to Purchaser), and prominently post a notice, in the form provided by Purchaser, to Seller's and its Affiliates' (as applicable) primary customer-facing website regarding the same; (ii) on a weekly basis, upon the expiration of any opt in period provided in the email notification distributed by Seller, but no earlier than the later of January 3, 2023 and entry of the Agreement Order, deliver to Purchaser the respective Acquired User Data for Users who have opted into the pre-Closing data transfer pursuant to the foregoing item (i) and whose Acquired User Data has not previously been transferred (the "Pre-Closing Data Transfer");

38

(iii) following the date of the initial email notification until the Closing Date, continue distributing additional email notifications, in the form provided by Purchaser, to such individuals, as Purchaser reasonably requires; and (iv) on the Closing Date, deliver to Purchaser all other Acquired User Data. All notifications contemplated by the foregoing shall be subject to Purchaser's consideration of any comments thereto proposed in good faith by Seller or counsel to the committee of unsecured creditors in the Bankruptcy Case and subject to applicable Law.

(b)     From and after the date hereof and through and following the Closing, Seller shall, and shall cause its Affiliates to, maintain or maintain with a third party data management and retention firm, for the entirety of the applicable retention period and at least ninety (90) days thereafter, all information required to be maintained pursuant to, or to comply with, applicable Money Transmitter Requirements or Laws related to Sanctions.

(c)     Seller shall, and shall cause its Affiliates to, use reasonable best efforts to procure that all information and documentation requested in connection with the KYC Procedures meets the standards set forth in such KYC Procedures (including moving files located in storage repositories (*e.g.*, Google Drive or Box) to the appropriate files associated with the applicable User and associating such information and documentation with the applicable User), as determined by Purchaser in its reasonable discretion, prior to the User Asset Migration Date, but in each case in no event prior to the applicable timing contemplated by clauses (i) through (iv) of <u>Section 6.6(a)</u>.

6.7     <u>Use of Name</u>.

(a)     Seller agrees that: (i) within ninety (90) days from the Closing Date, Seller shall (and shall cause its Affiliates to) cause an amendment to the governing documents of Seller and its Affiliates (as applicable) to be filed with the appropriate Governmental Body and shall take all other reasonable actions necessary to change Seller's and such Affiliate's legal, name to a name or names not containing "Voyager," any other trade mark or trade name set forth in <u>Schedule 6.7(a)</u> or any name confusingly similar to the foregoing; (ii) after the Closing Date neither Seller nor any of its Affiliates shall have any ownership rights in or to the name "Voyager," any other trade mark or trade name set forth in <u>Schedule 6.7(a)</u> or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing or comprising the foregoing, including any name or mark confusingly similar thereto (collectively, the "<u>Seller Marks</u>"); and (iii) except as set forth in <u>Section 6.7(a)</u>, Seller and its Affiliates shall, within ninety (90) days of the Closing Date, cease to make any use of the Seller Marks, including in any corporate or other legal name.

(b)     Notwithstanding <u>Section 6.7(a)</u>, for a period of ninety (90) days after the closing of the Bankruptcy Case, unless extended by mutual agreement of Purchaser and Seller, Purchaser hereby grants to Seller and its Affiliates (including, for the avoidance of doubt, any wind-down or similar administrator in the Bankruptcy Case or under the Plan) a non-exclusive, limited, non-transferable, non-sublicensable and revocable license to use the Seller Marks for the sole purposes of unwinding Seller's businesses and assisting Purchaser with all migrations, integrations and Transactions.

39

6.8    Further Assurances.

(a)    From time to time from and after the date hereof through and following the Closing (in the case of Seller, until the winddown or dissolution of Seller), as and when requested by either Party, the other Party will execute and deliver, or cause to be executed and delivered, all such further conveyances, notices, assumptions, assignments, documents and other instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions (including for the avoidance of doubt, the transfer and conveyance of any Acquired Assets that may be in the possession of Seller's Affiliates to Purchaser); provided that nothing in this Section 6.8 shall require Purchaser or the Purchaser Group to assume any Liabilities of Seller or any of its Affiliates other than the Assumed Liabilities or Seller or any of its Affiliates to transfer any assets other than Acquired Assets. In addition, from time to time following the Closing Date (in the case of Seller, until the winddown or dissolution of Seller), each Party shall, and shall cause its Affiliates to, promptly execute, acknowledge and deliver such further documents and perform such further acts as are reasonably requested by the other Party and as may be reasonably necessary to transfer and convey to Purchaser, or make available to Purchaser the Acquired Assets or the Assumed Liabilities pursuant to this Section 6.8.

(b)    Without limiting Section 6.8(a), Seller will use reasonable best efforts to evidence and effectuate the transfer and conveyance of all Seller Held Coins (solely for purposes of this Section 6.8(b)), deeming the phrase "who are Debtors" in the definition of Seller Held Coins to instead read as "who are not Debtors" in accordance with Section 6.8(a), *mutatis mutandis*.

6.9    Insurance Matters. Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to Seller and the Acquired Assets that is maintained by Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies; provided that to the extent such insurance coverage is available with respect to any Acquired Assets or Assumed Liabilities, after the Closing, (a) Seller shall, and shall cause its applicable Affiliates to, use reasonable best efforts to report in good faith to the applicable third-party insurance provider, if applicable, all events, acts, errors, accidents, omissions, incidents, injuries or other forms of occurrences to the extent relating to any Acquired Assets or Assumed Liabilities that, in each case, occurred at or prior to the Closing as reasonably requested by Purchaser to be so reported the extent covered by an occurrence-based insurance policy, (b) Purchaser shall use its reasonable best efforts to comply with the terms of any such insurance policy and (c) Seller shall, and shall cause its applicable Affiliates to, (i) use reasonable best efforts to obtain the benefit of the applicable insurance coverage under any such insurance policy and (ii) pay such benefit to Purchaser, net of (A) any deductibles, co-payment or self-insured amounts payable by Seller or any of its Affiliates or other out-of-pocket costs and expenses (including reasonable legal fees and expenses, if any) actually and reasonably incurred by Seller or any of its Affiliates in seeking such insurance proceeds and (B) any Taxes imposed on Seller or any of its Affiliates in respect of the receipt or accrual of such insurance proceeds.

6.10   <u>User Migration</u>.

(a)   Following the date hereof, Seller shall, and shall cause its Affiliates to cooperate with Purchaser to, develop (and each Party shall use reasonable best efforts to develop within 15 Business Days following the date hereof) a mutually agreed upon integration plan that sets forth all technology integrations that Purchaser deems reasonably necessary to enable all migrations of User accounts on the Voyager Platform to the Binance.US Platform as contemplated by this Agreement (the "<u>Integration Plan</u>"). The Integration Plan will include among other things: (i) directing customers on the Voyager Platform (including through links on the home screen for the web interface and mobile app for the Voyager Platform) to the Binance.US Platform log-in webpage or mobile app, (ii) migrating all Acquired User Data (subject to <u>Section 6.6(a)</u>) reasonably necessary for Purchaser to validate whether Users qualify as Existing Users and (iii) developing a process whereby any User that is not an Existing User can affirmatively accept terms and conditions to provide such User with access to their Net Owed Coins in a new Binance.US Platform account from directly within the Voyager Platform and related app in accordance with the provisions of this Agreement. Each Party shall, and shall cause its Affiliates and its and their respective employees and representatives to, comply with and implement the Integration Plan. From and after the date hereof (and following the Closing, if applicable, until the date that is six (6) months following the Closing Date), Seller shall, and shall cause its Affiliates and its and their respective employees and representatives to provide to Purchaser, its Affiliates and its and their respective employees and representatives (x) any assistance reasonably requested or required by Purchaser, its Affiliates and its and their respective employees and representatives in connection with the opening of User accounts on the Binance.US Platform, the transfer of information and Net Owed Coins from the Voyager Platform to the Binance.US Platform (including in connection with customer queries and troubleshooting with respect thereto), and the actions contemplated by this <u>Section 6.10</u> and the Integration Plan and (y) subject to <u>Section 6.6</u> and applicable Law, all necessary Acquired User Data in Seller's or its Affiliates' possession required to effectuate the Integration Plan. Purchaser shall bear the reasonable and documented out-of-pocket expenses incurred by Seller in connection with the provision of such assistance following the Closing pursuant to the immediately preceding sentence.

(b)   Notwithstanding the provisions of <u>Section 6.2(c)</u> or <u>Section 10.17</u>, following entry of the Agreement Order, Purchaser and its Affiliates shall, at their sole cost and expense, be entitled to issue communications directed to Users on the Binance.US Platform and through other means of Purchaser's choosing in connection with the Transactions or the opening of accounts on the Binance.US Platform; <u>provided</u> that such communications are consistent with this Agreement and applicable Law; <u>provided</u> that Purchaser shall not issue any such communications prior to the Closing Date without Seller's prior written consent (which shall not be unreasonably withheld, conditioned or delayed) and subject to reasonable consultation with counsel to the committee of unsecured creditors in the Bankruptcy Case. Except as required by <u>Section 6.11(d)</u>, Seller shall not, and Seller shall cause its Affiliates not to, issue any communication to Users, whether on the Voyager Platform or otherwise, except to the extent the form and substance of such communication has been previously approved by Purchaser or is required by applicable Law; <u>provided</u> that the foregoing shall not prohibit Seller from responding on an individual basis to technical support queries from Users or answering questions related to the amount of Coins such User has deposited on the Voyager Platform or communicating with customers regarding withdrawal of cash from the "for benefit of" customer accounts at

US-DOCS\137411268.27

Metropolitan Commercial Bank; provided further that Seller shall, and shall cause its Affiliates to, provide Purchaser and counsel to the committee of unsecured creditors in the Bankruptcy Case with regular updates on the timing and content of such communications and shall cooperate with Purchaser in addressing any concerns related thereto. The Parties will work in good faith to (i) develop a set of talking points or FAQs for Users and Eligible Creditors with respect to the Transactions, the Bankruptcy Cases, and related matters and (ii) continue to review and revise such talking points or FAQs as other inquiries from Users and Eligible Creditors or other circumstances arise.

(c)     Subject to Seller's providing the Acquired User Data in accordance with Section 6.6, and such Acquired User Data meeting the standards set forth in the KYC Procedures, as determined by Purchaser in its reasonable discretion, Purchaser shall cause an account to be opened for each User on the Binance.US Platform on or before the User Asset Migration Date. In addition to the foregoing, if Seller has not provided or does not have Acquired User Data meeting such standards with respect to a particular User, if such User provides such information and documentation meeting the standards set forth in such KYC Procedures, as determined by Purchaser in its reasonable discretion, Purchaser shall cause an account to be opened for such User in accordance with its standard account opening procedures following its receipt of such information and documentation.

(d)     Seller and Purchaser shall offer (i) each eligible creditor pursuant to the Plan that is not a User (each, an "Eligible Creditor" ) and (ii) each User the opportunity, subject to the consummation of the Closing and such User and Eligible Creditor meeting the requirements of the KYC Procedures and accepting the terms and conditions of the Binance.US Platform, to receive its Net Owed Coins or other Plan distribution through the Binance.US Platform in accordance with Section 6.12 and the Plan. Within three (3) Business Days following the request of Purchaser (which request for the sake of clarity may be offered multiple times), Seller shall send to each User and Eligible Creditor a communication in the form provided by Purchaser notifying them of such offer.

(e)     For the sake of clarity and notwithstanding anything to the contrary herein or otherwise, (i) none of Purchaser or any of its Affiliates shall be required to (A) activate an account or pay or credit any amount, whether in Coins, cash or otherwise, to any User or Eligible Creditor (or its account) that does not meet the requirements of the KYC Procedures and accept the terms and conditions of the Binance.US Platform, (B) pay or credit any amount, whether in Coins, cash or otherwise, to any User or Eligible Creditor or its account except in accordance with the Plan, or (C) credit the account of any User or Eligible Creditor with respect to Coins that have not actually been delivered to Purchaser in accordance with the provisions of Section 2.4(b), (ii) neither Purchaser nor any of its Affiliates is assuming any Liabilities of Seller or any of its Affiliates with respect to Users' accounts on the Voyager Platform or any Eligible Creditor, all of which Liabilities shall constitute Excluded Liabilities, and (iii) neither Purchaser nor any of its Affiliates shall be required to provide trading services on the Binance.US Platform or otherwise in respect of any Unsupported Coins.

US-DOCS\137411268.27

6.11    Rebalancing Exercise; Seller Statement.

(a)    Following the date hereof and prior to the Closing (or the earlier termination of this Agreement pursuant to Article VIII), (i) Seller shall purchase and sell Cryptocurrency through one or more transactions such that, following the completion of such transactions, the number of Acquired Coins of each type is equal to the aggregate number of Deposited Coins of such type multiplied by the Rebalancing Ratio (subject to a Rebalancing Exercise Delta with respect to each Acquired Coin of no more than five percent (5%) or, if after conducting such transactions and using reasonable best efforts to meet the Rebalancing Exercise Delta of five percent (5%), Seller reasonably and in good faith determines that it will not be able to meet such Rebalancing Exercise Delta, then such other amount as Purchaser and Seller consent to, such consent not to be unreasonably withheld, conditioned or delayed), the purpose of which transactions the Parties acknowledge and agree is to ensure that there are sufficient Acquired Coins of each type to pay to each User's account on the Binance.US Platform a number of Post-Rebalancing Coins of such type in accordance with the provisions of this Agreement (such transactions, the "Rebalancing Exercise"), and (ii) Seller shall, and shall cause its employees, accountants, advisors and representatives to, consult with, and keep reasonably informed, Purchaser, its Affiliates and their respective employees, accountants, advisors and representatives with respect to the Rebalancing Exercise and all actions taken in connection therewith, including by providing Purchaser with regular updates regarding the status of the Rebalancing Exercise. For the sake of clarity, the Parties agree that for purposes of the Rebalancing Exercise, if ETH Coins that are Staked Coins cannot be unstaked by the Rebalancing Date, or if there are Coins that Seller is otherwise unable to access due to such Coins being custodied with providers that have entered insolvency proceedings prior to the date hereof, then the Parties will agree on appropriate modifications to the Rebalancing Exercise and the process for distributing Net Owed Coins to Users in light of the foregoing. The Parties agree that the Rebalancing Exercise shall be completed in accordance with the provisions of this Agreement by no later than the date that is one (1) Business Day prior to the Closing Date (such date, the "Rebalancing Date").

(b)    In order to facilitate the Rebalancing Exercise, Seller shall, promptly following the date hereof, to the extent not already created prior to the date hereof, create an institutional account in Seller's name on the Binance.US Platform, and Seller may, but shall not be required to, transfer any or all Seller Held Coins to such institutional account in order to facilitate the Rebalancing Exercise (and, for the avoidance of doubt, the Binance.US Platform shall serve merely as an exchange agent in connection with the Rebalancing Exercise). Prior to engaging in any Subject Transaction outside the Binance.US Platform, Seller shall provide Purchaser with a written notice describing the parameters of such Subject Transaction, including the proposed number of Seller Held Coins of each type to be transferred in connection with such Subject Transaction (each, a "Transaction Notice") and Purchaser shall be entitled to make, by written notice (each, a "Transaction Offer Notice") to Seller within three (3) Business Days following receipt of such Transaction Notice, an offer to conduct such Subject Transaction on the Binance.US Platform, including a description of the estimated numbers of Acquired Coins that would result from the consummation of such Subject Transaction. If Seller receives any proposal to conduct such Subject Transaction from any third party which would result in a number of Acquired Coins in excess of that set forth in the Transaction Notice, Seller shall inform Purchaser of the same, and Seller shall not conduct such Subject Transaction with or through other Person(s) unless Seller provides written notice to Purchaser that Seller has determined in good faith that the

43

terms offered by such other Person(s) with respect to such Subject Transaction (which such terms shall be set forth in such notice) are more favorable (in terms of the best interests of Seller and its estate) than the terms set forth in the Transaction Offer Notice and Purchaser does not provide an updated Transaction Offer Notice within one (1) Business Day following receipt of such notice from Seller with terms as or more favorable (in terms of the best interests of Seller and its estate) than those set forth in Seller's notice. If Purchaser does so provide such an updated Transaction Offer Notice, Seller conduct such applicable Subject Transaction on the Binance.US Platform in accordance with such updated Transaction Offer Notice. In addition to the foregoing, Seller may request that Purchaser facilitate all or part of the Rebalancing Exercise, in which case all or such portion of the Rebalancing Exercise shall be conducted on the Binance.US Platform. Seller's use of the Binance.US Platform for the Rebalancing Exercise shall be subject in all respects to the standard terms and conditions of the Binance.US Platform (including applicable fees, spreads, costs and expenses except as set forth in the applicable Transaction Offer Notice). For the sake of clarity, Seller may withdraw any Coins from the Binance.US Platform prior to the Closing and Seller shall not be required to maintain Coins on the Binance.US Platform in connection with the Rebalancing Exercise or otherwise (except as otherwise expressly contemplated hereunder from and after the Closing and acknowledging that this sentence is not intended to and shall not preclude transactions in the Rebalancing Exercise being undertaken on the Binance.US Platform in accordance with the provisions hereof).

(c)     At least one (1) Business Day prior to the Closing Date and following completion of the Rebalancing Exercise in accordance with Section 6.11(a), Seller will deliver to Purchaser a ledger in a form reasonably specified by Purchaser as far in advance of the Rebalancing Date as is reasonably practicable (the "Seller Statement") setting forth in reasonable detail, in each case as of the Rebalancing Date and following the completion of the Rebalancing Exercise in accordance with Section 6.11(a), (i) each User's user identification number, (ii) the Rebalancing Ratio and the calculation thereof, (iii) the number of each User's Deposited Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Deposited Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject), (iv) the number of each User's Post-Rebalancing Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Post-Rebalancing Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject), (v) the total number of Seller Held Coins and Acquired Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Seller Held Coins and Acquired Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject), (vi) the total amount of gas fees that Seller will pay in connection with the transfer of each type of Acquired Coin to Purchaser in accordance with Section 2.4, and (vii) the amount of cash, Coins or other property (including the name and relevant ticker symbol used on the Voyager Platform for such Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject) payable to each Eligible Creditor, after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring such Coins to Purchaser, and any identifying information and information required to make such payments to such Eligible Creditor under the Plan, in each case together with reasonably detailed supporting information and documentation and prepared by Seller based on Seller's and its Affiliates' books and records. Notwithstanding anything to the contrary herein, Seller hereby acknowledges and agrees that (A) Purchaser and its Affiliates shall be entitled to fully rely on the Seller Statement

44

and any data, information or calculation set forth therein for purposes of <u>Section 6.11(d)</u>, and (B) in no event shall Purchaser of any of its Affiliates be responsible (x) to any Person for the Seller Statement, any data, information or calculation set forth therein or any error or inaccuracy with respect thereto or (y) for any losses, liabilities or damages in respect thereof, in each case, to the extent Purchaser takes any action in reliance thereon.

(d)     Promptly following the completion of the Rebalancing Exercise, Seller shall send to each User a communication notifying such User of the Rebalancing Exercise, such User's Deposited Coins, and the Net Owed Coins attributable to such User's account on the Voyager Platform following the Rebalancing Exercise and any gas fees incurred in connection with the transfer of Coins to Purchaser pursuant to <u>Section 2.4</u>. Seller will, upon Purchaser's request, deliver to each Eligible Creditor a communication relating to the Transactions, any payments to be made by Purchaser or any of its Affiliates to such Eligible Creditor and any matters relating to opening an account on the Binance.US Platform, in each case that is in form and substance reasonably acceptable to Purchaser.

6.12     <u>Crediting of Accounts; Unsupported Jurisdictions, Transfer of Coins to Seller; Liquidations or Distributions by Seller</u>.

(a)     Subject to the provisions of <u>Section 6.10</u>, on the User Asset Migration Date, Purchaser shall credit, or cause to be credited, (i) to the Binance.US Platform account of each User, such User's Net Owed Coins and (ii) to the Binance.US Platform account of each Eligible Creditor, the applicable amount payable to such Eligible Creditor as set forth in the Seller Statement. For the avoidance of doubt, Coins credited to any User's or Eligible Creditor's accounts on the Binance.US Platform may be made from any Coins held by or on behalf of Purchaser or any of its Affiliates. As a condition precedent to any User or Eligible Creditor accessing its account or Coins on the Binance.US Platform, such User or Eligible Creditor must satisfy the requirements set forth in <u>Section 6.10</u>. Following such User's or Eligible Creditor's satisfaction of such requirements, Purchaser shall allow such User or Eligible Creditor, as applicable, to access trading services with respect to its Coins subject to the Binance.US Platform's customary terms and conditions (including any transaction fees, spreads, costs and expenses). Notwithstanding anything to the contrary herein, with respect to any User or Eligible Creditor that does not satisfy such requirements prior to the date that is three (3) months following the later of the Closing Date or the date on which such terms and conditions are made available for such User or Eligible Creditor to accept, then Purchaser shall convert any Acquired Coins with respect to such Users or Eligible Creditors into United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such United States Dollars, together with any cash or others assets in respect of such Users or Eligible Creditors to Seller within five (5) Business Days, for further distribution by Seller in accordance with the Plan.

(b)     Notwithstanding anything to the contrary herein or otherwise, for any Person (including any User or Eligible Creditor) that is located in Hawaii, New York, Texas or Vermont, to the extent that Purchaser does not have a Money Transmitter License or similar license in such jurisdiction or in any other jurisdiction where the applicable Governmental Body asserts after the date of this Agreement that Purchaser or any of its Affiliates requires a Money Transmitter License or similar license in order to consummate the Transactions or perform its obligations hereunder (each, an "<u>Unsupported Jurisdiction</u>"), Purchaser and its Affiliates shall not be required

45

to (i) credit or make any payment (with any Coins, cash or otherwise) to any account of such Person (including any User or Eligible Creditor) on the Binance.US Platform, or (ii) permit any such Person or account of such Person on the Binance.US Platform to be active or conduct any trading or investing in Coins. Notwithstanding anything herein to the contrary, prior to the Closing, Seller have the option to elect (upon consultation with professionals representing the committee of unsecured creditors in the Bankruptcy Case) that either (i) Seller shall not deliver to Purchaser any Coins, cash, or other asset with respect to any User or Eligible Creditor located in an Unsupported Jurisdiction or (ii) Seller shall deliver such Coins to Purchaser at Closing. Upon receipt by Purchaser of any Unsupported Jurisdiction Approvals with respect to any Unsupported Jurisdiction(s), which Unsupported Jurisdiction Approvals permit Purchaser to perform its obligations under Section 6.12(a) in such Unsupported Jurisdiction, then Purchaser shall promptly notify Seller of receipt of such Unsupported Jurisdiction Approval and, if Seller has not previously delivered applicable Coins, cash, or other asset with respect to any User or Eligible Creditor located in such Unsupported Jurisdiction then Seller shall so deliver such assets to Purchaser within five (5) Business Days of such notification, and Purchaser shall (following receipt of any applicable assets if required) consummate the actions in such Unsupported Jurisdiction that were restricted by this Section 6.12(b); provided that to the extent Purchaser does not receive such Unsupported Jurisdiction Approval(s) with respect to any Unsupported Jurisdiction prior to the date that is six (6) months following the Closing Date, then to the extent Purchaser is holding any Acquired Coins with respect to Users or Eligible Creditors in such Unsupported Jurisdictions, Purchaser shall convert such Acquired Coins into United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such United States Dollars, together with any cash or others assets in respect of such Users or Eligible Creditors to Seller within five (5) Business Days, for further distribution by Seller in accordance with the Plan.

(c)     From and after the Closing, or if this Agreement is terminated in accordance with its terms (other than in connection with a Purchaser Default Termination), then from and after such termination, if Seller or any of its Affiliates intends to consummate a transaction or series of related transactions pursuant to which it will purchase, sell or liquidate any Coins or distribute the proceeds thereof to any User or Eligible Creditor, in each case other than any Additional Bankruptcy Distributions (but including any purchase, sale or liquidation of any Coins prior to making any Additional Bankruptcy Distributions) or any of the transactions provided for in the preceding provisions of this Section 6.12 then (i) Seller may, but shall not be required to, utilize the Binance.US Platform, or other service offerings of Purchaser or its Affiliates, to consummate such transaction or series of related transactions (including any purchase, sale, liquidation or distribution described above) on Purchaser's and its Affiliates' standard terms and conditions (including any transaction fees, spreads, costs and expenses) and (ii) if this Agreement is terminated in accordance with its terms (other than in connection with a Purchaser Default Termination), then Seller may, but shall not be required to, elect that Purchaser and Seller will (and Seller will cause its Affiliates and any other Person with whom Seller or its Affiliates is consummating any such transaction or transactions to) cooperate in good faith to develop and facilitate any transaction similar to the Rebalancing Exercise required by Seller, any of its Affiliates, and any other Person with whom Seller or its Affiliates is consummating any such transaction or transactions, in order to consummate any such transaction or series of related transactions; provided that in no event will Purchaser or any of its Affiliates be required to make any distribution or facilitate or consummate any transaction under this Section 6.12(c) with respect

46

to any User located in an Unsupported Jurisdiction. In connection with any distribution made by Purchaser or its Affiliates pursuant to this Section 6.12(c), all right, title and interest in and to any property so distributed (including any Coins) shall be made or transferred to Purchaser or its Affiliates free and clear of any Encumbrances prior to any such distribution by Purchaser or its Affiliates and such distributions will be made on Purchaser's and its Affiliates' standard terms and conditions (including any transaction fees, spreads, costs and expenses).

(d)    The provisions of Sections 6.10, 6.11, 6.12, and 6.14 shall be subject to such protocols, if any, as the Parties may agree in writing after the date hereof with respect to the transfer of information, migration of users, migration or transfer of Coins, and any matters related to the foregoing or such Sections.

(e)    Notwithstanding anything to the contrary herein, but subject to the last sentence of this Section 6.12(e), (i) Seller (prior to the Closing) and each User and Eligible Creditor (from and after the Closing) shall retain all right, title, and interest in and to Coins allocated to it in accordance with this Agreement on the Binance.US Platform (notwithstanding any terms and conditions of the Binance.US Platform) through and including such time as such Coins are returned or distributed to Seller or such User and Eligible Creditor, as applicable, hereunder, and such Coins shall be held by Purchaser solely in a custodial capacity in trust and solely for the benefit of Seller or the applicable User or Eligible Creditor; provided that in the case of Coins allocable to Users or Eligible Creditors located in Unsupported Jurisdictions, to the extent, if any, that such Coins are transferred to Purchaser pursuant to Section 6.12(b), from and after the Closing until the applicable Unsupported Jurisdiction Approval is obtained or such Coins are liquidated in accordance with Section 6.12(b) hereunder, such Coins shall be held by Purchaser in a custodial capacity on behalf of Seller and not the applicable User or Eligible Creditor; (ii) any and all cash or cash equivalents to be transferred at any time to Purchaser hereunder for further distribution to Seller or any User or Eligible Creditor (and not for Purchaser's own account (e.g., Purchaser Expenses)) shall at all times (until transferred by Purchaser to Seller or the applicable User or Eligible Creditor, as applicable, hereunder) be held solely in a third party bank account of a FDIC-insured financial institution solely for the benefit of or "fbo" Seller or such User or Eligible Creditor, as applicable; (iii) Purchaser shall not, after the date hereof, introduce any further conditions to the withdrawal of cash from accounts on the Binance.US Platform that are not in effect as of the date hereof that would apply to any User's or Eligible Creditor's account on the Binance.US Platform; (iv) Purchaser shall not at any time halt (temporarily or permanently) withdrawals of cash or such Coins from any User's or Eligible Creditor's account on the Binance.US Platform; (v) Purchaser shall not halt trading of such Coins on the Binance.US Platform at any point during the 30 days following any distribution to any User's or Eligible Creditor's account on the Binance.US Platform hereunder, except, in the case of each of the foregoing clauses (iii), (iv) and (v), (A) as required by applicable Law or any Order or Governmental Body, (B) as may be permitted pursuant to Purchaser's terms and conditions in effect on the Closing Date (including for purposes of halting fraud or illegal activity), (C) as necessary to complete any system, account, wallet, security or exchange maintenance, patching, repair, upgrade or to the extent any withdrawal or trading is unable to be processed due to any act or omission by, or any Event related to, any third party (e.g., a bank closure or a third party ceasing to support any Cryptocurrency), (D) in order to avoid any legal, compliance or regulatory issue or in order to ensure market stability, or (E) in order to avoid any information security risk; (vi) Purchaser shall not take, permit to be taken, or omit to take any action that would reasonably

47

be expected to (A) result in the insolvency of Purchaser or (B) prevent or materially impair or materially delay the ability of Purchaser to perform the Commercial Covenants in accordance herewith; (vii) Purchaser shall comply in all material respects with all provisions of the Plan applicable to Purchaser or the Distribution Agent (as defined in the Plan) to the extent Purchaser is acting as a distribution agent in connection with the Plan; and (viii) Purchaser shall not pledge, repledge, hypothecate, rehypothecate, sell, lend, stake, arrange for staking, or otherwise transfer or use any amount of such Coins, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining a like amount of Coins, or invest such Coins (except as otherwise directed by Seller or any User or Eligible Creditor, as applicable). Notwithstanding the foregoing, Purchaser's obligations under this Section 6.12(e) shall terminate and be of no further force or effect on the earlier of (x) the date that Purchaser's obligations under Section 6.10, Section 6.11, Section 6.12, and Section 6.14 have been performed in full or Purchaser otherwise ceases to have any obligations thereunder, and (y) the date on which this Agreement is terminated in accordance with is terms.

6.13    VGX Token Listing Review Process. Following the entry of the Agreement Order, Purchaser will initiate and undertake consistent with its policies and past practices an internal review process to determine whether VGX tokens can be listed for trading on the Binance.US Platform, which review process will include submitting the VGX token to Purchaser's listing committee for consideration consistent with its policies and past practices.

6.14    Additional Bankruptcy Distributions. The provisions of this Section 6.14 shall cease to apply and be of no further force and effect upon the soonest to occur of (a) Purchaser ceasing to provide the services necessary to comply with this Section 6.14, (b) Purchaser's bankruptcy or insolvency, (c) the issuance of a final, non-appealable Order by a Governmental Body prohibiting the consummation of the transactions contemplated by this Section 6.14, (d) any Purchaser Development (disregarding for the purposes of this Section 6.14 the language "prior to the Closing"), and (e) Purchaser's material breach of Section 6.12(e) or this Section 6.14 which remains uncured for 30 days following Purchaser's receipt of Seller's written notice of such material breach.

(a)    Any Additional Bankruptcy Distributions made on account of Users' or Eligible Creditors' claims against the Debtors and all right, title and interest therein and thereto shall be made or transferred to Purchaser free and clear of any Encumbrances. Any such transfers in Coins shall be deemed complete when each transfer is publicly confirmed on the blockchain for the related Coin at least the number of times set forth on https://support.kraken.com/hc/en-us/articles/203325283-Cryptocurrency-deposit-processing-times (or a successor site mutually agreed by Seller and Purchaser), or, for any Coins held in Seller's account on the Binance.US Platform, transferred to the Binance.US Platform account designated by Purchaser, or in the case of staked ETH Coins, such staked ETH Coins shall be delivered pursuant to the means reasonably specified by Purchaser.

(b)    Upon the Bankruptcy Court's approval of any Additional Bankruptcy Distributions (including through the Confirmation Order), Seller shall deliver to Purchaser a statement setting forth (i) the amount of Additional Bankruptcy Distributions to be made to each User or Eligible Creditor, as applicable, as approved by the Bankruptcy Court in Coins (including the name and relevant ticker symbol used on the Voyager Platform for such Coins, together with

48

all information regarding the underlying networks and smart contracts to which such Coins are subject) after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring such Coins to Purchaser in accordance with this <u>Section 6.14</u>, (ii) the amount of Additional Bankruptcy Distributions to be made to each User or Eligible Creditor, as applicable, as approved by the Bankruptcy Court in cash, and (iii) the user identification number of each such User or other identifying or account information of any Eligible Creditor, as applicable (such statement, the "<u>Post-Bankruptcy Statement</u>"). The provisions set forth in the last sentence of <u>Section 6.11(a)</u> shall apply to the Post-Bankruptcy Statement, *mutatis mutandis*.

(c)     Promptly following Purchaser's receipt of any Additional Bankruptcy Distributions (but no later than five (5) Business Days following receipt of any Additional Bankruptcy Distributions), Purchaser shall credit such Additional Bankruptcy Distributions to each User's and Eligible Creditor's accounts, if any, on the Binance.US Platform in such amounts set forth on, and in accordance with, the Post-Bankruptcy Statement. The Additional Bankruptcy Distributions credited to each User and Eligible Creditor in accordance with this <u>Section 6.14(a)</u> are referred to herein as "<u>Credited Additional Bankruptcy Distributions</u>".

(d)     If any Additional Bankruptcy Distribution is to be received by Purchaser pursuant to <u>Section 6.14(a)</u>, prior to the crediting of the applicable Credited Additional Bankruptcy Distribution pursuant to <u>Section 6.14(a)</u>, Seller shall reduce such Credited Additional Bankruptcy Distribution by and shall retain (i) the number of Coins allocated in the applicable Post-Bankruptcy Statement to each User or Eligible Creditor located in an Unsupported Jurisdiction in which Purchaser or its applicable Affiliate(s) have not received the necessary Money Transmitter License, and (ii) the amount of cash allocated in the applicable Post-Bankruptcy Statement to each User or Eligible Creditor located in an Unsupported Jurisdiction in which Purchaser or its applicable Affiliate(s) have not received the necessary Money Transmitter License, and, in either case, such amounts shall be distributed by Seller in accordance with the Plan.

(e)     There shall be no transaction fees, spreads, costs or expenses charged to or payable by Seller, any User, or any Eligible Creditor with respect to any Additional Bankruptcy Distributions to the account of Seller, such User or such Eligible Creditor, as applicable, on the Binance.US Platform contemplated by this <u>Section 6.14</u>.  With respect to any User or Eligible Creditor that does not meet the requirements of the KYC Procedures and accept the terms and conditions of the Binance.US Platform (or otherwise is not or no longer is a user with an active account on the Binance.US Platform) as of or prior to the date of such Post-Bankruptcy Statement, Purchaser shall convert all Coins allocable to such User or Eligible Creditor in such Additional Bankruptcy Distribution into United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such United States Dollars, together with any cash or others assets in respect of such Users or Eligible Creditors, to Seller within five (5) Business Days, for further distribution by Seller in accordance with the Plan.

6.15     <u>Unstaking</u>. Promptly following the date hereof (until the Closing or the earlier termination of this Agreement pursuant to <u>Article VIII</u>) but without limiting what is permitted by <u>Section 6.1(b)(iii)</u>, Seller shall, and shall cause its Affiliates to, (a) ensure that all Seller Held Coins (other than ETH Coins that are Staked Coins as of the date hereof) are freely transferable and not subject to any restrictions on transfer (including restrictions on transfer implemented through

US-DOCS\137411268.27

"smart contracts" or other technological means), (b) without limiting the foregoing, ensure that all Seller Held Coins (other than ETH Coins that are Staked Coins as of the date hereof) are unstaked prior to the Rebalancing Date, and (c) consult with Purchaser and its representatives, keep Purchaser and its representatives reasonably informed, and provide Purchaser and its representatives with draft documents reasonably in advance of execution or delivery thereof and incorporate any comments therein proposed in good faith by Purchaser or its representatives, in each case, in connection with any of the foregoing.

6.16    Receipt of Misdirected Assets; Liabilities. From and after the Closing, if Purchaser or Seller becomes aware that Seller or any of its Affiliates is in possession of any right, property or asset that is an Acquired Asset, such Party shall promptly inform the other Party of that fact. Thereafter, at the request of Purchaser, Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser or any other entities nominated by Purchaser for no consideration, and such asset will be deemed the property of Purchaser of any such nominees held in trust by Seller for Purchaser or any such nominees until so transferred. From and after the Closing, if Purchaser or Seller becomes aware that Purchaser or any of its Affiliates is in possession of any right, property or asset that is an Excluded Asset, such Party shall promptly inform the other Party of that fact. Thereafter, at the request of Seller, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Seller or any other entities nominated by Seller for no consideration, and such asset will be deemed the property of Seller of any such nominees held in trust by Purchaser for Seller or any such nominees until so transferred; provided that if Purchaser discovers any items (or portions thereof) that would be Documents but for the fact that they relate to Excluded Assets, Purchaser shall use reasonable best efforts to destroy such items. Notwithstanding anything to the contrary herein or otherwise, if any amount (including any principal, interest, fees, expenses or penalties) is outstanding or unpaid under any Loan from or after the Closing, then such Loan, any agreements or documents entered into in connection therewith and any collateral posted in respect thereof shall be deemed Acquired Assets for all purposes under this Agreement and any other agreements or documents entered into in connection herewith, and Seller shall, and shall cause its Affiliates to, sell, transfer, assign, convey and deliver to Purchaser all of its and their right, title and interest in and to the foregoing, free and clear of all Encumbrances in the same manner as the other Acquired Assets under Section 1.1, *mutatis mutandis*, for no additional consideration and at no cost or expense to Purchaser or its Affiliates.

6.17    Acknowledgment by Purchaser.

(a)    Purchaser acknowledges and agrees that it has conducted to its full satisfaction an independent investigation and verification of the business, including its financial condition, results of operations, assets, Liabilities, properties, Contracts, regulatory compliance, business risks and prospects of Seller and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the Transactions, Purchaser and the Purchaser Group have relied solely on the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, Seller, any information, statements, disclosures, documents, Projections, forecasts or other material made available to Purchaser or any of its Affiliates or their respective Advisors in the Dataroom, the Information

50

Presentation, or the Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Seller Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Seller Representations). Purchaser acknowledges and agrees that (i) the Express Seller Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the Transactions and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Seller Representations) including in the Dataroom, Information Presentation, Projections, meetings, calls or correspondence with management of Seller, any of the Seller Parties or any other Person on behalf of Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of Seller's assets, are, in each case, specifically disclaimed by Seller, on its behalf and on behalf of the Seller Parties. Purchaser: (x) disclaims reliance on the items in <u>clause (ii)</u> in the immediately preceding sentence (which, for the avoidance of doubt, do not include any Express Seller Representations); and (y) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in <u>clause (i)</u> in the immediately preceding sentence. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees that neither Seller or any other Person (including the Seller Parties), has made, is making or is authorized to make, any representations or warranties, whether in written, electronic or oral form, express or implied with respect to, (1) any potentially material information regarding Seller or any of its assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (2) as to the quality, merchantability, fitness for a particular purpose, or condition of Seller's business, operations, assets, Liabilities, Contracts, regulatory compliance, business risks and prospects or any portion thereof, except, in each case, solely to the extent set forth in the Express Seller Representations.

(b)     Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of Seller, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of Seller, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "<u>Projections</u>"). Purchaser acknowledges and agrees that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Seller, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

6.18     <u>IT Migration</u>. From and after the date hereof until one hundred twenty (120) days after the Closing Date, upon Purchaser's request, Seller shall, and shall cause its Affiliates to, use reasonable best efforts to make available all relevant technical staff, employees and representatives

US-DOCS\137411268.27

of Seller and its Affiliates, including the Chief Technology Officer of Seller and its Affiliates, to Purchaser and its Affiliates, to (a) assist Purchaser and its Affiliates in understanding all Business Software and Business Accounts, (b) assist with the Integration Plan, (c) transition of all accounts with third party sites necessary to support the Voyager Platform and its associated mobile applications, (d) address the logistics of transferring the Business Software and Business Accounts to Purchaser, including providing Purchaser with access to all credentials to GitHub accounts and other repositories for storage of source code for the Business Software, and (e) any other technical assistance that Purchaser or any of its Affiliates deems reasonably necessary to enable all migrations, integrations and Transactions. Purchaser hereby grants Seller a limited, non-exclusive, non-transferable, non-sublicensable and revocable license to access and use the Business Software for the sole purpose of providing the support to Purchaser as contemplated in this Section 6.18. Seller and its Affiliates may not use, modify, share, disclose or revise such Business Software for any other purpose. Seller shall bear all costs and expenses associated with the provision of such services on or prior to the Closing Date pursuant to this Section 6.18. Purchaser shall bear the reasonable and documented costs and expenses incurred by Seller in connection with the provision of such services during the 120-day period after the Closing Date pursuant to this Section 6.18. Seller can provide no assurance that Seller 's employees will elect to remain employed by Seller prior to or following the Closing and Seller will not be required to replace any such resigning employees.

6.19    Confidentiality.

(a)    Each Party acknowledges that Confidential Information has been, and in the future will be, provided to it in connection with this Agreement and the Transactions, including under Section 6.2.

(b)    Seller acknowledges that from and after the Closing, all non-public information relating to the Acquired Assets and the Assumed Liabilities will be valuable and proprietary to Purchaser and its Affiliates. Seller agrees that, from and after the Closing, Seller will not, and will cause their Affiliates and Advisors not to, directly or indirectly, without the prior consent of Purchaser, disclose to any Person any Confidential Information relating to Purchaser and its Affiliates, the Acquired Assets or the Assumed Liabilities.

(c)    Notwithstanding anything to the contrary herein, the provisions of this Section 6.19 will not prohibit any disclosure (i) required by applicable Law, Order or the rules of a securities exchange to which it is subject, (ii) in connection with a regulatory inquiry by a Governmental Body or self-regulatory organization, (iii) as necessary in connection with Seller's bankruptcy process or (iv) to each Party's Advisors who have been informed of the confidential nature of the information and have been instructed to keep such information confidential. Purchaser acknowledges and understands that this Agreement may be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders and that, except as prohibited herein, such disclosure will not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement or otherwise. Each Party agrees that such Party will be responsible for any breach or violation of the provisions of this Section 6.19 by any of such Party's Affiliates. Each Party acknowledges and agrees that the remedies at law for any breach or threatened breach of this Section 6.19 by Seller or Purchaser are inadequate to protect Purchaser or Seller and its Affiliates, as applicable, and that the damages resulting from any such

US-DOCS\137411268.27

breach are not readily susceptible to being measured in monetary terms. Accordingly, without prejudice to any other rights or remedies otherwise available to either Party or its Affiliates, each Party acknowledges and agrees that upon any breach or threatened breach by a Party of the terms and conditions of this <u>Section 6.19</u>, the other Party and its Affiliates, as applicable will be entitled to immediate injunctive relief and to seek an order restraining any threatened or future breach from any court of competent jurisdiction without proof of actual damages or posting of any bond in connection with any such remedy. The provisions of this <u>Section 6.19</u> will survive the Closing and terminate two (2) years after the Closing Date.

6.20    <u>Acquired Assets Owned by Non-Debtors</u>. To the extent any item set forth in <u>Schedule 6.20</u> or any other asset used in or relating to the Cryptocurrency custody and trading business of Seller constitutes property of Voyager IP, LLC, and, but for this <u>Section 6.20</u>, is of a type that would constitute an Acquired Asset (disregarding solely for this purpose any reference to "of Seller" or other reference indicating ownership, licensing, holding, leasing or use of any type of Acquired Asset by Seller), Seller shall cause Voyager IP, LLC's right, title and interest in and to such item or asset to be transferred (for no additional consideration) to Purchaser reasonably promptly after Closing as an Acquired Asset as if transferred at the Closing in accordance with the other provisions of this Agreement, including by designating Voyager IP, LLC as an additional assignor under the Trademark and Domain Name Assignment Agreement.

6.21    <u>Seller Expenses</u>.

(a)    Purchaser shall (i) at the Closing bear as a component of the Purchase Price pursuant to <u>Section 2.1(a)</u>, without duplication, the Seller Expenses or (ii) if this Agreement is validly terminated in accordance with its terms, pay to Seller, within three (3) Business Days following such termination, cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Seller in an amount equal to the Seller Expenses; <u>provided</u> that notwithstanding anything to the contrary herein, (A) in no event shall the aggregate amount of Seller Expenses payable by Purchaser hereunder exceed the Seller Expense Cap, (B) any fees and expenses (including reasonable and documented out-of-pocket financial advisor and legal fees, expenses and disbursements) incurred by Seller or any of its Affiliates, or otherwise relating to the activities or operations of Seller or any of its Affiliates, on or prior to the Seller Expense Start Date shall not constitute Seller Expenses, and (C) (x) if the Closing or the termination of this Agreement occurs on or prior to the Seller Expense Start Date, (y) if this Agreement is terminated pursuant to (1) <u>Section 8.1(b)</u> or <u>Section 8.1(c)</u> by Purchaser, or by Seller in circumstances where Purchaser would be entitled to terminate this Agreement pursuant to <u>Section 8.1(e)</u>, or (2) <u>Section 8.1(e)</u>, <u>Section 8.1(g)</u>, <u>Section 8.1(h)</u> or <u>Section 8.1(i)</u>, or (z) the Closing does not occur on or prior to the Seller Expense Start Date due to any act or omission by Seller or any of its Affiliates or any material breach of this Agreement by Seller, then in each case the Seller Expenses shall be zero (0).

(b)    For purposes of this Agreement, "<u>Seller Expenses</u>" means all reasonable and documented costs, fees, and expenses (including reasonable and documented out-of-pocket financial advisor and legal fees, expenses and disbursements) incurred by or behalf of any Debtor during the period beginning on the Seller Expense Start Date and ending on the earlier of (i) the Closing Date and (ii) the date on which this Agreement is validly terminated in accordance with its terms, in each case (A) solely in connection with maintaining its operations in the Ordinary

53

Course or by professionals in connection with the Bankruptcy Case, (B) that Seller would not have otherwise incurred if the Closing had occurred on or prior to the Seller Expense Start Date, and (C) which fees and expenses of such professional are approved by the Bankruptcy Court.

6.22    Purchaser Expenses.

(a)    If this Agreement is terminated (i) by Seller pursuant to Section 8.1(c), in circumstances where Purchaser would be entitled to terminate this Agreement pursuant to Section 8.1(e), or (ii) pursuant to Section 8.1(e), Section 8.1(g), Section 8.1(h) or Section 8.1(i)(ix), then Seller shall pay to Purchaser, within three (3) Business Days following such termination, cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Purchaser in an amount equal to the Purchaser Expenses; provided that notwithstanding anything to the contrary herein, in no event shall the aggregate amount of Purchaser Expenses payable by Seller hereunder exceed $5,000,000; provided further that if this Agreement is validly terminated by Seller pursuant to Section 8.1(g) (x) in order for Seller to pursue a Liquidation as a result of and following any Effect with respect to Purchaser's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, or any Effect with respect to Purchaser's Affiliates that has an Effect on Purchaser's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, that, individually or in the aggregate with all other such Effects, would reasonably be expected to (1) prevent or materially impair or materially delay the ability of Purchaser to consummate the Transactions in accordance herewith or (2) materially and adversely affect the Users, Eligible Creditors, or the Acquired Coins on the Binance.US Platform, including following the Closing, as compared to users and Coins on the Binance.US Platform as of the date hereof, and (y) such termination was not effected (1) in connection with a Higher and Better Offer or (2) because the estimated proceeds from such Liquidation are or would reasonably be expected to be greater than the Closing Date Payment (plus the fair market value of any Acquired Coins or any proceeds therefrom, in each case, as determined at the time Seller commences such Liquidation), then no Purchaser Expenses shall be payable.

(b)    For purposes of this Agreement, "Liquidation" means any combination of one or more of the following: (i) a plan under chapter 11 of the Bankruptcy Code that provides for sales or liquidation of the Debtors' assets through a transaction (other than a sale of substantially all of the Debtors' assets to one purchaser on a going concern basis), including the Plan, (ii) one or more sales of assets pursuant to section 363 of the Bankruptcy Code other than a sale of substantially all of the Debtors' assets to one purchaser on a going concern basis, (iii) conversion of the Bankruptcy Case to cases under chapter 7 of the Bankruptcy Code, (iv) foreclosure or other exercise of remedies (including a deed in lieu of foreclosure) by or in favor of one or more creditors, (v) abandonment of the Debtors' assets to a creditor, or (vi) a dismissal of the Bankruptcy Cases.

(c)    For the purposes of this Agreement, "Purchaser Expenses" means all reasonable and documented fees and expenses (including reasonable and documented out-of-pocket legal fees, expenses and disbursements) incurred by Purchaser since August 5, 2022, in connection with, arising from or related to efforts to purchase the Acquired Assets (as defined in the Bidding Procedures Order), which, for the avoidance of doubt, includes its evaluation,

54

negotiation and pursuit of the Transactions, this Agreement and the other documents and agreements contemplated hereby (the "Purchaser Bid Process").

(d)    All amounts payable to Purchaser pursuant to Section 6.22(a) upon termination of this Agreement shall be payable in cash by wire transfer of immediately available funds to such bank account as shall be designated by Purchaser in writing, and without the requirement of any notice or demand from Purchaser or any application to or order of the Bankruptcy Court other than the Agreement Order.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1    Conditions Precedent to the Obligations of Purchaser and Seller. The respective obligations of each Party to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    there shall be no Law or Order (including any temporary restraining order or preliminary or permanent injunction) in effect restraining, enjoining, making illegal or otherwise prohibiting the Transactions;

(b)    the Bankruptcy Court shall have entered the Agreement Order, which Agreement Order shall (i) be in form and substance reasonably acceptable to Purchaser, (ii) comply in all respects with Section 5.1(b), and (iii) be a Final Order; and

(c)    the Bankruptcy Court shall have entered the Confirmation Order, in form and substance, solely with respect to matters relating to this Agreement or the Transactions, reasonably acceptable to Purchaser, confirming a Plan in form and substance, solely with respect to matters relating to this Agreement or the Transactions, reasonably acceptable to Purchaser, and the Confirmation Order shall be a Final Order.

7.2    Conditions Precedent to the Obligations of Purchaser. The obligations of Purchaser to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    (i) the representations and warranties of Seller set forth in Article III (in each case, other than the Fundamental Representations and the representations and warranties set forth in Section 3.16(a)) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be so true and correct only as of such date and (y) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; provided that for purposes of the immediately preceding clause (i), the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect; (ii) the representations and warranties set forth in Section 3.1(a) (*Organization and Qualification*), Section 3.2 (*Authorization of Agreement*), Section 3.3(a)(i) (*Conflicts; Consents*), Section 3.6(a) (*Exclusive Ownership*), and Section 3.14 (*Brokers*) (collectively, the

"Fundamental Representations") shall be true and correct in all but *de minimis* respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all but *de minimis* respects only as of such date; and (iii) the representations and warranties set forth in Section 3.16(a) shall be true and correct in all respects as of the date hereof and as of the Closing Date as though made on and as of the Closing Date;

(b)    Seller shall not have materially breached any of the covenants required to be performed or complied with by Seller under this Agreement on or prior to the Closing; provided that notwithstanding the foregoing, Seller shall have performed or caused to be performed, in all respects, all of the obligations and covenants required by Section 6.15(a) and (b); and

(c)    Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.4.

7.3    Conditions Precedent to the Obligations of Seller. The obligations of Seller to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    the representations and warranties made by Purchaser in Article IV shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be so true and correct only as of such date and (y) where the failure of such representations or warranties to be so true and correct has not and would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions; provided that for purposes of this Section 7.3(a), the qualifications as to materiality, material adverse effect and words of similar import contained in such representations and warranties shall not be given effect;

(b)    Purchaser shall not have materially breached any of the covenants required to be performed or complied with by Purchaser under this Agreement on or prior to the Closing; and

(c)    Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 2.5.

7.4    Waiver of Conditions.  Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. Neither Purchaser nor Seller may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's material breach of any covenant, representation or warranty hereunder.

56

# ARTICLE VIII

# TERMINATION

8.1     <u>Termination of Agreement</u>. This Agreement may be terminated only in accordance with this <u>Section 8.1</u>. This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Seller and Purchaser;

(b)     by written notice of either Purchaser or Seller, upon the issuance of an Order by a Governmental Body restraining, enjoining or otherwise prohibiting the consummation of the Transactions or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; <u>provided</u> that no termination may be made by a Party under this <u>Section 8.1(b)</u> if the issuance of such Order was caused by such Party's material breach of any of its representation, warranties, covenants or agreements hereunder;

(c)     by written notice of either Purchaser or Seller, if the Closing shall not have occurred on or before the date that is four (4) months following the date hereof (the "<u>Outside Date</u>"); <u>provided</u> that Purchaser may, at its election and upon written notice to Seller, elect to extend the Outside Date for an additional thirty (30) days (such extended date, the "<u>Extended Outside Date</u>" ); <u>provided</u> <u>further</u> that a Party shall not be permitted to terminate this Agreement, or extend the Outside Date, pursuant to this <u>Section 8.1(c)</u> if the failure of the Closing to have occurred by the Outside Date or Extended Outside Date, as applicable, was caused by such Party's material breach of any of its representation, warranties, covenants or agreements;

(d)     by written notice from Seller to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser is or will have become untrue, in each case, such that the conditions set forth in <u>Section 7.1</u> or <u>Section 7.3</u> would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; <u>provided</u> that (i) if such breach is curable by Purchaser then Seller may not terminate this Agreement under this <u>Section 8.1(d)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date or Extended Outside Date, if any, and (B) thirty (30) days after Seller notifies Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(d)</u> will not be available to Seller at any time that Seller is in material breach of, any covenant, representation or warranty hereunder;

(e)     by written notice from Purchaser to Seller, upon a breach of any covenant or agreement on the part of Seller, or if any representation or warranty of Seller is or will have become untrue, in each case, such that the conditions set forth in <u>Section 7.2(a)</u> or <u>Section 7.2(b)</u> would not be satisfied; <u>provided</u> that (i) if such breach is curable by Seller then Purchaser may not terminate this Agreement under this <u>Section 8.1(e)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date or Extended Outside Date, if any, and (B) thirty (30) days after Purchaser notifies Seller of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(e)</u> will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

57

(f)    by written notice from Seller to Purchaser, if (A) all of the conditions set forth in Sections 7.1 and 7.2 have been and continue to be satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived, (B) Seller has confirmed in writing to Purchaser that all of the conditions set forth in Sections 7.1 and 7.2 have been and continue to be satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Seller stands ready, willing and able to consummate the Closing so, and (C) Purchaser fails to consummate the Closing within three (3) Business Days of its receipt of such written notice from Seller;

(g)    by written notice from Seller to Purchaser, which may be revocable in the sole discretion of Seller by written notice from Seller to Purchaser within five (5) Business Days, if Seller or the board of directors (or similar governing body) of Seller determine, in good faith and after consultation with its legal and other advisors, that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties; provided that if such determination is in connection with an Acquisition Proposal, Seller may only terminate this Agreement pursuant to this Section 8.1(g) upon compliance with the provisions set forth in Section 5.2(c);

(h)    by written notice from Purchaser to Seller, if (A) Seller seeks or otherwise take material steps in furtherance of, or do not use reasonable best efforts to oppose any other Person in seeking, an order of the Bankruptcy Court dismissing the Bankruptcy Case or converting the Bankruptcy Case to a petition for relief under Chapter 7 of the Bankruptcy Code, (B) the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Seller is appointed in the Bankruptcy Case or (C) the Bankruptcy Court enters an order pursuant to section 362 of the Bankruptcy Code lifting the automatic stay with respect to any Acquired Assets; or

(i)    by written notice from Purchaser to Seller, if:

(i)    the Agreement Order is not entered by January 6, 2023;

(ii)    the Plan Solicitation Motion and the Amended Disclosure Statement are not filed with the Bankruptcy Court by December 21, 2022;

(iii)    the Plan Solicitation Order is not entered by January 6, 2023;

(iv)    the Confirmation Order is not entered by March 1, 2023;

(v)    Seller or any of the other Debtors file any motions, pleadings, notices or other documents with the Bankruptcy Court in material breach of Section 5.7;

(vi)    Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser, or the Bankruptcy Court approves an Alternative Transaction other than with Purchaser;

58

(vii)     Seller has delivered a Higher Offer Determination Notice to Purchaser;

(viii)    Seller or its Affiliates or Advisors have committed a breach of Section 5.1(a); or

(ix)      Seller or its Affiliates or Advisors have committed a breach of, Section 5.2; provided that (without modifying Purchaser's rights to terminate this Agreement under any other Section of this Agreement) Purchaser shall not be entitled to terminate this Agreement pursuant to this Section 8.1(i)(ix) following entry of the Agreement Order by the Bankruptcy Court.

8.2     Effect of Termination.

(a)      In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and there shall be no Liability on the part of either Party or any of its partners, officers, directors or shareholders; provided that Section 2.2, Section 6.2(b), Section 6.12(c), Section 6.19, Section 6.21, Section 6.22, this Section 8.2, Section 8.3, Section 8.4 and Article X (other than Section 10.12 with respect to the availability of an injunction or injunctions, specific performance or other equitable relief to cause the Closing to occur, which shall terminate upon any termination of this Agreement) and the definitions referenced in such Sections and Articles, even if not included in such Sections and Articles, and, for the avoidance of doubt, the Confidentiality Agreement, shall survive any such termination; provided further that, subject to Section 8.3, no termination will relieve either Party from any Liability for damages (including damages based on the loss of the economic benefits of the Transactions, including the Purchase Price, to Seller), losses, costs, or expenses (including reasonable legal fees and expenses) resulting from any willful breach of this Agreement by such Party prior to any such termination or Fraud by such Party. For purposes of this Agreement, "willful breach" means with respect to any breaches or failures to perform any of the covenants or other agreements contained herein, a material breach that is a consequence of an act or failure to act undertaken by the breaching Person with actual knowledge (which shall not be deemed to include knowledge of facts that a Person acting reasonably should have, based on reasonable due inquiry) that such Person's act or failure to act would, or would reasonably be expected to, result in or constitute a material breach of this Agreement.

(b)      If this Agreement is terminated prior to the Closing, at any time following such termination, promptly following the written request of Seller, Purchaser shall, as soon as practicable, return, destroy or permanently erase (on all forms of physical and electronic media) all Acquired User Data transferred to Purchaser prior to the Closing in accordance with Section 6.6(a) or otherwise in connection with the KYC Procedures and permanently close and remove any account established with or with reference to any Acquired User Data, and, upon written request from Seller following any destruction or erasure of data, provide an officer's certificate certifying as to such destruction or erasure. Such destruction or erasure shall be in accordance with all Laws regarding data disposal, and the eradication and destruction technique used will be appropriate for the storage medium and format. Notwithstanding the foregoing, Purchaser shall have the right to retain a copy of the Acquired User Data to the extent required for legal, regulatory or compliance purposes, so long as such Acquired User Data is kept confidential

as required under this Agreement and the Confidentiality Agreement and is used for no other purpose.

8.3     Reverse Termination Fee. In the event that (a) the conditions set forth in Sections 7.1(b), 7.1(c), and 7.2 have been satisfied or duly waived and (b) (i) this Agreement is validly terminated in accordance with Section 8.1(b) or Section 8.1(c), (ii) Purchaser fails to consummate the Closing by the Outside Date or the Extended Outside Date, as applicable, as a result of the failure of the conditions set forth in Section 7.1(a), or (iii) this Agreement is terminated pursuant to Section 8.1(g) in connection with and following a Purchaser Development and not in connection with a Higher and Better Offer, then, in any such case, within three (3) Business Days following such valid termination the Deposit (including all received investment income, if any) shall be released to Seller (such release, which, for the avoidance of doubt, shall be equal to and shall not exceed $10,000,000 in the aggregate, the "Reverse Termination Fee").

8.4     Further Effect of Termination. Notwithstanding anything to the contrary in this Agreement, the Confidentiality Agreement or any other document or instrument delivered by either Party in connection with the Transactions, but subject in all respects to the other provisions of this Section 8.4:

(a)     Seller, on behalf of itself and the Seller Parties, acknowledges and agrees that any disbursement of the Deposit to Seller pursuant to Section 2.2(b), payment of any Seller Expenses to Seller pursuant to Section 6.21 or payment of the Reverse Termination Fee pursuant to Section 8.3 shall be deemed liquidated damages and shall be the sole and exclusive recourse of Seller and the Seller Parties against Purchaser and the Purchaser Group for any loss or damage suffered in connection with, relating to or arising out of this Agreement or the Transactions (including circumstances giving rise to any termination of this Agreement) and including losses or damages suffered as a result of any breach of this Agreement or any representation, warranty, covenant or agreement contained herein by Purchaser or the failure of the Transactions to be consummated (whether or not for intentional, unintentional or willful breach or otherwise), except in the event Seller is entitled to elect specific performance of Purchaser's obligations (including to consummate the Transactions) pursuant to Section 10.12.

(b)     In the event of a valid termination of this Agreement pursuant to Section 8.1, if Seller is entitled to receive the Deposit pursuant to Section 2.2, payment of any Seller Expenses pursuant to Section 6.21, or payment of the Reverse Termination Fee pursuant to Section 8.3, then, upon release of the Deposit to Seller in accordance with Section 2.2(b), payment of such Seller Expenses pursuant to Section 6.21 or payment of the Reverse Termination Fee pursuant to Section 8.3, as applicable, (i) Purchaser and the Purchaser Group shall not have any further liability or obligation relating to or arising out of this Agreement or the Transactions (including any liability or obligation for monetary damages) and (ii) neither Seller nor any of the Seller Parties will have any right of recovery, whether arising under contract Law, tort Law or any other theory of Law, against, and no personal liability shall attach to Purchaser or any other member of the Purchaser Group, whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil, by the enforcement of any assessment or by any legal or equitable Action, by virtue of any statute, regulation or applicable Law, or otherwise.

60

(c)        (i) The maximum aggregate liability of Purchaser and the Purchaser Group in connection with this Agreement and the Transactions shall be limited to the sum of (x) (1) solely where and to the extent the Deposit is forfeited by Purchaser in accordance with Section 2.2(b), the Deposit or (2) without duplication of any forfeiture of the Deposit pursuant to Section 2.2(b) and solely where and to the extent the Reverse Termination Fee is payable in accordance with Section 8.3, the Reverse Termination Fee, plus (y)  solely where and to extent the Seller Expenses are payable in accordance with Section 6.21, the Seller Expenses; (ii) in no event shall Purchaser be obligated to pay any of the Deposit, the Seller Expenses or the Reverse Termination Fee on more than one occasion and (iii) under no circumstances will any of Seller or any of the Seller Parties seek, obtain or accept, monetary damages or losses of any kind (including damages for the loss of the benefit of the bargain, opportunity cost, loss of premium, time value of money or otherwise, or any consequential, special, expectancy, indirect or punitive damages or any losses or damages based on a multiple or multiplier) in connection with, relating to or arising out of the termination of this Agreement in excess of the sum of (A) (1) solely where and to the extent the Deposit is forfeited in accordance with Section 2.2(b), the Deposit or (2) without duplication of any forfeiture of the Deposit pursuant to Section 2.2(b) and solely where and to the extent the Reverse Termination Fee is payable in accordance with Section 8.3, the Reverse Termination Fee, plus (B) solely where and to the extent the Seller Expenses are payable in accordance with Section 6.21; provided, however, that the foregoing shall not been interpreted to limit in any way Seller's right to require specific performance of Purchaser's obligations (including to consummate the Transactions) pursuant to Section 10.12 in the event this Agreement has not been terminated and to the extent such specific performance is available to Seller under Section 10.12.  Notwithstanding anything to the contrary herein or otherwise, in no event shall Seller be entitled to receive both (1) the forfeiture of the Deposit together with all received investment income, if any, pursuant to Section 2.2(b) and (2) the payment of the Reverse Termination Fee pursuant to Section 8.3 (it being acknowledged that the payment of the Reverse Termination Fee pursuant to Section 8.3 includes forfeiture of the Deposit together with all received investment income, if any).

(d)        Seller may seek both payment of monetary damages (including the Reverse Termination Fee, the Deposit or the Seller Expenses) in accordance with this Agreement, on the one hand, and specific performance of Purchaser's obligation to consummate the Closing pursuant to Section 10.12; provided that in no event shall Seller be entitled to receive both (1) payment of monetary damages (including the Reverse Termination Fee, the Deposit or the Seller Expenses) in accordance with this Agreement (and for the avoidance of doubt, subject to the other limitations thereon set forth in this Section 8.4) and (2) such specific performance pursuant to Section 10.12.

## ARTICLE IX

## TAXES

9.1        Transfer Taxes. Any sales, use, purchase, transfer, deed, stamp, documentary or other similar Taxes and recording charges (but excluding any such Taxes or charges that are based in whole or in part upon income, profits or gains) payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "Transfer Taxes") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes.

US-DOCS\137411268.27

9.2    <u>Cooperation</u>. Purchaser and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes. In furtherance thereof, Purchaser and Seller shall reasonably cooperate in good faith to determine and agree to the tax treatment to each of them and to the Users of the Transactions, provided that agreeing on consistent tax treatment shall not be a closing condition and neither Party shall have any liability under this Agreement if the Parties are unable to so agree.

9.3    <u>Preparation of Tax Returns and Payment of Taxes</u>.

(a)    Except as otherwise provided by <u>Section 9.1</u>, Seller shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets for any Tax period ending on or before the Closing Date and (ii) all Tax Returns of Seller (including, for the avoidance of doubt, for any Straddle Period, but not including, for the avoidance of doubt, information returns). With respect to any such Tax Return that reflects any Tax that is an Assumed Liability (not including, for the avoidance of doubt, any income Tax Return of Seller or Seller's Affiliates for any tax period and not including any information Tax Return), Seller shall use reasonable best efforts to (x) prepare such Tax Returns consistent with past practice, except as otherwise required by applicable Law, (y) provide Purchaser with a draft of such Tax Returns at least ten (10) days prior to the filing of any such Tax Return, and (z) incorporate any changes reasonably requested by Purchaser with respect to such Tax Returns prior to filing. Except to the extent any Tax reflected on a return required to be prepared and filed by Seller pursuant to this <u>Section 9.3</u> constitutes an Assumed Liability, Seller shall be responsible for paying any Taxes reflected on any Tax Return that Seller is obligated to prepare and file under this <u>Section 9.3(a)</u>. Notwithstanding anything herein to the contrary: (i) nothing in this Agreement shall give Purchaser or its Affiliates any rights with respect to or control over any income Tax Return of Seller or Seller's Affiliates for any tax period (any such Tax Return, a "<u>Seller Income Tax Return</u>"), and (ii) if any Governmental Body approaches (including by way of initiating any audit, investigation, or other proceeding) either Party with respect to the income Tax characterization of the Transactions (any such action, a "<u>Transaction-Related Action</u>"), then the Party in receipt of such notice shall reasonably promptly inform the other Party of such Transaction-Related Action.

(b)    Purchaser shall prepare and timely file all Tax Returns with respect to the Acquired Assets that are not addressed by <u>Section 9.3(a)</u> (including, for the avoidance of doubt, all Tax Returns with respect to the Acquired Assets for any taxable period beginning after the Closing Date). With respect to any such Tax Return for any Straddle Period that reflects any Tax that is an Excluded Liability (each, a "<u>Relevant Tax Return</u>"), Purchaser shall prepare such Relevant Tax Returns and shall provide Seller with a draft of such Relevant Tax Returns at least ten (10) days prior to the filing of any such Tax Return. Purchaser shall incorporate any changes reasonably requested by Seller with respect to such Tax Returns. Seller shall be responsible for paying any Taxes reflected on any Tax Return that Purchaser is obligated to prepare and file under this <u>Section 9.3(b)</u> to the extent such Taxes constitute Excluded Liabilities.

(c)    Purchaser shall not file any amendment to any previously filed Tax Return with respect to the Acquired Assets for any Pre-Closing Tax Period that would have the effect of increasing any Tax due for a Pre-Closing Tax Period or portion of a Straddle Period ending on the Closing Date, in each case, that is an Excluded Liability, unless Purchaser receives an opinion

US-DOCS\137411268.27

from a nationally recognized accounting firm or law firm that there is no adequate "reporting position" with respect to any previously-asserted position with respect to Taxes. Upon such determination, Purchaser shall provide no less than forty-five (45) days' notice of such position before filing any such Tax Return. In the event Seller disagrees with such Tax position, and the dispute cannot be resolved between the Parties, such dispute shall be submitted to an independent national accounting firm or law firm for resolution, with the costs of such resolution to be evenly split by Purchaser and Seller. The determination of such independent national accounting firm or law firm shall be binding on both Parties and any Tax Return shall be filed consistently with such resolution.

(d)     For all purposes under this Agreement, in respect of any Straddle Period, the portion of Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date will be: (i) in the case of any Taxes other than those described in clause (ii) below, deemed to include the amount that would be payable if the relevant Straddle Period ended on and included the Closing Date; and (ii) in the case of any property Taxes and other similar Taxes, deemed to include the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the number of days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

(e)     Notwithstanding anything herein to the contrary, prior to the Closing, Seller and its Affiliates may contribute, assign or otherwise transfer the 3AC Loan to any third-party purchaser, trust or other entity.

## ARTICLE X

## MISCELLANEOUS

10.1   <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years and (b) are an integral part of the Transactions and that, without the agreements set forth in this <u>Section 10.1</u>, neither of the Parties would enter into this Agreement.

63

10.2   Expenses. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, Section 8.2), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that all Transfer Taxes will be allocated pursuant to Section 9.1 and (c) all Cure Costs will be allocated pursuant to Section 5.4.

10.3   Notices. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

Notices to Purchaser:

BAM Trading Services, Inc. d/b/a Binance.us
611 Cowper Street, Suite 400
Palo Alto, CA 94301
Attention:      Norman Reed, General Counsel
Email:          norman.reed@binance.us;
                legal@binance.us

with a copy to (which shall not constitute notice):

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:      Robert M. Katz
                Daniel Mun
                Adam J. Goldberg
                Andrew D. Sorkin
Email:          Robert.Katz@lw.com
                Daniel.Mun@lw.com
                Adam.Goldberg@lw.com
                Andrew.Sorkin@lw.com

Notices to Seller:

Voyager Digital, LLC
33 Irving Place, 3rd Floor
New York, NY 10003
Attention:      Stephen Ehrlich
                David Brosgol
Email:          sehrlich@investvoyager.com
                dbrosgol@investvoyager.com

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:      Joshua A. Sussberg, P.C.
                Christine A. Okike, P.C.
                Christopher Marcus, P.C.
                Jonathan L. Davis, P.C.
                Steve Toth
                Eduardo M. Leal
                Allyson B. Smith
Email:          joshua.sussberg@kirkland.com
                christine.okike@kirkland.com
                cmarcus@kirkland.com
                jonathan.davis@kirkland.com
                steve.toth@kirkland.com
                eduardo.leal@kirkland.com
                allyson.smith@kirkland.com

10.4    Binding Effect; Assignment. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Agreement Order, the Plan and the Confirmation Order, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Seller, and any attempted assignment or delegation without such prior written consent shall be null and void; provided further that Purchaser shall be entitled to assign or delegate this Agreement or all or any part of its rights or obligations hereunder to any of its Affiliates; provided further that in each case no such assignment or delegation shall relieve Purchaser of any of its obligations hereunder.

10.5    Amendment and Waiver. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Seller or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any

65

way any other provision or prior or subsequent breach or default. Except where a specific period for action or inaction is provided herein, no delay on the part of either Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

10.6    <u>Third Party Beneficiaries</u>. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement is intended or will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    <u>Non-Recourse</u>. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future direct or indirect equityholder, shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of either Party will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction. To the extent permitted by applicable Law, each Party waives any provision of Law that renders any provision of this Agreement invalid or unenforceable in any respect.

10.9    <u>Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The table of contents and headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    <u>Schedules</u>. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; <u>however</u>, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, to the extent it is readily apparent on its face without the need for a cross-reference. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and neither Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or

66

included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by either Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11  Complete Agreement. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements between the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12  Specific Performance. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if either of the Parties fails to take any action required of it hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 10.13 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Seller nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that either Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 10.12 will not be required to provide any bond or other security in connection with any such Order. Except as limited by Section 8.4(d), (i) the remedies available to Seller pursuant to this Section 10.12 will be in addition to any other remedy to which they were entitled at law or in equity, and (ii) the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit Seller from seeking to collect or collecting damages. If, prior to the Outside Date or Extended Outside Date, if any, either Party brings any action, in each case in accordance with Section 10.13, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date or Extended Outside Date, if any, will automatically be extended

67

(y) for the period during which such action is pending, <u>plus</u> ten (10) Business Days or (z) by such other time period established by the court presiding over such action, as the case may be.

      10.13  <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the Transactions brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) ((a) and (b), the "<u>Chosen Courts</u>"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the Transactions. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in <u>Section 10.3</u>. Nothing in this Agreement will affect the right of either Party to serve process in any other manner permitted by Law.

      10.14  <u>Governing Law; Waiver of Jury Trial</u>.

      (a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the Transactions will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

      (b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE

US-DOCS\137411268.27

AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15   No Right of Set-Off. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

10.16   Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17   Publicity. The initial press release regarding this Agreement and the Transactions (the "Press Release") shall be made promptly following the execution and delivery of this Agreement and shall be in such form as the Parties mutually agree. Except as contemplated by the Commercial Covenants, and subject in all respects to Section 10.19, none of Seller and the Seller Parties shall issue any press release or public announcement (directly or indirectly) concerning this Agreement, the Transactions, the Acquired Assets, the Assumed Liabilities, the Purchaser Bid Process or any other matters related thereto or arising in connection therewith without obtaining the prior written approval of Purchaser (which approval will not be unreasonably withheld, conditioned or delayed) unless, (a) in the reasonable judgment of Seller after consultation with counsel (who may be in-house counsel), disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or the Plan or (b) to correct any misstatement of fact made by Purchaser in any communication pursuant to the immediate next sentence; provided that Seller shall use its

69

reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with Purchaser with respect to the disclosure thereof. Following the publication of the Press Release, Purchaser shall be permitted to make one or more public statements or issue one or more press releases, in each case, regarding the Acquired Assets and the Assumed Liabilities, this Agreement, the Transactions and the Purchaser Bid Process or any other matter related thereto or arising therefrom or otherwise in connection therewith to the extent not in violation of the Confidentiality Agreement and not in disparagement of Seller or any Seller Party; provided that Purchaser shall use its reasonable best efforts (considered in light of the circumstances in which such disclosure is to be made) to consult in good faith with Seller prior to making any such disclosure.

10.18   Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Confirmation Order. In furtherance of the foregoing, to the extent permitted by applicable Laws, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

10.19   Fiduciary Obligations. Nothing in this Agreement, or any document related to the Transactions, will require Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations; provided, however, that no such action or inaction shall be deemed to prevent Purchaser from exercising any termination rights it may have hereunder as a result of such action or inaction.

10.20   No Solicitation. This Agreement, the Plan and the transactions contemplated herein and therein are the product of negotiations between the Parties. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, (a) a solicitation of votes for the acceptance of the Plan or any other plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act or the Exchange Act and Seller will not solicit acceptances of the Plan from any party until such party has been provided with copies of a disclosure statement containing adequate information as required by section 1125 of the Bankruptcy Code.

10.21   Acknowledgment. Notwithstanding anything in this Agreement to the contrary (including Section 3.17, Section 3.18, Section 4.10, Section 4.11, Section 6.17 and Section 10.1), nothing herein shall relieve any Person from any Liability on account of Fraud.

US-DOCS\137411268.27

# ARTICLE XI

## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1    <u>Certain Definitions</u>.

(a)    "<u>3AC Loan</u>" means that certain Master Loan Agreement, dated March 4, 2022, by and between Three Arrows Capital, Ltd., as borrower, and Seller and HTC Trading, Inc., as lenders, and Seller in its capacity as administrative agent for the lenders.

(b)    "<u>Acquired Coins</u>" means, collectively, all Seller Held Coins (other than Withheld Coins) as of the Rebalancing Date and following the completion of the Rebalancing Exercise in accordance with this Agreement, and after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring such Coins to Purchaser in accordance with <u>Section 2.4(b)</u>.

(c)    "<u>Acquired Coins Value</u>" means, with respect to any Acquired Coin of any type, the VWAP of such Coin determined as of two Business Days prior to the Rebalancing Date.

(d)    "<u>Action</u>" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination, assessment, notice of violation, citation or investigation, of any kind whatsoever (civil, criminal, administrative, regulatory, investigative, appellate or otherwise), regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

(e)    "<u>Additional Bankruptcy Distributions</u>" means any distributions proposed to be made by the Debtors or any successor thereto to Users or Eligible Creditors after the Closing Date, whether made pursuant to the Plan (including distributions in cash or Coins) or otherwise.

(f)    "<u>Advisors</u>" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(g)    "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(h)    "<u>Alternative Transaction</u>" means any transaction (or series of transactions), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition of Seller or any of its Affiliates or any

71

portion of the equity interests or any material portion of the assets thereof (in any form of transaction, whether by merger, sale of assets or equity or otherwise).

(i)    "Bidding Procedures Order" means the *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation and (V) Granting Related Relief* [Docket No. 248].

(j)    "Binance.US Platform" means Purchaser's and its Affiliates' Binance.US Cryptocurrency savings and trading platform or any successor platform thereto.

(k)    "Business Accounts" means any and all accounts or registries that Seller owns, maintains or controls with third party vendors, software providers, service providers and other similar third parties that is related to the businesses of Seller.

(l)    "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(m)    "Business Software" means any and all proprietary Software owned by (or purported to be owned by) Seller that is related to the businesses of Seller, other than the VGX Token Smart Contracts.

(n)    "Cash and Cash Equivalents" means all of Seller's cash (including deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, or any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(o)    "Code" means the United States Internal Revenue Code of 1986.

(p)    "Coin" means, with respect to any type of Cryptocurrency, one coin or token or full unit of such Cryptocurrency (*e.g.*, one (1) Bitcoin); provided that, notwithstanding anything to the contrary herein, for purposes of this Agreement, (i) references to "Coins" shall mean more than one Coin and may include fractional Coins in excess of one (1) Coin, and (ii) as the context requires, "Coin" may refer to a fraction of one (1) Coin.

(q)    "Commercial Covenants" means, collectively, Sections 6.6, 6.10, 6.11, 6.12, 6.13, 6.14 and 6.15.

(r)    "Confidential Information" means any information relating to the business, financial or other affairs (including future plans and targets) of either Party or any of its Affiliates; provided, however, that "Confidential Information" will not include any information that (i) is or becomes (other than as a result of disclosure by either Party or any of its Affiliates in violation of this Agreement) generally available to, or known by, the public, (ii) is independently developed by a Party or any of its Affiliates without use of or reference to information that would be "Confidential Information" but for the exclusions set forth in this proviso or (iii) is received by a

Party or any of its Affiliates from a third party not known by such receiving Party or any of its Affiliates after reasonable inquiry to be bound by a duty of confidentiality to such other Party or any of its Affiliates with respect to such information.

(s)    "Confidentiality Agreement" means that certain letter agreement, dated as of August 2, 2022, by and between Parent and BAM Management US Holdings, Inc.

(t)    "Confirmation Order" means an Order of the Bankruptcy Court reasonably acceptable to the Parties pursuant to section 1129 of the Bankruptcy Code, which Order shall, among other things and without limitation, (A) confirm the Plan in a form reasonably acceptable to, solely to the extent related to this Agreement and the Transactions (but not with respect to the matters contemplated by Section 6.11(c)), Purchaser and Seller, as may have been amended, supplemented or otherwise modified, solely to the extent related to this Agreement and the Transactions (but not with respect to the matters contemplated by Section 6.11(c)), with the consent of Purchaser (such consent not to be unreasonably withheld, delayed or conditioned), (B) approve, pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Seller of its obligations under this Agreement, (C) authorize and empower Seller to assume and assign to Purchaser the Assigned Contracts, (D) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (E) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity (including under applicable Money Transmitter Requirements or any securities or commodities Laws of any Governmental Body), (F) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts, (G) find that Purchaser shall have no Liability for any Excluded Liability, and (H) find that Seller has title to, and the ability to sell, transfer and assign, Acquired Coins and Additional Bankruptcy Distributions, in each case, in accordance with the terms and conditions hereof.

(u)    "Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(v)    "Contract" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than a purchase order, service order, sales order or Money Transmitter License.

(w)    "Credit Matter" means any loan or other type of credit exposure or loan-like instrument.

US-DOCS\137411268.27

(x)    "Cryptocurrency" means a digital or crypto currency, asset, token or coin in which transactions are verified and records are maintained by a decentralized system using cryptography, rather than by a centralized authority.

(y)    "Deposited Coins" means, with respect to each User as of the Petition Date, the total number of Coins of each type owed to such User with respect to such User's deposits on the Voyager Platform as of the Petition Date, as set forth on the Seller Statement.

(z)    "Deposited Coins Value" means, with respect to any Deposited Coin of any type, the VWAP of such Coin determined as of the Petition Date.

(aa)    "Disclosure Statement" means the disclosure statement for the Plan approved by the Bankruptcy Court pursuant to the Plan Solicitation Order (including all exhibits and schedules thereto).

(bb)    "Documents" means all of Seller's written files, documents, instruments, papers, books, reports, records, accounts, accounting records, financial statements, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(cc)    "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, servitudes, restrictive covenants, rights of way, rights of use or possession, rights of first offer or first refusal, third party interest, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(dd)    "Environmental Laws" means all applicable Laws concerning pollution or protection of the environment.

(ee)    "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

(ff)    "ERISA" means the Employee Retirement Income Security Act of 1974.

(gg)    "ETH Coins" means Ether Coins, being the native Cryptocurrency of the Ethereum Network (symbol: ETH).

(hh)    "Existing User" means as of a particular date any User for which Seller has provided on or prior to such date all data and information reasonably necessary for Purchaser to

74

validate that such User or any Affiliate of such User has a Cryptocurrency account on the Binance.US Platform.

(ii)    "Exchange Act" means the Exchange Act of 1934 and the rules and regulations promulgated thereunder.

(jj)    "Final Order" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending; or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

(kk)    "Fraud" means an act committed by (a) Seller, in the making to Purchaser of the Express Seller Representations and (b) Purchaser, in the making to Seller of the Express Purchaser Representations, in any such case, with intent to (x) deceive the other Party or (y) induce such other party hereto to enter into this Agreement and requires (i) a false representation or warranty of material fact made in such representation; (ii) with knowledge that such representation or warranty is false; (iii) with an intention to induce the party to whom such representation or warranty is made to act or refrain from acting in reliance upon it; (iv) causing that party, in justifiable reliance upon such false representation or warranty, to take or refrain from taking action; and (v) causing such party to suffer damage by reason of such reliance, which together constitutes common law fraud under Delaware Law (and does not include any fraud claim based on constructive knowledge, negligent misrepresentation, recklessness or a similar theory).

(ll)    "GDPR" means the EU General Data Protection Regulation (and any European Union member states' laws and regulations implementing it), and the EU General Data Protection Regulation as it forms part of the United Kingdom ("UK") law by virtue of section 3 of the European Union (Withdrawal) Act 2018 and any applicable implementing or supplementary legislation of the UK (including the UK Data Protection Act 2018).

(mm)    "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

75

(nn)    "<u>Governmental Body</u>" means any government, quasi-governmental entity, or other governmental or regulatory body, commission, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(oo)    "<u>Hazardous Substance</u>" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

(pp)    "<u>Higher and Better Offer</u>" means a bona fide, written Acquisition Proposal that did not result from Seller's breach of <u>Section 5.1(a)</u> for an Alternative Transaction on terms that the board of directors (or comparable governing body) of Seller determines in good faith, after consultation with its financial advisor and outside legal counsel, (i) constitutes a higher and otherwise better offer for the Debtors' assets and (ii) is reasonably likely to be consummated in accordance with its terms.

(qq)    "<u>IFRS</u>" means the International Financial Reporting Standards.

(rr)    "<u>Intellectual Property</u>" means all intellectual property rights in any jurisdiction throughout the world, including all: (i) patents and patent applications and patent disclosures (including any provisional applications, patents of addition, continuations, continuations-in-part, substitutions, additions, divisionals, confirmations, re-examinations, reissues, revisions and extensions); (ii) trademarks, service marks, trade dress, logos, brand names, corporate names, social media handles, Internet domain names and other indicia of origin, together with all goodwill associated with each of the foregoing; (iii) copyrights and mask works, whether or not registered; (iv) registrations and applications for any of the foregoing; (v) trade secrets; (vi) Software; (vii) drawings, schematics and other technical plans; (viii) rights in data, data collections and databases; (ix) all other intellectual property; and (x) all legal rights arising from items (i) through (ix), including the right to prosecute, enforce and perfect such interests and rights to sue, oppose, cancel, interfere, enjoin and collect damages based upon such interests.

(ss)    "<u>IT Systems</u>" means all of the computer systems, servers, hardware, firmware, middleware, networks, workstations, routers, hubs, switches, circuits, servers, data communications lines and all other information technology equipment, and all associated documentation, in each case, only as necessary to use or operate the Voyager Platform.

(tt)    "<u>Knowledge of Seller</u>" means the actual knowledge without independent verification (and which in no event encompasses constructive, imputed or similar concepts of knowledge) of Stephen Ehrlich, Gerard Hanashe, and Rakesh Gidwani, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

(uu)    "<u>Knowledge of Purchaser</u>" means the actual knowledge without independent verification (and which in no event encompasses constructive, imputed or similar concepts of knowledge) of Brian Shroder, Krishna Juvvadi and Abhishek Baid, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

76

(vv)    "KYC Procedures" means the "know your customer" and "Customer Identification Program" policies, procedures and processes of Purchaser and its Affiliates as in effect from time to time and any equivalent procedures required under, or to comply with, applicable Law, in each case, including with respect to FCPA and any other applicable U.S. or foreign Law concerning anti-corruption, anti-bribery or anti-money laundering and consistent with the same applicable to other customers and users of Binance.US Platform.

(ww)    "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(xx)    "Liability" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, perfected or unperfected, determined or determinable, disputed or undisputed, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, at law or in equity or otherwise, including any claims or liability based on successor liability theories or otherwise under any theory of Law or equity, and including all costs and expenses related thereto.

(yy)    "Loan" means any loan made by Seller in the form of Cryptocurrency to counterparties in the cryptocurrency sector; provided that, the 3AC Loan shall not be deemed a Loan.

(zz)    "Loan Documents" means all agreements and documents relating to Loans and the 3AC Loan, including security agreements, pledge or collateral agreements, loan agreements, loan policies and manuals.

(aaa)    "Material Adverse Effect" means any matter, event, change, development, occurrence, circumstance, condition, occurrence or effect (each, an "Effect") that, individually or in the aggregate with all other Effects, (x) has had or would reasonably be expected to have a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole or (y) has had or would reasonably be expected to have a material adverse effect on the ability of Seller to perform its obligations under this Agreement or any of the Seller Documents or to consummate the Transactions; provided that with respect to clause (x) none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) Effects in, arising from or relating to general business or economic conditions affecting the industry in which Seller and its Affiliates operate; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any

77

other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from or relating to financial, banking, securities or Cryptocurrency markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, Cryptocurrency or index and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (v) Effects in, arising from or relating to changes in, IFRS or the interpretation thereof; (vi) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body; (vii) Effects in, arising from or relating to (A) the taking of any action contemplated by this Agreement or at the written request of Purchaser or its Affiliates, (B) the failure to take any action if such action is expressly prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1, (D) the negotiation, announcement or pendency of this Agreement or the Transactions, the identity, nature or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (viii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect); (ix) the Effect of any action taken by Purchaser or its Affiliates with respect to the Transactions or any breach by Purchaser of this Agreement or the matters set forth on Schedule 11.1(aaa); or (x)(A) the commencement or pendency of the Bankruptcy Case, (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions or thereby, (2) the Agreement Order, the Confirmation Order, the Plan, or the reorganization of Seller, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Assigned Contract, or (C) any Order of the Bankruptcy Court or any actions or omissions of Seller in compliance therewith; except in the case of clauses (i), (ii), (iii), (iv), (v) and (vi), to the extent such Effects have a materially disproportionate impact on the Acquired Assets and Assumed Liabilities, taken as a whole, as compared to other participants engaged in the business in which Seller operates.

(bbb)    "Moelis" means Moelis & Company LLC, a Delaware limited liability company.

(ccc)    "Money Transmitter License" means any consent, license, certificate, franchise, permission, variance, clearance, registration, qualification, authorization, waiver, exemption or other permit issued, granted, given or otherwise made available by or under the authority of any Governmental Body pursuant to state money transmission or similar Laws.

78

(ddd)   "Money Transmitter Requirements" shall mean any and all Law or Contract with a Governmental Body relating or pertaining to the business of transmitting or remitting money, monetary value or virtual currency, electronic funds transfers, remittances, issuing or selling stored value, prepaid access or the like, issuing or selling payment instruments, the custody, transfer or exchange of money, monetary value or virtual currency, or any similar payment or money services, including those related to money, monetary value, or Cryptocurrency.

(eee)   "Net Owed Coins" means, with respect to each User and each type of such User's Post-Rebalancing Coins, a number of Coins of such type equal to the total number of such User's Post-Rebalancing Coins of such type. For the avoidance of doubt, except as the context may otherwise require, references to Net Owed Coins in this Agreement relating to payments to any User or credits thereof to any User shall be deemed to be the sum of all Net Owed Coins with respect to each type of Post-Rebalancing Coin of such User. Notwithstanding the foregoing, in the event that there is a Rebalancing Exercise Delta for any type of Coin, then (i) Purchaser shall convert any excess Acquired Coins of any type into USDC or United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform, and (ii) Purchaser shall distribute the amounts resulting from such conversions to User accounts with respect to Net Owed Coins where the aggregate number of Net Owed Coins exceeds the number of Acquired Coins, pro rata based on the then-prevailing prices (including applicable fees, spreads, costs and expenses) for all such Net Owed Coins on the Binance.US Platform owed to any such User.

(fff)   "Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, whether preliminary, interim, temporary or final, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Confirmation Order) or any other court.

(ggg)   "Ordinary Course" means the ordinary and usual course of operations of the business of Seller consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Case.

(hhh)   "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) customary easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the use, ownership or operation of the Acquired Assets, (iii) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, being contested in good faith, (iv) licenses granted on a non-exclusive basis, (v) such other Encumbrances or title exceptions which do not, individually or in the aggregate, materially affect the operation, value or condition of the Acquired Assets, (vi) any Encumbrances set forth on Schedule 11.1(hhh), or (viii) any Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan.

(iii)   "Permitted Post-Closing Lien" means, with respect to the Acquired Assets (a) Encumbrances described in clause (ii) in the definition of "Permitted Encumbrances" and any non-monetary encumbrances not in fact released upon Closing pursuant to Confirmation Order or

Plan, as applicable; <u>provided</u> that with respect to all Encumbrances that are "Permitted Post-Closing Liens" pursuant to this clause (a), such Encumbrances do not materially detract from the use or value of the applicable property as it is currently being used, and (b) other Permitted Encumbrances described in clauses (i), (iii), (iv) and (v) in the definition of "Permitted Encumbrances" securing monetary obligations which, individually or in the aggregate with all other Permitted Encumbrances treated as Permitted Post-Closing Liens pursuant to this clause (b), do not exceed $10,000.

(jjj)    "<u>Person</u>" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(kkk)    "<u>Personal Information</u>" means information, in any form, that identifies, relates to, describes, could be used to locate or contact, is capable of being associated with, or could be linked, directly or indirectly, to, a natural Person, device or household, or is otherwise considered "personally identifiable information," "personal information," "personal data," "nonpublic personal information," or any similar term by any applicable Laws or Privacy Law.

(lll)    "<u>Plan</u>" means a plan of reorganization prepared by Seller and solely to the extent related to this Agreement (but not with respect to the matters contemplated by <u>Section 6.11(c)</u>) and the Transactions, approved by Purchaser in its reasonable discretion, and attached as an Exhibit to this Agreement by amendment hereto as promptly as practicable, implementing the Transactions.

(mmm)"<u>Plan Solicitation Motion</u>" means Seller's motion for an Order (which solely with respect to matters relating to this Agreement and the Transactions, shall be in form and substance reasonably acceptable to Purchaser), (i) approving the Disclosure Statement (including approving the Disclosure Statement as containing "adequate information" (as that term is used by section 1125 of the Bankruptcy Code)), (ii) establishing a voting record date for the Plan, (iii) approving solicitation packages and procedures for the distribution thereof, (iv) approving the forms of ballots, (v) establishing procedures for voting on the Plan, (vi) establishing notice and objection procedures for the confirmation of the Plan and (vii) establishing procedures for the assumption or assignment of executory contracts and unexpired leases under the Plan.

(nnn)    "<u>Plan Solicitation Order</u>" means an Order entered by the Bankruptcy Court, substantially in the form attached to the Plan Solicitation Motion, which Order shall, among other things, (A) be in form and substance reasonably acceptable to Purchaser (solely with respect to matters relating to this Agreement and the Transaction), and (B) approve the relief sought in the Plan Solicitation Motion, including approving of (i) the Disclosure Statement on a conditional basis and (ii) the procedures for solicitation of votes to accept or reject the Plan.

(ooo)    "<u>Plan Supplement</u>" has the meaning set forth in the Plan.

(ppp)    "<u>Post-Petition Coins</u>" means Coins that were deposited with the Debtors following the Petition Date.

(qqq)    "<u>Post-Rebalancing Coins</u>" means, with respect to each User as of the Rebalancing Date and each type of such User's Deposited Coins, (i) the total number of such

User's Deposited Coins of such type, <u>multiplied</u> by (ii) the Rebalancing Ratio, as set forth on the Seller Statement.

(rrr)    "<u>Pre-Closing Tax Period</u>" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

(sss)    "<u>Privacy Laws</u>" means all applicable Laws and legally binding self-regulatory guidelines or standards, in each case as amended, consolidated, re-enacted or replaced from time to time, relating to the privacy, security, or Processing of Personal Information, data breach notification, website and mobile application privacy policies and practices, Processing and security of payment card information, and email, text message, or telephone communications, including (to the extent applicable to the business of Seller): the Federal Trade Commission Act; the Gramm-Leach-Bliley Act; the Telephone Consumer Protection Act; the Telemarketing and Consumer Fraud and Abuse Prevention Act; the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003; the California Consumer Privacy Act; the Computer Fraud and Abuse Act; the Payment Card Industry Data Security Standards; the GDPR; and the EU e-Privacy Directive 2002/58/EC as amended by Directive 2009/136/EC (and any European Union member states' laws and regulations implementing it).

(ttt)    "<u>Process</u>", "<u>Processed</u>" or "<u>Processing</u>" means any operation or set of operations which is performed on Personal Information, such as the use, collection, processing, storage, recording, organization, adaption, alteration, transfer, retrieval, consultation, disclosure, dissemination or combination of such Personal Information, or is otherwise considering "processing" by any applicable Privacy Laws.

(uuu)    "<u>Purchaser Development</u>" means any of the following, first occurring after the date hereof and prior to the Closing:  (i) the filing of a criminal complaint against, or indictment of, Purchaser or any of its executive officers or "C-suite" officers (including any chief risk officer or chief compliance officer) by the United States Department of Justice, (ii) the filing of a criminal complaint against, or indictment of, any of Purchaser's Affiliates or any of their executive officers or "C-suite" officers (including any chief risk officer or chief compliance officer) by the United States Department of Justice or (iii) the commencement of any criminal or regulatory (including at the appellate level) suit, litigation, legal proceeding or prosecution by the United States Department of Justice against any of the Persons described in clauses (i) and (ii), (A) in each case of clauses (i), (ii) and (iii) that relate to the operation of the Binance.US platform and wallet custody business of Purchaser and its Subsidiaries or the business of such Affiliate or the ability of such Affiliate to provide Purchaser and its Subsidiaries with the licensed software and support services necessary to operate the Binance.US Platform; and (B) in each case of clauses (ii) and (iii), that, individually or in the aggregate, would reasonably be expected to (1) prevent or materially impair or materially delay the ability of Purchaser to consummate the Transactions in accordance herewith or (2) materially and adversely affect the Users, Eligible Creditors or the Acquired Coins, in each case in a manner that would prevent Purchaser from performing its obligations under <u>Section 6.12</u> or otherwise following the Closing.

(vvv)    "<u>Purchaser Group</u>" means Purchaser, any former, current or future Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

81

(www) "Rebalancing Exercise Delta" means, with respect to any Acquired Coin, the percentage by which the number of Acquired Coins is higher or lower than the number of Acquired Coins which would be required to cause the number of Acquired Coins to be in full compliance with the Rebalancing Ratio.

(xxx) "Rebalancing Ratio" means, with respect to any type of Acquired Coin, a fraction, expressed as a percentage, (i) the numerator of which is the Total Acquired Coins Value, and (ii) the denominator of which is the Total Deposited Coins Value; provided that in no event will the Rebalancing Ratio be greater than 100% and for the avoidance of doubt, the Rebalancing Ratio shall be calculated following the completion of the Rebalancing Exercise and after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring Coins to Purchaser in accordance with Section 2.4(b).

(yyy) "Retained Avoidance Action" means any preference or avoidance claim, right or cause of action under Chapter 5 of the Bankruptcy Code or any analogous state law claim against (i) Three Arrows Capital, Ltd. or any of its Affiliates, (ii) any insider as defined in the Bankruptcy Code, (iii) any other such claim, right or cause of action that Purchaser agrees in writing prior to the Closing may be retained by the Debtors, (iv) any person for an actual fraudulent transfer, and (v) West Realm Shires Inc., Alameda Ventures Ltd., or any of their Affiliates.

(zzz) "Sanctioned Person" means any Person that is the target of Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the OFAC or the U.S. Department of State, the United Nations Security Council, the European Union, any Member State of the European Union, or the United Kingdom (irrespective of its status vis-à-vis the European Union); (b) any Person operating, organized, or resident in a country or territory that is itself the target of comprehensive Sanctions (as of the date of this Agreement, Cuba, Iran, North Korea, Syria, the Crimea region of Ukraine, the so-called Donetsk People's Republic, and the so-called Luhansk People's Republic) ("Sanctioned Country"); (c) the government of a Sanctioned Country or the Government of Venezuela; or (d) any Person 50% or more owned or controlled by any such Person or Persons or acting for or on behalf of such Person or Persons.

(aaaa) "Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

(bbbb) "Security Incident" means any actual or suspected unauthorized access to, or acquisition, modification, use, destruction, loss or disclosure of any Personal Information maintained by or on behalf of Seller or its Affiliates.

(cccc) "Seller Expense Cap" means an amount equal to either (a) if Purchaser elects to extend the Outside Date to the Extended Outside Date pursuant to Section 8.1(c), $15,000,000 or (b) if Purchaser does not so elect to extend the Outside Date, $10,000,000.

(dddd) "Seller Expense Start Date" means the date that is three months following the date of this Agreement.

(eeee) "Seller Held Coins" means, without duplication, as of any date of determination, all Coins that are directly or indirectly owned or held by, or attributable to, Seller

or any of its Affiliates who are Debtors (including, for the avoidance of doubt, all Coins repaid to Seller or any of its Affiliates who are Debtors at or prior to the Closing in respect of Loans (including in respect of any principal, interest, fees, expenses and penalties thereunder and including for this purpose, the 3AC Loan), including all Coins held by or on behalf of Seller or any of its Affiliates who are Debtors in respect of User accounts on the Voyager Platform), except for any Coins constituting collateral under the 3AC Loan and except any Post-Petition Coins, which for the avoidance of doubt, shall not be included in the Rebalancing Exercise or any other Transactions.

(ffff) "Seller Intellectual Property" means all Intellectual Property owned or purported to be owned by Seller that is an Acquired Asset.

(gggg) "Seller Parties" means Seller, its former, current, or future Affiliates and the former, current or future officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns of the foregoing.

(hhhh) "Seller Plan" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Seller or Holdings or to which Seller or Holdings is obligated to contribute or with respect to which Seller or Holdings has any Liability.

(iiii) "Software" means any and all computer programs and other software in any form or format, including firmware, middleware, software implementations of algorithms, models and methodologies, whether in source code, object code or other form, including libraries, frameworks, software development kits (SDKs), application programming interfaces (APIs), subroutines, toolsets, procedures, and other components thereof.

(jjjj) "Straddle Period" means any taxable period that includes but does not end on the Closing Date.

(kkkk) "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

83

US-DOCS\137411268.27

(llll)   "Subject Transaction" means (a) a transaction or series of transactions with respect to the Rebalancing Exercise that involves a series of transactions or other actions that are (or are to be) executed with a Person or group of coordinated Persons that are intended to effectuate the Rebalancing Exercise or (b) the planning or negotiation of such transaction or series of transactions, or consulting with respect thereto and, for the avoidance of doubt, does not include individual trades of Coins by Seller that are not intended to effectuate the Rebalancing Exercise or that are components of Subject Transactions that are the subject of a Transaction Notice or any such transactions with respect to Coins that do not trade on the Binance.US Platform as of the date of the proposed Subject Transaction.

(mmmm)   "Tax" or "Taxes" means any federal, state, local, foreign or other taxes, charges, fees or other assessments, including income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, escheat and unclaimed property, ad valorem, personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative or add-on minimum or estimated tax, charge or assessment of any kind in the nature of (or similar to) taxes, including any interest, penalty or addition thereto, whether disputed or not.

(nnnn)   "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes filed or required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(oooo)   "Total Acquired Coins Value" means the aggregate Acquired Coins Value with respect to all Acquired Coins of each type (excluding Withheld Coins).

(pppp)   "Total Deposited Coins Value" means the aggregate Deposited Coins Value with respect to all Deposited Coins of each type.

(qqqq)   "Transactions" means the transactions contemplated by this Agreement or the Plan, as applicable.

(rrrr)   "Unsupported Coin" means any Coin, for which Purchaser or its Affiliates does not provide trading services on the Binance.US Platform.

(ssss)   "User" means any Person located and having a home address in the United States that had a Cryptocurrency account on the Voyager Platform as of the Petition Date; provided that, if a Person has multiple Cryptocurrency accounts on the Voyager Platform, such Person shall constitute a single User and all accounts of such User shall be aggregated for purposes of this Agreement.

(tttt)   "User Migration Preparation" means, collectively, (i) the completion of the transfer of all Acquired User Data (including, for the avoidance of doubt, any "know your customer" information of the Users) and integration thereof on Purchaser's and its Affiliates' information technology systems and the Binance.US Platform, and (ii) the completion of the other items identified in the Integration Plan as being required for accounts to be opened for Users on the Binance.US Platform.

(uuuu) "<u>User Asset Migration Date</u>" means the date that is four (4) weeks following the date of completion of the User Migration Preparation; <u>provided</u> that the completion of the User Migration Preparation shall not occur prior to the Closing Date.

(vvvv) "<u>VGX Token Smart Contracts</u>" means any "smart contracts" related to the VGX token, together with any private keys related solely to such "smart contracts."

(wwww)    "<u>Voyager Platform</u>" means Seller's proprietary Cryptocurrency savings and trading platform (including any website or desktop or mobile application with respect thereto).

(xxxx) "<u>VWAP</u>" means, with respect to any type of Coin and as of any date of determination, an amount equal to the volume weighted average price in U.S. dollars for such type of Coin for the consecutive 24-hour period immediately prior to 8:00 a.m. New York Time on such date of determination, as reported on https://coinmarketcap.com.

11.2    <u>Index of Defined Terms</u>.

Acquired Assets ...........................................1
Acquired Information ..................................2
Acquired User Data ....................................2
Acquired Voyager Claims ...........................2
Acquisition Proposal..................................26
Agreement....................................................1
Agreement Order .......................................25
Amended Disclosure Statement..................27
Anti-Money Laundering Laws .................17
Assigned Contracts ......................................3
Assignment and Assumption
    Agreement...............................................10
Assumed Liabilities .....................................5
Authentication Credentials ........................14
Balance Sheet Date ....................................13
Bankruptcy Case ..........................................1
Bankruptcy Code .........................................1
Bankruptcy Court.........................................1
Cash Payment ..............................................8
Chosen Courts.............................................68
Closing .........................................................9
Closing Date ...............................................10
Closing Date Payment .................................8
Covered Matters.........................................29
Credited Additional Bankruptcy
    Distributions...........................................49
CSA.............................................................11
Cure Costs....................................................5
Dataroom ...................................................21

Debtors.........................................................1
Deposit .........................................................9
DPA ............................................................18
Eligible Creditor ........................................42
Enforceability Exceptions..........................12
Environmental Permits ..............................18
Escrow Account............................................9
Escrow Agent...............................................9
Excluded Assets............................................3
Excluded Contracts ......................................3
Excluded Documents ....................................3
Excluded Liabilities .....................................6
Express Purchaser Representations ...........24
Express Seller Representations...................21
Extended Outside Date ..............................57
FCPA ..........................................................17
Filed CSA Documents ...............................11
Financial Statements..................................13
Fundamental Representations....................56
Higher Offer Determination Notice..........27
Holdings.......................................................1
Indebtedness ..............................................30
Information Presentation ...........................21
Integration Plan..........................................41
Leased Real Property .................................15
Liquidation .................................................54
Material Contract .......................................15
OFAC..........................................................17
Outside Date ..............................................57

Parent ...........................................................1
Parties .........................................................1
Party ...........................................................1
Paul Hastings ...........................................29
Petition Date ...............................................1
Petitions .....................................................1
Post-Bankruptcy Statement ........................49
Pre-Closing Data Transfer ..........................38
Press Release .............................................69
Privacy Requirements ..................................19
Projections .................................................51
Purchase Price .............................................8
Purchaser .....................................................1
Purchaser Bid Process ................................55
Purchaser Default Termination ...................9
Purchaser Expenses ...................................54
Rebalancing Date ........................................43
Rebalancing Exercise ..................................43
Relevant Tax Return ...................................62
Reverse Termination Fee ............................60
Sanctions ...................................................17
Seller ...........................................................1
Seller Contractors ......................................34
Seller Documents ........................................12
Seller Employees ........................................34
Seller Expenses ..........................................53
Seller Income Tax Return ...........................62
Seller Marks ...............................................39
Seller Registered IP ...................................18
Seller Statement .........................................44
Solvent ......................................................24
Staked Coins ..............................................14
Successor Liabilities ...................................29
Trademark and Domain Name
    Assignment Agreement ...........................10
Transaction Notice ......................................43
Transaction Offer Notice ............................43
Transaction-Related Action ........................62
Transfer Taxes ...........................................61
Unsupported Jurisdiction ............................45
Unsupported Jurisdiction Approvals .........22
Voyager User Accounts ................................2
WARN Act .................................................35
Withheld Coins ............................................9

86

11.3 <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a) Accounting terms which are used but not otherwise defined in this Agreement have the respective meanings given to them under IFRS as in effect on the date hereof or for the period with respect to which such principles are applied, consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under IFRS, the definition set forth in this Agreement will control.

(b) The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c) Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d) The words "to the extent" shall mean "the degree by which" and not "if."

(e) When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f) Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g) The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h) All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i) All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j) Any document or item will be deemed "delivered," "provided" or "made available" by Seller, within the meaning of this Agreement, if such document or item is included in the Dataroom at least one (1) Business Day prior to the date hereof.

(k) Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)     Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; <u>provided</u> that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)     A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

*(Signature pages follow.)*

US-DOCS\137411268.27

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**BAM TRADING SERVICES INC. D/B/A BINANCE.US**

By: _Brian Shroder_ _____
   DocuSigned by:
   ACA2F0AF79BC412...

Name: Brian Shroder

Title: Chief Executive Officer

DocuSign Envelope ID: 5481C387-5BBE-42A6-9F49-4E8946D6218

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**VOYAGER DIGITAL, LLC**

By: _Stephen Ehrlich_
Name: Stephen Ehrlich
Title:   Chief Executive Officer

## <u>EXHIBIT A</u>

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

(See attached.)

A

# BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

This BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into as of [●], by and between BAM Trading Services Inc. d/b/a Binance.us, a Delaware corporation ("Purchaser") and Voyager Digital, LLC, a Delaware limited liability company ("Seller").

WHEREAS, Seller and Purchaser have entered into that certain Asset Purchase Agreement, dated as of December 18, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), providing for, among other things, the sale and assignment by Seller to Purchaser of the Acquired Assets and the assumption by Purchaser of the Assumed Liabilities;

WHEREAS, Seller desires to sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, pursuant to the terms of, and in consummation of the transactions contemplated by, the Purchase Agreement;

WHEREAS, the execution and delivery of this Agreement is required by Sections 2.4(a) and 2.5(b) of the Purchase Agreement; and

WHEREAS, this Agreement, as duly executed by Seller and Purchaser, is being delivered as of the date hereof by each party hereto to the other party effective as of the Closing.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and intending to be legally bound hereby, Seller and the Purchaser hereby agree as follows:

1.     Definitions.  Capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement.

2.     Transfer of Acquired Assets.  Subject to the terms and conditions of the Purchase Agreement and the Agreement Order, the Plan and the Confirmation Order, Seller does hereby sell, transfer, assign, convey and deliver to Purchaser, and Purchaser does hereby purchase, acquire and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).

3.     Assignment and Assumption.  Subject to the terms and conditions of the Purchase Agreement and the Agreement Order, the Plan and the Confirmation Order, Purchaser does hereby irrevocably assume from Seller, and Seller shall irrevocably transfer, assign, convey, and deliver to Purchaser, and Purchaser does hereby take assignment of, all of Seller's right, title and interest in and to, as of the Closing, the Assigned Contracts free and clear of all Encumbrances (other than Permitted Encumbrances). Subject to the terms and conditions of the Purchase Agreement and the Agreement Order, the Plan and the Confirmation Order, Purchaser does hereby assume the Assumed Liabilities.

4.     Excluded Assets.  Notwithstanding anything to the contrary in this Agreement or in the Purchase Agreement, Seller shall not and does not hereby sell, transfer, assign, convey or

deliver to Purchaser, and Seller shall retain all right, title and interest to, and Purchaser shall not and does not hereby purchase, acquire or accept, or take assignment of, any of the Excluded Assets.

5. _Excluded Liabilities_. Notwithstanding anything to the contrary in this Agreement or in the Purchase Agreement, Purchaser shall not assume, be deemed to have assumed or be obligated to pay, perform or otherwise discharge or otherwise be liable in respect of or be responsible for, and hereby disclaims, any of the Excluded Liabilities.

6. _Terms of the Purchase Agreement_. This Agreement is executed and delivered pursuant to the Purchase Agreement. In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail in all respects to the extent of such conflict. Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall this Agreement be construed to, extend, amplify, modify, limit or otherwise alter in any way the terms and conditions of the Purchase Agreement (including, without limitation, any representation, warranty, covenant or obligation contained in the Purchase Agreement).

7. _Governing Law_. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

8. _Successors and Assigns_. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Agreement Order, the Plan and the Confirmation Order, Seller, and shall inure to the benefit of and be so binding on the parties hereto and their respective successors and permitted assigns under the Purchase Agreement.

9. _Counterparts_. For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

10. _Additional Provisions_. The provisions contained in Sections 6.8 (_Further Assurances_), 10.5 (_Amendment and Waiver_), 10.6 (_Third Party Beneficiaries_), 10.8 (_Severability_), 10.9 (_Construction_), 10.13 (_Jurisdiction and Exclusive Venue_) and 10.14(b) (_Waiver of Jury Trial_) of the Purchase Agreement are hereby incorporated by reference into this Agreement, _mutatis mutandis_, and made a part of this Agreement as if set forth fully herein.

_[The remainder of this page is intentionally left blank.]_

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**SELLER:**

**VOYAGER DIGITAL, LLC**

_____
Name:
Title:

**PURCHASER:**

**BAM TRADING SERVICES INC. D/B/A
BINANCE.US**


By:_____

Name:

Title:

# **EXHIBIT B**

## **FORM OF TRADEMARK AND DOMAIN NAME ASSIGNMENT AGREEMENT**

(See attached.)

B

## TRADEMARK AND DOMAIN NAME ASSIGNMENT

This TRADEMARK AND DOMAIN NAME ASSIGNMENT (this "Assignment"), effective as of [●] (the "Effective Date"), is made by Voyager Digital, LLC, a Delaware limited liability company ("Voyager Digital") and Voyager IP, LLC (f/k/a CryptoTrading IP LLC), a Delaware limited liability company ("Voyager IP," each of Voyager Digital and Voyager IP individually, an "Assignor," and together, the "Assignors"), to BAM Trading Services Inc. d/b/a Binance.us, a Delaware corporation ("Assignee"). Assignors and Assignee are each referred to individually as a "Party" and together as the "Parties."

**WHEREAS**, Voyager Digital and Assignee have executed an Asset Purchase Agreement, effective as of December 18, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), pursuant to which Voyager Digital has agreed to sell, transfer, assign and convey and to cause Voyager IP to sell, transfer, assign and convey to Assignee, and Assignee has agreed to purchase, acquire and accept from Assignors, all of such Assignor's right, title and interest in and to certain intellectual property assets to Assignee;

**WHEREAS**, the assets assigned pursuant to the Purchase Agreement include the intellectual property listed in Exhibit A attached hereto (the "Assigned IP");

**WHEREAS**, Assignee is a successor to that part of Assignors' business to which the Assigned IP pertain, and that business is ongoing and existing; and

**WHEREAS**, pursuant to the Purchase Agreement, Voyager Digital has agreed to execute this Assignment and to cause Voyager IP to execute this Assignment in order to effectuate, evidence and record such Assignor's assignment of the Assigned IP to Assignee in the United States Patent and Trademark Office and corresponding offices in other applicable jurisdictions.

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties do hereby agree as follows:

**SECTION 1.**  Assignment. Assignors hereby irrevocably conveys, assigns, transfers and delivers to Assignee and its successors and assigns, free and clear of all liens, all of such Assignor's right, title and interest in and to the Assigned IP, including all rights of priority and goodwill associated with any of the foregoing and any and all common law rights in and to any of the foregoing, all rights in and to any of the foregoing provided by applicable law of any jurisdiction, by international treaties or conventions, all rights, interests, and claims of such Assignor or any of its affiliates, all rights to collect royalties and proceeds in connection with the foregoing from and after the Effective Date, all rights to sue or otherwise recover for any past, present, or future infringement, dilution or other violations of the foregoing and all corresponding rights that, now or hereafter, may be secured throughout the world, including any deposits or prepayments with respect to any of the foregoing.

**SECTION 2.**   Recordation.  Assignors hereby authorize: (i) the Commissioner for Trademarks in the United States Patent and Trademark Office, and the officials of corresponding entities or agencies in any applicable jurisdictions to record this Assignment upon request by Assignee, and (ii) the registrar of the domain names identified as such in Exhibit A to effectuate the transfers to Assignee of such domain names.

**SECTION 3.**   Further Assurances.  From and after the Effective Date, upon Assignee's request, Assignors shall (and shall cause such Assignor's Affiliates to) cooperate with and use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable on such Assignor's part under applicable law to effect and validate the assignment of the Assigned IP to Assignee.

**SECTION 4.**   Definitions.  Capitalized terms used but not defined in this Assignment have the meanings given to such terms in the Purchase Agreement.

**SECTION 5.**   Purchase Agreement.  This Assignment is executed and delivered pursuant to the Purchase Agreement. In the event of a conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail in all respects to the extent of such conflict. Notwithstanding anything to the contrary in this Assignment, nothing herein is intended to, nor shall this Assignment be construed to, extend, amplify, modify, limit or otherwise alter in any way the terms and conditions of the Purchase Agreement (including, without limitation, any representation, warranty, covenant or obligation contained in the Purchase Agreement).

**SECTION 6.**   Governing Law.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Assignment, and any Action that may be based upon, arising out of or related to this Assignment or the negotiation, execution or performance of this Assignment or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

**SECTION 7.**   Counterparts and PDF. This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Assignment or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original. At the request of either Party, the other Party hereto will re-execute original forms of this Assignment and deliver it to the other Party. No Party will raise the use of a facsimile machine, .PDF or other electronic transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine, .PDF or other electronic transmission as a defense to the formation of a contract and each Party forever waives any such defense.

*[Signature Page Follows]*

A-2

   **IN WITNESS WHEREOF**, Assignors and Assignee have caused this Assignment to be
executed by its duly authorized representative as of the Effective Date.


                              **VOYAGER DIGITAL, LLC**


                              By: _____
                              Name:
                              Title:



                              **VOYAGER IP, LLC**


                              By: _____
                              Name:
                              Title:



                              **BAM TRADING SERVICES INC. D/B/A
                              BINANCE.US**

                              By: _____
                              Name:
                              Title:


                [Signature Page to Trademark and Domain Name Assignment]

# Exhibit 9

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF FILING OF FIRST**
**AMENDMENT TO ASSET PURCHASE AGREEMENT**

**PLEASE TAKE NOTICE** that on December 18, 2022, Voyager Digital, LLC, as seller, and BAM Trading Services Inc. d/b/a Binance.US). as, purchaser ("Binance US") entered into that certain asset purchase agreement (the "Initial Asset Purchase Agreement"). The Initial Asset Purchase Agreement was filed with the United States Bankruptcy Court for the Southern District of New York as Exhibit B to the *Debtors' Motion for Entry of An Order (I) Authorizing Entry Into the Binance US Purchase Agreement and (II) Granting Related Relief* [Docket No. 775] (the "APA Motion").

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

Debtors
Ex-9

PLEASE TAKE FURTHER NOTICE that on January 8, 2023, the Voyager Digital, LLC and Binance US entered into the first amendment to the Asset Purchase Agreement (the "First Amended Asset Purchase Agreement").

PLEASE TAKE FURTHER NOTICE that the Debtors hereby file the First Amended Asset Purchase Agreement, attached hereto as **Exhibit A**.

PLEASE TAKE FURTHER NOTICE that a comparison between the Initial Asset Purchase Agreement and the First Amended Asset Purchase Agreement, is attached hereto as **Exhibit B**.

PLEASE TAKE FURTHER NOTICE that copies of the APA Motion and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at http://www.cases.stretto.com/Voyager.  You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

Dated:  January 9, 2023          */s/ Joshua A. Sussberg*
New York, New York               **KIRKLAND & ELLIS LLP**
                                 **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                 Joshua A. Sussberg, P.C.
                                 Christopher Marcus, P.C.
                                 Christine A. Okike, P.C.
                                 Allyson B. Smith (admitted *pro hac vice*)
                                 601 Lexington Avenue
                                 New York, New York 10022
                                 Telephone:     (212) 446-4800
                                 Facsimile:     (212) 446-4900
                                 Email:         jsussberg@kirkland.com
                                                cmarcus@kirkland.com
                                                christine.okike@kirkland.com
                                                allyson.smith@kirkland.com

                                 *Counsel to the Debtors and Debtors in Possession*

# EXHIBIT A

**First Amended Asset Purchase Agreement**

**Execution Version**

# FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

January 8, 2023

This FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT (this "Amendment") is made and entered into as of the date first above written, by and between BAM Trading Services Inc. d/b/a Binance.us, a Delaware corporation ("Purchaser") and Voyager Digital, LLC, a Delaware limited liability company ("Seller"). Purchaser and Seller are each referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used but not otherwise defined herein have the respective meanings ascribed to such terms in the Purchase Agreement (as defined below).

WHEREAS, the Parties entered into that certain Asset Purchase Agreement (the "Purchase Agreement"), dated as of December 18, 2022 (the "Signing Date");

WHEREAS, the Parties wish to amend the Purchase Agreement in accordance with the terms of the Purchase Agreement and this Amendment; and

WHEREAS, Section 10.5 (Amendment and Waiver) of the Purchase Agreement provides that the Purchase Agreement be amended only in a writing signed by Purchaser and Seller.

NOW, THEREFORE, in consideration of premises, and of the representations, warranties, covenants and agreements contained herein, the value, receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      Amendment.  The Purchase Agreement is hereby amended by making the additions in blue or green underlined text (indicated textually in the same manner as the following example: **underlined text** or **underlined text**) and deletions in green or red stricken text (indicated textually in the same manner as the following example: ~~stricken text~~ or ~~stricken text~~) as set forth in Exhibit A attached hereto.

2.      Effect of Amendment.  Each Party represents that such Party has all necessary power and authority to enter into and perform the obligations of this Amendment and that there are no consents or approvals required to be obtained by such Party for such Party to enter into and perform its obligations under this Amendment that have not been obtained.  This Amendment shall be deemed incorporated into, and form a part of, the Purchase Agreement and have the same legal validity and effect as the Purchase Agreement.  Except as expressly and specifically amended hereby, all terms and provisions of the Purchase Agreement are and shall remain in full force and effect, and all references to the Purchase Agreement in this Amendment and in any ancillary agreements or documents delivered in connection with the Purchase Agreement shall hereafter refer to the Purchase Agreement as amended by this Amendment, and as it may hereafter be further amended or restated.  Each reference in the Purchase Agreement to "this Agreement," "herein," "hereof," "hereunder" or words of similar import shall hereafter be deemed to refer to the Purchase Agreement as amended hereby (except that references in the Purchase Agreement to the "date hereof" or "date of this Agreement" or words or phrases of similar import shall continue to mean the Signing Date).

3.      Inconsistency or Conflict.  In the event of any inconsistency or conflict between the terms and provisions of the Purchase Agreement, on the one hand, and this Amendment, on the other hand, the terms and provisions of this Amendment shall govern and control.

4.      Additional Provisions.  The provisions contained in Section 6.19 (Confidentiality), Article VIII (Termination), Sections 10.1 (Non-Survival or Representations and Warranties and Certain Covenants; Certain Waivers), 10.2 (Expenses), 10.3 (Notices), 10.4 (Binding Effect; Assignment), 10.5 (Amendment and Waiver), 10.6 (Third Party Beneficiaries), 10.7 (Non-Recourse), 10.8 (Severability), 10.9 (Construction), 10.11 (Complete Agreement), 10.13 (Jurisdiction and Exclusive Venue), 10.14 (Governing Law; Waiver of Jury Trial) and 10.16 (Counterparts and PDF) of the Purchase Agreement are hereby incorporated by reference into this Amendment, *mutatis mutandis*, and made a part of this Amendment as if set forth fully herein.

*(Signature pages follow)*

2

IN WITNESS WHEREOF, each of the Parties has caused this Amendment to be duly executed and delivered as of the date first above written.

**BAM TRADING SERVICES INC. D/B/A BINANCE.US**

By: _Brian Shroder_ _____
DocuSigned by:
ACA2F0AF79BC412...

Name: Brian Shroder
Title: Chief Executive Officer

[Signature Page to First Amendment to Asset Purchase Agreement]

IN WITNESS WHEREOF, each of the Parties has caused this Amendment to be duly executed and delivered as of the date first above written.

**VOYAGER DIGITAL, LLC**

By: _Stephen Ehrlich_
DocuSigned by:
3724C7E0863B426...
Name: Stephen Ehrlich
Title:   Chief Executive Officer

**Exhibit A**

(See attached)

_____

## ASSET PURCHASE AGREEMENT

## DATED AS OF DECEMBER 18, 2022

## BY AND BETWEEN

## BAM TRADING SERVICES INC. D/B/A BINANCE.US, AS PURCHASER,

## AND

## VOYAGER DIGITAL, LLC, AS SELLER.

_____

# TABLE OF CONTENTS

**Page**

**ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES** ........... **1**

1.1    Purchase and Sale of the Acquired Assets ........... 1
1.2    Excluded Assets ........... 3
1.3    Assumption of Certain Liabilities ........... 5
1.4    Excluded Liabilities ........... 6
1.5    Assumption/Rejection of Certain Contracts ........... 6

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING** ........... **8**

2.1    Consideration; Payment ........... 8
2.2    Deposit ........... 9
2.3    Closing ........... 9
2.4    Closing Deliveries by Seller ........... 10
2.5    Closing Deliveries by Purchaser ........... ~~10~~11
2.6    Withholding ........... 11

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER** ........... **~~11~~12**

3.1    Organization and Qualification ........... ~~11~~12
3.2    Authorization of Agreement ........... 12
3.3    Conflicts; Consents ........... ~~12~~13
3.4    Financial Statements ........... 13
3.5    Cryptocurrency; Loans; Customer Accounts ........... ~~13~~14
3.6    Title to Acquired Assets; Staked Coins; Exclusive Ownership; Sufficiency of Assets ........... ~~14~~15
3.7    Title to Properties ........... ~~14~~15
3.8    Contracts ........... 15
3.9    Permits; Compliance with Laws ........... ~~16~~17
3.10   Environmental Matters ........... 18
3.11   Intellectual Property; Data Privacy ........... ~~18~~19
3.12   Tax Matters ........... ~~19~~20
3.13   Affiliate Transactions ........... ~~20~~21
3.14   Brokers ........... 21
3.15   Litigation ........... 21
3.16   Absence of Changes ........... ~~21~~22
3.17   No Other Representations or Warranties ........... ~~21~~22
3.18   No Outside Reliance ........... ~~21~~22

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** ........... **~~22~~23**

4.1    Organization and Qualification ........... ~~22~~23
4.2    Authorization of Agreement ........... ~~22~~23
4.3    Conflicts; Consents ........... ~~22~~23
4.4    Financing ........... ~~23~~24
4.5    Permits ........... ~~23~~24
4.6    Brokers ........... ~~23~~24

# TABLE OF CONTENTS

**Page**

4.7    No Litigation ............................................................................ ~~23~~24

4.8    Certain Arrangements ............................................................... 24

4.9    Solvency .................................................................................... ~~24~~25

4.10    No Additional Representations or Warranties ......................... ~~24~~25

4.11    No Outside Reliance .................................................................. ~~24~~25

**ARTICLE V BANKRUPTCY COURT MATTERS** ............................................ ~~25~~26

5.1    Selection of Successful Bid and Winning Bidder and Sale Approval .... ~~25~~26

5.2    No-Shop ..................................................................................... 26

5.3    Bankruptcy Actions ................................................................... ~~27~~28

5.4    Cure Costs .................................................................................. 29

5.5    Approval ..................................................................................... ~~29~~30

5.6    No Successor Liability ............................................................... ~~29~~30

5.7    Filings ........................................................................................ ~~29~~30

~~5.8    Waiver of Conflicts ...................................................................    29~~

**ARTICLE VI COVENANTS AND AGREEMENTS** ........................................... 30

6.1    Conduct of Seller ....................................................................... 30

6.2    Access to Information ................................................................ ~~32~~33

6.3    Employee Matters ...................................................................... 34

6.4    Regulatory Matters .................................................................... 36

6.5    Reasonable Best Efforts; Cooperation ..................................... 38

6.6    Data Transfer Matters ................................................................ ~~38~~39

6.7    Use of Name .............................................................. ~~39~~; Voyager Platform                40

6.8    Further Assurances .................................................................... ~~40~~41

6.9    Insurance Matters ...................................................................... ~~40~~41

6.10    User Migration ........................................................................... ~~41~~42

6.11    Rebalancing Exercise; Seller Statement ................................... ~~43~~44

6.12    Crediting of Accounts; Unsupported Jurisdictions, Transfer of Coins to Seller; Liquidations or Distributions by Seller ........................... ~~45~~46

6.13    VGX Token Listing Review Process .......................................... ~~48~~50

6.14    Additional Bankruptcy Distributions ........................................ ~~48~~50

6.15    Unstaking ................................................................................... ~~49~~52

6.16    Receipt of Misdirected Assets; Liabilities ............................... ~~50~~53

6.17    Acknowledgment by Purchaser ................................................. ~~50~~53

6.18    IT Migration .............................................................................. ~~52~~54

6.19    Confidentiality ........................................................................... ~~52~~55

6.20    Acquired Assets Owned by Non-Debtors .................................. ~~53~~56

6.21    Seller Expenses .......................................................................... ~~53~~56

6.22    Purchaser Expenses ................................................................... ~~54~~57

**ARTICLE VII CONDITIONS TO CLOSING** .................................................. ~~55~~58

7.1    Conditions Precedent to the Obligations of Purchaser and Seller .... ~~55~~58

7.2    Conditions Precedent to the Obligations of Purchaser ............. ~~55~~58

7.3    Conditions Precedent to the Obligations of Seller .................... ~~56~~59

# TABLE OF CONTENTS

**Page**

7.4    Waiver of Conditions ......................................................... ~~56~~59

**ARTICLE VIII TERMINATION** ........................................................ ~~57~~60

8.1    Termination of Agreement ................................................. ~~57~~60
8.2    Effect of Termination ....................................................... ~~59~~62
8.3    Reverse Termination Fee ................................................... ~~60~~63
8.4    Further Effect of Termination ........................................... ~~60~~63

**ARTICLE IX TAXES** ...................................................................... ~~61~~64

9.1    Transfer Taxes ................................................................. ~~61~~64
9.2    Cooperation .................................................................... ~~61~~65
9.3    Preparation of Tax Returns and Payment of Taxes ............. ~~62~~65

**ARTICLE X MISCELLANEOUS** ...................................................... ~~63~~66

10.1   Non-Survival of Representations and Warranties and Certain Covenants;
       Certain Waivers .............................................................. ~~63~~66
10.2   Expenses ......................................................................... ~~63~~67
10.3   Notices ........................................................................... ~~64~~67
10.4   Binding Effect; Assignment ............................................. ~~65~~68
10.5   Amendment and Waiver ................................................... ~~65~~68
10.6   Third Party Beneficiaries ................................................. ~~65~~69
10.7   Non-Recourse ................................................................. ~~66~~69
10.8   Severability .................................................................... ~~66~~69
10.9   Construction ................................................................... ~~66~~69
10.10  Schedules ....................................................................... ~~66~~69
10.11  Complete Agreement ....................................................... ~~67~~70
10.12  Specific Performance ....................................................... ~~67~~70
10.13  Jurisdiction and Exclusive Venue ..................................... ~~67~~71
10.14  Governing Law; Waiver of Jury Trial ............................... ~~68~~71
10.15  No Right of Set-Off ........................................................ ~~69~~72
10.16  Counterparts and PDF ..................................................... ~~69~~72
10.17  Publicity ......................................................................... ~~69~~72
10.18  Bulk Sales Laws .............................................................. ~~70~~73
10.19  Fiduciary Obligations ...................................................... ~~70~~73
10.20  No Solicitation ................................................................ ~~70~~73
10.21  Acknowledgment ............................................................ ~~70~~73

**ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS** ... ~~70~~74

11.1   Certain Definitions ......................................................... ~~70~~74
11.2   Index of Defined Terms ................................................... ~~85~~88
11.3   Rules of Interpretation .................................................... ~~86~~89

**INDEX OF EXHIBITS**

EXHIBIT A    FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
AGREEMENT

EXHIBIT B    FORM OF TRADEMARK AND DOMAIN NAME ASSIGNMENT
AGREEMENT

i

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "<u>Agreement</u>"), dated as of December 18, 2022, is made by and between BAM Trading Services Inc. d/b/a Binance.us, a Delaware corporation ("<u>Purchaser</u>"), and Voyager Digital, LLC, a Delaware limited liability company ("<u>Seller</u>"). Purchaser and Seller are each referred to herein individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>." Capitalized terms used herein shall have the meanings set forth herein or in <u>Article XI</u>.

WHEREAS, on July 5, 2022 (the "<u>Petition Date</u>"), Seller, together with Voyager Digital Ltd., a Canadian corporation and Seller's indirect equityholder ("<u>Parent</u>"), and Voyager Digital Holdings, Inc., a Delaware corporation and Seller's direct equityholder ("<u>Holdings</u>" and, collectively with Seller and Parent, the "<u>Debtors</u>"), filed voluntary petitions for relief (collectively, the "<u>Petitions</u>") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), to be jointly administered for procedural purposes (collectively, the "<u>Bankruptcy Case</u>"); and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement, the Agreement Order, the Plan and the Confirmation Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchaser and Seller hereby agree as follows.

## ARTICLE I

## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1     <u>Purchase and Sale of the Acquired Assets</u>. Pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Agreement Order, the Plan and the Confirmation Order, at the Closing, Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Post-Closing Liens; <u>provided</u>, in respect of the Acquired Coins, Purchaser shall acquire all of Seller's right, title and interest in and to the Acquired Coins free and clear of all Encumbrances (including Encumbrances implemented through "smart contracts" or other technological means), except that with respect to any ETH Coins that are Staked Coins as of the date hereof and cannot be unstaked as of the **later of the** Closing **and the Delivery Date of such ETH Coins**, such ETH Coins shall be subject to such staking. "<u>Acquired Assets</u>" means all of the properties, rights and

interests in and to only the following assets of Seller as of the Closing, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with IFRS, including any such properties, rights and interests in any assets of the following types acquired by Seller after the date hereof and prior to the Closing:

(a)     all Acquired Coins, together with all information regarding the underlying networks and smart contracts to which such Acquired Coins are subject;

(b)     to the extent permissible under applicable Law, (1) all (i) information and Personal Information (including, for the avoidance of doubt, names, account numbers, social security numbers, passports (including passport numbers), drivers licenses (including driver license numbers), "liveness check" selfies, email addresses, mailing addresses, phone numbers, contact information, usernames, user IDs, passwords, and any Personal Information collected for purposes of KYC Procedures) related to (A) all active and inactive accounts of Users ("Voyager User Accounts") and (B) any other consumers located or having a home address in the United States from whom Personal Information was collected by Seller; (ii) information that has been anonymized, pseudonymized, or otherwise de-identified; (iii) data contained in the Seller Statement or the Post-Bankruptcy Statement; (iv) information relating to Voyager User Accounts that must be obtained and retained by Purchaser or any of its Affiliates for regulatory or legal purposes; and (v) any encryption key, passcode or cypher required to access any of the foregoing (collectively, the "Acquired User Data"), and (2) all other information and data relating to the other categories of Acquired Assets, the Voyager Platform, other than Acquired User Data (clauses (1) and (2), collectively, "Acquired Information");

(c)     all rights, causes of action, claims (including, for the avoidance of doubt, any claims and causes of action arising under Chapter 5 of the Bankruptcy Code), counterclaims, defenses, credits, rebates, demands, allowances, refunds (other than Tax refunds or Tax attributes, in each case, to the extent enumerated in Section 1.2(i)), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities of any kind, in each case that Seller may have against any User located or having a home address in the United States solely to the extent that such claim or cause of action is against a User in such Person's capacity as a User (in each case, excluding (i) Retained Avoidance Actions, (ii) claims, causes of action or other rights against Seller or any of its Affiliates, or (iii) any of the foregoing to the extent relating to any Credit Matter) (collectively, "Acquired Voyager Claims");

(d)     other than VGX Token Smart Contracts, all Intellectual Property owned by Seller or otherwise used or held for use by or on behalf of Seller in connection with the operation of its businesses, including all Business Software (in source code and object code form), any Bedrock source code and other IT Systems owned by Seller and required to operate the Voyager Platform, all Business Accounts (provided that Purchaser may elect, by written notice to Seller until two (2) Business Days prior to the Closing Date, to designate any Business Account(s) as Excluded Asset(s)), all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights, claims and causes of action to sue and recover for past, present and future infringements, dilutions, misappropriations

2

of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world;

(e)    all rights to continue the customer relationships with customers of Seller and its Affiliates to the extent pertaining to savings and trading services related to Cryptocurrency;

(f)    all Contracts listed on <u>Schedule 1.1(f)</u> (the "<u>Assigned Contracts</u>") (for the avoidance of doubt, not including the 3AC Loan); and

(g)    other than the Excluded Documents, all Documents, goodwill, payment intangibles and general intangible assets and rights of or otherwise used or held for use by or on behalf of Seller and its Affiliates, in each case in connection with or related to any of the foregoing categories of Acquired Assets; <u>provided</u> that Seller shall be entitled to retain copies of Documents (subject to <u>Section 6.19</u>).

1.2    <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, in no event shall Seller be deemed to sell, transfer, assign, convey or deliver, and Seller shall retain all right, title and interest to all other properties, rights, interests and other assets of Seller that are not Acquired Assets, including the following (collectively, the "<u>Excluded Assets</u>"):

(a)    all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by Seller, and any retainers or similar amounts paid to Advisors or other professional service providers, in each case, other than the Acquired Coins;

(b)    all Contracts of Seller other than the Assigned Contracts, including the Contracts listed on <u>Schedule 1.2(b)</u> (the "<u>Excluded Contracts</u>");

(c)    all Documents, in each case, (i) to the extent they are primarily used in, or primarily relate to, any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of Seller, other than Voyager User Accounts), (ii) to the extent that such Documents constitute Seller's financial accounting Documents, all minute books, organizational documents, stock registers and such other books and records of Seller to the extent pertaining to the ownership, organization or existence of Seller, Tax Returns (and any related work papers), corporate seals, checkbooks, and canceled checks, in each case to the extent not primarily relating to the Acquired Assets or Assumed Liabilities or (iii) that Seller is required by Law to retain; <u>provided</u> that, to the extent not prohibited by applicable Law, Purchaser shall have the right to make copies of any portions of such Documents;

(d)    all Documents to the extent prepared or received by Seller or any of its Affiliates in connection with the sale of the Acquired Assets, this Agreement, or the Transactions, including (i) all records and reports prepared or received by Seller or any of its Affiliates or Advisors in connection with the sale of the Acquired Assets and the Transactions, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received in connection therewith, (ii) all bids and expressions of interest received from third

parties with respect to the acquisition of Seller's business or assets, and (iii) all privileged materials, documents and records of Seller or any of its Affiliates (together with the Documents specified in Sections 1.2(c) and 1.2(h), the "Excluded Documents");

(e)        all current and prior insurance policies of Seller, including for the avoidance or doubt all director and officer insurance policies, and all rights and benefits of any nature of Seller with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, other than Acquired Voyager Claims;

(f)        all membership interests or other equity interests of Seller or any of its Affiliates or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests;

(g)        (i) all Retained Avoidance Actions, (ii) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law, (iii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of Seller or any of its Affiliates, in each case, either (A) arising out of or relating to events occurring on or prior to the Closing Date, except as set forth in Section 1.1, or (B) related to any Credit Matter, and (iv) all claims that Seller or any of its Affiliates may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities, in each case other than Acquired Voyager Claims;

(h)        Seller's claims or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between Seller and Purchaser or their respective Affiliates in connection with the Transactions, or any other agreement between Seller and Purchaser or their respective Affiliates entered into on or after the date hereof;

(i)        (x) all Tax attributes of Seller or its Affiliates (including refunds of income Taxes of Seller or its Affiliates, but excluding any Tax refunds or Tax attributes with respect to Taxes in respect of the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date allocable to Purchaser in accordance with Section 9.3(d) or with respect to Transfer Taxes), (y) all Tax refunds and Tax attributes with respect to Taxes in respect of the Acquired Assets (i) for any Pre-Closing Tax Period or (ii) that are Excluded Liabilities, and (z) all Tax refunds and Tax attributes with respect to Taxes in respect of the Excluded Assets;

(j)        every asset of Seller that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) at the direction of the Bankruptcy Court or (ii) as otherwise permitted under Section 6.1(b);

(k)        all demands, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising

4

against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date, in each case other than Acquired Voyager Claims;

(l)    the properties, rights, interests, equity and assets of Coinify ApS and its direct and indirect subsidiaries;

(m)    all Money Transmitter Licenses;

(n)    Seller's accounts receivable, and other amounts or Liabilities owing, from its Affiliates;

(o)    (i) all Seller Plans and assets of all Seller Plans that do not constitute Acquired Coins and (ii) personnel records relating to employees of Seller and Holdings;

(p)    all information and Personal Information related to individual consumers that is not Acquired User Data, including any Personal Information that is subject to the GDPR or collected from natural persons with addresses outside of the United States;

(q)    the 3AC Loan;

(r)    all VGX Token Smart Contracts; and

(s)    the properties, rights, interests and assets set forth on <u>Schedule 1.2(s)</u>.

1.3    <u>Assumption of Certain Liabilities</u>. On the terms and subject to the conditions set forth herein and in the Agreement Order, the Plan and the Confirmation Order, effective as of the Closing, in addition to the other components of the Purchase Price described in <u>Section 2.1(a)</u>, Purchaser shall irrevocably assume from Seller (or with respect to Taxes, if applicable, from Seller's applicable Affiliate) (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Seller shall (or with respect to Taxes, if applicable, cause Seller's applicable Affiliate to) irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "<u>Assumed Liabilities</u>"):

(a)    all Liabilities and obligations of Seller under the Assigned Contracts to the extent such Liabilities arise from and after the Closing or relate to events, facts and circumstances first existing after the Closing;

(b)    all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "<u>Cure Costs</u>");

(c)    all Liabilities arising out of the conduct of the business or the ownership of the Acquired Assets, in each case, solely by Purchaser from and after the Closing Date **or, with respect to any Delayed Acquired Coin, the Delivery Date with respect to such Delayed Acquired Coin,** and to the extent such Liabilities arise from events, facts and circumstances first

existing after the Closing Date **or, with respect to any Delayed Acquired Coin, the Delivery Date with respect to such Delayed Acquired Coin**;

(d)    all Liabilities for Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date allocable to Purchaser in accordance with Section 9.3(d);

(e)    all Liabilities relating to all Transfer Taxes; and

(f)    all Liabilities set forth on Schedule 1.3(f);

provided, however, that whether or not any Liability for Taxes is an Assumed Liability shall be governed solely by Section 1.3(d) and Section 1.3(e).

1.4    Excluded Liabilities. Notwithstanding anything herein to the contrary, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Seller or any of its Affiliates or relating to the Acquired Assets, the Excluded Assets or the business and operations of Seller and its Affiliates, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on or prior to the Closing Date or arising thereafter, including as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"). For the avoidance of doubt, and without limiting the foregoing, Purchaser shall not be obligated to assume, and does not assume, and hereby disclaims, all of the following Liabilities of Seller and its Affiliates (each of which shall constitute an Excluded Liability hereunder):

(a)    all Liabilities (i) existing prior to the filing of the Bankruptcy Case that are subject to compromise under the Bankruptcy Code and (ii) to the extent not otherwise expressly assumed herein (including in the Commercial Covenants), incurred subsequent to the filing of the Bankruptcy Case and prior to the Closing;

(b)    all Liabilities related to (i) customer accounts of Seller or its Affiliates (including Voyager User Accounts), except for those obligations of Purchaser expressly set forth in the Commercial Covenants and (ii) commercial payables or amounts owing by Seller or its Affiliates, including to any software vendors;

(c)    all Liabilities for Taxes (i) with respect to the Acquired Assets for any Pre-Closing Tax Period allocable to Seller in accordance with Section 9.3(d); (ii) of Seller and their Affiliates for any taxable period; or (iii) arising from or in connection with an Excluded Asset; and

(d)    all Liabilities resulting from Seller's or any of its Affiliates' breach of, violation of, or non-compliance with the provisions of any Laws relating to the ownership or operation of their respective businesses, the Acquired Assets and the Excluded Assets or the

6

Transactions, including any bulk transfer Laws or similar Laws of any jurisdiction in connection with the Transactions; and

(e)     all Successor Liabilities, including with respect to any investigation or other Action against, concerning or otherwise with respect to Seller, its business or its assets.

1.5     Assumption/Rejection of Certain Contracts.

(a)     Assumption and Assignment of Executory Contracts. Seller shall, and shall cause its Affiliates to, provide timely and proper written notice of the Seller's request for entry of the Confirmation Order to all parties to any executory Contracts or unexpired leases to which Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Seller and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing. The Confirmation Order shall provide that as of and conditioned on the occurrence of the Closing, Seller shall assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included on an exhibit attached to either the Plan Supplement, a notice filed in connection with the motion for approval of the Confirmation Order or a separate motion for authority to assume and assign such Assigned Contracts. Such exhibit shall also set forth Seller's good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Seller based on Seller's books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Seller shall, pursuant to the Agreement Order, the Confirmation Order and the Assignment and Assumption Agreement(s), assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to Section 1.5(b). At the Closing, Purchaser shall (i) pay all Cure Costs and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.

(b)     Excluding or Adding Assigned Contracts Prior to Closing. Purchaser shall have the right to notify Seller in writing of any Assigned Contract that it does not wish to assume or a Contract to which Seller is a party that Purchaser wishes to add as an Assigned Contract up to five (5) Business Days prior to the Closing Date, and (i) any such previously considered Assigned Contract that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed to be an Excluded Contract, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract that Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by Seller to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price. Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the

7

time of and after the Closing. No Contract set forth on <u>Schedule 1.2(s)</u> shall be subject to the terms of this <u>Section 1.5(b)</u>.

        (c)      <u>Non-Assignment</u>.

        (i)      Notwithstanding anything to the contrary in this Agreement but subject to <u>Section 6.1</u>, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by Seller or terminated by Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption; <u>provided</u> that Seller shall obtain Purchaser's consent prior to seeking to reject or terminate, or rejecting or terminating, any Assigned Contract or any Contract assumed by Purchaser pursuant to <u>Section 1.5(a)</u> or <u>Section 1.5(b)</u> from and after the date of this Agreement.

        (ii)      Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of Seller's rights over such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as it is to be transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. In the event that any Acquired Asset is deemed not to be assigned pursuant to this <u>clause (ii)</u>, the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and the closing of the Bankruptcy Case, Seller and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) enter into a commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without materially infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs actually incurred by Seller or its Affiliates or any direct reasonable and documented out-of-pocket costs actually incurred by Seller or its Affiliates resulting from the retention and maintenance by Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2) Purchaser shall assume any related burden and obligation with respect to such Acquired Asset to the extent such burden and obligation would constitute an Assumed Liability if such Acquired Asset was transferred at Closing. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement, the Agreement Order, the Plan and Confirmation Order, and the Bankruptcy Code. Notwithstanding anything herein to the contrary, the

US-DOCS\137411268.27138346099.6

provisions of this <u>Section 1.5(c)</u> shall not apply to any consent or approval that is not required to be obtained by operation of the Bankruptcy Code (including section 365(f)).

<div align="center">

**ARTICLE II**

**CONSIDERATION; PAYMENT; CLOSING**

</div>

2.1     <u>Consideration; Payment</u>.

(a)     Subject to the terms and conditions herein, the aggregate consideration (collectively, the "<u>Purchase Price</u>") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) (A) the assumption of Assumed Liabilities, (B) a cash payment of $20,000,000 (the "<u>Cash Payment</u>"), (C) the Seller Expenses, if any, payable pursuant to <u>Section 6.21</u>, and (D) Purchaser's obligations to make the payments set forth in <u>Section 6.12</u> and <u>Section 6.14</u>.

(b)     Subject to the terms and conditions herein, at the Closing, Purchaser shall deliver, or cause to be delivered, to Seller (i) the Cash Payment, <u>plus</u> (ii) the Seller Expenses, if any, payable pursuant to <u>Section 6.21</u>, <u>less</u> (iii) the Deposit, together with all received investment income, if any (the "<u>Closing Date Payment</u>"). Any payment required to be made pursuant to this Agreement in cash (including the Closing Date Payment) shall be made by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to the other Party at least two (2) Business Days prior to the date such payment is to be made.

(c)     Upon reasonable advance written notice to Purchaser (in any event delivered to Purchaser no less than five Business Days prior to the Closing Date) Seller shall be entitled to withhold such portion of the Seller Held Coins as is necessary to satisfy Seller's obligations under the Plan (the "<u>Withheld Coins</u>"), and Seller shall distribute, or take such other action with respect to, the Withheld Coins only in accordance with the Plan and the provisions of this Agreement. To the extent there are any Withheld Coins, the provisions of this Agreement shall be read accordingly to give effect to the withholding and subsequent transfer, distribution or other action with respect to any such Withheld Coins, *mutatis mutandis*.

2.2     <u>Deposit</u>.

(a)     Purchaser has made, on the date hereof or will make on the first Business Day following the date hereof, an earnest money deposit with Acquiom Clearing House LLC (the "<u>Escrow Agent</u>") in the amount equal to $10,000,000 (the "<u>Deposit</u>"), by wire transfer of immediately available funds for deposit into an escrow account (the "<u>Escrow Account</u>"). Subject to <u>Section 2.2(b)</u> and <u>Section 2.2(c)</u>, the Deposit and any received investment income, if any, shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date. Seller hereby acknowledges and agrees that the Deposit qualifies as the deposit required pursuant to the Bidding Procedures Order.

<div align="center">9</div>

(b)     If this Agreement has been validly terminated (i) by Seller pursuant to Section 8.1(d) or Section 8.1(f), (ii)  by Purchaser pursuant to Section 8.1(c), in circumstances where Seller would be entitled to terminate this Agreement pursuant to Section 8.1(d) or Section 8.1(f), or (iii) by Seller pursuant to Section 8.1(g) in connection with and following any Purchaser Development and not in connection with a Higher and Better Offer (each of (i), (ii), and (iii), a "Purchaser Default Termination"), then within three (3) Business Days after the date of such termination, the Parties shall execute any instructions necessary to permit the Escrow Agent to disburse the Deposit together with all received investment income, if any, to Seller.

(c)     If this Agreement has been validly terminated by either Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within three (3) Business Days after such termination, and, at Purchaser's request, Seller shall execute any instructions necessary to permit the Escrow Agent to disburse the Deposit together with all received investment income, if any, to Purchaser.

(d)     If the Closing occurs, the Deposit shall be transferred to Seller.

2.3     Closing. Subject to the terms and on the conditions set forth in this Agreement, the closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement at and in connection with such closing (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on the third (3rd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs in accordance with the provisions hereof is referred to herein as the "Closing Date."

2.4     Closing Deliveries by Seller. At the Closing, Seller shall deliver to Purchaser:

(a)     a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by Seller;

(b)     each of the Acquired Coins to the wallet address designated by Purchaser for the relevant Acquired Coins of such type; and prior to transferring any Acquired Coins in full, Seller shall send a test transaction of a *de minimis* amount and shall immediately deliver the remainder of the relevant Acquired Coins, following Purchaser's confirmation that the *de minimis* amount was properly delivered; provided that ~~such transfers of the Acquired Coins~~ :

**(i)     Seller shall delay the delivery pursuant to this Section 2.4 of Acquired Coins allocable to a particular User or Eligible Creditor until Purchaser has confirmed in writing that such User or Eligible Creditor has satisfied the requirements set forth in Section 6.10(c), Section 6.10(e) and Section 6.12(b) for**

**onboarding to the Binance.US Platform (any Acquired Coins so delayed, "Delayed Acquired Coins"), in which case Seller shall deliver such Delayed Acquired Coins to Purchaser on a weekly basis to the extent Purchaser has notified Seller at least five (5) Business Days in advance of such weekly delivery that such User or Eligible Creditor has satisfied such requirements (with such Delayed Acquired Coins being custodied by Seller or an entity on behalf of Seller if is selected by Seller in accordance with the other provisions of this Agreement); provided that (A) with respect to each such weekly transfer, Seller shall be responsible for all gas or other transaction fees incurred in connection with transferring such Coins to Purchaser and (B) with respect to any transfer of Delayed Acquired Coins to Purchaser (I) for subsequent liquidation and distribution of cash under the last sentence of Section 6.12(a) or (II) pursuant to Section 6.12(b), such Delayed Acquired Coins will be transferred by Seller to Purchaser on the date specified in such provisions;**

**(ii)    transfers of Acquired Coins not held on the Binance.US Platform prior to such transfer** shall be deemed complete when each transfer is publicly confirmed on the blockchain for the related Coin at least the number of times set forth                                                                                                    on https://support.kraken.com/hc/en-us/articles/203325283-Cryptocurrency-deposit-processing-times (or a successor site agreed by Seller and Purchaser); ~~provided further that~~

**(iii)**    ~~(i) for~~**transfers of** Acquired Coins held on the Binance.US Platform as of the Closing Date**, shall be deemed complete when** such Acquired Coins ~~shall be~~**are** transferred to the Binance.US Platform account designated by Purchaser**;** and

**(iv)**    ~~(ii)~~ in the case of ETH Coins that are Staked Coins as of the date hereof **and cannot be unstaked as of the later of the Closing Date and the Delivery Date with respect to such ETH Coins**, such staked ETH Coins shall be delivered pursuant to the means mutually agreed between Purchaser and Seller acting reasonably;

(c)    a short-form trademark and domain name assignment agreement substantially in the form of Exhibit B (the "Trademark and Domain Name Assignment Agreement"), duly executed by Seller;

(d)    an IRS Form W-9 properly completed and duly executed by Seller or Seller's regarded owner for U.S. federal income Tax purposes;

(e)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Seller certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied; and

(f)    the Seller Statement pursuant to Section 6.11(c).

2.5    Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver to (or at the direction of) Seller:

(a)    without duplication, the Closing Date Payment pursuant to Section 2.1(b);

(b)    the Assignment and Assumption Agreement, duly executed by Purchaser;

(c)    the Trademark and Domain Name Assignment Agreement, duly executed by Purchaser; and

(d)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in <u>Sections 7.3(a)</u> and <u>7.3(b)</u> have been satisfied.

2.6    <u>Withholding</u>. Purchaser and its Affiliates shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement such amounts as are required to be deducted or withheld under applicable tax Law. Prior to making any such deduction or withholding, Purchaser or its applicable Affiliate shall use reasonable best efforts to (x) notify the person in respect of which such withholding or deduction is proposed to be made of such deduction or withholding and (y) give such person a reasonable amount of time to demonstrate that no or reduced withholding is required under applicable tax Law. To the extent that amounts are so deducted or withheld and paid to the appropriate Governmental Body, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

### ARTICLE III

#### Representations and Warranties of Seller

Except as (i) disclosed in the forms, reports, schedules, statements, exhibits and other documents filed with (or furnished to) the Canadian Securities Administrators ("<u>CSA</u>") by Parent in respect of Seller and its business during the two-year period prior to the date hereof to the extent publicly available at least one (1) Business Day prior to the date hereof on the CSA's System for Electronic Document Analysis and Retrieval, excluding (x) any disclosures set forth or referred to in any risk factor or similar section that do not constitute statements of fact, (y) any disclosures in any forward-looking statements disclaimer, and (z) any other disclosures that are generally cautionary, predictive or forward-looking in nature (the "<u>Filed CSA Documents</u>") (it being acknowledged that nothing disclosed in the Filed CSA Documents will be deemed to modify or qualify the Fundamental Representations), (ii) disclosed in any forms, statements or other documents filed by any of the Debtors with the Bankruptcy Court in the Bankruptcy Case as of one (1) Business Day prior to the date hereof, or (iii) set forth in the Schedules delivered by Seller concurrently herewith and subject to <u>Section 10.10</u>, Seller represents and warrants to Purchaser as follows as of the date hereof and as of the Closing Date **(except where, and solely to the extent that, any of the following are made with respect to any Delivery Date, in which case, such representations and warranties, solely to such extent, are made only as of such Delivery Date)**:

3.1    <u>Organization and Qualification</u>.

(a)    Except as set forth on Schedule ~~3.1~~**3.1**, Seller is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has all requisite limited liability company power and authority necessary to own,

lease and operate its properties and assets and to carry on its business as it is now being conducted, except (other than with respect to Seller's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as set forth on <u>Schedule 3.1</u>, Seller is duly qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned, leased or operated by it makes such qualification necessary, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.2    <u>Authorization of Agreement</u>. Subject to requisite Bankruptcy Court approvals:

(a)    Seller has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions;

(b)    the execution, delivery and performance by Seller of this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement to which it is a party or to be executed by it in connection with the consummation of the Transactions (the "<u>Seller Documents</u>"), and the consummation by Seller of the Transactions, have been duly authorized by all requisite limited liability company action and no other limited liability company proceedings on its part are necessary to authorize the execution, delivery and performance by Seller of this Agreement and the Seller Documents and the consummation by it of the Transactions; and

(c)    this Agreement has been, and the Seller Documents will be, when delivered pursuant to the terms hereof, duly executed and delivered by Seller and, assuming due authorization, execution and delivery hereof by the other Party, constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except that such enforceability (i) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (ii) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "<u>Enforceability Exceptions</u>").

3.3    <u>Conflicts; Consents</u>.

(a)    Assuming that (x) requisite Bankruptcy Court approvals are obtained, and (y) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 3.3(a)</u> are made, given or obtained (as applicable), neither the execution and delivery by Seller of this Agreement, nor the consummation by Seller of the Transactions, nor performance or compliance by Seller with any of the terms or provisions hereof, will (i) conflict with or violate any provision of Seller's certificate of formation or limited liability company agreement, (ii) violate any Law or Order applicable to Seller, the Acquired Assets or the Assumed Liabilities, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancellation

13

of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate Seller's obligations under any such Material Contract, (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Seller or (v) violate, contravene or conflict with, result in termination or lapse of, or in any way affect any permit, except, in the case of <u>clauses (ii)</u> through <u>(v)</u>, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as set forth on <u>Schedule 3.3(a)</u>, Seller is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Seller of this Agreement or the consummation by Seller of the Transactions, except (i) any requisite Bankruptcy Court approvals, or (ii) where failure to file, seek or obtain such notice, authorization, approval, Order, permit or consent would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4    <u>Financial Statements</u>. Attached to <u>Schedule 3.4</u> are Parent's unaudited statements of financial position as of June 30, 2022 (the "<u>Balance Sheet Date</u>") and audited statements of financial position as of June 30, 2021, and the related statements of loss and cash flows for each fiscal year then ended, in each case (collectively, the "<u>Financial Statements</u>"). Except as set forth on <u>Schedule 3.4</u>, the Financial Statements have been prepared, in each case, in conformity in all material respects with IFRS consistently applied, except for the absence of footnote disclosure and any customary year-end adjustments and except, in the case of the unaudited statements as of June 30, 2020 or the fiscal year then ended, with respect to any Tax matters or any impact or effect thereof. The Financial Statements are prepared based on the books and records of Parent and its Subsidiaries and present fairly in all material respects, in accordance with IFRS consistently applied, the consolidated financial condition and results of operations of Parent as of the dates and for the periods referred to therein, except as may be indicated in the notes thereto.

3.5    <u>Cryptocurrency; Loans; Customer Accounts</u>.

(a)    <u>Schedule 3.5(a)</u> sets forth a list of all Cryptocurrency held by Seller as of a date within three (3) Business Days of the date hereof, the means through which Seller as of such date controls such Cryptocurrency (*e.g.*, "private keys," custody agreements or agreements with parties performing validation services), whether or not such Cryptocurrency is attributable to User accounts on the Voyager Platform, and whether such Cryptocurrency constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan), which <u>Schedule 3.5(a)</u> shall be provided to Purchaser no later than December 18, 2022.  **As of the date hereof, as of the Closing Date and, with respect to any Delayed Acquired Coin, as of the applicable Delivery Date with respect to such Acquired Coin,** Seller has the exclusive ability to control, including by use of "private keys" or other equivalent means or through custody arrangements or other equivalent means, all such Cryptocurrency set forth on <u>Schedule 3.5(a)</u> (other than, solely to the extent of any staking contract, Staked Coins), and owns such Cryptocurrency (other than Cryptocurrency that constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan) and, solely to the extent of any staking contract, Staked Coins) free and clear of all Encumbrances (other than Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan); <u>provided</u> that such ownership and exclusive ability to control

14

Cryptocurrency is subject to the continued existence, validity, legality, governance and public availability of the relevant blockchains.

(b)    Schedule 3.5(b) sets forth a true, correct and complete list of all amounts (including any principal, interest, fees, expenses or penalties) outstanding or unpaid under any Loan.

(c)    Schedule 3.5(c) sets forth a list of all Users (excluding Users with addresses in the United Kingdom, European Union or European Economic Area) as of the Petition Date and a date within three (3) Business Days of the date hereof and the account position (including type and amount of Cryptocurrency) that such User held as of immediately prior to the Petition Date and as of the date hereof, which Schedule 3.5(c) shall be provided to Purchaser no later than December 18, 2022.

(d)    **As of the date hereof, as of the Closing Date and, with respect to any Delayed Acquired Coin, as of the applicable Delivery Date with respect to such Delayed Acquired Coin,** Seller has implemented procedures and controls regarding management of authentication credentials such as private keys and means for instructing third party custodians ("Authentication Credentials") for Cryptocurrencies, including limitation of access to Authentication Credentials to employees who need to have such access and requiring multiple individuals to sign off on transactions. Where Authentication Credentials are not held by employees of Seller, such Authentication Credentials are held by reputable third-party custodians or wallet providers whose security procedures have been evaluated by Seller and found to be fit for purpose.

(e)    Schedule 3.5(e) sets forth a true, correct and complete list of the number and type of Post-Petition Coins, on a User-by-User basis, which Schedule 3.5(e) shall be provided to Purchaser no later than December 18, 2022.

3.6    Title to Acquired Assets; Staked Coins; Exclusive Ownership; Sufficiency of Assets.

(a)    Seller has good and valid title to all Acquired Assets (other than Coins pledged by a borrower as collateral in respect of any Loans and, solely to the extent of any staking contract, Staked Coins), free and clear of all Encumbrances (other than Permitted Encumbrances) and, at the Closing, subject to Section 1.5(c), Purchaser will be vested with good and valid title to all such Acquired Assets, free and clear of all Encumbrances (other than Permitted Post-Closing Liens) and Excluded Liabilities, to the fullest extent permissible under Law, including section 363(f) of the Bankruptcy Code; provided, in respect of the Acquired Coins, Purchaser will be vested with good and valid title thereto free and clear of all Encumbrances (including Encumbrances implemented through "smart contracts" or other technological means), except that with respect to any staked ETH Coins that cannot be unstaked as of the Closing, such ETH Coins shall be subject to such staking **and except that, with respect to any Delayed Acquired Coins, such title will vest with Purchaser on the applicable Delivery Date**. Schedule 3.6(a) sets forth a true, correct and complete list of all Seller Held Coins that are subject to staking ("Staked Coins").

15

(b)     Seller is the sole owner of all Coins relating to the ~~exchange~~**brokerage** and custody business of the Voyager Platform and has good and valid title to such Coins, free and clear of all Encumbrances (except to the extent such Coin constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan) and, solely to the extent of any staking contract, Staked Coins).

3.7     <u>Title to Properties</u>.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller has a good and valid leasehold interest to all real property leased by Seller (the "<u>Leased Real Property</u>"), free and clear of all Encumbrances (other than Permitted Encumbrances). Seller does not own any real property.

(b)     Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, Seller holds good title to, or holds a valid leasehold interest in, all of the material tangible property necessary in the conduct of its business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to Seller.

3.8     <u>Contracts</u>.

(a)     <u>Schedule 3.8</u> sets forth a list of each Material Contract as of the date of this Agreement. For purposes of this Agreement, "<u>Material Contract</u>" means (x) any Assigned Contract, and (y) any other Contract to which Seller is a party or by which it is bound (in each case, excluding any Seller Plan) that in the case of this clause (y):

(i)     relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement, other than for the avoidance of doubt, marketing and licensing Contracts entered into in the Ordinary Course;

(ii)     provides for indebtedness for borrowed money of Seller having an outstanding or committed amount in excess of $1,000,000, other than letters of credit;

(iii)     relates to the acquisition or disposition of any material business (whether by merger, sale of stock, sale of assets or otherwise) pursuant to which any earn-out or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments by or to Seller of more than $1,000,000 after the date hereof (in each case, excluding for the avoidance of doubt, acquisitions or dispositions of Equipment, Cryptocurrency, properties or other assets in the Ordinary Course or of Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the business of Seller);

(iv)     involves the license of material Seller Intellectual Property to third parties (other than (x) Contracts with end users of Seller's products and services entered into in the ordinary course of business or (y) non-exclusive licenses granted to service

16

providers, suppliers and other third parties in connection with the provision of goods or services to Seller; provided such licenses are ancillary to, and not the primary purpose of, such Contract);

(v)      is a Contract (other than purchase orders or Contracts with respect to the acquisition of Cryptocurrency in the Ordinary Course) for the purchase of materials, supplies, goods, services, Equipment, or other assets pursuant to which Seller would reasonably be expected to make payments of more than $3,000,000 during any fiscal year;

(vi)     contains any provision (A) limiting, in any material respect, the right of Seller to engage in any business, make use of any Seller Intellectual Property that is material to Seller, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of (A) and (B), other than (x) a Contract that can be terminated on ninety (90) days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or obligations or the payment of any penalty under, such Contract, (y) customer Contracts entered into in the Ordinary Course granting exclusive rights to certain of Seller's services or containing "most favored nation" provisions with respect to certain of Seller's products or (z) any provision in any license agreements for third party Intellectual Property being licensed to Seller that limits Seller's use of such licensed Intellectual Property to specified fields of use or specified territories;

(vii)    evidences or relates to a Loan, including security or collateral agreements;

(viii)   is a custody agreement or agreement with any Person performing validation or staking services with respect to any Cryptocurrency;

(ix)     each Contract evidencing or governing financial or commodity hedging or similar trading activities (including with respect to Cryptocurrency), including any master agreements or confirmations governing swaps, options or other derivatives, or futures account agreements and/or brokerage statements or similar Contract; and

(x)      any Contracts with any Governmental Body, regulatory service providers or self-regulatory organizations in connection with Seller's business or the Voyager Platform.

(b)      Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs) and except (i) as a result of the commencement of the Bankruptcy Case and (ii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced, (A) each Material Contract is valid and binding on Seller and, to the Knowledge of Seller, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) Seller, and, to the Knowledge of Seller, any other party thereto, have performed all obligations required to be performed by it under each

17

Material Contract, (C) Seller has not received a written notice of the existence of any breach or default on the part of Seller under any Material Contract, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of Seller, or to the Knowledge of Seller, any counterparty under such Material Contract and (E) to the Knowledge of Seller, Seller has not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except in each case of (A) through (E), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.9     Permits; Compliance with Laws.

(a)     Except as set forth on Schedule 3.9, (i) Seller is not in violation of any Laws, Orders or any Money Transmitter Requirement, applicable to the Acquired Assets and (ii) Seller holds, and is in compliance with, all licenses, permits, registrations and authorizations, including Money Transmitter Licenses, necessary for the lawful ownership and operation of the Acquired Assets and Seller's business, except in each case as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     Seller and each of its directors, officers and employees acting in such capacity are and have in the past three (3) years been in compliance with the Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"), and any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, and Seller is not, to the Knowledge of Seller, being investigated by any Governmental Body with respect to, or been given notice in writing by a Governmental Body of, any violation by Seller of the FCPA or any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, in each case, except to the extent such non-compliance, investigation or notice of violation would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) neither Seller nor any director or officer of Seller, or any employee, agent or representative or other Person who performs or has performed services on behalf of Seller in the past three (3) years, is a Person that is the subject or target of economic sanctions administered by the Office of Foreign Assets Control of the United States Department of Treasury ("OFAC") (including the designation as a "Specially Designated National or Blocked Person" thereunder), the United Nations Security Council, His Majesty's Treasury, the European Union, the Bureau of Industry Security of the U.S. Department of Commerce, the U.S. Department of State, or any sanctions measures under the U.S. International Emergency Economic Powers Act, the U.S. Trading with the Enemy Act, the U.S. Iran Sanctions Act, the U.S. Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010, the U.S. Iran Threat Reduction and Syria Human Rights Act of 2012, the U.S. National Defense Authorization Act of 2012 or the U.S. National Defense Authorization Act of 2013, or any executive order, directive or regulation pursuant to the authority of any of the foregoing, including the regulations of the United States Department of the Treasury set forth under 31 CFR, Subtitle B, Chapter V, or any orders or licenses issued thereunder (collectively, "Sanctions"), nor any Sanctioned Person; (ii) to the Knowledge of Seller, the Acquired Assets are not the property or interests in

US-DOCS\137411268.27138346099.6

property of a Sanctioned Person, and are not otherwise the subject or target of Sanctions; and (iii) Seller has not in the past three (3) years been in violation of applicable Sanctions.

(d)     Seller and each of its directors, officers and employees acting in such capacity are and have in the past three (3) years been in compliance with all anti-money laundering and financial recordkeeping and reporting Laws to which it is subject, including the related rules, regulations or guidelines issued, administered or enforced by any Governmental Body (collectively, the "<u>Anti-Money Laundering Laws</u>"), and no Action by or before any Governmental Body involving Seller (or, in respect of the dealings of Seller, involving any of Seller's directors, officers or employees) with respect to the Anti-Money Laundering Laws is pending, or, to the Knowledge of Seller, threatened, in each case, except to the extent such non-compliance or Action would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(e)     Seller does not (i) have assets located outside the United States, or (ii) derive revenue from users located outside the United States.

(f)     Seller does not engage in (a) the design, fabrication, development, testing, production, or manufacture of one or more "critical technologies" within the meaning of Section 721 of the Defense Production Act of 1950, as amended, including all implementing regulations thereof (the "<u>DPA</u>"), or (b) the ownership, operation, maintenance, supply, manufacture, or servicing of "covered investment critical infrastructure" within the meaning of the DPA (where such activities are covered by column 2 of Appendix A to 31 C.F.R. Part 800).

3.10    <u>Environmental Matters</u>. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) Seller is, and has been since January 1, 2021, in compliance with all applicable Environmental Laws, (b) since January 1, 2021, Seller has not received any written notice alleging that Seller is in violation of or liable under, any Environmental Law that is unresolved, (c) Seller possesses and is in compliance with all permits required under Environmental Laws for the operation of its business as currently conducted ("<u>Environmental Permits</u>"), (d) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Seller, threatened in writing against Seller, (e) Seller is not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of Seller and (f) Seller has not released any Hazardous Substances at the Leased Real Property in quantities or concentrations that currently require Seller to conduct remedial activities, or that have given rise to any Action against Seller, under Environmental Laws.

3.11    <u>Intellectual Property; Data Privacy</u>.

(a)     <u>Schedule 3.11(a)(i)</u> sets forth as of the date hereof a true, correct and complete list of all registrations and applications included in the Seller Intellectual Property (the "<u>Seller Registered IP</u>"), indicating for each item the owner, registration or application number, registration or application date and the applicable filing jurisdiction or domain name registrar, as applicable. Except as otherwise indicated on <u>Schedule 3.11(a)</u>, all Seller Registered IP is owned exclusively by Seller, and is subsisting, and to the Knowledge of Seller, valid and enforceable.

There is no outstanding Action or Order challenging or adversely affecting the validity or enforceability of any material Seller Registered IP, or Seller's ownership of or rights in any material Seller Intellectual Property.

(b)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller owns all of the rights, title and interest in and to the Seller Intellectual Property (other than Intellectual Property licensed to Seller), free and clear of all Encumbrances (other than Permitted Encumbrances). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all of the Seller Intellectual Property (other than Intellectual Property licensed to Seller) is subsisting, valid and enforceable.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) Seller owns or has legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the business of Seller as currently conducted free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) Seller has taken commercially reasonable steps in accordance with industry practice to maintain the confidentiality of non-public Intellectual Property; provided that nothing in this Section 3.11(c) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of Section 3.11(e).

(d)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Actions are pending or, to the Knowledge of Seller, threatened against Seller, and since January 1, 2021, Seller has not received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by Seller of any Intellectual Property owned by or exclusively licensed to Seller or (ii) alleging that Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any Person.

(e)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since January 1, 2021, (i) no Person has infringed, misappropriated or otherwise violated the rights of Seller with respect to any Intellectual Property owned by or exclusively licensed to Seller and (ii) the operation of the business of Seller has not violated, misappropriated or infringed the Intellectual Property of any other Person.

(f)     The consummation of the Transactions will not result in the grant of any right or license to any third party of any material Seller Intellectual Property (other than Intellectual Property licensed to Seller).

(g)     Seller has complied in the past three (3) years in all material respects with all applicable Privacy Laws, privacy policies and notices, and contractual commitments related to the Processing of Personal Information (collectively, "Privacy Requirements"), and the consummation of the Transactions will not cause Seller to breach, in any material respect, any Privacy Requirements.

US-DOCS\137411268.27138346099.6

(h)    Seller has established and implemented and maintains a written information security program that contains commercially reasonable safeguards designed to protect Personal Information and against any Security Incident.

(i)    Except as would not, individually or in the aggregate, reasonably be expected to have a material impact on the Acquired Assets, taken as a whole, there have been no Security Incidents involving Personal Information in Seller's custody, possession or control or for which Seller is otherwise responsible. Except as set forth on Schedule 3.11(i), Seller has not in the past three (3) years: (i) notified or been legally required to notify any affected individuals, Governmental Body or other parties in connection with any Security Incident pursuant to Privacy Requirements; (ii) been the subject of any Action with respect to any unauthorized Processing of Personal Information or violation of any Privacy Laws by any Person; (iii) received any written inquiry, notice, request, claim, complaint, correspondence, or other communication from any Governmental Body or other Person relating to any Security Incident or alleged violation of any Privacy Laws; or (iv) made any ransomware or similar payment in connection with any Security Incident.

3.12    Tax Matters.

(a)    To the Knowledge of Seller, except with respect to income Tax and information Tax Returns, Seller has prepared (or caused to be prepared) and duly and timely filed (taking into account valid extensions of time within which to file) all material Tax Returns in respect of the Acquired Assets or otherwise required to be filed by it, and all such Tax Returns (taking into account all amendments filed in respect thereto) are true, correct and complete in all material respects.

(b)    To the Knowledge of Seller, all material Taxes in respect of the Acquired Assets, other than income Taxes or Taxes attributable to information Tax Returns, or otherwise required to be paid by Seller (whether or not shown on any Tax Return) have been duly and timely paid.

(c)    To the Knowledge of Seller, there are no Encumbrances for Taxes on the Acquired Assets or any other assets of Seller other than for Taxes not yet due or payable.

(d)    Seller has not, within the past five (5) years, been a member of an affiliated group of corporations filing a consolidated federal income Tax Return (other than a group the common parent of which is Parent or one of its Subsidiaries).

(e)    Seller has not waived any statute of limitations in respect of material Taxes or agreed to any extension of time with respect to an assessment or deficiency for material Taxes (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course), including, for the avoidance of doubt, with respect to Taxes in respect of the Acquired Assets.

(f)    Seller has not participated in any "listed transaction" within the meaning of U.S. Treasury Regulation Section 1.6011-4(b)(2).

US-DOCS\137411268.27138346099.6

(g)      Except as set forth on Schedule 3.12(g), solely as of the date hereof, (x) Seller has not received a written notice from a Governmental Body of any proposed adjustment, deficiency or underpayment of material amounts of Taxes with respect to the Acquired Assets, and (y) there are no pending or threatened audits or other Actions for or relating to any Liability for Taxes with respect to the Acquired Assets, except for, in each case of clause (x) and (y), those that have been fully satisfied, resolved or finally withdrawn.

(h)      Seller has not received a claim from a Governmental Body that Tax Returns are required to be filed in relation to the Acquired Assets or the Assumed Liabilities in a jurisdiction where no such Tax Returns have been filed or are currently filed.

(i)      Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this Section 3.12 shall constitute the sole representations and warranties with respect to Taxes and no representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

3.13    Affiliate Transactions. Except as set forth on Schedule 3.13 or in the "Interest Of Management And Others In Material Transactions" disclosure in the Filed CSA Documents or customer accounts of officers or directors, to the Knowledge of Seller, no Affiliate of Seller, or any officer or director of Parent or Seller, (a) is a party to any agreement that constitutes an Acquired Asset having a potential or actual value or a contingent or actual Liability exceeding $500,000, other than (i) loans and other extensions of credit to directors and officers of Seller for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans or (b) has any material interest in any Acquired Asset.

3.14    Brokers. Except for Moelis, the fees and expenses of which will be paid by Seller, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Seller or any of its Affiliates for which Purchaser or its Affiliates shall be liable.

3.15    Litigation. Except for the general pendency of the Bankruptcy Case, Actions that would not reasonably be expected to have a Material Adverse Effect or as set forth Schedule 3.15, there are no filed actions, claims, complains, summons, suits, litigations, arbitrations pending or threatened in writing against Seller.

3.16    Absence of Changes. Since the Balance Sheet Date, (a) there has not been any Material Adverse Effect and i) no action has been taken with respect to the Acquired Assets that would have required the consent of Purchaser under Section 6.1 if undertaken after the date hereof.

3.17    No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement)

or in the certificate to be delivered pursuant to <u>Section 2.4(e)</u> (the "<u>Express Seller Representations</u>") (<u>it</u> <u>being</u> <u>understood</u> that Purchaser has relied only on the Express Seller Representations), Purchaser acknowledges and agrees that neither Seller nor any other Person on behalf of Seller makes, and Purchaser has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to Seller, the Acquired Assets or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Moelis) (the "<u>Information Presentation</u>") or in that certain datasite administered by Datasite (the "<u>Dataroom</u>") or elsewhere to Purchaser or any of its Affiliates or their respective Advisors by or on behalf of Seller or any of its Affiliates. Without limiting the foregoing, except for the Express Seller Representations, neither Seller nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or their respective Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise in expectation of the Transactions or any discussions with respect to any of the foregoing information.

3.18    <u>No Outside Reliance</u>. Notwithstanding anything contained in this <u>Article III</u> or any other provision of this Agreement to the contrary, Seller acknowledges and agrees that the Express Purchaser Representations are the sole and exclusive representations, warranties and statements of any kind made to Seller and on which Seller may rely in connection with the Transactions. Seller acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Purchaser Representations), including in any meetings, calls or correspondence with management of Purchaser or any other Person on behalf of Purchaser or any of its Affiliates or Advisors, are, in each case, specifically disclaimed by Purchaser and that Seller has not relied on any such representations, warranties or statements.

## ARTICLE IV

### Representations and Warranties of Purchaser

Except as set forth in the Schedules delivered by Purchaser concurrently herewith and subject to <u>Section 10.10</u>, Purchaser represents and warrants to Seller as follows as of the date hereof and as of the Closing Date.

4.1    <u>Organization and Qualification</u>. Purchaser is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due incorporation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is duly licensed or qualified to do

business and is in good standing (or its equivalent) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions.

4.2     <u>Authorization of Agreement</u>. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Party, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3     <u>Conflicts; Consents</u>.

(a)     Except for the consents, licenses, waivers, exemptions, authorizations, approvals, filings, notifications or registrations required under any Money Transmitter Requirements in any Unsupported Jurisdiction applicable to Purchaser and the Binance.US Platform (the "<u>Unsupported Jurisdiction Approvals</u>"), assuming that (i) requisite Bankruptcy Court approvals are obtained, and (ii) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 4.3</u> are made, given or obtained (as applicable), neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (A) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (B) violate any Law or Order applicable to Purchaser, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of <u>clauses (B)</u> through <u>(D)</u>, as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions.

(b)     Except for the Unsupported Jurisdiction Approvals, Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except where failure to obtain such consent, approval, authorization or action, or to make such filing or

notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions.

4.4     <u>Financing</u>. Purchaser has, as of the date hereof, and will have at the Closing, sufficient funds in cash in an aggregate amount necessary to (a) pay the Closing Date Payment pursuant to <u>Section 2.1(b)</u> and any Seller Expenses to the extent payable by Purchaser pursuant to <u>Section 6.21</u>, and (b) pay all fees and expenses of Purchaser in connection with the Closing. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5     <u>Permits</u>. Purchaser has Money Transmitter Licenses in all States of the United States of America, other than the Unsupported Jurisdictions and any States in which the operation of Purchaser's business does not require a Money Transmitter License. Assuming the accuracy in all material respects of the representations and warranties set forth on <u>Sections 3.9(a)</u>, <u>3.9(d)</u> and <u>3.9(e)</u> (in each case, as qualified by the Schedules) and Seller's compliance in all material respects with the covenants set forth in <u>Sections 6.4</u>, <u>6.6</u>, <u>6.10</u> and the other Commercial Covenants, except for the Unsupported Jurisdiction Approvals, Purchaser holds all licenses, franchises, permits, certificates, approvals, and authorizations from Governmental Bodies necessary for the ownership and use of the Acquired Assets.

4.6     <u>Brokers</u>. There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transactions.

4.7     <u>No Litigation</u>. There are no Actions pending or, to the Knowledge of Purchaser, threatened against or affecting Purchaser that will materially and adversely affect Purchaser's performance under this Agreement or Purchaser's ability to consummate the Transactions.

4.8     <u>Certain Arrangements</u>. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of Seller or its board of managers (or applicable governing body of any Affiliate of Seller), any holder of equity or debt securities of Seller, or any lender or creditor of Seller or any of its Affiliates, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the Transactions or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of Seller or any of its Affiliates to entertain, negotiate or participate in any of the Transactions.

4.9     <u>Solvency</u>. As of the date hereof Purchaser is and, assuming (x) that the representations and warranties made by Seller herein are true and connect, (y) Seller has complied in all material respects with its covenants and other agreements hereunder, and (z) the conditions set forth in <u>Section 7.1</u> and <u>Section 7.2</u> have been satisfied, then immediately after giving effect to the transactions contemplated hereby Purchaser shall be, Solvent. "Solvent" means, with respect to any Person, such Person (a) is able to pay its debts as they become due; (b) owns property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent liabilities) and (c) has adequate capital to carry on its business. In connection with the Transactions, Purchaser is not incurring,

US-DOCS\137411268.27138346099.6

has not incurred, and does not plan to incur, debts beyond its ability to pay as they become absolute and matured.

4.10   No Additional Representations or Warranties. Except for the representations and warranties expressly contained in this Article IV (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the certificate to be delivered pursuant to Section 2.5(d) (the "Express Purchaser Representations") (it being understood that Seller has relied only on the Express Purchaser Representations), Seller acknowledges and agrees that neither Purchaser nor any other Person on behalf of Purchaser makes, and Seller has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to Purchaser or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person to Seller or any of its Affiliates or their respective Advisors on behalf of Purchaser. Without limiting the foregoing, except for the Express Purchaser Representations, neither Purchaser nor any other Person will have or be subject to any Liability whatsoever to Seller, or any other Person, resulting from the distribution to Seller, its Affiliates or their respective Advisors, or Seller's, its Affiliates' or their respective Advisors' use of or reliance on, any such information, statements, disclosures, documents, projections, forecasts or other material made available to them in expectation of the Transactions or any discussions with respect to any of the foregoing information.

4.11   No Outside Reliance. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees that the Express Seller Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser and on which Purchaser may rely in connection with the Transactions. Purchaser acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Seller Representations), including in the Information Presentation, the Dataroom, any projections or in any meetings, calls or correspondence with management of Seller or any other Person on behalf of Seller or any of its Affiliates or Advisors and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of Seller's assets, are, in each case specifically disclaimed by Seller and Purchaser has not relied on any such representations, warranties or statements. Purchaser acknowledges that it has conducted to its full satisfaction an independent investigation and verification of the business including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, and, in making its determination to proceed with the Transactions, Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, Seller, the Information Presentation, any projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the

US-DOCS\137411268.27138346099.6

foregoing or Seller or any of its Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Express Seller Representations (it being understood that Purchaser has relied only on the Express Seller Representations).

## ARTICLE V

### BANKRUPTCY COURT MATTERS

5.1    <u>Selection of Successful Bid and Winning Bidder and Sale Approval</u>.

(a)    Pursuant to the Bidding Procedures Order, by execution and delivery of its counterpart signature page hereto, Seller hereby confirms that Purchaser has made the highest or otherwise best bid pursuant to the Bidding Procedures Order and has selected the Transactions as the Successful Bid and Purchaser as the Winning Bidder (each, as defined in the Bidding Procedures Order).

(b)    (i) Promptly, and in any event no later than December 21, 2022 (subject to Bankruptcy Court approval where indicated), Seller shall: publicly announce that the Transactions have been selected as the Successful Bid and Purchaser has been selected as the Winning Bidder; and (ii) promptly, and in any event no later than December 21, 2022 (subject to Bankruptcy Court approval where indicated), Seller shall file a motion with the Bankruptcy Court attaching the form of an order approving the execution, delivery and performance of this Agreement by Seller (including payment of the Purchaser Expenses pursuant to <u>Section 6.21(b)</u> and the provisions of this <u>Article V</u> contemplating certain performance by Seller prior to Closing), other than the performance of those obligations to be performed at or after the Closing (the "<u>Agreement Order</u>"), which Agreement Order shall be in form and substance acceptable to Purchaser. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Agreement Order.

5.2    <u>No-Shop</u>.

(a)    From and following the execution and delivery of this Agreement by Seller, Seller and its Affiliates shall not, and shall not permit their respective Advisors or Affiliates to, (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than Purchaser, its Affiliates and its and their respective Advisors) with respect to an Alternative Transaction, (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction, (iii) enter into any confidentiality agreement with respect to, or provide any non-public information or data to any Person relating to, any Alternative Transaction, or (iv) otherwise agree, authorize or commit to do any of the foregoing; <u>provided</u> that, notwithstanding the foregoing, from and after entry of the Agreement Order, Seller may take the actions set forth in clauses (ii) and (iii) above if (A) Seller has received a written, bona fide offer, proposal or indication of interest to engage in an Alternative Transaction (an "<u>Acquisition Proposal</u>") from any Person after the date of this Agreement that did not result from Seller's breach of this <u>Section 5.2(a)</u>, and (B) the board of directors (or similar governing body) of Seller determines in good faith, after consultation with its financial advisor and outside legal counsel, that such Acquisition Proposal constitutes or is reasonably

27

likely to lead to a Higher and Better Offer and that failure to take such actions would violate the directors' fiduciary duties under applicable Law; provided further that if the Closing has not occurred prior to the Outside Date unless the failure of the Closing to have occurred by the Outside Date was caused by Seller's failure to perform any of its obligations under this Agreement, and there is no Back-up Bidder (as defined in the Bidding Procedures Order) or the agreement with the Back-up Bidder has terminated in accordance with its terms, then this Section 5.2(a) shall automatically terminate and be of no further force and effect as of such date. Until entry of the Agreement Order, Seller shall promptly (but in any event within twenty-four (24) hours) provide written notice to Purchaser of any breach of this Section 5.2(a).

(b)     Seller shall promptly (but in any event within twenty-four (24) hours) give written notice to Purchaser if (i) any inquiries, proposals or offers with respect to an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction are received, (ii) any non-public information or data concerning Seller or its Affiliates or access to Seller's or its Affiliates' properties, books or records in connection with any Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction is requested, or (iii) any discussions or negotiations relating to an Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction are sought to be engaged in or continued by, from or with Seller, its Affiliates or any of its or their respective Advisors, as the case may be. Such notice shall set forth the name of the applicable Person making such inquiry, the material terms and conditions of any proposed Alternative Transaction (including, if applicable, correct and complete copies of any proposed agreements, inquiries, proposals or offers or, where no such copies are available, a reasonably detailed written description thereof) and the status of any such discussions or negotiations. Seller shall thereafter keep Purchaser reasonably informed, on a reasonably prompt basis, of the status of any discussions or negotiations with respect thereto. Until entry of the Agreement Order, Seller shall promptly (but in any event within twenty-four (24) hours) provide written notice to Purchaser of any breach of this Section 5.2(b).

(c)     Seller (i) shall promptly (and in any event within twenty-four (24) hours) give notice to Purchaser upon a determination by Seller or its board of directors (or comparable governing body) that any Acquisition Proposal received from any Person after the date of this Agreement that did not result from Seller's breach of Section 5.2(a) constitutes a Higher and Better Offer (a "Higher Offer Determination Notice") and (ii) may cause or permit Seller or any of the other Debtors to enter into a definitive agreement with respect to such Acquisition Proposal; provided that (A) Seller and its board of directors (or comparable governing body) may only make such determination described in clause (i) of this Section 5.2(c) if, prior to the determination that such Acquisition Proposal constitutes a Higher and Better Offer, Seller negotiates, and causes its representatives to negotiate, with Purchaser in good faith (to the extent Purchaser and its representatives desire to negotiate) during such three (3) Business Day period to amend the terms and conditions of this Agreement and, no earlier than the end of such three (3) Business Day period, the board of directors (or comparable governing body) of Seller determines in good faith (after consultation with its financial advisor(s) and outside legal counsel), after giving effect to such proposed amendments to the terms and conditions of this Agreement, that such Acquisition Proposal still constitutes a Higher and Better Offer (provided further that if any material amendment is made to such Acquisition Proposal, such Acquisition Proposal shall be subject again (but only once again) to the foregoing, except that references to

three (3) Business Days shall be deemed to be two (2) Business Days, and whatever the result of the second instance of the foregoing, Seller shall not be required to undertake the foregoing again before making a determination that such Acquisition Proposal constitutes a Higher and Better Offer and, if applicable, terminating this Agreement), and (B) Seller and its board of directors (or comparable governing body) may only take such action described in clause (ii) of this Section 5.2(c) if the board of directors (or comparable governing body) of Seller determines in good faith (after consultation with its outside legal counsel) that the failure to take such action would violate with its fiduciary duties under applicable Law.

     5.3    <u>Bankruptcy Actions</u>.

     (a)    No later than December 21, 2022, Seller shall file with the Bankruptcy Court an amended Disclosure Statement (the "<u>Amended Disclosure Statement</u>" ) containing such amendments as may be necessary or appropriate to reflect the Seller's entry into this Agreement and pursuit of the Transactions, which, solely with respect to matters relating to this Agreement and the Transactions, shall be in a form and substance reasonably acceptable to Purchaser. Concurrently with the filing of such Amended Disclosure Statement (*i.e.*, no later than December 21, 2022), Seller shall file the Plan Solicitation Motion which, solely with respect to matters relating to this Agreement and the Transactions, shall be in form and substance reasonably acceptable to Purchaser; provided that Seller may modify the Plan Solicitation Motion, the Plan, and the Confirmation Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest, in each case, with the consent of Purchaser solely as it pertains to matters relating to this Agreement and Transactions (such consent not to be unreasonably withheld, conditioned or delayed).

     (b)    From the date hereof until the earlier of (i) the termination of this Agreement in accordance with <u>Article VIII</u> and (ii) the Closing Date, Seller shall use reasonable best efforts to obtain entry by the Bankruptcy Court of the Agreement Order and the Confirmation Order.

     (c)    The Parties shall use their respective reasonable best efforts to (i) obtain entry by the Bankruptcy Court of the Agreement Order, (ii) obtain entry by the Bankruptcy Court of the Plan Solicitation Order, (iii) commence solicitation of the Plan, and (iv) (A) facilitate the solicitation, confirmation, and consummation of the Plan and the transactions contemplated thereby and hereby, (B) obtain entry of the Confirmation Order, and (C) and consummate the Plan and the Transactions on the timeline set forth in the Plan Solicitation Motion and in any case prior to the Outside Date.

     (d)    Purchaser shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Agreement Order, the Plan Solicitation Order, the Confirmation Order, and any other Order reasonably necessary in connection with the Transactions as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates reasonably available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by Purchaser under this Agreement, and demonstrating that Purchaser

US-DOCS\137411268.27138346099.6

is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e)       Any documents filed by Seller with the Bankruptcy Court in connection with obtaining approval of effectuating the Closing shall be reasonably acceptable to Purchaser.

(f)       Each of Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and the Plan solely with respect to matters relating to this Agreement and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement and the Plan solely as it pertains to matters relating to this Agreement and Transactions, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court with respect to the Transactions or the Plan solely as it pertains to matters relating to this Agreement and Transactions.

(g)       Seller and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval. Purchaser acknowledges that Seller and the other Debtors must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of the Debtors and other interested parties, providing information about Seller to prospective bidders, entertaining higher and better offers from such prospective bidders.

(h)       Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors reasonably available to testify before the Bankruptcy Court.

5.4       Cure Costs. Subject to entry of the Agreement Order and the Confirmation Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.5       Approval. Seller's and Purchaser's obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Agreement Order and the Confirmation Order). Nothing in this Agreement shall require Seller or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

5.6    No Successor Liability. The Parties intend that upon the Closing the Purchaser Group shall not and shall not be deemed to: (a) be a successor (or other such similarly situated party), or otherwise be deemed a successor, to Seller, including, a "successor employer" for the purposes of the Code, ERISA, or other applicable Laws; (b) have Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity (including under applicable Money Transmitter Requirements or securities Laws of any Governmental Body); (c) have, de facto or otherwise, merged with or into Seller; (d) be an alter ego or a mere continuation or substantial continuation of any of Seller (and there is no continuity of enterprise between Purchaser and Seller), including, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, COBRA, Tax, labor, employment, environmental, or other Law, rule or regulation (including filing requirements under any such Laws, rules or regulations), or under any products liability Law or doctrine with respect to Seller's Liability under such Law, rule or regulation or doctrine; or (e) be holding itself out to the public as a continuation of Seller or its estate (the foregoing clauses (a) through (e), collectively, "Successor Liabilities").

5.7    Filings. Seller shall, and shall cause the other Debtors to, give Purchaser reasonable advance notice of, and opportunity to review and approve, any motions, pleadings, notices and other documents to be filed during the Bankruptcy Case that would reasonably be expected to be material and adverse to the Transactions (such approval not to be unreasonably withheld, conditioned or delayed, provided that Purchaser may withhold their approval in their sole discretion to the extent such motions, pleadings, notices and other documents would be inconsistent with the consummation of the Transactions in accordance herewith).

5.8 Waiver of Conflicts. Notwithstanding anything to the contrary herein or otherwise, Seller acknowledges that Paul Hastings LLP ("Paul Hastings" ) may have represented and may currently represent the Purchaser or one or more of its Affiliates in connection with the Transactions (including the negotiation, preparation, execution and delivery of this Agreement and related agreements, and the consummation of the Transactions) as well as other past and ongoing regulatory matters generally (the "Covered Matters" ). Accordingly, Seller hereby irrevocably consents and agrees, on its behalf and on behalf of its Affiliates, to Paul Hastings representing the Purchaser and its Affiliates from and after the Closing in connection with any matter arising out of or related to the Covered Matters. Seller (i) hereby irrevocably waives and will not assert, and will cause each of its Affiliates to waive and not assert, any actual or potential conflict of interest which has or may arise as a result of Paul Hasting's representation of the Purchaser or one or more of its Affiliates, including in any Action, in a Covered Matter, (ii) hereby consents, and will cause each of its Affiliates to consent to, any such representation, even though, in each case, (x) the interests of the Purchaser or such Affiliates may be directly adverse to Seller or its Affiliates, (y) Paul Hastings may have represented Seller or its Affiliates in a substantially related matter, or (z) Paul Hastings may be handling other ongoing matters for Seller or its Affiliates, and (iii) shall cooperate, and shall cause each of its Affiliates to cooperate, with the Purchaser in effectuating the foregoing waiver (including with respect to any objections raised by or before the Bankruptcy Court or the

31

United States Trustee assigned to the Bankruptcy Case in respect of such waiver or representation).

## ARTICLE VI

### COVENANTS AND AGREEMENTS

6.1     Conduct of Seller.

(a)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii) as expressly contemplated or required by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing, Seller shall use its reasonable best efforts to carry on its business in the Ordinary Course in all material respects; provided that no action by Seller with respect to matters specifically addressed by Section 6.1(b) shall be deemed to be a breach of this Section 6.1(a) unless such action would constitute a breach of Section 6.1(b).

(b)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII) and, in the case of Sections 6.1(b)(ii), 6.1(b)(iii), 6.1(b)(vi), and 6.1(b)(xi) below, solely with respect to any Delayed Acquired Coins, through and including the applicable Delivery Date with respect to any such Delayed Acquired Coin, unless Purchaser otherwise consents in writing, Seller shall not:

(i)     (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or warrants or other rights to acquire any debt securities of Seller, guarantee any such indebtedness or any debt securities of another Person or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "Indebtedness"), except (1) for letters of credit, bank guarantees, security or performance bonds or similar credit support instruments, overdraft facilities or cash management programs, in each case issued, made or entered into in the Ordinary Course, (2) for Indebtedness incurred under existing arrangements (including in respect of letters of credit) in an amount not to exceed $5,000,000 in the aggregate outstanding at any time and (3) Indebtedness incurred in connection with the refinancing of any Indebtedness existing on the date of this Agreement or permitted to be incurred, assumed or otherwise entered into hereunder; provided that no such refinancing Indebtedness shall have a principal amount greater than the principal amount of the Indebtedness being refinanced (plus any applicable premiums, defeasance costs, accrued interest, fees and expenses) and shall not include any greater prepayment premiums or restrictions on prepayment than the Indebtedness being refinanced, in each case of this clause (A), other than Excluded Liabilities,

32

(B) enter into any swap or hedging transaction or other derivative agreements or (C) make any loans, capital contributions or advances to, or investments in, any Person;

(ii)     sell or transfer to any Person, in a single transaction or series of related transactions, any of the Acquired Assets, other than the sale or transfer of Withheld Coins;

(iii)    perform or offer to perform any staking that is not unstaked prior to the Rebalancing Date;

(iv)    enter into referral agreements with a third party with respect to Users and any Documents with respect to Users or account information with respect thereto;

(v)     make any changes in financial accounting methods, principles or practices affecting the consolidated assets, Liabilities or results of operations of Seller, except (x) insofar as may be required (A) by IFRS (or any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the International Accounting Standards Board or any similar organization) or (y) as necessary or desirable to accommodate reasonable tax positions, to the extent such tax positions would not adversely affect the Acquired Assets or Purchaser in a taxable period (or portion thereof) beginning after the Closing Date;

(vi)    (x) grant any Encumbrance (other than Permitted Encumbrances) on any of its material Acquired Assets (other than Acquired Coins, which, for the avoidance of doubt, are addressed in subclause (y) of this item (vi)) other than to secure Indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms), or (y) grant any Encumbrance (other than any Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan) on Acquired Coins, including by submitting any Cryptocurrency to any staking contract or otherwise causing any Seller Held Coins that are not currently Staked Coins to become Staked Coins;

(vii)   except, in each case, with respect to income Taxes or information Tax Returns: make, change or revoke any material Tax election; change an annual accounting period for material Taxes; adopt or change any material accounting method with respect to material Taxes; file any amended material Tax Return; enter into any closing agreement for material Taxes; settle or compromise any material Tax claim or assessment; or consent to any extension or waiver of the limitation period applicable to any claim or assessment with respect to material Taxes; in each case to the extent such action would adversely affect the Acquired Assets or Purchaser in a taxable period (or portion thereof) beginning after the Closing Date;

(viii)  waive, release, assign, settle or compromise any pending or threatened Action against Seller to the extent that such wavier, release, assignment, settlement or compromise would (A) result in an Assumed Liability in an amount in

33

excess of $1,000,000, individually or in the aggregate, or (B) waive or release any material rights or claims that would constitute Acquired Assets;

(ix)    enter into any referral agreement with a third party with respect to Users;

(x)    terminate or transfer any Business Accounts (other than any such Business Accounts that are not necessary to the operation of the Voyager Platform, with the Parties to cooperate in good faith to determine which Business Accounts are not necessary and may be terminated or transferred);

(xi)    lend any Cryptocurrency to any Person, or engage in purchases or sales of any Cryptocurrency (other than Withheld Coins) other than in connection with the Rebalancing Exercise; or

(xii)    authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)    Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct Seller's operations or business prior to the Closing, and nothing contained in this Agreement is intended to give Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Notwithstanding anything to the contrary contained herein, (i) any action taken, or omitted to be taken, by Seller pursuant to any Law, Order, directive, pronouncement or guideline issued by any Governmental Body or industry group providing for business closures, "sheltering-in-place" or other restrictions that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall in no event be deemed to constitute a breach of this <u>Section 6.1</u> and (ii) any action taken, or omitted to be taken, by Seller to protect the business of Seller that is responsive to any pandemic, epidemic or disease outbreak, as determined by Seller in its reasonable discretion, shall in no event be deemed to constitute a breach of this <u>Section 6.1</u>.

6.2    <u>Access to Information</u>.

(a)    From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to <u>Article VIII</u>), Seller will (x) provide Purchaser and its authorized Advisors with reasonable access to, upon reasonable advance notice and during regular business hours, Seller's officers, employees, Advisors, properties, systems, offices, and data, documents, and information of the Seller Parties regarding the Acquired Assets, the Assumed Liabilities, the Users, Voyager User Accounts and the Voyager Platform (including, for the avoidance of doubt any of the foregoing that constitutes Acquired Information), including such financial, operating and other data and information related to the Transactions, the Acquired Assets, the Assumed Liabilities, the Users, Voyager User Accounts, or the Voyager Platform (including, for the avoidance of doubt any of the foregoing that constitutes Acquired Information) as Purchaser or any of its representatives may reasonably request and (y) instruct the representatives of Seller to cooperate to provide such access; <u>provided</u> that (i) such access will occur in such a manner reasonably appropriate to protect the confidentiality of the Transactions, (ii) all requests for access will be directed to Moelis or such other Person(s) as Seller may designate in writing from

time to time and (iii) nothing herein will require Seller to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would waive any legal privilege or (B) would be in violation of applicable Laws or would violate any fiduciary duty under applicable Law with respect to Seller; provided that, in the event that Seller withholds access or information in reliance on the foregoing clause (A) or (B), Seller shall provide (to the extent possible without waiving or violating the applicable agreement, legal privilege, Law or fiduciary duty under applicable Law with respect to Seller) notice to Purchaser that such access or information is being so withheld and shall use reasonable best efforts to provide such access or information in a way that would not risk waiver of such legal privilege, applicable Law, or fiduciary duty.

(b)    The information provided pursuant to this Section 6.2 will be governed by the Confidentiality Agreement and the confidentiality provisions in Section 6.19. Each Party will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to such Party or any of its Advisors. Neither Party makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and the other Party may not rely on the accuracy of any such information, in each case, other than, with respect to Purchaser, the Express Seller Representations and, with respect to Seller, the Express Purchaser Representations.

(c)    From and after the Closing for a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Case), Purchaser will, following Seller's good faith written request, and solely to the extent necessary for Seller to (i) comply with Tax reporting obligations, (ii) consummate the closing of the Bankruptcy Case, (iii) prepare annual audited financial statements, (iv) submit a filing pursuant to applicable securities laws and regulations or (v) conduct the wind down of the estate (including reconciliation, investigation, and pursuit of claims) and dissolution of Seller and its Affiliates, provide Seller and its Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records in Purchaser's custody or control, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying), in each case to the extent relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser, in each case at no cost or expense to Purchaser; provided that (i) such access does not unreasonably interfere with the normal operations of Purchaser and (ii) nothing herein will require Purchaser to provide access to, or to disclose any information to, Seller or its Advisors if such access or disclosure (A) would waive any legal privilege or (B) would be in violation of applicable Laws or would violate any fiduciary duty; provided that, in the event that Purchaser withholds access or information in reliance on the foregoing clause (A) or (B), Purchaser shall provide (to the extent possible without waiving or violating the applicable agreement, legal privilege, Law or fiduciary duty) notice to Seller that such access or information is being so withheld and shall use reasonable best efforts to provide such access or information in a way that would not risk waiver of such legal privilege, applicable Law, or fiduciary duty. Unless otherwise consented to in writing by Seller, Purchaser will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records

US-DOCS\137411268.27138346099.6

without first offering to surrender to Seller such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of.

(d)    Except as expressly contemplated by this Agreement (including in connection with the Commercial Covenants, Section 6.3, Section 6.10(b) and Section 6.18), Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of Seller prior to the Closing with respect to Seller, their business or the Transactions without the prior written consent of Seller for each such contact.

6.3    Employee Matters.

(a)    From and after the date hereof (and, if applicable, following the Closing until the winddown or dissolution of Seller), subject to applicable Laws, Seller shall deliver to Purchaser such information and documents regarding employees of Holdings (the "Seller Employees") and independent contractors of Seller or Holdings (the "Seller Contractors"), in each case, as Purchaser shall reasonably request. Prior to the date hereof, Seller has provided Purchaser a true, correct and complete list of the Seller Employees and Seller Contractors identified by name, if applicable, department, and (subject to applicable Laws) true, correct and complete copies of all talent assessment reports for each such Seller Employee and Seller Contractor. From and after the date hereof (and, if applicable, following the Closing until the winddown or dissolution of Seller), Seller shall use reasonable best efforts to make such Seller Employees who remain employed by Holdings and Seller Contractors who remain engaged by Seller or Holdings, in each case, reasonably available to Purchaser or its Affiliates and Purchaser will work in good faith with Seller to identify top performing Seller Employees and Seller Contractors and will determine whether to make offers of employment or other services to any such Seller Employee or Seller Contractors (including by prioritizing review of Seller Employees for applicable open positions of Purchaser and its Affiliates, if any). Purchaser (or an Affiliate of Purchaser) may, in its sole discretion, make offers of employment, consulting or other services to such Seller Employees or Seller Contractors (if any) as Purchaser shall determine, on such terms and conditions as Purchaser shall determine in its sole and absolute discretion. In the event that Purchaser (or an Affiliate of Purchaser) makes such an offer of employment or services and such Seller Employee or Seller Contractor accepts, Seller hereby agrees not to enforce against Purchaser (or its Affiliate) or such Seller Employee or independent contractor the terms and conditions of any agreement to refrain from competing, directly or indirectly, with the business of Seller or any of its Affiliates or to refrain from soliciting employees, customers or suppliers of Seller or any of its Affiliates that may be applicable to such Seller Employee or Seller Contractor. Seller shall not take any action that would reasonably be expected to materially and adversely affect Purchaser's hiring or engagement of such Seller Employee(s) or Seller Contractor(s) in accordance with this Section 6.3; provided that the announcement and implementation of any Seller Plans (including any retention programs or post-Closing treatment of Seller Employees), in each case, in a manner consistent with the provisions of this Agreement, shall not be deemed to be a breach of this sentence. Notwithstanding anything to the contrary herein or otherwise, nothing herein shall require or obligate Purchaser or any of its Affiliates to

36

employ or make offers of employment to any Person, or make any such offers of employment on any particular terms, each of which decisions shall be made in Purchaser's sole discretion.

(b)     Prior to and following the Closing Date, Seller, Holdings and each of their Affiliates shall not communicate, and shall ensure that no representative of Seller, Holdings or their respective Affiliates communicates, with any Seller Employee or other service provider of Seller regarding post-Closing employment matters (including post-Closing employee benefit plans and compensation) with Purchaser without the prior written consent of Purchaser; provided that Seller, Holdings, and their Affiliates shall be permitted to communicate regarding their employment and termination plans and related matters.

(c)     Purchaser shall not assume any Seller Plans or any Liability to or in respect of any employees or former employees of Holdings and Seller and which relates to such employees' employment with Holdings or Seller, including (i) any employment agreement, whether or not written, between Seller and any person, (ii) any Liability under any Seller Plan, or (iii) Liability arising out of any claim of an unfair labor practice, or any claim under any state unemployment compensation or worker's compensation law or regulation or under any federal or state employment discrimination law or regulation as a result of an action taken by Seller or Holdings, and all such Liabilities shall be Excluded Liabilities hereunder.

(d)     Seller will, or will cause its Affiliates to, comply in all material respects with the Worker Adjustment and Retraining Notification Act of 1988 or any similar Laws ("WARN Act") with respect to any "plant closing" or "mass layoff" or group termination or similar event under the WARN Act affecting employees of Debtors (including as a result of the consummation of Transactions) whether occurring prior to or on the Closing. Subject to the terms of this Agreement, Seller and its Affiliates (including Holdings) reserve the right to (i) terminate any of their employees at any time, and otherwise reduce employee work hours, benefits and compensation, and (ii) issue termination and/or WARN Act notices relating to their employees at any time.

(e)     For any employees who are principally based outside the United States, the provisions of this Section 6.3 shall apply to such employees *mutatis mutandis* to the maximum extent permitted by applicable Law.

(f)     The provisions of this Section 6.3 are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any employees of Seller or Holdings), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this Section 6.3, alter or limit Purchaser's, Seller's or Holdings' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to an offer of employment or service, employment or continued

employment or service for any period of time by reason of this Agreement, or any right to a particular term or condition of employment or service.

6.4     Regulatory Matters.

(a)     From time to time from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), subject to the other provisions of this Section 6.4, Seller will, and will cause its Affiliates and its and their respective employees, representatives, advisors and agents to, (i) make or cause to be made all filings and submissions to the extent required to be made by Seller or any of its Affiliates under any applicable Laws for the consummation of the Transactions, if any, (ii) cooperate with Purchaser, its Affiliates and its and their respective representatives in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any filings or submissions to be made by any member of the Purchaser Group under any applicable Laws in connection with the Transactions, (iii) supply promptly any additional information and documentary material that may be requested in connection with such filings or submissions and (iv) use reasonable best efforts to take any actions necessary to obtain all approvals or clearances from any relevant Governmental Body that are required to be obtained by Seller or its Affiliates under applicable Law for the consummation of the Transactions.

(b)     From time to time from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), subject to the other provisions of this Section 6.4, Purchaser will, and will cause its respective employees, representatives, advisors and agents to, (i) make or cause to be made all filings and submissions to the extent required to be made by Purchaser under any applicable Laws for the consummation of the Transactions, if any, (ii) cooperate with Seller, its Affiliates and its and their respective representatives in exchanging such information and providing such assistance as Seller may reasonably request in connection with any filings or submissions to be made by Seller or any of its Affiliates under any applicable Laws in connection with the Transactions, (iii) supply promptly any additional information and documentary material that may be requested in connection with such filings or submissions, and (iv) use reasonable best efforts to take any actions necessary to obtain all approvals or clearances from any relevant Governmental Body that are required to be obtained by Purchaser under applicable Law for the consummation of the Transactions.

(c)     From time to time from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), the Parties commit to instruct their respective counsel to cooperate with each other to respond to any reasonable inquiries and use reasonable best efforts to seek to resolve any objections raised by any Governmental Body as promptly as practicable and for greater certainty, each Party and its respective counsel undertake to (i) promptly notify the other Party or its counsel of, and, if in writing, furnish such other Party or its counsel with copies of (or, in the case of oral communications, advise such other Party or its counsel of the contents of), any substantive communication received by such Person from a Governmental Body and (ii) keep the other Party or its counsel informed with respect to the status of any applicable submissions and filings to or inquiries by any Governmental Body in connection with this Agreement and the Transactions and any developments, meetings or discussions with any Governmental Body in respect thereof,

38

including with respect to (A) the commencement or proposed or threatened commencement of any investigation or other Action, and (B) the nature and status of any inquiries or objections raised or proposed or threatened to be raised by any Governmental Body with respect to this Agreement and the Transactions. From and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), none of Seller or any of its Affiliates, on the one hand, or Purchaser, on the other hand, will participate in any substantive meeting or discussion with any Governmental Body with respect of any such filings, applications, investigation or other inquiry without giving the other Party reasonable prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Body, a reasonable opportunity to attend and participate in such meeting or discussion, and each Party will have a reasonable opportunity to review and provide comments (which shall be considered in good faith by the other Party) on the content of any filing, submission or other written communication (and any analyses, memoranda, presentations, white papers, correspondence or other written materials submitted therewith) to be submitted by the other Party or any of its Affiliates to any Governmental Body in advance of any such submission. Each Party acknowledges that, with respect to any non-public information provided by a Party to the other under this <u>Section 6.4</u>, each Party may (1) designate such material as restricted to "outside counsel only" and any such material shall not be shared with employees, officers or directors or their equivalents of the receiving Party without approval of the disclosing Party and (2) make appropriately limited redactions necessary to satisfy contractual confidentiality obligations, preserve attorney-client privilege or protect material relating to the valuation of the Acquired Assets. Notwithstanding anything to the contrary herein or otherwise, Purchaser will control and have final decision making authority on all regulatory strategy, submissions and procedures, after considering in good faith any reasonable advice provided by Seller in good faith.

(d)    Notwithstanding anything to the contrary in this Agreement, nothing shall require or be construed to require any member of the Purchaser Group to (i) oppose any motion or Action for a temporary, preliminary or permanent Order against, or preventing or delaying, the consummation of the Transactions, or exhaust all avenues of appeal, including any proper appeal of any adverse decision or Order by any Governmental Body, (ii) enter into a consent decree, consent agreement, settlement or other agreement or arrangement (including any ancillary agreements) to hold separate, license, sell, transfer, dispose or divest (pursuant to such terms as may be required by any Governmental Body) any asset (whether tangible or intangible), (iii) agree to the termination, modification, or assignment of any relationships, joint ventures, contracts, assets, liabilities or obligations, (iv) agree to any limitations on governance, conduct, or actions of members of the Purchaser Group or operations of their respective businesses or with respect to the Acquired Assets or Assumed Liabilities, or (v) enter into any national security agreement, letter of assurance, or other mitigation agreement with the Committee on Foreign Investment in the United States or any member agency thereof acting in that capacity.

(e)    From and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), **and, solely with respect to Delayed Acquired Coins, through and including the applicable Delivery Date with respect to any such Delayed Acquired Coin,** Seller will not, and will not permit any of its Affiliates to, knowingly take any action, engage in any conduct or enter into any transaction that would reasonably be expected to (i) materially increase the risk of any Governmental Body entering an

39

Order prohibiting or materially delaying the consummation of the Transactions or (ii) materially delay the consummation of the Transactions.

(f)     Subject to Section 6.4(d), from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), **and, solely with respect to Delayed Acquired Coins, through and including the applicable Delivery Date with respect to any such Delayed Acquired Coin,** each Party will use reasonable best efforts to (i) cooperate with and (ii) seek to secure approvals or authorizations from, any relevant Governmental Body, including state banking departments enforcing money transmission laws, in order to permit consummation of the Transactions in a timely manner in compliance with applicable Laws.

6.5     Reasonable Best Efforts; Cooperation.

(a)     Subject to the other terms of this Agreement, and without limiting, affecting or modifying the Parties' obligations under Section 6.4, or any of the Commercial Covenants, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable and the closing conditions set forth in Article VII to be satisfied, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with the other Party, its Affiliates and its and their respective Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of Seller will not require Seller or any of its Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forgo any right, remedy or condition hereunder. Notwithstanding anything to the contrary herein, in the event of a conflict between this Section 6.5(a) and Section 6.4, the provisions of Section 6.4 shall control with respect to such conflict.

(b)     The obligations of Seller and Purchaser pursuant to this Agreement, including this Section 6.5, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), Seller's debtor-in-possession financing, if any, and Seller's obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order, the Agreement Order, and the Confirmation Order) and Seller's duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.6     Data Transfer Matters.

(a)     Seller shall, and shall cause its Affiliates to, (i) within 30 days (with the Parties using their reasonable best efforts to do so within five (5) Business Days) following the later of the date hereof and the date Purchaser provides the form of such notification, distribute an initial email notification, in the form provided by Purchaser, to all Users and any other consumers located or having a home address in the United States from whom Seller has collected Personal Information regarding the Transactions (including the Rebalancing Exercise)

40

and the transfer of such individuals' Personal Information or accounts (including the ability to opt in to a pre-Closing transfer of such User's Acquired User Data to Purchaser), and prominently post a notice, in the form provided by Purchaser, to Seller's and its Affiliates' (as applicable) primary customer-facing website regarding the same; (ii) on a weekly basis, upon the expiration of any opt in period provided in the email notification distributed by Seller, but no earlier than the later of January 3, 2023 and entry of the Agreement Order, deliver to Purchaser the respective Acquired User Data for Users who have opted into the pre-Closing data transfer pursuant to the foregoing item (i) and whose Acquired User Data has not previously been transferred (the "Pre-Closing Data Transfer"); (iii) following the date of the initial email notification until the Closing Date, continue distributing additional email notifications, in the form provided by Purchaser, to such individuals, as Purchaser reasonably requires; and (iv) on the Closing Date, deliver to Purchaser all other Acquired User Data. All notifications contemplated by the foregoing shall be subject to Purchaser's consideration of any comments thereto proposed in good faith by Seller or counsel to the committee of unsecured creditors in the Bankruptcy Case and subject to applicable Law.

(b)    From and after the date hereof and through and following the Closing, Seller shall, and shall cause its Affiliates to, maintain or maintain with a third party data management and retention firm, for the entirety of the applicable retention period and at least ninety (90) days thereafter, all information required to be maintained pursuant to, or to comply with, applicable Money Transmitter Requirements or Laws related to Sanctions.

(c)    Seller shall, and shall cause its Affiliates to, use reasonable best efforts to procure that all information and documentation requested in connection with the KYC Procedures meets the standards set forth in such KYC Procedures (including moving files located in storage repositories (*e.g.*, Google Drive or Box) to the appropriate files associated with the applicable User **or Eligible Creditor** and associating such information and documentation with the applicable User **or Eligible Creditor**), as determined by Purchaser in its reasonable discretion, prior to the ~~User Asset Migration Date~~**earlier of (x) the Closing Date and (y) with respect to such User or Eligible Creditor who has opted into the pre-Closing data transfer pursuant to Section 6.6(a)(i), the fifth (5th) Business Day following such opt in**, but in each case in no event prior to the applicable timing contemplated by clauses (i) through (iv) of Section 6.6(a).

6.7    Use of Name**; Voyager Platform**.

(a)    Seller agrees that: (i) within ninety (90) days from the Closing Date, Seller shall (and shall cause its Affiliates to) cause an amendment to the governing documents of Seller and its Affiliates (as applicable) to be filed with the appropriate Governmental Body and shall take all other reasonable actions necessary to change Seller's and such Affiliate's legal, name to a name or names not containing "Voyager," any other trade mark or trade name set forth in Schedule 6.7(a) or any name confusingly similar to the foregoing; (ii) after the Closing Date neither Seller nor any of its Affiliates shall have any ownership rights in or to the name "Voyager," any other trade mark or trade name set forth in Schedule 6.7(a) or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing or comprising the foregoing, including any name or mark confusingly similar thereto (collectively, the "Seller Marks"); and (iii) except as set forth in Section ~~6.7(a)~~**6.7(b)**,

Seller and its Affiliates shall, within ninety (90) days of the Closing Date, cease to make any use of the Seller Marks, including in any corporate or other legal name.

(b)    Notwithstanding Section 6.7(a), for a period of ninety (90) days after the closing of the Bankruptcy Case, unless extended by mutual agreement of Purchaser and Seller, Purchaser hereby grants to Seller and its Affiliates (including, for the avoidance of doubt, any wind-down or similar administrator in the Bankruptcy Case or under the Plan) a non-exclusive, limited, non-transferable, non-sublicensable and revocable license to use the Seller Marks for the sole purposes of unwinding Seller's businesses **and,** assisting Purchaser with all migrations, integrations and Transactions**, and consummating transfers of Coins, cash or other assets to Purchaser contemplated by this Agreement**.

**(c)    From and after the date hereof until the earlier of the Closing and the termination of this Agreement in accordance with its terms, Seller and Purchaser shall negotiate in good faith the terms and conditions of, and enter into at the Closing, a mutually agreed transition services agreement or other arrangements on commercially reasonable terms pursuant to which Seller shall have such access to and operation of the Voyager Platform and information acquired by Purchaser hereunder as are reasonably necessary for the sole purposes of Seller (w) holding Delayed Acquired Coins in accordance herewith, (x) assisting Purchaser with all migrations, integrations and Transactions contemplated by this Agreement, (y) consummating transfers of Coins, cash or other assets to Purchaser, Users, and Eligible Creditors contemplated by this Agreement and the Plan and (z) providing any related Tax reporting to Users required by applicable Law for periods prior to and including the Closing Date.  Such access and operation contemplated by clause (w) of this Section 6.7(c) shall cease upon the conversion of such Delayed Acquired Coins into fiat currency or, if earlier, upon the transfer to Purchaser of such Delayed Acquired Coins, in each case in accordance with this Agreement.  Such access and operation contemplated by clauses (x) and (y) of this Section 6.7(c) shall cease upon the completion of such assistance or transfers, as applicable.  Such access and operation contemplated by clause (z) of this Section 6.7(c) shall cease upon the completion of any such Tax reporting. Notwithstanding anything to the contrary herein, (i) Seller shall bear responsibility for the operation and administration (including by providing, at its expense, personnel to conduct such operation and administration), and the documented out-of-pocket third party costs and expenses, of the Voyager Platform following the Closing pursuant to the preceding provisions of this Section 6.7(c) and (ii) in no event will Seller (and Seller will cause its employees, contractors and other personnel not to) (A) use the Voyager Platform for purposes of (I) distributing any Coins to Users or Eligible Creditors or (II) performing any conversion of Coins to cash or other liquidation of Coins hereunder (provided that this clause (A)(II) shall not prevent Seller from using the software and functionality of the Voyager Platform solely for executing any conversion or liquidation transaction  permitted hereunder on other third party platforms), or (B) allow Users to (I) withdraw Coins through the Voyager Platform or (II) make any sale or other trading transaction through the Voyager Platform.**

US-DOCS\~~137411268.27~~138346099.6

6.8   <u>Further Assurances</u>.

(a)   From time to time from and after the date hereof through and following the Closing (in the case of Seller, until the winddown or dissolution of Seller), as and when requested by either Party, the other Party will execute and deliver, or cause to be executed and delivered, all such further conveyances, notices, assumptions, assignments, documents and other instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions (including for the avoidance of doubt, the transfer and conveyance of any Acquired Assets that may be in the possession of Seller's Affiliates to Purchaser); <u>provided</u> that nothing in this <u>Section 6.8</u> shall require Purchaser or the Purchaser Group to assume any Liabilities of Seller or any of its Affiliates other than the Assumed Liabilities or Seller or any of its Affiliates to transfer any assets other than Acquired Assets. In addition, from time to time following the Closing Date (in the case of Seller, until the winddown or dissolution of Seller), each Party shall, and shall cause its Affiliates to, promptly execute, acknowledge and deliver such further documents and perform such further acts as are reasonably requested by the other Party and as may be reasonably necessary to transfer and convey to Purchaser, or make available to Purchaser the Acquired Assets or the Assumed Liabilities pursuant to this <u>Section 6.8</u>.

(b)   Without limiting <u>Section 6.8(a)</u>, Seller will use reasonable best efforts to evidence and effectuate the transfer and conveyance of all Seller Held Coins (solely for purposes of this <u>Section 6.8(b)</u>), deeming the phrase "who are Debtors" in the definition of Seller Held Coins to instead read as "who are not Debtors" in accordance with <u>Section 6.8(a)</u>, *mutatis mutandis*.

6.9   <u>Insurance Matters</u>. Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to Seller and the Acquired Assets that is maintained by Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies; <u>provided</u> that to the extent such insurance coverage is available with respect to any Acquired Assets or Assumed Liabilities, after the Closing, (a) Seller shall, and shall cause its applicable Affiliates to, use reasonable best efforts to report in good faith to the applicable third-party insurance provider, if applicable, all events, acts, errors, accidents, omissions, incidents, injuries or other forms of occurrences to the extent relating to any Acquired Assets or Assumed Liabilities that, in each case, occurred at or prior to the Closing as reasonably requested by Purchaser to be so reported the extent covered by an occurrence-based insurance policy, (b) Purchaser shall use its reasonable best efforts to comply with the terms of any such insurance policy and (c) Seller shall, and shall cause its applicable Affiliates to, (i) use reasonable best efforts to obtain the benefit of the applicable insurance coverage under any such insurance policy and (ii) pay such benefit to Purchaser, net of (A) any deductibles, co-payment or self-insured amounts payable by Seller or any of its Affiliates or other out-of-pocket costs and expenses (including reasonable legal fees and expenses, if any) actually and reasonably incurred by Seller or any of its Affiliates in seeking such insurance proceeds and (B) any Taxes imposed on Seller or any of its Affiliates in respect of the receipt or accrual of such insurance proceeds.

43

6.10   <u>User Migration</u>.

(a)     Following the date hereof, Seller shall, and shall cause its Affiliates to cooperate with Purchaser to, develop (and each Party shall use reasonable best efforts to develop within 15 Business Days following the date hereof) a mutually agreed upon integration plan that sets forth all technology integrations that Purchaser deems reasonably necessary to enable all migrations of User accounts on the Voyager Platform to the Binance.US Platform as contemplated by this Agreement (the "<u>Integration Plan</u>"). The Integration Plan will include among other things: (i) directing customers on the Voyager Platform (including through links on the home screen for the web interface and mobile app for the Voyager Platform) to the Binance.US Platform log-in webpage or mobile app, (ii) migrating all Acquired User Data (subject to <u>Section 6.6(a)</u>) reasonably necessary for Purchaser to validate whether Users qualify as Existing Users and (iii) developing a process whereby any User that is not an Existing User can affirmatively accept terms and conditions to provide such User with access to their Net Owed Coins in a new Binance.US Platform account from directly within the Voyager Platform and related app in accordance with the provisions of this Agreement. Each Party shall, and shall cause its Affiliates and its and their respective employees and representatives to, comply with and implement the Integration Plan. From and after the date hereof (and following the Closing, if applicable, until the date that is six (6) months following the Closing Date), Seller shall, and shall cause its Affiliates and its and their respective employees and representatives to provide to Purchaser, its Affiliates and its and their respective employees and representatives (x) any assistance reasonably requested or required by Purchaser, its Affiliates and its and their respective employees and representatives in connection with the opening of User accounts on the Binance.US Platform, the transfer of information and Net Owed Coins from the Voyager Platform to the Binance.US Platform (including in connection with customer queries and troubleshooting with respect thereto), and the actions contemplated by this <u>Section 6.10</u> and the Integration Plan and (y) subject to <u>Section 6.6</u> and applicable Law, all necessary Acquired User Data in Seller's or its Affiliates' possession required to effectuate the Integration Plan. Purchaser shall bear the reasonable and documented out-of-pocket expenses incurred by Seller in connection with the provision of such assistance following the Closing pursuant to the immediately preceding sentence.**; provided that prior to incurring any such expenses in excess of $250,000, individually or in the aggregate, Seller shall obtain Purchaser's consent (which shall not be unreasonably withheld, conditioned or delayed) to incur such expenses.**

(b)     Notwithstanding the provisions of <u>Section 6.2(c)</u> or <u>Section 10.17</u>, following entry of the Agreement Order, Purchaser and its Affiliates shall, at their sole cost and expense, be entitled to issue communications directed to Users on the Binance.US Platform and through other means of Purchaser's choosing in connection with the Transactions or the opening of accounts on the Binance.US Platform; <u>provided</u> that such communications are consistent with this Agreement and applicable Law; <u>provided</u> that Purchaser shall not issue any such communications prior to the Closing Date without Seller's prior written consent (which shall not be unreasonably withheld, conditioned or delayed) and subject to reasonable consultation with counsel to the committee of unsecured creditors in the Bankruptcy Case. Except as required by <u>Section 6.11(d)</u>, Seller shall not, and Seller shall cause its Affiliates not to, issue any communication to Users, whether on the Voyager Platform or otherwise, except to the extent the form and substance of such communication has been previously approved by Purchaser or is required by applicable Law; <u>provided</u> that the foregoing shall not prohibit Seller from responding

on an individual basis to technical support queries from Users or answering questions related to the amount of Coins such User has deposited on the Voyager Platform or communicating with customers regarding withdrawal of cash from the "for benefit of" customer accounts at Metropolitan Commercial Bank; provided further that Seller shall, and shall cause its Affiliates to, provide Purchaser and counsel to the committee of unsecured creditors in the Bankruptcy Case with regular updates on the timing and content of such communications and shall cooperate with Purchaser in addressing any concerns related thereto. The Parties will work in good faith to (i) develop a set of talking points or FAQs for Users and Eligible Creditors with respect to the Transactions, the Bankruptcy Cases, and related matters and (ii) continue to review and revise such talking points or FAQs as other inquiries from Users and Eligible Creditors or other circumstances arise.

(c)     Subject to Seller's providing the Acquired User Data in accordance with Section 6.6, and such Acquired User Data meeting the standards set forth in the KYC Procedures, as determined by Purchaser in its reasonable discretion, Purchaser shall cause an account to be opened for each User on the Binance.US Platform on or before the ~~User~~ Asset Migration Date. In addition to the foregoing, if Seller has not provided or does not have Acquired User Data meeting such standards with respect to a particular User, if such User provides such information and documentation meeting the standards set forth in such KYC Procedures, as determined by Purchaser in its reasonable discretion, Purchaser shall cause an account to be opened for such User in accordance with its standard account opening procedures following its receipt of such information and documentation.

(d)     Seller and Purchaser shall offer (i) each eligible creditor pursuant to the Plan that is not a User (each, an "Eligible Creditor" ) and (ii) each User the opportunity, subject to the consummation of the Closing and such User and Eligible Creditor meeting the requirements of the KYC Procedures and accepting the terms and conditions of the Binance.US Platform, to receive its Net Owed Coins or other Plan distribution through the Binance.US Platform in accordance with Section 6.12 and the Plan. Within three (3) Business Days following the request of Purchaser (which request for the sake of clarity may be offered multiple times), Seller shall send to each User and Eligible Creditor a communication in the form provided by Purchaser notifying them of such offer.

(e)     For the sake of clarity and notwithstanding anything to the contrary herein or otherwise, (i) none of Purchaser or any of its Affiliates shall be required to (A) activate an account or pay or credit any amount, whether in Coins, cash or otherwise, to any User or Eligible Creditor (or its account) that does not meet the requirements of the KYC Procedures and accept the terms and conditions of the Binance.US Platform, (B) pay or credit any amount, whether in Coins, cash or otherwise, to any User or Eligible Creditor or its account except in accordance with the Plan, or (C) credit the account of any User or Eligible Creditor with respect to Coins that have not actually been delivered to Purchaser in accordance with the provisions of Section 2.4(b), (ii) neither Purchaser nor any of its Affiliates is assuming any Liabilities of Seller or any of its Affiliates with respect to Users' accounts on the Voyager Platform or any Eligible Creditor, all of which Liabilities shall constitute Excluded Liabilities, and (iii) neither Purchaser nor any of its Affiliates shall be required to provide trading services on the Binance.US Platform or otherwise in respect of any Unsupported Coins.

6.11    Rebalancing Exercise; Seller Statement.

(a)    Following the date hereof and prior to the Closing (or the earlier termination of this Agreement pursuant to Article VIII), (i) Seller shall purchase and sell Cryptocurrency through one or more transactions such that, following the completion of such transactions, the ~~number of~~ Acquired Coins Value of all Acquired Coins of each type is equal to the ~~aggregate number of~~ Deposited Coins Value of all Deposited Coins of such type multiplied by the Rebalancing Ratio (subject to a Rebalancing Exercise Delta with respect to each Acquired Coin of no more than five percent (5%) or, if after conducting such transactions and using reasonable best efforts to meet the Rebalancing Exercise Delta of five percent (5%), Seller reasonably and in good faith determines that it will not be able to meet such Rebalancing Exercise Delta, then such other amount as Purchaser and Seller consent to, such consent not to be unreasonably withheld, conditioned or delayed), the purpose of which transactions the Parties acknowledge and agree is to ensure that there are sufficient Acquired Coins of each type to pay to each User's account on the Binance.US Platform a number of Post-Rebalancing Coins of such type in accordance with the provisions of this Agreement (such transactions, the "Rebalancing Exercise"), and (ii) Seller shall, and shall cause its employees, accountants, advisors and representatives to, consult with, and keep reasonably informed, Purchaser, its Affiliates and their respective employees, accountants, advisors and representatives with respect to the Rebalancing Exercise and all actions taken in connection therewith, including by providing Purchaser with regular updates regarding the status of the Rebalancing Exercise. For the sake of clarity, the Parties agree that for purposes of the Rebalancing Exercise, if ETH Coins that are Staked Coins cannot be unstaked by the Rebalancing Date, or if there are Coins that Seller is otherwise unable to access due to such Coins being custodied with providers that have entered insolvency proceedings prior to the date hereof, then the Parties will agree on appropriate modifications to the Rebalancing Exercise and the process for distributing Net Owed Coins to Users in light of the foregoing. The Parties agree that the Rebalancing Exercise shall be completed in accordance with the provisions of this Agreement by no later than the date that is one (1) Business Day prior to the Closing Date (such date, the "Rebalancing Date").

(b)    In order to facilitate the Rebalancing Exercise, Seller shall, promptly following the date hereof, to the extent not already created prior to the date hereof, create an institutional account in Seller's name on the Binance.US Platform, and Seller may, but shall not be required to, transfer any or all Seller Held Coins to such institutional account in order to facilitate the Rebalancing Exercise (and, for the avoidance of doubt, the Binance.US Platform shall serve merely as an exchange agent in connection with the Rebalancing Exercise). Prior to engaging in any Subject Transaction outside the Binance.US Platform, Seller shall provide Purchaser with a written notice describing the parameters of such Subject Transaction, including the proposed number of Seller Held Coins of each type to be transferred in connection with such Subject Transaction (each, a "Transaction Notice") and Purchaser shall be entitled to make, by written notice (each, a "Transaction Offer Notice") to Seller within three (3) Business Days following receipt of such Transaction Notice, an offer to conduct such Subject Transaction on the Binance.US Platform, including a description of the estimated numbers of Acquired Coins that would result from the consummation of such Subject Transaction. If Seller receives any proposal to conduct such Subject Transaction from any third party which would result in a number of Acquired Coins in excess of that set forth in the Transaction Notice, Seller shall inform Purchaser of the same, and Seller shall not conduct such Subject Transaction with or

46

through other Person(s) unless Seller provides written notice to Purchaser that Seller has determined in good faith that the terms offered by such other Person(s) with respect to such Subject Transaction (which such terms shall be set forth in such notice) are more favorable (in terms of the best interests of Seller and its estate) than the terms set forth in the Transaction Offer Notice and Purchaser does not provide an updated Transaction Offer Notice within one (1) Business Day following receipt of such notice from Seller with terms as or more favorable (in terms of the best interests of Seller and its estate) than those set forth in Seller's notice. If Purchaser does so provide such an updated Transaction Offer Notice, Seller conduct such applicable Subject Transaction on the Binance.US Platform in accordance with such updated Transaction Offer Notice. In addition to the foregoing, Seller may request that Purchaser facilitate all or part of the Rebalancing Exercise, in which case all or such portion of the Rebalancing Exercise shall be conducted on the Binance.US Platform. Seller's use of the Binance.US Platform for the Rebalancing Exercise shall be subject in all respects to the standard terms and conditions of the Binance.US Platform (including applicable fees, spreads, costs and expenses except as set forth in the applicable Transaction Offer Notice). For the sake of clarity, Seller may withdraw any Coins from the Binance.US Platform prior to the Closing and Seller shall not be required to maintain Coins on the Binance.US Platform in connection with the Rebalancing Exercise or otherwise (except as otherwise expressly contemplated hereunder from and after the Closing and acknowledging that this sentence is not intended to and shall not preclude transactions in the Rebalancing Exercise being undertaken on the Binance.US Platform in accordance with the provisions hereof).

(c)     At least one (1) Business Day prior to the Closing Date and following completion of the Rebalancing Exercise in accordance with Section 6.11(a), Seller will deliver to Purchaser a ledger in a form reasonably specified by Purchaser as far in advance of the Rebalancing Date as is reasonably practicable (the "Seller Statement") setting forth in reasonable detail, in each case as of the Rebalancing Date and following the completion of the Rebalancing Exercise in accordance with Section 6.11(a), (i) each User's user identification number, (ii) the Rebalancing Ratio and the calculation thereof, (iii) the number of each User's Deposited Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Deposited Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject) **and the Deposited Coins Value thereof (by type of Coin)**, (iv) the number of each User's Post-Rebalancing Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Post-Rebalancing Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject) **and the Acquired Coins Value thereof (by type of Coin)**, (v) the total number of Seller Held Coins and Acquired Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Seller Held Coins and Acquired Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject), ~~(vi) the total amount of gas fees that Seller will pay in connection with the transfer of each~~ **and the Acquired Coins Value thereof (by** type of ~~Acquired~~ Coin ~~to Purchaser in accordance with Section 2.4)~~, and (~~vii~~**vi**) the amount of cash~~, Coins~~ or other property ~~(including the name and relevant ticker symbol used on the Voyager Platform for such Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject)~~ payable to each Eligible Creditor, *after taking into account gas or other transaction fees incurred and paid by Seller* ~~in connection with transferring such Coins to Purchaser,~~ and any identifying information and information

47

required to make such payments to such Eligible Creditor under the Plan, in each case together with reasonably detailed supporting information and documentation and prepared by Seller based on Seller's and its Affiliates' books and records. Notwithstanding anything to the contrary herein, Seller hereby acknowledges and agrees that (A) Purchaser and its Affiliates shall be entitled to fully rely on the Seller Statement and any data, information or calculation set forth therein for purposes of Section 6.11(d), and (B) in no event shall Purchaser of any of its Affiliates be responsible (x) to any Person for the Seller Statement, any data, information or calculation set forth therein or any error or inaccuracy with respect thereto or (y) for any losses, liabilities or damages in respect thereof, in each case, to the extent Purchaser takes any action in reliance thereon.

(d)     Promptly following the completion of the Rebalancing Exercise, Seller shall send to each User a communication notifying such User of the Rebalancing Exercise, such User's Deposited Coins, and the Net Owed Coins attributable to such User's account on the Voyager Platform following the Rebalancing Exercise and any gas fees incurred in **by Seller** connection with the transfer of Coins to Purchaser pursuant to Section 2.4. Seller will, upon Purchaser's request, deliver to each Eligible Creditor a communication relating to the Transactions, any payments to be made by Purchaser or any of its Affiliates to such Eligible Creditor and any matters relating to opening an account on the Binance.US Platform, in each case that is in form and substance reasonably acceptable to Purchaser.

6.12     Crediting of Accounts; Unsupported Jurisdictions, Transfer of Coins to Seller; Liquidations or Distributions by Seller.

(a)     Subject to the provisions of Section 6.10, ~~on the User~~**with respect to a particular User's Net Owed Coins or Eligible Creditor's cash, on the applicable** Asset Migration Date, Purchaser shall credit, or cause to be credited, (i) to the Binance.US Platform account of each User, such User's Net Owed Coins**; provided that such number of Coins to be credited shall be reduced by any gas or other transaction fees incurred in connection with transferring such Coins to Purchaser,** and (ii) to the Binance.US Platform account of each Eligible Creditor, the applicable amount payable to such Eligible Creditor as set forth in the Seller Statement. For the avoidance of doubt, Coins credited to any User's ~~or Eligible Creditor's~~ accounts on the Binance.US Platform may be made from any Coins held by or on behalf of Purchaser or any of its Affiliates. As a condition precedent to any User or Eligible Creditor accessing its account or Coins **or cash** on the Binance.US Platform, such User or Eligible Creditor must satisfy the requirements set forth in Section 6.10. ~~Following such User's or Eligible Creditor's satisfaction of such requirements~~**As promptly as practicable (using commercially reasonable efforts to do so within forty-eight (48) hours following receipt by Purchaser of the applicable Coins or cash hereunder), and in any event by the applicable Asset Migration Date,** Purchaser shall allow such User or Eligible Creditor, as applicable, to access trading services with respect to its Coins **or cash** subject to the Binance.US Platform's customary terms and conditions (including any transaction fees, spreads, costs and expenses). Notwithstanding anything to the contrary herein, with respect to any User or Eligible Creditor that does not satisfy such requirements prior to the date that is three (3) months following the later of the Closing Date ~~or~~**and** the date on which such terms and conditions are made available for such User or Eligible Creditor to accept, ~~then Purchaser shall convert any~~**Seller shall deliver all Delayed Acquired Coins in respect of such User or Eligible Creditor (other than**

48

**any Delayed** Acquired Coins with respect to ~~such Users~~**any User** or Eligible ~~Creditors~~**Creditor located in a jurisdiction that is an Unsupported Jurisdiction as of the Closing, which such Delayed Acquired Coins are addressed in Section 6.12(b)) to Purchaser in accordance with Section 2.4(b), Purchaser shall convert all such Delayed Acquired Coins** into United States Dollars at the then-prevailing rates (~~including~~**net of all** applicable fees, spreads, costs and expenses **(including any gas or other transaction fees incurred in connection with transferring such Coins to Purchaser)**) on the Binance.US Platform and deliver such United States Dollars, ~~together with any cash or others assets~~ in respect of such Users or Eligible Creditors to Seller within five (5) Business Days **following receipt thereof from Seller**, for further distribution by Seller in accordance with the Plan. **Purchaser shall make available to Seller, upon reasonable written request from Seller to Purchaser from time to time during Purchaser's regular business hours and at Seller's expense, books and records and related information, in each case, solely with respect to the transactions (including all applicable fees, spreads, costs and expenses) to effect such conversion described in the immediately preceding sentence.**

(b)     Notwithstanding anything to the contrary herein or otherwise, **(i)** for any Person (including any User or Eligible Creditor) that is located in Hawaii, New York, Texas or Vermont, to the extent that Purchaser does not have a Money Transmitter License or similar license in such jurisdiction or in any other jurisdiction where the applicable Governmental Body asserts after the date of this Agreement that Purchaser or any of its Affiliates requires a Money Transmitter License or similar license in order to consummate the Transactions or perform its obligations hereunder (each, an "Unsupported Jurisdiction"), Purchaser and its Affiliates shall not be required to (~~i~~**A**) credit or make any payment (with any Coins, cash or otherwise) to any account of such Person (including any User or Eligible Creditor) on the Binance.US Platform, or (~~ii~~**B**) permit any such Person or account of such Person on the Binance.US Platform to be active or conduct any trading or investing in Coins. ~~Notwithstanding anything herein to the contrary, prior to the Closing, Seller have the option to elect (upon consultation with professionals representing the committee of unsecured creditors in the Bankruptcy Case) that either (i), and (ii)~~ Seller shall not deliver to Purchaser any Coins, cash, or other asset with respect to any User or Eligible Creditor located in **a jurisdiction that is** an Unsupported Jurisdiction ~~or (ii)~~**as of the Closing (and** Seller shall ~~deliver such Coins to Purchaser at Closing. Upon receipt by Purchaser of any Unsupported Jurisdiction Approvals with respect to any Unsupported Jurisdiction(s), which Unsupported Jurisdiction Approvals permit Purchaser to perform its obligations under Section 6.12(a) in such Unsupported Jurisdiction, then Purchaser shall promptly notify Seller of receipt of such Unsupported Jurisdiction Approval and, if Seller has not previously delivered applicable~~**retain and hold such** Coins, cash, or other asset with respect to ~~any~~**such** User or Eligible Creditor ~~located in such~~**(including in accordance with Section 6.12(f))) until the relevant** Unsupported Jurisdiction ~~then Seller shall so deliver such assets to Purchaser within five (5) Business Days of such notification, and Purchaser~~**Approval is received and Purchaser has confirmed in writing that the relevant User or Eligible Creditor has satisfied the requirements set forth in Section 6.10 for onboarding to the Binance.US Platform, in which case, Purchaser** shall (following receipt of any applicable assets if required) ~~consummate~~**take** the actions **described in Section 6.12(a) and clauses (i)(A) and (i)(B) of this Section 6.12(b), as applicable, and Seller shall take the actions described in clause (ii) of this Section 6.12(b),** in such Unsupported Jurisdiction that were **otherwise** restricted **or not required** by this

Section 6.12(b); provided that to the extent Purchaser does not receive such Unsupported Jurisdiction Approval(s) with respect to any Unsupported Jurisdiction prior to the date that is six (6) months following the Closing Date, then ~~to the extent Purchaser is holding any Acquired Coins~~**instead of delivering such Coins, cash or other assets** with respect to **such** Users or Eligible Creditors ~~in such Unsupported Jurisdictions,~~**to** Purchaser **hereunder, Seller** shall convert such ~~Acquired~~ Coins into United States Dollars ~~at the then-prevailing rates (including~~**and deliver such United States Dollars (and such other cash or other assets) in respect of such Users or Eligible Creditors in accordance with the Plan. Notwithstanding anything to the contrary herein, in undertaking any transaction to effectuate such conversion, Seller shall provide Purchaser the opportunity to participate in such transaction as follows (or on such other terms as the Parties may agree in writing): (A) if Seller solicits terms for such transaction from any other Person, then Seller will substantially contemporaneously solicit terms for such transaction from Purchaser and (B) the Parties shall establish procedures pursuant to which, if Seller intends to execute such transaction based on terms that are available to Seller without soliciting such terms from any Person (e.g., based on information made available to participants in Cryptocurrency exchanges through an app or website), Seller shall be obligated to contact a designated contact through a designated form of contact at Purchaser for a significantly limited period of time that is appropriate under the circumstances of executing such transaction for Purchaser to propose terms for such transaction, and, in either case of (A) or (B), if Purchaser's terms (if Purchaser proposes any), including all** applicable fees, spreads, costs and expenses~~)~~**), represent the best execution for such transaction, Seller shall execute such transaction** on the Binance.US Platform ~~and deliver such United States Dollars, together with any cash or others assets in respect of such Users or Eligible Creditors to Seller within five (5) Business Days, for further distribution by Seller in accordance with the Plan.~~**on such terms proposed by Purchaser; provided that, in the case of clause (B), if Purchaser is unresponsive via such designated means of contact, or fails or declines to propose terms, during such period of time, Purchaser shall be deemed to have provided terms that do not represent the best execution for such transaction.**

(c)       From and after the Closing, or if this Agreement is terminated in accordance with its terms (other than in connection with a Purchaser Default Termination), then from and after such termination, if Seller or any of its Affiliates intends to consummate a transaction or series of related transactions pursuant to which it will purchase, sell or liquidate any Coins or distribute the proceeds thereof to any User or Eligible Creditor, in each case other than any Additional Bankruptcy Distributions (but including any purchase, sale or liquidation of any Coins prior to making any Additional Bankruptcy Distributions) or any of the transactions provided for in the preceding provisions of this Section 6.12 then (i) Seller may, but shall not be required to, utilize the Binance.US Platform, or other service offerings of Purchaser or its Affiliates, to consummate such transaction or series of related transactions (including any purchase, sale, liquidation or distribution described above) on Purchaser's and its Affiliates' standard terms and conditions (including any transaction fees, spreads, costs and expenses) and (ii) if this Agreement is terminated in accordance with its terms (other than in connection with a Purchaser Default Termination), then Seller may, but shall not be required to, elect that Purchaser and Seller will (and Seller will cause its Affiliates and any other Person with whom Seller or its Affiliates is consummating any such transaction or transactions to) cooperate in good faith to develop and facilitate any transaction similar to the Rebalancing Exercise required

50

by Seller, any of its Affiliates, and any other Person with whom Seller or its Affiliates is consummating any such transaction or transactions, in order to consummate any such transaction or series of related transactions; provided that in no event will Purchaser or any of its Affiliates be required to make any distribution or facilitate or consummate any transaction under this Section 6.12(c) with respect to any User located in an Unsupported Jurisdiction. In connection with any distribution made by Purchaser or its Affiliates pursuant to this Section 6.12(c), all right, title and interest in and to any property so distributed (including any Coins) shall be made or transferred to Purchaser or its Affiliates free and clear of any Encumbrances prior to any such distribution by Purchaser or its Affiliates and such distributions will be made on Purchaser's and its Affiliates' standard terms and conditions (including any transaction fees, spreads, costs and expenses).

(d)       The provisions of Sections 6.10, 6.11, 6.12, and 6.14 shall be subject to such protocols, if any, as the Parties may agree in writing after the date hereof with respect to the transfer of information, migration of users, migration or transfer of Coins, and any matters related to the foregoing or such Sections.

(e)       Notwithstanding anything to the contrary herein, but subject to the last sentence of this Section 6.12(e), (i) Seller (prior to the Closing) and each User and Eligible Creditor (from and after the Closing) shall retain all right, title, and interest in and to Coins allocated to it in accordance with this Agreement on the Binance.US Platform (notwithstanding any terms and conditions of the Binance.US Platform) through and including such time as such Coins are returned or distributed to Seller or such User and Eligible Creditor, as applicable, hereunder, and such Coins shall be held by Purchaser solely in a custodial capacity in trust and solely for the benefit of Seller or the applicable User or Eligible Creditor; provided that in the case of Coins allocable to Users or Eligible Creditors located in Unsupported Jurisdictions, to the extent, if any, that such Coins are transferred to Purchaser pursuant to Section 6.12(b), from and after the Closing until the applicable Unsupported Jurisdiction Approval is obtained or such Coins are liquidated in accordance with Section 6.12(b) hereunder, such Coins shall be held by Purchaser in a custodial capacity on behalf of Seller and not the applicable User or Eligible Creditor; (ii) any and all cash or cash equivalents to be transferred at any time to Purchaser hereunder for further distribution to Seller or any User or Eligible Creditor (and not for Purchaser's own account (e.g., Purchaser Expenses)) shall at all times (until transferred by Purchaser to Seller or the applicable User or Eligible Creditor, as applicable, hereunder) be held solely in a third party bank account of a FDIC-insured financial institution solely for the benefit of or "fbo" Seller or such User or Eligible Creditor, as applicable; (iii) Purchaser shall not, after the date hereof, introduce any further conditions to the withdrawal of cash from accounts on the Binance.US Platform that are not in effect as of the date hereof that would apply to any User's or Eligible Creditor's account on the Binance.US Platform; (iv) Purchaser shall not at any time halt (temporarily or permanently) withdrawals of cash or such Coins from any User's or Eligible Creditor's account on the Binance.US Platform; (v) Purchaser shall not halt trading of such Coins on the Binance.US Platform at any point during the 30 days following any distribution to any User's or Eligible Creditor's account on the Binance.US Platform hereunder, except, in the case of each of the foregoing clauses (iii), (iv) and (v), (A) as required by applicable Law or any Order or Governmental Body, (B) as may be permitted pursuant to Purchaser's terms and conditions in effect on the Closing Date (including for purposes of halting fraud or illegal activity), (C) as necessary to complete any system, account, wallet, security or exchange

maintenance, patching, repair, upgrade or to the extent any withdrawal or trading is unable to be processed due to any act or omission by, or any Event related to, any third party (*e.g.*, a bank closure or a third party ceasing to support any Cryptocurrency), (D) in order to avoid any legal, compliance or regulatory issue or in order to ensure market stability, or (E) in order to avoid any information security risk; (vi) Purchaser shall not take, permit to be taken, or omit to take any action that would reasonably be expected to (A) result in the insolvency of Purchaser or (B) prevent or materially impair or materially delay the ability of Purchaser to perform the Commercial Covenants in accordance herewith; (vii) Purchaser shall comply in all material respects with all provisions of the Plan applicable to Purchaser or the Distribution Agent (as defined in the Plan) to the extent Purchaser is acting as a distribution agent in connection with the Plan; and (viii) Purchaser shall not pledge, repledge, hypothecate, rehypothecate, sell, lend, stake, arrange for staking, or otherwise transfer or use any amount of such Coins, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining a like amount of Coins, or invest such Coins (except as otherwise directed by Seller or any User or Eligible Creditor, as applicable). Notwithstanding the foregoing, Purchaser's obligations under this Section 6.12(e) shall terminate and be of no further force or effect on the earlier of (x) the date that Purchaser's obligations under Section 6.10, Section 6.11, Section 6.12, and Section 6.14 have been performed in full or Purchaser otherwise ceases to have any obligations thereunder, and (y) the date on which this Agreement is terminated in accordance with is terms.

**(f)      Notwithstanding anything to the contrary herein, to the extent Seller retains any Delayed Acquired Coins following the Closing, (i) such Coins shall be held by Seller solely in a custodial capacity in trust and solely for the benefit of the applicable User or Eligible Creditor; (ii) Seller shall not pledge, repledge, hypothecate, rehypothecate, sell, lend, stake, arrange for staking, invest or otherwise transfer or use any amount of such Coins; (iii) Seller shall retain exclusive control, including by use of "private keys" or other equivalent means or through custody arrangements consistent in all material respects with Seller's practices as of the date hereof, of all such Coins (other than, solely to the extent of any staking contract, Staked Coins); provided that such ownership and exclusive ability to control Coins is subject to the continued existence, validity, legality, governance and public availability of the relevant blockchains; and (iv) Seller shall continue to comply with all procedures and controls in effect as of the Closing Date regarding management of Authentication Credentials, including limitation of access to Authentication Credentials to employees who need to have such access and requiring multiple individuals to sign off on transactions. For the sake of clarity, in the event any such Delayed Acquired Coins are unable to be delivered to Purchaser within the timeframes specified in this Agreement, Purchaser shall be entitled to notify Users and Eligible Creditors of the same or to require Seller to provide such a notice in the form provided by Purchaser, and Seller shall not issue any denial or other contradictory statement with respect thereto. The foregoing provisions of this Section 6.12(f) shall apply to Seller's Affiliates, *mutatis mutandis*, and Seller shall cause its Affiliates to comply with the foregoing provisions of this Section 6.12(f). Following the Closing, Seller agrees to use commercially reasonable efforts to keep Purchaser reasonably informed of any unauthorized acquisition, impairment, access, use, theft, destruction, alteration or disclosure of any "private key" or Authentication Credential or instance of any IT System used by Seller or any custodian of Seller to secure any Acquired**

**Coins or loss of Seller's exclusive control of any Acquired Coins and consult with Purchaser in connection with remedying any of the foregoing.**

6.13    <u>VGX Token Listing Review Process</u>. Following the entry of the Agreement Order, Purchaser will initiate and undertake consistent with its policies and past practices an internal review process to determine whether VGX tokens can be listed for trading on the Binance.US Platform, which review process will include submitting the VGX token to Purchaser's listing committee for consideration consistent with its policies and past practices.

6.14    <u>Additional Bankruptcy Distributions</u>. The provisions of this <u>Section 6.14</u> shall cease to apply and be of no further force and effect upon the soonest to occur of (a) Purchaser ceasing to provide the services necessary to comply with this <u>Section 6.14</u>, (b) Purchaser's bankruptcy or insolvency, (c) the issuance of a final, non-appealable Order by a Governmental Body prohibiting the consummation of the transactions contemplated by this <u>Section 6.14</u>, (d) any Purchaser Development (disregarding for the purposes of this <u>Section 6.14</u> the language "prior to the Closing"), and (e) Purchaser's material breach of <u>Section 6.12(e)</u> or this <u>Section 6.14</u> which remains uncured for 30 days following Purchaser's receipt of Seller's written notice of such material breach.

(a)    ~~Any~~**Seller will make or transfer to Purchaser any** Additional Bankruptcy Distributions made on account of Users' or Eligible Creditors' claims against the Debtors and all right, title and interest therein and thereto ~~shall be made or transferred to Purchaser~~ free and clear of any Encumbrances **promptly following (but in any event within five (5) Business Days of) delivery of the applicable Post-Bankruptcy Statement to Purchaser pursuant to Section 6.14(b)**. Any such transfers in Coins shall be deemed complete when each transfer is publicly confirmed on the blockchain for the related Coin at least the number of times set forth on https://support.kraken.com/hc/en-us/articles/203325283-Cryptocurrency-deposit-processing-times (or a successor site mutually agreed by Seller and Purchaser), or, for any Coins held in Seller's account on the Binance.US Platform, transferred to the Binance.US Platform account designated by Purchaser, or in the case of staked ETH Coins, such staked ETH Coins shall be delivered pursuant to the means reasonably specified by Purchaser. **Any Additional Bankruptcy Distributions made by Purchaser in the form of Coins shall be net of any gas or other transaction fees incurred in connection with transferring such Coins to Purchaser.**

(b)    Upon the Bankruptcy Court's approval of any Additional Bankruptcy Distributions (including through the Confirmation Order) **and (x) the determination by Seller to make any such Additional Bankruptcy Distribution or (y) Seller is required by the Plan to make any such Additional Bankruptcy Distribution**, Seller shall deliver to Purchaser a statement setting forth (i) the amount of **such** Additional Bankruptcy Distributions to be made to each User ~~or Eligible Creditor, as applicable, as approved by the Bankruptcy Court~~ in Coins (including the name and relevant ticker symbol used on the Voyager Platform for such Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject) after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring such Coins to Purchaser in accordance with this <u>Section 6.14</u>, (ii) the amount of Additional Bankruptcy Distributions to be made to each User or Eligible Creditor, as applicable, ~~as approved by the Bankruptcy Court~~ in cash **or other assets**,

and (iii) the user identification number of each such User or other identifying or account information of any Eligible Creditor, as applicable (such statement, the "Post-Bankruptcy Statement"). The provisions set forth in the last sentence of Section ~~6.11(a)~~6.11(c) shall apply to the Post-Bankruptcy Statement, *mutatis mutandis*.

(c)    Promptly following Purchaser's receipt of any Additional Bankruptcy Distributions (but no later than five (5) Business Days following receipt of any Additional Bankruptcy Distributions), Purchaser shall credit such Additional Bankruptcy Distributions to each User's and Eligible Creditor's accounts, if any, on the Binance.US Platform in such amounts set forth on, and in accordance with, the Post-Bankruptcy Statement **and in the same form (*i.e.*, Coins, cash, or other assets, as provided by Seller to Purchaser)**. The Additional Bankruptcy Distributions credited to each User and Eligible Creditor in accordance with this Section 6.14(a) are referred to herein as "Credited Additional Bankruptcy Distributions".

(d)    If any Additional Bankruptcy Distribution is to be received by Purchaser pursuant to Section 6.14(a), prior to the crediting of the applicable Credited Additional Bankruptcy Distribution pursuant to Section 6.14(a), Seller shall reduce such Credited Additional Bankruptcy Distribution by and shall retain (i) the number of Coins allocated in the applicable Post-Bankruptcy Statement to each User or Eligible Creditor located in an Unsupported Jurisdiction in which Purchaser or its applicable Affiliate(s) have not received the necessary Money Transmitter License, and (ii) the amount of cash allocated in the applicable Post-Bankruptcy Statement to each User or Eligible Creditor located in an Unsupported Jurisdiction in which Purchaser or its applicable Affiliate(s) have not received the necessary Money Transmitter License, and, in either case, such amounts shall be distributed by Seller in accordance with the Plan.

(e)    There shall be no transaction fees, spreads, costs or expenses charged to or payable by Seller, any User, or any Eligible Creditor with respect to any Additional Bankruptcy Distributions to the account of Seller, such User or such Eligible Creditor, as applicable, on the Binance.US Platform contemplated by this Section 6.14.  With respect to any User or Eligible Creditor that does not meet the requirements of the KYC Procedures and accept the terms and conditions of the Binance.US Platform (or otherwise is not or no longer is a user with an active account on the Binance.US Platform) as of or prior to the date of such Post-Bankruptcy Statement, Purchaser shall convert all Coins allocable to such User or Eligible Creditor in such Additional Bankruptcy Distribution into United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such United States Dollars, together with any cash or others assets in respect of such Users or Eligible Creditors, to Seller within five (5) Business Days, for further distribution by Seller in accordance with the Plan.

**(f)    Seller shall have the option but not the obligation to terminate Purchaser's role as Distribution Agent in connection with the Plan if one or more of the following has occurred and is continuing as of the time of exercise of such option and, in each case, such event would reasonably be expected to materially and adversely affect the Users, Eligible Creditors or the Acquired Coins (each, a "Distribution Agent Termination Event"): (i) Binance Holdings Limited or any of its Subsidiaries voluntarily files for bankruptcy protection in any jurisdiction and such filing would reasonably be expected to**

54

**prevent Purchaser from performing its obligations under this Section 6.14 or otherwise following the Closing; (ii) following a criminal complaint, indictment, or federal complaint filed by any U.S. federal law enforcement agency, a final and unappealable judgment is entered by a U.S. Federal Court of competent jurisdiction against Purchaser or any of Purchaser's executives officers or "C-Suite" officers; (iii) following a criminal complaint, indictment, or federal complaint filed by any U.S. federal law enforcement agency, a final and unappealable judgment is entered by a U.S. Federal Court of competent jurisdiction against any of Purchaser's Affiliates and such judgment would reasonably be expected to prevent Purchaser from performing its obligations under Section 6.14 or otherwise following the Closing; and (iv) a state regulator suspends or terminates Purchaser's Money Transmitter License or similar license or otherwise restricts in a manner that is final and binding under applicable Law; provided, however, that, with respect to this clause (iv), Seller shall have the option to terminate Purchaser's role as Distribution Agent with respect to only the state or states that have taken the adverse action described in this clause (iv).**

**Upon the occurrence of any Distribution Agent Termination Event, Seller is permitted to exercise the option to terminate Purchaser's role as Distribution Agent by providing written notice to Purchaser in accordance with Section 10.3 (a "Distribution Agent Termination Notice"). Purchaser's termination as Distribution Agent in connection with the Plan shall be effective on the tenth (10th) day following Purchaser's receipt of such Distribution Agent Termination Notice, unless such Distribution Agent Termination Event is cured prior to the expiration of such 10-day period. To the extent that Purchaser is in possession of any of Seller's fiat or Cryptocurrency at the time of the Distribution Agent Termination Notice, Purchaser shall transfer such fiat or cryptocurrency to Seller upon the effectiveness of such Distribution Agent Termination Notice.**

6.15    <u>Unstaking</u>. Promptly following the date hereof (until the **later of (A) the** Closing ~~or~~**and (B) the applicable Delivery Date, or, in any case,** the earlier termination of this Agreement pursuant to <u>Article VIII</u>) but without limiting what is permitted by <u>Section 6.1(b)(iii)</u>, Seller shall, and shall cause its Affiliates to, (a) ensure that all Seller Held Coins (other than ETH Coins that are Staked Coins as of the date hereof) are freely transferable and not subject to any restrictions on transfer (including restrictions on transfer implemented through "smart contracts" or other technological means), (b) without limiting the foregoing, ensure that all Seller Held Coins (other than ETH Coins that are Staked Coins as of the date hereof) are unstaked prior to the Rebalancing Date, and (c) consult with Purchaser and its representatives, keep Purchaser and its representatives reasonably informed, and provide Purchaser and its representatives with draft documents reasonably in advance of execution or delivery thereof and incorporate any comments therein proposed in good faith by Purchaser or its representatives, in each case, in connection with any of the foregoing.

6.16    <u>Receipt of Misdirected Assets; Liabilities</u>. From and after the Closing, if Purchaser or Seller becomes aware that Seller or any of its Affiliates is in possession of any right, property or asset that is an Acquired Asset, such Party shall promptly inform the other Party of that fact. Thereafter, at the request of Purchaser, Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to

Purchaser or any other entities nominated by Purchaser for no consideration, and such asset will be deemed the property of Purchaser of any such nominees held in trust by Seller for Purchaser or any such nominees until so transferred. From and after the Closing, if Purchaser or Seller becomes aware that Purchaser or any of its Affiliates is in possession of any right, property or asset that is an Excluded Asset, such Party shall promptly inform the other Party of that fact. Thereafter, at the request of Seller, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Seller or any other entities nominated by Seller for no consideration, and such asset will be deemed the property of Seller of any such nominees held in trust by Purchaser for Seller or any such nominees until so transferred; underlined provided that if Purchaser discovers any items (or portions thereof) that would be Documents but for the fact that they relate to Excluded Assets, Purchaser shall use reasonable best efforts to destroy such items. Notwithstanding anything to the contrary herein or otherwise, if any amount (including any principal, interest, fees, expenses or penalties) is outstanding or unpaid under any Loan from or after the Closing, then such Loan, any agreements or documents entered into in connection therewith and any collateral posted in respect thereof shall be deemed Acquired Assets for all purposes under this Agreement and any other agreements or documents entered into in connection herewith, and Seller shall, and shall cause its Affiliates to, sell, transfer, assign, convey and deliver to Purchaser all of its and their right, title and interest in and to the foregoing, free and clear of all Encumbrances in the same manner as the other Acquired Assets under Section 1.1, *mutatis mutandis*, for no additional consideration and at no cost or expense to Purchaser or its Affiliates.

6.17    Acknowledgment by Purchaser.

(a)    Purchaser acknowledges and agrees that it has conducted to its full satisfaction an independent investigation and verification of the business, including its financial condition, results of operations, assets, Liabilities, properties, Contracts, regulatory compliance, business risks and prospects of Seller and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the Transactions, Purchaser and the Purchaser Group have relied solely on the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, Seller, any information, statements, disclosures, documents, Projections, forecasts or other material made available to Purchaser or any of its Affiliates or their respective Advisors in the Dataroom, the Information Presentation, or the Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Seller Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Seller Representations). Purchaser acknowledges and agrees that (i) the Express Seller Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the Transactions and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Seller Representations) including in the Dataroom, Information Presentation, Projections, meetings,

56

calls or correspondence with management of Seller, any of the Seller Parties or any other Person on behalf of Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of Seller's assets, are, in each case, specifically disclaimed by Seller, on its behalf and on behalf of the Seller Parties. Purchaser: (x) disclaims reliance on the items in <u>clause (ii)</u> in the immediately preceding sentence (which, for the avoidance of doubt, do not include any Express Seller Representations); and (y) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in <u>clause (i)</u> in the immediately preceding sentence. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees that neither Seller or any other Person (including the Seller Parties), has made, is making or is authorized to make, any representations or warranties, whether in written, electronic or oral form, express or implied with respect to, (1) any potentially material information regarding Seller or any of its assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (2) as to the quality, merchantability, fitness for a particular purpose, or condition of Seller's business, operations, assets, Liabilities, Contracts, regulatory compliance, business risks and prospects or any portion thereof, except, in each case, solely to the extent set forth in the Express Seller Representations.

(b)     Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of Seller, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of Seller, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "<u>Projections</u>"). Purchaser acknowledges and agrees that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Seller, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

6.18     <u>IT Migration</u>. From and after the date hereof until one hundred twenty (120) days after the Closing Date, upon Purchaser's request, Seller shall, and shall cause its Affiliates to, use reasonable best efforts to make available all relevant technical staff, employees and representatives of Seller and its Affiliates, including the Chief Technology Officer of Seller and its Affiliates, to Purchaser and its Affiliates, to (a) assist Purchaser and its Affiliates in understanding all Business Software and Business Accounts, (b) assist with the Integration Plan, (c) transition of all accounts with third party sites necessary to support the Voyager Platform and its associated mobile applications, (d) address the logistics of transferring the Business Software and Business Accounts to Purchaser, including providing Purchaser with access to all credentials to GitHub accounts and other repositories for storage of source code for the Business Software, and (e) any other technical assistance that Purchaser or any of its Affiliates deems reasonably necessary to enable all migrations, integrations and Transactions. Purchaser hereby grants Seller a limited, non-exclusive, non-transferable, non-sublicensable and revocable license to access and use the Business Software for the sole purpose of providing the support to Purchaser as contemplated in this <u>Section 6.18</u>. Seller and its Affiliates may not use, modify, share, disclose or revise such Business Software for any other purpose. Seller shall bear all costs and expenses

US-DOCS\137411268.27138346099.6

associated with the provision of such services on or prior to the Closing Date pursuant to this Section 6.18. Purchaser shall bear the reasonable and documented costs and expenses incurred by Seller in connection with the provision of such services during the 120-day period after the Closing Date pursuant to this Section 6.18. Seller can provide no assurance that Seller 's employees will elect to remain employed by Seller prior to or following the Closing and Seller will not be required to replace any such resigning employees.

6.19    Confidentiality.

(a)    Each Party acknowledges that Confidential Information has been, and in the future will be, provided to it in connection with this Agreement and the Transactions, including under Section 6.2.

(b)    Seller acknowledges that from and after the Closing, all non-public information relating to the Acquired Assets and the Assumed Liabilities will be valuable and proprietary to Purchaser and its Affiliates. Seller agrees that, from and after the Closing, Seller will not, and will cause their Affiliates and Advisors not to, directly or indirectly, without the prior consent of Purchaser, disclose to any Person any Confidential Information relating to Purchaser and its Affiliates, the Acquired Assets or the Assumed Liabilities.

(c)    Notwithstanding anything to the contrary herein, the provisions of this Section 6.19 will not prohibit any disclosure (i) required by applicable Law, Order or the rules of a securities exchange to which it is subject, (ii) in connection with a regulatory inquiry by a Governmental Body or self-regulatory organization, (iii) as necessary in connection with Seller's bankruptcy process or (iv) to each Party's Advisors who have been informed of the confidential nature of the information and have been instructed to keep such information confidential. Purchaser acknowledges and understands that this Agreement may be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders and that, except as prohibited herein, such disclosure will not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement or otherwise. Each Party agrees that such Party will be responsible for any breach or violation of the provisions of this Section 6.19 by any of such Party's Affiliates. Each Party acknowledges and agrees that the remedies at law for any breach or threatened breach of this Section 6.19 by Seller or Purchaser are inadequate to protect Purchaser or Seller and its Affiliates, as applicable, and that the damages resulting from any such breach are not readily susceptible to being measured in monetary terms. Accordingly, without prejudice to any other rights or remedies otherwise available to either Party or its Affiliates, each Party acknowledges and agrees that upon any breach or threatened breach by a Party of the terms and conditions of this Section 6.19, the other Party and its Affiliates, as applicable will be entitled to immediate injunctive relief and to seek an order restraining any threatened or future breach from any court of competent jurisdiction without proof of actual damages or posting of any bond in connection with any such remedy. The provisions of this Section 6.19 will survive the Closing and terminate two (2) years after the Closing Date.

6.20    Acquired Assets Owned by Non-Debtors. To the extent any item set forth in Schedule 6.20 or any other asset used in or relating to the Cryptocurrency custody and trading business of Seller constitutes property of Voyager IP, LLC, and, but for this Section 6.20, is of a type that would constitute an Acquired Asset (disregarding solely for this purpose any reference

to "of Seller" or other reference indicating ownership, licensing, holding, leasing or use of any type of Acquired Asset by Seller), Seller shall cause Voyager IP, LLC's right, title and interest in and to such item or asset to be transferred (for no additional consideration) to Purchaser reasonably promptly after Closing as an Acquired Asset as if transferred at the Closing in accordance with the other provisions of this Agreement, including by designating Voyager IP, LLC as an additional assignor under the Trademark and Domain Name Assignment Agreement.

6.21   Seller Expenses.

(a)   Purchaser shall (i) at the Closing bear as a component of the Purchase Price pursuant to Section 2.1(a), without duplication, the Seller Expenses or (ii) if this Agreement is validly terminated in accordance with its terms, pay to Seller, within three (3) Business Days following such termination, cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Seller in an amount equal to the Seller Expenses; provided that notwithstanding anything to the contrary herein, (A) in no event shall the aggregate amount of Seller Expenses payable by Purchaser hereunder exceed the Seller Expense Cap, (B) any fees and expenses (including reasonable and documented out-of-pocket financial advisor and legal fees, expenses and disbursements) incurred by Seller or any of its Affiliates, or otherwise relating to the activities or operations of Seller or any of its Affiliates, on or prior to the Seller Expense Start Date shall not constitute Seller Expenses, and (C) (x) if the Closing or the termination of this Agreement occurs on or prior to the Seller Expense Start Date, (y) if this Agreement is terminated pursuant to (1) Section 8.1(b) or Section 8.1(c) by Purchaser, or by Seller in circumstances where Purchaser would be entitled to terminate this Agreement pursuant to Section 8.1(e), or (2) Section 8.1(e), Section 8.1(g), Section 8.1(h) or Section 8.1(i), or (z) the Closing does not occur on or prior to the Seller Expense Start Date due to any act or omission by Seller or any of its Affiliates or any material breach of this Agreement by Seller, then in each case the Seller Expenses shall be zero (0).

(b)   For purposes of this Agreement, "Seller Expenses" means all reasonable and documented costs, fees, and expenses (including reasonable and documented out-of-pocket financial advisor and legal fees, expenses and disbursements) incurred by or behalf of any Debtor during the period beginning on the Seller Expense Start Date and ending on the earlier of (i) the Closing Date and (ii) the date on which this Agreement is validly terminated in accordance with its terms, in each case (A) solely in connection with maintaining its operations in the Ordinary Course or by professionals in connection with the Bankruptcy Case, (B) that Seller would not have otherwise incurred if the Closing had occurred on or prior to the Seller Expense Start Date, and (C) which fees and expenses of such professional are approved by the Bankruptcy Court.

6.22   Purchaser Expenses.

(a)   If this Agreement is terminated (i) by Seller pursuant to Section 8.1(c), in circumstances where Purchaser would be entitled to terminate this Agreement pursuant to Section 8.1(e), or (ii) pursuant to Section 8.1(e), Section 8.1(g), Section 8.1(h) or Section 8.1(i)(ix), then Seller shall pay to Purchaser, within three (3) Business Days following such termination, cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Purchaser in an amount equal to the Purchaser Expenses; provided that notwithstanding anything to the contrary herein, in no event shall the aggregate amount of

US-DOCS\137411268.27138346099.6

Purchaser Expenses payable by Seller hereunder exceed $5,000,000; provided further that if this Agreement is validly terminated by Seller pursuant to Section 8.1(g) (x) in order for Seller to pursue a Liquidation as a result of and following any Effect with respect to Purchaser's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, or any Effect with respect to Purchaser's Affiliates that has an Effect on Purchaser's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, that, individually or in the aggregate with all other such Effects, would reasonably be expected to (1) prevent or materially impair or materially delay the ability of Purchaser to consummate the Transactions in accordance herewith or (2) materially and adversely affect the Users, Eligible Creditors, or the Acquired Coins on the Binance.US Platform, including following the Closing, as compared to users and Coins on the Binance.US Platform as of the date hereof, and (y) such termination was not effected (1) in connection with a Higher and Better Offer or (2) because the estimated proceeds from such Liquidation are or would reasonably be expected to be greater than the Closing Date Payment (plus the fair market value of any Acquired Coins or any proceeds therefrom, in each case, as determined at the time Seller commences such Liquidation), then no Purchaser Expenses shall be payable.

(b)        For purposes of this Agreement, "Liquidation" means any combination of one or more of the following:  (i) a plan under chapter 11 of the Bankruptcy Code that provides for sales or liquidation of the Debtors' assets through a transaction (other than a sale of substantially all of the Debtors' assets to one purchaser on a going concern basis), including the Plan, (ii) one or more sales of assets pursuant to section 363 of the Bankruptcy Code other than a sale of substantially all of the Debtors' assets to one purchaser on a going concern basis, (iii) conversion of the Bankruptcy Case to cases under chapter 7 of the Bankruptcy Code, (iv) foreclosure or other exercise of remedies (including a deed in lieu of foreclosure) by or in favor of one or more creditors, (v) abandonment of the Debtors' assets to a creditor, or (vi) a dismissal of the Bankruptcy Cases.

(c)        For the purposes of this Agreement, "Purchaser Expenses" means all reasonable and documented fees and expenses (including reasonable and documented out-of-pocket legal fees, expenses and disbursements) incurred by Purchaser since August 5, 2022, in connection with, arising from or related to efforts to purchase the Acquired Assets (as defined in the Bidding Procedures Order), which, for the avoidance of doubt, includes its evaluation, negotiation and pursuit of the Transactions, this Agreement and the other documents and agreements contemplated hereby (the "Purchaser Bid Process").

(d)        All amounts payable to Purchaser pursuant to Section 6.22(a) upon termination of this Agreement shall be payable in cash by wire transfer of immediately available funds to such bank account as shall be designated by Purchaser in writing, and without the requirement of any notice or demand from Purchaser or any application to or order of the Bankruptcy Court other than the Agreement Order.

# ARTICLE VII
## CONDITIONS TO CLOSING

7.1    <u>Conditions Precedent to the Obligations of Purchaser and Seller</u>. The respective obligations of each Party to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    there shall be no Law or Order (including any temporary restraining order or preliminary or permanent injunction) in effect restraining, enjoining, making illegal or otherwise prohibiting the Transactions;

(b)    the Bankruptcy Court shall have entered the Agreement Order, which Agreement Order shall (i) be in form and substance reasonably acceptable to Purchaser, (ii) comply in all respects with <u>Section 5.1(b)</u>, and (iii) be a Final Order; and

(c)    the Bankruptcy Court shall have entered the Confirmation Order, in form and substance, solely with respect to matters relating to this Agreement or the Transactions, reasonably acceptable to Purchaser, confirming a Plan in form and substance, solely with respect to matters relating to this Agreement or the Transactions, reasonably acceptable to Purchaser, and the Confirmation Order shall be a Final Order.

7.2    <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    (i) the representations and warranties of Seller set forth in <u>Article III</u> (in each case, other than the Fundamental Representations and the representations and warranties set forth in <u>Section 3.16(a)</u>) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be so true and correct only as of such date **and; provided that any representations and warranties that are made as of any Delivery Date (solely to the extent made as of any Delivery Date) shall be excluded from this Section 7.2(a) altogether, and** (y) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; <u>provided</u> that for purposes of the immediately preceding clause (i), the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect; (ii) the representations and warranties set forth in <u>Section 3.1(a)</u> (*Organization and Qualification*), <u>Section 3.2</u> (*Authorization of Agreement*), <u>Section 3.3(a)(i)</u> (*Conflicts; Consents*), <u>Section 3.6(a)</u> (*Exclusive Ownership*), and <u>Section 3.14</u> (*Brokers*) (collectively, the "<u>Fundamental Representations</u>") shall be true and correct in all but *de minimis* respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all but *de minimis* respects only as of such date; and (iii) the

representations and warranties set forth in Section 3.16(a) shall be true and correct in all respects as of the date hereof and as of the Closing Date as though made on and as of the Closing Date;

(b)     Seller shall not have materially breached any of the covenants required to be performed or complied with by Seller under this Agreement on or prior to the Closing; provided that notwithstanding the foregoing, Seller shall have performed or caused to be performed, in all respects, all of the obligations and covenants required by Section 6.15(a) and (b); and

(c)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.4.

7.3     Conditions Precedent to the Obligations of Seller. The obligations of Seller to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     the representations and warranties made by Purchaser in Article IV shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be so true and correct only as of such date and (y) where the failure of such representations or warranties to be so true and correct has not and would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions; provided that for purposes of this Section 7.3(a), the qualifications as to materiality, material adverse effect and words of similar import contained in such representations and warranties shall not be given effect;

(b)     Purchaser shall not have materially breached any of the covenants required to be performed or complied with by Purchaser under this Agreement on or prior to the Closing; and

(c)     Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 2.5.

7.4     Waiver of Conditions.  Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. Neither Purchaser nor Seller may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's material breach of any covenant, representation or warranty hereunder.

US-DOCS\137411268.27138346099.6

# ARTICLE VIII

# TERMINATION

8.1    <u>Termination of Agreement</u>. This Agreement may be terminated only in accordance with this <u>Section 8.1</u>. This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Purchaser;

(b)    by written notice of either Purchaser or Seller, upon the issuance of an Order by a Governmental Body restraining, enjoining or otherwise prohibiting the consummation of the Transactions or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; <u>provided</u> that no termination may be made by a Party under this <u>Section 8.1(b)</u> if the issuance of such Order was caused by such Party's material breach of any of its representation, warranties, covenants or agreements hereunder;

(c)    by written notice of either Purchaser or Seller, if the Closing shall not have occurred on or before the date that is four (4) months following the date hereof (the "<u>Outside Date</u>"); <u>provided</u> that Purchaser may, at its election and upon written notice to Seller, elect to extend the Outside Date for an additional thirty (30) days (such extended date, the "<u>Extended Outside Date</u>"); <u>provided</u> <u>further</u> that a Party shall not be permitted to terminate this Agreement, or extend the Outside Date, pursuant to this <u>Section 8.1(c)</u> if the failure of the Closing to have occurred by the Outside Date or Extended Outside Date, as applicable, was caused by such Party's material breach of any of its representation, warranties, covenants or agreements;

(d)    by written notice from Seller to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser is or will have become untrue, in each case, such that the conditions set forth in <u>Section 7.1</u> or <u>Section 7.3</u> would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; <u>provided</u> that (i) if such breach is curable by Purchaser then Seller may not terminate this Agreement under this <u>Section 8.1(d)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date or Extended Outside Date, if any, and (B) thirty (30) days after Seller notifies Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(d)</u> will not be available to Seller at any time that Seller is in material breach of, any covenant, representation or warranty hereunder;

(e)    by written notice from Purchaser to Seller, upon a breach of any covenant or agreement on the part of Seller, or if any representation or warranty of Seller is or will have become untrue, in each case, such that the conditions set forth in <u>Section 7.2(a)</u> or <u>Section 7.2(b)</u> would not be satisfied; <u>provided</u> that (i) if such breach is curable by Seller then Purchaser may not terminate this Agreement under this <u>Section 8.1(e)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date or Extended Outside Date, if any, and (B) thirty (30) days after Purchaser notifies Seller of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(e)</u> will not be available to

US-DOCS\137411268.27138346099.6

Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(f)     by written notice from Seller to Purchaser, if (A) all of the conditions set forth in Sections 7.1 and 7.2 have been and continue to be satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived, (B) Seller has confirmed in writing to Purchaser that all of the conditions set forth in Sections 7.1 and 7.2 have been and continue to be satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Seller stands ready, willing and able to consummate the Closing so, and (C) Purchaser fails to consummate the Closing within three (3) Business Days of its receipt of such written notice from Seller;

(g)     by written notice from Seller to Purchaser, which may be revocable in the sole discretion of Seller by written notice from Seller to Purchaser within five (5) Business Days, if Seller or the board of directors (or similar governing body) of Seller determine, in good faith and after consultation with its legal and other advisors, that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties; provided that if such determination is in connection with an Acquisition Proposal, Seller may only terminate this Agreement pursuant to this Section 8.1(g) upon compliance with the provisions set forth in Section 5.2(c);

(h)     by written notice from Purchaser to Seller, if (A) Seller seeks or otherwise take material steps in furtherance of, or do not use reasonable best efforts to oppose any other Person in seeking, an order of the Bankruptcy Court dismissing the Bankruptcy Case or converting the Bankruptcy Case to a petition for relief under Chapter 7 of the Bankruptcy Code, (B) the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Seller is appointed in the Bankruptcy Case or (C) the Bankruptcy Court enters an order pursuant to section 362 of the Bankruptcy Code lifting the automatic stay with respect to any Acquired Assets; or

(i)     by written notice from Purchaser to Seller, if:

(i)     the Agreement Order is not entered by January 611, 2023;

(ii)     the Plan Solicitation Motion and the Amended Disclosure Statement are not filed with the Bankruptcy Court by December 21, 2022;

(iii)     the Plan Solicitation Order is not entered by January 611, 2023;

(iv)     the Confirmation Order is not entered by March 16, 2023;

(v)     Seller or any of the other Debtors file any motions, pleadings, notices or other documents with the Bankruptcy Court in material breach of Section 5.7;

64

(vi)    Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser, or the Bankruptcy Court approves an Alternative Transaction other than with Purchaser;

(vii)    Seller has delivered a Higher Offer Determination Notice to Purchaser;

(viii)    Seller or its Affiliates or Advisors have committed a breach of Section 5.1(a); or

(ix)    Seller or its Affiliates or Advisors have committed a breach of, Section 5.2; provided that (without modifying Purchaser's rights to terminate this Agreement under any other Section of this Agreement) Purchaser shall not be entitled to terminate this Agreement pursuant to this Section 8.1(i)(ix) following entry of the Agreement Order by the Bankruptcy Court.

8.2    Effect of Termination.

(a)    In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and there shall be no Liability on the part of either Party or any of its partners, officers, directors or shareholders; provided that Section 2.2, Section 6.2(b), Section 6.12(c), Section 6.19, Section 6.21, Section 6.22, this Section 8.2, Section 8.3, Section 8.4 and Article X (other than Section 10.12 with respect to the availability of an injunction or injunctions, specific performance or other equitable relief to cause the Closing to occur, which shall terminate upon any termination of this Agreement) and the definitions referenced in such Sections and Articles, even if not included in such Sections and Articles, and, for the avoidance of doubt, the Confidentiality Agreement, shall survive any such termination; provided further that, subject to Section 8.3, no termination will relieve either Party from any Liability for damages (including damages based on the loss of the economic benefits of the Transactions, including the Purchase Price, to Seller), losses, costs, or expenses (including reasonable legal fees and expenses) resulting from any willful breach of this Agreement by such Party prior to any such termination or Fraud by such Party. For purposes of this Agreement, "willful breach" means with respect to any breaches or failures to perform any of the covenants or other agreements contained herein, a material breach that is a consequence of an act or failure to act undertaken by the breaching Person with actual knowledge (which shall not be deemed to include knowledge of facts that a Person acting reasonably should have, based on reasonable due inquiry) that such Person's act or failure to act would, or would reasonably be expected to, result in or constitute a material breach of this Agreement.

(b)    If this Agreement is terminated prior to the Closing, at any time following such termination, promptly following the written request of Seller, Purchaser shall, as soon as practicable, return, destroy or permanently erase (on all forms of physical and electronic media) all Acquired User Data transferred to Purchaser prior to the Closing in accordance with Section 6.6(a) or otherwise in connection with the KYC Procedures and permanently close and remove any account established with or with reference to any Acquired User Data, and, upon written request from Seller following any destruction or erasure of data, provide an officer's certificate certifying as to such destruction or erasure. Such destruction or erasure shall be in

accordance with all Laws regarding data disposal, and the eradication and destruction technique used will be appropriate for the storage medium and format. Notwithstanding the foregoing, Purchaser shall have the right to retain a copy of the Acquired User Data to the extent required for legal, regulatory or compliance purposes, so long as such Acquired User Data is kept confidential as required under this Agreement and the Confidentiality Agreement and is used for no other purpose.

8.3     Reverse Termination Fee. In the event that (a) the conditions set forth in Sections 7.1(b), 7.1(c), and 7.2 have been satisfied or duly waived and (b) (i) this Agreement is validly terminated in accordance with Section 8.1(b) or Section 8.1(c), (ii) Purchaser fails to consummate the Closing by the Outside Date or the Extended Outside Date, as applicable, as a result of the failure of the conditions set forth in Section 7.1(a), or (iii) this Agreement is terminated pursuant to Section 8.1(g) in connection with and following a Purchaser Development and not in connection with a Higher and Better Offer, then, in any such case, within three (3) Business Days following such valid termination the Deposit (including all received investment income, if any) shall be released to Seller (such release, which, for the avoidance of doubt, shall be equal to and shall not exceed $10,000,000 in the aggregate, the "Reverse Termination Fee").

8.4     Further Effect of Termination. Notwithstanding anything to the contrary in this Agreement, the Confidentiality Agreement or any other document or instrument delivered by either Party in connection with the Transactions, but subject in all respects to the other provisions of this Section 8.4:

(a)     Seller, on behalf of itself and the Seller Parties, acknowledges and agrees that any disbursement of the Deposit to Seller pursuant to Section 2.2(b), payment of any Seller Expenses to Seller pursuant to Section 6.21 or payment of the Reverse Termination Fee pursuant to Section 8.3 shall be deemed liquidated damages and shall be the sole and exclusive recourse of Seller and the Seller Parties against Purchaser and the Purchaser Group for any loss or damage suffered in connection with, relating to or arising out of this Agreement or the Transactions (including circumstances giving rise to any termination of this Agreement) and including losses or damages suffered as a result of any breach of this Agreement or any representation, warranty, covenant or agreement contained herein by Purchaser or the failure of the Transactions to be consummated (whether or not for intentional, unintentional or willful breach or otherwise), except in the event Seller is entitled to elect specific performance of Purchaser's obligations (including to consummate the Transactions) pursuant to Section 10.12.

(b)     In the event of a valid termination of this Agreement pursuant to Section 8.1, if Seller is entitled to receive the Deposit pursuant to Section 2.2, payment of any Seller Expenses pursuant to Section 6.21, or payment of the Reverse Termination Fee pursuant to Section 8.3, then, upon release of the Deposit to Seller in accordance with Section 2.2(b), payment of such Seller Expenses pursuant to Section 6.21 or payment of the Reverse Termination Fee pursuant to Section 8.3, as applicable, (i) Purchaser and the Purchaser Group shall not have any further liability or obligation relating to or arising out of this Agreement or the Transactions (including any liability or obligation for monetary damages) and (ii) neither Seller nor any of the Seller Parties will have any right of recovery, whether arising under contract Law, tort Law or any other theory of Law, against, and no personal liability shall attach to Purchaser or any other member of the Purchaser Group, whether by or through attempted piercing of the

66

corporate, limited partnership or limited liability company veil, by the enforcement of any assessment or by any legal or equitable Action, by virtue of any statute, regulation or applicable Law, or otherwise.

(c)    **In the event that the Closing does not occur:**  (i) The maximum aggregate liability of Purchaser and the Purchaser Group in connection with this Agreement and the Transactions shall be limited to the sum of (x) (1) solely where and to the extent the Deposit is forfeited by Purchaser in accordance with Section 2.2(b), the Deposit or (2) without duplication of any forfeiture of the Deposit pursuant to Section 2.2(b) and solely where and to the extent the Reverse Termination Fee is payable in accordance with Section 8.3, the Reverse Termination Fee, plus (y)  solely where and to extent the Seller Expenses are payable in accordance with Section 6.21, the Seller Expenses; (ii) in no event shall Purchaser be obligated to pay any of the Deposit, the Seller Expenses or the Reverse Termination Fee on more than one occasion and (iii) under no circumstances will any of Seller or any of the Seller Parties seek, obtain or accept, monetary damages or losses of any kind (including damages for the loss of the benefit of the bargain, opportunity cost, loss of premium, time value of money or otherwise, or any consequential, special, expectancy, indirect or punitive damages or any losses or damages based on a multiple or multiplier) in connection with, relating to or arising out of the termination of this Agreement in excess of the sum of (A) (1) solely where and to the extent the Deposit is forfeited in accordance with Section 2.2(b), the Deposit or (2) without duplication of any forfeiture of the Deposit pursuant to Section 2.2(b) and solely where and to the extent the Reverse Termination Fee is payable in accordance with Section 8.3, the Reverse Termination Fee, plus (B) solely where and to the extent the Seller Expenses are payable in accordance with Section 6.21, the Seller Expenses; provided, however, that the foregoing shall not been interpreted to limit in any way Seller's right to require specific performance of Purchaser's obligations (including to consummate the Transactions) pursuant to Section 10.12 in the event this Agreement has not been terminated and to the extent such specific performance is available to Seller under Section 10.12.  Notwithstanding anything to the contrary herein or otherwise, in no event shall Seller be entitled to receive both (1) the forfeiture of the Deposit together with all received investment income, if any, pursuant to Section 2.2(b) and (2) the payment of the Reverse Termination Fee pursuant to Section 8.3 (it being acknowledged that the payment of the Reverse Termination Fee pursuant to Section 8.3 includes forfeiture of the Deposit together with all received investment income, if any).

(d)    Seller may seek both payment of monetary damages (including the Reverse Termination Fee, the Deposit or the Seller Expenses) in accordance with this Agreement, on the one hand, and specific performance of Purchaser's obligation to consummate the Closing pursuant to Section 10.12; provided that in no event shall Seller be entitled to receive both (1) payment of monetary damages (including the Reverse Termination Fee, the Deposit or the Seller Expenses) in accordance with this Agreement (and for the avoidance of doubt, subject to the other limitations thereon set forth in this Section 8.4) and (2) such specific performance pursuant to Section 10.12.

US-DOCS\137411268.27138346099.6

# ARTICLE IX

## TAXES

9.1     Transfer Taxes. Any sales, use, purchase, transfer, deed, stamp, documentary or other similar Taxes and recording charges (but excluding any such Taxes or charges that are based in whole or in part upon income, profits or gains) payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "Transfer Taxes") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes.

9.2     Cooperation. Purchaser and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes. In furtherance thereof, Purchaser and Seller shall reasonably cooperate in good faith to determine and agree to the tax treatment to each of them and to the Users of the Transactions, provided that agreeing on consistent tax treatment shall not be a closing condition and neither Party shall have any liability under this Agreement if the Parties are unable to so agree.

9.3     Preparation of Tax Returns and Payment of Taxes.

(a)     Except as otherwise provided by Section 9.1, Seller shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets for any Tax period ending on or before the Closing Date and (ii) all Tax Returns of Seller (including, for the avoidance of doubt, for any Straddle Period, but not including, for the avoidance of doubt, information returns). With respect to any such Tax Return that reflects any Tax that is an Assumed Liability (not including, for the avoidance of doubt, any income Tax Return of Seller or Seller's Affiliates for any tax period and not including any information Tax Return), Seller shall use reasonable best efforts to (x) prepare such Tax Returns consistent with past practice, except as otherwise required by applicable Law, (y) provide Purchaser with a draft of such Tax Returns at least ten (10) days prior to the filing of any such Tax Return, and (z) incorporate any changes reasonably requested by Purchaser with respect to such Tax Returns prior to filing. Except to the extent any Tax reflected on a return required to be prepared and filed by Seller pursuant to this Section 9.3 constitutes an Assumed Liability, Seller shall be responsible for paying any Taxes reflected on any Tax Return that Seller is obligated to prepare and file under this Section 9.3(a). Notwithstanding anything herein to the contrary: (i) nothing in this Agreement shall give Purchaser or its Affiliates any rights with respect to or control over any income Tax Return of Seller or Seller's Affiliates for any tax period (any such Tax Return, a "Seller Income Tax Return"), and (ii) if any Governmental Body approaches (including by way of initiating any audit, investigation, or other proceeding) either Party with respect to the income Tax characterization of the Transactions (any such action, a "Transaction-Related Action"), then the Party in receipt of such notice shall reasonably promptly inform the other Party of such Transaction-Related Action.

(b)     Purchaser shall prepare and timely file all Tax Returns with respect to the Acquired Assets that are not addressed by Section 9.3(a) (including, for the avoidance of doubt, all Tax Returns with respect to the Acquired Assets for any taxable period beginning after the

Closing Date). With respect to any such Tax Return for any Straddle Period that reflects any Tax that is an Excluded Liability (each, a "Relevant Tax Return"), Purchaser shall prepare such Relevant Tax Returns and shall provide Seller with a draft of such Relevant Tax Returns at least ten (10) days prior to the filing of any such Tax Return. Purchaser shall incorporate any changes reasonably requested by Seller with respect to such Tax Returns. Seller shall be responsible for paying any Taxes reflected on any Tax Return that Purchaser is obligated to prepare and file under this Section 9.3(b) to the extent such Taxes constitute Excluded Liabilities.

(c)     Purchaser shall not file any amendment to any previously filed Tax Return with respect to the Acquired Assets for any Pre-Closing Tax Period that would have the effect of increasing any Tax due for a Pre-Closing Tax Period or portion of a Straddle Period ending on the Closing Date, in each case, that is an Excluded Liability, unless Purchaser receives an opinion from a nationally recognized accounting firm or law firm that there is no adequate "reporting position" with respect to any previously-asserted position with respect to Taxes. Upon such determination, Purchaser shall provide no less than forty-five (45) days' notice of such position before filing any such Tax Return. In the event Seller disagrees with such Tax position, and the dispute cannot be resolved between the Parties, such dispute shall be submitted to an independent national accounting firm or law firm for resolution, with the costs of such resolution to be evenly split by Purchaser and Seller. The determination of such independent national accounting firm or law firm shall be binding on both Parties and any Tax Return shall be filed consistently with such resolution.

(d)     For all purposes under this Agreement, in respect of any Straddle Period, the portion of Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date will be: (i) in the case of any Taxes other than those described in clause (ii) below, deemed to include the amount that would be payable if the relevant Straddle Period ended on and included the Closing Date; and (ii) in the case of any property Taxes and other similar Taxes, deemed to include the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the number of days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

(e)     Notwithstanding anything herein to the contrary, prior to the Closing, Seller and its Affiliates may contribute, assign or otherwise transfer the 3AC Loan to any third-party purchaser, trust or other entity.

## ARTICLE X

### MISCELLANEOUS

10.1     Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and

agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years and (b) are an integral part of the Transactions and that, without the agreements set forth in this <u>Section 10.1</u>, neither of the Parties would enter into this Agreement.

      10.2   <u>Expenses</u>. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, <u>Section 8.2</u>), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that all Transfer Taxes will be allocated pursuant to <u>Section 9.1</u> and (c) all Cure Costs will be allocated pursuant to <u>Section 5.4</u>.

      10.3   <u>Notices</u>. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

      <u>Notices to Purchaser</u>:

      BAM Trading Services, Inc. d/b/a Binance.us
      611 Cowper Street, Suite 400
      Palo Alto, CA 94301
      Attention:    Norman Reed, General Counsel
      Email:       norman.reed@binance.us;
                legal@binance.us

70

with a copy to (which shall not constitute notice):

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:    Robert M. Katz
              Daniel Mun
              Adam J. Goldberg
              Andrew D. Sorkin
              **Jenny Cieplak**
Email:        Robert.Katz@lw.com
              Daniel.Mun@lw.com
              Adam.Goldberg@lw.com
              ~~Andrew.Sorkin~~**Andrew.Sorkin@lw.com**
              **Jenny.Cieplak**@lw.com

Notices to Seller:

Voyager Digital, LLC
33 Irving Place, 3rd Floor
New York, NY 10003
Attention:    Stephen Ehrlich
              David Brosgol
Email:        sehrlich@investvoyager.com
              dbrosgol@investvoyager.com

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:    Joshua A. Sussberg, P.C.
              Christine A. Okike, P.C.
              Christopher Marcus, P.C.
              Jonathan L. Davis, P.C.
              Steve Toth
              Eduardo M. Leal
              Allyson B. Smith
Email:        joshua.sussberg@kirkland.com
              christine.okike@kirkland.com
              cmarcus@kirkland.com
              jonathan.davis@kirkland.com
              steve.toth@kirkland.com
              eduardo.leal@kirkland.com
              allyson.smith@kirkland.com

71

10.4    <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Agreement Order, the Plan and the Confirmation Order, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; <u>provided</u> that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Seller, and any attempted assignment or delegation without such prior written consent shall be null and void; <u>provided</u> <u>further</u> that Purchaser shall be entitled to assign or delegate this Agreement or all or any part of its rights or obligations hereunder to any of its Affiliates; <u>provided</u> <u>further</u> that in each case no such assignment or delegation shall relieve Purchaser of any of its obligations hereunder.

10.5    <u>Amendment and Waiver</u>. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Seller or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default. Except where a specific period for action or inaction is provided herein, no delay on the part of either Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

10.6    <u>Third Party Beneficiaries</u>. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement is intended or will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    <u>Non-Recourse</u>. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future direct or indirect equityholder, shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of either Party will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction. To the extent permitted by applicable Law, each Party waives any provision of Law that renders any provision of this Agreement invalid or unenforceable in any respect.

10.9    <u>Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction

will be applied against any Person. The table of contents and headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10   <u>Schedules</u>. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; <u>however</u>, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, to the extent it is readily apparent on its face without the need for a cross-reference. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and neither Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by either Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11   <u>Complete Agreement</u>. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements between the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12   <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if either of the Parties fails to take any action required of it

US-DOCS\137411268.27138346099.6

hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Seller nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that either Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order. Except as limited by <u>Section 8.4(d)</u>, (i) the remedies available to Seller pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and (ii) the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit Seller from seeking to collect or collecting damages. If, prior to the Outside Date or Extended Outside Date, if any, either Party brings any action, in each case in accordance with <u>Section 10.13</u>, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date or Extended Outside Date, if any, will automatically be extended (y) for the period during which such action is pending, <u>plus</u> ten (10) Business Days or (z) by such other time period established by the court presiding over such action, as the case may be.

10.13   <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the Transactions brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) ((a) and (b), the "<u>Chosen Courts</u>"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the Transactions. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in <u>Section 10.3</u>. Nothing in this Agreement will affect the right of either Party to serve process in any other manner permitted by Law.

US-DOCS\~~137411268.27~~138346099.6

10.14    <u>Governing Law; Waiver of Jury Trial</u>.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the Transactions will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15    <u>No Right of Set-Off</u>. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

10.16    <u>Counterparts and PDF</u>. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any

75

agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17    <u>Publicity</u>. The initial press release regarding this Agreement and the Transactions (the "<u>Press Release</u>") shall be made promptly following the execution and delivery of this Agreement and shall be in such form as the Parties mutually agree. Except as contemplated by the Commercial Covenants, and subject in all respects to <u>Section 10.19</u>, none of Seller and the Seller Parties shall issue any press release or public announcement (directly or indirectly) concerning this Agreement, the Transactions, the Acquired Assets, the Assumed Liabilities, the Purchaser Bid Process or any other matters related thereto or arising in connection therewith without obtaining the prior written approval of Purchaser (which approval will not be unreasonably withheld, conditioned or delayed) unless, (a) in the reasonable judgment of Seller after consultation with counsel (who may be in-house counsel), disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or the Plan or (b) to correct any misstatement of fact made by Purchaser in any communication pursuant to the immediate next sentence; <u>provided</u> that Seller shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with Purchaser with respect to the disclosure thereof. Following the publication of the Press Release, Purchaser shall be permitted to make one or more public statements or issue one or more press releases, in each case, regarding the Acquired Assets and the Assumed Liabilities, this Agreement, the Transactions and the Purchaser Bid Process or any other matter related thereto or arising therefrom or otherwise in connection therewith to the extent not in violation of the Confidentiality Agreement and not in disparagement of Seller or any Seller Party; <u>provided</u> that Purchaser shall use its reasonable best efforts (considered in light of the circumstances in which such disclosure is to be made) to consult in good faith with Seller prior to making any such disclosure.

10.18    <u>Bulk Sales Laws</u>. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Confirmation Order. In furtherance of the foregoing, to the extent permitted by applicable Laws, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

10.19    <u>Fiduciary Obligations</u>. Nothing in this Agreement, or any document related to the Transactions, will require Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations; <u>provided</u>, <u>however</u>, that no such action or inaction

76

shall be deemed to prevent Purchaser from exercising any termination rights it may have hereunder as a result of such action or inaction.

10.20    No Solicitation. This Agreement, the Plan and the transactions contemplated herein and therein are the product of negotiations between the Parties. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, (a) a solicitation of votes for the acceptance of the Plan or any other plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act or the Exchange Act and Seller will not solicit acceptances of the Plan from any party until such party has been provided with copies of a disclosure statement containing adequate information as required by section 1125 of the Bankruptcy Code.

10.21    Acknowledgment. Notwithstanding anything in this Agreement to the contrary (including Section 3.17, Section 3.18, Section 4.10, Section 4.11, Section 6.17 and Section 10.1), nothing herein shall relieve any Person from any Liability on account of Fraud.

## ARTICLE XI

### ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1    Certain Definitions.

(a)    "3AC Loan" means that certain Master Loan Agreement, dated March 4, 2022, by and between Three Arrows Capital, Ltd., as borrower, and Seller and HTC Trading, Inc., as lenders, and Seller in its capacity as administrative agent for the lenders.

(b)    "Acquired Coins" means, collectively, all Seller Held Coins (other than Withheld Coins) as of the Rebalancing Date and following the completion of the Rebalancing Exercise in accordance with this Agreement, and after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring such Coins to Purchaser in accordance with Section 2.4(b).

(c)    "Acquired Coins Value" means, with respect to any Acquired Coin of any type, the VWAP of such Coin determined as of two Business Days prior to the Rebalancing Date, *after taking into account gas or other transaction fees incurred and paid by Seller* **or any of its Affiliates in connection with transferring such Coins to Purchaser in accordance with Section 2.4(b)**.

(d)    "Action" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination, assessment, notice of violation, citation or investigation, of any kind whatsoever (civil, criminal, administrative, regulatory, investigative, appellate or otherwise), regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or

whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

(e)     "<u>Additional Bankruptcy Distributions</u>" means any distributions proposed to be made by the Debtors or any successor thereto to Users or Eligible Creditors after the Closing Date, whether made pursuant to the Plan (including distributions in cash or Coins) or otherwise.

(f)     "<u>Advisors</u>" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(g)     "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(h)     "<u>Alternative Transaction</u>" means any transaction (or series of transactions), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition of Seller or any of its Affiliates or any portion of the equity interests or any material portion of the assets thereof (in any form of transaction, whether by merger, sale of assets or equity or otherwise).

**(i)     "Asset Migration Date" means, with respect to any User or Eligible Creditor, as applicable, who has satisfied the requirements set forth in Section 6.10 and Section 6.12(b) for onboarding to the Binnace.US Platform, the date that is five (5) Business Days following the date on which Seller has delivered to Purchaser the Acquired Coins or cash to be distributed by Purchaser to such User or Eligible Creditor, as applicable, pursuant to this Agreement.**

**(j)**     ~~(i)~~ "<u>Bidding Procedures Order</u>" means the *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation and (V) Granting Related Relief* [Docket No. 248].

**(k)**     ~~(j)~~ "<u>Binance.US Platform</u>" means Purchaser's and its Affiliates' Binance.US Cryptocurrency savings and trading platform or any successor platform thereto.

**(l)     "BUSD" means a Binance branded stablecoin issued by Paxos Trust Company, approved and regulated by the New York State Department of Financial Services.**

**(m)** ~~(k)~~ "Business Accounts" means any and all accounts or registries that Seller owns, maintains or controls with third party vendors, software providers, service providers and other similar third parties that is related to the businesses of Seller.

**(n)** ~~(l)~~ "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

**(o)** ~~(m)~~ "Business Software" means any and all proprietary Software owned by (or purported to be owned by) Seller that is related to the businesses of Seller, other than the VGX Token Smart Contracts.

**(p)** ~~(n)~~ "Cash and Cash Equivalents" means all of Seller's cash (including deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, or any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

**(q)** ~~(o)~~ "Code" means the United States Internal Revenue Code of 1986.

**(r)** ~~(p)~~ "Coin" means, with respect to any type of Cryptocurrency, one coin or token or full unit of such Cryptocurrency (*e.g.*, one (1) Bitcoin; provided that, notwithstanding anything to the contrary herein, for purposes of this Agreement, (i) references to "Coins" shall mean more than one Coin and may include fractional Coins in excess of one (1) Coin, and (ii) as the context requires, "Coin" may refer to a fraction of one (1) Coin.

**(s)** ~~(q)~~ "Commercial Covenants" means, collectively, Sections 6.6, 6.10, 6.11, 6.12, ~~6.13~~6.12(f), 6.14 and 6.15.

**(t)** ~~(r)~~ "Confidential Information" means any information relating to the business, financial or other affairs (including future plans and targets) of either Party or any of its Affiliates; provided, however, that "Confidential Information" will not include any information that (i) is or becomes (other than as a result of disclosure by either Party or any of its Affiliates in violation of this Agreement) generally available to, or known by, the public, (ii) is independently developed by a Party or any of its Affiliates without use of or reference to information that would be "Confidential Information" but for the exclusions set forth in this proviso or (iii) is received by a Party or any of its Affiliates from a third party not known by such receiving Party or any of its Affiliates after reasonable inquiry to be bound by a duty of confidentiality to such other Party or any of its Affiliates with respect to such information.

**(u)** ~~(s)~~ "Confidentiality Agreement" means that certain letter agreement, dated as of August 2, 2022, by and between Parent and BAM Management US Holdings, Inc.

**(v)** ~~(t)~~ "Confirmation Order" means an Order of the Bankruptcy Court reasonably acceptable to the Parties pursuant to section 1129 of the Bankruptcy Code, which Order shall, among other things and without limitation, (A) confirm the Plan in a form reasonably acceptable to, solely to the extent related to this Agreement and the Transactions (but

not with respect to the matters contemplated by <u>Section 6.11(c)</u>), Purchaser and Seller, as may have been amended, supplemented or otherwise modified, solely to the extent related to this Agreement and the Transactions (but not with respect to the matters contemplated by <u>Section 6.11(c)</u>), with the consent of Purchaser (such consent not to be unreasonably withheld, delayed or conditioned), (B) approve, pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Seller of its obligations under this Agreement, (C) authorize and empower Seller to assume and assign to Purchaser the Assigned Contracts, (D) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (E) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity (including under applicable Money Transmitter Requirements or any securities or commodities Laws of any Governmental Body), (F) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts, (G) find that Purchaser shall have no Liability for any Excluded Liability, and (H) find that Seller has title to, and the ability to sell, transfer and assign, Acquired Coins and Additional Bankruptcy Distributions, in each case, in accordance with the terms and conditions hereof.

      **(w)** ~~(u)~~ "<u>Consent</u>" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

      **(x)** ~~(v)~~ "<u>Contract</u>" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than a purchase order, service order, sales order or Money Transmitter License.

      **(y)** ~~(w)~~ "<u>Credit Matter</u>" means any loan or other type of credit exposure or loan-like instrument.

      **(z)** ~~(x)~~ "<u>Cryptocurrency</u>" means a digital or crypto currency, asset, token or coin in which transactions are verified and records are maintained by a decentralized system using cryptography, rather than by a centralized authority.

      **(aa)** **"<u>Delivery Date</u>" means, with respect to any Delayed Acquired Coin, the date, if any, on which such Delayed Acquired Coin is delivered to Purchaser in accordance with (i) Section 2.4(b)(i), (ii) the last sentence of Section 6.12(a) or (iii) Section 6.12(b), as applicable.**

**(bb)** ~~(y)~~ "Deposited Coins" means, with respect to each User as of the Petition Date, the total number of Coins of each type owed to such User with respect to such User's ~~deposits~~**Coins deposited** on the Voyager Platform as of the Petition Date, as set forth on the Seller Statement.

**(cc)** ~~(z)~~ "Deposited Coins Value" means, with respect to any Deposited Coin of any type, the ~~VWAP~~**price** of such Coin ~~determined~~ as of **0:00 U.T.C. on** the Petition Date~~.~~**, as set forth under Section 4(m) of the "Global Notes and Overview of Methodology" included in the *Schedule of Assets and Liabilities of Voyager Digital, LLC (Case No. 22-10945)* [Docket No. 7] as filed in the Bankruptcy Court on the docket in the Bankruptcy Case.**

**(dd)** ~~(aa)~~ "Disclosure Statement" means the disclosure statement for the Plan approved by the Bankruptcy Court pursuant to the Plan Solicitation Order (including all exhibits and schedules thereto).

**(ee)** ~~(bb)~~ "Documents" means all of Seller's written files, documents, instruments, papers, books, reports, records, accounts, accounting records, financial statements, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

**(ff)** ~~(cc)~~ "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, servitudes, restrictive covenants, rights of way, rights of use or possession, rights of first offer or first refusal, third party interest, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

**(gg)** ~~(dd)~~ "Environmental Laws" means all applicable Laws concerning pollution or protection of the environment.

**(hh)** ~~(ee)~~ "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

**(ii)** ~~(ff)~~ "ERISA" means the Employee Retirement Income Security Act of 1974.

**(jj)** ~~(gg)~~ "ETH Coins" means Ether Coins, being the native Cryptocurrency of the Ethereum Network (symbol: ETH).

**(kk)**    **(hh)** "Existing User" means as of a particular date any User for which Seller has provided on or prior to such date all data and information reasonably necessary for Purchaser to validate that such User or any Affiliate of such User has a Cryptocurrency account on the Binance.US Platform.

**(ll)**    **(ii)** "Exchange Act" means the Exchange Act of 1934 and the rules and regulations promulgated thereunder.

**(mm)**    **(jj)** "Final Order" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending; or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; <u>provided</u> that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

**(nn)**    **(kk)** "Fraud" means an act committed by (a) Seller, in the making to Purchaser of the Express Seller Representations and (b) Purchaser, in the making to Seller of the Express Purchaser Representations, in any such case, with intent to (x) deceive the other Party or (y) induce such other party hereto to enter into this Agreement and requires (i) a false representation or warranty of material fact made in such representation; (ii) with knowledge that such representation or warranty is false; (iii) with an intention to induce the party to whom such representation or warranty is made to act or refrain from acting in reliance upon it; (iv) causing that party, in justifiable reliance upon such false representation or warranty, to take or refrain from taking action; and (v) causing such party to suffer damage by reason of such reliance, which together constitutes common law fraud under Delaware Law (and does not include any fraud claim based on constructive knowledge, negligent misrepresentation, recklessness or a similar theory).

**(oo)**    **(ll)** "GDPR" means the EU General Data Protection Regulation (and any European Union member states' laws and regulations implementing it), and the EU General Data Protection Regulation as it forms part of the United Kingdom ("UK") law by virtue of section 3 of the European Union (Withdrawal) Act 2018 and any applicable implementing or supplementary legislation of the UK (including the UK Data Protection Act 2018).

**(pp)**    **(mm)** "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization

issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(qq)    (nn) "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, commission, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(rr)    (oo) "Hazardous Substance" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

(ss)    (pp) "Higher and Better Offer" means a bona fide, written Acquisition Proposal that did not result from Seller's breach of Section 5.1(a) for an Alternative Transaction on terms that the board of directors (or comparable governing body) of Seller determines in good faith, after consultation with its financial advisor and outside legal counsel, (i) constitutes a higher and otherwise better offer for the Debtors' assets and (ii) is reasonably likely to be consummated in accordance with its terms.

(tt)    (qq) "IFRS" means the International Financial Reporting Standards.

(uu)    (rr) "Intellectual Property" means all intellectual property rights in any jurisdiction throughout the world, including all: (i) patents and patent applications and patent disclosures (including any provisional applications, patents of addition, continuations, continuations-in-part, substitutions, additions, divisionals, confirmations, re-examinations, reissues, revisions and extensions); (ii) trademarks, service marks, trade dress, logos, brand names, corporate names, social media handles, Internet domain names and other indicia of origin, together with all goodwill associated with each of the foregoing; (iii) copyrights and mask works, whether or not registered; (iv) registrations and applications for any of the foregoing; (v) trade secrets; (vi) Software; (vii) drawings, schematics and other technical plans; (viii) rights in data, data collections and databases; (ix) all other intellectual property; and (x) all legal rights arising from items (i) through (ix), including the right to prosecute, enforce and perfect such interests and rights to sue, oppose, cancel, interfere, enjoin and collect damages based upon such interests.

(vv)    (ss) "IT Systems" means all of the computer systems, servers, hardware, firmware, middleware, networks, workstations, routers, hubs, switches, circuits, servers, data communications lines and all other information technology equipment, and all associated documentation, in each case, only as necessary to use or operate the Voyager Platform.

(ww)    (tt) "Knowledge of Seller" means the actual knowledge without independent verification (and which in no event encompasses constructive, imputed or similar concepts of knowledge) of Stephen Ehrlich, Gerard Hanashe, and Rakesh Gidwani, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

(xx)    (uu) "Knowledge of Purchaser" means the actual knowledge without independent verification (and which in no event encompasses constructive, imputed or similar

US-DOCS\137411268.27138346099.6

concepts of knowledge) of Brian Shroder, Krishna Juvvadi and Abhishek Baid, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

(yy)   (vv) "KYC Procedures" means the "know your customer" and "Customer Identification Program" policies, procedures and processes of Purchaser and its Affiliates as in effect from time to time and any equivalent procedures required under, or to comply with, applicable Law, in each case, including with respect to FCPA and any other applicable U.S. or foreign Law concerning anti-corruption, anti-bribery or anti-money laundering and consistent with the same applicable to other customers and users of Binance.US Platform.

(zz)   (ww) "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(aaa)   (xx) "Liability" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, perfected or unperfected, determined or determinable, disputed or undisputed, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, at law or in equity or otherwise, including any claims or liability based on successor liability theories or otherwise under any theory of Law or equity, and including all costs and expenses related thereto.

(bbb)   (yy) "Loan" means any loan made by Seller in the form of Cryptocurrency to counterparties in the cryptocurrency sector; provided that, the 3AC Loan shall not be deemed a Loan.

(ccc)   (zz) "Loan Documents" means all agreements and documents relating to Loans and the 3AC Loan, including security agreements, pledge or collateral agreements, loan agreements, loan policies and manuals.

(ddd)   (aaa) "Material Adverse Effect" means any matter, event, change, development, occurrence, circumstance, condition, occurrence or effect (each, an "Effect") that, individually or in the aggregate with all other Effects, (x) has had or would reasonably be expected to have a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole or (y) has had or would reasonably be expected to have a material adverse effect on the ability of Seller to perform its obligations under this Agreement or any of the Seller Documents or to consummate the Transactions; provided that with respect to clause (x) none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) Effects in, arising from or relating to general business or

84

economic conditions affecting the industry in which Seller and its Affiliates operate; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from or relating to financial, banking, securities or Cryptocurrency markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, Cryptocurrency or index and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (v) Effects in, arising from or relating to changes in, IFRS or the interpretation thereof; (vi) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body; (vii) Effects in, arising from or relating to (A) the taking of any action contemplated by this Agreement or at the written request of Purchaser or its Affiliates, (B) the failure to take any action if such action is expressly prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1, (D) the negotiation, announcement or pendency of this Agreement or the Transactions, the identity, nature or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (viii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect); (ix) the Effect of any action taken by Purchaser or its Affiliates with respect to the Transactions or any breach by Purchaser of this Agreement or the matters set forth on Schedule ~~11.1(aaa)~~11.1(aaa); or (x)(A) the commencement or pendency of the Bankruptcy Case, (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions or thereby, (2) the Agreement Order, the Confirmation Order, the Plan, or the reorganization of Seller, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Assigned Contract, or (C) any Order of the Bankruptcy Court or any actions or omissions of Seller in compliance therewith; except in the case of clauses (i), (ii), (iii), (iv), (v) and (vi), to the extent such Effects have a materially disproportionate impact on the Acquired Assets and Assumed Liabilities, taken as a whole, as compared to other participants engaged in the business in which Seller operates.

(eee)    ~~(bbb)~~ "Moelis" means Moelis & Company LLC, a Delaware limited liability company.

**(fff)** ~~(ccc)~~ "Money Transmitter License" means any consent, license, certificate, franchise, permission, variance, clearance, registration, qualification, authorization, waiver, exemption or other permit issued, granted, given or otherwise made available by or under the authority of any Governmental Body pursuant to state money transmission or similar Laws.

**(ggg)** ~~(ddd)~~ "Money Transmitter Requirements" shall mean any and all Law or Contract with a Governmental Body relating or pertaining to the business of transmitting or remitting money, monetary value or virtual currency, electronic funds transfers, remittances, issuing or selling stored value, prepaid access or the like, issuing or selling payment instruments, the custody, transfer or exchange of money, monetary value or virtual currency, or any similar payment or money services, including those related to money, monetary value, or Cryptocurrency.

**(hhh)** ~~(eee)~~ "Net Owed Coins" means, with respect to each User and each type of such User's Post-Rebalancing Coins, a number of Coins of such type equal to the total number of such User's Post-Rebalancing Coins of such type. For the avoidance of doubt, except as the context may otherwise require, references to Net Owed Coins in this Agreement relating to payments to any User or credits thereof to any User shall be deemed to be the sum of all Net Owed Coins with respect to each type of Post-Rebalancing Coin of such User. Notwithstanding the foregoing, in the event that there is a Rebalancing Exercise Delta for any type of Coin, then (i) Purchaser shall convert any excess Acquired Coins of any type into USDC or United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform, and (ii) Purchaser shall distribute the amounts resulting from such conversions to User accounts with respect to Net Owed Coins where the aggregate number of Net Owed Coins exceeds the number of Acquired Coins, pro rata based on the then-prevailing prices (including applicable fees, spreads, costs and expenses) for all such Net Owed Coins on the Binance.US Platform owed to any such User.

**(iii)** ~~(fff)~~ "Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, whether preliminary, interim, temporary or final, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Confirmation Order) or any other court.

**(jjj)** ~~(ggg)~~ "Ordinary Course" means the ordinary and usual course of operations of the business of Seller consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Case.

**(kkk)** ~~(hhh)~~ "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) customary easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the use, ownership or operation of the Acquired Assets, (iii) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, being contested in good faith, (iv) licenses granted on a non-exclusive basis, (v) such other Encumbrances or title

US-DOCS\~~137411268.27~~138346099.6

exceptions which do not, individually or in the aggregate, materially affect the operation, value or condition of the Acquired Assets, (vi) any Encumbrances set forth on Schedule ~~11.1(hhh)~~11.1(hhh), or (viii) any Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan.

(lll)    ~~(iii)~~ "Permitted Post-Closing Lien" means, with respect to the Acquired Assets (a) Encumbrances described in clause (ii) in the definition of "Permitted Encumbrances" and any non-monetary encumbrances not in fact released upon Closing pursuant to Confirmation Order or Plan, as applicable; provided that with respect to all Encumbrances that are "Permitted Post-Closing Liens" pursuant to this clause (a), such Encumbrances do not materially detract from the use or value of the applicable property as it is currently being used, and (b) other Permitted Encumbrances described in clauses (i), (iii), (iv) and (v) in the definition of "Permitted Encumbrances" securing monetary obligations which, individually or in the aggregate with all other Permitted Encumbrances treated as Permitted Post-Closing Liens pursuant to this clause (b), do not exceed $10,000.

(mmm)    ~~(jjj)~~ "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(nnn)    ~~(kkk)~~ "Personal Information" means information, in any form, that identifies, relates to, describes, could be used to locate or contact, is capable of being associated with, or could be linked, directly or indirectly, to, a natural Person, device or household, or is otherwise considered "personally identifiable information," "personal information," "personal data," "nonpublic personal information," or any similar term by any applicable Laws or Privacy Law.

(ooo)    ~~(lll)~~ "Plan" means a plan of reorganization prepared by Seller and solely to the extent related to this Agreement (but not with respect to the matters contemplated by Section 6.11(c)) and the Transactions, approved by Purchaser in its reasonable discretion, and attached as an Exhibit to this Agreement by amendment hereto as promptly as practicable, implementing the Transactions.

(ppp)    ~~(mmm)~~ "Plan Solicitation Motion" means Seller's motion for an Order (which solely with respect to matters relating to this Agreement and the Transactions, shall be in form and substance reasonably acceptable to Purchaser), (i) approving the Disclosure Statement (including approving the Disclosure Statement as containing "adequate information" (as that term is used by section 1125 of the Bankruptcy Code)), (ii) establishing a voting record date for the Plan, (iii) approving solicitation packages and procedures for the distribution thereof, (iv) approving the forms of ballots, (v) establishing procedures for voting on the Plan, (vi) establishing notice and objection procedures for the confirmation of the Plan and (vii) establishing procedures for the assumption or assignment of executory contracts and unexpired leases under the Plan.

(qqq)    ~~(nnn)~~ "Plan Solicitation Order" means an Order entered by the Bankruptcy Court, substantially in the form attached to the Plan Solicitation Motion, which Order shall, among other things, (A) be in form and substance reasonably acceptable to

Purchaser (solely with respect to matters relating to this Agreement and the Transaction), and (B) approve the relief sought in the Plan Solicitation Motion, including approving of (i) the Disclosure Statement on a conditional basis and (ii) the procedures for solicitation of votes to accept or reject the Plan.

**(rrr)** ~~(ooo)~~ "Plan Supplement" has the meaning set forth in the Plan.

**(sss)** ~~(ppp)~~ "Post-Petition Coins" means Coins that were deposited with the Debtors following the Petition Date.

**(ttt)** ~~(qqq)~~ "Post-Rebalancing Coins" means, with respect to each User as of the Rebalancing Date and each type of such User's Deposited Coins, ~~(i) the total~~ number of ~~such User's Deposited~~ Coins of such type~~, multiplied by (ii)~~ **such that the Acquired Coins Value of such Coins divided by the Deposited Coins Value of such Coins is equal to** the Rebalancing Ratio, as set forth on the Seller Statement.

**(uuu)** ~~(rrr)~~ "Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

**(vvv)** ~~(sss)~~ "Privacy Laws" means all applicable Laws and legally binding self-regulatory guidelines or standards, in each case as amended, consolidated, re-enacted or replaced from time to time, relating to the privacy, security, or Processing of Personal Information, data breach notification, website and mobile application privacy policies and practices, Processing and security of payment card information, and email, text message, or telephone communications, including (to the extent applicable to the business of Seller): the Federal Trade Commission Act; the Gramm-Leach-Bliley Act; the Telephone Consumer Protection Act; the Telemarketing and Consumer Fraud and Abuse Prevention Act; the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003; the California Consumer Privacy Act; the Computer Fraud and Abuse Act; the Payment Card Industry Data Security Standards; the GDPR; and the EU e-Privacy Directive 2002/58/EC as amended by Directive 2009/136/EC (and any European Union member states' laws and regulations implementing it).

**(www)** ~~(ttt)~~ "Process", "Processed" or "Processing" means any operation or set of operations which is performed on Personal Information, such as the use, collection, processing, storage, recording, organization, adaption, alteration, transfer, retrieval, consultation, disclosure, dissemination or combination of such Personal Information, or is otherwise considering "processing" by any applicable Privacy Laws.

**(xxx)** ~~(uuu)~~ "Purchaser Development" means any of the following, first occurring after the date hereof and prior to the Closing:  (i) the filing of a criminal complaint against, or indictment of, Purchaser or any of its executive officers or "C-suite" officers (including any chief risk officer or chief compliance officer) by the United States Department of Justice, (ii) the filing of a criminal complaint against, or indictment of, any of Purchaser's Affiliates or any of their executive officers or "C-suite" officers (including any chief risk officer or chief compliance officer) by the United States Department of Justice or (iii) the commencement of any criminal or regulatory (including at the appellate level) suit, litigation,

legal proceeding or prosecution by the United States Department of Justice against any of the Persons described in clauses (i) and (ii), (A) in each case of clauses (i), (ii) and (iii) that relate to the operation of the Binance.US platform and wallet custody business of Purchaser and its Subsidiaries or the business of such Affiliate or the ability of such Affiliate to provide Purchaser and its Subsidiaries with the licensed software and support services necessary to operate the Binance.US Platform; and (B) in each case of clauses (ii) and (iii) that, individually or in the aggregate, would reasonably be expected to (1) prevent or materially impair or materially delay the ability of Purchaser to consummate the Transactions in accordance herewith or (2) materially and adversely affect the Users, Eligible Creditors or the Acquired Coins, in each case in a manner that would prevent Purchaser from performing its obligations under Section 6.12 or otherwise following the Closing.

       **(yyy)** ~~(vvv)~~ "Purchaser Group" means Purchaser, any former, current or future Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

       **(zzz)** ~~(www)~~ "Rebalancing Exercise Delta" means, with respect to any Acquired Coin, the percentage by which the number of Acquired Coins is higher or lower than the number of Acquired Coins which would be required to cause the number of Acquired Coins to be in full compliance with the Rebalancing Ratio.

       **(aaaa)** ~~(xxx)~~ "Rebalancing Ratio" means, with respect to any type of Acquired Coin, a fraction, expressed as a percentage, (i) the numerator of which is the Total Acquired Coins Value, and (ii) the denominator of which is the Total Deposited Coins Value; provided that in no event will the Rebalancing Ratio be greater than 100% and for the avoidance of doubt, the Rebalancing Ratio shall be calculated following the completion of the Rebalancing Exercise and after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring Coins to Purchaser in accordance with Section 2.4(b).

       **(bbbb)** ~~(yyy)~~ "Retained Avoidance Action" means any preference or avoidance claim, right or cause of action under Chapter 5 of the Bankruptcy Code or any analogous state law claim against (i) Three Arrows Capital, Ltd. or any of its Affiliates, (ii) any insider as defined in the Bankruptcy Code, (iii) any other such claim, right or cause of action that Purchaser agrees in writing prior to the Closing may be retained by the Debtors, (iv) any person for an actual fraudulent transfer, and (v) West Realm Shires Inc., Alameda Ventures Ltd., or any of their Affiliates.

       **(cccc)** ~~(zzz)~~ "Sanctioned Person" means any Person that is the target of Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the OFAC or the U.S. Department of State, the United Nations Security Council, the European Union, any Member State of the European Union, or the United Kingdom (irrespective of its status vis-à-vis the European Union); (b) any Person operating, organized, or resident in a country or territory that is itself the target of comprehensive Sanctions (as of the date of this Agreement, Cuba, Iran, North Korea, Syria, the Crimea region of Ukraine, the so-called Donetsk People's Republic, and the so-called Luhansk People's Republic) ("Sanctioned Country"); (c) the government of a Sanctioned Country or the Government of

Venezuela; or (d) any Person 50% or more owned or controlled by any such Person or Persons or acting for or on behalf of such Person or Persons.

**(dddd)** (aaaa) "Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

**(eeee)** (bbbb) "Security Incident" means any actual or suspected unauthorized access to, or acquisition, modification, use, destruction, loss or disclosure of any Personal Information maintained by or on behalf of Seller or its Affiliates.

**(ffff)** (cccc) "Seller Expense Cap" means an amount equal to either (a) if Purchaser elects to extend the Outside Date to the Extended Outside Date pursuant to Section 8.1(c), $15,000,000 or (b) if Purchaser does not so elect to extend the Outside Date, $10,000,000.

**(gggg)** (dddd) "Seller Expense Start Date" means the date that is three months following the date of this Agreement.

**(hhhh)** (eeee) "Seller Held Coins" means, without duplication, as of any date of determination, all Coins that are directly or indirectly owned or held by, or attributable to, Seller or any of its Affiliates who are Debtors (including, for the avoidance of doubt, all Coins repaid to Seller or any of its Affiliates who are Debtors at or prior to the Closing in respect of Loans (including in respect of any principal, interest, fees, expenses and penalties thereunder and including for this purpose, the 3AC Loan), including all Coins held by or on behalf of Seller or any of its Affiliates who are Debtors in respect of User accounts on the Voyager Platform), except for any Coins constituting collateral under the 3AC Loan and except any Post-Petition Coins, which for the avoidance of doubt, shall not be included in the Rebalancing Exercise or any other Transactions.

**(iiii)** (ffff) "Seller Intellectual Property" means all Intellectual Property owned or purported to be owned by Seller that is an Acquired Asset.

**(jjjj)** (gggg) "Seller Parties" means Seller, its former, current, or future Affiliates and the former, current or future officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns of the foregoing.

**(kkkk)** (hhhh) "Seller Plan" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Seller or Holdings or to which Seller

or Holdings is obligated to contribute or with respect to which Seller or Holdings has any Liability.

**(llll)** ~~(iiii)~~ "Software" means any and all computer programs and other software in any form or format, including firmware, middleware, software implementations of algorithms, models and methodologies, whether in source code, object code or other form, including libraries, frameworks, software development kits (SDKs), application programming interfaces (APIs), subroutines, toolsets, procedures, and other components thereof.

**(mmmm)** ~~(jjjj)~~ "Straddle Period" means any taxable period that includes but does not end on the Closing Date.

**(nnnn)** ~~(kkkk)~~ "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

**(oooo)** ~~(llll)~~ "Subject Transaction" means (a) a transaction or series of transactions with respect to the Rebalancing Exercise that involves a series of transactions or other actions that are (or are to be) executed with a Person or group of coordinated Persons that are intended to effectuate the Rebalancing Exercise or (b) the planning or negotiation of such transaction or series of transactions, or consulting with respect thereto and, for the avoidance of doubt, does not include individual trades of Coins by Seller that are not intended to effectuate the Rebalancing Exercise or that are components of Subject Transactions that are the subject of a Transaction Notice or any such transactions with respect to Coins that do not trade on the Binance.US Platform as of the date of the proposed Subject Transaction.

**(pppp)** ~~(mmmm)~~ "Tax" or "Taxes" means any federal, state, local, foreign or other taxes, charges, fees or other assessments, including income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, escheat and unclaimed property, ad valorem, personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative or add-on minimum or estimated tax, charge or assessment of any kind in the nature of (or similar to) taxes, including any interest, penalty or addition thereto, whether disputed or not.

**(qqqq)** ~~(nnnn)~~ "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes filed or required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

**(rrrr)** ~~(oooo)~~ "Total Acquired Coins Value" means the aggregate Acquired Coins Value with respect to all Acquired Coins of each type (excluding Withheld Coins).

(ssss) ~~(pppp)~~ "Total Deposited Coins Value" means the aggregate Deposited Coins Value with respect to all Deposited Coins of each type.

(tttt) ~~(qqqq)~~ "Transactions" means the transactions contemplated by this Agreement or the Plan, as applicable.

(uuuu) ~~(rrrr)~~ "Unsupported Coin" means any Coin, for which Purchaser or its Affiliates does not provide trading services on the Binance.US Platform.

(vvvv) ~~(ssss)~~ "User" means any Person located and having a home address in the United States that had a Cryptocurrency account on the Voyager Platform as of the Petition Date; provided that, if a Person has multiple Cryptocurrency accounts on the Voyager Platform, such Person shall constitute a single User and all accounts of such User shall be aggregated for purposes of this Agreement.

~~(tttt) "User Migration Preparation" means, collectively, (i) the completion of the transfer of all Acquired User Data (including, for the avoidance of doubt, any "know your customer" information of the Users) and integration thereof on Purchaser's and its Affiliates' information technology systems and the Binance.US Platform, and (ii) the completion of the other items identified in the Integration Plan as being required for accounts to be opened for Users on the Binance.US Platform.~~

~~(uuuu) "User Asset Migration Date" means the date that is four (4) weeks following the date of completion of the User Migration Preparation; provided that the completion of the User Migration Preparation shall not occur prior to the Closing Date.~~

(wwww) ~~(vvvv)~~ "VGX Token Smart Contracts" means any "smart contracts" related to the VGX token, together with any private keys related solely to such "smart contracts."

(xxxx) ~~(wwww)~~ "Voyager Platform" means Seller's proprietary Cryptocurrency savings and trading platform (including any website or desktop or mobile application with respect thereto).

(yyyy) ~~(xxxx)~~ "VWAP" means, with respect to any type of Coin and as of any date of determination, an amount equal to the volume weighted average price in U.S. dollars for such type of Coin for the consecutive 24-hour period immediately prior to 8:00 a.m. New York Time on such date of determination, as reported on https://coinmarketcap.com.

11.2   Index of Defined Terms.

| | | | |
|---|---|---|---|
| Acquired Assets | 1 | Amended Disclosure Statement | ~~27~~28 |
| Acquired Information | 2 | Anti-Money Laundering Laws | ~~17~~18 |
| Acquired User Data | 2 | Assigned Contracts | 3 |
| Acquired Voyager Claims | 2 | Assignment and Assumption Agreement | 10 |
| Acquisition Proposal | ~~26~~27 | Assumed Liabilities | 5 |
| Agreement | 1 | Authentication Credentials | 14 |
| Agreement Order | ~~25~~26 | | |

Balance Sheet Date...............................13
Bankruptcy Case...................................1
Bankruptcy Code...................................1
Bankruptcy Court..................................1
Cash Payment......................................8
Chosen Courts................................68 70
Closing.......................................9 10
Closing Date.....................................10
Closing Date Payment..........................8 9

**Covered Matters**...........................**2 9**

Credited Additional Bankruptcy
   Distributions.............................49 50
CSA...........................................11 12
Cure Costs........................................5
Dataroom......................................21 22
Debtors...........................................1
**Delayed Acquired Coins**.....................**10**
Deposit...........................................9
**Distribution Agent Termination
   Event**.....................................**51**
**Distribution Agent Termination
   Notice**....................................**51**
DPA..............................................18
Eligible Creditor.............................42 43
Enforceability Exceptions.....................12 13
Environmental Permits.........................18 19
Escrow Account....................................9
Escrow Agent......................................9
Excluded Assets...................................3
Excluded Contracts................................3
Excluded Documents................................3
Excluded Liabilities..............................6
Express Purchaser Representations.............24 25
Express Seller Representations................21 22
Extended Outside Date.........................57 59
FCPA.............................................17
Filed CSA Documents...........................11 12
Financial Statements.............................13
Fundamental Representations...................56 58
Higher Offer Determination Notice................27
Holdings..........................................1
Indebtedness..................................30 31
Information Presentation......................21 22
Integration Plan..............................41 42
Leased Real Property.............................15

Liquidation...................................54 56
Material Contract................................15
OFAC..........................................17 18
Outside Date..................................57 59
Parent............................................1
Parties...........................................1
Party.............................................1

**Paul Hastings**.............................**2 9**

Petition Date.....................................1
Petitions.........................................1
Post-Bankruptcy Statement.....................49 50
Pre-Closing Data Transfer.....................38 39
Press Release.................................69 72
Privacy Requirements..........................19 20
Projections...................................51 54
Purchase Price....................................8
Purchaser.........................................1
Purchaser Bid Process.........................55 57
Purchaser Default Termination.....................9
Purchaser Expenses............................54 57
Rebalancing Date..............................43 44
Rebalancing Exercise..........................43 44
Relevant Tax Return...........................62 65
Reverse Termination Fee.......................60 62
Sanctions.....................................17 18
Seller............................................1
Seller Contractors...............................34
Seller Documents.................................12
Seller Employees.................................34
Seller Expenses...............................53 56
Seller Income Tax Return......................62 64
Seller Marks..................................39 40
Seller Registered IP..........................18 19
Seller Statement..............................44 45
Solvent.......................................24 25
Staked Coins..................................14 15
Successor Liabilities.........................29 30
Trademark and Domain Name
   Assignment Agreement.......................10 11
Transaction Notice............................43 44
Transaction Offer Notice......................43 44
Transaction-Related Action....................62 64
Transfer Taxes................................61 64
Unsupported Jurisdiction......................45 47
Unsupported Jurisdiction Approvals............22 23

Voyager User Accounts ........................... 2          WARN Act ............................................ 35
                                                            Withheld Coins ................................... 9

11.3    <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)     Accounting terms which are used but not otherwise defined in this Agreement have the respective meanings given to them under IFRS as in effect on the date hereof or for the period with respect to which such principles are applied, consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under IFRS, the definition set forth in this Agreement will control.

(b)     The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)     Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)     The words "to the extent" shall mean "the degree by which" and not "if."

(e)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)     Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)     The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)     All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

US-DOCS\137411268.27138346099.6

(i)        All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)        Any document or item will be deemed "delivered," "provided" or "made available" by Seller, within the meaning of this Agreement, if such document or item is included in the Dataroom at least one (1) Business Day prior to the date hereof.

(k)        Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)        Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; underlined provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)        A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns. **References to Seller after the Plan Effective Date (as defined in the Plan) shall be deemed to include the Wind-Down Trust (as defined in the Plan) and the Wind-Down Debtor (as defined in the Plan) in respect of Seller.**

*(Signature pages follow.)*

95

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**BAM TRADING SERVICES INC. D/B/A BINANCE.US**


By: _____
Name:
Title:

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**VOYAGER DIGITAL, LLC**

By: _____
Name:
Title:

<u>EXHIBIT A</u>

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

(See attached.)

A

**EXHIBIT B**

**FORM OF TRADEMARK AND DOMAIN NAME ASSIGNMENT AGREEMENT**

(See attached.)

B

# Exhibit 10

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DECLARATION OF BRIAN TICHENOR**
**IN SUPPORT OF THE DEBTORS' MOTION FOR ENTRY**
**OF AN ORDER (I) AUTHORIZING ENTRY INTO THE BINANCE US**
**PURCHASE AGREEMENT, AND (II) GRANTING RELATED RELIEF**

I, Brian Tichenor, hereby declare under penalty of perjury:

1.      I am a Managing Director in the Financial Institutions Group (the "FIG Group") at

Moelis & Company LLC ("Moelis").  Moelis is an investment banking firm that has its principal

office at 399 Park Avenue, 5th Floor, New York, New York 10022.  Among the businesses and

products that fall within the purview of the FIG Group are cryptocurrency, banks, asset managers,

securities exchanges, specialty finance businesses, and insurance companies.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

Debtors
Ex-10

2.     The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") engaged Moelis as investment banker.  I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of An Order (I) Authorizing Entry Into the Binance US Purchase Agreement, and (II) Granting Related Relief* [Docket No. 775] (the "Motion").[2]

3.     A description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Steve Ehrlich, Co-Founder and Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration") and a description of the facts and circumstances of the marketing process, the Auction, and FTX US transaction is set forth in my previous *Declaration of Brian Tichenor in Support of Debtors' Motion for Entry of An Order (I) Authorizing Entry Into the Asset Purchase Agreement, and (II) Granting Related Relief* [Docket No. 476] (the "Previous Declaration"), and are incorporated by reference herein.

4.     Unless otherwise indicated, all facts set forth in this Declaration are based upon (a) my personal knowledge of the marketing and sale process and the Auction, (b) information learned from my review of relevant documents, or (c) information I received from the Debtors or the Debtors' other advisors.  I am not being specifically compensated for this testimony other than through payments that are proposed to be received by Moelis as a professional retained by the Debtors.  If I were called upon to testify, I could and would competently testify to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtors.

---

[2]   Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion or the First Day Declaration (as defined herein), as applicable.

### Qualifications

5.　　Moelis is an investment banking firm with its principal office located at 399 Park Avenue, 5th Floor, New York, New York 10022. Moelis is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority. Moelis was founded in 2007 and is a wholly-owned subsidiary of Moelis & Company Group LP. Moelis & Company Group LP, together with its subsidiaries, has approximately 1,000 employees based in offices in North America, South America, Europe, the Middle East, and Asia. Moelis & Company Group LP is a subsidiary of Moelis & Company, a public company listed on the New York Stock Exchange.

6.　　Moelis provides a broad range of financial advisory and investment banking services to its clients, including (a) general corporate finance; (b) mergers, acquisitions, and divestitures; (c) corporate restructurings; (d) special committee assignments; and (e) capital raising. Moelis and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 cases. Moelis' business reorganization professionals have served as financial advisors and/or investment bankers in numerous cases, including: In re Knotel, Inc., No. 21-10146 (MFW) (Bankr. D. Del. Mar. 12, 2021); In re CBL & Assocs. Props., Inc., No. 20-35226 (DRJ) (Bankr. S.D. Tex. Dec. 30, 2020); In re Energy Alloys Holdings, LLC, No. 20-12088 (MFW) (Bankr. D. Del. Nov. 23, 2020); In re Jason Indus., Inc., No. 20-22766 (RDD) (Bankr. S.D.N.Y. Aug. 27, 2020); In re The Hertz Corp., No. 20-11218 (MFW) (Bankr. D. Del. July 30, 2020); In re Extraction Oil & Gas, Inc., No. 20-11548 (CSS) (Bankr. D. Del. Aug. 11, 2020); In re The McClatchy Co., No. 20-10418 (MEW) (Bankr. S.D.N.Y. May 18, 2020); In re Internap Technology Solutions Inc., No. 20-22393 (RDD) (Bankr. S.D.N.Y. May 5, 2020); In re Rentpath Holdings, Inc., No. 20-10312 (BLS) (Bankr. D. Del. Mar. 10, 2020); In re Sanchez Energy Corp., No. 19-34508 (MI) (Bankr. S.D. Tex. Oct. 21,

3

2019); In re Monitronics Int'l, Inc., No. 19-33650 (DRJ) (Bankr. S. D. Tex. Aug. 1, 2019); In re

Aegerion Pharmaceuticals, Inc., No. 19-11632 (MG) (Bankr. S.D.N.Y. July 10, 2019); In re Joerns

WoundCo Holdings, Inc., No. 19-11401 (JTD) (Bankr. D. Del. July 25, 2019); In re FTD Cos.,

No. 19-11240 (LSS) (Bankr. D. Del. July 2, 2019); In re Hexion Holdings LLC, No. 19-10684

(KG) (Bankr. D. Del. May 15, 2019); In re Aegean Marine Petroleum Network Inc., No. 18-13374

(MEW) (Bankr. S.D.N.Y. Feb. 20, 2019); In re Parker Drilling Company, Inc., No. 18-36958 (MI)

(Bankr. S.D. Tex. Jan. 15, 2019); In re Aralez Pharmaceuticals US Inc., No. 18-12425 (MG)

(Bankr. S.D.N.Y. Oct. 31, 2018); In re iHeartMedia, Inc., No. 18-31274 (MI) (Bankr. S.D. Tex.

July 24, 2018); In re Global A&T Electronics Ltd., No. 17-23931 (RDD) (Bankr. S.D.N.Y. Feb.

26, 2018); In re Toys "R" US, Inc., No. 17-34665 (KLP) (Bankr. E.D. Va. Nov. 21, 2017); In re

TK Holdings, Inc., No. 17-11375 (BLS) (Bankr. D. Del. Aug. 30, 2017); In re Basic Energy

Services, Inc., No. 16-12320 (KJC) (Bankr. D. Del. Nov. 17, 2016); In re UCI International, LLC,

No. 16-11354 (MFW) (Bankr. D. Del. July 12, 2016); In re AOG Ent., Inc., No. 16-11090 (SMB)

(Bankr. S.D.N.Y. June 8, 2016); In re SFX Entertainment, Inc., No. 16-10238 (MFW) (Bankr. D.

Del. Mar. 21, 2016); In re American Apparel, Inc., No. 15-12055 (BLS) (Bankr. D. Del. Nov. 30,

2015); In re Allied Nevada Gold Corp., No. 15-10503 (MFW) (Bankr. D. Del. Apr. 15, 2015); In

re ITR Concession Co., No. 14-34284 (Bankr. N.D. Ill. Oct. 28, 2014); In re GSE Envt'l, Inc., No.

14-11126 (MFW) (Bankr. D. Del. May 30, 2014); In re MACH Gen, LLC, No. 14-10461 (MFW)

(Bankr. D. Del. Apr. 11, 2014); In re MPM Silicones, LLC, No. 14-22503 (RDD) (Bankr.

S.D.N.Y. May 16, 2014).

7.    I have over 10 years of investment banking experience advising companies, equity

investors, financial vehicles, and creditors across a broad range of industries and geographies in a

broad range of transactions. Prior to joining Moelis, I was in the corporate and investment banking

4

group at Citigroup Inc. where I focused on investment banking advisory transactions in the Financial Institutions Group. I hold Bachelor of Science degrees in finance and computer science from Boston College and have a Master's of Business Administration degree from Georgetown University.

8.    I have been involved in several notable chapter 11 cases and restructuring assignments, including as advisor to the ad hoc group of senior unsecured noteholders in Walter Investment Management Corporation's $4.1 billion restructuring; and as advisor to New Residential Investment Corporation's $1.2 billion acquisition of select assets from Ditech Holding Corporation pursuant to a section 363 asset sale. I have also been involved in numerous restructuring transactions outside of the chapter 11 context, including advising New Residential Investment Corporation in its $600 million recapitalization and restructuring, Ambac Financial Group in its $18 billion restructuring of Puerto Rico's sales tax financing corporation (COFINA), Syncora Guarantee Inc. in its $13.5 billion reinsurance of financial guarantee policies to Assured Guarantee Corporation and other liability management including the sale of its operating business to GoldenTree Asset Management, Ambac Financial Group on its $557 million exchange offer of its Auction Market Preferred Shares, Ambac Financial Group on its $538 million exchange of Corolla Trust obligations and Junior Surplus Notes, an approximately $10 billion ad hoc group of non-litigating preferred shareholders in a proposed $6.9 trillion restructuring of Fannie Mae and Freddie Mac assets, secured lenders of AG Mortgage Investment Trust in its $3.0 billion restructuring of its repurchase agreement portfolio and secured lenders of MFA Financial, Inc. in its $5.8 billion restructuring of its repurchase agreement portfolio.

## Overview and Recommencement of the Marketing Process

9.    As described in greater detail in my Previous Declaration, Moelis was engaged by the Debtors in June 2022 to advise the Debtors in their efforts to navigate challenges impacting

the cryptocurrency industry and evaluate strategic alternatives in connection therewith.  I have been involved as a senior member of the Moelis team throughout our engagement.

10.    As also described in greater detail in my Previous Declaration, the Debtors conducted a marketing process that resulted in a two-week Auction and the proposed asset purchase agreement (the "FTX Purchase Agreement") with West Realm Shires Inc. (along with affiliates, "FTX," and the sale transaction thereunder, the "FTX Transaction").  The Auction was the result of the Debtors' marketing process which included engagement with over 96 interested parties with over 60 parties entering into nondisclosure agreements with the Debtors.  Following the conclusion of the Auction, the Debtors sought and obtained approval to enter into the FTX Purchase Agreement.  Shortly thereafter, the Debtors commenced solicitation of votes on the FTX Plan.

11.    As FTX appeared to be facing financial challenges that could have impaired its ability to close on its purchase of Voyager, but before FTX's eventual chapter 11 filing, on November 10, 2022, the Debtors requested that FTX waive the "No-Shop" provision (Section 5.2) of the FTX Purchase Agreement.  FTX, through its counsel, acquiesced.  The Debtors immediately restarted outreach to, and received inbounds from, interested parties as a result of the growing probability that the FTX Transaction would not close.  On November 11, 2022, FTX commenced chapter 11 proceedings.[3]  It was well known that the Debtors' assets were once again for sale following the very public FTX collapse.

12.    The Debtors and their advisors were and are keenly aware that time is of the essence and that the Debtors need to move with deliberate speed to implement an alternative transaction given both the increased volatility in the crypto space and the increased administrative costs the

---

[3]    *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

longer the Debtors remain in chapter 11. The Debtors thus leveraged the significant groundwork

during the prior marketing process, engaging again with many of the parties that were previously

involved in the process, as well as several new parties who expressed interest in acquiring the

Debtors' assets. The Debtors and their advisors ensured that all interested parties understood the

dynamics surrounding the previously agreed to FTX Purchase Agreement and terms of the FTX

Purchase Agreement to help provide candor and transparency to the process and properly guide all

interested parties to provide the best possible bids.

13.     The Debtors received several proposals and engaged in extensive negotiations with

the interested parties that spanned approximately one month. Moelis, along with the Debtors'

other advisors, helped the Debtors consider the proposals received, including working with each

interested party, answering numerous requests for additional information, holding several

conferences with the Debtors' management teams, their advisors, and the Committee, pushing the

bidders to improve the economic and other terms of their bids, and analyzing the viability of each

of the proposed transactions. When analyzing proposals received from interested parties, the

Debtors and their advisors considered both the viability and risk factors associated with each

proposed transaction, including but not limited to, timing considerations, third-party financing

requirements, ability to consummate, cybersecurity risks, regulatory and licensing status, and

counterparty risk based on the counterparty due diligence conducted both prior to and during the

initial Auction and during the one-month negotiation period following the collapse of FTX.

14.     The Debtors also considered pursuing a transaction that would allow the Debtors

to distribute cryptocurrency or cash to creditors on their own (the "Toggle Transaction"). Pursuing

the Toggle Transaction would impose costs of its own on the Debtors, would take time, and would

present its own risks. Among other things, the Toggle Transaction would involve the Debtors

7

"rebalancing" their cryptocurrency holdings to prepare for distributions to creditors, and then reopening the Voyager platform for approximately a month to allow customers to withdraw their pro rata share of cryptocurrency, to extent it can be withdrawn. While a viable option, the Toggle Transaction, among other things, could likely (a) lead to incremental value leakage (*e.g.*, the Debtors would likely be forced to realize a discount due to liquidation of sizable positions in the marketplace), over and above that in a third party transaction, thereby resulting in worse creditor recoveries, (b) require the Debtors to liquidate additional cryptocurrency to fund working capital requirements to complete the work required, (c) create additional security risks (particularly if the Debtors are unable to retain critical personnel necessary to perform the Toggle Transaction), (d) be less tax efficient for customers than a third-party transaction, (e) strand some coins, which can be withdrawn by customers from certain third-party exchanges (like Binance.US) but not from Voyager,[4] and (f) may severely damage the value of the VGX token, which is the native token of the Voyager brokerage platform.

15.    Importantly, the Debtors and their advisors contemplated this route while utilizing it as a "floor" against which to compare bids received from third parties. Ultimately, the Debtors determined that pursuing a sale transaction with a third party could, depending on the structure of the transaction, provide the potential for the best recovery available to creditors under the circumstances while also reducing the risk surrounding execution of the transaction and reducing the likely value leakage that would occur in the Toggle Transaction. Accordingly, the Debtors, in their business judgment, determined to reengage with third parties to identify an alternative transaction partner.

---

[4]    We understand that 35 tokens, which we estimate represents approximately 20% of the value of all tokens held by Voyager, are not able to be withdrawn by customers from Voyager due to technical limitations, but can be withdrawn by customers from Binance.US following consummation of the proposed transaction.

**The Binance.US Transaction**

16.     The Debtors thoroughly engaged with all interested parties, and after negotiation and deliberation, on December 18, 2022, Debtor Voyager Digital, LLC (the "Seller") executed that certain asset purchase agreement (the "Binance.US Purchase Agreement") with BAM Trading Services Inc. ("Binance.US" and the sale transaction thereunder, the "Binance.US Transaction"). The Debtors value the Binance.US Transaction at approximately $1.022 billion, comprising (a) the value of cryptocurrency on the Voyager platform as of a date to be determined, which as of December 16, 2022 at 0:00 UTC, is estimated to be $1.002 billion, plus (b) additional consideration, which is estimated to provide at least $20 million of incremental value. The Binance.US Purchase Agreement is attached as Exhibit B to the Motion.

17.     Importantly, the Binance.US Purchase Agreement permits the Debtors to pivot to the Toggle Transaction if the Debtors exercise their "fiduciary out" or the Binance.US Transaction is not effectuated by the outside date included thereunder, subject to expense reimbursement of Binance.US in certain circumstances set forth in the Binance.US Purchase Agreement. The Binance.US Transaction also includes additional benefits, as it (a) provides the most tax efficient route forward as Binance.US supports 100% of the cryptocurrency coins on the Debtors' platform, (b) is the only transaction available to the Debtors that did not contemplate requiring the Debtors to liquidate cryptocurrency for working capital purposes in the first instance, (c) includes reimbursement by Binance.US of up to $15 million of Seller's expenses under certain circumstances set forth in the Binance.US Purchase Agreement, (d) provides a $10 million reverse termination fee payable to the Seller by Binance.US to compensate the Debtors' estates in the event that Binance.US cannot consummate the transaction under certain circumstances set forth in the Binance.US Purchase Agreement, and (e) in the event that the Debtors pivot to the Toggle

9

Transaction, provides that Binance.US will provide certain services to facilitate such Toggle Transaction to ensure that the Debtors can rely on the Binance.US platform to minimize leakage with, and cybersecurity risks when, returning cryptocurrency to creditors.

18.     Pursuant to the Binance.US Purchase Agreement, Binance.US will acquire substantially all of the Debtors' assets, including the distribution of substantially all of the cryptocurrency held by the Debtors.  The transactions contemplated by the Binance.US Purchase Agreement will be effectuated through a chapter 11 plan.  Ultimately, I believe that the Binance.US bid provides the most value currently available for the Debtors' assets and ultimately to their stakeholders—including the Debtors' customers under the circumstances that exist here.

19.     Moreover, the structure of the proposed transaction, including its "fiduciary out," permits the Debtors to toggle *either* to a higher and better third-party bid (should one emerge) *or* to the Toggle Transaction, if the Debtors determine in their business judgment between now and closing that the Binance.US Transaction is no longer the highest or otherwise best option.  Based on the diligence the Debtors have performed to date on their proposed counterparty, they (and I) believe the Binance.US Transaction is the highest and best option currently available under the circumstances.  But the Debtors recognize that the cryptocurrency industry is experiencing an extremely volatile period for an already volatile business, and we continue to closely monitor developments in the sector.  Not only does the structure of the proposed transaction permit the Debtors to pivot to the Toggle Transaction if they conclude the Binance.US Purchase Agreement is no longer higher and better due to a development along the way, but the work to prepare to consummate and execute on the Binance.US Purchase Agreement will better prepare the Debtors to complete the Toggle Transaction if necessary.

20.     Importantly, the Debtors, the Creditors Committee, and their respective advisors'

10

negotiated with Binance.US to include provisions designed to ensure the safety of the Debtors' cryptocurrency in advance of distributions being made to creditors.  Specifically, the Binance.US Purchase Agreement provides that, up until the transfer of cryptocurrency to Binance.US, the Debtors maintain control of all their cryptocurrency, including during the rebalancing of the Debtors' cryptocurrency portfolio (that may include the use of third parties and third-party exchanges to execute the rebalancing transactions), which is a prerequisite to closing and effectuating distributions to creditors.  I believe that retaining control of all of the Debtors' assets until closing is critical to minimizing risk given the increased volatility in the crypto space.

21.    Further, in connection with the evaluation of the Binance.US proposal the advisors conducted certain financial and business counterparty due diligence on Binance.US. This due diligence included reviews of certain documentation and discussions with senior management at Binance.US relating to:  audited financial statements, interim unaudited financial statements, available liquidity, related party services agreements, wallet infrastructure, AML/KYC procedures, money transmitter licensing status, and business plans submitted to selected state regulators in connection with the issuance of money transmitter licenses.

22.    Moreover, it is my understanding that section 6.12 of the Binance.US Purchase Agreement provides that the Seller (prior to the transfer of cryptocurrency to Binance.US) and each transferred creditor (from and after the transfer of cryptocurrency to Binance.US) will retain all right, title, and interest in and to the cryptocurrency allocated to it in accordance with the Binance.US Asset Purchase Agreement through and including such time as such cryptocurrency is returned to Seller or distributed to such transferred creditor.[5]  It is my understanding that under the Binance.US Purchase Agreement,  the cryptocurrency will be held by Binance.US solely for

---

[5]    *See* Binance US Purchase Agreement Section 6.12(e).

11

the benefit of the Seller or transferred creditor, as applicable, until such distributions are made.[6]

23.     Further, in states where Binance.US does not yet have the requisite money transmitter licensing approvals, authorizations, or exemptions (as applicable) to make distributions to creditors in those states (the "Unsupported Jurisdictions"), the Debtors will retain custody of the cryptocurrency that would be distributed to those creditors.  In the event that Binance.US is not able to obtain the necessary approvals to make distributions to creditors in Unsupported Jurisdictions within six (6) months following the closing (*i.e.*, an incremental 3 months following distributions to creditors in other jurisdictions), it is my understanding that the Debtors would convert the cryptocurrency attributable to such creditors to cash and the Debtors would then distribute the equivalent realized cash value associated with such liquidations to such creditors under the chapter 11 plan.  It is my understanding that Binance.US shall have the opportunity to execute in such conversion transactions subject to the agreed-upon protocol between the Debtors and Binance.US set forth in the Binance.US Purchase Agreement.  If Binance.US is able to obtain the necessary money transmitter licensing approvals within that six (6) month period, Binance.US would make in kind distributions to those creditors.

24.     Due to legal, operational and technical limitations, if the Binance.US Transaction is approved, the Debtors will not be able to distribute cryptocurrency themselves to creditors in Unsupported Jurisdictions.  First, the Voyager platform that would be required to facilitate in kind distributions to creditors is being sold to Binance.US in connection with the transaction.  This means that any in-kind distributions to creditors in Unsupported Jurisdictions would need to be done manually on a transaction-by-transaction basis for over 120,000 creditors.  My understanding is not only would manual distributions be extremely complex, but Voyager does not have

---

[6]     *Id.*

12

necessary infrastructure or personnel to accomplish this in a safe and secure manner.

25.     Second, my understanding is that there are risks associated with the Debtors'
distribution of cryptocurrency to individual creditor wallets as opposed to effectuating such
distributions through the Binance.US platform.   The Debtors must comply with anti-money
laundering ("AML") and know your customer ("KYC") laws when sending cryptocurrency to
individual wallets.  Historically, the Debtors used Chainanalysis for automated verification of
certain user generated cryptocurrency transfer requests.  However, Chainalysis does not support
all of the tokens listed on the Voyager platform (e.g., non-transferable tokens).  While AML/KYC
compliance is easy when transferring cryptocurrency to Binance.US wallets, it poses substantial
risk to the Debtors as it relates to the manual transfer of cryptocurrency to individual wallets for
over 120,000 creditors.   Binance.US has represented to the Debtors that it has existing
infrastructure in place that would allow it to perform AML/KYC compliance checks in connection
with transferring all cryptocurrency to customer accounts on its platform.  Unlike ACH transfers
which can be reversed, cryptocurrency sent to the wrong wallet cannot, which is why parties will
often send a small "test" transaction to a wallet address prior to initiating a large transfer.

26.     Fourth, there are technical limitations that would prevent the Debtors from making
in kind distributions of certain types of cryptocurrency on the Debtors' platform.  There are 35
cryptocurrency tokens (approximately 20% of the Debtors' cryptocurrency portfolio based on
equivalent USD value) on the Debtors' platform that cannot be transferred directly to individual
wallets due to technical limitations associated with the Debtors' platform while they can be
withdrawn from certain third-party exchanges (like Binance.US).  Historically, users of the
Debtors' platform have exited from their positions in such tokens by selling such tokens for cash,
transactions that previously required close interaction with market makers to effectuate.  The only

13

way for the Debtors to distribute the value associated with these non-transferable tokens to creditors in Unsupported Jurisdictions is to liquidate the tokens and distribute the resulting cash.

27.     Finally, the Debtors would need to significantly increase the engineering, regulatory, compliance and other operational staff contemplated under the chapter 11 plan to facilitate manual transfers to individual customer wallets that they otherwise would not have to do if transfers to customers were made through the Binance.US platform.  The Debtors would also need to revive certain dormant contracts with third-party vendors to process distributions to creditors in this manner.  This would result in increased administrative costs as compared to the costs of liquidating the cryptocurrency associated with creditors in Unsupported Jurisdictions and distributing the equivalent value in cash.

28.     It is my understanding that the Unsupported Jurisdictions can provide temporary solutions to allow Binance US to make distributions in kind to creditors in such Unsupported Jurisdictions similar to all other jurisdictions.  For example, the Unsupported Jurisdictions have the right to grant or not grant Binance US a provisional license to permit it to open accounts on behalf of creditors in the Unsupported Jurisdictions in their discretion.  While I understand the states may ultimately decline to do so, the Debtors likewise should not jeopardize the Binance US Transaction—which is in the best interests of their estates as a whole—or take on significant additional risks and costs to endeavor to give in-kind distributions to creditors in Unsupported Jurisdictions if the state banking departments do not opt to provide such temporary solutions.

29.     I understand the Binance.US Purchase Agreement has a "No-Shop" provision which, upon entry of the Order, prohibits the Seller from soliciting alternative offers from third parties and such provision is consistent with what the Court previously approved under the FTX Purchase Agreement.  However, I also understand that the Binance.US Purchase Agreement

14

includes a "Fiduciary Out" on the terms set forth in the Binance.US Purchase Agreement, that allows the Debtors to consider: (a) inbound third party offers that may be superior to the Binance.US Purchase Agreement; and (b) the Toggle Transaction, which the Debtors will take steps to ensure they are in a position to execute, as quickly and efficiently as possible, if it ultimately becomes the best solution for creditors.

30.    Additionally, I understand that the Binance.US Purchase Agreement includes an expense reimbursement provision whereby the expense reimbursement would be owed by the Seller to Binance.US only in a narrow set of circumstances, but proved to be a critical provision during negotiations with Binance.US. Further, the Debtors successfully negotiated both (a) reimbursement by Binance.US of up to $15 million of Seller's expenses (subject to and in accordance with Section 6.21 of the Binance.US Purchase Agreement) and (b) a $10 million reverse termination fee payable to the Seller by Binance.US, in each case, subject to the terms and conditions set forth in the Binance.US Purchase Agreement. Notably, the Debtors' claims against Three Arrows Capital and other parties will remain with the bankruptcy estate and any recovery thereon will be distributed to creditors.

31.    Based upon my involvement in the marketing process, including discussions and negotiations in which I both observed and participated, I believe that the Binance.US Purchase Agreement and the proposed sale are the product of good-faith, arm's-length negotiations between sophisticated and well-represented parties, and, in light of the marketing process described above, the transactions contemplated by the Binance.US Purchase Agreement provide the most value for the Debtors' assets currently available under the circumstances present in these cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Dated:  January 9, 2023

/s/ Brian Tichenor
Name:  Brian Tichenor
Title:   Managing Director
Moelis & Company LLC
*Investment Banker and Financial Advisor to the Debtors and Debtors in Possession*

Exhibit 11

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## ORDER (I) AUTHORIZING ENTRY INTO THE
## BINANCE US PURCHASE AGREEMENT AND (II) GRANTING RELATED RELIEF

Upon the Motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an order (this "Order"): (i) authorizing entry into the

Binance US Purchase Agreement and (ii) granting related relief; and the Debtors having

determined, after an extensive marketing process, that BAM Trading Services Inc. d/b/a

Binance.US ("Binance US" or the "Purchaser") has submitted the highest or otherwise best bid for

the Acquired Assets; and the Debtors having selected Binance US as the Winning Bidder pursuant

to the Bidding Procedures Order; and upon adequate and sufficient notice of the Motion, all as

more fully set forth in the Motion; and upon the First Day Declaration and the Tichenor

Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334 and the *Amended Standing Order of Reference from the United States District Court for the*

*Southern District of New York*, entered February 1, 2012; and this Court having the power to enter

a final order consistent with Article III of the United States Constitution; and this Court having

found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Debtors
Ex-11

§§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND DETERMINED THAT:

A.    The Debtors and the Purchaser negotiated the Binance US Purchase Agreement at arm's length and in good faith, without collusion, all within the meaning of section 363(m) of the Bankruptcy Code.

B.    The agreement to reimburse Purchaser Expenses, as set forth in the Binance US Purchase Agreement, is: (1) commensurate to the real and substantial benefits conferred upon the Debtors' estates by the Purchaser; (2) reasonable and appropriate in light of the size and nature of the proposed sale contemplated by the Binance US Purchase Agreement, the commitments that have been made by the Purchaser, and the efforts that have been and will be expended by the Purchaser; and (3) necessary to induce the Purchaser to continue to pursue such sale and continue to be bound by the Binance US Purchase Agreement.  The Purchaser Expenses are an essential inducement to, and condition of, the Purchaser's entry into, and continuing obligations under, the Binance US Purchase Agreement.  Unless it is assured that the Purchaser Expenses will be available, the Purchaser is unwilling to be bound to the terms of the Binance US Purchase Agreement (including the obligation to maintain its committed offer in accordance with the terms

2

of the Binance US Purchase Agreement while such offer is subject to higher or otherwise better

bids as contemplated by the Bidding Procedures). The Purchaser has provided a material benefit

to the Debtors and their creditors by providing a baseline value, thereby increasing the likelihood

that the value of the Acquired Assets will be maximized through the Debtors' sale process.

C.      The amount of Purchaser Expenses to be paid shall be subject to the review and

approval of this Court for reasonableness, and the Binance.US Purchase Agreement is deemed

modified to reflect this term. Accordingly, the Purchaser Expenses are (1) fair, reasonable and

appropriate and designed to maximize value for the benefit of the Debtors' estates; and (2) an

actual and necessary cost of preserving the Debtors' estates within the meanings of sections 503(b)

and 507(a) of the Bankruptcy Code.

IT IS HEREBY ORDERED THAT:

## I.      Notice of the Motion.

1.      Notice of the Hearing, the Motion, and the Debtors' entry into the Binance US

Purchase Agreement, was timely, proper, and reasonably calculated to provide interested parties

with timely and proper notice thereof, and no other or further notice of the Motion and the Hearing

is, or shall be, required. The requirements of Bankruptcy Rule 6004(a) and the Local Rules are

satisfied by such notice. A reasonable opportunity to object and be heard with respect to the

Motion and the relief requested therein has been afforded to all interested persons and entities.

## II.     Highest or Otherwise Best Offer.

2.      The Debtors' pre- and postpetition marketing process with respect to the Acquired

Assets afforded a full, fair, and reasonable opportunity for any person or entity to make a higher

or otherwise better offer to purchase the Acquired Assets. The transactions contemplated by the

Binance US Purchase Agreement constitute the highest or otherwise best offer for the Acquired

Assets, and the Debtors' determination that the terms of the Binance US Purchase Agreement constitute the highest or otherwise best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment; *provided* that nothing in this Order shall limit or otherwise restrict in any way the Seller's rights and obligations under section 5.2 of the Binance US Purchase Agreement. Entry of this Order, including approval of the Seller's entry into, and performance (for the limited purposes approved by this Order) under, the Binance US Purchase Agreement, is in the best interests of the Debtors, their estates, creditors, and all other parties in interest.

### III.  General Provisions.

3.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these chapter 11 cases pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

4.      All objections to the Motion to authorize the Debtors to enter into the Binance US Purchase Agreement or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Hearing or by stipulation filed with the Court, and all reservations of rights regarding the Motion, are hereby denied and overruled on the merits with prejudice; *provided* that, notwithstanding anything in this Order or the Binance US Purchase Agreement, the rights of all parties to object to the Plan and final approval of the Disclosure Statement are expressly reserved and preserved.

5.      The request by the United States Trustee for the appointment of a Consumer Privacy Ombudsman is denied without prejudice for the reasons stated on the record at the Hearing.

6.      The Motion is granted as set forth herein.

7.      Voyager Digital, LLC, as seller under the Binance US Purchase Agreement, is authorized, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, to enter into the Binance US Purchase Agreement and perform its obligations under the Binance US Purchase Agreement other than those obligations to be performed at or after the consummation of the Sale, which obligations the Debtors will seek approval of in connection with confirmation of a chapter 11 plan.  The Seller and Purchaser are granted all rights and remedies provided to them under the Binance US Purchase Agreement.

8.      The Binance US Purchase Agreement shall be binding and specifically enforceable against the parties thereto in accordance with its terms, including, without limitation, Section 5.2 (the "No-Shop" provision) and, as applicable, those additional obligations set forth in Article V (Bankruptcy Court Matters) and Article VI (Covenants and Agreements) of the Binance US Purchase Agreement.

9.      The Debtors are authorized, but not directed, to enter into non-material amendments to the Binance US Purchase Agreement from time to time as necessary, subject to the terms and conditions set forth in the Binance US Purchase Agreement, and without further order of the Court.

10.      The Seller is authorized to satisfy the Purchaser Expenses pursuant to the terms and conditions set forth in the Binance US Purchase Agreement and subject to the review and approval of the Court for reasonableness.  The Purchaser Expenses provisions in the Binance US Purchase Agreement and this Order shall be binding on the Seller, its successors and assigns, and shall survive the termination of the Binance US Purchase Agreement, appointment of a chapter 11 trustee or similar fiduciary, and dismissal or conversion of the chapter 11 cases; *provided, however,* that the obligation to pay or honor the Purchaser Expenses shall be subject to the terms and

5

conditions of the Binance US Purchase Agreement, and the reasonableness of the amount of any

Purchaser Expenses paid to Binance US are subject to the Court's review and approval. The

Purchaser Expenses shall be entitled to administrative expense status under sections 503(b) and

507(a)(2) of the Bankruptcy Code.

11.     The Purchaser is obligated to satisfy the terms and conditions of the Binance US

Purchase Agreement in its entirety, including Section 2.2 (Good Faith Deposit), Section 6.21

(Seller Expenses), and Section 8.3 (the Reverse Termination Fee).

12.     To the extent the automatic stay provisions of section 362 of the Bankruptcy Code

would otherwise apply, such provisions are vacated and modified to the extent necessary to permit

the parties to the Binance US Purchase Agreement to exercise their termination rights thereunder

in accordance with its terms, and deliver any notice contemplated thereunder, in each case, without

further order of the Court.

13.     The Debtors are authorized to rebalance their cryptocurrency portfolio subject to

the terms of the Binance US Purchase Agreement.

14.     Notwithstanding anything to the contrary in this Order or in the Binance US

Purchase Agreement, upon the transfer of any cryptocurrency or cash to Binance US, subject to

approval of the Binance US Purchase Agreement and in accordance with the terms thereof,

Binance US shall have only nominal title to such cryptocurrency or cash, which shall be held solely

in a custodial capacity in trust and solely for the benefit of the Seller or the applicable User or

Eligible Creditor (each as defined in the Binance US Purchase Agreement). For the avoidance of

doubt, beneficial title to such cryptocurrency or cash shall remain with the Debtors, or the

applicable User or Eligible Creditor, as applicable.

15.     For the avoidance of doubt, notwithstanding anything to the contrary in this Order, this Order does not approve the Binance US Transaction or authorize the Debtors to consummate the Binance US Transaction.   Consummation of the transaction is contingent upon the consummation of a plan of reorganization, among other things.

16.     Nothing in this Order or the Binance US Purchase Agreement releases, impairs or otherwise precludes: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" within the meaning section 101(5) of the Bankruptcy Code; (ii) any claim of any Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of the closing of the Sale; or (iii) any liability to a Governmental Unit on the part of any Person other than the Debtors.  Nor shall anything in this Order or Binance US Purchase Agreement enjoin or otherwise bar a Governmental Unit from asserting or enforcing any liability described in the preceding sentence.   Notwithstanding anything to the contrary, nothing in this paragraph 14 shall be construed as a determination as to any liability or claim owing to a Governmental Unit or whether any Governmental Unit is subject to the automatic stay under section 362 of the Bankruptcy Code or limits, lifts or otherwise modifies the automatic stay under section 362 of the Bankruptcy Code.

17.     Further, nothing in this Order or the Binance US Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order or the Binance US Purchase Agreement shall relieve any entity from any otherwise applicable obligation to address or comply with information requests or inquiries from any Governmental Unit. Nothing in this Order or the Binance US Purchase Agreement shall affect

7

any valid setoff or recoupment rights of any Governmental Unit.  Nothing in this Order or the

Binance US Purchase Agreement divests any state tribunal of any otherwise applicable jurisdiction

it may have under police or regulatory law.  Nothing in this Order or the Binance US Purchase

Agreement shall be construed as a determination of whether the automatic stay applies to this

paragraph 14 or limits, lifts or otherwise modifies the automatic stay under section 362 of the

Bankruptcy Code.

18.     Notwithstanding the relief granted in this Order and any actions taken pursuant to

such relief, nothing in this Order shall be deemed:  (a) an admission as to the validity of any

particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular

claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication

or admission that any particular claim is of a type specified or defined in this Order or the Motion;

(e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365

of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy

Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual,

common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors

expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all

such liens.  Any payment made pursuant to this Order is not intended and should not be construed

as an admission as the validity of any particular claim or a waiver of the Debtors' rights to

subsequently dispute such claim.

19.     Notwithstanding anything to the contrary in this Order or the Binance US Purchase

Agreement, no transitional use of Oracle America Inc.'s (including any of its predecessors-in-

interest) (collectively, "Oracle")) licenses, products or services is authorized to any party by virtue

of the Binance US Purchase Agreement approval herein, absent a further agreement between

Oracle, Debtors and the Purchaser, or further order of Court specifically relating to transitional services.

20.     Notwithstanding anything in this Order or the Binance US Purchase Agreement, in the event that any party receives a Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases (Asset Purchase Agreement), attached to the order approving the Disclosure Statement as Exhibit 9, after February 1, 2023, such parties shall have 21 days from the mailing of such notice to object to any proposed cure; *provided* that such cure objection, if any, shall not preclude confirmation of the Plan or effectuation of the Binance US Transaction pursuant thereto.

21.     The Debtors shall maintain copies of their books and records as set forth in the Plan. Nothing in this Order shall affect the obligations of the Debtors and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

22.     Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the Hearing, nothing in the Motion, this Order, or announced at the Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis is expressly reserved.

23.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

24.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

25.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

26.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

27.     The failure to specifically include any particular provision of the Binance US Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that entry into the Binance US Purchase Agreement be authorized and approved; *provided* that the consummation of the Binance US Purchase Agreement shall be subject to confirmation of the Plan, and the rights of all parties to object to the Plan are expressly reserved and preserved.

28.     The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Binance US Purchase Agreement, all amendments thereto and any waivers and consents thereunder, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to interpretation, implementation, or enforcement of the Binance US Purchase Agreement, including, but not limited to, any matter, claim, or dispute arising from or relating to the Binance US Purchase Agreement, and any purported termination of the Binance US Purchase Agreement pursuant to paragraph 11 of this Order.

29.     To the extent that this Order is inconsistent with the Motion, the terms of this Order

shall govern.

Dated: New York, New York
       January 13, 2023

                                  /s/ **Michael E. Wiles**
                                  THE HONORABLE MICHAEL E. WILES
                                  UNITED STATES BANKRUPTCY JUDGE

# Exhibit 12

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## ORDER (I) SCHEDULING
## A COMBINED DISCLOSURE STATEMENT
## APPROVAL AND PLAN CONFIRMATION HEARING,
## (II) CONDITIONALLY APPROVING THE ADEQUACY OF THE DEBTORS'
## DISCLOSURE STATEMENT, (III) APPROVING (A) PROCEDURES FOR
## SOLICITATION, (B) FORMS OF BALLOTS AND NOTICES, (C) PROCEDURES
## FOR TABULATION OF VOTES AND (D) PROCEDURES FOR OBJECTIONS

Upon the motion (the "Motion")[2] of the Debtors for entry of an order pursuant to sections 105, 363, 1125, 1126, and 1128 of the Bankruptcy Code, Bankruptcy Rules 2002, 3016, 3017, 3018, 3020, and 9006 and Local Rules 3017-1, 3018-1, and 3020-1 (i) conditionally approving the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement"); (ii) scheduling a combined Disclosure Statement approval and Plan confirmation hearing; and (iii) approving: (a) the Solicitation and Voting Procedures; (b) the Combined Hearing Notice; (c) the Non-Voting Status Notices; (d) the Ballots; (e) the manner and form of the Solicitation Packages and the materials contained therein; (f) the

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital, Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion or the Disclosure Statement, as applicable.

| Debtors |
|---|
| Ex-12 |

Plan Supplement Notice; (g) the Assumption Notice and Rejection Notice; (h) the Voting Record

Date; (i) the Plan and Disclosure Statement Objection Deadline; (j) the Solicitation Deadline; (k)

the Publication Deadline; (l) the Plan Supplement Filing Deadline; (m) the Voting Deadline; (n)

the deadline to file the Voting Report; (o) the Confirmation Brief Deadline and Plan Objection

Reply Deadline; (p) the Combined Hearing Date; and (q) the dates and deadlines related thereto,

all as more fully described in the Motion; and this Court having jurisdiction over this matter

pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the*

*United States District Court for the Southern District of New York*, entered February 1, 2012; and

this Court having the power to enter a final order consistent with Article III of the United States

Constitution; and this Court having found that venue of this proceeding and the Motion in this

district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the

relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and

other parties-in-interest; and this Court having found that the Debtors' notice of the Motion and

opportunity for a hearing on the Motion were appropriate under the circumstances and no other

notice need be provided; and this Court having reviewed the Motion and having heard the

statements in support of the relief requested therein at a hearing before this Court (the "Hearing");

and this Court having determined that the legal and factual bases set forth in the Motion and at the

Hearing establish just cause for the relief granted herein; and upon all of the proceedings had

before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY

ORDERED THAT:

1.      The Motion is granted as provided herein.

I.    **Conditional Approval of the Disclosure Statement.**

2.    The Disclosure Statement is hereby conditionally approved as providing Holders of Claims entitled to vote on the Plan with adequate information to make an informed decision as to whether to vote to accept or reject the Plan in accordance with section 1125(a)(1) of the Bankruptcy Code.

3.    The Disclosure Statement (including all applicable exhibits thereto) provides Holders of Claims or Interests, and other parties-in-interest with sufficient notice of the injunction, exculpation, and release provisions contained in Article VIII of the Plan, in satisfaction of the requirements of Bankruptcy Rule 3016(c).

4.    The Debtors' request for a Combined Hearing on the final approval of the Disclosure Statement and Confirmation of the Plan, and the Confirmation dates and deadlines provided herein are approved.

II.   **Approval of the Combined Hearing Notice.**

5.    The Combined Hearing Notice, in the form attached hereto as **Exhibit 6** filed by the Debtors and served upon parties-in-interest in these chapter 11 cases by no later than the Solicitation Deadline, constitutes adequate and sufficient notice of the hearing to consider approval of the Disclosure Statement and confirmation of the Plan, the manner in which a copy of the Plan and Disclosure Statement can be obtained, and the time fixed for filing objections thereto, in satisfaction of the requirements of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Five business days following the entry of this Order, or as soon as practicable thereafter, the Debtors shall submit the Publication Notice for publication in *The New York Times* (National Edition) and the *Financial Times* (International Edition).

III. **Approval of the Materials and Timeline for Soliciting Votes.**

A. **Approval of Key Dates and Deadlines with Respect to the Plan and Disclosure Statement.**

The following dates are hereby established (subject to modification as necessary) with respect to the solicitation of votes to accept or reject, and voting on, the Plan:

a. ***Voting Record Date.*** **January 10, 2023**, as the date for determining (i) which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and receive Solicitation Packages in connection therewith and (ii) whether Claims have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of the respective Claim (the "Voting Record Date");

b. ***Solicitation Deadline.*** **January 25, 2023**, as the deadline for distributing Solicitation Packages, including Ballots, to Holders of Claims entitled to vote to accept or reject the Plan (the "Solicitation Deadline");

c. ***Publication Deadline.*** **Five (5) business days after entry of the Order** as the last date by which the Debtors will submit the Combined Hearing Notice for publication in a format modified for publication (the "Publication Notice");

d. ***Plan Supplement Filing Deadline.*** **February 15, 2023**, as the deadline by which the Debtors must file the Plan Supplement; *provided that* the Debtors must file the Schedule of Assumed Executory Contracts and Unexpired Leases and the Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases by **February 1, 2023** and the Schedule of Retained Causes of Action and the Customer Onboarding Protocol by **February 8, 2023** (each such date collectively, the "Plan Supplement Filing Deadline");

e. ***Voting Deadline.*** **February 22, 2023, at 4:00 p.m.** prevailing Eastern Time as the deadline by which **all** Ballots must be properly executed, completed, and delivered so that they are **actually received** (the "Voting Deadline") by Stretto, Inc. (the "Claims, Noticing, and Solicitation Agent").

B. **Approval of the Form of, and Distribution of, Solicitation Packages to Parties Entitled to Vote on the Plan.**

6. The Solicitation Packages to be transmitted by the Solicitation Deadline to those Holders of Claims in the Voting Classes entitled to vote on the Plan as of the Voting Record Date,

4

shall include the following, the form of each of which is hereby approved (and with respect to the

Disclosure Statement on a conditional basis only):

a.     the Disclosure Statement (and exhibits thereto, including the Plan);

b.     a copy of the Solicitation and Voting Procedures, attached hereto as **Exhibit 1**;

c.     the applicable forms of Ballots, including the mechanisms for (i) opting in to the Third-Party Release contained in Article VIII.B of the Plan and (ii) electing to contribute Contributed Third-Party Claims, and which will include the detailed voting instructions and instructions on how to submit the Ballot, which are attached hereto as **Exhibit 3A**, **Exhibit 3B**, **Exhibit 3C**, and **Exhibit 3D**;

d.     the Cover Letter, attached hereto as **Exhibit 4**;

e.     the letter from the Committee, attached hereto as **Exhibit 5** (the "Committee Letter")

f.     this Order (without exhibits);

g.     the Combined Hearing Notice, attached hereto as **Exhibit 6**;

h.     the Plan Supplement Notice, attached hereto as **Exhibit 7**;

i.     the Notice of Rejection of Executory Contracts and Unexpired Leases, attached hereto as **Exhibit 8**;

j.     the Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases (Asset Purchase Agreement), attached hereto as **Exhibit 9**;

k.     the Notice of Assumption of Executory Contracts and Unexpired Leases (Wind-Down Entity), attached hereto as **Exhibit 10**; and

l.     such other materials as the Court may direct.

7.     The Solicitation Packages provide the Holders of Allowed Claims entitled to vote

on the Plan with adequate information to make informed decisions with respect to voting on the

Plan in accordance with Bankruptcy Rules 2002(b) and 3017(d), the Bankruptcy Code, and the

Local Rules.

8.      The Debtors shall distribute Solicitation Packages to all Holders of Claims who are

entitled to vote.  The Debtors shall distribute the Disclosure Statement (including the Plan), and

copies of the Committee Letter to all other creditors and interest holders as required by Rule 3017

of the Federal Rules of Bankruptcy Procedure; *provided* that the Disclosure Statement (including

the Plan) and the Committee Letter need to be sent to creditors in unimpaired classes only to the

extent such creditors are being asking to release claims against non-debtors, or to contribute claims

to a trust, or both.  The Debtors shall also send notices to various groups of creditors or interest

holders in the forms attached to this Order and in the manner described in this Order.

9.      The Debtors are authorized, but not directed or required, to cause the Solicitation

Packages to be distributed through the Claims, Noticing, and Solicitation Agent by e-mail to those

Holders of Claims in Class 3 and by first-class U.S. mail to those Holders of Claims in Class 4A,

Class 4B, and Class 4C.  The Debtors shall provide a copy of the Plan, the Disclosure Statement,

and this Order (without exhibits) to Holders of Claims in Class 4A, Class 4B, and Class 4C in

electronic format (CD-ROM or flash drive) and to Holders of Claims in Class 3 via e-mail.  The

Ballots, the Cover Letter, the letter from the Committee, the Solicitation and Voting Procedures,

and the Combined Hearing Notice shall be provided by e-mail to Holders of Claims in Class 3 and

in paper format to Holders of Claims in Class 4A, Class 4B, and Class 4C.  On or before the

Solicitation Deadline, the Debtors (through the Claims, Noticing, and Solicitation Agent) shall

provide complete Solicitation Packages (other than Ballots) to the U.S. Trustee and to all parties

on the 2002 List as of the Voting Record Date.

10.     Any party that receives the materials in electronic format but would prefer to

receive materials in paper format may contact the Claims, Noticing, and Solicitation Agent and

request paper copies of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense).

11.     The Claims, Noticing, and Solicitation Agent is authorized to assist the Debtors in: (a) distributing the Solicitation Packages; (b) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by Holders of Claims against the Debtors; (c) responding to inquiries from Holders of Claims or Interests and other parties-in-interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan; (d) soliciting votes on the Plan; and (e) if necessary, contacting stakeholders regarding the Plan.

### C.     Approval of Notice of Filing of the Plan Supplement.

12.     The Debtors are authorized to send notice of the filing of the Plan Supplement substantially in the form attached hereto as **Exhibit 7** on the Plan Supplement Filing Deadline or as soon as reasonably practicable thereafter; *provided that* the Debtors shall file the Schedule of Assumed Executory Contracts and Unexpired Leases and the Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases by February 1, 2023 and the Schedule of Retained Causes of Action and the Customer Onboarding Protocol by February 8, 2023.

### D.     Approval of the Form of Notices to Non-Voting Classes.

13.     On or before the Solicitation Deadline, the Claims, Noticing, and Solicitation Agent shall mail (first-class postage pre-paid) a Non-Voting Status Notice, the form of each of which, including the mechanisms for (i) opting in to the Third-Party Release contained in Article VIII.B

of the Plan and (ii) electing to contribute Contributed Third-Party Claims, is hereby approved, to

the parties outlined below, who are not entitled to vote on the Plan:

a. ***Unimpaired Claims—Conclusively Presumed to Accept.*** Holders of Claims in Classes 1 and 2 are not impaired under the Plan and, therefore, are conclusively presumed to have accepted the Plan. Holders of such Claims will receive a notice, substantially in the form attached to this Order as **Exhibit 2A**, and to the extent they are being asked to release claims against third parties and/or to contribute claims to a trust they shall also receive materials described in paragraph 14.

b. ***Other Interests and Claims—Deemed to Reject.*** Holders of Claims or Interests in Class 5 (Alameda Loan Facility Claims), Class 6 (Section 510(b) Claims) and Class 9 (Existing Equity Holders) may not be entitled to a distribution under the Plan and, therefore, are deemed to reject the Plan and will receive a notice, substantially in the form attached to this Order as **Exhibit 2B**, in addition to the materials specified in paragraph 14.

c. ***Disputed Claims.*** Holders of Claims that are subject to a pending objection by the Debtors filed on or before the Solicitation Deadline are not entitled to vote the disputed portion of their claim. As such, Holders of such Claims will receive a notice, substantially in the form attached to this Order as **Exhibit 2C**, in additional to the materials specified in paragraph 14.

14. On or before the Solicitation Deadline, the Claims, Noticing, and Solicitation Agent

shall also provide copies of the Disclosure Statement and the Committee Letter (or a link to

download such materials, as applicable) by electronic mail to Holders of Claims or Interests in

Class 5 (Alameda Loan Facility Claims), Class 6 (Section 510(b) Claims), Class 9 (Existing Equity

Holders), and Holders of Claims that are subject to a pending objection by the Debtors filed on or

before the Solicitation Deadline.

15. The Debtors are not required to mail Solicitation Packages or other solicitation

materials to Holders of Claims that have already been paid in full during these chapter 11 cases or

that are authorized to be paid in full in the ordinary course of business pursuant to an order

previously entered by this Court unless such Holders are being asked to provide releases in favor

of non-Debtor parties and/or are being asked to contribute claims to a trust. In addition, the

Debtors are not required to mail Solicitation Packages or other solicitation materials to any party to whom the Combined Hearing Notice was sent but was subsequently returned as undeliverable if, despite reasonable efforts, the Debtors are unable to locate current addresses for such parties.

16.     The Debtors will not provide the Holders of Class 7 Intercompany Claims or Class 8 Intercompany Interests with a Solicitation Package or any other type of notice in connection with solicitation.

### E.     Approval of Notices to Contract and Lease Counterparties.

17.     The Debtors are authorized to mail a notice of rejection or assumption of any Executory Contracts or Unexpired Leases, in the forms attached hereto as **Exhibit 8**, **Exhibit 9**, and **Exhibit 10**, respectively, to the applicable counterparties to Executory Contracts and Unexpired Leases that will be rejected or assumed pursuant to the Plan, respectively, within the time periods specified in the Plan.

## IV.     Approval of the Solicitation and Voting Procedures.

18.     The Debtors are authorized to solicit, receive, and tabulate votes to accept the Plan in accordance with the Solicitation and Voting Procedures attached hereto as **Exhibit 1**, which are hereby approved in their entirety.  The Debtors are authorized to convert each Claim asserted in currency other than U.S. dollars (other than Cryptocurrency) to the equivalent U.S. dollar value using the conversion rate for the applicable currency at prevailing market prices as of 8:00 a.m. (prevailing Eastern Time) on the Petition Date, and to convert each Claim in Cryptocurrency using the fair market value of the Cryptocurrency (based in U.S. Dollars) as of July 5, 2022 at 00:00 UTC, *provided* that such conversion shall be for voting tabulation purposes only and shall not be binding for any other purpose on the Debtors, including, without limitation, for purposes of the allowance of, and distribution with respect to, Claims under the Plan as set forth in Section 4(iii)(a) and (b) of the Solicitation and Voting Procedures.

## V.  Approval of Procedures for Confirming the Plan.

### A.  Approval of the Timeline for Filing Objections to the Plan and Disclosure Statement.

19.   The following dates are hereby established (subject to modification as needed) with

respect to filing objections to the Plan and confirming the Plan:

a.   ***Cure Notice Deadline.***  **February 1, 2023** as the deadline by which the Debtors must serve each assumption notice to the applicable counterparty to Executory Contracts and Unexpired Leases;

b.   ***Cure Objection Deadline.***  **February 22, 2023, at 4:00 p.m.** prevailing Eastern Time as the deadline by which objections to the proposed cure costs and objections to the assumption and/or assignment of Executory Contracts and Unexpired Leases must be filed with the Court and served so as to be **actually received** by the appropriate notice parties (the "Cure Objection Deadline");

c.   ***Plan and Disclosure Statement Objection Deadline.***  **February 22, 2023, at 4:00 p.m.** prevailing Eastern Time as the deadline by which objections to the Plan and Disclosure Statement must be filed with the Court and served so as to be **actually received** by the appropriate notice parties (the "Plan and Disclosure Statement Objection Deadline");

d.   ***Deadline to File Voting Report.***  **February 28, 2023, at 4:00 p.m.**, prevailing Eastern Time, as the date by which the report tabulating the voting on the Plan (the "Voting Report") shall be filed with the Court;

e.   ***Confirmation Brief Deadline and Plan Objection Reply Deadline.***  **February 28, 2023, at 4:00 p.m.** prevailing Eastern Time as the deadline by which the Debtors shall file their brief in support of the adequacy of the Disclosure Statement and Confirmation of the Plan (the "Confirmation Brief Deadline") and deadline by which replies to objections to the Disclosure Statement and Plan must be filed with the Court (the "Plan Objection Reply Deadline"); and

f.   ***Combined Hearing Date.***  **March 2, 2023**, or as soon thereafter as the Debtors may be heard, as the date for the hearing at which the Court will consider approval of the Disclosure Statement and Confirmation of the Plan (the "Combined Hearing Date").

**B.     Approval of the Procedures for Filing Objections to the Adequacy of the Disclosure Statement or Confirmation of the Plan.**

20.     Objections to the final approval of the Disclosure Statement or confirmation of the Plan will not be considered by the Court unless such objections are timely filed and properly served in accordance with this Order and the Case Management Order.  Specifically, all objections to final approval of the Disclosure Statement or confirmation of the Plan or requests for modifications to the Plan, if any, **must**:  (a) be in writing; (b) conform to the Bankruptcy Rules and the Local Rules; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Court and served upon the notice parties so as to be **actually received** on or before the **February 22, 2023, at 4:00 p.m.** prevailing Eastern Time by each of the notice parties identified in the Combined Hearing Notice.

**C.     Approval of the Procedures for Filing Objections to Proposed Cure Costs or to the Assumption or Assignment of Executory Contracts and Unexpired Leases.**

21.     Objections to proposed cure costs in connection with an assumption notice, or to the assumption or assignment of Executory Contracts and Unexpired Leases, will not be considered by the Court unless such objections are timely filed and properly served in accordance with this Order and the Case Management Order.  Specifically, all such objections **must**:  (a) be in writing; (b) conform to the Bankruptcy Rules and the Local Rules; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Court and served upon the notice parties so as to be **actually received** on or before the **February 22, 2023, at 4:00**

**p.m.** prevailing Eastern Time by each of the notice parties identified in the Combined Hearing Notice.

22.     Notwithstanding the foregoing provisions, if (pursuant to the Binance US Purchase Agreement) any party receives a Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases after February 1, 2023, such party shall have 21 days from the mailing of such notice to object to any proposed cure and to object to any proposed assumption or assignment of such Executory Contract or Unexpired Lease, and the confirmation of the Plan and the approval and effectuation of the Binance.US Transaction shall not be contingent upon or affected by the resolution of such objections.

### D.     Approval of Consequences of Not Confirming or Consummating the Plan.

23.     If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (1) the Plan will be null and void in all respects; (2) any settlement or compromise not previously approved by Final Order of the Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Classes of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

### VI.     No Effect on Governmental Regulatory Authority

24.     Nothing in this Order or the order approving entry into the Binance US APA releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("<u>Governmental Unit</u>") that is not a "claim" within the meaning section 101(5) of the

Bankruptcy Code; (ii) any liability to a Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of the closing of the Binance US Transaction; or (iii) any liability to a Governmental Unit on the part of any Person other than the Debtors. Nor shall anything in this Order or the order approving entry into the Binance US APA enjoin or otherwise bar a Governmental Unit from asserting or enforcing any liability described in the preceding sentence. Notwithstanding anything to the contrary, nothing in this paragraph 21 shall be construed as a determination as to any liability or claim owing to a Governmental Unit or whether any Governmental Unit is subject to the automatic stay under section 362 of the Bankruptcy Code or limits, lifts or otherwise modifies the automatic stay under section 362 of the Bankruptcy Code.

25.    Further, nothing in this Order or the order approving entry into the Binance US APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order or the order approving entry into the Binance US APA shall relieve any entity from any otherwise applicable obligation to address or comply with information requests or inquiries from any Governmental Unit. Nothing in this Order or the order approving entry into the Binance US APA shall affect any valid setoff or recoupment rights of any Governmental Unit. Nothing in this Order or the order approving entry into the Binance US APA divests any tribunal of any otherwise applicable jurisdiction it may have under police or regulatory law. Nothing in this order or the order approving entry into the Binance US APA shall be construed as a determination of whether the automatic stay applies to this paragraph 22 or limits, lifts or otherwise modifies the automatic stay under section 362 of the Bankruptcy Code.

## VII. Miscellaneous.

26.     The Debtors reserve the right to modify the Plan in accordance with Article X thereof, including the right to withdraw the Plan as to any or all Debtors at any time before the Confirmation Date.

27.     Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a proof of claim after the Voting Record Date.

28.     Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, this Order, or any findings announced at the Combined Hearing, nothing in the Disclosure Statement, the Plan, this Order, or announced at the Combined Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis is expressly reserved.

29.     The Debtors shall maintain copies of their books and records as set forth in the Plan. Nothing in this Order shall affect the obligations of the Debtors and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

30.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

31.     Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

32.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

14

33.     The Court retains jurisdiction with respect to all matters arising from or related to

the interpretation or implementation of this Order.

Dated:  New York, New York
        January 13, 2023

                                    /s/ **Michael E. Wiles**
                                    THE HONORABLE MICHAEL E. WILES
                                    UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

**Solicitation and Voting Procedures**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## SOLICITATION AND VOTING PROCEDURES

**PLEASE TAKE NOTICE THAT** on [●], 2023, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order") that (a) conditionally approved the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") for the purposes of solicitation, (b) authorized the Debtors to solicit votes with regard to the acceptance or rejection of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Plan"),[2] (c) approved the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approved procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

>        1.        The Voting Record Date.

The Court has approved **January 10, 2023** as the record date for purposes of determining which Holders of Claims in Class 3 (Account Holder Claims), Class 4A (OpCo General Unsecured Claims), Class 4B (HoldCo General Unsecured Claims) and Class 4C (TopCo General Unsecured Claims) are entitled to vote on the Plan (the "Voting Record Date").

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]     Capitalized terms not otherwise defined herein shall have the meaning given to them in the *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections, and (IV) Granting Related Relief* [Docket No. 779] or the Plan, as applicable.

2.    The Voting Deadline.

The Court has approved **February 22, 2023, at 4:00 p.m.** prevailing Eastern Time as the voting deadline (the "Voting Deadline") for the Plan.  The Debtors may extend the Voting Deadline, in their discretion, without further order of the Court.  The Voting Deadline for any counterparty to an Unexpired Lease or Executory Contract which is identified as rejected through the *Notice Regarding Executory Contracts and Unexpired Leases to be Rejected Pursuant to the Plan* mailed later than five (5) days prior to the Voting Deadline shall be extended by two (2) Business Days.

To be counted as votes to accept or reject the Plan, all ballots (the "Ballots") must be executed, completed, and delivered pursuant to the instructions set forth on the applicable Ballot so that they are **actually received** by Stretto, Inc. (the "Claims, Noticing, and Solicitation Agent") no later than the Voting Deadline.  Delivery of a Ballot to the Claims, Noticing, and Solicitation Agent by e-mail, facsimile, or other electronic means, other than via the Stretto online voting portal at https://cases.stretto.com/Voyager/balloting, shall not be valid.

3.    Form, Content, and Manner of Notices.

(i)    The Solicitation Package.

The following materials shall constitute the solicitation package (the "Solicitation Package"):

a.    a copy of these Solicitation and Voting Procedures;

b.    the applicable opt-in release notice, substantially in form attached as **Exhibit 2A** and **Exhibit 2B** to the Disclosure Statement Order, as applicable;

c.    the applicable form of Ballot, substantially in the form attached as **Exhibit 3A**, **Exhibit 3B**, **Exhibit 3C**, or **Exhibit 3D**, to the Disclosure Statement Order, as applicable;

d.    a pre-paid, pre-addressed return envelope for Holders of Claims in Class 4A (OpCo General Unsecured Claims), Class 4B (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims);

e.    the Cover Letter, which describes the contents of the Solicitation Package and urges Holders of Claims in each of the Voting Classes to vote to accept the Plan;

f.    the Committee Letter,

g.    the conditionally approved Disclosure Statement (and exhibits thereto, including the Plan);

h.    the Disclosure Statement Order (excluding exhibits, except for these Solicitation and Voting Procedures);

i.    the Combined Hearing Notice; and

j.    any additional documents that the Court has ordered to be made available.

(ii)    Distribution of the Solicitation Package.

The Solicitation Package shall provide the Plan, the Disclosure Statement, and the Disclosure Statement Order (without exhibits, except the Solicitation and Voting Procedures) in electronic format, and all other contents of the Solicitation Package, including the Ballots and the Cover Letter, shall be provided in paper format, except with respect to Holders of Claims in Class 3 (Account Holder Claims), who shall receive the entire Solicitation Package in electronic format.  Any party that receives the materials in electronic format but would prefer paper format may contact the Claims, Noticing, and Solicitation Agent by:  calling the Claims, Noticing, and Solicitation Agent at (855) 473-

8665 (Toll-Free) or +1 (949) 271-6507 (International); (b) e-mailing the Claims, Noticing, and Solicitation Agent at VoyagerInquiries@Stretto.com with a reference to "In re: Voyager - Solicitation Inquiry" in the subject line; or (c) writing to the Claims, Noticing, and Solicitation Agent at Voyager Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602.

The Debtors shall serve, or cause to be served, all of the materials in the Solicitation Package (excluding the Ballots) on the U.S. Trustee and all parties who have requested service of papers in this case pursuant to Bankruptcy Rule 2002 as of the Voting Record Date. In addition, the Debtors shall distribute, or cause to be distributed, the Solicitation Package to all Holders of Claims in the Voting Classes on or before **January 25, 2023** who are entitled to vote, as described in Section 4(i) below.

To avoid duplication and reduce expenses, the Debtors will make every reasonable effort to ensure that any Holder of a Claim who has filed duplicative Claims against a Debtor (whether against the same or multiple Debtors) that are classified under the Plan in the same Voting Class receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class as against that Debtor.

(iii)    <u>Resolution of Disputed Claims for Voting Purposes; Resolution Event</u>.

a.    The Debtors shall have until ten days prior to the Voting Deadline to object to Proofs of Claims for purposes of voting on the Plan (the "<u>Voting Claims Objection Deadline</u>"). To the extent the Debtors wish to object to a Proof of Claim that is timely filed following the Voting Claims Objection Deadline but prior to the Voting Deadline, the Debtors shall promptly file such objection. Any such objection that remains pending as of the Combined Hearing Date will be heard on an emergency basis at the Combined Hearing.

b.    If a Claim in a Voting Class is subject to an objection that is filed with the Court on or prior to seven days before the Voting Deadline: (i) the Debtors shall cause the applicable Holder to be served with the *Notice of Non-Voting Status with Respect to Disputed Claims* substantially in the form annexed as **Exhibit 2C** to the Disclosure Statement Order; and (ii) the applicable Holder shall not be entitled to vote to accept or reject the Plan on account of such Claim unless a Resolution Event (as defined herein) occurs as provided herein.

c.    If a Claim in a Voting Class is subject to an objection that is filed with the Court less than seven days prior to the Voting Deadline, the applicable Claim shall be deemed temporarily allowed for voting purposes only, without further action by the Holder of such Claim and without further order of the Court, unless the Court orders otherwise.

d.    A "<u>Resolution Event</u>" means the occurrence of one or more of the following events no later than two business days prior to the Voting Deadline:

i.    an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code;

ii.    an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a);

iii.    a stipulation or other agreement is executed between the Holder of such Claim and the Debtors resolving the objection and allowing such Claim in an agreed upon amount; or

iv.    the pending objection is voluntarily withdrawn by the objecting party.

e.    No later than one Business Day following the occurrence of a Resolution Event, the Debtors shall cause the Claims, Noticing, and Solicitation Agent to distribute via email,

hand delivery, or overnight courier service a Solicitation Package and a pre-addressed, postage pre-paid envelope to the relevant Holder.

(iv)    <u>Non-Voting Status Notices for Unimpaired Classes and Classes Deemed to Reject the Plan</u>.

Certain Holders of Claims and Interests that are not classified in accordance with section 1123(a)(1) of the Bankruptcy Code or who are not entitled to vote because they are Unimpaired or otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code will receive the *Notice of Non-Voting Status to Holders of Unimpaired Claims Conclusively Presumed to Accept the Plan*, substantially in the form annexed as **Exhibit 2A** to the Disclosure Statement Order, and will also receive the Disclosure Statement (including the Plan) and the Committee Letter if they are being asked to release claims against non-Debtors and/or to contribute claims to a trust. The notice will instruct Holders who do not receive Solicitation Packages as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots). Certain Holders of Claims or Interests who are not entitled to vote because they are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code will receive the *Notice of Non-Voting Status to Holders of Impaired Claims and Interests Deemed to Reject the Plan*, substantially in the form annexed as **Exhibit 2B** to the Disclosure Statement Order, and will receive the Disclosure Statement (including the Plan) and the Committee Letter.

(v)    <u>Notices in Respect of Executory Contracts and Unexpired Leases</u>.

Counterparties to Executory Contracts and Unexpired Leases that receive a *Notice of Rejection of Executory Contracts and Unexpired Leases* substantially in the form attached as **Exhibit 8** or a *Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases* substantially in the form attached as **Exhibit 9** or a *Notice of Assumption of Executory Contracts and Unexpired Leases* substantially in the form attached as **Exhibit 10**, as applicable, to the Disclosure Statement Order, may file an objection to the Debtors' proposed assumption, rejection, or cure amount, as applicable. Such objections must be in writing and filed with the Clerk of the United States Bankruptcy Court for the Southern District of New York on or before **February 22, 2023, at 4:00 p.m.** and shall be served as set forth in the applicable notice of assumption or rejection.

Notwithstanding the foregoing, if (pursuant to the Binance US Purchase Agreement) any party receives a Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases after February 1, 2023, such party shall have 21 days from the mailing of such notice to object to any proposed cure and to object to any proposed assumption or assignment of such Executory Contract or Unexpired Lease, and the confirmation of the Plan and the approval and effectuation of the Binance.US Transaction shall not be contingent upon or affected by the resolution of such objections.

4.    Voting and Tabulation Procedures.

(i)    <u>Holders of Claims Entitled to Vote</u>.

Only the following Holders of Claims in the Voting Classes shall be entitled to vote with regard to such Claims:

    a.    Holders of Claims who, on or before the Voting Record Date, have timely filed a Proof of Claim (or an untimely Proof of Claim that has been Allowed as timely by the Court under applicable law on or before the Voting Record Date) that: (i) has not been expunged, disallowed, disqualified, withdrawn, or superseded prior to the Voting Record Date; and (ii) is not the subject of a pending objection filed with the Court at least seven (7) days prior to the Voting Deadline, pending a Resolution Event as provided herein; *provided* that a Holder of a Claim that is the subject of a pending objection on a "reduce and allow" basis shall receive a Solicitation Package and be entitled to vote such Claim in the reduced amount contained in such objection absent a further order of the Court;

    b.    Holders of Claims that are listed in the Schedules, *provided* that Claims that are scheduled as contingent, unliquidated, or disputed (excluding such scheduled disputed, contingent, or unliquidated Claims that have been paid or superseded by a timely Filed Proof of Claim)

4

shall be allowed to vote only in the amounts set forth in Section 4(ii) of these Solicitation and Voting Procedures; *provided*, *further*, that if the Schedules are amended to schedule Claims against multiple Debtor entities, then votes on account of such Claims shall be tabulated for each applicable Debtor entity;

c.    Holders whose Claims arise:  (i) pursuant to an agreement or settlement with the Debtors, as reflected in a document filed with the Court; (ii) from an order entered by the Court; or (iii) from a document executed by the Debtors pursuant to authority granted by the Court, in each case regardless of whether a Proof of Claim has been filed or the Claim was scheduled as contingent, unliquidated, or disputed;

d.    Holders of any Claim that has been temporarily allowed to vote on the Plan pursuant to Bankruptcy Rule 3018; and

e.    with respect to any Entity described in subparagraphs (a) through (d) above, who, on or before the Voting Record Date, has transferred such Entity's Claim to another Entity, the assignee of such Claim; *provided* that such transfer or assignment has been fully effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Date.

(ii)    <u>Establishing Claim Amounts for Voting Purposes</u>.

**Filed and Scheduled Claims.**  The Claim amounts established herein shall control for voting purposes only and shall not constitute the Allowed amount of any Claim.  Moreover, any amounts filled in on Ballots by the Debtors through the Claims, Noticing, and Solicitation Agent, as applicable, are not binding for purposes of allowance and distribution. In tabulating votes, the amount of the Claim associated with each claimant's vote shall be determined as follows:

a.    the Claim amount: (i) settled and/or agreed upon by the Debtors, as reflected in a document filed with the Court; (ii) set forth in an order of the Court; or (iii) set forth in a document executed by the Debtors pursuant to authority granted by the Court;

b.    the Claim amount Allowed (temporarily or otherwise) pursuant to a Resolution Event;

c.    the Claim amount contained in a Proof of Claim that has been timely filed (or deemed timely filed by the Court under applicable law), except for any amounts asserted on account of any interest accrued after the Petition Date; *provided*, *however*, that Ballots cast by Holders of Class 4A, Class 4B, and Class 4C Claims who timely file a Proof of Claim in respect of a contingent Class 4A, Class 4B, and/or Class 4C Claim or in a wholly-unliquidated or unknown amount that is not the subject of a pending objection, based on a reasonable review of the Proof of Claim and supporting documentation by the Debtors or their advisors, will count for satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code, and, if such Proof of Claim is filed as partially liquidated and partially unliquidated, such Class 4A, Class 4B, and/or Class 4C Claim will be Allowed for voting purposes only in the liquidated amount; *provided*, *further*, *however*, that to the extent that any Claim amount contained in a Proof of Claim is different from the Claim amount set forth in a document filed with the Court referenced in subparagraph (a) above, the Claim amount in the document filed with the Court shall supersede the Claim amount set forth on the respective Proof of Claim;

d.    the Claim amount listed in the Schedules (to the extent such Claim is not superseded by a timely Filed Proof of Claim), provided that such Claim is not scheduled as contingent, disputed, or unliquidated; if a Claim is listed in the Debtors' Schedules as contingent, unliquidated, or disputed and a proof of claim was not (i) filed by the applicable bar date

5

for filing Proofs of Claim established by the Court or (ii) deemed timely filed by an order of the Court prior to the Voting Record Date, such Claim shall be disallowed for voting purposes;

e.       Holders of Proofs of Claim filed for $0.00 or zero (0) Cryptocurrency, as applicable, are not entitled to vote;

f.       Claims that have been paid, scheduled to be paid in the ordinary course, or otherwise satisfied are disallowed for voting purposes;

g.       notwithstanding anything to the contrary contained herein, any creditor who has filed or purchased duplicate Claims within the same Voting Class shall, to the extent possible, be provided with only one Solicitation Package and one Ballot for voting a single Claim in such Class, regardless of whether the Debtors have objected to such duplicate Claims; and

h.       in the absence of any of the foregoing, such Claim shall be disallowed for voting purposes.

If a Proof of Claim is amended, the last filed Claim shall be subject to these rules and will supersede any earlier filed Claim, and any earlier filed Claim will be disallowed for voting purposes.

(iii)      <u>Voting and Ballot Tabulation Procedures</u>.

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots, so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Local Rules:

a.       each Claim asserted in currency other than U.S. dollars (other than Cryptocurrency) shall be automatically deemed converted to the equivalent U.S. dollar value using the conversion rate for the applicable currency at prevailing market prices as of 8:00 a.m. (prevailing Eastern Time) on the Petition Date;

b.       each Claim asserted in Cryptocurrency shall be automatically deemed converted using the fair market value of the Cryptocurrency (based in U.S. Dollars) as of July 5, 2022 at 00:00 UTC.  Such conversion shall be for voting tabulation purposes only and shall not be binding for any other purpose on the Debtors, including, without limitation, for purposes of allowance of, and distribution with respect to, Claims under the Plan;

c.       except as otherwise provided in the Solicitation and Voting Procedures, unless the Ballot being furnished is timely submitted and actually received by the Claims, Noticing, and Solicitation Agent on or prior to the Voting Deadline (as the same may be extended by the Debtors), the Debtors shall reject such Ballot as invalid and, therefore, shall not count it in connection with confirmation of the Plan;

d.       the Claims, Noticing, and Solicitation Agent will date-stamp all Ballots when received. The Claims, Noticing, and Solicitation Agent shall retain the original Ballots and an electronic copy of the same for a period of one year after the Effective Date of the Plan, unless otherwise ordered by the Court;

e.       the Claims, Noticing, and Solicitation Agent shall tabulate Ballots on a Debtor-by-Debtor basis;

f.       the Debtors will file the Voting Report by **February 28, 2023 at 4:00 p.m.** prevailing Eastern Time.  The Voting Report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each an "<u>Irregular Ballot</u>"), including those Ballots that are late or (in whole or in material part)

illegible, unidentifiable, lacking signatures or other necessary information, or damaged. The Voting Report shall indicate the Debtors' decision with regard to such Irregular Ballots;

g.　the method of delivery of Ballots to be sent to the Claims, Noticing, and Solicitation Agent is at the election and risk of each Holder, and except as otherwise provided, a Ballot will be deemed delivered only when the Claims, Noticing, and Solicitation Agent actually receives the executed Ballot;

h.　an executed Ballot is required to be submitted by the Entity submitting such Ballot. Delivery of a Ballot to the Claims, Noticing, and Solicitation Agent by facsimile, or any electronic means other than expressly provided in these Solicitation and Voting Procedures will not be valid;

i.　no Ballot should be sent to the Debtors, the Debtors' agents (other than the Claims, Noticing, and Solicitation Agent), or the Debtors' financial or legal advisors, and, if so sent, will not be counted;

j.　if multiple Ballots are received from the same Holder with respect to the same Claim or Interest prior to the Voting Deadline, the last properly executed Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior received Ballot;

k.　Holders must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split any votes.  Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted.  Further, to the extent there are multiple Claims within the same Class, the applicable Debtor may, in its discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes;

l.　a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a Holder of Claims must indicate such capacity when signing;

m.　the Debtors, subject to a contrary order of the Court, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report;

n.　unless waived or as ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the Voting Deadline or such Ballots will not be counted; *provided* that the Debtors shall notify any Holder who submitted a Ballot not in proper form of any such defects and their intent to reject such Ballot if the alleged defects are not remedied prior to the Voting Deadline after receipt of notice of such alleged defect;

o.　in the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected;

p.　subject to any order of the Court, the Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; *provided* that any such rejections will be documented in the Voting Report;

q.      if a Claim has been estimated or otherwise Allowed only for voting purposes by order of the Court, such Claim shall be temporarily Allowed in the amount so estimated or Allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

r.      if an objection to a Claim is filed, such Claim shall be treated in accordance with the procedures set forth herein;

s.      the following Ballots shall not be counted in determining the acceptance or rejection of the Plan: (i) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (ii) any Ballot cast by any Entity that does not hold a Claim in a Voting Class; (iii) any Ballot cast for an OpCo General Unsecured Claim, HoldCo General Unsecured Claim, or TopCo General Unsecured Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim shall be entitled to vote in the amount of $1.00); (iv) any unsigned Ballot or Ballot lacking an original signature (for the avoidance of doubt, a Ballot submitted via the Claims, Noticing, and Solicitation Agent's online balloting portal shall be deemed an original signature); (v) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; (vi) any Ballot transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (vii) any Ballot sent to any of the Debtors, the Debtors' agents or representatives, or the Debtors' advisors (other than the Claims, Noticing, and Solicitation Agent); and (viii) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein;

t.      after the Voting Deadline, no Ballot may be withdrawn or modified without the prior written consent of the Debtors or further order of the Court;

u.      the Debtors are authorized to enter into stipulations with the Holder of any Claim agreeing to the amount of a Claim for voting purposes; and

v.      where any portion of a single Claim has been transferred to a transferee, all holders of any portion of such single Claim will be (a) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other solicitation and voting procedures set forth herein) and (b) required to vote every portion of such Claim collectively to accept or reject the Plan.  In the event that (a) a Ballot, (b) a group of Ballots within a Voting Class received from a single creditor, or (c) a group of Ballots received from the various Holders of multiple portions of a single Claim or partially reject and partially accept the Plan, such Ballots shall not be counted.

5.      Amendments to the Plan and Solicitation and Voting Procedures.

The Debtors reserve the right to make non-substantive or immaterial changes to the Plan, Disclosure Statement, Combined Hearing Notice, Solicitation Packages, Non-Voting Status Notices, Ballots, Publication Notice, Cover Letter, the Committee Letter, these Solicitation and Voting Procedures, Plan Supplement Notice, Rejection Notice, Assumption and Assignment Notice, Assumption Notice, and any related documents without further order of the Court, including changes to correct typographical and grammatical errors, if any, and to make conforming changes to the any materials in the Solicitation Packages before distribution.

*        *        *        *        *

**Exhibit 2A**

**Unimpaired Non-Voting Status Notice**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) Case No. 22-10943 (MEW) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**NOTICE OF**
**(I) NON-VOTING STATUS TO**
**HOLDERS OF UNIMPAIRED CLAIMS CONCLUSIVELY**
**PRESUMED TO ACCEPT THE PLAN, (II) OPPORTUNITY TO OPT IN TO THE**
**THIRD-PARTY RELEASES, AND (III) OPPORTUNITY TO CONTRIBUTE THIRD-PARTY CLAIMS**

**PLEASE TAKE NOTICE THAT** on [●], 2023, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order") that (a) conditionally approved the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") for the purposes of solicitation, (b) authorized the Debtors to solicit votes with regard to the acceptance or rejection of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Plan"),[2] (c) approved the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approved procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of your Claim under the Plan, **you are not entitled to vote on the Plan**. Specifically, under the terms of the Plan, as a Holder of a Claim (as currently asserted against the Debtors) that is Unimpaired and conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, you are **not** entitled to vote on the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** because you are receiving an opt in form (the "Opt-In Notice"), the Disclosure Statement (including the Plan) and the Committee Letter are included with this notice so that you may review the release provisions and all other disclosure to inform your decision as to whether to complete the Opt-In Form or to contribute your Contributed Third-Party Claims to the Wind-Down Entity.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]     Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider approval of the Disclosure Statement and Confirmation of the Plan (the "Combined Hearing") will commence on **March 2, 2023 at [●]:00 [●].m.** prevailing Eastern Time, or such other time as the Court determines, before the Honorable Michael E. Wiles, in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York, New York 10004.  In accordance with General Order M-543 dated March 20, 2020, the Hearing will be conducted telephonically.  Any parties wishing to participate must do so by making arrangements through CourtSolutions by visiting https://www.court-solutions.com.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to confirmation of the Plan and the adequacy of the Disclosure Statement is **February 22, 2023 at 4:00 p.m.** prevailing Eastern Time (the "Plan and Disclosure Statement Objection Deadline").  Any objection to the Plan **must**:  (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be **actually received** on or before **February 22, 2023 at 4:00 p.m.** prevailing Eastern Time:

| *Debtors* | |
|---|---|
| **Voyager Digital Holdings, Inc.**<br>33 Irving Place, Suite 3060<br>New York, NY 10003<br>Attention:  Stephen Ehrlich and David Brosgol | |
| *Counsel to the Debtors* | *Counsel to the Committee* |
| **Kirkland & Ellis LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention:  Joshua A. Sussberg; Christopher Marcus; Christine A. Okike; Allyson B. Smith | **McDermott Will & Emery LLP**<br>One Vanderbilt Avenue<br>New York, NY 10017-3852<br>Attention:  Darren Azman; Joseph B. Evans; Grayson Williams; Gregg Steinman |
| *United States Trustee* | |
| **Office of the United States Trustee for the Southern District of New York**<br>U.S. Federal Office Building<br>201 Varick Street, Room 1006<br>New York, NY 10014<br>Attention:  Richard Morrissey; Mark Bruh | |

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of any of the related documents, you should contact Stretto, Inc., the claims, noticing, and solicitation agent retained by the Debtors in these chapter 11 cases (the "Claims, Noticing, and Solicitation Agent"), by:  (a) calling the Claims, Noticing, and Solicitation Agent at (855) 473-8665 (Toll Free) or +1 (949) 271-6507 (International); (b) e-mailing the Claims, Noticing, and Solicitation Agent at VoyagerInquiries@Stretto.com with a reference to "In re: Voyager - Solicitation Inquiry" in the subject line; or (c) writing to the Claims, Noticing, and Solicitation Agent at Voyager Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602.  You may also obtain copies of any pleadings filed with the Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager/, or for a fee via PACER at: http://pacer.psc.uscourts.gov.

**OPTIONAL: RELEASE OPT IN NOTICE**

You are receiving this Opt-In Notice because you are a Holder of a Claim that is not entitled to vote on the Plan. Article IV of the Plan contains certain information regarding contribution of Contributed Third-Party Claims. Article VIII of the Plan contains certain release, injunction, and exculpation provisions, including the Third-Party Releases set forth below. You are advised to carefully review and consider the Plan, including the release, injunction, and exculpation provisions, as your rights may be affected. **Your decision to complete and return the Opt-In Notice is entirely voluntary and not a requirement under the Plan or applicable law**.

**If you choose to opt into the Third-Party Release set forth in Article VIII.B of the Plan and/or to contribute your Contributed Third-Party Claim(s) to the Wind-Down Entity, you may submit your election to opt-in by submitting the electronic version of your Opt In Notice through the e-balloting portal (the "E-Balloting Portal"), which can be accessed via the Debtors' restructuring website, https://cases.stretto.com/Voyager/balloting, according to instructions provided below**

**THIS OPT IN NOTICE MUST BE ACTUALLY RECEIVED BY THE CLAIMS, NOTICING, AND SOLICITATION AGENT BY FEBRUARY 22, 2023, AT 4:00 P.M. PREVAILING EASTERN TIME (THE "OPT IN DEADLINE").**

<u>Item 1</u>. **Amount of Claim.**

The undersigned hereby certifies that, as of January 10, 2023 (the "<u>Voting Record Date</u>"), the undersigned was the Holder of Claims in one or more of Classes 1 or 2 in the following aggregate amount of claims (insert amount in box below):

> Class 1 $ _____
>
> Class 2 $ _____

<u>Item 2.</u>　　　　　　**Important information regarding the Third-Party Release.**

AS A HOLDER OF A CLAIM, YOU ARE A "RELEASING PARTY" UNDER THE PLAN IF YOU OPT IN TO THE RELEASES CONTAINED IN THE PLAN.  YOU MAY CHECK THE BOX BELOW TO ELECT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.B OF THE PLAN.  YOU WILL BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN <u>ONLY IF</u> (I) THE COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT IN TO THE RELEASES AND (II) YOU CHECK THE BOX BELOW AND SUBMIT THE OPT IN NOTICE BY THE OPT IN DEADLINE.

---

☐　　　**By checking this box, you elect to opt <u>IN</u> to the Third-Party Releases.**

---

**Article VIII.B of the Plan contains the following Third-Party Release:**

　　　　**Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in Article VIII.B of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.**

　　　　**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

Definitions Related to the Debtor Release and the Third-Party Release:

(1)　　　　Under the Plan, "***Released Parties***" means, collectively, in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) Purchaser and each of its Related Parties; and (f) each of the Released Voyager Employees (subject to the limitations contained in Article IV.E and Article IV.F of the Plan); *provided that*, if the Asset

Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

(2) Under the Plan, "***Releasing Parties***" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (g) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (h) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (i) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided that*, if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

<u>Item 3</u>. **Contributed Third-Party Claims.**

If the Plan is confirmed, all causes of action that the Debtors are entitled to bring against third parties not released under the Plan (the "<u>Litigation Targets</u>") will be transferred to the Wind-Down Entity. In addition to these causes of action that can only be commenced by the Wind-Down Entity, certain creditors may have direct causes of action against the Litigation Targets. However, it is difficult and expensive for individual creditors to sue third parties for losses. Accordingly, creditors can elect to contribute direct causes of action to the Wind-Down Entity. By opting in to contribute causes of action to the Wind-Down Entity, you are giving the Wind-Down Entity the right to pursue those direct causes of action on your behalf together with other creditors. As a result, the Wind-Down Entity will be able to use its resources to sue the Litigation Targets on those direct causes of action, and all recoveries will inure to the benefit of all creditors and not just those that agreed to contribute their claims. For the avoidance of doubt, the decision to "opt in" to contribute third-party claims is entirely voluntary, and the failure to "opt in" does not prejudice any electing creditors' rights.

By electing such option on this Ballot, you agree that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Entity, you will be deemed, without further action, (i) to have irrevocably contributed your Contributed Third-Party Claims to the Wind-Down Entity, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Entity to memorialize and effectuate such contribution.

**The Committee strongly encourages you to elect to contribute your Contributed Third-Party Claims to the Wind-Down Entity, which will allow the Wind-Down Entity to potentially seek greater recoveries for the benefit of Holders of Claims and Interests.**

| | **By checking this box, you elect to contribute your Contributed Third-Party Claims to the Wind-Down Entity.** |
|---|---|

Definitions Related to Contributed Third-Party Claims:

Under the Plan, "***Contributed Third-Party Claims***" means all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform; (b) all Causes of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) all Causes of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided*, *however*, that Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors; (ii) any direct claims against the Released Parties; (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their

Related Parties; or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the currently filed complaint, dated as of July 6, 2022, in the Ontario Superior Court of Justice by Francine De Sousa, against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.

**Item 4.  Certifications.**

By signing this Opt In Notice, the undersigned certifies:

(a) that, as of the Record Date, either:  (i) the Entity is the Holder of the Claims set forth in Item 1; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Claims or Interests set forth in Item 1;

(b) that the Holder has received a copy of the *Notice of (I) Non-Voting Status to Holders of Unimpaired Claims Conclusively Presumed to Accept the Plan, (II) Opportunity to Opt In to the Third-Party Releases, and (III) Opportunity to Contribute Third-Party Claims* and that this Opt In Notice is submitted pursuant to the terms and conditions set forth therein;

(c) that the Entity has submitted the same respective election concerning the releases with respect to all Claims in a single Class set forth in Item 1; and

(d) that no other Opt In Notice with respect to the amount(s) of Claims identified in Item 1 have been submitted or, if any other Opt In Notices have been submitted with respect to such Claims, then any such earlier Opt In Notices are hereby revoked.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than Holder) |
| Title: | |
| Address: | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

6

**IF YOU WISH TO MAKE THE OPT IN ELECTION AND/OR ELECT TO CONTRIBUTE YOUR THIRD-PARTY CLAIMS, PLEASE SUBMIT THE ELECTRONIC VERSION OF YOUR OPT IN NOTICE THROUGH THE E-BALLOTING PORTAL PER INSTRUCTIONS PROVIDED BELOW:**

To submit your Opt In Notice via the online voting portal, please visit https://cases.stretto.com/Voyager/balloting and follow the instructions to submit your Opt In Notice.

The Claims, Noticing, and Solicitation Agent's online voting platform is the sole manner in which Opt In Notices will be accepted via electronic or online transmission. Opt In Notices submitted by facsimile, e-mail, or other means of electronic transmission will not be counted.

Please complete and submit an Opt In Notice for each Opt In Notice you receive, as applicable.

*     *     *

Dated: _____, 2023
New York, New York

/s/ Draft _____

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900
Email:            jsussberg@kirkland.com
                  cmarcus@kirkland.com
                  christine.okike@kirkland.com
                  allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**Exhibit 2B**

**Impaired Non-Voting Status Notice**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF (I) NON-VOTING STATUS TO HOLDERS**
**OF IMPAIRED CLAIMS OR INTERESTS CONCLUSIVELY PRESUMED**
**TO REJECT THE PLAN, (II) OPPORTUNITY TO OPT IN TO THE THIRD-PARTY**
**RELEASES, AND (III) OPPORTUNITY TO CONTRIBUTE THIRD-PARTY CLAIMS**

**PLEASE TAKE NOTICE THAT** on [●], 2023, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order") that (a) conditionally approved the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"), for the purposes of solicitation, (b) authorized the Debtors to solicit votes with regard to the acceptance or rejection of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Plan"),[2] (c) approved the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approved procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of your Claim or Interest under the Plan, **you are not entitled to vote on the Plan**. Specifically, under the terms of the Plan, as a Holder of a Claim or Interest (as currently asserted against the Debtors) that may receive no distribution under the Plan, you are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote on the Plan. However, copies of the Disclosure Statement (including the Plan) and the Committee Letter are being provided to you in compliance with the applicable Bankruptcy Rules and the Bankruptcy Court's order.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving an opt in form (the "Opt-In Notice") regarding certain voluntary release provisions and provisions regarding the voluntary contributions of claims. The Plan and Disclosure Statement should be reviewed to inform your decision as to whether to complete the Opt-In Form or to

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]    Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

contribute your Contributed Third-Party Claims to the Wind-Down Entity.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider approval of the Disclosure Statement and Confirmation of the Plan (the "Combined Hearing") will commence on March 2, 2023 at [●]:00 [●].m. prevailing Eastern Time, or such other time as the Court determines, before the Honorable Michael E. Wiles, in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York, New York 10004. In accordance with General Order M-543 dated March 20, 2020, the Hearing will be conducted telephonically. Any parties wishing to participate must do so by making arrangements through CourtSolutions by visiting https://www.court-solutions.com.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to confirmation of the Plan and the adequacy of the Disclosure Statement is **February 22, 2023 at 4:00 p.m.** prevailing Eastern Time (the "Plan and Disclosure Statement Objection Deadline"). Any objection to the Plan **must**: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be **actually** **received** on or before **February 22, 2023 at 4:00 p.m.** prevailing Eastern Time:

| Debtors | |
|---|---|
| **Voyager Digital Holdings, Inc.**<br>33 Irving Place, Suite 3060<br>New York, NY 10003<br>Attention: Stephen Ehrlich and David Brosgol | |
| _Counsel to the Debtors_ | _Counsel to the Committee_ |
| **Kirkland & Ellis LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention: Joshua A. Sussberg; Christopher Marcus;<br>Christine A. Okike; Allyson B. Smith | **McDermott Will & Emery LLP**<br>One Vanderbilt Avenue<br>New York, NY 10017-3852<br>Attention: Darren Azman; Joseph B. Evans; Grayson<br>Williams; Gregg Steinman |
| _United States Trustee_ | |
| **Office of the United States Trustee for the Southern District of New York**<br>U.S. Federal Office Building<br>201 Varick Street, Room 1006<br>New York, NY 10014<br>Attention: Richard Morrissey; Mark Bruh | |

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of any of the related documents, you should contact Stretto, Inc., the claims, noticing, and solicitation agent retained by the Debtors in these chapter 11 cases (the "Claims, Noticing, and Solicitation Agent"), by: (a) calling the Claims, Noticing, and Solicitation Agent at (855) 473-8665 (Toll Free) or +1 (949) 271-6507 (International); (b) e-mailing the Claims, Noticing, and Solicitation Agent at VoyagerInquiries@Stretto.com with a reference to "In re: Voyager - Solicitation Inquiry" in the subject line; or (c) writing to the Claims, Noticing, and Solicitation Agent at Voyager Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602. You may also obtain copies of any pleadings filed with the Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager/, or for a fee via PACER at: http://pacer.psc.uscourts.gov.

**OPTIONAL: RELEASE OPT IN NOTICE**

You are receiving this Opt-In Notice because you are a Holder of a Claim or Interest that is not entitled to vote on the Plan. Article IV of the Plan contains certain information regarding contribution of Contributed Third-Party Claims. Article VIII of the Plan contains certain release, injunction, and exculpation provisions, including the Third-Party Releases set forth below. You are advised to carefully review and consider the Plan, including the release, injunction, and exculpation provisions, as your rights may be affected. **Your decision to complete and return the Opt-In Notice is entirely voluntary and not a requirement under the Plan or applicable law**.

**If you choose to opt into the Third-Party Release set forth in Article VIII.B of the Plan and/or to contribute your Contributed Third-Party Claim(s) to the Wind-Down Entity, you may submit your election to opt-in by submitting the electronic version of your Opt In Notice through the e-balloting portal (the "E-Balloting Portal"), which can be accessed via the Debtors' restructuring website, https://cases.stretto.com/Voyager/balloting, according to instructions provided below**

**THIS OPT IN NOTICE MUST BE ACTUALLY RECEIVED BY THE CLAIMS, NOTICING, AND SOLICITATION AGENT BY FEBRUARY 22, 2023, AT 4:00 P.M. PREVAILING EASTERN TIME (THE "OPT IN DEADLINE").**

<u>Item 1</u>. **Amount of Claim or Interest.**

The undersigned hereby certifies that, as of January 10, 2023 (the "<u>Voting Record Date</u>"), the undersigned was the Holder of Claims or Interests in one or more of Classes 5, 6 or 9 in the following aggregate amount of claims or interests (insert amount in box below):

Class 5 $ _____

Class 6 $ _____

Class 9 Share Amount _____

3

Item 2.          Important information regarding the Third-Party Release.

AS A HOLDER OF A CLAIM OR INTEREST, YOU ARE A "RELEASING PARTY" UNDER THE PLAN IF YOU OPT IN TO THE RELEASES CONTAINED IN THE PLAN.  YOU MAY CHECK THE BOX BELOW TO ELECT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.B OF THE PLAN.  YOU WILL BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN <u>ONLY IF</u> (I) THE COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT IN TO THE RELEASES AND (II) YOU CHECK THE BOX BELOW AND SUBMIT THE OPT IN NOTICE BY THE OPT IN DEADLINE.

☐     **By checking this box, you elect to opt <u>IN</u> to the Third-Party Releases.**

**Article VIII.B of the Plan contains the following Third-Party Release:**

Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in Article VIII.B of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Definitions Related to the Debtor Release and the Third-Party Release:

1.   Under the Plan, "*Released Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) Purchaser and each of its Related Parties; and (f) each of the Released Voyager Employees (subject to the limitations contained in Article IV.E and Article IV.F of

4

the Plan); *provided that*, if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

2. Under the Plan, "***Releasing Parties***" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (g) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (h) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (i) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided that*, if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

<u>Item 3</u>. **Contributed Third-Party Claims.**

If the Plan is confirmed, all causes of action that the Debtors are entitled to bring against third parties not released under the Plan (the "<u>Litigation Targets</u>") will be transferred to the Wind-Down Entity. In addition to these causes of action that can only be commenced by the Wind-Down Entity, certain creditors may have direct causes of action against the Litigation Targets. However, it is difficult and expensive for individual creditors to sue third parties for losses. Accordingly, creditors can elect to contribute direct causes of action to the Wind-Down Entity. By opting in to contribute causes of action to the Wind-Down Entity, you are giving the Wind-Down Entity the right to pursue those direct causes of action on your behalf together with other creditors. As a result, the Wind-Down Entity will be able to use its resources to sue the Litigation Targets on those direct causes of action, and all recoveries will inure to the benefit of all creditors and not just those that agreed to contribute their claims. For the avoidance of doubt, the decision to "opt in" to contribute third-party claims is entirely voluntary, and the failure to "opt in" does not prejudice any electing creditors' rights.

By electing such option on this Ballot, you agree that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Entity, you will be deemed, without further action, (i) to have irrevocably contributed your Contributed Third-Party Claims to the Wind-Down Entity, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Entity to memorialize and effectuate such contribution.

**The Committee strongly encourages you to elect to contribute your Contributed Third-Party Claims to the Wind-Down Entity, which will allow the Wind-Down Entity to potentially seek greater recoveries for the benefit of Holders of Claims and Interests.**

> ☐ **By checking this box, you elect to contribute your Contributed Third-Party Claims to the Wind-Down Entity.**

Definitions Related to Contributed Third-Party Claims:

Under the Plan, "***Contributed Third-Party Claims***" means all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform; (b) all Causes of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) all Causes of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided*, *however*, that Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors; (ii) any direct claims against the Released Parties; (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their

Related Parties; or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the currently filed complaint, dated as of July 6, 2022, in the Ontario Superior Court of Justice by Francine De Sousa, against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.

**Item 4.** **Certifications.**

By signing this Opt In Notice, the undersigned certifies:

(a) that, as of the Record Date, either: (i) the Entity is the Holder of the Claims or Interests set forth in Item 1; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Claims or Interests set forth in Item 1;

(b) that the Holder has received a copy of the *Notice of (I) Non-Voting Status to Holders of Impaired Claims or Interests Conclusively Deemed to Reject the Plan, (II) Opportunity to Opt In to the Third-Party Releases, and (III) Opportunity to Contribute Third-Party Claims* and that this Opt In Notice is submitted pursuant to the terms and conditions set forth therein;

(c) that the Entity has submitted the same respective election concerning the releases with respect to all Claims or Interests in a single Class set forth in Item 1; and

(d) that no other Opt In Notice with respect to the amount(s) of Claims or Interests identified in Item 1 have been submitted or, if any other Opt In Notices have been submitted with respect to such Claims and Interests, then any such earlier Opt In Notices are hereby revoked.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| | |
| Name of Signatory: | |
| | (If other than Holder) |
| Title: | |
| Address: | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**IF YOU WISH TO MAKE THE OPT IN ELECTION AND/OR ELECT TO CONTRIBUTE YOUR THIRD-PARTY CLAIMS, PLEASE SUBMIT THE ELECTRONIC VERSION OF YOUR OPT IN NOTICE THROUGH THE E-BALLOTING PORTAL PER INSTRUCTIONS PROVIDED BELOW:**

To submit your Opt In Notice via the online voting portal, please visit https://cases.stretto.com/Voyager/balloting and follow the instructions to submit your Opt In Notice.

The Claims, Noticing, and Solicitation Agent's online voting platform is the sole manner in which Opt In Notices will be accepted via electronic or online transmission. Opt In Notices submitted by facsimile, e-mail, or other means of electronic transmission will not be counted.

Please complete and submit an Opt In Notice for each Opt In Notice you receive, as applicable.

<p align="center">*    *    *</p>

Dated: _____, 2023    /s/ Draft
New York, New York              _____

                                **KIRKLAND & ELLIS LLP**
                                **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                Joshua A. Sussberg, P.C.
                                Christopher Marcus, P.C.
                                Christine A. Okike, P.C.
                                Allyson B. Smith (admitted *pro hac vice*)
                                601 Lexington Avenue
                                New York, New York 10022
                                Telephone:    (212) 446-4800
                                Facsimile:    (212) 446-4900
                                Email:        jsussberg@kirkland.com
                                              cmarcus@kirkland.com
                                              christine.okike@kirkland.com
                                              allyson.smith@kirkland.com

                                *Counsel to the Debtors and Debtors in Possession*

**Exhibit 2C**

**Notice to Disputed Claim Holders**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:　　(212) 446-4800
Facsimile:　　(212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF NON-VOTING STATUS WITH RESPECT TO DISPUTED CLAIMS

**PLEASE TAKE NOTICE THAT** on [●], 2023, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order") that (a) conditionally approved the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"), for the purposes of solicitation, (b) authorized the Debtors to solicit votes with regard to the acceptance or rejection of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Plan"),[2] (c) approved the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approved procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because you are the Holder of a Claim that is subject to a pending objection by the Debtors. **You are not entitled to vote any disputed portion of your Claim on the Plan unless one or more of the following events have taken place before a date that is three business days before the Voting Deadline** (each, a "Resolution Event"):

　　1.　　an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

　　2.　　an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

---

[1]　　The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]　　Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

3.    a stipulation or other agreement is executed between the Holder of such Claim and the Debtors temporarily allowing the Holder of such Claim to vote its Claim in an agreed upon amount; or

4.    the pending objection to such Claim is voluntarily withdrawn by the objecting party.

Copies of the Disclosure Statement (including the Plan) and the Committee Letter are being provided to you in compliance with the applicable Bankruptcy Rules.  You will not receive a Ballot or other Solicitation Materials unless a Resolution Event occurs.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving an opt in form (the "Opt-In Notice") regarding certain voluntary release provisions and provisions regarding the voluntary contributions of claims.  The Plan and Disclosure Statement should be reviewed to inform your decision as to whether to complete the Opt-In Form or to contribute your Contributed Third-Party Claims to the Wind-Down Entity.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of any of the related documents, you should contact Stretto, Inc., the claims, noticing, and solicitation agent retained by the Debtors in these chapter 11 cases (the "Claims, Noticing, and Solicitation Agent"), by:  (a) calling the Claims, Noticing, and Solicitation Agent at (855) 473-8665 (Toll Free) or +1 (949) 271-6507 (International); (b) e-mailing the Claims, Noticing, and Solicitation Agent at VoyagerInquiries@Stretto.com with a reference to "In re: Voyager - Solicitation Inquiry" in the subject line; or (c) writing to the Claims, Noticing, and Solicitation Agent at Voyager Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602.  You may also obtain copies of any pleadings filed with the Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager/, or for a fee via PACER at: http://pacer.psc.uscourts.gov.

**PLEASE TAKE FURTHER NOTICE THAT** if you have any questions about the status of any of your Claims, you should contact the Claims, Noticing, and Solicitation Agent in accordance with the instructions provided above.

---

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.B CONTAINS A THIRD-PARTY RELEASE.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.  IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT.**

---

Dated: _____, 2023
New York, New York

*/s/ Draft*_____

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:          jsussberg@kirkland.com
                cmarcus@kirkland.com
                christine.okike@kirkland.com
                allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## OPTIONAL: RELEASE OPT IN NOTICE

You are receiving this Opt-In Notice because you are a Holder of a Claim or Interest that is not entitled to vote on the Plan. Article IV of the Plan contains certain information regarding contribution of Contributed Third-Party Claims. Article VIII of the Plan contains certain release, injunction, and exculpation provisions, including the Third-Party Releases set forth below. You are advised to carefully review and consider the Plan, including the release, injunction, and exculpation provisions, as your rights may be affected. **Your decision to complete and return the Opt-In Notice is entirely voluntary and not a requirement under the Plan or applicable law**.

**If you choose to opt into the Third-Party Release set forth in Article VIII.B of the Plan and/or to contribute your Contributed Third-Party Claim(s) to the Wind-Down Entity, you may submit your election to opt-in by submitting the electronic version of your Opt In Notice through the e-balloting portal (the "E-Balloting Portal"), which can be accessed via the Debtors' restructuring website, https://cases.stretto.com/Voyager/balloting, according to instructions provided below**

**THIS OPT IN NOTICE MUST BE ACTUALLY RECEIVED BY THE CLAIMS, NOTICING, AND SOLICITATION AGENT BY FEBRUARY 22, 2023, AT 4:00 P.M. PREVAILING EASTERN TIME (THE "OPT IN DEADLINE").**

<u>Item 1</u>. **Amount of Claim or Interest.**

The undersigned hereby certifies that, as of January 10, 2023 (the "Voting Record Date"), the undersigned was the Holder of Claims or Interests in one or more of Classes 5, 6 or 9 in the following aggregate amount of claims or interests (insert amount in box below):

Class 5 $ _____

Class 6 $ _____

Class 9 Share Amount _____

<u>Item 2.</u>          **Important information regarding the Third-Party Release.**

AS A HOLDER OF A CLAIM OR INTEREST, YOU ARE A "RELEASING PARTY" UNDER THE PLAN IF YOU OPT IN TO THE RELEASES CONTAINED IN THE PLAN.  YOU MAY CHECK THE BOX BELOW TO ELECT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.B OF THE PLAN.  YOU WILL BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN <u>ONLY IF</u> (I) THE COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT IN TO THE RELEASES AND (II) YOU CHECK THE BOX BELOW AND SUBMIT THE OPT IN NOTICE BY THE OPT IN DEADLINE.

---

☐          **By checking this box, you elect to opt <u>IN</u> to the Third-Party Releases.**

---

**Article VIII.B of the Plan contains the following Third-Party Release:**

      **Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in Article VIII.B of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.**

      **Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

Definitions Related to the Debtor Release and the Third-Party Release:

      3.    Under the Plan, "***Released Parties***" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) Purchaser and each of its Related Parties; and (f) each of the Released Voyager Employees (subject to the limitations contained in Article IV.E and Article IV.F of

the Plan); *provided that*, if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

4. Under the Plan, "***Releasing Parties***" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (g) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (h) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (i) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided that*, if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

<u>Item 3</u>. **Contributed Third-Party Claims.**

If the Plan is confirmed, all causes of action that the Debtors are entitled to bring against third parties not released under the Plan (the "<u>Litigation Targets</u>") will be transferred to the Wind-Down Entity. In addition to these causes of action that can only be commenced by the Wind-Down Entity, certain creditors may have direct causes of action against the Litigation Targets. However, it is difficult and expensive for individual creditors to sue third parties for losses. Accordingly, creditors can elect to contribute direct causes of action to the Wind-Down Entity. By opting in to contribute causes of action to the Wind-Down Entity, you are giving the Wind-Down Entity the right to pursue those direct causes of action on your behalf together with other creditors. As a result, the Wind-Down Entity will be able to use its resources to sue the Litigation Targets on those direct causes of action, and all recoveries will inure to the benefit of all creditors and not just those that agreed to contribute their claims. For the avoidance of doubt, the decision to "opt in" to contribute third-party claims is entirely voluntary, and the failure to "opt in" does not prejudice any electing creditors' rights.

By electing such option on this Ballot, you agree that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Entity, you will be deemed, without further action, (i) to have irrevocably contributed your Contributed Third-Party Claims to the Wind-Down Entity, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Entity to memorialize and effectuate such contribution.

**The Committee strongly encourages you to elect to contribute your Contributed Third-Party Claims to the Wind-Down Entity, which will allow the Wind-Down Entity to potentially seek greater recoveries for the benefit of Holders of Claims and Interests.**

| | **By checking this box, you elect to contribute your Contributed Third-Party Claims to the Wind-Down Entity.** |
|---|---|

Definitions Related to Contributed Third-Party Claims:

Under the Plan, "***Contributed Third-Party Claims***" means all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform; (b) all Causes of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) all Causes of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided*, *however*, that Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors; (ii) any direct claims against the Released Parties; (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their

Related Parties; or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the currently filed complaint, dated as of July 6, 2022, in the Ontario Superior Court of Justice by Francine De Sousa, against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.

**Item 4.** **Certifications.**

By signing this Opt In Notice, the undersigned certifies:

(e)   that, as of the Record Date, either:  (i) the Entity is the Holder of the Claims or Interests set forth in Item 1; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Claims or Interests set forth in Item 1;

(f)   that the Holder has received a copy of the *Notice of (I) Non-Voting Status to Holders of Impaired Claims or Interests Conclusively Deemed to Reject the Plan, (II) Opportunity to Opt In to the Third-Party Releases, and (III) Opportunity to Contribute Third-Party Claims* and that this Opt In Notice is submitted pursuant to the terms and conditions set forth therein;

(g)   that the Entity has submitted the same respective election concerning the releases with respect to all Claims or Interests in a single Class set forth in Item 1; and

(h)   that no other Opt In Notice with respect to the amount(s) of Claims or Interests identified in Item 1 have been submitted or, if any other Opt In Notices have been submitted with respect to such Claims and Interests, then any such earlier Opt In Notices are hereby revoked.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| | |
| Name of Signatory: | |
| | (If other than Holder) |
| Title: | |
| Address: | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**IF YOU WISH TO MAKE THE OPT IN ELECTION AND/OR ELECT TO CONTRIBUTE YOUR THIRD-PARTY CLAIMS, PLEASE SUBMIT THE ELECTRONIC VERSION OF YOUR OPT IN NOTICE THROUGH THE E-BALLOTING PORTAL PER INSTRUCTIONS PROVIDED BELOW:**

To submit your Opt In Notice via the online voting portal, please visit https://cases.stretto.com/Voyager/balloting and follow the instructions to submit your Opt In Notice.

The Claims, Noticing, and Solicitation Agent's online voting platform is the sole manner in which Opt In Notices will be accepted via electronic or online transmission. Opt In Notices submitted by facsimile, e-mail, or other means of electronic transmission will not be counted.

Please complete and submit an Opt In Notice for each Opt In Notice you receive, as applicable.

<p align="center">*   *   *</p>

Dated: _____, 2023
New York, New York

/s/ Draft
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:         jsussberg@kirkland.com
               cmarcus@kirkland.com
               christine.okike@kirkland.com
               allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**Exhibit 3A**

**Class 3 Ballots (Account Holder Claims)**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) ) | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) ) ) | Case No. 22-10943 (MEW) |
| Debtors. | ) ) ) | (Jointly Administered) |

<div align="center">

**BALLOT FOR VOTING TO ACCEPT OR REJECT**
**THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC.**
**AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**CLASS 3 HOLDERS OF ACCOUNT HOLDER CLAIMS**

</div>

> **PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**
>
> **THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE CLAIMS, NOTICING, AND SOLICITATION AGENT BY FEBRUARY 22, 2023, AT 4:00 P.M., PREVAILING EASTERN TIME (THE "VOTING DEADLINE").**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes in accordance with title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), to accept or reject the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, supplemented, or otherwise modified from time to time, the "Plan"),[2] attached as Exhibit A to the *Second Amended Disclosure Statement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented from time to time and including all exhibits or supplements thereto, the "Disclosure Statement") from Holders of Account Holder Claims, OpCo General Unsecured Claims, HoldCo General Unsecured Claims, and TopCo General Unsecured Claims (each, a "Voting Class" and collectively, the "Voting Classes").

Once completed and returned in accordance with the attached instructions, your vote on the Plan will be counted as set forth herein. A Voting Class will accept the Plan if Holders of at least two-thirds in amount and more than one-half

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]    Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

in number of Claims in that Voting Class votes to accept the Plan. The Court may confirm the Plan, which contemplates effectuating the Restructuring Transactions, if the Plan otherwise satisfies the requirements of section 1129 of the Bankruptcy Code, and the Plan then would be binding on all Holders of Allowed Claims in the Voting Classes, among others.

You are receiving this ballot (this "Ballot") because you are the Holder of a Class 3 Account Holder Claim in the Plan as of **January 10, 2023** (the "Voting Record Date"). **For additional discussion of the treatment of Class 3 Claims under the Plan and the rights of Holders of Class 3 Claims under the Plan, please read the Disclosure Statement.**

The rights and treatment for each Class are described in the Disclosure Statement, which is included in the package (the "Solicitation Package") you are receiving with this Ballot. If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from: (a) Stretto, Inc. (the "Claims, Noticing, and Solicitation Agent"), at no charge by: (i) accessing the Debtors' restructuring website at https://cases.stretto.com/Voyager/; (ii) writing to the Claims, Noticing, and Solicitation Agent at Voyager Inquiries, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602; (iii) calling (855) 473-8665 (Toll Free) or +1 (949) 271-6507 (International); or (iv) emailing VoyagerInquiries@stretto.com and referencing "In re Voyager - Solicitation Inquiry" in the subject line; or (b) for a fee via PACER at http://pacer.psc.uscourts.gov.

This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. In the event that the Schedules are amended to schedule Claims against multiple Debtor entities, then votes on account of such Claims shall be tabulated for each applicable Debtor entity. If you believe you have received this Ballot in error, please contact the Claims, Noticing, and Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

The Court may confirm the Plan and thereby bind all Holders of Claims and Interests. To have your vote count as either an acceptance or rejection of the Plan, you must complete and return this Ballot so that the Claims, Noticing, and Solicitation Agent *actually receives* it on or before the Voting Deadline.

As further described in the Committee Letter, the Committee recommends that you vote to accept the Plan and contribute your third-party claims.

**THE VOTING DEADLINE IS ON FEBRUARY 22, 2023, AT 4:00 P.M., PREVAILING EASTERN TIME.**

<u>Item 1.</u>    **Amount of Class 3 Claims.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder of Class 3 Account Holder Claims in the following aggregate principal amount (*please list the number of each type of Cryptocurrency held in your account as of July 5, 2022*):

| List of Coins Held on the Debtors' Platform as of the Petition Date | | | |
|---|---|---|---|
| **Cyrptocurrency** | **Number of Units Held by Account Holder** | **Cyrptocurrency** | **Number of Units Held by Account Holder** |
| 1. AAVE (AAVE) | | 54. ChainLink (LINK) | |
| 2. Cardano (ADA) | | 55. Locked Luna (LLUNA) | |
| 3. Algorand (ALGO) | | 56. Livepeer (LPT) | |
| 4. MyNeighborAlice (ALICE) | | 57. Loopring (LRC) | |
| 5. Amp (AMP) | | 58. Litecoin (LTC) | |
| 6. Ankr Protocol (ANKR) | | 59. Terra Luna (LUNA) | |
| 7. ApeCoin (APE) | | 60. Luna Classic (LUNC) | |
| 8. Cosmos (ATOM) | | 61. Decentraland (MANA) | |
| 9. Audius (AUDIO) | | 62. Polygon (MATIC) | |
| 10. Avalanche (AVAX) | | 63. Maker (MKR) | |
| 11. Axie Infinity (AXS) | | 64. Neo (NEO) | |

| 12. Band Protocol (BAND) | | 65. Ocean Protocol (OCEAN) | |
|---|---|---|---|
| 13. Basic Attention Token (BAT) | | 66. OMG Network (OMG) | |
| 14. Bitcoin Cash (BCH) | | 67. Ontology (ONT) | |
| 15. Biconomy (BICO) | | 68. Optimism (OP) | |
| 16. Bancor (BNT) | | 69. Orchid (OXT) | |
| 17. Bitcoin (BTC) | | 70. Perpetual Protocol (PERP) | |
| 18. BitTorrent (BTT) | | 71. Polymath (POLY) | |
| 19. Pancake Swap (CAKE) | | 72. Quant (QNT) | |
| 20. Celo (CELO) | | 73. Qtum (QTUM) | |
| 21. Chiliz (CHZ) | | 74. Raydium (RAY) | |
| 22. Nervos Network (CKB) | | 75. Ren (REN) | |
| 23. Compound (COMP) | | 76. Oasis Network (ROSE) | |
| 24. Curve Dao Token (CRV) | | 77. Sandbox (SAND) | |
| 25. Dai (DAI) | | 78. Shiba Inu (SHIB) | |
| 26. Dash (DASH) | | 79. Skale (SKL) | |
| 27. DigiByte (DGB) | | 80. Solana (SOL) | |
| 28. Dogecoin (DOGE) | | 81. Spell Token (SPELL) | |
| 29. Polkadot (DOT) | | 82. Serum (SRM) | |
| 30. dYdX (DYDX) | | 83. StormX (STMX) | |
| 31. Elrond (EGLD) | | 84. SushiSwap (SUSHI) | |
| 32. Enjin (ENJ) | | 85. OriginTrail (TRAC) | |
| 33. Ethereum Name Service (ENS) | | 86. TRON (TRX) | |
| 34. Eos (EOS) | | 87. TrueUSD (TUSD) | |
| 35. Ethereum Classic (ETC) | | 88. UMA (UMA) | |
| 36. Harvest Finance (FARM) | | 89. Uniswap (UNI) | |
| 37. Fetch.ai (FET) | | 90. USD Coin (USDC) | |
| 38. Filecoin (FIL) | | 91. Tether (USDT) | |
| 39. Flow (FLOW) | | 92. VeChain (VET) | |
| 40. Fantom (FTM) | | 93. Voyager Token (VGX) | |
| 41. Gala (GALA) | | 94. Waves (WAVES) | |
| 42. Golem (GLM) | | 95. Wrapped Bitcoin (WBTC) | |
| 43. The Graph (GRT) | | 96. Stellar Lumens (XLM) | |
| 44. Hedera Hashgraph (HBAR) | | 97. Monero (XMR) | |
| 45. Internet Computer (ICP) | | 98. Ripple (XRP) | |
| 46. ICON (ICX) | | 99. Tezos (XTZ) | |
| 47. IOTA (IOT) | | 100. Verge (XVG) | |
| 48. JASMYCoin (JASMY) | | 101. yearn.finance (YFI) | |
| 49. Kava (KAVA) | | 102. DFI.Money (YFII) | |
| 50. Keep Network (KEEP) | | 103. Yield Guild Games (YGG) | |
| 51. Kyber Network (KNC) | | 104. Zcash (ZEC) | |
| 52. Kusama (KSM) | | 105. Horizen (ZEN) | |
| 53. ChainLink (LINK) | | 106. 0x (ZRX) | |

<u>Item 2.</u>  **Recovery.**

- Pursuant to Article III.C of the Plan, each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim:  (i) if the Sale Transaction is consummated by the Outside Date (a) its Net Owed Coins, as provided in and subject to the requirements of Sections 6.10 and 6.12 of the Asset Purchase Agreement; *provided* that for Account Holders in Unsupported Jurisdictions and only to the extent that the Purchaser does not obtain the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides within 6 months following the Closing Date (as defined in the Asset Purchase Agreement), such Account Holders shall receive, after expiration of such time period, value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated; (b) its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement; (c) its Pro Rata share of Distributable OpCo Cash; and (d) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed

Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; *provided* that distributions made to any Account Holder pursuant to clauses (b), (c), and (d) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder; or (ii) if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated: (a) its Pro Rata share of Distributable OpCo Cash; (b) its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and (c) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

**Item 3.**   **Vote on Plan.**

The Holder of the Class 3 Account Holder Claims against the Debtors set forth in Item 1 votes to (please check <u>one</u>):

| ☐ **ACCEPT** (vote FOR) the Plan | ☐ **REJECT** (vote AGAINST) the Plan |
|---|---|

**<u>Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 3 above.</u>**

**Item 4.**   **Third-Party Release.**

AS A HOLDER OF A CLASS 3 CLAIM, YOU ARE A "RELEASING PARTY" UNDER THE PLAN IF YOU OPT IN TO THE RELEASES CONTAINED IN THE PLAN.  YOU MAY CHECK THE BOX BELOW TO ELECT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.B OF THE PLAN.  YOU WILL BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN <u>ONLY IF</u> (I) THE COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT IN TO THE RELEASES AND (II) YOU CHECK THE BOX BELOW AND SUBMIT THE OPT IN NOTICE BY THE OPT IN DEADLINE.  **YOUR DECISION TO COMPLETE AND RETURN THE OPT-IN NOTICE IS ENTIRELY VOLUNTARY AND NOT A REQUIREMENT UNDER THE PLAN OR APPLICABLE LAW**.  YOUR RECOVERY UNDER THE PLAN REMAINS UNAFFECTED WHETHER OR NOT YOU ELECT TO OPT IN TO THE THIRD-PARTY RELEASE.

| ☐ | **By checking this box, you elect to opt <u>IN</u> to the Third-Party Releases.** |
|---|---|

**Article VIII.B of the Plan contains the following Third-Party Release:**

Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in Article VIII.B of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Definitions Related to the Debtor Release and the Third-Party Release:

(1)     Under the Plan, "*Released Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) Purchaser and each of its Related Parties; and (f) each of the Released Voyager Employees (subject to the limitations contained in Article IV.E and Article IV.F of the Plan); *provided that*, if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

(2)     Under the Plan, "*Releasing Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (g) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (h) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (i) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided that*, if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

**Item 5.** **Contributed Third-Party Claims.**

If the Plan is confirmed, all causes of action that the Debtors are entitled to bring against third parties not released under the Plan (the "Litigation Targets") will be transferred to the Wind-Down Entity. In addition to these causes of action that can only be commenced by the Wind-Down Entity, certain creditors may have direct causes of action against the Litigation Targets. However, it is difficult and expensive for individual creditors to sue third parties for losses. Accordingly, creditors can elect to contribute direct causes of action to the Wind-Down Entity. By opting in to contribute causes of action to the Wind-Down Entity, you are giving the Wind-Down Entity the right to pursue those direct causes of action on your behalf together with other creditors. As a result, the Wind-Down Entity will be able to use its resources to sue the Litigation Targets on those direct causes of action, and all recoveries will inure to the benefit of all creditors and not just those that agreed to contribute their claims. For the avoidance of doubt, the decision to "opt in" to contribute third-party claims is entirely voluntary, and the failure to "opt in" does not prejudice any electing creditors' rights.

By electing such option on this Ballot, you agree that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Entity, you will be deemed, without further action, (i) to have irrevocably contributed your Contributed Third-Party Claims to the Wind-Down Entity, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Entity to memorialize and effectuate such contribution.

**The Committee strongly encourages you to elect to contribute your Contributed Third-Party Claims to the Wind-Down Entity, which will allow the Wind-Down Entity to potentially seek greater recoveries for the benefit of Holders of Claims and Interests.**

> ☐ **By checking this box, you elect to to contribute your Contributed Third-Party Claims to the Wind-Down Entity.**

Definitions Related to Contributed Third-Party Claims:

> Under the Plan, "*Contributed Third-Party Claims*" means all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform; (b) all Causes of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) all Causes of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided*, *however*, that Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors; (ii) any direct claims against the Released Parties; (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties; or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the currently filed complaint, dated as of July 6, 2022, in the Ontario Superior Court of Justice by Francine De Sousa, against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.

**Item 6.** **Certifications.**

1. The undersigned is (a) the Holder of the Account Holder Claims (Class 3) being voted or (b) the authorized signatory for an entity that is a Holder of such Account Holder Claims;

2. the undersigned has received a copy of the solicitation materials, including the Plan and the Disclosure Statement, and acknowledges that the undersigned's vote as set forth on this Ballot is subject to the terms and conditions set forth therein and herein;

3.  the undersigned has cast the same vote with respect to all of its Account Holder Claims (Class 3) in connection with the Plan; and

4.  (a) no other Ballot with respect to the same Account Holder Claims (Class 3) identified in Item 1 has been cast or (b) if any other Ballot has been cast with respect to such Account Holder Claims, then any such earlier Ballots are hereby revoked and deemed to be null and void.

**Item 7.  Ballot Completion Information.**

Name of Holder: _____

_____

Signature: _____

Signatory Name (if other than the Holder): _____

Title: _____

Address: _____

Email Address: _____

Telephone Number: _____

Date Completed: _____

No fees, commissions, or other remuneration will be payable to any broker, dealer, or other person for soliciting votes on the Plan.  This Ballot shall not constitute or be deemed a proof of claim or equity interest or an assertion of a claim or equity interest.

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN IT IN ACCORDANCE WITH INSTRUCTIONS CONTAINED HEREIN.  THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS ACTUALLY RECEIVED BY THE CLAIMS, NOTICING, AND SOLICITATION AGENT PRIOR TO THE VOTING DEADLINE VIA THE ONLINE VOTING PORTAL AT HTTPS://CASES.STRETTO.COM/VOYAGER/BALLOTING.**

---

**THE VOTING DEADLINE IS FEBRUARY 22, 2023, AT 4:00 P.M., PREVAILING EASTERN TIME.**

**THE CLAIMS, NOTICING, AND SOLICITATION AGENT MUST ACTUALLY RECEIVE THIS CLASS 3 BALLOT ON OR BEFORE THE VOTING DEADLINE.**

---

| Class 3 — Account Holder Claims |
|---|

## INSTRUCTIONS FOR COMPLETING THIS BALLOT

1. The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as Exhibit A to the Disclosure Statement. Capitalized terms used in the Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meanings set forth in the Plan, a copy of which also accompanies the Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon the Holders if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of Impaired creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. This Ballot contains voting options with respect to the Plan.

4. To vote, you MUST: (a) fully complete this Ballot; (b) clearly indicate your decision to accept or reject the Plan in Item 3 of this Ballot; and (c) sign, date, and return this Ballot via the Claims, Noticing, and Solicitation Agent's online voting portal as described more fully below.

   To submit your Ballot via the online voting portal, please visit https://cases.stretto.com/Voyager/balloting and follow the instructions to submit your Ballot.

   **IMPORTANT NOTE: You will need the following information to retrieve and submit your customized E-Ballot:**

   **Unique E-Ballot ID#:** _____

   **PIN#:** _____

   The Claims, Noticing, and Solicitation Agent's online voting platform is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, e-mail, or other means of electronic transmission will not be counted.

   Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your Ballot. Please complete and submit a Ballot for each E-Ballot ID# you receive, as applicable. Creditors who cast a Ballot using the Claims, Noticing, and Solicitation Agent's online voting portal should NOT also submit a hard copy Ballot.

5. Any Ballot submitted that is incomplete or illegible, indicates unclear or inconsistent votes with respect to the Plan, or is improperly signed and returned will NOT be counted unless the Debtors otherwise determine.

6. To vote, you MUST deliver your completed Ballot so that it is **ACTUALLY RECEIVED** by the Claims, Noticing, and Solicitation Agent on or before the Voting Deadline by one of the methods described above. The Voting Deadline is **February 22, 2023, at 4:00 p.m.** prevailing Eastern Time.

7. Any Ballot received by the Claims, Noticing, and Solicitation Agent after the Voting Deadline will not be counted with respect to acceptance or rejection of the Plan, as applicable, unless the Debtors otherwise determine. No Ballot may be withdrawn or modified after the Voting Deadline without the Debtors' prior consent.

8. Delivery of a Ballot reflecting your vote to the Claims, Noticing, and Solicitation Agent will be deemed to have occurred only when the Claims, Noticing, and Solicitation Agent actually receives the originally executed Ballot (for the avoidance of doubt, a Ballot submitted via the Claims, Noticing, and Solicitation Agent online voting

portal shall be deemed to contain an original signature). In all cases, you should allow sufficient time to assure timely delivery.

9. If you deliver multiple Ballots to the Claims, Noticing, and Solicitation Agent, ONLY the last properly executed Ballot timely received will be deemed to reflect your intent and will supersede and revoke any prior received Ballot(s).

10. You must vote all of your Class 3 Account Holder Claims either to accept or reject the Plan, and may not split your vote. Further, if a Holder has multiple Claims within Class 3, the Debtors may direct the Claims, Noticing, and Solicitation Agent to aggregate the Claims of any particular Holder within Class 3 for the purpose of counting votes.

11. This Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or Interest, or an assertion or admission of a Claim or an Interest, in the Debtors' Chapter 11 Cases.

12. You should not rely on any information, representations, or inducements made to obtain an acceptance of the Plan that are other than as set forth, or are inconsistent with, the information contained in the Disclosure Statement, the documents attached to or incorporated in the Disclosure Statement, and the Plan.

13. SIGN AND DATE your Ballot.[3] Please provide your name and mailing address in the space provided on this Ballot if it is different from that set forth on the Ballot or if no address is presented on the Ballot.

14. If your Claim is held in multiple accounts, you may receive more than one Ballot coded for each such account for which your Claims are held. Each Ballot votes only your Claims indicated on that Ballot. Accordingly, complete and return each Ballot you receive.

## PLEASE RETURN YOUR BALLOT PROMPTLY

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 3 BALLOT, THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING, PLEASE CALL THE CLAIMS, NOTICING, AND SOLICITATION AGENT AT: (855) 473-8665 (TOLL-FREE) OR +1 (949) 271-6507 (INTERNATIONAL) OR EMAIL VOYAGERINQUIRIES@STRETTO.COM AND REFERENCE "IN RE VOYAGER - SOLICITATION INQUIRY" IN THE SUBJECT LINE.**

---

**THE VOTING DEADLINE IS FEBRUARY 22, 2023, AT 4:00 P.M., PREVAILING EASTERN TIME.**

**THE CLAIMS, NOTICING, AND SOLICITATION AGENT MUST ACTUALLY RECEIVE THIS CLASS 3 BALLOT ON OR BEFORE THE VOTING DEADLINE.**

---

[3]  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney-in-fact, or officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Claims, Noticing, and Solicitation Agent, the Debtors, the Debtors' counsel, or the Court, must submit proper evidence to the requesting party of authority to so act on behalf of such holder.

**Exhibit 3B**

**Class 4A Ballot (OpCo General Unsecured Claims)**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**BALLOT FOR VOTING TO ACCEPT OR REJECT**
**THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC.**
**AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**CLASS 4A HOLDERS OF OPCO GENERAL UNSECURED CLAIMS**

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE CLAIMS, NOTICING, AND SOLICITATION AGENT BY FEBRUARY 22, 2023, AT 4:00 P.M., PREVAILING EASTERN TIME (THE "VOTING DEADLINE").**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes in accordance with title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), to accept or reject the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, supplemented, or otherwise modified from time to time, the "Plan"),[2] attached as Exhibit A to the *Second Amended Disclosure Statement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented from time to time and including all exhibits or supplements thereto, the "Disclosure Statement") from Holders of Account Holder Claims, OpCo General Unsecured Claims, HoldCo General Unsecured Claims, and TopCo General Unsecured Claims (each, a "Voting Class" and collectively, the "Voting Classes").

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]     Capitalized terms used but not otherwise defined herein shall have the meaning given to them in the Plan.

Once completed and returned in accordance with the attached instructions, your vote on the Plan will be counted as set forth herein. A Voting Class will accept the Plan if Holders of at least two-thirds in amount and more than one-half in number of Claims in that Voting Class votes to accept the Plan. The Court may confirm the Plan, which contemplates effectuating the Restructuring Transactions, if the Plan otherwise satisfies the requirements of section 1129 of the Bankruptcy Code, and the Plan then would be binding on all Holders of Allowed Claims in the Voting Classes, among others.

You are receiving this ballot (this "Ballot") because you are the Holder of Class 4A OpCo General Unsecured Claims as of **January 10, 2023** (the "Voting Record Date"). **For additional discussion of the treatment of Class 4A Claims under the Plan and the rights of Holders of Class 4A Claims under the Plan, please read the Disclosure Statement.**

The rights and treatment for each Class are described in the Disclosure Statement, which is included in the package (the "Solicitation Package") you are receiving with this Ballot. If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from: (a) Stretto, Inc. (the "Claims, Noticing, and Solicitation Agent"), at no charge by: (i) accessing the Debtors' restructuring website at https://cases.stretto.com/Voyager/; (ii) writing to the Claims, Noticing, and Solicitation Agent at Voyager Inquiries, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602; (iii) calling (855) 473-8665 (Toll Free) or +1 (949) 271-6507 (International); or (iv) emailing VoyagerInquiries@stretto.com and referencing "In re Voyager - Solicitation Inquiry" in the subject line; or (b) for a fee via PACER at http://pacer.psc.uscourts.gov.

This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. In the event that the Schedules are amended to schedule Claims against multiple Debtor entities, then votes on account of such Claims shall be tabulated for each applicable Debtor entity. If you believe you have received this Ballot in error, please contact the Claims, Noticing, and Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

The Court may confirm the Plan and thereby bind all Holders of Claims and Interests. To have your vote count as either an acceptance or rejection of the Plan, you must complete and return this Ballot so that the Claims, Noticing, and Solicitation Agent *actually receives* it on or before the Voting Deadline.

As further described in the Committee Letter, the Committee recommends that you vote to accept the Plan and contribute your third-party claims.

**THE VOTING DEADLINE IS ON FEBRUARY 22, 2023, AT 4:00 P.M., PREVAILING EASTERN TIME.**

<u>Item 1.</u>    **Amount of Class 4A Claims.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder of Class 4A OpCo General Unsecured Claims in the following aggregate principal amount (*please fill in the amount if not otherwise completed*):

| Amount of Claims:  $_____ |
| --- |

<u>Item 2.</u>    **Recovery.**

Pursuant to Article III.C of the Plan, each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim: (i) if the Sale Transaction is consummated by the Outside Date (a) its Pro Rata share of Distributable Cryptocurrency in Cash; (b) its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement, (c) its Pro Rata share of Distributable OpCo Cash, and (d) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any

distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; or (ii) if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated (a) its Pro Rata share of Distributable Cryptocurrency in Cash; (b) its Pro Rata share of Distributable OpCo Cash, and (c) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

**Item 3.**     **Vote on Plan.**

The Holder of the Class 4A OpCo General Unsecured Claims against the Debtors set forth in Item 1 votes to (please check <u>one</u>):

| | |
|---|---|
| ☐   **ACCEPT** (vote FOR) the Plan | ☐   **REJECT** (vote AGAINST) the Plan |

**<u>Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 3 above.</u>**

**Item 4.**     **Third-Party Release.**

AS A HOLDER OF A CLASS 4A CLAIM, YOU ARE A "RELEASING PARTY" UNDER THE PLAN IF YOU OPT IN TO THE RELEASES CONTAINED IN THE PLAN.  YOU MAY CHECK THE BOX BELOW TO ELECT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.B OF THE PLAN.  YOU WILL BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN <u>ONLY IF</u> (I) THE COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT IN TO THE RELEASES AND (II) YOU CHECK THE BOX BELOW AND SUBMIT THE OPT IN NOTICE BY THE OPT IN DEADLINE.  **YOUR DECISION TO COMPLETE AND RETURN THE OPT-IN NOTICE IS ENTIRELY VOLUNTARY AND NOT A REQUIREMENT UNDER THE PLAN OR APPLICABLE LAW**.  YOUR RECOVERY UNDER THE PLAN REMAINS UNAFFECTED WHETHER OR NOT YOU ELECT TO OPT IN TO THE THIRD-PARTY RELEASE.

| | |
|---|---|
| ☐ | **By checking this box, you elect to opt <u>IN</u> to the Third-Party Releases.** |

**Article VIII.B of the Plan contains the following Third-Party Release:**

**Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out of court restructuring efforts,**

3

intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, provided that nothing in Article VIII.B of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Definitions Related to the Debtor Release and the Third-Party Release:

(3)     Under the Plan, "***Released Parties***" means, collectively, in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) Purchaser and each of its Related Parties; and (f) each of the Released Voyager Employees (subject to the limitations contained in Article IV.E and Article IV.F of the Plan); *provided that*, if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

(4)     Under the Plan, "***Releasing Parties***" means, collectively, in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (g) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (h) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (i) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided that*, if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

<u>**Item 5**</u>.  **Contributed Third-Party Claims.**

If the Plan is confirmed, all causes of action that the Debtors are entitled to bring against third parties not released under the Plan (the "<u>Litigation Targets</u>") will be transferred to the Wind-Down Entity.  In addition to these causes of action that can only be commenced by the Wind-Down Entity, certain creditors may have direct causes of action against the Litigation Targets.  However, it is difficult and expensive for individual creditors to sue third parties for losses.  Accordingly, creditors can elect to contribute direct causes of action to the Wind-Down Entity. By opting in to contribute causes of action to the Wind-Down Entity, you are giving the Wind-Down Entity the right to pursue those direct causes of action on your behalf together with other creditors.  As a result, the Wind-Down Entity will be able to use its resources to sue the Litigation Targets on those direct causes of action, and all recoveries will inure to the benefit of all creditors and not just those that agreed to contribute their claims.  For the avoidance of doubt, the decision to "opt in" to contribute third-party claims is entirely voluntary, and the failure to "opt in" does not prejudice any electing creditors' rights.

By electing such option on this Ballot, you agree that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Entity, you will be deemed, without further action, (i) to have irrevocably contributed your

Contributed Third-Party Claims to the Wind-Down Entity, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Entity to memorialize and effectuate such contribution.

**The Committee strongly encourages you to elect to contribute your Contributed Third-Party Claims to the Wind-Down Entity, which will allow the Wind-Down Entity to potentially seek greater recoveries for the benefit of Holders of Claims and Interests.**

> [ ]  **By checking this box, you elect to to contribute your Contributed Third-Party Claims to the Wind-Down Entity.**

Definitions Related to Contributed Third-Party Claims:

Under the Plan, "***Contributed Third-Party Claims***" means all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform; (b) all Causes of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) all Causes of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided, however*, that Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors; (ii) any direct claims against the Released Parties; (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties; or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the currently filed complaint, dated as of July 6, 2022, in the Ontario Superior Court of Justice by Francine De Sousa, against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.

## Item 6.  Certifications.

1. The undersigned is (a) the Holder of the OpCo General Unsecured Claims (Class 4A) being voted or (b) the authorized signatory for an entity that is a Holder of such OpCo General Unsecured Claims;

2. the undersigned has received a copy of the solicitation materials, including the Plan and the Disclosure Statement, and acknowledges that the undersigned's vote as set forth on this Ballot is subject to the terms and conditions set forth therein and herein;

3. the undersigned has cast the same vote with respect to all of its OpCo General Unsecured Claims (Class 4A) in connection with the Plan; and

4. (a) no other Ballot with respect to the same OpCo General Unsecured Claims (Class 4A) identified in Item 3 has been cast or (b) if any other Ballot has been cast with respect to such OpCo General Unsecured Claims, then any such earlier Ballots are hereby revoked and deemed to be null and void.

## Item 7.  Ballot Completion Information.

Name of Holder: _____

_____

| | |
|---|---|
| Signature: | |
| Signatory Name (if other than the Holder): | |
| Title: | |
| Address: | |
| Email Address: | |
| Telephone Number: | |
| Date Completed: | |

No fees, commissions, or other remuneration will be payable to any broker, dealer, or other person for soliciting votes on the Plan.  This Ballot shall not constitute or be deemed a proof of claim or equity interest or an assertion of a claim or equity interest.

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN IT IN ACCORDANCE WITH INSTRUCTIONS CONTAINED HEREIN.  THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS ACTUALLY RECEIVED BY THE CLAIMS, NOTICING, AND SOLICITATION AGENT PRIOR TO THE VOTING DEADLINE VIA THE ONLINE VOTING PORTAL AT HTTPS://CASES.STRETTO.COM/VOYAGER/BALLOTING.**

<div style="border:1px solid black">

**THE VOTING DEADLINE IS FEBRUARY 22, 2023, AT 4:00 P.M., PREVAILING EASTERN TIME.**

**THE CLAIMS, NOTICING, AND SOLICITATION AGENT MUST ACTUALLY RECEIVE THIS CLASS 4A BALLOT ON OR BEFORE THE VOTING DEADLINE.**

</div>

| Class 4A — OpCo General Unsecured Claims |
|---|

## INSTRUCTIONS FOR COMPLETING THIS BALLOT

1. The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as <u>Exhibit A</u> to the Disclosure Statement. Capitalized terms used in the Ballot or in these instructions (the "<u>Ballot Instructions</u>") but not otherwise defined therein or herein shall have the meanings set forth in the Plan, a copy of which also accompanies the Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon the Holders if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of impaired creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. This Ballot contains voting options with respect to the Plan.

4. To vote, you <u>MUST</u>: (a) fully complete this Ballot; (b) clearly indicate your decision to accept or reject the Plan in Item 3 of this Ballot; and (c) sign, date, and return this Ballot via the Claims, Noticing, and Solicitation Agent's online voting portal or by mail as described more fully below.

    (a)    To submit your Ballot via the online voting portal, please visit https://cases.stretto.com/Voyager/balloting and follow the instructions to submit your Ballot.

        **IMPORTANT NOTE: You will need the following information to retrieve and submit your customized E-Ballot:**

        **Unique E-Ballot ID#:** _____

        **PIN#:** _____

        The Claims, Noticing, and Solicitation Agent's online voting platform is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, e-mail, or other means of electronic transmission will not be counted.

        Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your Ballot. Please complete and submit a Ballot for each E-Ballot ID# you receive, as applicable. Creditors who cast a Ballot using the Claims, Noticing, and Solicitation Agent's online voting portal should <u>NOT</u> also submit a hard copy Ballot.

    (b)    To submit your Ballot via mail, complete, sign, and date this Ballot and return it (with an original signature) promptly in the envelope provided via first-class mail, overnight courier, or hand-delivery to:

<div align="center">

Voyager Ballot Processing
c/o Stretto
410 Exchange, Suite 100
Irvine, CA 92602

</div>

5. Any Ballot submitted that is incomplete or illegible, indicates unclear or inconsistent votes with respect to the Plan, or is improperly signed and returned will <u>NOT</u> be counted unless the Debtors otherwise determine.

6.  To vote, you <u>MUST</u> deliver your completed Ballot so that it is **ACTUALLY RECEIVED** by the Claims, Noticing, and Solicitation Agent on or before the Voting Deadline by one of the methods described above. The Voting Deadline is **February 22, 2023, at 4:00 p.m., prevailing Eastern Time**.

7.  Any Ballot received by the Claims, Noticing, and Solicitation Agent after the Voting Deadline will not be counted with respect to acceptance or rejection of the Plan, as applicable, unless the Debtors otherwise determine. No Ballot may be withdrawn or modified after the Voting Deadline without the Debtors' prior consent.

8.  Delivery of a Ballot reflecting your vote to the Claims, Noticing, and Solicitation Agent will be deemed to have occurred only when the Claims, Noticing, and Solicitation Agent actually receives the originally executed Ballot (for the avoidance of doubt, a Ballot submitted via the Claims, Noticing, and Solicitation Agent online voting portal shall be deemed to contain an original signature). In all cases, you should allow sufficient time to assure timely delivery.

9.  If you deliver multiple Ballots to the Claims, Noticing, and Solicitation Agent, <u>ONLY</u> the last properly executed Ballot timely received will be deemed to reflect your intent and will supersede and revoke any prior received Ballot(s).

10. You must vote all of your Class 4A OpCo General Unsecured Claims either to accept or reject the Plan, and may not split your vote. Further, if a Holder has multiple Claims within Class 4A, the Debtors may direct the Claims, Noticing, and Solicitation Agent to aggregate the Claims of any particular Holder within Class 4A for the purpose of counting votes.

11. This Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or Interest, or an assertion or admission of a Claim or an Interest, in the Debtors' Chapter 11 Cases.

12. You should not rely on any information, representations, or inducements made to obtain an acceptance of the Plan that are other than as set forth, or are inconsistent with, the information contained in the Disclosure Statement, the documents attached to or incorporated in the Disclosure Statement, and the Plan.

13. <u>SIGN AND DATE</u> your Ballot.[3] Please provide your name and mailing address in the space provided on this Ballot if it is different from that set forth on the Ballot or if no address is presented on the Ballot.

14. If your Claim is held in multiple accounts, you may receive more than one Ballot coded for each such account for which your Claims are held. Each Ballot votes only your Claims indicated on that Ballot. Accordingly, complete and return each Ballot you receive.

<div align="center">

**PLEASE RETURN YOUR BALLOT PROMPTLY**

</div>

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 4A BALLOT, THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING, PLEASE CALL THE CLAIMS, NOTICING, AND SOLICITATION AGENT AT: (855) 473-8665 (TOLL-FREE) OR +1 (949) 271-6507 (INTERNATIONAL) OR EMAIL VOYAGERINQUIRIES@STRETTO.COM AND REFERENCE "IN RE VOYAGER - SOLICITATION INQUIRY" IN THE SUBJECT LINE.**

<div align="center">

**THE VOTING DEADLINE IS FEBRUARY 22, 2023, AT 4:00 P.M., PREVAILING EASTERN TIME. THE CLAIMS, NOTICING, AND SOLICITATION AGENT MUST ACTUALLY RECEIVE THIS CLASS 4A BALLOT ON OR BEFORE THE VOTING DEADLINE.**

</div>

---

[3] If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney-in-fact, or officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Claims, Noticing, and Solicitation Agent, the Debtors, the Debtors' counsel, or the Court, must submit proper evidence to the requesting party of authority to so act on behalf of such holder.

## Exhibit 3C

**Class 4B Ballot (HoldCo General Unsecured Claims)**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

<div align="center">

**BALLOT FOR VOTING TO ACCEPT OR REJECT**
**THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC.**
**AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**CLASS 4B HOLDERS OF HOLDCO GENERAL UNSECURED CLAIMS**

</div>

> **PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**
>
> **THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE CLAIMS, NOTICING, AND SOLICITATION AGENT BY FEBRUARY 22, 2023, AT 4:00 P.M., PREVAILING EASTERN TIME (THE "VOTING DEADLINE").**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes in accordance with title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), to accept or reject the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, supplemented, or otherwise modified from time to time, the "Plan"),[2] attached as Exhibit A to the *First Amended Disclosure Statement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented from time to time and including all exhibits or supplements thereto, the "Disclosure Statement") from Holders of Account Holder Claims, OpCo General Unsecured Claims, HoldCo General Unsecured Claims, and TopCo General Unsecured Claims (each, a "Voting Class" and collectively, the "Voting Classes").

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]     Capitalized terms used but not otherwise defined herein shall have the meaning given to them in the Plan.

Once completed and returned in accordance with the attached instructions, your vote on the Plan will be counted as set forth herein. A Voting Class will accept the Plan if Holders of at least two-thirds in amount and more than one-half in number of Claims in that Voting Class votes to accept the Plan. The Court may confirm the Plan, which contemplates effectuating the Restructuring Transactions, if the Plan otherwise satisfies the requirements of section 1129 of the Bankruptcy Code, and the Plan then would be binding on all Holders of Allowed Claims in the Voting Classes, among others.

You are receiving this ballot (this "Ballot") because you are the Holder of Class 4B HoldCo General Unsecured Claims as of **January 10, 2023** (the "Voting Record Date"). **For additional discussion of the treatment of Class 4B Claims under the Plan and the rights of Holders of Class 4B Claims under the Plan, please read the Disclosure Statement.**

The rights and treatment for each Class are described in the Disclosure Statement, which is included in the package (the "Solicitation Package") you are receiving with this Ballot. If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from: (a) Stretto, Inc. (the "Claims, Noticing, and Solicitation Agent"), at no charge by: (i) accessing the Debtors' restructuring website at https://cases.stretto.com/Voyager/; (ii) writing to the Claims, Noticing, and Solicitation Agent at Voyager Inquiries, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602; (iii) calling (855) 473-8665 (Toll Free) or +1 (949) 271-6507 (International); or (iv) emailing VoyagerInquiries@stretto.com and referencing "In re Voyager - Solicitation Inquiry" in the subject line; or (b) for a fee via PACER at http://pacer.psc.uscourts.gov.

This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. In the event that the Schedules are amended to schedule Claims against multiple Debtor entities, then votes on account of such Claims shall be tabulated for each applicable Debtor entity. If you believe you have received this Ballot in error, please contact the Claims, Noticing, and Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

The Court may confirm the Plan and thereby bind all Holders of Claims and Interests. To have your vote count as either an acceptance or rejection of the Plan, you must complete and return this Ballot so that the Claims, Noticing, and Solicitation Agent *actually receives* it on or before the Voting Deadline.

As further described in the Committee Letter, the Committee recommends that you vote to accept the Plan and contribute your third-party claims.

**THE VOTING DEADLINE IS ON FEBRUARY 22, 2023, AT 4:00 P.M., PREVAILING EASTERN TIME.**

<u>Item 1.</u>    **Amount of Class 4B Claims.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder of Class 4B HoldCo General Unsecured Claims in the following aggregate principal amount (*please fill in the amount if not otherwise completed*):

> Amount of Claims:  $_____

<u>Item 2.</u>    **Recovery.**

Pursuant to Article III.C of the Plan, each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim: (i) its Pro Rata share of Distributable HoldCo Cash, and (ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to HoldCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

<u>Item 3</u>.    **Vote on Plan.**

The Holder of the Class 4B HoldCo General Unsecured Claims against the Debtors set forth in Item 1 votes to (please check <u>one</u>):

| | |
|---|---|
| ☐  **ACCEPT** (vote FOR) the Plan | ☐  **REJECT** (vote AGAINST) the Plan |

**<u>Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 3 above.</u>**

<u>Item 4</u>.    **Third-Party Release.**

AS A HOLDER OF A CLASS 4B CLAIM, YOU ARE A "RELEASING PARTY" UNDER THE PLAN IF YOU OPT IN TO THE RELEASES CONTAINED IN THE PLAN.  YOU MAY CHECK THE BOX BELOW TO ELECT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.B OF THE PLAN.  YOU WILL BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN <u>ONLY IF</u> (I) THE COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT IN TO THE RELEASES AND (II) YOU CHECK THE BOX BELOW AND SUBMIT THE OPT IN NOTICE BY THE OPT IN DEADLINE.  **YOUR DECISION TO COMPLETE AND RETURN THE OPT-IN NOTICE IS ENTIRELY VOLUNTARY AND NOT A REQUIREMENT UNDER THE PLAN OR APPLICABLE LAW**.  YOUR RECOVERY UNDER THE PLAN REMAINS UNAFFECTED WHETHER OR NOT YOU ELECT TO OPT IN TO THE THIRD-PARTY RELEASE.

| | |
|---|---|
| ☐ | **By checking this box, you elect to opt <u>IN</u> to the Third-Party Releases.** |

**Article VIII.B of the Plan contains the following Third-Party Release:**

**Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out of court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, provided that nothing in Article VIII.B of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.**
 **Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy**

Court's finding that each release described in Article VIII.B of the Plan is: **(1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

Definitions Related to the Debtor Release and the Third-Party Release:

(1)     Under the Plan, "***Released Parties***" means, collectively, in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) Purchaser and each of its Related Parties; and (f) each of the Released Voyager Employees (subject to the limitations contained in Article IV.E and Article IV.F of the Plan); *provided that*, if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

(2)     Under the Plan, "***Releasing Parties***" means, collectively, in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (g) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (h) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (i) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided that*, if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

<u>**Item 5**</u>.  **Contributed Third-Party Claims.**

If the Plan is confirmed, all causes of action that the Debtors are entitled to bring against third parties not released under the Plan (the "<u>Litigation Targets</u>") will be transferred to the Wind-Down Entity.  In addition to these causes of action that can only be commenced by the Wind-Down Entity, certain creditors may have direct causes of action against the Litigation Targets.  However, it is difficult and expensive for individual creditors to sue third parties for losses.  Accordingly, creditors can elect to contribute direct causes of action to the Wind-Down Entity. By opting in to contribute causes of action to the Wind-Down Entity, you are giving the Wind-Down Entity the right to pursue those direct causes of action on your behalf together with other creditors.  As a result, the Wind-Down Entity will be able to use its resources to sue the Litigation Targets on those direct causes of action, and all recoveries will inure to the benefit of all creditors and not just those that agreed to contribute their claims.  For the avoidance of doubt, the decision to "opt in" to contribute third-party claims is entirely voluntary, and the failure to "opt in" does not prejudice any electing creditors' rights.

By electing such option on this Ballot, you agree that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Entity, you will be deemed, without further action, (i) to have irrevocably contributed your Contributed Third-Party Claims to the Wind-Down Entity, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Entity to memorialize and effectuate such contribution.

**The Committee strongly encourages you to elect to contribute your Contributed Third-Party Claims to the Wind-Down Entity, which will allow the Wind-Down Entity to potentially seek greater recoveries for the benefit of Holders of Claims and Interests.**

<div style="border:1px solid">

☐  **By checking this box, you elect to to contribute your Contributed Third-Party Claims to the Wind-Down Entity.**

</div>

Definitions Related to Contributed Third-Party Claims:

Under the Plan, "***Contributed Third-Party Claims***" means all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform; (b) all Causes of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) all Causes of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided, however*, that Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors; (ii) any direct claims against the Released Parties; (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties; or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the currently filed complaint, dated as of July 6, 2022, in the Ontario Superior Court of Justice by Francine De Sousa, against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.

<u>**Item 6.**</u>  **Certifications.**

1.   The undersigned is (a) the Holder of the HoldCo General Unsecured Claims (Class 4B) being voted or (b) the authorized signatory for an entity that is a Holder of such HoldCo General Unsecured Claims;

2.   the undersigned has received a copy of the solicitation materials, including the Plan and the Disclosure Statement, and acknowledges that the undersigned's vote as set forth on this Ballot is subject to the terms and conditions set forth therein and herein;

3.   the undersigned has cast the same vote with respect to all of its HoldCo General Unsecured Claims (Class 4B) in connection with the Plan; and

4.   (a) no other Ballot with respect to the same HoldCo General Unsecured Claims (Class 4B) identified in Item 3 has been cast or (b) if any other Ballot has been cast with respect to such HoldCo General Unsecured Claims, then any such earlier Ballots are hereby revoked and deemed to be null and void.

<u>**Item 7.**</u>  **Ballot Completion Information.**

Name of Holder:  _____

_____

Signature:  _____

| Signatory Name (if other than the Holder): | |
|---|---|
| Title: | |
| Address: | |
| Email Address: | |
| Telephone Number: | |
| Date Completed: | |

No fees, commissions, or other remuneration will be payable to any broker, dealer, or other person for soliciting votes on the Plan.  This Ballot shall not constitute or be deemed a proof of claim or equity interest or an assertion of a claim or equity interest.

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN IT IN ACCORDANCE WITH INSTRUCTIONS CONTAINED HEREIN.  THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS ACTUALLY RECEIVED BY THE CLAIMS, NOTICING, AND SOLICITATION AGENT PRIOR TO THE VOTING DEADLINE VIA THE ONLINE VOTING PORTAL AT HTTPS://CASES.STRETTO.COM/VOYAGER/BALLOTING.**

---

**THE VOTING DEADLINE IS FEBRUARY 22, 2023, AT 4:00 P.M., PREVAILING EASTERN TIME.**

**THE CLAIMS, NOTICING, AND SOLICITATION AGENT MUST ACTUALLY RECEIVE THIS CLASS 4B BALLOT ON OR BEFORE THE VOTING DEADLINE.**

---

| Class 4B — HoldCo General Unsecured Claims |
|:---:|

### INSTRUCTIONS FOR COMPLETING THIS BALLOT

1. The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as <u>Exhibit A</u> to the Disclosure Statement. Capitalized terms used in the Ballot or in these instructions (the "<u>Ballot Instructions</u>") but not otherwise defined therein or herein shall have the meanings set forth in the Plan, a copy of which also accompanies the Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon the Holders if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of impaired creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. This Ballot contains voting options with respect to the Plan.

4. To vote, you <u>MUST</u>: (a) fully complete this Ballot; (b) clearly indicate your decision to accept or reject the Plan in Item 3 of this Ballot; and (c) sign, date, and return this Ballot via the Claims, Noticing, and Solicitation Agent's online voting portal or by mail as described more fully below.

    (a) To submit your Ballot via the online voting portal, please visit https://cases.stretto.com/Voyager/balloting and follow the instructions to submit your Ballot.

    **IMPORTANT NOTE: You will need the following information to retrieve and submit your customized E-Ballot:**

    **Unique E-Ballot ID#:** _____

    **PIN#:** _____

    The Claims, Noticing, and Solicitation Agent's online voting platform is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, e-mail, or other means of electronic transmission will not be counted.

    Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your Ballot. Please complete and submit a Ballot for each E-Ballot ID# you receive, as applicable. Creditors who cast a Ballot using the Claims, Noticing, and Solicitation Agent's online voting portal should <u>NOT</u> also submit a hard copy Ballot.

    (b) To submit your Ballot via mail, complete, sign, and date this Ballot and return it (with an original signature) promptly in the envelope provided via first-class mail, overnight courier, or hand-delivery to:

    <div align="center">

    Voyager Ballot Processing
    c/o Stretto
    410 Exchange, Suite 100
    Irvine, CA 92602

    </div>

5. Any Ballot submitted that is incomplete or illegible, indicates unclear or inconsistent votes with respect to the Plan, or is improperly signed and returned will <u>NOT</u> be counted unless the Debtors otherwise determine.

6.  To vote, you <u>MUST</u> deliver your completed Ballot so that it is **ACTUALLY RECEIVED** by the Claims, Noticing, and Solicitation Agent on or before the Voting Deadline by one of the methods described above. The Voting Deadline is **February 22, 2023, at 4:00 p.m., prevailing Eastern Time**.

7.  Any Ballot received by the Claims, Noticing, and Solicitation Agent after the Voting Deadline will not be counted with respect to acceptance or rejection of the Plan, as applicable, unless the Debtors otherwise determine. No Ballot may be withdrawn or modified after the Voting Deadline without the Debtors' prior consent.

8.  Delivery of a Ballot reflecting your vote to the Claims, Noticing, and Solicitation Agent will be deemed to have occurred only when the Claims, Noticing, and Solicitation Agent actually receives the originally executed Ballot (for the avoidance of doubt, a Ballot submitted via the Claims, Noticing, and Solicitation Agent online voting portal shall be deemed to contain an original signature). In all cases, you should allow sufficient time to assure timely delivery.

9.  If you deliver multiple Ballots to the Claims, Noticing, and Solicitation Agent, <u>ONLY</u> the last properly executed Ballot timely received will be deemed to reflect your intent and will supersede and revoke any prior received Ballot(s).

10. You must vote all of your Class 4B HoldCo General Unsecured Claims either to accept or reject the Plan, and may not split your vote. Further, if a Holder has multiple Claims within Class 4B, the Debtors may direct the Claims, Noticing, and Solicitation Agent to aggregate the Claims of any particular Holder within Class 4B for the purpose of counting votes.

11. This Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or Interest, or an assertion or admission of a Claim or an Interest, in the Debtors' Chapter 11 Cases.

12. You should not rely on any information, representations, or inducements made to obtain an acceptance of the Plan that are other than as set forth, or are inconsistent with, the information contained in the Disclosure Statement, the documents attached to or incorporated in the Disclosure Statement, and the Plan.

13. <u>SIGN AND DATE</u> your Ballot.[3] Please provide your name and mailing address in the space provided on this Ballot if it is different from that set forth on the Ballot or if no address is presented on the Ballot.

14. If your Claim is held in multiple accounts, you may receive more than one Ballot coded for each such account for which your Claims are held. Each Ballot votes only your Claims indicated on that Ballot. Accordingly, complete and return each Ballot you receive.

**PLEASE RETURN YOUR BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 4B BALLOT, THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING, PLEASE CALL THE CLAIMS, NOTICING, AND SOLICITATION AGENT AT: (855) 473-8665 (TOLL-FREE) OR +1 (949) 271-6507 (INTERNATIONAL) OR EMAIL VOYAGERINQUIRIES@STRETTO.COM AND REFERENCE "IN RE VOYAGER - SOLICITATION INQUIRY" IN THE SUBJECT LINE.**

---

**THE VOTING DEADLINE IS FEBRUARY 22, 2023, AT 4:00 P.M., PREVAILING EASTERN TIME. THE CLAIMS, NOTICING, AND SOLICITATION AGENT MUST ACTUALLY RECEIVE THIS CLASS 4B BALLOT ON OR BEFORE THE VOTING DEADLINE.**

---

[3]  If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney-in-fact, or officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Claims, Noticing, and Solicitation Agent, the Debtors, the Debtors' counsel, or the Court, must submit proper evidence to the requesting party of authority to so act on behalf of such holder.

**Exhibit 3D**

**Class 4C Ballot (TopCo General Unsecured Claims)**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

<div align="center">

**BALLOT FOR VOTING TO ACCEPT OR REJECT**
**THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC.**
**AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**CLASS 4C HOLDERS OF TOPCO GENERAL UNSECURED CLAIMS**

</div>

> **PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**
>
> **THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE CLAIMS, NOTICING, AND SOLICITATION AGENT BY FEBRUARY 22, 2023, AT 4:00 P.M., PREVAILING EASTERN TIME (THE "VOTING DEADLINE").**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes in accordance with title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), to accept or reject the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, supplemented, or otherwise modified from time to time, the "Plan"),[2] attached as Exhibit A to the *Second Amended Disclosure Statement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented from time to time and including all exhibits or supplements thereto, the "Disclosure Statement") from Holders of Account Holder Claims, OpCo General Unsecured Claims, HoldCo General Unsecured Claims, and TopCo General Unsecured Claims (each, a "Voting Class" and collectively, the "Voting Classes").

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]    Capitalized terms used but not otherwise defined herein shall have the meaning given to them in the Plan.

Once completed and returned in accordance with the attached instructions, your vote on the Plan will be counted as set forth herein. A Voting Class will accept the Plan if Holders of at least two-thirds in amount and more than one-half in number of Claims in that Voting Class votes to accept the Plan. The Court may confirm the Plan, which contemplates effectuating the Restructuring Transactions, if the Plan otherwise satisfies the requirements of section 1129 of the Bankruptcy Code, and the Plan then would be binding on all Holders of Allowed Claims in the Voting Classes, among others.

You are receiving this ballot (this "Ballot") because you are the Holder of Class 4C TopCo General Unsecured Claims as of **January 10, 2023** (the "Voting Record Date"). **For additional discussion of the treatment of Class 4C Claims under the Plan and the rights of Holders of Class 4C Claims under the Plan, please read the Disclosure Statement.**

The rights and treatment for each Class are described in the Disclosure Statement, which is included in the package (the "Solicitation Package") you are receiving with this Ballot. If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from: (a) Stretto, Inc. (the "Claims, Noticing, and Solicitation Agent"), at no charge by: (i) accessing the Debtors' restructuring website at https://cases.stretto.com/Voyager/; (ii) writing to the Claims, Noticing, and Solicitation Agent at Voyager Inquiries, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602; (iii) calling (855) 473-8665 (Toll Free) or +1 (949) 271-6507 (International); or (iv) emailing VoyagerInquiries@stretto.com and referencing "In re Voyager - Solicitation Inquiry" in the subject line; or (b) for a fee via PACER at http://pacer.psc.uscourts.gov.

This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. In the event that the Schedules are amended to schedule Claims against multiple Debtor entities, then votes on account of such Claims shall be tabulated for each applicable Debtor entity. If you believe you have received this Ballot in error, please contact the Claims, Noticing, and Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

The Court may confirm the Plan and thereby bind all Holders of Claims and Interests. To have your vote count as either an acceptance or rejection of the Plan, you must complete and return this Ballot so that the Claims, Noticing, and Solicitation Agent *actually receives* it on or before the Voting Deadline.

As further described in the Committee Letter, the Committee recommends that you vote to accept the Plan and contribute your third-party claims.

**THE VOTING DEADLINE IS ON FEBRUARY 22, 2023, AT 4:00 P.M., PREVAILING EASTERN TIME.**

**Item 1.    Amount of Class 4C Claims.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder of Class 4C TopCo General Unsecured Claims in the following aggregate principal amount (*please fill in the amount if not otherwise completed*):

Amount of Claims:  $_____

**Item 2.    Recovery.**

Pursuant to Article III.C of the Plan, each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim (i) its Pro Rata share of Distributable TopCo Cash, and (ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or the Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

<u>Item 3</u>.    **Vote on Plan.**

The Holder of the Class 4C TopCo General Unsecured Claims against the Debtors set forth in Item 1 votes to (please check <u>one</u>):

| | |
|---|---|
| ☐ **ACCEPT** (vote FOR) the Plan | ☐ **REJECT** (vote AGAINST) the Plan |

**<u>Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 3 above.</u>**

<u>Item 4</u>.    **Third-Party Release.**

AS A HOLDER OF A CLASS 4C CLAIM, YOU ARE A "RELEASING PARTY" UNDER THE PLAN IF YOU OPT IN TO THE RELEASES CONTAINED IN THE PLAN.  YOU MAY CHECK THE BOX BELOW TO ELECT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.B OF THE PLAN.  YOU WILL BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN <u>ONLY IF</u> (I) THE COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT IN TO THE RELEASES AND (II) YOU CHECK THE BOX BELOW AND SUBMIT THE OPT IN NOTICE BY THE OPT IN DEADLINE.  **YOUR DECISION TO COMPLETE AND RETURN THE OPT-IN NOTICE IS ENTIRELY VOLUNTARY AND NOT A REQUIREMENT UNDER THE PLAN OR APPLICABLE LAW**.  YOUR RECOVERY UNDER THE PLAN REMAINS UNAFFECTED WHETHER OR NOT YOU ELECT TO OPT IN TO THE THIRD-PARTY RELEASE.

| | |
|---|---|
| ☐ | **By checking this box, you elect to opt IN to the Third-Party Releases.** |

**Article VIII.B of the Plan contains the following Third-Party Release:**

**Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out of court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, provided that nothing in Article VIII.B of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

Definitions Related to the Debtor Release and the Third-Party Release:

(1)     Under the Plan, "*Released Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) Purchaser and each of its Related Parties; and (f) each of the Released Voyager Employees (subject to the limitations contained in Article IV.E and Article IV.F of the Plan); *provided that*, if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

(2)     Under the Plan, "*Releasing Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (g) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (h) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (i) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided that*, if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

<u>Item 5</u>.  **Contributed Third-Party Claims.**

If the Plan is confirmed, all causes of action that the Debtors are entitled to bring against third parties not released under the Plan (the "Litigation Targets") will be transferred to the Wind-Down Entity. In addition to these causes of action that can only be commenced by the Wind-Down Entity, certain creditors may have direct causes of action against the Litigation Targets. However, it is difficult and expensive for individual creditors to sue third parties for losses. Accordingly, creditors can elect to contribute direct causes of action to the Wind-Down Entity. By opting in to contribute causes of action to the Wind-Down Entity, you are giving the Wind-Down Entity the right to pursue those direct causes of action on your behalf together with other creditors. As a result, the Wind-Down Entity will be able to use its resources to sue the Litigation Targets on those direct causes of action, and all recoveries will inure to the benefit of all creditors and not just those that agreed to contribute their claims. For the avoidance of doubt, the decision to "opt in" to contribute third-party claims is entirely voluntary, and the failure to "opt in" does not prejudice any electing creditors' rights.

By electing such option on this Ballot, you agree that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Entity, you will be deemed, without further action, (i) to have irrevocably contributed your Contributed Third-Party Claims to the Wind-Down Entity, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Entity to memorialize and effectuate such contribution.

**The Committee strongly encourages you to elect to contribute your Contributed Third-Party Claims to the Wind-Down Entity, which will allow the Wind-Down Entity to potentially seek greater recoveries for the benefit of Holders of Claims and Interests.**

| | |
|---|---|
| ☐ | **By checking this box, you elect to to contribute your Contributed Third-Party Claims to the Wind-Down Entity.** |

Definitions Related to Contributed Third-Party Claims:

Under the Plan, "***Contributed Third-Party Claims***" means all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform; (b) all Causes of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) all Causes of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided*, *however*, that Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors; (ii) any direct claims against the Released Parties; (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties; or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the currently filed complaint, dated as of July 6, 2022, in the Ontario Superior Court of Justice by Francine De Sousa, against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.

<u>Item 6</u>.  **Certifications.**

1. The undersigned is (a) the Holder of the TopCo General Unsecured Claims (Class 4C) being voted or (b) the authorized signatory for an entity that is a Holder of such TopCo General Unsecured Claims;

2. the undersigned has received a copy of the solicitation materials, including the Plan and the Disclosure Statement, and acknowledges that the undersigned's vote as set forth on this Ballot is subject to the terms and conditions set forth therein and herein;

3. the undersigned has cast the same vote with respect to all of its TopCo General Unsecured Claims (Class 4C) in connection with the Plan; and

4. (a) no other Ballot with respect to the same TopCo General Unsecured Claims (Class 4C) identified in Item 3 has been cast or (b) if any other Ballot has been cast with respect to such TopCo General Unsecured Claims, then any such earlier Ballots are hereby revoked and deemed to be null and void.

<u>Item 7</u>.  **Ballot Completion Information.**

Name of Holder: _____

_____

Signature: _____

| Signatory Name (if other than the Holder): | |
|---|---|
| Title: | |
| Address: | |
| Email Address: | |
| Telephone Number: | |
| Date Completed: | |

No fees, commissions, or other remuneration will be payable to any broker, dealer, or other person for soliciting votes on the Plan.  This Ballot shall not constitute or be deemed a proof of claim or equity interest or an assertion of a claim or equity interest.

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN IT IN ACCORDANCE WITH INSTRUCTIONS CONTAINED HEREIN.  THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS ACTUALLY RECEIVED BY THE CLAIMS, NOTICING, AND SOLICITATION AGENT PRIOR TO THE VOTING DEADLINE VIA THE ONLINE VOTING PORTAL AT HTTPS://CASES.STRETTO.COM/VOYAGER/BALLOTING.**

---

**THE VOTING DEADLINE IS FEBRUARY 22, 2023, AT 4:00 P.M., PREVAILING EASTERN TIME.**

**THE CLAIMS, NOTICING, AND SOLICITATION AGENT MUST ACTUALLY RECEIVE THIS CLASS 4C BALLOT ON OR BEFORE THE VOTING DEADLINE.**

---

| Class 4C — TopCo General Unsecured Claims |
|---|

## INSTRUCTIONS FOR COMPLETING THIS BALLOT

1. The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as <u>Exhibit A</u> to the Disclosure Statement. Capitalized terms used in the Ballot or in these instructions (the "<u>Ballot Instructions</u>") but not otherwise defined therein or herein shall have the meanings set forth in the Plan, a copy of which also accompanies the Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon the Holders if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of impaired creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. This Ballot contains voting options with respect to the Plan.

4. To vote, you <u>MUST</u>: (a) fully complete this Ballot; (b) clearly indicate your decision to accept or reject the Plan in Item 3 of this Ballot; and (c) sign, date, and return this Ballot via the Claims, Noticing, and Solicitation Agent's online voting portal or by mail as described more fully below.

    (a)    To submit your Ballot via the online voting portal, please visit https://cases.stretto.com/Voyager/balloting and follow the instructions to submit your Ballot.

        **IMPORTANT NOTE: You will need the following information to retrieve and submit your customized E-Ballot:**

        **Unique E-Ballot ID#:** _____

        **PIN#:** _____

        The Claims, Noticing, and Solicitation Agent's online voting platform is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, e-mail, or other means of electronic transmission will not be counted.

        Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your Ballot. Please complete and submit a Ballot for each E-Ballot ID# you receive, as applicable. Creditors who cast a Ballot using the Claims, Noticing, and Solicitation Agent's online voting portal should <u>NOT</u> also submit a hard copy Ballot.

    (b)    To submit your Ballot via mail, complete, sign, and date this Ballot and return it (with an original signature) promptly in the envelope provided via first-class mail, overnight courier, or hand-delivery to:

<div align="center">
Voyager Ballot Processing<br>
c/o Stretto<br>
410 Exchange, Suite 100<br>
Irvine, CA 92602
</div>

5. Any Ballot submitted that is incomplete or illegible, indicates unclear or inconsistent votes with respect to the Plan, or is improperly signed and returned will <u>NOT</u> be counted unless the Debtors otherwise determine.

6. To vote, you <u>MUST</u> deliver your completed Ballot so that it is **ACTUALLY RECEIVED** by the Claims, Noticing, and Solicitation Agent on or before the Voting Deadline by one of the methods described above. The Voting Deadline is **February 22, 2023, at 4:00 p.m., prevailing Eastern Time**.

7. Any Ballot received by the Claims, Noticing, and Solicitation Agent after the Voting Deadline will not be counted with respect to acceptance or rejection of the Plan, as applicable, unless the Debtors otherwise determine. No Ballot may be withdrawn or modified after the Voting Deadline without the Debtors' prior consent.

8. Delivery of a Ballot reflecting your vote to the Claims, Noticing, and Solicitation Agent will be deemed to have occurred only when the Claims, Noticing, and Solicitation Agent actually receives the originally executed Ballot (for the avoidance of doubt, a Ballot submitted via the Claims, Noticing, and Solicitation Agent online voting portal shall be deemed to contain an original signature). In all cases, you should allow sufficient time to assure timely delivery.

9. If you deliver multiple Ballots to the Claims, Noticing, and Solicitation Agent, <u>ONLY</u> the last properly executed Ballot timely received will be deemed to reflect your intent and will supersede and revoke any prior received Ballot(s).

10. You must vote all of your Class 4C TopCo General Unsecured Claims either to accept or reject the Plan, and may not split your vote. Further, if a Holder has multiple Claims within Class 4C, the Debtors may direct the Claims, Noticing, and Solicitation Agent to aggregate the Claims of any particular Holder within Class 4C for the purpose of counting votes.

11. This Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or Interest, or an assertion or admission of a Claim or an Interest, in the Debtors' Chapter 11 Cases.

12. You should not rely on any information, representations, or inducements made to obtain an acceptance of the Plan that are other than as set forth, or are inconsistent with, the information contained in the Disclosure Statement, the documents attached to or incorporated in the Disclosure Statement, and the Plan.

13. <u>SIGN AND DATE</u> your Ballot.[3] Please provide your name and mailing address in the space provided on this Ballot if it is different from that set forth on the Ballot or if no address is presented on the Ballot.

14. If your Claim is held in multiple accounts, you may receive more than one Ballot coded for each such account for which your Claims are held. Each Ballot votes only your Claims indicated on that Ballot. Accordingly, complete and return each Ballot you receive.

**PLEASE RETURN YOUR BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 4C BALLOT, THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING, PLEASE CALL THE CLAIMS, NOTICING, AND SOLICITATION AGENT AT: (855) 473-8665 (TOLL-FREE) OR +1 (949) 271-6507 (INTERNATIONAL) OR EMAIL VOYAGERINQUIRIES@STRETTO.COM AND REFERENCE "IN RE VOYAGER - SOLICITATION INQUIRY" IN THE SUBJECT LINE.**

---

**THE VOTING DEADLINE IS FEBRUARY 22, 2023, AT 4:00 P.M., PREVAILING EASTERN TIME. THE CLAIMS, NOTICING, AND SOLICITATION AGENT MUST ACTUALLY RECEIVE THIS CLASS 4C BALLOT ON OR BEFORE THE VOTING DEADLINE.**

---

[3] If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney-in-fact, or officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Claims, Noticing, and Solicitation Agent, the Debtors, the Debtors' counsel, or the Court, must submit proper evidence to the requesting party of authority to so act on behalf of such holder.

**Exhibit 4**

**Cover Letter**



**[DATE]**

<u>**Subject**</u>:  Summary of the Plan, Information Regarding Certain Key Dates, and Certain Other Matters

Dear Stakeholders,

You are receiving this letter because you are entitled to vote on the Debtors' Plan, an important step in the return of value to you and other stakeholders.  This letter and the materials enclosed concern the proposed sale of substantially all the assets of Voyager Digital Holdings, Inc. and its affiliated Debtors to Binance US, following the Debtors' July 5, 2022 voluntary filing of these Chapter 11 Cases.  Your vote to accept or reject the Plan must be received by February 22, 2023, at 4:00 p.m. prevailing Eastern Time.  Instructions on how to vote are included in this Solicitation Package.

As described below and in the Plan and Disclosure Statement also enclosed, the Debtors believe that the sale to Binance US is in the best interest of all stakeholders and, ultimately, is the best possible transaction available in light of the extraordinary facts and circumstances that have taken place since November 6, 2022.  Holders of Account Holder Claims and Holders of each class of General Unsecured Claims will receive significantly more consideration for their Claims under the Plan than in a liquidation.  As such, Voyager Digital Holdings, Inc. (on behalf of itself and each of the other Debtors) urge you to properly and timely submit your Ballot, in advance of the February 22, 2023 deadline, with a vote to accept the Plan.  Further details and instructions regarding how to get additional information appear on the following pages.

*** 

Voyager Digital Holdings, Inc. and its affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>")[1] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>") on July 5, 2022 (collectively, the "<u>Chapter 11 Cases</u>").

You have received this letter and the enclosed materials because you are entitled to vote on the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as modified, amended, or supplemented from time to time, the "<u>Plan</u>").[2]  On [●], 2023, the Court entered an order [Docket No. [●]] (the "<u>Disclosure Statement Order</u>"):  (a) authorizing the Debtors to solicit acceptances for the Plan; (b) conditionally approving the *Second Amended Disclosure Statement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as modified, amended, or supplemented from time to time, the "<u>Disclosure Statement</u>"); (c) approving the solicitation materials and documents to be included in the solicitation packages (the "<u>Solicitation Package</u>"); and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan, and for filing objections to the Plan.

The materials in the enclosed Solicitation Package are intended to be self-explanatory.  Should you have any questions, however, please feel free to contact Stretto, Inc., the claims, noticing, and solicitation agent retained by the Debtors in these chapter 11 cases (the "<u>Claims, Noticing, and Solicitation Agent</u>"), by:  (a) calling the Claims, Noticing, and Solicitation Agent at (855) 473-8665 (Toll Free) or +1 (949) 271-6507 (International), (b) writing to the Claims, Noticing, and Solicitation Agent at Voyager Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602, or (c) e-mailing the Claims, Noticing, and Solicitation Agent at <u>VoyagerInquiries@stretto.com</u> with a reference to "In re

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

Voyager - Solicitation Inquiry" in the subject line. You may also obtain copies of any pleadings filed with the Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager/, or for a fee via PACER at http://pacer.psc.uscourts.gov. Please be advised that the Claims, Noticing, and Solicitation Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may **not** advise you as to whether you should vote to accept or reject the Plan.

As described herein and in the Plan and Disclosure Statement, the Debtors believe that the sale to Binance US is in the best interest of stakeholders and, ultimately, is the most value-maximizing transaction available to the Debtors. **Account Holders and each class of General Unsecured Creditors will receive significantly more consideration on account of their claims under the Plan than they would in a liquidation**:

| Class | Claim or Interest | Projected Amount of Allowed Claims (in $mm)[34] | Projected Sale Transaction Recovery Under Plan | Projected Liquidation Transaction Recovery Under Plan | Liquidation Recovery |
|---|---|---|---|---|---|
| 1 | Secured Tax Claims | $0.0 | N/A | N/A | N/A |
| 2 | Other Priority Claims | $1.0 | 100% | 100% | 99% - 99% |
| 3 | Account Holder Claims | $1,763.8 | 51% | 45% | 35% - 39% |
| 4A | OpCo General Unsecured Claims | $14.0 | 50% | 45% | 35% - 39% |
| 4B | HoldCo General Unsecured Claims | $8.3 | 6% | 6% | 0% - 0% |
| 4C | TopCo General Unsecured Claims | $3.0 | 64% | 64% | 65% - 65% |
| 5 | Alameda Loan Facility Claims | $75.1 | 0% | 0% | 0% - 0% |
| 6 | Section 510(b) Claims | $0.0 | N/A | N/A | N/A |
| 7 | Intercompany Claims | $0.0 | 0% | 0% | 0% - 0% |
| 8 | Intercompany Interests | $0.0 | 0% | 0% | 0% - 0% |
| 9 | Existing Equity Interests | $0.0 | 0% | 0% | 0% - 0% |

---

[3] The lower recovery compared to the FTX Transaction is largely due to fluctuations in the market following the FTX collapse along with the value differential under the Sale Transaction.

[4] **The recoveries included in this Disclosure Statement are for illustrative purposes only and subject to material change particularly due to, among other things, market volatility, the ultimate treatment of the Alameda Loan Facility Claims and the Intercompany Obligations, and whether Alameda prevails on its asserted preference and related administrative claim, which could substantially reduce the recoveries projected above.** A detailed description of treatment and projected recoveries is included in the Disclosure Statement, Article III.D.

## I. The Sale Transaction

The Debtors filed these Chapter 11 Cases in response to a short-term "run on the bank" caused by a downturn in the cryptocurrency industry generally and the default of a significant loan made to a third party. Since the Petition Date, the Debtors have worked tirelessly to identify the most value-maximizing transaction for their customers and other creditors on an expedited timeline. Following a two-week competitive auction process, the Debtors selected the bid submitted by West Realm Shires Inc. ("FTX US," and along with its parent entity and affiliates, "FTX") as the winning bid (the transaction contemplated thereby, the "FTX Transaction"). Had it been effectuated, the FTX Transaction would have provided for substantial in-kind recoveries to Holders of Account Holder Claims, the transfer of substantially all of the customer accounts on the Voyager platform to the FTX platform, and the orderly wind down of the Debtors' estates. But after a series of extraordinary events outlined in detail below, FTX, and with it the FTX Transaction, collapsed. While the Debtors were shocked and dismayed by FTX's cataclysmic collapse, the Debtors swiftly reengaged in negotiations with numerous other potential counterparties to evaluate potential third-party transactions that would maximize value for the Debtors and their creditors on the quickest timeline and in the most favorable manner in light of the FTX collapse and related industry fallout.

Following good-faith, arm's length negotiations with several such alternative transaction parties, the Debtors elected to accept the bid submitted by BAM Trading Services Inc. (d/b/a Binance.US) ("Binance US" or the "Purchaser"). The Debtors value Binance US's offer at approximately $1.022 billion, comprising (i) the value of Cryptocurrency on the Voyager platform as of a date to be determined, which as of December 19, 2022, is estimated to be $1.002 billion, plus (ii) additional consideration, which is estimated to provide at least $20 million of incremental value. Importantly, the Binance US bid can be effectuated quickly, provides a meaningful recovery to creditors, and allows the Debtors to facilitate an efficient resolution of these chapter 11 cases, after which Binance US's market-leading, secured trading platform will enable customers to trade and store cryptocurrency.

Under the Asset Purchase Agreement, Binance US will acquire substantially all Cryptocurrency on the Voyager platform at fair market value as of a to be determined date to be distributed to Account Holders on the Binance US platform and submit VGX for its standard listing review process in an effort to allow VGX to be traded on the Binance US platform. Importantly, the Debtors and Account Holders will retain all right, title, and interest in and to the cryptocurrency allocated to it in accordance with the Asset Purchase Agreement through and including such time as such cryptocurrency is returned to the Debtors or distributed to such Account Holder. The Asset Purchase Agreement makes clear that the cryptocurrency will be held by Binance US solely for the benefit of the Debtors or Account Holder, as applicable, until such distributions are made.

In states where Binance US does not yet have the requisite money transmitter licensing approvals, authorizations, or exemptions to make distributions to creditors in those states (the "Unsupported Jurisdictions"), the Debtors will retain custody of the cryptocurrency that would be distributed to those creditors. In the event that Binance.US is not able to obtain the necessary approvals to make distributions to creditors in Unsupported Jurisdictions within six (6) months following the closing (i.e., an incremental 3 months following distributions to creditors in other jurisdictions), the Debtors would convert the cryptocurrency attributable to such creditors to cash and the Debtors would then distribute the equivalent realized cash value associated with such liquidations to such creditors under the Plan.

As described further in Article V of the Disclosure Statement, the Debtors will effectuate the transition of Account Holders to the Binance US platform pursuant to the Customer Onboarding Protocol, which will be included in the Plan Supplement and will be filed with the Bankruptcy Court at least 14 days in advance of the Voting Deadline.

In light of the extraordinary circumstances that precipitated the filing of these Chapter 11 Cases and the equally extraordinary events that transpired thereafter, the Debtors believe that they have achieved a plan that is fair and equitable, maximizes the value of the Debtors' estates, and maximizes recoveries to Holders of Claims, including, Holders of Account Holder Claims. Importantly, the "toggle" feature under the Plan ensures an outside date by which the Debtors can pivot to a standalone plan and return value to Holders of Claims without any further delay.

## II. Plan.

The Debtors seek to effectuate the transactions contemplated by the Asset Purchase Agreement (collectively, the "Sale Transaction") pursuant to the Plan.

3

The Plan provides, among other things, that upon the Effective Date:

- All Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims shall be paid in full in Cash, or receive such other customary treatment that renders such Claims Unimpaired under the Bankruptcy Code;

- Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim:  (i) if the Sale Transaction is consummated by the Outside Date (a) its Net Owed Coins, as provided in and subject to the requirements of Sections 6.10 and 6.12 of the Asset Purchase Agreement; *provided* that for Account Holders in Unsupported Jurisdictions and only to the extent that the Purchaser does not obtain the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides within 6 months following the Closing Date (as defined in the Asset Purchase Agreement), such Account Holders shall receive, after expiration of such time period, value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated; (b) its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement; (c) its Pro Rata share of Distributable OpCo Cash; and (d) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; *provided* that distributions made to any Account Holder pursuant to clauses (b), (c), and (d) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder; or (ii) if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated: (a) its Pro Rata share of Distributable OpCo Cash; (b) its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; provided that if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and (c) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; provided that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

- Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim: (i) if the Sale Transaction is consummated by the Outside Date (a) its Pro Rata share of Distributable Cryptocurrency in Cash; (b) its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement; (c) its Pro Rata share of Distributable OpCo Cash, and (d) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; or (ii) if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated: (a) its Pro Rata share of Distributable Cryptocurrency in Cash; (b) its Pro Rata share of Distributable OpCo Cash, and (c) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo;

*provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

- Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim: (i) its Pro Rata share of Distributable HoldCo Cash, and (ii) its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to HoldCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

- Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim (i) its Pro Rata share of Distributable TopCo Cash, and (ii) its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or the Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

- Each Holder of an Allowed Alameda Loan Facility Claim will receive in exchange for such Allowed Alameda Loan Facility Claim to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets; *provided* that any distributions on account of Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Claims at OpCo, HoldCo, and TopCo, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, Allowed OpCo General Unsecured Claims, Allowed HoldCo General Unsecured Claims, and Allowed TopCo General Unsecured Claims; *provided*, *however*, if the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity.

- Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims.

The following chart summarizes the classification of Claims and Interests set forth in the Plan and indicates whether such class is entitled to vote on the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| 4A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 4C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

## II. The Solicitation Package

This letter is part of your Solicitation Package, which was approved by the Court for distribution to Holders of Claims in connection with the solicitation of votes to accept or reject the Plan. Please review these materials carefully and follow instructions contained therein. The Solicitation Package consists of the following:

- a copy of the Solicitation and Voting Procedures;
- the applicable opt-in release notice;
- the applicable form of Ballot;
- a pre-addressed, postage pre-paid return envelope for Holders of Claims in Class 4A (OpCo General Unsecured Claims), Class 4B (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims);[5]
- this cover letter;
- the Committee Letter;
- the conditionally approved Disclosure Statement (and exhibits thereto, including the Plan);
- the Disclosure Statement Order (without exhibits, except the Solicitation and Voting Procedures);
- the Combined Hearing Notice; and
- any additional documents that the Court has ordered to be made available.

If you have any questions regarding your Solicitation Package, please do not hesitate to reach out to the Claims, Noticing, and Solicitation Agent.

## III. Key Upcoming Dates

The Deadline to vote to accept or reject the Plan is **February 22, 2023 at 4:00 p.m. prevailing Eastern Time**. **You must submit your Ballot per the instructions included in your Ballot by February 22, 2023 at 4:00 p.m. prevailing Eastern Time**.

After votes on the Plan are counted, the Court will hold a hearing to consider the adequacy of the Disclosure Statement and confirmation of the Plan (the "Combined Hearing"). The Combined Hearing will be held on **March 2, 2023, at [●]:00 [●].m.** prevailing Eastern Time. If the Court confirms the Plan at the Combined Hearing, the Debtors will seek

---

[5]    Holders of Account Holder Claims shall submit their votes electronically through the Claims, Noticing, and Solicitation Agent's online ballot portal. Please refer to your Ballot for detailed instructions on how to submit your vote.

to effectuate the Plan, consummate the sale of substantially all of the Debtors' assets, and distribute value to Holders of Account Holder Claims, Holders of General Unsecured Claims, and other creditors.

## III. Recommendation

Voyager Digital Holdings, Inc. (on behalf of itself and each of the other Debtors) has approved the filing of the Plan and the solicitation of votes to accept or reject the Plan. The Debtors believe that the acceptance of the Plan is in the best interests of their estates, Holders of Claims or Interests, and all other parties in interest. The Debtors believe that any valid alternative to confirmation of the Plan would result in significant delays, litigation, additional costs, and, ultimately, might result in smaller distributions (or no distributions) on account of Claims asserted in these chapter 11 cases.

<div style="border:1px solid black; text-align:center;">

**THE DEBTORS STRONGLY URGE YOU TO PROPERLY AND TIMELY SUBMIT YOUR BALLOT CASTING A VOTE TO ACCEPT THE PLAN IN ACCORDANCE WITH THE INSTRUCTIONS IN YOUR BALLOT.**

**THE VOTING DEADLINE IS FEBRUARY 22, 2023, AT 4:00 P.M. PREVAILING EASTERN TIME.**

</div>

Sincerely,

*/s/ Draft*
Name: Stephen Ehrlich
Title: Co-Founder and Chief Executive Officer
Voyager Digital Holdings, Inc.

7

# **Exhibit 5**

**The Committee Letter**

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**of Voyager Digital Holdings, Inc.,** *et al.*

Case No. 22-20943 (MEW)
in the United States Bankruptcy Court
for the Southern District of New York

c/o McDermott Will & Emery LLP
Attention: Darren Azman, Joseph B. Evans, and Charles R. Gibbs
One Vanderbilt Avenue
New York, NY 10017-3852

To: Customers and Creditors of Voyager Digital Holdings, Inc., *et al.*

## I. Introduction

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") was appointed by the Office of the United States Trustee to represent the interests of all unsecured creditors in the chapter 11 bankruptcy cases (the "<u>Bankruptcy Cases</u>") of Voyager Digital Holdings, Inc., *et al.* (collectively, "<u>Voyager</u>"). We write concerning Voyager's third amended chapter 11 plan filed on [●] (the "<u>Plan</u>").[1] For the reasons set forth below, the Committee strongly recommends that you vote as follows:

| | |
|---|---|
| **Item 3 of the Ballot:** | **VOTE TO <u>ACCEPT</u> the Plan.** |
| **Item 5 of the Ballot:** | **<u>OPT-IN</u> to contribute your direct claims.** |

The deadline to vote on whether to accept or reject the Plan is **February 22, 2023.** The hearing to confirm the Plan is currently scheduled on **March 2, 2023**.

## II. Why You Should Accept the Plan

The Committee's goal is to distribute the maximum amount of crypto and fiat as quickly as possible. With those goals in mind, the proposed but now-terminated deal with FTX.US that was the result of Voyager's auction process was seemingly an attractive option. As part of the negotiations for the FTX.US transaction, the Committee had sought a "toggle" to be included in Voyager's original chapter 11 plan so that if the transaction with FTX failed to close, Voyager would have the ability to distribute crypto to customers outside of a sale without delay. The Committee fought to include that "toggle" in the original plan and reached an agreement with Voyager to do so. FTX, however, refused to include such a provision in any plan contemplating their transaction. Ultimately, as we all now know, despite FTX's representations concerning its financial health and ability to consummate the transaction, FTX filed for bankruptcy and Sam Bankman-Fried is under indictment. This came as a surprise to the Committee as it did to most of the world.

---

[1] All documents filed in Voyager's Bankruptcy Cases are available free of charge at https://cases.stretto.com/voyager/court-docket/. The Plan is available at Docket No. [●]. Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

Following the demise of FTX, Voyager and the Committee acted quickly to secure a new method by which crypto and fiat could be distributed to creditors. The Committee considered two options: (1) self-liquidation; and (2) an alternative transaction with a third party. For the following reasons, the Committee supports Voyager's proposed transaction with BAM Trading Services Inc. d/b/a Binance.US ("Binance.US").

**First**, the Committee considered a "self-liquidation" centered around a distribution of crypto directly from Voyager's platform to customers. This option avoided the risks associated with a third-party purchaser. However, there are significant regulatory and practical hurdles in returning hundreds of millions of dollars in fiat and crypto to customers across the United States. For example, many creditors prefer distributions in crypto, but Voyager was the only place they traded and held crypto. Those customers would need to obtain self-hosted wallets or a new crypto exchange account to accept distributions. Even after educating those customers on that subject, a self-liquidation plan would likely include a large number of test transactions and other administrative burdens. Thus, an operating crypto exchange with the infrastructure to handle millions of retail customer crypto transactions appeared to be the most efficient option. Ultimately, the Committee determined that conducting a self-liquidation would materially decrease recoveries for a variety of reasons (e.g., value leakage from mass sales of crypto and working capital funding) and delay returning fiat and crypto to creditors, as compared to a sale to a third party. Moreover, Voyager would receive no cash consideration from a purchaser in a self-liquidation, thereby further reducing creditor recoveries.

**Second**, after FTX's collapse, other potential purchasers began to engage with Voyager. Throughout this process, the Committee had extensive discussions with a number of interested parties to assess the relative value of their offers, including their ability to close timely. Ultimately, the only purchaser that presented an economically attractive and actionable offer was Binance.US. In light of the FTX implosion, the Committee has worked diligently to negotiate protections in the asset purchase agreement with Binance.US to accelerate recoveries to creditors and ensure that all crypto will be safe in the event of a Binance.US insolvency.

More specifically, one of the Committee's concerns with the initial Binance.US proposal was the way in which Voyager would transfer crypto to Binance.US. The initial Binance.US proposal contemplated the transfer of nearly all of Voyager's crypto to Binance.US immediately upon closing. However, certain of that crypto would not be made available to some customers for up to six months because of, among other things, regulatory restrictions in four jurisdictions. The Committee viewed this structure as sub-optimal and voiced its concerns to Voyager and Binance.US.

Following these discussions, Binance.US supported our efforts to ensure that creditors receive distributions in the greatest amount as quickly as possible and agreed to restructure the way in which crypto is transferred. In short, after the transaction closes, crypto will move from Voyager to Binance.US on a weekly basis, and the only crypto that will be transferred is crypto that will be immediately distributed to customer accounts. In other words, each creditor's allocation of crypto distributions will remain at Voyager, rather than the Binance.US platform, until that crypto is ready to be made available to such creditor in accordance with the asset purchase agreement. As a result, the time between when Binance.US receives crypto from Voyager and when customers can access, trade, convert, sell, stake, or withdraw that crypto is

2

now very limited. Binance.US has agreed to other revisions in the amended asset purchase agreement that protect Voyager creditors and the transferred crypto.

Additionally, the new Plan now includes the "toggle" feature discussed above. If the Binance.US transaction fails to close for any reason, the Plan permits Voyager to conduct a self-liquidation. If Binance.US cannot or does not close, Voyager will not need to develop a new plan and instead can continue with a self-liquidation to avoid further delays and costs.

The Committee believes that the Binance.US transaction, relative to all alternatives (whether in the form of an alternative sale transaction or a self-liquidation), provides the highest and best value for creditors, as it offers both the highest value available for creditor recoveries as well as the fastest route to such recoveries.

The Committee supports the Binance.US transaction and the Plan, and encourages you to

<div align="center">

**VOTE TO ACCEPT THE PLAN**.

</div>

**a.    How to Vote to Accept the Plan.**

Item 3 on the ballot you will receive will include the option to vote to accept or reject the Plan. Below is what the voting box will look like:

**Item 3.    Vote on Plan.**

The Holder of the Class 3 Account Holder Claims against the Debtors set forth in Item 1 votes to (please check <u>one</u>):

| ✓ **ACCEPT** (vote FOR) the Plan | ☐ **REJECT** (vote AGAINST) the Plan |
| --- | --- |

## III.    Why You Should Opt-In to Contributing Direct Claims

If the Plan is confirmed, all causes of action that Voyager is entitled to bring against third parties for damage they caused to Voyager will be transferred to the Wind-Down Entity. The Committee, not Voyager, will select a Trustee to control the Wind-Down Entity. The Wind-Down Entity will investigate all potential causes of action against third parties and pursue litigation for their roles in Voyager's demise. The Wind-Down Entity will also be required to respond to inquiries from state and federal regulators, reconcile claims, and handle various administrative tasks, including determining future additional distributions to creditors.

In addition to these causes of action that can only be commenced by the Wind-Down Entity, certain creditors may have **_direct_** causes of action against third parties. However, it is difficult and expensive for individual creditors to sue third parties for losses. Accordingly, the Committee has negotiated with Voyager to include a mechanism in the Plan that allows you to contribute your direct causes of action to the Wind-Down Entity. By opting-in to contribute your causes of action to the Wind-Down Entity, you are giving the Wind-Down Entity the right to pursue those causes of action on your behalf. As a result, the Wind-Down Entity will be able to use its resources to sue third parties on your behalf, and **_all_** recoveries from those causes of action will inure to the benefit of creditors.

Put simply, "opting-in" to contribute your direct claims to the Wind-Down Entity is a valuable step towards making creditors whole because the Wind-Down Entity will have additional sources of recoveries and the financial means to efficiently pursue that litigation, rather than individual creditors expending their own money to commence separate litigation against third parties.

Accordingly, the Committee strongly encourages you to

**OPT-IN TO CONTRIBUTE YOUR DIRECT CLAIMS**.

a.      **How to Opt-In to Contributing Direct Claims.**

Item 5 on the ballot you receive will include the option to "opt-in" to contribute your causes of action to the Wind-Down Entity. Below is what the "opt-in" box will look like:

| ☐ | By checking this box, you elect to to contribute your Contributed Third-Party Claims to the Wind-Down Entity. |
|---|---|

\*\*\*

For the foregoing reasons, the Committee urges you to ***vote to accept*** the Plan and ***opt-in*** to contributing your direct claims to the Wind-Down Entity.

Sincerely,

***The Official Committee of
Unsecured Creditors***

4

**Exhibit 6**

**Combined Hearing Notice**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF HEARING TO CONSIDER**
**(I) ADEQUACY OF THE SECOND AMENDED DISCLOSURE**
**STATEMENT AND (II) CONFIRMATION OF THE THIRD AMENDED JOINT CHAPTER 11**
**PLAN FILED BY THE DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES**

**PLEASE TAKE NOTICE THAT** on [●], 2023, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order") that (a) conditionally approved the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"), for the purposes of solicitation, (b) authorized the Debtors to solicit votes with regard to the acceptance or rejection of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Plan"),[2] (c) approved the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approved procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider the adequacy of the Disclosure Statement and Confirmation of the Plan (the "Combined Hearing") will commence on **March 2, 2023 at [●]:00 [●].m.**, prevailing Eastern Time, or such other time that the Court determines, before the Honorable Michael E. Wiles, in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, Courtroom 617, New York, New York 10004.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]    Capitalized terms not otherwise defined herein shall have the meaning given to them in the *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections, and (IV) Granting Related Relief* [Docket No. 779] or the Plan, as applicable.

**PLEASE BE ADVISED**: THE COMBINED HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

## CRITICAL INFORMATION REGARDING VOTING ON THE PLAN

**Voting Record Date**. The voting record date is **January 10, 2023** (the "Voting Record Date"), which is the date for determining which Holders of Class 3 Claims (Account Holder Claims), Class 4A Claims (OpCo General Unsecured Claims), Class 4B Claims (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims) are entitled to vote on the Plan.

**Voting Deadline**. The deadline for voting on the Plan is on **February 22, 2023 at 4:00 p.m.** prevailing Eastern Time (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you **must**: (a) follow the instructions carefully; (b) complete **all** of the required information on the ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is **actually received** by the Debtors' claims, noticing, and solicitation agent Stretto, Inc. (the "Claims, Noticing, and Solicitation Agent") on or before the Voting Deadline. **A failure to follow such instructions may disqualify your vote**.

## CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN

**Plan and Disclosure Statement Objection Deadline**. The deadline for filing objections to the Plan or Disclosure Statement is **February 22, 2023 at 4:00 p.m.** prevailing Eastern Time (the "Plan and Disclosure Statement Objection Deadline"). All objections to the relief sought at the Combined Hearing **must**: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; **and** (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be **actually received** on or before **February 22, 2023 at 4:00 p.m.** prevailing Eastern Time:

| Debtors |
|---|
| **Voyager Digital Holdings, Inc.**<br>33 Irving Place, Suite 3060<br>New York, NY 10003<br>Attention: Stephen Ehrlich and David Brosgol |

| Counsel to the Debtors | Counsel to the Committee |
|---|---|
| **Kirkland & Ellis LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention: Joshua A. Sussberg; Christopher Marcus;<br>Christine A. Okike; Allyson B. Smith | **McDermott Will & Emery LLP**<br>One Vanderbilt Avenue<br>New York, NY 10017-3852<br>Attention: Darren Azman; Joseph B. Evans; Grayson<br>Williams; Gregg Steinman |

| United States Trustee |
|---|
| **Office of the United States Trustee for the Southern District of New York**<br>U.S. Federal Office Building<br>201 Varick Street, Room 1006<br>New York, NY 10014<br>Attention: Richard Morrissey; Mark Bruh |

## ADDITIONAL INFORMATION

**Obtaining Solicitation Materials**. The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received the materials in electronic format, or on a CD-ROM or flash drive), please feel free to contact the Debtors' Claims, Noticing, and Solicitation Agent, by: (a) calling the Claims, Noticing, and Solicitation Agent at (855) 473-8665 (Toll Free) or +1 (949) 271-6507 (International), (b) e-mailing the Claims, Noticing, and Solicitation Agent at VoyagerInquiries@Stretto.com with a reference to "In re: Voyager - Solicitation Inquiry" in the subject line, or (c) writing to the Claims, Noticing, and Solicitation Agent at Voyager Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602. You may also obtain copies of any pleadings filed with the Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager/, or for a fee via PACER at: http://pacer.psc.uscourts.gov. Please be advised that the Claims, Noticing, and Solicitation Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may **not** advise you as to whether you should vote to accept or reject the Plan.

**Filing the Plan Supplement**. The Debtors will file the Plan Supplement (as defined in the Plan) on or before **February 15, 2023** (*provided* that (i) the Notice of Assumption of Executory Contracts and Unexpired Leases and Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases will be filed on or before **February 1, 2023**; and (ii) the Customer Onboarding Protocol and the Schedule of Retained Causes of Action will be filed on or before **February 8, 2023**) and will serve notice on all Holders of Claims entitled to vote on the Plan, which will: (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

---

### BINDING NATURE OF THE PLAN

**IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THESE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

---

### HOW TO OPT INTO THE RELEASES

Any Holder of a Claim or Interest that wants to grant the Third-Party Release set forth in Article VIII.B of the Plan must return its Ballot or Non-Voting Status Notice, as applicable, to the Claims, Noticing, and Solicitation Agent by no later than **February 22, 2023**, by following the instructions for electing to opt into the Third-Party Release set forth in such Ballot or Non-Voting Status Notice, as applicable.

---

### RELEASES

**Article VIII.A of the Plan contains the following Debtor Release**:

**Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, the Wind-Down Entity, and in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been**

3

legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in Article VIII.A of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.A of the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Notwithstanding anything to the contrary contained herein, nothing in the Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of the Plan.

<u>Article VIII.B of the Plan contains the following Third-Party Release</u>:

Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, provided that

4

nothing in Article VIII.B of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

**Article VIII.C of the Plan provides for the following Exculpation:**

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**Article VIII.D of the Plan provides for the following Injunction:**

The assets of the Debtors and of the Wind-Down Entity shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in the Plan and shall not be available for any other purpose. All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Entity, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that

is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by the Plan.

Dated: _____, 2023     /s/ Draft
New York, New York                _____

                                  **KIRKLAND & ELLIS LLP**
                                  **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                  Joshua A. Sussberg, P.C.
                                  Christopher Marcus, P.C.
                                  Christine A. Okike, P.C.
                                  Allyson B. Smith (admitted *pro hac vice*)
                                  601 Lexington Avenue
                                  New York, New York 10022
                                  Telephone:      (212) 446-4800
                                  Facsimile:      (212) 446-4900
                                  Email:          jsussberg@kirkland.com
                                                  cmarcus@kirkland.com
                                                  christine.okike@kirkland.com
                                                  allyson.smith@kirkland.com

                                  *Counsel to the Debtors and Debtors in Possession*

**Exhibit 7**

**Plan Supplement Notice**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | )  | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF FILING OF PLAN SUPPLEMENT**

**PLEASE TAKE NOTICE THAT** on [●], 2023, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order") that (a) conditionally approved the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") for the purposes of solicitation, (b) authorized the Debtors to solicit votes with regard to the acceptance or rejection of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Plan"),[2] (c) approved the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approved procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Disclosure Statement Order, the Debtors filed with the Court the Notice of Assumption of Executory Contracts and Unexpired Leases and Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases on February 1, 2023, the Customer Onboarding Protocol and the Schedule of Retained Causes of Action as part of the Plan Supplement on February 8, 2023 [Docket No. [●]], and the remainder of the Plan Supplement on February 15, 2023 [Docket No. [●]].  The Plan Supplement contains the following documents each as defined in the Plan: (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Retained Causes of Action; (c) the Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases; (d) the Customer Onboarding Protocol; (e) the Restructuring Transactions Memorandum; (f) the Wind-Down Trust Agreement; and (g) any additional documents necessary to effectuate or that is contemplated by the Plan, including any compensation program for any of the Debtors' employees

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]     Capitalized terms not otherwise defined herein shall have the meaning given to them in the *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections, and (IV) Granting Related Relief* [Docket No. 779] or the Plan, as applicable.

1

to be established as contemplated in the Plan and the Definitive Documents to facilitate the transfer of Acquired Assets pursuant to the Asset Purchase Agreement and the wind-down of the Debtors' Estates.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider the adequacy of the Disclosure Statement and Confirmation of the Plan (the "Combined Hearing") will commence on **March 2, 2023 at [●] [●].m.**, prevailing Eastern Time, or such other time that the Court determines, before the Honorable Michael E. Wiles, in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, Courtroom 617, New York, New York 10004. In accordance with General Order M-543 dated March 20, 2020, the Hearing will be conducted telephonically. Any parties wishing to participate must do so by making arrangements through CourtSolutions by visiting https://www.court-solutions.com.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **February 22, 2023 at 4:00 p.m. prevailing Eastern Time** (the "Plan and Disclosure Statement Objection Deadline"). Any objection to the Plan **must**: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be **actually received** on or before **February 22, 2023 at 4:00 p.m. prevailing Eastern Time**:

| *Debtors* | |
|---|---|
| **Voyager Digital Holdings, Inc.**<br>33 Irving Place, Suite 3060<br>New York, NY 10003<br>Attention: Stephen Ehrlich and David Brosgol | |
| *Counsel to the Debtors* | *Counsel to the Committee* |
| **Kirkland & Ellis LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention: Joshua A. Sussberg; Christopher Marcus;<br>Christine A. Okike; Allyson B. Smith | **McDermott Will & Emery LLP**<br>One Vanderbilt Avenue<br>New York, NY 10017-3852<br>Attention: Darren Azman; Joseph B. Evans; Grayson<br>Williams; Gregg Steinman |
| *United States Trustee* | |
| **Office of the United States Trustee for the Southern District of New York**<br>U.S. Federal Office Building<br>201 Varick Street, Room 1006<br>New York, NY 10014<br>Attention: Richard Morrissey; Mark Bruh | |

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Stretto, Inc., the claims, noticing, and solicitation agent retained by the Debtors in these chapter 11 cases (the "Claims, Noticing, and Solicitation Agent"), by: (a) calling the Claims, Noticing, and Solicitation Agent at (855) 473-8665 (Toll Free) or +1 (949) 271-6507 (International), (b) e-mailing the Claims, Noticing, and Solicitation Agent at VoyagerInquiries@Stretto.com with a reference to "In re: Voyager - Solicitation Inquiry" in the subject line, or (c) writing to the Claims, Noticing, and Solicitation Agent at Voyager Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602. You may also obtain copies of any pleadings filed with the Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager/, or for a fee via PACER at: http://pacer.psc.uscourts.gov.

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.B CONTAINS A THIRD-PARTY RELEASE.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

**YOUR RECOVERY UNDER THE PLAN REMAINS UNAFFECTED WHETHER OR NOT YOU ELECT TO OPT IN TO THE THIRD-PARTY RELEASE.**

Dated: _____, 2023　　　　　/s/ Draft
New York, New York

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:　　(212) 446-4800
Facsimile:　　(212) 446-4900
Email:　　　　jsussberg@kirkland.com
　　　　　　　cmarcus@kirkland.com
　　　　　　　christine.okike@kirkland.com
　　　　　　　allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## Exhibit 8

**Notice of Rejection of Executory Contracts and Unexpired Leases**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE REGARDING EXECUTORY CONTRACTS**
**AND UNEXPIRED LEASES TO BE REJECTED PURSUANT TO THE PLAN**

**PLEASE TAKE NOTICE THAT** on [●], 2023, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order") that (a) conditionally approved the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") for the purposes of solicitation, (b) authorized the Debtors to solicit votes with regard to the acceptance or rejection of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Plan"),[2] (c) approved the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approved procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT**, on [●], 2023, the Debtors filed the *Schedule of Assumed Executory Contracts and Unexpired Leases* and the *Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases* (together, the "Assumption Schedules") with the Court as part of the *Plan Supplement for the Third Amended Joint Chapter 11 Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. [●]] (the "Plan Supplement"), as contemplated under the Plan. All Executory Contracts and Unexpired Leases that are not being assumed or assumed and assigned pursuant to the Assumption Schedules are automatically rejected as of the Effective Date. The determination to reject those Executory Contracts and Unexpired Leases that are not on the Assumption Schedules is subject to revision.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]     Capitalized terms not otherwise defined herein shall have the meaning given to them in the *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections, and (IV) Granting Related Relief* [Docket No. 779] or the Plan, as applicable.

> **PLEASE TAKE FURTHER NOTICE THAT YOU ARE RECEIVING THIS NOTICE BECAUSE THE DEBTORS' RECORDS REFLECT THAT YOU ARE A PARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT WILL BE REJECTED PURSUANT TO THE PLAN. THEREFORE, YOU ARE ADVISED TO REVIEW CAREFULLY THE INFORMATION CONTAINED IN THIS NOTICE AND THE RELATED PROVISIONS OF THE PLAN.[3]**

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider the adequacy of the Disclosure Statement and Confirmation of the Plan (the "Combined Hearing") will commence on **March 2, 2023 at [●]:00 [●].m.**, prevailing Eastern Time, or such other time that the Court determines, before the Honorable Michael E. Wiles, in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, Courtroom 617, New York, New York 10004. In accordance with General Order M-543 dated March 20, 2020, the Hearing will be conducted telephonically. Any parties wishing to participate must do so by making arrangements through CourtSolutions by visiting https://www.court-solutions.com.

**PLEASE TAKE FURTHER NOTICE THAT** all proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Court within **30 days** after the date of entry of the order of the Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed within such time shall not be enforceable against the Debtors or the Wind-Down Debtors, their Estates, or their property without the need for any objection by the Wind-Down Debtors or further notice to, or action, order, or approval of the Court.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **February 22, 2023 at 4:00 p.m, prevailing Eastern Time** (the "Plan and Disclosure Statement Objection Deadline"). Any objection to the Plan **must**: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be **actually received** on or before **February 22, 2023 at 4:00 p.m, prevailing Eastern Time**:

| Debtors | |
|---|---|
| **Voyager Digital Holdings, Inc.**<br>33 Irving Place, Suite 3060<br>New York, NY 10003<br>Attention: Stephen Ehrlich and David Brosgol | |
| ***Counsel to the Debtors*** | ***Counsel to the Committee*** |
| **Kirkland & Ellis LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention: Joshua A. Sussberg; Christopher Marcus; Christine A. Okike; Allyson B. Smith | **McDermott Will & Emery LLP**<br>One Vanderbilt Avenue<br>New York, NY 10017-3852<br>Attention: Darren Azman; Joseph B. Evans; Grayson Williams; Gregg Steinman |

---

[3]   Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumed Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. Further, the Debtors expressly reserve the right to (a) remove any Executory Contract or Unexpired Lease from the Rejection Schedule and assume such Executory Contract or Unexpired Lease pursuant to the terms of the Plan, up until the Effective Date and (b) contest any Claim asserted in connection with rejection of any Executory Contract or Unexpired Lease.

| United States Trustee |
|---|
| **Office of the United States Trustee for the Southern District of New York**<br>U.S. Federal Office Building<br>201 Varick Street, Room 1006<br>New York, NY 10014<br>Attention: Richard Morrissey; Mark Bruh |

**PLEASE TAKE FURTHER NOTICE THAT** any objections to Plan in connection with the rejection of the Executory Contract(s) and Unexpired Lease(s) identified above and/or related rejection damages proposed in connection with the Plan that remain unresolved as of the Combined Hearing will be heard at the Combined Hearing (or such other date as fixed by the Court).

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Stretto, Inc., the claims, noticing, and solicitation agent retained by the Debtors in these chapter 11 cases (the "Claims, Noticing, and Solicitation Agent"), by: (a) calling the Claims, Noticing, and Solicitation Agent at (855) 473-8665 (Toll Free) or +1 (949) 271-6507 (International), (b) e-mailing the Claims, Noticing, and Solicitation Agent at VoyagerInquiries@Stretto.com with a reference to "In re: Voyager - Solicitation Inquiry" in the subject line, or (c) writing to the Claims, Noticing, and Solicitation Agent at Voyager Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602. You may also obtain copies of any pleadings filed with the Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager/, or for a fee via PACER at: http://pacer.psc.uscourts.gov.

---

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.B CONTAINS A THIRD-PARTY RELEASE. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT.**

---

*[Remainder of Page Intentionally Left Blank]*

Dated: _____, 2023    /s/ Draft
New York, New York

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        jsussberg@kirkland.com
              cmarcus@kirkland.com
              christine.okike@kirkland.com
              allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**Exhibit 9**
**Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases**
**(Asset Purchase Agreement)**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE TO CONTRACT PARTIES**
**TO POTENTIALLY ASSUMED EXECUTORY CONTRACTS**

---

**YOU ARE RECEIVING THIS NOTICE BECAUSE**
**YOU OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY**
**TO AN EXECUTORY CONTRACT WITH ONE OR MORE**
**OF THE DEBTORS AS SET FORTH ON EXHIBIT A ATTACHED HERETO.**

---

**PLEASE TAKE NOTICE** that on December 21, 2022, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Debtors' Motion for Entry of an Order (I) Authorizing Entry Into the Binance US Purchase Agreement and (II) Granting Related Relief* [Docket No. [●]] (the "APA Motion"),[2] authorizing the Debtors to, among other things, enter into the Asset Purchase Agreement between the Debtors and BAM Trading Services Inc. (d/b/a Binance.US) ("Binance US") for the sale of substantially all of the Debtors' assets. The Debtors will consummate the sale transaction provided therein pursuant to a chapter 11 plan.[3]

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]     Capitalized terms used but not otherwise defined herein shall have the meaning given to them in the Plan (as defined herein) or the APA Motion.

[3]     On December 21, 2022, the Debtors filed the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 777] (as modified, amended, or supplemented from time to time, the "Plan").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the APA Motion and the terms of the Asset Purchase Agreement, the Debtors will assume and assign to Binance US certain contracts (the "Assigned Contracts") listed on the *Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases* (the "Assigned Contract Schedule") filed with the Court as part of the *Plan Supplement for the Third Amended Joint Chapter 11 Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. [●]] (the "Plan Supplement"), one or more of which you are a counterparty, upon approval of the Sale. The Assigned Contracts Schedule can also be viewed on the Debtors' case website (https://cases.stretto.com/Voyager/). The Debtors have conducted a review of their books and records and have determined that the cure amount for unpaid monetary obligations under such Assigned Contracts is as set forth on **Exhibit A** attached hereto (the "Cure Costs").

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the proposed Cure Costs, object to a proposed assignment to Binance US of any Assigned Contract, or object to the ability of Binance US to provide adequate assurance of future performance with respect to any Assigned Contract, your objection (a "Cure Objection") must: (i) be in writing; (ii) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the correct cure amount alleged to be owed to the objecting contract counterparty, together with any applicable and appropriate documentation in support thereof; (iv) be filed electronically with the Court on the docket of *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (the "Court") (which are available on the Court's website at http://www.nysb.uscourts.gov); and (v) be served so as to be actually received by **February 22, 2023, at 4:00 p.m., prevailing Eastern Time** (the "Cure Objection Deadline"), on counsel for the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg (jsussberg@kirkland.com); Christopher Marcus (cmarcus@kirkland.com); Christine Okike (christine.okike@kirkland.com); and Allyson B. Smith (allyson.smith@kirkland.com).

**PLEASE TAKE FURTHER NOTICE** that if no objection to (a) the Cure Costs, (b) the proposed assignment and assumption of any Assigned Contract, or (c) adequate assurance of Binance US's ability to perform is filed by the Cure Objection Deadline, then (i) you will be deemed to have stipulated that the Cure Costs as determined by the Debtors are correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional cure amount under the proposed Assigned Contract, and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assignment to Biance US on the grounds that Binance US has not provided adequate assurance of future performance as of the closing date of the Sale.

**PLEASE TAKE FURTHER NOTICE** that any Cure Objection in connection with the Asset Purchase Agreement that otherwise complies with these procedures yet remains unresolved as of the commencement of the Hearing, shall be heard at the Hearing or a later date to be fixed by the Court.

**PLEASE TAKE FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any Assigned Contract on the Assigned Contracts Schedule does not require or guarantee that such Assigned Contract will be assumed by the Debtors at any time or assumed and assigned, and all rights of the Debtors and Binance US with respect to such Assigned Contract are reserved. Moreover, the Debtors explicitly reserve their rights, in their reasonable discretion, to seek to reject or assume each Assigned Contract pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtors and/or Binance US, as applicable, to designate any Assigned Contract as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE** that, nothing herein (i) alters in any way the prepetition nature of the Assigned Contracts or the validity, priority, or amount of any claims of a counterparty to any Assigned Contract against the Debtors that may arise under such Assigned Contract, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Assigned Contract against the Debtors that may arise under such Assigned Contract.

*[Remainder of Page Intentionally Left Blank]*

Dated: _____, 2023          /s/ Draft
New York, New York                _____

                                  **KIRKLAND & ELLIS LLP**
                                  **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                  Joshua A. Sussberg, P.C.
                                  Christopher Marcus, P.C.
                                  Christine A. Okike, P.C.
                                  Allyson B. Smith (admitted *pro hac vice*)
                                  601 Lexington Avenue
                                  New York, New York 10022
                                  Telephone:    (212) 446-4800
                                  Facsimile:    (212) 446-4900
                                  Email:        jsussberg@kirkland.com
                                                cmarcus@kirkland.com
                                                christine.okike@kirkland.com
                                                allyson.smith@kirkland.com

                                  *Counsel to the Debtors and Debtors in Possession*

**Exhibit 10**
**Notice of Assumption of Executory Contracts and Unexpired Leases**
**(Wind-Down Entity)**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | Case No. 22-10943 (MEW) |
| Debtors. | (Jointly Administered) |

**NOTICE TO CONTRACT PARTIES**
**TO POTENTIALLY ASSUMED EXECUTORY CONTRACTS**

**PLEASE TAKE NOTICE THAT** on [●], 2023, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order") that (a) conditionally approved the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"), for the purposes of solicitation, (b) authorized the Debtors to solicit votes with regard to the acceptance or rejection of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [●]] (as modified, amended, or supplemented from time to time, the "Plan"),[2] (c) approved the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approved procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT**, on [●], 2023, the Debtors filed the *Schedule of Assumed Executory Contracts and Unexpired Leases* (the "Assumed Contracts Schedule") with the Court as part of the *Plan Supplement for the Third Amended Joint Chapter 11 Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. [●]] (the "Plan Supplement"), as contemplated under the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on the Effective Date, the Wind-Down Entity will assume the contracts (the "Assumed Contracts") listed on the Assumed Contracts Schedule, attached hereto as **Exhibit A**, one of more of

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]    Capitalized terms not otherwise defined herein shall have the meaning given to them in the *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections, and (IV) Granting Related Relief* [Docket No. 779] or the Plan, as applicable.

1

which you are a counterparty.  The Assumed Contracts Schedule can also be viewed on the Debtors' case website (https://cases.stretto.com/Voyager/).  The Debtors have conducted a review of their books and records and have determined that the cure amounts for unpaid monetary obligations under such Assumed Contracts are as set forth on **Exhibit A** attached hereto (the "Cure Costs").

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the proposed Cure Costs, your objection (a "Cure Objection") must:  (i) be in writing; (ii) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the correct cure amount alleged to be owed to the objecting contract counterparty, together with any applicable and appropriate documentation in support thereof; (iv) be filed electronically with the Court on the docket of *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (the "Court") (which are available on the Court's website at http://www.nysb.uscourts.gov); and (v) be served so as to be actually received by **February 22, 2023, at 4:00 p.m., prevailing Eastern Time** (the "Cure Objection Deadline"), on counsel for the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg (jsussberg@kirkland.com);   Christopher   Marcus   (cmarcus@kirkland.com);   Christine   Okike (christine.okike@kirkland.com); and Allyson B. Smith (allyson.smith@kirkland.com).

**PLEASE TAKE FURTHER NOTICE** that if no objection to is filed by the Cure Objection Deadline, then (i) you will be deemed to have stipulated that the Cure Costs as determined by the Debtors are correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional cure amount under the proposed Assumed Contract, and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assumption.

**PLEASE TAKE FURTHER NOTICE** that any Cure Objection that otherwise complies with these procedures yet remains unresolved as of the commencement of the Combined Hearing, shall be heard at the Combined Hearing or a later date to be fixed by the Court.

**PLEASE TAKE FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any Assumed Contract on the Assumed Contract Schedule does not require or guarantee that such Assumed Contract will be assumed by the Debtors at any time or assumed and assigned, and all rights of the Debtors with respect to such Assumed Contract are reserved.  Moreover, the Debtors explicitly reserve their rights, in their reasonable discretion, to seek to reject or assume each Assumed Contract pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtors to designate any Assumed Contract as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE** that, nothing herein (i) alters in any way the prepetition nature of the Assumed Contracts or the validity, priority, or amount of any claims of a counterparty to any Assumed Contract against the Debtors that may arise under such Assumed Contract, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Assumed Contract against the Debtors that may arise under such Assumed Contract.

*[Remainder of Page Intentionally Left Blank]*

Dated: _____, 2023
New York, New York

/s/ Draft

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:           jsussberg@kirkland.com
                     cmarcus@kirkland.com
                     christine.okike@kirkland.com
                     allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

3

# Exhibit 13

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF FILING OF SECOND AMENDED DISCLOSURE
STATEMENT RELATING TO THE THIRD AMENDED JOINT
PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR
AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that on August 12, 2022, the Debtors filed the *Disclosure Statement Relating to the First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 288].

**PLEASE TAKE FURTHER NOTICE** that on October 5, 2022, the Debtors filed the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

Debtors
Ex-13

KE 93145236

*Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 498].

**PLEASE TAKE FURTHER NOTICE** that on October 17, 2022, the Debtors filed the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 540].

**PLEASE TAKE FURTHER NOTICE** that on October 19, 2022, the Debtors filed the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 565].

**PLEASE TAKE FURTHER NOTICE** that on October 20, 2022, the Debtors filed the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 585].

**PLEASE TAKE FURTHER NOTICE** that on October 24, 2022, the Debtors filed the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 591].

**PLEASE TAKE FURTHER NOTICE** that on December 22, 2022, the Debtors filed the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 778].

PLEASE TAKE FURTHER NOTICE that on January 10, 2023, the Debtors filed the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 853] (the "Revised Disclosure Statement").

PLEASE TAKE FURTHER NOTICE that the Debtors hereby file the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, attached hereto as **Exhibit A** (the "Second Revised Disclosure Statement").

PLEASE TAKE FURTHER NOTICE THAT a comparison between the Revised Disclosure Statement and the Second Revised Disclosure Statement is attached hereto as **Exhibit B**.

PLEASE TAKE FURTHER NOTICE that copies of the Second Revised Disclosure Statement and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at http://www.cases.stretto.com/Voyager.  You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated:  January 13, 2023          /s/ Joshua A. Sussberg
New York, New York                **KIRKLAND & ELLIS LLP**
                                  **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                  Joshua A. Sussberg, P.C.
                                  Christopher Marcus, P.C.
                                  Christine A. Okike, P.C.
                                  Allyson B. Smith (admitted *pro hac vice*)
                                  601 Lexington Avenue
                                  New York, New York 10022
                                  Telephone:     (212) 446-4800
                                  Facsimile:     (212) 446-4900
                                  Email:         jsussberg@kirkland.com
                                                 cmarcus@kirkland.com
                                                 christine.okike@kirkland.com
                                                 allyson.smith@kirkland.com

                                  *Counsel to the Debtors and Debtors in Possession*

## Exhibit A

**Second Revised Disclosure Statement**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

**SECOND AMENDED DISCLOSURE STATEMENT RELATING TO**
**THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND**
**ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900

---

[1]   The debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital, Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

**TABLE OF CONTENTS**

**Page**

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT** ........................................ 1

**I.     INTRODUCTION** .................................................................................................................. 7

**II.    PRELIMINARY STATEMENT** ........................................................................................... 7

    A.     The Sale Transaction ......................................................................................................... 7
    B.     The FTX Collapse ............................................................................................................. 9

**III.   BACKGROUND** .................................................................................................................. 10

**IV.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
    THE PLAN** ........................................................................................................................ 12

    A.     What is chapter 11? .......................................................................................................... 12
    B.     Why are the Debtors sending me this Disclosure Statement? ........................................... 12
    C.     Am I entitled to vote on the Plan? .................................................................................... 12
    D.     What will I receive from the Debtors if the Plan is consummated? .................................. 13
    E.     What will I receive from the Debtors if I hold an Allowed Administrative Claim? ........... 19
    F.     What is the "toggle" feature of the Plan? ......................................................................... 20
    G.     How will my Account be transitioned to Binance.US? ..................................................... 20
    H.     What if I am unable or unwilling to transition my Account to Binance.US? ................... 20
    I.     What are the sources of Consideration and other consideration required to fund the Plan? ........ 20
    J.     Are any regulatory approvals required to consummate the Sale Transaction and confirm
        the Plan? ........................................................................................................................... 21
    K.     How will I receive my recovery as an Account Holder if the Sale Transaction is not
        consummated? .................................................................................................................. 22
    L.     What happens to my recovery if the Plan is not confirmed or does not go effective? ......... 22
    M.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
        Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
        "Consummation"? ............................................................................................................. 22
    N.     Is there potential litigation related to the Plan? ................................................................ 22
    O.     Does the Plan provide for the subordination of any Claims? ............................................ 23
    P.     Will there be releases and exculpation granted to parties in interest as part of the Plan? ..... 24
    Q.     What is the deadline to vote on the Plan? ......................................................................... 25
    R.     How do I vote for or against the Plan? .............................................................................. 25
    S.     Why is the Bankruptcy Court holding a Confirmation Hearing? ...................................... 25
    T.     When is the Confirmation Hearing set to occur? .............................................................. 25
    U.     What is the purpose of the Confirmation Hearing? ........................................................... 25
    V.     What is the effect of the Plan on the Debtors' ongoing business? ..................................... 26
    W.     What steps did the Debtors take to evaluate alternatives to a chapter 11 filing? .............. 26
    X.     Who do I contact if I have additional questions with respect to this Disclosure Statement
        or the Plan? ....................................................................................................................... 26

**V.     THE DEBTORS' PLAN** ..................................................................................................... 26

    A.     The Plan. ........................................................................................................................... 26
    B.     The Plan Toggle. .............................................................................................................. 33
    C.     Means for Implementation of the Plan. ............................................................................. 37

**VI.    THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE** .............. 40

    A.     The Debtors' Corporate Structure and History. ................................................................ 40
    B.     The Debtors' Assets and Operations. ................................................................................ 41
    C.     The Debtors' Capital Structure. ........................................................................................ 44

**VII.   EVENTS LEADING TO THESE CHAPTER 11 CASES** ................................................ 47

|   | A. | Market and Industry-Specific Challenges. | 47 |
|   | B. | The Alameda Loan. | 55 |
|   | C. | Retention of Restructuring Advisors and Initial Third-Party Outreach. | 56 |
|   | D. | Governance Initiatives. | 56 |
|   | E. | Voyager's Decision to Commence these Chapter 11 Cases. | 56 |
| **VIII.** | | **EVENTS OF THE CHAPTER 11 CASES** | **57** |
|   | A. | The Stand-Alone Plan. | 57 |
|   | B. | First and Second Day Relief and Other Case Matters. | 57 |
|   | C. | Appointment of Unsecured Creditors' Committee. | 59 |
|   | D. | Schedules and Statements. | 59 |
|   | E. | Bar Date Motion. | 59 |
|   | F. | The FBO Motion. | 60 |
|   | G. | The 3AC Liquidation Proceeding. | 61 |
|   | H. | Litigation Matters. | 61 |
|   | I. | The Coinify Sale. | 64 |
|   | J. | The Key Employee Retention Plan. | 64 |
|   | K. | Canadian Recognition Proceeding. | 64 |
|   | L. | The Unwind Motion. | 65 |
|   | M. | The Request for Appointment of an Equity Committee. | 65 |
|   | N. | The Post-Petition Sale Process and the Collapse of FTX. | 65 |
|   | O. | The Special Committee Investigation. | 68 |
| **IX.** | | **RISK FACTORS** | **69** |
|   | A. | Risks Related to the Restructuring. | 69 |
|   | B. | Risks Related to Recoveries under the Plan. | 72 |
|   | C. | Disclosure Statement Disclaimer. | 73 |
|   | D. | Miscellaneous Risk Factors and Disclaimers. | 74 |
| **X.** | | **SOLICITATION AND VOTING PROCEDURES** | **80** |
|   | A. | Classes Entitled to Vote on the Plan. | 80 |
|   | B. | Votes Required for Acceptance by a Class. | 80 |
|   | C. | Certain Factors to Be Considered Prior to Voting. | 80 |
|   | D. | Classes Not Entitled To Vote on the Plan. | 81 |
|   | E. | Solicitation Procedures. | 81 |
|   | F. | Voting Procedures. | 82 |
|   | G. | Voting Tabulation. | 83 |
|   | H. | Ballots Not Counted. | 84 |
| **XI.** | | **CONFIRMATION OF THE PLAN** | **84** |
|   | A. | Requirements of Section 1129(a) of the Bankruptcy Code. | 84 |
|   | B. | Best Interests of Creditors—Liquidation Analysis. | 85 |
|   | C. | Feasibility. | 86 |
|   | D. | Acceptance by Impaired Classes. | 86 |
|   | E. | Confirmation without Acceptance by All Impaired Classes. | 87 |
| **XII.** | | **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | **88** |
|   | A. | Introduction. | 88 |
|   | B. | Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors. | 89 |
|   | C. | Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote. | 90 |
| **XIII.** | | **RECOMMENDATION OF THE DEBTORS** | **97** |

**EXHIBITS**

EXHIBIT A        Plan

EXHIBIT B        Liquidation Analysis

EXHIBIT C        Frequently Asked Questions & Answers

EXHIBIT D        The Asset Purchase Agreement

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT**
DISCLOSURE STATEMENT, DATED JANUARY 13, 2023

**SOLICITATION OF VOTES TO ACCEPT OR REJECT THE THIRD AMENDED
JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND
ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE AS
OF THE VOTING RECORD DATE, YOU HELD A CLAIM AGAINST THE DEBTORS IN ONE OF THE
FOLLOWING CLASSES AND THEREFORE YOU ARE ENTITLED TO VOTE ON THE PLAN:**

| VOTING CLASSES | NAME OF CLASS UNDER THE PLAN |
|---|---|
| 3 | Account Holder Claims |
| 4A | OpCo General Unsecured Claims |
| 4B | HoldCo General Unsecured Claims |
| 4C | TopCo General Unsecured Claims |

| DELIVERY OF BALLOTS |
|---|
| 1.      Ballots must be actually received by Stretto, Inc. ("Stretto" or the "Claims, Noticing, and Solicitation Agent") before the Voting Deadline (4:00 p.m., prevailing Eastern Time, on February 22, 2023).<br><br>2.      Ballots may be returned by the following methods:<br><br>    a)    For Holders of Account Holder Claims:  via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://cases.stretto.com/Voyager/balloting.<br><br>    b)    For Holders of General Unsecured Claims:  (i) via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://cases.stretto.com/Voyager/balloting; (ii) in the enclosed pre-paid, pre-addressed return envelope; or (iii) via first class mail, overnight courier, or hand delivery to the address set forth below:<br><br>                  Voyager Ballot Processing<br>                      c/o Stretto<br>              410 Exchange, Suite 100<br>                  Irvine, CA 92602<br><br><br>If you have any questions on the procedures for voting on the Plan, as defined herein, please contact the Claims, Noticing, and Solicitation Agent by emailing voyagerinquiries@stretto.com and referencing "In re Voyager – Solicitation Inquiry" in the subject line, or by calling (855) 473-8665 (Toll-Free) or (949) 271-6507 (International). |

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN. IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO

AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, THOSE HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN, OR THOSE HOLDERS OF CLAIMS AND INTERESTS WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE IX, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS DISCLOSURE STATEMENT, NOTHING IN THIS DISCLOSURE STATEMENT CONSTITUTES A FINDING UNDER U.S. FEDERAL SECURITIES LAWS, FOREIGN SECURITIES LAWS OR ANY STATE SECURITIES LAWS AS TO WHETHER CRYPTOCURRENCY, INCLUDING THE VOYAGER TOKENS, OR TRANSACTIONS INVOLVING CRYPTOCURRENCY ARE SECURITIES. THE SEC AND ITS STAFF HAVE TAKEN THE POSITION THAT CERTAIN CRYPTOCURRENCY ASSETS AND CERTAIN TRANSACTIONS INVOLVING CRYPTOCURRENCY ASSETS FALL WITHIN THE DEFINITION OF A "SECURITY" UNDER THE U.S. FEDERAL SECURITIES LAWS. THE DETERMINATION AS TO WHETHER A CRYPTOCURRENCY ASSET OR A TRANSACTION INVOLVING CRYPTOCURRENCY MAY CONSTITUTE A "SECURITY" UNDER APPLICABLE LAWS IS A DETERMINATION FOR THE SEC, APPLICABLE STATE AND FOREIGN REGULATORY AUTHORITIES, AND COURTS WITH PROPER JURISDICTION.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING RISKS ASSOCIATED WITH THE FOLLOWING:

- THE OVERALL HEALTH OF THE CRYPTOCURRENCY INDUSTRY;

- POPULARITY AND RATE OF ADOPTION OF CRYPTOCURRENCIES;

- THE DEBTORS' REGULATORY LICENSES;

- THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS;

- THE DEBTORS' TECHNOLOGY AND ABILITY TO ADAPT TO RAPID TECHNOLOGICAL CHANGE;

- THE RELIABILITY, STABILITY, PERFORMANCE AND SCALABILITY OF THE DEBTORS' INFRASTRUCTURE AND TECHNOLOGY;

- THE DEBTORS' FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;

- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;

- **COUNTERPARTY CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**

- **EXCHANGE RATE FLUCTUATIONS AND CRYPTOCURRENCY PRICE FLUCTUATIONS;**

- **PLANS, OBJECTIVES, AND EXPECTATIONS;**

- **RISKS IN CONNECTION WITH DISPOSITIONS; AND**

- **RISK OF INFORMATION TECHNOLOGY OR DATA SECURITY BREACHES OR OTHER CYBERATTACKS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' AND THE WIND-DOWN DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' AND THE WIND-DOWN DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN OTHER THAN AS REQUIRED BY APPLICABLE LAW. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:**

- **THE RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO PURSUE THEIR BUSINESS STRATEGIES DURING THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO MAINTAIN COMPLIANCE WITH LAWS AND REGULATIONS OR THE INTERPRETATION OR APPLICATION OF SUCH LAWS THAT CURRENTLY APPLY OR MAY BECOME APPLICABLE TO THE DEBTORS' BUSINESS BOTH IN THE UNITED STATES AND INTERNATIONALLY;**

- **CHANGES TO A PARTICULAR CRYPTOCURRENCY ASSET'S OR PRODUCT OFFERING'S STATUS AS A "SECURITY" IN ANY RELEVANT JURISDICTION UNDER RELEVANT LAWS AND REGULATIONS OR REGULATORY INTERPRETATION THEREOF;**

- **LOSS OF CRITICAL BANKING OR INSURANCE RELATIONSHIPS;**

- **THE DIVERSION OF MANAGEMENT'S ATTENTION AS A RESULT OF THE CHAPTER 11 CASES;**

- **INCREASED LEVELS OF EMPLOYEE ATTRITION AS A RESULT OF THE CHAPTER 11 CASES;**

- **CUSTOMER RESPONSES TO THE CHAPTER 11 CASES;**

- **THE IMPACT OF A PROTRACTED RESTRUCTURING ON THE DEBTORS' BUSINESS;**

- **THE DEBTORS' ABILITY TO CONFIRM OR CONSUMMATE THE PLAN;**

- **THE DEBTORS' INABILITY TO PREDICT THEIR LONG-TERM LIQUIDITY REQUIREMENTS AND THE ADEQUACY OF THEIR CAPITAL RESOURCES;**

- **THE AVAILABILITY OF CASH TO MAINTAIN THE DEBTORS' OPERATIONS AND FUND EMERGENCE COSTS;**

- **RISKS ASSOCIATED WITH WEAK OR UNCERTAIN GLOBAL ECONOMIC CONDITIONS AND THEIR IMPACT ON DEMAND FOR DIGITAL ASSETS;**

- **OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS;**

- **INDUSTRY CONDITIONS, INCLUDING COMPETITION AND TECHNOLOGICAL INNOVATION;**

- **FLUCTUATIONS IN OPERATING COSTS;**

- **SHIFTS IN POPULATION AND OTHER DEMOGRAPHICS;**

- **LEGISLATIVE OR REGULATORY REQUIREMENTS; AND**

- **FLUCTUATIONS IN INTEREST RATES, EXCHANGE RATES, AND CURRENCY VALUES.**

**YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.  THE LIQUIDATION ANALYSIS AND OTHER PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

*[Remainder of page intentionally left blank]*

## I.    INTRODUCTION

Voyager Digital Holdings, Inc. (along with its debtor affiliates, the "<u>Debtors</u>," the "<u>Company</u>," or "<u>Voyager</u>") and its debtor affiliates submit this disclosure statement (including all exhibits hereto and as may be supplemented or amended from time to time, the "<u>Disclosure Statement</u>"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the Debtors' *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 852] (as supplemented or amended from time to time, the "<u>Plan</u>"), which was conditionally approved by the Bankruptcy Court on January 13, 2023 [Docket No. 861]. A copy of the Plan is attached hereto as **<u>Exhibit A</u>** and is incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for each of the Debtors. [2]

**THE DEBTORS BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS. THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

### A.    The Sale Transaction.

The Debtors filed these Chapter 11 Cases in response to a short-term "run on the bank" caused by a downturn in the cryptocurrency industry generally and the default of a significant loan made to a third party. Since the Petition Date, the Debtors have worked tirelessly to identify the most value-maximizing transaction for their customers and other creditors on an expedited timeline. Following a two-week competitive auction process, the Debtors selected the bid submitted by West Realm Shires Inc. ("<u>FTX US</u>," and along with its parent entity and affiliates, "<u>FTX</u>") as the winning bid (the transaction contemplated thereby, the "<u>FTX Transaction</u>"). Had it been effectuated, the FTX Transaction would have provided for substantial in-kind recoveries to Holders of Account Holder Claims, the transfer of substantially all of the customer accounts on the Voyager platform to the FTX platform, and the orderly wind down of the Debtors' estates. But after a series of extraordinary events outlined in detail below, FTX, and with it the FTX Transaction, collapsed. While the Debtors were shocked and dismayed by FTX's cataclysmic collapse, the Debtors swiftly reengaged in negotiations with numerous other potential counterparties to evaluate potential third-party transactions that would maximize value for the Debtors and their creditors. Following good-faith, arm's length negotiations with several such alternative transaction parties, the Debtors elected to accept the bid submitted by BAM Trading Services Inc. ("<u>Binance.US</u>" or the "<u>Purchaser</u>"). The Debtors value Binance.US's offer at approximately $1.022 billion, comprising (i) the fair market value of Cryptocurrency on the Voyager platform as of a date to be determined, which as of December 19, 2022, is estimated to be $1.002 billion plus (ii) additional consideration equal to $20 million of incremental value. Importantly, relative to all currently available alternatives, the Binance.US bid can be effectuated quickly, provides meaningfully greater recovery to creditors, and allows the Debtors to facilitate an efficient resolution of these chapter 11 cases, after which Binance.US's market-leading, secured trading platform will enable customers to trade and store cryptocurrency.

Under the Asset Purchase Agreement, Binance.US will accept transfers of certain assets relating to the Debtors' cryptocurrency custody and exchange business and will receive all or substantially all Cryptocurrency on the Voyager platform to hold such assets solely in a custodial capacity in trust and solely for the benefit of Account Holders who each open an account on the Binance.US Platform (subject to certain potential exceptions set forth in the Asset Purchase Agreement with respect to Cryptocurrency withheld for the purpose of satisfying the Debtors' obligations under the Plan) (such Cryptocurrency transfers being referred to as "<u>Acquired Coins</u>") in exchange for Purchaser's payment obligations set forth in Sections 2.1 and 2.2 of the Asset Purchase Agreement and Purchaser's

---

[2]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan or Asset Purchase Agreement, as applicable. Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan. **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan and the documents being summarized. In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

commitment to distribute the Acquired Coins to Account Holders and cash to Holders of Opco General Unsecured Claims pursuant to Sections 6.12 and 6.14 of the Asset Purchase Agreement. Additionally, Purchaser shall submit VGX for its standard listing review process in an effort to allow VGX to be traded on the Binance.US Platform. The Debtors will effectuate the transition of Account Holders to the Binance.US Platform as described in Article V.C.6 of this Disclosure Statement. It is currently anticipated that all Account Holders and Holders of OpCo General Unsecured Claims will transition to Binance.US subject to their successful completion of Binance.US's "Know Your Customer" process and other procedural and regulatory requirements. Further information regarding how Account Holders and Holders of OpCo General Unsecured Claims can open accounts on Binance.US are available on the Binance.US Platform Terms of Use (which are available at: https://www.binance.us/terms-of-use) and the Binance.US Privacy Policy (available at: https://binance.us/privacy-policy), and will also be provided to all Holders of such Claims in the Customer Onboarding Protocol.

Below is a chart of estimated recoveries to hypothetical Holders of Account Holder Claims. [3]

| Account | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Customer Claim** | | | **Crypto Recovery** | | | | |
| Coin | # of Coins Claimed | 7/5 Coin Price | Claim ($) | Recovery Type | Illustrative Crypto Recovery %[4] | 12/18 Coin Price | # of Coins Recovered[5] | Recovery Value |
| BTC | 0.05 | $20,157.69 | $990.50 | BTC | 51% | $16,769.35 | 0.03 | $500.57 |
| ETH | 0.19 | 1,131.60 | 214.41 | ETH | 51% | 1,185.35 | 0.09 | 108.36 |
| DAI | 49.19 | 1.00 | 49.17 | DAI | 51% | 1.00 | 24.86 | 24.85 |
| DOGE | 978.43 | 0.07 | 65.64 | DOGE | 51% | 0.08 | 419.59 | 33.17 |
| ALGO | 123.83 | 0.31 | 38.07 | ALGO | 51% | 0.19 | 100.67 | 19.24 |
| LINK | 0.29 | 6.31 | 1.83 | LINK | 51% | 6.02 | 0.15 | 0.92 |
| XRP | 122.38 | 0.33 | 39.79 | XRP | 51% | 0.35 | 57.24 | 20.11 |
| HBAR | 130.66 | 0.06 | 8.05 | HBAR | 51% | 0.04 | 92.21 | 4.07 |
| BAND | 24.73 | 1.32 | 32.65 | BAND | 51% | 1.73 | 9.54 | 16.50 |
| VGX | 249.05 | 0.24 | 59.32 | VGX | 51% | 0.29 | 101.90 | 29.98 |
| TRAC | 1,471.96 | 0.19 | 286.88 | TRAC | 51% | 0.18 | 785.81 | 144.98 |
| GALA | 2,274.69 | 0.05 | 121.01 | GALA | 51% | 0.02 | 2,978.93 | 61.16 |
| **Claim** | | | | | | | | |
| Value Claimed | | **$1,907.34** | | Value Recovered | | | | **$963.91** |
| *Proportion of Total Platform Value* | | *0.0001%* | | *Proportion of Total Platform Recovery* | | | | *0.0001%* |
| **Illustrative Recovery** | | | | | | | | |
| Crypto Recovery | | | | | | | | |
| Value Recovered (In-Kind) | | | | | | | | $1,022.16 |
| Value Recovered (Converted to U.S. Dollars)[6] | | | | | | | | - |
| **Crypto Value Recovered** | | | | | | | | **$1,022.16** |

---

[3]   Recoveries are for illustrative purposes and may materially differ from the amount portrayed in the chart. Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

[4]   Illustrative cryptocurrency recovery is shown based on the estimated total fair market value of Voyager's cryptocurrency assets based on coin prices as of December 18, 2022. Actual cryptocurrency recovery will be determined by cryptocurrency prices during the fair market value reference period prior to the Effective Date.

[5]   Illustrative number of coins recovered based on recovery value divided by the coin price as of December 18, 2022. Actual cryptocurrency prices for purposes of denominating initial distributions will be determined by such cryptocurrency's price during the fair market value reference period prior to the Effective Date.

[6]   Assumes hypothetical customer transfers to Binance.US Platform to receive in-kind recoveries; Account Holders that do not transfer to Binance.US will be liquidated at a future date; these non-transferred Account Holders will be subject to portfolio risk, as recoveries will be subject to cryptocurrency market volatility until such time as the estate makes U.S. dollar distributions.

| Other Items | |
|---|---|
| Plus: Binance US Consideration | $20.00 |
| Less: Wind-down Costs, Other Benefits and Other Expenses [7] | (78.24) |
| **Total Other Items** | **($58.24)** |
| **Total Value Recovered** | **$963.91** |
| *% Total Recovery* | *51%* |

### B.     The FTX Collapse.

Following an acute liquidity crunch and "run on the bank" at the FTX ecosystem, on November 11, 2022, 130 FTX entities commenced filing for voluntary relief under chapter 11 in the Bankruptcy Court for the District of Delaware (the "FTX Bankruptcy Proceeding").[8]   While the FTX Bankruptcy Proceeding is still unfolding, early indications are that Mr. Bankman-Fried and FTX were carrying on one of the largest financial frauds in history. Mr. John Ray III, who was appointed Chief Executive Officer of FTX following the resignation of Mr. Bankman-Fried and who oversaw the restructuring of Enron, commented in an early filing in the FTX Bankruptcy Proceeding that "[n]ever in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information."[9]   The full extent of the injury caused by this apparent rampant fraud will likely take years to uncover.

While FTX was collapsing, on November 10th, the Debtors requested that the "No-Shop" provision (Section 5.2) of the FTX Purchase Agreement (as defined herein) be waived.   FTX acquiesced.   Immediately thereafter, the Debtors swiftly reengaged in negotiations with several other potential transaction counterparties.   On December 9, 2022, the Debtors filed with this Court the *Joint Stipulation and Agreed Order Between the Debtors and FTX US* terminating the FTX Purchase Agreement [Docket No. 717].   On December 21, 2022, FTX filed a motion seeking approval of such stipulation by the court overseeing the FTX Bankruptcy Proceeding as well.[10]

The Debtors determined that engaging with third parties to identify an alternative transaction partner was a sound exercise of their business judgment as consummating an alternative transaction would reasonably provide greater recovery to Holders of Claims on a more certain timeline with limited execution risk than if the Debtors pursued a self-liquidating plan.   The Sale Transaction is the culmination of that process and provides more value than the Debtors would otherwise be able to distribute to Holders of Claims on a standalone basis.   Notably, the Plan includes a toggle that allows the Debtors to return Cryptocurrency, Cash, and other assets to Holders of Claims if the Sale Transaction is unable to close on the timeline contemplated under the Asset Purchase Agreement, as described further in Article V.A.2 herein.   Although any "toggle" to a self-liquidating plan may result in less recovery to customers than the Sale Transaction, it would be materially greater and quicker than if the Debtors had to undertake the cost and time necessary to resolicit Holders of Claims to vote on another plan.   Accordingly, the Debtors, whose goal is and has always been to maximize returns to Account Holders and other creditors, determined that the most value-maximizing path forward in these chapter 11 cases is to enter into a transaction with Binance.US that also allows

---

[7]    "Other Benefits" includes the estimated pro rata distribution to Account Holder Claims from (i) expense reimbursement and (ii) non-buyer proceeds (including sale of investments, tax returns, Directors and Officers insurance settlements, and other inflows); "Other Expenses" includes (iii) projected cash deficit at Effective Date, (iv) rebalancing leakage, (v) wind-down funding leakage and (vi) VGX impact.

[8]    *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

[9]    *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 24], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 17, 2022); *see also United States of America v. Samuel Bankman-Fried*, 22-crim-673 (S.D.N.Y. December 9, 2022); *Securities and Exchange Commission v. Samuel Bankman-Fried*, Civil Action. No. 22-cv-10501 (S.D.N.Y. Dec. 13, 2022).

[10]    *Motion of Debtors for Entry of an Order (A) Authorizing the Debtors to Enter Into the Stipulation with Voyager Digital, LLC and (B) Granting Related Relief* [Docket No. 283], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Dec. 21, 2022).

the Debtors to toggle to a plan that returns value to the Debtors' Account Holders and other creditors should the Sale Transaction not be consummated on the timeline contemplated under the Asset Purchase Agreement.

In light of the extraordinary circumstances that precipitated the filing of these Chapter 11 Cases and the equally extraordinary events that transpired thereafter, the Debtors believe that they have achieved a Plan that is fair and equitable, maximizes the value of the Debtors' estates, and maximizes recoveries to Holders of Claims, including, especially, Holders of Account Holder Claims. Importantly, the "toggle" feature under the Plan ensures an outside date by which the Debtors can pivot to a standalone plan and return value to Holders of Claims without any further delay.

Accordingly, the Debtors, in close consultation with Binance.US and other parties in interest, have worked tirelessly to negotiate and formulate a Plan that provides recoveries to Holders of Claims on the quickest timeline and in the most favorable manner in light of the FTX collapse and related industry fallout.

## III. BACKGROUND

Prior to the Petition Date, Voyager operated a cryptocurrency trading platform that allowed customers to buy, sell, and store cryptocurrency on an easy-to-use and "accessible-to-all" platform. Using the Company's mobile application, Voyager's customers could earn rewards on the cryptocurrency assets stored on the Company's platform and trade over 100 unique digital assets. Voyager's mission since inception has been to provide customers with the tools to enter the cryptocurrency industry on their own terms in a way that is tailored to the needs of each customer. Voyager's mobile application has been downloaded millions of times and had over 1.1 million active users as of July 5, 2022 (the "Petition Date"). In 2021, Voyager was one of the top ten most downloaded cryptocurrency mobile applications in the world.

Recent events in the world economy roiled traditional markets and the cryptocurrency markets alike. The lingering effects of the COVID-19 pandemic, coupled with rampant inflation and the adverse effects of the war in the Ukraine on the world economy, contributed to a massive sell-off in traditional assets in early 2022. Total wealth in the United States declined by $5 trillion between January 2022 and May 2022. The cryptocurrency market is not immune to these macroeconomic trends and likewise experienced extreme market volatility in 2022. All major coins and cryptocurrency-focused companies experienced significant declines; in early September 2022, the aggregate value of the cryptocurrency market sank below $1 trillion for the first time since 2020. Several major liquidity events in the cryptocurrency space, including the implosion of Terra LUNA ("Luna") (as discussed in Article VII.A.2 of this Disclosure Statement), accelerated the onset of a "crypto winter" and an industry-wide sell-off to manage risk in 2022.

As described in more detail in Article VII.A.2.b below, in June 2022, it became apparent that the Company's loan to Three Arrows Capital ("3AC" and such loan the "3AC Loan"), a cryptocurrency hedge fund based in Singapore, was in jeopardy of partial or full nonpayment. The Company's loan to 3AC was one of its largest outstanding loans. On June 17, 2022, 3AC announced that it had suffered heavy losses due to massive exposure to Luna. The Company's management team was acutely aware that nonpayment of the loan to 3AC, coupled with severe industry headwinds, would strain the Company's ability to continue operating its trading platform. Accordingly, the Company's management team immediately began to explore potential strategic solutions. The Company retained Kirkland & Ellis LLP ("Kirkland") and Moelis & Company LLC ("Moelis"). The Company subsequently retained Berkeley Research Group ("BRG") on June 30, 2022. The Company engaged in discussions with third parties and potential sources of new liquidity and ultimately obtained an unsecured loan from Alameda Ventures Ltd. ("Alameda"), a major participant in the cryptocurrency space. With the advice and assistance of Moelis, the Company began discussions with a host of third parties about a more long-term solution to the challenges facing the Company. Discussions with these third parties, however, ultimately revealed that an in-court process would be necessary to develop the most value-maximizing alternative available to the Company. Accordingly, the Debtors filed these Chapter 11 Cases on July 5, 2022.

On the first day of these chapter 11 cases, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17] (as amended and restated from time to time, the "Standalone Plan"). The Standalone Plan contemplated a restructuring that could be effectuated without a sale and served as a floor for the Debtors' marketing process. To that end, the Debtors, with the assistance of Moelis and their other advisors, continued their prepetition marketing efforts during these Chapter 11 Cases to canvas the market and identify interest in a transaction with a third-party investor

(the "Marketing Process").  Shortly after commencing these chapter 11 cases, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126] (the "Bidding Procedures Motion"), which set a timeline for interested parties to submit bids for an acquisition of the Debtors' assets and procedures for conducting an auction if multiple bids were received.  On August 5, 2022, the Bankruptcy Court entered the *Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 248] (the procedures approved thereby, the "Bidding Procedures") which, among others, established the Bid Deadline (as defined in the Bidding Procedures) as September 6, 2022 at 12:00 p.m., prevailing Eastern Time and set the Auction (as defined in the Bidding Procedures) for September 13, 2022 at 10:00 a.m., prevailing Eastern Time.  Throughout the Marketing Process, the Debtors evaluated Bids received from potential transaction parties in comparison both to other Bids received and the recoveries contemplated by the Stand-Alone Plan as it provided a critical metric in the Debtors' determination of their path forward.[11]

On the Bid Deadline, the Debtors received a number of bids from strategic investors and, accordingly commenced an auction on September 13, 2022, for a sale of the Debtors' business.  The two-week Auction featured hard-fought, arms-length negotiations with each participating bidder.  At the conclusion of the Auction, the Debtors, in an exercise of their business judgment and in consultation with the Committee, determined that the final bid submitted by FTX US represented the most value-maximizing transaction available to the Debtors.  Accordingly, on September 26, 2022, the Debtors announced FTX US as the winning bidder,[12] and on September 27, 2022, the Debtors and FTX US entered into an asset purchase agreement memorializing the terms of the winning bid (as may be amended from time to time in accordance with the terms thereof, the "FTX Purchase Agreement").  On October 20, 2022, the Court entered an order approving the Debtors' entry into the FTX Purchase Agreement.[13]  On October 24, 2022, the Debtors filed solicitation versions of their Disclosure Statement and Plan,[14] and began soliciting votes on the Plan.

As set forth in greater detail in Article VIII.N hereof, the Debtors' journey to consummation of the FTX Transaction was derailed over the ensuing weeks.  Following a series of extraordinary events, on November 11, 2022, Sam Bankman-Fried resigned from his role as CEO of the FTX enterprise, and FTX announced the chapter 11 filing of approximately 130 of its affiliates.  Immediately following announcement of the FTX bankruptcy, the Debtors reengaged in discussions with numerous potential transaction parties interested in consummating a transaction with the Debtors.  Following good-faith, arm's-length negotiations with several potential transaction parties regarding a variety of deal structures and terms, the Debtors determined, in an exercise of their business judgment and in consultation with the Committee, that the bid submitted by Binance.US represented the highest or otherwise best offer available to purchase the Debtors' business enterprise.  On December 18, 2022, the Debtors and the Purchaser entered into an asset purchase agreement memorializing the terms of the Binance.US bid (as may be amended from time to time in accordance with the terms thereof, the "Asset Purchase Agreement").

The Debtors seek to effectuate the transactions contemplated by the Asset Purchase Agreement (collectively, the "Sale Transaction") pursuant to the Plan.  The Plan, among other things:

- contemplates payment in full of Administrative Claims, Secured Tax Claims, Priority Tax Claims, and Other Priority Claims;

- provides for the distribution of Cryptocurrency, Cash, and any remaining assets at OpCo (including any recovery on account of the 3AC Claims, FTX Claims, or Alameda Claims) to Account Holders and Holders of OpCo General Unsecured Claims, subject to the terms of the Asset Purchase Agreement;

---

[11]  Certain dates in the Bidding Procedures were amended by Docket Nos. 328, 343, 365, and 442.

[12]  *See Notice of Successful Bidder* [Docket No. 457].

[13]  Docket No. 581.

[14]  Docket Nos. 590 and 591.

- provides for distribution of Cash and other assets at HoldCo to Holders of HoldCo General Unsecured Claims;

- provides for distribution of Cash and other assets at TopCo to Holders of TopCo General Unsecured Claims;

- provides for the equitable subordination of the Alameda Loan Facility Claims;

- provides for any residual value at TopCo after payment in full of TopCo General Unsecured Claims to be distributed to Holders of Section 510(b) Claims, if any, and Holders of Existing Equity Interests; and

- designates a Wind-Down Entity Trustee to wind down the Debtors' affairs in accordance with the Plan.

The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases.  In particular, the Sale Transaction with Binance.US that the Plan contemplates represents, relative to all currently available alternatives, meaningfully greater and faster recovery to creditors.  Accordingly, the Debtors urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots so that Stretto actually receives such ballots by February 22, 2023 at 4:00 p.m. prevailing Eastern Time (the "Voting Deadline").  Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at a hearing on March 2, 2023 at 10:00 a.m. (prevailing Eastern Time) (the "Confirmation Hearing").

## IV.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to

section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| 4A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan. Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan. Amounts in the far right column under the heading "Liquidation Recovery" are estimates only and are based on certain assumptions described herein and set forth in greater detail in the liquidation analysis attached hereto as **Exhibit B** (the "Liquidation Analysis").

**In a hypothetical liquidation under chapter 7 of the Bankruptcy Code, Holders of Account Holder Claims and General Unsecured Claims would likely receive a significantly reduced recovery relative to what such Holders would receive under the Plan.** In the event of a chapter 7 liquidation, the Bankruptcy Court may appoint a trustee (the "Liquidating Trustee") to oversee and effectuate the liquidation of the Debtors' assets. The Liquidating Trustee's fees and expenses would be paid by the Debtors and would be paid prior to any Account Holder Claims or General Unsecured Claims. Given the novelty and complexity of the Debtors' business and the strong likelihood that any Liquidating Trustee appointed by the Bankruptcy Court may have minimal cryptocurrency experience, the Liquidating Trustee's fees and expenses and the anticipated reduction in value obtained through the monetization of cryptocurrency by the Liquidating Trustee would likely result in Account Holders and Holders of General Unsecured Claims receiving significantly reduced recoveries.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE BASED ON, AMONG OTHER THINGS, ALLOWED CLAIMS ARISING FROM THE REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES AND THE RESOLUTION OF DISPUTED CLAIMS. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[15]**

---

[15]   The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| 1 | Secured Tax Claims | Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down Entity, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired. | $0.0 | N/A | N/A | N/A |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. | $1.0 | 100% | 100% | 99% – 99% |
| 3 | Account Holder Claims[18] | Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim:<br>(i) If the Sale Transaction is consummated by the Outside Date:<br>a. its Net Owed Coins, as provided in and subject to the requirements of Sections 6.10 and 6.12 of the Asset Purchase Agreement; *provided* that for Account Holders in Unsupported Jurisdictions and only to the extent that the Purchaser does not obtain the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides within 6 months following the Closing Date (as defined in the Asset Purchase Agreement), such Account Holders shall receive, after expiration of such time period, value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated;<br>b. its Pro Rata share of any Additional Bankruptcy | $1,763.8 | 51% | 45% | 35% – 39% |

---

[16]  The lower recovery compared to the FTX Transaction is largely due to fluctuations in the market following the FTX collapse along with the value differential under the Sale Transaction.

[17]  **The recoveries included in this Disclosure Statement are for illustrative purposes only and subject to material change particularly due to, among other things, market volatility, the ultimate treatment of the Alameda Loan Facility Claims and the Intercompany Obligations, and whether Alameda prevails on its asserted preference and related administrative claim which could substantially reduce the recoveries projected above.**

[18]  Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement; <br><br> c. its Pro Rata share of Distributable OpCo Cash; and <br><br> d. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; <br><br> *provided* that distributions made to any Account Holder pursuant to clauses (b), (c), and (d) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder; or <br><br> (ii) If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated: <br><br> a. its Pro Rata share of Distributable OpCo Cash; <br><br> b. its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that, if the applicable transfer is made through the Voyager platform and such Account Holder does not | | | | |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and<br><br>c. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | | |
| 4A | OpCo General Unsecured Claims | Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:<br><br>(i) If the Sale Transaction is consummated by the Outside Date:<br><br>a. its Pro Rata share of Distributable Cryptocurrency in Cash;<br><br>b. its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Section 6.12 and 6.14 of the Asset Purchase Agreement;<br><br>c. its Pro Rata share of Distributable OpCo Cash; and<br><br>d. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* | $14.0 | 51% | 45% | 35% – 39% |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; <br><br> (ii) If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated: <br><br> a. its Pro Rata share of Distributable Cryptocurrency in Cash; <br><br> b. its Pro Rata share of Distributable OpCo Cash; and <br><br> c. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | | |
| 4B | HoldCo General Unsecured Claims | Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim: <br><br> (i) its Pro Rata share of Distributable HoldCo Cash; and <br><br> (ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to HoldCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority | $8.3 | 6% | 6% | 0% – 0% |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | | |
| 4C | TopCo General Unsecured Claims | Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim: (i) its Pro Rata share of Distributable TopCo Cash; and (ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or the Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | $3.0 | 64% | 64% | 65% – 65% |
| 5 | Alameda Loan Facility Claims | Each Holder of an Allowed Alameda Loan Facility Claim will receive in exchange for such Allowed Alameda Loan Facility Claim to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets; *provided* that any distributions on account of Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Claims at OpCo, HoldCo, and TopCo, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, Allowed OpCo General Unsecured Claims, Allowed HoldCo General Unsecured Claims, and Allowed TopCo General Unsecured Claims; *provided*, *however*, if the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity. | $75.1 | 0% | 0% | 0% – 0% |
| 6 | Section 510(b) Claims | Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to TopCo; *provided* that any distributions on account of the Wind Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in | $0.0 | N/A | N/A | N/A |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims. | | | | |
| 7 | Intercompany Claims | On the Effective Date, all Intercompany Claims shall be, at the option of the Debtors, either (a) Reinstated or (b) converted to equity, otherwise set off, settled, distributed, contributed, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum. | $0.0 | 0% | 0% | 0% – 0% |
| 8 | Intercompany Interests | On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, cancelled, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum. | $0.0 | 0% | 0% | 0% – 0% |
| 9 | Existing Equity Interests | Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims. | $0.0 | N/A | N/A | N/A |

**E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan. The chart below summarizes the various unclassified claims and provides the relevant section of the Plan that addresses their treatment:

| Claim | Description of Claim | Plan Section |
|---|---|---|
| Administrative Claims | A Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims. For the avoidance of doubt, any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned in full to the sender. | Article II, Section A |
| Professional Fee Claims | Any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. | Article II, Section B |
| Priority Tax Claims | Any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code. | Article II, Section C |

**F.        What is the "toggle" feature of the Plan?**

The "toggle" feature of the Plan provides that, if the Sale Transaction is not consummated by Outside Date or the Asset Purchase Agreement is terminated, the Debtors can pivot to a standalone plan whereby the Debtors will distribute their assets to creditors in accordance with Article IV of the Plan. The "toggle" allows the Debtors to abandon the Sale Transaction and to initiate distributions to Holders of Claims without the need to restart the Disclosure Statement and Plan solicitation process. As a result, Holders of Claims will receive recoveries under the Plan on a much quicker timeline than if the Debtors have to recommence the solicitation process on the standalone plan.

**G.        How will my Account be transitioned to Binance.US?**

The Debtors will transition Account Holders and Holders of OpCo General Unsecured Claims to the Binance.US Platform and effectuate delivery of Plan distributions to such Holders' Binance.US Accounts as set forth in Article V.C.6 of this Disclosure Statement and subject to the terms of the Asset Purchase Agreement based on whether Account Holders and Holders of OpCo General Unsecured Claims are in Supported Jurisdictions or Unsupported Jurisdictions. All Account Holders and Holders of Allowed OpCo General Unsecured Claims should closely review Article V.C.6 of this Disclosure Statement. It is currently anticipated that all Account Holders and Holders of OpCo General Unsecured Claims will transition to Binance.US subject to their successful completion of Binance.US's "Know Your Customer" process and other procedural and regulatory requirements as further described in the Asset Purchase Agreement.

**H.        What if I am unable or unwilling to transition my Account to Binance.US?**

We expect that substantially all Account Holders will be transitioning to Binance.US. In the event that a customer is not successfully transitioned to Binance.US (for instance, in the event such Account Holder resides in an Unsupported Jurisdiction for which Binance.US does not obtain the Unsupported Jurisdiction Approval within six (6) months of the Closing Date (as defined in the Asset Purchase Agreement)), such customer will not receive any distributions in Cryptocurrency form ("in kind"). They will instead receive a Cash distribution from the Debtor's estates as and when such distributions are made pursuant to the Bankruptcy Code.

**I.        What are the sources of Consideration and other consideration required to fund the Plan?**

Distributions under the Plan shall be funded by (i) the proceeds of Purchaser's payment obligations under Sections 2.1 and 2.2 of the Asset Purchase Agreement, (ii) distributions of Acquired Coins pursuant to Sections 6.12

and 6.14 of the Asset Purchase Agreement, and (iii) the Wind-Down Entity or Wind-Down Trust (as applicable) from the Wind-Down Entity Assets or Wind-Down Trust Assets (as applicable); *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance. The Wind-Down Trust Entity Assets or Wind-Down Trust Assets (as applicable) shall be used to pay the Wind-Down Trust Entity Expenses (including the compensation of the Wind-Down Trustee and any professionals retained by the Wind-Down Trust), and to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

**J.      Are any regulatory approvals required to consummate the Sale Transaction and confirm the Plan?**

Voyager currently maintains state money transmission licenses or their equivalents (each, a "Money Transmission License") in seventeen (17) states,[19] and has license applications pending[20] in eighteen (18) states.[21]

The Debtors have engaged with the state banking departments throughout the bankruptcy process and will continue to actively do so with the goal of ensuring that the Sale Transaction and the Plan provides for compliance by Voyager and the Purchaser, as applicable, with state money transmission laws as of the consummation of the Sale Transaction. The state banking departments may have broad discretion as to the approvals required in connection with the Sale Transaction, thus it is not possible to predict with certainty the scope of such approvals, whether they will ultimately be granted, and the expected timeframes of the state banking departments' determinations. There are unresolved questions of law with respect to the intersection of state money transmission statutes and the Bankruptcy Code and the answers to those questions may impact the ability of the state banking departments to require certain approvals with respect to consummation of the Sale Transaction and confirmation of the Plan.

As an initial matter, it is important to note that Money Transmission Licenses are not assets that can be purchased or transferred; they are specific to the entity to which they are issued, and thus an acquisition of a licensed entity must be conducted through a stock purchase or merger in which the licensed entity is the surviving entity for the licenses to remain in effect.

Pursuant to the Asset Purchase Agreement, the Purchaser will not acquire Voyager's Money Transmission Licenses; rather, the Asset Purchase Agreement provides for the transfer of the Acquired Coins and Additional Bankruptcy Distributions to the Binance.US Platform for distribution in accordance with the Asset Purchase Agreement and the transition of Account Holders and Holders of OpCo General Unsecured Claims to Binance.US accounts in order to receive the same, subject to the terms and conditions set forth in the Asset Purchase Agreement (which include prohibitions on such transfers and transitions with respect to Account Holders and Holders of OpCo General Unsecured Claims located in Unsupported Jurisdictions).

Following consummation of the Sale Transaction, Voyager will take steps to (i) withdraw those money transmission license applications that are pending with state banking departments and (ii) surrender those Money Transmission Licenses it holds (the "Licensing Wind-Down Process"). Such Licensing Wind-Down Process will require notice to, and in some cases approval by, those state banking departments in states where the Debtors have

---

[19]   The Alaska Division of Banking and Securities suspended Voyager's license on July 6, 2022 and subsequently reversed such suspension on July 14, 2022. There is a risk that one or more additional state banking departments may choose to suspend Voyager's Money Transmission Licenses going forward.

[20]   On July 17, 2022, the North Dakota Department of Financial Institutions notified Voyager that it required Voyager's pending money transmitter license application be withdrawn on grounds that it would not approve an application with an active bankruptcy filing. There is a risk that one or more additional state banking departments with which Voyager has pending applications may impose similar restrictions on Voyager going forward.

The Debtors have two applications pending in New York: (a) a money transmitter license application and (b) a virtual currency business activity license application or "Bitlicense." Voyager Digital NY, LLC, a non-operational affiliate of the Debtors, filed such applications.

[21]   Voyager also maintains a registration as a "money services business" with the Financial Crimes Enforcement Network ("FinCEN") pursuant to federal money transmission laws. A change in ownership of an entity registered with FinCEN requires notice to FinCEN following consummation of the relevant transaction, but does not require prior regulatory approval.

applications pending or are licensed pursuant to the requirements set forth in each state money transmission statute and as otherwise required by the relevant state banking departments.[22]

In the event that the "toggle" function is triggered, causing a pivot to a self-liquidating plan, Voyager would maintain its Money Transmission Licenses for so long as necessary to effect distribution of recoveries to Holders of Claims and complete the Licensing Wind-Down Process at the appropriate time.

**K.      How will I receive my recovery as an Account Holder if the Sale Transaction is not consummated?**

In the event that the Sale Transaction is not consummated by the Outside Date, the Debtors will outline the steps necessary for Account Holders to receive Distributable Cryptocurrency on an in-kind basis and will describe the transition process in further detail.  It is currently anticipated that all Account Holders will receive the option to receive Distributable Cryptocurrency in certain formats that will render such transfer "in-kind" to allow such distributions to be positioned in the most tax-efficient manner possible for Account Holders.

**L.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to consummate the Restructuring Transactions.  It is possible that any alternative transaction may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article XI.B of this Disclosure Statement, titled "Best Interests of Creditors—Liquidation Analysis" and the Liquidation Analysis attached hereto as **Exhibit B**.

**M.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan.  *See* Article IX of the Plan for a description of the conditions precedent to consummation of the Plan.

**N.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which could potentially lead to litigation.  *See* Article IX.D.2 of this Disclosure Statement titled "The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations" for further discussion on this issue.

As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their business and could become parties to additional litigation in the future.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Account Holders and Holders of General Unsecured Claims could change, and such changes could be material.

The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages.  An increase in the estimated amount of rejection damages claims could result in reduced recoveries for Account Holders and Holders of General Unsecured Claims.  Finally, the Debtors may object to certain Proofs of Claim, and any such objections ultimately could cause the total amount of

---

[22]    The state approval process for the surrender of a license typically takes several months.

Allowed General Unsecured Claims to change. These changes could affect recoveries to Account Holders and Holders of General Unsecured Claims, and such changes could be material.

      **O.    Does the Plan provide for the subordination of any Claims?**

      The Plan contemplates that the Class 5 Alameda Loan Facility Claims are subordinated Claims. Section 510(c) of the Bankruptcy Code provides, in relevant part, that the Bankruptcy Court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c)(l). Bankruptcy courts have ruled that equitable subordination is proper where three conditions are met: ( 1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the federal bankruptcy regime. *See In re LightSquared Inc.*, 511 B.R. 253, 346 (Bankr. S.D.N.Y. 2014) citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977).

      The Debtors believe that the Alameda Loan Facility Claims should be equitably subordinated due to Alameda and its affiliates' inequitable conduct that has harmed the Debtors' creditors in multiple instances. Since the outset of these Chapter 11 Cases, Alameda has sought to undermine and sabotage the Debtors' restructuring efforts at every turn. The Alameda Loan Agreement that was entered into just prior to the filing of these Chapter 11 Cases included a provision that required the Debtors to only engage in lending activities with Alameda.[23] Alameda's effort to front-run the Debtors' marketing process continued when, on July 22, 2022, it issued a press release and low-ball proposal for the Debtors' business while openly disparaging the Debtors. Alameda's attempts to mislead creditors with false statements were so egregious that the Debtors were forced issue a response to correct the record.[24] Alameda's claims, made with full knowledge of their falsity, chilled the Debtors' marketing process and lowered the floor for potential bids in the Auction. Prior to the Auction, the Debtors requested that Alameda unwind all outstanding prepetition loans made by the Debtors to Alameda (some of which were collateralized) to ensure fairness and equal footing for all participants in the Auction.[25] Alameda finally acquiesced to the repayment of the prepetition loans once the Debtors communicated that Alameda's participation in the Auction was contingent on either repaying the prepetition loans or disclosing its financial wherewithal to the other bidders to ensure a level playing field for all Auction participants.

      Given the fallout following the discovery of the apparent historic fraud committed by Alameda and FTX, the Debtors and other parties-in-interest now understand that Alameda's behavior in the Chapter 11 Cases was an effort to fill holes on its balance sheet resulting from their apparent fraudulent business operations. Alameda's insistence to skirt the Debtors' robust marketing process was a feigned attempt to acquire the Debtors' cryptocurrency in the quick of night, not to return Cryptocurrency to the Debtors' stakeholders despite Alameda's and FTX's former leadership's adamant contentions.[26] Accordingly, the Debtors believe that such behavior warrants the equitable subordination of the Alameda Loan Facility Claims. The Debtors will further demonstrate the legal and factual bases for subordinating the Alameda Loan Facility Claims prior to or at Confirmation.

      Although the Debtors have classified the Alameda Loan Facility Claims as subordinated claims, the Bankruptcy Court may rule that subordination of the Alameda Loan Facility Claims is improper. If the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity.

---

[23]   *See* Alameda Loan Agreement, Section 4.7.

[24]   *See Notice of Response to Alameda/FTX US Press Release* [Docket No. 137].

[25]   *See* Unwind Motion; Article VIII.L of this Disclosure Statement.

[26]   *See, e.g.,* @SBF, Twitter (July 24, 2022, 8:32 P.M. ET),
     https://twitter.com/SBF_FTX/status/1551364656085602305?s=20&t=67p5C4w-kxALBYJjQ1UVCg.

**P.    Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article VIII of the Plan proposes to provide certain releases to the Released Parties and also provides for exculpation of the Exculpated Parties. The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article V.A.3 of this Disclosure Statement, entitled "Releases." For the avoidance of doubt, the decision to "opt in" to the releases is voluntary, and the failure to "opt in" does not prejudice any electing creditors' rights.

On the Petition Date, the board of directors of Voyager Digital, LLC voted to appoint two independent directors to the board of Voyager Digital, LLC and to establish a special committee (the "Special Committee"). The Special Committee consists of the newly appointed independent directors and was established to investigate certain historical transactions, including the facts and circumstances related to the Debtors' loan to 3AC (the "Investigation"). On August 4, 2022, the Bankruptcy Court entered an order approving the appointment of Quinn Emmanuel Urquhart & Sullivan, LLP as legal counsel to the Special Committee ("Special Committee Counsel") with the mandate to conduct the Investigation. The Special Committee's investigation, and the settlements reached by the Special Committee that are incorporated into the Plan, are described in more detail in Article VII.A.2(b)(i)-(ii) below. As described in Article VII.A.2(b)(i)-(ii), the potential estate claims the Special Committee identified as colorable are being settled pursuant to the Plan on the terms set forth herein.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' chapter 11 process through, among other things, efforts to market and sell the Debtors' assets and negotiate and implement the Plan, which will maximize value for the benefit of all parties in interest. The Debtors' Chief Executive Officer, Mr. Ehrlich ("CEO") and Chief Commercial Officer (and former Chief Financial Officer), Mr. Psaropoulos ("CCO") are also making additional personal contributions to the Plan pursuant to the settlements reached with the Special Committee. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

The Debtor releases (other than with respect to derivative claims) do not affect the Canadian Class Action. The Debtor releases are releases of the Debtors' claims against third parties. The Canadian Class Action claim against Voyager Digital Ltd. is a Claim against a Debtor, which will be subject to the treatment of Section 510(b) Claims under the Plan. The Canadian Class Action direct claims against the Debtors' directors and officers are not impacted by the Debtor release.

The third-party releases do not release direct claims unless a Holder of such Claim or Interest affirmatively elects to opt into the third-party release. Holders of Claims or Interests may also contribute their third-party claims against Persons other than the Debtors to the Wind-Down Entity pursuant to Article IV.Q of the Plan. If the Holder of a Claim or Interest contributes their Contributed Third-Party Claims to the Wind-Down Entity then they will be barred from pursuing such Contributed Third-Party Claims. However, pursuant to the Plan, Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors, (ii) any direct claims against the Releasing Parties, (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties, or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the Canadian Class Action against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks. The Wind-Down Entity will be able to pursue Contributed Third-Party Claims subject to the terms of the Plan. To the extent the Wind-Down Entity chooses to pursue the contributed Claims, and is successful, additional recovery may be generated as a result, which will be distributed in accordance with the Plan waterfall.

The Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Second Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

**ALL HOLDERS OF CLAIMS THAT (I) VOTE TO ACCEPT THE PLAN AND WHO AFFIRMATIVELY OPT INTO THE RELEASES PROVIDED BY THE PLAN; (II) VOTE TO REJECT THE PLAN AND WHO AFFIRMATIVELY OPT INTO THE RELEASES PROVIDED BY THE PLAN; OR (III) ABSTAIN FROM VOTING ON THE PLAN AND AFFIRMATIVELY OPT INTO THE**

RELEASES PROVIDED IN THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES, INCLUDING THE DEBTORS OR THE WIND-DOWN DEBTORS, AS APPLICABLE.

**Q.      What is the deadline to vote on the Plan?**

The Voting Deadline is February 22, 2023, at 4:00 p.m. (prevailing Eastern Time).

**R.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  To be counted as votes to accept or reject the Plan, each ballot (a "Ballot") must be properly executed, completed, and delivered in accordance with the instructions provided such that a vote cast is **actually received** before the Voting Deadline by Stretto.  *See* Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL NOT BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.**

---

**S.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**T.      When is the Confirmation Hearing set to occur?**

The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing for March 2, 2023, at 10:00 a.m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time without further notice.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* (national edition) and *Financial Times* to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**U.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan by a bankruptcy court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

V.   **What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are liquidating under chapter 11 of the Bankruptcy Code. Following Confirmation, the Plan will be consummated on the Effective Date. On or after the Effective Date, and unless otherwise provided in the Plan, the Wind-Down Trustee will commence the wind down of the Wind-Down Debtors in accordance with the terms of the Plan. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

W.   **What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?**

As described in Article VII herein, as well as in the *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration"), prior to the Petition Date, the Debtors evaluated numerous potential alternatives, including options relating to mergers, sales, capital raising, and consensual recapitalizations, to provide stability and requisite capitalization to their business enterprise in light of significant market volatility.

X.   **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims, Noticing, and Solicitation Agent:

By electronic mail at:
voyagerinquiries@stretto.com with a reference to "In re Voyager – Solicitation Inquiry" in the subject line.

By telephone at:
(855) 473-8665 (Toll-Free) or (949) 271-6507 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' Claims, Noticing, and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims, Noticing, and Solicitation Agent at http://cases.stretto.com/Voyager (free of charge) or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/ecf-and-pacer-information (for a fee).

V.   **THE DEBTORS' PLAN**

A.   **The Plan.**

The Plan contemplates, among other things, (a) if the Sale Transaction is consummated by the Outside Date, the Debtors will (i) transfer all Acquired Coins to the Binance.US Platform for distribution in accordance with the Asset Purchase Agreement, (ii) distribute recoveries to Holders of HoldCo General Unsecured Claims and TopCo Unsecured Claims, (iii) transfer all Claims, Interests, and assets to the Wind-Down Reserve, and (iv) liquidate the Debtors' business and remaining assets under chapter 11 of the Bankruptcy Code; or (b) if the Sale Transaction is not consummated by the Outside Date, (i) distribute substantially all of the Cryptocurrency on the Debtors platform to Account Holders and distribute Cash at each Debtor entity to Holders of Claims at such entity, (ii) transfer all Claims, Interests, and assets to the Wind-Down Reserve, and (iii) liquidate the Debtors' business and remaining assets under chapter 11 of the Bankruptcy Code. The Plan contemplates the following key terms, among others described herein and therein:

1.   *General Settlement of Claims and Interests*

Pursuant to section 1123 of the Bankruptcy Code, Bankruptcy Rule 9019 (as applicable), and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute

the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

The Debtors are working with the Committee (as defined in Article VIII.C hereof) and other parties in interest to resolve certain open issues and controversies, which may result in a settlement or settlements pursuant to Bankruptcy Rule 9019 and may be included in the Plan. The Debtors believe that resolution of these issues or controversies in advance of the Confirmation Hearing will facilitate closure to the Chapter 11 Cases and a more efficient wind down of the Debtors. The Plan may be modified prior to the Confirmation Hearing to incorporate any number of resolutions of the unresolved controversies. Any such resolution will be negotiated at arm's-length with the advisors representing the affected parties.

### 2. *Recoveries to Certain Holders of Claims and Interests*

The recoveries to Holders of Claims and Interests is described in Article IV.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

### 3. *Releases*

The Plan contains certain releases, as described in Article IV.O of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?" The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

"Related Party" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

"Released Parties" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) Purchaser and each of its Related Parties; and (f) each of the Released Voyager Employees (subject to the limitations contained in Article IV.F and Article IV.G of the Plan); *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

"Released Professionals" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable): (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Fasken Martineau DuMoulin LLP; (vii) Campbells Legal (BVI); (viii) McDermott Will & Emery LLP; (ix) FTI Consulting, Inc.; (x) Epiq Corporate Restructuring, LLC; (xi) Cassels, Brock & Blackwell LLP; (xii) Paul Hastings LLP; (xiii) Harney Westwood & Riegels LP (BVI); (xiv) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xv) Jenner & Block LLP; (xvi) Seyfarth Shaw LLP; (xvii) Alvarez & Marsal Canada Inc.; (xviii) Blake, Cassels & Graydon LLP; (xix) Latham & Watkins LLP; (xx) Lowenstein Sandler LLP; (xxi) Kramer Levin LLP and (xxii) Acura Law Firm; *provided* that if the Asset Purchase Agreement is terminated, Latham & Watkins LLP shall not be a "Released Professional" under the Plan.

"Released Voyager Employees" means all directors, officers, and Persons employed by each of the Debtors and their Affiliates serving in such capacity on or after the Petition Date but before the Effective Date (subject to the limitations contained in Article IV.E and Article IV.F of the Plan).

"Releasing Parties" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties, (g) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (h) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (i) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

(a)      **Releases by the Debtors.**

**Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, the Wind-Down Entity, and in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in Article VIII.A of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.A of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

**Notwithstanding anything to the contrary contained herein, nothing in the Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of the Plan.**

(b)      Release by Holders of Claims or Interests.

Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in Article VIII.B of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

(c)      Exculpation.

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

> (d)    Injunction.

The assets of the Debtors and of the Wind-Down Entity shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in the Plan and shall not be available for any other purpose. All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Entity, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by the Plan.

For more detail, see Article VIII of the Plan, entitled "Effect of Confirmation of the Plan" which is incorporated herein by reference.

### 4.    *Cryptocurrency Rebalancing*

As disclosed in Article VII.A.2 of this Disclosure Statement, the Debtors' loan to 3AC resulted in a hole in the Debtors' Cryptocurrency portfolio and a deficiency of certain Cryptocurrency coins, particularly Bitcoin and USDC. Additionally, given that Account Holder Claims are dollarized as of the Petition Date, variance between Account Holder Claims as of the Petition Date and the Effective Date will exist due to continued fluctuation in cryptocurrency prices. As a result, to effectuate *pro rata* in-kind distributions of the Distributable Cryptocurrency to Account Holders pursuant to Article III.C.3(c) of the Plan, the Debtors must rebalance their Cryptocurrency portfolio through the purchase and sale of Cryptocurrency in a series of transactions (the "Rebalancing Exercise"). The Rebalancing Exercise shall be conducted to ensure that the aggregate value (in U.S. Dollars) for each type of Cryptocurrency coin or token held by the Debtors as a percentage of the aggregate value (in U.S. Dollars) of such type of Cryptocurrency coin or token that was on deposit with the Debtors as of the Petition Date (the "Rebalancing Ratio") is consistent across the Debtors' Cryptocurrency portfolio to process and initiate in-kind distributions.

To effectuate the Rebalancing Exercise, prior to the Effective Date, the Debtors plan to enter into a series of transactions that would result in the buying and selling of Cryptocurrency coins until the Rebalancing Ratio is consistent for each type of Cryptocurrency coin or token held by the Debtors (subject to a 5% variance allowance). The Debtors intend to execute such transactions, particularly for such Cryptocurrency that is less liquid, over a multi-week period in order to minimize the impact any such transactions may have on prevailing market prices for such coins. In order to minimize the impact trades have on prevailing market prices, the Debtors may use varying types of orders including time-weighted average price (TWAPs), market orders, limit orders, stop-limit orders, and other such order types as may be appropriate. Such transactions are likely to include swap transactions (*i.e.*, ETH/BTC) in order to minimize the total number of trades that need to be executed, as well as transactions directly for U.S. Dollars or conversion into equivalent stablecoins of a portion of the Debtors' Cryptocurrency portfolio as is necessary to satisfy their obligations under the Plan. Transactions may be executed directly at prevailing market prices, executed on a bilateral basis through bid list requests or through block trades. At this time, the Debtors do not intend to use any derivatives or other hedging transactions. The Debtors anticipate that executing such transactions through third-party market makers, over-the-counter trading desks, and on third party exchanges where the Debtors maintains institutional

trading accounts. The Debtors may also seek to engage third parties, including Binance.US, to execute such transactions on their behalf. Pursuant to the Purchase Agreement, the Debtors have agreed to execute such transactions on the Binance.US Platform unless they can obtain a better price from another third party. The number of Cryptocurrency coins that need to be bought and sold is unknowable at this time as the target ratio is based on future Cryptocurrency coin prices.

Accordingly, the Rebalancing Exercise is necessary to effectuate both the Sale Transaction and Liquidation Transaction under the Plan to ensure the Debtors can provide in-kind distributions of Distributable Cryptocurrency to Account Holders. In the event that the Sale Transaction is not consummated and the Debtors are proceeding with the Liquidation Transaction, prior to the Effective Date, the Debtors shall, in consultation with the Committee, be authorized to conduct the Rebalancing Exercise.

The Asset Purchase Agreement provides that the Debtors (prior to the transfer of Cryptocurrency or cash to Binance.US) and each transferred creditor (from and after the transfer of Cryptocurrency or cash to Binance.US) will retain all right, title, and interest in and to the Cryptocurrency or cash allocated to it in accordance with the Asset Purchase Agreement through and including such time as such Cryptocurrency or cash is returned to the Debtors or distributed to such transferred creditor. This is so even if transactions related to the Rebalancing Exercise are consummated on the Binance.US Platform, and such Cryptocurrency will be subject to the Debtors' customary security and control protocols while held by the Debtors. Upon the Effective Date, any Cryptocurrency or cash transferred to Binance.US will be held by Binance.US solely for the benefit of the Debtors or the Account Holders or Holders of OpCo General Unsecured Claims, as applicable, until distributions to Account Holders and Holders of OpCo General Unsecured Claims are made. In addition, the Debtors will determine the amount of Cryptocurrency and cash to be allocated to each Account Holder.

### 5. *Management Transition Plan*

Pursuant to the terms of the Plan, the Debtors shall implement the Management Transition Plan, the terms of which shall be reasonably acceptable to Purchaser and the Committee and included in the Plan Supplement. The Management Transition Plan shall help ensure that employees are available to provide transition services to the Debtors and/or the Wind-Down Entity to effectuate the Sale Transaction and to wind down the Debtors' Estates.

### 6. *Employee Transition Plan*

The Asset Purchase Agreement imposes a number of obligations on the Debtors, including obligations related to (a) making regulatory filings and cooperating with regulators; (b) maintaining and transferring data, including Know-Your-Customer data, securely and completely; (c) developing and implementing a user migration plan involving modifications to Voyager's web interface and mobile app; and an electronic process facilitating the acceptance of certain terms and conditions on the Binance.US Platform; (d) being available for a period following close of the Sale Transaction to provide assistance reasonably requested by the Purchaser in connection with the opening of user accounts and the transfer of information and Cryptocurrency in connection with the Sale Transaction; (e) providing the Purchaser with updates on technical support communications with customers; (f) rebalancing the Cryptocurrency on the Debtors' platform to prepare for closing of the Sale Transaction on a timely basis; (g) "unstaking" certain coins and ensuring they are freely transferrable and not subject to restrictions; and (h) from the date of signing through the date that is four months following close of the Sale Transaction, making available technical IT staff to Binance.US to assist it in understanding the Debtors' business software and transition accounts. *See, e.g.*, Asset Purchase Agreement §§ 6.4, 6.6, 6.10, 6.11, 6.15, and 6.16.

The Debtors will require the services of certain employees to fulfill these obligations and, without such employees, may not be able to satisfy the obligations in the Asset Purchase Agreement. Specifically, the Debtors will need certain employees in legal, finance, and compliance to satisfy the obligations in Section 6.4 of the Asset Purchase Agreement; operations, customer service, engineering, and security to satisfy the obligations in Section 6.6 of the Asset Purchase Agreement; operations, finance, and data to satisfy the obligations of Section 6.11 of the Asset Purchase Agreement; operations to satisfy the obligations of Section 6.15 of the Asset Purchase Agreement; and security and engineering to satisfy the obligations of Section 6.16 of the Asset Purchase Agreement. The Debtors will also require the services of those employees in the event they need to "toggle" to a Liquidation Transaction for any reason, which would require the Debtors to, among other things, rebalance the Cryptocurrency in their possession and

reopen the Debtors' platform for a period to permit customers to withdraw Cryptocurrency safely, among other things, while still interacting with, among others, state and federal regulators. The Debtors have created a transition plan for the approximately 35–40 employees necessary to fulfill either of these options, which is part of the Wind-Down Reserve, has the agreement of the Committee, and will be implemented by the Debtors, the Wind-Down Trustee, or both.

### 7. Non-Released D&O Claims

Any Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' CEO and/or CCO (regardless of any fiduciary capacity in which such individuals were acting) that are expressly related to approval of the 3AC Loan are not released pursuant to the Plan (collectively, the "Non-Released D&O Claims") and shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved by the Wind-Down Entity in accordance with the terms of Article IV.F of the Plan and subject to the Wind-Down Reserve. Any claims against the D&O Carriers that the Debtors' insurance transactions within the 90 days prior to the Petition Date are avoidable under the Bankruptcy Code, applicable state law, or both (the "Non-Released Insurance Claims") shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved solely by the Wind-Down Entity in accordance with the terms of Article IV.F of the Plan. The Wind-Down Entity shall be a successor to the Debtors' rights, title, and interest in any Non-Released D&O Claims and Non-Released Insurance Claims, and the Wind-Down Entity shall have standing to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims in accordance with the terms of Article IV.F of the Plan; provided that: (i) any recovery by the Wind-Down Entity (and the beneficiaries thereof) on account of any Non-Released D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O Liability Insurance Policies (and/or from the D&O Carriers directly) after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims; (ii) any party, including any trustee or any beneficiary of the Wind-Down Entity, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the Non-Released D&O Claims shall do so solely upon available insurance coverage from the Debtors' available D&O Liability Insurance Policies; and (iii) no party shall (a) record any judgment against the CEO or CCO, or (b) otherwise attempt to collect, directly or indirectly, from the personal assets of the CEO or CCO with respect to the Non-Released D&O Claims. For the avoidance of doubt, this provision does not enjoin, limit, or impair direct claims held by third parties against the Debtors' CEO or CCO (if any) other than any direct claims held by Holders of Claims or Interests that opt into the third party release in Article VIII.B of the Plan. Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the Non-Released D&O Claims; (y) final resolution of any coverage claims asserted against the Debtors' available D&O Liability Insurance Policies on account of the Non Released D&O Claims; or (z) exhaustion of the available insurance coverage under the D&O Liability Insurance Policies, the Non-Released D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order. For the avoidance of doubt, any release of the Non-Released D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.

The Debtors currently maintain $20 million in total D&O insurance coverage consisting of: (i) a $5 million primary policy with XL Specialty Insurance Company (the "XL Primary Policy"), (ii) a $5 million excess policy issued by Euclid Financial and Relm Insurance Ltd. (the "Euclid/Relm Excess Policy"), and (iii) a $10 million excess policy issued again by XL Specialty Insurance Company (the "XL Excess Policy"). The Debtors' D&O insurance program provides coverage to the directors and officers of Voyager and its subsidiaries and will convert to a six-year tail period upon expiration or a change in control.

### 8. Corporate Structure Upon Emergence

On the Effective Date, the Wind-Down Entity shall be formed for the benefit of the Wind-Down Entity Beneficiaries, as determined by the Wind-Down Entity Agreement, to implement distributions of the Wind-Down Entity Assets. The Wind-Down Entity shall have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Wind-Down Trust. Upon the transfer of the Wind-Down Entity Assets pursuant to the Wind-Down Entity Agreement, the Debtors shall have no reversionary or further interest in or with respect to the Wind-Down Entity Assets. For all federal income tax purposes, the Wind-Down Entity Beneficiaries will be treated as grantors and owners thereof, and it is intended that the Wind-Down Entity be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations.

Accordingly, for federal income tax purposes, the transfer of assets to the Wind-Down Entity shall be deemed to occur as (i) a first-step transfer of the Wind-Down Entity Assets to the Holders of Secured Tax Claims, Other Priority Claims, Account Holder Claims, or General Unsecured Claims, as applicable, and (ii) a second-step transfer by such Holders to the Wind-Down Entity. As a result, the beneficiaries of the Wind-Down Entity shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Wind-Down Entity Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

As soon as possible after the transfer of the Wind-Down Entity Assets to the Wind-Down Entity, Wind-Down Trustee shall make a good faith valuation of the Wind-Down Entity Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the Wind-Down Trustee, and the Holders of Claims receiving interests in the Wind-Down Entity shall take consistent positions with respect to the valuation of the Wind-Down Entity Assets, and such valuations shall be utilized for all U.S. federal income tax purposes. The Wind-Down Entity shall file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Wind-Down Entity Assets (*e.g.*, income, gain, loss, deduction and credit). Each Wind-Down Entity Beneficiary holding a beneficial interest in the Wind-Down Entity shall receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Wind-Down Entity will pertain to Wind-Down Entity Beneficiaries who receive their interests in the Wind-Down Entity in connection with the Plan.

The Wind-Down Entity shall, in an expeditious but orderly manner, make timely distributions to the Wind-Down Entity Beneficiaries pursuant to the Plan and the Confirmation Order and not unduly prolong its duration. The Wind-Down Entity shall be deemed a successor in interest to the Debtors. For the avoidance of doubt, the Wind-Down Entity shall perform no actions other than receiving and distributing the Wind-Down Entity Assets, and not for any other purpose (including conducting any claims reconciliation).

The Wind-Down Trustee shall be the trustee responsible for executing the purpose of the Wind-Down Entity, which shall continue to have all of the rights and powers granted to the Wind-Down Debtors as set forth in the Plan and applicable non-bankruptcy law. The Wind-Down Trustee shall also have the rights, powers, and obligations set forth in the Wind-Down Entity Agreement.

The Restructuring Transactions Memorandum will enumerate the operational steps necessary to, if approved by the Court, effectuate the Plan, the Sale Transaction, and other transactions contemplated thereunder. The Restructuring Transactions Memorandum is a necessary mechanism, particularly for tax purposes, to outline the corporate actions taken. The Restructuring Transactions Memorandum does not alter the substantive rights of Holders of Claims or Interests. The Restructuring Transactions Memorandum will be included in the Plan Supplement.

**B.    The Sale Transaction and the Liquidation Transaction.**

**1.    *The Sale Transaction***

The Debtors, led by Moelis, engaged in a thorough marketing process for the sale of all or substantially all of the Debtors' assets in accordance with the Bidding Procedures. Following the two-week Auction, the Debtors entered into the FTX Purchase Agreement to sell substantially all of their assets to FTX US. Following the collapse of the FTX Transaction, the Debtors reengaged with several potential transaction parties and ultimately selected the offer from Binance.US, as described in greater detail in Article VIII.N of this Disclosure Statement, entitled "The Post-Petition Sale Process." The Debtors now seek to effectuate the Sale Transaction as set forth herein and in the Plan. If the Sale Transaction is consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the following terms shall govern:

On or prior to the Effective Date, the Debtors shall have consummated the Sale Transaction, and, among other things, the Acquired Assets and Assumed Liabilities shall have transferred to the Purchaser free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and the Purchaser shall pay to the Debtors or Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims, as applicable, the proceeds from the Sale Transaction and the Plan, as and to the extent provided for in the Asset Purchase Agreement and the Plan. The Debtors will have the right to continue to retain custody of Cryptocurrency on behalf of Holders of Account Holder Claims

and cash on behalf of Holders of OpCo General Unsecured Claims pending such Holders' onboarding to the Binance.US Platform, and the Purchaser's obligation to deliver such Cryptocurrency and cash will commence upon Purchaser's receipt of such Cryptocurrency and cash from the Debtors. The Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down Entity, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Asset Purchase Agreement, the Customer Onboarding Protocol, and the Plan. The Debtors shall be authorized to sell any Cryptocurrency to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims and Allowed Other Priority Claims. On and after the Effective Date, except as otherwise provided in the Plan and the Wind-Down Trust Agreement, the Wind-Down Debtors, the Wind-Down Entity, or the Purchaser, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

Notwithstanding anything contained in this Disclosure Statement, the Plan, and any Definitive Documents, if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, all provisions contained in this Plan and the Definitive Documents governing the Sale Transaction shall have no further force and effect, and the provisions governing the Liquidation Transaction shall govern. The rights and remedies of the Seller and Purchaser under the Asset Purchase Agreement and any related orders of the Bankruptcy Court shall be expressly preserved.

Included below are disclosures regarding certain considerations related to the Sale Transaction, including: (a) Binance.US's financial wherewithal, both in terms of its ability to consummate the Asset Purchase Agreement as well as its ability to meet obligations to Account Holders and Eligible Creditors (as defined in the Asset Purchase Agreement); (b) Binance.US's holding of the Cryptocurrency of the Account Holders following the delivery of such Cryptocurrency to Binance.US, including how such Cryptocurrency is stored and what measures Binance.US has taken to ensure the secure storage of such Cryptocurrency; (c) regulatory considerations; (d) the process of onboarding the Account Holders and Eligible Creditors onto the Binance.US Platform as contemplated under the Asset Purchase Agreement; (e) VGX considerations; (f) data transfer and privacy considerations; and (g) the timing for distributions to Account Holders and Eligible Creditors in Unsupported Jurisdictions.

(a)     **Binance.US's financial wherewithal.**

Binance.US has the requisite financial wherewithal to make the payments contemplated under the Asset Purchase Agreement. The payments that Binance.US is required to make under the Asset Purchase Agreement are (1) a $20 million payment to the Debtors' estates in connection with the Sale Transaction, and (2) reimbursement of up to $15 million of the Debtors' expenses (to the extent any are due pursuant to Section 6.21 of the Asset Purchase Agreement). Binance.US has ample cash on hand (which does not include, for the avoidance of doubt, any customer assets) immediately available to cover such payments without the need for any external financing.

The Asset Purchase Agreement does not require Binance.US to make any cash or other payments in exchange for the Cryptocurrency to be transferred by the Debtors to its platform. Such Cryptocurrency is to be transferred to Binance.US on the basis of Binance.US having the obligation to make distributions to Account Holders in accordance with the Asset Purchase Agreement and the Plan.

Binance.US maintains 100% reserves for all its customers' digital assets (*i.e.*, if a customer has deposited 1 BTC with Binance.US, Binance.US holds 1 BTC on account of such customer's deposit). Binance.US's customer assets are available to be withdrawn at any time, subject to Binance.US's Terms of Use (which are available at: https://www.Binance.US/terms-of-use). Binance.US also has a sizeable and adequately capitalized balance sheet. Even if all of Binance.US's customers withdraw all of their digital assets, Binance.US would have substantial capital remaining on its balance sheet.

Binance.US also does not lend any of its customers' assets or offer margin products on its platform.

**(b)      Binance.US's holding of customer assets.**

The Asset Purchase Agreement, as amended to reflect input from the Committee, contemplates that all beneficial title to Cryptocurrency will remain with the Debtors up until the Effective Date. After that point, such Cryptocurrency will be transferred from the Debtors to Binance.US only as and when relevant creditors become eligible users (*i.e.*, satisfy Binance.US's know-your-customer requirements and accept the Binance.US terms and conditions identified above) on the Binance.US Platform in accordance with the Asset Purchase Agreement and Plan, and upon such transfer, Binance.US will be obligated to make such Cryptocurrency available to the relevant creditors within five (5) business days of receipt. Cryptocurrency that is transferred to Binance.US will be held by Binance.US pursuant to its standard digital asset wallet infrastructure which is stored on Amazon Web Services (AWS) servers located in Northern Virginia and Tokyo.

Binance.US has various security protocols in place to ensure the safe storage of customer assets. Binance.US's security protocols have achieved various third-party expert certifications attesting to their compliance with industry standards, including: (a) Payment Card Industry Data Security Standard (PCI DSS) certification, (b) International Organization for Standardization (ISO) 27001 and 27701 certifications, and (c) Service Organization Control (SOC 2) Type 2 attestation verified by an independent auditor.

**(c)      Regulatory Considerations.**

The Asset Purchase Agreement provides that Binance.US will make distributions to Account Holders and Eligible Creditors following the transfer of Cryptocurrency or cash by the Debtors to Binance.US (subject to and in accordance with the Asset Purchase Agreement and the Plan). Pursuant to Binance.US's Terms of Use and related policies and procedures, Binance.US will not make any distributions in any Unsupported Jurisdictions or allow trading by the accounts of Account Holders located in Unsupported Jurisdictions unless and until Binance.US has received the necessary licenses and/or authorizations. Binance.US has licenses, authorizations, or exemptions (as applicable) in the following Supported Jurisdictions that require such licenses, authorizations, or exemptions: Alabama (Sale of Checks License, SC 814); Alaska (Money Transmitter License, AKMT-012960); Arizona (Money Transmitter, 1009212); Arkansas (Money Transmission License, 119231); Connecticut (Connecticut Money Transmission License, MT-1906829); Delaware (Sale of Checks and Transmission of Money, 030095); Florida (FT230000290); Georgia (Seller of Payment Instruments License, 72019); Guam (Foreign Exchange/Money Transmittal - SRL NO 2316097); Idaho (Idaho Money Transmitters, MTL – 306); Iowa (Money Services License, 2020-0087); Illinois (Transmitter of Money, MT.0000392); Kansas (Kansas Money Transmitter License, MT.0000182); Kentucky (Money Transmitter License, SC723443); Maryland (Money Transmission License, 12-1906829); Maine (Money Transmitter License, NMT2053153); Michigan (Money Transmitter License, MT0022936); Minnesota (Money Transmitter License, MT-1906829); Missouri (Sales of Checks and Money Transmitter, MO-21-8764); Mississippi (Money Transmitter License, MT1906829);Nebraska (Nebraska Money Transmitter License, 1906829); Nevada (FID Money Transmitter License, MT11161); New Hampshire (Money Transmitter, 23528-MT); New Jersey (Money Transmitter, L072139); New Mexico (Money Transmitter License); North Carolina (Money Transmitter License, 190690); North Dakota (North Dakota Money Transmitter License, MT103722); Ohio (Money Transmitter License, OHMT199); Oklahoma (Money Transmitter, OK-DOB-001); Oregon (Money Transmission License, 1906829); Pennsylvania (Pennsylvania Money Transmitter License, 80252); Puerto Rico (Money Transmitter License, TM-137); Rhode Island (Rhode Island Currency Transmitter License, 20224384CT); South Carolina (Money Transmitter License, 1906829); South Dakota (Money Transmitter, MT.2199); Tennessee (Money Transmitter License, 1906829); Virginia (Money Transmitter License, MO-403); Washington (Money Transmitter License, 550-MT-125281); Washington DC (District of Columbia Money Transmission License, MTR1906829); West Virginia (West Virginia Money Transmitter License, 1906829); and Wyoming (Money Transmitter License, 7292).[27]

---

[27]  A comprehensive list of the licenses and authorizations currently held by Binance.US is available at: https://support.Binance.US/hc/en-us/articles/360050532193-Licenses. Note that certain jurisdictions do not require such licenses, authorizations, or exemptions (*e.g.*, California and Montana).

Additionally, Binance.US does not currently intend on engaging in any activities in connection with or related to the Asset Purchase Agreement that require registration with the United States Securities Exchange Commission, the United States Commodity Futures Trading Commission, or any state securities and/or commodities authorities.

Again, Binance.US does not lend any of its customers' assets or offer margin products on its platform.

### (d)    The Binance.US Customer Onboarding Process.

In advance of the Effective Date, and continuing after the Effective Date, Account Holders will be provided with the opportunity to create an account with Binance.US in order to receive an in-kind distribution of their claims in the same types of Cryptocurrency that they deposited with the Debtors.  In connection with that process, such Account Holders will be prompted to accept Binance.US's Terms of Use (which are available at: https://www.Binance.US/terms-of-use) and Privacy Policy (available at: https://Binance.US/privacy-policy) and complete Binance.US's customer onboarding (*i.e.*, KYC) process.  Account Holders will be able to withdraw their in-kind distributions from the Binance.US Platform – no Account Holder is required to continue to use Binance.US on a go-forward basis.  To the extent any such Account Holders do not agree to the Terms of Use and Privacy Policy, or are unable to complete Binance.US's customer onboarding process, within three months of the Effective Date, Binance.US will liquidate the Cryptocurrency that would have been allocated to such Account Holders by selling such Cryptocurrency to other users of the Binance.US Platform at then-current market prices in accordance with Binance.US's trading rules (available at: https://www.Binance.US/trading-rules), and distribute the proceeds of such liquidation to the Debtors for further distribution to such Account Holders pursuant to the Plan. See also item (g) below with respect to distributions of Cryptocurrency to Account Holders located in Unsupported Jurisdictions.

### (e)    VGX considerations under the Sale Transaction.

The Asset Purchase Agreement does not impose on Binance.US any obligation to list VGX or support trading VGX on its platform.  Binance.US will conduct an internal review process with respect to whether it will support trading of the VGX on its platform.  Such a determination involves myriad factors and may require input from various third-party advisors and experts, including legal counsel.  Accordingly, Binance.US cannot predict with any accuracy the amount of time this analysis will require or its outcome.

Regardless of whether trading of VGX becomes supported on the Binance.US Platform, Account Holders may withdraw such tokens from their accounts on the Binance.US Platform when available to them in accordance with the Asset Purchase Agreement and the Plan, and subject to Binance.US's terms of use.

### (f)    Data Transfer and Privacy Considerations under the Sale Transaction.

The Debtors' customer-facing privacy policy permits transfers of user data to a buyer or other successor in connection with a sale of the Debtors' assets, including as part of a bankruptcy, liquidation, or similar proceeding.[28] Following the transfer of such data, Account Holders' data will be subject to the Binance.US Privacy Policy. However, in order to facilitate quicker customer onboarding in order to enable Account Holders to access their in-kind distributions promptly after the Effective Date, the Asset Purchase Agreement contemplates that Account Holders will be provided with the ability to "opt-in" and consent to the transfer of their user data to Binance.US before the Effective Date occurs.  Users will receive an email notification regarding the transfer of user data that presents the option to opt-in to the pre-closing transfer and provides a link to the Binance.US Privacy Policy.  As described in Article VI.B.7 of this Disclosure Statement, the Debtors will continue to impose its security protocols before, through, and following the closing of the Sale Transaction, as necessary.

### (g)    Unsupported Jurisdictions under the Sale Transaction.

Section 6.12(b) Asset Purchase Agreement contemplates that the Debtors are not required to deliver to Binance.US any assets associated with Account Holders or other creditors located in jurisdictions where Binance.US does not have appropriate licenses, regulatory authorizations or exemptions to provide the Binacnce.US platform and associated services (referred to herein as Unsupported Jurisdictions).  The Unsupported Jurisdictions are Hawaii, New

---

[28]    *See* Voyager Privacy Policy, ¶ 6, available at: https://www.investvoyager.com/privacypolicy/.

York, Texas, and Vermont. Instead of delivering the Cryptocurrency or cash distributions to Account Holders and Holders of OpCo General Unsecured Claims in such Unsupported Jurisdictions, the Debtors will retain control of such assets until Binance.US has received the appropriate license, authorization, or exemption, as applicable. If Binance.US does not receive such license, authorization, or exemption within six months following the Effective Date (*i.e.*, three months longer relative to Account Holders and Holders of OpCo General Unsecured Claims in Supported Jurisdictions), the Debtors will cause such assets to be liquidated (which liquidation may be conducted through Binance.US) and provide the cash proceeds for distribution to Account Holders and Holders of OpCo General Unsecured Claims in such Unsupported Jurisdictions in accordance with the Plan. Binance.US is currently working with state regulators to seek the requisite state licenses, authorizations, exemptions, or other alternative solutions, as applicable, in order to enable distributions to Account Holders and Holders of OpCo General Unsecured Claims in Unsupported Jurisdictions, and will continue to do so following the Effective Date to the extent such approvals or regulatory accommodations have not been granted. For avoidance of doubt, there is no guarantee or assurance that Binance.US will be able to obtain the necessary licenses, authorizations, or exemptions in order to enable it to make Cryptocurrency or cash distributions to Account Holders and Holders of OpCo General Unsecured Claims in Unsupported Jurisdictions. As such, the Debtors may be required to liquidate the Cryptocurrency held by Account Holders in Unsupported Jurisdictions and provide the cash proceeds for distribution to such Account Holders after the expiration of the six-month period following the Effective Date in accordance with the terms of the Plan.

### 2.    *The Liquidation Transaction*

If the Sale Transaction is not consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the Debtors will "toggle" to the Liquidation Transaction and the following terms shall govern:

On or after the Outside Date, the Debtors will pursue the Liquidation Transaction in accordance with the Liquidation Procedures. Pursuant to the Liquidation Transaction, the Debtors, the Wind-Down Entity, or the Wind-Down Trustee, as applicable, will distribute certain of the Cryptocurrency in-kind to Holders of Account Holder Claims in accordance with Article III.C of the Plan, transfer all Wind-Down Entity Assets or Wind-Down Trust Assets to the Wind-Down Reserve, liquidate certain of the Cryptocurrency, wind down and dissolve the Debtors, and pursue final administration of the Debtors' Estates pursuant to the Bankruptcy Code.

The Debtors, or the Wind-Down Entity, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Liquidation Transaction pursuant to the Plan. On or before the date that that is twenty-one days prior to the anticipated commencement of the Liquidation Transaction, the Debtors, or the Wind-Down Entity, as applicable, shall file the Liquidation Procedures with the Bankruptcy Court. Parties in interest shall have ten days to object to the Liquidation Procedures, and if no objections are timely filed, the Liquidation Procedures shall be approved. In the event of a timely objection, the Bankruptcy Court shall adjudicate any objection to the Liquidation Procedures.

On and after the Effective Date, except as otherwise provided in the Plan, the Wind-Down Trust Agreement, and the Liquidation Procedures, the Wind-Down Debtors or the Wind-Down Entity as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

### C.    **Means for Implementation of the Plan.**

### 1.    *Wind-Down Trust*

On or after the Effective Date, the Wind-Down Trust will be established. The Wind-Down Trust shall be the successor-in-interest to the Debtors, and the Wind-Down Trust shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Trust Assets. The Wind-Down Trust will conduct no business operations and will be charged with winding down the Debtors' Estates. The Wind-Down Trust shall be managed by the Wind-Down Trustee and shall be subject to a Wind-Down Trust Oversight Committee. For the avoidance of doubt, in the event that the Restructuring Transactions Memorandum specifies that the Wind-Down Debtors will be the Wind-Down Entity, the Wind-Down Debtors shall be managed by the Wind-Down Trustee and shall be subject to the Wind-Down Trust

Oversight Committee in the same manner as if the Wind-Down Entity is the Wind-Down Trust.  The Wind-Down Trust shall be administered in accordance with the terms of the Wind-Down Trust Agreement and shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget.  For the avoidance of doubt, the Wind-Down Trust shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset.  The Wind-Down Trust shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Trust Assets shall, subject to the Wind-Down Trust Agreement, be transferred to and vest in the Wind-Down Trust or the Wind-Down Debtors, as applicable.  For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Entity specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.E and Article IV.F.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Trust and the Wind-Down Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Wind-Down Trust Agreement, compromise or settle any Wind-Down Trust Assets transferred to the Wind-Down Trust.  On and after the Effective Date, the Wind-Down Trust and the Wind-Down Trustee may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Trust Assets transferred to the Wind-Down Trust or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Trust and Wind-Down Trustee on or after the Effective Date, except as otherwise expressly provided herein and in the Wind-Down Trust Agreement.  All of the Wind-Down Trust's activities shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget.  The Wind-Down Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

Based on its preliminary investigation of non-released Claims against third parties unaffiliated with the Debtors, the Committee has identified potential Claims against non-released third parties unaffiliated with the Debtors that the Wind-Down Entity will seek to investigate further and may pursue.  To ensure that the Wind-Down Entity has sufficient resources to pursue Claims discovered through its investigation, the Committee voted and determined that approximately $60 million should be included in the Wind-Down Reserve for that investigation and potential offensive litigation, and the Committee believes this investment (to the extent ultimately made) will benefit Holders of Claims.  All expenses will be reviewed and approved by the appointed Trustee of the Wind-Down Trust who has a fiduciary obligation to ensure that expenses are responsibly spent.  The Wind-Down Entity will act responsibly in assessing and pursuing litigation, only pursuing Claims that it believes will create a net benefit for Holders of Claims.  The funds obtained in litigation by the Wind-Down Trust and unused funds will be returned to Holders of Claims.  The Wind-Down Entity's goal is to obtain and return to Holders of Claims as much Cryptocurrency and fiat as possible.

### 2.  *Wind-Down Trustee and the Wind-Down Trust Oversight Committee Exculpation, Indemnification, Insurance, and Liability Limitation*

The Wind-Down Trustee, the Wind-Down Trust Oversight Committee, and all professionals retained by the Wind-Down Trustee and the Wind-Down Trust Oversight Committee, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors.  The Wind-Down Trustee may obtain, on behalf of itself and the Wind-Down Trust Oversight Committee, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors.  The Wind-Down Trustee and the Wind-Down Trust Oversight Committee may rely upon written information previously generated by the Debtors.

### 3.  *Tax Returns*

After the Effective Date, the Wind-Down Trustee shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors and the Wind-Down Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or

38

its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

### 4. *Dissolution of the Wind-Down Debtors*

Upon a certification to be Filed with the Bankruptcy Court by the Wind-Down Trustee of all distributions having been made and completion of all of its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction. The Wind-Down Trustee, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

### 5. *Statutory Committee and Cessation of Fee and Expense Payment*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except for the Filing of applications for compensation. The Wind-Down Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committee, including the Committee, after the Effective Date, except in connection with any fees or expenses for services rendered prior to the Effective Date that are Allowed by the Bankruptcy Court.

### 6. *Distributions of Net Owed Coins; Additional Bankruptcy Distributions*

As a general matter, the Purchaser will allocate each Account Holder's Net Owed Coins to its account on the Binance.US Platform, and each Holder of OpCo General Unsecured Claim's Pro Rata share of the Distributable Cryptocurrency (in Cash) to its account on the Binance.US Platform, in each case in accordance with, and subject to, the provisions of Section 6.12 and 6.14 of the Asset Purchase Agreement, as applicable.

As a general matter, the Customer Onboarding Protocol will provide that the Purchaser will make Additional Bankruptcy Distributions to Transferred Creditors corresponding to their Pro Rata shares of such Additional Bankruptcy Distribution (if such Additional Bankruptcy Distribution is in Cryptocurrency, based on the spot market value on the Binance.US Platform of the Cryptocurrency included in such Additional Bankruptcy Distribution), all in accordance with any applicable Post-Bankruptcy Statement (as defined in the Asset Purchase Agreement).

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim does not become a Transferred Creditor prior to the date that is three (3) months following the later of the Effective Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept, (as provided in the Customer Onboarding Protocol) then Purchaser shall convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with the Plan and the Customer Onboarding Protocol.

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim is located in an Unsupported Jurisdiction (as defined in the Asset Purchase Agreement), then the Net Owed Coins, cash and Additional Bankruptcy Distributions, as applicable, allocable to such Person shall be handled pursuant to Section 6.12(b) or, if applicable, Section 6.14(d) of the Asset Purchase Agreement.

Purchaser shall have no responsibility to make any distributions other than as contemplated by Sections 6.12 and 6.14 of the Asset Purchase Agreement.

### 7.  *Election to Contribute Third-Party Claims*

To date, there has not been an investigation into direct claims that can be asserted against third parties. Accordingly, specific claims against third parties, including the Contributed Third-Party Claims are not yet determined.  After the Effective Date, the Wind-Down Entity will conduct an investigation into claims that can be asserted against third parties. After that investigation is completed, the Wind-Down Entity will assess the viability and collectability of potential claims before determining whether to pursue them.  Because aggregating all Contributed Third-Party Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Wind-Down Entity.  By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Entity, it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind-Down Entity, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Entity to memorialize and effectuate such contribution.  For the avoidance of doubt, any recoveries by the Wind-Down Entity from the pursuit of Contributed Third-Party Claims shall be for the benefit of all creditors.

On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Wind-Down Entity and shall thereafter be Wind-Down Trust Assets for all purposes.  No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Wind-Down Trust Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down Trust will or will not pursue any and all available Contributed Third-Party Claims against such Person.  The Wind-Down Trust shall have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date.  For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

## VI.    THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE

### A.    The Debtors' Corporate Structure and History.

Voyager was founded in 2018 by Stephen Ehrlich, Philip Eytan, Gaspard de Dreuzy, and Oscar Salazar, a group of Wall Street and Silicon Valley entrepreneurs with extensive experience in the technology and finance sectors. Voyager was founded to bring choice, transparency, and cost efficiency to cryptocurrency investors and was designed to be "accessible to all" by focusing on the needs of retail customers.

Voyager grew rapidly—in just four years, Voyager's platform evolved from a small startup to an industry-leading trading platform that reached a peak of 3.5 million users and over $5.9 billion of cryptocurrency assets held.  Voyager is a public company that began trading on the Toronto Stock Exchange in 2021 under the ticker "VOYG."[29]  A simplified version of the Debtors' current corporate structure is as follows:

---

[29]  On July 6, 2022, the Toronto Stock Exchange suspended all trading in VOYG.



Voyager Corporate Structure

### B.    The Debtors' Assets and Operations.

Voyager's primary operations consist of (i) a trading platform, (ii) custodial services through which customers earn rewards on stored cryptocurrency assets, and (iii) lending and staking programs.  All of the Company's services are accessible through a mobile application that users can download on their smartphones and other smart devices.

#### 1.    The Trading Platform

Traditional trading platforms have largely focused on either retail investors or institutional investors, tailoring features to one group at the exclusion of the other.  Voyager's founders understood that, though retail investors do not need the full suite of services that an institutional-focused trading platform provides, retail investors deserve a high-quality trading experience that maximizes their ability to invest in the cryptocurrency sector on an equal playing field with other market participants.

Voyager operates as a cryptocurrency trading platform, matching its customers with counterparties who can facilitate the customer's desired trade.  The Company's platform is simple and easy to use, but beneath the retail customer-focused user interface is an institutional-grade trading platform built to provide Voyager's customers with high-quality trade execution across numerous digital currencies.  The Company's platform is unique as it surveys more than a dozen exchanges and liquidity providers and executes trades through a proprietary algorithm that evaluates the price, certainty of execution, reliability of the trading venue, and speed of execution to deliver each customer a high-quality execution.  Ultimately, Voyager's customers know that they have access to a best-in-class trading platform no matter how big or small their trade.

## 2.    *Custodial Services*

Digital currencies deposited by customers are stored on Voyager's platform in omnibus wallets rather than in individualized digital "wallets." In exchange, Voyager customers earn rewards on deposits. Prior to the Petition Date, rewards were primarily paid in three ways: (i) PIK Rewards, as defined below; and (ii) through the VGX Token and the Voyager Loyalty Program, as defined below. To complement its custodial services and the Voyager Loyalty Program, customers can sign up for the Voyager Debit Card.

***PIK Rewards***. Customers who deposit certain currencies with Voyager earn payable-in-kind interest ("PIK Rewards") on their assets through the Voyager Earn Program, provided that such users maintain a minimum monthly balance and keep their assets on the Company's platform.

***Voyager Loyalty Program and VGX Token***. Voyager token ("VGX" or "Voyager Token") is a digital currency issued and administered by the Company. VGX is primarily issued in connection with the Company's loyalty and rewards program (the "Voyager Loyalty Program"). Ownership of VGX entitles users to benefits on their accounts operating through a tiered reward system. VGX is traded on the Coinbase Exchange under the ticker "VGX."

The Voyager Loyalty Program is similar to retail or restaurant loyalty programs where loyal users are rewarded for continued use of the platform. Active users on the Voyager platform can earn a variety of rewards and incentives, including higher referral bonuses, lower transaction fees, prioritized customer support, higher PIK Rewards rates, and access to special events and investment opportunities.

## 3.    *Staking*

Staking offers another revenue avenue for Voyager by generating passive income on coins that are staked through staking protocols without needing to sell the underlying cryptocurrency. This process involves committing cryptocurrency assets to a project in exchange for a set rewards rate determined by each staking protocol.

## 4.    *Voyager's Lending Program* [30]

Prior to the Petition Date, the Debtors lent cryptocurrency deposited on its platform to third parties. Such third parties paid the Debtors a pre-negotiated interest rate that was payable in payment-in-kind (*i.e.*, a Bitcoin loan accrues interest payable in Bitcoin). During these chapter 11 cases, the Debtors recalled all outstanding loans made to third parties, with the exception of certain loans made to Galaxy Digital LLC. The Debtors expect to unwind the loans made to Galaxy Digital LLC prior to confirmation.

## 5.    *Voyager's Investments*

Prior to the Petition Date and in the ordinary course of business, Voyager made equity investments in certain public and private companies primarily focused on venture capital initiatives. Such investments are in an aggregate amount of approximately $9.7 million across 11 companies and yield varied amounts of dividends based on the terms of such equity investments.

## 6.    *Using Voyager's Platform*

Customers access the Company's entire suite of services through Voyager's mobile application (the "Voyager App"). Customers sign up for a Voyager account on the Voyager App after digitally executing Voyager's customer agreement and linking their bank account or off-site cryptocurrency wallet to the platform to facilitate the purchase of cryptocurrency or the transfer of the customer's own cryptocurrency to the platform.

The Company does not maintain a separate cryptocurrency wallet for each customer. Instead, all cryptocurrency assets are commingled on an asset-by-asset basis and held in omnibus accounts in the name of Voyager Digital, LLC. When a customer deposits crypto assets, the assets first enter Voyager's self-custody wallet system (such system, "Bedrock"). All deposits of crypto assets are subject to Voyager's transaction monitoring program that uses Chainalysis Pte. Ltd. ("Chainalysis"), a third-party vendor, to conduct blockchain review of crypto assets

---

[30]    The Lending Program is described in further detail in the First Day Declaration.

transferred to the Voyager platform. If a customer's external crypto wallet depositing crypto assets is flagged by Chainalysis, Voyager is alerted by Chainalysis and Voyager conducts an investigation and takes appropriate actions, up to and including restricting and offboarding the customer account. If the wallet passes Chainalysis verification, then the relevant crypto assets are swept automatically from Bedrock for transfer to the applicable omnibus account with a third-party custodian or self-custody solution, which Voyager controls.

## 7.    *Voyager's Security Processes and Procedures*

Voyager has a defined cybersecurity framework that includes protecting people, technology, and digital assets. The security protocols utilize several strategies and activities, including conducting first and third-party security assessments, multi-party computation ("MPC") and asset protection, and diligent monitoring and proactive hunting for risks. The Debtors use four different custodial solutions to hold and safely store a majority of the Cryptocurrency: Fireblocks Inc. ("Fireblocks"), Copper.co ("Copper"), Anchorage Digital Bank N.A. ("Anchorage"), and Coinbase Trust Company ("Coinbase"), and one self-custodial software solution called Gnosis (collectively, the "Custodians").[31] Specifically, all of the Custodians use MPC, which is one of the primary technologies custodians in the industry utilize to secure Cryptocurrency assets. Through MPC, private keys are never constructed in one place, which minimizes the possibility for a single point of compromise. To set up keys, wallets typically are "multi-signer" wallets that require a threshold of co-signers on behalf of the Custodian and a threshold of co-signers on behalf of Voyager. None of the parties are able to sign a transaction by themselves to setup a key and none of the Custodians hold the entire "private key" for wallets.

Each individual MPC key share is also randomized in a hardware isolated component to mitigate the risk of takeover by an outsider or insider who has access to a threshold device holding the MPC key shares. The process also involves a verification process where each of the co-signers assures that the metadata matches the request it carries. Fireblocks also enables Voyager to back up the set of MPC key shares of a Fireblocks Vault and load them onto a secure offline environment, which may be used to reconstruct a "master private key" of the Fireblocks Vault in the event of loss. Additionally, Voyager's other Custodians have the same or similar procedures (*e.g.*, the Company's agreement with Copper provides a failsafe mechanism through a trusted third-party agreement if Voyager or Copper loses their keys to access wallets).

Under all of the custodial agreements with the Custodians, Voyager must nominate authorized persons to access the custodial platform and give directions on what to do with the digital assets stored on their platform. The Custodians only act through directions provided by the nominated persons. A very limited number of people at the Company are deemed authorized persons who have access to control the custodial accounts. Such people are the only ones who can otherwise authorize the Custodian to move Cryptocurrency out of their "vault." Voyager selects designated persons only after going through a quorum approval process in place at the Company. There is not a single person at Voyager that can execute a transaction without authorization from at least one other person.

The Debtors also have their own robust key management processes in place, including key storage technology and secret managers such as LastPass to store passwords. These security measures have been sufficient to safeguard the Debtors' valuable Cryptocurrency assets and are on par with security measures employed by financial institutions and other sectors that employ military-grade security. To date, Voyager has never had any security issues with the Custodians or run into any issues with lost keys.

The Debtors utilize a combination of cutting-edge technology and top cybersecurity talent to protect their assets as part of a multilevel cybersecurity framework. For example, for any large withdrawals, the Debtors historically engaged in an automated risk assessment that utilized multiple techniques to analyze risk factors. Cases flagged at certain risk levels are first escalated to the Company's customer experience team and then escalated, as necessary, to the Company's anti-fraud operations team to review and investigate.

The Debtors maintain a robust security operations center that is responsible for the monitoring of the Debtors' infrastructure and interfaces to prevent misappropriation and external cyber-attacks with respect to the Cryptocurrency and Cryptocurrency-based transactions. The Debtors also work with leading vendors that are used by institutions

---

[31] The Debtors have approximately $15-20 million worth of Coins held on exchanges that are not supported by the Custodians. The Debtors' Head of Treasury has sole access and control over these Coins to minimize any security breaches.

worldwide to provide the security services needed to protect client assets and data. Importantly, Voyager has also never been subject to a security breach falling directly within Voyager's control (customers may have been susceptible to outside breaches due to weak passwords, for example). Between December 2021 and June 2022 alone, the Company's security team mitigated over six million intrusion attempts.

Due to the digital nature of the Cryptocurrency, they cannot be stored in a traditional bank account, the Debtors believe the security protocols and controls as described in herein and the ongoing collaboration and work with vendors, such as the Custodians, are sufficient to address the bespoke protections the Cryptocurrency require and all Cryptocurrency is secure. For the avoidance of doubt, the Debtors will continue to impose the security protocols defined herein for all Cryptocurrency held on their platform, including before, through, and following the Effective Date and closing of the Sale Transaction, as necessary.

### C.    The Debtors' Capital Structure.

#### 1.    The Debtors' Debt Obligations

On June 22, 2022, Voyager Digital Holdings, Inc. entered into that certain agreement for the revolving credit facility dated June 21, 2022 (the "Loan Agreement," and such facility, the "Loan Facility"), with Alameda Ventures Ltd. ("Alameda") as lender, to provide a revolving credit facility of $200 million cash and USD Coin ("USDC," and such loans, the "Cash Loans") and 15,000 Bitcoin ("BTC," and such loans the "BTC Loans") guaranteed by Voyager Digital Ltd. As of the Petition Date, the total value of aggregate consideration available under the Loan Facility was approximately $500 million.[32] However, Debtor Voyager Digital Holdings, Inc. was only able to access 75 million USDC under the Loan Facility due to borrowing restrictions. The aggregate value of the USDC outstanding is $75 million.[33]

The borrowers under the Loan Agreement can draw on the Loan Facility in U.S. dollars or USDC under the Cash Loans or in BTC under the BTC Loans. The Loan Facility accrues interest on the outstanding principal balance at a rate equal to five percent annually. Any accrued interest is due on December 31, 2024, the Loan Facility's maturity date. Repayment of any principal balance is required to be in the currency in which the amount was funded (if in BTC, the repayment must be equal to the amount drawn down and outstanding at the time of repayment).

#### 2.    The Debtors' Intercompany Obligations

There are six intercompany obligations owed between the Debtors (collectively, the "Intercompany Obligations"). The Intercompany Obligations comprise four Intercompany Obligations owed by OpCo to TopCo, one Intercompany Obligation owed by OpCo to HoldCo, and one Intercompany Obligation owed by HoldCo to TopCo. Additionally, in the ordinary course of business, the Debtors make payments by one Debtor on behalf of another Debtor, resulting in intercompany receivables between the Debtor entities (collectively, the "Intercompany Receivables"). Whether any given Intercompany Obligation or Intercompany Receivable is a valid intercompany loan or a capital contribution depends on the consideration of a number of relevant factors. Based on the Debtors' preliminary analysis, it is likely that at least five of the six Intercompany Obligations are capital contributions because TopCo received third-party equity investments and subsequently pushed down such investments to OpCo to fund the Debtors' operating business. Similarly, based on the Debtors' preliminary analysis, it is likely that the Intercompany Receivables are capital contributions based on a number of factors, including that the Debtors intentionally never settle the Intercompany Receivables. The independent directors at TopCo, HoldCo, and OpCo have engaged independent counsel and are conducting a review to analyze the Intercompany Obligations and their treatment as capital contributions or loans.

In the event that any Intercompany Obligation or Intercompany Receivable owed by OpCo one the one hand to TopCo or HoldCo on the other hand is determined to be a loan, recoveries to Account Holders and Holders of OpCo General Unsecured Claims may be reduced. This Disclosure Statement assumes that the Intercompany Obligations between the Debtors and all Intercompany Receivables between the Debtors will be recharacterized as capital

---

[32]    Assuming a Bitcoin price of $20,000.

[33]    As a stablecoin, USDC is pegged to $1 per coin.

contributions and will not be entitled to Pro Rata recoveries with other Holders of Claims at the applicable Debtor entity.

Below is a summary of each of the Intercompany Obligations and Intercompany Receivables and the Debtors' conclusions regarding whether such are valid loans or capital contributions. The Ad Hoc Equity Holder Group disputes the Debtors' conclusions regarding the Intercompany Obligations and Intercompany Receivables.

(a)        **Intercompany Obligations by OpCo to TopCo.**

i.        *The Loan Agreement between Voyager Digital Ltd., as Lender, and Voyager Digital, LLC, as Borrower, dated February 12, 2021*

On February 12, 2021, OpCo, as borrower, entered into that certain loan agreement with TopCo, as lender, to document the $70 million unsecured loan previously received from TopCo (the "February 2021 Term Loan"). The February 2021 Term Loan matures on February 12, 2024 and accrues interest at a rate equal to LIBOR plus 8.75% annually with interest payments due quarterly. No interest payments have ever been made by OpCo to TopCo on account of the February 2021 Term Loan. The Debtors contemplated and entered into the February 2021 Term Loan after the amount had already been funded to OpCo solely to optimize tax positions in the most efficient manner after TopCo received third-party equity investments and subsequently pushed down such investments to OpCo to fund the Debtors' operating business.

As of the Petition Date, the balance under the February 2021 Term Loan was approximately $78.9 million (including accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the February 2021 Term Loan would be determined to be a capital contribution due to (i) the lack of repayment history, (ii) the fact that the February 2021 Term Loan was documented significantly after the amount had already been funded to OpCo, (iii) the fact that the February 2021 Term Loan was entered into solely to optimize tax positions, (iv) OpCo is the primary operating entity for Voyager's entire enterprise and TopCo was providing the necessary capital contribution to allow OpCo to operate, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and TopCo, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment. Although the February 2021 Term Loan was formally documented, other factors, including those mentioned above, support the conclusion that the February 2021 Term Loan is most likely to be a capital contribution.

ii.        *The Revolving Credit Agreement between Voyager Digital Ltd., as Lender, and Voyager Digital, LLC, as Borrower, dated February 12, 2021*

On February 12, 2021, OpCo, as borrower, entered into that certain revolving credit agreement with TopCo, as lender, to document the unsecured revolving credit facility with borrowing availability of up to $17.5 million previously provided by TopCo to OpCo (the "February 2021 Revolving Loan"). The February 2021 Revolving Loan matures on February 12, 2024 and accrues interest at a rate equal to LIBOR plus 7.50% annually with interest payments due quarterly. No interest payments on behalf of the February 2021 Revolving Loan have ever been made by OpCo to TopCo. The purpose of the February 2021 Revolving Loan was to provide OpCo with access to ongoing working capital and operate the business for the enterprise. The Debtors contemplated and entered into the February 2021 Revolving Loan after the amount had already been funded to OpCo solely to optimize tax positions in the most efficient manner after TopCo received third-party equity investments and subsequently pushed down such investment to OpCo to fund the Debtors' operating business.

As of the Petition Date, the outstanding amount under the February 2021 Revolving Loan was approximately $1.47 million (consisting of approximately $886,619 of principal borrowings and $590,904 of accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the February 2021 Revolving Loan obligation would be determined to be a capital contribution due to (i) the lack of repayment history, (ii) the fact that the February 2021 Revolving Loan was documented significantly after the amount had already been funded to OpCo, (iii) the fact that the February 2021 Revolving Loan was entered into solely to optimize tax positions, (iv) OpCo is the primary operating entity for Voyager's entire enterprise and TopCo was

providing the necessary capital contribution to allow OpCo to operate, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and TopCo, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment. Although the February 2021 Revolving Loan was formally documented, other factors, including those mentioned above, support the conclusion that the February 2021 Revolving Loan is most likely to be a capital contribution.

### iii.    The November 2021 Intercompany Obligation between Voyager Digital Ltd. and Voyager Digital, LLC

In November 2021, TopCo received a third-party equity investment in amount of $75 million and pushed such investment down in its entirety to OpCo to fund OpCo's working capital for purposes of its business operations.

As of the Petition Date, the outstanding amount on this November 2021 intercompany obligation was approximately $79.27 million (including any accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the November 2021 intercompany obligation would be determined to be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and TopCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.

### iv.    The May 2022 Intercompany Obligation between Voyager Digital Ltd. and Voyager Digital, LLC

In May 2022, TopCo received a third-party equity investment in amount of $57 million and pushed such investment down in its entirety to OpCo to fund OpCo's working capital for purposes of its business operations.

As of the Petition Date, the outstanding amount on this May 2022 intercompany obligation was approximately $57.8 million (including any accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the May 2022 intercompany obligation would be determined to be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and TopCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.

### (b)    Intercompany Obligation by OpCo to HoldCo.

In June 2022, HoldCo received a loan under the Alameda Loan Facility in the amount of $75 million from Alameda for the purpose of providing funding directly to OpCo in light of the crypto industry downturn described in Article VII.A-B of this Disclosure Statement.  Accordingly, HoldCo pushed the entire investment down to OpCo to fund OpCo's platform.

As of the Petition Date, the outstanding amount on this June 2022 intercompany obligation was approximately $75 million.

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the June 2022 intercompany obligation would be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and HoldCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.  Alameda disputes the treatment of this Intercompany Obligation.

### (c)    Intercompany Obligation by HoldCo to TopCo.

On October 26, 2021, HoldCo, as borrower, entered into that certain promissory note with TopCo, as lender, in the amount of $6 million (the "Promissory Note").  The Promissory Note matures on September 30, 2024 and accrues interest at a rate equal to LIBOR plus 8.75% annually with interest payments due quarterly.  To date, no interest payments on behalf of the Promissory Note have been made by HoldCo to TopCo.  To comply with certain Canadian laws, TopCo made a third-party investment into a private company and then contributed the acquired shares of the third party company down to HoldCo.  In exchange for the contribution of the third-party's shares, TopCo and HoldCo then entered into the Promissory Note.

As of the Petition Date, the outstanding note amount was approximately $6.33 million (consisting of approximately $6 million of principal borrowings and $329,943 of accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the Promissory Note would be a capital contribution due to the fact that the Promissory Note was entered into after the amount was already funded to HoldCoto make a third-party equity investment into a privately-held company and then contributed the acquired shares to HoldCo in exchange for the Promissory Note.

### (d)    Intercompany Transactions Between Debtors.

As is customary for a company of the Debtors' size and scope, the Debtors have historically, in the ordinary course of business, engaged in routine business relationships with each other, including making payments by one Debtor on behalf of another (collectively, the "Intercompany Transactions"), resulting in intercompany receivables between the Debtor entities.  The Intercompany Transactions are generally allocation payments on account of such things as equity-based employee compensation, non-equity-based employee salaries and benefits, ordinary course professional fees, rent and other ordinary course operating costs.

As of the Petition Date, the following intercompany receivables were outstanding:

- approximately $138,000 owed by OpCo to HoldCo;
- approximately $26.3 million owed by HoldCo to OpCo; and
- approximately $2.1 million owed by HoldCo to TopCo.

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the Intercompany Transactions would be capital contributions due to (i) the Debtors' intentionally never settling the balances, (ii) the absence of instruments of indebtedness, (iii) no existence of a fixed maturity date or schedule of payments, (iv) no existence of a fixed interest rate and interest payments, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and HoldCo and TopCo, as applicable, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment.

### 3.    *The Equity Interests in the Debtors*

As of the Petition Date, the Debtors' ultimate parent, Voyager Digital Ltd., has approximately 196,000,000 shares of common stock outstanding, approximately 9.49 percent of which is held by Alameda and its affiliates with the remainder widely held by investors.

## VII.    EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.    Market and Industry-Specific Challenges.

### 1.    *2020 and 2021 Market Conditions*

The onset of the COVID-19 pandemic was a watershed moment in traditional markets and cryptocurrency markets alike.  Between February 12, 2020, and March 23, 2020, the Dow Jones Industrial Average lost 37 percent of its value and the S&P 500 lost 34 percent of its value.  The price of Bitcoin fell over 50 percent over the same time period, and most other cryptocurrencies experienced similar declines.

Fear of a lingering pandemic and its effect on the world economy drove many investors to exit the market altogether. Voyager, however, continued to operate its trading platform through the entirety of the 2020 "COVID Crash." Customers were able to use the platform to trade despite extreme volatility in the markets, and interest and rewards were paid out to qualifying customers as well. The Company's response to market headwinds in 2020 solidified its status as a leading cryptocurrency trading platform—between 2020 and 2022, the number of users on the Company's platform grew from 120,000 to over 3.5 million.

After the COVID Crash, traditional markets and cryptocurrency markets saw a short recovery period followed by a period of sustained growth. Central banks and governments around the world (including, in particular, the United States Federal Reserve) enacted relief programs and adopted quantitative easing monetary policies designed to bridge the world economy to the end of the COVID-19 pandemic. Such policies contributed to growth in traditional markets and cryptocurrency markets, and investment into new projects in the cryptocurrency industry skyrocketed. Between its lowest point in 2020 and its highest point in 2021, the price of Bitcoin rose by over 1,000 percent. The S&P 500 rose by nearly 100 percent over the same period.

In traditional markets, fears of new variants of the COVID-19 virus and a potential economic contraction drove a series of sell-offs as equity markets moved sideways through the end of 2021. In the cryptocurrency space, strong sell-offs in "risk-on" assets, like technology and early-stage equities, led to sell-offs in the cryptocurrency sector as investors trimmed exposure. Increased regulatory scrutiny internationally also contributed to market pessimism, and strong spot trading from institutional investors drove most cryptocurrencies to double-digit losses relative to all-time highs.

Ultimately, traditional markets closed 2021 with double-digit growth. On the surface, it seemed like markets were beginning to recover from the COVID-19 pandemic and that the lingering effects of the pandemic would be minimal. But discussions around a potential recession in 2022 began to materialize as inflation rose along with concerns over whether world governments could navigate a "soft landing" into a slower economic period in 2022.

The year 2022, to date, has been marked by historic levels of volatility in the traditional markets and cryptocurrency markets. On February 24, 2022, Russia invaded Ukraine in a major escalation of the conflict between the two countries (the "Ukrainian War"). The Ukrainian War had a swift and profound impact on the world economy. In an effort to weaken Russia's ability to pursue the war, Western countries imposed a series of financial, trade, and travel sanctions against Russia, all of which measures contributed to a rampant increase in global commodity prices. Equity markets were roiled as well. Between January 1, 2022, and the Petition Date, the S&P 500 shed 20 percent of its value while the tech-heavy Nasdaq declined by nearly 30 percent over the same period. Rising inflation and commodity prices contributed to investor pessimism and further sell-offs. In June 2022, market analysts officially labeled 2022 as a bear market.

### 2. Cryptocurrency Industry-Wide Sell-off

The widespread sell-off in traditional markets was mirrored in the cryptocurrency industry. All major cryptocurrencies experienced significant declines in 2022; Bitcoin slumped 37.3 percent in June 2022 alone and was down approximately 56 percent year-to-date as of the Petition Date. Companies in the cryptocurrency industry also experienced significant equity declines as declining cryptocurrency prices pressured margins and investor pessimism grew. In June 2022, the value of the aggregate cryptocurrency market slumped below $1 trillion for the first time since January 2021. The severe distress of two industry participants—Terra and 3AC—exacerbated this "cryptocurrency winter." The eventual implosion of Terra and 3AC, and the resulting fallout, created the "cryptopocalypse."

### (a) The Terra Luna Collapse.

Terra is an open-source blockchain protocol created by Terraform Labs. Similar to the Ethereum blockchain (which issues Ether for use on its network), Terra issued Luna, a cryptocurrency token that was used to execute transactions on the Terra blockchain. In early May 2022, Luna traded at approximately $86 per token and had a market capitalization of approximately $14 billion.

Terra also issued TerraUSD ("UST"), an algorithmic stablecoin. Historically, UST traded at $1 per token. UST maintained its "peg" to Luna via an arbitrage mechanism. If UST traded above $1, arbitrageurs bought $1 worth

of Luna for $1 and exchanged Luna for one UST worth more than a dollar, netting the difference as profit.  If UST traded below $1, arbitrageurs bought one UST for less than a dollar and exchanged it for $1 worth of Luna, netting the difference as profit.  These arbitrage trades push the price of UST back to $1 and were intended to keep the two tokens equally scarce and limit oversupply or undersupply of either.  To incentivize traders to burn Luna to create UST, Terra allowed owners of UST to stake their UST in exchange for a 19.5 percent yield (payable in UST).

On May 7, 2022, $2 billion of UST was unstaked and immediately sold.  The sale moved UST's per share price down to $0.91.  UST holders, already sensitive to price movements due to the sell-off in cryptocurrencies generally, saw UST "de-peg" and rushed to unstake and sell their coins.  Terra's arbitrage trade was designed to address this type of situation but was not designed to address a situation of this magnitude.  Although traders moved quickly to burn Luna and "arbitrage" the price of UST, traders realized that only $100 million of UST could be burned for Luna each day.  Due to high trading volume, $100 million of UST was insufficient to "re-peg" UST to $1.

Massive selling pressure led to a downward spiral or, as known in traditional finance, a "death spiral": traders redeemed UST for Luna and sold their Luna, leading to a significant decrease in the price of Luna.  Then traders attempted to "re-peg" Luna to UST by burning UST to create Luna, which in turn created an oversupply of Luna that further exacerbated its price decline.  Terra allegedly sold $2.2 billion of its Bitcoin reserves to enter the Luna/Terra arbitrage efforts and re-peg the tokens but was unsuccessful.  The per-token price of Luna fell from $82.55 to $0.000001 in one week.

The Terra/Luna blockchain protocol was widely viewed as a project with significant promise—Luna had attracted significant interest from institutional investors and retail investors alike.  The Luna collapse erased over $18 billion of value and contributed to further sell-offs in the cryptocurrency sector.

(b)  **The Making and Recalling of the Three Arrows Capital Loan.**

As described above, Voyager's business model contemplated generating revenue in several different ways, including by lending, in its business judgment, a portion of cryptocurrency held on its platform to institutional borrowers.

Voyager's lending business was described and disclosed in Voyager's public securities filings, which stated that "[w]e earn fees from crypto assets lending activities with institutional borrowers," including on "an unsecured … basis," and that "Voyager selects which and how much of its crypto assets are available for such lending activity."[34]  Account Holders acknowledged and consented to this activity in the Customer Agreement, as follows:

[P]articipants in the Rewards Program agree to allow Voyager to utilize Cryptocurrency held in the(ir) Account to be loaned to various third parties (each, a "Borrower") determined at Voyager's sole discretion (each, a "Loan"). Loans made to Borrowers may not be secured and the Borrowers may not be required to post collateral either to Voyager, or otherwise.[35]

As of December 31, 2021, Voyager held approximately $5.88 billion in crypto assets on its platform.[36]  Of that total, approximately $2.7 billion had been loaned to various counterparties as part of Voyager's lending program.  At the time, the largest individual counterparty was Alameda Research, a crypto hedge fund founded by FTX CEO Sam Bankman-Fried, which had borrowed approximately $1.6 billion and represented 61% of Voyager's loan book.[37]  These loans were made largely on an unsecured basis in exchange for market-based returns that, in Voyager's judgment, corresponded with acceptable risk.

---

[34]  December 31, 2021 Voyager Digital Ltd. Management Discussion and Analysis at 8, available at https://sedar.com/GetFile.do?lang=EN&docClass=7&issuerNo=00005648&issuerType=03&projectNo=03338405&docId=5 134463.

[35]  August 2021 Customer Agreement at 10; *see also* January 2022 Customer Agreement at 10 (same).

[36]  *Id.* at 6.

[37]  *Id.* 20-21.

In early 2022, Voyager was looking to diversify its available borrowers.  3AC was a well-known, prominent participant in the crypto space.[38]  Between 2015 and 2020, 3AC experienced rapid growth and apparent extreme profitability, becoming known as a "behemoth" in the industry.

Given 3AC's profile, Voyager sought out a relationship with the firm.  On February 7, 2022, Voyager's then-CFO (now Chief Commercial Officer), Evan Psaropoulos, and Treasury Director Ryan Whooley had an initial call with Tim Lo, an employee of 3AC's over-the-counter trading affiliate.  They discussed 3AC generally, including whether its business objectives made it an appropriate counterparty for institutional borrowing.  3AC advised that it had substantial interest given its size and investment philosophy.  On February 11, 2022, Voyager and 3AC signed a mutual non-disclosure agreement to permit the exchange of confidential information between the firms as they explored a lending relationship.  On February 13, 2022, 3AC provided Voyager with a statement signed by one of its founders, Kyle Davies, containing only a single sentence stating that 3AC's NAV as of January 1, 2022, was $3.729 billion.  Unlike other substantial borrowers of Voyager's assets, 3AC did not provide a balance sheet (audited or unaudited).  In response to Voyager's formal due diligence questionnaire, 3AC subsequently provided a description of its corporate structure, certificates of good standing and incorporation, and a copy of its Anti-Money Laundering policies and controls.

On February 28, 2022, a Voyager team, including Mr. Psaropoulos, Mr. Whooley, Treasurer Jon Brosnahan and others had a due diligence call with Messrs. Davies and Lo of 3AC.  During the call, the Voyager team asked questions about 3AC's business and financial position, and ascertained from Mr. Davies that 3AC:  (i) managed only its founders' assets; (ii) was involved in limited higher risk venture capital projects, and its venture activities involved modest sums; (iii) was largely engaged in arbitrage trading, which was delta neutral, and thematic trading; (iv) limits its own borrowing to 1x NAV; and (v) did not own positions larger than 1-3% of circulation of any given alt-coin, to maximize its ability to exit quickly from such volatile assets.  In response to requests for greater financial transparency, Mr. Davies explained that 3AC only provided summary NAV statements to its lenders, and that it needed to treat all lenders the same in this regard.  When pressed, Messrs. Davies and Lo explained that 3AC previously had a bad

---

[38]  *See, e.g.,* The Block, "Three Arrows reports more than $1.2 billion position in Grayscale's GBTC," January 4, 2021, https://www.theblock.co/post/89928/three-arrows-reports-more-than-1-2-billion-position-in-grayscales-gbtc;  Bloomberg, "Ex-High School Classmates Are Among the World's Largest Crypto Holders," May 25, 2021, https://www.bloomberg.com/news/articles/2021-05-25/ex-credit-suisse-traders-amass-billions-of-dollars-of-crypto?utm_medium=social&utm_content=business&utm_source=twitter&cmpid=socialflow-twitter-business&utm_campaign=socialflow-organic#xj4y7vzkg (describing Three Arrows Capital as "among the world's biggest crypto holders with a portfolio worth billions of dollars"); Sydney Morning Herald, "School Friends Started Their Own Firm, Now They Are Among The World's Largest Crypto Holders," May 27, 2021, https://www.smh.com.au/business/markets/school-friends-started-their-own-firm-now-they-are-among-the-world-s-largest-crypto-holders-20210526-p57v6b.html (describing "the extent of the firm's influence, when Three Arrows reported it owned a 5.6 per cent stake in the Grayscale Bitcoin Trust, a $US22 billion fund"); Messari Report, "Messari Crypto Thesis For 2022," December 26, 2021, https://messari.io/pdf/messari-report-crypto-theses-for-2022.pdf (describing Three Arrows Capital founder Su Zhu as one of "the big guys" and noting that "Three Arrows Capital has amassed one of the largest funds in Asia, and boasts one of the top performing portfolios in their own right"); Bloomberg, "Fund Manager Who Called End of Last Crypto Winter Remains Bullish," April 7, 2022, https://www.bloomberg.com/news/articles/2022-04-07/three-arrows-capital-s-su-zhu-remains-bullish-on-crypto-investments (noting that Three Arrows Capital's "blockchain holdings alone are worth close to $10 billion"); FTX, Crypto Bahamas 2022 Su Zhu Speaker Profile, April 26, 2022, https://www.cryptobahamas.com/speakers/su-zhu-1 (describing Three Arrows Capital as "a leading investor in the cryptocurrency space"); Benzinga, "The Top 10 DeFi Projects To Watch In The Second Half Of 2020," July 30, 2020, https://www.benzinga.com/markets/cryptocurrency/20/07/16856475/the-top-10-defi-projects-to-watch-in-the-second-half-of-2020 (describing Three Arrows Capital as a "leading investor"); Benzinga, "Crypto Hedge Funds Bought Bitcoin At 'A Reasonable Level' During The Dip," May 21, 2021, https://www.benzinga.com/cryptocurrency/21/05/21239323/crypto-hedge-funds-bought-bitcoin-at-a-reasonable-level-during-the-dip-report (reporting "advice to investors" from 3AC co-founder Kyle Davies);  Benzinga, "This Crypto Veteran Has 3 Potential Catalysts That Could Fuel A Bitcoin Market Comeback," May 22, 2022, https://www.benzinga.com/markets/cryptocurrency/22/05/27339698/this-crypto-veteran-lists-potential-catalysts-that-could-push-bitcoin-market (describing Su Zhu as a "crypto veteran"); Benzinga, "What Does Etherium 2.0 Have To Do With The Celsius, 3AC, And Other Insolvencies?" June 15, 2022, https://www.benzinga.com/markets/cryptocurrency/22/06/27724295/what-does-ethereum-2-0-have-to-do-with-the-celsius-3ac-and-other-insolvencies (describing Three Arrows Capital as "a major investment firm"); Benzinga, "What Impact Will A Recession Have On Crypto?" June 16, 2022, https://www.benzinga.com/22/06/27745465/what-impact-will-a-recession-have-on-crypto (describing Three Arrows Capital as "one of the biggest crypto hedge funds").

experience with a counterparty who had been given detailed financial information about 3AC. According to 3AC, the counterparty had mimicked its trading strategy based on holdings information disclosed in those confidential documents, to 3AC's detriment. Given its commercial sensitivity, 3AC therefore only provided the net amount of total assets under management minus total liabilities, without further details.

The next day, on March 1, 2022, Voyager's Risk Committee, which included certain officers and other members of the treasury and legal teams, had a regularly scheduled meeting to discuss, among other matters, Voyager's lending, trading, and staking positions. During this meeting, the Risk Committee considered the merits of entering into a new lending relationship with 3AC, as well as 3AC's position regarding the limited amount of financial information contained in the NAV statement. Those who participated on the due diligence call with Voyager's co-founder explained the rationale given by 3AC, and that this was an explanation that Voyager's finance team and executive leadership understood and found credible. The Risk Committee discussed the fact that 3AC represented itself to have $3.7 billion in net asset value. Ultimately, no member of the Risk Committee objected to entering into a lending relationship with 3AC.[39] The decision to approve the 3AC Loan was ultimately made by the CEO, Stephen Ehrlich, in consultation with Mr. Psaropoulos, as further described below.

On March 4, 2022, Voyager entered into a master loan agreement with 3AC, pursuant to which Voyager made several loans to 3AC between March 8, 2022 and May 5, 2022 in the aggregate amounts of 15,250 Bitcoins and 350 million USDC. The 3AC Loan was unsecured but callable at any time by Voyager, as per the terms of six individual term sheets governing discrete advances from time to time. After Voyager approved 3AC as a borrower on March 1, the Risk Committee was not subsequently consulted about the size or terms of any of the advances that comprised the 3AC Loan. In general, Mr. Whooley would receive an in-bound borrowing request from 3AC and would discuss terms for the specific loan request with Mr. Psaropoulos. Mr. Psaropoulos would obtain Mr. Whooley's recommendations about the size and terms of borrowing, at times consulting with Mr. Brosnahan as to any liquidity concerns. Mr. Psaropoulos would then discuss each advance with Mr. Ehrlich and obtain the CEO's official authorization prior to executing the corresponding term sheet.

As of April 3, 2022, Voyager had assets on platform of approximately of $5.64 billion, of which $3.1 billion was on loan to third parties. At that time, approximately $935 million was on loan to 3AC, making it Voyager's second-largest borrower behind Alameda Research, to which Voyager had loaned approximately $1.23 billion. Approximately two months later, on June 6, 2022, the amount of Voyager's assets on platform had decreased materially (in part due to market decline and in part due to customer withdrawals) to $3.39 billion, of which approximately 25% had been lent to 3AC, and another 25% lent to Alameda Research.

During the approximately three-month period between the start of the parties' lending relationship and 3AC's default, Voyager engaged with 3AC on several occasions to monitor 3AC's financial position, as part of Voyager's regular borrower outreach activity. During this period, Voyager sought and received a revised one-page NAV statement from 3AC on March 23, 2022, again signed by 3AC co-founder Kyle Davies, stating that as of March 1, 2022, 3AC's NAV was $3.218 billion.

On approximately May 9, 2022, Luna de-pegged from UST, causing many investors in the crypto space to suffer losses. Voyager promptly reached out to all of its borrowers to understand the impact (if any) of Luna's unraveling on their respective businesses. Specifically, concerning 3AC, Voyager's Mr. Whooley spoke to Mr. Lo on May 11, and he and Mr. Psaropoulos had dinner with Mr. Lo on May 12. On both occasions, Mr. Lo reported that 3AC was an early investors in LUNA but had limited exposure and therefore 3AC had suffered insignificant losses. In light of this, Voyager did not believe it needed to recall the loans to 3AC.

---

[39]    While no formal vote was taken by the Risk Committee to approve 3AC as a borrower, or the sufficiency of the due diligence conducted, this was not the function of the Risk Committee. The Risk Committee was established in 2021 as a consultative body consisting of members of Voyager management from different departments. The Risk Committee met regularly to discuss, among other things, Voyager's overall financial position and any potential borrowers that members of the finance team believed, following due diligence, to be appropriate counterparties. No decision-making authority was delegated to the Risk Committee, and no votes were taken by the members of the Risk Committee, until May 4, 2022, when a charter for the Risk Committee was finalized and approved.

On May 23, 2022, Voyager requested and received an updated one-page NAV statement from 3AC, again signed by 3AC co-founder Kyle Davies, stating that as of May 23, 2022, 3AC's NAV was $2.574 billion.  At this point, Voyager ceased issuing further loans to 3AC despite requests from 3AC to borrow more.

After declining 3AC's request for more borrowing in the second half of May, communications between Voyager and 3AC remained relatively quiet until June 12, the day that Celsius Network LLC ("Celsius") lowered its gates and paused withdrawals.[40]  Upon this occurrence, Voyager reached out again to all of its borrowers to inquire about their financial health, including 3AC.  On June 13, 2022, Mr. Psaropoulos held a Zoom videoconference with Mr. Lo during which Mr. Lo informed him that 3AC had no exposure to Celsius.  The next day, on June 14, 2022, Voyager issued a press release about its lack of exposure to Celsius.[41]  Mr. Lo sent a text message to Mr. Psaropoulos later that morning asking for a call "asap."  Mr. Psaropoulos called Mr. Lo, who advised him that Voyager should recall all of its loans to 3AC because he was concerned that the founders of 3AC were not responding to requests for information from Mr. Lo and other employees.  Mr. Psaropoulos immediately called Mr. Ehrlich to relay this alarming statement.  Within hours, Voyager had recalled all outstanding amounts loaned to 3AC.

On June 15, 2022, one of 3AC's founders stated that the fund had incurred significant losses on account of its staked Luna position and had hired legal and financial advisors to explore potential liquidity solutions.  3AC did not return any of the loaned assets, and on June 24, 2022, Voyager issued a notice of default and acceleration to 3AC.  On June 27, 2022, 3AC was ordered by a court in the British Virgin Islands to commence liquidation proceedings.

i.      *The Special Committee Investigation*

On July 5, 2022, OpCo formally created the Special Committee consisting of newly appointed Independent Directors Timothy Pohl and Jill Frizzley.  The Special Committee was vested with the authority to, among other things:  (a) investigate any historical transactions, public reporting, or regulatory issues undertaken by OpCo that the Special Committee deemed necessary or appropriate, and the facts and circumstances surrounding such transactions; (b) interview and solicit information and views from management, representatives, consultants, advisors, or any other party in connection with any historical transactions undertaken by OpCo that the Special Committee deems necessary or appropriate; (c) request documentation and information regarding OpCo's business, assets, properties, liabilities and business dealings with respect to any historical transactions undertaken by Voyager that the Special Committee deems necessary and appropriate to review; (d) perform any other activities consistent with the matters described herein or as the Special Committee or Voyager's board of directors otherwise deems necessary or appropriate; and (e) conduct an independent investigation with respect to any potential estate claims and causes of action against insiders of Voyager, including any claims arising from loans made to 3AC.  The Special Committee was also vested with sole authority to prosecute, settle, or extinguish any and all claims and causes of action arising from the historical transactions investigated by the Special Committee.  The Special Committee retained the Special Committee Counsel to provide independent advice to, and act at the exclusive direction of, the Special Committee in connection with the Special Committee's mandate.[42]

On August 23, 2022, the Debtors, the Special Committee, and the Committee entered into the Common Interest Confidentiality Stipulation and Protective Order (the "Protective Order") pursuant to which the parties

---

[40]  *See, e.g.*, Medium, "A Memo to the Celsius Community," June 12, 2022, https://celsiusnetwork.medium.com/a-memo-to-the-celsius-community-59532a06ecc6 ("Due to extreme market conditions, today we are announcing that Celsius is pausing all withdrawals, Swap, and transfers between accounts."); CNBC, "Crypto lender Celsius pauses withdrawals due to 'extreme market conditions,'" June 13, 2022, https://www.cnbc.com/2022/06/13/crypto-lender-celsius-pauses-withdrawals-bitcoin-slides.html; CoinDesk, "The Fall of Celsius Network: A Timeline of the Crypto Lender's Descent Into Insolvency," July 15, 2022, https://www.coindesk.com/markets/2022/07/15/the-fall-of-celsius-network-a-timeline-of-the-crypto-lenders-descent-into-insolvency/ ("Celsius freezes withdrawals, swaps and transfers in response to 'extreme market conditions,' fueling rumors that the platform had become deeply insolvent.").

[41]  Press Release, "Voyager Digital Provides Update on Asset and Risk Management," June 14, 2022, https://www.investvoyager.com/pressreleases/voyager-digital-provides-update-on-asset-and-risk-management.

[42]  *See* Docket No. 125 ¶ 7 (application to employ Quinn Emanuel as counsel to the Special Committee, with authority to "among other things, (a) investigate any historical transactions relating to Voyager LLC, and (b) investigate any estate claims and causes of action against insiders of Voyager LLC, including claims arising from its loan to Three Arrows Capital, and (c) perform any

(the "Common Interest Parties") agreed to the protections afforded to "Confidential" and "Highly Confidential" discovery material. Given the unique features of the Debtors' Chapter 11 Cases, the Common Interest Parties agreed that the attorney-client privilege and the attorney work-product doctrine would be preserved with respect to privileged documents and information shared among counsel for the Common Interest Parties. The Bankruptcy Court entered the Protective Order on September 13, 2022.

During the Investigation, Special Committee Counsel sought and received information relating to, among other things: Voyager's loans to third parties, with a particular focus on the 3AC Loan; the diligence performed in connection with those loans; Voyager's Risk Committee; Voyager's staking of customer cryptocurrency assets; Voyager's regulatory compliance; Voyager's communications with the public; Voyager's pre-petition payments to insiders and certain third parties; and other aspects of Voyager's business. Voyager collected and provided to the Special Committee responsive documents from its internal hard copy and electronic files, its outside counsel, and various third parties (*e.g.*, cryptocurrency custodians and exchanges). Among many other things, Voyager collected email, Slack communications, and, in certain cases, Telegram and cell phone data from a dozen Voyager employees, including Voyager's most senior officers and others. In addition to several voluminous spreadsheets of data, Voyager produced more than 11,000 documents—collectively totaling more than 40,000 pages.

In addition to reviewing the above-referenced documents, Special Committee Counsel also interviewed 12 Voyager employees, including Stephen Ehrlich (CEO), Gerard Hanshe (COO), Evan Psaropoulos (Chief Commercial Officer), Ashwin Prithipaul (CFO), Pamela Kramer (CMO), David Brosgol (General Counsel), Marshall Jensen (Head of Corporate Development), Ryan Whooley (Treasury Director), Jon Brosnahan (Treasurer), Brian Silard (Treasury Team), David Brill (Deputy General Counsel), and Manisha Lalwani (in-house regulatory counsel). Collectively, the interviews performed during the Special Committee's Investigation lasted more than 55 hours, and covered in great detail the range of topics most relevant to the Special Committee's Investigation.

Throughout the Special Committee's Investigation, Special Committee Counsel was assisted by Kirkland and BRG. At Special Committee Counsel's request, BRG also hosted information sessions specific to staking with management and the Committee's counsel in order to address questions that would make time spent during the interviews most efficient. BRG also provided necessary background information about crypto assets and historical financial data to Special Committee Counsel upon request.

Since the appointment of the Committee, Special Committee Counsel coordinated with the Committee's professionals in conducting the Investigation. Specifically, Special Committee Counsel and the Committee's counsel held several meetings concerning the scope, status, and progress of the Investigation, and Special Committee Counsel permitted the Committee's professionals to sit in on—and ask questions during—the Special Committee's interviews of the witnesses mentioned above. In light of the protections of the Protective Order, no discovery was withheld from the Committee's counsel on the basis of attorney-client privilege.

Throughout the course of the Investigation, Special Committee Counsel provided regular updates to members of the Special Committee. In particular, Special Committee Counsel held five formal videoconference meetings with the Special Committee, during which Special Committee Counsel updated the Special Committee on the status of the Investigation, including facts learned, impressions obtained, and relevant legal documents and standards. The members of the Special Committee were engaged, and asked many questions regarding the facts being developed and potentially applicable legal theories. These meetings were in addition to the Independent Directors' participation in several Board meetings concerning the Debtors' general business and case trajectory including their sale efforts.

## ii. *Investigation Report, Conclusions, and Proposed Settlements*

At the conclusion of the Investigation, on October 7, 2022, Special Committee Counsel delivered to the Special Committee its report ("Investigation Report"), setting forth, among other things, the factual record developed over the course of the Investigation, the legal framework of potential estate causes of action, and Special Committee Counsel's legal conclusions and recommendations.

---

other activities consistent with the foregoing that the Special Committee or Voyager LLC's board otherwise deems necessary or appropriate"); Docket No. 242 (Order approving application).

The Special Committee met to discuss the contents of the Investigation Report with Special Committee Counsel on October 10, 2022.  The Special Committee found no fraud or theft by any director or officer of any of the Debtors.  The Special Committee also concluded that the estate does not have colorable claims against any Voyager director or officer other than potential claims against its CEO and CCO,[43] related to the 3AC Loan.  With respect to these claims, while colorable, the standard for successfully prosecuting such claims would be difficult to meet, with any judgment being even more difficult to collect.  The Special Committee negotiated independent settlements with each of the CEO and CCO as set forth in the Plan, subject to approval of the Bankruptcy Court as part of Plan confirmation.  These settlements are described in the following table:[44]

| Debtors Retain Rights of Recourse to D&O Insurance | Upon receipt of personal financial contributions, described below, the Debtors will retain the right to seek maximum recovery under the Debtors' D&O Liability Insurance Policies, without further recourse to the individuals. |
|---|---|
| Releases and Waivers by the Officers against the Debtors | CEO and CCO agree to release all Causes of Action they may have against the Estates.<br><br>CCO further agrees to subordinate 50% of his Account Holder Claim against the Debtors until all other Holders of Account Holder Claims are paid in full.<br><br>CEO and CCO further agree that, because the Debtors are in bankruptcy, the Debtors are unable to provide advancement or indemnification to CEO and CCO, and CEO's and CCO's recourse is limited to the Management Liability Policy, the Excess Policies, and the Side-A Policy (except as set forth below).  CEO and CCO shall be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Entity and retain the right to assert general unsecured claims for advancement and indemnification up to the limits of any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to CEO and/or CCO based upon or arising out of the lack of a formal claim for indemnification.<br><br>CEO and CCO further agree to subordinate any and all rights and entitlements under the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd., Policy Number ELU184179-22, to any recovery by the Debtors and/or the Wind Down Entity on account of the Debtors' and/or Wind Down Estate's claims for the avoidance of the premium paid for the policy.  For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), Officer shall be entitled to seek coverage under the Side-A Policy. |
| Reversal of Insider Bonus Payment | CEO agrees to the avoidance/unwinding of the transfer of $1,900,000 that CEO received from the Debtors on or around February 28, 2022, with CEO paying $1,125,000 to the Debtors in cash and assigning the right, if any, to any tax refund for the balance. |

---

[43]  Mr. Psaropoulos was CFO of Voyager Digital, LLC when it made all loans to 3AC.

[44]  The settlements are subject to definitive documentation and in the event the sworn financial information provided by either CEO or CCO to the Special Committee is materially inaccurate, the Special Committee reserves the right to void the D&O Settlement.

| Commitment to Cooperate | CEO and CCO agree to remain at, and continue performing the responsibilities of, their position(s) with the Debtors and assist with the Debtors' transition for at least thirty (30) days from the date of approval of the settlement; *provided* that the CCO shall have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the CEO shall have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided, further*, that both the CEO and CCO shall be available to the Debtors and/or the Wind-Down Entity for a maximum of five hours per month for the one year following the Effective Date. |

The theoretical loss from the 3AC Loan would be equal to the amounts remaining to be collected from 3AC in the 3AC Liquidation Proceeding, less any amounts actually collected in those proceedings. The amounts to be realized from the proposed settlements (approximately $1.2 million - $2 million of personal assets plus recourse to up to $20 million of D&O insurance) are just a small fraction of such loss. Nevertheless, the Special Committee made the decision to settle, subject to Court approval, based on the fact that the individuals do not have personal assets available to satisfy any potential judgment even if the claims were successfully prosecuted, whereas the cost of prosecuting would likely dissipate the available D&O insurance coverage and the assets that are being paid through the settlement in defense costs.

The rationale for the Special Committee's negotiation and recommendation for the settlements is based on the following factors, among others: the relative strength of these claims, which (if pursued) would sound in breach of fiduciary duty premised on alleged gross negligence on the part of the officers; the challenges involved in litigating loss causation; the costs of litigating these claims, including attorneys' and experts' fees; the financial wherewithal of the officers; and the risk of depletion of substantial portions of available insurance coverage which prioritizes the rights of the officers to utilize the insurance for defense costs. The Special Committee believes, following due diligence and negotiations led by Special Committee Counsel, and after several additional videoconference meetings and written exchanges with Special Committee Counsel, that the settlements embodied in the Plan are in the best interests of the estate. The Special Committee does not believe there are viable causes of action against insiders beyond those potential claims mentioned with respect to CEO and CCO relating to the 3AC Loan.

### B.    The Alameda Loan.

Once it appeared that its loan to 3AC might be at risk, Voyager's management team immediately engaged in efforts to identify sources of potential liquidity to stabilize the Company's business and ensure that the Company remained adequately capitalized. On June 22, 2022, HoldCo, as borrower, TopCo., as guarantor, and Alameda Ventures Ltd., as lender, entered into the Alameda Loan Facility, which provided the Company with up to $200 million cash and USDC and 15,000 Bitcoin subject to certain restrictions. OpCo is not a party to the Alameda Loan Agreement. The Alameda Loan Agreement provided that the use of proceeds under the Alameda Loan Facility was to pay Account Holders for cryptocurrency assets that counterparties to the Company's lending and related activities failed to return to the Company.[45] Alameda asserts that OpCo is obligated on the Alameda Loan Facility, which the Debtors dispute. As discussed in Article IV.O of this Disclosure Statement, the Debtors seek to subordinate the Alameda Loan Facility Claims under the Plan due to Alameda's inequitable conduct prior to and throughout these Chapter 11 Cases, including Alameda and its affiliates' apparent fraud that directly harmed the Debtors' creditors and significantly reduced their anticipated recoveries under the Plan. If the Alameda Loan Facility Claims are determined to be valid against OpCo, recoveries to Account Holders and Holders of OpCo General Unsecured Claims would be reduced.

Alameda also asserts that it has an administrative preference action claim against the Debtors in the amount of approximately $445 million pursuant to certain loans made by OpCo to Alameda, which were repaid during the chapter 11 cases. The Debtors dispute Alameda's position, but in the event that Alameda were to prevail on its alleged preference claim, creditor recoveries would be materially reduced. Specifically, recoveries for both Account Holder Claims and OpCo General Unsecured Claims would be reduced to approximately 24% from approximately 51% under

---

[45]    *See* Section 2.6 of the Alameda Loan Agreement.

the Sale Transaction if the Alameda Loan Facility Claim is not subordinated and Alameda prevails in its alleged preference claims.

### C.    Retention of Restructuring Advisors and Initial Third-Party Outreach.

In June 2022 the Debtors engaged Kirkland and Moelis to advise the Debtors in navigating the recent challenges impacting the cryptocurrency industry.  Beginning on or about June 20, 2022, Moelis initiated a dual-track marketing process (the "Prepetition Marketing Process") to solicit interest in two general deal structures:  (a) a sale transaction in which the Debtors' entire business would be sold to either a financial sponsor or a strategic company in the cryptocurrency industry and (b) a capital raise whereby a third party (individually or as part of a consortium) would provide a capital infusion into the Debtors' business enterprise (together, a "Transaction") to allow the Debtors to weather the volatility in public equity markets, the decline in cryptocurrency prices, and dislocation in the cryptocurrency industry caused, in part, by the decline of 3AC and the collapse of the Terra Luna ecosystem, as described below.  Among the deal structures considered for the financing were additional debt facilities and the issuance of preferred equity in exchange for capital.

To that end, Moelis reached out to 60 potential financial and strategic partners across the globe (collectively, the "Potential Counterparties"), including domestic and international strategic cryptocurrency-related businesses and private equity and other investment firms that currently have crypto-related investments and/or historical experience investing in the cryptocurrency industry.  By the Petition Date, over 20 of the Potential Counterparties had entered into confidentiality agreements with the Debtors.  Parties who executed a confidentiality agreement received a copy of the Debtors' investor presentation and access to a virtual data room containing thousands of pages with certain information regarding the Debtors' business operations, finances, material contracts, tax information, and incorporation documents.  In addition, parties that signed confidentiality agreements were offered the opportunity to participate in telephone conferences with the Debtors' management team as well as to request additional due diligence information.

Simultaneously with their efforts to identify a Potential Counterparty to effectuate a Transaction, the Debtors, Moelis, and the Debtors' other advisors began to analyze potential strategies to effectuate a stand-alone restructuring without the participation of a third-party partner to consummate a Transaction.

While the Debtors' marketing efforts yielded one proposal for an out-of-court financing, the conditions precedent to the proposal and the pro forma capital structure contemplated thereunder were not achievable, and no other Potential Counterparty was willing to participate in an out-of-court Transaction on the timeline required.  Among other things, Potential Counterparties expressed concerns regarding current uncertainty in the cryptocurrency market and assumed liabilities on an out-of-court basis.  Potential Counterparties were similarly reticent to participate in an out-of-court financing alone, and the Debtors determined that a group investment could not be marshalled among other viable Potential Counterparties on the timeline required to consummate a Transaction on an out-of-court basis.

The Prepetition Marketing Process produced multiple preliminary proposals from parties willing to participate in an in-court Transaction.  However, as of the Petition Date, all of the preliminary offers that the Debtors received required more time to fully develop and structure and/or were not more attractive than a potential stand-alone restructuring.

### D.    Governance Initiatives.

On July 5, 2022, the Debtors undertook several actions to strengthen the independence and experience of their boards of directors:  (i) the board of Voyager Digital Ltd. voted to appoint Matthew Ray as an independent director; (ii) the board of Voyager Digital Holdings, Inc. voted to appoint Scott Vogel as an independent director; (iii) the member of Voyager Digital, LLC ("OpCo") appointed Stephen Ehrlich, CEO of the Voyager Digital Holdings, Inc., as a director  and Tim Pohl and Jill Frizzley as independent directors; and (iv) the board of OpCo voted to establish the Special Committee comprised of Mr. Pohl and Ms. Frizzley and tasked the Special Committee with, among other things, investigating the Company's historical lending practices, including the facts and circumstances around the 3AC Loan.

### E.    Voyager's Decision to Commence these Chapter 11 Cases.

As the general cryptocurrency market continued to decline, Voyager, like other peer platforms, saw a significant uptick in customer withdrawals—some of which was legitimate—putting additional strain on the Company's business and risking the Company's ability to serve customers who remained on its platform.

On June 23, 2022, Voyager reduced its daily withdrawal maximum from $25,000 to $10,000 per user per day. Putting a cap on withdrawals was necessary to ensure that the Company could effectuate trades for customers on its platform who elected to keep their cryptocurrency assets with Voyager as well as to stabilize the Company's business while it engaged in discussions with potential third-party sponsors. Ultimately, the initial withdrawal limits maximized the Company's ability to continue to provide brokerage services to its customers.[46]

The Debtors hoped that lower withdrawal limits would allow them to stabilize their business. However, as the cryptocurrency markets continued to trend downward, the Debtors realized that further steps were required to preserve customer assets, avoid irreparable damage to the Debtors' business, and ensure that their trading platform operated smoothly for all customers. Accordingly, on July 1, 2022, Voyager froze all withdrawals and trading activity on its platform.

Though Voyager continued to rigorously diligence all potential restructuring transactions, it became clear that a potential strategic transaction would only emerge after the Debtors petitioned for chapter 11 relief.

## VIII.    EVENTS OF THE CHAPTER 11 CASES

### A.    The Stand-Alone Plan.

On July 6, 2022, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17]. On August 12, 2022, the Debtors filed the *First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 287] and accompanying disclosure statement [Docket No. 288] (the "Stand-Alone Plan Disclosure Statement"). The Stand-Alone Plan contemplated, among other things, distributing to Holders of Account Holder Claims their pro rata share of the New Common Stock, available Cash, Coins, the Voyager Tokens, and the 3AC Recovery, each as defined in the Stand-Alone Plan. The Stand-Alone Plan Disclosure Statement, among other things, also made clear that, in parallel to pursuing the Stand-Alone Plan, the Debtors were pursuing a potential transaction to sell the Debtors to a third party either through an asset sale pursuant to section 363 of the Bankruptcy Code or an alternative chapter 11 plan of reorganization.

### B.    First and Second Day Relief and Other Case Matters.

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration. Following hearings on July 8, 2022, and August 4, 2022 (the "Second Day Hearing"), the Bankruptcy Court entered orders granting certain of the First Day Motions and applications on interim and final bases:

(i)    **The Joint Administration Order** authorizing the Debtors to jointly administer and maintain one docket for the chapter 11 cases of Voyager Digital, LLC and its Debtor affiliates [Docket No. 18];

(ii)    **The Foreign Representative Order** authorizing Debtor Voyager Digital Ltd. to act as "foreign representative" in a parallel insolvency case commenced in Canada under the Companies' Creditors Arrangement Act [Docket No. 52];

(iii)    **The Credit Matrix Order** authorizing the Debtors to (a) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (b) file a consolidated list of the Debtors' 50 largest unsecured creditors in lieu of filing lists for each Debtor; and (c) redact certain personal identification information [Docket No. 54];

---

[46]    Approximately 97% of customers on Voyager's platform have less than $10,000 in their accounts.

(iv)       **The Automatic Stay Order** restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and ipso facto protections of the Bankruptcy Code and approving the form and manner of notice thereof [Docket No. 55];

(v)       **The Schedules and Statements Order** authorizing the Debtors to extend the deadline by which the Debtors' Schedules and Statements must be filed by thirty (30) days [Docket No. 59];

(vi)       **Order Retaining Stretto as Noticing Agent** authorizing the Debtors to retain Stretto, Inc. as third-party claims and noticing agent [Docket No. 67];

(vii)       **The Wages Order** authorizing the Debtors to continue paying prepetition wages and certain administrative costs related thereto and continue employee benefits programs [Docket No. 233];

(viii)       **The Taxes Order** authorizing the Debtors to pay certain taxes and fees that accrued or arose in the ordinary course of business before the Petition Date [Docket No. 235];

(ix)       **The Interim Cash Management Orders** authorizing the Debtors to continue utilizing the Debtors' prepetition cash management system [Docket Nos. 53 and 237] (the "Cash Management Motion");[47]

(x)       **The NOL Order** approving certain notifications and procedures regarding the transfer of, and declarations of worthlessness with respect to, common stock of Voyager Digital Ltd. [Docket No. 238];

(xi)       **The Insurance Order** authorizing the Debtors to honor existing insurance obligations [Docket No. 239]; and

(xii)       **The Case Management Order** authorizing the Debtors to set the guidelines and requirements for the administration of their Chapter 11 Cases, including for scheduling purposes [Docket No. 240].

The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.stretto.com/Voyager.

The Debtors also filed several other motions subsequent to the Petition Date to facilitate the Debtors' restructuring efforts and ease administrative burdens. Following the Second Day Hearing, the Bankruptcy Court entered orders granting the following relief:

(i)       **The Interim Compensation Order** approving procedures for the compensation of retained professionals in these Chapter 11 Cases [Docket No. 236];

(ii)       **The Ordinary Course Professionals Order** approving procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses [Docket No. 244]; and

(iii)       **Applications to Retain Professionals** postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including:

       i.       **Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession [Docket No. 234];**

       ii.       **Moelis & Company LLC as Investment Banker and Capital Markets Advisor for the Debtors and Debtors in Possession [Docket No. 299];**

---

[47] On July 15, 2022, the Debtors filed a supplement to the Cash Management Motion that sought authorization to pay prepetition amounts owed on their corporate credit cards issued by Brex, Inc. (the "Supplemental Cash Management Motion") [Docket No. 84]. On July 25, 2022, the Bankruptcy Court entered an order granting the Supplemental Cash Management Motion [Docket No. 138].

    iii.       *Berkeley Research Group, LLC as Financial Advisors for the Debtors and Debtors in Possession [Docket No. 297];*

    iv.      *Quinn Emanuel Urquhart & Sullivan LLP as Special Counsel to Voyager Digital, LLC [Docket No. 242];*

    v.       *Stretto, Inc. as administrative advisor [Docket No. 241];*

    vi.      *Katten Muchin Rosenman LLP as Special Counsel to Voyager Digital Ltd. [Docket No. 732];*

    vii.     *ArentFox Schiff LLP as Special Counsel to Voyager Digital Holdings, Inc. [Docket No. 740];* **and**

    viii.    *Potter Anderson & Corroon LLP as Delaware counsel to the Debtors [Docket No. 798].*

The foregoing professionals, among others, are each integral to the Debtors' restructuring efforts and ultimate emergence from chapter 11. The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

**C.    Appointment of Unsecured Creditors' Committee.**

On July 19, 2022, the U.S. Trustee appointed the official committee of unsecured creditors (the "Committee").[48] The Debtors immediately engaged with the Committee to discuss the Debtors' restructuring efforts, the Plan, and Debtors' proposed case timeline. The seven-member Committee is currently composed of the following members: Russell G. Stewart, Jason Raznick, Brandon Mullenberg, Richard Kiss for Thincan Trust, Christopher Moser, Byron Walker, and Melissa and Adam Freedman. The Committee selected McDermott Will & Emery LLP as legal counsel and FTI Consulting, Inc. as financial advisor.[49]

**D.    Schedules and Statements.**

On July 8, 2022, the Bankruptcy Court entered the *Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, (II) Waiving Requirements to File List of Equity Holders, and (III) Granting Related Relief* [Docket No. 59] extending the deadline by which the Debtors were required to file their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") by an additional thirty (30) days for a total of forty-four (44) days after the Petition Date. Accordingly, the Debtors were required to file the Schedules and Statements by no later than August 18, 2022. This schedule provided creditors with ample time to analyze and evaluate scheduled claims in advance of Solicitation and the General Claims Bar Date.

On August 18, 2022, August 19, 2022, August 22, 2022, September 15, 2022, and November 18, 2022, the Debtors filed their Schedules and Statements [Docket Nos. 311, 312, 321, 429, 430, and 666]. Interested parties may review the Schedules and Statements and any amendments thereto free of charge at https://cases.stretto.com/Voyager.

**E.    Bar Date Motion.**

On July 18, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 98] (the "Bar Date Motion"). On August 8, 2022, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion [Docket No. 218] (the "Bar Date Order"), which established procedures and set deadlines for filing Proofs of Claim against the Debtors and approved the form and manner of the bar date notice (the "Bar Date Notice"). Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and

---

[48]   *See Amended Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 106].

[49]   *See* Docket Nos. 403 and 404.

entities to file Proofs of Claim in these Chapter 11 Cases is October 3, 2022, at 5:00 p.m. Eastern Time (the "General Claims Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is January 3, 2023, at 5:00 p.m. Eastern Time (the "Governmental Bar Date"). The Bar Date Notice was served on August 3, 2022 [Docket No. 226] and published in *The New York Times* (national and international editions) and the *Financial Times* (international edition) on August 10, 2022 [Docket No. 272].

On December 20, 2022, the Debtors filed the *Notice of Presentment and Opportunity for Hearing on Stipulation and Agreed Order Extending the Bar Date for the U.S. Securities and Exchange Commission* [Docket No. 758] thereby agreeing to extend the Governmental Bar Date for the SEC by two weeks to January 17, 2023, at 5:00 p.m. Eastern Time. On December 20, 2022, the Debtors filed the *Notice of Presentment and Opportunity for Hearing on Stipulation and Agreed Order Extending the Bar Date for the States* [Docket No. 792] thereby agreeing to extend the Governmental Bar Date for all states by two weeks to January 17, 2023, at 5:00 p.m. Eastern Time.

### F.    The FBO Motion.

On July 14, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (a) Honor Customer Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency From Customer Accounts With a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course Reconciliation of Customer Accounts, and (e) Continue to Stake Cryptocurrency; and (II) Granting Related Relief* [Docket No. 73] (the "FBO Motion"). The FBO Motion sought to continue certain ordinary course practices, including (i) honoring customer withdrawals from the "for the benefit of" accounts (the "MC FBO Accounts,") held at Metropolitan Commercial Bank; (ii) liquidating customer accounts that hold a negative U.S. dollar balance and sweeping the resulting cash from third-party exchanges into the Debtors' operating accounts; (iii) engaging in ordinary course reconciliation practices related to customer accounts; and (iv) staking cryptocurrency.

On July 29, 2022, the Debtors filed a supplement to the FBO Motion [Docket No. 173] (the "Supplemental FBO Motion," and together with the FBO Motion, the "FBO Motions"), which provided additional information on the prepetition procedures for processing customer withdrawal requests from the MC FBO Accounts, including, among other things, reconciliation of the MC FBO Accounts and funding of any deficit in the MC FBO Accounts on account of ACH chargebacks. On July 30, 2022, Metropolitan Commercial Bank filed a statement in support of the FBO Motion and Supplement [Docket No. 177]. On August 2, 2022, the Committee filed a statement in support of the FBO Motion [Docket No. 193]. On August 5, 2022, the Bankruptcy Court entered the *Order (I) Authorizing the Debtors to (a) Honor Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency from Customer Accounts with a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course Reconciliation of Customer Accounts, and (e) Continue Staking Cryptocurrency; and (II) Granting Related Relief*] [Docket No. 247] (the "FBO Order") approving the FBO Motion. The Debtors worked closely with the Committee regarding the requested relief, and the FBO Order affords the Committee various protections, including the requirement that the Debtors provide the Committee with written notice prior to staking or unstaking cryptocurrency, information sufficient to evaluate staking positions, and Court oversight of staking activities in the absence of agreement between the Committee and the Debtors. On August 11, 2022, the Debtors began returning customer funds in the MC FBO Accounts. To date, the Debtors have returned approximately $245.75 million of customer funds from the MC FBO Accounts.

On December 2, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Compelling the Release of the Reserve Held by Metropolitan Commercial Bank on Debtors' Bank Account and (II) Granting Related Relief* [Docket No. 690] seeking an order from the Bankruptcy Court compelling the full release of the $24 million reserve held by Metropolitan Commercial Bank given that the reserve is no longer necessary now that ACH chargeback period has expired and is in excess of the aggregate balance of the MC FBO Accounts. On January 5, 2023, the Court entered the *Stipulation and Agreed Order Between the Debtors and Metropolitan Commercial Bank* [Docket No. 821] (the "MC Bank Stipulation"), which provides for, among other things, the release of reserve funds and the process to distribute the remaining customer cash in the MC FBO Accounts to such customers.

As set forth in the FBO Motions, Cash in the MC FBO Accounts is not property of the Debtors' Estates. **Accordingly, customer withdrawals from the MC FBO Accounts are permitted to continue in accordance with the FBO Order, and any such customer withdrawals or distributions from the MC FBO Accounts are not included in the treatment provided for under the Plan. Customers have until February 4, 2023 to withdraw**

**their fiat funds from the MC FBO Accounts or will be sent a check in the amount of the applicable customer's funds in the MC FBO Accounts pursuant to the MC Bank Stipulation.**

      G.      **The 3AC Liquidation Proceeding.**

On June 29, 2022, the Eastern Caribbean Supreme Court in the High Court of Justice Virgin Islands (Commercial Division) (the "BVI Court") entered an order appointing Russell Crumpler and Christopher Farmer of Teneo (BVI) Limited as joint liquidators ("Joint Liquidators") to conduct an orderly and equitable wind-down of 3AC pursuant to Part 6 of the British Virgin Islands Insolvency Act, 2003 ("BVI Insolvency Act"). The liquidation of 3AC (the "3AC Liquidation Proceeding") is currently pending in the BVI Court.[50] On July 1, 2022, 3AC filed a petition with the United States Bankruptcy Court for the Southern District of New York (the "3AC Chapter 15 Court") seeking recognition of the 3AC Liquidation Proceeding as a "foreign main proceeding" pursuant to chapter 15 of the Bankruptcy Code (the "3AC Chapter 15 Proceeding").[51]

On July 18, 2022, in accordance with section 179 of the BVI Insolvency Act, the Joint Liquidators established a committee of creditors to work closely with the Joint Liquidators to support the interests of all creditors in the 3AC Liquidation Proceeding. Voyager was one of the five creditors appointed to the committee.[52] On July 28, 2022, the 3AC Chapter 15 Court entered an order granting recognition of the 3AC Liquidation Proceeding as a foreign main proceeding,[53] and on August 22, 2022, and October 7, 2022, respectively, the 3AC Liquidation Proceeding was recognized as a foreign main proceeding by the High Court of the Republic of Singapore (the "Singapore Court")[54] and the Ontario Superior Court of Justice.[55] Additional petitions for recognition as a foreign main proceeding are pending in the Grand Court of the Cayman Islands, Financial Services Division, and the Supreme Court of Seychelles.[56] At a December 2, 2022 hearing in the 3AC Chapter 15 Proceeding, the Foreign Representatives provided the 3AC Chapter 15 Court with an update regarding their efforts to recover 3AC assets and locate the 3AC founders.[57] Following the hearing, the 3AC Chapter 15 Court entered orders entrusting the distribution of 3AC's assets to the Foreign Representatives; establishing a cross-border cooperation and communication protocol among the BVI Court, the 3AC Chapter 15 Court, and the Singapore Court; and granting the Foreign Representatives authority to issue subpoenas to the co-founders of 3AC.[58] On December 29, 2022, the 3AC Chapter 15 Court entered an order authorizing the Foreign Representatives to subpoena one of the co-founders of 3AC using email and Twitter notifications.[59]

Voyager continues to work diligently to maximize its recovery in the 3AC Liquidation Proceeding on account of the 3AC Loan (the "3AC Recovery"). At this time, the amount of any 3AC Recovery is unknown. As set forth in greater detail in Article IV.D of this Disclosure Statement, the 3AC Recovery, if any, will be among the value distributed to Holders of Account Holder Claims and General Unsecured Claims under the Plan.

      H.      **Litigation Matters.**

---

[50]   *See In re Three Arrows Capital Limited*, Case No. BVIHCOM2022/0119 (June 27, 2022).

[51]   *See In re Three Arrows Capital, Ltd*, Case No. 2210920 (Bankr. S.D.N.Y. July 1, 2022).

[52]   The other members of the 3AC creditors' committee are Blockchain.com, CoinList, Digital Currency Group, and MatrixPort.

[53]   *See* Docket No. 47, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. July 28, 2022).

[54]   *See In re Three Arrows Capital Ltd*, Case No. HC/OA 317/2022 (Aug. 22, 2022).

[55]   *See* Docket No. 68, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. Dec. 2, 2022).

[56]   *See Id*.

[57]   *See Id*.

[58]   *See* Docket No. 69, 71, and 72, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. Dec. 6, 2022).

[59]   *See* Docket No. 79, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. Dec, 29, 2022).

1.    *Certain Non-Bankruptcy Litigation Matters*

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. The filing of the Chapter 11 Cases likewise generally stays any legal proceedings commenced to obtain possession of, or to exercise control over, the property of the Debtors' bankruptcy estate.

Further, the Debtors are party to various other legal proceedings (including individual, class and putative class actions as well as federal and state governmental investigations) covering a wide range of matters and types of claims including, but not limited to, securities laws, contracts, and trademark disputes. Such matters are subject to uncertainty and the outcome of individual matters is not predictable.

2.    *Certain Adversary Proceedings*

(a)    *Voyager Digital Holdings, Inc. v. De Sousa, et al.*

On July 6, 2022, a putative class-action litigation was filed in the Ontario Superior Court of Justice (the "Canadian Class Action").[60] The Canadian Class Action alleges claims against Debtor Voyager Digital Ltd. and some of its directors and officers for statutory secondary market liability under Canadian securities law, and common-law negligent misrepresentation. To prove many of the claims against Voyager Digital Ltd. in that suit, the plaintiffs must first establish the underlying liability of the named directors and officers, and then establish that Voyager Digital Ltd. is vicariously liable for their alleged wrongdoing. On August 10, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin prosecution of the Canadian Class Action.[61] On August 11, 2022, the Ontario Superior Court of Justice denied the proposed Canadian Class Action plaintiff's motion seeking appointment of an equity committee and funding of representative counsel in the Canadian foreign recognition proceeding.[62]

(b)    *Voyager Digital Holdings, Inc. v. Robertson, et al.*

On December 24, 2021, a putative class-action complaint was filed against two of the Debtors, Voyager Digital Ltd. and Voyager Digital, LLC, in the United States District Court for the Southern District of Florida, captioned *Cassidy et al. v. Voyager Digital Ltd. et al*. The named plaintiff was a Voyager customer. His complaint, which is publicly available, generally alleged that "Voyager's practices were deceptive, illegal and were the sale of unregistered securities," *Cassidy v. Voyager*, 1:21-cv-24441-CMA (S.D. Fla. Apr. 28, 2022) (Am. Compl. ¶ 5, ECF No. 46). *Cassidy* asserted causes of action under federal and state securities law, and violations of consumer-protection claims under New Jersey and Florida law.

*Cassidy* was litigated for six months prior to the Petition Date. The defendants filed a motion to dismiss the case, and also a motion to compel arbitration of the case. Those motions were pending on the Petition Date. Upon the Petition Date, the Debtors filed a suggestion of bankruptcy on the docket in *Cassidy*, and the District Court administratively closed the case.

After the *Cassidy* court administratively closed the case, the same lawyers who represent the *Cassidy* plaintiffs filed another putative-class-action proceeding in the United States District Court for the Southern District of Florida, this time naming Mark Cuban (owner of the Dallas Mavericks), Dallas Basketball Limited, d/b/a Dallas Mavericks, and Stephen Ehrlich, the Debtors' CEO and co-founder, as defendants. This action is captioned *Robertson et al. v. Cuban et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022) (the "Robertson Action"). The plaintiffs are also Voyager customers and, as proposed class representatives, assert claims against Mr. Ehrlich, Mr. Cuban, and the

---

[60]    *De Sousa v. Voyager Digital Ltd., et al.*, No. CV-22-00683699-00CP (Ontario Superior Court of Justice).

[61]    *Voyager Digital Holdings, Inc. v. De Sousa, et al.*, Adv. Pro. No 22-01133 (MEW).

[62]    *In re Voyager Digital Ltd.*, No. CV-22-00683820-00CL (Ontario Superior Court of Justice).

Dallas Mavericks, for allegedly aiding and abetting Voyager's alleged fraud claimed in the *Cassidy* action; aiding and abetting breach of fiduciary duty; civil conspiracy; and alleged violation of several states' consumer-protection and securities laws. The *Robertson* Complaint repeats the allegations made in *Cassidy* and explicitly claims that *Cassidy* "specifically alleged in detail … how Defendants Mark Cuban and Stephen Ehrlich were key players who personally reached out to investors, individually and through [defendant] Dallas Mavericks, to induce them to invest in the Deceptive Voyager Platform." Counsel representing the Plaintiffs in *Robertson* have advised that they intend to amend their complaint, but have not yet provided an amended complaint or described which claims they may attempt to pursue.

Accordingly, on August 10, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin prosecution of the Robertson action.[63] The *Robertson* adversary proceeding is pending before the Bankruptcy Court and a hearing is set on the matter for October 19, 2022.

The Debtors do not believe that either *Cassidy* or *Robertson* have merit, but Voyager customers may be within the putative class definition provided in each of the filed complaints. To the extent *Cassidy* or *Robertson* assert "direct" claims by individual customers against non-Debtors, such claims are not released by the proposed Plan and Confirmation Order unless, solely with respect to *Cassidy*, Contributing Claimants elect on their ballots or opt-in forms to contribute such claims to the Wind-Down Entity. To the extent *Cassidy* or *Robertson* assert derivative claims, or otherwise assert claims owned by the Debtors and/or the estates, they are released in and/or treated by the proposed Plan.

The Debtors do not believe that any pursuit of *Cassidy* or *Robertson* would have a material impact on creditor recoveries. But it is unclear what impact, if any, attempts to pursue the *Cassidy* or *Robertson* cases following confirmation of the Plan may have on the Wind-Down Debtors, creditors, or third parties. Creditors should obtain their own legal advice if they have questions concerning the viability of these matters (or lack thereof), likelihood of success, or potential impact on their long-term interests.

#### (c)        *Giacobbe v. Voyager Digital Holdings, Inc. et al.*

On September 1, 2022, Jon Giacobbe filed a complaint and commenced an adversary proceeding in the Bankruptcy Court alleging that the Debtors have a nondischargeable debt pursuant to section 523(a)(2)(A) of the Bankruptcy Code for money obtained by false pretenses, false representations, or actual fraud.[64] The *Giacobbe* adversary proceeding is pending before the Bankruptcy Court and a pretrial conference is scheduled for November 29, 2022. The Debtors' response to the complaint is due on October 17, 2022, pursuant to the *Stipulation and Order (1) Extending the Debtor Defendants' Time to Respond to the Complaint and Related Deadlines and (2) Adjourning the Pre-Trial Conference* SINE DIE (Adv. Pro. 22-01145 (MWE) [Docket No. 4]. On November 30, 2022, the Bankruptcy Court entered an order dismissing the *Giacobbe* adversary proceeding [Docket No. 13].

#### (d)        *Voyager Digital Holdings, Inc. v. Adam Lavine and Shingo Lavine.*

On September 27, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin the Lavines from terminating the Debtors' access to and use of the Ethos.io DNS servers that they have used for years.[65] On September 30, 2022, the Lavines and the Debtors jointly agreed to a stipulation and agreed order, which fully resolved the matter, and was subsequently entered by the Bankruptcy Court [Docket No. 11].

---

[63]   *Voyager Digital Holdings, Inc. v. Robertson, et al.*, Adv. Pro. No 22-01138 (MEW).

[64]   *Giacobbe v. Voyager Digital Holdings, Inc. et al.*, Adv. Pro. No 22-01145 (MEW).

[65]   *Voyager Digital Holdings, Inc. v. Adam Lavine and Shingo Lavine*, Adv. Pro. No 22-01150 (MEW).

### I.    The Coinify Sale.

Coinify ApS (along with its subsidiaries, collectively, "Coinify") is a limited liability corporation organized under the laws of Denmark that is a wholly owned subsidiary of Voyager European Holdings ApS ("Voyager Europe"). Voyager Europe is itself a wholly owned subsidiary of Debtor Voyager Digital Ltd. Coinify is a global cryptocurrency payment processor separate and distinct from the Voyager platform that enables buying, selling, and accepting cryptocurrency payment in stores worldwide.

On June 20, 2022, the Debtors engaged Moelis to assist in their exploration of available strategic alternatives, including a sale of the Coinify business. On June 28, 2022, Ascension ApS ("Ascension") submitted an unsolicited offer to purchase Coinify. In the following approximately two weeks, the Debtors and Ascension engaged in arm's-length, robust negotiations. On July 13, 2022, Voyager Europe entered into that certain share purchase agreement by and among Voyager Europe, as seller, and Ascension, as buyer (the "Coinify Purchase Agreement"). The Coinify Purchase Agreement contemplated the sale to Ascension in exchange for $2 million in cash and included an "Earn-Out" payment provision in an amount equal to 12.5% of a subsequent sale transaction of Coinify (capped at $15,000,000), if such sale were to be consummated by Ascension on or before the third anniversary of the Coinify sale closing date. The Coinify Purchase Agreement also contained a standard "fiduciary out" clause that allowed the Debtors to entertain competing offers to purchase Coinify should any such offers emerge. On July 14, 2022, the Debtors filed a motion for entry of an order, among other things, approving the Debtors' entry into the Coinify Purchase Agreement [Docket No. 72] (the "Coinify Motion").

Following the filing of the Coinify Motion the Debtors received indications of interest from several third parties interested in a potential purchase of Coinify. Accordingly, the Debtors adjourned the Coinify Motion while they continued to engage with all interested third parties to achieve a transaction that maximizes the value of the Coinify business. Following good faith, arm's-length negotiations with all potential transaction parties and discussion among the Board and the Debtors' advisors, the Board determined, in its business judgment, that the offer contemplated in the Coinify Purchase Agreement represented the most value maximizing option for the Debtors with respect to the Coinify business. Accordingly, the Debtors scheduled a hearing to approve the Coinify Motion for August 16, 2022. Shortly after the hearing, the Bankruptcy Court entered an order approving the Coinify Motion.

On September 30, 2022, the Debtors received an offer letter from Ascension to convert the "Earn Out" provision of the Coinify Purchase Agreement into a one-time cash payment of $250,000. Ultimately, the Debtors denied the offer because they believe that the "Earn Out" is worth substantially more than the offer received.

### J.    The Key Employee Retention Plan.

On August 2, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 212] (the "KERP Motion" and the plan set forth therein, the "KERP"), seeking approval of a key employee retention program.

The proposed KERP provides for payment of cash retention awards to 38 of the Debtors' non-insider employees who perform essential tasks for the Debtors, including accounting, cash and digital asset management, IT infrastructure, legal, human resources, and other critical functions (each, a "KERP Participant"). KERP Participants possess deep institutional knowledge of the Debtors' operations, the cryptocurrency industry generally, or both. Some KERP Participants maintain critical relationships with counterparties that are essential to the Debtors' business. Further, many KERP Participants are long-tenured employees that developed or helped to build the Debtors' platform. The KERP prevents the attrition of the KERP Participants and, by extension, the need to incur significant operational and financial costs to source and hire new employees.

Following a hearing on August 24, 2022, the Bankruptcy Court entered an order approving the KERP Motion [Docket No. 345].

### K.    Canadian Recognition Proceeding.

On July 12, 2022, the Debtors sought and were granted an Initial Recognition Order and a Supplemental Order by Madam Justice Kimmel of the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to a proceeding commended under Part IV of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c.

C-36 (the "CCAA Recognition Proceedings"). Among other things, the Initial Recognition Order (as amended and restated on August 5, 2022) and the Supplemental Order: (i) recognized the Chapter 11 case of Voyager Digital Ltd. as a foreign main proceeding; (ii) recognized Voyager Digital Ltd. as the Foreign Representative of its Chapter 11 case in Canada; (iii) recognized and gave effect in Canada to certain first-day orders granted by the Bankruptcy Court in Voyager Digital Ltd.'s Chapter 11 case; (iv) granted a stay of proceedings in Canada in respect of Voyager Digital Ltd., its property and business, and its directors and officers; (v) prohibited the commencement of any proceedings against Voyager Digital Ltd. in Canada absent further order of the Canadian Court; and (vi) appointed Alvarez & Marsal Canada Inc. as the Information Officer in respect of the CCAA Recognition Proceedings. On August 11, 2022, the Canadian Court recognized and gave effect in Canada to certain further orders of the Bankruptcy Court made in Voyager Digital Ltd.'s Chapter 11 case.

### L.    The Unwind Motion.

On September 19, 2022, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Return Collateral and (II) Granting Related Relief* [Docket No. 402] (the "Unwind Motion"). The Unwind Motion seeks entry of an order authorizing the Debtors to return collateral held on account of certain loans made by Debtor Voyager Digital, LLC and non-Debtor HTC Trading Inc. to Alameda Research Ltd. (the "Alameda Loan"), as part of and upon Alameda's return of lent cryptocurrency back to the Debtors. On September 28, 2022, the Bankruptcy Court entered an order approving the Unwind Motion [Docket No. 470].

### M.    The Request for Appointment of an Equity Committee.

On September 1, 2022, Shikar S. Partab, a self-identified minority shareholder and investor in Voyager Digital Ltd., filed a letter with the Bankruptcy Court (the "Partab Letter") requesting that the Bankruptcy Court grant several motions, including a motion for an order directing that an equity committee "be appointed to protect minority shareholders in Voyager Digital." *See* Letter [Docket No. 373]. According to the *First Amended Verified Statement Pursuant to Bankruptcy Rule 2019*, Mr. Partab joined an *ad hoc* group of Equity Interest Holders [Docket No. 482]. On September 30, 2022, David Stephenson, a self-identified minority shareholder and investor in Voyager Digital Ltd., filed a letter with the Bankruptcy Court in support of the Partab Letter and the relief sought therein, including the appointment of an equity committee [Docket No. 491]. On October 3, 2022, the United States Trustee filed the *Statement of the United States Trustee Regarding Motion for Entry of an Order Directing the United States Trustee to Appoint an Official Equity Committee* noting the legal and statutory framework for appointment of an equity committee and declining to take a position of the appointment of an equity committee in the Debtors' chapter 11 cases. The Debtors intend to object to the request sought in the Partab Letter. Pursuant to the *Notice of Adjournment*, the hearing on the Partab Letter is set for January 24, 2023. [Docket No. 682].

### N.    The Post-Petition Sale Process and the Collapse of FTX.

On July 14, 2022, Moelis distributed a letter to prospective buyers with key information regarding the Debtors' marketing process (the "Process Letter"). Among other things, the Process Letter requested that all parties interested in purchasing the Company submit a non-binding indication of interest (an "Indication of Interest") by no later than 12:00 p.m., prevailing Eastern Time, on Friday, July 29, 2022 (the "IOI Deadline"), and set forth the minimum requirements that any Indication of Interest must meet in order to be considered by the Company.

On July 21, 2022, the Debtors filed the Bidding Procedures Motion. The Bidding Procedures Motion was approved by the Bankruptcy Court on August 5, 2022.

The Bidding Procedures established an open process for the solicitation, receipt, and evaluation of Bids for the Debtors' equity and/or assets pursuant to section 363 of the Bankruptcy Code or Confirmation of a Plan. The Bidding Procedures complemented and continued the Prepetition Marketing Process described in greater detail in Articles II and III herein. The timeline set forth in the Bidding Procedures was calculated to balance the need to provide adequate notice to parties in interest and potential bidders with the need to run an expeditious and efficient sale process. Ultimately, the Bidding Procedures provided the Debtors with a clear and fair process to ascertain interest in the Debtors' assets and facilitate a sale of the Debtors if a value-maximizing bid was received.

As of the Bid Deadline (as defined in the Bidding Procedures), the Debtors had received multiple bids with varying structures and terms. On September 13, 2022, the Debtors commenced the Auction in accordance with the

Bidding Procedures. The Auction spanned two weeks and featured multiple rounds of bids. The Debtors and their advisors, in consultation with the Committee and its advisors, scrutinized each bid closely, analyzing (a) the assets sought to be purchased, (b) the total expected deal consideration, (c) the certainty of each bidder's ability to close a transaction and the timing thereof (including any anticipated delays to closing and the cost to the Debtors of such delays), (d) the expected net benefit to the estates, including recoveries to customers, and (e) other criteria considered by the Debtors in their reasonable, good-faith business judgment. Importantly, the Debtors also analyzed whether each bid would provide greater value to the Debtors' stakeholders than the Standalone Plan. The Debtors consulted closely with the Committee throughout the Auction and these chapter 11 cases more generally.

Ultimately, the Debtors, in consultation with the Committee, determined that the bid received from FTX US was the highest and otherwise best bid available at the Auction and would provide meaningful value to the Debtors' estates and stakeholders. On September 27, 2022, the Debtors and FTX executed the FTX Purchase Agreement memorializing the terms of the FTX bid. The FTX Purchase Agreement contained a "no-shop" provision that the parties later amended at the direction of the Court[66] to provide the Debtors greater flexibility to entertain incoming bids from potential transaction parties if such bids were reasonably likely to lead to a higher and otherwise better offer.[67] On October 20, 2022, the Court entered an order approving the Debtors' entry into the FTX Purchase Agreement[68] with the modified "no-shop" provision. On October 24, 2022, the Debtors filed solicitation versions of their Disclosure Statement and Plan,[69] solicitation of the Plan commenced in earnest shortly thereafter as the Debtors embarked towards confirmation, which, among other things, would have effectuated the FTX Transaction.

The Debtors' journey to consummation of the FTX Transaction and confirmation of the Plan was derailed over the ensuing weeks. Indeed, on November 11, 2022, Mr. Bankman Fried resigned as CEO and FTX announced that FTX and approximately 130 of its affiliates, including FTX US, had commenced filing for chapter 11 protection in the United States Bankruptcy Court for the District of Delaware.[70] Shortly prior to FTX's bankruptcy filing, Kirkland sent a letter on behalf of the Debtors to Sullivan & Cromwell LLP ("S&C"), counsel to FTX, informing S&C that FTX had until 12:00 p.m. Eastern Time on November 11, 2022, to indicate whether it intends to close the FTX Transaction or the Debtors would seek emergency relief from the Court to be released from the "no-shop" provision of the FTX Purchase Agreement. S&C responded shortly thereafter confirming that FTX had released the Debtors from the "no-shop" provision but did not indicate whether FTX intends to pursue or abandon the FTX Transaction. On December 9, 2022, the Debtors filed with this Court the *Joint Stipulation and Agreed Order Between the Debtors and FTX US* terminating the FTX Purchase Agreement [Docket No. 717]. On December 21, 2022, FTX filed a motion seeking approval of such stipulation by the court overseeing the FTX Bankruptcy Proceeding as well.[71]

While the FTX Bankruptcy Proceeding is still unfolding, early indications are that Mr. Bankman-Fried and FTX were carrying on one of the largest financial failures of all time. Mr. John Ray III, who was appointed Chief Executive Officer of FTX following the resignation of Mr. Bankman-Fried and who oversaw the restructuring of Enron, commented in an early filing in the FTX Bankruptcy Proceeding that "[n]ever in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information."[72]

---

[66] *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. Oct. 19, 2022) Hr'g Tr. 45:21–46:6.

[67] *See* Asset Purchase Agreement, Docket No. 472, Exhibit B, § 5.2.

[68] Docket No. 581.

[69] Docket Nos. 590 and 591.

[70] *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

[71] *Motion of Debtors for Entry of an Order (A) Authorizing the Debtors to Enter Into the Stipulation with Voyager Digital, LLC and (B) Granting Related Relief* [Docket No. 283], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Dec. 21, 2022).

[72] *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 24], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 17, 2022); *see also United States of America v. Samuel Bankman-*

The collapse of FTX caused a ripple effect across the broader digital currency industry as cryptocurrency businesses with large outstanding loans to FTX and its affiliates faced the prospect of having to write down hundreds of millions of dollars in balance sheet assets[73] and other businesses saw their value and future prospects crater along with the price of Bitcoin and other cryptocurrencies.[74] In the days and weeks following commencement of the FTX Bankruptcy Proceeding, major cryptocurrency players announced that they had suspended withdrawals.[75]

Following the announcement of the FTX bankruptcy, the Debtors received numerous inbound inquiries from potential transaction parties interested in consummating a transaction with the Debtors, and, following their release from the "no-shop" provision in the FTX Purchase Agreement, the Debtors began proactively to reengage with other potential transaction parties regarding a potential acquisition of the Debtors' business. Over the course of four weeks, the Debtors engaged in good-faith, arm's length negotiations with numerous potential transaction parties regarding a variety of deal structures and terms. Several of the parties had already conducted substantial diligence on the Debtors' businesses during prior marketing processes, and additional parties with whom the Debtors had not previously engaged entered into non-disclosure agreements and gained access to the Debtors' virtual dataroom. The Debtors conducted additional management meetings and responded to dozens of diligence requests from potential transaction parties during this process. Ultimately, following extensive discussions and consultation with their advisors and the Committee, the Debtors determined, in an exercise of their business judgment, that the offer submitted by Binance.US represented the highest and otherwise best offer to purchase the Debtors' business, and on December 18, 2022, the Debtors entered into the Asset Purchase Agreement.

In connection with the evaluation of the Binance.US bid, the Debtors' advisors conducted certain financial and business counterparty due diligence on Binance.US. This due diligence included reviews of certain documentation and discussions with senior management at Binance.US relating to: audited financial statements, interim unaudited financial statements, available liquidity, related party services agreements, wallet infrastructure, AML/KYC procedures, money transmitter licensing status, and business plans submitted to selected state regulators in connection with the issuance of money transmitter licenses.

The Debtors value the Sale Transaction at approximately $1.022 billion, comprising (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which as of December 19, 2022 at 0:00 UTC, is estimated to be $1.002 billion, plus (ii) additional consideration, which is estimated to provide at least $20 million of incremental value. The Sale Transaction also includes additional benefits, such as it (i) provides the most tax efficient route forward as the Binance.US Platform will provide the means for Account Holders to access 100% of the cryptocurrency types held by Account Holders on the Debtors' platform, (ii) it is the only transaction available to the Debtors that did not require the Debtors to liquidate cryptocurrency for working capital purposes, (iii) includes reimbursement by Binance.US of up to $15 million of Seller's expenses, (iv) provides a $10 million reverse termination fee payable to the Seller by Binance.US to compensate the Debtors' estates in the event that Binance.US cannot consummate the transaction, and (v) in the event that the Debtors pivot to the Liquidation Transaction, provides that Binance.US will provide certain services to facilitate such transaction to ensure that the Debtors can rely on the Binance.US Platform to minimize leakage with and cybersecurity risks when returning cryptocurrency to creditors.

---

*Fried*, 22-crim-673 (S.D.N.Y. December 9, 2022); *Securities and Exchange Commission v. Samuel Bankman-Fried*, Civil Action. No. 22-cv-10501 (S.D.N.Y. Dec. 13, 2022).

[73]  Reuters, "Factbox: From Binance to Voyager, Crypto Firms' Exposure to FTX Is Coming to Light," November 14, 2022, https://www.reuters.com/technology/binance-voyager-crypto-firms-exposure-ftx-is-coming-light-2022-11-14.

[74]  Cointelegraph, "The FTX Contagion: Which Companies Were Affected by the FTX Collapse?" November 17, 2022, https://cointelegraph.com/news/the-ftx-contagion-which-companies-were-affected-by-the-ftx-collapse.

[75]  Press Release, "November 11, 2022 BlockFi Update," November 11, 2022, https://blockfi.com/november-11-2022-blockfi-update; Press Release, "Important Update: Forward Through Adversity," November 13, 2022, https://trends.aax.com/important-update-forward-through-adversity; Press Release, "An Important Message Regarding Gemini Earn," November 16, 2022, https://www.gemini.com/blog/an-important-message-regarding-gemini-earn; Wall Street Journal, "Crypto Lender Genesis Suspends Withdrawals After FTX Collapse," November 16, 2022, https://www.wsj.com/articles/crypto-lender-genesis-suspends-withdrawals-after-ftx-collapse-11668607332; Press Release, "Important Updates on Services at Liquid," November 21, 2022, https://blog.liquid.com/important-updates-on-services-at-liquid.

Importantly, the Asset Purchase Agreement contains a "Fiduciary Out," which provides that the Seller may terminate the Asset Purchase Agreement at any time in the event that not doing so would be inconsistent with the Seller's fiduciary duties. Moreover, the structure of the proposed transaction, including its "Fiduciary Out," permits the Debtors to toggle *either* to a higher and better third-party bid (should one emerge) *or* to the Liquidation Transaction, if the Debtors determine in their business judgment between now and closing that the Sale Transaction is no longer the highest and best option for any reason. Based on the diligence the Debtors have performed to date on their proposed counterparty, they believe the Sale Transaction is the highest and best option. But the Debtors recognize that the cryptocurrency industry is experiencing an extremely volatile period for an already volatile business, and the Debtors continue to monitor what seem to be daily developments in the sector. Not only does the structure of the proposed transaction permit the debtors to pivot to the Liquidation Transaction if they conclude the Asset Purchase Agreement is no longer higher and better due to a development along the way, but the work to prepare to consummate and execute on the Asset Purchase Agreement will better prepare the Debtors to complete the Liquidation Transaction if the toggle becomes necessary.

The Sale Transaction can be effectuated quickly, provides a meaningful recovery to creditors, and allows the Debtors to facilitate an efficient resolution of these Chapter 11 Cases, after which Binance.US's market-leading, secured trading platform will enable customers to trade and store cryptocurrency. The terms of the Purchaser's offer are set forth in greater detail in the Asset Purchase Agreement. Due to this comprehensive marketing process, the robust Auction, and the extensive, arm's length negotiations with multiple potential transaction parties following the collapse of the FTX Transaction, the Debtors believe that the Sale Transaction is the most value-maximizing transaction under the facts and circumstances.

On December 30, 2022, the United States Attorney for the Southern District of New York filed the "Notice of the United States of America Concerning the Review of Certain Transactions by the Committee on Foreign Investment in the United States" ("CFIUS") review on the Sale Transaction [Docket No. 797] (the "CFIUS Notice"). The Sale Transaction is potentially subject to CFIUS review as CFIUS may review certain transactions involving foreign person(s) acquiring control of any business or investment in the United States in order to determine the effect of such transactions on the national security of the United States, and to mitigate risks arising from those transactions. The Debtors and Binance.US have been in discussion with CFIUS and intend to make a voluntary filing with CFIUS regarding the Sale Transaction. As set forth in the CFIUS Notice regarding the Sale transaction, there is risk that CFIUS takes action that could materially affect the Sale Transaction. In the event of any action taken by CFIUS that arises to that level, the Debtors will toggle to the Liquidation Transaction under the Plan as described in Article V.B.2 of this Disclosure Statement.

O.    **The Special Committee Investigation.**

As described in Article VII.D, on July 5, 2022, OpCo formally formed the Special Committee comprised of disinterested directors Timothy Pohl and Jill Frizzley. The Special Committee was vested with the authority to, among other things: (a) investigate any historical transactions, public reporting, or regulatory issues undertaken by OpCo that the Special Committee deemed necessary or appropriate, and the facts and circumstances surrounding such transactions; (b) interview and solicit information and views from management, representatives, consultants, advisors, or any other party in connection with any historical transactions undertaken by OpCo that the Special Committee deems necessary or appropriate; (c) request documentation and information regarding OpCo's business, assets, properties, liabilities and business dealings with respect to any historical transactions undertaken by Voyager that the Special Committee deems necessary and appropriate to review; (d) perform any other activities consistent with the matters described herein or as the Special Committee or Voyager's board of directors otherwise deems necessary or appropriate; and (e) conduct an independent investigation with respect to any potential estate claims and causes of action against insiders of Voyager, including any claims arising from loans made to 3AC. *Id.* The Special Committee retained the Special Committee Counsel to provide independent advice to, and act at the exclusive direction of, the Special Committee in connection with the Special Committee's mandate.

During its investigation, counsel for the Special Committee sought and received information related to, among other things: Voyager's loans to 3AC, Alameda, Celsius and numerous other borrowers; the diligence performed in connection with those loans; Voyager's staking of customer cryptocurrency assets; Voyager's regulatory compliance; pre-petition payments to insiders and third parties; and numerous other aspects of Voyager's business. The Special Committee drafted and negotiated a protective order, which was later entered by the Bankruptcy Court, to protect the confidentiality of the information sought and received. Voyager collected and provided to the Special

Committee responsive documents from its internal hard copy and electronic files, from its outside counsel, and from various third parties (e.g., cryptocurrency custodians and exchanges). Among many other things, Voyager collected email, Slack communications, and, in certain cases, Telegram and cell phone data—from a dozen Company employees, including all of Voyager's most senior officers and others. In addition to several voluminous spreadsheets of data, Voyager produced over 12,000 documents—collectively totaling over 50,000 pages—related to, among other things: loans between Voyager and its counterparties; the diligence performed by Voyager in connection with those loans; internal and external communications regarding those loans; meetings of Voyager's Risk Committee and board of directors; detailed information regarding Voyager's staking of customer assets; Voyager's applications for money transmitter licenses; audits for compliance with applicable laws and regulations; communications with Voyager's regulators; Voyager's public statements; Voyager's tax filings and financial statements; and detailed information regarding intercompany transfers and payments to insiders. No information was withheld from the Special Committee on privilege grounds.

In addition to reviewing the above-referenced documents, counsel for the Special Committee also interviewed numerous Voyager employees, including Steve Ehrlich (CEO), Gerard Hanshe (COO), Evan Psaropoulos (CCO), Ashwin Prithipaul (CFO), Pamela Kramer (CMO), David Brosgol (General Counsel), Marshall Jensen (Head of Corporate Development), Ryan Whooley (Head of Treasury and Trading), Jon Brosnahan (Treasurer), Brian Silard (Treasury Team), David Brill (Deputy General Counsel), and Manisha Lalwani (in-house regulatory counsel). Collectively, the interviews performed during the Special Committee's investigation lasted more than 55 hours, and covered in great detail a wide-range of topics.

## IX. RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE WIND-DOWN DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

### A. Risks Related to the Restructuring.

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors or the Plan and its implementation.

### 1. *The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions Are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors*

If the Restructuring Transactions are not implemented, the Debtors will consider all other restructuring alternatives available, which may include the filing of an alternative chapter 11 plan, conversion to chapter 7, or any other transaction that would maximize the value of the Debtors' estates. Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would also have other adverse effects on the Debtors. For example, it would also adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' ability to retain key employees;

- the Debtors' ability to retain account holders;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, and lenders; and

- the Debtors' enterprise value.

2.    ***Certain Bankruptcy Law Considerations***

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

(a)    **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  As provided in the Plan and this Disclosure Statement, the Debtors are not seeking to substantively consolidate and recoveries on account of Claims against or Interests in any Debtor shall be determined on a Debtor-by-Debtor basis.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims and Interests that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(b)    **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

(c)    **Failure to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

(d)    **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by the Bankruptcy Court that:  (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or

whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures, and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. If a chapter 11 plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to consummate the Sale and what, if anything, Holders of Allowed Claims against them would ultimately receive with respect to their Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### (e)    Nonconsensual Confirmation.

In the event that any Impaired Class of Claims or Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements, and the Debtors will request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Professional Fee Claims.

### (f)    Continued Risk After Consummation.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as increasing expenses and further industry deterioration or other changes in economic conditions. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan reflecting the Plan will achieve the Debtors' stated goals.

### (g)    Filing of a Competing Plan.

At the outset of the Chapter 11 cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors have retained the exclusive right to propose the Plan since filing their chapter 11 petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan in order to achieve the Debtors' stated goals because creditors and others may propose a plan.

### (h)    The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

(i)    **The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(j)    **Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will in fact occur.

(k)    **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies could affect distributions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

(l)    **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including releases by third parties of claims that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

3.    *The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims against or Interests in the Debtors*

The Debtors have not obtained or requested a fairness opinion from any banking or other firm as to the fairness of the consideration under the Plan.

4.    *Governmental Approvals May Not Be Granted*

Consummation of the Restructuring Transactions may depend on obtaining approvals of certain Governmental Units that may be necessary or advisable. Failure by any Governmental Unit to grant an approval could prevent or impose limitations or restrictions on Consummation of the Restructuring Transactions and Confirmation of the Plan.

B.    **Risks Related to Recoveries under the Plan.**

1.    *The Debtors Cannot Guarantee Recoveries or the Timing of Such Recoveries*

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims and Allowed Interests, it is possible that the actual amount of such Allowed Claims and Allowed Interests is materially different than the Debtors' estimates. Creditor recoveries could be materially reduced or eliminated in this instance. In addition,

the timing of actual distributions to Holders of Allowed Claims and Allowed Interests may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guaranty the timing or amount of any recovery on an Allowed Claim or an Allowed Interest.

**2.      The Debtors Are Subject to the Volatility of Cryptocurrency**

The volatility of cryptocurrency may adversely affect the fair market value of Voyager's Cryptocurrency, which could result in lower recoveries for creditors than the Debtors' current estimates based on the Fair Market Value as of December 19, 2022.

**3.      The Plan May Diminish the Value of VGX**

Upon confirmation of the Plan and approval of the Sale Transaction, Binance.US will review VGX to determine whether VGX meets its standards to be listed for trading on the Binance.US Platform. Regardless of whether VGX meets the standards to be listed for trading on the Binance.US Platform, holders of VGX will be able to receive their VGX tokens in kind and withdraw them from the Binance.US Platform. The Debtors' business operations will be winding down following the Effective Date and consummation of either the Sale Transaction or the Liquidation Transaction. Binance.US is not purchasing the VGX private keys and the Debtors will continue to engage with third parties regarding a sale of the VGX private keys to provide utility to VGX post-consummation of the Sale Transaction or the Liquidation Transaction as applicable. In the event that the VGX private keys are not sold to a third party, VGX will have no utility going forward and may have no value. Voyager will not be able to support commitments to VGX following the Effective Date and, in the event the Sale Transaction is consummated, Binance.US will not otherwise assume such obligations.

**4.      The Tax Implications of the Debtors' Bankruptcy and Restructuring Are Highly Complex**

Holders of Allowed Claims and Allowed Interests should carefully review Article XII of this Disclosure Statement, entitled "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

**5.      The Closing Conditions of the Sale Transaction May Not Be Satisfied**

It is possible that the Debtors may not satisfy the closing conditions of the Sale Transaction. A failure to satisfy any of the closing conditions of the Sale Transaction could prevent the Sale Transaction and the Plan from being consummated, which could lead to the Chapter 11 Cases being converted to cases under chapter 7.

**C.      Disclosure Statement Disclaimer.**

**1.      The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed**

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

**2.      No Legal or Tax Advice Is Provided By This Disclosure Statement**

This Disclosure Statement is not legal advice to any person or Entity. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each reader should consult their own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation of the Plan.

**3.      No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Wind-Down Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

### 4.   *Failure to Identify Litigation Claims or Projected Objections*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims and Interests after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims and Interests.

### 5.   *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors*

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

### 6.   *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Furthermore, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 7.   *No Representations Outside This Disclosure Statement Are Authorized*

**NO REPRESENTATIONS CONCERNING OR RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE VOTING HOLDERS' ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY VOTING HOLDERS IN ARRIVING AT THEIR DECISION. VOTING HOLDERS SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE SOUTHERN DISTRICT OF NEW YORK.**

### D.   Miscellaneous Risk Factors and Disclaimers.

### 1.   *The Debtors are Subject to an Extensive and Highly Evolving Regulatory Landscape and Any Adverse Changes to, or Their Failure to Comply with, any Laws and Regulations Could Adversely Affect Their Brand, Reputation, Business, Assets, Operating Results, and Financial Condition*

The Debtors' business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which the Debtors operate, including those governing money transmission, financial services, banks and trust companies, securities, broker-dealers and alternative trading systems, or ATS, commodities and commodities interests such as derivatives, credit, cryptocurrency asset custody, exchange, and transfer, cross-border and domestic money and cryptocurrency asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, retail protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing, among others.

74

Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, cryptocurrency assets, and related technologies. As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptocurrency economy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions. These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another and may conflict with one another. Moreover, the complexity and evolving nature of the Debtors' business and the significant uncertainty surrounding the regulation of the cryptocurrency economy require the Debtors to exercise their judgment as to whether certain laws, rules, and regulations apply to the Debtors, and it is possible that governmental bodies and regulators may disagree with their conclusions. To the extent the Debtors have not complied with such laws, rules, and regulations, the Debtors could be subject to significant fines, revocation of licenses (including Money Transmission Licenses as described in IV.F), limitations on their products and services, cease and desist orders in one or more states, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect their business, operating results, and financial condition.

Additionally, economic and trade sanctions, anti-money laundering, and anti-terrorism laws in the United States and other jurisdictions may restrict the Debtors' business from engaging in transactions in or relating to certain countries, individuals, and entities. The imposition of sanctions and related restrictions by different jurisdictions have been evolving quickly, including in response to the military conflict between Russia and Ukraine, and the ultimate impact on global economic and commercial activity as well the financial condition and performance of the Debtors' business and assets is difficult to predict.

In order to operate its business, Voyager currently maintains state money transmission licenses or their equivalents (each, a "Money Transmission License") in seventeen (17) states[76] and has license applications pending[77] in eighteen (18) states.[78]

The Debtors have engaged with the state banking departments throughout the bankruptcy process and will continue to actively do so with the goal of ensuring that Plan provides for compliance by Voyager with state money transmission laws. The state banking departments may have broad discretion as to the approvals required in connection with the Plan, thus it is not possible to predict with certainty the scope of such approvals, whether they will ultimately be granted, and the expected timeframes of the state banking departments' determinations. There are unresolved questions of law with respect to the intersection of state money transmission statutes and the Bankruptcy Code, and the answers to those questions may impact the ability of the state banking departments to require certain approvals with respect to confirmation of the Plan.

Following confirmation of the Plan, Voyager will take steps to (i) withdraw those money transmission license applications that are pending with state banking departments and (ii) surrender those Money Transmission Licenses it

---

[76]    The Alaska Division of Banking and Securities suspended Voyager's license on July 6, 2022, and subsequently reversed such suspension on July 14, 2022. There is a risk that one or more additional state banking departments may choose to suspend Voyager's Money Transmission Licenses going forward, or that one more states in which Voyager is licensed may decline to renew Voyager's licenses for 2023 based on regulatory concerns and/or the requirements of their money transmission statutes.

[77]    On July 17, 2022, the North Dakota Department of Financial Institutions notified Voyager that it required Voyager's pending money transmitter license application be withdrawn on grounds that it would not approve an application with an active bankruptcy filing. Other states have likewise inquired as to whether Voyager will seek to withdraw its pending applications or indicated they may require Voyager to do so. While Voyager is seeking to keep its applications on file with the state banking departments and has not withdrawn any applications, there is a risk that one or more state banking departments with which Voyager has pending applications may require Voyager to do so going forward.

The Debtors have two applications pending in New York: (a) a money transmitter license application and (b) a virtual currency business activity license application or "Bitlicense." Voyager Digital NY, LLC, a non-operational affiliate of the Debtors, filed such applications.

[78]    Voyager also maintains a registration as a "money services business" with the Financial Crimes Enforcement Network ("FinCEN") pursuant to federal money transmission laws. A change in ownership of an entity registered with FinCEN requires notice to FinCEN following consummation of the relevant transaction, but does not require prior regulatory approval.

holds (the "Licensing Wind-Down Process"). Such Licensing Wind-Down Process will require notice to, and in some cases approval by, those state banking departments in states where the Debtors have applications pending or are licensed pursuant to the requirements set forth in each state money transmission statute and as otherwise required by the relevant state banking departments.[79]

> ### 2.    The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations

The Debtors are currently subject to or interested in certain legal proceedings, some of which may adversely affect the Debtors or the Wind-Down Debtors, as applicable. In the future, the Debtors or the Wind-Down Debtors may become parties to additional litigation, including enforcement actions brought by state banking departments with respect to Voyager's historical compliance with money transmission laws, which could result in significant fines. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect recoveries to creditors in these Chapter 11 cases. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Debtors, however, could be material.

On January 5, 2022, Voyager received from the U.S. Securities and Exchange Commission ("SEC") a subpoena requesting certain information and documents. In response, Voyager actively dialogued with and provided the SEC staff with the requested material. The subpoena and dialogue related primarily to two issues: (1) whether the Rewards Program feature of the Voyager Account (also referred to as the "Earn Program" or "Voyager Earn Account") involved a securities offering and (2) whether Voyager or any of its affiliated entities required registration under the Investment Company Act of 1940. As a follow-up, on July 15, 2022, the SEC staff issued a second subpoena with additional requests for information and documents relating to public statements, internal communications, and third-party communications after May 1, 2022, and certain minutes, policies and procedures, internal documentation, loan agreements, due diligence, and June 30, 2022 financial statement information. As it does with most subpoenas, the SEC staff included a cover letter stating, among other things, "The investigation and the subpoena do not mean that we have concluded that your client or anyone else has violated the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security." Since then, Voyager has produced certain of the requested material and continues to work to provide the SEC with the remaining responsive material. As before, Voyager continues to dialogue with the SEC regarding the Voyager business and document and information requests.

On July 28, 2022, the FDIC and Federal Reserve Board issued a joint letter and a joint press release regarding potential false or misleading representations as to Voyager's deposit insurance status, and demanded immediate corrective action to address any false or misleading statements. While the Debtors disagree with the FDIC and Federal Reserve Board's position, the Debtors nonetheless took immediate steps to ensure that statements made as to the deposit insurance status of funds held through the Voyager platform are accurate. Following receipt of Voyager's responses on August 1, 2022 and August 9, 2022, the FDIC and the Federal Reserve Board requested additional information from Voyager. Voyager responded to those requests on October 28, 2022 and October 31, 2022.

Separate from the matters pertaining to the FDIC and Federal Reserve Board's letter dated July 28, 2022, the Federal Reserve Board on September 29, 2022 requested certain information pertaining to Voyager's operations; Voyager made an initial production in response to such request on November 10, 2022, and anticipates making further productions in satisfaction of the Federal Reserve Board's request.

On August 1, 2022, Voyager received from the Commodity Futures Trading Commission a letter seeking certain information and documents from Voyager on its business, its customers and its lending activities prior to its chapter 11 proceedings. On September 12, 2022, Voyager received a subpoena requesting the same information and documents. Voyager is working to provide the CFTC with information that its responsive to its requests.

On November 23, 2022, the Federal Trade Commission issued a civil investigative demand to Voyager seeking certain information from Voyager regarding its business.

---

[79]    The state approval process for the surrender of a license typically takes several months.

In addition to these federal subpoenas, requests for information, and cease and desist orders, Voyager has also received a number of administrative proceeding inquiries and orders from state securities regulators relating to the Rewards Program.  The states have alleged or asserted in a variety of ways that the accounts involved unregistered securities offerings.  Below is a brief summary of Voyager's contacts with applicable state regulators concerning the Rewards Program.

Alabama issued a show cause order[80] on March 29, 2022, which required a response within twenty-eight (28) days.  Alabama extended the response deadline to January 5, 2023.  On July 7, 2022, Alabama also issued a subpoena for information on Voyager customers, board of directors materials and other information related to the chapter 11 proceedings.  Voyager has produced all of the requested materials.

Indiana issued a cease and desist order[81] on March 29, 2022.  Given that neither the Voyager Account nor the Rewards Program is active, and given Voyager's current status in these Chapter 11 Cases, Voyager has requested an extension with respect to deadlines in connection with responding to Indiana's order.

Kentucky issued an emergency cease and desist order[82] on March 29, 2022.  Kentucky denied Voyager's request for a stay of effectiveness of the order on May 27, 2022.  Kentucky's order is still in effect.  Voyager has the option to request a hearing, but otherwise, there is no pending deadline.  Voyager ceased offering Rewards to all customers as of June 1, 2022 pursuant to the order.  Separately, on July 6, 2022, Kentucky asked for information in connection with Voyager's Kentucky customers.  Voyager produced that information on July 8, 2022.

New Jersey issued a cease and desist order[83] on March 29, 2022 with an effective date of April 29, 2022. Per New Jersey's communications with Voyager and an order issued on June 29, 2022, a version of the order is in effect as of July 31, 2022.  Specifically, Voyager has ceased offering Rewards to new customer accounts opted into the Rewards Program feature and has ceased offering Rewards for new assets contributed to existing such accounts.  Given that neither the Voyager Account nor Rewards Program is active, and given Voyager's current status in these Chapter 11 Cases, Voyager has requested an extension with respect to deadlines in connection with responding to New Jersey's order.

Oklahoma issued a cease and desist order[84] on March 29, 2022.  At Voyager's request, Oklahoma stayed the effectiveness of its order multiple times, but lifted the stay on July 29, 2022.  Most recently, given that neither the Voyager Account nor Rewards Program is active, and given Voyager's current status in these Chapter 11 Cases, Voyager has requested an extension with respect to deadlines in connection with responding to Oklahoma's order.

---

[80]  Alabama's show cause order required Voyager to show, within a certain period of time, why Voyager should not be directed to cease and desist from selling unregistered securities within the state.

[81]  Indiana's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering and selling securities unregistered/noncompliant under Indiana securities laws/codes; accepting additional assets into existing Voyager Rewards Accounts; and committing any further violations of the Indiana securities laws/codes.

[82]  Kentucky's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: soliciting or selling any security in Kentucky unregistered with the state's Department of Financial Institutions; and engaging in any other activity that would otherwise violate the Kentucky securities laws.

[83]  New Jersey's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling unregistered/nonexempt securities; accepting additional assets into existing Rewards Accounts; and violating any other provisions of the state's securities laws.

[84]  Oklahoma's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts to Oklahoma residents; and allowing further deposits into such existing accounts of Oklahoma residents.

South Carolina issued a cease and desist order and notice of opportunity for a hearing[85] on March 29, 2022. South Carolina stayed the effectiveness of its order and extended the applicable response deadlines multiple times. The order went into effect on August 1, 2022, but all response deadlines have been extended until January 31, 2023.

Vermont issued a show cause order on March 29, 2022. At Voyager's request, Vermont extended the deadline to respond to the order multiple times. On July 13, 2022, Vermont issued a subpoena for information on Voyager's Vermont customers and other information related to the chapter 11 proceedings. Voyager has produced some of the requested materials and continues to work with Vermont with the remaining responsive materials. On September 14, 2022, Vermont issued an *ex parte* order to cease and desist, as well as a standstill agreement, under which all deadlines in connection with responding to the order are suspended for ninety (90) days.

Washington issued a statement of charges and notice of opportunity for a hearing[86] on March 29, 2022. In response on April 15, 2022, Voyager submitted its application for an adjudicative hearing. On May 16, 2022, Voyager and Washington confirmed their agreement, in which Voyager would waive its right to a speedy hearing but maintain its right to request a hearing. Washington agreed to extend all applicable response deadlines until October 1, 2022. Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Washington's order.

Texas issued a notice of hearing[87] on April 12, 2022. The hearing has been scheduled for January 25, 2023. Prior to this hearing, both Texas and Voyager must pre-file all exhibits they intend to offer at the hearing; provide those exhibits to each other by email; number each exhibit sequentially; paginate or bates stamp multipage documents; and identify witnesses they intend to rely on and file witness statements accordingly.[88]

California issued a desist and refrain order[89] on June 3, 2022. As part of a prior agreement with California, on July 11, 2022, Voyager requested a hearing while waiving its right to have the hearing held within fifteen business days. In exchange, California agreed that it would not petition the superior court to enforce the order on or before July 31, 2022. Per a conversation with the state regulator on August 1, 2022, the department has no reason to go to

---

[85]  South Carolina's order alleged that Voyager Rewards Accounts were securities and required Voyager to: cease and desist from transacting business in the state in violation of the states securities laws; pay a civil penalty of $2,149,800.00 if the order becomes effective by operation of law or, if Voyager seeks a hearing, pay a civil penalty not to exceed $10,000 for each violation. The notice of hearing informed Voyager of its right to request a formal hearing to contest the statements and allegations made therein.

[86]  Washington's statement of charges notified Voyager that Washington had reason to believe Voyager had violated the state's securities laws and contained a list of tentative findings of fact and conclusions of law. Based on the findings and conclusions alleged therein, the statement issued a notice of intent to order Voyager to cease and desist from certain activities, impose fines, and charge costs. The notice of opportunity of hearing informed Voyager of its right to contest the charges made against it at an adjudicative hearing by making a written request for hearing and filing an answer to the statement of charges. Alternatively, Voyager was given the option to waive the right to a hearing and instead submit a written statement to the Director of the Department of Financial Institutions.

[87]  The notice of hearing informed Voyage that a hearing would be held before an administrative law judge to determine whether to issue: (1) an order requiring Voyager to cease and desist from violating various provisions of the state's securities act; and/or (2) a cease publication order requiring Voyager to cease from offering securities via statements that are materially misleading or otherwise likely to deceive the public.

[88]  Texas Department of Banking alleged that Voyager Digital, LLC engaged in unlicensed money transmission in violation of Chapter 151 of the Texas Finance Code. While Voyager neither admitted nor denied the Department's conclusions with respect to any factual findings or violations of law, Voyager and the Department agreed to a Consent Order (*In the Matter of Voyager Digital, LLC* (Order No.: 2022-035)) whereby Voyager agreed to cease and desist from engaging in the unauthorized business of money transmission in Texas. The Consent Order does not limit Voyager's ability to (i) hold money and monetary value on behalf of, and return money and monetary value to, existing Account Holders located in Texas during the pendency of Voyager's Chapter 11 Cases, or (ii) otherwise act in accordance with orders of the Bankruptcy Court.

[89]  California's order alleged that Voyager Rewards Accounts were securities and required Voyager to desist and refrain from further offers and sale of unregistered/noncompliant securities within the state.

court to enforce the order in light of the bankruptcy proceedings and because Voyager is not currently offering Rewards to customers. No hearing date has been set.

Washington, D.C. issued a summary cease and desist order[90] on July 26, 2022. On July 29, 2022, the D.C. regulator agreed to an extension of the deadline by which Voyager had to submit a written answer and request for hearing until September 30, 2022. Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Washington, D.C.'s order.

Alaska issued a cease and desist order[91] and notice of opportunity to request a hearing, on September 3, 2022. Per the notice, Voyager has thirty (30) days to request a hearing. Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Alaska's order.

In addition to the above-described state securities matters, Voyager has received and continues to respond to various requests from state banking departments in certain states with respect to Voyager's compliance with money transmission laws.

> **3.      *The Loss of Key Personnel Could Adversely Affect the Debtors' Ability to Consummate the Sale and Plan***

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. Because competition for experienced personnel in the cryptocurrency and financial industries can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to consummate the Sale and the Plan.

> **4.      *Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition***

Section 1141(d)(3) of the Bankruptcy Code limits a debtor's ability to discharge Claims in certain circumstances. Any Claims not ultimately discharged through a Plan could be asserted against the Wind-Down Entity and may have an adverse effect on the Debtors' financial condition.

> **5.      *Certain State Regulators Have Asserted that the Plan is Unconfirmable due to the Treatment of Account Holders in Unsupported Jurisdictions***

Certain state regulators in the Unsupported Jurisdictions (*i.e.*, New York, Texas, and Vermont (which filed an objection on behalf of Hawaii)) have asserted that the Plan provides for the disparate treatment of Account Holders in their jurisdictions due to the potential delay in distributions to such Account Holders in violation of section 1123(a)(4) of the Bankruptcy Code. The Debtors believe that the Plan's treatment of Account Holders in the Unsupported Jurisdictions complies with section 1123(a)(4) of the Bankruptcy Code and provides such Account Holders with the best possible path towards receiving an in-kind distribution of their claims in the same types of Cryptocurrency that they deposited with the Debtors, however, there can be no assurance that the Bankruptcy Court will reach the same conclusion. In the event that the Bankruptcy Court finds that the objections of the state regulators have merit, the Debtors may be required to modify the Plan, prior to or as a result of the Confirmation Hearing, to

---

[90]   Washington D.C.'s summary cease and desist order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts within D.C., from accepting any additional assets into existing accounts; and from any further violations of securities laws.

[91]   Alaska's cease and desist order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts in Alaska; and from accepting any assets into existing accounts. Alaska assessed a $1,000,000 administrative penalty but acknowledged Voyager's status in bankruptcy proceedings and noted that "so long as the automatic stay is in effect in [Voyager]'s bankruptcy proceedings, [Alaska] will not seek to execute or collect [the penalty] without first approaching the United States Bankruptcy Court . . . ."

provide for (a) the liquidation of the Cryptocurrency held by Account Holders in the Unsupported Jurisdictions on the date that is three months after the Effective Date (i.e., the date when Cryptocurrency for Account Holders who do not fulfill the requirements to access the Binance.US Platform would be converted into U.S. Dollars and distributed), or potentially, on the Effective Date, and (b) the distribution of such cash proceeds resulting from such liquidation to Account Holders in the Unsupported Jurisdictions promptly following three months after the Effective Date, or potentially, on the Effective Date, subject to the terms of the Plan and the Asset Purchase Agreement, including any amendments that may be required in light of the Bankruptcy Court's ruling. For the avoidance of doubt, Binance.US has not agreed to any such modification of the Asset Purchase Agreement and is under no obligation to do so. If the Bankruptcy Court rules in this manner, it is uncertain whether the Sale Transaction would be consummated.

## X.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the Solicitation Package.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
>
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.    Classes Entitled to Vote on the Plan.

The following Classes are entitled to vote to accept or reject the Plan (collectively, the "Voting Classes"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 3 | Account Holder Claims | Impaired |
| 4A | OpCo General Unsecured Claims | Impaired |
| 4B | HoldCo General Unsecured Claims | Impaired |
| 4C | TopCo General Unsecured Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined below). If you are a Holder of a Claim in one or more of the Voting Classes, you should read your Ballot(s) and carefully follow the instructions included in the Ballot(s). Please use only the Ballot(s) that accompanies this Disclosure Statement or the Ballot(s) that the Debtors, or the Claims, Noticing, and Solicitation Agent on behalf of the Debtors, otherwise provided to you. If you are a Holder of a Claim in more than one of the Voting Classes, you will receive a Ballot for each such Claim.

### B.    Votes Required for Acceptance by a Class.

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims is determined by calculating the amount and number of allowed claims voting to accept, as a percentage of the allowed claims that have voted. Acceptance of a chapter 11 plan by a class of interests is determined by calculating the amount of allowed interests voting to accept, as a percentage of the allowed interests that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

### C.    Certain Factors to Be Considered Prior to Voting.

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor guarantee that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a resolicitation of the votes of Holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article IX of this Disclosure Statement.

**D.      Classes Not Entitled To Vote on the Plan.**

Under the Bankruptcy Code, holders of claims or interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan.  Accordingly, the following Classes of Claims against and Interests in the Debtors are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 1 | Secured Tax Claims | Unimpaired |
| 2 | Other Priority Claims | Unimpaired |
| 5 | Alameda Loan Facility Claims | Impaired |
| 6 | Section 510(b) Claims | Impaired |
| 7 | Intercompany Claims | Unimpaired / Impaired |
| 8 | Intercompany Interests | Unimpaired / Impaired |
| 9 | Existing Equity Interests | Impaired |

**E.      Solicitation Procedures.**

**1.      *Claims, Noticing, and Solicitation Agent***

The Debtors have retained Stretto to act, among other things, as Claims, Noticing, and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

**2.      *Solicitation Package***

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

- a copy of the Solicitation and Voting Procedures (as defined in the Disclosure Statement Order);

- the applicable form of Ballot, together with detailed voting instructions and instructions on how to submit the Ballot;

- the Cover Letter (as defined in the Disclosure Statement Order);

- this Disclosure Statement (and exhibits thereto, including the Plan);

- the Disclosure Statement Order (without exhibits, except the solicitation and voting procedures);

- the Confirmation Hearing Notice (as defined in the Disclosure Statement Order); and

- such other materials as the Bankruptcy Court may direct.

        3.     ***Distribution of the Solicitation Package and Plan Supplement***

The Claims, Noticing, and Solicitation Agent shall distribute the Solicitation Package to Holders of Claims in the Voting Classes by no later than January 25, 2023 (the "Solicitation Launch").

The Solicitation Package (without Ballots, unless you are an eligible voting party) may also be obtained from the Claims, Noticing, and Solicitation Agent by:  (a) calling the Claims, Noticing, and Solicitation Agent at (855) 473-8665 (Toll-Free) or (949) 271-6507 (International) and asking for the "Solicitation Group" or (b) emailing the Claims, Noticing, and Solicitation Agent at voyagerinquiries@stretto.com.  You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager, or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/ecf-and-pacer-information (for a fee).  Holders that have more than one option to return a Ballot should choose only one method to return their Ballot.

No later than fourteen (14) days before the Voting Deadline, the Debtors will file the Customer Onboarding Protocol and Schedule of Retained Causes of Action as part of the Plan Supplement.  No later than seven days before the Voting Deadline, or such later date as may be approved by the Bankruptcy Court, the Debtors intend to file all other Plan Supplement documents.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.  The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims, Noticing, and Solicitation Agent by:  (a) calling the Claims, Noticing, and Solicitation Agent at the telephone number set forth above; (b) visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager, or (c) emailing the Claims, Noticing, and Solicitation Agent at voyagerinquiries@stretto.com.

        F.     **Voting Procedures.**

January 10, 2023 (the "Voting Record Date"), is the date that will be used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim in the Voting Classes to have its Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by (i) using the enclosed pre-paid, pre-addressed return envelope or (ii) via first class mail, overnight courier, or hand delivery to Voyager Ballot Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602, so that such Holder's Ballot is actually received by the Claims, Noticing, and Solicitation Agent on or before the Voting Deadline on February 22, 2023, at 4:00 p.m. (prevailing Eastern Time).

If a Holder of a Claim in a Voting Class transfers all of such Claim to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Claim Holder is automatically deemed to have provided a voting proxy to the purchaser(s) of the Holder's Claim, and such purchaser(s) shall be deemed to be the Holder(s) thereof as of the Voting Record Date for purposes of voting on the Plan, provided that the purchaser provides satisfactory confirmation of the transfer to the Claims, Noticing, and Solicitation Agent.

If you hold Claims in more than one Voting Class under the Plan, you should receive a separate Ballot for each Class of Claims, coded by Class number, and a set of solicitation materials.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.  IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLAIM AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.  NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.

G.      **Voting Tabulation.**

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. A Ballot will be deemed delivered only when the Claims, Noticing, and Solicitation Agent actually receives the executed Ballot as instructed in the applicable voting instructions.  No Ballot should be sent to the Debtors, the Debtors' agents (other than the Claims, Noticing, and Solicitation Agent) or the Debtors' financial or legal advisors.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to Confirmation of the Plan.  In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

In the event that a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Debtors will file with the Bankruptcy Court, as soon as practicable after the Voting Deadline, the voting report prepared by the Claims, Noticing, and Solicitation Agent (the "Voting Report").  The Voting Report shall, among other things, provide the votes received to accept or reject the Plan and Holders of Claims and Interests that have opted into the third-party releases or Contributed Third-Party Claims, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each an "Irregular Ballot"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged.  The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots.  Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification.

**H.    Ballots Not Counted.**

No Ballot will be counted toward Confirmation if, among other things:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims, Noticing, and Solicitation Agent), or the Debtors' financial or legal advisors instead of the Claims, Noticing, and Solicitation Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or is marked both to accept and reject the Plan.  Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT TOLL-FREE NUMBER AT (855) 473-8665.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

---

## XI.    CONFIRMATION OF THE PLAN

**A.    Requirements of Section 1129(a) of the Bankruptcy Code.**

Among the requirements for Confirmation are the following:  (i) the Plan is accepted by all impaired Classes of Claims and Interests or, if the Plan is rejected by an Impaired Class, at least one Impaired Class of Claims has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Impaired Claims or Interests (*i.e.*, Holders of Class 3 Account Holder Claims, Holders of Class 4A OpCo General Unsecured Claims, Holders of Class 4B HoldCo General Unsecured Claims, Holders of Class 4C TopCo General Unsecured Claims, Holders of Class 5 Alameda Loan Facility Claims, Holders of Class 6 Section 510(b) Claims, and Holders of Class 9 Existing Equity Interests).

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code.  Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment:  (i) made before Confirmation will be reasonable or (ii) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims will be paid in full on the Effective Date or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class.  Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

**B.      Best Interests of Creditors—Liquidation Analysis.**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit B**, showing that the value of the distributions provided to Holders of Allowed Claims and Interests under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Allowed Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Allowed Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code.  Generally, secured creditors are paid first from the proceeds of sales of their collateral.  If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid.  Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority.  Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will have been liquidated through the Sale Transaction and the Plan effects a wind down of the Debtors' remaining assets not otherwise acquired in the Sale Transaction.  Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation.

The liquidation of the Debtors' assets in chapter 7 would result in substantially less value than the proceeds of the Sale Transaction.  Notably, in the context of a chapter 7 liquidation, the Debtors would not receive the upfront cash payment, the earn-out, and other Binance.US Transaction proceeds that provide significantly greater value to Holders of Account Holder Claims and OpCo General Unsecured Claims than in a chapter 7 liquidation scenario.  Moreover, the proceeds of the sale of the Debtors' Cryptocurrency would likely be less in a fire sale liquidation than in an orderly sale under the Plan.

Liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed Claims with a larger, more timely recovery in part because of the expenses that would be incurred in a chapter 7 liquidation, including the potential added time (thereby reducing the present value of any recovery for Holders) and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Chapter 11 Cases and the Debtors' Cryptocurrency. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). Additionally, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 7 case.

The conversion to chapter 7 would also require entry of a new bar date. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced sale proceeds and recoveries, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that distributions under the Plan would provide Holders of Claims and Interests with the same or greater recovery than under a hypothetical chapter 7 liquidation.

## C.    Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Plan provides for the liquidation and distribution of the Debtors' assets. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

## D.    Acceptance by Impaired Classes.

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled or any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

E.       **Confirmation without Acceptance by All Impaired Classes.**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class of Claims or Interests rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor. Class 3 Account Holder Claims and Class 4A OpCo General Unsecured Claims are treated the same under the Plan, Class 4B HoldCo General Unsecured Claims and Class 4C TopCo General Unsecured Claims will receive the recovery available at HoldCo or TopCo, and the Debtors will seek to subordinate Class 5 Alameda Loan Facility Claims pursuant to the Plan. Therefore, the Plan does not discriminate unfairly.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

1.       *No Unfair Discrimination*

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that the treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

2.       *Fair and Equitable Test*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class. As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class. The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan. There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

(a)       **Unsecured Claims.**

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

(b)       **Interests.**

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either: (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (a) the allowed

amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

## XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction.

The following discussion is an overview of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Wind-Down Debtors, and to Holders entitled to vote to accept or reject the Plan.  This overview is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

The application of Applicable Tax Law to numerous material aspects of the transactions contemplated by the Plan, and to cryptocurrency in general, is subject to an unusually high level of uncertainty.  No opinion of counsel has been or will be obtained and the Debtors have not requested, and do not expect to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan.  No portion of this discussion is binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position that the Debtors or Wind-Down Debtors take.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.  THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances.  This discussion also does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in Section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Purchaser, Persons liable for alternative minimum tax, Persons (other than, if applicable, the Debtors) using a mark-to-market method of accounting, Holders who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction).  No aspect of state, local, non-income, or non-U.S. taxation is addressed (including, for the avoidance of doubt, the application of Canadian tax law to Holders or to the Debtors, which issues are under further review).  Furthermore, this preliminary overview assumes that a Holder holds only Claims or Interests in a single Class and, except as set forth below, holds such Claims or Interests only as "capital assets" (within the meaning of section 1221 of the IRC).  This preliminary overview also assumes that the various debt and other arrangements to which the Debtors and Wind-Down Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC.  This preliminary overview does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.  The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Wind-Down Debtors, and Holders of Claims and Interests described below also may vary depending on the ultimate nature of any Restructuring Transactions that the Debtors and/or Wind-Down Debtors engage in.  This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that for U.S. federal income tax purposes is: (1) an individual who is a citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The below discussion assumes that the Debtors obtained tax ownership of cryptocurrency deposits when customers made such deposits. The Debtors believe that position is the right one based on, among other things, the fact that the Debtors had the right to transfer, rehypothecate, and otherwise deal in deposited cryptocurrency. If the Debtors were determined to not have tax ownership of the cryptocurrency, the consequences of the Plan to Holders of Claims and the Debtors would vary significantly from the discussion below.

**ACCORDINGLY, THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

B.     **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.**

The consequences of the Plan to the Debtors will depend, in part, on whether the Plan is structured as a Sale Transaction or a Liquidation Transaction.

In a Sale Transaction, the Debtors expect that the Plan would be structured such that there would be taxable sale of certain assets of the Debtors to the Purchaser (the "Taxable Transaction") and, potentially, a deemed "in-kind" distribution of cryptocurrency to customers in exchange for Claims related to deposits of such cryptocurrency (the "In-Kind Distribution"). As a result and in connection therewith, the Debtors would realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets. Gain would be reduced by the amount of tax attributes (if any) available for use by the Debtors, and any remaining gain would be recognized by the Debtors and result in a cash tax obligation. Amounts subject to the In-Kind Distribution may be treated as a non-taxable transaction with respect to the underlying cryptocurrency, combined with incurrence of income or cancellation of indebtedness income related to any difference between the value of what customers receive in exchange for their Claims and the amount of their Claims (determined without regard to "dollarization" of such Claims).

Thus, the U.S. federal income tax consequences of the Taxable Transaction to the Debtors would in large part be a function of the Debtors' tax basis in their assets that the Debtors transfer or are deemed to have transferred, including the Debtors' cryptocurrency. There is generally no direct guidance under Applicable Tax Law on how to treat a customer's transfer of cryptocurrency to a business like the Debtors' (and as a result there is significant (and unusual) uncertainty with respect to the Debtors' tax basis in such cryptocurrency) or the transferee's utilization of the transferred cryptocurrency (for example, and without limitation, holding it and doing nothing more, lending it, staking it, selling it, or using it in a short sale). Accordingly, there is significant uncertainty with respect to the tax consequences of a Taxable Transaction to the Debtors.

It is possible that the IRS or a court could disagree with the Debtors' determination of their basis in their assets, including the Debtors' cryptocurrency. Any such disagreement could lead to a redetermination of the Debtors' basis in their assets and a resultant increase in the Debtors' tax liability from a Taxable Transaction, potentially in a way that would have a materially adverse impact on the Debtors. The Debtors, together with their advisors, continue to study this issue.

Were the Plan instead structured as a Liquidation Transaction, then, generally, subject to any rebalancing of the Debtors' cryptocurrency in order to facilitate distributions under the Plan or to otherwise effectuate the Liquidation Transaction, the Debtors would distribute cash and/or property in satisfaction of Claims. In connection with any rebalancing, the Debtors would realize gain or loss upon the sale of cryptocurrency involved in such rebalancing, with such gain or loss calculated as, and subject to the uncertainty, described above. With respect to the Debtors' distribution of cash and/or property to Holders of Claims, the Debtors would recognize income or cancellation of indebtedness income related to any difference between the value of what a Holder receives in exchange for its Claim and the amount of such Claim (determined without regard to "dollarization" of such Claims).

Whether the Plan is structured as a Sale Transaction or a Liquidation Transaction, the Debtors' tax attributes (if any) will not survive the implementation of the Plan. Accordingly, the rules regarding cancellation of indebtedness income are generally inapplicable and the rules regarding section 382 of the IRC are inapplicable and, in each case, not discussed further.

The Debtors continue to evaluate how "dollarization" of Claims as of the Effective Date may modify the above analysis, either with respect to the implementation of the Plan itself or with respect to any administrative tax period more generally. The Debtors currently cannot say with certainty that there will not be material administrative income tax liabilities that must be satisfied under the Plan.

C.  **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders[92] of Allowed Claims Entitled to Vote.**

1.  *Sale Transaction or Liquidation Transaction*

(a)  **U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 3 Claims (Account Holder Claims).**

If the Plan is structured as a Sale Transaction, each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim: (i) for Account Holders in Supported Jurisdictions, its Net Owed Coins, as provided in and subject to the requirements of Section 6.12 of the Asset Purchase Agreement; (ii) for Account Holders in Unsupported Jurisdictions, value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated; provided that to the extent that the Purchaser obtains the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides and the Debtors and/or Wind-Down Entity has not made such Cash distribution to such Account Holder, then such Account Holder shall receive the treatment in Article III.C.3(c)(i)(A) of the Plan; (iii) its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement; (iv) its Pro Rata share of Distributable OpCo Cash; and (v) to effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; provided that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; *provided* that distributions made to any Account Holder pursuant to clauses (iii), (iv), and (v) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder.

If, alternatively, the Plan is structured as a Liquidation Transaction, each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim: (i) its Pro Rata share of Distributable

---

[92]  Based on the Debtors' understanding of the residence of Holders, the Debtors do not discuss any U.S. federal income tax consequences of the consummation of the Plan to Non-U.S.-Holders.

OpCo Cash; (ii) its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that, if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and (iii) effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Whether the Plan is structured as a Sale Transaction or a Liquidation Transaction, there is a material risk that U.S. Holders of Account Holder Claims will have a taxable event in connection with the consummation of the Plan or the "dollarization" of Claims (or separate taxable events for one or both events). This is the case even though the Sale Transaction contemplates the migration of customers to an acquiring cryptocurrency platform and even though the Liquidation Transaction contemplates that Account Holders can withdraw cryptocurrency from the Voyager platform. To the extent any taxable event occurs, tax liability would be based on the difference between the Holder's tax basis in its Claim compared to the value it receives in respect of such Claim, with such gain or loss generally being capital in nature.

The tax treatment of Holders under the Plan depends significantly on the tax treatment of customer deposits in the first instance. There is uncertainty with respect to whether deposits are taxable when they occur, but the Debtors generally expect that most customers have taken the position that the act of depositing cryptocurrency with the Debtors is not a taxable event. While there is substantial theoretical debate regarding that position, it is a position that has some level of support in the idea that the exchange of cryptocurrency for a contractual right to the return of such cryptocurrency is not a transaction that results in a realization event under section 1001 of the IRC because it does not involve an exchange of property "differing materially either in kind or in extent." Such position relies, among other things, on caselaw that pre-dates the enactment of section 1058 of the IRC and analogies to the treatment afforded to securities lending under section 1058. On the other hand, there is also support for the position that the initial deposit of cryptocurrency is a taxable event because of various provisions in the Terms of Use that narrow a customer's rights with respect to the deposited cryptocurrency (in particular, provisions related to the Debtors' ability to not support "airdropped" cryptocurrency or cryptocurrency issued pursuant to a "hard fork").

To the extent an initial deposit of cryptocurrency was not taxable, there is an argument that the same position could be taken with respect to the return by the Debtors of such cryptocurrency to customers, because the exchange of the contractual right to the return of such cryptocurrency for the underlying cryptocurrency would itself not be an exchange of property "differing materially either in kind or in extent." This argument would be stronger in the case of a Liquidation Transaction than in a Sale Transaction, because the explicit form of the Liquidation Transaction would be that the Account Holder has the ability to withdraw its Pro Rata share of Distributable Cryptocurrency in kind for a period of thirty (30) days after the Effective Date through the Voyager platform; though if the Distributable Cryptocurrency were a different type of cryptocurrency than the cryptocurrency that the Account Holder originally deposited on the Voyager platform (because of, for example, rebalancing), then the ability to rely on such argument would be greatly impaired because the property withdrawn would differ "materially either in kind or in extent," likely leading to a taxable event (and in any event, for the avoidance of doubt, in a Liquidation Transaction, the receipt of cash or property other than cryptocurrency in exchange for deposited cryptocurrency should generally result in a taxable event).

As for a Sale Transaction, under principles that typically apply to determine whether obligations have been meaningfully modified, including principles under section 1.1001-3 of the Treasury Regulations (which are not directly applicable here, but are informative), a transaction that involves an exchange of a contractual right owed by the Debtors for a contractual right owed by a different party is highly likely to be treated as taxable. Nevertheless, the Debtors believe, in the case of a Sale Transaction, that it would be supportable for Holders to take the position that, pursuant to the consummation of the Plan whereby customers may migrate to Purchaser's platform, (a) the Debtors are deemed to transfer cryptocurrency in kind in a non-taxable transaction; and, immediately thereafter, (b) Holders

are deemed to re-deposit cryptocurrency to the new entity, again, in a non-taxable or a partially non-taxable transaction.

The Debtors continue to study whether the above arguments, when combined with a general "bifurcation" approach that separates the recovery Holders receive into multiple components (*i.e.*, the type of cryptocurrency the customer had deposited on the platform, other cryptocurrencies, cash, and recoveries in respect of the Wind-Down Entity), may permit Holders to take the position that Holders retain the portion of their recovery taking the form of the type of cryptocurrency that the customer had deposited on the platform even if the receipt of other consideration constitutes a taxable exchange as to such other cash and/or property. The Debtors emphasize that these positions are unclear.

The ability to take the position that an In-Kind Distribution (in the case of a Sale Transaction) or the withdrawal of Distributable Cryptocurrency from the Voyager platform (in the case of a Liquidation Transaction) is not taxable to Holders is subject to increased risk as a result of the "dollarization" of Claims. As noted above, it may be the case that "dollarization" resulted, or will result, in a taxable event to customers, either as of the Petition Date or as of the Confirmation Date. If such a taxable event were determined to have occurred, it would be because the contract to receive particular cryptocurrency was modified, as a result of dollarization, to have an economic "cap." In light of this, it is unclear whether the arguments described above that support tax-free treatment with respect to the receipt of cryptocurrency under the Plan could still apply. Such a "capped" contract arguably "differ[s] materially either in kind or in extent" from the underlying cryptocurrency. However, the Debtors also believe it would be reasonable to assert that this is not a material enough change to customers' underlying entitlements.

**The Debtors emphasize in the strongest possible terms that the law applicable to deposits and withdrawals of cryptocurrency from the Debtors, "dollarization," and the consummation of the Plan is subject to extreme uncertainty. There is effectively no "controlling" authority on any of these issues. Accordingly, there is a material risk that the positions described above may not be sustained. The concepts of a non-taxable in-kind distribution (in the case of a Sale transaction) or withdrawal (in the case of a Liquidation Transaction) of cryptocurrency referred to above rest in large part on the theory that the property that the Debtors would distribute in-kind to a Holder (in the case of a Sale Transaction) or that the Holder would withdraw (in the case of a Liquidation Transaction) would be in respect of an obligation that does not differ "materially either in kind or in extent" from the obligation that arose when the Holder deposited property with the Debtors. Given the structure of the Plan, and in particular the way in which the Debtors have valued Claims as of the Petition Date, there is a significant risk that the Claim that a Holder has against the Debtors as of the Petition Date is with respect to property that differs "materially either in kind or in extent" from the property that the Holder previously deposited with the Debtors, such that the Debtors would be distributing property in respect of an obligation that differs "materially either in kind or in extent" from the one that existed when the Holder deposited property with the Debtors (and thus tax-free treatment would likely be unavailable).**

Very generally, to the extent any form of transaction is taxable to a Holder (which, for the avoidance of doubt, would include any Holder who receives only Cash and/or Wind-Down Trust Units under the Plan), each such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash, Cryptocurrency, and/or Wind-Down Trust Units)[93] received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units and any Cryptocurrency received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

---

[93]    The Debtors generally do not expect that the right to become a Transferred Creditor would be ascribed independent value for U.S. federal income tax purposes.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

As noted repeatedly herein, nothing in this disclosure constitutes tax or legal advice to Holders. However, the Debtors wish to highlight one area of tax consideration that has been the subject of significant speculation in online resources and similar. The above language indicates that customers may be able to take a loss in connection with the consummation of the Plan. The Debtors generally expect such loss would arise *when the Plan is consummated*, and not before. There has been significant speculation in various sources with respect to whether a customer can take a loss, potentially under section 166 of the Tax Code (related to bad debts, including non-business bad debts). There are significant timing limitations on the ability to claim a loss under section 166 of the Tax Code. In particular, other than with respect to certain types of taxpayers that can take partial bad debt deductions in connection with a "charge-off" under section 166(a)(2) of the Tax Code, most taxpayers can only take a deduction under 166 when a debt has become entirely worthless. As set forth in the Plan, the Debtors do not believe customer claims will ever be entirely worthless, as all transactions under contemplation by the Debtors contemplate that there will be some form of recovery received by customers in respect of their claims. Accordingly, the Debtors are of the view that the overwhelming majority of customers are not able to take a section 166 loss with respect to their claims prior to the consummation of the Plan. However, in the event "dollarization" of Claims results in a taxable event to customers, customers likely can claim a loss in connection with such "dollarization."

(b)    **U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 4A Claims.**

If the Sale Transaction is consummated by the Outside Date, each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim: (i) its Pro Rata share of Distributable Cryptocurrency in Cash; (ii) its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Section 6.12 and 6.14 of the Asset Purchase Agreement; (iii) its Pro Rata share of Distributable OpCo Cash; and (iv) to effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; provided that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

If, alternatively, the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim: (i) its Pro Rata share of Distributable Cryptocurrency in Cash; (ii) its Pro Rata share of Distributable OpCo Cash; and (iii) to effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Each such U.S. Holder should recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash, Cryptocurrency, and/or Wind-Down Trust Units) received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units and any Cryptocurrency received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

The foregoing assumes that no Allowed Class 4A Claim is in respect of Cryptocurrency deposited with the Debtors. If any such Allowed Class 4A Claim were in respect of Cryptocurrency deposited with the Debtors, the considerations described in "U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 3 Claims (Account Holder Claims)" would apply.

(c)    **U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 4B and 4C Claims.**

Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim: (i) its Pro Rata share of Distributable HoldCo Cash; and (ii) its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to HoldCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Similarly, each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim: (i) its Pro Rata share of Distributable TopCo Cash; and (ii) its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Each such U.S. Holder should recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash and/or Wind-Down Trust Units) received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

(d)    **Net Investment Income Tax.**

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

(e)    **Limitations on Use of Capital Losses.**

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate U.S. Holders who have more capital losses than can be used

in a tax year may be allowed to carry over the excess capital losses for use in the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

> **2.      Certain U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Cryptocurrency Received Under the Plan**

The U.S. federal income tax consequences to a U.S. Holder of owning and disposing of Cryptocurrency received under the Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors, including , (x) if the Plan is structured as a Sale Transaction, (i) the U.S. federal income tax characterization of the relationship between such Holder and Purchaser, and (ii) the activities that such Holder and/or Purchaser pursue with respect to such Cryptocurrency on Purchaser's platform, and (y) if the Plan is structured as a Liquidation Transaction, the activities that such Holder pursues with respect to such Cryptocurrency.  In the event of a Sale Transaction, U.S. Holders are urged to consult their own tax advisors regarding the proper characterization of such relationship and the tax consequences that may result therefrom.

> **3.      The Wind-Down Entity**

The Plan provides that on the Effective Date and thereafter if additional Wind-Down Entity Assets become available, the Wind-Down Entity Assets shall automatically vest in the Wind-Down Entity.  Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Entity Assets or the Wind-Down Entity.

> **(a)      Liquidating Trust Treatment.**

Although not free from doubt, other than with respect to any assets that are subject to potential disputed claims of ownership or uncertain distributions, a Wind-Down Trust (if any) may be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" under section 671 of the Tax Code.  It may be that such treatment does not apply given the structure of the Plan.  If such treatment did apply to any assets of the Wind-Down Trust, any beneficiaries of the Wind-Down Trust would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the assets of the Wind-Down Trust and then contributed such undivided interest to the Wind-Down Trust.  Other than with respect to any assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of assets to applicable Holders of Claims prior to the contribution of such assets to the Wind-Down Trust should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly.  Other than with respect to any assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, no entity-level tax should be imposed on the Wind-Down Trust with respect to earnings generated by the assets held by it.  Each beneficiary must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by the Wind-Down Trust, even if no distributions are made.

> **(b)      Disputed Ownership Fund treatment.**

With respect to any of the assets of a Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).  To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss with respect to such property on the date that the property is so transferred.  Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

### 4.    *U.S. Information Reporting and Withholding*

The Debtors and the Wind-Down Entity, as applicable, intend to withhold all amounts required under the IRC with respect to distributions made under the Plan and to comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim or Interest under the Plan, as well as future payments made with respect to consideration received under the Plan.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

---

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS. THE FOREGOING SUMMARY DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

---

\* \* \* \* \*

## XIII.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote to accept or reject the Plan support Confirmation and vote to accept the Plan.

|  | Voyager Digital Holdings, Inc. on behalf of itself and each of the other Debtors |
|---|---|
| By: | /s/ Stephen Ehrlich |
| Name: | Stephen Ehrlich |
| Title: | Co-Founder and Chief Executive Officer Voyager Digital Ltd. |

Prepared By:

| | |
|---|---|
| Dated: January 13, 2023 | /s/ Joshua A. Sussberg |
| New York, New York | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| | Joshua A. Sussberg, P.C. |
| | Christopher Marcus, P.C. |
| | Christine A. Okike, P.C. |
| | Allyson B. Smith (admitted *pro hac vice*) |
| | 601 Lexington Avenue |
| | New York, New York 10022 |
| | Telephone:  (212) 446-4800 |
| | Facsimile:  (212) 446-4900 |
| | |
| | *Counsel to the Debtors and Debtors in Possession* |

**Exhibit A**

**Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|                                          |     |                          |
|------------------------------------------|-----|--------------------------|
| In re:                                   | )   | Chapter 11               |
|                                          | )   |                          |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | )   | Case No. 22-10943 (MEW)  |
|                                          | )   |                          |
| Debtors.                                 | )   | (Jointly Administered)   |
|                                          | )   |                          |

_____

### THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

---

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS.  THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital, LTD. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

## <u>TABLE OF CONTENTS</u>

Page

Introduction ........................................................................................................................1

Article I. Defined Terms, Rules of Interpretation, Computation of Time, Governing Law, and
    Other References....................................................................................................1
    A.    Defined Terms ...........................................................................1
    B.    Rules of Interpretation ..............................................................17
    C.    Computation of Time.................................................................17
    D.    Governing Law .........................................................................17
    E.    Reference to Monetary Figures...................................................18
    F.    Reference to the Debtors or the Wind-Down Debtors.....................18
    G.    Nonconsolidated Plan ...............................................................18

Article II. Administrative and Priority Claims ....................................................................18
    A.    Administrative Claims ...............................................................18
    B.    Professional Fee Claims.............................................................19
    C.    Priority Tax Claims...................................................................20

Article III. Classification, Treatment, and Voting of Claims and Interests ...........................20
    A.    Classification of Claims and Interests .........................................20
    B.    Summary of Classification.........................................................21
    C.    Treatment of Classes of Claims and Interests...............................22
    D.    Special Provision Governing Unimpaired Claims..........................28
    E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes ..28
    F.    Subordinated Claims.................................................................28
    G.    Intercompany Interests..............................................................28
    H.    Controversy Concerning Impairment ..........................................29
    I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
    Code .......................................................................................29

Article IV. Provisions for Implementation of the Plan..........................................................29
    A.    General Settlement of Claims and Interests...................................29
    B.    Restructuring Transactions ........................................................29
    C.    The Sale Transaction.................................................................30
    D.    The Liquidation Transaction.......................................................31
    E.    Management and Employee Transition Plans .................................31
    F.    Non-Released D&O Claims.........................................................32
    G.    The D&O Settlement .................................................................32
    H.    Wind-Down Trust.....................................................................34
    I.    Sources of Consideration for Plan Distributions ...........................39
    J.    Corporate Existence and Dissolution...........................................39
    K.    Corporate Action......................................................................40
    L.    Vesting of Assets in the Wind-Down Entity .................................40
    M.    Cancellation of Notes, Instruments, Certificates, and Other Documents ............41
    N.    Effectuating Documents; Further Transactions .............................41
    O.    Section 1146(a) Exemption .......................................................41

P.       Preservation of Rights of Action .................................................................42
Q.      Election to Contribute Third-Party Claims..............................................43
R.      Contribution of Contributed Third-Party Claims....................................43
S.      Closing the Chapter 11 Cases ...................................................................43

**Article V. Treatment of Executory Contracts and Unexpired Leases .....................................44**

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases .........44
B.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases......................................................................................44
C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases...........44
D.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.......45
E.      Insurance Policies and Surety Bonds........................................................46
F.      Reservation of Rights.................................................................................47
G.      Nonoccurrence of Effective Date ..............................................................47
H.      Contracts and Leases Entered into After the Petition Date ..................47

**Article VI. Provisions Governing Distributions ...........................................................................47**

A.      Timing and Calculation of Amounts to Be Distributed .........................47
B.      Rights and Powers of Distribution Agent ................................................48
C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions...........48
D.      Compliance Matters...................................................................................50
E.      Foreign Currency Exchange Rate .............................................................50
F.      Claims Paid or Payable by Third Parties .................................................51
G.      Setoffs and Recoupment ...........................................................................51
H.      Allocation between Principal and Accrued Interest ................................52

**Article VII. Procedures for Resolving Disputed, Contingent, and Unliquidated Claims and Interests..................................................................................................................................52**

A.      Disputed Claims Process ...........................................................................52
B.      Objections to Claims or Interests..............................................................53
C.      Estimation of Claims .................................................................................53
D.      No Distributions Pending Allowance ........................................................54
E.      Distributions After Allowance...................................................................54
F.      No Interest..................................................................................................54
G.      Adjustment to Claims and Interests without Objection ..........................54
H.      Time to File Objections to Claims.............................................................55
I.      Disallowance of Claims or Interests .........................................................55
J.      Amendments to Proofs of Claim ...............................................................55

**Article VIII. Effect of Confirmation of the Plan .........................................................................55**

A.      Releases by the Debtors .............................................................................55
B.      Releases by Holders of Claims and Interests...........................................56
C.      Exculpation ................................................................................................57
D.      Injunction ..................................................................................................58
E.      Release of Liens.........................................................................................58
F.      OSC and SEC............................................................................................58
G.      Protection against Discriminatory Treatment .........................................58
H.      Document Retention ..................................................................................59
I.      Reimbursement or Contribution ...............................................................59

J.       Term of Injunctions or Stays ............................................................59

**Article IX. Conditions Precedent to the Effective Date .................................................59**

A.       Conditions Precedent to the Effective Date ......................................59
B.       Waiver of Conditions Precedent .......................................................60
C.       Effect of Non-Occurrence of Conditions to Consummation .............60

**Article X. Modification, Revocation, or Withdrawal of the Plan ...............................61**

A.       Modification of Plan .........................................................................61
B.       Effect of Confirmation on Modifications ..........................................61
C.       Revocation or Withdrawal of Plan....................................................61

**Article XI. Retention of Jurisdiction .............................................................................61**

**Article XII. Miscellaneous Provisions ...........................................................................63**

A.       Immediate Binding Effect.................................................................63
B.       Additional Documents ......................................................................64
C.       Payment of Statutory Fees ...............................................................64
D.       Dissolution of Statutory Committees ................................................64
E.       Reservation of Rights.......................................................................64
F.       Successors and Assigns ....................................................................64
G.       Service of Documents .......................................................................64
H.       Entire Agreement; Controlling Document.........................................65
I.       Plan Supplement ..............................................................................65
J.       Non-Severability...............................................................................66
K.       Votes Solicited in Good Faith...........................................................66
L.       Waiver or Estoppel ..........................................................................66

# INTRODUCTION

Voyager Digital Holdings, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>") propose this third amended joint plan (the "<u>Plan</u>") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

# ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

## A.    Defined Terms

Capitalized terms used in this Plan have the meanings ascribed to them below.

1.    "*3AC*" means Three Arrows Capital, Ltd and any of its Affiliates or subsidiaries.

2.    "*3AC Claims*" means the claims or causes of action asserted or assertable by the Debtors against 3AC, whether in the 3AC Liquidation Proceeding or otherwise.

3.    "*3AC Liquidation Proceeding*" means that certain liquidation proceeding captioned *In the Matter of Three Arrows Capital Ltd. and in the Matter of Sections 159(1) and 162(1)(a) and (b) of the Insolvency Act 2003*, Claim No. BVIHC(COM)2022/0119 before the Eastern Caribbean Supreme Court in the High Court of Justice in the British Virgin Islands and the chapter 15 foreign recognition proceeding captioned *In re Three Arrows Capital, Ltd.*, No. 22-10920 (Bankr. S.D.N.Y. Jul. 1, 2022).

4.    "*3AC Loan*" means that loan of 15,250 Bitcoins and 350 million USDC to 3AC pursuant to that certain master loan agreement dated March 4, 2022 by and between 3AC, as borrower, and OpCo and HTC Trading, Inc., as lenders.

5.    "*3AC Recovery*" means the recovery, if any, of the Debtors from 3AC on account of the 3AC Claims.

6.    "*Account*" means any account at OpCo held by an Account Holder relating to Cryptocurrency, which Account is identified in the Debtors' books and records as holding Cryptocurrency as of the Petition Date.

7.      "*Account Holder*" means any Person or Entity who holds an Account with OpCo as of the Petition Date.

8.      "*Account Holder Claim*" means any Claim against the Debtors that is held by an Account Holder on account of such Holder's Account.

9.      "*Acquired Assets*" has the meaning ascribed to it in the Asset Purchase Agreement.

10.     "*Acquired Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

11.     "*Acquired Coins Value*" has the meaning ascribed to it in the Asset Purchase Agreement.

12.     "*Additional Bankruptcy Distribution*" has the meaning ascribed to it in the Asset Purchase Agreement.

13.     "*Administrative Claim*" means a Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims.

14.     "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), which:  (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five days after the Effective Date.

15.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

16.     "*Alameda*" means Alameda Ventures Ltd., along with its Affiliates and subsidiaries.

17.     "*Alameda Claims*" means the claims or causes of action asserted or assertable by the Debtors against Alameda, whether in the FTX Bankruptcy Proceeding or otherwise.

18.     "*Alameda Loan Agreement*" means that certain unsecured loan agreement, dated as of June 21, 2022, as amended, restated, amended and restated, modified, or supplemented from time to time, by and among Voyager Digital Holdings, Inc., as the borrower, Voyager, as the guarantor, and Alameda, as the lender thereto.

19.     "*Alameda Loan Facility*" means that certain unsecured loan facility provided for under the Alameda Loan Agreement.

20.     "*Alameda Loan Facility Claims*" means any Claim against any Debtor derived from, based upon, or arising under the Alameda Loan Agreement and any fees, costs, and expenses that are reimbursable by any Debtor pursuant to the Alameda Loan Agreement.

21.     "*Alameda Recovery*" means the recovery, if any, of the Debtors from Alameda on account of the Alameda Claims.

22.    "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein:  (a) a Claim or Interest that is evidenced by a Proof of Claim timely Filed by the Bar Date or a request for payment of Administrative Claim timely Filed by the Administrative Claims Bar Date (or for which Claim or Interest under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim or a request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; (c) a Claim or Interest Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court, or (d) a Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; *provided* that, with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim or Interest shall have been Allowed by a Final Order.  Any Claim or Interest that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. A Proof of Claim Filed after and subject to the Bar Date or a request for payment of an Administrative Claim Filed after and subject to the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

23.    "*Asset Purchase Agreement*" means that certain asset purchase agreement dated as of December 18, 2022 by and between BAM Trading Services Inc. (d/b/a Binance.US) as Purchaser and Voyager Digital, LLC as Seller.

24.    "*Assumed Liabilities*" has the meaning ascribed to it in the Asset Purchase Agreement.

25.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

26.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the Southern District of New York.

27.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

28.    "*Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

29.    "*Bar Date Order*" means the *Order (I) Setting Deadlines for Submitting Proofs of Claims, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 218].

30.     "*Binance.US Platform*" has the meaning ascribed to it in the Asset Purchase Agreement.

31.     "*Binance US*" means BAM Trading Services Inc. (d/b/a Binance.US).

32.     "*Binance US Account*" means a customer account opened with the Purchaser by an Account Holder or a Holder of an Allowed OpCo General Unsecured Claim.

33.     "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

34.     "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

35.     "*Causes of Action*" mean any action, Claim, cross-claim, third-party claim, damage, judgment, cause of action, controversy, demand, right, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, interest, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law or otherwise.  For the avoidance of doubt, "Causes of Action" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim arising from any contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

36.     "*CCO*" means Evan Psaropoulos.

37.     "*CEO*" means Stephen Ehrlich.

38.     "*Certificate*" means any instrument evidencing a Claim or an Interest.

39.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated cases filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

40.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

41.     "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) (i) with respect to Administrative Claims (other than Professional Fee Claims and Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), sixty days after the Administrative Claims Bar Date or (ii) with respect to all other Claims (other than Professional Fee Claims), 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Wind-Down Trust, as applicable, as approved by an order of the Bankruptcy Court for objecting to such Claims.

42.     "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Clerk of the Bankruptcy Court or the Claims, Noticing, and Solicitation Agent.

43.     "*Claims, Noticing, and Solicitation Agent*" means Bankruptcy Management Solutions, Inc. d/b/a Stretto, in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

44.     "*Class*" means a class of Claims against or Interests in the Debtors as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

45.     "*Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

46.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

47.     "*Confirmation Date*" means the date on which Confirmation occurs.

48.     "*Confirmation Hearing*" means the hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code at which the Debtors will seek Confirmation of the Plan.

49.     "*Confirmation Order*" has the meaning ascribed to it in the Asset Purchase Agreement.

50.     "*Consummation*" means the occurrence of the Effective Date.

51.     "*Contributed Third-Party Claims*" means all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform; (b) all Causes of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) all Causes of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided*, *however*, that Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors; (ii) any direct claims against the Released Parties; (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties; or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the currently filed complaint, dated as of July 6, 2022, in the Ontario Superior Court of Justice by Francine De Sousa, against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.

52.     "*Contributing Claimants*" means any Holders of Claims or Interests that elect on their ballots or opt-in forms to contribute their Contributed Third-Party Claims to the Wind-Down Entity.

53.     "*Cryptocurrency*" means a digital currency or crypto asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a centralized authority, including stablecoins, digital coins and tokens, such as security tokens, utility tokens and governance tokens.

54.     "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed

5

by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

55.     "*Customer Onboarding Protocol*" means the protocol describing the process of onboarding Account Holders and Holders of OpCo General Unsecured Claims onto the Binance.US Platform, the form of which shall be included in the Plan Supplement and filed no later than by February 8, 2023, and which shall be in a form acceptable to the Purchaser.

56.     "*D&O Carriers*" means the insurance carriers of the D&O Liability Insurance Policies.

57.     "*D&O Liability Insurance Policies*" means all unexpired insurance policies maintained by the Debtors, the Wind-Down Debtors, or the Estates as of the Effective Date that have been issued (or provide coverage) regarding directors', managers', officers', members', and trustees' liability (including any "tail policy"), including but not limited to the Management Liability Policy, the Excess Policies, and the Side-A Policy, and all agreements, documents, or instruments relating thereto.

58.     "*D&O Settlement*" means the settlement between the Debtors and CEO and CCO as set forth in Article IV.G of the Plan.

59.     "*Debtors*" means, collectively, each of the following:  Voyager Digital Holdings, Inc.; Voyager Digital Ltd.; and Voyager Digital, LLC.

60.     "*Definitive Documents*" means:  (a) the Plan (and any and all exhibits, annexes, and schedules thereto); (b) the Confirmation Order; (c) the Disclosure Statement and the other Solicitation Materials; (d) the Disclosure Statement Order; (e) all pleadings filed by the Debtors in connection with the Chapter 11 Cases (or related orders); (f) the Plan Supplement; (g) the Management Transition Plan; (h) any new material employment, consulting, or similar agreements entered into between the Wind-Down Trust and any of the Debtors' employees, if any; (i) the Asset Purchase Agreement; (j) the Customer Onboarding Protocol; and (k) any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments or other documents reasonably desired or necessary to consummate and document the transactions contemplated by the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements made from time to time thereto).

61.     "*Disclosure Statement*" means the *Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, as may be amended, supplemented, or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan.

62.     "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement.

63.     "*Disputed*" means a Claim or an Interest or any portion thereof:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order; and (c) with respect to which a party in interest has Filed a Proof of Claim, a Proof of Interest, or otherwise made a written request to a Debtor for payment.

64.     "*Disputed Claims Reserve*" means an appropriate reserve in an amount to be determined by the Wind-Down Trust for distributions on account of Disputed Claims that are subsequently Allowed after the Effective Date, in accordance with Article VII.D hereof.

65.     "*Distributable Cryptocurrency*" means all Cryptocurrency held on the Voyager platform or that is otherwise property of any Debtor on the Effective Date after payment in full of, or reserve for, all Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims.

66.     "*Distributable HoldCo Cash*" means HoldCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at HoldCo in full; and (y) to fund HoldCo's Pro Rata share of the Wind-Down Reserve.

67.     "*Distributable OpCo Cash*" means OpCo's Cash, including the Purchase Price Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at OpCo in full; and (y) to fund OpCo's Pro Rata share of the Wind-Down Reserve.

68.     "*Distributable TopCo Cash*" means TopCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at TopCo in full; and (y) to fund TopCo's Pro Rata share of the Wind-Down Reserve.

69.     "*Distribution Agent*" means, as applicable, the Purchaser, Wind-Down Debtors, Wind-Down Trust or any Entity or Entities designated by the Purchaser, Wind-Down Debtors, or the Wind-Down Trust (as applicable) to make or to facilitate distributions that are to be made pursuant to the Plan, Definitive Documents, and Asset Purchase Agreement.

70.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Wind-Down Trust, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

71.     "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims and Interests against the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date, or such other date as is determined by the Debtors or designated by an order of the Bankruptcy Court.

72.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.

73.     "*Employee Transition Plan*" has the meaning set forth in Article IV.E of the Plan, and which shall be in form and substance reasonably acceptable to the Committee.

74.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

75.     "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

76.     "*Excess Policies*" means, collectively, the Excess Insurance Policy, No. EFI1203041-01, issued by Euclid Financial on behalf of Certain Underwriters of Lloyd's, London, the Excess Insurance Policy, No. RILEDOA3392022, issued by Relm Insurance Ltd., both for the February 22, 2022 to February 22, 2023 period, and the Excess Policy, No. ELU184180-23, issued by XL Specialty Insurance Company, for the February 22, 2022 to July 1, 2023 period.

77.    "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) the Committee, and each of the members thereof, solely in their capacity as such; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; and (e) the Distribution Agent.

78.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

79.    "*Existing Equity Interests*" means any Interest in TopCo existing immediately prior to the occurrence of the Effective Date.

80.    "*Extended Outside Date*" has the meaning set forth in the Asset Purchase Agreement.

81.    "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

82.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing, respectively, in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee, or, with respect to the filing of a Proof of Claim or Proof of Interest, file, filed, or filing, respectively, with the Claims, Noticing, and Solicitation Agent.

83.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

84.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal that has been or may be taken or any petition for certiorari or any motion for a new trial, reargument, reconsideration, or rehearing that has been or may be made or filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the motion for a new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order (if any such motion has been or may be granted), or have otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

85.    "*FTX*" means FTX Trading, Ltd. and any of its Affiliates or subsidiaries, including West Realm Shires Inc (d/b/a "FTX.US").

86.    "*FTX Bankruptcy Proceeding*" means that certain chapter 11 proceeding captioned *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

87.    "*FTX Claims*" means the claims or causes of action asserted or assertable by the Debtors against FTX, whether in the FTX Bankruptcy Proceeding or otherwise.

88.    "*FTX Recovery*" means the recovery, if any, of the Debtors from FTX on account of the FTX Claims.

89.    "*General Unsecured Claim*" means, collectively, any HoldCo General Unsecured Claim, OpCo General Unsecured Claim, or TopCo General Unsecured Claim.

90.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

91.     "*Government Bar Date*" means the applicable deadline by which Proofs of Claim by a Governmental Unit must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

92.     "*HoldCo*" means Voyager Digital Holdings, Inc.

93.     "*HoldCo General Unsecured Claim*" means any Claim against HoldCo that is not Secured and is not:  (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; or (h) an Intercompany Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, against HoldCo are HoldCo General Unsecured Claims.

94.     "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

95.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

96.     "*Insurance Policies*" means any and all insurance policies entered into by the Debtors, including the D&O Insurance Policies.

97.     "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor.

98.     "*Intercompany Interest*" means, other than an Interest in Voyager, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

99.     "*Interest*" means any equity security (as such term is defined in section 101(16) of the Bankruptcy Code) including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in an Entity whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, and including any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

100.    "*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Docket No. 236].

101.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001 and the rules and regulations promulgated thereunder, as applicable to the Chapter 11 Cases.

102.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

103.    "*Liquidation Procedures*" means, in the event the Sale Transaction is not consummated by the Outside Date, such procedures filed by the Wind-Down Entity identifying the mechanics and procedures to effectuate the Liquidation Transaction.

104.    "*Liquidation Transaction*" means, in the event the Sale Transaction is not consummated by the Outside Date, the distribution of the Debtors' Cryptocurrency, Cash and other assets pursuant to Article IV.D of this Plan.

105.    "*Management Liability Policy*" means the Executive and Corporate Securities Liability Insurance Policy, No. ELU181214-22, issued by XL Specialty Insurance Company for the February 22, 2022 to February 22, 2023 period.

106.    "*Management Transition Plan*" has the meaning set forth in Article IV.E of the Plan, and which shall be in form and substance reasonably acceptable to the Committee.

107.    "*Net Owed Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

108.    "*Non-Released D&O Claims*" has the meaning set forth in Article IV.F of the Plan.

109.    "*Non-Released D&O Claim Budget*" means the amount allocated to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims, which amount shall be agreed upon between the Debtors and the Committee prior to the Confirmation Hearing.

110.    "*Non-Released Insurance Claims*" has the meaning set forth in Article IV.F of the Plan.

111.    "*OpCo*" means Voyager Digital, LLC.

112.    "*OpCo General Unsecured Claim*" means any Claim against OpCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Account Holder Claim; or (h) an Intercompany Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation against OpCo are OpCo General Unsecured Claims.

113.    "*OSC*" means the Ontario Securities Commission.

114.    "*Other Priority Claim*" means any Claim against a Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

115.    "*Outside Date*" has the meaning set forth in the Asset Purchase Agreement.  All references herein to the "Outside Date" shall be deemed to include the "Extended Outside Date" to the extent the Outside Date is extended in accordance with Section 8.1(c) of the Asset Purchase Agreement.

116.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

117.    "*Petition Date*" means July 5, 2022.

118.    "*Plan*" means this joint chapter 11 plan and all exhibits, supplements, appendices, and schedules hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in

accordance with Article X.A hereof, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

119.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may thereafter be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Plan, the Bankruptcy Code, the Bankruptcy Rules, and applicable law), to be Filed by the Debtors no later than seven days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement. The Plan Supplement may include the following, as applicable:  (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Retained Causes of Action; (c) the Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases; (d) the Customer Onboarding Protocol; (e) the Restructuring Transactions Memorandum; (f) the Wind-Down Trust Agreement; and (g) any additional documents necessary to effectuate or that is contemplated by the Plan, including any compensation program for any of the Debtors' employees to be established as contemplated in the Plan and the Definitive Documents to facilitate the transfer of Acquired Assets pursuant to the Asset Purchase Agreement and wind-down of the Debtors' Estates; *provided* that the Schedule of Retained Causes of Action shall be filed no later than 14 days before the Voting Deadline.  The Plan Supplement (and the contents thereof) shall be (x) subject to Purchaser's consent rights solely to the extent set forth under the Asset Purchase Agreement (and shall otherwise be consistent with the Asset Purchase Agreement) and (y) reasonably acceptable to the Committee.

120.    "*Priority Tax Claim*" means any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

121.    "*Pro Rata*" means the proportion that (i) an Allowed Claim or an Allowed Interest in a particular Class bears to (ii) the aggregate amount of Allowed Claims or Allowed Interests in that Class and, solely with respect to Claims in Classes 3 and 4(a), the proportion that an Allowed Claim in either such Class bears to the aggregate amount of Allowed Claims in Classes 3 and 4(a) in the aggregate, unless otherwise indicated.  For purposes of calculating Pro Rata distributions if the Sale Transaction is consummated by the Outside Date, the Pro Rata shares of all Holders of Allowed Claims or Allowed Interests shall be calculated taking into account the Acquired Coins Value of the Net Owed Coins distributed to each of the Account Holders.

122.    "*Professional*" means an Entity: (a) employed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

123.    "*Professional Fee Claim*" means any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

124.    "*Professional Fee Escrow Account*" means an escrow account funded by the Debtors with Cash no later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

125.     "*Professional Fee Escrow Amount*" means the aggregate amount of quarterly U.S. Trustee fees, Professional Fee Claims, and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, which shall be estimated pursuant to the method set forth in Article II.B of the Plan.

126.     "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

127.     "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

128.     "*Purchase Price Cash*" means the Cash paid by the Purchaser to OpCo pursuant to the Asset Purchase Agreement.

129.     "*Purchaser*" means Binance US.

130.     "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

131.     "*Related Party*" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

132.     "*Released Parties*" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) Purchaser and each of its Related Parties; and (f) each of the Released Voyager Employees (subject to the limitations contained in Article IV.F and Article IV.G of the Plan); *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

133.     "*Released Professionals*" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable):  (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Fasken Martineau DuMoulin LLP; (vii) Campbells Legal (BVI); (viii) McDermott Will & Emery LLP; (ix) FTI Consulting, Inc.; (x) Epiq Corporate Restructuring, LLC; (xi) Cassels, Brock & Blackwell LLP; (xii) Paul Hastings LLP; (xiii) Harney Westwood & Riegels LP (BVI); (xiv) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xv) Jenner & Block LLP; (xvi) Seyfarth Shaw LLP; (xvii) Alvarez & Marsal Canada Inc.; (xviii) Blake, Cassels & Graydon LLP; (xix) Jaffe Raitt Heuer & Weiss; (xx) Latham & Watkins LLP; (xxi) Lowenstein Sandler LLP; (xxii) Kramer Levin LLP; and (xxiii) Acura Law Firm; *provided* that if the Asset Purchase Agreement is terminated, Latham & Watkins LLP shall not be a "Released Professional" under the Plan.

134.     "*Released Voyager Employees*" means all directors, officers, and Persons employed by each of the Debtors and their Affiliates serving in such capacity on or after the Petition Date but before the Effective Date (subject to the limitations contained in Article IV.F and Article IV.G of the Plan).

135.    "*Releasing Parties*" means, collectively, in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (g) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (h) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (i) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

136.    " *Restructuring Transactions* " means those mergers, amalgamations, consolidations, reorganizations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Committee jointly determine to be necessary to implement the transactions described in this Plan, as described in more detail in Article IV.B herein and the Restructuring Transactions Memorandum.

137.    "*Restructuring Transactions Memorandum*" means that certain memorandum as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the Restructuring Transactions, the form of which shall be included in the Plan Supplement, and which shall be in a form reasonably acceptable to the Committee.

138.    "*Robertson Class Action*" means that certain putative class action litigation filed in the United States District Court for the Southern District of Florida, captioned *Robertson, et al. v. Cuban, et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022).

139.    "*Sale Transaction*" means the sale of certain of the Debtors' assets and all other transactions pursuant to the Asset Purchase Agreement.

140.    "*Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance acceptable to the Purchaser and in all respects consistent with the terms of the Asset Purchase Agreement, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors and assigned to the Purchaser pursuant to the Plan and Asset Purchase Agreement, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Trust, as applicable, in accordance with the Plan.

141.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance reasonably acceptable to the Committee, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Trust, as applicable, in accordance with the Plan.

142.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, settled, compromised, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors and/or the Wind-Down Entity, which shall be included in the Plan Supplement.  For the avoidance of doubt, any failure to specifically list any Causes of Action on the Schedule of Retained Causes of Action shall not be deemed a waiver or admission that any such Cause of Action does not constitute Vested Causes of Action.

143.    "*Schedules*" means, collectively, the schedules of assets and liabilities, Schedule of Assumed Executory Contracts and Unexpired Leases, Schedule of Assumed and Assigned Executory

Contracts and Unexpired Leases, and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may have been or may be amended, modified, or supplemented from time to time.

144.    "*SEC*" means the United States Securities and Exchange Commission.

145.    "*Section 510(b) Claim*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code.

146.    "*Secured*" means, when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a secured Claim.

147.    "*Secured Tax Claim*" means any Secured Claim against a Debtor that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

148.    "*Securities Act*" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

149.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

150.    "*Side-A Policy*" means the Cornerstone A-Side Management Liability Policy, ELU184179-22, issued by XL Specialty Insurance Company, for the July 1, 2022 to July 1, 2023 period.

151.    "*Solicitation Materials*" means all solicitation materials with respect to the Plan.

152.    "*Special Committee*" means the special committee established at OpCo, comprised of two independent directors, to conduct the Special Committee Investigation.

153.    "*Special Committee Investigation*" means that certain investigation undertaken by the Special Committee into certain historical transactions, as more fully described in the Disclosure Statement.

154.    "*Supported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

155.    "*TopCo*" means Voyager Digital Ltd., a Canadian corporation that is publicly traded on the Toronto Stock Exchange.

156.    "*TopCo General Unsecured Claim*" means any Claim against TopCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; (h) an Intercompany Claim; or (i) a Section 510(b) Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, other than 510(b) Claims, against TopCo are TopCo General Unsecured Claims.

157.    "*Transferred Creditors*" means Account Holders and Holders of Allowed OpCo General Unsecured Claims who have completed all documentation and "KYC" processes reasonably required by Purchaser in the ordinary course of Purchaser's business with respect to similarly situated clients and who have opened a Binance US Account as of the date that is three (3) months following the later of the Closing Date (as defined in the Asset Purchase Agreement) or such later date as may be specified in the Customer Onboarding Protocol, and the successors and assigns of such Holders.

158.    "*Transferred Cryptocurrency Value*" means the aggregate VWAP of any Cryptocurrency that is the subject of an Additional Bankruptcy Distribution as of the date that is two Business Days prior to such Additional Bankruptcy Distribution.

159.    "*U.S. Trustee*" means the Office of the United States Trustee for Region 2.

160.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that, after the expiration of six months after the Effective Date, has not:  (a) accepted a distribution, (b) given notice to the Wind-Down Trust of an intent to accept a particular distribution, (c) responded to the Debtors' or Wind-Down Trust's requests for information necessary to facilitate a particular distribution, or (d) taken any other action necessary to facilitate such distribution.

161.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

162.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

163.    "*Unsupported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

164.    "*Unsupported Jurisdiction Approval*" has the meaning ascribed to it in the Asset Purchase Agreement.

165.    "*Vested Causes of Action*" means the Causes of Action vesting in the Wind-Down Entity pursuant to Article IV.L of the Plan, including, but not limited to, those Causes of Action enumerated on the Schedule of Retained Causes of Action, which shall be included in the Plan Supplement and in all respects consistent with the terms of the Asset Purchase Agreement.

166.    "*VGX*" means Voyager Token, that certain Cryptocurrency issued by the Debtors.

167.    "*Voting Deadline*" means February 22, 2023.

168.    "*Voyager*" means Voyager Digital Ltd. and its direct and indirect Affiliates.

169.    "*VWAP*" means, with respect to any type of Cryptocurrency and as of any date of determination, an amount equal to the volume weighted average price in U.S. dollars for such type of Cryptocurrency for the consecutive 24-hour period immediately prior to 8:00 a.m. New York Time on such date of determination, as reported on https://coinmarketcap.com.

170.    "*Wind-Down Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date.

171.    "*Wind-Down Entity*" means the Wind-Down Debtor or the Wind-Down Trust, as applicable, pursuant to the Restructuring Transactions Memorandum.

172.    "*Wind-Down Entity Assets*" means the Wind-Down Trust Assets or any assets transferred to the Wind-Down Debtor, as applicable.

173.    "*Wind-Down Reserve*" means an amount, which shall be agreed upon between the Debtors and the Committee prior to the Confirmation Hearing.

174.    "*Wind-Down Trust*" means the trust established on the Effective Date and described in Article IV.H to be established under Delaware trust law that, among other things, shall effectuate the wind-down of the Wind-Down Debtors, commence, litigate and settle the Vested Causes of Action that are not released, waived, settled, compromised, or transferred under the Plan and make distributions pursuant to the terms of the Plan and the Wind-Down Trust Agreement; *provided* that, for the avoidance of doubt, the Wind-Down Trust shall not conduct any business operations or continue the Debtors' business operations after the Effective Date.

175.    "*Wind-Down Trust Agreement*" means that certain trust agreement by and among the Debtors, the Committee, and the Wind-Down Trust, which shall be included in the Plan Supplement in a form reasonably acceptable to the Committee.

176.    "*Wind-Down Trust Assets*" means all of the Debtors' assets transferred to, and vesting in, the Wind-Down Trust pursuant to the Wind-Down Trust Agreement, which, in the event the Sale Transaction is consummated, shall exclude the Acquired Assets, and which shall include, without limitation but only to the extent the following are not Acquired Assets, (a) the Wind-Down Reserve, (b) the Net-Owed Coins to be distributed to Account Holders in Unsupported Jurisdictions to the extent the Purchaser has not obtained the applicable Unsupported Jurisdiction Approval in accordance with Section 6.12 of the Asset Purchase Agreement, (c) any distributions to Account Holders or Holders of OpCo General Unsecured Claims that are returned to the Wind-Down Entity pursuant to Section 6.12(e) of the Asset Purchase Agreement, (d) 3AC Claims and 3AC Recovery, (e) FTX Claims and FTX Recovery, (f) Alameda Claims and Alameda Recovery, (g) the Non-Released D&O Claims, and (h) the Vested Causes of Action.

177.    "*Wind-Down Trust Beneficiaries*" means the Holders of Allowed Claims or Allowed Interests that are entitled to receive distributions pursuant to the terms of the Plan, whether or not such Claims or Interests are Allowed as of the Effective Date.

178.    "*Wind-Down Trust Expenses*" means all actual and necessary costs and expenses incurred by the Wind-Down Trustee in connection with carrying out the obligations of the Wind-Down Trust pursuant to the terms of the Plan and the Wind-Down Trust Agreement.

179.    "*Wind-Down Trust Oversight Committee*" means the oversight committee tasked with overseeing the Wind-Down Trust in accordance with the Plan and the Wind-Down Trust Agreement.

180.    "*Wind-Down Trust Units*" means the beneficial interests in the Wind-Down Trust as more fully set forth in the Wind-Down Trust Agreement.

181.    "*Wind-Down Trustee*" means the Person or Persons selected by the Committee, after consultation with the Debtors, subject to the approval of the Bankruptcy Court and identified in the Plan Supplement, to serve as the trustee(s) of the Wind-Down Trust, and any successor thereto, appointed pursuant to the Wind-Down Trust Agreement.

### B.    Rules of Interpretation

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (3) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (4) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter have been or may thereafter be validly amended, amended and restated, supplemented, or otherwise modified; (5) unless otherwise specified, any reference to an Entity as a Holder of a Claim or Interest, includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) unless otherwise specified, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases; (14) any effectuating provisions may be interpreted by the Debtors or the Wind-Down Trust in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (15) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (16) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (18) the use of "include" or "including" is without limitation unless otherwise stated.

### C.    Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

### D.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments,

17

or contracts, in which case the governing law of such agreement shall control); *provided* that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Wind-Down Debtors, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

**E.      Reference to Monetary Figures**

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

**F.      Reference to the Debtors or the Wind-Down Debtors**

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Wind-Down Debtors mean the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

**G.      Nonconsolidated Plan**

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

<div align="center">

**ARTICLE II.**

**ADMINISTRATIVE AND PRIORITY CLAIMS**

</div>

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

**A.      Administrative Claims**

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), unless previously Filed, requests for payment of Allowed Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code) must be Filed and served on the Wind-Down Entity pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied as of the Effective Date without the need for any objection from the Wind-Down Entity or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Objections to such requests, if any, must be Filed and served on the Wind-Down Entity and the requesting party by the Claims Objection Bar Date for Administrative Claims. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive an amount of Cash equal to the

<div align="center">18</div>

amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down Entity, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court. Any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned to the sender in full.

Objections to requests for payment of such Administrative Claims, if any, must be Filed with the Bankruptcy Court and served on the Wind-Down Entity and the requesting Holder no later than the Claims Objection Bar Date for Administrative Claims. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

**B.**     **Professional Fee Claims**

1.     <u>Final Fee Applications and Payment of Professional Fee Claims</u>

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules. The Wind-Down Entity shall pay Professional Fee Claims in Cash to such Professionals in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Entity's obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

2.     <u>Professional Fee Escrow Account</u>

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and the U.S. Trustee and for no other Entities until all quarterly U.S. Trustee fees and all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the U.S. Trustee or to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Wind-Down Entity. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, and all U.S. Trustee quarterly fees plus statutory interest, if any, have been paid in full, any remaining funds held in the Professional Fee

Escrow Account shall be turned over to the Wind-Down Entity without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

      3.      <u>Professional Fee Escrow Amount</u>

The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided* that the Wind-Down Entity shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

      4.      <u>Post-Confirmation Date Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors and/or the Wind-Down Entity, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Wind-Down Entity. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Entity may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

For the avoidance of doubt, no Administrative Claims, Professional Fee Claims, or any other post-confirmation fees and expenses shall be paid prior to payment of any quarterly fees due and outstanding to the U.S. Trustee.

**C.      Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**ARTICLE III.**

**CLASSIFICATION, TREATMENT,
AND VOTING OF CLAIMS AND INTERESTS**

**A.      Classification of Claims and Interests**

Except for the Claims addressed in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article III for all purposes, including voting,

Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

**B.    Summary of Classification**

A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is set forth in the following chart. The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below applies separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.E hereof. Voting tabulations for recording acceptances or rejections of the Plan will be conducted on a Debtor-by-Debtor basis as set forth above.[1]

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| 4A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |

---

[1]    The Debtors reserve the right to separately classify Claims or Interests to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

## C.    Treatment of Classes of Claims and Interests

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or Wind-Down Entity, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable.  In no event shall any Holder of a Claim receive more than such Holder's Allowed amount on account of such Claim.

1.    Class 1 —Secured Tax Claims

(a)    *Classification*:  Class 1 consists of all Secured Tax Claims.

(b)    *Treatment*:  Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down Entity, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired.

(c)    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Secured Tax Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Secured Tax Claims are not entitled to vote to accept or reject the Plan.

2.    Class 2 — Other Priority Claims

(a)    *Classification*:  Class 2 consists of all Other Priority Claims.

(b)    *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

(c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3 — Account Holder Claims

(a)    *Classification*:  Class 3 consists of all Account Holder Claims.

(b)    *Allowance*: Account Holder Claims shall be conclusively Allowed in the amount listed on OpCos's *Amended Schedules of Assets and Liabilities* (Case No. 22-10945) [Docket No. 18]; *provided* that the rights of any Holder of an

22

Account Holder Claim to object to the scheduled amount shall be preserved. To the extent an Account Holder Claim is Allowed in a greater amount than the scheduled amount of such Account Holder Claim, such Holder shall be entitled to a subsequent distribution such that it will receive its Pro Rata share of recoveries to Holders of Allowed Account Holder Claims. Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

(c)     *Treatment*:  Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim:

(i)     If the Sale Transaction is consummated by the Outside Date:

A.     its Net Owed Coins, as provided in and subject to the requirements of Sections 6.10 and 6.12 of the Asset Purchase Agreement; *provided* that for Account Holders in Unsupported Jurisdictions and only to the extent that the Purchaser does not obtain the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides within 6 months following the Closing Date (as defined in the Asset Purchase Agreement), such Account Holders shall receive, after expiration of such time period, value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated;

B.     its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

C.     its Pro Rata share of Distributable OpCo Cash; and

D.     to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims;

*provided* that distributions made to any Account Holder pursuant to clauses (B), (C), and (D) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder; or

(ii)    If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

A.     its Pro Rata share of Distributable OpCo Cash;

B.  its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and

C.  to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(d)  *Voting:* Class 3 is Impaired under the Plan. Holders of Allowed Account Holder Claims are entitled to vote to accept or reject the Plan.

4.  Class 4A — OpCo General Unsecured Claims

(a)  *Classification*: Class 4A consists of all OpCo General Unsecured Claims.

(b)  *Treatment*: Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:

(i)  If the Sale Transaction is consummated by the Outside Date:

A.  its Pro Rata share of Distributable Cryptocurrency in Cash;

B.  its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

C.  its Pro Rata share of Distributable OpCo Cash; and

D.  to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or

24

> Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; or

    (ii)    If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

        A.    its Pro Rata share of Distributable Cryptocurrency in Cash;

        B.    its Pro Rata share of Distributable OpCo Cash; and

        C.    to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

    (c)    *Voting*:  Class 4A is Impaired under the Plan.  Holders of Allowed OpCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.    <u>Class 4B — HoldCo General Unsecured Claims</u>

    (a)    *Classification*:  Class 4B consists of all HoldCo General Unsecured Claims.

    (b)    *Treatment*:  Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim:

        (i)    its Pro Rata share of Distributable HoldCo Cash; and

        (ii)    to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to HoldCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(c)    *Voting*: Class 4B is Impaired under the Plan. Holders of Allowed HoldCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

6.    <u>Class 4C — TopCo General Unsecured Claims</u>

(a)    *Classification*: Class 4C consists of all TopCo General Unsecured Claims.

(b)    *Treatment*: Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim:

    (i)    its Pro Rata share of Distributable TopCo Cash; and

    (ii)    to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or the Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

(c)    *Voting*: Class 4C is Impaired under the Plan. Holders of Allowed TopCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

7.    <u>Class 5 — Alameda Loan Facility Claims</u>

(a)    *Classification*: Class 5 consists of all Alameda Loan Facility Claims.

(b)    *Treatment*: Each Holder of an Allowed Alameda Loan Facility Claim will receive in exchange for such Allowed Alameda Loan Facility Claim to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets; *provided* that any distributions on account of Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Claims at OpCo, HoldCo, and TopCo, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, Allowed OpCo General Unsecured Claims, Allowed HoldCo General Unsecured Claims, and Allowed TopCo General Unsecured Claims; *provided*, *however*, if the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity.

(c)    *Voting*: Class 5 is Impaired under the Plan. Holders of Allowed Alameda Loan Facility Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Alameda Loan Facility Claims are not entitled to vote to accept or reject the Plan.

26

8.    Class 6 — Section 510(b) Claims

    (a)    *Classification*:  Class 6 consists of all Section 510(b) Claims against TopCo.

    (b)    *Allowance*:  Notwithstanding anything to the contrary herein, a Section 510(b) Claim against TopCo, if any such Section 510(b) Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

    (c)    *Treatment*:  Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims.

    (d)    *Voting*:  Class 6 is Impaired under the Plan.  Holders (if any) of Allowed Section 510(b) Claims against TopCo are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders (if any) of Allowed Section 510(b) Claims against TopCo are not entitled to vote to accept or reject the Plan.

9.    Class 7 — Intercompany Claims

    (a)    *Classification*:  Class 7 consists of all Intercompany Claims.

    (b)    *Treatment*:  On the Effective Date, all Intercompany Claims shall be, at the option of the Debtors, either (a) Reinstated or (b) converted to equity, otherwise set off, settled, distributed, contributed, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum.

    (c)    *Voting*:  Holders of Intercompany Claims are either Unimpaired or Impaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

10.    Class 8 — Intercompany Interests

    (a)    *Classification*:  Class 8 consists of all Intercompany Interests.

    (b)    *Treatment*:  On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum.

    (c)    *Voting*:  Holders of Intercompany Interests are either Unimpaired or Impaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore,

Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

11.  Class 9 — Existing Equity Interests

(a)  *Classification*:  Class 9 consists of all Existing Equity Interests.

(b)  *Treatment*:  Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims.

(c)  *Voting*:  Class 9 is Impaired under the Plan.  Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

**D.  Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Wind-Down Entity's rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**E.  Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**F.  Subordinated Claims**

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Entity reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**G.  Intercompany Interests**

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate

structure given the existing intercompany systems connecting the Debtors and their Affiliates, and in exchange for the Debtors' and Wind-Down Entity's agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

## H.     Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## I.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims or Interests. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE IV.

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

## A.     General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

## B.     Restructuring Transactions

On or before the Effective Date, the applicable Debtors will take any action as may be necessary or advisable to effectuate the Restructuring Transactions described in the Plan, the Restructuring Transactions Memorandum, and the Customer Onboarding Protocol, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate

certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) the transfer or distribution of any Cryptocurrency or Cash pursuant to the Asset Purchase Agreement, or the Liquidation Procedures, as applicable; (5) the execution and delivery of the Wind-Down Trust Agreement; (6) any transactions necessary or appropriate to form the Wind-Down Entity; (7) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (8) all transactions necessary to provide for the purchase of the Acquired Assets by Purchaser under the Asset Purchase Agreement; and (9) all other actions that the applicable Entities determine to be necessary or appropriate, or that are reasonably requested by the Purchaser in accordance with the Asset Purchase Agreement, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

## C.    The Sale Transaction

If the Sale Transaction is consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the following terms shall govern:

On or prior to the Effective Date, the Debtors shall have consummated the Sale Transaction, and, among other things, the Acquired Assets and Assumed Liabilities shall have transferred to the Purchaser free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and the Purchaser shall pay to the Debtors or Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims, as applicable, the proceeds from the Sale Transaction, as and to the extent provided for in the Asset Purchase Agreement, and this Plan. The Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down Entity, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Asset Purchase Agreement the Customer Onboarding Protocol, and this Plan. The Debtors shall be authorized to sell any Cryptocurrency to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. On and after the Effective Date, except as otherwise provided in the Plan and the Wind-Down Trust Agreement, the Wind-Down Debtors, the Wind-Down Entity, or the Purchaser, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

Notwithstanding anything contained in this Plan and any Definitive Documents, if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, all provisions contained in this Plan and the Definitive Documents governing the Sale Transaction shall have no further force and effect, and the provisions governing the Liquidation Transaction shall govern. The rights and remedies of the Seller and Purchaser under the Asset Purchase Agreement and any related orders of the Bankruptcy Court shall be expressly preserved.

### D.    The Liquidation Transaction

If the Sale Transaction is not consummated by the Outside Date, pursuant to the Asset Purchase Agreement, then the following terms shall govern:

1.    *The Liquidation Transaction*

On or after the Outside Date, the Debtors will pursue the Liquidation Transaction in accordance with the Liquidation Procedures. Pursuant to the Liquidation Transaction, the Debtors, the Wind-Down Entity, or the Wind-Down Trustee, as applicable, will distribute certain of the Cryptocurrency in-kind to Holders of Account Holder Claims in accordance with Article III.C of the Plan, transfer all Wind-Down Entity Assets or Wind-Down Trust Assets to the Wind-Down Reserve, liquidate certain of the Cryptocurrency, distribute Cash to Holders of Claims, wind down and dissolve the Debtors, and pursue final administration of the Debtors' Estates pursuant to the Bankruptcy Code.

The Debtors, or the Wind-Down Entity, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Liquidation Transaction pursuant to this Plan. On or before the date that is twenty-one days prior to the anticipated commencement of the Liquidation Transaction, the Debtors, or the Wind-Down Entity, as applicable, shall file the Liquidation Procedures with the Bankruptcy Court. Parties in interest shall have ten days to object to the Liquidation Procedures, and if no objections are timely filed, the Liquidation Procedures shall be approved. In the event of a timely objection, the Bankruptcy Court shall adjudicate any objection to the Liquidation Procedures.

On and after the Effective Date, except as otherwise provided in the Plan, the Wind-Down Trust Agreement, and the Liquidation Procedures, the Wind-Down Debtors or the Wind-Down Entity as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

2.    *Cryptocurrency Rebalancing*

Prior to the Effective Date the Debtors shall, in consultation with the Committee, be authorized to rebalance their Cryptocurrency portfolio to ensure that the Debtors can effectuate *pro rata* in-kind distributions of the Distributable Cryptocurrency according to Article III.C.3(c) of this Plan, *provided* that such rebalancing shall be in accordance with the Asset Purchase Agreement (if the Asset Purchase Agreement has not been terminated). The Debtors may effectuate such rebalancing by (i) selling such Cryptocurrency that cannot be distributed to Account Holders, (ii) purchasing Cryptocurrency supported by Voyager's or Purchaser's platform (as provided by the Asset Purchase Agreement) that shall be distributed to Account Holders, and (iii) engaging in any other transaction, including the execution of trades of Cryptocurrency, necessary or appropriate to effectuate distributions of the Distributable Cryptocurrency to Holders of Allowed Account Holder Claims.

### E.    Management and Employee Transition Plans

The Debtors shall be authorized to implement the Management Transition Plan and Employee Transition Plan, the terms of which shall be reasonably acceptable to Purchaser and the Committee and included in the Plan Supplement. The Management Transition Plan and Employee Transition Plan shall help ensure that employees are available to provide transition services to the Debtors and/or the Wind-Down Entity to effectuate the Sale Transaction and to wind down the Debtors' Estates.

## F.      Non-Released D&O Claims

Any Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' CEO and/or CCO (regardless of any fiduciary capacity in which such individuals were acting) that are expressly related to approval of the 3AC Loan are not released pursuant to the Plan (collectively, the "Non-Released D&O Claims"), and shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved by the Wind-Down Entity in accordance with the terms of Article IV.G of this Plan and subject to the Wind-Down Reserve.  Any claims against the D&O Carriers that the Debtors' insurance transactions within the 90 days prior to the Petition Date are avoidable under the Bankruptcy Code, applicable state law, or both (the "Non-Released Insurance Claims") shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved solely by the Wind-Down Entity in accordance with the terms of Article IV.G of this Plan.  The Wind-Down Entity shall be a successor to the Debtors' rights, title, and interest in any Non-Released D&O Claims and Non-Released Insurance Claims, and the Wind-Down Entity shall have standing to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims in accordance with the terms of Article IV.G of this Plan; *provided* that: (i) any recovery by the Wind-Down Entity (and the beneficiaries thereof) on account of any Non-Released D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O Liability Insurance Policies (and/or from the D&O Carriers directly) after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims; (ii) any party, including any trustee or any beneficiary of the Wind-Down Entity, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the Non-Released D&O Claims shall do so solely upon available insurance coverage from the Debtors' available D&O Liability Insurance Policies; and (iii) no party shall (a) record any judgment against the CEO or CCO, or (b) otherwise attempt to collect, directly or indirectly, from the personal assets of the CEO or CCO with respect to the Non-Released D&O Claims. For the avoidance of doubt, this provision does not enjoin, limit, or impair direct claims held by third parties against the Debtors' CEO or CCO (if any) other than any direct claims held by Holders of Claims or Interests that opt into the third party release in Article VIII.B of this Plan.  Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the Non-Released D&O Claims; (y) final resolution of any coverage claims asserted against the Debtors' available D&O Liability Insurance Policies on account of the Non-Released D&O Claims; or (z) exhaustion of the available insurance coverage under the D&O Liability Insurance Policies, the Non-Released D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order.  For the avoidance of doubt, any release of the Non-Released D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.

## G.      The D&O Settlement

On the Effective Date, the terms of the D&O Settlement shall be effectuated as provided in this Article IV.G.

Pursuant to the D&O Settlement, CEO shall repay the $1,900,000 received from the Debtors on or around February 28, 2022, by paying the after-tax amount of such transfer (approximately $1,125,000) to OpCo in cash and assigning the right, if any, to any tax refund for the balance to the Wind-Down Entity. CEO shall subordinate any Claims (including any indemnification claims asserted under this Art. IV.F) he holds against the Debtors until all other Holders of Claims are paid in full.  CCO shall subordinate 50 percent of any Claims he holds other than indemnification claims (and 100% of any indemnification claims asserted under this Art. IV.F) against the Debtors until all other Holders of Claims are paid in full; *provided*, *however*, that in the event the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

32

CEO and CCO, each as insureds, under the D&O Liability Insurance Policies agree: (i) not to draw down on the Side-A Policy; *provided*, *however*, that should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise) such officer shall be entitled to seek coverage under the Side-A Policy to the extent any such coverage remains; and (ii) not to object to any settlement by the Debtors or Wind Down Entity of avoidance claims under the Side-A Policy, even if such settlement results in termination of benefits under the Side-A Policy. For the avoidance of doubt, this agreement is not intended to and shall not alter or amend each of the insureds' duties under the D&O Liability Insurance Policies. In the event that any insurer under the D&O Liability Insurance Policies denies coverage for any reason, the Wind-Down Entity shall have the right to bring a coverage claim against the insurer(s) in the name of the insured, the insureds shall reasonably cooperate with respect to any such claim, and the insured may participate at their election (and at their sole cost). For the avoidance of doubt, nothing contained in this Plan is intended as a waiver or release of the Debtors' and/or Wind-Down Entity's right to assert any Non-Released D&O Claim, but rather limits such recovery in the manner set forth above.

CEO and CCO shall be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Entity and retain the right to assert claims for advancement and indemnification up to the limits of any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to CEO and/or CCO based upon or arising out of the lack of a formal claim for indemnification; *provided*, *however*, that any such indemnification or advancement claims shall be subordinated in full unless and until all other Holders of Claims are paid in full; *provided*, *further*, that in the event that any of the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO shall subordinate any and all rights and entitlements under the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd., Policy Number ELU184179-22, to any recovery by the Debtors and/or the Wind-Down Entity on account of the Debtors' and/or Wind-Down Entity's claims for the avoidance of the premium paid for the policy. For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), CEO and/or CCO shall be entitled to seek coverage under the Side-A Policy. CEO and CCO shall remain at, and continue performing the responsibilities of, their respective position(s) with the Debtors and assist with the Debtors' transition for at least 30 days from entry of the Confirmation Order; *provided* that CCO shall have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the CEO shall have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided*, *further*, that both the CEO and CCO shall be available to the Debtors and/or the Wind-Down Entity for a maximum of five hours per month for the one year following the Effective Date.

In the event that the sworn financial disclosure statements under penalty of perjury provided to the Debtors, the Special Committee and the Committee by CEO and CCO are later determined at any time by Final Order of the Bankruptcy Court or other court of competent jurisdiction to be materially inaccurate, (a) the limitations on recovery by the Wind-Down Entity under this Article IV.G shall no longer apply, (b) any and all release, exculpation and injunction provisions in Article VIII of this Plan with respect to CEO and/or CCO (as applicable) shall be deemed null and void, (c) all Releasing Parties' rights with respect to the CEO and/or CCO (as applicable) shall be fully intact and preserved, (d) amounts paid by CEO shall not be repaid by the Wind-Down Entity, and (e) any applicable statute of limitations shall be deemed tolled from the Petition Date to the date of entry of the order referenced above. The Wind-Down Trust, as successor to the Debtors, shall have standing to bring a motion seeking relief pursuant to this Article IV.G.

Entry of the Confirmation Order shall be deemed approval of the D&O Settlement and, to the extent not already approved by the Bankruptcy Court, the Debtors or the Wind-Down Debtors, as applicable, are authorized to negotiate, execute, and deliver those documents necessary or appropriate to effectuate the D&O Settlement, without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors, the Wind-Down Debtors, the Committee, and the Special Committee may deem to be necessary to effectuate the D&O Settlement.

**H.    Wind-Down Trust**

On the Effective Date, the Wind-Down Trust shall be formed for the benefit of the Wind-Down Trust Beneficiaries and each of the Debtors shall transfer the Wind-Down Trust Assets for distribution in accordance with the terms of the Plan. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

1.    <u>Establishment of a Wind-Down Trust</u>

Pursuant to the Wind-Down Trust Agreement, the Wind-Down Trust will be established. The Wind-Down Trust shall be the successor-in-interest to the Debtors, and the Wind-Down Trust shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Trust Assets. The Wind-Down Trust will conduct no business operations and will be charged with winding down the Debtors' Estates. The Wind-Down Trust shall be managed by the Wind-Down Trustee and shall be subject to a Wind-Down Trust Oversight Committee. For the avoidance of doubt, in the event that the Restructuring Transactions Memorandum specifies that the Wind-Down Debtors will be the Wind-Down Entity, the Wind-Down Debtors shall be managed by the Wind-Down Trustee and shall be subject to the Wind-Down Trust Oversight Committee in the same manner as if the Wind-Down Entity is the Wind-Down Trust. The Wind-Down Trust shall be administered in accordance with the terms of the Wind-Down Trust Agreement and shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget. For the avoidance of doubt, the Wind-Down Trust shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset. The Wind-Down Trust shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Trust Assets shall, subject to the Wind-Down Trust Agreement, be transferred to and vest in the Wind-Down Trust or the Wind-Down Debtors, as applicable. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Entity specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.F and Article IV.G.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Trust and the Wind-Down Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Wind-Down Trust Agreement, compromise or settle any Wind-Down Trust Assets transferred to the Wind-Down Trust. On and after the Effective Date, the Wind-Down Trust and the Wind-Down Trustee may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Trust Assets transferred to the Wind-Down Trust or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Trust or

34

the Wind-Down Trustee on or after the Effective Date, except as otherwise expressly provided herein and in the Wind-Down Trust Agreement. All of the Wind-Down Trust's activities shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget. The Wind-Down Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

The Wind-Down Trustee shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Trust Asset without the need for filing any motion for such relief. On the Effective Date, the Debtors and the Wind-Down Trustee shall execute the Wind-Down Trust Agreement and shall have established the Wind-Down Trust pursuant hereto. In the event of any conflict between the terms of this Article IV.H and the terms of the Wind-Down Trust Agreement, the terms of the Wind-Down Trust Agreement shall control.

2.    Wind-Down Entity Assets

Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional Wind-Down Entity Assets become available, the Debtors shall be deemed, subject to the Wind-Down Trust Agreement, to have automatically transferred to the applicable Wind-Down Entity all of their right, title, and interest in and to all of the Wind-Down Trust Assets, in accordance with section 1141 of the Bankruptcy Code. All such assets shall automatically vest in the Wind-Down Entity free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Interests as set forth herein and the expenses of the Wind-Down Trust as set forth herein and in the Wind-Down Trust Agreement. Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Entity Assets or the Wind-Down Trust.

3.    Treatment of Wind-Down Trust for Federal Income Tax Purposes; No Successor-in-Interest

The Wind-Down Trust shall be established for the primary purpose of liquidating and distributing the Wind-Down Trust Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind-Down Trust. Accordingly, the Wind-Down Trustee may, in an expeditious but orderly manner, liquidate the Wind-Down Trust Assets, make timely distributions to the Wind-Down Trust Beneficiaries and not unduly prolong its duration. The Wind-Down Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Wind-Down Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Wind-Down Trustee expressly for such purpose.

The Wind-Down Trust is intended to qualify as a "grantor trust" for federal income tax purposes to the extent reasonably practicable, with the Wind-Down Trust Beneficiaries treated as grantors and owners of the Wind-Down Trust. However, with respect to any of the assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account

35

(and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

4.      Appointment of Wind-Down Trustee

The Wind-Down Trustee shall be selected by the Committee, in consultation with the Debtors, and shall be identified in the Plan Supplement.  The appointment of the Wind-Down Trustee shall be approved in the Confirmation Order, and the Wind-Down Trustee's duties shall commence as of the Effective Date. The Wind-Down Trustee shall administer the distributions to the Wind-Down Trust Beneficiaries and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Vested Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan, including Article IV.F and Article IV.G.

In accordance with the Wind-Down Trust Agreement, the Wind-Down Trustee shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Trust is dissolved in accordance with the Wind-Down Trust Agreement, and (ii) the date on which a Wind-Down Trustee resigns, is terminated, or is otherwise unable to serve; *provided, however,* that, in the event that a Wind-Down Trustee resigns, is terminated, or is otherwise unable to serve, the Wind-Down Trust Oversight Committee shall appoint a successor to serve as a Wind-Down Trustee in accordance with the Wind-Down Trust Agreement.  If the Wind-Down Trust Oversight Committee does not appoint a successor within the time periods specified in the Wind-Down Trust Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Trust, shall approve a successor to serve as a Wind-Down Trustee.

5.      Responsibilities of Wind-Down Trustee

Responsibilities of the Wind-Down Trustee shall be as identified in the Wind-Down Trust Agreement and shall include, but are not limited to:

(a)     Implementing the Wind-Down Trust, and making the distributions contemplated by the Plan;

(b)     Marshalling, marketing for sale, and wind-down of any of the Debtors' assets constituting Wind-Down Trust Assets;

(c)     Filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan hereof;

(d)     Commencing, prosecuting, or settling claims and Vested Causes of Action;

(e)     Recovering and compelling turnover of the Debtors' property;

(f)     Prosecuting and settling the 3AC Claims, FTX Claims, and Alameda Claims;

(g)     Paying Wind-Down Trust Expenses;

(h)     Abandoning any Debtor assets that cannot be sold or otherwise disposed of for value and where a distribution to Holders of Allowed Claims or Interests would not be feasible or cost-effective in the Wind-Down Trustee's reasonable judgment;

    (i)          Preparing and filing post-Effective Date operating reports (including the month in which the Effective Date occurs);

    (j)          Filing appropriate tax returns in the exercise of the Wind-Down Trustee's fiduciary obligations;

    (k)        Retaining such Professionals as are necessary and appropriate in furtherance of the Wind-Down Trustee's fiduciary obligations; and

    (l)          Taking such actions as are necessary and reasonable to carry out the purposes of the Wind-Down Trust, including winding down the Debtors' business affairs.

6.      The Wind-Down Trust Oversight Committee

The Wind-Down Trust Oversight Committee shall consist of those parties selected by the Committee and identified in the Plan Supplement, and which, at no time shall consist of greater than seven members.

The Wind-Down Trust Oversight Committee shall have the responsibility to review and advise the Wind-Down Trustee with respect to the liquidation and distribution of the Wind-Down Entity Assets transferred to the Wind-Down Trust in accordance herewith and the Wind-Down Trust Agreement. For the avoidance of doubt, in advising the Wind-Down Trustee, the Wind-Down Trust Oversight Committee shall maintain the same fiduciary responsibilities as the Wind-Down Trustee. Vacancies on the Wind-Down Trust Oversight Committee shall be filled by a Person designated by the remaining member or members of the Wind-Down Trust Oversight Committee from among the Holders of Account Holder Claims. The Wind-Down Trustee shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down Trust Oversight Committee for cause.

7.      Expenses of Wind-Down Trustee

The Wind-Down Trust Expenses shall be paid from the Wind-Down Trust Assets subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget.

8.      Insurance; Bond

The Wind-Down Trustee may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the Wind-Down Trustee and the Wind-Down Trust Oversight Committee under the Wind-Down Trust Agreement. Unless otherwise agreed to by the Wind-Down Trust Oversight Committee, the Wind-Down Trustee shall serve with a bond, the terms of which shall be agreed to by the Wind-Down Trust Oversight Committee, and the cost and expense of which shall be paid by the Wind-Down Trust.

9.      Fiduciary Duties of the Wind-Down Trustee

Pursuant hereto and the Wind-Down Trust Agreement and the Wind-Down Trustee shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.

10.      Termination of the Wind-Down Trust

The Wind-Down Trust will terminate on the earlier of:  (a) (i) the final liquidation, administration and distribution of the Wind-Down Trust Assets in accordance with the terms of the Wind-Down Trust Agreement and the Plan, and its full performance of all other duties and functions as set forth herein or in the Wind-Down Trust Agreement and (ii) the Chapter 11 Cases of the Debtors have been closed; or (b) the Wind-Down Trustee determines in its reasonable judgment that the Wind-Down Trust lacks sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him or her under the Plan, the Confirmation Order and/or the Wind-Down Trust Agreement. After (x) the final distributions pursuant hereto, (y) the Filing by or on behalf of the Wind-Down Trust of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the Wind-Down Trustee, the Wind-Down Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

11.      Liability of Wind-Down Trustee; Indemnification

Neither the Wind-Down Trustee, the Wind-Down Trust Oversight Committee, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, a "Wind-Down Trust Party" and collectively, the "Wind-Down Trust Parties") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Wind-Down Trust or for the act or omission of any other Wind-Down Trust Party, nor shall the Wind-Down Trust Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Wind-Down Trust Agreement or the Plan other than for specific acts or omissions resulting from such Wind-Down Trust Party's willful misconduct, gross negligence or actual fraud.  Subject to the Wind-Down Trust Agreement, the Wind-Down Trustee shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee, and the Wind-Down Trust Oversight Committee shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors.  The Wind-Down Trustee or the Wind-Down Trust Oversight Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing.  Notwithstanding such authority, neither the Wind-Down Trustee nor the Wind-Down Trust Oversight Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Wind-Down Trustee, the Wind-Down Trust Oversight Committee, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud.  The Wind-Down Trust shall indemnify and hold harmless the Wind-Down Trust Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Wind-Down Trust or the Plan or the discharge of their duties hereunder; *provided*, *however*, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual

fraud. Persons dealing or having any relationship with the Wind-Down Trustee shall have recourse only to the Wind-Down Trust Assets and shall look only to the Wind-Down Trust Assets to satisfy any liability or other obligations incurred by the Wind-Down Trustee or the Wind-Down Trust Oversight Committee to such Person in carrying out the terms of the Wind-Down Trust Agreement, and neither the Wind-Down Trustee nor the Wind-Down Trust Oversight Committee, shall have any personal obligation to satisfy any such liability. The Wind-Down Trustee and/or the Wind-Down Trust Oversight Committee members shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Wind-Down Trust Agreement against any of them. The Wind-Down Trust shall promptly pay expenses reasonably incurred by any Wind-Down Trust Party in defending, participating in, or settling any action, proceeding or investigation in which such Wind-Down Trust Party is a party or is threatened to be made a party or otherwise is participating in connection with the Wind-Down Trust Agreement or the duties, acts or omissions of the Wind-Down Trustee or otherwise in connection with the affairs of the Wind-Down Trust, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Wind-Down Trust Party hereby undertakes, and the Wind-Down Trust hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such exculpated party is not entitled to be indemnified therefor under the Wind-Down Trust Agreement. The foregoing indemnity in respect of any Wind-Down Trust Party shall survive the termination of such Wind-Down Trust Party from the capacity for which they are indemnified.

12.    No Liability of the Wind-Down Trust.

On and after the Effective Date, the Wind-Down Trust shall have no liability on account of any Claims or Interests except as set forth herein and in the Wind-Down Trust Agreement. All payments and all distributions made by the Wind-Down Trustee hereunder shall be in exchange for all Claims or Interests against the Debtors.

**I.      Sources of Consideration for Plan Distributions**

Distributions under the Plan shall be funded by (i) the proceeds of Purchaser's payment obligations under Sections 2.1 and 2.2 of the Asset Purchase Agreement and distributions of Acquired Coins pursuant to Sections 6.12, and 6.14 of the Asset Purchase Agreement, (ii) the Wind-Down Entity or Wind-Down Trust (as applicable) from the Wind-Down Entity Assets or Wind-Down Trust Assets (as applicable); *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance. The Wind-Down Entity Assets or Wind-Down Trust Assets (as applicable) shall be used to pay the Wind-Down Entity Expenses (including the compensation of the Wind-Down Trustee and any professionals retained by the Wind-Down Trust), and to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

**J.      Corporate Existence and Dissolution**

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) in effect prior to the Effective Date, except to the extent such certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation

39

documents) are amended pursuant to the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings under applicable state or federal law).

On and after the Effective Date, the Wind-Down Entity will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Entity shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

Upon a certification to be Filed with the Bankruptcy Court by the Wind-Down Trustee of all distributions having been made and completion of all of its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction. The Wind-Down Trustee, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

As soon as practicable after the Effective Date, the Wind-Down Entity shall take such actions as the Wind-Down Entity may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Wind-Down Entity on behalf of any Wind-Down Debtor without need for any action or approval by the shareholders or board of directors or managers of such Debtor. On and after the Effective Date, the Wind-Down Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Notwithstanding such Debtors' dissolution, such Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

## K.    Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, Definitive Documents, and Asset Purchase Agreement shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, managing-members, limited or general partners, or officers of the Debtors, the Wind-Down Debtors, the Wind-Down Trust or any other Entity, including: (1) appointment of the directors, managers, members, and officers for the Wind-Down Debtors as provided herein; (2) the issuances, transfer, and distribution of the Wind-Down Trust Units; (3) the formation of the Wind-Down Trust and appointment of the Wind-Down Trustee and Wind-Down Trust Oversight Committee; (4) the formation of any entities pursuant to and the implementation of the Plan and performance of all actions and transactions contemplated hereby and thereby; (5) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (6) all other acts or actions contemplated by the Plan, Definitive Documents, and Asset Purchase Agreement or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions (including effectuating the Restructuring Transactions Memorandum and the Customer Onboarding Protocol) (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan, Definitive Documents, and Asset Purchase Agreement involving the corporate structure of the Debtors or the Wind-Down Debtors, as applicable, and any corporate action required by the Debtors or the Wind-Down Debtors, as applicable, in connection with the Plan shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the

Wind-Down Debtors, as applicable. On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtors or the Wind-Down Trust, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, Securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.K shall be effective notwithstanding any requirements under non-bankruptcy law.

## L.    Vesting of Assets in the Wind-Down Entity

Except as otherwise provided in the Plan, or in any agreement, instrument, or other document incorporated in the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting Wind-Down Trust Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, transferred, or discharged pursuant to the Plan), and any property acquired by any of the Debtors under the Plan shall vest in the Wind-Down Entity, free and clear of all Liens, Claims, charges, or other encumbrances.

## M.    Cancellation of Notes, Instruments, Certificates, and Other Documents

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions (including, without limitation, the Definitive Documents and the Asset Purchase Agreement), all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

## N.    Effectuating Documents; Further Transactions

On and after the Effective Date, the Wind-Down Debtors, and its directors, managers, partners, officers, authorized persons, and members thereof, and the Wind-Down Trust and Wind-Down Trustee are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Definitive Documents, and Asset Purchase Agreement, in the name of and on behalf of the Wind-Down Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

## O.    Section 1146(a) Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor, the Wind-Down Trust, the Purchaser, or to any other Entity) of property under the Plan, Definitive Documents, and Asset Purchase Agreement or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or

the Wind-Down Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Asset Purchase Agreement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**P.      Preservation of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Entity shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred. Such rights shall be preserved by the Debtors and Wind-Down Debtors and shall vest in the Wind-Down Entity, with the Wind-Down Entity's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and Wind-Down Debtors as of the Effective Date.

The Wind-Down Trust may pursue such Causes of Action, as appropriate, in accordance with the best interests of the beneficiaries of the Wind-Down Trust and in accordance with the Wind-Down Trust Agreement and the Plan. **No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors, the Wind-Down Debtors or the Wind-Down Trust, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Wind-Down Trust, on behalf of the Debtors and the Wind-Down Debtors, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan.** Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Trust, on behalf of the Debtors and Wind-Down Debtors and in accordance with the Wind-Down Trust Agreement, expressly reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Wind-Down Trust, on behalf of the Debtors and Wind-Down Debtors, reserves and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Trust, except as otherwise provided in the Plan, including Article VIII of the Plan. The Wind-Down Trust, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan.

**Q.      Election to Contribute Third-Party Claims**

Because aggregating all Contributed Third-Party Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Wind-Down Entity. By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Entity, it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind-Down Entity, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Entity to memorialize and effectuate such contribution.

**R.      Contribution of Contributed Third-Party Claims**

On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Wind-Down Entity and shall thereafter be Wind-Down Trust Assets for all purposes. No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Wind-Down Trust Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down Trust will or will not pursue any and all available Contributed Third-Party Claims against such Person. The Wind-Down Trust shall have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date. For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

**S.      Closing the Chapter 11 Cases**

On and after the Effective Date, the Wind-Down Entity shall be permitted to classify all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, as closed, and all contested matters relating to any of the Debtors, including objections to Claims or Interests and any adversary proceedings, may be administered and heard in the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date,

irrespective of whether such Claims or Interests were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

## ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.    Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy other than the Side-A Policy.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

**B.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtors, as applicable, under such Executory Contract or Unexpired Lease.  Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors and Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

**C.    Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Counterparties to Executory Contracts or Unexpired Leases listed subject to rejection under the Plan shall be served with a notice of rejection of Executory Contracts and Unexpired Leases with the Plan Supplement.  Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims, Noticing, and Solicitation Agent and served on the Debtors or Wind-Down Entity, as applicable, no later than thirty days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, or the Wind-Down Entity, the Estates, or their property without the need for any objection by the Wind-Down Entity or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed released, and be subject to the permanent injunction set forth in Article VIII.D of the Plan, including any Claims against any**

**Debtor listed on the Debtors' schedules as unliquidated, contingent, or disputed.** All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims in accordance with Article III.C of the Plan.

**D.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed**

The Debtors, the Wind-Down Entity, or the Purchaser, as applicable pursuant to the Asset Purchase Agreement, shall pay Cures, if any, on the Effective Date.  The Debtors shall provide notice of the amount and timing of payment of any such Cure to the parties to the applicable assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors, the Wind-Down Entity, or the Purchaser shall be dealt with in the ordinary course of business and, if needed, shall be Filed with the Claims, Noticing, and Solicitation Agent on or before thirty days after the Effective Date.  **If any counterparty to an Executory Contract or Unexpired Lease does not receive a notice of assumption and applicable cure amount, such counterparty shall have until on or before thirty days after the Effective Date to bring forth and File a request for payment of Cure.**  Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Wind-Down Debtor or the Wind-Down Entity, without the need for any objection by the Wind-Down Entity or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied and released upon payment by the Debtors or the Wind-Down Entity or the Purchaser of the Cure in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty); *provided, however,* that nothing herein shall prevent the Wind-Down Entity or the Purchaser, as applicable, from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure.  The Wind-Down Entity or the Purchaser may also settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' first scheduled omnibus hearing for which such objection is timely Filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

In the event of a dispute regarding:  (1) the amount of any Cure Claim, (2) the ability of the Wind-Down Debtors, Purchaser, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed (or assumed and assigned, as applicable), or (3) any other matter pertaining to assumption or assignment, then any disputed Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made as soon as reasonably practicable following, and in accordance with, the entry of a Final Order of the Bankruptcy Court resolving such dispute or as may be agreed upon by the Debtors, the Wind-Down Entity, or Purchaser, as applicable, and the counterparty to the Executory Contract or Unexpired Lease, and any such unresolved dispute shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise or assignment of any Executory Contract or Unexpired Lease to the Purchaser and full payment of any applicable Cure pursuant to this Article V.D, or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall result in the full release and satisfaction of any Cures,

Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assumed and assigned in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.D, in the amount and at the time in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and applicable proposed Cure amount, and disputes the Debtors' proposed Cure amount, such party shall not be required to File a Proof of Claim with respect to such dispute. Any counterparty to an Executory Contract or Unexpired Lease that does not receive a notice or applicable proposed Cure amount, and believes a Cure amount is owed, shall have thirty days after the Effective Date to File a Proof of Claim with respect to such alleged Cure amount, which Claim shall not be expunged until such Cure dispute is resolved.**

## E.    Insurance Policies and Surety Bonds

Each D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) other than the Side-A Policy shall be assumed, in their entirety, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to sections 105 and 365 of the Bankruptcy Code with the Wind-Down Entity being authorized to pursue any proceeds thereof on behalf of the Debtors or the Wind-Down Entity. The Side-A Policy shall ride through these Chapter 11 Cases with the Debtors, and the Wind-Down Entity preserves all avoidance and other actions in connection with the premium paid thereunder. All beneficiaries under the D&O Insurance Policies reserve their rights under such D&O Insurance Policies subject to the limitations set forth in this Plan.

The Debtors or the Wind-Down Entity, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date, and any current and former directors, officers, managers, and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Entity shall retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or Wind-Down Entity may deem necessary, subject to the prior written consent of the Wind-Down Entity. Notwithstanding anything to the contrary contained in the Plan, the Wind-Down Trust shall be entitled to pursue avoidance of the premium paid for the XL Specialty Insurance Company Cornerstone A-Side Management Liability Insurance Policy No. ELU184179-22, and nothing in this Plan shall be deemed a waiver or abrogation of any such rights.

The Debtors shall continue to satisfy their obligations under their surety bonds and insurance policies in full and continue such programs in the ordinary course of business. Each of the Debtors' surety bonds and insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan. On the Effective Date: (a) the Debtors shall be deemed to have assumed all such surety bonds and insurance policies and any agreements, documents, and instruments relating thereto in their entirety; *provided* that the Debtors have assumed all indemnity agreements and cash

collateral agreements related to the surety bonds and (b) such surety bonds and insurance policies and any agreements, documents, or instruments relating thereto shall revest in the applicable Wind-Down Debtor(s) unaltered.

## F.    Reservation of Rights

Nothing contained in the Plan or the Plan Supplement (unless otherwise explicitly provided) shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Wind-Down Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Entity, as applicable, shall have forty-five days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease effective as of the Confirmation Date.

## G.    Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## H.    Contracts and Leases Entered into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Wind-Down Debtor liable thereunder in the ordinary course of its business.  Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

## A.    Timing and Calculation of Amounts to Be Distributed

Except (1) as otherwise provided herein, (2) upon a Final Order, or (3) as otherwise agreed to by the Debtors, the Purchaser, or the Wind-Down Entity, as the case may be, and the Holder of the applicable Claim, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the next Distribution Date after such Claim becomes, as applicable, an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of distributions that the Plan provides for Allowed Claims in the applicable Class from the Distribution Agent.  In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

## B.     Rights and Powers of Distribution Agent

1.     Powers of the Distribution Agent

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities and powers; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

2.     Expenses Incurred on or after the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including reasonable attorney and/or other professional fees and expenses) made by such Distribution Agent shall be paid in Cash by the Wind-Down Entity.

## C.     Delivery of Distributions and Undeliverable or Unclaimed Distributions

1.     Distributions Generally

Except as otherwise provided in the Plan (including in paragraph 8 below), the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.

2.     Distributions on Account of Obligations of Multiple Debtors

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan.  Any such Claims shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.

3.     Record Date of Distributions

On the Distribution Record Date, the various transfer registers for each Class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims or Interests.  The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

4.     Special Rules for Distributions to Holders of Disputed Claims and Interests

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Wind-Down Entity, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand, or

48

as set forth in a Final Order, no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all of the Disputed Claim or Interest has become an Allowed Claim or Interest or has otherwise been resolved by settlement or Final Order; *provided* that, if the Wind-Down Entity does not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim or Interest, the Distribution Agent may make a partial distribution on account of that portion of such Claim or Interest that is not Disputed at the time and in the manner that the Distribution Agent makes distributions to similarly situated Holders of Allowed Claims or Interests pursuant to the Plan. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

5.     <u>De Minimis Distributions; Minimum Distributions</u>

The Distribution Agent shall not make any Cash distributions to any Holder of an Allowed Claim or Interest pursuant to Article III.C.1-11 of this Plan on account of such Allowed Claim or Interest if such distribution is valued, in the reasonable discretion of the Distribution Agent, at less than $1.00, and each Holder of an Allowed Claim or Interest to which this limitation applies shall not be entitled to any distributions under the Plan. Notwithstanding anything to the contrary in this Plan, there shall be no minimum distribution threshold on account of distributions of any Cryptocurrency to Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims.

6.     <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that either (a) a distribution to any Holder is returned as undeliverable or (b) the Holder of an Allowed Claim or Interest does not respond to a request by the Debtors or the Distribution Agent for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Wind-Down Entity automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall not be entitled to any distributions under the Plan.

7.     <u>Manner of Payment Pursuant to the Plan</u>

At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check, wire transfer, automated clearing house, credit card, or as otherwise provided in applicable agreements.

8.     <u>Distributions of Net Owed Coins; Additional Bankruptcy Distributions</u>

As a general matter, the Purchaser will allocate each Account Holder's Net Owed Coins to its account on the Binance.US Platform, and each Holder of OpCo General Unsecured Claim's Pro Rata share of the Distributable Cryptocurrency (in Cash) to its account on the Binance.US Platform in accordance with, and subject to, the provisions of Section 6.12 of the Asset Purchase Agreement.

As a general matter, the Customer Onboarding Protocol will provide that Purchaser will make Additional Bankruptcy Distributions to Transferred Creditors corresponding to their Pro Rata shares of such Additional Bankruptcy Distribution (if such Additional Bankruptcy Distribution is in Cryptocurrency, based on the Transferred Cryptocurrency Value of the Cryptocurrency included in such Additional Bankruptcy Distribution), all in accordance with any applicable Post-Bankruptcy Statement (as defined in the Asset Purchase Agreement).

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim does not become a Transferred Creditor prior to the date that is three (3) months following the later of the Closing Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept (as provided in the Customer Onboarding Protocol), then Purchaser shall convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with this Plan and the Customer Onboarding Protocol.

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim is located in an Unsupported Jurisdiction (as defined in the Asset Purchase Agreement), then the Net Owed Coins, if applicable, and Additional Bankruptcy Distributions allocable to such Person shall be handled pursuant to Section 6.12(b) or, if applicable, Section 6.14(d) of the Asset Purchase Agreement.

Purchaser shall have no responsibility to make any distributions other than as contemplated by Sections 6.12 and 6.14 of the Asset Purchase Agreement.

## D. Compliance Matters

In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Entity, any Distribution Agent, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Wind-Down Entity, the Distribution Agent, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including wind-down a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the Wind-Down Entity and the Distribution Agent, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond. The Debtors, the Wind-Down Entity, the Distribution Agent, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

## E. Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim, asserted in government issued currency (for the avoidance of doubt, not including any Cryptocurrency) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using

the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

## F.    Claims Paid or Payable by Third Parties

### 1.    Claims Paid by Third Parties

The Debtors or the Wind-Down Entity, as applicable, shall reduce a Claim or Interest, and such Claim or Interest (or portion thereof) shall be disallowed without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim or Interest receives a payment on account of such Claim or Interest from a party that is not a Debtor or Wind-Down Debtor (or other Distribution Agent), as applicable, including any payments made in connection with the Sale Transaction.  To the extent a Holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not a Debtor or a Wind-Down Debtor (or other Distribution Agent), including payments made in connection with the Sale Transaction, as applicable, on account of such Claim or Interest, such Holder shall, within ten Business Days of receipt thereof, repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Wind-Down Debtor to the extent the Holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay, return, or deliver such distribution shall result in the Holder owing the applicable Wind-Down Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the ten-Business Day grace period specified above until the amount is repaid.

### 2.    Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim or Interest that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim or Interest has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim or Interest (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such payment, such Claim or Interest may be expunged or reduced on the Claims Register by the Claims, Noticing, and Solicitation Agent to the extent of any such payment without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3.    Applicability of Insurance Policies

Except as otherwise provided herein, payments to Holders of Claims or Interests shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any rights, defenses, or Cause of Action that the Debtors, the Wind-Down Entity or any other Entity may hold against any other Entity, including insurers, under any policies of insurance, agreements related thereto, or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the applicable insurance policies, agreements related thereto, and applicable non-bankruptcy law.

## G.    Setoffs and Recoupment

Except as otherwise expressly provided for herein, each Debtor, Wind-Down Debtor, the Wind-Down Entity, or such Entity's designee as instructed by such Debtor, Wind-Down Entity, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code),

applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, set off against or recoup from an Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature whatsoever that the Debtor, Wind-Down Debtor or Wind-Down Entity, as applicable, may have against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise). Notwithstanding the foregoing, except as expressly stated in Article VIII of this Plan, neither the failure to effect such a setoff or recoupment nor the non allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors or the Wind-Down Entity of any such Claims, rights, or Causes of Action the Debtors or the Wind-Down Entity may possess against such Holder.

## H.    Allocation between Principal and Accrued Interest

Except as otherwise provided herein, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Claims, to the remaining portion of such Allowed Claim if any.

## ARTICLE VII.

## PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS

## A.    Disputed Claims Process

After the Effective Date, the Wind-Down Entity, and any party-in-interest, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest. If a Holder of a Claim or Interest in Class disputes the amount of their Claim or Interest as listed in the Schedules, the Holder should notify the Debtors or the Wind-Down Entity of such dispute. If the Debtors and the Holder agree to an amended Claim amount prior to the Effective Date, the Debtors shall file amended Schedules prior to the Effective Date. If between the Confirmation Date and the Effective Date, the dispute cannot be consensually resolved, the Holder may seek (by letter to the Court) to have the claim or interest dispute resolved before the Bankruptcy Court (and, with the consent of the Debtors, before any other court or tribunal with jurisdiction over the parties). After the Effective Date, the creditor may seek to have the claim dispute resolved before the Bankruptcy Court or any other court or tribunal with jurisdiction over the parties.

Unless relating to a Claim or Interest expressly Allowed pursuant to the Plan, all Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors. Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Proofs of Claim filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below. Notwithstanding anything in this Plan to the contrary: (1) all Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease; (2) Claims filed to dispute the amount of any proposed Cure pursuant to section 365 of the Bankruptcy Code; and (3) Claims that the Debtors seek to have determined by the Bankruptcy Court, shall

in all cases be determined by the Bankruptcy Court, if not otherwise resolved through settlement with the applicable claimant.

Notwithstanding any provision herein to the contrary, nothing in the Disclosure Statement, Plan, or Confirmation Order grants the Bankruptcy Court with jurisdiction over any police and regulatory actions by the SEC, and the SEC shall retain the power and authority to commence and continue any such actions against any person or entity, including without limitation, the Debtors, in any forum with jurisdiction, provided, however, that enforcement of any money judgment against the Debtors must be in accordance with the Plan.  In addition, the SEC may file any proof of claim by the Government Bar Date or such later date as ordered by the Bankruptcy Court and amend its proof of claim upon determination of liability on its claims.  Any objection to such claim shall be in accordance with Bankruptcy Rule 3007, and such claim shall not automatically be deemed objected to, withdrawn, or expunged.

On the Effective Date, the Debtors or Wind-Down Trustee, as applicable, may establish one or more accounts or funds to hold and dispose of certain assets, pursue certain litigation (including the Causes of Action preserved under the Plan or otherwise vesting in the Wind-Down Trust), and/or satisfy certain Claims (including Claims that are contingent or have not yet been Allowed).  For any such account or fund, the Debtors or the Wind-Down Trustee, as applicable, may take the position that grantor trust treatment applies in whole or in part.  To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations.  Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9.  If such rules apply, such assets would be subject to entity-level taxation, and the Debtors and Wind-Down Trustee would be required to comply with the relevant rules.

**B.     Objections to Claims or Interests**

Except as otherwise specifically provided in the Plan, after the Effective Date, the Wind-Down Entity shall have the sole authority to:  (1) File, withdraw, or litigate to judgment, any objections to Claims or Interests; and (2) settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Wind-Down Entity shall have and retain any and all rights and defenses each such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.P of the Plan.

Any objections to Claims or Interests shall be Filed on or before the Claims Objection Bar Date. For the avoidance of doubt, the Bankruptcy Court may extend the time period to object to Claims or Interests set forth in this paragraph at any time, including before or after the expiration of one hundred eighty days after the Effective Date, in its discretion or upon request by the Debtors or any party in interest.

**C.     Estimation of Claims**

Before or after the Effective Date, the Debtors or the Wind-Down Entity, as applicable, may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Disputed Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim or Interest, including during the litigation of any objection to any Disputed Claim or Interest or during the pendency of any appeal relating to such objection.  Notwithstanding any provision

otherwise in the Plan, a Disputed Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Debtors or the Wind-Down Entity may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Disputed Claim or Interest is estimated.

## D.     No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only a portion of a Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

## E.     Distributions After Allowance

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Allowed Claim or Interest unless required under applicable bankruptcy law.

## F.     No Interest

Unless otherwise specifically provided for herein or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## G.     Adjustment to Claims and Interests without Objection

Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Entity without the Wind-Down Entity having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.  Additionally, any Claim or Interest that is duplicative or redundant with another Claim or Interest against the same Debtor may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Entity without the Wind-Down Entity having to File an application, motion, complaint, objection, or any other legal proceeding

seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

**H.    Time to File Objections to Claims**

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

**I.    Disallowance of Claims or Interests**

Any Claims or Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Wind-Down Entity, as applicable.

**Except as otherwise provided herein or as agreed to by the Debtors or the Wind-Down Entity, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

**J.    Amendments to Proofs of Claim**

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Proof of Claim or Proof of Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Wind-Down Entity, and any such new or amended Proof of Claim or Proof of Interest Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

## ARTICLE VIII.

## EFFECT OF CONFIRMATION OF THE PLAN

**A.    Releases by the Debtors**

**Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, the Wind-Down Entity, and in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their**

capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in this Article VIII.A by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.A is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Notwithstanding anything to the contrary contained herein, nothing in this Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement or the Definitive Documents and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of this Plan.

**B.      Releases by Holders of Claims and Interests**

Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the

56

pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in this Article VIII.B shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.B, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.B is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.F and Article IV.G of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

C.    Exculpation

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan

**D.      Injunction**

The assets of the Debtors and of the Wind-Down Entity shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in this Plan and shall not be available for any other purpose.  All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Entity, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of this Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by this Plan.

**E.      Release of Liens**

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Debtor or Wind-Down Debtor, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as requested by the Debtors or Wind-Down Entity to evidence the release of such Lien, including the execution, delivery, and filing or recording of such documents evidencing such releases.  The presentation or filing of the Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

**F.      OSC and SEC**

Notwithstanding any language to the contrary herein, no provision shall (a) preclude the OSC or the SEC from enforcing its police or regulatory powers; or (b) enjoin, limit, impair or delay the OSC or SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any non-Debtor person or non-Debtor entity in any forum.

**G.      Protection against Discriminatory Treatment**

As provided by section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Entity, including Governmental Units, shall discriminate against any Wind-Down Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, any

Wind-Down Debtor, or any Entity with which a Wind-Down Debtor has been or is associated, solely because such Wind-Down Debtor was a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**H.      Document Retention**

Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Wind-Down Entity, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently in the Debtors' possession.  The Wind-Down Trust shall not destroy or otherwise abandon any such documents or records without providing advance notice to the U.S. Securities and Exchange Commission (c/o Therese Scheuer, U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, ScheuerT@SEC.GOV) and seeking further authorization from this Court.  Nothing in this Plan or the Confirmation Order shall affect the obligations of the pre-Effective Date Debtors, the Wind-Down Entity, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

**I.      Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**J.      Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  **All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

## ARTICLE IX.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**A.      Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1.   The Bankruptcy Court shall have entered the Confirmation Order, which shall be in a form and substance reasonably satisfactory to the Debtors and the Committee, and subject to the consent rights of Purchaser under the Asset Purchase Agreement, and such order shall be a Final Order and in full force and effect.

2. The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, Definitive Documents, and the Asset Purchase Agreement.

3. Each Definitive Document and each other document contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all respects with the Plan, and subject to the Purchaser's consent rights under the Asset Purchase Agreement, and shall not have been modified in a manner inconsistent therewith;

4. The Professional Fee Escrow Account shall have been established and funded with Cash in accordance with Article II.B.2 of the Plan.

5. The Wind-Down Reserve shall have been established and funded with Cash in accordance with the Plan.

6. If prior to the Outside Date, the Asset Purchase Agreement shall be in full force and effect and the Sale Transaction shall have been consummated.

7. The Restructuring Transactions shall have been consummated or shall be anticipated to be consummated concurrently with the occurrence of the Effective Date in a manner consistent with the Plan, the Customer Onboarding Protocol, the other Definitive Documents, and the Asset Purchase Agreement, and the Plan shall have been substantially consummated or shall be anticipated to be substantially consummated concurrently with the occurrence of the Effective Date.

## B.   Waiver of Conditions Precedent

The Debtors, with the consent of the Committee and, solely to the extent related to the Asset Purchase Agreement and the Sale Transaction, prior to the Outside Date, the consent of Purchaser, may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

## C.   Effect of Non-Occurrence of Conditions to Consummation

If the Effective Date does not occur within 120 days after the Confirmation Date, then the Plan will be null and void in all respects, any and all compromises or settlements not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including with respect to the fixing, limiting, or treatment of any Claim or Interest, including, without limitation, the Alameda Loan Facility Claims), shall be deemed null and void, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action held by any Debtor or any other Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity in any respect.

# ARTICLE X.

# MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**A.      Modification of Plan**

Subject to the limitations and terms contained in the Plan and Purchaser's consent rights under the Asset Purchase Agreement, the Debtors, with the consent of the Committee, reserve the right to (1) amend or modify the Plan before the entry of the Confirmation Order, in accordance with the Bankruptcy Code and the Bankruptcy Rules and (2) after the entry of the Confirmation Order, the Debtors or the Wind-Down Entity, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, to remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

**B.      Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications or amendments to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**C.      Revocation or Withdrawal of Plan**

The Debtors reserve the right, with the consent of the Committee, to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Classes of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

# ARTICLE XI.

# RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims or other Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.      ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court;

7.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.     hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) anything that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan and the Confirmation Order; or (d) related to section 1141 of the Bankruptcy Code;

11.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

13.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

14.     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Entity's rights arising from or obligations incurred in connection with the Plan;

15.     hear and determine matters concerning local, state, federal, and foreign taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

16.     enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.     enforce all orders previously entered by the Bankruptcy Court; and

18.     hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or the Judicial Code.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

### A.     Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Entity, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims against and Interests in the Debtors shall be

as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

**B.      Additional Documents**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Wind-Down Entity, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.      Payment of Statutory Fees**

All fees and applicable interest payable pursuant to section 1930 of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Wind-Down Debtors (or the Distribution Agent on behalf of the Wind-Down Entity) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

**D.      Dissolution of Statutory Committees**

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, however, that such committees will remain in existence for the limited purposes of (a) pursuing, supporting, or otherwise participating in, any outstanding appeals in the Chapter 11 Cases; and (b) filing, objecting, or otherwise participating in, any final fee applications of Professionals.

**E.      Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests, unless and until the Effective Date has occurred.

**F.      Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Entity.

**G.      Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Wind-Down Debtors shall be served on:

| | |
|---|---|
| Wind-Down Debtors | **Voyager Digital Holdings, Inc.**<br>33 Irving Place<br>New York, New York 10003<br>Attention: David Brosgol<br>General Counsel,<br>E-mail address: dbrosgol@investvoyager.com<br><br>with copies for information only (which shall not constitute notice) to: |
| Counsel to the Debtors | **Kirkland & Ellis LLP**<br>**Kirkland & Ellis International LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention: Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., and Allyson B. Smith |
| Counsel to the Committee | **McDermott Will & Emery LLP**<br>One Vanderbilt Avenue<br>New York, New York 10017<br>Attention: Darren Azman |

## H.    Entire Agreement; Controlling Document

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan; *provided, however*, that notwithstanding the foregoing or anything to the contrary herein, to the extent there is any conflict between the Plan and the Confirmation Order, on the one hand, and the Asset Purchase Agreement, on the other hand, the Asset Purchase Agreement shall govern solely in the event the Sale Transaction is consummated. Except as set forth in the Plan, in the event that any provision of the Disclosure Statement, the Plan Supplement, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## I.    Plan Supplement

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Claims, Noticing, and Solicitation Agent at https://cases.stretto.com/Voyager or the Bankruptcy Court's website at http://www.nysb.uscourts.gov. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

**J.    Non-Severability**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the Purchaser's consent rights under the Asset Purchase Agreement prior to the Outside Date, shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

**K.    Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties nor individuals or the Wind-Down Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

**L.    Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation Date.

Dated:  January 10, 2023

VOYAGER DIGITAL HOLDINGS, INC.
on behalf of itself and all other Debtors

_/s/ Stephen Ehrlich_

Stephen Ehrlich
Co-Founder and Chief Executive Officer
Voyager Digital Holdings, Inc.

**Exhibit B**

**Liquidation Analysis**

## LIQUIDATION ANALYSIS FOR VOYAGER DIGITAL HOLDINGS, INC., *et al.*[1]

## I.    INTRODUCTION

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, a bankruptcy court may not confirm a plan under chapter 11 of the Bankruptcy Code unless each holder of an allowed claim or interest in an impaired class either:  (a) accepts the plan; or (b) will receive or retain property on account of such claim or interest of a value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the proposed plan satisfies the "best interests of creditors" test, the Debtors, with the assistance of their advisors, have prepared the following hypothetical liquidation analysis presenting recoveries available assuming a hypothetical liquidation (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to this Liquidation Analysis.

This Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests that may be realizable upon the disposition of assets pursuant to a hypothetical chapter 7 liquidation of the Debtors' estates.  As illustrated by this Liquidation Analysis, Holders of Claims in certain Unimpaired Classes that would receive a full recovery under either the Plan or Plan Toggle scenarios would receive less than a full recovery in a hypothetical liquidation.  Additionally, Holders of Claims or Interests in Impaired Classes would receive a lower recovery in a hypothetical liquidation than they would under either the Plan or Plan Toggle scenario.  Further, no Holder of a Claim or Interest would receive or retain property under the Plan or Plan Toggle scenario of a value that is less than such Holder would receive in a hypothetical chapter 7 liquidation.  Accordingly, and as set forth in greater detail below, the Debtors believe that both the Plan and Plan Toggle scenarios satisfy the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

### Statement of Limitations

The preparation of a liquidation analysis is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors.  Inevitably, some assumptions in this Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation.  This Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code.  This Liquidation Analysis is not intended and should not be used for any other purpose.  The underlying financial information in this Liquidation Analysis and values stated herein have not been subject to any review, compilation, or audit by any independent accounting firm.  In addition, various liquidation decisions upon which certain assumptions are based are subject to change.  As a result, the actual amount of Claims that would ultimately be Allowed against the Debtors' estates could vary significantly from the estimates stated herein, depending on the nature and amount of Claims asserted during the pendency of the hypothetical chapter 7 cases.  Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in this Liquidation Analysis.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A CHAPTER 7 LIQUIDATION OF THE DEBTORS' ESTATES WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THIS LIQUIDATION ANALYSIS.  THE ACTUAL LIQUIDATION VALUE

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement").

OF THE DEBTORS' ESTATES IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED IN THIS LIQUIDATION ANALYSIS.

THE RECOVERIES SHOWN DO NOT CONTEMPLATE A SALE OR SALES OF THE DEBTORS' BUSINESS UNITS ON A GOING CONCERN BASIS. WHILE THE DEBTORS MAKE NO ASSURANCES, IT IS POSSIBLE THAT PROCEEDS RECEIVED FROM SUCH GOING CONCERN SALE(S) WOULD BE MORE THAN IN THE HYPOTHETICAL LIQUIDATION, THE COSTS ASSOCIATED WITH THE SALE(S) WOULD BE LESS, FEWER CLAIMS WOULD BE ASSERTED AGAINST THE BANKRUPTCY ESTATES AND/OR CERTAIN ORDINARY COURSE CLAIMS WOULD BE ASSUMED BY THE BUYER(S) OF SUCH BUSINESS(ES).

THIS LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE, GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE PLAN EFFECTIVE DATE. THIS LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THIS LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THIS LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION. NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM AGAINST OR INTEREST IN THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS AND INTERESTS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

**Basis of Presentation**

This Liquidation Analysis has been prepared assuming that the Debtors convert their current chapter 11 cases to cases under chapter 7 of the Bankruptcy Code on or about April 18, 2023 (the "Conversion Date"). Except as otherwise noted herein, this Liquidation Analysis is based upon the unaudited balance sheets of the Debtors as of October 31, 2022, and those values, in total, are assumed to be representative of the Debtors' assets and liabilities as of the Conversion Date. Certain balances, including cash and cryptocurrency, and certain receipts and expenses have been projected forward or estimated as of the Conversion Date. As noted above, the assets available to the Debtors in an actual liquidation may differ from the assets assumed to be available pursuant to this Liquidation Analysis.

In preparing this Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Debtors' financial statements. In addition, this Liquidation Analysis includes estimates for Claims not currently asserted in the chapter 11 cases, but which could be asserted and Allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, chapter 7 Administrative Claims such as liquidation and wind-down expenses, trustee fees, tax liabilities, and professional fees attributable to the liquidation and wind-down. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims that were used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in this Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distributions to be made on account of Allowed Claims and Interests under the Plan or Plan Toggle scenario.

**Conversion Date and Appointment of a Chapter 7 Trustee**

This Liquidation Analysis assumes that on the Conversion Date, the Bankruptcy Court would appoint a chapter 7 trustee to oversee the liquidation of the Debtors' estates, during which time all of the Debtors' assets would be sold or surrendered and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law. There can be no assurance, however, that the liquidation would be completed within a certain timeframe, nor is there any assurance that the recoveries assigned to the assets would in fact be realized. In accordance with section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally at distressed prices) as is compatible with the best interests of parties in interest.

**Deconsolidated Liquidations**

This Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered, but not substantively consolidated proceeding, and takes into account the administrative priority status of intercompany claims arising post-petition. The results of this analysis have been consolidated for convenience.

**Additional Global Notes and Assumptions**

This Liquidation Analysis should be read in conjunction with the following global notes and assumptions:

1. <u>Unaudited Financial Statements</u>. This Liquidation Analysis contains numerous estimates. Except as otherwise noted herein, available recoveries are based upon the unaudited financial statements and balance sheets of the Debtors as projected as of the Conversion Date.

2. <u>Chapter 7 Liquidation Costs</u>. The Debtors have assumed that a hypothetical chapter 7 liquidation would last approximately 12 months, in order to pursue sales of substantially all remaining assets and collect receivables as well as to arrange distributions and otherwise administer and close the estates. In an actual liquidation, the length of the wind-down process could vary significantly, thereby impacting recoveries. Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.

3. <u>Distribution of Net Proceeds</u>. Pursuant to section 726 of the Bankruptcy Code, Allowed Administrative Claims incurred by the chapter 7 trustee, including expenses affiliated with selling the Debtors' assets, are entitled to payment in full prior to any distribution to chapter 11 Administrative Claims or Other Priority Claims. The estimates used in this Liquidation Analysis for these expenses includes estimates for operational expenses and certain legal, accounting, and other professionals, as well as an assumed 3.0% fee based upon liquidated assets payable to the chapter 7 trustee. Any remaining net Cash would then be distributed to creditors in accordance with applicable law in the following priority: (a) first to pay the Allowed Secured Tax Claims, (b) second to pay any Allowed Administrative Claims, Priority Tax Claims, and Other Priority Claims; and (c) third to creditors holding Account Holder Claims and General Unsecured Claims.

   Under the absolute priority rule, no junior creditor at a given entity would receive any distribution until all senior creditors are paid in full at such entity, and no equity holder at such entity would receive any distribution until all creditors at such entity are paid in full. The assumed distributions to creditors as reflected in this Liquidation Analysis are estimated in accordance with the absolute priority rule.

4. <u>Certain Exclusions and Assumptions</u>. This Liquidation Analysis does not include detailed estimates for the tax consequences that may be triggered upon the liquidation and sale events included in the analysis. Such tax consequences may be material.

## II.    CONCLUSIONS

> **THE DEBTORS HAVE DETERMINED, AS SUMMARIZED IN THE FOLLOWING ANALYSIS, THAT CONFIRMATION OF THE PLAN WILL PROVIDE CREDITORS WITH A RECOVERY THAT IS GREATER THAN OR EQUAL TO WHAT THEY WOULD OTHERWISE RECEIVE IN CONNECTION WITH A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.**

### SUMMARY OF ESTIMATED RECOVERIES FOR CLAIMS AND INTERESTS

| Class | Name of Class Under Plan | Status Under the Plan | Estimated Percentage Recovery Under the Plan | Estimated Percentage Recovery Under the Plan Toggle | Recovery Under Hypothetical Liquidation (Low) | Recovery Under Hypothetical Liquidation (High) |
|---|---|---|---|---|---|---|
| Unclassified | Administrative Claims | Unimpaired | 100% | 100% | 100% | 100% |
| Unclassified | Priority Tax Claims | Unimpaired | 100% | 100% | 47% | 48% |
| 1 | Secured Tax Claims | Unimpaired | NA | NA | NA | NA |
| 2 | Other Priority Claims | Unimpaired | 100% | 100% | 99% | 99% |
| 3 | Account Holder Claims | Impaired | 51% | 45% | 35% | 39% |
| 4A | OpCo General Unsecured Claims | Impaired | 51% | 45% | 35% | 39% |
| 4B | HoldCo General Unsecured Claims | Impaired | 6% | 6% | 0% | 0% |
| 4C | TopCo General Unsecured Claims | Impaired | 64% | 64% | 65% | 65% |
| 5 | Alameda Loan Facility Claims | Impaired | 0% | 0% | 0% | 0% |
| 6 | Section 510(b) Claims | Impaired | NA | NA | NA | NA |
| 7 | Intercompany Claims[1] | Unimpaired | 0% | 0% | 0% | 0% |

| 8 | Intercompany Interests | Unimpaired | 0% | 0% | 0% | 0% |
| 9 | Existing Equity Interests | Impaired | 0% | NA | N/A | N/A |

*1) For purposes of this Liquidation Analysis, Intercompany Claims are assumed to be recharacterized as capital contributions.*

## III.    NOTES FOR PROCEEDS AVAILABLE FOR DISTRIBUTION

### A.    *Gross Liquidation Proceeds*

1. <u>Cash and Cash Equivalents</u>:  This Liquidation Analysis projects the level of cash balances on hand from December 30, 2022 and represents the Debtor's best estimate of balances on hand at the Conversion Date. Balances are assumed to be recoverable at 100%. The cash balance does not reflect any cash proceeds or transaction fees from the Sale Transaction contemplated under the Plan.

2. <u>Cryptocurrency Assets Held</u>:  Estimated cryptocurrency values at Conversion Date are based on spot prices as of December 18, 2022 and assumes certain illiquid cryptocurrencies are liquidated at a discount to account for the impact of market depth constraints, including an inherently volatile market and significant industry disruption as a result of recent filings from major players. This discount also reflects the impact of transaction fees.

3. <u>Other Assets / Investments (Non-Debtor)</u>: The Debtors have prepaid certain expenses, including but not limited to, professional fee retainers, licenses, engineering, software, marketing and various other contractual obligations. This Liquidation Analysis assumes that prepaid amounts will continue to be consumed during the liquidation period to offset against potential liabilities. The Debtors furthermore own equity investments in various private and public companies. The Liquidation Analysis reflects proceeds from the sale of these investments and assumes recovery rates between 0% and 100% across these positions depending on the liquidity of the investment.

4. <u>Claims against 3AC Estate:</u> The Debtors have a claim against 3AC related to a cryptocurrency loan of 15,250 BTC and 350,000,000 USDC made in 2022. The value of the claim is based on prices as of October 31, 2022. This Liquidation Analysis makes no assumption regarding recovery on account of this claim and is reflected as a 0% recovery for purposes of this Liquidation Analysis.

5. <u>Intangible Assets</u>:  Intellectual property owned by the Debtors is comprised of goodwill, favorable leasehold interests, trademarks, patents, license agreements, and e-commerce registered domain names (collectively, the "<u>Debtors' IP</u>"). The Liquidation Analysis assumes no recovery value for the Debtors' IP.

6. <u>Litigation Claims:</u> Litigation claim recoveries are assumed to be the same under both the Plan, Plan Toggle and a Chapter 7 Liquidation and are not included for comparative purposes of this presentation.

### B.    *Liquidation Costs*

7. <u>Chapter 7 Professional Fees</u>:  Professional fees include costs for financial advisors, attorneys, accountants, and other professionals retained by the chapter 7 trustee.  Professional fees were estimated to be approximately $18.2 million for the liquidation period, based on an estimate of approximately $0.1 million to $3.0 million per month with approximately 77% of the fees incurred in the first 6 months.

8. <u>Chapter 7 Trustee Fees</u>:  In a Chapter 7 liquidation, the Bankruptcy Court may allow reasonable compensation for the trustee's services not to exceed a certain percentage of such proceeds greater than a set amount upon all proceeds disbursed or turned over in the case by the trustee to parties in interest.  Chapter 7 trustee fees were estimated at 3% of proceeds from Debtor, excluding recoveries related to cash and cash equivalents.

9.  Chapter 7 Estate Wind-Down Costs:  During the chapter 7 liquidation period, the trustee will incur certain costs necessary to wind-down the estates.  Such expenses include the cost of the Debtors' operating personnel to liquidate customer accounts, technology and platform operating costs. For the entirety of the wind-down process, these costs have been estimated to be $ 16.9 million.

10. 3AC Litigation Pursuit: The Debtors have a claim against 3AC related to a cryptocurrency loan of 15,250 BTC and 350,000,000 USDC made in 2022. This Liquidation Analysis makes no assumption regarding the cost of pursuit of recovery of this claim and therefore does not reflect the cost of any related litigation.

11. Other Fees:  During the chapter 7 liquidation period the trustee with incur miscellaneous expenses including temporary labor costs, insurance, document management costs and banking fees, among others.  For the entirety of the chapter 7 process, these costs have been estimated to be approximately $8.4 million.

   **C.     Claims**

12. Secured Tax Claims:  Based on the December 6, 2022 claims register, no Secured Tax Claims have been identified and scheduled. To the extent that Secured Tax Claim amounts are later identified, a recovery of 100% is expected.

13. Administrative, Priority Tax Claims and Other Priority Claims:

   - Administrative Claims:  Administrative Claims include unpaid post-petition accounts payable, accrued operating expenses, unpaid post-petition taxes, and Professional Fee Claims among others.  This Liquidation Analysis estimates Administrative Claims to be approximately $ 39.1 million on the Conversion Date.

   - Priority Tax Claims: Based on the December 6, 2022 claims register, federal and state tax claims are estimated to be $3.0M.

   - Other Priority Claims:  Total Other Priority Claims are estimated to be $1.0.

14. Account Holder Claims:  Account Holder Claims are estimated to be approximately $1.764 billion as of the Conversion Date based on the number of customer coins and coin prices as of the Petition Date.

15. Alameda Loan Facility Claims:  Alameda Loan Facility Claims are estimated to be approximately $75.1 million as of the Conversion Date.

16. General Unsecured Claims:  Based on the December 6, 2022 claims register, General Unsecured Claims are estimated to total approximately $25.3 million on the Conversion Date.

   - General Unsecured Claims at OpCo are estimated to be $14.0 million.

   - General Unsecured Claims at HoldCo are estimated to be $8.3 million.

   - General Unsecured Claims at TopCo are estimated to be $3.0 million.

## IV.   LIQUIDATION ANALYSIS RESULTS

The following pages present the results for the hypothetical liquidation of the Debtors. This Liquidation Analysis is presented on a consolidated basis for all Debtors and is compared against recoveries under the Plan and Plan Toggle scenarios.

.

| | Claims | Binance | | Toggle | | High Case | | Low Case | |
|---|---|---|---|---|---|---|---|---|---|
| **Voyager Digital Consolidated [1,2]** | All Scenarios | Plan | Recovery | Plan | Recovery | Liquidation | Recovery | Liquidation | Recovery |
| | 4/18/2023 | 4/18/2023 | | 6/18/2023 | | 4/18/2023 | | 4/18/2023 | |
| **TOTAL ESTIMATED PROCEEDS (NET) [3, 4, 5, 6]** | | 943.9 | | 849.8 | | 734.4 | | 669.6 | |
| Administrative Claims[7] | 39.1 | 39.1 | 100% | 39.1 | 100% | 39.1 | 100% | 39.1 | 100% |
| Priority Tax Claims | 3.0 | 3.0 | 100% | 3.0 | 100% | 1.4 | 48% | 1.4 | 47% |
| Secured Tax Claims | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Other Priority Claims | 1.0 | 1.0 | 100% | 1.0 | 100% | 1.0 | 99% | 1.0 | 99% |
| Account Holder Claims[8] | 1,763.8 | 891.4 | 51% | 797.9 | 45% | 685.5 | 39% | 621.2 | 35% |
| OpCo General Unsecured Claims [9] | 14.0 | 7.1 | 51% | 6.3 | 45% | 5.4 | 39% | 4.9 | 35% |
| HoldCo General Unsecured Claims [9] | 8.3 | 0.5 | 6% | 0.5 | 6% | - | 0% | - | 0% |
| TopCo General Unsecured Claims [9] | 3.0 | 1.9 | 64% | 1.9 | 64% | 2.0 | 65% | 2.0 | 65% |
| Alameda Loan Facility Claims | 75.1 | - | 0% | - | 0% | - | 0% | - | 0% |
| Section 510(b) Claims | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Intercompany Claims [10] | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Intercompany Interests | - | - | 0% | - | 0% | - | 0% | - | 0% |
| Existing Equity Interests | - | - | 0% | - | 0% | - | 0% | - | 0% |
| **TOTAL RECOVERIES** | 1,907.3 | 943.9 | 49% | 849.8 | 45% | 734.4 | 39% | 669.6 | 35% |

Footnotes to Analysis
(1) Assumes Binance sale transaction does not occur in a liquidation scenario and that the conversion to a chapter 7 liquidation occurs at April 18, 2023.
(2) For the purposes of this presentation, the Plan and Liquidation Analysis do not assume any recovery on the 3AC loan.
(3) Total Estimated Proceeds (Net): primarily includes (x) (i) Binance Transaction Proceeds including Expense Reimbursements (Binance/Toggle only), (ii) Estimated Value of Cryptocurrency Portfolio, (iii) Cash & Cash Equivalents and (iv) proceeds from other assets of the estate; and (y) net estimated wind down costs.
(4) Estimated value of cryptocurrency portfolio under all scenarios is based on spot prices as of December 18, 2022.
(5) Estimated value of cryptocurrency portfolio in the liquidation scenario is discounted based on the estimated impact of market depth constraints, including an inherently volatile market and significant industry disruption as a result of recent filings from major players, as well as transaction fees.
(6) Analysis assumes that the Company is able to retain the necessary employees with experience and expertise required to execute a rebalance and distribution. To the extent the company is unable to retain the personnel necessary to perform these actions, recoveries would likely be significantly negatively impacted.
(7) Administrative claims include estimated unpaid accrued payables, and chapter 11 professional fees incurred through hypothetical conversion date of April 18, 2023.
  OpEx and professional fees related to the extension of time in the Toggle scenario are assumed to be effectively on a cash basis and assumed to have no impact on administrative claims for illustrative purposes.
(8) Estimated value of Account Holders Claims is based on the dollarization of the customer portfolio based on asset prices as of the Petition Date (July 5, 2022).
(9) OpCo, HoldCo, and TopCo GUCs estimated based off of December 6, 2022 Claims registry and are subject to further reconciliation and objections.
(10) For purposes of this Liquidation Analysis, Intercompany Claims are assumed to be recharacterized as capital contributions.

Note: Litigation claim recoveries are assumed to be the same under both the Plan and a Chapter 7 Liquidation and ignored for comparative purposes of this presentation

**Exhibit C**

**Frequently Asked Questions & Answers**

## Exhibit C

## FREQUENTLY ASKED QUESTIONS & ANSWERS

**About the Plan**

1. **How are my Account Holder Claims calculated? Can I receive recoveries greater than my Account Holder Claim amount?**

As is required by the U.S. Bankruptcy Code, each Account Holder's Claim is determined by the fair market value of the cryptocurrency (based in U.S. Dollars) held by the Account Holder at Voyager Digital, LLC as of July 5th, 2022 at 00:00 UTC. This process is generally referred to as a "dollarization." Dollarization allows the Debtors to put all Account Holders' Claims on equal footing to calculate recoveries in accordance with the requirements of the U.S. Bankruptcy Code.

For example, if an Account Holder's portfolio consisted of 0.5 ETH, 30 USDC, 20 APE and 100 ALGO on July 5, 2022, the Account Holder would have a total claim against OpCo of $724.81 (see illustrative example below). All Account Holder Claims will be calculated in an identical manner, regardless of whether such claims are denominated in BTC, ETH, VGX or USDC or in any other cryptocurrency.

Keep in mind, the U.S. Bankruptcy Code requires that all creditors of the same class receive "equal treatment", so the value that is available for distribution to Account Holders is equitably distributed amongst all Account Holders (i.e., no Account Holder can have a greater opportunity to recover on their claim than another Account Holder). (See Question 6 below.)

| Coin | Customer Claim | | |
| | # of Coins Claimed | 7/5 Coin Price | Claim ($) |
|---|---|---|---|
| ETH | 0.50 | $1,131.60 | $565.80 |
| USDC | 30.00 | 1.00 | 30.00 |
| APE | 20.00 | 4.91 | 98.27 |
| ALGO | 100.00 | 0.31 | 30.74 |
| **Total** | | | **$724.81** |

In accordance with the U.S. Bankruptcy Code and applicable bankruptcy law, a creditor is not eligible to receive consideration exceeding 100% of the value of their claim. Additionally, until Account Holders and Holders of OpCo General Unsecured Claims receive 100% of their claims against OpCo, no consideration is allowed to be distributed to creditors holding interests and/or lower priority claims against OpCo in accordance with the absolute priority rule.

2. **How is the Initial Distribution calculated?**

The total Initial Distribution to Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims consists of a pro rata amount to be determined by the Debtors that will be informed by:

(i)    the upfront cash payment of $20.0 million,

(ii)    all cash and cash equivalents held at OpCo (net of any cash and cash equivalents necessary (x) to satisfy those claims at OpCo senior to Account Holder Claims and OpCo General Unsecured Claims and (y) to fund a wind-down reserve),

(iii)    any expense reimbursement received from BAM Trading Services Inc. d/b/a Binance.US ("Binance.US") pursuant to the Binance.US asset purchase agreement for reasonable expenses incurred by Voyager Digital between March 18, 2023 and Closing, subject to a $15mm cap, and

(iv)    the fair market value of all cryptocurrency held at OpCo.

Each Account Holder's Initial Distribution will be calculated based on their pro rata share of the total Account Holder Claims and OpCo General Unsecured Claims. For example, to the extent the fair market value of all cryptocurrency held at OpCo was transferred to Binance.US at prices as of approximately UTC 20:30 on December 18, 2022, the estimated Initial Distribution would be equal to 51% of the total dollarized claims of all Account Holders and Holders of Opco General Unsecured Claims.

Account Holders located in Supported Jurisdictions who are current Binance.US users or who are able to satisfy onboarding requirements at Binance.US within three months of Closing will receive their share of the Initial Distribution on an in-kind basis within four weeks following the later of the Closing or the completion of the transfer of user data to Binance.US. All Account Holders in Supported Jurisdictions who do not complete such onboarding requirements within three months following the later of the Closing or the completion of the transfer of user data to Binance.US will have their in-kind cryptocurrency distribution converted into U.S. Dollars at then prevailing market prices which will be distributed to such Account Holders by OpCo.

For any Account Holders located in jurisdictions where Binance.US does not have required regulatory approvals as of the Closing ("Unsupported Jurisdictions" which as of the date hereof are Hawaii, New York, Texas, and Vermont), Binance. US will have until six (6) months following the Closing to obtain approvals to make distributions to Account Holders in such jurisdictions on a provisional basis. If Binance.US is unable to make distributions to Account Holders in an Unsupported Jurisdiction at the conclusion of the six (6) month period, the Account Holders in such Unsupported Jurisdiction will have their in-kind cryptocurrency distribution converted into U.S. Dollars at then prevailing market prices, which will be distributed to such Account Holders by OpCo.

Under the Plan, the cryptocurrency shall be subject to a rebalancing exercise, which shall occur no more than one business day prior to the Closing Date. As such, the size of the Initial Distribution and ultimate recoveries relative to each Account Holder's dollarized claim as of July 5th, 2022, is unknowable at this time and will be impacted by the price performance of OpCo's cryptocurrency portfolio during such reference period.

After the completion of the rebalancing exercise, to the extent the estate has a shortfall in any specific cryptocurrency relative to the implied required distribution amount, the implied dollar amount of the shortfall will made through a distribution of USDC or U.S. Dollars.

### 3.    When, and how, will I receive value from 3AC recoveries?

Voyager continues to work diligently to maximize its recovery in the 3AC Liquidation Proceeding on account of the 3AC Loan and the recovery from the 3AC Loan, if any, will be distributed to Holders of Account Holder Claims and OpCo General Unsecured Claims as soon as commercially reasonable. However, the timing of actual distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims may be affected by many factors that cannot be predicted. Therefore, the estate cannot guarantee the timing or amount of the 3AC recovery.

Upon receipt of a 3AC recovery, the Distribution Agent shall make distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims at the address for each such Holder as indicated on the applicable register or in the Voyager records as of the date of any such distribution (as applicable). Any 3AC recovery distributions shall be dependent upon the form in which received (token or U.S. Dollars) and the transition status of each respective Account Holder. For users onboarded onto the Binance.US platform, any distributions will be done through such platform.

**4.    Why do the implied recoveries move up or down based on cryptocurrency prices? Don't Account Holders just receive a fixed percentage?**

As previously discussed (see Question 1 above), claims are fixed based on an Account Holder's tokens and cryptocurrency prices as of the Petition Date. Since the Petition Date, the Debtor has been "long" the entire cryptocurrency portfolio. This exposes implied dollar value recoveries to movements in cryptocurrency prices between the Petition Date and the rebalancing date, given the distribution values are also based on volume-weighted dollar prices of cryptocurrency as of two days prior to the rebalancing date.

As such, an individual Account Holder's implied recoveries are impacted by (i) _**gross**_ movements in U.S. Dollar-denominated cryptocurrency prices relative to the Petition Date, and (ii) _**relative**_ movements in cryptocurrency prices (e.g., BTC vs. ETH).

Voyager has a relatively high percentage of altcoins, which have underperformed in the market relative to BTC / ETH and stablecoins. These cryptocurrency movements are the primary driver of any changes to an Account Holder's recovery value, as evidenced by the charts below.



**5.    The cryptocurrencies in my account have gone up since July 5th, are my recoveries then based on price of those cryptocurrencies at the time of the Initial Distribution?**

_**No**_, in order for all creditors, Account Holders or otherwise, to be treated in an equal and fair manner, as required by the U.S. Bankruptcy Code, the value of each creditor's claims is "dollarized" as of July 5th, 2022. (See Question 1)

At the time of the Initial Distribution, all Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims will receive an equal pro rata recovery relative to their dollarized July 5th, 2022 claim, regardless of the price performance of the underlying cryptocurrencies in such Account Holder's account.

---

[1]    Implied Binance.US recovery values leave all assumptions (including Binance.US consideration, wind-down costs, other benefits (expense reimbursement and non-buyer proceeds) and other expenses (rebalancing leakage, wind-down funding leakage and VGX impact)) constant except for the difference in cryptocurrency prices on the specified dates / date ranges.

All cryptocurrencies at OpCo, including VGX, are property of OpCo's estate and the value of such cryptocurrencies at the time of the rebalancing exercise will be a key factor in determining the size of the Initial Distribution.

***Under the Plan, all Holders of Account Holder Claims and OpCo General Unsecured Claims are effectively "long" OpCo's entire cryptocurrency portfolio through the date at which the fair market value is determined under the Binance.US asset purchase agreement, regardless of the specific cryptocurrencies held by any individual Account Holder, with any upside limited by the amount of such Account Holder's or OpCo General Unsecured Creditor's Allowed Claim.***

***In the event of a wind down, liquidation, or an alternative plan construct (even to the extent it supported 100% of the same cryptocurrencies as those available on the Voyager platform), claims and distributions would be treated in an identical manner with Account Holder Claims being dollarized as of July 5th, 2022 and distributions to Holders of Account Holder Claims and OpCo General Unsecured Claims being based on the value of consideration at the time of such distribution relative to such creditors' dollarized claim value.***

***Under a wind-down or liquidation, all cryptocurrency would be immediately sold into the market and distributions would not be made in-kind, but in cash in U.S. Dollars which may result in adverse tax impacts for Account Holders.***

For example, under the Binance.US transaction, to the extent an Account Holder had a claim for $1,000 based on the dollarized value of their cryptocurrencies as of July 5, 2022, and the sale price of the cryptocurrency held at OpCo implied an Initial Distribution of 51%, such Account Holder would receive an Initial Distribution with value equal to $510. Such value may be in a mix of in-kind cryptocurrencies or U.S. Dollars depending on whether such Account Holder transitioned to Binance.US in a timely manner.

Such Account Holder would then have a deficiency claim of $490 which could be satisfied through subsequent distributions from the liquidating trust relating to cash hold backs, 3AC recoveries, and other retained value at OpCo after any claims at OpCo that are senior to Account Holder Claims and OpCo General Unsecured Claims, such as priority and administrative claims, have been satisfied.

A deficiency claim in this case is simply the difference between the Initial Distribution and the Account Holder Claim (dollarized value of cryptocurrencies as of July 5, 2022). It is the amount necessary to achieve 100% recovery vs. total (cumulative) recoveries received at any point in time. (See Question 16)

| $ actual | $10.0 | $100.0 | $1,000.0 | $10,000.0 | $100,000.0 | $1,000,000.0 | $10,000,000.0 |
|---|---|---|---|---|---|---|---|
| **Illustrative July 5, 2022 Claim Value** | | | | | | | |
| **Initial Distribution Value @ Illustrative Initial Distribution % of Claim Value** | | | | | | | |
| @ 43.0% | $4.3 | $43.0 | $430.0 | $4,300.0 | $43,000.0 | $430,000.0 | $4,300,000.0 |
| @ 45.0% | $4.5 | $45.0 | $450.0 | $4,500.0 | $45,000.0 | $450,000.0 | $4,500,000.0 |
| @ 47.0% | $4.7 | $47.0 | $470.0 | $4,700.0 | $47,000.0 | $470,000.0 | $4,700,000.0 |
| @ 49.0% | $4.9 | $49.0 | $490.0 | $4,900.0 | $49,000.0 | $490,000.0 | $4,900,000.0 |
| @ 51.0% | $5.1 | $51.0 | $510.0 | $5,100.0 | $51,000.0 | $510,000.0 | $5,100,000.0 |
| @ 53.0% | $5.3 | $53.0 | $530.0 | $5,300.0 | $53,000.0 | $530,000.0 | $5,300,000.0 |
| @ 55.0% | $5.5 | $55.0 | $550.0 | $5,500.0 | $55,000.0 | $550,000.0 | $5,500,000.0 |
| @ 57.0% | $5.7 | $57.0 | $570.0 | $5,700.0 | $57,000.0 | $570,000.0 | $5,700,000.0 |
| @ 59.0% | $5.9 | $59.0 | $590.0 | $5,900.0 | $59,000.0 | $590,000.0 | $5,900,000.0 |
| **Implied Deficiency Claim @ Illustrative Initial Distribution % of Claim Value** | | | | | | | |
| @ 43.0% | $5.7 | $57.0 | $570.0 | $5,700.0 | $57,000.0 | $570,000.0 | $5,700,000.0 |
| @ 45.0% | $5.5 | $55.0 | $550.0 | $5,500.0 | $55,000.0 | $550,000.0 | $5,500,000.0 |
| @ 47.0% | $5.3 | $53.0 | $530.0 | $5,300.0 | $53,000.0 | $530,000.0 | $5,300,000.0 |
| @ 49.0% | $5.1 | $51.0 | $510.0 | $5,100.0 | $51,000.0 | $510,000.0 | $5,100,000.0 |
| @ 51.0% | $4.9 | $49.0 | $490.0 | $4,900.0 | $49,000.0 | $490,000.0 | $4,900,000.0 |
| @ 53.0% | $4.7 | $47.0 | $470.0 | $4,700.0 | $47,000.0 | $470,000.0 | $4,700,000.0 |
| @ 55.0% | $4.5 | $45.0 | $450.0 | $4,500.0 | $45,000.0 | $450,000.0 | $4,500,000.0 |
| @ 57.0% | $4.3 | $43.0 | $430.0 | $4,300.0 | $43,000.0 | $430,000.0 | $4,300,000.0 |
| @ 59.0% | $4.1 | $41.0 | $410.0 | $4,100.0 | $41,000.0 | $410,000.0 | $4,100,000.0 |

**6. Can't recoveries be 'tiered' based on account size? Some accounts had less than $100, but mine had $100,000, shouldn't I receive a higher percentage recovery if I'm losing more in dollar terms?**

_No_, the U.S. Bankruptcy Code requires that all creditors of the same class receive "equal treatment." A Debtor is not permitted to favor some creditors within the same class over others. Account Holders are the same class of creditors regardless of account size. As such, all Account Holder recoveries need to be treated in the same manner, whether such distributions were made under a plan, wind down, liquidation, or otherwise. This does not mean that all Account Holders will receive the same amount of distribution, but rather that each Account Holder will receive the same treatment under the Plan, the same opportunities in connection with the distributions contemplated under the Plan, and the same percentage recovery on their claims (i.e., each Account Holder will receive a recovery of approximately 51% of their claim).

**7. Will VGX be supported? How is the value of my VGX being treated?**

Account Holders that held VGX will be receiving their pro rata share of their VGX claim similar to all other cryptocurrency claims. All Account Holder Claims and recoveries will be treated in an identical manner. All Account Holder Claims will be "dollarized" as of July 5th, 2022 with Account Holders receiving the same proportional amount of value in recoveries relative to such claims, regardless of whether an Account Holder had BTC, ETH, USDC, VGX, or any other cryptocurrency in their account.

In connection with their proposal, Binance.US has agreed to initiate and undertake an internal review process to determine whether VGX tokens can be listed for trading on the Binance.US platform. In the event Binance.US's review process does not deem VGX eligible for trading on the Binance.US platform, Account Holders will still receive their pro rata share of their VGX claim and will have the ability to hold their VGX in custody at Binance.US or transfer their VGX tokens off the Binance.US platform.

Under the Plan, for Account Holders with VGX in their accounts on the Petition Date, the VGX portion of such claims will be determined based on the U.S. Dollar price of VGX on the Petition Date of $0.2382. To Dollarize the VGX portion of a claim an Account Holder would multiply the U.S. Dollar price of VGX on the Petition Date of $0.2382 by the amount of VGX coins held as of the Petition Date.

***For illustrative purposes, to the extent that the implied Cryptocurrency Initial Distribution under the Plan is 51% of claim value, an Account Holder would receive an Initial Distribution in VGX based on (x) their VGX claim value multiplied by (y) the Initial Distribution percentage.***

As outlined in the table below, if an Account Holder has a 1,000 VGX token claim, the associated dollar value of such claim would be $238.19. If the Initial Distribution is 51% of claim value, the Account Holder would receive an Initial Distribution equal to $121.47.

| | [A] | [B] | [A] x [B] = [C] | [B] x Token Holdings | | | | [C] x Token Holdings | | | |
| | | | | Implied Claim @ VGX Token Holdings | | | | Illustrative Initial Distribution @ VGX Token Holdings | | | |
| | Illustrative Initial Distribution % | 7/5 VGX Token Price | Implied VGX Recovery Price / Token | 100 | 1,000 | 10,000 | 100,000 | 100 | 1,000 | 10,000 | 100,000 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.) | 43.0% | $0.2382 | $0.1024 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $10.24 | $102.42 | $1,024.22 | $10,242.29 |
| 2.) | 45.0% | $0.2382 | $0.1072 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $10.71 | $107.18 | $1,071.86 | $10,718.67 |
| 3.) | 47.0% | $0.2382 | $0.1120 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $11.19 | $111.95 | $1,119.50 | $11,195.06 |
| 4.) | 49.0% | $0.2382 | $0.1167 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $11.67 | $116.71 | $1,167.14 | $11,671.44 |
| 5.) | 51.0% | $0.2382 | $0.1215 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $12.14 | $121.47 | $1,214.78 | $12,147.83 |
| 6.) | 53.0% | $0.2382 | $0.1262 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $12.62 | $126.24 | $1,262.42 | $12,624.21 |
| 7.) | 55.0% | $0.2382 | $0.1310 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $13.10 | $131.00 | $1,310.06 | $13,100.60 |
| 8.) | 57.0% | $0.2382 | $0.1358 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $13.57 | $135.76 | $1,357.69 | $13,576.99 |
| 9.) | 59.0% | $0.2382 | $0.1405 | $23.81 | $238.19 | $2,381.92 | $23,819.28 | $14.05 | $140.53 | $1,405.33 | $14,053.37 |

The Account Holder will then have a deficiency claim against OpCo in an amount of $116.72 ($238.19 claim value less $121.47 Initial Distribution), which may be satisfied through (i) recoveries on OpCo's loan to 3AC and (ii) any residual cash proceeds attributable to OpCo from the liquidation trust after the full satisfaction of claims at OpCo that are senior to Account Holder Claims.

**8.   What will happen to the VGX token going forward under the Plan?**

The VGX Token Smart Contracts (including any private keys related solely to such smart contracts) are excluded from the transaction scope for the Binance.US proposal. The Debtors continue to work with third parties in an effort to identify a solution to support the ongoing utility of VGX. If the Debtors are unable to identify a solution for VGX's ongoing utility, VGX may decline in value and may have no value post-consummation of the Plan.

Similar to all other Voyager tokens, Binance.US has agreed to support custody of the VGX token on the Binance.US platform. In connection with their proposal, Binance.US has also agreed to initiate and undertake an internal review process to determine whether VGX tokens can be listed for trading on the Binance.US platform. The sale of the VGX Token Smart Contracts could adversely affect such review process and may result in VGX being ineligible to be listed for trading on the Binance.US platform. In the event Binance.US's review process does not deem VGX eligible for trading on the Binance.US platform, Account Holders will still receive their pro rata share of their VGX claim and will have the ability to hold their VGX tokens on the Binance.US platform or transfer their VGX tokens off the Binance.US platform to a third-party wallet.

**9.   Do I still have access to my tokens on Binance.US if they are not supported for trading?**

<u>***Yes***</u>, upon successfully migrating to Binance.US each Account Holder will have access to the entirety of their pro rata share of the Initial Distribution (which will be made in-kind as described above). At this time, Binance.US supports trading for 82 tokens that were available on the Voyager platform. These 82 tokens represent approximately 93.2% of the dollar value of cryptocurrency denominated claims as of July 5th, 2022. Regardless of whether a token is supported or not supported for trading, Account Holders will have the ability to withdrawal and transfer their cryptocurrencies to a third-party wallet upon their receipt of a distribution should they so choose post-closing.

Binance.US has also indicated to the Debtors that other tokens currently unsupported for trading are likely to become supported by the time of Closing. For tokens that are not currently supported for trading on the Binance.US platform, Account Holders will have the ability to hold those tokens on the Binance.US platform or transfer off the platform into a third-party wallet.

For example, if an Account Holder held BTC, ETH and XRP in its account, for purposes of the Initial Distribution, the BTC portion of such recovery will be made in BTC, the ETH portion will be made in ETH and the XRP portion will be made in XRP. The Account Holder would be able to immediately trade the BTC and ETH received; however, the Account Holder would not be able to trade XRP on the Binance.US platform as XRP is currently unsupported for trading purposes. To the extent such Account Holder wishes to sell their XRP for U.S. Dollars, the Account Holder will be able to transfer their XRP to a third-party wallet that supports trading in XRP.

### *Voyager Tokens Currently Supported for Trading on Binance.US Platform*

| AAVE | ADA | ALGO | ALICE |
|------|------|------|-------|
| ANKR | APE | ATOM | AUDIO |
| AVAX | AXS | BAND | BAT |
| BCH | BICO | BNT | BTC |
| CELO | CHZ | COMP | CRV |
| DAI | DASH | DGB | DOGE |
| DOT | EGLD | ENJ | ENS |
| EOS | ETC | ETH | FET |
| FIL | FLOW | FTM | GALA |
| GLM | GRT | HBAR | ICP |
| ICX | JASMY | KAVA | KNC |
| KSM | LINK | LPT | LRC |
| LTC | MANA | MATIC | MKR |
| NEO | OCEAN | OMG | ONT |
| OP | OXT | QNT | QTUM |
| REN | ROSE | SAND | SHIB |
| SKL | SOL | SPELL | SUSHI |
| TRX | TUSD | UNI | USDC |
| USDT | VET | WAVES | WBTC |
| XLM | XTZ | YFI | ZEC |
| ZEN | ZRX | | |

**10. If a token in my Voyager account was listed as being unsupported for trading at Binance.US, can I select a different supported token to receive my distribution?**

*No*, the in-kind distribution will be made in the same token(s) currently in each Account Holder's Voyager account. In order to provide Account Holders with their pro rata share of the original tokens in their account and limit any potential adverse tax implications related to liquidating or converting tokens, Binance.US has agreed to provide in-kind distributions for Account Holders on all tokens, including tokens currently unsupported for trading. However, if the estate has a shortfall in any specific cryptocurrency relative to the implied required distribution amount, the implied dollar amount of the shortfall will made through a distribution of USDC or U.S. Dollars.

**11. If my account only had BTC, will all of my distributions be made in BTC?**

*Maybe*, the Initial Distribution will be made in-kind for all tokens for Account Holders who successfully transition to the Binance.US. platform. Any future recoveries received in token form may be distributed in-kind to successfully

transitioned Account Holders through the Binance.US platform. If any future recoveries are received in U.S. Dollars or an Account Holder has not successfully transitioned to the Binance.US platform, such distributions will be made in U.S. Dollars based on the respective U.S. Dollar denominated claim amount.

**12. Why can't I receive my recovery under the Plan from the Voyager platform?**

Binance.US offers users the ability to withdraw an additional 35 cryptocurrency tokens (approximately 20% of the Debtors' cryptocurrency portfolio based on equivalent USD value) on the Debtors' platform that cannot be transferred directly to individual wallets due to technical limitations associated with the Debtors' platform. Historically, users of the Debtors' platform have exited from their positions in such tokens by selling such tokens for cash, transactions that previously required close interaction with market makers to effectuate. Accordingly, the only way for the Debtors to distribute the value associated with these non-transferable tokens to creditors in Unsupported Jurisdictions is to liquidate the tokens and distribute the resulting cash. The Binance.US platform allows users to freely transfer such tokens to their individual wallets.

Further, the Debtors would not only need to significantly increase their engineering, regulatory, compliance and other operational staff and resources, but would also require additional money transmitter licenses, authorizations, or exemptions which they currently lack. The aforementioned additional staff and resources would also be necessary to facilitate manual transfers to individual customer wallets that they otherwise would not have to do if transfers to customers were made through the Binance.US platform. The Debtors would also need to revive certain dormant contracts with third-party vendors to process distributions to creditors in this manner. This would result in increased administrative costs as compared to the costs of liquidating the cryptocurrency associated with creditors in Unsupported Jurisdictions and distributing the equivalent value in cash.

Finally, there are risks associated with the Debtors' distribution of cryptocurrency to individual creditor wallets as opposed to effectuating such distributions through the Binance.US platform. The Debtors must comply with anti-money laundering ("AML") and know your customer ("KYC") laws when sending cryptocurrency to individual wallets. Historically, the Debtors used Chainanalysis for automated verification of certain user generated cryptocurrency transfer requests. However, Chainalysis does not support all of the tokens listed on the Voyager platform (*e.g.*, non-transferable tokens). While AML/KYC compliance is easy when transferring cryptocurrency to Binance.US wallets, it poses substantial risk to the Debtors as it relates to the manual transfer of cryptocurrency to individual wallets for over 120,000 creditors. Binance.US has represented to the Debtors that it has existing infrastructure in place that would allow it to perform AML/KYC compliance checks in connection with transferring all cryptocurrency to customer accounts on its platform. Unlike ACH transfers which can be reversed, cryptocurrency sent to the wrong wallet cannot, which is why parties will often send a small "test" transaction to a wallet address prior to initiating a large transfer.

**13. Are my recoveries capped at the value I receive in the Initial Distribution?**

*No*, in addition to recoveries associated with the Initial Distribution, Holders of Account Holder Claims and OpCo General Unsecured Claims are entitled to receive additional recoveries, net of any OpCo administrative and priority claims and wind-down expenses up to their total dollarized claim amount, including with respect to (i) any recoveries on account of the 3AC loan, (ii) value associated with the sale of any other OpCo assets, and (iii) residual cash distributions attributable to OpCo from the liquidating trust.

However, in accordance with the U.S. Bankruptcy Code, a creditor is not eligible to receive consideration exceeding 100% of the amount of their claim.

**14. How will the amount of my distribution of cryptocurrency be determined?**

Under the Plan, the rebalancing exercise, and as a result each creditor's distribution of cryptocurrency, will be determined based on fair market value of such cryptocurrency as of two business days prior to the completion of the rebalancing exercise. As such, actual Initial Distributions will be dependent on the future price performance of OpCo's

cryptocurrency portfolio and will be subject to increases or decreases relative to the estimated 51% based on actual cryptocurrency prices during such reference period.

Prior to Closing, OpCo will undergo a rebalancing exercise such that the aggregate value (in U.S. Dollars) for each token to held by OpCo as a percentage of the aggregate value (in U.S. Dollars) of such token that was on deposit with Voyager as of July 5th, 2022 is consistent across OpCo's entire token portfolio, subject to a 5% variance allowance. To the extent a rebalancing delta exists for any specific token, Account Holders may receive a portion of their initial distribution in USDC or U.S. Dollars based on any implied shortfall between the value of the cryptocurrency deposited into their account relative to the dollar value of their Initial Distribution. In order to aid in the facilitation of the rebalancing exercise, OpCo has agreed to execute such exercise on the Binance.US Platform unless they can obtain a better price from another third party..

### 15. Is the $20 million of cash Binance.US is paying to the estate above and beyond the value that Binance.US will distribute for the cryptocurrency on the Voyager platform? Do I get a portion of that $20 million?

_Yes_, the $20 million of upfront consideration is _in addition to_ the fair market value of the cryptocurrency Binance.US is distributing under the Plan. Under the Plan, such cash value directly and indirectly accrues to the benefit of OpCo's creditors.

### 16. Who is eligible to join Binance.US under the Plan in order to receive an in-kind Initial Distribution?

Holders of Account Holder Claims and OpCo General Unsecured Claims in Supported Jurisdictions are eligible to join Binance.US.

Only Account Holders in Supported Jurisdictions who timely transfer their Accounts to Binance.US within three months after the later of the Closing or the completion of the transfer of user data to Binance.US will receive their share of the Initial Distribution on an in-kind basis (as further detailed in Question 2 above).  Account Holders who are located in Unsupported Jurisdictions six (6) months following the Closing, in addition to Account Holders in Supported Jurisdictions who do not successfully transition to Binance.US within the timeframe specified above, will receive their share of the Initial Distribution in the form of U.S. Dollars.

Holders of OpCo General Unsecured Claims in Supported Jurisdictions will receive their Initial Distribution in cash on the Binance.US platform if they successfully open an account on the Binance.US platform within three months of the Closing.  Otherwise such Holders of OpCo General Unsecured Claims will receive their Initial Distribution in cash from OpCo.

Future distributions will be dependent upon several factors including form of consideration recovered (as further detailed in Question 10 above).

### 17. What is a "deficiency claim"?

A deficiency claim means the difference between a creditor's total dollarized claim value as of July 5th, 2022 and the dollar value of recoveries distributed to such creditor at any point in time pursuant to the Plan. In effect, it represents the difference between the cumulative value returned to a creditor relative to their total claim value at any point in time.

### 18. What does an "in-kind" distribution mean?

An "in-kind distribution" means a Holder of an Account Holder Claim may be eligible to receive value in the same type of cryptocurrency that their initial claim was denominated in.

All cryptocurrency tokens regardless of whether supported for trading on the Binance.US platform will be eligible for an in-kind distribution and in-kind distributions will only be made available through Binance.US. As such, Account Holders in Supported Jurisdictions are required to sign up for a Binance.US account to the extent they wish to receive

an in-kind distribution. The number of in-kind cryptocurrency tokens received will depend on (i) the Initial Distribution and (ii) the volume weighted average price of such cryptocurrency on the reference date.

For any specific cryptocurrency, an Account Holder in a Supported Jurisdiction can determine the number of tokens that it will receive at Binance.US for that specific cryptocurrency based on the following formula:

$$Claim\ Value = \#\ of\ prepetition\ tokens * 7/5\ coin\ price$$

$$\#\ of\ in\ kind\ tokens\ received = \frac{Claim\ Value * Initial\ Distribution\ Percentage}{2\ day\ volume\ weighted\ average\ reference\ price}$$

For example, to the extent an Account Holder has a claim for 1.0 BTC, the dollarized value of such claim as of July 5, 2022 would be $20,157.69. To the extent the Account Holder signs up for a Binance.US account, the Initial Distribution is 51%, and the volume weighted average reference price of BTC is $16,816.20, such Account Holder would receive an Initial Distribution consisting of (a) 0.6113 BTC (equal to (i) (x) $20,157.69 claim multiplied by (y) 51% Initial Distribution divided by (ii) $16,816.20 volume weighted average reference price).

### 19. Who is responsible for calculating the Initial Distribution and subsequent distributions?

As is required by the Plan, the Debtors will calculate the number of tokens and the amount of cash that is distributable to each Account Holder and each Holder of an OpCo General Unsecured Claim. To the extent distributions are to be made through the Binance.US platform, Binance.US will rely on these calculations.

### 20. What is the administrative claim asserted by Alameda, and how does this impact my recovery?

On January 4, 2023, Alameda Research Ltd. filed an objection to the Conditional Disclosure Statement Motion, claiming that they have a $445mm administrative expense claim against the Debtors, due to the loan payment that was made to the Debtors within the 90-day period prior to Alameda filing for bankruptcy protection. The Debtors dispute this claim and do not view it as valid. However, if Alameda were to prevail on its asserted administrative claim, recoveries to Account Holders and Holders of OpCo General Unsecured Claims would be materially impacted, potentially reducing illustrative recoveries to approximately 26% from 51%.

**Exhibit D**

**Asset Purchase Agreement**

Execution Version

# FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

January 8, 2023

This FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT (this "Amendment") is made and entered into as of the date first above written, by and between BAM Trading Services Inc. d/b/a Binance.us, a Delaware corporation ("Purchaser") and Voyager Digital, LLC, a Delaware limited liability company ("Seller"). Purchaser and Seller are each referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used but not otherwise defined herein have the respective meanings ascribed to such terms in the Purchase Agreement (as defined below).

WHEREAS, the Parties entered into that certain Asset Purchase Agreement (the "Purchase Agreement"), dated as of December 18, 2022 (the "Signing Date");

WHEREAS, the Parties wish to amend the Purchase Agreement in accordance with the terms of the Purchase Agreement and this Amendment; and

WHEREAS, Section 10.5 (Amendment and Waiver) of the Purchase Agreement provides that the Purchase Agreement be amended only in a writing signed by Purchaser and Seller.

NOW, THEREFORE, in consideration of premises, and of the representations, warranties, covenants and agreements contained herein, the value, receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    Amendment.  The Purchase Agreement is hereby amended by making the additions in blue or green underlined text (indicated textually in the same manner as the following example: **underlined text** or underlined text) and deletions in green or red stricken text (indicated textually in the same manner as the following example: ~~stricken text~~ or ~~stricken text~~) as set forth in Exhibit A attached hereto.

2.    Effect of Amendment.  Each Party represents that such Party has all necessary power and authority to enter into and perform the obligations of this Amendment and that there are no consents or approvals required to be obtained by such Party for such Party to enter into and perform its obligations under this Amendment that have not been obtained.  This Amendment shall be deemed incorporated into, and form a part of, the Purchase Agreement and have the same legal validity and effect as the Purchase Agreement.  Except as expressly and specifically amended hereby, all terms and provisions of the Purchase Agreement are and shall remain in full force and effect, and all references to the Purchase Agreement in this Amendment and in any ancillary agreements or documents delivered in connection with the Purchase Agreement shall hereafter refer to the Purchase Agreement as amended by this Amendment, and as it may hereafter be further amended or restated.  Each reference in the Purchase Agreement to "this Agreement," "herein," "hereof," "hereunder" or words of similar import shall hereafter be deemed to refer to the Purchase Agreement as amended hereby (except that references in the Purchase Agreement to the "date hereof" or "date of this Agreement" or words or phrases of similar import shall continue to mean the Signing Date).

3.      <u>Inconsistency or Conflict</u>.  In the event of any inconsistency or conflict between the terms and provisions of the Purchase Agreement, on the one hand, and this Amendment, on the other hand, the terms and provisions of this Amendment shall govern and control.

4.      <u>Additional Provisions</u>.  The provisions contained in Section 6.19 (Confidentiality), Article VIII (Termination), Sections 10.1 (Non-Survival or Representations and Warranties and Certain Covenants; Certain Waivers), 10.2 (Expenses), 10.3 (Notices), 10.4 (Binding Effect; Assignment), 10.5 (Amendment and Waiver), 10.6 (Third Party Beneficiaries), 10.7 (Non-Recourse), 10.8 (Severability), 10.9 (Construction), 10.11 (Complete Agreement), 10.13 (Jurisdiction and Exclusive Venue), 10.14 (Governing Law; Waiver of Jury Trial) and 10.16 (Counterparts and PDF) of the Purchase Agreement are hereby incorporated by reference into this Amendment, *mutatis mutandis*, and made a part of this Amendment as if set forth fully herein.

(*Signature pages follow*)

2

IN WITNESS WHEREOF, each of the Parties has caused this Amendment to be duly executed and delivered as of the date first above written.

**BAM TRADING SERVICES INC. D/B/A BINANCE.US**

By: _Brian Shroder_ _____
ACA2F0AF79BC412...
Name: Brian Shroder
Title: Chief Executive Officer

IN WITNESS WHEREOF, each of the Parties has caused this Amendment to be duly executed and delivered as of the date first above written.

**VOYAGER DIGITAL, LLC**

By: _____

Name: Stephen Ehrlich

Title:   Chief Executive Officer

**Exhibit A**

(See attached)

**Execution ~~Verion~~ Version**
**~~CONFIDENTIAL~~ CONFIDENTIAL**

---

**ASSET PURCHASE AGREEMENT**

**DATED AS OF DECEMBER 18, 2022**

**BY AND BETWEEN**

**BAM TRADING SERVICES INC. D/B/A BINANCE.US, AS PURCHASER,**

**AND**

**VOYAGER DIGITAL, LLC, AS SELLER.**

---

# TABLE OF CONTENTS

**Page**

**ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES** .......................................................................................... 1

1.1   Purchase and Sale of the Acquired Assets ............................................. 1
1.2   Excluded Assets ....................................................................................... 3
1.3   Assumption of Certain Liabilities ........................................................... 5
1.4   Excluded Liabilities ................................................................................. 6
1.5   Assumption/Rejection of Certain Contracts ........................................... 6

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING** ................................................ 8

2.1   Consideration; Payment ........................................................................... 8
2.2   Deposit ..................................................................................................... 9
2.3   Closing ..................................................................................................... 9
2.4   Closing Deliveries by Seller ................................................................... 10
2.5   Closing Deliveries by Purchaser ............................................................ ~~10~~11
2.6   Withholding ............................................................................................. 11

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER** .......................... ~~11~~12

3.1   Organization and Qualification ............................................................... ~~11~~12
3.2   Authorization of Agreement .................................................................... 12
3.3   Conflicts; Consents ................................................................................. ~~12~~13
3.4   Financial Statements ............................................................................... 13
3.5   Cryptocurrency; Loans; Customer Accounts .......................................... ~~13~~14
3.6   Title to Acquired Assets; Staked Coins; Exclusive Ownership; Sufficiency of Assets ................................................................................................. ~~14~~15
3.7   Title to Properties ................................................................................... ~~14~~15
3.8   Contracts .................................................................................................. 15
3.9   Permits; Compliance with Laws ............................................................. ~~16~~17
3.10   Environmental Matters ........................................................................... 18
3.11   Intellectual Property; Data Privacy ........................................................ ~~18~~19
3.12   Tax Matters ............................................................................................. ~~19~~20
3.13   Affiliate Transactions ............................................................................. ~~20~~21
3.14   Brokers .................................................................................................... 21
3.15   Litigation ................................................................................................. 21
3.16   Absence of Changes ................................................................................ ~~21~~22
3.17   No Other Representations or Warranties ................................................. ~~21~~22
3.18   No Outside Reliance ................................................................................ ~~21~~22

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** .................... ~~22~~23

4.1   Organization and Qualification ............................................................... ~~22~~23
4.2   Authorization of Agreement .................................................................... ~~22~~23
4.3   Conflicts; Consents ................................................................................. ~~22~~23
4.4   Financing ................................................................................................. ~~23~~24
4.5   Permits .................................................................................................... ~~23~~24
4.6   Brokers .................................................................................................... ~~23~~24

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---:|
| 4.7 | No Litigation | ~~23~~24 |
| 4.8 | Certain Arrangements | 24 |
| 4.9 | Solvency | ~~24~~25 |
| 4.10 | No Additional Representations or Warranties | ~~24~~25 |
| 4.11 | No Outside Reliance | ~~24~~25 |

**ARTICLE V BANKRUPTCY COURT MATTERS** — ~~25~~26

| | | |
|---|---|---:|
| 5.1 | Selection of Successful Bid and Winning Bidder and Sale Approval | ~~25~~26 |
| 5.2 | No-Shop | 26 |
| 5.3 | Bankruptcy Actions | ~~27~~28 |
| 5.4 | Cure Costs | 29 |
| 5.5 | Approval | ~~29~~30 |
| 5.6 | No Successor Liability | ~~29~~30 |
| 5.7 | Filings | ~~29~~30 |
| ~~5.8~~ | ~~Waiver of Conflicts~~ | ~~29~~ |

**ARTICLE VI COVENANTS AND AGREEMENTS** — 30

| | | |
|---|---|---:|
| 6.1 | Conduct of Seller | 30 |
| 6.2 | Access to Information | ~~32~~33 |
| 6.3 | Employee Matters | 34 |
| 6.4 | Regulatory Matters | 36 |
| 6.5 | Reasonable Best Efforts; Cooperation | 38 |
| 6.6 | Data Transfer Matters | ~~38~~39 |
| 6.7 | Use of Name | ~~39~~; Voyager Platform    40 |
| 6.8 | Further Assurances | ~~40~~41 |
| 6.9 | Insurance Matters | ~~40~~41 |
| 6.10 | User Migration | ~~41~~42 |
| 6.11 | Rebalancing Exercise; Seller Statement | ~~43~~44 |
| 6.12 | Crediting of Accounts; Unsupported Jurisdictions, Transfer of Coins to Seller; Liquidations or Distributions by Seller | ~~45~~46 |
| 6.13 | VGX Token Listing Review Process | ~~48~~50 |
| 6.14 | Additional Bankruptcy Distributions | ~~48~~50 |
| 6.15 | Unstaking | ~~49~~52 |
| 6.16 | Receipt of Misdirected Assets; Liabilities | ~~50~~53 |
| 6.17 | Acknowledgment by Purchaser | ~~50~~53 |
| 6.18 | IT Migration | ~~52~~54 |
| 6.19 | Confidentiality | ~~52~~55 |
| 6.20 | Acquired Assets Owned by Non-Debtors | ~~53~~56 |
| 6.21 | Seller Expenses | ~~53~~56 |
| 6.22 | Purchaser Expenses | ~~54~~57 |

**ARTICLE VII CONDITIONS TO CLOSING** — ~~55~~58

| | | |
|---|---|---:|
| 7.1 | Conditions Precedent to the Obligations of Purchaser and Seller | ~~55~~58 |
| 7.2 | Conditions Precedent to the Obligations of Purchaser | ~~55~~58 |
| 7.3 | Conditions Precedent to the Obligations of Seller | ~~56~~59 |

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| 7.4 | Waiver of Conditions | 5659 |
| **ARTICLE VIII TERMINATION** | | 5760 |
| 8.1 | Termination of Agreement | 5760 |
| 8.2 | Effect of Termination | 5962 |
| 8.3 | Reverse Termination Fee | 6063 |
| 8.4 | Further Effect of Termination | 6063 |
| **ARTICLE IX TAXES** | | 6164 |
| 9.1 | Transfer Taxes | 6164 |
| 9.2 | Cooperation | 6165 |
| 9.3 | Preparation of Tax Returns and Payment of Taxes | 6265 |
| **ARTICLE X MISCELLANEOUS** | | 6366 |
| 10.1 | Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers | 6366 |
| 10.2 | Expenses | 6367 |
| 10.3 | Notices | 6467 |
| 10.4 | Binding Effect; Assignment | 6568 |
| 10.5 | Amendment and Waiver | 6568 |
| 10.6 | Third Party Beneficiaries | 6569 |
| 10.7 | Non-Recourse | 6669 |
| 10.8 | Severability | 6669 |
| 10.9 | Construction | 6669 |
| 10.10 | Schedules | 6669 |
| 10.11 | Complete Agreement | 6770 |
| 10.12 | Specific Performance | 6770 |
| 10.13 | Jurisdiction and Exclusive Venue | 6771 |
| 10.14 | Governing Law; Waiver of Jury Trial | 6871 |
| 10.15 | No Right of Set-Off | 6972 |
| 10.16 | Counterparts and PDF | 6972 |
| 10.17 | Publicity | 6972 |
| 10.18 | Bulk Sales Laws | 7073 |
| 10.19 | Fiduciary Obligations | 7073 |
| 10.20 | No Solicitation | 7073 |
| 10.21 | Acknowledgment | 7073 |
| **ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS** | | 7074 |
| 11.1 | Certain Definitions | 7074 |
| 11.2 | Index of Defined Terms | 8588 |
| 11.3 | Rules of Interpretation | 8689 |

## INDEX OF EXHIBITS

EXHIBIT A   FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
AGREEMENT

EXHIBIT B   FORM OF TRADEMARK AND DOMAIN NAME ASSIGNMENT
AGREEMENT

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of December 18, 2022, is made by and between BAM Trading Services Inc. d/b/a Binance.us, a Delaware corporation ("Purchaser"), and Voyager Digital, LLC, a Delaware limited liability company ("Seller"). Purchaser and Seller are each referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

WHEREAS, on July 5, 2022 (the "Petition Date"), Seller, together with Voyager Digital Ltd., a Canadian corporation and Seller's indirect equityholder ("Parent"), and Voyager Digital Holdings, Inc., a Delaware corporation and Seller's direct equityholder ("Holdings" and, collectively with Seller and Parent, the "Debtors"), filed voluntary petitions for relief (collectively, the "Petitions") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), to be jointly administered for procedural purposes (collectively, the "Bankruptcy Case"); and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement, the Agreement Order, the Plan and the Confirmation Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchaser and Seller hereby agree as follows.

## ARTICLE I

## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1     Purchase and Sale of the Acquired Assets. Pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Agreement Order, the Plan and the Confirmation Order, at the Closing, Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Post-Closing Liens; provided, in respect of the Acquired Coins, Purchaser shall acquire all of Seller's right, title and interest in and to the Acquired Coins free and clear of all Encumbrances (including Encumbrances implemented through "smart contracts" or other technological means), except that with respect to any ETH Coins that are Staked Coins as of the date hereof and cannot be unstaked as of the **later of the** Closing **and the Delivery Date of such ETH Coins**, such ETH Coins shall be subject to such staking. "Acquired Assets" means all of the properties, rights and

interests in and to only the following assets of Seller as of the Closing, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with IFRS, including any such properties, rights and interests in any assets of the following types acquired by Seller after the date hereof and prior to the Closing:

(a)    all Acquired Coins, together with all information regarding the underlying networks and smart contracts to which such Acquired Coins are subject;

(b)    to the extent permissible under applicable Law, (1) all (i) information and Personal Information (including, for the avoidance of doubt, names, account numbers, social security numbers, passports (including passport numbers), drivers licenses (including driver license numbers), "liveness check" selfies, email addresses, mailing addresses, phone numbers, contact information, usernames, user IDs, passwords, and any Personal Information collected for purposes of KYC Procedures) related to (A) all active and inactive accounts of Users ("Voyager User Accounts") and (B) any other consumers located or having a home address in the United States from whom Personal Information was collected by Seller; (ii) information that has been anonymized, pseudonymized, or otherwise de-identified; (iii) data contained in the Seller Statement or the Post-Bankruptcy Statement; (iv) information relating to Voyager User Accounts that must be obtained and retained by Purchaser or any of its Affiliates for regulatory or legal purposes; and (v) any encryption key, passcode or cypher required to access any of the foregoing (collectively, the "Acquired User Data"), and (2) all other information and data relating to the other categories of Acquired Assets, the Voyager Platform, other than Acquired User Data (clauses (1) and (2), collectively, "Acquired Information");

(c)    all rights, causes of action, claims (including, for the avoidance of doubt, any claims and causes of action arising under Chapter 5 of the Bankruptcy Code), counterclaims, defenses, credits, rebates, demands, allowances, refunds (other than Tax refunds or Tax attributes, in each case, to the extent enumerated in Section 1.2(i)), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities of any kind, in each case that Seller may have against any User located or having a home address in the United States solely to the extent that such claim or cause of action is against a User in such Person's capacity as a User (in each case, excluding (i) Retained Avoidance Actions, (ii) claims, causes of action or other rights against Seller or any of its Affiliates, or (iii) any of the foregoing to the extent relating to any Credit Matter) (collectively, "Acquired Voyager Claims");

(d)    other than VGX Token Smart Contracts, all Intellectual Property owned by Seller or otherwise used or held for use by or on behalf of Seller in connection with the operation of its businesses, including all Business Software (in source code and object code form), any Bedrock source code and other IT Systems owned by Seller and required to operate the Voyager Platform, all Business Accounts (provided that Purchaser may elect, by written notice to Seller until two (2) Business Days prior to the Closing Date, to designate any Business Account(s) as Excluded Asset(s)), all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights, claims and causes of action to sue and recover for past, present and future infringements, dilutions, misappropriations

2

of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world;

(e)    all rights to continue the customer relationships with customers of Seller and its Affiliates to the extent pertaining to savings and trading services related to Cryptocurrency;

(f)    all Contracts listed on <u>Schedule 1.1(f)</u> (the "<u>Assigned Contracts</u>") (for the avoidance of doubt, not including the 3AC Loan); and

(g)    other than the Excluded Documents, all Documents, goodwill, payment intangibles and general intangible assets and rights of or otherwise used or held for use by or on behalf of Seller and its Affiliates, in each case in connection with or related to any of the foregoing categories of Acquired Assets; <u>provided</u> that Seller shall be entitled to retain copies of Documents (subject to <u>Section 6.19</u>).

1.2    <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, in no event shall Seller be deemed to sell, transfer, assign, convey or deliver, and Seller shall retain all right, title and interest to all other properties, rights, interests and other assets of Seller that are not Acquired Assets, including the following (collectively, the "<u>Excluded Assets</u>"):

(a)    all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by Seller, and any retainers or similar amounts paid to Advisors or other professional service providers, in each case, other than the Acquired Coins;

(b)    all Contracts of Seller other than the Assigned Contracts, including the Contracts listed on <u>Schedule 1.2(b)</u> (the "<u>Excluded Contracts</u>");

(c)    all Documents, in each case, (i) to the extent they are primarily used in, or primarily relate to, any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of Seller, other than Voyager User Accounts), (ii) to the extent that such Documents constitute Seller's financial accounting Documents, all minute books, organizational documents, stock registers and such other books and records of Seller to the extent pertaining to the ownership, organization or existence of Seller, Tax Returns (and any related work papers), corporate seals, checkbooks, and canceled checks, in each case to the extent not primarily relating to the Acquired Assets or Assumed Liabilities or (iii) that Seller is required by Law to retain; <u>provided</u> that, to the extent not prohibited by applicable Law, Purchaser shall have the right to make copies of any portions of such Documents;

(d)    all Documents to the extent prepared or received by Seller or any of its Affiliates in connection with the sale of the Acquired Assets, this Agreement, or the Transactions, including (i) all records and reports prepared or received by Seller or any of its Affiliates or Advisors in connection with the sale of the Acquired Assets and the Transactions, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received in connection therewith, (ii) all bids and expressions of interest received from third

3

parties with respect to the acquisition of Seller's business or assets, and (iii) all privileged materials, documents and records of Seller or any of its Affiliates (together with the Documents specified in Sections 1.2(c) and 1.2(h), the "Excluded Documents");

(e)      all current and prior insurance policies of Seller, including for the avoidance or doubt all director and officer insurance policies, and all rights and benefits of any nature of Seller with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, other than Acquired Voyager Claims;

(f)      all membership interests or other equity interests of Seller or any of its Affiliates or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests;

(g)      (i) all Retained Avoidance Actions, (ii) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law, (iii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of Seller or any of its Affiliates, in each case, either (A) arising out of or relating to events occurring on or prior to the Closing Date, except as set forth in Section 1.1, or (B) related to any Credit Matter, and (iv) all claims that Seller or any of its Affiliates may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities, in each case other than Acquired Voyager Claims;

(h)      Seller's claims or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between Seller and Purchaser or their respective Affiliates in connection with the Transactions, or any other agreement between Seller and Purchaser or their respective Affiliates entered into on or after the date hereof;

(i)      (x) all Tax attributes of Seller or its Affiliates (including refunds of income Taxes of Seller or its Affiliates, but excluding any Tax refunds or Tax attributes with respect to Taxes in respect of the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date allocable to Purchaser in accordance with Section 9.3(d) or with respect to Transfer Taxes), (y) all Tax refunds and Tax attributes with respect to Taxes in respect of the Acquired Assets (i) for any Pre-Closing Tax Period or (ii) that are Excluded Liabilities, and (z) all Tax refunds and Tax attributes with respect to Taxes in respect of the Excluded Assets;

(j)      every asset of Seller that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) at the direction of the Bankruptcy Court or (ii) as otherwise permitted under Section 6.1(b);

(k)      all demands, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising

4

against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date, in each case other than Acquired Voyager Claims;

(l)    the properties, rights, interests, equity and assets of Coinify ApS and its direct and indirect subsidiaries;

(m)    all Money Transmitter Licenses;

(n)    Seller's accounts receivable, and other amounts or Liabilities owing, from its Affiliates;

(o)    (i) all Seller Plans and assets of all Seller Plans that do not constitute Acquired Coins and (ii) personnel records relating to employees of Seller and Holdings;

(p)    all information and Personal Information related to individual consumers that is not Acquired User Data, including any Personal Information that is subject to the GDPR or collected from natural persons with addresses outside of the United States;

(q)    the 3AC Loan;

(r)    all VGX Token Smart Contracts; and

(s)    the properties, rights, interests and assets set forth on Schedule 1.2(s).

1.3    Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and in the Agreement Order, the Plan and the Confirmation Order, effective as of the Closing, in addition to the other components of the Purchase Price described in Section 2.1(a), Purchaser shall irrevocably assume from Seller (or with respect to Taxes, if applicable, from Seller's applicable Affiliate) (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Seller shall (or with respect to Taxes, if applicable, cause Seller's applicable Affiliate to) irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities"):

(a)    all Liabilities and obligations of Seller under the Assigned Contracts to the extent such Liabilities arise from and after the Closing or relate to events, facts and circumstances first existing after the Closing;

(b)    all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs");

(c)    all Liabilities arising out of the conduct of the business or the ownership of the Acquired Assets, in each case, solely by Purchaser from and after the Closing Date **or, with respect to any Delayed Acquired Coin, the Delivery Date with respect to such Delayed Acquired Coin,** and to the extent such Liabilities arise from events, facts and circumstances first

existing after the Closing Date **or, with respect to any Delayed Acquired Coin, the Delivery Date with respect to such Delayed Acquired Coin**;

(d)    all Liabilities for Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date allocable to Purchaser in accordance with Section 9.3(d);

(e)    all Liabilities relating to all Transfer Taxes; and

(f)    all Liabilities set forth on Schedule 1.3(f);

provided, however, that whether or not any Liability for Taxes is an Assumed Liability shall be governed solely by Section 1.3(d) and Section 1.3(e).

1.4    Excluded Liabilities. Notwithstanding anything herein to the contrary, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Seller or any of its Affiliates or relating to the Acquired Assets, the Excluded Assets or the business and operations of Seller and its Affiliates, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on or prior to the Closing Date or arising thereafter, including as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"). For the avoidance of doubt, and without limiting the foregoing, Purchaser shall not be obligated to assume, and does not assume, and hereby disclaims, all of the following Liabilities of Seller and its Affiliates (each of which shall constitute an Excluded Liability hereunder):

(a)    all Liabilities (i) existing prior to the filing of the Bankruptcy Case that are subject to compromise under the Bankruptcy Code and (ii) to the extent not otherwise expressly assumed herein (including in the Commercial Covenants), incurred subsequent to the filing of the Bankruptcy Case and prior to the Closing;

(b)    all Liabilities related to (i) customer accounts of Seller or its Affiliates (including Voyager User Accounts), except for those obligations of Purchaser expressly set forth in the Commercial Covenants and (ii) commercial payables or amounts owing by Seller or its Affiliates, including to any software vendors;

(c)    all Liabilities for Taxes (i) with respect to the Acquired Assets for any Pre-Closing Tax Period allocable to Seller in accordance with Section 9.3(d); (ii) of Seller and their Affiliates for any taxable period; or (iii) arising from or in connection with an Excluded Asset; and

(d)    all Liabilities resulting from Seller's or any of its Affiliates' breach of, violation of, or non-compliance with the provisions of any Laws relating to the ownership or operation of their respective businesses, the Acquired Assets and the Excluded Assets or the

6

Transactions, including any bulk transfer Laws or similar Laws of any jurisdiction in connection with the Transactions; and

(e)     all Successor Liabilities, including with respect to any investigation or other Action against, concerning or otherwise with respect to Seller, its business or its assets.

1.5     Assumption/Rejection of Certain Contracts.

(a)     Assumption and Assignment of Executory Contracts. Seller shall, and shall cause its Affiliates to, provide timely and proper written notice of the Seller's request for entry of the Confirmation Order to all parties to any executory Contracts or unexpired leases to which Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Seller and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing. The Confirmation Order shall provide that as of and conditioned on the occurrence of the Closing, Seller shall assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included on an exhibit attached to either the Plan Supplement, a notice filed in connection with the motion for approval of the Confirmation Order or a separate motion for authority to assume and assign such Assigned Contracts. Such exhibit shall also set forth Seller's good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Seller based on Seller's books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Seller shall, pursuant to the Agreement Order, the Confirmation Order and the Assignment and Assumption Agreement(s), assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to Section 1.5(b). At the Closing, Purchaser shall (i) pay all Cure Costs and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.

(b)     Excluding or Adding Assigned Contracts Prior to Closing. Purchaser shall have the right to notify Seller in writing of any Assigned Contract that it does not wish to assume or a Contract to which Seller is a party that Purchaser wishes to add as an Assigned Contract up to five (5) Business Days prior to the Closing Date, and (i) any such previously considered Assigned Contract that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed to be an Excluded Contract, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract that Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by Seller to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price. Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the

time of and after the Closing. No Contract set forth on Schedule 1.2(s) shall be subject to the terms of this Section 1.5(b).

    (c)    <u>Non-Assignment</u>.

    (i)    Notwithstanding anything to the contrary in this Agreement but subject to Section 6.1, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by Seller or terminated by Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption; <u>provided</u> that Seller shall obtain Purchaser's consent prior to seeking to reject or terminate, or rejecting or terminating, any Assigned Contract or any Contract assumed by Purchaser pursuant to Section 1.5(a) or Section 1.5(b) from and after the date of this Agreement.

    (ii)    Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of Seller's rights over such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as it is to be transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. In the event that any Acquired Asset is deemed not to be assigned pursuant to this <u>clause (ii)</u>, the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and the closing of the Bankruptcy Case, Seller and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) enter into a commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without materially infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs actually incurred by Seller or its Affiliates or any direct reasonable and documented out-of-pocket costs actually incurred by Seller or its Affiliates resulting from the retention and maintenance by Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2) Purchaser shall assume any related burden and obligation with respect to such Acquired Asset to the extent such burden and obligation would constitute an Assumed Liability if such Acquired Asset was transferred at Closing. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement, the Agreement Order, the Plan and Confirmation Order, and the Bankruptcy Code. Notwithstanding anything herein to the contrary, the

provisions of this <u>Section 1.5(c)</u> shall not apply to any consent or approval that is not required to be obtained by operation of the Bankruptcy Code (including section 365(f)).

## ARTICLE II

### CONSIDERATION; PAYMENT; CLOSING

2.1   <u>Consideration; Payment</u>.

(a)   Subject to the terms and conditions herein, the aggregate consideration (collectively, the "<u>Purchase Price</u>") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) (A) the assumption of Assumed Liabilities, (B) a cash payment of $20,000,000 (the "<u>Cash Payment</u>"), (C) the Seller Expenses, if any, payable pursuant to <u>Section 6.21</u>, and (D) Purchaser's obligations to make the payments set forth in <u>Section 6.12</u> and <u>Section 6.14</u>.

(b)   Subject to the terms and conditions herein, at the Closing, Purchaser shall deliver, or cause to be delivered, to Seller (i) the Cash Payment, <u>plus</u> (ii) the Seller Expenses, if any, payable pursuant to <u>Section 6.21</u>, <u>less</u> (iii) the Deposit, together with all received investment income, if any (the "<u>Closing Date Payment</u>"). Any payment required to be made pursuant to this Agreement in cash (including the Closing Date Payment) shall be made by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to the other Party at least two (2) Business Days prior to the date such payment is to be made.

(c)   Upon reasonable advance written notice to Purchaser (in any event delivered to Purchaser no less than five Business Days prior to the Closing Date) Seller shall be entitled to withhold such portion of the Seller Held Coins as is necessary to satisfy Seller's obligations under the Plan (the "<u>Withheld Coins</u>"), and Seller shall distribute, or take such other action with respect to, the Withheld Coins only in accordance with the Plan and the provisions of this Agreement. To the extent there are any Withheld Coins, the provisions of this Agreement shall be read accordingly to give effect to the withholding and subsequent transfer, distribution or other action with respect to any such Withheld Coins, *mutatis mutandis*.

2.2   <u>Deposit</u>.

(a)   Purchaser has made, on the date hereof or will make on the first Business Day following the date hereof, an earnest money deposit with Acquiom Clearing House LLC (the "<u>Escrow Agent</u>") in the amount equal to $10,000,000 (the "<u>Deposit</u>"), by wire transfer of immediately available funds for deposit into an escrow account (the "<u>Escrow Account</u>"). Subject to <u>Section 2.2(b)</u> and <u>Section 2.2(c)</u>, the Deposit and any received investment income, if any, shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date. Seller hereby acknowledges and agrees that the Deposit qualifies as the deposit required pursuant to the Bidding Procedures Order.

9

(b)     If this Agreement has been validly terminated (i) by Seller pursuant to Section 8.1(d) or Section 8.1(f), (ii) by Purchaser pursuant to Section 8.1(c), in circumstances where Seller would be entitled to terminate this Agreement pursuant to Section 8.1(d) or Section 8.1(f), or (iii) by Seller pursuant to Section 8.1(g) in connection with and following any Purchaser Development and not in connection with a Higher and Better Offer (each of (i), (ii), and (iii), a "Purchaser Default Termination"), then within three (3) Business Days after the date of such termination, the Parties shall execute any instructions necessary to permit the Escrow Agent to disburse the Deposit together with all received investment income, if any, to Seller.

(c)     If this Agreement has been validly terminated by either Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within three (3) Business Days after such termination, and, at Purchaser's request, Seller shall execute any instructions necessary to permit the Escrow Agent to disburse the Deposit together with all received investment income, if any, to Purchaser.

(d)     If the Closing occurs, the Deposit shall be transferred to Seller.

2.3     Closing. Subject to the terms and on the conditions set forth in this Agreement, the closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement at and in connection with such closing (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on the third (3rd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs in accordance with the provisions hereof is referred to herein as the "Closing Date."

2.4     Closing Deliveries by Seller. At the Closing, Seller shall deliver to Purchaser:

(a)     a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by Seller;

(b)     each of the Acquired Coins to the wallet address designated by Purchaser for the relevant Acquired Coins of such type; and prior to transferring any Acquired Coins in full, Seller shall send a test transaction of a *de minimis* amount and shall immediately deliver the remainder of the relevant Acquired Coins, following Purchaser's confirmation that the *de minimis* amount was properly delivered; provided that ~~such transfers of the Acquired Coins~~ :

**(i)     Seller shall delay the delivery pursuant to this Section 2.4 of Acquired Coins allocable to a particular User or Eligible Creditor until Purchaser has confirmed in writing that such User or Eligible Creditor has satisfied the requirements set forth in Section 6.10(c), Section 6.10(e) and Section 6.12(b) for**

onboarding to the Binance.US Platform (any Acquired Coins so delayed, "Delayed Acquired Coins"), in which case Seller shall deliver such Delayed Acquired Coins to Purchaser on a weekly basis to the extent Purchaser has notified Seller at least five (5) Business Days in advance of such weekly delivery that such User or Eligible Creditor has satisfied such requirements (with such Delayed Acquired Coins being custodied by Seller or an entity on behalf of Seller that is selected by Seller in accordance with the other provisions of this Agreement); provided that (A) with respect to each such weekly transfer, Seller shall be responsible for all gas or other transaction fees incurred in connection with transferring such Coins to Purchaser and (B) with respect to any transfer of Delayed Acquired Coins to Purchaser (I) for subsequent liquidation and distribution of cash under the last sentence of Section 6.12(a) or (II) pursuant to Section 6.12(b), such Delayed Acquired Coins will be transferred by Seller to Purchaser on the date specified in such provisions;

(ii) transfers of Acquired Coins not held on the Binance.US Platform prior to such transfer shall be deemed complete when each transfer is publicly confirmed on the blockchain for the related Coin at least the number of times set forth on https://support.kraken.com/hc/en-us/articles/203325283-Cryptocurrency-deposit-processing-times (or a successor site agreed by Seller and Purchaser); provided further that

(iii) (i) for transfers of Acquired Coins held on the Binance.US Platform as of the Closing Date, shall be deemed complete when such Acquired Coins shall be are transferred to the Binance.US Platform account designated by Purchaser; and

(iv) (ii) in the case of ETH Coins that are Staked Coins as of the date hereof and cannot be unstaked as of the later of the Closing Date and the Delivery Date with respect to such ETH Coins, such staked ETH Coins shall be delivered pursuant to the means mutually agreed between Purchaser and Seller acting reasonably;

(c)     a short-form trademark and domain name assignment agreement substantially in the form of Exhibit B (the "Trademark and Domain Name Assignment Agreement"), duly executed by Seller;

(d)     an IRS Form W-9 properly completed and duly executed by Seller or Seller's regarded owner for U.S. federal income Tax purposes;

(e)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Seller certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied; and

(f)     the Seller Statement pursuant to Section 6.11(c).

2.5     Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver to (or at the direction of) Seller:

(a)     without duplication, the Closing Date Payment pursuant to Section 2.1(b);

11

(b)    the Assignment and Assumption Agreement, duly executed by Purchaser;

(c)    the Trademark and Domain Name Assignment Agreement, duly executed by Purchaser; and

(d)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied.

2.6    <u>Withholding</u>. Purchaser and its Affiliates shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement such amounts as are required to be deducted or withheld under applicable tax Law. Prior to making any such deduction or withholding, Purchaser or its applicable Affiliate shall use reasonable best efforts to (x) notify the person in respect of which such withholding or deduction is proposed to be made of such deduction or withholding and (y) give such person a reasonable amount of time to demonstrate that no or reduced withholding is required under applicable tax Law. To the extent that amounts are so deducted or withheld and paid to the appropriate Governmental Body, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF SELLER

Except as (i) disclosed in the forms, reports, schedules, statements, exhibits and other documents filed with (or furnished to) the Canadian Securities Administrators ("CSA") by Parent in respect of Seller and its business during the two-year period prior to the date hereof to the extent publicly available at least one (1) Business Day prior to the date hereof on the CSA's System for Electronic Document Analysis and Retrieval, excluding (x) any disclosures set forth or referred to in any risk factor or similar section that do not constitute statements of fact, (y) any disclosures in any forward-looking statements disclaimer, and (z) any other disclosures that are generally cautionary, predictive or forward-looking in nature (the "Filed CSA Documents") (it being acknowledged that nothing disclosed in the Filed CSA Documents will be deemed to modify or qualify the Fundamental Representations), (ii) disclosed in any forms, statements or other documents filed by any of the Debtors with the Bankruptcy Court in the Bankruptcy Case as of one (1) Business Day prior to the date hereof, or (iii) set forth in the Schedules delivered by Seller concurrently herewith and subject to Section 10.10, Seller represents and warrants to Purchaser as follows as of the date hereof and as of the Closing Date **(except where, and solely to the extent that, any of the following are made with respect to any Delivery Date, in which case, such representations and warranties, solely to such extent, are made only as of such Delivery Date)**:

3.1    <u>Organization and Qualification</u>.

(a)    Except as set forth on Schedule ~~3.1~~**3.1**, Seller is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has all requisite limited liability company power and authority necessary to own,

lease and operate its properties and assets and to carry on its business as it is now being conducted, except (other than with respect to Seller's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as set forth on Schedule 3.1, Seller is duly qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned, leased or operated by it makes such qualification necessary, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.2    Authorization of Agreement. Subject to requisite Bankruptcy Court approvals:

(a)    Seller has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions;

(b)    the execution, delivery and performance by Seller of this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement to which it is a party or to be executed by it in connection with the consummation of the Transactions (the "Seller Documents"), and the consummation by Seller of the Transactions, have been duly authorized by all requisite limited liability company action and no other limited liability company proceedings on its part are necessary to authorize the execution, delivery and performance by Seller of this Agreement and the Seller Documents and the consummation by it of the Transactions; and

(c)    this Agreement has been, and the Seller Documents will be, when delivered pursuant to the terms hereof, duly executed and delivered by Seller and, assuming due authorization, execution and delivery hereof by the other Party, constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except that such enforceability (i) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (ii) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "Enforceability Exceptions").

3.3    Conflicts; Consents.

(a)    Assuming that (x) requisite Bankruptcy Court approvals are obtained, and (y) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 3.3(a) are made, given or obtained (as applicable), neither the execution and delivery by Seller of this Agreement, nor the consummation by Seller of the Transactions, nor performance or compliance by Seller with any of the terms or provisions hereof, will (i) conflict with or violate any provision of Seller's certificate of formation or limited liability company agreement, (ii) violate any Law or Order applicable to Seller, the Acquired Assets or the Assumed Liabilities, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancellation

13

of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate Seller's obligations under any such Material Contract, (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Seller or (v) violate, contravene or conflict with, result in termination or lapse of, or in any way affect any permit, except, in the case of <u>clauses (ii)</u> through <u>(v)</u>, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as set forth on <u>Schedule 3.3(a)</u>, Seller is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Seller of this Agreement or the consummation by Seller of the Transactions, except (i) any requisite Bankruptcy Court approvals, or (ii) where failure to file, seek or obtain such notice, authorization, approval, Order, permit or consent would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4    <u>Financial Statements</u>. Attached to <u>Schedule 3.4</u> are Parent's unaudited statements of financial position as of June 30, 2022 (the "<u>Balance Sheet Date</u>") and audited statements of financial position as of June 30, 2021, and the related statements of loss and cash flows for each fiscal year then ended, in each case (collectively, the "<u>Financial Statements</u>"). Except as set forth on <u>Schedule 3.4</u>, the Financial Statements have been prepared, in each case, in conformity in all material respects with IFRS consistently applied, except for the absence of footnote disclosure and any customary year-end adjustments and except, in the case of the unaudited statements as of June 30, 2020 or the fiscal year then ended, with respect to any Tax matters or any impact or effect thereof. The Financial Statements are prepared based on the books and records of Parent and its Subsidiaries and present fairly in all material respects, in accordance with IFRS consistently applied, the consolidated financial condition and results of operations of Parent as of the dates and for the periods referred to therein, except as may be indicated in the notes thereto.

3.5    <u>Cryptocurrency; Loans; Customer Accounts</u>.

(a)    <u>Schedule 3.5(a)</u> sets forth a list of all Cryptocurrency held by Seller as of a date within three (3) Business Days of the date hereof, the means through which Seller as of such date controls such Cryptocurrency (*e.g.*, "private keys," custody agreements or agreements with parties performing validation services), whether or not such Cryptocurrency is attributable to User accounts on the Voyager Platform, and whether such Cryptocurrency constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan), which <u>Schedule 3.5(a)</u> shall be provided to Purchaser no later than December 18, 2022. **<u>As of the date hereof, as of the Closing Date and, with respect to any Delayed Acquired Coin, as of the applicable Delivery Date with respect to such Acquired Coin,</u>** Seller has the exclusive ability to control, including by use of "private keys" or other equivalent means or through custody arrangements or other equivalent means, all such Cryptocurrency set forth on <u>Schedule 3.5(a)</u> (other than, solely to the extent of any staking contract, Staked Coins), and owns such Cryptocurrency (other than Cryptocurrency that constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan) and, solely to the extent of any staking contract, Staked Coins) free and clear of all Encumbrances (other than Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan); <u>provided</u> that such ownership and exclusive ability to control

14

Cryptocurrency is subject to the continued existence, validity, legality, governance and public availability of the relevant blockchains.

(b)    Schedule 3.5(b) sets forth a true, correct and complete list of all amounts (including any principal, interest, fees, expenses or penalties) outstanding or unpaid under any Loan.

(c)    Schedule 3.5(c) sets forth a list of all Users (excluding Users with addresses in the United Kingdom, European Union or European Economic Area) as of the Petition Date and a date within three (3) Business Days of the date hereof and the account position (including type and amount of Cryptocurrency) that such User held as of immediately prior to the Petition Date and as of the date hereof, which Schedule 3.5(c) shall be provided to Purchaser no later than December 18, 2022.

(d)    **As of the date hereof, as of the Closing Date and, with respect to any Delayed Acquired Coin, as of the applicable Delivery Date with respect to such Delayed Acquired Coin,** Seller has implemented procedures and controls regarding management of authentication credentials such as private keys and means for instructing third party custodians ("Authentication Credentials") for Cryptocurrencies, including limitation of access to Authentication Credentials to employees who need to have such access and requiring multiple individuals to sign off on transactions. Where Authentication Credentials are not held by employees of Seller, such Authentication Credentials are held by reputable third-party custodians or wallet providers whose security procedures have been evaluated by Seller and found to be fit for purpose.

(e)    Schedule 3.5(e) sets forth a true, correct and complete list of the number and type of Post-Petition Coins, on a User-by-User basis, which Schedule 3.5(e) shall be provided to Purchaser no later than December 18, 2022.

3.6    Title to Acquired Assets; Staked Coins; Exclusive Ownership; Sufficiency of Assets.

(a)    Seller has good and valid title to all Acquired Assets (other than Coins pledged by a borrower as collateral in respect of any Loans and, solely to the extent of any staking contract, Staked Coins), free and clear of all Encumbrances (other than Permitted Encumbrances) and, at the Closing, subject to Section 1.5(c), Purchaser will be vested with good and valid title to all such Acquired Assets, free and clear of all Encumbrances (other than Permitted Post-Closing Liens) and Excluded Liabilities, to the fullest extent permissible under Law, including section 363(f) of the Bankruptcy Code; provided, in respect of the Acquired Coins, Purchaser will be vested with good and valid title thereto free and clear of all Encumbrances (including Encumbrances implemented through "smart contracts" or other technological means), except that with respect to any staked ETH Coins that cannot be unstaked as of the Closing, such ETH Coins shall be subject to such staking **and except that, with respect to any Delayed Acquired Coins, such title will vest with Purchaser on the applicable Delivery Date**. Schedule 3.6(a) sets forth a true, correct and complete list of all Seller Held Coins that are subject to staking ("Staked Coins").

(b)     Seller is the sole owner of all Coins relating to the ~~exchange~~**brokerage** and custody business of the Voyager Platform and has good and valid title to such Coins, free and clear of all Encumbrances (except to the extent such Coin constitutes collateral under any Loan (including, solely for this purpose, the 3AC Loan) and, solely to the extent of any staking contract, Staked Coins).

3.7     Title to Properties.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller has a good and valid leasehold interest to all real property leased by Seller (the "Leased Real Property"), free and clear of all Encumbrances (other than Permitted Encumbrances). Seller does not own any real property.

(b)     Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, Seller holds good title to, or holds a valid leasehold interest in, all of the material tangible property necessary in the conduct of its business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to Seller.

3.8     Contracts.

(a)     Schedule 3.8 sets forth a list of each Material Contract as of the date of this Agreement. For purposes of this Agreement, "Material Contract" means (x) any Assigned Contract, and (y) any other Contract to which Seller is a party or by which it is bound (in each case, excluding any Seller Plan) that in the case of this clause (y):

(i)     relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement, other than for the avoidance of doubt, marketing and licensing Contracts entered into in the Ordinary Course;

(ii)     provides for indebtedness for borrowed money of Seller having an outstanding or committed amount in excess of $1,000,000, other than letters of credit;

(iii)     relates to the acquisition or disposition of any material business (whether by merger, sale of stock, sale of assets or otherwise) pursuant to which any earn-out or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments by or to Seller of more than $1,000,000 after the date hereof (in each case, excluding for the avoidance of doubt, acquisitions or dispositions of Equipment, Cryptocurrency, properties or other assets in the Ordinary Course or of Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the business of Seller);

(iv)     involves the license of material Seller Intellectual Property to third parties (other than (x) Contracts with end users of Seller's products and services entered into in the ordinary course of business or (y) non-exclusive licenses granted to service

providers, suppliers and other third parties in connection with the provision of goods or services to Seller; provided such licenses are ancillary to, and not the primary purpose of, such Contract);

(v)      is a Contract (other than purchase orders or Contracts with respect to the acquisition of Cryptocurrency in the Ordinary Course) for the purchase of materials, supplies, goods, services, Equipment, or other assets pursuant to which Seller would reasonably be expected to make payments of more than $3,000,000 during any fiscal year;

(vi)     contains any provision (A) limiting, in any material respect, the right of Seller to engage in any business, make use of any Seller Intellectual Property that is material to Seller, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of (A) and (B), other than (x) a Contract that can be terminated on ninety (90) days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or obligations or the payment of any penalty under, such Contract, (y) customer Contracts entered into in the Ordinary Course granting exclusive rights to certain of Seller's services or containing "most favored nation" provisions with respect to certain of Seller's products or (z) any provision in any license agreements for third party Intellectual Property being licensed to Seller that limits Seller's use of such licensed Intellectual Property to specified fields of use or specified territories;

(vii)    evidences or relates to a Loan, including security or collateral agreements;

(viii)   is a custody agreement or agreement with any Person performing validation or staking services with respect to any Cryptocurrency;

(ix)     each Contract evidencing or governing financial or commodity hedging or similar trading activities (including with respect to Cryptocurrency), including any master agreements or confirmations governing swaps, options or other derivatives, or futures account agreements and/or brokerage statements or similar Contract; and

(x)      any Contracts with any Governmental Body, regulatory service providers or self-regulatory organizations in connection with Seller's business or the Voyager Platform.

(b)      Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs) and except (i) as a result of the commencement of the Bankruptcy Case and (ii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced, (A) each Material Contract is valid and binding on Seller and, to the Knowledge of Seller, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) Seller, and, to the Knowledge of Seller, any other party thereto, have performed all obligations required to be performed by it under each

17

Material Contract, (C) Seller has not received a written notice of the existence of any breach or default on the part of Seller under any Material Contract, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of Seller, or to the Knowledge of Seller, any counterparty under such Material Contract and (E) to the Knowledge of Seller, Seller has not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except in each case of (A) through (E), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

      3.9    <u>Permits; Compliance with Laws</u>.

      (a)    Except as set forth on <u>Schedule 3.9</u>, (i) Seller is not in violation of any Laws, Orders or any Money Transmitter Requirement, applicable to the Acquired Assets and (ii) Seller holds, and is in compliance with, all licenses, permits, registrations and authorizations, including Money Transmitter Licenses, necessary for the lawful ownership and operation of the Acquired Assets and Seller's business, except in each case as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

      (b)    Seller and each of its directors, officers and employees acting in such capacity are and have in the past three (3) years been in compliance with the Foreign Corrupt Practices Act of 1977, as amended (the "<u>FCPA</u>"), and any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, and Seller is not, to the Knowledge of Seller, being investigated by any Governmental Body with respect to, or been given notice in writing by a Governmental Body of, any violation by Seller of the FCPA or any other U.S. or foreign Law concerning anti-corruption or anti-bribery applicable to its business, in each case, except to the extent such non-compliance, investigation or notice of violation would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

      (c)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) neither Seller nor any director or officer of Seller, or any employee, agent or representative or other Person who performs or has performed services on behalf of Seller in the past three (3) years, is a Person that is the subject or target of economic sanctions administered by the Office of Foreign Assets Control of the United States Department of Treasury ("<u>OFAC</u>") (including the designation as a "Specially Designated National or Blocked Person" thereunder), the United Nations Security Council, His Majesty's Treasury, the European Union, the Bureau of Industry Security of the U.S. Department of Commerce, the U.S. Department of State, or any sanctions measures under the U.S. International Emergency Economic Powers Act, the U.S. Trading with the Enemy Act, the U.S. Iran Sanctions Act, the U.S. Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010, the U.S. Iran Threat Reduction and Syria Human Rights Act of 2012, the U.S. National Defense Authorization Act of 2012 or the U.S. National Defense Authorization Act of 2013, or any executive order, directive or regulation pursuant to the authority of any of the foregoing, including the regulations of the United States Department of the Treasury set forth under 31 CFR, Subtitle B, Chapter V, or any orders or licenses issued thereunder (collectively, "<u>Sanctions</u>"), nor any Sanctioned Person; (ii) to the Knowledge of Seller, the Acquired Assets are not the property or interests in

property of a Sanctioned Person, and are not otherwise the subject or target of Sanctions; and (iii) Seller has not in the past three (3) years been in violation of applicable Sanctions.

(d)     Seller and each of its directors, officers and employees acting in such capacity are and have in the past three (3) years been in compliance with all anti-money laundering and financial recordkeeping and reporting Laws to which it is subject, including the related rules, regulations or guidelines issued, administered or enforced by any Governmental Body (collectively, the "Anti-Money Laundering Laws"), and no Action by or before any Governmental Body involving Seller (or, in respect of the dealings of Seller, involving any of Seller's directors, officers or employees) with respect to the Anti-Money Laundering Laws is pending, or, to the Knowledge of Seller, threatened, in each case, except to the extent such non-compliance or Action would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(e)     Seller does not (i) have assets located outside the United States, or (ii) derive revenue from users located outside the United States.

(f)     Seller does not engage in (a) the design, fabrication, development, testing, production, or manufacture of one or more "critical technologies" within the meaning of Section 721 of the Defense Production Act of 1950, as amended, including all implementing regulations thereof (the "DPA"), or (b) the ownership, operation, maintenance, supply, manufacture, or servicing of "covered investment critical infrastructure" within the meaning of the DPA (where such activities are covered by column 2 of Appendix A to 31 C.F.R. Part 800).

3.10    Environmental Matters. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) Seller is, and has been since January 1, 2021, in compliance with all applicable Environmental Laws, (b) since January 1, 2021, Seller has not received any written notice alleging that Seller is in violation of or liable under, any Environmental Law that is unresolved, (c) Seller possesses and is in compliance with all permits required under Environmental Laws for the operation of its business as currently conducted ("Environmental Permits"), (d) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Seller, threatened in writing against Seller, (e) Seller is not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of Seller and (f) Seller has not released any Hazardous Substances at the Leased Real Property in quantities or concentrations that currently require Seller to conduct remedial activities, or that have given rise to any Action against Seller, under Environmental Laws.

3.11    Intellectual Property; Data Privacy.

(a)     Schedule 3.11(a)(i) sets forth as of the date hereof a true, correct and complete list of all registrations and applications included in the Seller Intellectual Property (the "Seller Registered IP"), indicating for each item the owner, registration or application number, registration or application date and the applicable filing jurisdiction or domain name registrar, as applicable. Except as otherwise indicated on Schedule 3.11(a), all Seller Registered IP is owned exclusively by Seller, and is subsisting, and to the Knowledge of Seller, valid and enforceable.

US-DOCS-137411268.27138346099.6

There is no outstanding Action or Order challenging or adversely affecting the validity or enforceability of any material Seller Registered IP, or Seller's ownership of or rights in any material Seller Intellectual Property.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller owns all of the rights, title and interest in and to the Seller Intellectual Property (other than Intellectual Property licensed to Seller), free and clear of all Encumbrances (other than Permitted Encumbrances). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all of the Seller Intellectual Property (other than Intellectual Property licensed to Seller) is subsisting, valid and enforceable.

(c)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) Seller owns or has legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the business of Seller as currently conducted free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) Seller has taken commercially reasonable steps in accordance with industry practice to maintain the confidentiality of non-public Intellectual Property; provided that nothing in this Section 3.11(c) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of Section 3.11(e).

(d)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Actions are pending or, to the Knowledge of Seller, threatened against Seller, and since January 1, 2021, Seller has not received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by Seller of any Intellectual Property owned by or exclusively licensed to Seller or (ii) alleging that Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any Person.

(e)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since January 1, 2021, (i) no Person has infringed, misappropriated or otherwise violated the rights of Seller with respect to any Intellectual Property owned by or exclusively licensed to Seller and (ii) the operation of the business of Seller has not violated, misappropriated or infringed the Intellectual Property of any other Person.

(f)    The consummation of the Transactions will not result in the grant of any right or license to any third party of any material Seller Intellectual Property (other than Intellectual Property licensed to Seller).

(g)    Seller has complied in the past three (3) years in all material respects with all applicable Privacy Laws, privacy policies and notices, and contractual commitments related to the Processing of Personal Information (collectively, "Privacy Requirements"), and the consummation of the Transactions will not cause Seller to breach, in any material respect, any Privacy Requirements.

US-DOCS\137411268.27138346099.6

(h)     Seller has established and implemented and maintains a written information security program that contains commercially reasonable safeguards designed to protect Personal Information and against any Security Incident.

(i)     Except as would not, individually or in the aggregate, reasonably be expected to have a material impact on the Acquired Assets, taken as a whole, there have been no Security Incidents involving Personal Information in Seller's custody, possession or control or for which Seller is otherwise responsible. Except as set forth on <u>Schedule 3.11(i)</u>, Seller has not in the past three (3) years: (i) notified or been legally required to notify any affected individuals, Governmental Body or other parties in connection with any Security Incident pursuant to Privacy Requirements; (ii) been the subject of any Action with respect to any unauthorized Processing of Personal Information or violation of any Privacy Laws by any Person; (iii) received any written inquiry, notice, request, claim, complaint, correspondence, or other communication from any Governmental Body or other Person relating to any Security Incident or alleged violation of any Privacy Laws; or (iv) made any ransomware or similar payment in connection with any Security Incident.

3.12    <u>Tax Matters</u>.

(a)     To the Knowledge of Seller, except with respect to income Tax and information Tax Returns, Seller has prepared (or caused to be prepared) and duly and timely filed (taking into account valid extensions of time within which to file) all material Tax Returns in respect of the Acquired Assets or otherwise required to be filed by it, and all such Tax Returns (taking into account all amendments filed in respect thereto) are true, correct and complete in all material respects.

(b)     To the Knowledge of Seller, all material Taxes in respect of the Acquired Assets, other than income Taxes or Taxes attributable to information Tax Returns, or otherwise required to be paid by Seller (whether or not shown on any Tax Return) have been duly and timely paid.

(c)     To the Knowledge of Seller, there are no Encumbrances for Taxes on the Acquired Assets or any other assets of Seller other than for Taxes not yet due or payable.

(d)     Seller has not, within the past five (5) years, been a member of an affiliated group of corporations filing a consolidated federal income Tax Return (other than a group the common parent of which is Parent or one of its Subsidiaries).

(e)     Seller has not waived any statute of limitations in respect of material Taxes or agreed to any extension of time with respect to an assessment or deficiency for material Taxes (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course), including, for the avoidance of doubt, with respect to Taxes in respect of the Acquired Assets.

(f)     Seller has not participated in any "listed transaction" within the meaning of U.S. Treasury Regulation Section 1.6011-4(b)(2).

(g)      Except as set forth on Schedule 3.12(g), solely as of the date hereof, (x) Seller has not received a written notice from a Governmental Body of any proposed adjustment, deficiency or underpayment of material amounts of Taxes with respect to the Acquired Assets, and (y) there are no pending or threatened audits or other Actions for or relating to any Liability for Taxes with respect to the Acquired Assets, except for, in each case of clause (x) and (y), those that have been fully satisfied, resolved or finally withdrawn.

(h)      Seller has not received a claim from a Governmental Body that Tax Returns are required to be filed in relation to the Acquired Assets or the Assumed Liabilities in a jurisdiction where no such Tax Returns have been filed or are currently filed.

(i)      Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this Section 3.12 shall constitute the sole representations and warranties with respect to Taxes and no representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

3.13      Affiliate Transactions. Except as set forth on Schedule 3.13 or in the "Interest Of Management And Others In Material Transactions" disclosure in the Filed CSA Documents or customer accounts of officers or directors, to the Knowledge of Seller, no Affiliate of Seller, or any officer or director of Parent or Seller, (a) is a party to any agreement that constitutes an Acquired Asset having a potential or actual value or a contingent or actual Liability exceeding $500,000, other than (i) loans and other extensions of credit to directors and officers of Seller for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans or (b) has any material interest in any Acquired Asset.

3.14      Brokers. Except for Moelis, the fees and expenses of which will be paid by Seller, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Seller or any of its Affiliates for which Purchaser or its Affiliates shall be liable.

3.15      Litigation. Except for the general pendency of the Bankruptcy Case, Actions that would not reasonably be expected to have a Material Adverse Effect or as set forth Schedule 3.15, there are no filed actions, claims, complains, summons, suits, litigations, arbitrations pending or threatened in writing against Seller.

3.16      Absence of Changes. Since the Balance Sheet Date, (a) there has not been any Material Adverse Effect and i) no action has been taken with respect to the Acquired Assets that would have required the consent of Purchaser under Section 6.1 if undertaken after the date hereof.

3.17      No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement)

or in the certificate to be delivered pursuant to <u>Section 2.4(e)</u> (the "<u>Express Seller Representations</u>") (<u>it</u> <u>being</u> <u>understood</u> that Purchaser has relied only on the Express Seller Representations), Purchaser acknowledges and agrees that neither Seller nor any other Person on behalf of Seller makes, and Purchaser has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to Seller, the Acquired Assets or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Moelis) (the "<u>Information Presentation</u>") or in that certain datasite administered by Datasite (the "<u>Dataroom</u>") or elsewhere to Purchaser or any of its Affiliates or their respective Advisors by or on behalf of Seller or any of its Affiliates. Without limiting the foregoing, except for the Express Seller Representations, neither Seller nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or their respective Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise in expectation of the Transactions or any discussions with respect to any of the foregoing information.

3.18    <u>No Outside Reliance</u>. Notwithstanding anything contained in this <u>Article III</u> or any other provision of this Agreement to the contrary, Seller acknowledges and agrees that the Express Purchaser Representations are the sole and exclusive representations, warranties and statements of any kind made to Seller and on which Seller may rely in connection with the Transactions. Seller acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Purchaser Representations), including in any meetings, calls or correspondence with management of Purchaser or any other Person on behalf of Purchaser or any of its Affiliates or Advisors, are, in each case, specifically disclaimed by Purchaser and that Seller has not relied on any such representations, warranties or statements.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as set forth in the Schedules delivered by Purchaser concurrently herewith and subject to <u>Section 10.10</u>, Purchaser represents and warrants to Seller as follows as of the date hereof and as of the Closing Date.

4.1    <u>Organization and Qualification</u>. Purchaser is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due incorporation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is duly licensed or qualified to do

business and is in good standing (or its equivalent) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions.

4.2    <u>Authorization of Agreement</u>. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Party, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3    <u>Conflicts; Consents</u>.

(a)    Except for the consents, licenses, waivers, exemptions, authorizations, approvals, filings, notifications or registrations required under any Money Transmitter Requirements in any Unsupported Jurisdiction applicable to Purchaser and the Binance.US Platform (the "<u>Unsupported Jurisdiction Approvals</u>"), assuming that (i) requisite Bankruptcy Court approvals are obtained, and (ii) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 4.3</u> are made, given or obtained (as applicable), neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (A) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (B) violate any Law or Order applicable to Purchaser, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of <u>clauses (B)</u> through <u>(D)</u>, as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions.

(b)    Except for the Unsupported Jurisdiction Approvals, Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except where failure to obtain such consent, approval, authorization or action, or to make such filing or

notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions.

4.4     Financing. Purchaser has, as of the date hereof, and will have at the Closing, sufficient funds in cash in an aggregate amount necessary to (a) pay the Closing Date Payment pursuant to Section 2.1(b) and any Seller Expenses to the extent payable by Purchaser pursuant to Section 6.21, and (b) pay all fees and expenses of Purchaser in connection with the Closing. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5     Permits. Purchaser has Money Transmitter Licenses in all States of the United States of America, other than the Unsupported Jurisdictions and any States in which the operation of Purchaser's business does not require a Money Transmitter License. Assuming the accuracy in all material respects of the representations and warranties set forth on Sections 3.9(a), 3.9(d) and 3.9(e) (in each case, as qualified by the Schedules) and Seller's compliance in all material respects with the covenants set forth in Sections 6.4, 6.6, 6.10 and the other Commercial Covenants, except for the Unsupported Jurisdiction Approvals, Purchaser holds all licenses, franchises, permits, certificates, approvals, and authorizations from Governmental Bodies necessary for the ownership and use of the Acquired Assets.

4.6     Brokers. There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transactions.

4.7     No Litigation. There are no Actions pending or, to the Knowledge of Purchaser, threatened against or affecting Purchaser that will materially and adversely affect Purchaser's performance under this Agreement or Purchaser's ability to consummate the Transactions.

4.8     Certain Arrangements. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of Seller or its board of managers (or applicable governing body of any Affiliate of Seller), any holder of equity or debt securities of Seller, or any lender or creditor of Seller or any of its Affiliates, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the Transactions or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of Seller or any of its Affiliates to entertain, negotiate or participate in any of the Transactions.

4.9     Solvency. As of the date hereof Purchaser is and, assuming (x) that the representations and warranties made by Seller herein are true and connect, (y) Seller has complied in all material respects with its covenants and other agreements hereunder, and (z) the conditions set forth in Section 7.1 and Section 7.2 have been satisfied, then immediately after giving effect to the transactions contemplated hereby Purchaser shall be, Solvent. "Solvent" means, with respect to any Person, such Person (a) is able to pay its debts as they become due; (b) owns property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent liabilities) and (c) has adequate capital to carry on its business. In connection with the Transactions, Purchaser is not incurring,

US-DOCS\137411268.27138346099.6

has not incurred, and does not plan to incur, debts beyond its ability to pay as they become absolute and matured.

4.10  <u>No Additional Representations or Warranties</u>. Except for the representations and warranties expressly contained in this <u>Article IV</u> (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the certificate to be delivered pursuant to <u>Section 2.5(d)</u> (the "<u>Express Purchaser Representations</u>") (it being understood that Seller has relied only on the Express Purchaser Representations), Seller acknowledges and agrees that neither Purchaser nor any other Person on behalf of Purchaser makes, and Seller has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to Purchaser or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person to Seller or any of its Affiliates or their respective Advisors on behalf of Purchaser. Without limiting the foregoing, except for the Express Purchaser Representations, neither Purchaser nor any other Person will have or be subject to any Liability whatsoever to Seller, or any other Person, resulting from the distribution to Seller, its Affiliates or their respective Advisors, or Seller's, its Affiliates' or their respective Advisors' use of or reliance on, any such information, statements, disclosures, documents, projections, forecasts or other material made available to them in expectation of the Transactions or any discussions with respect to any of the foregoing information.

4.11  <u>No Outside Reliance</u>. Notwithstanding anything contained in this <u>Article IV</u> or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees that the Express Seller Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser and on which Purchaser may rely in connection with the Transactions. Purchaser acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Seller Representations), including in the Information Presentation, the Dataroom, any projections or in any meetings, calls or correspondence with management of Seller or any other Person on behalf of Seller or any of its Affiliates or Advisors and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of Seller's assets, are, in each case specifically disclaimed by Seller and Purchaser has not relied on any such representations, warranties or statements. Purchaser acknowledges that it has conducted to its full satisfaction an independent investigation and verification of the business including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, and, in making its determination to proceed with the Transactions, Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, Seller, the Information Presentation, any projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the

foregoing or Seller or any of its Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Express Seller Representations (it being understood that Purchaser has relied only on the Express Seller Representations).

<div align="center">

**ARTICLE V**

**BANKRUPTCY COURT MATTERS**

</div>

5.1    <u>Selection of Successful Bid and Winning Bidder and Sale Approval</u>.

(a)    Pursuant to the Bidding Procedures Order, by execution and delivery of its counterpart signature page hereto, Seller hereby confirms that Purchaser has made the highest or otherwise best bid pursuant to the Bidding Procedures Order and has selected the Transactions as the Successful Bid and Purchaser as the Winning Bidder (each, as defined in the Bidding Procedures Order).

(b)    (i) Promptly, and in any event no later than December 21, 2022 (subject to Bankruptcy Court approval where indicated), Seller shall: publicly announce that the Transactions have been selected as the Successful Bid and Purchaser has been selected as the Winning Bidder; and (ii) promptly, and in any event no later than December 21, 2022 (subject to Bankruptcy Court approval where indicated), Seller shall file a motion with the Bankruptcy Court attaching the form of an order approving the execution, delivery and performance of this Agreement by Seller (including payment of the Purchaser Expenses pursuant to <u>Section 6.21(b)</u> and the provisions of this <u>Article V</u> contemplating certain performance by Seller prior to Closing), other than the performance of those obligations to be performed at or after the Closing (the "<u>Agreement Order</u>"), which Agreement Order shall be in form and substance acceptable to Purchaser. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Agreement Order.

5.2    <u>No-Shop</u>.

(a)    From and following the execution and delivery of this Agreement by Seller, Seller and its Affiliates shall not, and shall not permit their respective Advisors or Affiliates to, (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than Purchaser, its Affiliates and its and their respective Advisors) with respect to an Alternative Transaction, (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction, (iii) enter into any confidentiality agreement with respect to, or provide any non-public information or data to any Person relating to, any Alternative Transaction, or (iv) otherwise agree, authorize or commit to do any of the foregoing; <u>provided</u> that, notwithstanding the foregoing, from and after entry of the Agreement Order, Seller may take the actions set forth in clauses (ii) and (iii) above if (A) Seller has received a written, bona fide offer, proposal or indication of interest to engage in an Alternative Transaction (an "<u>Acquisition Proposal</u>") from any Person after the date of this Agreement that did not result from Seller's breach of this <u>Section 5.2(a)</u>, and (B) the board of directors (or similar governing body) of Seller determines in good faith, after consultation with its financial advisor and outside legal counsel, that such Acquisition Proposal constitutes or is reasonably

<div align="center">27</div>

likely to lead to a Higher and Better Offer and that failure to take such actions would violate the directors' fiduciary duties under applicable Law; provided further that if the Closing has not occurred prior to the Outside Date unless the failure of the Closing to have occurred by the Outside Date was caused by Seller's failure to perform any of its obligations under this Agreement, and there is no Back-up Bidder (as defined in the Bidding Procedures Order) or the agreement with the Back-up Bidder has terminated in accordance with its terms, then this Section 5.2(a) shall automatically terminate and be of no further force and effect as of such date. Until entry of the Agreement Order, Seller shall promptly (but in any event within twenty-four (24) hours) provide written notice to Purchaser of any breach of this Section 5.2(a).

(b)    Seller shall promptly (but in any event within twenty-four (24) hours) give written notice to Purchaser if (i) any inquiries, proposals or offers with respect to an Alternative Transaction or that could reasonably be expected to lead to an Alternative Transaction are received, (ii) any non-public information or data concerning Seller or its Affiliates or access to Seller's or its Affiliates' properties, books or records in connection with any Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction is requested, or (iii) any discussions or negotiations relating to an Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to an Alternative Transaction are sought to be engaged in or continued by, from or with Seller, its Affiliates or any of its or their respective Advisors, as the case may be. Such notice shall set forth the name of the applicable Person making such inquiry, the material terms and conditions of any proposed Alternative Transaction (including, if applicable, correct and complete copies of any proposed agreements, inquiries, proposals or offers or, where no such copies are available, a reasonably detailed written description thereof) and the status of any such discussions or negotiations. Seller shall thereafter keep Purchaser reasonably informed, on a reasonably prompt basis, of the status of any discussions or negotiations with respect thereto. Until entry of the Agreement Order, Seller shall promptly (but in any event within twenty-four (24) hours) provide written notice to Purchaser of any breach of this Section 5.2(b).

(c)    Seller (i) shall promptly (and in any event within twenty-four (24) hours) give notice to Purchaser upon a determination by Seller or its board of directors (or comparable governing body) that any Acquisition Proposal received from any Person after the date of this Agreement that did not result from Seller's breach of Section 5.2(a) constitutes a Higher and Better Offer (a "Higher Offer Determination Notice") and (ii) may cause or permit Seller or any of the other Debtors to enter into a definitive agreement with respect to such Acquisition Proposal; provided that (A) Seller and its board of directors (or comparable governing body) may only make such determination described in clause (i) of this Section 5.2(c) if, prior to the determination that such Acquisition Proposal constitutes a Higher and Better Offer, Seller negotiates, and causes its representatives to negotiate, with Purchaser in good faith (to the extent Purchaser and its representatives desire to negotiate) during such three (3) Business Day period to amend the terms and conditions of this Agreement and, no earlier than the end of such three (3) Business Day period, the board of directors (or comparable governing body) of Seller determines in good faith (after consultation with its financial advisor(s) and outside legal counsel), after giving effect to such proposed amendments to the terms and conditions of this Agreement, that such Acquisition Proposal still constitutes a Higher and Better Offer (provided further that if any material amendment is made to such Acquisition Proposal, such Acquisition Proposal shall be subject again (but only once again) to the foregoing, except that references to

three (3) Business Days shall be deemed to be two (2) Business Days, and whatever the result of the second instance of the foregoing, Seller shall not be required to undertake the foregoing again before making a determination that such Acquisition Proposal constitutes a Higher and Better Offer and, if applicable, terminating this Agreement), and (B) Seller and its board of directors (or comparable governing body) may only take such action described in clause (ii) of this Section 5.2(c) if the board of directors (or comparable governing body) of Seller determines in good faith (after consultation with its outside legal counsel) that the failure to take such action would violate with its fiduciary duties under applicable Law.

     5.3    <u>Bankruptcy Actions</u>.

     (a)    No later than December 21, 2022, Seller shall file with the Bankruptcy Court an amended Disclosure Statement (the "<u>Amended Disclosure Statement</u>" ) containing such amendments as may be necessary or appropriate to reflect the Seller's entry into this Agreement and pursuit of the Transactions, which, solely with respect to matters relating to this Agreement and the Transactions, shall be in a form and substance reasonably acceptable to Purchaser. Concurrently with the filing of such Amended Disclosure Statement (*i.e.*, no later than December 21, 2022), Seller shall file the Plan Solicitation Motion which, solely with respect to matters relating to this Agreement and the Transactions, shall be in form and substance reasonably acceptable to Purchaser; provided that Seller may modify the Plan Solicitation Motion, the Plan, and the Confirmation Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest, in each case, with the consent of Purchaser solely as it pertains to matters relating to this Agreement and Transactions (such consent not to be unreasonably withheld, conditioned or delayed).

     (b)    From the date hereof until the earlier of (i) the termination of this Agreement in accordance with <u>Article VIII</u> and (ii) the Closing Date, Seller shall use reasonable best efforts to obtain entry by the Bankruptcy Court of the Agreement Order and the Confirmation Order.

     (c)    The Parties shall use their respective reasonable best efforts to (i) obtain entry by the Bankruptcy Court of the Agreement Order, (ii) obtain entry by the Bankruptcy Court of the Plan Solicitation Order, (iii) commence solicitation of the Plan, and (iv) (A) facilitate the solicitation, confirmation, and consummation of the Plan and the transactions contemplated thereby and hereby, (B) obtain entry of the Confirmation Order, and (C) and consummate the Plan and the Transactions on the timeline set forth in the Plan Solicitation Motion and in any case prior to the Outside Date.

     (d)    Purchaser shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Agreement Order, the Plan Solicitation Order, the Confirmation Order, and any other Order reasonably necessary in connection with the Transactions as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates reasonably available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by Purchaser under this Agreement, and demonstrating that Purchaser

is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e)    Any documents filed by Seller with the Bankruptcy Court in connection with obtaining approval of effectuating the Closing shall be reasonably acceptable to Purchaser.

(f)    Each of Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and the Plan solely with respect to matters relating to this Agreement and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement and the Plan solely as it pertains to matters relating to this Agreement and Transactions, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court with respect to the Transactions or the Plan solely as it pertains to matters relating to this Agreement and Transactions.

(g)    Seller and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval. Purchaser acknowledges that Seller and the other Debtors must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of the Debtors and other interested parties, providing information about Seller to prospective bidders, entertaining higher and better offers from such prospective bidders.

(h)    Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors reasonably available to testify before the Bankruptcy Court.

5.4    <u>Cure Costs</u>. Subject to entry of the Agreement Order and the Confirmation Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to <u>Section 1.5</u>, on or prior to the date of such assignment), pay the Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.5    <u>Approval</u>. Seller's and Purchaser's obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Agreement Order and the Confirmation Order). Nothing in this Agreement shall require Seller or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

5.6 No Successor Liability. The Parties intend that upon the Closing the Purchaser Group shall not and shall not be deemed to: (a) be a successor (or other such similarly situated party), or otherwise be deemed a successor, to Seller, including, a "successor employer" for the purposes of the Code, ERISA, or other applicable Laws; (b) have Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity (including under applicable Money Transmitter Requirements or securities Laws of any Governmental Body); (c) have, de facto or otherwise, merged with or into Seller; (d) be an alter ego or a mere continuation or substantial continuation of any of Seller (and there is no continuity of enterprise between Purchaser and Seller), including, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, COBRA, Tax, labor, employment, environmental, or other Law, rule or regulation (including filing requirements under any such Laws, rules or regulations), or under any products liability Law or doctrine with respect to Seller's Liability under such Law, rule or regulation or doctrine; or (e) be holding itself out to the public as a continuation of Seller or its estate (the foregoing clauses (a) through (e), collectively, "Successor Liabilities").

5.7 Filings. Seller shall, and shall cause the other Debtors to, give Purchaser reasonable advance notice of, and opportunity to review and approve, any motions, pleadings, notices and other documents to be filed during the Bankruptcy Case that would reasonably be expected to be material and adverse to the Transactions (such approval not to be unreasonably withheld, conditioned or delayed, provided that Purchaser may withhold their approval in their sole discretion to the extent such motions, pleadings, notices and other documents would be inconsistent with the consummation of the Transactions in accordance herewith).

~~5.8 Waiver of Conflicts. Notwithstanding anything to the contrary herein or otherwise, Seller acknowledges that Paul Hastings LLP ("Paul Hastings" ) may have represented and may currently represent the Purchaser or one or more of its Affiliates in connection with the Transactions (including the negotiation, preparation, execution and delivery of this Agreement and related agreements, and the consummation of the Transactions) as well as other past and ongoing regulatory matters generally (the "Covered Matters" ). Accordingly, Seller hereby irrevocably consents and agrees, on its behalf and on behalf of its Affiliates, to Paul Hastings representing the Purchaser and its Affiliates from and after the Closing in connection with any matter arising out of or related to the Covered Matters. Seller (i) hereby irrevocably waives and will not assert, and will cause each of its Affiliates to waive and not assert, any actual or potential conflict of interest which has or may arise as a result of Paul Hasting's representation of the Purchaser or one or more of its Affiliates, including in any Action, in a Covered Matter, (ii) hereby consents, and will cause each of its Affiliates to consent to, any such representation, even though, in each case, (x) the interests of the Purchaser or such Affiliates may be directly adverse to Seller or its Affiliates, (y) Paul Hastings may have represented Seller or its Affiliates in a substantially related matter, or (z) Paul Hastings may be handling other ongoing matters for Seller or its Affiliates, and (iii) shall cooperate, and shall cause each of its Affiliates to cooperate, with the Purchaser in effectuating the foregoing waiver (including with respect to any objections raised by or before the Bankruptcy Court or the~~

United States Trustee assigned to the Bankruptcy Case in respect of such waiver or
representation).

## ARTICLE VI

### COVENANTS AND AGREEMENTS

6.1    <u>Conduct of Seller</u>.

(a)    Except (i) as required by applicable Law, Order or a Governmental Body,
(ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code,
(iii) as expressly contemplated or required by this Agreement, (iv) to the extent related to an
Excluded Asset or an Excluded Liability or (v) as set forth on <u>Schedule 6.1</u>, during the period
from the date of this Agreement until the Closing (or such earlier date and time on which this
Agreement is terminated pursuant to <u>Article VIII</u>), unless Purchaser otherwise consents in
writing, Seller shall use its reasonable best efforts to carry on its business in the Ordinary Course
in all material respects; <u>provided</u> that no action by Seller with respect to matters specifically
addressed by <u>Section 6.1(b)</u> shall be deemed to be a breach of this <u>Section 6.1(a)</u> unless such
action would constitute a breach of <u>Section 6.1(b)</u>.

(b)    Except (i) as required by applicable Law, Order or a Governmental Body,
(ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code,
(iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related
to an Excluded Asset or an Excluded Liability or (v) as set forth on <u>Schedule 6.1</u>, during the
period from the date of this Agreement until the Closing (or such earlier date and time on which
this Agreement is terminated pursuant to <u>Article VIII</u> **and, in the case of Sections 6.1(b)(ii),**
**6.1(b)(iii), 6.1(b)(vi), and 6.1(b)(xi) below, solely with respect to any Delayed Acquired**
**Coins, through and including the applicable Delivery Date with respect to any such**
**Delayed Acquired Coin**, unless Purchaser otherwise consents in writing, Seller shall not:

(i)    (A) incur, assume or otherwise become liable for any indebtedness
for borrowed money, issue or sell any debt securities or warrants or other rights to
acquire any debt securities of Seller, guarantee any such indebtedness or any debt
securities of another Person or enter into any "keep well" or other agreement to maintain
any financial statement condition of another Person (collectively, "<u>Indebtedness</u>"), except
(1) for letters of credit, bank guarantees, security or performance bonds or similar credit
support instruments, overdraft facilities or cash management programs, in each case
issued, made or entered into in the Ordinary Course, (2) for Indebtedness incurred under
existing arrangements (including in respect of letters of credit) in an amount not to
exceed $5,000,000 in the aggregate outstanding at any time and (3) Indebtedness incurred
in connection with the refinancing of any Indebtedness existing on the date of this
Agreement or permitted to be incurred, assumed or otherwise entered into hereunder;
<u>provided</u> that no such refinancing Indebtedness shall have a principal amount greater than
the principal amount of the Indebtedness being refinanced (plus any applicable
premiums, defeasance costs, accrued interest, fees and expenses) and shall not include
any greater prepayment premiums or restrictions on prepayment than the Indebtedness
being refinanced, in each case of this <u>clause (A)</u>, other than Excluded Liabilities,

(B) enter into any swap or hedging transaction or other derivative agreements or (C) make any loans, capital contributions or advances to, or investments in, any Person;

(ii)    sell or transfer to any Person, in a single transaction or series of related transactions, any of the Acquired Assets, other than the sale or transfer of Withheld Coins;

(iii)    perform or offer to perform any staking that is not unstaked prior to the Rebalancing Date;

(iv)    enter into referral agreements with a third party with respect to Users and any Documents with respect to Users or account information with respect thereto;

(v)    make any changes in financial accounting methods, principles or practices affecting the consolidated assets, Liabilities or results of operations of Seller, except (x) insofar as may be required (A) by IFRS (or any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the International Accounting Standards Board or any similar organization) or (y) as necessary or desirable to accommodate reasonable tax positions, to the extent such tax positions would not adversely affect the Acquired Assets or Purchaser in a taxable period (or portion thereof) beginning after the Closing Date;

(vi)    (x) grant any Encumbrance (other than Permitted Encumbrances) on any of its material Acquired Assets (other than Acquired Coins, which, for the avoidance of doubt, are addressed in subclause (y) of this item (vi)) other than to secure Indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms), or (y) grant any Encumbrance (other than any Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan) on Acquired Coins, including by submitting any Cryptocurrency to any staking contract or otherwise causing any Seller Held Coins that are not currently Staked Coins to become Staked Coins;

(vii)    except, in each case, with respect to income Taxes or information Tax Returns: make, change or revoke any material Tax election; change an annual accounting period for material Taxes; adopt or change any material accounting method with respect to material Taxes; file any amended material Tax Return; enter into any closing agreement for material Taxes; settle or compromise any material Tax claim or assessment; or consent to any extension or waiver of the limitation period applicable to any claim or assessment with respect to material Taxes; in each case to the extent such action would adversely affect the Acquired Assets or Purchaser in a taxable period (or portion thereof) beginning after the Closing Date;

(viii)    waive, release, assign, settle or compromise any pending or threatened Action against Seller to the extent that such wavier, release, assignment, settlement or compromise would (A) result in an Assumed Liability in an amount in

excess of $1,000,000, individually or in the aggregate, or (B) waive or release any material rights or claims that would constitute Acquired Assets;

(ix)   enter into any referral agreement with a third party with respect to Users;

(x)   terminate or transfer any Business Accounts (other than any such Business Accounts that are not necessary to the operation of the Voyager Platform, with the Parties to cooperate in good faith to determine which Business Accounts are not necessary and may be terminated or transferred);

(xi)   lend any Cryptocurrency to any Person, or engage in purchases or sales of any Cryptocurrency (other than Withheld Coins) other than in connection with the Rebalancing Exercise; or

(xii)   authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)   Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct Seller's operations or business prior to the Closing, and nothing contained in this Agreement is intended to give Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Notwithstanding anything to the contrary contained herein, (i) any action taken, or omitted to be taken, by Seller pursuant to any Law, Order, directive, pronouncement or guideline issued by any Governmental Body or industry group providing for business closures, "sheltering-in-place" or other restrictions that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall in no event be deemed to constitute a breach of this <u>Section 6.1</u> and (ii) any action taken, or omitted to be taken, by Seller to protect the business of Seller that is responsive to any pandemic, epidemic or disease outbreak, as determined by Seller in its reasonable discretion, shall in no event be deemed to constitute a breach of this <u>Section 6.1</u>.

6.2   <u>Access to Information</u>.

(a)   From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to <u>Article VIII</u>), Seller will (x) provide Purchaser and its authorized Advisors with reasonable access to, upon reasonable advance notice and during regular business hours, Seller's officers, employees, Advisors, properties, systems, offices, and data, documents, and information of the Seller Parties regarding the Acquired Assets, the Assumed Liabilities, the Users, Voyager User Accounts and the Voyager Platform (including, for the avoidance of doubt any of the foregoing that constitutes Acquired Information), including such financial, operating and other data and information related to the Transactions, the Acquired Assets, the Assumed Liabilities, the Users, Voyager User Accounts, or the Voyager Platform (including, for the avoidance of doubt any of the foregoing that constitutes Acquired Information) as Purchaser or any of its representatives may reasonably request and (y) instruct the representatives of Seller to cooperate to provide such access; <u>provided</u> that (i) such access will occur in such a manner reasonably appropriate to protect the confidentiality of the Transactions, (ii) all requests for access will be directed to Moelis or such other Person(s) as Seller may designate in writing from

US-DOCS-137411268.27138346099.6

time to time and (iii) nothing herein will require Seller to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would waive any legal privilege or (B) would be in violation of applicable Laws or would violate any fiduciary duty under applicable Law with respect to Seller; provided that, in the event that Seller withholds access or information in reliance on the foregoing clause (A) or (B), Seller shall provide (to the extent possible without waiving or violating the applicable agreement, legal privilege, Law or fiduciary duty under applicable Law with respect to Seller) notice to Purchaser that such access or information is being so withheld and shall use reasonable best efforts to provide such access or information in a way that would not risk waiver of such legal privilege, applicable Law, or fiduciary duty.

(b)    The information provided pursuant to this Section 6.2 will be governed by the Confidentiality Agreement and the confidentiality provisions in Section 6.19. Each Party will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to such Party or any of its Advisors. Neither Party makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and the other Party may not rely on the accuracy of any such information, in each case, other than, with respect to Purchaser, the Express Seller Representations and, with respect to Seller, the Express Purchaser Representations.

(c)    From and after the Closing for a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Case), Purchaser will, following Seller's good faith written request, and solely to the extent necessary for Seller to (i) comply with Tax reporting obligations, (ii) consummate the closing of the Bankruptcy Case, (iii) prepare annual audited financial statements, (iv) submit a filing pursuant to applicable securities laws and regulations or (v) conduct the wind down of the estate (including reconciliation, investigation, and pursuit of claims) and dissolution of Seller and its Affiliates, provide Seller and its Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records in Purchaser's custody or control, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying), in each case to the extent relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser, in each case at no cost or expense to Purchaser; provided that (i) such access does not unreasonably interfere with the normal operations of Purchaser and (ii) nothing herein will require Purchaser to provide access to, or to disclose any information to, Seller or its Advisors if such access or disclosure (A) would waive any legal privilege or (B) would be in violation of applicable Laws or would violate any fiduciary duty; provided that, in the event that Purchaser withholds access or information in reliance on the foregoing clause (A) or (B), Purchaser shall provide (to the extent possible without waiving or violating the applicable agreement, legal privilege, Law or fiduciary duty) notice to Seller that such access or information is being so withheld and shall use reasonable best efforts to provide such access or information in a way that would not risk waiver of such legal privilege, applicable Law, or fiduciary duty. Unless otherwise consented to in writing by Seller, Purchaser will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records

35

without first offering to surrender to Seller such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of.

(d)    Except as expressly contemplated by this Agreement (including in connection with the Commercial Covenants, Section 6.3, Section 6.10(b) and Section 6.18), Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of Seller prior to the Closing with respect to Seller, their business or the Transactions without the prior written consent of Seller for each such contact.

6.3    Employee Matters.

(a)    From and after the date hereof (and, if applicable, following the Closing until the winddown or dissolution of Seller), subject to applicable Laws, Seller shall deliver to Purchaser such information and documents regarding employees of Holdings (the "Seller Employees") and independent contractors of Seller or Holdings (the "Seller Contractors"), in each case, as Purchaser shall reasonably request. Prior to the date hereof, Seller has provided Purchaser a true, correct and complete list of the Seller Employees and Seller Contractors identified by name, if applicable, department, and (subject to applicable Laws) true, correct and complete copies of all talent assessment reports for each such Seller Employee and Seller Contractor. From and after the date hereof (and, if applicable, following the Closing until the winddown or dissolution of Seller), Seller shall use reasonable best efforts to make such Seller Employees who remain employed by Holdings and Seller Contractors who remain engaged by Seller or Holdings, in each case, reasonably available to Purchaser or its Affiliates and Purchaser will work in good faith with Seller to identify top performing Seller Employees and Seller Contractors and will determine whether to make offers of employment or other services to any such Seller Employee or Seller Contractors (including by prioritizing review of Seller Employees for applicable open positions of Purchaser and its Affiliates, if any). Purchaser (or an Affiliate of Purchaser) may, in its sole discretion, make offers of employment, consulting or other services to such Seller Employees or Seller Contractors (if any) as Purchaser shall determine, on such terms and conditions as Purchaser shall determine in its sole and absolute discretion. In the event that Purchaser (or an Affiliate of Purchaser) makes such an offer of employment or services and such Seller Employee or Seller Contractor accepts, Seller hereby agrees not to enforce against Purchaser (or its Affiliate) or such Seller Employee or independent contractor the terms and conditions of any agreement to refrain from competing, directly or indirectly, with the business of Seller or any of its Affiliates or to refrain from soliciting employees, customers or suppliers of Seller or any of its Affiliates that may be applicable to such Seller Employee or Seller Contractor. Seller shall not take any action that would reasonably be expected to materially and adversely affect Purchaser's hiring or engagement of such Seller Employee(s) or Seller Contractor(s) in accordance with this Section 6.3; provided that the announcement and implementation of any Seller Plans (including any retention programs or post-Closing treatment of Seller Employees), in each case, in a manner consistent with the provisions of this Agreement, shall not be deemed to be a breach of this sentence. Notwithstanding anything to the contrary herein or otherwise, nothing herein shall require or obligate Purchaser or any of its Affiliates to

employ or make offers of employment to any Person, or make any such offers of employment on any particular terms, each of which decisions shall be made in Purchaser's sole discretion.

(b)    Prior to and following the Closing Date, Seller, Holdings and each of their Affiliates shall not communicate, and shall ensure that no representative of Seller, Holdings or their respective Affiliates communicates, with any Seller Employee or other service provider of Seller regarding post-Closing employment matters (including post-Closing employee benefit plans and compensation) with Purchaser without the prior written consent of Purchaser; provided that Seller, Holdings, and their Affiliates shall be permitted to communicate regarding their employment and termination plans and related matters.

(c)    Purchaser shall not assume any Seller Plans or any Liability to or in respect of any employees or former employees of Holdings and Seller and which relates to such employees' employment with Holdings or Seller, including (i) any employment agreement, whether or not written, between Seller and any person, (ii) any Liability under any Seller Plan, or (iii) Liability arising out of any claim of an unfair labor practice, or any claim under any state unemployment compensation or worker's compensation law or regulation or under any federal or state employment discrimination law or regulation as a result of an action taken by Seller or Holdings, and all such Liabilities shall be Excluded Liabilities hereunder.

(d)    Seller will, or will cause its Affiliates to, comply in all material respects with the Worker Adjustment and Retraining Notification Act of 1988 or any similar Laws ("WARN Act") with respect to any "plant closing" or "mass layoff" or group termination or similar event under the WARN Act affecting employees of Debtors (including as a result of the consummation of Transactions) whether occurring prior to or on the Closing. Subject to the terms of this Agreement, Seller and its Affiliates (including Holdings) reserve the right to (i) terminate any of their employees at any time, and otherwise reduce employee work hours, benefits and compensation, and (ii) issue termination and/or WARN Act notices relating to their employees at any time.

(e)    For any employees who are principally based outside the United States, the provisions of this Section 6.3 shall apply to such employees *mutatis mutandis* to the maximum extent permitted by applicable Law.

(f)    The provisions of this Section 6.3 are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any employees of Seller or Holdings), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this Section 6.3, alter or limit Purchaser's, Seller's or Holdings' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to an offer of employment or service, employment or continued

US-DOCS-137411268.27138346099.6

employment or service for any period of time by reason of this Agreement, or any right to a particular term or condition of employment or service.

6.4     <u>Regulatory Matters</u>.

(a)     From time to time from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), subject to the other provisions of this <u>Section 6.4</u>, Seller will, and will cause its Affiliates and its and their respective employees, representatives, advisors and agents to, (i) make or cause to be made all filings and submissions to the extent required to be made by Seller or any of its Affiliates under any applicable Laws for the consummation of the Transactions, if any, (ii) cooperate with Purchaser, its Affiliates and its and their respective representatives in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any filings or submissions to be made by any member of the Purchaser Group under any applicable Laws in connection with the Transactions, (iii) supply promptly any additional information and documentary material that may be requested in connection with such filings or submissions and (iv) use reasonable best efforts to take any actions necessary to obtain all approvals or clearances from any relevant Governmental Body that are required to be obtained by Seller or its Affiliates under applicable Law for the consummation of the Transactions.

(b)     From time to time from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), subject to the other provisions of this <u>Section 6.4</u>, Purchaser will, and will cause its respective employees, representatives, advisors and agents to, (i) make or cause to be made all filings and submissions to the extent required to be made by Purchaser under any applicable Laws for the consummation of the Transactions, if any, (ii) cooperate with Seller, its Affiliates and its and their respective representatives in exchanging such information and providing such assistance as Seller may reasonably request in connection with any filings or submissions to be made by Seller or any of its Affiliates under any applicable Laws in connection with the Transactions, (iii) supply promptly any additional information and documentary material that may be requested in connection with such filings or submissions, and (iv) use reasonable best efforts to take any actions necessary to obtain all approvals or clearances from any relevant Governmental Body that are required to be obtained by Purchaser under applicable Law for the consummation of the Transactions.

(c)     From time to time from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), the Parties commit to instruct their respective counsel to cooperate with each other to respond to any reasonable inquiries and use reasonable best efforts to seek to resolve any objections raised by any Governmental Body as promptly as practicable and for greater certainty, each Party and its respective counsel undertake to (i) promptly notify the other Party or its counsel of, and, if in writing, furnish such other Party or its counsel with copies of (or, in the case of oral communications, advise such other Party or its counsel of the contents of), any substantive communication received by such Person from a Governmental Body and (ii) keep the other Party or its counsel informed with respect to the status of any applicable submissions and filings to or inquiries by any Governmental Body in connection with this Agreement and the Transactions and any developments, meetings or discussions with any Governmental Body in respect thereof,

including with respect to (A) the commencement or proposed or threatened commencement of any investigation or other Action, and (B) the nature and status of any inquiries or objections raised or proposed or threatened to be raised by any Governmental Body with respect to this Agreement and the Transactions. From and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), none of Seller or any of its Affiliates, on the one hand, or Purchaser, on the other hand, will participate in any substantive meeting or discussion with any Governmental Body with respect of any such filings, applications, investigation or other inquiry without giving the other Party reasonable prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Body, a reasonable opportunity to attend and participate in such meeting or discussion, and each Party will have a reasonable opportunity to review and provide comments (which shall be considered in good faith by the other Party) on the content of any filing, submission or other written communication (and any analyses, memoranda, presentations, white papers, correspondence or other written materials submitted therewith) to be submitted by the other Party or any of its Affiliates to any Governmental Body in advance of any such submission. Each Party acknowledges that, with respect to any non-public information provided by a Party to the other under this <u>Section 6.4</u>, each Party may (1) designate such material as restricted to "outside counsel only" and any such material shall not be shared with employees, officers or directors or their equivalents of the receiving Party without approval of the disclosing Party and (2) make appropriately limited redactions necessary to satisfy contractual confidentiality obligations, preserve attorney-client privilege or protect material relating to the valuation of the Acquired Assets. Notwithstanding anything to the contrary herein or otherwise, Purchaser will control and have final decision making authority on all regulatory strategy, submissions and procedures, after considering in good faith any reasonable advice provided by Seller in good faith.

(d)     Notwithstanding anything to the contrary in this Agreement, nothing shall require or be construed to require any member of the Purchaser Group to (i) oppose any motion or Action for a temporary, preliminary or permanent Order against, or preventing or delaying, the consummation of the Transactions, or exhaust all avenues of appeal, including any proper appeal of any adverse decision or Order by any Governmental Body, (ii) enter into a consent decree, consent agreement, settlement or other agreement or arrangement (including any ancillary agreements) to hold separate, license, sell, transfer, dispose or divest (pursuant to such terms as may be required by any Governmental Body) any asset (whether tangible or intangible), (iii) agree to the termination, modification, or assignment of any relationships, joint ventures, contracts, assets, liabilities or obligations, (iv) agree to any limitations on governance, conduct, or actions of members of the Purchaser Group or operations of their respective businesses or with respect to the Acquired Assets or Assumed Liabilities, or (v) enter into any national security agreement, letter of assurance, or other mitigation agreement with the Committee on Foreign Investment in the United States or any member agency thereof acting in that capacity.

(e)     From and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), **<u>and, solely with respect to Delayed Acquired Coins, through and including the applicable Delivery Date with respect to any such Delayed Acquired Coin,</u>** Seller will not, and will not permit any of its Affiliates to, knowingly take any action, engage in any conduct or enter into any transaction that would reasonably be expected to (i) materially increase the risk of any Governmental Body entering an

Order prohibiting or materially delaying the consummation of the Transactions or (ii) materially delay the consummation of the Transactions.

(f)    Subject to Section 6.4(d), from and after the date hereof until the Closing (or the valid termination of this Agreement in accordance with its terms, if earlier), **and, solely with respect to Delayed Acquired Coins, through and including the applicable Delivery Date with respect to any such Delayed Acquired Coin,** each Party will use reasonable best efforts to (i) cooperate with and (ii) seek to secure approvals or authorizations from, any relevant Governmental Body, including state banking departments enforcing money transmission laws, in order to permit consummation of the Transactions in a timely manner in compliance with applicable Laws.

6.5    Reasonable Best Efforts; Cooperation.

(a)    Subject to the other terms of this Agreement, and without limiting, affecting or modifying the Parties' obligations under Section 6.4, or any of the Commercial Covenants, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable and the closing conditions set forth in Article VII to be satisfied, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with the other Party, its Affiliates and its and their respective Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of Seller will not require Seller or any of its Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forgo any right, remedy or condition hereunder. Notwithstanding anything to the contrary herein, in the event of a conflict between this Section 6.5(a) and Section 6.4, the provisions of Section 6.4 shall control with respect to such conflict.

(b)    The obligations of Seller and Purchaser pursuant to this Agreement, including this Section 6.5, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), Seller's debtor-in-possession financing, if any, and Seller's obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order, the Agreement Order, and the Confirmation Order) and Seller's duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.6    Data Transfer Matters.

(a)    Seller shall, and shall cause its Affiliates to, (i) within 30 days (with the Parties using their reasonable best efforts to do so within five (5) Business Days) following the later of the date hereof and the date Purchaser provides the form of such notification, distribute an initial email notification, in the form provided by Purchaser, to all Users and any other consumers located or having a home address in the United States from whom Seller has collected Personal Information regarding the Transactions (including the Rebalancing Exercise)

40

and the transfer of such individuals' Personal Information or accounts (including the ability to opt in to a pre-Closing transfer of such User's Acquired User Data to Purchaser), and prominently post a notice, in the form provided by Purchaser, to Seller's and its Affiliates' (as applicable) primary customer-facing website regarding the same; (ii) on a weekly basis, upon the expiration of any opt in period provided in the email notification distributed by Seller, but no earlier than the later of January 3, 2023 and entry of the Agreement Order, deliver to Purchaser the respective Acquired User Data for Users who have opted into the pre-Closing data transfer pursuant to the foregoing item (i) and whose Acquired User Data has not previously been transferred (the "Pre-Closing Data Transfer"); (iii) following the date of the initial email notification until the Closing Date, continue distributing additional email notifications, in the form provided by Purchaser, to such individuals, as Purchaser reasonably requires; and (iv) on the Closing Date, deliver to Purchaser all other Acquired User Data. All notifications contemplated by the foregoing shall be subject to Purchaser's consideration of any comments thereto proposed in good faith by Seller or counsel to the committee of unsecured creditors in the Bankruptcy Case and subject to applicable Law.

(b)     From and after the date hereof and through and following the Closing, Seller shall, and shall cause its Affiliates to, maintain or maintain with a third party data management and retention firm, for the entirety of the applicable retention period and at least ninety (90) days thereafter, all information required to be maintained pursuant to, or to comply with, applicable Money Transmitter Requirements or Laws related to Sanctions.

(c)     Seller shall, and shall cause its Affiliates to, use reasonable best efforts to procure that all information and documentation requested in connection with the KYC Procedures meets the standards set forth in such KYC Procedures (including moving files located in storage repositories (*e.g.*, Google Drive or Box) to the appropriate files associated with the applicable User **or Eligible Creditor** and associating such information and documentation with the applicable User **or Eligible Creditor**), as determined by Purchaser in its reasonable discretion, prior to the ~~User Asset Migration Date~~**earlier of (x) the Closing Date and (y) with respect to such User or Eligible Creditor who has opted into the pre-Closing data transfer pursuant to Section 6.6(a)(i), the fifth (5th) Business Day following such opt in**, but in each case in no event prior to the applicable timing contemplated by clauses (i) through (iv) of Section 6.6(a).

6.7     Use of Name**; Voyager Platform**.

(a)     Seller agrees that: (i) within ninety (90) days from the Closing Date, Seller shall (and shall cause its Affiliates to) cause an amendment to the governing documents of Seller and its Affiliates (as applicable) to be filed with the appropriate Governmental Body and shall take all other reasonable actions necessary to change Seller's and such Affiliate's legal, name to a name or names not containing "Voyager," any other trade mark or trade name set forth in Schedule 6.7(a) or any name confusingly similar to the foregoing; (ii) after the Closing Date neither Seller nor any of its Affiliates shall have any ownership rights in or to the name "Voyager," any other trade mark or trade name set forth in Schedule 6.7(a) or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing or comprising the foregoing, including any name or mark confusingly similar thereto (collectively, the "Seller Marks"); and (iii) except as set forth in Section ~~6.7(a)~~**6.7(b)**,

Seller and its Affiliates shall, within ninety (90) days of the Closing Date, cease to make any use of the Seller Marks, including in any corporate or other legal name.

(b)    Notwithstanding Section 6.7(a), for a period of ninety (90) days after the closing of the Bankruptcy Case, unless extended by mutual agreement of Purchaser and Seller, Purchaser hereby grants to Seller and its Affiliates (including, for the avoidance of doubt, any wind-down or similar administrator in the Bankruptcy Case or under the Plan) a non-exclusive, limited, non-transferable, non-sublicensable and revocable license to use the Seller Marks for the sole purposes of unwinding Seller's businesses ~~and,~~ assisting Purchaser with all migrations, integrations and Transactions, **and consummating transfers of Coins, cash or other assets to Purchaser contemplated by this Agreement**.

**(c)    From and after the date hereof until the earlier of the Closing and the termination of this Agreement in accordance with its terms, Seller and Purchaser shall negotiate in good faith the terms and conditions of, and enter into at the Closing, a mutually agreed transition services agreement or other arrangements on commercially reasonable terms pursuant to which Seller shall have such access to and operation of the Voyager Platform and information acquired by Purchaser hereunder as are reasonably necessary for the sole purposes of Seller (w) holding Delayed Acquired Coins in accordance herewith, (x) assisting Purchaser with all migrations, integrations and Transactions contemplated by this Agreement, (y) consummating transfers of Coins, cash or other assets to Purchaser, Users, and Eligible Creditors contemplated by this Agreement and the Plan and (z) providing any related Tax reporting to Users required by applicable Law for periods prior to and including the Closing Date. Such access and operation contemplated by clause (w) of this Section 6.7(c) shall cease upon the conversion of such Delayed Acquired Coins into fiat currency or, if earlier, upon the transfer to Purchaser of such Delayed Acquired Coins, in each case in accordance with this Agreement. Such access and operation contemplated by clauses (x) and (y) of this Section 6.7(c) shall cease upon the completion of such assistance or transfers, as applicable. Such access and operation contemplated by clause (z) of this Section 6.7(c) shall cease upon the completion of any such Tax reporting. Notwithstanding anything to the contrary herein, (i) Seller shall bear responsibility for the operation and administration (including by providing, at its expense, personnel to conduct such operation and administration), and the documented out-of-pocket third party costs and expenses, of the Voyager Platform following the Closing pursuant to the preceding provisions of this Section 6.7(c) and (ii) in no event will Seller (and Seller will cause its employees, contractors and other personnel not to) (A) use the Voyager Platform for purposes of (I) distributing any Coins to Users or Eligible Creditors or (II) performing any conversion of Coins to cash or other liquidation of Coins hereunder (provided that this clause (A)(II) shall not prevent Seller from using the software and functionality of the Voyager Platform solely for executing any conversion or liquidation transaction permitted hereunder on other third party platforms), or (B) allow Users to (I) withdraw Coins through the Voyager Platform or (II) make any sale or other trading transaction through the Voyager Platform.**

US-DOCS\\~~137411268.27~~138346099.6

6.8    Further Assurances.

(a)    From time to time from and after the date hereof through and following the Closing (in the case of Seller, until the winddown or dissolution of Seller), as and when requested by either Party, the other Party will execute and deliver, or cause to be executed and delivered, all such further conveyances, notices, assumptions, assignments, documents and other instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions (including for the avoidance of doubt, the transfer and conveyance of any Acquired Assets that may be in the possession of Seller's Affiliates to Purchaser); provided that nothing in this Section 6.8 shall require Purchaser or the Purchaser Group to assume any Liabilities of Seller or any of its Affiliates other than the Assumed Liabilities or Seller or any of its Affiliates to transfer any assets other than Acquired Assets. In addition, from time to time following the Closing Date (in the case of Seller, until the winddown or dissolution of Seller), each Party shall, and shall cause its Affiliates to, promptly execute, acknowledge and deliver such further documents and perform such further acts as are reasonably requested by the other Party and as may be reasonably necessary to transfer and convey to Purchaser, or make available to Purchaser the Acquired Assets or the Assumed Liabilities pursuant to this Section 6.8.

(b)    Without limiting Section 6.8(a), Seller will use reasonable best efforts to evidence and effectuate the transfer and conveyance of all Seller Held Coins (solely for purposes of this Section 6.8(b)), deeming the phrase "who are Debtors" in the definition of Seller Held Coins to instead read as "who are not Debtors" in accordance with Section 6.8(a), *mutatis mutandis*.

6.9    Insurance Matters.    Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to Seller and the Acquired Assets that is maintained by Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies; provided that to the extent such insurance coverage is available with respect to any Acquired Assets or Assumed Liabilities, after the Closing, (a) Seller shall, and shall cause its applicable Affiliates to, use reasonable best efforts to report in good faith to the applicable third-party insurance provider, if applicable, all events, acts, errors, accidents, omissions, incidents, injuries or other forms of occurrences to the extent relating to any Acquired Assets or Assumed Liabilities that, in each case, occurred at or prior to the Closing as reasonably requested by Purchaser to be so reported the extent covered by an occurrence-based insurance policy, (b) Purchaser shall use its reasonable best efforts to comply with the terms of any such insurance policy and (c) Seller shall, and shall cause its applicable Affiliates to, (i) use reasonable best efforts to obtain the benefit of the applicable insurance coverage under any such insurance policy and (ii) pay such benefit to Purchaser, net of (A) any deductibles, co-payment or self-insured amounts payable by Seller or any of its Affiliates or other out-of-pocket costs and expenses (including reasonable legal fees and expenses, if any) actually and reasonably incurred by Seller or any of its Affiliates in seeking such insurance proceeds and (B) any Taxes imposed on Seller or any of its Affiliates in respect of the receipt or accrual of such insurance proceeds.

43

6.10    <u>User Migration</u>.

(a)    Following the date hereof, Seller shall, and shall cause its Affiliates to cooperate with Purchaser to, develop (and each Party shall use reasonable best efforts to develop within 15 Business Days following the date hereof) a mutually agreed upon integration plan that sets forth all technology integrations that Purchaser deems reasonably necessary to enable all migrations of User accounts on the Voyager Platform to the Binance.US Platform as contemplated by this Agreement (the "<u>Integration Plan</u>"). The Integration Plan will include among other things: (i) directing customers on the Voyager Platform (including through links on the home screen for the web interface and mobile app for the Voyager Platform) to the Binance.US Platform log-in webpage or mobile app, (ii) migrating all Acquired User Data (subject to <u>Section 6.6(a)</u>) reasonably necessary for Purchaser to validate whether Users qualify as Existing Users and (iii) developing a process whereby any User that is not an Existing User can affirmatively accept terms and conditions to provide such User with access to their Net Owed Coins in a new Binance.US Platform account from directly within the Voyager Platform and related app in accordance with the provisions of this Agreement. Each Party shall, and shall cause its Affiliates and its and their respective employees and representatives to, comply with and implement the Integration Plan. From and after the date hereof (and following the Closing, if applicable, until the date that is six (6) months following the Closing Date), Seller shall, and shall cause its Affiliates and its and their respective employees and representatives to provide to Purchaser, its Affiliates and its and their respective employees and representatives (x) any assistance reasonably requested or required by Purchaser, its Affiliates and its and their respective employees and representatives in connection with the opening of User accounts on the Binance.US Platform, the transfer of information and Net Owed Coins from the Voyager Platform to the Binance.US Platform (including in connection with customer queries and troubleshooting with respect thereto), and the actions contemplated by this <u>Section 6.10</u> and the Integration Plan and (y) subject to <u>Section 6.6</u> and applicable Law, all necessary Acquired User Data in Seller's or its Affiliates' possession required to effectuate the Integration Plan. Purchaser shall bear the reasonable and documented out-of-pocket expenses incurred by Seller in connection with the provision of such assistance following the Closing pursuant to the immediately preceding sentence<del>.</del>**<ins>; provided that prior to incurring any such expenses in excess of $250,000, individually or in the aggregate, Seller shall obtain Purchaser's consent (which shall not be unreasonably withheld, conditioned or delayed) to incur such expenses.</ins>**

(b)    Notwithstanding the provisions of <u>Section 6.2(c)</u> or <u>Section 10.17</u>, following entry of the Agreement Order, Purchaser and its Affiliates shall, at their sole cost and expense, be entitled to issue communications directed to Users on the Binance.US Platform and through other means of Purchaser's choosing in connection with the Transactions or the opening of accounts on the Binance.US Platform; <u>provided</u> that such communications are consistent with this Agreement and applicable Law; <u>provided</u> that Purchaser shall not issue any such communications prior to the Closing Date without Seller's prior written consent (which shall not be unreasonably withheld, conditioned or delayed) and subject to reasonable consultation with counsel to the committee of unsecured creditors in the Bankruptcy Case. Except as required by <u>Section 6.11(d)</u>, Seller shall not, and Seller shall cause its Affiliates not to, issue any communication to Users, whether on the Voyager Platform or otherwise, except to the extent the form and substance of such communication has been previously approved by Purchaser or is required by applicable Law; <u>provided</u> that the foregoing shall not prohibit Seller from responding

44

on an individual basis to technical support queries from Users or answering questions related to the amount of Coins such User has deposited on the Voyager Platform or communicating with customers regarding withdrawal of cash from the "for benefit of" customer accounts at Metropolitan Commercial Bank; provided further that Seller shall, and shall cause its Affiliates to, provide Purchaser and counsel to the committee of unsecured creditors in the Bankruptcy Case with regular updates on the timing and content of such communications and shall cooperate with Purchaser in addressing any concerns related thereto. The Parties will work in good faith to (i) develop a set of talking points or FAQs for Users and Eligible Creditors with respect to the Transactions, the Bankruptcy Cases, and related matters and (ii) continue to review and revise such talking points or FAQs as other inquiries from Users and Eligible Creditors or other circumstances arise.

(c)     Subject to Seller's providing the Acquired User Data in accordance with Section 6.6, and such Acquired User Data meeting the standards set forth in the KYC Procedures, as determined by Purchaser in its reasonable discretion, Purchaser shall cause an account to be opened for each User on the Binance.US Platform on or before the ~~User~~ Asset Migration Date. In addition to the foregoing, if Seller has not provided or does not have Acquired User Data meeting such standards with respect to a particular User, if such User provides such information and documentation meeting the standards set forth in such KYC Procedures, as determined by Purchaser in its reasonable discretion, Purchaser shall cause an account to be opened for such User in accordance with its standard account opening procedures following its receipt of such information and documentation.

(d)     Seller and Purchaser shall offer (i) each eligible creditor pursuant to the Plan that is not a User (each, an "Eligible Creditor" ) and (ii) each User the opportunity, subject to the consummation of the Closing and such User and Eligible Creditor meeting the requirements of the KYC Procedures and accepting the terms and conditions of the Binance.US Platform, to receive its Net Owed Coins or other Plan distribution through the Binance.US Platform in accordance with Section 6.12 and the Plan. Within three (3) Business Days following the request of Purchaser (which request for the sake of clarity may be offered multiple times), Seller shall send to each User and Eligible Creditor a communication in the form provided by Purchaser notifying them of such offer.

(e)     For the sake of clarity and notwithstanding anything to the contrary herein or otherwise, (i) none of Purchaser or any of its Affiliates shall be required to (A) activate an account or pay or credit any amount, whether in Coins, cash or otherwise, to any User or Eligible Creditor (or its account) that does not meet the requirements of the KYC Procedures and accept the terms and conditions of the Binance.US Platform, (B) pay or credit any amount, whether in Coins, cash or otherwise, to any User or Eligible Creditor or its account except in accordance with the Plan, or (C) credit the account of any User or Eligible Creditor with respect to Coins that have not actually been delivered to Purchaser in accordance with the provisions of Section 2.4(b), (ii) neither Purchaser nor any of its Affiliates is assuming any Liabilities of Seller or any of its Affiliates with respect to Users' accounts on the Voyager Platform or any Eligible Creditor, all of which Liabilities shall constitute Excluded Liabilities, and (iii) neither Purchaser nor any of its Affiliates shall be required to provide trading services on the Binance.US Platform or otherwise in respect of any Unsupported Coins.

45

6.11   Rebalancing Exercise; Seller Statement.

(a)     Following the date hereof and prior to the Closing (or the earlier termination of this Agreement pursuant to Article VIII), (i) Seller shall purchase and sell Cryptocurrency through one or more transactions such that, following the completion of such transactions, the ~~number of~~ Acquired Coins Value of all Acquired Coins of each type is equal to the ~~aggregate number of~~ Deposited Coins Value of all Deposited Coins of such type multiplied by the Rebalancing Ratio (subject to a Rebalancing Exercise Delta with respect to each Acquired Coin of no more than five percent (5%) or, if after conducting such transactions and using reasonable best efforts to meet the Rebalancing Exercise Delta of five percent (5%), Seller reasonably and in good faith determines that it will not be able to meet such Rebalancing Exercise Delta, then such other amount as Purchaser and Seller consent to, such consent not to be unreasonably withheld, conditioned or delayed), the purpose of which transactions the Parties acknowledge and agree is to ensure that there are sufficient Acquired Coins of each type to pay to each User's account on the Binance.US Platform a number of Post-Rebalancing Coins of such type in accordance with the provisions of this Agreement (such transactions, the "Rebalancing Exercise"), and (ii) Seller shall, and shall cause its employees, accountants, advisors and representatives to, consult with, and keep reasonably informed, Purchaser, its Affiliates and their respective employees, accountants, advisors and representatives with respect to the Rebalancing Exercise and all actions taken in connection therewith, including by providing Purchaser with regular updates regarding the status of the Rebalancing Exercise. For the sake of clarity, the Parties agree that for purposes of the Rebalancing Exercise, if ETH Coins that are Staked Coins cannot be unstaked by the Rebalancing Date, or if there are Coins that Seller is otherwise unable to access due to such Coins being custodied with providers that have entered insolvency proceedings prior to the date hereof, then the Parties will agree on appropriate modifications to the Rebalancing Exercise and the process for distributing Net Owed Coins to Users in light of the foregoing. The Parties agree that the Rebalancing Exercise shall be completed in accordance with the provisions of this Agreement by no later than the date that is one (1) Business Day prior to the Closing Date (such date, the "Rebalancing Date").

(b)     In order to facilitate the Rebalancing Exercise, Seller shall, promptly following the date hereof, to the extent not already created prior to the date hereof, create an institutional account in Seller's name on the Binance.US Platform, and Seller may, but shall not be required to, transfer any or all Seller Held Coins to such institutional account in order to facilitate the Rebalancing Exercise (and, for the avoidance of doubt, the Binance.US Platform shall serve merely as an exchange agent in connection with the Rebalancing Exercise). Prior to engaging in any Subject Transaction outside the Binance.US Platform, Seller shall provide Purchaser with a written notice describing the parameters of such Subject Transaction, including the proposed number of Seller Held Coins of each type to be transferred in connection with such Subject Transaction (each, a "Transaction Notice") and Purchaser shall be entitled to make, by written notice (each, a "Transaction Offer Notice") to Seller within three (3) Business Days following receipt of such Transaction Notice, an offer to conduct such Subject Transaction on the Binance.US Platform, including a description of the estimated numbers of Acquired Coins that would result from the consummation of such Subject Transaction. If Seller receives any proposal to conduct such Subject Transaction from any third party which would result in a number of Acquired Coins in excess of that set forth in the Transaction Notice, Seller shall inform Purchaser of the same, and Seller shall not conduct such Subject Transaction with or

US-DOCS-~~137411268.27~~138346099.6

through other Person(s) unless Seller provides written notice to Purchaser that Seller has determined in good faith that the terms offered by such other Person(s) with respect to such Subject Transaction (which such terms shall be set forth in such notice) are more favorable (in terms of the best interests of Seller and its estate) than the terms set forth in the Transaction Offer Notice and Purchaser does not provide an updated Transaction Offer Notice within one (1) Business Day following receipt of such notice from Seller with terms as or more favorable (in terms of the best interests of Seller and its estate) than those set forth in Seller's notice. If Purchaser does so provide such an updated Transaction Offer Notice, Seller conduct such applicable Subject Transaction on the Binance.US Platform in accordance with such updated Transaction Offer Notice. In addition to the foregoing, Seller may request that Purchaser facilitate all or part of the Rebalancing Exercise, in which case all or such portion of the Rebalancing Exercise shall be conducted on the Binance.US Platform. Seller's use of the Binance.US Platform for the Rebalancing Exercise shall be subject in all respects to the standard terms and conditions of the Binance.US Platform (including applicable fees, spreads, costs and expenses except as set forth in the applicable Transaction Offer Notice). For the sake of clarity, Seller may withdraw any Coins from the Binance.US Platform prior to the Closing and Seller shall not be required to maintain Coins on the Binance.US Platform in connection with the Rebalancing Exercise or otherwise (except as otherwise expressly contemplated hereunder from and after the Closing and acknowledging that this sentence is not intended to and shall not preclude transactions in the Rebalancing Exercise being undertaken on the Binance.US Platform in accordance with the provisions hereof).

(c)     At least one (1) Business Day prior to the Closing Date and following completion of the Rebalancing Exercise in accordance with Section 6.11(a), Seller will deliver to Purchaser a ledger in a form reasonably specified by Purchaser as far in advance of the Rebalancing Date as is reasonably practicable (the "Seller Statement") setting forth in reasonable detail, in each case as of the Rebalancing Date and following the completion of the Rebalancing Exercise in accordance with Section 6.11(a), (i) each User's user identification number, (ii) the Rebalancing Ratio and the calculation thereof, (iii) the number of each User's Deposited Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Deposited Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject) **and the Deposited Coins Value thereof (by type of Coin)**, (iv) the number of each User's Post-Rebalancing Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Post-Rebalancing Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject) **and the Acquired Coins Value thereof (by type of Coin)**, (v) the total number of Seller Held Coins and Acquired Coins of each type (including the name and relevant ticker symbol used on the Voyager Platform for such Seller Held Coins and Acquired Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject)~~, (vi) the total amount of gas fees that Seller will pay in connection with the transfer of each~~ **and the Acquired Coins Value thereof (by** type of ~~Acquired~~ Coin ~~to Purchaser in accordance with Section 2.4)~~, and (~~vii~~**vi**) the amount of cash~~, Coins~~ or other property ~~(including the name and relevant ticker symbol used on the Voyager Platform for such Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject)~~ payable to each Eligible Creditor, *after taking into account gas or other transaction fees incurred and paid by Seller* ~~in connection with transferring such Coins to Purchaser,~~ and any identifying information and information

47

required to make such payments to such Eligible Creditor under the Plan, in each case together with reasonably detailed supporting information and documentation and prepared by Seller based on Seller's and its Affiliates' books and records. Notwithstanding anything to the contrary herein, Seller hereby acknowledges and agrees that (A) Purchaser and its Affiliates shall be entitled to fully rely on the Seller Statement and any data, information or calculation set forth therein for purposes of Section 6.11(d), and (B) in no event shall Purchaser of any of its Affiliates be responsible (x) to any Person for the Seller Statement, any data, information or calculation set forth therein or any error or inaccuracy with respect thereto or (y) for any losses, liabilities or damages in respect thereof, in each case, to the extent Purchaser takes any action in reliance thereon.

(d)    Promptly following the completion of the Rebalancing Exercise, Seller shall send to each User a communication notifying such User of the Rebalancing Exercise, such User's Deposited Coins, and the Net Owed Coins attributable to such User's account on the Voyager Platform following the Rebalancing Exercise and any gas fees incurred in **by Seller** connection with the transfer of Coins to Purchaser pursuant to Section 2.4. Seller will, upon Purchaser's request, deliver to each Eligible Creditor a communication relating to the Transactions, any payments to be made by Purchaser or any of its Affiliates to such Eligible Creditor and any matters relating to opening an account on the Binance.US Platform, in each case that is in form and substance reasonably acceptable to Purchaser.

6.12    Crediting of Accounts; Unsupported Jurisdictions, Transfer of Coins to Seller; Liquidations or Distributions by Seller.

(a)    Subject to the provisions of Section 6.10, ~~on the User~~**with respect to a particular User's Net Owed Coins or Eligible Creditor's cash, on the applicable** Asset Migration Date, Purchaser shall credit, or cause to be credited, (i) to the Binance.US Platform account of each User, such User's Net Owed Coins**; provided that such number of Coins to be credited shall be reduced by any gas or other transaction fees incurred in connection with transferring such Coins to Purchaser,** and (ii) to the Binance.US Platform account of each Eligible Creditor, the applicable amount payable to such Eligible Creditor as set forth in the Seller Statement. For the avoidance of doubt, Coins credited to any User's ~~or Eligible Creditor's~~ accounts on the Binance.US Platform may be made from any Coins held by or on behalf of Purchaser or any of its Affiliates. As a condition precedent to any User or Eligible Creditor accessing its account or Coins **or cash** on the Binance.US Platform, such User or Eligible Creditor must satisfy the requirements set forth in Section 6.10. ~~Following such User's or Eligible Creditor's satisfaction of such requirements~~**As promptly as practicable (using commercially reasonable efforts to do so within forty-eight (48) hours following receipt by Purchaser of the applicable Coins or cash hereunder), and in any event by the applicable Asset Migration Date**, Purchaser shall allow such User or Eligible Creditor, as applicable, to access trading services with respect to its Coins **or cash** subject to the Binance.US Platform's customary terms and conditions (including any transaction fees, spreads, costs and expenses). Notwithstanding anything to the contrary herein, with respect to any User or Eligible Creditor that does not satisfy such requirements prior to the date that is three (3) months following the later of the Closing Date ~~or~~**and** the date on which such terms and conditions are made available for such User or Eligible Creditor to accept, ~~then Purchaser shall convert any~~**Seller shall deliver all Delayed Acquired Coins in respect of such User or Eligible Creditor (other than**

any Delayed Acquired Coins with respect to ~~such Users~~any User or Eligible ~~Creditors~~Creditor located in a jurisdiction that is an Unsupported Jurisdiction as of the Closing, which such Delayed Acquired Coins are addressed in Section 6.12(b)) to Purchaser in accordance with Section 2.4(b), Purchaser shall convert all such Delayed Acquired Coins into United States Dollars at the then-prevailing rates (~~including~~net of all applicable fees, spreads, costs and expenses (including any gas or other transaction fees incurred in connection with transferring such Coins to Purchaser)) on the Binance.US Platform and deliver such United States Dollars, ~~together with any cash or others assets~~ in respect of such Users or Eligible Creditors to Seller within five (5) Business Days following receipt thereof from Seller, for further distribution by Seller in accordance with the Plan. Purchaser shall make available to Seller, upon reasonable written request from Seller to Purchaser from time to time during Purchaser's regular business hours and at Seller's expense, books and records and related information, in each case, solely with respect to the transactions (including all applicable fees, spreads, costs and expenses) to effect such conversion described in the immediately preceding sentence.

(b)    Notwithstanding anything to the contrary herein or otherwise, (i) for any Person (including any User or Eligible Creditor) that is located in Hawaii, New York, Texas or Vermont, to the extent that Purchaser does not have a Money Transmitter License or similar license in such jurisdiction or in any other jurisdiction where the applicable Governmental Body asserts after the date of this Agreement that Purchaser or any of its Affiliates requires a Money Transmitter License or similar license in order to consummate the Transactions or perform its obligations hereunder (each, an "Unsupported Jurisdiction"), Purchaser and its Affiliates shall not be required to (i~~A~~) credit or make any payment (with any Coins, cash or otherwise) to any account of such Person (including any User or Eligible Creditor) on the Binance.US Platform, or (ii~~B~~) permit any such Person or account of such Person on the Binance.US Platform to be active or conduct any trading or investing in Coins. ~~Notwithstanding anything herein to the contrary, prior to the Closing, Seller have the option to elect (upon consultation with professionals representing the committee of unsecured creditors in the Bankruptcy Case) that either (i), and (ii)~~ Seller shall not deliver to Purchaser any Coins, cash, or other asset with respect to any User or Eligible Creditor located in a jurisdiction that is an Unsupported Jurisdiction ~~or (ii)~~as of the Closing (and Seller shall ~~deliver such Coins to Purchaser at Closing. Upon receipt by Purchaser of any Unsupported Jurisdiction Approvals with respect to any Unsupported Jurisdiction(s), which Unsupported Jurisdiction Approvals permit Purchaser to perform its obligations under Section 6.12(a) in such Unsupported Jurisdiction, then Purchaser shall promptly notify Seller of receipt of such Unsupported Jurisdiction Approval and, if Seller has not previously delivered applicable~~retain and hold such Coins, cash, or other asset with respect to ~~any~~such User or Eligible Creditor ~~located in such~~(including in accordance with Section 6.12(f))) until the relevant Unsupported Jurisdiction ~~then Seller shall so deliver such assets to Purchaser within five (5) Business Days of such notification, and Purchaser~~Approval is received and Purchaser has confirmed in writing that the relevant User or Eligible Creditor has satisfied the requirements set forth in Section 6.10 for onboarding to the Binance.US Platform, in which case, Purchaser shall (following receipt of any applicable assets if required) ~~consummate~~take the actions described in Section 6.12(a) and clauses (i)(A) and (i)(B) of this Section 6.12(b), as applicable, and Seller shall take the actions described in clause (ii) of this Section 6.12(b), in such Unsupported Jurisdiction that were otherwise restricted or not required by this

Section 6.12(b); provided that to the extent Purchaser does not receive such Unsupported Jurisdiction Approval(s) with respect to any Unsupported Jurisdiction prior to the date that is six (6) months following the Closing Date, then ~~to the extent Purchaser is holding any Acquired Coins~~**instead of delivering such Coins, cash or other assets** with respect to **such** Users or Eligible Creditors ~~in such Unsupported Jurisdictions,~~**to** Purchaser **hereunder, Seller** shall convert such ~~Acquired~~ Coins into United States Dollars ~~at the then-prevailing rates (including~~**and deliver such United States Dollars (and such other cash or other assets) in respect of such Users or Eligible Creditors in accordance with the Plan. Notwithstanding anything to the contrary herein, in undertaking any transaction to effectuate such conversion, Seller shall provide Purchaser the opportunity to participate in such transaction as follows (or on such other terms as the Parties may agree in writing): (A) if Seller solicits terms for such transaction from any other Person, then Seller will substantially contemporaneously solicit terms for such transaction from Purchaser and (B) the Parties shall establish procedures pursuant to which, if Seller intends to execute such transaction based on terms that are available to Seller without soliciting such terms from any Person (e.g., based on information made available to participants in Cryptocurrency exchanges through an app or website), Seller shall be obligated to contact a designated contact through a designated form of contact at Purchaser for a significantly limited period of time that is appropriate under the circumstances of executing such transaction for Purchaser to propose terms for such transaction, and, in either case of (A) or (B), if Purchaser's terms (if Purchaser proposes any), including all** applicable fees, spreads, costs and expenses~~)~~**, represent the best execution for such transaction, Seller shall execute such transaction** on the Binance.US Platform ~~and deliver such United States Dollars, together with any cash or others assets in respect of such Users or Eligible Creditors to Seller within five (5) Business Days, for further distribution by Seller in accordance with the Plan.~~**on such terms proposed by Purchaser; provided that, in the case of clause (B), if Purchaser is unresponsive via such designated means of contact, or fails or declines to propose terms, during such period of time, Purchaser shall be deemed to have provided terms that do not represent the best execution for such transaction.**

(c)     From and after the Closing, or if this Agreement is terminated in accordance with its terms (other than in connection with a Purchaser Default Termination), then from and after such termination, if Seller or any of its Affiliates intends to consummate a transaction or series of related transactions pursuant to which it will purchase, sell or liquidate any Coins or distribute the proceeds thereof to any User or Eligible Creditor, in each case other than any Additional Bankruptcy Distributions (but including any purchase, sale or liquidation of any Coins prior to making any Additional Bankruptcy Distributions) or any of the transactions provided for in the preceding provisions of this Section 6.12 then (i) Seller may, but shall not be required to, utilize the Binance.US Platform, or other service offerings of Purchaser or its Affiliates, to consummate such transaction or series of related transactions (including any purchase, sale, liquidation or distribution described above) on Purchaser's and its Affiliates' standard terms and conditions (including any transaction fees, spreads, costs and expenses) and (ii) if this Agreement is terminated in accordance with its terms (other than in connection with a Purchaser Default Termination), then Seller may, but shall not be required to, elect that Purchaser and Seller will (and Seller will cause its Affiliates and any other Person with whom Seller or its Affiliates is consummating any such transaction or transactions to) cooperate in good faith to develop and facilitate any transaction similar to the Rebalancing Exercise required

by Seller, any of its Affiliates, and any other Person with whom Seller or its Affiliates is consummating any such transaction or transactions, in order to consummate any such transaction or series of related transactions; provided that in no event will Purchaser or any of its Affiliates be required to make any distribution or facilitate or consummate any transaction under this Section 6.12(c) with respect to any User located in an Unsupported Jurisdiction. In connection with any distribution made by Purchaser or its Affiliates pursuant to this Section 6.12(c), all right, title and interest in and to any property so distributed (including any Coins) shall be made or transferred to Purchaser or its Affiliates free and clear of any Encumbrances prior to any such distribution by Purchaser or its Affiliates and such distributions will be made on Purchaser's and its Affiliates' standard terms and conditions (including any transaction fees, spreads, costs and expenses).

(d)    The provisions of Sections 6.10, 6.11, 6.12, and 6.14 shall be subject to such protocols, if any, as the Parties may agree in writing after the date hereof with respect to the transfer of information, migration of users, migration or transfer of Coins, and any matters related to the foregoing or such Sections.

(e)    Notwithstanding anything to the contrary herein, but subject to the last sentence of this Section 6.12(e), (i) Seller (prior to the Closing) and each User and Eligible Creditor (from and after the Closing) shall retain all right, title, and interest in and to Coins allocated to it in accordance with this Agreement on the Binance.US Platform (notwithstanding any terms and conditions of the Binance.US Platform) through and including such time as such Coins are returned or distributed to Seller or such User and Eligible Creditor, as applicable, hereunder, and such Coins shall be held by Purchaser solely in a custodial capacity in trust and solely for the benefit of Seller or the applicable User or Eligible Creditor; provided that in the case of Coins allocable to Users or Eligible Creditors located in Unsupported Jurisdictions, to the extent, if any, that such Coins are transferred to Purchaser pursuant to Section 6.12(b), from and after the Closing until the applicable Unsupported Jurisdiction Approval is obtained or such Coins are liquidated in accordance with Section 6.12(b) hereunder, such Coins shall be held by Purchaser in a custodial capacity on behalf of Seller and not the applicable User or Eligible Creditor; (ii) any and all cash or cash equivalents to be transferred at any time to Purchaser hereunder for further distribution to Seller or any User or Eligible Creditor (and not for Purchaser's own account (e.g., Purchaser Expenses)) shall at all times (until transferred by Purchaser to Seller or the applicable User or Eligible Creditor, as applicable, hereunder) be held solely in a third party bank account of a FDIC-insured financial institution solely for the benefit of or "fbo" Seller or such User or Eligible Creditor, as applicable; (iii) Purchaser shall not, after the date hereof, introduce any further conditions to the withdrawal of cash from accounts on the Binance.US Platform that are not in effect as of the date hereof that would apply to any User's or Eligible Creditor's account on the Binance.US Platform; (iv) Purchaser shall not at any time halt (temporarily or permanently) withdrawals of cash or such Coins from any User's or Eligible Creditor's account on the Binance.US Platform; (v) Purchaser shall not halt trading of such Coins on the Binance.US Platform at any point during the 30 days following any distribution to any User's or Eligible Creditor's account on the Binance.US Platform hereunder, except, in the case of each of the foregoing clauses (iii), (iv) and (v), (A) as required by applicable Law or any Order or Governmental Body, (B) as may be permitted pursuant to Purchaser's terms and conditions in effect on the Closing Date (including for purposes of halting fraud or illegal activity), (C) as necessary to complete any system, account, wallet, security or exchange

maintenance, patching, repair, upgrade or to the extent any withdrawal or trading is unable to be processed due to any act or omission by, or any Event related to, any third party (*e.g.*, a bank closure or a third party ceasing to support any Cryptocurrency), (D) in order to avoid any legal, compliance or regulatory issue or in order to ensure market stability, or (E) in order to avoid any information security risk; (vi) Purchaser shall not take, permit to be taken, or omit to take any action that would reasonably be expected to (A) result in the insolvency of Purchaser or (B) prevent or materially impair or materially delay the ability of Purchaser to perform the Commercial Covenants in accordance herewith; (vii) Purchaser shall comply in all material respects with all provisions of the Plan applicable to Purchaser or the Distribution Agent (as defined in the Plan) to the extent Purchaser is acting as a distribution agent in connection with the Plan; and (viii) Purchaser shall not pledge, repledge, hypothecate, rehypothecate, sell, lend, stake, arrange for staking, or otherwise transfer or use any amount of such Coins, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining a like amount of Coins, or invest such Coins (except as otherwise directed by Seller or any User or Eligible Creditor, as applicable). Notwithstanding the foregoing, Purchaser's obligations under this Section 6.12(e) shall terminate and be of no further force or effect on the earlier of (x) the date that Purchaser's obligations under Section 6.10, Section 6.11, Section 6.12, and Section 6.14 have been performed in full or Purchaser otherwise ceases to have any obligations thereunder, and (y) the date on which this Agreement is terminated in accordance with is terms.

**(f)        Notwithstanding anything to the contrary herein, to the extent Seller retains any Delayed Acquired Coins following the Closing, (i) such Coins shall be held by Seller solely in a custodial capacity in trust and solely for the benefit of the applicable User or Eligible Creditor; (ii) Seller shall not pledge, repledge, hypothecate, rehypothecate, sell, lend, stake, arrange for staking, invest or otherwise transfer or use any amount of such Coins; (iii) Seller shall retain exclusive control, including by use of "private keys" or other equivalent means or through custody arrangements consistent in all material respects with Seller's practices as of the date hereof, of all such Coins (other than, solely to the extent of any staking contract, Staked Coins); provided that such ownership and exclusive ability to control Coins is subject to the continued existence, validity, legality, governance and public availability of the relevant blockchains; and (iv) Seller shall continue to comply with all procedures and controls in effect as of the Closing Date regarding management of Authentication Credentials, including limitation of access to Authentication Credentials to employees who need to have such access and requiring multiple individuals to sign off on transactions. For the sake of clarity, in the event any such Delayed Acquired Coins are unable to be delivered to Purchaser within the timeframes specified in this Agreement, Purchaser shall be entitled to notify Users and Eligible Creditors of the same or to require Seller to provide such a notice in the form provided by Purchaser, and Seller shall not issue any denial or other contradictory statement with respect thereto. The foregoing provisions of this Section 6.12(f) shall apply to Seller's Affiliates, *mutatis mutandis*, and Seller shall cause its Affiliates to comply with the foregoing provisions of this Section 6.12(f). Following the Closing, Seller agrees to use commercially reasonable efforts to keep Purchaser reasonably informed of any unauthorized acquisition, impairment, access, use, theft, destruction, alteration or disclosure of any "private key" or Authentication Credential or instance of any IT System used by Seller or any custodian of Seller to secure any Acquired**

**Coins or loss of Seller's exclusive control of any Acquired Coins and consult with Purchaser in connection with remedying any of the foregoing.**

6.13    <u>VGX Token Listing Review Process</u>. Following the entry of the Agreement Order, Purchaser will initiate and undertake consistent with its policies and past practices an internal review process to determine whether VGX tokens can be listed for trading on the Binance.US Platform, which review process will include submitting the VGX token to Purchaser's listing committee for consideration consistent with its policies and past practices.

6.14    <u>Additional Bankruptcy Distributions</u>. The provisions of this <u>Section 6.14</u> shall cease to apply and be of no further force and effect upon the soonest to occur of (a) Purchaser ceasing to provide the services necessary to comply with this <u>Section 6.14</u>, (b) Purchaser's bankruptcy or insolvency, (c) the issuance of a final, non-appealable Order by a Governmental Body prohibiting the consummation of the transactions contemplated by this <u>Section 6.14</u>, (d) any Purchaser Development (disregarding for the purposes of this <u>Section 6.14</u> the language "prior to the Closing"), and (e) Purchaser's material breach of <u>Section 6.12(e)</u> or this <u>Section 6.14</u> which remains uncured for 30 days following Purchaser's receipt of Seller's written notice of such material breach.

(a)    ~~Any~~**Seller will make or transfer to Purchaser any** Additional Bankruptcy Distributions made on account of Users' or Eligible Creditors' claims against the Debtors and all right, title and interest therein and thereto ~~shall be made or transferred to Purchaser~~ free and clear of any Encumbrances **promptly following (but in any event within five (5) Business Days of) delivery of the applicable Post-Bankruptcy Statement to Purchaser pursuant to Section 6.14(b)**. Any such transfers in Coins shall be deemed complete when each transfer is publicly confirmed on the blockchain for the related Coin at least the number of times set forth on https://support.kraken.com/hc/en-us/articles/203325283-Cryptocurrency-deposit-processing-times (or a successor site mutually agreed by Seller and Purchaser), or, for any Coins held in Seller's account on the Binance.US Platform, transferred to the Binance.US Platform account designated by Purchaser, or in the case of staked ETH Coins, such staked ETH Coins shall be delivered pursuant to the means reasonably specified by Purchaser. **Any Additional Bankruptcy Distributions made by Purchaser in the form of Coins shall be net of any gas or other transaction fees incurred in connection with transferring such Coins to Purchaser.**

(b)    Upon the Bankruptcy Court's approval of any Additional Bankruptcy Distributions (including through the Confirmation Order) **and (x) the determination by Seller to make any such Additional Bankruptcy Distribution or (y) Seller is required by the Plan to make any such Additional Bankruptcy Distribution**, Seller shall deliver to Purchaser a statement setting forth (i) the amount of **such** Additional Bankruptcy Distributions to be made to each User ~~or Eligible Creditor, as applicable, as approved by the Bankruptcy Court~~ in Coins (including the name and relevant ticker symbol used on the Voyager Platform for such Coins, together with all information regarding the underlying networks and smart contracts to which such Coins are subject) after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring such Coins to Purchaser in accordance with this <u>Section 6.14</u>, (ii) the amount of Additional Bankruptcy Distributions to be made to each User or Eligible Creditor, as applicable, ~~as approved by the Bankruptcy Court~~ in cash **or other assets**,

and (iii) the user identification number of each such User or other identifying or account information of any Eligible Creditor, as applicable (such statement, the "Post-Bankruptcy Statement"). The provisions set forth in the last sentence of Section ~~6.11(a)~~6.11(c) shall apply to the Post-Bankruptcy Statement, *mutatis mutandis*.

(c)    Promptly following Purchaser's receipt of any Additional Bankruptcy Distributions (but no later than five (5) Business Days following receipt of any Additional Bankruptcy Distributions), Purchaser shall credit such Additional Bankruptcy Distributions to each User's and Eligible Creditor's accounts, if any, on the Binance.US Platform in such amounts set forth on, and in accordance with, the Post-Bankruptcy Statement **and in the same form (*i.e.*, Coins, cash, or other assets, as provided by Seller to Purchaser)**. The Additional Bankruptcy Distributions credited to each User and Eligible Creditor in accordance with this Section 6.14(a) are referred to herein as "Credited Additional Bankruptcy Distributions".

(d)    If any Additional Bankruptcy Distribution is to be received by Purchaser pursuant to Section 6.14(a), prior to the crediting of the applicable Credited Additional Bankruptcy Distribution pursuant to Section 6.14(a), Seller shall reduce such Credited Additional Bankruptcy Distribution by and shall retain (i) the number of Coins allocated in the applicable Post-Bankruptcy Statement to each User or Eligible Creditor located in an Unsupported Jurisdiction in which Purchaser or its applicable Affiliate(s) have not received the necessary Money Transmitter License, and (ii) the amount of cash allocated in the applicable Post-Bankruptcy Statement to each User or Eligible Creditor located in an Unsupported Jurisdiction in which Purchaser or its applicable Affiliate(s) have not received the necessary Money Transmitter License, and, in either case, such amounts shall be distributed by Seller in accordance with the Plan.

(e)    There shall be no transaction fees, spreads, costs or expenses charged to or payable by Seller, any User, or any Eligible Creditor with respect to any Additional Bankruptcy Distributions to the account of Seller, such User or such Eligible Creditor, as applicable, on the Binance.US Platform contemplated by this Section 6.14.  With respect to any User or Eligible Creditor that does not meet the requirements of the KYC Procedures and accept the terms and conditions of the Binance.US Platform (or otherwise is not or no longer is a user with an active account on the Binance.US Platform) as of or prior to the date of such Post-Bankruptcy Statement, Purchaser shall convert all Coins allocable to such User or Eligible Creditor in such Additional Bankruptcy Distribution into United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such United States Dollars, together with any cash or others assets in respect of such Users or Eligible Creditors, to Seller within five (5) Business Days, for further distribution by Seller in accordance with the Plan.

**(f)    Seller shall have the option but not the obligation to terminate Purchaser's role as Distribution Agent in connection with the Plan if one or more of the following has occurred and is continuing as of the time of exercise of such option and, in each case, such event would reasonably be expected to materially and adversely affect the Users, Eligible Creditors or the Acquired Coins (each, a "Distribution Agent Termination Event"): (i) Binance Holdings Limited or any of its Subsidiaries voluntarily files for bankruptcy protection in any jurisdiction and such filing would reasonably be expected to**

54

**prevent Purchaser from performing its obligations under this Section 6.14 or otherwise following the Closing; (ii) following a criminal complaint, indictment, or federal complaint filed by any U.S. federal law enforcement agency, a final and unappealable judgment is entered by a U.S. Federal Court of competent jurisdiction against Purchaser or any of Purchaser's executives officers or "C-Suite" officers; (iii) following a criminal complaint, indictment, or federal complaint filed by any U.S. federal law enforcement agency, a final and unappealable judgment is entered by a U.S. Federal Court of competent jurisdiction against any of Purchaser's Affiliates and such judgment would reasonably be expected to prevent Purchaser from performing its obligations under Section 6.14 or otherwise following the Closing; and (iv) a state regulator suspends or terminates Purchaser's Money Transmitter License or similar license or otherwise restricts in a manner that is final and binding under applicable Law; provided, however, that, with respect to this clause (iv), Seller shall have the option to terminate Purchaser's role as Distribution Agent with respect to only the state or states that have taken the adverse action described in this clause (iv).**

**Upon the occurrence of any Distribution Agent Termination Event, Seller is permitted to exercise the option to terminate Purchaser's role as Distribution Agent by providing written notice to Purchaser in accordance with Section 10.3 (a "Distribution Agent Termination Notice"). Purchaser's termination as Distribution Agent in connection with the Plan shall be effective on the tenth (10th) day following Purchaser's receipt of such Distribution Agent Termination Notice, unless such Distribution Agent Termination Event is cured prior to the expiration of such 10-day period. To the extent that Purchaser is in possession of any of Seller's fiat or Cryptocurrency at the time of the Distribution Agent Termination Notice, Purchaser shall transfer such fiat or cryptocurrency to Seller upon the effectiveness of such Distribution Agent Termination Notice.**

6.15    <u>Unstaking</u>. Promptly following the date hereof (until the **later of (A) the** Closing ~~or~~**and (B) the applicable Delivery Date, or, in any case,** the earlier termination of this Agreement pursuant to <u>Article VIII</u>) but without limiting what is permitted by <u>Section 6.1(b)(iii)</u>, Seller shall, and shall cause its Affiliates to, (a) ensure that all Seller Held Coins (other than ETH Coins that are Staked Coins as of the date hereof) are freely transferable and not subject to any restrictions on transfer (including restrictions on transfer implemented through "smart contracts" or other technological means), (b) without limiting the foregoing, ensure that all Seller Held Coins (other than ETH Coins that are Staked Coins as of the date hereof) are unstaked prior to the Rebalancing Date, and (c) consult with Purchaser and its representatives, keep Purchaser and its representatives reasonably informed, and provide Purchaser and its representatives with draft documents reasonably in advance of execution or delivery thereof and incorporate any comments therein proposed in good faith by Purchaser or its representatives, in each case, in connection with any of the foregoing.

6.16    <u>Receipt of Misdirected Assets; Liabilities</u>. From and after the Closing, if Purchaser or Seller becomes aware that Seller or any of its Affiliates is in possession of any right, property or asset that is an Acquired Asset, such Party shall promptly inform the other Party of that fact. Thereafter, at the request of Purchaser, Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to

Purchaser or any other entities nominated by Purchaser for no consideration, and such asset will be deemed the property of Purchaser of any such nominees held in trust by Seller for Purchaser or any such nominees until so transferred. From and after the Closing, if Purchaser or Seller becomes aware that Purchaser or any of its Affiliates is in possession of any right, property or asset that is an Excluded Asset, such Party shall promptly inform the other Party of that fact. Thereafter, at the request of Seller, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Seller or any other entities nominated by Seller for no consideration, and such asset will be deemed the property of Seller of any such nominees held in trust by Purchaser for Seller or any such nominees until so transferred; provided that if Purchaser discovers any items (or portions thereof) that would be Documents but for the fact that they relate to Excluded Assets, Purchaser shall use reasonable best efforts to destroy such items. Notwithstanding anything to the contrary herein or otherwise, if any amount (including any principal, interest, fees, expenses or penalties) is outstanding or unpaid under any Loan from or after the Closing, then such Loan, any agreements or documents entered into in connection therewith and any collateral posted in respect thereof shall be deemed Acquired Assets for all purposes under this Agreement and any other agreements or documents entered into in connection herewith, and Seller shall, and shall cause its Affiliates to, sell, transfer, assign, convey and deliver to Purchaser all of its and their right, title and interest in and to the foregoing, free and clear of all Encumbrances in the same manner as the other Acquired Assets under Section 1.1, *mutatis mutandis*, for no additional consideration and at no cost or expense to Purchaser or its Affiliates.

6.17    Acknowledgment by Purchaser.

(a)    Purchaser acknowledges and agrees that it has conducted to its full satisfaction an independent investigation and verification of the business, including its financial condition, results of operations, assets, Liabilities, properties, Contracts, regulatory compliance, business risks and prospects of Seller and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the Transactions, Purchaser and the Purchaser Group have relied solely on the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, Seller, any information, statements, disclosures, documents, Projections, forecasts or other material made available to Purchaser or any of its Affiliates or their respective Advisors in the Dataroom, the Information Presentation, or the Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Seller Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Seller Representations). Purchaser acknowledges and agrees that (i) the Express Seller Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the Transactions and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Seller Representations) including in the Dataroom, Information Presentation, Projections, meetings,

56

calls or correspondence with management of Seller, any of the Seller Parties or any other Person on behalf of Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of Seller's assets, are, in each case, specifically disclaimed by Seller, on its behalf and on behalf of the Seller Parties. Purchaser: (x) disclaims reliance on the items in <u>clause (ii)</u> in the immediately preceding sentence (which, for the avoidance of doubt, do not include any Express Seller Representations); and (y) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in <u>clause (i)</u> in the immediately preceding sentence. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees that neither Seller or any other Person (including the Seller Parties), has made, is making or is authorized to make, any representations or warranties, whether in written, electronic or oral form, express or implied with respect to, (1) any potentially material information regarding Seller or any of its assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (2) as to the quality, merchantability, fitness for a particular purpose, or condition of Seller's business, operations, assets, Liabilities, Contracts, regulatory compliance, business risks and prospects or any portion thereof, except, in each case, solely to the extent set forth in the Express Seller Representations.

(b)     Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of Seller, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of Seller, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "<u>Projections</u>"). Purchaser acknowledges and agrees that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Seller, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

6.18    <u>IT Migration</u>. From and after the date hereof until one hundred twenty (120) days after the Closing Date, upon Purchaser's request, Seller shall, and shall cause its Affiliates to, use reasonable best efforts to make available all relevant technical staff, employees and representatives of Seller and its Affiliates, including the Chief Technology Officer of Seller and its Affiliates, to Purchaser and its Affiliates, to (a) assist Purchaser and its Affiliates in understanding all Business Software and Business Accounts, (b) assist with the Integration Plan, (c) transition of all accounts with third party sites necessary to support the Voyager Platform and its associated mobile applications, (d) address the logistics of transferring the Business Software and Business Accounts to Purchaser, including providing Purchaser with access to all credentials to GitHub accounts and other repositories for storage of source code for the Business Software, and (e) any other technical assistance that Purchaser or any of its Affiliates deems reasonably necessary to enable all migrations, integrations and Transactions. Purchaser hereby grants Seller a limited, non-exclusive, non-transferable, non-sublicensable and revocable license to access and use the Business Software for the sole purpose of providing the support to Purchaser as contemplated in this <u>Section 6.18</u>. Seller and its Affiliates may not use, modify, share, disclose or revise such Business Software for any other purpose. Seller shall bear all costs and expenses

associated with the provision of such services on or prior to the Closing Date pursuant to this Section 6.18. Purchaser shall bear the reasonable and documented costs and expenses incurred by Seller in connection with the provision of such services during the 120-day period after the Closing Date pursuant to this Section 6.18. Seller can provide no assurance that Seller 's employees will elect to remain employed by Seller prior to or following the Closing and Seller will not be required to replace any such resigning employees.

6.19    Confidentiality.

(a)    Each Party acknowledges that Confidential Information has been, and in the future will be, provided to it in connection with this Agreement and the Transactions, including under Section 6.2.

(b)    Seller acknowledges that from and after the Closing, all non-public information relating to the Acquired Assets and the Assumed Liabilities will be valuable and proprietary to Purchaser and its Affiliates. Seller agrees that, from and after the Closing, Seller will not, and will cause their Affiliates and Advisors not to, directly or indirectly, without the prior consent of Purchaser, disclose to any Person any Confidential Information relating to Purchaser and its Affiliates, the Acquired Assets or the Assumed Liabilities.

(c)    Notwithstanding anything to the contrary herein, the provisions of this Section 6.19 will not prohibit any disclosure (i) required by applicable Law, Order or the rules of a securities exchange to which it is subject, (ii) in connection with a regulatory inquiry by a Governmental Body or self-regulatory organization, (iii) as necessary in connection with Seller's bankruptcy process or (iv) to each Party's Advisors who have been informed of the confidential nature of the information and have been instructed to keep such information confidential. Purchaser acknowledges and understands that this Agreement may be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders and that, except as prohibited herein, such disclosure will not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement or otherwise. Each Party agrees that such Party will be responsible for any breach or violation of the provisions of this Section 6.19 by any of such Party's Affiliates. Each Party acknowledges and agrees that the remedies at law for any breach or threatened breach of this Section 6.19 by Seller or Purchaser are inadequate to protect Purchaser or Seller and its Affiliates, as applicable, and that the damages resulting from any such breach are not readily susceptible to being measured in monetary terms. Accordingly, without prejudice to any other rights or remedies otherwise available to either Party or its Affiliates, each Party acknowledges and agrees that upon any breach or threatened breach by a Party of the terms and conditions of this Section 6.19, the other Party and its Affiliates, as applicable will be entitled to immediate injunctive relief and to seek an order restraining any threatened or future breach from any court of competent jurisdiction without proof of actual damages or posting of any bond in connection with any such remedy. The provisions of this Section 6.19 will survive the Closing and terminate two (2) years after the Closing Date.

6.20    Acquired Assets Owned by Non-Debtors. To the extent any item set forth in Schedule 6.20 or any other asset used in or relating to the Cryptocurrency custody and trading business of Seller constitutes property of Voyager IP, LLC, and, but for this Section 6.20, is of a type that would constitute an Acquired Asset (disregarding solely for this purpose any reference

to "of Seller" or other reference indicating ownership, licensing, holding, leasing or use of any type of Acquired Asset by Seller), Seller shall cause Voyager IP, LLC's right, title and interest in and to such item or asset to be transferred (for no additional consideration) to Purchaser reasonably promptly after Closing as an Acquired Asset as if transferred at the Closing in accordance with the other provisions of this Agreement, including by designating Voyager IP, LLC as an additional assignor under the Trademark and Domain Name Assignment Agreement.

6.21    <u>Seller Expenses</u>.

(a)    Purchaser shall (i) at the Closing bear as a component of the Purchase Price pursuant to <u>Section 2.1(a)</u>, without duplication, the Seller Expenses or (ii) if this Agreement is validly terminated in accordance with its terms, pay to Seller, within three (3) Business Days following such termination, cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Seller in an amount equal to the Seller Expenses; <u>provided</u> that notwithstanding anything to the contrary herein, (A) in no event shall the aggregate amount of Seller Expenses payable by Purchaser hereunder exceed the Seller Expense Cap, (B) any fees and expenses (including reasonable and documented out-of-pocket financial advisor and legal fees, expenses and disbursements) incurred by Seller or any of its Affiliates, or otherwise relating to the activities or operations of Seller or any of its Affiliates, on or prior to the Seller Expense Start Date shall not constitute Seller Expenses, and (C) (x) if the Closing or the termination of this Agreement occurs on or prior to the Seller Expense Start Date, (y) if this Agreement is terminated pursuant to (1) <u>Section 8.1(b)</u> or <u>Section 8.1(c)</u> by Purchaser, or by Seller in circumstances where Purchaser would be entitled to terminate this Agreement pursuant to <u>Section 8.1(e)</u>, or (2) <u>Section 8.1(e)</u>, <u>Section 8.1(g)</u>, <u>Section 8.1(h)</u> or <u>Section 8.1(i)</u>, or (z) the Closing does not occur on or prior to the Seller Expense Start Date due to any act or omission by Seller or any of its Affiliates or any material breach of this Agreement by Seller, then in each case the Seller Expenses shall be zero (0).

(b)    For purposes of this Agreement, "<u>Seller Expenses</u>" means all reasonable and documented costs, fees, and expenses (including reasonable and documented out-of-pocket financial advisor and legal fees, expenses and disbursements) incurred by or behalf of any Debtor during the period beginning on the Seller Expense Start Date and ending on the earlier of (i) the Closing Date and (ii) the date on which this Agreement is validly terminated in accordance with its terms, in each case (A) solely in connection with maintaining its operations in the Ordinary Course or by professionals in connection with the Bankruptcy Case, (B) that Seller would not have otherwise incurred if the Closing had occurred on or prior to the Seller Expense Start Date, and (C) which fees and expenses of such professional are approved by the Bankruptcy Court.

6.22    <u>Purchaser Expenses</u>.

(a)    If this Agreement is terminated (i) by Seller pursuant to <u>Section 8.1(c)</u>, in circumstances where Purchaser would be entitled to terminate this Agreement pursuant to <u>Section 8.1(e)</u>, or (ii) pursuant to <u>Section 8.1(e)</u>, <u>Section 8.1(g)</u>, <u>Section 8.1(h)</u> or <u>Section 8.1(i)(ix)</u>, then Seller shall pay to Purchaser, within three (3) Business Days following such termination, cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Purchaser in an amount equal to the Purchaser Expenses; <u>provided</u> that notwithstanding anything to the contrary herein, in no event shall the aggregate amount of

Purchaser Expenses payable by Seller hereunder exceed $5,000,000; provided further that if this Agreement is validly terminated by Seller pursuant to Section 8.1(g) (x) in order for Seller to pursue a Liquidation as a result of and following any Effect with respect to Purchaser's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, or any Effect with respect to Purchaser's Affiliates that has an Effect on Purchaser's business, financial condition, operations, assets, management, employees, compliance, or liabilities, taken as a whole, that, individually or in the aggregate with all other such Effects, would reasonably be expected to (1) prevent or materially impair or materially delay the ability of Purchaser to consummate the Transactions in accordance herewith or (2) materially and adversely affect the Users, Eligible Creditors, or the Acquired Coins on the Binance.US Platform, including following the Closing, as compared to users and Coins on the Binance.US Platform as of the date hereof, and (y) such termination was not effected (1) in connection with a Higher and Better Offer or (2) because the estimated proceeds from such Liquidation are or would reasonably be expected to be greater than the Closing Date Payment (plus the fair market value of any Acquired Coins or any proceeds therefrom, in each case, as determined at the time Seller commences such Liquidation), then no Purchaser Expenses shall be payable.

(b)     For purposes of this Agreement, "Liquidation" means any combination of one or more of the following:  (i) a plan under chapter 11 of the Bankruptcy Code that provides for sales or liquidation of the Debtors' assets through a transaction (other than a sale of substantially all of the Debtors' assets to one purchaser on a going concern basis), including the Plan, (ii) one or more sales of assets pursuant to section 363 of the Bankruptcy Code other than a sale of substantially all of the Debtors' assets to one purchaser on a going concern basis, (iii) conversion of the Bankruptcy Case to cases under chapter 7 of the Bankruptcy Code, (iv) foreclosure or other exercise of remedies (including a deed in lieu of foreclosure) by or in favor of one or more creditors, (v) abandonment of the Debtors' assets to a creditor, or (vi) a dismissal of the Bankruptcy Cases.

(c)     For the purposes of this Agreement, "Purchaser Expenses" means all reasonable and documented fees and expenses (including reasonable and documented out-of-pocket legal fees, expenses and disbursements) incurred by Purchaser since August 5, 2022, in connection with, arising from or related to efforts to purchase the Acquired Assets (as defined in the Bidding Procedures Order), which, for the avoidance of doubt, includes its evaluation, negotiation and pursuit of the Transactions, this Agreement and the other documents and agreements contemplated hereby (the "Purchaser Bid Process").

(d)     All amounts payable to Purchaser pursuant to Section 6.22(a) upon termination of this Agreement shall be payable in cash by wire transfer of immediately available funds to such bank account as shall be designated by Purchaser in writing, and without the requirement of any notice or demand from Purchaser or any application to or order of the Bankruptcy Court other than the Agreement Order.

60

# ARTICLE VII
# CONDITIONS TO CLOSING

7.1    <u>Conditions Precedent to the Obligations of Purchaser and Seller</u>. The respective obligations of each Party to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    there shall be no Law or Order (including any temporary restraining order or preliminary or permanent injunction) in effect restraining, enjoining, making illegal or otherwise prohibiting the Transactions;

(b)    the Bankruptcy Court shall have entered the Agreement Order, which Agreement Order shall (i) be in form and substance reasonably acceptable to Purchaser, (ii) comply in all respects with <u>Section 5.1(b)</u>, and (iii) be a Final Order; and

(c)    the Bankruptcy Court shall have entered the Confirmation Order, in form and substance, solely with respect to matters relating to this Agreement or the Transactions, reasonably acceptable to Purchaser, confirming a Plan in form and substance, solely with respect to matters relating to this Agreement or the Transactions, reasonably acceptable to Purchaser, and the Confirmation Order shall be a Final Order.

7.2    <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    (i) the representations and warranties of Seller set forth in <u>Article III</u> (in each case, other than the Fundamental Representations and the representations and warranties set forth in <u>Section 3.16(a)</u>) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be so true and correct only as of such date **and; provided that any representations and warranties that are made as of any Delivery Date (solely to the extent made as of any Delivery Date) shall be excluded from this Section 7.2(a) altogether, and** (y) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; <u>provided</u> that for purposes of the immediately preceding clause (i), the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect; (ii) the representations and warranties set forth in <u>Section 3.1(a)</u> (*Organization and Qualification*), <u>Section 3.2</u> (*Authorization of Agreement*), <u>Section 3.3(a)(i)</u> (*Conflicts; Consents*), <u>Section 3.6(a)</u> (*Exclusive Ownership*), and <u>Section 3.14</u> (*Brokers*) (collectively, the "<u>Fundamental Representations</u>") shall be true and correct in all but *de minimis* respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all but *de minimis* respects only as of such date; and (iii) the

representations and warranties set forth in Section 3.16(a) shall be true and correct in all respects as of the date hereof and as of the Closing Date as though made on and as of the Closing Date;

(b)      Seller shall not have materially breached any of the covenants required to be performed or complied with by Seller under this Agreement on or prior to the Closing; provided that notwithstanding the foregoing, Seller shall have performed or caused to be performed, in all respects, all of the obligations and covenants required by Section 6.15(a) and (b); and

(c)      Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.4.

7.3      Conditions Precedent to the Obligations of Seller. The obligations of Seller to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)      the representations and warranties made by Purchaser in Article IV shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be so true and correct only as of such date and (y) where the failure of such representations or warranties to be so true and correct has not and would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of Purchaser to consummate the Transactions; provided that for purposes of this Section 7.3(a), the qualifications as to materiality, material adverse effect and words of similar import contained in such representations and warranties shall not be given effect;

(b)      Purchaser shall not have materially breached any of the covenants required to be performed or complied with by Purchaser under this Agreement on or prior to the Closing; and

(c)      Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 2.5.

7.4      Waiver of Conditions.  Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. Neither Purchaser nor Seller may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's material breach of any covenant, representation or warranty hereunder.

US-DOCS\137411268.27138346099.6

# ARTICLE VIII

# TERMINATION

8.1    <u>Termination of Agreement</u>. This Agreement may be terminated only in accordance with this <u>Section 8.1</u>. This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Purchaser;

(b)    by written notice of either Purchaser or Seller, upon the issuance of an Order by a Governmental Body restraining, enjoining or otherwise prohibiting the consummation of the Transactions or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; <u>provided</u> that no termination may be made by a Party under this <u>Section 8.1(b)</u> if the issuance of such Order was caused by such Party's material breach of any of its representation, warranties, covenants or agreements hereunder;

(c)    by written notice of either Purchaser or Seller, if the Closing shall not have occurred on or before the date that is four (4) months following the date hereof (the "<u>Outside Date</u>"); <u>provided</u> that Purchaser may, at its election and upon written notice to Seller, elect to extend the Outside Date for an additional thirty (30) days (such extended date, the "<u>Extended Outside Date</u>"); <u>provided</u> <u>further</u> that a Party shall not be permitted to terminate this Agreement, or extend the Outside Date, pursuant to this <u>Section 8.1(c)</u> if the failure of the Closing to have occurred by the Outside Date or Extended Outside Date, as applicable, was caused by such Party's material breach of any of its representation, warranties, covenants or agreements;

(d)    by written notice from Seller to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser is or will have become untrue, in each case, such that the conditions set forth in <u>Section 7.1</u> or <u>Section 7.3</u> would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; <u>provided</u> that (i) if such breach is curable by Purchaser then Seller may not terminate this Agreement under this <u>Section 8.1(d)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date or Extended Outside Date, if any, and (B) thirty (30) days after Seller notifies Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(d)</u> will not be available to Seller at any time that Seller is in material breach of, any covenant, representation or warranty hereunder;

(e)    by written notice from Purchaser to Seller, upon a breach of any covenant or agreement on the part of Seller, or if any representation or warranty of Seller is or will have become untrue, in each case, such that the conditions set forth in <u>Section 7.2(a)</u> or <u>Section 7.2(b)</u> would not be satisfied; <u>provided</u> that (i) if such breach is curable by Seller then Purchaser may not terminate this Agreement under this <u>Section 8.1(e)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date or Extended Outside Date, if any, and (B) thirty (30) days after Purchaser notifies Seller of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(e)</u> will not be available to

63

Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(f)    by written notice from Seller to Purchaser, if (A) all of the conditions set forth in Sections 7.1 and 7.2 have been and continue to be satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived, (B) Seller has confirmed in writing to Purchaser that all of the conditions set forth in Sections 7.1 and 7.2 have been and continue to be satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Seller stands ready, willing and able to consummate the Closing so, and (C) Purchaser fails to consummate the Closing within three (3) Business Days of its receipt of such written notice from Seller;

(g)    by written notice from Seller to Purchaser, which may be revocable in the sole discretion of Seller by written notice from Seller to Purchaser within five (5) Business Days, if Seller or the board of directors (or similar governing body) of Seller determine, in good faith and after consultation with its legal and other advisors, that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties; provided that if such determination is in connection with an Acquisition Proposal, Seller may only terminate this Agreement pursuant to this Section 8.1(g) upon compliance with the provisions set forth in Section 5.2(c);

(h)    by written notice from Purchaser to Seller, if (A) Seller seeks or otherwise take material steps in furtherance of, or do not use reasonable best efforts to oppose any other Person in seeking, an order of the Bankruptcy Court dismissing the Bankruptcy Case or converting the Bankruptcy Case to a petition for relief under Chapter 7 of the Bankruptcy Code, (B) the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Seller is appointed in the Bankruptcy Case or (C) the Bankruptcy Court enters an order pursuant to section 362 of the Bankruptcy Code lifting the automatic stay with respect to any Acquired Assets; or

(i)    by written notice from Purchaser to Seller, if:

(i)    the Agreement Order is not entered by January ~~6~~**11**, 2023;

(ii)    the Plan Solicitation Motion and the Amended Disclosure Statement are not filed with the Bankruptcy Court by December 21, 2022;

(iii)    the Plan Solicitation Order is not entered by January ~~6~~**11**, 2023;

(iv)    the Confirmation Order is not entered by March ~~1~~**6**, 2023;

(v)    Seller or any of the other Debtors file any motions, pleadings, notices or other documents with the Bankruptcy Court in material breach of Section 5.7;

64

(vi)     Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser, or the Bankruptcy Court approves an Alternative Transaction other than with Purchaser;

(vii)    Seller has delivered a Higher Offer Determination Notice to Purchaser;

(viii)   Seller or its Affiliates or Advisors have committed a breach of Section 5.1(a); or

(ix)     Seller or its Affiliates or Advisors have committed a breach of, Section 5.2; provided that (without modifying Purchaser's rights to terminate this Agreement under any other Section of this Agreement) Purchaser shall not be entitled to terminate this Agreement pursuant to this Section 8.1(i)(ix) following entry of the Agreement Order by the Bankruptcy Court.

8.2     Effect of Termination.

(a)     In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and there shall be no Liability on the part of either Party or any of its partners, officers, directors or shareholders; provided that Section 2.2, Section 6.2(b), Section 6.12(c), Section 6.19, Section 6.21, Section 6.22, this Section 8.2, Section 8.3, Section 8.4 and Article X (other than Section 10.12 with respect to the availability of an injunction or injunctions, specific performance or other equitable relief to cause the Closing to occur, which shall terminate upon any termination of this Agreement) and the definitions referenced in such Sections and Articles, even if not included in such Sections and Articles, and, for the avoidance of doubt, the Confidentiality Agreement, shall survive any such termination; provided further that, subject to Section 8.3, no termination will relieve either Party from any Liability for damages (including damages based on the loss of the economic benefits of the Transactions, including the Purchase Price, to Seller), losses, costs, or expenses (including reasonable legal fees and expenses) resulting from any willful breach of this Agreement by such Party prior to any such termination or Fraud by such Party. For purposes of this Agreement, "willful breach" means with respect to any breaches or failures to perform any of the covenants or other agreements contained herein, a material breach that is a consequence of an act or failure to act undertaken by the breaching Person with actual knowledge (which shall not be deemed to include knowledge of facts that a Person acting reasonably should have, based on reasonable due inquiry) that such Person's act or failure to act would, or would reasonably be expected to, result in or constitute a material breach of this Agreement.

(b)     If this Agreement is terminated prior to the Closing, at any time following such termination, promptly following the written request of Seller, Purchaser shall, as soon as practicable, return, destroy or permanently erase (on all forms of physical and electronic media) all Acquired User Data transferred to Purchaser prior to the Closing in accordance with Section 6.6(a) or otherwise in connection with the KYC Procedures and permanently close and remove any account established with or with reference to any Acquired User Data, and, upon written request from Seller following any destruction or erasure of data, provide an officer's certificate certifying as to such destruction or erasure. Such destruction or erasure shall be in

65

accordance with all Laws regarding data disposal, and the eradication and destruction technique used will be appropriate for the storage medium and format. Notwithstanding the foregoing, Purchaser shall have the right to retain a copy of the Acquired User Data to the extent required for legal, regulatory or compliance purposes, so long as such Acquired User Data is kept confidential as required under this Agreement and the Confidentiality Agreement and is used for no other purpose.

8.3    Reverse Termination Fee. In the event that (a) the conditions set forth in Sections 7.1(b), 7.1(c), and 7.2 have been satisfied or duly waived and (b) (i) this Agreement is validly terminated in accordance with Section 8.1(b) or Section 8.1(c), (ii) Purchaser fails to consummate the Closing by the Outside Date or the Extended Outside Date, as applicable, as a result of the failure of the conditions set forth in Section 7.1(a), or (iii) this Agreement is terminated pursuant to Section 8.1(g) in connection with and following a Purchaser Development and not in connection with a Higher and Better Offer, then, in any such case, within three (3) Business Days following such valid termination the Deposit (including all received investment income, if any) shall be released to Seller (such release, which, for the avoidance of doubt, shall be equal to and shall not exceed $10,000,000 in the aggregate, the "Reverse Termination Fee").

8.4    Further Effect of Termination. Notwithstanding anything to the contrary in this Agreement, the Confidentiality Agreement or any other document or instrument delivered by either Party in connection with the Transactions, but subject in all respects to the other provisions of this Section 8.4:

(a)    Seller, on behalf of itself and the Seller Parties, acknowledges and agrees that any disbursement of the Deposit to Seller pursuant to Section 2.2(b), payment of any Seller Expenses to Seller pursuant to Section 6.21 or payment of the Reverse Termination Fee pursuant to Section 8.3 shall be deemed liquidated damages and shall be the sole and exclusive recourse of Seller and the Seller Parties against Purchaser and the Purchaser Group for any loss or damage suffered in connection with, relating to or arising out of this Agreement or the Transactions (including circumstances giving rise to any termination of this Agreement) and including losses or damages suffered as a result of any breach of this Agreement or any representation, warranty, covenant or agreement contained herein by Purchaser or the failure of the Transactions to be consummated (whether or not for intentional, unintentional or willful breach or otherwise), except in the event Seller is entitled to elect specific performance of Purchaser's obligations (including to consummate the Transactions) pursuant to Section 10.12.

(b)    In the event of a valid termination of this Agreement pursuant to Section 8.1, if Seller is entitled to receive the Deposit pursuant to Section 2.2, payment of any Seller Expenses pursuant to Section 6.21, or payment of the Reverse Termination Fee pursuant to Section 8.3, then, upon release of the Deposit to Seller in accordance with Section 2.2(b), payment of such Seller Expenses pursuant to Section 6.21 or payment of the Reverse Termination Fee pursuant to Section 8.3, as applicable, (i) Purchaser and the Purchaser Group shall not have any further liability or obligation relating to or arising out of this Agreement or the Transactions (including any liability or obligation for monetary damages) and (ii) neither Seller nor any of the Seller Parties will have any right of recovery, whether arising under contract Law, tort Law or any other theory of Law, against, and no personal liability shall attach to Purchaser or any other member of the Purchaser Group, whether by or through attempted piercing of the

66

corporate, limited partnership or limited liability company veil, by the enforcement of any assessment or by any legal or equitable Action, by virtue of any statute, regulation or applicable Law, or otherwise.

(c) **In the event that the Closing does not occur:** (i) The maximum aggregate liability of Purchaser and the Purchaser Group in connection with this Agreement and the Transactions shall be limited to the sum of (x) (1) solely where and to the extent the Deposit is forfeited by Purchaser in accordance with Section 2.2(b), the Deposit or (2) without duplication of any forfeiture of the Deposit pursuant to Section 2.2(b) and solely where and to the extent the Reverse Termination Fee is payable in accordance with Section 8.3, the Reverse Termination Fee, plus (y) solely where and to extent the Seller Expenses are payable in accordance with Section 6.21, the Seller Expenses; (ii) in no event shall Purchaser be obligated to pay any of the Deposit, the Seller Expenses or the Reverse Termination Fee on more than one occasion and (iii) under no circumstances will any of Seller or any of the Seller Parties seek, obtain or accept, monetary damages or losses of any kind (including damages for the loss of the benefit of the bargain, opportunity cost, loss of premium, time value of money or otherwise, or any consequential, special, expectancy, indirect or punitive damages or any losses or damages based on a multiple or multiplier) in connection with, relating to or arising out of the termination of this Agreement in excess of the sum of (A) (1) solely where and to the extent the Deposit is forfeited in accordance with Section 2.2(b), the Deposit or (2) without duplication of any forfeiture of the Deposit pursuant to Section 2.2(b) and solely where and to the extent the Reverse Termination Fee is payable in accordance with Section 8.3, the Reverse Termination Fee, plus (B) solely where and to the extent the Seller Expenses are payable in accordance with Section 6.21, the Seller Expenses; provided, however, that the foregoing shall not been interpreted to limit in any way Seller's right to require specific performance of Purchaser's obligations (including to consummate the Transactions) pursuant to Section 10.12 in the event this Agreement has not been terminated and to the extent such specific performance is available to Seller under Section 10.12. Notwithstanding anything to the contrary herein or otherwise, in no event shall Seller be entitled to receive both (1) the forfeiture of the Deposit together with all received investment income, if any, pursuant to Section 2.2(b) and (2) the payment of the Reverse Termination Fee pursuant to Section 8.3 (it being acknowledged that the payment of the Reverse Termination Fee pursuant to Section 8.3 includes forfeiture of the Deposit together with all received investment income, if any).

(d) Seller may seek both payment of monetary damages (including the Reverse Termination Fee, the Deposit or the Seller Expenses) in accordance with this Agreement, on the one hand, and specific performance of Purchaser's obligation to consummate the Closing pursuant to Section 10.12; provided that in no event shall Seller be entitled to receive both (1) payment of monetary damages (including the Reverse Termination Fee, the Deposit or the Seller Expenses) in accordance with this Agreement (and for the avoidance of doubt, subject to the other limitations thereon set forth in this Section 8.4) and (2) such specific performance pursuant to Section 10.12.

# ARTICLE IX

## TAXES

9.1    <u>Transfer Taxes</u>. Any sales, use, purchase, transfer, deed, stamp, documentary or other similar Taxes and recording charges (but excluding any such Taxes or charges that are based in whole or in part upon income, profits or gains) payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "<u>Transfer Taxes</u>") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes.

9.2    <u>Cooperation</u>. Purchaser and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes. In furtherance thereof, Purchaser and Seller shall reasonably cooperate in good faith to determine and agree to the tax treatment to each of them and to the Users of the Transactions, provided that agreeing on consistent tax treatment shall not be a closing condition and neither Party shall have any liability under this Agreement if the Parties are unable to so agree.

9.3    <u>Preparation of Tax Returns and Payment of Taxes</u>.

(a)    Except as otherwise provided by <u>Section 9.1</u>, Seller shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets for any Tax period ending on or before the Closing Date and (ii) all Tax Returns of Seller (including, for the avoidance of doubt, for any Straddle Period, but not including, for the avoidance of doubt, information returns). With respect to any such Tax Return that reflects any Tax that is an Assumed Liability (not including, for the avoidance of doubt, any income Tax Return of Seller or Seller's Affiliates for any tax period and not including any information Tax Return), Seller shall use reasonable best efforts to (x) prepare such Tax Returns consistent with past practice, except as otherwise required by applicable Law, (y) provide Purchaser with a draft of such Tax Returns at least ten (10) days prior to the filing of any such Tax Return, and (z) incorporate any changes reasonably requested by Purchaser with respect to such Tax Returns prior to filing. Except to the extent any Tax reflected on a return required to be prepared and filed by Seller pursuant to this <u>Section 9.3</u> constitutes an Assumed Liability, Seller shall be responsible for paying any Taxes reflected on any Tax Return that Seller is obligated to prepare and file under this <u>Section 9.3(a)</u>. Notwithstanding anything herein to the contrary: (i) nothing in this Agreement shall give Purchaser or its Affiliates any rights with respect to or control over any income Tax Return of Seller or Seller's Affiliates for any tax period (any such Tax Return, a "<u>Seller Income Tax Return</u>"), and (ii) if any Governmental Body approaches (including by way of initiating any audit, investigation, or other proceeding) either Party with respect to the income Tax characterization of the Transactions (any such action, a "<u>Transaction-Related Action</u>"), then the Party in receipt of such notice shall reasonably promptly inform the other Party of such Transaction-Related Action.

(b)    Purchaser shall prepare and timely file all Tax Returns with respect to the Acquired Assets that are not addressed by <u>Section 9.3(a)</u> (including, for the avoidance of doubt, all Tax Returns with respect to the Acquired Assets for any taxable period beginning after the

Closing Date). With respect to any such Tax Return for any Straddle Period that reflects any Tax that is an Excluded Liability (each, a "Relevant Tax Return"), Purchaser shall prepare such Relevant Tax Returns and shall provide Seller with a draft of such Relevant Tax Returns at least ten (10) days prior to the filing of any such Tax Return. Purchaser shall incorporate any changes reasonably requested by Seller with respect to such Tax Returns. Seller shall be responsible for paying any Taxes reflected on any Tax Return that Purchaser is obligated to prepare and file under this Section 9.3(b) to the extent such Taxes constitute Excluded Liabilities.

(c)    Purchaser shall not file any amendment to any previously filed Tax Return with respect to the Acquired Assets for any Pre-Closing Tax Period that would have the effect of increasing any Tax due for a Pre-Closing Tax Period or portion of a Straddle Period ending on the Closing Date, in each case, that is an Excluded Liability, unless Purchaser receives an opinion from a nationally recognized accounting firm or law firm that there is no adequate "reporting position" with respect to any previously-asserted position with respect to Taxes. Upon such determination, Purchaser shall provide no less than forty-five (45) days' notice of such position before filing any such Tax Return. In the event Seller disagrees with such Tax position, and the dispute cannot be resolved between the Parties, such dispute shall be submitted to an independent national accounting firm or law firm for resolution, with the costs of such resolution to be evenly split by Purchaser and Seller. The determination of such independent national accounting firm or law firm shall be binding on both Parties and any Tax Return shall be filed consistently with such resolution.

(d)    For all purposes under this Agreement, in respect of any Straddle Period, the portion of Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date will be: (i) in the case of any Taxes other than those described in clause (ii) below, deemed to include the amount that would be payable if the relevant Straddle Period ended on and included the Closing Date; and (ii) in the case of any property Taxes and other similar Taxes, deemed to include the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the number of days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

(e)    Notwithstanding anything herein to the contrary, prior to the Closing, Seller and its Affiliates may contribute, assign or otherwise transfer the 3AC Loan to any third-party purchaser, trust or other entity.

## ARTICLE X

### MISCELLANEOUS

10.1    Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and

69

agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years and (b) are an integral part of the Transactions and that, without the agreements set forth in this <u>Section 10.1</u>, neither of the Parties would enter into this Agreement.

10.2    <u>Expenses</u>. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, <u>Section 8.2</u>), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that all Transfer Taxes will be allocated pursuant to <u>Section 9.1</u> and (c) all Cure Costs will be allocated pursuant to <u>Section 5.4</u>.

10.3    <u>Notices</u>. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

<u>Notices to Purchaser</u>:

BAM Trading Services, Inc. d/b/a Binance.us
611 Cowper Street, Suite 400
Palo Alto, CA 94301
Attention:    Norman Reed, General Counsel
Email:    norman.reed@binance.us;
legal@binance.us

70

with a copy to (which shall not constitute notice):

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:   Robert M. Katz
                Daniel Mun
                Adam J. Goldberg
                Andrew D. Sorkin
                **Jenny Cieplak**
Email:         Robert.Katz@lw.com
                Daniel.Mun@lw.com
                Adam.Goldberg@lw.com
                ~~Andrew.Sorkin~~**Andrew.Sorkin@lw.com**
                **Jenny.Cieplak**@lw.com

<u>Notices to Seller</u>:

Voyager Digital, LLC
33 Irving Place, 3rd Floor
New York, NY 10003
Attention:   Stephen Ehrlich
                David Brosgol
Email:         sehrlich@investvoyager.com
                dbrosgol@investvoyager.com

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:   Joshua A. Sussberg, P.C.
                Christine A. Okike, P.C.
                Christopher Marcus, P.C.
                Jonathan L. Davis, P.C.
                Steve Toth
                Eduardo M. Leal
                Allyson B. Smith
Email:         joshua.sussberg@kirkland.com
                christine.okike@kirkland.com
                cmarcus@kirkland.com
                jonathan.davis@kirkland.com
                steve.toth@kirkland.com
                eduardo.leal@kirkland.com
                allyson.smith@kirkland.com

10.4   Binding Effect; Assignment. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Agreement Order, the Plan and the Confirmation Order, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Seller, and any attempted assignment or delegation without such prior written consent shall be null and void; provided further that Purchaser shall be entitled to assign or delegate this Agreement or all or any part of its rights or obligations hereunder to any of its Affiliates; provided further that in each case no such assignment or delegation shall relieve Purchaser of any of its obligations hereunder.

10.5   Amendment and Waiver. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Seller or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default. Except where a specific period for action or inaction is provided herein, no delay on the part of either Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

10.6   Third Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement is intended or will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7   Non-Recourse. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future direct or indirect equityholder, shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of either Party will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8   Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction. To the extent permitted by applicable Law, each Party waives any provision of Law that renders any provision of this Agreement invalid or unenforceable in any respect.

10.9   Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction

72

will be applied against any Person. The table of contents and headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10   <u>Schedules</u>. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; <u>however</u>, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, to the extent it is readily apparent on its face without the need for a cross-reference. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and neither Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by either Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11   <u>Complete Agreement</u>. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements between the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12   <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if either of the Parties fails to take any action required of it

hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Seller nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that either Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order. Except as limited by <u>Section 8.4(d)</u>, (i) the remedies available to Seller pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and (ii) the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit Seller from seeking to collect or collecting damages. If, prior to the Outside Date or Extended Outside Date, if any, either Party brings any action, in each case in accordance with <u>Section 10.13</u>, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date or Extended Outside Date, if any, will automatically be extended (y) for the period during which such action is pending, <u>plus</u> ten (10) Business Days or (z) by such other time period established by the court presiding over such action, as the case may be.

10.13   <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the Transactions brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) ((a) and (b), the "<u>Chosen Courts</u>"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the Transactions. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in <u>Section 10.3</u>. Nothing in this Agreement will affect the right of either Party to serve process in any other manner permitted by Law.

10.14   <u>Governing Law; Waiver of Jury Trial</u>.

(a)   Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the Transactions will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)   EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15   <u>No Right of Set-Off</u>. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

10.16   <u>Counterparts and PDF</u>. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any

US-DOCS:~~137411268.27~~138346099.6

agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17    Publicity. The initial press release regarding this Agreement and the Transactions (the "Press Release") shall be made promptly following the execution and delivery of this Agreement and shall be in such form as the Parties mutually agree. Except as contemplated by the Commercial Covenants, and subject in all respects to Section 10.19, none of Seller and the Seller Parties shall issue any press release or public announcement (directly or indirectly) concerning this Agreement, the Transactions, the Acquired Assets, the Assumed Liabilities, the Purchaser Bid Process or any other matters related thereto or arising in connection therewith without obtaining the prior written approval of Purchaser (which approval will not be unreasonably withheld, conditioned or delayed) unless, (a) in the reasonable judgment of Seller after consultation with counsel (who may be in-house counsel), disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or the Plan or (b) to correct any misstatement of fact made by Purchaser in any communication pursuant to the immediate next sentence; provided that Seller shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with Purchaser with respect to the disclosure thereof. Following the publication of the Press Release, Purchaser shall be permitted to make one or more public statements or issue one or more press releases, in each case, regarding the Acquired Assets and the Assumed Liabilities, this Agreement, the Transactions and the Purchaser Bid Process or any other matter related thereto or arising therefrom or otherwise in connection therewith to the extent not in violation of the Confidentiality Agreement and not in disparagement of Seller or any Seller Party; provided that Purchaser shall use its reasonable best efforts (considered in light of the circumstances in which such disclosure is to be made) to consult in good faith with Seller prior to making any such disclosure.

10.18    Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Confirmation Order. In furtherance of the foregoing, to the extent permitted by applicable Laws, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

10.19    Fiduciary Obligations. Nothing in this Agreement, or any document related to the Transactions, will require Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations; provided, however, that no such action or inaction

shall be deemed to prevent Purchaser from exercising any termination rights it may have hereunder as a result of such action or inaction.

10.20   <u>No Solicitation</u>. This Agreement, the Plan and the transactions contemplated herein and therein are the product of negotiations between the Parties. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, (a) a solicitation of votes for the acceptance of the Plan or any other plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act or the Exchange Act and Seller will not solicit acceptances of the Plan from any party until such party has been provided with copies of a disclosure statement containing adequate information as required by section 1125 of the Bankruptcy Code.

10.21   <u>Acknowledgment</u>. Notwithstanding anything in this Agreement to the contrary (including <u>Section 3.17</u>, <u>Section 3.18</u>, <u>Section 4.10</u>, <u>Section 4.11</u>, <u>Section 6.17</u> and <u>Section 10.1</u>), nothing herein shall relieve any Person from any Liability on account of Fraud.

<div align="center">

**ARTICLE XI**

**ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS**

</div>

11.1   <u>Certain Definitions</u>.

(a)   "<u>3AC Loan</u>" means that certain Master Loan Agreement, dated March 4, 2022, by and between Three Arrows Capital, Ltd., as borrower, and Seller and HTC Trading, Inc., as lenders, and Seller in its capacity as administrative agent for the lenders.

(b)   "<u>Acquired Coins</u>" means, collectively, all Seller Held Coins (other than Withheld Coins) as of the Rebalancing Date and following the completion of the Rebalancing Exercise in accordance with this Agreement, and after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring such Coins to Purchaser in accordance with <u>Section 2.4(b)</u>.

(c)   "<u>Acquired Coins Value</u>" means, with respect to any Acquired Coin of any type, the VWAP of such Coin determined as of two Business Days prior to the Rebalancing Date*, after taking into account gas or other transaction fees incurred and paid by Seller* **or any of its Affiliates in connection with transferring such Coins to Purchaser in accordance with Section 2.4(b)**.

(d)   "<u>Action</u>" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination, assessment, notice of violation, citation or investigation, of any kind whatsoever (civil, criminal, administrative, regulatory, investigative, appellate or otherwise), regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or

<div align="center">77</div>

whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

(e) "Additional Bankruptcy Distributions" means any distributions proposed to be made by the Debtors or any successor thereto to Users or Eligible Creditors after the Closing Date, whether made pursuant to the Plan (including distributions in cash or Coins) or otherwise.

(f) "Advisors" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(g) "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(h) "Alternative Transaction" means any transaction (or series of transactions), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition of Seller or any of its Affiliates or any portion of the equity interests or any material portion of the assets thereof (in any form of transaction, whether by merger, sale of assets or equity or otherwise).

(i) **"Asset Migration Date" means, with respect to any User or Eligible Creditor, as applicable, who has satisfied the requirements set forth in Section 6.10 and Section 6.12(b) for onboarding to the Binnace.US Platform, the date that is five (5) Business Days following the date on which Seller has delivered to Purchaser the Acquired Coins or cash to be distributed by Purchaser to such User or Eligible Creditor, as applicable, pursuant to this Agreement.**

(j) ~~(i)~~ "Bidding Procedures Order" means the *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation and (V) Granting Related Relief* [Docket No. 248].

(k) ~~(j)~~ "Binance.US Platform" means Purchaser's and its Affiliates' Binance.US Cryptocurrency savings and trading platform or any successor platform thereto.

(l) **"BUSD" means a Binance branded stablecoin issued by Paxos Trust Company, approved and regulated by the New York State Department of Financial Services.**

78

**(m)** ~~(k)~~ "Business Accounts" means any and all accounts or registries that Seller owns, maintains or controls with third party vendors, software providers, service providers and other similar third parties that is related to the businesses of Seller.

**(n)** ~~(l)~~ "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

**(o)** ~~(m)~~ "Business Software" means any and all proprietary Software owned by (or purported to be owned by) Seller that is related to the businesses of Seller, other than the VGX Token Smart Contracts.

**(p)** ~~(n)~~ "Cash and Cash Equivalents" means all of Seller's cash (including deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, or any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

**(q)** ~~(o)~~ "Code" means the United States Internal Revenue Code of 1986.

**(r)** ~~(p)~~ "Coin" means, with respect to any type of Cryptocurrency, one coin or token or full unit of such Cryptocurrency (*e.g.*, one (1) Bitcoin; provided that, notwithstanding anything to the contrary herein, for purposes of this Agreement, (i) references to "Coins" shall mean more than one Coin and may include fractional Coins in excess of one (1) Coin, and (ii) as the context requires, "Coin" may refer to a fraction of one (1) Coin.

**(s)** ~~(q)~~ "Commercial Covenants" means, collectively, Sections 6.6, 6.10, 6.11, 6.12, ~~6.13~~6.12(f), 6.14 and 6.15.

**(t)** ~~(r)~~ "Confidential Information" means any information relating to the business, financial or other affairs (including future plans and targets) of either Party or any of its Affiliates; provided, however, that "Confidential Information" will not include any information that (i) is or becomes (other than as a result of disclosure by either Party or any of its Affiliates in violation of this Agreement) generally available to, or known by, the public, (ii) is independently developed by a Party or any of its Affiliates without use of or reference to information that would be "Confidential Information" but for the exclusions set forth in this proviso or (iii) is received by a Party or any of its Affiliates from a third party not known by such receiving Party or any of its Affiliates after reasonable inquiry to be bound by a duty of confidentiality to such other Party or any of its Affiliates with respect to such information.

**(u)** ~~(s)~~ "Confidentiality Agreement" means that certain letter agreement, dated as of August 2, 2022, by and between Parent and BAM Management US Holdings, Inc.

**(v)** ~~(t)~~ "Confirmation Order" means an Order of the Bankruptcy Court reasonably acceptable to the Parties pursuant to section 1129 of the Bankruptcy Code, which Order shall, among other things and without limitation, (A) confirm the Plan in a form reasonably acceptable to, solely to the extent related to this Agreement and the Transactions (but

not with respect to the matters contemplated by <u>Section 6.11(c)</u>), Purchaser and Seller, as may have been amended, supplemented or otherwise modified, solely to the extent related to this Agreement and the Transactions (but not with respect to the matters contemplated by <u>Section 6.11(c)</u>), with the consent of Purchaser (such consent not to be unreasonably withheld, delayed or conditioned), (B) approve, pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Seller of its obligations under this Agreement, (C) authorize and empower Seller to assume and assign to Purchaser the Assigned Contracts, (D) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (E) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity (including under applicable Money Transmitter Requirements or any securities or commodities Laws of any Governmental Body), (F) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts, (G) find that Purchaser shall have no Liability for any Excluded Liability, and (H) find that Seller has title to, and the ability to sell, transfer and assign, Acquired Coins and Additional Bankruptcy Distributions, in each case, in accordance with the terms and conditions hereof.

**(w)** ~~(u)~~ "<u>Consent</u>" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

**(x)** ~~(v)~~ "<u>Contract</u>" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than a purchase order, service order, sales order or Money Transmitter License.

**(y)** ~~(w)~~ "<u>Credit Matter</u>" means any loan or other type of credit exposure or loan-like instrument.

**(z)** ~~(x)~~ "<u>Cryptocurrency</u>" means a digital or crypto currency, asset, token or coin in which transactions are verified and records are maintained by a decentralized system using cryptography, rather than by a centralized authority.

**(aa)** **"Delivery Date" means, with respect to any Delayed Acquired Coin, the date, if any, on which such Delayed Acquired Coin is delivered to Purchaser in accordance with (i) Section 2.4(b)(i), (ii) the last sentence of Section 6.12(a) or (iii) Section 6.12(b), as applicable.**

US-DOCS-~~137411268.27~~138346099.6

(bb) ~~(y)~~ "Deposited Coins" means, with respect to each User as of the Petition Date, the total number of Coins of each type owed to such User with respect to such User's ~~deposits~~**Coins deposited** on the Voyager Platform as of the Petition Date, as set forth on the Seller Statement.

(cc) ~~(z)~~ "Deposited Coins Value" means, with respect to any Deposited Coin of any type, the ~~VWAP~~**price** of such Coin ~~determined~~ as of **0:00 U.T.C. on** the Petition Date~~.~~**, as set forth under Section 4(m) of the "Global Notes and Overview of Methodology" included in the *Schedule of Assets and Liabilities of Voyager Digital, LLC (Case No. 22-10945)* [Docket No. 7] as filed in the Bankruptcy Court on the docket in the Bankruptcy Case.**

(dd) ~~(aa)~~ "Disclosure Statement" means the disclosure statement for the Plan approved by the Bankruptcy Court pursuant to the Plan Solicitation Order (including all exhibits and schedules thereto).

(ee) ~~(bb)~~ "Documents" means all of Seller's written files, documents, instruments, papers, books, reports, records, accounts, accounting records, financial statements, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(ff) ~~(cc)~~ "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, servitudes, restrictive covenants, rights of way, rights of use or possession, rights of first offer or first refusal, third party interest, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(gg) ~~(dd)~~ "Environmental Laws" means all applicable Laws concerning pollution or protection of the environment.

(hh) ~~(ee)~~ "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

(ii) ~~(ff)~~ "ERISA" means the Employee Retirement Income Security Act of 1974.

(jj) ~~(gg)~~ "ETH Coins" means Ether Coins, being the native Cryptocurrency of the Ethereum Network (symbol: ETH).

**(kk)** ~~(hh)~~ "Existing User" means as of a particular date any User for which Seller has provided on or prior to such date all data and information reasonably necessary for Purchaser to validate that such User or any Affiliate of such User has a Cryptocurrency account on the Binance.US Platform.

**(ll)** ~~(ii)~~ "Exchange Act" means the Exchange Act of 1934 and the rules and regulations promulgated thereunder.

**(mm)** ~~(jj)~~ "Final Order" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending; or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; underline{provided} that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

**(nn)** ~~(kk)~~ "Fraud" means an act committed by (a) Seller, in the making to Purchaser of the Express Seller Representations and (b) Purchaser, in the making to Seller of the Express Purchaser Representations, in any such case, with intent to (x) deceive the other Party or (y) induce such other party hereto to enter into this Agreement and requires (i) a false representation or warranty of material fact made in such representation; (ii) with knowledge that such representation or warranty is false; (iii) with an intention to induce the party to whom such representation or warranty is made to act or refrain from acting in reliance upon it; (iv) causing that party, in justifiable reliance upon such false representation or warranty, to take or refrain from taking action; and (v) causing such party to suffer damage by reason of such reliance, which together constitutes common law fraud under Delaware Law (and does not include any fraud claim based on constructive knowledge, negligent misrepresentation, recklessness or a similar theory).

**(oo)** ~~(ll)~~ "GDPR" means the EU General Data Protection Regulation (and any European Union member states' laws and regulations implementing it), and the EU General Data Protection Regulation as it forms part of the United Kingdom ("UK") law by virtue of section 3 of the European Union (Withdrawal) Act 2018 and any applicable implementing or supplementary legislation of the UK (including the UK Data Protection Act 2018).

**(pp)** ~~(mm)~~ "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization

US-DOCS\~~137411268.27~~138346099.6

issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(qq) (nn) "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, commission, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(rr) (oo) "Hazardous Substance" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

(ss) (pp) "Higher and Better Offer" means a bona fide, written Acquisition Proposal that did not result from Seller's breach of Section 5.1(a) for an Alternative Transaction on terms that the board of directors (or comparable governing body) of Seller determines in good faith, after consultation with its financial advisor and outside legal counsel, (i) constitutes a higher and otherwise better offer for the Debtors' assets and (ii) is reasonably likely to be consummated in accordance with its terms.

(tt) (qq) "IFRS" means the International Financial Reporting Standards.

(uu) (rr) "Intellectual Property" means all intellectual property rights in any jurisdiction throughout the world, including all: (i) patents and patent applications and patent disclosures (including any provisional applications, patents of addition, continuations, continuations-in-part, substitutions, additions, divisionals, confirmations, re-examinations, reissues, revisions and extensions); (ii) trademarks, service marks, trade dress, logos, brand names, corporate names, social media handles, Internet domain names and other indicia of origin, together with all goodwill associated with each of the foregoing; (iii) copyrights and mask works, whether or not registered; (iv) registrations and applications for any of the foregoing; (v) trade secrets; (vi) Software; (vii) drawings, schematics and other technical plans; (viii) rights in data, data collections and databases; (ix) all other intellectual property; and (x) all legal rights arising from items (i) through (ix), including the right to prosecute, enforce and perfect such interests and rights to sue, oppose, cancel, interfere, enjoin and collect damages based upon such interests.

(vv) (ss) "IT Systems" means all of the computer systems, servers, hardware, firmware, middleware, networks, workstations, routers, hubs, switches, circuits, servers, data communications lines and all other information technology equipment, and all associated documentation, in each case, only as necessary to use or operate the Voyager Platform.

(ww) (tt) "Knowledge of Seller" means the actual knowledge without independent verification (and which in no event encompasses constructive, imputed or similar concepts of knowledge) of Stephen Ehrlich, Gerard Hanashe, and Rakesh Gidwani, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

(xx) (uu) "Knowledge of Purchaser" means the actual knowledge without independent verification (and which in no event encompasses constructive, imputed or similar

US-DOCS\137411268.27138346099.6

concepts of knowledge) of Brian Shroder, Krishna Juvvadi and Abhishek Baid, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal liability or obligations regarding such knowledge.

(yy) ~~(vv)~~ "KYC Procedures" means the "know your customer" and "Customer Identification Program" policies, procedures and processes of Purchaser and its Affiliates as in effect from time to time and any equivalent procedures required under, or to comply with, applicable Law, in each case, including with respect to FCPA and any other applicable U.S. or foreign Law concerning anti-corruption, anti-bribery or anti-money laundering and consistent with the same applicable to other customers and users of Binance.US Platform.

(zz) ~~(ww)~~ "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(aaa) ~~(xx)~~ "Liability" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, perfected or unperfected, determined or determinable, disputed or undisputed, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, at law or in equity or otherwise, including any claims or liability based on successor liability theories or otherwise under any theory of Law or equity, and including all costs and expenses related thereto.

(bbb) ~~(yy)~~ "Loan" means any loan made by Seller in the form of Cryptocurrency to counterparties in the cryptocurrency sector; provided that the 3AC Loan shall not be deemed a Loan.

(ccc) ~~(zz)~~ "Loan Documents" means all agreements and documents relating to Loans and the 3AC Loan, including security agreements, pledge or collateral agreements, loan agreements, loan policies and manuals.

(ddd) ~~(aaa)~~ "Material Adverse Effect" means any matter, event, change, development, occurrence, circumstance, condition, occurrence or effect (each, an "Effect") that, individually or in the aggregate with all other Effects, (x) has had or would reasonably be expected to have a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole or (y) has had or would reasonably be expected to have a material adverse effect on the ability of Seller to perform its obligations under this Agreement or any of the Seller Documents or to consummate the Transactions; provided that with respect to clause (x) none of the following shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) Effects in, arising from or relating to general business or

US-DOCS\~~137411268.27~~138346099.6

economic conditions affecting the industry in which Seller and its Affiliates operate; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from or relating to financial, banking, securities or Cryptocurrency markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, Cryptocurrency or index and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (v) Effects in, arising from or relating to changes in, IFRS or the interpretation thereof; (vi) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body; (vii) Effects in, arising from or relating to (A) the taking of any action contemplated by this Agreement or at the written request of Purchaser or its Affiliates, (B) the failure to take any action if such action is expressly prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1, (D) the negotiation, announcement or pendency of this Agreement or the Transactions, the identity, nature or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (viii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect); (ix) the Effect of any action taken by Purchaser or its Affiliates with respect to the Transactions or any breach by Purchaser of this Agreement or the matters set forth on Schedule ~~11.1(aaa)~~11.1(aaa); or (x)(A) the commencement or pendency of the Bankruptcy Case, (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions or thereby, (2) the Agreement Order, the Confirmation Order, the Plan, or the reorganization of Seller, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Assigned Contract, or (C) any Order of the Bankruptcy Court or any actions or omissions of Seller in compliance therewith; except in the case of clauses (i), (ii), (iii), (iv), (v) and (vi), to the extent such Effects have a materially disproportionate impact on the Acquired Assets and Assumed Liabilities, taken as a whole, as compared to other participants engaged in the business in which Seller operates.

**(eee)**    ~~(bbb)~~ "Moelis" means Moelis & Company LLC, a Delaware limited liability company.

**(fff)** ~~(ccc)~~ "Money Transmitter License" means any consent, license, certificate, franchise, permission, variance, clearance, registration, qualification, authorization, waiver, exemption or other permit issued, granted, given or otherwise made available by or under the authority of any Governmental Body pursuant to state money transmission or similar Laws.

**(ggg)** ~~(ddd)~~ "Money Transmitter Requirements" shall mean any and all Law or Contract with a Governmental Body relating or pertaining to the business of transmitting or remitting money, monetary value or virtual currency, electronic funds transfers, remittances, issuing or selling stored value, prepaid access or the like, issuing or selling payment instruments, the custody, transfer or exchange of money, monetary value or virtual currency, or any similar payment or money services, including those related to money, monetary value, or Cryptocurrency.

**(hhh)** ~~(ccc)~~ "Net Owed Coins" means, with respect to each User and each type of such User's Post-Rebalancing Coins, a number of Coins of such type equal to the total number of such User's Post-Rebalancing Coins of such type. For the avoidance of doubt, except as the context may otherwise require, references to Net Owed Coins in this Agreement relating to payments to any User or credits thereof to any User shall be deemed to be the sum of all Net Owed Coins with respect to each type of Post-Rebalancing Coin of such User. Notwithstanding the foregoing, in the event that there is a Rebalancing Exercise Delta for any type of Coin, then (i) Purchaser shall convert any excess Acquired Coins of any type into USDC or United States Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform, and (ii) Purchaser shall distribute the amounts resulting from such conversions to User accounts with respect to Net Owed Coins where the aggregate number of Net Owed Coins exceeds the number of Acquired Coins, pro rata based on the then-prevailing prices (including applicable fees, spreads, costs and expenses) for all such Net Owed Coins on the Binance.US Platform owed to any such User.

**(iii)** ~~(fff)~~ "Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, whether preliminary, interim, temporary or final, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Confirmation Order) or any other court.

**(jjj)** ~~(ggg)~~ "Ordinary Course" means the ordinary and usual course of operations of the business of Seller consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Case.

**(kkk)** ~~(hhh)~~ "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) customary easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the use, ownership or operation of the Acquired Assets, (iii) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, being contested in good faith, (iv) licenses granted on a non-exclusive basis, (v) such other Encumbrances or title

exceptions which do not, individually or in the aggregate, materially affect the operation, value or condition of the Acquired Assets, (vi) any Encumbrances set forth on Schedule ~~11.1(hhh)~~11.1(hhh), or (viii) any Encumbrances that will be removed or released by operation of the Confirmation Order or the Plan.

(lll)   ~~(iii)~~ "Permitted Post-Closing Lien" means, with respect to the Acquired Assets (a) Encumbrances described in clause (ii) in the definition of "Permitted Encumbrances" and any non-monetary encumbrances not in fact released upon Closing pursuant to Confirmation Order or Plan, as applicable; provided that with respect to all Encumbrances that are "Permitted Post-Closing Liens" pursuant to this clause (a), such Encumbrances do not materially detract from the use or value of the applicable property as it is currently being used, and (b) other Permitted Encumbrances described in clauses (i), (iii), (iv) and (v) in the definition of "Permitted Encumbrances" securing monetary obligations which, individually or in the aggregate with all other Permitted Encumbrances treated as Permitted Post-Closing Liens pursuant to this clause (b), do not exceed $10,000.

(mmm)   ~~(jjj)~~ "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(nnn)   ~~(kkk)~~ "Personal Information" means information, in any form, that identifies, relates to, describes, could be used to locate or contact, is capable of being associated with, or could be linked, directly or indirectly, to, a natural Person, device or household, or is otherwise considered "personally identifiable information," "personal information," "personal data," "nonpublic personal information," or any similar term by any applicable Laws or Privacy Law.

(ooo)   ~~(lll)~~ "Plan" means a plan of reorganization prepared by Seller and solely to the extent related to this Agreement (but not with respect to the matters contemplated by Section 6.11(c)) and the Transactions, approved by Purchaser in its reasonable discretion, and attached as an Exhibit to this Agreement by amendment hereto as promptly as practicable, implementing the Transactions.

(ppp)   ~~(mmm)~~ "Plan Solicitation Motion" means Seller's motion for an Order (which solely with respect to matters relating to this Agreement and the Transactions, shall be in form and substance reasonably acceptable to Purchaser), (i) approving the Disclosure Statement (including approving the Disclosure Statement as containing "adequate information" (as that term is used by section 1125 of the Bankruptcy Code)), (ii) establishing a voting record date for the Plan, (iii) approving solicitation packages and procedures for the distribution thereof, (iv) approving the forms of ballots, (v) establishing procedures for voting on the Plan, (vi) establishing notice and objection procedures for the confirmation of the Plan and (vii) establishing procedures for the assumption or assignment of executory contracts and unexpired leases under the Plan.

(qqq)   ~~(nnn)~~ "Plan Solicitation Order" means an Order entered by the Bankruptcy Court, substantially in the form attached to the Plan Solicitation Motion, which Order shall, among other things, (A) be in form and substance reasonably acceptable to

Purchaser (solely with respect to matters relating to this Agreement and the Transaction), and (B) approve the relief sought in the Plan Solicitation Motion, including approving of (i) the Disclosure Statement on a conditional basis and (ii) the procedures for solicitation of votes to accept or reject the Plan.

(rrr) (ooo) "Plan Supplement" has the meaning set forth in the Plan.

(sss) (ppp) "Post-Petition Coins" means Coins that were deposited with the Debtors following the Petition Date.

(ttt) (qqq) "Post-Rebalancing Coins" means, with respect to each User as of the Rebalancing Date and each type of such User's Deposited Coins, (i) the total a number of such User's Deposited Coins of such type, multiplied by (ii) such that the Acquired Coins Value of such Coins divided by the Deposited Coins Value of such Coins is equal to the Rebalancing Ratio, as set forth on the Seller Statement.

(uuu) (rrr) "Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

(vvv) (sss) "Privacy Laws" means all applicable Laws and legally binding self-regulatory guidelines or standards, in each case as amended, consolidated, re-enacted or replaced from time to time, relating to the privacy, security, or Processing of Personal Information, data breach notification, website and mobile application privacy policies and practices, Processing and security of payment card information, and email, text message, or telephone communications, including (to the extent applicable to the business of Seller): the Federal Trade Commission Act; the Gramm-Leach-Bliley Act; the Telephone Consumer Protection Act; the Telemarketing and Consumer Fraud and Abuse Prevention Act; the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003; the California Consumer Privacy Act; the Computer Fraud and Abuse Act; the Payment Card Industry Data Security Standards; the GDPR; and the EU e-Privacy Directive 2002/58/EC as amended by Directive 2009/136/EC (and any European Union member states' laws and regulations implementing it).

(www) (ttt) "Process", "Processed" or "Processing" means any operation or set of operations which is performed on Personal Information, such as the use, collection, processing, storage, recording, organization, adaption, alteration, transfer, retrieval, consultation, disclosure, dissemination or combination of such Personal Information, or is otherwise considering "processing" by any applicable Privacy Laws.

(xxx) (uuu) "Purchaser Development" means any of the following, first occurring after the date hereof and prior to the Closing: (i) the filing of a criminal complaint against, or indictment of, Purchaser or any of its executive officers or "C-suite" officers (including any chief risk officer or chief compliance officer) by the United States Department of Justice, (ii) the filing of a criminal complaint against, or indictment of, any of Purchaser's Affiliates or any of their executive officers or "C-suite" officers (including any chief risk officer or chief compliance officer) by the United States Department of Justice or (iii) the commencement of any criminal or regulatory (including at the appellate level) suit, litigation,

88

legal proceeding or prosecution by the United States Department of Justice against any of the Persons described in clauses (i) and (ii), (A) in each case of clauses (i), (ii) and (iii) that relate to the operation of the Binance.US platform and wallet custody business of Purchaser and its Subsidiaries or the business of such Affiliate or the ability of such Affiliate to provide Purchaser and its Subsidiaries with the licensed software and support services necessary to operate the Binance.US Platform; and (B) in each case of clauses (ii) and (iii), that, individually or in the aggregate, would reasonably be expected to (1) prevent or materially impair or materially delay the ability of Purchaser to consummate the Transactions in accordance herewith or (2) materially and adversely affect the Users, Eligible Creditors or the Acquired Coins, in each case in a manner that would prevent Purchaser from performing its obligations under <u>Section 6.12</u> or otherwise following the Closing.

(yyy)    (vvv) "Purchaser Group" means Purchaser, any former, current or future Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(zzz)    (www) "Rebalancing Exercise Delta" means, with respect to any Acquired Coin, the percentage by which the number of Acquired Coins is higher or lower than the number of Acquired Coins which would be required to cause the number of Acquired Coins to be in full compliance with the Rebalancing Ratio.

(aaaa)    (xxx) "Rebalancing Ratio" means, with respect to any type of Acquired Coin, a fraction, expressed as a percentage, (i) the numerator of which is the Total Acquired Coins Value, and (ii) the denominator of which is the Total Deposited Coins Value; <u>provided</u> that in no event will the Rebalancing Ratio be greater than 100% and for the avoidance of doubt, the Rebalancing Ratio shall be calculated following the completion of the Rebalancing Exercise and after taking into account gas or other transaction fees incurred and paid by Seller in connection with transferring Coins to Purchaser in accordance with <u>Section 2.4(b)</u>.

(bbbb)(yyy) "Retained Avoidance Action" means any preference or avoidance claim, right or cause of action under Chapter 5 of the Bankruptcy Code or any analogous state law claim against (i) Three Arrows Capital, Ltd. or any of its Affiliates, (ii) any insider as defined in the Bankruptcy Code, (iii) any other such claim, right or cause of action that Purchaser agrees in writing prior to the Closing may be retained by the Debtors, (iv) any person for an actual fraudulent transfer, and (v) West Realm Shires Inc., Alameda Ventures Ltd., or any of their Affiliates.

(cccc)    (zzz) "Sanctioned Person" means any Person that is the target of Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the OFAC or the U.S. Department of State, the United Nations Security Council, the European Union, any Member State of the European Union, or the United Kingdom (irrespective of its status vis-à-vis the European Union); (b) any Person operating, organized, or resident in a country or territory that is itself the target of comprehensive Sanctions (as of the date of this Agreement, Cuba, Iran, North Korea, Syria, the Crimea region of Ukraine, the so-called Donetsk People's Republic, and the so-called Luhansk People's Republic) ("<u>Sanctioned Country</u>"); (c) the government of a Sanctioned Country or the Government of

Venezuela; or (d) any Person 50% or more owned or controlled by any such Person or Persons or acting for or on behalf of such Person or Persons.

**(dddd)** ~~(aaaa)~~ "Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

**(eeee)** ~~(bbbb)~~ "Security Incident" means any actual or suspected unauthorized access to, or acquisition, modification, use, destruction, loss or disclosure of any Personal Information maintained by or on behalf of Seller or its Affiliates.

**(ffff)** ~~(cccc)~~ "Seller Expense Cap" means an amount equal to either (a) if Purchaser elects to extend the Outside Date to the Extended Outside Date pursuant to Section 8.1(c), $15,000,000 or (b) if Purchaser does not so elect to extend the Outside Date, $10,000,000.

**(gggg)** ~~(dddd)~~ "Seller Expense Start Date" means the date that is three months following the date of this Agreement.

**(hhhh)** ~~(eeee)~~ "Seller Held Coins" means, without duplication, as of any date of determination, all Coins that are directly or indirectly owned or held by, or attributable to, Seller or any of its Affiliates who are Debtors (including, for the avoidance of doubt, all Coins repaid to Seller or any of its Affiliates who are Debtors at or prior to the Closing in respect of Loans (including in respect of any principal, interest, fees, expenses and penalties thereunder and including for this purpose, the 3AC Loan), including all Coins held by or on behalf of Seller or any of its Affiliates who are Debtors in respect of User accounts on the Voyager Platform), except for any Coins constituting collateral under the 3AC Loan and except any Post-Petition Coins, which for the avoidance of doubt, shall not be included in the Rebalancing Exercise or any other Transactions.

**(iiii)** ~~(ffff)~~ "Seller Intellectual Property" means all Intellectual Property owned or purported to be owned by Seller that is an Acquired Asset.

**(jjjj)** ~~(gggg)~~ "Seller Parties" means Seller, its former, current, or future Affiliates and the former, current or future officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns of the foregoing.

**(kkkk)** ~~(hhhh)~~ "Seller Plan" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Seller or Holdings or to which Seller

or Holdings is obligated to contribute or with respect to which Seller or Holdings has any Liability.

**(llll)** (iiii) "Software" means any and all computer programs and other software in any form or format, including firmware, middleware, software implementations of algorithms, models and methodologies, whether in source code, object code or other form, including libraries, frameworks, software development kits (SDKs), application programming interfaces (APIs), subroutines, toolsets, procedures, and other components thereof.

**(mmmm)** (jjjj) "Straddle Period" means any taxable period that includes but does not end on the Closing Date.

**(nnnn)** (kkkk) "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

**(oooo)** (llll) "Subject Transaction" means (a) a transaction or series of transactions with respect to the Rebalancing Exercise that involves a series of transactions or other actions that are (or are to be) executed with a Person or group of coordinated Persons that are intended to effectuate the Rebalancing Exercise or (b) the planning or negotiation of such transaction or series of transactions, or consulting with respect thereto and, for the avoidance of doubt, does not include individual trades of Coins by Seller that are not intended to effectuate the Rebalancing Exercise or that are components of Subject Transactions that are the subject of a Transaction Notice or any such transactions with respect to Coins that do not trade on the Binance.US Platform as of the date of the proposed Subject Transaction.

**(pppp)** (mmmm) "Tax" or "Taxes" means any federal, state, local, foreign or other taxes, charges, fees or other assessments, including income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, escheat and unclaimed property, ad valorem, personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative or add-on minimum or estimated tax, charge or assessment of any kind in the nature of (or similar to) taxes, including any interest, penalty or addition thereto, whether disputed or not.

**(qqqq)** (nnnn) "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes filed or required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

**(rrrr)** (oooo) "Total Acquired Coins Value" means the aggregate Acquired Coins Value with respect to all Acquired Coins of each type (excluding Withheld Coins).

(ssss) ~~(pppp)~~ "Total Deposited Coins Value" means the aggregate Deposited Coins Value with respect to all Deposited Coins of each type.

(tttt) ~~(qqqq)~~ "Transactions" means the transactions contemplated by this Agreement or the Plan, as applicable.

(uuuu) ~~(rrrr)~~ "Unsupported Coin" means any Coin, for which Purchaser or its Affiliates does not provide trading services on the Binance.US Platform.

(vvvv) ~~(ssss)~~ "User" means any Person located and having a home address in the United States that had a Cryptocurrency account on the Voyager Platform as of the Petition Date; *provided* that, if a Person has multiple Cryptocurrency accounts on the Voyager Platform, such Person shall constitute a single User and all accounts of such User shall be aggregated for purposes of this Agreement.

~~(tttt) "User Migration Preparation" means, collectively, (i) the completion of the transfer of all Acquired User Data (including, for the avoidance of doubt, any "know your customer" information of the Users) and integration thereof on Purchaser's and its Affiliates' information technology systems and the Binance.US Platform, and (ii) the completion of the other items identified in the Integration Plan as being required for accounts to be opened for Users on the Binance.US Platform.~~

~~(uuuu) "User Asset Migration Date" means the date that is four (4) weeks following the date of completion of the User Migration Preparation; provided that the completion of the User Migration Preparation shall not occur prior to the Closing Date.~~

(wwww) ~~(vvvv)~~ "VGX Token Smart Contracts" means any "smart contracts" related to the VGX token, together with any private keys related solely to such "smart contracts."

(xxxx) ~~(wwww)~~ "Voyager Platform" means Seller's proprietary Cryptocurrency savings and trading platform (including any website or desktop or mobile application with respect thereto).

(yyyy) ~~(xxxx)~~ "VWAP" means, with respect to any type of Coin and as of any date of determination, an amount equal to the volume weighted average price in U.S. dollars for such type of Coin for the consecutive 24-hour period immediately prior to 8:00 a.m. New York Time on such date of determination, as reported on https://coinmarketcap.com.

11.2    Index of Defined Terms.

Acquired Assets .......................................... 1
Acquired Information .................................. 2
Acquired User Data .................................... 2
Acquired Voyager Claims ........................... 2
Acquisition Proposal ............................. ~~26~~27
Agreement ................................................. 1
Agreement Order ................................... ~~25~~26

Amended Disclosure Statement ........... ~~27~~28
Anti-Money Laundering Laws ............... ~~17~~18
Assigned Contracts ..................................... 3
Assignment and Assumption
    Agreement ........................................... 10
Assumed Liabilities .................................... 5
Authentication Credentials ...................... 14

92

Balance Sheet Date.....................13
Bankruptcy Case..........................1
Bankruptcy Code..........................1
Bankruptcy Court.........................1
Cash Payment...............................8
Chosen Courts........................68 70
Closing...................................9 10
Closing Date................................10
Closing Date Payment.............8 9

**Covered Matters**..........................2 9

Credited Additional Bankruptcy
   Distributions.......................49 50
CSA........................................11 12
Cure Costs..................................5
Dataroom............................21 22
Debtors......................................1
**Delayed Acquired Coins**.........10
Deposit......................................9
**Distribution Agent Termination
   Event**................................51
**Distribution Agent Termination
   Notice**..............................51
DPA.........................................18
Eligible Creditor...................42 43
Enforceability Exceptions....12 13
Environmental Permits..........18 19
Escrow Account..........................9
Escrow Agent.............................9
Excluded Assets.........................3
Excluded Contracts.....................3
Excluded Documents...................3
Excluded Liabilities....................6
Express Purchaser Representations....24 25
Express Seller Representations....21 22
Extended Outside Date............57 59
FCPA........................................17
Filed CSA Documents.............11 12
Financial Statements..................13
Fundamental Representations....56 58
Higher Offer Determination Notice....27
Holdings....................................1
Indebtedness.........................30 31
Information Presentation.......21 22
Integration Plan....................41 42
Leased Real Property................15

Liquidation...........................54 56
Material Contract......................15
OFAC...................................17 18
Outside Date.........................57 59
Parent.......................................1
Parties.......................................1
Party.........................................1

**Paul Hastings**.........................2 9

Petition Date..............................1
Petitions....................................1
Post-Bankruptcy Statement....49 50
Pre-Closing Data Transfer......38 39
Press Release.........................69 72
Privacy Requirements...........19 20
Projections.............................51 54
Purchase Price............................8
Purchaser...................................1
Purchaser Bid Process...........55 57
Purchaser Default Termination....9
Purchaser Expenses..............54 57
Rebalancing Date...................43 44
Rebalancing Exercise............43 44
Relevant Tax Return..............62 65
Reverse Termination Fee.......60 62
Sanctions..............................17 18
Seller.........................................1
Seller Contractors......................34
Seller Documents.......................12
Seller Employees.......................34
Seller Expenses.....................53 56
Seller Income Tax Return.......62 64
Seller Marks..........................39 40
Seller Registered IP...............18 19
Seller Statement.....................44 45
Solvent.................................24 25
Staked Coins.........................14 15
Successor Liabilities.............29 30
Trademark and Domain Name
   Assignment Agreement......10 11
Transaction Notice................43 44
Transaction Offer Notice.......43 44
Transaction-Related Action...62 64
Transfer Taxes......................61 64
Unsupported Jurisdiction.......45 47
Unsupported Jurisdiction Approvals....22 23

93

Voyager User Accounts................................2        WARN Act................................35
                                                          Withheld Coins................................9

11.3   <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)   Accounting terms which are used but not otherwise defined in this Agreement have the respective meanings given to them under IFRS as in effect on the date hereof or for the period with respect to which such principles are applied, consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under IFRS, the definition set forth in this Agreement will control.

(b)   The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)   Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)   The words "to the extent" shall mean "the degree by which" and not "if."

(e)   When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)   Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)   The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)   All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

US-DOCS\137411268.27138346099.6

       (i)     All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

       (j)     Any document or item will be deemed "delivered," "provided" or "made available" by Seller, within the meaning of this Agreement, if such document or item is included in the Dataroom at least one (1) Business Day prior to the date hereof.

       (k)     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

       (l)     Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; <u>provided</u> that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

       (m)     A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns. **References to Seller after the Plan Effective Date (as defined in the Plan) shall be deemed to include the Wind-Down Trust (as defined in the Plan) and the Wind-Down Debtor (as defined in the Plan) in respect of Seller.**

<p align="center">(<em>Signature pages follow.</em>)</p>

<p align="center">95</p>

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**BAM TRADING SERVICES INC. D/B/A BINANCE.US**

By: _____

Name:

Title:

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**VOYAGER DIGITAL, LLC**


By: _____

Name:

Title:

<u>EXHIBIT A</u>

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

(See attached.)

A

**EXHIBIT B**

**FORM OF TRADEMARK AND DOMAIN NAME ASSIGNMENT AGREEMENT**

(See attached.)

**Exhibit B**

**Redline**

**THE DEBTORS ARE NOT CURRENTLY SOLICITING VOTES ON A CHAPTER 11 PLAN. THIS DISCLOSURE STATEMENT REMAINS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT.**
**THE DEBTORS WILL SEEK APPROVAL OF THE DISCLOSURE STATEMENT AT A HEARING ON JANUARY 10, 2023, OR SUCH OTHER DATE AS DETERMINED BY THE BANKRUPTCY COURT.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SECOND AMENDED DISCLOSURE STATEMENT RELATING TO**
**THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND**

**ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

---

[1]   The debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital, Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

# TABLE OF CONTENTS

**Page**

IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT .................. 1

I.  INTRODUCTION ............................................................................................................. 7

II.  PRELIMINARY STATEMENT ..................................................................................... 7
   A.  The Sale Transaction. ......................................................................................... 7
   B.  The FTX Collapse. .............................................................................................. 9

III.  BACKGROUND ............................................................................................................. 10

IV.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN .......................................................................................................... 12
   A.  What is chapter 11? ........................................................................................... 12
   B.  Why are the Debtors sending me this Disclosure Statement? ........................... 12
   C.  Am I entitled to vote on the Plan? ..................................................................... 12
   D.  What will I receive from the Debtors if the Plan is consummated? ................... 13
   E.  What will I receive from the Debtors if I hold an Allowed Administrative Claim? ... 19
   F.  What is the "toggle" feature of the Plan? ......................................................... 20
   G.  How will my Account be transitioned to Binance.US? ..................................... 20
   H.  What if I am unable or unwilling to transition my Account to Binance.US? ..... 20
   I.  What are the sources of Consideration and other consideration required to fund the Plan? ... 20
   J.  Are any regulatory approvals required to consummate the Sale Transaction and confirm the Plan? ................................................................................................... 21
   K.  How will I receive my recovery as an Account Holder if the Sale Transaction is not consummated? ............................................................................................ 22
   L.  What happens to my recovery if the Plan is not confirmed or does not go effective? ... 22
   M.  If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"? ........................................................................... 22
   N.  Is there potential litigation related to the Plan? ................................................ 22
   O.  Does the Plan provide for the subordination of any Claims? ............................ 22
   P.  Will there be releases and exculpation granted to parties in interest as part of the Plan? ... 23
   Q.  What is the deadline to vote on the Plan? ......................................................... 24
   R.  How do I vote for or against the Plan? .............................................................. 25
   S.  Why is the Bankruptcy Court holding a Confirmation Hearing? ...................... 25
   T.  When is the Confirmation Hearing set to occur? .............................................. 25
   U.  What is the purpose of the Confirmation Hearing? ........................................... 25
   V.  What is the effect of the Plan on the Debtors' ongoing business? .................... 25
   W.  What steps did the Debtors take to evaluate alternatives to a chapter 11 filing? ... 25
   X.  Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ........................................................................................ 26

V.  THE DEBTORS' PLAN .................................................................................................. 26
   A.  The Plan. ............................................................................................................ 26
   B.  The Plan Toggle. ............................................................................................... 33
   C.  Means for Implementation of the Plan. ............................................................. 37

VI.  THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE ............ 40
   A.  The Debtors' Corporate Structure and History. ................................................ 40
   B.  The Debtors' Assets and Operations. ................................................................ 41
   C.  The Debtors' Capital Structure. ........................................................................ 44

VII.     **EVENTS LEADING TO THESE CHAPTER 11 CASES** ................................................47

    A.     Market and Industry-Specific Challenges. ...........................................................47
    B.     The Alameda Loan. .............................................................................................55
    C.     Retention of Restructuring Advisors and Initial Third-Party Outreach. ..............56
    D.     Governance Initiatives. ........................................................................................56
    E.     Voyager's Decision to Commence these Chapter 11 Cases. ...............................56

VIII.    **EVENTS OF THE CHAPTER 11 CASES** .................................................................57

    A.     The Stand-Alone Plan. .........................................................................................57
    B.     First and Second Day Relief and Other Case Matters. .......................................57
    C.     Appointment of Unsecured Creditors' Committee. .............................................59
    D.     Schedules and Statements. ...................................................................................59
    E.     Bar Date Motion. .................................................................................................59
    F.     The FBO Motion. .................................................................................................60
    G.     The 3AC Liquidation Proceeding. .......................................................................61
    H.     Litigation Matters. ...............................................................................................61
    I.     The Coinify Sale. .................................................................................................64
    J.     The Key Employee Retention Plan. ....................................................................64
    K.     Canadian Recognition Proceeding. ......................................................................64
    L.     The Unwind Motion. ............................................................................................65
    M.     The Request for Appointment of an Equity Committee. ......................................65
    N.     The Post-Petition Sale Process and the Collapse of FTX. ...................................65
    O.     The Special Committee Investigation. .................................................................68

IX.     **RISK FACTORS** .........................................................................................................69

    A.     Risks Related to the Restructuring. .....................................................................69
    B.     Risks Related to Recoveries under the Plan. .......................................................72
    C.     Disclosure Statement Disclaimer. .......................................................................73
    D.     Miscellaneous Risk Factors and Disclaimers. ....................................................74

X.     **SOLICITATION AND VOTING PROCEDURES** .....................................................80

    A.     Classes Entitled to Vote on the Plan. ..................................................................80
    B.     Votes Required for Acceptance by a Class. ........................................................80
    C.     Certain Factors to Be Considered Prior to Voting. .............................................80
    D.     Classes Not Entitled To Vote on the Plan. ..........................................................81
    E.     Solicitation Procedures. .......................................................................................81
    F.     Voting Procedures. ..............................................................................................82
    G.     Voting Tabulation. ..............................................................................................83
    H.     Ballots Not Counted. ...........................................................................................84

XI.     **CONFIRMATION OF THE PLAN** ...........................................................................84

    A.     Requirements of Section 1129(a) of the Bankruptcy Code. ................................84
    B.     Best Interests of Creditors—Liquidation Analysis. ............................................85
    C.     Feasibility. ............................................................................................................86
    D.     Acceptance by Impaired Classes. ........................................................................86
    E.     Confirmation without Acceptance by All Impaired Classes. ...............................87

XII.     **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
     PLAN** ...........................................................................................................................88

    A.     Introduction. .........................................................................................................88
    B.     Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors. ......89
    C.     Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed
     Claims Entitled to Vote. .......................................................................................90

**XIII.    RECOMMENDATION OF THE DEBTORS**........................................................................................97

**EXHIBITS**

EXHIBIT A  Plan

EXHIBIT B  Liquidation Analysis

EXHIBIT C  Frequently Asked Questions & Answers

EXHIBIT D  The Asset Purchase Agreement

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT**
DISCLOSURE STATEMENT, DATED JANUARY 1~~0~~3, 2023

**SOLICITATION OF VOTES TO ACCEPT OR REJECT THE THIRD AMENDED
JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND
ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE AS
OF THE VOTING RECORD DATE, YOU HELD A CLAIM AGAINST THE DEBTORS IN ONE OF THE
FOLLOWING CLASSES AND THEREFORE YOU ARE ENTITLED TO VOTE ON THE PLAN:**

| VOTING CLASSES | NAME OF CLASS UNDER THE PLAN |
|---|---|
| 3 | Account Holder Claims |
| 4A | OpCo General Unsecured Claims |
| 4B | HoldCo General Unsecured Claims |
| 4C | TopCo General Unsecured Claims |

| DELIVERY OF BALLOTS |
|---|
| 1. Ballots must be actually received by Stretto, Inc. ("Stretto" or the "Claims, Noticing, and Solicitation Agent") before the Voting Deadline (4:00 p.m., prevailing Eastern Time, on February 22, 2023). |
| 2. Ballots may be returned by the following methods: |
| a) For Holders of Account Holder Claims: via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://cases.stretto.com/Voyager/balloting. |
| b) For Holders of General Unsecured Claims: (i) via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://cases.stretto.com/Voyager/balloting; (ii) in the enclosed pre-paid, pre-addressed return envelope; or (iii) via first class mail, overnight courier, or hand delivery to the address set forth below: |
| <div align="center">Voyager Ballot Processing<br>c/o Stretto<br>410 Exchange, Suite 100<br>Irvine, CA 92602</div> |
| If you have any questions on the procedures for voting on the Plan, as defined herein, please contact the Claims, Noticing, and Solicitation Agent by emailing voyagerinquiries@stretto.com and referencing "In re Voyager – Solicitation Inquiry" in the subject line, or by calling (855) 473-8665 (Toll-Free) or (949) 271-6507 (International). |

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN. IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY

2

SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, THOSE HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN, OR THOSE HOLDERS OF CLAIMS AND INTERESTS WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE IX, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

3

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS DISCLOSURE STATEMENT, NOTHING IN THIS DISCLOSURE STATEMENT CONSTITUTES A FINDING UNDER U.S. FEDERAL SECURITIES LAWS, FOREIGN SECURITIES LAWS OR ANY STATE SECURITIES LAWS AS TO WHETHER CRYPTOCURRENCY, INCLUDING THE VOYAGER TOKENS, OR TRANSACTIONS INVOLVING CRYPTOCURRENCY ARE SECURITIES. THE SEC AND ITS STAFF HAVE TAKEN THE POSITION THAT CERTAIN CRYPTOCURRENCY ASSETS AND CERTAIN TRANSACTIONS INVOLVING CRYPTOCURRENCY ASSETS FALL WITHIN THE DEFINITION OF A "SECURITY" UNDER THE U.S. FEDERAL SECURITIES LAWS. THE DETERMINATION AS TO WHETHER A CRYPTOCURRENCY ASSET OR A TRANSACTION INVOLVING CRYPTOCURRENCY MAY CONSTITUTE A "SECURITY" UNDER APPLICABLE LAWS IS A DETERMINATION FOR THE SEC, APPLICABLE STATE AND FOREIGN REGULATORY AUTHORITIES, AND COURTS WITH PROPER JURISDICTION.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING RISKS ASSOCIATED WITH THE FOLLOWING:

- THE OVERALL HEALTH OF THE CRYPTOCURRENCY INDUSTRY;

- POPULARITY AND RATE OF ADOPTION OF CRYPTOCURRENCIES;

- THE DEBTORS' REGULATORY LICENSES;

- THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS;

- THE DEBTORS' TECHNOLOGY AND ABILITY TO ADAPT TO RAPID TECHNOLOGICAL CHANGE;

- THE RELIABILITY, STABILITY, PERFORMANCE AND SCALABILITY OF THE DEBTORS' INFRASTRUCTURE AND TECHNOLOGY;

- THE DEBTORS' FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;

- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

4

- **EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;**

- **COUNTERPARTY CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**

- **EXCHANGE RATE FLUCTUATIONS AND CRYPTOCURRENCY PRICE FLUCTUATIONS;**

- **PLANS, OBJECTIVES, AND EXPECTATIONS;**

- **RISKS IN CONNECTION WITH DISPOSITIONS; AND**

- **RISK OF INFORMATION TECHNOLOGY OR DATA SECURITY BREACHES OR OTHER CYBERATTACKS.**

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' AND THE WIND-DOWN DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' AND THE WIND-DOWN DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN OTHER THAN AS REQUIRED BY APPLICABLE LAW. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:

- **THE RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO PURSUE THEIR BUSINESS STRATEGIES DURING THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO MAINTAIN COMPLIANCE WITH LAWS AND REGULATIONS OR THE INTERPRETATION OR APPLICATION OF SUCH LAWS THAT CURRENTLY APPLY OR MAY BECOME APPLICABLE TO THE DEBTORS' BUSINESS BOTH IN THE UNITED STATES AND INTERNATIONALLY;**

- **CHANGES TO A PARTICULAR CRYPTOCURRENCY ASSET'S OR PRODUCT OFFERING'S STATUS AS A "SECURITY" IN ANY RELEVANT JURISDICTION UNDER RELEVANT LAWS AND REGULATIONS OR REGULATORY INTERPRETATION THEREOF;**

- **LOSS OF CRITICAL BANKING OR INSURANCE RELATIONSHIPS;**

- **THE DIVERSION OF MANAGEMENT'S ATTENTION AS A RESULT OF THE CHAPTER 11 CASES;**

- **INCREASED LEVELS OF EMPLOYEE ATTRITION AS A RESULT OF THE CHAPTER 11 CASES;**

- **CUSTOMER RESPONSES TO THE CHAPTER 11 CASES;**

- **THE IMPACT OF A PROTRACTED RESTRUCTURING ON THE DEBTORS' BUSINESS;**

5

- **THE DEBTORS' ABILITY TO CONFIRM OR CONSUMMATE THE PLAN;**

- **THE DEBTORS' INABILITY TO PREDICT THEIR LONG-TERM LIQUIDITY REQUIREMENTS AND THE ADEQUACY OF THEIR CAPITAL RESOURCES;**

- **THE AVAILABILITY OF CASH TO MAINTAIN THE DEBTORS' OPERATIONS AND FUND EMERGENCE COSTS;**

- **RISKS ASSOCIATED WITH WEAK OR UNCERTAIN GLOBAL ECONOMIC CONDITIONS AND THEIR IMPACT ON DEMAND FOR DIGITAL ASSETS;**

- **OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS;**

- **INDUSTRY CONDITIONS, INCLUDING COMPETITION AND TECHNOLOGICAL INNOVATION;**

- **FLUCTUATIONS IN OPERATING COSTS;**

- **SHIFTS IN POPULATION AND OTHER DEMOGRAPHICS;**

- **LEGISLATIVE OR REGULATORY REQUIREMENTS; AND**

- **FLUCTUATIONS IN INTEREST RATES, EXCHANGE RATES, AND CURRENCY VALUES.**

**YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS AND OTHER PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

*[Remainder of page intentionally left blank]*

6

## I.       INTRODUCTION

Voyager Digital Holdings, Inc. (along with its debtor affiliates, the "Debtors," the "Company," or "Voyager") and its debtor affiliates submit this disclosure statement (including all exhibits hereto and as may be supplemented or amended from time to time, the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the Debtors' *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [●]852] (as supplemented or amended from time to time, the "Plan"), which was conditionally approved by the Bankruptcy Court on January [●]13, 2023 [Docket No. [●]861].  A copy of the Plan is attached hereto as **Exhibit A** and is incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for each of the Debtors.[2]

**THE DEBTORS BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS.  THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.      PRELIMINARY STATEMENT

### A.       The Sale Transaction.

The Debtors filed these Chapter 11 Cases in response to a short-term "run on the bank" caused by a downturn in the cryptocurrency industry generally and the default of a significant loan made to a third party.  Since the Petition Date, the Debtors have worked tirelessly to identify the most value-maximizing transaction for their customers and other creditors on an expedited timeline.  Following a two-week competitive auction process, the Debtors selected the bid submitted by West Realm Shires Inc. ("FTX US," and along with its parent entity and affiliates, "FTX") as the winning bid (the transaction contemplated thereby, the "FTX Transaction").  Had it been effectuated, the FTX Transaction would have provided for substantial in-kind recoveries to Holders of Account Holder Claims, the transfer of substantially all of the customer accounts on the Voyager platform to the FTX platform, and the orderly wind down of the Debtors' estates.  But after a series of extraordinary events outlined in detail below, FTX, and with it the FTX Transaction, collapsed.  While the Debtors were shocked and dismayed by FTX's cataclysmic collapse, the Debtors swiftly reengaged in negotiations with numerous other potential counterparties to evaluate potential third-party transactions that would maximize value for the Debtors and their creditors.  Following good-faith, arm's length negotiations with several such alternative transaction parties, the Debtors elected to accept the bid submitted by BAM Trading Services Inc. ("Binance.US" or the "Purchaser").  The Debtors value Binance.US's offer at approximately $1.022 billion, comprising (i) the fair market value of Cryptocurrency on the Voyager platform as of a date to be determined, which as of December 19, 2022, is estimated to be $1.002 billion plus (ii) additional consideration equal to $20 million of incremental value. Importantly, relative to all currently available alternatives, the Binance.US bid can be effectuated quickly, provides meaningfully greater recovery to creditors, and allows the Debtors to facilitate an efficient resolution of these chapter 11 cases, after which Binance.US's market-leading, secured trading platform will enable customers to trade and store cryptocurrency.

Under the Asset Purchase Agreement, Binance.US will acquireaccept transfers of certain assets relating to the Debtors' cryptocurrency custody and exchange business and will receive all or substantially all Cryptocurrency on the Voyager platform for distribution toto hold such assets solely in a custodial capacity in trust and solely for the benefit of Account Holders who each open an account on the Binance.US Platform (subject to certain potential exceptions set forth in the Asset Purchase Agreement with respect to Cryptocurrency withheld for the purpose of

---

[2]      Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan or Asset Purchase Agreement, as applicable.  Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan.  **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan and the documents being summarized.  In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

satisfying the Debtors' obligations under the Plan) (such Cryptocurrency, transfers being referred to as "Acquired Coins") in exchange for Purchaser's payment obligations set forth in Sections 2.1 and 2.2 of the Asset Purchase Agreement and Purchaser's commitment to distribute the Acquired Coins to Account Holders and cash to Holders of Opco General Unsecured Claims pursuant to Sections 6.12 and 6.14 of the Asset Purchase Agreement. Additionally, Purchaser shall submit VGX for its standard listing review process in an effort to allow VGX to be traded on the Binance.US Platform. The Debtors will effectuate the transition of Account Holders to the Binance.US Platform as described in Article V.C.6 of this Disclosure Statement. It is currently anticipated that all Account Holders and Holders of OpCo General Unsecured Claims will transition to Binance.US subject to their successful completion of Binance.US's "Know Your Customer" process and other procedural and regulatory requirements. Further information regarding how Account Holders and Holders of OpCo General Unsecured Claims can open accounts on Binance.US are available on the Binance.US Platform Terms of Use (which are available at: https://www.binance.us/terms-of-use) and the Binance.US Privacy Policy (available at: https://binance.us/privacy-policy), and will also be provided to all Holders of such Claims in the Customer Onboarding Protocol.

Below is a chart of estimated recoveries to hypothetical Holders of Account Holder Claims.[3]

---

[3]   Recoveries are for illustrative purposes and may materially differ from the amount portrayed in the chart. Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

8

**Account**

| Coin | # of Coins Claimed | 7/5 Coin Price | Claim ($) | Recovery Type | Illustrative Crypto Recovery %[4] | 12/18 Coin Price | # of Coins Recovered[5] | Recovery Value |
|------|------|------|------|------|------|------|------|------|
| | Customer Claim | | | Crypto Recovery | | | | |
| BTC | 0.05 | $20,157.69 | $990.50 | BTC | 51% | $16,769.35 | 0.03 | $500.57 |
| ETH | 0.19 | 1,131.60 | 214.41 | ETH | 51% | 1,185.35 | 0.09 | 108.36 |
| DAI | 49.19 | 1.00 | 49.17 | DAI | 51% | 1.00 | 24.86 | 24.85 |
| DOGE | 978.43 | 0.07 | 65.64 | DOGE | 51% | 0.08 | 419.59 | 33.17 |
| ALGO | 123.83 | 0.31 | 38.07 | ALGO | 51% | 0.19 | 100.67 | 19.24 |
| LINK | 0.29 | 6.31 | 1.83 | LINK | 51% | 6.02 | 0.15 | 0.92 |
| XRP | 122.38 | 0.33 | 39.79 | XRP | 51% | 0.35 | 57.24 | 20.11 |
| HBAR | 130.66 | 0.06 | 8.05 | HBAR | 51% | 0.04 | 92.21 | 4.07 |
| BAND | 24.73 | 1.32 | 32.65 | BAND | 51% | 1.73 | 9.54 | 16.50 |
| VGX | 249.05 | 0.24 | 59.32 | VGX | 51% | 0.29 | 101.90 | 29.98 |
| TRAC | 1,471.96 | 0.19 | 286.88 | TRAC | 51% | 0.18 | 785.81 | 144.98 |
| GALA | 2,274.69 | 0.05 | 121.01 | GALA | 51% | 0.02 | 2,978.93 | 61.16 |

**Claim**

| | | | | | | | | |
|------|------|------|------|------|------|------|------|------|
| **Value Claimed** | | | **$1,907.34** | **Value Recovered** | | | | **$963.91** |
| *Proportion of Total Platform Value* | | | *0.0001%* | *Proportion of Total Platform Recovery* | | | | *0.0001%* |

**Illustrative Recovery**

**Crypto Recovery**

| | |
|------|------|
| Value Recovered (In-Kind) | $1,022.16 |
| Value Recovered (Converted to U.S. Dollars)[6] | - |
| **Crypto Value Recovered** | **$1,022.16** |

**Other Items**

| | |
|------|------|
| Plus: Binance US Consideration | $20.00 |
| Less: Wind-down Costs, Other Benefits and Other Expenses[7] | (78.24) |
| **Total Other Items** | **($58.24)** |

[4]    Illustrative cryptocurrency recovery is shown based on the estimated total fair market value of Voyager's cryptocurrency assets based on coin prices as of December 18, 2022.  Actual cryptocurrency recovery will be determined by cryptocurrency prices during the fair market value reference period prior to the Effective Date.

[5]    Illustrative number of coins recovered based on recovery value divided by the coin price as of December 18, 2022.  Actual cryptocurrency prices for purposes of denominating initial distributions will be determined by such cryptocurrency's price during the fair market value reference period prior to the Effective Date.

[6]    Assumes hypothetical customer transfers to Binance.US Platform to receive in-kind recoveries; Account Holders that do not transfer to Binance.US will be liquidated at a future date; these non-transferred Account Holders will be subject to portfolio risk, as recoveries will be subject to cryptocurrency market volatility until such time as the estate makes U.S. dollar distributions.

[7]    "Other Benefits" includes the estimated pro rata distribution to Account Holder Claims from (i) expense reimbursement and (ii) non-buyer proceeds (including sale of investments, tax returns, Directors and Officers insurance settlements, and other inflows); "Other Expenses" includes (iii) projected cash deficit at Effective Date, (iv) rebalancing leakage, (v) wind-down funding leakage and (vi) VGX impact.

9

| Total Value Recovered | $963.91 |
| *% Total Recovery* | *51%* |

### B.    The FTX Collapse.

Following an acute liquidity crunch and "run on the bank" at the FTX ecosystem, on November 11, 2022, 130 FTX entities commenced filing for voluntary relief under chapter 11 in the Bankruptcy Court for the District of Delaware (the "FTX Bankruptcy Proceeding").[8]  While the FTX Bankruptcy Proceeding is still unfolding, early indications are that Mr. Bankman-Fried and FTX were carrying on one of the largest financial frauds in history. Mr. John Ray III, who was appointed Chief Executive Officer of FTX following the resignation of Mr. Bankman-Fried and who oversaw the restructuring of Enron, commented in an early filing in the FTX Bankruptcy Proceeding that "[n]ever in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information."[9]  The full extent of the injury caused by this apparent rampant fraud will likely take years to uncover.

While FTX was collapsing, on November 10th, the Debtors requested that the "No-Shop" provision (Section 5.2) of the FTX Purchase Agreement (as defined herein) be waived.  FTX acquiesced.  Immediately thereafter, the Debtors swiftly reengaged in negotiations with several other potential transaction counterparties.  On December 9, 2022, the Debtors filed with this Court the *Joint Stipulation and Agreed Order Between the Debtors and FTX US* terminating the FTX Purchase Agreement [Docket No. 717].  On December 21, 2022, FTX filed a motion seeking approval of such stipulation by the court overseeing the FTX Bankruptcy Proceeding as well.[10]

The Debtors determined that engaging with third parties to identify an alternative transaction partner was a sound exercise of their business judgment as consummating an alternative transaction would reasonably provide greater recovery to Holders of Claims on a more certain timeline with limited execution risk than if the Debtors pursued a self-liquidating plan.  The Sale Transaction is the culmination of that process and provides more value than the Debtors would otherwise be able to distribute to Holders of Claims on a standalone basis.  Notably, the Plan includes a toggle that allows the Debtors to return Cryptocurrency, Cash, and other assets to Holders of Claims if the Sale Transaction is unable to close on the timeline contemplated under the Asset Purchase Agreement, as described further in Article V.A.2 herein.  Although any "toggle" to a self-liquidating plan may result in less recovery to customers than the Sale Transaction, it would be materially greater and quicker than if the Debtors had to undertake the cost and time necessary to resolicit Holders of Claims to vote on another plan.  Accordingly, the Debtors, whose goal is and has always been to maximize returns to Account Holders and other creditors, determined that the most value-maximizing path forward in these chapter 11 cases is to enter into a transaction with Binance.US that also allows the Debtors to toggle to a plan that returns value to the Debtors' Account Holders and other creditors should the Sale Transaction not be consummated on the timeline contemplated under the Asset Purchase Agreement.

In light of the extraordinary circumstances that precipitated the filing of these Chapter 11 Cases and the equally extraordinary events that transpired thereafter, the Debtors believe that they have achieved a Plan that is fair and equitable, maximizes the value of the Debtors' estates, and maximizes recoveries to Holders of Claims, including, especially, Holders of Account Holder Claims.  Importantly, the "toggle" feature under the Plan ensures an outside date by which the Debtors can pivot to a standalone plan and return value to Holders of Claims without any further delay.

---

8    *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

9    *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 24], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 17, 2022); *see also United States of America v. Samuel Bankman-Fried*, 22-crim-673 (S.D.N.Y. December 9, 2022); *Securities and Exchange Commission v. Samuel Bankman-Fried*, Civil Action. No. 22-cv-10501 (S.D.N.Y. Dec. 13, 2022).

10   *Motion of Debtors for Entry of an Order (A) Authorizing the Debtors to Enter Into the Stipulation with Voyager Digital, LLC and (B) Granting Related Relief* [Docket No. 283], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Dec. 21, 2022).

Accordingly, the Debtors, in close consultation with Binance.US and other parties in interest, have worked tirelessly to negotiate and formulate a Plan that provides recoveries to Holders of Claims on the quickest timeline and in the most favorable manner in light of the FTX collapse and related industry fallout.

## III. BACKGROUND

Prior to the Petition Date, Voyager operated a cryptocurrency trading platform that allowed customers to buy, sell, and store cryptocurrency on an easy-to-use and "accessible-to-all" platform. Using the Company's mobile application, Voyager's customers could earn rewards on the cryptocurrency assets stored on the Company's platform and trade over 100 unique digital assets. Voyager's mission since inception has been to provide customers with the tools to enter the cryptocurrency industry on their own terms in a way that is tailored to the needs of each customer. Voyager's mobile application has been downloaded millions of times and had over 1.1 million active users as of July 5, 2022 (the "Petition Date"). In 2021, Voyager was one of the top ten most downloaded cryptocurrency mobile applications in the world.

Recent events in the world economy roiled traditional markets and the cryptocurrency markets alike. The lingering effects of the COVID-19 pandemic, coupled with rampant inflation and the adverse effects of the war in the Ukraine on the world economy, contributed to a massive sell-off in traditional assets in early 2022. Total wealth in the United States declined by $5 trillion between January 2022 and May 2022. The cryptocurrency market is not immune to these macroeconomic trends and likewise experienced extreme market volatility in 2022. All major coins and cryptocurrency-focused companies experienced significant declines; in early September 2022, the aggregate value of the cryptocurrency market sank below $1 trillion for the first time since 2020. Several major liquidity events in the cryptocurrency space, including the implosion of Terra LUNA ("Luna") (as discussed in Article VII.A.2 of this Disclosure Statement), accelerated the onset of a "crypto winter" and an industry-wide sell-off to manage risk in 2022.

As described in more detail in Article VII.A.2.b below, in June 2022, it became apparent that the Company's loan to Three Arrows Capital ("3AC") and such loan the "3AC Loan"), a cryptocurrency hedge fund based in Singapore, was in jeopardy of partial or full nonpayment. The Company's loan to 3AC was one of its largest outstanding loans. On June 17, 2022, 3AC announced that it had suffered heavy losses due to massive exposure to Luna. The Company's management team was acutely aware that nonpayment of the loan to 3AC, coupled with severe industry headwinds, would strain the Company's ability to continue operating its trading platform. Accordingly, the Company's management team immediately began to explore potential strategic solutions. The Company retained Kirkland & Ellis LLP ("Kirkland") and Moelis & Company LLC ("Moelis"). The Company subsequently retained Berkeley Research Group ("BRG") on June 30, 2022. The Company engaged in discussions with third parties and potential sources of new liquidity and ultimately obtained an unsecured loan from Alameda Ventures Ltd. ("Alameda"), a major participant in the cryptocurrency space. With the advice and assistance of Moelis, the Company began discussions with a host of third parties about a more long-term solution to the challenges facing the Company. Discussions with these third parties, however, ultimately revealed that an in-court process would be necessary to develop the most value-maximizing alternative available to the Company. Accordingly, the Debtors filed these Chapter 11 Cases on July 5, 2022.

On the first day of these chapter 11 cases, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17] (as amended and restated from time to time, the "Standalone Plan"). The Standalone Plan contemplated a restructuring that could be effectuated without a sale and served as a floor for the Debtors' marketing process. To that end, the Debtors, with the assistance of Moelis and their other advisors, continued their prepetition marketing efforts during these Chapter 11 Cases to canvas the market and identify interest in a transaction with a third-party investor (the "Marketing Process"). Shortly after commencing these chapter 11 cases, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126] (the "Bidding Procedures Motion"), which set a timeline for interested parties to submit bids for an acquisition of the Debtors' assets and procedures for conducting an auction if multiple bids were received. On August 5, 2022, the Bankruptcy Court entered the *Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting*

11

*Related Relief* [Docket No. 248] (the procedures approved thereby, the "Bidding Procedures") which, among others, established the Bid Deadline (as defined in the Bidding Procedures) as September 6, 2022 at 12:00 p.m., prevailing Eastern Time and set the Auction (as defined in the Bidding Procedures) for September 13, 2022 at 10:00 a.m., prevailing Eastern Time. Throughout the Marketing Process, the Debtors evaluated Bids received from potential transaction parties in comparison both to other Bids received and the recoveries contemplated by the Stand-Alone Plan as it provided a critical metric in the Debtors' determination of their path forward.[11]

On the Bid Deadline, the Debtors received a number of bids from strategic investors and, accordingly commenced an auction on September 13, 2022, for a sale of the Debtors' business. The two-week Auction featured hard-fought, arms-length negotiations with each participating bidder. At the conclusion of the Auction, the Debtors, in an exercise of their business judgment and in consultation with the Committee, determined that the final bid submitted by FTX US represented the most value-maximizing transaction available to the Debtors. Accordingly, on September 26, 2022, the Debtors announced FTX US as the winning bidder,[12] and on September 27, 2022, the Debtors and FTX US entered into an asset purchase agreement memorializing the terms of the winning bid (as may be amended from time to time in accordance with the terms thereof, the "FTX Purchase Agreement"). On October 20, 2022, the Court entered an order approving the Debtors' entry into the FTX Purchase Agreement.[13] On October 24, 2022, the Debtors filed solicitation versions of their Disclosure Statement and Plan,[14] and began soliciting votes on the Plan.

As set forth in greater detail in Article VIII.N hereof, the Debtors' journey to consummation of the FTX Transaction was derailed over the ensuing weeks. Following a series of extraordinary events, on November 11, 2022, Sam Bankman-Fried resigned from his role as CEO of the FTX enterprise, and FTX announced the chapter 11 filing of approximately 130 of its affiliates. Immediately following announcement of the FTX bankruptcy, the Debtors reengaged in discussions with numerous potential transaction parties interested in consummating a transaction with the Debtors. Following good-faith, arm's-length negotiations with several potential transaction parties regarding a variety of deal structures and terms, the Debtors determined, in an exercise of their business judgment and in consultation with the Committee, that the bid submitted by Binance.US represented the highest or otherwise best offer available to purchase the Debtors' business enterprise. On December 18, 2022, the Debtors and the Purchaser entered into an asset purchase agreement memorializing the terms of the Binance.US bid (as may be amended from time to time in accordance with the terms thereof, the "Asset Purchase Agreement").

The Debtors seek to effectuate the transactions contemplated by the Asset Purchase Agreement (collectively, the "Sale Transaction") pursuant to the Plan. The Plan, among other things:

- contemplates payment in full of Administrative Claims, Secured Tax Claims, Priority Tax Claims, and Other Priority Claims;

- provides for the distribution of Cryptocurrency, Cash, and any remaining assets at OpCo (including any recovery on account of the 3AC Claims, FTX Claims, or Alameda Claims) to Account Holders and Holders of OpCo General Unsecured Claims, subject to the terms of the Asset Purchase Agreement;

- provides for distribution of Cash and other assets at HoldCo to Holders of HoldCo General Unsecured Claims;

- provides for distribution of Cash and other assets at TopCo to Holders of TopCo General Unsecured Claims;

- provides for the equitable subordination of the Alameda Loan Facility Claims;

---

[11]   Certain dates in the Bidding Procedures were amended by Docket Nos. 328, 343, 365, and 442.

[12]   *See Notice of Successful Bidder* [Docket No. 457].

[13]   Docket No. 581.

[14]   Docket Nos. 590 and 591.

- provides for any residual value at TopCo after payment in full of TopCo General Unsecured Claims to be distributed to Holders of Section 510(b) Claims, if any, and Holders of Existing Equity Interests; and

- designates a Wind-Down Entity Trustee to wind down the Debtors' affairs in accordance with the Plan.

The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases. In particular, the Sale Transaction with Binance.US that the Plan contemplates represents, relative to all currently available alternatives, meaningfully greater and faster recovery to creditors. Accordingly, the Debtors urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots so that Stretto actually receives such ballots by February 22, 2023 at 4:00 p.m. prevailing Eastern Time (the "Voting Deadline"). Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at a hearing on March 2, 2023 at [●]:00 [a/p.m.]10:00 a.m. (prevailing Eastern Time) (the "Confirmation Hearing").

## IV. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A. What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B. Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C. Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

| | | | |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Account Holder Claims | Impaired | Entitled to Vote |

13

| | | | |
|---|---|---|---|
| 4A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.  Amounts in the far right column under the heading "Liquidation Recovery" are estimates only and are based on certain assumptions described herein and set forth in greater detail in the liquidation analysis attached hereto as **Exhibit B** (the "Liquidation Analysis").

**In a hypothetical liquidation under chapter 7 of the Bankruptcy Code, Holders of Account Holder Claims and General Unsecured Claims would likely receive a significantly reduced recovery relative to what such Holders would receive under the Plan**.  In the event of a chapter 7 liquidation, the Bankruptcy Court may appoint a trustee (the "Liquidating Trustee") to oversee and effectuate the liquidation of the Debtors' assets.  The Liquidating Trustee's fees and expenses would be paid by the Debtors and would be paid prior to any Account Holder Claims or General Unsecured Claims.  Given the novelty and complexity of the Debtors' business and the strong likelihood that any Liquidating Trustee appointed by the Bankruptcy Court may have minimal cryptocurrency experience, the Liquidating Trustee's fees and expenses and the anticipated reduction in value obtained through the monetization of cryptocurrency by the Liquidating Trustee would likely result in Account Holders and Holders of General Unsecured Claims receiving significantly reduced recoveries.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE BASED ON, AMONG OTHER THINGS, ALLOWED CLAIMS ARISING FROM THE REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES AND THE RESOLUTION OF DISPUTED CLAIMS.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[15]**

---

[15]   The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|-------|-------------------|-----------|-----------------|-----------------|-----------------|----------------------|
| 1 | Secured Tax Claims | Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down Entity, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired. | $0.0 | N/A | N/A | N/A |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. | $1.0 | 100% | 100% | 99% – 99% |
| 3 | Account Holder Claims[18] | Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim: (i) If the Sale Transaction is consummated by the Outside Date: a. its Net Owed Coins, as provided in and subject to the requirements of Sections 6.10 and 6.12 of the Asset Purchase Agreement; *provided* that for Account Holders in Unsupported Jurisdictions and only to the extent that the Purchaser does not obtain the Unsupported Jurisdiction Approval for the jurisdiction in | $1,763.8 | 51% | 45% | 35% – 39% |

---

[16]   The lower recovery compared to the FTX Transaction is largely due to fluctuations in the market following the FTX collapse along with the value differential under the Sale Transaction.

[17]   **The recoveries included in this Disclosure Statement are for illustrative purposes only and subject to material change particularly due to, among other things, market volatility, the ultimate treatment of the Alameda Loan Facility Claims and the Intercompany Obligations, and whether Alameda prevails on its asserted preference and related administrative claim which could substantially reduce the recoveries projected above.**

[18]   Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | which such Account Holder resides within 6 months following the Closing Date (as defined in the Asset Purchase Agreement), such Account Holders shall receive, after expiration of such time period, value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated; | | | | |
| | | b.   its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement; | | | | |
| | | c.   its Pro Rata share of Distributable OpCo Cash; and | | | | |
| | | d.   to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; | | | | |
| | | *provided* that distributions made to any Account Holder pursuant to clauses (b), (c), and (d) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder; or | | | | |
| | | (ii)  If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated: | | | | |
| | | a.   its Pro Rata share of Distributable OpCo Cash; | | | | |
| | | b.   its Pro Rata share of Distributable Cryptocurrency, which such Account Holder | | | | |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that, if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and<br><br>c.  to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | | |
| 4A | OpCo General Unsecured Claims | Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:<br><br>(i)  If the Sale Transaction is consummated by the Outside Date:<br><br>a.  its Pro Rata share of Distributable Cryptocurrency in Cash;<br><br>b.  its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as | $14.0 | 51% | 45% | 35% – 39% |

17

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | provided in and subject to the requirements of Section 6.12 and 6.14 of the Asset Purchase Agreement;<br><br>c. its Pro Rata share of Distributable OpCo Cash; and<br><br>d. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims;<br><br>(ii) If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:<br><br>a. its Pro Rata share of Distributable Cryptocurrency in Cash;<br><br>b. its Pro Rata share of Distributable OpCo Cash; and<br><br>c. to effectuate distributions from the Wind-Down Entity, its Pro Rata share of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | | |
| 4B | HoldCo General | Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such | $8.3 | 6% | 6% | 0% – 0% |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | Unsecured Claims | Allowed HoldCo General Unsecured Claim:<br>(i) its Pro Rata share of Distributable HoldCo Cash; and<br>(ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to HoldCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | | | | |
| 4C | TopCo General Unsecured Claims | Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim:<br>(i) its Pro Rata share of Distributable TopCo Cash; and<br>(ii) to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Entity Assets or the Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. | $3.0 | 64% | 64% | 65% – 65% |
| 5 | Alameda Loan Facility Claims | Each Holder of an Allowed Alameda Loan Facility Claim will receive in exchange for such Allowed Alameda Loan Facility Claim to effectuate distributions from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets; *provided* that any distributions on account of Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Claims at OpCo, HoldCo, and TopCo, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, Allowed | $75.1 | 0% | 0% | 0% – 0% |

19

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims (in $mm)[16][17] | Projected Sale Transaction Recovery under the Plan | Projected Liquidation Transaction Recovery under the Plan | Liquidation Recovery |
|---|---|---|---|---|---|---|
| | | OpCo General Unsecured Claims, Allowed HoldCo General Unsecured Claims, and Allowed TopCo General Unsecured Claims; *provided, however,* if the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity. | | | | |
| 6 | Section 510(b) Claims | Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to TopCo; *provided* that any distributions on account of the Wind Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims. | $0.0 | N/A | N/A | N/A |
| 7 | Intercompany Claims | On the Effective Date, all Intercompany Claims shall be, at the option of the Debtors, either (a) Reinstated or (b) converted to equity, otherwise set off, settled, distributed, contributed, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum. | $0.0 | 0% | 0% | 0% – 0% |
| 8 | Intercompany Interests | On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum. | $0.0 | 0% | 0% | 0% – 0% |
| 9 | Existing Equity Interests | Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the Wind-Down Entity, its Pro Rata share of the Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Trust Units shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims. | $0.0 | N/A | N/A | N/A |

20

**E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  The chart below summarizes the various unclassified claims and provides the relevant section of the Plan that addresses their treatment:

| Claim | Description of Claim | Plan Section |
|---|---|---|
| Administrative Claims | A Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims.  For the avoidance of doubt, any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned in full to the sender. | Article II, Section A |
| Professional Fee Claims | Any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. | Article II, Section B |
| Priority Tax Claims | Any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code. | Article II, Section C |

**F.      What is the "toggle" feature of the Plan?**

The "toggle" feature of the Plan provides that, if the Sale Transaction is not consummated by Outside Date or the Asset Purchase Agreement is terminated, the Debtors can pivot to a standalone plan whereby the Debtors will distribute their assets to creditors in accordance with Article IV of the Plan.  The "toggle" allows the Debtors to abandon the Sale Transaction and to initiate distributions to Holders of Claims without the need to restart the Disclosure Statement and Plan solicitation process.  As a result, Holders of Claims will receive recoveries under the Plan on a much quicker timeline than if the Debtors have to recommence the solicitation process on the standalone plan.

**G.      How will my Account be transitioned to Binance.US?**

The Debtors will transition Account Holders and Holders of OpCo General Unsecured Claims to the Binance.US Platform and effectuate delivery of Plan distributions to such Holders' Binance.US Accounts as set forth in Article V.C.6 of this Disclosure Statement and subject to the terms of the Asset Purchase Agreement based on whether Account Holders and Holders of OpCo General Unsecured Claims are in Supported Jurisdictions or Unsupported Jurisdictions.  All Account Holders and Holders of Allowed OpCo General Unsecured Claims should closely review Article V.C.6 of this Disclosure Statement.  It is currently anticipated that all Account Holders and Holders of OpCo General Unsecured Claims will transition to Binance.US subject to their successful completion of Binance.US's "Know Your Customer" process and other procedural and regulatory requirements as further described in the Asset Purchase Agreement.

**H.      What if I am unable or unwilling to transition my Account to Binance.US?**

We expect that substantially all Account Holders will be transitioning to Binance.US.  In the event that a customer is not successfully transitioned to Binance.US (for instance, in the event such Account Holder resides in an Unsupported Jurisdiction for which Binance.US does not obtain the Unsupported Jurisdiction Approval within

21

six (6) months of the Closing Date (as defined in the Asset Purchase Agreement)), such customer will not receive any distributions in Cryptocurrency form ("in kind"). They will instead receive a Cash distribution from the Debtor's estates as and when such distributions are made pursuant to the Bankruptcy Code.

**I.**      **What are the sources of Consideration and other consideration required to fund the Plan?**

Distributions under the Plan shall be funded by (i) the proceeds of Purchaser's payment obligations under Sections 2.1 and 2.2 of the Asset Purchase Agreement, (ii) distributions of Acquired Coins pursuant to Sections 6.12 and 6.14 of the Asset Purchase Agreement, and (iii) the Wind-Down Entity or Wind-Down Trust (as applicable) from the Wind-Down Entity Assets or Wind-Down Trust Assets (as applicable); *provided, however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance. The Wind-Down Trust Entity Assets or Wind-Down Trust Assets (as applicable) shall be used to pay the Wind-Down Trust Entity Expenses (including the compensation of the Wind-Down Trustee and any professionals retained by the Wind-Down Trust), and to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

**J.**      **Are any regulatory approvals required to consummate the Sale Transaction and confirm the Plan?**

Voyager currently maintains state money transmission licenses or their equivalents (each, a "Money Transmission License") in seventeen (17) states,[19] and has license applications pending[20] in eighteen (18) states.[21]

The Debtors have engaged with the state banking departments throughout the bankruptcy process and will continue to actively do so with the goal of ensuring that the Sale Transaction and the Plan provides for compliance by Voyager and the Purchaser, as applicable, with state money transmission laws as of the consummation of the Sale Transaction. The state banking departments may have broad discretion as to the approvals required in connection with the Sale Transaction, thus it is not possible to predict with certainty the scope of such approvals, whether they will ultimately be granted, and the expected timeframes of the state banking departments' determinations. There are unresolved questions of law with respect to the intersection of state money transmission statutes and the Bankruptcy Code and the answers to those questions may impact the ability of the state banking departments to require certain approvals with respect to consummation of the Sale Transaction and confirmation of the Plan.

As an initial matter, it is important to note that Money Transmission Licenses are not assets that can be purchased or transferred; they are specific to the entity to which they are issued, and thus an acquisition of a licensed entity must be conducted through a stock purchase or merger in which the licensed entity is the surviving entity for the licenses to remain in effect.

Pursuant to the Asset Purchase Agreement, the Purchaser will not acquire Voyager's Money Transmission Licenses; rather, the Asset Purchase Agreement provides for the transfer of the Acquired Coins and Additional Bankruptcy Distributions to the Binance.US Platform for distribution in accordance with the Asset Purchase

---

[19] The Alaska Division of Banking and Securities suspended Voyager's license on July 6, 2022 and subsequently reversed such suspension on July 14, 2022. There is a risk that one or more additional state banking departments may choose to suspend Voyager's Money Transmission Licenses going forward.

[20] On July 17, 2022, the North Dakota Department of Financial Institutions notified Voyager that it required Voyager's pending money transmitter license application be withdrawn on grounds that it would not approve an application with an active bankruptcy filing. There is a risk that one or more additional state banking departments with which Voyager has pending applications may impose similar restrictions on Voyager going forward.

The Debtors have two applications pending in New York: (a) a money transmitter license application and (b) a virtual currency business activity license application or "Bitlicense." Voyager Digital NY, LLC, a non-operational affiliate of the Debtors, filed such applications.

[21] Voyager also maintains a registration as a "money services business" with the Financial Crimes Enforcement Network ("FinCEN") pursuant to federal money transmission laws. A change in ownership of an entity registered with FinCEN requires notice to FinCEN following consummation of the relevant transaction, but does not require prior regulatory approval.

Agreement and the transition of Account Holders and Holders of OpCo General Unsecured Claims to Binance.US accounts in order to receive the same, subject to the terms and conditions set forth in the Asset Purchase Agreement (which include prohibitions on such transfers and transitions with respect to Account Holders and Holders of OpCo General Unsecured Claims located in Unsupported Jurisdictions).

Following consummation of the Sale Transaction, Voyager will take steps to (i) withdraw those money transmission license applications that are pending with state banking departments and (ii) surrender those Money Transmission Licenses it holds (the "Licensing Wind-Down Process"). Such Licensing Wind-Down Process will require notice to, and in some cases approval by, those state banking departments in states where the Debtors have applications pending or are licensed pursuant to the requirements set forth in each state money transmission statute and as otherwise required by the relevant state banking departments.[22]

In the event that the "toggle" function is triggered, causing a pivot to a self-liquidating plan, Voyager would maintain its Money Transmission Licenses for so long as necessary to effect distribution of recoveries to Holders of Claims and complete the Licensing Wind-Down Process at the appropriate time.

**K.    How will I receive my recovery as an Account Holder if the Sale Transaction is not consummated?**

In the event that the Sale Transaction is not consummated by the Outside Date, the Debtors will outline the steps necessary for Account Holders to receive Distributable Cryptocurrency on an in-kind basis and will describe the transition process in further detail. It is currently anticipated that all Account Holders will receive the option to receive Distributable Cryptocurrency in certain formats that will render such transfer "in-kind" to allow such distributions to be positioned in the most tax-efficient manner possible for Account Holders.

**L.    What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to consummate the Restructuring Transactions. It is possible that any alternative transaction may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article XI.B of this Disclosure Statement, titled "Best Interests of Creditors—Liquidation Analysis" and the Liquidation Analysis attached hereto as **Exhibit B**.

**M.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan. *See* Article IX of the Plan for a description of the conditions precedent to consummation of the Plan.

**N.    Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which could potentially lead to litigation. *See* Article IX.D.2 of this Disclosure Statement titled "The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations" for further discussion on this issue.

As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their business and could become parties to additional litigation in the future. Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation

---

[22]    The state approval process for the surrender of a license typically takes several months.

counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Account Holders and Holders of General Unsecured Claims could change, and such changes could be material.

The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages. An increase in the estimated amount of rejection damages claims could result in reduced recoveries for Account Holders and Holders of General Unsecured Claims. Finally, the Debtors may object to certain Proofs of Claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change. These changes could affect recoveries to Account Holders and Holders of General Unsecured Claims, and such changes could be material.

### O.    Does the Plan provide for the subordination of any Claims?

The Plan contemplates that the Class 5 Alameda Loan Facility Claims are subordinated Claims. Section 510(c) of the Bankruptcy Code provides, in relevant part, that the Bankruptcy Court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c)(l). Bankruptcy courts have ruled that equitable subordination is proper where three conditions are met: ( 1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the federal bankruptcy regime. *See In re LightSquared Inc.*, 511 B.R. 253, 346 (Bankr. S.D.N.Y. 2014) citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977).

The Debtors believe that the Alameda Loan Facility Claims should be equitably subordinated due to Alameda and its affiliates' inequitable conduct that has harmed the Debtors' creditors in multiple instances. Since the outset of these Chapter 11 Cases, Alameda has sought to undermine and sabotage the Debtors' restructuring efforts at every turn. The Alameda Loan Agreement that was entered into just prior to the filing of these Chapter 11 Cases included a provision that required the Debtors to only engage in lending activities with Alameda.[23] Alameda's effort to front-run the Debtors' marketing process continued when, on July 22, 2022, it issued a press release and low-ball proposal for the Debtors' business while openly disparaging the Debtors. Alameda's attempts to mislead creditors with false statements were so egregious that the Debtors were forced issue a response to correct the record.[24] Alameda's claims, made with full knowledge of their falsity, chilled the Debtors' marketing process and lowered the floor for potential bids in the Auction. Prior to the Auction, the Debtors requested that Alameda unwind all outstanding prepetition loans made by the Debtors to Alameda (some of which were collateralized) to ensure fairness and equal footing for all participants in the Auction.[25] Alameda finally acquiesced to the repayment of the prepetition loans once the Debtors communicated that Alameda's participation in the Auction was contingent on either repaying the prepetition loans or disclosing its financial wherewithal to the other bidders to ensure a level playing field for all Auction participants.

Given the fallout following the discovery of the apparent historic fraud committed by Alameda and FTX, the Debtors and other parties-in-interest now understand that Alameda's behavior in the Chapter 11 Cases was an effort to fill holes on its balance sheet resulting from their apparent fraudulent business operations. Alameda's insistence to skirt the Debtors' robust marketing process was a feigned attempt to acquire the Debtors' cryptocurrency in the quick of night, not to return Cryptocurrency to the Debtors' stakeholders despite Alameda's and FTX's former leadership's adamant contentions.[26] Accordingly, the Debtors believe that such behavior

---

[23]   *See* Alameda Loan Agreement, Section 4.7.

[24]   *See Notice of Response to Alameda/FTX US Press Release* [Docket No. 137].

[25]   *See* Unwind Motion; Article VIII.L of this Disclosure Statement.

[26]   *See, e.g.*, @SBF, TWITTER (July 24, 2022, 8:32 P.M. ET),
       https://twitter.com/SBF_FTX/status/1551364656085602305?s=20&t=67p5C4w-kxALBYJjQ1UVCg.

warrants the equitable subordination of the Alameda Loan Facility Claims. The Debtors will further demonstrate the legal and factual bases for subordinating the Alameda Loan Facility Claims prior to or at Confirmation.

Although the Debtors have classified the Alameda Loan Facility Claims as subordinated claims, the Bankruptcy Court may rule that subordination of the Alameda Loan Facility Claims is improper. If the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity.

**P.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article VIII of the Plan proposes to provide certain releases to the Released Parties and also provides for exculpation of the Exculpated Parties. The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article V.A.3 of this Disclosure Statement, entitled "Releases." For the avoidance of doubt, the decision to "opt in" to the releases is voluntary, and the failure to "opt in" does not prejudice any electing creditors' rights.

On the Petition Date, the board of directors of Voyager Digital, LLC voted to appoint two independent directors to the board of Voyager Digital, LLC and to establish a special committee (the "Special Committee"). The Special Committee consists of the newly appointed independent directors and was established to investigate certain historical transactions, including the facts and circumstances related to the Debtors' loan to 3AC (the "Investigation"). On August 4, 2022, the Bankruptcy Court entered an order approving the appointment of Quinn Emmanuel Urquhart & Sullivan, LLP as legal counsel to the Special Committee ("Special Committee Counsel") with the mandate to conduct the Investigation. The Special Committee's investigation, and the settlements reached by the Special Committee that are incorporated into the Plan, are described in more detail in Article VII.A.2(b)(i)-(ii) below. As described in Article VII.A.2(b)(i)-(ii), the potential estate claims the Special Committee identified as colorable are being settled pursuant to the Plan on the terms set forth herein.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' chapter 11 process through, among other things, efforts to market and sell the Debtors' assets and negotiate and implement the Plan, which will maximize value for the benefit of all parties in interest. The Debtors' Chief Executive Officer, Mr. Ehrlich ("CEO") and Chief Commercial Officer (and former Chief Financial Officer), Mr. Psaropoulos ("CCO") are also making additional personal contributions to the Plan pursuant to the settlements reached with the Special Committee. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

The Debtor releases (other than with respect to derivative claims) do not affect the Canadian Class Action. The Debtor releases are releases of the Debtors' claims against third parties. The Canadian Class Action claim against Voyager Digital Ltd. is a Claim against a Debtor, which will be subject to the treatment of Section 510(b) Claims under the Plan. The Canadian Class Action direct claims against the Debtors' directors and officers are not impacted by the Debtor release.

The third-party releases do not release direct claims unless a Holder of such Claim or Interest affirmatively elects to opt into the third-party release. Holders of Claims or Interests may also contribute their third-party claims against Persons other than the Debtors to the Wind-Down Entity pursuant to Article IV.Q of the Plan. If the Holder of a Claim or Interest contributes their Contributed Third-Party Claims to the Wind-Down Entity then they will be barred from pursuing such Contributed Third-Party Claims. However, pursuant to the Plan, Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors, (ii) any direct claims against the Releasing Parties, (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties, or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the Canadian Class Action against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks. The Wind-Down Entity will be able to pursue Contributed Third-Party Claims subject to the terms of the Plan. To the extent the Wind-Down Entity chooses to pursue the contributed Claims, and is successful, additional recovery may be generated as a result, which will be distributed in accordance with the Plan waterfall.

The Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Second Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

**ALL HOLDERS OF CLAIMS THAT (I) VOTE TO ACCEPT THE PLAN AND WHO AFFIRMATIVELY OPT INTO THE RELEASES PROVIDED BY THE PLAN; (II) VOTE TO REJECT THE PLAN AND WHO AFFIRMATIVELY OPT INTO THE RELEASES PROVIDED BY THE PLAN; OR (III) ABSTAIN FROM VOTING ON THE PLAN AND AFFIRMATIVELY OPT INTO THE RELEASES PROVIDED IN THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES, INCLUDING THE DEBTORS OR THE WIND-DOWN DEBTORS, AS APPLICABLE.**

**Q.    What is the deadline to vote on the Plan?**

The Voting Deadline is February 22, 2023, at 4:00 p.m. (prevailing Eastern Time).

**R.    How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. To be counted as votes to accept or reject the Plan, each ballot (a "Ballot") must be properly executed, completed, and delivered in accordance with the instructions provided such that a vote cast is **actually received** before the Voting Deadline by Stretto. *See* Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL NOT BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.**

---

**S.    Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**T.    When is the Confirmation Hearing set to occur?**

The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing for March 2, 2023, at [●] [a/p].m 10:00 a.m. (prevailing Eastern Time). The Confirmation Hearing may be adjourned from time to time without further notice. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* (national edition) and *Financial Times* to provide notification to those persons who may not receive notice by mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**U.    What is the purpose of the Confirmation Hearing?**

The confirmation of a plan by a bankruptcy court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

V.      **What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are liquidating under chapter 11 of the Bankruptcy Code.  Following Confirmation, the Plan will be consummated on the Effective Date.  On or after the Effective Date, and unless otherwise provided in the Plan, the Wind-Down Trustee will commence the wind down of the Wind-Down Debtors in accordance with the terms of the Plan.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

W.      **What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?**

As described in Article VII herein, as well as in the *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 15] (the "First Day Declaration"), prior to the Petition Date, the Debtors evaluated numerous potential alternatives, including options relating to mergers, sales, capital raising, and consensual recapitalizations, to provide stability and requisite capitalization to their business enterprise in light of significant market volatility.

X.      **How do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims, Noticing, and Solicitation Agent:

By electronic mail at:
voyagerinquiries@stretto.com with a reference to "In re Voyager – Solicitation Inquiry" in the subject line.

By telephone at:
(855) 473-8665 (Toll-Free) or (949) 271-6507 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' Claims, Noticing, and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims, Noticing, and Solicitation Agent at http://cases.stretto.com/Voyager (free of charge) or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/ecf-and-pacer-information (for a fee).

## V.      THE DEBTORS' PLAN

A.      **The Plan.**

The Plan contemplates, among other things, (a) if the Sale Transaction is consummated by the Outside Date, the Debtors will (i) transfer all Acquired Coins to the Binance.US Platform for distribution in accordance with the Asset Purchase Agreement, (ii) distribute recoveries to Holders of HoldCo General Unsecured Claims and TopCo Unsecured Claims, (iii) transfer all Claims, Interests, and assets to the Wind-Down Reserve, and (iv) liquidate the Debtors' business and remaining assets under chapter 11 of the Bankruptcy Code; or (b) if the Sale Transaction is not consummated by the Outside Date, (i) distribute substantially all of the Cryptocurrency on the Debtors platform to Account Holders and distribute Cash at each Debtor entity to Holders of Claims at such entity, (ii) transfer all Claims, Interests, and assets to the Wind-Down Reserve, and (iii) liquidate the Debtors' business and remaining assets under chapter 11 of the Bankruptcy Code.  The Plan contemplates the following key terms, among others described herein and therein:

1.      *General Settlement of Claims and Interests*

27

Pursuant to section 1123 of the Bankruptcy Code, Bankruptcy Rule 9019 (as applicable), and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

The Debtors are working with the Committee (as defined in Article VIII.C hereof) and other parties in interest to resolve certain open issues and controversies, which may result in a settlement or settlements pursuant to Bankruptcy Rule 9019 and may be included in the Plan. The Debtors believe that resolution of these issues or controversies in advance of the Confirmation Hearing will facilitate closure to the Chapter 11 Cases and a more efficient wind down of the Debtors. The Plan may be modified prior to the Confirmation Hearing to incorporate any number of resolutions of the unresolved controversies. Any such resolution will be negotiated at arm's-length with the advisors representing the affected parties.

### 2. *Recoveries to Certain Holders of Claims and Interests*

The recoveries to Holders of Claims and Interests is described in Article IV.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

### 3. *Releases*

The Plan contains certain releases, as described in Article IV.O of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?" The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

"Related Party" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

"Released Parties" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) Purchaser and each of its Related Parties; and (f) each of the Released Voyager Employees (subject to the limitations contained in Article IV.F and Article IV.G of the Plan); *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

"Released Professionals" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable): (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Fasken Martineau DuMoulin LLP; (vii) Campbells Legal (BVI); (viii) McDermott Will & Emery LLP; (ix) FTI Consulting, Inc.; (x) Epiq Corporate Restructuring, LLC; (xi) Cassels, Brock & Blackwell LLP; (xii) Paul Hastings LLP; (xiii) Harney Westwood & Riegels LP (BVI); (xiv) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xv) Jenner & Block LLP; (xvi) Seyfarth Shaw LLP; (xvii) Alvarez & Marsal Canada Inc.; (xviii) Blake, Cassels & Graydon LLP; (xix) Latham &

Watkins LLP; (xx) Lowenstein Sandler LLP; (xxi) Kramer Levin LLP and (xxii) Acura Law Firm; *provided* that if the Asset Purchase Agreement is terminated, Latham & Watkins LLP shall not be a "Released Professional" under the Plan.

"Released Voyager Employees" means all directors, officers, and Persons employed by each of the Debtors and their Affiliates serving in such capacity on or after the Petition Date but before the Effective Date (subject to the limitations contained in Article IV.E and Article IV.F of the Plan).

"Releasing Parties" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Committee, and each of the members thereof; (d) each of the Released Professionals; (e) each of the Released Voyager Employees; (f) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties, (g) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (h) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (i) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

(a)      **Releases by the Debtors.**

**Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, the Wind-Down Entity, and in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in Article VIII.A of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.A of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

**Notwithstanding anything to the contrary contained herein, nothing in the Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement**

29

and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of the Plan.

(b)      **Release by Holders of Claims or Interests.**

Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in Article VIII.B of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

(c)      **Exculpation.**

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud,

willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

(d)    Injunction.

The assets of the Debtors and of the Wind-Down Entity shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in the Plan and shall not be available for any other purpose. All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Entity, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by the Plan.

For more detail, see Article VIII of the Plan, entitled "Effect of Confirmation of the Plan" which is incorporated herein by reference.

4.    *Cryptocurrency Rebalancing*

As disclosed in Article VII.A.2 of this Disclosure Statement, the Debtors' loan to 3AC resulted in a hole in the Debtors' Cryptocurrency portfolio and a deficiency of certain Cryptocurrency coins, particularly Bitcoin and USDC. Additionally, given that Account Holder Claims are dollarized as of the Petition Date, variance between Account Holder Claims as of the Petition Date and the Effective Date will exist due to continued fluctuation in cryptocurrency prices. As a result, to effectuate *pro rata* in-kind distributions of the Distributable Cryptocurrency to Account Holders pursuant to Article III.C.3(c) of the Plan, the Debtors must rebalance their Cryptocurrency portfolio through the purchase and sale of Cryptocurrency in a series of transactions (the "Rebalancing Exercise"). The Rebalancing Exercise shall be conducted to ensure that the aggregate value (in U.S. Dollars) for each type of Cryptocurrency coin or token held by the Debtors as a percentage of the aggregate value (in U.S. Dollars) of such type of Cryptocurrency coin or token that was on deposit with the Debtors as of the Petition Date (the "Rebalancing Ratio") is consistent across the Debtors' Cryptocurrency portfolio to process and initiate in-kind distributions.

To effectuate the Rebalancing Exercise, prior to the Effective Date, the Debtors plan to enter into a series of transactions that would result in the buying and selling of Cryptocurrency coins until the Rebalancing Ratio is consistent for each type of Cryptocurrency coin or token held by the Debtors (subject to a 5% variance allowance). The Debtors intend to execute such transactions, particularly for such Cryptocurrency that is less liquid, over a multi-week period in order to minimize the impact any such transactions may have on prevailing market prices for such coins. In order to minimize the impact trades have on prevailing market prices, the Debtors may use varying types of orders including time-weighted average price (TWAPs), market orders, limit orders, stop-limit orders, and other such order types as may be appropriate. Such transactions are likely to include swap transactions (*i.e.*, ETH/BTC) in order to minimize the total number of trades that need to be executed, as well as transactions directly for U.S. Dollars or conversion into equivalent stablecoins of a portion of the Debtors' Cryptocurrency portfolio as is

31

necessary to satisfy their obligations under the Plan. Transactions may be executed directly at prevailing market prices, executed on a bilateral basis through bid list requests or through block trades. At this time, the Debtors do not intend to use any derivatives or other hedging transactions. The Debtors anticipate that executing such transactions through third-party market makers, over-the-counter trading desks, and on third party exchanges where the Debtors maintains institutional trading accounts. The Debtors may also seek to engage third parties, including Binance.US, to execute such transactions on their behalf. Pursuant to the Purchase Agreement, the Debtors have agreed to execute such transactions on the Binance.US Platform unless they can obtain a better price from another third party. The number of Cryptocurrency coins that need to be bought and sold is unknowable at this time as the target ratio is based on future Cryptocurrency coin prices.

Accordingly, the Rebalancing Exercise is necessary to effectuate both the Sale Transaction and Liquidation Transaction under the Plan to ensure the Debtors can provide in-kind distributions of Distributable Cryptocurrency to Account Holders. In the event that the Sale Transaction is not consummated and the Debtors are proceeding with the Liquidation Transaction, prior to the Effective Date, the Debtors shall, in consultation with the Committee, be authorized to conduct the Rebalancing Exercise.

The Asset Purchase Agreement provides that the Debtors (prior to the transfer of Cryptocurrency or cash to Binance.US) and each transferred creditor (from and after the transfer of Cryptocurrency or cash to Binance.US) will retain all right, title, and interest in and to the Cryptocurrency or cash allocated to it in accordance with the Asset Purchase Agreement through and including such time as such Cryptocurrency or cash is returned to the Debtors or distributed to such transferred creditor. This is so even if transactions related to the Rebalancing Exercise are consummated on the Binance.US Platform, and such Cryptocurrency will be subject to the Debtors' customary security and control protocols while held by the Debtors. Upon the Effective Date, any Cryptocurrency or cash transferred to Binance.US will be held by Binance.US solely for the benefit of the Debtors or the Account Holders or Holders of OpCo General Unsecured Claims, as applicable, until distributions to Account Holders and Holders of OpCo General Unsecured Claims are made. In addition, the Debtors will determine the amount of Cryptocurrency and cash to be allocated to each Account Holder.

### 5. *Management Transition Plan*

Pursuant to the terms of the Plan, the Debtors shall implement the Management Transition Plan, the terms of which shall be reasonably acceptable to Purchaser and the Committee and included in the Plan Supplement. The Management Transition Plan shall help ensure that employees are available to provide transition services to the Debtors and/or the Wind-Down Entity to effectuate the Sale Transaction and to wind down the Debtors' Estates.

### 6. *Employee Transition Plan*

The Asset Purchase Agreement imposes a number of obligations on the Debtors, including obligations related to (a) making regulatory filings and cooperating with regulators; (b) maintaining and transferring data, including Know-Your-Customer data, securely and completely; (c) developing and implementing a user migration plan involving modifications to Voyager's web interface and mobile app; and an electronic process facilitating the acceptance of certain terms and conditions on the Binance.US Platform; (d) being available for a period following close of the Sale Transaction to provide assistance reasonably requested by the Purchaser in connection with the opening of user accounts and the transfer of information and Cryptocurrency in connection with the Sale Transaction; (e) providing the Purchaser with updates on technical support communications with customers; (f) rebalancing the Cryptocurrency on the Debtors' platform to prepare for closing of the Sale Transaction on a timely basis; (g) "unstaking" certain coins and ensuring they are freely transferrable and not subject to restrictions; and (h) from the date of signing through the date that is four months following close of the Sale Transaction, making available technical IT staff to Binance.US to assist it in understanding the Debtors' business software and transition accounts. *See, e.g.*, Asset Purchase Agreement §§ 6.4, 6.6, 6.10, 6.11, 6.15, and 6.16.

The Debtors will require the services of certain employees to fulfill these obligations and, without such employees, may not be able to satisfy the obligations in the Asset Purchase Agreement. Specifically, the Debtors will need certain employees in legal, finance, and compliance to satisfy the obligations in Section 6.4 of the Asset Purchase Agreement; operations, customer service, engineering, and security to satisfy the obligations in Section 6.6 of the Asset Purchase Agreement; operations, finance, and data to satisfy the obligations of Section 6.11 of the

Asset Purchase Agreement; operations to satisfy the obligations of Section 6.15 of the Asset Purchase Agreement; and security and engineering to satisfy the obligations of Section 6.16 of the Asset Purchase Agreement. The Debtors will also require the services of those employees in the event they need to "toggle" to a Liquidation Transaction for any reason, which would require the Debtors to, among other things, rebalance the Cryptocurrency in their possession and reopen the Debtors' platform for a period to permit customers to withdraw Cryptocurrency safely, among other things, while still interacting with, among others, state and federal regulators. The Debtors have created a transition plan for the approximately 35–40 employees necessary to fulfill either of these options, which is part of the Wind-Down Reserve, has the agreement of the Committee, and will be implemented by the Debtors, the Wind-Down Trustee, or both.

### 7. Non-Released D&O Claims

Any Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' CEO and/or CCO (regardless of any fiduciary capacity in which such individuals were acting) that are expressly related to approval of the 3AC Loan are not released pursuant to the Plan (collectively, the "Non-Released D&O Claims") and shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved by the Wind-Down Entity in accordance with the terms of Article IV.F of the Plan and subject to the Wind-Down Reserve. Any claims against the D&O Carriers that the Debtors' insurance transactions within the 90 days prior to the Petition Date are avoidable under the Bankruptcy Code, applicable state law, or both (the "Non-Released Insurance Claims") shall be assigned and transferred to the Wind-Down Entity to be pursued, settled, or resolved solely by the Wind-Down Entity in accordance with the terms of Article IV.F of the Plan. The Wind-Down Entity shall be a successor to the Debtors' rights, title, and interest in any Non-Released D&O Claims and Non-Released Insurance Claims, and the Wind-Down Entity shall have standing to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims in accordance with the terms of Article IV.F of the Plan; *provided that*:  (i) any recovery by the Wind-Down Entity (and the beneficiaries thereof) on account of any Non-Released D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O Liability Insurance Policies (and/or from the D&O Carriers directly) after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims; (ii) any party, including any trustee or any beneficiary of the Wind-Down Entity, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the Non-Released D&O Claims shall do so solely upon available insurance coverage from the Debtors' available D&O Liability Insurance Policies; and (iii) no party shall (a) record any judgment against the CEO or CCO, or (b) otherwise attempt to collect, directly or indirectly, from the personal assets of the CEO or CCO with respect to the Non-Released D&O Claims. For the avoidance of doubt, this provision does not enjoin, limit, or impair direct claims held by third parties against the Debtors' CEO or CCO (if any) other than any direct claims held by Holders of Claims or Interests that opt into the third party release in Article VIII.B of the Plan. Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the Non-Released D&O Claims; (y) final resolution of any coverage claims asserted against the Debtors' available D&O Liability Insurance Policies on account of the Non Released D&O Claims; or (z) exhaustion of the available insurance coverage under the D&O Liability Insurance Policies, the Non-Released D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order. For the avoidance of doubt, any release of the Non-Released D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.

The Debtors currently maintain $20 million in total D&O insurance coverage consisting of:  (i) a $5 million primary policy with XL Specialty Insurance Company (the "XL Primary Policy"), (ii) a $5 million excess policy issued by Euclid Financial and Relm Insurance Ltd. (the "Euclid/Relm Excess Policy"), and (iii) a $10 million excess policy issued again by XL Specialty Insurance Company (the "XL Excess Policy"). The Debtors' D&O insurance program provides coverage to the directors and officers of Voyager and its subsidiaries and will convert to a six-year tail period upon expiration or a change in control.

### 8. Corporate Structure Upon Emergence

On the Effective Date, the Wind-Down Entity shall be formed for the benefit of the Wind-Down Entity Beneficiaries, as determined by the Wind-Down Entity Agreement, to implement distributions of the Wind-Down Entity Assets. The Wind-Down Entity shall have no objective to continue or engage in the conduct of a trade or

business, except to the extent reasonably necessary to, and consistent with, the purpose of the Wind-Down Trust. Upon the transfer of the Wind-Down Entity Assets pursuant to the Wind-Down Entity Agreement, the Debtors shall have no reversionary or further interest in or with respect to the Wind-Down Entity Assets. For all federal income tax purposes, the Wind-Down Entity Beneficiaries will be treated as grantors and owners thereof, and it is intended that the Wind-Down Entity be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations. Accordingly, for federal income tax purposes, the transfer of assets to the Wind-Down Entity shall be deemed to occur as (i) a first-step transfer of the Wind-Down Entity Assets to the Holders of Secured Tax Claims, Other Priority Claims, Account Holder Claims, or General Unsecured Claims, as applicable, and (ii) a second-step transfer by such Holders to the Wind-Down Entity. As a result, the beneficiaries of the Wind-Down Entity shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Wind-Down Entity Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

As soon as possible after the transfer of the Wind-Down Entity Assets to the Wind-Down Entity, Wind-Down Trustee shall make a good faith valuation of the Wind-Down Entity Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the Wind-Down Trustee, and the Holders of Claims receiving interests in the Wind-Down Entity shall take consistent positions with respect to the valuation of the Wind-Down Entity Assets, and such valuations shall be utilized for all U.S. federal income tax purposes. The Wind-Down Entity shall file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Wind-Down Entity Assets (*e.g.*, income, gain, loss, deduction and credit). Each Wind-Down Entity Beneficiary holding a beneficial interest in the Wind-Down Entity shall receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Wind-Down Entity will pertain to Wind-Down Entity Beneficiaries who receive their interests in the Wind-Down Entity in connection with the Plan.

The Wind-Down Entity shall, in an expeditious but orderly manner, make timely distributions to the Wind-Down Entity Beneficiaries pursuant to the Plan and the Confirmation Order and not unduly prolong its duration. The Wind-Down Entity shall be deemed a successor in interest to the Debtors. For the avoidance of doubt, the Wind-Down Entity shall perform no actions other than receiving and distributing the Wind-Down Entity Assets, and not for any other purpose (including conducting any claims reconciliation).

The Wind-Down Trustee shall be the trustee responsible for executing the purpose of the Wind-Down Entity, which shall continue to have all of the rights and powers granted to the Wind-Down Debtors as set forth in the Plan and applicable non-bankruptcy law. The Wind-Down Trustee shall also have the rights, powers, and obligations set forth in the Wind-Down Entity Agreement.

The Restructuring Transactions Memorandum will enumerate the operational steps necessary to, if approved by the Court, effectuate the Plan, the Sale Transaction, and other transactions contemplated thereunder. The Restructuring Transactions Memorandum is a necessary mechanism, particularly for tax purposes, to outline the corporate actions taken. The Restructuring Transactions Memorandum does not alter the substantive rights of Holders of Claims or Interests. The Restructuring Transactions Memorandum will be included in the Plan Supplement.

B.       The ~~Plan Toggle~~ **Sale Transaction and the Liquidation Transaction**.

1.       *The Sale Transaction*

The Debtors, led by Moelis, engaged in a thorough marketing process for the sale of all or substantially all of the Debtors' assets in accordance with the Bidding Procedures. Following the two-week Auction, the Debtors entered into the FTX Purchase Agreement to sell substantially all of their assets to FTX US. Following the collapse of the FTX Transaction, the Debtors reengaged with several potential transaction parties and ultimately selected the offer from Binance.US, as described in greater detail in Article VIII.N of this Disclosure Statement, entitled "The Post-Petition Sale Process." The Debtors now seek to effectuate the Sale Transaction as set forth herein and in the Plan. If the Sale Transaction is consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the following terms shall govern:

On or prior to the Effective Date, the Debtors shall have consummated the Sale Transaction, and, among other things, the Acquired Assets and Assumed Liabilities shall have transferred to the Purchaser free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and the Purchaser shall pay to the Debtors or Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims, as applicable, the proceeds from the Sale Transaction and the Plan, as and to the extent provided for in the Asset Purchase Agreement and the Plan. The Debtors will have the right to continue to retain custody of Cryptocurrency on behalf of Holders of Account Holder Claims and cash on behalf of Holders of OpCo General Unsecured Claims pending such Holders' onboarding to the Binance.US Platform, and the Purchaser's obligation to deliver such Cryptocurrency and cash will commence upon Purchaser's receipt of such Cryptocurrency and cash from the Debtors. The Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down Entity, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Asset Purchase Agreement, the Customer Onboarding Protocol, and the Plan. The Debtors shall be authorized to sell any Cryptocurrency to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims and Allowed Other Priority Claims. On and after the Effective Date, except as otherwise provided in the Plan and the Wind-Down Trust Agreement, the Wind-Down Debtors, the Wind-Down Entity, or the Purchaser, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

Notwithstanding anything contained in this Disclosure Statement, the Plan, and any Definitive Documents, if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, all provisions contained in this Plan and the Definitive Documents governing the Sale Transaction shall have no further force and effect, and the provisions governing the Liquidation Transaction shall govern. The rights and remedies of the Seller and Purchaser under the Asset Purchase Agreement and any related orders of the Bankruptcy Court shall be expressly preserved.

Included below are disclosures regarding certain considerations related to the Sale Transaction, including: (a) Binance.US's financial wherewithal, both in terms of its ability to consummate the Asset Purchase Agreement as well as its ability to meet obligations to Account Holders and Eligible Creditors (as defined in the Asset Purchase Agreement); (b) Binance.US's holding of the Cryptocurrency of the Account Holders following the delivery of such Cryptocurrency to Binance.US, including how such Cryptocurrency is stored and what measures Binance.US has taken to ensure the secure storage of such Cryptocurrency; (c) regulatory considerations; (d) the process of onboarding the Account Holders and Eligible Creditors onto the Binance.US Platform as contemplated under the Asset Purchase Agreement; (e) VGX considerations; (f) data transfer and privacy considerations; and (g) the timing for distributions to Account Holders and Eligible Creditors in Unsupported Jurisdictions.

(a)       **Binance.US's financial wherewithal.**

Binance.US has the requisite financial wherewithal to make the payments contemplated under the Asset Purchase Agreement. The payments that Binance.US is required to make under the Asset Purchase Agreement are (1) a $20 million payment to the Debtors' estates in connection with the Sale Transaction, and (2) reimbursement of up to $15 million of the Debtors' expenses (to the extent any are due pursuant to Section 6.21 of the Asset Purchase Agreement). Binance.US has ample cash on hand (which does not include, for the avoidance of doubt, any customer assets) immediately available to cover such payments without the need for any external financing.

The Asset Purchase Agreement does not require Binance.US to make any cash or other payments in exchange for the Cryptocurrency to be transferred by the Debtors to its platform. Such Cryptocurrency is to be transferred to Binance.US on the basis of Binance.US having the obligation to make distributions to Account Holders in accordance with the Asset Purchase Agreement and the Plan.

Binance.US maintains 100% reserves for all its customers' digital assets (*i.e.*, if a customer has deposited 1 BTC with Binance.US, Binance.US holds 1 BTC on account of such customer's deposit). Binance.US's customer assets are available to be withdrawn at any time, subject to Binance.US's Terms of Use (which are available at: https://www.Binance.US/terms-of-use). Binance.US also has a sizeable and adequately capitalized balance sheet. Even if all of Binance.US's customers withdraw all of their digital assets, Binance.US would have substantial capital remaining on its balance sheet.

Binance.US also does not lend any of its customers' assets or offer margin products on its platform.

**(b)      Binance.US's holding of customer assets.**

The Asset Purchase Agreement, as amended to reflect input from the Committee, contemplates that all beneficial title to Cryptocurrency will remain with the Debtors up until the Effective Date. After that point, such Cryptocurrency will be transferred from the Debtors to Binance.US only as and when relevant creditors become eligible users (*i.e.*, satisfy Binance.US's know-your-customer requirements and accept the Binance.US terms and conditions identified above) on the Binance.US Platform in accordance with the Asset Purchase Agreement and Plan, and upon such transfer, Binance.US will be obligated to make such Cryptocurrency available to the relevant creditors within five (5) business days of receipt. Cryptocurrency that is transferred to Binance.US will be held by Binance.US pursuant to its standard digital asset wallet infrastructure which is stored on Amazon Web Services (AWS) servers located in Northern Virginia and Tokyo.

Binance.US has various security protocols in place to ensure the safe storage of customer assets. Binance.US's security protocols have achieved various third-party expert certifications attesting to their compliance with industry standards, including: (a) Payment Card Industry Data Security Standard (PCI DSS) certification, (b) International Organization for Standardization (ISO) 27001 and 27701 certifications, and (c) Service Organization Control (SOC 2) Type 2 attestation verified by an independent auditor.

**(c)      Regulatory Considerations.**

The Asset Purchase Agreement provides that Binance.US will make distributions to Account Holders and Eligible Creditors following the transfer of Cryptocurrency or cash by the Debtors to Binance.US (subject to and in accordance with the Asset Purchase Agreement and the Plan). Pursuant to Binance.US's Terms of Use and related policies and procedures, Binance.US will not make any distributions in any Unsupported Jurisdictions or allow trading by the accounts of Account Holders located in Unsupported Jurisdictions unless and until Binance.US has received the necessary licenses and/or authorizations. Binance.US has licenses, authorizations, or exemptions (as applicable) in the following Supported Jurisdictions that require such licenses, authorizations, or exemptions: Alabama (Sale of Checks License, SC 814); Alaska (Money Transmitter License, AKMT-012960); Arizona (Money Transmitter, 1009212); Arkansas (Money Transmission License, 119231); Connecticut (Connecticut Money Transmission License, MT-1906829); Delaware (Sale of Checks and Transmission of Money, 030095); Florida (FT230000290); Georgia (Seller of Payment Instruments License, 72019); Guam (Foreign Exchange/Money Transmittal - SRL NO 2316097); Idaho (Idaho Money Transmitters, MTL – 306); Iowa (Money Services License, 2020-0087); Illinois (Transmitter of Money, MT.00000392); Kansas (Kansas Money Transmitter License, MT.0000182); Kentucky (Money Transmitter License, SC723443); Maryland (Money Transmission License, 12-1906829); Maine (Money Transmitter License, NMT2053153); Michigan (Money Transmitter License,

36

MT0022936); Minnesota (Money Transmitter License, MT-1906829); Missouri (Sales of Checks and Money Transmitter, MO-21-8764); Mississippi (Money Transmitter License, MT1906829);Nebraska (Nebraska Money Transmitter License, 1906829); Nevada (FID Money Transmitter License, MT11161); New Hampshire (Money Transmitter, 23528-MT); New Jersey (Money Transmitter, L072139); New Mexico (Money Transmitter License); North Carolina (Money Transmitter License, 190690); North Dakota (North Dakota Money Transmitter License, MT103722); Ohio (Money Transmitter License, OHMT199); Oklahoma (Money Transmitter, OK-DOB-001); Oregon (Money Transmission License, 1906829); Pennsylvania (Pennsylvania Money Transmitter License, 80252); Puerto Rico (Money Transmitter License, TM-137); Rhode Island (Rhode Island Currency Transmitter License, 20224384CT); South Carolina (Money Transmitter License, 1906829); South Dakota (Money Transmitter, MT.2199); Tennessee (Money Transmitter License, 1906829); Virginia (Money Transmitter License, MO-403); Washington (Money Transmitter License, 550-MT-125281); Washington DC (District of Columbia Money Transmission License, MTR1906829); West Virginia (West Virginia Money Transmitter License, 1906829); and Wyoming (Money Transmitter License, 7292).[27]

Additionally, Binance.US does not currently intend on engaging in any activities in connection with or related to the Asset Purchase Agreement that require registration with the United States Securities Exchange Commission, the United States Commodity Futures Trading Commission, or any state securities and/or commodities authorities.

Again, Binance.US does not lend any of its customers' assets or offer margin products on its platform.

**(d)      The Binance.US Customer Onboarding Process.**

In advance of the Effective Date, and continuing after the Effective Date, Account Holders will be provided with the opportunity to create an account with Binance.US in order to receive an in-kind distribution of their claims in the same types of Cryptocurrency that they deposited with the Debtors. In connection with that process, such Account Holders will be prompted to accept Binance.US's Terms of Use (which are available at: https://www.Binance.US/terms-of-use) and Privacy Policy (available at: https://Binance.US/privacy-policy) and complete Binance.US's customer onboarding (*i.e.*, KYC) process. Account Holders will be able to withdraw their in-kind distributions from the Binance.US Platform – no Account Holder is required to continue to use Binance.US on a go-forward basis. To the extent any such Account Holders do not agree to the Terms of Use and Privacy Policy, or are unable to complete Binance.US's customer onboarding process, within three months of the Effective Date, Binance.US will liquidate the Cryptocurrency that would have been allocated to such Account Holders by selling such Cryptocurrency to other users of the Binance.US Platform at then-current market prices in accordance with Binance.US's trading rules (available at: https://www.Binance.US/trading-rules), and distribute the proceeds of such liquidation to the Debtors for further distribution to such Account Holders pursuant to the Plan. See also item (g) below with respect to distributions of Cryptocurrency to Account Holders located in Unsupported Jurisdictions.

**(e)      VGX considerations under the Sale Transaction.**

The Asset Purchase Agreement does not impose on Binance.US any obligation to list VGX or support trading VGX on its platform. Binance.US will conduct an internal review process with respect to whether it will support trading of the VGX on its platform. Such a determination involves myriad factors and may require input from various third-party advisors and experts, including legal counsel. Accordingly, Binance.US cannot predict with any accuracy the amount of time this analysis will require or its outcome.

Regardless of whether trading of VGX becomes supported on the Binance.US Platform, Account Holders may withdraw such tokens from their accounts on the Binance.US Platform when available to them in accordance with the Asset Purchase Agreement and the Plan, and subject to Binance.US's terms of use.

**(f)      Data Transfer and Privacy Considerations under the Sale Transaction.**

---

[27]   A comprehensive list of the licenses and authorizations currently held by Binance.US is available at: https://support.Binance.US/hc/en-us/articles/360050532193-Licenses. Note that certain jurisdictions do not require such licenses, authorizations, or exemptions (*e.g.*, California and Montana).

The Debtors' customer-facing privacy policy permits transfers of user data to a buyer or other successor in connection with a sale of the Debtors' assets, including as part of a bankruptcy, liquidation, or similar proceeding.[28] Following the transfer of such data, Account Holders' data will be subject to the Binance.US Privacy Policy. However, in order to facilitate quicker customer onboarding in order to enable Account Holders to access their in-kind distributions promptly after the Effective Date, the Asset Purchase Agreement contemplates that Account Holders will be provided with the ability to "opt-in" and consent to the transfer of their user data to Binance.US before the Effective Date occurs. Users will receive an email notification regarding the transfer of user data that presents the option to opt-in to the pre-closing transfer and provides a link to the Binance.US Privacy Policy. As described in Article VI.B.7 of this Disclosure Statement, the Debtors will continue to impose its security protocols before, through, and following the closing of the Sale Transaction, as necessary.

(g)     **Unsupported Jurisdictions under the Sale Transaction.**

Section 6.12(b) Asset Purchase Agreement contemplates that the Debtors are not required to deliver to Binance.US any assets associated with Account Holders or other creditors located in jurisdictions where Binance.US does not have appropriate licenses, regulatory authorizations or exemptions to provide the Binacnce.US platform and associated services (referred to herein as Unsupported Jurisdictions). The Unsupported Jurisdictions are Hawaii, New York, Texas, and Vermont. Instead of delivering the Cryptocurrency or cash distributions to Account Holders and Holders of OpCo General Unsecured Claims in such Unsupported Jurisdictions, the Debtors will retain control of such assets until Binance.US has received the appropriate license, authorization, or exemption, as applicable. If Binance.US does not receive such license, authorization, or exemption within six months following the Effective Date (*i.e.*, three months longer relative to Account Holders and Holders of OpCo General Unsecured Claims in Supported Jurisdictions), the Debtors will cause such assets to be liquidated (which liquidation may be conducted through Binance.US) and provide the cash proceeds for distribution to Account Holders and Holders of OpCo General Unsecured Claims in such Unsupported Jurisdictions in accordance with the Plan. Binance.US is currently working with state regulators to seek the requisite state licenses, authorizations, exemptions, or other alternative solutions, as applicable, in order to enable distributions to Account Holders and Holders of OpCo General Unsecured Claims in Unsupported Jurisdictions, and will continue to do so following the Effective Date to the extent such approvals or regulatory accommodations have not been granted. For avoidance of doubt, there is no guarantee or assurance that Binance.US will be able to obtain the necessary licenses, authorizations, or exemptions in order to enable it to make Cryptocurrency or cash distributions to Account Holders and Holders of OpCo General Unsecured Claims in Unsupported Jurisdictions. As such, the Debtors may be required to liquidate the Cryptocurrency held by Account Holders in Unsupported Jurisdictions and provide the cash proceeds for distribution to such Account Holders after the expiration of the six-month period following the Effective Date in accordance with the terms of the Plan.

2.     *The Liquidation Transaction*

If the Sale Transaction is not consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the Debtors will "toggle" to the Liquidation Transaction and the following terms shall govern:

---

[28]   *See* Voyager Privacy Policy, ¶ 6, available at: https://www.investvoyager.com/privacypolicy/.

On or after the Outside Date, the Debtors will pursue the Liquidation Transaction in accordance with the Liquidation Procedures. Pursuant to the Liquidation Transaction, the Debtors, the Wind-Down Entity, or the Wind-Down Trustee, as applicable, will distribute certain of the Cryptocurrency in-kind to Holders of Account Holder Claims in accordance with Article III.C of the Plan, transfer all Wind-Down Entity Assets or Wind-Down Trust Assets to the Wind-Down Reserve, liquidate certain of the Cryptocurrency, wind down and dissolve the Debtors, and pursue final administration of the Debtors' Estates pursuant to the Bankruptcy Code.

The Debtors, or the Wind-Down Entity, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Liquidation Transaction pursuant to the Plan. On or before the date that that is twenty-one days prior to the anticipated commencement of the Liquidation Transaction, the Debtors, or the Wind-Down Entity, as applicable, shall file the Liquidation Procedures with the Bankruptcy Court. Parties in interest shall have ten days to object to the Liquidation Procedures, and if no objections are timely filed, the Liquidation Procedures shall be approved. In the event of a timely objection, the Bankruptcy Court shall adjudicate any objection to the Liquidation Procedures.

On and after the Effective Date, except as otherwise provided in the Plan, the Wind-Down Trust Agreement, and the Liquidation Procedures, the Wind-Down Debtors or the Wind-Down Entity as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

## C.     Means for Implementation of the Plan.

### 1.     *Wind-Down Trust*

On or after the Effective Date, the Wind-Down Trust will be established. The Wind-Down Trust shall be the successor-in-interest to the Debtors, and the Wind-Down Trust shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Trust Assets. The Wind-Down Trust will conduct no business operations and will be charged with winding down the Debtors' Estates. The Wind-Down Trust shall be managed by the Wind-Down Trustee and shall be subject to a Wind-Down Trust Oversight Committee. For the avoidance of doubt, in the event that the Restructuring Transactions Memorandum specifies that the Wind-Down Debtors will be the Wind-Down Entity, the Wind-Down Debtors shall be managed by the Wind-Down Trustee and shall be subject to the Wind-Down Trust Oversight Committee in the same manner as if the Wind-Down Entity is the Wind-Down Trust. The Wind-Down Trust shall be administered in accordance with the terms of the Wind-Down Trust Agreement and shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget. For the avoidance of doubt, the Wind-Down Trust shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset. The Wind-Down Trust shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Trust Assets shall, subject to the Wind-Down Trust Agreement, be transferred to and vest in the Wind-Down Trust or the Wind-Down Debtors, as applicable. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Entity specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.E and Article IV.F.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Trust and the Wind-Down Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Wind-Down Trust Agreement, compromise or settle any Wind-Down Trust Assets transferred to the Wind-Down Trust. On and after the Effective Date, the Wind-Down Trust and the Wind-Down Trustee may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Trust Assets transferred to the Wind-Down Trust or rights to payment or Claims that belong to the

Debtors as of the Effective Date or are instituted by the Wind-Down Trust and Wind-Down Trustee on or after the Effective Date, except as otherwise expressly provided herein and in the Wind-Down Trust Agreement. All of the Wind-Down Trust's activities shall be subject to the Wind-Down Reserve and the Non-Released D&O Claim Budget. The Wind-Down Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

Based on its preliminary investigation of non-released Claims against third parties unaffiliated with the Debtors, the Committee has identified potential Claims against non-released third parties unaffiliated with the Debtors that the Wind-Down Entity will seek to investigate further and may pursue. To ensure that the Wind-Down Entity has sufficient resources to pursue Claims discovered through its investigation, the Committee voted and determined that approximately $60 million should be included in the Wind-Down Reserve for that investigation and potential offensive litigation, and the Committee believes this investment (to the extent ultimately made) will benefit Holders of Claims. All expenses will be reviewed and approved by the appointed Trustee of the Wind-Down Trust who has a fiduciary obligation to ensure that expenses are responsibly spent. The Wind-Down Entity will act responsibly in assessing and pursuing litigation, only pursuing Claims that it believes will create a net benefit for Holders of Claims. The funds obtained in litigation by the Wind-Down Trust and unused funds will be returned to Holders of Claims. The Wind-Down Entity's goal is to obtain and return to Holders of Claims as much Cryptocurrency and fiat as possible.

### 2. Wind-Down Trustee and the Wind-Down Trust Oversight Committee Exculpation, Indemnification, Insurance, and Liability Limitation

The Wind-Down Trustee, the Wind-Down Trust Oversight Committee, and all professionals retained by the Wind-Down Trustee and the Wind-Down Trust Oversight Committee, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors. The Wind-Down Trustee may obtain, on behalf of itself and the Wind-Down Trust Oversight Committee, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors. The Wind-Down Trustee and the Wind-Down Trust Oversight Committee may rely upon written information previously generated by the Debtors.

### 3. Tax Returns

After the Effective Date, the Wind-Down Trustee shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors and the Wind-Down Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

### 4. Dissolution of the Wind-Down Debtors

Upon a certification to be Filed with the Bankruptcy Court by the Wind-Down Trustee of all distributions having been made and completion of all of its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction. The Wind-Down Trustee, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

### 5. Statutory Committee and Cessation of Fee and Expense Payment

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except for the Filing of applications for compensation. The Wind-Down Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committee, including the

Committee, after the Effective Date, except in connection with any fees or expenses for services rendered prior to the Effective Date that are Allowed by the Bankruptcy Court.

### 6. *Distributions of Net Owed Coins; Additional Bankruptcy Distributions*

As a general matter, the Purchaser will allocate each Account Holder's Net Owed Coins to its account on the Binance.US Platform, and each Holder of OpCo General Unsecured Claim's Pro Rata share of the Distributable Cryptocurrency (in Cash) to its account on the Binance.US Platform, in each case in accordance with, and subject to, the provisions of Section 6.12 and 6.14 of the Asset Purchase Agreement, as applicable.

As a general matter, the Customer Onboarding Protocol will provide that the Purchaser will make Additional Bankruptcy Distributions to Transferred Creditors corresponding to their Pro Rata shares of such Additional Bankruptcy Distribution (if such Additional Bankruptcy Distribution is in Cryptocurrency, based on the spot market value on the Binance.US Platform of the Cryptocurrency included in such Additional Bankruptcy Distribution), all in accordance with any applicable Post-Bankruptcy Statement (as defined in the Asset Purchase Agreement).

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim does not become a Transferred Creditor prior to the date that is three (3) months following the later of the Effective Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept, (as provided in the Customer Onboarding Protocol) then Purchaser shall convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with the Plan and the Customer Onboarding Protocol.

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim is located in an Unsupported Jurisdiction (as defined in the Asset Purchase Agreement), then the Net Owed Coins, cash and Additional Bankruptcy Distributions, as applicable, allocable to such Person shall be handled pursuant to Section 6.12(b) or, if applicable, Section 6.14(d) of the Asset Purchase Agreement.

Purchaser shall have no responsibility to make any distributions other than as contemplated by Sections 6.12 and 6.14 of the Asset Purchase Agreement.

### 7. *Election to Contribute Third-Party Claims*

To date, there has not been an investigation into direct claims that can be asserted against third parties. Accordingly, specific claims against third parties, including the Contributed Third-Party Claims are not yet determined. After the Effective Date, the Wind-Down Entity will conduct an investigation into claims that can be asserted against third parties. After that investigation is completed, the Wind-Down Entity will assess the viability and collectability of potential claims before determining whether to pursue them. Because aggregating all Contributed Third-Party Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Wind-Down Entity. By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Entity, it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind-Down Entity, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Entity to memorialize and effectuate such contribution. For the avoidance of doubt, any recoveries by the Wind-Down Entity from the pursuit of Contributed Third-Party Claims shall be for the benefit of all creditors.

On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Wind-Down Entity and shall thereafter be Wind-Down Trust Assets for all purposes. No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Wind-Down Trust Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down Trust will or will not pursue any and all available Contributed Third-Party Claims against such Person. The Wind-Down Trust shall

41

have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date. For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

## VI. THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE

### A. The Debtors' Corporate Structure and History.

Voyager was founded in 2018 by Stephen Ehrlich, Philip Eytan, Gaspard de Dreuzy, and Oscar Salazar, a group of Wall Street and Silicon Valley entrepreneurs with extensive experience in the technology and finance sectors. Voyager was founded to bring choice, transparency, and cost efficiency to cryptocurrency investors and was designed to be "accessible to all" by focusing on the needs of retail customers.

Voyager grew rapidly—in just four years, Voyager's platform evolved from a small startup to an industry-leading trading platform that reached a peak of 3.5 million users and over $5.9 billion of cryptocurrency assets held. Voyager is a public company that began trading on the Toronto Stock Exchange in 2021 under the ticker "VOYG."[29] A simplified version of the Debtors' current corporate structure is as follows:



### B. The Debtors' Assets and Operations.

Voyager's primary operations consist of (i) a trading platform, (ii) custodial services through which customers earn rewards on stored cryptocurrency assets, and (iii) lending and staking programs. All of the

---

[29]    On July 6, 2022, the Toronto Stock Exchange suspended all trading in VOYG.

Company's services are accessible through a mobile application that users can download on their smartphones and other smart devices.

### 1.    The Trading Platform

Traditional trading platforms have largely focused on either retail investors or institutional investors, tailoring features to one group at the exclusion of the other.  Voyager's founders understood that, though retail investors do not need the full suite of services that an institutional-focused trading platform provides, retail investors deserve a high-quality trading experience that maximizes their ability to invest in the cryptocurrency sector on an equal playing field with other market participants.

Voyager operates as a cryptocurrency trading platform, matching its customers with counterparties who can facilitate the customer's desired trade.  The Company's platform is simple and easy to use, but beneath the retail customer-focused user interface is an institutional-grade trading platform built to provide Voyager's customers with high-quality trade execution across numerous digital currencies.  The Company's platform is unique as it surveys more than a dozen exchanges and liquidity providers and executes trades through a proprietary algorithm that evaluates the price, certainty of execution, reliability of the trading venue, and speed of execution to deliver each customer a high-quality execution.  Ultimately, Voyager's customers know that they have access to a best-in-class trading platform no matter how big or small their trade.

### 2.    Custodial Services

Digital currencies deposited by customers are stored on Voyager's platform in omnibus wallets rather than in individualized digital "wallets."  In exchange, Voyager customers earn rewards on deposits.  Prior to the Petition Date, rewards were primarily paid in three ways: (i) PIK Rewards, as defined below; and (ii) through the VGX Token and the Voyager Loyalty Program, as defined below.  To complement its custodial services and the Voyager Loyalty Program, customers can sign up for the Voyager Debit Card.

*PIK Rewards*.  Customers who deposit certain currencies with Voyager earn payable-in-kind interest ("<u>PIK Rewards</u>") on their assets through the Voyager Earn Program, provided that such users maintain a minimum monthly balance and keep their assets on the Company's platform.

*Voyager Loyalty Program and VGX Token*.  Voyager token ("<u>VGX</u>" or "<u>Voyager Token</u>") is a digital currency issued and administered by the Company.  VGX is primarily issued in connection with the Company's loyalty and rewards program (the "<u>Voyager Loyalty Program</u>").  Ownership of VGX entitles users to benefits on their accounts operating through a tiered reward system.  VGX is traded on the Coinbase Exchange under the ticker "VGX."

The Voyager Loyalty Program is similar to retail or restaurant loyalty programs where loyal users are rewarded for continued use of the platform.  Active users on the Voyager platform can earn a variety of rewards and incentives, including higher referral bonuses, lower transaction fees, prioritized customer support, higher PIK Rewards rates, and access to special events and investment opportunities.

### 3.    Staking

Staking offers another revenue avenue for Voyager by generating passive income on coins that are staked through staking protocols without needing to sell the underlying cryptocurrency.  This process involves committing cryptocurrency assets to a project in exchange for a set rewards rate determined by each staking protocol.

### 4.    Voyager's Lending Program[30]

Prior to the Petition Date, the Debtors lent cryptocurrency deposited on its platform to third parties.  Such third parties paid the Debtors a pre-negotiated interest rate that was payable in payment-in-kind (*i.e.*, a Bitcoin loan accrues interest payable in Bitcoin).  During these chapter 11 cases, the Debtors recalled all outstanding loans made

---

[30]    The Lending Program is described in further detail in the First Day Declaration.

to third parties, with the exception of certain loans made to Galaxy Digital LLC. The Debtors expect to unwind the loans made to Galaxy Digital LLC prior to confirmation.

### 5.    *Voyager's Investments*

Prior to the Petition Date and in the ordinary course of business, Voyager made equity investments in certain public and private companies primarily focused on venture capital initiatives. Such investments are in an aggregate amount of approximately $9.7 million across 11 companies and yield varied amounts of dividends based on the terms of such equity investments.

### 6.    *Using Voyager's Platform*

Customers access the Company's entire suite of services through Voyager's mobile application (the "Voyager App"). Customers sign up for a Voyager account on the Voyager App after digitally executing Voyager's customer agreement and linking their bank account or off-site cryptocurrency wallet to the platform to facilitate the purchase of cryptocurrency or the transfer of the customer's own cryptocurrency to the platform.

The Company does not maintain a separate cryptocurrency wallet for each customer. Instead, all cryptocurrency assets are commingled on an asset-by-asset basis and held in omnibus accounts in the name of Voyager Digital, LLC. When a customer deposits crypto assets, the assets first enter Voyager's self-custody wallet system (such system, "Bedrock"). All deposits of crypto assets are subject to Voyager's transaction monitoring program that uses Chainalysis Pte. Ltd. ("Chainalysis"), a third-party vendor, to conduct blockchain review of crypto assets transferred to the Voyager platform. If a customer's external crypto wallet depositing crypto assets is flagged by Chainalysis, Voyager is alerted by Chainalysis and Voyager conducts an investigation and takes appropriate actions, up to and including restricting and offboarding the customer account. If the wallet passes Chainalysis verification, then the relevant crypto assets are swept automatically from Bedrock for transfer to the applicable omnibus account with a third-party custodian or self-custody solution, which Voyager controls.

### 7.    *Voyager's Security Processes and Procedures*

Voyager has a defined cybersecurity framework that includes protecting people, technology, and digital assets. The security protocols utilize several strategies and activities, including conducting first and third-party security assessments, multi-party computation ("MPC") and asset protection, and diligent monitoring and proactive hunting for risks. The Debtors use four different custodial solutions to hold and safely store a majority of the Cryptocurrency: Fireblocks Inc. ("Fireblocks"), Copper.co ("Copper"), Anchorage Digital Bank N.A. ("Anchorage"), and Coinbase Trust Company ("Coinbase"), and one self-custodial software solution called Gnosis (collectively, the "Custodians").[31] Specifically, all of the Custodians use MPC, which is one of the primary technologies custodians in the industry utilize to secure Cryptocurrency assets. Through MPC, private keys are never constructed in one place, which minimizes the possibility for a single point of compromise. To set up keys, wallets typically are "multi-signer" wallets that require a threshold of co-signers on behalf of the Custodian and a threshold of co-signers on behalf of Voyager. None of the parties are able to sign a transaction by themselves to setup a key and none of the Custodians hold the entire "private key" for wallets.

Each individual MPC key share is also randomized in a hardware isolated component to mitigate the risk of takeover by an outsider or insider who has access to a threshold device holding the MPC key shares. The process also involves a verification process where each of the co-signers assures that the metadata matches the request it carries. Fireblocks also enables Voyager to back up the set of MPC key shares of a Fireblocks Vault and load them onto a secure offline environment, which may be used to reconstruct a "master private key" of the Fireblocks Vault in the event of loss. Additionally, Voyager's other Custodians have the same or similar procedures (*e.g.*, the Company's agreement with Copper provides a failsafe mechanism through a trusted third-party agreement if Voyager or Copper loses their keys to access wallets).

---

[31]    The Debtors have approximately $15-20 million worth of Coins held on exchanges that are not supported by the Custodians. The Debtors' Head of Treasury has sole access and control over these Coins to minimize any security breaches.

Under all of the custodial agreements with the Custodians, Voyager must nominate authorized persons to access the custodial platform and give directions on what to do with the digital assets stored on their platform. The Custodians only act through directions provided by the nominated persons. A very limited number of people at the Company are deemed authorized persons who have access to control the custodial accounts. Such people are the only ones who can otherwise authorize the Custodian to move Cryptocurrency out of their "vault." Voyager selects designated persons only after going through a quorum approval process in place at the Company. There is not a single person at Voyager that can execute a transaction without authorization from at least one other person.

The Debtors also have their own robust key management processes in place, including key storage technology and secret managers such as LastPass to store passwords. These security measures have been sufficient to safeguard the Debtors' valuable Cryptocurrency assets and are on par with security measures employed by financial institutions and other sectors that employ military-grade security. To date, Voyager has never had any security issues with the Custodians or run into any issues with lost keys.

The Debtors utilize a combination of cutting-edge technology and top cybersecurity talent to protect their assets as part of a multilevel cybersecurity framework. For example, for any large withdrawals, the Debtors historically engaged in an automated risk assessment that utilized multiple techniques to analyze risk factors. Cases flagged at certain risk levels are first escalated to the Company's customer experience team and then escalated, as necessary, to the Company's anti-fraud operations team to review and investigate.

The Debtors maintain a robust security operations center that is responsible for the monitoring of the Debtors' infrastructure and interfaces to prevent misappropriation and external cyber-attacks with respect to the Cryptocurrency and Cryptocurrency-based transactions. The Debtors also work with leading vendors that are used by institutions worldwide to provide the security services needed to protect client assets and data. Importantly, Voyager has also never been subject to a security breach falling directly within Voyager's control (customers may have been susceptible to outside breaches due to weak passwords, for example). Between December 2021 and June 2022 alone, the Company's security team mitigated over six million intrusion attempts.

Due to the digital nature of the Cryptocurrency, they cannot be stored in a traditional bank account, the Debtors believe the security protocols and controls as described in herein and the ongoing collaboration and work with vendors, such as the Custodians, are sufficient to address the bespoke protections the Cryptocurrency require and all Cryptocurrency is secure. For the avoidance of doubt, the Debtors will continue to impose the security protocols defined herein for all Cryptocurrency held on their platform, including before, through, and following the Effective Date and closing of the Sale Transaction, as necessary.

## C.     The Debtors' Capital Structure.

### 1.     *The Debtors' Debt Obligations*

On June 22, 2022, Voyager Digital Holdings, Inc. entered into that certain agreement for the revolving credit facility dated June 21, 2022 (the "Loan Agreement," and such facility, the "Loan Facility"), with Alameda Ventures Ltd. ("Alameda") as lender, to provide a revolving credit facility of $200 million cash and USD Coin ("USDC," and such loans, the "Cash Loans") and 15,000 Bitcoin ("BTC," and such loans the "BTC Loans") guaranteed by Voyager Digital Ltd. As of the Petition Date, the total value of aggregate consideration available under the Loan Facility was approximately $500 million.[32] However, Debtor Voyager Digital Holdings, Inc. was only able to access 75 million USDC under the Loan Facility due to borrowing restrictions. The aggregate value of the USDC outstanding is $75 million.[33]

The borrowers under the Loan Agreement can draw on the Loan Facility in U.S. dollars or USDC under the Cash Loans or in BTC under the BTC Loans. The Loan Facility accrues interest on the outstanding principal balance at a rate equal to five percent annually. Any accrued interest is due on December 31, 2024, the Loan Facility's maturity date. Repayment of any principal balance is required to be in the currency in which the amount

---

[32]   Assuming a Bitcoin price of $20,000.

[33]   As a stablecoin, USDC is pegged to $1 per coin.

was funded (if in BTC, the repayment must be equal to the amount drawn down and outstanding at the time of repayment).

### 2.    The Debtors' Intercompany Obligations

There are six intercompany obligations owed between the Debtors (collectively, the "Intercompany Obligations"). The Intercompany Obligations comprise four Intercompany Obligations owed by OpCo to TopCo, one Intercompany Obligation owed by OpCo to HoldCo, and one Intercompany Obligation owed by HoldCo to TopCo. Additionally, in the ordinary course of business, the Debtors make payments by one Debtor on behalf of another Debtor, resulting in intercompany receivables between the Debtor entities (collectively, the "Intercompany Receivables"). Whether any given Intercompany Obligation or Intercompany Receivable is a valid intercompany loan or a capital contribution depends on the consideration of a number of relevant factors. Based on the Debtors' preliminary analysis, it is likely that at least five of the six Intercompany Obligations are capital contributions because TopCo received third-party equity investments and subsequently pushed down such investments to OpCo to fund the Debtors' operating business. Similarly, based on the Debtors' preliminary analysis, it is likely that the Intercompany Receivables are capital contributions based on a number of factors, including that the Debtors intentionally never settle the Intercompany Receivables. The independent directors at TopCo, HoldCo, and OpCo have engaged independent counsel and are conducting a review to analyze the Intercompany Obligations and their treatment as capital contributions or loans.

In the event that any Intercompany Obligation or Intercompany Receivable owed by OpCo one the one hand to TopCo or HoldCo on the other hand is determined to be a loan, recoveries to Account Holders and Holders of OpCo General Unsecured Claims may be reduced. This Disclosure Statement assumes that the Intercompany Obligations between the Debtors and all Intercompany Receivables between the Debtors will be recharacterized as capital contributions and will not be entitled to Pro Rata recoveries with other Holders of Claims at the applicable Debtor entity.

Below is a summary of each of the Intercompany Obligations and Intercompany Receivables and the Debtors' conclusions regarding whether such are valid loans or capital contributions. The Ad Hoc Equity Holder Group disputes the Debtors' conclusions regarding the Intercompany Obligations and Intercompany Receivables.

### (a)    Intercompany Obligations by OpCo to TopCo.

#### i.    *The Loan Agreement between Voyager Digital Ltd., as Lender, and Voyager Digital, LLC, as Borrower, dated February 12, 2021*

On February 12, 2021, OpCo, as borrower, entered into that certain loan agreement with TopCo, as lender, to document the $70 million unsecured loan previously received by OpCo from TopCo (the "February 2021 Term Loan"). The February 2021 Term Loan matures on February 12, 2024 and accrues interest at a rate equal to LIBOR plus 8.75% annually with interest payments due quarterly. No interest payments have ever been made by OpCo to TopCo on account of the February 2021 Term Loan. The Debtors contemplated and entered into the February 2021 Term Loan after the amount had already been funded to OpCo solely to optimize tax positions in the most efficient manner after TopCo received third-party equity investments and subsequently pushed down such investments to OpCo to fund the Debtors' operating business.

As of the Petition Date, the balance under the February 2021 Term Loan was approximately $78.9 million (including accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the February 2021 Term Loan would be determined to be a capital contribution due to (i) the lack of repayment history, (ii) the fact that the February 2021 Term Loan was documented significantly after the amount had already been funded to OpCo, (iii) the fact that the February 2021 Term Loan was entered into solely to optimize tax positions, (iv) OpCo is the primary operating entity for Voyager's entire enterprise and TopCo was providing the necessary capital contribution to allow OpCo to operate, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and TopCo, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment. Although the February 2021

Term Loan was formally documented, other factors, including those mentioned above, support the conclusion that the February 2021 Term Loan is most likely to be a capital contribution.

        ii.        ***The Revolving Credit Agreement between Voyager Digital Ltd., as Lender, and Voyager Digital, LLC, as Borrower, dated February 12, 2021***

On February 12, 2021, OpCo, as borrower, entered into that certain revolving credit agreement with TopCo, as lender, to document the unsecured revolving credit facility with borrowing availability of up to $17.5 million previously provided by TopCo to OpCo (the "February 2021 Revolving Loan"). The February 2021 Revolving Loan matures on February 12, 2024 and accrues interest at a rate equal to LIBOR plus 7.50% annually with interest payments due quarterly. No interest payments on behalf of the February 2021 Revolving Loan have ever been made by OpCo to TopCo. The purpose of the February 2021 Revolving Loan was to provide OpCo with access to ongoing working capital and operate the business for the enterprise. The Debtors contemplated and entered into the February 2021 Revolving Loan after the amount had already been funded to OpCo solely to optimize tax positions in the most efficient manner after TopCo received third-party equity investments and subsequently pushed down such investment to OpCo to fund the Debtors' operating business.

As of the Petition Date, the outstanding amount under the February 2021 Revolving Loan was approximately $1.47 million (consisting of approximately $886,619 of principal borrowings and $590,904 of accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the February 2021 Revolving Loan obligation would be determined to be a capital contribution due to (i) the lack of repayment history, (ii) the fact that the February 2021 Revolving Loan was documented significantly after the amount had already been funded to OpCo, (iii) the fact that the February 2021 Revolving Loan was entered into solely to optimize tax positions, (iv) OpCo is the primary operating entity for Voyager's entire enterprise and TopCo was providing the necessary capital contribution to allow OpCo to operate, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and TopCo, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment. Although the February 2021 Revolving Loan was formally documented, other factors, including those mentioned above, support the conclusion that the February 2021 Revolving Loan is most likely to be a capital contribution.

        iii.        ***The November 2021 Intercompany Obligation between Voyager Digital Ltd. and Voyager Digital, LLC***

In November 2021, TopCo received a third-party equity investment in amount of $75 million and pushed such investment down in its entirety to OpCo to fund OpCo's working capital for purposes of its business operations.

As of the Petition Date, the outstanding amount on this November 2021 intercompany obligation was approximately $79.27 million (including any accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the November 2021 intercompany obligation would be determined to be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and TopCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.

        iv.        ***The May 2022 Intercompany Obligation between Voyager Digital Ltd. and Voyager Digital, LLC***

In May 2022, TopCo received a third-party equity investment in amount of $57 million and pushed such investment down in its entirety to OpCo to fund OpCo's working capital for purposes of its business operations.

47

As of the Petition Date, the outstanding amount on this May 2022 intercompany obligation was approximately $57.8 million (including any accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the May 2022 intercompany obligation would be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and TopCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.

### (b)    Intercompany Obligation by OpCo to HoldCo.

In June 2022, HoldCo received a loan under the Alameda Loan Facility in the amount of $75 million from Alameda for the purpose of providing funding directly to OpCo in light of the crypto industry downturn described in Article VII.A-B of this Disclosure Statement.  Accordingly, HoldCo pushed the entire investment down to OpCo to fund OpCo's platform.

As of the Petition Date, the outstanding amount on this June 2022 intercompany obligation was approximately $75 million.

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the June 2022 intercompany obligation would be a capital contribution due to (i) the absence of instruments of indebtedness, (ii) no existence of a fixed maturity date or schedule of payments, (iii) no existence of a fixed interest rate and interest payments, (iv) the source of repayment was solely dependent on OpCo's business performance, (v) the identity of interest between OpCo and HoldCo, (vi) the absence of security for the advance, and (vii) the absence of a sinking fund to provide for repayment.  Alameda disputes the treatment of this Intercompany Obligation.

### (c)    Intercompany Obligation by HoldCo to TopCo.

On October 26, 2021, HoldCo, as borrower, entered into that certain promissory note with TopCo, as lender, in the amount of $6 million (the "Promissory Note").  The Promissory Note matures on September 30, 2024 and accrues interest at a rate equal to LIBOR plus 8.75% annually with interest payments due quarterly.  To date, no interest payments on behalf of the Promissory Note have been made by HoldCo to TopCo.  To comply with certain Canadian laws, TopCo made a third-party investment into a private company and then contributed the acquired shares of the third party company down to HoldCo.  In exchange for the contribution of the third-party's shares, TopCo and HoldCo then entered into the Promissory Note.

As of the Petition Date, the outstanding note amount was approximately $6.33 million (consisting of approximately $6 million of principal borrowings and $329,943 of accrued interest).

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the Promissory Note would be a capital contribution due to the fact that the Promissory Note was entered into after the amount was already funded to HoldCoto make a third-party equity investment into a privately-held company and then contributed the acquired shares to HoldCo in exchange for the Promissory Note.

### (d)    Intercompany Transactions Between Debtors.

As is customary for a company of the Debtors' size and scope, the Debtors have historically, in the ordinary course of business, engaged in routine business relationships with each other, including making payments by one Debtor on behalf of another (collectively, the "Intercompany Transactions"), resulting in intercompany receivables between the Debtor entities.  The Intercompany Transactions are generally allocation payments on account of such things as equity-based employee compensation, non-equity-based employee salaries and benefits, ordinary course professional fees, rent and other ordinary course operating costs.

As of the Petition Date, the following intercompany receivables were outstanding:

48

- approximately $138,000 owed by OpCo to HoldCo;
- approximately $26.3 million owed by HoldCo to OpCo; and
- approximately $2.1 million owed by HoldCo to TopCo.

Based on the totality of the circumstances, the Debtors believe, if litigated, that there is a high likelihood that the Intercompany Transactions would be capital contributions due to (i) the Debtors' intentionally never settling the balances, (ii) the absence of instruments of indebtedness, (iii) no existence of a fixed maturity date or schedule of payments, (iv) no existence of a fixed interest rate and interest payments, (v) the source of repayment was solely dependent on OpCo's business performance, (vi) the identity of interest between OpCo and HoldCo and TopCo, as applicable, (vii) the absence of security for the advance, and (viii) the absence of a sinking fund to provide for repayment.

### 3.    *The Equity Interests in the Debtors*

As of the Petition Date, the Debtors' ultimate parent, Voyager Digital Ltd., has approximately 196,000,000 shares of common stock outstanding, approximately 9.49 percent of which is held by Alameda and its affiliates with the remainder widely held by investors.

## VII.    EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.    Market and Industry-Specific Challenges.

### 1.    *2020 and 2021 Market Conditions*

The onset of the COVID-19 pandemic was a watershed moment in traditional markets and cryptocurrency markets alike. Between February 12, 2020, and March 23, 2020, the Dow Jones Industrial Average lost 37 percent of its value and the S&P 500 lost 34 percent of its value. The price of Bitcoin fell over 50 percent over the same time period, and most other cryptocurrencies experienced similar declines.

Fear of a lingering pandemic and its effect on the world economy drove many investors to exit the market altogether. Voyager, however, continued to operate its trading platform through the entirety of the 2020 "COVID Crash." Customers were able to use the platform to trade despite extreme volatility in the markets, and interest and rewards were paid out to qualifying customers as well. The Company's response to market headwinds in 2020 solidified its status as a leading cryptocurrency trading platform—between 2020 and 2022, the number of users on the Company's platform grew from 120,000 to over 3.5 million.

After the COVID Crash, traditional markets and cryptocurrency markets saw a short recovery period followed by a period of sustained growth. Central banks and governments around the world (including, in particular, the United States Federal Reserve) enacted relief programs and adopted quantitative easing monetary policies designed to bridge the world economy to the end of the COVID-19 pandemic. Such policies contributed to growth in traditional markets and cryptocurrency markets, and investment into new projects in the cryptocurrency industry skyrocketed. Between its lowest point in 2020 and its highest point in 2021, the price of Bitcoin rose by over 1,000 percent. The S&P 500 rose by nearly 100 percent over the same period.

In traditional markets, fears of new variants of the COVID-19 virus and a potential economic contraction drove a series of sell-offs as equity markets moved sideways through the end of 2021. In the cryptocurrency space, strong sell-offs in "risk-on" assets, like technology and early-stage equities, led to sell-offs in the cryptocurrency sector as investors trimmed exposure. Increased regulatory scrutiny internationally also contributed to market pessimism, and strong spot trading from institutional investors drove most cryptocurrencies to double-digit losses relative to all-time highs.

Ultimately, traditional markets closed 2021 with double-digit growth. On the surface, it seemed like markets were beginning to recover from the COVID-19 pandemic and that the lingering effects of the pandemic would be minimal. But discussions around a potential recession in 2022 began to materialize as inflation rose along with concerns over whether world governments could navigate a "soft landing" into a slower economic period in 2022.

49

The year 2022, to date, has been marked by historic levels of volatility in the traditional markets and cryptocurrency markets. On February 24, 2022, Russia invaded Ukraine in a major escalation of the conflict between the two countries (the "Ukrainian War"). The Ukrainian War had a swift and profound impact on the world economy. In an effort to weaken Russia's ability to pursue the war, Western countries imposed a series of financial, trade, and travel sanctions against Russia, all of which measures contributed to a rampant increase in global commodity prices. Equity markets were roiled as well. Between January 1, 2022, and the Petition Date, the S&P 500 shed 20 percent of its value while the tech-heavy Nasdaq declined by nearly 30 percent over the same period. Rising inflation and commodity prices contributed to investor pessimism and further sell-offs. In June 2022, market analysts officially labeled 2022 as a bear market.

## 2. *Cryptocurrency Industry-Wide Sell-off*

The widespread sell-off in traditional markets was mirrored in the cryptocurrency industry. All major cryptocurrencies experienced significant declines in 2022; Bitcoin slumped 37.3 percent in June 2022 alone and was down approximately 56 percent year-to-date as of the Petition Date. Companies in the cryptocurrency industry also experienced significant equity declines as declining cryptocurrency prices pressured margins and investor pessimism grew. In June 2022, the value of the aggregate cryptocurrency market slumped below $1 trillion for the first time since January 2021. The severe distress of two industry participants—Terra and 3AC—exacerbated this "cryptocurrency winter." The eventual implosion of Terra and 3AC, and the resulting fallout, created the "cryptopocalypse."

### (a)    The Terra Luna Collapse.

Terra is an open-source blockchain protocol created by Terraform Labs. Similar to the Ethereum blockchain (which issues Ether for use on its network), Terra issued Luna, a cryptocurrency token that was used to execute transactions on the Terra blockchain. In early May 2022, Luna traded at approximately $86 per token and had a market capitalization of approximately $14 billion.

Terra also issued TerraUSD ("UST"), an algorithmic stablecoin. Historically, UST traded at $1 per token. UST maintained its "peg" to Luna via an arbitrage mechanism. If UST traded above $1, arbitrageurs bought $1 worth of Luna for $1 and exchanged Luna for one UST worth more than a dollar, netting the difference as profit. If UST traded below $1, arbitrageurs bought one UST for less than a dollar and exchanged it for $1 worth of Luna, netting the difference as profit. These arbitrage trades push the price of UST back to $1 and were intended to keep the two tokens equally scarce and limit oversupply or undersupply of either. To incentivize traders to burn Luna to create UST, Terra allowed owners of UST to stake their UST in exchange for a 19.5 percent yield (payable in UST).

On May 7, 2022, $2 billion of UST was unstaked and immediately sold. The sale moved UST's per share price down to $0.91. UST holders, already sensitive to price movements due to the sell-off in cryptocurrencies generally, saw UST "de-peg" and rushed to unstake and sell their coins. Terra's arbitrage trade was designed to address this type of situation but was not designed to address a situation of this magnitude. Although traders moved quickly to burn Luna and "arbitrage" the price of UST, traders realized that only $100 million of UST could be burned for Luna each day. Due to high trading volume, $100 million of UST was insufficient to "re-peg" UST to $1.

Massive selling pressure led to a downward spiral or, as known in traditional finance, a "death spiral": traders redeemed UST for Luna and sold their Luna, leading to a significant decrease in the price of Luna. Then traders attempted to "re-peg" Luna to UST by burning UST to create Luna, which in turn created an oversupply of Luna that further exacerbated its price decline. Terra allegedly sold $2.2 billion of its Bitcoin reserves to enter the Luna/Terra arbitrage efforts and re-peg the tokens but was unsuccessful. The per-token price of Luna fell from $82.55 to $0.000001 in one week.

The Terra/Luna blockchain protocol was widely viewed as a project with significant promise—Luna had attracted significant interest from institutional investors and retail investors alike. The Luna collapse erased over $18 billion of value and contributed to further sell-offs in the cryptocurrency sector.

(b)        **The Making and Recalling of the Three Arrows Capital Loan.**

As described above, Voyager's business model contemplated generating revenue in several different ways, including by lending, in its business judgment, a portion of cryptocurrency held on its platform to institutional borrowers.

Voyager's lending business was described and disclosed in Voyager's public securities filings, which stated that "[w]e earn fees from crypto assets lending activities with institutional borrowers," including on "an unsecured … basis," and that "Voyager selects which and how much of its crypto assets are available for such lending activity."[34]  Account Holders acknowledged and consented to this activity in the Customer Agreement, as follows:

> [P]articipants in the Rewards Program agree to allow Voyager to utilize Cryptocurrency held in the(ir) Account to be loaned to various third parties (each, a "Borrower") determined at Voyager's sole discretion (each, a "Loan"). Loans made to Borrowers may not be secured and the Borrowers may not be required to post collateral either to Voyager, or otherwise.[35]

As of December 31, 2021, Voyager held approximately $5.88 billion in crypto assets on its platform.[36]  Of that total, approximately $2.7 billion had been loaned to various counterparties as part of Voyager's lending program.  At the time, the largest individual counterparty was Alameda Research, a crypto hedge fund founded by FTX CEO Sam Bankman-Fried, which had borrowed approximately $1.6 billion and represented 61% of Voyager's loan book.[37]  These loans were made largely on an unsecured basis in exchange for market-based returns that, in Voyager's judgment, corresponded with acceptable risk.

---

[34]   December 31, 2021 Voyager Digital Ltd. Management Discussion and Analysis at 8, available at https://sedar.com/GetFile.do?lang=EN&docClass=7&issuerNo=00005648&issuerType=03&projectNo=033384 05&docId=5134463.

[35]   August 2021 Customer Agreement at 10; *see also* January 2022 Customer Agreement at 10 (same).

[36]   *Id.* at 6.

[37]   *Id.* 20-21.

In early 2022, Voyager was looking to diversify its available borrowers. 3AC was a well-known, prominent participant in the crypto space.[38] Between 2015 and 2020, 3AC experienced rapid growth and apparent extreme profitability, becoming known as a "behemoth" in the industry.

Given 3AC's profile, Voyager sought out a relationship with the firm. On February 7, 2022, Voyager's then-CFO (now Chief Commercial Officer), Evan Psaropoulos, and Treasury Director Ryan Whooley had an initial call with Tim Lo, an employee of 3AC's over-the-counter trading affiliate. They discussed 3AC generally, including whether its business objectives made it an appropriate counterparty for institutional borrowing. 3AC advised that it had substantial interest given its size and investment philosophy. On February 11, 2022, Voyager and 3AC signed a mutual non-disclosure agreement to permit the exchange of confidential information between the firms as they explored a lending relationship. On February 13, 2022, 3AC provided Voyager with a statement signed by one of its founders, Kyle Davies, containing only a single sentence stating that 3AC's NAV as of January 1, 2022, was $3.729 billion. Unlike other substantial borrowers of Voyager's assets, 3AC did not provide a balance sheet (audited or unaudited). In response to Voyager's formal due diligence questionnaire, 3AC subsequently provided a description of its corporate structure, certificates of good standing and incorporation, and a copy of its Anti-Money Laundering policies and controls.

On February 28, 2022, a Voyager team, including Mr. Psaropoulos, Mr. Whooley, Treasurer Jon Brosnahan and others had a due diligence call with Messrs. Davies and Lo of 3AC. During the call, the Voyager team asked questions about 3AC's business and financial position, and ascertained from Mr. Davies that 3AC: (i) managed only its founders' assets; (ii) was involved in limited higher risk venture capital projects, and its venture activities involved modest sums; (iii) was largely engaged in arbitrage trading, which was delta neutral, and

---

[38] *See, e.g.,* The Block, "Three Arrows reports more than $1.2 billion position in Grayscale's GBTC," January 4, 2021, https://www.theblock.co/post/89928/three-arrows-reports-more-than-1-2-billion-position-in-grayscales-gbtc; Bloomberg, "Ex-High School Classmates Are Among the World's Largest Crypto Holders," May 25, 2021, https://www.bloomberg.com/news/articles/2021-05-25/ex-credit-suisse-traders-amass-billions-of-dollars-of-crypto?utm_medium=social&utm_content=business&utm_source=twitter&cmpid=socialflow-twitter-business&utm_campaign=socialflow-organic#xj4y7vzkg (describing Three Arrows Capital as "among the world's biggest crypto holders with a portfolio worth billions of dollars"); Sydney Morning Herald, "School Friends Started Their Own Firm, Now They Are Among The World's Largest Crypto Holders," May 27, 2021, https://www.smh.com.au/business/markets/school-friends-started-their-own-firm-now-they-are-among-the-world-s-largest-crypto-holders-20210526-p57v6b.html (describing "the extent of the firm's influence, when Three Arrows reported it owned a 5.6 per cent stake in the Grayscale Bitcoin Trust, a $US22 billion fund"); Messari Report, "Messari Crypto Thesis For 2022," December 26, 2021, https://messari.io/pdf/messari-report-crypto-theses-for-2022.pdf (describing Three Arrows Capital founder Su Zhu as one of "the big guys" and noting that "Three Arrows Capital has amassed one of the largest funds in Asia, and boasts one of the top performing portfolios in their own right"); Bloomberg, "Fund Manager Who Called End of Last Crypto Winter Remains Bullish," April 7, 2022, https://www.bloomberg.com/news/articles/2022-04-07/three-arrows-capital-s-su-zhu-remains-bullish-on-crypto-investments (noting that Three Arrows Capital's "blockchain holdings alone are worth close to $10 billion"); FTX, Crypto Bahamas 2022 Su Zhu Speaker Profile, April 26, 2022, https://www.cryptobahamas.com/speakers/su-zhu-1 (describing Three Arrows Capital as "a leading investor in the cryptocurrency space"); Benzinga, "The Top 10 DeFi Projects To Watch In The Second Half Of 2020," July 30, 2020, https://www.benzinga.com/markets/cryptocurrency/20/07/16856475/the-top-10-defi-projects-to-watch-in-the-second-half-of-2020 (describing Three Arrows Capital as a "leading investor"); Benzinga, "Crypto Hedge Funds Bought Bitcoin At 'A Reasonable Level' During The Dip," May 21, 2021, https://www.benzinga.com/markets/cryptocurrency/21/05/21239323/crypto-hedge-funds-bought-bitcoin-at-a-reasonable-level-during-the-dip-report (reporting "advice to investors" from 3AC co-founder Kyle Davies); Benzinga, "This Crypto Veteran Has 3 Potential Catalysts That Could Fuel A Bitcoin Market Comeback," May 22, 2022, https://www.benzinga.com/markets/cryptocurrency/22/05/27339698/this-crypto-veteran-lists-potential-catalysts-that-could-push-bitcoin-market (describing Su Zhu as a "crypto veteran"); Benzinga, "What Does Etherium 2.0 Have To Do With The Celsius, 3AC, And Other Insolvencies?" June 15, 2022, https://www.benzinga.com/markets/cryptocurrency/22/06/27724295/what-does-ethereum-2-0-have-to-do-with-the-celsius-3ac-and-other-insolvencies (describing Three Arrows Capital as "a major investment firm"); Benzinga, "What Impact Will A Recession Have On Crypto?" June 16, 2022, https://www.benzinga.com/22/06/27745465/what-impact-will-a-recession-have-on-crypto (describing Three Arrows Capital as "one of the biggest crypto hedge funds").

thematic trading; (iv) limits its own borrowing to 1x NAV; and (v) did not own positions larger than 1-3% of circulation of any given alt-coin, to maximize its ability to exit quickly from such volatile assets. In response to requests for greater financial transparency, Mr. Davies explained that 3AC only provided summary NAV statements to its lenders, and that it needed to treat all lenders the same in this regard. When pressed, Messrs. Davies and Lo explained that 3AC previously had a bad experience with a counterparty who had been given detailed financial information about 3AC. According to 3AC, the counterparty had mimicked its trading strategy based on holdings information disclosed in those confidential documents, to 3AC's detriment. Given its commercial sensitivity, 3AC therefore only provided the net amount of total assets under management minus total liabilities, without further details.

The next day, on March 1, 2022, Voyager's Risk Committee, which included certain officers and other members of the treasury and legal teams, had a regularly scheduled meeting to discuss, among other matters, Voyager's lending, trading, and staking positions. During this meeting, the Risk Committee considered the merits of entering into a new lending relationship with 3AC, as well as 3AC's position regarding the limited amount of financial information contained in the NAV statement. Those who participated on the due diligence call with Voyager's co-founder explained the rationale given by 3AC, and that this was an explanation that Voyager's finance team and executive leadership understood and found credible. The Risk Committee discussed the fact that 3AC represented itself to have $3.7 billion in net asset value. Ultimately, no member of the Risk Committee objected to entering into a lending relationship with 3AC.[39] The decision to approve the 3AC Loan was ultimately made by the CEO, Stephen Ehrlich, in consultation with Mr. Psaropoulos, as further described below.

On March 4, 2022, Voyager entered into a master loan agreement with 3AC, pursuant to which Voyager made several loans to 3AC between March 8, 2022 and May 5, 2022 in the aggregate amounts of 15,250 Bitcoins and 350 million USDC. The 3AC Loan was unsecured but callable at any time by Voyager, as per the terms of six individual term sheets governing discrete advances from time to time. After Voyager approved 3AC as a borrower on March 1, the Risk Committee was not subsequently consulted about the size or terms of any of the advances that comprised the 3AC Loan. In general, Mr. Whooley would receive an in-bound borrowing request from 3AC and would discuss terms for the specific loan request with Mr. Psaropoulos. Mr. Psaropoulos would obtain Mr. Whooley's recommendations about the size and terms of borrowing, at times consulting with Mr. Brosnahan as to any liquidity concerns. Mr. Psaropoulos would then discuss each advance with Mr. Ehrlich and obtain the CEO's official authorization prior to executing the corresponding term sheet.

As of April 3, 2022, Voyager had assets on platform of approximately of $5.64 billion, of which $3.1 billion was on loan to third parties. At that time, approximately $935 million was on loan to 3AC, making it Voyager's second-largest borrower behind Alameda Research, to which Voyager had loaned approximately $1.23 billion. Approximately two months later, on June 6, 2022, the amount of Voyager's assets on platform had decreased materially (in part due to market decline and in part due to customer withdrawals) to $3.39 billion, of which approximately 25% had been lent to 3AC, and another 25% lent to Alameda Research.

During the approximately three-month period between the start of the parties' lending relationship and 3AC's default, Voyager engaged with 3AC on several occasions to monitor 3AC's financial position, as part of Voyager's regular borrower outreach activity. During this period, Voyager sought and received a revised one-page NAV statement from 3AC on March 23, 2022, again signed by 3AC co-founder Kyle Davies, stating that as of March 1, 2022, 3AC's NAV was $3.218 billion.

On approximately May 9, 2022, Luna de-pegged from UST, causing many investors in the crypto space to suffer losses. Voyager promptly reached out to all of its borrowers to understand the impact (if any) of Luna's unraveling on their respective businesses. Specifically, concerning 3AC, Voyager's Mr. Whooley spoke to Mr. Lo

---

[39] While no formal vote was taken by the Risk Committee to approve 3AC as a borrower, or the sufficiency of the due diligence conducted, this was not the function of the Risk Committee. The Risk Committee was established in 2021 as a consultative body consisting of members of Voyager management from different departments. The Risk Committee met regularly to discuss, among other things, Voyager's overall financial position and any potential borrowers that members of the finance team believed, following due diligence, to be appropriate counterparties. No decision-making authority was delegated to the Risk Committee, and no votes were taken by the members of the Risk Committee, until May 4, 2022, when a charter for the Risk Committee was finalized and approved.

on May 11, and he and Mr. Psaropoulos had dinner with Mr. Lo on May 12.  On both occasions, Mr. Lo reported that 3AC was an early investors in LUNA but had limited exposure and therefore 3AC had suffered insignificant losses.  In light of this, Voyager did not believe it needed to recall the loans to 3AC.

On May 23, 2022, Voyager requested and received an updated one-page NAV statement from 3AC, again signed by 3AC co-founder Kyle Davies, stating that as of May 23, 2022, 3AC's NAV was $2.574 billion.  At this point, Voyager ceased issuing further loans to 3AC despite requests from 3AC to borrow more.

After declining 3AC's request for more borrowing in the second half of May, communications between Voyager and 3AC remained relatively quiet until June 12, the day that Celsius Network LLC ("Celsius") lowered its gates and paused withdrawals.[40]  Upon this occurrence, Voyager reached out again to all of its borrowers to inquire about their financial health, including 3AC.  On June 13, 2022, Mr. Psaropoulos held a Zoom videoconference with Mr. Lo during which Mr. Lo informed him that 3AC had no exposure to Celsius.  The next day, on June 14, 2022, Voyager issued a press release about its lack of exposure to Celsius.[41]  Mr. Lo sent a text message to Mr. Psaropoulos later that morning asking for a call "asap."  Mr. Psaropoulos called Mr. Lo, who advised him that Voyager should recall all of its loans to 3AC because he was concerned that the founders of 3AC were not responding to requests for information from Mr. Lo and other employees.  Mr. Psaropoulos immediately called Mr. Ehrlich to relay this alarming statement.  Within hours, Voyager had recalled all outstanding amounts loaned to 3AC.

On June 15, 2022, one of 3AC's founders stated that the fund had incurred significant losses on account of its staked Luna position and had hired legal and financial advisors to explore potential liquidity solutions.  3AC did not return any of the loaned assets, and on June 24, 2022, Voyager issued a notice of default and acceleration to 3AC.  On June 27, 2022, 3AC was ordered by a court in the British Virgin Islands to commence liquidation proceedings.

i.    *The Special Committee Investigation*

---

[40]  *See, e.g.*, Medium, "A Memo to the Celsius Community," June 12, 2022, https://celsiusnetwork.medium.com/a-memo-to-the-celsius-community-59532a06ecc6 ("Due to extreme market conditions, today we are announcing that Celsius is pausing all withdrawals, Swap, and transfers between accounts."); CNBC, "Crypto lender Celsius pauses withdrawals due to 'extreme market conditions,'" June 13, 2022, https://www.cnbc.com/2022/06/13/crypto-lender-celsius-pauses-withdrawals-bitcoin-slides.html; CoinDesk, "The Fall of Celsius Network: A Timeline of the Crypto Lender's Descent Into Insolvency," July 15, 2022, https://www.coindesk.com/markets/2022/07/15/the-fall-of-celsius-network-a-timeline-of-the-crypto-lenders-descent-into-insolvency/ ("Celsius freezes withdrawals, swaps and transfers in response to 'extreme market conditions,' fueling rumors that the platform had become deeply insolvent.").

[41]  Press Release, "Voyager Digital Provides Update on Asset and Risk Management," June 14, 2022, https://www.investvoyager.com/pressreleases/voyager-digital-provides-update-on-asset-and-risk-management.

54

On July 5, 2022, OpCo formally created the Special Committee consisting of newly appointed Independent Directors Timothy Pohl and Jill Frizzley. The Special Committee was vested with the authority to, among other things: (a) investigate any historical transactions, public reporting, or regulatory issues undertaken by OpCo that the Special Committee deemed necessary or appropriate, and the facts and circumstances surrounding such transactions; (b) interview and solicit information and views from management, representatives, consultants, advisors, or any other party in connection with any historical transactions undertaken by OpCo that the Special Committee deems necessary or appropriate; (c) request documentation and information regarding OpCo's business, assets, properties, liabilities and business dealings with respect to any historical transactions undertaken by Voyager that the Special Committee deems necessary and appropriate to review; (d) perform any other activities consistent with the matters described herein or as the Special Committee or Voyager's board of directors otherwise deems necessary or appropriate; and (e) conduct an independent investigation with respect to any potential estate claims and causes of action against insiders of Voyager, including any claims arising from loans made to 3AC. The Special Committee was also vested with sole authority to prosecute, settle, or extinguish any and all claims and causes of action arising from the historical transactions investigated by the Special Committee. The Special Committee retained the Special Committee Counsel to provide independent advice to, and act at the exclusive direction of, the Special Committee in connection with the Special Committee's mandate.[42]

On August 23, 2022, the Debtors, the Special Committee, and the Committee entered into the Common Interest Confidentiality Stipulation and Protective Order (the "Protective Order") pursuant to which the parties (the "Common Interest Parties") agreed to the protections afforded to "Confidential" and "Highly Confidential" discovery material. Given the unique features of the Debtors' Chapter 11 Cases, the Common Interest Parties agreed that the attorney-client privilege and the attorney work-product doctrine would be preserved with respect to privileged documents and information shared among counsel for the Common Interest Parties. The Bankruptcy Court entered the Protective Order on September 13, 2022.

During the Investigation, Special Committee Counsel sought and received information relating to, among other things: Voyager's loans to third parties, with a particular focus on the 3AC Loan; the diligence performed in connection with those loans; Voyager's Risk Committee; Voyager's staking of customer cryptocurrency assets; Voyager's regulatory compliance; Voyager's communications with the public; Voyager's pre-petition payments to insiders and certain third parties; and other aspects of Voyager's business. Voyager collected and provided to the Special Committee responsive documents from its internal hard copy and electronic files, its outside counsel, and various third parties (e.g., cryptocurrency custodians and exchanges). Among many other things, Voyager collected email, Slack communications, and, in certain cases, Telegram and cell phone data from a dozen Voyager employees, including Voyager's most senior officers and others. In addition to several voluminous spreadsheets of data, Voyager produced more than 11,000 documents—collectively totaling more than 40,000 pages.

In addition to reviewing the above-referenced documents, Special Committee Counsel also interviewed 12 Voyager employees, including Stephen Ehrlich (CEO), Gerard Hanshe (COO), Evan Psaropoulos (Chief Commercial Officer), Ashwin Prithipaul (CFO), Pamela Kramer (CMO), David Brosgol (General Counsel), Marshall Jensen (Head of Corporate Development), Ryan Whooley (Treasury Director), Jon Brosnahan (Treasurer), Brian Silard (Treasury Team), David Brill (Deputy General Counsel), and Manisha Lalwani (in-house regulatory counsel). Collectively, the interviews performed during the Special Committee's Investigation lasted more than 55 hours, and covered in great detail the range of topics most relevant to the Special Committee's Investigation.

Throughout the Special Committee's Investigation, Special Committee Counsel was assisted by Kirkland and BRG. At Special Committee Counsel's request, BRG also hosted information sessions specific to staking with management and the Committee's counsel in order to address questions that would make time spent during the interviews most efficient. BRG also provided necessary background information about crypto assets and historical financial data to Special Committee Counsel upon request.

---

[42] *See* Docket No. 125 ¶ 7 (application to employ Quinn Emanuel as counsel to the Special Committee, with authority to "among other things, (a) investigate any historical transactions relating to Voyager LLC, and (b) investigate any estate claims and causes of action against insiders of Voyager LLC, including claims arising from its loan to Three Arrows Capital, and (c) perform any other activities consistent with the foregoing that the Special Committee or Voyager LLC's board otherwise deems necessary or appropriate"); Docket No. 242 (Order approving application).

Since the appointment of the Committee, Special Committee Counsel coordinated with the Committee's professionals in conducting the Investigation. Specifically, Special Committee Counsel and the Committee's counsel held several meetings concerning the scope, status, and progress of the Investigation, and Special Committee Counsel permitted the Committee's professionals to sit in on—and ask questions during—the Special Committee's interviews of the witnesses mentioned above. In light of the protections of the Protective Order, no discovery was withheld from the Committee's counsel on the basis of attorney-client privilege.

Throughout the course of the Investigation, Special Committee Counsel provided regular updates to members of the Special Committee. In particular, Special Committee Counsel held five formal videoconference meetings with the Special Committee, during which Special Committee Counsel updated the Special Committee on the status of the Investigation, including facts learned, impressions obtained, and relevant legal documents and standards. The members of the Special Committee were engaged, and asked many questions regarding the facts being developed and potentially applicable legal theories. These meetings were in addition to the Independent Directors' participation in several Board meetings concerning the Debtors' general business and case trajectory including their sale efforts.

ii.     ***Investigation Report, Conclusions, and Proposed Settlements***

At the conclusion of the Investigation, on October 7, 2022, Special Committee Counsel delivered to the Special Committee its report ("Investigation Report"), setting forth, among other things, the factual record developed over the course of the Investigation, the legal framework of potential estate causes of action, and Special Committee Counsel's legal conclusions and recommendations.

The Special Committee met to discuss the contents of the Investigation Report with Special Committee Counsel on October 10, 2022. The Special Committee found no fraud or theft by any director or officer of any of the Debtors. The Special Committee also concluded that the estate does not have colorable claims against any Voyager director or officer other than potential claims against its CEO and CCO,[43] related to the 3AC Loan. With respect to these claims, while colorable, the standard for successfully prosecuting such claims would be difficult to meet, with any judgment being even more difficult to collect. The Special Committee negotiated independent settlements with each of the CEO and CCO as set forth in the Plan, subject to approval of the Bankruptcy Court as part of Plan confirmation. These settlements are described in the following table:[44]

| Debtors Retain Rights of Recourse to D&O Insurance | Upon receipt of personal financial contributions, described below, the Debtors will retain the right to seek maximum recovery under the Debtors' D&O Liability Insurance Policies, without further recourse to the individuals. |
|---|---|
| Releases and Waivers by the Officers against the Debtors | CEO and CCO agree to release all Causes of Action they may have against the Estates.<br><br>CCO further agrees to subordinate 50% of his Account Holder Claim against the Debtors until all other Holders of Account Holder Claims are paid in full.<br><br>CEO and CCO further agree that, because the Debtors are in bankruptcy, the Debtors are unable to provide advancement or indemnification to CEO and CCO, and CEO's and CCO's recourse is limited to the Management Liability Policy, the Excess Policies, and the Side-A Policy (except as set forth below). CEO and CCO shall be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Entity and retain the right to assert general unsecured claims for advancement and indemnification up to the limits of |

---

[43]   Mr. Psaropoulos was CFO of Voyager Digital, LLC when it made all loans to 3AC.

[44]   The settlements are subject to definitive documentation and in the event the sworn financial information provided by either CEO or CCO to the Special Committee is materially inaccurate, the Special Committee reserves the right to void the D&O Settlement.

| | any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to CEO and/or CCO based upon or arising out of the lack of a formal claim for indemnification. |
| | CEO and CCO further agree to subordinate any and all rights and entitlements under the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd., Policy Number ELU184179-22, to any recovery by the Debtors and/or the Wind Down Entity on account of the Debtors' and/or Wind Down Estate's claims for the avoidance of the premium paid for the policy. For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind Down Entity's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), Officer shall be entitled to seek coverage under the Side-A Policy. |
| **Reversal of Insider Bonus Payment** | CEO agrees to the avoidance/unwinding of the transfer of $1,900,000 that CEO received from the Debtors on or around February 28, 2022, with CEO paying $1,125,000 to the Debtors in cash and assigning the right, if any, to any tax refund for the balance. |
| **Commitment to Cooperate** | CEO and CCO agree to remain at, and continue performing the responsibilities of, their position(s) with the Debtors and assist with the Debtors' transition for at least thirty (30) days from the date of approval of the settlement; *provided* that the CCO shall have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the CEO shall have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided, further*, that both the CEO and CCO shall be available to the Debtors and/or the Wind-Down Entity for a maximum of five hours per month for the one year following the Effective Date. |

The theoretical loss from the 3AC Loan would be equal to the amounts remaining to be collected from 3AC in the 3AC Liquidation Proceeding, less any amounts actually collected in those proceedings. The amounts to be realized from the proposed settlements (approximately $1.2 million - $2 million of personal assets plus recourse to up to $20 million of D&O insurance) are just a small fraction of such loss. Nevertheless, the Special Committee made the decision to settle, subject to Court approval, based on the fact that the individuals do not have personal assets available to satisfy any potential judgment even if the claims were successfully prosecuted, whereas the cost of prosecuting would likely dissipate the available D&O insurance coverage and the assets that are being paid through the settlement in defense costs.

The rationale for the Special Committee's negotiation and recommendation for the settlements is based on the following factors, among others: the relative strength of these claims, which (if pursued) would sound in breach of fiduciary duty premised on alleged gross negligence on the part of the officers; the challenges involved in litigating loss causation; the costs of litigating these claims, including attorneys' and experts' fees; the financial wherewithal of the officers; and the risk of depletion of substantial portions of available insurance coverage which prioritizes the rights of the officers to utilize the insurance for defense costs. The Special Committee believes, following due diligence and negotiations led by Special Committee Counsel, and after several additional videoconference meetings and written exchanges with Special Committee Counsel, that the settlements embodied in the Plan are in the best interests of the estate. The Special Committee does not believe there are viable causes of action against insiders beyond those potential claims mentioned with respect to CEO and CCO relating to the 3AC Loan.

B.     **The Alameda Loan.**

Once it appeared that its loan to 3AC might be at risk, Voyager's management team immediately engaged in efforts to identify sources of potential liquidity to stabilize the Company's business and ensure that the Company remained adequately capitalized. On June 22, 2022, HoldCo, as borrower, TopCo., as guarantor, and Alameda Ventures Ltd., as lender, entered into the Alameda Loan Facility, which provided the Company with up to $200 million cash and USDC and 15,000 Bitcoin subject to certain restrictions. OpCo is not a party to the Alameda Loan Agreement. The Alameda Loan Agreement provided that the use of proceeds under the Alameda Loan Facility was to pay Account Holders for cryptocurrency assets that counterparties to the Company's lending and related activities failed to return to the Company.[45] Alameda asserts that OpCo is obligated on the Alameda Loan Facility, which the Debtors dispute. As discussed in Article IV.O of this Disclosure Statement, the Debtors seek to subordinate the Alameda Loan Facility Claims under the Plan due to Alameda's inequitable conduct prior to and throughout these Chapter 11 Cases, including Alameda and its affiliates' apparent fraud that directly harmed the Debtors' creditors and significantly reduced their anticipated recoveries under the Plan. If the Alameda Loan Facility Claims are determined to be valid against OpCo, recoveries to Account Holders and Holders of OpCo General Unsecured Claims would be reduced.

Alameda also asserts that it has an administrative preference action claim against the Debtors in the amount of approximately $445 million pursuant to certain loans made by OpCo to Alameda, which were repaid during the chapter 11 cases. The Debtors dispute Alameda's position, but in the event that Alameda were to prevail on its alleged preference claim, creditor recoveries would be materially reduced. Specifically, recoveries for both Account Holder Claims and OpCo General Unsecured Claims would be reduced to approximately 24% from approximately 51% under the Sale Transaction if the Alameda Loan Facility Claim is not subordinated and Alameda prevails in its alleged preference claims.

## C.    Retention of Restructuring Advisors and Initial Third-Party Outreach.

In June 2022 the Debtors engaged Kirkland and Moelis to advise the Debtors in navigating the recent challenges impacting the cryptocurrency industry. Beginning on or about June 20, 2022, Moelis initiated a dual-track marketing process (the "Prepetition Marketing Process") to solicit interest in two general deal structures: (a) a sale transaction in which the Debtors' entire business would be sold to either a financial sponsor or a strategic company in the cryptocurrency industry and (b) a capital raise whereby a third party (individually or as part of a consortium) would provide a capital infusion into the Debtors' business enterprise (together, a "Transaction") to allow the Debtors to weather the volatility in public equity markets, the decline in cryptocurrency prices, and dislocation in the cryptocurrency industry caused, in part, by the decline of 3AC and the collapse of the Terra Luna ecosystem, as described below. Among the deal structures considered for the financing were additional debt facilities and the issuance of preferred equity in exchange for capital.

To that end, Moelis reached out to 60 potential financial and strategic partners across the globe (collectively, the "Potential Counterparties"), including domestic and international strategic cryptocurrency-related businesses and private equity and other investment firms that currently have crypto-related investments and/or historical experience investing in the cryptocurrency industry. By the Petition Date, over 20 of the Potential Counterparties had entered into confidentiality agreements with the Debtors. Parties who executed a confidentiality agreement received a copy of the Debtors' investor presentation and access to a virtual data room containing thousands of pages with certain information regarding the Debtors' business operations, finances, material contracts, tax information, and incorporation documents. In addition, parties that signed confidentiality agreements were offered the opportunity to participate in telephone conferences with the Debtors' management team as well as to request additional due diligence information.

Simultaneously with their efforts to identify a Potential Counterparty to effectuate a Transaction, the Debtors, Moelis, and the Debtors' other advisors began to analyze potential strategies to effectuate a stand-alone restructuring without the participation of a third-party partner to consummate a Transaction.

While the Debtors' marketing efforts yielded one proposal for an out-of-court financing, the conditions precedent to the proposal and the pro forma capital structure contemplated thereunder were not achievable, and no other Potential Counterparty was willing to participate in an out-of-court Transaction on the timeline required.

---

[45]    *See* Section 2.6 of the Alameda Loan Agreement.

Among other things, Potential Counterparties expressed concerns regarding current uncertainty in the cryptocurrency market and assumed liabilities on an out-of-court basis. Potential Counterparties were similarly reticent to participate in an out-of-court financing alone, and the Debtors determined that a group investment could not be marshalled among other viable Potential Counterparties on the timeline required to consummate a Transaction on an out-of-court basis.

The Prepetition Marketing Process produced multiple preliminary proposals from parties willing to participate in an in-court Transaction. However, as of the Petition Date, all of the preliminary offers that the Debtors received required more time to fully develop and structure and/or were not more attractive than a potential stand-alone restructuring.

### D. Governance Initiatives.

On July 5, 2022, the Debtors undertook several actions to strengthen the independence and experience of their boards of directors: (i) the board of Voyager Digital Ltd. voted to appoint Matthew Ray as an independent director; (ii) the board of Voyager Digital Holdings, Inc. voted to appoint Scott Vogel as an independent director; (iii) the member of Voyager Digital, LLC ("OpCo") appointed Stephen Ehrlich, CEO of the Voyager Digital Holdings, Inc., as a director and Tim Pohl and Jill Frizzley as independent directors; and (iv) the board of OpCo voted to establish the Special Committee comprised of Mr. Pohl and Ms. Frizzley and tasked the Special Committee with, among other things, investigating the Company's historical lending practices, including the facts and circumstances around the 3AC Loan.

### E. Voyager's Decision to Commence these Chapter 11 Cases.

As the general cryptocurrency market continued to decline, Voyager, like other peer platforms, saw a significant uptick in customer withdrawals—some of which was legitimate—putting additional strain on the Company's business and risking the Company's ability to serve customers who remained on its platform.

On June 23, 2022, Voyager reduced its daily withdrawal maximum from $25,000 to $10,000 per user per day. Putting a cap on withdrawals was necessary to ensure that the Company could effectuate trades for customers on its platform who elected to keep their cryptocurrency assets with Voyager as well as to stabilize the Company's business while it engaged in discussions with potential third-party sponsors. Ultimately, the initial withdrawal limits maximized the Company's ability to continue to provide brokerage services to its customers.[46]

The Debtors hoped that lower withdrawal limits would allow them to stabilize their business. However, as the cryptocurrency markets continued to trend downward, the Debtors realized that further steps were required to preserve customer assets, avoid irreparable damage to the Debtors' business, and ensure that their trading platform operated smoothly for all customers. Accordingly, on July 1, 2022, Voyager froze all withdrawals and trading activity on its platform.

Though Voyager continued to rigorously diligence all potential restructuring transactions, it became clear that a potential strategic transaction would only emerge after the Debtors petitioned for chapter 11 relief.

## VIII. EVENTS OF THE CHAPTER 11 CASES

### A. The Stand-Alone Plan.

On July 6, 2022, the Debtors filed the *Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 17]. On August 12, 2022, the Debtors filed the *First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 287] and accompanying disclosure statement [Docket No. 288] (the "Stand-Alone Plan Disclosure Statement"). The Stand-Alone Plan contemplated, among other things, distributing to Holders of Account Holder Claims their pro rata share of the New Common Stock, available Cash, Coins, the Voyager Tokens, and the 3AC Recovery, each as defined in the Stand-Alone Plan. The

---

[46]    Approximately 97% of customers on Voyager's platform have less than $10,000 in their accounts.

Stand-Alone Plan Disclosure Statement, among other things, also made clear that, in parallel to pursuing the Stand-Alone Plan, the Debtors were pursuing a potential transaction to sell the Debtors to a third party either through an asset sale pursuant to section 363 of the Bankruptcy Code or an alternative chapter 11 plan of reorganization.

**B.      First and Second Day Relief and Other Case Matters.**

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration. Following hearings on July 8, 2022, and August 4, 2022 (the "Second Day Hearing"), the Bankruptcy Court entered orders granting certain of the First Day Motions and applications on interim and final bases:

(i)    ***The Joint Administration Order*** authorizing the Debtors to jointly administer and maintain one docket for the chapter 11 cases of Voyager Digital, LLC and its Debtor affiliates [Docket No. 18];

(ii)   ***The Foreign Representative Order*** authorizing Debtor Voyager Digital Ltd. to act as "foreign representative" in a parallel insolvency case commenced in Canada under the Companies' Creditors Arrangement Act [Docket No. 52];

(iii)  ***The Credit Matrix Order*** authorizing the Debtors to (a) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (b) file a consolidated list of the Debtors' 50 largest unsecured creditors in lieu of filing lists for each Debtor; and (c) redact certain personal identification information [Docket No. 54];

(iv)   ***The Automatic Stay Order*** restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and ipso facto protections of the Bankruptcy Code and approving the form and manner of notice thereof [Docket No. 55];

(v)    ***The Schedules and Statements Order*** authorizing the Debtors to extend the deadline by which the Debtors' Schedules and Statements must be filed by thirty (30) days [Docket No. 59];

(vi)   ***Order Retaining Stretto as Noticing Agent*** authorizing the Debtors to retain Stretto, Inc. as third-party claims and noticing agent [Docket No. 67];

(vii)  ***The Wages Order*** authorizing the Debtors to continue paying prepetition wages and certain administrative costs related thereto and continue employee benefits programs [Docket No. 233];

(viii) ***The Taxes Order*** authorizing the Debtors to pay certain taxes and fees that accrued or arose in the ordinary course of business before the Petition Date [Docket No. 235];

(ix)   ***The Interim Cash Management Orders*** authorizing the Debtors to continue utilizing the Debtors' prepetition cash management system [Docket Nos. 53 and 237] (the "Cash Management Motion");[47]

(x)    ***The NOL Order*** approving certain notifications and procedures regarding the transfer of, and declarations of worthlessness with respect to, common stock of Voyager Digital Ltd. [Docket No. 238];

(xi)   ***The Insurance Order*** authorizing the Debtors to honor existing insurance obligations [Docket No. 239]; and

---

[47]    On July 15, 2022, the Debtors filed a supplement to the Cash Management Motion that sought authorization to pay prepetition amounts owed on their corporate credit cards issued by Brex, Inc. (the "Supplemental Cash Management Motion") [Docket No. 84]. On July 25, 2022, the Bankruptcy Court entered an order granting the Supplemental Cash Management Motion [Docket No. 138].

(xii)    *The Case Management Order* authorizing the Debtors to set the guidelines and requirements for the administration of their Chapter 11 Cases, including for scheduling purposes [Docket No. 240].

The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.stretto.com/Voyager.

The Debtors also filed several other motions subsequent to the Petition Date to facilitate the Debtors' restructuring efforts and ease administrative burdens.  Following the Second Day Hearing, the Bankruptcy Court entered orders granting the following relief:

(i)    *The Interim Compensation Order* approving procedures for the compensation of retained professionals in these Chapter 11 Cases [Docket No. 236];

(ii)    *The Ordinary Course Professionals Order* approving procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses [Docket No. 244]; and

(iii)    *Applications to Retain Professionals* postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including:

    i.    *Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession [Docket No. 234]*;

    ii.    *Moelis & Company LLC as Investment Banker and Capital Markets Advisor for the Debtors and Debtors in Possession [Docket No. 299]*;

    iii.    *Berkeley Research Group, LLC as Financial Advisors for the Debtors and Debtors in Possession [Docket No. 297]*;

    iv.    *Quinn Emanuel Urquhart & Sullivan LLP as Special Counsel to Voyager Digital, LLC [Docket No. 242]*;

    v.    *Stretto, Inc. as administrative advisor [Docket No. 241]*;

    vi.    *Katten Muchin Rosenman LLP as Special Counsel to Voyager Digital Ltd. [Docket No. 732]*;

    vii.    *ArentFox Schiff LLP as Special Counsel to Voyager Digital Holdings, Inc. [Docket No. 740]; and*

    viii.    *Potter Anderson & Corroon LLP as Delaware counsel to the Debtors [Docket No. 798].*

The foregoing professionals, among others, are each integral to the Debtors' restructuring efforts and ultimate emergence from chapter 11.  The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

**C.    Appointment of Unsecured Creditors' Committee.**

On July 19, 2022, the U.S. Trustee appointed the official committee of unsecured creditors (the "Committee").[48]  The Debtors immediately engaged with the Committee to discuss the Debtors' restructuring efforts, the Plan, and Debtors' proposed case timeline.  The seven-member Committee is currently composed of the following members:  Russell G. Stewart, Jason Raznick, Brandon Mullenberg, Richard Kiss for Thincan Trust,

---

[48]    *See Amended Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 106].

Christopher Moser, Byron Walker, and Melissa and Adam Freedman.  The Committee selected McDermott Will & Emery LLP as legal counsel and FTI Consulting, Inc. as financial advisor.[49]

D.      **Schedules and Statements.**

On July 8, 2022, the Bankruptcy Court entered the *Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, (II) Waiving Requirements to File List of Equity Holders, and (III) Granting Related Relief* [Docket No. 59] extending the deadline by which the Debtors were required to file their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") by an additional thirty (30) days for a total of forty-four (44) days after the Petition Date.  Accordingly, the Debtors were required to file the Schedules and Statements by no later than August 18, 2022.  This schedule provided creditors with ample time to analyze and evaluate scheduled claims in advance of Solicitation and the General Claims Bar Date.

On August 18, 2022, August 19, 2022, August 22, 2022, September 15, 2022, and November 18, 2022, the Debtors filed their Schedules and Statements [Docket Nos. 311, 312, 321, 429, 430, and 666].  Interested parties may review the Schedules and Statements and any amendments thereto free of charge at https://cases.stretto.com/Voyager.

E.      **Bar Date Motion.**

On July 18, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 98] (the "Bar Date Motion").  On August 8, 2022, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion [Docket No. 218] (the "Bar Date Order"), which established procedures and set deadlines for filing Proofs of Claim against the Debtors and approved the form and manner of the bar date notice (the "Bar Date Notice").  Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in these Chapter 11 Cases is October 3, 2022, at 5:00 p.m. Eastern Time (the "General Claims Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is January 3, 2023, at 5:00 p.m. Eastern Time (the "Governmental Bar Date").  The Bar Date Notice was served on August 3, 2022 [Docket No. 226] and published in *The New York Times* (national and international editions) and the *Financial Times* (international edition) on August 10, 2022 [Docket No. 272].

On December 20, 2022, the Debtors filed the *Notice of Presentment and Opportunity for Hearing on Stipulation and Agreed Order Extending the Bar Date for the U.S. Securities and Exchange Commission* [Docket No. 758] thereby agreeing to extend the Governmental Bar Date for the SEC by two weeks to January 17, 2023, at 5:00 p.m. Eastern Time.  On December 20, 2022, the Debtors filed the *Notice of Presentment and Opportunity for Hearing on Stipulation and Agreed Order Extending the Bar Date for the States* [Docket No. 792] thereby agreeing to extend the Governmental Bar Date for all states by two weeks to January 17, 2023, at 5:00 p.m. Eastern Time.

---

[49]   *See* Docket Nos. 403 and 404.

### F.    The FBO Motion.

On July 14, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (a) Honor Customer Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency From Customer Accounts With a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course Reconciliation of Customer Accounts, and (e) Continue to Stake Cryptocurrency; and (II) Granting Related Relief* [Docket No. 73] (the "FBO Motion").  The FBO Motion sought to continue certain ordinary course practices, including (i) honoring customer withdrawals from the "for the benefit of" accounts (the "MC FBO Accounts,") held at Metropolitan Commercial Bank; (ii) liquidating customer accounts that hold a negative U.S. dollar balance and sweeping the resulting cash from third-party exchanges into the Debtors' operating accounts; (iii) engaging in ordinary course reconciliation practices related to customer accounts; and (iv) staking cryptocurrency.

On July 29, 2022, the Debtors filed a supplement to the FBO Motion [Docket No. 173] (the "Supplemental FBO Motion," and together with the FBO Motion, the "FBO Motions"), which provided additional information on the prepetition procedures for processing customer withdrawal requests from the MC FBO Accounts, including, among other things, reconciliation of the MC FBO Accounts and funding of any deficit in the MC FBO Accounts on account of ACH chargebacks.  On July 30, 2022, Metropolitan Commercial Bank filed a statement in support of the FBO Motion and Supplement [Docket No. 177].  On August 2, 2022, the Committee filed a statement in support of the FBO Motion [Docket No. 193].  On August 5, 2022, the Bankruptcy Court entered the *Order (I) Authorizing the Debtors to (a) Honor Withdrawals from the MC FBO Accounts, (b) Liquidate Cryptocurrency from Customer Accounts with a Negative Balance, (c) Sweep Cash Held in Third-Party Exchanges, (d) Conduct Ordinary Course Reconciliation of Customer Accounts, and (e) Continue Staking Cryptocurrency; and (II) Granting Related Relief*] [Docket No. 247] (the "FBO Order") approving the FBO Motion.  The Debtors worked closely with the Committee regarding the requested relief, and the FBO Order affords the Committee various protections, including the requirement that the Debtors provide the Committee with written notice prior to staking or unstaking cryptocurrency, information sufficient to evaluate staking positions, and Court oversight of staking activities in the absence of agreement between the Committee and the Debtors.  On August 11, 2022, the Debtors began returning customer funds in the MC FBO Accounts.  To date, the Debtors have returned approximately $245.75 million of customer funds from the MC FBO Accounts.

On December 2, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Compelling the Release of the Reserve Held by Metropolitan Commercial Bank on Debtors' Bank Account and (II) Granting Related Relief* [Docket No. 690] seeking an order from the Bankruptcy Court compelling the full release of the $24 million reserve held by Metropolitan Commercial Bank given that the reserve is no longer necessary now that ACH chargeback period has expired and is in excess of the aggregate balance of the MC FBO Accounts.  On January 5, 2023, the Court entered the *Stipulation and Agreed Order Between the Debtors and Metropolitan Commercial Bank* [Docket No. 821] (the "MC Bank Stipulation"), which provides for, among other things, the release of reserve funds and the process to distribute the remaining customer cash in the MC FBO Accounts to such customers.

As set forth in the FBO Motions, Cash in the MC FBO Accounts is not property of the Debtors' Estates.  **Accordingly, customer withdrawals from the MC FBO Accounts are permitted to continue in accordance with the FBO Order, and any such customer withdrawals or distributions from the MC FBO Accounts are not included in the treatment provided for under the Plan.  Customers have until February 4, 2023 to withdraw their fiat funds from the MC FBO Accounts or will be sent a check in the amount of the applicable customer's funds in the MC FBO Accounts pursuant to the MC Bank Stipulation.**

### G.    The 3AC Liquidation Proceeding.

On June 29, 2022, the Eastern Caribbean Supreme Court in the High Court of Justice Virgin Islands (Commercial Division) (the "BVI Court") entered an order appointing Russell Crumpler and Christopher Farmer of Teneo (BVI) Limited as joint liquidators ("Joint Liquidators") to conduct an orderly and equitable wind-down of 3AC pursuant to Part 6 of the British Virgin Islands Insolvency Act, 2003 ("BVI Insolvency Act").  The liquidation of 3AC (the "3AC Liquidation Proceeding") is currently pending in the BVI Court.[50]  On July 1, 2022, 3AC filed a petition with the United States Bankruptcy Court for the Southern District of New York (the "3AC Chapter 15

---

[50]    *See In re Three Arrows Capital Limited*, Case No. BVIHCOM2022/0119 (June 27, 2022).

63

Court") seeking recognition of the 3AC Liquidation Proceeding as a "foreign main proceeding" pursuant to chapter 15 of the Bankruptcy Code (the "3AC Chapter 15 Proceeding").[51]

On July 18, 2022, in accordance with section 179 of the BVI Insolvency Act, the Joint Liquidators established a committee of creditors to work closely with the Joint Liquidators to support the interests of all creditors in the 3AC Liquidation Proceeding. Voyager was one of the five creditors appointed to the committee.[52] On July 28, 2022, the 3AC Chapter 15 Court entered an order granting recognition of the 3AC Liquidation Proceeding as a foreign main proceeding,[53] and on August 22, 2022, and October 7, 2022, respectively, the 3AC Liquidation Proceeding was recognized as a foreign main proceeding by the High Court of the Republic of Singapore (the "Singapore Court")[54] and the Ontario Superior Court of Justice.[55] Additional petitions for recognition as a foreign main proceeding are pending in the Grand Court of the Cayman Islands, Financial Services Division, and the Supreme Court of Seychelles.[56] At a December 2, 2022 hearing in the 3AC Chapter 15 Proceeding, the Foreign Representatives provided the 3AC Chapter 15 Court with an update regarding their efforts to recover 3AC assets and locate the 3AC founders.[57] Following the hearing, the 3AC Chapter 15 Court entered orders entrusting the distribution of 3AC's assets to the Foreign Representatives; establishing a cross-border cooperation and communication protocol among the BVI Court, the 3AC Chapter 15 Court, and the Singapore Court; and granting the Foreign Representatives authority to issue subpoenas to the co-founders of 3AC.[58] On December 29, 2022, the 3AC Chapter 15 Court entered an order authorizing the Foreign Representatives to subpoena one of the co-founders of 3AC using email and Twitter notifications.[59]

Voyager continues to work diligently to maximize its recovery in the 3AC Liquidation Proceeding on account of the 3AC Loan (the "3AC Recovery"). At this time, the amount of any 3AC Recovery is unknown. As set forth in greater detail in Article IV.D of this Disclosure Statement, the 3AC Recovery, if any, will be among the value distributed to Holders of Account Holder Claims and General Unsecured Claims under the Plan.

**H.    Litigation Matters.**

**1.    *Certain Non-Bankruptcy Litigation Matters***

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. The filing of the Chapter 11 Cases likewise generally stays any legal proceedings commenced to obtain possession of, or to exercise control over, the property of the Debtors' bankruptcy estate.

Further, the Debtors are party to various other legal proceedings (including individual, class and putative class actions as well as federal and state governmental investigations) covering a wide range of matters and types of

---

[51]    *See In re Three Arrows Capital, Ltd*, Case No. 2210920 (Bankr. S.D.N.Y. July 1, 2022).

[52]    The other members of the 3AC creditors' committee are Blockchain.com, CoinList, Digital Currency Group, and MatrixPort.

[53]    *See* Docket No. 47, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. July 28, 2022).

[54]    *See In re Three Arrows Capital Ltd*, Case No. HC/OA 317/2022 (Aug. 22, 2022).

[55]    *See* Docket No. 68, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. Dec. 2, 2022).

[56]    *See Id.*

[57]    *See Id.*

[58]    *See* Docket No. 69, 71, and 72, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. Dec. 6, 2022).

[59]    *See* Docket No. 79, filed in *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. Dec, 29, 2022).

claims including, but not limited to, securities laws, contracts, and trademark disputes. Such matters are subject to uncertainty and the outcome of individual matters is not predictable.

### 2. Certain Adversary Proceedings

#### (a) Voyager Digital Holdings, Inc. v. De Sousa, et al.

On July 6, 2022, a putative class-action litigation was filed in the Ontario Superior Court of Justice (the "Canadian Class Action").[60]  The Canadian Class Action alleges claims against Debtor Voyager Digital Ltd. and some of its directors and officers for statutory secondary market liability under Canadian securities law, and common-law negligent misrepresentation.  To prove many of the claims against Voyager Digital Ltd. in that suit, the plaintiffs must first establish the underlying liability of the named directors and officers, and then establish that Voyager Digital Ltd. is vicariously liable for their alleged wrongdoing.  On August 10, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin prosecution of the Canadian Class Action.[61]  On August 11, 2022, the Ontario Superior Court of Justice denied the proposed Canadian Class Action plaintiff's motion seeking appointment of an equity committee and funding of representative counsel in the Canadian foreign recognition proceeding.[62]

#### (b) Voyager Digital Holdings, Inc. v. Robertson, et al.

On December 24, 2021, a putative class-action complaint was filed against two of the Debtors, Voyager Digital Ltd. and Voyager Digital, LLC, in the United States District Court for the Southern District of Florida, captioned Cassidy et al. v. Voyager Digital Ltd. et al.  The named plaintiff was a Voyager customer.  His complaint, which is publicly available, generally alleged that "Voyager's practices were deceptive, illegal and were the sale of unregistered securities," Cassidy v. Voyager, 1:21-cv-24441-CMA (S.D. Fla. Apr. 28, 2022) (Am. Compl. ¶ 5, ECF No. 46).  Cassidy asserted causes of action under federal and state securities law, and violations of consumer-protection claims under New Jersey and Florida law.

Cassidy was litigated for six months prior to the Petition Date.  The defendants filed a motion to dismiss the case, and also a motion to compel arbitration of the case.  Those motions were pending on the Petition Date.  Upon the Petition Date, the Debtors filed a suggestion of bankruptcy on the docket in Cassidy, and the District Court administratively closed the case.

After the Cassidy court administratively closed the case, the same lawyers who represent the Cassidy plaintiffs filed another putative-class-action proceeding in the United States District Court for the Southern District of Florida, this time naming Mark Cuban (owner of the Dallas Mavericks), Dallas Basketball Limited, d/b/a Dallas Mavericks, and Stephen Ehrlich, the Debtors' CEO and co-founder, as defendants.  This action is captioned Robertson et al. v. Cuban et al., No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022) (the "Robertson Action").  The plaintiffs are also Voyager customers and, as proposed class representatives, assert claims against Mr. Ehrlich, Mr. Cuban, and the Dallas Mavericks, for allegedly aiding and abetting Voyager's alleged fraud claimed in the Cassidy action; aiding and abetting breach of fiduciary duty; civil conspiracy; and alleged violation of several states' consumer-protection and securities laws.  The Robertson Complaint repeats the allegations made in Cassidy and explicitly claims that Cassidy "specifically alleged in detail … how Defendants Mark Cuban and Stephen Ehrlich were key players who personally reached out to investors, individually and through [defendant] Dallas Mavericks, to induce them to invest in the Deceptive Voyager Platform."  Counsel representing the Plaintiffs in Robertson have advised that they intend to amend their complaint, but have not yet provided an amended complaint or described which claims they may attempt to pursue.

---

[60]    De Sousa v. Voyager Digital Ltd., et al., No. CV-22-00683699-00CP (Ontario Superior Court of Justice).

[61]    Voyager Digital Holdings, Inc. v. De Sousa, et al., Adv. Pro. No 22-01133 (MEW).

[62]    In re Voyager Digital Ltd., No. CV-22-00683820-00CL (Ontario Superior Court of Justice).

Accordingly, on August 10, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin prosecution of the Robertson action.[63] The *Robertson* adversary proceeding is pending before the Bankruptcy Court and a hearing is set on the matter for October 19, 2022.

The Debtors do not believe that either *Cassidy* or *Robertson* have merit, but Voyager customers may be within the putative class definition provided in each of the filed complaints. To the extent *Cassidy* or *Robertson* assert "direct" claims by individual customers against non-Debtors, such claims are not released by the proposed Plan and Confirmation Order unless, solely with respect to *Cassidy*, Contributing Claimants elect on their ballots or opt-in forms to contribute such claims to the Wind-Down Entity. To the extent *Cassidy* or *Robertson* assert derivative claims, or otherwise assert claims owned by the Debtors and/or the estates, they are released in and/or treated by the proposed Plan.

The Debtors do not believe that any pursuit of *Cassidy* or *Robertson* would have a material impact on creditor recoveries. But it is unclear what impact, if any, attempts to pursue the *Cassidy* or *Robertson* cases following confirmation of the Plan may have on the Wind-Down Debtors, creditors, or third parties. Creditors should obtain their own legal advice if they have questions concerning the viability of these matters (or lack thereof), likelihood of success, or potential impact on their long-term interests.

### (c)    *Giacobbe v. Voyager Digital Holdings, Inc. et al.*

On September 1, 2022, Jon Giacobbe filed a complaint and commenced an adversary proceeding in the Bankruptcy Court alleging that the Debtors have a nondischargeable debt pursuant to section 523(a)(2)(A) of the Bankruptcy Code for money obtained by false pretenses, false representations, or actual fraud.[64] The *Giacobbe* adversary proceeding is pending before the Bankruptcy Court and a pretrial conference is scheduled for November 29, 2022. The Debtors' response to the complaint is due on October 17, 2022, pursuant to the *Stipulation and Order (1) Extending the Debtor Defendants' Time to Respond to the Complaint and Related Deadlines and (2) Adjourning the Pre-Trial Conference* SINE DIE (Adv. Pro. 22-01145 (MWE) [Docket No. 4]. On November 30, 2022, the Bankruptcy Court entered an order dismissing the *Giacobbe* adversary proceeding [Docket No. 13].

### (d)    *Voyager Digital Holdings, Inc. v. Adam Lavine and Shingo Lavine.*

On September 27, 2022, the Debtors filed a complaint and commenced an adversary proceeding in the Bankruptcy Court to extend the automatic stay, or alternatively, enjoin the Lavines from terminating the Debtors' access to and use of the Ethos.io DNS servers that they have used for years.[65] On September 30, 2022, the Lavines and the Debtors jointly agreed to a stipulation and agreed order, which fully resolved the matter, and was subsequently entered by the Bankruptcy Court [Docket No. 11].

### I.    The Coinify Sale.

Coinify ApS (along with its subsidiaries, collectively, "Coinify") is a limited liability corporation organized under the laws of Denmark that is a wholly owned subsidiary of Voyager European Holdings ApS ("Voyager Europe"). Voyager Europe is itself a wholly owned subsidiary of Debtor Voyager Digital Ltd. Coinify is a global cryptocurrency payment processor separate and distinct from the Voyager platform that enables buying, selling, and accepting cryptocurrency payment in stores worldwide.

On June 20, 2022, the Debtors engaged Moelis to assist in their exploration of available strategic alternatives, including a sale of the Coinify business. On June 28, 2022, Ascension ApS ("Ascension") submitted an unsolicited offer to purchase Coinify. In the following approximately two weeks, the Debtors and Ascension engaged in arm's-length, robust negotiations. On July 13, 2022, Voyager Europe entered into that certain share purchase agreement by and among Voyager Europe, as seller, and Ascension, as buyer (the "Coinify Purchase

---

[63]    *Voyager Digital Holdings, Inc. v. Robertson, et al.*, Adv. Pro. No 22-01138 (MEW).

[64]    *Giacobbe v. Voyager Digital Holdings, Inc. et al.*, Adv. Pro. No 22-01145 (MEW).

[65]    *Voyager Digital Holdings, Inc. v. Adam Lavine and Shingo Lavine*, Adv. Pro. No 22-01150 (MEW).

Agreement"). The Coinify Purchase Agreement contemplated the sale to Ascension in exchange for $2 million in cash and included an "Earn-Out" payment provision in an amount equal to 12.5% of a subsequent sale transaction of Coinify (capped at $15,000,000), if such sale were to be consummated by Ascension on or before the third anniversary of the Coinify sale closing date. The Coinify Purchase Agreement also contained a standard "fiduciary out" clause that allowed the Debtors to entertain competing offers to purchase Coinify should any such offers emerge. On July 14, 2022, the Debtors filed a motion for entry of an order, among other things, approving the Debtors' entry into the Coinify Purchase Agreement [Docket No. 72] (the "Coinify Motion").

Following the filing of the Coinify Motion the Debtors received indications of interest from several third parties interested in a potential purchase of Coinify. Accordingly, the Debtors adjourned the Coinify Motion while they continued to engage with all interested third parties to achieve a transaction that maximizes the value of the Coinify business. Following good faith, arm's-length negotiations with all potential transaction parties and discussion among the Board and the Debtors' advisors, the Board determined, in its business judgment, that the offer contemplated in the Coinify Purchase Agreement represented the most value maximizing option for the Debtors with respect to the Coinify business. Accordingly, the Debtors scheduled a hearing to approve the Coinify Motion for August 16, 2022. Shortly after the hearing, the Bankruptcy Court entered an order approving the Coinify Motion.

On September 30, 2022, the Debtors received an offer letter from Ascension to convert the "Earn Out" provision of the Coinify Purchase Agreement into a one-time cash payment of $250,000. Ultimately, the Debtors denied the offer because they believe that the "Earn Out" is worth substantially more than the offer received.

## J.    The Key Employee Retention Plan.

On August 2, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 212] (the "KERP Motion" and the plan set forth therein, the "KERP"), seeking approval of a key employee retention program.

The proposed KERP provides for payment of cash retention awards to 38 of the Debtors' non-insider employees who perform essential tasks for the Debtors, including accounting, cash and digital asset management, IT infrastructure, legal, human resources, and other critical functions (each, a "KERP Participant"). KERP Participants possess deep institutional knowledge of the Debtors' operations, the cryptocurrency industry generally, or both. Some KERP Participants maintain critical relationships with counterparties that are essential to the Debtors' business. Further, many KERP Participants are long-tenured employees that developed or helped to build the Debtors' platform. The KERP prevents the attrition of the KERP Participants and, by extension, the need to incur significant operational and financial costs to source and hire new employees.

Following a hearing on August 24, 2022, the Bankruptcy Court entered an order approving the KERP Motion [Docket No. 345].

### K.    Canadian Recognition Proceeding.

On July 12, 2022, the Debtors sought and were granted an Initial Recognition Order and a Supplemental Order by Madam Justice Kimmel of the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to a proceeding commended under Part IV of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "CCAA Recognition Proceedings"). Among other things, the Initial Recognition Order (as amended and restated on August 5, 2022) and the Supplemental Order: (i) recognized the Chapter 11 case of Voyager Digital Ltd. as a foreign main proceeding; (ii) recognized Voyager Digital Ltd. as the Foreign Representative of its Chapter 11 case in Canada; (iii) recognized and gave effect in Canada to certain first-day orders granted by the Bankruptcy Court in Voyager Digital Ltd.'s Chapter 11 case; (iv) granted a stay of proceedings in Canada in respect of Voyager Digital Ltd., its property and business, and its directors and officers; (v) prohibited the commencement of any proceedings against Voyager Digital Ltd. in Canada absent further order of the Canadian Court; and (vi) appointed Alvarez & Marsal Canada Inc. as the Information Officer in respect of the CCAA Recognition Proceedings. On August 11, 2022, the Canadian Court recognized and gave effect in Canada to certain further orders of the Bankruptcy Court made in Voyager Digital Ltd.'s Chapter 11 case.

### L.    The Unwind Motion.

On September 19, 2022, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Return Collateral and (II) Granting Related Relief* [Docket No. 402] (the "Unwind Motion"). The Unwind Motion seeks entry of an order authorizing the Debtors to return collateral held on account of certain loans made by Debtor Voyager Digital, LLC and non-Debtor HTC Trading Inc. to Alameda Research Ltd. (the "Alameda Loan"), as part of and upon Alameda's return of lent cryptocurrency back to the Debtors. On September 28, 2022, the Bankruptcy Court entered an order approving the Unwind Motion [Docket No. 470].

### M.    The Request for Appointment of an Equity Committee.

On September 1, 2022, Shikar S. Partab, a self-identified minority shareholder and investor in Voyager Digital Ltd., filed a letter with the Bankruptcy Court (the "Partab Letter") requesting that the Bankruptcy Court grant several motions, including a motion for an order directing that an equity committee "be appointed to protect minority shareholders in Voyager Digital." *See* Letter [Docket No. 373]. According to the *First Amended Verified Statement Pursuant to Bankruptcy Rule 2019*, Mr. Partab joined an *ad hoc* group of Equity Interest Holders [Docket No. 482]. On September 30, 2022, David Stephenson, a self-identified minority shareholder and investor in Voyager Digital Ltd., filed a letter with the Bankruptcy Court in support of the Partab Letter and the relief sought therein, including the appointment of an equity committee [Docket No. 491]. On October 3, 2022, the United States Trustee filed the *Statement of the United States Trustee Regarding Motion for Entry of an Order Directing the United States Trustee to Appoint an Official Equity Committee* noting the legal and statutory framework for appointment of an equity committee and declining to take a position of the appointment of an equity committee in the Debtors' chapter 11 cases. The Debtors intend to object to the request sought in the Partab Letter. Pursuant to the *Notice of Adjournment*, the hearing on the Partab Letter is set for January 24, 2023. [Docket No. 682].

### N.    The Post-Petition Sale Process and the Collapse of FTX.

On July 14, 2022, Moelis distributed a letter to prospective buyers with key information regarding the Debtors' marketing process (the "Process Letter"). Among other things, the Process Letter requested that all parties interested in purchasing the Company submit a non-binding indication of interest (an "Indication of Interest") by no later than 12:00 p.m., prevailing Eastern Time, on Friday, July 29, 2022 (the "IOI Deadline"), and set forth the minimum requirements that any Indication of Interest must meet in order to be considered by the Company.

On July 21, 2022, the Debtors filed the Bidding Procedures Motion. The Bidding Procedures Motion was approved by the Bankruptcy Court on August 5, 2022.

The Bidding Procedures established an open process for the solicitation, receipt, and evaluation of Bids for the Debtors' equity and/or assets pursuant to section 363 of the Bankruptcy Code or Confirmation of a Plan. The Bidding Procedures complemented and continued the Prepetition Marketing Process described in greater detail in Articles II and III herein. The timeline set forth in the Bidding Procedures was calculated to balance the need to

provide adequate notice to parties in interest and potential bidders with the need to run an expeditious and efficient sale process. Ultimately, the Bidding Procedures provided the Debtors with a clear and fair process to ascertain interest in the Debtors' assets and facilitate a sale of the Debtors if a value-maximizing bid was received.

As of the Bid Deadline (as defined in the Bidding Procedures), the Debtors had received multiple bids with varying structures and terms. On September 13, 2022, the Debtors commenced the Auction in accordance with the Bidding Procedures. The Auction spanned two weeks and featured multiple rounds of bids. The Debtors and their advisors, in consultation with the Committee and its advisors, scrutinized each bid closely, analyzing (a) the assets sought to be purchased, (b) the total expected deal consideration, (c) the certainty of each bidder's ability to close a transaction and the timing thereof (including any anticipated delays to closing and the cost to the Debtors of such delays), (d) the expected net benefit to the estates, including recoveries to customers, and (e) other criteria considered by the Debtors in their reasonable, good-faith business judgment. Importantly, the Debtors also analyzed whether each bid would provide greater value to the Debtors' stakeholders than the Standalone Plan. The Debtors consulted closely with the Committee throughout the Auction and these chapter 11 cases more generally.

Ultimately, the Debtors, in consultation with the Committee, determined that the bid received from FTX US was the highest and otherwise best bid available at the Auction and would provide meaningful value to the Debtors' estates and stakeholders. On September 27, 2022, the Debtors and FTX executed the FTX Purchase Agreement memorializing the terms of the FTX bid. The FTX Purchase Agreement contained a "no-shop" provision that the parties later amended at the direction of the Court[66] to provide the Debtors greater flexibility to entertain incoming bids from potential transaction parties if such bids were reasonably likely to lead to a higher and otherwise better offer.[67] On October 20, 2022, the Court entered an order approving the Debtors' entry into the FTX Purchase Agreement[68] with the modified "no-shop" provision. On October 24, 2022, the Debtors filed solicitation versions of their Disclosure Statement and Plan,[69] solicitation of the Plan commenced in earnest shortly thereafter as the Debtors embarked towards confirmation, which, among other things, would have effectuated the FTX Transaction.

The Debtors' journey to consummation of the FTX Transaction and confirmation of the Plan was derailed over the ensuing weeks. Indeed, on November 11, 2022, Mr. Bankman Fried resigned as CEO and FTX announced that FTX and approximately 130 of its affiliates, including FTX US, had commenced filing for chapter 11 protection in the United States Bankruptcy Court for the District of Delaware.[70] Shortly prior to FTX's bankruptcy filing, Kirkland sent a letter on behalf of the Debtors to Sullivan & Cromwell LLP ("S&C"), counsel to FTX, informing S&C that FTX had until 12:00 p.m. Eastern Time on November 11, 2022, to indicate whether it intends to close the FTX Transaction or the Debtors would seek emergency relief from the Court to be released from the "no-shop" provision of the FTX Purchase Agreement. S&C responded shortly thereafter confirming that FTX had released the Debtors from the "no-shop" provision but did not indicate whether FTX intends to pursue or abandon the FTX Transaction. On December 9, 2022, the Debtors filed with this Court the *Joint Stipulation and Agreed Order Between the Debtors and FTX US* terminating the FTX Purchase Agreement [Docket No. 717]. On December 21, 2022, FTX filed a motion seeking approval of such stipulation by the court overseeing the FTX Bankruptcy Proceeding as well.[71]

---

[66] *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. Oct. 19, 2022) Hr'g Tr. 45:21–46:6.

[67] *See* Asset Purchase Agreement, Docket No. 472, Exhibit B, § 5.2.

[68] Docket No. 581.

[69] Docket Nos. 590 and 591.

[70] *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

[71] *Motion of Debtors for Entry of an Order (A) Authorizing the Debtors to Enter Into the Stipulation with Voyager Digital, LLC and (B) Granting Related Relief* [Docket No. 283], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Dec. 21, 2022).

While the FTX Bankruptcy Proceeding is still unfolding, early indications are that Mr. Bankman-Fried and FTX were carrying on one of the largest financial failures of all time. Mr. John Ray III, who was appointed Chief Executive Officer of FTX following the resignation of Mr. Bankman-Fried and who oversaw the restructuring of Enron, commented in an early filing in the FTX Bankruptcy Proceeding that "[n]ever in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information."[72]

The collapse of FTX caused a ripple effect across the broader digital currency industry as cryptocurrency businesses with large outstanding loans to FTX and its affiliates faced the prospect of having to write down hundreds of millions of dollars in balance sheet assets[73] and other businesses saw their value and future prospects crater along with the price of Bitcoin and other cryptocurrencies.[74] In the days and weeks following commencement of the FTX Bankruptcy Proceeding, major cryptocurrency players announced that they had suspended withdrawals.[75]

Following the announcement of the FTX bankruptcy, the Debtors received numerous inbound inquiries from potential transaction parties interested in consummating a transaction with the Debtors, and, following their release from the "no-shop" provision in the FTX Purchase Agreement, the Debtors began proactively to reengage with other potential transaction parties regarding a potential acquisition of the Debtors' business. Over the course of four weeks, the Debtors engaged in good-faith, arm's length negotiations with numerous potential transaction parties regarding a variety of deal structures and terms. Several of the parties had already conducted substantial diligence on the Debtors' businesses during prior marketing processes, and additional parties with whom the Debtors had not previously engaged entered into non-disclosure agreements and gained access to the Debtors' virtual dataroom. The Debtors conducted additional management meetings and responded to dozens of diligence requests from potential transaction parties during this process. Ultimately, following extensive discussions and consultation with their advisors and the Committee, the Debtors determined, in an exercise of their business judgment, that the offer submitted by Binance.US represented the highest and otherwise best offer to purchase the Debtors' business, and on December 18, 2022, the Debtors entered into the Asset Purchase Agreement.

In connection with the evaluation of the Binance.US bid, the Debtors' advisors conducted certain financial and business counterparty due diligence on Binance.US. This due diligence included reviews of certain documentation and discussions with senior management at Binance.US relating to: audited financial statements, interim unaudited financial statements, available liquidity, related party services agreements, wallet infrastructure, AML/KYC procedures, money transmitter licensing status, and business plans submitted to selected state regulators in connection with the issuance of money transmitter licenses.

---

[72]  *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 24], filed in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 17, 2022); *see also United States of America v. Samuel Bankman-Fried*, 22-crim-673 (S.D.N.Y. December 9, 2022); *Securities and Exchange Commission v. Samuel Bankman-Fried*, Civil Action. No. 22-cv-10501 (S.D.N.Y. Dec. 13, 2022).

[73]  Reuters, "Factbox: From Binance to Voyager, Crypto Firms' Exposure to FTX Is Coming to Light," November 14, 2022, https://www.reuters.com/technology/binance-voyager-crypto-firms-exposure-ftx-is-coming-light-2022-11-14.

[74]  Cointelegraph, "The FTX Contagion: Which Companies Were Affected by the FTX Collapse?" November 17, 2022, https://cointelegraph.com/news/the-ftx-contagion-which-companies-were-affected-by-the-ftx-collapse.

[75]  Press Release, "November 11, 2022 BlockFi Update," November 11, 2022, https://blockfi.com/november-11-2022-blockfi-update; Press Release, "Important Update: Forward Through Adversity," November 13, 2022, https://trends.aax.com/important-update-forward-through-adversity; Press Release, "An Important Message Regarding Gemini Earn," November 16, 2022, https://www.gemini.com/blog/an-important-message-regarding-gemini-earn; Wall Street Journal, "Crypto Lender Genesis Suspends Withdrawals After FTX Collapse," November 16, 2022, https://www.wsj.com/articles/crypto-lender-genesis-suspends-withdrawals-after-ftx-collapse-11668607332; Press Release, "Important Updates on Services at Liquid," November 21, 2022, https://blog.liquid.com/important-updates-on-services-at-liquid.

The Debtors value the Sale Transaction at approximately $1.022 billion, comprising (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which as of December 19, 2022 at 0:00 UTC, is estimated to be $1.002 billion, plus (ii) additional consideration, which is estimated to provide at least $20 million of incremental value. The Sale Transaction also includes additional benefits, such as it (i) provides the most tax efficient route forward as the Binance.US Platform will provide the means for Account Holders to access 100% of the cryptocurrency types held by Account Holders on the Debtors' platform, (ii) it is the only transaction available to the Debtors that did not require the Debtors to liquidate cryptocurrency for working capital purposes, (iii) includes reimbursement by Binance.US of up to $15 million of Seller's expenses, (iv) provides a $10 million reverse termination fee payable to the Seller by Binance.US to compensate the Debtors' estates in the event that Binance.US cannot consummate the transaction, and (v) in the event that the Debtors pivot to the Liquidation Transaction, provides that Binance.US will provide certain services to facilitate such transaction to ensure that the Debtors can rely on the Binance.US Platform to minimize leakage with and cybersecurity risks when returning cryptocurrency to creditors.

Importantly, the Asset Purchase Agreement contains a "Fiduciary Out," which provides that the Seller may terminate the Asset Purchase Agreement at any time in the event that not doing so would be inconsistent with the Seller's fiduciary duties. Moreover, the structure of the proposed transaction, including its "Fiduciary Out," permits the Debtors to toggle *either* to a higher and better third-party bid (should one emerge) *or* to the Liquidation Transaction, if the Debtors determine in their business judgment between now and closing that the Sale Transaction is no longer the highest and best option for any reason. Based on the diligence the Debtors have performed to date on their proposed counterparty, they believe the Sale Transaction is the highest and best option. But the Debtors recognize that the cryptocurrency industry is experiencing an extremely volatile period for an already volatile business, and the Debtors continue to monitor what seem to be daily developments in the sector. Not only does the structure of the proposed transaction permit the debtors to pivot to the Liquidation Transaction if they conclude the Asset Purchase Agreement is no longer higher and better due to a development along the way, but the work to prepare to consummate and execute on the Asset Purchase Agreement will better prepare the Debtors to complete the Liquidation Transaction if the toggle becomes necessary.

The Sale Transaction can be effectuated quickly, provides a meaningful recovery to creditors, and allows the Debtors to facilitate an efficient resolution of these Chapter 11 Cases, after which Binance.US's market-leading, secured trading platform will enable customers to trade and store cryptocurrency. The terms of the Purchaser's offer are set forth in greater detail in the Asset Purchase Agreement. Due to this comprehensive marketing process, the robust Auction, and the extensive, arm's length negotiations with multiple potential transaction parties following the collapse of the FTX Transaction, the Debtors believe that the Sale Transaction is the most value-maximizing transaction under the facts and circumstances.

On December 30, 2022, the United States Attorney for the Southern District of New York filed the "Notice of the United States of America Concerning the Review of Certain Transactions by the Committee on Foreign Investment in the United States" ("CFIUS") review on the Sale Transaction [Docket No. 797] (the "CFIUS Notice"). The Sale Transaction is potentially subject to CFIUS review as CFIUS may review certain transactions involving foreign person(s) acquiring control of any business or investment in the United States in order to determine the effect of such transactions on the national security of the United States, and to mitigate risks arising from those transactions. The Debtors and Binance.US have been in discussion with CFIUS and intend to make a voluntary filing with CFIUS regarding the Sale Transaction. As set forth in the CFIUS Notice regarding the Sale transaction, there is risk that CFIUS takes action that could materially affect the Sale Transaction. In the event of any action taken by CFIUS that arises to that level, the Debtors will toggle to the Liquidation Transaction under the Plan as described in Article V.B.2 of this Disclosure Statement.

### O.   The Special Committee Investigation.

As described in Article VII.D, on July 5, 2022, OpCo formally formed the Special Committee comprised of disinterested directors Timothy Pohl and Jill Frizzley. The Special Committee was vested with the authority to, among other things: (a) investigate any historical transactions, public reporting, or regulatory issues undertaken by OpCo that the Special Committee deemed necessary or appropriate, and the facts and circumstances surrounding such transactions; (b) interview and solicit information and views from management, representatives, consultants, advisors, or any other party in connection with any historical transactions undertaken by OpCo that the Special

Committee deems necessary or appropriate; (c) request documentation and information regarding OpCo's business, assets, properties, liabilities and business dealings with respect to any historical transactions undertaken by Voyager that the Special Committee deems necessary and appropriate to review; (d) perform any other activities consistent with the matters described herein or as the Special Committee or Voyager's board of directors otherwise deems necessary or appropriate; and (e) conduct an independent investigation with respect to any potential estate claims and causes of action against insiders of Voyager, including any claims arising from loans made to 3AC. *Id.* The Special Committee retained the Special Committee Counsel to provide independent advice to, and act at the exclusive direction of, the Special Committee in connection with the Special Committee's mandate.

During its investigation, counsel for the Special Committee sought and received information related to, among other things: Voyager's loans to 3AC, Alameda, Celsius and numerous other borrowers; the diligence performed in connection with those loans; Voyager's staking of customer cryptocurrency assets; Voyager's regulatory compliance; pre-petition payments to insiders and third parties; and numerous other aspects of Voyager's business. The Special Committee drafted and negotiated a protective order, which was later entered by the Bankruptcy Court, to protect the confidentiality of the information sought and received. Voyager collected and provided to the Special Committee responsive documents from its internal hard copy and electronic files, from its outside counsel, and from various third parties (e.g., cryptocurrency custodians and exchanges). Among many other things, Voyager collected email, Slack communications, and, in certain cases, Telegram and cell phone data—from a dozen Company employees, including all of Voyager's most senior officers and others. In addition to several voluminous spreadsheets of data, Voyager produced over 12,000 documents—collectively totaling over 50,000 pages—related to, among other things: loans between Voyager and its counterparties; the diligence performed by Voyager in connection with those loans; internal and external communications regarding those loans; meetings of Voyager's Risk Committee and board of directors; detailed information regarding Voyager's staking of customer assets; Voyager's applications for money transmitter licenses; audits for compliance with applicable laws and regulations; communications with Voyager's regulators; Voyager's public statements; Voyager's tax filings and financial statements; and detailed information regarding intercompany transfers and payments to insiders. No information was withheld from the Special Committee on privilege grounds.

In addition to reviewing the above-referenced documents, counsel for the Special Committee also interviewed numerous Voyager employees, including Steve Ehrlich (CEO), Gerard Hanshe (COO), Evan Psaropoulos (CCO), Ashwin Prithipaul (CFO), Pamela Kramer (CMO), David Brosgol (General Counsel), Marshall Jensen (Head of Corporate Development), Ryan Whooley (Head of Treasury and Trading), Jon Brosnahan (Treasurer), Brian Silard (Treasury Team), David Brill (Deputy General Counsel), and Manisha Lalwani (in-house regulatory counsel). Collectively, the interviews performed during the Special Committee's investigation lasted more than 55 hours, and covered in great detail a wide-range of topics.

## IX. RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE WIND-DOWN DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

A.        **Risks Related to the Restructuring.**

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors or the Plan and its implementation.

1.        ***The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions Are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors***

If the Restructuring Transactions are not implemented, the Debtors will consider all other restructuring alternatives available, which may include the filing of an alternative chapter 11 plan, conversion to chapter 7, or any other transaction that would maximize the value of the Debtors' estates.  Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would also have other adverse effects on the Debtors.  For example, it would also adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' ability to retain key employees;

- the Debtors' ability to retain account holders;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, and lenders; and

- the Debtors' enterprise value.

2.        ***Certain Bankruptcy Law Considerations***

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

(a)        **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  As provided in the Plan and this Disclosure Statement, the Debtors are not seeking to substantively consolidate and recoveries on account of Claims against or Interests in any Debtor shall be determined on a Debtor-by-Debtor basis.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims and Interests that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(b)    **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

(c)    **Failure to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

(d)    **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by the Bankruptcy Court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures, and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. If a chapter 11 plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to consummate the Sale and what, if anything, Holders of Allowed Claims against them would ultimately receive with respect to their Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

(e)    **Nonconsensual Confirmation.**

In the event that any Impaired Class of Claims or Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements, and the Debtors will request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Professional Fee Claims.

(f)    **Continued Risk After Consummation.**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as increasing expenses and further industry deterioration or other changes in economic conditions. Some of these concerns and effects typically become more acute when a case under the

74

Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan reflecting the Plan will achieve the Debtors' stated goals.

**(g)        Filing of a Competing Plan.**

At the outset of the Chapter 11 cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors have retained the exclusive right to propose the Plan since filing their chapter 11 petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan in order to achieve the Debtors' stated goals because creditors and others may propose a plan.

**(h)        The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

**(i)        The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**(j)        Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will in fact occur.

**(k)        Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies could affect distributions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

75

(l)    **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including releases by third parties of claims that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

3.    *The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims against or Interests in the Debtors*

The Debtors have not obtained or requested a fairness opinion from any banking or other firm as to the fairness of the consideration under the Plan.

4.    *Governmental Approvals May Not Be Granted*

Consummation of the Restructuring Transactions may depend on obtaining approvals of certain Governmental Units that may be necessary or advisable.  Failure by any Governmental Unit to grant an approval could prevent or impose limitations or restrictions on Consummation of the Restructuring Transactions and Confirmation of the Plan.

B.    **Risks Related to Recoveries under the Plan.**

1.    *The Debtors Cannot Guarantee Recoveries or the Timing of Such Recoveries*

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims and Allowed Interests, it is possible that the actual amount of such Allowed Claims and Allowed Interests is materially different than the Debtors' estimates.  Creditor recoveries could be materially reduced or eliminated in this instance.  In addition, the timing of actual distributions to Holders of Allowed Claims and Allowed Interests may be affected by many factors that cannot be predicted.  Therefore, the Debtors cannot guaranty the timing or amount of any recovery on an Allowed Claim or an Allowed Interest.

2.    *The Debtors Are Subject to the Volatility of Cryptocurrency*

The volatility of cryptocurrency may adversely affect the fair market value of Voyager's Cryptocurrency, which could result in lower recoveries for creditors than the Debtors' current estimates based on the Fair Market Value as of December 19, 2022.

3.    *The Plan May Diminish the Value of VGX*

Upon confirmation of the Plan and approval of the Sale Transaction, Binance.US will review VGX to determine whether VGX meets its standards to be listed for trading on the Binance.US Platform.  Regardless of whether VGX meets the standards to be listed for trading on the Binance.US Platform, holders of VGX will be able to receive their VGX tokens in kind and withdraw them from the Binance.US Platform.  The Debtors' business operations will be winding down following the Effective Date and consummation of either the Sale Transaction or the Liquidation Transaction. Binance.US is not purchasing the VGX private keys and the Debtors will continue to engage with third parties regarding a sale of the VGX private keys to provide utility to VGX post-consummation of the Sale Transaction or the Liquidation Transaction as applicable. In the event that the VGX private keys are not sold to a third party, VGX will have no utility going forward and may have no value. Voyager will not be able to support commitments to VGX following the Effective Date and, in the event the Sale Transaction is consummated, Binance.US will not otherwise assume such obligations.

76

        **4.**      ***The Tax Implications of the Debtors' Bankruptcy and Restructuring Are Highly Complex***

Holders of Allowed Claims and Allowed Interests should carefully review Article XII of this Disclosure Statement, entitled "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

        **5.**      ***The Closing Conditions of the Sale Transaction May Not Be Satisfied***

It is possible that the Debtors may not satisfy the closing conditions of the Sale Transaction. A failure to satisfy any of the closing conditions of the Sale Transaction could prevent the Sale Transaction and the Plan from being consummated, which could lead to the Chapter 11 Cases being converted to cases under chapter 7.

      **C.**      **Disclosure Statement Disclaimer.**

        **1.**      ***The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed***

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

        **2.**      ***No Legal or Tax Advice Is Provided By This Disclosure Statement***

This Disclosure Statement is not legal advice to any person or Entity. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each reader should consult their own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation of the Plan.

        **3.**      ***No Admissions Made***

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Wind-Down Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

        **4.**      ***Failure to Identify Litigation Claims or Projected Objections***

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims and Interests after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims and Interests.

        **5.**      ***Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors***

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

6.       *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Furthermore, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

7.       *No Representations Outside This Disclosure Statement Are Authorized*

**NO REPRESENTATIONS CONCERNING OR RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.   ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE VOTING HOLDERS' ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY VOTING HOLDERS IN ARRIVING AT THEIR DECISION.   VOTING HOLDERS SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE SOUTHERN DISTRICT OF NEW YORK.**

D.       **Miscellaneous Risk Factors and Disclaimers.**

1.       *The Debtors are Subject to an Extensive and Highly Evolving Regulatory Landscape and Any Adverse Changes to, or Their Failure to Comply with, any Laws and Regulations Could Adversely Affect Their Brand, Reputation, Business, Assets, Operating Results, and Financial Condition*

The Debtors' business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which the Debtors operate, including those governing money transmission, financial services, banks and trust companies, securities, broker-dealers and alternative trading systems, or ATS, commodities and commodities interests such as derivatives, credit, cryptocurrency asset custody, exchange, and transfer, cross-border and domestic money and cryptocurrency asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, retail protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing, among others. Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, cryptocurrency assets, and related technologies.  As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptocurrency economy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions.  These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another and may conflict with one another.  Moreover, the complexity and evolving nature of the Debtors' business and the significant uncertainty surrounding the regulation of the cryptocurrency economy require the Debtors to exercise their judgment as to whether certain laws, rules, and regulations apply to the Debtors, and it is possible that governmental bodies and regulators may disagree with their conclusions.  To the extent the Debtors have not complied with such laws, rules, and regulations, the Debtors could be subject to significant fines, revocation of licenses (including Money Transmission Licenses as described in IV.F), limitations on their products and services, cease and desist orders in one or more states, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect their business, operating results, and financial condition.

Additionally, economic and trade sanctions, anti-money laundering, and anti-terrorism laws in the United States and other jurisdictions may restrict the Debtors' business from engaging in transactions in or relating to

78

certain countries, individuals, and entities. The imposition of sanctions and related restrictions by different jurisdictions have been evolving quickly, including in response to the military conflict between Russia and Ukraine, and the ultimate impact on global economic and commercial activity as well the financial condition and performance of the Debtors' business and assets is difficult to predict.

In order to operate its business, Voyager currently maintains state money transmission licenses or their equivalents (each, a "Money Transmission License") in seventeen (17) states[76] and has license applications pending[77] in eighteen (18) states.[78]

The Debtors have engaged with the state banking departments throughout the bankruptcy process and will continue to actively do so with the goal of ensuring that Plan provides for compliance by Voyager with state money transmission laws. The state banking departments may have broad discretion as to the approvals required in connection with the Plan, thus it is not possible to predict with certainty the scope of such approvals, whether they will ultimately be granted, and the expected timeframes of the state banking departments' determinations. There are unresolved questions of law with respect to the intersection of state money transmission statutes and the Bankruptcy Code, and the answers to those questions may impact the ability of the state banking departments to require certain approvals with respect to confirmation of the Plan.

Following confirmation of the Plan, Voyager will take steps to (i) withdraw those money transmission license applications that are pending with state banking departments and (ii) surrender those Money Transmission Licenses it holds (the "Licensing Wind-Down Process"). Such Licensing Wind-Down Process will require notice to, and in some cases approval by, those state banking departments in states where the Debtors have applications pending or are licensed pursuant to the requirements set forth in each state money transmission statute and as otherwise required by the relevant state banking departments.[79]

## 2. The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations

The Debtors are currently subject to or interested in certain legal proceedings, some of which may adversely affect the Debtors or the Wind-Down Debtors, as applicable. In the future, the Debtors or the Wind-Down Debtors may become parties to additional litigation, including enforcement actions brought by state banking departments with respect to Voyager's historical compliance with money transmission laws, which could result in significant fines. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect recoveries to creditors in these

---

[76] The Alaska Division of Banking and Securities suspended Voyager's license on July 6, 2022, and subsequently reversed such suspension on July 14, 2022. There is a risk that one or more additional state banking departments may choose to suspend Voyager's Money Transmission Licenses going forward, or that one more states in which Voyager is licensed may decline to renew Voyager's licenses for 2023 based on regulatory concerns and/or the requirements of their money transmission statutes.

[77] On July 17, 2022, the North Dakota Department of Financial Institutions notified Voyager that it required Voyager's pending money transmitter license application be withdrawn on grounds that it would not approve an application with an active bankruptcy filing. Other states have likewise inquired as to whether Voyager will seek to withdraw its pending applications or indicated they may require Voyager to do so. While Voyager is seeking to keep its applications on file with the state banking departments and has not withdrawn any applications, there is a risk that one or more state banking departments with which Voyager has pending applications may require Voyager to do so going forward.

The Debtors have two applications pending in New York: (a) a money transmitter license application and (b) a virtual currency business activity license application or "Bitlicense." Voyager Digital NY, LLC, a non-operational affiliate of the Debtors, filed such applications.

[78] Voyager also maintains a registration as a "money services business" with the Financial Crimes Enforcement Network ("FinCEN") pursuant to federal money transmission laws. A change in ownership of an entity registered with FinCEN requires notice to FinCEN following consummation of the relevant transaction, but does not require prior regulatory approval.

[79] The state approval process for the surrender of a license typically takes several months.

Chapter 11 cases. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Debtors, however, could be material.

On January 5, 2022, Voyager received from the U.S. Securities and Exchange Commission ("SEC") a subpoena requesting certain information and documents. In response, Voyager actively dialogued with and provided the SEC staff with the requested material. The subpoena and dialogue related primarily to two issues: (1) whether the Rewards Program feature of the Voyager Account (also referred to as the "Earn Program" or "Voyager Earn Account") involved a securities offering and (2) whether Voyager or any of its affiliated entities required registration under the Investment Company Act of 1940. As a follow-up, on July 15, 2022, the SEC staff issued a second subpoena with additional requests for information and documents relating to public statements, internal communications, and third-party communications after May 1, 2022, and certain minutes, policies and procedures, internal documentation, loan agreements, due diligence, and June 30, 2022 financial statement information. As it does with most subpoenas, the SEC staff included a cover letter stating, among other things, "The investigation and the subpoena do not mean that we have concluded that your client or anyone else has violated the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security." Since then, Voyager has produced certain of the requested material and continues to work to provide the SEC with the remaining responsive material. As before, Voyager continues to dialogue with the SEC regarding the Voyager business and document and information requests.

On July 28, 2022, the FDIC and Federal Reserve Board issued a joint letter and a joint press release regarding potential false or misleading representations as to Voyager's deposit insurance status, and demanded immediate corrective action to address any false or misleading statements. While the Debtors disagree with the FDIC and Federal Reserve Board's position, the Debtors nonetheless took immediate steps to ensure that statements made as to the deposit insurance status of funds held through the Voyager platform are accurate. Following receipt of Voyager's responses on August 1, 2022 and August 9, 2022, the FDIC and the Federal Reserve Board requested additional information from Voyager. Voyager responded to those requests on October 28, 2022 and October 31, 2022.

Separate from the matters pertaining to the FDIC and Federal Reserve Board's letter dated July 28, 2022, the Federal Reserve Board on September 29, 2022 requested certain information pertaining to Voyager's operations; Voyager made an initial production in response to such request on November 10, 2022, and anticipates making further productions in satisfaction of the Federal Reserve Board's request.

On August 1, 2022, Voyager received from the Commodity Futures Trading Commission a letter seeking certain information and documents from Voyager on its business, its customers and its lending activities prior to its chapter 11 proceedings. On September 12, 2022, Voyager received a subpoena requesting the same information and documents. Voyager is working to provide the CFTC with information that its responsive to its requests.

On November 23, 2022, the Federal Trade Commission issued a civil investigative demand to Voyager seeking certain information from Voyager regarding its business.

In addition to these federal subpoenas, requests for information, and cease and desist orders, Voyager has also received a number of administrative proceeding inquiries and orders from state securities regulators relating to the Rewards Program. The states have alleged or asserted in a variety of ways that the accounts involved unregistered securities offerings. Below is a brief summary of Voyager's contacts with applicable state regulators concerning the Rewards Program.

Alabama issued a show cause order[80] on March 29, 2022, which required a response within twenty-eight (28) days. Alabama extended the response deadline to January 5, 2023. On July 7, 2022, Alabama also issued a

---

[80]  Alabama's show cause order required Voyager to show, within a certain period of time, why Voyager should not be directed to cease and desist from selling unregistered securities within the state.

subpoena for information on Voyager customers, board of directors materials and other information related to the chapter 11 proceedings. Voyager has produced all of the requested materials.

Indiana issued a cease and desist order[81] on March 29, 2022. Given that neither the Voyager Account nor the Rewards Program is active, and given Voyager's current status in these Chapter 11 Cases, Voyager has requested an extension with respect to deadlines in connection with responding to Indiana's order.

Kentucky issued an emergency cease and desist order[82] on March 29, 2022. Kentucky denied Voyager's request for a stay of effectiveness of the order on May 27, 2022. Kentucky's order is still in effect. Voyager has the option to request a hearing, but otherwise, there is no pending deadline. Voyager ceased offering Rewards to all customers as of June 1, 2022 pursuant to the order. Separately, on July 6, 2022, Kentucky asked for information in connection with Voyager's Kentucky customers. Voyager produced that information on July 8, 2022.

New Jersey issued a cease and desist order[83] on March 29, 2022 with an effective date of April 29, 2022. Per New Jersey's communications with Voyager and an order issued on June 29, 2022, a version of the order is in effect as of July 31, 2022. Specifically, Voyager has ceased offering Rewards to new customer accounts opted into the Rewards Program feature and has ceased offering Rewards for new assets contributed to existing such accounts. Given that neither the Voyager Account nor Rewards Program is active, and given Voyager's current status in these Chapter 11 Cases, Voyager has requested an extension with respect to deadlines in connection with responding to New Jersey's order.

Oklahoma issued a cease and desist order[84] on March 29, 2022. At Voyager's request, Oklahoma stayed the effectiveness of its order multiple times, but lifted the stay on July 29, 2022. Most recently, given that neither the Voyager Account nor Rewards Program is active, and given Voyager's current status in these Chapter 11 Cases, Voyager has requested an extension with respect to deadlines in connection with responding to Oklahoma's order.

South Carolina issued a cease and desist order and notice of opportunity for a hearing[85] on March 29, 2022. South Carolina stayed the effectiveness of its order and extended the applicable response deadlines multiple times. The order went into effect on August 1, 2022, but all response deadlines have been extended until January 31, 2023.

Vermont issued a show cause order on March 29, 2022. At Voyager's request, Vermont extended the deadline to respond to the order multiple times. On July 13, 2022, Vermont issued a subpoena for information on Voyager's Vermont customers and other information related to the chapter 11 proceedings. Voyager has produced some of the requested materials and continues to work with Vermont with the remaining responsive materials. On

---

[81] Indiana's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering and selling securities unregistered/noncompliant under Indiana securities laws/codes; accepting additional assets into existing Voyager Rewards Accounts; and committing any further violations of the Indiana securities laws/codes.

[82] Kentucky's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: soliciting or selling any security in Kentucky unregistered with the state's Department of Financial Institutions; and engaging in any other activity that would otherwise violate the Kentucky securities laws.

[83] New Jersey's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling unregistered/nonexempt securities; accepting additional assets into existing Rewards Accounts; and violating any other provisions of the state's securities laws.

[84] Oklahoma's order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts to Oklahoma residents; and allowing further deposits into such existing accounts of Oklahoma residents.

[85] South Carolina's order alleged that Voyager Rewards Accounts were securities and required Voyager to: cease and desist from transacting business in the state in violation of the states securities laws; pay a civil penalty of $2,149,800.00 if the order becomes effective by operation of law or, if Voyager seeks a hearing, pay a civil penalty not to exceed $10,000 for each violation. The notice of hearing informed Voyager of its right to request a formal hearing to contest the statements and allegations made therein.

81

September 14, 2022, Vermont issued an *ex parte* order to cease and desist, as well as a standstill agreement, under which all deadlines in connection with responding to the order are suspended for ninety (90) days.

Washington issued a statement of charges and notice of opportunity for a hearing[86] on March 29, 2022. In response on April 15, 2022, Voyager submitted its application for an adjudicative hearing. On May 16, 2022, Voyager and Washington confirmed their agreement, in which Voyager would waive its right to a speedy hearing but maintain its right to request a hearing. Washington agreed to extend all applicable response deadlines until October 1, 2022. Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Washington's order.

Texas issued a notice of hearing[87] on April 12, 2022. The hearing has been scheduled for January 25, 2023. Prior to this hearing, both Texas and Voyager must pre-file all exhibits they intend to offer at the hearing; provide those exhibits to each other by email; number each exhibit sequentially; paginate or bates stamp multipage documents; and identify witnesses they intend to rely on and file witness statements accordingly.[88]

California issued a desist and refrain order[89] on June 3, 2022. As part of a prior agreement with California, on July 11, 2022, Voyager requested a hearing while waiving its right to have the hearing held within fifteen business days. In exchange, California agreed that it would not petition the superior court to enforce the order on or before July 31, 2022. Per a conversation with the state regulator on August 1, 2022, the department has no reason to go to court to enforce the order in light of the bankruptcy proceedings and because Voyager is not currently offering Rewards to customers. No hearing date has been set.

Washington, D.C. issued a summary cease and desist order[90] on July 26, 2022. On July 29, 2022, the D.C. regulator agreed to an extension of the deadline by which Voyager had to submit a written answer and request for hearing until September 30, 2022. Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Washington, D.C.'s order.

---

[86]   Washington's statement of charges notified Voyager that Washington had reason to believe Voyager had violated the state's securities laws and contained a list of tentative findings of fact and conclusions of law. Based on the findings and conclusions alleged therein, the statement issued a notice of intent to order Voyager to cease and desist from certain activities, impose fines, and charge costs. The notice of opportunity of hearing informed Voyager of its right to contest the charges made against it at an adjudicative hearing by making a written request for hearing and filing an answer to the statement of charges. Alternatively, Voyager was given the option to waive the right to a hearing and instead submit a written statement to the Director of the Department of Financial Institutions.

[87]   The notice of hearing informed Voyage that a hearing would be held before an administrative law judge to determine whether to issue: (1) an order requiring Voyager to cease and desist from violating various provisions of the state's securities act; and/or (2) a cease publication order requiring Voyager to cease from offering securities via statements that are materially misleading or otherwise likely to deceive the public.

[88]   Texas Department of Banking alleged that Voyager Digital, LLC engaged in unlicensed money transmission in violation of Chapter 151 of the Texas Finance Code. While Voyager neither admitted nor denied the Department's conclusions with respect to any factual findings or violations of law, Voyager and the Department agreed to a Consent Order (*In the Matter of Voyager Digital, LLC* (Order No.: 2022-035)) whereby Voyager agreed to cease and desist from engaging in the unauthorized business of money transmission in Texas. The Consent Order does not limit Voyager's ability to (i) hold money and monetary value on behalf of, and return money and monetary value to, existing Account Holders located in Texas during the pendency of Voyager's Chapter 11 Cases, or (ii) otherwise act in accordance with orders of the Bankruptcy Court.

[89]   California's order alleged that Voyager Rewards Accounts were securities and required Voyager to desist and refrain from further offers and sale of unregistered/noncompliant securities within the state.

[90]   Washington D.C.'s summary cease and desist order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts within D.C., from accepting any additional assets into existing accounts; and from any further violations of securities laws.

Alaska issued a cease and desist order[91] and notice of opportunity to request a hearing, on September 3, 2022. Per the notice, Voyager has thirty (30) days to request a hearing. Given that neither the Voyager Account nor Rewards Program are active, and given Voyager's current status in the bankruptcy proceedings, Voyager has requested an extension with respect to deadlines in connection with responding to Alaska's order.

In addition to the above-described state securities matters, Voyager has received and continues to respond to various requests from state banking departments in certain states with respect to Voyager's compliance with money transmission laws.

### 3. The Loss of Key Personnel Could Adversely Affect the Debtors' Ability to Consummate the Sale and Plan

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. Because competition for experienced personnel in the cryptocurrency and financial industries can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to consummate the Sale and the Plan.

### 4. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition

Section 1141(d)(3) of the Bankruptcy Code limits a debtor's ability to discharge Claims in certain circumstances. Any Claims not ultimately discharged through a Plan could be asserted against the Wind-Down Entity and may have an adverse effect on the Debtors' financial condition.

### 5. Certain State Regulators Have Asserted that the Plan is Unconfirmable due to the Treatment of Account Holders in Unsupported Jurisdictions

Certain state regulators in the Unsupported Jurisdictions (i.e., New York, Texas, and Vermont (which filed an objection on behalf of Hawaii)) have asserted that the Plan provides for the disparate treatment of Account Holders in their jurisdictions due to the potential delay in distributions to such Account Holders in violation of section 1123(a)(4) of the Bankruptcy Code. The Debtors believe that the Plan's treatment of Account Holders in the Unsupported Jurisdictions complies with section 1123(a)(4) of the Bankruptcy Code and provides such Account Holders with the best possible path towards receiving an in-kind distribution of their claims in the same types of Cryptocurrency that they deposited with the Debtors, however, there can be no assurance that the Bankruptcy Court will reach the same conclusion. In the event that the Bankruptcy Court finds that the objections of the state regulators have merit, the Debtors may be required to modify the Plan, prior to or as a result of the Confirmation Hearing, to provide for (a) the liquidation of the Cryptocurrency held by Account Holders in the Unsupported Jurisdictions on the date that is three months after the Effective Date (i.e., the date when Cryptocurrency for Account Holders who do not fulfill the requirements to access the Binance.US Platform would be converted into U.S. Dollars and distributed), or potentially, on the Effective Date, and (b) the distribution of such cash proceeds resulting from such liquidation to Account Holders in the Unsupported Jurisdictions promptly following three months after the Effective Date, or potentially, on the Effective Date, subject to the terms of the Plan and the Asset Purchase Agreement, including any amendments that may be required in light of the Bankruptcy Court's ruling. For the avoidance of doubt, Binance.US has not agreed to any such modification of the Asset Purchase Agreement and is under no obligation to do so. If the Bankruptcy Court rules in this manner, it is uncertain whether the Sale Transaction would be consummated.

---

[91]   Alaska's cease and desist order alleged that Voyager Rewards Accounts were securities and required Voyager to cease and desist from: offering or selling such accounts in Alaska; and from accepting any assets into existing accounts. Alaska assessed a $1,000,000 administrative penalty but acknowledged Voyager's status in bankruptcy proceedings and noted that "so long as the automatic stay is in effect in [Voyager]'s bankruptcy proceedings, [Alaska] will not seek to execute or collect [the penalty] without first approaching the United States Bankruptcy Court . . . ."

## X.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the Solicitation Package.

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

### A.    Classes Entitled to Vote on the Plan.

The following Classes are entitled to vote to accept or reject the Plan (collectively, the "Voting Classes"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 3 | Account Holder Claims | Impaired |
| 4A | OpCo General Unsecured Claims | Impaired |
| 4B | HoldCo General Unsecured Claims | Impaired |
| 4C | TopCo General Unsecured Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined below). If you are a Holder of a Claim in one or more of the Voting Classes, you should read your Ballot(s) and carefully follow the instructions included in the Ballot(s). Please use only the Ballot(s) that accompanies this Disclosure Statement or the Ballot(s) that the Debtors, or the Claims, Noticing, and Solicitation Agent on behalf of the Debtors, otherwise provided to you. If you are a Holder of a Claim in more than one of the Voting Classes, you will receive a Ballot for each such Claim.

### B.    Votes Required for Acceptance by a Class.

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims is determined by calculating the amount and number of allowed claims voting to accept, as a percentage of the allowed claims that have voted. Acceptance of a chapter 11 plan by a class of interests is determined by calculating the amount of allowed interests voting to accept, as a percentage of the allowed interests that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

### C.    Certain Factors to Be Considered Prior to Voting.

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor guarantee that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a resolicitation of the votes of Holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article IX of this Disclosure Statement.

**D.      Classes Not Entitled To Vote on the Plan.**

Under the Bankruptcy Code, holders of claims or interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan. Accordingly, the following Classes of Claims against and Interests in the Debtors are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 1 | Secured Tax Claims | Unimpaired |
| 2 | Other Priority Claims | Unimpaired |
| 5 | Alameda Loan Facility Claims | Impaired |
| 6 | Section 510(b) Claims | Impaired |
| 7 | Intercompany Claims | Unimpaired / Impaired |
| 8 | Intercompany Interests | Unimpaired / Impaired |
| 9 | Existing Equity Interests | Impaired |

**E.      Solicitation Procedures.**

**1.      *Claims, Noticing, and Solicitation Agent***

The Debtors have retained Stretto to act, among other things, as Claims, Noticing, and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

**2.      *Solicitation Package***

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

- a copy of the Solicitation and Voting Procedures (as defined in the Disclosure Statement Order);

- the applicable form of Ballot, together with detailed voting instructions and instructions on how to submit the Ballot;

- the Cover Letter (as defined in the Disclosure Statement Order);

- this Disclosure Statement (and exhibits thereto, including the Plan);

- the Disclosure Statement Order (without exhibits, except the solicitation and voting procedures);

- the Confirmation Hearing Notice (as defined in the Disclosure Statement Order); and

- such other materials as the Bankruptcy Court may direct.

**3.      Distribution of the Solicitation Package and Plan Supplement**

The Claims, Noticing, and Solicitation Agent shall distribute the Solicitation Package to Holders of Claims in the Voting Classes by no later than January 25, 2023 (the "Solicitation Launch").

The Solicitation Package (without Ballots, unless you are an eligible voting party) may also be obtained from the Claims, Noticing, and Solicitation Agent by: (a) calling the Claims, Noticing, and Solicitation Agent at (855) 473-8665 (Toll-Free) or (949) 271-6507 (International) and asking for the "Solicitation Group" or (b) emailing the Claims, Noticing, and Solicitation Agent at voyagerinquiries@stretto.com. You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager, or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/ecf-and-pacer-information (for a fee). Holders that have more than one option to return a Ballot should choose only one method to return their Ballot.

No later than fourteen (14) days before the Voting Deadline, the Debtors will file the Customer Onboarding Protocol and Schedule of Retained Causes of Action as part of the Plan Supplement. No later than seven days before the Voting Deadline, or such later date as may be approved by the Bankruptcy Court, the Debtors intend to file all other Plan Supplement documents. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims, Noticing, and Solicitation Agent by: (a) calling the Claims, Noticing, and Solicitation Agent at the telephone number set forth above; (b) visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager, or (c) emailing the Claims, Noticing, and Solicitation Agent at voyagerinquiries@stretto.com.

**F.      Voting Procedures.**

January 10, 2023 (the "Voting Record Date"), is the date that will be used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures. Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim in the Voting Classes to have its Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by (i) using the enclosed pre-paid, pre-addressed return envelope or (ii) via first class mail, overnight courier, or hand delivery to Voyager Ballot Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602, so that such Holder's Ballot is actually received by the Claims, Noticing, and Solicitation Agent on or before the Voting Deadline on February 22, 2023, at 4:00 p.m. (prevailing Eastern Time).

If a Holder of a Claim in a Voting Class transfers all of such Claim to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Claim Holder is automatically deemed to have provided a voting proxy to the purchaser(s) of the Holder's Claim, and such purchaser(s) shall be deemed to be the Holder(s) thereof as of the Voting Record Date for purposes of voting on the Plan, provided that the purchaser provides satisfactory confirmation of the transfer to the Claims, Noticing, and Solicitation Agent.

If you hold Claims in more than one Voting Class under the Plan, you should receive a separate Ballot for each Class of Claims, coded by Class number, and a set of solicitation materials.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING

AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN. IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLAIM AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS. NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.

### G. Voting Tabulation.

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. A Ballot will be deemed delivered only when the Claims, Noticing, and Solicitation Agent actually receives the executed Ballot as instructed in the applicable voting instructions. No Ballot should be sent to the Debtors, the Debtors' agents (other than the Claims, Noticing, and Solicitation Agent) or the Debtors' financial or legal advisors.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to Confirmation of the Plan. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

In the event that a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Debtors will file with the Bankruptcy Court, as soon as practicable after the Voting Deadline, the voting report prepared by the Claims, Noticing, and Solicitation Agent (the "Voting Report"). The Voting Report shall, among other things, provide the votes received to accept or reject the Plan and Holders of Claims and Interests that have opted into the third-party releases or Contributed Third-Party Claims, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each an "Irregular Ballot"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged. The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots. Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification.

### H. Ballots Not Counted.

No Ballot will be counted toward Confirmation if, among other things: (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims, Noticing, and Solicitation Agent), or the Debtors' financial or legal advisors instead of the Claims, Noticing, and Solicitation Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or is marked both to accept and reject the Plan. Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT TOLL-FREE NUMBER AT (855) 473-8665.**

---

> **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT**
> **IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

## XI.    CONFIRMATION OF THE PLAN

### A.    Requirements of Section 1129(a) of the Bankruptcy Code.

Among the requirements for Confirmation are the following: (i) the Plan is accepted by all impaired Classes of Claims and Interests or, if the Plan is rejected by an Impaired Class, at least one Impaired Class of Claims has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Impaired Claims or Interests (*i.e.*, Holders of Class 3 Account Holder Claims, Holders of Class 4A OpCo General Unsecured Claims, Holders of Class 4B HoldCo General Unsecured Claims, Holders of Class 4C TopCo General Unsecured Claims, Holders of Class 5 Alameda Loan Facility Claims, Holders of Class 6 Section 510(b) Claims, and Holders of Class 9 Existing Equity Interests).

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code. Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment: (i) made before Confirmation will be reasonable or (ii) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims will be paid in full on the Effective Date or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than

one-half in number of the allowed claims of such class. Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

**B.      Best Interests of Creditors—Liquidation Analysis.**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit B**, showing that the value of the distributions provided to Holders of Allowed Claims and Interests under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Allowed Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Allowed Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will have been liquidated through the Sale Transaction and the Plan effects a wind down of the Debtors' remaining assets not otherwise acquired in the Sale Transaction. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation.

The liquidation of the Debtors' assets in chapter 7 would result in substantially less value than the proceeds of the Sale Transaction. Notably, in the context of a chapter 7 liquidation, the Debtors would not receive the upfront cash payment, the earn-out, and other Binance.US Transaction proceeds that provide significantly greater value to Holders of Account Holder Claims and OpCo General Unsecured Claims than in a chapter 7 liquidation scenario. Moreover, the proceeds of the sale of the Debtors' Cryptocurrency would likely be less in a fire sale liquidation than in an orderly sale under the Plan.

Liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed Claims with a larger, more timely recovery in part because of the expenses that would be incurred in a chapter 7 liquidation, including the potential added time (thereby reducing the present value of any recovery for Holders) and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Chapter 11 Cases and the Debtors' Cryptocurrency. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). Additionally, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 7 case.

The conversion to chapter 7 would also require entry of a new bar date. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

89

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced sale proceeds and recoveries, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that distributions under the Plan would provide Holders of Claims and Interests with the same or greater recovery than under a hypothetical chapter 7 liquidation.

### C.       Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Plan provides for the liquidation and distribution of the Debtors' assets. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### D.       Acceptance by Impaired Classes.

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled or any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

### E.       Confirmation without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class of Claims or Interests rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor. Class 3 Account Holder Claims and Class 4A OpCo General Unsecured Claims are treated the same under the Plan, Class 4B HoldCo General Unsecured Claims and Class 4C TopCo General Unsecured Claims will receive the recovery available at HoldCo or TopCo, and the

Debtors will seek to subordinate Class 5 Alameda Loan Facility Claims pursuant to the Plan.  Therefore, the Plan does not discriminate unfairly.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

### 1.    *No Unfair Discrimination*

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan.  The test does not require that the treatment be the same or equivalent, but that the treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.    *Fair and Equitable Test*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class.  The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan.  There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

### (a)    Unsecured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

### (b)    Interests.

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

## XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction.

The following discussion is an overview of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Wind-Down Debtors, and to Holders entitled to vote to accept or reject the Plan. This overview is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

The application of Applicable Tax Law to numerous material aspects of the transactions contemplated by the Plan, and to cryptocurrency in general, is subject to an unusually high level of uncertainty. No opinion of counsel has been or will be obtained and the Debtors have not requested, and do not expect to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan. No portion of this discussion is binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position that the Debtors or Wind-Down Debtors take.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances. This discussion also does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in Section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Purchaser, Persons liable for alternative minimum tax, Persons (other than, if applicable, the Debtors) using a mark-to-market method of accounting, Holders who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, non-income, or non-U.S. taxation is addressed (including, for the avoidance of doubt, the application of Canadian tax law to Holders or to the Debtors, which issues are under further review). Furthermore, this preliminary overview assumes that a Holder holds only Claims or Interests in a single Class and, except as set forth below, holds such Claims or Interests only as "capital assets" (within the meaning of section 1221 of the IRC). This preliminary overview also assumes that the various debt and other arrangements to which the Debtors and Wind-Down Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This preliminary overview does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Wind-Down Debtors, and Holders of Claims and Interests described below also may vary depending on the ultimate nature of any Restructuring Transactions that the Debtors and/or Wind-Down Debtors engage in. This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that for U.S. federal income tax purposes is: (1) an individual who is a citizen or resident of the United States; (2) a corporation (or

other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The below discussion assumes that the Debtors obtained tax ownership of cryptocurrency deposits when customers made such deposits. The Debtors believe that position is the right one based on, among other things, the fact that the Debtors had the right to transfer, rehypothecate, and otherwise deal in deposited cryptocurrency. If the Debtors were determined to not have tax ownership of the cryptocurrency, the consequences of the Plan to Holders of Claims and the Debtors would vary significantly from the discussion below.

**ACCORDINGLY, THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

B.      **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.**

The consequences of the Plan to the Debtors will depend, in part, on whether the Plan is structured as a Sale Transaction or a Liquidation Transaction.

In a Sale Transaction, the Debtors expect that the Plan would be structured such that there would be taxable sale of certain assets of the Debtors to the Purchaser (the "Taxable Transaction") and, potentially, a deemed "in-kind" distribution of cryptocurrency to customers in exchange for Claims related to deposits of such cryptocurrency (the "In-Kind Distribution"). As a result and in connection therewith, the Debtors would realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets. Gain would be reduced by the amount of tax attributes (if any) available for use by the Debtors, and any remaining gain would be recognized by the Debtors and result in a cash tax obligation. Amounts subject to the In-Kind Distribution may be treated as a non-taxable transaction with respect to the underlying cryptocurrency, combined with incurrence of income or cancellation of indebtedness income related to any difference between the value of what customers receive in exchange for their Claims and the amount of their Claims (determined without regard to "dollarization" of such Claims).

Thus, the U.S. federal income tax consequences of the Taxable Transaction to the Debtors would in large part be a function of the Debtors' tax basis in their assets that the Debtors transfer or are deemed to have transferred, including the Debtors' cryptocurrency. There is generally no direct guidance under Applicable Tax Law on how to treat a customer's transfer of cryptocurrency to a business like the Debtors' (and as a result there is significant (and unusual) uncertainty with respect to the Debtors' tax basis in such cryptocurrency) or the transferee's utilization of the transferred cryptocurrency (for example, and without limitation, holding it and doing nothing more, lending it, staking it, selling it, or using it in a short sale). Accordingly, there is significant uncertainty with respect to the tax consequences of a Taxable Transaction to the Debtors.

It is possible that the IRS or a court could disagree with the Debtors' determination of their basis in their assets, including the Debtors' cryptocurrency. Any such disagreement could lead to a redetermination of the Debtors' basis in their assets and a resultant increase in the Debtors' tax liability from a Taxable Transaction, potentially in a way that would have a materially adverse impact on the Debtors. The Debtors, together with their advisors, continue to study this issue.

Were the Plan instead structured as a Liquidation Transaction, then, generally, subject to any rebalancing of the Debtors' cryptocurrency in order to facilitate distributions under the Plan or to otherwise effectuate the Liquidation Transaction, the Debtors would distribute cash and/or property in satisfaction of Claims. In connection with any rebalancing, the Debtors would realize gain or loss upon the sale of cryptocurrency involved in such rebalancing, with such gain or loss calculated as, and subject to the uncertainty, described above. With respect to the Debtors' distribution of cash and/or property to Holders of Claims, the Debtors would recognize income or cancellation of indebtedness income related to any difference between the value of what a Holder receives in exchange for its Claim and the amount of such Claim (determined without regard to "dollarization" of such Claims).

Whether the Plan is structured as a Sale Transaction or a Liquidation Transaction, the Debtors' tax attributes (if any) will not survive the implementation of the Plan. Accordingly, the rules regarding cancellation of indebtedness income are generally inapplicable and the rules regarding section 382 of the IRC are inapplicable and, in each case, not discussed further.

The Debtors continue to evaluate how "dollarization" of Claims as of the Effective Date may modify the above analysis, either with respect to the implementation of the Plan itself or with respect to any administrative tax period more generally. The Debtors currently cannot say with certainty that there will not be material administrative income tax liabilities that must be satisfied under the Plan.

### C. Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders[92] of Allowed Claims Entitled to Vote.

#### 1. *Sale Transaction or Liquidation Transaction*

##### (a) U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 3 Claims (Account Holder Claims).

If the Plan is structured as a Sale Transaction, each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim: (i) for Account Holders in Supported Jurisdictions, its Net Owed Coins, as provided in and subject to the requirements of Section 6.12 of the Asset Purchase Agreement; (ii) for Account Holders in Unsupported Jurisdictions, value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated; provided that to the extent that the Purchaser obtains the Unsupported Jurisdiction Approval for the jurisdiction in which such Account Holder resides and the Debtors and/or Wind-Down Entity has not made such Cash distribution to such Account Holder, then such Account Holder shall receive the treatment in Article III.C.3(c)(i)(A) of the Plan; (iii) its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement; (iv) its Pro Rata share of Distributable OpCo Cash; and (v) to effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; provided that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims; *provided* that distributions made to any Account Holder pursuant to clauses (iii), (iv), and (v) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder.

---

[92] Based on the Debtors' understanding of the residence of Holders, the Debtors do not discuss any U.S. federal income tax consequences of the consummation of the Plan to Non-U.S.-Holders.

If, alternatively, the Plan is structured as a Liquidation Transaction, each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim: (i) its Pro Rata share of Distributable OpCo Cash; (ii) its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that, if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and (iii) effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Whether the Plan is structured as a Sale Transaction or a Liquidation Transaction, there is a material risk that U.S. Holders of Account Holder Claims will have a taxable event in connection with the consummation of the Plan or the "dollarization" of Claims (or separate taxable events for one or both events). This is the case even though the Sale Transaction contemplates the migration of customers to an acquiring cryptocurrency platform and even though the Liquidation Transaction contemplates that Account Holders can withdraw cryptocurrency from the Voyager platform. To the extent any taxable event occurs, tax liability would be based on the difference between the Holder's tax basis in its Claim compared to the value it receives in respect of such Claim, with such gain or loss generally being capital in nature.

The tax treatment of Holders under the Plan depends significantly on the tax treatment of customer deposits in the first instance. There is uncertainty with respect to whether deposits are taxable when they occur, but the Debtors generally expect that most customers have taken the position that the act of depositing cryptocurrency with the Debtors is not a taxable event. While there is substantial theoretical debate regarding that position, it is a position that has some level of support in the idea that the exchange of cryptocurrency for a contractual right to the return of such cryptocurrency is not a transaction that results in a realization event under section 1001 of the IRC because it does not involve an exchange of property "differing materially either in kind or in extent." Such position relies, among other things, on caselaw that pre-dates the enactment of section 1058 of the IRC and analogies to the treatment afforded to securities lending under section 1058. On the other hand, there is also support for the position that the initial deposit of cryptocurrency is a taxable event because of various provisions in the Terms of Use that narrow a customer's rights with respect to the deposited cryptocurrency (in particular, provisions related to the Debtors' ability to not support "airdropped" cryptocurrency or cryptocurrency issued pursuant to a "hard fork").

To the extent an initial deposit of cryptocurrency was not taxable, there is an argument that the same position could be taken with respect to the return by the Debtors of such cryptocurrency to customers, because the exchange of the contractual right to the return of such cryptocurrency for the underlying cryptocurrency would itself not be an exchange of property "differing materially either in kind or in extent." This argument would be stronger in the case of a Liquidation Transaction than in a Sale Transaction, because the explicit form of the Liquidation Transaction would be that the Account Holder has the ability to withdraw its Pro Rata share of Distributable Cryptocurrency in kind for a period of thirty (30) days after the Effective Date through the Voyager platform; though if the Distributable Cryptocurrency were a different type of cryptocurrency than the cryptocurrency that the Account Holder originally deposited on the Voyager platform (because of, for example, rebalancing), then the ability to rely on such argument would be greatly impaired because the property withdrawn would differ "materially either in kind or in extent," likely leading to a taxable event (and in any event, for the avoidance of doubt, in a Liquidation Transaction, the receipt of cash or property other than cryptocurrency in exchange for deposited cryptocurrency should generally result in a taxable event).

As for a Sale Transaction, under principles that typically apply to determine whether obligations have been meaningfully modified, including principles under section 1.1001-3 of the Treasury Regulations (which are not directly applicable here, but are informative), a transaction that involves an exchange of a contractual right owed by the Debtors for a contractual right owed by a different party is highly likely to be treated as taxable. Nevertheless, the Debtors believe, in the case of a Sale Transaction, that it would be supportable for Holders to take the position

95

that, pursuant to the consummation of the Plan whereby customers may migrate to Purchaser's platform, (a) the Debtors are deemed to transfer cryptocurrency in kind in a non-taxable transaction; and, immediately thereafter, (b) Holders are deemed to re-deposit cryptocurrency to the new entity, again, in a non-taxable or a partially non-taxable transaction.

The Debtors continue to study whether the above arguments, when combined with a general "bifurcation" approach that separates the recovery Holders receive into multiple components (*i.e.*, the type of cryptocurrency the customer had deposited on the platform, other cryptocurrencies, cash, and recoveries in respect of the Wind-Down Entity), may permit Holders to take the position that Holders retain the portion of their recovery taking the form of the type of cryptocurrency that the customer had deposited on the platform even if the receipt of other consideration constitutes a taxable exchange as to such other cash and/or property. The Debtors emphasize that these positions are unclear.

The ability to take the position that an In-Kind Distribution (in the case of a Sale Transaction) or the withdrawal of Distributable Cryptocurrency from the Voyager platform (in the case of a Liquidation Transaction) is not taxable to Holders is subject to increased risk as a result of the "dollarization" of Claims. As noted above, it may be the case that "dollarization" resulted, or will result, in a taxable event to customers, either as of the Petition Date or as of the Confirmation Date. If such a taxable event were determined to have occurred, it would be because the contract to receive particular cryptocurrency was modified, as a result of dollarization, to have an economic "cap." In light of this, it is unclear whether the arguments described above that support tax-free treatment with respect to the receipt of cryptocurrency under the Plan could still apply. Such a "capped" contract arguably "differ[s] materially either in kind or in extent" from the underlying cryptocurrency. However, the Debtors also believe it would be reasonable to assert that this is not a material enough change to customers' underlying entitlements.

**The Debtors emphasize in the strongest possible terms that the law applicable to deposits and withdrawals of cryptocurrency from the Debtors, "dollarization," and the consummation of the Plan is subject to extreme uncertainty. There is effectively no "controlling" authority on any of these issues. Accordingly, there is a material risk that the positions described above may not be sustained. The concepts of a non-taxable in-kind distribution (in the case of a Sale transaction) or withdrawal (in the case of a Liquidation Transaction) of cryptocurrency referred to above rest in large part on the theory that the property that the Debtors would distribute in-kind to a Holder (in the case of a Sale Transaction) or that the Holder would withdraw (in the case of a Liquidation Transaction) would be in respect of an obligation that does not differ "materially either in kind or in extent" from the obligation that arose when the Holder deposited property with the Debtors. Given the structure of the Plan, and in particular the way in which the Debtors have valued Claims as of the Petition Date, there is a significant risk that the Claim that a Holder has against the Debtors as of the Petition Date is with respect to property that differs "materially either in kind or in extent" from the property that the Holder previously deposited with the Debtors, such that the Debtors would be distributing property in respect of an obligation that differs "materially either in kind or in extent" from the one that existed when the Holder deposited property with the Debtors (and thus tax-free treatment would likely be unavailable).**

Very generally, to the extent any form of transaction is taxable to a Holder (which, for the avoidance of doubt, would include any Holder who receives only Cash and/or Wind-Down Trust Units under the Plan), each such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash, Cryptocurrency, and/or Wind-Down Trust Units)[93] received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units and any Cryptocurrency

---

[93]   The Debtors generally do not expect that the right to become a Transferred Creditor would be ascribed independent value for U.S. federal income tax purposes.

received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

As noted repeatedly herein, nothing in this disclosure constitutes tax or legal advice to Holders. However, the Debtors wish to highlight one area of tax consideration that has been the subject of significant speculation in online resources and similar. The above language indicates that customers may be able to take a loss in connection with the consummation of the Plan. The Debtors generally expect such loss would arise *when the Plan is consummated*, and not before. There has been significant speculation in various sources with respect to whether a customer can take a loss, potentially under section 166 of the Tax Code (related to bad debts, including non-business bad debts). There are significant timing limitations on the ability to claim a loss under section 166 of the Tax Code. In particular, other than with respect to certain types of taxpayers that can take partial bad debt deductions in connection with a "charge-off" under section 166(a)(2) of the Tax Code, most taxpayers can only take a deduction under 166 when a debt has become entirely worthless. As set forth in the Plan, the Debtors do not believe customer claims will ever be entirely worthless, as all transactions under contemplation by the Debtors contemplate that there will be some form of recovery received by customers in respect of their claims. Accordingly, the Debtors are of the view that the overwhelming majority of customers are not able to take a section 166 loss with respect to their claims prior to the consummation of the Plan. However, in the event "dollarization" of Claims results in a taxable event to customers, customers likely can claim a loss in connection with such "dollarization."

<div align="center">

(b)  **U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed**

</div>

**Class 4A Claims.**

If the Sale Transaction is consummated by the Outside Date, each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim: (i) its Pro Rata share of Distributable Cryptocurrency in Cash; (ii) its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Section 6.12 and 6.14 of the Asset Purchase Agreement; (iii) its Pro Rata share of Distributable OpCo Cash; and (iv) to effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets attributable to OpCo; provided that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

If, alternatively, the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim: (i) its Pro Rata share of Distributable Cryptocurrency in Cash; (ii) its Pro Rata share of Distributable OpCo Cash; and (iii) to effectuate distributions from the Wind Down Entity, its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to OpCo; *provided* that any distributions on account of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Each such U.S. Holder should recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash, Cryptocurrency, and/or Wind-Down Trust Units) received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units and any Cryptocurrency received in a taxable exchange should equal the fair market value of such property as of the

97

Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

The foregoing assumes that no Allowed Class 4A Claim is in respect of Cryptocurrency deposited with the Debtors. If any such Allowed Class 4A Claim were in respect of Cryptocurrency deposited with the Debtors, the considerations described in "U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 3 Claims (Account Holder Claims)" would apply.

      **(c)**      **U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 4B and 4C Claims.**

Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim: (i) its Pro Rata share of Distributable HoldCo Cash; and (ii) its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of Wind-Down Trust Assets (if applicable) attributable to HoldCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Similarly, each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim: (i) its Pro Rata share of Distributable TopCo Cash; and (ii) its Pro Rata share of the Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) on account of any recovery of the Wind-Down Trust Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Entity Assets or Wind-Down Trust Units (if applicable) shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims.

Each such U.S. Holder should recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash and/or Wind-Down Trust Units) received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in the Wind-Down Trust Units received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

A U.S. Holder should not recognize gain or loss in connection with any distribution from a Wind-Down Debtor (if any) until such Wind-Down Debtor makes such distribution.

(d)    **Net Investment Income Tax.**

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

(e)    **Limitations on Use of Capital Losses.**

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

2.    *Certain U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Cryptocurrency Received Under the Plan*

The U.S. federal income tax consequences to a U.S. Holder of owning and disposing of Cryptocurrency received under the Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors, including , (x) if the Plan is structured as a Sale Transaction, (i) the U.S. federal income tax characterization of the relationship between such Holder and Purchaser, and (ii) the activities that such Holder and/or Purchaser pursue with respect to such Cryptocurrency on Purchaser's platform, and (y) if the Plan is structured as a Liquidation Transaction, the activities that such Holder pursues with respect to such Cryptocurrency. In the event of a Sale Transaction, U.S. Holders are urged to consult their own tax advisors regarding the proper characterization of such relationship and the tax consequences that may result therefrom.

3.    *The Wind-Down Entity*

The Plan provides that on the Effective Date and thereafter if additional Wind-Down Entity Assets become available, the Wind-Down Entity Assets shall automatically vest in the Wind-Down Entity. Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Entity Assets or the Wind-Down Entity.

(a)    **Liquidating Trust Treatment.**

Although not free from doubt, other than with respect to any assets that are subject to potential disputed claims of ownership or uncertain distributions, a Wind-Down Trust (if any) may be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" under section 671 of the Tax Code. It may be that such treatment does not apply given the structure of the Plan. If such treatment did apply to any assets of the Wind-Down Trust, any beneficiaries of the Wind-Down Trust would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the assets of the Wind-Down Trust and then contributed such undivided interest to the Wind-Down Trust. Other than with respect to any assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of assets to applicable Holders of Claims prior to the contribution of such assets to the Wind-Down Trust should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly. Other than with respect to any assets of the Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, no entity-level tax should be imposed on the Wind-Down Trust with respect to earnings generated by the assets held by it. Each beneficiary must report on its

federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by the Wind-Down Trust, even if no distributions are made.

> **(b)**    **Disputed Ownership Fund treatment.**

With respect to any of the assets of a Wind-Down Trust that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).  To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss with respect to such property on the date that the property is so transferred.  Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

> **4.**    ***U.S. Information Reporting and Withholding***

The Debtors and the Wind-Down Entity, as applicable, intend to withhold all amounts required under the IRC with respect to distributions made under the Plan and to comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim or Interest under the Plan, as well as future payments made with respect to consideration received under the Plan.

Backup withholding is not an additional tax.  Any amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

---

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.  THE FOREGOING SUMMARY DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

---

* * * * *

## XIII.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote to accept or reject the Plan support Confirmation and vote to accept the Plan.

Voyager Digital Holdings, Inc. on behalf of itself and each of the other Debtors

By:     /s/ Stephen Ehrlich

Name:   Stephen Ehrlich

Title:   Co-Founder and Chief Executive Officer Voyager Digital Ltd.

Prepared By:

Dated:  January 13, 2023          /s/ Joshua A. Sussberg
New York, New York               **KIRKLAND & ELLIS LLP**
                                 **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                 Joshua A. Sussberg, P.C.
                                 Christopher Marcus, P.C.
                                 Christine A. Okike, P.C.
                                 Allyson B. Smith (admitted *pro hac vice*)
                                 601 Lexington Avenue
                                 New York, New York 10022
                                 Telephone:  (212) 446-4800
                                 Facsimile:  (212) 446-4900

                                 *Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Plan**

[INTENTIONALLY OMITTED.  AVAILABLE AT DOCKET NO.  ]

**Exhibit B**

**Liquidation Analysis**

**Exhibit C**

**Frequently Asked Questions & Answers**

**Exhibit D**

**Asset Purchase Agreement**

[INTENTIONALLY OMITTED.  AVAILABLE AT DOCKET NO. 835]

# Exhibit 14

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## AFFIDAVIT OF SERVICE

I, Leticia Sanchez, depose and say that I am employed by Stretto, the claims and noticing agent for the Debtors in the above-captioned cases.

On January 19, 2023, at my direction and under my supervision, employees of Stretto caused the following documents to be served via first-class mail on Novawulf Digital Parallel Master Fund, L.P. Attn: Michael Abbate at 9 Federal Street, Easton, MD 21601, and on eleven (11) confidential parties not included herein:

- **Voyager Cover Letter in Support of Plan** (Substantially in the form attached as **Exhibit 4** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Unsecured Creditors Committee Letter in Support of Plan** (Substantially in the form attached as **Exhibit 5** to the Disclosure Statement Order filed as **Docket No. 861**)

- ***Individualized* Class 3 Holders of Account Holder Claims – Ballot for Voting to Accept or Reject the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Substantially in the form attached as **Exhibit 3A** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections** (Docket No. 861 *less Exhibits*)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

Debtors
Ex-14

- **Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Docket No. 863)

- **Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Substantially in the form attached as **Exhibit A** to the Disclosure Statement filed as **Docket No. 863**)

- **Solicitation and Voting Procedures** (Substantially in the form attached as **Exhibit 1** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Notice of Hearing to Consider (I) Adequacy of the Second Amended Disclosure Statement and (II) Confirmation of the Third Amended Joint Chapter 11 Plan Filed by the Debtors and Related Voting and Objection Deadlines** (Substantially in the form attached as **Exhibit 6** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Pre-addressed, postage prepaid return envelope**

Furthermore, on or before January 19, 2023, at my direction and under my supervision, employees of Stretto caused the following documents to be served via first-class mail on the service list attached hereto as **Exhibit A**, and on two (2) confidential parties not included herein:

- **Voyager Cover Letter in Support of Plan** (Substantially in the form attached as **Exhibit 4** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Unsecured Creditors Committee Letter in Support of Plan** (Substantially in the form attached as **Exhibit 5** to the Disclosure Statement Order filed as **Docket No. 861**)

- *Individualized* **Class 4A Holders of OPCO General Unsecured Claims – Ballot for Voting to Accept or Reject the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Substantially in the form attached as **Exhibit 3B** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections** (Docket No. 861 *less Exhibits*)

- **Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Docket No. 863)

- **Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Substantially in the form attached as

**Exhibit A** to the Disclosure Statement filed as **Docket No. 863**)

- **Solicitation and Voting Procedures** (Substantially in the form attached as **Exhibit 1** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Notice of Hearing to Consider (I) Adequacy of the Second Amended Disclosure Statement and (II) Confirmation of the Third Amended Joint Chapter 11 Plan Filed by the Debtors and Related Voting and Objection Deadlines** (Substantially in the form attached as **Exhibit 6** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Pre-addressed, postage prepaid return envelope**

Furthermore, on January 19, 2023, at my direction and under my supervision, employees of Stretto caused the following documents to be served via first-class mail on the service list attached hereto as **Exhibit B**, and on seventeen (17) confidential parties not included herein:

- **Voyager Cover Letter in Support of Plan** (Substantially in the form attached as **Exhibit 4** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Unsecured Creditors Committee Letter in Support of Plan** (Substantially in the form attached as **Exhibit 5** to the Disclosure Statement Order filed as **Docket No. 861**)

- *Individualized* **Class 4B Holders of HoldCo General Unsecured Claims – Ballot for Voting to Accept or Reject the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Substantially in the form attached as **Exhibit 3C** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections** (Docket No. 861 *less Exhibits*)

- **Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Docket No. 863)

- **Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Substantially in the form attached as **Exhibit A** to the Disclosure Statement filed as **Docket No. 863**)

- **Solicitation and Voting Procedures** (Substantially in the form attached as **Exhibit 1** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Notice of Hearing to Consider (I) Adequacy of the Second Amended Disclosure**

**Statement and (II) Confirmation of the Third Amended Joint Chapter 11 Plan Filed by the Debtors and Related Voting and Objection Deadlines** (Substantially in the form attached as **Exhibit 6** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Pre-addressed, postage prepaid return envelope**

Furthermore, on January 19, 2023, at my direction and under my supervision, employees of Stretto caused the following documents to be served via first-class mail on the service list attached hereto as **Exhibit C**, and on ten (10) confidential parties not included herein:

- **Voyager Cover Letter in Support of Plan** (Substantially in the form attached as **Exhibit 4** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Unsecured Creditors Committee Letter in Support of Plan** (Substantially in the form attached as **Exhibit 5** to the Disclosure Statement Order filed as **Docket No. 861**)

- ***Individualized* Class 4C Holders of TOPCO General Unsecured Claims – Ballot for Voting to Accept or Reject the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Substantially in the form attached as **Exhibit 3D** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections** (Docket No. 861 *less Exhibits*)

- **Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Docket No. 863)

- **Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Substantially in the form attached as **Exhibit A** to the Disclosure Statement filed as **Docket No. 863**)

- **Solicitation and Voting Procedures** (Substantially in the form attached as **Exhibit 1** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Notice of Hearing to Consider (I) Adequacy of the Second Amended Disclosure Statement and (II) Confirmation of the Third Amended Joint Chapter 11 Plan Filed by the Debtors and Related Voting and Objection Deadlines** (Substantially in the form attached as **Exhibit 6** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Pre-addressed, postage prepaid return envelope**

Furthermore, on January 19, 2023, at my direction and under my supervision, employees of Stretto caused the following documents to be served via first-class mail on Alameda Ventures Ltd. c/o Sullivan Cromwell LLP Attn: Brian Glueckstein, Andrew G. Dietderich and Benjamin S. Beller at 125 Broad Street, New York, NY 10004:

- **Unsecured Creditors Committee Letter in Support of Plan** (Substantially in the form attached as **Exhibit 5** to the Disclosure Statement Order filed as **Docket No. 861**)

- *Individualized* **Notice of (I) Non-Voting Status to Holders of Impaired Claims or Interests Conclusively Presumed to Reject the Plan, (II) opportunity to Opt In to the Third-Party Releases, and (III) Opportunity to Contribute Third-Party Claims** (Substantially in the form attached as **Exhibit 2B** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections** (Docket No. 861 *less Exhibits*)

- **Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Docket No. 863)

- **Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Substantially in the form attached as **Exhibit A** to the Disclosure Statement filed as **Docket No. 863**)

- **Solicitation and Voting Procedures** (Substantially in the form attached as **Exhibit 1** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Notice of Hearing to Consider (I) Adequacy of the Second Amended Disclosure Statement and (II) Confirmation of the Third Amended Joint Chapter 11 Plan Filed by the Debtors and Related Voting and Objection Deadlines** (Substantially in the form attached as **Exhibit 6** to the Disclosure Statement Order filed as **Docket No. 861**)

Furthermore, on January 19, 2023, at my direction and under my supervision, employees of Stretto caused the following documents to be served via first-class mail on the service list attached hereto as **Exhibit D**, and on forty-seven (47) confidential parties not included herein:

- **Unsecured Creditors Committee Letter in Support of Plan** (Substantially in the form attached as **Exhibit 5** to the Disclosure Statement Order filed as **Docket No. 861**)

- *Individualized* **Notice of (I) Non-Voting Status to Holders of Impaired Claims or Interests Conclusively Presumed to Reject the Plan, (II) opportunity to Opt In to the Third-Party Releases, and (III) Opportunity to Contribute Third-Party Claims**

(Substantially in the form attached as **Exhibit 2B** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections** (Docket No. 861 *less Exhibits*)

- **Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Docket No. 863)

- **Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Substantially in the form attached as **Exhibit A** to the Disclosure Statement filed as **Docket No. 863**)

- **Solicitation and Voting Procedures** (Substantially in the form attached as **Exhibit 1** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Notice of Hearing to Consider (I) Adequacy of the Second Amended Disclosure Statement and (II) Confirmation of the Third Amended Joint Chapter 11 Plan Filed by the Debtors and Related Voting and Objection Deadlines** (Substantially in the form attached as **Exhibit 6** to the Disclosure Statement Order filed as **Docket No. 861**)

Furthermore, on January 19, 2023, at my direction and under my supervision, employees of Stretto caused the following documents to be served via first-class mail on the service list attached hereto as **Exhibit E**, and via electronic mail on the service list attached hereto as **Exhibit F**:

- **Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections** (Docket No. 861 *less Exhibits*)

- **Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Docket No. 863)

- **Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Substantially in the form attached as **Exhibit A** to the Disclosure Statement filed as **Docket No. 863**)

- **Solicitation and Voting Procedures** (Substantially in the form attached as **Exhibit 1** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Notice of Hearing to Consider (I) Adequacy of the Second Amended Disclosure Statement and (II) Confirmation of the Third Amended Joint Chapter 11 Plan Filed by the Debtors and Related Voting and Objection Deadlines** (Substantially in the form attached as **Exhibit 6** to the Disclosure Statement Order filed as **Docket No. 861**)

Furthermore, on January 20, 2023, at my direction and under my supervision, employees of Stretto caused the following documents to be served via first-class mail Metropolitan Commercial Bank Attn: Brandon Green at 11806 Ironstone Ct, Houston, TX 77067 and on three (3) confidential parties not included herein:

- ***Individualized* Notice of (I) Non-Voting Status to Holders on Unimpaired Claims Conclusively Presumed to Accept the Plan, (II) Opportunity to Opt In to the Third-Party Releases, and (III) Opportunity to Contribute Third-Party Claims** (Substantially in the form attached as **Exhibit 2A** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections** (Docket No. 861 *less Exhibits*)

- **Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Docket No. 863)

- **Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Substantially in the form attached as **Exhibit A** to the Disclosure Statement filed as **Docket No. 863**)

- **Solicitation and Voting Procedures** (Substantially in the form attached as **Exhibit 1** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Notice of Hearing to Consider (I) Adequacy of the Second Amended Disclosure Statement and (II) Confirmation of the Third Amended Joint Chapter 11 Plan Filed by the Debtors and Related Voting and Objection Deadlines** (Substantially in the form attached as **Exhibit 6** to the Disclosure Statement Order filed as **Docket No. 861**)

Furthermore, on January 20, 2023, at my direction and under my supervision, employees of Stretto caused the following documents to be served via first-class mail on the service list attached hereto as **Exhibit G**, and on three thousand eight hundred and fifty-one (3851) confidential parties not included herein:

- **Notice of Hearing to Consider (I) Adequacy of the Second Amended Disclosure Statement and (II) Confirmation of the Third Amended Joint Chapter 11 Plan Filed**

by the Debtors and Related Voting and Objection Deadlines (Substantially in the form attached as **Exhibit 6** to the Disclosure Statement Order filed as **Docket No. 861**)

Furthermore, on January 20, 2023, at my direction and under my supervision, employees of Stretto caused 63,000 copies of the following documents to be served via overnight mail on Broadridge Financial Services, Inc., at Attn: Receiving, 51 Mercedes Way, Edgewood, NY 11717, Job # E32569:

- **Notice to Equity** (attached hereto as **Exhibit K**)

- **Unsecured Creditors Committee Letter in Support of Plan** (Substantially in the form attached as **Exhibit 5** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Notice of (I) Non-Voting Status to Holders of Impaired Claims or Interests Conclusively Presumed to Reject the Plan, (II) opportunity to Opt In to the Third-Party Releases, and (III) Opportunity to Contribute Third-Party Claims** (Substantially in the form attached as **Exhibit 2B** to the Disclosure Statement Order filed as **Docket No. 861**)

Furthermore, on January 20, 2023, at my direction and under my supervision, employees of Stretto caused 50 copies of the following documents to be served via overnight mail on Mediant Communications Inc. at Attn: Stephany Hernandez, 100 Demarest Drive, Wayne, NJ 07470, Job # 1986497:

- **Notice to Equity** (attached hereto as **Exhibit K**)

- **Unsecured Creditors Committee Letter in Support of Plan** (Substantially in the form attached as **Exhibit 5** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Notice of (I) Non-Voting Status to Holders of Impaired Claims or Interests Conclusively Presumed to Reject the Plan, (II) opportunity to Opt In to the Third-Party Releases, and (III) Opportunity to Contribute Third-Party Claims** (Substantially in the form attached as **Exhibit 2B** to the Disclosure Statement Order filed as **Docket No. 861**)

Furthermore, on January 20, 2023, at my direction and under my supervision, employees of Stretto caused the following documents to be served via first-class mail on the service list attached hereto as **Exhibit H**, and via electronic mail on the service list attached hereto as **Exhibit I**:

- **Notice to Equity** (attached hereto as **Exhibit K**)

- **Unsecured Creditors Committee Letter in Support of Plan** (Substantially in the form attached as **Exhibit 5** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Notice of (I) Non-Voting Status to Holders of Impaired Claims or Interests Conclusively Presumed to Reject the Plan, (II) opportunity to Opt In to the Third-Party Releases, and (III) Opportunity to Contribute Third-Party Claims** (Substantially in the form attached as **Exhibit 2B** to the Disclosure Statement Order filed as **Docket No. 861**)

Furthermore, on January 20, 2023, at my direction and under my supervision, employees of Stretto caused 10 sets of the following documents to be served via overnight mail on the service list attached hereto as **Exhibit J**:

- **Notice to Equity** (attached hereto as **Exhibit K**)

- **Unsecured Creditors Committee Letter in Support of Plan** (Substantially in the form attached as **Exhibit 5** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Notice of (I) Non-Voting Status to Holders of Impaired Claims or Interests Conclusively Presumed to Reject the Plan, (II) opportunity to Opt In to the Third-Party Releases, and (III) Opportunity to Contribute Third-Party Claims** (Substantially in the form attached as **Exhibit 2B** to the Disclosure Statement Order filed as **Docket No. 861**)

Furthermore, on January 20, 2023, at my direction and under my supervision, employees of Stretto caused the following documents to be served via first class mail on two hundred and ten (210) confidential parties not included herein:

- **Notice to Equity** (attached hereto as **Exhibit K**)

- **Unsecured Creditors Committee Letter in Support of Plan** (Substantially in the form attached as **Exhibit 5** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Notice of (I) Non-Voting Status to Holders of Impaired Claims or Interests Conclusively Presumed to Reject the Plan, (II) opportunity to Opt In to the Third-Party Releases, and (III) Opportunity to Contribute Third-Party Claims** (Substantially in the form attached as **Exhibit 2B** to the Disclosure Statement Order filed as **Docket No. 861**)

Furthermore, on or before January 23, 2023, at my direction and under my supervision, employees of Stretto caused the following document to be served via electronic mail on one thousand seven hundred and twenty-three (1723) confidential parties not included herein:

- **Notice of Hearing to Consider (I) Adequacy of the Second Amended Disclosure Statement and (II) Confirmation of the Third Amended Joint Chapter 11 Plan Filed by the Debtors and Related Voting and Objection Deadlines** (Substantially in the form attached as **Exhibit 6** to the Disclosure Statement Order filed as **Docket No. 861**)

Furthermore, on January 23, 2023, at my direction and under my supervision, employees of Stretto caused the following documents to be served via first class mail on three (3) confidential parties not included herein:

- **Notice to Equity** (attached hereto as **Exhibit K**)

- **Unsecured Creditors Committee Letter in Support of Plan** (Substantially in the form attached as **Exhibit 5** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Notice of (I) Non-Voting Status to Holders of Impaired Claims or Interests Conclusively Presumed to Reject the Plan, (II) opportunity to Opt In to the Third-Party Releases, and (III) Opportunity to Contribute Third-Party Claims** (Substantially in the form attached as **Exhibit 2B** to the Disclosure Statement Order filed as **Docket No. 861**)

Furthermore, on or before January 25, 2023, at my direction and under my supervision, employees of Stretto caused the following documents to be served via electronic mail on (977,134) confidential parties not included herein:

- **Voyager Cover Letter in Support of Plan** (Substantially in the form attached as **Exhibit 4** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Unsecured Creditors Committee Letter in Support of Plan** (Substantially in the form attached as **Exhibit 5** to the Disclosure Statement Order filed as **Docket No. 861**)

- *Individualized* **Class 3 Holders of Account Holder Claims – Ballot for Voting to Accept or Reject the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Substantially in the form attached as **Exhibit 3A** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections** (Docket No. 861 *less Exhibits*)

- **Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Docket No. 863)

- **Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code** (Substantially in the form attached as **Exhibit A** to the Disclosure Statement filed as **Docket No. 863**)

- **Solicitation and Voting Procedures** (Substantially in the form attached as **Exhibit 1** to the Disclosure Statement Order filed as **Docket No. 861**)

- **Notice of Hearing to Consider (I) Adequacy of the Second Amended Disclosure Statement and (II) Confirmation of the Third Amended Joint Chapter 11 Plan Filed by the Debtors and Related Voting and Objection Deadlines** (Substantially in the form attached as **Exhibit 6** to the Disclosure Statement Order filed as **Docket No. 861**)

Dated: January 30, 2023

Leticia Sanchez

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California,
County of Orange

Subscribed and sworn to (or affirmed) before me on this 30th day of January 2023 by Leticia Sanchez, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature:

STEPHANIE M. DELGADO
Notary Public - California
Orange County
Commission # 2288834
My Comm. Expires May 17, 2025

# Exhibit A

STRETTO

**Exhibit A**
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country |
|------|-----------|-----------|-----------|------|-------|-----|---------|
| AMAZON WEB SERVICES, INC. | C/O K&L GATES LLP | ATTN: BRIAN PETERSON | 925 4TH AVENUE, SUITE 2900 | SEATTLE | WA | 98104 | |
| APPLE INC [APPLE DISTRIBUTION INTERNATIONAL LTD.] | ATTN: GBS CREDIT TEAM | 5505 W PARMER LANE | MS: 580-AR | AUSTIN | TX | 78727 | |
| BATES GROUP LLC [CORCOM, LLC] | C/O TONKON TORP LLP | ATTN: SPENCER FISHER AND AVA L. SCHOEN | 888 SW FIFTH AVE STE 1600 | PORTLAND | OR | 97204 | |
| CELLCO PARTNERSHIP D/B/A/ VERIZON WIRELESS | WILLIAM M VERMETTE | 22001 LOUDOUN COUNTY PKWY | | ASHBURN | VA | 20147 | |
| D.C. DEPARTMENT OF INSURANCE, SECURITIES AND BANKING | C/O ASSOCIATE COMMISSIONER FOR SECURITIES | ATTN: STEPHEN BOUCHARD AND DAVID O'BRIEN | DISTRICT OF COLUMBIA DEPARTMENT OF INSURANCE, SECURITIES AND BANKING 1050 1ST STREET, NE, 8TH FLOOR | WASHINGTON | DC | 20002 | |
| DEVEXPERTS SOFIA LTD. | ATTN: VIKTOR ANDONOV | 109 BULGARIA BLVD,VERTIGO BUSINESS TOWER | | SOFIA | | 1404 | BULGARIA |
| DISTRUST, LLC | ATTN: LANCE VICK | 2085 E BAYSHORE ROAD, #51687 | | PALO ALTO | CA | 94303 | |
| FEDERAL TRADE COMMISSION | KATHERINE JOHNSON | 600 PENNSYLVANIA AVE., NW | CC-9528 | WASHINGTON | DC | 20580 | |
| FICENTIVE, INC. | RANDALL A. PULMAN | PULMAN CAPPUCCIO & PULLEN, LLP | 2161 NW MILITARY HWY., SUITE 400 | SAN ANTONIO | TX | 78213 | |
| FRAGOMEN, DEL REY, BERNSEN & LOEWY, LLP | ATTN: JENNIFER O'BRIEN, ASSOCIATE GENERAL COUNSEL | 90 MATAWAN ROAD | | MATAWAN | NJ | 07747 | |
| FRANCHISE TAX BOARD | ATTN: BANKRUPTCY SECTION MS A340 | PO BOX 2952 | | SACRAMENTO | CA | 95812-2952 | |
| METROPOLITAN COMMERCIAL BANK [MC BANK] | ATTN: MICHAEL A. GUARINO AND YIM WIDJAJA, ACCOUNTS PAYABLE/RECEIVABLE | 99 PARK AVE. | 12TH FL. | NEW YORK | NY | 10016 | |
| METROPOLITAN COMMERCIAL BANK [MC BANK] | ATTN: MICHAEL A. GUARINO AND YIM WIDJAJA, ACCOUNTS PAYABLE/RECEIVABLE | 99 PARK AVE. | 12TH FL. | NEW YORK | NY | 10016 | |
| NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES | | 1 STATE STREET | | NEW YORK | NY | 10004 | |
| OFFICE OF THE SOUTH CAROLINA ATTORNEY GENERAL, SECURITIES DIVISION | | SECURITIES DIVISION | P.O. BOX 11549 | COLUMBIA | SC | 29211 | |
| PLAID INC. [PLAID TECHNOLOGIES, INC.] | C/O QUARLES & BRADY LLP | ATTN: JOHN A. HARRIS, ESQ. | 2 N. CENTRAL AVENUE | PHOENIX | AZ | 85004 | |
| SNYK, INC. | ATTN: SHERICA R. BRYAN, ESQ. | 100 SUMMER STREET | 7TH FLOOR | BOSTON | MA | 02110 | |
| SOCURE INC. | C/O POTOMAC LAW GRP. PLLC | ATTN: PAMELA MARIE EGAN | 1905 7TH AVENUE W | SEATTLE | WA | 98119 | |
| STATE OF RHODE ISLAND DIVISION OF TAXATION | | ONE CAPITAL HILL | | PROVIDENCE | RI | 02908 | |
| STEPHEN EHRLICH | | 33 IRVING PLACE | SUITE 3060 | NEW YORK | NY | 10003 | |
| TENNESSEE DEPARTMENT OF REVENUE | TDOR C/O ATTORNEY GENERAL | PO BOX 20207 | | NASHVILLE | TN | 37202-0207 | |
| TEXAS COMPTROLLER OF PUBLIC ACCOUNTS | C/O OFFICE OF THE ATTORNEY GENERAL | ATTN: BANKRUPTCY AND COLLECTIONS DIVISION | PO BOX 12548 MC-008 | AUSTIN | TX | 78711 | |
| TEXAS DEPARTMENT OF BANKING | | 2601 N LAMAR BLVD | STE 300 | AUSTIN | TX | 78705 | |
| THE NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | ATTN: JEFFREY BERNSTEIN, ESQ. | 570 BROAD STREET, SUITE 1401 | NEWARK | NJ | 07102 | |
| TN DEPT OF COMMERCE AND INSURANCE | C/O TN ATTORNEY GENERAL'S OFFICE, BANKRUPTCY DIVISION | ATTN: MARVIN E. CLEMENTS JR. | PO BOX 20207 | NASHVILLE | TN | 37202-0207 | |
| USIO, INC. | C/O PULMAN CAPPUCCIO & PULLEN, LLP | ATTN: RANDALL A. PULMAN | 2161 NW MILITARY HWY., SUITE 400 | SAN ANTONIO | TX | 78213 | |
| VINCENT MANUFACTURING, INC. | ATTN: COURTNEY VINCENT | 1929 KENWOOD PARKWAY | | MINNEAPOLIS | MN | 55405 | |
| VT DEPARTMENT OF FINANCIAL REGULATION | JENNIFER ROOD | 89 MAIN STREET | | MONTPELIER | VT | 05620 | |
| WINJIT INC | ATTN: PRIYANKA PAREEK | 1441 BROADWAY | SUITE NO. 6033 | NEW YORK | NY | 10018 | |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 1 of 1

# Exhibit B

**Exhibit B**
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country |
|------|-----------|-----------|-----------|------|-------|-----|---------|
| ALABAMA SECURITIES COMMISSION | ANDREW O. SCHIFF | 445 DEXTER AVENUE | SUITE 1200 | MONTGOMERY | AL | 36104 | |
| AMANO GLOBAL HOLDINGS, INC. | C/O LAW OFFICES OF DOUGLAS T. TABACHNIK PC | 63 WEST MAIN STREET | SUITE C | FREEHOLD | NJ | 07728 | |
| ARIZONA CORPORATE COMMISSION | C/O ARIZONA ATTORNEY GENERAL'S OFFICE | ATTN: MATTHEW A. SILVERMAN | 2005 N. CENTRAL AVE. | PHOENIX | AZ | 85004 | |
| BREX CREDIT CARD | | PMB 15548 | 548 MARKET ST | SAN FRANCISCO | CA | 94104-5401 | |
| D.C. DEPARTMENT OF INSURANCE, SECURITIES AND BANKING | C/O ASSOCIATE COMMISSIONER FOR SECURITIES | ATTN: STEPHEN BOUCHARD AND DAVID O'BRIEN | DISTRICT OF COLUMBIA DEPARTMENT OF INSURANCE, SECURITIES AND BANKING 1050 1ST STREET, NE, 8TH FLOOR | WASHINGTON | DC | 20002 | |
| FEDERAL TRADE COMMISSION | KATHERINE JOHNSON | 600 PENNSYLVANIA AVE., NW | CC-9528 | WASHINGTON | DC | 20580 | |
| GOOGLE LLC | C/O WHITE AND WILLIAMS LLP | ATTN: JAMES C. VANDERMARK | 1650 MARKET STREET, SUITE 1800 | PHILADELPHIA | PA | 19103 | |
| IMPACT TECH, INC. | ATTN: LEGAL DEPARTMENT, SR. CORPORATE COUNSEL AND GENERAL COUNSEL | 223 E. DE LA GUERRA ST. | | SANTA BARBARA | CA | 93101 | |
| JDI STUDIO LLC | ATTN: ALEXIS BLAIR ROMANOFF | 55 BYRAM RIDGE RD | | ARMONK | NY | 10504 | |
| METROPOLITAN COMMERCIAL BANK [MC BANK] | ATTN: MICHAEL A. GUARINO AND YIM WIDJAJA, ACCOUNTS PAYABLE/RECEIVABLE | 99 PARK AVE. | 12TH FL. | NEW YORK | NY | 10016 | |
| NEW HAMPSHIRE BUREAU OF SECURITIES REGULATION | | 107 N. MAIN STREET, STATE HOUSE RM. 204 | | CONCORD | NH | 03301 | |
| NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES | | 1 STATE STREET | | NEW YORK | NY | 10004 | |
| OFFICE OF THE SOUTH CAROLINA ATTORNEY GENERAL, SECURITIES DIVISION | SECURITIES DIVISION | P.O. BOX 11549 | | COLUMBIA | SC | 29211 | |
| OKLAHOMA DEPARTMENT OF SECURITIES | GERRI KAVANAUGH, GENERAL COUNSEL | 204 NORTH ROBINSON AVENUE | SUITE 400 | OKLAHOMA CITY | OK | 73102 | |
| SECURITY RISK ADVISORS INTL, LLC | | 1600 MARKET ST | STE 3000 | PHILADELPHIA | PA | 19103 | |
| STATE OF IOWA, TREASURER OF STATE | ATTN: UNCLAIMED PROPERTY | 321 E 12TH STREET | | DES MOINES | IA | 50319 | |
| STATE OF WISCONSIN, DEPARTMENT OF FINANCIAL INSTITUTIONS | ATTN: MICHAEL D. MORRIS | PO BOX 7857 | | MADISON | WI | 53707 | |
| SWEATCO LTD [SWEATCOIN] | ATTN: SHAUN AZAM | 107 CHEAPSIDE | 9TH FLOOR | LONDON | | EC2V 6DN | UNITED KINGDOM |
| TEXAS DEPARTMENT OF BANKING | | 2601 N LAMAR BLVD | STE 300 | AUSTIN | TX | 78705 | |
| TEXAS STATE SECURITIES BOARD | ATTN: JOE ROTUNDA | 208 E. 10TH STREET | ROOM 610 | AUSTIN | TX | 78701 | |
| THE NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | ATTN: JEFFREY BERNSTEIN, ESQ. | 570 BROAD STREET, SUITE 1401 | NEWARK | NJ | 07102 | |
| TN DEPT OF COMMERCE AND INSURANCE | C/O TN ATTORNEY GENERAL'S OFFICE, BANKRUPTCY DIVISION | ATTN: MARVIN E. CLEMENTS JR. | PO BOX 20207 | NASHVILLE | TN | 37202-0207 | |
| TN DEPT OF LABOR - BUREAU OF UNEMPLOYMENT INSURANCE | C/O BANKRUPTCY DIVISION | ATTN: TN ATTORNEY GENERAL; MARVIN E. CLEMENS, JR. | PO BOX 20207 | NASHVILLE | TN | 37202-0207 | |
| VERMONT DEPARTMENT OF FINANCIAL REGULATION | C/O ASSISTANT GENERAL COUNSEL | ATTN: JENNIFER ROOD, ESQ. | 89 MAIN STREET THIRD FLOOR | MONTPELIER | VT | 05620 | |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 1 of 1

# Exhibit C

STRETTO

**Exhibit C**
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip |
|------|-----------|-----------|-----------|------|-------|-----|
| AMANO GLOBAL HOLDINGS, INC. | C/O LAW OFFICES OF DOUGLAS T. TABACHNIK PC | 63 WEST MAIN STREET | SUITE C | FREEHOLD | NJ | 07728 |
| GOODBAY TECHNOLOGIES, INC. | C/O KATTEN MUCHIN ROSENMAN LLP | ATTN: MICHAELA C. CROCKER | 2121 NORTH PEARL STREET, SUITE 1100 | DALLAS | TX | 75201-2591 |
| STATE OF WASHINGTON DEPARTMENT OF FINANCIAL INSTITUTIONS SECURITIES DIVISION VS. VOYAGER DIGITAL LLC, ET AL. | ATTN: WILLIAM BEATTY, SECURITY ADMINISTRATOR | PO BOX 9033 | | OLYMPIA | WA | 98507 |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 1 of 1

# Exhibit D

**Exhibit D**
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip |
|------|-----------|-----------|-----------|------|-------|-----|
| BLUE ARROW INTERNATIONAL LLC | ATTN: MARK ANTHONY CZERWINSKI | 19 STATEN DR | | HOCKESSIN | DE | 19707-1338 |
| NORDIC EYE K/S | C/O COVINGTON & BURLING LLP | ATTN: DIANNE COFFINO | THE NEW YORK TIMES BUILDING 620 EIGHTH AVENUE | NEW YORK | NY | 10018 |
| SUSQUEHANNA GOVERNMENT PRODUCTS LLP | ATTN: BRIAN SOPINSKY | 401 E CITY AVENUE | SUITE 220 | BALA CYNWYD | PA | 19004 |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

# Exhibit E

**Exhibit E**
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| AD HOC GROUP OF EQUITY INTEREST HOLDERS OF VOYAGER DIGITAL LTD. | C/O KILPATRICK TOWNSEND & STOCKTON LLP | ATTN: DAVID M. POSNER & KELLY MOYNIHAN | 1114 AVENUE OF THE AMERICAS THE GRACE BUILDING | NEW YORK | NY | 10036-7703 | |
| AD HOC GROUP OF EQUITY INTEREST HOLDERS OF VOYAGER DIGITAL LTD. | C/O KILPATRICK TOWNSEND & STOCKTON LLP | ATTN: PAUL M. ROSENBLATT | 1100 PEACHTREE STREET NE SUITE 2800 | ATLANTA | GA | 30309 | |
| ALAMEDA RESEARCH LLC | C/O SULLIVAN & CROMWELL LLP | ATTN: ANDREW G. DIETDERICH, BRIAN D. GLUECKSTEIN, BENJAMIN S. BELLER | 125 BROAD STREET | NEW YORK | NY | 10004 | |
| ATTORNEY FOR THE STATES OF ALABAMA, ARKANSAS, CALIFORNIA, DISTRICT OF COLUMBIA, HAWAII, MAINE, NORTH DAKOTA, OKLAHOMA, AND SOUTH CAROLINA | C/O NATIONAL ASSOCIATION OF ATTORNEYS GENERAL | ATTN: KAREN CORDRY BANKRUPTCY COUNSEL | 1850 M ST. NW 12TH FLOOR | WASHINGTON | DC | 20036 | |
| BAM TRADING SERVICES INC. D/B/A BINANCE US | C/O LATHAM & WATKINS LLP | ATTN: ADAM J. GOLDBERG, NACIF TAOUSSE, & JONATHAN J. WECHSELBAUM | 1271 AVENUE OF THE AMERICAS | NEW YORK | NY | 10020 | |
| BAM TRADING SERVICES INC. D/B/A BINANCE US | C/O LATHAM & WATKINS LLP | ATTN: ANDREW D. SORKIN | 555 EVELENTH STREET, NW, SUITE 1000 | WASHINGTON | DC | 20004 | |
| DISTRICT OF COLUMBIA | OFFICE OF THE ATTORNEY GENERAL | 400 6TH STREET NW | | WASHINGTON | DC | 20001 | |
| ED BOLTON | C/O AKERMAN LLP | ATTN: R. ADAM SWICK, JOHN H. THOMPSON, JOANNE GELFAND | 98 SOUTHEAST SEVENTH STREET, SUITE 1100 | NEW YORK | NY | 10022 | |
| EMERALD OCEAN ISLE, LLC, AMANO GLOBAL HOLDINGS, INC., SHINGO LAVINE, AND ADAM LAVINE | C/O GOLDSTEIN & MCCLINKOCK LLLP | ATTN: MATTHEW E. MCCLINTOCK, HARLEY GOLDSTEIN, AND STEVE YACHIK | 111 W WASHINGTON STREET SUITE 1221 | CHICAGO | IL | 60602 | |
| EMERALD OCEAN ISLE, LLC, AMANO GLOBAL HOLDINGS, INC., SHINGO LAVINE, AND ADAM LAVINE | C/O LAW OFFICES OF DOUGLAS T. TABACHNIK, P.C. | ATTN: DOUGLAS T. TABACHNIK | 63 WEST MAIN STREET SUITE C | FREEHOLD | NJ | 07728-2141 | |
| FRANCINE DE SOUSA | C/O SISKINDS LLP | ATTN: ANTHONY O'BRIEN | 100 LOMBARD STREET SUITE 302 | TORONTO | ON | M5C1M3 | CANADA |
| FRANCINE DE SOUSA | C/O SISKINDS LLP | ATTN: MICHAEL G. ROBB & GARETT M. HUNTER | 275 DUNDAS STREET UNIT 1 | LONDON | ON | N6B 3L1 | CANADA |
| ILLINOIS SECRETARY OF STATE | C/O OFFICE OF THE ILLINOIS ATTORNEY GENERAL | ATTN: JOHN P. REDING ASSISTANT ATTORNEY GENERAL | 100 W. RANDOLPH ST FL. 13 | CHICAGO | IL | 60601 | |
| INTERNAL REVENUE SERVICE | | PO BOX 7346 | | PHILADELPHIA | PA | 19101-7346 | |
| JASON RAZNICK | C/O JAFFE RAITT HEUER & WEISS, P.C. | ATTN: PAUL R. HAGE | 27777 FRANKLIN ROAD SUITE 2500 | SOUTHFIELD | MI | 48034 | |
| JON GIACOBBE | ATTN: A. MANNY ALICANDRO | 11 BROADWAY, SUITE 615 | | NEW YORK | NY | 10004 | |
| KELLEHER PLACE MANAGEMENT, LLC | C/O HORWOOD MARCUS & BERK CHARTERED | ATTN: AARON L. HAMMER & NATHAN E. DELMAN | 500 W. MADISON ST STE 3700 | CHICAGO | IL | 60661 | |
| MARCUM LLP | C/O MINTZ & GOLD, LLP | ATTN: ANDREW R. GOTTESMAN, ESQ. | 600 THIRD AVENUE, 25TH FLOOR | NEW YORK | NY | 10016 | |
| MARK CUBAN AND DALLAS BASKETBALL LIMITED D/B/A DALLAS MAVERICKS | C/O BROWN RUDNICK LLP | ATTN: STEPHEN A. BEST ESQ & RACHEL O. WOLKINSON, ESQ. | 601 THIRTEENTH STREET NW SUITE 600 | WASHINGTON | DC | 20005 | |
| MARK CUBAN AND DALLAS BASKETBALL LIMITED, D/B/A DALLAS MAVERICKS | C/O BROWN RUDNICK LLP | ATTN: SIGMUND S. WISSNER-GROSS ESQ. & KENNETH J. AULET ESQ. | SEVEN TIMES SQUARE | NEW YORK | NY | 10036 | |
| MATTHEW EDWARDS | C/O LIZ GEORGE AND ASSOCIATES | ATTN: LYSBETH GEORGE | 8101 S. WALKER SUITE F | OKLAHOMA CITY | OK | 73139 | |
| METROPOLITAN COMMERCIAL BANK | C/O BALLARD SPAHR LLP | ATTN: GEORGE H. SINGER, ESQ | 2000 IDS CENTER 80 SOUTH 8TH STREET | MINNEAPOLIS | MN | 55402-2119 | |
| METROPOLITAN COMMERCIAL BANK | C/O WACHTELL, LIPTON, ROSEN & KATZ | ATTN: RICHARD G. MASON, AMY R. WOLF, ANGELA K. HERRING | 51 WEST 52ND STREET | NEW YORK | NY | 10019-6150 | |
| MICHAEL GENTSCH | C/O BARSKI LAW PLC | ATTN: CHRIS D. BARSKI | 9375 E. SHEA BLVD. STE 100 | SCOTTSDALE | AZ | 85260 | |
| MICHAEL LEGG | C/O MCCARTHY, LEBIT, CRYSTAL & LIFFMAN CO. | ATTN: ROBERT R. KRACHT & NICHOLAS R. OLESKI | 1111 SUPERIOR AVENUE EAST SUITE 2700 | CLEVELAND | OH | 44114 | |
| MURPHY PLACE MANAGEMENT LLC | C/O HORWOOD MARCUS & BERK CHARTERED | ATTN: AARON L. HAMMER, NATHAN E. DELMAN | 500 W. MADISON ST., STE 3700 | CHICAGO | IL | 60661 | |
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | ATTN: JEFFREY BERNSTEIN | 570 BROAD STREET, SUITE 1500 | NEWARK | NJ | 07102 | |
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | ATTN: NICOLE LEONARD | 225 LIBERTY STREET, 36TH FLOOR | NEW YORK | NY | 10281 | |
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | ATTN: VIRGINIA T. SHEA | 1300 MT KEMBLE AVENUE PO BOX 2075 | MORRISTOWN | NJ | 02075 | |
| NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES | C/O ACTING EXECUTIVE DEPUTY SUPERINTENDENT, DEPUTY GENERAL COUNSEL FOR LITIGATION, AND ASSISTANT DEPUTY SUPERINTENDENT | ATTN: KEVIN R. PUVALOWSKI, LINDA DONAHUE, & JASON D. ST. JOHN | ONE STATE STREET | NEW YORK | NY | 10004-1511 | |
| OFFICE OF THE UNITED STATES TRUSTEE | FOR THE SOUTHERN DIST OF NEW YORK | ATTN: RICHARD C. MORRISSEY, ESQ. AND MARK BRUH, ESQ. | 1 BOWLING GRN STE 534 | NEW YORK | NY | 10004-1459 | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | C/O MCDERMOTT WILL & EMERY LLP | ATTN: CHARLES R. GIBBS & GRAYSON WILLIAMS | 2501 NORTH HARWOOD STREET, SUITE 1900 | DALLAS | TX | 75201-1664 | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | C/O MCDERMOTT WILL & EMERY LLP | ATTN: GREGG STEINMAN | 333 SE 2ND AVENUE SUITE 4500 | MIAMI | FL | 33131-2184 | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | C/O MCDERMOTT WILL & EMERY LLP | ATTN: JOHN J. CALANDRA & JOSEPH B. EVANS & DARREN AZMAN | ONE VANDERBILT AVENUE | NEW YORK | NY | 10017-3852 | |
| ORACLE AMERICA, INC. | C/O BUCHALTER | ATTN: SHAWN M. CHRISTIANSON | 425 MARKET ST., SUITE 2900 | SAN FRANCISCO | CA | 94105 | |
| PIERCE ROBERTSON | C/O PAGULOSKI STANG ZIEHL & JONES LLP | ATTN: RICHARD M. PACHULSKI, ALAN J. KORNFELD, DEBRA I. GRASSGREEN, AND JASON H. ROSELL | 10100 SANTA MONICA BLVD 13TH FLOOR | LOS ANGELES | CA | 90067 | |
| ROBERT SNYDERS & LISA SNYDERS | C/O JOHNSON, POPE, BOKOR, RUPPEL & BURNS, LLP | ATTN: ANGELINA E. LIM | 401 E JACKSON STREET SUITE 3100 | TAMPA | FL | 33602 | |
| SECURITIES & EXCHANGE COMMISSION | NEW YORK REGIONAL OFFICE | 100 F STREET NE | | WASHINGTON | DC | 20549 | |
| SECURITIES & EXCHANGE COMMISSION | NEW YORK REGIONAL OFFICE | ATTN: THERESE A. SCHEUER, SENIOR TRIAL COUNSEL | 100 PEARL STREET SUITE 20-100 | NEW YORK | NY | 10004-2616 | |
| SECURITIES & EXCHANGE COMMISSION | NEW YORK REGIONAL OFFICE | ATTN: ANDREW CALAMARI REGIONAL DIRECTOR | 200 VESEY STREET SUITE 400 | NEW YORK | NY | 10281-1022 | |
| SPECIAL COUNSEL TO DEBTOR VOYAGER DIGITAL, LLC | C/O QUINN EMANUEL URQUHART & SULLIVAN LLP | ATTN: SUSHEEL KIRPALANI, KATE SCHERLING, & ZACHARY RUSSELL | 51 MADISON AVENUE 22ND FLOOR | NEW YORK | NY | 10010 | |
| STATE OF ALABAMA | OFFICE OF THE ATTORNEY GENERAL | 501 WASHINGTON AVE | | MONTGOMERY | AL | 36104 | |
| STATE OF ALASKA | OFFICE OF THE ATTORNEY GENERAL | 1031 W 4TH AVE, STE 200 | | ANCHORAGE | AK | 99501 | |
| STATE OF ARIZONA | OFFICE OF THE ATTORNEY GENERAL | 2005 N CENTRAL AVE | | PHOENIX | AZ | 85004 | |
| STATE OF ARKANSAS | OFFICE OF THE ATTORNEY GENERAL | 323 CENTER ST, STE 200 | | LITTLE ROCK | AR | 72201 | |
| STATE OF CALIFORNIA | OFFICE OF THE ATTORNEY GENERAL | PO BOX 944255 | | SACRAMENTO | CA | 94244-2550 | |
| STATE OF COLORADO | OFFICE OF THE ATTORNEY GENERAL | RALPH L. CARR JUDICIAL BUILDING | 1300 BROADWAY, 10TH FL | DENVER | CO | 80203 | |
| STATE OF CONNECTICUT | OFFICE OF THE ATTORNEY GENERAL | 165 CAPITOL AVENUE | | HARTFORD | CT | 6106 | |
| STATE OF FLORIDA | OFFICE OF THE ATTORNEY GENERAL | THE CAPITOL PL01 | | TALLAHASSEE | FL | 32399 | |
| STATE OF GEORGIA | OFFICE OF THE ATTORNEY GENERAL | 40 CAPITOL SQ SW | | ATLANTA | GA | 30334 | |
| STATE OF HAWAII | OFFICE OF THE ATTORNEY GENERAL | 425 QUEEN STREET | | HONOLULU | HI | 96813 | |
| STATE OF IDAHO | OFFICE OF THE ATTORNEY GENERAL | 700 W. JEFFERSON ST., SUITE 210 | PO BOX 83720 | BOISE | ID | 83720 | |
| STATE OF ILLINOIS | OFFICE OF THE ATTORNEY GENERAL | JAMES R. THOMPSON CENTER | 100 W. RANDOLPH ST | CHICAGO | IL | 60601 | |
| STATE OF INDIANA | OFFICE OF THE INDIANA ATTORNEY GENERAL | INDIANA GOVERNMENT CENTER SOUTH | 302 W WASHINGTON ST, 5TH FLOOR | INDIANAPOLIS | IN | 46204 | |
| STATE OF IOWA | OFFICE OF THE ATTORNEY GENERAL | HOOVER STATE OFFICE BUILDING | 1305 E. WALNUT STREET | DES MOINES | IA | 50319 | |
| STATE OF KANSAS | ATTN: ATTORNEY GENERAL DEREK SCHMIDT | 120 SW 10TH AVE, 2ND FLOOR | | TOPEKA | KS | 66612 | |
| STATE OF KENTUCKY | ATTORNEY GENERAL - DANIEL CAMERON | 700 CAPITOL AVENUE, SUITE 118 | | FRANKFORT | KY | 40601 | |
| STATE OF LOUISIANA | DEPT. OF JUSTICE - ATTORNEY GENERAL'S OFFICE | 300 CAPITAL DRIVE | | BATON ROUGE | LA | 70802 | |
| STATE OF MAINE | OFFICE OF THE ATTORNEY GENERAL | 6 STATE HOUSE STATION | | AUGUSTA | ME | 04333 | |
| STATE OF MARYLAND | OFFICE OF THE ATTORNEY GENERAL | 200 ST. PAUL PLACE | | BALTIMORE | MD | 21202 | |
| STATE OF MASSACHUSETTS | ATTORNEY GENERAL'S OFFICE | 1 ASHBURTON PLACE, 20TH FLOOR | | BOSTON | MA | 02108 | |
| STATE OF MICHIGAN | DEPARTMENT OF ATTORNEY GENERAL | 525 W OTTAWA ST | | LANSING | MI | 48933 | |
| STATE OF MINNESOTA | OFFICE OF THE ATTORNEY GENERAL | 445 MINNESOTA ST, STE 1400 | | ST. PAUL | MN | 55101 | |
| STATE OF MISSISSIPPI | OFFICE OF THE ATTORNEY GENERAL | WALTER SILLERS BUILDING | 550 HIGH ST, PO BOX 220 | JACKSON | MS | 39201 | |
| STATE OF MISSOURI | OFFICE OF THE ATTORNEY GENERAL | SUPREME COURT BUILDING | 207 W HIGH ST | JEFFERSON CITY | MO | 65101 | |
| STATE OF MONTANA | OFFICE OF THE ATTORNEY GENERAL | JUSTICE BUILDING, 3RD FLOOR | 215 N SANDERS, PO BOX 201401 | HELENA | MT | 59602 | |
| STATE OF NEBRASKA | OFFICE OF THE ATTORNEY GENERAL | 2115 STATE CAPITOL | | LINCOLN | NE | 68509 | |
| STATE OF NEVADA | OFFICE OF THE ATTORNEY GENERAL | OLD SUPREME COURT BUILDING | 100 N CARSON ST | CARSON CITY | NV | 89701 | |
| STATE OF NEW HAMPSHIRE | OFFICE OF THE ATTORNEY GENERAL | NH DEPARTMENT OF JUSTICE | 33 CAPITOL ST. | CONCORD | NH | 3301 | |
| STATE OF NEW JERSEY | OFFICE OF THE ATTORNEY GENERAL | RICHARD J. HUGHES JUSTICE COMPLEX | 25 MARKET ST 8TH FL, WEST WING BOX 080 | TRENTON | NJ | 8611 | |
| STATE OF NEW MEXICO | OFFICE OF THE ATTORNEY GENERAL | 408 GALISTEO STREET | VILLAGRA BUILDING | SANTA FE | NM | 87501 | |
| STATE OF NEW YORK | OFFICE OF THE ATTORNEY GENERAL | THE CAPITOL | 2ND FLOOR | ALBANY | NY | 12224 | |
| STATE OF NORTH CAROLINA | OFFICE OF THE ATTORNEY GENERAL | 114 W EDENTON ST | | RALEIGH | NC | 27603 | |
| STATE OF NORTH DAKOTA | OFFICE OF THE ATTORNEY GENERAL | STATE CAPITOL, 600 E BOULEVARD AVE | DEPT. 125 | BISMARCK | ND | 58505 | |
| STATE OF OHIO | OFFICE OF THE ATTORNEY GENERAL | STATE OFFICE TOWER | 30 E BROAD ST 14TH FL | COLUMBUS | OH | 43215 | |
| STATE OF OKLAHOMA | OFFICE OF THE ATTORNEY GENERAL | 313 NE 21ST ST | | OKLAHOMA CITY | OK | 73105 | |

In re: Voyager Digital Holdings, Inc. et.al.
Case No. 22-10943 (MEW)

Page 1 of 2

**Exhibit E**

Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| STATE OF OREGON | OFFICE OF THE ATTORNEY GENERAL | 1162 COURT ST NE | | SALEM | OR | 97301-4096 | |
| STATE OF PENNSYLVANIA | OFFICE OF THE ATTORNEY GENERAL | STRAWBERRY SQUARE 16TH FL | | HARRISBURG | PA | 17120 | |
| STATE OF RHODE ISLAND | OFFICE OF THE ATTORNEY GENERAL | 150 S MAIN ST | | PROVIDENCE | RI | 2903 | |
| STATE OF SOUTH CAROLINA | OFFICE OF THE ATTORNEY GENERAL | PO BOX 11549 | | COLUMBIA | SC | 29211 | |
| STATE OF SOUTH CAROLINA | OFFICE OF THE ATTORNEY GENERAL | REMBERT C. DENNIS BLDG | 1000 ASSEMBLY ST RM 519 | COLUMBIA | SC | 29201 | |
| STATE OF SOUTH DAKOTA | OFFICE OF THE ATTORNEY GENERAL | 1302 E HIGHWAY 14, STE 1 | | PIERRE | SD | 57501-8501 | |
| STATE OF TENNESSEE | OFFICE OF THE ATTORNEY GENERAL | PO BOX 20207 | | NASHVILLE | TN | 37202-0207 | |
| STATE OF TEXAS | OFFICE OF THE ATTORNEY GENERAL | 300 W. 15TH ST | | AUSTIN | TX | 78701 | |
| STATE OF UTAH | OFFICE OF THE ATTORNEY GENERAL | UTAH STATE CAPITOL COMPLEX | 350 NORTH STATE ST STE 230 | SALT LAKE CITY | UT | 84114 | |
| STATE OF UTAH | OFFICE OF THE ATTORNEY GENERAL, SEAN D. REYES | UTAH STATE CAPITOL COMPLEX | 350 NORTH STATE ST STE 230 | SALT LAKE CITY | UT | 84114 | |
| STATE OF VERMONT | OFFICE OF THE ATTORNEY GENERAL | 109 STATE ST. | | MONTPELIER | VT | 5609 | |
| STATE OF VIRGINIA | OFFICE OF THE ATTORNEY GENERAL | 202 N. NINTH ST. | | RICHMOND | VA | 23219 | |
| STATE OF WASHINGTON | OFFICE OF THE ATTORNEY GENERAL | 1125 WASHINGTON ST SE | | OLYMPIA | WA | 98501 | |
| STATE OF WASHINGTON | OFFICE OF THE ATTORNEY GENERAL | GOVERNMENT COMPLIANCE AND ENFORCEMENT DIVISION | ATTN: STEPHEN MANNING PO BOX 40100 | OLYMPIA | WA | 98504-4010 | |
| STATE OF WASHINGTON | OFFICE OF THE ATTORNEY GENERAL | PO BOX 40100 | | OLYMPIA | WA | 98504-00 | |
| STATE OF WEST VIRGINIA | OFFICE OF THE ATTORNEY GENERAL | STATE CAPITOL, 1900 KANAWHA BLVD E | BUILDING 1 RM E-26 | CHARLESTON | WV | 25305 | |
| STATE OF WISCONSIN | OFFICE OF THE ATTORNEY GENERAL | 17 WEST MAIN STREET, ROOM 114 EAST P | | MADISON | WI | 53702 | |
| STATE OF WYOMING | OFFICE OF THE ATTORNEY GENERAL | 109 STATE CAPITOL | | CHEYENNE | WY | 82002 | |
| STEVE LAIRD | C/O FORSHEY & PROSTOK LLP | ATTN: J. ROBERT FORSHEY | 777 MAIN STREET SUITE 1550 | FORT WORTH | TX | 76102 | |
| TEXAS DEPARTMENT OF BANKING | C/O OFFICE OF THE ATTORNEY GENERAL OF TEXAS | ATTN: ABIGAL R. RYAN, LAYLA D. MILLIGAN, JASON B. BINFORD, AND ROMA N. DESAI | PO BOX 12548 BANKRUPTCY AND COLLECTIONS DIVISION | AUSTIN | TX | 78711-2548 | |
| TEXAS SECURITIES BOARD | C/O OFFICE OF THE ATTORNEY GENERAL OF TEXAS | ATTN: ROMA N. DESAI ASSISTANT ATTORNEY GENERAL | PO BOX 12548 BANKRUPTCY & COLLECTIONS DIVISION | AUSTIN | TX | 78711-2548 | |
| TEXAS STATE SECURITIES BOARD | OFFICE OF THE ATTORNEY GENERAL OF TEXAS | ATTN: ABIGAIL R RYAN, LAYLA D MILLIGAN, ROMA N. DESAI & JASON B BINFORD | PO BOX 12548 BANKRUPTCY & COLLECTIONS DIVISION | AUSTIN | TX | 78711-2548 | |
| TORONTO STOCK EXCHANGE | | 300  100 ADELAIDE ST. | | WEST TORONTO | ON | M5H 1S3 | CANADA |
| TN DEPT OF COMMERCE AND INSURANCE | C/O TN ATTORNEY GENERAL'S OFFICE, BANKRUPTCY DIVISION | ATTN: MARVIN E. CLEMENTS JR. | PO BOX 20207 | NASHVILLE | TN | 37202-0207 | |
| UNITED STATES ATTORNEY'S OFFICE | SOUTHERN DISTRICT OF NEW YORK | ONE ST. ANDREWS PLAZA | | NEW YORK | NY | 10007 | |
| UNITED STATES DEPARTMENT OF JUSTICE | ATTORNEY GENERAL OF THE U.S. | 950 PENNSYLVANIA AVE, NW | | WASHINGTON | DC | 20530-0001 | |
| USIO, INC. | C/O PULMAN CAPPUCCIO & PULLEN, LLP | ATTN: RANDALL A. PULMAN | 2161 NW MILITARY HWY., SUITE 400 | SAN ANTONIO | TX | 78213 | |
| USIO, INC. | C/O RUSKIN MOSCOU FALTISCHEK, P.C. | ATTN: SHERYL P. GIUGLIANO, RUSKIN MOSCOU FALTISCHEK | 1425 RXR PLAZA, 15TH FLOOR | UNIONDALE | NY | 11556-1425 | |
| VERMONT DEPARTMENT OF FINANCIAL REGULATION | C/O ASSISTANT GENERAL COUNSEL | ATTN: JENNIFER ROOD, ESQ. | 89 MAIN STREET THIRD FLOOR | MONTPELIER | VT | 05602 | |
| WELLS FARGO BANK, N.A. | C/O ALDRIDGE PITE, LLP | ATTN: GREGORY A. WALLACH | 15 PIEDMONT CENTER 3575 PIEDMONT ROAD N.E. | ATLANTA | GA | 30305 | |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 2 of 2

# Exhibit F

**Exhibit F**

Served via Electronic Mail

| Name | Attention | Email |
|---|---|---|
| AD HOC GROUP OF EQUITY INTEREST HOLDERS OF VOYAGER DIGITAL LTD. | C/O KILPATRICK TOWNSEND & STOCKTON LLP | DPOSNER@KILPATRICKTOWNSEND.COM KMOYNIHAN@KILPATRICKTOWNSEND.COM |
| AD HOC GROUP OF EQUITY INTEREST HOLDERS OF VOYAGER DIGITAL LTD. | C/O KILPATRICK TOWNSEND & STOCKTON LLP | PROSENBLATT@KILPATRICKTOWNSEND.COM |
| ALAMEDA RESEARCH LLC | C/O SULLIVAN & CROMWELL LLP | DIETDERICHA@SULLCROM.COM GLUECKSTEINB@SULLCROM.COM BELLERB@SULLCROM.COM |
| ATTORNEY FOR THE STATES OF ALABAMA, ARKANSAS, CALIFORNIA, DISTRICT OF COLUMBIA, HAWAII, MAINE, NORTH DAKOTA, OKLAHOMA, AND SOUTH CAROLINA | C/O NATIONAL ASSOCIATION OF ATTORNEYS GENERAL | KCORDRY@NAAG.ORG |
| BAM TRADING SERVICES INC. D/B/A BINANCE.US | C/O LATHAM & WATKINS LLP | ADAM.GOLDBERG@LW.COM NACIF.TAOUSSE@LW.COM JON.WEICHSELBAUM@LW.COM |
| BAM TRADING SERVICES INC. D/B/A BINANCE.US | C/O LATHAM & WATKINS LLP | ANDREW.SORKIN@LW.COM |
| DISTRICT OF COLUMBIA | OFFICE OF THE ATTORNEY GENERAL | OAG@DC.GOV |
| ED BOLTON | C/O AKERMAN LLP | ADAM.SWICK@AKERMAN.COM JOHN.THOMPSON@AKERMAN.COM JOANNE.GELFAND@AKERMAN.COM |
| EMERALD OCEAN ISLE, LLC, AMANO GLOBAL HOLDINGS, INC., SHINGO LAVINE, AND ADAM LAVINE | C/O GOLDSTEIN & MCCLINKOCK LLLP | MATTM@GOLDMCLAW.COM HARLEYG@RESTRUCTURINGSHOP.COM STEVENY@GOLDMCLAW.COM |
| EMERALD OCEAN ISLE, LLC, AMANO GLOBAL HOLDINGS, INC., SHINGO LAVINE, AND ADAM LAVINE | C/O LAW OFFICES OF DOUGLAS T. TABACHNIK, P.C. | DTABACHNIK@DTTLAW.COM |
| FRANCINE DE SOUSA | C/O SISKINDS LLP | ANTHONY.OBRIEN@SISKINDS.COM |
| FRANCINE DE SOUSA | C/O SISKINDS LLP | MICHAEL.ROBB@SISKINDS.COM GARETT.HUNTER@SISKINDS.COM |
| ILLINOIS SECRETARY OF STATE | C/O OFFICE OF THE ILLINOIS ATTORNEY GENERAL | JOHN.REDING@ILAG.GOV |
| JASON RAZNICK | C/O JAFFE RAITT HEUER & WEISS, P.C. | PHAGE@JAFFELAW.COM |
| JON GIACOBBE | ATTN: A. MANNY ALICANDRO | MANNY@ALICANDROLAWOFFICE.COM |
| KELLEHER PLACE MANAGEMENT, LLC | C/O HORWOOD MARCUS & BERK CHARTERED | AHAMMER@HMBLAW.COM NDELMAN@HMBLAW.COM EFCNOTICES@HMBLAW.COM |
| MARCUM LLP | C/O MINTZ & GOLD, LLP | GOTTESMAN@MINTZANDGOLD.COM |
| MARK CUBAN AND DALLAS BASKETBALL LIMITED D/B/A DALLAS MAVERICKS | C/O BROWN RUDNICK LLP | SBEST@BROWNRUDNICK.COM RWOLKINSON@BROWNRUDNICK.COM |
| MARK CUBAN AND DALLAS BASKETBALL LIMITED, D/B/A DALLAS MAVERICKS | C/O BROWN RUDNICK LLP | SWISSNER-GROSS@BROWNRUDNICK.COM KAULET@BROWNRUDNICK.COM |
| MATTHEW EDWARDS | C/O LIZ GEORGE AND ASSOCIATES | GEORGELAWOK@GMAIL.COM |
| METROPOLITAN COMMERCIAL BANK | C/O BALLARD SPAHR LLP | SINGERG@BALLARDSPAHR.COM |
| METROPOLITAN COMMERCIAL BANK | C/O WACHTELL, LIPTON, ROSEN & KATZ | RGMASON@WLRK.COM ARWOLF@WLRK.COM AKHERRING@WLRK.COM |
| MICHAEL GENTSCH | C/O BARSKI LAW PLC | CBARSKI@BARSKILAW.COM |
| MICHAEL LEGG | C/O MCCARTHY, LEBIT, CRYSTAL & LIFFMAN CO. | RRK@MCCARTHYLEBIT.COM NRO@MCCARTHYLEBIT.COM |
| MURPHY PLACE MANAGEMENT LLC | C/O HORWOOD MARCUS & BERK CHARTERED | AHAMMER@HMBLAW.COM NDELMAN@HMBLAW.COM ECFNOTICES@HMBLAW.COM |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

**STRETTO**

**Exhibit F**

Served via Electronic Mail

| Name | Attention | Email |
|---|---|---|
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | JBERNSTEIN@MDMC-LAW.COM |
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | VSHEA@MDMC-LAW.COM |
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | NLEONARD@MDMC-LAW.COM |
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | VSHEA@MDMC-LAW.COM |
| NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES | C/O ACTING EXECUTIVE DEPUTY SUPERINTENDENT, DEPUTY GENERAL COUNSEL FOR LITIGATION, AND ASSISTANT DEPUTY SUPERINTENDENT | KEVIN.PUVALOWSKI@DFS.NY.GOV LINDA.DONAHUE@DFS.NY.GOV JASON.STJOHN@DFS.NY.GOV |
| OFFICE OF THE UNITED STATES TRUSTEE | FOR THE SOUTHERN DIST OF NEW YORK | RICHARD.MORRISSEY@USDOJ.GOV MARK.BRUH@USDOJ.GOV |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | ATTN: BRANDON MULLENBERG | BRANDONMULLENBERG2022@GMAIL.COM |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | ATTN: BYRON WALKER | BYWALKER01@GMAIL.COM |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | ATTN: CHRISTOPHER MOSER | CHRISMMOSER@GMAIL.COM |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | ATTN: JASON RAZNICK | JASON@BEZINGA.COM |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | ATTN: RICHARD KISS FOR THINCAT TRUST | RICHARD.KISS@GMAIL.COM |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | ATTN: RUSSELL G. STEWART | RUSS.STEWART@TMF.MORTGAGE.COM |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | C/O MCDERMOTT WILL & EMERY LLP | CRGIBBS@MWE.COM GWILLIAMS@MWE.COM |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | C/O MCDERMOTT WILL & EMERY LLP | DAZMAN@MWE.COM JCALANDRA@MWE.COM JBEVANS@MWE.COM |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | C/O MCDERMOTT WILL & EMERY LLP | GSTEINMAN@MWE.COM |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | C/O MELISSA AND ADAM FREEDMAN | FREEMANMELISSAC@GMAIL.COM |
| ORACLE AMERICA, INC. | C/O BUCHALTER | SCHRISTIANSON@BUCHALTER.COM |
| PIERCE ROBERTSON | C/O PACHULSKI STANG ZIEHL & JONES LLP | RPACHULSKI@PSZJLAW.COM AKORNFELD@PSZJLAW.COM DGRASSGREEN@PSZJLAW.COM JROSELL@PSZJLAW.COM |
| ROBERT SNYDERS & LISA SNYDERS | C/O JOHNSON, POPE, BOKOR, RUPPEL & BURNS, LLP | ANGELINAL@JPFIRM.COM |
| SECURITIES & EXCHANGE COMMISSION | ATTN: THERESE A. SCHEUER, SENIOR TRIAL COUNSEL | SECBANKRUPTCY-OGC-ADO@SEC.GOV SCHEUERT@SEC.GOV |
| SECURITIES & EXCHANGE COMMISSION | NEW YORK REGIONAL OFFICE | BANKRUPTCYNOTICESCHR@SEC.GOV |
| SECURITIES & EXCHANGE COMMISSION | NEW YORK REGIONAL OFFICE | NYROBANKRUPTCY@SEC.GOV |
| STATE OF ALABAMA | OFFICE OF THE ATTORNEY GENERAL | CONSUMERINTEREST@ALABAMAAG.GOV |
| STATE OF ALASKA | OFFICE OF THE ATTORNEY GENERAL | ATTORNEY.GENERAL@ALASKA.GOV |
| STATE OF ARIZONA | OFFICE OF THE ATTORNEY GENERAL | AGINFO@AZAG.GOV |
| STATE OF ARKANSAS | OFFICE OF THE ATTORNEY GENERAL | OAG@ARKANSASAG.GOV |
| STATE OF CALIFORNIA | OFFICE OF THE ATTORNEY GENERAL | XAVIER.BECERRA@DOJ.CA.GOV |
| STATE OF COLORADO | OFFICE OF THE ATTORNEY GENERAL | CORA.REQUEST@COAG.GOV |
| STATE OF CONNECTICUT | OFFICE OF THE ATTORNEY GENERAL | ATTORNEY.GENERAL@CT.GOV |
| STATE OF FLORIDA | OFFICE OF THE ATTORNEY GENERAL | ASHLEY.MOODY@MYFLORIDALEGAL.COM |
| STATE OF HAWAII | OFFICE OF THE ATTORNEY GENERAL | HAWAIIAG@HAWAII.GOV |
| STATE OF IDAHO | OFFICE OF THE ATTORNEY GENERAL | STEPHANIE.GUYON@AG.IDAHO.GOV |
| STATE OF ILLINOIS | OFFICE OF THE ATTORNEY GENERAL | MICHELLE@LISAMADIGAN.ORG |
| STATE OF IOWA | OFFICE OF THE ATTORNEY GENERAL | CONSUMER@AG.IOWA.GOV |
| STATE OF KANSAS | ATTN: ATTORNEY GENERAL DEREK SCHMIDT | DEREK.SCHMIDT@AG.KS.GOV |
| STATE OF LOUISIANA | DEPT. OF JUSTICE - ATTORNEY GENERAL'S OFFICE | ADMININFO@AG.STATE.LA.US |
| STATE OF MAINE | OFFICE OF THE ATTORNEY GENERAL | ATTORNEY.GENERAL@MAINE.GOV |
| STATE OF MARYLAND | OFFICE OF THE ATTORNEY GENERAL | OAG@OAG.STATE.MD.US |
| STATE OF MINNESOTA | OFFICE OF THE ATTORNEY GENERAL | ATTORNEY.GENERAL@AG.STATE.MN.US |

STRETTO

**Exhibit F**

Served via Electronic Mail

| Name | Attention | Email |
|------|-----------|-------|
| STATE OF MISSOURI | OFFICE OF THE ATTORNEY GENERAL | CONSUMER.HELP@AGO.MO.GOV |
| STATE OF MONTANA | OFFICE OF THE ATTORNEY GENERAL | CONTACTDOJ@MT.GOV |
| STATE OF NEW HAMPSHIRE | OFFICE OF THE ATTORNEY GENERAL | ATTORNEYGENERAL@DOJ.NH.GOV |
| STATE OF NEW MEXICO | OFFICE OF THE ATTORNEY GENERAL | HBALDERAS@NMAG.GOV |
| STATE OF NORTH DAKOTA | OFFICE OF THE ATTORNEY GENERAL | NDAG@ND.GOV |
| STATE OF OKLAHOMA | OFFICE OF THE ATTORNEY GENERAL | QUESTIONS@OAG.OK.GOV |
| STATE OF OREGON | OFFICE OF THE ATTORNEY GENERAL | ELLEN.ROSENBLUM@DOG.STATE.OR.US ATTORNEYGENERAL@DOJ.STATE.OR.US |
| STATE OF RHODE ISLAND | OFFICE OF THE ATTORNEY GENERAL | AG@RIAG.RI.GOV |
| STATE OF UTAH | OFFICE OF THE ATTORNEY GENERAL | UAG@UTAH.GOV |
| STATE OF UTAH | OFFICE OF THE ATTORNEY GENERAL, SEAN D. REYES | UAG@UTAH.GOV |
| STATE OF VERMONT | OFFICE OF THE ATTORNEY GENERAL | AGO.INFO@VERMONT.GOV |
| STATE OF VIRGINIA | OFFICE OF THE ATTORNEY GENERAL | MAIL@OAG.STATE.VA.US |
| STATE OF WASHINGTON | OFFICE OF THE ATTORNEY GENERAL | STEPHEN.MANNING@ATG.WA.GOV |
| STATE OF WEST VIRGINIA | OFFICE OF THE ATTORNEY GENERAL | CONSUMER@WVAGO.GOV |
| STEVE LAIRD | C/O FORSHEY & PROSTOK LLP | BFORSHEY@FORSHEYPROSTOK.COM |
| TEXAS DEPARTMENT OF BANKING | C/O OFFICE OF THE ATTORNEY GENERAL OF TEXAS | JASON.BINFORD@OAG.TEXAS.GOV LAYLA.MILLIGAN@OAG.TEXAS.GOV ABIGAIL.RYAN@OAG.TEXAS.GOV ROMA.DESAI@OAG.TEXAS.GOV |
| TEXAS STATE SECURITIES BOARD | OFFICE OF THE ATTORNEY GENERAL OF TEXAS | ABIGAIL.RYAN@OAG.TEXAS.GOV LAYLA.MILLIGAN@OAG.TEXAS.GOV JASON.BINFORD@OAG.TEXAS.GOV ROMA.DESAI@OAG.TEXAS.GOV AUTUMN.HIGHSMITH@OAG.TEXAS.GOV |
| TN DEPT OF COMMERCE AND INSURANCE | C/O TN ATTORNEY GENERAL'S OFFICE, BANKRUPTCY DIVISION | AGBANKNEWYORK@AG.TN.GOV MARVIN.CLEMENTS@AG.TN.GOV |
| TORONTO STOCK EXCHANGE | | WEBMASTER@TMX.COM |
| USIO, INC. | C/O PULMAN CAPPUCCIO & PULLEN, LLP | RPULMAN@PULMANLAW.COM |
| VERMONT DEPARTMENT OF FINANCIAL REGULATION | C/O ASSISTANT GENERAL COUNSEL | JENNIFER.ROOD@VERMONT.GOV |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 3 of 3

# Exhibit G

≡ STRETTO

**Exhibit G**
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| 15FIVE, INC. | | DEPT LA 25012 | | PASADENA | CA | 91185-5012 | |
| 1PASSWORD | | 4711 YONGE STREET | 1TH FLOOR | TORONTO | ON | M2N 6K8 | CANADA |
| 33 IRVING TENANT LLC | | 33 IRVING PL | | NEW YORK | NY | 10003 | |
| 4TH JUDICIAL DISTRICT ATTORNEY'S OFFICE | | 105 E. VERMIJO AVE | | COLORADO SPRINGS | CO | 80903 | |
| A&V SPORTS GROUP LLC | | 8699 GRAND PRIX LANE | | BOYNTON BEACH | FL | 33472 | |
| ACCELERACE INVEST K/S | | FRUEBJERGVEJ 3 | | KOBENHAVN O 2100 | | | DENMARK |
| ACCRETIVE CAPITAL DBA BENZINGA | | 1 CAMPUS MARTIUS | SUITE 200 | DETROIT | MI | 48226 | |
| ACCURA ADVOKATPARTNERSELSKAB | | TUBORG BOULEVARD 1 | | HELLERUP COPENHAGEN | | 02900 | DENMARK |
| ACCURATE STAFFING SOLUTIONS CORP. | | 27 WEST NECK ROAD | | HUNTINGTON | NY | 11743 | |
| ACTIMIZE | | 221 RIVER ST | 1TH FLOOR | HOBOKEN | NJ | 07030 | |
| ACTIMIZE INC | | NICE ACTIMIZE, ATTN: CFO | 221 RIVER ST 10TH FLOOR | HOBOKEN | NJ | 07030 | |
| ACTIMIZE, INC. | | 221 RIVER STREET | 10TH FLOOR | HOBOKEN | NJ | 07032 | |
| ACXIOM LLC | THE INTERPUBLIC GROUP OF COMPANIES, INC. | 301 E DAVE WARD DRIVE | | CONWAY | AR | 72032 | |
| ADA SUPPORT INC. | | 371 FRONT STREET W | SUITE 314 | TORONTO | ON | M5V-3S8 | CANADA |
| ADA SUPPORT INC. | | 371 FRONT STREET W | SUITE 314 | TORONTO | ON | M5V 3S8 | CANADA |
| ADAM ATLAS ATTORNEYS AT LAW | | 2301 MELROSE AVENUE | | MONTREAL | QC | H4A 2R7 | CANADA |
| ADCOLONY, INC | | PO BOX 205518 | | DALLAS | TX | 75320 | |
| ADOBE | | 345 PARK AVENUE | | SAN JOSE | CA | 9511-274 | |
| ADPERIO NETWORK LLC | | 2000 S COLORADO BLVD | | DENVER | CO | 80222 | |
| ADVOKAADIBÜROO COBALT OÜ (COBALT LAW FIRM) | | PARNU MNT 15 | | TALLINN | | 10141 | ESTONIA |
| AKTIENCHECK.DE AG | | BAHNHOFSTRASE 6 | | BAD MARIENBERG | | 56470 | GERMANY |
| ALABAMA SECRETARY OF STATE, CORPORATIONS DIVISION | ANDREW O. SCHIFF | STATE CAPITOL BUILDING SUITE S-105 | 600 DEXTER AVENUE | MONTGOMERY | AL | 36130 | |
| ALABAMA SECURITIES COMMISSION | JOSEPH P. BORG, DIRECTOR | 445 DEXTER AVENUE | SUITE 1200 | MONTGOMERY | AL | 36104 | |
| ALABAMA SECURITIES COMMISSION | | 445 DEXTER AVENUE | SUITE 12000 | MONTGOMERY | AL | 36104 | |
| ALABAMA STATE BANKING DEPARTMENT | | PO BOX 4600 | | MONTGOMERY | AL | 36103-4600 | |
| ALABAMA STATE TREASURY | UNCLAIMED PROPERTY DIVISION | RSA UNION BLDG 100 N UNION ST STE 636 | | MONTGOMERY | AL | 36104 | |
| ALAMEDA RESEARCH | | TORTOLA PIER PARK, BUILDING 1, SECOND FLOOR | WICKHAMS CAY I, | ROAD TOWN | TORTOLA | | BRITISH VIRGIN ISLANDS |
| ALAMEDA RESEARCH LTD. | | TORTOLA PIER PARK | WICKHAMS CAY I, | ROAD TOWN | TORTOLA | VG1110 | BRITISH VIRGIN ISLANDS |
| ALAMEDA RESEARCH VENTURES LLC | | 2000 CENTER ST 4TH FLOOR | | BERKELEY | CA | 94704 | |
| ALAMEDA RESEARCH VENTURES LLC | | 2000 CENTER ST 4TH FLOOR | | BERKELEY | CA | 94704 | |
| ALAMEDA VENTURES LTD | | F20 1ST FLOOR | | EDEN PLAZA ISLAND | | | SEYCHELLES |
| ALAMEDA VENTURES LTD | | F20 1ST FLOOR, EDEN PLAZA | | EDEN ISLAND | | | SEYCHELLES |
| ALASKA DEPARTMENT OF COMMERCE, COMMUNITY AND ECONOMIC DEVELOPMENT, DIV OF CORPORATIONS | | 550 W 7TH AVE | SUITE 1535 | ANCHORAGE | AK | 99501-3587 | |
| ALASKA DEPARTMENT OF LAW CONSUMER PROTECTION UNIT | | 1031 WEST 4TH AVENUE, SUITE 200 | | ANCHORAGE | AK | 99501-1994 | |
| ALASKA DEPARTMENT OF REVENUE | TREASURY DIVISION | UNCLAIMED PROPERTY PROGRAM | PO BOX 110405 | JUNEAU | AK | 99811-0405 | |
| ALASKA DIVISION OF BANKING & SECURITIES | ROBERT H. SCHMIDT, DIRECTOR | 550 W. 7TH AVENUE | SUITE 1850 | ANCHORAGE | AK | 99501 | |
| ALASKA DIVISION OF BANKING AND SECURITIES | | PO BOX 110807 | | JUNEAU | AK | 99811-0807 | |
| ALBANY COUNTY DEPARTMENT OF CONSUMER AFFAIRS | ATTN: ALBANY COUNTY DEPARTMENT OF GENERAL SERVICES | HAROLD L. JOYCE ALBANY COUNTY OFFICE BUILDING | 112 STATE STREET ROOM 1315 | ALBANY | NY | 12207 | |
| ALETH HOUGAARD APS | | SOBAKKEVLJ 4B | OVERØD | HOLTE | | 2840 | DENMARK |
| A-LIGN | | 400 N ASHLEY DRIVE | SUITE 1325 | TAMPA | FL | 33602 | |
| A-LIGN COMPLIANCE AND SECURITY INC | | 400 N. ASHLEY DRIVE | SUITE 1325 | TAMPA | FL | 33602 | |
| A-LIGN COMPLIANCE AND SECURITY, INC., D/B/A A-LIGN | | 400 N ASHLEY DRIVE | SUITE 1325 | TAMPA | FL | 33602 | |
| ALISHAAN PARIKH LLC | ATTN: KETUL PARIKH, MANAGING MEMBER | 50339 DRAKES BAY DR. | | NOVI | MI | 48374 | |
| ALPS CONSULTING LLP | | NO. 11/2 KHR HOUES | PALACE ROAD VASANTHNAGAR BANGALORE | KARNATAKA | | 560 052 | INDIA |
| ALREADY DESIGN CO. | | 185 HUDSON STREET | SUITE 2500 | JERSEY CITY | NJ | 7311 | |
| ALY & MARSAL CANADA INC | | 200 BAY STREET, ROYAL BANK PLAZA SOUTH TOWER | SUITE 2900 P O BOX 22 | TORONTO | ON | M5J 2J1 | CANADA |
| AMALGAMATED SUNCOAST PORTFOLIO LLC | | 1680 FRUITVILLE ROAD | SUITE 305 | SARASOTA | FL | 34236 | |
| AMALGAMATED SUNCOAST PORTFOLIO LLC (CHARLIE SHREM) | | 2 NORTH TAMIAMI TRAIL | SUITE 200 | SARASOTA | FL | 34236 | |
| AMANO GLOBAL HOLDINGS, INC. | ATTN: ADAM LAVINE | 1798 HOVENWEEP ROAD | | WESLEY CHAPEL | FL | 33543 | |
| AMANO GLOBAL HOLDINGS, INC. | ATTN: ADAM LAVINE | 1798 HOVENWEEP ROAD | | WESLEY CHAPEL | FL | 33543 | |
| AMAZON WEB SERVICES, INC | | P.O. BOX 81226 | | SEATTLE | WA | 98108 | |
| AMAZON WEB SERVICES, INC | | P.O.BOX 84023 | | SEATTLE | WA | 98124 | |
| AMAZON WEB SERVICES, INC. | | PO BOX 84023 | | SEATTLE | WA | 98124 | |
| AMAZON WEB SERVICES, INC. | ATTN: STEVE BERANEK | 2345 CRYSTAL DRIVE SUITE 1100 | | ARLINGTON | VA | 22202 | |
| AMERICAN ARBITRATION ASSOCIATION, INC. | | 120 BROADWAY FLOOR 21 | | NEW YORK | NY | 10271 | |
| AMERICAN ENTERPRISE INVESTMENT SVCS | GREG WRAALSTAD | 901 3RD AVE SOUTH | | MINNEAPOLIS | MN | 55474 | |
| AMERICAN SAMOA GOVERNMENT OFFICE OF FINANCIAL INSTITUTIONS, DPT OF TREASURY | | EXECUTIVE OFFICE BUILDING | | PAGO PAGO | AS | 96799 | |
| AMICAZ GROUP LLC | | 317 OAK STREET | | NEPTUNE BEACH | FL | 32266 | |
| ANCHORAGE | | 101 S REID ST | STE 307 | SIOUX FALLS | SD | 57103-7045 | |
| ANCHORAGE DIGITAL BANK | | 101 S REID ST | STE 307 | SIOUX FALLS | SD | 57103-7045 | |
| ANCHORAGE DIGITAL BANK | | PO BOX 2623 | | SAN FRANCISCO | CA | 94126-2623 | |
| ANGRY PUG SPORTSWEAR LLC | | 15138 GRAYOAK FOREST | | SAN ANTONIO | TX | 78248 | |
| AON CONSULTING INC. | | PO BOX 100137 | | PASADENA | CA | 91189 | |
| AON CONSULTING, INC. ("RADFORD") | | THE LEADENHALL BUILDING | 122 LEADENHALL STREET | LONDON | | EC3V 4AN | UNITED KINGDOM |
| APEX CLEARING CORPORATION | ATTN: BRIAN DARBY | ONE DALLAS CENTER | 350 M. ST. PAUL, SUITE 1300 | DALLAS | TX | 75201 | |
| APP ANNIE INC. | | 23 GEARY STREET | SUITE 800 | SAN FRANCISCO | CA | 94109 | |
| APPLE INC [APPLE DISTRIBUTION INTERNATIONAL LTD.] | ATTN: GABRIEL ALDANA | 1 ALHAMBRA PLAZA | | CORAL GABLES | FL | 33134 | |
| APPLE INC [APPLE DISTRIBUTION INTERNATIONAL LTD.] | ATTN: JESSICA FINK | 11 PENN PLAZA | | NEW YORK | NY | 10001 | |
| APPLE INC. | | ONE APPLE PARK WAY | | CUPERTINO | CA | 95014 | |
| APPLE INC. | | ONE APPLE PARK WAY | | CUPERTINO | CA | 95014 | |
| APPLE SEARCH ADS | | ONE APPLE PARK WAY CUPERTINO | | CUPERTINO | CA | 95014 | |
| APPLE SEARCH ADS | | ONE APPLE PARK WAY CUPERTINO | | CUPERTINO | CA | 95014 | |
| APPS FLYER INC. | | 100 1ST STREET | 25TH FLOOR | SAN FRANCISCO | CA | 94105 | |
| APPSFLYER INC | | 300 PARK AVE SOUTH | 8TH FLOOR | NEW YORK | NY | 10010 | |
| ARIANNA JONAE LLC | | 13603 MARINA POINTE DR | APT A411 | MARINA DEL REY | CA | 90292 | |
| ARIZONA ATTORNEY GENERAL | ATTN: CONSUMER PROTECTION & ADVOCACY | 2005 N CENTRAL AVENUE | | PHOENIX | AZ | 85004 | |
| ARIZONA ATTORNEY GENERAL | ATTN: CONSUMER PROTECTION & ADVOCACY | 400 WEST CONGRESS | SOUTH BUILDING, SUITE 315 | TUCSON | AZ | 85701-1367 | |
| ARIZONA CORPORATION COMMISSION, CORPORATIONS DIVISION | | 1300 W. WASHINGTON STREET | | PHOENIX | AZ | 85007-2996 | |
| ARIZONA DEPARTMENT OF FINANCIAL INSTITUTIONS | | 100 N. 15TH AVENUE | SUITE 261 | PHOENIX | AZ | 85007 | |
| ARIZONA DEPARTMENT OF REVENUE | ATTN: LORRAINE AVERITT | 1600 W. MONROE 7TH FLOOR | | PHOENIX | AZ | 85007 | |
| ARIZONA SECURITIES DIVISION | MARK DINELL, DIRECTOR OF SECURITIES | 1300 WEST WASHINGTON STREET | THIRD FLOOR | PHOENIX | AZ | 85007 | |
| ARKANSAS AUDITOR OF STATE | UNCLAIMED PROPERTY DIVISION | 1401 W CAPITOL AVE, STE 325 | | LITTLE ROCK | AR | 72201 | |
| ARKANSAS SECRETARY OF STATE, BUSINESS DEPARTMENT | | 500 WOODLANE AVENUE | SUITE 256 | LITTLE ROCK | AR | 72201 | |
| ARKANSAS SECURITIES DEPARTMENT | CAMPBELL MCLAURIN, III, INTERIM COMMISSIONER | 1 COMMERCE WAY | SUITE 402 | LITTLE ROCK | AR | 72202 | |
| ARKANSAS STATE BANK DEPARTMENT | | 1 COMMERCE WAY | STE 303 | LITTLE ROCK | AR | 72202-2084 | |
| ARROW SEARCH PARTNERS | | 530 5TH AVENUE | | NEW YORK | NY | 10036 | |
| ARROW SEARCH PARTNERS | | 530 5TH AVENUE | FLOOR 9 | NEW YORK | NY | 10036 | |
| ARROW SEARCH PARTNERS | | 530 5TH AVENUE | FLOOR 9 | NEW YORK | NY | 10036 | |
| ASCENSION APS | | POPPEL ALLE 28 | | HARESKOV | | 3500 | DENMARK |
| ASCENSION APS | | POPPEL ALLE 28 | | HARESKOV | | 3500 | DENMARK |
| ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA | CVR NO. 25 34 85 59 | 400 6TH STREET, NW | | WASHINGTON | DC | 20001 | |
| ATTORNEY GENERAL'S OFFICE | ATTN: OFFICE OF CONSUMER PROTECTION | STATE OF ALABAMA | 501 WASHINGTON AVENUE | MONTGOMERY | AL | 36104 | |
| ATTORNEY GENERAL'S OFFICE | ATTN: CONSUMER INTEREST DIVISION | 323 CENTER STREET SUITE 200 | | LITTLE ROCK | AR | 72201 | |
| AURA SUB, LLC | ATTN: CONSUMER PROTECTION DIVISION | 2553 DULLES VIEW DRIVE | SUITE 400 | HERNDON | VA | 20171 | |
| AURA SUB, LLC | | AURA IDENTITY GUARD | 2553 DULLES VIEW DRIVE 4TH FL | HERNDON | VA | 20171 | |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

≡ STRETTO

**Exhibit G**
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| AURA SUB, LLC | AURA IDENTITY GUARD | 2553 DULLES VIEW DRIVE 4TH FL | | HERNDON | VA | 20171 | |
| AUTHENTICM, INC. | | 333 TWIN DOLPHIN DR #112 | | REDWOOD CITY | CA | 94065 | |
| BAKER & MCKENZIE LLP | | TWO EMBARCADERO CENTER, 11TH FLOOR | | SAN FRANCISCO | CA | 94111-3802 | |
| BAREFOOT LLC | BAREFOOT PROXIMITY | 700 W PETE ROSE WAY | | CINCINNATI | OH | 45203 | |
| BARO1905 | | NEVZAT GUNGOR CADDESI | | AGRI | | 04100 | TURKEY |
| BATEMAN CAPITAL INC | | 392 THORNHILL WOOD DRIVE | | THORNHILL | ON | L4J 9A6 | CANADA |
| BATEMAN CAPITAL INC | GOOD | 392 THORNHILL WOOD DRIVE | | THORNHILL | ON | L4J 9A6 | CANADA |
| BATES GROUP LLC | | 10220 SW GREENBURG RD | | PORTLAND | OR | 97223-5562 | |
| BATES GROUP LLC (F.K.A. CORCOM) | | 10220 SW GREENBURG RD | STE 200 | PORTLAND | OR | 97223-5562 | |
| BATES GROUP LLC [CORCOM, LLC] | ATTN: BRANDI REYNOLDS | 10220 SW GREENBURG RD | STE 200 | PORTLAND | OR | 97223 | |
| BC TRUCKS | | 346 LAWRENCE AVE SUITE 100 | | KELOWNA | BC | V1Y 6L4 | CANADA |
| BD VENTURES LIMITED | | PO BOX 10008 | CRICKET SQUARE GRAND | WILLOW HOUSE | CAYMAN | KY1-1001 | CAYMAN ISLANDS |
| BDA INTERNATIONAL | | 347 5TH AVE | STE 1402-415 | NEW YORK | NY | 10016 | |
| BDA INTERNATIONAL | | 375 5TH AVENUE | SUITE 1402 | NEW YORK | NY | 10016 | |
| BDA INTERNATIONAL, INC. | | 347 5TH AVE | SUITE 1402-15 | NEW YORK | NY | 10016 | |
| BDA INTERNATIONAL INC | | 347 5TH AVE | SUITE 1402-15 | NEW YORK | NY | 10016 | |
| BEEKMAN SOCIAL | | 1401 FORAH WAY | STE 503 | WEST PALM BCH | FL | 33401-2324 | |
| BEEKMAN SOCIAL | | 584 BROADWAY | #901 | NEW YORK | NY | 10012 | |
| BEEKMAN SOCIAL LLC | | 675 N LAKE WAY | | PALM BEACH | FL | 33480 | |
| BEEKMAN SOCIAL LLC | | 675 N LAKE WAY | | PALM BEACH | FL | 33480 | |
| BEHMER & BLACKFORD LLP | | 12526 HIGH BLUFF DRIVE | SUITE 300 | SAN DIEGO | CA | 92130 | |
| BERGEN COUNTY OFFICE OF CONSUMER PROTECTION | | ONE BERGEN COUNTY PLAZA | | HACKENSACK | NJ | 07601-7076 | |
| BERGEN COUNTY OFFICE OF CONSUMER PROTECTION | | ONE BERGEN COUNTY PLAZA | 5TH FLOOR RM 580 | HACKENSACK | NJ | 07601-7076 | |
| BERGER SINGERMAN LLP | | 201 E LAS OLAS BLVD | SUITE 1500 | FORT LAUDERDALE | FL | 33301 | |
| BERGER SINGERMAN LLP | | 201 EAST LAS OLAS BOULEVARD | SUITE 1500 | FORT LAUDERDALE | FL | 33301 | |
| BERK V. VOYAGER DIGITAL LLC | | SUPREME COURT OF CALIFORNIA, 350 MCALLISTER STREET, ROOM 1295 | ROOM 1295 | SAN FRANCISCO | CA | 94102 | |
| BERKELEY RESEARCH GROUP, LLC | | 2200 POWELL STREET | SUITE 1200 | EMERYVILLE | CA | 94608 | |
| BETTERINVESTING | | 570 KIRTS BLVD | STE 237 | TROY | MI | 48084 | |
| BEUTLER ENTERPRISES INC D/B/A BEUTLER INK | | PO BOX 1069 | | CROZET | VA | 22932 | |
| BEYOND STUDIOS | | 15 GREENE STREET 2R | | NEW YORK CITY | NY | 10013 | |
| BEYOND STUDIOS | | PO BOX 694 | | NEW YORK | NY | 10013 | |
| BIG OUTDOOR HOLDINGS, LLC | | 3811 TURTLE CREEK BLVD. | SUITE 1200 | DALLAS | TX | 75219 | |
| BIGOUTDOOR | | 3811 TURTLE CREEK BLVD | STE 1200 | DALLAS | TX | 75219-4424 | |
| BITGO PRIME, LLC | | 2443 ASH STREET | | PALO ALTO | CA | 94306 | |
| BITGO, INC. | | 2443 ASH ST | | PALO ALTO | CA | 94306 | |
| BLACKWIRED | | | DBS ASIA CENTRAL @ MARINA BAY FINANCIAL CENTRE TOWER 3 | | | | SINGAPORE |
| BLACKWIRED (US), INC. | ATTN: TERENCE LIM | 12 MARINA BOULEVARD | | NORTH OLMSTED | OH | 44070 | |
| BLAKE, CASSELS & GRADON LLP | | 24950 COUNTRY CLUB BLVD | SUITE 102 | NEW YORK | NY | 10022-3072 | |
| BLOCKCHAIN ASSOCIATION | | 126 E 56TH ST RM 17 | | NEW YORK | NY | 10022 | |
| BLOCKDAEMON INC. | | 1701 RHODE ISLAND AVE NW | | WASHINGTON | DC | 20036 | |
| BLOCKDAEMON INC. | | 6060 CENTER DRIVE | 10TH FLOOR | LOS ANGELES | CA | 90045 | |
| BLOCKDAEMON LIMITED | | 6060 CENTER DRIVE | 10TH FLOOR | LOS ANGELES | CA | 90045 | |
| BLOCKDAEMON, INC. | | 1055 WEST 7TH STREET | 33RD FLOOR | LOS ANGELES | CA | 90017 | |
| BLOCKDAEMON, INC. | | 1055 WEST 7TH STREET, 33RD FLOOR | | LOS ANGELES | CA | 90017 | |
| BLOCKWORKS ADVISORS LLC | | 240 KENT AVENUE | | BROOKLYN | NY | 11249 | |
| BLOCKWORKS GROUP LLC | | 20 WEST STREET | | NEW YORK | NY | 10004 | |
| BLOCKWORKS GROUP LLC | | 20 WEST STREET, 19M | | NEW YORK | NY | 10004 | |
| BLOOMBERG FINANCE L.P. | | PO BOX 416004 | | BOSTON | MA | 02241 | |
| BMO BANK OF MONTREAL | | 595 BURRARD STREET | | VANCOUVER | BC | V7X 1L7 | CANADA |
| BMO HARRIS BANK | ATTN: ANTONIO VIDAL | 885 WEST GEORGIA STREET | SUITE 1440 | VANCOUVER | BC | V6C 3E8 | CANADA |
| BMO NESBITT BURNS INC./CDS | CORPORATE ACTIONS | PHUTHORN PENKETT | 250 YONGE STREET, 14TH FL | TORONTO | ON | M5B 2M8 | CANADA |
| BNP PARIBAS | | NEW YORK BRANCH 8TH FLOOR | 525 WASHINGTON BLVD | JERSEY CITY | NJ | 07310 | |
| BNP PARIBAS | | NEW YORK BRANCH 9TH FLOOR | 525 WASHINGTON BLVD | JERSEY CITY | NJ | 07310 | |
| BNY MELLON | CORP ACTIONS | 525 WILLIAM PENN PLACE | SUITE 153-0400 | PITTSBURGH | PA | 15259 | |
| BNY MELLON WEALTH MANAGEMENT | OPERATIONS DEPT | BETH COYLE | TWO BNY MELLON CENTER, SUITE 1215 | PITTSBURGH | PA | 15222 | |
| BNYMELLON/WEALTH MANAGEMENT | KEVIN KELLY | CORPORATE ACTIONS | | PITTSBURGH | PA | 15258 | |
| BNYMELLON/WEALTH MANAGEMENT | MICHAEL KANIA | CORP ACTIONS | 525 WILLIAM PENN PLACE, SUITE 1215 | PITTSBURGH | PA | 15259 | |
| BOGANI APS | | BOGANIVEJ 8 | | RUNGSTED KYST | | 2960 | DENMARK |
| BPM LLP | | 2001 NORTH MAIN STREET | SUITE 360 | WALNUT CREEK | CA | 94596 | |
| BRADFORD CAPITAL HOLDINGS, LP | ATTN: BRIAN L. BRAGER | PO BOX 4353 | | CLIFTON | NJ | 07012 | |
| BREX, INC | ATTN: JONATHAN SMITH | PMB 15548 | 548 MARKET ST | SAN FRANCISCO | CA | 94104-5401 | |
| BRIGHTEDGE | | 989 E. HILLSDALE BLVD | SUITE 300 | FOSTER CITY | CA | 94404 | |
| BRIGHTEDGE TECHNOLOGIES, INC. | | 989 E HILLSDALE BLVD | SUITE 300 | SAN MATEO | CA | 94404 | |
| BRIGHTEDGE TECHNOLOGIES, INC. | | 989 E. HILLSDALE BLVD. | SUITE 300 | SAN MATEO | CA | 94404 | |
| BRILL ADVISORS, LLC | | 7901 4TH ST N | STE 300 | ST. PETERSBURG | FL | 33702 | |
| BROADRIDGE | | PO BOX 57401 | | TORONTO | ON | M5W 5M5 | CANADA |
| BROADRIDGE - USD | | PO BOX 416423 | | BOSTON | MA | 02241 | |
| BROADRIDGE INVESTOR COMMUNICATIONS CORPORATION | | 5 DAKOTA DRIVE | SUITE 300 | LAKE SUCCESS | NY | 11042 | |
| BROWARD COUNTY | | 1 N UNIVERSITY DRIVE | | PLANTATION | FL | 33324 | |
| BROWN BROTHERS HARRIMAN & CO. | ATTN: CONSUMER PROTECTION DIVISION | 525 WASHINGTON BLVD. | | JERSEY CITY | NJ | 07310 | |
| BROWN RUDNICK LLP | ATTN: JERRY TRAVERS | SIGMUND S. WISSNER-GROSS, KENNETH J. AULET | 7 TIMES SQUARE | NEW YORK | NY | 11036 | |
| BROWN RUDNICK LLP | ATTN: SIGMUND S. WISSNER-GROSS | 601 THIRTEENTH STREET NW, SUITE 600 | | WASHINGTON | DC | 20005 | |
| BTC MEDIA | ATTN: STEPHEN A. BEST, RACHEL O. WOLKINSON | 438 HOUSTON STREET SUITE 257 | | NASHVILLE | TN | 37203 | |
| BTC MEDIA, LLC | | 438 HOUSTON STREET | OFFICE 257 | NASHVILLE | TN | 37203 | |
| BTIG, LLC | | 600 MONTGOMERY STREET, 6TH FLOOR | | SAN FRANCISCO | CA | 94111 | |
| BUCKS COUNTY DEPARTMENT OF CONSUMER PROTECTION | | BUCKS COUNTY ADMINISTRATION BUILDING | 55 EAST COURT STREET | DOYLESTOWN | PA | 18901 | |
| BURLINGTON COUNTY OFFICE OF CONSUMER AFFAIRS | | 49 RANCOCAS ROAD | | MOUNT HOLLY | NJ | 08060 | |
| BURLINGTON COUNTY OFFICE OF CONSUMER AFFAIRS/WEIGHTS & MEASURES | | 49 RANCOCAS ROAD | | MOUNT HOLLY | NJ | 08060 | |
| BUSINESS WIRE, INC | | 101 CALIFORNIA STREET, 20TH FL | | SAN FRANCISCO | CA | 94111 | |
| CAC SPECIALTY CO. | | 3434 PEACHTREE ROAD NE | SUITE 1000 | ATLANTA | GA | 30326-1166 | |
| CALIFORNIA DEPARTMENT OF BUSINESS OVERSIGHT | C/O COBBS ALLEN CAPITAL, LLC | 1515 K STREET | | SACRAMENTO | CA | 95814 | |
| CALIFORNIA DEPARTMENT OF CONSUMER AFFAIRS | | 1625 NORTH MARKET BLVD | SUITE N 112 | SACRAMENTO | CA | 95834 | |
| CALIFORNIA DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION | CLOTHILDE V. HEWLETT, COMMISSIONER | 2101 ARENA BOULEVARD | SUITE 269 | SACRAMENTO | CA | 95834 | |
| CALIFORNIA SECRETARY OF STATE | | 1500 11TH STREET | | SACRAMENTO | CA | 95814 | |
| CALIFORNIA STATE CONTROLLER | UNCLAIMED PROPERTY DIVISION | 10600 WHITE ROCK RD, STE 141 | | RANCHO CORDOVA | CA | 95670 | |
| CAMPBELLS LEGAL (BVI) LIMITED | | FLOOR 4  BANCO POPULAR BUILDING | PO BOX 4467 | ROAD TOWN TORTOLA | VG | 1110 | VIRGIN ISLANDS, BRITISH |
| CAMPBELLS LLP | | FLOOR 4 | WILLOW HOUSE CRICKET SQUARE | GRAND CAYMAN | | KY1-9010 | CAYMAN ISLANDS |
| CAMPBELLS LLP | | FLOOR 4 | WILLOW HOUSE CRICKET SQUARE | GRAND CAYMAN | | KY1-9010 | CAYMAN ISLANDS |
| CANACCORD GENUITY CORP./CDS | BEN THIESSEN | 2200-609 GRANVILLE STREET | | VANCOUVER | BC | V7Y 1H2 | CANADA |
| CANADA REVENUE AGENCY | | PO BOX 3800 STN A | | SUDBURY | ON | P5A 0C3 | CANADA |
| CANADIAN SECURITIES EXCHANGE | | 100 KING STREET WEST | SUITE 7210 | TORONTO | ON | M5X-1E1 | CANADA |
| CAPE MAY COUNTY CONSUMER AFFAIRS | | 4 MOORE ROAD | | CAPE MAY COURT HOUSE | NJ | 08210 | |
| CAPE MAY COUNTY OFFICE OF CONSUMER AFFAIRS | | 4 MOORE ROAD DN 310 | | CAPE MAY | NJ | 08210 | |
| CARAVEL PARTNERS, A BPM TECHNOLOGY SOLUTIONS COMPANY | | 1 CALIFORNIA ST | STE 2500 | SAN FRANCISCO | CA | 94111-5426 | |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 2 of 15

≡ STRETTO

**Exhibit G**
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| CASSIDY V. VOYAGER DIGITAL LTD. AND VOYAGER DIGITAL LLC | | UNITED STATES COURTHOUSE, JAMES LAWRENCE KING BUILDING, TENTH FLOOR - COURTROOM 5, 99 N.E. FOURTH STREET | TENTH FLOOR - COURTROOM 5 | MIAMI | FL | 33132 | |
| CASSIDY V. VOYAGER DIGITAL LTD. AND VOYAGER DIGITAL LLC | | UNITED STATES COURTHOUSE, JAMES LAWRENCE KING BUILDING, TENTH FLOOR - COURTROOM 5, 99 N.E. FOURTH STREET | TENTH FLOOR - COURTROOM 5 | MIAMI | FL | 33132 | |
| CATAMORPHIC CO., DBA LAUNCHDARKLY | | 1999 HARRISON ST. | SUITE 1100 | OAKLAND | CA | 94612 | |
| CCM ADVISORY LLC | | 300 CREST ROAD | | RIDGEWOOD | NJ | 07450 | |
| CCM ADVISORY LLC | | 300 CREST ROAD | | RIDGEWOOD | NJ | 07450 | |
| CDS & CO | | 100 ADELAIDE ST W SUITE 300 | | TORONTO | ON | M5H 1S3 | CANADA |
| CDS CLEARING & DEPOSITORY SERVICES | NCI ACCOUNT | 100 ADELAIDESTREET WEST | | TORONTO | ON | M5H 1S3 | CANADA |
| CDS CLEARING AND DEPOSITORY SVCS | LORETTA VERELLI | 600 BOUL DE MAISONNEUVE | OUEST BUREAU 210 | MONTREAL | QC | H3A 3J2 | CANADA |
| CDW | | 200 N. MILWAUKEE AVE | | VERNON HILLS | IL | 60061 | |
| CDW, LLC | | PO BOX 75723 | | CHICAGO | IL | 60675-5723 | |
| CEDE & CO | | 570 WASHINGTON BLVD | | JERSEY CITY | NJ | 07310 | |
| CEDE & CO | | 570 WASHINGTON BLVD | | JERSEY CITY | NJ | 07310 | |
| CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS | ATTN: PAUL ADAMEC | 500 TECHNOLOGY DRIVE | | WELDON SPRING | MO | 63304 | |
| CELLCO PARTNERSHIP DBA VERIZON WIRELESS | | ONE VERIZON WAY | | BASKING RIDGE | NJ | 07920 | |
| CELSIUS | | 35 GREAT ST. HELEN'S | | LONDON | | EC3A 6AP | UNITED KINGDOM |
| CELSIUS NETWORK LLC | C/O AKIN GUMP STRAUSS HAUER & FELD LLP | ATTN: MITCHELL P. HURLEY & DEAN L. CHAPMNA JR. | ONE BRYANT PARK | NEW YORK | NY | 10036 | |
| CERTIFIED KERNEL TECH LLC | | 1001 AVE OF THE AMERICAS | SUITE 1801 | NEW YORK | NY | 10018 | |
| CERTIFIED KERNEL TECH LLC ("CERTIK") | | 1001 AVE OF THE AMERICAS | SUITE 1801 | NEW YORK | NY | 10018 | |
| CETERA INVESTMENT SERVICES LLC | ANGELA HANDELAND | SUPERVISOR | 400 1ST STREET SOUTH, STE 300 | ST. CLOUD | MN | 56301 | |
| CEXIO | | 33 ST. JAMES'S SQUARE | | LONDON | | SW1Y 4JS | UNITED KINGDOM |
| CHAINALYSIS US | | 228 PARK AVE S, #23474 | | NEW YORK | NY | 10003 | |
| CHAINANALYSIS INC. | | 114 5TH AVE | 18TH FLOOR | NEW YORK | NY | 10011 | |
| CHAMELEON COLLECTIVE CONSULTING LLC | | 10012 NW 2ND ST | | PLANTATION | FL | 33324 | |
| CHANG TSI & COMPANY | | 6-8 FLOOR TOWER A | HUNDRED ISLAND PARK BEI ZHAN BEI JIE STREET | XICHENG DISTRICT | BEIJING | 100044 | CHINA |
| CHARLES SCHWAB & CO., INC. | CHRISTINA YOUNG | 2423 E LINCOLN DRIVE | | PHOENIX | AZ | 85016-1215 | |
| CHARLES SCHWAB & CO., INC. | CORPORATE ACTIONS DEPT.: 01-1B572 | CHRISTINA YOUNG | 2423 E LINCOLN DRIVE | PHOENIX | AZ | 85016-1215 | |
| CHEROKEE DEBT ACQUISITION, LLC | | 1384 BROADWAY SUITE 906 | | NEW YORK | NY | 10018 | |
| CHORD ADVISORS LLC | | 3300 IRVINE AVE STE 350 | | NEWPORT BEACH | CA | 92660 | |
| CIRRUS GROUP CONSULTING, INC. | | 4020 CALLE BIENVENIDO | | SAN CLEMENTE | CA | 92673 | |
| CISION | | 180 N. STETSON AVE | SUITE 1350 | CHICAGO | IL | 60601 | |
| CITIBANK, N.A. | SHERIDA SINANAN | 3801 CITIBANK CENTER | B/3RD FLOOR/ZONE 12 | TAMPA | FL | 33610 | |
| CITIGATE DEWE ROGERSON LTD | | 26 SOUTHAMPTON BUILDING | 8TH FLOOR | LONDON | | WC2A 1AN | UNITED KINGDOM |
| CITIGATE DEWE ROGERSON LTD | | 26 SOUTHAMPTON BUILDING, 8TH FLOOR | | LONDON | | WC2A 1AN | UNITED KINGDOM |
| CITIGROUP GLOBAL MKTS, INC/CLEARING | CORRESPONDENT CLEARING | 388 GREENWICH STREET, 11TH FLOOR | | NEW YORK | NY | 10013 | |
| CITRIX | | 851 CYPRESS CREEK ROAD | | FORT LAUDERDALE | FL | 33309 | |
| CITY OF BOSTON | ATTN: CONSUMER AFFAIRS | 1 CITY HALL SQUARE, ROOM 809 | | BOSTON | MA | 02201 | |
| CITY OF CAMBRIDGE | ATTN: CONSUMERS COUNCIL | 795 MASSACHUSETTS AVE. | | CAMBRIDGE | MA | 02139 | |
| CITY OF CHICAGO | ATTN: BUSINESS AFFAIRS AND CONSUMER PROTECTION | 121 N. LASALLE STREET | 8TH FLOOR | CHICAGO | IL | 60602 | |
| CITY OF REVERE | ATTN: CONSUMER AFFAIRS | 281 BROADWAY | | REVERE | MA | 02151 | |
| CITY OF SPRINGFIELD | ATTN: MAYOR'S OFFICE OF CONSUMER PROTECTION | CITY HALL, ROOM 315 | 36 COURT STREET | SPRINGFIELD | MA | 01103 | |
| CLOUD POSSE, LLC | | 340 S LEMON AVE | SUITE 1430 | WALNUT | CA | 91789 | |
| CLOUD POSSE, LLC | | 340 S LEMON AVENUE | STE 1430 | WALNUT | CA | 91789 | |
| CLOUD POSSE, LLC | | 340 S LEMON AVENUE | STE 1430 | WALNUT | CA | 91789 | |
| CLOUDFLARE | | 101 TOWNSEND STREET | | SAN FRANCISCO | CA | 94107 | |
| CLOUDFLARE, INC. | | 101 TOWNSEND STREET | | SAN FRANCISCO | CA | 94107 | |
| CLOUDINARY | | 3400 CENTRAL EXPRESSWAY | SUITE 110 | SANTA CLARA | CA | 95051 | |
| CNW GROUP LTD. | | 88 QUEENS QUAY W #3000 | | TORONTO | ON | M5J 0B8 | CANADA |
| CNW GROUP LTD. | | 88 QUEENS QUAY W #3000 | | TORONTO | ON | M5J 0B8 | CANADA |
| CNW GROUP LTD. | | 88 QUEENS QUAY STREET | SUITE 3 RBC WATERPARK PLACE | TORONTO | ON | M5J 0B8 | CANADA |
| COCKROACH LABS, INC. | | 125 W 25TH STREET | FL 11 | NEW YORK | NY | 10001 | |
| COCKROACH LABS, INC. | | 125 W 25TH STREET | FLOOR 11 | NEW YORK | NY | 10001 | |
| CODING LOBSTER | | 19 DUTCH ST | SUITE 59C | NEW YORK | NY | 10038 | |
| CODING LOBSTER, LLC | | 113 NASSAU ST | | NEW YORK | NY | 10038 | |
| COIN LEDGER, INC. | ATTENTION: DAVID R. KEMMERER | 1336 NE 106TH TERRACE | | KANSAS CITY | MO | 64155 | |
| COINBASE INC. | | 548 MARKET ST. | #23008 | SAN FRANCISCO | CA | 94104 | |
| COINBOUND INC | | 3499 TENTH ST | | RIVERSIDE | CA | 92501 | |
| COLORADO DEPARTMENT OF LAW | ATTN: CONSUMER PROTECTION SECTION | RALPH L. CARR COLORADO JUDICIAL CENTER, 9TH FL | 1300 BROADWAY | DENVER | CO | 80203 | |
| COLORADO DIVISION OF BANKING | | 1560 BROADWAY, SUITE 975 | | DENVER | CO | 80202 | |
| COLORADO DIVISION OF SECURITIES | TUNG CHAN, SECURITIES COMMISSIONER | 1560 BROADWAY | SUITE 900 | DENVER | CO | 80202 | |
| COLORADO STATE TREASURY | UNCLAIMED PROPERTY DIVISION | 200 E. COLFAX AVE RM 141 | | DENVER | CO | 80203-1722 | |
| COMMISSION FOR PROTECTION OF COMPETITION | | SAVSKA 25 | | BELGRADE | | 11000 | SERBIA |
| COMMODITY FUTURES TRADING COMMISSION | | THREE LAFAYETTE CENTRE | 1155 21ST STREET, NW | WASHINGTON | DC | 20581 | |
| COMMONWEALTH OF KENTUCKY, DEPARTMENT OF FINANCIAL INSTITUTIONS VS. VOYAGER DIGITAL LLC, ET AL. | | 500 METRO STREET | | FRANKFORT | KY | 40601 | |
| COMMONWEALTH OF KENTUCKY, DEPARTMENT OF FINANCIAL INSTITUTIONS VS. VOYAGER DIGITAL LLC, ET AL. | | 500 METRO STREET | | FRANKFORT | KY | 40601 | |
| COMMONWEALTH OF KENTUCKY, DEPARTMENT OF FINANCIAL INSTITUTIONS VS. VOYAGER DIGITAL LLC, ET AL. | | 500 METRO STREET | | FRANKFORT | KY | 40601 | |
| COMMONWEALTH OF MASSACHUSETTS | OFFICE OF THE TREASURER AND RECEIVER GENERAL - DEBORAH B. GOLDBERG | ADMINISTRATIVE OFFICE | 1 ASHBURTON PLACE, 12TH FLOOR | BOSTON | MA | 02108 | |
| COMPLEX SPORTS & ENTERTAINMENT | | PO BOX 21528 | | WINSTON SALEM | NC | 27120 | |
| COMPLIANCE EXCHANGE GROUP, LLC | | 150 MOTOR PARKWAY | SUITE 401 | HAUPPAUGE | NY | 11788 | |
| COMPTROLLER OF MARYLAND | UNCLAIMED PROPERTY | STATE OFFICE BLDG | 301 W PRESTON STREET, ROOM 310 | BALTIMORE | MD | 21201-2384 | |
| COMPUTERSHARE | | 100 UNIVERSITY AVE, 11TH FLOOR SOUTH TOWER | | TORONTO | ON | M5J-2Y1 | CANADA |
| COMPUTERSHARE TRUST COMPANY OF CANADA | | 100 UNIVERSITY AVE | 8TH FLOOR | TORONTO | ON | M5J 2Y1 | CANADA |
| CONCARE HOLDING APS | | C/O POUL SCHMITH | | KALVEBOD | BRYGGE | 32 V1560 | DENMARK |
| CONCARE HOLDING APS | C/O POUL SCHMITH | KALVEBOD | | KALVEBOD | BRYGGE | 32 V1560 | DENMARK |
| CONCUR TECHNOLOGIES, INC. | | 601 108TH AVENUE NE STE 1000 | | BELLEVUE | WA | 98004 | |
| CONCUR TECHNOLOGIES, INC. | | 601 AVENUE 108TH AVE NE | SUITE 1000 | BELLEVUE | WA | 98004 | |
| CONEXION | | 75 STATE ST | | BOSTON | MA | 2109 | |
| CONNECTICUT DEPARTMENT OF BANKING | | 260 CONSTITUTION PLAZA | | HARTFORD | CT | 06103-1800 | |
| CONNECTICUT SECRETARY OF STATE, COMMERCIAL RECORDING DIVISION | | 165 CAPITOL AVENUE SUITE 1000 | PO BOX 150470 | HARTFORD | CT | 06115-0470 | |
| CONNECTICUT SECURITIES & BUSINESS INVESTMENTS DIVISION | LYNN MCKENNA-KRUMINS, DIRECTOR OF SECURITIES | 260 CONSTITUTION PLAZA | | HARTFORD | CT | 06103-1800 | |
| CONNECTICUT STATE DEPARTMENT OF CONSUMER PROTECTION | ATTN: MICHELLE H. SEAGULL, COMMISSIONER | 450 COLUMBUS BOULEVARD | SUITE 901 | HARTFORD | CT | 06103-1840 | |
| CONSELO MB LLC | | CONSELLO MB LLC, ATTN: GENERAL COUNSEL | 590 MADISON AVENUE | NEW YORK | NY | 10022 | |
| CONSUMER FINANCIAL PROTECTION BUREAU | | 1700 G ST. NW | | WASHINGTON | DC | 20552 | |
| CONSUMER PROTECTION AND FAIR TRADE AUTHORITY | | 5 NAHUM HAFTZADI STREET | | JERUSALEM | | 9548401 | ISRAEL |
| CONSUMER PROTECTION ASSOCIATION | | CPA HOUSE | NORTH BRIDGE STREET, SHEFFORD | BEDFORDSHIRE | | SG17 5DQ | UNITED KINGDOM |
| CONSUMER PROTECTION SERVICE | | 6 ANDREA ARAOUZOU STREET | | LEFKOSIA | | NICOSIA | CY | 1421 | CYPRUS |
| CONTRA COSTA COUNTY DISTRICT ATTORNEY'S OFFICE | ATTN: CONSUMER PROTECTION (CIVIL) UNIT | 900 WARD STREET | | MARTINEZ | CA | 94553 | |
| CONTRARIAN FUNDS, LLC | ATTN: ALPA JIMENEZ | 411 WEST PUTNAM AVENUE, SUITE 425 | | GREENWICH | CT | 06830 | |
| CONYERS DILL & PEARMAN | | PO BOX 3140 | COMMERCE HOUSE WICHAMS CAY 1 | ROAD TOWN TORTOLA | | VG1110 | BRITISH INDIAN OCEAN TERRITORY |
| COPPER TECHNOLOGIES (UK) LIMITED | | 64 NORTH ROW | 3RD FLOOR | LONDON | | W1K 7DA | UNITED KINGDOM |
| COR CLEARING LLC | ANH MECHALS | 9300 UNDERWOOD AVENUE | SUITE 400 | OMAHA | NE | 68114 | |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 3 of 15

≡ STRETTO

**Exhibit G**
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| CORCOM LLC | | 1855 EAST MAIN STREET | STE 14 | SPARTANBURG | SC | 29307 | |
| CORPAY ONE, INC. | | 3280 PEACHTREE RD | SUITE 2400 | ATLANTA | GA | 30305 | |
| CREATIVE CIRCLE, LLC | | 5900 WILSHIRE BOULEVARD | 11TH FLOOR | LOS ANGELES | CA | 90036 | |
| CREATIVE CIRCLE LLC | | PO BOX 74008799 | | CHICAGO | IL | 60674 | |
| CREDENTIAL SECURITIES INC./CDS | CORPORATE ACTIONS | 700 – 1111 WEST GEORGIA ST | | VANCOUVER | BC | V6E 4T6 | CANADA |
| CRYPTO RATING COUNCIL | | 100 PINE STREET | SUITE 1250 | SAN FRANCISCO | CA | 94111 | |
| CSC | | PO BOX 7410023 | | CHICAGO | IL | 60674-5023 | |
| CSC | | PO BOX 7410023 | | CHICAGO | IL | 60674-5023 | |
| CSC (CORP SERVICE COMPANY) | | PO BOX 14677 | | LEXINGTON | KY | 405 12-4677 | |
| CUMBERLAND COUNTY DEPARTMENT OF CONSUMER AFFAIRS | | 220 NORTH LAUREL STREET | | BRIDGETON | NJ | 08302 | |
| CUMBERLAND COUNTY DIVISION OF CONSUMER AFFAIRS | | 164 W. BROAD ST | | BRIDGETON | NJ | 08302 | |
| CUYAHOGA COUNTY CONSUMER AFFAIRS | | 2079 EAST NINTH STREET | | CLEVELAND | OH | 44115 | |
| CXG HOLDINGS, INC. | | 150 MOTOR PARKWAY | | HAUPPAUGE | NY | 11788 | |
| CYBER JOB CENTRAL | COMPLIANCE EXCHANGE GROUP | 20 SYCAMORE LN | | GLENMOORE | PA | 19343 | |
| CYBER JOB CENTRAL, LLC | | 25 WASHINGTON LANE SUITE 307 | | WYNCOTE | PA | 19095 | |
| CYPRESS GROUP STAFFING | | 1460 BROADWAY | 12TH FLOOR | NEW YORK | NY | 10036 | |
| CYPRESS GROUP STAFFING, INC. | | 1460 BROADWAY, 12TH FLOOR | | NEW YORK | NY | 10036 | |
| CYPRESS GROUP STAFFING, INC. | | PO BOX 1120 | | RIVERSIDE | CT | 06878 | |
| CYPRUS SECURITIES AND EXCHANGE COMMISSION | | 19 DIAGOROU STR. | | NICOSIA | CY | 1097 | CYPRUS |
| D. A. DAVIDSON & CO. | RITA LINSKEY | 8 THIRD STREET NORTH | | GREAT FALLS | MT | 59401 | |
| D.C. DEPARTMENT OF INSURANCE, SECURITIES AND BANKING | ATTN: STEPHEN BOUCHARD AND DAVID PETER O'BRIEN | 1050 FIRST STREET, NE, SUITE 801 | | WASHINGTON | DC | 20002 | |
| D.C. DEPARTMENT OF INSURANCE, SECURITIES AND BANKING | C/O D.C. OFFICE OF ATTORNEY GENERAL | ATTN: NANCY ALPER | 400 6TH ST., NW, SUITE 1010S | WASHINGTON | DC | 20001 | |
| D.C. DEPARTMENT OF INSURANCE, SECURITIES AND BANKING | C/O D.C. OFFICE OF ATTORNEY GENERAL | ATTN: NANCY ALPER | 400 6TH STREET, N.W., SUITE 1010S | WASHINGTON | DC | 20001 | |
| D.C. DEPARTMENT OF INSURANCE, SECURITIES AND BANKING | C/O D.C. OFFICE OF ATTORNEY GENERAL | ATTN: NANCY ALPER | 400 6TH STREET, N.W., SUITE 1010S | WASHINGTON | DC | 20001 | |
| D.C. DEPARTMENT OF INSURANCE, SECURITIES AND BANKING | C/O THE OFFICE OF THE ATTORNEY GENERAL | ATTN: NANCY ALPER | 400 6TH STREET, N.W., SUITE 1010S | WASHINGTON | DC | 20001 | |
| DAJAX LLC | | 28 TYLER RD | | LEXINGTON | MA | 02420 | |
| DALLAS MAVERICKS | | 1333 N. STEMMONS FWY. | SUITE 105 | DALLAS | TX | 75207 | |
| DALLAS MAVERICKS | DALLAS BASKETBALL LIMITED | 1333 N STEMMONS FWY | STE 105 | DALLAS | TX | 75207 | |
| DATA.AI INC. (FORMERLY KNOWN AS APP ANNIE INC.) | DATA.AI INC. | 44 MONTGOMERY STREET, 3RD FLOOR | | SAN FRANCISCO | CA | 94104 | |
| DATADOG, INC. | | 620 8TH AVE | 45TH FLOOR | NEW YORK | NY | 10018 | |
| DATADOG, INC. | | 620 8TH AVENUE 45TH FLOOR | | NEW YORK | NY | 10018 | |
| DATASITE | | BAKER CENTER | 733 S. MARQUETTE AVE SUITE 600 | MINNEAPOLIS | MN | 55402 | |
| DATTELS & CO LIMITED | | 25 KING ST W PO BOX 405 | PO BOX 405 | TORONTO | ON | M5L 1G3 | CANADA |
| DAVERSA PARTNERS | | 330 MADISON AVENUE | 25TH FLOOR | NEW YORK | NY | 10017 | |
| DAVERSA PARTNERS | | 55 GREENS FARMS RD, 2ND FLR | | WESTPORT | CT | 06880 | |
| DAY PITNEY LLP | | ONE JEFFERSON ROAD | | PARSIPPANY | NJ | 07054 | |
| DAY PITNEY LLP | | ONE JEFFERSON ROAD | | PARSIPPANY | NJ | 07054 | |
| DBA. ALREADY DESIGN CO. | | 1015 E ROAD TO SIX FLAGS | | ARLINGTON | TX | 76011 | |
| DBA. ALREADY DESIGN CO. | | 1015 E ROAD TO SIX FLAGS | | ARLINGTON | TX | 76011 | |
| DC DEPARTMENT OF INSURANCE, SECURITIES AND BANKING | ATTN: STEPHEN BOUCHARD AND DAVID O'BRIEN | 1050 FIRST STREET, NE, SUITE 801 | | WASHINGTON | DC | 20002 | |
| DC DEPARTMENT OF INSURANCE, SECURITIES & BANKING | ATTN: NANCY L. ALPER | 400 6TH STREET NW | | WASHINGTON | DC | 20001 | |
| DC DEPARTMENT OF INSURANCE, SECURITIES & BANKING | ATTN: STEPHEN BOUCHARD | 1050 FIRST STREET NE | | WASHINGTON | DC | 20002 | |
| DCG INTERNATIONAL INVESTMENTS LTD | | 3 MILL CREEK ROAD | | PEMBROKE PARISH | HM05 | | BERMUDA |
| DE SOUSA V. VOYAGER DIGITAL LTD. ET AL. | | 275 DUNDAS STREET, UNIT 1 | UNIT 1 | LONDON | ON | N6B 3L1 | CANADA |
| DECHERT (PARIS) LLP | | 32 RUE DE MONCEAU | | PARIS | | 75008 | FRANCE |
| DECLARATIVE RECRUITMENT | | 10875 71ST AVE | | SEMINOLE | FL | 33772 | |
| DELAWARE COUNTY OFFICE OF CONSUMER AFFAIRS | | GOVERNMENT CENTER BUILDING | 201 WEST FRONT STREET | MEDIA | PA | 19063 | |
| DELAWARE DEPARTMENT OF JUSTICE | ATTN: FRAUD AND CONSUMER PROTECTION UNIT | CARVEL STATE BUILDING | 820 N. FRENCH ST. | WILMINGTON | DE | 19801 | |
| DELAWARE DEPT OF FINANCE | OFFICE OF UNCLAIMED PROPERTY | PO BOX 8931 | | WILMINGTON | DE | 19899-8931 | |
| DELAWARE INVESTOR PROTECTION UNIT | JILLIAN LAZAR, DIRECTOR OF INVESTOR PROTECTION | CARVEL STATE OFFICE BUILDING | 820 NORTH FRENCH STREET, 5TH FL. | WILMINGTON | DE | 19801 | |
| DELAWARE OFFICE OF THE STATE BANK COMMISSIONER | | 1110 FORREST AVENUE | | DOVER | DE | 19904 | |
| DELAWARE SECRETARY OF STATE | DIVISION OF CORPORATIONS | 401 FEDERAL STREET - SUITE 4 | | DOVER | DE | 19901 | |
| DELOITTE & TOUCHE LLP | | PO BOX 844708 | | DALLAS | TX | 75284-4708 | |
| DELTON & RUTH ANN MARTIN JT TEN | | RUTH ANN MARTIN JT TEN | 4463 EDWARDS RD | GREENWICH | OH | 44837 | |
| DENVER DISTRICT ATTORNEY | ATTN: CONSUMER PROTECTION | 201 W. COLFAX AVENUE | 8TH FLOOR | DENVER | CO | 80202 | |
| DEPARTMENT OF CONSUMER AFFAIRS | CONSUMER INFORMATION DIVISION | 1625 NORTH MARKET BLVD. | SUITE 112 | SACRAMENTO | CA | 95834 | |
| DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS | | 1100 4TH STREET, SW | | WASHINGTON | | 20024 | |
| DEPARTMENT OF INSURANCE, SECURITIES AND BANKING | DAVID O'BRIEN | DISTRICT OF COLUMBIA DEPARTMENT OF INSURANCE, SECURITIES AND BANKING | 1050 FIRST STREET, NE, 801 WASHINGTON | WASHINGTON | DISTRICT OF COLUMBIA | 20002 | |
| DESIREE FIRE | DESIREE FIRE | 13740 SARITA DR, B | 13740 SARITA DR | DHS | RIVERSIDE | CA | |
| DEUTSCHE BANK AG NY/CEDEAR | JOHN BINDER | VICE PRESIDENT | 100 PLAZA ONE, 2ND FL | JERSEY CITY | NJ | 07311 | |
| DEVANHA HOLDINGS LTD | | 630 MILLBANK | | VANCOUVER | BC | V5Z 4B7 | CANADA |
| DEVEXPERTS SOFIA LTD | | 109 BULGARIA BLVD | VERTIGO BUSINESS TOWER | SOFIA | SOFIA CITY | 1404 | BULGARIA |
| DEVEXPERTS SOFIA LTD. | | 109 BULGARIA BLVD FLOOR 15 | 1404 MANASTIRSKI LIVADI | SOFIA | | | BULGARIA |
| DEVEXPERTS SOFIA LTD. | | 109 BULGARIA BLVD FLOOR 15 | 1404 MANASTIRSKI LIVADI | SOFIA | | | BULGARIA |
| DEZENHALL RESOURCES | | 1201 CONNECT AVENUE NW | SUITE 600 | WASHINGTON | DC | 20036 | |
| DEZENHALL RESOURCES, LTD. | | 1202 CONNECTICUT AVE NW | SUITE 600 | WASHINGTON DC | DC | 20036 | |
| DIAMOND EQUITY RESEARCH, LLC | | 1441 BROADWAY, 3RD FLOOR | | NEW YORK | NY | 10018 | |
| DIANOMI INC. | | 135E 57TH STREET (14TH FLOOR) | | NEW YORK | NY | 10022 | |
| DIGICERT | | 281 NORTH THANKSGIVING WAY | SUITE 5 | LEHI | UT | 84043 | |
| DIGITAL NICHE AGENCY | | 4640 ADMIRALTY WAY | STE 500 | MARINA DL REY | CA | 90292-6636 | |
| DIGITAL257 TECHNOLOGIES INC | | 565 BURRARD ST, 16TH FLOOR | | VANCOUVER | BC | V7X-YL4 | CANADA |
| DINWIDDIE, INC | | 10960 WILSHIRE BLVD 5TH FLOOR | | LOS ANGELES | CA | 90024 | |
| DINWIDDIE, INC. | | 10960 WILSHIRE BLVD | 5TH FLOOR | LOS ANGELES | CA | 90024 | |
| DIRECTCASH BANK | | 736 MERIDIAN ROAD NE | | CALGARY | AB | T2A 2N7 | CANADA |
| DISTINGUISHED SEARCH LLC | | 500 EAST 4TH STREET | SUITE 563 | AUSTIN | TX | 78701 | |
| DISTRICT OF COLUMBIA | UNCLAIMED PROPERTY DIVISION | OFFICE OF THE CFO | 1350 PENNSYLVANIA AVE, NW STE 203 | WASHINGTON | DC | 20004 | |
| DISTRICT OF COLUMBIA - OFFICE OF TAX AND REVENUE | | 1101 4TH ST., SW, SUITE 270 WEST | | WASHINGTON | DC | 20024 | |
| DISTRICT OF COLUMBIA DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS, BUSINESS AND PROFESSIONAL LICENSING ADMINISTRATION | CORPORATIONS DIVISION | 1100 4TH STREET, SW, | | WASHINGTON | DC | 20024 | |
| DISTRICT OF COLUMBIA DEPARTMENT OF INSURANCE, SECURITIES & BANKING | STEPHEN BOUCHARD, ASSOCIATE COMMISSIONER FOR SECURITIES | 1050 FIRST STREET, NE | SUITE 801 | WASHINGTON | DC | 20002 | |
| DISTRICT OF COLUMBIA DEPARTMENT OF INSURANCE, SECURITIES AND BANKING | | 1050 FIRST STREET, NE, SUITE 801 | | WASHINGTON | DC | 20002 | |
| DISTRUST, LLC | | 2085 E BAYSHORE ROAD, #51687 | | PALO ALTO | CA | 94303 | |
| DITTO | | 1611 TELEGRAPH AVE | #600 | OAKLAND | CA | 94612 | |
| DOCKER INC. | | 3790 EL CAMINO REAL #1052 | | PALO ALTO | CA | 94306 | |
| DOCKER, INC. | | 3790 EL CAMINO REAL | | PALO ALTO | CA | 94306 | |
| DOCUSIGN | | 221 MAIN ST | SUITE 155 | SAN FRANCISCO | CA | 94105 | |
| DOCUSIGN INC. | | 221 MAIN STREET | SUITE 1000 | SAN FRANCISCO | CA | 94105 | |
| DOCUSIGN INC. | | 221 MAIN STREET | SUITE 1000 | SAN FRANCISCO | CA | 94105 | |
| DONNELLEY FINANCIAL SOLUTIONS CANADA CORPORATION | | 220 BAY STREET | SUITE 200 | TORONTO | ON | M5J 2W4 | CANADA |
| DONNELLEY FINANCIAL SOLUTIONS CANADA CORPORATION | | 220 BAY STREET | SUITE 200 | TORONTO | ON | M5J-2W4 | CANADA |
| DOTDIGITAL, INC | | 806 MACDONOUGH ST | APT 2R | BROOKLYN | NY | 11233-1670 | |
| DOTMAILER INC | | 806 MACDONOUGH ST | APT 2R | BROOKLYN | NY | 11233-1670 | |
| DOUBLESTRUCK DESIGNS | | 1002 BRADFORD PLACE | | JOELTON | TN | 37080 | |
| DOUGLAS COUNTY DISTRICT ATTORNEY'S OFFICE | ATTN: CONSUMER PROTECTION UNIT | 111 EAST 11TH STREET | | LAWRENCE | KS | 66044 | |
| DREUZY CAPITAL LLC | | C/O EAGLE BAY ADVISORS | 250 GREENWICH ST 46TH FLOOR | | NY | 10007 | |
| DREUZY CAPITAL LLC | C/O EAGLE BAY ADVISORS | C/O EAGLE BAY ADVISORS | 250 GREENWICH ST 46TH FLOOR | NEW YORK | NY | 10007 | |
| DREUZY DEVELOPMENT LLC | C/O EAGLE BAY ADVISORS | C/O EAGLE BAY ADVISORS | 250 GREENWICH ST 46TH FLOOR | | NY | 10007 | |
| DUANE MORRIS LLP | | 30 S 17TH ST FL 5 | | PHILADELPHIA | PA | 19103-4196 | |

≡ STRETTO

**Exhibit G**
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| DV CHAIN, LLC | | 425 S FINANCIAL PL | | CHICAGO | IL | 60605-1000 | |
| E*TRADE CLEARING LLC | C/O BROADRIDGE | ATTN: CORPORATE ACTIONS DEPT. | 2 JOURNAL SQUARE PLAZA, 5TH FL | JERSEY CITY | NJ | 07306 | |
| EDWARD D JONES & CO | | 12555 MANCHESTER RD | | DES PERES | MO | 07300 | |
| EDWARD D JONES & CO | | 12555 MANCHESTER RD | | DES PERES | MO | 63131 | |
| EDWARD D JONES & CO | | 12555 MANCHESTER ROAD | | ST LOUIS | MO | 63131 | |
| EDWARD D. JONES & CO. | DEREK ADAMS | CORPORATE ACTIONS | 201 PROGRESS PARKWAY | MARYLAND HEIGHTS | MO | 63043-3042 | |
| EDWARD D. JONES & CO. | ELIZABETH ROLWES | 201 PROGRESS PARKWAY | | MARYLAND HEIGHTS | MO | 63043-3042 | |
| ELASTIC | ELIZABETH ROLWES | 800 W EL CAMINO REAL | SUITE 350 | MOUNTAIN VIEW | CA | 94040 | |
| ELASTICSEARCH, INC | | 800 W EL CAMINO REAL | SUITE 350 | MOUNTAIN VIEW | CA | 94040 | |
| ELEVATE BRAND MARKETING | | 5418 SAINT CHARLES AVENUE | | DALLAS | TX | 75223 | |
| ELLENOFF GROSSMAN & SCHOLE LLP | | 1345 AVENUE OF THE AMERIC | | NEW YORK | NY | 10105 | |
| ENDEAVOR PARENT, LLC (DBA. IMG MODELS,LLC) | | 304 PARK AVENUE SOUTH | PENHOUSE NORTH 12TH FLOOR | NEW YORK | NY | 10010 | |
| EQS GROUP AG | | KARLSTRAßE 47 | | MÜNCHEN DEUTSCHLAND | | 80333 | GERMANY |
| ESSENTIAL ACCESSIBILITY | | 658 DANFORTH AVENUE | SUITE 200 | TORONTO | ON | M4J 5B9 | CANADA |
| ESSENTIAL ACCESSIBILITY INC | | 658 DANFORTH AVENUE | SUITE 200 | TORONTO | ON | M4J-5B9 | CANADA |
| ESSENTIAL ACCESSIBILITY INC | | 83 YONGE STREET | SUITE 300 | TORONTO | ON | M5C-1S8 | CANADA |
| ESSEX COUNTY DIVISION OF CITIZEN SERVICES | | 50 SOUTH CLINTON STREET | SUITE S400 | EAST ORANGE | NJ | 07018 | |
| ESSEX COUNTY DIVISION OF CITIZEN SERVICES | ATTN: CONSUMER PROTECTION | 465 DR. MARTIN LUTHER KING, JR. BOULEVARD | | NEWARK | NJ | 07102 | |
| ETHOS.IO PTE, LTD. | SHINGO LAVINE | 11040 BOLLINGER CANYON ROAD, SUITE E882 | | SAN RAMON | CA | 94582 | |
| ETHOS.IO PTE. LTD. [GREEN GATE MANAGEMENT, AMANO GLOBAL HOLDINGS INC.] | ATTN: SHINGO LAVINE | 11040 BOLLINGER CANYON ROAD, SUITE E882 | | SAN RAMON | CA | 94582 | |
| ETHOS.IO PTE. LTD. [GREEN GATE MANAGEMENT, AMANO GLOBAL HOLDINGS INC.] | | 11040 BOLLINGER CANYON ROAD, SUITE E882 | | SAN RAMON | CA | 94582 | |
| ETHOS.IO PTE. LTD. [GREEN GATE MANAGEMENT, AMANO GLOBAL HOLDINGS INC.] | C/O LAW OFFICES OF DOUGLAS T. TABACHNIK, P.C. | 63 W. MAIN ST., | | FREEHOLD | NJ | 07728 | |
| ETHOS.IO PTE. LTD. [GREEN GATE MANAGEMENT, AMANO GLOBAL HOLDINGS INC.] | C/O LAW OFFICES OF DOUGLAS T. TABACHNIK PC | 63 W. MAIN ST., FREEHOLD, NJ 07726 | | FREEHOLD | NJ | 07728 | |
| EUCLID FINANCIAL INSTITUTION UNDERWRITERS, LLC | | 234 SPRING LAKE DRIVE | | ITASCA | IL | 60143 | |
| EUCLID'S LLOYDS OF LONDON SYNDICATE | C/O EUCLID FINANCIAL INSTITUTION UNDERWRITERS, LLC | 234 SPRING LAKE DRIVE | | ITASCA | IL | 60143 | |
| EXZAC INC. DBA MATRIX-IFS | EXZAC INC. (MATRIX-IFS) | 3 2ND STREET | SUITE 802 | JERSEY CITY | NJ | 07311 | |
| FAIRFAX COUNTY DEPARTMENT OF CABLE AND CONSUMER SERVICES | ATTN: CONSUMER PROTECTION DIVISION | 12000 GOVERNMENT CENTER PARKWAY | SUITE 433 | FAIRFAX | VA | 22035 | |
| FASKEN MARTINEAU DUMOULIN | | 333 BAY STREET | SUITE 2400 | TORONTO | ON | M5H 2R2 | CANADA |
| FASKEN MARTINEAU DUMOULIN, LLP | | 333 BAY STREET | SUITE 2400 | TORONTO | ON | M5H 2T6 | CANADA |
| FICENTIVE, INC. | ATTN: LOUIS HOCH, PRESIDENT AND CEO | 3611 PAESANO'S PARKWAY STE. 300 | | SAN ANTONIO | TX | 78231 | |
| FICENTIVE, INC. | C/O MARYANN VILLA | PULMAN CAPPUCCIO & PULLEN, LLP | 2161 NW MILITARY HWY., SUITE 400 | SAN ANTONIO | TX | 78213 | |
| FICENTIVE, INC. | C/O PULMAN CAPPUCCIO & PULLEN, LLP | 2161 NW MILITARY HWY STE 400 | | SAN ANTONIO | TX | 78213 | |
| FICENTIVE, INC. | LOUIS HOCH, PRESIDENT AND CEO | 3611 PAESANO PKWY., SUITE 300 | | SAN ANTONIO | TX | 78231 | |
| FICENTIVE, INC. (MASTERCARD) | | 3611 PAESANOS PARKWAY, SUITE 300 | | SAN ANTONIO | TX | 78231 | |
| FIDELIFACTS METROPOLITAN NEW YORK, INC. | | 114 OLD COUNTRY ROAD | SUITE 652 | MINEOLA | NY | 11501 | |
| FIGMA | | PO BOX 16189 | | OAKLAND | CA | 94610-6189 | |
| FINANCIAL CONDUCT AUTHORITY | | 12 ENDEAVOUR SQUARE | | LONDON | | E20 1JN | UNITED KINGDOM |
| FINANCIAL CRIMES ENFORCEMENT NETWORK | U.S. DEPARTMENT OF THE TREASURY | P.O. BOX 39 | | VIENNA | VA | 22183 | |
| FIND YOUR HAPPY LLC (F/S/O SHEENA MELWANI) | | 15 COMMON ST, #410 | | NATICK | MA | 01760 | |
| FIND YOUR HAPPY, LLC | | 15 COMMON STREET | #410 | NATICK | MA | 1760 | |
| FINNEY APS | | SORTEDAM DOSSERING 55 | | KOEBENHAVN OE | | 2100 | DENMARK |
| FIREBLOCKS INC OR LTD | | 33 IRVING PLACE | SUITE 36 | NEW YORK | NY | 10003 | |
| FIREBLOCKS INC OR LTD | | 500 7TH AV | 14TH FLOOR | NEW YORK | NY | 10018 | |
| FIREBLOCKS INC. | | 500 7TH AV | | NEW YORK | NY | 10018 | |
| FIRMEY APS | | BRONSHOJGÅRDVEJ 27 ST TH | | BRONSHOJ | | 2700 | DENMARK |
| FIRST CLEARING, LLC | CORPORATE ACTIONS | 2801 MARKET STREET | H0006-09B | ST. LOUIS | MO | 63103 | |
| FIRSTBROOK CASSIE & ANDERSON LTD | | 1867 YONGE ST. | SUITE 300 | TORONTO | ON | M4S 1Y5 | CANADA |
| FIRSTBROOK CASSIE & ANDERSON LTD. | | 1867 YONGE ST. | SUITE 300 | TORONTO | ON | M4S 1Y5 | CANADA |
| FIVETRAN | | 1221 BROADWAY | STE 2400 | OAKLAND | CA | 94612-1824 | |
| FIVETRAN INC. | | 1221 BROADWAY, 24TH FLOOR | | OAKLAND | CA | 94612 | |
| FLINT INC | | 65 SPRING STREET | | NEW YORK | NY | 10012 | |
| FLORIDA DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES | | FLORIDA CAPITOL | | TALLAHASSEE | FL | 32399-0800 | |
| FLORIDA DEPARTMENT OF STATE, DIVISION OF CORPORATIONS | | THE CENTRE OF TALLAHASSEE | 2415 N. MONROE STREET, SUITE 810 | TALLAHASSEE | FL | 32303 | |
| FLORIDA DEPT OF AGRICULTURE AND CONSUMER SERVICES | KYLE GARNER | P.O.BOX 6700 | | TALLAHASSEE | FL | 32314 | |
| FLORIDA OFFICE OF FINANCIAL REGULATION | | 200 EAST GAINES STREET | | TALLAHASSEE | FL | 32399-0380 | |
| FLORIDA OFFICE OF FINANCIAL REGULATION | RUSSELL C. WEIGEL, III, COMMISSIONER | 200 EAST GAINES STREET | | TALLAHASSEE | FL | 32399-0372 | |
| FLORIDA STATE TREASURY | UNCLAIMED PROPERTY DIVISION | PO BOX 8599 | | TALLAHASSEE | FL | 32314-8599 | |
| FORT CAPITAL ONTARIO INC. | | 40 KING STREET WEST | SUITE 3803 PO BOX 710 | TORONTO | ON | M5H-3Y2 | CANADA |
| FRAGOMEN, DEL REY, BERNSEN & LOEWY, LLP | | 1400 BROADWAY | | NEW YORK | NY | 10018 | |
| FRAGOMEN, DEL REY, BERNSEN & LOEWY, LLP | | 7 HANOVER SQUARE | | NEW YORK | NY | 10004 | |
| FRAGOMEN, DEL REY, BERNSEN & LOEWY, LLP | | 90 MATAWAN ROAD, 4TH FLOOR | | MATAWAN | NJ | 07747 | |
| FRANCINE DE SOUSA | C/O AIRD & BERLIS LLP | ATTN: STEVEN GRAFF MIRANDA SPENCE TAMIE DOLNY | BROOKEFIELD PLACE 181 BAY STREET, SUITE 1800 | TORONTO | ON | M5J 2T9 | CANADA |
| FRANK SOMER & PATTI SOMER JT TEN | | PATTI SOMER JT TEN | 54 EGGLETON STREET | RED DEER | AB | T4R 2L2 | |
| FRANKFURT KURNIT KLEIN & SELZ, P.C. | | 28 LIBERTY STREET | | NEW YORK | NY | 10005 | |
| FRANKFURT KURNIT KLEIN & SELZ, P.C. | | 28 LIBERTY STREET | | NEW YORK | NY | 10005 | |
| FRESNO COUNTY DISTRICT ATTORNEY'S OFFICE | ATTN: CONSUMER PROTECTION | 2281 TULARE ST | ROOM 304 | FRESNO | CA | 93721 | |
| FRIEDMAN CYZEN LLP | | 1700 BROADWAY - 23RD FL | | NEW YORK | NY | 10019 | |
| FRONTLINE GOLD CORPORATION | | 1 TORONTO ST | SUITE 201 | TORONTO | ON | M5C 2V6 | CANADA |
| FS-ISAC | | 12120 SUNSET HILLS ROAD | SUITE 500 | RESTON | VA | 20190 | |
| FS-ISAC | | 12120 SUNSET HILLS ROAD | SUITE 500 | RESTON | VA | 20190 | |
| FTX | ATTN: KATHRYN SCHULTEA | 2600 SOUTH SHORE BLVD, SUITE 300 | | LEAGUE CITY | TX | 77573 | |
| FTX | C/O ALVAREZ & MARSAL NORTH AMERICA LLC | ATTN: DAVID COLES, STEVEN GLUSTEIN | | | | | |
| FTX | C/O PERELLA WEINBERG PARTNERS | ATTN: MATT RAHMANI, WASIF SYED, KENDYL FLINN | | | | | |
| FTX | C/O SULLIVAN & CROMWELL LLP | ATTN: MITCH EITEL, AUDRA COHEN AND BRIAN HAMILTON | | | | | |
| FTX US | C/O SULLIVAN & CROMWELL LLP | ATTN: ANDREW G. DIETDERICH & BRIAN GLUECKSTEIN | 125 BROAD STREET | NEW YORK | NY | 10004 | |
| FUNDAMENTAL RESEARCH CORP. | | 1155 WEST PENDER STREET | SUITE 308 | VANCOUVER | BRITISH COLUMBIA | V6E 2P4 | CANADA |
| FUNDAMENTAL RESEARCH CORP. | | 1155 WEST PENDER | SUITE 308 | VANCOUVER CITY | BC | V6E-2P4 | CANADA |
| FUNDSTRAT | | 150 EAST 52ND ST | 3RD FLOOR | NEW YORK | NY | 10022 | |
| FUSION OF IDEAS, INC | | 40 EMPIRE DRIVE | | LAKE FOREST | CA | 92630 | |
| FUSION OF IDEAS, INC | | 40 EMPIRE DRIVE | | LAKE FOREST | CA | 92630 | |
| FUSION OF IDEAS, INC. | C/O SMITH LC | ATTN: JOHN CLIFFORD | 4 PARK PLAZA, SUITE 1050 | IRVINE | CA | 92630 | |
| FUSION OF IDEAS, INC. | | 40 EMPIRE DR. | | LAKE FOREST | CA | 92630 | |
| G13 ENDORSEMENTS | CHRISTOPHER GRONKOWSKI | 1601 KINGSWOOD LANE | | COLLEYVILLE | TX | 76034 | |
| GALAXY DIGITAL LLC | | 101 HUDSON STREET | FLOOR 21 | JERSEY CITY | NJ | 07302 | |
| GENESIS GLOBAL CAPITAL, LLC | | 111 TOWN SQUARE PLACE | SUITE 1203 | JERSEY CITY | NJ | 07310 | |
| GEORGIA DEPARTMENT OF BANKING & FINANCE | | 2990 BRANDYWINE ROAD, SUITE 200 | | ATLANTA | GA | 30341-5565 | |
| GEORGIA DEPARTMENT OF BANKING AND FINANCE | C/O ASSISTANT ATTORNEY GENERAL | ATTN: NATHAN HOVEY | DEPARTMENT OF LAW 40 CAPITOL SQUARE SW | ATLANTA | GA | 30334 | |
| GEORGIA DEPARTMENT OF LAW CONSUMER PROTECTION DIVISION | | 2 MARTIN LUTHER KING, JR. DRIVE | SUITE 356 | ATLANTA | GA | 30334-9077 | |
| GEORGIA DEPT OF REVENUE | UNCLAIMED PROPERTY PROGRAM | 4125 WELCOME ALL RD STE 701 | | ATLANTA | GA | 30349-1824 | |
| GEORGIA DIVISION OF SECURITIES AND BUSINESS REGULATION | NOULA ZAHARIS, DIRECTOR | TWO MARTIN LUTHER KING, JR. DRIVE SE | SUITE 317, WEST TOWER | ATLANTA | GA | 30334 | |
| GEORGIA SECRETARY OF STATE, CORPORATIONS DIVISION | | 2 MLK, JR. DR. SUITE 313, FLOYD WEST TOWER | | ATLANTA | GA | 30334-1530 | |
| GITHUB, INC | | 88 COLIN P.KELLY JR STREET | | SAN FRANCISCO | CA | 94107 | |
| GITHUB, INC. | | 88 COLIN P KELLY JR STREET | | SAN FRANCISCO | CA | 94107 | |
| GLASS LEWIS & CO, LLC | | 255 CALIFORNIA STREET | SUITE 1100 | SAN FRANCISCO | CA | 94111 | |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

STRETTO

**Exhibit G**
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| GLENDALE SECURITIES INC. | | 15233 VENTURA BLVD | SUITE 712 | SHERMAN OAKS | CA | 91403 | |
| GLOBAL CUSTODY & CLEARING LTD | | THE LOM BUILDING 27 REID | | ST HAMILTON | HM | 11 | BERMUDA |
| GLOUCESTER COUNTY OFFICE OF CONSUMER AFFAIRS | | GLOUCESTER COUNTY ADMINISTRATION BUILDING | 2 SOUTH BROAD ST. PO BOX 337 | WOODBURY | NJ | 08096 | |
| GLOUCESTER COUNTY OFFICE OF CONSUMER AFFAIRS AND WEIGHTS & MEASURES | | PO BOX 337 | 2 SOUTH BROAD STREET | WOODBURY | NJ | 08096 | |
| GLUSHON SPORTS MANAGEMENT | | 16255 VENTURA BLVD. | STE 950 | ENCINO | CA | 91436 | |
| GODADDY | | 2155 E. GODADDY WAY | | TEMPE | AZ | 85284 | |
| GOLDMAN SACHS INTERNATIONAL | ASSET SERVICING | 30 HUDSON STREET | PROXY DEPARTMENT | JERSEY CITY | NJ | 07302 | |
| GOLDMAN, SACHS & CO. | ATTN: STEVE BERRIOS - CORP ACTIONS | 100 BURMA ROAD | | JERSEY CITY | NJ | 07305 | |
| GOLDMAN, SACHS & CO. | PROXY HOTLINE 1 | 30 HUDSON STREET | PROXY DEPARTMENT | JERSEY CITY | NJ | 07302 | |
| GOODBAY TECHNOLOGIES | | 7500 RIALTO BLVD BLDG 1 | STE 250 | AUSTIN | TX | 78735 | |
| GOODBAY TECHNOLOGIES | | 7500 RIALTO BLVD BLDG 1 STE 250 | | AUSTIN | TX | 78735 | |
| GOODBAY TECHNOLOGIES, INC. | | 7500 RIALTO BLVD. | BLDG. 1, SUITE 250 | AUSTIN | TX | 78735 | |
| GOODBAY TECHNOLOGIES, INC. | ATTN: SAPAN SHAHANI | 7500 RIALTO BLVD., BLDG. 1 STE. 250 | | AUSTIN | TX | 78735 | |
| GOODHIRE | | 303 TWIN DOLPHIN DR | STE 600 | REDWOOD CITY | CA | 94065-1422 | |
| GOODHIRE | | 303 TWIN DOLPHIN DRIVE | SUITE 600 | REDWOOD CITY | CA | 94065 | |
| GOODHIRE.COM | | 303 TWIN DOLPHIN DRIVE | SUITE 600 | REDWOOD CITY | CA | 94065 | |
| GOOGLE LLC | ATTN: DEPT. 33654 | P.O. BOX 39000 | | SAN FRANCISCO | CA | 94139 | |
| GOOGLE LLC | C/O WHITE AND WILLIAMS LLP | ATTN: JAMES VANDERMARK | 7 TIMES SQUARE SUITE 2900 | NEW YORK | NY | 10036 | |
| GOOGLE VOICE INC. | | 1600 AMPHITHEATRE PARKWAY | | MOUNTAIN VIEW | CA | 94043 | |
| GOOGLE, LLC | | 1600 AMPHITHEATRE PKWY | | MOUNTAIN VIEW | CA | 94043 | |
| GOOGLE, LLC. | | 1600 AMPHITHEATRE PARKWAY | | MOUNTAIN VIEW | CA | 94043 | |
| GOOGLE, LLC. | | 1600 AMPHITHEATRE PARKWAY | | MOUNTAIN VIEW | CA | 94043 | |
| GOWRK | | 3534 FIFTH AVE | | SAN DIEGO | CA | 92103 | |
| GRA ENTERPRISES LLC | | 55 DOROTHEA TERRACE | | BELLEVILLE | NJ | 07109 | |
| GRANT STEWART LLC | | 142 GOODWIVERS RIVER RD | | DARIEN | CT | 06820 | |
| GRANT STEWART LLC | | 142 GOODWIVERS RIVER RD | | DARIEN | CT | 06820 | |
| GRANT STEWART LLC | | 142 GOODWIVERS RIVER ROAD | | DARIEN | CT | 06820 | |
| GRANT STEWART LLC | | 142 GOODWIVERS RIVER ROAD | | DARIEN | CT | 06820 | |
| GRANT THORNTON LLP | | 3333 FINLEY ROAD | STE 700 | DOWNERS GROVE | IL | 60515 | |
| GRAVITATIONAL, INC. | | NOVA CENTRE | NORTH TOWER 1001 - 1675 GRAFTON ST | HALIFAX | NS | B3J-0E9 | CANADA |
| GRAVITATIONAL, INC. | | 1611 TELEGRAPH AVE | 14TH FLOOR | OAKLAND | CA | 94612 | |
| GRAVITATIONAL, INC. | | 340 S LEMON AVE, #8219 | | WALNUT | CA | 91789 | |
| GRAVITATIONAL, INC. | | PMB 8219 | 340 S LEMON AVE | WALNUT | CA | 91789-2706 | |
| GREAT MIDWEST INSURANCE COMPANY | ATTN: RICHARD BAUDOUIN AND CHRISTOPHER GAGNON | 800 GESSNER RD. | SUITE 600 | HOUSTON | TX | 77024 | |
| GREAT MIDWESTERN INSURANCE CO. | | 800 GESSNER RD #600 | | HOUSTON | TX | 77024 | |
| GREENHOUSE SOFTWARE | | 18 W 18TH STREET | 11TH FLOOR | NEW YORK | NY | 10011 | |
| GREENHOUSE SOFTWARE, INC. | | 18 W 18TH STREET | | NEW YORK | NY | 10011 | |
| GUAM DEPARTMENT OF REVENUE & TAXATION | | PO BOX 23607 | | GMF | GU | 96921 | |
| HACKERONE INC. | | 420 MONTGOMERY ST | | SAN FRANCISCO | CA | 94104 | |
| HACKERRANK | | PMB 10121 | 1321 UPLAND DR | HOUSTON | TX | 77043-4718 | |
| HAPPYFUNCORP LLC | | 18 BRIDGE ST | SUITE #4A | BROOKLYN | NY | 11201 | |
| HAPPYFUNCORP, LLC (HFC) | | 18 BRIDGE STREET | SUITE 1C | BROOKLYN | NY | 11201 | |
| HARBOR GATES CAPITAL LLC | | 53 PALMERA ST SUITE 601 | SUITE 601 | SAN JUAN | | 00901 | PUERTO RICO |
| HARE & CO LLC | | PO BOX 392002 | | PITTSBURGH | PA | 15230 | |
| HARE & CO LLC | | PO BOX 392002 | | PITTSBURGH | PA | 15230 | |
| HARGREAVES LANSDOWN NOMINEES | LIMITED | ONE COLLEGE SQUARE SOUTH | ANCHOR ROAD | BRISTOL | | BS1 5HL | UNITED KINGDOM |
| HARGREAVES LANSDOWN NOMINEES LTD | | ONE COLLEGE SQUARE SOUTH | | ANCHOR ROAD | | BS1 5HL | UNITED KINGDOM |
| HARTFORD FIRE INSURANCE COMPANY | | 1145 NICHOLSON ROAD, UNIT 2 | | NEWMARKET | ON | L3Y 9C3 | CANADA |
| HARTFORD UNDERWRITERS INSURANCE COMPANY | | ONE HARTFORD PLAZA | | HARTFORD | CT | 06155 | |
| HASHTAG BUSINESS LLC | | 17 NORMANDY PARKWAY | | MORRISTOWN | NJ | 07960-0000 | |
| HASHTAG BUSINESS LLC | | 17 NORMANDY PARKWAY | | MORRISTOWN | NJ | 07960-0000 | |
| HAWAII DIVISION OF BUSINESS REGISTRATION | TY Y. NOHARA, COMMISSIONER OF SECURITIES | P.O. BOX 40 | | HONOLULU | HI | 96810 | |
| HAWAII DIVISION OF FINANCIAL INSTITUTIONS DEPARTMENT OF COMMERCE & CONS. AFFAIRS | | PO BOX 2054 | | HONOLULU | HI | 96805 | |
| HIFI PROJECT INC. | | 742 S HILL STREET | SUITE 605 | LOS ANGELES | CA | 90014 | |
| HIFI PROJECT INC. | | PO BOX 120009 | | BOSTON | MA | 02112-0009 | |
| HIGH COUNTRY SEARCH GROUP | | 900 E LOUISIANA AVE | STE 201 | DENVER | CO | 80210-1722 | |
| HILLTOP SECURITIES INC. | ATTN: RHONDA JACKSON | 717 N HARWOOD ST | STE 3400 | DALLAS | TX | 75201-6534 | |
| HIRE QUEST, LLC (B/D/A NORTHBOUND EXECUTIVE SEARCH) | | 111 SPRINGHALL DRIVE | 0 | GOOSE CREEK | SC | 29445 | |
| HIRECLOUT | | 5950 CANOGA AVENUE | SUITE 200 | WOODLAND HILLS | CA | 91367 | |
| HIRECLOUT, INC | | 5950 CANOGA AVENUE | SUITE 200 | WOODLAND HILLS | CA | 91367 | |
| HOTJAR LIMITED | | DRAGONARA BUSINESS CENTRE, 5TH FLOOR | DRAGONARA ROAD | PACEVILLE ST JULIAN'S | | STJ-3141 | MALTA |
| HOWARD COUNTY | ATTN: OFFICE OF CONSUMER AFFAIRS | 9830 PATUXENT WOODS DRIVE | | COLUMBIA | MD | 21046 | |
| HUDSON COUNTY DIVISION OF CONSUMER AFFAIRS | | 595 NEWARK AVENUE | | JERSEY CITY | NJ | 07306 | |
| HUDSON COUNTY DIVISION OF CONSUMER PROTECTION | | 257 CORNELISON AVENUE – 4TH FLOOR | | JERSEY CITY | NJ | 07302 | |
| HUXLEY ASSOCIATES | | 330 HUDSON STREET | SUITE 304 | NEW YORK | NY | 10013 | |
| ICE SYSTEMS, INC. D/B/A PROXYTRUST | | 100 PATCO CT. SUITE 9 | | ISLANDIA | NY | 11749 | |
| IDAHO DEPARTMENT OF FINANCE | | PO BOX 83720 | | BOISE | ID | 83720-0031 | |
| IDAHO DEPARTMENT OF FINANCE | PATRICIA HIGHLEY, SECURITIES BUREAU CHIEF | P.O. BOX 83720 | 2ND FLOOR | BOISE | ID | 83720-0031 | |
| IDAHO SECRETARY OF STATE, BUSINESS ENTITIES | | 450 N. 4TH STREET | | BOISE | ID | 83702 | |
| IDAHO STATE TREASURER | UNCLAIMED PROPERTY DIVISION | PO BOX 83720 | | BOISE | ID | 83720-9101 | |
| ILLINOIS DEPARTMENT OF FINANCIAL & PROFESSIONAL REGULATION - DIVISION OF BANKING | | 320 WEST WASHINGTON STREET | | SPRINGFIELD | IL | 62786 | |
| ILLINOIS SECRETARY OF STATE, DEPARTMENT OF BUSINESS SERVICES | | 501 S. SECOND ST., RM. 350 | | SPRINGFIELD | IL | 62756 | |
| ILLINOIS SECURITIES DEPARTMENT | JAMES NIX, ACTING DIRECTOR | 69 WEST WASHINGTON STREET | SUITE 1220 | CHICAGO | IL | 60602 | |
| ILLINOIS STATE TREASURER | UNCLAIMED PROPERTY DIVISION | 555 W. MONROE STREET, 14TH FLOOR | | CHICAGO | IL | 60661 | |
| IMPACT | | 2500 PLAZA 5 | 25TH FLOOR | JERSEY CITY | NJ | 7311 | |
| IMPACT TECH, INC | | 223 EAST DE LA GUERRA STREET | | SANTA BARBARA | CA | 93101 | |
| IMPACT TECH, INC. | | 223 EAST DE LA GUERRA STREET | | SANTA BARBARA | CA | 93101 | |
| INDEPENDENT TRADING GROUP (ITG) INC. | | 370 KING ST. W. SUITE 701 | | TORONTO | ON | M5V 1J9 | CANADA |
| INDIANA ATTORNEY GENERAL | | PO BOX 2504 | | GREENWOOD | IN | 46142 | |
| INDIANA DEPARTMENT OF FINANCIAL INSTITUTIONS | UNCLAIMED PROPERTY DIVISION | 30 SOUTH MERIDIAN STREET | | INDIANAPOLIS | IN | 46204 | |
| INDIANA SECRETARY OF STATE, BUSINESS SERVICES DIVISION | | BUSINESS SERVICES DIVISION | 302 W. WASHINGTON STREET ROOM E018 | INDIANAPOLIS | IN | 46204 | |
| INDIANA SECURITIES DIVISION | JOHN COCHRAN, SECURITIES COMMISSIONER | 302 WEST WASHINGTON | ROOM E-111 | INDIANAPOLIS | IN | 46204 | |
| INDIANAOPLIS MOTOR SPEEDWAY | | 479 W. 16TH ST. | | INDIANAPOLIS | IN | 46222 | |
| INFINITE AGENCY, LLC | | 220 E LAS COLINAS BLVD | STE C-120 | IRVING | TX | 75039 | |
| INFINITE I.P. INC., LLC | | 220 E LAS COLINAS BLVD | STE C-120 | IRVING | TX | 75039 | |
| INFINITE IP CORPORATION | | 52 MILL ROAD | | PRINCETON JUNCTION | NJ | 08550 | |
| INFINITE IP CORPORATION | | 52 N MILL ROAD | | PRINCETON JUNCTION | NJ | 08550 | |
| INFINITY CONSULTING SOLUTIONS, INC | | 462 7TH AVENUE, 2ND FLOOR | | NEW YORK | NY | 10018 | |
| INFINITY TECH GROUP INC | | 12 N ROUTE 17TH | SUITE 201 | PARAMUS | NJ | 07652 | |
| INTERACTIVE BROKERS RETAIL EQTY CL | KARIN MCCARTHY | 8 GREENWICH OFFICE PARK | | GREENWICH | CT | 06831 | |
| INTERNAL REVENUE SERVICE | | 15 NEW SUDBURY ST., MS 20800 | | BOSTON | MA | 02203 | |
| INTERNAL REVENUE SERVICE | | PO BOX 7346 | | PHILADELPHIA | PA | 19101 | |
| INTERWEBSTREET INCORPORATION DBA HACKERRANK | | PMB 10121 | 1321 UPLAND DR | HOUSTON | TX | 77043-4718 | |
| INTRALINKS | | PO BOX 392134 | | PITTSBURGH | PA | 15251 | |
| IOWA DIVISION OF BANKING | | 200 EAST GRAND AVENUE | | DES MOINES | IA | 50309-1827 | |
| IOWA INSURANCE DIVISION | ANDREW HARTNETT | 1963 BELL AVENUE | | DES MOINES | IA | 50315 | |

≡ STRETTO

**Exhibit G**
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| IOWA INSURANCE DIVISION | ANDREW HARTNETT, DEPUTY ADMINISTRATOR FOR SECURITIES | 1963 BELL AVENUE | SUITE 100 | DES MOINES | IA | 50315 | |
| IOWA SECRETARY OF STATE, CORPORATIONS DEPARTMENT | | SECRETARY OF STATE | FIRST FLOOR, LUCAS BUILDING 321 E. 12TH ST. | DES MOINES | IA | 50319 | |
| IOWA TREASURER OF STATE | ATTN: UNCLAIMED PROPERTY | PO BOX 856791 | | MINNEAPOLIS | MN | 55485 | |
| IQTALENT PARTNERS INC | | 201 4TH AVENUE N STE 1300 | | NASHVILLE | TN | 37219 | |
| IQTALENT PARTNERS, INC. | | 201 4TH AVE N | SUITE 1300 | NASHVILLE | TN | 37218 | |
| IQTALENT PARTNERS, INC. | | 21 4TH AVE N | SUITE 13 | NASHVILLE | TN | 37218 | |
| IRONCLAD, INC | | 71 STEVENSON STREET, #600 | | SAN FRANCISCO | CA | 94105 | |
| IRONCLAD, INC | | 71 STEVENSON ST. | # 600 | SAN FRANCISCO | CA | 94105 | |
| ISRAEL MONEY LAUNDERING AND TERROR FINANCING PROHIBITION AUTHORITY | | P.O.BOX 7330 | | TEL AVIV | | 6107202 | ISRAEL |
| ISRAEL SECURITIES AUTHORITY | | 22 KANFEI NESHARIM ST. | | JERUSALEM | | 95464 | ISRAEL |
| ITERABLE | | 71 STEVENSON ST | SUITE 3 | SAN FRANCISCO | CA | 94105 | |
| ITERABLE, INC | | 71 STEVENSON ST | SUITE 300 | SAN FRANCISCO | CA | 94105 | |
| ITERABLE, INC | | 71 STEVENSON ST | SUITE 300 | SAN FRANCISCO | CA | 94105 | |
| J.P. MORGAN CLEARING CORP. | MARCIN BIEGANSKI | 14201 DALLAS PARKWAY, 12TH FL | | DALLAS | TX | 75254 | |
| JA VISUAL SOLUTIONS LLC | | 610 PETERSON FARM CT | | RIVER VALE | NJ | 07675 | |
| JACKSON LEWIS P.C. | | 58 SOUTH SERVICE ROAD | | MELVILLE | NY | 11747 | |
| JACKSON LEWIS P.C. | | 666 THIRD AVENUE | | NEW YORK | NY | 10017-4030 | |
| JAMF | | 1 WASHINGTON AVE S | SUITE 11 | MINNEAPOLIS | MN | 55401 | |
| JANNEY MONTGOMERY SCOTT LLC | ATTN: CORPORATE ACTIONS DEPARTMENT | 1717 ARCH STREET, 19TH FLOOR | | PHILADELPHIA | PA | 19103 | |
| JDI STUDIO LLC | | 850 PACIFIC ST #1255 | | STAMFORD | CT | 06902 | |
| JDI STUDIO LLC | | 850 PACIFIC STREET | UNIT 1255 | STAMFORD | CT | 06902 | |
| JEFFERIES LLC | ROBERT MARANZANO | 34 EXCHANGE PL | | JERSEY CITY | NJ | 07311 | |
| JEFFERSON PARISH DISTRICT ATTORNEY'S OFFICE | ATTN: CONSUMER PROTECTION SECTION | 24TH JUDICIAL DISTRICT, | JEFFERSON PARISH 200 DERBIGNY ST. | GRETNA | LA | 70053 | |
| JENNER & BLOCK LLP | | 1155 AVENUE OF THE AMERICAS | | NEW YORK | NY | 10036-2711 | |
| JENNER & BLOCK LLP | | 353 N CLARK STREET | | CHICAGO | IL | 60654 | |
| JENSEN HUGHES, INC. | | 3610 COMMERCE DRIVE | SUITE 817 | BALTIMORE | ML | 21227 | |
| JESPAR HOLDINGS LLC | | 3110 CHATHAM CT | | WESTLAKE | OH | 44145 | |
| JESPAR HOLDINGS LLC | | 3110 CHATHAM CT | | WESTLAKE | OH | 44145 | |
| JFROG INC | | 270 EAST CARIBBEAN DRIVE | | SUNNYVALE | CA | 94089 | |
| JIVARO PROFESSIONAL HEADHUNTERS | | 1111 W. EL CAMINO REAL | # 109 | SUNNYVALE | CA | 94087 | |
| JIVARO PROFESSIONAL HEADHUNTERS, LLC | | PO BOX 45310 | | BOISE | ID | 83711 | |
| JOHNSON COUNTY DISTRICT ATTORNEY'S OFFICE | ATTN: CONSUMER PROTECTION UNIT | 150 W. SANTA FE ST | | OLATHE | KS | 66061 | |
| JOHNSON RIVERS LYONS LLC | | 1909 SUFFOLK WAY | | CARMICHAEL | CA | 95608 | |
| JOHNSON RIVERS LYONS LLC | | 1909 SUFFOLK WAY | | CARMICHAEL | CA | 95608 | |
| JP GALDA & CO | | 2416 N GREENHILL ROAD | | BROOMALL | PA | 19008 | |
| JUMIO CORPORATION | | 395 PAGE MILL ROAD SUITE 150 | | PALO ALTO | CA | 94306-2067 | |
| JUMP DIGITAL CURRENCIES LLC | | 600 WEST CHICAGO AVE | SUITE 600 | CHICAGO | IL | 60654 | |
| JUMP DIGITAL CURRENCIES LLC | | 600 WEST CHICAGO AVE | SUITE 600 | CHICAGO | IL | 60654 | |
| JUMP DIGITAL CURRENCIES LLC | | 600 WEST CHICAGO AVE SUITE 600 | SUITE 600 | CHICAGO | IL | 60654 | |
| KANSAS OFFICE OF THE STATE BANK COMMISSIONER | | 700 SW JACKSON STREET, SUITE 300 | | TOPEKA | KS | 66603 | |
| KANSAS SECRETARY OF STATE | | MEMORIAL HALL, 1ST FLOOR 120 SW 10TH AVENUE | | TOPEKA | KS | 66612-1594 | |
| KANSAS STATE TREASURER | | ATTN: LYNN ROGERS | 900 SW JACKSON, SUITE 201 | TOPEKA | KS | 66612 | |
| KATE LEAVELL COMPANIES LLC | UNCLAIMED PROPERTY DIVISION | 2417 LAKEWOOD RANCH BLVD | UNIT 4413 | LAKEWOOD RCH | FL | 34240-7042 | |
| KAULING RACING, INC | | 1521 GEORGETOWN ROAD | | HUDSON | OH | 44236 | |
| KB507 LLC | ATTN: THOMAS BRAZIEL | 10830 SW 69 AVE | | PINECREST | FL | 33156 | |
| KCG AMERICAS LLC | | CORPORATE ACTIONS | 545 WASHINGTON BLVD. | JERSEY CITY | NJ | 07310 | |
| KCSA STRATEGIC COMMUNICATIONS | JANICA BRINK, VP | 420 5TH AVE | | NEW YORK | NY | 10018 | |
| KENTUCKY DEPARTMENT OF FINANCIAL INSTITUTIONS | | 500 MERO STREET 2SW19 | | FRANKFORT | KY | 40601 | |
| KENTUCKY DEPARTMENT OF FINANCIAL INSTITUTIONS | MARNI ROCK GIBSON, SECURITIES ADMINISTRATOR/DIRECTOR | 500 MERO STREET | MAYO-UNDERWOOD BUILDING | FRANKFORT | KY | 40601 | |
| KENTUCKY SECRETARY OF STATE | | 700 CAPITAL AVE., STE. 152 | | FRANKFORT | KY | 40601 | |
| KENTUCKY STATE TREASURER | UNCLAIMED PROPERTY DIVISION | 1050 US HWY 127S, SUITE 100 | | FRANKFORT | KY | 40601 | |
| KERN COUNTY DISTRICT ATTORNEY'S OFFICE | ATTN: CONSUMER PROTECTION | 1115 TRUXTUN AVENUE | FIFTH FLOOR | BAKERSFIELD | CA | 93301 | |
| KETCHUM INC. | | PO BOX 771796 | | SAINT LOUIS | MO | 63177 | |
| KETCHUM, INC. | | 1285 6TH AVE | #401 | NEW YORK | NY | 10019 | |
| KFORCE INC | | 8405 BENJAMIN RD | STE G | TAMPA | FL | 33634-1235 | |
| KIRKLAND & ELLIS LLP | | 300 N LASALLE DRIVE | | CHICAGO | IL | 60654 | |
| KIRKLAND & ELLIS LLP | ATTN: JOSHUA A. SUSSBERG, P.C., CHRISTOPHER MARCUS, P.C., CHRISTINE A. OKIKE, P.C. AND ALLYSON B. SMITH | 601 LEXINGTON AVENUE | | NEW YORK | NY | 10022 | |
| KNIGHT CAPITAL AMERICAS LLC | | 545 WASHINGTON BLVD | | JERSEY CITY | NJ | 07310 | |
| KNIGHT CAPITAL AMERICAS LLC | | 545 WASHINGTON BLVD | | JERSEY CITY | NJ | 07310 | |
| KNOWBE4 | | 33 N. GARDEN AVE. | SUITE 1200 | CLEARWATER | FL | 33755 | |
| KNOWBE4 INC. | | 33 N GARDEN AVENUE | SUITE 1200 | CLEARWATER | FL | 33755 | |
| KORN FERRY (US) | | NW5854 | PO BOX 1450 | MINNEAPOLIS | MN | 55485 | |
| KOTO STUDIO LLC | | 9014 LINDBLADE ST. | | CULVER CITY | CA | 90232 | |
| KOTO STUDIO LLC | | 9014 LINDBLADE STREET | | CULVER CITY | CA | 90232 | |
| KRAMER LEVIN NAFTALIS & FRANKEL LLP | | 47 AVENUE HOCHE | | PARIS | | 75008 | FRANCE |
| KRAMER LEVIN NAFTALIS & FRANKEL LLP | | 47 AVENUE HOCHE | | PARIS | | 75008 | FRANCE |
| L GLESSNER CUST C GLESSNER UTMA CA | | CUST CADE GLESSNER UTMA CA | 4274 WESTDALE RD | MOORPARK | CA | 93021 | |
| LAKESHORE SECURITIES INC. | | 277 LAKESHORE ROAD EAST | SUITE 308 | OAKVILLE | ON | L6J-1H9 | CANADA |
| LANDLORD | | 2500 PLAZA 5, 25TH FLOOR | | JERSEY CITY | NJ | 07311-0000 | |
| LANDLORD | | 333 BAY STREET, SUITE 2400 | | TORONTO | ON | M5H 2R2 | CANADA |
| LANDON CAPITAL MANAGEMENT LLC | | 3414 PEACHTREE RD NE | STE 735 | ATLANTA | GA | 30326-1599 | |
| LANDON CASSIL, INC. | | 2939 16TH AVE SW | | CEDAR RAPIDS | IO | 52404 | |
| LASTPASS | | 32 SUMMER STREET | | BOSTON | MA | 02125 | |
| LAUNCHDAILY | CATAMORPHIC CO | 1999 HARRISON STREET | SUITE 1100 | OAKLAND | CA | 94612 | |
| LAUREL HILL ADVISORY GROUP COMPANY | LAUREL HILL | 70 UNIVERSITY AVENUE | SUITE 1440 | TORONTO | ON | M5J-2M4 | CANADA |
| LAW OFFICE OF A. MANNY ALICANDRO | | 11 BROADWAY | STE 615 | NEW YORK | NY | 10004-1490 | |
| LD.MICRO | | 11040 BOLLINGER CANYON RD | STE E-405 | SAN RAMON | CA | 94582 | |
| LEARFIELD COMMUNICATIONS, LLC | | 2400 DALLAS PARKWAY | SUITE 500 | PLANO | TX | 75093 | |
| LEDGER TECHNOLOGIES INC | | 1013 CENTRE ROAD | SUITE 403S | WILMINGTON | DE | 19805 | |
| LEDGER TECHNOLOGIES INC | | 1013 CENTRE ROAD | SUITE 403S | WILMINGTON | DE | 19805 | |
| LEDGER TECHNOLOGIES INC | | 214 W 29TH ST | | NEW YORK | NY | 10001 | |
| LEVIN GROUP LIMITED | | 1 FINSBURY AVENUE | | LONDON | | EC2M 2PF | UNITED KINGDOM |
| LEVIN GROUP LTD. T/A STORM2 | | 66 PRESCOT ST | | LONDON | | E1 8NN | UNITED KINGDOM |
| LMAX DIGITAL | | YELLOW BUILDING | 1A NICHOLAS ROAD | LONDON | | W11 4AN | UNITED KINGDOM |
| LOGMEIN USA, INC. | | 320 SUMMER STREET | | BOSTON | MA | 02210 | |
| LOS ANGELES CITY ATTORNEY'S OFFICE | ATTN: CONSUMER PROTECTION | CITY HALL EAST | SUITE 800 | LOS ANGELES | CA | 90012 | |
| LOS ANGELES COUNTY DEPARTMENT OF CONSUMER AFFAIRS | ATTN: DEPARTMENT OF CONSUMER AND BUSINESS AFFAIRS | 320 W TEMPLE ST | ROOM G-10 | LOS ANGELES | CA | 90012 | |
| LOUISIANA DEPT OF THE TREASURY | UNCLAIMED PROPERTY | PO BOX 91010 | | BATON ROUGE | LA | 70821-9010 | |
| LOUISIANA OFFICE OF FINANCIAL INSTITUTIONS | | PO BOX 94095 | | BATON ROUGE | LA | 70804-9095 | |
| LOUISIANA OFFICE OF FINANCIAL INSTITUTIONS | P. SCOTT JOLLY, DEPUTY COMMISSIONER OF SECURITIES | 8660 UNITED PLAZA BOULEVARD | 2ND FLOOR | BATON ROUGE | LA | 70809 | |
| LOUISIANA SECRETARY OF STATE, COMMERCIAL DIVISION, CORPORATIONS SECTION | | 8585 ARCHIVES AVE. | | BATON ROUGE | LA | 70809 | |
| LOWENSTEIN SANDLER LLP | | ONE LOWENSTEIN DRIVE | | ROSELAND | NJ | 07068 | |
| LOYALIST, LLC | | 4 PERRY ST | APT 2 | NEW YORK | NY | 10014-2700 | |
| LOYALIST, LLC | | 4 PERRY STREET | 2ND FLOOR | NEW YORK CITY | NY | 10014 | |
| LOYALIST, LLC | | 4 PERRY STREET, 2ND FLOOR | | NEW YORK | NY | 10014 | |
| LPL FINANCIAL CORPORATION | CORPORATE ACTIONS | KRISTIN KENNEDY | 9785 TOWNE CENTRE DRIVE | SAN DIEGO | CA | 92121-1968 | |
| LYTHAM PARTNERS LLC | | 4602 E THOMAS ROAD | | PHOENIX | AZ | 85018 | |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 7 of 15

≡ STRETTO

**Exhibit G**
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| MAESTROQA, INC. | | 33 W 17TH STREET | 4TH FLOOR | NEW YORK | NY | 10011 | |
| MAESTROQA, INC. | | 33 WEST 17TH STREET | FLOOR 4 | NEW YORK | NY | 10011 | |
| MAINE BUREAU OF FINANCIAL INSTITUTIONS | | 36 STATE HOUSE STATION | | AUGUSTA | ME | 04333-0036 | |
| MAINE OFFICE OF SECURITIES | JUDITH SHAW, SECURITIES ADMINISTRATOR | STATE HOUSE STATION 121 | | AUGUSTA | ME | 04333-0121 | |
| MAINE SECRETARY OF STATE, BUREAU OF CORPORATIONS, ELECTIONS AND COMMISSIONS | | 148 STATE HOUSE STATION | | AUGUSTA | ME | 04333-0148 | |
| MAINE STATE TREASURER | OFFICE OF THE STATE TREASURER | 39 STATE HOUSE STATION | BURTON M. CROSS OFFICE BUILDING, 3RD FLOOR 111 SEWALL STREET | AUGUSTA | ME | 04333 | |
| MAJOR, LINDSEY & AFRICA, LLC | | 521 FIFTH AVE, 5TH FLOOR | | NEW YORK | NY | 10175 | |
| MALWAREBYTES INC | | 3979 FREEDOM CIRCLE, 12TH FLOOR | | SANTA CLARA | CA | 95054 | |
| MAMOUTH DIVISION OF CONSUMER AFFAIRS | | PO BOX 1255 | ONE EAST MAIN STREET | FREEHOLD | NJ | 07728 | |
| MARCUM LLP | | 730 3RD AVE | | NEW YORK | NY | 10017-3216 | |
| MARELLI SUPPORT SERVICES, INC. | | 82 RICHMOND STREET EAST | | TORONTO | ON | M5C-1P1 | CANADA |
| MARIN COUNTY DISTRICT ATTORNEY'S OFFICE | ATTN: CONSUMER PROTECTION | 3501 CIVIC CENTER DRIVE | SUITE 145 | SAN RAFAEL | CA | 94903 | |
| MARK FABIANI LLC | | 6002 BEAUMONT AVENUE | | LA JOLLA | CA | 92037 | |
| MARKET ONE MEDIA GROUP INC. | | 440 WEST HASTINGS STREET | SUITE 320 | VANCOUVER CITY | BC | V6B-1L | CANADA |
| MARKET REBELLION, LLC | | 8201 PETERS RD | SUITE 1000 | PLANTATION | FL | 33324 | |
| MARKET REBELLION, LLC | ATTEN: THOMAS FURGUSON | 8201 PETERS ROAD | SUITE 1000 | PLANTATION | FL | 33324 | |
| MARKET REBELLION, LLC | ATTN: DIRK MUELLER-INGRAND | PO BOX 1012 | | LIBERTYVILLE | IL | 60048 | |
| MARKET REBELLION, LLC | ATTN: DIRK MUELLER-INGRAND | 23 W JACKSON BOULEVARD | | CHICAGO | IL | 60606 | |
| MARISCO INVESTMENT CORPORATION | MARK KADISON | 101 EISENHOWER PARKWAY | SUITE 350 | ROSELAND | NJ | 07068 | |
| MARYLAND DIVISION OF SECURITIES | MELANIE SENTER LUBIN, SECURITIES COMMISSIONER | 200 SAINT PAUL ST | | BALTIMORE | MD | 21202-2020 | |
| MARYLAND OFFICE OF FINANCIAL REGULATION | | 1100 N. EUTAW STREET | SUITE 611 | BALTIMORE | MD | 21201 | |
| MARYLAND STATE DEPARTMENT OF ASSESSMENTS AND TAXATION | | 301 W. PRESTON STREET, ROOM 801 | | BALTIMORE | MD | 21201-2395 | |
| MASSACHUSETTS DIVISION OF BANKS | | 1000 WASHINGTON STREET | | BOSTON | MA | 02118-6400 | |
| MASSACHUSETTS SECURITIES DIVISION | DIANE YOUNG-SPITZER, DIRECTOR & GENERAL COUNSEL | ONE ASHBURTON PLACE | ROOM 1701 | BOSTON | MA | 02108 | |
| MATTHEW LEVITT | C/O J. SINGER LAW GROUP, PLLC | ATTN: JEB SINGER | ONE LIBERTY PLAZA 23RD FLOOR | NEW YORK | NY | 10006 | |
| MATTHEW LEVITT | C/O MCGRAIL & BENSINGER LLP | ATTN: ILANA VOLKOV | 888-C 8TH AVENUE #107 | NEW YORK | NY | 10019 | |
| MAXX MANAGEMENT LLC | | 650 TERRACE AVE | EXECUTIVE STE #4 | HASBROUCK HEIGHTS | NJ | 07604 | |
| MCCARTER & ENGLISH, LLP | | FOUR GATEWAY CENTER 100 MULBERRY STREET | | NEWARK | NJ | 07102 | |
| MCCARTHY, LEBIT, CRYSTAL & LIFEMAN CO., LPA | | 1111 SUPERIOR AVENUE EAST | SUITE 2700 | CLEVELAND | OH | 44114 | |
| MCDERMOTT WILL & EMERY LLP | ATTN: DARREN T. AZMAN, JOSEPH B. EVANS | 340 MADISON AVENUE | | NEW YORK | NY | 10173 | |
| MEDIANT COMMUNICATIONS INC. | | PO BOX 29976 | | NEW YORK | NY | 10087 | |
| MEDIUM RARE LIVE, LLC | | 447 BROADWAY | 2ND FLOOR #278 | NEW YORK CITY | NY | 10013 | |
| MEDIUM RARE LIVE, LLC | C/O MONARCH BUSINESS & WEALTH MGMT LLC | MEDIUM RARE LIVE | LLC 209 EAST 31ST STREET | NEW YORK | NY | 10016 | |
| MELTWATER | | 61 MONTGOMERY ST | #18 | SAN FRANCISCO | CA | 94104 | |
| MELTWATER NEWS US INC | | 465 CALIFORNIA STREET | FLOOR 11 | SAN FRANCISCO | CA | 94101 | |
| MERCER COUNTY OFFICE OF CONSUMER AFFAIRS | | 640 S BROAD ST | | TRENTON | NJ | 08650 | |
| MERCER COUNTY OFFICE OF CONSUMER AFFAIRS | | PO BOX 8068 | 640 S BROAD ST | TRENTON | NJ | 08650-0068 | |
| MERLIN MEDIA LLC | | 3905 BENTLEY DR | | BEDFORD | TX | 76021 | |
| MERRILL LYNCH PIERCE FENNER INC | | ASSET SVCS CONTROL | 4804 DEER LAKE DR. E | JACKSONVILLE | FL | 32246 | |
| MERRILL LYNCH PIERCE FENNER & SMITH | DTC 8862 | EARL WEEKS | 4804 DEERLAKE DR. E | JACKSONVILLE | FL | 32246 | |
| MERRILL LYNCH PIERCE FENNER & SMITH | EARL WEEKS | ATTN CORPORATE ACTIONS | 4804 DEER LAKE DR. E | JACKSONVILLE | FL | 32246 | |
| MERRILL LYNCH PIERCE FENNER AND SMITH INC | | ASSET SVCS CONTROL | 4804 DEER LAKE DR E | JACKSONVILLE | FL | 32246 | |
| MERRILL LYNCH, PIERCE, FENNER & | SMITH INC. -SECURITIES LENDING | EARL WEEKS | 4804 DEER LAKE DR. E | JACKSONVILLE | FL | 32246 | |
| MERRILL LYNCH, PIERCE, FENNER & | SMITH INCORPORATED | EARL WEEKS | 4804 DEAR LAKE DR E | JACKSONVILLE | FL | 32246 | |
| MESSAGEBANK, LLC | | 260 MADISON AVE | | NEW YORK | NY | 10016 | |
| META PLATFORMS, INC. | FACEBOOK, INC. | 1601 WILLOW ROAD | | MENLO PARK | CA | 94025 | |
| METROPOLITAN COMMERCIAL BANK | | 99 PARK AVENUE | 12TH FLOOR | NEW YORK | NY | 10016 | |
| METROPOLITAN COMMERCIAL BANK | ATTN: MICHAEL GUARINO, RICHARD FOSTER | 99 PARK AVENUE, 12TH FLOOR | NEW YORK | | NY | 10016 | |
| METROPOLITAN COMMERCIAL BANK [MC BANK] | C/O WACHTELL, LIPTON, ROSEN & KATZ | ATTN: RICHARD G. MASON, AMY R. WOLF AND ANGELA K. HERRING | 51 WEST 52ND STREET | NEW YORK | NY | 10019 | |
| MG PHARMACY INC | | 950 BROADWAY | | BROOKLYN | NY | 11221 | |
| MIAMI DADE COUNTY | ATTN: CONSUMER PROTECTION DIVISION | STEPHEN P. CLARK CENTER | 111 NW 1ST STREET | MIAMI | FL | 33128 | |
| MICHIGAN CORPORATIONS, SECURITIES & COMMERCIAL LICENSING BUREAU | LINDA CLEGG, ACTING BUREAU DIRECTOR | 2407 N. GRAND RIVER AVENUE | | LANSING | MI | 48906 | |
| MICHIGAN CORPORATIONS, SECURITIES & COMMERCIAL LICENSING DIVISION | | 2407 N. GRAND RIVER AVE. | | LANSING | MI | 48906 | |
| MICHIGAN DEPARTMENT OF ATTORNEY GENERAL | ATTN: CONSUMER PROTECTION | G. MENNEN WILLIAMS BUILDING | 525 W. OTTAWA STREET P.O. BOX 30212 | LANSING | MI | 48909 | |
| MICHIGAN DEPARTMENT OF INSURANCE AND FINANCIAL SERVICES | | PO BOX 30220 | | LANSING | MI | 48909-7720 | |
| MICHIGAN DEPT OF TREASURY | UNCLAIMED PROPERTY | PO BOX 30756 | | LANSING | MI | 48909 | |
| MIDDLESEX COUNTY DIVISION OF CONSUMER AFFAIRS | | COUNTY ADMINISTRATION BUILDING | 75 BAYARD STREET | NEW BRUNSWICK | NJ | 08901 | |
| MIDDLESEX COUNTY DIVISION OF CONSUMER AFFAIRS AND WEIGHTS & MEASURES | | 75 BAYARD STREET | | NEW BRUNSWICK | NJ | 08901 | |
| MINDSBEAM TECHNOLOGIES INC | | #2, MULLAI COMPLEX | MOHAN NAGAR MAIN ST MADAMBAKKAM | TAMIL NADU | | 600126 | INDIA |
| MINNESOTA DEPARTMENT OF COMMERCE | | 85 SEVENTH PLACE EAST, SUITE 280 | | ST. PAUL | MN | 55101-2198 | |
| MINNESOTA DEPARTMENT OF COMMERCE | GRACE ARNOLD, COMMISSIONER | 85 EAST 7TH PLACE | SUITE 280 | ST. PAUL | MN | 55101 | |
| MINNESOTA DEPT OF COMMERCE | UNCLAIMED PROPERTY DIVISION | MAIN OFFICE, GOLDEN RULE BLDG | 85 7TH PLACE E, STE 280 | ST. PAUL | MN | 55101 | |
| MINNESOTA SECRETARY OF STATE, BUSINESS SERVICES OFFICE | | FIRST NATIONAL BANK BUILDING | 332 MINNESOTA STREET, SUITE N201 | ST. PAUL | MN | 55101 | |
| MINTZ & GOLD LLP | | 600 THIRD AVENUE, 25TH FLOOR | | NEW YORK | NY | 10016 | |
| MIRO | | 201 SPEAR STREET | SUITE 1100 | SAN FRANCISCO | CA | 94105 | |
| MIRO | | 21 SPEAR STREET | SUITE 11 | SAN FRANCISCO | CA | 94105 | |
| MISSISSIPPI SECRETARY OF BANKING AND CONSUMER FINANCE | | P.O. BOX 12129 | | JACKSON | MS | 39236-2129 | |
| MISSISSIPPI SECURITIES DIVISION | | 401 MISSISSIPPI STREET | | JACKSON | MS | 39201 | |
| MISSISSIPPI SECURITIES DIVISION | JESSICA LEIGH LONG, ASSISTANT SECRETARY OF STATE | P.O. BOX 136 | | JACKSON | MS | 39205-0136 | |
| MISSOURI DIVISION OF FINANCE | | PO BOX 716 | | JEFFERSON CITY | MO | 65102 | |
| MISSOURI SECURITIES DIVISION | DAVID MINNICK, COMMISSIONER | 600 WEST MAIN STREET | | JEFFERSON CITY | MO | 65101 | |
| MISSOURI STATE TREASURER | UNCLAIMED PROPERTY DIVISION | PO BOX 210 | | JEFFERSON CITY | MO | 65102 | |
| MIXPANEL INC | | ONE FRONT STREET, 28TH FLOOR | | SAN FRANCISCO | CA | 94111 | |
| MJD3 ASSOCIATES LLC | | 233 LAFAYETTE AVENUE | | SUFFERN | NY | 10901 | |
| MJD3 ASSOCIATES, LLC. | | 233 LAFAYETTE AVENUE, SUITE 201 | | SUFFERN | NY | 10901-4822 | |
| MOBILE ACTION INC. | | 233 LAFAYETTE AVENUE | | SUFFERN | NY | 10901 | |
| MOBILE ACTION, INC. | | 353 KEARNY ST | | SAN FRANCISCO | CA | 94133 | |
| MOECKLI FINANCE AND MGT LTD | | WIESENSTRASSE 7 | | ZURICH | | 8008 | SWITZERLAND |
| MOELIS & COMPANY LLC | | 399 PARK AVENUE, 5TH FLOOR | | NEW YORK | NY | 10021 | |
| MONDAY.COM | | 6 YITZHAK SADEH ST | | TEL-AVIV | | | ISRAEL |
| MONDAY.COM LTD | | 52 MENACHEM BEGIN ST. TEL AVIV 6713701 | ISRAEL | SANTA CLARA | CA | 95054 | |
| MONEY SERVICES BUSINESS ASSOCIATION | | 29 VALLEY TERRACE | | FRANKLIN | NJ | 07416 | |
| MONMOUTH COUNTY DIVISION OF CONSUMER AFFAIRS | ATTN: OFFICE OF CONSUMER PROTECTION | ONE EAST MAIN STREET | PO BOX 1255 | FREEHOLD | NJ | 07728 | |
| MONTANA DEPARTMENT OF JUSTICE | ATTN: OFFICE OF CONSUMER PROTECTION | P. O. BOX 200151 | | HELENA | MT | 59620-0151 | |
| MONTANA DEPT OF REVENUE | UNCLAIMED PROPERTY | PO BOX 5805 | | HELENA | MT | 59604 | |
| MONTANA DIVISION OF BANKING AND FINANCIAL INSTITUTIONS | | PO BOX 200546 | | HELENA | MT | 59620-0546 | |
| MONTANA SECURITIES DEPARTMENT | LYNNE EGAN, DEPUTY SECURITIES COMMISSIONER | 840 HELENA AVENUE | | HELENA | MT | 59601 | |
| MONTEREY COUNTY DISTRICT ATTORNEY'S OFFICE | ATTN: CONSUMER PROTECTION | PO BOX 1728 | | SALINAS | CA | 93902 | |
| MONTGOMERY COUNTY | ATTN: DIVISION OF CONSUMER PROTECTION | 100 MARYLAND AVENUE | SUITE 3600 | ROCKVILLE | MD | 20850 | |
| MORGAN STANLEY & CO. INTERNATIONAL | DAN SPADACCINI | 901 SOUTH BOND ST | 6TH FL | BALTIMORE | MD | 21231 | |
| MORGAN STANLEY & CO. PLC | | 25 CABOT SQUARE CANNARY WHARF | | LONDON | | E14 4QA | UNITED KINGDOM |
| MORGAN STANLEY & CO. LLC | CORP ACTIONS | 1300 THAMES STREET | 7TH FLOOR | BALTIMORE | MD | 21231 | |
| MORGAN STANLEY & CO. LLC | MICHELLE FORD | 901 SOUTH BOND ST | 6TH FL | BALTIMORE | MD | 21231 | |
| MORGAN STANLEY SMITH BARNEY | | 75 VARICK ST | | NEW YORK | NY | 10013 | |
| MORGAN STANLEY SMITH BARNEY | | 75 VARICK ST | | NEW YORK | NY | 10013 | |

≡ STRETTO

**Exhibit G**
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| MORVAL LIMITED | | BRITISH COLONIAL CENTRE STE 401 | | NASSAU | | | BAHAMAS |
| MOTION RECRUITMENT | | 185 DARTMOUTH ST. | SUITE 1105 | BOSTON | MA | 2116 | |
| MOTIVE DESIGN LLC (DBA UX HIRES) | | 55 MADISON AVE | FL 5 | NEW YORK | NY | 10010-1603 | |
| MOTIVE INTERACTIVE INC | | PO BOX 10841 | | ZEPHYR COVE | NV | 89448-2841 | |
| MPJ ADVISORS LLC | | 414 ELDRIDGE AVENUE | | MILL VALLEY | CA | 94941 | |
| MSG ARENA LLC | | 2 PENNSYLVANIA PLAZA | | NEW YORK | NY | 10121 | |
| MT. VERNON OFFICE OF CONSUMER AFFAIRS/BUREAU OF WEIGHTS AND MEASURES | | 1 ROOSEVELT SQUARE NORTH | | MOUNT VERNON | NY | 10550 | |
| NACIONALNA ORGANIZACIJA POTROSACA SRBIJE | | KRALJA PETRA 45/1ST FLOOR/OFFICE 7 | | BELGRADE | | 11000 | SERBIA |
| NAI INTERACTIVE LTD | | 1111 ALBERNI STREET | SUITE 2209 | VANCOUVER CITY | BC | V6E-4V2 | CANADA |
| NAPA COUNTY DISTRICT ATTORNEY'S OFFICE | ATTN: CONSUMER/ENVIRONMENTAL PROTECTION UNIT (CEPU) | 1127 FIRST STREET | SUITE C | NAPA | CA | 94559 | |
| NASDAQ CORPORATE SOLUTIONS, LLC | | 151 W 42ND STREET | | NEW YORK | NY | 10038 | |
| NASDAQ CORPORATE SOLUTIONS, LLC ("CORPORATE SOLUTIONS") | | ONE LIBERTY PLAZA | 165 BROADWAY | NEW YORK | NY | 10006 | |
| NASSAU COUNTY OFFICE OF CONSUMER AFFAIRS | | 240 OLD COUNTRY RD | 3RD FLOOR | MINEOLA | NY | 11501 | |
| NASSAU COUNTY OFFICE OF CONSUMER AFFAIRS | ATTN: DEPARTMENT OF CONSUMER AFFAIRS | 240 OLD COUNTRY RD | 3RD FLOOR | MINEOLA | NY | 11501 | |
| NATIONAL ASSOCIATION OF INVESTORS CORPORATION (BETTERINVESTING) | | 570 KIRTS BLVD | SUITE 237 | TROY | MI | 48084 | |
| NATIONAL BANK OF SERBIA | | KRALJA PETRA 12 | | BELGRADE | | 11000 | SERBIA |
| NATIONAL FINANCIAL SERVICES LLC | CORP ACTIONS | 200 SEAPORT BOULEVARD, Z1B | | BOSTON | MA | 02210 | |
| NATIONAL INVESTOR RELATIONS INSTITUTE (NIRI) | | 908 KING STREET | SUITE 310 | ALEXANDRIA | VA | 22314 | |
| NATIONAL WOMENS SOCCER LEAGUE | | 4130 BEN MILLER ROAD | | GIBSONIA | PA | 15044 | |
| NATIONAL WOMENS SOCCER LEAGUE, LLC | | 1556 S MICHIGAN AVE | FLOOR 2 | CHICAGO | IL | 60605 | |
| NATIONAL WOMEN'S SOCCER LEAGUE, LLC | | 1556 S MICHIGAN AVE | FLOOR 2 | CHICAO | IL | 60605 | |
| NBCN CLEARING INC. | | 250 YONGE STREET | SUITE 1900 | TORONTO | ON | M5B-2L7 | CANADA |
| NBCN INC./CDS | ANNA MEDEIROS | CORPORATE ACTIONS | 1010 RUE DE LA GAUCHETIERE ST WEST, SUITE 1925 | MONTREAL | QC | H3B 5J2 | CANADA |
| NBSM WORLD, LLC D/B/A NOMT | | 25 W 45TH ST. | | NEW YORK | NY | 10036 | |
| NEBRASKA BUSINESS SERVICES DIVISION | | PO BOX 94608 | | LINCOLN | NE | 68509-4608 | |
| NEBRASKA DEPARTMENT OF BANKING & FINANCE BUREAU OF SECURITIES | CLAIRE MCHENRY, DEPUTY DIRECTOR – BUREAU OF SECURITIES | P.O. BOX 95006 | | LINCOLN | NE | 68509-5006 | |
| NEBRASKA DEPARTMENT OF BANKING AND FINANCE | | PO BOX 95006 | | LINCOLN | NE | 68509-5006 | |
| NEBRASKA STATE TREASURER | UNCLAIMED PROPERTY DIVISION | 809 P ST | | LINCOLN | NE | 68508-1390 | |
| NETKI, INC. | | 6433 TOPANGA CANYON BLVD | SUITE 235 | CANOGA PARK | CA | 91303 | |
| NETWORK REDUX | | 5200 SW MACADAM AVE | SUITE 470 | PORTLAND | OR | 97239 | |
| NETWORK REDUX | | 5200 SW MACADAM AVE. SUITE 470 | | PORTLAND | OR | 97239 | |
| NETWORK REDUX LLC | | 5200 S MACADAM AVENUE | | PORTLAND | OR | 97239 | |
| NEVADA FINANCIAL INSTITUTIONS DIVISION, DEPARTMENT OF BUSINESS & INDUSTRY | | 3300 W. SAHARA AVE | | LAS VEGAS | NV | 89102 | |
| NEVADA SECURITIES DIVISION | ERIN HOUSTON, ADMINISTRATOR/DEPUTY SECRETARY OF STATE FOR SECURITIES | 2250 LAS VEGAS BOULEVARD NORTH | STE. 400 | NORTH LAS VEGAS | NV | 89030 | |
| NEVADA STATE TREASURER | UNCLAIMED PROPERTY DIVISION | 555 E WASHINGTON AVE, STE 4200 | | LAS VEGAS | NV | 89101 | |
| NEW HAMPSHIRE BUREAU OF SECURITIES REGULATION | ATTN: MICHAEL KIRWIN | NH BUREAU OF SECURITIES REGULATION | 25 CAPITOL ST | CONCORD | NH | 03301 | |
| NEW HAMPSHIRE BUREAU OF SECURITIES REGULATION | ERIC FORCIER, DEPUTY SECRETARY, BUREAU OF SECURITIES REGULATION | 107 N. MAIN ST. | STATE HOUSE ROOM 204 | CONCORD | NH | 03301-4989 | |
| NEW HAMPSHIRE SECRETARY OF STATE, CORPORATION DIVISION | | N.H. DEPARTMENT OF STATE | 107 NORTH MAIN STREET | CONCORD | NH | 03301-4989 | |
| NEW HAMPSHIRE STATE BANKING DEPARTMENT | | 53 REGIONAL DRIVE | | CONCORD | NH | 03301 | |
| NEW JERSEY BUREAU OF SECURITIES | AMY KOPLETON, ACTING BUREAU CHIEF | 153 HALSEY STREET, 6TH FLOOR | | NEWARK | NJ | 07102 | |
| NEW JERSEY DEPARTMENT OF BANKING AND INSURANCE | | PO BOX 040 | | TRENTON | NJ | 08625-0040 | |
| NEW JERSEY DEPARTMENT OF LAW AND PUBLIC SAFETY, NEWARK, NJ | ATTN: NEW JERSEY DIVISION OF CONSUMER AFFAIRS | 124 HALSEY STREET | | NEWARK | NJ | 07102 | |
| NEW JERSEY DEPARTMENT OF THE TREASURY, DIVISION OF REVENUE, BUSINESS SERVICES BUREAU | | DIVISION OF REVENUE AND ENTERPRISE SERVICES | PO BOX 628 | TERNTON | NJ | 08625-0628 | |
| NEW JERSEY DIVISION OF CONSUMER AFFAIRS | | 124 HALSEY STREET | | NEWARK | NJ | 07101 | |
| NEW MEXICO FINANCIAL INSTITUTIONS DIVISION | | PO BOX 25101 | | SANTA FE | NM | 87504-5101 | |
| NEW MEXICO SECRETARY OF STATE, CORPORATIONS BUREAU | | 325 DON GASPAR, SUITE 300 | | SANTA FE | NM | 87501 | |
| NEW MEXICO SECURITIES DIVISION | BENJAMIN SCHROPE, INTERIM DIRECTOR/ATTORNEY | 2550 CERRILLOS RD | | SANTA FE | NM | 87505-3260 | |
| NEW MEXICO TAXATION & REVENUE DEPT | UNCLAIMED PROPERTY DIVISION | 1200 SOUTH ST | | SANTA FE | NM | 87504 | |
| NEW YORK CITY DEPARTMENT OF CONSUMER AFFAIRS | ATTN: CONSUMER SERVICES DIVISION | 42 BROADWAY | 9TH FLOOR | NEW YORK | NY | 10004 | |
| NEW YORK DEPARTMENT OF STATE | ATTN: DIVISION OF CONSUMER PROTECTION | 123 WILLIAM STREET | | NEW YORK | NY | 10038-3804 | |
| NEW YORK DEPARTMENT OF STATE | ATTN: DIVISION OF CONSUMER PROTECTION | ONE COMMERCE PLAZA | 99 WASHINGTON AVE | ALBANY | NY | 12231-0001 | |
| NEW YORK DEPARTMENT OF STATE | ATTN: DIVISION OF CONSUMER PROTECTION | ONE COMMERCE PLAZA | 99 WASHINGTON AVENUE | ALBANY | NY | 12231-0001 | |
| NEW YORK INVESTOR PROTECTION BUREAU | SHAMISO MASIWOSWE, CHIEF, INVESTOR PROTECTION BUREAU | 28 LIBERTY STREET | 15TH FLOOR | NEW YORK | NY | 10005 | |
| NEW YORK STATE COMPTROLLER | OFFICE OF UNCLAIMED FUNDS | 110 STATE ST | | ALBANY | NY | 12236 | |
| NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES | | 1 STATE STREET | | NEW YORK | NY | 10004 | |
| NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES | | ONE COMMERCE PLAZA | | ALBANY | NY | 12257 | |
| NEW YORK STATE DEPARTMENT OF TAXATION AND FINANCE | ATTN: BANKRUPTCY SECTION | PO BOX 5300 | | ALBANY | NY | 12205-0300 | |
| NEXT FOR ME MEDIA, INC. | | 941 SOUTH VERMONT AVENUE, #56 | | LOS ANGELES | CA | 90006 | |
| NOBLE CAPITAL MARKETS, INC | | 150 EAST PALMETTO PARK ROAD | SUITE 110 | BOCA RATON | FL | 33432 | |
| NOBLE CAPITAL MARKETS, INC. | ATTENTION: CHANTAL PEREIRA | 150 E PALMETTO PARK RD | STE 110 | BOCA RATON | FL | 33432-4808 | |
| NOMINIS ADVISORY LTD | | 93 STRATHVILLE ROAD | | LONDON | | SW18 4QR | UNITED KINGDOM |
| NORDGAARDS APS | | HOJEN 23 | | SKELSKOR | | 4230 | DENMARK |
| NORDIC EYE A/S | | HAVNEGADE 55 ST TH | | KOVENHAVN K 1058 | | | DENMARK |
| NORDIC EYE K/S | ATTN: ANDERS KAASGAARD | HAVNEGADE 55 | | KøBENHAVN | | 1058 | DENMARK |
| NORDIC EYE K/S | C/O BRUUN & HJEJLE | ATTN: CHRISTIAN EICHEN | NøRREGADE 21 CVR NO. 37 97 51 92 | COPENHAGEN | | DK-1165 | DENMARK |
| NORFOLK DISTRICT ATTORNEY OFFICE | ATTN: CONSUMER PROTECTION | 48 SHAWMUT RD. | | CANTON | MA | 02021 | |
| NORGAARDS APS | | HOJEN 23 | | SKELSKOR | | 4230 | DENMARK |
| NORTH CAROLINA DEPARTMENT OF AGRICULTURE & CONSUMER SERVICES | | 1001 MAIL SERVICE CENTER | | RALEIGH | NC | 27699-1001 | |
| NORTH CAROLINA OFFICE OF COMMISSIONER OF BANKS | | 4309 MAIL SERVICE CENTER | | RALEIGH | NC | 27699-4309 | |
| NORTH CAROLINA SECRETARY OF STATE, CORPORATIONS DIVISION | | PO BOX 29622 | | RALEIGH | NC | 27626-0622 | |
| NORTH CAROLINA SECURITIES DIVISION | ANDY PENRY, DIRECTOR, SECURITIES DIVISION, NC SECRETARY OF STATE | P.O. BOX 29622 | | RALEIGH | NC | 27626-0622 | |
| NORTH CAROLINA STATE TREASURER | UNCLAIMED PROPERTY DIVISION | PO BOX 20431 | | RALEIGH | NC | 27619-0431 | |
| NORTH DAKOTA DEPARTMENT OF FINANCIAL INSTITUTIONS | | 1200 MEMORIAL HWY | | BISMARCK | ND | 58504-5262 | |
| NORTH DAKOTA SECRETARY OF STATE, BUSINESS INFORMATION/REGISTRATION DIVISION | | 600 E BOULEVARD AVENUE DEPT 108 | | BISMARK | ND | 58505-0500 | |
| NORTH DAKOTA SECURITIES DEPARTMENT | | 600 EAST BOULEVARD, DEPT. 414 | | BISMARCK | ND | 58505-0510 | |
| NORTHERN MARIANA ISLANDS DEPARTMENT OF COMMERCE | KAREN TYLER, COMMISSIONER | CALLER BOX 10007 | STATE CAPITOL, 5TH FLOOR | SAIPAN | MP | 96950 | |
| NORTHWESTERN DISTRICT ATTORNEY OFFICE | | ONE GLEASON PLAZA | | NORTHAMPTON | MA | 01060 | |
| NUMEDIA LLC | | 121 NE 3RD ST #1202 | FT | | FL | 33301 | |
| NYC CONSUMER AFFAIRS | | 42 BROADWAY | | NEW YORK | NY | 10004 | |
| NYS DEPARTMENT OF TAXATION AND FINANCE | OPTS-CORPORATION TAX LIABILITY RESOLUTION | W A HARRIMAN CAMPUS | | ALBANY | NY | 12227 | |
| OCEAN COUNTY DEPARTMENT OF CONSUMER AFFAIRS | | 1027 HOOPER AVENUE | BLDG 2 | TOMS RIVER | NJ | 08754-2191 | |
| OCEAN COUNTY DIVISION OF CONSUMER AFFAIRS | | 1027 HOOPER AVENUE | BLDG 2 | TOMS RIVER | NJ | 08754-2191 | |
| OCTIVE | | 136A RUE SAINT-PAUL EST | | MONTREAL | QC | H2Y 1G6 | CANADA |
| OFFICE OF ATTORNEY GENERAL ASHLEY MOODY | ATTN: CONSUMER PROTECTION DIVISION | 1 SE 3RD AVE. | 9TH FLOOR | MIAMI | FL | 33131 | |
| OFFICE OF ATTORNEY GENERAL ASHLEY MOODY | ATTN: CONSUMER PROTECTION DIVISION | 110 SE 6TH STREET | 9TH FLOOR | FORT LAUDERDALE | FL | 33301-5000 | |
| OFFICE OF ATTORNEY GENERAL ASHLEY MOODY | ATTN: CONSUMER PROTECTION DIVISION | 135 W. CENTRAL BLVD., SUITE 670 | | ORLANDO | FL | 32801 | |
| OFFICE OF ATTORNEY GENERAL ASHLEY MOODY | ATTN: CONSUMER PROTECTION DIVISION | 1515 N. FLAGLER DRIVE, SUITE 900 | | WEST PALM BEACH | FL | 33401 | |
| OFFICE OF ATTORNEY GENERAL ASHLEY MOODY | ATTN: CONSUMER PROTECTION DIVISION | CONCOURSE CENTER 4 | 3507 E. FRONTAGE ROAD, SUITE 325 | TAMPA | FL | 33607-1795 | |
| OFFICE OF ATTORNEY GENERAL ASHLEY MOODY | ATTN: CONSUMER PROTECTION DIVISION | STATE OF FLORIDA | THE CAPITOL | TALLAHASSEE | FL | 32399-1050 | |
| OFFICE OF CONSUMER AFFAIRS AND BUSINESS REGULATION | ATTN: CONSUMER PROTECTION | 501 BOYLSTON STREET, SUITE 5100 | | BOSTON | MA | 02116 | |
| OFFICE OF MINNESOTA ATTORNEY GENERAL | ATTN: CONSUMER PROTECTION | 445 MINNESOTA STREET, SUITE 1400 | | ST. PAUL | MN | 55101 | |
| OFFICE OF THE ATTORNEY GENERAL OF IOWA | ATTN: CONSUMER PROTECTION DIVISION | HOOVER STATE OFFICE BUILDING | 1305 E. WALNUT STREET | DES MOINES | IA | 50319-0106 | |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 9 of 15

**Exhibit G**
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| OFFICE OF THE ATTORNEY GENERAL OF KANSAS | ATTN: CONSUMER PROTECTION DIVISION | 120 SW 10TH AVE, 2ND FLOOR | | TOPEKA | KS | 66612-1597 | |
| OFFICE OF THE ATTORNEY GENERAL OF KENTUCKY | ATTN: OFFICE OF CONSUMER PROTECTION | 1024 CAPITAL CENTER DRIVE, SUITE 200 | | FRANKFORT | KY | 40601 | |
| OFFICE OF THE ATTORNEY GENERAL OF LOUISIANA | ATTN: CONSUMER PROTECTION SECTION | P.O. BOX 94005 | | BATON ROUGE | LA | 70804-9005 | |
| OFFICE OF THE ATTORNEY GENERAL OF MARYLAND | ATTN: CONSUMER PROTECTION DIVISION | 200 ST. PAUL PLACE | | BALTIMORE | MD | 21202 | |
| OFFICE OF THE ATTORNEY GENERAL OF MASSACHUSETTS | ATTN: CONSUMER ADVOCACY & RESPONSE DIVISION | ONE ASHBURTON PLACE | 18TH FLOOR | BOSTON | MA | 02108 | |
| OFFICE OF THE ATTORNEY GENERAL OF NEVADA | ATTN: BUREAU OF CONSUMER PROTECTION | 100 NORTH CARSON STREET | | CARSON CITY | NV | 89701 | |
| OFFICE OF THE ATTORNEY GENERAL OF NEW HAMPSHIRE | C/O CONSUMER PROTECTION BUREAU | 33 CAPITOL STREET | | CONCORD | NH | 03301 | |
| OFFICE OF THE ATTORNEY GENERAL OF NEW MEXICO | | 408 GALISTEO STREET | VILLAGRA BUILDING | SANTA FE | NM | 87501 | |
| OFFICE OF THE ATTORNEY GENERAL OF NEW YORK | ATTN: BUREAU OF CONSUMER FRAUDS & PROTECTION | THE CAPITOL | | ALBANY | NY | 12224-0341 | |
| OFFICE OF THE ATTORNEY GENERAL OF NORTH CAROLINA | ATTN: CONSUMER PROTECTION | 9001 MAIL SERVICE CENTER | | RALEIGH | NC | 27699-9001 | |
| OFFICE OF THE ATTORNEY GENERAL OF NORTH DAKOTA | ATTN: CONSUMER PROTECTION | 600 E. BOULEVARD AVE DEPT. 125 | | BISMARCK | ND | 58505 | |
| OFFICE OF THE ATTORNEY GENERAL OF OHIO | ATTN: CONSUMER PROTECTION SECTION | RHODES STATE OFFICE TOWER | 30 EAST BROAD STREET, 14TH FLOOR | COLUMBUS | OH | 43215 | |
| OFFICE OF THE ATTORNEY GENERAL OF RHODE ISLAND | ATTN: CONSUMER PROTECTION BUREAU | 150 SOUTH MAIN STREET | | PROVIDENCE | RI | 2903 | |
| OFFICE OF THE ILLINOIS ATTORNEY GENERAL | ATTN: CONSUMER PROTECTION BUREAU | 100 WEST RANDOLPH STREET | | CHICAGO | IL | 60601 | |
| OFFICE OF THE ILLINOIS ATTORNEY GENERAL | ATTN: CONSUMER PROTECTION BUREAU | 1776 E. WASHINGTON ST. | | URBANA | IL | 61802 | |
| OFFICE OF THE ILLINOIS ATTORNEY GENERAL | ATTN: CONSUMER PROTECTION BUREAU | 201 WEST POINTE DRIVE, SUITE 7 | | BELLEVILLE | IL | 62226 | |
| OFFICE OF THE ILLINOIS ATTORNEY GENERAL | ATTN: CONSUMER PROTECTION BUREAU | 306 N. PULASKI RD. | | CHICAGO | IL | 60624 | |
| OFFICE OF THE ILLINOIS ATTORNEY GENERAL | ATTN: CONSUMER PROTECTION BUREAU | 500 SOUTH SECOND STREET | | SPRINGFIELD | IL | 62701 | |
| OFFICE OF THE ILLINOIS ATTORNEY GENERAL | ATTN: CONSUMER PROTECTION BUREAU | 601 SOUTH UNIVERSITY AVE. | | CARBONDALE | IL | 62901 | |
| OFFICE OF THE ILLINOIS ATTORNEY GENERAL | ATTN: CONSUMER PROTECTION BUREAU | 628 MAINE STREET | | QUINCY | IL | 62301 | |
| OFFICE OF THE ILLINOIS ATTORNEY GENERAL | ATTN: CONSUMER PROTECTION BUREAU | 8100 S. STONY ISLAND, SUITE C | | CHICAGO | IL | 60617 | |
| OFFICE OF THE INDIANA ATTORNEY GENERAL | ATTN: CONSUMER PROTECTION BUREAU | ZEKE GIORGI CENTER | 200 SOUTH WYMAN ST.SUITE 307 | ROCKFORD | IL | 61101 | |
| OFFICE OF THE INDIANA ATTORNEY GENERAL | ATTN: CONSUMER PROTECTION DIVISION | 302 W. WASHINGTON STREET, 5TH FLOO | | INDIANAPOLIS | IN | 46204 | |
| OFFICE OF THE KANSAS SECURITIES COMMISSIONER | DAN KLUCAS, SECURITIES COMMISSIONER | 1300 SW ARROWHEAD ROAD | SUITE 600 | TOPEKA | KS | 66604 | |
| OFFICE OF THE MAINE ATTORNEY GENERAL | | 6 STATE HOUSE STATION | | AUGUSTA | ME | 04333 | |
| OFFICE OF THE RHODE ISLAND GENERAL TREASURER | UNCLAIMED PROPERTY DIVISION | 50 SERVICE AVE | | WARWICK | RI | 02886 | |
| OFFICE OF THE SOUTH CAROLINA ATTORNEY GENERAL | SECURITIES DIVISION | P.O. BOX 11549 | | COLUMBIA | SC | 29211 | |
| OFFICE OF THE SOUTH CAROLINA ATTORNEY GENERAL, SECURITIES DIVISION | SECURITIES DIVISION | P.O. BOX 11549 | | COLUMBIA | SC | 29211 | |
| OFFICE OF THE SOUTH CAROLINA ATTORNEY GENERAL, SECURITIES DIVISION | SECURITIES DIVISION | P.O. BOX 11549 | | COLUMBIA | SC | 29211 | |
| OFFICE OF THE UNITED STATES TRUSTEE | ATTN: RICHARD C. MORRISSEY | ALEXANDER HAMILTON CUSTOM HOUSE | ONE BOWLING GREEN, ROOM 534 | NEW YORK | NY | 10004-1408 | |
| OFFICE OF THE WEST VIRGINIA STATE TREASURER | UNCLAIMED PROPERTY DIVISION | STATE CAPITOL, ROOM E-145 | 1900 KANAWHA BLVD, E | CHARLESTON | WV | 25305 | |
| OGON LLC. | | 575 5TH AVE | FL 14 | NEW YORK | NY | 10017-2452 | |
| OGON,LLC | | 135 EAST 57TH STREET | SUITE 16-113 | NEW YORK | NY | 10022 | |
| OHIO DEPT OF COMMERCE | DIVISION OF UNCLAIMED FUNDS | 77 SOUTH HIGH ST, 20TH FL | | COLUMBUS | OH | 43215-6108 | |
| OHIO DIVISION OF FINANCIAL INSTITUTIONS | | 77 SOUTH HIGH STREET | | COLUMBUS | OH | 43215-6120 | |
| OHIO DIVISION OF SECURITIES | ANDREA SEIDT, COMMISSIONER | 77 SOUTH HIGH STREET | 22ND FLOOR | COLUMBUS | OH | 43215 | |
| OHIO SECRETARY OF STATE | | 22 NORTH FOURTH STREET, 16TH FLOOR | | COLUMBUS | OH | 43215 | |
| OKLAHOMA DEPARTMENT OF SECURITIES | GERRI KAVANAUGH, GENERAL COUNSEL | 204 NORTH ROBINSON AVENUE | SUITE 400 | OKLAHOMA CITY | OK | 73102 | |
| OKLAHOMA DEPARTMENT OF SECURITIES | MELANIE HALL, ADMINISTRATOR | 204 N. ROBINSON | SUITE 400, CITY PLACE | OKLAHOMA CITY | OK | 73102 | |
| OKLAHOMA OFFICE OF THE ATTORNEY GENERAL | ATTN: CONSUMER PROTECTION | 313 NE 21ST ST | | OKLAHOMA CITY | OK | 73105 | |
| OKLAHOMA SECRETARY OF STATE | | COLCORD CENTER | 421 NW 13TH ST, SUITE 210/220 | OKLAHOMA CITY | OK | 73103 | |
| OKLAHOMA STATE BANKING DEPARTMENT | | 2900 NORTH LINCOLN BOULEVARD | | OKLAHOMA CITY | OK | 73105 | |
| OKLAHOMA STATE TREASURER | UNCLAIMED PROPERTY DIVISION | 9520 N. MAY AVE. | LOWER LEVEL | OKLAHOMA CITY | OK | 73120 | |
| OKTA | | 1 FIRST STREET | 6TH FLOOR | SAN FRANCISCO | CA | 94105 | |
| OLIVIA FARIA LLC | | 460 SUNSET WAY | | JUNO BEACH | FL | 33408 | |
| ONLINE BUSINESS SYSTEM | | 8600 NORMANDALE LAKE BLVD | | BLOOMINGTON | MN | 55437 | |
| ONLINE BUSINESS SYSTEMS | | 8500 NORMANDALE LAKE BLVD. SUITE 350 | SUITE 350 | BLOOMINGTON | MN | 55437 | |
| ONTARIO SECURITIES COMMISSION | | 20 QUEEN ST. W. | PO BOX 55 | TORONTO | ON | M5H-3S8 | CANADA |
| OPPENHEIMER & CO. INC. | | 85 BROAD STREET | | NEW YORK | NY | 10004 | |
| OPSGENIE, INC. | OSCAR MAZARIO | 239 CAUSEWAY STREET | SUITE 300 | BOSTON | MA | 02114 | |
| ORACLE AMERICA, INC. | | 2300 ORACLE WAY | | AUSTIN | TX | 78741 | |
| ORACLE AMERICA, INC. | ATTN: PEGGY BRUGGMAN, BENJAMIN WHEELER | 500 ORACLE PARKWAY | | REDWOOD SHORES | CA | 94065 | |
| ORACLE AMERICA, INC. | C/O DOSHI LEGAL GROUP, P.C. | ATTN: AMISH R. DOSHI | 1979 MARCUS AVENUE, SUITE 210E | LAKE SUCCESS | NY | 11042 | |
| ORANGE COUNTY CONSUMER PROTECTION | | 2450 33RD STREET, 2ND FLOOR | | ORLANDO | FL | 32839 | |
| ORANGE COUNTY DEPARTMENT OF CONSUMER AFFAIRS AND WEIGHTS & MEASURES | | 255 MAIN STREET | | GOSHEN | NY | 10924 | |
| ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE | ATTN: CONSUMER PROTECTION | 300 NORTH FLOWER ST | | SANTA ANA | CA | 92703 | |
| ORANGE COUNTY GOVERNMENT CENTER | CONSUMER AFFAIRS & WEIGHTS & MEASURES DEPARTMENT | 255 MAIN STREET | | GOSHEN | NY | 10924 | |
| OREGON DEPARTMENT OF JUSTICE | ATTN: CONSUMER PROTECTION | 1162 COURT ST NE | | SALEM | OR | 97301-4096 | |
| OREGON DEPT OF STATE LANDS | UNCLAIMED PROPERTY DIVISION | 775 SUMMER ST NE | STE 100 | SALEM | OR | 97301-1279 | |
| OREGON DIVISION OF FINANCIAL REGULATION | | PO BOX 14480 | | SALEM | OR | 97309-0405 | |
| OREGON DIVISION OF FINANCIAL REGULATION | TK KEEN, ADMINISTRATOR | 350 WINTER STREET, NE | ROOM 410 | SALEM | OR | 97301-3881 | |
| OREGON SECRETARY OF STATE, CORPORATION DIVISION | | 255 CAPITOL ST. NEW SUITE 151 | PUBLIC SERVICE BUILDING | SALEM | OR | 97310 | |
| ORGANIC INC. | | 600 CALIFORNIA STREET | 8TH FLOOR | SAN FRANCISCO | CA | 94108 | |
| ORGANIC INC. | | 600 CALIFORNIA STREET, 8TH FLOOR | | SAN FRANCISCO | CA | 94108 | |
| ORGANIC, INC. | | 22 EAST 42ND ST | | NEW YORK | NY | 10017 | |
| ORGANIC, INC. | | 220 E 42ND ST. | | NEW YORK CITY | NY | 10017 | |
| OTC MARKETS GROUP INC. | | 300 VERSEY STREET | 12TH FLOOR | NEW YORK | NY | 10282 | |
| OTC MARKETS GROUP INC. | | PO BOX 29959 | | NEW YORK | NY | 10087-9959 | |
| OWEN BIRD LAW CORPORATION | | 2900-595 BURRARD STREET | THREE BENTALL CENTRE | VANCOUVER CITY | BC | V7X-1J5 | CANADA |
| PACHULSKI STANG ZIEHL & JONES LLP | ATTN: JASON ROSELL | 780 3RD AVENUE, 36TH FLOOR | | NEW YORK | NY | 10017 | |
| PADA VENTURES,INC. D/B/A GROWRK REMOTE | | 3534 5TH AVENUE | UNITE 513 | SAN DIEGO | CA | 92103 | |
| PADA VENTURES,INC. D/B/A GROWRK REMOTE | | 3534 FIFTH AVE | | SAN DIEGO | CA | 92103 | |
| PAGERDUTY, INC. | | 600 TOWNSEND ST STE 200E | | SAN FRANCISCO | CA | 94103-5690 | |
| PALM BEACUTY CONSUMER AFFAIRS | | 50 SOUTH MILITARY TRAIL | SUITE 201 | WEST PALM BEACH | FL | 33415 | |
| PARIAN GLOBAL US FUND II LP | | 61 POUND RIDGE ROAD | | POUND RIDGE | NY | 10576 | |
| PARIAN GLOBAL US FUND II LP | | 61 POUND RIDGE ROAD | | POUND RIDGE | NY | 10576 | |
| PASSAIC COUNTY DEPARTMENT OF CONSUMER PROTECTION AND WEIGHTS & MEASURES | | 401 GRAND STREET | | PATERSON | NJ | 07505 | |
| PASSIAC COUNTY DIVISION OF CONSUMER PROTECTION | | 220 E RIDGEWOOD AVE | | PARAMUS | NJ | 07652 | |
| PATRICK KUEHL, JR V. VOYAGER DIGITAL LTD. | | PATRICK KUEHL, JR., 7 WEST 62ND STREET | | MISSOURI | KS | 64113 | |
| PAUL HASTINGS LLP | | 1170 PEACHTREE STREET N.E. | SUITE 100 | ATLANTA | GA | 30309 | |
| PAUL HASTINGS LLP | | 515 S. FLOWER STREET | SUITE 2500 | LOS ANGELES | CA | 90071 | |
| PEAPLE TALENT | | 4 COLSTON YARD | | BRISTOL | | BS1 5BD | UNITED KINGDOM |
| PEAPLE TALENT | | COLSTON YD, 4 COLSTON YARD | | BRISTOL | | BS1 5BD | UNITED KINGDOM |
| PENN RECRUITING, LLC | | 1290 VALLEY FORGE ROAD | | VILLANOVA | PA | 19085 | |
| PENNSYLVANIA DEPARTMENT OF BANKING AND SECURITIES | ERIC PISTILLI, DEPUTY SECRETARY OF SECURITIES | 17 NORTH SECOND STREET | | HARRISBURG | PA | 17101-2290 | |
| PENNSYLVANIA DEPARTMENT OF BANKING AND SECURITIES | | 17 NORTH 2ND STREET | SUITE 1300 | HARRISBURG | PA | 17101-2290 | |
| PENNSYLVANIA DEPARTMENT OF STATE, CORPORATION BUREAU | | PENN CENTER, 2601 N. 3RD STREET | | HARRISBURG | PA | 17110 | |
| PENNSYLVANIA OFFICE OF THE DISTRICT ATTORNEY | ATTN: BUREAU OF CONSUMER PROTECTION RESOURCES | STRAWBERRY SQUARE | 15TH FLOOR | HARRISBURG | PA | 17120 | |
| PENNSYLVANIA STATE TREASURY | UNCLAIMED PROPERTY DIVISION | 4TH FL, RIVERFRONT OFFICE CTR | 1101 SOUTH FRONT ST | HARRISBURG | PA | 17104-2516 | |
| PEOPLE'S SECURITIES INC | | 850 MAIN ST | | BRIDGEPORT | CT | 06604 | |
| PEOPLE'S SECURITIES INC | | 850 MAIN ST | | BRIDGEPORT | CT | 06604 | |
| PERKINS COIE | | 1201 3RD AVE STE 4800 | | SEATTLE | WA | 98101-3266 | |
| PERSHING LLC | JOSEPH LAVARA | ONE PERSHING PLAZA | | JERSEY CITY | NJ | 07399 | |
| PERSHING LLC FR | MOONLIGHT CAPITAL INC | 1 PERSHING PLAZA | | JERSEY CITY | NJ | 07399 | |
| PERSHING LLC TR MOONLIGHT CAPITAL INC | | MOONLIGHT CAPITAL, INC | 1 PERSHING PLAZA | JERSEY CITY | NJ | 07399 | |
| PHILECO APS | | TYGE KRABBES VEJ 9 | | KOBENHAVN | | 2300 | DENMARK |
| PICKWICK CAPITAL PARTNERS, LLC | | 445 HAMILTON AVENUE | SUITE 1102 | WHITE PLAINS | NY | 10601 | |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 10 of 15

STRETTO

**Exhibit G**
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| PICKWICK CAPITAL PARTNERS, LLC | | CONSELLO MB LLC, ATTN: GENERAL COUNSEL | 590 MADISON AVENUE | NEW YORK | NY | 10022 | |
| PINELLAS COUNTY CONSUMER PROTECTION | | 14250 49TH STREET NORTH | SUITE 1000, RM 2 | CLEARWATER | FL | 33762 | |
| PINK ROSE CAPITAL LLC | | PO BOX 396 | | NEW VERNON | NJ | 07976 | |
| PINK ROSE CAPITAL LLC | | PO BOX 396 | | NEW VERNON | NJ | 07976 | |
| PIPER COMPANIES, LLC | | 1410 SPRING HILL DR | STE. 300 | MCLEAN | VA | 22102 | |
| PIPER COMPANIES, LLC | | 1410 SPRING HILL ROAD | SUITE 300 | MC LEAN | VA | 22102 | |
| PITCHBOOK DATA, INC. | | 901 5TH AVENUE | SUITE 1200 | SEATTLE | WA | 98164 | |
| PITCHBOOK DATA, INC. | | 901 FIFTH AVENUE | SUITE 1200 | SEATTLE | WA | 98164 | |
| PLAID FINANCIAL LTD. | | 25 MAIDEN LANE | | SAN FRANCISCO | CA | 94108 | |
| PLAID INC. | | 85 2ND ST STE 400 | | SAN FRANCISCO | CA | 94105-3462 | |
| PLAID INC. | | 85 2ND ST STE 400 | | SAN FRANCISCO | CA | 94105-3462 | |
| PLAID INC. (F.K.A. PLAID TECHNOLOGIES, INC.) | | 25 MAIDEN LANE | | SAN FRANCISCO | CA | 94108 | |
| PN AGENCY | | 2 TORONTO ST. | | TORONTO | ON | M5C-2B5 | CANADA |
| PNC BANK, NATIONAL ASSOCIATION | JUANITA NICHOLS | 8800 TINICUM BLVD | SUITE 202 | PHILADELPHIA | PA | 19153 | |
| PR NEWSWIRE | | 602 HARBORSIDE FINANCIAL CENTER | PLACE 3 6TH FLOOR | JERSEY CITY | NJ | 07311 | |
| PREMIER PARTNERSHIPS, INC. | | 1148 4TH STREET | | SANTA MONICA | CA | 90401 | |
| PRESEED VENTURES A/S | | DIPLOMVEJ 381 | | KGS L.YNGBY | | 2800 | DENMARK |
| PRICE AND ASSOCIATES CPAS, LLC, D/B/A ALIGN ASSURANCE | | 400 N ASHLEY DRIVE | SUITE 1325 | TAMPA | FL | 33602 | |
| PROCONSUL CAPITAL LTD | | 45 JEROME STREET | | TORONTO | ON | M6P 1H8 | CANADA |
| PROCONSUL CAPITAL, LTD. | | 45 JEROME STREET | | TORONTO | ON | M6P 1H8 | CANADA |
| PROJECT 1972, INC. | | 13 E 16TH STREET | | NEW YORK | NY | 10003 | |
| PRO-SPORT MEDIA MANAGEMENT LLC | | 517 ALCONE ROAD | STE 202 | MOORESVILLE | NC | 28117 | |
| PUBLICIST INC. | | 12A MOHAMMED AL MARAASHLY | MOHAMMED MAZHAR ZAMALEK | CAIRO GOVERNORATE | | 4271151 | |
| PUBLICIST INC. | | 133 MULBERRY STREET | | NEW YORK | NY | 10013 | |
| PUEBLO COUNTY DISTRICT ATTORNEY | | 701 COURT STREET | | PUEBLO | CO | 81003 | |
| PUERTO RICO COMMISSIONER OF FINANCIAL INSTITUTIONS | DAMARIS MENDOZA, ESQ., SECURITIES REGULATION & REGISTRATION DIVISION DIRECTOR | FERNÁNDEZ JUNCOS STATION | P.O. BOX 11855 | SAN JUAN | PR | 00910-3855 | |
| PUERTO RICO CORPORATION DIVISION STATE DEPT. OF THE COMMONWEALTH OF PUERTO RICO | | FVBM+352, C | | SAN JUAN | | 00901 | PUERTO RICO |
| PUERTO RICO OFFICE OF THE COMMISSIONER OF FINANCIAL INSTITUTIONS | | PO BOX 11855 | | SAN JUAN | PR | 00910-3855 | |
| PUTNAM COUNTY DEPARTMENT OF CONSUMER AFFAIRS | | DONALD B. SMITH COUNTY GOVERNMENT CAMPUS | 110 OLD ROUT 6 BLDG. 3 | CARMEL | NY | 10512 | |
| QLUE FORENSIC SYSTEMS INC. | | 1130 W PENDER ST SUITE 1220 | | VANCOUVER CITY | BC | V6E 4A4 | CANADA |
| QUANTSTAMP, INC. | | 3 EMBARCADERO CENTER | | SAN FRANCISCO | CA | 94111 | |
| QUANTUM TALENT GROUP | | 2900 NE 7TH AVENUE | | MIAMI | FL | 33137 | |
| QUANTUM TALENT GROUP | | 383 VIA ANDALUSIA | | ENCINITAS | CA | 92024 | |
| QUESTRADE INC./CDS | CORPORATE ACTIONS | 5650 YONGE STREET | SUITE 1700 | TORONTO | ON | M2M 4G3 | CANADA |
| R A EPNER MD & A M ANDRESON JT TEN | | 18260 FADJUR LN | 18260 FADJUR LN | SISTERS | OR | 97759 | |
| RASHAD JENNINGS, INC. | | 300 NW 70TH AVENUE | | FORT LAUDERDALE | FL | 33317 | |
| RAYMOND JAMES & ASSOCIATES, INC. | ROBERTA GREEN | 880 CARRLION PARKWAY | | SAIT PETERSBURG | FL | 33733 | |
| RAYMOND JAMES LTD./CDS | CORPORATE ACTIONS | PO BOX 23558 | | ST PETERSBURG | FL | 33742-3558 | |
| RBC CAPITAL MARKETS, LLC | STEVE SCHAFER SR | ASSOCIATE | 60 S 6TH ST - P09 | MINNEAPOLIS | MN | 55402-4400 | |
| RBC DOMINION SECURITIES INC./CDS | KAREN OLIVERES | 200 BAY STREET, 6TH FLOOR | ROYAL BANK PLAZA NORTH TOWER | TORONTO | ON | M5J 2W7 | CANADA |
| RECIPROCITY, INC. | | 548 MARKET STREET #73905 | | SAN FRANCISCO | CA | 94104 | |
| RECIPROCITY, INC. | | 548 MARKET STREET, #73905 | | SAN FRANCISCO | CA | 94104 | |
| REGUS | | 2500 PLAZA 5 | 25TH FLOOR | JERSEY CITY | NJ | 07311 | |
| REGUS MANAGEMENT GROUP, LLC | | PO BOX 842456 | | DALLAS | TX | 75284-2456 | |
| REGUS MANAGEMENT GROUP, LLC | | PO BOX 842456 | | DALLAS | TX | 75284-2456 | |
| RELM INSURANCE LIMITED | | PHASE 1 WASHINGTON MALL, SUITE 202 | 20 CHURCH STREET | HAMILTON | | HM 11 | BERMUDA |
| RELM INSURANCE LTD. | | PHASE 1 WASHINGTON MALL | SUITE 202 20 CHURCH STREET | HAMILTON | | HM 11 | BERMUDA |
| REMOTI S.A.S. | | 207 OLD STREET | | LONDON | | EC1V 9NR | UNITED KINGDOM |
| REPUBLIC CRYPTO LLC | | 149 5TH AVE | RM 2E | NEW YORK | NY | 10010-6934 | |
| REPUBLIC CRYPTO LLC DBA | REPUBLIC ADVISORY SERVICES | 149 5TH AVE SUITE 2E | | NEW YORK | NY | 10010 | |
| REPUBLIC CRYPTO LLC DBA RAS | | THREE EMBARCADERO CENTER | P5 | SAN FRANCISCO | CA | 94111 | |
| REPUBLIC CRYPTO LLC DBA REP ADV VCS | REPUBLIC ADVISORY SERVICES | REPUBLIC ADVISORY SERVICES | 149 5TH AVE SUITE 2E | NEW YORK | NY | 10010 | |
| REPUBLIC CRYPTO LLC DBA REPUBLIC ADVISORY SERVICES | REPUBLIC ADVISORY SERVICES | REPUBLIC ADVISORY SERVICES | 149 5TH AVE SUITE 2E | NEW YORK | NY | 10010 | |
| REPUBLIC OF SERBIA SECURITIES COMMISSION | | OMLADINSKIH BRIGADA 1, 7 FLOOR | | BELGRADE | | | SERBIA |
| REXCO | | 1900 - 666 BURRARD ST | | VANCOUVER | BC | V6C 3N1 | CANADA |
| RHODE ISLAND DEPARTMENT OF BUSINESS REGULATION | DON DEFEDELE, ASSOCIATE DIRECTOR OF SECURITIES & COMMERCIAL LICENSING | 1511 PONTIAC AVENUE | JOHN O. PASTORE COMPLEX, BLDG.69-1 | CRANSTON | RI | 02920 | |
| RHODE ISLAND DEPARTMENT OF BUSINESS REGULATION DIVISION OF BANKING | | 1511 PONTIAC AVENUE | | CRANSTON | RI | 02920 | |
| RHODE ISLAND SECRETARY OF STATE, CORPORATIONS DIVISION | | 148 W RIVER ST | | PROVIDENCE | RI | 02904 | |
| RIM NOMINEES LIMITED | | 2ND FLR QUEENS HOUSE DON RD | ST HELIER | | | JE1 4HP | UNITED KINGDOM |
| RINGSIDE CANADA INC | | 117 BRENTWOOD ROAD BORTH | | TORONTO | ON | M8X 2C7 | CANADA |
| ROCKETSHIP HQ LLC | | 1412 BROADWAY, 21ST FLOOR - SUITE MA124 | | NEW YORK | NY | 10018 | |
| ROCKLAND COUNTY OFFICE OF CONSUMER PROTECTION AND WEIGHTS & MEASURES | | ALLISON-PARRIS COUNTY OFFICE BUILDING | 11 NEW HEMPSTEAD RD | NEW CITY | NY | 10956 | |
| SAN DIEGO CITY ATTORNEY'S OFFICE | ATTN: CONSUMER PROTECTION | 1200 THIRD AVE | SUITE 1620 | SAN DIEGO | CA | 92101 | |
| SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE | ATTN: CONSUMER PROTECTION | 330 W BROADWAY | | SAN DIEGO | CA | 92101 | |
| SAN FRANCISCO COUNTY DISTRICT ATTORNEY'S OFFICE | ATTN: CONSUMER PROTECTION | 350 RHODE ISLAND STREET | NORTH BUILDING, SUITE 400N | SAN FRANCISCO | CA | 94103 | |
| SAN LUIS OBISPO COUNTY DISTRICT ATTORNEY'S OFFICE | ATTN: CONSUMER PROTECTION | 1055 MONTEREY STREET | | SAN LUIS OBISPO | CA | 93408 | |
| SAN MATEO COUNTY DISTRICT ATTORNEY'S OFFICE | ATTN: CONSUMER AND ENVIRONMENTAL PROTECTION UNIT | 400 COUNTY CENTER | 3RD FLOOR | REDWOOD CITY | CA | 94063 | |
| SANTA BARBARA COUNTY DISTRICT ATTORNEY'S OFFICE | ATTN: CONSUMER PROTECTION | 1112 SANTA BARBARA STREET | | SANTA BARBARA | CA | 93101 | |
| SANTA CLARA COUNTY DISTRICT ATTORNEY'S OFFICE | ATTN: CONSUMER & ENVIRONMENTAL PROTECTION AGENCY | 1553 BERGER DRIVE | | SAN JOSE | CA | 95112 | |
| SANTA CRUZ COUNTY DISTRICT ATTORNEY'S OFFICE | ATTN: CONSUMER PROTECTION | 701 OCEAN STREET | RM 200 | SANTA CRUZ | CA | 95060 | |
| SANTA MONICA CITY ATTORNEY'S OFFICE | ATTN: CONSUMER PROTECTION | 1685 MAIN ST | | SANTA MONICA | CA | 90401 | |
| SANTOSHI ENTERPRISE | | 60-A STREET 5 | MADAN PARK EAST PUNJABI BAGH | NEW DELHI | | 110026 | INDIA |
| SCHENECTADY COUNTY DEPT. OF CONSUMER AFFAIRS/BUREAU OF WEIGHTS & MEASURES | | 130 PRINCETOWN PLAZA | | PRINCETOWN | NY | 12306 | |
| SCHIFF HARDIN LLP | | 233 SOUTH WACKER DRIVE SUITE 7100 | | CHICAGO | IL | 60606 | |
| SCHOW HOLDING BV | | STORE KONGENSGADE 110 | | KOBENHAVN K | | 1264 | DENMARK |
| SCOTIA CAPITAL INC./CDS | CORPORATE ACTIONS | LUISA DOMINGUES | 40 KING STREET W | TORONTO | ON | M5H1H1 | CANADA |
| SECURITIES COMMISSIONER OF SOUTH CAROLINA VS. VOYAGER DIGITAL LLC, ET AL. | | P.O BOX 11549 | | COLUMBIA | SC | 29211 | |
| SECURITIES COMMISSIONER OF SOUTH CAROLINA VS. VOYAGER DIGITAL LLC, ET AL. | | P.O BOX 11549 | | COLUMBIA | SC | 29211 | |
| SECURITIES COMMISSIONER OF SOUTH CAROLINA VS. VOYAGER DIGITAL LLC, ET AL. | | P.O BOX 11549 | | COLUMBIA | SC | 29211 | |
| SECURITY RISK ADVISORS INTL, LLC | | 1750 MARKET ST | 3RD FLOOR | PHILADELPHIA | PA | 19103 | |
| SEDGWICK COUNTY DISTRICT ATTORNEY'S OFFICE | ATTN: CONSUMER PROTECTION DIVISION | 18TH JUDICIAL DISTRICT OF KANSAS | 535 N. MAIN | WICHITA | KS | 67203 | |
| SEED CAPITAL III K/S | | HOJBRO PLADS 10 | | KOBENHAVN K 1200 | | | DENMARK |
| SEEKING ALPHA | | 2524 N 29TH ST | | PHILADELPHIA | PA | 19132-3022 | |
| SEGMENT IO, INC. | | 101 SPEAR ST | FL 1 | SAN FRANCISCO | CA | 94105-1580 | |
| SEGMENT.IO, INC. | | 101 SPEAR STREET | FLOOR 1 | SAN FRANCISCO | CA | 94105-1580 | |
| SEI PRIVATE TRUST COMPANY | ERIC GREENE | ONE FREEDOM VALLEY DRIVE | | OAKS | PA | 19456 | |
| SEI PRIVATE TRUST COMPANY/C/O GWP | ERIC GREENE | ONE FREEDOM VALLEY DRIVE | | OAKS | PA | 19456 | |
| SENAHILL ADVISORS LLC | | 115 BROADWAY | 5TH FLOOR | NEW YORK | NY | 10006 | |
| SENAHILL ADVISORS LLC | | 115 BROADWAY | 5TH FLOOR | NEW YORK | NY | 10006 | |
| SEPRIO LLC | | 1200 VALLEY W DR | # 500 | WEST DES MOINES | IA | 50266 | |
| SEPRIO, LLC | | 1200 VALLEY WEST DRIVE | SUITE 500 | WEST DES MOINES | IA | 50266 | |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 11 of 15

≡ STRETTO

**Exhibit G**
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| SEYFARTH SHAW LLP | | 233 S. WACKER DRIVE | SUITE 8000 | CHICAGO | IL | 60606 | |
| SIDOTI & COMPANY, LLC | | PO BOX 5337 | | NEW YORK | NY | 10185 | |
| SIFT SCIENCE INC | C/O FINANCE DEPARTMENT | ATTN: EVA GUTIERREZ | 525 MARKET STREET, SIXTH FLOOR | SAN FRANCISCO | CA | 94105 | |
| SIFT SCIENCE, INC | | 525 MARKET STREET | 6TH FLOOR | SAN FRANCISCO | CA | 94105 | |
| SIFT SCIENCE, INC. | | 525 MARKET ST, 6TH FLOOR | | SAN FRANCISCO | CA | 94105 | |
| SIFT SCIENCE, INC. | | 525 MARKET ST, 6TH FLOOR | | SAN FRANCISCO | CA | 94105 | |
| SIGNATURE BANK | | 565 FIFTH AVENUE | | NEW YORK | NY | 10017 | |
| SILVER MANAGEMENT GROUP INC | | 114 RABBIT HILL RD | | PRINCETON JUNCTION | NJ | 08550-2831 | |
| SILVERGATE BANK | | 4250 EXECUTIVE SQUARE | SUITE 300 | LA JOLLA | CA | 92037 | |
| SINGULAR RESEARCH | | 22287 MULHOLLAND HWY | | CALABASAS | CA | 91302 | |
| SJE CONSULTING LLC | | 27 HANNAHS RD | | STAMFORD | CT | 06903 | |
| SJE CONSULTING LLC | | 27 HANNAHS RD | | STAMFORD | CT | 06903 | |
| SLACK TECHNOLOGIES, LLC | | 415 MISSION STREET, 3RD FLOOR | | SAN FRANCISCO | CA | 94105 | |
| SLOANE & COMPANY LLC | | 7 TIMES SQ FL 17 | | NEW YORK | NY | 10036 | |
| SMARSH INC. | | 110 WILLIAM STREET | SUITE 1804 | NEW YORK | NY | 10038 | |
| SMARSH INC. | | 851 SW 6TH AVENUE | SUITE 800 | PORTLAND | OR | 97204-1337 | |
| SMARSH INC. | | 851 SW 6TH AVENUE | SUITE 800 | PORTLAND | OR | 97204-1337 | |
| SNAPCHAT | | 3000 31ST STREET | | SANTA MONICA | CA | 90405 | |
| SNAPCHAT | SNAP INC. | 3000 31ST STREET | | SANTA MONICA | CA | 90405 | |
| SNOWFLAKE | | 450 CONCAR DR | | SAN MATEO | CA | 94402 | |
| SNOWFLAKE INC | | 106 EAST BABCOCK STREET | SUITE 3A | BOZEMAN | MT | 59715 | |
| SNYK | | 100 SUMMER ST | 7TH FLOOR | BOSTON | MA | 2110 | |
| SNYK INC. | | 100 SUMMER STREET | FLOOR 7 | BOSTON | MA | 02110-2106 | |
| SNYK INC. | | 100 SUMMER STREET | FLOOR 7 | BOSTON | MA | 02110-2106 | |
| SOCURE INC. | | 330 7TH AVE | FLOOR 2 | NEW YORK | NY | 10001 | |
| SOCURE INC. | | MOUNTAIN WORKSPACE | 885 TAHOE BLVD SUITE 11 | INCLINE VILAGE | NV | 89451 | |
| SOCURE INC. | | P.O. BOS 392296 | | PITTSBURGH | PA | 15251-9296 | |
| SOLANO COUNTY DISTRICT ATTORNEY'S OFFICE | ATTN: CONSUMER PROTECTION | 675 TEXAS ST | | FAIRFIELD | CA | 94533 | |
| SOUTH CAROLINA SECRETARY OF STATE, DIVISION OF CORPORATIONS | | SC SECRETARY OF STATE'S OFFICE | 1205 PENDLETON STREET SUITE 525 | COLUMBIA | SC | 29201 | |
| SOUTH CAROLINA SECURITIES DIVISION | T. STEPHEN LYNCH, DEPUTY SECURITIES COMMISSIONER AND DEPUTY ATTORNEY GENERAL | P.O. BOX 11549 | | COLUMBIA | SC | 29211-1549 | |
| SOUTH CAROLINA STATE BOARD OF FINANCIAL INSTITUTIONS | | 1205 PENDLETON STREET, SUITE 305 | | COLUMBIA | SC | 29201 | |
| SOUTH CAROLINA STATE TREASURY | UNCLAIMED PROPERTY PROGRAM | WADE HAMPTON BLDG. | 1200 SENATE ST, ROOM 214 | COLUMBIA | SC | 29201 | |
| SOUTH CAROLINA DEPARTMENT OF CONSUMER AFFAIRS | | 293 GREYSTONE BOULEVARD | STE 400 | COLUMBIA | SC | 29210 | |
| SOUTH DAKOTA DIVISION OF BANKING | | 1601 N. HARRISON AVENUE | | PIERRE | SD | 57501-4590 | |
| SOUTH DAKOTA DIVISION OF INSURANCE - SECURITIES REGULATION | LARRY DEITER, DIRECTOR | 124 SOUTH EUCLID AVENUE | SUITE 104 | PIERRE | SD | 57501 | |
| SOUTH DAKOTA OFFICE OF THE ATTORNEY GENERAL | ATTN: DIVISION OF CONSUMER PROTECTION | 1302 E HWY 14 | SUITE 3 | PIERRE | SD | 57501-8501 | |
| SOUTH DAKOTA SECRETARY OF STATE | | SECRETARY OF STATE | CAPITOL BUILDING 500 EAST CAPITOL AVENUE STE 204 | PIERRE | SD | 57501-5070 | |
| SOUTH DAKOTA STATE TREASURY | SD STATE TREASURER - UCP | 124 E DAKOTA AVE | | PIERRE | SD | 57501 | |
| SPACELIFT, INC. | | 541 JEFFERSON AVENUE | SUITE 100 | REDWOOD CITY | CA | 94063 | |
| SPATIALIZE | | PO BOX 521 | | BRATTLEBORO | WI | 53202 | |
| SQUAREWORKS CONSULTING | | 101 ARCH ST 8TH FLOOR | | BOSTON | MA | 02110 | |
| STANDOUT TECH SOLUTIONS LLC | | PO BOX 951 | | LEVITTOWN | NY | 11756 | |
| STANISLAUS COUNTY DISTRICT ATTORNEY'S OFFICE | ATTN: CONSUMER PROTECTION | 1010 10TH STREET | #6400 | MODESTO | CA | 95354 | |
| STATE OF ALABAMA | ALABAMA DEPARTMENT OF REVENUE | 50 N. RIPLEY | | MONTGOMERY | AL | 36130 | |
| STATE OF ALABAMA SECURITIES COMMISSION VS. VOYAGER DIGITAL LLC, ET AL. | | 445 DEXTER AVENUE, SUITE 12000 | | MONTGOMERY | AL | 36104 | |
| STATE OF ALABAMA SECURITIES COMMISSION VS. VOYAGER DIGITAL LLC, ET AL. | | 445 DEXTER AVENUE, SUITE 12000 | | MONTGOMERY | AL | 36104 | |
| STATE OF ALABAMA SECURITIES COMMISSION VS. VOYAGER DIGITAL LLC, ET AL. | | 445 DEXTER AVENUE, SUITE 12000 | | MONTGOMERY | AL | 36104 | |
| STATE OF ALASKA | DEPARTMENT OF REVENUE | PO BOX 110400 | | JUNEAU | AK | 99811-0400 | |
| STATE OF ARIZONA | ARIZONA DEPARTMENT OF REVENUE | PO BOX 29085 | | PHOENIX | AZ | 85038 | |
| STATE OF ARIZONA | UNCLAIMED PROPERTY UNIT | PO BOX 29026 | | PHOENIX | AZ | 85038-9026 | |
| STATE OF ARKANSAS | DEPARTMENT OF FINANCE AND ADMINISTRATION | 1509 W 7TH ST, RM 401 | DFA BUILDING | LITTLE ROCK | AR | 72201 | |
| STATE OF CALIFORNIA | CALIFORNIA FRANCHISE TAX BOARD | 300 SOUTH SPRING STREET, SUITE 5704 | | LOS ANGELES | CA | 90013-1265 | |
| STATE OF CALIFORNIA BUSINESS, CONSUMER SERVICES AND HOUSING AGENCY, DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION VS. VOYAGER DIGITAL LLC, ET AL. | | 2101 ARENA BOULEVARD | | SACRAMENTO | CA | 95834 | |
| STATE OF CALIFORNIA BUSINESS, CONSUMER SERVICES AND HOUSING AGENCY, DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION VS. VOYAGER DIGITAL LLC, ET AL. | | 2101 ARENA BOULEVARD | | SACRAMENTO | CA | 95834 | |
| STATE OF CALIFORNIA BUSINESS, CONSUMER SERVICES AND HOUSING AGENCY, DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION VS. VOYAGER DIGITAL LLC, ET AL. | | 2101 ARENA BOULEVARD | | SACRAMENTO | CA | 95834 | |
| STATE OF CONNECTICUT | DEPARTMENT OF REVENUE SERVICES | 450 COLUMBUS BLVD., STE 1 | | HARTFORD | CT | 6103 | |
| STATE OF CONNECTICUT | UNCLAIMED PROPERTY DIVISION | OFFICE OF THE STATE TREASURER | PO BOX 5065 | HARTFORD | CT | 6102 | |
| STATE OF DELAWARE | DIVISION OF JUSTICE | CARVEL STATE OFFICE BUILDING | 820 N FRENCH STREET | WILMINGTON | DE | 19801 | |
| STATE OF DELAWARE | DIVISION OF REVENUE | 820 N. FRENCH STREET | | WILMINGTON | DE | 19801 | |
| STATE OF FLORIDA | FLORIDA DEPARTMENT OF REVENUE | 5050 W TENNESSEE ST | | TALLAHASSEE | FL | 32399-0100 | |
| STATE OF GEORGIA | GEORGIA DEPARTMENT OF REVENUE | 1800 CENTURY BOULEVARD, NE | | ATLANTA | GA | 30345 | |
| STATE OF HAWAII | ATTN: DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS | LEIOPAPA A KAMEHAMEHA BUILDING | 235 SOUTH BERETANIA STREET, ROOM 801 | HONOLULU | HI | 96813 | |
| STATE OF HAWAII | ATTN: DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS | KEKUANAO'A BUILDING | 120 PAUAHI STREET, SUITE 212 | HILO | HI | 96720 | |
| STATE OF HAWAII | ATTN: DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS | WELLS ST. PROFESSIONAL CENTER | 2145 WELLS STREET, SUITE 106 | WAILUKU | HI | 96791 | |
| STATE OF HAWAII | UNCLAIMED PROPERTY PROGRAM | P.O. BOX 150 | | HONOLULU | HI | 96810 | |
| STATE OF IDAHO | IDAHO STATE TAX COMMISSION | COLLECTION DIVISION | PO BOX 36 | BOISE | ID | 83720-0410 | |
| STATE OF IDAHO - OFFICE OF ATTORNEY GENERAL | | 700 W. JEFFERSON STREET | P.O. BOX 83720 | BOISE | ID | 83720-0010 | |
| STATE OF ILLINOIS | DEPARTMENT OF REVENUE | WILLARD ICE BUILDING | 101 WEST JEFFERSON ST | SPRINGFIELD | IL | 62702 | |
| STATE OF INDIANA | INDIANA DEPARTMENT OF REVENUE | ATTN: LEGAL DIVISION | 100 N. SENATE AVE, MS 102 | INDIANAPOLIS | IN | 46204 | |
| STATE OF INDIANA, OFFICE OF THE SECRETARY OF STATE, SECURITIES DIVISION VS. VOYAGER DIGITAL LLC, ET AL. | | 302 W WASHINGTON ST, 5TH FLOOR | | INDIANAPOLIS | IN | 46204 | |
| STATE OF INDIANA, OFFICE OF THE SECRETARY OF STATE, SECURITIES DIVISION VS. VOYAGER DIGITAL LLC, ET AL. | | 302 W WASHINGTON ST, 5TH FLOOR | | INDIANAPOLIS | IN | 46204 | |
| STATE OF INDIANA, OFFICE OF THE SECRETARY OF STATE, SECURITIES DIVISION VS. VOYAGER DIGITAL LLC, ET AL. | | 302 W WASHINGTON ST, 5TH FLOOR | | INDIANAPOLIS | IN | 46204 | |
| STATE OF IOWA | DEPARTMENT OF REVENUE | PO BOX 10460 | | DES MOINES | IA | 50306-0460 | |
| STATE OF KANSAS | KANSAS DEPARTMENT OF REVENUE | SCOTT STATE OFFICE BUILDING | 120 SE 10TH AVENUE | TOPEKA | KS | 66612-1103 | |
| STATE OF KENTUCKY | KENTUCKY DEPARTMENT OF REVENUE | 501 HIGH STREET | STATION 38 | FRANKFORT | KY | 40601 | |
| STATE OF LOUISIANA | LOUISIANA DEPARTMENT OF REVENUE | BATON ROUGE HEADQUARTERS | 617 NORTH THIRD STREET | BATON ROUGE | LA | 70802 | |
| STATE OF MAINE | MAINE REVENUE SERVICES | TAXPAYER CONTACT CENTER | PO BOX 1057 | AUGUSTA | ME | 04332-1057 | |
| STATE OF MARYLAND | COMPTROLLER OF MARYLAND | REVENUE ADMINISTRATION CENTER | TAXPAYER SERVICE DIVISION 110 CARROLL STREET | ANNAPOLIS | MD | 21411-0001 | |
| STATE OF MICHIGAN | | MICHIGAN DEPARTMENT OF TREASURY | | LANSING | MI | 48922 | |
| STATE OF MINNESOTA | MINNESOTA DEPARTMENT OF REVENUE | 600 NORTH ROBERT ST | | ST. PAUL | MN | 55101 | |
| STATE OF MISSISSIPPI | MISSISSIPPI DEPARTMENT OF REVENUE | 500 CLINTON CENTER DRIVE | | CLINTON | MS | 39056 | |
| STATE OF MISSISSIPPI OFFICE OF THE ATTORNEY GENERAL | ATTN: CRYSTAL UTLEY SECOY, CONSUMER PROTECTION | PO BOX 220 | 550 HIGH STREET | JACKSON | MS | 39205-39201 | |
| STATE OF NEBRASKA | DEPARTMENT OF REVENUE | NEBRASKA STATE OFFICE BUILDING | 301 CENTENNIAL MALL S. | LINCOLN | NE | 68508 | |
| STATE OF NEBRASKA OFFICE OF THE ATTORNEY GENERAL, CONSUMER PROTECTION | ATTN: CONSUMER AFFAIRS RESPONSE TEAM | 2115 STATE CAPITOL | | LINCOLN | NE | 68509 | |
| STATE OF NEVADA DEPARTMENT OF BUSINESS AND INDUSTRY | ATTN: NEVADA CONSUMER AFFAIRS | 3300 E. COLLEGE PARKWAY, SUITE 100 | | CARSON CITY | NV | 89706 | |
| STATE OF NEVADA DEPARTMENT OF BUSINESS AND INDUSTRY | ATTN: NEVADA CONSUMER AFFAIRS | 3300 W. SAHARA AVE., SUITE 425 | | LAS VEGAS | NV | 89102 | |
| STATE OF NEW HAMPSHIRE TREASURY | DEPARTMENT OF REVENUE ADMINISTRATION | GOVERNOR HUGH GALLEN STATE OFFICE PARK | 109 PLEASANT STREET | CONCORD | NH | 3301 | |
| STATE OF NEW HAMPSHIRE TREASURY | UNCLAIMED PROPERTY DIVISION | 25 CAPITOL ST, ROOM 121 | | CONCORD | NH | 3301 | |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

≡ STRETTO

Exhibit G
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| STATE OF NEW JERSEY | NEW JERSEY DIVISION OF TAXATION | REVENUE PROCESSING CENTER | PO BOX 281 | TRENTON | NJ | 08695-0281 | |
| STATE OF NEW JERSEY | UNCLAIMED PROPERTY ADMINISTRATION | PO BOX 214 | | TRENTON | NJ | 08635-0214 | |
| STATE OF NEW JERSEY BUREAU OF SECURITIES VS. VOYAGER DIGITAL LLC, ET AL. | | P.O. BOX 47029 | | NEWARK | NJ | 07101 | |
| STATE OF NEW JERSEY BUREAU OF SECURITIES VS. VOYAGER DIGITAL LLC, ET AL. | | P.O. BOX 47029 | | NEWARK | NJ | 07101 | |
| STATE OF NEW JERSEY BUREAU OF SECURITIES VS. VOYAGER DIGITAL LLC, ET AL. | | P.O. BOX 47029 | | NEWARK | NJ | 07101 | |
| STATE OF NEW MEXICO | NEW MEXICO TAX AND REVENUE DEPT | 1100 SOUTH ST. FRANCIS DRIVE, SUITE 1100 | | SANTE FE | NM | 87504 | |
| STATE OF NORTH CAROLINA | DEPARTMENT OF REVENUE | PO BOX 25000 | | RALEIGH | NC | 27640-0640 | |
| STATE OF NORTH DAKOTA | OFFICE OF STATE TAX COMMISSIONER | 600 E. BOULEVARD AVE | DEPT 127 | BISMARCK | ND | 58505-0599 | |
| STATE OF NORTH DAKOTA | UNCLAIMED PROPERTY DIVISION | 1707 NORTH 9TH STREET | PO BOX 5523 | BISMARCK | ND | 58506-5523 | |
| STATE OF OKLAHOMA | TAX COMMISSION | 300 N BROADWAY AVE | | OKLAHOMA CITY | OK | 73194-1004 | |
| STATE OF OKLAHOMA DEPARTMENT OF SECURITIES VS. VOYAGER DIGITAL LLC, ET AL. | | 204 NORTH ROBINSON, SUITE 400 | | OKLAHOMA CITY | OK | 73102 | |
| STATE OF OKLAHOMA DEPARTMENT OF SECURITIES VS. VOYAGER DIGITAL LLC, ET AL. | | 204 NORTH ROBINSON, SUITE 400 | | OKLAHOMA CITY | OK | 73102 | |
| STATE OF OREGON | OREGON DEPARTMENT OF REVENUE | 955 CENTER ST NE | | SALEM | OR | 97301-2555 | |
| STATE OF PENNSYLVANIA | DEPARTMENT OF REVENUE | 1846 BROOKWOOD ST | | HARRISBURG | PA | 17104 | |
| STATE OF SOUTH CAROLINA | SOUTH CAROLINA DEPARTMENT OF REVENUE | 300A OUTLET POINTE BOULEVARD | | COLUMBIA | SC | 29210 | |
| STATE OF TENNESSEE | ATTN: DAVID GERREGANO, COMMISSIONER | TENNESSEE DEPARTMENT OF REVENUE COLLECTION SERVICES DIVISION | 500 DEADERICK STREET | NASHVILLE | TN | 37242 | |
| STATE OF TENNESSEE | UNCLAIMED PROPERTY DIVISION | ANDREW JACKSON STATE OFFICE BLDG | PO BOX 190693 | NASHVILLE | TN | 37219-0693 | |
| STATE OF TEXAS | TEXAS COMPTROLLER OF PUB. ACCOUNTS | PO BOX 13528 | CAPITOL STATION | AUSTIN | TX | 78711-3528 | |
| STATE OF UTAH | STATE TAX COMMISSION | 210 NORTH 1950 WEST | | SALT LAKE CITY | UT | 84134-0700 | |
| STATE OF VERMONT | OFFICE OF THE STATE TREASURER | UNCLAIMED PROPERTY DIVISION | 109 STATE STREET, 4TH FLOOR | MONTPELIER | VT | 05609-6200 | |
| STATE OF VERMONT DEPARTMENT OF FINANCIAL REGULATION VS. VOYAGER DIGITAL LLC, ET AL. | | 89 MAIN STREET | | MONTPELIER | VT | 05620 | |
| STATE OF VERMONT DEPARTMENT OF FINANCIAL REGULATION VS. VOYAGER DIGITAL LLC, ET AL. | | 89 MAIN STREET | | MONTPELIER | VT | 05620 | |
| STATE OF VERMONT DEPARTMENT OF FINANCIAL REGULATION VS. VOYAGER DIGITAL LLC, ET AL. | | 89 MAIN STREET | | MONTPELIER | VT | 05620 | |
| STATE OF VIRGINIA | DEPARTMENT OF TAXATION | 1957 WESTMORELAND STREET | | RICHMOND | VA | 23230 | |
| STATE OF WASHINGTON DEPARTMENT OF FINANCIAL INSTITUTIONS SECURITIES DIVISION VS. VOYAGER DIGITAL LLC, ET AL | ATTN: ADAM NATHANIAL YEATON | 150 ISRAEL RD SW | | TUMWATER | WA | 98501 | |
| STATE OF WASHINGTON DEPARTMENT OF FINANCIAL INSTITUTIONS SECURITIES DIVISION VS. VOYAGER DIGITAL LLC, ET AL. | | PO BOX 9033 | | OLYMPIA | WA | 98507 | |
| STATE OF WEST VIRGINIA | WEST VIRGINIA TAX DEPARTMENT | STATE CAPITOL | BUILDING 1, W-300 | CHARLESTON | WV | 25305 | |
| STATE OF WISCONSIN | WISCONSIN DEPARTMENT OF REVENUE | PO BOX 8949 | | MADISON | WI | 53713 | |
| STATE OF WISCONSIN | WISCONSIN DEPARTMENT OF REVENUE | PO BOX 8982 | | MADISON | WI | 53713-8982 | |
| STATE OF WISCONSIN, DEPARTMENT OF FINANCIAL INSTITUTIONS | | 17 WEST MAIN STREET | | MADISON | WI | 53703 | |
| STATE STREET BANK & TRUST/STATE ST | JOSEPH J. CALLAHAN | GLOBAL CORP ACTION DEPT JAB5W | | BOSTON | MA | 02105-1631 | |
| STATE STREET BANK & TRUST/TOTALETF | GLOBAL CORP ACTION DEPT JAB5W | JERRY PARRILLA | P.O. BOX 1631 | NORTH QUINCY | MA | 02171 | |
| STATE TREASURER OF IOWA | UNCLAIMED PROPERTY COMPLIANCE | STATE TREASURER'S OFFICE CAPITOL BLDG | 1776 HERITAGE DR | DES MOINES | IA | 50319 | |
| STATE TREASURY OF MISSISSIPPI | UNCLAIMED PROPERTY DIVISION | 501 NORTH W ST, STE 1101 | | JACKSON | MS | 39201 | |
| STEPHEN EHRLICH | C/O DAY PITNEY LLP | ATTN: DANIEL L. SCHWARTZ & JOSHUA W. COHEN | ONE STAMFORD PLAZA 7TH FLOOR 263 TRESSER BOULEVARD | STAMFORD | CT | 06901 | |
| STERLING TRADING TECH | | 225 W WASHINGTON | SUITE 400 | CHICAGO | IL | 60606 | |
| STERNE, AGEE & LEACH, INC. | KEN SIMPSON, JAMES MEZRANO | 2 PERIMETER PARK | SUITE 100W | BIRMINGHAM | AL | 35209 | |
| STIFEL, NICOLAUS & COMPANY, INC | 501 N BROADWAY | ONE FINANCIAL PLAZA | | ST LOUIS | MO | 63102 | |
| STIFEL, NICOLAUS & COMPANY, INC | C/O MEDIAN COMMUNICATIONS | 200 REGENCY FOREST DRIVE | | CARY | NC | 27518 | |
| STOCKCROSS FINANCIAL SERVICES, INC. | DIANE TOBEY | 77 SUMMER STREET | | BOSTON | MA | 02110 | |
| STOCKHOUSE PUBLISHING LTD. | | 1625 - 1185 WEST GEORGIA STREET | | VANCOUVER | BRITISH COLUMBIA | V6E 4E6 | CANADA |
| STOCKHOUSE PUBLISHING LTD. | | 1625 - 1185 WEST GEORGIA STREET | | VANCOUVER CITY | BC | V6E 4E6 | CANADA |
| STOCKJOCK.COM LP | | 22287 MULHOLLAND HWY | | CALABASAS | CA | 91302 | |
| STOCKVEST | | 52 RILEY ROAD | UNIT 376 | CELEBRATION | FL | 34747 | |
| STOCKVEST INCORPORATED | | 52 RILEY ROAD | SUITE 376 | KISSIMMEE | FL | 34747 | |
| STREAMLINED VENTURES II LP | | 1825 EMERSON ST | | PALO ALTO | CA | 94301 | |
| STREAMLINED VENTURES II LP | | 1825 EMERSON ST | | PALO ALTO | CA | 94301 | |
| STREAMLINED VENTURES II LP | | 1825 EMERSON STREET | | PALO ALTO | CA | 94301 | |
| STREAMLINED VENTURES II LP | | 1825 EMERSON STREET | | PALO ALTO | CA | 94301 | |
| SUFFOLK COUNTY | DIVISION OF CONSUMER AFFAIRS | PO BOX 6100 | | HAUPPAUGE | NY | 11788 | |
| SUN VILLAGE LLC | | 116 WOODWIND | | VICTORIA | TX | 77904-1120 | |
| SUN VILLAGE LLC | | 116 WOODWIND | | VICTORIA | TX | 77904-1120 | |
| SUNVAULT ENERGY INC | | 10703 181ST ST | SUITE 200 | EDMONTON | AB | T5S 1N3 | CANADA |
| SUSQUEHANNA GOVERNMENT PRODUCTS LLP | PRODUCTS LLLP | 401 CITY AVENUE | SUITE 220 | BALA CYNWYD | PA | 19004 | |
| SUSQUEHANNA GOVERNMENT PRODUCTS LLP | | C/O TED BRYCE | 401 CITY AVE | BALA CYNWYD | PA | 19004 | |
| SUSQUEHANNA GOVERNMENT PRODUCTS LLP | | C/O TED BRYCE | 401 CITY AVE | BALA CYNWYD | PA | 19004 | |
| SUSQUEHANNA GOVERNMENT PRODUCTS LLP | | C/O TED BRYCE 401 CITY AVE SUITE 220 | SUITE 220 | BALA CYNWYD | PA | 19004 | |
| SUSQUEHANNA GOVERNMENT PRODUCTS LLP | | PRODUCTS LLLP | 401 CITY AVENUE | BALA CYNWYD | PA | 19004 | |
| SWEATCO LTD (SWEATCOIN) | ATTN: OLGA MAKEEV | 16 DROR STREET | APT #10 | TEL AVIV | | 6813520 | ISRAEL |
| TABLEAU SOFTWARE, INC. | | 1621 N 34TH ST | | SEATTLE | WA | 98103-9193 | |
| TAI MO SHAN LIMITED | ATTN: JUMP OPERATIONS, LLC LEGAL DEPARTMENT | 600 WEST CHICAGO | SUITE 825 | CHICAGO | IL | 60654 | |
| TALENTLY | | 1923 HIGHLAND DR | | NEWPORT BEACH | CA | 92660 | |
| TALOS TRADING | | 154 W 14TH ST | FL2 | NEW YORK | NY | 10011 | |
| TALOS TRADING | | 154 W 14TH ST | FLOOR 2 | NEW YORK | NY | 10011 | |
| TALOS TRADING, INC. | | 228 PARK AVE S | SUITE 21958 | NEW YORK | NY | 10003 | |
| TAPJOY INC | | 353 SACRAMENTO STREET, 6TH FLOOR | | SAN FRANCISCO | CA | 94111 | |
| TAYLOR & GRAY LLC | | 733 THIRD AVENUE, 16TH FLOOR | | NEW YORK | NY | 10017 | |
| TD AMERITRADE CLEARING, INC. | ATTN: CORP ACTIONS | SUZANNE BRODD | 200 S. 108TH AVENUE | OMAHA | NE | 68154 | |
| TD AMERITRADE CLEARING, INC. | KEVIN STRINE | 4211 S. 102ND STREET | | OMAHA | NE | 68127 | |
| TD AMERITRADE CLEARING, INC. | MANDI FOSTER | 1005 N. AMERITRADE PLACE | | BELLEVUE | NE | 68005 | |
| TD WATERHOUSE CANADA INC./CDS | YOUSUF AHMED | 77 BLOOR STREET WEST | 3RD FLOOR | TORONTO | ON | M4Y 2T1 | CANADA |
| TDOR C/O BANKRUPTCY UNIT | SHERRY GRUBBS | PO BOX 190665 | | NASHVILLE | TN | 37219-0665 | |
| TDOR C/O BANKRUPTCY UNIT | SHERRY GRUBBS | PO BOX 190665 | | NASHVILLE | TN | 37219-0665 | |
| TEAMBLIND HUB LLC | | 3003 NORTH 1ST STREET | SUITE 221 | SAN JOSE | CA | 95134 | |
| TENEO STRATEGY LLC | | 280 PARK AVENUE, 4TH FLOOR | | NEW YORK | NY | 10017 | |
| TENNESSEE DEPARTMENT OF FINANCIAL INSTITUTIONS | | TN TOWER, 26TH FLOOR | | NASHVILLE | TN | 37243 | |
| TENNESSEE DEPARTMENT OF REVENUE | ATTN: SHERRY L GRUBBS | 500 DEADERICK ST | | NASHVILLE | TN | 37242 | |
| TENNESSEE DEPARTMENT OF REVENUE | TDOR C/O ATTORNEY GENERAL | PO BOX 20207 | | NASHVILLE | TN | 37202-0207 | |
| TENNESSEE DEPARTMENT OF REVENUE | TDOR C/O ATTORNEY GENERAL | PO BOX 20207 | | NASHVILLE | TN | 37207-0202 | |
| TENNESSEE DEPARTMENT OF REVENUE | TDOR C/O ATTORNEY GENERAL | PO BOX 20207 | | NASHVILLE | TN | 37202-0207 | |
| TENNESSEE DEPARTMENT OF REVENUE | TDOR C/O BANKRUPTCY UNIT | ATTN: SHERRY GRUBBS | PO BOX 190665 | NASHVILLE | TN | 37219-0665 | |
| TENNESSEE DEPARTMENT OF REVENUE | TDOR C/O BANKRUPTCY UNIT | ATTN: SHERRY GRUBBS | PO BOX 190665 | NASHVILLE | TN | 37219-0665 | |
| TENNESSEE DEPARTMENT OF STATE, DIVISION OF BUSINESS SERVICES | | TRE HARGETT STATE CAPITOL | | NASHVILLE | TN | 37243-1102 | |
| TENNESSEE DIVISION OF CONSUMER AFFAIRS | | PO BOX 20207 | | NASHVILLE | TN | 37202 | |
| TENNESSEE SECURITIES DIVISION | ELIZABETH BOWLING, TDCI ASSISTANT COMMISSIONER- SECURITIES DIVISION | DAVY CROCKETT TOWER | 500 JAMES ROBERTSON PARKWAY | NASHVILLE | TN | 37243 | |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

STRETTO

**Exhibit G**
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| TERMINAL, INC. | | 1 LETTERMAN DR | | SAN FRANCISCO | CA | 94129 | |
| TERMINAL, INC. | | 1 LETTERMAN DRIVE, BLDG C | | SAN FRANCISCO | CA | 94129 | |
| TESSERACT GROUP OY | | LAPINLAHDENKATU 16 | | HELSINKI | | 00180 | FINLAND |
| TEXAS COMPTROLLER OF PUBLIC ACCOUNTS | ATTN: REVENUE ACCOUNTING DIVISION | 111 E 17TH ST | | AUSTIN | TX | 78711 | |
| TEXAS COMPTROLLER OF PUBLIC ACCOUNTS | C/O REVENUE ACCOUNTING DIVISION | ATTN: BANKRUPTCY | PO BOX 13528 | AUSTIN | TX | 78711 | |
| TEXAS COMPTROLLER OF PUBLIC ACCOUNTS | UNCLAIMED PROPERTY CLAIMS SECTION | LBJ STATE OFFICE BLDG 111 E 17TH ST | | AUSTIN | TX | 78711 | |
| TEXAS DEPARTMENT OF BANKING | | 2601 NORTH LAMAR BLVD. | | AUSTIN | TX | 78705-4294 | |
| TEXAS OFFICE OF THE ATTORNEY GENERAL | ATTN: CONSUMER PROTECTION | PO BOX 12548 | | AUSTIN | TX | 78711-2548 | |
| TEXAS SECRETARY OF STATE, STATUTORY FILINGS DIVISION, CORPORATIONS SECTION | | BUSINESS & COMMERCIAL SECTION | SECRETARY OF STATE PO BOX 13697 | AUSTIN | TX | 78711 | |
| TEXAS STATE SECURITIES BOARD | TRAVIS ILES, SECURITIES COMMISSIONER | 208 EAST 10TH STREET | 5TH FLOOR | AUSTIN | TX | 78701 | |
| TEXAS STATE SECURITIES BOARD VS. VOYAGER DIGITAL LLC, ET AL. | | 208 E. 10TH STREET, 5TH FLOOR | | AUSTIN | TX | 78701 | |
| TEXAS STATE SECURITIES BOARD VS. VOYAGER DIGITAL LLC, ET AL. | | 208 E. 10TH STREET, 5TH FLOOR | | AUSTIN | TX | 78701 | |
| TEXAS STATE SECURITIES BOARD VS. VOYAGER DIGITAL LLC, ET AL. | | 208 E. 10TH STREET, 5TH FLOOR | | AUSTIN | TX | 78701 | |
| THE BENCHMARK COMPANY LLC | | 150 EAST 58TH ST, 17TH FLOOR | | NEW YORK | NY | 10155 | |
| THE BENCHMARK COMPANY LLC INVE | | 150 EAST 58TH STREET | FLOOR 17 | NEW YORK | NY | 10155 | |
| THE BENCHMARK COMPANY LLC INVE | | 150 EAST 58TH STREET | FLOOR 17 | NEW YORK | NY | 10155 | |
| THE BLOCK CRYPTO, INC. | | 45 BOND STREET | | NEW YORK | NY | 10012 | |
| THE BLOCK CRYPTO, INC. | ATTN: THE BLOCK | 45 BOND STREET | FLOOR 5 | NEW YORK | NY | 10013 | |
| THE CENTRAL BANK OF CYPRUS | | 80 KENNEDY AVENUE | | NICOSIA | CY | 1076 | CYPRUS |
| THE CONSTANT PLAN LLC | | 537 CLINTON AVE | APT 6D | BROOKLYN | NY | 11238 | |
| THE FRIENDS OF FALCON HOCKEY INC. | | 575 HIGHLAND AVENUE | | CHESHIRE | CT | 06410-0000 | |
| THE LOYALIST | | 4 PERRY STREET | 2ND FLOOR | NEW YORK CITY | NY | 10014 | |
| THE MOSKOWITZ LAW FIRM PLLC | ATTN: ADAM M. MOSKOWITZ, JOSEPH M. KAYE, BARBARA C. LEWIS | PO BOX 141609 | | CORAL GABLES | FL | 33114-1609 | |
| THE SPORTS GIRLS | | 1140 LINDEN ST | | HOLLYWOOD | FL | 33019 | |
| THOMPSON HOUSE GROUP | | 54 THOMPSON ST FL 3 | | NEW YORK | NY | 10012 | |
| THOMPSON SQUARE | | 54 THOMPSON ST | 3RD FLOOR | NEW YORK | NY | 10012 | |
| THOUGHTWORKS, INC. | | 200 E RANDOLPH | 25TH FLOOR | CHICAGO | IL | 60601 | |
| THOUGHTWORKS, INC. | | 200 E RANDOLPH, 25TH FLOOR | | CHICAGO | IL | 60601 | |
| THOUGHTWORKS, INC. | | 200 E RANDOLPH, 25TH FLOOR | | CHICAGO | IL | 60601 | |
| THOUGHTWORKS, INC. | | 200 E RANDOLPH ST | 25TH FLOOR | CHICAGO | IL | 60601 | |
| THREE ARROWS CAPITAL LTD. | | 7 TEMASEK BOULEVARD | #21-04 | SINGAPORE | | 038987 | SINGAPORE |
| TOWN OF COLONIE ATTORNEY | ATTN: CONSUMER PROTECTION | 534 NEW LOUDON ROAD | | LATHAM | NY | 12110-0508 | |
| TRADESTATION SECURITIES, INC. | ATTN: ANDREA AUGUSTIN | CORPORATE ACTIONS | 8050 SW 10TH ST | PLANTATION | FL | 33324 | |
| TRADINGVIEW, INC. | | 470 OLDE WORTHINGTON RD | SUITE 200 | WESTERVILLE | OH | 43082 | |
| TRAVELATOR, INC. | | 1100 SULLIVAN AVENUE | SUITE 838 | DALY CITY | CA | 94015 | |
| TRAVELBANK | | 1100 SULLIVAN AVE | SUITE 838 | DALY CITY | CA | 94017 | |
| TRINET HR III, INC. | | ONE PARK PLACE | SUITE 600 | DUBLIN | CA | 94568 | |
| TROUTMAN PEPPER HAMILTON SANDERS LLP | | 222 CENTRAL PARK AVENUE | SUITE 2000 | VIRGINIA BEACH | VA | 23462 | |
| TRULIOO INFORMATION SERVICES INC. | | 300 - 420 W. HASTINGS STREET | | VANCOUVER | BRITISH COLUMBIA | V6B 1L1 | CANADA |
| TSX INC. | | 300-100 ADELAIDE ST W | | TORONTO | ON | M5H 1S3 | CANADA |
| TSX INC. | | 300-100 ADELAIDE ST W | | TORONTO | ON | M5H 1S3 | CANADA |
| TSX INC. | ATTENTION: TSX MARKETS | THE EXCHANGE TOWER | 130 KING STREET WEST | TORONTO | ON | M5X 1J2 | CANADA |
| TUPLE, LLC | | PO BOX 441548 | | SOMERVILLE | MA | 02144-0035 | |
| TWITER, INC | | 1355 MARKET STREET | | SAN FRANCISCO | CA | 94103 | |
| TWILIO | | 101 SPEAR ST | STE 100 | SAN FRANCISCO | CA | 94105-1524 | |
| TWILIO | | 101 SPEAR ST | STE 100 | SAN FRANCISCO | CA | 94105-1524 | |
| TWILIO INC. | | 101 SPEAR STREET | 1ST FLOOR | SAN FRANCISCO | CA | 94105 | |
| TWITTER, INC. | | PO BOX 7247 | | PHILADELPHIA | PA | 19170-0043 | |
| TWITTER, INC. | | PO BOX 7247 | | PHILADELPHIA | PA | 19170-0043 | |
| U.S. BANCORP INVESTMENTS, INC. | KEVIN BROWN | ASSISTANT VICE PRESIDENT | 60 LIVINGSTON AVE | ST. PAUL | MN | 55107-1419 | |
| U.S. BANK, N.A. V. VOYAGER DIGITAL, LLC | | DIANA E. MURPHY UNITED STATES COURTHOUSE, 300 SOUTH FOURTH STREET - SUITE 202 | SUITE 202 | MINNEAPOLIS | MN | 55415 | |
| U.S. VIRGIN ISLANDS DIVISION OF BANKING, INSURANCE AND FINANCIAL REGULATION | MS. GLENDINA P. MATTHEW, ESQ., ACTING DIRECTOR | 5049 KONGENS GADE | | SAINT THOMAS | VI | 00802-6487 | |
| UBS FINANCIAL SERVICES INC. | JANE FLOOD | 1000 HARBOR BLVD | | WEEHAWKEN | NJ | 07086 | |
| ULSTER COUNTY COMMON AFFAIRS | | 239  GOLDEN HILL LN | | KINGSTON | NY | 12401-3708 | |
| UNION COUNTY DEPARTMENT OF PUBLIC SAFETY | ATTN: CONSUMER PROTECTION | 10 ELIZABETHTOWN PLAZA | | ELIZABETH | NJ | 07202 | |
| UNIPLAN CONSULTING LLC | | 26131 DEER RIDGE TRAIL | | WATERFORD | WI | 53185 | |
| UNIQUE PRINTS LLC | | 13800 DRAGLINE DRIVE | UNIT A | AUSTIN | TX | 78728 | |
| UNIQUE PRINTS LLC | | 13800 DRAGLINE DRIVE | | AUSTIN | TX | 78728 | |
| UNITED STATES ATTORNEY FOR THE SOUTHERN DISTRICT OF NEW YORK | C/O ASSISTANT UNITED STATES ATTORNEY | ATTN: JEAN-DAVID BARNEA | 86 CHAMBERS STREET, 3RD FLOOR | NEW YORK | NY | 10007 | |
| UNITED STATES DEPARTMENT OF JUSTICE | U.S. ATTORNEY'S OFFICE | 601 D STREET, NW | | WASHINGTON | DC | 20530 | |
| UNITED STATES DEPARTMENT OF JUSTICE | U.S ATTORNEY'S OFFICE | HERCULES BUILDING | 1313 N. MARKET STREET | WILMINGTON | DE | 19801 | |
| UNITY TECHNOLOGIES | | 30 3RD STREET | | SAN FRANCISCO | CA | 94103 | |
| UPS | | 55 GLENLAKE PARKWAY | NE | ATLANTA | GA | 30328 | |
| USERTESTING, INC. | | 144 TOWNSEND STREET | | SAN FRANCISCO | CA | 94107 | |
| USIO, INC. | | 3611 PAESANOS PARKWAY | SUITE 300 | SAN ANTONIO | TX | 78231 | |
| USIO, INC. | | 3611 PAESANOS PKWY | SUITE 300 | SAN ANTONIO | TX | 78231 | |
| USIO, INC. | | 3611 PAESANOS PKWY | SUITE 300 | SAN ANTONIO | TX | 78231 | |
| USIO, INC. | ATTN: LOUIS HOCH, PRESIDENT AND CEO | 3611 PAESANO'S PARKWAY STE. 300 | | SAN ANTONIO | TX | 78231 | |
| USIO, INC. | C/O PULMAN CAPPUCCIO & PULLEN, LLP | 2161 NW MILITARY HWY SUITE 400 | | SAN ANTONIO | TX | 78213 | |
| USIO, INC. | C/O PULMAN CAPPUCCIO & PULLEN, LLP | ATTN: MARYANN VILLA, LEGAL ASSISTANT | 2161 NW MILITARY HWY., SUITE 400 | SAN ANTONIO | TX | 78213 | |
| USIO, INC. | LOUIS HOCH, PRESIDENT AND CEO | 3611 PAESANO'S PARKWAY, SUITE 300 | | SAN ANTONIO | TX | 78231 | |
| UTAH DEPARTMENT OF COMMERCE | ATTN: CONSUMER PROTECTION DIVISION | PO BOX 146704 | | SALT LAKE CITY | UT | 84114-6704 | |
| UTAH DEPARTMENT OF COMMERCE, DIVISION OF CORPORATIONS & COMMERCIAL CODE | | PO BOX 146705 | | SALT LAKE CITY | UT | 84114-6705 | |
| UTAH DEPARTMENT OF FINANCIAL INSTITUTIONS | | PO BOX 146800 | | SALT LAKE CITY | UT | 84114-6800 | |
| UTAH DIVISION OF SECURITIES | JASON STERZER, DIRECTOR OF THE DIVISION OF SECURITIES | P.O. BOX 146760 | | SALT LAKE CITY | UT | 84114-6760 | |
| UTAH STATE TREASURY | UNCLAIMED PROPERTY DIVISION | 168 N 1950 W., STE 102 | | SALT LAKE CITY | UT | 84116 | |
| VALUATION RESEARCH CORPORATION | | 950 MAIN AVENUE | SUITE 2100 | NEW YORK | NY | 10017 | |
| VALUATION RESEARCH CORPORATION | | 330 E KILBOURN AVE | SUITE 1425 | MILWAUKEE | WI | 53202 | |
| VANGUARD MARKETING CORPORATION | | 100 VANGUARD BOULEVARD | | MALVERN | PA | 19355 | |
| VANGUARD MARKETING CORPORATION | 0 | PO BOX 1170 | | VALLEY FORGE | PA | 19482-1170 | |
| VANGUARD MARKETING CORPORATION | ATTN: BEN BEGUIN | 14321 N. NORTHSIGHT BOULEVARD | | SCOTTSDALE | AZ | 85260 | |
| VENTURA COUNTY DISTRICT ATTORNEY'S OFFICE | ATTN: CONSUMER PROTECTION | 800 S VICTORIA AVENUE | SUITE 314 | VENTURA | CA | 93009 | |
| VENTURE GROUP CAPITAL LLC | | 95 VERA STREET | | STATEN ISLAND | NY | 10305 | |
| VERIZON WIRELESS SERVICES LLC | | 1 VERIZON WAY | | BASKING RIDGE | NJ | 07920 | |
| VERMONT AGENCY OF AGRICULTURE, FOOD, AND MARKETS | ATTN: CONSUMER PROTECTION SECTION | 116 STATE STREET | | MONTELIER | VT | 05620-2901 | |
| VERMONT DEPARTMENT OF FINANCIAL REGULATION | | 89 MAIN STREET | | MONTPELIER | VT | 05620-3101 | |
| VERMONT DEPARTMENT OF FINANCIAL REGULATION | EMILY KISICKI, DIRECTOR OF POLICY | 89 MAIN STREET | | MONTPELIER | VT | 05620-3101 | |
| VERMONT SECRETARY OF STATE, CORPORATIONS/UCC DIVISION | | CORPORATIONS DIVISION | VT SECRETARY OF STATE 128 STATE STREET | MONTPELIER | VT | 05633-1104 | |
| VINCENT MANUFACTURING | | 1329 KENWOOD PARKWAY | | MINNEAPOLIS | MN | 55405 | |
| VIRGIN ISLANDS DIVISION OF BANKING & INSURANCE, ST. THOMAS | | KONGENS GADE #5049 | | ST. THOMAS | VI | 00802 | |
| VIRGINIA BUREAU OF FINANCIAL INSTITUTIONS | | PO BOX 640 | | RICHMOND | VA | 23218-0640 | |
| VIRGINIA DEPARTMENT OF THE TREASURY | UNCLAIMED PROPERTY DIVISION | JAMES MONROE BLDG, 3RD FL | 101 NORTH 14TH ST | RICHMOND | VA | 23219 | |
| VIRGINIA DIVISION OF SECURITIES AND RETAIL FRANCHISING | RON THOMAS, DIRECTOR | 1300 EAST MAIN STREET | 9TH FLOOR | RICHMOND | VA | 23219 | |
| VIRGINIA OFFICE OF THE ATTORNEY GENERAL | ATTN: CONSUMER PROTECTION DIVISION | 202 NORTH 9TH STREET | | RICHMOND | VA | 23219 | |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 14 of 15

**Exhibit G**
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| VIRGINIA STATE CORPORATION COMMISSION | | PO BOX 1197 | | RICHMOND | VA | 23218 | |
| VISION FINANCIAL MARKETS LLC | | 4 HIGH RIDGE PARK | SUITE 100 | STAMFORD | CT | 06905 | |
| VISION FINANCIAL MARKETS LLC | | 4 HIGH RIDGE PARK | SUITE 100 | STAMFORD | CT | 06905 | |
| VOYAGER DIGITAL HOLDINGS, INC. | ATTN: DAVID BROSGOL AND BRIAN NISTLER | 33 IRVING PLACE SUITE 3060 | | NEW YORK | NY | 10003 | |
| VT DEPARTMENT OF FINANCIAL REGULATION | JENNIFER ROOD | 89 MAIN STREET | | MONTPELIER | VT | 05620 | |
| VULCANIDE INC | | 2093 PHILADELPHIA PIKE #6707 | | CLAYMONT | DE | 19703 | |
| WALKERS (CAYMAN) LLP | | 190 ELGIN AVENUE | | GEORGE TOWN | | | CAYMAN ISLANDS |
| WALKERS CORPORATE LIMITED | | 90 ELGIN AVENUE | | GEORGE TOWN | | KY1-9001 | CAYMAN ISLANDS |
| WALKERS IRELAND LLP | | GEORGES DOCK | INTERNATIONAL FINANCIAL SERVICES CENTRE | DUBLIN | | D01 W3P9 | IRELAND |
| WALL STREET DEAD AHEAD | ATTN: DEBORAH SOLOMON | 235 WEST 56TH STREET | SUITE 22N | NEW YORK | NY | 10019 | |
| WALL STREET DEAD AHEAD NETWORKING LLC | | 235 WEST 56TH STREET SUITE 22N | | NEW YORK | NY | 10019 | |
| WANDERING BEAR COFFEE | | 201 VARICK STREET | PO BOX 321 | NEW YORK | NY | 10014 | |
| WASHINGTON DEPARTMENT OF FINANCIAL INSTITUTIONS | | PO BOX 41200 | | OLYMPIA | WA | 98504-1200 | |
| WASHINGTON OFFICE OF THE ATTORNEY GENERAL | ATTN: CONSUMER PROTECTION DIVISION | 800 FIFTH AVENUE | SUITE 2000 | SEATTLE | WA | 98104 | |
| WASHINGTON OFFICE OF THE SECRETARY OF STATE, CORPORATIONS DIVISION | | DOLLIVER BUILDING | 801 CAPITOL WAY SOUTH | OLYMPIA | | 98501 | |
| WASHINGTON SECURITIES DIVISION | | 150 ISRAEL ROAD, SW | | TUMWATER | WA | 98507 | |
| WASHINGTON STATE DEPT OF REVENUE | UNCLAIMED PROPERTY SECTION | PO BOX 47477 | | OLYMPIA | WA | 98504-7477 | |
| WAYNE COUNTY CONSUMER AFFAIRS | ATTN: RICH MOLISANI, DIRECTOR | 7227 RT. 31 | | LYONS | NY | 14489 | |
| WEDBUSH SECURITIES INC. | ALAN FERREIRA | P.O. BOX 30014 | | LOS ANGELES | CA | 90030 | |
| WEDBUSH SECURITIES INC./P3 | ALAN FERREIRA | 1000 WILSHIRE BLVD | SUITE #850 | LOS ANGELES | CA | 90030 | |
| WEISMAN TECH LAW LLC | | 19 KOLBERT DR | | SCARSDALE | NY | 10583 | |
| WEISMAN TECH LAW LLC | | 19 KOLBERT DR | | SCARSDALE | NY | 10583 | |
| WEISSMAN TECH LAW | | 43 W 43RD ST | SUITE 110 | NEW YORK | NY | 10036 | |
| WELD COUNTY DISTRICT ATTORNEY | | 915 TENTH STREET | P.O. BOX 1167 | GREELEY | CO | 80632-1167 | |
| WEST VIRGINIA DIVISION OF FINANCIAL INSTITUTIONS | | 900 PENNSYLVANIA AVENUE | | CHARLESTON | WV | 25302-3542 | |
| WEST VIRGINIA OFFICE OF THE ATTORNEY GENERAL, CHARLESTON, WV | ATTN: CONSUMER PROTECTION DIVISION | STATE CAPITOL COMPLEX | BLDG. 1, RM E-26 1900 KANAWHA BLVD. E | CHARLESTON | WV | 25305 | |
| WEST VIRGINIA SECRETARY OF STATE | | 1900 KANAWHA BOULEVARD EAST STATE CAPITOL COMPLEX | BLDG. 1, STE. 157-K | CHARLESTON | WV | 25305 | |
| WEST VIRGINIA SECURITIES COMMISSION | LISA HOPKINS, GENERAL COUNSEL AND SENIOR DEPUTY COMMISSIONER OF SECURITIES | 1900 KANAWHA BOULEVARD EAST | BUILDING 1, ROOM W-100 | CHARLESTON | WV | 25305 | |
| WESTCHESTER COUNTY DEPARTMENT OF CONSUMER PROTECTION | | 148 MARTINE AVENUE | ROOM 407 | WHITE PLAINS | NY | 10601 | |
| WEWORK | | 33 IRVING PL | | NEW YORK | NY | 10003 | |
| WEWORK | | 33 IRVING PLACE | 3RD FLOOR | NEW YORK | NY | 10003 | |
| WHISTLER SEARCH PARTNERS, LLC | | 3320 LOWRY ROAD | | LOS ANGELES | CA | 90027 | |
| WHISTLER SEARCH PARTNERS, LLC | | 45 W 21ST ST | 3RD FLOOR | NEW YORK | NY | 10010 | |
| WILLIAMSMARSTON LLC | | 265 FRANKLIN STREET, 4TH FLOOR | | BOSTON | MA | 02110 | |
| WILSON-DAVIS & CO., INC. | BILL WALKER | 236 SOUTH MAIN STREET | | SALT LAKE CITY | UT | 84101 | |
| WINJIT INC. | | 1441 BROADWAY | SUITE 6033 | NEW YORK | NY | 10018 | |
| WINJIT INC. | | 1441 BROADWAY | SUITE #6033 | NEW YORK | NY | 10018 | |
| WINTERMUTE TRADING LTD | | 1 ASHLEY ROAD | 3RD FLOOR | ALTRINCHAM | CHESHIRE | WA14 2DT | UNITED KINGDOM |
| WISCONSIN DEPARTMENT OF AGRICULTURE, TRADE AND CONSUMER PROTECTION | ATTN: CONSUMER PROTECTION DIVISION | 1027 W. ST. PAUL AVENUE | | MILWAUKEE | WI | 53223 | |
| WISCONSIN DEPARTMENT OF AGRICULTURE, TRADE AND CONSUMER PROTECTION | ATTN: CONSUMER PROTECTION DIVISION | 2811 AGRICULTURE DR. | PO BOX 8911 | MADISON | WI | 53708-8911 | |
| WISCONSIN DEPARTMENT OF FINANCIAL INSTITUTIONS | | 4822 MADISON YARDS WAY, NORTH TOWER | | MADISON | WI | 53705 | |
| WISCONSIN DEPARTMENT OF FINANCIAL INSTITUTIONS | | PO BOX 7876 | | MADISON | WI | 53708-8861 | |
| WISCONSIN DIVISION OF SECURITIES | LESLIE M. VAN BUSKIRK, ADMINISTRATOR, DIVISION OF SECURITIES | 4822 MADISON YARDS | NORTH TOWER | MADISON | WI | 53703 | |
| WORKBEAST, LLC | | 69 ISLAND ST | | KEENE | NH | 3431 | |
| WRIKE, INC. | | 7 NORTH 2ND STREET | | SAN JOSE | CA | 95113 | |
| WRIKE, INC. | | 851 NW 62ND ST | | FT LAUDERDALE | FL | 33309-2009 | |
| WRZ CHARTERED ACCOUNTANTS | | 15 WERTHEIM CT | SUITE 311 | RICHMOND HILL | ON | L4B-3H7 | CANADA |
| WYOMING DIVISION OF BANKING | | 2300 CAPITOL AVENUE, SECOND FLOOR | | CHEYENNE | WY | 82002 | |
| WYOMING OFFICE OF THE ATTORNEY GENERAL | ATTN: CONSUMER PROTECTION DIVISION | 109 STATE CAPITOL | | CHEYENNE | WY | 82002 | |
| WYOMING SECURITIES DIVISION | KELLY JANES, DIVISION DIRECTOR | HERSCHLER BUILDING EAST 122 | WEST 25TH STREET, SUITE 100 | CHEYENNE | WY | 82002-0020 | |
| WYOMING STATE TREASURER | UNCLAIMED PROPERTY DIVISION | HERSCHLER BLDG EAST | 122 WEST 25TH ST., SUITE E300 | CHEYENNE | WY | 82002 | |
| X4 GROUP LTD | | BRETTENHAM HOUSE | | LONDON | | WC2R 7EN | UNITED KINGDOM |
| XL SPECIALTY INS. COMPANY | | 100 CONSTITUTION PLAZA | 17TH FLOOR | HARTFORD | CT | 06103 | |
| XL SPECIALTY INS. COMPANY | | 24111 NETWORK PLACE | | CHICAGO | IL | 60673-1241 | |
| XL SPECIALTY INSURANCE COMPANY | | 505 EAGLEVIEW BLVD | SUITE 100 DEPT: REGULATORY | EXTON | PA | 19341-1120 | |
| Y PRENDERGAST TR L/V TR UA 6/21/96 | | 735 EMERSON ST | | DENVER | CO | 80218 | |
| YOH SERVICES LLC | | 1500 SPRING GARDEN STREET | | PHILADELPHIA | PA | 19130 | |
| YONKERS CONSUMER PROTECTION BUREAU | | 87 NEPPERHAN AVE | ROOM 212 | YONKERS | NY | 10701 | |
| ZAGALABS | | CL. 93B #18-12 | | BOGOTA | | | COLOMBIA |
| ZENDESK | | 989 MARKET STREET | STE. 300 | SAN FRANCISCO | CA | 94103 | |
| ZENDESK INC & SUBSIDIARIES | | 989 MARKET STREET | SUITE 300 | SAN FRANCISCO | CA | 94103 | |
| ZENDESK, INC | | 1019 MARKET ST | | SAN FRANCISCO | CA | 94103 | |
| ZENDESK, INC | | 1019 MARKET ST | | SAN FRANCISCO | CA | 94103 | |
| ZEROFOX | | 1834 S. CHARLES STREET | | BALTIMORE | MD | 21230 | |
| ZEROFOX, INC. | | 1834 CHARLES ST. | | BALTIMORE | MD | 21230 | |
| ZOOM VIDEO COMMUNICATIONS, INC. | | 55 ALMADEN BOULEVARD, 6TH FLOOR | | SAN JOSE | CA | 95113 | |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 15 of 15

# Exhibit H

**Exhibit H**
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | Address 3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| AMERICAN ENTERPRISE INVEST SVCS INC | ATTN: CORPORATE ACTIONS | 2178 AMERIPRISE FINANCIAL | ROUTING S6/2178 | | MINNEAPOLIS | MN | 55474 | |
| AMERICAN ENTERPRISE INVEST SVCS INC | ATTN: PENNY ZALESKY | 2178 AMERIPRISE FINANCIAL CENTER | ROUTING: S6/2178 | | MINNEAPOLIS | MN | 55474 | |
| AMERICAN ENTERPRISE INVEST SVCS INC | ERIN M STIELER | 682 AMP FINANCIAL CENTER | | | MINNEAPOLIS | MN | 55474 | |
| AMERICAN ENTERPRISE INVEST SVCS INC | GREG WRAALSTAD | CORPORATE ACTIONS | 901 3RD AVE SOUTH | | MINNEAPOLIS | MN | 55474 | |
| APEX CLEARING CORPORATION | ATTN: BILIANA STOIMENOVA | 1700 PACIFIC AVENUE | SUITE 1400 | | DALLAS | TX | 75201 | |
| APEX CLEARING CORPORATION | ATTN: BRIAN DARBY | ONE DALLAS CENTER | 350 M. ST. PAUL, SUITE 1300 | | DALLAS | TX | 75201 | |
| AXOS/COR CLEARING LLC | ANH MECHALS | 9300 UNDERWOOD AVENUE | SUITE 400 | | OMAHA | NE | 68114 | |
| AXOS/COR CLEARING LLC | ISSUER SERVICES | C/O MEDIANT COMMUNICATION | 8000 REGENCY PARKWAY | | CARY | NC | 27518 | |
| AXOS/COR CLEARING LLC | LUKE HOLLAND | 1200 LANDMARK CENTER | SUITE 800 | | OMAHA | NE | 68102 | |
| BBS SECURITIES INC./CDS | CORPORATE ACTIONS | 4100 YONGE STREET | SUITE 415 | | TORONTO | ON | M2P 2B5 | CANADA |
| BBS SECURITIES INC./CDS | CORPORATE ACTIONS | DEBORAH CARLYLE | 4100 YONGE STREET | SUITE 504A | TORONTO | ON | M2P 2G2 | CANADA |
| BMO NESBITT BURNS INC./CDS | CORPORATE ACTIONS | LOUISE TORANGEAU; PHUTHORN PENIKETT | 1 FIRST CANADIAN PLACE, 13TH FL | PO BOX 150 | TORONTO | ON | M5X 1H3 | CANADA |
| BMO NESBITT BURNS INC./CDS | CORPORATE ACTIONS | PHUTHORN PENIKETT | 250 YONGE STREET | 14TH FLOOR | TORONTO | ON | M5B 2M8 | CANADA |
| BNP PARIBAS NY BRANCH/CUST/CLTASSTS | DEAN GALLI | CORPORATE ACTIONS | AD. D. JOAO II | N. 49 | LISBON | | 1988-028 | PORTUGAL |
| BNP PARIBAS NY BRANCH/CUST/CLTASSTS | RUSSELL YAP | CORPORATE ACTIONS | 525 WASHINGTON BLVD | 9TH FLOOR | JERSEY CITY | NJ | 07310 | |
| BNY MELLON WEALTH MANAGEMENT | CORPORATE ACTIONS | KEVIN KELLY | ONE WALL STREET | | NEW YORK | NY | 10005 | |
| BNY MELLON WEALTH MANAGEMENT | OPERATIONS DEPT | BETH COYLE | TWO BNY MELLON CENTER | SUITE 1215 | PITTSBURGH | PA | 15222 | |
| BNYMELLON/WEALTH MANAGEMENT | KEVIN KELLY | CORPORATE ACTIONS | ONE MELLON BANK CENTER | 4TH FLOOR- 151-0440 | PITTSBURGH | PA | 15258 | |
| BROWN BROTHERS HARRIMAN & CO. | JERRY TRAVERS | 525 WASHINGTON BLVD. | | | JERSEY CITY | NJ | 07310 | |
| CDS CLEARING AND DEPOSITORY SERVICES | LORETTA VERELLI | 600 BOUL.DE MAISONNEUVE | OUEST BUREAU 210 | | MONTREAL | QC | H3A 3J2 | CANADA |
| CETERA INVESTMENT SERVICES LLC | ANGELA HANDELAND | SUPERVISOR | 400 1ST STREET SOUTH | SUITE 300 | ST. CLOUD | MN | 56301 | |
| CETERA INVESTMENT SERVICES LLC | ATTN: ASHLEY ROELIKE | CORPORATE ACTIONS | 400 1ST STREET SOUTH | SUITE 300 | ST. CLOUD | MN | 56301 | |
| CHARLES SCHWAB & CO., INC. | CORP ACTIONS DEPT.: 01-1B572 | CHRISTINA YOUNG | 2423 E LINCOLN DRIVE | | PHOENIX | AZ | 85016-1215 | |
| CITIBANK, N.A. | PAUL WATTERS | 3801 CITIBANK CENTER | B/3RD FLOOR/ZONE 12 | | TAMPA | FL | 33610 | |
| CITIBANK, N.A. | SHERIDA SINANAN | 3801 CITIBANK CENTER | B/3RD FLOOR/ZONE 12 | | TAMPA | FL | 33610 | |
| CITIGROUP GLOBAL MARKETS, INC./CORRESPONDENT CLEARING | CHARLES FERNANDES | 388 GREENWICH STREET | | | NEW YORK | NY | 10013 | |
| CITIGROUP GLOBAL MARKETS, INC./CORRESPONDENT CLEARING | CORRESPONDENT CLEARING | ABIGAIL DAVIES | 388 GREENWICH STREET | 11TH FLOOR | NEW YORK | NY | 10013 | |
| CREDENTIAL SECURITIES INC./CDS | CORPORATE ACTIONS | 700 – 1111 WEST GEORGIA ST | | | VANCOUVER | BC | V6E 4T6 | CANADA |
| CREDIT SUISSE SECURITIES (USA) LLC | ANTHONY MILO | VICE PRESIDENT | 7033 LOUIS STEVENS DRIVE | GLOBAL PROXY SERVICES | RESEARCH TRIANGLE PARK | NC | 27709 | |
| CREDIT SUISSE SECURITIES (USA) LLC | C/O BROADRIDGE | 51 MERCEDES WAY | | | EDGEWOOD | NY | 11717 | |
| D. A. DAVIDSON & CO. | ATTN: CORPORATE ACTIONS | 8 THIRD STREET NORTH | | | GREAT FALLS | MT | 59401 | |
| D. A. DAVIDSON & CO. | ATTN: DEBBIE GYGER | 8 THIRD STREET NORTH | | | GREAT FALLS | MT | 59401 | |
| D. A. DAVIDSON & CO. | RITA LINSKEY | 8 THIRD STREET NORTH | ONE WALL STREET | | GREAT FALLS | MT | 59401 | |
| DEUTSCHE BANK AG NY/CEDEAR | AGOSTINO RICCI | 60 WALL ST. | | | NEW YORK | NY | 10005 | |
| DEUTSCHE BANK AG NY/CEDEAR | JOHN BINDER | VICE PRESIDENT | 100 PLAZA ONE | 2ND FLOOR | JERSEY CITY | NJ | 07311 | |
| DEUTSCHE BANK AG NY/US CUSTODY | JOHN BINDER | VICE PRESIDENT | 100 PLAZA ONE | 2ND FLOOR | JERSEY CITY | NJ | 07311 | |
| E*TRADE CLEARING LLC | C/O BROADRIDGE | ATTN: CORPORATE ACTIONS DEPT. | 2 JOURNAL SQUARE PLAZA | 5TH FLOOR | JERSEY CITY | NJ | 07306 | |
| E*TRADE CLEARING LLC | JOHN ROSENBACH | 1271 AVENUE OF THE AMERICAS | 14TH FLOOR | | NEW YORK | NY | 10020 | |
| E*TRADE CLEARING LLC | JOHN ROSENBACH | 200 HUDSON STREET | SUITE 501 | | JERSEY CITY | NJ | 07311 | |
| E*TRADE CLEARING LLC | VICTOR LAU | 34 EXCHANGE PLACE | PLAZA II | | JERSEY CITY | NJ | 07311 | |
| EDWARD D. JONES & CO. | DEREK ADAMS | 12555 MANCHESTER ROAD | | | ST. LOUIS | MO | 63131 | |
| EDWARD D. JONES & CO. | ELIZABETH ROLWES | 201 PROGRESS PARKWAY | | | MARYLAND HEIGHTS | MO | 63043-3042 | |
| EDWARD JONES/CDS | CORPORATE ACTIONS | 201 PROGRESS PARKWAY | | | MARYLAND HEIGHTS | MO | 63043 | |
| EDWARD JONES/CDS | DIANE YOUNG | 1255 MANCHESTER ROAD | | | ST. LOUIS | MO | 63141 | |
| FIRST CLEARING, LLC | CORPORATE ACTIONS | 2801 MARKET STREET | H0006-09B | | ST. LOUIS | MO | 63103 | |
| GOLDMAN SACHS & CO. LLC | PROXY HOTLINE 1 | 30 HUDSON STREET | PROXY DEPARTMENT | | JERSEY CITY | NJ | 07302 | |
| GOLDMAN SACHS INTERNATIONAL | ASSET SERVICING | 30 HUDSON STREET | PROXY DEPARTMENT | | JERSEY CITY | NJ | 07302 | |
| GOLDMAN, SACHS & CO. | ATTN: STEVE BERRIOS - CORPORATE ACTIONS | 100 BURMA ROAD | | | JERSEY CITY | NJ | 07305 | |
| HILLTOP SECURITIES INC. | ATTN: CORPORATE ACTIONS | 1201 ELM STREET | SUITE 3500 | | DALLAS | TX | 75270 | |
| HILLTOP SECURITIES INC. | RHONDA JACKSON | 717 N HARWOOD ST | SUITE 3400 | | DALLAS | TX | 75201 | |
| HRT FINANCIAL, LLC | CORPORATE ACTIONS | 32 OLD SLIP | 30TH FLOOR | | NEW YORK | NY | 10005 | |
| INTERACTIVE BROKERS RETAIL EQUITY CLEARING | KARIN MCCARTHY | 2 PICKWICK PLAZA | 2ND FLOOR | | GREENWICH | CT | 06830 | |
| INTERACTIVE BROKERS RETAIL EQUITY CLEARING | KARIN MCCARTHY | 8 GREENWICH OFFICE PARK | | | GREENWICH | CT | 06831 | |
| J.P. MORGAN CLEARING CORP. | ATTN: CORPORATE ACTIONS | 14201 DALLAS PARKWAY | 12TH FLOOR | | DALLAS | TX | 75254 | |
| J.P. MORGAN CLEARING CORP. | JOHN FAY | 500 STANTON CHRISTIANA ROAD | OPS 4, FLOOR 03 | NCC5 | NEWARK | DE | 19713-2107 | |
| JANNEY MONTGOMERY SCOTT LLC | ATTN: CORPORATE ACTIONS DEPARTMENT | 1717 ARCH STREET, 19TH FLOOR | | | PHILADELPHIA | PA | 19103 | |
| JANNEY MONTGOMERY SCOTT LLC | MARK F. GRESS | C/O MEDIANT COMMUNICATIONS INC. | 200 REGENCY FOREST DRIVE | | CARY | NC | 27518 | |
| JANNEY MONTGOMERY SCOTT LLC | REGINA LUTZ | 1801 MARKET STREET, 9TH FLOOR | | | PHILADELPHIA | PA | 19103-1675 | |
| JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | FAREED HAMEEDUDDIN | 4 CHASE METROTECH CENTER | | | BROOKLYN | NY | 11245 | |
| JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | MARCIN BIEGANSKI | ASSOCIATE | 14201 DALLAS PKWY | FLOOR 12 - CORP ACTIONS DEPT | DALLAS | TX | 75254 | |
| JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | SACHIN GOYAL | 500 STANTON CHRISTIANA ROAD | OPS 4, FLOOR 03 | | NEWARK | DE | 19713-2107 | |
| KCG AMERICAS LLC | JANICA BRINK, VP | CORPORATE ACTIONS | 545 WASHINGTON BLVD. | | JERSEY CITY | NJ | 07310 | |
| LPL FINANCIAL CORPORATION | CORPORATE ACTIONS | JACQUI TEAGUE ; KRISTIN KENNEDY | 1055 LPL WAY | | FORT MILL | SC | 29715 | |
| LPL FINANCIAL CORPORATION | CORPORATE ACTIONS | KRISTIN KENNEDY | 9785 TOWNE CENTRE DRIVE | | SAN DIEGO | CA | 92121-1968 | |
| MACKIE RESEARCH CAPITAL CORPORATION/ | TONY RODRIGUES | SUPERVISOR | 199 BAY STREET | COMMERCE COURT WEST, SUITE 4600 | TORONTO | ON | M5L 1G2 | CANADA |
| MACKIE RESEARCH CAPITAL CORPORATION/CDS | ATTN: CORPORATE ACTIONS | 199 BAY STREET | COMMERCE COURT WEST, SUITE 4600 | | TORONTO | ON | M5L 1G2 | CANADA |
| MARSCO INVESTMENT CORPORATION/TRADEUP | MARK KADISON | 101 EISENHOWER PARKWAY | | | ROSELAND | NJ | 07068 | |
| MERRILL LYNCH PIERCE FENNER & SMITH | DTC 8862 | EARL WEEKS | 4804 DEERLAKE DR. E. | | JACKSONVILLE | FL | 32246 | |
| MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED/STOCK LOAN | CORPORATE ACTIONS | 101 HUDSON STREET | | | JERSEY CITY | NJ | 07302 | |
| MORGAN STANLEY & CO. INTERNATIONAL P | DAN SPADACCINI | 901 SOUTH BOND ST | 6TH FL | | BALTIMORE | MD | 21231 | |
| MORGAN STANLEY & CO. INTERNATIONAL PLC/MORGAN STANLEY BANK A.G. | 25 CABOT SQUARE CANNARY WHARF | | | | LONDON | | E14 4QA | UNITED KINGDOM |
| MORGAN STANLEY & CO. INTERNATIONAL PLC/MORGAN STANLEY BANK A.G. | MANSUR PRESIDENT | 1300 THAMES ST | 5TH FLOOR | | BALTIMORE | MD | 21231 | |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

**Exhibit H**
Served via First-Class Mail

| Name | Attention | Address 1 | Address 2 | Address 3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| MORGAN STANLEY & CO. LLC | ATTN: CORPORATE ACTIONS | 1300 THAMES STREET | 7TH FLOOR | | BALTIMORE | MD | 21231 | |
| MORGAN STANLEY & CO. LLC | MICHELLE FORD | 901 SOUTH BOND ST | 6TH FL | | BALTIMORE | MD | 21231 | |
| MORGAN STANLEY SMITH BARNEY LLC | JOHN BARRY | 1300 THAMES ST | 6TH FLOOR | | BALTIMORE | MD | 21231 | |
| MURIEL SIEBERT & CO., INC. | | 15 EXCHANGE PLACE SUITE 800 | | | JERSEY CITY | NY | 07302 | |
| NATIONAL FINANCIAL SERVICES LLC | CORP ACTIONS | 200 SEAPORT BLVD, Z1B | | | BOSTON | MA | 02210 | |
| NATIONAL FINANCIAL SERVICES LLC | PETER CLOSS | 499 WASHINGTON BLVD. | | | JERSEY CITY | NJ | 07310 | |
| NBCN INC./CDS | ANNA MEDEIROS | CORPORATE ACTIONS | 1010 RUE DE LA GAUCHETIERE ST WEST | SUITE 1925 | MONTREAL | QC | H3B 5J2 | CANADA |
| OPPENHEIMER & CO. INC. | ATTN: CORPORATE ACTIONS | 85 BROAD STREET | | | NEW YORK | NY | 10004 | |
| OPPENHEIMER & CO. INC. | OSCAR MAZARIO | 85 BROAD STREET | | | NEW YORK | NY | 10004 | |
| PERSHING LLC | ATTN: REGAN PALMER | CORPORATE ACTIONS | ONE PERSHING PLAZA | 10TH FLOOR | JERSEY CITY | NJ | 07399 | |
| PERSHING LLC | JOSEPH LAVARA | ONE PERSHING PLAZA | | | JERSEY CITY | NJ | 07399 | |
| PNC BANK, NATIONAL ASSOCIATION | JUANITA NICHOLS | 8800 TINICUM BLVD | MAILSTOP F6-F266-02-2 | | PHILADELPHIA | PA | 19153 | |
| RAYMOND JAMES & ASSOCIATES, INC. | ATTN: ELAINE MULLEN | CORPORATE ACTIONS | 880 CARILLON PARKWAY | | ST. PETERSBURG | FL | 33716 | |
| RAYMOND JAMES & ASSOCIATES, INC. | ROBERTA GREEN | 880 CARILLON PARKWAY | | | SAIT PETERSBURG | FL | 33716 | |
| RAYMOND JAMES LTD./CDS** | CORPORATE ACTIONS | PO BOX 23558 | | | ST PETERSBURG | FL | 33742-3558 | |
| RBC DOMINION SECURITIES INC./CDS | KAREN OLIVERES | 200 BAY STREET, 6TH FLOOR | ROYAL BANK PLAZA NORTH TOWER | | TORONTO | ON | M5J 2W7 | CANADA |
| ROBERT W. BAIRD & CO. INCORPORATED | JAN SUDFELD | 777 E. WISCONSIN AVENUE | 19TH FLOOR | | MILWAUKEE | WI | 53202 | |
| SCOTIA CAPITAL INC./CDS | CORPORATE ACTIONS | LUISA  DOMINGUES | 40 KING STREET W | | TORONTO | ON | M5H1H1 | CANADA |
| SCOTIA CAPITAL INC./CDS | LILIAN  NIE | CORPORATE ACTIONS | 40 KING STREET W | 23RD FLOOR | TORONTO | ON | M5H1H1 | CANADA |
| SEI PRIVATE TRUST COMPANY/C/O GWP | DIANA  MASON | CORPORATE ACTIONS | 1 FREEDOM VALLEY DRIVE | | OAKS | PA | 19456 | |
| SEI PRIVATE TRUST COMPANY/C/O GWP | ERIC GREENE | ONE FREEDOM VALLEY DRIVE | | | OAKS | PA | 19456 | |
| SSB - TRUST CUSTODY | ED CHANEY | VICE PRESIDENT | 1200 CROWN COLONY DRIVE | | QUINCY | MA | 02169 | |
| STATE STREET BANK & TRUST COMPANY | PROXY SERVICES | 1776 HERITAGE DRIVE | | | NORTH QUINCY | MA | 02171 | |
| STERNE, AGEE & LEACH, INC. | ATTN: JUSTIN WOODHAM | CORPORATE ACTIONS | 2 PERIMETER PARK SOUTH | SUITE 100W | BIRMINGHAM | AL | 35243 | |
| STERNE, AGEE & LEACH, INC. | KEN SIMPSON, JAMES MEZRANO | 2 PERIMETER PARK | SUITE 100W | | BIRMINGHAM | AL | 35209 | |
| STIFEL, NICOLAUS & COMPANY, INCORPORATED | | 501 N BROADWAY | | | ST LOUIS | MO | 63102 | |
| STIFEL, NICOLAUS & COMPANY, INCORPORATED | C/O MEDIANT COMMUNICATIONS | 200 REGENCY FOREST DRIVE | | | CARY | NC | 27518 | |
| STOCKCROSS FINANCIAL SERVICES, INC. | ATTN: CORPORATE ACTIONS, LORETTA RACER | 1900 ST. JAMES PLACE #120 | | | HOUSTON | TX | 77056 | |
| STOCKCROSS FINANCIAL SERVICES, INC. | CORPORATE ACTIONS | 9464 WILSHIRE BLVD. | | | BEVERLY HILLS | CA | 90212 | |
| STOCKCROSS FINANCIAL SERVICES, INC. | DIANE TOBEY | 77 SUMMER STREET | | | BOSTON | MA | 02110 | |
| TD AMERITRADE CLEARING, INC. | ATTN: CORP ACTIONS | SUZANNE  BRODD | 200 S. 108TH AVENUE | | OMAHA | NE | 68154 | |
| TD AMERITRADE CLEARING, INC. | KEVIN STRINE | 4211 S. 102ND STREET | | | OMAHA | NE | 68127 | |
| TD AMERITRADE CLEARING, INC. | MANDI FOSTER | 1005 N. AMERITRADE PLACE | | | BELLEVUE | NE | 68005 | |
| TD WATERHOUSE CANADA INC./CDS | YOUSUF AHMED | 77 BLOOR STREET WEST | 3RD FLOOR | | TORONTO | ON | M4Y 2T1 | CANADA |
| THE BANK OF NEW YORK MELLON | CELESTE MORRIS | 500 GRANT STREET | ROOM 151-2610 | | PITTSBURGH | PA | 15259 | |
| THE BANK OF NEW YORK MELLON | CELESTE MORRIS | 50 GRANT STREET | ROOM 151-2610 | | PITTSBURGH | PA | 15259 | |
| THE BANK OF NEW YORK MELLON | CORP ACTIONS | 525 WILLIAM PENN PLACE | SUITE 153-0400 | | PITTSBURGH | PA | 15259 | |
| TRADESTATION SECURITIES, INC. | ATTN: ANDREA AUGUSTIN | CORPORATE ACTIONS | 8050 SW 10TH ST | | PLANTATION | FL | 33324 | |
| TRADESTATION SECURITIES, INC. | ATTN: DAVID BIALER | 8050 SW 10TH STREET | SUITE 400 | | PLANTATION | FL | 33324 | |
| TRADEUP SECURITIES, INC. | | 101 EISENHOWER PARKWAY | | | ROSELAND | NJ | 07068 | |
| U.S. BANCORP INVESTMENTS, INC. | ATTN: REORG DEPARTMENT | 60 LIVINGSTON AVE | | | ST. PAUL | MN | 55107 | |
| U.S. BANCORP INVESTMENTS, INC. | KEVIN BROWN | ASSISTANT VICE PRESIDENT | 60 LIVINGSTON AVE | | ST. PAUL | MN | 55107-1419 | |
| UBS FINANCIAL SERVICES INC. | ATTN: CORPORATE ACTIONS | 1000 HARBOR DRIVE | | | WEEHAWKEN | NJ | 07086 | |
| UBS FINANCIAL SERVICES INC. | JANE FLOOD | 1000 HARBOR BLVD | | | WEEHAWKEN | NJ | 07086 | |
| UBS FINANCIAL SERVICES INC. | JANE FLOOD | 1000 HARBOR BLVD | | | WEEHAWKEN | NJ | 07086 | |
| VANGUARD MARKETING CORPORATION | | 100 VANGUARD BOULEVARD | | | MALVERN | PA | 19355 | |
| VANGUARD MARKETING CORPORATION | | PO BOX 1170 | | | VALLEY FORGE | PA | 19482-1170 | |
| VANGUARD MARKETING CORPORATION | ATTN: BEN BEGUIN | 14321 N. NORTHSIGHT BOULEVARD | | | SCOTTSDALE | AZ | 85260 | |
| VIRTU AMERICAS LLC | JANICA BRINK | VICE PRESIDENT | 165 BROADWAY | | NEW YORK | NY | 10006 | |
| VIRTU AMERICAS LLC | JANICA BRINK | VICE PRESIDENT | 545 WASHINGTON BLVD. | | JERSEY CITY | NJ | 07310 | |
| VISION FINANCIAL MARKETS LLC | ANA MARTINEZ | 120 LONG RIDGE ROAD | 3 NORTH | | STAMFORD | CT | 06902 | |
| VISION FINANCIAL MARKETS LLC | ANA MARTINEZ | CORPORATE ACTIONS | 4 HIGH RIDGE PARK | | STAMFORD | CT | 06804 | |
| WEDBUSH SECURITIES INC. | ALAN FERREIRA | P.O. BOX 30014 | | | LOS ANGELES | CA | 90030 | |
| WEDBUSH SECURITIES INC. | DONNA WONG | 1000 WILSHIRE BLVD | | | LOS ANGELES | CA | 90030 | |
| WEDBUSH SECURITIES INC./P3 | ALAN FERREIRA | 1000 WILSHIRE BLVD | SUITE #850 | | LOS ANGELES | CA | 90030 | |
| WELLS FARGO CLEARING SERVICES LLC | CHRISTY HALLORAN | 1 N JEFFERSON AVE | | | ST. LOUIS | MO | 63103 | |
| WELLS FARGO CLEARING SERVICES LLC | MATT BUETTNER | 2801 MARKET STREET | H0006-09B | | ST. LOUIS | MO | 63103 | |
| WILSON-DAVIS & CO., INC. | BILL WALKER | 236 SOUTH MAIN STREET | | | SALT LAKE CITY | UT | 84101 | |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 2 of 2

# Exhibit I

## Exhibit I

Served via Electronic Mail

| Name | Email |
|---|---|
| AMERICAN ENTERPRISE INVEST SVCS INC | GREGORY.A.WRAALSTAD@AMPF.COM |
| AMERICAN ENTERPRISE INVEST SVCS INC | GREGORY.A.WRAALSTAD@AMPF.COM |
| | REORG@AMPF.COM |
| AMERICAN ENTERPRISE INVEST SVCS INC | REORG@AMPF.COM |
| | GREGORY.A.WRAALSTAD@AMPF.COM |
| AMERICAN ENTERPRISE INVESTMENT SVCS | GREGORY.A.WRAALSTAD@AMPF.COM |
| APEX CLEARING CORPORATION | CORPORATEACTIONS@APEXCLEARING.COM |
| APEX CLEARING CORPORATION | FRANK.A.CONTI@RIDGECLEARING.COM |
| | CORPORATEACTIONS@APEXCLEARING.COM |
| BANK OF AMERICA DTC #0773 #05198 | BASCORPORATEACTIONS@BOFASECURITIES.COM |
| BANK OF AMERICA DTC #0773 #05198 | CORPACTIONSPROXY@ML.COM |
| BANK OF AMERICA DTC #0773 #05198 | CPACTIONSLITIGATION@ML.COM |
| BANK OF AMERICA NA/CLIENT ASSETS DTC #02251 | TSS.CORPORATE.ACTIONS@BANKOFAMERICA.COM |
| BARCLAYS CAPITAL INC. DTC #0229 | NYVOLUNTARY@BARCLAYS.COM |
| BBS SECURITIES INC./CDS | INFO@BBSSECURITIES.COM |
| BLOOMBERG | RELEASE@BLOOMBERG.NET |
| BMO NESBITT BURNS INC./CDS | NBOPS.PROXY@BMO.COM |
| | DINA.FERNANDES@BMONB.COM |
| | BMOCMSETTLEMENTS.NEWYORK@BMO.COM |
| | BMOGAM.SLOPERATIONS@BMO.COM |
| BMO NESBITT BURNS INC./CDS | PHUTHORN.PENIKETT@BMONB.COM |
| BMO NESBITT BURNS INC./CDS | PHUTHORN.PENIKETT@BMONB.COM |
| | NBOPS.PROXY@BMO.COM |
| BMO NESBITT BURNS INC./CDS | WMPOCLASS.ACTIONS@BMO.COM |
| BNP PARIBAS -EMAIL | INES FRANCO RAMOS INES.FRANCORAMOS@BNPPARIBAS.COM |
| | IPB ASSET SERVICING IPB.ASSET.SERVICING@BNPPARIBAS.COM |
| BNY MELLON  - EMAIL | SLCW@BNYMELLON.COM |
| BNY MELLON / NORDEA - EMAIL | PKB@NORDEA.COM |
| | AHTI.TOMINGAS@NORDEA.COM |
| | THERESA.STANTON@BNYMELLON.COM |
| BNY MELLON WEALTH MANAGEMENT | GCE_INQUIRY_AMERICAS_CLIENTS@BNYMELLON.COM |
| | PXRPT@BNYMELLON.COM |
| | PGHEVENTCREATION@BNYMELLON.COM |
| | PGH.CA.EVENT.CREATION@BNYMELLON.COM |
| BNYMELLON/WEALTH MANAGEMENT | GCE_INQUIRY_AMERICAS_CLIENTS@BNYMELLON.COM |
| | PXRPT@BNYMELLON.COM |
| | PGHEVENTCREATION@BNYMELLON.COM |
| | PGH.CA.EVENT.CREATION@BNYMELLON.COM |
| BNYMELLON/WEALTH MANAGEMENT | JMICHAEL.JOHNSONJR@BNYMELLON.COM |
| | MATTHEW.BARTEL@BNYMELLON.COM |
| | JOHN-HENRY.DOKTORSKI@BNYMELLON.COM |
| | PGHEVENTCREATION@BNYMELLON.COM |
| | PGH.CA.EVENT.CREATION@BNYMELLON.COM |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 1 of 11

**STRETTO**

Exhibit I

Served via Electronic Mail

| Name | Email |
|------|-------|
| BROWN BROTHERS HARRIMAN & CO. | CA.CLASS.ACTIONS@BBH.COM |
| | CALEB.LANFEAR@BBH.COM |
| | JERRY.TRAVERS@BBH.COM |
| BROWN BROTHERS HARRIMAN & CO. DTC #010 | PAUL.NONNON@BBH.COM |
| BROWN BROTHERS HARRIMAN & CO. DTC #010 | EDWIN.ORTIZ@BBH.COM |
| BROWN BROTHERS HARRIMAN & CO. DTC #010 | MAVIS.LUQUE@BBH.COM |
| BROWN BROTHERS HARRIMAN & CO. DTC #010 | MICHAEL.LERMAN@BBH.COM |
| BROWN BROTHERS HARRIMAN & CO. DTC #010 | NJ.MANDATORY.INBOX@BBH.COM |
| BROWN BROTHERS HARRIMAN & CO. DTC #010 | PAUL.NONNON@BBH.COM |
| BROWN BROTHERS HARRIMAN & CO. DTC #010 | SEAN.IMHOF@BBH.COM |
| CDS | CDSCUSTOMERSUPPORT@TMX.COM |
| CETERA INVESTMENT SERVICES LLC | ASHLEY.ROELIKE@CETERAFI.COM |
| | STEVE.SCHMITZ@CETERA.COM |
| CETERA INVESTMENT SERVICES LLC | REORG@CETERAFI.COM |
| | ALICE.HEMPHILL@CETERA.COM |
| | AMANDA.ZWILLING@CETERA.COM |
| | RUSSELL.MARKFELDER@CETERA.COM |
| | KATIE.BIEDLER@CETERAFI.COM |
| | STEVE.SCHMITZ@CETERA.COM |
| CHARLES SCHWAB & CO. INC. DTC #0164 | PHXMCBR@SCHWAB.COM |
| CHARLES SCHWAB & CO. INC. DTC #0164 | PHXMCBR@SCHWAB.COM |
| CHARLES SCHWAB & CO. INC. DTC #0164 | VOLUNTARYSETUP@SCHWAB.COM |
| CHARLES SCHWAB & CO., INC. | CHRISTINA.YOUNG@SCHWAB.COM |
| CHARLES SCHWAB & CO., INC. | PHXMCBR@SCHWAB.COM |
| | JEN.CURTIN@SCHWAB.COM |
| CITIBANK, N.A. | GTS.CAEC.TPA@CITI.COM |
| | MARIANNE.SULLIVAN@CITI.COM |
| | PAOLA.PRINS@CITI.COM |
| | DARYL.SLATER@CITI.COM |
| | MICHAEL.FENNER@CITI.COM |
| | THEOPHILUS.CHAN@CITI.COM |
| | PRABHA.L.BATNI@CITI.COM |
| | ANN.E.NOBBE@CITI.COM |
| CITIBANK, N.A. DTC #0908 | GTS.CAEC.TPA@CITI.COM |
| CITIBANK, N.A. DTC #0908 | GTS.CAEC.TPA@CITI.COM |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 2 of 11

![STRETTO]

## Exhibit I
Served via Electronic Mail

| Name | Email |
|------|-------|
| CITIGROUP GLOBAL MARKETS, INC./CORRESPONDENT CLEARING | GTS.CAEC.TPA@CITI.COM<br>MARIANNE.SULLIVAN@CITI.COM<br>PAOLA.PRINS@CITI.COM<br>DARYL.SLATER@CITI.COM<br>MICHAEL.FENNER@CITI.COM<br>THEOPHILUS.CHAN@CITI.COM<br>PRABHA.L.BATNI@CITI.COM<br>ANN.E.NOBBE@CITI.COM |
| CLEARSTREAM INTERNATIONAL SA | CA_GENERAL.EVENTS@CLEARSTREAM.COM |
| CLEARSTREAM INTERNATIONAL SA | CA_LUXEMBOURG@CLEARSTREAM.COM |
| CLEARSTREAM INTERNATIONAL SA | CA_MANDATORY.EVENTS@CLEARSTREAM.COM |
| CLEARSTREAM INTERNATIONAL SA | CHERIFA.MAAMERI@CLEARSTREAM.COM |
| CLEARSTREAM INTERNATIONAL SA | HULYA.DIN@CLEARSTREAM.COM |
| CLEARSTREAM INTERNATIONAL SA | NATHALIE.CHATAIGNER@CLEARSTREAM.COM |
| COR CLEARING LLC | CORPORATE.ACTION@CORCLEARING.COM |
| COR CLEARING LLC | CORPORATE.ACTION@CORCLEARING.COM<br>ANH.MECHALS@LEGENTCLEARING.COM |
| CREDIT AGRICOLE SECS USA INC. DTC #0651 | CSICORPACTIONS@CA-CIB.COM |
| CREDIT SUISSE SECURITIES (USA) LLC | ANTHONY.MILO@CREDIT-SUISSE.COM<br>HIEP.LIEN@CREDIT-SUISSE.COM<br>LIST.NYEVTINTGRP@CREDIT-SUISSE.COM |
| CREDIT SUISSE SECURITIES (USA) LLC | HIEP.LIEN@CREDIT-SUISSE.COM<br>LIST.NYEVTINTGRP@CREDIT-SUISSE.COM |
| CREDIT SUISSE SECURITIES (USA) LLC DTC #0355 | ASSET.SERVNOTIFICATION@CREDIT-SUISSE.COM |
| CREDIT SUISSE SECURITIES (USA) LLC DTC #0355 | ASSET.SERVNOTIFICATION@CREDIT-SUISSE.COM |
| CREDIT SUISSE SECURITIES (USA) LLC DTC #0355 | LIST.NYEVTINTGRP@CREDIT-SUISSE.COM |
| D. A. DAVIDSON & CO. | DGYGER@DADCO.COM<br>REORG@DADCO.COM |
| D. A. DAVIDSON & CO. | REORG@DADCO.COM<br>KSAPP@DADCO.COM<br>DWEGNER@DADCO.COM<br>THOWELL@DADCO.COM |
| D. A. DAVIDSON & CO. | RLINSKEY@DADCO.COM |
| D. A. DAVIDSON & CO. | RLINSKEY@DADCO.COM<br>REORG@DADCO.COM |
| DEUTSCHE BANK AG NY/CEDEAR | KEVIN.MILLER@DB.COM<br>SAGAR.SHARMA@DB.COM<br>CYNTHIA.RAINIS@DB.COM<br>JAMIE.SILVERSTEIN@DB.COM |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 3 of 11

# STRETTO

## Exhibit I
Served via Electronic Mail

| Name | Email |
|------|-------|
| DEUTSCHE BANK AG NY/CEDEAR | KEVIN.MILLER@DB.COM |
| | SAGAR.SHARMA@DB.COM |
| | CYNTHIA.RAINIS@DB.COM |
| | JAMIE.SILVERSTEIN@DB.COM |
| | JOHN.BINDER@DB.COM |
| DEUTSCHE BANK AG NY/US CUSTODY | JOHN.BINDER@DB.COM |
| DEUTSCHE BANK SECURITIES INC. DTC #0573 | JAXCA.NOTIFICATIONS@DB.COM |
| E*TRADE CLEARING LLC | VANDANA.X.VEMULA@BROADRIDGE.COM |
| EDWARD D. JONES & CO. | ELIZABETH.ROLWES@EDWARDJONES.COM |
| EDWARD D. JONES & CO. | GINGER.STILLMAN@EDWARDJONES.COM |
| EDWARD JONES/CDS | EDJCLASSACTIONS@EDWARDJONES.COM |
| | NICK.HUMMEL@EDWARDJONES.COM |
| EDWARD JONES/CDS | GINGER.STILLMAN@EDWARDJONES.COM |
| | MATT.BROMLEY@EDWARDJONES.COM |
| | ANNA.SCHIERMANN@EDWARDJONES.COM |
| | MARIE.MOHN@EDWARDJONES.COM |
| | BRETT.BROWN@EDWARDJONES.COM |
| | EDJCLASSACTIONS@EDWARDJONES.COM |
| EUROCLEAR BANK S.A./N.V. | CA.OMK@EUROCLEAR.COM |
| EUROCLEAR BANK S.A./N.V. | EB.CA@EUROCLEAR.COM |
| FINANCIAL INFORMATION INC. | REORGNOTIFICATIONLIST@FIINET.COM |
| FIRST CLEARING, LLC | PPCA@FIRSTCLEARING.COM |
| | CYNTHIA.BROWN@FIRSTCLEARING.COM |
| | CYNTHIA.BROWN@WELLSFARGOADVISORS.COM |
| | JOHN.KALINOWSKI@FIRSTCLEARING.COM |
| | OPS@FIRSTCLEARING.COM |
| | CAV@FIRSTCLEARING.COM |
| FOLIOFN INVESTMENTS | PROXYSERVICES@FOLIOINVESTING.COM |
| | WADE.LYNCH@GS.COM |
| GOLDMAN SACHS & CO DTC #0005 | GS-AS-NY-PROXY@NY.EMAIL.GS.COM |
| GOLDMAN SACHS & CO DTC #0005 | GS-AS-NY-PROXY@NY.EMAIL.GS.COM |
| GOLDMAN SACHS & CO DTC #0005 | NEWYORKANNCHUB@GS.COM |
| GOLDMAN SACHS & CO. LLC | GS-AS-NY-PROXY@GS.COM |
| GOLDMAN SACHS INTERNATIONAL | GS-AS-NY-PROXY@EMAIL.GS.COM |
| GOLDMAN SACHS INTERNATIONAL | GS-AS-NY-PROXY@GS.COM |
| | GS-OPS-DIVMGMT-COM@GS.COM |
| | GS-AS-NY-CLASS-ACTION@NY.EMAIL.GS.COM |
| | GS-AS-NY-REORG@NY.EMAIL.GS.COM |
| GOLDMAN, SACHS & CO. | GS-AS-NY-PROXY@GS.COM |
| HILLTOP SECURITIES INC. | BONNIE.ALLEN@SWST.COM |
| | BONNIE.ALLEN@HILLTOPSECURITIES.COM |
| HILLTOP SECURITIES INC. | PROXY@SWST.COM |
| INTERACTIVE BROKERS LLC DTC#0017 | BANKRUPTCY@IBKR.COM |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 4 of 11

STRETTO

**Exhibit I**

Served via Electronic Mail

| Name | Email |
|---|---|
| INTERACTIVE BROKERS RETAIL EQUITY CLEARING | PROXY@INTERACTIVEBROKERS.COM |
| INTERACTIVE BROKERS RETAIL EQUITY CLEARING | PROXY@INTERACTIVEBROKERS.COM<br>BANKRUPTCY@INTERACTIVEBROKERS.COM<br>IBCORPACTION@INTERACTIVEBROKERS.COM |
| J.P. MORGAN CLEARING CORP. | USSO.PROXY.TEAM@JPMORGAN.COM<br>JPMORGANINFORMATION.SERVICES@JPMORGAN.COM<br>IB.MANDATORY.CORP.ACTIONS@JPMORGAN.COM |
| JANNEY MONTGOMERY SCOTT LLC | KWALTON@JANNEY.COM<br>REORGCONTACTS@JANNEY.COM |
| JANNEY MONTGOMERY SCOTT LLC | ZSCHWARZ@JANNEY.COM |
| JEFFERIES LLC DTC #0019 | CORPORATE_ACTIONS_REORG@JEFFERIES.COM |
| JEFFERIES LLC DTC #0019 | MHARDIMAN@JEFFERIES.COM |
| JPMORGAN CHASE BANK | JPMORGANINFORMATION.SERVICES@JPMCHASE.COM |
| JPMORGAN CHASE BANK, NATIONAL ASSOCI | USSO.PROXY.TEAM@JPMORGAN.COM |
| JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | USSO.PROXY.TEAM@JPMORGAN.COM<br>JPMORGANINFORMATION.SERVICES@JPMORGAN.COM<br>IB.MANDATORY.CORP.ACTIONS@JPMORGAN.COM |
| JPMORGAN CLEARING CORP. DTC #0352 | IB_DOMESTIC_VOLUNTARY_CORPORATE_ACTIONS@JPMORGAN.COM |
| JPMORGAN CLEARING CORP. DTC #0352 | IB_DOMESTIC_VOLUNTARY_CORPORATE_ACTIONS@JPMORGAN.COM |
| KCG AMERICAS LLC | JBRINK@KNIGHT.COM |
| LPL FINANCIAL CORPORATION | KRISTIN.KENNEDY@LPL.COM<br>JASON.ADAMEK@LPL.COM<br>CORPORATE.ACTION@LPL.COM<br>CINTHYA.LEITE@LPL.COM<br>STEVEN.TRZCINSKI@LPL.COM<br>KEVIN.MOULTON@LPL.COM<br>MICAH.WEINSTEIN@LPL.COM |
| MACKIE RESEARCH CAPITAL CORPORATION/ | TRODRIGUES@RESEARCHCAPITAL.COM |
| MARSCO INVESTMENT CORPORATION/TRADEUP | MKADISON@MARSCO.COM |
| MEDIANT COMMUNICATIONS | DOCUMENTS@MEDIANTONLINE.COM<br>CORPORATEACTIONS@MEDIANTONLINE.COM |
| MERRILL LYNCH PIERCE FENNER & SMITH | CPACTIONSLITIGATION@ML.COM<br>EARL.WEEKS@BAML.COM<br>KATELYN.BECK@BAML.COM<br>CORPACTIONSPROXY@ML.COM |
| MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED/STOCK LOAN | CPACTIONSLITIGATION@ML.COM<br>EARL.WEEKS@BAML.COM<br>KATELYN.BECK@BAML.COM<br>CORPACTIONSPROXY@ML.COM |
| MITSUBISHI UFJ TRUST & BANKING CORP DTC #2932 | CORPORATEACTIONS-DL@US.TR.MUFG.JP |
| MORGAN STANLEY & CO. INTERNATIONAL P | DANIEL.SPADACCIN@MORGANSTANLEY.COM |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

# Exhibit I

Served via Electronic Mail

| Name | Email |
|------|-------|
| MORGAN STANLEY & CO. LLC | DEALSETUP@MORGANSTANLEY.COM<br>RAQUEL.DEL.MONTE@MORGANSTANLEY.COM<br>MARIA.CACOILO@MORGANSTANLEY.COM<br>PSCLASSACT@MORGANSTANLEY.COM<br>PROXY.BALT@MS.COM<br>PSCLASSACT@MS.COM<br>CLASSACT@MS.COM<br>PRODDATA@MORGANSTANLEY.COM<br>CLASSACT@MORGANSTANLEY.COM |
| MORGAN STANLEY & CO. LLC | PROXY.BALT@MS.COM<br>PSCLASSACT@MS.COM<br>CLASSACT@MS.COM<br>PRODDATA@MORGANSTANLEY.COM<br>CLASSACT@MORGANSTANLEY.COM |
| MORGAN STANLEY & CO. LLC | PSCLASSACT@MORGANSTANLEY.COM<br>DEALSETUP@MORGANSTANLEY.COM<br>RAQUEL.DEL.MONTE@MORGANSTANLEY.COM<br>MARIA.CACOILO@MORGANSTANLEY.COM<br>PROXY.BALT@MS.COM<br>PSCLASSACT@MS.COM<br>CLASSACT@MS.COM<br>PRODDATA@MORGANSTANLEY.COM<br>CLASSACT@MORGANSTANLEY.COM<br>PROXY.BALT@MS.COM<br>PSCLASSACT@MS.COM<br>CLASSACT@MS.COM<br>PRODDATA@MORGANSTANLEY.COM<br>CLASSACT@MORGANSTANLEY.COM |
| MORGAN STANLEY & CO. LLC/INTERNATIONAL PLC | DEALSETUP@MORGANSTANLEY.COM<br>RAQUEL.DEL.MONTE@MORGANSTANLEY.COM<br>MARIA.CACOILO@MORGANSTANLEY.COM<br>PROXY.BALT@MS.COM<br>PSCLASSACT@MS.COM<br>CLASSACT@MS.COM<br>PRODDATA@MORGANSTANLEY.COM<br>CLASSACT@MORGANSTANLEY.COM |
| MORGAN STANLEY SMITH BARNEY DTC #0015 | USPROXIES@MORGANSTANLEY.COM |
| MORGAN STANLEY SMITH BARNEY DTC #0015 | CAVSDOM@MORGANSTANLEY.COM |
| MORGAN STANLEY SMITH BARNEY DTC #0015 | JODANCY.MACKENSY@MORGANSTANLEY.COM |
| MORGAN STANLEY SMITH BARNEY DTC #0015 | JOHN.FALCO@MORGANSTANLEY.COM |
| MORGAN STANLEY SMITH BARNEY DTC #0015 | PROXY.BALT@MORGANSTANLEY.COM |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Exhibit I
Served via Electronic Mail

**Exhibit I**
Served via Electronic Mail

| Name | Email |
|---|---|
| MORGAN STANLEY SMITH BARNEY DTC #0015 | RAQUEL.DEL.MONTE@MORGANSTANLEY.COM |
| MORGAN STANLEY SMITH BARNEY DTC #0015 | ROBERT.CREGAN@MORGANSTANLEY.COM |
| MORGAN STANLEY SMITH BARNEY DTC #0015 | USPROXIES@MORGANSTANLEY.COM |
| MORGAN STANLEY SMITH BARNEY LLC | DEALSETUP@MORGANSTANLEY.COM |
|  | RAQUEL.DEL.MONTE@MORGANSTANLEY.COM |
|  | MARIA.CACOILO@MORGANSTANLEY.COM |
|  | PROXY.BALT@MS.COM |
|  | PSCLASSACT@MS.COM |
|  | CLASSACT@MS.COM |
|  | PRODDATA@MORGANSTANLEY.COM |
|  | CLASSACT@MORGANSTANLEY.COM |
|  | JOHN.BARRY@MSSB.COM |
|  | WM_CLASSACTIONS@MORGANSTANLEY.COM |
| MURIEL SIEBERT & CO., INC. | SERVICE@SIEBERT.COM |
|  | AGUERRIERO@SIEBERT.COM |
| NATIONAL FINANCIAL SERVICES LLC | PETER.CLOSS@FMR.COM |
|  | LISA.GANESH@FMR.COM |
|  | SEAN.MCDONOUGH@FMR.COM |
|  | JASON.DRESS@FMR.COM |
|  | ROHAN.ROSE@FMR.COM |
|  | JOHN.SPURWAY@FMR.COM |
|  | GERARDO.FLEITES@FMR.COM |
|  | ROB.DAY@FMR.COM |
| OPPENHEIMER & CO. INC. | GUILLERMO.GONZALEZ@OPCO.COM |
|  | COLIN.SANDY@OPCO.COM |
|  | REORG@OPCO.COM |
|  | KENYA.WHITE@OPCO.COM |
|  | FRAN.BANSON@OPCO.COM |
| OPTIONSXPRESS INC. DTC #0338 | PROXYSERVICES@OPTIONSXPRESS.COM |
| PERSHING LLC | JLAVARA@PERSHING.COM |
|  | PERSHINGCORPORATEACTIONS@PERSHING.COM |
|  | VOLUNTARYPROCESSING@PERSHING.COM |
|  | PERSHINGCORPROATEACTIONSPROXY@PERSHING.COM |
|  | CHENICE.BRINSON@PERSHING.COM |
|  | PERSHINGCORPORATEACTIONSPROXY@PERSHING.COM |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 7 of 11

STRETTO

## Exhibit I
Served via Electronic Mail

| Name | Email |
|---|---|
| PERSHING LLC | REGAN.PALMER@PERSHING.COM |
| | JLAVARA@PERSHING.COM |
| | CHARLENE.POLDEN@PERSHING.COM |
| | KRISTIE.MEDICH@PERSHING.COM |
| | MARIA.RUIZ-MARTINEZ@PERSHING.COM |
| | VOLUNTARYPROCESSING@PERSHING.COM |
| | PERSHINGCORPROATEACTIONSPROXY@PERSHING.COM |
| | CHENICE.BRINSON@PERSHING.COM |
| | PERSHINGCORPORATEACTIONSPROXY@PERSHING.COM |
| PNC BANK NA DTC #02616 | CASPR@PNC.COM |
| PNC BANK NA DTC #02616 | CASPR@PNC.COM |
| PNC BANK, NATIONAL ASSOCIATION | CASPR@PNC.COM |
| | MCA@PNC.COM |
| | JNICHOLS@PNC.COM |
| | YVONNE.MUDD@PNCBANK.COM |
| RAYMOND JAMES & ASSOCIATES, INC. | ELAINE.MULLEN@RAYMONDJAMES.COM |
| | CORPORATEACTIONS@RAYMONDJAMES.COM |
| RAYMOND JAMES & ASSOCIATES, INC. | ROBERTA.GREEN@RAYMONDJAMES.COM |
| | CORPORATEACTIONS@RAYMONDJAMES.COM |
| RAYMOND JAMES LTD./CDS | CORPORATEACTIONS@RAYMONDJAMES.COM |
| ROBERT W. BAIRD & CO. INCORPORATED | JSUDFELD@RWBAIRD.COM |
| | NROBERTSTAD@RWBAIRD.COM |
| | REORG@RWBAIRD.COM |
| ROYAL BANK OF CANADA | DONALD.GARCIA@RBC.COM |
| SEI PV/GWP #02663 | GWSUSOPSCAINCOME@SEIC.COM |
| SEI PV/GWP #02663 | PLATFORMCA@SEIC.COM |
| SIS SEGAINTERSETTLE AG | CA.NOTICES@SIX-SECURITIES-SERVICES.COM |
| SIS SEGAINTERSETTLE AG | CORPACTIONSOVERSEAS.GROUP@SISCLEAR.COM |
| SOUTHWEST SECURITIES | PROXY@SWST.COM |
| SOUTHWEST SECURITIES | VALLWARDT@SWST.COM |
| STATE STREET BANK & TRUST COMPANY | USCARESEARCH@STATESTREET.COM |
| | BAM_CLIENTSERVICES_MO_INQ@STATESTREET.COM |
| STATE STREET BANK AND TRUST CO DTC #0997 | JKKYAN@STATESTREET.COM |
| STATE STREET BANK AND TRUST CO DTC #0997 | RJRAY@STATESTREET.COM |
| STATE STREET BANK AND TRUST CO DTC #0997 | USCARESEARCH@STATESTREET.COM |
| STERNE, AGEE & LEACH, INC. | JMEZRANO@STERNEAGEE.COM |
| | KSIMPSON@STERNEAGEE.COM |
| STERNE, AGEE & LEACH, INC. | SECURITIESTRANSFER@STERNEAGEE.COM |
| | KSIMPSON@STERNEAGEE.COM |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 8 of 11

**STRETTO**

## Exhibit I
Served via Electronic Mail

| Name | Email |
|------|-------|
| STIFEL, NICOLAUS & COMPANY, INCORPORATED | RESMANNZ@STIFEL.COM<br>RUSSELLC@STIFEL.COM<br>CAOP@STIFEL.COM<br>JENKINSK@STIFEL.COM |
| STIFEL, NICOLAUS & COMPANY, INCORPORATED | RUSSELLC@STIFEL.COM<br>CAOP@STIFEL.COM<br>JENKINSK@STIFEL.COM |
| STIFEL, NICOLAUS & COMPANY, INCORPORATED | RUSSELLC@STIFEL.COM<br>KIVLEHENS@STIFEL.COM<br>WIEGANDC@STIFEL.COM<br>OPSSTOCKRECORDS@STIFEL.COM<br>BLANNERM@STIFEL.COM<br>CAOP@STIFEL.COM<br>JENKINSK@STIFEL.COM |
| STIFEL, NICOLAUS & COMPANY, INCORPORATED | WIEGANDC@STIFEL.COM |
| STOCKCROSS FINANCIAL SERVICES, INC. | AGUERRIERO@SIEBERT.COM |
| STOCKCROSS FINANCIAL SERVICES, INC. | AGUERRIERO@SIEBERT.COM<br>OFEINA.TUIHALAMAKA@STOCKCROSS.COM<br>DANIEL.LOGUE@STOCKCROSS.COM |
| STOCKCROSS FINANCIAL SERVICES, INC. | INFO@STOCKCROSS.COM<br>AGUERRIERO@SIEBERT.COM |
| STOCKCROSS FINANCIAL SERVICES, INC. | LISA.BRUNSON@STOCKCROSS.COM<br>AGUERRIERO@SIEBERT.COM |
| TD AMERITRADE CLEARING, INC. | ZCLASSACTIONS@TDAMERITRADE.COM<br>DIANE.EASTER@TDAMERITRADE.COM<br>TDWPROXY@TDSECURITIES.COM |
| TD WATERHOUSE CANADA INC./CDS | TDWPROXY@TD.COM |
| THE BANK OF NEW YORK MELLON | PROXYSUPPORT@BNYMELLON.COM<br>GCE_INQUIRY_AMERICAS_CLIENTS@BNYMELLON.COM<br>PXRPT@BNYMELLON.COM<br>PGHEVENTCREATION@BNYMELLON.COM<br>PGH.CA.EVENT.CREATION@BNYMELLON.COM<br>STEPHEN.COCCODRILLI@BNYMELLON.COM<br>THERESA.STANTON@BNYMELLON.COM |
| THE BANK OF NEW YORK MELLON | PROXYSUPPORT@BNYMELLON.COM<br>THERESA.STANTON@BNYMELLON.COM |
| THE BANK OF NEW YORK MELLON DTC #0901 | PGHEVENTCREATION@BNYMELLON.COM<br>THERESA.STANTON@BNYMELLON.COM |
| THE BANK OF NEW YORK MELLON DTC #0901 | BRIAN.MARNELL@BNYMELLON.COM<br>THERESA.STANTON@BNYMELLON.COM |
| THE BANK OF NEW YORK MELLON DTC #0901 | JUSTIN.WHITEHOUSE@BNYMELLON.COM<br>THERESA.STANTON@BNYMELLON.COM |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 9 of 11

STRETTO

**Exhibit I**

Served via Electronic Mail

| Name | Email |
|---|---|
| THE BANK OF NEW YORK MELLON DTC #0901 | MATTHEW.BARTEL@BNYMELLON.COM |
|  | THERESA.STANTON@BNYMELLON.COM |
| THE BANK OF NEW YORK MELLON DTC #0901 | PGHEVENTCREATION@BNYMELLON.COM |
|  | PROXYSUPPORT@BNYMELLON.COM |
|  | THERESA.STANTON@BNYMELLON.COM |
| THE BANK OF NY MELLON DTC #0954 | ATHOMPSON@BNYMELLON.COM |
| THE BANK OF NY MELLON DTC #0954 | THERESA.STANTON@BNYMELLON.COM |
| THE DEPOSITORY TRUST CO | CSCOTTO@DTCC.COM |
| THE DEPOSITORY TRUST CO | DAVID.BOGGS@MARKIT.COM |
| THE DEPOSITORY TRUST CO | JOSEPH.POZOLANTE@MARKIT.COM |
| THE DEPOSITORY TRUST CO | KEVIN.JEFFERSON@MARKIT.COM |
| THE DEPOSITORY TRUST CO | LEGALANDTAXNOTICES@DTCC.COM |
| THE DEPOSITORY TRUST CO | LENSNOTICES@DTCC.COM |
| THE DEPOSITORY TRUST CO | MANDATORYREORGANNOUNCEMENTS@DTCC.COM |
| THE DEPOSITORY TRUST CO | MK-CORPORATEACTIONSANNOUNCEMENTS@MARKIT.COM |
| THE DEPOSITORY TRUST CO | VOLUNTARYREORGANNOUNCEMENTS@DTCC.COM |
| THE NORTHERN TRUST COMPANY DTC #02669 | CS_NOTIFICATIONS@NTRS.COM |
| TRADESTATION SECURITIES, INC. | CORPACTIONS@TRADESTATION.COM |
| TRADESTATION SECURITIES, INC. | DBIALER@TRADESTATION.COM |
| TRADEUP SECURITIES, INC. | TRANSFER@TRADEUP.COM |
| TRUIST BANK | CORPORATE.ACTIONS@TRUIST.COM |
| U.S. BANCORP INVESTMENTS, INC. | USBIIREORGINCOME@USBANK.COM |
| U.S. BANCORP INVESTMENTS, INC. | USBIIREORGINCOME@USBANK.COM |
|  | TRUSTCLASSACTIONS@USBANK.COM |
|  | TRUST.PROXY@USBANK.COM |
| UBS | OL-STAMFORDCORPACTIONS@UBS.COM |
| UBS | OL-WMA-CA-PROXY@UBS.COM |
| UBS | OL-WMA-VOLCORPACTIONS@UBS.COM |
| UBS | SH-VOL-CAIP-NA@UBS.COM |
| UBS | SH-WMA-CAPROXYCLASSACTIONS@UBS.COM |
| UBS FINANCIAL SERVICES INC. | JANE.FLOOD@UBS.COM |
| UBS FINANCIAL SERVICES INC. | OL-CA-MANAGERS@UBS.COM |
|  | OL-WMA-CA-BONDREDEMPTION@UBS.COM |
|  | DL-WMA-PROXY@UBS.COM |
|  | OL-WMA-CA-PROXY@UBS.COM |
|  | GCE_INQUIRY_AMERICAS_CLIENTS@BNYMELLON.COM |
|  | PXRPT@BNYMELLON.COM |
|  | MANAGER@UBS.COM |
| UBS SECURITIES LLC DTC #0642 | OL-EVENTMANAGEMENT@UBS.COM |
| VANGUARD MARKETING CORPORATION | VBS_CORPORATE_ACTIONS@VANGUARD.COM |
| VIRTU AMERICAS LLC | JBRINK@KNIGHT.COM |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 10 of 11

**STRETTO**

**Exhibit I**

Served via Electronic Mail

| Name | Email |
|------|-------|
| VISION FINANCIAL MARKETS LLC | AMARTINEZ@VISIONFINANCIALMARKETS.COM |
| | REORGS@VISIONFINANCIALMARKETS.COM |
| | LLUCIEN@VFMARKETS.COM |
| | SECURITIESOPS@VFMARKETS.COM |
| WEDBUSH SECURITIES INC. | ALAN.FERREIRA@WEDUBUSH.COM |
| WEDBUSH SECURITIES INC. | DONNA.WONG@WEDBUSH.COM |
| | CARMEN.RIVERA@WEDBUSH.COM |
| | ALAN.FERREIRA@WEDBUSH.COM |
| WEDBUSH SECURITIES INC./P3 | ALAN.FERREIRA@WEDBUSH.COM |
| WELLS FARGO CLEARING SERVICES LLC | MATT.BUETTNER@FIRSTCLEARING.COM |
| WELLS FARGO DTCC #0141 | VOLUNTARYCORPORATEACTIONS@WELLSFARGO.COM |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 11 of 11

# Exhibit J

≡ STRETTO

**Exhibit J**

Served via Overnight Mail

| Name | Attention | Address 1 | Address 2 | City | State | Zip |
|---|---|---|---|---|---|---|
| DEPOSITORY TRUST COMPANY | | 570 WASHINGTON BLVD. | ATTN REORG DEPT 4TH FLOOR | JERSEY CITY | NJ | 07310 |
| FOLIOFN, INC. | | 8180 GREENSBORO DRIVE | 8TH FLOOR | MCLEAN | VA | 22102 |
| PROXYTRUST | ATTN RECEIVING DEPARTMENT | 100 PATCO COURT | SUITE 9 | ISLANDIA | NY | 11749 |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

# Exhibit K

**To Holders of Existing Equity Interests (Class 9):**

**PLEASE TAKE NOTICE THAT** on January 13, 2023, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No. 861] (the "Disclosure Statement Order") that (a) conditionally approved the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 863] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"), for the purposes of solicitation, (b) authorized the Debtors to solicit votes with regard to the acceptance or rejection of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 852] (as modified, amended, or supplemented from time to time, the "Plan"), (c) approved the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approved procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

Pursuant to the Disclosure Statement Order, Stretto, Inc., the claims, noticing, and solicitation agent retained by the Debtors in these chapter 11 cases, shall mail a Non-Voting Status Notice in lieu of Solicitation Packages to parties who are not entitled to vote on the Plan, including Holders of Interests in Class 9 (Existing Equity Holders).

**If you would like to obtain copies of the Disclosure Statement, the Plan, the Disclosure Statement Order, or related documents, you may do so free of charge by visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager/.**

Additionally, you may contact Stretto by: (a) calling (855) 473-8665 (Toll Free) or +1 (949) 271-6507 (International); (b) e-mailing VoyagerInquiries@Stretto.com with a reference to "In re: Voyager - Solicitation Inquiry" in the subject line; or (c) writing to Voyager Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602.

# Exhibit 15

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | Case No. 22-10943 (MEW) |
| Debtors. | (Jointly Administered) |

## NOTICE OF FILING OF PLAN SUPPLEMENT

  **PLEASE TAKE NOTICE THAT** on January 13, 2023, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections, and (IV) Granting Related Relief* (the "Disclosure Statement Order") [Docket No. 861],[2] (a) authorizing the debtors and debtors in possession (collectively, the "Debtors"), to solicit votes for the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as modified, amended, or supplemented from time to time, the "Plan") [Docket No. 852]; (b) conditionally approving the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement") [Docket No. 853] as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the Solicitation Packages; (d) approving procedures for soliciting, receiving, and

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]   Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan or Disclosure Statement Order, as applicable.

<div style="border:1px solid black; display:inline-block; padding:4px;">Debtors
Ex-15</div>

KE 93766081

tabulating votes on the Plan and for filing objections to the Plan; and (e) scheduling the Combined Hearing.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors hereby file this plan supplement (the "Plan Supplement"), in support of the Plan and as contemplated by the Plan and the Disclosure Statement Order.

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Disclosure Statement Order, the Plan Supplement includes the following documents:[3]

| Exhibit | Description |
|---------|-------------|
| **A** | Schedule of Assumed Executory Contracts and Unexpired Leases |

**PLEASE TAKE FURTHER NOTICE THAT** counterparties to the executory contracts and unexpired leases listed on **Exhibit A** may file an objection to the Debtors' proposed assumption of such executory contracts and unexpired leases and related cure costs (a "Cure Objection").

**PLEASE TAKE FURTHER NOTICE** that a Cure Objection must:  (i) be in writing; (ii) conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed cure costs, state the correct cure amount alleged to be owed to the objecting contract counterparty, together with any applicable and appropriate documentation in support thereof; (iv) be filed electronically with the Court on the docket of *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the Court which are available on the Court's website at http://www.nysb.uscourts.gov; and (v) be served so as to be actually received by **February 22, 2023, at 4:00 p.m., prevailing Eastern Time** (the "Cure Objection Deadline"), on counsel for the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg (jsussberg@kirkland.com); Christopher Marcus (cmarcus@kirkland.com); Christine Okike (christine.okike@kirkland.com); and Allyson B. Smith (allyson.smith@kirkland.com).

**PLEASE TAKE FURTHER NOTICE THAT** the Combined Hearing will commence on **March 2, 2023, at 10:00 a.m.** prevailing Eastern Time, before the Honorable Michael E. Wiles, in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York, New York 10004.

**PLEASE TAKE FURTHER NOTICE THAT** pursuant to the Court's General Order M-543, dated March 20, 2020 ("General Order M-543"), the Combined Hearing will be conducted

---

[3]    The Debtors anticipate filing the remaining Plan Supplement exhibits on or before February 8, 2023, and February 15, 2023, as applicable, as contemplated by the Disclosure Statement Order.

telephonically. Parties wishing to participate in the Combined Hearing should do so by making arrangements through CourtSolutions LLC. Instructions to register for CourtSolutions LLC are attached to General Order M-543.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan or Disclosure Statement is **February 22, 2023, at 4:00 p.m.** **prevailing Eastern Time** (the "Objection Deadline"). Any objections to the relief sought at the Combined Hearing must: (a) be in writing; (b) conform to the Bankruptcy Rules and the Local Rules; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be *actually received* on or before the Objection Deadline:

| Debtors | |
|---|---|
| **Voyager Digital Holdings, Inc.** 33 Irving Place, Suite 3060 New York, NY 10003 Attention: Stephen Ehrlich and David Brosgol | |
| **Counsel to the Debtors** | **Counsel to the Committee** |
| **Kirkland & Ellis LLP** 601 Lexington Avenue New York, New York 10022 Attention: Joshua A. Sussberg; Christopher Marcus; Christine A. Okike; Allyson B. Smith | **McDermott Will & Emery LLP** One Vanderbilt Avenue New York, NY 10017 Attention: Darren Azman; Joseph B. Evans; Grayson Williams; Gregg Steinman |
| **United States Trustee** | |
| **Office of the United States Trustee for the Southern District of New York** U.S. Federal Office Building 201 Varick Street, Room 1006 New York, NY 10014 Attention: Richard Morrissey; Mark Bruh | |

**PLEASE TAKE FURTHER NOTICE THAT** certain documents, or portions thereof, contained in the Plan Supplement remain subject to ongoing review, revision, and further negotiation among the Debtors and interested parties with respect thereto. The Debtors reserve the right to alter, amend, modify, or supplement any document in this Plan Supplement in accordance with the Plan at any time before the Effective Date of the Plan or any such other date as may be provided for by the Plan or by order of the Court; provided that if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the date of the Combined Hearing, the Debtors will file a blackline of such document with the Court.

**PLEASE TAKE FURTHER NOTICE THAT** copies of the Plan, the Disclosure Statement, the Disclosure Statement Order, and other pleadings filed in these chapter 11 cases are available free of charge by visiting the website of Stretto at http://www.cases.stretto.com/Voyager. You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov/ in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

Dated:  February 1, 2023                    /s/ Joshua A. Sussberg
New York, New York                          **KIRKLAND & ELLIS LLP**
                                            **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                            Joshua A. Sussberg, P.C.
                                            Christopher Marcus, P.C.
                                            Christine A. Okike, P.C.
                                            Allyson B. Smith (admitted *pro hac vice*)
                                            601 Lexington Avenue
                                            New York, New York 10022
                                            Telephone:     (212) 446-4800
                                            Facsimile:     (212) 446-4900
                                            Email:         jsussberg@kirkland.com
                                                           cmarcus@kirkland.com
                                                           christine.okike@kirkland.com
                                                           allyson.smith@kirkland.com

                                            *Counsel to the Debtors and Debtors in Possession*

## Exhibit A

### Schedule of Assumed Executory Contracts and Unexpired Leases

**Article V.A.**  of the Plan Provides as follows

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy other than the Side-A Policy.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

This Exhibit A contains the Schedule of Assumed Executory Contracts and Unexpired Leases. In the schedule, cure amounts are aggregated for certain counterparties with whom the Debtors have multiple contracts and/or leases.  The aggregation of cure amounts shall not be deemed or construed as an admission or acknowledgment by any Debtor that it has any liability for such cure amount except to the extent it is obligated under an assumed contract to which it is a party.  Further, to the extent any Debtor actually pays a cure amount on behalf of another Debtor, all rights of subrogation, contribution, and reimbursement are expressly reserved.

| No. | Debtor Name | Counterparty Name | Description of Contract | Cure Amount |
|---|---|---|---|---|
| 1 | Voyager Digital, LLC | Ada Support Inc. | ADA Services Agreement and Amendment #1 | $ 0.00 |
| 2 | Voyager Digital, LLC | Amazon Web Services | AWS Customer Agreement | $ 220,614.04 |
| 3 | Voyager Digital, LLC | Amazon Web Services | AWS Service Terms | See above |
| 4 | Voyager Digital, LLC | Anchorage | Digital Bank Order Form | $ 0.00 |
| 5 | Voyager Digital Holdings, LLC | Blockdaemon Inc. | Order Form | $ 351.03 |
| 6 | Voyager Digital Holdings, Inc. | Blockdaemon Inc. | Validator Agreement | See above |
| 7 | Voyager Digital, LLC | Coinbase, Inc. | Coinbase Prime Institutional Client Agreement | $ 0.00 |
| 8 | Voyager Digital, LLC | Coinbase Custody Trust Company, LLC | Custodial Services Agreement | $ 0.00 |
| 9 | Voyager Digital, LLC | CDW | CDW Customer Service Order Form Google Workspace | $ 0.00 |
| 10 | Voyager Digital, LLC | Chainalysis Inc. | Order Form | $ 0.00 |
| 11 | Voyager Digital Holdings, Inc. | Cloudflare | Enterprise Service Order Form | $ 0.00 |
| 12 | Voyager Digital Holdings, Inc. | Cloudflare | Insertion Order Form | See above |
| 13 | Voyager Digital, LLC | Concur Technologies, Inc. | Order Form | $ 0.00 |
| 14 | Voyager Digital, LLC | Copper Technologies (UK) Limited | Third Party Agreement | $ 0.00 |
| 15 | Voyager Digital, LLC | Copper Technologies (UK) Limited | Side Letter To Copper's Terms & Conditions — Crypto Asset Service | See above |
| 16 | Voyager Digital Holdings, Inc. | Datasite | Statement of Work | $ 0.00 |
| 17 | Voyager Digital, LLC | Dropbox | Dropbox Services Agreement | $ 0.00 |
| 18 | Voyager Digital Ltd. | Fireblocks Inc. | Fireblocks License Agreement | $ 0.00 |
| 19 | Voyager Digital Ltd. | Fireblocks Inc. | First Amendment to the Fireblocks License Agreement | See above |
| 20 | Voyager Digital, LLC | Fivetran | Service Order Form | $ 0.00 |
| 21 | Voyager Digital, LLC | GoDaddy | Universal Terms Of Service Agreement | $ 0.00 |
| 22 | Voyager Digital Ltd. | Goodbay Technologies, Inc. | Client Services Agreement | $ 54,604.00 |
| 23 | Voyager Digital, LLC | Iterable | Enterprise Sales Order Form | $ 35,423.46 |
| 24 | Voyager Digital, LLC | JAMF | Software License And Services Agreement | $ 0.00 |
| 25 | Voyager Digital, LLC | MaestroQA | SaaS Services Order Form | $ 0.00 |
| 26 | Voyager Digital Holdings, Inc. | Network Redux LLC | Statement of Work | $ 1,727.82 |
| 27 | Voyager Digital, LLC | Okta | Master Subscription Agreement | $ 0.00 |
| 28 | Voyager Digital, LLC | Oracle America, Inc. | Oracle Netsuite Fee Estimate | $ 0.00 |
| 29 | Voyager Digital Ltd. | Plaid Inc. (f.k.a. Plaid Technologies, Inc.) | Plaid Inc. Master Services Agreement | $ 100,000.00 |
| 30 | Voyager Digital Ltd. | Plaid Inc. (f.k.a. Plaid Technologies, Inc.) | Assets Addendum to the Master Services Agreement | See above |
| 31 | Voyager Digital, LLC | Plaid Inc. (f.k.a. Plaid Technologies, Inc.) | Addendum to Master Services Agreement | See above |
| 32 | Voyager Digital, LLC | RECIPROCITY, INC. | Order Form | $ 0.00 |
| 33 | Voyager Digital, LLC | Segment.io, Inc | Order Form | $ 0.00 |
| 34 | Voyager Digital, LLC | Sift Science, Inc | Order Form | $ 77,240.41 |
| 35 | Voyager Digital, LLC | Slack Technologies, LLC | Order Form | $ 0.00 |
| 36 | Voyager Digital, LLC | Snowflake | Order Form | $ 0.00 |
| 37 | Voyager Digital, LLC | Socure Inc. | MSA & Amendments #1-7 | $ 1,404,493.38 |
| 38 | Voyager Digital, LLC | Tableau Software, LLC | Tableau Purchase Authorization Form | $ 0.00 |
| 39 | Voyager Digital, LLC | Talos | Software Subscription Agreement | $ 195,685.88 |
| 40 | Voyager Digital Holdings, Inc. | ThoughtWorks, Inc. | Statement of Work and Subsequent Amendments | $ 0.00 |
| 41 | Voyager Digital Holdings, Inc. | ThoughtWorks, Inc. | Master Services Agreement | See above |
| 42 | Voyager Digital, LLC | TriNet HR III, Inc. | TriNet Technology Services Requisition Form | $ 0.00 |
| 43 | Voyager Digital Holdings, Inc. | TriNet HR III, Inc. | Consent to Assignment of TriNet Contract | See above |
| 44 | Voyager Digital, LLC | Twilio Inc. | Order Form | $ 20,339.21 |
| 45 | Voyager Digital, LLC | Usio, Inc. | Automated Clearing House Services Agreement and Second through Fourth Amendments | $ 3,700.00 |
| 46 | Voyager Digital Holdings, Inc. | 33 Irving Tenant LLC | WeWork New York and Subsequent Amendments | $ 0.00 |
| 47 | Voyager Digital, LLC | 78 SW 7th Street Tenant LLC | WeWork Miami | See above |
| 48 | Voyager Digital Holdings, Inc. | 150 4th Ave N Tenant LLC | WeWork Nashville | See above |
| 49 | Voyager Digital, LLC | Zendesk | Service Order Form | 23,335.71 |

# Exhibit 16

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## <u>AFFIDAVIT OF SERVICE</u>

I, Gregory A. Lesage, depose and say that I am employed by Stretto, the claims and noticing agent for the Debtors in the above-captioned cases.

On February 1, 2023, at my direction and under my supervision, employees of Stretto caused the following document to be served via first-class mail on the service list attached hereto as **<u>Exhibit A</u>**, and via electronic mail on the service list attached hereto as **<u>Exhibit B</u>**:

- **Notice of Filing of Plan Supplement** (Docket No. 943)

[THIS SPACE INTENTIONALLY LEFT BLANK]

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

Debtors
Ex-16

Furthermore, on February 1, 2023, at my direction and under my supervision, employees of Stretto caused the following document to be served via first-class mail on the service list attached hereto as **Exhibit C**, and on three (3) confidential parties not included herein:

- **Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases** (attached hereto as **Exhibit D**)

Dated: February 2, 2023

Gregory A. Lesage

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California,
County of Orange

Subscribed and sworn to (or affirmed) before me on this 2nd day of February, 2023, by Gregory A. Lesage, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: _____

NAOMI RODRIGUEZ
Notary Public - California
Orange County
Commission # 2401472
My Comm. Expires Apr 20, 2026

# Exhibit A

 **STRETTO**

**Exhibit A**
Served via First-Class Mail

| NAME | ATTENTION | ADDRESS 1 | ADDRESS 2 | CITY | STATE | ZIP | COUNTRY |
|------|-----------|-----------|-----------|------|-------|-----|---------|
| AD HOC GROUP OF EQUITY INTEREST HOLDERS OF VOYAGER DIGITAL LTD. | C/O KILPATRICK TOWNSEND & STOCKTON LLP | ATTN: DAVID M. POSNER & KELLY MOYNIHAN | 1114 AVENUE OF THE AMERICAS THE GRACE BUILDING | NEW YORK | NY | 10036-7703 | |
| AD HOC GROUP OF EQUITY INTEREST HOLDERS OF VOYAGER DIGITAL LTD. | C/O KILPATRICK TOWNSEND & STOCKTON LLP | ATTN: PAUL M. ROSENBLATT | 1100 PEACHTREE STREET NE SUITE 2800 | ATLANTA | GA | 30309 | |
| ALAMEDA RESEARCH LLC | C/O SULLIVAN & CROMWELL LLP | | 125 BROAD STREET | NEW YORK | NY | 10004 | |
| ATTORNEY FOR THE STATES OF ALABAMA, ARKANSAS, CALIFORNIA, DISTRICT OF COLUMBIA, HAWAII, MAINE, NORTH DAKOTA, OKLAHOMA, AND SOUTH CAROLINA | C/O NATIONAL ASSOCIATION OF ATTORNEYS GENERAL | ATTN: KAREN CORDRY BANKRUPTCY COUNSEL | 1850 M ST. NW 12TH FLOOR | WASHINGTON | DC | 20036 | |
| BAM TRADING SERVICES INC. D/B/A BINANCE.US | C/O LATHAM & WATKINS LLP | ATTN: A. JAMABO J. GOLDBERG, NACIF TAOUSSE, & JONATHAN J. WECHSELBAUM | 1271 AVENUE OF THE AMERICAS | NEW YORK | NY | 10020 | |
| BAM TRADING SERVICES INC. D/B/A BINANCE.US | C/O LATHAM & WATKINS LLP | ATTN: ANDREW D. SORKIN | 555 EVELENTH STREET, NW, SUITE 1000 | WASHINGTON | DC | 20004 | |
| DISTRICT OF COLUMBIA | OFFICE OF THE ATTORNEY GENERAL | 400 6TH STREET NW | | WASHINGTON | DC | 20001 | |
| ED BOLTON | C/O AKERMAN LLP | ATTN: R. ADAM SWICK, JOHN H. THOMPSON, JOANNE GELFAND | 1251 AVENUE OF THE AMERICAS, 37TH FL | NEW YORK | NY | 10020 | |
| EMERALD OCEAN ISLE, LLC, AMANO GLOBAL HOLDINGS, INC., SHINGO LAVINE, AND ADAM LAVINE | C/O GOLDSTEIN & MCCLINKOCK LLLP | ATTN: MATTHEW E. MCCLINTOCK, HARLEY GOLDSTEIN, AND STEVE YACHIK | 111 W WASHINGTON STREET SUITE 1221 | CHICAGO | IL | 60602 | |
| EMERALD OCEAN ISLE, LLC, AMANO GLOBAL HOLDINGS, INC., SHINGO LAVINE, AND ADAM LAVINE | C/O LAW OFFICES OF DOUGLAS T. TABACHNIK, P.C. | ATTN: DOUGLAS T. TABACHNIK | 63 WEST MAIN STREET SUITE C | FREEHOLD | NJ | 07728-2141 | |
| FRANCINE DE SOUSA | C/O SISKINDS LLP | ATTN: ANTHONY O'BRIEN | 100 LOMBARD STREET SUITE 302 | TORONTO | ON | M5C1M3 | CANADA |
| FRANCINE DE SOUSA | C/O SISKINDS LLP | ATTN: MICHAEL G. ROBB & GARETT M. HUNTER | 275 DUNDAS STREET 1 | LONDON | ON | N6B 3L1 | CANADA |
| ILLINOIS SECRETARY OF STATE | C/O OFFICE OF THE ILLINOIS ATTORNEY GENERAL | ATTN: JOHN P. REDING ASSISTANT ATTORNEY GENERAL | 100 W. RANDOLPH ST FL. 13 | CHICAGO | IL | 60601 | |
| INTERNAL REVENUE SERVICE | | PO BOX 7346 | | PHILADELPHIA | PA | 19101-7346 | |
| JASON RAZNICK | C/O JAFFE RAITT HEUER & WEISS, P.C. | ATTN: PAUL R. HAGE | 27777 FRANKLIN ROAD SUITE 2500 | SOUTHFIELD | MI | 48034 | |
| JON GIACOBBE | ATTN: A. MANNY ALCANDRO | 11 BROADWAY, SUITE 615 | | NEW YORK | NY | 10004 | |
| KELLEHER PLACE MANAGEMENT, LLC | C/O HORWOOD MARCUS & BERK CHARTERED | ATTN: AARON L. HAMMER & NATHAN E. DELMAN | 500 W. MADISON ST STE 3700 | CHICAGO | IL | 60661 | |
| MARCUM LLP | C/O MINTZ & GOLD, LLP | ATTN: ANDREW R. GOTTESMAN, ESQ. | 600 THIRD AVENUE, 25TH FLOOR | NEW YORK | NY | 10016 | |
| MARK CUBAN AND DALLAS BASKETBALL LIMITED D/B/A DALLAS MAVERICKS | C/O BROWN RUDNICK LLP | ATTN: STEPHEN A. BEST ESQ & RACHEL O. WOLKINSON, ESQ. | 601 THIRTEENTH STREET NW SUITE 600 | WASHINGTON | DC | 20005 | |
| MARK CUBAN AND DALLAS BASKETBALL LIMITED, D/B/A DALLAS MAVERICKS | C/O BROWN RUDNICK LLP | ATTN: SIGMUND S. WISSNER-GROSS ESQ. & KENNETH J. AULET ESQ. | SEVEN TIMES SQUARE | NEW YORK | NY | 10036 | |
| MATTHEW EDWARDS | C/O LIZ GEORGE AND ASSOCIATES | ATTN: LYSBETH GEORGE | 8101 S. WALKER SUITE T | OKLAHOMA CITY | OK | 73139 | |
| METROPOLITAN COMMERCIAL BANK | C/O BALLARD SPAHR LLP | ATTN: GEORGE H. SINGER, ESQ | 2000 IDS CENTER 80 SOUTH 8TH STREET | MINNEAPOLIS | MN | 55402-2119 | |
| METROPOLITAN COMMERCIAL BANK | C/O WACHTELL, LIPTON, ROSEN & KATZ | ATTN: RICHARD G. MASON, AMY R. WOLF, ANGELA K. HERRING | 51 WEST 52ND STREET | NEW YORK | NY | 10019-6150 | |
| MICHAEL GENTSCH | C/O BARSKI LAW PLC | ATTN: CHRIS D. BRASKI | 9375 E. SHEA BLVD. STE 100 | SCOTTSDALE | AZ | 85260 | |
| MICHAEL LEGG | C/O MCCARTHY, LEBIT, CRYSTAL & LIFFMAN CO. | ATTN: ROBERT R. KRACHT & NICHOLAS R. OLESKI | 1111 SUPERIOR AVENUE EAST SUITE 2700 | CLEVELAND | OH | 44114 | |
| MURPHY PLACE MANAGEMENT LLC | C/O HORWOOD MARCUS & BERK CHARTERED | ATTN: AARON L. HAMMER, NATHAN E. DELMAN | 500 W MADISON ST., STE 3700 | CHICAGO | IL | 60661 | |
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | ATTN: JEFFREY BERNSTEIN | 570 BROAD STREET, SUITE 1500 | NEWARK | NJ | 07102 | |
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | ATTN: NICOLE LEONARD | 225 LIBERTY STREET, 36TH FLOOR | NEW YORK | NY | 10281 | |
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | ATTN: VIRGINIA T. SHEA | 1300 MT KEMBLE AVENUE PO BOX 2075 | MORRISTOWN | NJ | 02075 | |
| NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES | C/O ACTING EXECUTIVE DEPUTY SUPERINTENDENT, DEPUTY GENERAL COUNSEL FOR LITIGATION, AND ASSISTANT DEPUTY SUPERINTENDENT | ATTN: KEVIN R. PUVALOWSKI, LINDA DONAHUE, & JASON D. ST. JOHN | ONE STATE STREET | NEW YORK | NY | 10004-1511 | |
| OFFICE OF THE UNITED STATES TRUSTEE | FOR THE SOUTHERN DIST OF NEW YORK | ATTN: RICHARD C. MORRISSEY, ESQ. AND MARK BRUH, ESQ. | 1 BOWLING GRN STE 534 | NEW YORK | NY | 10004-1459 | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | C/O MCDERMOTT WILL & EMERY LLP | ATTN: CHARLES R. GIBBS & GRAYSON WILLIAMS | 2501 NORTH HARWOOD STREET, SUITE 1900 | DALLAS | TX | 75201-1664 | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | C/O MCDERMOTT WILL & EMERY LLP | ATTN: GREGG STEINMAN | 333 SE 2ND AVENUE SUITE 4500 | MIAMI | FL | 33131-2184 | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | C/O MCDERMOTT WILL & EMERY LLP | ATTN: JOHN J. CALANDRA & JOSEPH B. EVANS & DARREN AZMAN | ONE VANDERBILT AVENUE | NEW YORK | NY | 10017-3852 | |
| ORACLE AMERICA, INC. | C/O BUCHALTER | ATTN: SHAWN M. CHRISTIANSON | 425 MARKET ST., SUITE 2900 | SAN FRANCISCO | CA | 94105 | |
| PIERCE ROBERTSON | C/O PACHULSKI STANG ZIEHL & JONES LLP | ATTN: RICHARD M. PACHULSKI, ALAN J. KORNFELD, DEBRA I. GRASSGREEN, AND JASON H. ROSELL | 10100 SANTA MONICA BLVD 13TH FLOOR | LOS ANGELES | CA | 90067 | |
| ROBERT SNYDERS & LISA SNYDERS | C/O JOHNSON, POPE, BOKOR, RUPPEL & BURNS, LLP | ATTN: ANGELINA E. LIM | 401 E JACKSON STREET SUITE 3100 | TAMPA | FL | 33602 | |
| SECURITIES & EXCHANGE COMMISSION | ATTN: THERESE A. SCHEUER, SENIOR TRIAL COUNSEL | 100 F STREET NE | | WASHINGTON | DC | 20549 | |
| SECURITIES & EXCHANGE COMMISSION | NEW YORK REGIONAL OFFICE | 100 PEARL STREET SUITE 20-100 | | NEW YORK | NY | 10004-2616 | |
| SECURITIES & EXCHANGE COMMISSION | NEW YORK REGIONAL OFFICE | ATTN: ANDREW CALAMARI REGIONAL DIRECTOR | 200 VESEY STREET SUITE 400 | NEW YORK | NY | 10281-1022 | |
| SPECIAL COUNSEL TO DEBTOR VOYAGER DIGITAL, LLC | C/O QUINN EMANUEL URQUHART & SULLIVAN LLP | ATTN: SUSHEEL KIRPALANI, KATE SCHERLING, & ZACHARY RUSSELL | 51 MADISON AVENUE 22ND FLOOR | NEW YORK | NY | 10010 | |
| STATE OF ALABAMA | OFFICE OF THE ATTORNEY GENERAL | 501 WASHINGTON AVE | | MONTGOMERY | AL | 36104 | |
| STATE OF ALASKA | OFFICE OF THE ATTORNEY GENERAL | 1031 W 4TH AVE, STE 200 | | ANCHORAGE | AK | 99501 | |
| STATE OF ARIZONA | OFFICE OF THE ATTORNEY GENERAL | 2005 N CENTRAL AVE | | PHOENIX | AZ | 85004 | |
| STATE OF ARKANSAS | OFFICE OF THE ATTORNEY GENERAL | 323 CENTER ST, STE 200 | | LITTLE ROCK | AR | 72201 | |
| STATE OF CALIFORNIA | OFFICE OF THE ATTORNEY GENERAL | PO BOX 944255 | | SACRAMENTO | CA | 94244-2550 | |
| STATE OF COLORADO | OFFICE OF THE ATTORNEY GENERAL | RALPH L. CARR JUDICIAL BUILDING | 1300 BROADWAY, 10TH FL | DENVER | CO | 80203 | |
| STATE OF CONNECTICUT | OFFICE OF THE ATTORNEY GENERAL | 165 CAPITOL AVENUE | | HARTFORD | CT | 6106 | |
| STATE OF FLORIDA | OFFICE OF THE ATTORNEY GENERAL | THE CAPITOL PL01 | | TALLAHASSEE | FL | 32399 | |
| STATE OF GEORGIA | OFFICE OF THE ATTORNEY GENERAL | 40 CAPITOL SQ SW | | ATLANTA | GA | 30334 | |
| STATE OF HAWAII | OFFICE OF THE ATTORNEY GENERAL | 425 QUEEN STREET | | HONOLULU | HI | 96813 | |
| STATE OF IDAHO | OFFICE OF THE ATTORNEY GENERAL | 700 W. JEFFERSON ST, SUITE 210 | PO BOX 83720 | BOISE | ID | 83720 | |
| STATE OF ILLINOIS | OFFICE OF THE ATTORNEY GENERAL | JAMES R. THOMPSON CENTER | 100 W RANDOLPH ST | CHICAGO | IL | 60601 | |
| STATE OF INDIANA | OFFICE OF THE INDIANA ATTORNEY GENERAL | INDIANA GOVERNMENT CENTER SOUTH | 302 W WASHINGTON ST, 5TH FLOOR | INDIANAPOLIS | IN | 46204 | |
| STATE OF IOWA | OFFICE OF THE ATTORNEY GENERAL | HOOVER STATE OFFICE BUILDING | 1305 E. WALNUT STREET | DES MOINES | IA | 50319 | |
| STATE OF KANSAS | ATTN: ATTORNEY GENERAL DEREK SCHMIDT | 120 SW 10TH AVE, 2ND FLOOR | | TOPEKA | KS | 66612 | |
| STATE OF KENTUCKY | ATTORNEY GENERAL - DANIEL CAMERON | 700 CAPITAL AVENUE, SUITE 118 | | FRANKFORT | KY | 40601 | |
| STATE OF LOUISIANA | DEPT. OF JUSTICE - ATTORNEY GENERAL'S OFFICE | 300 CAPITAL DRIVE | | BATON ROUGE | LA | 70802 | |
| STATE OF MAINE | OFFICE OF THE ATTORNEY GENERAL | 6 STATE HOUSE STATION | | AUGUSTA | ME | 04333 | |
| STATE OF MARYLAND | OFFICE OF THE ATTORNEY GENERAL | 200 ST. PAUL PLACE | | BALTIMORE | MD | 21202 | |
| STATE OF MASSACHUSETTS | ATTORNEY GENERAL'S OFFICE | 1 ASHBURTON PLACE, 20TH FLOOR | | BOSTON | MA | 02108 | |
| STATE OF MICHIGAN | DEPARTMENT OF ATTORNEY GENERAL | 525 W OTTAWA ST | | LANSING | MI | 48906 | |
| STATE OF MINNESOTA | OFFICE OF THE ATTORNEY GENERAL | 445 MINNESOTA ST, STE 1400 | | ST. PAUL | MN | 55101 | |
| STATE OF MISSISSIPPI | OFFICE OF THE ATTORNEY GENERAL | WALTER SILLERS BUILDING | 550 HIGH ST, PO BOX 220 | JACKSON | MS | 39201 | |
| STATE OF MISSOURI | OFFICE OF THE ATTORNEY GENERAL | SUPREME COURT BUILDING | 207 W HIGH ST | JEFFERSON CITY | MO | 65101 | |
| STATE OF MONTANA | OFFICE OF THE ATTORNEY GENERAL | JUSTICE BUILDING, 3RD FLOOR | 215 N SANDERS, PO BOX 201401 | HELENA | MT | 59602 | |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 1 of 2



**Exhibit A**
Served via First-Class Mail

| NAME | ATTENTION | ADDRESS 1 | ADDRESS 2 | CITY | STATE | ZIP | COUNTRY |
|---|---|---|---|---|---|---|---|
| STATE OF NEBRASKA | OFFICE OF THE ATTORNEY GENERAL | 2115 STATE CAPITOL | | LINCOLN | NE | 68509 | |
| STATE OF NEVADA | OFFICE OF THE ATTORNEY GENERAL | OLD SUPREME COURT BUILDING | 100 N CARSON ST | CARSON CITY | NV | 89701 | |
| STATE OF NEW HAMPSHIRE | OFFICE OF THE ATTORNEY GENERAL | NH DEPARTMENT OF JUSTICE | 33 CAPITOL ST | CONCORD | NH | 3301 | |
| STATE OF NEW JERSEY | OFFICE OF THE ATTORNEY GENERAL | RICHARD J. HUGHES JUSTICE COMPLEX | 25 MARKET ST 8TH FL, WEST WING BOX 080 | TRENTON | NJ | 8611 | |
| STATE OF NEW MEXICO | OFFICE OF THE ATTORNEY GENERAL | 408 GALISTEO STREET | VILLAGRA BUILDING | SANTA FE | NM | 87501 | |
| STATE OF NEW YORK | OFFICE OF THE ATTORNEY GENERAL | THE CAPITOL | 2ND FLOOR | ALBANY | NY | 12224 | |
| STATE OF NORTH CAROLINA | OFFICE OF THE ATTORNEY GENERAL | 114 W EDENTON ST | | RALEIGH | NC | 27603 | |
| STATE OF NORTH DAKOTA | OFFICE OF THE ATTORNEY GENERAL | STATE CAPITOL, 600 E BOULEVARD AVE | DEPT. 125 | BISMARCK | ND | 58505 | |
| STATE OF OHIO | OFFICE OF THE ATTORNEY GENERAL | STATE OFFICE TOWER | 30 E BROAD ST 14TH FL | COLUMBUS | OH | 43215 | |
| STATE OF OKLAHOMA | OFFICE OF THE ATTORNEY GENERAL | 313 NE 21ST ST | | OKLAHOMA CITY | OK | 73105 | |
| STATE OF OREGON | OFFICE OF THE ATTORNEY GENERAL | 1162 COURT ST NE | | SALEM | OR | 97301-4096 | |
| STATE OF PENNSYLVANIA | OFFICE OF THE ATTORNEY GENERAL | STRAWBERRY SQUARE 16TH FL | | HARRISBURG | PA | 17120 | |
| STATE OF RHODE ISLAND | OFFICE OF THE ATTORNEY GENERAL | 150 S MAIN ST | | PROVIDENCE | RI | 2903 | |
| STATE OF SOUTH CAROLINA | OFFICE OF THE ATTORNEY GENERAL | PO BOX 11549 | | COLUMBIA | SC | 29211 | |
| STATE OF SOUTH CAROLINA | OFFICE OF THE ATTORNEY GENERAL | REMBERT C. DENNIS BLDG | 1000 ASSEMBLY ST RM 519 | COLUMBIA | SC | 29201 | |
| STATE OF SOUTH DAKOTA | OFFICE OF THE ATTORNEY GENERAL | 1302 E HIGHWAY 14, STE 1 | | PIERRE | SD | 57501-8501 | |
| STATE OF TENNESSEE | OFFICE OF THE ATTORNEY GENERAL | PO BOX 20207 | | NASHVILLE | TN | 37202-0207 | |
| STATE OF TEXAS | OFFICE OF THE ATTORNEY GENERAL | 300 W. 15TH ST | | AUSTIN | TX | 78701 | |
| STATE OF UTAH | OFFICE OF THE ATTORNEY GENERAL | UTAH STATE CAPITOL COMPLEX | 350 NORTH STATE ST STE 230 | SALT LAKE CITY | UT | 84114 | |
| STATE OF UTAH | OFFICE OF THE ATTORNEY GENERAL, SEAN D. REYES | UTAH STATE CAPITOL COMPLEX | 350 NORTH STATE ST STE 230 | SALT LAKE CITY | UT | 84114 | |
| STATE OF VERMONT | OFFICE OF THE ATTORNEY GENERAL | 109 STATE ST. | | MONTPELIER | VT | 5609 | |
| STATE OF VIRGINIA | OFFICE OF THE ATTORNEY GENERAL | 202 N. NINTH ST. | | RICHMOND | VA | 23219 | |
| STATE OF WASHINGTON | OFFICE OF THE ATTORNEY GENERAL | 1125 WASHINGTON ST SE | | OLYMPIA | WA | 98501 | |
| STATE OF WASHINGTON | OFFICE OF THE ATTORNEY GENERAL | PO BOX 40100 | | OLYMPIA | WA | 98504-00 | |
| STATE OF WASHINGTON | OFFICE OF THE ATTORNEY GENERAL GOVERNMENT COMPLIANCE AND ENFORCEMENT DIVISION | ATTN: STEPHEN MANNING | PO BOX 40100 | OLYMPIA | WA | 98504-4010 | |
| STATE OF WEST VIRGINIA | OFFICE OF THE ATTORNEY GENERAL | STATE CAPITOL, 1900 KANAWHA BLVD E | BUILDING 1 RM E-26 | CHARLESTON | WV | 25305 | |
| STATE OF WISCONSIN | OFFICE OF THE ATTORNEY GENERAL | 17 WEST MAIN STREET, ROOM 114 EAST P | | MADISON | WI | 53702 | |
| STATE OF WYOMING | OFFICE OF THE ATTORNEY GENERAL | 109 STATE CAPITOL | | CHEYENNE | WY | 82002 | |
| STEVE LAIRD | C/O FORSHEY & PROSTON LLP | ATTN: J. ROBERT FORSHEY | 777 MAIN STREET SUITE 1550 | FORT WORTH | TX | 76102 | |
| TEXAS DEPARTMENT OF BANKING | C/O OFFICE OF THE ATTORNEY GENERAL OF TEXAS ASSISTANT ATTORNEY GENERALS | ATTN: ABIGAL R. RYAN, LAYLA D. MILLIGAN, JASON B. BINFORD, AND ROMA N. DESAI | PO BOX 12548 BANKRUPTCY AND COLLECTIONS DIVISION | AUSTIN | TX | 78711-2548 | |
| TEXAS SECURITIES BOARD | C/O OFFICE OF THE ATTORNEY GENERAL OF TEXAS | ATTN: ROMA N. DESAI ASSISTANT ATTORNEY GENERAL | PO BOX 12548 BANKRUPTCY & COLLECTIONS DIVISION | AUSTIN | TX | 78711-2548 | |
| TEXAS STATE SECURITIES BOARD | OFFICE OF THE ATTORNEY GENERAL OF TEXAS | ATTN: ABIGAL R RYAN, LAYLA D MILLIGAN, ROMA N. DESAI & JASON B BINFORD | BANKRUPTCY & COLLECTIONS DIVISION PO BOX 12548 | AUSTIN | TX | 78711-2548 | |
| TN DEPT OF COMMERCE AND INSURANCE | C/O TN ATTORNEY GENERAL'S OFFICE, BANKRUPTCY DIVISION | ATTN: MARVIN E. CLEMENTS JR. | PO BOX 20207 | NASHVILLE | TN | 37202-0207 | |
| TORONTO STOCK EXCHANGE | | 300  100 ADELAIDE ST. | | WEST TORONTO | ON | M5H 1S3 | CANADA |
| UNITED STATES ATTORNEY'S OFFICE | SOUTHERN DISTRICT OF NEW YORK | ONE ST. ANDREWS PLAZA | | NEW YORK | NY | 10007 | |
| UNITED STATES DEPARTMENT OF JUSTICE | ATTORNEY GENERAL OF THE U.S. | 950 PENNSYLVANIA AVE, NW | | WASHINGTON | DC | 20530-0001 | |
| USIO, INC. | C/O PULMAN CAPPUCCIO & PULLEN, LLP | ATTN: RANDALL A. PULMAN | 2161 NW MILITARY HWY., SUITE 400 | SAN ANTONIO | TX | 78213 | |
| USIO, INC. | C/O RUSKIN MOSCOU FALTISCHEK, P.C. | ATTN: SHERYL P. GIUGLIANO, RUSKIN MOSCOU FALTISCHEK | 1425 RXR PLAZA, 15TH FLOOR | UNIONDALE | NY | 11556-1425 | |
| VERMONT DEPARTMENT OF FINANCIAL REGULATION | C/O ASSISTANT GENERAL COUNSEL | ATTN: JENNIFER ROOD, ESQ. | 89 MAIN STREET THIRD FLOOR | MONTPELIER | VT | 05620 | |
| WELLS FARGO BANK, N.A. | C/O ALDRIDGE PITE, LLP | ATTN: GREGORY A. WALLACH | 15 PIEDMONT CENTER 3575 PIEDMONT ROAD N.E. | ATLANTA | GA | 30305 | |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

Page 2 of 2

# **Exhibit B**

 **STRETTO**

Served via Electronic Mail

| Name | Attention 1 | Attention 2 | Email |
|---|---|---|---|
| AD HOC GROUP OF EQUITY INTEREST HOLDERS OF VOYAGER DIGITAL LTD. | C/O KILPATRICK TOWNSEND & STOCKTON LLP | ATTN: DAVID M. POSNER & KELLY MOYNIHAN | DPOSNER@KILPATRICKTOWNSEND.COM KMOYNIHAN@KILPATRICKTOWNSEND.COM |
| AD HOC GROUP OF EQUITY INTEREST HOLDERS OF VOYAGER DIGITAL LTD. | C/O KILPATRICK TOWNSEND & STOCKTON LLP | ATTN: PAUL M. ROSENBLATT | PROSENBLATT@KILPATRICKTOWNSEND.COM |
| ALAMEDA RESEARCH LLC | C/O SULLIVAN & CROMWELL LLP | ATTN: ANDREW G. DIETDERICH, BRIAN D. GLUECKSTEIN, BENJAMIN S. BELLER | DIETDERICHA@SULLCROM.COM GLUECKSTEINB@SULLCROM.COM BELLERB@SULLCROM.COM |
| ATTORNEY FOR THE STATES OF ALABAMA, ARKANSAS, CALIFORNIA, DISTRICT OF COLUMBIA, HAWAII, MAINE, NORTH DAKOTA, OKLAHOMA, AND SOUTH CAROLINA | C/O NATIONAL ASSOCIATION OF ATTORNEYS GENERAL | ATTN: KAREN CORDRY BANKRUPTCY COUNSEL | KCORDRY@NAAG.ORG |
| BAM TRADING SERVICES INC. D/B/A BINANCE.US | C/O LATHAM & WATKINS LLP | ATTN: ADAM J. GOLDBERG, NACIF TAOUSSE, & JONATHAN J. WECHSELBAUM | ADAM.GOLDBERG@LW.COM NACIF.TAOUSSE@LW.COM JON.WEICHSELBAUM@LW.COM |
| BAM TRADING SERVICES INC. D/B/A BINANCE.US | C/O LATHAM & WATKINS LLP | ATTN: ANDREW D. SORKIN | ANDREW.SORKIN@LW.COM |
| DISTRICT OF COLUMBIA | OFFICE OF THE ATTORNEY GENERAL | | OAG@DC.GOV |
| ED BOLTON | C/O AKERMAN LLP | ATTN: R. ADAM SWICK, JOHN H. THOMPSON, JOANNE GELFAND | ADAM.SWICK@AKERMAN.COM JOHN.THOMPSON@AKERMAN.COM JOANNE.GELFAND@AKERMAN.COM |
| EMERALD OCEAN ISLE, LLC, AMANO GLOBAL HOLDINGS, INC., SHINGO LAVINE, AND ADAM LAVINE | C/O GOLDSTEIN & MCCLINKOCK LLLP | ATTN: MATTHEW E. MCCLINTOCK, HARLEY GOLDSTEIN, AND STEVE YACHIK | MATTM@GOLDMCLAW.COM HARLEYG@RESTRUCTURINGSHOP.COM STEVENY@GOLDMCLAW.COM |
| EMERALD OCEAN ISLE, LLC, AMANO GLOBAL HOLDINGS, INC., SHINGO LAVINE, AND ADAM LAVINE | C/O LAW OFFICES OF DOUGLAS T. TABACHNIK, P.C. | ATTN: DOUGLAS T. TABACHNIK | DTABACHNIK@DTTLAW.COM |
| FRANCINE DE SOUSA | C/O SISKINDS LLP | ATTN: ANTHONY O'BRIEN | ANTHONY.OBRIEN@SISKINDS.COM |
| FRANCINE DE SOUSA | C/O SISKINDS LLP | ATTN: MICHAEL G. ROBB & GARETT M. HUNTER | MICHAEL.ROBB@SISKINDS.COM GARETT.HUNTER@SISKINDS.COM |
| ILLINOIS SECRETARY OF STATE | C/O OFFICE OF THE ILLINOIS ATTORNEY GENERAL | ATTN: JOHN P. REDING ASSISTANT ATTORNEY GENERAL | JOHN.REDING@ILAG.GOV |
| JASON RAZNICK | C/O JAFFE RAITT HEUER & WEISS, P.C. | ATTN: PAUL R. HAGE | PHAGE@JAFFELAW.COM |
| JON GIACOBBE | ATTN: A. MANNY ALICANDRO | | MANNY@ALICANDROLAWOFFICE.COM |
| KELLEHER PLACE MANAGEMENT, LLC | C/O HORWOOD MARCUS & BERK CHARTERED | ATTN: AARON L. HAMMER & NATHAN E. DELMAN | AHAMMER@HMBLAW.COM NDELMAN@HMBLAW.COM EFCNOTICES@HMBLAW.COM |
| MARCUM LLP | C/O MINTZ & GOLD, LLP | ATTN: ANDREW R. GOTTESMAN, ESQ. | GOTTESMAN@MINTZANDGOLD.COM |
| MARK CUBAN AND DALLAS BASKETBALL LIMITED D/B/A DALLAS MAVERICKS | C/O BROWN RUDNICK LLP | ATTN: STEPHEN A. BEST ESQ & RACHEL O. WOLKINSON, ESQ. | SBEST@BROWNRUDNICK.COM RWOLKINSON@BROWNRUDNICK.COM |
| MARK CUBAN AND DALLAS BASKETBALL LIMITED, D/B/A DALLAS MAVERICKS | C/O BROWN RUDNICK LLP | ATTN: SIGMUND S. WISSNER-GROSS ESQ. & KENNETH J. AULET ESQ. | SWISSNER-GROSS@BROWNRUDNICK.COM KAULET@BROWNRUDNICK.COM |
| MATTHEW EDWARDS | C/O LIZ GEORGE AND ASSOCIATES | ATTN: LYSBETH GEORGE | GEORGELAWOK@GMAIL.COM |
| METROPOLITAN COMMERCIAL BANK | C/O BALLARD SPAHR LLP | ATTN: GEORGE H. SINGER, ESQ | SINGERG@BALLARDSPAHR.COM |
| METROPOLITAN COMMERCIAL BANK | C/O WACHTELL, LIPTON, ROSEN & KATZ | ATTN: RICHARD G. MASON, AMY R. WOLF, ANGELA K. HERRING | RGMASON@WLRK.COM ARWOLF@WLRK.COM AKHERRING@WLRK.COM |
| MICHAEL GENTSCH | C/O BARSKI LAW PLC | ATTN: CHRIS D. BRASKI | CBARSKI@BARSKILAW.COM |
| MICHAEL LEGG | C/O MCCARTHY, LEBIT, CRYSTAL & LIFFMAN CO. | ATTN: ROBERT R. KRACHT & NICHOLAS R. OLESKI | RRK@MCCARTHYLEBIT.COM NRO@MCCARTHYLEBIT.COM |
| MURPHY PLACE MANAGEMENT LLC | C/O HORWOOD MARCUS & BERK CHARTERED | ATTN: AARON L. HAMMER, NATHAN E. DELMAN | AHAMMER@HMBLAW.COM NDELMAN@HMBLAW.COM EFCNOTICES@HMBLAW.COM |
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | ATTN: JEFFREY BERNSTEIN | JBERNSTEIN@MDMC-LAW.COM VSHEA@MDMC-LAW.COM |
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | ATTN: NICOLE LEONARD | NLEONARD@MDMC-LAW.COM |
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | ATTN: VIRGINIA T. SHEA | VSHEA@MDMC-LAW.COM |
| NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES | C/O ACTING EXECUTIVE DEPUTY SUPERINTENDENT, DEPUTY GENERAL COUNSEL FOR LITIGATION, AND ASSISTANT DEPUTY SUPERINTENDENT | ATTN: KEVIN R. PUVALOWSKI, LINDA DONAHUE, & JASON D. ST. JOHN | KEVIN.PUVALOWSKI@DFS.NY.GOV LINDA.DONAHUE@DFS.NY.GOV JASON.STJOHN@DFS.NY.GOV |
| OFFICE OF THE UNITED STATES TRUSTEE | FOR THE SOUTHERN DISTRICT OF NEW YORK | ATTN: RICHARD C. MORRISSEY, ESQ. AND MARK BRUH, ESQ. | RICHARD.MORRISSEY@USDOJ.GOV MARK.BRUH@USDOJ.GOV |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | ATTN: BRANDON MULLENBERG | | BRANDONMULLENBERG2022@GMAIL.COM |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | ATTN: BYRON WALKER | | BYWALKER01@GMAIL.COM |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | ATTN: CHRISTOPHER MOSER | | CHRISMMOSER@GMAIL.COM |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | ATTN: JASON RAZNICK | | JASON@BEZINGA.COM |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | ATTN: RICHARD KISS FOR THINCAT TRUST | | RICHARD.KISS@GMAIL.COM |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | ATTN: RUSSELL G. STEWART | | RUSS.STEWART@TMF.MORTGAGE.COM |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | C/O MCDERMOTT WILL & EMERY LLP | ATTN: CHARLES E. GIBBS & GRAYSON WILLIAMS | CRGIBBS@MWE.COM GWILLIAMS@MWE.COM |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | C/O MCDERMOTT WILL & EMERY LLP | ATTN: GREGG STEINMAN | GSTEINMAN@MWE.COM |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)



Served via Electronic Mail

| Name | Attention 1 | Attention 2 | Email |
|---|---|---|---|
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | C/O MCDERMOTT WILL & EMERY LLP | ATTN: JOHN J. CALANDRA & JOSEPH B. EVANS & DARREN AZMAN | DAZMAN@MWE.COM<br>JCALANDRA@MWE.COM<br>JBEVANS@MWE.COM |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | C/O MELISSA AND ADAM FREEDMAN | | FREEMANMELISSAC@GMAIL.COM |
| ORACLE AMERICA, INC. | C/O BUCHALTER | ATTN: SHAWN M. CHRISTIANSON | SCHRISTIANSON@BUCHALTER.COM |
| PIERCE ROBERTSON | C/O PACHULSKI STANG ZIEHL & JONES LLP | ATTN: RICHARD M. PACHULSKI, ALAN J. KORNFELD, DEBRA I. GRASSGREEN, AND JASON H. ROSELL | RPACHULSKI@PSZJLAW.COM<br>AKORNFELD@PSZJLAW.COM<br>DGRASSGREEN@PSZJLAW.COM<br>JROSELL@PSZJLAW.COM |
| ROBERT SNYDERS & LISA SNYDERS | C/O JOHNSON, POPE, BOKOR, RUPPEL & BURNS, LLP | ATTN: ANGELINA E. LIM | ANGELINAL@JPFIRM.COM |
| SECURITIES & EXCHANGE COMMISSION | ATTN: THERESE A. SCHEUER, SENIOR TRIAL COUNSEL | | SECBANKRUPTCY-OGC-ADO@SEC.GOV<br>SCHEUERT@SEC.GOV |
| SECURITIES & EXCHANGE COMMISSION | NEW YORK REGIONAL OFFICE | ATTN: ANDREW CALAMARI REGIONAL DIRECTOR | BANKRUPTCYNOTICESCHR@SEC.GOV |
| SECURITIES & EXCHANGE COMMISSION | NEW YORK REGIONAL OFFICE | | NYROBANKRUPTCY@SEC.GOV |
| STATE OF ALABAMA | OFFICE OF THE ATTORNEY GENERAL | | CONSUMERINTEREST@ALABAMAAG.GOV |
| STATE OF ALASKA | OFFICE OF THE ATTORNEY GENERAL | | ATTORNEY.GENERAL@ALASKA.GOV |
| STATE OF ARIZONA | OFFICE OF THE ATTORNEY GENERAL | | AGINFO@AZAG.GOV |
| STATE OF ARKANSAS | OFFICE OF THE ATTORNEY GENERAL | | OAG@ARKANSASAG.GOV |
| STATE OF CALIFORNIA | OFFICE OF THE ATTORNEY GENERAL | | XAVIER.BECERRA@DOJ.CA.GOV |
| STATE OF COLORADO | OFFICE OF THE ATTORNEY GENERAL | | CORA.REQUEST@COAG.GOV |
| STATE OF CONNECTICUT | OFFICE OF THE ATTORNEY GENERAL | | ATTORNEY.GENERAL@CT.GOV |
| STATE OF FLORIDA | OFFICE OF THE ATTORNEY GENERAL | | ASHLEY.MOODY@MYFLORIDALEGAL.COM |
| STATE OF HAWAII | OFFICE OF THE ATTORNEY GENERAL | | HAWAIIAG@HAWAII.GOV |
| STATE OF IDAHO | OFFICE OF THE ATTORNEY GENERAL | | STEPHANIE.GUYON@AG.IDAHO.GOV |
| STATE OF IOWA | OFFICE OF THE ATTORNEY GENERAL | | CONSUMER@AG.IOWA.GOV |
| STATE OF KANSAS | ATTN: ATTORNEY GENERAL DEREK SCHMIDT | | DEREK.SCHMIDT@AG.KS.GOV |
| STATE OF LOUISIANA | DEPT. OF JUSTICE - ATTORNEY GENERAL'S OFFICE | | ADMININFO@AG.STATE.LA.US |
| STATE OF MAINE | OFFICE OF THE ATTORNEY GENERAL | | ATTORNEY.GENERAL@MAINE.GOV |
| STATE OF MARYLAND | OFFICE OF THE ATTORNEY GENERAL | | OAG@OAG.STATE.MD.US |
| STATE OF MINNESOTA | OFFICE OF THE ATTORNEY GENERAL | | ATTORNEY.GENERAL@AG.STATE.MN.US |
| STATE OF MISSOURI | OFFICE OF THE ATTORNEY GENERAL | | CONSUMER.HELP@AGO.MO.GOV |
| STATE OF MONTANA | OFFICE OF THE ATTORNEY GENERAL | | CONTACTDOJ@MT.GOV |
| STATE OF NEW HAMPSHIRE | OFFICE OF THE ATTORNEY GENERAL | | ATTORNEYGENERAL@DOJ.NH.GOV |
| STATE OF NEW MEXICO | OFFICE OF THE ATTORNEY GENERAL | | HBALDERAS@NMAG.GOV |
| STATE OF NORTH DAKOTA | OFFICE OF THE ATTORNEY GENERAL | | NDAG@ND.GOV |
| STATE OF OKLAHOMA | OFFICE OF THE ATTORNEY GENERAL | | QUESTIONS@OAG.OK.GOV |
| STATE OF OREGON | OFFICE OF THE ATTORNEY GENERAL | | ELLEN.ROSENBLUM@DOG.STATE.OR.US<br>ATTORNEYGENERAL@DOJ.STATE.OR.US |
| STATE OF RHODE ISLAND | OFFICE OF THE ATTORNEY GENERAL | | AG@RIAG.RI.GOV |
| STATE OF UTAH | OFFICE OF THE ATTORNEY GENERAL | | UAG@UTAH.GOV |
| STATE OF UTAH | OFFICE OF THE ATTORNEY GENERAL, SEAN D. REYES | | UAG@UTAH.GOV |
| STATE OF VERMONT | OFFICE OF THE ATTORNEY GENERAL | | AGO.INFO@VERMONT.GOV |
| STATE OF VIRGINIA | OFFICE OF THE ATTORNEY GENERAL | | MAIL@OAG.STATE.VA.US |
| STATE OF WASHINGTON | OFFICE OF THE ATTORNEY GENERAL | | STEPHEN.MANNING@ATG.WA.GOV |
| STATE OF WEST VIRGINIA | OFFICE OF THE ATTORNEY GENERAL | | CONSUMER@WVAGO.GOV |
| STEVE LAIRD | C/O FORSHEY & PROSTOK LLP | ATTN: J. ROBERT FORSHEY | BFORSHEY@FORSHEYPROSTOK.COM |
| TEXAS DEPARTMENT OF BANKING | C/O OFFICE OF THE ATTORNEY GENERAL OF TEXAS | ASSISTANT ATTORNEY GENERALS | JASON.BINFORD@OAG.TEXAS.GOV<br>LAYLA.MILLIGAN@OAG.TEXAS.GOV<br>ABIGAIL.RYAN@OAG.TEXAS.GOV<br>ROMA.DESAI@OAG.TEXAS.GOV |
| TEXAS STATE SECURITIES BOARD | OFFICE OF THE ATTORNEY GENERAL OF TEXAS | ATTN: ABIGAIL R RYAN, LAYLA D MILLIGAN, ROMA N. DESAI & JASON B BINFORD | ABIGAIL.RYAN@OAG.TEXAS.GOV<br>LAYLA.MILLIGAN@OAG.TEXAS.GOV<br>JASON.BINFORD@OAG.TEXAS.GOV<br>ROMA.DESAI@OAG.TEXAS.GOV<br>AUTUMN.HIGHSMITH@OAG.TEXAS.GOV |
| TN DEPT OF COMMERCE AND INSURANCE | C/O TN ATTORNEY GENERAL'S OFFICE, BANKRUPTCY DIVISION | ATTN: MARVIN E. CLEMENTS JR. | AGBANKNEWYORK@AG.TN.GOV<br>MARVIN.CLEMENTS@AG.TN.GOV |
| TORONTO STOCK EXCHANGE | | | WEBMASTER@TMX.COM |
| USIO, INC. | C/O PULMAN CAPPUCCIO & PULLEN, LLP | ATTN: RANDALL A. PULMAN | RPULMAN@PULMANLAW.COM |
| VERMONT DEPARTMENT OF FINANCIAL REGULATION | C/O ASSISTANT GENERAL COUNSEL | ATTN: JENNIFER ROOD, ESQ. | JENNIFER.ROOD@VERMONT.GOV |

In re: Voyager Digital Holdings, Inc. et al.
Case No. 22-10943 (MEW)

# Exhibit C



**Exhibit C**

Served via First-Class Mail

| NAME | ATTENTION | ADDRESS 1 | ADDRESS 2 | CITY | STATE | ZIP | COUNTRY |
|---|---|---|---|---|---|---|---|
| 150 4TH AVE N TENANT LLC | | 150 4TH AVE N | | NASHVILLE | TN | 37219 | |
| 33 IRVING TENANT LLC | | 33 IRVING PL | | NEW YORK | NY | 10003 | |
| 78 SW 7TH STREET TENANT LLC | | 78 SW 7TH STREET | | MIAMI | FL | 33130 | |
| ADA SUPPORT INC. | | 371 FRONT STREET W | SUITE 314 | TORONTO | ON | M5V-3S8 | CANADA |
| AMAZON WEB SERVICES | | 420 MONTGOMERY STREET | | SAN FRANCISCO | CA | 94163 | |
| AMAZON WEB SERVICES, INC | | P.O. BOX 81226 | | SEATTLE | WA | 98108 | |
| AMAZON WEB SERVICES, INC | | P.O.BOX 84023 | | SEATTLE | WA | 98124 | |
| AMAZON WEB SERVICES, INC. | ATTN: STEVE BERANEK | 2345 CRYSTAL DRIVE SUITE 1100 | | ARLINGTON | VA | 22202 | |
| AMAZON WEB SERVICES, INC. | C/O K&L GATES LLP | ATTN: BRIAN PETERSON | 925 4TH AVENUE, SUITE 2900 | SEATTLE | WA | 98104 | |
| ANCHORAGE | | 4901 S. ISABEL PLACE SUITE 200 | | SIOUX FALLS | SD | 57108 | |
| BLOCKDAEMON INC. | | 6060 CENTER DRIVE | 10TH FLOOR | LOS ANGELES | CA | 90045 | |
| BLOCKDAEMON, INC. | | 1055 WEST 7TH STREET, 33RD FLOOR | | LOS ANGELES | CA | 90017 | |
| CDW | | 200 N. MILWAUKEE AVE | | VERNON HILLS | IL | 60061 | |
| CHAINALYSIS INC. | | 114 5TH AVE 18TH FLOOR | | NEW YORK | NY | 10011 | |
| CLOUDFLARE | | 101 TOWNSEND STREET | | SAN FRANCISCO | CA | 94107 | |
| COINBASE, INC. | | 200 PARK AVENUE SOUTH SUITE 1208 | | NEW YORK | NY | 10003 | |
| CONCUR TECHNOLOGIES, INC. | | 601 108TH AVE NE | SUITE 1000 | BELLEVUE | WA | 98004 | |
| COPPER TECHNOLOGIES (UK) LIMITED) | | 64 NORTH ROW | 3RD FLOOR | LONDON | | W1K 7DA | UNITED KINGDOM |
| DATASITE | | BAKER CENTER | 733 S. MARQUETTE AVE SUITE 600 | MINNEAPOLIS | MN | 55402 | |
| DROPBOX | | 1800 OWEN ST | | SAN FRANCISCO | CA | 94158 | |
| FIREBLOCKS INC. | | 33 IRVING PLACE SUITE 3060 | | NEW YORK | NY | 10003 | |
| FIREBLOCKS INC. | | 500 7TH AV | | NEW YORK | NY | 10018 | |
| FIVETRAN | | 1221 BROADWAY | STE 2400 | OAKLAND | CA | 94612-1824 | |
| FIVETRAN | | 405 14TH STREET SUITE 1100 | | OAKLAND | CA | 94612 | |
| GODADDY | | 2155 E. GODADDY WAY | | TEMPE | AZ | 85284 | |
| GOODBAY TECHNOLOGIES, INC. | | 7500 RIALTO BLVD. | BLDG. 1, SUITE 250 | AUSTIN | TX | 78735 | |
| GOODBAY TECHNOLOGIES, INC. | C/O KATTEN MUCHIN ROSENMAN LLP | ATTN: MICHAELA C. CROCKER | 2121 NORTH PEARL STREET, SUITE 1100 | DALLAS | TX | 75201-2591 | |
| ITERABLE | | 71 STEVENSON ST | SUITE 3 | SAN FRANCISCO | CA | 94105 | |
| ITERABLE, INC | | 71 STEVENSON ST | SUITE 300 | SAN FRANCISCO | CA | 94105 | |
| JAMF | | 1 WASHINGTON AVE S | SUITE 11 | MINNEAPOLIS | MN | 55401 | |
| JAMF | | 100 WASHINGTON AVE S SUITE 1100 | | MINNEAPOLIS | MN | 55401 | |
| MAESTROQA, INC. | | 33 WEST 17TH STREET | FLOOR 4 | NEW YORK | NY | 10011 | |
| NETWORK REDUX LLC | | 5200 S MACADAM AVENUE | | PORTLAND | OR | 97239 | |
| OKTA | | 1 FIRST STREET | 6TH FLOOR | SAN FRANCISCO | CA | 94105 | |
| OKTA | | 100 FIRST STREET 6TH FLOOR | | SAN FRANCISCO | CA | 94105 | |
| ORACLE AMERICA, INC. | | 2300 ORACLE WAY | | AUSTIN | TX | 78741 | |
| ORACLE AMERICA, INC. | ATTN: PEGGY BRUGGMAN, BENJAMIN WHEELER | 500 ORACLE PARKWAY | | REDWOOD SHORES | CA | 94065 | |
| ORACLE AMERICA, INC. | C/O BUCHALTER | ATTN: SHAWN M. CHRISTIANSON | 425 MARKET ST., SUITE 2900 | SAN FRANCISCO | CA | 94105 | |
| ORACLE AMERICA, INC. | C/O DOSHI LEGAL GROUP, P.C. | ATTN: AMISH R. DOSHI | 1979 MARCUS AVENUE, SUITE 210E | LAKE SUCCESS | NY | 11042 | |
| PLAID INC. | | 85 2ND ST STE 400 | | SAN FRANCISCO | CA | 94105-3462 | |
| PLAID INC. (F.K.A. PLAID TECHNOLOGIES, INC.) | | 25 MAIDEN LANE | | SAN FRANCISCO | CA | 94108 | |
| PLAID INC. [PLAID TECHNOLOGIES, INC.] | C/O QUARLES & BRADY LLP | ATTN: JOHN A. HARRIS, ESQ. | 2 N. CENTRAL AVENUE | PHOENIX | AZ | 85004 | |
| RECIPROCITY, INC. | | 548 MARKET STREET, #73905 | | SAN FRANCISCO | CA | 94104 | |
| SEGMENT.IO, INC | | 100 CALIFORNIA ST. SUITE 700 | | SAN FRANCISCO | CA | 94103 | |
| SEGMENT.IO, INC. | | 101 SPEAR STREET | FLOOR 1 | SAN FRANCISCO | CA | 94105-1580 | |
| SIFT SCIENCE INC | C/O FINANCE DEPARTMENT | ATTN: EVA GUTIERREZ | 525 MARKET STREET, SIXTH FLOOR | SAN FRANCISCO | CA | 94105 | |
| SIFT SCIENCE, INC. | | 525 MARKET ST, 6TH FLOOR | | SAN FRANCISCO | CA | 94105 | |
| SLACK TECHNOLOGIES, LLC | | 41 E 11TH ST 11TH FLOOR | | NEW YORK | NY | 10003 | |
| SNOWFLAKE | | 450 CONCAR DR. | | SAN MATEO | CA | 94402 | |
| SOCURE INC. | | 330 7TH AVE | FLOOR 2 | NEW YORK | NY | 10001 | |
| SOCURE INC. | | MOUNTAIN WORKSPACE | 885 TAHOE BLVD SUITE 11 | INCLINE VILAGE | NV | 89451 | |
| SOCURE INC. | | P.O. BOX 392296 | | PITTSBURGH | PA | 15251-9296 | |
| SOCURE INC. | C/O POTOMAC LAW GRP. PLLC | ATTN: PAMELA MARIE EGAN | 1905 7TH AVENUE W | SEATTLE | WA | 98119 | |
| TABLEAU SOFTWARE, INC. | | 1621 N 34TH ST | | SEATTLE | WA | 98103-9193 | |
| TALOS | | 154 W 14TH ST | | NEW YORK | NY | 10011 | |
| TALOS TRADING | | 154 W 14TH ST | FLOOR 2 | NEW YORK | NY | 10011 | |
| THOUGHTWORKS, INC. | | 200 E RANDOLPH ST | 25TH FLOOR | CHICAGO | IL | 60601 | |
| TRINET HR III, INC. | | ONE PARK PLACE | SUITE 600 | DUBLIN | CA | 94568 | |
| TWILIO | | 101 SPEAR ST | STE 100 | SAN FRANCISCO | CA | 94105-1524 | |
| TWILIO INC. | | 101 SPEAR STREET | 1ST FLOOR | SAN FRANCISCO | CA | 94105 | |
| USIO, INC. | | 3611 PAESANOS PKWY | SUITE 300 | SAN ANTONIO | TX | 78231 | |
| USIO, INC. | C/O PULMAN CAPPUCCIO & PULLEN, LLP | ATTN: MARYANN VILLA, LEGAL ASSISTANT | 2161 NW MILITARY HWY., SUITE 400 | SAN ANTONIO | TX | 78213 | |
| USIO, INC. | C/O PULMAN CAPPUCCIO & PULLEN, LLP | ATTN: RANDALL A. PULMAN | 2161 NW MILITARY HWY., SUITE 400 | SAN ANTONIO | TX | 78213 | |
| USIO, INC. | C/O RUSKIN MOSCOU FALTISCHEK, P.C. | ATTN: SHERYL P. GIUGLIANO, RUSKIN MOSCOU FALTISCHEK | 1425 RXR PLAZA, 15TH FLOOR | UNIONDALE | NY | 11556-1425 | |
| USIO, INC. | LOUIS HOCH, PRESIDENT AND CEO | 3611 PAESANO'S PARKWAY, SUITE 300 | | SAN ANTONIO | TX | 78231 | |
| WEWORK | | 33 IRVING PL | | NEW YORK | NY | 10003 | |
| ZENDESK | | 989 MARKET STREET | STE. 300 | SAN FRANCISCO | CA | 94103 | |

# Exhibit D

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE TO CONTRACT PARTIES TO POTENTIALLY**
**ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**PLEASE TAKE NOTICE THAT** on January 13, 2023, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No. 861] (the "Disclosure Statement Order") that (a) conditionally approved the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 863] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"), for the purposes of solicitation, (b) authorized the Debtors to solicit votes with regard to the acceptance or rejection of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 852] (as modified, amended, or supplemented from time to time, the "Plan"),[2] (c) approved the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"), and (d) approved procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT**, on February 1, 2023, the Debtors filed the *Schedule of Assumed Executory Contracts and Unexpired Leases* (the "Assumed Contracts Schedule") with the Court as part of the *Plan Supplement for the Third Amended Joint Chapter 11 Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. 943] (the "Plan Supplement"), as contemplated under the Plan.

**PLEASE TAKE FURTHER NOTICE THAT**, on the Effective Date, the Wind-Down Entity will assume the contracts (the "Assumed Contracts") listed on the Assumed Contracts Schedule, attached hereto as **Exhibit A**, one or more of which you are a counterparty. The Assumed Contracts Schedule can also be viewed on the Debtors' case website (https://cases.stretto.com/Voyager/). The Debtors have conducted a review of their books and records and

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]    Capitalized terms not otherwise defined herein shall have the meaning given to them in the *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections, and (IV) Granting Related Relief* [Docket No. 779] or the Plan, as applicable.

have determined that the cure amounts for unpaid monetary obligations under such Assumed Contracts are as set forth on **Exhibit A** attached hereto (the "Cure Costs").

**PLEASE TAKE FURTHER NOTICE THAT** if you disagree with the proposed Cure Costs, your objection (a "Cure Objection") must: (i) be in writing; (ii) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the correct cure amount alleged to be owed to the objecting contract counterparty, together with any applicable and appropriate documentation in support thereof; (iv) be filed electronically with the Court on the docket of *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (the "Court") (which are available on the Court's website at http://www.nysb.uscourts.gov); and (v) be served so as to be actually received by **February 22, 2023, at 4:00 p.m., prevailing Eastern Time** (the "Cure Objection Deadline"), on counsel for the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg (jsussberg@kirkland.com); Christopher Marcus (cmarcus@kirkland.com); Christine Okike (christine.okike@kirkland.com); and Allyson B. Smith (allyson.smith@kirkland.com).

**PLEASE TAKE FURTHER NOTICE THAT** if no objection is filed by the Cure Objection Deadline, then (i) you will be deemed to have stipulated that the Cure Costs as determined by the Debtors are correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional cure amount under the proposed Assumed Contract, and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assumption.

**PLEASE TAKE FURTHER NOTICE THAT** any Cure Objection that otherwise complies with these procedures yet remains unresolved as of the commencement of the Combined Hearing, shall be heard at the Combined Hearing or a later date to be fixed by the Court.

**PLEASE TAKE FURTHER NOTICE THAT** the Combined Hearing will commence on **March 2, 2023, at 10:00 a.m. prevailing Eastern Time**, before the Honorable Michael E. Wiles, in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York, New York 10004.

**PLEASE TAKE FURTHER NOTICE THAT** pursuant to the Court's General Order M-543, dated March 20, 2020 ("General Order M-543"), the Combined Hearing will be conducted telephonically. Parties wishing to participate in the Hearing should do so by making arrangements through CourtSolutions LLC. Instructions to register for CourtSolutions LLC are attached to General Order M-543.

**PLEASE TAKE FURTHER NOTICE THAT**, notwithstanding anything herein, the mere listing of any Assumed Contract on the Assumed Contract Schedule does not require or guarantee that such Assumed Contract will be assumed by the Debtors at any time, and all rights of the Debtors with respect to such Assumed Contract are reserved. Moreover, the Debtors explicitly reserve their rights, in their reasonable discretion, to seek to reject or assume each Assumed Contract pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtors to designate any Assumed Contract as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE THAT** nothing herein (i) alters in any way the prepetition nature of the Assumed Contracts or the validity, priority, or amount of any claims of a counterparty to any Assumed Contract against the Debtors that may arise under such Assumed Contract, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Assumed Contract against the Debtors that may arise under such Assumed Contract.

*[Remainder of page intentionally left blank]*

Dated:  February 1, 2023          /s/ Joshua A. Sussberg
New York, New York                **KIRKLAND & ELLIS LLP**
                                  **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                  Joshua A. Sussberg, P.C.
                                  Christopher Marcus, P.C.
                                  Christine A. Okike, P.C.
                                  Allyson B. Smith (admitted *pro hac vice*)
                                  601 Lexington Avenue
                                  New York, New York 10022
                                  Telephone:      (212) 446-4800
                                  Facsimile:      (212) 446-4900
                                  Email:          jsussberg@kirkland.com
                                                  cmarcus@kirkland.com
                                                  christine.okike@kirkland.com
                                                  allyson.smith@kirkland.com

                                  *Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Assumed Contracts Schedule**

| No. | Debtor Name | Counterparty Name | Description of Contract | Cure Amount |
|---|---|---|---|---|
| 1 | Voyager Digital, LLC | Ada Support Inc. | ADA Services Agreement and Amendment #1 | $ 0.00 |
| 2 | Voyager Digital, LLC | Amazon Web Services | AWS Customer Agreement | $ 220,614.04 |
| 3 | Voyager Digital, LLC | Amazon Web Services | AWS Service Terms | See above |
| 4 | Voyager Digital, LLC | Anchorage | Digital Bank Order Form | $ 0.00 |
| 5 | Voyager Digital Holdings, Inc. | Blockdaemon Inc. | Order Form | $ 351.03 |
| 6 | Voyager Digital Holdings, Inc. | Blockdaemon Inc. | Validator Agreement | See above |
| 7 | Voyager Digital, LLC | Coinbase, Inc. | Coinbase Prime Institutional Client Agreement | $ 0.00 |
| 8 | Voyager Digital, LLC | Coinbase Custody Trust Company, LLC | Custodial Services Agreement | $ 0.00 |
| 9 | Voyager Digital, LLC | CDW | CDW Customer Service Order Form Google Workspace | $ 0.00 |
| 10 | Voyager Digital, LLC | Chainalysis Inc. | Order Form | $ 0.00 |
| 11 | Voyager Digital Holdings, Inc. | Cloudflare | Enterprise Service Order Form | $ 0.00 |
| 12 | Voyager Digital Holdings, Inc. | Cloudflare | Insertion Order Form | See above |
| 13 | Voyager Digital, LLC | Concur Technologies, Inc. | Order Form | $ 0.00 |
| 14 | Voyager Digital, LLC | Copper Technologies (UK) Limited | Third Party Agreement | $ 0.00 |
| 15 | Voyager Digital, LLC | Copper Technologies (UK) Limited | Side Letter To Copper's Terms & Conditions — Crypto Asset Service | See above |
| 16 | Voyager Digital Holdings, Inc. | Datasite | Statement of Work | $ 0.00 |
| 17 | Voyager Digital, LLC | Dropbox | Dropbox Services Agreement | $ 0.00 |
| 18 | Voyager Digital Ltd. | Fireblocks Inc. | Fireblocks License Agreement | $ 0.00 |
| 19 | Voyager Digital Ltd. | Fireblocks Inc. | First Amendment to the Fireblocks License Agreement | See above |
| 20 | Voyager Digital Ltd. | Fivetran | Service Order Form | $ 0.00 |
| 21 | Voyager Digital, LLC | GoDaddy | Universal Terms Of Service Agreement | $ 0.00 |
| 22 | Voyager Digital Ltd. | Goodbay Technologies, Inc. | Client Services Agreement | $ 54,604.00 |
| 23 | Voyager Digital, LLC | Iterable | Enterprise Sales Order Form | $ 35,423.46 |
| 24 | Voyager Digital, LLC | JAMF | Software License And Services Agreement | $ 0.00 |
| 25 | Voyager Digital, LLC | MaestroQA | SaaS Services Order Form | $ 0.00 |
| 26 | Voyager Digital Holdings, Inc. | Network Redux LLC | Statement of Work | $ 1,727.82 |
| 27 | Voyager Digital, LLC | Okta | Master Subscription Agreement | $ 0.00 |
| 28 | Voyager Digital, LLC | Oracle America, Inc. | Oracle Netsuite Fee Estimate | $ 0.00 |
| 29 | Voyager Digital Ltd. | Plaid Inc. (f.k.a. Plaid Technologies, Inc.) | Plaid Inc. Master Services Agreement | $ 100,000.00 |
| 30 | Voyager Digital Ltd. | Plaid Inc. (f.k.a. Plaid Technologies, Inc.) | Assets Addendum to the Master Services Agreement | See above |
| 31 | Voyager Digital Ltd. | Plaid Inc. (f.k.a. Plaid Technologies, Inc.) | Addendum to Master Services Agreement | See above |
| 32 | Voyager Digital, LLC | RECIPROCITY, INC. | Order Form | $ 0.00 |
| 33 | Voyager Digital, LLC | Segment.io, Inc | Order Form | $ 0.00 |
| 34 | Voyager Digital, LLC | Sift Science, Inc | Order Form | $ 77,240.41 |
| 35 | Voyager Digital, LLC | Slack Technologies, LLC | Order Form | $ 0.00 |
| 36 | Voyager Digital, LLC | Snowflake | Order Form | $ 0.00 |
| 37 | Voyager Digital, LLC | Socure Inc. | MSA & Amendments #1-7 | $ 1,404,493.38 |
| 38 | Voyager Digital, LLC | Tableau Software, LLC | Tableau Purchase Authorization Form | $ 0.00 |
| 39 | Voyager Digital, LLC | Talos | Software Subscription Agreement | $ 195,685.88 |
| 40 | Voyager Digital Holdings, Inc. | ThoughtWorks, Inc. | Statement of Work and Subsequent Amendments | $ 0.00 |
| 41 | Voyager Digital Holdings, Inc. | ThoughtWorks, Inc. | Master Services Agreement | See above |
| 42 | Voyager Digital, LLC | TriNet HR III, Inc. | TriNet Technology Services Requisition Form | $ 0.00 |
| 43 | Voyager Digital Holdings, Inc. | TriNet HR III, Inc. | Consent to Assignment of TriNet Contract | See above |
| 44 | Voyager Digital, LLC | Twilio Inc. | Order Form | $ 20,339.21 |
| 45 | Voyager Digital, LLC | Usio, Inc. | Automated Clearing House Services Agreement and Second through Fourth Amendments | $ 3,700.00 |
| 46 | Voyager Digital Holdings, Inc. | 33 Irving Tenant LLC | WeWork New York and Subsequent Amendments | $ 0.00 |
| 47 | Voyager Digital, LLC | 78 SW 7th Street Tenant LLC | WeWork Miami | See above |
| 48 | Voyager Digital Holdings, Inc. | 150 4th Ave N Tenant LLC | WeWork Nashville | See above |
| 49 | Voyager Digital, LLC | Zendesk | Service Order Form | 23,335.71 |

# Exhibit 17



**The New York Times Company**

620 8th Avenue
New York, NY 10018
nytimes.com

## PROOF OF PUBLICATION

February 1, 2023

Sworn to me this 1st day
of February, 2023

*Ellen Herb*
_____
Notary Public

Ellen Herb
Notary Public, State of New York
No. 01HE6163785
Qualified in New York County
Commission Expires April 2, 2023

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

 2/1/2023, NYT & NATL, pg B3
_____

_____

*Larnyce Tabron*

Debtors
Ex-17

**POLICY | LABOR**

SCOTT MCINTYRE FOR THE NEW YORK TIMES

**Federal Reserve officials are closely watching hiring and wages in their campaign against high inflation.**

# *Wages Showed Moderation At Year's End, Report Says*

By JEANNA SMIALEK

A measure of pay and benefits that the Federal Reserve has been watching closely amid a strong labor market rose less than expected at the end of 2022, fresh data showed Tuesday.

The Employment Cost Index climbed 1 percent in the final quarter of 2022 versus the prior three months, more slowly than the 1.1 percent that economists expected and a slowdown from the previous 1.2 percent reading.

The data will probably reaffirm to central bankers that the economy and labor market are cooling, which could help inflation return to normal over time. While wage gains are still faster than normal, the moderation could help central bankers feel comfortable as they adjust interest rates less aggressively than they did throughout 2022.

The employment cost measure picked up by 5.1 percent on a yearly basis, close to the 5 percent reading in the previous quarter's report. In the decade leading up to the pandemic, the index averaged 2.2 percent yearly gains, underscoring the continued rapidness of today's pace. But a measure of private-sector wages not including benefits, which economists see as a particularly good indicator of labor market tightness, slowed slightly.

Fed officials are closely watching the labor market — and wages in particular — as they try to gauge how much further they have to go in their campaign against stubbornly high inflation. While goods price increases that are tied to supply chain snarls are beginning to fade, central bankers are worried that rapid pay gains could keep services costs rising rapidly. Labor is a big expense for service companies, like hotels and restaurants, and firms might pass higher wage costs on to customers in the form of higher prices. Bigger paychecks could also help sustain consumer demand, keeping pressure on prices.

***Cool-down signals could influence a rate increase by the Fed.***

The Fed's next interest-rate decision will be announced on Wednesday. Central bankers are widely expected to raise rates by a quarter of a percentage point, after raising them by three-quarters of a point per meeting for much of 2022 and by half a point at their last gathering, in December.

The new adjustment would push rates up to a range of 4.5 to 4.75 percent. The question now is how many more moves the Fed will make — and how long policymakers will hold interest rates at a high level.

Steeper borrowing costs deter consumers from making big purchases and businesses from expanding, which can slow the economy and weaken the labor market. Fed officials are hoping that they can cool the economy by just enough to allow supply and demand to come back into balance — causing inflation to moderate — without causing a punishing recession. But they have been clear that they are willing to accept some pain to bring price increases back under control.

And they have underlined that they think the labor market needs to slow down to put inflation on a more sustainable path.

"We want strong wage increases," Jerome H. Powell, the Fed chair, said at his last news conference in December. "We just want them to be at a level that's consistent with 2 percent inflation," he said, referring to the Fed's target inflation rate.

For now, America's rate of price increases remains much faster, at 5 percent. Mr. Powell will give another news conference on Wednesday, after the release of the Fed's rate decision at 2 p.m. Eastern time.

# *Republicans Want Spending Cuts but Are Short on Specifics*

KENNY HOLSTON/THE NEW YORK TIMES

**Speaker Kevin McCarthy called President Biden "childish" for refusing to bargain over the debt ceiling. "Why would you play political games?" he asked.**

FROM FIRST BUSINESS PAGE

him about when House Republicans plan to release their budget.

"It is essential that Speaker McCarthy likewise commit to releasing a budget, so that the American people can see how House Republicans plan to reduce the deficit," Brian Deese, the director of the White House's National Economic Council, and Shalanda Young, the director of the White House budget office, wrote in a memo released on Tuesday.

Ahead of the meeting, the three primary negotiators who have to broker a deal jousted from afar.

At a fund-raiser in New York on Tuesday, Mr. Biden called Mr. McCarthy a "decent man" but lamented that he had to cater to the hard-liners in the Republican Party to become speaker by offering "off the wall" concessions.

"Look, this is not your father's Republican Party," Mr. Biden said. "No, I mean it, this is a different breed of cat."

Separately on Tuesday, Mr. McCarthy accused Mr. Biden of being irresponsible by suggesting that he was unwilling to seek common ground over the debt ceiling and said that the White House's refusal to bargain was "childish."

"Why would you put the economics of America in jeopardy?" Mr. McCarthy said to reporters. "Why would you play political games? I'm not."

Senator Mitch McConnell, Republican of Kentucky and the minority leader, said on Tuesday that he would defer to Mr. McCarthy given that Republicans hold a majority in the House while Democrats control the Senate. He also noted that during a similar debt standoff in 2011, he ultimately cut a deal with Mr. Biden, then the vice president, that averted a default by imposing spending cuts. Mr. Biden is resisting such an approach today.

"It is not unprecedented to have a discussion about spending in connection with the debt ceiling," Mr. McConnell said. "The president knows full well since he was my negotiating partner years ago that this has been done before."

He added, "I think the deal has to be cut obviously between the House majority and the Democratic president in order to have a chance to survive over here."

Reaching a deal will not be easy. The White House has said it will not negotiate over raising the debt limit, and Republicans have been struggling to find agreement among themselves over how to cut spending. Deficit reduction pledges are poised to collide with the reality that austerity measures tend to be unpleasant.

"The public doesn't like debt and deficits, but it doesn't like spending cuts or tax increases, either," said William G. Gale, a senior fellow at the Brookings Institution and the author of "Fiscal Therapy: Curing America's Debt Addiction and Investing in the Future." "Against that backdrop, why would any politician fall on his sword to cut spending or raise taxes?"

After a $5 trillion spending spree to combat the coronavirus pandemic, the nation's debt burden has become too enormous to chip away at without considerable pain. The Committee for a Responsible Federal Budget estimated this month that it would require $14.6 trillion in deficit reduction to balance the budget over the next decade. That feat would require all spending to be cut by roughly one-quarter.

Excluding the most politically crucial budget items — defense, veterans, Social Security and Medicare — would require an even bigger scalpel. With those areas off the table, spending on the remaining "discretionary" items would need to be slashed by 85 percent.

For months before the midterm elections in November, Mr. Biden warned voters that if Republicans won control of Congress, they would seek to slash funding for social safety net programs, threatening Social Security and Medicare. That has left Republicans on the defensive since taking control of the House this year, because making a dent in future deficits is practically impossible without touching those programs.

Many Republicans are mindful that they are facing something of a political live wire. Former President Donald J. Trump warned Republicans this month to steer clear of the retirement programs during the debt ceiling negotiations. "Under no circumstances should Republicans vote to cut a single penny from Medicare or Social Security," he said in a video message.

Despite vague proposals to restructure the safety net programs, most Republicans insist that they merely want to cut waste from the programs to preserve them long term.

The White House and Republicans are expected to unveil detailed budget proposals over the next two months that will formally lay out spending priorities. The Biden administration's budget will be released on March 9. Representative Steve Scalise of Louisiana, the majority leader, suggested on Tuesday that House Republicans would submit a budget in April.

"I hope the president meets his deadline, just like we're going to work to meet our deadline," Mr. Scalise said at a news conference.

The contours of that budget are starting to take shape, but differences within the Republican Party will not be easy to bridge.

Representative Chip Roy, a Texas Republican who initially withheld support from Mr. McCarthy in his run for House speaker, said Mr. McCarthy had committed to enacting the biggest discretionary spending cuts in history for the upcoming fiscal year. He said that a $130 billion reduction could be accomplished without cuts to military spending, Social Security or Medicare. Instead, he said on Twitter, money that goes to "woke & weaponized bureaucrats" would be scaled back.

But other influential Republicans contend that big changes to so-called entitlement programs must be considered.

Representative Matt Gaetz, Republican of Florida, said on Fox News last week that he was disappointed that some of his colleagues had given up on overhauling safety net programs such as Medicaid and the Supplemental Nutrition Assistance Program, which provides food stamps. He called for changes that would make fewer people eligible to receive the benefits.

***A renewed focus on fiscal restraint poses its own political risks.***

"If we impose work requirements on SNAP and on Medicaid expansion for able-bodied adults, we would have the ability to save $1 trillion during the 10-year budget window," Mr. Gaetz said.

Some Republicans, such as Senator Rand Paul of Kentucky and Representative Nancy Mace of South Carolina, have been calling for "penny plans" that would cut total spending across the board by a percentage to balance the budget in as little as five years.

Russell Vought, who was Mr. Trump's director of the Office of Management and Budget, has produced the most detailed budget proposal thus far. He has been talking with House Republicans since late last year about how to balance the budget without cutting Social Security and Medicare.

The plan includes a $22 billion cut to the Department of Health and Human Services that would gut funding for the Centers for Disease Control and Prevention and chop $26 billion from the Department of Housing and Urban Development, including a phaseout of Section 8 grants that Mr. Vought says are "a magnet for crime and decreased property values." It would also freeze Medicaid, eliminate the Affordable Care Act's coverage expansions and reduce disability benefits for veterans.

To help balance the budget over a decade, Mr. Vought's budget projects that the economy will achieve 3.1 percent growth next year and average about 2.8 percent for the remaining years. Those forecasts are far more optimistic than those of the International Monetary Fund, which projected this week that the U.S. economy would grow by a tepid 1.4 percent this year and 1 percent in 2024.

Mr. Vought acknowledged that it was unfortunate that more was not done to curtail spending during the Trump era, when Republicans and Democrats lifted the debt ceiling three times.

"I do wish we could have had other things attached to the debt ceiling increases," Mr. Vought said. "The new House Republican majority was put into office to deal with these economic problems."

Mr. Biden and his aides have increasingly called for House Republicans to make their debt limit demands clear, as proposals that would reduce funding for poor people and veterans could prove to be a political gift for the president.

However, the White House has held firm that Mr. Biden does not intend to cut a deal to raise the debt limit and warned that Republicans were being reckless by threatening the full faith and credit of the United States.

"Raising the debt ceiling is not a negotiation," Mr. Deese and Ms. Young wrote in their memo on Tuesday. "It is an obligation of this country and its leaders to avoid economic chaos."

Catie Edmondson, Jim Tankersley and Carl Hulse contributed reporting.

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

In re: TRICIDA, INC.,[1] Debtor. | Chapter 11, Case No. 23-10024 (JTD) **Docket Ref. Nos. 11 & 100**

**NOTICE OF AUCTION AND SALE HEARING**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1. On January 11, 2023, the above-captioned debtor and debtor-in-possession (the "Debtor"), filed a voluntary petition for relief pursuant to chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

2. On January 11, 2023, the Debtor filed a motion (the "Bidding Procedures and Sale Motion"), pursuant to sections 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), seeking entry of an order (the "Bidding Procedures Order") (a) scheduling an auction (the "Auction") for the sale of the Debtor's assets (the "Assets") on or about February 15, 2023, at 10:00 a.m. and a hearing to approve the sale of the Assets (the "Sale Hearing") on or about February 21, 2023, (b) approving procedures (the "Bidding Procedures")[2] for submitting competing bids for the Assets, (c) authorizing, but not directing, the Debtor to designate the Stalking Horse Bidder and approving the Bid Protections in accordance with the Bid Procedures, (d) subject to final Court approval at the Sale Hearing, authorizing and approving the Debtor to enter into and perform under a purchase agreement, as applicable, subject to higher or otherwise better offers submitted in accordance with the Bidding Procedures, (e) approving the form and manner of the notice of the Auction and the Sale Hearing, and (f) establishing procedures for the assumption and assignment of the Assumed Contracts (as defined in the Bidding Procedures and Sale Motion) to any purchaser(s) of the Assets and approving the manner of notice thereof (the "Assumption and Assignment Notice").

3. On January 26, 2023, the Bankruptcy Court entered the Bidding Procedures Order. Pursuant to the Bidding Procedures Order, if at least two (2) Qualified Bids with regard to any Assets (as defined in the Bidding Procedures Order) are received by the Bid Deadline (as defined below), the Debtor will conduct the Auction. The Auction shall be held on February 15, 2023, starting at 10:00 a.m. (prevailing Eastern Time), or such other time as the Debtor shall designate, and notify all Qualified Bidders. Professionals and principals for the Debtor, each Qualified Bidder (including, its representative(s), if any), each of the Consultation Parties, the U.S. Trustee, any creditors that request access to the Auction prior to the Bid Deadline in accordance with the Bidding Procedures, and any other parties the Debtor deems appropriate shall be permitted to attend and observe the Auction. Only parties that have submitted a Qualified Bid, as set forth in the Bidding Procedures Order, by no later than **February 10, 2023, at 10:00 a.m. (prevailing Eastern Time)** (the "Bid Deadline") may bid at the Auction. Any party that wishes to submit a Bid (as defined in the Bidding Procedures) for all or any portion of the Assets must submit a Bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

4. The Sale Hearing to consider approval of the sale of the Assets to the Successful Bidder(s) at the Auction, free and clear of all liens, claims and encumbrances, will be held before the Honorable John T. Dorsey, United States Bankruptcy Judge, 824 North Market Street, 5th Floor, Courtroom No. 6, Wilmington, Delaware 19801 on **February 21 2023, at 2:00 p.m. (prevailing Eastern Time)**, or at such other time thereafter as counsel may be heard. The Sale Hearing may be adjourned by the Debtor from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by including such adjournment on any agenda filed with the Bankruptcy Court or by the filing of a notice with the Bankruptcy Court.

5. Objections to approval of the Sale, the conduct at the Auction, the identity of the Successful Bidder, and adequate assurance of future performance by the Successful Bidder must be in writing, state the basis of such objection with specificity, and be filed with the Bankruptcy Court and served so as to be received before **4:00 p.m. (prevailing Eastern Time) on February 17, 2023** (the "Sale Objection Deadline") by the following parties (collectively, the "Notice Parties"): (a) proposed counsel to the Debtor, Sidley Austin LLP, 555 West Fifth Street, Los Angeles, CA 90013 (Attn.: Sam Newman (sam.newman@sidley.com), Julia Philips Roth (julia.roth@sidley.com), Charles Persons (cpersons@sidley.com) and Geoffrey Levin (glevin@sidley.com)); (b) proposed co-counsel to the Debtor, Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Rodney Square, Wilmington, DE 19801 (Attn.: Sean M. Beach (sbeach@ycst.com) and Allison S. Mielke, (amielke@ycst.com)); (c) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Wilmington, DE 19801 (Attn.: Timothy J. Fox, Jr., Esq. (Timothy.J.Fox@usdoj.gov)); and (d) proposed counsel to the Official Committee of Unsecured Creditors, Womble Bond Dickinson (US) LLP 1313 North Market Street, Suite 1200, Wilmington, DE 19801 (Attn: Donald J. Detweiler (Don.Detweiler@wbd-us.com) and Todd Atkinson (Todd.Atkinson@wbd-us.com)).

**UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED WITHOUT FURTHER HEARING AND NOTICE.**

6. This Sale Notice is subject to the fuller terms and conditions of the Bidding Procedures and Sale Motion and the Bidding Procedures Order, with such Bidding Procedures Order controlling in the event of any conflict. The Debtor encourages all parties-in-interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale of the Assets and/or copies of any related document, including the Bidding Procedures and Sale Motion or the Bidding Procedures Order, may make a written request to Julia Philips Roth (julia.roth@sidley.com) and Charles Persons (cpersons@sidley.com). In addition, copies of the Bidding Procedures and Sale Motion, the Bidding Procedures Order and this Notice are on file with the Clerk of the Bankruptcy Court, Third Floor, 824 North Market Street, Wilmington, Delaware 19801 and are available on the Debtor's claims and noticing agent's website free of charge at http://kccllc.net/Tricida.

Dated: January 27, 2023, Wilmington, Delaware, */s/ Allison S. Mielke*, **YOUNG CONAWAY STARGATT & TAYLOR, LLP,** Sean M. Beach (No. 4070), Allison S. Mielke (No. 5934), Andrew A. Mark (No. 6861), Carol Cox (No. 6936), Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Telephone: (302) 571-6600, Facsimile: (302) 571-1253, Email: sbeach@ycst.com, amielke@ycst.com, amark@ycst.com, ccox@ycst.com -and- **SIDLEY AUSTIN LLP,** Samuel A. Newman (admitted *pro hac vice*), Julia Philips Roth (admitted *pro hac vice*), 555 West Fifth Street, Los Angeles, California 90013, Telephone: (213) 896-6000, Facsimile: (213) 896-6600, Email: sam.newman@sidley.com, julia.roth@sidley.com -and- Charles M. Persons (admitted *pro hac vice*), Jeri Leigh Miller (admitted *pro hac vice*), Chelsea McManus (admitted *pro hac vice*), 2021 McKinney Avenue, Suite 2000, Dallas, Texas 75201, Telephone: (214) 981-3300, Facsimile: (213) 981-3400, Email: cpersons@sidley.com, jeri.miller@sidley.com, cmcmanus@sidley.com -and- Michael A. Sabino (admitted *pro hac vice*), 787 Seventh Avenue, New York, New York 10019, Telephone: (212) 839-5300, Facsimile: (212) 839-5599, Email: msabino@sidley.com, *Proposed Attorneys for Debtor, Tricida, Inc.*

[1] The Debtor in this chapter 11 case, together with the last four digits of the Debtor's federal tax identification number, is Tricida, Inc. (2526). The Debtor's service address is 7000 Shoreline Court, Suite 201, South San Francisco, CA 94080.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures.

**UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK**

In re: VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] Debtors. ) Chapter 11 ) Case No. 22-10943 (MEW) ) (Jointly Administered)

**NOTICE OF HEARING TO CONSIDER (I) ADEQUACY OF THE SECOND AMENDED DISCLOSURE STATEMENT AND (II) CONFIRMATION OF THE THIRD AMENDED JOINT CHAPTER 11 PLAN FILED BY THE DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES**

**PLEASE TAKE NOTICE THAT** on January 13, 2023, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No. 861] (the "Disclosure Statement Order") that (a) conditionally approved the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 863] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"), for the purposes of solicitation, (b) authorized the Debtors to solicit votes with regard to the acceptance or rejection of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 852] (as modified, amended, or supplemented from time to time, the "Plan"),[2] (c) approved the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approved procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider the adequacy of the Disclosure Statement and Confirmation of the Plan (the "Combined Hearing") will commence on **March 2, 2023 at 10:00 a.m.**, prevailing Eastern Time, or such other time that the Court determines, before the Honorable Michael E. Wiles, in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, Courtroom 617, New York, New York 10004.

**PLEASE BE ADVISED**: THE COMBINED HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

**CRITICAL INFORMATION REGARDING VOTING ON THE PLAN**

**Voting Record Date**. The voting record date is **January 10, 2023** (the "Voting Record Date"), which is the date for determining which Holders of Class 3 Claims (Account Holder Claims), Class 4A Claims (OpCo General Unsecured Claims), Class 4B Claims (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims) are entitled to vote on the Plan.

**Voting Deadline**. The deadline for voting on the Plan is on **February 22, 2023 at 4:00 p.m.** prevailing Eastern Time (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you **must**: (a) follow the instructions carefully; (b) complete **all** of the required information on the ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is **actually received** by the Debtors' claims, noticing, and solicitation agent Stretto, Inc. (the "Claims, Noticing, and Solicitation Agent") on or before the Voting Deadline. **A failure to follow such instructions may disqualify your vote**.

**CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN**

**Plan and Disclosure Statement Objection Deadline**. The deadline for filing objections to the Plan or Disclosure Statement is **February 22, 2023 at 4:00 p.m.** prevailing Eastern Time (the "Plan and Disclosure Statement Objection Deadline"). All objections to the relief sought at the Combined Hearing **must**: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; **and** (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be **actually received** on or before **February 22, 2023 at 4:00 p.m.** prevailing Eastern Time: (i) ***Debtors:* Voyager Digital Holdings, Inc.,** 33 Irving Place, Suite 3060, New York, NY 10003, Attention: Stephen Ehrlich and David Brosgol; (ii) ***Counsel to the Debtors:* Kirkland & Ellis LLP,** 601 Lexington Avenue, New York, New York 10022, Attention: Joshua A. Sussberg; Christopher Marcus; Christine A. Okike; Allyson B. Smith; (iii) ***Counsel to the Committee:* McDermott Will & Emery LLP,** One Vanderbilt Avenue, New York, NY 10017-3852, Attention: Darren Azman; Joseph B. Evans; Grayson Williams; Gregg Steinman; and (iv) ***United States Trustee:* Office of the United States Trustee for the Southern District of New York,** U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, NY 10014, Attention: Richard Morrissey; Mark Bruh.

**ADDITIONAL INFORMATION**

**Obtaining Solicitation Materials**. The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received the materials in electronic format, or on a CD-ROM or flash drive), contact the Debtors' Claims, Noticing, and Solicitation Agent, by: (a) calling (855) 473-8665 (Toll Free) or +1 (949) 271-6507 (International), (b) e-mailing VoyagerInquiries@Stretto.com with a reference to "In re: Voyager - Solicitation Inquiry" in the subject line, or (c) writing to the Claims, Noticing, and Solicitation Agent at Voyager Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602. You may also obtain copies of any pleadings filed with the Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager/, or for a fee via PACER at: http://pacer.psc.uscourts.gov. Please be advised that the Claims, Noticing, and Solicitation Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may **not** advise you as to whether you should vote to accept or reject the Plan.

**Filing the Plan Supplement**. The Debtors will file the Plan Supplement (as defined in the Plan) on or before **February 15, 2023** (*provided* that (i) the Notice of Assumption of Executory Contracts and Unexpired Leases and Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases will be filed on or before **February 1, 2023**; and (ii) the Customer Onboarding Protocol and the Schedule of Retained Causes of Action will be filed on or before **February 8, 2023**) and will serve notice on all Holders of Claims entitled to vote on the Plan, which will: (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

**BINDING NATURE OF THE PLAN: IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THESE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

**HOW TO OPT INTO THE RELEASES:** Any Holder of a Claim or Interest that wants to grant the Third-Party Release set forth in Article VIII.B of the Plan must return its Ballot or Non-Voting Status Notice, as applicable, to the Claims, Noticing, and Solicitation Agent by no later than **February 22, 2023**, by following the instructions for electing to opt into the Third-Party Release set forth in such Ballot or Non-Voting Status Notice, as applicable.

**RELEASES**

**Article VIII.A of the Plan contains the following Debtor Release: Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, the Wind-Down Entity, and in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in Article VIII.A of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.A of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

**Notwithstanding anything to the contrary contained herein, nothing in the Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of the Plan.**

**Article VIII.B of the Plan contains the following Third-Party Release: Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, provided that nothing in Article VIII.B of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

**Article VIII.C of the Plan provides for the following Exculpation: Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

**The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

**Article VIII.D of the Plan provides for the following Injunction: The assets of the Debtors and of the Wind-Down Entity shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in the Plan and shall not be available for any other purpose. All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Entity, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.**

**In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by the Plan.**

Dated: January 13, 2023, New York, New York, */s/ Joshua A. Sussberg*, **KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP,** Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., Allyson B. Smith (admitted *pro hac vice*), 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: jsussberg@kirkland.com, cmarcus@kirkland.com, christine.okike@kirkland.com, allyson.smith@kirkland.com, *Counsel to the Debtors and Debtors in Possession*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2] Capitalized terms not otherwise defined herein shall have the meaning given to them in the *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections, and (IV) Granting Related Relief* [Docket No. 779] or the Plan, as applicable.

# Exhibit 18

**AFFIDAVIT OF PUBLICATION**

**IN THE MATTER OF:** *{ KIRKLAND & ELLIS LLP }*

**STATE OF NEW YORK**

        **ss:**

**COUNTY OF NEW YORK**

I, Jonathan Florez, being duly sworn, hereby certify that (a) I am the Account Planner, US Advertising of FT Publications, Inc. Publisher of the FINANCIAL TIMES, a daily newspaper published and of general circulation Worldwide including the City and County of New York, and (b) that the Notice of which the annexed is a copy was published in THE FINANCIAL TIMES ON THE:

<div align="center">2nd Day of February 2023.</div>

<div align="center">Jonathan Florez, ACCOUNT PLANNER, <b>ADVERTISING:</b></div>

**Signature**

JESSICA WONG
Notary Public - State of New York
NO. 01WO6203455
Qualified in Kings County
My Commission Expires _4/6/20__

**Date: 02/02/2023**

---

Debtors
Ex-18

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re: VOYAGER DIGITAL | Chapter 11
HOLDINGS, INC., *et al.*,[1] | Case No. 22-10943 (MEW)
Debtors. | (Jointly Administered)

**NOTICE OF HEARING TO CONSIDER (I) ADEQUACY OF THE SECOND AMENDED DISCLOSURE STATEMENT AND (II) CONFIRMATION OF THE THIRD AMENDED JOINT CHAPTER 11 PLAN FILED BY THE DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES**

**PLEASE TAKE NOTICE THAT** on January 13, 2023, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No. 861] (the "Disclosure Statement Order") that (a) conditionally approved the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 863] (as modified, amended, or supplemented from time to time, the "Plan"),[2] (c) approved the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approved procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider the adequacy of the Disclosure Statement and Confirmation of the Plan (the "Combined Hearing") will commence on **March 2, 2023 at 10:00 a.m.**, prevailing Eastern Time, or such other time that the Court determines, before the Honorable Michael E. Wiles, in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, Courtroom 617, New York, New York 10004.

**PLEASE BE ADVISED:** THE COMBINED HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

**CRITICAL INFORMATION REGARDING VOTING ON THE PLAN**

**Voting Record Date**. The voting record date is **January 10, 2023** (the "Voting Record Date"), which is the date for determining which Holders of Class 3 Claims (Account Holder Claims), Class 4A Claims (OpCo General Unsecured Claims), Class 4B Claims (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims) are entitled to vote on the Plan.

**Voting Deadline**. The deadline for voting on the Plan is on **February 22, 2023 at 4:00 p.m.**, prevailing Eastern Time (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you **must**: (a) follow the instructions carefully; (b) complete **all** of the required information on the ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is **actually received** by the Debtors' claims, noticing, and solicitation agent Stretto, Inc. (the "Claims, Noticing, and Solicitation Agent") on or before the Voting Deadline. **A failure to follow such instructions may disqualify your vote.**

**CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN**

**Plan and Disclosure Statement Objection Deadline**. The deadline for filing objections to the Plan or Disclosure Statement is **February 22, 2023 at 4:00 p.m.**, prevailing Eastern Time (the "Plan and Disclosure Statement Objection Deadline"). All objections to the relief sought at the Combined Hearing **must**: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; **and** (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be **actually received** on or before **February 22, 2023 at 4:00 p.m.** prevailing Eastern Time: (i) *Debtors:* Voyager Digital **Holdings, Inc.**, 33 Irving Place, Suite 3060, New York, NY 10003, Attention: Stephen Ehrlich and David Brosgol; (ii) *Counsel to the Debtors:* **Kirkland & Ellis LLP,** 601 Lexington Avenue, New York, New York 10022, Attention: Joshua A. Sussberg; Christopher Marcus; Christine A. Okike; Allyson B. Smith; (iii) *Counsel to the Committee:* **McDermott Will & Emery LLP,** One Vanderbilt Avenue, New York, NY 10017-3852, Attention: Darren Azman; Joseph B. Evans; Grayson Williams; Gregg Steinman; and (iv) *United States Trustee:* **Office of the United States Trustee for the Southern District of New York,** U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, NY 10014, Attention: Richard Morrissey; Mark Bruh.

**ADDITIONAL INFORMATION**

**Obtaining Solicitation Materials.** The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received the materials in electronic format, or on a CD-ROM or flash drive), contact the Debtors' Claims, Noticing, and Solicitation Agent, by: (a) calling (855) 473-8665 (Toll Free) or +1 (949) 271-6507 (International), (b) e-mailing VoyagerInquiries@Stretto.com with a reference to "In re: Voyager – Solicitation Inquiry" in the subject line, or (c) writing to the Claims, Noticing, and Solicitation Agent at Voyager Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602. You may also obtain copies of any pleadings filed with the Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Voyager/, or for a fee via PACER at: http://pacer.psc.uscourts.gov. Please be advised that the Claims, Noticing, and Solicitation Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may **not** advise you as to whether you should vote to accept or reject the Plan.

**Filing the Plan Supplement.** The Debtors will file the Plan Supplement (as defined in the Plan) on or before **February 15, 2023** (*provided* that (i) the Notice of Assumption of Executory Contracts and Unexpired Leases and Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases will be filed on or before **February 1, 2023**; and (ii) the Customer Onboarding Protocol and the Schedule of Retained Causes of Action will be filed on or before

**February 8, 2023**) and will serve notice on all Holders of Claims entitled to vote on the Plan, which will: (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

**BINDING NATURE OF THE PLAN: IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THESE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

**HOW TO OPT INTO THE RELEASES:** Any Holder of a Claim or Interest that wants to grant the Third-Party Release set forth in Article VIII.B of the Plan must return its Ballot or Non-Voting Status Notice, as applicable, to the Claims, Noticing, and Solicitation Agent by no later than **February 22, 2023**, by following the instructions for electing to opt into the Third-Party Release set forth in such Ballot or Non-Voting Status Notice, as applicable.

**RELEASES**

**Article VIII.A of the Plan contains the following Debtor Release:** Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, the Wind-Down Entity, and in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in Article VIII.A of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.A of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Notwithstanding anything to the contrary contained herein, nothing in the Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of the Plan.

**Article VIII.B of the Plan contains the following Third-Party Release:** Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the

Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, provided that nothing in Article VIII.B of the Plan shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.B of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Releasing Parties or the Debtors or Wind-Down Debtors or their respective Estates or Wind-Down Entity asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

**Article VIII.C of the Plan provides for the following Exculpation:** Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**Article VIII.D of the Plan provides for the following Injunction:** The assets of the Debtors and of the Wind-Down Entity shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in the Plan and shall not be available for any other purpose. All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Entity, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by the Plan.

Dated: January 13, 2023, New York, New York, /s/ Joshua A. Sussberg
**KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP,** Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., Allyson B. Smith (admitted *pro hac vice*), 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: jsussberg@kirkland.com, cmarcus@kirkland.com, christine.okike@kirkland.com, allyson.smith@kirkland.com, *Counsel to the Debtors and Debtors in Possession*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2] Capitalized terms not otherwise defined herein shall have the meanings given to them in the *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections, and (IV) Granting Related Relief* [Docket No. 779] or the Plan, as applicable.

# COMPANIES & MARKETS

## The day in the markets

### What you need to know

- Wall Street stocks edge lower as investors await Fed meeting plans
- Markets expect quarter-point rate rise but await Powell comments
- Dollar slips while Asian equities advance

Wall Street stocks slipped yesterday with the US Federal Reserve poised to lift borrowing costs by a quarter percentage point in what would be the smallest increase in rates since last March.

The benchmark S&P 500 fell 0.3 per cent while the tech-heavy Nasdaq Composite declined 0.2 per cent after demand for US workers grew more than expected in December and US manufacturing activity declined to its weakest level in more than two-and-a-half years.

The US Dollar index, a measure of the currency's strength against a basket of six peers, fell 0.4 per cent.

Fed officials were yesterday expected to increase rates by 0.25 percentage points to a range of 4.5–4.75 per cent, the highest level since September 2007 at the start of the global financial crisis.

Having lifted rates in 0.25 percentage point and 0.75 percentage point increments since May, such a move would mark a shift to a more traditional pace of monetary tightening and reflect growing confidence that inflation is on a downward trajectory.

With a quarter-point move all but nailed on, markets are likely to swing higher or lower on the language deployed by Fed chair Jay Powell in his press conference after the rate announcement.

"We expect Powell's comments will be

quite hawkish in order to underscore that slowing is not stopping and to discourage markets from expecting rate cuts in 2023," said analysts at JPMorgan.

Despite a more "encouraging" outlook, Powell is expected to point yet again to the "historical costs of easing too soon".

The Bank of England and European Central Bank are due to implement their own interest rate increases today with both expected to opt for 0.5 percentage point adjustments upwards.

The pan-regional Stoxx Europe 600 traded flat after eurozone inflation fell more than expected to 8.5 per cent in

January, down from 9.2 per cent in December.

Economists polled by Reuters had forecast a decline to 9 per cent. Core inflation, which omits relatively volatile food and energy prices, remained at 5.2 per cent with investors having expected a decline to 5.1 per cent.

London's FTSE 100 benchmark edged 0.1 per cent lower.

In Asia, Hong Kong's Hang Seng added 1 per cent, China's CSI 300 index of Shanghai and Shenzhen stocks rose 0.9 per cent while Seoul's Kospi gained 1.2 per cent. **George Steer**



### US manufacturing shrank at the fastest pace in over 2.5 years
ISM Manufacturing PMI index



A reading below 50 shows the sector is contracting
Source: Refinitiv

## Markets update

  

| | US | Eurozone | Japan | UK | China | Brazil |
|---|---|---|---|---|---|---|
| Stocks | S&P 500 | Eurofirst 300 | Nikkei 225 | FTSE100 | Shanghai Comp | Bovespa |
| Level | 4058.40 | 1765.45 | 27346.88 | 7761.11 | 3284.92 | 111215.52 |
| % change on day | -0.45 | -0.14 | 0.07 | -0.14 | 0.90 | -1.95 |
| Currency | $ index (DXY) | $ per € | Yen per $ | $ per £ | Rmb per $ | Real per $ |
| Level | 102.229 | 1.092 | 129.255 | 1.233 | 6.747 | 5.068 |
| % change on day | 0.29% | 0.552 | -0.607 | 0.162 | -0.229 | -0.325 |
| Govt. bonds | 10-year Treasury | 10-year Bund | 10-year JGB | 10-year Gilt | 10-year bond | 10-year bond |
| Yield | 3.488 | 2.282 | 0.477 | 3.305 | 2.925 | 12.666 |
| Basis point change on day | -2.870 | -3.500 | -1.460 | -2.600 | 1.000 | -5.600 |
| World index, Commods | FTSE All-World | Oil - Brent | Oil - WTI | Gold | Silver | Metals (LMEX) |
| Level | 427.88 | 85.55 | 78.24 | 1923.90 | 23.00 | 4356.30 |
| % change on day | -0.02 | -2.23 | -2.07 | -0.01 | -2.71 | 0.67 |

Yesterday's close apart from: Currencies = 16:00 GMT; S&P, Bovespa, All World, Oil = 17:00 GMT; Gold, Silver = London pm fix. Bond data supplied by Tullett Prebon.

## Main equity markets

### S&P 500 index



### Eurofirst 300 index

### FTSE 100 index

### Biggest movers

| | | US | |
|---|---|---|---|
| Ups | Old Dominion Freight Line | 9.06 |
| | Advanced Micro Devices | 8.55 |
| | Stryker | 7.36 |
| | Altria | 4.46 |
| | Applied Materials | 2.88 |
| Downs | Westrock | -14.54 |
| | Electronic Arts | -11.93 |
| | Match | -9.52 |
| | Johnson Controls Int | -6.43 |
| | Synchrony Fin | -5.74 |

| | Eurozone | |
|---|---|---|
| Ibva | 4.70 |
| Renault | 3.17 |
| Koninklijke Philips | 3.10 |
| Publicise | 2.47 |
| Deutsche Post | 2.09 |
| Hannover Re | -5.26 |
| Infineon Techs | -4.29 |
| Telenet | -3.64 |
| Raiffeisen Bank Internat | -2.61 |
| Jeronimo Martins | -2.21 |

| | UK | |
|---|---|---|
| Segro | 2.38 |
| Smiths | 2.23 |
| 3i | 2.21 |
| Ocado | 2.20 |
| Rs | 1.86 |
| Astrazeneca | -2.34 |
| Anglo American | -2.29 |
| Abrdn | -2.12 |
| Vodafone | -2.08 |
| Compass | -1.84 |

Prices taken at 17:00 GMT. Based on the constituents of the FTSE Eurofirst 300 Eurozone

All data provided by Morningstar unless otherwise noted.

## Wall Street

Transportation and logistics group **Old Dominion Freight** topped the S&P 500 index after reporting "record-breaking results in 2022".

Adding a further boost to the stock was a 33.3 per cent year-on-year rise in quarterly dividend to 40 cents per share. This would be paid on March 15 to shareholders registered on March 1.

Joining Old Dominion Freight near the peak of the blue-chip benchmark was chipmaker **Advanced Micro Devices**, which reported forecast-beating earnings and revenue.

UBS drew attention to AMD's data centre performance, which achieved a 42 per cent year-on-year jump in revenue to $1.7bn in the fourth quarter.

The broker expected this division to increase sales by another 20 per cent this year as rival Intel lagged behind AMD in its product road map.

Narrowing losses propelled **Peloton** higher with the fitness bikes group posting a quarterly net loss of $335.4mn, its best performance since its fiscal fourth quarter of 2021.

Peloton said this showed "the changes we're making are working". For its third consecutive quarter, Peloton generated more revenue from subscriptions than it did from hardware sales, paving the way towards a significant improvement in gross margins, it added. **Ray Douglas**

## Europe

Italian fashion group **OVS** jumped after announcing strong 2022 sales and calling off its acquisition of department store chain Coin.

OVS said takeover talks had ended, allowing it to instead focus on deleveraging, "which, in this market context . . . appears to be in our shareholders' best interests".

Net sales leapt 11 per cent last year to exceed €1.5bn, beating consensus estimates and generating free cash flow of more than €60mn.

Retirement homes operator **Orpea**, which had been rocked by allegations that residents were being mistreated, dived on reaching an agreement in principle on a financial restructuring plan.

This scheme, unveiled in November, included a debt-to-equity swap worth about €3.8bn and a capital increase of up to €1.5bn.

The French group warned that the restructure would "lead to a massive dilution for existing shareholders".

If they opted not to participate in the capital increase, these shareholders would see their stake reduced to just 0.4 per cent of Orpea.

Sweden's **Husqvarna**, home to outdoor power products such as Flymo lawnmowers, rallied after net sales in the fourth quarter comfortably topped analysts' estimates. **Ray Douglas**

## London

Commercial broadcaster **ITV** advanced off the back of an article stating that there were multiple expressions of interest in its content production arm.

Reuters said French TV production group Banijay and Hollywood executive Peter Chernin were both eyeing a stake in the maker of Love Island.

Citi said such speculation highlighted "the potential 'hidden value' within" ITV Studios, although it was difficult to see how this could be unlocked.

"Selling a small stake would obviously be the easiest way to signal value for ITV shareholders," said the broker, "but it is not clear that potential acquirers would be willing to pay a premium for a stake unless there is a pathway to control" the division.

**Vodafone** was in the top half of the FTSE 100 index after Margherita Della Valle, interim chief executive, admitted the telco could "do better" following a recent decline in European revenue.

Growth in service revenue slowed to 1.8 per cent in its fiscal third quarter, down from 2.5 per cent in the preceding period, driven by a particularly weak performance in Spain where revenue slid 8.7 per cent.

**Made Tech**, which provides IT services to the public sector, leapt more than a fifth on reporting a 76 per cent jump in half-year revenue. **Ray Douglas**

---

# Specialised ETFs fall flat from marijuana to the metaverse

### Francesco Franzoni

#### Markets Insight



From the legalisation of marijuana to the rise of working from home, if there is a trend or theme in markets, there will be an exchange traded fund for it. As the cost of issuance of new ETFs is low and the competition between fund issuers intense, financial innovation has flourished.

Thousands of new ETFs have been launched over the past three decades. The range of recent specialised ETFs seemingly stretches as far as the imagination of investors.

But does financial innovation in the ETF space create value for investors? A study to be published in the Review of Financial Studies that I co-authored with Itzhak Ben-David, Byungwook Kim and Rabih Moussawi suggests otherwise. Our results show that, on average, new equity ETFs are poor investments on a risk-adjusted basis.

It points the finger at specialised equity ETFs that focus on specific industries and themes. Over the past two decades, industry and thematic ETFs have underperformed broad-based benchmarks by about 30 per cent in the first five years since their inception.

Out of these, only about 5 percentage points is due to their fees and 27 percentage points to the underperformance of the base assets.

The need to attract investors' attention has led ETF providers to ride the latest trends, turning a passive product into an active bet on the theme du jour.

After the success of the first wave of ETFs tracking broad-based indices such as the S&P 500 index, competition intensified and fees declined.

To counteract this development, issuers came up with new types of products which charged higher fees and tracked

smaller segments of the market. Smart beta ETFs, which are constructed to reflect investment approach rather than straight market capitalisation, were introduced. Then came ETFs based on industries and, thematic versions. Single-stock ETFs are but the latest step in the evolution of the species.

Newly launched ETFs focus on the flavour-of-the-month topics that investors are excited about. In 2020, new ETFs held portfolios related to areas such as Covid-19 vaccines, telemedicine and gaming/sports betting. In 2021, investors' dreams included bitcoin, electric cars and the metaverse.

Naturally, ETF issuers design new products with one consideration in

> ## Assets are overvalued at the time of launch and underperform in the following years

mind: to maximise their revenues. Revenues are greater when the fee rate and the assets that investors pour in are higher. With thousands of ETFs already on the market, new ETFs need to be unique and catch investors' attention.

If the idea behind the ETF provides investors with the excitement to bet on their preferred theme, they will be less sensitive to the price that they pay for the product.

So amid the forced restructuring imposed by falling markets, the industry is renewing its bet on specialised ETFs.

Despite managing only 18 per cent of the assets in equity-focused ETFs in the US, these products are true blockbusters as they collect about 35 per cent of the

revenues due to higher fees. Academic literature has shown that investors chase assets that have recently experienced good returns. Possibly aware of these results, issuers introduce products that track "hot" industries and themes.

As a result, the stocks in the baskets of specialised ETFs start from relatively high valuations. In particular, new ETFs hold firms that, before the fund launch, had unusually high past returns (outperforming benchmarks by 5 per cent a year, on average) and received very favourable media coverage. The high fees that specialised ETFs charge contribute to their poor performance — overall about 0.60 percentage points.

But fees are not the main reason for the gross underperformance. That is driven simply by the assets that specialised ETFs choose to hold. They are overvalued at the time of launch and underperform in the following years.

Investors should beware when considering investing in specialised ETFs. They risk losing along three dimensions: they sacrifice portfolio diversification, they are likely to invest in overvalued assets and they pay higher fees.

Our research shows that recent episodes of protracted and deep drawdowns for specialised ETFs are a widespread phenomenon.

Jack Bogle, the founder of the index fund industry and an advocate of passive investing, was very critical of ETFs. His view was that ETFs are the greatest marketing innovation of the 21st century but one that does not serve investors well. Our study buttresses this view, as far as specialised ETFs are concerned.

*Francesco Franzoni is professor of finance at the University of Lugano and senior chair at the Swiss Finance Institute*

## Legal Notices

*[Legal notices text — United States Bankruptcy Court Southern District of New York and related bankruptcy disclosure statement notices regarding Bed Bath & Beyond and other matters.]*

## Businesses For Sale

FT BUSINESS
Tuesday, Friday & Saturday: Business for Sale, Business Opportunities, Business Services, Business Wanted, Franchises

Classified Business Advertising
UK: +44 20 7873 3823 | Email: advertising@ft.com

# Exhibit 19

# Customer Agreement

**V** **investvoyager.com/useragreement**

Updated January 7, 2022

In consideration of Voyager Digital, LLC, and its agents and assigns, which includes affiliated entities, ("Voyager") opening an account (the "Account") on your ("Customer") behalf, Customer represents and agrees to the terms and conditions set forth below (the "Customer Agreement"). For the avoidance of doubt, this Customer Agreement governs the relationship between Customer and Voyager exclusively as it relates to the services provided by Voyager as described herein. Any other services, now or in the future, provided by an affiliate of Voyager, whether in connection with the Account, or otherwise, unless specifically identified herein shall not be governed by this Customer Agreement. Customer understands that the Voyager trading platform (the "Platform") is operated by Voyager, together with certain of its affiliates (each, an "Affiliate" and together, the "Affiliates"), and may be accessed via website (the "Website") and mobile application (the "App").

**CUSTOMER UNDERSTANDS THAT THE TERMS AND CONDITIONS OF THIS CUSTOMER AGREEMENT GOVERN ALL ASPECTS OF RELATIONSHIP WITH VOYAGER REGARDING CUSTOMER'S ACCOUNT. THE CUSTOMER WILL CAREFULLY READ, UNDERSTAND AND ACCEPT THE TERMS AND CONDITIONS OF THIS CUSTOMER AGREEMENT BEFORE CHECKING THE BOX AND CLICKING CONTINUE UNDER "BY CREATING AN ACCOUNT, YOU AGREE TO OUR TERMS" (WHICH ARE AVAILABLE BY CLICKING ON "TERMS" LINK (OR SIMILAR LINK). IF THE CUSTOMER HAS ANY QUESTIONS ABOUT ANY OF THE PROVISIONS IN THIS CUSTOMER AGREEMENT, THE CUSTOMER MAY EMAIL SUPPORT@INVESTVOYAGER.COM. THE CUSTOMER UNDERSTANDS THAT CLICKING CONTINUE UNDER "BY CREATING AN ACCOUNT, YOU AGREE TO OUR TERMS" IS THE LEGAL EQUIVALENT OF MANUALLY SIGNING THIS CUSTOMER AGREEMENT AND THE CUSTOMER WILL BE LEGALLY BOUND BY ITS TERMS AND CONDITIONS. BY ENTERING INTO THIS CUSTOMER AGREEMENT, THE CUSTOMER ACKNOWLEDGES RECEIPT OF THE VOYAGER PRIVACY POLICY.**

THE TRADING OF CRYPTOCURRENCY INVOLVES SIGNIFICANT RISK. BY ENTERING INTO THIS CUSTOMER AGREEMENT, THE CUSTOMER ACKNOWLEDGES RECEIPT OF THE VOYAGER RISK DISCLOSURE STATEMENT.

**1.    Acceptance of Terms and Conditions**

Debtors
Ex-19

By using the Platform, Customer agrees to follow and be bound by this Customer Agreement, including, without limitation, the policies referenced herein. If Customer does not agree to be bound by the terms of this Customer Agreement, Customer should not access the Platform. Customer further understands that Voyager has the right to change and modify the terms and conditions of the Customer Agreement at any time in Voyager's sole discretion. If Voyager materially updates, modifies, or revises the Customer Agreement, Voyager will, at its discretion, post a revised copy of the Customer Agreement on the Website, or make it available through the App, as further detailed in **Section 33 - Miscellaneous**. Other than as may be required pursuant to applicable law, Voyager shall have full discretion to determine when and how Voyager notifies Customer of changes to the Customer Agreement. All changes will be effective immediately. Customer understands that by continuing to use the Platform, accessing the Account, or utilizing the Services (as defined below) constitutes an act of acceptance with respect to any such changes.

## 2.    Capacity and Status; Eligibility

The Customer represents and warrants that Customer is of legal age under the laws of the state where the Customer resides and is authorized to enter into the Customer Agreement. Voyager reserves the right to assess or reassess at any time Customer's eligibility to maintain an Account and utilize the Platform. Without limiting the foregoing, by accessing the Platform and utilizing the Services, Customer acknowledges and understands that laws regarding financial instruments, which sometimes include Cryptocurrency (as defined below), may vary from state to state, and it is Customer's obligation alone to ensure that Customer fully complies with any law, regulation or directive, relevant to Customer's state of residency with regard to the use of the Platform and the Services. For the avoidance of doubt, the ability to open an Account and access the Platform does not necessarily mean that Customer's activities in connection therewith are legal under the laws, regulations or directives relevant to the Customer's state of residency. "Cryptocurrency" means any digital asset or digital currency that is available for trading or custody through the Services.

## 3.    U.S. Residents Only

The Information (as defined below), Platform, and associated Services are intended for U.S. residents only. They shall not be considered a solicitation to any person in any jurisdiction where such solicitation would be illegal. The products and services described on the Website and available through the Platform are offered only in jurisdictions where they may be legally offered. Neither the Website nor the App shall be considered a solicitation for, or offering of, any investment product or service to any person in any jurisdiction where such solicitation or offering would be illegal. Customer understands that Voyager, at Voyager's sole discretion, may accept unsolicited accounts from non-U.S. residents, depending on the country of residence and other factors.

## 4.    Account Opening; Applicable Laws and Regulations

To help the U.S. government better detect the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an Account. Customer understands that when the Customer opens an Account that Voyager will ask for the Customer's name, address, date of birth and other identifying information. Voyager may also ask for copies of the Customer's driver's license, passport or other identifying documents. The Customer understands that Voyager will take steps to verify the accuracy of the information the Customer provides to Voyager in connection with an Account opening. These verification procedures may, in Voyager's sole discretion, require that Customer verify certain information provided to Voyager or provide additional documentation to Voyager, including but not limited to providing bank statements, social security number verification, bank account ownership verification, or liveness checks. Voyager will not open an Account or may restrict Customer's access to the Account and the Services at any time and in Voyager's sole discretion, but in any event until such time as all verification procedures have been completed to Voyager's satisfaction.

The Customer further understands that if the Customer attempts to access the Account from a jurisdiction subject to certain U.S. sanctions or if the Customer is ordinarily resident in such a jurisdiction, or if Voyager reasonably believes that the Customer is attempting such access or has become a resident in such a jurisdiction, Voyager may restrict the Account, and any pending orders may be cancelled. If this happens, the Customer understands that the Customer should contact support@investvoyager.com, and that the Customer may be asked to provide supplemental information as part of this process. The Customer further understands that the Customer must close all Accounts before establishing residency in any jurisdiction subject to U.S. sanctions.

## 5.    Account Funding; Regulatory Treatment

(A)  Customer Cash. Customer understands and acknowledges that Customer may arrange to deposit United States Dollars ("USD" or "Cash") into the Account. Cash deposited into the Customer's Account is maintained in an omnibus account at Metropolitan Commercial Bank (the "Bank"), which is a member of the Federal Deposit Insurance Corporation ("FDIC"). Voyager maintains an agreement with the Bank whereby the Bank provides all services associated with the movement of and holding of USD in connection with the provision of each Account. Therefore, each Customer is a customer of the Bank.  All U.S. regulatory obligations associated with the movement of, and holding of, USD in connection with each Account are the responsibility of the Bank.  For purposes of clarity, any services pertaining to the movement of, and holding of, USD are not provided by Voyager or its Affiliates. Cash in the Account is insured up to $250,000 per depositor by the FDIC in the event the Bank fails if specific insurance deposit requirements are met. FDIC insurance does not protect against the failure of Voyager or any Custodian (as defined below) or malfeasance by any Voyager or

Custodian employee. Voyager is not a member of the Financial Industry Regulatory Authority, Inc. ("FINRA") or the Securities Investor Protection Corporation ("SIPC"), and therefore Cash is not SIPC-protected.

(B)  Customer Cryptocurrency Deposits. When Customer initiates a Cryptocurrency deposit (a "Cryptocurrency Deposit") into the Customer's Account, Customer is solely responsible for executing the Cryptocurrency Deposit properly and accurately. Voyager is not responsible for any Cryptocurrency until such time as such Cryptocurrency is successfully deposited into the relevant wallet address provided by Voyager to Customer as evidenced by such deposit appearing on the relevant block explorer for such deposit. Voyager is not responsible for any delays, losses or fees in connection with a Cryptocurrency Deposit and is not obligated to assist or support Customer in any fashion with respect to an unsuccessful Cryptocurrency Deposit or with respect to any issues that Customer may experience at a point in time prior to the successful completion of a Cryptocurrency Deposit; *provided*, *however*, that Voyager may, in its sole discretion, provide reasonable assistance to Customer in the event that a Customer requests assistance in connection with an attempted, failed, erroneous, or otherwise incomplete Cryptocurrency Deposit, including but not limited to, those deposits sent by Customer to a Cryptocurrency wallet designated by Voyager for a different type of Cryptocurrency than the Cryptocurrency being sent by Customer, whether or not such deposit is evidenced on the blockchain. Voyager does not guarantee that any such assistance will result in the successful completion or remediation of a Cryptocurrency Deposit or the recovery of any Cryptocurrency. Furthermore, subject to Voyager's sole discretion, Voyager may charge reasonable fees in connection with any such assistance upon recovery of Customer assets to Customer Account. Customer understands that a Cryptocurrency Deposit cannot be reversed once properly initiated.

(C)  Customer Cryptocurrency. Customer authorizes and instructs Voyager to hold Customer's Cryptocurrency (whether purchased on the Platform or deposited by Customer into the Account pursuant to the Cryptocurrency Deposit mechanics outlined above) on its behalf. Customer understands that Voyager may hold Customer's Cryptocurrency together with the Cryptocurrency of other Voyager customers in omnibus accounts or wallets. In addition, Customer understands and authorizes Voyager to delegate some or all custody functions to one or more Affiliates or third parties (which may include, but not be limited to exchanges and custodians) at Voyager's discretion (each a "Custodian"). Some or all custody functions provided by a Custodian may be performed, supported, or conducted in foreign jurisdictions, or conducted by Custodians domiciled, registered, or subject to the laws and regulations of foreign jurisdictions. Voyager will exercise reasonable skill and care in the selection, appointment, and periodic review of any such Custodian. Voyager will maintain true, complete and accurate records relating to Customer Cryptocurrency. Customer and Voyager understand that the legal treatment of Cryptocurrency is unsettled and disparate across different jurisdictions. In the event that Customer, Voyager or a Custodian become subject to an insolvency proceeding it is unclear how Customer Cryptocurrency would be

treated and what rights Customer would have to such Cryptocurrency. How an insolvency court would categorize and treat Customer Cryptocurrency is a highly fact-dependent inquiry that necessarily depends upon the circumstances of each individual case. In addition, within the U.S. there is notably little case law addressing insolvency proceedings involving Cryptocurrency. As such, the law governing the likely treatment of Customer Cryptocurrency in the event of a Customer, Voyager or Custodian insolvency proceeding remains largely unsettled. Voyager does not make any representation as to the likely treatment of Customer Cryptocurrency in the event of a Customer, Voyager, or Custodian insolvency proceeding whether in the U.S. or in any other jurisdiction. Customer explicitly understands and acknowledges that the treatment of Customer Cryptocurrency in the event of a Customer, Voyager, or Custodian insolvency proceeding is unsettled, not guaranteed, and may result in a number of outcomes that are impossible to predict, including but not limited to Customer being treated as an unsecured creditor and/or the total loss of all Customer Cryptocurrency.

(D)  Consent to Rehypothecate. Customer grants Voyager the right, subject to applicable law, without further notice to Customer, to hold Cryptocurrency held in Customer's Account in Voyager's name or in another name, and to pledge, repledge, hypothecate, rehypothecate, sell, lend, stake, arrange for staking, or otherwise transfer or use any amount of such Cryptocurrency, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining a like amount of Cryptocurrency, and to use or invest such Cryptocurrency at Customer's sole risk.

## 6.   Voyager Services

The Account is self-directed. The services offered by Voyager pursuant to this Customer Agreement include, but are not limited to (a) the ability to place various types of orders through the Platform with respect to Cryptocurrency, (b) participation in the Rewards Program (as defined below), and (c) such other programs, features, or services as Voyager may make available to Customer through the Platform from time to time (collectively, the "Services").

Customer appoints Voyager as Customer's agent for the purposes of (a) supporting Customer's activities with respect to the Services, (b) carrying out Customer's instructions to Voyager in accordance with the terms and conditions of this Customer Agreement, and (c) taking any action that Voyager reasonably and in good faith deems necessary or advisable to accomplish the purposes of this Customer Agreement.

Customer understands and acknowledges that Voyager is authorized at all times to place, withdraw, modify, suspend, cancel, terminate, or alter, in any fashion orders and transactions placed by Customer through the Platform, as well as take any and all other actions that Voyager deems appropriate or necessary in order to carry out Customer instructions.

## 7. Orders

(A)  Overview. Customer may place market orders through the Account in either USD amounts or in Cryptocurrency amounts. In addition to market orders, Customer may also place limit orders. A limit order may be "good till canceled" which means the order remains valid until (A) it is executed, or (B) Customer cancels the order. Customer understands that limit orders may not be executed at any particular time, or at all, if there is not sufficient trading at or better than the limit price that Customer specifies, and are good until Customer cancels them; provided, however, that Voyager has the right, in its sole discretion, to cancel any limit order, whether "good till canceled" or otherwise, that remains unexecuted for sixty (60) calendar days or if deemed a risk by Voyager. Customer understands that additional transaction and order types may be made available to Customer on the Platform from time to time as determined by Voyager in Voyager's sole discretion.

(B)  Sufficient Funds. To execute a purchase order for Cryptocurrency, Voyager requires that Customer's Account contain available funds equal to, but in most cases, greater than the purchase price of the Cryptocurrency plus any associated fees or commissions and that all payments for the purchase be made without set-off, counterclaim or deduction. Customer agrees that any purchase order accepted by Voyager (inadvertently or otherwise) without sufficient funds or Cryptocurrency in Customer's Account will be subject to liquidation at Customer's expense.

(C)  No Liability for Failure to Settle. Customer understands and agrees that Voyager is not responsible for any delay in the settlement of a transaction resulting from circumstances beyond Voyager's reasonable control, or the failure of any other person or party (including Customer) to perform all necessary steps to enable the completion of a transaction.

(D)  Refusal to Allow USD Withdrawals. Voyager may refuse to allow a USD withdrawal from Customer's Account, when it deems it appropriate or necessary, in its sole discretion, including in the following instances: (1) Voyager believes that such refusal is necessary in order for Voyager to comply with its anti-money laundering compliance obligations, (2) the withdrawal would leave insufficient funds in the Account to pay for any unsettled transactions, (3) the amount of such withdrawal is equal to or greater than the sum of all USD deposits made into the Account within the immediately preceding sixty (60) days, or (4) the account ownership, naming convention, or other details associated with the withdrawal account, do not match the Account. Where Customer makes a deposit into the Account and effectuates one or more transactions thereafter, subsequent withdrawal requests may be subject to delays, holds, or limits, as determined by Voyager in its sole discretion.

(E)  Discretion to Decline Execution of or Cancel Orders. Voyager may, in its sole discretion, decline the execution of any order for any reason, including, but not limited to, the size of an order, market conditions, Customer breach of this Customer Agreement, actual, potential, or apparent violation of any applicable laws, rules or regulations, insufficient or inadequate

funds in the Account (including all commission, charges, taxes and any amount in addition to the price of the Cryptocurrency that Voyager reasonably considers may be necessary), or any other appropriate risk considerations. If Voyager accepts an order and then an event takes place which means that it is no longer reasonable for Voyager, in its sole determination, to act on that order, Voyager will be entitled to disregard or cancel Customer's order and Voyager shall not have any liability to Customer as a result of such action. Voyager further reserves the right not to execute orders for Cryptocurrency or to close any open positions therein without any further notice to Customer, in the following circumstances: (a) Customer order violates any applicable laws, rules, regulations, or appears intended to defraud or manipulate the market; (b) the existence of abnormal market conditions or a significant disruption in, or premature close of, trading in or of the underlying Cryptocurrency or the market or an exchange on which the underlying Cryptocurrency is traded; (c) Force Majeure (as defined in **Section 15 - Information**), or action by an exchange, regulatory or governmental authority that disrupts trading in the relevant security; or (d) Voyager is unable to obtain satisfactory liquidity in order to satisfy the order.

(F)   Trade Receipts. Voyager will prepare receipts outlining the details of orders and the corresponding transactions effected by a Customer through the Platform, in form and format as required pursuant to applicable law, rule or regulation (each, a "Trade Receipt"). Voyager will deliver and make available Trade Receipts to Customer electronically, through the App, or otherwise, in Voyager's sole discretion.

(G)  Cancellations. Customer agrees that it is Customer's responsibility to review order execution confirmations and statements promptly upon receipt. Notwithstanding any other provision in this Agreement, Trade Receipts will be considered binding on Customer unless Customer notifies Voyager of any objections within two (2) hours from the time Trade Receipts are delivered. Customer understands that any objection that Voyager receives from Customer consistent with the immediately preceding sentence is simply a request that Voyager attempt to cancel or modify an order. Voyager is not liable to Customer if Voyager is unable to cancel or modify an order. Customer understands and agrees that, if an order cannot be cancelled or modified, Customer is bound by any execution of the original order, even if Customer's objection to the transaction is ultimately determined to be valid.

(H)  No Guarantee Order Will be Filled. There is no guarantee that an order will be filled. An Order may fail to be filled or Voyager may, in its sole discretion, refuse to execute an order for any reason, including: (1) due to the failure, misuse, degradation, corruption, downtime, or unavailability of any Voyager or third party trading, communication or operations systems, (2) market volatility, (3) the existence, detection, or suspicion of unusual market, trading, or order activity, or (4) the existence, detection, or suspicion of fraud or any other activity that presents, or potentially presents to Voyager, in Voyager's sole discretion, any commercial, economic, or reputational risk. Where a delay in fulfilling an order occurs for any reason, Voyager will attempt to execute the order as soon as reasonably practicable; provided that Voyager reserves the right to cancel a delayed order in the event of a material

price fluctuation or for any other reason in accordance with this Customer Agreement. Voyager will not be liable or have any responsibility for any Losses (as defined below) suffered by Customer in connection with an order that is not filled or is erroneously filled.

(I)    Aggregation of Orders. Customer understands and acknowledges that Voyager may, in its sole discretion, aggregate Customer orders with the orders of other customers (a "Batched Order"). In such instances, a Customer order may not be placed or executed on a real-time basis, but rather batched with one or more orders from other Voyager customers. The price of a particular Cryptocurrency may be higher or lower at the time of execution of a Batched Order as compared to the time at which the Customer's original order was placed. A Batched Order may only partially fill, in which case some or part of the order is executed. In the event of a partial fill, Voyager will allocate the purchased Cryptocurrency or proceeds among the participating Customers in the Batched Order in a pro-rata fashion. A Batched Order may become fully executed through one or more partial fills, in which case the price of the relevant Cryptocurrency or amount of proceeds may change, or, for a variety of reasons, a Batched Order may only ever be executed partially. Voyager will not be liable or have any responsibility for any Losses suffered by Customer in connection with or as a result of a Customer order being included in a Batched Order.

(J)    Market Volatility. In the event of a market disruption or Force Majeure, Voyager may do one or more of the following: (a) suspend access to the Account; (b) prevent Customer from completing any and all actions via the Services, including closing any open positions in the Account; or (c) cease to follow any Customer instructions. Following any such event, when trading resumes, Customer acknowledges that prevailing market rates may differ significantly from the rates available prior to such event.

(K)    Suspension. If at any time any exchange, trading venue, or market suspends trading in any Cryptocurrency that forms the subject of a Customer order, then the applicable order may be suspended. In addition, Customer may not be able to sell any Cryptocurrency that Voyager holds on Customer's behalf or effectuate Withdrawals (defined in **Section 8 – Cryptocurrency Withdrawals** below) or USD withdrawals until such suspension is terminated and trading recommences. Following the lifting of a suspension, outstanding orders with respect to the affected Cryptocurrency will be executed as and when Voyager is reasonably able to do so. Voyager cannot guarantee the price at which such orders will execute.

(L)    Delisting or Non-Supported Cryptocurrency. Voyager, at all times and in its sole and absolute discretion, determines the Cryptocurrencies available on the Platform. Voyager may, at any time and in its sole and absolute discretion, (i) remove or restrict the trading of a particular Cryptocurrency on the Platform, either completely or limit such removal or restriction to a particular jurisdiction, and (ii) determine the time and date on which trading should cease or be restricted. Customers shall generally receive not less than 30 days' notice, which notice shall be posted in the App, (see **Section 23 – Consent to Electronic**

**Delivery of Documents**) regarding any such actions, unless Voyager determines in its sole and absolute discretion that immediate removal or restriction of such Cryptocurrency is appropriate and/or necessary due to legal, regulatory, compliance, reputational or similar concerns. If at any time any Cryptocurrency that forms the subject of a Customer order is delisted or Voyager no longer supports the trading in such Cryptocurrency for any reason, then the applicable order will be immediately closed. If Voyager is notified that a Cryptocurrency in Customer's Account is likely to be delisted or removed or canceled from one or more exchanges or trading venues, and Voyager reasonably believes that trading in the Cryptocurrency will be materially affected by such delisting, removal or cancellation, then Customer authorizes Voyager to attempt to sell the Cryptocurrency on Customer's behalf at such time and price, and in such manner, as Voyager may determine in its sole discretion (a "Delisting Sale"). Customer understands and agrees that Voyager is not obligated to engage in a Delisting Sale and will not be liable for any loss sustained by Customer during Voyager's attempt to execute a Delisting Sale.

(M) Position Limits. Customer understands and acknowledges that Voyager may impose trading and/or position or volume limits on Customer's Account ("Limits"). Limits are subject to change at any time in Voyager's sole discretion. In the event that Customer attempts to place an order or effect a transaction that would result in the breach of a particular Limit, Voyager may, in its sole discretion, refuse to act upon such instructions. Customers may request details regarding Limits by contacting Voyager at support@investvoyager.com.

(N) No Leverage. Customer understands that Voyager does not offer leverage as part of the Services. For the avoidance of doubt each purchase of Cryptocurrency must be fully funded.

## 8. Cryptocurrency Withdrawals

Customer may arrange to withdraw and transfer Cryptocurrency in the Account to an external wallet (such process, a "***Withdrawal***"). Voyager will effectuate a Withdrawal based upon Customer's written instructions; provided that Customer understands and agrees that Voyager may, in its sole discretion, delay, modify or prohibit, in whole or in part, any requested Withdrawal, including in instances where: (a) Voyager believes such action is prudent in order to satisfy Voyager's anti-money laundering obligations, (b) Voyager suspects that the Customer, the wallet address, or the Withdrawal itself are connected to, associated with, or being used in furtherance of potential fraud, (c) Customer is in violation of the Customer Agreement, (d) the Withdrawal is being attempted within sixty (60) days of a deposit of USD or Cryptocurrency into the Account, or (e) outstanding fees are associated with the Account or the Account would, after the Withdrawal, have an insufficient balance to cover actual or anticipated fees. Customer understands that, once initiated on the network associated with the Cryptocurrency subject to the Withdrawal, a Withdrawal will typically be processed at the speed of such network, but that in certain situations, a Withdrawal may be delayed in connection with any latency, congestion, disruption, or other delay of such

network. Customer understands that Voyager cannot reverse a Withdrawal that has been broadcast to a Cryptocurrency network. Customer also understands that Voyager reserves the right to cancel any pending Withdrawal as required by law or in response to a subpoena, court order, or other binding government order.

Customer understands that Customer is exclusively responsible for ensuring that a Withdrawal is being made to the correct or intended wallet address. Withdrawals cannot be reversed once broadcast to the relevant Cryptocurrency network. Voyager will not be liable for any loss that results from inaccurate, incomplete, or misleading details that Customer may provide in connection with a Withdrawal. Voyager will not bear any liability for any failure, error or delay in processing a Withdrawal. Voyager may, in its sole discretion, provide reasonable assistance to Customer in the event that a Customer requests reasonable assistance in connection with an attempted, failed, or otherwise erroneous Withdrawal. Voyager does not guarantee that any such assistance will result in the successful completion or remediation of a Withdrawal or the recovery of any Cryptocurrency. Voyager may charge fees in connection with any such assistance. Customer understands that a Withdrawal cannot be reversed once properly initiated.

With respect to certain Cryptocurrencies on the Voyager Platform, the Services available to Customer may only include the ability to purchase or sell Cryptocurrencies, and may not permit the transfer or withdrawal of all or any part of the balance held in such Cryptocurrencies (a "Non-Supported Transfer Cryptocurrency"). The Cryptocurrencies that Voyager supports for transfer or withdrawal as part of the Services on the Platform may change from time to time, in Voyager's sole and absolute discretion. Customer acknowledges and agrees that, unless Voyager supports the Cryptocurrency for withdrawal and transfer, Customer will not be able to take possession of Cryptocurrencies. Accordingly, a Non-Supported Transfer Cryptocurrency may not be withdrawn or transferred from Customer Account to any wallet, address, storage device or the like, or exchange, brokerage, bank, staking platform, custodian or the like. Subject to other limitations set forth herein, Customer shall have the option to sell Customer's Non-Supported Transfer Cryptocurrencies on the Voyager Platform and withdraw all or any part of the balance (held in U.S. dollars) from Customer Account.

## 9.    Cryptocurrency Networks; Forks; Aidrops.

(A)  Voyager does not own or control the underlying software protocols which govern the operation of a Cryptocurrency available for trading on the Platform. In general, the underlying protocols are open source and anyone can use, copy, modify, and distribute them. Voyager is not responsible for operation of the underlying protocols, and Voyager makes no guarantee of their functionality, security, or availability. The underlying protocols are subject to sudden changes in operating rules ("Forks"), and such Forks may materially affect the value, function, or even the name of the Cryptocurrency Voyager or its Custodian holds for Customer benefit. In the event of a Fork or any other similar operational change to a

Cryptocurrency network Voyager may take all steps that it determines necessary to protect the security and safety of the Platform, including temporarily suspending Voyager operations (with or without advance notice to Customer). Voyager will use its reasonable efforts to provide notice to Customer of its response to any Fork or similar operational change affecting a Cryptocurrency. In response to a Fork or other similar operational change, Voyager may determine not to support such Cryptocurrency on the Platform. Customer understands and accepts the risks of Forks and other similar operating changes to Cryptocurrency available through the Platform. Customer agrees that Voyager is not responsible for any loss of value that Customer may experience as a result, whether directly or indirectly, from any such Fork or similar operating change. Customer further acknowledges and accepts that Voyager has no obligation or responsibility to assist Customer with respect to any Cryptocurrency that Voyager determines not to support.

(B)  In the event that a Cryptocurrency network attempts to or does contribute (an "Airdrop") Cryptocurrency ("Airdropped Cryptocurrency") or any other similar event to a Cryptocurrency network, then Voyager may, in its sole discretion, take steps that it determines necessary to manage the Platform, including how and whether to incorporate Airdropped Cryptocurrency into the Platform, distribute it to Customer or do nothing, or such other action or inaction that Voyager deems appropriate in its sole discretion. Customer understands and accepts the risks of Airdrops and other similar events to a Cryptocurrency available through the Platform, and understands and agrees that ownership of a Cryptocurrency in the Voyager App for which an Airdrop is occurring on the date of such Airdrop does not in and of itself grant entitlement to or ownership of the Airdropped Cryptocurrency. Customer agrees that Voyager is not responsible for any loss of value that Customer may experience as a result, whether directly or indirectly, from any such Airdrop or similar event. Customer further acknowledges and accepts that Voyager has no obligation or responsibility to assist Customer with respect to any Cryptocurrency that Voyager determines not to support whether or not Voyager receives an Airdropped Cryptocurrency by virtue of its holding omnibus custody of the Cryptocurrency related to such airdrop. To the extent that Voyager is aware of the Airdrop, Voyager will use its reasonable efforts to provide notice to Customer of its response to any Airdrop. Voyager may, in its sole discretion, elect to: (1) subject to potential fees, support the Airdropped Cryptocurrency and update the Account as appropriate, (2) abandon or otherwise not pursue obtaining the Airdropped Cryptocurrency from the relevant network, (3) liquidate the Airdropped Cryptocurrency and distribute the proceeds to Customer or hold the funds in Customers Account for the benefit of Customer, (4) deliver the Airdropped Cryptocurrency to Customer within a time period as determined by Voyager in its sole discretion, together with any credentials, keys, or other information sufficient to gain control over such Airdropped Cryptocurrency (subject to the withholding and retention by Voyager of any amount reasonably necessary, as determined by Voyager in its sole discretion, to fairly compensate Voyager for the efforts expended to obtain and deliver such Airdropped Cryptocurrency to Customer), or (5) determine, in its sole

discretion, that the Airdrop, although received by Voyager, does not have sufficient market support or sufficient value to warrant Voyager incorporating the Airdropped Cryptocurrency into the Platform in any way or distribute the Airdropped Cryptocurrency to its users.

## 10.  Rewards Program

By entering into this Customer Agreement, and subject to clause (F) of this Section 10, Customer understands, acknowledges and agrees that Customer is opting into the Voyager Earn Program (the "Rewards Program"). The Rewards Program allows Customer to earn additional Cryptocurrency of the same kind of Cryptocurrency held in Customer's Account (the "Rewards"). The terms and conditions governing the Rewards Program are as follows:

(A)  Overview. Each Customer participating in the Rewards Program acknowledges and agrees that Voyager may rely on the consent to rehypothecate granted by each customer pursuant to **Section 5(D) – Consent to Rehypothecate** with respect to Cryptocurrency held in such Customer Account. Such consent to rehypothecate expressly includes allowing Voyager to (1) stake Cryptocurrency held in an omnibus fashion through various blockchain protocols (either by delegating Cryptocurrencies to the financial institutions which, in return, stake such Cryptocurrencies or using staking service providers to stake Cryptocurrencies); and (2) lend such Cryptocurrency to various institutional third parties (each, a "Borrower") determined at Voyager's sole discretion (each, a "Loan"). Voyager enters into these Loans as principal and independently negotiates with each Borrower the terms of a Loan, but these Loans are generally unsecured, for a fixed term of less than one year or can be repaid on a demand basis, and provide a fee payable in Cryptocurrency based on the percentage and denominated in the Cryptocurrency lent. Voyager selects which and how much Cryptocurrencies are available for such staking and lending.

(B)  How Rewards Are Calculated. Rewards earned on Cryptocurrency are variable. Voyager will typically publish anticipated reward rates once per month on or before the first business day of each month. Reward rates may be tiered, with specified rates in effect at any time only applied to specified portions of amounts of Cryptocurrency held in the Account. Rewards will be payable in arrears and added to the Account on or before the fifth business day of each calendar month for the prior calendar month. Voyager uses the daily balance method to calculate the Rewards on the Account. This method applies a daily periodic rate to the specified principal in the Account each day. The daily periodic rate is calculated by dividing the applicable interest rate by three hundred sixty-five (365) days, even in leap years. Voyager will determine the Reward rates and tiers for each month in Voyager's sole discretion, and Customer acknowledges that such Rewards may not be equivalent to benchmark interest rates observed in the market for bank deposit accounts.

(C)  How Rewards Are Paid. Rewards will be credited to the Account within five (5) business days following the end of each calendar month. The Account must be open on such date in order to receive this payment of Rewards. All Rewards will be paid in Cryptocurrency. Once

Rewards have been credited to the Account, Customer may earn Rewards on such Cryptocurrency in future months. Rewards will be paid in kind (i.e., in the type of Cryptocurrency that is held in the Account).

(D)  Withdrawals. Customer may request a Withdrawal at any time, consistent with the mechanics outlined in **Section 8 – Cryptocurrency Withdrawals**. However, for Customers in the Rewards Program, Withdrawals may be delayed, or in some instances subject to partial completion. Customer understands and acknowledges that Customer may only be able to earn Rewards to the extent that Customer satisfies certain minimum Cryptocurrency balance requirements ("Minimum Balance"). Voyager will publish Minimum Balance details on the Platform. Minimum Balance details are subject to change at any time. If a Withdrawal results in a particular Cryptocurrency balance in Customer's Account falling below a Minimum Balance, then Customer will not earn Rewards with respect to such Cryptocurrency.

**(E)  REWARDS PROGRAM RISKS. Participating in the Rewards Program may put Customer's Cryptocurrency at risk.**

**(1)  Voyager will use Customer's Cryptocurrency to engage in staking and lending activities. Loans made by Voyager may not be secured. Customer has exposure to both Voyager's and each Borrower's credit risk. In the event of a Borrower default, Voyager does not have an obligation or the ability to return affected Cryptocurrency back to Customer's Account.**

**(2)  Loans may not be secured. Cryptocurrency subject to all lending activity or certain staking activity delegated to a third party financial institution will not be held by Voyager or its Custodians. Customer understands and acknowledges that Voyager is not responsible for any Cryptocurrency that Voyager does not itself hold or that is not held with one of its Custodians.**

**(3)  The Rewards Program and Voyager's underlying staking and lending activities are not insured.**

**(4)  Customer understands each of the aforementioned risks and accepts the risk of loss associated with participating in the Rewards Program up to, and including, total loss of all Customer Cryptocurrency.**

(F)  Opt Out. Customer may opt-out of the Rewards Program at any time by doing so in the App.

**CUSTOMER UNDERSTANDS AND ACKNOWLEDGES THAT EVEN IF CUSTOMER OPTS OUT OF THE REWARDS PROGRAM, CUSTOMER WILL REMAIN SUBJECT TO THE TERMS OF SECTION 5 – ACCOUNT FUNDING; REGULATORY TREATMENT. THEREFORE, EVEN IF CUSTOMER DOES NOT**

**PARTICIPATE IN THE REWARDS PROGRAM, CUSTOMER CRYPTOCURRENCY WILL STILL BE SUBJECT TO BEING HELD BY CUSTODIANS, WHICH MAY BE: (1) LOCATED WITHIN THE U.S. OR IN A FOREIGN JURISDICTION OR (2) HELD IN VOYAGER'S NAME OR OTHERWISE, OR (3) PLEDGED, REPLEDGED, HYPOTHECATED, SOLD, LOANED, STAKED OR OTHERWISE TRANSFERRED AT CUSTOMER'S SOLE RISK AND IN VOYAGER'S SOLE DISCRETION.**

## 11. Account Termination

(A)  Termination by Customer. Customer may request to close or terminate the Account at any time by notifying Voyager Support at support@investvoyager.com and requesting in writing that their Account be closed. Closing the Account will not affect any rights and obligations incurred prior to the date of Account closure. Upon the termination of the Account, Customer authorizes Voyager to immediately settle all outstanding transactions in the Account and liquidate outstanding positions in the Account, as necessary. Customer shall be required to provide transfer instructions with respect to USD or Cryptocurrency remaining in the Account. Customer understands and agrees that Customer is responsible for any fees, costs, expenses, charges, or obligations (including, but not limited to, attorney and court fees or transfer costs of funds or Cryptocurrency) associated with closing the Account. In the event that the costs of closing the Account exceed the value in the Account, Customer will be responsible for reimbursing Voyager. Voyager may delay or refuse to terminate an Account, in instances it deems appropriate or necessary, in its sole discretion, including but not limited to, where: (a) Voyager believes such action is prudent in order to satisfy Voyager's anti-money laundering obligations, (b) Voyager suspects that the Customer is connected to, engaged in, or acting in furtherance of fraud, or potential fraud, (c) Customer is in violation of the Customer Agreement, (d) termination is being attempted within sixty (60) days of a deposit of USD or Cryptocurrency into the Account, or (e) the Account has outstanding actual or anticipated fees or other charges against it (the "Voyager Hold Purposes").

(B)  Termination by Voyager. Customer agrees that, without notice, Voyager may terminate this Customer Agreement, suspend, restrict, limit or shutdown all or part of the Services, the Account, as well as Customer's access to the Platform, with or without cause at any time and effective immediately, whether for maintenance or otherwise. Voyager shall not be liable to Customer or any third party for the termination or suspension of the Services or Platform, or any claims related to such termination or suspension.

(C)  Effect of Termination. Upon termination or cancellation of the Account, Customer must provide Voyager with transfer instructions, together with all other information that Voyager may reasonably request, in order to transfer any remaining Cryptocurrency out of the Account. All such transfers must be completed within ninety (90) days following Account deactivation or cancellation. Voyager may delay or refuse to effectuate such a transfer or termination, in instances it deems appropriate or necessary, in its sole discretion, including, but not limited to, the Voyager Hold Purposes described in Section 11(A) above. If

14/40

Cryptocurrency is not transferred out of the Account within ninety (90) days of the termination or cancellation of the Account, Customer hereby agrees that Voyager is permitted to sell any remaining Cryptocurrency on the open market at the prevailing market price and return the proceeds (less any damages, fee, costs, or other obligations to which Voyager is entitled) to any valid bank account linked to the Account.

## 12.  Customer Representations, Warranties and Responsibilities

Customer represents, warrants, and/or acknowledges, as applicable, as of the date of this Customer Agreement, and on each date that the Customer utilizes the Services:

(A)  Self-Directed Account. Customer understands and acknowledges that the Account is self-directed, and that Customer is solely responsible for any and all orders placed in the Account. Customer understands that Customer is fully responsible for safeguarding Customer's login credentials and that Customer is responsible for any trade placed through, originating from, or associated with the Account whether placed by Customer or another third-party as a result of Customer's failure to safeguard the login credentials. Customer represents that all orders entered by Customer through the Account are unsolicited and based upon Customer's decisions.

(B)  Investment Advice. Customer understands that Voyager, together with its affiliates, does not provide recommendations or any investment advice. Customer represents that Customer has not received any investment advice from Voyager, or its affiliates, and does not expect to receive any investment advice from Voyager or any of its affiliates. Customer understands and agrees that under no circumstances will Customer's use of the Platform or Account be deemed to create a relationship that includes the provision of or tendering of investment advice.

(C)  Research Materials. To the extent that research materials or similar information is made available through the Platform, the Customer understands that these materials are intended for information and educational purposes only and they do not constitute a recommendation to enter into any transactions or to engage in any investment strategies.

(D)  Anti-Money Laundering. Customer represents and warrants to Voyager that Customer is not: (a) located in, under the control of, or a national or resident of any country to which the United States has embargoed goods or services, (b) identified as a "Specially Designated National," (c) placed on the Commerce Department's Denied Persons List, and (d) a person who is subject to any law, regulation, or list of any government authority (including, without limitation, the U.S. Office of Foreign Asset Control list) that would prohibit or limit Voyager's ability to conduct business with Customer. Customer further represents and warrants that Customer will not use the Platform if the laws of Customer's country or jurisdiction prohibit Customer from doing so in accordance with this Agreement.

(E)  Customer Information. Customer: (i) certifies that the information contained in this Customer Agreement, the Account application, and any other document that Customer furnishes to Voyager in connection with the Account is complete, true, and correct; (ii) authorizes Voyager to contact any individual or firm noted on documents provided to Voyager and any other normal sources of debit or credit information; (iii) authorizes anyone so contacted to furnish such information to Voyager as Voyager may request; and (iv) agrees that this Customer Agreement, the Account application, and any other document Customer furnishes in connection with the Account is Voyager's property. Customer shall promptly advise Voyager of any changes to the information in such agreements and documents in writing within ten (10) calendar days. Customer authorizes Voyager to obtain reports and provide information to others concerning Customer's creditworthiness and business conduct. Upon Customer request, Voyager agrees to provide Customer a copy of any report so obtained. Voyager may retain this Customer Agreement, the Account application, and all other such documents and their respective records at Voyager's sole discretion. Customer understands that Voyager may take steps to verify the accuracy of the information Customer provides to Voyager in the Voyager Account application or otherwise, including by directly or indirectly making any inquiries Voyager considers necessary to verify Customer identity or protect against fraud and that Voyager may restrict Customer access to the Account or take other action Voyager reasonably deems necessary pending such verification.

(F)  Risks. The Customer understands that all investments involve risk, that losses may exceed the principal invested, and that the past performance of a Cryptocurrency, industry, sector, market, or financial product does not guarantee future results or returns. Customer further understands that there are risks associated with utilizing an internet-based trading system including, without limitation, the failure of hardware, software and internet connections as well as the risk of malicious software introductions.

(G)  Assistance by Voyager. Customer understands that when Customer requests assistance from Voyager or Voyager employees in using the tools available on the Website or the App, it will be limited to an explanation of the tool's functionality and, if requested by Customer, to the entry by Voyager or Voyager or its affiliates employees of variables provided by Customer, and that such assistance does not constitute investment advice, a recommendation, an opinion with respect to the suitability of any transaction, or solicitation of any orders.

(H)  Unavailability in Certain Jurisdictions. Customer understands that the Service is not provided to, and may not be used by, any person in any jurisdiction where the provision or use thereof would be contrary to applicable laws and regulations. Voyager is not available in all jurisdictions. Customer agrees to refrain from using the Service if Customer begins to reside in a jurisdiction where the Service would violate any of the laws and regulations of such jurisdiction. Customer will not provide incorrect information about Customer's address, residency or domicile and will immediately inform Voyager if there is any change to previously provided information.

(I)   No Tax or Legal Advice. Customer understands that neither the Customer Agreement or any other document or communication received from Voyager shall be construed as providing any legal, accounting, estate, actuary, or tax advice. Customer agrees to review publicly available information regarding the Customer's positions in the Account, Account statements and Trade Confirmations. Customer must rely upon its own representatives, including its own legal counsel and accountant, as to legal, tax and related matters concerning any of Customer's activities with respect to the Account, including any assets or transactions in the Account and for preparation of any legal, accounting or tax documents.

### 13.  Risk Disclosure Statement

Customer represents that they have read and understands the Voyager Cryptocurrency Disclosure Statement, available at https://www.investvoyager.com/riskdisclosure/.

### 14.  Limited License; Restrictions; Related Terms

(A)  Limited License. Subject to the registration and eligibility requirements and the terms and conditions set forth herein, Voyager hereby grants to Customer a limited, non-exclusive and non-transferable license to (i) download the App from an authorized application store and install and use the App in accordance with this Customer Agreement and any and all other documentation governing the use of the App, and (ii) use the Services, made available in or otherwise accessible through the App.

(B)  Restrictions. Customer will not: (i) copy the App, except as expressly permitted by this license; (ii) modify, translate, adapt, or otherwise create derivative works or improvements, whether or not patentable, of the App; (iii) reverse engineer, disassemble, decompile, decode, or otherwise attempt to derive or gain access to the source code of the App or any part thereof; (iv) remove, delete, alter, or obscure any trademarks or any copyright, trademark, patent, or other intellectual property or proprietary rights notices from the App, including any copy thereof; (v) rent, lease, lend, sell, sublicense, assign, distribute, publish, transfer, or otherwise make available the App, or any features or functionality of the App, to any third-party for any reason, including by making the App available on a network where it is capable of being accessed by more than one device at any time; or (vi) remove, disable, circumvent, or otherwise create or implement any workaround to any copy protection, rights management, or security features in or protecting the App.

(C)  Related Terms. Customer acknowledges and agrees that the App is provided under license, and not sold, to Customer. Customer does not acquire any ownership interest in the App under this Customer Agreement, or any other rights thereto other than to use the App in accordance with the license granted, and subject to all terms, conditions, and restrictions, under this Customer Agreement. Voyager and its licensors reserve and shall retain their entire right, title, and interest in and to the App, including all copyrights, trademarks, and other intellectual property rights therein or relating thereto, except as expressly granted to

Customer in this Customer Agreement. Customer acknowledges that when Customer downloads, installs, or uses the App, Voyager may use automatic means (including, for example, cookies and web beacons) to collect information about Customer's Mobile Device (as defined below) and about Customer's use of the App. Customer also may be required to provide certain information as a condition for downloading, installing, or using the App or certain of its features or functionality. All information Voyager collects through or in connection with the App is subject to Voyager's <u>Privacy Policy</u>. By downloading, installing, using, and providing information to or through the App, Customer consents to all actions taken by Voyager with respect to Customer information in compliance with the <u>Privacy Policy</u>. Voyager may, from time to time, in its sole discretion, develop and provide App updates, which may include upgrades, bug fixes, patches, other error corrections, and/or new features (collectively, including related documentation, "Updates"). Updates may also modify or delete in their entirety certain features and functionality. Customer agrees that Voyager has no obligation to provide any Updates or to continue to provide or enable any particular features or functionality. Based on Customer's Mobile Device settings, when Customer's Mobile Device is connected to the internet either (i) the App will automatically download and install all available Updates; or (ii) Customer may receive notice of or be prompted to download and install available Updates. Customer shall promptly download and install all Updates and acknowledge and agree that the App or portions thereof may not properly operate should Customer fail to do so. Customer further agrees that all Updates will be deemed part of the App and be subject to all terms and conditions of this Customer Agreement. Customer acknowledges and agrees that, in order to use certain features and functions of the App, including the ability to purchase and sell Cryptocurrency, Customer must have and maintain an active Account. In addition, Customer acknowledges and agrees that Customer may not be able to access all or some of the Services through the App outside of jurisdictions where Voyager is approved to conduct business. Customer acknowledges and agrees that Voyager may suspend or terminate, at any time and without notice to Customer, Customer's license to download, install, and use the App, and to access and use Services through the App.

### 15. Information

The Platform and Services may include and make available certain Information. "Information" includes, without limitation, market data, various analytical tools (such as price quotes, exchange rates, news, headlines and graphs), links to other websites, newsletters and other information ("Third Party Information") provided by third parties (each, a "Third Party" and collectively, the "Third Parties"). By making Information available through the Platform, neither Voyager nor any of its Affiliates endorse, represent, warrant, guarantee, sponsor or otherwise are responsible for the accuracy, correctness, timeliness, completeness or suitability of such Information. Information is provided solely for the Customer's personal and noncommercial use. Customer understands that Voyager is not required to continue to provide or update any Information and that Voyager may cease to

provide such Information at any time. For the avoidance of doubt, Voyager is not responsible for the termination, interruption, delay or inaccuracy of any Information. Customer undertakes not to enable deep linking or any other form or re-distribution or re-use of the Information. None of the Information may be redistributed or used for any purpose other than with respect to the Services, including, without limitation, any trading activity outside of the Platform and the Services. In addition, certain Third Parties may impose additional restrictions and rules with respect to the use of Third Party Information, the terms of which are available on the relevant Third Party websites.

Third Party Information may also include links to other websites or resources. Customer acknowledges and agrees that neither Voyager nor the Third Parties are responsible for the availability of such external sites or resources. Voyager and the Third Parties do not endorse and are not liable for any content, advertising, products, or other materials on or available through such sites or resources.

Voyager does not prepare, edit, or endorse Third Party Information. Voyager does not guarantee the accuracy, timeliness, completeness or usefulness of Third Party Information, and is not responsible or liable for any content, advertising, products, or other materials on or available from third party sites. Customer will not hold Voyager and/or any Third Party liable in any way for (a) any inaccuracy of, error or delay in, or omission of the Information; or (b) any loss or damage arising from or occasioned by (i) any error or delay in the transmission of such Information; (ii) interruption in any such Information due either to any negligent act or omission by any party to any "Force Majeure" (e.g., flood, extraordinary weather conditions, earthquake or other act of God, fire, war, insurrection, epidemic, pandemic, riot, labor dispute, accident, action of government, communications or power failure, equipment or software malfunction); (iii) to any other cause beyond the reasonable control of Voyager and/or Third Party; or (iv) non-performance.

## 16. Third Party Services

Voyager may, at Voyager's sole discretion, arrange for certain actions on the Platform to be performed by or through certain Third Parties. In addition, Customer may be made aware of, or offered, additional services, content, features, products, non-Voyager applications, offers and promotions provided through Third Parties ("Third Party Services"). Voyager's inclusion or promotion of Third Party Services on the Platform does not reflect a sponsorship, endorsement, approval, investigation, verification and certification or monitoring of such Third Party Services by Voyager. Customer's acquisition of Third Party Services, and any exchange of data between Customer and any provider of Third Party Services, is solely between Customer and such Third Party. Customer chooses to use any Third Party Services at Customer's own risk, and under terms and conditions agreed between Customer and such Third Party. Customer further acknowledges that Voyager has no control over Third Party Services and that Customer may be charged fees by the Third Party Service provider. Voyager

is not responsible for any Third Party Services' fees. Customer is solely responsible for the use of any Third Party Service, and Customer agrees to comply with all terms and conditions applicable to any Third Party Service when using such.

## 17.  Prohibited Use

In connection with Customer's use of the Services, Customer agrees and represents that it will not engage in any Prohibited Business or Prohibited Use (each as defined below). Voyager reserves the right to cancel or suspend an Account or block transactions or freeze funds or Cryptocurrency immediately and without notice if Voyager determines, in its sole discretion, that an Account is associated with a Prohibited Use or a Prohibited Business.

(A)  Prohibited Use. Without express written consent from Voyager and compliance with applicable laws and regulations, Customer may not use an Account to engage in the following categories of activity ("Prohibited Uses"). Each of the below examples are representative, but not exhaustive. If at any time Customer is uncertain as to whether or not Customer's use of the Services involves a Prohibited Use, or if Customer has any questions about how these requirements apply, please contact Voyager at support@investvoyager.com. By opening an Account, Customer confirms that it will not use an Account to do any of the following:

(1)  Investment Activity. Make statements as to Customer's eligibility to provide investment advice, portfolio management or any other services or activities which may require a license, registration or notification in the state where the Customer is resident or the state where other Customers are resident.

(2)  Endorsements. Make statements that Voyager or its Affiliates endorse, maintain any control or guarantee the accuracy or completeness of any information published, posted or shared by Customer with other Customers.

(3)  Unlawful Activity. Activity which would violate, or assist in violation of, any law, statute, ordinance, or regulation, sanctions programs administered in the countries where Voyager conducts business, including, without limitation, the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC"), or which would involve proceeds of any unlawful activity; publish, distribute or disseminate any unlawful material or information.

(4)  Abusive Activity. Actions which impose an unreasonable or disproportionately large load on Voyager's infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data, or information; transmit or upload any material to the Platform that contains viruses, trojan horses, worms, or any other harmful or deleterious programs; attempt to gain unauthorized access to the Platform, other Customers' Accounts, computer systems or networks connected to the Platform, through password mining or any other means; use Account information of another party to access or use the Platform; or transfer Customer's Account access or rights to Customer's Account to a third party, unless by operation of law or with the express permission of Voyager.

(5)   Circumvention and Reverse Engineering. Unlawfully access or attempt to gain access, reverse engineer or otherwise circumvent any security measures that Voyager has applied to the Services or the Platform.

(6)   Abusive Trading Techniques. Utilize trading strategies aimed at exploiting errors in prices or concluding trades at off-market prices, or taking advantage of internet delays (such a scalping or sniping), including, without limitation, entering into transactions or combinations of transactions which taken together or separately are for the purpose of manipulating the Platform and the Services.

(7)   Abuse Other Customers. Interfere with another individual's or entity's access to or use of any Services; defame, abuse, extort, harass, stalk, threaten or otherwise violate or infringe the legal rights (such as, but not limited to, rights of privacy, publicity and intellectual property) of others; incite, threaten, facilitate, promote, or encourage hate, racial intolerance, or violent acts against others; harvest or otherwise collect information from the Platform about others, including without limitation, email addresses, without proper consent.

(8)   Fraud: Activity which operates to defraud Voyager, Voyager customers, or any other person; provide any false, inaccurate, or misleading information to Voyager.

(9)   Gambling: Lotteries; bidding fee auctions; sports forecasting or odds making; fantasy sports leagues with cash prizes; internet gaming; contests; sweepstakes; games of chance.

(10)   Intellectual Property Infringement: Engage in transactions involving items that infringe or violate any copyright, trademark, right of publicity or privacy or any other proprietary right under the law, including, without limitation, sales, distribution, or access to counterfeit music, movies, software, or other licensed materials without the appropriate authorization from the rights holder; use of Voyager intellectual property, name, or logo, including, without limitation, use of Voyager trade or service marks, without express consent from Voyager or in a manner that otherwise harms Voyager or the Voyager brand; any action that implies an untrue endorsement by or affiliation with Voyager.

(11)   Competition: Utilize confidential information received by Customer from Voyager or Third Party to develop a service that competes with the Services, or the services of any of Voyager's Affiliates.

(B)   Prohibited Business. In addition to the Prohibited Uses described above, the following categories of businesses, business practices, and sale items are barred from the Services ("Prohibited Businesses"). Most Prohibited Businesses categories are imposed by law as well as card networks, the requirements of Voyager's banking providers or processors. The specific types of use listed below are representative, but not exhaustive. If Customer is uncertain as to whether or not Customer's use of the Services involves a Prohibited Business, or if Customer has any questions about how these requirements apply, please contact

Voyager support@investvoyager.com. By opening an Account, Customer confirms that Customer will not use the Services in connection with any of the following businesses, activities, practices or items:

(1)   Intellectual Property or Proprietary Rights Infringement: Sales, distribution, or access to counterfeit music, movies, software, or other licensed materials without the appropriate authorization from the rights holder.

(2)   Counterfeit or Unauthorized Goods: Unauthorized sale or resale of brand name or designer products or services; sale of goods or services that are illegally imported or exported or which are stolen.

(3)   Drugs and Drug Paraphernalia: Sale of narcotics, controlled substances, and any equipment designed for making or using drugs, such as bongs, vaporizers, and hookahs.

(4)   Pseudo-Pharmaceuticals: Pharmaceuticals and other products that make health claims that have not been approved or verified by the applicable local or national regulatory body.

(5)   Substances Designed to Mimic Illegal Drugs: Sale of a legal substance that provides the same effect as an illegal drug (e.g., salvia, kratom).

(6)   Multi-level Marketing: Pyramid schemes, network marketing, and referral marketing programs.

(7)   Unfair, Predatory or Deceptive Practices: Investment opportunities or other services that promise high rewards; Sale or resale of a service without added benefit to the buyer; resale of government offerings without authorization or added value; sites that Voyager determines, in its sole discretion, to be unfair, deceptive, or predatory towards consumers.

(8)   High Risk Businesses: Any businesses that Voyager believes poses elevated financial risk, legal liability, or violates card network or bank policies.

## 18. Privacy

By accessing the Platform and using the Services, Customer is consenting to having Customer's personal data transferred to and processed by Voyager. For information about how Voyager collects, uses, shares and otherwise processes Customer information, please see Voyager's Privacy Policy.

By entering into this Customer Agreement, Customer acknowledges receipt of the Privacy Policy, which may be amended from time to time by posting a new version to the Website, or as made available through the App.

## 19.  State License Disclosures

22/40

Voyager maintains various licenses to engage in money transmission activities. Voyager maintains licenses in each of the jurisdictions identified in the Voyager State License Disclosure, available here. By accessing the Platform and using the Services, Customer acknowledges receipt of the Voyager State License Disclosure.

**20. Limitation of Liability; Indemnification**

Customer agrees that the Customer's use of the Information, Services and Platform is provided by Voyager at the Customer's sole risk. The Platform, Services, Information, or any other information or features provided, or made available by, Voyager, any of its Affiliates, or any Third Party, including, without limitation, Third Party Services are provided on an "as is," "as available" basis without warranties of any kind, either express or implied, statutory (including, but not limited to, timeliness, truthfulness, sequence, completeness, accuracy, freedom from interruption), implied warranties arising from trade usage, course of dealing, course of performance, or the implied warranties of merchantability or fitness for a particular purpose or application, other than those warranties which are implied by and incapable of exclusion, restriction or modification under the laws applicable to the Customer Agreement.

**THE CUSTOMER UNDERSTANDS AND AGREES THAT VOYAGER, ITS AFFILIATES, AND THEIR RESPECTIVE PARTNERS, MANAGING DIRECTORS, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, AND THIRD PARTY PROVIDERS WILL NOT BE LIABLE TO THE CUSTOMER OR TO THIRD PARTIES UNDER ANY CIRCUMSTANCES, OR HAVE ANY RESPONSIBILITY WHATSOEVER, FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, LOST PROFITS, TRADING LOSSES, AND DAMAGES) THAT THE CUSTOMER MAY INCUR IN CONNECTION WITH THE CUSTOMER'S USE OF THE SERVICES (INCLUDING BUT NOT LIMITED TO THIRD PARTY SERVICES) OR THE PLATFORM PROVIDED BY VOYAGER UNDER THE CUSTOMER AGREEMENT. VOYAGER, ITS AFFILIATES AND ITS AND THEIR RESPECTIVE PARTNERS, DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS SHALL NOT BE LIABLE BY REASON OF DELAYS OR INTERRUPTIONS OF INFORMATION, THE PLATFORM OR SERVICES (INCLUDING BUT NOT LIMITED TO THIRD PARTY SERVICES) OR TRANSMISSIONS, OR FAILURES OF PERFORMANCE OF VOYAGER'S, ITS AFFILIATES, OR THIRD PARTY SYSTEMS, REGARDLESS OF CAUSE, INCLUDING, WITHOUT LIMITATION, THOSE CAUSED BY GOVERNMENTAL OR REGULATORY ACTION, THE ACTION OF ANY EXCHANGE OR OTHER SELF REGULATORY ORGANIZATION, OR THOSE CAUSED BY SOFTWARE OR HARDWARE MALFUNCTIONS.**

Except as otherwise provided by law, Voyager, its Affiliates and their respective partners, directors, officers, employees or agents (collectively, "Indemnified Parties") shall not be liable for any expenses, losses, costs, damages, liabilities, demands, debts, obligations,

23/40

penalties, charges, claims, causes of action, penalties, fines and taxes of any kind or nature (including, without limitation, legal expenses and attorneys' fees) (whether known or unknown, absolute or contingent, liquidated or unliquidated, direct or indirect, due or to become due, accrued or not accrued, asserted or unasserted, related or not related to a third party claim, or otherwise) (collectively, "Losses") by or with respect to any matters pertaining to the Customer Agreement, the Services, Information, or Third Party Services, except to the extent that such Losses are actual Losses and are determined by a court of competent jurisdiction or an arbitration panel in a final non-appealable judgment or order to have resulted solely from the Voyager's gross negligence or intentional misconduct. In addition, the Customer agrees that the Indemnified Parties shall have no liability for, and the Customer agrees to indemnify, defend and hold harmless the Indemnified Parties from all Losses that result from: (i) any noncompliance by the Customer with any of the terms and conditions of the Customer Agreement or Third Party Services; (ii) any third-party actions related to the Customer's receipt and use of any Information, Third Party Services, other third party content, or other such information obtained through the Platform, whether authorized or unauthorized under the Customer Agreement; (iii) any third party actions related to the Customer's use of the Platform, Information, or Third Party Services; (iv) the Customer or the Customer's agent's misrepresentation or alleged misrepresentation, or act or omission; (v) Indemnified Parties following the Customer or the Customer's agent's directions or instructions, or failing to follow the Customer or the Customer's agent's unlawful or unreasonable directions or instructions; (vi) any activities or services of the Indemnified Parties in connection with an Account (including, without limitation, any technology services, reporting, trading, or research services); (vii) the occurrence of, and any Indemnified Parties' action or inaction with respect to, a Potential Fraudulent Event (as defined in paragraph 3 of Section 21 below); or (viii) the failure by any person not controlled by the Indemnified Parties and their Affiliates to perform any obligations to the Customer. Further, if the Customer authorizes or allows third parties to gain access to the Platform, Information or the Account, whether by virtue of Third Party Services or otherwise, the Customer will indemnify, defend and hold harmless Voyager, its Affiliates and its and their respective directors, officers, employees and agents against any Losses arising out of claims or suits by such third parties based upon or relating to such access and use. Voyager does not warrant against loss of use or any direct, indirect or consequential damages or Losses to the Customer caused by the Customer's assent, expressed or implied, to a third party accessing an Account or information, including, without limitation, access provided through any Third Party Service.

The Customer also agrees that Indemnified Parties will have no responsibility or liability to the Customer in connection with the performance or non-performance by any exchange, clearing organization, data provider, or other third party (including, but not limited to, other money services businesses, clearing firms, banks, liquidity providers, or market makers) or any of their respective agents or affiliates, of its or their obligations relative to any Cryptocurrency or other products. The Customer agrees that Indemnified Parties will have

24/40

no liability, to the Customer or to third parties, or responsibility whatsoever for: (i) any Losses resulting from a cause over which Indemnified Parties do not have direct control, including, without limitation, the failure of mechanical equipment, hack, unauthorized access, theft, operator errors, government restrictions, force majeure, market data availability or quality, exchange rulings or suspension of trading; and (ii) any special, indirect, incidental, consequential, punitive or exemplary damages (including, without limitation, lost profits, trading losses and damages) that the Customer may incur in connection with the Customer's use of the Platform, and other services provided by Indemnified Parties under the Customer Agreement or in connection therewith.

**CUSTOMER AGREES TO INDEMNIFY VOYAGER FOR ACTUAL, REASONABLE LEGAL COSTS AND EXPENSES DIRECTLY RELATED TO THE ACCOUNT THAT ARE A RESULT OF ANY REGULATORY INQUIRY, LEGAL ACTION, LITIGATION, DISPUTE, OR INVESTIGATION THAT ARISES OR RELATES TO CUSTOMER OR CUSTOMER'S USE OF THE ACCOUNT OR THE SERVICES. CUSTOMER UNDERSTANDS THAT, AS A RESULT, VOYAGER WILL BE ENTITLED TO CHARGE THE ACCOUNT FOR SUCH COSTS WITHOUT NOTICE, INCLUDING LEGAL AND ENFORCEMENT RELATED COSTS THAT VOYAGER INCURS. ANY WITHHOLDING WILL LAST FOR A PERIOD OF TIME THAT IS REASONABLY NECESSARY TO RESOLVE ANY REGULATORY OR LEGAL ISSUE AT HAND, AND VOYAGER MAY PLACE ANY AMOUNTS GARNERED FROM CUSTOMER IN A SEPARATE ACCOUNT, AND WILL PAY TO CUSTOMER THE REMAINING BALANCE AFTER ANY NOTED ISSUE HAS BEEN RESOLVED. FURTHERMORE, CUSTOMER AGREES THAT WHERE SUCH ACTIONS RELATE TO A SPECIFIC ASSET IN THE ACCOUNT, THAT ASSET MAY NOT BE TRANSFERRED OUT OF THE ACCOUNT UNTIL THE MATTER IS RESOLVED.**

## 21. Electronic Access

Customer is solely responsible for keeping all Account numbers and CSI confidential and will not share this information with third parties. "CSI" shall mean all of the Customer's sensitive information regarding access to the Account, including the Customer's username, password, as well as any other information connected to Customer's two-factor authentication Account access methodology ("2-Factor Authentication"). Customer agrees and accepts full responsibility for monitoring and safeguarding the Accounts and access to the Accounts. Specifically, by using the Services, Customer represents and warrants to Voyager that Customer has installed and implemented appropriate means of protection relating to the security and integrity of the internet-connected device(s) that Customer uses to access the Platform and the Services and that Customer has taken appropriate action to protect such devices from viruses or other similar harmful or inappropriate materials, devices,

information, or data. Customer further undertakes to protect Voyager from any wrongful transmission of computer or other viruses or similarly harmful or inappropriate materials or devices to the Platform.

**CUSTOMER UNDERSTANDS AND ACKNOWLEDGES THAT THE USE OF 2-FACTOR AUTHENTICATION PROVIDES ADDITIONAL SECURITY AND PROTECTION AGAINST UNAUTHORIZED ACCOUNT ACCESS. FAILURE TO IMPLEMENT 2-FACTOR AUTHENTICATION EXPOSES CUSTOMER TO POTENTIAL SIGNIFICANT RISK, INCLUDING THE RISK OF UNAUTHORIZED ACCOUNT ACCESS AS WELL AS THE COMPLETE LOSS OF ALL FUNDS AND CRYPTOCURRENCY IN THE CUSTOMER ACCOUNT. IF CUSTOMER CHOOSES TO ACCESS THE ACCOUNT AND THE SERVICES WITHOUT 2-FACTOR AUTHENTICATION ENABLED IT SHALL DO SO AT ITS SOLE RISK AND SHALL BE SOLELY LIABLE FOR ANY LOSSES SUFFERED BY CUSTOMER OR VOYAGER IN CONNECTION WITH ANY UNAUTHORIZED ACCOUNT ACCESS, TAKEOVER, OR USE OF ANY KIND.**

The Customer agrees to immediately notify Voyager in writing, delivered via e-mail and a recognized international delivery service, if the Customer becomes aware of: (i) any loss, theft, or unauthorized use of Customer CSI or Account numbers, including inability to utilize 2-Factor Authentication; (ii) any failure by the Customer to receive any communication from Voyager indicating that an order was received, executed or cancelled, as applicable; (iii) any failure by the Customer to receive an accurate written confirmation of an order, execution, or cancellation; (iv) any receipt by the Customer of confirmation of an order, execution or cancellation, which the Customer did not place; (v) any inaccurate information in or relating to the Customer orders, trades, margin status, Account balances, deposits, withdrawals, securities positions or transaction history; or (vi) any other unauthorized use or access of the Customer Accounts.

Each of the events described above shall be deemed a "Potential Fraudulent Event." The use and storage of any information including the Account numbers, CSI, portfolio information, transaction activity, account balances and any other information or orders available on the Customer's wireless, web-enabled cellular telephone or similar wireless communications device (each, a "Mobile Device") or the Customer's personal computer is at the Customer's own risk and is the Customer's sole responsibility. The Customer represents that the Customer is solely responsible for and has authorized any orders or instructions appearing in, originating from, or associated with the Accounts, the Account numbers, the Customer username and password, or CSI. The Customer agrees to notify Voyager immediately after the Customer discovers any Potential Fraudulent Event, but in no event more than twenty-four (24) hours following discovery.

Upon the occurrence of a Potential Fraudulent Event or Voyager's suspicion that a Potential Fraudulent Event has occurred or is likely to occur, Voyager may amend or issue Customer new CSI, require Customer to change CSIs, and/or suspend or limit access to the Platform and Services. In the event that Customer is unable to access the Account due to the fact that they are unable, for any reason, to complete necessary 2-Factor Authentication, including because Customer is unable to access their Mobile Device, changed their telephone number, or otherwise, Customer may be unable to access the Account for an extended period of time. Voyager will provide Customer with reasonable assistance in an attempt to restore 2-Factor Authentication operability.

Upon request by Voyager, the Customer agrees to report any Potential Fraudulent Event promptly to legal authorities and to provide Voyager a copy of any report prepared by such legal authorities. The Customer agrees to cooperate fully with the legal authorities and Voyager in any investigation of any Potential Fraudulent Event and the Customer will complete any required affidavits promptly, accurately and thoroughly. The Customer also agrees to allow Voyager access to the Customer's Mobile Device, the Customer's computer, and the Customer's network in connection with Voyager's investigation of any Potential Fraudulent Event. The Customer understands that if the Customer fails to do any of these things the Customer may encounter delays in regaining access to the Account.

## 22.  Electronic Signatures: Modifications to the Customer Agreement

The Customer agrees to transact business with the Voyager electronically. By electronically signing the Customer Agreement, the Customer acknowledges and agrees that such electronic signature is valid evidence of the Customer's consent to be legally bound by the Customer Agreement and such subsequent terms as may govern the use of the Platform. The use of an electronic version of any document fully satisfies any requirement that the document be provided to the Customer in writing. The Customer accepts notice by electronic means as reasonable and proper notice, for the purpose of any and all laws, rules and regulations. Customer understands that, if required by applicable law, or if Voyager decides in its sole discretion, Voyager may provide Customer with notices by other means, including emails linking to the Platform, other emails, or text messages. The electronically stored copy of the Customer Agreement on the Website is considered to be the true, complete, valid, authentic and enforceable record of the Customer Agreement, admissible in judicial or administrative proceedings to the same extent as if the documents and records were originally generated and maintained in printed form. The Customer agrees to not contest the admissibility or enforceability of Voyager's electronically stored copy of the Customer Agreement.

In addition, if the Customer requests other Services provided by Voyager that require the Customer to agree to specific terms and conditions electronically (through clicks or other actions) or otherwise, such terms and conditions will be deemed an amendment and will be incorporated into and made part of this Customer Agreement.

**23. Consent to Electronic Delivery of Documents**

(A)  Consent. By agreeing to electronic delivery, the Customer is giving informed consent to electronic delivery of all Agreement Documents, as defined below, other than those the Customer has specifically requested to be delivered in paper form. "Agreement Documents" include notices, disclosures, current and future account statements, regulatory communications (such as prospectuses, proxy solicitations, and privacy notices), trade confirmations, tax-related documents, and any other information, documents, data, and records regarding the Account, the Customer Agreement (including, without limitation, amendments to the Customer Agreement), and the Services delivered or provided to the Customer by Voyager, and any other parties. The Customer agrees that the Customer can access, view, download, save, and print any Agreement Documents received via electronic delivery for the Customer's records.

(B)  Electronic Delivery System. The Customer acknowledges Voyager's primary method of communication with the Customer includes: (i) posting information on the Website, (ii) providing information via the App, (iii) sending email(s) to the Customer's email address of record, and, to the extent required by law, (iv) providing the Customer with notice(s) that will direct the Customer to the App or the Website where information can be read and printed. Unless otherwise required by law, Voyager reserves the right to post Agreement Documents on the Website without providing notice to the Customer. Further, Voyager reserves the right to send Agreement Documents to the Customer's postal or email address of record, or via the App or Website. The Customer agrees that all Agreement Documents provided to the Customer in any of the foregoing manners is considered delivered to the Customer personally when sent or posted by Voyager, whether the Customer receives it or not.

All email notifications regarding Agreement Documents will be sent to the Customer's email address of record. The Customer agrees to maintain the email address provided to Voyager until the Customer provides Voyager with a new one. The Customer understands that email messages may fail to transmit promptly or properly, including being delivered to SPAM folders. The Customer further understands that it is their sole responsibility to ensure that any emails from Voyager are not marked as SPAM. Regardless of whether or not the Customer receives an email notification, the Customer agrees to check the Website regularly to avoid missing any information, including time-sensitive or otherwise important communication. If the Customer authorizes someone else to access the email account provided to Voyager, the Customer agrees to tell the authorized individual to share the Agreement Documents with the Customer promptly, and the Customer accepts the risk that they will see sensitive Account information. The Customer understands that if a work email address or computing or communications device is used for Account access the employer or other employees may have access to the Agreement Documents.

Additionally, the Customer acknowledges that the internet is not a secure network and agrees that the Customer will not send any confidential information, including, without limitation, Account numbers or passwords, in any unencrypted emails. The Customer also understands that communications transmitted over the internet may be accessed by unauthorized or unintended third parties and agrees to hold Voyager and its Affiliates, and each Voyager's and ifs Affiliates' respective directors, officers, employees and agents harmless for any such access regardless of the cause.

The Customer agrees to promptly and carefully review all Agreement Documents when they are delivered and notify Voyager in writing within five (5) calendar days of delivery if there is objection to the information provided (or other such time specified in the Customer Agreement). If the Customer fails to object in writing within such time, Voyager is entitled to treat such information as accurate and conclusive. The Customer will contact Voyager to report any problems with accessing the Agreement Documents.

(C)  Costs. Potential costs associated with electronic delivery of Agreement Documents may include charges from internet access providers and telephone companies, and the Customer agrees to bear these costs. Voyager will not charge the Customer additional online access fees for receiving electronic delivery of Agreement Documents.

(D)  Revocation of Consent. Subject to the terms of the Agreement Documents, the Customer may revoke or restrict consent to electronic delivery of Agreement Documents at any time by notifying the Voyager in writing of the intention to do so. The Customer also understands that the Customer has the right to request paper delivery of any Agreement Document that the law requires Voyager to provide to the Customer in paper form. Voyager will not treat the Customer request for paper copies as a withdrawal of consent to electronic delivery of Agreement Documents. The Customer understands that if revoking or restricting consent to electronic delivery or requesting paper delivery of Agreement Documents, Voyager, in its sole discretion, may charge the Customer a reasonable service fee for the delivery of any Agreement Documents that would otherwise be delivered to the Customer electronically, restrict or close the Account(s), or terminate the Customer's access to the Platform in each case, in Voyager's sole discretion. The Customer understands that neither the revocation or restriction of consent, nor the request for paper delivery, nor Voyager's delivery of paper copies of Agreement Documents will affect the legal effectiveness or validity of any electronic communication provided while consent was in effect.

(E)  Duration of Consent. Customer consent to receive electronic delivery of Agreement Documents will be effective immediately and will remain in effect unless and until either the Customer or Voyager revokes it. In the event that Customer revokes such consent, Customer understands and acknowledges that Voyager may immediately terminate this Agreement. The Customer understands that it may take up to three (3) business days to process a revocation of consent to electronic delivery, and that the Customer may receive electronic notifications until such consent is processed.

(F)  Hardware and Software Requirements. The Customer understands that in order to access the Platform, utilize the Services and receive electronic deliveries, the Customer must have access to a computer or Mobile Device, a valid e-mail address, and the ability to download such applications as Voyager may specify and to which the Customer has access. The Customer also understands that if the Customer wishes to download, print, or save any information, that the Customer must have access to a printer or other device in order to do so.

(G)  Consent and Representations. The Customer hereby agrees to have carefully read the above information regarding informed consent to electronic delivery and fully understand the implications thereof. Additionally, the Customer hereby agrees to all conditions outlined above with respect to electronic delivery of any Agreement Document. The Customer will maintain a valid e-mail address and continue to have access to the internet.

## 24.  Electronic Fund Transfers

(A)  Overview. Customer understands that the Account provides for certain electronic fund transfer ("EFT") capabilities. This Section applies solely with respect to EFTs. Customer understands and agrees that Customer's use of any EFT function is subject to the disclosures set forth in Section 24 – Electronic Fund Transfers, and Customer acknowledges that they have received and reviewed such disclosures.

 (B)  Customer Liability. Customer agrees to contact Voyager immediately if Customer believes an EFT has been initiated without Customer's permission. Also, in the event that an Account Statement shows an EFT transfer that Customer did not make, Customer agrees to contact Voyager promptly but in any event within 60 days after the Account Statement is made available to Customer. The longer Customer waits to notify Voyager of any unauthorized EFT the more likely it is that Customer will be unable to obtain any lost funds.

(C)  Contact Information. In the event of an unauthorized EFT Customer should contact Voyager Support.

(D)  Transfer Types and Limits. EFTs are subject to the following limits:

USD Deposits: Daily limit: $5,000.

USD Withdrawals: Daily limit: $25,000.

30/40

(E)  Fees. Voyager will not charge Customer any fees in connection with the initiation and completion of any EFT, however, third party fees, including foreign taxes, as applicable, may apply.

 (F)   Confidentiality. Voyager may disclose information to third parties about Customer as well as the EFTs effectuated out of the Account in the following circumstances:

(1)   Where it is necessary or helpful for completing or correcting transactions and resolving claims regarding transactions;

(2)   In order to verify the existence and condition of the Account to a third party;

 (3)   In order to comply with a valid request by a government agency a court order, or other legal or administrative reporting requirements;

(4)   If Customer consents by giving Voyager written permission; to Voyager employees, auditors, affiliates, service providers, or attorneys as needed;

(5)   In order to prevent, investigate or report possible illegal activity;

(6)   In order to authorize EFTs; or

(7)   Otherwise as necessary to fulfill our obligations under this Agreement.

Please see Voyager's Privacy Policy for further details.

(G)  Documentation. Upon the completion of an EFT Customer has a right to a written receipt (an "EFT Receipt") including the details of the EFT. In addition, the Customer has a right to transaction statements in connection with the Account ("Account Statements").

(H)  Voyager Liability. In no event will Voyager be liable to Customer for any equitable, consequential (including lost profits, indirect, extraordinary, incidental, punitive, or special damages). For instance, Voyager will not be liable to Customer if:

(1)   Customer does not have enough funds in the Account to complete the EFT;

(2)   Voyager has placed a hold or other limit on Customer's Account in connection with any legal, regulatory, or administrative process, or in connection with Voyager's anti-money laundering and compliance obligations;

(3)   Voyager experienced a technical malfunction that the Customer was aware of at the time of the transaction;

(4)   Voyager suspects that the requested EFT is unauthorized; or

(5)  Circumstances beyond Voyager's control prevent the completion of the EFT or otherwise cause an EFT to be completed incorrectly or inaccurately.

(I)  Errors; Questions.
In the event that Customer believes an EFT Receipt or Account Statement is incorrect (an "EFT Error") or if Customer has any questions about an EFT, contact Voyager at <u>Voyager Support</u>.

 The following are considered EFT Errors:

(1)  An unauthorized EFT;

(2)  An incorrect EFT to or from Customer's Account;

(3)  An improperly recorded EFT on Customer's Account Statement; or

(4)  A computational or bookkeeping error related to Customer's Account.

The following are NOT considered EFT Errors:

(1)  A routine inquiry about Customer's account balance or the status of pending transfers to or from Customer's account, unless Customer expressly notifies Voyager of an error in connection with the transfer;

(2)  A request for information for tax or other recordkeeping purposes; or

(3)  A request for duplicate copies of documentation.

Voyager must be properly notified no later than 60 days after Customer was provided access to the statement in question. In order for Voyager to be properly notified, Customer must conduct the following steps:

(1)  Contact <u>Voyager Support</u> and submit the request under the subcategory: **Unauthorized USD Transfer or USD Transfer Error.**

(2)  Provide Voyager with Customer's name and email address or phone number that is actively associated with the Account.

(3)  Describe the EFT Error or the transfer that Customer is unsure of and explain as clearly as Customer can why Customer believes an error is present or why Customer needs more information.

(4)  State the type, date, and dollar amount of the suspected EFT Error.

If Customer orally notifies Voyager of an EFT Error or question, Customer is required to send the complaint or question, in writing and in the same manner described above, to <u>Voyager Support</u> within 10 business Days.

Voyager will generally determine whether an error occurred within 10 business days after Voyager is properly notified of the EFT Error by Customer and will correct any error promptly. If Voyager needs more time, however, Voyager may take up to 45 days to investigate Customer's complaint or question.

For EFT Errors involving new Accounts and point-of-sale transactions, Voyager may take up to 90 days to investigate the complaint or question.

Within 3 business days after completing an investigation, Voyager will communicate the results to Customer. If Voyager determines that there was no error, Voyager will send Customer a written explanation. Customer may ask for copies of the documents that Voyager used in an investigation. "Business days" are Monday through Friday, excluding federal holidays.

## 25. ACH

Customer authorizes Voyager, at its discretion and without further prior notice, to utilize an electronic check process or Automated Clearing House ("ACH") facility to draft funds in the amount of any checks payable to Voyager, its agents or assigns. Money deposited via ACH is normally not available for five (5) to ten (10) business days. Customer understands that for ACH transfers to be established, the name on the Account must match Customer's bank account. To send and receive funds via ACH, Customer's bank must be a member of the ACH system. For ACH transactions, Customer hereby grants Voyager limited power of attorney to effectuate such transactions. Customer understand that if Customer decides to rescind an ACH transfer, or if an ACH transaction is returned to Customer's bank for any reason, Customer hereby directs and grants Voyager power of attorney to redeem any and all Cryptocurrency purchases and deposits necessary to fulfill and make such rescission regardless of whether Customer incurs a loss. The remediation described in the preceding sentence may result in a delay of returned funds or liquidation of Customer assets. Voyager may also choose to sever the client relationship and return prior deposits if warranted to protect Voyager from risk or potential fraud. An ACH bank reversal may occur when (1) there are insufficient funds in Customer's bank account, (2) there is a duplicate transaction, (3) the

transaction is denied, (4) the type of account is incorrect, or 5) any of the return reasons as noted in ACH Return Codes R01 – R33. Customer acknowledges that in the event of an ACH bank reversal, Customer might incur a fee.

## 26.  Questions; Feedback; Complaints

If Customer has any questions, would like to provide feedback, or would like more information regarding the Services, please feel free to email Voyager at support@investvoyager.com.

If Customer has a complaint or dispute with Voyager in connection with the Services (a "Complaint"), Customer agrees to contact Voyager through Voyager's support team at support@investvoyager.com in order to attempt to resolve any such Complaint amicably. When submitting a Complaint, please provide Voyager with your name, address, and any other information that Voyager may need in order to identify Customer and the Account. Voyager will acknowledge receipt of the Complaint upon receipt. Upon receipt of a Complaint, a Voyager support member will review the Complaint based upon the information provided in such Complaint and, if necessary, reach out to Customer via email in order to attempt to resolve such Complaint. Customer satisfaction is a priority and while Voyager hopes that all issues related to the Account or Service can be resolved through the aforementioned Customer support process, if a Complaint is not resolved in a manner satisfactory to Customer, the Customer may require that Customer and Voyager pursue any unresolved Complaint (or portion thereof) through arbitration, consistent with the terms of **Section 26 – Arbitration Agreement** below.

## 27.  Arbitration Agreement

Voyager and Customer agree to attempt informal resolution of any Complaint arising in connection with this Agreement, the Account, the Platform, or the Services consistent with the procedures outlined in **Section 25 – Questions; Feedback; Complaints,** including but not limited to engaging in non-lawyer mediation, prior to any demand for arbitration.

**VOYAGER AND CUSTOMER FURTHER AGREE THAT IF THE PARTIES CANNOT RESOLVE SUCH COMPLAINT INFORMALLY AND CONSISTENT WITH THE PROCEDURES OUTLINED IN SECTION 25 – QUESTIONS; FEEDBACK; COMPLAINTS, THE COMPLAINT SHALL BE FINALLY AND EXCLUSIVELY RESOLVED IN BINDING ARBITRATION, ON AN INDIVIDUAL BASIS, ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ("AAA") AND IN ACCORDANCE WITH THE AAA'S RULES FOR ARBITRATION OF CONSUMER-RELATED DISPUTES. VOYAGER AND CUSTOMER HEREBY EXPRESSLY WAIVE ANY RIGHT TO GO TO COURT, TO HAVE A TRIAL BY JURY, AND THE RIGHT TO PARTICIPATE IN A CLASS-ACTION LAWSUIT OR CLASS-WIDE ARBITRATION. UNLESS VOYAGER AND CUSTOMER BOTH**

AGREE IN WRITING, THE ARBITRATOR MAY NOT CONSOLIDATE
PROCEEDINGS OR MORE THAN ONE CUSTOMER'S CLAIMS, AND MAY NOT
OTHERWISE PRESIDE OVER ANY FORM OF REPRESENTATIVE OR CLASS
PROCEEDING. THE ARBITRATOR SHALL ALSO HAVE EXCLUSIVE
AUTHORITY TO DECIDE ANY ISSUES RELATING TO THE MAKING,
VALIDITY, ENFORCEMENT, OR SCOPE OF THIS ARBITRATION AGREEMENT,
ARBITRABILITY, DEFENSES TO ARBITRATION INCLUDING
UNCONSCIONABILITY, OR THE VALIDITY OF THE JURY TRIAL OR CLASS
ACTION WAIVERS.

THE ARBITRATION WILL BE CONDUCTED CONFIDENTIALLY BY A SINGLE,
NEUTRAL ARBITRATOR AND WILL OCCUR ON A DOCUMENTS-ONLY BASIS
OR, IF VOYAGER OR CUSTOMER CHOOSES, OVER TELEPHONE, VIDEO, OR
IN PERSON. FOR AN IN-PERSON ARBITRATION, THE PROCEEDINGS WILL
BE IN THE CITY OR COUNTY WHERE CUSTOMER PRIMARILY RESIDES, OR
IF CUSTOMER DOES NOT RESIDE IN THE UNITED STATES, IN THE STATE OF
NEW JERSEY. CUSTOMER AGREES TO BEAR ITS OWN ATTORNEY'S FEES,
COSTS, AND EXPENSES. THE ARBITRATOR MAY AWARD ANY RELIEF THAT
A COURT OF COMPETENT JURISDICTION COULD AWARD, INCLUDING
ATTORNEYS' FEES WHEN AUTHORIZED BY LAW, AND THE ARBITRATOR'S
DECISION MAY BE ENFORCED IN ANY COURT. ANY DISPUTE BETWEEN THE
PARTIES WILL BE GOVERNED BY THIS CUSTOMER AGREEMENT AND THE
LAWS OF THE STATE OF NEW JERSEY AND APPLICABLE UNITED STATES
LAW, WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAWS PRINCIPLES
THAT MAY PROVIDE FOR THE APPLICATION OF THE LAW OF ANOTHER
JURISDICTION. VOYAGER AND CUSTOMER FURTHER AGREE THAT THE
STATE OR FEDERAL COURTS IN NEW JERSEY HAVE EXCLUSIVE
JURISDICTION OVER ANY APPEALS OF OR AN APPLICATION TO VACATE AN
ARBITRATION AWARD AND OVER ANY LAWSUIT BETWEEN THE PARTIES
NOT SUBJECT TO ARBITRATION. IN SUCH CASES, VOYAGER AND
CUSTOMER AGREE TO SUBMIT TO THE PERSONAL JURISDICTION OF THE
STATE AND FEDERAL COURTS OF NEW JERSEY AND AGREE TO WAIVE ANY
AND ALL OBJECTIONS TO THE EXERCISE OF JURISDICTION OVER THE
PARTIES BY SUCH COURTS AND TO VENUE IN SUCH COURTS.

IN THE EVENT THE PROHIBITION ON CLASS ARBITRATION OR ANY OTHER
PROVISION OF THIS SECTION IS DEEMED INVALID OR UNENFORCEABLE,
THEN CUSTOMER AGREES AND UNDERSTANDS THAT THE REMAINING
PORTIONS OF THE ARBITRATION PROVISIONS IN THIS SECTION WILL
REMAIN IN FULL FORCE AND EFFECT.

NOTWITHSTANDING VOYAGER AND CUSTOMER'S AGREEMENT TO
RESOLVE ALL DISPUTES THROUGH ARBITRATION, EITHER VOYAGER OR

**CUSTOMER MAY SEEK RELIEF IN A SMALL CLAIMS COURT FOR DISPUTES OR CLAIMS WITHIN THE SCOPE OF THAT COURT'S JURISDICTION.**

## 28. Telephone Conversations and Electronic Communications

Customer understands and agrees that Voyager may record and monitor any telephone or electronic communications with the Customer. Unless otherwise agreed in writing in advance, Voyager does not consent to the recording of telephone conversations by any third party of the Customer. The Customer acknowledges and understands that not all telephone or electronic communications are recorded by Voyager, and Voyager does not guarantee that recordings of any particular telephone or electronic communications will be retained or are capable of being retrieved.

## 29. Oral Authorization

Customer agrees that Voyager shall be entitled to act upon any oral instructions given by the Customer with respect to the Account so long as Voyager reasonably believes such instruction was actually given by the Customer or the Customer's authorized agent.

## 30. Effect of Attachment or Sequestration of Account

If Voyager, a service provider, or their respective officers, directors, agents, employees, and representatives (collectively, the "Voyager Representatives") are served with levies, attachments, garnishments, summons, subpoenas, court orders, or other legal process which name Customer as a debtor or otherwise, Voyager Representatives shall be entitled to rely upon the representations, warranties, and statements made in such legal process. Customer hereby agrees that Voyager Representatives may respond to any such legal process in their own discretion without regard to jurisdiction or forward such legal process to any other party as may be appropriate. Voyager Representatives shall not be liable for refusing to obey any orders given by or for the Customer with respect to an Account that has been subject to an attachment or sequestration in any legal proceeding against the Customer, and Voyager Representatives shall be under no obligation to contest the validity of any such attachment or sequestration. Customer agrees to indemnify, defend, and hold all of the Voyager Representatives harmless from all actions, claims, liabilities, losses, costs, attorney's fees, or damages associated with compliance with any process that any Voyager Representative reasonably believes in good faith to be valid.

## 31. Event of Death

It is agreed that in the event of the Customer's death or the death of one of the joint Account holders, the representative of the Customer's estate or the survivor or survivors shall promptly give Voyager written notice thereof, and Voyager may, before or after receiving such notice, take such proceedings, require such papers and inheritance or estate tax waivers, retain such portion of, or restrict transactions in the Accounts as Voyager may deem

advisable to protect Voyager against any tax, liability, penalty or loss under any present or future laws or otherwise. Notwithstanding the above, in the event of the Customer's death or the death of one of the joint Account holders, all open orders shall be canceled, but Voyager shall not be responsible for any action taken on such orders prior to the actual receipt of notice of death. Further, in Voyager's discretion it may close out the Account without awaiting the appointment of a personal representative for the Customer's estate and without demand upon or notice to any such personal representative. The estate of any of the Account holders who have died shall be liable and each survivor shall continue to be liable, jointly and severally, to Voyager for any net debit balance or loss in said Account in any way resulting from the completion of transactions initiated prior to the receipt by Voyager of the written notice of the death of the decedent or incurred in the liquidation of the Account or the adjustment of the interests of the respective parties, and for all other obligations pursuant to the Customer Agreement. Such notice shall not affect Voyager's rights under the Customer Agreement to take any action that Voyager could have taken if the Customer had not died.

Upon the death or incapacity of an Account owner and if the legal heirs or representatives of such Account owner would like to withdraw the remaining balance in the Account, to the extent there is any, such legal heirs should present to Voyager the necessary official legal documents from the applicable authorities in the relevant jurisdiction, and Voyager, upon checking such documents, shall allow such withdrawal in accordance with any applicable laws.

## 32. Unclaimed Property

If there are funds or Cryptocurrency in an Account and Voyager is unable to contact Customer at the address shown in Voyager's records, and has no record of Customer's use of the Services for an extended period (as defined by applicable law), Voyager may be required to report and deliver such funds or Cryptocurrency to the applicable governmental authority as unclaimed property. Voyager reserves the right to deduct a dormancy fee or other administrative charges from such unclaimed funds and Cryptocurrency, as permitted by applicable law.

## 33. Tax Reporting; Tax Withholding

The taxation of Cryptocurrency transactions is extremely complex, and no attempt is made herein to fully describe the various tax rules that apply to such transactions or to explain in complete detail the rules which are mentioned. However, generally, any sales, exchanges or dispositions of Cryptocurrency may have U.S. federal, state, local and non-U.S. income tax consequences for the Customer and may result in the Customer having to pay additional income taxes. Customers may have a variety of tax reporting obligations with respect to certain Cryptocurrency. Each Customer should confer with their tax advisor regarding the tax consequences of utilizing each of the Account based upon the Customer's particular circumstances. The Customer and Customer's tax advisors are responsible for how

Customer's activity in the Account is reported to the Internal Revenue Service ("IRS") or any other taxing authority. Voyager assumes no responsibility to Customer for the tax consequences of any transactions.

The proceeds of sale transactions and dividends paid will be reported to the IRS in accordance with applicable law. Under penalties of perjury, the Customer certifies that the taxpayer identification number provided or will provide to Voyager (including any taxpayer identification number on any Form W-9 that the Customer has provided or will provide to Voyager) is the Customer's correct taxpayer identification number. The Customer certifies that the Customer is not subject to backup withholding and is a United States Person (including a U.S. resident alien) as such term is defined in section 7701(a)(30) of the Internal Revenue Code of 1986, as amended ("U.S. Person"). If a correct Taxpayer Identification Number is not provided to Voyager, the Customer understands the Customer may be subject to backup withholding tax at the appropriate rate on all dividends, interest and gross proceeds paid to the Customer. Backup withholding taxes are sent to the IRS and cannot be refunded by Voyager. The Customer further understands that if the Customer waives tax withholding and fails to pay sufficient estimated taxes to the IRS, the Customer may be subject to tax penalties.

## 34. Miscellaneous.

(A)  Interpretation. The heading of each provision of the Customer Agreement is for descriptive purposes only and shall not be (1) deemed to modify or qualify any of the rights or obligations set forth in the Customer Agreement or (2) used to construe or interpret any of the provisions under the Customer Agreement. When a reference is made in this Customer Agreement to a Section, such reference shall be to a Section of this Customer Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in the Customer Agreement, they shall be deemed to be followed by the words "without limitation." The word "or," when used in the Customer Agreement, has the inclusive meaning represented by the phrase "and/or." Unless the context of the Customer Agreement otherwise requires: (i) words using the singular or plural number also include the plural or singular number, respectively; and (ii) the terms "hereof," "herein," "hereunder" and derivative or similar words refer to the Customer Agreement in its entirety. The word "will" expresses an obligation equivalent to "shall." The Customer Agreement will not be construed in favor of or against any party by reason of the extent to which any party participated in the preparation of the Customer Agreement.

(B)  Binding Effect; Assignment. This Customer Agreement shall bind Customer's heirs, assigns, executors, successors, conservators, and administrators. Customer may not assign this Customer Agreement or any rights or obligations under this Customer Agreement without first obtaining Voyager's prior written consent. Voyager may assign, sell or transfer the Account and this Customer Agreement, or any portion thereof, at any time, without prior notice to Customer.

(C)  Severability. If any provisions or conditions of this Customer Agreement are or become inconsistent with any present or future law, rule or regulation of any applicable government, regulatory, or self-regulatory agency or body, or are deemed invalid or unenforceable by any court of competent jurisdiction, such provisions shall be deemed rescinded or modified, to the extent permitted by applicable law, to make this Customer Agreement in compliance with such law, rule or regulation, or to be valid and enforceable, but in all other respects, this Customer Agreement shall continue in full force and effect.

(D)  Website Postings. Customer agrees and understands that Voyager or any of its Affiliates may post other specific agreements, disclosures, policies, procedures, terms and conditions that apply to Customer's use of the App, the Website or the Account on the Website ("Website Postings"). Customer understands that it is Customer's continuing obligation to understand the terms of the Website Postings, and Customer agrees to be bound by the Web Postings as are in effect at the time of Customer's use.

(E)  Entirety of Agreement. This Customer Agreement, any attachments hereto, other agreements and policies referred to in this Customer Agreement (including the Website Postings), and the terms and conditions contained in Customer's Account statements and confirmations, contain the entire agreement between Voyager and Customer and supersedes all prior or contemporaneous communications and proposals, whether electronic, oral or written, between Voyager and Customer, provided, however, that any and all other agreements between Voyager and Customer, not inconsistent with this Customer Agreement, will remain in full force and effect.

(F)  Amendment. Voyager may, at any time, amend the Customer Agreement without prior notice to the Customer. No provision of the Customer Agreement can be amended by Customer in any respect. The current version of the Customer Agreement will be posted on the Website and made available through the App and Customer's continued use of the Platform after such amendment constitutes agreement to be bound by all then-in-effect amendments to the Customer Agreement, regardless of whether the Customer has actually reviewed it. Continued use of the Platform after such posting will constitute the Customer's acknowledgment and acceptance of such amendment. The Customer agrees to regularly consult the App and Website for up-to-date information about the Services and any modifications to the Customer Agreement.

(G)  No Waiver; Cumulative Nature of Rights and Remedies; Non-Waiver of Rights. Customer understands that Voyager's failure to insist at any time upon strict compliance with any term contained in this Customer Agreement, or any delay or failure on Voyager's part to exercise any power or right given to Voyager in this Customer Agreement, or a continued course of such conduct on Voyager's part, shall at no time operate as a waiver of such power or right, nor shall any single or partial exercise preclude any other further exercise. All rights and remedies given to Voyager in this Customer Agreement are cumulative and not exclusive

of any other rights or remedies to which Voyager is entitled. This Customer Agreement shall not be construed to waive rights that cannot be waived under applicable laws and regulations.

(H)  Relationship of the Parties. Customer agrees and understands that nothing in this Customer Agreement shall be deemed to constitute, create, imply, give effect to, or otherwise recognize a partnership, employment, joint venture, or formal business entity of any kind; and the rights and obligations of the parties shall be limited to those expressly set forth herein.

(I)  No Third-Party Beneficiaries. Except for the indemnity and exculpation provisions herein, nothing expressed in, mentioned in, or implied from this Customer Agreement is intended or shall be construed to give any person other than the parties hereto any legal or equitable right, remedy, or claim under or in respect to this Customer Agreement to enforce any of its terms which might otherwise be interpreted to confer such rights to such persons, and this Customer Agreement and all representations, warranties, covenants, conditions and provisions hereof are intended to be and are for the exclusive benefit of the parties.

(J)  Survival. All provisions of this Customer Agreement that by their nature extend beyond the expiration or termination of this Agreement, including, without limitation, sections pertaining to suspension or termination, debts owed, general use of the Services, disputes with Voyager, and general provisions, shall survive the termination or expiration of this Agreement.

(K)  Written Notice. Customer agrees that if Voyager sends an email to the email address on record for the Account, this constitutes "written notice" from Voyager to Customer. For all notices made by email, the date of receipt is considered to be the date of transmission.

(L)  Governing Law. The laws of the State of New Jersey (regardless of the choice of law rules thereof) shall govern this Customer Agreement and all transactions in the Account.

**Exhibit 2**

Cardano Explorer Screenshot



# Exhibit 20

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE OF FILING OF FIRST AMENDED PLAN SUPPLEMENT**

**PLEASE TAKE NOTICE THAT** on January 13, 2023, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections, and (IV) Granting Related Relief* (the "Disclosure Statement Order") [Docket No. 861],[2] (a) authorizing the debtors and debtors in possession (collectively, the "Debtors") to solicit votes for the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as modified, amended, or supplemented from time to time, the "Plan") [Docket No. 852]; (b) conditionally approving the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement") [Docket No. 853] as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the Solicitation Packages; (d) approving procedures for soliciting, receiving, and

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]    Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan or Disclosure Statement Order, as applicable.

Debtors
Ex-20

tabulating votes on the Plan and for filing objections to the Plan; and (e) scheduling the Combined Hearing.

**PLEASE TAKE FURTHER NOTICE THAT** on February 1, 2023, the above-captioned debtors and debtors-in-possession (the "Debtors") filed the plan supplement (the "Plan Supplement") [Docket No. 943], in support of the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors hereby file this amended plan supplement (the "First Amended Plan Supplement"), in support of the Plan and as contemplated by the Plan and the Disclosure Statement Order.

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Disclosure Statement Order, the First Amended Plan Supplement includes the following documents:[3]

| Exhibit | Description |
|---------|-------------|
| **B** | Schedule of Retained Causes of Action |
| **C** | Customer Onboarding Protocol |

**PLEASE TAKE FURTHER NOTICE THAT** the documents contained in the First Amended Plan Supplement are integral to, and are considered part of, the Plan. If the Plan is approved, the documents contained in the First Amended Plan Supplement will be approved by the Court pursuant to the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE THAT** the Combined Hearing will commence on **March 2, 2023, at 10:00 a.m. prevailing Eastern Time**, before the Honorable Michael E. Wiles, in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York, New York 10004.

**PLEASE TAKE FURTHER NOTICE THAT** pursuant to the Court's General Order M-543, dated March 20, 2020 ("General Order M-543"), the Combined Hearing will be conducted telephonically. Parties wishing to participate in the Combined Hearing should do so by making arrangements through CourtSolutions LLC. Instructions to register for CourtSolutions LLC are attached to General Order M-543.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan or Disclosure Statement is **February 22, 2023, at 4:00 p.m. prevailing Eastern Time** (the "Objection Deadline"). Any objections to the relief sought at the Combined Hearing must: (a) be in writing; (b) conform to the Bankruptcy Rules and the Local Rules; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed

---

[3]   The Debtors anticipate filing the remaining Plan Supplement exhibits on or before February 15, 2023 as contemplated by the Disclosure Statement Order.

with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be ***actually received*** on or before the Objection Deadline:

| Debtors |
| --- |
| **Voyager Digital Holdings, Inc.**<br>33 Irving Place, Suite 3060<br>New York, NY 10003<br>Attention: Stephen Ehrlich and David Brosgol |

| Counsel to the Debtors | Counsel to the Committee |
| --- | --- |
| **Kirkland & Ellis LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention: Joshua A. Sussberg; Christopher Marcus; Christine A. Okike; Allyson B. Smith | **McDermott Will & Emery LLP**<br>One Vanderbilt Avenue<br>New York, NY 10017<br>Attention: Darren Azman; Joseph B. Evans; Grayson Williams; Gregg Steinman |

| United States Trustee |
| --- |
| **Office of the United States Trustee for the Southern District of New York**<br>U.S. Federal Office Building<br>201 Varick Street, Room 1006<br>New York, NY 10014<br>Attention: Richard Morrissey; Mark Bruh |

**PLEASE TAKE FURTHER NOTICE THAT** certain documents, or portions thereof, contained in the First Amended Plan Supplement remain subject to ongoing review, revision, and further negotiation among the Debtors and interested parties with respect thereto. The Debtors reserve the right to alter, amend, modify, or supplement any document in this First Amended Plan Supplement in accordance with the Plan at any time before the Effective Date of the Plan or any such other date as may be provided for by the Plan or by order of the Court; *provided* that if any document in this First Amended Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the date of the Combined Hearing, the Debtors will file a blackline of such document with the Court.

**PLEASE TAKE FURTHER NOTICE THAT** copies of the Plan, the Disclosure Statement, the Disclosure Statement Order, and other pleadings filed in these chapter 11 cases are available free of charge by visiting the website of Stretto at http://www.cases.stretto.com/Voyager. You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov/ in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

Dated:  February 8, 2023          /s/ Joshua A. Sussberg
New York, New York               **KIRKLAND & ELLIS LLP**
                                 **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                 Joshua A. Sussberg, P.C.
                                 Christopher Marcus, P.C.
                                 Christine A. Okike, P.C.
                                 Allyson B. Smith (admitted *pro hac vice*)
                                 601 Lexington Avenue
                                 New York, New York 10022
                                 Telephone:    (212) 446-4800
                                 Facsimile:    (212) 446-4900
                                 Email:        jsussberg@kirkland.com
                                               cmarcus@kirkland.com
                                               christine.okike@kirkland.com
                                               allyson.smith@kirkland.com

                                 *Counsel to the Debtors and Debtors in Possession*

## Exhibit B

### Schedule of Retained Causes of Action

This **Exhibit B** contains the Schedule of Retained Causes of Action.

**Article IV.P** of the Plan provides as follows:

  In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Entity shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred. Such rights shall be preserved by the Debtors and Wind-Down Debtors and shall vest in the Wind-Down Entity, with the Wind-Down Entity's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and Wind-Down Debtors as of the Effective Date.

  The Wind-Down Trust may pursue such Causes of Action, as appropriate, in accordance with the best interests of the beneficiaries of the Wind-Down Trust and in accordance with the Wind-Down Trust Agreement and the Plan. **No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors, the Wind-Down Debtors or the Wind-Down Trust, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Wind-Down Trust, on behalf of the Debtors and the Wind-Down Debtors, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan.** Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Trust, on behalf of the Debtors and Wind-Down Debtors and in accordance with the Wind-Down Trust Agreement, expressly reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), lack of standing or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

  The Wind-Down Trust, on behalf of the Debtors and Wind-Down Debtors, reserves and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-

Down Trust, except as otherwise provided in the Plan, including Article VIII of the Plan. The Wind-Down Trust, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan.

**The Causes of Action set forth in the Plan and as set forth below, are non-exclusive and are not intended to be a comprehensive list of all retained Causes of Action.**

**The Debtors and the Wind-Down Debtors expressly reserve the right to alter, modify, amend, remove, augment, or supplement the List of Retained Causes of Action as set forth below, at any time with additional Causes of Action. Failure to include any Cause of Action herein at any time shall not be a bar nor have any impact on the Wind-Down Debtors' rights to bring any Cause of Action not otherwise released pursuant to the Plan.**

All rights to enforce, commence, prosecute, pursue, settle, or take any other action with respect to any Cause of Action shall be preserved for the sole benefit of the Wind-Down Debtors, regardless of whether any Causes of Action or any entity is specifically referenced herein, in the Plan, in the Disclosure Statement, or in any Plan Supplement. The decision whether to enforce, commence, prosecute, pursue, settle, or take any other action with respect to any Causes of Action, or to refrain from doing so, shall remain within the discretion of the Wind-Down Trustee.

Notwithstanding, and without limiting the generality of Article IV.P of the Plan and the express disclaimers set forth above, this **Exhibit B** includes certain types of Causes of Actions preserved by the Debtors and the Wind-Down Debtors, subject to the terms of the Plan and the information provided in this **Exhibit B**. Without limiting the full universe of Causes of Action vesting in the Wind-Down Debtors under the Plan, these Causes of Action include (but are not limited to) the following types of claims:

## I.    Claims Related to Insurance Policies

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against the D&O Carriers (as defined in the Plan) based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtor or Wind-Down Debtor is a party or pursuant to which any Debtor or Wind-Down Debtor has any rights whatsoever, regardless of whether such contract or policy is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, without limitation, Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters. These Causes of Action include, without limitation, the Non-Released D&O Claims and the Non-Released Insurance Claims, as such terms are defined in the Plan.

II.     **Claims Related to Tax Refunds**

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against federal, state, local, or international taxing authorities based in whole or in part upon any and all tax obligations, tax credits, refunds, offsets, or other claims to which any Debtor or Wind-Down Debtor is a party or pursuant to which any Debtor or Wind-Down Debtor has any rights whatsoever, including, without limitation, against or related to all federal, state, local, or international taxing authorities that owe or that may in the future owe money related to tax obligations, tax credits, refunds, offsets, or other claims to the Debtors or the Wind-Down Debtors, regardless of whether such entity is specifically identified herein.

III.    **Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation, Including Adversary Proceedings**

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, any adversary proceeding in these chapter 11 cases (including, without limitation, *Voyager Digital Holdings, Inc. v. Lavine et al*, Adv. Case No. 22-01150), or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial, regardless of whether such Entity is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, but not limited to, the 3AC Claims, Alameda Claims, and FTX Claims (each as defined in the Plan), and any such Claims against directors, officers, employees, managers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, or other professionals and/or advisors, or any other persons or entities affiliated with 3AC, Alameda or FTX, or any of their respective related parties, which include any Cause of Action assertable in the FTX Bankruptcy Cases or adversary proceedings initiated thereunder (including, without limitation, *Alameda Research Ltd. v. Voyager Digital LLC et al*, Adv. Case No. 23-50084).

IV.     **Claims Related to Accounts Receivable and Accounts Payable**

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors or Wind-Down Debtors, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto. Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Wind Down Debtors, as applicable, owe money to them. The claims and Causes of Action reserved include Causes of Action against vendors, suppliers of goods and services, or any other parties.

## V.    Claims Related to Deposits, Adequate Assurance Postings, and Other Collateral Postings

Unless otherwise released by the Plan, the Debtors and the Wind-Down Debtors expressly reserve all Causes of Action based in whole or in part upon any and all postings of a security deposit, adequate assurance payment, or any other type of deposit or collateral, regardless of whether such posting of security deposit, adequate assurance payment, or other type of deposit or collateral is specifically identified herein.

## VI.    Claims Related to Contracts and Leases

Unless otherwise specifically released by the Plan, the Debtors and the Wind-Down Debtors expressly reserve the claims or Causes of Actions, based in whole or in part upon any and all contracts and leases to which any Debtor or Wind-Down Debtor is a party or pursuant to which any Debtor or Wind-Down Debtor has any rights whatsoever, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto, including without limitation all contracts and leases that are assumed pursuant to the Plan, were previously assumed by the Debtors, or rejected by the Debtors.  The claims and Causes of Actions reserved include, without limitation, claims and Causes of Action against vendors, suppliers of goods or services, customers, landlords, utilities, promoters, banks, or any other parties, unless such claims or Causes of Action were previously released through the Plan or separate written agreement executed by the Debtors for, among other things:  (a) overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) breach of contract, wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) any liens, including mechanic's, artisan's, materialmen's, possessory, or statutory liens held by any one or more of the Debtors; (f) environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies, or suppliers of environmental services or goods; (g) counterclaims and defenses related to any contractual obligations; (h) any turnover actions arising under section 542 or 543 of the Bankruptcy Code; (i) and unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claims.

## VII.    Avoidance Actions

Unless otherwise released by the Plan or transferred to the Purchaser pursuant to the Asset Purchase Agreement, the Debtors and the Wind-Down Debtors expressly reserve all actual or potential Causes of Action that may be brought by or on behalf of the Debtors, the Wind-Down Debtors, their Estates, or other authorized parties in interest to avoid a transfer of property or an obligation incurred by the Debtors (including, without limitation, the Retained Avoidance Actions under the Asset Purchase Agreement) pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through and including 553, and 724(a) of the

Bankruptcy Code, under similar or related state or federal statutes and common law, including preference and fraudulent transfer laws.

## VIII.  Non-Released D&O Claims

The Debtors and the Wind-Down Debtors expressly reserve the Non-Released D&O Claims and may pursue such claims subject to the limitations in Articles IV.E and IV.F of the Plan.  The Debtors and the Wind-Down Debtors also expressly reserve and may assert claims for aiding and abetting breach of fiduciary duties against third parties unaffiliated with the Debtors who are not Released Parties as defined in the Plan.

## IX.  Promoter Claims

Unless otherwise released by the Plan, the Debtors and the Wind-Down Debtors expressly reserve all claims against public promoters, marketers, and advertisers of the Debtors who are not Released Parties as defined in the Plan for, among other things, false or deceptive marketing or advertising, false inducement of the Debtors' customers, misleading or fraudulent claims, aiding and abetting breaches of fiduciary duty, and other claims or causes of action relating to any oral or written statements made in connection with the Debtors' services.

## X.  Claims Against Professional Persons

Unless identified as a "Released Professional", or otherwise released or exculpated by the Plan, the Debtors and the Wind-Down Debtors expressly reserve all claims against any attorneys, financial advisors, investment bankers, auditors, or other professional persons for any claims or causes of action, including, without limitation, negligence, malpractice, fraud, misrepresentation, and aiding and abetting breaches of fiduciary duty in connection with services rendered to the Debtors.

## XI.  Contributed Third-Party Claims

The Debtors and the Wind-Down Debtors expressly reserve all Contributed Third-Party Claims, subject to the procedures identified in Articles IV.Q and IV.R of the Plan and the ballots, which such Contributed Third-Party Claims shall have been irrevocably contributed to the Wind-Down Debtors.

*[Remainder of page intentionally left blank.]*

**Exhibit C**

**Customer Onboarding Protocol**

# Customer Onboarding Protocol

# Voyager Digital, LLC to BAM Trading Services Inc. (d/b/a Binance.US)

## Timeline

| Phase | Claims Portal Live | Early Opt In | Post-Closing Assets Available | Post-Expiration |
|-------|-------------------|--------------|-------------------------------|-----------------|
| **Data** | *No transfer of customer data* | *Data of customers who opt in to early transfer sent on daily basis* | *All remaining customers' data transfers* | *Migration period expires* |
| **Est. Date** | 5 Jan 2023 | On or around 1 Feb 2023 | On or around 16 Mar | 3-6 mos. after closing, depending on jurisdiction |

## Experience

Voyager customers will go through 4 distinct phases pending the closing of the asset purchase agreement between Voyager and Binance.US.

**Phase 1: Claims Portal**

**Go-live date:** Already live

**Description:** Voyager app will begin showing a screen to customers that will give them details about their claim including the USD value of their assets as of July 5, 2022.



**Phase 2: Pre-Closing Data Transfer Opt-In**

**Go-live date:** First week of February 2023 *(tentative)*

In the Voyager app and via email, Voyager will inform customers of the asset purchase agreement Voyager entered into with Binance.US and announce that they will gain access to their cryptocurrency distributions on the Binance.US platform once the Binance.US purchase transaction closes.

Customers will be encouraged to start the process of connecting their existing Voyager account with a Binance.US account in order to facilitate these distributions. In order to do this, customers will need to consent to transferring their data to Binance.US before the closing of the transaction, which they will be able to do in the Voyager app. Customers will also be presented with a link to the Binance.US privacy policy, which will apply to their data after it transfers.

Once the customer consents, Voyager will share their data with Binance.US using a secured protocol. Voyager may periodically share customers' data with Binance.US in batches.

Binance.US will perform quality control checks on the data to ensure it is parsed, validated and meets Binace.US' KYC standards.

Binance.US will then check customers' data (SSN and date of birth) against its own existing customers to see if the Voyager customer already has an account with Binance.US.

Once these checks have been performed, customers whose data has been validated will either be notified that they already have an existing Binance.US account, or that they need to open a new Binance.US account, in accordance with the flows below.



**Case 1: For customers who already have a Binance.US account:**

If a customer has an account with Binance.US, they will get an email from Binance.US saying no further action is necessary from their side.



**Case 2: For customers who do not have a Binance.US account:**

If a customer does not have an account with Binance.US, they will receive an email invitation from Binance.US asking them to set-up an account. This email invitation will have a special link that will expedite Binance.US account creation. The link will take the customer to a Binance.US account creation flow where they will choose a password, accept the Binance.US terms of use and privacy policy, and verify (using SMS) the phone number that was registered with Voyager. All other customer profile data (SSN, date of birth, address, picture of an ID if present, etc.) will automatically be saved to their account.



**Case 3: Special Cases:**

There will be some special cases where the data sent by Voyager may not match what Binance.US has (e.g., date of birth for the same SSN is different, an email or phone number is registered with a different person, etc.). Binance.US will handle these special cases separately by redoing their Know Your Customer check, verifying their information using uploaded ID documents, or interacting directly with the customer if needed.

Certain users may reside in states where Binance.US is still working on securing the requisite licensing or authorization to operate (i.e., Hawaii, New York, Texas, and Vermont). Binance.US will not open accounts for customers who reside in these states until the required license or authorization is received.

Regardless of which of the 3 cases above applies, once an account is connected (using SSN and date of birth), there is no action necessary from the customer. The customer may choose to immediately begin using Binance.US for currently available services in their region; however, they will not be able to access their Voyager distributions until the transaction closes.

---

**Phase 3: After the asset purchase agreement between Binance.US and Voyager closes and distributions are sent by Voyager to Binance.US**

**Go-live date:** March 2023 *(tentative)*

**Case 1: For customers who have opted in to the pre-closing transfer of their data and whose accounts are already linked (Cases 1 and 2 in Phase 2 above)**

When the asset purchase agreement closes, Binance.US will receive distributions of cryptocurrency from Voyager in respect of customers who have already linked their Voyager accounts to their Binance.US accounts, and will make these distributions available to those customers in their Binance.US accounts within five business days of receiving those distributions. Customers will receive a notification / email when their distributions are available. At that point they may go to their Binance.US wallet and see the details of their distributions.



**Case 2: For customers who have not opted in to the pre-closing transfer of their data**

Voyager will send their data (such as SSN, date of birth, address, picture of an ID if present, etc.) to Binance.US upon the closing of the asset purchase agreement. As described in Phase 2 above, Binance.US will check this data (SSN and date of birth) against its own existing customers to see if the Voyager customer already has an account with Binance.US.

For customers who have Binance.US accounts, no further action is required. Binance.US will notify Voyager that such customer has an existing Binance.US account, and Voyager will send to Binance.US the distribution allocable to such customer. Binance.US will make such customers' distributions available to those customers in their Binance.US accounts within five business days of receiving those distributions.

Customers who do not have a Binance.US account as of this date will be sent an email asking them to set-up an account. The link will take the customer to a Binance.US account creation flow where they will choose a password, accept the Binance.US terms of use and privacy policy, and verify (using SMS) the phone number that was registered with Voyager. All other customer information profile data (SSN, date of birth, address, picture of an ID if present, etc.) will be automatically saved to their account. After a customer has accepted the Binance.US terms of use and privacy policy and verified their phone number, Binance.US will notify Voyager that such customer has opened a Binance.US account, and Voyager will send to Binance.US the distributions allocable to such customers. Binance.US will make such customers' distributions available to those customers in their Binance.US accounts within five business days of receiving those distributions.

## Case 3: Special Cases

### Customer takes no action

For customers that do not have a Binance.US account and have not created one following the closing of the purchase transaction, Binance.US will ask these customers to take action via email.

### Customer is from unsupported states

If Binance.US receives a required license or authorization in an unsupported state (i.e., Hawaii, New York, Texas and Vermont) within 6 months of the closing of the asset purchase agreement, Binance.US will follow the procedures for customers who do not have previously existing Binance.US accounts, as described in Case 2 above.

To the extent Binance.US does not receive the required licensing and/or authorization to operate in the unsupported states within 6 months from the closing of the asset purchase agreement, Voyager will convert the distributions allocable to such customers to cash and will distribute them separately.

### Customer account has data issue / suspected fraud

There will be some special cases where the data sent by Voyager may not match what Binance.US has. (e.g., date of birth for the same SSN is different, an email or phone number is registered with a different person, etc.). Binance.US will handle these special cases separately by redoing their Know Your Customer check, verifying their information using uploaded ID documents, or interacting directly with the customer if needed. Voyager app will show a 30-digit account number during phase 3. This may be used by Binance.US to verify ownership of assets on Voyager.



## Phase 4: Post-expiration

For customers who have not accepted the Binance.US terms of use and privacy policy and otherwise taken necessary action to open an account, if required, by 3 months following the closing of the asset purchase agreement, Binance.US will liquidate their cryptocurrency distributions and deliver the resulting cash to Voyager for distribution in accordance with Voyager's bankruptcy plan.

This time period will be extended to 6 months for users in unsupported jurisdictions (i.e., Hawaii, New York, Texas and Vermont).



# Exhibit 21

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE OF FILING OF SECOND AMENDED PLAN SUPPLEMENT**

**PLEASE TAKE NOTICE THAT** on January 13, 2023, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections, and (IV) Granting Related Relief* (the "Disclosure Statement Order") [Docket No. 861],[2] (a) authorizing the debtors and debtors in possession (collectively, the "Debtors") to solicit votes for the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as modified, amended, or supplemented from time to time, the "Plan") [Docket No. 852]; (b) conditionally approving the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement") [Docket No. 853] as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the Solicitation Packages; (d) approving procedures for soliciting, receiving, and

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]    Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan or Disclosure Statement Order, as applicable.

| Debtors |
| Ex-21 |

tabulating votes on the Plan and for filing objections to the Plan; and (e) scheduling the Combined Hearing.

PLEASE TAKE FURTHER NOTICE THAT on February 1, 2023, the above-captioned debtors and debtors-in-possession (the "Debtors") filed the *Notice of Filing of Plan Supplement* (the "Initial Plan Supplement") [Docket No. 943], in support of the Plan.

PLEASE TAKE FURTHER NOTICE THAT on February 8, 2023, the Debtors filed the *Notice of Filing of First Amended Plan Supplement* (the "First Amended Plan Supplement") [Docket No. 986], in support of the Plan.

PLEASE TAKE FURTHER NOTICE THAT the Debtors hereby file this second amended plan supplement (the "Second Amended Plan Supplement"), in support of the Plan and as contemplated by the Plan and the Disclosure Statement Order.

PLEASE TAKE FURTHER NOTICE THAT as contemplated by the Plan and the Disclosure Statement Order, the Second Amended Plan Supplement includes the following documents:

| Exhibit | Description |
|---------|-------------|
| A | Amended Schedule of Assumed Executory Contracts and Unexpired Leases |
| A-1 | Redline of **Exhibit A** to Exhibit A of the Initial Plan Supplement |
| D | Restructuring Transactions Memorandum |
| E | Identity of Plan Administrator and Oversight Committee |
| F | Plan Administrator Agreement |
| G | Wind-Down Budget |
| H | Employee Transition Plan |

PLEASE TAKE FURTHER NOTICE THAT the documents contained in the Second Amended Plan Supplement are integral to, and are considered part of, the Plan.  If the Plan is approved, the documents contained in the Second Amended Plan Supplement will be approved by the Court pursuant to the Confirmation Order.

PLEASE TAKE FURTHER NOTICE THAT the Combined Hearing will commence on **March 2, 2023, at 10:00 a.m. prevailing Eastern Time**, before the Honorable Michael E. Wiles, in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York, New York 10004.

PLEASE TAKE FURTHER NOTICE THAT pursuant to the Court's General Order M-543, dated March 20, 2020 ("General Order M-543"), the Combined Hearing will be conducted telephonically.  Parties wishing to participate in the Combined Hearing should do so by making

arrangements through CourtSolutions LLC. Instructions to register for CourtSolutions LLC are attached to General Order M-543.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan or Disclosure Statement is **February 22, 2023, at 4:00 p.m.** prevailing **Eastern Time** (the "Objection Deadline"). Any objections to the relief sought at the Combined Hearing must: (a) be in writing; (b) conform to the Bankruptcy Rules and the Local Rules; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be *actually received* on or before the Objection Deadline:

| Debtors |
|---|
| **Voyager Digital Holdings, Inc.**<br>33 Irving Place, Suite 3060<br>New York, NY 10003<br>Attention: Stephen Ehrlich and David Brosgol |

| Counsel to the Debtors | Counsel to the Committee |
|---|---|
| **Kirkland & Ellis LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention: Joshua A. Sussberg; Christopher Marcus; Christine A. Okike; Allyson B. Smith | **McDermott Will & Emery LLP**<br>One Vanderbilt Avenue<br>New York, NY 10017<br>Attention: Darren Azman; Joseph B. Evans; Grayson Williams; Gregg Steinman |

| United States Trustee |
|---|
| **Office of the United States Trustee for the Southern District of New York**<br>U.S. Federal Office Building<br>201 Varick Street, Room 1006<br>New York, NY 10014<br>Attention: Richard Morrissey; Mark Bruh |

**PLEASE TAKE FURTHER NOTICE THAT** certain documents, or portions thereof, contained in the Second Amended Plan Supplement remain subject to ongoing review, revision, and further negotiation among the Debtors and interested parties with respect thereto. The Debtors reserve the right to alter, amend, modify, or supplement any document in this Second Amended Plan Supplement in accordance with the Plan at any time before the Effective Date of the Plan or any such other date as may be provided for by the Plan or by order of the Court; *provided* that if any document in this Second Amended Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the date of the Combined Hearing, the Debtors will file a blackline of such document with the Court.

**PLEASE TAKE FURTHER NOTICE THAT** copies of the Plan, the Disclosure Statement, the Disclosure Statement Order, and other pleadings filed in these chapter 11 cases are

available free of charge by visiting the website of Stretto at http://www.cases.stretto.com/Voyager.
You may also obtain copies of any pleadings by visiting the Court's website at
http://www.nysb.uscourts.gov/ in accordance with the procedures and fees set forth therein.

[*Remainder of page intentionally left blank*]

Dated:  February 15, 2023
New York, New York

/s/ Joshua A. Sussberg
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        jsussberg@kirkland.com
              cmarcus@kirkland.com
              christine.okike@kirkland.com
              allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## **Exhibit A**

**Amended Schedule of Assumed Executory Contracts and Unexpired Leases**

| No. | Debtor Name | Counterparty Name | Description of Contract | Cure Amount |
|---|---|---|---|---|
| 1 | Voyager Digital, LLC | Ada Support Inc. | ADA Services Agreement and Amendment #1 | $ 0.00 |
| 2 | Voyager Digital, LLC | Amazon Web Services | AWS Customer Agreement | $ 220,614.04 |
| 3 | Voyager Digital, LLC | Amazon Web Services | AWS Service Terms | See above |
| 4 | Voyager Digital, LLC | Anchorage | Digital Bank Order Form | $ 0.00 |
| 5 | Voyager Digital Holdings, Inc. | Blockdaemon Inc. | Order Form | $ 351.03 |
| 6 | Voyager Digital Holdings, Inc. | Blockdaemon Inc. | Validator Agreement | See above |
| 7 | Voyager Digital, LLC | Coinbase, Inc. | Coinbase Prime Institutional Client Agreement | $ 0.00 |
| 8 | Voyager Digital, LLC | Coinbase Custody Trust Company, LLC | Custodial Services Agreement | $ 0.00 |
| 9 | Voyager Digital, LLC | CDW | CDW Customer Service Order Form Google Workspace | $ 0.00 |
| 10 | Voyager Digital, LLC | Chainalysis Inc. | Order Form | $ 0.00 |
| 11 | Voyager Digital Holdings, Inc. | Cloudflare | Enterprise Service Order Form | $ 0.00 |
| 12 | Voyager Digital Holdings, Inc. | Cloudflare | Insertion Order Form | See above |
| 13 | Voyager Digital, LLC | Concur Technologies, Inc. | Order Form | $ 0.00 |
| 14 | Voyager Digital, LLC | Copper Technologies (UK) Limited | Third Party Agreement | $ 0.00 |
| 15 | Voyager Digital, LLC | Copper Technologies (UK) Limited | Side Letter To Copper's Terms & Conditions — Crypto Asset Service | See above |
| 16 | Voyager Digital Holdings, Inc. | Datasite | Statement of Work | $ 0.00 |
| 17 | Voyager Digital, LLC | Dropbox | Dropbox Services Agreement | $ 0.00 |
| 18 | Voyager Digital Ltd. | Fireblocks Inc. | Fireblocks License Agreement | $ 0.00 |
| 19 | Voyager Digital Ltd. | Fireblocks Inc. | First Amendment to the Fireblocks License Agreement | See above |
| 20 | Voyager Digital Ltd. | Fivetran | Service Order Form | $ 0.00 |
| 21 | Voyager Digital, LLC | GoDaddy | Universal Terms Of Service Agreement | $ 0.00 |
| 22 | Voyager Digital Ltd. | Goodbay Technologies, Inc. | Client Services Agreement | $ 63,011.00 |
| 23 | Voyager Digital, LLC | Iterable | Enterprise Sales Order Form | $ 35,423.46 |
| 24 | Voyager Digital, LLC | JAMF | Software License And Services Agreement | $ 0.00 |
| 25 | Voyager Digital, LLC | MaestroQA | SaaS Services Order Form | $ 0.00 |
| 26 | Voyager Digital Holdings, Inc. | Network Redux LLC | Statement of Work | $ 1,727.82 |
| 27 | Voyager Digital, LLC | Okta | Master Subscription Agreement | $ 0.00 |
| 28 | Voyager Digital, LLC | Oracle America, Inc. | Oracle Netsuite Fee Estimate | $ 0.00 |
| 29 | Voyager Digital Ltd. | Plaid Inc. (f.k.a. Plaid Technologies, Inc.) | Plaid Inc. Master Services Agreement | $ 100,000.00 |
| 30 | Voyager Digital Ltd. | Plaid Inc. (f.k.a. Plaid Technologies, Inc.) | Assets Addendum to the Master Services Agreement | See above |
| 31 | Voyager Digital, LLC | Plaid Inc. (f.k.a. Plaid Technologies, Inc.) | Addendum to Master Services Agreement | See above |
| 32 | Voyager Digital, LLC | RECIPROCITY, INC. | Order Form | $ 0.00 |
| 33 | Voyager Digital, LLC | Segment.io, Inc | Order Form | $ 0.00 |
| 34 | Voyager Digital, LLC | Sift Science, Inc | Order Form | $ 77,240.41 |
| 35 | Voyager Digital, LLC | Slack Technologies, LLC | Order Form | $ 0.00 |
| 36 | Voyager Digital, LLC | Snowflake | Order Form | $ 0.00 |
| 37 | Voyager Digital, LLC | Socure Inc. | MSA & Amendments #1-7 | $ 1,404,493.38 |
| 38 | Voyager Digital, LLC | Tableau Software, LLC | Tableau Purchase Authorization Form | $ 0.00 |
| 39 | Voyager Digital, LLC | Talos | Software Subscription Agreement | $ 195,685.88 |
| 40 | Voyager Digital Holdings, Inc. | ThoughtWorks, Inc. | Statement of Work and Subsequent Amendments | $ 0.00 |
| 41 | Voyager Digital Holdings, Inc. | ThoughtWorks, Inc. | Master Services Agreement | See above |
| 42 | Voyager Digital, LLC | TriNet HR III, Inc. | TriNet Technology Services Requisition Form | $ 0.00 |
| 43 | Voyager Digital Holdings, Inc. | TriNet HR III, Inc. | Consent to Assignment of TriNet Contract | See above |
| 44 | Voyager Digital, LLC | Twilio Inc. | Order Form | $ 20,339.21 |
| 45 | Voyager Digital, LLC | Usio, Inc. | Automated Clearing House Services Agreement and Second through Fourth Amendments | $ 3,700.00 |
| 46 | Voyager Digital Holdings, Inc. | 33 Irving Tenant LLC | WeWork New York and Subsequent Amendments | $ 0.00 |
| 47 | Voyager Digital, LLC | 78 SW 7th Street Tenant LLC | WeWork Miami | See above |
| 48 | Voyager Digital Holdings, Inc. | 150 4th Ave N Tenant LLC | WeWork Nashville | See above |
| 49 | Voyager Digital, LLC | Zendesk | Service Order Form | 23,335.71 |

# Exhibit A-1

**Redline of <u>Exhibit A</u> to Exhibit A of the Initial Plan Supplement**

| No. | Debtor Name | Counterparty Name | Description of Contract | Cure Amount |
|---|---|---|---|---|
| 1 | Voyager Digital, LLC | Ada Support Inc. | ADA Services Agreement and Amendment #1 | $ 0.00 |
| 2 | Voyager Digital, LLC | Amazon Web Services | AWS Customer Agreement | $ 220,614.04 |
| 3 | Voyager Digital, LLC | Amazon Web Services | AWS Service Terms | See above |
| 4 | Voyager Digital, LLC | Anchorage | Digital Bank Order Form | $ 0.00 |
| 5 | Voyager Digital Holdings, Inc. | Blockdaemon Inc. | Order Form | $ 351.03 |
| 6 | Voyager Digital Holdings, Inc. | Blockdaemon Inc. | Validator Agreement | See above |
| 7 | Voyager Digital, LLC | Coinbase, Inc. | Coinbase Prime Institutional Client Agreement | $ 0.00 |
| 8 | Voyager Digital, LLC | Coinbase Custody Trust Company, LLC | Custodial Services Agreement | $ 0.00 |
| 9 | Voyager Digital, LLC | CDW | CDW Customer Service Order Form Google Workspace | $ 0.00 |
| 10 | Voyager Digital, LLC | Chainalysis Inc. | Order Form | $ 0.00 |
| 11 | Voyager Digital Holdings, Inc. | Cloudflare | Enterprise Service Order Form | $ 0.00 |
| 12 | Voyager Digital Holdings, Inc. | Cloudflare | Insertion Order Form | See above |
| 13 | Voyager Digital, LLC | Concur Technologies, Inc. | Order Form | $ 0.00 |
| 14 | Voyager Digital, LLC | Copper Technologies (UK) Limited | Third Party Agreement | $ 0.00 |
| 15 | Voyager Digital, LLC | Copper Technologies (UK) Limited | Side Letter To Copper's Terms & Conditions — Crypto Asset Service | See above |
| 16 | Voyager Digital Holdings, Inc. | Datasite | Statement of Work | $ 0.00 |
| 17 | Voyager Digital, LLC | Dropbox | Dropbox Services Agreement | $ 0.00 |
| 18 | Voyager Digital Ltd. | Fireblocks Inc. | Fireblocks License Agreement | $ 0.00 |
| 19 | Voyager Digital Ltd. | Fireblocks Inc. | First Amendment to the Fireblocks License Agreement | See above |
| 20 | Voyager Digital, LLC | Fivetran | Service Order Form | $ 0.00 |
| 21 | Voyager Digital, LLC | GoDaddy | Universal Terms Of Service Agreement | $ 0.00 |
| 22 | Voyager Digital Ltd. | Goodbay Technologies, Inc. | Client Services Agreement | $ ~~5463,60~~411.00 |
| 23 | Voyager Digital, LLC | Iterable | Enterprise Sales Order Form | $ 35,423.46 |
| 24 | Voyager Digital, LLC | JAMF | Software License And Services Agreement | $ 0.00 |
| 25 | Voyager Digital, LLC | MaestroQA | SaaS Services Order Form | $ 0.00 |
| 26 | Voyager Digital Holdings, Inc. | Network Redux LLC | Statement of Work | $ 1,727.82 |
| 27 | Voyager Digital, LLC | Okta | Master Subscription Agreement | $ 0.00 |
| 28 | Voyager Digital, LLC | Oracle America, Inc. | Oracle Netsuite Fee Estimate | $ 0.00 |
| 29 | Voyager Digital Ltd. | Plaid Inc. (f.k.a. Plaid Technologies, Inc.) | Plaid Inc. Master Services Agreement | $ 100,000.00 |
| 30 | Voyager Digital Ltd. | Plaid Inc. (f.k.a. Plaid Technologies, Inc.) | Assets Addendum to the Master Services Agreement | See above |
| 31 | Voyager Digital Ltd. | Plaid Inc. (f.k.a. Plaid Technologies, Inc.) | Addendum to Master Services Agreement | See above |
| 32 | Voyager Digital, LLC | RECIPROCITY, INC. | Order Form | $ 0.00 |
| 33 | Voyager Digital, LLC | Segment.io, Inc | Order Form | $ 0.00 |
| 34 | Voyager Digital, LLC | Sift Science, Inc | Order Form | $ 77,240.41 |
| 35 | Voyager Digital, LLC | Slack Technologies, LLC | Order Form | $ 0.00 |
| 36 | Voyager Digital, LLC | Snowflake | Order Form | $ 0.00 |
| 37 | Voyager Digital, LLC | Socure Inc. | MSA & Amendments #1-7 | $ 1,404,493.38 |
| 38 | Voyager Digital, LLC | Tableau Software, LLC | Tableau Purchase Authorization Form | $ 0.00 |
| 39 | Voyager Digital, LLC | Talos | Software Subscription Agreement | $ 195,685.88 |
| 40 | Voyager Digital Holdings, Inc. | ThoughtWorks, Inc. | Statement of Work and Subsequent Amendments | See above |
| 41 | Voyager Digital Holdings, Inc. | ThoughtWorks, Inc. | Master Services Agreement | See above |
| 42 | Voyager Digital, LLC | TriNet HR III, Inc. | TriNet Technology Services Requisition Form | $ 0.00 |
| 43 | Voyager Digital Holdings, Inc. | TriNet HR III, Inc. | Consent to Assignment of TriNet Contract | See above |
| 44 | Voyager Digital, LLC | Twilio Inc. | Order Form | $ 20,339.21 |
| 45 | Voyager Digital, LLC | Usio, Inc. | Automated Clearing House Services Agreement and Second through Fourth Amendments | $ 3,700.00 |
| 46 | Voyager Digital Holdings, Inc. | 33 Irving Tenant LLC | WeWork New York and Subsequent Amendments | See above |
| 47 | Voyager Digital, LLC | 78 SW 7th Street Tenant LLC | WeWork Miami | See above |
| 48 | Voyager Digital Holdings, Inc. | 150 4th Ave N Tenant LLC | WeWork Nashville | See above |
| 49 | Voyager Digital, LLC | Zendesk | Service Order Form | $ 23,335.71 |

**Exhibit D**

**Restructuring Transactions Memorandum**

*Restructuring Transactions Memorandum*

In accordance with the Plan, the steps set forth in this Restructuring Transactions Memorandum[1] remain subject to modification until the Effective Date. The following assumes that the Sale Transaction is consummated by the Outside Date. If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement (the "APA") is terminated, a materially different Restructuring Transactions Memorandum will be filed.

Unless otherwise set forth below, the following steps shall occur in the order set forth below.

1. Prior to the Effective Date, including in connection with the Rebalancing Exercise (as defined in the APA), Voyager Digital, LLC, a Delaware limited liability company ("Seller") may transfer Cryptocurrency to BAM Trading Services Inc. d/b/a Binance.us, a Delaware corporation ("Purchaser") or an Affiliate thereof or another third party as permitted or required by the APA (any such transferee, a "Step 1 Transferee"); provided, any such transfer by Seller to a Step 1 Transferee (including pursuant to Section 6.11(b) or 6.12(e) of the APA) shall be made in a manner such that legal title of the transferred Cryptocurrency does not pass to a Step 1 Transferee and without a Step 1 Transferee acquiring any ownership interest in such transferred Cryptocurrency, and any Step 1 Transferee shall hold or utilize, as applicable, any such Cryptocurrency solely for the specific purpose that Seller transferred such Cryptocurrency to such Step 1 Transferee pursuant to the APA.

2. [HoldCo] is designated as the Wind-Down Debtor[, and no Wind-Down Trust will be established].

3. On the Effective Date (and, for the avoidance of doubt, following the Rebalancing Exercise (as defined in the APA)), with respect to Holders of Account Holder Claims who are entitled to receive Net Owed Coins pursuant to the Plan and the APA on the Effective Date, Seller shall to the maximum extent possible (and for such purpose, proportionately across such Holders of Account Holder Claims) be deemed to make an in-kind distribution, from the fraction of Acquired Coins (as defined in the APA) attributable to such Holders of Account Holder Claims on such date, to such Holders of Account Holder Claims of the same type of Cryptocurrency in each such Person's account on the Voyager Platform (as defined in the APA) as of the Petition Date, in each case, in proportionate satisfaction of such Person's Account Holder Claim, and immediately thereafter each such Holder of an Account Holder Claim shall be deemed to transfer such Cryptocurrency that it received to Purchaser or Purchaser's applicable Affiliate in a manner consistent with the APA. To the extent that any of the Cryptocurrency that is deemed transferred in this Step 3 is held by a Step 1 Transferee for the benefit of Seller, such Step 1 Transferee shall be deemed to transfer such Cryptocurrency back to Seller immediately prior to Seller's deemed transfer of such Cryptocurrency to the applicable Holder of an Account Holder Claim.

4. [On the Effective Date, in redemption of all of the stock of TopCo pursuant to a plan (and in complete liquidation of TopCo pursuant to a plan), Existing Equity Interests shall be cancelled

---

[1] Capitalized terms that are not defined herein shall have the meaning ascribed to them in the Plan or Disclosure Statement, as the case may be.

and Holders of Existing Equity Interests shall receive the entitlement to payments from the Wind-Down Debtor of their Pro Rata share of Wind-Down Trust Assets as determined pursuant to the Plan. For the avoidance of doubt, Voyager Digital Ltd. shall continue to exist with no new equity being issued or held by any party.]

5. The Debtors shall make other distributions on the Effective Date pursuant to the Plan.

6. If Seller delivers any Delayed Acquired Coins (as defined in the APA) to Purchaser or an applicable Affiliate (a "Step 6 Transferee") for such person to convert into United States Dollars, and such Step 6 Transferee thereafter returns such United States Dollars to Seller for Seller to distribute in accordance with the Plan, all pursuant to Section 6.12(a) of the APA, then the delivery of such Delayed Acquired Coins by Seller shall be made in a manner such that legal title of such Delayed Acquired Coins does not pass to a Step 6 Transferee and without a Step 6 Transferee acquiring any ownership interest in such Cryptocurrency, and any Step 6 Transferee shall hold or utilize, as applicable, any such Cryptocurrency solely for the specific purpose that Seller transferred such Cryptocurrency to such Step 6 Transferee pursuant to the APA.

7. If Holders of Account Holder Claims become entitled to receive Net Owed Coins pursuant to the Plan and the APA after the Effective Date, then such Holders of Account Holder Claims shall be deemed to receive such Net Owed Coins through the transactions described in Step 3, applied *mutatis mutandis*.

## **Exhibit E**

### **Identity of Plan Administrator and Oversight Committee**

The Committee, in consultation with the Debtors, has designated Paul R. Hage as the Plan Administrator, and Russell Stewart, Richard Kiss, and Melissa Freeman as Members of the Oversight Committee.

**Exhibit F**

**Plan Administrator Agreement**

# PLAN ADMINISTRATOR AGREEMENT

This Plan Administrator Agreement (as it may be amended, modified, supplemented, or restated from time to time, this "Agreement") dated as of [●], 2023, is made and entered into by and among the entities listed as "Debtors" on the signature pages hereto (each, a "Debtor"), and Paul R. Hage, solely in his capacity as Plan Administrator for purposes of this Agreement (the "Plan Administrator"), and is executed in connection with and pursuant to the terms of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* dated January 10, 2023 [Docket No. 852] (as it may be amended, modified, supplemented, or restated from time to time, the "Plan").[1]

## RECITALS

WHEREAS, on July 5, 2022, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, (the "Bankruptcy Court"), and their chapter 11 cases are being jointly administered as *In re Voyager Digital Holdings, Inc., et al.,* Case No. 23-10943 (MEW);

WHEREAS, on July 19, 2022, the United States Trustee for Region 2 (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee");[2]

WHEREAS, the Plan contemplates that a plan administrator will be appointed to perform its duties in accordance with the Plan and this Agreement;

WHEREAS, the Plan provides that the Plan Administrator will, among other things, retain, preserve, and distribute certain assets of the Wind-Down Debtor for the benefit of Holders of Allowed Claims or Allowed Interests that are entitled to receive distributions pursuant to the terms of the Plan, whether or not such Claims or Interests are Allowed as of the Effective Date;

WHEREAS on March [●], 2023, the Bankruptcy Court entered an order ("Confirmation Order")[3] confirming the Plan, which became effective on [●], 2023 ("Effective Date");

WHEREAS, this Agreement is entered into in accordance with, and to facilitate the implementation and execution of, the Plan; and

WHEREAS, on the Effective Date of the Plan, the Plan Administrator shall be appointed in accordance with the Plan, and the Plan Administrator is willing to serve in such capacity, in each case upon the terms set forth in this Agreement and pursuant to the Plan;

WHEREAS, the Plan provides that the Plan Administrator shall act for the Debtors and Wind-Down Debtor in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions of the Plan and this Agreement; and

---

[1]    All capitalized terms used in this Agreement and not otherwise defined herein have the meanings ascribed to such defined terms in the Plan.

[2]    Docket No. 106.

[3]    Docket No. [●].

NOW, THEREFORE, in accordance with the Plan and the Confirmation Order, and in consideration of the promises, and the mutual covenants and agreements of the Parties contained in the Plan and herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties agree and declare as follows:

## RECITALS, INTERPRETATION, AND CONSTRUCTION

1.1     <u>Recitals</u>. The Recitals are incorporated into and made terms of this Agreement.

1.2     <u>Interpretation; Headings</u>. All references herein to specific provisions of the Plan or Confirmation Order are without exclusion or limitation of other applicable provisions of the Plan or Confirmation Order. Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender. The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the provisions of this Agreement.

1.3     <u>Construction of Agreement</u>. This Agreement shall not be construed to impair or limit in any way the rights of any Person under the Plan.

1.4     <u>Conflict Among Plan Documents</u>. In the event of any inconsistency between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall govern and control. In the event of any inconsistency between this Agreement, on the one hand, and the Confirmation Order, on the other hand, the Confirmation Order shall control and take precedence.

## ARTICLE II
## ACCEPTANCE OF POSITION; OBLIGATION TO PAY CLAIMS; FIDUCIARY
**STATUS**<u>Acceptance</u>. (a) Paul. R. Hage hereby accepts appointment as the Plan Administrator; and (b) Paul R. Hage agrees to observe and perform all duties and obligations imposed upon the Plan Administrator under the Plan, this Agreement, other orders of the Bankruptcy Court, and applicable law.

2.2     <u>Fiduciary</u>. The Plan Administrator shall perform its obligations consistent with the Plan, this Agreement, and applicable orders of the Bankruptcy Court. The Plan Administrator shall be the sole officer and director of the Wind-Down Debtor.  The Plan Administrator shall hold the equity of the Voyager Digital Ltd., to the extent that any new equity is issued, in an agency capacity, for the benefit of and to facilitate the rights of Holders of Interests provided under the Plan. The Plan Administrator shall act for the Wind-Down Debtor in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions in the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Wind-Down Debtor shall be deemed to have resigned, solely in their capacities as such, and a representative of the Plan Administrator shall be appointed as the sole director and sole officer of the Wind-Down Debtor and shall succeed to the powers of the Wind-Down Debtor's directors and officers. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtor. For the avoidance of doubt, the foregoing shall not limit the authority of the Wind-Down Debtor or the Plan Administrator, as applicable, to continue the employment any

former director or officer, including pursuant to the Purchase Agreement (if any) or any transition services agreement entered into on or after the Effective Date by and between the Wind-Down Debtor and the Purchaser.

## ARTICLE III
## GENERAL POWERS, RIGHTS AND OBLIGATIONS OF THE PLAN ADMINISTRATOR

3.1     <u>Rights, Powers, and Privileges of Plan Administrator Generally</u>. Effective as of the Effective Date, the Plan Administrator is appointed under the Plan for purposes of implementing the terms and conditions of the Plan with respect to (i) effectuating the transactions beneficial and necessary to wind down the Wind-Down Debtor, including as set forth in the Restructuring Transactions Memorandum, (ii) administration of, and distributions with respect to, the claims asserted against the Debtors, and (iii) such other matters agreed to by the Debtors and Plan Administrator in accordance with the terms of the Plan (collectively, the "<u>Plan Administrator Responsibilities</u>"), in each case, subject to the terms and conditions set forth in this Agreement, the Plan, and the Confirmation Order. The Plan Administrator is hereby appointed to make all disbursements and distributions under the Plan, subject to the terms and conditions set forth in this Agreement, the Plan, and the Confirmation Order.  The Wind-Down Debtor shall be managed, administered, and wound down by the Plan Administrator in accordance with the terms of the Plan, in consultation with the Oversight Committee established pursuant to this Agreement (the "<u>Oversight Committee</u>") as set forth in this Agreement, and the Plan Administrator shall have full authority to administer the provisions of the Plan, and subject to the terms and conditions of this Agreement, the Plan, and the Confirmation Order. In performing the Plan Administrator Responsibilities, the Plan Administrator shall be deemed to be a judicial substitute and estate representative for the Wind-Down Debtor as the party-in-interest in the Chapter 11 Cases, under the Plan, or in any judicial proceeding or appeal to which any of the Debtors or Wind-Down Debtor is a party. The Plan Administrator shall be deemed a "representative" of the Wind-Down Debtor as contemplated by Bankruptcy Code section 1123(b)(3)(B), and performance of certain services in connection with this Agreement shall be authorized by the execution of this Agreement to the extent not already authorized by the Plan or the Confirmation Order.

3.1.1   <u>Power to Contract</u>. In furtherance of the purpose of the Wind-Down Debtor, and except as otherwise specifically restricted in the Plan, Confirmation Order, or this Agreement, the Plan Administrator shall have the right and power on behalf of the Wind-Down Entity, and also may cause the Wind-Down Debtor, to enter into any covenants or agreements binding the Wind-Down Debtor, and to execute, acknowledge and deliver any and all instruments that are necessary or deemed by the Plan Administrator to be consistent with and advisable in furthering the purpose of the Wind-Down Debtor in accordance with the Plan, Confirmation Order, and this Agreement.

3.1.2   <u>Ultimate Right to Act Based on Advice of Counsel or Other Professionals</u>. Nothing in this Agreement shall be deemed to prevent the Plan Administrator from taking or refraining to take any action on behalf of the Wind-Down Debtor that, based upon the advice of counsel or other professionals, the Plan Administrator determines he is obligated to take or to refrain from taking in the performance of any duty under the Plan, Confirmation Order, or this Agreement.

3

      3.2    <u>Powers of Plan Administrator</u>. The Plan Administrator shall provide the post-Effective Date administration, wind down, dissolution, and liquidation services related to the Plan Administrator Responsibilities that are necessary, required, desirable, or advisable to effectuate the terms and conditions of the Plan and the wind down of the Wind-Down Debtor, in consultation with the Oversight Committee as set forth in this Agreement. Subject to the oversight and direction of the Oversight Committee set forth in Article VI of this Agreement, the Plan Administrator shall have all duties, powers, and rights set forth herein, in the Plan, and in the Confirmation Order, including but not limited to, the following services related to the Wind-Down Debtor:

      3.2.1    oversee the accounts of the Wind-Down Debtor and the wind down and dissolution of the Wind-Down Debtor, including effectuating the transactions described in the Restructuring Transactions Memorandum;

      3.2.2    receive, maintain, conserve, supervise, prosecute, collect, settle, manage, invest, protect, and where appropriate, cause the Wind-Down Debtor to abandon the Wind-Down Debtor's Assets, including causing the Wind-Down Debtor to invest any moneys held as Wind-Down Debtor's Assets;

      3.2.3    open and maintain bank accounts on behalf of or in the name of the Wind-Down Debtor, including, in the Plan Administrator's discretion, separate bank accounts for each of the Debtors;

      3.2.4    cause the Wind-Down Debtor to enter into any agreement or execute any document or instrument required by or consistent with the Plan, the Confirmation Order, or this Agreement, and to perform all obligations thereunder;

      3.2.5    collect and liquidate all Wind-Down Debtor's Assets, including the sale of any Wind-Down Debtor's Assets;

      3.2.6    protect and enforce the rights to the Wind-Down Debtor's Assets (including any Vested Causes of Action and Contributed Third-Party Claims) vested in the Wind-Down Debtor and Plan Administrator by this Agreement by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

      3.2.7    investigate any Wind-Down Debtor's Assets, and any other potential Vested Causes of Action and Contributed Third-Party Claims;

      3.2.8    review, reconcile, compromise, settle, or object to Claims or Interests of any kind;

      3.2.9    cause the Wind-Down Debtor to seek the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004;

      3.2.10    cause the Wind-Down Debtor to retain professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to this Agreement and pay the reasonable compensation thereof;

3.2.11 cause the Wind-Down Debtor to pay all of their lawful expenses, debts, charges, taxes, and other liabilities, and make all other payments relating to the Wind-Down Debtor's Assets, solely out of Wind-Down Debtor's Assets;

3.2.12 prosecute and settle the Vested Causes of Action, including, without limitation, the 3AC Claims, FTX Claims, Alameda Claims, Contributed Third-Party Claims, and any causes of action not included in the Asset Purchase Agreement or released under the Plan;

3.2.13 cause the Wind-Down Debtor to review, reconcile, pursue, commence, prosecute, compromise, settle, dismiss, release, waive, withdraw, abandon, resolve, or elect not to pursue all Vested Causes of Action and Contributed Third-Party Claims;

3.2.14 acquire litigation and other claims related to the Debtors, and prosecute such claims;

3.2.15 review and compel turnover of the Wind-Down Debtor's property;

3.2.16 calculate and make all Distributions to the holders of Allowed Claims against each Debtor and, solely to the extent of payment in full of Allowed Claims, to holders of Allowed Interests, as provided for in, or contemplated by, the Plan and this Agreement; *provided* that because the Plan does not substantively consolidate the Debtors' Estates, the Plan Administrator shall make Distributions from the Wind-Down Debtor's Assets of each Debtor to the holders of Claims and Interests (if applicable) against that specific Debtor;

3.2.17 establish, administer, adjust, and maintain the Wind-Down Reserve and the Disputed Claims Reserve;

3.2.18 cause the Wind-Down Debtor to withhold from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Plan Administrator has determined, based upon the advice of his agents or professionals, may be required to be withheld from such Distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

3.2.19 in reliance upon the Debtors' Schedules, the official Claims Register maintained in the Chapter 11 Cases and the Debtors' filed lists of equity security holders, review, and where appropriate, cause the Wind-Down Debtor to allow or object to Claims and (if applicable) Interests, and supervise and administer the Wind-Down Debtor's commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and (if applicable) Disputed Interests required to be administered by the Wind-Down Debtor;

3.2.20 cause the Wind-Down Debtor to make all tax withholdings, file tax information returns, file and prosecute tax refunds claims, make tax elections by and on behalf of the Wind-Down Debtor, and file tax returns for the Wind-Down Debtor pursuant to and in accordance with the Plan, and pay taxes, if any, payable for and on behalf of the Wind-Down Debtor, and to file any and all remaining tax returns for the Debors and the Estates, as applicable; *provided, however*, that notwithstanding any other provision of this Agreement, the Plan Administrator shall not have any responsibility or personal liability in any capacity whatsoever for

5

the signing or accuracy of the Debtors' income tax returns that are due to be filedd after the
Effective Date or for any tax liability related thereto;

    3.2.21 cause the Wind-Down Debtor to abandon or donate to a charitable
organization qualifying under IRC section 501(c)(3) any Wind-Down Debtor's Assets that the Plan
Administrator determines to be too impractical to distribute or of inconsequential value to the
Wind-Down Debtor;

    3.2.22 cause the Wind-Down Debtor to seek a determination of tax liability or
refund under Bankruptcy Code section 505;

    3.2.23 cause the Wind-Down Debtor to establish reserves for taxes, assessments,
and other expenses of administration of the Wind-Down Debtor as may be necessary and
appropriate for the proper operation of matters incident to the Wind-Down Debtor;

    3.2.24 if the Plan Administrator deems appropriate in the Plan Administrator's sole
discretion, seek to establish a bar date for filing proofs of Interest in any Debtor or otherwise to
determine the holders and extent of Allowed Interests in any Debtor;

    3.2.25 cause the Wind-Down Debtor to purchase and carry all insurance policies
that the Plan Administrator deems reasonably necessary or advisable and to pay all associated
insurance premiums and costs;

    3.2.26 undertake all administrative functions remaining in the Chapter 11 Cases to
the extent necessary to carry out the Wind-Down Debtor's or Plan Administrator's duties under
the Plan, including reporting and making required payments of fees to the U.S. Trustee and
overseeing the closing of the Chapter 11 Cases;

    3.2.27 exercise, implement, enforce, and discharge all of the terms, conditions,
powers, duties, and other provisions of the Plan, the Confirmation Order, and this Agreement; and

    3.2.28 take all other actions consistent with the provisions of the Plan and this
Agreement that the Plan Administrator deems reasonably necessary or desirable to administer the
Wind-Down Debtor.

    3.3   <u>Exclusive Authority to Pursue Vested Causes of Action</u>. The Plan Administrator
shall have the exclusive right, power, and interest to review, reconcile, enforce, collect,
compromise, settle, or elect not to pursue the Vested Causes of Action, including, without
limitation, the FTX Claims, 3AC Claims, Alameda Claims, and the Contributed Third-Party
Claims, on behalf of the Wind-Down Debtor. The Plan Administrator shall be the sole
representative of the Estates under Bankruptcy Code section 1123(b)(3) with respect to the Vested
Causes of Action. The Wind-Down Debtor shall be vested with and entitled to assert all setoffs
and defenses of the Debtors or the Wind-Down Debtor and the Contributed Third-Party Claimants
to any counterclaims that may be asserted by any defendant with respect to any Vested Cause of
Action or Contributed Third-Party Claim, as applicable. The Wind-Down Debtor shall also be
vested with and entitled to assert all of the Debtors' and the Estates' rights with respect to any such
counterclaims, under Bankruptcy Code section 558. All costs and expenses of pursuing the Vested
Causes of Action and the Contributed Third-Party Claims shall be satisfied first from the Wind-

Down Debtor's Assets, and all other expenses of the Wind-Down Debtor shall be paid or reserved for, before any proceeds of Vested Causes of Action or Contributed Third-Party Claims are distributed. For the avoidance of doubt, all evidentiary privileges of the Debtors of any type or nature whatsoever, including the Debtors' attorney-client privilege, the work product privilege, and any other applicable evidentiary privileges of the Debtors, shall and shall be deemed to be assigned by the Debtors and shall vest in the Wind-Down Debtor as of the Effective Date.

3.4    Authority to Enter Into Settlement Agreements. The Plan Administrator shall have the exclusive right to enter into settlements regarding the Vested Causes of Action and Contributed Third-Party Claims without requiring court approval, subject to gaining majority approval from the Oversight Committee for any such action in excess of $5,000,000.00.

3.5    Abandonment. If, in the Plan Administrator's reasonable judgment, any non-cash Wind-Down Debtor's Assets cannot be sold in a commercially reasonable manner or the Plan Administrator believes in good faith that such property has inconsequential value to the Wind-Down Debtor, the Plan Administrator shall have the right to cause the Wind-Down Debtor to abandon or otherwise dispose of such property, including by donation of such property to a charitable organization.

3.6    Responsibility for Administration of Claims. From and after the Effective Date, the Wind-Down Debtor shall become responsible for administering and paying Distributions to the holders of Allowed Claims and (if applicable) Allowed Interests. The Wind-Down Debtor shall have the exclusive right to object to the allowance of any Claim or Interest on any ground, to file, withdraw, or litigate to judgment objections to Claims or Interests, to settle or compromise any Disputed Claims or Disputed Interests without any further notice to or action, order, or approval by the Bankruptcy Court, and to assert all defenses of the Debtors and their Estates. The Wind-Down Debtor shall also be entitled to assert all of the Debtors' and the Estates' rights under, without limitation, Bankruptcy Code section 558. The Wind-Down Debtor may also seek estimation of any Claims under and subject to Bankruptcy Code section 502(c).

3.7    Agents and Professionals. The Plan Administrator may, but shall not be required to, consult with and retain attorneys, financial advisors, accountants, appraisers, and other professionals the Plan Administrator believes have qualifications necessary to assist in the administration of the Wind-Down Debtor, including professionals previously retained by the Debtors or the Committee. For the avoidance of doubt, and without limitation of applicable law, nothing in this Agreement shall limit the Plan Administrator from engaging counsel or other professionals, including the Plan Administrator himself, to do work for the Wind-Down Debtor. The Plan Administrator may pay the reasonable salaries, fees, and expenses of such Persons out of the Wind-Down Debtor's Assets in the ordinary course of business.

3.8    Maintenance and Disposition of Wind-Down Debtor's Records. The Plan Administrator shall maintain accurate records of the administration of the Wind-Down Debtor's Assets, including receipts and disbursements and other activity of the Wind-Down Debtor. The Wind-Down Debtor may, but shall have no obligation to, engage a claims agent (including, but not limited to, the Claims, Noticing, and Solicitation Agent) to continue to maintain and update the Claims Register maintained in the Chapter 11 Cases throughout the administration of the Wind-Down Debtor. To the extent of any Unsecured Claims reflected thereon, the Claims Register may

7

serve as the Plan Administrator's register of beneficial interests held by creditors. The Plan Administrator shall be provided with originals or copies of or access to all documents and business records of the Debtors that are in the possession of the Debtors and reasonably necessary for the disposition of the Wind-Down Debtor's Assets and objections to Claims or (if applicable) Interests except, in each case, to the extent necessary to: (i) ensure compliance with any applicable law or an order of the Bankruptcy Court; (ii) preserve any applicable privilege (including the attorney-client privilege); or (iii) comply with any contractual confidentiality obligations. The Debtors and the Wind-Down Debtor shall use commercially reasonable efforts to cooperate with the Plan Administrator in connection with the Plan Administrator's investigation and prosecution of Vested Causes of Action, Contributed Third-Party Claims, and objections to Claims and Interests, including with respect to providing evidence and information as reasonably requested by the Plan Administrator. Nothing in the Plan or the Confirmation Order shall affect the obligations of the pre-Effective Date Debtors, the Wind-Down Debtor, or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

3.9     Reporting Requirements. The Plan Administrator shall provide the Oversight Committee the information and reports they may reasonably request concerning the Wind-Down Debtor's administration.

**ARTICLE IV**
**DISTRIBUTIONS**

4.1     Reserves; Pooling of Reserved Funds. Before any distribution can be made to any holders of Allowed Claims and (if applicable) Allowed Interests, the Plan Administrator shall, in his reasonable discretion, establish reserves in an amount sufficient to meet any and all expenses and liabilities of the Wind-Down Debtor, including attorneys' fees and expenses, the fees and expenses of other professionals, and fees owed the U.S. Trustee. The Wind-Down Debtor may also maintain as necessary a Disputed Claims Reserve with respect to Claims and (if applicable) Interests required to be administered by the Wind-Down Debtor. For the avoidance of doubt, the Plan Administrator may withhold any distribution pending the Plan Administrator's determination of whether to object to any Claim or Interest. Any such withheld distribution shall become part of the Wind-Down Debtor's Disputed Claims Reserve and shall be distributed to the appropriate claimholder no later than the first Distribution Date after a decision is made not to object to the pertinent Claim or Interest, or the Claim or Interest becomes Allowed. The Plan Administrator need not maintain the Wind-Down Debtor's reserves in segregated bank accounts and may pool funds in the reserves with each other and other funds of the Wind-Down Debtor; *provided*, *however*, that the Wind-Down Debtor shall treat all such reserved funds as being held in a segregated manner in its books and records, by use of book entries, subledgers, or other means of recognizing the separateness of non-consolidated estates, such that the Wind-Down Debtor will be able to account for all distributions under the Plan separately for each Debtor, as expressly contemplated by the Plan.

4.2     Plan Distributions in General. Except as otherwise provided in the Plan, the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any

such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.

4.3    Record Date of Distributions. On the Distribution Record Date, the various transfer registers for each Class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims or Interests. The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

4.4    Tax Identification Numbers. The Plan Administrator may require any creditor to furnish its taxpayer identification number as assigned by the Internal Revenue Service, including without limitation by providing an executed current Form W-9, Form W-8 or similar tax form, as a prerequisite to receiving any distribution under the Plan or this Agreement. If a creditor does not timely provide the Plan Administrator with its taxpayer identification number in the manner and by the deadline established by the Plan Administrator and/or the Plan, the creditor shall be deemed to have forfeited its right to any current, reserved or future distributions provided for under the Plan and such creditor's Claim or Interest shall be disallowed and expunged without further order of the Bankruptcy Court. Any such forfeited distribution shall be deemed to have reverted back to the Wind-Down Debtor for all purposes, including for distributions to other holders of Allowed Claims or Allowed Interests (as applicable) against the particular Debtor in respect of which the forfeited distribution was made, notwithstanding any federal, provincial or state escheat, abandoned or unclaimed property law to the contrary.

4.5    Unclaimed and Undeliverable Distributions. If any distribution to a creditor is returned to the Plan Administrator as undeliverable and/or otherwise remains unclaimed, no further Plan Distributions to such creditor shall be made unless and until the creditor claims the distribution(s) by timely notifying the Plan Administrator in writing of any information necessary to make the distribution to the creditor in accordance with this Agreement, the Plan, and applicable law, including such creditor's then-current address or taxpayer identification number. If a creditor timely provides the Plan Administrator the necessary information within the period specified in Article VI.C(6) of the Plan, all missed distributions shall be made to the creditor as soon as is practicable, without interest. After the passage of the deadlines set forth in Article VI.C(6) of the Plan, such distribution shall be deemed unclaimed property under Bankruptcy Code section 347(b) and all title to and beneficial interest in such undeliverable Distribution shall revert to or remain in the Wind-Down Debtor automatically and without any need for further order by the Bankruptcy Court, notwithstanding any federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary, and shall be distributed in accordance with this Article IV and the Plan. For the avoidance of doubt, undeliverable or unclaimed Plan distributions shall be administered in accordance with Article VI of the Plan as supplemented hereby.

9

4.6     No Responsibility to Attempt to Locate Creditors. The Plan Administrator may, in his sole discretion, attempt to determine a creditor's current address or otherwise locate a creditor, but nothing in this Agreement or the Plan shall require the Plan Administrator to do so.

4.7     Disallowance of Claims and Interests; Cancellation of Corresponding Beneficial Interests. All Claims in respect of undeliverable or unclaimed Distributions that have been deemed to have reverted back to the Plan Administrator for all purposes (including, but not limited to, for distribution to holders of other Allowed Claims or Allowed Interests, as applicable, against the particular Debtor in respect of which the unclaimed or undeliverable distribution was made) pursuant to Article VI of the Plan shall be deemed disallowed and expunged without further action by the Wind-Down Debtor or Plan Administrator and without further order of the Bankruptcy Court, and the corresponding interests of any creditor holding such disallowed Claims or Interests shall be deemed canceled. The creditor with respect to any such disallowed Claim or Interest shall no longer have any right, claim, or interest in or to any distributions in respect of such Claim or Interest, and further, such creditor is forever barred, estopped, and enjoined from receiving any distributions under the Plan or this Agreement and from asserting such disallowed Claim or Interest against the Wind-Down Debtor or Plan Administrator.

4.8     Inapplicability of Escheat, Abandoned, or Unclaimed Property Laws.  Unclaimed property held by the Wind-Down Debtor shall not be subject to the escheat, abandoned or unclaimed property laws of the United States or any state, local or foreign governmental unit.

4.9     Delivery of Distributions.    Subject to the terms of this Agreement, the Plan Administrator shall cause the Wind-Down Debtor to make Distributions to creditors in the manner provided in the Plan.

## ARTICLE V
## THIRD PARTY RIGHTS AND LIMITATION OF LIABILITY

5.1     Parties Dealing with the Plan Administrator. In the absence of actual knowledge to the contrary, any Person dealing with the Wind-Down Debtor or the Plan Administrator shall be entitled to rely on the authority of the Plan Administrator or any of the Plan Administrator's agents to act in connection with the Wind-Down Debtor's Assets. There is no obligation of any Person dealing with the Plan Administrator to inquire into the validity or expediency or propriety of any transaction by the Plan Administrator or any agent of the Plan Administrator.

5.2     Limitation of Plan Administrator and Oversight Committee Liability. In exercising the rights granted herein, the Plan Administrator shall exercise the Plan Administrator's best judgment with respect to the affairs of the Wind-Down Debtor and the interests of creditors. However, notwithstanding anything herein to the contrary, neither the Plan Administrator nor any member of the Oversight Committee, nor any of their respective firms, companies, affiliates, partners, officers, directors, members, employees, designees, professionals, advisors, attorneys, representatives, disbursing agents, or agents, and any of such Person's successors and assigns, shall incur any responsibility or liability by reason of any error of law or fact or of any matter or thing done or suffered or omitted to be done under or in connection with this Agreement, including with respect to any intercreditor or other issues that may arise as a result of the non-consolidation of Estates under the Plan, whether sounding in tort, contract, or otherwise, except for fraud, gross

10

negligence, or willful misconduct that is found by a final judgment (not subject to further appeal or review) of a court of competent jurisdiction to be the direct and primary cause of loss, liability, damage, or expense suffered by the Wind-Down Debtor. In no event shall the Plan Administrator or any member of the Oversight Committee be liable for indirect, punitive, special, incidental, or consequential damage or loss (including but not limited to lost profits) whatsoever, even if the Plan Administrator or the Oversight Committee has been informed of the likelihood of such loss or damages and regardless of the form of action. Without limiting the foregoing, the Plan Administrator shall be entitled to the benefits of the limitation of liability and exculpation provisions set forth in Article IV of the Plan, and the Plan Administrator and the Oversight Committee shall be entitled to the benefits of the limitation of liability and exculpation provisions set forth in the Confirmation Order.

5.3     <u>No Liability for Acts of Other Persons</u>. None of the Persons identified in the immediately preceding section 5.2 of this Agreement shall be liable for the act or omission of any other Person identified in that section.

5.4     <u>No Liability for Acts of Predecessors</u>. No successor Plan Administrator shall be in any way responsible for the acts or omissions of any Plan Administrator in office prior to the date on which such successor becomes the Plan Administrator, unless a successor Plan Administrator expressly assumes such responsibility.

5.5     <u>No Liability for Good Faith Error of Judgment</u>. The Plan Administrator shall not be liable for any error of judgment made in good faith, unless it shall be finally determined by a final judgment of a court of competent jurisdiction (not subject to further appeal or review) that the Plan Administrator was grossly negligent in ascertaining the pertinent facts.

5.6     <u>Reliance by Plan Administrator on Documents and Advice of Counsel or Other Persons</u>. Except as otherwise provided herein, the Plan Administrator may rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties. The Plan Administrator may engage and consult with his legal counsel and other agents and advisors, and shall not be liable for any action taken, omitted, or suffered in reliance upon the advice of such counsel, agents, or advisors.

5.7     <u>No Liability For Acts Approved by Bankruptcy Court</u>. The Plan Administrator shall have the right at any time to seek instructions from the Bankruptcy Court concerning the administration or disposition of the Wind-Down Debtor. The Plan Administrator shall not be liable for any act or omission that has been approved by the Bankruptcy Court, and all such actions or omissions shall conclusively be deemed not to constitute fraud, gross negligence, or willful misconduct.

5.8     <u>No Personal Obligation for Wind-Down Debtor's Liabilities</u>. Persons dealing with the Plan Administrator shall have recourse only to the Wind-Down Debtor's Assets to satisfy any liability incurred by the Plan Administrator to any such Person in carrying out the terms of this Agreement, and the Plan Administrator shall have no personal, individual obligation to satisfy any such liability.

5.9    <u>Indemnification</u>. The Plan Administrator and the Oversight Committee, and their respective consultants, agents, attorneys, accountants, financial advisors, estates, employees, officers, directors, principals, professionals, and other representatives, each in their representative capacity as such, and any of such Person's successors and assigns (collectively, the "<u>Indemnified Parties</u>" and each, an "<u>Indemnified Party</u>") shall, to the fullest extent permitted by applicable law, be defended, held harmless, and indemnified by the Wind-Down Debtor from time to time and receive reimbursement from and against any and all loss, liability, expense (including counsel fees), or damage of any kind, type or nature, whether sounding in tort, contract, or otherwise, that the Indemnified Parties may incur or sustain in connection with the exercise or performance of any of the Wind-Down Debtor's, the Plan Administrator's, or the Oversight Committee's respective powers and duties under this Agreement or in rendering services by the Indemnified Party to the Wind-Down Debtor or the Plan Administrator, including, without limitation, the costs of counsel or others in investigating, preparing, defending, or settling any action or claim (whether or not litigation has been initiated against the Indemnified Party) or in enforcing this Agreement (including its indemnification provisions), except if such loss, liability, expense, or damage is finally determined by a final judgment (not subject to further appeal or review) of a court of competent jurisdiction to result directly and primarily from the fraud, gross negligence, or willful misconduct of the Indemnified Party asserting this provision.

5.9.1    <u>Expense of Wind-Down Debtor; Limitation on Source of Payment of Indemnification</u>. All indemnification liabilities of the Wind-Down Debtor under this section 3.9 shall be expenses of the Wind-Down Debtor. The amounts necessary for such indemnification and reimbursement shall be paid by the Wind-Down Debtor out of the available Wind-Down Debtor's Assets after reserving for all other actual and anticipated expenses and liabilities of the Wind-Down Debtor. Neither the Plan Administrator nor the Oversight Committee or its members shall be personally liable for the payment of any Wind-Down Debtor's expense or claim or other liability of the Wind-Down Debtor, and no Person shall look to the Plan Administrator, the Oversight Committee, or other Indemnified Parties personally for the payment of any such expense or liability.

5.9.2    <u>Procedure for Current Payment of Indemnified Expenses; Undertaking to Repay</u>. The Wind-Down Debtor shall promptly pay an Indemnified Party all amounts subject to indemnification under this section 5.9 on submission of invoices for such amounts by the Indemnified Party. By accepting any indemnification payment, the Indemnified Party undertakes to repay such amount promptly if it is determined that the Indemnified Party is not entitled to be indemnified under this Agreement. The Bankruptcy Court shall hear and finally determine any dispute arising out of this section 5.9.

5.10    <u>No Implied Obligations</u>. The Plan Administrator shall not be liable except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into this Agreement against the Plan Administrator.

5.11    <u>Confirmation of Survival of Provisions</u>. Without limitation in any way of any provision of this Agreement, the provisions of this Article III shall survive the death, dissolution, liquidation, incapacity, resignation, replacement, or removal, as may be applicable, of the Plan Administrator, or the termination of the Wind-Down Debtor or this Agreement, and shall inure to the benefit of the Plan Administrator's and the Indemnified Parties' heirs and assigns.

## ARTICLE VI
## OVERSIGHT COMMITTEE

6.1    <u>Appointment, Composition, and Governance of Oversight Committee</u>. As provided for in Article IV of the Plan, the Oversight Committee shall consist of those initial members identified on **<u>Exhibit A</u>** hereto. In the event that a member of the Oversight Committee resigns, the Plan Administrator may appoint a new member, subject to the unanimous approval of the remaining members of the Oversight Committee. If, in the future, the Oversight Committee consists of greater than three members, then upon the resignation of an Oversight Committee member, only majority consent of the remaining members shall be necessary. If (A) there are two remaining members and unanimous consent is not obtained or (B) there are three or more remaining members and a majority of the remaining members do not consent, the members may, upon motion, request that the Bankruptcy Court determine the matter. Notwithstanding the foregoing, in the event that fewer than three persons are willing to serve on the Oversight Committee or there shall have been fewer than three (3) Oversight Committee members for a period of thirty (30) consecutive days, then during such vacancy all references to the Oversight Committee's ongoing rights and duties in the Plan, this Agreement, and the Confirmation Order will require the Oversight Committee's unanimous consent.

6.2    <u>Resignation of Oversight Committee Members</u>. Any member of the Oversight Committee may resign upon reasonable notice to the Plan Administrator, counsel for the Plan Administrator, and other members of the Oversight Committee. Sixty (60) days' prior written notice shall constitute reasonable notice under this Section 6.2. Pursuant to Section 6.1 of this Agreement, during the sixty-day notice period, the Plan Administrator will seek a replacement for the position on the Oversight Committee that will begin their duties under this Agreement immediately following resignation or replacement of the previous member. Any member of the Oversight Committee may be removed by the Bankruptcy Court for cause or inactivity. The Oversight Committee may authorize its own dissolution by filing with the Bankruptcy Court an appropriate notice that its responsibilities under the Plan have concluded.

6.3    <u>Fiduciary Duties</u>. Members of the Oversight Committee shall have fiduciary duties to creditors in the same manner that members of an official committee of creditors appointed pursuant to Bankruptcy Code section 1102 have fiduciary duties to the constituents represented by such a committee, and shall be entitled to indemnification from the Wind-Down Debtor in the same manner as the Plan Administrator for service as members of the Oversight Committee from and after the Effective Date of the Plan under or in connection with this Agreement.

6.4    <u>Limitations on Plan Administrator's Actions</u>. The Plan Administrator shall obtain the approval of the Oversight Committee by at least a majority vote prior to taking any action regarding the administration, reconciliation, objection to, compromise, resolution, settlement, or litigation of any Claim (as determined by the Plan Administrator in his sole discretion) where the asserted Claim exceeds $5,000,000.00.

6.5    <u>Payment of Fees and Expenses</u>. The Plan Administrator shall pay from the Wind-Down Debtor's Assets the reasonable out-of-pocket expenses of the members of the Oversight Committee incurred solely in connection with their role as an Oversight Committee member, and not in their individual capacity. For the avoidance of doubt, attorneys' fees incurred by an

Oversight Committee member, including, but not limited to, attendance at any meetings of the Oversight Committee shall not be paid out of the Wind-Down Debtor's Assets pursuant to this section 6.5. The Bankruptcy Court shall hear and finally determine any dispute arising out of this section 6.5.

## ARTICLE VII
## REMOVAL, REPLACEMENT
## AND COMPENSATION OF PLAN ADMINISTRATOR

7.1    <u>Initial Plan Administrator</u>. The Initial Plan Administrator shall be Paul R. Hage. The Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date.

7.2    <u>Term of Service</u>. The Plan Administrator shall serve until: (a) the completion of the administration of the Wind-Down Debtor's Assets and the Wind-Down Debtor, including the winding down of the Wind-Down Debtor, in accordance with this Agreement and the Plan; (b) the termination of the Wind-Down Debtor in accordance with the terms of this Agreement and the Plan; or (c) the Plan Administrator's resignation, death, dissolution, incapacity, liquidation, or removal. In the event that the Plan Administrator's appointment terminates by reason of resignation, death, dissolution, incapacity, liquidation, or removal, the Plan Administrator shall be immediately compensated for all reasonable fees and expenses accrued but unpaid through the effective date of termination, whether or not previously invoiced. The provisions of Article III of this Agreement shall survive the resignation or removal of any Plan Administrator.

7.3    <u>Removal of Plan Administrator for Cause</u>: The Oversight Committee may seek to remove the Plan Administrator for cause by filing a motion (the "<u>Removal Motion</u>") with the Bankruptcy Court upon not less than thirty (30) days' prior written notice to the Plan Administrator. For purposes of this agreement, "cause" means

7.3.1    arrest or conviction (or plea of guilty or nolo contendere) of the Plan Administrator for any felony, or any other crime involving dishonesty or moral turpitude;

7.3.2    a finding by the Oversight Committee that the Plan Administrator engaged in willful misconduct, or was grossly negligent, in the performance of its duties;

7.3.3    a determination, in good faith, by the Oversight Committee that the Plan Administrator is not acting in the best interest of the creditors; or

7.3.4    a determination, in good faith, by the Oversight Committee that the Plan Administrator has a material and direct conflict of interest, not previously disclosed or specifically waived in advance by the Wind-Down Debtor.

7.4    <u>Resignation of Plan Administrator</u>. The Plan Administrator may resign at any time upon no less than sixty (60) days' prior written notice to the Oversight Committee. The resignation shall be effective on the later of (i) the date specified in the notice of resignation and (ii) the date that is sixty days (60) after the date such notice is delivered to the Oversight Committee members. In the event of a resignation, the resigning Plan Administrator shall render to the Oversight Committee a full and complete accounting of monies and assets received, disbursed, and held during the term of office of such Plan Administrator.

7.5    <u>Appointment of Successor Plan Administrator</u>. Upon the resignation, death, or removal of the Plan Administrator, the Oversight Committee shall appoint a successor. In the event the Oversight Committee does not seek the appointment of a successor Plan Administrator, the Bankruptcy Court may do so on its own motion. Any successor Plan Administrator so appointed (a) shall consent to and accept his, her, or its appointment as successor Plan Administrator, which may be done by e-mail or through acquiescence in not objecting to a motion for approval of his, her, or its appointment as successor Plan Administrator and (b) shall not have any liability or responsibility for the acts or omissions of any predecessor(s).

7.6    <u>Powers and Duties of Successor Plan Administrator</u>. A successor Plan Administrator shall have all the rights, privileges, powers, and duties of his, her, or its predecessor under this Agreement, the Plan, and Confirmation Order.

7.7    <u>Compensation of Plan Administrator and Costs of Administration</u>. The Plan Administrator shall receive fair and reasonable compensation for his services in accordance with the terms and conditions of the Plan, which shall be a charge against and paid out of the Wind-Down Debtor's Assets. All costs, expenses, and obligations incurred by the Plan Administrator (or professionals who may be employed by the Plan Administrator in administering the Wind-Down Debtor, in carrying out their other responsibilities under this Agreement, or in any manner connected, incidental, or related thereto) shall be paid by the Wind-Down Debtor from the Wind-Down Debtor's Assets prior to any distribution to holders of Allowed Claims or Allowed Interests. The terms of the compensation of the Plan Administrator are set forth on **Exhibit B** hereto. The Oversight Committee may modify the Plan Administrator's compensation as agreed to by a majority vote.

### ARTICLE VIII
### CLOSING OF THE CHAPTER 11 CASES

8.1    <u>Termination</u>. When each of the following have occurred or will have occurred by the hearing on a motion to close the Chapter 11 Cases, the Plan Administrator shall promptly seek authority from the Bankruptcy Court to close the Chapter 11 Cases for each of the Wind-Down Estates in accordance with the Bankruptcy Code and the Bankruptcy Rules: (a) all Claims against the Wind-Down Estates (i) have been satisfied in accordance with the Plan or (ii) have been disallowed by Final Order; (b) all assets have been liquidated and converted into Cash (other than those assets abandoned by the Wind-Down Debtor in the Plan Administrator's sole discretion), and such Cash has been distributed in accordance with the Plan; and (c) all wind-down costs and expenses have been paid in full in Cash. Notwithstanding the foregoing, the Plan Administrator may seek authority from the Bankruptcy Court to close the Chapter 11 Cases of the Debtors individually, prior to the requirements above being met with respect to all of the Debtors' Chapter

15

11 Cases, and may seek to close the Chapter 11 Cases in the event the Wind-Down Debtor lacks sufficient funding for further administration. Subject to further order of the Court, this Agreement shall terminate when the Bankruptcy Court enters a final decree contemplated by Bankruptcy Code section 350 and Bankruptcy Rule 3022 closing the Wind-Down Debtor's Chapter 11 Cases with respect to each Debtor.

7.2 <u>Winding Up, Discharge, and Release of the Plan Administrator and Oversight Committee</u>. For the purposes of winding up the affairs of the Debtors and/or the Wind-Down Debtor, as applicable, the Plan Administrator shall continue to act as Plan Administrator and the Oversight Committee shall continue their duties under this Agreement until such duties have been fully discharged or their role as Plan Administrator and/or on the Oversight Committee are otherwise terminated under this Agreement and the Plan. Upon a motion or notice by the Plan Administrator and/or the Oversight Committee, the Bankruptcy Court may enter an order relieving the Plan Administrator and/or Oversight Committee, its members, agents, and employees of any further duties and discharging and releasing the Plan Administrator and/or the Oversight Committee.

## ARTICLE IX
## MISCELLANEOUS

9.1 <u>Cumulative Rights and Remedies</u>. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights and remedies under law or in equity.

9.2 <u>Notices</u>. All notices to be given to creditors may be given by electronic mail, first class mail, or may be delivered personally, at the addresses for such creditors appearing on the books kept by the Plan Administrator. Any notice or other communication that may be or is required to be given, served, or sent to the Plan Administrator shall be in writing and shall be sent by registered or certified United States mail, return receipt requested, postage prepaid, or transmitted by hand delivery or facsimile (if receipt is confirmed) addressed as follows:

> If to the Plan Administrator:
> Paul R. Hage, Plan Administrator
> 27777 Franklin Rd.
> Suite 2500
> Southfield, Michigan 48034
> Email: phage@taftlaw.com
>
> with a copy to counsel:
> [                    ]

or to such other address as may from time to time be provided in written notice by the Plan Administrator.

9.3 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York.

9.4 <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and shall be binding upon the Parties and their respective successors and assigns.

9.5    Particular Words. Reference in this Agreement to any Section or Article is, unless otherwise specified, to that such Section or Article under this Agreement. The words "hereof," "herein," and similar terms shall refer to this Agreement and not to any particular Section or Article of this Agreement.

9.6    Execution. All funds in the Wind-Down Debtor shall be deemed *in custodia legis* until such times as the funds have actually been paid to or for the benefit of a creditor, and no creditor or any other Person can execute upon, garnish or attach the Wind-Down Debtor's Assets or the Plan Administrator in any manner or compel payment from the Wind-Down Debtor except by Final Order of the Bankruptcy Court. Payments will be solely governed by the Plan and this Agreement.

9.7    Amendment. This Agreement may be amended by written agreement of the Plan Administrator and the Oversight Committee or by order of the Bankruptcy Court; *provided*, *however*, that such amendment may not be inconsistent with the Plan or the Confirmation Order.

9.8    No Waiver. No failure or delay of any party to exercise any right or remedy pursuant to this Agreement shall affect such right or remedy or constitute a waiver thereof.

9.9    No Relationship Created. Nothing contained herein shall be construed to constitute any relationship created by this Agreement as an association, partnership or joint venture of any kind.

9.10    Severability. If any term, provision covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

9.11    Further Assurances. The Parties agree to execute and deliver all such documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes and provide for the full implementation of this Agreement and the pertinent provisions of the Plan, and to consummate the transactions contemplated hereby.

9.12    Counterparts. This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

9.13    Jurisdiction. The Bankruptcy Court shall have jurisdiction regarding the Debtors, the Wind-Down Debtor, the Plan Administrator, the Oversight Committee, and the Wind-Down Debtor's Assets, including, without limitation, the determination of all disputes arising out of or related to administration of the Wind-Down Debtor. The Bankruptcy Court shall have continuing jurisdiction and venue to hear and finally determine all disputes and related matters among the Parties arising out of or related to this Agreement or the administration of the Wind-Down Debtor. The Parties expressly consent to the Bankruptcy Court hearing and exercising such judicial power as is necessary to finally determine all such disputes and matters. If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth

17

in this Agreement, the provisions of this Agreement shall have no effect on and shall not control, limit or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter, and all applicable references in this Agreement to an order or decision of the Bankruptcy Court shall instead mean an order or decision of such other court of competent jurisdiction.

* * * * *

IN WITNESS WHEREOF, the Parties have or are deemed to have executed this Agreement as of the day and year written above.

Voyager Digital Holdings, Inc.

By:_____

Name:_____

Title:_____

Voyager Digital Ltd.

By:_____

Name:_____

Title:_____

Voyager Digital Holdings, LLC

By: _____

Name_____

Title:_____

Paul Hage, as Plan Administrator

By: _____

Name_____

Title:_____

# EXHIBIT A

**Oversight Committee Members**

## **Oversight Committee Members**

1.  Richard Kiss

2.  Russell Stewart

3.  Melissa Freeman

## **EXHIBIT B**

**Plan Administrator Compensation**

**Plan Administrator Compensation**

| Plan Administrator | Compensation |
|---|---|
| Paul R. Hage | $500 per hour for professional services rendered, plus reimbursement of reasonable and documented out-of-pocket fees, costs, and expenses. This hourly rate is subject to annual rate increases to reflect economic and other conditions. |

## **Exhibit G**

### **Wind-Down Budget**

**Voyager**
**Estimated Wind Down Budget**
*$ in mm*

| | Total Wind Down[1,2] |
|---|---|
| **I. Operating Expenses** | |
| 1.) Headcount Related Costs[3] | (12.0) |
| 2.) Other Operating Expenses[4] | (8.0) |
| 3.)    **Total Operating Expenses** | **(20.0)** |
| | |
| **II. Wind Down Professional Fees** | |
| A. Wind Down Administration | |
| 4.) Trust / Wind Down Debtor Counsel | (11.0) |
| 5.) Trust / Wind Down Debtor FA | (6.0) |
| 6.) Claims/Noticing Agent | (1.0) |
| 7.) Wind Down Trustee | (1.0) |
| 8.) Tax Professionals[5] | (2.5) |
| 9.)    Subtotal - Wind Down Administration | (21.4) |
| | |
| B. Wind Down Legal / Regulatory Matters | |
| 10.) Regulatory Cooperation & Defense[6] | (12.0) |
| 11.) Investigate & Prosecute 3rd Party Claims[7] | (60.0) |
| | |
| 12.)    **Wind Down Professional Fees** | **(93.4)** |
| **III. Other Wind Down Support Costs** | |
| 13.) Document Retention Costs | (4.0) |
| 14.) Processing Fees | (1.4) |
| 15.) Other Wind Down Costs[8] | (16.8) |
| 16.)    **Other Wind Down Costs** | **(22.1)** |
| 17.) **Total Wind Down Costs[9]** | **(135.6)** |

**Footnotes to Wind Down Analysis**

(1) The budgeted amounts presented herein represents the Debtors best estimates of potential expenditures that will be incurred to effectuate the Plan and wind down the estate. These estimates are subject to material change and do not represent a commitment to spend. Any amounts not spent will be returned to creditors in a subsequent / final distribution.

(2) For budgeting purposes; the analysis assumes a wind down period of 24 months. The actual time to wind down the estate could vary materially from estimates.

(3) Includes wages, benefits, payroll taxes, and severance to employees.

(4) Estimated expense for critical vendors necessary to effectuate the plan and subsequent wind down.

(5) Preparation of 2022, 2023 and final tax returns and ad hoc tax related services.

(6) Represents estimated cost of legal support for ongoing regulatory inquiries, litigation defense, employment matters and misc. legal support.

(7) The Wind-Down budget assumes $60 million to ensure that the Wind-Down Entity has sufficient resources to pursue certain Claims against third parties unaffiliated with the Debtors that are not Released Claims against Released Parties under the Plan discovered through the Committee's investigation and as will be discovered through the Wind-Down Entity's more robust investigation. These funds will be used for that investigation and potential offensive litigation, and the Committee believes this investment (to the extent ultimately made) will benefit Holders of Claims. All expenses will be reviewed and approved by the appointed Trustee of the Wind-Down Trust who has a fiduciary obligation to ensure that expenses are responsibly spent. The Wind-Down Entity will act responsibly in assessing and pursuing litigation, only pursuing Claims that it believes will create a net benefit for Holders of Claims. The funds obtained in litigation by the Wind-Down Trust and unused funds will be returned to Holders of Claims. No benefit from any litigation is assumed in this Wind-Down budget.

(8) Includes estimated cure costs, US Trustee payments, D&O Insurance, various entity related wind down costs and reserve for contingencies.

(9) Total wind down costs include $67.4 million already contemplated in the calculation of illustrative customer recoveries included in the Disclosure Statement filed on January 13, 2023 and would not be dilutive to estimated recoveries.

## Exhibit H

**Employee Transition Plan**

# EMPLOYEE TRANSITION PLAN[1]

Since the Petition Date, the Debtors have radically reduced employee headcount.  As of the Petition Date, including their Coinify operation, the Debtors had approximately 350 employees. Today the Debtors have 80 employees.  If the Plan is confirmed, as described below, the Debtors will need at least 38 of them to ensure the Plan can be consummated.  Absent the Employee Transition Plan, which will be implemented by the Wind-Down Debtor, the employees needed to consummate the plan ("Employees") have no incentive to remain in the Debtors' employ, are likely to leave immediately, and the Plan itself may not be feasible.

Specifically, if the Sale Transaction is consummated, the Employees are necessary to ensuring a safe, efficient and orderly transition of customer accounts to Binance.US and subsequent wind-down of the Debtors' businesses.  If the Sale Transaction does not close and the Debtors "toggle" to the Liquidation Transaction, the Employees will be necessary to effectuate the rebalancing, distribution, and remediation of customer accounts through the Voyager platform, safely and securely, followed by the wind-down of the Debtors' businesses.  The Liquidation Transaction cannot be done without the Employees.  In sum, the Employees are needed to consummate either the Sale Transaction or Liquidation Transaction, and without them the likely only option would be a conversion to a full liquidation under chapter 7 of the Bankruptcy Code, which would materially reduce and materially delay customer recoveries and materially complicate the wind-down, which would lead to additional expense.

This Employee Transition Plan generally contemplates payment of severance in the amount of six months salary for the remaining Employees *if* and *when* they and the estate complete the tasks required for the Sale Transaction or Liquidation Transaction, as applicable.  For two employees, Mr. Hanshe and Mr. Whooley, the Debtors will not pay any severance but, provided they complete the tasks required to effectuate the Sale Transaction or Liquidation Transaction, as applicable, the Debtors will honor obligations to forgive amounts owed by them with respect to prior tax matters including a gross up for an amount approximating the resulting tax effects.[2]  The expenses incurred related to the Employee Transaction Plan are included in the Wind-Down Budget and the Employee Transition Plan has the support of the Committee.  For the avoidance of doubt, the Debtors' Chief Executive Officer ("CEO") and Chief Commercial Officer ("CCO") are not included in the Employee Transition Plan, and neither will receive any payments thereunder.[3]

---

[1] Terms used but not defined herein shall have the meaning ascribed to them in the *Third Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 852] (as amended from time to time, the "Plan").

[2] Prior to the Petition Date, the Debtors entered into written agreements with Mr. Hanshe and Mr. Whooley regarding these tax matters.  Those agreements, which would otherwise need to be amended to account for these present circumstances, are superseded by this Employee Transition Plan.

[3] The Debtors CEO and CCO have both agreed to be available to assist the Wind-Down Debtor for limited periods of time each month (as needed) for the year following the Effective Date, consistent with their settlement agreements, at no cost to the estate or Wind-Down Debtor.  *See* Plan, Article IV.G.

The tasks expected to be performed by the Employees are described below:

## TRANSITION & WIND DOWN TEAM / DUTIES

## Operations - Data Analysis & Reporting

*Team Description/Duties*: This team is responsible for all reporting and data analytics for the operation, leveraging Snowflake, PostGresQL and Tableau to provide data for critical business functions. Financial reporting is derived from reports generated by this team.

*Transition Responsibilities*: This team will be critical to the transition process, as the work with Binance.US will include a substantial data exercise.  They will pull together all the data that is to go over to Binance.US on customers, including PII, KYC and account position data.  Any reporting to the Bankruptcy Court and counsel along the way will be provided by this team.  The function will be needed to the very end, and the size of the team can scale down once the transition is complete of customers, un-converted customers have been handled (whether a data share to the Debtors' Claims, Noticing, and Solicitation Agent or a cash withdrawal process that runs internally) and reporting has been done on the same.  Final financial reporting data will also come from this team during the wind-down, and the Debtors will not be able to finally close the books on the business without data provided by this team.

## Operations - Treasury & Trading

*Team Description/Duties*: This is the team that is responsible for handling all treasury, trading, lending, staking & settlement operational tasks.  This group also (i) manages the day-to-day treasury balances to ensure customer balances and overall custody environment are in balance, (ii) is responsible for the safe-keeping and control of the private keys for digital asset custody, and (iii) provides data for all treasury/trading related financial reporting.

*Transition Responsibilities*: This team will be critical to the transition process, as they will be needed to manage, perform, and complete any necessary rebalancing and handle the transition of customer funds to Binance.US or directly to customers, as applicable.

## Operations - Business Process Management

*Team Description/Duties*: This is the core operational team, which handles all process design, implementation and documentation.  They serve as the business owners for the internal business systems and processes, and work with all external stakeholders to coordinate work done to support the customer base.  They implement all audit controls and processes and are responsible for all bulk handling of customer actions (e.g., KYC, transaction approvals, bank links).  This team also owned the FBO account cash withdrawal process implemented during the Chapter 11 Cases.

*Transition Responsibilities*: This team is critical to the transition, and will be needed in some capacity through the wind-down.  They will handle all coordination with Binance.US on the customer conversion, and if the Debtors are required to distribute cash, will own that process.  The Debtors cannot execute the Sale Transaction without retaining this team through the account transition process and the remediation of un-converted accounts, or in the case of the Liquidation Transaction, through the self-liquidation and distribution process.

## Operations - Data Quality Assurance

*Team Description/Duties*: This team's primary responsibility is ensuring the quality of data being collected by the system in its automated and synchronization processes.  This team is the primary owner of all "reconciliation" processes that ensure completeness and correctness of all trading and transactional data for customers as it relates to third party systems. This team also supports operational processes and procedures through the creation of operational reporting dashboards in Tableau.

*Transition Responsibilities*: This team is critical to the transition and will be needed in some capacity through the wind-down.  They will provide primary data support to operations as the Debtors work with Binance.US on the conversion, and will be responsible for making sure all data extractions that go to Binance.US for PII, KYC, Positions are correct and complete.  As the Debtors close their books and records, they will ensure all data is correct and complete in the final financial reports.

## Product/UX

*Team Description/Duties*:  This group is responsible for all aspects of the entire Voyager platform which includes each micro service necessary to transfer, hold and secure the assets as well as allowing customers to view their balances.  This team will also be responsible for the decommissioning of the Debtors' products at the end of the wind-down.

*Transition Responsibilities*: This team will be needed to ensure the "opt in" is complete and that the Voyager App properly reflects customer balances in a way that customers can absorb and understand this information.  The team will also coordinate the shut down of the app and related products as the Debtors complete the transition to Binance.US and will be critical if the Debtors need to toggle to the Liquidation Transaction and distribute cryptocurrency to customers through the Voyager app.  The Debtors will need some semblance of a product team likely through the wind-down, and most critically until the customer accounts are converted to Binance.US and un-converted accounts are liquidated and distributed.

## IT Operations

*Team Description/Duties*: This team handles all device and system provisioning, de-provisioning and access requests as well as primary technical support for any issue with any hardware or software platform for internal employees.

*Transition Responsibilities*: This team will be critical to the offboarding of employees, deprovisioning of systems and software, termination of contracts, and ongoing access/software issues that arise during the wind-down.  This function will be needed to the very end of the wind-down, operating with only one person. Outsourcing this function would likely be expensive and inefficient, with potentially detrimental effects on the Wind-Down Debtor's ability to access information necessary to pursue claims.

## Customer Experience & Operations

*Team Description/Duties*: This team handles many customer interactions (chat, email, service website), onboarding processes (KYC) and transaction reviews. Inquiries span all areas of customer support, including closing accounts, ID verification, updates to personal information and general status questions.

These employees are responsible for updating, maintaining and reviewing all customer-facing content including managing the web-based self-service Help Center, AI chatbot (VAL), automations and templated responses for agent use in ticket responses.  The AI chat bot, available both in-app and on the website, requires ongoing training to respond to customer inquiries while reducing overall associate interaction by 25% to 50%.

## Customer Communications / Service

*Team Description/Duties*:  This team will ensure communications are properly synchronized as the Debtors transition accounts, certain tokens, the app, and customer support, and that communications through FAQs and messaging, social channels, and employees are consistent across all channels.  Channel communications include Email, Website, Blog, in app, Slack for employees, etc. This group will also (i) identify, organize and provide detailed materials for various regulatory bodies and respond to other requests regarding marketing, (ii) transition MarketingTech platforms, including business, data and security and other risks, and (iii) ensure fundamental tools like Iterable, Segment (connects databases to Iterable), Website, social media accounts, etc. are fully utilized during the transition and then either moved over or turned off properly.

## Engineering

*Team Description/Duties*:  Engineering team members are critical both in the Sale Transaction scenario and in the toggle to the Liquidation Transaction where the Debtors would be reopening the platform and permitting customers to withdraw from the Voyager platform through the Voyager App.  They are needed to move assets, maintain infrastructure and security, and complete the transactions.  The Debtors cannot complete either path described in the Plan safely and securely without retaining key engineering staff.

## Legal & Finance

*Team Description/Duties*. The legal team manages and assists with information requests and address all regulatory inquiries and subpoenas from government agencies interested in Voyager's bankruptcy and business, including the SEC, CFTC, FDIC, and numerous other federal and state regulators as well as Canadian regulators, and other civil matters.  The legal team also (i) prepares regulatory filings and reports, (ii) manages third party actions against Voyager as well as insurance communications, (iii) manages Voyager's role on the creditors committee of 3AC as well as the transition of such to the Wind Down Trustee, (iv) advises on various contractual issues, operational matters (including those contemplated as part of the Sale Transaction or the toggle  to a Liquidation Transaction), compliance matters and employment matters, and (v)  handles all other internal and external matters in order to efficiently reduce reliance on outside corporate, regulatory, and litigation counsel (as departure of these individuals would require more reliance on more expensive outside counsel who will not be as familiar with the many Voyager specific issues).

The finance team is responsible for filing of all monthly operating reports submitted to the bankruptcy court, completion of all financial information which is the basis for the monthly operating reports, paying Voyager's bills, overseeing payroll, and providing information needed for legal, compliance, or operations related to accounting or financial matters.

# Exhibit 22

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE OF FILING OF THIRD AMENDED PLAN SUPPLEMENT**

**PLEASE TAKE NOTICE THAT** on January 13, 2023, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections, and (IV) Granting Related Relief* (the "Disclosure Statement Order") [Docket No. 861],[2] (a) authorizing the debtors and debtors in possession (collectively, the "Debtors") to solicit votes for the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as modified, amended, or supplemented from time to time, the "Plan") [Docket No. 852]; (b) conditionally approving the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement") [Docket No. 853] as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the Solicitation Packages; (d) approving procedures for soliciting, receiving, and

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]    Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan or Disclosure Statement Order, as applicable.

Debtors
Ex-22

tabulating votes on the Plan and for filing objections to the Plan; and (e) scheduling the Combined Hearing.

PLEASE TAKE FURTHER NOTICE THAT on February 1, 2023, the above-captioned debtors and debtors-in-possession (the "Debtors") filed the *Notice of Filing of Plan Supplement* [Docket No. 943], in support of the Plan.

PLEASE TAKE FURTHER NOTICE THAT on February 8, 2023, the Debtors filed the *Notice of Filing of First Amended Plan Supplement* (the "First Amended Plan Supplement") [Docket No. 986], in support of the Plan.

PLEASE TAKE FURTHER NOTICE THAT on February 15, 2023, the Debtors filed the *Notice of Filing of Second Amended Plan Supplement* [Docket No. 1006] (the "Second Amended Plan Supplement"), in support of the Plan and as contemplated by the Plan and the Disclosure Statement Order.

PLEASE TAKE FURTHER NOTICE THAT the Debtors hereby file this third amended plan supplement (the "Third Amended Plan Supplement"), in support of the Plan and as contemplated by the Plan and the Disclosure Statement Order.

PLEASE TAKE FURTHER NOTICE THAT as contemplated by the Plan and the Disclosure Statement Order, the Third Amended Plan Supplement includes the following documents:

| Exhibit | Description |
|---------|-------------|
| A | Amended Schedule of Assumed Executory Contracts and Unexpired Leases |
| A-1 | Redline of **Exhibit A** to Exhibit A of the Second Amended Plan Supplement |
| C | Customer Onboarding Protocol[3] |

PLEASE TAKE FURTHER NOTICE THAT the documents contained in the Third Amended Plan Supplement are integral to, and are considered part of, the Plan.  If the Plan is approved, the documents contained in the Third Amended Plan Supplement will be approved by the Court pursuant to the Confirmation Order.

PLEASE TAKE FURTHER NOTICE THAT the Combined Hearing will commence on **March 2, 2023, at 10:00 a.m.** **prevailing Eastern Time**, before the Honorable Michael E. Wiles, in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York, New York 10004.

---

[3]     Certain of the screenshot images in the Customer Onboarding Protocol in the First Amended Plan Supplement appeared slightly blurry. No changes were made to the Customer Onboarding Protocol, and Exhibit C is being refiled solely to include clearer images.

**PLEASE TAKE FURTHER NOTICE THAT** pursuant to the Court's General Order M-543, dated March 20, 2020 ("General Order M-543"), the Combined Hearing will be conducted telephonically. Parties wishing to participate in the Combined Hearing should do so by making arrangements through CourtSolutions LLC. Instructions to register for CourtSolutions LLC are attached to General Order M-543.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan or Disclosure Statement is **February 22, 2023, at 4:00 p.m.** prevailing Eastern Time (the "Objection Deadline"). Any objections to the relief sought at the Combined Hearing must: (a) be in writing; (b) conform to the Bankruptcy Rules and the Local Rules; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be *actually received* on or before the Objection Deadline:

| Debtors | |
|---|---|
| **Voyager Digital Holdings, Inc.**<br>33 Irving Place, Suite 3060<br>New York, NY 10003<br>Attention: Stephen Ehrlich and David Brosgol | |
| ***Counsel to the Debtors*** | ***Counsel to the Committee*** |
| **Kirkland & Ellis LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention: Joshua A. Sussberg; Christopher Marcus; Christine A. Okike; Allyson B. Smith | **McDermott Will & Emery LLP**<br>One Vanderbilt Avenue<br>New York, NY 10017<br>Attention: Darren Azman; Joseph B. Evans; Grayson Williams; Gregg Steinman |
| ***United States Trustee*** | |
| **Office of the United States Trustee for the Southern District of New York**<br>U.S. Federal Office Building<br>201 Varick Street, Room 1006<br>New York, NY 10014<br>Attention: Richard Morrissey; Mark Bruh | |

**PLEASE TAKE FURTHER NOTICE THAT** certain documents, or portions thereof, contained in the Third Amended Plan Supplement remain subject to ongoing review, revision, and further negotiation among the Debtors and interested parties with respect thereto. The Debtors reserve the right to alter, amend, modify, or supplement any document in the Third Amended Plan Supplement in accordance with the Plan at any time before the Effective Date of the Plan or any such other date as may be provided for by the Plan or by order of the Court; *provided* that if any document in the Third Amended Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the date of the Combined Hearing, the Debtors will file a blackline of such document with the Court.

PLEASE TAKE FURTHER NOTICE THAT copies of the Plan, the Disclosure Statement, the Disclosure Statement Order, and other pleadings filed in these chapter 11 cases are available free of charge by visiting the website of Stretto at http://www.cases.stretto.com/Voyager. You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov/ in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

Dated:  February 21, 2023          /s/ Joshua A. Sussberg
New York, New York                 **KIRKLAND & ELLIS LLP**
                                   **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                   Joshua A. Sussberg, P.C.
                                   Christopher Marcus, P.C.
                                   Christine A. Okike, P.C.
                                   Allyson B. Smith (admitted *pro hac vice*)
                                   601 Lexington Avenue
                                   New York, New York 10022
                                   Telephone:     (212) 446-4800
                                   Facsimile:     (212) 446-4900
                                   Email:         jsussberg@kirkland.com
                                                  cmarcus@kirkland.com
                                                  christine.okike@kirkland.com
                                                  allyson.smith@kirkland.com

                                   *Counsel to the Debtors and Debtors in Possession*

## **Exhibit A**

**Amended Schedule of Assumed Executory Contracts and Unexpired Leases**

| No. | Debtor Name | Counterparty Name | Description of Contract | Cure Amount |
|---|---|---|---|---|
| 1 | Voyager Digital, LLC | Ada Support Inc. | ADA Services Agreement and Amendment #1 | $ 0.00 |
| 2 | Voyager Digital, LLC | Amazon Web Services | AWS Customer Agreement | $ 304,635.94 |
| 3 | Voyager Digital, LLC | Amazon Web Services | AWS Service Terms | See above |
| 4 | Voyager Digital, LLC | Anchorage | Digital Bank Order Form | $ 0.00 |
| 5 | Voyager Digital Holdings, Inc. | Blockdaemon Inc. | Order Form | $ 351.03 |
| 6 | Voyager Digital Holdings, Inc. | Blockdaemon Inc. | Validator Agreement | See above |
| 7 | Voyager Digital, LLC | Coinbase, Inc. | Coinbase Prime Institutional Client Agreement | $ 0.00 |
| 8 | Voyager Digital, LLC | Coinbase Custody Trust Company, LLC | Custodial Services Agreement | $ 0.00 |
| 9 | Voyager Digital, LLC | CDW | CDW Customer Service Order Form Google Workspace | $ 0.00 |
| 10 | Voyager Digital, LLC | Chainalysis Inc. | Order Form | $ 0.00 |
| 11 | Voyager Digital Holdings, Inc. | Cloudflare | Enterprise Service Order Form | $ 0.00 |
| 12 | Voyager Digital Holdings, Inc. | Cloudflare | Insertion Order Form | See above |
| 13 | Voyager Digital, LLC | Concur Technologies, Inc. | Order Form | $ 0.00 |
| 14 | Voyager Digital, LLC | Copper Technologies (UK) Limited | Third Party Agreement | $ 0.00 |
| 15 | Voyager Digital, LLC | Copper Technologies (UK) Limited | Side Letter To Copper's Terms & Conditions — Crypto Asset Service | See above |
| 16 | Voyager Digital Holdings, Inc. | Datasite | Statement of Work | $ 0.00 |
| 17 | Voyager Digital, LLC | Dropbox | Dropbox Services Agreement | $ 0.00 |
| 18 | Voyager Digital Ltd. | Fireblocks Inc. | Fireblocks License Agreement | $ 0.00 |
| 19 | Voyager Digital Ltd. | Fireblocks Inc. | First Amendment to the Fireblocks License Agreement | See above |
| 20 | Voyager Digital, LLC | Fivetran | Service Order Form | $ 0.00 |
| 21 | Voyager Digital, LLC | GoDaddy | Universal Terms Of Service Agreement | $ 0.00 |
| 22 | Voyager Digital, LLC | Iterable | Enterprise Sales Order Form | $ 35,423.46 |
| 23 | Voyager Digital, LLC | JAMF | Software License And Services Agreement | $ 0.00 |
| 24 | Voyager Digital, LLC | MaestroQA | SaaS Services Order Form | $ 0.00 |
| 25 | Voyager Digital Holdings, Inc. | Network Redux LLC | Statement of Work | $ 1,727.82 |
| 26 | Voyager Digital, LLC | Okta | Master Subscription Agreement | $ 0.00 |
| 27 | Voyager Digital, LLC | Oracle America, Inc. | Oracle Netsuite Fee Estimate | $ 0.00 |
| 28 | Voyager Digital Ltd. | Plaid Inc. (f.k.a. Plaid Technologies, Inc.) | Plaid Inc. Master Services Agreement | $ 116,129.05 |
| 29 | Voyager Digital Ltd. | Plaid Inc. (f.k.a. Plaid Technologies, Inc.) | Assets Addendum to the Master Services Agreement | See above |
| 30 | Voyager Digital Ltd. | Plaid Inc. (f.k.a. Plaid Technologies, Inc.) | Addendum to Master Services Agreement | See above |
| 31 | Voyager Digital, LLC | RECIPROCITY, INC. | Order Form | $ 0.00 |
| 32 | Voyager Digital, LLC | Segment.io, Inc | Order Form | $ 0.00 |
| 33 | Voyager Digital, LLC | Sift Science, Inc | Order Form | $ 77,240.41 |
| 34 | Voyager Digital, LLC | Slack Technologies, LLC | Order Form | $ 0.00 |
| 35 | Voyager Digital, LLC | Snowflake | Order Form | $ 0.00 |
| 36 | Voyager Digital, LLC | Socure Inc. | MSA & Amendments #1-7 | $ 1,717,180.00 |
| 37 | Voyager Digital, LLC | Tableau Software, LLC | Tableau Purchase Authorization Form | $ 0.00 |
| 38 | Voyager Digital, LLC | Talos | Software Subscription Agreement | $ 195,685.88 |
| 39 | Voyager Digital Holdings, Inc. | ThoughtWorks, Inc. | Statement of Work and Subsequent Amendments | $ 0.00 |
| 40 | Voyager Digital Holdings, Inc. | ThoughtWorks, Inc. | Master Services Agreement | See above |
| 41 | Voyager Digital, LLC | TriNet HR III, Inc. | TriNet Technology Services Requisition Form | $ 0.00 |
| 42 | Voyager Digital Holdings, Inc. | TriNet HR III, Inc. | Consent to Assignment of TriNet Contract | See above |
| 43 | Voyager Digital, LLC | Twilio Inc. | Order Form | $ 20,339.21 |
| 44 | Voyager Digital, LLC | Usio, Inc.[1] | Automated Clearing House Services Agreement and Second through Fourth Amendments | $ 3,700.00 |
| 45 | Voyager Digital Holdings, Inc. | 33 Irving Tenant LLC | WeWork New York and Subsequent Amendments | $ 0.00 |
| 46 | Voyager Digital, LLC | 78 SW 7th Street Tenant LLC | WeWork Miami | See above |
| 47 | Voyager Digital Holdings, Inc. | 150 4th Ave N Tenant LLC | WeWork Nashville | See above |
| 48 | Voyager Digital, LLC | Zendesk | Service Order Form | $ 23,335.71 |

[1] The Debtors and Usio, Inc. have consensually agreed to extend the deadline by which the Debtors must assume or reject the contract with Usio, Inc. to March 10, 2023. *See Stipulation Between the Debtors and Usio, Inc. Regarding Assumption of Automated Clearing House Services Agreement* [Docket No. 1029], which is currently pending before the Court.

**Exhibit A-1**

**Redline of <u>Exhibit A</u> to Exhibit A of the Second Amended Plan Supplement**

| No. | Debtor Name | Counterparty Name | Description of Contract | Cure Amount |
|---|---|---|---|---|
| 1 | Voyager Digital, LLC | Ada Support Inc. | ADA Services Agreement and Amendment #1 | $ 0.00 |
| 2 | Voyager Digital, LLC | Amazon Web Services | AWS Customer Agreement | $ ~~223,04.61~~35,94.04 |
| 3 | Voyager Digital, LLC | Amazon Web Services | AWS Service Terms | See above |
| 4 | Voyager Digital, LLC | Anchorage | Digital Bank Order Form | $ 0.00 |
| 5 | Voyager Digital Holdings, Inc. | Blockdaemon Inc. | Order Form | $ 351.03 |
| 6 | Voyager Digital Holdings, Inc. | Blockdaemon Inc. | Validator Agreement | See above |
| 7 | Voyager Digital, LLC | Coinbase, Inc. | Coinbase Prime Institutional Client Agreement | $ 0.00 |
| 8 | Voyager Digital, LLC | Coinbase Custody Trust Company, LLC | Custodial Services Agreement | $ 0.00 |
| 9 | Voyager Digital, LLC | CDW | CDW Customer Service Order Form Google Workspace | $ 0.00 |
| 10 | Voyager Digital, LLC | Chainalysis Inc. | Order Form | $ 0.00 |
| 11 | Voyager Digital Holdings, Inc. | Cloudflare | Enterprise Service Order Form | $ 0.00 |
| 12 | Voyager Digital Holdings, Inc. | Cloudflare | Insertion Order Form | See above |
| 13 | Voyager Digital, LLC | Concur Technologies, Inc. | Order Form | $ 0.00 |
| 14 | Voyager Digital, LLC | Copper Technologies (UK) Limited | Third Party Agreement | $ 0.00 |
| 15 | Voyager Digital, LLC | Copper Technologies (UK) Limited | Side Letter To Copper's Terms & Conditions — Crypto Asset Service | See above |
| 16 | Voyager Digital Holdings, Inc. | Datasite | Statement of Work | $ 0.00 |
| 17 | Voyager Digital, LLC | Dropbox | Dropbox Services Agreement | $ 0.00 |
| 18 | Voyager Digital Ltd. | Fireblocks Inc. | Fireblocks License Agreement | $ 0.00 |
| 19 | Voyager Digital Ltd. | Fireblocks Inc. | First Amendment to the Fireblocks License Agreement | See above |
| 20 | Voyager Digital, LLC | Fivetran | Service Order Form | $ 0.00 |
| 21 | Voyager Digital, LLC | GoDaddy | Universal Terms Of Service Agreement | $ 0.00 |
| ~~22~~ | ~~Voyager Digital Ltd.~~ | ~~Goodbay Technologies, Inc.~~ | ~~Client Services Agreement~~ | $ ~~63,011.00~~ |
| 2~~3~~2 | Voyager Digital, LLC | Iterable | Enterprise Sales Order Form | $ 35,423.46 |
| 2~~4~~3 | Voyager Digital, LLC | JAMF | Software License And Services Agreement | $ 0.00 |
| 2~~5~~4 | Voyager Digital, LLC | MaestroQA | SaaS Services Order Form | $ 0.00 |
| 2~~6~~5 | Voyager Digital Holdings, Inc. | Network Redux LLC | Statement of Work | $ 1,727.82 |
| 2~~7~~6 | Voyager Digital, LLC | Okta | Master Subscription Agreement | $ 0.00 |
| 2~~8~~7 | Voyager Digital, LLC | Oracle America, Inc. | Oracle Netsuite Fee Estimate | $ 0.00 |
| 2~~9~~8 | Voyager Digital Ltd. | Plaid Inc. (f.k.a. Plaid Technologies, Inc.) | Plaid Inc. Master Services Agreement | $ ~~100~~~~16,000~~129.00~~5~~ |
| ~~30~~29 | Voyager Digital Ltd. | Plaid Inc. (f.k.a. Plaid Technologies, Inc.) | Assets Addendum to the Master Services Agreement | See above |
| 3~~1~~0 | Voyager Digital Ltd. | Plaid Inc. (f.k.a. Plaid Technologies, Inc.) | Addendum to Master Services Agreement | See above |
| 3~~2~~1 | Voyager Digital, LLC | RECIPROCITY, INC. | Order Form | $ 0.00 |
| 3~~3~~2 | Voyager Digital, LLC | Segment.io, Inc | Order Form | $ 0.00 |
| 3~~4~~3 | Voyager Digital, LLC | Sift Science, Inc | Order Form | $ 77,240.41 |
| 3~~5~~4 | Voyager Digital, LLC | Slack Technologies, LLC | Order Form | $ 0.00 |
| 3~~6~~5 | Voyager Digital, LLC | Snowflake | Order Form | $ 0.00 |
| 3~~7~~6 | Voyager Digital, LLC | Socure Inc. | MSA & Amendments #1-7 | $ 1,~~471~~~~7,180~~~~4~~,493.3~~800~~ |
| 3~~8~~7 | Voyager Digital, LLC | Tableau Software, LLC | Tableau Purchase Authorization Form | $ 0.00 |
| 3~~9~~8 | Voyager Digital, LLC | Talos | Software Subscription Agreement | $ 195,685.88 |
| ~~40~~39 | Voyager Digital Holdings, Inc. | ThoughtWorks, Inc. | Statement of Work and Subsequent Amendments | $ 0.00 |
| 4~~1~~0 | Voyager Digital Holdings, Inc. | ThoughtWorks, Inc. | Master Services Agreement | See above |
| 4~~2~~1 | Voyager Digital, LLC | TriNet HR III, Inc. | TriNet Technology Services Requisition Form | $ 0.00 |
| 4~~3~~2 | Voyager Digital Holdings, Inc. | TriNet HR III, Inc. | Consent to Assignment of TriNet Contract | See above |
| 4~~4~~3 | Voyager Digital, LLC | Twilio Inc. | Order Form | $ 20,339.21 |
| 4~~5~~4 | Voyager Digital, LLC | Usio, Inc.[1] | Automated Clearing House Services Agreement and Second through Fourth Amendments | $ 3,700.00 |
| 4~~6~~5 | Voyager Digital Holdings, Inc. | 33 Irving Tenant LLC | WeWork New York and Subsequent Amendments | $ 0.00 |
| 4~~7~~6 | Voyager Digital, LLC | 78 SW 7th Street Tenant LLC | WeWork Miami | See above |
| 4~~8~~7 | Voyager Digital Holdings, Inc. | 150 4th Ave N Tenant LLC | WeWork Nashville | See above |
| 4~~9~~8 | Voyager Digital, LLC | Zendesk | Service Order Form | $ 23,335.71 |

[1] The Debtors and Usio, Inc. have consensually agreed to extend the deadline by which the Debtors must assume or reject the contract with Usio, Inc. to March 10, 2023. *See Stipulation Between the Debtors and Usio, Inc. Regarding Assumption of Automated Clearing House Services Agreement* [Docket No. 1029], which is currently pending before the Court.

**Exhibit C**

**Customer Onboarding Protocol**[1]

---

[1]    Certain of the screenshot images in the Customer Onboarding Protocol in the First Amended Plan Supplement
appeared slightly blurry. No changes were made to the Customer Onboarding Protocol, and this Exhibit C is being
refiled solely to include clearer images.

## Customer Onboarding Protocol
## Voyager Digital, LLC to BAM Trading Services Inc. (d/b/a Binance.US)

### Timeline

| Phase | Claims Portal Live | Early Opt In | Post-Closing Assets Available | Post-Expiration |
|---|---|---|---|---|
| **Data** | *No transfer of customer data* | *Data of customers who opt in to early transfer sent on daily basis* | *All remaining customers' data transfers* | *Migration period expires* |
| **Est. Date** | 5 Jan 2023 | On or around 1 Feb 2023 | On or around 16 Mar | 3-6 mos. after closing, depending on jurisdiction |

### Experience

Voyager customers will go through 4 distinct phases pending the closing of the asset purchase agreement between Voyager and Binance.US.

**Phase 1: Claims Portal**

**Go-live date:** Already live

**Description:** Voyager app will begin showing a screen to customers that will give them details about their claim including the USD value of their assets as of July 5, 2022.



### Phase 2: Pre-Closing Data Transfer Opt-In

**Go-live date:** First week of February 2023 *(tentative)*

In the Voyager app and via email, Voyager will inform customers of the asset purchase agreement Voyager entered into with Binance.US and announce that they will gain access to their cryptocurrency distributions on the Binance.US platform once the Binance.US purchase transaction closes.

Customers will be encouraged to start the process of connecting their existing Voyager account with a Binance.US account in order to facilitate these distributions. In order to do this, customers will need to consent to transferring their data to Binance.US before the closing of the transaction, which they will be able to do in the Voyager app. Customers will also be presented with a link to the Binance.US privacy policy, which will apply to their data after it transfers.

Once the customer consents, Voyager will share their data with Binance.US using a secured protocol. Voyager may periodically share customers' data with Binance.US in batches.

Binance.US will perform quality control checks on the data to ensure it is parsed, validated and meets Binace.US' KYC standards.

Binance.US will then check customers' data (SSN and date of birth) against its own existing customers to see if the Voyager customer already has an account with Binance.US.

Once these checks have been performed, customers whose data has been validated will either be notified that they already have an existing Binance.US account, or that they need to open a new Binance.US account, in accordance with the flows below.



**Case 1: For customers who already have a Binance.US account:**

If a customer has an account with Binance.US, they will get an email from Binance.US saying no further action is necessary from their side.



**Case 2: For customers who do not have a Binance.US account:**

If a customer does not have an account with Binance.US, they will receive an email invitation from Binance.US asking them to set-up an account. This email invitation will have a special link that will expedite Binance.US account creation. The link will take the customer to a Binance.US account creation flow where they will choose a password, accept the Binance.US terms of use and privacy policy, and verify (using SMS) the phone number that was registered with Voyager. All other customer profile data (SSN, date of birth, address, picture of an ID if present, etc.) will automatically be saved to their account.



**Case 3: Special Cases:**

There will be some special cases where the data sent by Voyager may not match what Binance.US has (e.g., date of birth for the same SSN is different, an email or phone number is registered with a different person, etc.). Binance.US will handle these special cases separately by redoing their Know Your Customer check, verifying their information using uploaded ID documents, or interacting directly with the customer if needed.

Certain users may reside in states where Binance.US is still working on securing the requisite licensing or authorization to operate (i.e., Hawaii, New York, Texas, and Vermont). Binance.US will not open accounts for customers who reside in these states until the required license or authorization is received.

Regardless of which of the 3 cases above applies, once an account is connected (using SSN and date of birth), there is no action necessary from the customer. The customer may choose to immediately begin using Binance.US for currently available services in their region; however, they will not be able to access their Voyager distributions until the transaction closes.

**Phase 3: After the asset purchase agreement between Binance.US and Voyager closes and distributions are sent by Voyager to Binance.US**

**Go-live date:** March 2023 *(tentative)*

**Case 1: For customers who have opted in to the pre-closing transfer of their data and whose accounts are already linked (Cases 1 and 2 in Phase 2 above)**

When the asset purchase agreement closes, Binance.US will receive distributions of cryptocurrency from Voyager in respect of customers who have already linked their Voyager accounts to their Binance.US accounts, and will make these distributions available to those customers in their Binance.US accounts within five business days of receiving those distributions. Customers will receive a notification / email when their distributions are available. At that point they may go to their Binance.US wallet and see the details of their distributions.



**Case 2: For customers who have not opted in to the pre-closing transfer of their data**

Voyager will send their data (such as SSN, date of birth, address, picture of an ID if present, etc.) to Binance.US upon the closing of the asset purchase agreement. As described in Phase 2 above, Binance.US will check this data (SSN and date of birth) against its own existing customers to see if the Voyager customer already has an account with Binance.US.

For customers who have Binance.US accounts, no further action is required. Binance.US will notify Voyager that such customer has an existing Binance.US account, and Voyager will send to Binance.US the distribution allocable to such customer. Binance.US will make such customers' distributions available to those customers in their Binance.US accounts within five business days of receiving those distributions.

Customers who do not have a Binance.US account as of this date will be sent an email asking them to set-up an account. The link will take the customer to a Binance.US account creation flow where they will choose a password, accept the Binance.US terms of use and privacy policy, and verify (using SMS) the phone number that was registered with Voyager. All other customer information profile data (SSN, date of birth, address, picture of an ID if present, etc.) will be automatically saved to their account. After a customer has accepted the Binance.US terms of use and privacy policy and verified their phone number, Binance.US will notify Voyager that such customer has opened a Binance.US account, and Voyager will send to Binance.US the distributions allocable to such customers. Binance.US will make such customers' distributions available to those customers in their Binance.US accounts within five business days of receiving those distributions.

## Case 3: Special Cases

### Customer takes no action

For customers that do not have a Binance.US account and have not created one following the closing of the purchase transaction, Binance.US will ask these customers to take action via email.

### Customer is from unsupported states

If Binance.US receives a required license or authorization in an unsupported state (i.e., Hawaii, New York, Texas and Vermont) within 6 months of the closing of the asset purchase agreement, Binance.US will follow the procedures for customers who do not have previously existing Binance.US accounts, as described in Case 2 above.

To the extent Binance.US does not receive the required licensing and/or authorization to operate in the unsupported states within 6 months from the closing of the asset purchase agreement, Voyager will convert the distributions allocable to such customers to cash and will distribute them separately.

### Customer account has data issue / suspected fraud

There will be some special cases where the data sent by Voyager may not match what Binance.US has. (e.g., date of birth for the same SSN is different, an email or phone number is registered with a different person, etc.). Binance.US will handle these special cases separately by redoing their Know Your Customer check, verifying their information using uploaded ID documents, or interacting directly with the customer if needed. Voyager app will show a 30-digit account number during phase 3. This may be used by Binance.US to verify ownership of assets on Voyager.



## Phase 4: Post-expiration

For customers who have not accepted the Binance.US terms of use and privacy policy and otherwise taken necessary action to open an account, if required, by 3 months following the closing of the asset purchase agreement, Binance.US will liquidate their cryptocurrency distributions and deliver the resulting cash to Voyager for distribution in accordance with Voyager's bankruptcy plan.

This time period will be extended to 6 months for users in unsupported jurisdictions (i.e., Hawaii, New York, Texas and Vermont).



# Exhibit 23

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE OF FILING OF FOURTH AMENDED PLAN SUPPLEMENT**

    **PLEASE TAKE NOTICE THAT** on January 13, 2023, the United States Bankruptcy
Court for the Southern District of New York (the "Court") entered an *Order (I) Scheduling a
Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally
Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for
Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and
(D) Procedures for Objections, and (IV) Granting Related Relief* (the "Disclosure Statement
Order") [Docket No. 861],[2] (a) authorizing the debtors and debtors in possession (collectively, the
"Debtors") to solicit votes for the *Third Amended Joint Plan of Voyager Digital Holdings, Inc.
and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as modified, amended,
or supplemented from time to time, the "Plan") [Docket No. 852]; (b) conditionally approving the
*Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager
Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*
(the "Disclosure Statement") [Docket No. 853] as containing "adequate information" pursuant to
section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to
be included in the Solicitation Packages; (d) approving procedures for soliciting, receiving, and

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC
(8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY
10003.

[2]    Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan or Disclosure
Statement Order, as applicable.

Debtors
Ex-23

tabulating votes on the Plan and for filing objections to the Plan; and (e) scheduling the Combined Hearing.

**PLEASE TAKE FURTHER NOTICE THAT** on February 1, 2023, the above-captioned debtors and debtors-in-possession (the "Debtors") filed the *Notice of Filing of Plan Supplement* [Docket No. 943], in support of the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** on February 8, 2023, the Debtors filed the *Notice of Filing of First Amended Plan Supplement* (the "First Amended Plan Supplement") [Docket No. 986], in support of the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** on February 15, 2023, the Debtors filed the *Notice of Filing of Second Amended Plan Supplement* [Docket No. 1006] (the "Second Amended Plan Supplement"), in support of the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** on February 21, 2023, the Debtors filed the *Notice of Filing of Third Amended Plan Supplement* [Docket No. 1035], in support of the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors hereby file this fourth amended plan supplement (the "Fourth Amended Plan Supplement"), in support of the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Disclosure Statement Order, the Fourth Amended Plan Supplement includes the following documents:

| Exhibit | Description |
|---------|-------------|
| **B** | Amended Schedule of Retained Causes of Action |
| **B-1** | Redline of **Exhibit B** to Exhibit B of the First Amended Plan Supplement |
| **F** | Plan Administrator Agreement |
| **F-1** | Redline of **Exhibit F** to Exhibit F of the Second Amended Plan Supplement |

**PLEASE TAKE FURTHER NOTICE THAT** the documents contained in the Fourth Amended Plan Supplement are integral to, and are considered part of, the Plan.  If the Plan is approved, the documents contained in the Fourth Amended Plan Supplement will be approved by the Court pursuant to the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE THAT** the Combined Hearing will commence on **March 2, 2023, at 10:00 a.m. prevailing Eastern Time**.

**PLEASE TAKE FURTHER NOTICE THAT** the Combined Hearing will take place in a hybrid fashion both in person and via CourtSolutions.  Those wishing to participate in the Combined Hearing in person may appear before the Honorable Michael E. Wiles, in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green,

New York, New York 10004.  In accordance with the Court's General Order M-543, dated March 20, 2020 ("General Order M-543"), the Combined Hearing will also be conducted telephonically. Parties wishing to participate in the Combined Hearing telephonically should do so by making arrangements through CourtSolutions LLC.  Instructions to register for CourtSolutions LLC are attached to General Order M-543.

**PLEASE TAKE FURTHER NOTICE THAT** certain documents, or portions thereof, contained in the Fourth Amended Plan Supplement remain subject to ongoing review, revision, and further negotiation among the Debtors and interested parties with respect thereto.  The Debtors reserve the right to alter, amend, modify, or supplement any document in the Fourth Amended Plan Supplement in accordance with the Plan at any time before the Effective Date of the Plan or any such other date as may be provided for by the Plan or by order of the Court; *provided* that if any document in the Fourth Amended Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the date of the Combined Hearing, the Debtors will file a blackline of such document with the Court.

**PLEASE TAKE FURTHER NOTICE THAT** copies of the Plan, the Disclosure Statement, the Disclosure Statement Order, and other pleadings filed in these chapter 11 cases are available free of charge by visiting the website of Stretto at http://www.cases.stretto.com/Voyager. You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov/ in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

Dated:  February 28, 2023
New York, New York

/s/ Joshua A. Sussberg
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:         jsussberg@kirkland.com
               cmarcus@kirkland.com
               christine.okike@kirkland.com
               allyson.smith@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## **Exhibit B**

**Amended Schedule of Retained Causes of Actions**

## Exhibit B

### Schedule of Retained Causes of Action

This **Exhibit B** contains the Schedule of Retained Causes of Action.

**Article IV.P** of the Plan provides as follows:

In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Entity shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred. Such rights shall be preserved by the Debtors and Wind-Down Debtors and shall vest in the Wind-Down Entity, with the Wind-Down Entity's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in **Error! Reference source not found.** of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and Wind-Down Debtors as of the Effective Date.

The Wind-Down Trust may pursue such Causes of Action, as appropriate, in accordance with the best interests of the beneficiaries of the Wind-Down Trust and in accordance with the Wind-Down Trust Agreement and the Plan. **No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors, the Wind-Down Debtors or the Wind-Down Trust, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Wind-Down Trust, on behalf of the Debtors and the Wind-Down Debtors, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Error! Reference source not found. of the Plan.** Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Trust, on behalf of the Debtors and Wind-Down Debtors and in accordance with the Wind-Down Trust Agreement, expressly reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), lack of standing or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Wind-Down Trust, on behalf of the Debtors and Wind-Down Debtors, reserves and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code,

any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Trust, except as otherwise provided in the Plan, including **Error! Reference source not found.** of the Plan.  The Wind-Down Trust, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan.

**The Causes of Action set forth in the Plan and as set forth below, are non-exclusive and are not intended to be a comprehensive list of all retained Causes of Action.**

**The Debtors and the Wind-Down Debtors expressly reserve the right to alter, modify, amend, remove, augment, or supplement the List of Retained Causes of Action as set forth below, at any time with additional Causes of Action.  Failure to include any Cause of Action herein at any time shall not be a bar nor have any impact on the Wind-Down Debtors' rights to bring any Cause of Action not otherwise released pursuant to the Plan.**

All rights to enforce, commence, prosecute, pursue, settle, or take any other action with respect to any Cause of Action shall be preserved for the sole benefit of the Wind-Down Debtors, regardless of whether any Causes of Action or any entity is specifically referenced herein, in the Plan, in the Disclosure Statement, or in any Plan Supplement.  Releases contained in the Plan are solely for the benefit of specific and identified parties in accordance with, and subject to the Plan, and the Plan does not confer upon any other Person or Entity any third-party beneficiary rights to obtain the benefit of any such releases contained therein.  The decision whether to enforce, commence, prosecute, pursue, settle, or take any other action with respect to any Causes of Action, or to refrain from doing so, shall remain within the discretion of the Wind-Down Trustee.

Notwithstanding, and without limiting the generality of Article IV.P of the Plan and the express disclaimers set forth above, this **<u>Exhibit B</u>** includes certain types of Causes of Actions preserved by the Debtors and the Wind-Down Debtors, subject to the terms of the Plan and the information provided in this **<u>Exhibit B</u>**.  Without limiting the full universe of Causes of Action vesting in the Wind-Down Debtors under the Plan, these Causes of Action include (but are not limited to) the following types of claims:

**I.    Claims Related to Insurance Policies**

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtor or Wind-Down Debtor is a party or pursuant to which any Debtor or Wind-Down Debtor has any rights whatsoever, regardless of whether such contract or policy is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, without limitation, Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters.  These Causes of Action include, without limitation, the Non-Released D&O Claims and the Non-Released Insurance Claims, as such terms are defined in the Plan.

## II.    Claims Related to Tax Refunds

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against federal, state, local, or international taxing authorities based in whole or in part upon any and all tax obligations, tax credits, refunds, offsets, or other claims to which any Debtor or Wind-Down Debtor is a party or pursuant to which any Debtor or Wind-Down Debtor has any rights whatsoever, including, without limitation, against or related to all federal, state, local, or international taxing authorities that owe or that may in the future owe money related to tax obligations, tax credits, refunds, offsets, or other claims to the Debtors or the Wind-Down Debtors, regardless of whether such entity is specifically identified herein.

## III.    Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation, Including Adversary Proceedings

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, any adversary proceeding in these chapter 11 cases (including, without limitation, *Voyager Digital Holdings, Inc. v. Lavine et al*, Adv. Case No. 22-01150), or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial, regardless of whether such Entity is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, but not limited to, the 3AC Claims, Alameda Claims, and FTX Claims (each as defined in the Plan), and any such Claims against directors, officers, employees, managers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, or other professionals and/or advisors, or any other persons or entities affiliated with 3AC, Alameda or FTX, or any of their respective related parties, which include any Cause of Action assertable in the FTX Bankruptcy Cases or adversary proceedings initiated thereunder (including, without limitation, *Alameda Research Ltd. v. Voyager Digital LLC et al*, Adv. Case No. 23-50084).

## IV.    Claims Related to Accounts Receivable and Accounts Payable

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors or Wind-Down Debtors, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto. Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Wind Down Debtors, as applicable, owe money to them. The claims and Causes of Action reserved include Causes of Action against vendors, suppliers of goods and services, or any other parties.

## V.    Claims Related to Deposits, Adequate Assurance Postings, and Other Collateral Postings

Unless otherwise released by the Plan, the Debtors and the Wind-Down Debtors expressly reserve all Causes of Action based in whole or in part upon any and all postings of a security deposit, adequate assurance payment, or any other type of deposit or collateral, regardless of whether such posting of security deposit, adequate assurance payment, or other type of deposit or collateral is specifically identified herein.

## VI.    Claims Related to Contracts and Leases

Unless otherwise specifically released by the Plan, the Debtors and the Wind-Down Debtors expressly reserve the claims or Causes of Actions, based in whole or in part upon any and all contracts and leases to which any Debtor or Wind-Down Debtor is a party or pursuant to which any Debtor or Wind-Down Debtor has any rights whatsoever, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto, including without limitation all contracts and leases that are assumed pursuant to the Plan, were previously assumed by the Debtors, or rejected by the Debtors.  The claims and Causes of Actions reserved include, without limitation, claims and Causes of Action against vendors, suppliers of goods or services, customers, landlords, utilities, promoters, banks, or any other parties, unless such claims or Causes of Action were previously released through the Plan or separate written agreement executed by the Debtors for, among other things:  (a) overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) breach of contract, wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) any liens, including mechanic's, artisan's, materialmen's, possessory, or statutory liens held by any one or more of the Debtors; (f) environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies, or suppliers of environmental services or goods; (g) counterclaims and defenses related to any contractual obligations; (h) any turnover actions arising under section 542 or 543 of the Bankruptcy Code; (i) and unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claims.

## VII.    Avoidance Actions

Unless otherwise released by the Plan or transferred to the Purchaser pursuant to the Asset Purchase Agreement, the Debtors and the Wind-Down Debtors expressly reserve all actual or potential Causes of Action that may be brought by or on behalf of the Debtors, the Wind-Down Debtors, their Estates, or other authorized parties in interest to avoid a transfer of property or an obligation incurred by the Debtors (including, without limitation, the Retained Avoidance Actions under the Asset Purchase Agreement) pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through and including 553, and 724(a) of the

3

Bankruptcy Code, under similar or related state or federal statutes and common law, including preference and fraudulent transfer laws.

## VIII.   Non-Released D&O Claims

The Debtors and the Wind-Down Debtors expressly reserve the Non-Released D&O Claims and may pursue such claims subject to the limitations in Articles IV.E and IV.F of the Plan.  The Debtors and the Wind-Down Debtors also expressly reserve and may assert claims for aiding and abetting breach of fiduciary duties against third parties who are not Released Parties as defined in the Plan.

## IX.    Promoter Claims

Unless otherwise released by the Plan, the Debtors and the Wind-Down Debtors expressly reserve all claims against public promoters, marketers, and advertisers of the Debtors who are not Released Parties as defined in the Plan for, among other things, false or deceptive marketing or advertising, false inducement of the Debtors' customers, misleading or fraudulent claims, aiding and abetting breaches of fiduciary duty, and other claims or causes of action relating to any oral or written statements made in connection with the Debtors' services.

## X.     Claims Against Professional Persons

Unless identified as a "Released Professional", or otherwise released or exculpated by the Plan, the Debtors and the Wind-Down Debtors expressly reserve all claims against any attorneys, financial advisors, investment bankers, auditors, or other professional persons for any claims or causes of action, including, without limitation, negligence, malpractice, fraud, misrepresentation, and aiding and abetting breaches of fiduciary duty in connection with services rendered to the Debtors.

## XI.    Contributed Third-Party Claims

The Debtors and the Wind-Down Debtors expressly reserve all Contributed Third-Party Claims, subject to the procedures identified in Articles IV.Q and IV.R of the Plan and the ballots, which such Contributed Third-Party Claims shall have been irrevocably contributed to the Wind-Down Debtors.

*[Remainder of page intentionally left blank.]*

4

## Exhibit B-1

**Redline of <u>Exhibit B</u> to <u>Exhibit B</u> of the First Amended Plan Supplement**

# Exhibit B

## Schedule of Retained Causes of Action

This **Exhibit B** contains the Schedule of Retained Causes of Action.

**Article IV.P** of the Plan provides as follows:

In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Entity shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred. Such rights shall be preserved by the Debtors and Wind-Down Debtors and shall vest in the Wind-Down Entity, with the Wind-Down Entity's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and Wind-Down Debtors as of the Effective Date.

The Wind-Down Trust may pursue such Causes of Action, as appropriate, in accordance with the best interests of the beneficiaries of the Wind-Down Trust and in accordance with the Wind-Down Trust Agreement and the Plan. **No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors, the Wind-Down Debtors or the Wind-Down Trust, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Wind-Down Trust, on behalf of the Debtors and the Wind-Down Debtors, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan.** Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Trust, on behalf of the Debtors and Wind-Down Debtors and in accordance with the Wind-Down Trust Agreement, expressly reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), lack of standing or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Wind-Down Trust, on behalf of the Debtors and Wind-Down Debtors, reserves and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the

Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Trust, except as otherwise provided in the Plan, including Article VIII of the Plan. The Wind-Down Trust, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan.

**The Causes of Action set forth in the Plan and as set forth below, are non-exclusive and are not intended to be a comprehensive list of all retained Causes of Action.**

**The Debtors and the Wind-Down Debtors expressly reserve the right to alter, modify, amend, remove, augment, or supplement the List of Retained Causes of Action as set forth below, at any time with additional Causes of Action. Failure to include any Cause of Action herein at any time shall not be a bar nor have any impact on the Wind-Down Debtors' rights to bring any Cause of Action not otherwise released pursuant to the Plan.**

All rights to enforce, commence, prosecute, pursue, settle, or take any other action with respect to any Cause of Action shall be preserved for the sole benefit of the Wind-Down Debtors, regardless of whether any Causes of Action or any entity is specifically referenced herein, in the Plan, in the Disclosure Statement, or in any Plan Supplement. _Releases contained in the Plan are solely for the benefit of specific and identified parties in accordance with, and subject to the Plan, and the Plan does not confer upon any other Person or Entity any third-party beneficiary rights to obtain the benefit of any such releases contained therein._ The decision whether to enforce, commence, prosecute, pursue, settle, or take any other action with respect to any Causes of Action, or to refrain from doing so, shall remain within the discretion of the Wind-Down Trustee.

Notwithstanding, and without limiting the generality of Article IV.P of the Plan and the express disclaimers set forth above, this **Exhibit B** includes certain types of Causes of Actions preserved by the Debtors and the Wind-Down Debtors, subject to the terms of the Plan and the information provided in this **Exhibit B**. Without limiting the full universe of Causes of Action vesting in the Wind-Down Debtors under the Plan, these Causes of Action include (but are not limited to) the following types of claims:

## I.    Claims Related to Insurance Policies

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action ~~against the D&O Carriers (as defined in the Plan)~~ based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtor or Wind-Down Debtor is a party or pursuant to which any Debtor or Wind-Down Debtor has any rights whatsoever, regardless of whether such contract or policy is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, without limitation, Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters.

1

These Causes of Action include, without limitation, the Non-Released D&O Claims and the Non-Released Insurance Claims, as such terms are defined in the Plan.

## II.    Claims Related to Tax Refunds

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against federal, state, local, or international taxing authorities based in whole or in part upon any and all tax obligations, tax credits, refunds, offsets, or other claims to which any Debtor or Wind-Down Debtor is a party or pursuant to which any Debtor or Wind-Down Debtor has any rights whatsoever, including, without limitation, against or related to all federal, state, local, or international taxing authorities that owe or that may in the future owe money related to tax obligations, tax credits, refunds, offsets, or other claims to the Debtors or the Wind-Down Debtors, regardless of whether such entity is specifically identified herein.

## III.    Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation, Including Adversary Proceedings

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, any adversary proceeding in these chapter 11 cases (including, without limitation, *Voyager Digital Holdings, Inc. v. Lavine et al*, Adv. Case No. 22-01150), or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial, regardless of whether such Entity is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, but not limited to, the 3AC Claims, Alameda Claims, and FTX Claims (each as defined in the Plan), and any such Claims against directors, officers, employees, managers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, or other professionals and/or advisors, or any other persons or entities affiliated with 3AC, Alameda or FTX, or any of their respective related parties, which include any Cause of Action assertable in the FTX Bankruptcy Cases or adversary proceedings initiated thereunder (including, without limitation, *Alameda Research Ltd. v. Voyager Digital LLC et al*, Adv. Case No. 23-50084).

## IV.    Claims Related to Accounts Receivable and Accounts Payable

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors or Wind-Down Debtors, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto.  Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Wind Down Debtors, as applicable, owe money to them.  The claims and Causes of Action reserved include Causes of Action against vendors, suppliers of goods and services, or any other parties.

## V.    Claims Related to Deposits, Adequate Assurance Postings, and Other Collateral Postings

Unless otherwise released by the Plan, the Debtors and the Wind-Down Debtors expressly reserve all Causes of Action based in whole or in part upon any and all postings of a security deposit, adequate assurance payment, or any other type of deposit or collateral, regardless of whether such posting of security deposit, adequate assurance payment, or other type of deposit or collateral is specifically identified herein.

## VI.    Claims Related to Contracts and Leases

Unless otherwise specifically released by the Plan, the Debtors and the Wind-Down Debtors expressly reserve the claims or Causes of Actions, based in whole or in part upon any and all contracts and leases to which any Debtor or Wind-Down Debtor is a party or pursuant to which any Debtor or Wind-Down Debtor has any rights whatsoever, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto, including without limitation all contracts and leases that are assumed pursuant to the Plan, were previously assumed by the Debtors, or rejected by the Debtors.  The claims and Causes of Actions reserved include, without limitation, claims and Causes of Action against vendors, suppliers of goods or services, customers, landlords, utilities, promoters, banks, or any other parties, unless such claims or Causes of Action were previously released through the Plan or separate written agreement executed by the Debtors for, among other things:  (a) overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) breach of contract, wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) any liens, including mechanic's, artisan's, materialmen's, possessory, or statutory liens held by any one or more of the Debtors; (f) environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies, or suppliers of environmental services or goods; (g) counterclaims and defenses related to any contractual obligations; (h) any turnover actions arising under section 542 or 543 of the Bankruptcy Code; (i) and unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claims.

## VII.    Avoidance Actions

Unless otherwise released by the Plan or transferred to the Purchaser pursuant to the Asset Purchase Agreement, the Debtors and the Wind-Down Debtors expressly reserve all actual or potential Causes of Action that may be brought by or on behalf of the Debtors, the Wind-Down Debtors, their Estates, or other authorized parties in interest to avoid a transfer of property or an obligation incurred by the Debtors (including, without limitation, the Retained Avoidance Actions under the Asset Purchase Agreement) pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through and including 553,

3

and 724(a) of the Bankruptcy Code, under similar or related state or federal statutes and common law, including preference and fraudulent transfer laws.

## VIII.    Non-Released D&O Claims

The Debtors and the Wind-Down Debtors expressly reserve the Non-Released D&O Claims and may pursue such claims subject to the limitations in Articles IV.E and IV.F of the Plan.  The Debtors and the Wind-Down Debtors also expressly reserve and may assert claims for aiding and abetting breach of fiduciary duties against third parties ~~unaffiliated with the Debtors~~ who are not Released Parties as defined in the Plan.

## IX.    Promoter Claims

Unless otherwise released by the Plan, the Debtors and the Wind-Down Debtors expressly reserve all claims against public promoters, marketers, and advertisers of the Debtors who are not Released Parties as defined in the Plan for, among other things, false or deceptive marketing or advertising, false inducement of the Debtors' customers, misleading or fraudulent claims, aiding and abetting breaches of fiduciary duty, and other claims or causes of action relating to any oral or written statements made in connection with the Debtors' services.

## X.    Claims Against Professional Persons

Unless identified as a "Released Professional", or otherwise released or exculpated by the Plan, the Debtors and the Wind-Down Debtors expressly reserve all claims against any attorneys, financial advisors, investment bankers, auditors, or other professional persons for any claims or causes of action, including, without limitation, negligence, malpractice, fraud, misrepresentation, and aiding and abetting breaches of fiduciary duty in connection with services rendered to the Debtors.

## XI.    Contributed Third-Party Claims

The Debtors and the Wind-Down Debtors expressly reserve all Contributed Third-Party Claims, subject to the procedures identified in Articles IV.Q and IV.R of the Plan and the ballots, which such Contributed Third-Party Claims shall have been irrevocably contributed to the Wind-Down Debtors.

*[Remainder of page intentionally left blank.]*

4

**Exhibit F**

**Amended Plan Administrator Agreement**

## PLAN ADMINISTRATOR AGREEMENT

This Plan Administrator Agreement (as it may be amended, modified, supplemented, or restated from time to time, this "Agreement") dated as of [●], 2023, is made and entered into by and among the entities listed as "Debtors" on the signature pages hereto (each, a "Debtor"), and Paul R. Hage, solely in his capacity as Plan Administrator for purposes of this Agreement (the "Plan Administrator"), and is executed in connection with and pursuant to the terms of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* dated January 10, 2023 [Docket No. 852] (as it may be amended, modified, supplemented, or restated from time to time, the "Plan").[1]

## RECITALS

WHEREAS, on July 5, 2022, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, (the "Bankruptcy Court"), and their chapter 11 cases are being jointly administered as *In re Voyager Digital Holdings, Inc., et al.,* Case No. 23-10943 (MEW);

WHEREAS, on July 19, 2022, the United States Trustee for Region 2 (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee");[2]

WHEREAS, the Plan contemplates that a plan administrator will be appointed to perform its duties in accordance with the Plan and this Agreement;

WHEREAS, the Plan provides that the Plan Administrator will, among other things, retain, preserve, and distribute certain assets of the Wind-Down Debtor for the benefit of Holders of Allowed Claims or Allowed Interests that are entitled to receive distributions pursuant to the terms of the Plan, whether or not such Claims or Interests are Allowed as of the Effective Date;

WHEREAS on March [●], 2023, the Bankruptcy Court entered an order ("Confirmation Order")[3] confirming the Plan, which became effective on [●], 2023 ("Effective Date");

WHEREAS, this Agreement is entered into in accordance with, and to facilitate the implementation and execution of, the Plan;

WHEREAS, on the Effective Date of the Plan, the Plan Administrator shall be appointed in accordance with the Plan, and the Plan Administrator is willing to serve in such capacity, in each case upon the terms set forth in this Agreement and pursuant to the Plan; and

WHEREAS, the Plan provides that the Plan Administrator shall act for the Debtors and Wind-Down Debtor in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions of the Plan and this Agreement;

---

[1] All capitalized terms used in this Agreement and not otherwise defined herein have the meanings ascribed to such defined terms in the Plan.

[2] Docket No. 106.

[3] Docket No. [●].

NOW, THEREFORE, in accordance with the Plan and the Confirmation Order, and in consideration of the promises, and the mutual covenants and agreements of the Parties contained in the Plan and herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties agree and declare as follows:

## RECITALS, INTERPRETATION, AND CONSTRUCTION

1.1     <u>Recitals</u>. The Recitals are incorporated into and made terms of this Agreement.

1.2     <u>Interpretation; Headings</u>. All references herein to specific provisions of the Plan or Confirmation Order are without exclusion or limitation of other applicable provisions of the Plan or Confirmation Order. Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender. The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the provisions of this Agreement.

1.3     <u>Construction of Agreement</u>. This Agreement shall not be construed to impair or limit in any way the rights of any Person under the Plan.

1.4     <u>Conflict Among Plan Documents</u>. In the event of any inconsistency between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall govern and control. In the event of any inconsistency between this Agreement, on the one hand, and the Confirmation Order, on the other hand, the Confirmation Order shall control and take precedence.

## ARTICLE II
## ACCEPTANCE OF POSITION; OBLIGATION TO PAY CLAIMS; FIDUCIARY STATUS<u>Acceptance</u>. (a) Paul. R. Hage hereby accepts appointment as the Plan Administrator; and (b) Paul R. Hage agrees to observe and perform all duties and obligations imposed upon the Plan Administrator under the Plan, this Agreement, other orders of the Bankruptcy Court, and applicable law.

2.2     <u>Fiduciary</u>. The Plan Administrator shall perform its obligations consistent with the Plan, this Agreement, and applicable orders of the Bankruptcy Court. The Plan Administrator shall be the sole officer and director of the Wind-Down Debtor.  The Plan Administrator shall hold the equity of the Voyager Digital Ltd., to the extent that any new equity is issued, in an agency capacity, for the benefit of and to facilitate the rights of Holders of Interests provided under the Plan. The Plan Administrator shall act for the Wind-Down Debtor in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions in the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Debtors and the Wind-Down Debtor shall be deemed to have resigned, solely in their capacities as such, and a the Plan Administrator or a representative of the Plan Administrator shall be appointed as the sole director and sole officer of the Debtors and the Wind-Down Debtor and shall succeed to the powers of the Debtors' directors and officers. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Debtors and the Wind-Down Debtor. For the

2

avoidance of doubt, the foregoing shall not limit the authority of the Debtors, the Wind-Down Debtor, or the Plan Administrator, as applicable, to continue the employment any former director or officer, including pursuant to the Purchase Agreement (if any) or any transition services agreement entered into on or after the Effective Date by and between the Debtors, the Wind-Down Debtor, and the Purchasers.

## ARTICLE III
## GENERAL POWERS, RIGHTS AND OBLIGATIONS OF THE PLAN ADMINISTRATOR

3.1    <u>Rights, Powers, and Privileges of Plan Administrator Generally</u>. Effective as of the Effective Date, the Plan Administrator is appointed under the Plan for purposes of implementing the terms and conditions of the Plan with respect to (i) effectuating the transactions beneficial and necessary to wind down the Debtors and the Wind-Down Debtor, including as set forth in the Restructuring Transactions Memorandum, (ii) administration of, and distributions with respect to, the claims asserted against the Debtors, and (iii) such other matters agreed to by the Debtors and Plan Administrator in accordance with the terms of the Plan (collectively, the "<u>Plan Administrator Responsibilities</u>"), in each case, subject to the terms and conditions set forth in this Agreement, the Plan, and the Confirmation Order. The Plan Administrator is hereby appointed to make all disbursements and distributions under the Plan, subject to the terms and conditions set forth in this Agreement, the Plan, and the Confirmation Order.  The Debtors and the Wind-Down Debtor shall be managed, administered, and wound down by the Plan Administrator in accordance with the terms of the Plan, in consultation with the Oversight Committee established pursuant to this Agreement (the "<u>Oversight Committee</u>") as set forth in this Agreement, and the Plan Administrator shall have full authority to administer the provisions of the Plan, and subject to the terms and conditions of this Agreement, the Plan, and the Confirmation Order.  T he Plan Administrator shall be deemed to be a judicial substitute and estate representative for the Debtors as the party-in-interest in the Chapter 11 Cases, under the Plan, or in any judicial proceeding or appeal to which any of the Debtors or Wind-Down Debtor is a party. The Plan Administrator shall be deemed a "representative" of the estate as contemplated by Bankruptcy Code section 1123(b)(3)(B), and performance of certain services in connection with this Agreement shall be authorized by the execution of this Agreement to the extent not already authorized by the Plan or the Confirmation Order.

3.1.1    <u>Power to Contract</u>. In furtherance of the purpose of the Debtors and the Wind-Down Debtor, and except as otherwise specifically restricted in the Plan, Confirmation Order, or this Agreement, the Plan Administrator shall have the right and power on behalf of the Wind-Down Entity, and also may cause the Debtors or the Wind-Down Debtor, to enter into any covenants or agreements binding the Debtors or the Wind-Down Debtor, and to execute, acknowledge and deliver any and all instruments that are necessary or deemed by the Plan Administrator to be consistent with and advisable in furthering the purpose of the Plan or this Agreement.

3.1.2    <u>Ultimate Right to Act Based on Advice of Counsel or Other Professionals</u>. Nothing in this Agreement shall be deemed to prevent the Plan Administrator from taking or refraining to take any action on behalf of the Debtors or the Wind-Down Debtor that, based upon the advice of counsel or other professionals, the Plan Administrator determines he is obligated to

take or to refrain from taking in the performance of any duty under the Plan, Confirmation Order, or this Agreement.

      3.2    <u>Oversight Committee Member Designation</u>. If a conflict arises that prevents the involvement of the Plan Administrator from performing his duties, the Oversight Committee shall designate a member of the Oversight Committee to act as the Plan Administrator solely with respect to such conflict. During such time as an Oversight Committee member is acting as Plan Administrator, such member shall not be entitled to vote on matters requiring Oversight Committee approval and the voting provisions set forth in section 6.1 hereof shall apply.

      3.3    <u>Powers of Plan Administrator</u>. The Plan Administrator shall provide the post-Effective Date administration, wind down, dissolution, and liquidation services related to the Plan Administrator Responsibilities that are necessary, required, desirable, or advisable to effectuate the terms and conditions of the Plan and the wind down of the Debtors and the Wind-Down Debtor, in consultation with the Oversight Committee as set forth in this Agreement. Subject to the oversight and direction of the Oversight Committee set forth in Article VI of this Agreement, the Plan Administrator shall have all duties, powers, and rights set forth herein, in the Plan, and in the Confirmation Order, including but not limited to, the following services related to the Debtors and the Wind-Down Debtor:

      3.3.1    implementing the Wind-Down Debtor, and making distributions contemplated by the Plan;

      3.3.2    marshalling, marketing for sale, and winding down any of the Debtors' assets constituting Wind-Down Debtor Assets;

      3.3.3    appointing an independent director at each Debtor to act as a fiduciary for such Debtor entity in connection with the resolution of the Intercompany Claims;

      3.3.4    overseeing the accounts of the Debtors and the Wind-Down Debtor and the wind down and dissolution of the Debtors and the Wind-Down Debtor, including effectuating the transactions described in the Restructuring Transactions Memorandum;

      3.3.5    receiving, maintaining, conserving, supervising, prosecuting, collecting, settling, managing, investing, protecting, and where appropriate, causing the Wind-Down Debtor to abandon the Wind-Down Debtor Assets, including causing the Wind-Down Debtor to invest any moneys held as Wind-Down Debtor Assets;

      3.3.6    opening and maintaining bank accounts on behalf of or in the name of the Debtors or the Wind-Down Debtor, including, in the Plan Administrator's discretion, separate bank accounts for each of the Debtors;

      3.3.7    entering into any agreement or executing any document or instrument required by or consistent with the Plan, the Confirmation Order, or this Agreement, and to perform all obligations thereunder;

      3.3.8    collecting and liquidating all Wind-Down Debtor Assets, including the sale of any Wind-Down Debtor Assets;

3.3.9    protecting and enforcing the rights to the Wind-Down Debtor Assets (including any Vested Causes of Action and Contributed Third-Party Claims) vested in the Wind-Down Debtor and Plan Administrator by this Agreement by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

3.3.10   investigating any Wind-Down Debtor Assets, and any other potential Vested Causes of Action and Contributed Third-Party Claims;

3.3.11   reviewing, reconciling, compromising, settling, objecting, or prosecuting Claims or Interests of any kind;

3.3.12   seeking the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004;

3.3.13   retaining professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to this Agreement and pay the reasonable compensation thereof;

3.3.14   paying all lawful expenses, debts, charges, taxes, and other liabilities, and make all other payments relating to the Wind-Down Debtor Assets, solely out of Wind-Down Debtor Assets;

3.3.15   prosecuting and settling the Vested Causes of Action, including, without limitation, the 3AC Claims, FTX Claims, Alameda Claims, Contributed Third-Party Claims, and any causes of action not included in the Asset Purchase Agreement or released under the Plan;

3.3.16   reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Vested Causes of Action and Contributed Third-Party Claims;

3.3.17   acquiring litigation and other claims related to the Debtors, and prosecuting such claims;

3.3.18   reviewing and compelling turnover of the Debtors or the Wind-Down Debtor's property;

3.3.19   calculating and making all Distributions to the holders of Allowed Claims against each Debtor and, solely to the extent of payment in full of Allowed Claims, to holders of Allowed Interests, as provided for in, or contemplated by, the Plan and this Agreement; *provided* that because the Plan does not substantively consolidate the Debtors' Estates, the Plan Administrator shall make Distributions from the Wind-Down Debtor Assets to the holders of Claims and Interests (if applicable) against that specific Debtor;

3.3.20   establishing, administering, adjusting, and maintaining the Wind-Down Reserve and the Disputed Claims Reserve;

3.3.21   withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Plan Administrator has determined, based

5

upon the advice of his agents or professionals, may be required to be withheld from such Distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

3.3.22  in reliance upon the Debtors' Schedules, the official Claims Register maintained in the Chapter 11 Cases and the Debtors' filed lists of equity security holders, reviewing, and where appropriate, allowing or objecting to Claims and (if applicable) Interests, and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and (if applicable) Disputed Interests required to be administered by the Wind-Down Debtor;

3.3.23  making all tax withholdings, filing tax information returns, filing and prosecuting tax refunds claims, making tax elections by and on behalf of the Debtors or the Wind-Down Debtor, and filing tax returns for the Debtors or the Wind-Down Debtor pursuant to and in accordance with the Plan, and paying taxes, if any, payable for and on behalf of the Debtors or the Wind-Down Debtor, as applicable; *provided, however*, that notwithstanding any other provision of this Agreement, the Plan Administrator shall not have any responsibility or personal liability in any capacity whatsoever for the signing or accuracy of the Debtors' income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto;

3.3.24  abandoning or donating to a charitable organization qualifying under IRC section 501(c)(3) any Wind-Down Debtor Assets that the Plan Administrator determines to be too impractical to distribute or of inconsequential value;

3.3.25  seeking a determination of tax liability or refund under Bankruptcy Code section 505;

3.3.26  establishing reserves for taxes, assessments, and other expenses of administration of the Debtors or the Wind-Down Debtor as may be necessary and appropriate for the proper operation of matters incident to the Debtors or the Wind-Down Debtor;

3.3.27  paying the Wind-Down Debtor Expenses;

3.3.28  if the Plan Administrator deems appropriate in the Plan Administrator's sole discretion, seeking to establish a bar date for filing proofs of Interest in any Debtor or otherwise to determine the holders and extent of Allowed Interests in any Debtor;

3.3.29  purchasing and carrying all insurance policies that the Plan Administrator deems reasonably necessary or advisable and to pay all associated insurance premiums and costs;

3.3.30  undertaking all administrative functions remaining in the Chapter 11 Cases to the extent necessary to carry out the Debtors', the Wind-Down Debtor's, or the Plan Administrator's duties under the Plan, including reporting and making required payments of fees to the U.S. Trustee and overseeing the closing of the Chapter 11 Cases;

3.3.31  retaining, terminating, appointing, hiring, or otherwise employees, personnel, management, and directors at any of the Debtors to the extent necessary to carry out the

purposes of this Agreement and the Plan, including, without limitation, to address any disputes between the Debtors;

        3.3.32  exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and this Agreement; and

        3.3.33  taking all other actions consistent with the provisions of the Plan and this Agreement that the Plan Administrator deems reasonably necessary or desirable to administer the Debtors and the Wind-Down Debtor.

        3.4    <u>Exclusive Authority to Pursue Vested Causes of Action</u>. The Plan Administrator shall have the exclusive right, power, and interest to review, reconcile, enforce, collect, compromise, settle, or elect not to pursue the Vested Causes of Action, including, without limitation, the FTX Claims, 3AC Claims, Alameda Claims, and the Contributed Third-Party Claims, on behalf of the Wind-Down Debtor. The Plan Administrator shall be the sole representative of the Estates under Bankruptcy Code section 1123(b)(3) with respect to the Vested Causes of Action. The Wind-Down Debtor shall be vested with and entitled to assert all setoffs and defenses of the Debtors or the Wind-Down Debtor and the Contributed Third-Party Claimants to any counterclaims that may be asserted by any defendant with respect to any Vested Cause of Action or Contributed Third-Party Claim, as applicable. The Wind-Down Debtor shall also be vested with and entitled to assert all of the Debtors' and the Estates' rights with respect to any such counterclaims, under Bankruptcy Code section 558. All costs and expenses of pursuing the Vested Causes of Action and the Contributed Third-Party Claims shall be satisfied first from the Wind-Down Debtor Assets, and all other expenses of the Wind-Down Debtor shall be paid or reserved for, before any proceeds of Vested Causes of Action or Contributed Third-Party Claims are distributed. For the avoidance of doubt, all evidentiary privileges of the Debtors of any type or nature whatsoever, including the Debtors' attorney-client privilege, the work product privilege, and any other applicable evidentiary privileges of the Debtors, shall and shall be deemed to be assigned by the Debtors and shall vest in the Wind-Down Debtor as of the Effective Date.

        3.5    <u>Authority to Enter Into Settlement Agreements</u>. The Plan Administrator shall have the exclusive right to enter into settlements regarding the Vested Causes of Action and Contributed Third-Party Claims without requiring court approval, subject to gaining majority approval from the Oversight Committee for any such action in excess of $5,000,000.00.

        3.6    <u>Abandonment</u>. If, in the Plan Administrator's reasonable judgment, any non-cash Wind-Down Debtor Assets cannot be sold in a commercially reasonable manner or the Plan Administrator believes in good faith that such property has inconsequential value, the Plan Administrator shall have the right to cause the Wind-Down Debtor to abandon or otherwise dispose of such property, including by donation of such property to a charitable organization.

        3.7    <u>Responsibility for Administration of Claims</u>. From and after the Effective Date, the Wind-Down Debtor shall become responsible for administering and paying Distributions to the holders of Allowed Claims and (if applicable) Allowed Interests. The Wind-Down Debtor shall have the exclusive right to object to the allowance of any Claim or Interest on any ground, to file, withdraw, or litigate to judgment objections to Claims or Interests, to settle or compromise any

Disputed Claims or Disputed Interests without any further notice to or action, order, or approval by the Bankruptcy Court, and to assert all defenses of the Debtors and their Estates. The Wind-Down Debtor shall also be entitled to assert all of the Debtors' and the Estates' rights under, without limitation, Bankruptcy Code section 558. The Wind-Down Debtor may also seek estimation of any Claims under and subject to Bankruptcy Code section 502(c).

3.8    <u>Agents and Professionals</u>. The Plan Administrator may, but shall not be required to, consult with and retain attorneys, financial advisors, accountants, appraisers, and other professionals the Plan Administrator believes have qualifications necessary to assist in the administration of the Wind-Down Debtor, including professionals previously retained by the Debtors or the Committee. For the avoidance of doubt, and without limitation of applicable law, nothing in this Agreement shall limit the Plan Administrator from engaging counsel or other professionals, including the Plan Administrator himself, to do work for the Wind-Down Debtor. The Plan Administrator may pay the reasonable salaries, fees, and expenses of such Persons out of the Wind-Down Debtor Assets in the ordinary course of business.

3.9    <u>Maintenance and Disposition of Wind-Down Debtor's Records</u>. The Plan Administrator shall maintain accurate records of the administration of the Wind-Down Debtor Assets, including receipts and disbursements and other activity of the Wind-Down Debtor. The Wind-Down Debtor may, but has no obligation to, engage a claims agent (including, but not limited to, the Claims, Noticing, and Solicitation Agent) to continue to maintain and update the Claims Register maintained in the Chapter 11 Cases throughout the administration of the Wind-Down Debtor. To the extent of any Unsecured Claims reflected thereon, the Claims Register may serve as the Plan Administrator's register of beneficial interests held by creditors. The Plan Administrator shall be provided with originals or copies of or access to all documents and business records of the Debtors that are in the possession of the Debtors and reasonably necessary for the disposition of the Wind-Down Debtor Assets and objections to Claims or (if applicable) Interests except, in each case, to the extent necessary to: (i) ensure compliance with any applicable law or an order of the Bankruptcy Court; (ii) preserve any applicable privilege (including the attorney-client privilege); or (iii) comply with any contractual confidentiality obligations. The Debtors and the Wind-Down Debtor shall use commercially reasonable efforts to cooperate with the Plan Administrator in connection with the Plan Administrator's investigation and prosecution of Vested Causes of Action, Contributed Third-Party Claims, and objections to Claims and Interests, including with respect to providing evidence and information as reasonably requested by the Plan Administrator. Nothing in the Plan or the Confirmation Order shall affect the obligations of the Debtors, the Wind-Down Debtor, or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

3.10    <u>Reporting Requirements</u>. The Plan Administrator shall provide the Oversight Committee the information and reports they may reasonably request concerning the Wind-Down Debtor's administration.

## ARTICLE IV
## DISTRIBUTIONS

4.1    <u>Reserves; Pooling of Reserved Funds</u>. Before any distribution can be made to any holders of Allowed Claims and (if applicable) Allowed Interests, the Plan Administrator shall, in his reasonable discretion, establish reserves in an amount sufficient to meet any and all expenses and liabilities of the Wind-Down Debtor, including attorneys' fees and expenses, the fees and expenses of other professionals, and fees owed the U.S. Trustee. The Wind-Down Debtor may also maintain as necessary a Disputed Claims Reserve with respect to Claims and (if applicable) Interests required to be administered by the Wind-Down Debtor. For the avoidance of doubt, the Plan Administrator may withhold any distribution pending the Plan Administrator's determination of whether to object to any Claim or Interest. Any such withheld distribution shall become part of the Wind-Down Debtor's Disputed Claims Reserve and shall be distributed to the appropriate claimholder no later than the first Distribution Date after a decision is made not to object to the pertinent Claim or Interest, or the Claim or Interest becomes Allowed. The Plan Administrator need not maintain the Wind-Down Debtor's reserves in segregated bank accounts and may pool funds in the reserves with each other and other funds of the Wind-Down Debtor; *provided*, *however*, that the Wind-Down Debtor shall treat all such reserved funds as being held in a segregated manner in its books and records, by use of book entries, subledgers, or other means of recognizing the separateness of non-consolidated estates, such that the Wind-Down Debtor will be able to account for all distributions under the Plan separately for each Debtor, as expressly contemplated by the Plan.

4.2    <u>Plan Distributions in General</u>. Except as otherwise provided in the Plan, the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.

4.3    <u>Record Date of Distributions</u>. On the Distribution Record Date, the various transfer registers for each Class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims or Interests. The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

4.4    <u>Tax Identification Numbers</u>. The Plan Administrator may require any creditor to furnish its taxpayer identification number as assigned by the Internal Revenue Service, including without limitation by providing an executed current Form W-9, Form W-8 or similar tax form, as a prerequisite to receiving any distribution under the Plan or this Agreement. If a creditor does not timely provide the Plan Administrator with its taxpayer identification number in the manner and by the deadline established by the Plan Administrator and/or the Plan, the creditor shall be deemed to have forfeited its right to any current, reserved or future distributions provided for under the

9

Plan and such creditor's Claim or Interest shall be disallowed and expunged without further order of the Bankruptcy Court. Any such forfeited distribution shall be deemed to have reverted back to the Wind-Down Debtor for all purposes, including for distributions to other holders of Allowed Claims or Allowed Interests (as applicable) against the particular Debtor in respect of which the forfeited distribution was made, notwithstanding any federal, provincial or state escheat, abandoned or unclaimed property law to the contrary.

       4.5    <u>Unclaimed and Undeliverable Distributions</u>. If any distribution to a creditor is returned to the Plan Administrator as undeliverable and/or otherwise remains unclaimed, no further Plan Distributions to such creditor shall be made unless and until the creditor claims the distribution(s) by timely notifying the Plan Administrator in writing of any information necessary to make the distribution to the creditor in accordance with this Agreement, the Plan, and applicable law, including such creditor's then-current address or taxpayer identification number. If a creditor timely provides the Plan Administrator the necessary information within the period specified in Article VI.C(6) of the Plan, all missed distributions shall be made to the creditor as soon as is practicable, without interest. After the passage of the deadlines set forth in Article VI.C(6) of the Plan, such distribution shall be deemed unclaimed property under Bankruptcy Code section 347(b) and all title to and beneficial interest in such undeliverable Distribution shall revert to or remain in the Wind-Down Debtor automatically and without any need for further order by the Bankruptcy Court, notwithstanding any federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary, and shall be distributed in accordance with this Article IV and the Plan. For the avoidance of doubt, undeliverable or unclaimed Plan distributions shall be administered in accordance with Article IV of the Plan as supplemented hereby.

       4.6    <u>No Responsibility to Attempt to Locate Creditors</u>. The Plan Administrator may, in his sole discretion, attempt to determine a creditor's current address or otherwise locate a creditor, but nothing in this Agreement or the Plan shall require the Plan Administrator to do so.

       4.7    <u>Disallowance of Claims and Interests; Cancellation of Corresponding Beneficial Interests</u>. All Claims in respect of undeliverable or unclaimed Distributions that have been deemed to have reverted back to the Plan Administrator for all purposes (including, but not limited to, for distribution to holders of other Allowed Claims or Allowed Interests, as applicable, against the particular Debtor in respect of which the unclaimed or undeliverable distribution was made) pursuant to Article VI of the Plan shall be deemed disallowed and expunged without further action by the Wind-Down Debtor or Plan Administrator and without further order of the Bankruptcy Court, and the corresponding interests of any creditor holding such disallowed Claims or Interests shall be deemed canceled. The creditor with respect to any such disallowed Claim or Interest shall no longer have any right, claim, or interest in or to any distributions in respect of such Claim or Interest, and further, such creditor is forever barred, estopped, and enjoined from receiving any distributions under the Plan or this Agreement and from asserting such disallowed Claim or Interest against the Wind-Down Debtor or Plan Administrator.

       4.8    <u>Inapplicability of Escheat, Abandoned, or Unclaimed Property Laws</u>. Unclaimed property held by the Wind-Down Debtor shall not be subject to the escheat, abandoned or unclaimed property laws of the United States, any state, any local or any foreign governmental unit.

    4.9    <u>Delivery of Distributions</u>.  Subject to the terms of this Agreement, the Plan Administrator shall cause the Wind-Down Debtor to make Distributions to creditors in the manner provided in the Plan.

<div align="center">

**ARTICLE V**
**THIRD PARTY RIGHTS AND LIMITATION OF LIABILITY**

</div>

    5.1    <u>Parties Dealing With the Plan Administrator</u>. In the absence of actual knowledge to the contrary, any Person dealing with the Wind-Down Debtor or the Plan Administrator shall be entitled to rely on the authority of the Plan Administrator or any of the Plan Administrator's agents to act in connection with the Wind-Down Debtor Assets. There is no obligation of any Person dealing with the Plan Administrator to inquire into the validity or expediency or propriety of any transaction by the Plan Administrator or any agent of the Plan Administrator.

    5.2    <u>Limitation of Plan Administrator and Oversight Committee Liability</u>. In exercising the rights granted herein, the Plan Administrator shall exercise the Plan Administrator's best judgment with respect to the affairs of the Wind-Down Debtor and the interests of creditors. However, notwithstanding anything herein to the contrary, neither the Plan Administrator nor any member of the Oversight Committee, nor any of their respective firms, companies, affiliates, partners, officers, directors, members, employees, designees, professionals, advisors, attorneys, representatives, disbursing agents, or agents, and any of such Person's successors and assigns, shall incur any responsibility or liability by reason of any error of law or fact or of any matter or thing done or suffered or omitted to be done under or in connection with this Agreement, including with respect to any intercreditor or other issues that may arise as a result of the non-consolidation of Estates under the Plan, whether sounding in tort, contract, or otherwise, except for fraud, gross negligence, or willful misconduct that is found by a final judgment (not subject to further appeal or review) of a court of competent jurisdiction to be the direct and primary cause of loss, liability, damage, or expense suffered by the Wind-Down Debtor. In no event shall the Plan Administrator or any member of the Oversight Committee be liable for indirect, punitive, special, incidental, or consequential damage or loss (including but not limited to lost profits) whatsoever, even if the Plan Administrator or the Oversight Committee has been informed of the likelihood of such loss or damages and regardless of the form of action. Without limiting the foregoing, the Plan Administrator shall be entitled to the benefits of the limitation of liability and exculpation provisions set forth in Article IV of the Plan, and the Plan Administrator and the Oversight Committee shall be entitled to the benefits of the limitation of liability and exculpation provisions set forth in the Confirmation Order.

    5.3    <u>No Liability for Acts of Other Persons</u>. None of the Persons identified in the immediately preceding section 5.2 5.2of this Agreement shall be liable for the act or omission of any other Person identified in that section.

    5.4    <u>No Liability for Acts of Predecessors</u>. No successor Plan Administrator shall be in any way responsible for the acts or omissions of any Plan Administrator in office prior to the date on which such successor becomes the Plan Administrator, unless a successor Plan Administrator expressly assumes such responsibility.

5.5    <u>No Liability for Good Faith Error of Judgment</u>. The Plan Administrator shall not be liable for any error of judgment made in good faith, unless it shall be finally determined by a final judgment of a court of competent jurisdiction (not subject to further appeal or review) that the Plan Administrator was grossly negligent in ascertaining the pertinent facts.

5.6    <u>Reliance by Plan Administrator on Documents and Advice of Counsel or Other Persons</u>. Except as otherwise provided herein, the Plan Administrator may rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties. The Plan Administrator may engage and consult with his legal counsel and other agents and advisors, and shall not be liable for any action taken, omitted, or suffered in reliance upon the advice of such counsel, agents, or advisors.

5.7    <u>No Liability For Acts Approved by Bankruptcy Court</u>. The Plan Administrator shall have the right at any time to seek instructions from the Bankruptcy Court concerning the administration or disposition of the Wind-Down Debtor. The Plan Administrator shall not be liable for any act or omission that has been approved by the Bankruptcy Court, and all such actions or omissions shall conclusively be deemed not to constitute fraud, gross negligence, or willful misconduct.

5.8    <u>No Personal Obligation for Wind-Down Debtor's Liabilities</u>. Persons dealing with the Plan Administrator shall have recourse only to the Wind-Down Debtor Assets to satisfy any liability incurred by the Plan Administrator to any such Person in carrying out the terms of this Agreement, and the Plan Administrator shall have no personal, individual obligation to satisfy any such liability.

5.9    <u>Indemnification</u>. The Plan Administrator and the Oversight Committee, and their respective consultants, agents, attorneys, accountants, financial advisors, estates, employees, officers, directors, principals, professionals, and other representatives, each in their representative capacity as such, and any of such Person's successors and assigns (collectively, the "<u>Indemnified Parties</u>" and each, an "<u>Indemnified Party</u>") shall, to the fullest extent permitted by applicable law, be defended, held harmless, and indemnified by the Wind-Down Debtor from time to time and receive reimbursement from and against any and all loss, liability, expense (including counsel fees), or damage of any kind, type or nature, whether sounding in tort, contract, or otherwise, that the Indemnified Parties may incur or sustain in connection with the exercise or performance of any of the Wind-Down Debtor's, the Plan Administrator's, or the Oversight Committee's respective powers and duties under this Agreement or in rendering services by the Indemnified Party to the Wind-Down Debtor or the Plan Administrator, including, without limitation, the costs of counsel or others in investigating, preparing, defending, or settling any action or claim (whether or not litigation has been initiated against the Indemnified Party) or in enforcing this Agreement (including its indemnification provisions), except if such loss, liability, expense, or damage is finally determined by a final judgment (not subject to further appeal or review) of a court of competent jurisdiction to result directly and primarily from the fraud, gross negligence, or willful misconduct of the Indemnified Party asserting this provision.

5.9.1    <u>Expense of Wind-Down Debtor; Limitation on Source of Payment of Indemnification</u>. All indemnification liabilities of the Wind-Down Debtor under this section 5.9

12

shall be expenses of the Wind-Down Debtor. The amounts necessary for such indemnification and reimbursement shall be paid by the Wind-Down Debtor out of the available Wind-Down Debtor Assets after reserving for all other actual and anticipated expenses and liabilities of the Wind-Down Debtor. Neither the Plan Administrator nor the Oversight Committee or its members shall be personally liable for the payment of any Wind-Down Debtor's expense or claim or other liability of the Wind-Down Debtor, and no Person shall look to the Plan Administrator, the Oversight Committee, or other Indemnified Parties personally for the payment of any such expense or liability.

5.9.2    Procedure for Current Payment of Indemnified Expenses; Undertaking to Repay. The Wind-Down Debtor shall promptly pay an Indemnified Party all amounts subject to indemnification under this section 5.9 on submission of invoices for such amounts by the Indemnified Party. By accepting any indemnification payment, the Indemnified Party undertakes to repay such amount promptly if it is determined that the Indemnified Party is not entitled to be indemnified under this Agreement. The Bankruptcy Court shall hear and finally determine any dispute arising out of this section 5.9.

5.10    No Implied Obligations. The Plan Administrator shall not be liable except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into this Agreement against the Plan Administrator.

5.11    Confirmation of Survival of Provisions. Without limitation in any way of any provision of this Agreement, the provisions of this Article V shall survive the death, dissolution, liquidation, incapacity, resignation, replacement, or removal, as may be applicable, of the Plan Administrator, or the termination of the Wind-Down Debtor or this Agreement, and shall inure to the benefit of the Plan Administrator's and the Indemnified Parties' heirs and assigns.

**ARTICLE VI**
**OVERSIGHT COMMITTEE**

6.1    Appointment, Composition, and Governance of Oversight Committee. As provided for in Article IV of the Plan, the Oversight Committee shall consist of those initial members identified on **Exhibit A** hereto. In the event that a member of the Oversight Committee resigns, the Plan Administrator may appoint a new member, subject to the unanimous approval of the remaining members of the Oversight Committee. If, in the future, the Oversight Committee consists of greater than three members, then upon the resignation of an Oversight Committee member, only majority consent of the remaining members shall be necessary. If (A) there are two remaining members and unanimous consent is not obtained or (B) there are three or more remaining members and a majority of the remaining members do not consent, the members may, upon motion, request that the Bankruptcy Court determine the matter. Notwithstanding the foregoing, in the event that fewer than three persons are willing to serve on the Oversight Committee or there shall have been fewer than three (3) Oversight Committee members for a period of thirty (30) consecutive days, then during such vacancy all references to the Oversight Committee's ongoing rights and duties in the Plan, this Agreement, and the Confirmation Order will require the Oversight Committee's unanimous consent.

13

6.2     <u>Resignation of Oversight Committee Members</u>. Any member of the Oversight Committee may resign upon reasonable notice to the Plan Administrator, counsel for the Plan Administrator, and other members of the Oversight Committee. Sixty (60) days' prior written notice shall constitute reasonable notice under this Section 6.2. Pursuant to Section 6.1 of this Agreement, during the sixty-day notice period, the Plan Administrator will seek a replacement for the position on the Oversight Committee that will begin their duties under this Agreement immediately following resignation or replacement of the previous member. Any member of the Oversight Committee may be removed by the Bankruptcy Court for cause or inactivity. The Oversight Committee may authorize its own dissolution by filing with the Bankruptcy Court an appropriate notice that its responsibilities under the Plan have concluded.

6.3     <u>Fiduciary Duties</u>. Members of the Oversight Committee shall have fiduciary duties to creditors in the same manner that members of an official committee of creditors appointed pursuant to Bankruptcy Code section 1102 have fiduciary duties to the constituents represented by such a committee, and shall be entitled to indemnification from the Wind-Down Debtor in the same manner as the Plan Administrator for service as members of the Oversight Committee from and after the Effective Date of the Plan under or in connection with this Agreement.

6.4     <u>Limitations on Plan Administrator's Actions</u>. The Plan Administrator shall obtain the approval of the Oversight Committee by at least a majority vote prior to taking any action regarding the administration, reconciliation, objection to, compromise, resolution, settlement, or litigation of any Claim (as determined by the Plan Administrator in his sole discretion) where the asserted Claim exceeds $5,000,000.00.

6.5     <u>Payment of Fees and Expenses</u>. The Plan Administrator shall pay from the Wind-Down Debtor Assets the reasonable out-of-pocket expenses of the members of the Oversight Committee incurred solely in connection with their role as an Oversight Committee member, and not in their individual capacity. For the avoidance of doubt, attorneys' fees incurred by an Oversight Committee member, including, but not limited to, attendance at any meetings of the Oversight Committee shall not be paid out of the Wind-Down Debtor Assets pursuant to this section 6.5. The Bankruptcy Court shall hear and finally determine any dispute arising out of this section 6.5.

<div align="center">

**ARTICLE VII**
**REMOVAL, REPLACEMENT**
**AND COMPENSATION OF PLAN ADMINISTRATOR**

</div>

7.1     <u>Initial Plan Administrator</u>. The Initial Plan Administrator shall be Paul R. Hage. The Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date.

7.2     <u>Term of Service</u>. The Plan Administrator shall serve until: (a) the completion of the administration of the Wind-Down Debtor Assets and the Wind-Down Debtor, including the winding down of the Debtors and the Wind-Down Debtor, in accordance with this Agreement and the Plan; (b) the termination of the Wind-Down Debtor in accordance with the terms of this Agreement and the Plan; or (c) the Plan Administrator's resignation, death, dissolution, incapacity, liquidation, or removal. In the event that the Plan Administrator's appointment terminates by

<div align="center">14</div>

reason of resignation, death, dissolution, incapacity, liquidation, or removal, the Plan Administrator shall be immediately compensated for all reasonable fees and expenses accrued but unpaid through the effective date of termination, whether or not previously invoiced. The provisions of Article V of this Agreement shall survive the resignation or removal of any Plan Administrator.

7.3     Removal of Plan Administrator for Cause: The Oversight Committee may seek to remove the Plan Administrator for cause by filing a motion (the "Removal Motion") with the Bankruptcy Court upon not less than thirty (30) days' prior written notice to the Plan Administrator. For purposes of this agreement, "cause" means

7.3.1     arrest or conviction (or plea of guilty or nolo contendere) of the Plan Administrator for any felony, or any other crime involving dishonesty or moral turpitude;

7.3.2     a finding by the Oversight Committee that the Plan Administrator engaged in willful misconduct, or was grossly negligent, in the performance of its duties;

7.3.3     a determination, in good faith, by the Oversight Committee that the Plan Administrator is not acting in the best interest of the creditors; or

7.3.4     a determination, in good faith, by the Oversight Committee that the Plan Administrator has a material and direct conflict of interest, not previously disclosed or specifically waived in advance by the Wind-Down Debtor.

7.4     Resignation of Plan Administrator. The Plan Administrator may resign at any time upon no less than sixty (60) days' prior written notice to the Oversight Committee. The resignation shall be effective on the later of (i) the date specified in the notice of resignation and (ii) the date that is sixty days (60) after the date such notice is delivered to the Oversight Committee members. In the event of a resignation, the resigning Plan Administrator shall render to the Oversight Committee a full and complete accounting of monies and assets received, disbursed, and held during the term of office of such Plan Administrator.

7.5     Appointment of Successor Plan Administrator. Upon the resignation, death, or removal of the Plan Administrator, the Oversight Committee shall appoint a successor. In the event the Oversight Committee does not seek the appointment of a successor Plan Administrator, the Bankruptcy Court may do so on its own motion. Any successor Plan Administrator so appointed (a) shall consent to and accept his, her, or its appointment as successor Plan Administrator, which may be done by e-mail or through acquiescence in not objecting to a motion for approval of his, her, or its appointment as successor Plan Administrator and (b) shall not have any liability or responsibility for the acts or omissions of any predecessor(s).

7.6     Powers and Duties of Successor Plan Administrator. A successor Plan Administrator shall have all the rights, privileges, powers, and duties of his, her, or its predecessor under this Agreement, the Plan, and Confirmation Order.

7.7     Compensation of Plan Administrator and Costs of Administration. The Plan Administrator shall receive fair and reasonable compensation for his services in accordance with the terms and conditions of the Plan, which shall be a charge against and paid out of the Wind-

Down Debtor Assets. All costs, expenses, and obligations incurred by the Plan Administrator (or professionals who may be employed by the Plan Administrator in administering the Wind-Down Debtor, in carrying out their other responsibilities under this Agreement, or in any manner connected, incidental, or related thereto) shall be paid by the Wind-Down Debtor from the Wind-Down Debtor Assets prior to any distribution to holders of Allowed Claims or Allowed Interests. The terms of the compensation of the Plan Administrator are set forth on **Exhibit B** hereto. The Oversight Committee may modify the Plan Administrator's compensation as agreed to by a majority vote.

## ARTICLE VIII
## CLOSING OF THE CHAPTER 11 CASES

8.1     Termination. When each of the following have occurred or will have occurred by the hearing on a motion to close the Chapter 11 Cases, the Plan Administrator shall promptly seek authority from the Bankruptcy Court to close the Chapter 11 Cases for each of the Wind-Down Estates in accordance with the Bankruptcy Code and the Bankruptcy Rules: (a) all Claims against the Wind-Down Estates entitled to payment under the Plan (i) have been satisfied in accordance with the Plan or (ii) have been disallowed by Final Order; (b) all assets have been liquidated and converted into Cash (other than those assets abandoned by the Wind-Down Estates in the Plan Administrator's sole discretion), and such Cash has been distributed in accordance with the Plan; and (c) all wind-down costs and expenses have been paid in full in Cash. Notwithstanding the foregoing, the Plan Administrator may seek authority from the Bankruptcy Court to close the Chapter 11 Cases of the Debtors individually, prior to the requirements above being met with respect to all of the Debtors' Chapter 11 Cases, and may seek to close the Chapter 11 Cases in the event the Debtors lack sufficient funding for further administration. Subject to further order of the Court, this Agreement shall terminate when the Bankruptcy Court enters a final decree contemplated by Bankruptcy Code section 350 and Bankruptcy Rule 3022 closing the Debtors' Chapter 11 Cases with respect to each Debtor.

8.2     Winding Up, Discharge, and Release of the Plan Administrator and Oversight Committee. For the purposes of winding up the affairs of the Debtors and/or the Wind-Down Debtor, as applicable, the Plan Administrator shall continue to act as Plan Administrator and the Oversight Committee shall continue their duties under this Agreement until such duties have been fully discharged or their role as Plan Administrator and/or on the Oversight Committee are otherwise terminated under this Agreement and the Plan. Upon a motion or notice by the Plan Administrator and/or the Oversight Committee, the Bankruptcy Court may enter an order relieving the Plan Administrator and/or Oversight Committee, its members, agents, and employees of any further duties and discharging and releasing the Plan Administrator and/or the Oversight Committee.

## ARTICLE IX
## MISCELLANEOUS

9.1    <u>Cumulative Rights and Remedies</u>. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights and remedies under law or in equity.

9.2    <u>Notices</u>. All notices to be given to creditors may be given by electronic mail, first class mail, or may be delivered personally, at the addresses for such creditors appearing on the books kept by the Plan Administrator. Any notice or other communication that may be or is required to be given, served, or sent to the Plan Administrator shall be in writing and shall be sent by registered or certified United States mail, return receipt requested, postage prepaid, or transmitted by hand delivery or facsimile (if receipt is confirmed) addressed as follows:

> If to the Plan Administrator:
> Paul R. Hage, Plan Administrator
> 27777 Franklin Rd.
> Suite 2500
> Southfield, Michigan 48034
> Email: phage@taftlaw.com
>
> with a copy to counsel:
> [                          ]

or to such other address as may from time to time be provided in written notice by the Plan Administrator.

9.3    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York.

9.4    <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and shall be binding upon the Parties and their respective successors and assigns.

9.5    <u>Particular Words</u>. Reference in this Agreement to any Section or Article is, unless otherwise specified, to that such Section or Article under this Agreement. The words "hereof," "herein," and similar terms shall refer to this Agreement and not to any particular Section or Article of this Agreement.

9.6    <u>Execution</u>. All funds in the Wind-Down Debtor shall be deemed *in custodia legis* until such times as the funds have actually been paid to or for the benefit of a creditor, and no creditor or any other Person can execute upon, garnish or attach the Wind-Down Debtor Assets or the Plan Administrator in any manner or compel payment from the Wind-Down Debtor except by Final Order of the Bankruptcy Court. Payments will be solely governed by the Plan and this Agreement.

9.7    <u>Amendment</u>. This Agreement may be amended by written agreement of the Plan Administrator and the Oversight Committee or by order of the Bankruptcy Court; *provided*, *however*, that such amendment may not be inconsistent with the Plan or the Confirmation Order.

9.8     <u>No Waiver</u>. No failure or delay of any party to exercise any right or remedy pursuant to this Agreement shall affect such right or remedy or constitute a waiver thereof.

9.9     <u>No Relationship Created</u>. Nothing contained herein shall be construed to constitute any relationship created by this Agreement as an association, partnership or joint venture of any kind.

9.10     <u>Severability</u>. If any term, provision covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

9.11     <u>Further Assurances</u>. The Parties agree to execute and deliver all such documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes and provide for the full implementation of this Agreement and the pertinent provisions of the Plan, and to consummate the transactions contemplated hereby.

9.12     <u>Counterparts</u>. This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

9.13     <u>Jurisdiction</u>. The Bankruptcy Court shall have jurisdiction regarding the Debtors, the Wind-Down Debtor, the Plan Administrator, the Oversight Committee, and the Wind-Down Debtor Assets, including, without limitation, the determination of all disputes arising out of or related to administration of the Wind-Down Debtor. The Bankruptcy Court shall have continuing jurisdiction and venue to hear and finally determine all disputes and related matters among the Parties arising out of or related to this Agreement or the administration of the Wind-Down Debtor. The Parties expressly consent to the Bankruptcy Court hearing and exercising such judicial power as is necessary to finally determine all such disputes and matters. If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Agreement, the provisions of this Agreement shall have no effect on and shall not control, limit or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter, and all applicable references in this Agreement to an order or decision of the Bankruptcy Court shall instead mean an order or decision of such other court of competent jurisdiction.

\* \* \* \* \*

18

IN WITNESS WHEREOF, the Parties have or are deemed to have executed this Agreement as of the day and year written above.

Voyager Digital Holdings, Inc.

By:_____

Name:_____

Title:_____

Voyager Digital Ltd.

By:_____

Name:_____

Title:_____

Voyager Digital Holdings, LLC

By: _____

Name_____

Title:_____

19

Paul Hage, as Plan Administrator

By: _____

Name_____

Title:_____

**EXHIBIT A**

**Oversight Committee Members**

## <u>Oversight Committee Members</u>

1. Richard Kiss

2. Russell Stewart

3. Melissa Freeman

## EXHIBIT B

**Plan Administrator Compensation**

**Plan Administrator Compensation**

| Plan Administrator | Compensation |
|---|---|
| Paul R. Hage | $500 per hour for professional services rendered, plus reimbursement of reasonable and documented out-of-pocket fees, costs, and expenses. This hourly rate is subject to annual rate increases to reflect economic and other conditions. |

## **Exhibit F-1**

**Redline of <u>Exhibit F</u> to Exhibit F of the Second Amended Plan Supplement**

# PLAN ADMINISTRATOR AGREEMENT

This Plan Administrator Agreement (as it may be amended, modified, supplemented, or restated from time to time, this "Agreement") dated as of [  ], 2023, is made and entered into by and among the entities listed as "Debtors" on the signature pages hereto (each, a "Debtor"), and Paul R. Hage, solely in his capacity as Plan Administrator for purposes of this Agreement (the "Plan Administrator"), and is executed in connection with and pursuant to the terms of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* dated January 10, 2023 [Docket No. 852] (as it may be amended, modified, supplemented, or restated from time to time, the "Plan").[1]

## RECITALS

WHEREAS, on July 5, 2022, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, (the "Bankruptcy Court"), and their chapter 11 cases are being jointly administered as *In re Voyager Digital Holdings, Inc., et al.,* Case No. 23-10943 (MEW);

WHEREAS, on July 19, 2022, the United States Trustee for Region 2 (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee");[2]

WHEREAS, the Plan contemplates that a plan administrator will be appointed to perform its duties in accordance with the Plan and this Agreement;

WHEREAS, the Plan provides that the Plan Administrator will, among other things, retain, preserve, and distribute certain assets of the Wind-Down Debtor for the benefit of Holders of Allowed Claims or Allowed Interests that are entitled to receive distributions pursuant to the terms of the Plan, whether or not such Claims or Interests are Allowed as of the Effective Date;

WHEREAS on March [  ], 2023, the Bankruptcy Court entered an order ("Confirmation Order")[3]

---

[1]    All capitalized terms used in this Agreement and not otherwise defined herein have the meanings ascribed to such defined terms in the Plan.

[2]    Docket No. 106.

[3]    Docket No. [  ].

confirming the Plan, which became effective on [   ], 2023 ("Effective Date");

WHEREAS, this Agreement is entered into in accordance with, and to facilitate the implementation and execution of, the Plan; ~~and~~

WHEREAS, on the Effective Date of the Plan, the Plan Administrator shall be appointed in accordance with the Plan, and the Plan Administrator is willing to serve in such capacity, in each case upon the terms set forth in this Agreement and pursuant to the Plan; and

WHEREAS, the Plan provides that the Plan Administrator shall act for the Debtors and Wind-Down Debtor in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions of the Plan and this Agreement; ~~and~~

NOW, THEREFORE, in accordance with the Plan and the Confirmation Order, and in consideration of the promises, and the mutual covenants and agreements of the Parties contained in the Plan and herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties agree and declare as follows:

## RECITALS, INTERPRETATION, AND CONSTRUCTION

1.1    <u>Recitals</u>. The Recitals are incorporated into and made terms of this Agreement.

1.2    <u>Interpretation; Headings</u>. All references herein to specific provisions of the Plan or Confirmation Order are without exclusion or limitation of other applicable provisions of the Plan or Confirmation Order. Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender. The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the provisions of this Agreement.

1.3    <u>Construction of Agreement</u>. This Agreement shall not be construed to impair or limit in any way the rights of any Person under the Plan.

1.4    <u>Conflict Among Plan Documents</u>. In the event of any inconsistency between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall govern and control. In the event of any inconsistency between this Agreement, on the one hand, and the Confirmation Order, on the other hand, the Confirmation Order shall control and take precedence.

## ARTICLE II
## ACCEPTANCE OF POSITION; OBLIGATION TO PAY CLAIMS; FIDUCIARY
STATUS<u>Acceptance</u>. (a) Paul. R. Hage hereby accepts appointment as the Plan Administrator; and (b) Paul R. Hage agrees to observe and perform all duties and obligations imposed upon the

Plan Administrator under the Plan, this Agreement, other orders of the Bankruptcy Court, and applicable law.

2.2    **Fiduciary**. The Plan Administrator shall perform its obligations consistent with the Plan, this Agreement, and applicable orders of the Bankruptcy Court. The Plan Administrator shall be the sole officer and director of the Wind-Down Debtor. The Plan Administrator shall hold the equity of the Voyager Digital Ltd., to the extent that any new equity is issued, in an agency capacity, for the benefit of and to facilitate the rights of Holders of Interests provided under the Plan. The Plan Administrator shall act for the Wind-Down Debtor in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions in the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Debtors and the Wind-Down Debtor shall be deemed to have resigned, solely in their capacities as such, and a the Plan Administrator or a representative of the Plan Administrator shall be appointed as the sole director and sole officer of the Debtors and the Wind-Down Debtor and shall succeed to the powers of the Wind-Down Debtor's' directors and officers. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Debtors and the Wind-Down Debtor. For the avoidance of doubt, the foregoing shall not limit the authority of the Debtors, the Wind-Down Debtor, or the Plan Administrator, as applicable, to continue the employment any former director or officer, including pursuant to the Purchase Agreement (if any) or any transition services agreement entered into on or after the Effective Date by and between the Debtors, the Wind-Down Debtor, and the Purchasers.

## ARTICLE III
## GENERAL POWERS, RIGHTS AND OBLIGATIONS OF THE PLAN ADMINISTRATOR

3.1    **Rights, Powers, and Privileges of Plan Administrator Generally**. Effective as of the Effective Date, the Plan Administrator is appointed under the Plan for purposes of implementing the terms and conditions of the Plan with respect to (i) effectuating the transactions beneficial and necessary to wind down the Debtors and the Wind-Down Debtor, including as set forth in the Restructuring Transactions Memorandum, (ii) administration of, and distributions with respect to, the claims asserted against the Debtors, and (iii) such other matters agreed to by the Debtors and Plan Administrator in accordance with the terms of the Plan (collectively, the "Plan Administrator Responsibilities"), in each case, subject to the terms and conditions set forth in this Agreement, the Plan, and the Confirmation Order. The Plan Administrator is hereby appointed to make all disbursements and distributions under the Plan, subject to the terms and conditions set forth in this Agreement, the Plan, and the Confirmation Order. The Debtors and the Wind-Down Debtor shall be managed, administered, and wound down by the Plan Administrator in accordance with the terms of the Plan, in consultation with the Oversight Committee established pursuant to this Agreement (the "Oversight Committee") as set forth in this Agreement, and the Plan Administrator shall have full authority to administer the provisions of the Plan, and subject to the terms and conditions of this Agreement, the Plan, and the Confirmation Order. In performing the Plan Administrator Responsibilities, theThe Plan Administrator shall be deemed to be a judicial substitute and estate representative for the Wind-Down Debtors as the party-in-interest in the Chapter 11 Cases, under the Plan, or in any

3

judicial proceeding or appeal to which any of the Debtors or Wind-Down Debtor is a party. The Plan Administrator shall be deemed a "representative" of the ~~Wind-Down Debtor~~estate as contemplated by Bankruptcy Code section 1123(b)(3)(B), and performance of certain services in connection with this Agreement shall be authorized by the execution of this Agreement to the extent not already authorized by the Plan or the Confirmation Order.

3.1.1    Power to Contract. In furtherance of the purpose of the Debtors and the Wind-Down Debtor, and except as otherwise specifically restricted in the Plan, Confirmation Order, or this Agreement, the Plan Administrator shall have the right and power on behalf of the Wind-Down Entity, and also may cause the Debtors or the Wind-Down Debtor, to enter into any covenants or agreements binding the Debtors or the Wind-Down Debtor, and to execute, acknowledge and deliver any and all instruments that are necessary or deemed by the Plan Administrator to be consistent with and advisable in furthering the purpose of the ~~Wind-Down Debtor in accordance with the Plan, Confirmation Order, and~~Plan or this Agreement.

3.1.2    Ultimate Right to Act Based on Advice of Counsel or Other Professionals. Nothing in this Agreement shall be deemed to prevent the Plan Administrator from taking or refraining to take any action on behalf of the Debtors or the Wind-Down Debtor that, based upon the advice of counsel or other professionals, the Plan Administrator determines he is obligated to take or to refrain from taking in the performance of any duty under the Plan, Confirmation Order, or this Agreement.

3.2    Oversight Committee Member Designation. If a conflict arises that prevents the involvement of the Plan Administrator from performing his duties, the Oversight Committee shall designate a member of the Oversight Committee to act as the Plan Administrator solely with respect to such conflict. During such time as an Oversight Committee member is acting as Plan Administrator, such member shall not be entitled to vote on matters requiring Oversight Committee approval and the voting provisions set forth in section 6.1 hereof shall apply.

3.3    ~~3.2~~ Powers of Plan Administrator. The Plan Administrator shall provide the post-Effective Date administration, wind down, dissolution, and liquidation services related to the Plan Administrator Responsibilities that are necessary, required, desirable, or advisable to effectuate the terms and conditions of the Plan and the wind down of the Debtors and the Wind-Down Debtor, in consultation with the Oversight Committee as set forth in this Agreement. Subject to the oversight and direction of the Oversight Committee set forth in ~~Article VI~~Article VI of this Agreement, the Plan Administrator shall have all duties, powers, and rights set forth herein, in the Plan, and in the Confirmation Order, including but not limited to, the following services related to the Debtors and the Wind-Down Debtor:

3.3.1    implementing the Wind-Down Debtor, and making distributions contemplated by the Plan;

3.3.2    marshalling, marketing for sale, and winding down any of the Debtors' assets constituting Wind-Down Debtor Assets;

3.3.3    appointing an independent director at each Debtor to act as a fiduciary for such Debtor entity in connection with the resolution of the Intercompany Claims;

3.3.4 ~~3.2.1~~ oversee~~ing~~ the accounts of the Debtors and the Wind-Down Debtor and the wind down and dissolution of the Debtors and the Wind-Down Debtor, including effectuating the transactions described in the Restructuring Transactions Memorandum;

3.3.5 ~~3.2.2~~ receiv~~ing~~, maintain~~ing~~, conserv~~ing~~, supervis~~ing~~, prosecut~~ing~~, collect~~ing~~, settl~~ing~~, manag~~ing~~, invest~~ing~~, protect~~ing~~, and where appropriate, ~~cause~~causing the Wind-Down Debtor to abandon the Wind-Down Debtor's Assets, including causing the Wind-Down Debtor to invest any moneys held as Wind-Down Debtor's Assets;

3.3.6 ~~3.2.3 open~~opening and maintain~~ing~~ bank accounts on behalf of or in the name of the Debtors or the Wind-Down Debtor, including, in the Plan Administrator's discretion, separate bank accounts for each of the Debtors;

3.3.7 ~~3.2.4 cause the Wind-Down Debtor to~~ enter~~ing~~ into any agreement or execut~~ing~~ any document or instrument required by or consistent with the Plan, the Confirmation Order, or this Agreement, and to perform all obligations thereunder;

3.3.8 ~~3.2.5~~ collect~~ing~~ and liquidat~~ing~~ all Wind-Down Debtor's Assets, including the sale of any Wind-Down Debtor's Assets;

3.3.9 ~~3.2.6~~ protect~~ing~~ and enforc~~ing~~ the rights to the Wind-Down Debtor's Assets (including any Vested Causes of Action and Contributed Third-Party Claims) vested in the Wind-Down Debtor and Plan Administrator by this Agreement by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

3.3.10 ~~3.2.7~~ investigat~~ing~~ any Wind-Down Debtor's Assets, and any other potential Vested Causes of Action and Contributed Third-Party Claims;

3.3.11 ~~3.2.8~~ review~~ing~~, reconcil~~ing~~, compromis~~ing~~, settl~~ing, objecting~~, or ~~object to~~prosecuting Claims or Interests of any kind;

3.3.12 ~~3.2.9 cause the Wind-Down Debtor to seek~~seeking the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004;

3.3.13 ~~3.2.10 cause the Wind-Down Debtor to~~ retain~~ing~~ professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to this Agreement and pay the reasonable compensation thereof;

3.3.14 ~~3.2.11 cause the Wind-Down Debtor to pay all of their~~paying all lawful expenses, debts, charges, taxes, and other liabilities, and make all other payments relating to the Wind-Down Debtor's Assets, solely out of Wind-Down Debtor's Assets;

3.3.15 ~~3.2.12~~ prosecut~~ing~~ and settl~~ing~~ the Vested Causes of Action, including, without limitation, the 3AC Claims, FTX Claims, Alameda Claims, Contributed Third-Party Claims, and any causes of action not included in the Asset Purchase Agreement or released under the Plan;

3.2.13 cause the Wind-Down Debtor to review, reconcile, pursue, commence, prosecute, compromise, settle, dismiss, release, waive, withdraw, abandon, resolve, or elect not to pursue all Vested Causes of Action and Contributed Third-Party Claims;

3.3.16 reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Vested Causes of Action and Contributed Third-Party Claims;

3.3.17 3.2.14 acquireing litigation and other claims related to the Debtors, and prosecuteing such claims;

3.3.18 3.2.15 reviewing and compelcompelling turnover of the Debtors or the Wind-Down Debtor's property;

3.3.19 3.2.16 calculateing and makemaking all Distributions to the holders of Allowed Claims against each Debtor and, solely to the extent of payment in full of Allowed Claims, to holders of Allowed Interests, as provided for in, or contemplated by, the Plan and this Agreement; *provided* that because the Plan does not substantively consolidate the Debtors' Estates, the Plan Administrator shall make Distributions from the Wind-Down Debtor's Assets of each Debtor to the holders of Claims and Interests (if applicable) against that specific Debtor;

3.3.20 3.2.17 establishing, administering, adjusting, and maintaining the Wind-Down Reserve and the Disputed Claims Reserve;

3.3.21 3.2.18 cause the Wind-Down Debtor to withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Plan Administrator has determined, based upon the advice of his agents or professionals, may be required to be withheld from such Distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

3.3.22 3.2.19 in reliance upon the Debtors' Schedules, the official Claims Register maintained in the Chapter 11 Cases and the Debtors' filed lists of equity security holders, reviewing, and where appropriate, cause the Wind-Down Debtor to allowing or objecting to Claims and (if applicable) Interests, and superviseing and administering the Wind-Down Debtor's commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and (if applicable) Disputed Interests required to be administered by the Wind-Down Debtor;

3.3.23 3.2.20 cause the Wind-Down Debtor to makemaking all tax withholdings, filefiling tax information returns, filefiling and prosecuteing tax refunds claims, makemaking tax elections by and on behalf of the Debtors or the Wind-Down Debtor, and filefiling tax returns for the Debtors or the Wind-Down Debtor pursuant to and in accordance with the Plan, and paypaying taxes, if any, payable for and on behalf of the Debtors or the Wind-Down Debtor, and to file any and all remaining tax returns for the Debors and the Estates, as applicable; *provided, however*, that notwithstanding any other provision of this Agreement, the Plan Administrator shall not have any responsibility or personal liability in any capacity whatsoever for the signing

6

or accuracy of the Debtors' income tax returns that are due to be filed ~~d~~ after the Effective Date or for any tax liability related thereto;

3.3.24 ~~3.2.21 cause the Wind-Down Debtor to~~ abandon~~ing~~ or donat~~e~~ing to a charitable organization qualifying under IRC section 501(c)(3) any Wind-Down Debtor~~'s~~ Assets that the Plan Administrator determines to be too impractical to distribute or of inconsequential value ~~to the Wind-Down Debtor~~;

3.3.25 ~~3.2.22 cause the Wind-Down Debtor to seek~~ seeking a determination of tax liability or refund under Bankruptcy Code section 505;

3.3.26 ~~3.2.23 cause the Wind-Down Debtor to~~ establish~~ing~~ reserves for taxes, assessments, and other expenses of administration of the Debtors or the Wind-Down Debtor as may be necessary and appropriate for the proper operation of matters incident to the Debtors or the Wind-Down Debtor;

3.3.27 paying the Wind-Down Debtor Expenses;

3.3.28 ~~3.2.24~~ if the Plan Administrator deems appropriate in the Plan Administrator's sole discretion, ~~seek~~ seeking to establish a bar date for filing proofs of Interest in any Debtor or otherwise to determine the holders and extent of Allowed Interests in any Debtor;

3.3.29 ~~3.2.25 cause the Wind-Down Debtor to~~ purchas~~e~~ing and carry~~ing~~ all insurance policies that the Plan Administrator deems reasonably necessary or advisable and to pay all associated insurance premiums and costs;

3.3.30 ~~3.2.26~~ undertak~~e~~ing all administrative functions remaining in the Chapter 11 Cases to the extent necessary to carry out the Debtors', the Wind-Down Debtor's, or the Plan Administrator's duties under the Plan, including reporting and making required payments of fees to the U.S. Trustee and overseeing the closing of the Chapter 11 Cases;

3.3.31 retaining, terminating, appointing, hiring, or otherwise employees, personnel, management, and directors at any of the Debtors to the extent necessary to carry out the purposes of this Agreement and the Plan, including, without limitation, to address any disputes between the Debtors;

3.3.32 ~~3.2.27~~ exercis~~e~~ing, implement~~ing~~, enforc~~e~~ing, and discharg~~e~~ing all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and this Agreement; and

3.3.33 ~~3.2.28 take~~ taking all other actions consistent with the provisions of the Plan and this Agreement that the Plan Administrator deems reasonably necessary or desirable to administer the Debtors and the Wind-Down Debtor.

3.4 ~~3.3~~ Exclusive Authority to Pursue Vested Causes of Action. The Plan Administrator shall have the exclusive right, power, and interest to review, reconcile, enforce, collect, compromise, settle, or elect not to pursue the Vested Causes of Action, including, without limitation, the FTX Claims, 3AC Claims, Alameda Claims, and the Contributed

Third-Party Claims, on behalf of the Wind-Down Debtor. The Plan Administrator shall be the sole representative of the Estates under Bankruptcy Code section 1123(b)(3) with respect to the Vested Causes of Action. The Wind-Down Debtor shall be vested with and entitled to assert all setoffs and defenses of the Debtors or the Wind-Down Debtor and the Contributed Third-Party Claimants to any counterclaims that may be asserted by any defendant with respect to any Vested Cause of Action or Contributed Third-Party Claim, as applicable. The Wind-Down Debtor shall also be vested with and entitled to assert all of the Debtors' and the Estates' rights with respect to any such counterclaims, under Bankruptcy Code section 558. All costs and expenses of pursuing the Vested Causes of Action and the Contributed Third-Party Claims shall be satisfied first from the Wind-Down Debtor's Assets, and all other expenses of the Wind-Down Debtor shall be paid or reserved for, before any proceeds of Vested Causes of Action or Contributed Third-Party Claims are distributed. For the avoidance of doubt, all evidentiary privileges of the Debtors of any type or nature whatsoever, including the Debtors' attorney-client privilege, the work product privilege, and any other applicable evidentiary privileges of the Debtors, shall and shall be deemed to be assigned by the Debtors and shall vest in the Wind-Down Debtor as of the Effective Date.

3.5    3.4 Authority to Enter Into Settlement Agreements. The Plan Administrator shall have the exclusive right to enter into settlements regarding the Vested Causes of Action and Contributed Third-Party Claims without requiring court approval, subject to gaining majority approval from the Oversight Committee for any such action in excess of $5,000,000.00.

3.6    3.5 Abandonment. If, in the Plan Administrator's reasonable judgment, any non-cash Wind-Down Debtor's Assets cannot be sold in a commercially reasonable manner or the Plan Administrator believes in good faith that such property has inconsequential value to the Wind-Down Debtor, the Plan Administrator shall have the right to cause the Wind-Down Debtor to abandon or otherwise dispose of such property, including by donation of such property to a charitable organization.

3.7    3.6 Responsibility for Administration of Claims. From and after the Effective Date, the Wind-Down Debtor shall become responsible for administering and paying Distributions to the holders of Allowed Claims and (if applicable) Allowed Interests. The Wind-Down Debtor shall have the exclusive right to object to the allowance of any Claim or Interest on any ground, to file, withdraw, or litigate to judgment objections to Claims or Interests, to settle or compromise any Disputed Claims or Disputed Interests without any further notice to or action, order, or approval by the Bankruptcy Court, and to assert all defenses of the Debtors and their Estates. The Wind-Down Debtor shall also be entitled to assert all of the Debtors' and the Estates' rights under, without limitation, Bankruptcy Code section 558. The Wind-Down Debtor may also seek estimation of any Claims under and subject to Bankruptcy Code section 502(c).

3.8    3.7 Agents and Professionals. The Plan Administrator may, but shall not be required to, consult with and retain attorneys, financial advisors, accountants, appraisers, and other professionals the Plan Administrator believes have qualifications necessary to assist in the administration of the Wind-Down Debtor, including professionals previously retained by the Debtors or the Committee. For the avoidance of doubt, and without limitation of applicable law, nothing in this Agreement shall limit the Plan Administrator from engaging counsel or other

professionals, including the Plan Administrator himself, to do work for the Wind-Down Debtor. The Plan Administrator may pay the reasonable salaries, fees, and expenses of such Persons out of the Wind-Down Debtor's Assets in the ordinary course of business.

3.9    3.8    Maintenance and Disposition of Wind-Down Debtor's Records. The Plan Administrator shall maintain accurate records of the administration of the Wind-Down Debtor's Assets, including receipts and disbursements and other activity of the Wind-Down Debtor. The Wind-Down Debtor may, but shall havehas no obligation to, engage a claims agent (including, but not limited to, the Claims, Noticing, and Solicitation Agent) to continue to maintain and update the Claims Register maintained in the Chapter 11 Cases throughout the administration of the Wind-Down Debtor. To the extent of any Unsecured Claims reflected thereon, the Claims Register may serve as the Plan Administrator's register of beneficial interests held by creditors. The Plan Administrator shall be provided with originals or copies of or access to all documents and business records of the Debtors that are in the possession of the Debtors and reasonably necessary for the disposition of the Wind-Down Debtor's Assets and objections to Claims or (if applicable) Interests except, in each case, to the extent necessary to: (i) ensure compliance with any applicable law or an order of the Bankruptcy Court; (ii) preserve any applicable privilege (including the attorney-client privilege); or (iii) comply with any contractual confidentiality obligations. The Debtors and the Wind-Down Debtor shall use commercially reasonable efforts to cooperate with the Plan Administrator in connection with the Plan Administrator's investigation and prosecution of Vested Causes of Action, Contributed Third-Party Claims, and objections to Claims and Interests, including with respect to providing evidence and information as reasonably requested by the Plan Administrator. Nothing in the Plan or the Confirmation Order shall affect the obligations of the pre-Effective Date Debtors, the Wind-Down Debtor, or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

3.10    3.9    Reporting Requirements. The Plan Administrator shall provide the Oversight Committee the information and reports they may reasonably request concerning the Wind-Down Debtor's administration.

**ARTICLE IV**
**DISTRIBUTIONS**

4.1    Reserves; Pooling of Reserved Funds. Before any distribution can be made to any holders of Allowed Claims and (if applicable) Allowed Interests, the Plan Administrator shall, in his reasonable discretion, establish reserves in an amount sufficient to meet any and all expenses and liabilities of the Wind-Down Debtor, including attorneys' fees and expenses, the fees and expenses of other professionals, and fees owed the U.S. Trustee. The Wind-Down Debtor may also maintain as necessary a Disputed Claims Reserve with respect to Claims and (if applicable) Interests required to be administered by the Wind-Down Debtor. For the avoidance of doubt, the Plan Administrator may withhold any distribution pending the Plan Administrator's determination of whether to object to any Claim or Interest. Any such withheld distribution shall become part of the Wind-Down Debtor's Disputed Claims Reserve and shall be distributed to the appropriate claimholder no later than the first Distribution Date after a decision is made not to object to the pertinent Claim or Interest, or the Claim or Interest becomes Allowed. The Plan

Administrator need not maintain the Wind-Down Debtor's reserves in segregated bank accounts and may pool funds in the reserves with each other and other funds of the Wind-Down Debtor; *provided*, *however*, that the Wind-Down Debtor shall treat all such reserved funds as being held in a segregated manner in its books and records, by use of book entries, subledgers, or other means of recognizing the separateness of non-consolidated estates, such that the Wind-Down Debtor will be able to account for all distributions under the Plan separately for each Debtor, as expressly contemplated by the Plan.

4.2    <u>Plan Distributions in General</u>. Except as otherwise provided in the Plan, the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.

4.3    <u>Record Date of Distributions</u>. On the Distribution Record Date, the various transfer registers for each Class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims or Interests. The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

4.4    <u>Tax Identification Numbers</u>. The Plan Administrator may require any creditor to furnish its taxpayer identification number as assigned by the Internal Revenue Service, including without limitation by providing an executed current Form W-9, Form W-8 or similar tax form, as a prerequisite to receiving any distribution under the Plan or this Agreement. If a creditor does not timely provide the Plan Administrator with its taxpayer identification number in the manner and by the deadline established by the Plan Administrator and/or the Plan, the creditor shall be deemed to have forfeited its right to any current, reserved or future distributions provided for under the Plan and such creditor's Claim or Interest shall be disallowed and expunged without further order of the Bankruptcy Court. Any such forfeited distribution shall be deemed to have reverted back to the Wind-Down Debtor for all purposes, including for distributions to other holders of Allowed Claims or Allowed Interests (as applicable) against the particular Debtor in respect of which the forfeited distribution was made, notwithstanding any federal, provincial or state escheat, abandoned or unclaimed property law to the contrary.

4.5    <u>Unclaimed and Undeliverable Distributions</u>. If any distribution to a creditor is returned to the Plan Administrator as undeliverable and/or otherwise remains unclaimed, no further Plan Distributions to such creditor shall be made unless and until the creditor claims the distribution(s) by timely notifying the Plan Administrator in writing of any information necessary to make the distribution to the creditor in accordance with this Agreement, the Plan, and applicable law, including such creditor's then-current address or taxpayer identification number. If a creditor timely provides the Plan Administrator the necessary information within the period specified in Article VI.C(6) of the Plan, all missed distributions shall be made to the creditor as

soon as is practicable, without interest. After the passage of the deadlines set forth in Article VI.C(6) of the Plan, such distribution shall be deemed unclaimed property under Bankruptcy Code section 347(b) and all title to and beneficial interest in such undeliverable Distribution shall revert to or remain in the Wind-Down Debtor automatically and without any need for further order by the Bankruptcy Court, notwithstanding any federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary, and shall be distributed in accordance with this ~~Article IV~~Article IV and the Plan. For the avoidance of doubt, undeliverable or unclaimed Plan distributions shall be administered in accordance with ~~Article VI~~Article IV of the Plan as supplemented hereby.

4.6     No Responsibility to Attempt to Locate Creditors. The Plan Administrator may, in his sole discretion, attempt to determine a creditor's current address or otherwise locate a creditor, but nothing in this Agreement or the Plan shall require the Plan Administrator to do so.

4.7     Disallowance of Claims and Interests; Cancellation of Corresponding Beneficial Interests. All Claims in respect of undeliverable or unclaimed Distributions that have been deemed to have reverted back to the Plan Administrator for all purposes (including, but not limited to, for distribution to holders of other Allowed Claims or Allowed Interests, as applicable, against the particular Debtor in respect of which the unclaimed or undeliverable distribution was made) pursuant to Article VI of the Plan shall be deemed disallowed and expunged without further action by the Wind-Down Debtor or Plan Administrator and without further order of the Bankruptcy Court, and the corresponding interests of any creditor holding such disallowed Claims or Interests shall be deemed canceled. The creditor with respect to any such disallowed Claim or Interest shall no longer have any right, claim, or interest in or to any distributions in respect of such Claim or Interest, and further, such creditor is forever barred, estopped, and enjoined from receiving any distributions under the Plan or this Agreement and from asserting such disallowed Claim or Interest against the Wind-Down Debtor or Plan Administrator.

4.8     Inapplicability of Escheat, Abandoned, or Unclaimed Property Laws.  Unclaimed property held by the Wind-Down Debtor shall not be subject to the escheat, abandoned or unclaimed property laws of the United States ~~or,~~ any state, any local or any foreign governmental unit.

4.9     Delivery of Distributions.  Subject to the terms of this Agreement, the Plan Administrator shall cause the Wind-Down Debtor to make Distributions to creditors in the manner provided in the Plan.

**ARTICLE V**
**THIRD PARTY RIGHTS AND LIMITATION OF LIABILITY**

5.1     Parties Dealing ~~with~~With the Plan Administrator. In the absence of actual knowledge to the contrary, any Person dealing with the Wind-Down Debtor or the Plan Administrator shall be entitled to rely on the authority of the Plan Administrator or any of the Plan Administrator's agents to act in connection with the Wind-Down Debtor~~'s~~s Assets. There is no obligation of any Person dealing with the Plan Administrator to inquire into the validity or

expediency or propriety of any transaction by the Plan Administrator or any agent of the Plan Administrator.

5.2     <u>Limitation of Plan Administrator and Oversight Committee Liability</u>.  In exercising the rights granted herein, the Plan Administrator shall exercise the Plan Administrator's best judgment with respect to the affairs of the Wind-Down Debtor and the interests of creditors. However, notwithstanding anything herein to the contrary, neither the Plan Administrator nor any member of the Oversight Committee, nor any of their respective firms, companies, affiliates, partners, officers, directors, members, employees, designees, professionals, advisors, attorneys, representatives, disbursing agents, or agents, and any of such Person's successors and assigns, shall incur any responsibility or liability by reason of any error of law or fact or of any matter or thing done or suffered or omitted to be done under or in connection with this Agreement, including with respect to any intercreditor or other issues that may arise as a result of the non-consolidation of Estates under the Plan, whether sounding in tort, contract, or otherwise, except for fraud, gross negligence, or willful misconduct that is found by a final judgment (not subject to further appeal or review) of a court of competent jurisdiction to be the direct and primary cause of loss, liability, damage, or expense suffered by the Wind-Down Debtor. In no event shall the Plan Administrator or any member of the Oversight Committee be liable for indirect, punitive, special, incidental, or consequential damage or loss (including but not limited to lost profits) whatsoever, even if the Plan Administrator or the Oversight Committee has been informed of the likelihood of such loss or damages and regardless of the form of action. Without limiting the foregoing, the Plan Administrator shall be entitled to the benefits of the limitation of liability and exculpation provisions set forth in Article IV of the Plan, and the Plan Administrator and the Oversight Committee shall be entitled to the benefits of the limitation of liability and exculpation provisions set forth in the Confirmation Order.

5.3     <u>No Liability for Acts of Other Persons</u>. None of the Persons identified in the immediately preceding section ~~5.2~~5.2 of this Agreement shall be liable for the act or omission of any other Person identified in that section.

5.4     <u>No Liability for Acts of Predecessors</u>. No successor Plan Administrator shall be in any way responsible for the acts or omissions of any Plan Administrator in office prior to the date on which such successor becomes the Plan Administrator, unless a successor Plan Administrator expressly assumes such responsibility.

5.5     <u>No Liability for Good Faith Error of Judgment</u>. The Plan Administrator shall not be liable for any error of judgment made in good faith, unless it shall be finally determined by a final judgment of a court of competent jurisdiction (not subject to further appeal or review) that the Plan Administrator was grossly negligent in ascertaining the pertinent facts.

5.6     <u>Reliance by Plan Administrator on Documents and Advice of Counsel or Other Persons</u>. Except as otherwise provided herein, the Plan Administrator may rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties. The Plan Administrator may engage and consult with his legal counsel and other agents and advisors, and shall not be liable for any

12

action taken, omitted, or suffered in reliance upon the advice of such counsel, agents, or advisors.

5.7     No Liability For Acts Approved by Bankruptcy Court. The Plan Administrator shall have the right at any time to seek instructions from the Bankruptcy Court concerning the administration or disposition of the Wind-Down Debtor. The Plan Administrator shall not be liable for any act or omission that has been approved by the Bankruptcy Court, and all such actions or omissions shall conclusively be deemed not to constitute fraud, gross negligence, or willful misconduct.

5.8     No Personal Obligation for Wind-Down Debtor's Liabilities. Persons dealing with the Plan Administrator shall have recourse only to the Wind-Down Debtor's Assets to satisfy any liability incurred by the Plan Administrator to any such Person in carrying out the terms of this Agreement, and the Plan Administrator shall have no personal, individual obligation to satisfy any such liability.

5.9     Indemnification. The Plan Administrator and the Oversight Committee, and their respective consultants, agents, attorneys, accountants, financial advisors, estates, employees, officers, directors, principals, professionals, and other representatives, each in their representative capacity as such, and any of such Person's successors and assigns (collectively, the "Indemnified Parties" and each, an "Indemnified Party") shall, to the fullest extent permitted by applicable law, be defended, held harmless, and indemnified by the Wind-Down Debtor from time to time and receive reimbursement from and against any and all loss, liability, expense (including counsel fees), or damage of any kind, type or nature, whether sounding in tort, contract, or otherwise, that the Indemnified Parties may incur or sustain in connection with the exercise or performance of any of the Wind-Down Debtor's, the Plan Administrator's, or the Oversight Committee's respective powers and duties under this Agreement or in rendering services by the Indemnified Party to the Wind-Down Debtor or the Plan Administrator, including, without limitation, the costs of counsel or others in investigating, preparing, defending, or settling any action or claim (whether or not litigation has been initiated against the Indemnified Party) or in enforcing this Agreement (including its indemnification provisions), except if such loss, liability, expense, or damage is finally determined by a final judgment (not subject to further appeal or review) of a court of competent jurisdiction to result directly and primarily from the fraud, gross negligence, or willful misconduct of the Indemnified Party asserting this provision.

5.9.1     Expense of Wind-Down Debtor; Limitation on Source of Payment of Indemnification. All indemnification liabilities of the Wind-Down Debtor under this section 3.95.9 shall be expenses of the Wind-Down Debtor. The amounts necessary for such indemnification and reimbursement shall be paid by the Wind-Down Debtor out of the available Wind-Down Debtor's Assets after reserving for all other actual and anticipated expenses and liabilities of the Wind-Down Debtor. Neither the Plan Administrator nor the Oversight Committee or its members shall be personally liable for the payment of any Wind-Down Debtor's expense or claim or other liability of the Wind-Down Debtor, and no Person shall look to the Plan Administrator, the Oversight Committee, or other Indemnified Parties personally for the payment of any such expense or liability.

13

     5.9.2   Procedure for Current Payment of Indemnified Expenses; Undertaking to Repay. The Wind-Down Debtor shall promptly pay an Indemnified Party all amounts subject to indemnification under this section ~~5.9~~5.9 on submission of invoices for such amounts by the Indemnified Party. By accepting any indemnification payment, the Indemnified Party undertakes to repay such amount promptly if it is determined that the Indemnified Party is not entitled to be indemnified under this Agreement. The Bankruptcy Court shall hear and finally determine any dispute arising out of this section ~~5.9~~5.9.

     5.10   No Implied Obligations. The Plan Administrator shall not be liable except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into this Agreement against the Plan Administrator.

     5.11   Confirmation of Survival of Provisions. Without limitation in any way of any provision of this Agreement, the provisions of this ~~Article III~~Article V shall survive the death, dissolution, liquidation, incapacity, resignation, replacement, or removal, as may be applicable, of the Plan Administrator, or the termination of the Wind-Down Debtor or this Agreement, and shall inure to the benefit of the Plan Administrator's and the Indemnified Parties' heirs and assigns.

## ARTICLE VI
## OVERSIGHT COMMITTEE

     6.1   Appointment, Composition, and Governance of Oversight Committee. As provided for in Article IV of the Plan, the Oversight Committee shall consist of those initial members identified on **Exhibit A** hereto. In the event that a member of the Oversight Committee resigns, the Plan Administrator may appoint a new member, subject to the unanimous approval of the remaining members of the Oversight Committee. If, in the future, the Oversight Committee consists of greater than three members, then upon the resignation of an Oversight Committee member, only majority consent of the remaining members shall be necessary. If (A) there are two remaining members and unanimous consent is not obtained or (B) there are three or more remaining members and a majority of the remaining members do not consent, the members may, upon motion, request that the Bankruptcy Court determine the matter. Notwithstanding the foregoing, in the event that fewer than three persons are willing to serve on the Oversight Committee or there shall have been fewer than three (3) Oversight Committee members for a period of thirty (30) consecutive days, then during such vacancy all references to the Oversight Committee's ongoing rights and duties in the Plan, this Agreement, and the Confirmation Order will require the Oversight Committee's unanimous consent.

     6.2   Resignation of Oversight Committee Members. Any member of the Oversight Committee may resign upon reasonable notice to the Plan Administrator, counsel for the Plan Administrator, and other members of the Oversight Committee. Sixty (60) days' prior written notice shall constitute reasonable notice under this Section ~~6.2~~6.2. Pursuant to Section ~~6.1~~6.1 of this Agreement, during the sixty-day notice period, the Plan Administrator will seek a replacement for the position on the Oversight Committee that will begin their duties under this Agreement immediately following resignation or replacement of the previous member. Any member of the Oversight Committee may be removed by the Bankruptcy Court for cause or

inactivity. The Oversight Committee may authorize its own dissolution by filing with the Bankruptcy Court an appropriate notice that its responsibilities under the Plan have concluded.

6.3    Fiduciary Duties. Members of the Oversight Committee shall have fiduciary duties to creditors in the same manner that members of an official committee of creditors appointed pursuant to Bankruptcy Code section 1102 have fiduciary duties to the constituents represented by such a committee, and shall be entitled to indemnification from the Wind-Down Debtor in the same manner as the Plan Administrator for service as members of the Oversight Committee from and after the Effective Date of the Plan under or in connection with this Agreement.

6.4    Limitations on Plan Administrator's Actions. The Plan Administrator shall obtain the approval of the Oversight Committee by at least a majority vote prior to taking any action regarding the administration, reconciliation, objection to, compromise, resolution, settlement, or litigation of any Claim (as determined by the Plan Administrator in his sole discretion) where the asserted Claim exceeds $5,000,000.00.

6.5    Payment of Fees and Expenses. The Plan Administrator shall pay from the Wind-Down Debtor's Assets the reasonable out-of-pocket expenses of the members of the Oversight Committee incurred solely in connection with their role as an Oversight Committee member, and not in their individual capacity. For the avoidance of doubt, attorneys' fees incurred by an Oversight Committee member, including, but not limited to, attendance at any meetings of the Oversight Committee shall not be paid out of the Wind-Down Debtor's Assets pursuant to this section 6.56.5. The Bankruptcy Court shall hear and finally determine any dispute arising out of this section 6.56.5.

## ARTICLE VII
## REMOVAL, REPLACEMENT
## AND COMPENSATION OF PLAN ADMINISTRATOR

7.1    Initial Plan Administrator. The Initial Plan Administrator shall be Paul R. Hage. The Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date.

7.2    Term of Service. The Plan Administrator shall serve until: (a) the completion of the administration of the Wind-Down Debtor's Assets and the Wind-Down Debtor, including the winding down of the Debtors and the Wind-Down Debtor, in accordance with this Agreement and the Plan; (b) the termination of the Wind-Down Debtor in accordance with the terms of this Agreement and the Plan; or (c) the Plan Administrator's resignation, death, dissolution, incapacity, liquidation, or removal. In the event that the Plan Administrator's appointment terminates by reason of resignation, death, dissolution, incapacity, liquidation, or removal, the Plan Administrator shall be immediately compensated for all reasonable fees and expenses accrued but unpaid through the effective date of termination, whether or not previously invoiced. The provisions of Article IIIArticle V of this Agreement shall survive the resignation or removal of any Plan Administrator.

15

7.3     Removal of Plan Administrator for Cause: The Oversight Committee may seek to remove the Plan Administrator for cause by filing a motion (the "Removal Motion") with the Bankruptcy Court upon not less than thirty (30) days' prior written notice to the Plan Administrator. For purposes of this agreement, "cause" means

7.3.1   arrest or conviction (or plea of guilty or nolo contendere) of the Plan Administrator for any felony, or any other crime involving dishonesty or moral turpitude;

7.3.2   a finding by the Oversight Committee that the Plan Administrator engaged in willful misconduct, or was grossly negligent, in the performance of its duties;

7.3.3   a determination, in good faith, by the Oversight Committee that the Plan Administrator is not acting in the best interest of the creditors; or

7.3.4   a determination, in good faith, by the Oversight Committee that the Plan Administrator has a material and direct conflict of interest, not previously disclosed or specifically waived in advance by the Wind-Down Debtor.

7.4     Resignation of Plan Administrator. The Plan Administrator may resign at any time upon no less than sixty (60) days' prior written notice to the Oversight Committee. The resignation shall be effective on the later of (i) the date specified in the notice of resignation and (ii) the date that is sixty days (60) after the date such notice is delivered to the Oversight Committee members. In the event of a resignation, the resigning Plan Administrator shall render to the Oversight Committee a full and complete accounting of monies and assets received, disbursed, and held during the term of office of such Plan Administrator.

7.5     Appointment of Successor Plan Administrator. Upon the resignation, death, or removal of the Plan Administrator, the Oversight Committee shall appoint a successor. In the event the Oversight Committee does not seek the appointment of a successor Plan Administrator, the Bankruptcy Court may do so on its own motion. Any successor Plan Administrator so appointed (a) shall consent to and accept his, her, or its appointment as successor Plan Administrator, which may be done by e-mail or through acquiescence in not objecting to a motion for approval of his, her, or its appointment as successor Plan Administrator and (b) shall not have any liability or responsibility for the acts or omissions of any predecessor(s).

7.6     Powers and Duties of Successor Plan Administrator. A successor Plan Administrator shall have all the rights, privileges, powers, and duties of his, her, or its predecessor under this Agreement, the Plan, and Confirmation Order.

7.7     Compensation of Plan Administrator and Costs of Administration. The Plan Administrator shall receive fair and reasonable compensation for his services in accordance with the terms and conditions of the Plan, which shall be a charge against and paid out of the Wind-Down Debtor's Assets. All costs, expenses, and obligations incurred by the Plan Administrator (or professionals who may be employed by the Plan Administrator in administering the Wind-Down Debtor, in carrying out their other responsibilities under this Agreement, or in any manner connected, incidental, or related thereto) shall be paid by the Wind-Down Debtor from the Wind-Down Debtor's Assets prior to any distribution to holders of Allowed Claims or Allowed Interests. The terms of the compensation of the Plan Administrator

16

are set forth on **Exhibit B** hereto. The Oversight Committee may modify the Plan Administrator's compensation as agreed to by a majority vote.

## ARTICLE VIII
## CLOSING OF THE CHAPTER 11 CASES

8.1     Termination. When each of the following have occurred or will have occurred by the hearing on a motion to close the Chapter 11 Cases, the Plan Administrator shall promptly seek authority from the Bankruptcy Court to close the Chapter 11 Cases for each of the Wind-Down Estates in accordance with the Bankruptcy Code and the Bankruptcy Rules: (a) all Claims against the Wind-Down Estates entitled to payment under the Plan (i) have been satisfied in accordance with the Plan or (ii) have been disallowed by Final Order; (b) all assets have been liquidated and converted into Cash (other than those assets abandoned by the Wind-Down Debtor Estates in the Plan Administrator's sole discretion), and such Cash has been distributed in accordance with the Plan; and (c) all wind-down costs and expenses have been paid in full in Cash. Notwithstanding the foregoing, the Plan Administrator may seek authority from the Bankruptcy Court to close the Chapter 11 Cases of the Debtors individually, prior to the requirements above being met with respect to all of the Debtors' Chapter 11 Cases, and may seek to close the Chapter 11 Cases in the event the Wind-Down Debtors lacks sufficient funding for further administration. Subject to further order of the Court, this Agreement shall terminate when the Bankruptcy Court enters a final decree contemplated by Bankruptcy Code section 350 and Bankruptcy Rule 3022 closing the Wind-Down Debtor's' Chapter 11 Cases with respect to each Debtor.

8.2     7.2     Winding Up, Discharge, and Release of the Plan Administrator and Oversight Committee. For the purposes of winding up the affairs of the Debtors and/or the Wind-Down Debtor, as applicable, the Plan Administrator shall continue to act as Plan Administrator and the Oversight Committee shall continue their duties under this Agreement until such duties have been fully discharged or their role as Plan Administrator and/or on the Oversight Committee are otherwise terminated under this Agreement and the Plan. Upon a motion or notice by the Plan Administrator and/or the Oversight Committee, the Bankruptcy Court may enter an order relieving the Plan Administrator and/or Oversight Committee, its members, agents, and employees of any further duties and discharging and releasing the Plan Administrator and/or the Oversight Committee.

## ARTICLE IX
## MISCELLANEOUS

9.1     Cumulative Rights and Remedies. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights and remedies under law or in equity.

9.2     Notices. All notices to be given to creditors may be given by electronic mail, first class mail, or may be delivered personally, at the addresses for such creditors appearing on the books kept by the Plan Administrator. Any notice or other communication that may be or is required to be given, served, or sent to the Plan Administrator shall be in writing and shall be

sent by registered or certified United States mail, return receipt requested, postage prepaid, or transmitted by hand delivery or facsimile (if receipt is confirmed) addressed as follows:

> If to the Plan Administrator:
> Paul R. Hage, Plan Administrator
> 27777 Franklin Rd.
> Suite 2500
> Southfield, Michigan 48034
> Email: phage@taftlaw.com
>
> with a copy to counsel:
> [                    ]

or to such other address as may from time to time be provided in written notice by the Plan Administrator.

9.3     <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York.

9.4     <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and shall be binding upon the Parties and their respective successors and assigns.

9.5     <u>Particular Words</u>. Reference in this Agreement to any Section or Article is, unless otherwise specified, to that such Section or Article under this Agreement. The words "hereof," "herein," and similar terms shall refer to this Agreement and not to any particular Section or Article of this Agreement.

9.6     <u>Execution</u>. All funds in the Wind-Down Debtor shall be deemed *in custodia legis* until such times as the funds have actually been paid to or for the benefit of a creditor, and no creditor or any other Person can execute upon, garnish or attach the Wind-Down Debtor's Assets or the Plan Administrator in any manner or compel payment from the Wind-Down Debtor except by Final Order of the Bankruptcy Court. Payments will be solely governed by the Plan and this Agreement.

9.7     <u>Amendment</u>. This Agreement may be amended by written agreement of the Plan Administrator and the Oversight Committee or by order of the Bankruptcy Court; *provided*, *however*, that such amendment may not be inconsistent with the Plan or the Confirmation Order.

9.8     <u>No Waiver</u>. No failure or delay of any party to exercise any right or remedy pursuant to this Agreement shall affect such right or remedy or constitute a waiver thereof.

9.9     <u>No Relationship Created</u>. Nothing contained herein shall be construed to constitute any relationship created by this Agreement as an association, partnership or joint venture of any kind.

9.10    <u>Severability</u>. If any term, provision covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants

and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

9.11   <u>Further Assurances</u>. The Parties agree to execute and deliver all such documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes and provide for the full implementation of this Agreement and the pertinent provisions of the Plan, and to consummate the transactions contemplated hereby.

9.12   <u>Counterparts</u>. This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

9.13   <u>Jurisdiction</u>. The Bankruptcy Court shall have jurisdiction regarding the Debtors, the Wind-Down Debtor, the Plan Administrator, the Oversight Committee, and the Wind-Down Debtor's Assets, including, without limitation, the determination of all disputes arising out of or related to administration of the Wind-Down Debtor. The Bankruptcy Court shall have continuing jurisdiction and venue to hear and finally determine all disputes and related matters among the Parties arising out of or related to this Agreement or the administration of the Wind-Down Debtor. The Parties expressly consent to the Bankruptcy Court hearing and exercising such judicial power as is necessary to finally determine all such disputes and matters. If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Agreement, the provisions of this Agreement shall have no effect on and shall not control, limit or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter, and all applicable references in this Agreement to an order or decision of the Bankruptcy Court shall instead mean an order or decision of such other court of competent jurisdiction.

\* \* \* \* \*

IN WITNESS WHEREOF, the Parties have or are deemed to have executed this Agreement as of the day and year written above.

Voyager Digital Holdings, Inc.


By:_____


Name:_____


Title:_____


Voyager Digital Ltd.


By:_____


Name:_____


Title:_____


Voyager Digital Holdings, LLC


By: _____


Name_____


Title:_____

Paul Hage, as Plan Administrator

By: _____

Name_____

Title:_____

# **EXHIBIT A**

**Oversight Committee Members**

## **Oversight Committee Members**

1. Richard Kiss

2. Russell Stewart

3. Melissa Freeman

*[Different first page link-to-previous setting changed from on in original to off in modified.].*

## EXHIBIT B

**Plan Administrator Compensation**

**Plan Administrator Compensation**

| Plan Administrator | Compensation |
|---|---|
| Paul R. Hage | $500 per hour for professional services rendered, plus reimbursement of reasonable and documented out-of-pocket fees, costs, and expenses. This hourly rate is subject to annual rate increases to reflect economic and other conditions. |

# Exhibit 24

## Exhibit 2

Cardano Explorer Screenshot



Debtors
Ex-24