## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### AMENDED ORDER (I) APPROVING THE SECOND AMENDED DISCLOSURE STATEMENT AND (II) CONFIRMING THE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Voyager Digital Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors")[2] having:

    a.    commenced, on July 5, 2022 (the "Petition Date"), these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief in the United States Bankruptcy Court for the Southern District of New York (the "Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

    b.    continued to operate their business and manage their property during these Chapter 11 Cases as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

    c.    filed,[3] on July 21, 2022, the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126];

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital, Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan, the Disclosure Statement, the Asset Purchase Agreement, or the Bankruptcy Code (each as defined herein), as applicable. The rules of interpretation set forth in Article I.B. of the Plan apply.

[3] Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in these Chapter 11 Cases, as applicable.

d.     obtained, on August 5, 2022, the entry of the *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation and (V) Granting Related Relief* [Docket No. 248] (the "Bidding Procedures Order") approving the *Bidding Procedures for the Submission, Receipt, and Analysis of Bids in Connection with the Sale of the Debtors*, attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures");

e.     commenced, on September 13, 2022, the Auction for the sale of substantially all of the Debtors' assets in accordance with the Bidding Procedures;

f.     selected West Realm Shires Inc. ("FTX US") as the Winning Bidder (as defined in the Bidding Procedures);

g.     obtained, on October 20, 2022, entry of the *Order (I) Authorizing Entry of the Asset Purchase Agreement and (II) Granting Related Relief* [Docket No. 581], which authorized entry into that certain asset purchase agreement by and between Voyager Digital, LLC and West Realm Shires Inc. (together with its affiliates, "FTX US," and the asset purchase agreement, the "FTX US Asset Purchase Agreement");

h.     filed, on December 9, 2022, the *Stipulation and Agreed Order* [Docket No. 717] by and between FTX US and the Debtors (the "FTX US APA Stipulation"), terminating the FTX US Asset Purchase Agreement;

i.     filed, on December 21, 2022, the *Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Binance US Purchase Agreement and (II) Granting Related Relief* [Docket No. 775] and that certain asset purchase agreement by and between Voyager Digital, LLC and BAM Trading Services Inc. d/b/a Binance.US (together with its affiliates, "Binance.US," and the asset purchase agreement, the "Asset Purchase Agreement")

j.     filed, on December 22, 2022, the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 777] (as amended, modified, or supplemented from time to time, the "Plan"), the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 778] (as amended, modified, or supplemented from time to time, the "Disclosure Statement"), and the *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes, and (D) Procedures for Objections, and (IV) Granting Related Relief* [Docket No. 779];

k.  filed, on January 9, 2023, the first amendment to the Asset Purchase Agreement [Docket No. 835];

l.  obtained, on January 10, 2023, approval of the FTX US APA Stipulation [Docket No. 849];

m.  filed, on January 10, 2023, the revised Plan [Docket No. 852];

n.  filed, on January 13, 2023, the revised Disclosure Statement [Docket No. 863];

o.  obtained, on January 13, 2023, entry of the *Order (I) Authorizing Entry into the Asset Purchase Agreement and (II) Granting Related Relief* [Docket No. 775], which granted entry into the asset purchase agreement with Binance.US (the "Asset Purchase Agreement Order");

p.  obtained, on January 13, 2023, entry of the *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections* [Docket No. 861] (the "Conditional Disclosure Statement Order") conditionally approving the Disclosure Statement, solicitation procedures (the "Solicitation Procedures"), and solicitation materials, including notices, forms, and ballots (collectively, the "Solicitation Packages");

q.  caused the Solicitation Packages and notice of the Combined Hearing and the deadline for objecting to the Disclosure Statement and to confirmation of the Plan ("Confirmation") to be distributed on or before January 25, 2023 (the "Solicitation Date"), in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), the Disclosure Statement Order, and the Solicitation Procedures, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 926] and the *Supplemental Affidavit of Service* [Docket Nos. 927 and 1016] (collectively, the "Affidavit of Solicitation");

r.  filed, on February 1, 2023, the *Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. 943] (the "Initial Plan Supplement") and caused notice of the filing of the Initial Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 951];

s.  published, on February 3, 2023, notice of the Combined Hearing (the "Combined Hearing Notice") in the *The New York Times* (National Edition) and *Financial Times* (International Edition), as evidenced by the *Affidavits of Publication* [Docket Nos. 954 and 955] (the "Publication Affidavits" and, together with the Affidavit of Solicitation, the "Affidavits");

t.      filed, on February 8, 2023, the *First Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. 986] (the "First Amended Plan Supplement") and caused notice of the filing of the First Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 992];

u.      filed, on February 15, 2023, the *Second Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (the "Second Amended Plan Supplement") [Docket No. 1006] and caused notice of the filing of the Second Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 1037];

v.      filed, on February 21, 2023, the *Third Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (the "Third Amended Plan Supplement") [Docket No. 1035] and caused notice of the filing of the Third Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 1058];

w.      filed, on February 28, 2023, the *Declaration of Leticia Sanchez Regarding the Solicitation and Tabulation of Votes on the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1108];

x.      filed, on February 28, 2023, the *Debtors' Memorandum of Law in Support of (I) Final Approval of the Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and (II) an Order Confirming the Debtors' Third Amended Joint Chapter 11 Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. 1110] (the "Confirmation Brief");

y.      filed, on February 28, 2023, the *Declaration of Timothy R. Pohl, Independent Director and Member of the Special Committee of the Board of Directors of Voyager Digital, LLC, in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1111] (the "Pohl Declaration"), which was admitted into evidence at the Combined Hearing;

z.      filed, on February 28, 2023, the *Declaration of Brian Tichenor in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1113] (the "Tichenor Declaration"), which was admitted into evidence at the Combined Hearing;

aa. filed, on February 28, 2023, the *Fourth Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (the "Fourth Amended Plan Supplement") [Docket No. 1115] and will cause notice of the filing of the Fourth Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order;

bb. filed, on February 28, 2023, the revised version of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1117];

cc. filed, on February 28, 2023, the *Declaration of Mark A. Renzi in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1119] (the "Renzi Declaration"), which was admitted into evidence at the Combined Hearing for certain limited purposes;

dd. filed, on March 1, 2023, the revised version of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1125];

ee. filed, on March 1, 2023, the *Amended Declaration of Leticia Sanchez Regarding the Solicitation and Tabulation of Votes on the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1127] (the "Voting Report" and, together with the Pohl Declaration, the Tichenor Declaration and the Renzi Declaration, the "Declarations");

ff. filed, on March 5, 2023, the revised version of the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1138];

gg. filed, on March 6, 2023, the *Fifth Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* [Docket No. 1143]; and

hh. filed, on March 7, 2023, a revised *Fifth Amended Plan Supplement for the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates* (the "Fifth Amended Plan Supplement") (together with the Initial Plan Supplement, First Amended Plan Supplement, Second Amended Plan Supplement, Third Amended Plan Supplement, and Fourth Amended Plan Supplement, and as may be modified, amended, or supplemented from time to time, the "Plan Supplement") [Docket No. 1149] and will cause notice of the filing of the Fifth Amended Plan Supplement to be distributed in accordance with paragraph 12 of the Disclosure Statement Order.

The Court having:

a. entered the Bidding Procedures Order on August 5, 2022 [Docket No. 248];

b.  entered the Asset Purchase Agreement Order on January 13, 2023 [Docket No. 775];

c.  entered the Conditional Disclosure Statement Order on January 13, 2023 [Docket No. 861];

d.  set February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) as the deadline to object to the Disclosure Statement and the Plan and to object to proposed cure costs and any assumption of an Executory Contract or Unexpired Lease pursuant to the *Schedule of Assumed Executory Contracts and Unexpired Leases* (the "Assumed Contract Schedule"), filed as Exhibit A to the Plan Supplement (the "Plan Objection Deadline");

e.  set February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) as the deadline for voting on the Plan (the "Voting Deadline");

f.  set March 2, 2023 at 10:00 a.m. (prevailing Eastern Time) as the date and time for the commencement of the Combined Hearing, pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code;

g.  reviewed the Plan, the Disclosure Statement, the Plan Supplement, the Confirmation Brief, the Declarations, the Voting Report, the Combined Hearing Notice, the Affidavits, and all filed pleadings, exhibits, statements, and comments regarding Confirmation, including all objections, statements, and reservations of rights filed by parties in interest on the docket of the Chapter 11 Cases;

h.  held the Combined Hearing beginning March 2, 2023 at 10:00 a.m., prevailing Eastern Time and continuing on March 3, 2023, March 6, 2023, and March 7, 2023;

i.  heard the statements and arguments made by counsel with respect to final approval of the Disclosure Statement and Confirmation of the Plan;

j.  considered all oral representations, live testimony, written direct testimony, exhibits, documents, filings, and other evidence presented at the Combined Hearing; and

k.  dictated its decision with respect to disputed factual and legal issues at the conclusion of Combined Hearing, the text of which shall be revised as necessary and issued as the Court's formal decision with respect to Confirmation of the Plan and resolution of all outstanding objections thereto (the "Decision"),

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor,

the Court makes and issues the following findings of fact and conclusions of law, and orders:

6

## JURISDICTION, VENUE AND CORE PROCEEDING

The Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and

1334 and the *Amended Standing Order of Reference from the United States District Court for the*

*Southern District of New York*, entered February 1, 2012. The Court has exclusive jurisdiction to

determine whether the Disclosure Statement and the Plan comply with the applicable provisions

of the Bankruptcy Code and should be approved and confirmed, respectively. Venue is proper

pursuant to 28 U.S.C. §§ 1408 and 1409. Confirmation of the Plan is a core proceeding within

the meaning of 28 U.S.C. § 157(b)(2).

## MODIFICATIONS TO PROPOSED PLAN

The following modifications and amendments to the Plan and its supporting documents

either have already been made or hereby are deemed to have been made. **All references herein**

**to the "Plan" (including the copy of the Plan that is attached hereto) and to the "Asset**

**Purchase Agreement" shall be interpreted as references to the Plan and the Asset Purchase**

**Agreement as modified by the following provisions.**

A.      Article VIII.C of each filed versions of the Plan is hereby stricken in its

entirety and Article VIII.C of the Plan is deemed to have been revised to state as follows:

> **"Effective as of the Effective Date, to the fullest extent permissible under**
> **applicable law and without affecting or limiting either the Debtor release or**
> **the third-party release, and except as otherwise specifically provided in the**
> **Plan, no Exculpated Party shall have or incur, and each Exculpated Party is**
> **hereby exculpated from, any liability for damages based on the negotiation,**
> **execution and implementation of any transactions or actions approved by the**
> **Bankruptcy Court in the Chapter 11 Cases, except for Causes of Action related**
> **to any act or omission that is determined in a Final Order to have constituted**
> **actual fraud, willful misconduct, or gross negligence;** *provided* **that nothing in**

the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes.

In addition, the Plan contemplates certain rebalancing transactions and the completion of distributions of cryptocurrencies to creditors. The Exculpated Parties shall have no liability for, and are exculpated from, any claim for fines, penalties, damages, or other liabilities based on their execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan.

For the avoidance of doubt, the foregoing paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would violate applicable laws or regulations. Nothing in this provision shall limit in any way the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further. Nor does anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, or limit the penalties that may be applicable if such a future regulatory or court order is issued and is violated. Similarly, nothing herein shall limit the authority of the Committee on Foreign Investment of the United States to bar any of the contemplated transactions. Nor does anything in this provision alter the terms of the Plan regarding the compliance of the Purchaser with applicable laws in the Unsupported Jurisdictions before distributions of cryptocurrency occur in those Unsupported Jurisdictions.

And all references herein the approval, reasonableness, scope or applicability of Article VIII.C of the Plan. or of the "exculpation" provisions of the Plan, shall refer only to the exculpation provisions as set forth above.

B. The following proviso is deemed to have been added to Article I.A.60 of the Plan:

"*provided* that any documents included in subsection (i) only include documents arising on or after the Petition Date but prior to the Effective Date and that are within the jurisdiction of the Bankruptcy Court";

C.  The following definition is deemed to have been added as Article I.A.103

of the Plan:

"***Investigated Matters***' means (i) the Debtors' loans to third parties, including
the 3AC Loan; (ii) the diligence performed in connection with the loans
described in (i); (iii) the formation and function of the Debtors' Risk
Committee; (iv) the Debtors' staking of cryptocurrency assets; (v) the Debtors'
regulatory compliance; (vi) the Debtors' communications with the public; and
(vii) the Debtors' pre-petition transfers to Released Voyager Employees
(including customer withdrawals) within one (1) year of the Petition Date";

D.  Article I.A.139 of the Plan is deemed to have been revised to state:

"***Released Voyager Employees***' means the following directors, officers, and
members of senior management of the Debtors serving in such capacity on or
after the Petition Date whose conduct was reviewed as part of the Special
Committee Investigation: Jennifer Ackert, David Brill, Brian Brooks, David
Brosgol, Jonathan Brosnahan, Dan Constantino, Stephen Ehrlich, Philip
Eytan, Rakesh Gidwani, Gerard Hanshe, Marshall Jensen, Pam Kramer,
Manisha Lalwani, Brian Nistler, Ashwin Prithipaul, Evan Psaropoulos, Brian
Silard, Glen Stevens, Krisztian Toth, and Ryan Whooley (subject to the
limitations contained in Article IV.F and Article IV.G of the Plan)";

E.  The following language is deemed to have been removed from Article

VIII.A:

"in whole or in part, the Debtors (including the management, ownership, or
operation thereof), their capital structure, the purchase, sale, or rescission of
the purchase or sale of any Security of the Debtors, the subject matter of, or
the transactions or events giving rise to, any Claim or Interest that is treated
in the Plan, the business or contractual arrangements between any Debtor and
any Released Party" and replaced with "the Investigated Matters";

F.  Article IV.H.5(c) of the Plan is deemed to have been revised to state:

"appointing an independent director at each Debtor to act as a fiduciary for
such Debtor entity solely in connection with matters that may implicate actual
or potential intra-Debtor conflicts of interests between the Plan Administrator
and the applicable Debtor(s) or Wind-Down Debtor including (i) the
Intercompany Claims; (ii) the Alameda Loan Facility Claims; (iii) the
Signatory Governmental Claims (as defined in the Governmental Claimant
Stipulation) asserted against TopCo; and (iv) any matter involving the transfer
or allocation of value, claims, or costs between or among the Debtors, but only
to the extent that such issues continue to implicate actual or potential intra-

9

Debtor conflicts of interests between the Plan Administrator and the applicable Debtor(s) or Wind-Down Debtor";

G.       Article VI.C.6 of the Plan is deemed revised to state:

**"In the event that any distribution to any Holder is returned as undeliverable and/or otherwise remains unclaimed, the Plan Administrator shall use reasonable efforts to contact such Holder; *provided* that no further distributions to such Holder shall be made unless and until the Plan Administrator has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *further*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the applicable Distribution Date. After such date, all unclaimed property or interests in property shall revert to the Wind-Down Debtor automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall not be entitled to any distributions under the Plan.**

**A distribution shall be deemed unclaimed if a Holder has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Wind-Down Debtor of an intent to accept a particular distribution; (c) responded to the Wind-Down Debtor's requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution";**

H.       All references to section 1145 of the Bankruptcy Code and related provisions in the Plan have been removed;

I.       References to "Confirmation Date" in Article II.B.1 of the Plan are deemed revised to state "Effective Date"; and

J.       The Asset Purchase Agreement has been and is deemed to be amended to contain the following provisions:

1.       **There will be a two-week period for Account Holders to opt out of transferring (i) selfies, (ii) uploaded IDs or bank statements and (iii) bank account information to the Purchaser. Any opted out information would not be acquired by the Purchaser in the Sale Transaction. The opt out notice will be provided by the Debtors at the Debtors' expense;**

2.       **The Seller Expense Start Date will be moved back to April 1, 2023 (from March 18, 2023);**

3. **If the Purchaser is ready to close by April 1, 2023 (assuming closing conditions are satisfied or waived by the Purchaser) and the Seller is not (including because the Seller declines to waive any Closing conditions, other than breaches or defaults by the Purchaser), then the Seller will cease to have Seller Expense reimbursement protection thereafter;**

4. **Each of the Seller and Purchaser acknowledge that (i) the closing condition relating to entry and finalization of the Asset Purchase Agreement Order has been satisfied and (ii) to its knowledge, there is no breach of the Asset Purchase Agreement by the other party as of the date that this Confirmation Order is entered.**

### FINDINGS OF FACT[4]

1.  The findings of fact set forth in the Decision are incorporated herein by reference.

2.  The Disclosure Statement contains (a) sufficient information of a kind necessary to satisfy the disclosure requirements of all applicable nonbankruptcy laws, rules, and regulations, including the Securities Act, and (b) "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein. All objections to the contents of the Disclosure Statement are overruled.

3.  The Debtors provided due, adequate, and sufficient notice of the Disclosure Statement, the Conditional Disclosure Statement Order, the Plan, the Plan Supplement, the Solicitation Packages, the Combined Hearing Notice, the proposed assumption and rejection of Executory Contracts and Unexpired Leases and the proposed cure amounts, and all the other materials distributed by the Debtors in connection with Confirmation of the Plan, together with

---

[4]  The findings of fact and the conclusions of law set forth herein and in the Decision of the Court announced at the conclusion of the Combined Hearing constitute the Court's findings of fact and its conclusions of law under rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. Many issues raised in connection with Confirmation of the Plan are mixed issues of law and fact, so to the extent any of the listed finding of fact constitute conclusions of law, or vice versa, they are adopted as such.

the Plan Objection Deadline, the Voting Deadline, and the Combined Hearing, and any applicable

bar dates and hearings described in the Conditional Disclosure Statement Order, in compliance

with the Bankruptcy Rules, Local Rules, and the procedures set forth in the Disclosure Statement

Order.

4.      Prior to the Combined Hearing, the Debtors filed the Voting Report.  The Voting

Report was admitted into evidence during the Combined Hearing.  As described in the Voting

Report, the solicitation of votes on the Plan complied with the Solicitation Procedures.

5.      The Solicitation Packages, the Plan Supplement, and the Combined Hearing Notice

were transmitted and served in compliance with this Court's orders, and such transmission and

service was timely, adequate, and sufficient.

6.      The period during which Holders in the Voting Classes were required to submit

acceptances or rejections to the Plan was reasonable and sufficient for such Holders to make an

informed decision to accept or reject the Plan.

7.      Holders of Claims in Class 1 (Secured Tax Claims) and Class 2 (Other Priority

Claims) (collectively,  the "Presumed Accepting Classes") are Unimpaired and conclusively

presumed to accept the Plan and, therefore, did not vote to accept or reject the Plan.  Holders of

Claims in Class 7 (Intercompany Claims) and Interests in Class 8 (Intercompany Interests) either

are Unimpaired and conclusively presumed to have accepted the Plan (to the extent reinstated) or

Impaired and conclusively deemed to have rejected the Plan, and, therefore, are not entitled to vote

to accept or reject the Plan.  Holders of Claims in Class 5 (Alameda Loan Facility Claims) and

Class 6 (Section 510(b) Claims) and Interests in Class 9 (Existing Equity Interests) (collectively,

the "Deemed Rejecting Classes") are Impaired under the Plan and are deemed to have rejected the

Plan.

12

8.      As evidenced by the Voting Report, Class 3 (Account Holder Claims), Class 4A (OpCo General Unsecured Claims), Class 4B (HoldCo General Unsecured Claims), and Class 4C (TopCo General Unsecured Claims) voted to accept the Plan in accordance with section 1126 of the Bankruptcy Code.

9.      Based on the foregoing, and as evidenced by the Voting Report, at least one Impaired Class of Claims (excluding the acceptance by any insiders of any of the Debtors) has voted to accept the Plan.

10.     The Filing and notice of the documents included in the Plan Supplement were adequate and proper and in compliance with this Court's orders.

11.     Any modifications to the Plan since the commencement of Solicitation described or set forth herein constitute technical changes or changes with respect to particular Claims or Interests made pursuant to the agreement of the Holders of such Claims or Interests and do not materially and adversely affect or change the treatment of any other Claims or Interests.

12.     The Plan and all modifications thereto are dated and identify the Entities submitting them, thereby satisfying Bankruptcy Rule 3016(a).  The Debtors appropriately filed the Disclosure Statement and the Plan with the Court, thereby satisfying Bankruptcy Rule 3016(b). The injunction, release, and exculpation provisions in the Disclosure Statement and the Plan describe, in bold font and with specific and conspicuous language, all acts to be enjoined and identify the entities that will be subject to the injunction, thereby satisfying Bankruptcy Rule 3016(c).

13.     The Debtors' decisions to assume or reject certain Executory Contracts and Unexpired Leases, as provided in Article V of the Plan and in the Plan Supplement, are reasonable exercises of the Debtors' business judgment.  The Debtors have demonstrated adequate assurance

of future performance of the assumed Executory Contracts and Unexpired Leases within the meaning of section 365(b)(1)(C) of the Bankruptcy Code by the Wind-Down Debtor.

14. Consummation of the Sale Transaction is in the best interests of the Debtors, their Estates, and their creditors. The Debtors have exercised sound business judgment in selecting the Purchaser and the Debtors have done so without collusion and in good faith. The Purchaser is consummating the Sale Transaction in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code. The Purchaser has proceeded in good faith and without collusion in all respects in connection with the Sale Transaction.

15. The consideration provided by the Purchaser pursuant to the Asset Purchase Agreement (a) is fair and reasonable, (b) constitutes the best offer for the Acquired Assets, and (c) represents reasonably equivalent value for the assets being acquired.

16. As explained more fully in this Court's Decision, the Debtors' decision to effectuate the Sale Transaction or the Liquidation Transaction, as applicable, is an appropriate exercise of their business judgment.

17. The D&O Settlement constitutes a good-faith compromise and settlement of all Claims, Causes of Action, disputes, and controversies released, settled, compromised, or otherwise resolved between the Debtors and the CEO and CCO. The D&O Settlement is fair, equitable, and reasonable and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.

## CONCLUSIONS OF LAW

18.     The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code.

(a)     In accordance with sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan provides for the separate classification of Claims and Interests into eleven Classes.  Valid business, factual, and legal reasons exist for the separate classification of such Classes of Claims and Interests.  The classifications were not implemented for any improper purpose and do not unfairly discriminate between, or among, Holders of Claims or Interests.  Each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.  Accordingly, the Plan satisfies the requirements of sections 1122(a), 1122(b), and 1123(a)(1) of the Bankruptcy Code.

