UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

**Hearing Date: March 15, 2023**
**Hearing Time: 2:00 p.m.**

------------------------------------------------------------x

In re

Chapter 11

VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1]

Case No. 22-10943 (MEW)

Jointly Administered

Debtors.

------------------------------------------------------------x

### MEMORANDUM IN SUPPORT OF THE UNITED STATES OF AMERICA AND UNITED STATES TRUSTEE'S EXPEDITED MOTION FOR STAY OF CONFIRMATION ORDER PENDING APPEAL PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 8007

**DAMIAN WILLIAMS**
United States Attorney for the
Southern District of New York

**LAWRENCE H. FOGELMAN**
**JEAN-DAVID BARNEA**
**PETER ARONOFF**
Assistant United States Attorneys

United States Attorney's Office
Southern District of New York
86 Chambers Street, Third Floor
New York, NY 10007

**WILLIAM K. HARRINGTON**
United States Trustee, Region 2
**LINDA A. RIFFKIN**
Assistant United States Trustee

Department of Justice
Office of the United States Trustee
One Bowling Green
New York, NY 10004

**RAMONA D. ELLIOTT**
Deputy Director/General Counsel
**P. MATTHEW SUTKO**
Associate General Counsel
**BETH A. LEVENE**
**ANDREW BEYER**
**SUMI K. SAKATA**
Trial Attorneys

Department of Justice
Executive Office for United States Trustees
441 G Street, N.W., Suite 6150
Washington, DC 20530

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (N/A); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

### Table of Contents

PRELIMINARY STATEMENT ................................................................................ 1

   A.   General Background ............................................................... 5

   B.   The Evolution of the Plan and Confirmation Order.................................. 9

   C.   Objections to the Plan and its Associated Transactions ........................... 14

   D.   Confirmation Hearing ........................................................ 15

LEGAL STANDARD ......................................................................................... 19

ARGUMENT ................................................................................................... 20

   I.   The Court Should Stay the Exculpation Provision or, If Necessary, the
Confirmation Order in its Entirety. .................................................................. 20

     A.   The Government Has a Likelihood of Success on the Merits............................. 20

     1)   The Court Improperly Exceeded Its Statutory Authority in Approving the
Exculpation Provision............................................................................. 21

     2)   The Exculpation Provision Far Exceeds the Limited Scope of Defenses Other
Courts Have Recognized for Certain Conduct. .............................................. 26

     3)   The Exculpation Provision Is Impermissibly Overbroad Because It
Exculpates Both Non-Fiduciaries and Future Conduct. ................................... 28

     B.   The Balance of Harms Weighs in Favor of a Stay of the Exculpation Clause
and, as Necessary, the Entire Confirmation Order. ....................................... 30

CONCLUSION ................................................................................................ 33

TO:    **THE HONORABLE MICHAEL E. WILES,**
       **UNITED STATES BANKRUPTCY JUDGE:**

The United States of America, (the "**United States**"), by its attorney Damian Williams, United States Attorney for the Southern District of New York; and Justice Department official William K. Harrington, the United States Trustee for Region 2 (the "**United States Trustee**") (together, the "**Government**"), submit this memorandum of law in support of this Expedited Motion for Stay Pending Appeal (the "**Stay Motion**") pursuant to Federal Rule of Bankruptcy Procedure 8007. This Motion seeks (1) a partial stay pending appeal[1] of the Exculpation Provision (defined below) of the March 8, 2023, Confirmation Order confirming Third Amended Joint Chapter 11 Plan of Voyager Digital Holdings, Inc., *et al*. (the "**Debtors**") [Dkt. No 1159], or, if necessary, a stay of the entire Confirmation Order, and (2) in the alternative, if the Court denies the stay pending appeal, a two-week stay for the Government to pursue a stay in the District Court. Additionally, the Government requests an interim stay until the Court decides and determines this Stay Motion, because the current stay expires on Wednesday, March 15, 2023.[2] Thus, absent an interim stay, the Exculpation Provision will become effective before the Court has had an opportunity to rule on the Stay Motion.

## PRELIMINARY STATEMENT

Even a casual reader of the news is aware that the cryptocurrency space is rife with regulatory concerns, underscored by the massive fraud relating to FTX. *See, e.g.*, Debtors' Memorandum of Law in Support of the Second Amended Disclosure Statement (the "**2/28 Memo in Support**") [Dkt. No. 1110] ¶ 2 ("FTX's new CEO publicly announced that the proposed

---

[1] *See* Notice of Appeal of United States and U.S. Trustee Region 2 of Order Confirming Debtors' Chapter 11 Plan [Dkt. No. 1165].
[2] *See* Order Extending the Stay of the Confirmation Order [Dkt. No. 1169].

purchaser was a fraud of historic proportions, sending shockwaves through the entire cryptocurrency industry. Senior FTX executives were charged with federal felonies and at least three have pled guilty, admitting that FTX and its affiliates defrauded many, including its own customers and commercial counterparties like the Debtors."). "Outright fraud, scams, and theft in digital asset markets are on the rise: according to FBI statistics, reported monetary losses from digital asset scams were nearly 600 percent higher in 2021 than the year before."[3] The Government has been critically involved in the efforts to identify and prosecute frauds and abuse that stems from cryptocurrency. *See id.* ("Since taking office, the Biden-Harris Administration and independent regulators have worked to protect consumers and ensure fair play in digital assets markets by issuing guidance, increasing enforcement resources, and aggressively pursuing fraudulent actors.").

Government investigations of potential wrongdoing in any area, including cryptocurrency, take time, and involve the development of a complex or extensive factual record. Investigations into wrongdoing almost always occur *after* wrongdoing has taken place, and it is rare for the Government to identify and prevent a civil or criminal violation before it happens or for a party to obtain an advance ruling on the legality of its anticipated conduct. Congress has set time limits for the Government to investigate and prosecute civil and criminal violations—statutes of limitation. These generally provide the Government several years after the conduct at issue to investigate and to decide whether to bring a claim or prosecute an offense. For example, under the False Claims Act, the Government has six years from the submission of a false claim, or three years from when

---

[3]    https://www.whitehouse.gov/briefing-room/statements-releases/2022/09/16/fact-sheet-white-house-releases-first-ever-comprehensive-framework-for-responsible-development-of-digital-assets/

it learns of the fraud (up to ten years from the false claim), whichever is later, to bring a civil fraud claim. 31 U.S.C. § 3731(b)(1).

Notwithstanding the complexity of investigating criminal and civil wrongdoing and applicable statutes of limitations, the Court in this case required the Government to come forward with evidence of affirmative wrongdoing in the few months between December 2022, when Debtors announced a new deal with Binance.US (following Debtors' failed deal with FTX), and March 2023, when the Court confirmed the Plan, and decreed that if the Government did not do so, then the parties implementing the commercial deal between Debtors and Binance.US would be released from any past *or future* civil or criminal liability to the Government. But this approach turns Government enforcement on its head. It is not the job of the Government to advise commercial business participants as to whether a proposed transaction violates the law. Nor, in most circumstances, would that even be possible as it cannot be known precisely what will happen in the course of such a proposed transaction. The Court cannot tell the Government to speak now or forever hold its peace before Voyager and Binance.US wed. Rather, it is the obligation of commercial participants to a transaction to consult with counsel and determine what regulatory, civil, or criminal risks are attendant to the transaction they are contemplating, and to decide whether to undertake it after evaluating those risks.

