Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' MEMORANDUM OF LAW IN OPPOSITION
## TO THE GOVERNMENT'S MOTION TO STAY

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

## TABLE OF CONTENTS

**Page(s)**

Preliminary Statement.......................................................................................................1

Argument .........................................................................................................................12

I.      The Government Has No Chance of Success On the Merits. ...........................13

        A.      It is Well-Established that Exculpation Provisions Are Proper in This
                Circuit. ...................................................................................................13

        B.      The Bankruptcy Court Has the Statutory Authority to Approve
                Exculpation Clauses................................................................................18

        C.      None of the Government's Remaining Arguments Actually Challenge the
                Long-Held Permissibility of Exculpation Provisions. ...........................22

II.     The Government Cannot Identify Let Alone Prove Irreparable Injury Absent a
        Stay. .................................................................................................................24

III.    The Issuance of a Stay Will Substantially Injure Thousands of Creditors Who Are
        Relying on Implementation of the Plan. ..........................................................30

IV.     The Public Interest Compels Denial of the Stay. .............................................32

Conclusion .......................................................................................................................34

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 461 7th Avenue Mkt., Inc.*,
2021 WL 5917775 (2d Cir. Dec. 15, 2021) .............................................................................12

*In re Adelphia Commc'ns Corp.*,
333 B.R. 649 (S.D.N.Y. 2005)...........................................................................12, 27, 28, 29

*In re Adelphia Commc'ns Corp.*,
361 B.R. 337 (S.D.N.Y. 2007).........................................................................................27, 29

*In re Aegean Marine Petroleum Network Inc.*,
599 B.R. 717 (Bankr. S.D.N.Y. 2019)...............................................................15, 16, 19, 22

*In re AMR Corp.*,
2021 WL 5016606 (Bankr. S.D.N.Y. Oct. 28, 2021) .......................................................30, 31

*In re Barneys New York, Inc.*,
No. 19-36300 (CGM) (Bankr. S.D.N.Y. Feb. 5, 2020) ..........................................................17

*In re Brown*,
2020 WL 3264057 (Bankr. S.D.N.Y. June 10, 2020)..............................................................12

*In re Calpine Corp.*,
2008 WL 207841 (Bankr. S.D.N.Y. Jan. 24, 2008).................................................................25

*In re Cenveo, Inc.*,
No. 18-22178 (RDD) (Bankr. S.D.N.Y. Aug. 21, 2018) .........................................................17

*In re DAEBO Int'l Shipping Co., Ltd.*,
2016 WL 447655 (Bankr. S.D.N.Y. Feb. 4, 2016 ..................................................................29

*In re Dairy Mart Convenience Stores, Inc.*,
351 F.3d 86 (2d Cir. 2003)......................................................................................................18

*In re Deluxe Entertainment Services Group Inc.*,
No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 25, 2019) .........................................................17

*In re Ditech Holding Corp.*,
2021 WL 3716398 (Bankr. S.D.N.Y. Aug. 20, 2021) .......................................................15, 16

*In re DJK Residential, LLC*,
2008 WL 650389 (S.D.N.Y. March 7, 2008) .......................................................25, 26, 27, 28

*In Re Enron Corp.*,
    326 B.R. 497 (S.D.N.Y. 2005).........................................................................14, 16

*In re FGIC Corp.*,
    No. 10-14215 (SMB) (Bankr. S.D.N.Y. Apr. 23, 2012).........................................18

*In re Fullbeauty Brands Holdings Corp.*,
    No. 19-22185 (RDD) (Bankr. S.D.N.Y. Feb. 5, 2019)..........................................17

*In re Gen. Motors Corp.*,
    409 B.R. 24 (Bankr. S.D.N.Y. 2009)..............................................................28, 32

*In re Granite Broad. Corp.*,
    369 B.R. 120 (S.D.N.Y. 2007)..................................................................14, 15, 21

*Green Point Bank v. Treston*,
    188 B.R. 9 (S.D.N.Y. 1996)..............................................................................13

*In re Highland Cap. Mgmt., L.P.*,
    48 F.4th 419 (5th Cir. 2022)..............................................................................21

*In re Hollander Sleep Products, LLC*,
    No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019)..........................................17

*In re Johns-Manville Corp.*,
    517 F.3d 52 (2d Cir. 2008)..............................................................................23

*In re Lakeland Tours, LLC*,
    No. 20-11647 (JLG) (Bankr. S.D.N.Y. Sept. 15, 2020) .........................................17

*LaRouche v. Kezer*,
    20 F.3d 68 (2d Cir. 1994) ..............................................................................13

*In re Latam Airlines Group S.A.*,
    2022 WL 2811904 (Bankr. S.D.N.Y. July 16, 2022) ...................................... *passim*

*In re Latam Airlines Grp. S.A.,*
    2022 WL 2541298 (Bankr. S.D.N.Y. July 7, 2022) ...............................................15

*In re Latam Airlines Grp., S.A.*,
    2022 WL 2657345 (Bankr. S.D.N.Y. July 8, 2022) ..............................28, 29, 30, 32

*In re Latam Airlines Grp. S.A.,*
    2022 WL 2962948 (Bankr. S.D.N.Y. July 26, 2022) .............................................15

*In re Latam Airlines Grp. S.A.*,
    2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022).......................................15, 17

*In re Metromedia Fiber Network, Inc.*,
   416 F.3d 136 (2d Cir. 2005)..................................................................21

*In re Moreau*,
   135 B.R. 209 (N.D.N.Y. 1992)............................................................25

*In re Olinda Star Ltd.*,
   614 B.R. 28 (Bankr. S.D.N.Y. 2020)...................................................16

*In re Oneida Ltd.*,
   351 B.R. 79 (S.D.N.Y. 2006)..........................................................14, 16

*In re Purdue Pharma, L.P.,*
   635 B.R. 26 (S.D.N.Y. 2021)..........................................................21, 22

*In re Sabine*,
   548 B.R. 674 (Bankr. S.D.N.Y. 2016)...................................25, 30, 32

*In re Sbarro LLC*,
   No. 14-10557 (MG) (Bankr. S.D.N.Y. May 19, 2014)].....................17

*In re Stearns Holdings, LLC*,
   607 B.R. 781 (Bankr. S.D.N.Y. 2019)..................................................16

*Turner v. Citizens Nat'l Bank of Hammond* (*In re Turner*),
   207 B.R. 373 (2d Cir. B.A.P. 1997)....................................................13

*In re United Retail Group, Inc.*,
   No 12-10405 (SMB) (Bankr. S.D.N.Y. Sept. 18 2012).......................17

*In re Voyager Digital Holdings*,
   No. 22-10943 (Mar. 7, 2023) ...................................................... *passim*

*Williams v. George Junior Republic* (*In re Cujas*),
   376 B.R. 480 (Bankr. E.D. Pa. 2007) ...................................................28

*In re World Trade Ctr. Disaster Site Litig.*,
   503 F.3d 167 (2d Cir. 2007).................................................................12

**Statutes**

11 U.S.C. § 101(5) ........................................................................................10

11 U.S.C. § 101(27) ......................................................................................10

11 U.S.C. § 105 ........................................................................................18, 22

11 U.S.C. § 1129(a)(3).......................................................................11, 18, 19, 23

11 U.S.C. § 1141(d) ...........................................................................................................10, 21

11 U.S.C. § 1142 ..........................................................................................................12, 19, 20

11 U.S.C. § 1142(a) ..................................................................................................................20

11 U.S.C. § 1142(b) ..................................................................................................................20

**Rules**

N.Y. Comp. Codes R. & Regs.
  tit. 22 § 1200.08 Rule 1.8(h)(1) (2009)..............................................................................7, 8, 9

**Other Authorities**

U.S. Const., Art. I § VIII...........................................................................................................23

The above-captioned debtors (the "Debtors") respectfully submit this memorandum in opposition to the United States of America (the "Government")'s Motion for Stay pending appeal [Docket No. 1181] (the "Motion") and Memorandum of Law [Docket No. 1182] (the "Mem.").

