**MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP**
Darren Azman
Joseph B. Evans
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

**MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP**
Charles R. Gibbs (admitted *pro hac vice*)
2501 North Harwood Street, Suite 1900
Dallas, Texas 75201-1664
Telephone: (214) 295-8000
Facsimile: (972) 232-3098

**MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP**
Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131-2184
Telephone: (305) 329-4473
Facsimile: (305) 503-8805

*Counsel to the Official Committee of*
*Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*, | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | |

**OPPOSITION OF THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS TO MOTION FOR STAY PENDING APPEAL**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number, are:  Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and
Voyager Digital, LLC (8013). The location of the Voyager Digital Holdings, Inc.'s and Voyager Digital
Ltd.'s principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003. Voyager
Digital, LLC's principal place of business is 701 S. Miami Ave, 8ᵗʰ Floor, Miami, FL 33131.

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ..................................................................................................2

**BACKGROUND** ......................................................................................................................8

**ARGUMENT** ...........................................................................................................................11

**I.   PARTIES SEEKING A STAY PENDING APPEAL FACE A HEAVY BURDEN..11**

**II.  THE GOVERNMENT FAILED TO SATISFY ANY OF THE FOUR REQUISITE FACTORS FOR A STAY PENDING APPEAL.** ..........................................................13

   A.  The Balance of Equities Tips Overwhelmingly Against a Stay Pending Appeal........13

      i.   The Government Has Not Demonstrated a Likelihood of Irreparable Injury Absent a Stay.................................................................................................................................14

      ii.  A Stay Would Cause Incalculable Harm to the Debtors, Their Estates, and Their Creditors.............................................................................................................................18

      iii. A Stay is Not in the Public Interest......................................................................24

   B.  The Government Failed to Demonstrate a Strong Likelihood of Success on the Merits. ................................................................................................................................26

**CONCLUSION** ......................................................................................................................32

The Official Committee of Unsecured Creditors (the "Committee") appointed in the above-captioned chapter 11 cases (the "Chapter 11 Cases") of Voyager Digital Holdings, Inc., *et al.* (collectively, the "Debtors") hereby submits this opposition (the "Opposition") to: the *Notice of Expedited Motion for Stay Pending Appeal* (the "Expedited Motion") and the *Memorandum in Support of the United States of America and United States Trustee's Expedited Motion for Stay of Confirmation Order Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8007* (the "Stay Memorandum" and together with the Expedited Motion, the "Motion"). By the Motion, the United States of America (the "United States") and the Office of the United States Trustee for Region 2 (the "U.S. Trustee")[1] seeks the imposition of a stay pending its appeal of this Court's *Corrected and Amended Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1166] (the "Confirmation Order"), which (i) confirmed the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1138] (as subsequently amended, modified, or supplemented, the "Plan") and (ii) approved, on a final basis, the *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 863] (as amended, modified, or supplemented from time to

---

[1] The Court held a status conference regarding the Motion on March 14, 2023 with counsel from the Debtors, the United States, the U.S. Trustee, Binance.US, and the Committee. Notably, the U.S. Trustee declined to inform anyone on the status conference that it would be party to the Motion, surprising everyone with its name on the cover page of the Motion and forcing responding parties to address the U.S. Trustee's arguments in addition to those set forth by the United States less than 18 hours prior to the hearing on the Motion. That said, the U.S. Trustee's positions regarding post-effective date estate fiduciaries read as an afterthought in the Motion and merely an appeal for the sake of appeal, arguments which certainly do not justify or merit the grant of a stay pending appeal.

time, the "<u>Disclosure Statement</u>").[2] In support of this Opposition, the Committee respectfully
states as follows:

## **PRELIMINARY STATEMENT**

1.      The United States and the U.S. Trustee (together, the "<u>Government</u>") seek
either (a) a stay of the exculpation provision in the Confirmation Order and Plan while the
Appeal (as defined herein) is pending or (b) a two-week stay of the Confirmation Order while
the Government seeks similar relief from the District Court.[3]  This stay of the Confirmation
Order pending its subsequent appeal(s) of the same is sought by the Government seemingly
without regard for creditors in favor of preserving their own ability to make a belated
decision on what cryptocurrency activities required by the Plan violate unspecified laws. In
essence, the Motion represents the Government's blatantly transparent attempt to (a) buy
itself additional time at the expense of the Debtors' creditors to analyze and (in theory)
subsequently determine the legality of certain transactions under the Plan and (b) preserve its
rights to retroactively prosecute the Debtors and other estate professionals for their post-
confirmation actions in these chapter 11 cases that are specifically authorized by the
Confirmation Order and required by the Bankruptcy Code. As the Court correctly recognized,
the Government's position represents a "serious misunderstanding of just what it means when
a court confirms a chapter 11 plan."[4] Given the Committee's continued commitment to
protecting and advocating for the interests of unsecured creditors throughout these chapter 11

---

[2]    Capitalized terms used but not otherwise defined shall have the meaning ascribed to them in the Plan.

[3]    By seeking to preclude the exculpation provisions from going effective but allowing the rest of the Plan to
go effective, the Government is presenting the following options, neither of which are viable options: the
Debtors and estate fiduciaries implementing the Plan can either violate a federal court order and refuse to
take actions required under the Confirmation Order or they can take those same actions but run the risk of
personally getting prosecuted criminally. Accordingly, the Government has created impossible and unfair
"catch-22" scenario for the Debtors and the estate fiduciaries.

[4]    *Decision Regarding (1) Approval of the Debtors' Disclosure Statement, (2) Confirmation of the Debtors'
Plan of Reorganization, (3) Motions Seeking the Appointment of a Trustee, (4) Motions Requesting Full
Customer Access to Account Holdings, and (5) Related Matters* [Docket No. 1170] (the "<u>Confirmation
Decision</u>"), at 33.

cases, it should come as no surprise to the Government or any other parties in interest that the Committee **vehemently** opposes the relief requested in the Motion. As discussed in greater detail herein, the Government has failed to satisfy its heavy burden of meeting *any* of the four requisite factors set forth by the Supreme Court in *Nken v. Holder*,[5] thereby mandating denial of its stay request.

2.      ***First,*** the Government's purported claim of irreparable harm absent a stay is speculative, premature, and hypothetical—a far cry from the "imminent" and "actual" harm necessary to satisfy this factor. As an initial matter, despite the Government's assertions to the contrary, it is well settled in this district that equitable mootness, without more, is insufficient to demonstrate irreparable harm and, when measured against the severe, cognizable injuries to other parties in interest, the balance tips in favor of ***not*** granting the stay. Moreover, the Government is incapable of demonstrating that its purported harm is "imminent" or "actual"; to the contrary, the purported harm ***has yet to materialize*** in the very regulatory framework of which the Government complains there ***may be*** a violation and remains a hypothetical exercise at best, despite the fact that the Government has had months to analyze and subsequently determine whether the transactions contemplated under the Plan violate applicable securities laws or other governing laws. At bottom, the activities contemplated under the Plan are not new—VGX has been trading for years and Binance.US has been a licensed money transmitter across the United States. The Government has had plenty of time to determine that any such activities violate the law but it declined to do so.

3.      In the Motion, the Government attempts to analogize to investigation and prosecution of False Claims Act violations.[6] However, this example is not analogous to the

---

5    *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (holding that courts must consider (i) whether the stay applicant has made a strong showing of likelihood of success on the merits; (ii) whether the applicant will be irreparably injured absent a stay; (iii) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (iv) where the public interest lies).

6    *See* Motion, at 2-3.

instant facts in any way, as there is a big difference between a statute of limitations to prosecute fraud under the False Claims Act (which was not ordered by a federal court order), whereunder the applicable fraud is a well-established and actual criminal offense, and allowing the Government to delay its decision on what constitutes the purported criminal activity, then retroactively prosecute a newly-defined crime that did not even exist at the time of the purported wrongdoing. One path illustrates the typical progression of a governmental investigation and prosecution, while the other effectively operates as an unfair "GOTCHA!" by which the Government can manufacture its definition of criminal behavior after the fact <u>and</u> retroactively prosecute individuals or entities for that previously unknown crime. This equates to retroactively ticketing car passengers who failed to wear a seatbelt when there was no such law requiring wearing a seatbelt and the result is equally absurd.

4.      Put simply, the Government's allegations of hypothetical and unsubstantiated harms simply cannot justify further delay of the consummation of the Plan and the effectuation of the heavily negotiated transactions and distributions contemplated thereunder, particularly when the Government had ample opportunity to be heard and object to confirmation, yet declined to provide this Court with ***any*** justification for its position on exculpation. Indeed, although pressed on multiple occasions about this issue at confirmation, the Government still has yet to make such a determination (or, at the very least, has yet to disclose it to this Court, the Debtors, or the Committee) and until such a determination has been reached, the Government cannot demonstrate irreparable harm worthy of a stay pending appeal, thereby failing to satisfy this first factor.

5.      ***Second***, contrary to the Government's assertions, a stay of the Confirmation Order would undoubtedly impose immediate and severe harm on the Debtors, their estates, and their creditors, which significantly outweighs the purported harm to the Government that, to date, remains largely a work of fiction. To begin, the Motion, if granted, will result in

indefinite delays of both effectuating distributions to creditors. Permitting such delays solely because of a wholly hypothetical and unmaterialized harm to the Government is inequitable to the Debtors and their customers, particularly given the volatility and uncertainty of the cryptocurrency market along with the recent failures of certain related financial institutions. Given that the cryptocurrency industry, including cryptocurrency lenders and banks, show no signs of near-term stabilization in conjunction with looming signs of a global recession, it is *imperative* that customer distributions are made as soon as possible to avoid further losses or destruction of value. The Debtors' customers, who have already experienced a great deal of volatility and suffering in these chapter 11 cases as a result of the failed FTX sale transaction, should not be forced to suffer any longer simply because the Government (particularly the United States) has yet to make up its mind about the legality of the transactions contemplated under the Plan.

6.    Additionally, the Debtors and their estates will incur substantial amounts of additional operating costs and professional fees while the Appeal (as defined herein) remains pending and is litigated, all of which will significantly diminish recoveries to the detriment of account holders and other general unsecured claimants under the Plan. Moreover, delays attendant with the stay and appellate process could also cause the value of the cryptocurrency to be distributed under the Plan to substantially decrease while the Confirmation Order is stayed, which would in turn negatively impact the value of distributions. Finally, if granted, the stay may make it impossible for the Debtors to comply with the provisions of the APA (as defined herein) with Binance.US, meaning that their sole option under the Plan will be to toggle to a self-liquidation. The evidence at the Confirmation Hearing reflects that the estimated differential between creditor recoveries in a self-liquidation under the toggle Plan

and the recoveries under the Binance.US sale would be ***approximately $100 million***.[7]
Accordingly, in addition to general delays regarding distributions and access, granting the
requested stay would result in significantly decreasing creditor recoveries. In sum, the
incalculable harms that will likely befall the Debtors, their estates, and creditors significantly
outweigh the amorphous claims of purported harm from the Government, meaning that the
second factor also weighs against granting the stay.

7.      ***Third***, granting the relief requested in the Motion is contrary to the public
interest. The Government argues that a stay is needed to preserve its rights to protect the
public health, welfare, and safety of American citizens, citing generalized wrongdoing in the
cryptocurrency industry. While those are certainly important considerations to prioritize in
the ordinary course, it is unclear how a hypothetical violation of law that ***the Government
itself has yet to identify*** relates to or impacts the protection of those public policy
considerations, let alone how it merits a stay of the Confirmation Order. In actuality, the
Government is merely seeking to preserve its preference to lay in wait to see whether it
determines at a later date that there was some violation of law for the transactions required
under the Plan. The Government had every opportunity to present evidence that anything in
the Plan violated the law but declined to do so. The Government's focus is clearly misguided
and has strayed away from what really matters to the public interest here—*i.e.*, ensuring the
expedient administration of chapter 11 cases and prompt distribution of funds to creditors.
Indeed, the Government fails to recognize the far-reaching public policy implications of its
proposed modification to the exculpation provision. If the Government's position is accepted,
it would become impossible for debtors and estate professionals to carry out the provisions of
signed confirmation orders without fear of future liability from the Government. It would

---

[7]   *See* Hr'g Tr. 25:24-25, 26:3-16, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr.
S.D.N.Y. Mar. 3, 2023).

influence professionals to simply convert all cryptocurrency to fiat to distribute to creditors, irrespective of the lower value it would provide to creditors. In such case, no chapter 11 plan could ever be consummated and the entire purpose of chapter 11 would be defeated, meaning that the public interest lies squarely against granting the requested stay.

8.    ***Finally***, the Government cannot establish a substantial possibility of success on the merits of its appeal. As discussed herein, the Government has introduced ***absolutely no evidence*** to date with respect to the purported illegality of the transactions proposed in the Plan, nor could it identify for the Court the potential causes of action that could be applicable here, despite numerous requests from this Court to do so during the Confirmation Hearing (as defined herein).  Furthermore, the Government has yet to articulate ***any*** of the merits of its arguments, opting instead for vague assertions of hypothetical concerns that have yet to (and may never) materialize. As highlighted by the Court at the Confirmation Hearing and in its Confirmation Decision, the arguments made by the Government, particularly the United States, are "complete red herrings"[8] and "mostly straw men"[9] that (a) take issue with irrelevant purported legal justifications that are "absolutely not" the legal justifications for inclusion of the exculpation provision in the Plan and (b) fail to discuss any of the case law that is relevant to the permissibility of exculpation provisions in the Second Circuit, choosing instead to misconstrue inapplicable cases to weigh in its favor.  The Debtors and estate professionals are required to comply with the Confirmation Order and there is no just reason for the Government to stop compliance with the Plan while it tries to make a decision on some unspecified violation of law. The Debtors and estate professionals are required to

---

[8]    *See* Hr'g Tr. 92:1-11, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 7, 2023) ("I think most of the arguments that the government has made in that regard are complete red herrings. They pose reasons and explanations and legal justifications for what I am doing that are absolutely not the actual justifications for what I am doing and then rebut those irrelevant purported legal justifications. The actual authorities on which I have relied, including my own *Aegean* decision and the decisions that I cited in there are not even discussed in the objections and supplemental submissions that the government authorities made to me.").