(b)     Article III of the Plan specifies that Claims in Class 1 (Secured Tax Claims) and Class 2 (Other Priority Claims) are Unimpaired under the Plan and Claims and Interests in Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests), respectively, are either Impaired or Unimpaired under the Plan.  Article II of the Plan specifies that Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, and all fees due and payable pursuant to section 1930 of title 28 of the United States Code before the Effective Date will be paid in full in accordance with the terms of the Plan, although these Claims are not separately classified under the Plan.  Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

(c)     Article III of the Plan specifies that Claims and Interests, as applicable, in the following Classes (collectively, the "Impaired Classes") are Impaired under the Plan

15

within the meaning of section 1124 of the Bankruptcy Code, and describes the treatment

of such Classes, in compliance with section 1123(a)(3) of the Bankruptcy Code:

| Class | Designation |
|-------|-------------|
| 3 | Account Holder Claims |
| 4A | OpCo General Unsecured Claims |
| 4B | HoldCo General Unsecured Claims |
| 4C | TopCo General Unsecured Claims |
| 5 | Alameda Loan Facility Claims |
| 6 | Section 510(b) Claims |
| 9 | Existing Equity Interests |

(d)      The Plan provides for the same treatment by the Debtors for each Claim or

Interest in each respective Class unless the Holder of a particular Claim or Interest has

agreed to a less favorable treatment of such Claim or Interest, and complies with section

1123(a)(4) of the Bankruptcy Code.

(e)      The provisions in Article IV and elsewhere in the Plan and the Plan

Supplement, and in the exhibits and attachments to the Disclosure Statement provide, in

detail, adequate and proper means for the Plan's implementation, in satisfaction of the

requirements of section 1123(a)(5) of the Bankruptcy Code.

(f)      On the Effective Date the Wind-Down Debtor Assets shall, subject to the

Plan Administrator Agreement, be transferred to and vest in the Wind-Down Debtor.  The

Wind-Down Debtor shall be managed by the Plan Administrator and shall be subject to a

Wind-Down Debtor Oversight Committee.   On or prior to the Effective Date, the

Wind-Down Debtor's organizational documents will be amended to prohibit the issuance

of non-voting equity securities.  Accordingly, the Plan satisfies the requirements of section

1123(a)(6) of the Bankruptcy Code.

16

(g)     The Debtors have disclosed that the independent director at (i) Voyager Digital, LLC shall be Timothy R. Pohl and/or Jill Frizzley, (ii) Voyager Digital Holdings, Inc. shall be Scott Vogel, and (iii) Voyager Digital Ltd. shall be Matthew D. Ray. Article IV.J of the Plan provides that, upon filing of the certificate of dissolution (or equivalent document), the Wind-Down Debtor will be dissolved.  Article IV.H of the Plan provides for the formation of the Wind-Down Debtor for the benefit of the Wind-Down Debtor Beneficiaries.  Paul R. Hage will serve as Plan Administrator.  The Wind-Down Debtor shall be managed by the Plan Administrator and shall be subject to a Wind-Down Debtor Oversight Committee, which will consist of Russell Stewart, Richard Kiss, and Melissa Freeman.  The selection of the Plan Administrator and the appointment of the independent directors, and the provisions of the Plan and the Plan Administrator Agreement regarding the potential selection of successors to such persons, is consistent with the interests of Holders of Claims and Interests and public policy.  Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

(h)     Article III of the Plan specifies that some Classes of Claims are Impaired and others are not Impaired, as permitted by section 1123(b)(1) of the Bankruptcy Code.

(i)     As permitted by section 1123(b)(2) of the Bankruptcy Code, Article V of the Plan provides that, on the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (1) is specifically described in the Plan as to be assumed in connection

17

with Confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy other than the Side-A Policy.

(j)     The Plan provides for the settlement of certain potential claims against Mr. Ehrlich and Mr. Psaropolous, as permitted by section 1123(b)(3) of the Bankruptcy Code. It also provides for the retention of various causes of action as permitted by section 1123(b)(3).

(k)     The Plan provides for a sale of assets as permitted by section 1123(a)(4) of the Bankruptcy Code.

(l)     The Plan includes other discretionary provisions that are approved in various parts of this Confirmation Order.  The inclusion of such provisions is consistent with section 1123(b)(6) of the Bankruptcy Code.

19.     The Debtors have complied with the applicable provisions of the Bankruptcy Code and satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.  Specifically, each Debtor:

(a)     is an eligible debtor under section 109 of the Bankruptcy Code and a proper proponent of the Plan under section 1121(a) of the Bankruptcy Code; and

(b)     complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126, the Bankruptcy Rules, the Local Rules, any applicable

nonbankruptcy law, rule, and regulation, the Conditional Disclosure Statement Order, and all other applicable law, in transmitting the Solicitation Packages and related documents and notices, and in soliciting and tabulating the votes on the Plan.

20.     The Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code. The Debtors have proposed the Plan in good faith and not by any means forbidden by law.

21.     Any payment made or to be made by the Debtors for services or for costs and expenses in or in connection with these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, shall be subject to the approval of the Court for reasonableness, in compliance with section 1129(a)(4) of the Bankruptcy Code.

22.     The Debtors have disclosed the names of the individuals who will serve as independent directors, as Plan Administrator, and as members of the Wind-Down Debtor Oversight Committee, and the appointment of such persons is consistent with the interests of creditors and equityholders and with public policy.

23.     Section 1129(a)(6) of the Bankruptcy Code is not applicable to these Chapter 11 Cases.  The Plan does not propose any rate change subject to the jurisdiction of any governmental regulatory commission.

24.     The Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code. The liquidation analysis attached to the Disclosure Statement and the other evidence related thereto in support of the Plan that was proffered or adduced in the Declarations or at, prior to, or in connection with the Combined Hearing:  (a) are reasonable; (b) utilize reasonable and appropriate methodologies and assumptions;  (c) have not been controverted by other evidence;  and (d) establish that Holders of Allowed Claims and Interests in each Class will recover at least as much under the Plan on account of such Claim or Interest, as of the Effective Date, as such Holder

19

would receive if the Debtors were liquidated, on the Effective Date, under chapter 7 of the Bankruptcy Code.

25.    No Class of voting creditors voted to reject the Plan.  However, Class 5 (Alameda Loan Facility Claims), Class 6 (Section 510(b) Claims), and Class 9 (Existing Equity Interests) are impaired under the Plan and are deemed to reject the Plan.  Because the Plan has not been accepted by the Deemed Rejecting Classes, the Debtors seek Confirmation under section 1129(b), solely with respect to the Deemed Rejecting Classes, rather than section 1129(a)(8) of the Bankruptcy Code.  Although section 1129(a)(8) has not been satisfied with respect to the Deemed Rejecting Classes, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Deemed Rejecting Classes and thus satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes as described further below.

26.    The treatment of Allowed Administrative Claims, Allowed Professional Fee Claims, and Allowed Priority Tax Claims under Article II of the Plan, and of Allowed Other Priority Claims under Article III of the Plan, satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

27.    The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code. As evidenced by the Voting Report, the Voting Classes voted to accept the Plan by the requisite numbers and amounts of Claims, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code), specified under the Bankruptcy Code.

28.    The Plan satisfies section 1129(a)(11) of the Bankruptcy Code.  The evidence supporting the Plan proffered or adduced by the Debtors at or before the Combined Hearing is reasonable, persuasive, and credible, has not been controverted by other persuasive evidence, and

establishes that the Plan is feasible and Confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization except as contemplated by the Plan itself.

29.     The Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code. Article XII.C of the Plan provides for the payment of all fees due and payable under 28 U.S.C. § 1930 by each of the Wind-Down Debtor (or the Distribution Agent on behalf of the Wind-Down Debtor).

30.     The Debtors do not have any remaining obligations to pay retiree benefits (as defined in section 1114 of the Bankruptcy Code).   Therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases or the Plan.

31.     Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to these Chapter 11 Cases.  The Debtors owe no domestic support obligations, are not individuals, and are not nonprofit corporations.

32.     The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. Notwithstanding the fact that the Deemed Rejecting Classes have not accepted the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code.  *First*, all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) have been met. *Second*, the Plan is fair and equitable with respect to Class 5 (Alameda Loan Facility Claims), Class 6 (Section 510(b) Claims), and Class 9 (Existing Equity Interests).  The Plan has been proposed in good faith, is reasonable, and meets the requirements that (a) no Holder of any Claim or Interest that is junior to each such Class will receive or retain any property under the Plan on account of such junior Claim or Interest, and (b) no Holder of a Claim or Interest in a Class senior to such Classes is receiving more than payment in full on account of its Claim or Interest.

Specifically, to the extent Class 8 (Intercompany Interests) are Reinstated, such treatment is provided for administrative convenience and efficiency, and not on account of such Interests, and will not alter the treatment provided for any other Holder of any Claim or Interest. Further, Class 7 (Intercompany Claims) will receive the treatment as determined by the Court. Accordingly, the Plan is fair and equitable towards all Holders of Claims and Interests in the Deemed Rejecting Classes. *Third*, the Plan does not discriminate unfairly with respect to the Deemed Rejecting Classes because similarly situated Claim and Interest Holders will receive substantially similar treatment on account of their Claims or Interests, as applicable, in such class. Therefore, the Plan may be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

33.     The Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code. The Plan is the only chapter 11 plan filed in each of these Chapter 11 Cases.

34.     The Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.

35.     The Chapter 11 Cases are not small business cases and, accordingly, section 1129(e) of the Bankruptcy Code does not apply to the Chapter 11 Cases.

36.     The Debtors have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to support and consummation of the Plan, including the solicitation and receipt of acceptances of the Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

37.     For the reasons set forth in the Decision, the exculpation provisions of the Plan (as modified herein) are reasonable in scope and consistent with applicable authority.

38.    Based on the foregoing, the Plan satisfies the requirements for Confirmation set forth in section 1129 of the Bankruptcy Code.

## ORDER

BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

39.    **Approval of the Disclosure Statement.**    The Disclosure Statement, the Solicitation Packages, and the Solicitation Procedures are approved on a final basis pursuant to section 1125 of the Bankruptcy Code.

40.    **Solicitation.**  To the extent applicable, the solicitation of votes on the Plan complied with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, all other provisions of the Bankruptcy Code, and all other applicable rules, laws, and regulations, and was appropriate and satisfactory and is approved in all respects.

41.    **Notice of Combined Hearing.**  The Notice of Combined Hearing was appropriate and satisfactory and is approved in all respects.

42.    **Confirmation of the Plan.**  The Plan (as it has been modified by the parties, including any modifications set forth herein) is approved in its entirety and CONFIRMED under section 1129 of the Bankruptcy Code.

43.    **Objections.**  All objections and all reservations of rights pertaining to Confirmation of the Plan and approval of the Disclosure Statement that have not been withdrawn, waived, or consensually resolved are overruled on the merits unless otherwise indicated in this Confirmation Order.

44.    **Plan Modifications.**  The Plan Modifications do not materially adversely affect the treatment of any Claim against or Interest in any of the Debtors under the Plan.  Pursuant to Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125

23

of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan. Accordingly, the Plan Modifications are hereby approved pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019. After giving effect to the Plan Modifications, the Plan continues to meet the requirements of sections 1122 and 1123 of the Bankruptcy Code.

45. **Deemed Acceptance of Plan.** In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Interests who voted to accept the Plan or who are conclusively presumed to accept the Plan are deemed to have accepted the Plan, as modified by the Plan Modifications. No Holder of a Claim or Interest shall be permitted to change its vote as a consequence of the Plan Modifications.

46. **Restructuring Transactions**. On or before the Effective Date, the applicable Debtors will take any action as may be necessary or advisable to effectuate the Restructuring Transactions described in the Plan, the Restructuring Transactions Memorandum, and the Customer Onboarding Protocol, including, without limitation, the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the transfer or distribution of any Cryptocurrency or Cash pursuant to the Asset Purchase Agreement and the Plan, as applicable, and the execution and delivery of the Plan Administrator Agreement

47. **The Sale Transaction.** The Sale Transaction and the Asset Purchase Agreement, all other ancillary documents, and all of the terms and conditions thereof, are hereby approved, pursuant to sections 105, 363, 364, and 554 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014, each as applicable. Entry of this Confirmation Order shall authorize the

Debtors, the Purchaser, and the Wind-Down Debtor, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, as applicable, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

48.   Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Sale Transaction pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, (b) close the Sale Transaction as contemplated in the Asset Purchase Agreement, and (c) execute and deliver, perform under, consummate, implement, and fully close the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement and the Sale Transaction.

49.   Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Acquired Assets in accordance with the terms of the Asset Purchase Agreement and such transfer shall constitute a legal, valid, binding, and effective sale of the Acquired Assets and shall vest Purchaser with title to the Acquired Assets subject to the Asset Purchase Agreement, and to the fullest extent permitted by sections 363(f) and 1123(b)(4) of the Bankruptcy Code the Acquired Assets shall be free and clear of all Liens, Claims, Encumbrances, and other interests of any kind or nature whatsoever (other than as expressly permitted under the Asset Purchase Agreement), with all such Liens, Claims, or other interests to attach to the cash proceeds of the Purchase Price ultimately attributable to the property against or in which such Liens, Claims, or other interests are asserted, subject to the terms thereof, with the same validity, force, and effect, and in the same order of priority, which such Liens, Claims, or

25

other interests had prior to the Sale Transaction, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

50.     Except as otherwise permitted by the Asset Purchase Agreement, the Plan, or this Confirmation Order, all persons and entities holding Claims against or other interests in the Debtors, or any Liens against the Acquired Assets arising prior to the Effective Date, are hereby forever barred, estopped, and permanently enjoined from asserting such Claims, interests, or Liens against the Purchaser, any of the foregoing's affiliates, successors, or assigns, their property or the Acquired Assets.

51.     The Purchaser has acted in good faith and is entitled to the protections afforded under section 363(m) of the Bankruptcy Code.  No evidence has been presented to this Court indicating that the Sale Transaction may be avoided pursuant to section 363(n) of the Bankruptcy Code.

52.     Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.  A certified copy of this Confirmation Order may be filed with the appropriate clerk or recorded with the recorder of any state, county, or local authority to act to cancel any of the Liens, Claims, and other encumbrances of record.

53.     The Debtors and the Purchaser are each authorized to file a copy of this Confirmation Order, which, upon filing, shall be conclusive evidence of the release and termination of any Claim, Lien, or interest that is terminated under the terms of the Plan.

54.     This Confirmation Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title

26

companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

55.     All persons and entities that are presently, or on the Closing may be, in possession of some or all of the Acquired Assets pursuant to the Asset Purchase Agreement are hereby directed to surrender possession of the Acquired Assets to the Purchaser unless such person or entity was a good faith, bona fide purchaser of the Acquired Assets without notice of the Debtors' rights in such property.  Subject to the terms, conditions, and provisions of this Confirmation Order, all persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and/or transfer the Acquired Assets to the Purchaser in accordance with the terms of the Asset Purchase Agreement and this Confirmation Order.

56.     To the fullest extent permitted by sections 363(f) and 1123(b)(4) of the Bankruptcy Code, and except as otherwise specified in the Asset Purchase Agreement, the Purchaser shall acquire the Acquired Assets free of any claim that it is liable for liabilities of the Debtors under theories of successor liability, *de facto* merger, substantial continuity or other similar theory.  For the avoidance of doubt, (i) nothing herein shall release the Purchaser with respect to its obligations as Distribution Agent of Cryptocurrency and Cash to Holders of Account Holder Claims and OpCo General Unsecured Creditor Claims as provided in, and subject to the terms and conditions of, the

Asset Purchase Agreement and the Plan, and (ii) notwithstanding the transfer to Purchaser,

pursuant to the Asset Purchase Agreement, of any Acquired Assets that constitute Coins or Cash,

each User and Eligible Creditor shall retain, from and after the Closing of the Sale Transaction, all

right, title, and interest in and to such Coins and Cash allocated to it on the Binance.US Platform

in accordance with the Asset Purchase Agreement (notwithstanding any terms and conditions of

the Binance.US Platform to the contrary, if any) through and including such time as such Coins

and Cash are returned or distributed to Seller or such User and Eligible Creditor, as applicable,

and such Coins and Cash shall be held by Purchaser solely in a custodial capacity in trust and

solely for the benefit of Seller or the applicable User or Eligible Creditor thereafter.

57.     The Asset Purchase Agreement and any related documents or other instruments

may be modified, amended, or supplemented by the parties thereto in non-material ways in

accordance with the terms thereof, without further order of the Court.  Any material changes

require the approval of this Court.

58.     Paragraphs 47–57 of this Confirmation Order shall be deemed to be excised from

this Confirmation Order in the event that the Asset Purchase Agreement is terminated prior to

Closing.  For the avoidance of doubt, subject to the requirements set forth in the Asset Purchase

Agreement (including, without limitation, Sections 6.22 and 5.2(c) thereof), the Debtors may

exercise the "fiduciary out" in Section 8.1(g) of the Asset Purchase Agreement at any time prior

to Closing.

59.     **Actions by the Wind-Down Debtor.**  As soon as practicable after the Effective

Date, the Wind-Down Debtor shall take such actions as the Wind-Down Debtor may determine to

be necessary or desirable to carry out the purposes of the Plan.  Any certificate of dissolution or

equivalent document may be executed by the Wind-Down Debtor on behalf of any Wind-Down

Debtor without need for any action or approval by the shareholders or board of directors or managers of such Debtor; *provided*, that, no Debtor shall be dissolved while the independent director(s) at such Debtor remains in place.  On and after the Effective Date, the Debtors or the Wind-Down Debtor (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal (2) shall be deemed to have cancelled pursuant to the Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.  Pursuant to the terms of the Plan, any Money Transmitter Licenses that have not been terminated shall be deemed withdrawn and no further action is required to be taken by the Debtors or the Wind-Down Debtor to effectuate such withdrawal; *provided* that, following the Effective Date, the Debtors or the Wind-Down Debtor, as applicable, shall use commercially reasonable efforts to comply with all state banking department requirements for the surrender of a Money Transmitter License.  Notwithstanding such Debtors' dissolution, such Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

60.     **[Reserved]**

61.     **[Reserved]**

62.     **[Reserved]**

63.     **Binding Effect.**  Upon the occurrence of the Effective Date, the terms of the Plan are immediately effective and enforceable and deemed binding on the Debtors, the Wind-Down Debtor, any and all Holders of Claims or Interests (regardless of whether such Holders of Claims

or Interests have, or are deemed to have, accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or this Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

64. Pursuant to section 1141 of the Bankruptcy Code, subject to the occurrence of the Effective Date and subject to the terms of the Plan and this Confirmation Order, all prior orders entered in these Chapter 11 Cases and all documents and agreements executed by the Debtors as authorized and directed thereunder as of the Effective Date shall be binding upon and shall inure to the benefit of the Debtors, the Purchaser, or the Wind-Down Debtor, as applicable, and their respective successors and assigns.

65. **Vesting of Assets.** Except as otherwise provided in the Plan, this Confirmation Order, the Asset Purchase Agreement, the Schedule of Retained Causes of Action, or in any agreement, instrument, or other documented incorporated herein or therein, or in any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting Wind-Down Debtor Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, satisfied, or transferred pursuant to the Plan) shall vest in the Wind-Down Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.

66. Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date

the Wind-Down Debtor Assets shall, subject to the Plan Administrator Agreement, be transferred

to and vest in the Wind-Down Debtor.  For the avoidance of doubt, to the extent not otherwise

waived in writing, released, settled, compromised, assigned, or sold pursuant to a prior order or

the Plan, the Plan Administrator specifically retains and reserves the right to assert, after the

Effective Date, any and all of the Vested Causes of Action and related rights, whether or not

asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan,

including without limitation Article IV.F.

67.     On the Effective Date, the Debtors or Plan Administrator, as applicable, may

establish one or more accounts or funds to hold and dispose of certain assets, pursue certain

litigation (including the Vested Causes of Action), and/or satisfy certain Claims (including Claims

that are contingent or have not yet been Allowed).

68.     **Effectiveness of All Actions**.  All actions required to implement the Plan, including

all actions in connection with the Sale Transaction or the Liquidation Transaction, as applicable,

are hereby effective and authorized to be taken on, prior to, or after the Effective Date, as

applicable, under this Confirmation Order, without further application to, or order of the Court, or

further action by the respective officers, directors, managers, members, or equity holders of the

Debtors or the Wind-Down Debtor and with the effect that such actions had been taken by

unanimous action of such officers, directors, managers, members, or equity holders.

69.     **Cancellation of Notes, Instruments, Certificates, and Other Documents.**  On

the later of the Effective Date and the date on which distributions are made pursuant to the Plan

(if not made on the Effective Date), except for the purpose of evidencing a right to and allowing

Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise

specifically provided for in the Plan, this Confirmation Order, or any agreement, instrument, or

31

other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions, all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

70.     For the avoidance of doubt, cancellation of Existing Equity Interests pursuant to the Plan shall not affect the rights of the Holders of Existing Equity Interests to receive distributions, if any, under the Plan on account of such Existing Equity Interests.  Holders of Existing Equity Interests shall continue to possess all rights, powers, privileges, and standing associated with such Existing Equity Interests as if those Existing Equity Interests continue to exist subject to the terms of the Plan and this Confirmation Order.

71.     **Distributions.**  The procedures governing distributions contained in Article VI of the Plan shall be, and hereby are, approved in their entirety.  Except as otherwise set forth in the Plan or this Confirmation Order, the Plan Administrator shall make all distributions required under the Plan and the timing of distributions required under the Plan or this Confirmation Order shall be made in accordance with and as set forth in the Plan, this Confirmation Order, or the Plan Administrator Agreement, as applicable; *provided* that, if a creditor does not timely provide the Plan Administrator with its taxpayer identification number in the manner and by the deadline established by the Plan Administrator and/or the Plan, the creditor shall be deemed to have forfeited its right to any current, reserved or future distributions provided for under the Plan and

such creditor's Claim or Interest shall be disallowed and expunged without further order of the Court. Any such forfeited distribution shall be deemed to have reverted back to the Wind-Down Debtor for all purposes, including for distributions to other holders of Allowed Claims or Allowed Interests (as applicable) against the particular Debtor in respect of which the forfeited distribution was made, notwithstanding any federal, provincial or state escheat, abandoned or unclaimed property law to the contrary.

72.     **Claims Register.**  Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged, as applicable, on the Claims Register at the direction of the Debtors or Wind-Down Debtor without the Debtors or Wind-Down Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Court.

73.     **Preservation of Rights of Action.**  In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtor shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred.  Such rights shall be preserved by the Debtors and Wind-Down Debtor and shall vest in the Wind-Down Debtor, with the Wind-Down Debtor's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII

33

of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and
waived by the Debtors and the Wind-Down Debtor as of the Effective Date.

74. No Entity may rely on the absence of a specific reference in the Schedules of Assets
and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure
Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any
indication that the Debtors or the Wind-Down Debtor will not pursue any and all available Causes
of Action against it. The Wind-Down Debtor, on behalf of the Debtors and the Wind-Down
Debtor, expressly reserves all rights to prosecute any and all Causes of Action against any Entity,
except as otherwise provided in the Plan, including Article VIII of the Plan. Unless any Cause of
Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or
settled in the Plan or pursuant to a Final Order, the Wind-Down Debtor, on behalf of the Debtors
and Wind-Down Debtor and in accordance with the Plan Administrator Agreement, expressly
reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine,
including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion,
estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action as a
consequence of Confirmation.