The Government is likely to prevail in its argument that the Exculpation Provision is impermissible because nothing in the Bankruptcy Code permits courts to exculpate parties from liability to the Government for past and future conduct, nor to subvert statutes of limitation that govern how long *after conduct takes place* the Government may investigate and charge wrongdoing. This appeal concerns the fundamental ability of the Government to enforce the law not just for past actions, but for actions in any number of transactions that have not yet occurred

and will take place only after the Plan's effective date. One can imagine any number of illegal acts that could take place in the course of these transactions, from using stolen funds to carry them out to negligently failing to report associated taxes.

The Court cites no statutory authority permitting it to cut off the Government's police and regulatory powers. Instead, it relied on 11 U.S.C. § 1142(a), which addresses the implementation of a plan, for the proposition that "the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court." 11 U.S.C. § 1142(a). *See* Court's Decision (the **"Decision"**) at 33 [Dkt. No. 1170]. But this provision says nothing about prospectively exculpating parties from enforcement under the Government's police and regulatory powers.

The Court also cited its prior decision in *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y. 2019)—which likewise cites no statutory basis for exculpation of governmental claims—as a basis for the Exculpation Provision here. *Id.* at 721 (citing no statutory authority in discussing exculpation and observing that the "reported case law is thin"). But even if *Aegean* and a few other similar cases set forth a legitimate standard for exculpation, the facts of this case fall far outside that standard in exculpating parties for future conduct and parties that did not even exist before the plan's effective date.

The remaining stay factors likewise favor the Government. The Exculpation Provision harms the public by extinguishing the rights of governmental entities to pursue wrongdoing by exculpated parties. It would peremptorily foreclose the rights of the United States and states against the Debtors and non-debtors, including their rights to enforce important federal and state laws that protect public health, safety, and welfare.

4

Moreover, absent a stay, the Debtors may attempt to evade appellate review altogether by arguing that the Government's appeal has become equitably moot. The Second Circuit's law on equitable mootness requires parties to exercise due diligence in vindicating their rights before "substantial consummation" of a bankruptcy plan. While the Government maintains that equitable mootness should not apply to this or any appeal, it is timely seeking a stay to ensure that these important issues are decided on the merits.

Debtors have not identified any countervailing harm to justify denying a stay. The Government proposed that the Debtors agree to stay just the Exculpation Provision pending appeal, rather than the entire Confirmation Order, but they declined. Nor did the parties identify a concrete date when the Plan will become effective that might obviate the need for a stay, stating that they would seek to consummate the Plan "expeditiously" or "as quickly as possible."[4] Today, Debtors indicated that it was unlikely that the transactions contemplated by the Plan would close by Monday, and estimated that it would take a week or two. We are only asking the Court to stay the Exculpation Provision, not the remainder of the Plan, while the United States pursues its appeal.

## **BACKGROUND**

### A.    **General Background**

1.    Voyager Digital Holdings, Inc. and its affiliated entities (collectively, "**Voyager**" or the "**Debtors**") commenced voluntary cases under chapter 11 of the Bankruptcy Code on July 5, 2022 (the "**Petition Date**"). [Dkt. No. 1].

2.    The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[4] *See* Hearing Transcript, March 7, 2023, at 34-35.

3.      The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure. [Dkt. No. 73].

4.      On the first day of these chapter 11 cases, the Debtors filed the Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code [Dkt. No. 17]. It served as a floor for the marketing process of Debtors' assets. Shortly thereafter, the Debtors filed the Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief [Dkt. No. 126], which set a timeline for interested parties to submit bids for an acquisition of the Debtors' assets and procedures for conducting an auction if multiple bids were received.

5.      On August 12, 2022, the Debtors filed the First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code [Dkt. No. 287] and the Disclosure Statement Relating to the First Amended Joint Plan of Reorganization of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code [Dkt. No. 288] and the Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates With Respect Thereto [Dkt No. 289].

6.      On September 28, 2022, the Debtors filed a Motion for Entry of an Order (I) Authorizing Entry Into the Asset Purchase Agreement and (II) Granting Related Relief. [Dkt. No.

472]. This motion sought approval of the an agreement with FTX US with respect to the sale of substantially all of the Debtors' assets.

7.    On October 5, 2022, the Debtors filed the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code [Dkt. No. 496] and the First Amended Disclosure Statement Relating to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code [Dkt. No. 498].

8.    On October 19, 2022, the Debtors filed their proposed Order Approving (I) the Adequacy of the Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates With Respect Thereto [Dkt. No. 563]. On October 20, 2022, the Court entered an order approving the Debtors' entry into the Asset Purchase Agreement [Dkt. No. 581], and on October 21, 2022, the Court entered an order approving the FTX Disclosure Statement. Dkt. No. 586.

9.    On October 20, 2022, the Court entered an Order Authorizing Entry into the Asset Purchase Agreement [Dkt. No. 581]. The Debtors contemplated effectuating the transaction with FTX pursuant to the Second Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code [Dkt. No. 590]. The Court entered an order approving the adequacy of this disclosure statement on October 21, 2022, and solicitation for acceptance or rejection of the associated plan commenced shortly thereafter. [Dkt. No. 586]. A confirmation hearing was scheduled for December 8, 2022.

10.    The Court entered the order authorizing the Debtors to enter into an Asset Purchase Agreement with FTX on October 20, 2022 [Dkt. No. 581] only to see FTX collapse in November 2022. *See In re FTX Trading Ltd..* No. 22-11068-JTD, *Declaration of John J. Ray III in Support*

*of Chapter 11 Petitions and First Day Pleadings* [Dkt. No. 24] (Bankr. D. Del. Filed Nov. 17,

2022); *see* 2/28 Memo in Support ¶ 2 ("The Debtors were weeks away from consummating a sale

when their proposed purchaser, *FTX, epically collapsed*." (emphasis added)). On November 11,

2022, FTX and its affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy

Code in the Bankruptcy Court for the District of Delaware. *In re FTX Trading Ltd.*, No. 22-11068-

JTD [Dkt. No. 1] (Bankr. D. Del. filed Nov. 11, 2022). Moreover, "FTX's new CEO publicly

announced that the proposed purchaser was a fraud of historic proportions, sending shockwaves

through the entire cryptocurrency industry. Senior FTX executives were charged with federal

felonies and at least three have pled guilty, admitting that FTX and its affiliates defrauded many,

including its own customers and commercial counterparties like the Debtors." 2/28 Memo in

Support ¶ 2; *see also SEC v. Nishad Singh*, No. 1:23-cv-01691 (S.D.N.Y. filed Feb. 28, 2023).

11.    On December 18, 2022, after the collapse of FTX US (and its affiliated entities)

had "derailed . . . the Debtors' journey to consummation" of its Asset Purchase Agreement with

that entity, the Debtors entered into a new Asset Purchase Agreement (the "**APA**") with BAM

Trading Services Inc. ("**Binance.US**" or the "**Purchaser**") [Dkt. No. 863, at 20 of 420].

12.    On December 22, 2022, the Debtors filed the Third Amended Joint Plan of Voyager

Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code

[Dkt. No. 777]; the Second Amended Disclosure Statement Relating to the Third Amended Joint

Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the

Bankruptcy Code [Dkt. No. 778]; and the Debtors' Motion for Entry of an Order (I) Scheduling a

Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally

Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures

for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections, and (IV) Granting Related Relief [Dkt. No. 779].