## **Preliminary Statement**

1.      As the first significant cryptocurrency restructuring, the Debtors' chapter 11 cases featured several questions of first impression for this Court and the bankruptcy bar more generally. But the issues presented in the Government's appeal and motion for a stay are not among them. Instead, the Government seeks to stay the Court's Confirmation Decision,[2] and implementation of the Debtors' Plan,[3] based on an exculpation provision that is standard in the Second Circuit, has been approved by *numerous* courts, and has bound the Government many times before. Moreover, if exculpation is appropriate in any case, it is appropriate here, given the Government's lack of guidance on any relevant issue for *years*[4] and various officials' vague threats—even after the Confirmation Order was entered[5]—to take action based on standards they refused to articulate to the Court,[6] but somehow believe are clear enough to follow.

---

[2]   *Decision Regarding (1) Approval of the Debtors' Disclosure Statement, (2) Confirmation of the Debtors' Plan of Reorganization, (3) Motions Seeking the Appointment of a Trustee, (4) Motions Requesting Full Customer Access to Account Holdings, and (5) Related Matters* [Docket No. 1170] (the "Confirmation Decision").

[3]   *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Cod*e [Docket No. 1161-1] (as amended, modified, or supplemented from time to time, the "Plan").

[4]   Transcript, *In re Voyager Digital Holdings*, No. 22-10943 at 39:25–41:4 (Mar. 7, 2023) ("There are firms that operate as cryptocurrency brokers or exchanges and have done so for several years without being subject to clearer and well-defined regulatory requirements. The regulators themselves cannot seem to agree[.]").

[5]   *See, e.g.,* Gary Gensler, Opinion, https://thehill.com/opinion/congress-blog/3891970-getting-crypto-firms-to-do-their-work-within-the-bounds-of-the-law/ ("I find the talking point that there's a lack of clarity in the securities laws unpersuasive. Some crypto companies might message that the laws are unclear rather than admitting that their platforms don't have sufficient investor protection.").

[6]   Transcript, *In re Voyager Digital Holdings*, No. 22-10943 at 24:18–25 (Mar. 2, 2023) (Mr. Uptegrove (on behalf of the SEC): "On the issue of the securities laws, the SEC is not taking a position on whether any of the transactions in the plan are violative of the federal security laws.")

2.      The Government's rationale for seeking a stay is even more puzzling than its position during the Confirmation Hearing.   The Debtors and others have been asking the government for *months* to identify what, if anything, is legally amiss about the now-confirmed Plan—which effectively mirrors the plan filed after the Debtors' two-week auction in September 2022.   In response, *none* of the *numerous* federal agencies involved in these Chapter 11 Cases identified *anything at all.*   And at the Confirmation Hearing, the relevant officials refused to say.[7] Even in its Motion, the Government does not say what (if anything) the challenged Exculpation Provision prevents it from doing that it actually plans to do.   Instead, what the Government seeks is the ultimate reservation of rights—it wants to be free to punish those charged with implementing the Plan and Confirmation Order even after they do so in reliance on this Court's directions.

3.      The Government has already forced Voyager to waste millions of dollars of funds that should be going to creditors on extensive investigations.   The Government now asks the Court to halt customer recoveries in their tracks, and impose *still more* harm on Voyager account holders, for no identified purpose.   The Court should see the dogged pursuit of a doomed appeal for what it is:   a transparent attempt to delay consummation while the Government sorts out its own cryptocurrency enforcement priorities and theories.    And every day the Court allows the Government to stall is another day of delayed distributions to Voyager customers—the very people the Government should be serving.   The Court already found that the Plan was proposed in good faith and not by means forbidden in law, and directed all exculpated parties to implement the plan. It is imperative that they be able to do so free from reprisal.

---

[7]     *Id.*; *see also* Confirmation Decision ("All of the government entities . . .had every opportunity to tell me if they believed that anything contemplated by the Plan would violate any applicable statute, rule, or regulation. Four States have taken the position that Binance.US cannot open customer accounts in those States without additional approvals, and the Plan specifically takes account of that fact. No other regulator has contended during the confirmation hearing that there is anything illegal in what the plan contemplates.")

**Background**

4.      On July 5, 2022 (the "Petition Date"), the Debtors filed voluntary petitions for relief in the United States Bankruptcy Court for the Southern District of New York (the "Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

5.      The Court initially set the bar date for the filing of proofs of claim against the debtors by governmental parties for January 3, 2023 [the "Bar Date Order," Docket No. 218.]  On December 20, 2022, the Debtors filed the *Stipulation and Agreed Order Extending Governmental Bar Date for the US Securities and Exchange Commission* [Docket No. 758], whereby the Debtors agreed to extend the deadline by which the Securities and Exchange Commission (the "SEC") must file a proof of claim to January 17, 2023.  But the SEC did not ultimately file a proof of claim prior to or following the extended deadline.  Nor did the United States Attorneys' Office (the "USAO"), the United States Trustee's Office (the "US Trustee"), nor the Commodities Futures Trading Commission ("CFTC"), nor the Federal Deposit Insurance Corporation (the "FDIC").

6.      On December 21, 2022, the Debtors filed their *Motion for Entry of An Order (I) Authorizing Entry Into the Binance US Purchase Agreement and (II) Granting Related Relief* [Docket No. 775].  In that motion, among other things, the Debtors expressly requested Court approval to commence a "rebalancing" exercise to buy and sell cryptocurrency in preparation for making in-kind distributions to creditors following confirmation of a plan of reorganization.  At the hearing on that motion, the Debtors' counsel described the rebalancing process that the Debtors intended to pursue *in detail*.[8]  Despite being on notice, the Government did not object, and the Court authorized the Debtors to consummate the rebalancing process.

---

[8]    Transcript, *In re Voyager Digital Holdings*, No. 22-10943 at 75:16–76:10 (Jan. 10, 2023).

7.      Specifically, on January 13, 2023, the Court entered the *Order (I) Authorizing Entry into the Asset Purchase Agreement and (II) Granting Related Relief* [Docket No. 860], which granted the Debtors' entry into the asset purchase agreement with BAM Trading Services Inc. d/b/a Binance.US ("Binance.US,") and provided that "[t]he Debtors are authorized to rebalance their cryptocurrency portfolio subject to the terms of the Binance US Purchase Agreement." Neither the Government nor any other party objected to or otherwise opposed the rebalancing provisions included in that certain asset purchase agreement. To date, the Government has not articulated any laws, rules, or regulations that any of the restructuring transactions contravene, nor do they do so in their Motion or Memorandum.

8.      On January 13, 2023, the Debtors filed the Plan and the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 863] (as amended or supplemented from time to time, the "Disclosure Statement").

9.      On January 13, 2023, the Court entered *the Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Adequacy of the Debtors' Disclosure Statement, (III) Approving (A) Procedures for Solicitation, (B) Forms of Ballots and Notices, (C) Procedures for Tabulation of Votes and (D) Procedures for Objections* [Docket No. 861] (the "Conditional Disclosure Statement Order") conditionally approving the Disclosure Statement, establishing February 22, 2023, at 4:00 p.m. (prevailing Eastern Time) as the deadline to file an objection to approval of the Disclosure Statement on a final basis and confirmation of the Plan (the "Objection Deadline"), and approving solicitation materials, including notices, forms, and ballots (collectively, the "Solicitation Packages").

10.    The Debtors caused the Solicitation Packages and the deadline for objecting to the Disclosure Statement and to confirmation of the Plan to be distributed on or before January 25, 2023, in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), the Disclosure Statement Order, and the Solicitation Procedures, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 926] and the *Supplemental Affidavit of Service* [Docket Nos. 927 and 1016].

11.    The Plan as proposed provided in bold-face type as follows:

**C.    Exculpation**

**Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

**The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan**

Plan at 66.  While the proposed plan did include a provision saying that the SEC could enforce its police powers, *see id.* at 58, there was no general governmental "carve out" from exculpation.

12.    On February 22, 2023, certain federal and state governmental agencies filed objections to approval of the Disclosure Statement and confirmation of the Plan in advance of the Objection Deadline [Docket Nos. 1042, 1047, 1051].  Notably, none of the objections included opposition to the exculpation provision contained in Article VIII.C of the Plan.