[9]    Confirmation Decision, at 39.

comply with the Confirmation Order and there is no just reason for the Stay Appellants to stop compliance with the Plan while it tries to make a decision on some unspecified violation of law. The Government's contention that the prospect of future civil and criminal liability should weigh on the Debtors and other estate professionals as a proverbial Sword of Damocles while they endeavor, as they must, to comply with the provisions set forth in the Confirmation Order, despite the fact that the Government itself has yet to explain the reasons for its concerns or provide any evidence to substantiate its mere suspicions, is textbook inequity. The Government's vague, aspirational assertions of wrongdoing, without more, certainly do not demonstrate a "substantial likelihood" of success on the merits of the Appeal, further weighing against granting the requested stay.

9.      Accordingly, because the Government falls woefully short of its burden to demonstrate each of the requisite four factors to grant a stay pending appeal, the Court should deny the relief requested in the Motion and permit the Plan to go effective as soon as possible.

## **BACKGROUND**

10.     On July 5, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief in the United States Bankruptcy Court for the Southern District of New York (the "Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11.     On July 19, 2022, the U.S. Trustee appointed the Committee pursuant to Bankruptcy Code section 1102(a).[10]

12.     On July 21, 2022, the Debtors filed their motion seeking approval of bidding procedures (the "Bidding Procedures") and related scheduling requests with respect to the

---

[10]    *See* Docket No. 106.

chapter 11 cases.[11] The Court approved the Bidding Procedures on August 5, 2022 (the

"Bidding Procedures Order").[12]

13.    On December 18, 2022, the Debtors and BAM Trading Services Inc.

("Binance.US") entered into that certain asset purchase agreement (the "APA") and sought

Court authorization to do so on December 21, 2022.[13] On January 9, 2023, the Debtors filed

an amended version of the APA (the "First Amended APA"),[14] reflecting certain

modifications including, among other things, extensions of certain milestones contained

therein. On January 9, 2023, the Committee filed its statement in support of the sale to

Binance.US.[15] On January 13, 2023, the Court entered an order authorizing the Debtors'

entry into the First Amended APA.[16] Under the First Amended APA, the outside effective

date for the closing of the sale to Binance.US is May 8, 2023, with a possible 30-day

extension.[17]

14.    On December 22, 2022, the Debtors filed the Disclosure Statement[18] and

original version of the Plan.[19] Revised versions of the Plan were subsequently filed on

---

[11]  *See Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief.*

[12]  *See Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 126].

[13]  *See Motion for Entry of an Order (I) Authorizing Entry into the Binance US Purchase Agreement and (II) Granting Related Relief* [Docket No. 775] (the "Sale Motion").

[14]  *See Notice of Filing of First Amendment to Asset Purchase Agreement* [Docket No. 835]. On March 1, 2023, the Debtors filed that certain *Side Letter to the First Amended Asset Purchase Agreement* [Docket No. 1126].

[15]  *See* Docket No. 837.

[16]  *See Order (I) Authorizing Entry into the Binance US Purchase Agreement and (II) Granting Related Relief* [Docket No. 860] (the "APA Order").

[17]  *See* First Amended APA, § 8.1(i).

[18]  *See Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 778].

[19]  *See Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 777].

January 10, 2023,[20] February 28, 2023,[21] March 1, 2023,[22] and March 5, 2023.[23] On January 13, 2023, the Court conditionally approved the Disclosure Statement.[24]

15.    Beginning on March 2, 2023 and continuing on March 3, 2023, March 6, 2023, and March 7, 2023, the Court held a combined hearing (the "Confirmation Hearing") to consider approval of the Disclosure Statement on a final basis and confirmation of the Plan which included multiple days of witness testimony and oral argument. On March 7, 2023, the Court issued a bench ruling approving the Disclosure Statement on a final basis and confirming the Plan (subject to certain modifications to the proposed confirmation order), which was subsequently memorialized in a written opinion issued by the Court on March 11, 2023.[25] On March 8, 2023, the Court entered the Confirmation Order,[26] which was subsequently corrected and amended on March 10, 2023 and March 11, 2023.[27] On March 10, 2023, the Government filed a notice of appeal (the "Appeal") of the Confirmation Order.[28]

16.    Pursuant to paragraph 124 of the Confirmation Order, the stay of the Confirmation Order was to terminate at the end of the day on March 13, 2023.[29] On March 11, 2023, the Court entered an order extending the stay of the Confirmation Order to March 15, 2023 at 5:00 p.m. (prevailing Eastern Time).[30]

---

[20]  *See* Docket No. 852.
[21]  *See* Docket No. 1117.
[22]  *See* Docket No. 1125.
[23]  *See* Docket No. 1138.
[24]  *See* Docket No. 861.
[25]  *See generally* Confirmation Decision.
[26]  *See Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1157].
[27]  *See* Docket Nos. 1159, 1166.
[28]  *See* Docket No. 1165.
[29]  *See* Confirmation Order, ¶ 124.
[30]  *See Order Extending the Stay of the Confirmation Order* [Docket No. 1169].

10

17.    On March 14, 2023, at 8:58 p.m. (prevailing Eastern Time), the Government filed the Motion. The hearing to consider the Motion is scheduled to take place at 2:00 p.m. (prevailing Eastern Time) on March 15, 2023.

## ARGUMENT

## I.    PARTIES SEEKING A STAY PENDING APPEAL FACE A HEAVY BURDEN.

18.    Federal Rule of Bankruptcy Procedure 8007 governs stays pending appeals in bankruptcy proceedings.[31] Such stays are an extraordinary form of relief that "are the exception, not the rule, and are granted only in limited circumstances."[32] Indeed, a stay pending appeal is "an intrusion into the ordinary processes of administration and judicial review,"[33] and an "extraordinary remedy" evaluated under "stringent" standards.[34] When seeking a stay pending appeal, "[t]he burden on the movant is a 'heavy' one" and "[t]he decision . . . lies within the sound discretion of the court."[35] The burden is especially heavy where, as here, the Government seeks to stay an order confirming a plan of reorganization.[36]

19.    In evaluating a request for a stay pending appeal, courts must consider (and the applicant must sufficiently demonstrate) the following four factors:[37]

---

[31]  *See* Fed. R. Bankr. Proc. 8007.

[32]  *In re Brown*, No. 18-10617 (JLG), 2020 WL 3264057, at *5 (Bankr. S.D.N.Y. June 10, 2020) (internal citation omitted).

[33]  *Nken v. Holder*, 556 U.S. 418, 433 (2009) (internal citation omitted).

[34]  *Nat. Res. Defense Council, Inc. v. U.S. Food & Drug Admin.*, 884 F. Supp. 2d 108, 122 (S.D.N.Y. 2012); *see also In re 461 7th Ave. Mkt., Inc.*, 623 B.R. 681, 688–89 (S.D.N.Y. 2020), *aff'd*, No. 20-3555, 2021 WL 5917775 (2d Cir. Dec. 15, 2021) (denying stay pending appeal because debtor failed to make the showing required for the "extraordinary relief" sought under Bankruptcy Rule 8007(b)).

[35]  *In re Gen. Motors Corp.*, 409 B.R. 24, 30 (Bankr. S.D.N.Y. 2009).

[36]  *See In re MPM Silicones, LLC, et al.*, No. 14-22503 (Bankr. S.D.N.Y. Sept. 17, 2014) (Drain, J.) [Docket No. 1036] at 169:6–9 ("The party seeking a stay has what is described as a heavy burden, and that is particularly [] the case where it is seeking a stay of a confirmation order. . .").

[37]  In the Motion, the Government implies that it is entitled to a friendlier standard by virtue of the fact it is a governmental unit, citing several cases regarding the standard for issuing a preliminary injunction (which is irrelevant to a motion for stay pending appeal). *See* Motion, ¶ 43 n.8. However, the case cited in support of this proposition, *Trump v. Deutsche Bank AG*, 943 F.3d 627, 639 (2d Cir. 2019), is a non-bankruptcy case where a non-governmental party sought to enjoin a governmental party. Accordingly, despite the Government's contentions to the contrary, there is no special consideration afforded here by virtue of the fact that the government is involved.

11

- **Factor 1:** whether the stay applicant has made a strong showing of likelihood of success on the merits;

- **Factor 2:** whether the applicant will be irreparably injured absent a stay;

- **Factor 3:** whether issuance of the stay will substantially injure the other parties interested in the proceeding; and

- **Factor 4:** whether the public interest lies in favor of or against granting a stay.[38]

20.    "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of . . . discretion."[39] While the first two factors in this analysis are the "most critical,"[40] a movant must show "satisfactory evidence on all criteria"[41] to prevail on a stay request. Recent cases in this circuit have "engaged in a balancing process with respect to the four factors, as opposed to adopting a rigid rule."[42] However, where the balance of the equities (specifically, factors two, three, and four referenced above) weigh against granting relief, a stay pending appeal may be denied outright.[43]

21.    As discussed below, the Government fails to satisfy *any* of the requisite factors—let alone all four of them—and accordingly, the Court should exercise its discretion and deny the relief requested in the Motion.

---

[38]    *Nken v. Holder*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 480 U.S. 770, 776 (1987)).

[39]    *Uniformed Fire Officers Ass'n v. de Blasio*, 973 F.3d 41, 48 (2d Cir. 2020) (quoting *Nken*, 556 U.S. at 433–34); *In re Terrestar Corp.*, No. 11-10612 (SHL), 2012 WL 1028218, at *2–3 (Bankr. S.D.N.Y. Mar. 26, 2012) (stating that "[t]he moving party faces a heavy burden").

[40]    *Nken v. Holder*, 556 U.S. at 434.

[41]    *In re Turner*, 207 B.R. 373, 375 (2d Cir. B.A.P. 1997); *see also In re Adelphia Commc'ns Corp.*, 333 B.R. 649, 659 (S.D.N.Y. 2005) ("All four criteria must be satisfied to some extent before a stay is granted."); *Curry v. Baker*, 479 U.S. 1301, 1302 (1986) (Powell, J., in chambers) ("It is no doubt true that, absent [a stay], the applicant here will suffer irreparable injury. This fact alone is not sufficient to justify a stay."); *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672–73 (1926) ("A stay is not a matter of right, even if irreparable injury might otherwise result."); *Uniformed Fire Officers Ass'n*, 973 F.3d at 49 ("With likelihood of success totally lacking, the aggregate assessment of the factors bearing on the issuance of a stay pending appeal cannot possibly support a stay."); *In re DJK Residential, LLC*, No. 08-10375 (JMP), 2008 WL 650389, at *2 (S.D.N.Y. Mar. 7, 2008) ("Failure to satisfy one prong of this standard for granting a stay will doom the motion." (internal quotation marks and citation omitted)).

[42]    *In re AMR Corp.*, No. 11-15463 (SHL), 2021 WL 5016606, at *4 (Bankr. S.D.N.Y. Oct. 28, 2021) (internal citations omitted).

[43]    *See, e.g.*, *Ledesma v. Garland*, 850 F. App'x 84, 89–90 (2d Cir. 2021) ("[W]e need not resolve whether [movant] has actually met th[e] [merits] factor because, even if he has, his motion still fails on the other remaining *Nken* prongs.").

## II.    THE GOVERNMENT FAILED TO SATISFY ANY OF THE FOUR REQUISITE FACTORS FOR A STAY PENDING APPEAL.

### A.    The Balance of Equities Tips Overwhelmingly Against a Stay Pending Appeal.

22.    As discussed above, a stay pending appeal may be denied outright if the balance of equities, which include factors two, three, and four enumerated above, weigh against granting the requested relief.[44] As the Supreme Court previously emphasized, a stay "is not a matter of right, even if irreparable injury might otherwise result to the appellant."[45] "[T]he traditional stay inquiry" also "calls for assessing the harm to the opposing party and weighing the public interest."[46] In the end, the decision to grant extraordinary stay relief is committed to judicial discretion.[47]

23.    Here, the Government falls well short of demonstrating that it will suffer irreparable harm in the absence of a stay pending appeal. Rather, its assertions that the exculpation provisions are unlawful because they "prospectively exculpat[e] parties from enforcement under the Government's police and regulatory powers"[48] reinforce the reality that the balance of equities tilts overwhelmingly ***against*** the Government and illustrates the degree to which the Government is willing to prioritize its own, largely hypothetical and unmaterialized interests over the very real and vulnerable interests of the Debtors' creditors, particularly their unsecured account holders.  Therefore, as set forth below, the Court need not even reach the likelihood of the merits of the Government's appeal to deny the requested stay relief but can do so based purely on (a) the Government's failure to demonstrate a likelihood of irreparable injury absent a stay; (b) the incalculable harm to the Debtors, their estates, and their account holders, among other creditors, that would inevitably result should a

---

[44]    *Id.*

[45]    *Nken v. Holder*, 556 U.S. at 427 (quoting *Virginian Ry. Co. v. United States*, 272 U.S. at 672).