75. **Subordination.** Pursuant to section 510 of the Bankruptcy Code, the Debtors and
the Wind-Down Debtor reserve the right to reclassify any Allowed Claim or Allowed Interest in
accordance with any contractual, legal, or equitable subordination relating thereto.

76. **Release of Liens.** Except as otherwise provided in the Plan, the Plan Supplement,
or any contract, instrument, release, or other agreement or document created pursuant to the Plan
or this Confirmation Order on the Effective Date, and concurrently with the applicable
distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other

security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Debtor or Wind-Down Debtor, as applicable, and their successors and assigns, in each case, without any further approval or order of the Court and without any action or Filing being required to be made by the Debtors. The presentation or filing of this Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

77. **Intercompany Claims.** For the avoidance of doubt, nothing in this Confirmation Order or the Plan shall have any impact on the validity, extent, priority, or treatment of the Intercompany Claims. Any determination as to the validity, extent, priority, or treatment of the Intercompany Claims shall be determined by the Court in a separate matter on proper notice to parties in interest. Notwithstanding anything to the contrary in this Confirmation Order or the Plan, the rights of the ad hoc group of equityholders (the "AHG") to continue or participate in any adjudication of the Intercompany Claims are preserved, and any party reserves any and all rights, claims, and defenses in connection therewith, including without limitation, the Debtors and/or the Wind-Down Debtor's right to challenge the AHG's standing with respect thereto; *provided* that such right, claim, or defense is not based on any provision in this Confirmation Order or the Plan.

78. **Reserve for FTX Preference Claims.** The Debtors shall reserve and hold the amount of $445 million in Cash on account of the preference claims asserted by FTX, Alameda, and their estates in the FTX Bankruptcy Proceeding, until such time as this Court rules upon the Debtors' pending motion for approval of a stipulation with FTX and Alameda.

79. **Third-Party Releases.** For the avoidance of doubt, any party that did not affirmatively "opt in" to the Third-Party Releases contained in the Plan shall not be deemed to grant such Third-Party Releases contained in the Plan.

80. **Contributed Third Party Claims.** For the avoidance of doubt, any party that did not affirmatively "opt in" to contribute their Contributed Third-Party Claims to the Wind-Down Debtor shall not be deemed to contribute their claims to the Wind-Down Debtor; *provided*, *however*, that any party may contribute their Contributed Third-Party Claims to the Wind-Down Debtor on or after the Effective Date by separate agreement with the Plan Administrator and Wind-Down Debtor. Any such agreement shall be valid to the same extent as if the party affirmatively opted in to contribute their Contributed Third-Party Claims to the Wind-Down Debtor.

81. **Operations After Closing.** On and after the Effective Date, expect as otherwise provided in the Plan, the Debtors or the Wind-Down Debtor may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

82. **Assumption and Rejection of Executory Contracts and Unexpired Leases.** On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (a) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (b) is subject to a pending motion to assume such Unexpired Lease or Executory

Contract as of the Effective Date; (c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (e) is a D&O Liability Insurance Policy other than the Side-A Policy. Entry of this Confirmation Order constitutes approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise provided in this Confirmation Order, any and all objections or reservations of rights in connection with the rejection of an Executory Contract or Unexpired Lease under the Plan, if any, are overruled on their merits.

83. Except with respect to the Executory Contracts and Unexpired Leases discussed in the following paragraph of this Confirmation Order, the amounts set forth in the Plan Supplement (the "Cure Amounts") are the sole amounts necessary to be paid upon assumption of the associated Executory Contracts and Unexpired Leases under section 365(b)(1)(A) and (B) of the Bankruptcy Code, and the payment of such amounts will effect a cure of all defaults existing under such Executory Contracts and Unexpired Leases and compensate the counterparties to such Executory Contracts and Unexpired Leases for any actual pecuniary loss resulting from all defaults existing under such Executory Contracts and Unexpired Leases as of the Effective Date.

84. The objections of counterparties to the assumption of their Executory Contracts and Unexpired Leases, to the extent that such objection was timely raised in accordance with Article V.C of the Plan, are preserved and will be considered by the Court at a date and time to be scheduled. As provided in the Conditional Disclosure Statement Order and the Solicitation Packages, the Debtors and the Wind-Down Debtor have reserved the right to (a) add any Executory

37

Contract or Unexpired Lease to the Assumed Contract Schedule and assume such Executory
Contract or Unexpired Lease pursuant to the terms of the Plan, or remove any Executory Contract
or Unexpired Lease from the Assumed Contract Schedule, in each case, up until the Effective Date
and (b) contest any Claim asserted in connection with rejection of any Executory Contract or
Unexpired Lease.

85. **Insurance Policies and Surety Bonds.** The Debtors shall continue to satisfy their
obligations under their insurance policies in full and continue such programs in the ordinary course
of business. Each of the Debtors' insurance policies, and any agreements, documents, or
instruments relating thereto shall be treated as Executory Contracts under the Plan. Without ruling
as to whether the assumption of an insurance policy was required, for the avoidance of doubt, on
the Effective Date: (a) the Debtors shall be deemed to have assumed, to the extent necessary, each
D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all
agreements, documents, or instruments related thereto) other than the Side-A Policy, with the
Wind-Down Debtor being authorized to pursue any proceeds thereof on behalf of the Debtors or
the Wind-Down Debtor; and (b) such insurance policies and any agreements, documents, or
instruments relating thereto shall revest in the applicable Wind-Down Debtor(s) unaltered. The
Side-A Policy shall remain in effect, with all insureds retaining the right to coverage (subject to
the D&O settlement); *provided*, however, that Wind-Down Debtor preserves all avoidance and
other actions against the D&O Carriers in connection with the premium paid thereunder. All
beneficiaries under the D&O Insurance Policies reserve their rights under such D&O Insurance
Policies (including the Side-A Policy) subject to the limitations set forth in the Plan.

86. Subject to their rights to pursue claims against the D&O Carriers to seek avoidance
of the policy premium paid for the Side-A Policy, as detailed in Paragraph 85 herein, the Debtors

or the Wind-Down Debtor, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date, and subject in all respects to the D&O Settlement, any current and former directors, officers, managers, and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Debtor shall retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or Wind-Down Debtor may deem necessary, subject to the prior written consent of the Wind-Down Debtor.

87.     Nothing in paragraphs 85–86 shall be read to alter, impair, waive, or otherwise limit the Debtors' and the Wind-Down Debtors' rights to pursue claims against the D&O Carriers to seek avoidance of the policy premium for the Side-A Policy.

88.     **Authorization to Consummate.** The Debtors are authorized to consummate the Plan at any time after the entry of this Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to consummation as set forth in Article IX of the Plan.

89.     **Professional Compensation.** All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than sixty (60) days after the Effective Date. The Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy Rules. The Wind-Down Debtor shall pay Professional Fee Claims in Cash to such Professionals in the amount the Court

39

allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Court; *provided* that the Debtors' and the Wind-Down Debtor's obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

90.    No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Wind-Down Debtor. When all Professional Fee Claims Allowed by the Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Court, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Wind-Down Debtor without any further notice to or action, order, or approval of the Court or any other Entity.

91.    The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final

40

request for payment of Professional Fee Claims Filed with the Court, and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; provided that the Wind-Down Debtor shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

92.     Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors and/or the Wind-Down Debtor, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Wind-Down Debtor. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtor may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Court.

93.     **Return of Deposits.** All utilities, including, but not limited to, any Person or Entity that received a deposit or other form of adequate assurance of performance under section 366 of the Bankruptcy Code during these Chapter 11 Cases, must return such deposit or other form of adequate assurance of performance to the Wind-Down Debtor promptly following the occurrence of the Effective Date, if not returned or applied earlier.

41

94.     **Release, Exculpation, and Injunction Provisions.**  The release and exculpation provisions set forth in the Plan and as modified herein (including as set forth in sections VI.B.1, VIII.A, VIII.B, and VIII.C of the Plan) are approved and authorized, and such provisions are effective and binding on all Persons and Entities to the extent provided therein except as otherwise provided in this Confirmation Order, *provided*, *however*, that nothing in the exculpation related provisions of the Plan shall release the Debtors from the provisions of the Plan governing satisfaction of Allowed Claims including Allowed Administrative Expense Claims or change the standard for liability on Allowed Claims or Allowed Administrative Expense Claims, subject to any applicable bankruptcy and non-bankruptcy law.

95.     As set forth in Article VIII.C of the Plan, the assets of the Debtors and of the Wind-Down Debtor shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in this Plan and shall not be available for any other purpose.  All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Debtor, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

96.     In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of this Plan shall be precluded and permanently enjoined on and

after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by this Plan.

97.     Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; *provided* that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

98.     The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes.

99.     In addition, the Plan contemplates certain rebalancing transactions and the completion of distributions of cryptocurrencies to creditors. The Exculpated Parties shall have no liability for, and are exculpated from, any claim for fines, penalties, damages, or other liabilities based on their execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan. For the avoidance of doubt, this paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would

43

violate applicable laws or regulations.  Nothing in this provision shall limit in any way the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further.  Nor does anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, or limit the penalties that may be applicable if such a future regulatory or court order is issued and is violated. Similarly, nothing herein shall limit the authority of the Committee on Foreign Investment of the United States to bar any of the contemplated transactions.  Nor does anything in this provision alter the terms of the Plan regarding the compliance of the Purchaser with applicable laws in the Unsupported Jurisdictions before distributions of cryptocurrency occur in those Unsupported Jurisdictions.

100.  For the avoidance of doubt, the Debtors are not entitled to a discharge under section 1141(d).

101.  **Governmental Units.**  Except as set forth in the exculpation provisions set forth in the Plan (including sections VI.B.1 and VIII.C of the Plan) and in this Confirmation Order, nothing in this Confirmation Order or the Plan shall release or restrict any claim by the United States, the States or any of their agencies of any claim arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or the States from bringing any claim, suit, action or other proceedings against the Released Parties for any liability for any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any

rules or regulations enforced by the United States, the States or any of their agencies, nor shall anything in the Confirmation Order or the Plan exculpate any such party from any liability to the United States, the States or any of their agencies, arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies; *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.

102.    Except as set forth in the exculpation provisions set forth in the Plan (including sections VI.B.1 and VIII.C of the Plan) and in this Confirmation Order, nothing in this Confirmation Order, the Disclosure Statement, the Plan, or the Asset Purchase Agreement releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the Effective Date; or (iii) any liability to a Governmental Unit on the part of any non-Debtor (except to the extent set forth in paragraphs 49 and 56 herein); *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.

103.    **Securities and Exchange Commission Provisions.**  Notwithstanding anything to the contrary in this Confirmation Order, or any findings announced at the Combined Hearing, nothing in this Confirmation Order, or announced at the Combined Hearing, constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the SEC to challenge transactions involving crypto tokens on any basis is expressly reserved.

104. Notwithstanding any provision herein to the contrary, nothing in this Confirmation Order or the Plan grants this Court jurisdiction over any police and regulatory actions by the SEC, and the SEC shall retain the power and authority to commence and continue any such actions against any person or entity, including without limitation, the Debtors, in any forum with jurisdiction; *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.

105. Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Wind-Down Debtor, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently in the Debtors' possession. The Wind-Down Debtor shall not destroy or otherwise abandon any such documents or records without providing advance notice to the SEC (c/o Therese Scheuer, U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, ScheuerT@SEC.GOV) and seeking further authorization from this Court. Nothing in the Plan or this Confirmation Order shall affect the obligations of the pre-Effective Date Debtors, the Wind-Down Debtor, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

106. Notwithstanding any language to the contrary herein, no provision in the Plan or this Confirmation Order shall (a) preclude the OSC or the SEC from enforcing its police or regulatory powers or conducting any investigations of any person or entity, or (b) subject to the exculpation provisions set forth in the Plan (including sections VI.B.1 and VIII.C of the Plan) and in this Confirmation Order, enjoin, limit, impair or delay the OSC or SEC from commencing or

46

continuing any claims, causes of action or proceeding against any non-Debtor person or non-Debtor entity in any forum.

107.    **Employee Transition Plan.**  The Employee Transition Plan, the terms of which are included in the Plan Supplement as <u>Exhibit H</u>, will be implemented following the Effective Date and is not subject to the Court's approval.

108.    **Compliance with Tax Requirements.**  In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Debtor, any Distribution Agent, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including winding-down a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the Wind-Down Debtor and the Distribution Agent, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond.  The Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

109.    **Exemption from Certain Taxes and Fees.**  To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Debtor, the Wind-Down Debtor, the Purchaser, or to any other Entity) of property under the Plan or pursuant to:  (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtor;  (b) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means;  (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Asset Purchase Agreement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

110.    **Termination of Asset Purchase Agreement.**   If the Asset Purchase Agreement is terminated and the Sale Transaction is not consummated, all provisions in this Confirmation Order relating to the Asset Purchase Agreement, the Sale Transaction, and the Purchaser shall be of no force and effect, and the Debtors are authorized to consummate the Liquidation Transaction without further order of the Court.

111.    **The Liquidation Transaction.**   If the Asset Purchase Agreement is terminated, the Debtors shall pursue the Liquidation Transaction contemplated under the Plan and shall provide all Holders of Claims and Interests with the treatment afforded to such Holders under the Plan.   In the event that the Debtors determine to pursue the Liquidation Transaction contemplated under Article IV of the Plan, the Debtors shall promptly notify the Court and all parties in interest.   The Plan shall be deemed to satisfy all requirements under the Bankruptcy Code with respect to either the Sale Transaction or the Liquidation Transaction pursuant to this Confirmation Order.

112.    **Documents, Mortgages, and Instruments.**   Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring Transactions, and this Confirmation Order.

113.    **The BNY Objection.**   This Confirmation Order confirms that the Deed of Trust and Assignment of Rents recorded January 5, 2023 Official Records of Orange County (the "Deed") transferring title of 37 Black Hawk, Irvine, California 92603 (the "Property") from Michael G. Beason and Mickey L. Wiebeis (collectively, the "Property Borrowers") to Voyager Digital, LLC is void.   This Confirmation Order may be recorded against the Property as evidence and confirmation that the Deed is void.   The Bank Of New York Mellon f/k/a the Bank Of New York, As Trustee For The Certificateholders Of CWALT, Inc., Alternative Loan Trust 2005-38,

Mortgage Pass-Through Certificates, Series 2005-38 as Serviced by Shellpoint Mortgage Servicing ("Shellpoint") shall be permitted to take any other the necessary actions to void the Deed. To the extent necessary, the automatic stay is lifted solely as it pertains to Shellpoint's rights to take action against the Property and shall be effective immediately upon entry of this Confirmation Order. The Debtor(s) shall not be party to any foreclosure or other proceeding related to the Property as they lack any interest in the Property. Shellpoint shall release the Debtors and the Wind-Down Debtor of any costs and claims incurred on account of the Property, including any actions taken in any foreclosure or other proceeding or associated with voiding the Deed. This Confirmation Order shall in no way prevent Shellpoint from pursuing any and all lawful rights and remedies as to the Property Borrowers.

114.    **Continued Effect of Stays and Injunction.**  Unless otherwise provided in the Plan or this Confirmation Order, all injunctions or stays arising under or entered during these Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

115.    **Notice of Subsequent Pleadings.**  Except as otherwise provided in the Plan or in this Confirmation Order, notice of all subsequent pleadings in these Chapter 11 Cases after the Effective Date will be limited to the following parties:  (a) the Wind-Down Debtor and its counsel; (b) the U.S. Trustee; (c) counsel to the Purchaser; (d) any party known to be directly affected by the relief sought by such pleadings; and (e) any party that has previously requested notice or who files a request for notice under Bankruptcy Rule 2002 after the Effective Date.  The Claims, Noticing, and Solicitation Agent shall not be required to file updated service lists.

50

116.    **Choice of Law.**  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control); provided that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Wind-Down Debtor, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

117.    **Protection Against Discriminatory Treatment.**  As provided by section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Entity, including Governmental Units, shall discriminate against any Wind-Down Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, any Wind-Down Debtor, or any Entity with which a Wind-Down Debtor has been or is associated, solely because such Wind-Down Debtor was a debtor under chapter 11 of the Bankruptcy Code or may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases).

118.    **Notices of Confirmation and Effective Date.**  The Debtors or the Wind-Down Debtor, as applicable, shall serve notice of entry of this Confirmation Order, of the occurrence of the Effective Date, and of applicable deadlines (the "Notice of Confirmation") in accordance with Bankruptcy Rules 2002 and 3020(c) on all parties served with the Combined Hearing Notice seven

51

Business Days after the Effective Date; *provided* that no notice of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed notice of the Combined Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address," or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. For those parties receiving electronic service, filing on the docket is deemed sufficient to satisfy such service and notice requirements.

119.     No later than ten Business Days after the Effective Date, the Wind-Down Debtor shall cause the Notice of Confirmation, modified for publication, to be published on one occasion in *The New York Times* (national edition) and *USA Today* (national edition). Mailing and publication of the Notice of Confirmation in the time and manner set forth in this paragraph will be good, adequate, and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c). No further notice is necessary.

120.     **Dissolution of Statutory Committees.** On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, *however*, that such committees will remain in existence for the limited purposes of (a) pursuing, supporting, or otherwise participating in, any outstanding appeals in the Chapter 11 Cases; and (b) filing, objecting, or otherwise participating in, any final fee applications of Professionals.

121.     **Exemption from Registration.** The Plan Administrator shall hold the equity of Voyager Digital Ltd., to the extent that any new equity is issued, in an agency capacity, for the

benefit of and to facilitate the rights of Holders of Interests provided under the Plan; *provided* that such equity, if issued, shall be uncertificated and non-transferable.

122.    **Effect of Non-Occurrence of Conditions to Confirmation.**  If the Effective Date does not occur within 120 days after the Confirmation Date, then the Plan will be null and void in all respects, any and all compromises or settlements not previously approved by Final Order of the Court embodied in the Plan (including with respect to the fixing, limiting, or treatment of any Claim or Interest), shall be deemed null and void, and nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims, Interests, or Causes of Action held by any Debtor or any other Entity; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity in any respect.

123.    **Substantial Consummation.**  On the Effective Date, the Plan shall be deemed to have been substantially consummated or shall be anticipated to be substantially consummated concurrent with the occurrence of the Effective Date.

124.    **Waiver of Stay.**  For good cause shown, the stay of this Confirmation Order provided by the Bankruptcy Rules shall terminate at the end of the day on March 13, 2023, and this Confirmation Order shall be effective and enforceable immediately thereafter.

125.    **Headings.**  Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

126.    **Effect of Conflict.**  This Confirmation Order supersedes any Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order shall govern and control.  For the avoidance of doubt, the

*Stipulation and Agreed Order Between the Debtors and Metropolitan Commercial Bank* [Docket No. 821] remains in effect and is not superseded by this Confirmation Order.

127.    **Final, Appealable Order.**  This Confirmation Order is a final judgment, order, or decree for purposes of 28 U.S.C. § 158(a), and the period in which an appeal must be filed shall commence upon the entry hereof.

128.    **Retention of Jurisdiction.**  The Court may properly, and upon the Effective Date shall, to the full extent set forth in the Plan, retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including (i) the matters set forth in Article XI of the Plan and (ii) as set forth in Section 10.13 of the Asset Purchase Agreement.