13.    On December 30, 2022, the Government filed a Notice Concerning the Review of Certain Transactions by the Committee of Foreign Investment in the United States (CFIUS) [Dkt. No. 797]. It stated that CFIUS review of the proposed transaction "could affect the ability of the parties to complete the transactions, the timing of completion, or relevant terms. Bankruptcy courts have previously acknowledged that potential national security concerns (including CFIUS review) are relevant factors in bankruptcy proceedings, and specifically in determining whether bidders are qualified." *Id*. at 1.

14.    On January 13, 2023, the Court entered an order [Dkt. No. 861] (i) conditionally approving the adequacy of the latest disclosure statement, (ii) scheduling a combined hearing to consider confirmation of the Plan and approval of the Disclosure Statement on a final basis, and (iii) approving (a) the Solicitation and Voting Procedures; (b) certain notices and certain dates and deadlines in connection with solicitation and confirmation of the Plan; and (c) the manner and form of the Solicitation Packages and the materials contained therein.

**B.    The Evolution of the Plan and Confirmation Order**

15.    The original plan provided that each "Exculpated Party" was "exculpated" from:

> any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other

agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; provided that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

[January 10 Plan Article VIII(C)]. The proposed Plan further concludes that:

To the extent that any Cryptocurrency is deemed to be a "security" by the SEC or any Governmental Unit, distribution of such Cryptocurrency shall have been done in good faith and in compliance with all applicable laws, rules, and regulations and the Exculpated Parties shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the distribution of Cryptocurrency whether such Cryptocurrency is deemed to be a "security" or otherwise.

*Id.* It also states that:

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

16.    The definition of "Exculpated Parties" includes major participants in these cases,

including (in each case in its capacity as such) "(a) each of the Debtors; (b) the Committee, and

each of the members thereof, solely in their capacity as such; (c) each of the Released

Professionals; (d) each of the Released Voyager Employees; and (e) the Distribution Agent." *Id*.

at Art. I(A)(77), pg. 17 of 151.

17.    On February 28, 2023, the Debtors filed a revised Third Amended Joint Plan. [Dkt.

No. 1117].

18.    The concept of a Plan Administrator was first introduced in that document:

> 120. "Plan Administrator" means the Person or Persons selected by the Committee, after consultation with the Debtors, subject to the approval of the Bankruptcy Court and identified in the Plan Supplement, to serve as the administrator(s) of the Wind-Down Debtor, and any successor thereto, appointed pursuant to the Plan Administrator Agreement.
>
> 121. "Plan Administrator Agreement" means that certain agreement by and among the Debtors, the Committee, the Plan Administrator and the Wind-Down Debtor, which shall be included in the Plan Supplement in a form reasonably acceptable to the Committee.

[*Id.* ¶¶ 120, 121, pg. 20 of 157]. However, the Debtors did not provide the Court or interested parties a copy of any proposed or executed administrator plan agreement at the time of filing the February 28 Plan.

19.      On February 28, 2023, the Debtors filed their first Proposed Order [Dkt. No. 1120]. It included language that would have principally—and appropriately—carved the Government out of any exculpation or releases in the plan:

> 141. Governmental Units. Nothing in this Confirmation Order or the Plan shall effect a release of any claim by the United States or any of its agencies arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States, or under any rules or regulations enforced by the United States or any of its agencies against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States from bringing any claim, suit, action or other proceedings against the Released Parties for any liability for any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States, or under any rules or regulations enforced by the United States or any of its agencies, nor shall anything in the Confirmation Order or the Plan exculpate any such party from any liability to the United States or any of its agencies, arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States, or under any rules or regulations enforced by the United States or any of its agencies; provided, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order and thus no person or entity, including the United States or any of its agencies, can seek or receive a direct or indirect distribution of any property of the Debtors' estates unless they filed a Proof of Claim prior to the Governmental Bar Date.

[*Id.* ¶ 141, pg. 64-65].

20.     On March 1, 2023, just one day before the plan confirmation hearing, the Debtors

filed a Third Amended Joint Plan. [Dkt. No. 1125].

21.     On March 2, 2023, during the Confirmation Hearing (defined below) and weeks

after the voting deadline and objections were due and without providing notice to anyone, the

Debtors for the first time added language that would expressly undo the Government carve-out

they had previously proposed. [Dkt. No. 1130, Amended Proposed Order]:

> 142. **Governmental Units.** Nothing in this Confirmation Order or the Plan shall
> effect a release by the United States, the States or any of their agencies of any claim
> arising under the Internal Revenue Code, the environmental laws or any civil or
> criminal laws of the United States or the States, or under any rules or regulations
> enforced by the United States, the States or any of their agencies against the
> Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin
> the United States or the States from bringing any claim, suit, action or other
> proceedings against the Released Parties for any liability for any claim, suit or
> action arising under the Internal Revenue Code, the environmental laws or any civil
> or criminal laws of the United States or the States, or under any rules or regulations
> enforced by the United States, the States or any of their agencies, nor shall anything
> in the Confirmation Order or the Plan exculpate any such party from any liability
> to the United States, the States or any of their agencies, arising under the Internal
> Revenue Code, the environmental laws or any civil or criminal laws of the United
> States or the States, or under any rules or regulations enforced by the United States,
> the States or any of their agencies; *provided, however*, that nothing in this
> Confirmation Order or the Plan shall modify in any respect the relief previously
> granted in the Bar Date Order and thus no person or entity, including the United
> States, the States or any of their agencies, can seek or receive a direct or indirect
> distribution of any property of the Debtors' estates unless they filed a Proof of
> Claim prior to the Governmental Bar Date; *provided, further*, **that the United
> States, the States, and their agencies may not, and will not, allege that the
> Restructuring Transactions are a violation of any rules or regulations enforced
> by the United States, the States or any of their agencies, nor will they bring
> any claim against any Person[5] on account of or relating to the Restructuring
> Transactions**.

---

[5] The Plan defines "Person" as having "the meaning set forth in section 101(41) of the Bankruptcy
Code," Plan, Article I(A)(118)—which broadly includes:

> [an] individual, partnership, and corporation, but does not include governmental unit,
> except that a governmental unit that—
>> (A) acquires an asset from a person—
>>> (i) as a result of the operation of a loan guarantee agreement; or
>>> (ii) as receiver or liquidating agent of a person;

143. Nothing in this Confirmation Order, the Disclosure Statement, the Plan, or the Asset Purchase Agreement releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the Effective Date; or (iii) any liability to a Governmental Unit on the part of any non-Debtor **(except to the extent set forth in paragraphs 97 and 99 herein)**; provided, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order; *provided, further*, **that no Governmental Unit will allege that the Restructuring Transactions are a violation of any rules or regulations enforced by the United States, the States or any of their agencies, nor will they bring any claim against any Person on account of or relating to the Restructuring Transactions.** Nothing in this Confirmation Order, the Disclosure Statement, the Plan, or the Asset Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, without compliance with all applicable legal requirements.

[Dkt. 1130, Amended Proposed Order, ¶¶ 142 and 143 (emphasis added)].