13.    On February 24, 2023, after the Debtors granted an extension of the Objection Deadline for certain parties and the U.S. Trustee, the Texas State Securities Board and the Texas Department of Banking, and the New Jersey Bureau of Securities filed objections to approval of the Disclosure Statement and confirmation of the Plan [Docket Nos. 1085, 1086, 1087].  The U.S. Trustee's objection to the exculpation provision contained in Article VIII.C of the Plan took the position that such provision went broader than the Court's previous rulings while also focusing on the fact that "Exculpated Parties" should not also be "Released Parties" under the Plan.  The Debtors continued to regularly engage with all state and federal governmental agencies regarding both formal and informal objections up and through the entry of the Confirmation Order.[9]

14.    On March 2, 2023, the Court commenced the joint hearing to consider the adequacy of the Debtors' Disclosure Statement and confirmation of the Plan (the "Combined Hearing").

15.    On March 5, 2023, the Debtors filed the revised version of the Plan [Docket No. 1138], which included the below exculpation provision as Article VIII.C of the Plan:

> Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement,

---

[9]    The dispute over the proposed exculpation provision began when the SEC and certain other regulators began to argue with Debtors' counsel over the meaning of the Bar Date Order and began to dispute the consequences of their failure to file a proof of claim, arguing for an indefinite "reservation of rights" that effectively exempted them from these chapter 11 cases forever.

the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; *provided* that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

To the extent that any Cryptocurrency is deemed to be a "security" by the SEC or any Governmental Unit, distribution of such Cryptocurrency shall have been done in good faith and in compliance with all applicable laws, rules, and regulations and the Exculpated Parties shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the distribution of Cryptocurrency whether such Cryptocurrency is deemed to be a "security" or otherwise.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

16.    On March 2, 2023, the Government filed an objection to certain provisions contained in the proposed Confirmation Order.  [Docket No. 1132].  The Debtors continued to engage with all parties in an effort to reach resolution on outstanding issues and consensus on proposed language to the Confirmation Order, including with respect to the exculpation of liability from carrying out the "Restructuring Transactions" under the Plan, including by proposing language to the proposed Confirmation Order and sharing with the certain state and federal governmental agencies on numerous occasions to reach resolution of any outstanding issues.

17.     On March 6, 2023, the Government filed an objection to confirmation of the Plan alleging that the Plan and Confirmation Order "contain improperly broad exculpation language that purports to bind the Government from exercising its police and regulatory powers against the Debtors and various third parties."  [Docket No. 1144].

18.     Following the four-day Combined Hearing, the Court entered the *Corrected and Amended Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1166] (the "Confirmation Order").   The Confirmation Order modified certain provisions of the Plan, including Article VIII.C of the Plan, which was stricken in its entirety and replaced by the language in section A of the Confirmation Order (the "Exculpation Provision"):

- Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; *provided* that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

- The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes.

- In addition, the Plan contemplates certain rebalancing transactions and the completion of distributions of cryptocurrencies to creditors.  The Exculpated Parties shall have no liability for, and are exculpated from, any claim for fines, penalties, damages, or other liabilities based on their execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan.

- For the avoidance of doubt, the foregoing paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would violate applicable laws or regulations. Nothing in this provision shall limit in any way the powers of any Governmental Unit to

contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further. Nor does anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, or limit the penalties that may be applicable if such a future regulatory or court order is issued and is violated. Similarly, nothing herein shall limit the authority of the Committee on Foreign Investment of the United States to bar any of the contemplated transactions. Nor does anything in this provision alter the terms of the Plan regarding the compliance of the Purchaser with applicable laws in the Unsupported Jurisdictions before distributions of cryptocurrency occur in those Unsupported Jurisdictions.

Confirmation Order, § A. The Confirmation Order also included the below provisions regarding

the Exculpation Provision:

> 97.     Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; *provided* that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

> 98.     The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes.

> 99.     In addition, the Plan contemplates certain rebalancing transactions and the completion of distributions of cryptocurrencies to creditors. The Exculpated Parties shall have no liability for, and are exculpated from, any claim for fines, penalties, damages, or other liabilities based on their execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan. For the avoidance of doubt, this paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would violate applicable laws or regulations. Nothing in this provision shall limit in any way the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further. Nor does anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, or limit the penalties that may be applicable if such a future regulatory or court order is issued and is violated. Similarly, nothing herein shall limit the

authority of the Committee on Foreign Investment of the United States to bar any of the contemplated transactions.  Nor does anything in this provision alter the terms of the Plan regarding the compliance of the Purchaser with applicable laws in the Unsupported Jurisdictions before distributions of cryptocurrency occur in those Unsupported Jurisdictions.

100.    For the avoidance of doubt, the Debtors are not entitled to a discharge under section 1141(d).

101.    Governmental Units.  Except as set forth in the exculpation provisions set forth in the Plan (including sections VI.B.1 and VIII.C of the Plan) and in this Confirmation Order, nothing in this Confirmation Order or the Plan shall release or restrict any claim by the United States, the States or any of their agencies of any claim arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or the States from bringing any claim, suit, action or other proceedings against the Released Parties for any liability for any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies, nor shall anything in the Confirmation Order or the Plan exculpate any such party from any liability to the United States, the States or any of their agencies, arising under the Internal Revenue Code, the environmental laws or any civil or criminal laws of the United States or the States, or under any rules or regulations enforced by the United States, the States or any of their agencies; *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.

102.    Except as set forth in the exculpation provisions set forth in the Plan (including sections VI.B.1 and VIII.C of the Plan) and in this Confirmation Order, nothing in this Confirmation Order, the Disclosure Statement, the Plan, or the Asset Purchase Agreement releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the Effective Date; or (iii) any liability to a Governmental Unit on the part of any non-Debtor (except to the extent set forth in paragraphs 49 and 56 herein); *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.

104.    Notwithstanding any provision herein to the contrary, nothing in this Confirmation Order or the Plan grants this Court jurisdiction over any police and regulatory actions by the SEC, and the SEC shall retain the power and authority to commence and continue any such actions against any person or entity, including

without limitation, the Debtors, in any forum with jurisdiction; *provided*, however, that nothing in this Confirmation Order or the Plan shall modify in any respect the relief previously granted in the Bar Date Order.

Confirmation Order ¶ 97–102, 104.

19.    On March 11, 2023, the Court issued the Confirmation Decision, overruling all objections and approving the Disclosure Statement and confirming the Plan.

20.    Certain of the Court's finding in the Confirmation Decision warrant emphasis.

21.    First, Section 1129(a)(3) of the Bankruptcy Code required the Court to conclude that the Plan was "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  In its Confirmation Decision, the Court stated, in part:

> Voyager's case is a high-profile one, and the facts that Voyager has been attempting to sell itself to another firm, and to make "in kind" distributions of cryptocurrencies to account holders, has been known for many months.  The SEC and all other government agencies have had a full and fair opportunity to object if they believe that the rebalancing transactions that I have previously approved and that are contemplated by the plan are illegal in any way, or if they believe that the distributions of cryptocurrencies and cash that are contemplated by the plan are violative in any way of any applicable statute, rule or regulation.  I have no desire or intention to approve anything that runs afoul of legal limits, just as I have no desire to approve anything that will put customers at risk.  The plain fact is, however, that the SEC has not actually made any objection.  It has only vaguely hinted at possible issues that have not even been described in a manner that would permit the Court or the parties to address them.

Confirmation Decision at 13.  Later in the Confirmation Decision, the Court expressly concluded that "[b]ased on the evidence that has actually been offered to me, if I were to make that determination today I would have no choice but to conclude that the transactions are perfectly legal." *Id.* at 39.  **Critically, the Government does not contest <u>any</u> of these findings.**

22.    The Confirmation Decision also directly addressed the appropriateness of the Exculpation Provision and the absurdity of the Government's position, calling it "unreasonable and wrong" that "any officers or directors or entities who would implement the confirmed plan

would just have to 'take their chances' as to whether the Government might contend that their conduct was illegal, and as to whether the Government might seek to punish them for doing what I had authorized and directed them to do." *Id.* at 33.  This Court would not let civil or criminal liability hang over people's heads in a situation where the Government was not "prepared to say . . . that there is anything wrongful about what we are currently contemplating." *Id.* at 34–35.

23.    The Plan will go effective shortly, when the Debtors complete diligence and decide between the two paths provided therein: (a) a sale to Binance.US; or (b) a "self-liquidation" pursuant to the confirmed Plan.  When that happens, the Debtors and their professionals, along with the Committee and its professionals, will be directed—by the Court's Order and by the Bankruptcy Code—to implement the Plan.  *See* 11 U.S.C. § 1142.