[46]    *Id.* at 435.

[47]    *Id.* at 434.

[48]    Motion, at 6.

stay be granted; and (c) the fact that the public interest weighs against granting a stay of the

Confirmation Order.

> ### i.    The Government Has Not Demonstrated a Likelihood of Irreparable Injury Absent a Stay.

24.    "'[I]rreparable harm is the single most important prerequisite for the issuance

of a preliminary injunction' . . . accordingly, 'the moving party must first demonstrate that

such injury is likely before the other requirements for the issuance of an injunction will be

considered.'"[49] This harm "must be neither remote nor speculative, but actual and

imminent."[50] As the Supreme Court has explained, simply showing a "possibility of

irreparable injury" fails to satisfy this factor, as "the 'possibility' standard is too lenient."[51]

Here, the Government contends that it will suffer irreparable harm on the theory that (a) if the

Plan goes effective, the Government's arguments on appeal could be deemed equitably moot

and (b) the exculpation provisions unlawfully prevent the Government from asserting causes

of action—which have not yet been determined by the Government and remain purely

hypothetical and unsubstantiated—against the Debtors and other estate fiduciaries for

violations of securities law, among others. However, the Government has not shown that, in

the absence of a stay, it will suffer "*probable* irreparable harm" or that the purported harm is

anything but "remote []or speculative,"[52] and as such, the Government falls woefully short of

satisfying this factor.

---

[49]    *In re Calpine Corp.*, 2008 WL 207841, at *4 (internal citations omitted); *In re Sabine Oil & Gas Corp.*, 551 B.R. 132, 143 (Bankr. S.D.N.Y. 2016) (indicating that "irreparable harm is the 'principal prerequisite' for the issuance of a stay pursuant to Bankruptcy Rule 8007"); *In re Brown*, No. 18-10617 (JLG), 2020 WL 3264057, at *6.

[50]    *In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 681 (Bankr. S.D.N.Y. 2016) (citations omitted).

[51]    *Nken*, 556 U.S. at 434–35 (quoting *Inter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

[52]    *In re Sabine Oil & Gas Corp.*, 548 B.R. at 681.

## a. Equitable Mootness Alone is Insufficient to Show Irreparable Harm.

25.     In the Motion, the Government argues that equitable mootness alone is

sufficient to demonstrate irreparable harm.[53] This assertion blatantly disregards the views of

this district. It is well established in the Second Circuit that the potential mootness of an

appeal absent a stay does not constitute irreparable harm.[54] The weight of authority outside of

the Second Circuit also agrees that equitable mootness does not amount to irreparable harm.[55]

Indeed,

> the existence of such harm is no guarantee that an appellant is entitled to a stay
> pending appeal. It is also necessary to go one step further and consider the nature of
> the underlying dispute and the harm that the loss of appellate rights may have on the
> moving party. That harm must then be balanced against the potential harm other
> parties may suffer if the stay is granted.[56]

## b. The Government Failed to Show Actual and Imminent Irreparable Harm.

26.     Even assuming *arguendo* that equitable mootness alone were legally sufficient

to demonstrate irreparable harm in this district (which it is not), the Government has not

shown actual and imminent irreparable harm because the injury of which it complains is

---

[53]  *See* Motion, ¶ 69.

[54]  *See In re LATAM Airlines Grp. S.A.*, No. 20-11254, 2022 WL 2657345, at *5 (Bankr. S.D.N.Y. July 8, 2022) (noting "the mere threat of equitable mootness is not grounds, per se, for granting stay relief"); *In re Windstream Holdings, Inc.*, 2020 WL 4481933, at *3 (S.D.N.Y. Aug. 3, 2020) (finding that a risk of mootness, standing alone, does not constitute irreparable harm); *In re Adelphia Commc'ns Corp.*, 361 B.R. at 34; *In re Sabine Oil & Gas Corp.*, 548 B.R. at 682 (noting "a risk of mootness, standing alone, does not constitute irreparable harm"); *In re Calpine Corp.*, No. 05-60200 (BRL), 2008 WL 207841, at *4 ("[M]erely invoking equitable mootness . . . —a risk that is present in any post-confirmation appeal of a chapter 11 plan—is not sufficient to demonstrate irreparable harm."); *DJK Residential, LLC*, 2008 WL 650389, at *3 (stating "there is no reason why the majority view that the risk of mootness does not constitute irreparable harm should not apply"); *In re Moreau*, 135 B.R. 209, 215 (N.D.N.Y. 1992) ("It is clear that the danger of an appeal becoming moot is by itself never a sufficient ground to justify grant of a stay.").

[55]  *See, e.g.*, *BEPCO, L.P. v. 15375 Mem'l Corp. (In re 15375 Mem'l Corp.)*, 2009 WL 393948, at *1 (D. Del. Feb. 18, 2009) ("[E]quitable mootness of an appeal, without more, does not constitute irreparable harm."); *Turner v. Frascella Enters., Inc. (In re Frascella Enters., Inc.)*, 388 B.R. 619, 627 (Bankr. E.D. Pa. 2008) ("[A] majority of courts find the potential of mootness insufficient to demonstrate irreparable harm."); *In Re Trans World Airlines, Inc.*, 2001 WL 1820325, at *10 (Bankr. D. Del. Mar. 27, 2001) ("It is well settled that an appeal being rendered moot does not itself constitute irreparable harm." (quoting *In re 203 N LaSalle P'ship*, 190 B.R. 595, 598 (N.D. Ill. 2005))); *In re Adelphia*, 361 B.R. at 347 n.39 (collecting authorities).

[56]  *In re LATAM Airlines Grp. S.A.*, No. 20-11254, 2022 WL 2657345, at *5 (Bankr. S.D.N.Y. July 8, 2022).

speculative and hypothetical.[57] The Government has had months, specifically since July

2022, to, at the very least, come forward with an actual determination that the VGX token

constitutes a security, but it has yet to make such a determination.[58] Indeed, as reflected in the

Confirmation Decision, despite being asked to do so throughout the Confirmation Hearing,[59]

the Government provided "absolutely no admissible evidence—literally none—that would

support a conclusion that Binance.US will misuse customer assets or that Binance.US cannot

be trusted"[60] and therefore, the Government failed to demonstrate **any** bases for carving out

purported causes of action that have not yet and may never materialize from the exculpation

provision.[61]

---

[57]  *See, e.g.*, *In re Sabine*, 548 B.R. at 681 (holding that the claimed irreparable harm "must be 'neither remote nor speculative, but actual and imminent.'").

[58]  *See* Hr'g Tr. 30:5-8, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 2, 2023) (THE COURT: "Your objection is based on stuff Voyager has been doing for years and stuff that Binance has been doing for years. I mean, are you standing here telling me that the SEC is going to challenge whether the Debtor is selling securities?").

[59]  *See* Hr'g Tr. 314:22-23, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 2, 2023) (THE COURT: "You have no evidence to offer, right?" MR. UPTEGROVE: "No, Your Honor."); *see id.* at 38:5-17 (THE COURT: "You know, maybe not, but it's a disclosure issue and I'm absolutely shocked, I have to say, that a regulator would come in and say, I'm charged with regulatory authority over these things. These are reasons that I have concerns because they're within my regulatory jurisdiction, but I've done nothing. I have nothing to offer to you except questions, and my excuse for that is that it's somebody else's burden in the context of confirmation. That's incredible. Absolutely incredible."); *see* Hr'g Tr. 231:6-19, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 3, 2023) ("So at least I know that the SEC isn't just saying maybe, that it's saying it thinks that there are issues. But I still don't have evidence and I still don't have very much clarity as to exactly why they think there are issues or how they would affect this transaction.").

[60]  Confirmation Decision, at 20.

[61]  Indeed, as discussed at the Confirmation Hearing, the speculated potential securities law violations came from individual staff members at the SEC, not from the actual Securities & Exchange Commission itself, meaning that a determination as to whether the transactions contemplated under the Plan violate securities law could be months or even years away. *See* Hr'g Tr. 230:16-24, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 3, 2023) ("With that being said, the staff believes based solely on the facts and circumstances currently known to the staff that the offering and sale of [V]GX tokens have the attributes of a securities transaction – securities transactions. Staff also believes that Binance.US is operating an unregistered security exchange in the United States. The Commission has not made any determination on either of these issues. The staff beliefs do not represent the position of the Commission."); *see also* Jay Clayton, *Statement Regarding SEC Staff Views*, SEC.gov (Sept. 13, 2018), https://www.sec.gov/news/public-statement/statement-clayton-091318#_ftn2 (noting that the "Commission's longstanding position is that all staff statements are nonbinding and create no enforceable legal rights or obligations of the Commission or other parties").

27.    Though the Government was on notice of the Plan's provisions and was afforded the opportunity to be heard and object to the transactions proposed therein,[62] the Government failed to demonstrate that there is anything illegal in those contemplated transactions to bolster its arguments for preserving its ability to retroactively prosecute the Debtors and estate professionals for things that may or may not violate securities laws at some unknown point in the future when the Debtors and estate professionals are required by law to implement the transactions set forth in the confirmed Plan pursuant to Bankruptcy Code section 1142.

28.    Furthermore, the Court previously approved and authorized the Debtors to undertake the rebalancing steps contemplated under the Plan as part of the APA Order.[63] The Government declined to raise any issues with the contemplated transactions approved under the APA Order, choosing instead to wait until the middle of the Confirmation Hearing, with the knowledge that such actions have already commenced,[64] to make the case that the Government should be permitted to pursue the Debtors for operating under the APA Order in addition to the Confirmation Order. Such a result cannot stand, as it would only serve to undercut the impact of an order issued by a bankruptcy court.

---

[62]  Confirmation Decision, at 34 ("All of the relevant governmental entities have been on notice of what the plan proposes. They had every opportunity to tell me if they believed that anything contemplated by the plan would violate any applicable statute, rule or regulation . . . No other regulator has contended during the confirmation hearing that there is anything illegal in what the plan contemplates.").

[63]  *See* Docket No. 860, ¶ 13.

[64]  *See* Hr'g Tr. 26:17-25, 27:1-2, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 6, 2023) (MR. SLADE: "[A]s an example, Your Honor authorized us to start the rebalancing when Your Honor approved the APA a month or so ago. Then we see in there a filing that they think that might violate the securities laws. It doesn't make any sense for us to come and propose a plan, and for us to get approved and start implementing it because we want to return cryptocurrency to customers as soon as possible, and then for the regulators to come at us after the fact that said, oh, yeah, remember those super vague rules? They meant that was illegal. That is not what's supposed to happen here.").

> **c.    Any Asserted Risk of Irreparable Harm to the Government Absent a Stay is Greatly Outweighed by the Substantial Injury to the Debtors and Other Parties if a Stay is Granted.**

29.    Importantly, any risk of harm asserted by the Government must be weighed against the degree of injury facing the Debtors and their creditors if the Court grants the Motion and imposes a stay pending the adjudication of the appeal.[65] As discussed below, the resultant harm experienced by the Debtors and their creditors following the imposition of a stay would be exponential compared to the Government's ***hypothetical and unsubstantiated harms***, mandating denial of the requested stay.

> **ii.    A Stay Would Cause Incalculable Harm to the Debtors, Their Estates, and Their Creditors.**

30.    The Government cannot satisfy its burden as to the second requirement for a stay: "that the non-moving party or other parties will not suffer substantial harm if the stay is granted."[66] To the contrary, the issuance of a stay threatens to cause the Debtors, their estates, and their creditors substantial harm by delaying consummation of the Plan and, more importantly, an indefinite delay with respect to accessing customer accounts and receiving distributions. To overcome this potential harm, the Government must prove that "the balance of harms tips in favor of granting the stay."[67] Given that the Government's purported harms are purely speculative and fall far short of "actual and imminent irreparable harm", the balance of harms clearly tips in favor of denying the stay request.

---

[65]    *See In re Sabine*, 548 B.R. at 682 ("Even if the risk of mootness were sufficient to satisfy the requirement of some showing of irreparable injury, however, the Court finds that any threat of harm here is insignificant when weighed against the injury that the Debtors would suffer if the stay sought by the Committee were granted.").

[66]    In the Motion, the Government baselessly asserts that "[t]he Debtors have not identified any countervailing harm to justify denying a stay." Motion, at 5. Unless the Government has received an advanced copy of the Debtors' response to the Motion, which has yet to be publicly filed, such contentions are meritless and should be given no weight in this Court's evaluation of the Motion.

[67]    *In re Brown*, 2020 WL 3264057, at *7 (Bankr. S.D.N.Y. June 10, 2020) (quoting *Adelphia*, 361 B.R. at 349).