 Dated:  New York, New York
         March 8, 2023

                                         **s/Michael E. Wiles**
                                         THE HONORABLE MICHAEL E. WILES
                                         UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

**The Plan**

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

---

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS. THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital, LTD. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

# **TABLE OF CONTENTS**

<div align="right">

**Page**

</div>

Introduction ...................................................................................................................................... 1

**Article I. Defined Terms, Rules of Interpretation, Computation of Time, Governing Law, and
    Other References** ...................................................................................................................... 1

    A.    Defined Terms ............................................................................................................ 1
    B.    Rules of Interpretation ............................................................................................. 17
    C.    Computation of Time ............................................................................................... 18
    D.    Governing Law ......................................................................................................... 18
    E.    Reference to Monetary Figures ............................................................................... 18
    F.    Reference to the Debtors or the Wind-Down Debtor ............................................. 18
    G.    Nonconsolidated Plan ............................................................................................. 18

**Article II. Administrative and Priority Claims** ...................................................................... 18

    A.    Administrative Claims ............................................................................................. 19
    B.    Professional Fee Claims .......................................................................................... 19
    C.    Priority Tax Claims .................................................................................................. 21

**Article III. Classification, Treatment, and Voting of Claims and Interests** ........................ 21

    A.    Classification of Claims and Interests ..................................................................... 21
    B.    Summary of Classification ...................................................................................... 21
    C.    Treatment of Classes of Claims and Interests ........................................................ 22
    D.    Special Provision Governing Unimpaired Claims .................................................. 28
    E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes ..... 29
    F.    Subordinated Claims ............................................................................................... 29
    G.    Intercompany Interests ............................................................................................ 29
    H.    Controversy Concerning Impairment ..................................................................... 29
    I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
        Code ........................................................................................................................ 29

**Article IV. Provisions for Implementation of the Plan** ......................................................... 30

    A.    General Settlement of Claims and Interests ............................................................ 30
    B.    Restructuring Transactions ...................................................................................... 30
    C.    The Sale Transaction ............................................................................................... 30
    D.    The Liquidation Transaction ................................................................................... 31
    E.    Employee Transition Plan ....................................................................................... 32
    F.    Non-Released D&O Claims ..................................................................................... 32
    G.    The D&O Settlement ............................................................................................... 33
    H.    The Wind-Down Debtor .......................................................................................... 35
    I.    Sources of Consideration for Plan Distributions .................................................... 42
    J.    Corporate Existence and Dissolution ..................................................................... 42
    K.    Corporate Action ..................................................................................................... 43
    L.    Vesting of Assets in the Wind-Down Debtor .......................................................... 44
    M.    Cancellation of Notes, Instruments, Certificates, and Other Documents .............. 44
    N.    Effectuating Documents; Further Transactions ...................................................... 44
    O.    Section 1146(a) Exemption ..................................................................................... 45

P.      Preservation of Rights of Action..................................................................... 45
Q.      Election to Contribute Third-Party Claims ...................................................... 46
R.      Contribution of Contributed Third-Party Claims ............................................. 46
S.      Closing the Chapter 11 Cases ........................................................................ 46

**Article V. Treatment of Executory Contracts and Unexpired Leases ........................ 47**

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases..................... 47
B.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired
        Leases .......................................................................................................... 47
C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases ..................... 47
D.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed .................. 48
E.      Insurance Policies .......................................................................................... 49
F.      Reservation of Rights....................................................................................... 50
G.      Nonoccurrence of Effective Date...................................................................... 50
H.      Contracts and Leases Entered into After the Petition Date ................................. 50

**Article VI. Provisions Governing Distributions ........................................................ 50**

A.      Timing and Calculation of Amounts to Be Distributed ....................................... 50
B.      Rights and Powers of Distribution Agent ......................................................... 51
C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions ............. 51
D.      Compliance Matters ........................................................................................ 54
E.      Foreign Currency Exchange Rate ..................................................................... 54
F.      Claims Paid or Payable by Third Parties ........................................................... 54
G.      Setoffs and Recoupment ................................................................................. 55
H.      Allocation between Principal and Accrued Interest............................................. 55

**Article VII. Procedures for Resolving Disputed, Contingent, and Unliquidated Claims and
Interests......................................................................................................... 55**

A.      Disputed Claims Process ................................................................................. 55
B.      Objections to Claims or Interests ..................................................................... 56
C.      Estimation of Claims ....................................................................................... 57
D.      No Distributions Pending Allowance ................................................................ 57
E.      Distributions After Allowance .......................................................................... 57
F.      No Interest...................................................................................................... 57
G.      Adjustment to Claims and Interests without Objection ....................................... 58
H.      Time to File Objections to Claims .................................................................... 58
I.      Disallowance of Claims or Interests ................................................................. 58
J.      Amendments to Proofs of Claim ...................................................................... 58

**Article VIII. Effect of Confirmation of the Plan ...................................................... 59**

A.      Releases by the Debtors .................................................................................. 59
B.      Releases by Holders of Claims and Interests ..................................................... 59
C.      Exculpation .................................................................................................... 60
D.      Injunction ...................................................................................................... 61
E.      Release of Liens .............................................................................................. 61
F.      OSC and SEC ................................................................................................. 62
G.      Protection against Discriminatory Treatment .................................................... 62
H.      Document Retention ........................................................................................ 62
I.      Reimbursement or Contribution ...................................................................... 62

J.      Term of Injunctions or Stays................................................................................. 62

**Article IX. Conditions Precedent to the Effective Date** ...................................................... **63**

A.      Conditions Precedent to the Effective Date ......................................................... 63
B.      Waiver of Conditions Precedent .......................................................................... 63
C.      Effect of Non-Occurrence of Conditions to Consummation ............................... 64

**Article X. Modification, Revocation, or Withdrawal of the Plan** ...................................... **64**

A.      Modification of Plan ............................................................................................ 64
B.      Effect of Confirmation on Modifications ............................................................ 64
C.      Revocation or Withdrawal of Plan....................................................................... 64

**Article XI. Retention of Jurisdiction** ................................................................................... **65**

**Article XII. Miscellaneous Provisions** ................................................................................. **67**

A.      Immediate Binding Effect .................................................................................... 67
B.      Additional Documents .......................................................................................... 67
C.      Payment of Statutory Fees ................................................................................... 67
D.      Dissolution of Statutory Committees ................................................................... 67
E.      Reservation of Rights............................................................................................ 67
F.      Successors and Assigns ........................................................................................ 68
G.      Service of Documents ........................................................................................... 68
H.      Entire Agreement; Controlling Document............................................................ 68
I.       Plan Supplement ................................................................................................... 69
J.      Non-Severability ................................................................................................... 69
K.      Votes Solicited in Good Faith .............................................................................. 69
L.      Waiver or Estoppel ............................................................................................... 69

## INTRODUCTION

Voyager Digital Holdings, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors") propose this third amended joint plan (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

### A.   Defined Terms

Capitalized terms used in this Plan have the meanings ascribed to them below.

1.      "*3AC*" means Three Arrows Capital, Ltd and any of its Affiliates or subsidiaries.

2.      "*3AC Claims*" means the claims or causes of action asserted or assertable by the Debtors against 3AC, whether in the 3AC Liquidation Proceeding or otherwise.

3.      "*3AC Liquidation Proceeding*" means that certain liquidation proceeding captioned *In the Matter of Three Arrows Capital Ltd. and in the Matter of Sections 159(1) and 162(1)(a) and (b) of the Insolvency Act 2003*, Claim No. BVIHC(COM)2022/0119 before the Eastern Caribbean Supreme Court in the High Court of Justice in the British Virgin Islands and the chapter 15 foreign recognition proceeding captioned *In re Three Arrows Capital, Ltd.*, No. 22-10920 (Bankr. S.D.N.Y. Jul. 1, 2022).

4.      "*3AC Loan*" means that loan of 15,250 Bitcoins and 350 million USDC to 3AC pursuant to that certain master loan agreement dated March 4, 2022 by and between 3AC, as borrower, and OpCo and HTC Trading, Inc., as lenders.

5.      "*3AC Recovery*" means the recovery, if any, of the Debtors from 3AC on account of the 3AC Claims.

6.      "*Account*" means any account at OpCo held by an Account Holder relating to Cryptocurrency, which Account is identified in the Debtors' books and records as holding Cryptocurrency as of the Petition Date.

7.     "*Account Holder*" means any Person or Entity who holds an Account with OpCo as of the Petition Date.

8.     "*Account Holder Claim*" means any Claim against the Debtors that is held by an Account Holder on account of such Holder's Account.

9.     "*Acquired Assets*" has the meaning ascribed to it in the Asset Purchase Agreement.

10.    "*Acquired Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

11.    "*Acquired Coins Value*" has the meaning ascribed to it in the Asset Purchase Agreement.

12.    "*Additional Bankruptcy Distribution*" has the meaning ascribed to it in the Asset Purchase Agreement.

13.    "*Administrative Claim*" means a Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims.

14.    "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five days after the Effective Date.

15.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

16.    "*Alameda*" means Alameda Ventures Ltd., along with its Affiliates and subsidiaries.

17.    "*Alameda Claims*" means the claims or causes of action asserted or assertable by the Debtors against Alameda, whether in the FTX Bankruptcy Proceeding or otherwise.

18.    "*Alameda Loan Agreement*" means that certain unsecured loan agreement, dated as of June 21, 2022, as amended, restated, amended and restated, modified, or supplemented from time to time, by and among HoldCo, as the borrower, TopCo, as the guarantor, and Alameda, as the lender thereto.

19.    "*Alameda Loan Facility*" means that certain unsecured loan facility provided for under the Alameda Loan Agreement.

20.    "*Alameda Loan Facility Claims*" means any Claim against any Debtor derived from, based upon, or arising under the Alameda Loan Agreement and any fees, costs, and expenses that are reimbursable by any Debtor pursuant to the Alameda Loan Agreement.

21.    "*Alameda Recovery*" means the recovery, if any, of the Debtors from Alameda on account of the Alameda Claims.

22.     "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein:  (a) a Claim or Interest that is evidenced by a Proof of Claim timely Filed by the Bar Date or a request for payment of Administrative Claim timely Filed by the Administrative Claims Bar Date (or for which Claim or Interest under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim or a request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; (c) a Claim or Interest Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court, or (d) a Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; *provided* that, with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim or Interest shall have been Allowed by a Final Order.  Any Claim or Interest that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. A Proof of Claim Filed after and subject to the Bar Date or a request for payment of an Administrative Claim Filed after and subject to the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

23.     "*Asset Purchase Agreement*" means that certain asset purchase agreement dated as of December 18, 2022 by and between BAM Trading Services Inc. (d/b/a Binance.US) as Purchaser and Voyager Digital, LLC as Seller.

24.     "*Assumed Liabilities*" has the meaning ascribed to it in the Asset Purchase Agreement.

25.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

26.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the Southern District of New York.

27.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

28.     "*Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

29.     "*Bar Date Order*" means the *Order (I) Setting Deadlines for Submitting Proofs of Claims, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 218].

30. "*Binance.US Platform*" has the meaning ascribed to it in the Asset Purchase Agreement.

31. "*Binance US*" means BAM Trading Services Inc. (d/b/a Binance.US).

32. "*Binance US Account*" means a customer account opened with the Purchaser by an Account Holder or a Holder of an Allowed OpCo General Unsecured Claim.

33. "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

34. "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

35. "*Causes of Action*" mean any action, Claim, cross-claim, third-party claim, damage, judgment, cause of action, controversy, demand, right, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, interest, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law in accordance with applicable law.  For the avoidance of doubt, "Causes of Action" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim arising from any contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

36. "*CCO*" means Evan Psaropoulos.

37. "*CEO*" means Stephen Ehrlich.

38. "*Certificate*" means any instrument evidencing a Claim or an Interest.

39. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated cases filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

40. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

41. "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) (i) with respect to Administrative Claims (other than Professional Fee Claims and Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), sixty days after the Administrative Claims Bar Date or (ii) with respect to all other Claims (other than Professional Fee Claims), 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Wind-Down Debtor, as applicable, as approved by an order of the Bankruptcy Court for objecting to such Claims.

42.    "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Clerk of the Bankruptcy Court or the Claims, Noticing, and Solicitation Agent.

43.    "*Claims, Noticing, and Solicitation Agent*" means Bankruptcy Management Solutions, Inc. d/b/a Stretto, in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

44.    "*Class*" means a class of Claims against or Interests in the Debtors as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

45.    "*Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

46.    "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

47.    "*Confirmation Date*" means the date on which Confirmation occurs.

48.    "*Confirmation Hearing*" means the hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code at which the Debtors will seek Confirmation of the Plan.

49.    "*Confirmation Order*" has the meaning ascribed to it in the Asset Purchase Agreement.

50.    "*Consummation*" means the occurrence of the Effective Date.

51.    "*Contributed Third-Party Claims*" means all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform; (b) all Causes of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) all Causes of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided*, *however*, that Contributed Third-Party Claims do not include (i) any derivative claims of the Debtors; (ii) any direct claims against the Released Parties; (iii) any direct Causes of Action that any Contributing Claimant has against Mark Cuban, Dallas Basketball Limited d/b/a Dallas Mavericks, the National Basketball Association, and any of their Related Parties; or (iv) any direct Causes of Action that any Contributing Claimant, in its capacity as an equity holder of Voyager Digital Ltd., has that are asserted in the currently filed complaint, dated as of July 6, 2022, in the Ontario Superior Court of Justice by Francine De Sousa, against Voyager Digital Ltd., Stephen Ehrlich, Philip Eytan, Evan Psaropoulos, Lewis Bateman, Krisztian Toth, Jennifer Ackart, Glenn Stevens, and Brian Brooks.

52.    "*Contributing Claimants*" means any Holders of Claims or Interests that elect on their ballots or opt-in forms to contribute their Contributed Third-Party Claims to the Wind-Down Debtor.

53.    "*Cryptocurrency*" means a digital currency or crypto asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a centralized authority, including stablecoins, digital coins and tokens, such as security tokens, utility tokens and governance tokens.

54.     "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

55.     "*Customer Onboarding Protocol*" means the protocol describing the process of onboarding Account Holders and Holders of OpCo General Unsecured Claims onto the Binance.US Platform, the form of which shall be included in the Plan Supplement and filed no later than by February 8, 2023, and which shall be in a form acceptable to the Purchaser.

56.     "*D&O Carriers*" means the insurance carriers of the D&O Liability Insurance Policies.

57.     "*D&O Liability Insurance Policies*" means all unexpired insurance policies maintained by the Debtors, the Wind-Down Debtor, or the Estates as of the Effective Date that have been issued (or provide coverage) regarding directors', managers', officers', members', and trustees' liability (including any "tail policy"), including but not limited to the Management Liability Policy, the Excess Policies, and the Side-A Policy, and all agreements, documents, or instruments relating thereto.

58.     "*D&O Settlement*" means the settlement between the Debtors and CEO and CCO as set forth in Article IV.G of the Plan.

59.     "*Debtors*" means, collectively, each of the following:  Voyager Digital Holdings, Inc.; Voyager Digital Ltd.; and Voyager Digital, LLC.

60.     "*Definitive Documents*" means (a) the Plan (and any and all exhibits, annexes, and schedules thereto); (b) the Confirmation Order; (c) the Disclosure Statement and the other Solicitation Materials; (d) the Disclosure Statement Order; (e) all pleadings filed by the Debtors in connection with the Chapter 11 Cases (or related orders); (f) the Plan Supplement; (g) the Asset Purchase Agreement; (h) the Customer Onboarding Protocol; and (i) any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments or other documents reasonably desired or necessary to consummate and document the transactions contemplated by the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements made from time to time thereto); *provided* that any documents included in subsection (i) only include documents arising on or after the Petition Date but prior to the Effective Date and that are within the jurisdiction of the Bankruptcy Court.

61.     "*Disclosure Statement*" means the *Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, as may be amended, supplemented, or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan.

62.     "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement.

63.     "*Disputed*" means a Claim or an Interest or any portion thereof:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order; and (c) with respect to which a party in interest has Filed a Proof of Claim, a Proof of Interest, or otherwise made a written request to a Debtor for payment.

64.     "*Disputed Claims Reserve*" means an appropriate reserve in an amount to be determined by the Wind-Down Debtor for distributions on account of Disputed Claims that are subsequently Allowed after the Effective Date, in accordance with Article VII.D hereof.

65.     "*Distributable Cryptocurrency*" means all Cryptocurrency held on the Voyager platform or that is otherwise property of any Debtor on the Effective Date after payment in full of, or reserve for, all Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims.

66.     "*Distributable HoldCo Cash*" means HoldCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at HoldCo in full; and (y) to fund HoldCo's Pro Rata share of the Wind-Down Budget.

67.     "*Distributable OpCo Cash*" means OpCo's Cash, including the Purchase Price Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at OpCo in full; and (y) to fund OpCo's Pro Rata share of the Wind-Down Budget.

68.     "*Distributable TopCo Cash*" means TopCo's Cash, less (x) any Cash necessary to satisfy Allowed Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Other Priority Claims at TopCo in full; and (y) to fund TopCo's Pro Rata share of the Wind-Down Budget.

69.     "*Distribution Agent*" means, as applicable, the Purchaser, the Debtors, the Wind-Down Debtor or any Entity or Entities designated by the Purchaser, the Debtors, or the Wind-Down Debtor to make or to facilitate distributions that are to be made pursuant to the Plan, Definitive Documents, and Asset Purchase Agreement.

70.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Wind-Down Debtor, on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims or Allowed Interests entitled to receive distributions under the Plan.

71.     "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims and Interests against the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date, or such other date as is determined by the Debtors or designated by an order of the Bankruptcy Court.

72.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.

73.     "*Employee Transition Plan*" has the meaning set forth in Article IV.E of the Plan, and which shall be in form and substance reasonably acceptable to the Committee.

74.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

75.     "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

76.     "*Excess Policies*" means, collectively, the Excess Insurance Policy, No. EFI1203041-01, issued by Euclid Financial on behalf of Certain Underwriters of Lloyd's, London, the Excess Insurance Policy, No. RILEDOA3392022, issued by Relm Insurance Ltd., both for the February 22, 2022 to

February 22, 2023 period, and the Excess Policy, No. ELU184180-23, issued by XL Specialty Insurance Company, for the February 22, 2022 to July 1, 2023 period.

77.    "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) the Committee, and each of the members thereof, solely in their capacity as such; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; (e) the Plan Administrator; and (f) the Distribution Agent.

78.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

79.    "*Existing Equity Interests*" means any Interest in TopCo existing immediately prior to the occurrence of the Effective Date.

80.    "*Extended Outside Date*" has the meaning set forth in the Asset Purchase Agreement.

81.    "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

82.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing, respectively, in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee, or, with respect to the filing of a Proof of Claim or Proof of Interest, file, filed, or filing, respectively, with the Claims, Noticing, and Solicitation Agent.

83.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

84.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal that has been or may be taken or any petition for certiorari or any motion for a new trial, reargument, reconsideration, or rehearing that has been or may be made or filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the motion for a new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order (if any such motion has been or may be granted), or have otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

85.    "*FTX*" means FTX Trading, Ltd. and any of its Affiliates or subsidiaries, including West Realm Shires Inc (d/b/a "FTX.US").

86.    "*FTX Bankruptcy Proceeding*" means that certain chapter 11 proceeding captioned *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022).

87.    "*FTX Claims*" means the claims or causes of action asserted or assertable by the Debtors against FTX, whether in the FTX Bankruptcy Proceeding or otherwise.

88.    "*FTX Recovery*" means the recovery, if any, of the Debtors from FTX on account of the FTX Claims.

89.    "*FTX Settlement*" means the settlement between the Debtors, the Committee, FTX, Alameda, and the official committee of unsecured creditors in the FTX Bankruptcy Proceeding, pursuant to the terms set forth in the *Debtors' Motion for Entry of an Order Approving the Joint Stipulation and Agreed Order Between the Voyager Debtors, the FTX Debtors, and Their Respective Official Committees of Unsecured Creditors* [Docket No. 1106].

90.    "*General Unsecured Claim*" means, collectively, any HoldCo General Unsecured Claim, OpCo General Unsecured Claim, or TopCo General Unsecured Claim.

91.    "*Governmental Claimant Stipulation*" means the *Joint Stipulation and Agreed Order Between the Debtors and Governmental Claimants* [Docket. No. 1100].

92.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

93.    "*Government Bar Date*" means the applicable deadline by which Proofs of Claim by a Governmental Unit must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

94.    "*HoldCo*" means Voyager Digital Holdings, Inc.

95.    "*HoldCo General Unsecured Claim*" means any Claim against HoldCo that is not Secured and is not:  (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; or (h) an Intercompany Claim. For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, against HoldCo are HoldCo General Unsecured Claims.

96.    "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

97.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

98.    "*Insurance Policies*" means any and all insurance policies entered into by the Debtors, including the D&O Insurance Policies.

99.    "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor.

100.    "*Intercompany Interest*" means, other than an Interest in Voyager, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

101.    "*Interest*" means any equity security (as such term is defined in section 101(16) of the Bankruptcy Code) including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of an Entity, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in an Entity whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, and including any Claim against

9

the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the foregoing.

102.    "*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Docket No. 236].

103.    "*Investigated Matters*" means (i) the Debtors' loans to third parties, including the 3AC Loan; (ii) the diligence performed in connection with the loans described in (i); (iii) the formation and function of the Debtors' Risk Committee; (iv) the Debtors' staking of cryptocurrency assets; (v) the Debtors' regulatory compliance; (vi) the Debtors' communications with the public; and (vii) the Debtors' pre-petition transfers to Released Voyager Employees (including customer withdrawals) within one (1) year of the Petition Date.

104.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001 and the rules and regulations promulgated thereunder, as applicable to the Chapter 11 Cases.

105.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

106.    "*Liquidation Procedures*" means, in the event the Sale Transaction is not consummated by the Outside Date, such procedures filed by the Wind-Down Debtor identifying the mechanics and procedures to effectuate the Liquidation Transaction.

107.    "*Liquidation Transaction*" means, in the event the Sale Transaction is not consummated by the Outside Date, the distribution of the Debtors' Cryptocurrency, Cash and other assets pursuant to Article IV.D of this Plan.

108.    "*Management Liability Policy*" means the Executive and Corporate Securities Liability Insurance Policy, No. ELU181214-22, issued by XL Specialty Insurance Company for the February 22, 2022 to February 22, 2023 period.

109.    "*Money Transmitter License*" means any consent, license, certificate, franchise, permission, variance, clearance, registration, qualification, authorization, waiver, exemption or other permit issued, granted, given or otherwise made available by or under the authority of any Governmental Unit pursuant to state money transmission or similar laws.

110.    "*Net Owed Coins*" has the meaning ascribed to it in the Asset Purchase Agreement.

111.    "*Non-Released D&O Claims*" has the meaning set forth in Article IV.F of the Plan.

112.    "*Non-Released D&O Claim Budget*" means the amount allocated to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims, which amount shall be agreed upon between the Debtors and the Committee prior to the Confirmation Hearing.

113.    "*Non-Released Insurance Claims*" has the meaning set forth in Article IV.F of the Plan.

114.    "*OpCo*" means Voyager Digital, LLC.

115.    "*OpCo General Unsecured Claim*" means any Claim against OpCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim;

(f) a Professional Fee Claim; (g) an Account Holder Claim; or (h) an Intercompany Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation against OpCo are OpCo General Unsecured Claims.

116.    "*OSC*" means the Ontario Securities Commission.

117.    "*Other Priority Claim*" means any Claim against a Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

118.    "*Outside Date*" has the meaning set forth in the Asset Purchase Agreement.  All references herein to the "Outside Date" shall be deemed to include the "Extended Outside Date" to the extent the Outside Date is extended in accordance with Section 8.1(c) of the Asset Purchase Agreement.

119.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

120.    "*Petition Date*" means July 5, 2022.

121.    "*Plan*" means this joint chapter 11 plan and all exhibits, supplements, appendices, and schedules hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with Article X.A hereof, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

122.    "*Plan Administrator*" means the Person or Persons selected by the Committee, after consultation with the Debtors, subject to the approval of the Bankruptcy Court and identified in the Plan Supplement, to serve as the administrator(s) of the Wind-Down Debtor, and any successor thereto, appointed pursuant to the Plan Administrator Agreement.

123.    "*Plan Administrator Agreement*" means that certain agreement by and among the Debtors, the Committee, the Plan Administrator and the Wind-Down Debtor, which shall be included in the Plan Supplement in a form reasonably acceptable to the Committee.

124.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may thereafter be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Plan, the Bankruptcy Code, the Bankruptcy Rules, and applicable law), to be Filed by the Debtors no later than seven days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court, and additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.  The Plan Supplement may include the following, as applicable:  (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Retained Causes of Action; (c) the Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases; (d) the Customer Onboarding Protocol; (e) the Restructuring Transactions Memorandum; (f) the Plan Administrator Agreement; (g) the Employee Transition Plan; and (h) any additional documents necessary to effectuate or that is contemplated by the Plan, including any compensation program for any of the Debtors' employees to be established as contemplated in the Plan and the Definitive Documents to facilitate the transfer of Acquired Assets pursuant to the Asset Purchase Agreement and the wind-down of the Debtors' Estates; *provided* that the Schedule of Retained Causes of Action shall be filed no later than 14 days before the Voting Deadline.  The Plan Supplement (and the contents thereof) shall be (x) subject to Purchaser's consent rights solely to the extent

set forth under the Asset Purchase Agreement (and shall otherwise be consistent with the Asset Purchase Agreement) and (y) reasonably acceptable to the Committee.

125.    "*Priority Tax Claim*" means any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

126.    "*Pro Rata*" means the proportion that (i) an Allowed Claim or an Allowed Interest in a particular Class bears to (ii) the aggregate amount of Allowed Claims or Allowed Interests in that Class and, solely with respect to Claims in Classes 3 and 4(a), the proportion that an Allowed Claim in either such Class bears to the aggregate amount of Allowed Claims in Classes 3 and 4(a) in the aggregate, unless otherwise indicated.   For purposes of calculating Pro Rata distributions if the Sale Transaction is consummated by the Outside Date, the Pro Rata shares of all Holders of Allowed Claims or Allowed Interests shall be calculated taking into account the Acquired Coins Value of the Net Owed Coins distributed to each of the Account Holders.