22.     The latest version of the Plan defines the Restructuring Transactions as "those

mergers, amalgamations, consolidations, reorganizations, arrangements, continuances,

restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate

transactions that the Debtors and the Committee jointly determine to be necessary to implement

the transactions described in this Plan, as described in more detail in Article IV.B herein and the

Restructuring Transactions Memorandum." Plan, Article I(A)(140). By definition, then, each of

these Restructuring Transactions will not occur until after the Plan's effective date and in

furtherance of the goals set forth in the plan. Nor are they defined with any specificity by the

---

(B) is a guarantor of a pension benefit payable by or on behalf of the debtor or an affiliate of the debtor; or
(C) is the legal or beneficial owner of an asset of—
    (i) an employee pension benefit plan that is a governmental plan, as defined in section 414(d) of the Internal Revenue Code of 1986; or
    (ii) an eligible deferred compensation plan, as defined in section 457(b) of the Internal Revenue Code of 1986 . . . .

11 U.S.C. § 101(41).

Court—they are simply whatever transactions "Debtors and the Committee jointly determine to be necessary to implement the transactions described in the Plan."

23.     The Plan also included a "toggle" feature, whereby if the sale transaction is not consummated by an "Outside Date" [Dkt. No. 1125, pg. 39-40 of 155]—defined in section 8.1 of the APA as four (4) months after the date of the APA [Dkt. No. 775, pg. 108 of 150]—or if the APA is terminated, the Debtors will pivot to a standalone plan. [Dkt. No. 863, Amended Disclosure Statement, Section IV, at pg. 29 of 420].

24.     On March 5, 2023, Debtors filed their Third Amended Joint Chapter 11 Plan (the "**Confirmed Plan**"). [Dkt. No. 1138].

25.     Also on March 5, 2023, while the Confirmation Hearing was still ongoing, the Debtors filed a further revised Confirmation Order [Dkt. No. 1140], that includes the same language improperly seeking exculpation and releases as against the Government and enjoining the Government from enforcing the law, in paragraphs 142 and 143.

**C.     Objections to the Plan and its Associated Transactions**

26.     On January 4, 2023, the United States Trustee filed an Objection to the Debtors' motions to enter into an asset purchase agreement with Binance.US and for conditional approval of the Debtors' Amended Disclosure Statement. [Dkt. No. 811].

27.     On February 22, 2023, the United States Securities and Exchange Commission filed its Objection to final approval of the Amended Disclosure Statement and to confirmation of the Plan. [Dkt. No. 1047].

28.     On February 24, 2023, the United States Trustee filed his objection to final approval of the Amended Disclosure Statement and to confirmation of the January 10 Plan. [Dkt. No. 1085]. Among other grounds, the United States Trustee objected to the Plan's exculpation provision,

arguing that the non-debtor releases are unconstitutional, violate the Bankruptcy Code, and are inconsistent with Second Circuit law. [Dkt. No. 1085 pg. 3, 17-18 of 22]. Moreover, he argued that the Plan inappropriately provides prospective releases to entities that do not yet exist. Specifically, the Wind-Down Debtors, the Plan Administrator, among others, are to receive prospective releases under the Amended Plan's release provisions.

29.     On March 2, 2023, the Government filed a letter objecting to the change that Debtors had just made to the Exculpation Provision removing the governmental carve-out arguing, *inter alia*, that the exculpation language improperly barred the Government from enforcing its laws and regulations in the ordinary course against the Debtors and third parties in connection with the Restructuring Transactions. Dkt. No. 1132. This objection was joined by the Federal Trade Commission and the New Jersey Bureau of Securities. [Dkt. Nos. 1134, 1135.]

30.     On March 3, 2023, the Texas State Securities Board filed its objection to the Plan and Disclosure Statement, arguing *inter alia*, that the government should be excluded from the broad exculpation language. [Dkt. No. 1136].

31.     On March 6, 2023, the USAO filed a brief objecting to the latest iteration of the Exculpation Provision (the "**USAO Objection**") again arguing, *inter alia*, that the proposed exculpation language improperly barred the Government from enforcing its laws and regulations in the ordinary course against the Debtors and third parties in connection with the Restructuring Transactions. [Dkt. No. 1144].

**D.     Confirmation Hearing**

32.     From March 2 through March 7, 2023, the Court held a hearing to consider, *inter alia*, final approval of the Amended Disclosure Statement and confirmation of the Third Amended Joint Plan (the "**Confirmation Hearing**").

33.     On March 2, 2023, on the morning the Confirmation Hearing began, the Debtors

for the first time proposed to undo the Government carve-out they had previously proposed. *See*

*supra* ¶ 19.

34.     On March 6, 2023, as part of the Confirmation Hearing, the Court held a brief oral

argument on the Government's objection, at which the Debtors offered to further revise the

Amended Proposed Order. However, at the hearing, the Court stated it would approve an

exculpation provision, consistent with its decision in *Aegean*, insulating Debtors and others from

prospective governmental liability in connection with their consummation of the transactions

contemplated in the Plan and related documents. The Court expressly and emphatically rejected

the Government's argument that the Court did not have the authority to release criminal liability.

*See* Transcript of Confirmation Hearing, March 7, 2023, at 25-26.

35.     In *Aegean*, however, as in many cases where the Government is actively involved,

the Government was carved out of the exculpation provision. *See In re Aegean Marine Petroleum*

*Network*, 18-13374-mew, Confirmation Order, filed March 29, 2019, ECF No 503, paragraph

92(a) ("Moreover, nothing in the Confirmation Order or the Plan shall release or exculpate any

non-debtor, including any Released Parties and/or Exculpated Parties, from any liability to any

Domestic Governmental Unit, including but not limited to any liabilities arising under the Internal

Revenue Code, the environmental laws, or the criminal laws against the Released Parties and/or

Exculpated Parties, nor shall anything in this Confirmation Order or the Plan enjoin any Domestic

Governmental Unit from bringing any claim, suit, action or other proceeding against any non-

debtor for any liability to a Domestic Governmental Unit; provided, however, that this paragraph

shall not (i) limit the scope of discharge granted to the Debtors under sections 524 and 1141 of the

Bankruptcy Code; (ii) diminish the scope of any exculpation to which any party, including the

Exculpated Parties, is entitled under section 1125(e) of the Bankruptcy Code; or (iii) diminish the scope of any release to which any Released Parties are entitled to the extent provided by and subject to the limitations of the provisions of 92(b) below.[6]

36.    Following the conclusion of the Confirmation Hearing, on March 8, 2023, the Court entered an Order Approving the Second Amended Disclosure Statement and Confirming the Third Amended Joint Plan of Reorganization [Dkt. No. 1157], and later that day a further amended Order Approving the Second Amended Disclosure Statement and Confirming the March 5 Plan (the "**Confirmation Order**"), [Dkt. No. 1159].

37.    The Confirmation Order revised the exculpation provisions Debtors had proposed to the following (the "**Exculpation Provision**"):

> Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; provided that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

---

[6] *See also, e.g.*, *In re Cenveo*, 18-22178-rdd, Findings of Fact and Conclusions of Law, Aug 21, 2018, Dkt. No. 685 ¶ 117 ("Moreover, nothing in the Plan or this Confirmation Order shall release or exculpate any non-Debtor, including any Released Parties, from any liability to any Governmental Unit…"); *In re SunEdison*, 16-10992 (SMB), Plan, Section 11.8, filed July 28, 2017, Dkt. No. 3735 ("Nothing in the Confirmation Order or the Plan shall release or exculpate any non-Debtor, including any Released Parties, from any liability to the United States or Texas, including but not limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws, or any legal action or claim brought by the SEC, nor shall anything in this Confirmation Order or the Plan enjoin the United States or Texas from bringing any claim, suit, action or other proceeding against any non-Debtor, including any Released Party for any liability whatsoever; provided, however, that the foregoing sentence shall not limit the scope of discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code).