### Argument

24.    The Motion and Memorandum do not come remotely close to meeting the stringent requirements for a stay pending appeal.  The Court must consider: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *In re 461 7th Avenue Mkt., Inc.*, 2021 WL 5917775 (2d Cir. Dec. 15, 2021) (quoting *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007)).  Stays pending appeal are an extraordinary form of relief that "are the exception, not the rule, and are granted only in limited circumstances." *In re Brown*, 2020 WL 3264057, at *5 (Bankr. S.D.N.Y. June 10, 2020).

25.    Any stay applicant bears a "heavy" burden.  *In re Adelphia Commc'ns Corp.*, 333 B.R. 649, 659 (S.D.N.Y. 2005).  But the "burden is especially heavy" where, as here, the movant "seeks to stay the Confirmation Order." *In re Latam Airlines Group S.A.*, 2022 WL 2811904, at *2 (Bankr. S.D.N.Y. July 16, 2022).  The Government "must show 'satisfactory' evidence on all

four criteria." *Turner v. Citizens Nat'l Bank of Hammond* (*In re Turner*), 207 B.R. 373, 375 (2d Cir. B.A.P. 1997). "Failure to satisfy one prong of the standard for granting a stay pending appeal dooms [the Government's] motion." *Green Point Bank v. Treston*, 188 B.R. 9, 12 (S.D.N.Y. 1996). Here, the Government has offered **zero** evidence. And it fails to satisfy any of the four factors—let alone all of them. This Court should deny the requested stay.

## I.    The Government Has No Chance of Success On the Merits.

26.    The Government's appeal is contrary to well-established precedent. To obtain a stay, the Government must demonstrate "a substantial possibility" that its appeal will succeed. *LaRouche v. Kezer*, 20 F.3d 68, 72 (2d Cir. 1994). No such possibility exists here. To the contrary, courts in this District and throughout the Second Circuit routinely approve chapter 11 plans containing the same or similar exculpation language as is challenged here. The Government offers no reason why this Court should ignore or overturn that precedent. Nor does the Government raise a unique question of law that might cause the district or appellate courts to overturn such precedent. On this basis alone, the Court should deny the Motion.

### A.    It is Well-Established that Exculpation Provisions Are Proper in This Circuit.

27.    The overwhelming case law in this Circuit sanctions this Court's approval of the challenged Exculpation Provision. The plain language of the Exculpation Provision is narrow, providing only that *court-approved* parties (and their advisors) tasked with carrying out the Plan will not face criminal or civil liability for taking the *court-approved* steps necessary to implement the Plan, provided their actions do not constitute fraud, willful misconduct or gross negligence. Plan, Art. VIII.C. Contrary to the Government's characterization, this provision does not release any claims currently held or even anticipated by any government entity. And the Government's new theory in its Memorandum—that it objects to the exculpation provision because of the need to police fraud in the cryptocurrency sector more generally (Mem. at 1-3)—makes no sense

13

whatsoever given that, as the Government well knows from its extensive investigation of the matter: (a) Voyager was *the victim of the FTX fraud, not a perpetrator*; and (b) the exculpation provision itself contains a carve out for fraud.  Instead, all the exculpation provision does is set forth the standard of care to be applied to parties charged with implementing the Plan.  As set forth below, approval of this standard of care is well-established in this Circuit.

28.    Even going back only 20 years, the precedent for the Court's findings is pervasive. In 2006, in *Enron*, the district court affirmed an exculpation clause like the one at-issue here, characterizing it as "*reasonable and customary* and in the best interests of the estates."  *In Re Enron Corp.,* 326 B.R. 497, 504 (S.D.N.Y. 2005) (emphasis added).  Like the Exculpation Provision in the Plan, the *Enron* clause exculpated the debtors, the creditors' committee, and others involved in the development and implementation of the plan from liability for "any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases, the formulation, preparation, dissemination, *implementation*, confirmation or approval of the Plan or any compromises or settlements contained therein."  *Id.* at 500–01 (emphasis added). Like the Government here, the *Enron* appellant did not present the court with evidence that it currently had or would ever have a claim covered by the exculpation provision—meaning the court was approving a plan no party had challenged as illegal under the current laws and exculpating parties that implement the plan in good faith.  *Id.*  The *Enron* rationale applies with equal force in this case, more than 15 years later.

29.    The District Court in *In re Oneida Ltd.* similarly overruled an objection to an exculpation clause, concluding the proposed language was "standard in this district." 351 B.R. 79, 94 n.22 (S.D.N.Y. 2006); *see also In re Granite Broad. Corp.*, 369 B.R. 120, 139 (S.D.N.Y. 2007) (exculpating the debtors and others for "actions in connection, related to, or arising out of the

Reorganization Cases . . . exclud[ing] gross negligence and intentional misconduct"). Like the provision here, the provisions in *Oneida* covered any "act or omission in connection with, or arising out of, the Disclosure Statement, the Plan or any Plan Document ... the solicitation of votes for and the pursuit of Confirmation of [the] Plan, the Effective Date of [the] Plan, ***or the administration of [the] Plan or the property to be distributed under [the] Plan***." *Id.* (emphasis added). And as the paragraphs that follow make clear, exculpation provisions like the one in the Plan have been standard in this district for nearly two decades.

30.    Indeed, four years ago, this Court recognized the propriety of exculpation provisions "meant to insulate court-supervised fiduciaries and some other parties from claims that are based on actions that relate to the restructuring, with the exception of claims that are based on allegations of fraud, willful misconduct, or gross negligence." *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 720–21 (Bankr. S.D.N.Y. 2019). Additional courts have followed suit since. *See, e.g., In re Latam Airlines Grp. S.A.*, 2022 WL 2206829, at *49–50 (Bankr. S.D.N.Y. June 18, 2022), *corrected*, 2022 WL 2541298 (Bankr. S.D.N.Y. July 7, 2022), and *motion to certify appeal denied*, 2022 WL 2962948 (Bankr. S.D.N.Y. July 26, 2022), and *aff'd sub nom. In re Latam Airlines Grp.*, S.A., 643 B.R. 756 (S.D.N.Y. 2022), and *aff'd sub nom. In re Latam Airlines Grp., S.A.*, 643 B.R. 741 (S.D.N.Y. 2022), *aff'd sub nom. In re Latam Airlines Grp. S.A.*, 55 F.4th 377 (2d Cir. 2022) (overruling the trustee's objection because "[i]t is well settled that an exculpation clause approved at confirmation may exculpate estate fiduciaries like a committee, its members, and estate professionals for their actions in the bankruptcy case except where those actions amount to willful misconduct or gross negligence"); *In re Ditech Holding Corp.*, 2021 WL 3716398, at *9 (Bankr. S.D.N.Y. Aug. 20, 2021) (collecting cases for the proposition that "[i]t is settled that exculpatory provisions are proper to protect those authorized

15

by bankruptcy courts to carry out the bankruptcy process, even after the effective date of a plan");

*In re Olinda Star Ltd.*, 614 B.R. 28, 48 (Bankr. S.D.N.Y. 2020) ("This Court agrees that

[exculpation] is necessary and appropriate to prevent interference with the consummation of the

[restructuring], and issuance of the New 2024 Notes Guarantee because without such exculpations

the ability of the JPLs and their advisors to take action to effectuate the restructuring would be

limited."); *In re Stearns Holdings, LLC*, 607 B.R. 781, 790–91 (Bankr. S.D.N.Y. 2019) ("In light

of the exculpation provision's carve-out for gross negligence, intentional fraud, and willful

misconduct, the Court finds that (i) the standard of care established by the exculpation provision

is entirely consistent with, and appropriate under, applicable law and (ii) the protections afforded

by the exculpation provision, which represent an integral component of the Global Settlement and

the Amended Plan, are reasonable and appropriate.").