18

a.    **A Stay Would Indefinitely Delay Access to the Customers'
Accounts and Distributions to the Debtors' Creditors.**

31.    Here, the Debtors' account holders are primarily individuals who have been

waiting for distributions since July 2022. If implemented, the requested stay would result in

an indefinite delay of renewed access to customer accounts as well as a delay in receiving

distributions under the Plan. Denying such access to distributions based solely on the

Government's vague assertions of *potential but unsubstantiated* criminal activity is woefully

inequitable. Indeed, it is well settled that the delay caused to creditors receiving distributions

on account of their allowed claims is a significant harm in warranting denial of a stay

request.[68] Such delays are particularly harmful here given the downward spiral of various

cryptocurrency lenders as well as the recent financial distress exhibited by certain financial

institutions, including the collapse of Silicon Valley Bank and Signature Bank.[69] In a similar

vein, Moody's downgraded six other U.S. banks just yesterday, including First Republic

Bank, Zions, Western Alliance, Comerica, UMB Financial, and Intrust Financial, noting that

it expects more banks to experience additional pressure after the other recent banking

failures.[70] To add insult to injury, the world economy appears "perilously close to falling into

recession", as the World Bank projects a "period of pronounced weakness" for the U.S.,

Europe, and China (the three most influential parts of the world for economic growth.[71]

---

[68]    *See In re Fairmont Commc'ns Corp.*, No. 92 B 44861, 1993 WL 428710, at *4 (Bankr. S.D.N.Y. Oct. 12, 1993) (internal citations omitted); *see also In re 29 Brooklyn Ave. LLC*, No. 12-40279-CEC, 2015 Bankr. LEXIS 4192, at *5 (Bankr. E.D.N.Y. 2015).

[69]    *See* Alain Sherter, *Silicon Valley Bank's Collapse Sows Fear Over Banking System. Here's What to Know*, CBS News, March 13, 2023, https://www.cbsnews.com/news/silicon-valley-bank-signature-bank-collapse-joe-biden-cbs-news-explains/; *see* Matthew Goldstein and Emily Flitter, *Risky Bet on Crypto and a Run on Deposits Tank Signature Bank*, New York Times, March 12, 2023, https://www.nytimes.com/2023/03/12/business/signature-bank-collapse.html.

[70]    *See* Matt Egan, *Moody's sees harder times ahead for all US banks and puts six on 'downgrade' watch*, CNN, March 14, 2023, https://www.cnn.com/2023/03/14/investing/moodys-us-banks-downgrade/index.html.

[71]    *See* Jonathan Josephs, *Global recession warning as World Bank cuts economic forecast*, BBC News, Jan. 10, 2023, https://www.bbc.com/news/business-64213830.

19

Given mounting economic uncertainty, it is even more imperative that customers receive their distributions as soon as possible in order to avoid additional harm.

### b.    A Stay Will Result in Additional Fees and Costs to the Debtors' Estates.

32.    The Debtors and their estates will incur substantial amounts of additional operating costs and professional fees while the Appeal is pending, all of which will significantly diminish recoveries to the detriment of general unsecured claimants under the Plan. Indeed, the Debtors indicated that they have a current administrative burn rate of $10 million per month.[72] Furthermore, the Debtors have incurred between approximately $114 million to $122 million of additional operating costs and professional fees as a result of the failed sale to FTX to the further detriment of the Debtors' customers and other creditors.[73] Given that the Government is requesting either an indefinite stay of the exculpation provision in the Confirmation Order or a two-week stay to pursue relief in the District Court pending potentially multiple rounds of appeals,[74] the Debtors could incur millions of additional fees and costs on top of the already sizeable operational costs and professional fees that serve as yet another obstacle to creditor recoveries. Moreover, delays attendant with the stay and appellate process could also cause the value of the cryptocurrency to be distributed under the Plan to substantially decrease while the Confirmation Order is stayed, which would in turn negatively impact the value of the distributions owed to customers. All told, a stay will result in unnecessary fees and costs that will only serve to further harm the Debtors, their estates,

---

[72]    *See Supplemental Declaration of Mark A. Renzi in Support of Confirmation of the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1139], ¶ 5 ("The Debtors are burning more than $10 million a month.").

[73]    *See Objection of the Official Committee of Unsecured Creditors to Proofs of Claim Nos. 11206, 11209, and 11213* [Docket No. 936], ¶¶ 62, 77.

[74]    The Motion does not indicate precisely how long of a stay the Government is seeking, nor does it specify across how many levels of appeal are anticipated. Notably, however, the Motion requests a two-week stay of the Confirmation Order to pursue similar relief in the District Court, should the Court deny its limited request for staying the exculpation provision contained in the Plan. A two-week stay seems unnecessary for this particular purpose, however, given that the Motion is already drafted and largely regurgitates the arguments that the Government raised at the Confirmation Hearing and in its related objections.

and particularly their unsecured creditors who already face potentially insurmountable

obstacles to obtaining their projected recoveries.

> c.    **A Stay May Make it Impossible for the Debtors to Proceed
> with the Binance.US Sale, Forcing Them to Toggle to Self-
> Liquidation Under the Plan.**

33.    If granted, a stay may make it impossible for the Debtors to comply with the

provisions of the First Amended APA, meaning that their sole option under the Plan will be

to toggle to self-liquidation. Courts have previously declined to grant a motion for stay

pending appeal where the stay would interfere with the proposed sale.[75]

34.    At the Confirmation Hearing, the Debtors offered unrefuted testimony that the

differential between creditor recoveries in a self-liquidation under the toggle Plan and the

recoveries under the Binance.US sale would be ***approximately $100 million*** and, under self-

liquidation, the Debtors' customers would lose the ability to receive in-kind distributions of

their cryptocurrency.[76] Accordingly, in addition to general delays regarding distributions,

---

[75]    *See, e.g., In re Frantz*, 534 B.R. 378, 390 (Bankr. D. Idaho 2015) ("Imposing a stay will result in potential harm and prejudice to the creditors of the estate due to the delay in administration of the estate and the potential for loss of the sale to CPI. A stayed sale will also expose the estate to additional costs to secure and maintain the Property for the duration of the appeal. . . if stayed there would be a risk of loss of that sale as well as additional expenses incurred by the estate pending resolution of the appeal . . ."); *In re Innovative Commun. Co., LLC*, Nos. 2007-106, 2007-105, 2007-156, 2008 U.S. Dist. LEXIS 107853, at *13 (D.V.I. 2008) ("To delay asset sales of the bankruptcy estate would not only disrupt the bankruptcy proceedings but also work an injury to the creditors of the bankruptcy estate. As such, the Court finds that this factor disfavors a stay."); *In re TWA*, Case No. 01-0056 (PJW), 2001 Bankr. LEXIS 723, at *30 (Bankr. D. Del. 2001) ("The evidence is overwhelming that TWA cannot be sustained as a viable business enterprise in the face of a material delay in closing the American transaction. Specifically, the uncontroverted testimony at the Sale Hearing was that TWA has a cash burn of $3 million per day. If the sale to American is unduly delayed, there is a very serious risk of losing a sale transaction which materially benefits substantial and diverse creditor constituencies. At the conclusion of the Sale Hearing, I found that there would be an immediate and precipitous decline in the financial affairs of TWA followed by a very high probably, if not certainty, of liquidation if I were to deny or reject the Sale Motion.").

[76]    *See* Hr'g Tr. 25:24-25, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 3, 2023) ("How much value leakage would there be if the Debtors decide to exercise their fiduciary out and move away from Binance towards the toggle plan?" "We would estimate that the differential would be $100 million, approximately."); *see id.* at 26:1-16 ("Can you describe for the Court what the $100 million of value leakage consists of?" "So of the $100 million of value leakage, $20 million of that would relate to the differential from the purchase price perspective relating to Binance's upfront purchase price consideration of $20 million. The remaining $80 million relates primarily to value leakage associated with two components. One would be estimated incremental value reduction associated with VGX token and the lack of support from Binance.US perspective and inability to potentially create additional value for that token. That is a relatively small component of the estimated $80 million. The remaining component relates to additional discounts that would likely be associated with the liquidation of the 35 unsupported tokens on

21

granting the requested stay may also result in a significant decrease in size and type of

recoveries to the severe detriment of unsecured creditors.

35.    Finally, pursuant to paragraph L of the Confirmation Order, the First

Amended APA was further amended to provide the following:

> If the Purchaser is ready to close by April 1, 2023 (assuming closing conditions are
> satisfied or waived by Purchaser) and the Seller is not (including because the Seller
> declines to waive any Closing conditions, other than breaches or defaults by the
> Purchaser), then the Seller will cease to have Seller Expense reimbursement
> protection thereafter[.][77]

As such, if Binance.US is ready to close the sale by April 1, 2023 (approximately two and a

half weeks from now) but the Debtors are not because the Plan has yet to go effective due to

a stay pending the Appeal, then the Debtors risk losing their expense reimbursement rights

under the First Amended APA (as amended by the Confirmation Order).

36.    In sum, the incalculable harms that will likely befall the Debtors, their estates,

and creditors significantly outweigh the amorphous claims of purported harm from the

Government, meaning that the second factor also weighs against granting the stay.

> ### d.    A Stay Will Make it Challenging for the Debtors and Other Estate Professionals to Consummate the Plan and its Contemplated Transactions.

37.    The Government seems inexplicably unperturbed by the intended

consequences of its requested relief—namely, the fact that the Debtors and other estate

professionals will be required to implement the transactions contemplated by the

Confirmation Order while simultaneously living in fear of incurring potential future civil and

criminal liabilities (that are not yet known to the public or the SEC)[78] for merely complying

---

Voyager platform."); *see id.* at 72:1-6 ("Additionally, the other consequence would really be around the
ability for certain creditors to receive in-kind distributions relating to the 35 tokens that are unsupported,
and so there may be, for example, adverse tax consequences associated with those 35 coins which would
need to be returned in cash as opposed to on an in-kind basis.").

[77]    Confirmation Order, ¶ L.

[78]    Despite its purported expertise in securities law, counsel to the SEC admitted on the record at the
Confirmation Hearing that the SEC was "not in a position to expound upon what a particular entity . . . may
or may not have done and what the consequences legally are regarding that conduct."  Hr'g Tr. 33:16-20, *In*

with a court order. To permit such retroactive criminalization of the Debtors and other estate

fiduciaries on pure speculation that there *may* be worthwhile causes of action at some point in

the future is the very definition of inequity. The Debtors, their professionals, and their

employees, who have spent the last several months working tirelessly to negotiate,

implement, and eventually consummate the transactions contemplated by the Plan, should not

be penalized as a result of the ever-changing regulatory and legal framework of the

cryptocurrency industry and the Government's inability to articulate what causes of action

may be applicable in these chapter 11 cases.[79] Such a result would impermissibly create a

proverbial "gotcha!", with the threat of future civil and criminal liability perpetually hovering

over the Debtors, their professionals, and their employees despite their duties to carry out the

provisions of the Confirmation Order. As correctly recognized by this Court in its

Confirmation Decision,

> [t]he persons and entities who will carry out specific activities that are not only
> approved by [the] Confirmation Order, but also are required by that Order by virtue of
> section 1142 of the Bankruptcy Code, are entitled to know that they will not incur
> liability just for doing what I have approved and required, particularly when the SEC
> and all other Government agencies have had a full and fair opportunity to argue to me
> that the proposed transactions are illegal in any way and have not made any such
> contentions.[80]

Moreover, contrary to the Government's assertions, the Confirmation Order does not

"foreclose future arguments by the Government, or the Government's assertion of changing

---

re *Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 2, 2023). In response
to the SEC's assertion that the Debtor has hired "legions of lawyers" and other experts that could address
the issue, the Court indicated that such experts would be opining about what the SEC would likely do and
what it would insist upon. Hr'g Tr. 34:6-14, *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943
(MEW) (Bankr. S.D.N.Y. Mar. 2, 2023) (THE COURT: "How can they know more than you do about
that?").

[79] The Government complains that it would be "impossible for any court to predetermine that a defendant has
*in fact complied* with court orders and done nothing else", referencing possible wrongful acts committed
while implementing the Confirmation Order. Motion, ¶ 57. However, the Government fails to appreciate the
inclusion of carveouts for actual fraud, willful misconduct, or gross negligence in the exculpation provision
contained in the Plan, which should alleviate these concerns. *See* Plan, Art. VII.C.

[80] Confirmation Decision, at 36; *see also id.* at 38 ("[T]he individuals and entities who will be required by my
confirmation order to engage in those activities are entitled to know that they have not been sentenced by
me to incur statutory and regulatory liabilities just for doing what I have ordered. That is consistent with
ordinary practice in bankruptcy cases . . . and with basic principles of equity and estoppel.").

or evolving regulatory views."[81] Rather, the inclusion of the exculpation provisions in the

Confirmation Order is "simply protecting those persons who in the interim will be engaging

in transactions that the Government has failed to challenge and that must be carried out under

the authority" of the Confirmation Order.[82] Therefore, any such allegation from the

Government that its right to prosecute wrongdoing or police improper behavior is inaccurate

and mischaracterizes the intention of the exculpation provision.

### iii.    A Stay is Not in the Public Interest.

38.    The Government has failed to show that a stay pending appeal would be in the

public interest. To the contrary, the public interest would be served by denying a stay and

allowing the Debtors to proceed with consummating the Plan, particularly given the severe

harm that will potentially befall the Debtors, their estates, and creditors as well as the

possible negative implications of this particular stay with respect to future chapter 11 cases.

39.    Courts recognize that the public interest disfavors stays because "the public

interest favors the expedient administration of the bankruptcy proceedings."[83] Moreover, the

public interest in settlements and finality weighs against granting a stay pending appeal.[84]

Most importantly, the public interest lies with abating the financial crisis caused by the

collapse of cryptocurrency—it is imperative that the Plan be consummated to alleviate the

financial hemorrhaging experienced by the Debtors' creditors and customers in recent months

due to, among other things, the failed sale to FTX and mounting economic pressures. As

---

[81] Confirmation Decision, at 39.