127.    "*Professional*" means an Entity: (a) employed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

128.    "*Professional Fee Claim*" means any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

129.    "*Professional Fee Escrow Account*" means an escrow account funded by the Debtors with Cash no later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

130.    "*Professional Fee Escrow Amount*" means the aggregate amount of quarterly U.S. Trustee fees, Professional Fee Claims, and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, which shall be estimated pursuant to the method set forth in Article II.B of the Plan.

131.    "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

132.    "*Proof of Interest*" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

133.    "*Purchase Price Cash*" means the Cash paid by the Purchaser to OpCo pursuant to the Asset Purchase Agreement.

134.    "*Purchaser*" means Binance US.

135.    "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

136. "*Related Party*" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

137. "*Released Parties*" means, collectively, in each case solely in its capacity as such: (a) the Debtors; (b) the Committee, and each of the members thereof; (c) each of the Released Professionals; (d) Purchaser and each of its Related Parties; and (e) each of the Released Voyager Employees (subject to the limitations contained in Article IV.F and Article IV.G of the Plan); *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Released Parties" under the Plan.

138. "*Released Professionals*" means the following professionals retained by the Debtors, the Committee, or the Purchaser (as applicable): (i) Kirkland & Ellis LLP; (ii) Moelis & Company LLC; (iii) Berkeley Research Group, LLC; (iv) Bankruptcy Management Solutions, Inc. d/b/a Stretto; (v) Quinn Emanuel Urquhart & Sullivan LLP; (vi) Deloitte Tax LLP; (vii) Deloitte & Touche LLP; (viii) ArentFox Schiff LLP; (ix) Katten Muchin Rosenman LLP; (x) Fasken Martineau DuMoulin LLP; (xi) Campbells Legal (BVI); (xii) McDermott Will & Emery LLP; (xiii) FTI Consulting, Inc.; (xiv) Epiq Corporate Restructuring, LLC; (xv) Cassels, Brock & Blackwell LLP; (xvi) Paul Hastings LLP; (xvii) Harney Westwood & Riegels LP (BVI); (xviii) Day Pitney LLP (solely in their capacity as counsel to the Debtors); (xix) Jenner & Block LLP; (xx) Seyfarth Shaw LLP; (xxi) Alvarez & Marsal Canada Inc.; (xxii) Blake, Cassels & Graydon LLP; (xxiii) Jaffe Raitt Heuer & Weiss; (xxiv) Latham & Watkins LLP; (xxv) Lowenstein Sandler LLP; (xxvi) Kramer Levin LLP; and (xxvii) Acura Law Firm; *provided* that if the Asset Purchase Agreement is terminated, Latham & Watkins LLP shall not be a "Released Professional" under the Plan.

139. "*Released Voyager Employees*" means the following directors, officers, and members of senior management of the Debtors serving in such capacity on or after the Petition Date whose conduct was reviewed as part of the Special Committee Investigation: Jennifer Ackert, David Brill, Brian Brooks, David Brosgol, Jonathan Brosnahan, Dan Constantino, Stephen Ehrlich, Philip Eytan, Rakesh Gidwani, Gerard Hanshe, Marshall Jensen, Pam Kramer, Manisha Lalwani, Brian Nistler, Ashwin Prithipaul, Evan Psaropoulos, Brian Silard, Glen Stevens, Krisztian Toth, and Ryan Whooley (subject to the limitations contained in Article IV.F and Article IV.G of the Plan).

140. "*Releasing Parties*" means, collectively, in each case solely in its capacity as such: (a) the Debtors; (b) the Committee, and each of the members thereof; (c) each of the Released Professionals; (d) each of the Released Voyager Employees; (e) Purchaser and each of its Related Parties to the extent Purchaser is able to bind such Related Parties; (f) all Holders of Claims that vote to accept the Plan and affirmatively opt into the releases provided by the Plan; (g) all Holders of Claims that vote to reject the Plan and affirmatively opt into the releases provided by the Plan; and (h) all Holders of Claims or Interests that abstain from voting (or are otherwise not entitled to vote) on the Plan and affirmatively opt into the releases provided by the Plan; *provided* that if the Asset Purchase Agreement is terminated, Purchaser and each of its Related Parties shall not be "Releasing Parties" under the Plan.

141. "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, reorganizations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Committee jointly

determine to be necessary to implement the transactions described in this Plan, as described in more detail in Article IV.B herein and the Restructuring Transactions Memorandum.

142.     "*Restructuring Transactions Memorandum*" means that certain memorandum as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the Restructuring Transactions, the form of which shall be included in the Plan Supplement, and which shall be in a form reasonably acceptable to the Committee.

143.     "*Robertson Class Action*" means that certain putative class action litigation filed in the United States District Court for the Southern District of Florida, captioned *Robertson, et al. v. Cuban, et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022).

144.     "*Sale Transaction*" means the sale of certain of the Debtors' assets and all other transactions pursuant to the Asset Purchase Agreement.

145.     "*Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance acceptable to the Purchaser and in all respects consistent with the terms of the Asset Purchase Agreement, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors and assigned to the Purchaser pursuant to the Plan and Asset Purchase Agreement, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Debtor, as applicable, in accordance with the Plan.

146.     "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means a schedule that may be Filed as part of the Plan Supplement, which shall be in form and substance reasonably acceptable to the Committee, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or Wind-Down Debtor, as applicable, in accordance with the Plan.

147.     "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, settled, compromised, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors and/or the Wind-Down Debtor, which shall be included in the Plan Supplement.  For the avoidance of doubt, any failure to specifically list any Causes of Action on the Schedule of Retained Causes of Action shall not be deemed a waiver or admission that any such Cause of Action does not constitute Vested Causes of Action.

148.     "*Schedules*" means, collectively, the schedules of assets and liabilities, Schedule of Assumed Executory Contracts and Unexpired Leases, Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may have been or may be amended, modified, or supplemented from time to time.

149.     "*SEC*" means the United States Securities and Exchange Commission.

150.     "*Section 510(b) Claim*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code.

151.     "*Secured*" means, when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's

interest in such property or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a secured Claim.

152.    "*Secured Tax Claim*" means any Secured Claim against a Debtor that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

153.    "*Securities Act*" means the U.S. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

154.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

155.    "*Side-A Policy*" means the Cornerstone A-Side Management Liability Policy, ELU184179-22, issued by XL Specialty Insurance Company, for the July 1, 2022 to July 1, 2023 period.

156.    "*Solicitation Materials*" means all solicitation materials with respect to the Plan.

157.    "*Special Committee*" means the special committee established at OpCo, comprised of two independent directors, to conduct the Special Committee Investigation.

158.    "*Special Committee Investigation*" means that certain investigation undertaken by the Special Committee into certain historical transactions, as more fully described in the Disclosure Statement.

159.    "*Supported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

160.    "*TopCo*" means Voyager Digital Ltd., a Canadian corporation that is publicly traded on the Toronto Stock Exchange.

161.    "*TopCo General Unsecured Claim*" means any Claim against TopCo that is not Secured and is not: (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a Secured Tax Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Professional Fee Claim; (g) an Alameda Loan Facility Claim; (h) an Intercompany Claim; or (i) a Section 510(b) Claim.  For the avoidance of doubt, all (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation, other than 510(b) Claims, against TopCo are TopCo General Unsecured Claims.

162.    "*Transferred Creditors*" means Account Holders and Holders of Allowed OpCo General Unsecured Claims who have completed all documentation and "KYC" processes reasonably required by Purchaser in the ordinary course of Purchaser's business with respect to similarly situated clients and who have opened a Binance US Account as of the date that is three (3) months following the later of the Closing Date (as defined in the Asset Purchase Agreement) or such later date as may be specified in the Customer Onboarding Protocol, and the successors and assigns of such Holders.

163.    "*Transferred Cryptocurrency Value*" means the aggregate VWAP of any Cryptocurrency that is the subject of an Additional Bankruptcy Distribution as of the date that is two Business Days prior to such Additional Bankruptcy Distribution.

164.    "*U.S. Trustee*" means the Office of the United States Trustee for Region 2.

165.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that, after the expiration of six months after the Effective Date, has not: (a) accepted a distribution, (b) given notice to the Wind-Down Debtor of an intent to accept a particular distribution, (c) responded to the Debtors' or Wind-Down Debtor's requests for information necessary to facilitate a particular distribution, or (d) taken any other action necessary to facilitate such distribution.

166.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

167.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

168.    "*Unsupported Jurisdiction*" has the meaning ascribed to it in the Asset Purchase Agreement.

169.    "*Unsupported Jurisdiction Approval*" has the meaning ascribed to it in the Asset Purchase Agreement.

170.    "*Vested Causes of Action*" means the Causes of Action vesting in the Wind-Down Debtor pursuant to Article IV.L of the Plan, including, but not limited to, those Causes of Action enumerated on the Schedule of Retained Causes of Action, which shall be included in the Plan Supplement and in all respects consistent with the terms of the Asset Purchase Agreement.

171.    "*VGX*" means Voyager Token, that certain Cryptocurrency issued by the Debtors.

172.    "*Voting Deadline*" means February 22, 2023.

173.    "*Voyager*" means Voyager Digital Ltd. and its direct and indirect Affiliates.

174.    "*VWAP*" means, with respect to any type of Cryptocurrency and as of any date of determination, an amount equal to the volume weighted average price in U.S. dollars for such type of Cryptocurrency for the consecutive 24-hour period immediately prior to 8:00 a.m. New York Time on such date of determination, as reported on https://coinmarketcap.com.

175.    "*Wind-Down Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, and as described in Article IV.H to, among other things, effectuate the wind-down of the Debtors and the Wind-Down Debtor, commence, litigate and settle the Vested Causes of Action that are not released, waived, settled, compromised, or transferred under the Plan and make distributions pursuant to the terms of the Plan and the Plan Administrator Agreement; *provided* that, for the avoidance of doubt, the Wind-Down Debtor shall not conduct any business operations or continue the Debtors' business operations after the Effective Date.

176.    "*Wind-Down Debtor Assets*" means any assets of the Debtors transferred to, and vesting in, the Wind-Down Debtor pursuant to the Plan Administrator Agreement, which, in the event the Sale Transaction is consummated, shall exclude the Acquired Assets, and which shall include, without limitation but only to the extent the following are not Acquired Assets, (a) the Wind-Down Reserve, (b) the Net-Owed Coins to be distributed to Account Holders in Supported Jurisdictions until such Account Holders complete the Purchaser's onboarding requirements in accordance with the Asset Purchase Agreement, (c) the Net-Owed Coins to be distributed to Account Holders in Unsupported Jurisdictions to the extent the Purchaser has not obtained the applicable Unsupported Jurisdiction Approval in accordance with Section 6.12 of the

16

Asset Purchase Agreement, (d) any distributions to Account Holders or Holders of OpCo General Unsecured Claims that are returned to the Wind-Down Debtor pursuant to Section 6.12(e) of the Asset Purchase Agreement, (e) 3AC Claims and 3AC Recovery, (f) FTX Claims and FTX Recovery, (g) Alameda Claims and Alameda Recovery, (h) the Non-Released D&O Claims, and (i) the Vested Causes of Action.

177.    "*Wind-Down Debtor Beneficiaries*" means the Holders of Allowed Claims or Allowed Interests that are entitled to receive distributions pursuant to the terms of the Plan, whether or not such Claims or Interests are Allowed as of the Effective Date.

178.    "*Wind-Down Debtor Expenses*" means all actual and necessary costs and expenses incurred by the Wind-Down Debtor or Plan Administrator in connection with carrying out the obligations of the Wind-Down Debtor pursuant to the terms of the Plan and the Plan Administrator Agreement.

179.    "*Wind-Down Debtor Oversight Committee*" means the oversight committee tasked with overseeing the Wind-Down Debtor in accordance with the Plan and the Plan Administrator Agreement.

180.    "*Wind-Down Budget*" means the budget to fund the Wind-Down Debtor, which will be included in the Plan Supplement.

181.    "*Wind-Down Reserve*" means the amount set forth in the Wind-Down Budget to fund the Wind-Down Debtor.

## B.    Rules of Interpretation

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (3) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (4) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed, shall mean that document, schedule, or exhibit, as it may thereafter have been or may thereafter be validly amended, amended and restated, supplemented, or otherwise modified; (5) unless otherwise specified, any reference to an Entity as a Holder of a Claim or Interest, includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (7) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) unless otherwise specified, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases; (14) any effectuating provisions may be interpreted by the Debtors or the Wind-Down Debtor in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (15) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably

practicable thereafter; (16) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (18) the use of "include" or "including" is without limitation unless otherwise stated.

### C.    Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

### D.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control); *provided* that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Wind-Down Debtor, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

### E.    Reference to Monetary Figures

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

### F.    Reference to the Debtors or the Wind-Down Debtor

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Wind-Down Debtor mean the Debtors and the Wind-Down Debtor, as applicable, to the extent the context requires.

### G.    Nonconsolidated Plan

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

## ARTICLE II.

## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

## A.    Administrative Claims

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), unless previously Filed, requests for payment of Allowed Administrative Claims (other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code) must be Filed and served on the Wind-Down Debtor pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied as of the Effective Date without the need for any objection from the Wind-Down Debtor or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  Objections to such requests, if any, must be Filed and served on the Wind-Down Debtor and the requesting party by the Claims Objection Bar Date for Administrative Claims. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive an amount of Cash equal to the amount of the unpaid or unsatisfied portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down Debtor, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.  Any Cryptocurrency inadvertently deposited to the Debtors' account(s) after the Petition Date shall be returned to the sender in full.

Objections to requests for payment of such Administrative Claims, if any, must be Filed with the Bankruptcy Court and served on the Wind-Down Debtor and the requesting Holder no later than the Claims Objection Bar Date for Administrative Claims.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

## B.    Professional Fee Claims

1.    <u>Final Fee Applications and Payment of Professional Fee Claims</u>

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than sixty (60) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and Bankruptcy

Rules.  The Wind-Down Debtor shall pay Professional Fee Claims in Cash to such Professionals in the amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Debtor's obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

   2.   <u>Professional Fee Escrow Account</u>

   No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and the U.S. Trustee and for no other Entities until all quarterly U.S. Trustee fees and all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the U.S. Trustee or to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Wind-Down Debtor.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, and all U.S. Trustee quarterly fees plus statutory interest, if any, have been paid in full, any remaining funds held in the Professional Fee Escrow Account shall be turned over to the Wind-Down Debtor without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

   3.   <u>Professional Fee Escrow Amount</u>

   The Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date.  For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.  The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided* that the Wind-Down Debtor shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

   4.   <u>Post-Effective Date Fees and Expenses</u>

   Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors and/or the Wind-Down Debtor, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Wind-Down Debtor.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtor may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

For the avoidance of doubt, no Administrative Claims, Professional Fee Claims, or any other post-confirmation fees and expenses shall be paid prior to payment of any quarterly fees due and outstanding to the U.S. Trustee.

### C.     Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.

### CLASSIFICATION, TREATMENT,
### AND VOTING OF CLAIMS AND INTERESTS

### A.     Classification of Claims and Interests

Except for the Claims addressed in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

### B.     Summary of Classification

A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is set forth in the following chart.  The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below applies separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.E hereof.  Voting tabulations for recording acceptances or rejections of the Plan will be conducted on a Debtor-by-Debtor basis as set forth above.[1]

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

---

[1]    The Debtors reserve the right to separately classify Claims or Interests to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

22-10943-mew Doc 1159-1 Filed 03/09/23 Entered 03/09/23 12:15:16 Exhibit Page 27 of 75

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 3 | Account Holder Claims | Impaired | Entitled to Vote |
| 4A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4B | HoldCo General Unsecured Claims | Impaired | Entitled to Vote |
| 4C | TopCo General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Alameda Loan Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**C. Treatment of Classes of Claims and Interests**

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or Wind-Down Debtor, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable. In no event shall any Holder of a Claim receive more than such Holder's Allowed amount on account of such Claim.

1. Class 1 —Secured Tax Claims

(a) *Classification*: Class 1 consists of all Secured Tax Claims.

(b) *Treatment*: Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the Wind-Down Debtor, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired.

(c) *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Secured Tax Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Secured Tax Claims are not entitled to vote to accept or reject the Plan.

2.      Class 2 — Other Priority Claims

    (a)      *Classification*:  Class 2 consists of all Other Priority Claims.

    (b)      *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

    (c)      *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.      Class 3 — Account Holder Claims

    (a)      *Classification*:  Class 3 consists of all Account Holder Claims.

    (b)      *Allowance*: Account Holder Claims shall be conclusively Allowed in the amount listed on OpCos's *Amended Schedules of Assets and Liabilities* (Case No. 22-10945) [Docket No. 18]; *provided* that the rights of any Holder of an Account Holder Claim to object to the scheduled amount shall be preserved.  To the extent an Account Holder Claim is Allowed in a greater amount than the scheduled amount of such Account Holder Claim, such Holder shall be entitled to a subsequent distribution such that it will receive its Pro Rata share of recoveries to Holders of Allowed Account Holder Claims.  Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

    (c)      *Treatment*:  Each Holder of an Allowed Account Holder Claim will receive in exchange for such Allowed Account Holder Claim:

        (i)      If the Sale Transaction is consummated by the Outside Date:

            A.      its Net Owed Coins, as provided in and subject to the requirements of Sections 6.10 and 6.12 of the Asset Purchase Agreement and Article VI.C.8 of the Plan; *provided* that (i) for Account Holders in Supported Jurisdictions who do not complete the Purchaser's onboarding requirements within three (3) months following the Closing Date, (ii) Account Holders in Unsupported Jurisdictions who make a written election, in accordance with a notice to be issued by the Debtors and within three (3) months following the later of the Closing Date or the date which the terms and conditions for the Binance.US Platform are made available to such Account Holders to accept, to receive value in Cash on account of the Net Owed Coins allocable to such Account Holders, and (iii) Account Holders in Unsupported Jurisdictions who do not make the election in the prior clause only to the extent that the Purchaser does not obtain the Unsupported Jurisdiction Approval for the jurisdiction in

which such Account Holder resides within 6 months following the Closing Date (as defined in the Asset Purchase Agreement), such Account Holders shall receive, after expiration of such applicable time period (*i.e.*, (a) three (3) months following the Closing Date for the Account Holders described in subsection (i) of this paragraph, (b) three (3) months following the later of the Closing Date or the date which the terms and conditions for the Binance.US Platform are made available to such Account Holder to accept for the Account Holders described in subsection (ii) of this paragraph, and (c) six (6) months for the Account Holders described in subsection (iii) of this paragraph), value in Cash at which such Net Owed Coins allocable to such Account Holder are liquidated;

B.   its Pro Rata share of any Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

C.   its Pro Rata share of Distributable OpCo Cash; and

D.   to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo;

*provided* that distributions made to any Account Holder pursuant to clauses (B), (C), and (D) above shall be made after taking into account the Acquired Coins Value of the Net Owed Coins or the value in Cash at which such Net Owed Coins are liquidated, as applicable, previously allocated to such Account Holder; or

(ii)   If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

A.   its Pro Rata share of Distributable OpCo Cash;

B.   its Pro Rata share of Distributable Cryptocurrency, which such Account Holder shall be able to withdraw in kind, alternative Cryptocurrency, and/or Cash for a period of thirty (30) days after the Effective Date through the Voyager platform or, if elected by Seller pursuant to Section 6.12(d) of the Asset Purchase Agreement, through the Binance.US Platform; *provided* that if the applicable transfer is made through the Voyager platform and such Account Holder does not withdraw its Pro Rata share of Distributable Cryptocurrency available to such Account Holder from the Voyager platform within such

thirty (30) day period, such Account Holder will receive Cash in the equivalent value to its Pro Rata share of Distributable Cryptocurrency; and

C.    to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo.

(d)    *Voting:* Class 3 is Impaired under the Plan. Holders of Allowed Account Holder Claims are entitled to vote to accept or reject the Plan.

4.    <u>Class 4A — OpCo General Unsecured Claims</u>

(a)    *Classification*: Class 4A consists of all OpCo General Unsecured Claims.

(b)    *Treatment*: Each Holder of an Allowed OpCo General Unsecured Claim will receive in exchange for such Allowed OpCo General Unsecured Claim:

(i)    If the Sale Transaction is consummated by the Outside Date:

A.    its Pro Rata share of Distributable Cryptocurrency in Cash;

B.    its Pro Rata share of Additional Bankruptcy Distributions, in Cryptocurrency or Cash as provided in and subject to the requirements of Sections 6.12 and 6.14 of the Asset Purchase Agreement;

C.    its Pro Rata share of Distributable OpCo Cash; and

D.    to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo; or

(ii)    If the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated:

A.    its Pro Rata share of Distributable Cryptocurrency in Cash;

B.    its Pro Rata share of Distributable OpCo Cash; and

    C.   to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to OpCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to OpCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at OpCo.

(c)   *Voting*:  Class 4A is Impaired under the Plan.  Holders of Allowed OpCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.   <u>Class 4B — HoldCo General Unsecured Claims</u>

(a)   *Classification*:  Class 4B consists of all HoldCo General Unsecured Claims.

(b)   *Treatment*:  Each Holder of an Allowed HoldCo General Unsecured Claim will receive in exchange for such Allowed HoldCo General Unsecured Claim:

   (i)   its Pro Rata share of Distributable HoldCo Cash; and

   (ii)   to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to HoldCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to HoldCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at HoldCo.

(c)   *Voting*:  Class 4B is Impaired under the Plan.  Holders of Allowed HoldCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

6.   <u>Class 4C — TopCo General Unsecured Claims</u>

(a)   *Classification*:  Class 4C consists of all TopCo General Unsecured Claims.

(b)   *Treatment*:  Each Holder of an Allowed TopCo General Unsecured Claim will receive in exchange for such Allowed TopCo General Unsecured Claim:

   (i)   its Pro Rata share of Distributable TopCo Cash; and

   (ii)   to effectuate distributions from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable at TopCo shall only be made following payment in full of, or reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims at TopCo.

(c)   *Voting*:  Class 4C is Impaired under the Plan.  Holders of Allowed TopCo General Unsecured Claims are entitled to vote to accept or reject the Plan.

26

7. <u>Class 5 — Alameda Loan Facility Claims</u>

(a) *Classification*: Class 5 consists of all Alameda Loan Facility Claims.