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes.

In addition, the Plan contemplates certain rebalancing transactions and the completion of distributions of cryptocurrencies to creditors. The Exculpated Parties shall have no liability for, and are exculpated from, any claim for fines, penalties, damages, or other liabilities based on their execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan.

For the avoidance of doubt, the foregoing paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would violate applicable laws or regulations. Nothing in this provision shall limit in any way the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further. Nor does anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, or limit the penalties that may be applicable if such a future regulatory or court order is issued and is violated. Similarly, nothing herein shall limit the authority of the Committee on Foreign Investment of the United States to bar any of the contemplated transactions. Nor does anything in this provision alter the terms of the Plan regarding the compliance of the Purchaser with applicable laws in the Unsupported Jurisdictions before distributions of cryptocurrency occur in those Unsupported Jurisdictions.

Confirmation Order at 7-8.

38.    The Confirmation Order also provided that "[f]or good cause shown, the stay of this Confirmation Order provided by the Bankruptcy Rules shall terminate at the end of the day on March 13, 2023, and this Confirmation Order shall be effective and enforceable immediately thereafter." [Dkt. No. 1159, Confirmation Order, ¶ 124]. This time has been extended to March 15, 2023, at 5:00 pm. [Dkt. No. 1169, Order Extending Stay].

39.    Before entry of the Confirmation Order, no copy of the Plan Administrator Agreement or the terms thereof had been filed on the docket of the Debtors' cases, or otherwise provided to the Government and the United States Trustee.

18

40.     On March 9, 2023, after the conclusion of the four-day Confirmation Hearing and after the entry of the Confirmation Order, and despite having introduced the concept of the Plan Administrator in earlier iterations of the plan, the Debtors filed the Sixth Amended Plan Supplement, which included, for the first time, the Plan Administrator Agreement. [Dkt. No. 1161].

41.     Although the Plan Administrator was contemplated pre-Confirmation Hearing and was embodied in the various iterations of proposed confirmation orders, it was only after the conclusion of the Confirmation Hearing that the Debtors added the Plan Administrator to the list of Exculpated Parties.

## **LEGAL STANDARD**

42.     Federal Rule of Bankruptcy Procedure 8007 provides that a request for a stay of a bankruptcy court's order pending the outcome of an appeal "must ordinarily be presented to the bankruptcy judge in the first instance." Fed. R. Bankr. P. 8007.[7] To determine whether a stay pending appeal is appropriate, a court considers: whether the movant is likely to succeed on the merits on appeal; whether the movant will suffer irreparable injury if the stay is denied; whether issuance of the stay will substantially injure the other parties interested in the proceeding; and where the public interest lies. *Nken v. Holder*, 556 U.S. 418, 426 (2009). Where the Government is a party, the injury and public interest factors merge. *Id*. (holding factors of "assessing the harm to the opposing party and weighing the public interest" "merge when the Government is the opposing party").

---

[7] A bond or other security is not required when an appeal is taken by the United States, its officer, or its agency or by direction of any department of the federal government. Fed. R. Bankr. P. 8007(d).

43.    There is substantial overlap between these factors and those that govern preliminary injunctions. *Id.* at 434. Under Second Circuit law, "[f]or a preliminary injunction to issue, the movant must establish (1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor, and (2) irreparable harm in the absence of the injunction." *Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 183-84 (2d Cir. 2019) (internal quotation marks omitted); *accord Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35-38 (2d Cir. 2010); *Mohamed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002); *ACC Bondholder Grp. v. Adelphia Comm. Corp. (In re Adelphia Comm. Corp.)*, 361 B.R. 337, 346-47 (S.D.N.Y. 2007).[8]

44.    "Before issuing a stay, it is ultimately necessary to balance the equities—to explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (internal alteration and quotation marks omitted). The balance of equities favors granting a stay here.

## ARGUMENT

**I.    The Court Should Stay the Exculpation Provision or, If Necessary, the Confirmation Order in its Entirety.**

### A.  The Government Has a Likelihood of Success on the Merits.

45.    The Government is likely to succeed in this appeal since Congress did not afford bankruptcy courts the power to release and immunize from suit debtors' or non-debtors' conduct that falls within the Government's police and regulatory powers. But even assuming such

---

[8] The Second Circuit applies a more stringent likelihood-of-success standard when a party is seeking to enjoin government action. *See Trump v. Deutsche Bank AG*, 943 F.3d 627, 637 (2d Cir. 2019), *vacated on other grounds by Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020).

exculpation were allowed in the limited circumstances recognized by some courts, the Court may not exculpate persons who are not estate fiduciaries or conduct that occurs after a Chapter 11 bankruptcy plan has become effective.

**1) The Court Improperly Exceeded Its Statutory Authority in Approving the Exculpation Provision.**

46.     Bankruptcy is the "subject of the relations between a[] . . . debtor[] and his creditors, extending to his and their relief." *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513-14 (1938) (quotation omitted). To standardize an "expansive (and sometimes unruly) area of law," *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 649 (2012), Congress enacted the Bankruptcy Code under the Bankruptcy Clause of the U.S. Constitution, which vests Congress with power to "adjust[] . . . a failing debtor's obligations," *Railway Labor Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982) (quotation omitted). The Code's intricate provisions are intended to give the honest but unfortunate debtor a fresh start while ensuring the maximum possible equitable distribution to creditors. *See Stellwagen v. Clum*, 245 U.S. 605, 617 (1918); *Williams v. U.S. Fid. & Guar. Co.*, 236 U.S. 549, 554-55 (1915). Because the purpose of bankruptcy is to adjust the debtor-creditor relationship, the Code is replete with provisions related to that objective.

47.     As the focus of the Code is the creditor-debtor relationship, it provides no basis for courts to prospectively immunize debtors and non-debtors from law enforcement and other actions undertaken by the Government. Nor can courts release debtors and non-debtors for acts committed after a plan becomes effective. And courts cannot exculpate entities that do not even exist at plan confirmation. Rather, the Code permits a discharge of the debtor against *pre-petition claims* by creditors, *see* 11 U.S.C. § 1141(d), not actions that take place *after* the effective date of a plan. Liquidating Debtors like Voyager are not even entitled to a discharge. S*ee id.* § 1141(d)(3). The exculpation provision here violates all these proscriptions.

21

48.     Notwithstanding these background principles, the Court approved a broad

exculpation that would bar the Government from exercising its police and regulatory authority to

pursue Exculpated Parties not just for conduct that took place during the bankruptcy but also for

the "implementation of any transactions" contemplated by the Plan that will largely happen after

the Plan becomes effective. *See* Exculpation Provision. Nor would this Court permit the

Government to pursue the Exculpated Parties for liability for their actions pertaining to the

"rebalancing transactions and the completion of distribution of cryptocurrencies to creditors." *Id.*

While the Court contemplated that the Government could seek to enjoin these transactions, or seek

other prospective relief, it forbade the Government from pursuing its civil or criminal remedies

relating to these transactions that occur before they are stopped or prevented. *Id.* But the Plan does

not spell out with precision all the steps that the parties must take in accomplishing the

restructuring transactions or rebalancing transactions. The definition of "Restructuring

Transactions" expressly recognizes that the specific transactions that will be conducted have not

been defined, as it allows for "corporate transactions that the Debtors and the Committee jointly

determine to be ne necessary to implement the transactions described in the Plan." In other words,

the Court gave a broad release for conduct that has not yet occurred, at least in substantial part,

with license for certain parties to later determine how to accomplish the transactions.