31.    The Government ignores this body of law. Based only on a comparison to the

exculpation provision in *Aegean*, the Government argues the challenged Exculpation Provision is

broader than those approved by other courts because it covers post-effective conduct and extends

to non-fiduciaries. Mem. ¶¶ 58–61. Not so. The courts in *Enron* and *Oneida* approved exculpation

clauses that extended beyond the effective date to the implementation and administration of the

company's respective plans. *Enron,* 326 B.R. 497 at 500–01; *Oneida*, 351 B.R. at 94 n.22. And in

2021, the *Ditech* court concluded that "[i]t is settled that exculpatory provisions are proper to

protect those authorized by bankruptcy courts to carry out the bankruptcy process, ***even after the***

***effective date of a plan***." 2021 WL 3716398, at *9 (emphasis added).  It is also not the case that

the Exculpation Prevision impermissibly extends to non-fiduciaries. The *Latam* court expressly

concluded "Exculpated Parties who are not estate fiduciaries are entitled to benefit from a broad

exculpation provision. They have been actively involved in all aspects of these Chapter 11 Cases

and have made significant contributions to the success of these cases. In the absence of gross negligence or intentional wrongdoing on their parts, the Court will extend the Exculpation clause to the Exculpated Parties who are not estate fiduciaries." 2022 WL 2206829, at *50.

32.    The Government's protestation that "none of the cases cited in the [Confirmation] Decision address governmental enforcement actions" is incorrect and meaningless.  Mem. ¶ 55. The Government does not deserve special treatment with respect to the exculpation provision. Bankruptcy courts routinely approve exculpation provisions, with language substantially similar to the challenged provision here, that contain no carve out for government entities, government enforcement actions, or criminal sanctions.  *See, e.g.,* Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan, Art. VIII.F, *In re Lakeland Tours, LLC*, No. 20-11647 (JLG) (Bankr. S.D.N.Y. Sept. 15, 2020) [Docket No. 191-1]; Order Confirming Chapter 11 Plan, Ex. A, Plan, Art. VIII.F, *In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Feb. 5, 2020) [Docket No.789-1]; Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan § 8.4, *In re Deluxe Entertainment Services Group Inc.*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 25, 2019) [Docket No. 96]; Order Confirming Chapter 11 Plan, Ex. 1, Plan, Art. VIII.E, I*n re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019) [Docket No. 356]; Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan, Art. IX.D, *In re Fullbeauty Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y. Feb. 5, 2019) [Docket No. 39]; Order Confirming Chapter 11 Plan of Reorganization, Ex. 1, Plan, Art. VIII.E, *In re Cenveo, Inc.*, No. 18-22178 (RDD) (Bankr. S.D.N.Y. Aug. 21, 2018) [Docket No. 685]; Order Confirming Chapter 11 Plan of Reorganization, Ex. 1, Plan, Art. IX.D, *In re Sbarro LLC*, No. 14-10557 (MG) (Bankr. S.D.N.Y. May 19, 2014) [Docket No. 238]; Order Confirming Plan of Liquidation, Ex. A, Plan, Art. IX.F, *In re United Retail Group*, Inc. No 12-10405 (SMB) (Bankr. S.D.N.Y. Sept. 18,

2012) [Docket No. 776]; Order Confirming Chapter 11 Plan of Reorganization, Ex. 1, Plan, Art. X.G, *In re FGIC Corp.*, No. 10-14215 (SMB) (Bankr. S.D.N.Y. Apr. 23, 2012) [Docket No. 314].

33.     The Government's failure to meaningfully address, let alone differentiate the Exculpation Provision from the dozens of provisions approved by courts in this district is fatal. On that ground alone, their Motion should be denied.

**B.     The Bankruptcy Court Has the Statutory Authority to Approve Exculpation Clauses**

34.     In lieu of citations in this circuit contradicting or even calling into question the mountain of case law supporting the Exculpation Provision, the Government wrongly argues that the Court exceeded its statutory authority by approving the provision.  As evidenced by the two decades of case law supporting the Court's approval, the authority to authorize the Exculpation Provision is firmly rooted in the broad authority granted to this Court in the Bankruptcy Code. Section 105(a) grants the Court the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105.  While the Second Circuit limits Section 105's authority to that power "which must and can only be exercised within the confines of the Bankruptcy Code." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (internal quotations omitted), that is exactly what is happening here.

35.     First, under the law, this Court could only approve the Plan after concluding it had "been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Consistent with its conduct throughout these Chapter 11 proceedings, the Government ignores and does not even cite Section 1129(a)(3).  The Government had ample opportunity to present evidence that the law forbids some aspect of the Plan.  But after three full days of hearings the Government failed to identify a single part of the Plan that even arguably violates the law.  *See* Confirmation Decision at 13–14.  Instead, the Government relied on hypothetical concerns this Court concluded

fell far short of raising actual concerns of legality. *Id.* at 13–14, 38. Its Memorandum here does much of the same, focusing on "potential criminal claims" and hypothetical obligations to "bring real property into compliance with the Americans with Disabilities Act, or to clean up toxic waste under federal environmental law." Mem. ¶¶ 52, 55. None of these concerns are remotely relevant here. The Government's continued failure to identify even one potentially unlawful act called for by the Plan concedes the crucial point—the transactions and processes contemplated by the Plan are legal and do not currently give rise to any civil or criminal liability.

36. The Court's exculpation provision does little more than ensure its findings under 11 U.S.C. § 1129(a)(3) are enforced. As this Court has recognized, here and previously, once it "has authorized [a] transaction to proceed, [] the parties to those transactions should be not subject to claims that effectively seek to undermine or second-guess this Court's determinations. In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do." *Aegean*, 599 B.R. at 721. The Government's challenge to the Court's commonsense reasoning is astonishing and, quite frankly, would fundamentally undermine ***any*** transaction approved in bankruptcy. It cannot be the case that the Government retains an indefinite reservation of rights to pursue parties years after the fact for transactions confirmed by the Bankruptcy Court after a multi-day evidentiary hearing. To the contrary, if that were the law, Congress should either re-write the Bankruptcy Code altogether or simply repeal it.

37. ***Second***, as the Court recognized at the Confirmation Hearing, section 1142 of the Bankruptcy Code makes the Exculpation Provision particularly essential to the Plan in this case. Section 1142 of the Bankruptcy Code commands "the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with

any orders of the court." 11 U.S.C. § 1142(a). Likewise, section 1142 also permits the Court to "direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan." *Id.* § 1142(b). That is exactly what the Court did here.

38. In essence, once approved, the Plan functions as a court order. And those tasked with implementing the Plan have no choice but to follow its mandates. The Government's position that individuals should "'take their chances' as to whether the Government might contend that their conduct was illegal and as to whether the Government might seek to punish them for doing what [this Court] authorized and directed them to do" is contrary not just to well-established bankruptcy law in this Circuit, but to fundamental fairness. *See* Confirmation Decision at 33. In addition, nothing in the Plan prevents the Government from taking steps to enjoin conduct sanctioned by the Plan after Confirmation if, for example, CFIUS decides to block the transaction from going forward. The Government may also pursue legal action for conduct that falls outside the scope of the Exculpation Provision, either because the conduct constituted fraud, willful misconduct or gross negligence or the complained of conduct was not sanctioned under the Plan. The Exculpation Provision only functions to protect the individuals who ***acted in accordance with the Plan***—and by extension the Bankruptcy Code—prior to any formal government action that signaled the Court approved conduct was unlawful. *Id.* at 38.

39. The Government previously challenged this Court's statutory authority to enter the Exculpation Provision by improperly equating exculpation to a different type of provision—third-party releases. As discussed above, exculpation provisions, like the one in this case, are forward looking and set forth a standard of care for *future* conduct. By contrast, a third-party release looks

backward, discharging claims held by non-debtors against other non-debtors, arising out of conduct that already occurred and is unrelated to the administration of the bankruptcy proceedings.

40.    Despite these differences, the Government challenges this Court's clear statutory authority by arguing that because the Bankruptcy Code specifically authorizes certain types of *third-party* releases, it does not provide the "general authorization" necessary to approve the Exculpation Provision. *See* Mem. ¶¶ 50–51 (discussing 1125(e) and 524(g)).[10]  But courts in this district have long recognized that a bankruptcy court's authority to approve exculpation clauses is distinct from its authority to approve third-party releases. *Granite Broad.*, 369 B.R. at 138 (citing *In re Metromedia Fiber Network, Inc.,* 416 F.3d 136, 142 (2d Cir. 2005 and explaining exculpation "does not affect claims held individually by creditors or shareholders and thus does not raise any issue regarding the power of the bankruptcy court to approve a 'third-party release'").[11]

41.    The recent opinion in *In re Purdue Pharma, L.P.* affirms the distinction between exculpation and third party releases. 635 B.R. 26 (S.D.N.Y. 2021).  The *Purdue* plan contemplated releasing the Sackler family and various entities related to the Sackler family (all non-debtors) from thousands of tort and consumer fraud claims brought by states, municipalities and personal

---

[10]    The Government also makes a passing reference to 11 U.S.C. § 1141(d).  But the Confirmation Order is clear that the Debtors are not getting a discharge (although the Government entities are bound by the Bar Date Order).