[82] *See id.*

[83] *In re Savage & Assocs., P.C.*, No. 05 CIV 2072 (SAS), 2005 WL 488643, at *2 (S.D.N.Y. Feb. 28, 2005); *see also In re Health Diagnostic Lab'y, Inc.*, No. 15-3219-KRH, 2015 WL 4915621, at *5 (Bankr. E.D. Va. Aug. 17, 2015) (finding that "third parties and the public interest in general will be harmed by imposition of the stay").

[84] *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005) ("The compromise of complex litigation is encouraged by the courts and favored by public policy."); *In re Motors Liquidation Co.*, 555 B.R. 355, 364–65 (Bankr. S.D.N.Y. 2016) ("Settlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate.").

discussed above, the stay could delay distributions indefinitely and potentially unravel the
multiple complex transactions and settlements involved with the Plan.

40.    The Government invokes its duty to protect the public health, welfare, and
safety of its citizens,[85] as well as its job to "enforce the law and prosecute misconduct."[86]
There are thousands of citizens who are creditors that stand to be personally harmed by the
Government's efforts. It is not exactly clear which citizens the Government is currently
seeking to protect, but it is abundantly clear that it is not the Debtors' unsecured creditors. It
remains unclear how a hypothetical violation of civil or criminal law that **the Government
itself has yet to identify** merits a stay of the Confirmation Order. Instead, the Government
asserts that a stay would serve the public interest by "ensuring that the rights of the state and
federal governmental units released under the [ ] Plan through the Exculpation Provision are
protected."[87] The Government's focus on those generic considerations and its own self-
interests has strayed away from what really matters to the public interest here—*i.e.*, ensuring
the expedient administration of chapter 11 cases and prompt distribution of funds to creditors
following consummation of a chapter 11 plan. The Government's efforts to stay the
Confirmation Order pending appeal are **actually working against the public interest** and the
very purpose of chapter 11.

41.    The Government fails to recognize the far-reaching public policy implications
of its proposed modification to the exculpation provision. It would discourage professionals
from executing value-maximizing cryptocurrency transactions out of fear that the
Government would later accuse them of some violations of law. In such case, no chapter 11
plan could ever be consummated, and the entire purpose of chapter 11 would be defeated,
meaning that the public interest lies squarely against granting the requested stay. Indeed, with

---

[85]    *See* Motion, at 6.
[86]    *See id.*, at ¶ 64.
[87]    *See id.*

respect to the transactions and distributions that will be statutorily mandated under the Plan

pursuant to 11 U.S.C. § 1142(a), "[a] fundamental principle in our legal system is that laws

which regulate persons or entities must give fair notice of conduct that is forbidden or

required."[88] Instead of providing "fair notice of conduct that [the Government claims] is

forbidden," the Government is instead seeking to lay in wait while professionals and others

comply with the Plan to later decide whether it thinks anything the Plan contemplates is

illegal.[89]

42.    As noted in the Court's well-reasoned Confirmation Decision, exculpation

provisions are "based on the theory that court-supervised fiduciaries are entitled to a qualified

immunity for discretionary actions that they take in their official capacities" and also function

as "a protection for court-supervised and court-approved transactions."[90] This supports the

notion that "parties should not be liable for doing things that the Court authorizes them to do

and that in many instances a court may direct them to do."[91]

### B.    The Government Failed to Demonstrate a Strong Likelihood of Success on the Merits.

43.    Beyond the equities, the Government's inability to satisfy the "likelihood of

success" stay factor provides an independent reason to deny relief.[92] Although the

Government likened a stay pending appeal to an injunction and otherwise seek to lower the

bar for stay relief,[93] the Second Circuit has been clear that "[t]o obtain a stay of a . . . court's

order pending appeal, more is required [than in the injunction context], including a strong

---

[88]    *Securities and Exchange Commission v. Ripple Labs, Inc., et al.*, No. 20-cv-10832, Doc. No. 440 at 1 (S.D.N.Y. Mar. 11, 2022) (quoting *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)).

[89]    *Id.*

[90]    Confirmation Decision, at 31.

[91]    *Id.* at 31–32.

[92]    *See In re 461 7th Ave. Mkt., Inc.*, 623 B.R. 681, 691 (S.D.N.Y. 2020) ("Here, aside from the fact that the other three factors militate against granting a stay, the [appellant] fails to make the required showing on [the merits].").

[93]    *See Motion,* ¶ 43.

showing that [the movant] is likely to succeed on the merits."[94] The Supreme Court has also

used the same "strong showing" language in reiterating the traditional stay-pending-appeal

standard (and distinguishing it from injunctions).[95] Particularly given that the balance of

equities disfavors a stay by a wide margin, the Government cannot prevail on its Motion

simply by showing that its appeal is non-frivolous (which, objectively, it is not).

44.    Indeed, in the Second Circuit, "[t]he probability of success that must be

demonstrated is inversely proportional to the amount of irreparable injury plaintiff[ ] will

suffer absent the stay. Simply stated, more of one excuses less of the other."[96] Because the

Government cannot show that it will suffer irreparable harm absent the stay, the Government

now bears the burden of establishing that it has a substantial probability of success on

appeal.[97] Here, the Government argues, among other things, that the exculpation provision is

unlawful and contends that the Court "improperly exceeded its statutory authority in

approving the exculpation provision."[98] Not only is this assertion incorrect, but it also

blatantly disregards the importance of federal common law as a potential grant of bankruptcy

court authority. Indeed, the Court has statutory authority to approve the plan's exculpation

provisions pursuant to Bankruptcy Code sections 105(a) and 1123, as has been recognized by

multiple circuit courts.[99] Moreover, Bankruptcy Code section 105(a) is frequently cited as

---

[94]  *Agudath Israel of Am. v. Cuomo*, 980 F.3d 222, 226 (2d Cir. 2020 (second alteration in original).
[95]  *Nken v. Holder*, 556 U.S. at 428–29, 434.
[96]  *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002) (internal citations omitted).
[97]  *In re Taub*, 470 B.R. 273, 278 (E.D.N.Y. 2012) ("Because the [appellant] has failed to demonstrate why she
      will suffer irreparable harm . . ., she must clearly establish a substantial possibility of success on appeal.").
[98]  *See* Motion, ¶¶ 46-53.
[99]  *See Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084 (9th Cir. 2020) ("Under 11 U.S.C. § 105(a), which
      empowers a bankruptcy court to 'issue any order, process, or judgment that is necessary or appropriate to
      carry out the provisions of [Chapter 11],' and 11 U.S.C. § 1123, which establishes the appropriate content
      of a bankruptcy plan, the bankruptcy court here had the authority to approve an exculpation clause intended
      to trim subsequent litigation over acts taken during the bankruptcy proceedings and so render the Plan
      viable" (citations omitted)) (citing *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000)).

proper statutory authority for approving of release and exculpation provisions in this
district.[100]

45.    Assuming, *arguendo*, that Bankruptcy Code sections 105(a) and 1123 do not
confer the authority for bankruptcy courts to approve exculpation provisions, the
Government's contentions that there is a requisite lack of statutory authority here still fails, as
it is well settled that not all of the Court's authority is derived from the Bankruptcy Code. In
fact, the Second Circuit has recognized the existence of a federal common law specifically
related to bankruptcy.[101] Therefore, even if the Court had no statutory authority to approve
the exculpation provision, it could base its decision, as this Court did here in part, on relevant
governing federal common law.

46.    As discussed herein, the Government has introduced ***absolutely no evidence*** to
date with respect to the purported illegality of the transactions proposed in the Plan, nor could
it identify for the Court the potential causes of action that could be applicable here, despite
numerous requests from this Court to do so during the Confirmation Hearing.[102] Furthermore,

---

[100]  *See, e.g., In re Almatis B.V.*, No. 10-12308 (MG), 2010 Bankr. LEXIS 5875, at *22 (Bankr. S.D.N.Y. 2010)
("In addition, section 105(a) of the Bankruptcy Code permits approval of the releases, approval of the
exculpation and issuance of the injunction set forth in Article IX of the Plan …"); *In re Finlay Enters., Inc.*,
No. 09-14873, 2010 Bankr. LEXIS 5584, at *24 (Bankr. S.D.N.Y. 2010) ("Section 105 (a) of the
Bankruptcy Code permits issuance of the injunction and approval of the releases and exculpations set forth
in Article X of the Plan …"); *In re Sabine Oil & Gas Corp.*, No. 15-11835 (SCC), 2016 Bankr. LEXIS
4753, at *50 (Bankr. S.D.N.Y. 2016) ("Sections 105(a) and 1123(b) of the Bankruptcy Code permit
issuance of the injunctions and approval of the releases, exculpations, and injunctions set forth in Article
VIII of the Plan."); *In re Gen. Growth Props., Inc.*, No. 09-11977, 2010 Bankr. LEXIS 5943, at *38 (Bankr.
S.D.N.Y. 2010) ("Sections 105(a) and 1123(b) of the Bankruptcy Code permit issuance of the injunctions
and approval of the releases and exculpations set forth in Article 11 of the Plan …").

[101]  *See, e.g., Compagnie Noga D'Importation et D'Exportation S.A. v. The Russian Fed'n*, 361 F.3d 676, 688
(2d Cir. 2004) ("we note that an issue similar to the one before us has arisen in the federal common law of
bankruptcy and set off"); *see also Toward a Federal Common Law of Bankruptcy: Judicial Lawmaking in a
Statutory Regime*, 80 Am. Bankr. L.J. 1, 4 (arguing that federal courts have common lawmaking powers in
bankruptcy, as such lawmaking is proper because there is an implicit Congressional authorization of
common lawmaking power in the Bankruptcy Code, as indicated by its legislative history and
Congressional and judicial ratification of common lawmaking powers).

[102]  Nevertheless, the Government argues that the Court lacks jurisdiction over criminal matters. *See* Motion,
¶ 52. This assertion is puzzling, as the Government has yet to assert ***any alleged violations of criminal
laws***. Moreover, the Court is not enforcing criminal laws through its approval of the Confirmation Order.
This is yet another example of the Government effectively transferring its burden to identify potential
criminal causes of action to anyone but itself. Similarly, the Government indicates that "the Debtors have
not identified any specific enforcement actions that the Exculpation Provision is intended to enjoin."
Motion, ¶ 53. The only reason that no such enforcement actions have been identified is because the

the Government has yet to articulate *any* of the merits of its arguments, opting instead for

vague assertions of hypothetical concerns that have yet to (and may never) materialize. The

Government's contention that the prospect of future liability should weigh on the Debtors and

other estate professionals while they dutifully endeavor to comply with the provisions set

forth in the Confirmation Order, despite the fact that the Government itself has yet to explain

the reasons for its concerns or provide any evidence to substantiate its mere suspicions, is

textbook inequity. Such vague, aspirational assertions of wrongdoing, without more, certainly

do not demonstrate a "substantial likelihood" of success on the merits of the Appeal, further

weighing against granting the requested stay.

    47.     Moreover, in the Second Circuit, it is well settled that an exculpation clause

approved at confirmation may exculpate estate fiduciaries for their actions related to the

restructuring efforts and is designed to be a "protection not only of court-supervised

fiduciaries, but also of court-supervised and court-approved transactions."[103] As this Court

has explained, if the court approves a transaction as being in the best interests of the estate

---

Government *has yet to identify any such enforcement action*. The Government cannot put the burden of identifying governmental causes of action or enforcement actions on the Debtors when it is patently the job of the Government to do so.

[103] *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 720 (Bankr. S.D.N.Y. 2019); *In re LATAM Airlines Grp. S.A.*, 2022 WL 2206829, at *49–50 (Bankr. S.D.N.Y. June 18, 2022), *corrected*, 2022 WL 2541298 (Bankr. S.D.N.Y. July 7, 2022), and *motion to certify appeal denied*, 2022 WL 2962948 (Bankr. S.D.N.Y. July 26, 2022), and *aff'd sub nom. In re Latam Airlines Grp.*, S.A., 643 B.R. 756 (S.D.N.Y. 2022), and *aff'd sub nom. In re Latam Airlines Grp., S.A.*, 643 B.R. 741 (S.D.N.Y. 2022), *aff'd sub nom. In re Latam Airlines Grp. S.A.*, 55 F.4th 377 (2d Cir. 2022) (overruling the trustee's objection because "[i]t is well settled that an exculpation clause approved at confirmation may exculpate estate fiduciaries like a committee, its members, and estate professionals for their actions in the bankruptcy case except where those actions amount to willful misconduct or gross negligence"); *In re Ditech Holding Corp.*, 2021 WL 3716398, at *9 (Bankr. S.D.N.Y. Aug. 20, 2021) (collecting cases for the proposition that "[i]t is settled that exculpatory provisions are proper to protect those authorized by bankruptcy courts to carry out the bankruptcy process, even after the effective date of a plan"); *In re Olinda Star Ltd.*, 614 B.R. 28, 48 (Bankr. S.D.N.Y. 2020) ("This Court agrees that [exculpation] is necessary and appropriate to prevent interference with the consummation of the [restructuring], and issuance of the New 2024 Notes Guarantee because without such exculpations the ability of the JPLs and their advisors to take action to effectuate the restructuring would be limited."); *In re Stearns Holdings, LLC*, 607 B.R. 781, 790–91 (Bankr. S.D.N.Y. 2019) ("In light of the exculpation provision's carve-out for gross negligence, intentional fraud, and willful misconduct, the Court finds that (i) the standard of care established by the exculpation provision is entirely consistent with, and appropriate under, applicable law and (ii) the protections afforded by the exculpation provision, which represent an integral component of the Global Settlement and the Amended Plan, are reasonable and appropriate.").

and has authorized the transaction to proceed, then the parties to those transactions should not

be subject to claims that effectively seek to undermine or second-guess such court's

determinations.[104] Furthermore, courts in this district have concluded that "[i]t is settled that

exculpatory provisions are proper to protect those authorized by bankruptcy courts to carry

out the bankruptcy process, ***even after the effective date of a plan***."[105] Contrary to the

Government's assertions, bankruptcy courts routinely approve exculpation provisions

***without*** a carve out for governmental entities, government, enforcement actions, or criminal

sanctions.[106] Here, it is apparent that the Government has misunderstood the breadth and

scope of the exculpation provisions in the Plan, and has based its arguments on a "serious

misunderstanding of just what it means when a court confirms a plan of reorganization."[107]

Quizzically, the Government is effectively asking in the same breath for (a) the Debtors and

their employees, officers, and professionals to complete the transactions and effectuate the

distributions contemplated by the Plan while also (b) maintaining possible liability exposure

---

[104]  *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. at 721; Confirmation Decision, at 30 ("It is routine that bankruptcy plans contain provisions that state that fiduciaries and other parties do not incur liabilities by having engaged in transactions that the Court has approved, or by taking actions that the Court has directed them to take.").