(b) *Treatment*: If the FTX Settlement becomes effective, each Holder of an Allowed Alameda Loan Facility Claim shall, at the election of the Debtors with the consent of the Committee, in their sole discretion, following written notice to counsel to FTX, Alameda and to the official committee of unsecured creditors in the FTX Bankruptcy Proceeding of such election, which written notice shall be given no later than the date that is thirty (30) days after the Confirmation Hearing, (a) withdraw its Alameda Loan Facility Claims in their entirety, with prejudice to FTX or any other party reasserting such claims, or (b) contribute the Alameda Loan Facility Claims to OpCo. If the FTX Settlement does not become effective, the Alameda Loan Facility Claims shall be subordinated to all Allowed Claims at OpCo, HoldCo, and TopCo, including, but not limited to, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, Allowed Account Holder Claims, Allowed OpCo General Unsecured Claims, Allowed HoldCo General Unsecured Claims, and Allowed TopCo General Unsecured Claims; *provided, however*, if the Bankruptcy Court denies subordination of the Alameda Loan Facility Claims, then such Alameda Loan Facility Claims shall be *pari passu* with General Unsecured Claims at the applicable Debtor entity.

(c) *Voting*: Class 5 is Impaired under the Plan. Holders of Allowed Alameda Loan Facility Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Alameda Loan Facility Claims are not entitled to vote to accept or reject the Plan.

8. <u>Class 6 — Section 510(b) Claims</u>

(a) *Classification*: Class 6 consists of all Section 510(b) Claims against TopCo.

(b) *Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim against TopCo, if any such Section 510(b) Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

(c) *Treatment*: Each Holder of Allowed Section 510(b) Claims against TopCo will receive, to effectuate distributions, if applicable, from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to TopCo; *provided* that any distributions on account of the Wind-Down Debtor Assets attributable to TopCo shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims at TopCo.

(d) *Voting*: Class 6 is Impaired under the Plan. Holders (if any) of Allowed Section 510(b) Claims against TopCo are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders (if any) of Allowed Section 510(b) Claims against TopCo are not entitled to vote to accept or reject the Plan.

9.      <u>Class 7 — Intercompany Claims</u>

     (a)      *Classification*: Class 7 consists of all Intercompany Claims.

     (b)      *Treatment*: Each Intercompany Claim shall receive the treatment for such Intercompany Claim as determined by the Bankruptcy Court.

     (c)      *Voting*: Holders of Intercompany Claims are either Unimpaired or Impaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

10.      <u>Class 8 — Intercompany Interests</u>

     (a)      *Classification*: Class 8 consists of all Intercompany Interests.

     (b)      *Treatment*: On the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated in accordance with Article III.G of the Plan or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum.

     (c)      *Voting*: Holders of Intercompany Interests are either Unimpaired or Impaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

11.      <u>Class 9 — Existing Equity Interests</u>

     (a)      *Classification*: Class 9 consists of all Existing Equity Interests.

     (b)      *Treatment*: Each Holder of Existing Equity Interests will receive, to effectuate distributions, if applicable, from the Wind-Down Debtor, its Pro Rata share of the Wind-Down Debtor Assets attributable to TopCo; *provided* that any distributions on account of Wind-Down Debtor Assets attributable at TopCo shall only be made following payment in full of, or reserve for, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Priority Claims, and Allowed TopCo General Unsecured Claims at TopCo.

     (c)      *Voting*: Class 9 is Impaired under the Plan. Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

**D.      Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Wind-Down Debtor's rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**F.    Subordinated Claims**

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims against and Allowed Interests in the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Debtor reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**G.    Intercompany Interests**

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure given the existing intercompany systems connecting the Debtors and their Affiliates, and in exchange for the Debtors' and Wind-Down Debtor's agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

**H.    Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code is satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims or Interests.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

# ARTICLE IV.

# PROVISIONS FOR IMPLEMENTATION OF THE PLAN

**A.      General Settlement of Claims and Interests**

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

**B.      Restructuring Transactions**

On or before the Effective Date, the applicable Debtors will take any action as may be necessary or advisable to effectuate the Restructuring Transactions described in the Plan, the Restructuring Transactions Memorandum, and the Customer Onboarding Protocol, including:  (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) the transfer or distribution of any Cryptocurrency or Cash pursuant to the Asset Purchase Agreement, or the Liquidation Procedures, as applicable; (5) the execution and delivery of the Plan Administrator Agreement; (6) any transactions necessary or appropriate to form or convert into the Wind-Down Debtor; (7) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (8) all transactions necessary to provide for the purchase of the Acquired Assets by Purchaser under the Asset Purchase Agreement; and (9) all other actions that the applicable Entities determine to be necessary or appropriate, or that are reasonably requested by the Purchaser in accordance with the Asset Purchase Agreement, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

**C.      The Sale Transaction**

If the Sale Transaction is consummated by the Outside Date, pursuant to the terms of the Asset Purchase Agreement, then the following terms shall govern:

On or prior to the Effective Date, the Debtors shall have consummated the Sale Transaction, and, among other things, the Acquired Assets and Assumed Liabilities shall have transferred to the Purchaser free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and the Purchaser shall pay to the Debtors or Holders of Account Holder Claims and Holders of OpCo General Unsecured Claims, as applicable, the proceeds from the Sale Transaction, as and to the extent provided for in the Asset Purchase Agreement, and this Plan. The Confirmation Order shall authorize the Debtors, the Purchaser, and the Wind-Down Debtor, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

The Debtors and Purchaser shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Sale Transaction pursuant to the terms of the Asset Purchase Agreement the Customer Onboarding Protocol, and this Plan. The Debtors shall be authorized to sell any Cryptocurrency to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Priority Claims. On and after the Effective Date, except as otherwise provided in the Plan and the Plan Administrator Agreement, the Wind-Down Debtor, or the Purchaser, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided*, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

Notwithstanding anything to the contrary in the Asset Purchase Agreement, this Plan, or any Definitive Document, the Debtors, each Account Holder or Holder of an Allowed OpCo General Unsecured Claim, as applicable, shall retain all right, title, and interest in and to any Cryptocurrency allocated to such Account Holder or Holder of an Allowed OpCo General Unsecured Claim pursuant to this Plan through and including such time as such Cryptocurrency is returned or distributed to the Debtors or such Account Holder or Holder of an Allowed OpCo General Unsecured Claim, as applicable, hereunder, and such Cryptocurrency shall be held by Purchaser solely in a custodial capacity in trust and solely for the benefit of the Debtors or Account Holder or Holder of an Allowed OpCo General Unsecured Claim, as applicable, thereafter.

Notwithstanding anything contained in this Plan and any Definitive Documents, if the Sale Transaction is not consummated by the Outside Date or the Asset Purchase Agreement is terminated, all provisions contained in this Plan and the Definitive Documents governing the Sale Transaction shall have no further force and effect, and the provisions governing the Liquidation Transaction shall govern. The rights and remedies of the Seller and Purchaser under the Asset Purchase Agreement and any related orders of the Bankruptcy Court shall be expressly preserved.

**D.     The Liquidation Transaction**

If the Sale Transaction is not consummated by the Outside Date, pursuant to the Asset Purchase Agreement, then the following terms shall govern:

1.     *The Liquidation Transaction*

On or after the Outside Date, the Debtors will pursue the Liquidation Transaction in accordance with the Liquidation Procedures. Pursuant to the Liquidation Transaction, the Debtors, the Wind-Down Debtor, or the Plan Administrator, as applicable, will distribute certain of the Cryptocurrency in-kind to Holders of Account Holder Claims in accordance with Article III.C of the Plan, transfer all Wind-Down

Debtor Assets to the Wind-Down Debtor, liquidate certain of the Cryptocurrency, distribute Cash to Holders of Claims, wind down and dissolve the Debtors, and pursue final administration of the Debtors' Estates pursuant to the Bankruptcy Code.

The Debtors, or the Wind-Down Debtor, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Liquidation Transaction pursuant to this Plan. On or before the date that is twenty-one days prior to the anticipated commencement of the Liquidation Transaction, the Debtors, or the Wind-Down Debtor, as applicable, shall file the Liquidation Procedures with the Bankruptcy Court. Parties in interest shall have ten days to object to the Liquidation Procedures, and if no objections are timely filed, the Liquidation Procedures shall be approved. In the event of a timely objection, the Bankruptcy Court shall adjudicate any objection to the Liquidation Procedures.

On and after the Effective Date, except as otherwise provided in the Plan, the Plan Administrator Agreement, and the Liquidation Procedures, the Debtors or the Wind-Down Debtor, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided*, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

2.    *Cryptocurrency Rebalancing*

Prior to the Effective Date the Debtors shall, in consultation with the Committee, be authorized to rebalance their Cryptocurrency portfolio to ensure that the Debtors can effectuate *pro rata* in-kind distributions of the Distributable Cryptocurrency according to Article III.C.3(c) of this Plan, *provided* that such rebalancing shall be in accordance with the Asset Purchase Agreement (if the Asset Purchase Agreement has not been terminated). The Debtors may effectuate such rebalancing by (i) selling such Cryptocurrency that cannot be distributed to Account Holders, (ii) purchasing Cryptocurrency supported by Voyager's or Binance.US Platform (as provided by the Asset Purchase Agreement) that shall be distributed to Account Holders, and (iii) engaging in any other transaction, including the execution of trades of Cryptocurrency, necessary or appropriate to effectuate distributions of the Distributable Cryptocurrency to Holders of Allowed Account Holder Claims.

**E.    Employee Transition Plan**

The Debtors shall be authorized to implement the Employee Transition Plan, the terms of which shall be reasonably acceptable to Purchaser and the Committee and included in the Plan Supplement. The Employee Transition Plan shall help ensure that employees are available to provide transition services to the Debtors and/or the Wind-Down Debtor to effectuate the Sale Transaction and to wind down the Debtors' Estates.

**F.    Non-Released D&O Claims**

Any Claims or Causes of Action held by the Debtors or their respective estates against the Debtors' CEO and/or CCO (regardless of any fiduciary capacity in which such individuals were acting) that are expressly related to approval of the 3AC Loan are not released pursuant to the Plan (collectively, the "Non-Released D&O Claims"), and shall be assigned and transferred to the Wind-Down Debtor to be pursued, settled, or resolved by the Wind-Down Debtor in accordance with the terms of Article IV.G of this Plan and subject to the Wind-Down Budget. Any claims against the D&O Carriers that the Debtors' insurance transactions within the 90 days prior to the Petition Date are avoidable under the Bankruptcy Code, applicable state law, or both (the "Non-Released Insurance Claims") shall be assigned and transferred to

32

the Wind-Down Debtor to be pursued, settled, or resolved solely by the Wind-Down Debtor in accordance with the terms of Article IV.G of this Plan. The Wind-Down Debtor shall be a successor to the Debtors' rights, title, and interest in any Non-Released D&O Claims and Non-Released Insurance Claims, and the Wind-Down Debtor shall have standing to pursue the Non-Released D&O Claims and the Non-Released Insurance Claims in accordance with the terms of Article IV.G of this Plan; *provided* that: (i) any recovery by the Wind-Down Debtor (and the beneficiaries thereof) on account of any Non-Released D&O Claim, including in each case by way of settlement or judgment, shall be satisfied solely by and to the extent of the proceeds of the Debtors' available D&O Liability Insurance Policies (and/or from the D&O Carriers directly) after payment from such D&O Liability Insurance Policies of any and all covered costs and expenses incurred in connection with the defense of the Non-Released D&O Claims; (ii) any party, including any trustee or any beneficiary of the Wind-Down Debtor, seeking to execute, garnish, or otherwise attempt to collect on any settlement of or judgment in the Non-Released D&O Claims shall do so solely upon available insurance coverage from the Debtors' available D&O Liability Insurance Policies; and (iii) no party shall (a) record any judgment against the CEO or CCO, or (b) otherwise attempt to collect, directly or indirectly, from the personal assets of the CEO or CCO with respect to the Non-Released D&O Claims. For the avoidance of doubt, this provision does not enjoin, limit, or impair direct claims held by third parties against the Debtors' CEO or CCO (if any) other than any direct claims held by Holders of Claims or Interests that opt into the third-party release in Article VIII.B of this Plan. Only upon the occurrence of the earlier of (x) a release being given as part of any later settlement of the Non-Released D&O Claims; (y) final resolution of any coverage claims asserted against the Debtors' available D&O Liability Insurance Policies on account of the Non-Released D&O Claims; or (z) exhaustion of the available insurance coverage under the D&O Liability Insurance Policies, the Non-Released D&O Claims shall be released and discharged without the need for further action or Bankruptcy Court order. For the avoidance of doubt, any release of the Non-Released D&O Claims shall not become effective until one of the three conditions stated in the preceding sentence above has been met.

### G. The D&O Settlement

On the Effective Date, the terms of the D&O Settlement shall be effectuated as provided in this Article IV.G.

Pursuant to the D&O Settlement, CEO shall repay the $1,900,000 received from the Debtors on or around February 28, 2022, by paying the after-tax amount of such transfer (approximately $1,125,000) to OpCo in cash and assigning the right, if any, to any tax refund for the balance to the Wind-Down Debtor. CEO shall subordinate any Claims (including any indemnification claims asserted under this Art. IV.F) he holds against the Debtors until all other Holders of Claims are paid in full. CCO shall subordinate 50 percent of any Claims he holds other than indemnification claims (and 100% of any indemnification claims asserted under this Art. IV.F) against the Debtors until all other Holders of Claims are paid in full; *provided, however*, that in the event the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO, each as insureds, under the D&O Liability Insurance Policies agree: (i) not to draw down on the Side-A Policy; *provided, however*, that should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Debtor's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise) such officer shall be entitled to seek coverage under the Side-A Policy to the extent any such coverage remains; and (ii) not to object to any settlement by the Debtors or the Wind-Down Debtor of avoidance claims under the Side-A Policy, even if such settlement results in termination of benefits under the Side-A Policy. For the avoidance of doubt, this agreement is not intended to and shall not alter or amend each of the insureds' duties under the D&O Liability Insurance Policies. In the event that any insurer under the D&O Liability

33

Insurance Policies denies coverage for any reason, the Wind-Down Debtor shall have the right to bring a coverage claim against the insurer(s) in the name of the insured, the insureds shall reasonably cooperate with respect to any such claim, and the insured may participate at their election (and at their sole cost). For the avoidance of doubt, nothing contained in this Plan is intended as a waiver or release of the Debtors' and/or Wind-Down Debtor's right to assert any Non-Released D&O Claim, but rather limits such recovery in the manner set forth above.

CEO and CCO shall be entitled to receive their salary and benefits for as long as they work for the Debtors and/or the Wind-Down Debtor and retain the right to assert claims for advancement and indemnification up to the limits of any available coverage in the event any of the insurers that issued the Management Liability Policy, the Excess Policy, or the Side-A Policy denies coverage to CEO and/or CCO based upon or arising out of the lack of a formal claim for indemnification; *provided*, *however*, that any such indemnification or advancement claims shall be subordinated in full unless and until all other Holders of Claims are paid in full; *provided*, *further*, that in the event that any of the D&O Carriers deny coverage to CEO or CCO under the D&O Insurance Policies on account of such subordination of any indemnification claim, then any indemnification claims by CEO or CCO shall not be so subordinated, but may be filed as an OpCo General Unsecured Claim.

CEO and CCO shall subordinate any and all rights and entitlements under the Cornerstone A-Side Management Liability Insurance Policy to Voyager Digital Ltd., Policy Number ELU184179-22, to any recovery by the Debtors and/or the Wind-Down Debtor on account of the Debtors' and/or Wind-Down Debtor's claims for the avoidance of the premium paid for the policy. For the avoidance of doubt, should coverage continue to be available under the Side-A Policy following resolution of the Debtors' and/or the Wind-Down Debtor's claims for the avoidance of the premium paid for the policy (whether by judgment or settlement or otherwise), CEO and/or CCO shall be entitled to seek coverage under the Side-A Policy. CEO and CCO shall remain at, and continue performing the responsibilities of, their respective position(s) with the Debtors and assist with the Debtors' transition for at least 30 days from entry of the Confirmation Order; *provided* that CCO shall have no obligation to remain at his position with the Debtors beyond January 15, 2023 and the CEO shall have the right to pursue and engage in any employment opportunity, business venture, consulting arrangement, or investment that may become available; *provided*, *further*, that both the CEO and CCO shall be available to the Debtors and/or the Wind-Down Debtor for a maximum of five hours per month for the one year following the Effective Date.

In the event that the sworn financial disclosure statements under penalty of perjury provided to the Debtors, the Special Committee and the Committee by CEO and CCO are later determined at any time by Final Order of the Bankruptcy Court or other court of competent jurisdiction to be materially inaccurate, (a) the limitations on recovery by the Wind-Down Debtor under this Article IV.G shall no longer apply, (b) any and all release, exculpation and injunction provisions in Article VIII of this Plan with respect to CEO and/or CCO (as applicable) shall be deemed null and void, (c) all Releasing Parties' rights with respect to the CEO and/or CCO (as applicable) shall be fully intact and preserved, (d) amounts paid by CEO shall not be repaid by the Wind-Down Debtor, and (e) any applicable statute of limitations shall be deemed tolled from the Petition Date to the date of entry of the order referenced above. The Wind-Down Debtor, as successor to the Debtors, shall have standing to bring a motion seeking relief pursuant to this Article IV.G.

Entry of the Confirmation Order shall be deemed approval of the D&O Settlement and, to the extent not already approved by the Bankruptcy Court, the Debtors or the Wind-Down Debtor, as applicable, are authorized to negotiate, execute, and deliver those documents necessary or appropriate to effectuate the D&O Settlement, without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors, the Wind-Down Debtor, the Committee, and the Special Committee may deem to be necessary to effectuate the D&O Settlement.

H.    **The Wind-Down Debtor**

On the Effective Date, the Wind-Down Debtor shall be formed or converted into for the benefit of the Wind-Down Debtor Beneficiaries and each of the Debtors shall transfer the Wind-Down Debtor Assets for distribution in accordance with the terms of the Plan. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

1.    <u>Establishment of a Wind-Down Debtor</u>

Pursuant to the Plan Administrator Agreement, the Wind-Down Debtor will be established, formed, merged, or converted. The Wind-Down Debtor shall be the successor-in-interest to the Debtors, and the Wind-Down Debtor shall be a successor to the Debtors' rights, title, and interest to the Wind-Down Debtor Assets. The Wind-Down Debtor will conduct no business operations and will be charged with winding down the Debtors' Estates. The Wind-Down Debtor shall be managed by the Plan Administrator and shall be subject to the Wind-Down Debtor Oversight Committee. The Wind-Down Debtor shall be administered in accordance with the terms of the Plan Administrator Agreement and shall be subject to the Wind-Down Budget and the Non-Released D&O Claim Budget. For the avoidance of doubt, the Wind-Down Debtor shall not have any right or interest in any Cause of Action or Claim constituting an Acquired Asset. The Wind-Down Debtor shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Debtor Assets shall, subject to the Plan Administrator Agreement, be transferred to and vest in the Wind-Down Debtor. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Debtor specifically retains and reserves the right to assert, after the Effective Date, any and all of the Vested Causes of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including without limitation Article IV.F and Article IV.G.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Debtor and the Plan Administrator shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Plan Administrator Agreement, compromise or settle any Wind-Down Debtor Assets transferred to the Wind-Down Debtor. On and after the Effective Date, the Wind-Down Debtor and the Plan Administrator may, without further Bankruptcy Court approval, commence, litigate, and settle any Vested Causes of Action or Claims relating to any Wind-Down Debtor Assets transferred to the Wind-Down Debtor or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Debtor and the Plan Administrator on or after the Effective Date, except as otherwise expressly provided herein and in the Plan Administrator Agreement. All of the Wind-Down Debtor's activities shall be subject to the Wind-Down Budget and the Non-Released D&O Claim Budget. The Wind-Down Debtor shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

The Wind-Down Debtor shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors and the Committee, as applicable, in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Debtor Asset without the need for filing any motion for such relief. On the Effective Date, the Debtors and the Plan Administrator shall execute the Plan Administrator Agreement and shall have established the Wind-Down Debtor pursuant hereto. In the

event of any conflict between the terms of this Article IV.H and the terms of the Plan Administrator Agreement, the terms of the Plan Administrator Agreement shall control.

    2.    <u>Wind-Down Debtor Assets</u>

Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional Wind-Down Debtor Assets become available, the Debtors shall be deemed, subject to the Plan Administrator Agreement, to have automatically transferred to the applicable Wind-Down Debtor all of their right, title, and interest in and to all of the Wind-Down Debtor Assets, in accordance with section 1141 of the Bankruptcy Code. All such assets shall automatically vest in the Wind-Down Debtor free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Interests as set forth herein and the expenses of the Wind-Down Debtor as set forth herein and in the Plan Administrator Agreement. Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Debtor Assets or the Wind-Down Debtor.

    3.    <u>Treatment of Wind-Down Debtor for Federal Income Tax Purposes; No Successor-in-Interest</u>

The Wind-Down Debtor shall be established for the primary purpose of liquidating and distributing the Wind-Down Debtor Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind-Down Debtor. Accordingly, the Plan Administrator may, in an expeditious but orderly manner, liquidate the Wind-Down Debtor Assets, make timely distributions to the Wind-Down Debtor Beneficiaries and not unduly prolong its duration. The Wind-Down Debtor shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Wind-Down Debtor Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Wind-Down Debtor expressly for such purpose.

The Wind-Down Debtor is intended to qualify as a "grantor trust" for federal income tax purposes to the extent reasonably practicable, with the Wind-Down Debtor Beneficiaries treated as grantors and owners of the Wind-Down Debtor. However, with respect to any of the assets of the Wind-Down Debtor that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

    4.    <u>Appointment of Plan Administrator</u>

The Plan Administrator shall be selected by the Committee, in consultation with the Debtors, and shall be identified in the Plan Supplement. The appointment of the Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date. The Plan Administrator shall administer the distributions to the Wind-Down Debtor Beneficiaries and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Vested Causes of Action belonging to the Estates that are not released, waived, settled,

compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan, including Article IV.F and Article IV.G.

In accordance with the Plan Administrator Agreement, the Plan Administrator shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Debtor is dissolved in accordance with the Plan Administrator Agreement, and (ii) the date on which a Plan Administrator resigns, is terminated, or is otherwise unable to serve; *provided*, *however*, that, in the event that a Plan Administrator resigns, is terminated, or is otherwise unable to serve, the Wind-Down Debtor Oversight Committee shall appoint a successor to serve as a Plan Administrator in accordance with the Plan Administrator Agreement. If the Wind-Down Debtor Oversight Committee does not appoint a successor within the time periods specified in the Plan Administrator Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Debtor, shall approve a successor to serve as a Plan Administrator.