49.     An "exculpation" is merely a subspecies of a release, which requires a proper

statutory basis in the Code. *See, e.g., In re Chemtura Corp.*, 439 B.R. 561, 610-11 (Bankr.

S.D.N.Y. 2010) (explaining that "[w]hether they're called 'exculpation provisions' (principally

dealing with the post-petition period) or 'third-party releases' (applying more broadly),"

exculpation and third-party releases both generally involve claims by nondebtors against other

nondebtors). Only one Code provision—section 1125(e)—explicitly contemplates any sort of

exculpation, for liability for certain actions relating to soliciting acceptance of a bankruptcy plan. The challenged Exculpation Provision is far broader, and thus cannot be justified by section 1125(e). Moreover, section 1125(e) provides only an affirmative defense to subsequent litigation, not a prospective release from suit. *See, e.g.*, *SEC v. Universal Exp., Inc.,* 475 F. Supp. 2d 412, 425-26 (S.D.N.Y. 2007) (Lynch, J.) (noting that defendant bears burden of proof on a defense under section 1125(e), and denying defendant's summary judgment motion on the defense because, *inter alia*, "no reasonable factfinder could conclude that the securities in question were issued pursuant to the Option Plan and therefore exempted from registration, or even that defendants have raised a genuine issue of fact about whether they were"). The Exculpation Provision here elevates an affirmative defense that a defendant must prove with specific facts into a total bar against suit—which is not how section 1125(e) operates, even if it applied.[9]

50.    The only statutory authority the Court cited to justify the Exculpation Provision is 11 U.S.C. § 1142(a), which provides: "Notwithstanding any otherwise applicable non-bankruptcy law, rule, or regulation relating to financial condition, the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court." *Id.*; Decision at 33-35. The Court explained: "Section 1142 thereby imposes an affirmative, statutory obligation on the debtors, other entities and their personnel to do

_____

[9] Some courts have held that 11 U.S.C. § 1103(c) provides a degree of qualified immunity as an affirmative defense to an official committee acting in furtherance of its official duties. *See, e.g., Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 514 (S.D.N.Y. 1994). As an initial matter, there is nothing in Section 1103(c) that expressly confers such immunity. In any event, the Code does not authorize bankruptcy courts to preemptively extinguish or enjoin claims, including those that might arguably fall within the scope of a bankruptcy participant's qualified immunity. Thus, courts have recognized that this type of qualified immunity is also an affirmative defense. *See, e.g., Luedke v. Delta Air Lines, Inc.*, 159 B.R. 385, 391-94 (S.D.N.Y. 1993); *In re Tucker Freight Lines, Inc.*, 62 B.R. 213, 215, 218 (Bankr. W.D. Mich. 1986) (denying committee members' motion for summary judgment on immunity). Qualified immunity—in this context or any other— is not a basis for a preemptive injunction against litigation in which it might arguably apply.

23

what the plan contemplates. In effect, the confirmation order acts as a court order that the plan be carried out." Decision at 33. But while this statute instructs the debtor and others to "carry out the plan," it does not authorize a bankruptcy court to bar the Government from enforcing its police and regulatory powers over actions taken during the implementation of the plan or shield post-effective date conduct from governmental scrutiny. Moreover, this provision only addresses "the debtor and any entity organized or to be organized for the purpose of carrying out the plan," which is a far narrower set of entities than the Exculpated Parties.

51.      Moreover, reading section 1142 to authorize a third party-release (including exculpation) would contravene more specific Code sections—which the Supreme Court has repeatedly held is impermissible. *See Law v. Siegel*, 571 U.S. 415, 421 (2014). Here, section 524 is the sole, specific provision addressing third-party releases, *see In re Purdue Pharma, L.P.*, No. 21 Civ. 7532 (CM), 2021 WL 5979108, at *49 (S.D.N.Y. Dec. 16, 2021), and section 1125(e) is the sole provision permitting exculpation. But the exculpation language here is not an asbestos-related release under Section 524(g) or (solely) a solicitation-related exculpation under Section 1125(e). A general authorization cannot swallow a "more limited, specific authorization" in the Bankruptcy Code. *RadLAX Gateway Hotel*, 566 U.S. at 645-46, 649.[10]

52.      Nor did the Court cite any basis for releasing the Government's potential criminal claims for conduct that has not yet even occurred when it is beyond cavil that an Article I

---

[10] Although not cited by the Court, Section 105 likewise does not provide any authority to approve involuntary third-party releases, including exculpation. That is because—as the Second Circuit has acknowledged—section 105(a) does not expand bankruptcy courts' statutory powers. *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, *See* 416 F.3d 136, 142 (2d Cir. 2005); *see also In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) ("[Section 105(a)] does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity") (quotation marks and citations omitted).

bankruptcy court lacks *any* power over criminal matters. *See, e.g.*, *In re Grabis*, No. 13-10669 (JLG), 2020 WL 7346467, at *12 n.71 (Bankr. S.D.N.Y. Dec. 11, 2020) ("The Court lacks subject matter jurisdiction to enforce state or federal criminal laws."); *In re Rae*, 436 B.R. 266, 275 (Bankr. D. Conn. 2010) ("As a matter of law, this Court lacks subject matter jurisdiction over alleged violations of criminal statutes.").

53.    There are several other jurisdictional and constitutional reasons why the Government is likely to succeed on the merits of its appeal, in addition to the lack of any statutory authority regarding the Exculpation Provision. First, there is no waiver of sovereign immunity in 11 U.S.C. § 106 that would subject the Government to the Court's determination that it cannot bring police and regulatory enforcement actions even for post-effective date conduct. *See* USAO Objection ¶¶ 41-49. Second, as Debtors have not identified any specific enforcement actions that the Exculpation Provision is intended to enjoin, there was no case or controversy that the Court had the power to hear. *See id.* ¶¶ 50-55. Third, the Court cannot purport to evaluate and insulate claims for conduct that has not even happened yet. Fourth, the Court lacks jurisdiction to enter the Exculpation Provision, which swept far broader than the *res* of the estate and enjoined potential *in personam* enforcement actions by the Government and others against other non-debtors. *See id.* ¶ 54-59; *In re Johns-Manville Corp.*, 600 F.3d 135, 158 (2d Cir. 2010) (bankruptcy court "was not exercising its *in rem* power when it concluded that [the nondebtor's claims against another non-debtor] were enjoined"). Fifth, and fundamentally, the Exculpation Provision violates basic core principles of due process. *See* USAO Objection ¶¶ 66-72. Although government entities have no right to due process under the Fifth Amendment's due process clause, *see United States v. Cardinal Mine Supply*, 916 F.2d 1087, 1089 n. 3 (6th Cir. 1990), everyone else subject to the Exculpation Provision's prohibition against suit for post-petition conduct have a right not to be prevented from

recovering for post-effective date conduct. And regarding the Government specifically, the Supreme Court recognized in *City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 297 (1953), that it is "a basic principle of justice . . . that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights." The Exculpation Provision violates that requirement both by providing inadequate notice of which claims were released, and by depriving the Government of an opportunity to be heard on any claims of which it has no notice. USAO Objection ¶¶ 66-72. "[I]n the absence of a clear expression of Congress' intent to" permit bankruptcy courts to extinguish non-debtors' claims against other non-debtors without consent, this Court should not "construe the [Code] in a manner that could in turn call upon the Court to resolve" the due-process issues presented by this appeal. *United States v. Security Indus. Bank*, 459 U.S. 70, 82 (1982) (quotation omitted).