[11]    To the extent *Metromedia* and its third party release progeny are relevant at all, they support rather than undermine the Exculpation Provision at issue here.  *Metromedia* held that non-debtor releases *are* appropriate under four circumstances: (1) the estate received substantial consideration; (2) the enjoined claims would directly impact the debtors' reorganization; (3) the plan otherwise provided for the full payment of the enjoined claims; and (4) the creditors or claimholders consent. *Id.* at 142.  In fact, as recently as September 2022, the Fifth Circuit, citing *Metromedia*, acknowledged that the Second Circuit, as well as the Third, Fourth, Sixth, Seventh, Ninth, and Eleventh Circuits, all "allow varying degrees of limited third-party exculpations." *In re Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 436 (5th Cir. 2022).  Here, the exculpation provisions are part of a plan that received 97% creditor support, and the exculpated parties are, by definition, providing substantial consideration to the estate by implementing the Plan and returning cryptocurrency to customers as promptly as possible.  Indeed, unless the Government succeeds in blocking these transactions, given the current state of the cryptocurrency market, recoveries are projected to be quite robust for a chapter 11 case.  The Government's decision to stand in the way of a creditor recovery by threatening to sue or penalize those who work to return assets to customers following confirmation—in order (at best) to pursue a hypothetical future issue—is astonishing, giving new meaning to the phrase "no good deed goes unpunished."

injury plaintiffs arising out of pre-petition allegations related to opioid manufacturing and marketing, in exchange for a $4.275 billion payment from the Sackler family to the Purdue estate. 635 B.R. at 67.  On appeal the district court concluded that Section 105 of the Bankruptcy Code does not, on its own, authorize the bankruptcy court to "order the non-consensual release of third-party claims against non-debtors." *Id.* at 115.  But that is not at all what is happening here.  The Debtors' counsel and professionals, and the Voyager officers, directors and employees who will be implementing the confirmed Plan, are not the Sacklers, and *Purdue Pharma*'s interpretation of Section 105 does not remotely support overturning the Exculpation Provision.

42.      Indeed, Judge McMahon acknowledged the difference between third-party releases and exculpation and cites this Court's opinion in *Aegean* for the proposition that involuntary third-party releases are "different . . . from what courts ordinarily do." *Id.* at 110. (quoting *Aegean*, 599 B.R. at 723).  As shown above, courts "ordinarily" exculpate those involved in implementing Court-approved transactions, and the *Aegean* option affirms the importance of exculpation for court-sanctioned conduct. *Aegean*, 599 B.R. at 720.  Given the *Purdue Pharma* court's extensive survey of relevant release case law and repeated, favorable discussion of *Aegean*, the failure to discuss the Court's exculpation holding strongly suggests the district court agrees with the debtors (and the volumes of cited case law)—exculpation and third-party releases are materially different.

43.      The Government's misplaced reliance on statutes and case law governing third-party releases cannot overcome the weight of authority approving of exculpation provisions. For this separate reason, the Court should deny the Motion.

C.      **None of the Government's Remaining Arguments Actually Challenge the Long-Held Permissibility of Exculpation Provisions.**

44.      As a last ditch effort, the Government sets forth a number of half-hearted arguments that the Bankruptcy Court lacked the jurisdiction or authority to confirm the Exculpation

Provision.  None of these arguments has any merit, nor suggests any real possibility that the Government will succeed on appeal.

45.    First, the Government's barely-developed argument that it cannot be not subject to the Exculpation Provision because it did not waive sovereign immunity ignores the Court's repeated statements that nothing in the Exculpation Provision prevents the Government from exercising its police power and bringing regulatory enforcement actions.  *Compare* Mem. ¶ 53 *with infra* ¶ 68.

46.    Second, the argument that the Court lacks constitutional authority to issue the Exculpation Provision and adjudicate claims that have not happened yet relies on a threadbare recitations of standing law and does nothing to address the volumes of cases that have entered the relief granted here.  Moreover, the Government concedes that the Constitution has a Bankruptcy Clause, *see* U.S. Const., Art. I § VIII, and Congress, authorized by the Constitution, has passed express provisions that clearly authorize the Court to make such findings, *see* 11 U.S.C. §§ 1129(a)(3), 1142.  Quite frankly, given the circumstances here, the Court had the authority to make *express findings* that every transaction authorized by the Conformation Order *was* consistent with all applicable laws, and the Government would and should be estopped from arguing the contrary given its refusal to give anyone notice of any dispute on that point.

47.    Third, the Exculpation Provision does not exceed this Court's "jurisdiction to enjoin third-party non-debtor claims that directly affect the res of the bankruptcy estate." *In re Johns-Manville Corp.*, 517 F.3d 52, 66 (2d Cir. 2008).  To the contrary, the purpose of the exculpation provision is to ensure the proper distribution of the estate's res.  Allowing those ordered to administer the Plan to face civil and criminal penalties for court ordered conduct would indisputably have a direct effect on the orderly administration of the estate.

48.    Finally, the Government's complaints of lack of notice and fundamental fairness strain credulity. The Government contends it lacks notice of the actions that could be encompassed by the Exculpation Provision. This of course ignores the fact that the Plan and each of its amendments, and by extension the steps necessary to carry out the Plan, are publicly available. That there may be some as-yet undefined civil or criminal penalty associated with the Court-approved conduct does not mean the Government had no notice. Indeed, it was entirely within the Government's purview to identify any potentially unlawful conduct and raise it with the Court prior to confirmation. That's the Government's job, and the Government has imposed a massive burden on the Debtors (to the detriment of creditors) already. That it intentionally declined to do so does not mean the government was prejudiced or raise issues of fundamental fairness.

49.    At bottom, the Government's hollow challenge to the exculpation provisions fail. Faced with a mountain of case law on all fours with the provision at issue, the Government relies exclusively on inapposite arguments that prove way too much. The Government cannot seriously believe that it always has the right to sue parties that implement chapter 11 plans, after the fact, even though they are doing what they are directed to do by court order and the Bankruptcy Code. In other words, if the Bankruptcy Code is to have any effect, the Government cannot be right. This appeal has no likelihood of success on the merits. The Government's Motion should be denied.

**II.    The Government Cannot Identify Let Alone Prove Irreparable Injury Absent a Stay.**

50.    In an effort to mask the deficiencies in its argument, the Government consolidates the remaining three factors into one analysis, suggesting that where the movant is the Government, the injury and public interest factors merge. Mem. ¶¶ 62-63. But none of the cases the Government cites excuses it from establishing irreparable injury, which it has not done here. Moreover, as discussed below in Section IV, there is no question that in this case the public interest diverges from the Government's interest and weighs in favor of denial of the Government's Motion.

51.     The only purported harm that the Government postulates is that absent a stay, the Government's appeal will be deemed "equitably moot" and dismissed on that basis.  Mem. ¶¶ 67–70  The Debtors agree that the Government's appeal will likely be equitably moot.  But as a matter of law, that does not suggest the existence of irreparable harm that is "neither remote nor speculative, but actual and imminent."  *In re Latam Airlines Group S.A.*, 2022 WL 2811904, at \*3 (citation omitted); *see also In re Sabine*, 548 B.R. at 681 (irreparable harm must be "probable").

52.     Indeed, despite the Government's protestations, "a majority of courts" have held that the risk of equitable mootness absent a stay ***does not constitute irreparable injury***.  *In re Sabine*, 548 B.R. at 682; *In re DJK Residential, LLC*, 2008 WL 650389, at \*3 (S.D.N.Y. March 7, 2008) (same).  Even cases cited by the Government do not support granting a stay here.  *See, e.g., In re Moreau*, 135 B.R. 209, 215 (N.D.N.Y. 1992) ("It is clear that the danger of an appeal becoming moot ***is by itself never a sufficient ground to justify grant of a stay***.") (emphasis added) (internal citations omitted). As the court opined in *In re Calpine Corp.*, "merely invoking equitable mootness . . . a risk that is present in any post-confirmation appeal of a chapter 11 plan—is not sufficient to demonstrate irreparable harm." 2008 WL 207841, at \*4 (Bankr. S.D.N.Y. Jan. 24, 2008).