[105]  *In re Ditech Holding Corp.*, 2021 WL 3716398, at *9 (Bankr. S.D.N.Y. Aug. 20, 2021).

[106]  *See, e.g.,* Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan, Art. VIII.F, *In re Lakeland Tours, LLC*, No. 20-11647 (JLG) (Bankr. S.D.N.Y. Sept. 15, 2020) [Docket No. 191-1]; Order Confirming Chapter 11 Plan, Ex. A, Plan, Art. VIII.F, *In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Feb. 5, 2020) [Docket No.789-1]; Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan § 8.4, *In re Deluxe Entertainment Services Group Inc.*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 25, 2019) [Docket No. 96]; Order Confirming Chapter 11 Plan, Ex. 1, Plan, Art. VIII.E, *In re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019) [Docket No. 356]; Order Confirming Chapter 11 Plan of Reorganization, Ex. A, Plan, Art. IX.D, *In re Fullbeauty Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y. Feb. 5, 2019) [Docket No. 39]; Order Confirming Chapter 11 Plan of Reorganization, Ex. 1, Plan, Art. VIII.E, *In re Cenveo, Inc.*, No. 18-22178 (RDD) (Bankr. S.D.N.Y. Aug. 21, 2018) [Docket No. 685]; Order Confirming Chapter 11 Plan of Reorganization, Ex. 1, Plan, Art. IX.D, *In re Sbarro LLC*, No. 14-10557 (MG) (Bank. S.D.N.Y. May 19, 2014) [Docket No. 238]; Order Confirming Plan of Liquidation, Ex. A, Plan, Art. IX.F, *In re United Retail Group*, Inc. No 12-10405 (SMB) (Bank. S.D.N.Y. Sept. 18, 2012) [Docket No. 776]; Order Confirming Chapter 11 Plan of Reorganization, Ex. 1, Plan, Art. X.G, *In re FGIC Corp.*, No. 10-14215 (SMB) (Bankr. S.D.N.Y. Apr. 23, 2012) [Docket No. 314].

[107]  *See* Confirmation Decision, at 33.

for those same actors for merely consummating the affirmative obligations set forth in the Confirmation Order.[108]

48.     In the Motion, the Government has also resurrected its argument that the exculpation provision elevates the affirmative defense to subsequent litigation in Bankruptcy Code section 1125(e) into "a total bar against suit."[109] In the Government's view, the Debtors and estate fiduciaries should first be prosecuted for potential liability without immunity, then may avail themselves of various applicable affirmative defenses. This argument is illogical and makes no sense—the expectation that the Debtors and other estate fiduciaries would willingly expose themselves to criminal liability for crimes that have not yet been identified but could depend on affirmative defenses to bail them out of trouble is absurd. Indeed, many cases make clear that there is a broader immunity for actions that are specifically approved by a court and/or that have been explicitly required to be taken by court order, particularly where government officials or other parties had the opportunity to object to the court's approval of an action and did not do so.[110]

*[Remainder of Page Intentionally Left Blank]*

---

[108] *See* Confirmation Decision, at 34–35.
[109] Motion, ¶ 49.
[110] Confirmation Decision, at 35 (citing cases).

31

## CONCLUSION

WHEREFORE, the Committee respectfully requests that this Court deny the Motion

and grant such other and further relief as the Court deems just and proper.

Dated:   New York, New York
         March 15, 2023

MCDERMOTT WILL & EMERY LLP

*/s/ Darren Azman*
Darren Azman
Joseph B. Evans
One Vanderbilt Avenue
New York, NY 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
E-mail: dazman@mwe.com
       jbevans@mwe.com

- and -

Charles R. Gibbs (admitted *pro hac vice*)
2501 North Harwood Street, Suite 1900
Dallas, TX 75201
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
E-mail: cgribbs@mwe.com

- and -

Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131-2184
Telephone: (305) 329-4473
Facsimile: (305) 503-8805
E-mail: gsteinman@mwe.com

*Counsel to the Official*
*Committee of Unsecured Creditors*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of March 2023, I caused a true and correct copy of the foregoing *Opposition of the Official Committee of Unsecured Creditors to Motion for Stay Pending Appeal* to be served by (i) electronic notification pursuant to the CM/ECF system for the United States Bankruptcy Court for the Southern District of New York or (ii) e-mail, as indicated on the attached Service List.