5.   <u>Responsibilities of Plan Administrator</u>

Responsibilities of the Plan Administrator shall be as identified in the Plan Administrator Agreement and shall include, but are not limited to:

(a)   implementing the Wind-Down Debtor, and making distributions contemplated by the Plan;

(b)   marshalling, marketing for sale, and winding down any of the Debtors' assets constituting Wind-Down Debtor Assets;

(c)   appointing an independent director at each Debtor to act as a fiduciary for such Debtor entity solely in connection with matters that may implicate actual or potential intra-Debtor conflicts of interests between the Plan Administrator and the applicable Debtor(s) or Wind-Down Debtor including (i) the Intercompany Claims; (ii) the Alameda Loan Facility Claims; (iii) the Signatory Governmental Claims (as defined in the Governmental Claimant Stipulation) asserted against TopCo; and (iv) any matter involving the transfer or allocation of value, claims, or costs between or among the Debtors, but only to the extent that such issues continue to implicate actual or potential intra-Debtor conflicts of interests between the Plan Administrator and the applicable Debtor(s) or Wind-Down Debtor;

(d)   overseeing the accounts of the Debtors and the Wind-Down Debtor and the wind down and dissolution of the Debtors and the Wind-Down Debtor, including effectuating the transactions described in the Restructuring Transactions Memorandum;

(e)   receiving, maintaining, conserving, supervising, prosecuting, collecting, settling, managing, investing, protecting, and where appropriate, causing the Wind-Down Debtor to abandon the Wind-Down Debtor Assets, including causing the Wind-Down Debtor to invest any moneys held as Wind-Down Debtor Assets;

(f)   opening and maintaining bank accounts on behalf of or in the name of the Debtors or the Wind-Down Debtor, including, in the Plan Administrator's discretion, separating bank accounts for each of the Debtors;

(g)    entering into any agreement or executing any document or instrument required by or consistent with the Plan, the Confirmation Order, or the Plan Administrator Agreement, and to perform all obligations thereunder;

(h)    collecting and liquidating all Wind-Down Debtor Assets, including the sale of any Wind-Down Debtor Assets;

(i)    protecting and enforcing the rights to the Wind-Down Debtor Assets (including any Vested Causes of Action and Contributed Third-Party Claims) vested in the Wind-Down Debtor and Plan Administrator by the Plan Administrator Agreement by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

(j)    investigating any Wind-Down Debtor Assets, and any other potential Vested Causes of Action and Contributed Third-Party Claims;

(k)    reviewing, reconciling, compromising, settling, objecting, or prosecuting Claims or Interests of any kind;

(l)    seeking the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004;

(m)    retaining professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to the Plan Administrator Agreement and paying the reasonable compensation thereof;

(n)    paying all lawful expenses, debts, charges, taxes, and other liabilities, and making all other payments relating to the Wind-Down Debtor Assets, solely out of Wind-Down Debtor Assets;

(o)    prosecuting and settling the Vested Causes of Action, including, without limitation, the 3AC Claims, FTX Claims, Alameda Claims, Contributed Third-Party Claims, and any causes of action not included in the Asset Purchase Agreement or released under the Plan;

(p)    reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Vested Causes of Action and Contributed Third-Party Claims;

(q)    acquiring litigation and other claims related to the Debtors, and prosecuting such claims;

(r)    reviewing and compelling turnover of the Debtors or the Wind-Down Debtor's property;

(s)    calculating and making all Distributions to the holders of Allowed Claims against each Debtor and, solely to the extent of payment in full of Allowed Claims, to holders of Allowed Interests, as provided for in, or contemplated by, the Plan and the Plan Administrator Agreement; *provided* that because the Plan does not substantively consolidate the Debtors' Estates, the Plan Administrator shall make

38

Distributions from the Wind-Down Debtor Assets to the holders of Claims and Interests (if applicable) against that specific Debtor;

(t)     establishing, administering, adjusting, and maintaining the Wind-Down Reserve and the Disputed Claims Reserve;

(u)     withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Plan Administrator has determined, based upon the advice of his agents or professionals, may be required to be withheld from such Distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

(v)     in reliance upon the Debtors' Schedules, the official Claims Register maintained in the Chapter 11 Cases and the Debtors' filed lists of equity security holders, reviewing, and where appropriate, allowing or objecting to Claims and (if applicable) Interests, and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and (if applicable) Disputed Interests required to be administered by the Wind-Down Debtor;

(w)     making all tax withholdings, filing tax information returns, filing and prosecuting tax refunds claims, making tax elections by and on behalf of the Debtors or the Wind-Down Debtor, and filing tax returns for the Debtors or the Wind-Down Debtor pursuant to and in accordance with the Plan, and paying taxes, if any, payable for and on behalf of the Debtors or the Wind-Down Debtor, as applicable; *provided, however*, that notwithstanding any other provision of the Plan Administrator Agreement, the Plan Administrator shall not have any responsibility or personal liability in any capacity whatsoever for the signing or accuracy of the Debtors' income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto;

(x)     abandoning or donating to a charitable organization qualifying under IRC section 501(c)(3) any Wind-Down Debtor Assets that the Plan Administrator determines to be too impractical to distribute or of inconsequential value;

(y)     seeking a determination of tax liability or refund under Bankruptcy Code section 505;

(z)     establishing reserves for taxes, assessments, and other expenses of administration of the Debtors or the Wind-Down Debtor as may be necessary and appropriate for the proper operation of matters incident to the Debtors or the Wind-Down Debtor;

(aa)    paying Wind-Down Debtor Expenses;

(bb)    if the Plan Administrator deems appropriate in the Plan Administrator's sole discretion, seeking to establish a bar date for filing proofs of Interest in any Debtor or otherwise to determine the holders and extent of Allowed Interests in any Debtor;

(cc)    purchasing and carrying all insurance policies that the Plan Administrator deems reasonably necessary or advisable and paying all associated insurance premiums and costs;

(dd)    undertaking all administrative functions remaining in the Chapter 11 Cases to the extent necessary to carry out the Debtors', the Wind-Down Debtor's, or the Plan Administrator's duties under the Plan, including reporting and making required payments of fees to the U.S. Trustee and overseeing the closing of the Chapter 11 Cases;

(ee)    retaining, terminating, appointing, hiring, or otherwise employees, personnel, management, and directors at any of the Debtors to the extent necessary to carry out the purposes of the Plan Administrator Agreement and the Plan, including, without limitation, to address any disputes between the Debtors;

(ff)    exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and the Plan Administrator Agreement; and

(gg)    taking all other actions consistent with the provisions of the Plan and the Plan Administrator Agreement that the Plan Administrator deems reasonably necessary or desirable to administer the Debtors and the Wind-Down Debtor.

6.    The Wind-Down Debtor Oversight Committee

The Wind-Down Debtor Oversight Committee shall consist of those parties selected by the Committee and identified in the Plan Supplement, and which, at no time shall consist of greater than seven members.

The Wind-Down Debtor Oversight Committee shall have the responsibility to review and advise the Plan Administrator with respect to the liquidation and distribution of the Wind-Down Debtor Assets transferred to the Wind-Down Debtor in accordance herewith and the Plan Administrator Agreement. For the avoidance of doubt, in advising the Plan Administrator, the Wind-Down Debtor Oversight Committee shall maintain the same fiduciary responsibilities as the Plan Administrator. Vacancies on the Wind-Down Debtor Oversight Committee shall be filled by a Person designated by the Plan Administrator, subject to the unanimous consent of the remaining member or members of the Wind-Down Debtor Oversight Committee. The Plan Administrator shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down Debtor Oversight Committee for cause.

7.    Expenses of Wind-Down Debtor

The Wind-Down Debtor Expenses shall be paid from the Wind-Down Debtor Assets subject to the Wind-Down Budget and the Non-Released D&O Claim Budget.

8.    Insurance; Bond

The Plan Administrator may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the Plan Administrator and the Wind-Down Debtor Oversight Committee under the Plan Administrator Agreement. Unless otherwise agreed to by the Wind-Down Debtor Oversight Committee, the Plan Administrator shall serve with a bond, the terms

of which shall be agreed to by the Wind-Down Debtor Oversight Committee, and the cost and expense of which shall be paid by the Wind-Down Debtor.

9.     Fiduciary Duties of the Plan Administrator

Pursuant hereto and the Plan Administrator Agreement, the Plan Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.

10.     Termination of the Wind-Down Debtor

The Wind-Down Debtor will terminate on the earlier of:  (a) (i) the final liquidation, administration and distribution of the Wind-Down Debtor Assets in accordance with the terms of the Plan Administrator Agreement and the Plan, and its full performance of all other duties and functions as set forth herein or in the Plan Administrator Agreement and (ii) the Chapter 11 Cases of the Debtors have been closed; or (b) the Plan Administrator determines in its reasonable judgment that the Wind-Down Debtor lacks sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him or her under the Plan, the Confirmation Order and/or the Plan Administrator Agreement. After (x) the final distributions pursuant hereto, (y) the Filing by or on behalf of the Wind-Down Debtor of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the Plan Administrator, the Wind-Down Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions.

11.     Liability of Plan Administrator; Indemnification

Neither the Plan Administrator, the Wind-Down Debtor Oversight Committee, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, a "Wind-Down Debtor Party" and collectively, the "Wind-Down Debtor Parties") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Wind-Down Debtor or for the act or omission of any other Wind-Down Debtor Party, nor shall the Wind-Down Debtor Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Plan Administrator Agreement or the Plan other than for specific acts or omissions resulting from such Wind-Down Debtor Party's willful misconduct, gross negligence or actual fraud. Subject to the Plan Administrator Agreement, the Plan Administrator shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee, and the Wind-Down Debtor Oversight Committee shall be entitled to enjoy all of the rights, powers, immunities and privileges of an official committee of unsecured creditors. The Plan Administrator or the Wind-Down Debtor Oversight Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, neither the Plan Administrator nor the Wind-Down Debtor Oversight Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Plan Administrator, the Wind-Down Debtor Oversight Committee, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud. The Wind-Down Debtor shall indemnify and hold harmless the Wind-Down Debtor Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out

of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Wind-Down Debtor or the Plan or the discharge of their duties hereunder; *provided*, *however*, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual fraud. Persons dealing or having any relationship with the Plan Administrator shall have recourse only to the Wind-Down Debtor Assets and shall look only to the Wind-Down Debtor Assets to satisfy any liability or other obligations incurred by the Wind-Down Debtor or the Wind-Down Debtor Oversight Committee to such Person in carrying out the terms of the Plan Administrator Agreement, and neither the Plan Administrator nor the Wind-Down Debtor Oversight Committee, shall have any personal obligation to satisfy any such liability. The Plan Administrator and/or the Wind-Down Debtor Oversight Committee members shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Plan Administrator Agreement against any of them. The Wind-Down Debtor shall promptly pay expenses reasonably incurred by any Wind-Down Debtor Party in defending, participating in, or settling any action, proceeding or investigation in which such Wind-Down Debtor Party is a party or is threatened to be made a party or otherwise is participating in connection with the Plan Administrator Agreement or the duties, acts or omissions of the Plan Administrator or otherwise in connection with the affairs of the Wind-Down Debtor, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Wind-Down Debtor Party hereby undertakes, and the Wind-Down Debtor hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such exculpated party is not entitled to be indemnified therefor under the Plan Administrator Agreement. The foregoing indemnity in respect of any Wind-Down Debtor Party shall survive the termination of such Wind-Down Debtor Party from the capacity for which they are indemnified.

12.    No Liability of the Wind-Down Debtor

On and after the Effective Date, the Wind-Down Debtor shall have no liability on account of any Claims or Interests except as set forth herein and in the Plan Administrator Agreement. All payments and all distributions made by the Plan Administrator hereunder shall be in exchange for all Claims or Interests against the Debtors.

I.    **Sources of Consideration for Plan Distributions**

Distributions under the Plan shall be funded by (i) the proceeds of Purchaser's payment obligations under Sections 2.1 and 2.2 of the Asset Purchase Agreement and distributions of Acquired Coins pursuant to Sections 6.12, and 6.14 of the Asset Purchase Agreement, (ii) the Wind-Down Debtor from the Wind-Down Debtor Assets; *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance. The Wind-Down Debtor Assets shall be used to pay the Wind-Down Debtor Expenses (including the compensation of the Plan Administrator and any professionals retained by the Wind-Down Debtor), and to satisfy payment of Allowed Claims and Interests as set forth in the Plan.

J.    **Corporate Existence and Dissolution**

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) in effect

prior to the Effective Date, except to the extent such certificates or articles of incorporation, certificates of formation, certificates of organization, or certificates of limited partnership and bylaws, operating agreements, limited liability company agreements, or limited partnership agreements (or other formation documents) are amended pursuant to the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings under applicable state or federal law).

On and after the Effective Date, the Wind-Down Debtor will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Debtor shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all of its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtor shall be deemed to be dissolved without any further action by the Debtors or the Wind-Down Debtor, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtor are formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Debtors or the Wind-Down Debtor in and withdraw the Wind-Down Debtor from applicable states.

As soon as practicable after the Effective Date, the Wind-Down Debtor shall take such actions as the Wind-Down Debtor may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Wind-Down Debtor on behalf of any Wind-Down Debtor without need for any action or approval by the shareholders or board of directors or managers of such Debtor. On and after the Effective Date, the Debtors or the Wind-Down Debtor (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Pursuant to the terms of this Plan, any Money Transmitter Licenses that have not been terminated shall be deemed withdrawn and no further action is required to be taken by the Debtors or the Wind-Down Debtor to effectuate such withdrawal; *provided* that, following the Effective Date, the Debtors or the Wind-Down Debtor, as applicable, shall use commercially reasonable efforts to comply with all state banking department requirements for the surrender of a Money Transmitter License. Nothing in this Plan shall be construed to limit the rights of creditors, Debtors, the Wind-Down Debtor, or regulators to pursue recoveries against surety bonds maintained by the Debtors in connection with this Money Transmitter Licenses. Notwithstanding such Debtors' dissolution, such Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

## K.    Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, Definitive Documents, and Asset Purchase Agreement shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, managing-members, limited or general partners, or officers of the Debtors, the Wind-Down Debtor or any other Entity, including: (1) appointment of the directors, managers, members, and officers for the Wind-Down Debtor as provided herein; (2) the issuances, transfer, and distribution of the Wind-Down Debtor Assets; (3) the formation of the Wind-Down Debtor and appointment of the Plan Administrator and Wind-Down Debtor Oversight Committee; (4) the formation of any entities pursuant to and the implementation of the Plan and performance of all actions and transactions contemplated hereby

43

and thereby; (5) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (6) all other acts or actions contemplated by the Plan, Definitive Documents, and Asset Purchase Agreement or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions (including effectuating the Restructuring Transactions Memorandum and the Customer Onboarding Protocol) (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan, Definitive Documents, and Asset Purchase Agreement involving the corporate structure of the Debtors or the Wind-Down Debtor, as applicable, and any corporate action required by the Debtors or the Wind-Down Debtor, as applicable, in connection with the Plan shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Wind-Down Debtor, as applicable. On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtor, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, Securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtor, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.K shall be effective notwithstanding any requirements under non-bankruptcy law.

**L.     Vesting of Assets in the Wind-Down Debtor**

Except as otherwise provided in the Plan, or in any agreement, instrument, or other document incorporated in the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting Wind-Down Debtor Assets, including all Vested Causes of Action of the Debtors (unless otherwise released, waived, compromised, settled, transferred, or discharged pursuant to the Plan), and any property acquired by any of the Debtors under the Plan shall vest in the Wind-Down Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.

**M.     Cancellation of Notes, Instruments, Certificates, and Other Documents**

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions (including, without limitation, the Definitive Documents and the Asset Purchase Agreement), all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

**N.     Effectuating Documents; Further Transactions**

On and after the Effective Date, the Debtors, and its directors, managers, partners, officers, authorized persons, and members thereof, and the Wind-Down Debtor and Plan Administrator are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, Definitive Documents,

and Asset Purchase Agreement, in the name of and on behalf of the Debtors and Wind-Down Debtor, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

**O.    Section 1146(a) Exemption**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor, the Purchaser, or to any other Entity) of property under the Plan, Definitive Documents, and Asset Purchase Agreement or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtor; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, including the Asset Purchase Agreement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**P.    Preservation of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtor shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred. Such rights shall be preserved by the Debtors and Wind-Down Debtor and shall vest in the Wind-Down Debtor, with the Wind-Down Debtor's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and Wind-Down Debtor as of the Effective Date.

The Wind-Down Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the beneficiaries of the Wind-Down Debtor and in accordance with the Plan Administrator Agreement and the Plan. **No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtor, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Wind-Down Debtor, on behalf of the Debtors and the Wind-Down Debtor, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the**

**Plan.** Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Debtor, on behalf of the Debtors and Wind-Down Debtor and in accordance with the Plan Administrator Agreement, expressly reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Wind-Down Debtor, on behalf of the Debtors, reserves and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtor, except as otherwise provided in the Plan, including Article VIII of the Plan. The Wind-Down Debtor, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan.

**Q.      Election to Contribute Third-Party Claims**

Because aggregating all Contributed Third-Party Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its ballot or opt-in form, to contribute its Contributed Third-Party Claims to the Wind-Down Debtor. By electing such option on its ballot or opt-in form, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the formation of the Wind-Down Debtor, it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Third-Party Claims to the Wind-Down Debtor, and (ii) to have agreed to execute any documents reasonably requested by the Debtors or the Wind-Down Debtor to memorialize and effectuate such contribution.

**R.      Contribution of Contributed Third-Party Claims**

On the Effective Date, all Contributed Third-Party Claims will be irrevocably contributed to the Wind-Down Debtor and shall thereafter be Wind-Down Debtor Assets for all purposes. No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Plan Administrator Agreement, the Plan Supplement, or any other document as any indication that the Wind-Down Debtor will or will not pursue any and all available Contributed Third-Party Claims against such Person. The Wind-Down Debtor shall have, retain, reserve, and be entitled to assert all Contributed Third-Party Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date. For the avoidance of doubt, the Contributed Third-Party Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests.

**S.      Closing the Chapter 11 Cases**

On and after the Effective Date, the Wind-Down Debtor shall be permitted to classify all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, as closed, and all contested matters relating to any of the Debtors, including objections to Claims or Interests and any adversary proceedings, may be administered and heard

in the Chapter 11 Case of Voyager Digital, LLC, or any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, irrespective of whether such Claims or Interests were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

# ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.      Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy other than the Side-A Policy. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

**B.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtor, as applicable, under such Executory Contract or Unexpired Lease. Without limiting the general nature of the foregoing, and notwithstanding any non-bankruptcy law to the contrary, the Debtors and Wind-Down Debtor expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to any rejected Executory Contract or Unexpired Lease.

**C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Counterparties to Executory Contracts or Unexpired Leases listed subject to rejection under the Plan shall be served with a notice of rejection of Executory Contracts and Unexpired Leases with the Plan Supplement. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims, Noticing, and Solicitation Agent and served on the Debtors or Wind-Down Debtor, as applicable, no later than thirty days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, or the Wind-Down Debtor, the Estates, or their property without the need for any objection by the Wind-Down Debtor or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the**

47

rejection of the Executory Contract or Unexpired Lease shall be deemed released, and be subject to the permanent injunction set forth in Article VIII.D of the Plan, including any Claims against any Debtor listed on the Debtors' schedules as unliquidated, contingent, or disputed. All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims in accordance with Article III.C of the Plan.

**D.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed**

The Debtors, the Wind-Down Debtor, or the Purchaser, as applicable pursuant to the Asset Purchase Agreement, shall pay Cures, if any, on the Effective Date. The Debtors shall provide notice of the amount and timing of payment of any such Cure to the parties to the applicable assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors, the Wind-Down Debtor, or the Purchaser shall be dealt with in the ordinary course of business and, if needed, shall be Filed with the Claims, Noticing, and Solicitation Agent on or before thirty days after the Effective Date. **If any counterparty to an Executory Contract or Unexpired Lease does not receive a notice of assumption and applicable cure amount, such counterparty shall have until on or before thirty days after the Effective Date to bring forth and File a request for payment of Cure.** Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or the Wind-Down Debtor, without the need for any objection by the Wind-Down Debtor or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied and released upon payment by the Debtors or the Wind-Down Debtor or the Purchaser of the Cure in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty); *provided*, *however*, that nothing herein shall prevent the Wind-Down Debtor or the Purchaser, as applicable, from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure. The Wind-Down Debtor or the Purchaser may also settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' first scheduled omnibus hearing for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

In the event of a dispute regarding: (1) the amount of any Cure Claim, (2) the ability of the Debtors, the Wind-Down Debtor, Purchaser, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed (or assumed and assigned, as applicable), or (3) any other matter pertaining to assumption or assignment, then any disputed Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made as soon as reasonably practicable following, and in accordance with, the entry of a Final Order of the Bankruptcy Court resolving such dispute or as may be agreed upon by the Debtors, the Wind-Down Debtor, or Purchaser, as applicable, and the counterparty to the Executory Contract or Unexpired Lease, and any such unresolved dispute shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise or assignment of any Executory Contract or Unexpired Lease to the Purchaser and full payment of any applicable Cure pursuant to this Article V.D, or upon and in accordance with any resolution of a Cure

dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assumed and assigned in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.D, in the amount and at the time in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract or Unexpired Lease counterparty), shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and applicable proposed Cure amount, and disputes the Debtors' proposed Cure amount, such party shall not be required to File a Proof of Claim with respect to such dispute.  Any counterparty to an Executory Contract or Unexpired Lease that does not receive a notice or applicable proposed Cure amount, and believes a Cure amount is owed, shall have thirty days after the Effective Date to File a Proof of Claim with respect to such alleged Cure amount, which Claim shall not be expunged until such Cure dispute is resolved.**

## E.    Insurance Policies

Each D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) other than the Side-A Policy shall be assumed, in their entirety, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to sections 105 and 365 of the Bankruptcy Code with the Wind-Down Debtor being authorized to pursue any proceeds thereof on behalf of the Debtors or the Wind-Down Debtor.  The Side-A Policy shall ride through these Chapter 11 Cases with the Debtors, and the Wind-Down Debtor preserves all avoidance and other actions in connection with the premium paid thereunder. All beneficiaries under the D&O Insurance Policies reserve their rights under such D&O Insurance Policies subject to the limitations set forth in this Plan.

The Debtors or the Wind-Down Debtor, as applicable, shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date, and any current and former directors, officers, managers, and employees of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Debtor shall retain the ability to supplement such D&O Liability Insurance Policy as the Debtors or Wind-Down Debtor may deem necessary, subject to the prior written consent of the Wind-Down Debtor.  Notwithstanding anything to the contrary contained in the Plan, the Wind-Down Debtor shall be entitled to pursue avoidance of the premium paid for the XL Specialty Insurance Company Cornerstone A-Side Management Liability Insurance Policy No. ELU184179-22, and nothing in this Plan shall be deemed a waiver or abrogation of any such rights.