### 2) The Exculpation Provision Far Exceeds the Limited Scope of Defenses Other Courts Have Recognized for Certain Conduct.

54.     The Decision cited several cases holding that court-appointed trustees or others acting under court orders could be exculpated for actions taken within the scope of those duties, but the limited defense recognized in these cases cannot justify the Exculpation Provision here. The Government does not question that, as a general matter, parties acting under court direction or supervision may assert an immunity defense to the extent applicable in subsequent actions seeking to hold them liable for such acts. However, the Exculpation Provision departs from that general rule—and the Government's appeal is likely to succeed—for several reasons.

55.     First, none of the cases cited in the Decision address governmental enforcement actions, let alone criminal actions. It is at least an open question whether (and to what extent) common law or judicially created immunity doctrines apply to specific statutory enforcement schemes or criminal law, as opposed to ordinary tort law. Indeed, not all government enforcement

schemes rely on malicious intent or some other mental state. Tax liability may arise simply based on the structure of a transaction. An obligation to bring real property into compliance with the Americans with Disabilities Act, or to clean up toxic waste under federal environmental law, does not require a mental state, but is inherent in the ownership of property. It is not obvious that any immunity could apply in such a circumstance.

56.     Second, even assuming that a species of immunity might apply to some future Government action, such immunity would create at most an affirmative defense to liability. The doctrines of absolute and qualified immunity require defendants to demonstrate that their challenged actions fell within the protected scope. *See, e.g.*, *Imbler v. Pachtman*, 424 U.S. 409, 419 (1976) ("An absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity."). For example, in *Stewart v. Lattanzi*, the Second Circuit reversed and remanded a district court's holding that state parole officers were absolutely immune, because "[s]ome factual inquiry must be made to determine whether the duties of the defendants were judicial or prosecutorial in nature entitling them, or any of them, to absolute immunity." 832 F.2d 12, 13 (2d Cir. 1987). Indeed, the cases the Decision cites note that common-law immunity has its own fact-based exceptions. For example, *In re Ctr. Teleproductions, Inc.*, the court acknowledged—citing the Supreme Court—that there is no immunity when a party claims that the very court order a trustee purportedly followed was obtained through fraud. 112 B.R. 567, 580 (Bankr. S.D.N.Y. 1990).

57.     Third, and relatedly, because most of the purportedly exculpated conduct has not even yet occurred, it would be impossible for any court to predetermine that a defendant has *in fact complied* with court orders and done nothing else. A party could accomplish a court-approved (or court-directed) transaction by illegal means, such as by funding a court-authorized purchase

27

with stolen property. For example, in *In re J & S Properties, LLC*, cited in the Decision, the court

noted that even a bankruptcy trustee otherwise afforded immunity "may be sued in his or her

individual capacity for wrongful acts which exceed the scope of his or her authority—i.e., a

bankruptcy trustee may be personally liable for wrongful acts that are *ultra vires*." 545 B.R. 91,

105 (Bankr. W.D. Pa. 2015). Determining whether such an exception will apply to a hypothetical

future claim is impossible at this time.

### 3) The Exculpation Provision Is Impermissibly Overbroad Because It Exculpates Both Non-Fiduciaries and Future Conduct.

58.     Further, even assuming bankruptcy courts had some statutory authority

affirmatively to provide exculpation (rather than making findings that could be relied upon to

support a hypothetical future affirmative defense to liability), the Exculpation Clause here is far

broader than those approved by courts permitting some degree of exculpation for fiduciaries of the

estate, including by this Court in *Aegean*. The Exculpation Provision is particularly problematic

because it not only extends to non-fiduciaries of the estate but also covers conduct not just during

the bankruptcy proceeding itself but also conduct after the plan's effective date. *See, e.g., In re

Fraser's Boiler Serv., Inc.*, 593 B.R. at 640 ("Exculpation clauses generally only exculpate those

actions taken in connection with a bankruptcy case between the petition date and the effective date

of the plan.").

59.     Here, the "Exculpated Parties" include non-fiduciaries of the estate and people who

had no direct involvement with any action taken during the pendency of the bankruptcy

proceedings. These include, for example, the Purchaser, Binance.US, and the Plan Administrator,

who is not an estate fiduciary even if he will have some fiduciary duties. Indeed, the Plan

Administrator will not even exist until after the Effective Date of the Plan. *See In re Washington

Mutual, Inc.*, 442 B.R. 314, 348 (Bankr. D. Del. 2011) ("[These parties] have not done anything

yet for which they need a release. They will not even come into existence until the Plan is confirmed.").

60.    Because the Exculpation Provision includes actions that post-date the plan's effective date, it provides impermissible prospective immunity from suit. This is especially problematic because, after the plan's effective date, the exculpated parties will no longer be acting under the supervision of the Court. Thus, while the Court has broadly approved certain transactions—and the Court's order may be used to defend against any collateral attacks on that approval—there remain many specific but undefined actions that must be taken to implement those transactions. And there are myriad ways the exculpated parties could engage in misconduct for which they should—and otherwise would—be liable but for the Exculpation Provision. One can imagine any number of laws or regulations Debtors and others may violate after the Plan's effective date—tax laws, environmental laws, securities laws, and criminal laws, among others, in connection with whatever steps they take to effectuate the Plan. And while the Purchaser's exculpation excludes criminal conduct and other *ultra vires* acts, Plan at 51, the exculpation of the Plan Administrator and others is not so limited. This exculpation of future conduct is rendered even more problematic by the toggle feature of the Plan, which creates even more uncertainty regarding what potential conduct is being exculpated.

61.    Notably, the Exculpation Provision is importantly different than that approved by the Court in *Aegean*. The exculpation provision in *Aegean* expressly did not pertain to transactions that occurred after the effective date of the plan:

> NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING OR IN THE PLAN, OTHER THAN WITH RESPECT TO THE REORGANIZED DEBTORS AND THE NON-DEBTOR SUBSIDIARIES THEMSELVES, THE EXCULPATION SET FORTH ABOVE SHALL NOT RELEASE OR BE AN EXCULPATION WITH RESPECT TO . . . (II) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY

UNDER THE PLAN, ANY TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.

*In re Aegean Marine Petroleum Network Inc.,* No. 18-13374-mew, Dkt. No. 503, pg. 41 of 60. In contrast to *Aegean*, the Exculpation Provision here purports to prospectively exculpate actions that post-date the plan effective date and that have not yet occurred. The exculpation in *Aegean* also only covered entities that existed at the time the plan went effective, and not entities that did not come into existence until after the effective date of the plan. The exculpation at issue thus far exceeds even what this Court permitted in *Aegean*, and accordingly, the Government is likely to prevail on the merits that the Exculpation Provision is impermissible.

### B. The Balance of Harms Weighs in Favor of a Stay of the Exculpation Clause and, as Necessary, the Entire Confirmation Order.