53.     That reasoning is particularly true in this case because the Government has not shown any harm stemming from the Exculpation Provision at all.  Despite myriad opportunities, the Government still fails to identify anything contemplated by the Plan that the Government believes violates a statute or regulation or is otherwise wrongful.  In other words, the Government does not identify anything that it actually wants to do which the exculpation provision stops it from doing.  As this Court described: "All of the relevant governmental agencies have been on notice of what the plan proposes.  They had every opportunity to tell me if they believed that anything

contemplated by the Plan would violate any applicable statute, rule or regulation." Confirmation

Decision at 34. But no federal regulator "has contended during the confirmation hearing that there

is anything illegal in what the plan contemplates." *Id.*

54.    Moreover, as this Court has made abundantly clear to the Government, the

Confirmation Order (and the Exculpation Provision) "does not purport to limit any contention

regarding things that the Debtors may have done in the past that I did not specifically authorize or

approve. It does not bar the Government from trying to stop transactions from occurring, and does

not bar any regulatory contention in that regard." *Id*. at 38. Nor does the Confirmation Order as

entered by the Court purport to bar the Government from pursuing actions against Exculpated

Parties for fraud, willful misconduct, or gross negligence in carrying out the Plan (if any such thing

were to occur).

55.    Thus, given that the Government has not even attempted to make any showing, now

or ever, regarding: (1) any illegal conduct contemplated by the Plan that the Government may wish

to prosecute, civilly or criminally, or (2) any legal action that the Government may wish to take

but from which it will be barred under the Exculpation Provision, the Government has not and

could not possibly show that it will be irreparably harmed if its appeal is equitably mooted. In

essence, the Government is asking this Court to require (as a condition of confirmation) a perpetual

"Reservation of Rights" whereby the Government could always retroactively complain that some

act required to implement the Plan violated some federal regulation. Given the realities here—the

government has set forth no relevant regulations or rules, has refused requests for clarity for nearly

a decade, and yet certain governmental officials with tremendous power somehow assert that the

rules are clear—no person would in good conscience execute on the Plan absent exculpation.

Accordingly, the only people "irreparably harmed" by a stay would be Voyager account holders.

56.     Given the Government's utter failure to articulate anything *specific* that it will be prevented from doing by the Plan, the cases that the Government cites where courts held equitable mootness constituted irreparable injury are inapposite.  Those cases largely rely on the District Court's decision in *In re Adelphia Commc'ns Corp.*, 361 B.R. 337 (S.D.N.Y. 2007).  But the *Adelphia* Court held that "where the denial of a stay pending appeal risks mooting ***any*** appeal of ***significant*** claims of error, the irreparable harm requirement is satisfied."[12]  *Id*. at 348 (emphasis in original).  Other courts have recognized this qualifying language in *Adelphia* to hold that in other factual circumstances, the risk of equitable mootness was not irreparable harm because the mooted appeal did not relate to a "significant" claim of error.  For example, the District Court in *In re DJK Residential, LLC* explained that in *Adelphia*, "the claims of error related to the 'troubling' failure by the proponents of the confirmation plan to comply with a central order of the Bankruptcy Court and the Bankruptcy Court's failure to enforce that order." 2008 WL 650389, at *3 (S.D.N.Y. March 7, 2008).  The *DJK* Court held that in the case before it, the movant "failed to demonstrate a similarly ***significant claim of error*** such as the one that concerned the court in *Adelphia* [] . . . Here, there is no such 'troubling' claim of error, but merely an argument that the Bankruptcy Court was wrong on the merits of two situations.  In this situation, there is no reason why the majority view that the risk of mootness does not constitute irreparable harm should not apply to [movant's] situation."  *Id*. (emphasis added).

57.     So too here.  The Government cannot cogently identify any meaningful error at all. For this reason, *Adelphia's* presumption of irreparable harm stemming from equitable mootness

---

[12]  The Government recognizes as much, suggesting that courts follow *Adelphia* and find irreparable injury from potential equitable mootness where "the appeal involves ***important issues*** or when the loss of the ability to appeal is ***not the only harm*** from the the appeal being mooted." (Mem. ¶ 68 (emphasis added).)  This alone dictates a finding of no irreparable injury here.  As discussed above, the Government has not identified ***any*** actual error for appeal that will be lost to equitable mootness, let alone an important one.  And the risk of equitable mootness is the only purported irreparable injury the Government identifies.

does not apply. Instead, this Court should follow *DJK's* reasoning and hold that because the Government has not identified "a significant claim of error" that will be lost if its appeal is equitably mooted, the Government has not established irreparable harm. *Id.*

58. Even where the risk of equitable mootness has actual substantive impact on a party's identified rights (which the Government does not allege here), courts have taken pains to caveat that such a finding ***does not mean that the movant is entitled to a stay***. Rather, any such harm is "enough to get on the scoreboard with respect to th[e] issue" of harm. *General Motors*, 409 B.R. at 31. But where equitable mootness is the primary harm identified, the balancing of the four factors becomes more critical, and courts place less emphasis on the irreparable injury prong. *See, e.g., Williams v. George Junior Republic (In re Cujas)*, 376 B.R. 480, 487 (Bankr. E.D. Pa. 2007) ("I accept the proposition [in *Adelphia*] that the potential loss of a party's appellate rights though the mootness doctrine may constitute irreparable harm. I hasten to add, however, that the existence of such harm is no guarantee that an appellant is entitled to a stay pending appeal. It is also necessary to go one step further and consider the nature of the underlying dispute and the harm that the loss of appellate rights may have on the moving party. The harm must then be balanced against the potential harm other parties may suffer if the stay is granted."); *In re Latam*, 2022 WL 2657345, at *5 (accepting presumption of harm from equitable mootness but affording it little weight where "concern [] is speculative and premature"); *Gen Motors*, 409 B.R. 24, 31 (Bankr. S.D.N.Y. 2009) (assuming without deciding "that the threat of equitable mootness is enough to satisfy the requirement of showing some irreparable injury . . . How much that should be weighed, however—and especially how it should be weighed against different kinds of irreparable injury that others would suffer—is a very different question"). The *Adelphia* Court

cautioned that while "loss of appellate rights" might constitute harm, "it is not dispositive of the ultimate question of whether to grant a stay pending appeal." *Adelphia,* 361 B.R. at 352 n.68.

59.     For this reason, this Court's decision in *In re DAEBO* (which the Government does not cite) is also distinguishable in light of the facts here. *In re DAEBO Int'l Shipping Co., Ltd.*, 2016 WL 447655 (Bankr. S.D.N.Y. Feb. 4, 2016) (Wiles, J.). In that case, this Court relied on *Adelphia* to hold that the risk of equitable mootness justified a finding of irreparable injury. *Id.* at *3 (citing *Adelphia*, 361 B.R. at 347). However, this Court made clear that its decision to grant the stay rested not on the finding of injury to the movant stemming from equitable mootness, but rather on its finding that the **debtor** "has not alleged [it] will be prejudiced by continuing a stay pending the appeal." *Id.* at *3. Here, in contrast, the Debtors and their creditors will suffer significant injury if the Court issues a stay. *See, e.g.*, *In re Latam*, 2022 WL 2657345, at *12 (holding reasoning of *DAEBO* not applicable because debtors "demonstrated[] that they would be harmed if the court stayed the Confirmation Order, as a stay would jeopardize critical financing facilities, backstop commitments, and potentially the Plan itself"). Cryptocurrency is extremely volatile. Voyager customers have been waiting nearly a year for a distribution. If the Government succeeds, the Plan will collapse and only the creditors (who voted 97% in favor of the Plan) will suffer. The Government appears completely insensitive to that fact. The Debtors are not.