*/s/ Darren Azman*
Darren Azman

## SERVICE LIST

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country | Email | Method of Service |
|---|---|---|---|---|---|---|---|---|---|
| DISTRICT OF COLUMBIA | OFFICE OF THE ATTORNEY GENERAL | 400 6TH STREET NW | | WASHINGTON | DC | 20001 | | OAG@DC.GOV | VIA E-MAIL |
| FRANCINE DE SOUSA | C/O SISKINDS LLP | ATTN: ANTHONY O'BRIEN | 100 LOMBARD STREET SUITE 302 | TORONTO | ON | M5C1M3 | | ANTHONY.OBRIEN@SISKINDS.COM | VIA E-MAIL |
| FRANCINE DE SOUSA | C/O SISKINDS LLP | ATTN: MICHAEL G. ROBB & GARETT M. HUNTER | 275 DUNDAS STREET UNIT 1 | LONDON | ON | N6B3L1 | | MICHAEL.ROBB@SISKINDS.COM GARETT.HUNTER@SISKINDS.COM | VIA E-MAIL |
| GOOGLE, LLC | | 1600 AMPHITHEATRE PKWY | | MOUNTAIN VIEW | CA | 94043 | | COLLECTIONS@GOOGLE.COM | VIA E-MAIL |
| INTERNAL REVENUE SERVICE | | PO BOX 7346 | | PHILADELPHIA | PA | 19101-7346 | | | VIA FIRST CLASS MAIL |
| OFFICE OF THE UNITED STATES TRUSTEE | FOR THE SOUTHERN DIST OF NEW YORK | ATTN: RICHARD C. MORRISSEY, ESQ. AND MARK BRUH, ESQ. | 201 VARICK STREET, ROOM 1006 | NEW YORK | NY | 10014 | | RICHARD.MORRISSEY@USDOJ.GOV MARK.BRUH@USDOJ.GOV | VIA E-MAIL |
| SECURITIES & EXCHANGE COMMISSION | | 100 F STREET NE | | WASHINGTON | DC | 20549 | | SECBANKRUPTCY-OGC-ADO@SEC.GOV | VIA E-MAIL |
| SECURITIES & EXCHANGE COMMISSION | NEW YORK REGIONAL OFFICE | 100 PEARL STREET SUITE 20-100 | | NEW YORK | NY | 10004-2616 | | NYROBANKRUPTCY@SEC.GOV | VIA E-MAIL |
| SECURITIES & EXCHANGE COMMISSION | NEW YORK REGIONAL OFFICE | ATTN: ANDREW CALAMARI REGIONAL DIRECTOR | 200 VESEY STREET SUITE 400 | NEW YORK | NY | 10281-1022 | | BANKRUPTCYNOTICESCHR@SEC.GOV | VIA E-MAIL |
| STATE OF ALABAMA | OFFICE OF THE ATTORNEY GENERAL | 501 WASHINGTON AVE | | MONTGOMERY | AL | 36104 | | CONSUMERINTEREST@ALABAMAAG.GO | VIA E-MAIL |
| STATE OF ALASKA | OFFICE OF THE ATTORNEY GENERAL | 1031 W 4TH AVE, STE 200 | | ANCHORAGE | AK | 99501 | | ATTORNEY.GENERAL@ALASKA.GOV | VIA E-MAIL |
| STATE OF ARIZONA | OFFICE OF THE ATTORNEY GENERAL | 2005 N CENTRAL AVE | | PHOENIX | AZ | 85004 | | AGINFO@AZAG.GOV | VIA E-MAIL |
| STATE OF ARKANSAS | OFFICE OF THE ATTORNEY GENERAL | 323 CENTER ST, STE 200 | | LITTLE ROCK | AR | 72201 | | OAG@ARKANSASAG.GOV | VIA E-MAIL |
| STATE OF CALIFORNIA | OFFICE OF THE ATTORNEY GENERAL | PO BOX 944255 | | SACRAMENTO | CA | 94244-2550 | | XAVIER.BECERRA@DOJ.CA.GOV | VIA E-MAIL |
| STATE OF COLORADO | OFFICE OF THE ATTORNEY GENERAL | RALPH L. CARR JUDICIAL BUILDING | 1300 BROADWAY, 10TH FL | DENVER | CO | 80203 | | CORA.REQUEST@COAG.GOV | VIA E-MAIL |
| STATE OF CONNECTICUT | OFFICE OF THE ATTORNEY GENERAL | 165 CAPITOL AVENUE | | HARTFORD | CT | 06106 | | ATTORNEY.GENERAL@CT.GOV | VIA E-MAIL |
| STATE OF FLORIDA | OFFICE OF THE ATTORNEY GENERAL | THE CAPITOL PL01 | | TALLAHASSEE | FL | 32399 | | ASHLEY.MOODY@MYFLORIDALEGAL.CO | VIA E-MAIL |
| STATE OF GEORGIA | OFFICE OF THE ATTORNEY GENERAL | 40 CAPITOL SQ SW | | ATLANTA | GA | 30334 | | | VIA FIRST CLASS MAIL |
| STATE OF HAWAII | OFFICE OF THE ATTORNEY GENERAL | 425 QUEEN STREET | | HONOLULU | HI | 96813 | | HAWAIIAG@HAWAII.GOV | VIA E-MAIL |
| STATE OF IDAHO | OFFICE OF THE ATTORNEY GENERAL | 700 W. JEFFERSON ST, SUITE 210 | PO BOX 83720 | BOISE | ID | 83720 | | LAWRENCE.WASDEN@AG.IDAHO.GOV AGWASDEN@AG.IDAHO.GOV | VIA E-MAIL |
| STATE OF ILLINOIS | OFFICE OF THE ATTORNEY GENERAL | JAMES R. THOMPSON CENTER | 100 W. RANDOLPH ST | CHICAGO | IL | 60601 | | INFO@LISAMADIGAN.ORG | VIA E-MAIL |
| STATE OF INDIANA | OFFICE OF THE INDIANA ATTORNEY GENERAL | INDIANA GOVERNMENT CENTER SOUTH | 302 W WASHINGTON ST, 5TH FLOOR | INDIANAPOLIS | IN | 46204 | | | VIA FIRST CLASS MAIL |
| STATE OF IOWA | OFFICE OF THE ATTORNEY GENERAL | HOOVER STATE OFFICE BUILDING | 1305 E. WALNUT STREET | DES MOINES | IA | 50319 | | CONSUMER@AG.IOWA.GOV | VIA E-MAIL |
| STATE OF KANSAS | ATTN: ATTORNEY GENERAL DEREK SCHMIDT | 120 SW 10TH AVE, 2ND FLOOR | | TOPEKA | KS | 66612 | | DEREK.SCHMIDT@AG.KS.GOV | VIA E-MAIL |
| STATE OF KENTUCKY | ATTORNEY GENERAL - DANIEL CAMERON | 700 CAPITAL AVENUE, SUITE 118 | | FRANKFORT | KY | 40601 | | | VIA FIRST CLASS MAIL |
| STATE OF LOUISIANA | DEPT. OF JUSTICE - ATTORNEY GENERAL'S OFFICE | 300 CAPITAL DRIVE | | BATON ROUGE | LA | 70802 | | ADMININFO@AG.STATE.LA.US | VIA E-MAIL |
| STATE OF MAINE | OFFICE OF THE ATTORNEY GENERAL | 6 STATE HOUSE STATION | | AUGUSTA | ME | 04333 | | ATTORNEY.GENERAL@MAINE.GOV | VIA E-MAIL |
| STATE OF MARYLAND | OFFICE OF THE ATTORNEY GENERAL | 200 ST. PAUL PLACE | | BALTIMORE | MD | 21202 | | OAG@OAG.STATE.MD.US | VIA E-MAIL |
| STATE OF MASSACHUSETTS | ATTORNEY GENERAL'S OFFICE | 1 ASHBURTON PLACE, 20TH FLOOR | | BOSTON | MA | 02108 | | | VIA FIRST CLASS MAIL |
| STATE OF MICHIGAN | DEPARTMENT OF ATTORNEY GENERAL | 525 W OTTAWA ST | | LANSING | MI | 48906 | | | VIA FIRST CLASS MAIL |
| STATE OF MINNESOTA | OFFICE OF THE ATTORNEY GENERAL | 445 MINNESOTA ST, STE 1400 | | ST. PAUL | MN | 55101 | | ATTORNEY.GENERAL@AG.STATE.MN.US | VIA E-MAIL |
| STATE OF MISSISSIPPI | OFFICE OF THE ATTORNEY GENERAL | WALTER SILLERS BUILDING | 550 HIGH ST, PO BOX 220 | JACKSON | MS | 39201 | | | VIA FIRST CLASS MAIL |
| STATE OF MISSOURI | OFFICE OF THE ATTORNEY GENERAL | SUPREME COURT BUILDING | 207 W HIGH ST | JEFFERSON CITY | MO | 65101 | | CONSUMER.HELP@AGO.MO.GOV | VIA E-MAIL |
| STATE OF MONTANA | OFFICE OF THE ATTORNEY GENERAL | JUSTICE BUILDING, 3RD FLOOR | 215 N SANDERS, PO BOX 201401 | HELENA | MT | 59602 | | CONTACTDOJ@MT.GOV | VIA E-MAIL |
| STATE OF NEBRASKA | OFFICE OF THE ATTORNEY GENERAL | 2115 STATE CAPITOL | | LINCOLN | NE | 68509 | | | VIA FIRST CLASS MAIL |
| STATE OF NEVADA | OFFICE OF THE ATTORNEY GENERAL | OLD SUPREME COURT BUILDING | 100 N CARSON ST | CARSON CITY | NV | 89701 | | | VIA FIRST CLASS MAIL |
| STATE OF NEW HAMPSHIRE | OFFICE OF THE ATTORNEY GENERAL | NH DEPARTMENT OF JUSTICE | 33 CAPITOL ST. | CONCORD | NH | 03301 | | ATTORNEYGENERAL@DOJ.NH.GOV | VIA E-MAIL |
| STATE OF NEW JERSEY | OFFICE OF THE ATTORNEY GENERAL | RICHARD J. HUGHES JUSTICE COMPLEX | 25 MARKET ST 8TH FL, WEST WING BOX 080 | TRENTON | NJ | 08611 | | | VIA FIRST CLASS MAIL |
| STATE OF NEW MEXICO | OFFICE OF THE ATTORNEY GENERAL | 408 GALISTEO STREET | VILLAGRA BUILDING | SANTA FE | NM | 87501 | | HBALDERAS@NMAG.GOV | VIA E-MAIL |
| STATE OF NEW YORK | OFFICE OF THE ATTORNEY GENERAL | THE CAPITOL | 2ND FLOOR | ALBANY | NY | 12224 | | | VIA FIRST CLASS MAIL |
| STATE OF NORTH CAROLINA | OFFICE OF THE ATTORNEY GENERAL | 114 W EDENTON ST | | RALEIGH | NC | 27603 | | | VIA FIRST CLASS MAIL |
| STATE OF NORTH DAKOTA | OFFICE OF THE ATTORNEY GENERAL | STATE CAPITOL, 600 E | DEPT. 125 | BISMARCK | ND | 58505 | | NDAG@ND.GOV | VIA E-MAIL |
| STATE OF OHIO | OFFICE OF THE ATTORNEY GENERAL | STATE OFFICE TOWER | 30 E BROAD ST 14TH FL | COLUMBUS | OH | 43215 | | | VIA FIRST CLASS MAIL |
| STATE OF OKLAHOMA | OFFICE OF THE ATTORNEY GENERAL | 313 NE 21ST ST | | OKLAHOMA CITY | OK | 73105 | | QUESTIONS@OAG.OK.GOV | VIA E-MAIL |
| STATE OF OREGON | OFFICE OF THE ATTORNEY GENERAL | 1162 COURT ST NE | | SALEM | OR | 97301-4096 | | ELLEN.ROSENBLUM@DOJ.STATE.OR.US ATTORNEYGENERAL@DOJ.STATE.OR.U | VIA E-MAIL |
| STATE OF PENNSYLVANIA | OFFICE OF THE ATTORNEY GENERAL | STRAWBERRY SQUARE 16TH FL | | HARRISBURG | PA | 17120 | | | VIA FIRST CLASS MAIL |
| STATE OF RHODE ISLAND | OFFICE OF THE ATTORNEY GENERAL | 150 S MAIN ST | | PROVIDENCE | RI | 02903 | | AG@RIAG.RI.GOV | VIA E-MAIL |
| STATE OF SOUTH CAROLINA | OFFICE OF THE ATTORNEY GENERAL | PO BOX 11549 | | COLUMBIA | SC | 29211 | | | VIA FIRST CLASS MAIL |
| STATE OF SOUTH CAROLINA | OFFICE OF THE ATTORNEY GENERAL | REMBERT C. DENNIS BLDG | 1000 ASSEMBLY ST RM 519 | COLUMBIA | SC | 29201 | | | VIA FIRST CLASS MAIL |
| STATE OF SOUTH DAKOTA | OFFICE OF THE ATTORNEY GENERAL | 1302 E HIGHWAY 14, STE 1 | | PIERRE | SD | 57501-8501 | | | VIA FIRST CLASS MAIL |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| STATE OF TENNESSEE | OFFICE OF THE ATTORNEY GENERAL | PO BOX 20207 | | NASHVILLE | TN | 37202-0207 | | VIA FIRST CLASS MAIL |
| STATE OF TEXAS | OFFICE OF THE ATTORNEY GENERAL | 300 W. 15TH ST | | AUSTIN | TX | 78701 | | VIA FIRST CLASS MAIL |
| STATE OF UTAH | OFFICE OF THE ATTORNEY GENERAL | UTAH STATE CAPITOL COMPLEX | 350 NORTH STATE ST STE 230 | SALT LAKE CITY | UT | 84114 | UAG@UTAH.GOV | VIA E-MAIL |
| STATE OF VERMONT | OFFICE OF THE ATTORNEY GENERAL | 109 STATE ST. | | MONTPELIER | VT | 05609 | AGO.INFO@VERMONT.GOV | VIA E-MAIL |
| STATE OF VIRGINIA | OFFICE OF THE ATTORNEY GENERAL | 202 N. NINTH ST. | | RICHMOND | VA | 23219 | MAIL@OAG.STATE.VA.US | VIA E-MAIL |
| STATE OF WASHINGTON | OFFICE OF THE ATTORNEY GENERAL | 1125 WASHINGTON ST SE | | OLYMPIA | WA | 98501 | | VIA FIRST CLASS MAIL |
| STATE OF WASHINGTON | OFFICE OF THE ATTORNEY GENERAL | PO BOX 40100 | | OLYMPIA | WA | 98504-00 | | VIA FIRST CLASS MAIL |
| STATE OF WEST VIRGINIA | OFFICE OF THE ATTORNEY GENERAL | STATE CAPITOL, 1900 KANAWHA | BUILDING 1 RM E-26 | CHARLESTON | WV | 25305 | CONSUMER@WVAGO.GOV | VIA E-MAIL |
| STATE OF WISCONSIN | OFFICE OF THE ATTORNEY GENERAL | 17 WEST MAIN STREET, ROOM 114 EAST P | | MADISON | WI | 53702 | | VIA FIRST CLASS MAIL |
| STATE OF WYOMING | OFFICE OF THE ATTORNEY GENERAL | 109 STATE CAPITOL | | CHEYENNE | WY | 82002 | | VIA FIRST CLASS MAIL |
| TORONTO STOCK EXCHANGE | | 300 - 100 ADELAIDE ST. | | WEST TORONTO | ON | M5H 1S3 | WEBMASTER@TMX.COM | VIA E-MAIL |
| UNITED STATES ATTORNEY'S OFFICE | SOUTHERN DISTRICT OF NEW YORK | ONE ST. ANDREWS PLAZA | | NEW YORK | NY | 10007 | | VIA FIRST CLASS MAIL |
| UNITED STATES DEPARTMENT OF | ATTORNEY GENERAL OF THE U.S. | 950 PENNSYLVANIA AVE, NW | | WASHINGTON | DC | 20530-0001 | | VIA FIRST CLASS MAIL |
| KELLEHER PLACE MANAGEMENT, LLC | HORWOOD MARCUS & BERK CHARTERED | 500 W. MADISON ST. | SUITE 3700 | CHICAGO | IL | 60661 | AHAMMER@HMBLAW.COM NDELMAN@HMBLAW.COM | VIA ECF VIA E-MAIL |
| METROPOLITAN COMMERCIAL BANK | BALLARD SPAHR LLP | 200 IDS CENTER | 80 SOUTH 8TH STREET | MINNEAPOLIS | MN | 55402-2119 | SINGERG@BALLARDSPAHR.COM | VIA E-MAIL |
| METROPOLITAN COMMERCIAL BANK | WACHTELL, LIPTON, ROSEN & KATZ | 51 WEST 52ND STREET | | NEW YORK | NY | 10019-6150 | RGMASON@WLRK.COM ARWOLF@WLRK.COM AKHERRING@WLRK.COM | VIA E-MAIL VIA ECF VIA E-MAIL |
| JASON RAZNICK | JAFFE RAITT HEUER & WEISS, P.C. | 27777 FRANKLIN ROAD | SUITE 2500 | SOUTHFIELD | MI | 48034 | PHAGE@JAFFELAW.COM | VIA ECF |
| STEVE LAIRD | FORSHEY & PROSTOK LLP | 777 MAIN STREET | SUITE 1550 | FORT WORTH | TX | 76102 | BFORSHEY@FORSHEYPROSTOK.COM | VIA ECF |
| ORACLE AMERICA, INC. | BUCHALTER, A PROFESSIONAL CORPORA | 425 MARKET ST. | SUITE 2900 | SAN FRANCISCO | CA | 94105 | SCHRISTIANSON@BUCHALTER.COM | VIA ECF |
| ALAMEDA RESEARCH LLC & AFFILIATES | SULLIVAN & CROMWELL, LLP | 125 BROAD STREET | | NEW YORK | NY | 10004 | DIETDERICHA@SULLCROM.COM GLUECKSTEINB@SULLCROM.COM BELLERB@SULLCROM.COM | VIA ECF VIA ECF VIA E-MAIL |
| VOYAGER DIGITAL HOLDINGS, INC., ET AL | KIRKLAND & ELLIS LLP KIRKLAND & ELLIS INTERNATIONAL LLP | 601 LEXINGTON AVENUE | | NEW YORK | NY | 10022 | JSUSSBERG@KIRKLAND.COM CMARCUS@KIRKLAND.COM CHRISTINE.OKIKE@KIRKLAND.COM ALLYSON.SMITH@KIRKLAND.COM | VIA ECF VIA E-MAIL VIA E-MAIL VIA E-MAIL |
| EMERALD OCEAN ISLE, LLC, AMANO GLOBAL HOLDINGS, INC., SHINGO LAVINE, AND ADAM LAVINE | C/O GOLDSTEIN & MCCLINKOCK LLLP | ATTN: MATTHEW E. MCCLINTOCK, HARLEY GOLDSTEIN, AND STEVE YACHIK | 111 W WASHINGTON STREET SUITE 1221 | CHICAGO | IL | 60602 | MATTM@GOLDMCLAW.COM HARLEYG@RESTRUCTURINGSHOP.COM STEVENY@GOLDMCLAW.COM | VIA ECF VIA E-MAIL VIA E-MAIL |
| EMERALD OCEAN ISLE, LLC, AMANO GLOBAL HOLDINGS, INC., SHINGO LAVINE, AND ADAM LAVINE | C/O LAW OFFICES OF DOUGLAS T. TABACHNIK, P.C. | ATTN: DOUGLAS T. TABACHNIK | 63 WEST MAIN STREET SUITE C | FREEHOLD | NJ | 07728-2141 | DTABACHNIK@DTTLAW.COM | VIA ECF |
| MATTHEW EDWARDS | C/O LIZ GEORGE AND ASSOCIATES | ATTN: LYSBETH GEORGE | 8101 S. WALKER SUITE F | OKLAHOMA CITY | OK | 73139 | GEORGELAWOK@GMAIL.COM | VIA ECF |
| TEXAS STATE SECURITIES BOARD | OFFICE OF THE ATTORNEY GENERAL OF TEXAS | ATTN: ABIGAIL R RYAN, LAYLA D MILLIGAN & JASON B BINFORD | BANKRUPTCY & COLLECTIONS DIVISION PO BOX 12548 | AUSTIN | TX | 78711-2548 | ABIGAIL.RYAN@OAG.TEXAS.GOV LAYLA.MILLIGAN@OAG.TEXAS.GOV JASON.BINFORD@OAG.TEXAS.GOV | VIA ECF VIA E-MAIL VIA E-MAIL |
| OFFICE OF THE ATTORNEY GENERAL OF TEXAS | | ATTN: ROMA N. DESAI | BANKRUPTCY & COLLECTIONS DIVISION PO BOX 12548 | AUSTIN | TX | 78711-2548 | ROMA.DESAI@OAG.TEXAS.GOV | VIA ECF |
| OFFICE OF THE ATTORNEY GENERAL | BANKRUPTCY DIVISION | ATTN: MARVIN E. CLEMENTS, JR. | BANKRUPTCY DIVISION P O BOX 20207 | NASHVILLE | TN | 37202-0207 | AGBANKNEWYORK@AG.TN.GOV | VIA ECF |
| VERMONT DEPARTMENT OF FINANCIAL REGULATION | ASSISTANT GENERAL COUNSEL | ATTN: JENNIFER ROOD | 89 MAIN STREET THIRD FLOOR | MONTPELIER | VT | 05620 | JENNIFER.ROOD@VERMONT.GOV | VIA ECF |
| ROBERT SNYDERS & LISA SNYDERS | C/O JOHNSON, POPE, BOKOR, RUPPEL & BURNS, LLP | ATTN: ANGELINA E. LIM | 401 E JACKSON STREET SUITE 3100 | TAMPA | FL | 33602 | ANGELINAL@JPFIRM.COM | VIA ECF |
| MICHAEL LEGG | C/O MCCARTHY, LEBIT, CRYSTAL & LIFFMAN CO | ATTN: ROBERT R. KRACHT & NICHOLAS R. OLESKI | 1111 SUPERIOR AVENUE EAST SUITE 2700 | CLEVELAND | OH | 44114 | RRK@MCCARTHYLEBIT.COM NRO@MCCARTHYLEBIT.COM | VIA E-MAIL VIA ECF |
| MICHAEL GENTSCH | C/O BARSKI LAW PLC | ATTN: CHRIS D. BARSKI | 9375 E. SHEA BLVD. STE 100 | SCOTTSDALE | AZ | 85260 | CBARSKI@BARSKILAW.COM | VIA ECF |
| ILLINOIS SECRETARY OF STATE | C/O OFFICE OF THE ATTORNEY GENERAL | ATTN: JOHN P. REDING | 100 W. RANDOLPH ST FLOOR 13 | CHICAGO | IL | 60601 | JOHN.REDING@ILAG.GOV | VIA ECF |
| GEORGIA DEPARTMENT OF BANKING AND FINANCE | | ATTN: NATHAN HOVEY, ASSISTANT ATTORNEY GENERAL | DEPARTMENT OF LAW 40 CAPITOL SQUARE SW | ATLANTA | GA | 30334 | NHOVEY@LAW.GA.GOV | VIA ECF |
| MARK CUBAN AND DALLAS BASKETBALL LIMITED. D/B/A DALLAS MAVERICKS | C/O BROWN RUDNICK LLP | ATTN: SIGMUND S. WISSNER-GROSS ESQ. & KENNETH J. AULET | SEVEN TIMES SQUARE | NEW YORK | NY | 10036 | SWISSNER-GROSS@BROWNRUDNICK.COM KAULET@BROWNRUDNICK.COM | VIA ECF VIA E-MAIL |
| MARK CUBAN AND DALLAS BASKETBALL LIMITED D/B/A DALLAS MAVERICKS | C/O BROWN RUDNICK LLP | ATTN: STEPHEN A. BEST ESQ & RACHEL O. WOLKINSON, ESQ. | 601 THIRTEENTH STREET NW SUITE 600 | WASHINGTON | DC | 2005 | SBEST@BROWNRUDNICK.COM RWOLKINSON@BROWNRUDNICK.COM | VIA E-MAIL VIA E-MAIL |
| ED BOLTON | C/O AKERMAN LLP | ATTN: R. ADAM SWICK, JOHN H. THOMPSON, JOANNE GELFAND | 1251 AVENUE OF THE AMERICAS, 37TH FL | NEW YORK | NY | 10020 | ADAM.SWICK@AKERMAN.COM; JOHN.THOMPSON@AKERMAN.COM; JOANNE.GELFAND@AKERMAN.COM | VIA ECF VIA ECF VIA ECF |
| JON GIACOBBE | | ATTN: A. MANNY ALICANDRO | 11 BROADWAY, SUITE 615 | NEW YORK | NY | 10004 | MANNY@ALICANDROLAWOFFICE.COM | VIA ECF |
| WELLS FARGO BANK, N.A. | C/O ALDRIDGE PITE, LLP | ATTN: GREGORY WALLACH | FIFTEEN PIEDMONT CENTER 3575 PIEDMONT ROAD, N.E. | ATLANTA | GA | 30305 | GWALLACH@ALDRIDGEPITE.COM | VIA ECF |
| AD HOC GROUP OF EQUITY INTEREST HOLDERS | C/O KILPATRICK TOWNSEND & STOCKTON LLP | ATTN: DAVID M. POSNER & KELLY E. MOYNIHAN | THE GRACE BUILDING 1114 AVENUE OF THE | NEW YORK | NY | 10036 | DPOSNER@KILPATRICKTOWNSEND.COM KMOYNIHAN@KILPATRICKTOWNSEND.C | VIA ECF VIA E-MAIL |
| AD HOC GROUP OF EQUITY INTEREST HOLDERS | C/O KILPATRICK TOWNSEND & STOCKTON LLP | ATTN: PAUL M. ROSENBLATT | 1100 PEACHTREE STREET NE SUITE 2800 | ATLANTA | GA | 30309 | PROSENBLATT@KILPATRICKTOWNSEND.COM | VIA E-MAIL |
| PIERCE ROBERTSON | C/O PACHULSKI STANG ZIEHL & JONES LLP | ATTN: RICHARD M. PACHULSKI, ALAN J. KORNFELD, DEBRA I. GRASSGREEN, AND JASON H. ROSELL | 10100 SANTA MONICA BLVD 13TH FLOOR | LOS ANGELES | CA | 90067 | RPACHULSKI@PSZJLAW.COM AKORNFELD@PSZJLAW.COM DGRASSGREEN@PSZJLAW.COM JROSELL@PSZJLAW.COM | VIA E-MAIL VIA E-MAIL VIA E-MAIL VIA ECF |