The Debtors shall continue to satisfy their obligations under their insurance policies in full and continue such policies in the ordinary course of business.  Each of the Debtors' insurance policies, and any agreements, documents, or instruments relating thereto shall be treated as Executory Contracts under the Plan.  On the Effective Date:  (a) the Debtors shall be deemed to have assumed all such insurance policies

and any agreements, documents, and instruments relating thereto in their entirety; and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the applicable Debtors or the Wind-Down Debtor unaltered.

## F.      Reservation of Rights

Nothing contained in the Plan or the Plan Supplement (unless otherwise explicitly provided) shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or the Wind-Down Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Debtor, as applicable, shall have forty-five days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease effective as of the Confirmation Date.

## G.      Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## H.      Contracts and Leases Entered into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Wind-Down Debtor liable thereunder in the ordinary course of its business.  Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

# ARTICLE VI.

# PROVISIONS GOVERNING DISTRIBUTIONS

## A.      Timing and Calculation of Amounts to Be Distributed

Except (1) as otherwise provided herein, (2) upon a Final Order, or (3) as otherwise agreed to by the Debtors, the Purchaser, or the Wind-Down Debtor, as the case may be, and the Holder of the applicable Claim, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the next Distribution Date after such Claim becomes, as applicable, an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of distributions that the Plan provides for Allowed Claims in the applicable Class from the Distribution Agent.  In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      **Rights and Powers of Distribution Agent**

    1.      Powers of the Distribution Agent

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities and powers; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

From and after the Effective Date, the Distribution Agent, solely in its capacity as Distribution Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Distribution Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Distribution Agent. No holder of a Claim or Interest or other party in interest shall have or pursue any Claim or Cause of Action vested in a Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by such Distribution Agent to be necessary and proper to implement the provisions hereof.

    2.      Expenses Incurred on or after the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including reasonable attorney and/or other professional fees and expenses) made by such Distribution Agent shall be paid in Cash by the Wind-Down Debtor.

C.      **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

    1.      Distributions Generally

Except as otherwise provided in the Plan (including in paragraph 8 below), the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.

    2.      Distributions on Account of Obligations of Multiple Debtors

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan.  Any such Claims shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.

    3.      Record Date of Distributions

On the Distribution Record Date, the various transfer registers for each Class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further

51

changes in the record Holders of any Claims or Interests. The Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

4.    Special Rules for Distributions to Holders of Disputed Claims and Interests

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Wind-Down Debtor, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand, or as set forth in a Final Order, no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all of the Disputed Claim or Interest has become an Allowed Claim or Interest or has otherwise been resolved by settlement or Final Order; *provided* that, if the Wind-Down Debtor does not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim or Interest, the Distribution Agent may make a partial distribution on account of that portion of such Claim or Interest that is not Disputed at the time and in the manner that the Distribution Agent makes distributions to similarly situated Holders of Allowed Claims or Interests pursuant to the Plan. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

5.    De Minimis Distributions; Minimum Distributions

The Distribution Agent shall not make any Cash distributions to any Holder of an Allowed Claim or Interest pursuant to Article III.C.1-11 of this Plan on account of such Allowed Claim or Interest if such distribution is valued, in the reasonable discretion of the Distribution Agent, at less than $1.00, and each Holder of an Allowed Claim or Interest to which this limitation applies shall not be entitled to any distributions under the Plan. Notwithstanding anything to the contrary in this Plan, there shall be no minimum distribution threshold on account of distributions of any Cryptocurrency to Holders of Allowed Account Holder Claims and Allowed OpCo General Unsecured Claims.

6.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable and/or otherwise remains unclaimed, the Plan Administrator shall use reasonable efforts to contact such Holder; *provided* that no further distributions to such Holder shall be made unless and until the Plan Administrator has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided, further*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the applicable Distribution Date. After such date, all unclaimed property or interests in property shall revert to the Wind-Down Debtor automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall not be entitled to any distributions under the Plan.

A distribution shall be deemed unclaimed if a Holder has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Wind-Down Debtor of an intent to accept a particular distribution; (c) responded to the Wind-Down Debtor's requests

for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

7.    Manner of Payment Pursuant to the Plan

At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check, wire transfer, automated clearing house, credit card, or as otherwise provided in applicable agreements.

8.    Distributions of Net Owed Coins; Additional Bankruptcy Distributions

As a general matter, the Purchaser will allocate each Account Holder's Net Owed Coins to its account on the Binance.US Platform, and each Holder of OpCo General Unsecured Claim's Pro Rata share of the Distributable Cryptocurrency (in Cash) to its account on the Binance.US Platform in accordance with, and subject to, the provisions of Section 6.12 of the Asset Purchase Agreement.

Subject to the terms of the Asset Purchase Agreement, the Purchaser may make Additional Bankruptcy Distributions to Transferred Creditors, including Distributable OpCo Cash and/or other Wind-Down Debtor Assets, corresponding to their Pro Rata shares of such Additional Bankruptcy Distribution (if such Additional Bankruptcy Distribution is in Cryptocurrency, based on the Transferred Cryptocurrency Value of the Cryptocurrency included in such Additional Bankruptcy Distribution), all in accordance with any applicable Post-Bankruptcy Statement (as defined in the Asset Purchase Agreement).

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim does not become a Transferred Creditor prior to the date that is three (3) months following the later of the Closing Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept (as provided in the Customer Onboarding Protocol), then Purchaser shall convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with this Plan and the Customer Onboarding Protocol.

If any Account Holder or Holder of an Allowed OpCo General Unsecured Claim is located in an Unsupported Jurisdiction (as defined in the Asset Purchase Agreement), then the Net Owed Coins, Distributable Cryptocurrency (in Cash) and Additional Bankruptcy Distributions, if applicable, allocable to such Person shall be handled pursuant to Section 6.12(b) or, if applicable, Section 6.14(d) of the Asset Purchase Agreement.  Notwithstanding anything to the contrary in the Asset Purchase Agreement, this Plan, or any Definitive Document, if any Account Holder or Holder of an Allowed OpCo General Unsecured Claim in an Unsupported Jurisdiction elects to not become a Transferred Creditor prior to the date that is three (3) months following the later of the Closing Date or the date on which the terms and conditions for the Binance.US Platform are made available for such Person to accept (as provided in the Customer Onboarding Protocol), then Purchaser shall on the date that is three (3) months following the later of the Closing Date or the date which the terms and conditions for the Binance.US Platform are made available for such person to accept, convert any Cryptocurrency allocable to such Person into U.S. Dollars at the then-prevailing rates (including applicable fees, spreads, costs and expenses) on the Binance.US Platform and deliver such U.S. Dollars, together with any cash or others assets in respect of such Persons, to the Debtors within five (5) Business Days, for further distribution by the Debtors in accordance with this Plan and the Customer Onboarding Protocol.

Purchaser shall have no responsibility to make any distributions other than as contemplated by Sections 6.12 and 6.14 of the Asset Purchase Agreement.

### D.    Compliance Matters

In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Debtor, any Distribution Agent, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including wind-down a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the Wind-Down Debtor and the Distribution Agent, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond.  The Debtors, the Wind-Down Debtor, the Distribution Agent, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

### E.    Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim, asserted in government issued currency (for the avoidance of doubt, not including any Cryptocurrency) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

### F.    Claims Paid or Payable by Third Parties

#### 1.    Claims Paid by Third Parties

The Debtors or the Wind-Down Debtor, as applicable, shall reduce a Claim or Interest, and such Claim or Interest (or portion thereof) shall be disallowed without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim or Interest receives a payment on account of such Claim or Interest from a party that is not a Debtor or Wind-Down Debtor (or other Distribution Agent), as applicable, including any payments made in connection with the Sale Transaction.  To the extent a Holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not a Debtor or a Wind-Down Debtor (or other Distribution Agent), including payments made in connection with the Sale Transaction, as applicable, on account of such Claim or Interest, such Holder shall, within ten Business Days of receipt thereof, repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Wind-Down Debtor to the extent the Holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay, return, or deliver such distribution shall result in the Holder owing the applicable Wind-Down Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the ten-Business Day grace period specified above until the amount is repaid.

#### 2.    Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim or Interest that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim or

Interest has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim or Interest (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such payment, such Claim or Interest may be expunged or reduced on the Claims Register by the Claims, Noticing, and Solicitation Agent to the extent of any such payment without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    Applicability of Insurance Policies

Except as otherwise provided herein, payments to Holders of Claims or Interests shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any rights, defenses, or Cause of Action that the Debtors, the Wind-Down Debtor or any other Entity may hold against any other Entity, including insurers, under any policies of insurance, agreements related thereto, or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the applicable insurance policies, agreements related thereto, and applicable non-bankruptcy law.

**G.    Setoffs and Recoupment**

Except as otherwise expressly provided for herein, each Debtor, the Wind-Down Debtor, or such Entity's designee as instructed by such Debtor, the Wind-Down Debtor, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, set off against or recoup from an Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature whatsoever that the Debtor or the Wind-Down Debtor, as applicable, may have against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise). Notwithstanding the foregoing, except as expressly stated in Article VIII of this Plan, neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors or the Wind-Down Debtor of any such Claims, rights, or Causes of Action the Debtors or the Wind-Down Debtor may possess against such Holder.

**H.    Allocation between Principal and Accrued Interest**

Except as otherwise provided herein, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Claims, to the remaining portion of such Allowed Claim if any.

## ARTICLE VII.

### PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS

**A.    Disputed Claims Process**

After the Effective Date, the Debtors, the Wind-Down Debtor, and any party-in-interest, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in

the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest.  If a Holder of a Claim or Interest in Class disputes the amount of their Claim or Interest as listed in the Schedules, the Holder should notify the Debtors or the Wind-Down Debtor of such dispute.  If the Debtors and the Holder agree to an amended Claim amount prior to the Effective Date, the Debtors shall file amended Schedules prior to the Effective Date.  If between the Confirmation Date and the Effective Date, the dispute cannot be consensually resolved, the Holder may seek (by letter to the Court) to have the claim or interest dispute resolved before the Bankruptcy Court (and, with the consent of the Debtors, before any other court or tribunal with jurisdiction over the parties).  After the Effective Date, the creditor may seek to have the claim dispute resolved before the Bankruptcy Court or any other court or tribunal with jurisdiction over the parties.

Notwithstanding anything in this Plan to the contrary: (1) all Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease; (2) Claims filed to dispute the amount of any proposed Cure pursuant to section 365 of the Bankruptcy Code; and (3) Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court, if not otherwise resolved through settlement with the applicable claimant.

On the Effective Date, the Debtors or Plan Administrator, as applicable, may establish one or more accounts or funds to hold and dispose of certain assets, pursue certain litigation (including the Causes of Action preserved under the Plan or otherwise vesting in the Wind-Down Debtor), and/or satisfy certain Claims (including Claims that are contingent or have not yet been Allowed).  For any such account or fund, the Debtors or the Plan Administrator, as applicable, may take the position that grantor trust treatment applies in whole or in part.  To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations.  Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9.  If such rules apply, such assets would be subject to entity-level taxation, and the Debtors and the Wind-Down Debtor would be required to comply with the relevant rules.

## B.    Objections to Claims or Interests

Except as otherwise specifically provided in the Plan, after the Effective Date, the Wind-Down Debtor shall have the sole authority on behalf of the Debtors to:  (1) File, withdraw, or litigate to judgment, any objections to Claims or Interests; and (2) settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Wind-Down Debtor shall have and retain any and all rights and defenses each such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.P of the Plan.  In the event that the Wind-Down Debtor settles or otherwise compromises the Signatory Governmental Claims (as defined in the Governmental Claimant Stipulation) asserted against TopCo, any other Claim Filed or asserted by a Governmental Unit against TopCo, or any other Claim Filed or asserted against TopCo in an amount greater than $100,000, any such proposed settlement or compromise shall require approval of the Bankruptcy Court after notice and a hearing.

Any objections to Claims or Interests shall be Filed on or before the Claims Objection Bar Date.  For the avoidance of doubt, any party may object to any Claims or Interests prior to the Claims Objection Bar Date.  Further, the Bankruptcy Court may extend the time period to object to Claims or Interests set

forth in this paragraph at any time, including before or after the expiration of one hundred eighty days after the Effective Date, in its discretion or upon request by the Debtors or any party in interest.

### C.      Estimation of Claims

Before or after the Effective Date, the Debtors or the Wind-Down Debtor, as applicable, may (but are not required to), at any time, request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any party previously has objected to such Disputed Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim or Interest, including during the litigation of any objection to any Disputed Claim or Interest or during the pendency of any appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Disputed Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Debtors or the Wind-Down Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Disputed Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Disputed Claim or Interest is estimated.

### D.      No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only a portion of a Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

### E.      Distributions After Allowance

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Allowed Claim or Interest unless required under applicable bankruptcy law.

### F.      No Interest

Unless otherwise specifically provided for herein or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim

with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## G.    Adjustment to Claims and Interests without Objection

Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Debtor without the Wind-Down Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.  Additionally, any Claim or Interest that is duplicative or redundant with another Claim or Interest against the same Debtor may be adjusted or expunged on the Claims Register at the direction of the Wind-Down Debtor without the Wind-Down Debtor having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

## H.    Time to File Objections to Claims

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

## I.    Disallowance of Claims or Interests

Any Claims or Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Wind-Down Debtor, as applicable.

**Except as otherwise provided herein or as agreed to by the Debtors or the Wind-Down Debtor, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date subject to the approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

## J.    Amendments to Proofs of Claim

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Proof of Claim or Proof of Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Wind-Down Debtor, and any such new or amended Proof of Claim or Proof of Interest Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

## ARTICLE VIII.

## EFFECT OF CONFIRMATION OF THE PLAN

**A.    Releases by the Debtors**

Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtor, and their Estates, and in each case on behalf of themselves and their respective successors, assigns, and representatives, who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert (whether individually or collectively) based on, relating to, or arising from the Investigated Matters, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, or the administration and implementation of the Restructuring Transactions.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in this Article VIII.A by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.A is:   (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.E and Article IV.F of the Plan, a bar to any of the Debtors or Wind-Down Debtor or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Notwithstanding anything to the contrary contained herein, nothing in this Plan shall release, waive, or otherwise limit the (i) rights, duties, or obligations of the Purchaser under the Asset Purchase Agreement or the Definitive Documents and (ii) the Non-Released D&O Claims, but such Non-Released D&O Claims shall remain subject to the limitations contained in Article IV.E and Article IV.F of this Plan.

**B.    Releases by Holders of Claims and Interests**

Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law,

equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date, *provided* that nothing in this Article VIII.B shall be construed to release the Released Parties from actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.B, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.B is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) except to the extent contemplated by Article IV.F and Article IV.G of the Plan, a bar to any of the Releasing Parties or the Debtors or the Wind-Down Debtor or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

C.      Exculpation

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from any criminal or civil liability or claim arising in whole or in part from any act or omission based on the negotiation, execution, and implementation of any transaction or act approved by the Bankruptcy Court in the Chapter 11 Cases, including the Disclosure Statement, the Asset Purchase Agreement, the order approving entry into the Asset Purchase Agreement, the Plan, the Plan Supplement, including the Plan Administrator Agreement, the D&O Settlement, the Confirmation Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the Plan Supplement or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Asset Purchase Agreement, the order approving entry into the Asset Purchase Agreement, the Plan, the Plan Supplement, including the Plan Administrator Agreement, the D&O Settlement, the Confirmation Order, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, including the Plan Administrator Agreement, and the implementation of the

Restructuring Transactions contemplated by the Plan, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; *provided* that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

D.     Injunction

The assets of the Debtors and of the Wind-Down Debtor shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in this Plan and shall not be available for any other purpose.  All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Debtor, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.B and Article VIII.C of this Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or distributions that are contemplated by this Plan.

E.     Release of Liens

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or Confirmation Order on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors shall automatically revert to the applicable Debtor or the Wind-Down Debtor, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as requested by the Debtors or Wind-Down Debtor to evidence the release of such Lien, including the execution, delivery, and filing or recording of such documents evidencing such releases.  The presentation or filing of the Confirmation Order to or with any local, state, federal, or foreign agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

## F.     OSC and SEC

Notwithstanding any language to the contrary herein, no provision shall (a) preclude the OSC or the SEC from enforcing its police or regulatory powers; or (b) enjoin, limit, impair or delay the OSC or SEC from commencing or continuing any claims, causes of action, proceeding, or investigations against any non-Debtor person or non-Debtor Entity in any forum.

## G.     Protection against Discriminatory Treatment

As provided by section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Entity, including Governmental Units, shall discriminate against any Debtor or the Wind-Down Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, any Debtor or the Wind-Down Debtor, or any Entity with which a Debtor or the Wind-Down Debtor has been or is associated, solely because such Debtor or the Wind-Down Debtor was a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## H.     Document Retention

Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Wind-Down Debtor, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently in the Debtors' possession. The Wind-Down Debtor shall not destroy or otherwise abandon any such documents or records without providing advance notice to the U.S. Securities and Exchange Commission (c/o Therese Scheuer, U.S. Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, ScheuerT@SEC.GOV) and seeking further authorization from this Bankruptcy Court. Nothing in this Plan or the Confirmation Order shall affect the obligations of the pre-Effective Date Debtors, the Wind-Down Debtor, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

## I.     Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## J.     Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. **All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

# ARTICLE IX.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**A.    Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1.    The Bankruptcy Court shall have entered the Confirmation Order, which shall be in a form and substance reasonably satisfactory to the Debtors and the Committee, and subject to the consent rights of Purchaser under the Asset Purchase Agreement, and such order shall be a Final Order and in full force and effect.

2.    The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, Definitive Documents, and the Asset Purchase Agreement.

3.    Each Definitive Document and each other document contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all respects with the Plan, and subject to the Purchaser's consent rights under the Asset Purchase Agreement, and shall not have been modified in a manner inconsistent therewith;

4.    The Professional Fee Escrow Account shall have been established and funded with Cash in accordance with Article II.B.2 of the Plan.

5.    The Wind-Down Reserve shall have been established and funded with Cash in accordance with the Plan.

6.    If prior to the Outside Date, the Asset Purchase Agreement shall be in full force and effect and the Sale Transaction shall have been consummated.

7.    The Restructuring Transactions shall have been consummated or shall be anticipated to be consummated concurrently with the occurrence of the Effective Date in a manner consistent with the Plan, the Customer Onboarding Protocol, the other Definitive Documents, and the Asset Purchase Agreement, and the Plan shall have been substantially consummated or shall be anticipated to be substantially consummated concurrently with the occurrence of the Effective Date.

**B.    Waiver of Conditions Precedent**

The Debtors, with the consent of the Committee and, solely to the extent related to the Asset Purchase Agreement and the Sale Transaction, prior to the Outside Date, the consent of Purchaser, may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

C.      **Effect of Non-Occurrence of Conditions to Consummation**

If the Effective Date does not occur within 120 days after the Confirmation Date, then the Plan will be null and void in all respects, any and all compromises or settlements not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including with respect to the fixing, limiting, or treatment of any Claim or Interest, including, without limitation, the Alameda Loan Facility Claims), shall be deemed null and void, and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims, Interests, or Causes of Action held by any Debtor or any other Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity in any respect.

## ARTICLE X.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      **Modification of Plan**

Subject to the limitations and terms contained in the Plan and Purchaser's consent rights under the Asset Purchase Agreement, the Debtors, with the consent of the Committee, reserve the right to (1) amend or modify the Plan before the entry of the Confirmation Order, in accordance with the Bankruptcy Code and the Bankruptcy Rules and (2) after the entry of the Confirmation Order, the Debtors or the Wind-Down Debtor, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, to remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

B.      **Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall constitute approval of all modifications or amendments to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      **Revocation or Withdrawal of Plan**

The Debtors reserve the right, with the consent of the Committee, to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Classes of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.     Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.     decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.     resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims or other Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.     ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6.     enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court;

7.     enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.     grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.     hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) anything that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan and the Confirmation Order; or (d) related to section 1141 of the Bankruptcy Code;

11.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

13.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

14.     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Entity's rights arising from or obligations incurred in connection with the Plan;

15.     hear and determine matters concerning local, state, federal, and foreign taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

16.     enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.     enforce all orders previously entered by the Bankruptcy Court; and

18.     hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or the Judicial Code.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

# ARTICLE XII.

## MISCELLANEOUS PROVISIONS

**A.      Immediate Binding Effect**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtor, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

**B.      Additional Documents**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Wind-Down Debtor, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.      Payment of Statutory Fees**

All fees and applicable interest payable pursuant to section 1930 of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Debtors or the Wind-Down Debtor (or the Distribution Agent on behalf of the Wind-Down Debtor) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

**D.      Dissolution of Statutory Committees**

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, however, that such committees will remain in existence for the limited purposes of (a) pursuing, supporting, or otherwise participating in, any outstanding appeals in the Chapter 11 Cases; and (b) filing, objecting, or otherwise participating in, any final fee applications of Professionals.

**E.      Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests, unless and until the Effective Date has occurred.

## F.  Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Entity.

## G.  Service of Documents

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Wind-Down Debtor shall be served on:

| | |
|---|---|
| Debtors | **Voyager Digital Holdings, Inc.** |
| | 33 Irving Place |
| | New York, New York 10003 |
| | Attention:  David Brosgol |
| | General Counsel, |
| | E-mail address:  dbrosgol@investvoyager.com |
| | |
| | with copies for information only (which shall not constitute notice) to: |
| | |
| Counsel to the Debtors | **Kirkland & Ellis LLP** |
| | **Kirkland & Ellis International LLP** |
| | 601 Lexington Avenue |
| | New York, New York 10022 |
| | Attention:  Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., and Allyson B. Smith |
| | |
| Counsel to the Committee | **McDermott Will & Emery LLP** |
| | One Vanderbilt Avenue |
| | New York, New York 10017 |
| | Attention: Darren Azman |

## H.  Entire Agreement; Controlling Document

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan; *provided, however*, that notwithstanding the foregoing or anything to the contrary herein, to the extent there is any conflict between the Plan and the Confirmation Order, on the one hand, and the Asset Purchase Agreement, on the other hand, the Asset Purchase Agreement shall govern solely in the event the Sale Transaction is consummated.  Except as set forth in the Plan, in the event that any provision of the Disclosure Statement, the Plan Supplement, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

I.      **Plan Supplement**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Claims, Noticing, and Solicitation Agent at https://cases.stretto.com/Voyager or the Bankruptcy Court's website at http://www.nysb.uscourts.gov.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

J.      **Non-Severability**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the Purchaser's consent rights under the Asset Purchase Agreement prior to the Outside Date, shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

K.      **Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and solely to the extent permitted by section 1125(e) of the Bankruptcy Code, the Debtors, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties nor individuals or the Debtors or the Wind-Down Debtor will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

L.      **Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation Date.

Dated:  March 8, 2023                    VOYAGER DIGITAL HOLDINGS, INC.
                                         on behalf of itself and all other Debtors


                                         _/s/ Stephen Ehrlich_
                                         Stephen Ehrlich
                                         Co-Founder and Chief Executive Officer
                                         Voyager Digital Holdings, Inc.