62. Not only is the Government likely to succeed on appeal, but the balance of the harms also weighs in favor of a stay. The final three factors—whether there is irreparable injury if the stay is denied, substantial injury to other parties if the stay is issued, or an impact on public interest—require the court to balance these respective harms. *Nken*, 556 U.S. at 426. Here, the balance of the harms weighs in favor of a stay.

63. As noted, when the Government is a party, the injury and public interest factors merge. *Cf. id.* at 426 (holding factors of "assessing the harm to the opposing party and weighing the public interest" "merge when the Government is the opposing party"). That is particularly true here, where the United States Trustee is acting as the congressionally designated "bankruptcy watch-dog[]," H.R. Rep. No. 95-595 at 88 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6049, and fulfilling his "responsibility to represent and protect the public interest," *Adams v. Zarnel (In re Zarnel)*, 691 F.3d 156, 162 (2d Cir. 2010). In ensuring compliance with the law, the United

States Trustee is advocating on behalf of the interests of all stakeholders, the integrity of the bankruptcy system, and the public interest.

64.     This case implicates important public interests. As explained above, the cryptocurrency space has been rife with fraud and abuse. "Outright fraud, scams, and theft in digital asset markets are on the rise: according to FBI statistics, reported monetary losses from digital asset scams were nearly 600 percent higher in 2021 than the year before."[11] The Government's job is to enforce the law and prosecute misconduct. The release here that unlawfully ties the Government's hands is thus a matter of critical public importance. A stay would serve the public interest by ensuring that the rights of the state and federal governmental units released under the Debtors' Plan through the Exculpation Provision are protected.

65.     By contrast, a stay will not cause any harm that outweighs the harms from denying a stay. Indeed, the parties are not even ready to consummate the transaction. At the Confirmation Hearing, the parties were unable to provide the Court with a date for closing. *See* March 3, 2023 Transcript at 70:13-71:14. Even more critically, the Debtors testified that they would do more due diligence before closing a deal with Binance.US. *Id*. at 70:24-25 ("We plan to continue to perform due diligence in advance of a closing"); 70:13-21 ("we would anticipate closing probably in the range of three to four weeks from approval of the plan. There's still work that needs to be done from the Debtors' perspective in order to be able to prepare for the closing of the transaction, that includes its ability to, for example, meet the requirements under the rebalancing ratio and work that needs to be done around that. There's operational work that would still need to be done from an integration and transfer perspective"); 74:11-17 ("We're still continuing to perform due diligence").

---

[11]    https://www.whitehouse.gov/briefing-room/statements-releases/2022/09/16/fact-sheet-white-house-releases-first-ever-comprehensive-framework-for-responsible-development-of-digital-assets/

The Confirmed Plan itself provides a five month outside date (four months plus an additional 30-day election) for closing with still time to determine if the toggle feature should be implemented. *See* Dkt. No. 775, APA at Art. VII, ¶ 8.1(c).[12] *See also* March 3, 2023 Transcript at 40:12-41:1 (discussing the analysis for initiating the Confirmed Plan's toggle feature).

66.    There is thus no proverbial melting ice cube here. The Debtors and Binance.US can continue their due diligence and other preclosing activities while the Exculpation Provision (or the entire Confirmation Order) is stayed and this is appeal is litigated.

67.    A stay pending appeal would also preserve the public's right to meaningful appellate review of the Exculpation Provision. *See Adelphia*, 361 B.R. at 349. Although the Government believes that an equitable mootness argument would not succeed here, the Debtors have refused to waive this argument and would presumably seek to bar any appeal if the deal closes and a stay is not approved. Accordingly, the Government is moving out of an abundance of caution to stay at least the Exculpation Provision, to prevent Debtors from seeking to moot any appeal and avoid the risk of litigating equitable mootness. Any delay in consummating the Plan does not outweigh the potential outright elimination of rights effected by the overly broad Exculpation Provision.

68.    Debtors incorrectly argued at the scheduling hearing today that the potential for equitable mootness could not be considered in balancing the harms to the parties. This contention is inaccurate. The ability to appeal "is a substantial and important right" because it is "the guarantee of accountability in our judicial system." *ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In*

---

[12] The Confirmed Plan states that "'Outside Date' has the meaning set forth in the Asset Purchase Agreement. All references herein to the 'Outside Date' shall be deemed to include the 'Extended Outside Date' to the extent the Outside Date is extended in accordance with Section 8.1(c) of the Asset Purchase Agreement." Confirmed Plan at ¶ 116, pg. 20 of 157.

*re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 342 (S.D.N.Y. 2007). The mooting of an appeal thus

is a "'quintessential form of prejudice.'" *Country Squire Assocs. of Carle Place, L.P. v. Rochester*

*Cmty. Sav. Bank*, 203 B.R. 182, 183 (B.A.P. 2d Cir. 1996) (quoting *Lutin v. United States Bankr.*

*Court (In re Advanced Mining Sys., Inc.)*, 173 B.R. 467, 469 (S.D.N.Y. 1994)); *accord Adelphia*

*Commc'ns Corp.*, 361 B.R. at 348.

69.     Courts have found that the irreparable injury from potential equitable mootness

warrants a stay when, as here, the appeal involves important issues or when the loss of the ability

to appeal is not the only harm from the appeal being mooted. *See Adelphia Commc'ns Corp.*, 361

B.R. at 346-47 (granting stay of confirmation order where equitable mootness threatened denial of

review of settlement, incorporated into plan, that eliminated claims without consent); *Beneficial*

*Homeowner Serv. Corp. v. Moreau (In re Moreau)*, 135 B.R. 209, 215 (N.D.N.Y. 1992) (holding

$20,000 loss unreviewable on appeal because of mootness would be irreparable harm); *In re St.*

*Johnsbury Trucking Co.*, 185 B.R. 689-90 & n.1 (S.D.N.Y. 1995) (holding risk of equitable

mootness of appeal challenging contested release that would cause government to lose claims

against releasees constituted irreparable harm); *Advanced Mining Sys., Inc.*, 173 B.R. at 469

(granting stay where mooting of appeal would deny appellants any recovery)

70.     Accordingly, because the "loss of appellate rights is a quintessential form of

prejudice," and the Government's ability to enforce its police and regulatory powers is implicated

by the Exculpation Provision, avoiding equitable mootness issues satisfies the irreparable harm

requirement. *Adelphia*, 361 B.R. at 348 (internal quotation marks omitted).

## CONCLUSION

WHEREFORE, for these reasons, the Government respectfully requests (1) a stay of the

Exculpation Provision pending appeal and (2) an immediate interim stay pending a decision on

this Stay Motion. If this Court grants no other relief, the Government requests a two-week stay to

allow it time to seek relief in the District Court.

Dated: March 14, 2023
      New York, New York

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

By:    /s/ Lawrence H. Fogelman
LAWRENCE H. FOGELMAN
JEAN-DAVID BARNEA
PETER ARONOFF
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:   (212) 637-2800
E-mail:
Lawrence.Fogelman@usdoj.gov
Jean-David.Barnea@usdoj.gov
Peter.Aronoff@usdoj.gov

By:    /s/ Linda A. Riffkin
WILLIAM K. HARRINGTON
United States Trustee, Region 2
LINDA A. RIFFKIN
Assistant United States Trustee
RICHARD C. MORRISSEY
MARK BRUH
Trial Attorneys

U.S. Department of Justice
Office of the United States Trustee –
NY Office
Alexander Hamilton Custom House
One Bowling Green, Room 534
New York, New York 10004-1408
(212) 510-0500

34