60.     In sum, in this case and on these facts, the Government has not established that the risk of equitable mootness requires a finding of irreparable harm here. The Government has failed to identify **any** error for appeal, let alone a **significant** one as *Adelphia* requires. 361 B.R. at 348. Regardless, any purported harm to the Government is substantially outweighed by the harm to Debtors and their creditors, as well as the complete failure of the Government to show a likelihood

of success on the merits. *See, e.g., In re Latam*, 2022 WL 2657345, at *12 (adopting *Adelphia's* presumption of irreparable injury but denying stay after balancing remaining factors).

### III.    The Issuance of a Stay Will Substantially Injure Thousands of Creditors Who Are Relying on Implementation of the Plan.

61.    While the Government's injury is purely hypothetical, the injuries inured by the Voyager customers are certain and substantial.  The Government's requested stay will postpone, yet again, the relief due Voyager customers.  "Courts have recognized numerous harms resulting from the postponement of reorganization proceedings, including (i) lost strategic opportunities; (ii) difficulty in recruiting and retaining talent for the Debtor; (iii) incurrence of administrative and professional expenses; (iv) placing plan settlements in jeopardy; and (v) exposing the equity to be granted to non-moving creditors to market volatility and other risks."  *In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 683 (Bankr. S.D.N.Y. 2016).  Creditors are further harmed where they "have been waiting for [a] distribution to take place" that the stay would delay.  *In re AMR Corp.*, 2021 WL 5016606, at *4 (Bankr. S.D.N.Y. Oct. 28, 2021).  These are the precise circumstances that the Government's stay would impose.

62.    The Debtors' asset portfolio is comprised almost entirely of cryptocurrencies.  The crypto market itself is inherently volatile and has only been further strained by recent mass liquidation events and numerous crypto firm bankruptcies, as the Government notes.  Last weekend's banking crisis did not help, either.  To maximize the return for creditors, the Debtors' highly skilled experts must execute trades and transfers opportunistically to minimize market disruption.  The Debtors' team has been working tirelessly before and since the Plan confirmation to structure these transactions.  The Government's requested indefinite stay would lock these assets in place—making the creditors lose out on the benefit of the current planned trades and forcing the Debtors to try and recreate these balancing transactions in an uncertain future.

63.    The Government suggests that since there is time between confirmation and closing, a stay will not cause harm (Mem. ¶¶ 65-66.) But this argument neglects to consider that Debtors' preclosing activities need to proceed in the interim. The Government suggests, wrongly, that if the Exculpation Provision (or the entire Confirmation Order) were stayed, the Debtors could continue its preclosing activities.  Mem. ¶ 66. Even if the Court were to stay only the "Exculpation Provision," as the Government suggests, the Debtors would necessarily have to halt their preclosing activities, including rebalancing transactions, due to the risks invited by future, unknown prosecution by the Government.

64.    Lost efforts would not be the only money leaving the Debtors' coffers.  Maintaining the Voyager platform while these cases remain pending requires that the Debtors to fund engineering, software fees, and other operating costs, including the continued employment of a robust staff to manage operations.  Similarly, a stay would require that the Debtors extend their retention of advisors and other third-party professionals to protect them during the pendency of these chapter 11 cases.  These expenses cannot be avoided, and the Government's requested stay would significantly expand them.  Every dollar spent on these continued efforts takes funds away from customer recoveries.  Likewise, delaying the Effective Date delays the Plan Administrator's pursuit of other recoveries on behalf of the customers, including from 3AC.

65.    In effect, the Government's stay seeks to hold these funds hostage and deny the account holders' long-awaited and well-deserved distributions, and all the opportunity that comes with those distributions, while it contemplates what it thinks the law might be in the future.  *See In re AMR Corp.*, 2021 WL 5016606, at *4.  That is not fair to the creditors, as this Court has already explained: "This bankruptcy case has been pending since July 2022. Customers and Creditors have been denied access to their assets for many months, and they deserve to have

resolution of this case. Bankruptcy cases also are very expensive, and each and every delay means that administrative expenses eat away at the recoveries that Creditors may eventually receive." Transcript, *In re Voyager Digital Holdings*, No. 22-10943 at 46:20-47:1 (Mar. 7, 2023).

66.     Simply put, while the Government has identified no harm to itself from not receiving a stay, the harm to creditors is extensive. Individual account holders, who are eager to have their cryptocurrency holdings returned to their hands, will be forced to remain emptyhanded while the Government determines whatever its interests may be. At the same time, the Debtors would be forced to incur additional fees to maintain their platform and continue these proceedings, draining ultimate creditor recoveries.

## IV.     The Public Interest Compels Denial of the Stay.

67.     In light of the fact that the Government's harm is purely hypothetical, and the stay serves only to delay and reduce the recoveries of thousands of creditors eagerly awaiting the Plan's contemplated distributions, it is plain that the public interest compels the denial of the stay.

68.     "[T]he public interest favors the expedient administration of the bankruptcy proceedings." *In re Latam Airlines Grp. S.A.*, 2022 WL 2657345, at *11 (Bankr. S.D.N.Y. July 8, 2022); *In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 685 (Bankr. S.D.N.Y. 2016); *In re Gen. Motors Corp.*, 409 B.R. 24, 33 (Bankr. S.D.N.Y. 2009). The Government does not and cannot suggest otherwise. But its requested stay would do the exact opposite of expedient administration.

69.     In fact, denying the stay costs the Government nothing. Despite the fact that the Government claims the Exculpation Provision "ties the Government's hands," this Court has assured the Government that nothing in the Exculpation Provision restricts the Government's authority to regulate in the future: "We're not trying to restrict the SEC or any other governmental entity's ability to argue in the future that the transactions that we are authorizing and directing

32

should be stopped or prevented from going further for regulatory reasons of any kind." Transcript,

*In re Voyager Digital Holdings*, No. 22-10943 at 88:25-89:4 (Mar. 7, 2023). The Court reiterated:

> Nothing in this provision shall limit in any way the powers of any governmental unit to contend that any rebalancing transaction should be stopped or prevented or that any other action contemplated by the plan should be enjoined or prevented from proceeding further, nor does anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, nor does anything limit the penalties that might be applicable if such a future regulatory order is issued and violated. Similarly, nothing herein shall limit the authority of the committee on foreign investment of the United States [CFIUS] to bar any of the contemplated transactions, nor does anything in this provision alter the terms of the plan regarding the compliance of the purchaser with applicable laws in the unsupported jurisdictions before distributions of cryptocurrencies occur in those unsupported jurisdictions.

*Id.* at 90:22-91-13. The Government cannot seriously suggest otherwise.

70.     But, while the Government's authority is protected in every circumstance, a stay would irreparably harm the Debtors' estate. As discussed, the stay would require the continued exhaustion of resources to administer and maintain the Voyager platform at a cost that would be borne by each and every creditor. While the creditors' recoveries would be reduced, account holders would also be forced to stand idly for an indeterminant amount of time watching their assets sit in a volatile market with no ability to take protective action. That is not the public interest, and the Court must deny the Government's request.

## **Conclusion**

71.     The Government has failed to show that *any* of the four factors weigh in its favor,

let alone all of them.  The Government has thus failed to satisfy its "especially heavy" burden of

justifying a stay of this Court's Confirmation Order.  *In re Latam*, 2022 WL 2811904, at *2.  The

Court should therefore deny the extraordinary remedy that the Government seeks.


Dated:  March 15, 2023          */s/ Joshua Sussberg*
New York, New York              **KIRKLAND & ELLIS LLP**
                                **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                Joshua A. Sussberg, P.C.
                                Christopher Marcus, P.C.
                                Christine A. Okike, P.C.
                                Allyson B. Smith (admitted *pro hac vice*)
                                601 Lexington Avenue
                                New York, New York 10022
                                Telephone:    (212) 446-4800
                                Facsimile:    (212) 446-4900
                                Email:        jsussberg@kirkland.com
                                              cmarcus@kirkland.com
                                              christine.okike@kirkland.com
                                              allyson.smith@kirkland.com

                                Michael B. Slade (admitted *pro hac vice*)
                                Richard U.S. Howell, P.C. (admitted *pro hac vice*)
                                300 N. LaSalle Drive
                                Chicago, IL 60654
                                Telephone:    (312) 862-2000
                                Fascimile:    (312) 862-2200
                                Email:        mslade@kirkland.com
                                              rhowell@kirkland.com

                                *Counsel to the Debtors and Debtors in Possession*