| Party | Firm | Attn | Address | City | State | Zip | Email | Method |
|---|---|---|---|---|---|---|---|---|
| STATE OF WASHINGTON | OFFICE OF ATTORNEY GENERAL | ATTN: STEPHEN MANNING, ASSISTANT ATTORNEY GENERAL | GOVERNMENT COMPLIANCE AND ENFORCEMENT DIVISION P.O. BOX 40100 | OLYMPIA | WA | 98504-4010 | STEPHEN.MANNING@ATG.WA.GOV | VIA ECF |
| MARCUM LLP | MINTZ & GOLD LLP | ATTN: ANDREW R. GOTTESMAN | 600 THIRD AVENUE, 25TH | NEW YORK | NY | 10016 | GOTTESMAN@MINTZANDGOLD.COM | VIA ECF |
| U.S. SECURITIES & EXCHANGE COMMISSION | | ATTN: THERESE A. SCHEUER | 100 F STREET, NE | WASHINGTON | DC | 20549 | SCHEUERT@SEC.GOV | VIA E-MAIL |
| NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES | CONSUMER PROTECTION AND FINANCIAL ENFORCEMENT | ATTN: KEVIN R. PUVALOWSKI, LINDA DONAHUE, JASON D. ST. JOHN | ONE STATE STREET | NEW YORK | NY | 10004 | KEVIN.PUVALOWSKI@DFS.NY.GOV LINDA.DONAHUE@DFS.NY.GOV JASON.ST.JOHN@DFS.NY.GOV | VIA E-MAIL VIA E-MAIL VIA ECF |
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | ATTN: VIRGINIA T. SHEA | 1300 MT KEMBLE AVENUE PO BOX 2075 | MORRISTOWN | NJ | 02075 | VSHEA@MDMC-LAW.COM | VIA ECF |
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | ATTN: NICOLE LEONARD | 225 LIBERTY STREET, 36TH FLOOR | NEW YORK | NY | 10281 | NLEONARD@MDMC-LAW.COM | VIA ECF |
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | ATTN: JEFFREY BERNSTEIN | 570 BROAD STREET, SUITE 1500 | NEWARK | NJ | 07102 | JBERNSTEIN@MDMC-LAW.COM | VIA ECF |
| USIO, INC. | PULMAN, CAPPUCCIO & PULLEN, LLP | ATTN: RANDALL A. PULMAN | 2161 NW MILITARY HIGHWAY SUITE 400 | SAN ANTONIO | TX | 78213 | RPULMAN@PULMANLAW.COM | E-MAIL |
| BAM TRADING SERVICES INC. D/B/A BINANCE.US | LATHAM & WATKINS LLP | ATTN: ADAM J. GOLDBERG, NACIF TAOUSSE, JONATHAN J. WEICHSELBAUM | 1271 AVENUE OF THE AMERICAS | NEW YORK | NY | 10020 | ADAM.GOLDBERG@LW.COM NACIF.TAOUSSE@LW.COM JON.WEICHSELBAUM@LW.COM | VIA ECF VIA E-MAIL VAI E-MAIL |
| BAM TRADING SERVICES INC. D/B/A BINANCE.US | LATHAM & WATKINS LLP | ATTN: ANDREW D. SORKIN | 555 ELEVENTH STREET, NW SUITE 1000 | WASHINGTON | DC | 20004 | ANDREW.SORKIN@LW.COM | VIA E-MAIL |
| ATTORNEY FOR THE STATES OF ALABAMA, ARKANSAS, CALIFORNIA, DISTRICT OF COLUMBIA, HAWAII, MAINE, NORTH DAKOTA, OKLAHOMA, AND SOUTH | C/O NATIONAL ASSOCIATION OF ATTORNEYS GENERAL | ATTN: KAREN CORDRY BANKRUPTCY COUNSEL | 1850 M ST. NW 12TH FLOOR | WASHINGTON | DC | 20036 | KCORDRY@NAAG.ORG | VIA ECF |
| USIO, INC. & FCENTIVE, INC. | RUSKIN MOSCOU FALTISCHEK, P.C. | ATTN: SHERYL P. GIUGLIANO | 1425 RXR PLAZA, 15TH FLOOR | UNIONDALE | NY | 11556 | SGIUGLIANO@RMFPC.COM | VIA ECF |
| CELSIUS NETWORK LLC | AKIN GUMP STRAUSS HAUER & FELD, L.L.P. | ATTN: MITCHELL P. HURLEY, DEAN L. CHAPMAN, JR. | ONE BRYANT PARK | NEW YORK | NY | 10036 | MHURLEY@AKINGUMP.COM DCHAPMAN@AKINGUMP.COM | VIA ECF VIA E-MAIL |
| VOYAGER DIGITAL HOLDINGS, INC., ET AL. | PAUL HASTINGS LLP | ATTN: JONATHAN D. CANFIELD | 200 PARK AVENUE | NEW YORK | NY | 10166 | JONCANFIELD@PAULHASTINGS.COM | VIA ECF |
| VOYAGER DIGITAL HOLDINGS, INC., ET AL. | PAUL HASTINGS LLP | ATTN: MATTHEW M. MURPHY, MICHAEL C. WHALEN | 71 SOUTH WACKER DRIVE SUITE 4500 | CHICAGO | IL | 60606 | MATTMURPHY@PAULHASTINGS.COM MICHAELCWHALEN@PAULHASTINGS.COM | VIA E-MAIL VIA E-MAIL |
| FEDERAL TRADE COMMISSION | | ATTN: KATHERINE JOHNSON | 600 PENNSYLVANIA AVE., NW MAIL STOP CC-9528 | WASHINGTON | DC | 20580 | KJOHNSON3@FTC.GOV | VIA ECF |
| OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF NEW YORK | SENIOR ENFORCEMENT COUNSEL INVESTOR PROTECTION BUREAU | ATTN: TANYA TRAKHT | 28 LIBERTY STREET 21ST FLOOR | NEW YORK | NY | 10005 | TANYA.TRAKHT@AG.NY.GOV | VIA ECF |
| VOYAGER DIGITAL HOLDINGS, INC., ET AL. | KIRKLAND & ELLIS LLP KIRKLAND & ELLIS INTERNATIONAL LLP | ATTN: RAVI SUBRAMANIAN SHANKAR | 300 NORTH LASALLE | CHICAGO | IL | 60654 | RAVI.SHANKAR@KIRKLAND.COM | VIA ECF |
| U.S. SECURITIES & EXCHANGE COMMISSION | | ATTN: WILLIAM M. UPTEGROVE | 950 EAST PACES FERRY RD., N.E.   SUITE 900 | ATLANTA | GA | 30326 | UPTEGROVEW@SEC.GOV | VIA E-MAIL |
| THE BANK OF NEW YORK MELLON F/K/A THE BANK OF NEW YORK AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWALT, INC. ALTERNATIVE LOAN TRUST 2005-38 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-38 | MCCALLA RAYMER LEIBERT PIERCE, LLC | ATTN: PHILLIP RAYMOND | 420 LEXINGTON AVENUE SUITE 840 | NEW YORK | NY | 10170 | NY_ECF_NOTICES@MCCALLA.COM PHILLIP.RAYMOND@MCCALLA.COM MCCALLAECF@ECF.COURTDRIVE.COM | VIA ECF |
| UNITED STATES ATTORNEY SOUTHERN DISTRICT OF NEW YORK | | ATTN: LAWRENCE H. FOGELMAN, JEAN-DAVID BARNEA, PETER ARONOFF | 86 CHAMBERS STREET 3RD FLOOR | NEW YORK | NY | 10007 | LAWRENCE.FOGELMAN@USDOJ.GOV JEAN-DAVID.BARNEA@USDOJ.GOV PETER.ARONOFF@USDOJ.GOV | VIA ECF |