Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - x

4    In the Matter of:

5

6    VOYAGER DIGITAL HOLDINGS, INC.,    Case No. 22-10943 (MEW)

7

8              Debtor.

9    - - - - - - - - - - - - - - - - - - - - - - - - - x

10   VOYAGER DIGITAL HOLDINGS, INC.,

11             Plaintiff,

12        v.                    Adv. Case No. 22-01133 (MEW)

13   DESOUSA,

14             Defendant.

15   - - - - - - - - - - - - - - - - - - - - - - - - - x

16     THE AD HOC GROUP OF EQUITY INTEREST

17   HOLDERS OF VOY,

18             Plaintiff,

19        v.                    Adv. Case No. 22-01170 (MEW)

20   VOYAGER DIGITAL HOLDINGS, INC.,

21   ET AL.,

22             Defendants.

23   - - - - - - - - - - - - - - - - - - - - - - - - - x

24

25

```
 1                   U.S. Bankruptcy Court

 2                   One Bowling Green

 3                   New York, New York 10004

 4

 5                   Monday, March 6, 2023

 6                   10:08 AM

 7

 8   B E F O R E :

 9   HON. MICHAEL WILES

10   U.S. BANKRUPTCY JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

1    HEARING Re: To reconsider approval of the disclosure

2    statement and confirmation of the Chapter 11 plan.

3    Objections filed.

4

5    HEARING Re: Motion by Michelle D. DiVita to appoint a

6    Chapter 11 trustee.  Objections filed.

7

8    HEARING Re: Motion by Tracy Hendershott to convert case to

9    Chapter 7.  Objection filed.

10

11    HEARING Re: Motions by Alah Shehadeh.  Objection filed.

12

13    HEARING Re: Motion for an equity committee and to hold the

14    directors personally liable.  Joinder to motion by David

15    Stephenson.

16

17    HEARING Re: Objection to the Official Committee of Unsecured

18    Creditors to proofs of claim nos. 11206, 11209, and 11213

19

20    HEARING Re: Adv. Pro. 22-01133-mew.  Motion to extend

21    automatic stay or, in the alternative, for injunctive relief

22    enjoining prosecution of certain pending litigation against

23    the debtors, directors, and officers

24

25    HEARING Re: Adv. Pro. 22-01170-mew. Pre-trial conference.

1    Transcribed by:   Jamie Gallagher, Sheila Orms, Tracey

2    Williams, Sherri Brach, and Cathy Kleinbart

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1    A P P E A R A N C E S :

2

3    KATTEN MUCHIN ROSEMAN, LLP

4         Attorneys for the Debtor

5         575 Madison Avenue

6         New York, NY 10022

7

8    BY:  STEVEN REISMAN, ESQ.

9         SHAYA ROCHESTER, ESQ.

10

11   UNITED STATES ATTORNEY'S OFFICE

12        Attorney for the United States of America

13        86 Chambers Street

14        3rd Floor

15        New York, NY 10007

16

17   BY:  JEAN-DAVID BARNEA, ESQ.

18

19   WACHTEL, LIPTON, ROSEN & KATZ

20        Attorney for Metropolitan Commercial Bank

21        51 W. 52nd Street

22        New York, NY 10019

23

24   BY:  ANGELA HERRING, ESQ.

25

Page 6

1    FEDERAL TRADE COMMISSION

2          Attorney for Federal Trade Commission

3          600 Pennsylvania Avenue, NW

4          Washington, DC 20580

5

6    BY:  KATHERINE JOHNSON, ESQ.

7

8    UNITED STATES SECURITIES AND EXCHANGE COMMISSION

9          Attorney for the U.S. Securities and Exchange

10         Commission

11         100 F Street, NE

12         Washington, DC 20549

13

14   BY:  THERESE SCHEUER, ESQ.

15

16   UNITED STATES SECURITIES AND EXCHANGE COMMISSION

17         Attorney for the U.S. Securities and Exchange

18         Commission

19         950 E Paces Ferry Road, NE

20         Atlanta, GA 30326

21

22   BY:  WILLIAM UPTEGROVE, ESQ.

23

24

25

Page 7

1    JAFFE RAITT HEUER & WEISS, PC

2         Attorney for Jason Raznick

3         27777 Franklin Road

4         Southfield, MI 48034

5

6    BY:  PAUL HAGE, ESQ.

7

8    SULLIVAN & CROMWELL, LLP

9         Attorney for FTX Trading Ltd. And its affiliates

10        125 Broad Street

11        New York, NY 10004

12

13   BY:  BENJAMIN BELLER, ESQ.

14

15   ARENTFOX SCHIFF LLP

16        Attorneys for Voyager Digital Holdings

17        1301 Avenue of the Americas

18        42nd Floor

19        New York, NY 10019

20

21   BY:  JEFF GLEIT, ESQ.

22        BRETT GOODMAN, ESQ.

23

24

25

1   NATIONAL ASSOCIATION OF ATTORNEYS GENERAL

2        Attorney for the States

3        1850 M St., NW

4        12th Floor

5        Washington, DC 20036

6

7   BY:  KAREN CORDRY, ESQ.

8

9   RUSKIN MOSCOU FALTISCHEK, P.C.

10        Attorney for Usio, Inc.; FiCentive, Inc.

11        1425 RXR Plaza

12        Uniondale, NY 11556

13

14   BY:  SHERYL GIUGLIANO, ESQ.

15

16   YOUNG CONAWAY STARGATT & TAYLOR, LLP

17        Attorneys for the Committee Counsel in FTX Bankruptcy

18        Rodney Square

19        Wilmington, DE 19801

20

21   BY:  MATTHEW LUNN, ESQ.

22        ROBERT POPPITI, JR., ESQ.

23

24

25

**Page 9**

1   OFFICE OF THE ATTORNEY GENERAL OF TEXAS

2        Attorney for TX State Securities Board & TX Dept. of

3        Banking

4        P.O. Box 12548

5        Austin, TX 78711

6

7   BY:  ABIGAIL RYAN, ESQ.

8

9   WINTHROP & WEINSTINE, P.A.

10       Attorney for N/A

11       225 South 6th Street

12       Minneapolis, MN 55402

13

14  BY:  MICHELLE DIVITA, ESQ.

15

16  QUINN EMANUEL URQUHART & SULLIVAN, LLP

17       Attorneys for Voyager Digital, LLC Special Committee

18       51 Madison Avenue

19       New York, NY 10010

20

21  BY:  KATHERINE SCHERLING, ESQ.

22       SUSHEEL KIRPALANI, ESQ.

23

24

25

Page 10

1   LATHAM & WATKINS, LLP

2        Attorneys for BAM Trading Services Inc. d/b/a

3        Binance.US

4        885 3rd Avenue

5        New York, NY 10022

6

7   BY:  NACIF TAOUSSE, ESQ.

8        ADAM GOLDBERG, ESQ.

9

10   PULMAN, CAPPUCCIO, & PULLEN, LLP

11        Attorney for USIO, Inc. and FiCentive, Inc.

12        2161 N.W. Military Highway

13        Suite 400

14        San Antonio, TX 78213

15

16   BY:  RANDALL PULMAN, ESQ.

17

18   MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

19        Attorney for the New Jersey Bureau of Securities

20        1300 Mount Kemble Avenue

21        Morristown, NJ 07962

22

23   BY:  VIRGINIA SHEA, ESQ.

24

25

1    MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

2        Attorney for the New Jersey Bureau of Securities

3        570 Broad Street

4        Newark, NJ 07102

5

6    BY:  JEFFREY BERNSTEIN, ESQ.

7

8    KIRKLAND & ELLIS LLP

9        Attorneys for Voyager Digital Holdings, LLC, et al.

10        601 Lexington Avenue

11        New York, NY 10022

12

13    BY:  EVAN SWAGER, ESQ.

14        CHRISTINE OKIKE, ESQ.

15        ALLYSON SMITH, ESQ.

16

17    KIRKLAND & ELLIS LLP

18        Attorney for Voyager Digital Holdings, LLC, et al.

19        300 North LaSalle

20        Chicago, IL 60654

21

22    BY:  MICHAEL SLADE, ESQ.

23

24

25

Page 12

1    KILPATRICK TOWNSEND & STOCKTON LLP

2         Attorney for Ad Hoc Group of Equity Interest Holders

3         1114 Avenue of the Americas

4         New York, NY 10036

5

6    BY:  DAVID POSNER, ESQ.

7

8    KILPATRICK TOWNSEND & STOCKTON LLP

9         Attorney for Ad Hoc Group of Equity Interest Holders

10        1100 Peachtree Street NE

11        Atlanta, GA 30309

12

13   BY:  PAUL ROSENBLATT, ESQ.

14

15   KILPATRICK TOWNSEND & STOCKTON LLP

16        Attorney for Ad Hoc Group of Equity Interest Holders

17        The Grace Building

18        New York, GA 10036

19

20   BY:  KELLY MOYNIHAN, ESQ.

21

22

23

24

25

Page 13

1    OFFICE OF THE U.S. TRUSTEE

2         Attorney for the United States Trustee

3         201 Varick Street

4         New York, NY 10014

5

6    BY:  LINDA RIFFKIN, ESQ.

7

8    OFFICE OF THE U.S. TRUSTEE

9         Attorney for the United States Trustee

10        One Bowling Green

11        Suite 534

12        New York, NY 10004

13

14   BY:  RICHARD MORRISSEY, ESQ.

15

16   MCDERMOTT WILL & EMERY

17        Attorneys for Official Committee of Unsecured Creditors

18        of Voyager Digital Holdings, Inc., et al.

19        2501 North Harwood Street

20        Dallas, TX 75201

21

22   BY:  CHARLES COWDEN, ESQ.

23        CHARLES GIBBS, ESQ.

24

25

1    MCDERMOTT WILL & EMERY

2         Attorney for Official Committee of Unsecured Creditors

3         of Voyager Digital Holdings, Inc., et al.

4         1180 Peachtree Street, NE

5         Atlanta, GA 30309

6

7    BY:  DANIEL SIMON, ESQ.

8

9    MCDERMOTT WILL & EMERY

10        Attorneys for Official Committee of Unsecured Creditors

11        One Vanderbilt Avenue

12        New York, NY 10017

13

14   BY:  JOSEPH EVANS, ESQ.

15        DARREN AZMAN, ESQ.

16

17   UNITED STATES ATTORNEY'S OFFICE

18        Attorney for the United States of America

19        86 Chambers Street

20        New York, NY 10007

21

22   BY:  LAWRENCE FOGELMAN, ESQ.

23

24

25

1   VERMONT DEPARTMENT OF FINANCIAL REGULATION

2        Attorney for Vermont DFR

3        89 Main Street

4        Montpelier, VT 05620

5

6   BY:  JENNIFER ROOD, ESQ.

7

8   NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES

9        Attorney

10       One State Street

11       New York, NY 10004

12

13  BY:  JASON ST. JOHN, ESQ.

14

15  ALSO APPEARING:

16       TRACY HENDERSHOTT, PRO SE

17       GINA DIRESTA, PRO SE

18       JENNIFER WALL, PRO SE

19       DAN NEWSOM, PRO SE

20       MARSHALL MENDELL, PRO SE

21       LISA PROVINO

22       SETH JONES

23       JON WARREN

24       ANDREW RIZK

25       ARTHUR JONES

1       LISA DAGNOLI

2       DAN LAWRENCE

3       JASON RAZNICK

4       ANDRES LUCERO

5       BRAD RAWE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Please be seated.  All right.  And
 3     we're ready to continue on the Voyager case.
 4              MR. SLADE:  Yes, Your Honor.  Good morning.
 5              THE COURT:  Good morning.
 6              MR. SLADE:  Mike Slade for the Debtors.  I hope
 7     you had a good weekend.  We have a couple of updates for the
 8     Court.  First is that Your Honor had made three requests of
 9     Binance at the beginning of the confirmation hearing.  And
10     Binance has agreed to make the changes for the first two.
11              First, we added language to the plan, clarifying
12     that cryptocurrency that is sent to Binance for customers
13     will always be held in trust by Binance.  So I think what
14     Your Honor had said --
15              THE COURT:  For all time.
16              MR. SLADE:  For all time.  Your Honor wanted to
17     make that clear, and there's additional language now.  This
18     is in the revised plan that was filed at Docket No. 1138 at
19     Article 4(c) on page 31.  And so I think it makes it
20     abundantly clear, and hopefully the Court will agree.
21              Second, Your Honor had asked with respect to the
22     unsupported jurisdictions that Binance give a cash out
23     option to all customers after three months in parallel with
24     the option given to, Your Honor used the example of
25     customers in Ohio, and Binance has agreed to that.  That
```

Page 18

1    appears in language that is in the new plan Article

2    C(3)(c)(i)(A) on page 23 of the plan.  And so those two

3    issues should be resolved.

4           Your Honor had also asked them whether it was

5    possible to segregate customer data.  That, we were not able

6    to convince them to change for Binance.  They could explain

7    this to you whenever Your Honor would like, but it's an

8    economic issue for them.  One of the things they bought of

9    the transaction was customer data, which Voyager had the

10   right to sell under Voyager's customer agreement and privacy

11   policy.  So two out of the three changes were made, and the

12   revised plan was filed at Docket No. 1138.  And I would

13   offer that into evidence.

14           THE COURT:  What is the problem on the data

15   transfer?

16           MR. GOLDBERG:  Your Honor, Adam Goldberg of Latham

17   Watkins on behalf of Binance.US.  Thank you for the

18   opportunity to address the Court on this issue.

19           Essentially, Your Honor, the data transfer is from

20   Binance.US's perspective a core economic element to the

21   deal.  This is a retail case, and in the retail world,

22   getting a customer in the door is everything.  And so what

23   this --

24           THE COURT:  Well, I thought what I said the other

25   day was that I didn't mind the transfer of the customers'

Page 19

1    contact information, that it was just the remainder, the

2    customers' bank account, social security number, things like

3    that that would be transferred only after a customer had

4    elected to become a customer of Binance.  So what's wrong

5    with that?

6              MR. GOLDBERG:  So on those issues, that data

7    remains valuable to Binance.US, regardless of whether the

8    customer joins.

9              THE COURT:  How?

10             MR. GOLDBERG:  Well, it can be valuable if the

11   customer ever joins the platform in the future.  As Your

12   Honor is well aware, over the last year we've seen

13   tremendous volatility in the crypto markets.  People can

14   choose to exit the market and maybe come back in in the

15   future.  And having that information reduces the cost

16   materially of onboarding a customer by having their KYC

17   information on hand already.

18             On this point, I think, Your Honor, it's important

19   to note that the Voyager privacy policy squarely provides

20   the ability of Voyager to transfer this data in connection

21   with the transaction to sell its assets, expressly including

22   a bankruptcy case.

23             THE COURT:  Is there any reason you want it, other

24   than potentially to make onboarding easier in the future?

25             MR. GOLDBERG:  Your Honor, that's the primary

Page 20

1    reason.  It is a valuable data.  It reduces the cost of

2    onboarding.  And it was part of the purchase price

3    agreement, and I think that that is a core part of why the

4    transaction was agreed at this pricing level.

5             I think Mr. Tichner (ph) testified that Binance.US

6    was asked to modify these terms and that this was an

7    economic point that affected the purchase price.  So we

8    would respectfully request that Your Honor approve that part

9    of the transaction as part of the confirmation as a whole if

10   Your Honor is so inclined on the basis of the 97 percent

11   class acceptance of the transaction that evidences the

12   interest of the estate and the will of the majority behind

13   this transaction, Your Honor.

14            THE COURT:  I have to tell you, I'm not entirely

15   convinced.

16            MR. GOLDBERG:  I understand that parties have

17   raised issues with this aspect of the deal.  No one has

18   submitted any law or evidence contrary to the legal position

19   that the -- each --

20            THE COURT:  Well, just because you can do

21   something doesn't mean you should.  Right?  There's got to

22   be a business -- good business reason for it.

23            People, especially these days, are entitled to

24   have concerns about their sensitive financial and personal

25   information, particularly given the nature of the

Page 21

1    information that's been accumulated here by Voyager.

2              I'm not convinced that just the possibility that

3    some customer will change his mind in the future and elect

4    to become a Binance customer is good enough reason to send

5    everybody's -- all of everybody's sensitive information to

6    Binance, even people who may not want to be Binance

7    customers.

8              MR. GOLDBERG:  Your Honor, I should add Binance

9    provides the ability for any customer to delete their

10   accounts and their data.  If a customer joins the Binance

11   platform and clears their assets out of that account, they

12   can then delete their account and their data on Binance.

13             This goes to the fundamental point, Your Honor,

14   Binance.US wants the opportunity to have customers

15   experience the platform.

16             THE COURT:  If I require the wind down trustee, or

17   it should be the wind down plan administrator.  I'm sorry,

18   the terms have been changing so much that I'm having trouble

19   using the right one.  If I require the plan administrator to

20   keep custody of the customer data, so that if you do have

21   somebody who changes their mind in the future, it can be

22   immediately transferred to you by that customer.  Why

23   doesn't that solve your issue?

24             MR. GOLDBERG:  Well, that requires additional

25   resources on Binance.US's part, as well as materially

Page 22

1   impacting, you know, administrative expenses of the case --

2             THE COURT:  Why does it require additional

3   resources on your part?

4             MR. GOLDBERG:  Well, I think rather than having a

5   bulk data transfer, it would require additional data

6   transfers as and when people elect in the future.  The

7   ability of having that data, and having someone be able to

8   clear their account and trade very quickly is of economic

9   value to Binance.US.  They would not have agreed on this

10  purchase price without these terms.  Mr. Tichner testified

11  to that and that was uncontroverted, Your Honor.

12            THE COURT:  I don't remember him testifying to

13  that specifically.  And I certainly don't have testimony

14  from Binance on that point.  So you're saying customers can

15  elect to erase data and get rid of their accounts, right?

16            MR. GOLDBERG:  Yes.

17            THE COURT:  So why shouldn't a customer have the

18  right to opt out of this data transfer and say that you

19  don't get their information?

20            MR. GOLDBERG:  Well, that's a great question and

21  that goes exactly to the retail nature of this case, is that

22  Binance.US negotiated for the opportunity to have customers

23  experience the platform.  Because it's one thing to say I

24  don't want anything to do with Binance.US, it's another

25  thing to experience the platform and decide after you have

1     the opportunity to take a look at it.

2              Getting the customer in the door is the value of

3     this deal, and that's the core fundamental economic

4     proposition.

5              THE COURT:  Nobody is going to be in the door

6     unless they elect and sign Binance's various -- whoever's on

7     the phone, stop talking.  Mute yourself.  I'm having a

8     question with counsel here, please.

9              Customers have to go through other procedures

10    before they -- it's not like they're automatically --

11    without doing anything else, customers of Binance, right?

12             MR. GOLDBERG:  That's right, Your Honor.  The

13    customer has to accept the Binance.US terms.

14             THE COURT:  And if they don't, nothing happens.

15    So I'm still stumped here.  Why shouldn't a customer be

16    allowed to say, I don't want you to have my data?

17             MR. GOLDBERG:  Well, each customer agreed in their

18    contract with Voyager, Your Honor, that Voyager had their

19    data and could sell that data as part of a transaction.

20             THE COURT:  But I already said, just because you

21    legally can do something doesn't mean you should.

22             MR. GOLDBERG:  I understand, Your Honor.  The

23    reason -- the equitable reason that we should do this

24    transaction is because all customers benefit with payment of

25    money into the estate from these terms, and they would not

Page 24

1    have agreed -- Binance.US would not have agreed on these

2    economic terms without acquiring all of this data.

3            THE COURT:  And what if I were to just say that

4    anybody who hasn't become a Binance customer within six

5    months, you're required to delete their data?

6            MR. GOLDBERG:  So I don't know, Your Honor.  I'd

7    have to consult with my client.  I don't think that that

8    would be part of the deal, and I believe that they would

9    seek economic adjustments to the transaction.

10           THE COURT:  All right.  You should talk to your

11   client and find a solution to this because I'm having

12   problems with it.  Okay?

13           MR. GOLDBERG:  Thank you, Your Honor.

14           MR. SLADE:  Thank you, Your Honor.  Again, Mike

15   Slade for the Debtors.

16           As I told you when we last left on Friday night,

17   the Debtors regrouped over the weekend to try to assess what

18   to do in light of the SEC's position.  The other amendments

19   that were made to the plan that was filed yesterday relate

20   to the 1145 exemption.  To the extent --

21           THE COURT:  Do you seriously think that filing a

22   proposed order on Friday that has new injunctive terms is

23   compliance with due process with the procedures for seeking

24   an injunction?

25           MR. SLADE:  I don't perceive us as being --

Page 25

1       seeking new -- a new injunction, Your Honor.

2               THE COURT:  You've added to your proposed order

3       brand new injunctions that would broadly ban the federal and

4       state governments from contending that an of your

5       transactions -- restructuring transactions are illegal or in

6       violation of any state or federal regulation of any kind,

7       and that would ban them from suing any person involved in

8       the transactions to stop them in any way, or to hold them

9       liable in any way.

10              You didn't seek such thing.  In fact, just the

11      opposite of what you sought and what your original order

12      said.  How is that an appropriate way to seek an injunction?

13              MR. SLADE:  I guess that's not our interpretation

14      of what we're seeking.  And if we need to adjust the

15      language, we can.  What the Debtors are trying to do is, you

16      know, create a transaction and once we implement that

17      transaction in good faith, assure that we are not going to

18      be, you know, come after -- after the fact, after Your Honor

19      has approved the transaction.

20              To us, it's aligned with the common exculpation

21      terms that are in, you know, nearly every plan.

22              THE COURT:  Not really.  I don't think I've ever

23      issued an order in connection with plan confirmation that

24      says that if a regulator thinks there's a problem, the

25      regulator can't stop.

Page 26

1          MR. SLADE:  We're not saying that, Your Honor.  If

2     --

3          THE COURT:  Sure, you did.  That's exactly what

4     your proposed order says.

5          MR. SLADE:  So we certainly can work on the

6     language.  What our position is, is that if the SEC were --

7     let's say, as an example, the plan is confirmed, and then

8     two weeks later, Cepheus says we want to block the

9     transaction.  We're not saying that Cepheus doesn't have the

10    power to do that.  They do.  What we're saying is that our

11    efforts to implement the order that Your Honor would approve

12    today, that --

13         THE COURT:  What if two weeks from today, the SEC

14    wants to accuse Binance of being an unregistered

15    broker/dealer and to shut its operations until such time as

16    it files registration?

17         MR. SLADE:  Same thing.

18         THE COURT:  They can do that?

19         MR. SLADE:  They can do that.

20         THE COURT:  It didn't look to me like they could

21    do it from reading your order.

22         MR. SLADE:  Well, what we are trying to accomplish

23    is that -- what we are doing to effectuate the plan, until

24    and unless they change the rules, okay, they can't come back

25    to us and say retroactively, you are violating the rules,

1    even though all you were doing is honoring and trying to

2    effectuate a court order to return cryptocurrency to

3    customers.  That is not -- that is not a fair outcome.

4            THE COURT:  Let me put it differently.  Are you

5    saying that you don't want individuals who are doing what I

6    have given them permission to do, to be subject to

7    penalties?

8            MR. SLADE:  Correct.

9            THE COURT:  So you're not trying to stop anybody

10   from doing what they can -- what their regulatory authority

11   would otherwise permit them to do?

12           MR. SLADE:  Correct.

13           THE COURT:  Simply saying that if I authorized

14   them based on the evidence in front of me, they shouldn't be

15   penalized based on a regulator later saying, by the way, I

16   didn't tell you at the time, but this was wrongful.

17           MR. SLADE:  Correct, Your Honor.  And I'll just --

18   as an example, Your Honor authorized us to start the

19   rebalancing when Your Honor approved the APA a month or so

20   ago.  Then we see in there a filing that they think that

21   might violate the securities laws.  It doesn't make any

22   sense for us to come and propose a plan, and for us to get

23   approved and start implementing it because we want to return

24   cryptocurrency to customers as soon as possible, and then

25   for the regulators to come at us after the fact that said,

 1    oh, yeah, remember those super vague rules?  They meant that

 2    was illegal.  That is not what's supposed to happen here.

 3              THE COURT:  A number of governmental entities

 4    who've objected to your language, if all of the language is

 5    -- if we change it to clarify, the only thing that it's

 6    doing is saying that the people who have done what I have

 7    authorized them to do are not liable for having done so, do

 8    you have a problem with that?

 9              MR. SLADE:  That's fine, Your Honor.

10              THE COURT:  Let me ask -- I assume that the SEC

11    and the other agencies who would object to this language are

12    on the phone, although I haven't looked at the list.  Are

13    they there?

14              MS. RYAN:  Good morning, Your Honor.  This is

15    Abigail Ryan with the State of Texas.  And we did object to

16    the language.  Were changes to clarify that language are

17    fine.  I think that very helpful because we read that

18    language as you did, to be very broad.

19              The only other portions that are objectionable are

20    the references back to paragraph 97 and 99 in the plan, and

21    to the exculpation provision.  I mean, 97 and 99 in the

22    proposed order, and exculpation provision in the plan.

23              That basically guts any type of regulatory

24    enforcement as it excludes us from bringing any type of

25    case.  They're injunction provisions, Your Honor.  And so if

Page 29

1    we could have those three things removed, our objection to

2    that language would be taken care of.

3                THE COURT:  All right.  We'll get to the

4    exculpation a little later, but I was more focused on the

5    new language that was proposed, and just what it was trying

6    to get at and what the proper scope of it would be.

7                How about the SEC or the Justice Department?  The

8    other people who weighed in on this.  With that

9    clarification, do you have an objection?

10               MS. SCHEUER:  Your Honor, Therese Scheuer from the

11   U.S. Securities and Exchange Commission.

12               Your Honor, I think we would need to see the

13   precise language that the Debtors are proposing.  I would

14   note that, you know, we have objected to confirmation on the

15   plan because there are risks that, you know, the

16   transactions may violate the security (indiscernible -

17   10:25:44).  And to somehow, you know, be enjoining us

18   because -- in the face of our highlighting these regulatory

19   concerns is -- you know, Section 523(a)(19) (indiscernible -

20   10:26:06) prohibits -- excuse me, Your Honor, prohibits the

21   discharge of securities (indiscernible - 10:26:13)

22   violations in individual bankruptcy cases.

23               So I'm just unclear about precisely what the

24   Debtors will be seeking with this revised language.

25               THE COURT:  I think what they're saying is -- you

1    know, at this point, the SEC hasn't actually taken a

2    position.  It's sort of indicated to me in what I can only

3    describe as conclusory terms that there might be an issue as

4    to the VGX token.  But I think all the Debtors are saying is

5    that, look, if based on the evidence that I have today, I

6    authorized the Debtors to do certain things, then the people

7    who do what I say that they can do shouldn't be penalized or

8    in hindsight subjected to penalties for allegedly having

9    violated laws and regulations that the applicable regulators

10   haven't stood up in front of me and said affirmatively that

11   they're being violated.  That's just not fair.

12            You know, I understand, and nobody's trying to

13   stop you from making arguments as to whether something's

14   illegal, but if you want to penalize the people who will

15   actually do what they're proposing to do, and that I may

16   authorize them to do, you ought to be speaking up and taking

17   a more affirmative position today and not just showing up

18   later and say, got you.  You know?  We didn't give you any

19   reason to think that what you were doing, you know, was

20   going to be punished, but you know, now we've decided to do

21   so.

22            I mean, that's just -- how is anybody supposed to

23   do anything in the world if they have that hanging over

24   their heads?

25            MS. SCHEUER:  Your Honor, it's not in every case

1    that we raise these kinds of concerns.  The SEC has objected

2    to plan confirmation.  We objected at the disclosure

3    statement phase.  We objected to the motion to approve the

4    sale.  The Debtors here are seeking to immunize themselves

5    and third parties.  And they're -- I mean, the language that

6    they have in now, and I understand, you know, that it's --

7    they may be changing it, but it would allow them to make

8    securities laws and other violations in connection with

9    their restructuring transactions.

10           They're asking Your Honor for permission to

11   violate the securities laws to give them essentially a blank

12   check.  We've raised concerns regarding the sale.  We filed

13   an objection to the sale and disclosure statement.  The

14   parties have been on notice that there are regulatory

15   concerns here and they've proceeded at their own risk.

16           I think that we would have to analyze the -- you

17   know, any revised language (indiscernible - 10:29:10) if we

18   could get comfortable with it.

19           THE COURT:  The parties who are in front of me are

20   entitled to know whether they can proceed or not.  If you

21   want to reserve the right to try to stop them and enjoin

22   what they're doing, if and when you eventually make up your

23   minds about this stuff, then I'm not going to stop you from

24   doing that.

25           But are you seriously telling me that without

1    taking a position on the issue at all, and only telling me

2    what the potential issue might be in a limited sense, that I

3    should leave a sword hanging over the heads of anybody who's

4    going to do this transaction, and tell them that although

5    I'm approving it, by the way, you might get -- you know, be

6    the subject of an enforcement action, and subject to

7    whatever penalties the securities laws might impose on you,

8    that it's okay with me, but, you know, you'd be crazy if you

9    did anything because you have no idea what the government

10   might do.

11            How can a bankruptcy case or any court proceeding

12   function with that kind of suggestion?

13            MS. SCHEUER:  If Your Honor is suggesting language

14   that is (indiscernible - 10:30:37) with 1125(e).

15            THE COURT:  I mean, look, if you want to do it a

16   different way, I'll tell you -- I'll compel you to come

17   forward with your evidence.  And I will hold against you as

18   a matter of collateral estoppel and res judicata if you

19   don't come forward with it.  Okay?

20            So there's no way that I'm going to approve a

21   transaction that essentially says to the business people

22   involved here, go ahead.  Go forth.  Subject yourself to

23   penalties.  Okay?

24            I'm trying to leave you the ability to do what

25   your regulatory authority compels you to do, but just in a

1    way that doesn't, in hindsight, come back and unfairly

2    punish the people who may do what I authorized them to do.

3    If that's not good enough for you, then we'll have a full-

4    blown litigation today about whether this is legal or not,

5    and I'll make findings on it today.  And they will bind you.

6              And I cannot imagine that you want that.  Okay?

7              So all the Debtors are suggesting is that when we

8    have no clear contention that anything is in violation of

9    law, quite the opposite.  We have the regulatory agencies

10   sort of -- practically deliberately avoiding taking a

11   position on the issue.  That when I authorize it to go

12   forward and, in fact, order that it go forward by my

13   approval, that those people who are doing what I have

14   authorized are not subject to penalties or liabilities for

15   having done so.  That's standard exculpation that I've done

16   in a lot of bankruptcy cases.

17             So I would hope you would agree to that because

18   the alternative is we just have to open up the hearing.

19   Because the one thing I'm not going to do is basically say,

20   go forward, but take your chances.  That's not fair.  It's

21   absolutely not fair.  I don't know anybody in this case who

22   would or should go forward with that kind of risk hanging

23   over their heads.

24             So the language that I've approved in other cases,

25   I don't have it memorized, but in the Aegean (ph) case, I

Page 34

1    said that parties were exculpated from liability for

2    entering into and performing under agreements and

3    transactions that have been approved by the Court.  Okay?

4         And I think all the Debtors are saying is, you

5    know, it's just like personal liability of the people

6    involved.  We're not trying to stop you from saying that as

7    a regulatory matter, something should be stopped.  It's just

8    if you come in later and say, you know, we didn't tell you

9    at the time, but that was illegal and you're subject to this

10   fine and penalty.  That's what it's meant to focus on.

11        MR. SLADE:  Your Honor, the language we were

12   looking at over the weekend was from Aegean and also from

13   the Fairway case that Honor had.

14        THE COURT:  Mr. Morrissey?

15        MR. MORRISSEY:  Your Honor, very quickly.  Richard

16   Morrissey for the U.S. Trustee.  Good morning, Your Honor.

17        I just -- just for a point of clarification

18   regarding what Your Honor just said, coupled with what Your

19   Honor said a few moments ago about when we're going to deal

20   with the exculpation issues in general, I'm perfectly

21   prepared to wait for that.

22        But one of the issues we had was who generally is

23   covered by the exculpation provision, not just what actions

24   are covered.  And I can defer that, but one of the issues we

25   have is that the distribution agent is included in the

1    exculpation provision.  As a matter of fact, something was

2    just added to Article 6 of the plan, stating that rather

3    specifically, and I just didn't know when Your Honor wanted

4    to deal with that issue.  But I'd be happy to wait if that's

5    Your Honor's preference.

6              THE COURT:  Let's wait.

7              MR. MORRISSEY:  Thank you.

8              THE COURT:  All right.  Does the SEC need time to

9    --

10             MR. BARNEA:  Good morning, Your Honor.  I'm sorry.

11   Can you hear me over the telephone?

12             THE COURT:  Who's speaking?

13             MR. BARNEA:  This is J.B. Barnea from the U.S.

14   Attorney's Office.  We filed a limited objection to the last

15   proposed approval order last week, and then we saw the

16   revised language last night.  If it would be possible for

17   the government to be heard as well.

18             THE COURT:  Yes.

19             MR. BARNEA:  So our concerns are somewhat

20   different, although overlapping with those of the other

21   governmental entities that Your Honor just heard from.  We

22   cannot agree to an order that broadly immunizes all

23   participants, including non-debtors, from all possible

24   liabilities to all possible government authorities in

25   connection with implementing, you know, a variety of

Page 36

1    transactions.

2              Transactions may incur taxable income.  They would

3    then have to be responsible for those texts -- for the

4    resulting payment of tax.  And if there's a disagreement,

5    the IRS has to be free to go after them.  People might

6    commit fraud in some ways, civil or criminal, in engaging in

7    transactions.  The government has to be free to pursue that

8    fraud.  People may violate all -- any number of rules or

9    regulations.  We understand that the Court is prepared to

10   approve a transaction.  It seems that way.  And that's fine.

11             And in the event that --

12             THE COURT:  Nobody is trying to deal with any of

13   those things.  Here's the issue.  Under Section 1142(a) of

14   the Bankruptcy Code, the Debtor and any entity organized or

15   to be organized for the purpose of carrying out a plan,

16   shall carry out the plan.  Okay?

17             There is an affirmative statutory obligation once

18   I confirm a plan for the plan to be carried out.  Now,

19   nobody has been willing to come forward and to actually have

20   a litigation in front of me today on the question of whether

21   anything that the plan would require the Debtor or the

22   winddown Debtor to do is actually illegal.

23             And if I confirm the plan, those people will have

24   a positive obligation under the Bankruptcy Code to do what

25   the plan contemplates.  So for anybody to suggest that they

Page 37

1   should both have a positive obligation to do those things,

2   and be subject to punishment under different statutes for

3   doing exactly what they are obligated by my order and the

4   Bankruptcy Code to do, makes no sense.  Okay?

5           So if somebody thinks that what the individuals,

6   what the Debtors are going to be doing is illegal, they

7   should be speaking up.  Okay?  We are not going to bar

8   people from enjoining things.  All we're saying is that

9   people shouldn't be subject to punishments.

10          If the SEC wants to step in and say Binance should

11  not be allowed to go forward because it's operating as an

12  unregistered dealer, I don't think anybody is stopping them.

13  If the SEC wants to try to enjoin the distribution of VGX, I

14  don't think we're trying to -- well, maybe we're trying to

15  stop that, depending on the 1145 issue that I haven't heard

16  yet.  But not by this language we're not.

17          All we're saying is in the context of exculpation,

18  you know, that there are people here who are going to be

19  ordered by me to do these things when I confirm the plan.

20  And that should carry with it an exemption from legal

21  liability for doing what I am, in effect, ordering them to

22  do.  Unless you want to step forward and tell me why I

23  shouldn't order them to do it.  And so far, nobody's been

24  willing to do that.

25          Telling me people on notice.  First of all,

Page 38

1    nobody's on notice of anything here.  I have a hard time

2    understanding just what basis it is for the limited things

3    that you told me the other day.  And I certainly, if I were

4    one of the individuals who had an obligation to carry out

5    this plan, I wouldn't feel very comfortable that I knew

6    exactly what risks I was taking.

7                MR. BARNEA:  Your Honor, the government -- putting

8    aside -- the government -- the parts of the government that

9    I represent right now, as opposed to the SEC or any other

10   office that may be separately represented in this case,

11   don't have any current sense that any specific transaction

12   is itself illegal.  But that does not mean that someone may

13   not in executing those transactions violate some rule or

14   regulation, or incur a tax liability, or do something else

15   that may expose them to some kind of liability to the

16   government.  And that is --

17                THE COURT:  That's fine.

18                MR. BARNEA:  -- what we are trying to protect

19   against.

20                THE COURT:  They may vary from what they're

21   compelled to do under the plan, and may engage in who knows

22   what the mind can invent that might go wrong.  And nobody's

23   trying to say that people are freed from that.  They may

24   commit tax fraud.  They may lie.  They may do all kinds of

25   things, but the question is, you know, if I'm approving a

1    plan that authorizes a distribution to VGX, a pointed

2    example, and by my confirmation of that plan, the Debtors

3    are under a statutory obligation to distribute VGX in the

4    way that the plan contemplates.

5              For somebody to come in and say, you people who

6    did that are subject to fines under the securities laws,

7    even though you had no choice once I ordered it, would be

8    rather absurd, wouldn't it?

9              MR. BARNEA:  Well, to the extend that the Court is

10   providing exculpation as allowed under 1125(e), I think

11   that's uncontroversial.  If the question is if the Court is

12   going beyond that, that is a separate question.

13             THE COURT:  Well, I already issued a decision in

14   Aegean about what I think about exculpation, and that I

15   think that I do have the power, and it is absolutely

16   appropriate for me to say that if people engage in

17   transactions that I approve, after notice and a hearing,

18   they shouldn't be liable for having done so.  That makes

19   perfect sense to me.

20             Otherwise, I'm in effect having a meaningless

21   confirmation hearing, and leaving you with a regulatory veto

22   of what I'm doing.  And you may have veto to the extent --

23             MR. BARNEA:  Well, another way to put it is Your

24   Honor is authorizing parties to do something and they are --

25   those actions are subject to the normal rules and laws that

1    all actions in the world are subject to.

2         THE COURT:  But you didn't listen to what I said.

3    When I confirm a plan, I'm not just giving somebody an

4    option.  I'm not telling them that it's okay with me, and

5    they just take their chances.  Under the statute, once I

6    confirm the plan, there is an affirmative obligation to do

7    what the plan contemplates.  It's not an option.  Okay?

8         The people who are involved here are required to

9    go forward.  So it's not like I'm saying, well, it's okay

10   with me if you want to take that risk.  That's not what it

11   -- that's not what confirmation amounts to.

12        MR. BARNEA:  I understand Your Honor's position.

13   The government respectfully disagrees, and we would like to

14   see any final language to which we may well still have

15   objections before this matter is resolved.

16        THE COURT:  You can certainly see final language,

17   and I'll ask the Debtors to dig out from the Aegean case,

18   and try to propose some language that's more consistent with

19   that.

20        What about this 1145 issue?  You know, I don't

21   really have any indication at the moment of who is contended

22   to be the issuer of any cryptocurrency that might constitute

23   a security.  There was a reference to VGX, and my guess

24   would be that the contention would be that Voyager was the

25   issuer or is the issuer of VGX.  But I don't -- haven't

Page 41

1    heard any contention that Voyager is the issuer of Bitcoin,

2    for example, which would -- and I have -- while I won't

3    contend that I understand all of the arguments about the

4    commodity and securities laws here, I would have trouble

5    understanding an argument that Voyager was the issuer.

6              So you've proposed that I find that everything is

7    exempt under 1145.  But under 1145, to the extent that the

8    plan includes the offer or sale of a security of an issuer

9    other than the Debtor, that there's an exemption only if the

10   issuer of such security is required to file reports under

11   Section 13 or 15(d) of the Securities Exchange Act of 1934.

12   And in -- okay.  I -- just I'll stop right there.

13             You're not prepared to tell me that you have

14   identified an issuer of all of these cryptocurrencies and to

15   show that they are in compliance with that provision so that

16   1145 applies to them, are you?

17             MR. SLADE:  We included the language because the

18   SEC had said that VGX may be a security, and to the extent

19   they ultimately come to that conclusion, it would be likely

20   that Voyager was the issuer.  So that's what we were talking

21   about when we included the 1145 language.

22             THE COURT:  Yeah, but the language you've proposed

23   said all of your transactions, all of your cryptocurrency

24   transfers are exempt under Section 1145.  Nice try, but I

25   mean, you plainly can't satisfy that requirement, can you?

1           MR. SLADE:  We understand Your Honor's point.  We

2    were talking about VGX.  Who knows what the SEC is going to

3    say tomorrow.

4           THE COURT:  All right.  So you want to say that to

5    the extent that VGX is intended to be a security issued by

6    the Debtor, that it's subject to 1145?  I don't know.  Maybe

7    they have some theory that it's a security issued by

8    somebody else.

9           MR. SLADE:  I don't know what their theory is.

10   They won't tell us.

11          THE COURT:  But I can't apply 1145 if it's their

12   -- that's their theory, because you can't show me that the

13   issuer, if it's somebody else, just complied with those

14   other requirements.  Right?

15          MR. SLADE:  Well, I'm not sure if I can or can't,

16   to be honest.  I would have to check with other folks that

17   know more about the token than me.

18          THE COURT:  If the issuer were somebody other than

19   Voyager, you'd have to show me that the issuer had filed --

20   had been required to file the reports under Section 13 or

21   15(d) of the Securities Exchange Act of 1934.  How would you

22   do that?

23          MR. SLADE:  I don't know.

24          THE COURT:  Yeah.  So to the extent you say that

25   Voyager is the issuer of VGX, you're asking for the

Page 43

1      application of 1145.

2              MR. SLADE:  Correct.

3              THE COURT:  And I saw the SEC's supplemental

4      objection, where they say that you just haven't made the

5      showings that you need to, and I think to the extent that,

6      as I have said, the extent that you wanted to seek the

7      application of 1145 to every cryptocurrency that you are

8      transferring, I think the SEC is entirely right.  You

9      haven't and I don't think can make such showings.

10             But as to VGX, is there an -- what's the objection

11     as to the application of 1145?

12             MS. SCHEUER:  Your Honor, Therese Scheuer for the

13     Securities and Exchange Commission.

14             THE COURT:  Yeah.

15             MS. SCHEUER:  Your Honor, I will just begin by

16     noting that these provisions were added to the plan and

17     confirmation order overnight.  We had conjured and knew the

18     Debtors arguments, to the extent they have any, with respect

19     to VGX, and to discuss with other divisions, including the

20     Division of Corporation Finance.  It is their role to review

21     these types of transactions.

22             If it's acceptable to the Court, we would request

23     permission to make a written submission following argument

24     on these issues, and any specific questions that Your Honor

25     may have regarding 1145.

1            THE COURT:  Well, I raised the 1145 issue, and I'm

2    not sure I -- I'm not sure it's something that the Debtors

3    have to affirmatively invoke in their plan, is it?

4            MS. SCHEUER:  Well, Your Honor, the Debtors have

5    the legal burden of demonstrating that 1145 of the Code or

6    4(a)(2) are available exemptions for them.  And they've

7    provided no argument.

8            I am prepared to, you know, go forward with an

9    argument today, but I think as -- you know, to the extent

10   Your Honor has an additional specific question --

11           THE COURT:  Well, I think the Debtor's initial

12   position is probably that VGX is not a security.  So that's

13   probably why they didn't mention 1145.  And I think what

14   they're saying is, hey, if you think otherwise, and this is

15   the question I had for you the other day, if you think

16   otherwise, the SEC, why wouldn't Section 1145(a) be

17   applicable?

18           And you're in the same boat you were the other

19   day, where you keep telling me it's the Debtor's burden.

20   It's the Debtor's burden.  What is it that you think the

21   Debtor needs to prove that the Debtor hasn't shown in that

22   case?

23           If VGX is a security issued by the Debtor, what

24   more do you think the Debtor needs to show to me in order to

25   be entitled to Section 1145 as to the distribution of VGX

1    under the terms of the plan?

2            MS. SCHEUER:  Your Honor, (indiscernible -

3    10:50:23) that 1145 is not available for the proposed

4    transaction because the crypto assets, including VGX, being

5    purchased and sold were not in exchange for claims.  In the

6    rebalancing exercise, (indiscernible - 10:50:39)

7    distribution of securities for which there is no Securities

8    Act exemption.

9            For VGX, the rebalancing exercise appears to

10   involve within market purchases and sales that are not in

11   exchange for claims against the Debtor.

12           THE COURT:  But when the --

13           MS. SCHEUER:  So there's --

14           THE COURT:  When the Debtors turn over VGX to

15   Binance for credit to customers' accounts, how is that not a

16   distribution on a claim?

17           MS. SCHEUER:  Your Honor, I don't think you can

18   separate out that piece of the distribution from how it got

19   there.  And it got there through the rebalancing transaction

20   or the rebalancing exercise.

21           THE COURT:  Well, the Debtor have held VGX for a

22   long time.  Right?  I suspect that if the Debtors have done

23   anything, they've probably reduced how much VGX -- I don't

24   -- I have no idea what -- how the rebalancing worked.  But

25   let's just focus on that, you know, to leave aside the

1    rebalancing.  Let's just focus on the distributions.  Okay?

2            When the Debtors --

3            MS. SCHEUER:  Your Honor --

4            THE COURT:  -- deliver things to Binance --

5            MS. SCHEUER:  I don't think the Debtor --

6            THE COURT:  Obviously, when the --

7            MS. SCHEUER:  I don't think the Debtors were --

8            THE COURT:  Obviously, when the Debtors give VGX

9    to Binance for credit to customer accounts, that is a

10   distribution on a claim.

11           MS. SCHEUER:  My understanding, Your Honor, is

12   that VGX is subject to the rebalancing exercise.  It is not

13   -- the Debtors aren't engaging in a rebalancing of VGX.

14           THE COURT:  But when the Debtors take the VGX that

15   they have and give it to Binance for credit to a customer's

16   account, that act is plainly in distribution on a claim,

17   isn't it?

18           MS. SCHEUER:  Your Honor, I don't think that you

19   can separate that fact out from how it got there.  And it

20   got there through the rebalancing transaction -- the

21   rebalancing exercise.

22           THE COURT:  So you're saying -- I understand that

23   you're saying that the rebalancing may have been

24   unauthorized transactions in securities.  And I'm -- I

25   understand that you don't want to give up that argument, but

```
 1    I'm trying to focus on, you know, they are different things,

 2    whether you complained about how the Debtors got them or

 3    not.

 4              When the Debtor has turned VGX over to customers,

 5    as the plan contemplates, that plainly is a distribution on

 6    a claim, right?

 7              MS. SCHEUER:  Again, Your Honor -- I understand

 8    Your Honor's position, but I don't think that you can --

 9    (indiscernible - 10:53:35) position is that you cannot

10    separate the transaction out into those pieces.  You have to

11    look at how VGX got there.

12              And as part of the rebalancing, you know, it

13    appears that Voyager is conducting a distribution of VGX to

14    Binance or any other party that's acting as a broker of

15    trades on behalf of Voyager in the rebalancing exercise.

16              Neither 1145 nor any exemption for that matter,

17    including 4(a)(2) is available for Debtors that are

18    conducting distributions.  Nor is it available for

19    underwriters involved in such distribution.

20              THE COURT:  Who is the underwriter here?

21              MS. SCHEUER:  Potentially Binance.

22              THE COURT:  How is Binance an underwriter here?

23              MS. SCHEUER:  It could potentially be Binance or

24    any other party acting as a broker of trade on behalf of

25    Binance -- or Voyager in the rebalancing exercise.
```

 1                THE COURT:  Is that --

 2                MS. SCHEUER:  And if Your Honor would like further

 3      detail on that, we would request permission to submit a

 4      written submission.

 5                THE COURT:  Do you think any broker is an

 6      underwriter?

 7                MS. SCHEUER:  In the rebalancing transaction,

 8      Binance or potentially any other party acting as a broker of

 9      trades on behalf of Voyager in that transaction may be

10      acting as an underwriter.

11                MR. SLADE:  Your Honor, briefly.  Just to respond

12      to the SEC's request for more time, I mean we provided them

13      all the information they requested about VGX in 2021.  Since

14      the bankruptcy, we have responded to numerous information

15      requests from the SEC.  I was on weekly calls with the SEC

16      to make sure we were satisfying their information --

17                THE COURT:  You didn't ask for a specific 1145

18      finding until you -- until after I raised the issue on

19      Thursday, and then you mentioned that you might on Friday

20      night.  And then you did over the weekend.

21                MR. SLADE:  Well, the SEC didn't tell us that they

22      even thought anything might be a security until Friday

23      afternoon, after refusing to take a position the day before.

24      So --

25                THE COURT:  But I'm not going to rule without

Page 49

1      giving them a chance to be heard.  I'm not going to give

2      them a long time to be heard because they have had some

3      notice.  But if they want to make a submission, I'm going to

4      let them make it.  And we're going to have to fix our timing

5      here, because either that or you drop your request as to the

6      VGX finding, because they're entitled to let me know what

7      their position is.

8              MR. SLADE:  Okay.  We also have a milestone for

9      today that Binance has not --

10             THE COURT:  That's what I'm saying.  You better

11     change it or you better drop the VGX, because we're not

12     going to do both.  I'm not going to overrule the SEC's

13     objection without letting them be heard, and do all that

14     today just to meet your milestone.  The issue has come up

15     too late.

16             So I will require them to make a submission.  I'll

17     require it by tomorrow.  I'll rule promptly.  But you're

18     going to have to get relief from your milestone.  I'm not

19     going to let your milestone be used to squeeze a party on an

20     issue that only came up effectively for sure over the

21     weekend.  Okay?

22             MR. SLADE:  The other thing I want --

23             THE COURT:  I think it was reversible error for me

24     to do so, which wouldn't serve any of your purposes.

25             MR. SLADE:  I'm not sure about that, but I

```
1    understand Your Honor's point.  The one other thing I just

2    wanted to make sure that there was no ambiguity about,

3    pursuant to Your Honor's order that you entered, approving

4    our entry into the APA, the Debtors have been doing the

5    rebalancing.  We have been selling VGX.  And so I didn't

6    want Your Honor to be under any other impression, because

7    that has been happening, as Your Honor authorized us to do.

8                THE COURT:  I understand that.  No, I do

9    understand that.

10               MR. SLADE:  Okay.

11               THE COURT:  Right.

12               MR. SLADE:  I was actually just standing up to

13   complete the evidentiary record, and I was going to hand the

14   podium to my colleague to do argument.  So I guess, Your

15   Honor, I would offer the revised plan that was filed, which

16   was Docket 1138.  And we did file a supplemental declaration

17   from Mr. Renzi to explain that as Docket No. 1139.  And I

18   would offer those.  And Mr. Renzi is here.

19               THE COURT:  But I didn't see any supporting facts

20   in Mr. Renzi's declaration.  It was just the explanation of

21   why you're seeking it.

22               MR. SLADE:  Supporting facts for?

23               THE COURT:  For anything.  Whether VGX is a

24   security, whether you're the issuer, whether it's proper to

25   issue relief as to anything other than VGX.  All I see is a
```

1   statement that -- an explanation that you're trying to

2   modify your plan, and that an argument is still -- it's not

3   really a declaration with any facts.  It's not testimony.

4   It's an argument.

5           MR. SLADE:  Okay.  Mr. Renzi did discuss in the

6   declaration why we were making the change, what the change

7   was, and the fact that the Debtors don't believe VGX is a

8   security, and that we have an opinion letter from a

9   nationally recognized law firm supporting that view.  I

10  mean, those are certainly facts.

11          THE COURT:  Are you preparing to offer that

12  opinion letter into evidence?

13          MR. SLADE:  I'm not.  I don't have authority to do

14  that.

15          THE COURT:  Well, then telling me there's an

16  opinion letter is just hearsay.

17          MR. SLADE:  Not to the extent that it's offered to

18  show that the Debtors are relying on that fact to take a

19  position.

20          THE COURT:  What -- why do I care what they're

21  relying on to take a position?  What does that tell me?

22          MR. SLADE:  I think it explains why the Debtors

23  are making this proposal in the plan.

24          THE COURT:  I don't think I need any further

25  explanation.  I know why you're seeking the approval, right?

Page 52

1    It's pretty obvious why you're seeking it.  It's a question

2    of whether you're entitled to it.

3              MR. SLADE:  Okay.  I guess I'm -- where would Your

4    Honor propose to go from here?  I'm not sure.

5              THE COURT:  Well, if you want the -- first of all,

6    I'm not going to give you a ruling on anything other than

7    VGX.  And I'm not going to give you a ruling on anything

8    other than VGX insofar as you allegedly are the issuer of

9    VGX.  As to whether I give you a ruling on that, I'm going

10   to let the SEC make a submission by no later than tomorrow

11   morning.  And I will review it and consider it, and we

12   either get relief from your milestone as to the entry of a

13   confirmation order, or you'll have to drop the 1145 issue as

14   to VGX.  I can't do both.

15             MR. SLADE:  Okay.  Can we take a recess and talk

16   about that, Your Honor?

17             THE COURT:  Yeah.  We'll take ten minutes.

18        (Recessed at 11:01 a.m.; reconvened at 11:16 a.m.)

19             THE COURT:  Please be seated.  Yes?

20             MR. SLADE:  Thank you, Your Honor, we appreciate

21   the opportunity to discuss it and, you know, collectively,

22   we've come to the conclusion that as long as we get the

23   exculpation in the form that the Court has approved in

24   previous cases and we get confirmation that it's going to

25   apply to the rebalancing that has taken place pursuant to

 1    the Court's order, that we won't need the 1145 exception,

 2    and so we would be prepared to remove it.

 3              And so what I would propose is we just proceed to

 4    arguments on the confirmation issues under the premise that

 5    we are going to proceed with the plan that does not include

 6    the 1145 exception.

 7              THE COURT:  Okay.

 8              MR. SLADE:  And I would cede the podium to Ms.

 9    Okike to do that.

10              MS. OKIKE:  Good morning, Your Honor.

11              THE COURT:  By the way, let me -- the debtors have

12    closed their case, is there any other party that has

13    evidence they wish to offer?

14         (No verbal response)

15              THE COURT:  Okay, I'll consider the evidentiary

16    record closed then.

17              MS. OKIKE:  Good morning, Your Honor, Christine

18    Okike of Kirkland & Ellis on behalf of the debtors.

19              Your Honor, in terms of argument, I would propose

20    to address each of the issues raised by the objectors,

21    followed by opportunity for the committee and the purchaser

22    to weigh in, if they so choose, followed by each of the

23    objectors, just in terms of proceeding in a way that makes

24    sense.  Does that work for Your Honor?

25              THE COURT:  I think so, but it may make sense to

1    take issue by issue rather than kind of have you run through

2    your position on all --

3              MS. OKIKE:  Yes, correct --

4              THE COURT:  -- 20 issues.

5              MS. OKIKE:  -- that's what I was proposing.

6              THE COURT:  Okay, good.

7              MS. OKIKE:  So, Your Honor, I'm going to start

8    with feasibility.  A number of the objections go to the

9    feasibility of the plan.

10             We believe the plan is feasible.  It provides for

11   either the sale transaction or the liquidation transaction,

12   as applicable, as determined by the debtors to be in the

13   best interests of their estates.

14             Your Honor, with respect to the sale transaction,

15   a number of the objectors question Binance.US's financial

16   wherewithal and the security of the crypto to be transferred

17   to Binance.US.

18             Your Honor, based on our due diligence and

19   representations made by Binance.US, as highlighted in Mr.

20   Tischner's testimony, we believe that Binance.US has the

21   financial wherewithal to close the sale transaction.

22             Under the sale transaction, Binance.US would not

23   be required to pay the debtors the value of the

24   cryptocurrency on the Voyager platform to consummate the

25   transaction; rather, Binance.US will only be obligated to

Page 55

1    pay up to 35 million in consideration to the debtors.  We

2    have performed due diligence on Binance.US and Binance.US's

3    financials show that it has ample cash on hand to pay the

4    debtors up to 35 million in cash.

5           In addition, the risk of a run on the bank, which

6    has befallen some of the other companies in the industry, is

7    minimized by what we understand to be Binance.US's business

8    model.  Our understanding, based on sworn statements by

9    Binance.US, is that Binance.US maintains a hundred percent

10   reserves for all of its customers' digital assets.  That

11   means that if a customer has deposited one bitcoin with

12   Binance.US, Binance.US holds one bitcoin on account of such

13   customer.  And, importantly, Your Honor, our understanding

14   is that Binance.US does not engage in any lending.

15          Based on what we know, even if all of Binance.US's

16   customers withdrew all of their assets, Binance.US would

17   still have the financial wherewithal to consummate the

18   proposed transaction.

19          Although the debtors will transfer substantially

20   all of the cryptocurrency on the debtors' platform to

21   Binance.US, assuming that the vast majority of customers

22   onboard onto their platform, Binance.US is essentially

23   serving as a distribution agent of that cryptocurrency to

24   accountholders in accordance with the plan.

25          Your Honor, the objectors also question the

Page 56

1    security of the crypto to be distributed to customers once

2    transferred to the Binance.US platform.  Your Honor, based

3    on our due diligence and sworn statements made by Binance.US

4    to the debtors, we understand that Binance.US holds digital

5    assets of its customers solely in a custodial capacity and

6    on a one-to-one reserve basis.  Binance.US segregates

7    customer assets from Binance.US's digital assets on its

8    general ledger.  Only employees of Binance.US are able to

9    move customer assets from the platform.  Binance.US does not

10   lend or re-hypothecate customer assets.

11            Binance.US has the technical expertise, required

12   licenses, other than in the unsupported jurisdictions, and

13   existing infrastructure to perform its obligations under the

14   asset purchase agreement, including with respect to the

15   onboarding and making distributions to customers.

16            Binance.US maintains information security

17   protocols, policies, procedures, and standards consistent

18   with leading industry standards, which are reviewed by

19   multiple independent auditors and which Binance.US believes

20   are adequate to ensure the safeguarding of customer assets

21   and customer personally-identifiable information.

22            Your Honor, notwithstanding Binance.US's

23   representations, we believe the structure of the sale

24   transaction is designed to minimize risk, which also goes to

25   feasibility.  These protections include, first, all of the

Page 57

1    debtors' cryptocurrency will not transfer to Binance.US at

2    closing; rather, cryptocurrency and cash will be transferred

3    to Binance.US following closing on a weekly basis as

4    accountholders and OpCo general unsecured creditors complete

5    Binance.US's onboarding requirements.

6         Second, Binance.US has to make any cryptocurrency

7    and cash transferred to it by the debtors available to those

8    accountholders and holders of OpCo general unsecured claims

9    that have completed the onboarding requirements within five

10   business days of receipt, and to use commercially-reasonable

11   efforts to do it in 48 hours following receipt.

12        Third, accountholders and holders of OpCo general

13   unsecured claims will retain all right, title, and interest

14   in the distributions made to them on the Binance.US

15   platform.

16        Fourth, cryptocurrency will be held by Binance.US

17   solely in a custodial capacity in trust for the benefit of

18   accountholders with no time limitation.

19        Fifth, cash transferred to Binance.US for further

20   distribution to accountholders or OpCo general unsecured

21   creditors will at all times until transferred to such

22   creditor be held solely in a third party bank account of an

23   FDIC-insured financial institution solely for the benefit of

24   such creditors.

25        Sixth, Binance.US will not pledge, re-pledge,

Page 58

1    hypothecate, re-hypothecate, invest, sell, lend, stake,

2    transfer, or use any of the cryptocurrency to be distributed

3    to accountholders for any period of time and without

4    retaining a like amount of cryptocurrency, except as may

5    otherwise be directed by such creditors.

6           Your Honor, the debtors believe these protections

7    significantly reduce the risks associated with the sale

8    transaction and the transfer of cryptocurrency to Binance.US

9    to facilitate distributions to creditors.

10          Your Honor, you may be wondering why we are still

11   considering the sale transaction given the numerous rumors

12   regarding Binance.US and, Your Honor, the simple answer is

13   that the sale transaction maximizes the value of the

14   debtors' estates.

15          As Mr. Tischner testified, based on our estimates,

16   the sale transaction will provide over a hundred million of

17   value compared to the liquidation transaction due to, among

18   other things, the costs of restarting the platform and

19   liquidating 20 percent of the unsupported tokens that cannot

20   be withdrawn in kind.  Your Honor, the debtors believe --

21          THE COURT:  What happens under the -- remind me,

22   under the Binance deal, what happens if I confirm it and

23   before closing the SEC gets an injunction against Binance

24   doing business?

25          MS. OKIKE:  Your Honor, at that point, we would

Page 59

1      proceed with the liquidation transaction.

2              THE COURT:  What happens with your Binance deal,

3      is it terminated?  Who has what obligation to whom?

4              MS. OKIKE:  I would have to look at the specific

5      termination provisions.  We do have a fiduciary out, so we

6      can always exercise that, but there are certain regulatory

7      actions which allow us to terminate the agreement without

8      exercising the fiduciary out.

9              THE COURT:  And, if that happens, does one party

10     owe any money to the other for termination, for expenses,

11     for forfeiting of deposits, any of that kind of thing?

12             MS. OKIKE:  It's very fact specific, Your Honor.

13     There are certain circumstances -- if we were to exercise

14     the fiduciary out in the absence of a purchase or a default,

15     it's likely that their expense reimbursement would be

16     triggered, but if there's a regulatory action, there's -- a

17     lot of those provisions were explicitly included in the APA

18     as to not trigger the expense reimbursement.

19             THE COURT:  Okay.  And are there circumstances

20     where Binance would give up a deposit or anything like that?

21             MS. OKIKE:  Yes, Your Honor.

22          (Pause)

23             MS. OKIKE:  So, Your Honor, with respect to the

24     good faith deposit, if Binance were to terminate the APA, in

25     the absence of a seller breach, we would be entitled to the

Page 60

1    good faith deposit.

2           THE COURT:  Okay.  Okay, please go forward.

3           MS. OKIKE:  So, Your Honor, we believe that the

4    sale transaction, to the extent that it can be consummated

5    and is in the best interests of the estates, is the most

6    value-maximizing option available to the debtors today, but

7    we recognize that this is a volatile industry and

8    circumstances change every day and, for that reason, we

9    included a toggle to the liquidation transaction whereby the

10   debtors would distribute cryptocurrency and cash to

11   creditors on their own if the debtors determine in their

12   business judgment between now and closing that the sale

13   transaction is no longer the highest or otherwise best

14   option.

15          So, Your Honor, we believe that the plan is

16   feasible whether we move forward with the sale transaction

17   or the liquidation transactions.

18          THE COURT:  Okay.

19          MS. OKIKE:  Would you like to hear from other

20   parties on feasibility before --

21          THE COURT:  Yes.  I think the SEC is the primary

22   objector who raised the feasibility; do they wish to be

23   heard?

24      (Pause)

25          THE COURT:  Is the SEC on the phone?

Page 61

1             MS. SCHEUER:  Yes, Your Honor.  My apologies, my

2      phone was muted.  Therese Scheuer for the Securities and

3      Exchange Commission.  And, Your Honor, I should have said it

4      earlier, but thank you for allowing us to participate in the

5      hearing today telephonically.

6             Your Honor, there's a lot -- going to some of the

7      points that Ms. Okike raised, there's a lack of credible

8      evidence demonstrating that customer assets are secure on

9      the Binance platform.  No one from Binance testified and the

10     only evidence submitted about Binance are declarations and

11     testimony from Voyager's professionals.

12            Mr. Tischner admitted that his team doesn't have

13     expertise regarding the safety of crypto assets or security

14     protocols.  He also testified that the debtors haven't hired

15     any expert to assist it in the review of the representations

16     made by purchaser.

17            Given the specific circumstances of this case,

18     Your Honor, that's concerning.  And, as Your Honor has

19     observed, most of the assurances about the safety of assets

20     are based on hearsay.  There were apparently some third

21     party reviews of the buyer's security protocols, but the

22     debtors haven't offered an adequate description or details

23     about those reports of evidence.  Although there is an

24     officer certificate filed from Binance, it was not admitted

25     for evidentiary purposes and there was no opportunity for

Page 62

1      cross-examination of the declarant --

2                THE COURT:  What provision of --

3                MS. SCHEUER:  -- and the debtor's professional --

4                THE COURT:  -- Section 1129 of the Bankruptcy Code

5      are you invoking and do you think wasn't complied with by

6      not having a Binance witness testify or by not having an

7      outside security consultant look at the security protocols?

8      Just what is it about that that you think means that I

9      shouldn't confirm the plan or can't confirm the plan?

10               MS. SCHEUER:  Your Honor, we acknowledge that this

11     is a liquidating debtor.  The debtor is transferring its

12     assets and its customers to a buyer and I think making it,

13     for practical purposes, a successor, as discussed at the

14     last hearing, the staff believes Binance.US is operating an

15     unregistered securities exchange in the United States.

16     Binance.US and those seeking to trade on Binance.US may be

17     impacted by ongoing regulatory investigations, as previously

18     discussed with the Court.  Given these issues, it could be

19     faced with highly challenging legal and practical issues,

20     and Your Honor is well aware of what effect a business

21     failure can have on a crypto platform.

22               THE COURT:  But, you know, it doesn't sound like

23     there's a specific Code provision that you can point to that

24     suggests that I needed to actually have Binance testify

25     about its security protocols, for example, or that the

Page 63

1    debtors needed to have an independent expert.  You're kind

2    of picking away at what the debtors did in due diligence to

3    try to criticize it, but in terms of whether there should be

4    a sale to Binance, whether that makes sense as a business

5    matter, I think, under the applicable Second Circuit

6    authorities, my job and the limit of my authority is to

7    determine whether the debtors have exercised a reasonable

8    business judgment -- not a guarantee, but a reasonable

9    business judgment; not even the judgment that I would have

10   made, not even the judgment that another reasonable person

11   might have made, but a reasonable business judgment.

12          So on some of these points that you're complaining

13   about, you're really saying that you disagree; you would

14   have hired an outside security consultant and not just

15   accepted the audits that the debtors received.  You would

16   have wanted a witness by Binance, although you didn't

17   subpoena a witness from Binance and nobody else did either.

18          But at the same time, while you criticize the

19   assurances and the value of the assurances that the debtors

20   got, nobody here has offered any -- and I mean any --

21   admissible evidence that anything of any kind is going on at

22   Binance that is wrong, that it is mistreating -- misusing

23   customer assets, that customers who go to Binance will be

24   unsafe, that it is not doing what it represented in its

25   sworn statement that it does in terms of the handling of

Page 64

1    customers, that its security protocols are faulty, zero.  I

2    have absolutely nothing on that point.

3            So criticizing, you know, just how strong the

4    assurances are that the debtors have received, how does that

5    get me to the point of saying that, as a matter of business

6    judgment that the debtors -- no reasonable person could

7    decide to go forward with this deal?

8            MS. SCHEUER:  Your Honor, I think it goes to both

9    the adequacy of disclosures -- and this is the final -- the

10   hearing on final approval of the disclosure statement -- and

11   also feasibility of the plan under 1129(a)(11) --

12           THE COURT:  Well, under 1129 --

13           MS. SCHEUER:  -- Your Honor --

14           THE COURT:  -- feasibility under 1129(a)(11) just

15   means that the confirmation of the plan won't be followed by

16   a further reorganization or a liquidation unless a

17   liquidation is contemplated in the plan.

18           So I already pointed out --

19           MS. SCHEUER:  Yes.

20           THE COURT:  -- even if everything goes wrong as to

21   Binance and it drops out of the deal, we have a toggle plan.

22   So I don't see how confirmation of the plan would create an

23   issue under 1129(a)(11).

24           MS. SCHEUER:  Your Honor, I think, after the deal

25   closes, the toggle becomes unavailable.  That's my

1    understanding from the debtors, they can correct me --

2            THE COURT:  Yeah, I don't --

3            MS. SCHEUER:  -- if that is not --

4            THE COURT:  -- I don't think that's right.  And,

5    you know, my job, under 1129(a)(11), is to confirm unless it

6    is likely that there's going to be a further reorganization

7    or liquidation, the only evidence I have is that it's not

8    likely.

9            I mean, I'm as worried as anybody else.  I'm the

10   one who's probably going to be blamed if anything does go

11   wrong here.  But, you know, I'm a Judge; I'm not a

12   regulator, I'm not an investigator, I have -- not only do I

13   have no independent information on any of these points, as a

14   matter of judicial ethics, I'm barred from having

15   information on any of these points.  I can only consider the

16   evidence that the parties have brought in front of me.

17           I am aware of scores of hearsay allegations and

18   conclusory arguments that, gosh, aren't we worried, maybe

19   Binance is another FTX, but I have absolutely -- and I mean

20   absolutely -- zero, zero evidence that any of that is true.

21           So, given my role, given what I'm supposed to do

22   here, how could I possibly say that the risks of Binance

23   here are so great that the debtors could not reasonably make

24   the choice that they are making?  How could I possibly

25   conclude that based on the actual evidence that I have,

Page 66

 1    particularly when you like to make hints and suggestions,

 2    but you haven't offered me anything?

 3            You know, you criticized the review of the

 4    security protocols.  I don't have any reason -- so far as I

 5    know, you don't have any reason -- to doubt the security

 6    protocols that Binance uses, at least you haven't elected to

 7    clue me in on any.

 8            So, you know, all these little kind of nits and

 9    gnats criticisms, how do they amount -- how do they get you

10    to the point of saying that the debtor's business judgment

11    has been wrongfully exercised here and no reasonable person

12    could want to do this?

13            MS. SCHEUER:  Your Honor, I think the issues that

14    we're raising can also be looked under 1125 and whether the

15    debtors have provided adequate information about risk and

16    how it could affect customers who transfer to the Binance

17    platform.

18            THE COURT:  Well, the debtors told customers that

19    they understood that Binance holds assets in custody, they

20    told customers that they understand that Binance holds

21    assets in a one-to-one ratio, so that -- and that it doesn't

22    lend or re-hypothecate.  They told customers that they are

23    satisfied that Binance has the financial resources to

24    complete this deal.  Okay?

25            Now, you've called this a disclosure issue.  I

Page 67

1    said at the beginning and I'll repeat it:  this is a

2    substantive objection masquerading as a disclosure issue.

3            The debtors have made clear that as questions come

4    up, as newspaper articles appear, they have and will

5    continue to ask questions of Binance.  That doesn't mean

6    that every single time they have a conversation with Binance

7    we have to stop, redo the disclosure statement, and start

8    this entire process over again.

9            We would never get anywhere if we had to do that

10   and it would be peculiar because, you know -- well, I'm

11   certainly not going to tell the debtors that they have to

12   stop doing their due diligence at the risk of having to redo

13   their disclosure statement.  Maybe they haven't done as many

14   things in due diligence as you think they should have done

15   or you don't like the degree of assurances that they've

16   gotten, those aren't disclosure issues.  Those are

17   substantive criticisms of the due diligence, there's no --

18   the debtors haven't changed their conclusions that they

19   offered in the disclosure statement.

20           And, you know, you're just saying that you wanted

21   more, that's all, that you think that the debtors should do

22   more before they do this deal.  I don't think those are

23   disclosure issues, I think those are questions of business

24   judgment.  The debtors -- I just don't see where, you know,

25   for example, the fact that the debtors looked at an

Page 68

1    independent audit of security protocols and didn't

2    commission their own, I don't see that that's a disclosure

3    issue in the slightest.

4              And as to the risk of --

5              MS. SCHEUER:  Your Honor --

6              THE COURT:  -- as to the risk of regulatory

7    actions, the debtors did say that it's a highly uncertain

8    regulatory environment.  There are several places in the

9    disclosure statement they said they couldn't predict what

10   regulators would do.  Regulators may decide to take action;

11   it's an extremely uncertain environment, they don't know

12   what people might do.

13             So you can't even tell me what you're going to do,

14   so what was the debtor supposed to say other than what they

15   actually said?

16             MS. SCHEUER:  Your Honor, the debtors didn't

17   include how distributions to accountholders and their

18   ability to trade could be affected by regulatory

19   investigations and potential regulatory actions if they're

20   successful.  You know, Mr. Raznick testified that those

21   risks he didn't take into account in putting together his

22   liquidation analysis.  These are all disclosure issues that

23   could have informed how creditors vote on the plan --

24             THE COURT:  Well --

25             MS. SCHEUER:  -- because the numbers --

1            THE COURT:  -- as to how --

2            MS. SCHEUER:  -- as presented --

3            THE COURT:  -- as to how this could affect the

4    ability to trade at Binance, for example, I asked you --

5    your colleague, actually, was standing at the podium on

6    Thursday -- if the SEC were to take action contending that

7    Binance needs to register as a broker/dealer, would that

8    mean that all Binance activities would have to stop, or

9    would it just mean that the particular activities that

10   required registration would have to stop, but that other

11   activities could continue, and your answer was you don't

12   know.

13           So now you're telling me that the debtors should

14   have made a prediction on this point and should have

15   disclosed to their customers exactly what would happen in

16   this situation when you yourself couldn't answer the

17   question.  So how does that make sense?

18       (Pause)

19           THE COURT:  Do you have an answer?

20           MS. SCHEUER:  To clarify, I think, you know,

21   subject to all of the caveats that were stated at the last

22   hearing, you know, as to that point, Your Honor, the staff

23   believes that, you know, based solely on the facts and

24   circumstances known to the staff that they previously

25   stated, that Binance.US is operating an unregistered

1  securities exchange in the United States, and Binance.US and

2  those seeking to trade on Binance.US may be impacted by

3  ongoing regulatory investigations and could be faced with

4  highly challenging legal and practical issues.

5            THE COURT:  Well, did you say that to anybody

6  publicly before last Friday?  And, if not, how are you

7  contending that the debtor should have disclosed it in the

8  disclosure statement that they circulated in January?

9            MS. SCHEUER:  I think the regulatory risks were

10  known to the parties -- could have been disclosed by the

11  parties involved.

12            THE COURT:  I'm sorry, I couldn't understand what

13  you said; could you repeat it?

14            MS. SCHEUER:  Regulatory risks could have been

15  disclosed by the parties involved.

16            THE COURT:  They did disclose.  They said they

17  didn't know what regulators might do.

18      (Pause)

19            THE COURT:  Are you saying they should have

20  somehow anticipated the exact statement that you wound up

21  making this past Friday.  They should have read your mind

22  and known six weeks in advance that you were going to take

23  that position?

24            MS. SCHEUER:  Your Honor, it could have been

25  modeled from -- in numbers that were provided in the

Page 71

1    liquidation analysis or, you know, further risk factors or

2    caveats added to make clear that distributions could be

3    affected by those risk factors.

4           THE COURT:  I think they did that.  They said they

5    don't know what's going to happen with regulators; that the

6    regulators might take action that might influence or impede

7    the completion of the distributions that are contemplated.

8    I don't know what more they could have said.

9           Okay.  I think the disclosures on these points

10   were sufficient and the criticisms --

11          MS. SCHEUER:  Understood, Your Honor.

12          THE COURT:  -- the criticisms of individual due

13   diligence points are just substantive attacks, not

14   disclosure issues.  And I don't think that this goes to

15   feasibility in the sense that term is used in the Bankruptcy

16   Code.  There could be regulatory issues here, but the

17   debtors, I think, have tried not to eliminate that

18   possibility, you know, that maybe could have taken a

19   different approach and required you to put your proof on,

20   but nobody has tried to do that.  They've tried to give you

21   your regulatory freedom to the extent that it makes some

22   sense here, but all they can do in that regard is say, look,

23   there are risks that people might interfere, regulators

24   might interfere, we can't guarantee what will happen.

25          But, you know, the only alternative to saying

Page 72

1    something like that in this regulatory environment would be

2    to sit around for I have no idea how long and do nothing,

3    and wait until Congress and the competing regulatory

4    authorities sort out amongst themselves just who has what

5    authority over what aspects of this business and what kind

6    of authority they have.  I have no idea how long that's

7    going to take and we can't do that in bankruptcy.  The

8    Bankruptcy Code doesn't contemplate an endless period of

9    time, things have to be done.  We have creditors who are

10   waiting and who, in the midst of all this uncertainty, have

11   no access to property in which they've invested, in some

12   case, their life savings.

13          So we have to take some kind of action, we have to

14   do something, and we can't just put everything on pause just

15   because we don't know for sure how the regulators will

16   eventually make up their minds on points that they seem to

17   have been debating for years.  Okay?

18          I just don't think that that's really a disclosure

19   point here and I don't think it's a reason to criticize

20   business judgment.  Things need to be done, the world needs

21   to move.

22          Okay, let's move -- I think the U.S. Trustee had

23   objections also on the disclosures about Binance and its

24   controls.  Are you satisfied or do you have additional

25   points to make?

Page 73

1              MR. MORRISSEY:  Your Honor, if I may, I do have

2     additional points.

3              THE COURT:  Okay.

4              MR. MORRISSEY:  Your Honor, good morning, Richard

5     Morrissey for the U.S. Trustee.  Although I do have

6     additional points to make, there will be some overlap

7     regarding disclosure and feasibility.

8              At the January 10th hearing on the debtor's

9     motions to enter into the asset purchase agreement with

10    Binance and for conditional approval of the debtor's amended

11    disclosure statement, we pointed out that in the wake of the

12    collapse of Voyager's prior deal with FTX that the creditors

13    wanted to know as much as possible about the new purchaser

14    as they could, not least to be assured that the painful FTX

15    experience would not be repeated in this case.

16             The creditors had reason to be especially

17    sensitive about the Binance transaction as Voyager was to

18    share their personal information, personal information that

19    Voyager worked so hard to protect at the beginning of these

20    cases with Binance.

21             Voyager's customers had questions.  How stable is

22    Binance?  Was the proposed purchaser in the crosshairs of

23    any government investigations?  Would any intercompany

24    transactions at Binance impact the customers'

25    cryptocurrency?  Was Binance.US truly independent of

Page 74

1   Binance.com or Binance.Global?

2          As the Court has heard over the first two days of

3   this hearing, Voyager's customers still have such questions.

4          Now, to be sure, Your Honor -- and I'm talking

5   about the disclosure statement here -- if they looked hard

6   enough in various portions of the amended disclosure

7   statement, the customers could find answers to certain other

8   questions such as how their recoveries would be affected if,

9   for example, the litigation with respect to Voyager's

10  intercompany transactions went one way or another, or if

11  Alameda's claim against the debtors were allowed or

12  disallowed.  They could also find --

13         THE COURT:  You know, you're standing here telling

14  me that customers found the disclosures on these points

15  inadequate, I don't have a single customer who's taken that

16  position.

17         MR. MORRISSEY:  Your Honor, I apologize if that's

18  what it seems that I said --

19         THE COURT:  That's what you just said.

20         MR. MORRISSEY:  -- that's not what I was trying to

21  say.

22         THE COURT:  You just said that this is all stuff

23  that customers wanted to know, and that might be what you

24  think, but not a single customer has filed an objection on

25  that ground, not a single one, as far as I know.

1          MR. MORRISSEY:  Okay.  Your Honor, my point is

2    what is and what is not in the disclosure statement for any

3    parties in interest to discover.

4          One example, Your Honor, is that the customers

5    could find a description of Voyager's security protocol,

6    both in the amended disclosure statement and in the

7    declaration that was filed in connection with the debtor's

8    cash management motion.

9          THE COURT:  I'm sorry, what is it, you think

10   Voyager should have disclosed its own security protocol?

11         MR. MORRISSEY:  Well, no, Your Honor.  As a matter

12   of fact, I'm saying that Voyager did.  Voyager gave a

13   description in the disclosure statement regarding its own

14   security protocol, it did not give a description of

15   Binance's security protocol.  And I'll get into that in just

16   a moment, if I may, Your Honor.  The --

17         THE COURT:  Didn't they say that Binance

18   maintained wallets at Amazon Web Services located in two

19   jurisdictions and didn't they talk about various

20   certifications that Binance had provided as to its

21   compliance with a number of different security standards?

22         MR. MORRISSEY:  That was discussed, Your Honor, in

23   a combination of the declarations submitted shortly before

24   the hearing --

25         THE COURT:  I'm pretty sure it was in the

Page 76

1    disclosure statement.

2           MS. OKIKE:  Yeah, it's in the disclosure

3    statement, Your Honor, it's Article 5(b)(1)(B).

4           THE COURT:  I reread the disclosure statement in

5    preparation for this hearing and I remember seeing it there.

6           MR. MORRISSEY:  But, Your Honor, what the debtor

7    provided here in the disclosure statement was assurances

8    about Binance.  The disclosure statement was very

9    informative about Voyager's history both before and during

10   the pendency of the cases.  It said a lot about where the

11   customers have been, but very little about where they've

12   been invited to go.

13          Your Honor, in a conventional sale -- and the

14   final approval of the sale is up for today as well, as it's

15   part of the plan, assets are exchanged for proceeds and the

16   latter has a reasonably equivalent value to the former.

17   Here, the 20 million or the maximum 35 million amount to far

18   less than the value of the assets.

19          The vast bulk of the sale involves the transfer of

20   the crypto held by Voyager to the Binance.US platform.

21   Although the crypto goes to Binance.US, the debtor's due

22   diligence cannot follow the crypto to Binance.US.  Once the

23   crypto has been transferred, the matter is out of Voyager's

24   hands.  Voyager's control of the asset is limited to either

25   the 20 or the 35 million, or whatever number in between may

1    eventuate.

2            The debtors assure the parties that Binance has

3    the wherewithal to consummate the asset purchase agreement,

4    but there's precious little information about Binance.US in

5    the disclosure statement to back up that assurance.  Now, we

6    did hear testimony regarding that.

7            Also, as far as the mechanisms to protect the

8    cryptocurrency, we heard that from Voyager's witnesses and,

9    as Your Honor pointed out, there's something about that in

10   the disclosure statement --

11           THE COURT:  Well, here -- what you just said is

12   really not so much an argument that there was a lack of

13   disclosure, but that there was -- they didn't kind of

14   incorporate all their declarations into the disclosure

15   statement itself to give a full explanation of all the

16   homework that they had done and intended to do that

17   supported the conclusions that they had reached --

18           MR. MORRISSEY:  No --

19           THE COURT:  -- that's not really a disclosure.

20           MR. MORRISSEY:  Well, except that --

21           THE COURT:  When does anybody ever do that in a

22   disclosure statement?

23           MR. MORRISSEY:  Well, the -- a lot of the

24   information contained in the declarations and disclosed in

25   the live testimony should have been in the disclosure

Page 78

1    statement before the ballots went out, so that the people

2    voting could make a more informed decision as to what they

3    were voting on.

4            And, Your Honor, I'd like to interject one point.

5    It's been repeated many times over the last two days and

6    even in the press about the fact that 97 percent of the

7    creditors supported the plan and they had overwhelming

8    support among the creditors.  As I said the other day, Your

9    Honor, six percent of the creditors voted on the plan; I

10   don't know why the 94 percent did not, but the overwhelming

11   majority of the creditors did not.

12           Having said that, Your Honor, I do concede, as I

13   did the other day, that what Your Honor has to consider in

14   terms of whether there's adequate support is in fact the

15   votes that were actually cast, not the ones that were not

16   cast.  So we understand that, but I just want to make sure

17   that everyone is clear that there is not an overwhelming

18   support for the plan among the entire creditor body.

19           THE COURT:  By the same token, I heard a couple of

20   customers complain about Binance and say they didn't want to

21   go to Binance, only a few.  So, out of the thousands of

22   customers who voted and the, what, million customers that

23   exist, I have less than a handful of customers who objected

24   to the proposal of having the debtor deal with Binance here,

25   recognizing that we've also tried to set it up so that

Page 79

1    customers who don't want to have Binance accounts don't have

2    to have Binance accounts and are free to elect not to have

3    that; right?

4            MR. MORRISSEY:  Yes, Your Honor, and there's also

5    the toggle to the other plan, which we do recognize.

6            THE COURT:  So nobody is forced to be a Binance

7    customer who doesn't want to be a Binance customer.

8            MR. MORRISSEY:  That is correct, Your Honor.

9            MS. PROVINO:  (Indiscernible) --

10           THE COURT:  Who is speaking?

11           MS. PROVINO:  I'm sorry.  This is Lisa Provino,

12   pro se.  I just wanted to support something that Mr.

13   Morrissey is saying that is quite --

14           UNIDENTIFIED SPEAKER:  (Indiscernible) --

15           MS. PROVINO:  -- which is quite important.  I

16   found yesterday that -- and the reason -- this is on his

17   first comment about us not commenting on some of the

18   documents, Your Honor, there have been documents on Stretto

19   that have been deleted.  Please note for the record that

20   Docs. 66, 70, 149, 219, 187, 184, 165, 359, 380, 381, 382,

21   497 (indiscernible) 607, 359, and 1049 documents have been

22   deleted from Stretto.

23           So it has been very challenging for us, as we have

24   mentioned multiple times, to keep up, but it's even worse

25   when the documents have been deleted.  And so, if they have

1    been deleted and we have not been able to respond, I want

2    for the Court to know that it's unfair, and we did support

3    what -- excuse me -- what Mr. Morrissey has just stated.

4                THE COURT:  Okay.

5                MS. PROVINO:  So --

6                THE COURT:  You're not --

7                MS. PROVINO:  -- meaning that (indiscernible) --

8                THE COURT:  You did get the disclosure statement;

9    right?

10               MS. PROVINO:  No, not the one that -- which one

11   are you talking about, sir?  The one that you mentioned that

12   we didn't respond to that Richard Morrissey just brought up.

13   Which disclosure statement are you speaking of?  As I

14   mentioned, there were multiple documents --

15               THE COURT:  There is no --

16               MS. PROVINO:  -- deleted off of Stretto and I'm

17   very upset about that.

18               THE COURT:  There was a large disclosure statement

19   submitted in connection with the request for confirmation of

20   the plan.

21               MR. MORRISSEY:  Your Honor, if it may help, I do

22   remember one ECF document number for the amended disclosure

23   statement, I believe that's the one we objected to, it was

24   Document Number 863 on the docket and I hope that is still

25   there.

1              THE COURT:  But it didn't have to be, it was --

2              MS. PROVINO:  That one --

3              THE COURT:  -- it was mailed out, right, Ms.

4     Okike?

5              MS. PROVINO:  I went through -- and then I wanted

6     to mention something else as well.

7              THE COURT:  Well, you should have gotten a big

8     document in the mail.

9              MS. PROVINO:  Sir, I did not.  I have gotten

10    nothing in the mail.

11             MS. OKIKE:  Email, email.

12             THE COURT:  Email, excuse me, in the email.

13             MS. PROVINO:  On Document 863?  I'm sorry, which

14    are you speaking of?  Please clarify for me.

15             THE COURT:  The disclosure statement that we're

16    talking about should have been sent to you by email in

17    approximately mid-January.

18             MS. OKIKE:  Along with a ballot --

19             MS. PROVINO:  No, I did not receive it.

20             MS. OKIKE:  -- for you to exercise your vote.

21             THE COURT:  Along with a ballot.

22             MS. PROVINO:  No, if you remember, this goes to

23    the point -- another point of Mr. Morrissey that 94 percent

24    of the people didn't vote.  May I comment again that 3506

25    people were blocked from voting?  Yes, I understand that we

1    got an email about the ballot, but, if you remember

2    correctly, there were several of us that had complained.

3              And we went to extreme lengths, we did call Mr.

4    Morrissey, as well as many other regulatory bodies that we

5    possibly could, in addition to the debtor.  So I just want

6    to see things for the record because --

7              THE COURT:  Let me ask you to hold -- let me ask

8    you to hold on those complaints while we just finish with

9    Mr. Morrissey's comments about the disclosures.  Okay?  And

10   then we'll come back to you.

11             MS. PROVINO:  That's fine, but I just wanted you

12   to know about we support what he just said and I need you to

13   know that, sir, that's all --

14             THE COURT:  I understand.

15             MS. PROVINO:  -- and especially about the

16   documents, I'm very upset about that as well.

17             THE COURT:  Okay.  Go ahead.

18             MR. MORRISSEY:  Thank you, Your Honor.

19        (Pause)

20             MS. OKIKE:  Your Honor, just to address that

21   point.  We understand from Stretto that the docket numbers

22   referenced were removed because they included customer PII.

23             MS. PROVINO:  But that was never mentioned to us

24   at all, so we could have at least downloaded those.

25        (Background noise)

1           THE COURT:  All right, a lot of people have open

2     lines.  Please mute your line unless you have permission to

3     speak.  Okay?

4           MR. MORRISSEY:  Thank you, Your Honor.

5           Your Honor, although Voyager's history and actions

6     are well described in the disclosure statement, when it

7     comes to information about Binance.US, the disclosure

8     statement is more of a statement of assurance.

9           The debtors have said that the objectors have not

10    produced any evidence to counter their assurances about

11    Binance, but it is not the objectors' obligation to make

12    disclosures about Binance, it is the debtors' job to do so

13    and it's a job that the debtors have not done.

14          THE COURT:  What should they have said?

15          MR. MORRISSEY:  Your Honor, they had a lot of

16    communications between the debtors on one side, and perhaps

17    the committee on the same side, and Binance on the other and

18    they got a lot of assurances from them.

19          Again, I understand that these are restructuring

20    professionals and not specifically crypto experts, but they

21    got the assurances from them, including the fact that there

22    are third parties, independent third parties who have

23    reviewed the security protocols.  But the information they

24    got from them was walled off from the creditor body because

25    there was not -- the substance of the information was not in

Page 84

1    the disclosure statement.

2              THE COURT:  What information did they get, the

3    substance of which was not in the disclosure statement?

4              MR. MORRISSEY:  They were -- they got assurances,

5    Your Honor, they got assurances that they had the financial

6    wherewithal to --

7              THE COURT:  That's in the disclosure statement.

8              MR. MORRISSEY:  That they did have the

9    wherewithal?

10             THE COURT:  Yeah.

11             MR. MORRISSEY:  Yes, it was a -- it was a small

12   comment.

13             And just to put it in perspective, Your Honor,

14   Binance itself, there were three pages out of the 98 in the

15   disclosure statement dedicated to Binance.  This plan, Your

16   Honor, is all about Binance, a lot more than it's about

17   Voyager.  It's all about what Binance can do holding and

18   protecting the assets on the platform because Voyager, as I

19   said earlier, is transferring the bulk of the assets to

20   Binance.

21             One last point, if I may make, about due

22   diligence, Your Honor.  We learned that the debtor's

23   restructuring professionals had reviewed the information

24   that they received from Binance, but because they were not

25   crypto experts, they -- meaning the debtors themselves,

Page 85

1    their restructuring professionals -- were unable to make an

2    independent determination regarding the security protocols.

3    They got a showing, they were satisfied with the showing,

4    obviously, but they didn't make their own determination.

5         And that's why I said, Your Honor, this is more of

6    a statement of assurances than a disclosure statement and

7    that's where I think that the debtors fell short.

8         Your Honor, there are other issues that we have,

9    but, again, I'll defer to other parties and take those on

10   later, such as releases, exculpations, et cetera.

11        THE COURT:  Right.

12        MR. MORRISSEY:  Thank you, Your Honor.

13        MR. GOLDBERG:  Your Honor, if I may be heard?

14   Adam Goldberg of Latham & Watkins on behalf of Binance.US.

15   I'd like to respond quickly to one point that Mr. Morrissey

16   made about the voting and the questions Your Honor has about

17   who voted and why.

18        I was doing some math, looking at the voting

19   declaration, which is at Docket Number 1127, to think about

20   that, and what it shows is that $541 million of claimed

21   value voted in favor of the plan out of the customer class,

22   which in the disclosure statement is estimated at 1.763

23   billion.  By my math, that's a little over $9,000 per claim

24   of the people who voted in favor.  There was only 10 million

25   in claims that voted against the plan and by my math that

1    was a little over 5,000 per claim who voted against.  The

2    remaining over 900,000 people who did not vote, the

3    remaining claims pool, would be about $1900 per claim.

4            And so what that math shows, Your Honor, is that

5    the people with the greatest interest in this estate voted

6    in favor of the plan.

7            And, Your Honor, this plan, my client's goal, the

8    debtor's goal, as I understand it, is to deliver

9    cryptocurrency to customers as quickly as possible, and

10   that's why we believe that the customers voted

11   overwhelmingly in favor and those with the greatest

12   interests did so.

13           Thank you, Your Honor.

14           MR. HENDERSHOTT:  Your Honor, this is Tracy

15   Hendershott, pro se creditor, may I approach the podium?

16           THE COURT:  In a minute, Mr. Hendershott.  We've

17   got the committee counsel already standing here ready to

18   argue, so we'll hear the committee counsel first.

19           MR. HENDERSHOTT: Thank you, sir.

20           MR. EVANS:  Your Honor, Joseph Evans from

21   McDermott Will & Emery on behalf of the committee.  I'd like

22   to share a few points and I'll try not to repeat things that

23   have already been said.  We think it's important for the

24   creditors to know what the committee's role has been and

25   what we've done in connection with this deal.

1             The committee supports the plan.  According to the

2     experts, the Binance deal will give customers incremental

3     value of $100 million.

4             Based on the substantial diligence that we've done

5     concerning the Binance deal, the information provided and

6     the representations made by Binance, the committee supports

7     a plan which includes the Binance deal and the opportunity

8     to toggle.  We believe that it's the best available option

9     to get the most crypto back as quickly as possible.

10             One reason why the committee supports the plan is

11     because of the significant protections that the committee

12     negotiated for and obtained in the APA.  For example, the

13     Binance.US deal initially contemplated transferring all

14     Voyager crypto to Binance.US before Voyager creditors

15     onboarded with Binance.US.  This would mean that Voyager

16     customers' crypto would have been exposed to Binance.US

17     risks for a period of time before they were able to

18     withdrawal.  The committee refused that deal.

19             The committee negotiated for and Binance agreed to

20     have customer crypto transferred on a weekly basis only

21     after customers are onboarded with Binance.  So, if they

22     choose to withdraw and not be Binance customers, the

23     exposure to Binance will only be for a matter of days.

24             Those provisions are contained in Section 2.4 of

25     the APA.

```
 1              There are also provisions that we negotiated for

 2      that made clear that when Voyager customer crypto goes to

 3      Binance that Voyager customer crypto remains property of the

 4      estate until the customers have the ability to withdraw.

 5      And there is also the fiduciary out, which has been the

 6      subject of a lot of the testimony, though, before Your

 7      Honor.

 8              The second reason why the committee became

 9      comfortable with the Binance deal was because of the

10      significant amount of due diligence conducted by the

11      committee, the debtors and their professionals.

12              The committee interviewed Binance.US executives on

13      these issues on seven separate occasions.  And, as this

14      Court heard from experts from BRG and Moelis, the Binance

15      deal is the best available deal for creditors.  So the

16      committee supports a plan which includes the Binance deal.

17              There was a number of representations that we've

18      all heard that were important.  The crypto is held on a one-

19      to-one reserve basis; the company segregates the company's

20      assets from customer assets; CZ, Binance.Global, anyone

21      outside of Binance.US cannot take customer crypto out of

22      Binance.US; and the company does not lend or re-hypothecate

23      the customer assets.

24              There were also a number of press releases,

25      Tweets, congressional letters.  We've also diligenced those,
```

1    that diligence is ongoing.

2           With respect to one important report from Reuters

3    on February 16th, 2023, we've done diligence and we were

4    assured that; one, Merit Peak does not withdraw a customer

5    fee out of crypto; Merit Peak nor any other market maker had

6    the ability to withdraw a customer fee out of crypto; and

7    Merit Peak no longer conducts any activity at Binance.US.

8           And we'd like to take a moment to speak about the

9    SEC's position.  With respect to the SEC, the SEC staff

10   statements on Thursday, Friday, and this morning do not

11   change the committee's position.  We were particularly

12   unmoved by the SEC staff statement this morning that we are,

13   quote, "on notice" of some unspecified regulatory violation;

14   we are not.

15          On Friday, the SEC attempted to clarify its

16   position with respect to its objection.  In its

17   clarification, they said on four separate occasions that

18   these were statements of the staff and not the Commission.

19          Why does that matter?  Well, for one thing, the

20   staff cannot bring lawsuits without approval from the

21   Commission.  The staff cannot initiate an administrative

22   proceeding without Commissioner approval.

23          In a statement from then-Chairman Jay Clayton, he

24   stated that, quote, "The Commission's long-standing position

25   is that all staff statements are nonbinding and create no

Page 90

1    enforceable legal rights or obligations of the Commission or

2    other parties."

3              In short, this statement from the SEC staff about

4    what they believe is not something that we can meaningfully

5    consider when weighing against $100 million of customer

6    value.

7              The staff stated that the VGX, quote, "has the

8    attributes of a securities transaction."  So even the staff

9    is not willing to say that VGX is a security.

10             With respect to Binance, they say that Binance.US

11   is operating as an unregistered securities exchange.  Well,

12   what does that mean?  You could be operating an unregistered

13   securities exchange because one token that you're selling is

14   a security, there's ten tokens that you're selling as a

15   security, there's a hundred tokens that you're selling as a

16   security.  We don't know what they're thinking and they're

17   not willing to tell us.

18             Let's say, for example, they think BUSD stablecoin

19   is a security.  Okay.  There was a statement a few weeks ago

20   from Paxos indicating that they were being investigated for

21   BUSD.  Okay.  The committee and its professionals, the

22   debtors and its professionals, did not consider the Treasury

23   and BUSD in connection with their valuation of whether

24   Binance.US can close the deal; they have enough cash in the

25   bank to do so.

1           When you look at the recent actions against crypto

2      exchanges and settlements, on January 19th, the SEC settled

3      charges with Nexo for $22.5 million; on February 9th, the

4      SEC settled with Kraken for $30 million.  Those amounts,

5      even multiples of those amounts, would not impact

6      Binance.US's ability to close the deal based on the

7      diligence we've performed.

8           The SEC's stated purpose is to protect investors.

9      The SEC's refusal to take a firm position here stands to

10     harm retail investors.  The SEC staff is asking the Court,

11     the UCC, and the debtors to eradicate $100 million of

12     creditor recovery based on a position that the staff members

13     cannot even get the Commission to support.  They are saying

14     we are on notice that there may be a regulatory violation.

15          From where I sit, the SEC staff statement appears

16     to be designed to intimidate the professionals and the

17     fiduciaries to refuse to go forward with the plan, hoping

18     that we will be afraid of having a decision called into

19     question and we will choose to instead erase over $100

20     million of customer recovery.  We are not going to do that.

21          We have had one goal from the outset of this case:

22     get as much crypto back to customers as quickly as possible.

23     The SEC's refusal to take a firm position does not alter

24     that goal.  The committee supports the plan.

25              THE COURT:  All right.  Thank you.

Page 92

1              Mr. Hendershott, it's your turn.

2              MR. HENDERSHOTT:  Yes, sir, thank you.  I just

3    want to tag onto Mr. Morrissey as a representative of DOJ

4    and address comments that you've made, as well as we've

5    heard throughout this entire trial comments from counsel to

6    the debtors-in-possession that by not hearing from a

7    plethora of creditors that means agreement with what is

8    going on.

9              I understand the counsel for the debtors, they're

10   being paid to advance their agenda and that's why they would

11   promote that false narrative, but I know, Your Honor, I

12   don't believe you have an agenda.  And I just want to call

13   out that it's an undue burden, you know, to expect creditors

14   to miss work, you know, spend all of their nights and

15   weekends, you know, reading thousands of documents.

16             The Department of Justice is the voice of

17   creditors here.  Every single objection and motion that the

18   Department of Justice has pushed throughout this trial,

19   starting with trying to object to the KERP, which actually

20   had 2,000 creditors documented as going against it, and that

21   information was held from me, Your Honor, when you

22   specifically asked what is the creditor perspective of that.

23             They also try to protect us with data privacy

24   ombudsmen.  And you've heard the handful of creditors that

25   have sacrificed their work relationships and they're

Page 93

1    attending these meetings at personal sacrifice.

2            Everyone is in agreement with the Department of

3    Justice and it's unfair to state that if thousands of

4    creditors do not invest the time for every nuance of this

5    trial that he does not speak on our behalf.  And I just

6    wanted to call that out to your attention for your

7    consideration.

8            THE COURT:  Okay.  Just to make clear, Mr.

9    Hendershott, today there are substantive issues that I -- as

10   to whether the plan complies with the requirements of the

11   Bankruptcy Code and, of course, I'll hear everybody's

12   testimony about that.  There's also the issue for the final

13   approval of the disclosure statement and my comments about

14   not having a creditor complaint about the disclosure

15   statement I think reflected the fact that the information

16   that Mr. Morrissey says should have been in that lengthy

17   document, but wasn't, I said I hadn't gotten any complaints

18   from creditors to that effect.

19           Now, what you just said really is to the effect

20   that creditors shouldn't have to read all of that, but that

21   doesn't really support Mr. Morrissey's objection because

22   what Mr. Morrissey is saying is that you should have read

23   all of it and that there should have been even more in it

24   for you to read, which seems different from what you just

25   said to me.

1              MR. HENDERSHOTT:  I apologize, sir, if I misspoke,

2       but that was not my intent.  I never intended to say

3       creditors should not have read the disclosure statement.  I

4       was certainly -- my intent was to call out that I wished

5       more credence of Mr. Morrissey and his department

6       representing and speaking on behalf of the creditors was

7       taken into consideration.

8              Thank you.

9              MS. PROVINO:  Exactly.  This is Lisa Provino, pro

10      se again, I support that last statement.  And we are reading

11      the documents, Your Honor, that's why I brought up the

12      deletion of the Stretto documents just for the record.

13             THE COURT:  Okay.

14             MS. RYAN:  Your Honor, this is Ms. Ryan with the

15      Texas Attorney General's Office.  We did have a disclosure

16      statement objection and if I may address it now?

17             THE COURT:  Yes.

18             MS. RYAN:  So, in reading the disclosure

19      statement, the information pertinent to customers was not

20      easily laid out for the consumers to see and digest.  And

21      one particular segment of the information that was buried is

22      these Alameda claims and what will happen to the customers,

23      the consumers if the debtor is not successful in fighting

24      these claims.

25             And I don't think any of the creditors objected to

1    that because they didn't see it, it wasn't there.  It was

2    hard to tease out.

3                And so, in that regard --

4                THE COURT:  The information --

5                MS. RYAN:  Yes, sir.

6                THE COURT:  -- the information about the effect of

7    the Alameda's claims that you say should have been in the

8    disclosure statement, you cite that information and it comes

9    from the disclosure statement.  The very information that

10   you say should have been in the disclosure statement is

11   information you took from the disclosure statement.

12               MS. RYAN:  You're right, Your Honor.  My point is

13   it was buried in this disclosure statement.

14               When we're working with this many consumers -- I

15   do lots of work for consumer protection in bankruptcy --

16   generally, we make those things easy to read and easy to

17   find and in this disclosure statement they just aren't.  In

18   fact, on the page that I would assume most consumers would

19   look at, there is no reference to the drastic cut of the

20   returns --

21               THE COURT:  I don't --

22               MS. RYAN:  -- if Alameda is successful.

23               THE COURT:  -- I don't agree with you.  You know,

24   there are so many things that the Bankruptcy Code requires

25   to be in and practice requires to be in a disclosure

Page 96

1    statement, and then so many additional things that the

2    debtor added because of objections and criticisms and

3    comments that were received in January, that to say that all

4    of that somehow should have been done in an easily-read-and-

5    digestible form, you can't do it, you just can't.

6    Disclosure statements necessarily are long; they necessarily

7    have things in different sections.  You can't take

8    everything that every individual thinks is important and put

9    it on page 1 because there's 180 pages of things that

10   everybody would want to be on page 1.  You just can't do it.

11         It is in there and I'm not going to say that it

12   was inadequate just because you don't think it had as much

13   highlighting or was as easy to find as you think it should

14   have been.

15         MS. RYAN:  Your Honor, I understand your point and

16   I still object.  I do believe that that should have been

17   highlighted better for the consumers and it wasn't.  And I

18   think an effect of that lack of -- that lack of highlighting

19   for the consumers is the fact we have no idea of what a

20   bottom return number would be, it's been quoted in the

21   disclosure statement as low as 24 percent, it's been quoted

22   in testimony as high as 48 percent.

23         The consumers have really no understanding of the

24   bottom of their return and I think the disclosure statement

25   was also very inadequate in that manner.

1              THE COURT:  Well, because some of the

2     distributions will be in the form of cryptocurrencies and

3     because cryptocurrency values can fluctuate quite widely,

4     there is no practical ability to be extremely precise in

5     what people will actually get, but the debtors did offer an

6     analysis in the liquidation analysis of specifically what

7     recoveries would be under the financial transactions, what

8     recoveries would be if they toggled to the other plan, and

9     what recoveries would be if instead they were to be under

10    Chapter 7.

11             And they did that, frankly, I think, as precisely

12    as circumstances permitted.  Given the nature of this

13    business, given the nature of some of the uncertainties, and

14    given the nature of the assets, I don't know how anybody

15    could have been any more precise than they were.

16             MS. RYAN:  Your Honor, I believe they could have

17    added one more column that said recoveries if Alameda is

18    successful, and that would have given an estimated bottom

19    number and that was not disclosed.

20             THE COURT:  But it's in a footnote on the same

21    page, isn't it?

22             MS. RYAN:  Your Honor, it is -- the footnote on

23    that page does not tell us any type of percentage and it

24    doesn't actually point to the consumers' claims or

25    accountholders' claims, it's in a general section at the

1    top.  And so I don't think that it was meaningful for the

2    accountholders.

3              THE COURT:  By the way, I know you were heard when

4    we considered the initial approval of the disclosure

5    statement in January, did you raise this issue then?

6              MS. RYAN:  Honestly, Your Honor, I don't remember.

7              THE COURT:  Okay.

8              MS. PROVINO:  What date was that?  I can check.

9    This is Lisa Provino.  I wrote notes.

10             THE COURT:  In January, I don't remember the date.

11             MR. MORRISSEY:  Your Honor, Richard Morrissey for

12   the U.S. Trustee.  Actually, I raised the issue and a

13   footnote was added, and my questions or comments were very

14   similar to Ms. Ryan's that they were hidden in -- certain

15   things were hidden in different parts of the disclosure

16   statement at the time.  I don't remember, however, whether

17   Ms. Ryan chimed in.

18             THE COURT:  But we discussed it and the change we

19   made is what I approved, right?

20             MR. MORRISSEY:  Yes, Your Honor.

21             THE COURT:  I don't think anybody complained that

22   the change we made didn't adequately address the objection.

23             MR. MORRISSEY:  Your Honor, there's another aspect

24   of that as well.  The intercompany transfers, the litigation

25   on that, will also affect possibly the distribution.

Page 99

1            THE COURT:  One at a time.

2            MR. MORRISSEY:  Yes.

3            THE COURT:  So, in terms of the Alameda, you know,

4    I vaguely remember some issues coming up and we put this

5    information in specifically to address them, and my

6    understanding is that that took care of the objection and

7    that there -- you know, to say now that it just wasn't

8    highlighted or was in the wrong place, I don't think that's

9    sufficient for me to find that the disclosure statement was

10   inadequate.  Okay?

11           MS. RYAN:  Okay, Your Honor.  I had one other

12   issue that I wanted to raise now and then when we come to

13   the releases and exculpation issue, I'll save my arguments

14   for then.

15           Texas does have concerns with the security on

16   Binance's side and we believe that Texas is an unsupported

17   jurisdiction whose customers can't go over to Binance right

18   now.  Their personally identifiable information should not

19   be transferred to Binance.

20           I understand Binance bought the customer list and

21   so information such as emails, so they can market once they

22   are licensed in Texas, that's fine, that should go over, but

23   bank accounts and other personally identifiable information

24   transferring I think is not appropriate in this case.

25           THE COURT:  Okay.

Page 100

```
 1              MS. RYAN:  And then, finally, on the feasibility

 2    of the plan, Texas is concerned with the lack of information

 3    on Binance's wherewithal.  Binance abandoned their

 4    Department of Banking license application after a year for

 5    failure to give us financial information that was necessary.

 6    Binance's documents --

 7              THE COURT:  Wasn't that --

 8              MS. RYAN:  -- that were just filed --

 9              THE COURT:  -- wasn't that a refusal -- in Texas,

10    wasn't that a refusal to give you financial statements of

11    its parent company, isn't that what led to the --

12              MS. RYAN:  Your Honor, I would need to go back and

13    look at the abandonment letter.  Regardless, it is a

14    qualification to be licensed in Texas and they would not

15    provide us the information.

16              THE COURT:  But --

17              MS. RYAN:  Secondarily, the --

18              THE COURT:  -- as I recall -- as I recall your

19    prior submissions on this point, Binance.US gave you and was

20    willing to answer your questions about its finances, but

21    declined to give you information about the finances of its

22    parent company; right?

23              MS. RYAN:  I again would have to go back and

24    review the documents, but the point is Binance doesn't want

25    to disclose financial information when regulators require it
```

```
 1    and, whether it was Binance.US or Binance.com, it was a

 2    requirement to be licensed in Texas and they refused to do

 3    so.

 4             Likewise, in the documents uploaded to support the

 5    Binance due diligence done, no mention of Binance.US's

 6    wherewithal is mentioned in there, none.  All we have is

 7    hearsay testimony or testimony that they relied upon X, Y,

 8    Z, and we've never seen X, Y, Z.  And so we actually are

 9    very concerned with Binance's financials as there's very

10    little to no information in the record about it.

11             And that's all of my argument for now, Your Honor.

12             THE COURT:  If Binance doesn't have the 20 million

13    or 35 million or whatever it's supposed to pay at closing,

14    then the deal will be done, right?

15             MS. RYAN:  Correct.

16             THE COURT:  So --

17             MS. RYAN:  Well, that --

18             THE COURT:  -- what do we need to --

19             MS. RYAN:  -- my -- Your Honor, my big concern is

20    -- you know, 25 or 30 million, they can probably pay that, I

21    haven't seen any proof that they could -- my concern is, six

22    weeks after the sale closes Binance ends up in bankruptcy

23    and all of the accountholders that transferred over are once

24    again in this same position.

25             We don't have evidence that Binance won't end up
```

Page 102

1    in a liquidation like FTX did, Your Honor.  We don't have

2    evidence as to their financials --

3              THE COURT:  We don't have any --

4              MS. RYAN:  -- to make sure they won't.

5              THE COURT:  We don't have any evidence that they

6    will, do we?

7              MS. RYAN:  Your Honor, it's the debtor's burden to

8    prove that Binance is -- that it is a good business judgment

9    to sell to Binance and right now I don't see anything that

10   proves Binance isn't going to end up in bankruptcy too

11   because we have no financial information.

12             THE COURT:  But when you say you don't see enough

13   to prove it, you're just saying that you wouldn't make the

14   same judgment.  You don't trust --

15             MS. RYAN:  No, I don't --

16             THE COURT:  -- the evidence that the debtors have

17   relied on?

18             MS. RYAN:  No, that's correct because the debtors

19   haven't shown us what they relied on for financial

20   information.  They've testified as to hearsay and they've

21   testified that they relied on some documents, which nobody

22   has ever seen except them.  And so, no, I don't trust that

23   evidence, Your Honor.

24             THE COURT:  Okay.  Anything else --

25             MS. RYAN:  Thank you.

1            THE COURT:  -- Ms. Ryan?

2            MS. RYAN:  Not at this time, Your Honor.  I will

3    reserve some argument for the releases and exculpation

4    provisions.  Thank you.

5            MR. GOLDBERG:  Your Honor, Adam Goldberg of Latham

6    & Watkins on behalf of Binance.US, if I may respond to a few

7    points.

8            First, on the personal information point, we are

9    working on coming back to Your Honor on that issue, but I

10   think, generally speaking, this is a fundamental and core

11   aspect of the deal that is the basis for the economic

12   transaction embedded in the $20 million purchase price.

13           On the point of the abandonment of the application

14   as Texas asserts, Binance.US completely disagrees with that

15   characterization.  In Binance.US's view, they made every

16   effort to provide financial information that was requested

17   of Texas to them.  Texas found that that was not sufficient

18   and deemed the application withdrawn.  Binance is working on

19   providing -- on filing a new application, which we expect to

20   be done as soon as possible.

21           And Binance.US continues to make every effort to

22   work with the State of Texas to resolve its issues to make

23   it -- take it out of the category of being an unsupported

24   jurisdiction, as we have done with Vermont.

25           On the question of feasibility and Binance's

Page 104

1     financial wherewithal to perform the transaction, I think

2     Your Honor has correctly found that the question of

3     feasibility is -- that that is not a question of feasibility

4     in this case; it is a question of the debtor's business

5     judgment.  Binance.US provided bank statements to the

6     debtors as the basis for their business judgment.  The State

7     of Texas, if they distrusted that information and the

8     debtor's diligence, had every opportunity to conduct

9     discovery on Binance.US and they did not do so.

10            In our view, the debtor's business judgment is

11    correct in this case because the Binance.US transaction does

12    what we have set out to do from day one of our involvement

13    in this process going back to last year and that is deliver

14    cryptocurrency to customers as quickly as possible.

15            Thank you, Your Honor.

16            THE COURT:  All right.  Anything --

17            MS. DIRESTA:  Your Honor, I'm a pro se creditor,

18    am I allowed to speak to the security issues that have been

19    brought up thus far or do I have to wait for a different

20    time?

21            THE COURT:  Go ahead.  Who is this?

22            MS. DIRESTA:  I am Gina DiResta; I'm a pro se

23    creditor.  And I read the Binance officer's certificate and

24    one of the things -- or a couple of things that -- let me

25    just go to it -- a couple of the things that they mention,

Page 105

1    for example, is like it says only employees of the company

2    are able to -- this is number 5 -- only employees of the

3    company are able to move or withdraw the customer assets

4    from the company's platform.

5         So there's that portion about my assets and then I

6    think it's number 8 where they talk about access to my

7    personal identifiable information.  It doesn't say anything

8    about whether my assets or my personal information is in the

9    U.S., like is it being, you know, held here in the U.S., or

10   is it being possibly held say like in China or something

11   like that?

12        So that does concern me that it doesn't say

13   anything like that.

14        And the other concern that I have is it says, you

15   know, only the company's employees or in the security

16   section it says only the authorized person, but, you know,

17   there are a lot of companies that kind of comingle their

18   employees.  So there's nothing in there that says absolutely

19   no one at Binance.com, which is the global (indiscernible)

20   has access to any of my funds or personal information at

21   Binance.US.

22        So those things I find concerning from a security

23   perspective.

24        THE COURT:  All right.  Who wishes to address that

25   objection?

Page 106

1          MR. GOLDBERG:  Your Honor, Adam Goldberg of Latham

2      & Watkins on behalf of Binance.US.

3          We are -- I think we have provided ample diligence

4      to the debtors on these issues that evidences the security

5      of the information and currency, cryptocurrency that is held

6      by Binance.US.  I am working with my client in order to be

7      in a position to respond to the Court directly about where

8      data is held, which would be in accordance with the

9      Binance.US privacy policy, which is available online on the

10     Binance platform.

11          THE COURT:  What does the privacy policy say about

12     where information is held?

13          MR. GOLDBERG:  I'm working on that right now, Your

14     Honor.

15          THE COURT:  Okay.

16          MR. GOLDBERG:  I can understand --

17          MS. DIRESTA:  And I'm sorry, just --

18          MR. GOLDBERG:  -- that that is held in the United

19     States, Your Honor.

20          THE COURT:  Okay.

21          MS. DIRESTA:  What is held in the U.S.?  Is it my

22     personal information or also my crypto assets?

23          MR. GOLDBERG:  The response I just received is

24     that I understand personal data is held in the United

25     States.  Cryptocurrency is held in the United States and in

1    Japan.  So it's disclosed in the disclosure statement.

2            MS. DIRESTA:  And what about, you know, the

3    terminology of the company's employees and, you know, let's

4    just use CZ as an example.  CZ might be right now an

5    employee of Binance.com, but who's to say that at some point

6    he doesn't be considered an employee of Binance.US, and so

7    then he has access to my stuff.  And now, you know, then

8    Binance.com and Binance.US aren't independent like they

9    claim they are.

10           THE COURT:  Is CZ an employee of Binance.US and

11   does he have access to transfer customer assets off the

12   Binance.US platform?

13           MR. GOLDBERG:  Your Honor, CZ is the ultimate

14   beneficial owner in majority of Binance.US, not the

15   exclusive owner.  I can't get into the security protocols in

16   detail in an open proceeding for security reasons.  But my

17   understanding is that one individual would not be able to

18   cause the transfer of customer funds off of the U.S.

19   platform.

20           MS. DIRESTA:  But my question isn't how many

21   individuals can cause a transfer.  My question is can

22   Binance.com employees at some point then be considered

23   Binance.US employees, and therefore, someone like CZ now has

24   access to not just my crypto, but my personal information,

25   when they're supposed to be completely independent.

1          To me, independent means no employee of

2     Binance.com ever touches anything to do with Binance.US.

3          MR. GOLDBERG:  Your Honor, I can report to the

4     Court that CZ is not an employee and has no access to

5     personal information of customers or cryptocurrency of

6     customers on the Binance.US platform.  I think in terms of

7     the details of the division between Binance.US and

8     Binance.com, they are separate companies.  Binance.com does

9     not own Binance.US.  They are separate legal entities with

10    separate governance structures.  And I think the Debtor's

11    diligence should suffice to satisfy the statutory

12    requirements for their business judgment to go forward with

13    this deal.

14          MS. DIRESTA:  But the only person -- the only

15    employee you addressed is CZ because I gave him as an

16    example.  But what about all of the other employees, that no

17    Binance.com employees have access to Binance.US assets and

18    customer information; is that correct?  That no employees

19    whatsoever, not just CZ.

20          MR. AZMAN:  Your Honor, Darren Azman for the

21    committee.

22          While Mr. Goldberg looks for it, I think one thing

23    to remind the Court, at least as it relates to crypto and

24    creditors on the phone is, and this is by design, right, the

25    customers have two options here.  They can go (indiscernible

Page 109

1    - 12:42:38).  And even if they do go with Binance, they can

2    pull their crypto off of the platform immediately.  The

3    second that it's distributed and hits their account.

4              MR. GOLDBERG:  Your Honor, I would say two things.

5    One, the officer certificate which has been filed in the

6    Court, it says that only employees of the company are able

7    to move or withdraw customer assets from the company's

8    platform.

9              In addition to Mr. Azman's points, no one is

10   required to sign up to the Binance.US platform.  If they

11   don't want to be a Binance.US customer, they can have their

12   crypto liquidated and receive cash.

13             THE COURT:  The question was are there employees

14   of Binance.US who have access to the cryptocurrencies and

15   the power to move it, who are also officers or employees of

16   Binance.com?

17             MR. GOLDBERG:  Your Honor, my understanding is

18   that that is not the case.

19             THE COURT:  Okay.

20             MR. GOLDBERG:  In terms -- I assume Your Honor

21   meant that there would be officers of Binance.com who could

22   move assets, I believe you may have misspoken.  You said

23   Binance.US officers.

24             THE COURT:  Well, what I meant was, are there

25   people who do have that power because they are employees of

Page 110

1    Binance.US, who are also officers or employees of

2    Binance.com?

3              MR. GOLDBERG:  Your Honor, I understand my

4    client's listening in and reports no.

5              THE COURT:  Okay.

6              MR. GOLDBERG:  Thank you, Your Honor.

7              MS. DIRESTA:  Did I hear him correctly, Your

8    Honor?  He said no employees of Binance.com has access to

9    anything in  -- with Binance.US?

10             THE COURT:  I believe that is what he said.  He

11   said that the people who are employees at Binance.US, who

12   have access to and the ability to transfer cryptocurrency,

13   are not officers or employees of Binance.com.

14             MR. GOLDBERG:  That's correct, Your Honor.

15             MS. DIRESTA:  Okay.  And then to the point that

16   the UCC just made about how customers can go to Binance and

17   immediately remove their assets, I understand that.  But my

18   personal information still ends up with Binance.  So I do

19   still have that concern, regardless of whether I can remove

20   my assets immediately.  And also, what system does

21   Binance.US share with Binance.com?  Because I think the

22   comingling of systems is not safe and secure.  Whether

23   that's regarding my crypto assets or my personal

24   information.

25             THE COURT:  Well, I'm not sure, you know, we're

Page 111

1    past the evidentiary stage.  We're addressing objections

2    that have actually been made.  On this particular point, did

3    you make an objection about this?  How does this relate to

4    one of the objections that's actually been made?

5              MS. DIRESTA:  Just related to security issues, and

6    that was being talked about right now.

7              THE COURT:  And it's -- you want to know what

8    contract arrangements Binance.com and Binance.US may have?

9              MS. DIRESTA:  What systems do they share?  Because

10   it's -- let's say they share a system that then, you know,

11   can make them get access to my crypto or my personal

12   information, you know, even if it's not intentional or

13   inadvertently.  I just don't know how secure that is, if

14   they might be sharing systems.

15             THE COURT:  I'll give Binance a chance to give you

16   a quick answer to that, but I think we've strayed -- we have

17   so much to accomplish today in terms of the objections that

18   have actually been filed, and I think that strays into new

19   territory, to tell you the truth.

20             MR. GOLDBERG:  Your Honor, Adam Goldberg of Latham

21   & Watkins on behalf of Binance.US, again.

22             I think I would make a couple of points.  One is,

23   I'll refer to the officer's certificate, which has been

24   filed with the Court that makes clear that the company, that

25   is Binance.US's relationship with Binance.com, is limited to

Page 112

1    the common ultimate beneficial owner and three commercial

2    agreements that the company previously disclosed to the

3    sellers' advisors.  On a professionals' eyes only and

4    confidential basis in connection with the sellers' diligence

5    related to the purchase agreement.

6            Those matters are confidential, proprietary, and

7    would be harmful to the market insecurity to be disclosed.

8    I would believe that the Debtor's diligence, as well as the

9    committee's diligence, have taken a deep dive on these

10   issues.  I think this has become extremely apparent from all

11   of these proceedings.  The level of diligence conducted on a

12   buyer of assets in this proceeding has been extraordinary

13   and well beyond the norm.

14           It is, from my experience, much more than would

15   typically be conducted on a seller of assets.  And so I

16   would invite the Debtors and the creditors committee to

17   express any concerns that they have about these issues.  I

18   understand their diligence continues to be ongoing, as they

19   have testified, but that they are satisfied at present.

20           And finally, I would make the point, Your Honor,

21   that if anyone individually feels uncomfortable, no one is

22   required to sign up to Binance.com and have their assets on

23   -- excuse me, Binance.US and have their assets on the

24   Binance.US platform.  We are merely making the platform

25   available to achieve distributions of cryptocurrency to

1      customers that elect to receive it in that manner.

2                THE COURT:  Okay.

3                MR. GOLDBERG:  Thank you, Your Honor.

4                MS. DIRESTA:  Your Honor, they just keep bringing

5      up the whole crypto asset portion that I don't have to stay

6      on the platform, but my personal information does stay with

7      them, whether I want to open an account or not.  So of

8      course I had security concerns about -- and as you stated in

9      the very beginning of the hearing, why can't they just

10     simply have my email address if they want to market to me?

11     Why do they have to have my bank account, my -- a copy of

12     the photo of my driver's license, my biometric information,

13     and all of those other things.

14                You know, I'm -- for me, I'm already uncomfortable

15     for them having my email, but now they have all these other

16     things, so they keep saying, well, you know, you can sign up

17     and then immediately remove your assets.  That's my asset.

18     But you know what's more important to me is my personal

19     identifying information, especially when identity fraud and

20     hacking is very rampant nowadays.  I value that more than

21     thousands of dollars on a platform.

22                THE COURT:  Okay.  My understanding is they can't

23     distribute the crypto to you unless you become a customer,

24     and that you can't become a customer without them having to

25     know your customer and other information about you.

Page 114

1          I also understand from what they've said to day

2     that any customer has the option of telling Binance at any

3     time, not only to close an account but to delete all that

4     customer's personal information.

5          I can't make it any better than that.  I can't

6     order or suggest to Binance that it make distributions to

7     you without know your customer information and anti-money

8     laundering information, because I would probably be

9     directing Binance to do something that's illegal.  I can't

10    do that.

11         MS. DIRESTA:  And I understand that.  I just, like

12    I said, don't understand why they -- if I do not want to

13    open an account at all, why they can't just keep my email,

14    but leave the rest.  And I don't understand why I have to --

15    because earlier it was stated I would literally have to sign

16    up for a Binance account --

17         THE COURT:  That's an issue --

18         MS. DIRESTA:  -- and then request them to delete

19    it.

20         THE COURT:  That's the same issue that I have

21    raised as to why they need personal information of people

22    who don't want to open accounts.  And I think we're still

23    waiting to hear a definitive answer on what we can do about

24    that.  Okay?

25         MS. DIRESTA:  Okay.  Thank you so much, Your

1    Honor, for allowing me to speak.

2              THE COURT:  Okay.

3              MR. EVANS:  Your Honor, Joseph Evans from the

4    committee.

5              Just one thing.  There was a question as to

6    inviting us to talk if we weren't satisfied with the

7    diligence (indiscernible - 12:51:41).  I want to make clear

8    that the diligence process continues.

9              THE COURT:  I understand.  All right.

10             It's lunchtime.  I think we're going to break

11   until 1:40 for lunch.  And then we'll continue the argument.

12   Do we have any relief from the inflexible milestone, which

13   is beginning to look like quite a burden on the Court

14   because I not only have a lot of issues to rule on and a

15   decision to prepare (indiscernible - 12:52:17) but also the

16   extremely lengthy order to go through and mark up.

17             So do we have any relief from the proposed

18   milestone that that all be done by today?

19             MR. GOLDBERG:  Your Honor, Adam Goldberg of Latham

20   & Watkins on behalf of Binance.US.  That question has been

21   asked of our client.  We do not have an agreement on

22   extension of the milestone at this time.

23             Time is of the essence on this transaction.

24             THE COURT:  It may be of the essence, but you know

25   you've got an old man as a judge who can only do so much so

1      quickly.  So --

2                MR. GOLDBERG:  We're grateful for your attention

3      and efforts, Your Honor, and all the time you've made

4      available for us.  We'll be speaking to my client at lunch.

5                THE COURT:  Okay.  Please convey to them my strong

6      urging that they extend that milestone until tomorrow.

7                MR. GOLDBERG:  Thank you, Your Honor.

8           (Recessed at 12:53 p.m.; reconvened at 1:40 p.m.)

9                THE COURT:  Please be seated.

10               MS. OKIKE:  Good afternoon, Your Honor.  Christine

11     Okike of Kirkland and Ellis on behalf of the debtors.

12               Your Honor, we would propose to move next to the

13     unfair discrimination arguments.

14               THE COURT:  Okay.

15               MS. OKIKE:  So, Your Honor, Binance.US and the

16     debtors have had productive conversations with the

17     unsupported jurisdictions to date.  As we noted, we've

18     reached a deal with Vermont which will allow customers in

19     that state to receive in kind distributions.  And we're

20     committed to continuing to work with the other three states

21     to try to come up with solutions that will allow customers

22     in their states to also receive in kind distributions.

23               We have also made revisions to the plan to allow

24     customers in unsupported jurisdictions who do not want to

25     sign up for the Binance.US platform to elect not to and to

Page 117

1    receive cash distributions on the same timeline as customers

2    in the supported jurisdictions.

3            Your Honor, New York and Texas allege that the

4    plan unfairly discriminates against account holders in their

5    states by potentially delaying their recoveries relative to

6    account holders in supported jurisdictions and by providing

7    that they will receive their distributions in cash instead

8    of crypto if Binance.US does not get the necessary

9    regulatory approvals.

10           Your Honor, we took a look at the voting results

11   to see what New York and Texas customers want.  And 95.68

12   percent of Texas customers that voted, voted in favor of the

13   plan and 96.28 percent of New York customers that voted,

14   voted in favor of the plan.

15           We also confirmed that none of the customers that

16   filed objections are located in New York or Texas based on

17   our most recent contact information that the debtors have

18   for them.

19           Your Honor, while we're hopeful that we will reach

20   agreements with all the unsupported states, the plan as

21   amended does not unfairly discriminate --

22           THE COURT:  Did you say none of the objectors or

23   none of the negative votes?

24           MS. OKIKE:  None of the objectors based off of our

25   books and records including the ones who had -- did not file

Page 118

1    objections, but have raised concerns during the hearing are

2    located in New York and Texas.  I do recall there was one --

3              THE COURT:  There was somebody --

4              MS. OKIKE:  -- woman --

5              THE COURT:  -- who identified herself as --

6              MS. OKIKE:  -- who identified --

7              THE COURT:  -- from Texas.

8              MS. OKIKE:  -- herself as Texas.  We don't have

9    her listed as Texas --

10             THE COURT:  Okay.

11             MS. OKIKE:  -- but she may have moved.

12             THE COURT:  Okay.

13             MS. OKIKE:  So, Your Honor, while we'll hope -- we

14   are hopeful that we will reach agreements with all the

15   unsupported states, we do not believe that the plan unfairly

16   discriminates against account holders in unsupported

17   jurisdictions.

18             THE COURT:  How is that -- what is the deal you

19   reached with Vermont and why is that not good enough for all

20   of the states?

21             MS. OKIKE:  Your Honor, we hope that that deal is

22   good enough for all the states.  It was reached very

23   recently.  I think we filed it the night before the

24   confirmation hearing.  My understanding is that Hawaii is

25   likely to also sign onto that deal.  But, unfortunately, New

1    York did not really engage with us on any constructive

2    solutions.  We have had conversations with Texas that have

3    been productive, but I think they will require potentially a

4    more creative solution than Vermont given --

5             THE COURT:  The Texas submission, I was a little

6    befuddled because the Texas submission said, I think, that

7    other than with respect to stablecoins they don't think you

8    need any licenses to do what you want to do and that even as

9    to stablecoins, if I remember right, they thought you could

10   make the initial distributions.  It's just that Binance

11   couldn't continue to trade them without some --

12            MS. OKIKE:  Correct, Your Honor.

13            THE COURT:  -- further approvals.

14            MS. OKIKE:  And my understanding is that

15   Binance.US's existing infrastructure does not allow them to

16   turn off trading for specific coins.

17            THE COURT:  I see.

18            MS. OKIKE:  So Texas, if -- to the extent we are

19   able to reach a resolution will require a more creative

20   solution.

21          MS. WALL:  Judge Wiles, this is Jennifer Wall and I was

22   the one that spoke up last week.  I am a resident of Texas.

23   I have been a resident of Texas for 43 years.

24            THE COURT:  Okay.  Thank you, Ms. Wall.

25            MS. WALL:  Thank you.

Page 120

1          THE COURT:  Okay.  Go ahead, Ms. Okike.

2          MS. OKIKE:  So, Your Honor, our view is that all

3     account holders regardless of where they reside are going to

4     have their claims dollarized as of the petition date and are

5     going to receive the same pro rata recovery based on all

6     account holder claims.

7          Your Honor, we don't dispute that the ability of

8     customers in the unsupported jurisdictions to access their

9     recovery and the form of that recovery may be different from

10    customers in supported jurisdictions.  But any difference in

11    the outcome for account holders in New York, Texas or any

12    other unsupported jurisdiction is of the unsupported

13    jurisdiction's own making.

14         The unsupported jurisdictions can, as the other 47

15    states have, provide a way for their constituents to receive

16    distributions in kind.  And the fact that they have not does

17    not mean that the plan unfairly discriminates against

18    customers in those --

19         THE COURT:  Well, that's --

20         MS. OKIKE:  -- states.

21         THE COURT:  -- putting it a little pejoratively,

22    isn't it?  You make it sound like the jurisdictions are

23    acting out of spite or laziness or who knows what else.

24    It's really a question of they have different regulatory

25    requirements and you can only do what your existing licenses

1    permit you to do, isn't that what it is?

2              MS. OKIKE:  That's correct, Your Honor.  But they

3    can't have it both ways.  They can't ask us to comply with

4    regulations that don't permit us to make in kind

5    distributions and also act -- ask for their customers to

6    receive in kind distributions.

7              THE COURT:  Right.  As I understand it, the -- now

8    that you've equalized the ability to get cash distributions,

9    essentially what you've said is people who want in kind can

10   get it from Binance and they can get it as soon as they are

11   able to become Binance customers in compliance with the laws

12   of the jurisdiction -- the state where they reside.

13             MS. OKIKE:  Correct.

14             THE COURT:  And in some states that's more of a

15   problem than in others.

16             MS. OKIKE:  Correct.

17             THE COURT:  Okay.  Is somebody here representing

18   New York?

19             My --

20             MR. ST. JOHN:  Good afternoon, Your Honor.

21             THE COURT:  You know, my question for plan

22   purposes is whether the plan creates a discrimination, but

23   it sounds to me like the debtors and Binance would be more

24   than happy to distribute to New York customers exactly the

25   same way they do everywhere else, and that the only thing

Page 122

1    standing in the way of that is New York's regulations and

2    the status of licenses in New York state.

3            Why is that an impermissible discrimination by the

4    plan?

5            MR. ST. JOHN:  Good afternoon, Your Honor.  Jason

6    St. John for -- on behalf of the New York State Department

7    of Financial Services.

8            To answer your question, there are still two

9    differences between what a New Yorker today or frankly six

10   months post-closing is going to be able to achieve and the

11   same account holder in New Jersey or, you know, any of the

12   other 48 or the other states that are supported

13   jurisdictions.

14           One, there's still no possibility of, you know,

15   crypto in kind recovery and, two, to the timeline, the last

16   possible date for an account holder in the supported

17   jurisdictions to receive the dollarized value in cash of

18   their claim is three months post-closing.  And for New York,

19   that date is still six months post-closing even under the

20   amended plan.

21           We want to note, of course, that, you know, the

22   amendments that, you know, Your Honor encouraged on Friday

23   and that the debtors of Binance --

24           THE COURT:  It was only -- it's only six months if

25   there's a New York customer who would prefer to wait and see

Page 123

1    if they can become a Binance customer, right?

2            MR. ST. JOHN:  Yes, Your Honor.  But part of the

3    basis of our objection is that the option of a in kind

4    recovery due to, you know, Binance licensure six months

5    post-closing isn't a realistic scenario.  So the option

6    that's being given to those account holders isn't a

7    realistic one grounded in fact.

8            You know, we haven't heard anything other than a

9    -- you know, of statements in the reply memorandum of law

10   and statements in the plan that they will try for licensure

11   to show that that is actually a realistic possibility.

12           So the idea of holding off on recovery for New

13   Yorkers until, you know, possibly six months post-closing

14   for those who, you know, have perhaps failed to elect to

15   receive their recovery in cash still prevents an instance of

16   unfair discrimination in that point.  It's not a realistic

17   option.

18           THE COURT:  Well, there's a difference between

19   saying it's not a realistic option and that it's an unfair

20   discrimination.  Nobody's -- no customer is forced to wait

21   the six months.  They -- if they want their crypto in kind

22   and want to take their chances on being a Binance customer,

23   they can make that choice, take their chances whether

24   Binance gets the approvals or not.

25           But I don't -- I just don't see how this is -- you

Page 124

1    know, they're trying to do what they can do consistent with

2    what the regulatory restrictions are.  You know, in your

3    papers you said it's their own fault if they don't already

4    have the approvals.  That doesn't mean that the plan is

5    creating a discrimination.  Maybe it means that the past has

6    created a discrimination, but it doesn't mean that the plan

7    is -- we can only deal with the situation as it exists.

8              MR. ST. JOHN:  Uh-huh.

9              THE COURT:  And I think you would be the first one

10   to admit that they cannot do in New York right away what

11   they're proposing to do for Ohio customers.

12             MR. ST. JOHN:  That's absolutely correct.

13             THE COURT:  I presume you're not suggesting that

14   we should deny all residents of all other states the right

15   to get crypto currency distributions.

16             MR. ST. JOHN:  Absolutely not, Your Honor.  Our

17   objection is --

18             THE COURT:  That's --

19             MR. ST. JOHN:  -- focused on New Yorkers.

20             THE COURT:  -- the only way I can think of to make

21   it equal.  There's no other way to do it unless we make

22   everybody wait until whenever the regulatory process drags

23   out or unless we deny everybody in the country the

24   opportunity to get something just because New York customers

25   can't get it.

1          Is there any other way to make it equal in the way

2     that you suggest?

3          MR. ST. JOHN:  Well, one, I think, immediate and

4     relatively easy adjustment would be rather than three months

5     post-closing being the date by which New Yorkers may elect

6     to receive cash, as it is with the supported jurisdictions

7     simply have that be the date in which they will receive a

8     dollarized value of their claim.

9          THE COURT:  Well, but your complaint is about

10    equal -- by the way, it's phrased as unfair discrimination

11    which I think as a bankruptcy matter is the wrong term

12    because I don't need a cram down as to this class.  I have

13    an acceptance by this class.  I think your real argument is

14    whether all members of the class are being treated the same.

15         MR. ST. JOHN:  Yes, Your Honor.  I apologize.

16         THE COURT:  And even that standard is they have to

17    be treated the same unless they elect otherwise.  So if a

18    New York customer elects not to cash out and to wait to see

19    if he or she can get crypto currency in kind from Binance,

20    how does that violate the requirements of the code?

21         MR. ST. JOHN:  Right.

22         The difference in timeline is, you know, again, as

23    we've alleged unequal treatment within a class.  The --

24    while case law certainly does allow, as Your Honor's pointed

25    out and the debtors pointed out in their reply memorandum of

Page 126

```
 1   law, differences in either type of consideration or even
 2   timeline on distribution for reasons, we would allege there
 3   hasn't really been a reason here.  The debtors have and
 4   Binance have held out the hope of licensure or negotiation
 5   within that six-month time frame.  They -- you know, they
 6   haven't really produced any evidence to show that the idea
 7   or the, you know, perspective being --
 8            THE COURT:  But, you know, what if they had said
 9   customers in New York have to wait a year and a half.  That
10   would correspond to your regulatory timeline maybe, but it
11   seems to me that would be worse for New York customers
12            MR. ST. JOHN:  We would be making the same
13   objection, Your Honor, of trying to, you know, get quicker
14   recovery for New York account holders.  But perhaps I'm
15   missing your point.
16            THE COURT:  So you don't want any New York
17   customers to have the right to wait to see if Binance can
18   get approval?
19            MR. ST. JOHN:  Yes, Your Honor.  That's one way of
20   putting it.  We could also perhaps phrase it as, you know,
21   we don't think that the debtors and Binance have shown
22   through the plan or the supplemental materials that that's a
23   realistic option for New York account holders such that --
24            THE COURT:  Why can't New York account holders
25   make that decision for themselves?
```

1          MR. ST. JOHN:  Even if they were, Your Honor, it

2     is still an extra three months away from the latest possible

3     account holder in Ohio or New Jersey or a supporting

4     jurisdiction.

5          THE COURT:  But they can -- you know, it's only if

6     they so elect, right?

7          MR. ST. JOHN:  Yes, Your Honor.  Although, if I

8     may respond.  You know, given the number of creditors who

9     voted on the current plan, there may be reason to suspect

10    that, you know, creditors may not -- may miss a -- you know,

11    an election that's been given to them by the debtors to

12    receive their cash, you know, value and then at that point

13    their recovery would be delayed by --

14         THE COURT:  All right.  But it's not --

15         MR. ST. JOHN:  -- three months.

16         THE COURT:  -- unequal treatment under the plan if

17    people pay no attention and fail to take advantage of the

18    rights that they're given.  There's only --

19         MR. ST. JOHN:  it is.

20         THE COURT:  There's only so much I can do.  You

21    know, when you have this many people involved, is somebody

22    going to sleep on their rights, ignore things, fail to make

23    claims.  All kinds of things can happen.  There's only so

24    much I can do.

25         MR. ST. JOHN:  Of course, Your Honor.

Page 128

1          THE COURT:  Right.  And so if people have the

2     right to cash out at exactly the same time, that's the

3     feature that worried me because it did seem to be in the

4     parties' control and it did seem to be a difference that I

5     was having trouble thinking of a justification for.

6          But --

7          MR. ST. JOHN:  And we appreciate the parties

8     reaching, you know --

9          THE COURT:  Yeah.  But the --

10         MR. ST. JOHN:  -- an amendment (sic) on that

11    point.

12         THE COURT:  -- ability to -- but they cannot do --

13    they cannot give crypto, so you're saying that equal

14    treatment would mean cashing them out even if they don't

15    want to be cashed out, even if they would prefer to wait to

16    see if they might still get in kind distributions.  How is

17    that the same treatment?

18         MR. ST. JOHN:  Your Honor, again, so we are the

19    licensing entity.  You know, as the debtors have pointed

20    out, that's, you know, seemingly, you know, holding up this

21    in kind distribution.  And we're objecting on the grounds

22    that we don't think that option or that -- to New Yorkers to

23    wait to see if there will be in kind distributions is one

24    that's grounded in fact or a realistic scenario even six

25    months post-closing.

Page 129

1           THE COURT:  Why does this take so long?

2           MR. ST. JOHN:  Your Honor, New York is a pretty

3   strict virtual currency licensing regime.

4           THE COURT:  That just tells me that it takes long.

5       (Laughter)

6           THE COURT:  Why does it -- what does that mean?

7   What has to be done and why does that take so long?

8           MR. ST. JOHN:  Your Honor, there's a number of

9   requirements that go into virtual, you know, currency

10  licensing regime.  You know, showing reserve requirements,

11  of course meeting certain cyber security regulations and

12  showings.  You know, as Your Honor likely knows, you know,

13  complying with regulatory requirements can certainly just

14  take a while, which is sometimes at odds with the bankruptcy

15  goal of returning accounts or, you know, or accounts or

16  claims to creditors as quickly as possible.

17          And so in this case we do have a conflict here.

18  But New York as the licensing entity can simply waive its

19  licensing requirements to allow Binance to make that

20  distribution.

21          THE COURT:  And what about the Vermont solution,

22  why doesn't that work for New York?

23          MR. ST. JOHN:  Of course, Your Honor.

24          From my understanding, but I will defer to the

25  debtors and to Binance if I misunderstand it, the Vermont

Page 130

```
1    solution is a full trading account that limits staking and

2    has a sunset date which is not -- that's essentially

3    granting licensure to Binance for those New York account

4    holders if it allows full trading.  That's not a, from our

5    view, a particularly limited account that would or a limited

6    licensure that would be a possible negotiation for us.

7             Of course, I defer to the debtors and Binance if

8    I've misstated that deal.

9             THE COURT:  I'm sorry.

10            MR. ST. JOHN:  I would defer to the debtors and

11   Binance if I have misunderstood the deal with Vermont.

12            THE COURT:  Well, I think any difference in

13   treatment that results here is the result of regulatory

14   constraints.  And the particular differences that you

15   complained about, which is the ability to get crypto

16   currency, is that is -- that would not be solved by the

17   solution that you suggested, which is just forcing everybody

18   to get cashed out in three months whether they want to or

19   not.  It seems to me that forcing that decision on everybody

20   actually would create more of a differentiation.

21            As long as Binance is trying to get licensed in

22   New York, and so long as people in New York would prefer to

23   take their chances and possibly get their crypto in kind, it

24   seems to me that the debtor's proposal actually goes further

25   in the way of kind of providing the same opportunities, as
```

Page 131

1    least as far as they can in light of regulatory constraints.

2              And I don't think your proposed solution is really

3    an answer.  I think your solution would make it worse.

4              MR. ST. JOHN:  Okay.  Yes, Your Honor.  You know,

5    as our objection noted, you know, the objection was on two

6    points, both distribution of, you know, crypto in kind and

7    the timeline.  It seems like Your Honor has already answered

8    the timeline point.

9              On crypto in kind, again, the distribution

10   couldn't -- you know, right now would not happen through

11   Binance for regulatory reasons.  You know, obviously under

12   the toggle it would happen through Voyager.  It seems as

13   though, you know, it is still possible for Voyager to

14   execute the toggle.

15             THE COURT:  Well, but if they do the Binance deal,

16   they will have sold their platform.  They won't be able to

17   do anything.  They won't -- they couldn't transfer crypto

18   anymore than I could, I don't think.

19             MR. ST. JOHN:  They would still be effecting

20   transfers to --

21             THE COURT:  Well, probably they could do it better

22   than I could.

23        (Laughter)

24             THE COURT:  I think anybody in the room could

25   probably do it better than I could, but.

Page 132

1              MR. ST. JOHN:  Yes, Your Honor.

2              They would still be effecting transfers to

3    Binance, of course, and we recognize that's a different

4    scenario than transferring to account holders themselves.

5              THE COURT:  Yeah.  Okay.

6              MR. ST. JOHN:  Thank you, Your Honor.

7              THE COURT:  Does Texas have anything in addition

8    that they want to add on this issue?

9              MS. RYAN:  Yes, Your Honor.  For the record this

10   is Abigail Ryan with the Office of the Texas Attorney

11   General on behalf of the State Securities Board and the

12   Texas Department of Banking.

13             I was happy to see the change that our citizens

14   can get a cash out option as early as three months to be

15   aligned with supported jurisdictions' account holders that

16   choose not to go to Binance.  I think that makes it a more

17   fair plan in that regard.

18             And while we would love to see our citizens get

19   their crypto back, at this point due to the set up of our

20   regulatory (indiscernible) here in Texas, that's not an

21   option.

22             However, we have been in conversations with

23   Binance and the debtors and are looking to do some sort

24   of an agreement like Vermont, but as Ms. Okike said, it will

25   have to be a little different based upon our rules here.

1    The trading of the stablecoin, the ability to stake, those

2    things we can't agree to.  But if Binance can find a way to

3    do a withdrawal only account, I think that's something that

4    we definitely could consider and we will move forward in

5    these discussions in hopes that we can come to an agreement.

6            THE COURT:  Okay.

7            MS. WALL:  I will say that from a Texas resident,

8    that is wonderful news for all the residents in Texas.  So

9    thank you very much for (indiscernible) that.

10           MS. RYAN:  Thank you.  Absolutely.

11           And if you have any questions, Your Honor, I'm

12   happy to answer them.

13           THE COURT:  No.  It sounds like as long as we've

14   made the cash out option that you understand that there's

15   only so much that can be done in terms of making crypto

16   available in kind and that it's not really a bankruptcy

17   issue at that point.

18           And I -- to the extent you can work it out with

19   the parties, I encourage you to do so and hope you are able

20   to do so.

21           MS. RYAN:  Thank you, Your Honor.  Me, too.

22           THE COURT:  All right.  Is there anybody else that

23   wants to be heard on the, what I will call the unequal

24   treatment or unfair discrimination argument?

25           MR. NEWSOM:  Your Honor, this is Dan Newsom, pro

Page 134

1    se creditor.  I did file an objection as it relates to the

2    plan for VGX, specifically Section 1123(a)(4) in terms of

3    unequal treatment for VGX account holders.

4            THE COURT:  Yeah.  I saw your objection, but I was

5    having a little trouble understanding just what you think is

6    unequal about the treatment.

7            MR. NEWSOM:  Well, I would be happy to expound on

8    that, Your Honor.

9            I believe -- first it's important to state that in

10   the event that the smart contract is not sold, it's

11   important for Your Honor to understand that VGX has no

12   underlying technology or utilities, and in the event that

13   it's not sold, even the treasury statement states that VGX

14   may decline in value and may have no value post confirmation

15   of the plan.

16            So as it relates to discriminatory treatment, I

17   bought VGX prior to petition date.  I bought a crypto

18   currency that had utility, had value from the described

19   organization which by their accounts had a straight road

20   trajectory.

21            Following the petition, in the event that the

22   smart contract is not sold, I would be receiving something

23   in kind that is not what I bought prior to petition where

24   other creditors in the same class are going to get back

25   their pro rata share of crypto currency that not

Page 135

1    fundamentally changed.

2           So in terms of opportunity for recovery, I believe

3    that in the event that the smart contract is not sold, the

4    VGX account holders would be discriminated against unfairly.

5           THE COURT:  What are the smart contracts and how

6    did they tie in with VGX, and would you say it's otherwise

7    -- otherwise there's no underlying contract?

8           Ms. Okike, can you explain all that to me in terms

9    a fourth grader would understand?

10          MS. OKIKE:  Sure.

11          Your Honor, so my understanding is that the smart

12   contracts determine the utility of the token, so the value

13   of the token.  And different entities could use the smart

14   contracts to generate utility for the token.

15          We are not selling the smart contacts (sic) in

16   connection with the Binance.US transaction.  Binance.US has

17   agreed to submit VGX for listing, to go through the process

18   of listing the token on the exchange.  It's not currently

19   listed.  And we are actively marketing the smart contracts

20   that underline the token.

21          Our hope is that we are able to sell the smart

22   contracts to a third party which will allow the token to

23   continue to have utility going forward.

24          Your Honor, in our view VGX is no different than

25   other tokens that don't have utility like Bitcoin or

Page 136

1    Dogecoin, and the value will fluctuate depending on a number

2    of different factors.  And from our perspective we don't

3    believe that there's unequal treatment with respect to VGX

4    because --

5              THE COURT:  VGX is on a blockchain transfer of the

6    same kind of ways that either Bitcoin or other --

7              MS. OKIKE:  Correct.

8              THE COURT:  Okay.  So it may not be as attractive

9    to people as Bitcoin, but it's just another coin in that

10   respect.

11             But these smart contracts that -- what exactly are

12   they and how do they support or generate value to VGX?

13             MS. OKIKE:  Your Honor, I may need to ask Mr.

14   Tishner (phonetic) to help on the technical aspects with

15   respect to that.

16             MR. AZMAN:  Your Honor, if you would like Mr.

17   Evans can probably provide us the technical information --

18             THE COURT:  That's fine.

19             MR. AZMAN:  -- rather than calling a witness.

20             MR. EVANS:  Joseph Evans, McDermott Will & Emery

21   on behalf of the committee.

22             Your Honor, each token has a smart contract.  That

23   smart contract dictates how a token will work.  And so what

24   the token is worth, if there are any rewards for staking the

25   token, for example, but as a technical underpinning for each

Page 137

1      token VGX is what's called an ERC20 token.  That means that

2      it's traded on the Thorium blockchain, like many other

3      tokens, but it has its own smart contract that governs how

4      transactions will work and what the token can be used for.

5              There's a little bit of a difference between

6      utility and smart contract.  Utility is what the token is

7      used for, meaning can I buy things with it, can I pay

8      transaction fees with it, can I use it to join a group, for

9      example.

10             But the smart contract is the technical software

11     that permits it to work.  And so what's being marketed is

12     the sale of that smart contract so a third party can use,

13     possibly withdraw the smart contract and initiate a new one

14     to allow for other usages of VGX.

15             THE COURT:  Okay.  Thank you.

16             And if nobody buys the smart contract, how could

17     anybody use VGX?

18             MR. EVANS:  Well, the smart contract is public.

19     It's out in the world.  And so VGX can still be traded and

20     used.  It's just -- there will be no entity behind it really

21     making improvements or trying to figure out how to use it in

22     a meaningful way.

23             And so I think what the concern is, is that

24     without any entity really using and promoting the VGX smart

25     contract, the value of VGX will decline and the amount of

Page 138

1    entities actually using it for something other than

2    speculation would decline.

3              THE COURT:  Do all crypto currencies have backing

4    of that kind and smart contracts of that kind?

5              MR. EVANS:  Yes.

6              THE COURT:  So Bitcoin, for example?

7              MR. EVANS:  Well, Bitcoin is a separate

8    blockchain, so Bitcoin is a blockchain that only -- that the

9    Bitcoin token is on.  Ethereum, for example, is another

10   blockchain and there are a variety of other tokens that are

11   offshoots of the Ethereum blockchain.  Those are called

12   ERC20 compliant.  Those each have their own smart contracts.

13             THE COURT:  Okay.  I'm pretty sure I would not

14   pass a test on this subject, but I think I understand.

15        (Laughter)

16             MR. EVANS:  Thank you, Your Honor.

17             MR. AZMAN:  Your Honor, I think what you're -- you

18   were getting at just now is that the risk of the VGX token

19   potentially not being worth anything is a risk that you

20   might have with any other token that's being distributed

21   such that if Bitcoin were to collapse tomorrow, you could

22   potentially make the same argument.

23             But I don't think that that is unfair or

24   discriminatory treatment.

25             THE COURT:  Well, I think in fairness to the

1    objection, what he's saying is VGX may have a much higher

2    chance of cratering than Bitcoin does.

3              Is that essentially what you're saying?

4              MR. NEWSOM:   Thank you, Your Honor.

5              I would actually go further to state that VGX

6    uniquely is singularly impacted by the actions or inactions

7    of the debtors.  And (indiscernible) that VGX has

8    (indiscernible) utility in the event that its smart contract

9    is not sold to an entity other than speculation is very

10   misleading, Your Honor.  No one's going to be able to sell

11   VGX as -- or use it as a currency, use it in any way.  It's

12   literally just an ERC20 branch -- excuse me -- branch chain

13   (sic).

14             What -- you can -- anybody can just create a chain

15   off of the ERC20 token and the smart contract allows VGX to

16   be (indiscernible) into infinity.  That precipitates the

17   drop in value even further.

18             So I -- there's really, really no value for VGX

19   other than (indiscernible) speculation -- I'm sorry -- I

20   said (indiscernible) in the court, Your Honor, but that's

21   what this might become.  And the chance that it has any

22   value at all if the debtors do not smell the smart contract

23   is nearly guaranteed.

24             THE COURT:  And what is the solution that you

25   suggest?  Are you saying that --

Page 140

1           MR. NEWSOM:  The specific relief for -- I'm sorry.

2     Go ahead.

3           THE COURT:  Yeah.  Are you saying the debtor

4     shouldn't distribute VGX to people who had it?

5           MR. NEWSOM:  I'm saying that in the event that

6     they don't smell the smart contract, they've admitted that

7     they remain hopeful that they can.  However, I think that

8     the FTC's unique statements from the last couple of days'

9     hearings might add additional barriers to that.

10          But in the event that they don't smell the smart

11    contract, that they allow VGX holders to -- or I guess

12    rather they liquidate the VGX position and distribute it in

13    UFC (sic) rather than giving it to them in kind so then have

14    to work with (indiscernible) digital code and instead

15    receive their pro rata share of UFC at the same algorithm

16    that all the other second class creditors are receiving.

17          THE COURT:  Of course, you and other holders of

18    VGX, if you don't want VGX, have the right to just get cash

19    for all your cryptocurrencies.  You just don't have the

20    right to kind of do that on a coin by coin basis, right?

21          MR. NEWSOM:  That is correct.  If I -- I had

22    multiple positions, Your Honor, but I did have a large VGX

23    position.  And if I wanted to take all of those positions in

24    cash, I would have to take all of them in cash, not just

25    VGX.

1          THE COURT:  Right.

2          Well, I'm not sure how as a practical matter it

3     would be possible for the debtors to do the re-balancings

4     and calculations that they would need to do if they were

5     going to give people a sort of coin by coin decision-making

6     opportunity as to whether as to that particular coin they

7     wanted cash or the coin.  I just -- what I do understand

8     about this, it seems to me that the task would be just about

9     impossible.

10          MR. NEWSOM:  Your Honor, I do think that it would

11     probably be an undue burden to a lot of the, you know, the

12     individual choices or cryptos to be liquidated either in

13     cash or in kind.  That probably would become plus.  However,

14     Voyager is -- or the VGX token is unique in that Voyager

15     actually has direct control over its stake.  And in the

16     event that it does not take the necessary steps

17     (indiscernible) smart contract, they are in -- they are

18     materially impacting the opportunity for recovery of VGX

19     account holders.

20          Further complicating the matter, Your Honor, is

21     that Voyager holds in my estimation somewhere in 35 million

22     plus of their own VGX tokens.  And if they go to liquidate

23     that on the open market, that further drops the price of the

24     token and therefore the opportunity of recovery for

25     creditors.

Page 142

1           There's a lot that Voyager can't control about the

2      outcome of the recovery for creditor.  And I think it is

3      unique and deserves a special carveout in the disclosure

4      statement and the plan in the event that they don't sell the

5      smart contract.  They have a responsibility to the creditors

6      (indiscernible).

7                THE COURT:  What's the debtor's response?

8                MS. OKIKE:  Your Honor, from the debtor's

9      perspective, I agree with -- and, apologies, I don't

10     remember the gentleman's name.  I agree that the debtor's --

11               THE COURT:  It's Mr. Newsom.

12               MS. OKIKE:  Mr. Newsom.

13               I agree with Mr. Newsom that the debtors do have

14     more control with respect to VGX just given that it's a

15     token obviously that is issued by Voyager.  We have every

16     intention of doing what we can to make sure that there is

17     utility going forward.  But the reality is, is that we are

18     either consummating a sale transaction or a liquidating

19     transaction and winding down.

20               And so while the plan provides for all account

21     holders to receive the same recovery, same pro rata recovery

22     based off of values of the tokens at a particular point in

23     time, there is the risk of, you know, a material decrease in

24     value of VGX to the extent that there is no utility going

25     forward.  And we acknowledge that.  I'm not sure what the

Page 143

1    solution is.  I think from our perspective we do still

2    believe that creditors are being treated equally because

3    we're determining the value at a specific point in time.

4    Customers are receiving distributions.  They're able to cash

5    them out immediately if they so choose.

6            THE COURT:  When customers get in kind

7    distributions, if I had VGX in my account, am I going to get

8    more VGX than I ever held in the past or --

9            MS. OKIKE:  No.

10           THE COURT:  Okay.  So it's not like my entire --

11   I'm going to be a poor customer who gets an entire

12   distribution in the form of VGX or anything like that.

13           MS. OKIKE:  No.

14           THE COURT:  Okay.  Unless V --

15           MS. OKIKE:  And so what we are doing --

16           THE COURT:  Unless VGX is the only thing that I

17   ever owned.

18           MS. OKIKE:  Correct.

19           What we are doing in the rebalancing is making

20   sure that people get their pro rata recoveries in the same

21   form.

22           THE COURT:  Does anybody have any idea of how

23   likely it is that VGX will continue to have value?  I mean,

24   I -- somebody -- I asked somebody the other day what the

25   current value is and they told me and I forget, but it was

Page 144

1   relatively low.

2           MS. OKIKE:  I think it was 30, 36 cents, 33 cents.

3   We can check.  I believe it was in the 30 cents.

4           But, Your Honor --

5           MR. NEWSOM:  Your Honor, it's currently 39 cents,

6   but I -- it is important to understand that the majority of

7   the (indiscernible) is locked up on the platform and that

8   number can be manipulated, I suppose, easily by market

9   forces.

10          Furthermore, my cost average was close to $2.00.

11  And so, I mean, I -- it's -- I mean, 39 cents is relative to

12  the average cost of VGX to take on a (indiscernible)

13  position, but I don't think that we can clearly state that

14  because VGX has increased in value since we filed the

15  petition that it will continue to do so.  In fact, if we

16  remove the smart contract -- or don't sell the smart

17  contract, there's no value.  It's (indiscernible) a

18  guarantee that it goes to zero and the opportunity for

19  recovery is essentially lost, zero.

20          MS. OKIKE:  Your Honor, I think the reality is we

21  just don't know.  Everyone knows Voyager is in bankruptcy

22  and VGX has been rising.  So there's no real explanation for

23  why VGX is rising, but it has.  And I don't think we know

24  how it will trade post-closing.  And I think that's --

25          MR. NEWSOM:  I think we can read --

Page 145

 1              MS. OKIKE:  -- the same --

 2              MR. NEWSOM:  Excuse me.

 3              MS. OKIKE:  I'm sorry.

 4              MR. NEWSOM:  I'm sorry.  Go ahead.

 5              MS. OKIKE:  No.  No.  go ahead.

 6              MR. NEWSOM:  I was just saying that I think we can

 7    reasonably assume that it's risen in price because of the

 8    speculatory nature of in the event the smart contract sold.

 9    Also, the elements that (indiscernible) more is locked up

10    and you can move the price easily and therefore manipulate

11    the market to make money off of (indiscernible) trading.

12              I think that those elements will not exist going

13    forward post-consummation of the deal and the failure to

14    sell the smart contract.

15              MR. AZMAN:  Your Honor, Darren Azman for the

16    committee.

17              Just a practical thought.  And I think what the

18    gentleman on the phone is suggesting that he would like to

19    have happen is for the estate to liquidate VGX and

20    distribute cash.  I think that's what I'm hearing.

21              But if the estate were to do that, that in and of

22    itself would have the same effect on the price of VGX.  It

23    would probably crater.  So whether the VGX is liquidated in

24    the hands of customers immediately after they receive it or

25    whether it is liquidated today, it's --

Page 146

```
 1              THE COURT:  I think as I understand the objection

 2    it's not that so much.  It's that Mr. Newsom thinks that the

 3    current market value for VGX is much more elusory than the

 4    current market value for other coins, and that treating it

 5    as an item that actually has a value of 39 cents as of the

 6    date of distribution is unrealistic and has the effect of

 7    reducing his recovery because there's, unlike other coins,

 8    there's much greater risk that the real value of VGX is

 9    zero.

10              I think that's -- does that correctly sum up your

11    objection, Mr. Newsom?

12              MR. NEWSOM:  Yes, Your Honor.  That's a pretty

13    fair characterization.

14              MR. AZMAN:  I'm not sure how we fix that.

15              MS. OKIKE:  Your Honor, but just to -- further

16    counterargument, I mean, if we are able to sell the utility,

17    the smart contracts underlying the token, and the value

18    rises, I mean --

19              THE COURT:  He might get more.

20              MS. OKIKE:  Exactly.

21              THE COURT:  Right.

22              MR. NEWSOM:  And to be clear, I'm not asking that

23    the debtors do not continue to pursue the sale of the smart

24    contract.  I do think it is more unlikely since the FTC has

25    stated that some of their staff believe it has elements of
```

1       the security streams action.

2              However, I remain hopeful that the ultimate buyer

3       would be a high quality buyer that intends to comply with

4       all regulatory (indiscernible).  But I think that's probably

5       unlikely, and hope is not a strategy here and where we fail

6       to do that we are materially impacted.

7              I would state that the difference between

8       liquidating as part of the estate and distributing

9       (indiscernible) pro rata share in cash to VGX account

10      holders is different than giving them in kind VGX

11      distributions and then allowing them to sell it on the open

12      market.  I do think that's -- it -- I think it's -- it

13      needed to be pointed out to Mr. Azman's point that there is

14      a difference in those two things.

15             THE COURT:  But assuming we can't give customers

16      the right to make a coin by coin election, because I just

17      don't think that would be practical, what other solution do

18      we have, Mr. Newsom?  You most certainly, and everybody

19      else, have the right to take cash instead of any

20      cryptocurrencies.  I'm not sure that there's any

21      intermediate approach that is practical.

22             Do you -- what is it you see --

23             MR. NEWSOM:  It would need -- I'm sorry.

24             THE COURT:  Go ahead.  What would you suggest?

25             MR. NEWSOM:  Well, do we need a coin by coin

Page 148

1    solution here or should we just specifically carve out these

2    -- well, let me rephrase that.

3            Should we amend the disclosure statement and the

4    plan which is already singled out for VGX.  It would just be

5    more thorough or thoughtful, rather, in the event that the

6    smart contract is not sold and a plan as a result of that.

7    VGX is already singled out in the plan and the disclosure

8    statement.  I'm just asking that we be a little bit more

9    thorough and thoughtful about how that opportunity for

10   recovery is more equal to those VGX account holders.

11           THE COURT:  Given the amount of VGX the debtor

12   holds at that current market price, what does that translate

13   to in terms of value?

14           MR. NEWSOM:  I believe it's between 10 and 20

15   million based off of Mr. Tishner's testimony and that's

16   probably in line with what I believe they had in 35 million

17   to 40 million tokens (indiscernible) in the estate.  But I

18   -- correct me if I'm wrong.

19           THE COURT:  And we have some people scurrying

20   around the room getting an answer to the question, so.

21           MR. SLADE:  Your Honor, I apologize.  Mike Slade

22   for the debtors.

23           If we disclose the information it's going to move

24   the market.  That's the concern.

25           THE COURT:  Oh, you -- it's not public how much

Page 149

1    you hold at the moment?

2              MR. SLADE:  No.

3              THE COURT:  Okay.

4              Is it fair to say it is a relatively small

5    component of the total value that will be distributed?

6              MR. NEWSOM:  Your Honor, I believe 30 percent of

7    accounts held some amount of VGX.  I believe it's the third

8    largest holding on the platform.

9              THE COURT:  Well, that's different in terms of,

10   you know, measuring the value of what's being distributed.

11             MS. OKIKE:  I would say it's relatively small

12   compared to the overall value of the portfolio.

13             THE COURT:  The problem, Mr. Newsom, is it seems

14   to me you yourself would not want the debtors to just give

15   up on VGX.  You kind of want them to, I don't know what,

16   wait, see if they can sell the smart contract before they

17   distribute VGX.  I'm not sure we have that option at the

18   moment, to tell you the truth.

19             So what are we supposed to do?

20             MR. NEWSOM:  I think that's part of the problem,

21   Your Honor, is that we don't know the fate of VGX.  We don't

22   know that Binance.US is in (indiscernible).  We don't know

23   that they'll sell the smart contracts.  We think -- I think

24   personally that it's probably unlikely given the FTC's

25   statements.

1          So I think in the event that the smart contract is

2    not sold, since VGX already has its specific clause carved

3    out for it and what happens to it, we amend that clause to

4    ensure protection and (indiscernible) treatment for those

5    VGX account holders.

6          If the value of the estate is relative -- if it's

7    relatively small in terms of dollarized value to the estate,

8    I don't think there's a large impact on the creditor body at

9    large.  It seems like a simple thing to ask and it would

10   ensure protection while also allowing the debtors to

11   continue to pursue the sale of the smart contract.  I think

12   -- it sounds simple to me, and if I'm wrong please correct

13   me, but I think the ask is simple and the solution is

14   simple.

15          THE COURT:  I'm not sure the solution is that

16   simple.  You know, if the debtors hold VGX until they see if

17   they sell the smart contract, the prices may change.  The

18   debtors will have allocated things to other customers.  They

19   won't necessarily have the ability to make up the

20   difference.  These are all calculations that have to be done

21   at one time to make sure that the value is based on the date

22   of calculation or at least equal.  That's what the

23   bankruptcy code commands.

24          So I'm not sure we can hold VGX aside without

25   making it impossible to do the all -- do all of the

1    calculations.

2          MR. NEWSOM:  That's a fair point, Your Honor.  And

3    I think that we should consider that we've had nine months

4    to sell the smart contact and we have yet to do it, and I do

5    think the FTC adds a wrinkle to it now.  And so perhaps

6    putting a time frame on which steps should be done, and in

7    the event that it's not done say in the next three or four

8    weeks, whenever the pro rata calculations are determined, we

9    make the decision to liquidate VGX at the USD value pro rata

10   share equal to (indiscernible) class creditors.

11         THE COURT:  Is there any time frame for the sale

12   of the smart contract?

13         MS. OKIKE:  Your Honor, we have some parties that

14   are interested.  They've been meeting with the company and

15   the creditors' committee as well.  But we haven't made an

16   actual determination as to a specific buyer.

17         THE COURT:  Okay.  But is it fair to say that it's

18   not a hopeless prospect for VGX?  There's some people who

19   are at least indicating interest in buying the contract?

20         MS. OKIKE:  That's correct, Your Honor.

21         We have some holders of VGX who are interested in

22   providing utility for the token going forward and have

23   offered various solutions.

24         THE COURT:  I see.

25         Does that change your feeling, Mr. Newsom?

1          MR. NEWSOM:  I think it's the same simply because

2     it -- we have no confirmation that that will indeed happen.

3     And I would wonder if these individuals that are interested

4     in purchasing the smart contract and providing utility for

5     VGX, are they aware of the FTC statements in the last two

6     days that VGX has elements of a securities transaction.  I

7     think that's a barrier there.

8          MS. OKIKE:  I think, Your Honor, the only

9     alternative would be to sell all of the VGX at the time that

10    we do the distribution and, you know, have those dollars be

11    distributed in exchange.

12         THE COURT:  And how would all the other customers

13    who at the moment aren't expecting that as part of the plan,

14    how would they feel about that?

15         MS. OKIKE:  That's why -- I mean, I don't think

16    it's necessarily a viable solution.  I don't know if we

17    could do it on a customer by customer basis.  It seems

18    overly burdensome.

19         THE COURT:  Okay.  Is there anybody else who would

20    like to be heard on this question?

21         Okay.  Technically, as a matter of equal

22    treatment, the VGX coin is being treated just like all the

23    other coins and the amount that holders will receive is

24    being calculated in exactly the same manner.

25         I think the real objection here is not so much

Page 153

1    whether there is equal treatment as whether the calculations

2    are skewed and, therefore, the recoveries are actually

3    different because the VGX value might be elusory.

4              And I don't think anybody's suggesting that it

5    actually is elusory, certainly not at its current value of

6    39 cents, or that it is necessarily going to be elusory,

7    just that it might turn out to be elusory.

8              But the value is already fairly low.  It seems to

9    reflect the fact that people don't know just what utility

10   it's going to have.  And I don't think I have enough

11   evidence in front of me to say that it is worthless to the

12   point of being inappropriate to be taken into account as an

13   item od distributive value.

14             And nor do I have enough reason to believe that

15   it's so hopeless that I should kind of require it to just be

16   excluded from the entire set of calculations.  And I don't

17   know how to do the kind of in between that you're suggesting

18   without making the calculations of the plan impossible.

19             So unless somebody has a better mathematical

20   solution for me than I'm thinking of, I just don't think

21   what you want, Mr. Newsom, is something that I can grant.

22             MR. NEWSOM:  Your Honor, I certainly respect your

23   decision.  But I will state that I think that if we were to

24   ask the debtors or the professionals if they were to receive

25   their salary in VGX based off the current plans or future --

Page 154

 1    likely future, they would all quickly refuse.  I think that

 2    there's a high likelihood that this is elusory.  It's not a

 3    guarantee.

 4              THE COURT:  Okay.

 5              MR. MENDELL:  Your Honor --

 6              THE COURT:  Yes.

 7              MR. MENDELL:  -- this is Marshall Mendell, pro se

 8    creditor.  I just want to add that I am a very large VGX

 9    holder, maybe the largest, and so this is a position which

10    is very important to me as it is to Mr. Newsom and many

11    other creditors who I know personally who also have large

12    stakes in VGX.

13              And I'm wondering if it's possible to please ask

14    the debtor what is the hold up in securing the transaction

15    if we've already had a couple of transactions with FTX and

16    Binance that were kind of put together.  But it appears that

17    a utility for the VGX token is taking longer.

18              MS. OKIKE:  Your Honor, I think at the time that

19    we were negotiating the various transactions, there was a

20    question as to, at least in the first transaction, whether

21    FTX was going to acquire VGX.  We did not want to proceed

22    with selling obviously the smart contracts given that it

23    might have been included in the sale.

24              With respect to Binance, again, we're hopeful that

25    the token is withstood on the exchange.

Page 155

```
 1                 That being said, until the sale transaction is

 2      approved, we weren't really seeking to sell off piecemeal

 3      assets.  So, you know, we are working towards this, but I

 4      will confess it hasn't been, you know, the primary focus

 5      just given the larger transaction that we were, you know,

 6      diligently trying to execute.

 7                 THE COURT:  Historically, what did VGX trade at?

 8                 MS. OKIKE:  So the all time high was $12.54.

 9           (Pause)

10                 MS. OKIKE:  24 cents as of the petition date.

11                 THE COURT:  Don't I have to assume that the 39

12      cent market value is the market's calculation of the

13      likelihoods here and the option value, I suppose, associated

14      with VGX?

15                 You know, there are options that sell that based

16      on current market conditions are way out of the money, but

17      they have value.  For heaven's sake, even companies that

18      have announced bankruptcy, sometimes their stock still sells

19      for a price when it's hard to see any realistic likelihood

20      that the stock will have any value, but it's option value.

21           And we distribute options sometimes in bankruptcy that

22      are way out of the money, but they're deemed to be items of

23      value precisely for that reason, because there's a chance

24      that they may come into value.

25                 So I guess unless you have evidence that the 39
```

Page 156

1   cents is not a fair calculation of the option value of the

2   VGX, I'm not really in a position to say that giving that

3   kind of value to VGX would be unfair to the people who are

4   going to receive VGX.

5          MR. MENDELL:  Your Honor, I have a secondary

6   question.

7          Is 22 cents or whatever the buyout number, is that

8   a worst case scenario for our recovery on VGX, please?

9          THE COURT:  22 cents?  I don't know what you meant

10  by 22 cents.

11         MR. MENDELL:  I think that that might be the

12  number of the Chapter 11 date back to, what is it, June 5th

13  or July 1st, something like that --

14         THE COURT:  Oh --

15         MR. MENDELL:  -- the --

16         THE COURT:  The testimony --

17         MR. MENDELL:  -- (indiscernible) --

18         THE COURT:  The testimony based on the current or

19  based on last Wednesday or Thursday's values, I thought that

20  the testimony was that the minimum recovery would be in the

21  40-something range with an upside up to maybe 73 or so if

22  things go right on various contingencies.

23         Did I remember that right?

24         MR. MENDELL:  Your Honor, I think that's the -- I

25  think that may have to do with market value, but there is a

Page 157

1    -- on our Voyager app we have a particular maximum recovery.

2         MS. OKIKE:  I don't think it's the maximum

3    recovery.  I think you're seeing your claim dollarized as of

4    the petition date based off of the price as of the petition

5    date.

6         MR. MENDELL:  Yes.  You're right.  Thank you for

7    clarifying.

8         So can you please answer, is there a minimum

9    recovery for VGX holders on each token, please?

10        MS. OKIKE:  No.  There's not a minimum account --

11   sorry -- there's not a minimum amount.  It will depend on a

12   number of factors, but we anticipate, you know, a 48 percent

13   to potentially in the 70 percent recovery on account of, you

14   know, the claims that you have against the company,

15   including VGX.

16        THE COURT:  So the way the calculations work, the

17   dollar amount of your claim is based on the dollar value of

18   your account as of the petition date.

19        Everybody will get the same percentage of that

20   dollar amount in either cash or crypto currencies.  But

21   people -- in terms of which crypto currencies they get, that

22   will -- there will be some effort to match that to what your

23   prior holdings were so that hopefully there will be fewer

24   tax consequences, though no guarantee that that will be the

25   case.  So --

Page 158

1          MR. MENDELL:  And if that applies to VGX, that

2    would be somewhat satisfactory to me given all things

3    considered.  So I think that would be good.

4          THE COURT:  Yeah.  What it would mean as to VGX

5    would be, you know, if you had a $10,000 allowed claim as of

6    the petition date and if the initial distribution was going

7    to be 40 cents, just to make the math easier in my head, you

8    would get a package of things that has a value as of the

9    calculation date of 40 cents.  Some of that would be made up

10   of VGX based on whatever VGX's price was as of that date.

11   Some of that might be made up of other coins if you held

12   other coins.

13          Is that fair, Ms. Okike?

14          MS. OKIKE:  Correct.

15          THE COURT:  Okay.

16          MR. MENDELL:  Thank you.  Thank you very much,

17   Your Honor, for the clarification.

18          I have nothing --

19          MR. NEWSOM:  Your Honor --

20          MR. MENDELL:  -- further.

21          MR. NEWSOM:  -- I'm sorry to spend so much time

22   here.  I know we're all very busy.  But I would like to go

23   back to your point with regards to proof to the elusory

24   value of VGX currently.

25          It is hard to state since the debtors have refused

1    to reveal their position on VGX how much of VGX tokens are

2    currently locked up and what the remainder is available on

3    the open market.

4              But suffice it to say that it is a very low

5    percentage of the overall available tokens and, as such, the

6    trade -- the token can be manipulated easily.  And we know

7    with several efforts from anonymous groups on social media

8    sites or otherwise that have attempted to pump the VGX

9    price.  They've even pumped it up to 92 cents and there is

10   some residual value left as people have been sort of left in

11   the wake of the pump and dump scheme.

12             So I -- Your Honor, there's multiple factors here

13   that are currently holding the value of VGX and none of them

14   would remain in place in the event that the smart contract

15   is not sold.

16             THE COURT:  What evidence do I have of that?  See,

17   that's the problem.  I don't have evidence.  I have rumors

18   or suspicions, but I don't have evidence.

19             MR. NEWSOM:  I have to admit, Your Honor, in my

20   lack of legal experience I did not frame the argument in

21   terms of the value being elusory, but instead equitable.

22   And I did not think it would be necessary to go down this

23   route because it seems to me that the debtors are aware,

24   given their disclosure statement, that the value of VGX may

25   have no value for its consummation if the smart contract is

Page 160

1     not sold.

2          That by itself seems like indiscriminatory

3     treatment --

4          THE COURT:  It may --

5          MR. NEWSOM:  -- in the event -- in terms of

6     (indiscernible) recovery.

7          THE COURT:  It may have no value.  We usually

8     think of things that have some reported market value as the

9     market reflecting what their value is.  It's what willing

10    people are willing to transact at.

11         What you've now said to me is that based on

12    trading volumes or perhaps people's desire to manipulate the

13    price, maybe that market is not a true market, but is

14    manipulated.  But that's something that I would need

15    evidence to reach that conclusion and I don't have any.  So

16    much of this --

17         MR. NEWSOM:  I would be happy to provide it, but I

18    don't know how much time we have.  But --

19         THE COURT:  Well, we've already closed the

20    evidentiary record.

21         MR. NEWSOM:  I'll make one final plea, Your Honor,

22    and then defer to your good judgment.

23         In Mr. Tishner's testimony he stated this.  He

24    said, if I were an eTrade customer and I bought shares in GE

25    and eTrade got into trouble, then I would be upset if I

Page 161

1    received something other than what I originally bought in

2    return.

3              That is what's happening here, Your Honor.  I am

4    not receiving back what I bought in return in the event that

5    the VGX smart contract is not sold.  I believe that there

6    are elements of this plan that are discriminatory based on

7    opportunities for recovery, whereas -- and this is important

8    -- other coin type actual utility have the ability to be

9    traded, sold -- I'm sorry -- used as a currency.  VGX will

10   have none of that.  And all of the value that is ascribed to

11   it right now is speculatory in nature.

12             And when we flood the market with the VGX tokens,

13   it will only go to zero.  I don't believe there is any

14   chance whatsoever for the value of VGX to go up beyond what

15   it is at today in the event the smart contract is not sold

16   and the market is flooded with the number of coins held on

17   the Voyager platform.

18             THE COURT:  Okay.  All right.

19             Thank you, Mr. Newsom.

20             Is there anybody else who wants to be heard on

21   unequal treatment or unfair discrimination objections?

22             Okay.

23             MS. OKIKE:  Okay, Your Honor.  I think we'll move

24   to the liquidation analysis next.

25             THE COURT:  Why don't we do the releases?

Page 162

1           MS. OKIKE:  Releases?

2           THE COURT:  While I have the energy for it.

3           MS. OKIKE:  Sorry.

4           THE COURT:  While I have the energy for it.

5           MS. OKIKE:  Okay.  Great.

6       (Laughter)

7           MS. OKIKE:  Okay.  So, Your Honor, we had a number

8    of objections to the third party release.  As a threshold

9    matter, the plan does not propose a non-consensual third

10   party release.  Any third party's direct claims against non-

11   debtors, to the extent such direct claims exist, are not

12   released unless such third party affirmatively consents,

13   which would be reflected in opting into the third party

14   release that was included on the ballets and in the notices

15   of non-voting status.

16          Your Honor, holders of claims in interest could

17   also affirmatively elect to contribute their direct claims

18   against third parties unaffiliated with the debtors to the

19   extent they have any to the winddown debtor, and the

20   winddown debtor will be vested with authority to pursue

21   those claims.

22          Your Honor, we did have a number of parties who

23   chose to affirmatively consent to the third party release

24   and to contribute their direct claims to the winddown

25   debtor.

Page 163

1            Specifically, 65 percent or 40,112 claimants in

2     the voting classes opted into the third party release, and

3     85 percent or 726 of claimants in the non-voting classes

4     opted into the third party release.

5            52 percent or 31,878 claimants in the voting

6     classes chose to contribute their direct claims to the

7     winddown debtor, and 90 percent or 765 credits in the non-

8     voting classes contributed their claims to the winddown

9     debtor.

10           Your Honor, courts routinely approve consensual

11    third party releases to be included in a plan.  Here, again,

12    the release is entirely consensual.  We have not imposed a

13    release on holders of claims that voted in favor of the

14    plan.  And so we believe that the third party release, to

15    the extent that a creditor affirmatively opted in should be

16    approved.

17           THE COURT:  All right.  I -- it seemed to me from

18    a lot of the objections that there was a misunderstanding of

19    who the releasing parties would be and the extent to which

20    creditors and regulatory bodies, governmental entities were

21    having releases of their own claims hoisted (sic) on them,

22    that certainly is an issue that is a hot issue in many

23    bankruptcy cases.  But it's not really one here.  There are

24    no non-consensual third party releases here.

25           So as to the releases being granted by non-debtors

1     here, is there anybody who still has an objection that they

2     need me to consider?

3              MS. DAGNOLI:  Judge --

4              THE COURT:  Yes.

5              MS. DAGNOLI:  This is Lisa Dagnoli.  I just want

6     to understand what you're saying.

7              Are you saying the third party releases include

8     the executives of Voyager and the CEO or we're not speaking

9     about that?

10             THE COURT:  Well, you mean as beneficiaries of the

11    releases?

12             MS. DAGNOLI:  I don't really know the difference,

13    I'm just going to be honest.

14             THE COURT:  In any release, there is a person who

15    grants the release and there's a person in whose favor the

16    release is granted.

17             MS. DAGNOLI:  So the important point here is that

18    the only people granting releases, other than the debtors

19    themselves of the debtor's own claims, the only people

20    granting releases are people who have voluntarily agreed to

21    do so.  Nobody's being forced to do so.

22             So if you, for example, Ms. Dagnoli, owned a

23    direct, personal claim against Mr. Ehrlich, there is nothing

24    in what we're doing today that would purport to release that

25    claim or terminate that claim.

1            The debtors have their own claims.  We'll get to

2       that in a minute because the debtors have proposed to

3       release their claims, and that may be of concern to people

4       who have derivative interests and the value of the debtor's

5       claims.  But in terms of claims that belong directly to

6       third parties, nobody is being enforced to release anything.

7       They're just volunteering.  And there was disclosure as to

8       who the people would be who would benefit from that release

9       and a certain number of people have elected to go ahead and

10      provide it.

11           MS. DAGNOLI:  Okay.  I'm sorry.  Then I was going

12      to speak on not having liability releases for the executors,

13      and that's not what you're speaking about.  So I'm sorry.

14           THE COURT:  Yeah.  Just to be clear, if a customer

15      has elected to grant the proposed release, then that

16      customer's claim against those executives has been

17      voluntarily released.

18           But the theory of the Bankruptcy Code is, you

19      know, that's something that was asked and granted

20      consensually by that particular creditor.  That creditor can

21      make up his or her own mind as to whether to grant that

22      release or not and elected to do it.

23           I, quite frankly, would have no authority to tell

24      them no, that they can't.  The case law in the Second

25      Circuit is quite clear that creditors can consent to

Page 166

1   releases and, in fact, here the debtors are much more narrow

2   than has been approved in other cases.  In many other cases,

3   simply voting in favor of the plan is deemed to be a consent

4   to the releases.

5           We don't have that here.  People who voted for the

6   plan are not deemed to have consent to releases unless they

7   separately and explicitly and affirmatively opted into them.

8   So they are about as voluntary --

9           MS. DAGNOLI:  Okay.

10          THE COURT:  They're about as voluntary here as

11  they could be.

12          MS. DAGNOLI:  Okay.  I just wanted to go on the

13  record to say that I don't want to have any releases of

14  liability for fraud or, you know, negligence or anything

15  like that for the executives of Voyager or the CEO.  And I

16  don't know where that would be put in, but that's what I

17  wanted to say.

18          Thank you, sir.

19          THE COURT:  Okay.  Well --

20          MR. NEWSOM:  Your Honor, this is --

21          THE COURT:  -- to the extent --

22          MR. NEWSOM:  -- Dan Newsom, pro se --

23          THE COURT:  -- to the extent --

24          MR. NEWSOM:  -- creditor again --

25          THE COURT:  -- to the extent, Ms. Dagnoli, that

Page 167

1    you're objecting to somebody else giving up their direct

2    claim of fraud against Mr. Ehrlich, I'm not sure you have

3    standing to object to that.  They've done it.  They've

4    agreed to it.  They made their own decision.  It's not my

5    job or yours or anybody else's to tell them they shouldn't

6    have done it or that they can't do it.  They've done it.

7           You certainly are entitled to be heard on whether

8    the debtors can or should release their own claims, but to

9    the extent, you know, somebody -- an account holder had a

10   claim or a shareholder had a claim of fraud and elected to

11   release it, well, that's what they're entitled to do.  If

12   they don't want to pursue it, they don't have to.  Okay.

13          MR. NEWSOM:  Your Honor, this is Dan Newsom.  This

14   is also in one of my specific requests for relief.

15          I would say -- and, again, I want to be brief out

16   of respect for time.  I would say this, and I do understand

17   the difference between my direct claim as a creditor and

18   whether I opted in or not.

19          But as it relates to the releases of the estate,

20   they are overly broad.  The investigation by the special

21   committee and the UCC's counsel were limited in scope.

22   They've admitted that they focused primarily around the

23   details of the (indiscernible).  They did not investigate

24   the concerns raised by the FTC for, you know, misleading

25   fraudulent or (indiscernible) false claims, FDIC for

Page 168

1    fraudulent claims.  They did not investigate securities

2    fraud.  They did not examine third parties that the estate

3    may have viable claims against that are currently being

4    released under the plan, such as (indiscernible), for

5    example, and out of an arrangement to produce an equities

6    platform that they did not follow through with.  In fact, in

7    this own bankruptcy proceeding (indiscernible) platform was

8    in its infancy stage and Voyager routinely touted that as

9    something that was coming soon, as early as the first half

10    of 2022 or second half of 2022.

11            My point being they're releasing valuable claims

12    from the estate where we might have derivative claims, but

13    they could be more successfully pursued by the estate.  And

14    I think they don't see any reason for it.  It's not

15    necessary to effectuate the transaction, and we've been

16    given no consideration or the estate's been given no

17    consideration (indiscernible) creditors.

18            THE COURT:  Okay.

19            MR. NEWSOM:  I don't think they belong.

20            THE COURT:  Just before we -- we'll come back to

21    that in a second, but I just want to see if there's anybody

22    else who wants to be heard on the releases by third parties

23    by people other than the debtors and the estate.

24            Is there anybody else who wants to be heard?

25            MS. DIRESTA:  Hi, Your Honor.

1          THE COURT:  Yeah.

2          MS. DIRESTA:  Yeah, Your Honor.  It's Gina DiResta

3     again, pro se creditor.

4          One of the problems I have with the releases --

5     and I agree with you.  I do not care how anybody votes on

6     the release.  That is every individual's choice.

7          But what I do care about is that people understand what

8     they're voting on.  And the verbiage in that third party

9     release is so confusing that even I, with my 15 years of

10    legal experience and drafting 70 documents and contracts,

11    when I first read that release, I literally was like, wait,

12    what, and I had to read it multiple times slowly to really

13    understand what I was doing.

14          And other people in -- within the Voyager investor

15    community, because I am very active online and having talked

16    with a lot of different people or reading a lot of comments

17    that are out there, so many people said they did not

18    understand what they read.  They were confused.  They didn't

19    know how to vote.

20          There are people who literally voted and then

21    would get in like Twitter spaces or would message on social

22    media and say, hey, I checked off that box, that means I'm

23    saying -- I'm agreeing to getting my claims, right, that

24    means I'm going to get my money back.  Like they -- like so

25    many people have different interpretations of the verbiage

Page 170

1   of that release that to say that all 65 percent of people

2   who voted for it obviously agree with it.  There's a lot of

3   people who didn't even understand what they're voting for.

4              And I think that was like one of the biggest

5   issues that I found from people and it's -- I mean, they

6   were like, I don't know what I'm voting for.  And then for

7   them to, well, accidentally (indiscernible), I checked the

8   box.  I didn't know what I was doing.

9              The secondary problem is they did not even know

10   that they could change their vote.  The UCC has never made

11   it clear to creditors that they actually had the option of

12   changing their votes by simply going through the voting

13   process all over again.  So a lot of people felt stuck.

14   They're like, oops, oh, well, kind of an attitude.  And they

15   literally like wrote that online or verbally said that in

16   these Twitter spaces.

17              So that's the thing that I would like to argue is

18   I feel like the verbiage was confusing and kind of

19   deceptive, and people really didn't understand what they

20   were voting for.

21              THE COURT:  Well, under the bankruptcy rules when

22   a release is being sought, it's got to be highlighted.  And

23   somebody remember me -- remind me what the rule number is.

24   I -- does it require that you quote the provision

25   specifically?

1          MS. OKIKE:  I think it has to be bolded and

2     highlighted.

3          (Pause)

4          THE COURT:  I think it's Rule 3016(c) as to

5     injunctions, but isn't there a similar provision as to

6     release?

7          Well, in any event, the ballots that were approved

8     here and the description of the releases were the subject of

9     motions that were considered in January.  And they were

10    approved by me after people had a chance to be heard as to

11    whether they were sufficient or not.  They are in line with

12    the same kinds of information and same kinds of texts that

13    we've given to people in other cases.

14         You know, there's a constant push and pull in

15    bankruptcy between, on the one hand people will say it's not

16    simple enough and in plain English I can't understand it,

17    and then on the other hand if you try to do something in

18    simple and plain English you get complaints that you haven't

19    been clear enough as to the full details.

20         We can't do it both ways.  And so we try to make

21    sure that the full information is there so that people can

22    see it.  If anybody thought that they were doing anything

23    other than granting a release, I'm not sure how they could

24    have been confused unless they simply didn't read because it

25    says, you're granting a release.  It says you don't have to.

Page 172

1      You're doing it voluntarily, but you're granting a release.

2              So I'm not going to back and say that this whole

3      process has to stop and is no good because of the way the

4      releases were presented.  I think they were presented

5      fairly.

6              Okay.  So I think we should move onto the releases

7      by the debtors.  And, you know, there's some validity to

8      what Mr. Newsom has just said.  You've proposed very broad

9      releases and at least one specific settlement in the form of

10     the deal with the -- Mr. Psaropoulos and Mr. Ehrlich.

11             But the testimony by Mr. Pohl was that his

12     committee looked at potential claims against insiders, not

13     even being very clear about who that was.

14             I know that the debtors in their statement of

15     financial affairs defined insiders as people who had actual

16     authority over the disposition of assets of the debtor,

17     which means a relatively narrow group.  And yet you've

18     proposed very broad releases as to professional persons, all

19     persons who were employed by the debtors during the course

20     of the case.  These are releases that would go beyond

21     insiders as I read them.  It would cover members of the

22     creditors' committee who certainly are not debtor insiders

23     as that term is used.

24             The description of the claims that are being

25     released are -- I detected no effort to kind of confine it

Page 173

1    to what the independent committee had actually looked at.

2    Rather, just the very terms of the release suggest that

3    somebody sat down and tried to make it as indisputably broad

4    and all encompassing as was humanly possible.

5            It would appear to cover preference claims, for

6    example, so that customers who weren't employees would be

7    subject to preference claims, but committee members and

8    employees would not, even if they had made similar

9    withdrawals from their accounts.  And in terms of whether

10   there's justification of that, I didn't hear a peep of

11   evidence to support it.

12           So how can I, based on the record that I have, how

13   can I support the breadth of the releases that you've

14   proposed?

15           MS. OKIKE:  Your Honor, may I confer with our co-

16   counsel for one moment?

17       (Pause)

18           MR. GOLDBERG:  Your Honor, pardon me for

19   interrupting.

20           THE COURT:  Yes.

21           MR. GOLDBERG:  May I be excused to continue

22   discussions with my client about the issues we've --

23           THE COURT:  Yes.  Please --

24           MR. GOLDBERG:  Thank you.

25           THE COURT:  -- go ahead.

Page 174

1           (Pause)

2                THE COURT:  We'll break for ten minutes while you

3      have your discussions.  Okay.

4           (Recessed at 3:06 p.m.; reconvened at 3:23 p.m.)

5                THE COURT:  Okay.  Are we ready to continue?

6                MR. KIRPALANI:  Yes, Your Honor, thank you.  For

7      the record Susheel Kirpalani from Quinn Emmanuel Urquhart &

8      Sullivan on behalf of the special committee of the debtors,

9      Voyager LLC to be precise.

10               Judge, I want to tell you what we did do as well

11     as what I understood Mr. Pohl's testimony to be about

12     insiders.  Mr. Pohl didn't equate his definition of insiders

13     with anything in the statement of financial affairs

14     definition that determine insiders under the Bankruptcy

15     Code, which is how he meant it and used it, is directors and

16     officers.

17               And I can tell you what we did do, and I can also

18     give you some comfort on the direct -- on the scope of the

19     released parties under Section 136 of the plan, definition

20     136 of the plan.

21               First just to get it out of the way, the reference

22     to committee members being released from preference

23     liability, that's not how the plan works.  The defined term

24     released parties means, and I'm quoting from it,

25     collectively in each case in its capacity as such, and then

1    it refers to the committee and each of the members thereof.

2          So a member of a committee, his capacity as such

3    is incapable of receiving preference, because all of that

4    activity happened post-petition.  So just to give customers

5    comfort, nobody who sat on the creditor's committee is in

6    the release of potential preference liability.  If there was

7    any (indiscernible) committee.

8          We did not look at potential exposure of committee

9    members because we on behalf of the special committee we're

10   not releasing them.  It's not true that the only focus of

11   the special committee's work was to look at the 3AC loan.

12   We did look at the statements that were made to the FDIC.

13   We did look at the statements that were made to customers

14   generally and press releases that were made generally and

15   Mr. Pohl did explain that in his testimony.

16         But those do not give rise to causes of action in

17   favor of the debtor.  If the debtor had misled the

18   customers, in order to obtain more assets to grow the

19   business, that does not create a cause of action that the

20   debtor has against the officer or director for pursuing that

21   strategy.

22         It may give rise to a cause of action in favor of

23   a customer who received, for example, a text message from

24   Mr. Ehrlich or an equity holder who received a text message

25   or an e-mail from Mr. Ehrlich, of course, we're not

Page 176

1    releasing that.  That belongs to those individuals and we

2    take that very seriously.

3            With respect to the preferences that have been

4    mentioned on behalf of directors and officers we did look at

5    transfers made to directors and officers.  They're detailed

6    in the statement of financial affairs.  And we did note

7    there were two bonus payments.  We looked into them, they

8    were not preferential, they were ordinary course of

9    business, but we still got a reversal of Mr. Ehrlich's bonus

10   as part of the consideration for the overall settlement.

11           THE COURT:  But the schedules listing payments to

12   insiders only listed dollar payments and not account

13   withdrawals.

14           MR. KIRPALANI:  Thank you, Your Honor, I'm coming

15   to that.

16           THE COURT:  Whereas it seems quite clear from the

17   position the debtor has taken about who owned the property

18   that account withdrawals are preferences or might be

19   preferences anyway.

20           MR. KIRPALANI:  That's true, Your Honor, and we

21   did look at potential preference liability of directors and

22   officers for withdrawing their crypto assets off the

23   platform.  There were no such withdrawals within the 90 days

24   prior to bankruptcy.

25           Now, of course, we know that insiders as defined

Page 177

1   in the Bankruptcy Code does a look back period of one year,

2   not 90 days and we did look at withdrawals of crypto assets

3   off the platform beyond 90 days up to one year.

4           There were a handful of withdrawals beyond the 90

5   day period, but those same individuals also put more assets

6   on the platform during the 90 day period, did not give any -

7   - give rise to any suggestion of any impropriety or

8   favoritism or they knew something the market didn't.

9           At the time of those withdrawals the market

10  capitalization for Voyager was over $700 million.  And so

11  the notion that the estate should expend funds to try to get

12  what would have amounted to $500,000 worth of transfers, to

13  try to prove insolvency during the period in the end of

14  March and early April, that is beyond the 90 day period with

15  that, but within the one year period just seems cost

16  prohibitive and not a wise use of resources.  And so that's

17  the rationale why directors and officers --

18          THE COURT:  Why can't the plan administrator make

19  that decision?  What do you need a release for?  If it's

20  just a question of whether a claim is worth pursuing and not

21  something you're getting any consideration for, why are you

22  granting the release?

23          MR. KIRPALANI:  Well, it is the business judgment

24  of the special committee to grant the releases that were

25  proposed in the plan and --

Page 178

1              THE COURT:  And my question is why.

2              MR. KIRPALANI:  These individuals served post

3    bankruptcy, I want to be very clear about that, Your Honor.

4    There is no director or officer or employee, for that

5    matter, that's getting a release that didn't serve the

6    estates post bankruptcy.

7              There are directors and officers that were not

8    part of this organization on the commencement of Chapter 11,

9    they are not getting releases.  They are not defined as a

10   released party.

11             And when this company filed part and parcel of

12   encouraging folks to stay aboard, work with the debtors,

13   maximize value for customers, was that releases were going

14   to be proposed and if they were appropriate, meaning that

15   there was no wrong doing or no viable causes of action

16   against them, then it would be set up for both by creditors

17   to see if that plan was confirmable and if it was approved.

18             THE COURT:  I have no evidence of that.

19             MR. KIRPALANI:  You don't have evidence that the

20   plan was sent up for --

21             THE COURT:  No, I have no evidence that these

22   employees were told that releases would be sought in

23   exchange for their continued service.  I have zero evidence

24   of that.

25             MR. KIRPALANI:  Mr. Renzi (ph), I believe in his

1   declaration --

2          THE COURT:  I also don't have any disclosure to

3   anybody of just what potential claims are being given up in

4   exchange for that, just what withdrawals they might have

5   made.  I have conclusory remarks about it today, I have

6   nothing.  I have a suggestion that releasing them from

7   preference claims that have never been described were

8   somehow part of the deal about which I have no evidence.

9          MR. KIRPALANI:  I believe Mr. Renzi (ph) testified

10  of the importance of the employee base for this organization

11  and for keeping this sale process together.  And that is in

12  his declaration and it was part of his live testimony as

13  well.

14          I don't -- I think you're correct, Your Honor,

15  that there was no specific mention by Mr. Renzi or Mr. Pohl

16  or Mr. Tiffner (ph) that employee X was told, if you stick

17  around, you know, it'll be worth it because we'll be able to

18  obtain global peace from this bankruptcy in exchange for

19  your hard work and your efforts, but I think it is --

20          THE COURT:  What about the scope of the release,

21  which seems, you know?  The release has provisions in it

22  like anything that you ever did that has any bearing on any

23  claim that anybody ever had against the debtor you're

24  released from.  Your investigation didn't go that far,

25  right?

Page 180

1          MR. KIRPALANI:  That's true, Your Honor.

2          THE COURT:  So why give a release of that breadth?

3     Seems like a gift, a throwaway.  Somebody decided we're

4     going to make this as broad as possible, kind of untethered

5     by any actual investigation or review that had been done.

6          MR. KIRPALANI:  I can't stand here before you and

7     tell you that we looked at every employee and what they did

8     to everybody in every way, but over the course of --

9          THE COURT:  That's literally, if you read through

10    the release, I mean, I'm not sure I've ever read a release

11    that has as many terms as this one, to kind of try to round

12    out the corners of just how the broad release is.  And

13    there's no way, I don't care how broad your charter was,

14    there's no way you could have investigated all of those

15    things.

16          And certainly, in terms of evidence that these are

17    reasonable, that they're actual claims, or that there's been

18    actual consideration by the company of the risks and rewards

19    or pursuing claims on these things, no, there isn't.

20    There's just an effort to make the releases as broad as

21    possible, that's not enough.

22          I'm supposed to -- I may be required to some

23    extent to defer to the company's judgment as long as it's

24    reasonable, and so long as the other standards make sense,

25    but implies that a judgment has been made.  And the only

Page 181

1   judgment made here was, let's free the employees.  I don't

2   see any investigation of the full amount of claims for which

3   people are supposed to be getting releases, it's just not

4   there.

5            MR. KIRPALANI:  And we did look at the directors

6   and officers, Your Honor.

7            THE COURT:  Yeah, I understand.

8            MR. KIRPALANI:  Respectfully --

9            THE COURT:  That's a different matter.  You did

10  look at the directors and officers.  I don't know that I can

11  free them from preference claims because I don't have any

12  information about that, but I know you did look at the 3AC

13  loans, but let's just stick with the other releases.

14           I just -- you know, if I'd had some evidence maybe

15  it would've come out differently, but I just don't have it.

16  I think we have to carve them back.  That's not to say that

17  the plan administrator has to sue these people for

18  preferences, for example.  The plan administrator can decide

19  whether it makes sense or not.  But I certainly don't have

20  evidence that would allow me to say that it is so clearly

21  without sense, that it should just be released.

22           MR. KIRPALANI:  I understand, Your Honor.

23           THE COURT:  Okay.

24           MR. KIRPALANI:  Do you want me to continue with my

25  argument about the directors and officers' releases?

Page 182

```
 1                 THE COURT:  Go ahead, yes.
 2                 MR. KIRPALANI:  So as Your Honor just covered I
 3     believe with Ms. Okike, there is no -- I want to talk for a
 4     moment what's not being released, to try to alleviate any
 5     kind of tension that may exist.
 6                 There are no non-consensual third party releases.
 7     Customers, creditors and regulators will retain their rights
 8     to sue under they have permanently opted in to releases of
 9     their own.  Their rights to sue people, if any, exist are
10     not impaired by the settlement and by the releases by the
11     estate on the plan.
12                 And I wanted to emphasize that, because Mr. Pohl
13     last week was asked questions by customers that really
14     related to non-estate claims, including some of the things I
15     mentioned earlier about statements made to the market,
16     statements made to securities holders, statements made to
17     customers through e-mails, through text messages, through
18     press releases.
19                 To the extent, anyone has a direct cause of action
20     and I'm not saying they do, to the extent that they do
21     against individuals, those claims are not released.  To the
22     extent they have claims against the debtor, those claims are
23     not released except as part of the discharge and release
24     that will be receiving a dividend pursuant to the plan.
25                 Second, the estate that I mentioned, is not
```

Page 183

1    releasing former officers, former directors, or former

2    employees, who did not serve the Chapter 11 estate at all.

3              Third, the estate is not released Mr. Ehrlich or

4    Mr. Psaropoulos from the breach of fiduciary duty of care

5    claims relating to their decision to make the 3AC loans.

6    The issue is one of recourse but not on releasing the claim

7    itself.

8              As Mr. Pohl testified, the special committee

9    determined after a comprehensive investigation that was done

10   hand in hand with the statutory creditor's committee that

11   these breach of fiduciary duty claims are colorable,

12   cognizable and they should be released.

13             Fourth, the estate is not releasing Alameda or the

14   insurance company that received millions of dollars on the

15   eve of bankruptcy or any other third parties for anything.

16   All of those claims are being retained pursuant to Section

17   1123(b)(3) of the Bankruptcy Code by the plan administrator

18   and will be prosecuted or not based on that individual's

19   cost benefit analysis.

20             So while we determined that the estate may have

21   cognizable claims against Mr. Ehrlich and Mr. Psaropoulos,

22   the special committee decided in their business judgment

23   acting independent of any connection whatsoever with the

24   board members, the officers being investigated, counsel for

25   the debtors, to pursue a settlement with respect to these

Page 184

1      individuals personally assets.

2              THE COURT:  So as to Mr. Ehrlich and Mr.

3      Psaropoulos, did I pronounce that correctly?

4              MR. KIRPALANI:  Yep.

5              THE COURT:  You've proposed an actual settlement

6      that includes a release and I do understand if you want to

7      settle claims against a party it's often part of the

8      discussion that there be a release.  But you've preserved

9      certain claims as to the insurance and 3AC, but you've

10     released all others against not only Mr. Ehrlich and Mr.

11     Psaropoulos, but all other officers and directors, not as

12     part of a settlement with them or any demonstrable or

13     identified consideration from them, but just a release.

14             MR. KIRPALANI:  The demonstrative -- the

15     demonstrated consideration was to prevent dissipation of the

16     potential distributions of other customers by having

17     indemnification claims filed by those officers and directors

18     for frivolous claims that would have been brought.

19             There was concerted effort and investigation into

20     all of the directors and officers in connection not just

21     with the 3AC loan, but in potential with all of the

22     historical transactions, at least of a magnitude that

23     requires spending time to look into them, as well as press

24     releases, messaging by the company, et cetera, to see are

25     there any claims against these individuals.  Because all of

Page 185

1      them have indemnity obligations from the company.  All of

2      them were exculpated and indemnified pursuant to the

3      operating agreement of the company.

4              And the sea suite (ph) level managers even had

5      separate indemnification agreements from the company that

6      would become more general unsecured claims.  As well as the

7      fact that all of those individuals would also tap into the

8      D&O insurance, which is what we desperately are trying to

9      preserve.

10             And we're happy that today there's still the full

11     $20 million of coverage available for the plan

12     administrative to attempt to negotiate at least a decent

13     settlement from, if not fully litigated against the carrier

14     and the individuals, Mr. Psaropoulos and Mr. Ehrlich because

15     they are the ones where the buck stopped.  They were the

16     ones who had potential liability.

17             THE COURT:  Who was in the officer and director

18     group that you looked at besides Mr. Ehrlich and Mr.

19     Psaropoulos?

20             MR. KIRPALANI:  All of them.  The chairman, Mr.

21     Philip Atan (ph), Ryan Wooley (ph), I remember because I

22     remember he's specifically not a director or an officer, but

23     he's a senior member of management, might be considered an

24     insider.

25             Dave Brosgol, general counsel, Gerard Hanshe as

Page 186

1    well, just going off my memory.  Let me take a closer look

2    here.  Ashwin Prithipaul, the chief financial officer,

3    Marshall Jensen, Pam Kramer (ph), Stephen Ehrlich I

4    mentioned already and Evan Psaropoulos I mentioned already.

5            Misha Milani (ph) -- one second, Your Honor.

6    Yeah, Mr. Slater (ph) reminds me it were the individuals

7    that were interviewed, the 12 individuals that were

8    interviewed, who we interviewed for any potential wrongdoing

9    and they were all disclosed in the disclosure statement by

10   name.

11           THE COURT:  Okay.

12           MR. KIRPALANI:  So as I was saying, Your Honor,

13   the special committee decided to pursue potential settlement

14   discussions with Mr. Ehrlich and Mr. Psaropoulos in the hope

15   that we could accomplish a few goals.  First, get whatever

16   personal assets are liquid and get it all from these

17   individuals, that we can get consensually.

18           Assuming it was a sizeable chunk from what

19   otherwise we could collect, it might be worth pursuing that.

20   That was goal number one.

21           Goal number two, minimize or get the waiver of

22   claims by those individuals against the estate because

23   that's currency that they could trade, that they could get.

24   And third, preserve the D&O coverage to the extent possible

25   and specifically with respect to that bizarre eve of

Page 187

1    bankruptcy side A policy, could we get them to agree not to

2    look to that policy, until after the plan administrative has

3    had its day in court or a conference room to negotiate with

4    the D&O carriers, and we got that too, Your Honor.

5            So the -- all three of those goals were met by the

6    special committee.  Significant to Mr. Pohl's analysis was

7    that there was no evidence of self dealing, in connection

8    with making the loans to 3AC.  These officers would have

9    been entitled or would be entitled to business judgment --

10   the business judgment rule shield of liability.

11           Also, as Mr. Pohl mentioned, Voyager Digital's

12   operating agreement gave these individuals broad exculpation

13   and they enjoyed broad indemnification rights that were

14   provided by separate contracts with the debtors.

15           Mr. Pohl testified in his rule book they didn't

16   conduct sufficient due diligence on making the 3AC loans.

17   But if the special committee pursued litigation, he

18   explained that we would need to prove that the acts and

19   omissions were not just negligent, but they were grossly

20   negligent and there was no evidence of willful misconduct.

21           Could they have been grossly negligent?

22   Potentially, yes, potentially.  There is a gray area between

23   willful misconduct -- I'm sorry, between gross negligence

24   and negligence.  But what we've determined and what Mr. Pohl

25   testified is that both of these men had a keen interest in

Page 188

1    the success of Voyager.  If Voyager did well, they did well.

2    If Voyager failed, so too would their careers and their

3    personal investments kept on the platform, as well as their

4    equity investments.

5              Even if a plaintiff could prove that their acts

6    and omissions were grossly negligent, the plaintiff would

7    still need to prove that it's that gross negligence that

8    caused the losses to the estate, when by all acts and by all

9    indications and as Mr. Pohl testified, his view, the estate

10   was defrauded by 3AC and its founders.

11             And even if the plaintiff could surpass those

12   hurdles and obtain the judgment against those individuals,

13   after undoubtedly incurring significant costs and expenses,

14   Mr. Ehrlich and Mr. Psaropoulos simply did not have the

15   personal assets that satisfied any significant judgment.

16             And Mr. Pohl testified that we did look at their

17   (indiscernible) assets and the states in which they lived to

18   see are these community property estates and they are not.

19             So after doing all that, we still weren't prepared

20   to let them walk for nothing, so we decided --

21             THE COURT:  No, I understand the case as to the

22   settlement with Mr. Ehrlich and Mr. Psaropoulos and I

23   understand that that's the one that's going to bother some

24   of the customers the most, but I do understand that it has

25   been looked at, it has actually been considered, it has

Page 189

1    actually been weighed.  You offered me the evidence and I

2    understand what the company standards are and the limits of

3    my authority as to what I can do as to that.  And I really

4    want to set that settlement aside and just make sure that

5    the rest of the releases make sense.

6              As to the other members of the trove who you've

7    interviewed, you said that the reason for the releases that

8    it prevents a frivolous depletion by the assertion of claims

9    that might be subject to indemnity.  Well, but these are the

10   debtor's claims.  So who's going to make a frivolous

11   assertion of claims on behalf of the debtors?

12             MR. KIRPALANI:  Well, I mean the charge for the

13   special committee was to determine whether there are any

14   non-frivolous claims to be brought.  So they made that

15   determination and determined that there are no non-frivolous

16   things that could be brought, and so therefore, the releases

17   of those individuals is --

18             THE COURT:  But I think we've also made clear that

19   you did not and could not possibly have looked into claims

20   relating to all of the kinds of things that are covered by

21   that release.

22             MR. KIRPALANI:  We looked at the -- obviously the

23   3AC loan was a primary focus as Mr. Pohl testified and it

24   was.  It is the reason this company wound up in bankruptcy.

25   As for disclosure to customers, dealings with the FDIC,

Page 190

1    dealings with regulators, we did look at all of those as

2    well, as to whether the estate, the company would have a

3    cause of action against its own officer, its own director

4    under the terms of the operating agreement, there's no such

5    claim for those types of conduct.

6              THE COURT:  Okay.  Let me say that as to the

7    proposed settlement with Mr. Ehrlich and Mr. Psaropoulos,

8    the standards that I am obligated to apply are for me to

9    assess whether it is in the range of reasonableness, based

10   on likelihood of success, possibility of recovery, et

11   cetera, I do think that the evidence that you have given me

12   which while the conclusion has been disagreed with, the

13   actual evidence has not been controverted.

14             I think that supports the settlement and I'm sure

15   that's going to be an enormous disappointment to many of the

16   account holders on the phone, but I think that the evidence

17   is going to compel me to that conclusion.

18             I'm much less convinced, the scope of the releases

19   as to the other insiders and certainly not at all convinced

20   as to the scope of the releases as to people who may not

21   have even been the subject of your investigation.  Let me

22   hear from the U.S. Trustee because they had objections on

23   this point.

24             MR. KIRPALANI:  Thank you.

25             THE COURT:  Thank you.

Page 191

1           MR. MORRISSEY:  Thank you, Your Honor, good

2     afternoon.  Richard Morrissey for the U.S. Trustee.

3           Just so it's clear, Your Honor is talking about

4     debtor releases, they're all third party releases, they

5     cover --

6           THE COURT:  Third party releases were voluntary,

7     they cover what they cover.  I'm not undoing any of those.

8           MR. MORRISSEY:  Okay.  Your Honor, the releases in

9     the Chapter 11 cases can be brought, but there's a limit as

10    to how broad they can be.  And the -- as Your Honor has

11    stated here, it covers a lot of ground and too much ground.

12    And there was not consideration given in exchange for some

13    of those releases and I'm speaking specifically of retained

14    professionals, for example, who are covered by the way by

15    exculpation, which we'll be talking about later.  And also

16    all the employees of the debtor.

17          So I believe, Your Honor, that the releasees

18    should be circumscribed as pretty much in line what Your

19    Honor just said.

20          Your Honor, there's a lot of overlap between the

21    exculpation provisions and the release provision.  I can

22    certainly wait to discuss the issues we have there.  But,

23    Your Honor, on the third party releases, just one point I

24    wanted to make.

25          The debtors have agreed to leave something from

Page 192

```
 1    the third --

 2              THE COURT:  Okay.

 3              MR. MORRISSEY:  -- released party and that would

 4    be the wind down debtor, because we believe, Your Honor,

 5    that releases should not be applied prospectively.  And we

 6    do believe that only the people who have been involved in

 7    the case between the petition date and the effective date --

 8              THE COURT:  Okay.

 9              MR. MORRISSEY:  -- should be covered.

10              So with that, Your Honor, I'll -- I guess I'll

11    wait until exculpation.

12              THE COURT:  Well, let's do it together, to the

13    extent that you're complaining about releases of

14    professionals, or I suppose, committee members.  I do think

15    the exculpation here, the provision was too broad as -- at

16    least as set forth in what I've seen.  I don't know, I

17    haven't gotten through all the different iterations of the

18    confirmation order that you've submitted, but you know what

19    I did in the Aegean case, which was narrower and are you

20    suggesting more than that here, and if so, why?

21              MR. MORRISSEY:  The answer to that is, no, Your

22    Honor.  We -- as a matter of fact we --

23              THE COURT:  I'm sorry, I was asking them.

24              MR. MORRISSEY:  Oh.

25              THE COURT:  That's all right.
```

Page 193

1           MS. OKIKE:  No, Your Honor, we tried to be

2    consistent with Aegean, but if we weren't successful in that

3    we're happy to (indiscernible).

4           THE COURT:  Okay.  What I read in the plan seemed

5    much broader than what I had done in Aegean.

6           MR. MORRISSEY:  Your Honor, would you like me to

7    allow Ms. Okike to respond?

8           THE COURT:  To that question only, yeah, but stay

9    where you are at the podium and I'll hear you.

10          MS. OKIKE:  Your Honor, we tried to limit it to,

11   you know, transactions and orders that Your Honor has

12   approved in connection with, you know, various negotiating,

13   executing, implementing transactions in connection with

14   these Chapter 11 cases.  That was our intention.

15          THE COURT:  Okay.  I don't know, maybe I'm

16   remembering something wrong, but I thought when I looked at

17   it that the exculpation language was significantly broader

18   than what I had done in Aegean.

19          MR. MORRISSEY:  Your Honor, we thought so too and

20   as a matter of fact, we actually came to an agreement that

21   debtor's counsel on certain parts of that exculpation

22   provision.

23          THE COURT:  Okay.

24          MR. MORRISSEY:  And I think that should narrow the

25   issue --

Page 194

1           THE COURT:  Very good.

2           MR. MORRISSEY:  -- before Your Honor.

3           THE COURT:  So is there any remaining issue on the

4    exculpation?

5           MR. MORRISSEY:  There is some.

6           THE COURT:  Okay.

7           MR. MORRISSEY:  Not nearly as much as there was

8    originally.

9           THE COURT:  All right.

10          MR. MORRISSEY:  (indiscernible) that, Your Honor.

11          Your Honor, I already mentioned the professionals

12   being on the list of both released parties and exculpated

13   parties.

14          THE COURT:  Yeah.

15          MR. MORRISSEY:  We don't have a problem with them

16   being on the list of exculpated parties.  I just wanted to

17   make that clear.  The plan also provided for not only

18   prospective releases to entities that didn't exist or

19   individuals, but also the exculpation provision does the

20   same thing.

21          The -- we had an issue that we did resolve, Your

22   Honor, regarding the special committee since Mr. Kirpalani

23   just spoke, I figured I'd raise that first.

24          The special committee itself was actually -- I'm

25   sorry, not committee, the special committee investigation

Page 195

1    itself was among the exculpated parties.  And in response to

2    the U.S. concern about that, debtors proposed that the Court

3    -- if the Court approves the settlement or transaction, to

4    use Your Honor's language, the parties to that settlement or

5    transaction so that the investigation itself can be part of

6    the exculpation provision.

7              So I think we have an agreement on that, Your

8    Honor, as long as its tied to the Aegean standard of the

9    Court approved settlement or transaction.

10             THE COURT:  Okay.

11             MR. MORRISSEY:  The debtors have also agreed that

12   to add a provision that nothing in the plan shall limit the

13   liability of professionals to their clients, pursuant to New

14   York comp codes and regulations, Rule 1.8(h).  It's

15   basically the idea --

16             THE COURT:  I'm familiar with that --

17             MR. MORRISSEY:  -- (indiscernible) professionals.

18             THE COURT:  I understand it.

19             MR. MORRISSEY:  So the -- one issue we have

20   regarding exculpation is that we still have, is that the

21   distribution agent which is the same finance, is listed

22   among the exculpated parties.  This we believe is an

23   improper perspective release and effectively shields the

24   distribution agent from future, which is to sale post sale,

25   post effective date conduct.

Page 196

1            And we would ask that the distribution agent be

2    stricken unless the Court wants to apply the Aegean standard

3    to narrow that release for the distribution agent, related

4    to carrying out the Court's orders.

5            I can -- I was going to go on to other issues but

6    I can stop now and allow counsel to respond.

7            THE COURT:  Well, I'll hear from the debtor's

8    counsel on the proposed exculpation or releases as to the

9    distribution agent.

10           MS. OKIKE:  Your Honor, with respect to the

11   distribution agent, the distribution agent is going to be

12   taking certain actions in connection with effectuating the

13   transactions that Your Honor is approving under the plan.

14   And we think particularly in this case, you know, dealing

15   with some of the comments by the governmental entities they

16   should be protected as, you know, in the capacity when

17   they're acting as a distribution agent under the plan.  It

18   essentially (indiscernible) that Your Honor has approved.

19           We know that you approved something similar in the

20   Fairway case and we tried to model that in the plan as well.

21   We think it's appropriate in this case, given that the

22   distribution agent is a fiduciary acting on behalf of the

23   debtors, in connection with consummating the transactions

24   under the plan.

25           THE COURT:  Okay.  Have you shared that language

Page 197

 1   with Mr. Morrissey?  Is there a continued objection to it?

 2            MS. OKIKE:  I think this -- I don't want to speak

 3   for Mr. Morrissey, but I think he categorically opposes an

 4   entity that doesn't come into effect until after the

 5   effective date from receiving an exculpation.  And I think

 6   we just have a disagreement given the rule that the

 7   distribution agent will play, in addition prior to the

 8   effective date and getting ready to actually effectuate the

 9   transactions.

10            MR. MORRISSEY:  Your Honor, Richard Morrissey

11   again for the U.S. Trustee.  To be candid, Your Honor, I

12   don't remember exactly what the language of the Fairway

13   provision was, because (indiscernible) in fact provided to

14   us a while ago.

15            All I can go by, Your Honor, what I'm reading here

16   in the (indiscernible) as far as whether it's being

17   exculpated and who is exculpated.  This is not an estate

18   fiduciary that's being exculpated here, the distribution

19   agent.  We do recognize as Ms. Okike said, there's certain

20   things that the -- that finance or the distribution which it

21   has to do in order to carry out the plan.  But the --

22            THE COURT:  Yes, they do it --

23            MR. MORRISSEY:  -- exculpation goes beyond that.

24            THE COURT:  They do it -- well, in what way are

25   they not a fiduciary under my order, they receive these

Page 198

1    assets in trust and they distribute them in trust, so how

2    are they not a fiduciary?

3           MR. MORRISSEY:  Well, Your Honor, they're

4    (indiscernible) to the extent that they are fiduciaries

5    (indiscernible) where the exculpation is not.

6           THE COURT:  Well, I don't have the problem if you

7    want to -- yeah, I'm not going to give him exculpations for

8    anything that they do, right.  For heaven sakes, if they

9    steal assets, I'm not exculpating them from that.  But in

10   performance of the tasks that I have approved and the

11   faithful performance of the duties or of the agreements that

12   I have approved, why should they be liable?  And the same

13   thing I said this morning, you know, they're going to have -

14   - once I order them to do these things, they're going to

15   have a statutory obligation to do them, right?

16          MR. MORRISSEY:  Yes, Your Honor, but not

17   everything that they do is going to be within the Court's

18   purview.  So if there's signed agreements, for example,

19   things like that --

20          THE COURT:  Surely you can come up with language

21   that makes clear that all we're really doing is saying

22   they're exculpated to the extent that they faithfully

23   perform and execute the transactions that I have approved an

24   the duties that I have assigned to them, right?  If that's

25   not the perfect language, you should surely can come up with

Page 199

```
 1    some.

 2               MR. MORRISSEY:  We will do that.  Thank you, Your

 3    Honor.

 4               Your Honor, the next issue --

 5               THE COURT:  Before we go to the next issue, just

 6    hang on one second.  Just one second.

 7               Before we go to the next issue, where do we stand

 8    on the one that is nearest and dearest to my heart, which is

 9    whether I have to do a confirmation order by this evening?

10               MR. GOLDBERG:  Your Honor, I think we have someone

11    --

12               THE COURT:  Just wait, please.

13               MR. GOLDBERG:  We had some ongoing discussions

14    that we had with the debtor and the committee regarding Your

15    Honor's request on that point as well.  And so the next

16    break I'll speak with them and hopefully (indiscernible).

17               THE COURT:  Okay.  Whoever was speaking on the

18    line.  Who was it?

19               MR. BARNEA:  Sorry, this is J.D. Barnea from the

20    U.S. Attorney's Office.  I spoke earlier this morning about

21    the exculpation clause.

22               THE COURT:  Right.

23               MR. BARNEA:  I just wanted to note for the record

24    our continued objection to this entire enterprise and to

25    note that in the initial proposed order that would have
```

Page 200

```
 1    approved the plan in this case, it would have carved out the

 2    government from the exculpation provision, it was only the

 3    revised proposed order that was proposed for the first time

 4    on the morning, on Thursday morning at the beginning of the

 5    confirmation hearing that purported to undo the appropriate

 6    carve out for the government from the exculpation clause.

 7            That is why we objected that same day and the

 8    letter that I sent.  And that's why in our letter we asked

 9    for an opportunity to fully brief the issue of whether

10    exculpation is appropriate in this case as against the

11    government.

12            We understand, Your Honor, that you've decided the

13    Aegean case, a decision that we don't necessarily agree with

14    on the government's side, but we wanted an opportunity to

15    submit fully our arguments as to why an exculpation as

16    against the government is inconsistent with any number of

17    constitutional provisions that's been consistent with the

18    Bankruptcy Code, it's been consistent with the District

19    Court's decision in the Perdue case and in many other

20    provisions that we could explain if we were permitted to

21    submit a full brief.

22            Again, time prevented us from doing so, although

23    we're working on as we speak and are prepared to submit one

24    perhaps even this afternoon or tomorrow, but we didn't want

25    to lose the opportunity to object and to preserve our
```

Page 201

```
1      appellate rights if necessary to the perspective exculpation

2      of debtors and non-debtors as to many tasks that may or may

3      not violate all sorts of obligations they may have to the

4      government and others.

5              And so we just wanted to put that on the record.

6      We understand, Your Honor, that the Court has already spoken

7      a little bit to that this morning, but we really would like

8      the opportunity to submit our arguments in writing, before

9      the Court enters any final order.

10             We also don't -- haven't seen any final order yet.

11     We understand that they're going to be working on that, so

12     we'd like the opportunity to see that language before it's

13     approved by the Court and to submit our written objections

14     to it.

15             THE COURT:  Okay.

16             MR. MORRISSEY:  Your Honor, just to add what

17     counsel had just said.  I thought it would be helpful to

18     point out to Your Honor where the new language appears,

19     because it's not actually with the exculpation language

20     itself.  It's separate.  And I hesitate to say the most

21     recent version of the plan, I think this is.  It's Article

22     6, provisions governing distributions, Subsection B, which

23     is called power -- rights and powers of distribution agent.

24             And then Subparagraph 1, powers of the

25     distribution agent, the debtors added a paragraph and I
```

Page 202

```
 1    believe that's what Mr. Barnea was referring to.

 2              THE COURT:  Okay.

 3              MR. MORRISSEY:  Your Honor, I was going to

 4    continue.  I didn't know if anyone else wanted to comment on

 5    the exculpation regarding the distribution agent.

 6              THE COURT:  Go ahead.

 7              MR. UPTEGROVE:  Your Honor, William Uptegrove on

 8    behalf of the United States Securities & Exchange

 9    Commission, if I may.

10              THE COURT:  Yes.

11              MR. UPTEGROVE:  Your Honor, I don't have any

12    further argument on the issue of exculpation per se, but did

13    want to clarify a couple of points, I think including the

14    provision of the plan that the U.S. Trustee was just

15    mentioning.

16              So I understand that the Court wants to

17    (indiscernible) the exculpation language consistent with its

18    standard language particularly used in the Aegean case.  We

19    just wanted to confirm that the portions of the three

20    paragraphs in our objection filed this morning will be

21    stricken as inconsistent with, you know, the Aegean standard

22    and will be applicable law that Your Honor discussed this

23    morning.

24              THE COURT:  I don't have --

25              UNIDENTIFIED:  Your Honor --
```

Page 203

1           THE COURT:  I don't have all that language in

2    front of me, but I think that's right.

3           MR. UPTEGROVE:  And I think -- I don't have the

4    full plan in front of me, but I think the U.S. Trustee, I

5    think that it's -- we're talking about the same provision.

6    I see it here as page 69 and 70 of the PDF of 158 of Docket

7    No. 1138.  There's a -- there's similar language to what

8    we've been (indiscernible) confirmation.  It's a little

9    different, so I don't know if that's the same provision but

10   it reads something to the effect and extent that any

11   cryptocurrency is deemed to be a security of the SEC or any

12   governmental unit.

13          And then it goes on to talk about good faith and

14   no liability for any -- various acts, including distribution

15   of cryptocurrency.  That in addition to the Aegean language

16   that Your Honor talked about, so I just wanted to make sure

17   that that would be something that wouldn't be, you know,

18   included and applied in the order, it's over and above

19   (indiscernible) of the Aegean standard.

20          MR. BARNEA:  Your Honor, this is J.D. Barnea again

21   from the U.S. Attorney's Office.  I just wanted to read to

22   the Court the specifics, most problematic language that's in

23   paragraph 142 and 143 of the proposed -- the latest version

24   of the proposed confirmation order, which in our view, goes

25   well beyond even what this Court allowed in Aegean, and is

Page 204

1    totally improper in many respects.

2            It says, provided further that the United States,

3    the state, and their agencies may not and will not allege

4    that the restructuring transactions are a violation of any

5    rules or regulations enforced by the United States, the

6    state, or any of their agencies, nor will they bring a claim

7    against any person, extremely broadly defined, on account of

8    their -- on account of or relating to the restructuring

9    transactions.

10           This language, if approved in the final order,

11   could potentially make it so that if someone incurs a tax

12   liability in the restructuring transaction, the IRS cannot

13   assess that tax.  If someone commits a crime in implementing

14   the restructuring transaction, they can't be prosecuted for

15   it.

16           If they commit a fraud, they can't be prosecuted

17   or civilly charged with that.  If they violated the

18   securities rules, or if they violate an environmental rule,

19   or any other possible governmental action that relates in

20   any way to the restructuring transactions of which no one

21   even knows what those things might be, this language would

22   enjoin and tie the hands of the United States and the states

23   and all of their agencies from ever claiming so, simply

24   because, you know, they relate in some way to transactions

25   contemplated by a plan of reorganization, not -- that goes

1    well beyond Aegean even to the extent that Aegean is the

2    appropriate standard here --

3            THE COURT:  I'm not going to do -- I'm not going

4    to do anything of that scope.  On the other hand, as I said

5    earlier, whatever I approve and confirm, there are

6    individuals who will have a statutory obligation to do it.

7    The regulators have had the chance, but have declined the

8    chance to suggest or to show me that any of these

9    transactions are illegal or should not go forward.  It just

10   suggested that there might be issues, but have not taken an

11   official position.

12           To me you ought to be and will be estopped through

13   the exculpation provision from contending that the

14   individuals who carry out their statutory obligations to

15   implement the deal that I approve are personally liable in

16   any way for doing so.  That doesn't mean that you can't go

17   after them if they violate tax laws.  It doesn't mean you

18   can't go after them if they act unfaithfully, et cetera.

19           It does mean to be a hundred percent clear that I

20   am not going to sit here and say that you can say nothing to

21   me, deliberately remain silent as to whether this is a

22   problem and actually is a problem in your view, only to come

23   back after I direct debtors, for example, to distribute VGX

24   and say that the people who did so violated the securities

25   laws and may be criminally or civilly punished individually

Page 206

1    for having done so.

2           That to me is something I will not tolerate and

3    will not allow.  You've had your chance if that's what you

4    think to make that argument.  And I won't subject

5    individuals under the compulsion of my own order, my own

6    confirmation order to do things that will subject them to

7    potential liabilities.  It's just not appropriate in the

8    slightest.  Okay?

9           MR. BARNEA:  So it's the Court's position and we

10   respectfully request the opportunity to submit a brief

11   setting forth our argument in more detail before the Court

12   enters any confirmation.

13          THE COURT:  Go ahead, but hurry up.

14          MR. GOLDBERG:  Your Honor, I just wanted to

15   clarify for the record.  We refer individuals, we don't mean

16   just (indiscernible) persons but also legal entities in

17   their roles (indiscernible).

18          THE COURT:  Correct.  And I'm just saying, you

19   know, I'm not saying that they can't be stopped, that people

20   can't preserve their injunctive rights.  That's fine.  But,

21   you know, to kind of purposefully stay on the sidelines and

22   take no position on the issue and then come in and say that

23   what people are under court order to do, they're now

24   personally or they're not subject to penalties for, that's

25   just doesn't make any sense to me, not in the slightest.

1            MR. UPTEGROVE:  Your Honor, William Uptegrove for

2     the SEC.  Just to go back to our point, we understand your

3     position.  We just for the purpose of clarity to make sure

4     that the final order reflects what I think you've said,

5     paragraph -- again paragraphs -- the U.S. Attorney's Office

6     just talked about two of the three paragraphs that are cited

7     in our objections, so 142 and 143 are the paragraphs the

8     U.S. Attorney's Office mentioned and those are two of the

9     three in our objection.

10           The third one is SEC specific injunction.  And so

11    I think those were the problematic language Your Honor

12    talked about this morning, that you weren't going to be --

13    you weren't going to enter.  So we just wanted to confirm so

14    that when we talk to the debtors afterwards, we're all on

15    the same page about what the language is and isn't.

16           I think that language should be stricken.  I think

17    that's what Your Honor said earlier.  I just wanted to make

18    sure that we're all talking about the same thing, one.  And

19    then two, there is some sort of I would think similar

20    language in the plan I mentioned about good faith and things

21    of that that go above and beyond Aegean, and just want to

22    make sure that things like that, you know, finding no

23    liability per se isn't what Your Honor has in mind.

24           THE COURT:  I guess --

25           MS. RYAN:  Your Honor, this is Ms. Ryan --

1              THE COURT:  -- until we see the final language we

2       don't know, but I think -- I hope the concept is clear.

3       Let's just see if we can get the wordsmithing down.

4              MR. JONES:  Your Honor, Seth Jones, pro se.

5              THE COURT:  Yeah.

6              MR. JONES:  A quick question.  The SEC has taken a

7       stance that (indiscernible) XRP is a security, that's

8       currently in the middle of a trial.  Is that not violating

9       security laws (indiscernible) XRP on the (indiscernible)

10      platform?

11             THE COURT:  Well, there's no ruling at trial,

12      right?

13             MR. JONES:  Okay.  But you keep talking about

14      taking a stance on (indiscernible), they took a stance on

15      XLT (ph), right, I just want to clarify that.

16             THE COURT:  I don't think the SEC has even

17      suggested that what Voyager's going to be doing with XRP is

18      a violation of the securities laws, although that's just

19      something they haven't revealed.  They haven't said that.

20             MR. JONES:  All right.  Thank you, sir.

21             MS. RYAN:  Your Honor, this is Ms. Ryan from the

22      State of Texas.  If I may be heard regarding the releases?

23             THE COURT:  Sure.

24             MS. RYAN:  Thank you, Your Honor.  The State has

25      objected and agrees on the same grounds that you've heard.

Page 209

1   Additionally, paragraph 143 of the proposed order I think

2   the newest version is Docket 1140.  It contains language

3   that references back to paragraph 97 and 99 of the proposed

4   order.  And those paragraphs are very broad releases for the

5   purchaser.  And again, we find that broad release

6   objectionable.  Once the purchaser purchases the property,

7   they're going to have to comply with law, just as, you know,

8   any purchaser, buyer or even debtor in possession would have

9   to.  And so we also object to that addition, in addition to

10  what you've already heard.

11          THE COURT:  Which paragraphs in particular of

12  which?

13          MS. RYAN:  In particular, it's 97 and 99, Your

14  Honor.  And 99 particularly the breath of it is concerning

15  to me.

16          THE COURT:  Which version --

17          MS. RYAN:  97 --

18          THE COURT:  Which version of the confirmation

19  order to make sure I look at the right paragraphs?

20          MS. RYAN:  At Docket 1140, Your Honor.

21          THE COURT:  1140?

22          MS. RYAN:  Yes, sir.

23          THE COURT:  Okay.  I don't have that right in

24  front of me, but we'll -- I think the best thing to do on

25  all of these provisions is to see what language we come up

Page 210

1    with and then see if there are further objections.  Okay?

2              MS. RYAN:  Yes, Your Honor.

3              MS. OKIKE:  Your Honor, I will just say we have

4    been negotiating back and forth with the various

5    governmental entities on these various provisions.  And the

6    proviso which appears in all of the paragraphs was what we

7    added to try to get at what Your Honor said in terms of the

8    exculpated parties not being personally liable, in terms of

9    taking actions that Your Honor approves or may approve under

10   the plan.

11             I totally understand we probably could have done

12   that a little bit better, but that is what we're trying to

13   get at.  The second thing we're trying to get at is that we

14   don't believe any language in here should somehow preclude

15   the governmental agencies from having complied with the bar

16   date order.

17             So, for instance, the SEC did not file a claim

18   against the debtors.  And we don't think that there should

19   be anything in this order that somehow insinuates that

20   they're now entitled to file (indiscernible) proof of claim.

21             THE COURT:  I haven't heard anything being said

22   that would entitle them to do that, but.

23             MS. OKIKE:  But we have a specific proviso here,

24   Your Honor, that they're objecting to that says nothing in

25   this confirmation order or the plan shall modify in any

Page 211

1   respect the relief previously granted in the bar date order.

2   And they're explicitly objecting to that proviso and they

3   did not file a proof of claim.

4            THE COURT:  I think --

5            MR. UPTEGROVE:  Your Honor --

6            THE COURT:  I thought they were objecting to -- I

7   thought the objection was a different proviso.  What's the

8   objection to that one?

9            MR. UPTEGROVE:  Your Honor, William Uptegrove on

10  behalf of the United States Securities & Exchange

11  Commission.  There's room on filing a proof of claim and

12  untimely proofs of claims.  I don't think there needs to be

13  a provision in the confirmation order specifically singling

14  out, you know, the government bar date and our proving

15  claim, one.

16           And two, there's additional language in here that,

17  let me just find it.  So it says -- so I think this is -- I

18  think it's the second to last or maybe to last version of

19  the confirmation order, paragraph 142 in our objection.

20  It's quoted, provided however that nothing in this

21  confirmation order or the plan shall modify in any respects

22  the relief previously granted in the bar date order, just to

23  point out that parenthetically that don't need another order

24  to say what's already in a prior order.

25           But, no person or entity including the United

Page 212

1    States, the state, or any other agencies can seek or receive

2    a direct or indirect distribution of any property of the

3    debtor's estate unless they filed a proof of claim prior to

4    the government bar date.

5              Again, there's already rules in the Code and the

6    bankruptcy rules for this.  And a big problem with it is the

7    language, the indirect language.  Your Honor, I have

8    absolutely no idea what that means.  And it could mean all

9    types of things in hindsight, and it's just an unmuted

10   provision that potentially does enjoin something that we

11   otherwise could do by saying we can't indirectly

12   (indiscernible) that language, indirect, you know, seek

13   (indiscernible) a direct or indirect distribution of

14   property of the debtor's estate.  It's -- in our view, it's

15   not a needed provision.  It has ambiguous language that

16   could be read at some point could somehow impair our police

17   and regulatory powers and we think that's improper.

18             MS. OKIKE:  Your Honor, the reason we have the

19   proviso is because the provision that they requested that we

20   add, says nothing in this confirmation order or the plan

21   shall (indiscernible) release by the United States of any

22   claim arising under, and all these different things, or

23   enjoin them from bringing a claim against the released

24   parties, which includes the debtors.

25             And so we think you need a proviso in light of the

Page 213

1    fact that we have a bar date order and the SEC did not file

2    a proof of claim.

3            THE COURT:  All right.  I will --

4            MR. UPTEGROVE:  Your Honor, it's a liquidating

5    debtor, it doesn't get a discharge.

6            THE COURT:  I will --

7            MS. OKIKE:  It's not a discharge.

8            THE COURT:  I will look at the proviso and modify

9    it appropriately.  If I can't do so, I shouldn't have this

10   job, but we don't need any further argument about that.

11           MR. GOLDBERG:  Your Honor, Adam Goldberg on Latham

12   & Watkins on behalf of Finance U.S.  Just very quickly to

13   the frame issue raised by the State of Texas on paragraphs

14   97 and 99.

15           From our perspective, that language is intended to

16   implement the free and clear nature of the asset sales and

17   to protect the purchaser and the acquired assets from claims

18   and interests that could be brought against those assets and

19   the debtor's -- in the hands of the debtor's estate.

20           THE COURT:  Right.

21           MR. GOLDBERG:  Thank you, Your Honor.

22           THE COURT:  That just means you're not liable,

23   taking on liability for liabilities of the debtor.

24           MR. GOLDBERG:  Correct.

25           THE COURT:  It doesn't mean that you're freed from

Page 214

1      any of your own liabilities.

2                MR. GOLDBERG:  That's exactly right, Your Honor.

3                THE COURT:  Yeah.

4                MR. GOLDBERG:  And we (indiscernible) to protect

5      the purchaser of liability is protect against action against

6      the acquired assets.  Thank you.

7                THE COURT:  Okay.

8                MS. RYAN:  Your Honor, this is Ms. Ryan.  I think

9      that's the spirit of those two paragraphs.  I do think that

10     they're overly broad, but I'm happy to work with counsel to

11     find wording that we can all live with.

12               THE COURT:  Okay.

13               MR. MORRISSEY:  Your Honor, Richard Morrissey for

14     the U.S. Trustee, shall I continue?

15               THE COURT:  Go ahead.

16               MR. MORRISSEY:  Okay.  Your Honor, the next issue

17     on the subject of exculpation covers certain definitive

18     documents.  That is a defined term.  It's paragraph 60 of

19     the plan.  We have no objection, Your Honor, to the

20     inclusion of certain of these documents listed, in the

21     context of exculpation such as the disclosure statement and

22     the plan and confirmation order, for example.

23               But we did raise objections to the inclusion of

24     certain other documents.  And, Your Honor, the debtors have

25     agreed to take out a couple of those exceptions from the

1      exculpation provision.

2           THE COURT:  Right.

3           MR. MORRISSEY:  One is listed in the declaration

4      as subsection G as in George.  The management transition

5      plan which is something that's going to be happening later

6      on.  And also subsection H which is any new material

7      employment consulting or similar agreements entered to

8      between the (indiscernible) any of the debtor's employees if

9      any.

10           So those we agreed to.  There's one thing that we

11      didn't quite come up with an agreement on, but I believe we

12      can agree right here and now, as a matter of fact counsel

13      and I discussed this before Your Honor took the bench this

14      morning.

15           Subsection K of that definition has a catch all to

16      basically account for anything that is missed in the prior

17      subparagraphs.  And it covers all kinds of documents, deeds,

18      agreements by filing notification to pleadings,

19      certificates, orders, letters, instruments and the list goes

20      on and on.

21           Your Honor, the catch all provision we believe

22      should be expressly limited post petition, pre-effective

23      date, that time period.  And the U.S. Trustee would also go

24      along with this language provided that all of the definitive

25      documents in the catch all paragraph are within the Court's

Page 216

1   purview.

2           In other words, we don't object to the language so

3   long as the Court will (indiscernible) those documents.  Now

4   then counsel can tell me if I have that correct.

5           MS. OKIKE:  Yes, I think subject to the agreement

6   on language.

7           THE COURT:  Okay.

8           MR. MORRISSEY:  Okay.  Your Honor, while I'm here,

9   I resolved a couple of other issues unrelated to

10  exculpation.  I can certainly let the Court know later or

11  now, it's not that long, it's up to the Court.

12          THE COURT:  Let's get the good news now.

13          MR. MORRISSEY:  Okay.  And, Your Honor, I should

14  say also that the parties have been very cooperative

15  throughout this process in striving to reach certain

16  understanding.

17          The amended disclosure statement, Your Honor, does

18  disclose both the management transition plan and an employee

19  transition plan, but it --

20          THE COURT:  You resolved it by saying I'm not

21  specifically approving them, yes.

22          MR. MORRISSEY:  Correct.

23          THE COURT:  Okay.

24          MR. MORRISSEY:  Thank you, Your Honor.  The debtor

25  has agreed to that.

Page 217

1          The amended plan provided that all proofs of claim

2   were to be considered objective and disputed without further

3   action --

4          THE COURT:  Right, that's changed.  I saw that

5   change.  I saw the change to delete the requirement that

6   only -- the provision that said that only the plan

7   administrator could object.

8          MR. MORRISSEY:  Correct.

9          THE COURT:  And I saw that they addressed your

10  concern about how late claims would be treated and made

11  clear that they're not automatically gone.  They're gone

12  subject to my approval that they're gone.

13         MR. MORRISSEY:  Yes, and Your Honor has officially

14  stolen my thunder.  And therefore, I have nothing further.

15  Thank you, Your Honor.

16         THE COURT:  Okay.  All right.

17         MR. KIRPALANI:  Your Honor, if I may?

18         THE COURT:  Yeah.

19         MR. KIRPALANI:  Susheel Kirpalani from Quinn

20  Emmanuel.  I just wanted to come back to you on the issue of

21  the releases, the insiders, the justification for why

22  insiders who aren't actually paying anything should be

23  getting a release.  And the individuals as we mentioned and

24  as Mr. Pohl testified with whom the buck stopped were the

25  CEO and COO, Mr. Ehrlich and Mr. Psaropoulos.  In all of the

Page 218

1    negotiations with them, it was always the understanding that

2    this is a package D&O settlement for the insiders and it's

3    for a reason.

4           Every one of those subordinate officers would

5    otherwise be pointing the finger and potential cross claim

6    against those two, because those are the individuals with

7    whom the buck stops.

8           And so I think it is -- it's not going to be a

9    faithful implementation of the settlement, the so-called D&O

10   settlement if individuals who could then claim --

11          THE COURT:  That explains why you want to release

12   them of liability as to the 3AC problem.

13          MR. KIRPALANI:  Well, if I may, Your Honor, on

14   that point I anticipated you asking me that.  In paragraph

15   10 of Mr. Pohl's declaration it's clear what the

16   investigation entailed.  It's more than just the loans of

17   3AC.  It was Voyage -- all of Voyager's loans to third

18   parties, the diligence performed in connection with all of

19   those loans, the formation and function of the risk

20   committee, Voyager's staking of customer cryptocurrency

21   assets, Voyager's regulatory compliance, Voyager's

22   communications with the public, Voyager's prepetition

23   payments to insiders and certain third parties, and other

24   aspects that's referring to the insurance company, Your

25   Honor, and other aspects of Voyager LLC's business.

1          While I understand we didn't take on a wholesale

2      investigation of what payments might have been paid to

3      employees generally.  I will come to that in a moment.

4      Certainly with respect to the insiders, I think if the

5      releases could have least tracked the language of the

6      testimony that we had of what was investigated, I think that

7      would be acceptable.

8          THE COURT:  Read that language to me again,

9      please.

10         MR. KIRPALANI:  Yes, Your Honor.  Voyager's loans

11     to third parties, with a particular focus on the couple of

12     loans to 3AC, the diligence performed in connection with

13     those loans, the formation and function of Voyager LLC's

14     risk committee, Voyager LLC's staking of customer

15     cryptocurrency assets, Voyager LLC's regulatory compliance,

16     Voyager LLC's communications with the public, Voyager LLC's

17     prepetition payments to insiders and certain third parties

18     and other aspects of Voyager LLC's business, the last one,

19     you know, I think is probably too vague to be meaningful.

20         The specific individuals were also listed in

21     paragraph 13 of Mr. Pohl's declaration.  I did miss a couple

22     when I was trying to do it from memory.

23         And with respect to the employees broadly, Your

24     Honor, although it wasn't the focus of the special committee

25     or of Mr. Pohl's work and his testimony, it was the focus of

Page 220

1    Mr. Renzi's testimony in paragraphs 114 and 115 of his

2    declaration, which is at Docket 1119.  Mr. Slade pointed

3    that out to me.

4              THE COURT:  His declaration was admitted only to

5    the extent that it dealt with uncontroverted aspects of the

6    Bankruptcy Code.

7              MR. SLADE:  That's correct, Your Honor.  He did

8    testify on those particular points, I think that's what you

9    directed us to do on -- and I think what Mr. Kirpalani

10   (indiscernible) it.

11             MR. KIRPALANI:  In his testimony, Your Honor, he

12   did specify that the debtor's releases of potential debtor

13   claims for the individuals who searched faithfully during

14   the post petition process, including all of the employees

15   which are defined as the Voyager released employees, that

16   those releases were critical to keeping the band together,

17   to ensuring maximum value for the estate and the customers,

18   this has not been (indiscernible) of these people.  And

19   there is record evidence on that.  And so we would continue

20   to urge the releases of those employees.

21             THE COURT:  I'll go back to my notes and look for

22   that.

23             MR. KIRPALANI:  Thank you.

24             MR. SLADE:  Your Honor, I would add that Mr.

25   Renzi's testimony on that point was in the context of the

1    feasibility of the plan, that these folks are necessary in

2    either direction, whether we sell (indiscernible) and

3    frankly particularly if we do the (indiscernible)

4    liquidation.  The feasibility of that is tied to the --

5    these individuals continuing to perform their services.

6                THE COURT:  Okay.  What else do we have, Ms.

7    Okike?

8                MS. OKIKE:  Your Honor, there were some objections

9    that we are impermissibly seeking a discharge, who obviously

10   are not entitled a discharge, and we included a provision in

11   the confirmation order to that effect.

12               I believe we need to consult with counsel Debias

13   (ph) on the customer data, so that we can come back on that

14   point.

15               Your Honor, we also had an objection, I believe,

16   with respect to dollarization.  This was by Mr. Schupato

17   (ph) who argued that customers were entitled to the return

18   of cryptocurrency on the debtor's platform and that their

19   claim should not be (indiscernible) as of the petition date.

20               We continue to take the position that

21   cryptocurrency on the platform is property of the estate and

22   dollarization is required under Section 502(b) of the

23   Bankruptcy Code.

24               Your Honor, with respect to the liquidation

25   analysis, I think Mr. Renzi's testimony made clear that

Page 222

1    under either the sale transaction or the liquidation

2    transaction, creditors will receive at least as equal if not

3    greater recoveries.  We believe that he testified that the

4    impact of a forced liquidation would result in materially

5    lower recovery values for cryptocurrency in a Chapter 7.  We

6    believe we've satisfied the best interest tests.  And there

7    was a handful of objections on that which we're happy to

8    address.

9            THE COURT:  I don't think I need any further

10   argument on that, I understand the evidence.  You know --

11           MS. OKIKE:  Oh, sorry.

12           THE COURT:  -- one thing that troubles me, you're

13   supposed to identify the people who will serve as directors.

14           MS. OKIKE:  Oh, correct, Your Honor, I --

15           THE COURT:  The original plan said that well,

16   you're just going to have a trustee, you're not going to

17   have directors so you don't have to do it.  But you've

18   modified your plan now to say that there will be independent

19   directors who will be pursuing the intercompany issues.

20   Don't you have to say who they are?  Doesn't the Code

21   require that?

22           MS. OKIKE:  Yes, Your Honor, we agree that we do

23   need to disclose who those parties are.  We would like to be

24   able to work with the plan administrator with respect to

25   that.

Page 223

```
 1              Ideally I think in the debtor's view it would be
 2     the independent directors that are currently serving, but I
 3     think there was a desire to have a conversation with the
 4     plan administrator, as to who would continue to serve in
 5     those roles.
 6              We do agree that we need an independent director
 7     at all three entities, given the complex within the entities
 8     with respect to intercompany claims.  And we would identify
 9     those persons, you know, prior to the plan going effective.
10     I guess we could provide an opportunity for --
11              THE COURT:  See that's the problem I think people
12     may not have been paying attention to, but 1129(a)(5)(A)(i)
13     says you have to disclosed it as a condition to
14     confirmation.
15              MS. OKIKE:  Understood, Your Honor.
16              THE COURT:  I didn't write that, but I'm required
17     to abide by it, so I think you have to come up with the
18     names.
19              MS. OKIKE:  Your Honor, if we could confer with
20     the committee during the break on that.  We understand that
21     we do need to disclose the identities and we'd just like to
22     have a conversation with them.
23              THE COURT:  Okay.  Two relatively minor points
24     that I noticed.  There may be others in the proposed order,
25     but in the plan and disclosure statement, you say that
```

Page 224

1    professional fees will be subject to review through the

2    confirmation date, it's kind of a specific distinction

3    between the confirmation date and the effective date in that

4    regard.  I think I'm required to approve the reasonableness

5    of all fees through the effective date of the plan.  So you

6    need to change that.

7              MS. OKIKE:  Understood, Your Honor.

8              THE COURT:  There are provisions in the plan

9    administrator agreement and in the plan that effectively say

10   that if you get a letter or a communication or a

11   distribution that's returned to some undeliverable that you

12   don't have to do anything to try to find that customer.

13   Almost every plan I see has that provision, and so far as I

14   know I've never approved it.  So --

15             MS. OKIKE:  Okay.

16             THE COURT:  -- I'm sure you can see whatever

17   language in prior cases you've had with me, that I require

18   you make reasonable efforts to find people.  I don't think

19   it's right --

20             MS. OKIKE:  Yes, Your Honor.

21             THE COURT:  -- just because one letter is returned

22   that they forfeit their distributions.

23             And then look at the various insurance provisions

24   of your proposed order, because the -- a number of them,

25   there are five or six of them that essentially require the

1   debtors to honor, keep in place, not change any of their

2   insurance policies.  I don't understand how that's

3   consistent with potentially going after this $10 million

4   insurance policy that was bought shortly before the filing

5   of the case.  It seems like it would directly order you not

6   to do so and to keep that policy in place.  You need to look

7   at that language.

8           MS. OKIKE:  Will do.

9           THE COURT:  It's probably just form language you

10  took from something else, but it doesn't match what you're

11  trying to do in this case.

12          MS. OKIKE:  Understood, thank you, Your Honor.

13          THE COURT:  Is there any argument as to the

14  confirmation of the plan of reorganization?

15          MS. MOYNIHAN:  Your Honor?

16          THE COURT:  Yes, who is that?

17          MS. MOYNIHAN:  Kelly Moynihan, Kilpatrick Townsend

18  & Stockton, counsel for the ad hoc group of equity interest

19  holders of Voyager Digital Limited.

20          We did want to be heard briefly related to an

21  issue that you just addressed about the post effective

22  dates, independent directors and the plan administrator.  I

23  can do them now or whenever else you would prefer.

24          THE COURT:  Well, there's no time like the

25  present.

Page 226

1              MS. MOYNIHAN:  Thank you, Your Honor.  As Mr.

2     Posner from my firm noted on Friday while we've resolved our

3     filed objections to the plan, subsequent to those

4     resolutions, there have bene certain developments that are

5     concerning to our client on -- as I'll explain it, I think

6     the confirmed can be equally resolved.

7              As the Court is aware Voyager Digital Limited,

8     commonly referred to TopCo and (indiscernible) a publicly

9     traded on the Toronto stock exchange, the ad hoc group is

10    comprised of shareholders who are parties to a class action

11    of defrauded equity holders and common stock holders.

12             Our clients have asserted that there are

13    approximately $230 million of intercompany claims due from

14    OpCo and SoldCo to TopCo that are dollars in allowable

15    claims, which should result in a distribution to TopCo

16    equity interest holders.

17             Late last year, we commenced an adversary

18    proceeding for declaration of the intercompany claims are

19    valid and allowable, based upon among other things, the

20    debtor's own statements and schedules, which listed those

21    intercompany claims as allowable and did not mark them as

22    disputed, unliquidated or contingent.

23             On the eve of this confirmation hearing that

24    changed a little bit, which I will explain.  As the Court's

25    aware the debtors have asserted in the various iterations of

Page 227

```
 1    the disclosure statement that the intercompany claims should

 2    be subordinated, and then ultimately substantially all of

 3    the intercompany claims should be recharacterized.

 4            After engaging in expensive dialogue with debtor's

 5    counsel, as well as document discovery, approximately two or

 6    so months ago the debtor's counsel advised that they had

 7    determined that the debtors couldn't resolve the

 8    intercompany claims, but rather than independent directors

 9    of each of the debtors would investigate and analyze the

10    intercompany claims and engaged in negotiation to resolve

11    those claims and determine to what extent, if any, they

12    should be recharacterized.

13            Over the last six weeks the ad hoc group has had

14    several meetings with TopCo's independent director counsel

15    Katten Muchin.  The ad hoc group believes that the Katten

16    independent director Mr. Ray has been thoughtfully,

17    carefully and robustly advocating on behalf of creditors and

18    interest holders at TopCo with respect to the intercompany

19    claims issue.

20            Despite what the debtors and other parties had

21    hoped, the issues surrounding the intercompany claims have

22    not been resolved prior to this hearing.  And as a result,

23    all of the parties' rights including the ad hoc groups have

24    been preserved under the plan and the intercompany issues

25    we've resolved post confirmation part of the winddown debtor
```

Page 228

1    activities.

2           We understand as of this hearing that TopCo and

3    OpCo are still engaged in the dialogue over the intercompany

4    claims and that no resolution has been reached yet.

5           There's been some very recent developments in the

6    case, we believe that there should be a separate plan

7    administrator appointed for TopCo.  For example, the FTX

8    stipulation which I'll discuss in a minute was filed just

9    now before confirmation objections were due.  The government

10   security stipulation was filed on February 27th.  The

11   debtors filed the amended plan, which included a number of

12   changes, including that the current independent director

13   would be discharged upon the effective date, or we one wind

14   down debtor with one plan administrator appointed by the

15   committee for all of the debtor entities.

16          The oversight committee will be comprised solely

17   of members from the creditor's committee and the plan

18   administrator will direct new independent directors of each

19   debtor entity.

20          Last Wednesday HoldCo amended its schedule to

21   reflect the intercompany claims are now disputed, contingent

22   and unliquidated.  And last Wednesday evening finance

23   circulated an e-mail to customers that stated among other

24   things, that their recoveries assumed -- intercompany claims

25   would be recharacterized and that the (indiscernible) claims

Page 229

1     would be subordinated to customer claims.

2               Having the committee appoint the plan

3     administrator and have the oversight committee be made up of

4     solely creditor committee members means that there's real no

5     advocate for the interest of creditors and interest holders

6     at TopCo post (indiscernible) date, allowing members of the

7     committee to appoint the new confirmation independent --

8     post confirmation independent director at TopCo should be

9     problematic.

10              The committee's goals in this case has been clear

11    and obvious, that's to maximize values to the claims of the

12    customers at OpCo which comes with a cost to TopCo as

13    interest holders.  This has been evidenced in a number of

14    ways.

15              First, the debtor's stipulation with Alameda and

16    the committee we think is very telling.  The stipulation

17    allows -- provides that FTX will waive its $75 million claim

18    against the debtors or assign its claims to OpCo at the

19    debtor's option.

20              The ad hoc group certainly questions

21    (indiscernible) object to assigning the loan claims to OpCo

22    (indiscernible) have tried to assert the guarantee claims

23    for the 75 million against TopCo.

24              Further, in the event that the particular tactic

25    doesn't work and there is value for TopCo's equity interest

Page 230

```
 1    holders, the stipulation further allows FTX to assign any

 2    recoveries received from its TopCo equity interest to OpCo

 3    at the debtor's option.

 4            Second, as I previously noted, the $230 million in

 5    intercompany claims have not been resolved yet.  While there

 6    are current independent directors appointed at each debtor

 7    that are attempting to negotiate a resolution of those

 8    claims --

 9            THE COURT:  Can I interrupt?

10            MS. MOYNIHAN:  -- upon the effective date --

11            THE COURT:  Can I interrupt you?

12            MS. MOYNIHAN:  Sure.

13            THE COURT:  Can I interrupt you?

14            MS. MOYNIHAN:  Uh-huh, yes.

15            THE COURT:  You're not telling me anything new,

16    with very few exceptions, you're not telling me anything I

17    didn't already know.  But I thought your issues had been

18    resolved.  I'm --

19            MS. MOYNIHAN:  I'm --

20            THE COURT:  -- very unclear as to what has

21    happened to unresolve them.

22            MS. MOYNIHAN:  I think the changes to the plan in

23    the last week were concerning.  Our concern is that there

24    isn't going to be an independent party who zealously

25    advocated for what's best at TopCo.
```

Page 231

1              We understand as Mr. Hague (ph) testified that if

2      there is a conflict that arises, whether we will, or

3      position conflict a member of the oversight committee will

4      presume the plan administrator's duties with respect to that

5      conflict.  Our position is that the plan administrator is

6      being appointed by the creditor's committee.  The oversight

7      committee is being appointed by the creditor's committee.

8      The creditor's committee has made its goals in this case

9      pretty apparent and our concern is that there won't be some

10     independent director appointed by TopCo that really truly

11     represents TopCo's interest.  It's being chosen by the plan

12     administrator or essentially the creditor's committee.

13             We would like a truly independent person to be

14     appointed to represent TopCo post effective date, who can

15     hire their own counsel.  The ad hoc group is certainly

16     willing to select an independent plan administrator to act

17     for TopCo and would be willing to consult with that plan

18     administrator.

19             Alternatively, Your Honor, given how diligently

20     and deliberately and apparently aggressively Mr. Ray has

21     been in discharging his duties as independent director of

22     TopCo, the ad hoc group would be satisfied with Mr. Ray

23     continuing in that position post-effective date and

24     continuing to retain his counsel Katten on his behalf.  And

25     we would like for him to be granted with authority to handle

1    the matters that are issue here, including intercompany

2    claims, the Alameda guarantee claim and the government

3    claims asserted against TopCo.

4            THE COURT:  What were the matters you wanted --

5    the intercompany claims and what other matters?

6            MS. MOYNIHAN:  The Alameda guarantee --

7            THE COURT:  Alameda.

8            MS. MOYNIHAN:  -- claim.  We ask in the event

9    under the FTX Alameda stipulation that OpCo retains those

10   claims to (indiscernible) against TopCo, as well as the

11   government claims that have been filed against TopCo.

12           The ad hoc group did not believe those are valid

13   claims against TopCo and does intend to object to those

14   claims.  So we would like to have authority to address those

15   as well on behalf of TopCo because -- they're certainly at

16   issue between our clients and any recovery.

17           MR. ASMAN:  Your Honor, Darren Asman from

18   (indiscernible) for the committee.

19           Your Honor asked what has changed since the

20   objection deadline of the plan, and there's nothing that has

21   changed.  In fact, the only thing that's changed is that

22   protections have been added in response to some of the

23   concerns raised by equity.

24           This is the first time this -- even outside of

25   this court that we're hearing of a request for a separate

Page 233

1    plan administrator.  So I would object to this objection

2    just as untimely, but more substantively just to address the

3    concerns that were raised by Mr. Bosner and the ad hoc

4    equity group.  We agree that until the intercompany claims

5    are resolved, there will be an independent director in

6    place.  That's an independent director who will hold

7    fiduciary duties to that entity.  That is exactly the

8    current system that's in place right now at the company and

9    it's a system that we are carrying forward through post

10   confirmation.

11            I think the odd part about this request --

12            THE COURT:  Will it be the same director or no?

13            MR. ASMAN:  Well, that's a subject for discussion

14   that we want to talk about outside.  It's not something

15   we've thought about, to be quite frank.  We've been focused

16   on confirmation.  The plan administrator agreement gives the

17   plan administrator the authority to put independent

18   directors in.  Somebody has to have the authority to remove

19   them, they just can't be in there in perpetuity and that

20   again is the system that's in place right now.  The

21   independent directors could be removed today.

22            THE COURT:  Why is the authority limited to the

23   intercompany issues, as opposed to more generally issues

24   where there are conflicts between the debtors?  For example,

25   that provision in the Alameda loan clearly there's a

1    conflict between the different debtors.

2              MR. ASMAN:  Your Honor, again, this is the first

3    we're hearing this from the ad hoc group.  I don't have a

4    good answer on the spot right now, it was just raised a few

5    minutes ago and it's something we can certainly consider.

6              THE COURT:  Yeah, but surely it had to be obvious

7    to you that that's a matter -- that's a provision about

8    which the different entities would have to produce.

9              MR. ASMAN:  Maybe.  I think it depends on --

10             THE COURT:  Maybe?  I think there have been prior

11   objections to your suggestion that it would work that way if

12   I remember right.  You were suggesting something similar to

13   that at the time of the FTX deal and you got an explicit

14   objection.

15             MR. ASMAN:  Correct.  But I think if the

16   intercompany claim is resolved in a way such that there's

17   nothing (indiscernible) up to TopCo it's resolved.  I guess

18   what you're suggesting Your Honor is if at least until that

19   is resolved, or if it is resolved in a way where

20   (indiscernible).  I hear your point, I'm not saying it's not

21   an issue.  I'm just saying we haven't considered it.

22             But one thing I want to make really clear, the odd

23   part about this request is it's not really equity that

24   should even have a say in this.  It's creditors at TopCo.

25   Equity here has a nearly insurmountable obstacle to getting

Page 235

1    a recovery in this case and it's for good reason, because

2    they're equity.

3              The first, Your Honor, they have to somehow

4    convince this Court and more than $200 million of capital

5    contributions from one affiliate to another are somehow not

6    equity, that's step one.  Second --

7              THE COURT:  They were a focused debt, weren't

8    they?

9              MR. ASMAN:  Correct, Your Honor.

10             THE COURT:  Okay.

11             MR. ASMAN:  I will not stray too far afield from

12   why that's not the debt, but understood.  Second, they have

13   to knock out the $75 million Alameda claim that comes ahead

14   of equity.  Third, they have to knock out more than $40

15   million of claims by governmental entities against TopCo.

16   And then fourth, and probably most importantly, even after

17   all of that, there's around $10 million of general unsecured

18   claims at TopCo, non-government claims, not Alameda claims,

19   just unsecured claims.  And there's 2 and a half million

20   dollars at HoldCo.

21             I don't see why it would be -- there's been no

22   demonstration yet that there's going to be sufficient flow

23   of cash that's going to satisfy any of those claims at all,

24   let alone in full.

25             THE COURT:  Well, whether we're doing this for

Page 236

1    equity or creditors there obviously has to be an independent

2    party at TopCo to handle issues as to which TopCo's

3    interests differ from the interests of other debtors.

4            MR. ASMAN:  I agree with that, Your Honor.  That's

5    the role of the independent director.

6            THE COURT:  So let's make sure it isn't so

7    explicitly cabined to the intercompany issues and it's more

8    broad as to issues where there's a conflict.

9            MR. ASMAN:  Understood.

10           THE COURT:  And then let's disclose who it is and

11   hopefully that'll make everybody happy and we won't have a

12   further issue.

13           MR. ASMAN:  Thank you, Your Honor.

14           THE COURT:  Okay.  Any other objections or

15   arguments as to confirmation of the plan?

16           MR. UPTEGROVE:  Your Honor, William Uptegrove for

17   the SEC.  Just not an argument, but a further clarification

18   from this morning is the Section 1145 I believe is being

19   dropped from the plan if I heard it correctly on the phone.

20   So I just wanted to make sure we no longer needed to put in

21   our submission tomorrow.

22           THE COURT:  I understand the debtor is not seeking

23   anything -- any specific findings one way or the other about

24   it, 1145; is that right?

25           MS. OKIKE:  Correct.

Page 237

1              THE COURT:  That's correct.

2              MR. UPTEGROVE:  Thank you, Your Honor.

3              MR. HENDERSHOTT:  Your Honor, this is Tracy

4      Hendershott, pro se, creditor.

5              THE COURT:  Yes, Mr. Hendershott.

6              MR. HENDERSHOTT:  You're saying any other

7      objections?  Does that include our request for a trustee for

8      creditor request to invoke our rights under Code 1112(a) and

9      (b) as well as Bankruptcy Code 1104(a)(1) for the findings

10     of or at least the evaluation of -- for the findings of

11     fraud, dishonesty, incompetence, gross management?

12             THE COURT:  We can move to that unless there are

13     other points that people want to make on the confirmation

14     issue itself.

15             MS. OKIKE:  Your Honor --

16             MR. HENDERSHOTT:  Very good.

17             MS. OKIKE:  -- the last point we just wanted to

18     note there were some objections to the plan administrator.

19     We believe he's (indiscernible) serving the role, he's an

20     experienced bankruptcy professional who's intimately

21     familiar with the debtors and their estates.

22             He testified that he doesn't believe that his

23     prior representation of the committees here would impede his

24     ability to serve as plan administrator and that he would

25     recuse himself in the benefit of any conflicts.  And the

1     plan administrator agreement provides for the same.  So we

2     believe he should be appointed.

3                 THE COURT:  Okay.

4                 MR. HERNDERSHOTT:  Your Honor, Tracy Hendershott

5     again.  I offered to submit that change from yesterday, you

6     know, it's well intended and certainly does have credentials

7     in the space.  Mr. Hague has not a single day of experience

8     as administrator.  In addition Mr. Hague was providing

9     counsel to the UCC chairman, you know, approving these, you

10    know, very extensive, broad reaching, overreaching

11    discharges, you know, that you called out yourself, this

12    gives us great concern that we are going to have the maximum

13    potential of -- for recovery due to the winddown activity

14    afterwards.

15              You know, the creditors, Your Honor, are looking

16    for a mystery (indiscernible), you know, a shark that can

17    try to increase the 24 percent return that we're talking

18    about now closer, you know, as high as possible.

19              We need an individual that is experienced,

20    aggressive, and is, you know, knowing the (indiscernible) of

21    Mr. Ray that's assigned to the FTX case.  We have seen none

22    of that behavior yet exhibited by Mr. Hague in his guidance

23    or (indiscernible) UCC and, you know, we stand with our

24    objections from yesterday.  Thank you.

25                 THE COURT:  Anybody else want to be heard about

Page 239

1    Mr. Hague's appointment?

2            MR. NEWSOM:  Your Honor?

3            THE COURT:  Go ahead.

4            MR. NEWSOM:  Your Honor, this is Dan Newsom for

5    (indiscernible) as well.  I will second Mr. Hendershott's

6    arguments and state that my position hasn't changed as well

7    and no offense to Mr. Hague, it seems like he has a lot of

8    experience in estates and (indiscernible) is even desirable.

9    However, I would note that the debtors spared no expense as

10   it relates to hiring their counsel and now we're being asked

11   to do I guess pinch our pennies when it comes to appointing

12   the plan administrator.

13           And, Your Honor, frankly, you know, while the

14   conflict of interests aren't as strong as, you know, we

15   might have led to believe or might have believed ourselves,

16   it is the matter of effectiveness.  And in terms of the

17   ability of the Court to appoint an independent plan

18   administrator, creditors would receive maximum confidence

19   that their best interests are heart, versus what we've seen

20   so far in terms of effectiveness from the UCC and by

21   extension Mr. Hague.

22           THE COURT:  Anybody else?

23           UNIDENTIFIED:  Your Honor (indiscernible).  Sorry.

24   Ladies first.

25           MS. DIRESTA:  Go ahead, Seth.

1           UNIDENTIFED:  Your Honor, the plan administrator

2    is ultimately the most important role for creditors in this

3    bankruptcy.  As you know, they can decide if they want to go

4    after someone or not.  Why are we now penny pinching

5    (indiscernible) law firm from Detroit, Michigan only because

6    his clients was elected as a chairperson on the UCC when a

7    dozen other professional agencies that have been hired in

8    this case are all (indiscernible) recognized (indiscernible)

9    firms.

10          Creditors don't want (indiscernible) as Mr. Hague

11   said was his goal.  We want to be made whole.  We've

12   suffered enough.  This is not the time for on the job

13   training.  Creditors (indiscernible) the best recovery

14   possible.  We deserve a (indiscernible) or a (indiscernible)

15   ticker type plan administrator that has zero connections of

16   Voyager, zero (indiscernible) interest and is only looking

17   to bring the hammer down.  Thank you, Your Honor.

18          THE COURT:  Okay.  Mr. Asman?

19          MR. ASMAN:  Your Honor --

20          MS. DIRESTA:  Hi, Your Honor.

21          THE COURT:  Oh, who was that?

22          MS. DIRESTA:  Oh, this is Gina DiResta, Your

23   Honor.  And I agree with my fellow creditors.  We are

24   against having Mr. Hague be the plan administrator.  The UCC

25   voted to have him be the plan administrator and we don't

Page 241

1    agree with the UCC judgment, because what we found most of

2    the time in this entire case is I think the UCC has only

3    objected to like maybe two things, but otherwise, they have

4    pretty much just gone along to get along with the debtors.

5            And so we feel that we need an independent party,

6    so it's just not the credentials of Mr. Hague and not having

7    the experience and us wanting a more experience who's really

8    going to fight for us, but someone who has to know fresh

9    eyes, no conflict of interest, who can really come in and

10   fight for us.  Like I said, the UCC we feel has not done a

11   good job in representing us and in fighting for us.

12           I mean, even if you just look at the list of

13   objections, the (indiscernible) objections with, you know,

14   the court documents has only been, you know -- that's it,

15   you know, like go along to get along.

16           So having someone independent, having someone with

17   proper credentials to really fight for us is what we need,

18   Your Honor.  And you're really our last hope when it comes

19   to this, so I hope that you will help us in some way.  Thank

20   you.

21           MR. ASMAN:  Your Honor, again Darren Asman from

22   McDermott Wilhelm for the committee.  Your Honor, Mr. Hague

23   is going to be tasked with an important role that we expect

24   is going to last through the years.  Specifically he's going

25   to be responsible for pursuing a number of bad actors,

Page 242

1    investigating potential claims, and ultimately I hope

2    recovering a lot more for creditors to bring them closer to

3    whole.

4            Mr. Hague, will also, of course, be responsible

5    for a number of administrative functions that are typical of

6    post confirmation trust tax returns affecting future

7    distributions and objecting to claims among others.

8            Your Honor, the committee was given discretion to

9    select a plan administrator in consultation with the

10   debtors.  This is common in Chapter 11 cases, as you know,

11   particularly in a case like this, where the only real

12   constituents are unsecured creditors.

13           The committee took this process seriously at the

14   recommendation of professionals.  They interviewed three

15   different candidates for the role, including Mr. Hague.  The

16   committee voted for Mr. Hague to serve in this role, and

17   again, this is a committee of seven creditors of whom -- all

18   whom lost their personal assets on Voyager's platform and

19   there are seven creditors who the U.S. Trustee felt could

20   best adequately represent the entire creditor body at their

21   significant (indiscernible) a process that we were not a

22   part of, of course.

23           The plan and disclosure statement made clear to

24   creditors that the committee would be sluffing if its plan

25   administrator.  And on February 15th, the debtors filed a

Page 243

1    second plan supplement, it's Docket No. 1006 which

2    identifies Mr. Hague as the plan administrator.

3            Importantly as Your Honor's order required, this

4    identification was made one week prior to the voting

5    deadline which was on February 22nd.  The purpose of this

6    disclosure, of course, was to ensure that creditors are

7    aware of not only the process for selecting a plan

8    administrator, but ultimately who that plan administrator

9    would be when casting a vote on the plan.

10           More than 60,000 creditors voted on the plan with

11   an aggregate dollar value of more than $550 million.  Your

12   Honor, one of the creditors asked the witness on Friday,

13   Thursday, I'm losing track of the days now, whether it was

14   unusual that only 60,000 creditors voted.  I wasn't on the

15   stand at the time, but I thought about that question quite a

16   bit on the weekend, and my answer is that actually the

17   number is really high.  60,000 people took time to fill out

18   a ballot and then while it may not be a high percentage in

19   number, it's still a big number and it suggests a lot of

20   creditors are watching this case closely and fully

21   understand what's going on.

22           Your Honor already knows this, but just as a

23   reminder, the creditors who voted, 97 percent in number

24   accepted, 98 percent in dollar amount, for $541,000 in

25   dollars, voted to accept the plan.  And again, that is all

Page 244

1    with the understanding that the committee would be selecting

2    a plan administrator and later that it would be Mr. Hague.

3              You have objections in front of you from a few

4    creditors to the selection of Mr. Hague as the plan

5    administrator.  The aggregate claims of those creditors is

6    around $500,000.  Your Honor, we submit that the objections

7    are without merit and simply represent the preference by a

8    few creditors that someone other than Mr. Hague serve as the

9    plan administrator.

10             And out of 60,000 creditors who voted on the plan,

11   it's not all that surprising that we have objections to many

12   different aspects of the plan, including this one.

13             Your Honor, in its simplest terms, the objection

14   rests on a notion that Mr. Resnick, the chair of the

15   committee is too friendly with Mr. Ehrlich or was too

16   friendly and has acted as a committee member in a manner

17   that is somehow contrary to creditor interests --

18             THE COURT:  That's what the written objections

19   were, but what I've heard today is that they don't think Mr.

20   Hague is as -- I'll put it this way, as much out for blood

21   as they would like.

22             MR. ASMAN:  I don't think there's anything in

23   evidence that says he's not up for blood or that he doesn't

24   have the experience to do that.  No questions were asked

25   about that.  And I don't know that that's a confirmation

Page 245

```
 1   requirement under 1129.  That's not.

 2            THE COURT:  Not in so many words anyway.

 3            MR. ASMAN:  Your Honor, unless you have any

 4   questions, I'll stop there, thank you.

 5            THE COURT:  Okay.  Does the U.S. Trustee have a

 6   position about Mr. Hague's appointment?

 7            MR. MORRISSEY:  Your Honor, Richard Morrissey for

 8   the U.S. Trustee.  The U.S. Trustee raised no objection

 9   about it, as the U.S. Trustee has no position on the

10   committee's choice of Mr. Hague.  Unless the Court has any

11   questions for me.

12            THE COURT:  No, that's fine.  I just wanted to

13   know.

14            MR. MORRISSEY:  Thank you, Your Honor.

15            THE COURT:  All right.  I'll take those points

16   under advisement.  What else do we need to -- we need to

17   cover the trustee motion.  Is there anything else on

18   confirmation that we need to cover?

19            MS. OKIKE:  I don't believe so, Your Honor.

20            THE COURT:  Okay.  I have a host of rulings to

21   make on the objections.  And a host of open points that

22   still need to be addressed.  And a 78-page confirmation

23   order that I have many changes to make to.  None of that is

24   going to happen tonight.  It's already 5:10.  I can't see

25   myself finishing all that.
```

1          MR. GOLDBERG:  Thank you, Your Honor,

2     (indiscernible) this.  We're very grateful for all the time

3     you've given us, Your Honor, completely understand the

4     situation.  We have been working throughout the day in an

5     effort to resolve Your Honor's requests and customer data

6     point and just as we months ago sent a proposal to the

7     debtors and perhaps we could have a recess to go over that

8     and all have the opportunity to speak to and the committee

9     and then come back to you.

10          THE COURT:  Yeah, is my health and schedule

11     contingent on that?  You're not going to give me a break

12     from your milestone until you work that out?

13          MR. GOLDBERG:  My client, Your Honor, you know, is

14     putting a tremendous amount of resources to this case.

15     We've been the subject of a wide array of accusations

16     without any evidence brought to bear and we are very focused

17     on bringing these proceedings to a successful conclusion as

18     quickly as possible.

19          We would very much like to resolve the customer

20     data issue as part of the extension of (indiscernible) with

21     Your Honor's permission.

22          THE COURT:  Certainly I'll let you talk to them.

23     Mr. Hendershott, on your trustee motion, if I confirm a

24     plan, a trustee is sort of pointless, isn't it?

25          MR. HERNDERSHOTT:  Yes, sir, that's why we're

Page 247

1    hoping to have your consideration to (indiscernible) before

2    you confirm the plan.  We understand that under Bankruptcy

3    Code 1112 there is a lot of leeway that Congress has given

4    for you (indiscernible).  But, you know, admittedly it's

5    limited our understanding, we're not experts, but we believe

6    that (indiscernible) Congress' intent for 1104(a)(1), there

7    really is no leeway.  It doesn't say and, or, should, could,

8    it says the trustee shall be appointed if any of the for

9    cause criteria is found.  And those are fraud, dishonesty,

10   incompetence, or gross mismanagement.

11             THE COURT:  Well, if you -- actually you've got

12   that slightly wrong.  What the case law says is that --

13             MR. HENDERSHOTT:  Okay.

14             THE COURT:  -- I should appoint a trustee for

15   cause which may include various things.  The case law does

16   not say that I must appoint a trustee no matter what the

17   other circumstances are in any instance where I think there

18   was any kind of fraud.  The case law is actually to the

19   opposite.  It actually says that I have considerable

20   discretion in deciding what constitutes cause, and whether

21   allegations of particular kinds in the context of an

22   individual case constitute cause.

23             And one of the factors it seems to me here as to

24   whether it's cause for a trustee is, by the time we got a

25   trustee in place, we'll already have a plan administrator in

Page 248

1    place.  We're on the verge of confirmation.  It doesn't

2    really -- if I confirm the plan, it doesn't make any sense.

3    Now if I don't confirm the plan, then I have to consider it.

4    But it seems to me I have trouble thinking of anything that

5    would constitute cause at this stage of game to appoint a

6    trustee when we're right on the verge of plan confirmation.

7            MR. HENDERSHOTT:  Well, I appreciate your

8    interpretation of that, you know, and I read the Court shall

9    order the appointment of a trustee, I didn't really see the

10   flexibility.  But I do know Congress has given you, the

11   bankruptcy court (indiscernible) the judge, the jury and,

12   you know, the executioner.  So I don't profess to be an

13   expert.

14           What I do know, sir, is that this was brought up -

15   - you know, this would've made more sense.  This would've

16   made more sense back in August to have this discussion.

17   This would've made more sense back in October of last year

18   when Nexus (indiscernible) you know, brought this up.

19           Unfortunately during that time period is I

20   (indiscernible) for me personally, I was in a Category 5

21   hurricane.  I lost September, October, November to the end

22   of December for any type of communication, but as soon as I

23   was able to reconnect on January 9th, 10th I think was my

24   initial letter that I brought this up at that point.

25           And that was a letter, and I understand it wasn't

1    a motion, and -- but I do want the Court to understand we

2    were told by the chairman of the UCC to write you letters.

3    And that was false advice until you clarified that for us,

4    that we had to try to put it in a motion, then that's the

5    next step that we did.

6           Then other creditors have done that as well.  They

7    were pushed off until this late stage for discussion.  So

8    while the timeliness is not perfect, I think Congress

9    specifically said that any point before confirmation

10   intentionally.  I don't think that was an accident.

11          THE COURT:  I -- certainly --

12          MR. HENDERSHOTT:  (indiscernible)

13          THE COURT:  The Code would permit me to do it, but

14   I still have to decide whether there's cause to do it.  And

15   I just --

16          MR. HENDERSHOTT:  Right.

17          THE COURT:  It just seems inconsistent to me with

18   where we are on the confirmation hearing.  Maybe not

19   inconsistent if we don't confirm a plan, but if I do confirm

20   a plan it just doesn't seem to me to make much sense, right.

21          MR. HENDERSHOTT:  Well, if there truly is fraud,

22   Your Honor, then there is significant benefit to the

23   creditors.  And again, this is why this would've been

24   beneficial to have it actually addressed a long time ago.

25          You know, we're all guaranteed to take a

1    significant financial hit.  And we are limited to a $3,000

2    you know year write off for the tens or hundreds of

3    thousands, whatever the case may be.  You know, if someone

4    has $100,000 loss, this is going to take, you know, end of

5    their natural lifetime.  And if there's a case of fraud, if

6    you find that there clearly is a foundation of fraud, that

7    changes for the creditors --

8              THE COURT:  What do you think --

9              MR. HENDERSHOTT:  -- (indiscernible) financial

10   damages that --

11             THE COURT:  What is it you think would happen if

12   right now I said, I want a trustee.  What is it do you think

13   would be the consequence?  What would result?

14             MR. HENDERSHOTT:  I believe we would be classified

15   at the federal level as victims of fraud, given a

16   significant abilities to take this damages earlier and not

17   parse (indiscernible) amount for the next 30, 40 years

18   (indiscernible) of 3,000.

19             THE COURT:  Well, you know what --

20             MR. HENDERSHOTT:  (indiscernible)

21             THE COURT:  -- let me just disabuse you of that

22   notion.  You know, treating you victims of a fraud just

23   makes you a creditor.  It doesn't give you any different

24   status or any different kind of claim than the ones you have

25   just by virtue of being an account holder.

Page 251

1            MR. HENDERSHOTT:  No, not for claims, for IRS

2      purposes, it's (indiscernible).  I apologize for not

3      clarifying that.

4            THE COURT:  Okay.

5            MR. HENDERSHOTT:  Right now, we can't even write

6      off the damages that have been caused by the actions of

7      their debtors in possession.

8            THE COURT:  But the appointment of a trustee -- I

9      don't think the appointment of a trustee automatically gives

10     you any right to claim that you're a fraud victim.

11           MR. HENDERSHOTT:  No, you wouldn't appoint a

12     trustee, Your Honor, unless you found fraud.  If you found

13     cause, one of them being fraud, then you would appoint the

14     trustee and we would also get the benefit to actually be

15     able to have some tax, significant tax consequences for the

16     financial harm that's been occurred to us.

17           We understand.  You said numerous times, Your

18     Honor, the path of the (indiscernible), we know we're not

19     going to go back, you know, over the last nine months and

20     change any rulings, but again, 1104(a)(1) states, any time

21     before confirmation.  They specifically open it up from this

22     very point in time to have justice served and an evaluation

23     performed, and the defraud, dishonesty, incompetence, or

24     gross mismanagement has occurred.  We've never been given

25     that opportunity throughout this last nine months to have it

Page 252

1    really made on that.

2            At least the creditors that submitted this, that's

3    what we're asking for.  We want you to evaluate the motion

4    that we submitted with all of the different events and

5    evidence that we submitted.  Our impression, Your Honor, is

6    that cause occurred, fraud occurred, dishonesty occurred,

7    incompetence and gross mismanagement occurred, but no one

8    cares what we think.  We've elected to give us your

9    ruling if you agree with that or not.

10            THE COURT:  Okay.  Who else wants to be heard?

11            MS. PROVINO:  Your Honor?

12            THE COURT:  Yes.

13            MS. PROVINO:  This is Lisa Provino, pro se

14    creditor.  Is there another option for that tax credit that

15    Tracy Hendershott has discussed?  Because if not, then I

16    would be supportive of that particular motion that he's

17    talking about at the moment, unless you could talk about

18    something else that we would be able to do a write off.

19            THE COURT:  I don't have --

20            MS. PROVINO:  I probably would (indiscernible).

21            THE COURT:  I don't know about this tax write off

22    or what it is that you would need to show to tell you the

23    truth but it seems to me I would be very dubious about the

24    idea that anything that could be labeled as fraud would

25    automatically give you rise to claim all of your losses as

Page 253

1    tax losses.  Because frauds come in many different forms and

2    they have many different victims and I would expect that it

3    -- you wouldn't get a tax benefit unless if I were to find

4    that there was something about your whole course of dealing,

5    your individual courses of dealing with Voyager was a fraud

6    that you were induced to buy cryptocurrencies that you

7    didn't want to buy that, I don't know, all kinds of things

8    that I don't even have allegations to that effect.

9            MR. HENDERSHOTT:  Sir, Tracy Hendershott again.

10   Specifically it's IRS Revenue ruling 2009-9 that allows us

11   to be able to take a credit for fraud, financial fraud, but

12   it has to be declared, it just can't be self-proclaimed.

13   And I think it exists in this case and that's what we're

14   asking for you to rule on.

15           THE COURT:  Okay.  But then here's my problem.  I

16   have no evidence.  I have a lot of allegations and letters

17   of fraud, but I have no evidence.

18           MR. HENDERSHOTT:  It's about 20 pages that we

19   submitted on Document 1061, Your Honor.

20           THE COURT:  There's no --

21           MR. HENDERSHOTT:  There's been a mountain of

22   paperwork.

23           THE COURT:  But --

24           MR. HENDERSHOTT:  Sorry?

25           THE COURT:  But unless it -- unless I have

1    testimony from people as to what they actually did, right,

2    you know, just kind of hearsay reports or complaints about

3    specific things without a hearing from the witnesses to tell

4    me whether it actually happened, and why it actually

5    happened, and what the intent was behind it, I don't have a

6    record on which I could find fraud.

7            You understand in order to find fraud I have to

8    actually find that somebody had an intent to commit fraud,

9    right.

10           MR. HENDERSHOTT:  Well, I don't know if I agree

11   with that, you know, civil laws the burden of proof is much

12   less than the criminal law.  We don't have to find beyond a

13   reasonable doubt.  And civil law is more likely than not;

14   isn't that correct?

15           THE COURT:  Well, that part is true as to what the

16   burden of proof is but -- or the level of proof but the

17   element of fraud, one of the elements of fraud is intent.

18   Something -- and actually in many states, fraud requires

19   proof by clear and convincing evidence, not by a

20   preponderance of the evidence, which is a standard in

21   between the criminal standard and the ordinary civil

22   standard.  I'm still waiting for somebody to be precise

23   enough to tell me where exactly in between, but I guess we

24   know it when we see it.

25           But fraud is definitely -- you know, intent is an

Page 255

1    element of a fraud claim.  So I don't -- nobody's taken

2    testimony of Mr. Ehrlich on these points.  Nobody's asked

3    him.  I really don't have an evidentiary record from which I

4    could find fraud.

5            You know, I'm concerned by the things you've

6    raised, I don't want to make you think that I'm sweeping

7    them under the rug and I really haven't had -- nobody's

8    really even addressed half of them in response.  So I don't

9    want you to think that I'm by any means giving anybody a

10   pass on anything that's happened in this case or with

11   Voyager in general.  I am not.

12           I am concerned by the things that you've

13   mentioned, but sitting here right today, I can only make

14   rulings based on evidence.  And to the extent you would like

15   me today to rule that people at Voyager committed fraud, I

16   would require evidence of their actual intent and I don't

17   have it.  I just don't have it.

18           MS. PROVINO:  Your Honor, Lisa Provino, pro se,

19   I'm sorry, Tracy, were you going to talk?

20           MR. HENDERSHOTT:  Yes, just one second, Lisa.

21           MS. PROVINO:  You're welcome.

22           MR. HENDERSHOTT:  So, Your Honor, you make a good

23   point and this goes back to our earlier conversation.  You

24   know, you said despite -- or no one has submitted evidence.

25   This is our concern with the representation that we received

Page 256

```
 1    from the UCC.  And the recent (indiscernible) selecting Mr.

 2    Hague going forward.  We have been frustrated with the lack

 3    of what we consider obvious.  We don't know the legal

 4    procedures.  I -- we thought that the documents that we

 5    submitted, we worked so hard on finding all of the financial

 6    reports, I mean literally a week's worth of effort that

 7    weren't even into the court record was evidence submission.

 8           Now, you're saying it's not.  You know, our UCC

 9    should have been doing this.  But they didn't.  And now they

10    pick the business partner of the brother of the chairman of

11    the UCC who, Your Honor, we feel the next step after Mr.

12    Hague is selected, he's going to then pick Jason Resnick's

13    brother to be his personal legal representation.  I mean,

14    the conflict of interest just never ends and the lack of

15    representation that we've had as creditors has been almost

16    as frustrating as the loss of the financial (indiscernible).

17           Your Honor, my understanding is fraud, it's not

18    the only one for cause, it's dishonesty, simpler than fraud.

19    It's incompetence, it's gross mismanagement, any of these

20    quality as for cause.

21           THE COURT:  But none of those --

22           MR. HENDERSHOTT:  And during --

23           THE COURT:  But none of those get what you wanted

24    under your revenue ruling, right?

25           MR. HENDERSHOTT:  I think it's just fraud under
```

Page 257

```
 1   the IRS, yes.  Is my recollection, but I'm not an expert on

 2   IRS Code, but I do think it's specifically for fraud.

 3            But talking about fraud, Your Honor, if I may.

 4   Again, we're not experts, so again, what is fraud,

 5   especially in a civil case versus a criminal case.  I go to

 6   Black Law Dictionary, I don't need to insult you, sir, but

 7   I'd like to read it.  It says nothing about intent.  Not in

 8   a court of equity Lex Law states probably includes all acts,

 9   omissions, concealment which involve a breach of legal or

10   equitable duty, (indiscernible) or competence and are

11   injurious to another or by which an undue and unconscious

12   advantage is taken of another.  There's not one word about

13   intent in there.  It's about fraudulently committing acts

14   that causes damage to another.

15            THE COURT:  Well, fraud means fraudulently doing

16   something that's kind of a tautology there.  I will tell you

17   that fraud in almost every context I know requires proof of

18   intent.  If any of the lawyers in the room think I'm wrong

19   about that, speak up please.  But nobody is doing so.  It's

20   kind of -- it's a basic.  What can I say.

21            MR. HERNDERSHOTT:  Okay.  So Black's Law is not

22   correct.

23            THE COURT:  I'm sorry?

24            MR. HENDERSHOTT:  So the definition in Black Law

25   for a court of equity is not correct.
```

1          THE COURT:  I don't know what the context was, I'm

2     just telling you fraud, in my understanding, requires proof

3     of intent.  That's been something I've understood my entire

4     legal career.  Every time I've litigated a fraud claim, any

5     time I've ruled on a fraud claim, intent has been element of

6     the offense.

7          I am not aware of -- I'm aware of some things like

8     fraudulent transfers, where people use the word, and it

9     really isn't fraud, it's kind of a misnomer, but when you're

10    talking about actual fraud of the kind that's addressed in

11    Section 1104 that requires intent.

12         Let me hear from --

13         MR. HENDERSHOTT:  Okay.  So are you making your

14    ruling now, no fraud, no dishonesty, no incompetence, no

15    risk management, or is this the discussion and your ruling

16    comes later?

17         THE COURT:  Well I'm going to hear from the debtor

18    first.

19         MR. HENDERSHOTT:  Okay.  Thank you, sir.

20         THE CLERK:  Your Honor, we're coming on the four

21    hour mark.

22         THE COURT:  Okay.  Why doesn't everybody relog in

23    on the telephone and then we'll finish, okay.

24       (Recessed at 5:28 p.m.; reconvened at 5:44 p.m.)

25         THE CLERK:  Your Honor, would you like me to --

1           THE COURT:  Yeah.  Why don't you go get them.

2           MR. GOLDBERG:  Good afternoon, Your Honor. Adam

3    Goldberg for the record on behalf of Binance.US.  We're

4    having some just ongoing dialog about the issues in an

5    effort to resolve things for Your Honor.  I think if you

6    could give us another 15 minutes, we should be able to

7    report back.

8           THE COURT:  Well, I've lost patience with my

9    request that you agree to change the milestone, and I don't

10   appreciate you holding that up while you try to resolve

11   other issues.  It is 100 percent clear, including based on

12   the exculpation that you and others would want, that we're

13   not going to get there today because I have to give the

14   Government a chance to file its response either this

15   afternoon or tomorrow.

16          It's 100 percent clear, since it is already quarter

17   to 6:00 that I cannot organize my thoughts, issue a ruling

18   on the disputed points, and go through the 78-page

19   confirmation order to get something done by midnight.  So

20   tell me that you either extend it, or we'll stop.  And I'm

21   tired of being toyed with on that point.  Okay?  I want an

22   answer.

23          MR. GOLDBERG:  Very well, Your Honor.  May I have

24   five minutes to call my client?

25          THE COURT:  Yes.

Page 260

```
 1              MR. GOLDBERG:  Thank you.

 2              MS. PROVINO:  Your Honor?

 3              THE COURT:  Yeah.

 4              MS. PROVINO:  This is Lisa Provino.  May I speak,

 5     or I'm not allowed to speak yet?

 6              THE COURT:  I think we should wait for the, in

 7     fairness the Binance lawyer who's gone out to call his

 8     client.  Let's wait for him to come back, okay?  He has a --

 9              MS. PROVINO:  I appreciate that, sir.

10              THE COURT:  He has a right to hear what you --

11              MS. PROVINO:  No.  That's fine.  I just don't want

12     you to forget me.  Thank you.

13              THE COURT:  How could I do that?

14              MS. PROVINO:  I would hope that you won't.

15         (Pause)

16              THE COURT:  Yes?

17              MR. GOLDBERG:  For the record, Adam Goldberg from

18     Lantham and Watkins on behalf of Binance,US.

19              Thank you for bearing with us, Your Honor.  This

20     has been a long process, and we appreciate everyone's

21     efforts towards it.  Binance.US consents to an extension of

22     the milestone for entry of the confirmation order due

23     tomorrow at 5:00 p.m., and we expect to be working with the

24     Debtors and the committee to respond to Your Honor on the

25     customer data point in the meantime, and hope to have a
```

Page 261

1   proposed resolution in the morning, if not tonight.

2          THE COURT:  Okay.  All right.  Let's get back to

3   the trustee motion then.  There was a creditor on the phone

4   who wished to be heard?

5          MS. PROVINO:  Yes, sir.  Myself, Lisa Provino, and

6   my husband is here as well, Scott Provino.

7          So what -- we have a few questions for you, Your

8   Honor, please.  So we did, just while we were waiting, we

9   looked up the IRS Ruling 2009-9 and 2009-14, both of which

10  do say that we need -- we definitely need it to be declared

11  either a Ponzi, or a criminally fraudulent investment of

12  some sort in order for us to be able to write off these

13  significant losses that --

14         THE COURT:  Yeah.  I was curious about --

15         MS. PROVINO:  -- most of the --

16         THE COURT:  I was curious about moving 2009-9, and

17  I looked it up, and it deals with Ponzi schemes.

18         A Ponzi scheme is quite different from what

19  anything that's been alleged here.  You know, in a Ponzi

20  scheme, people are lied to about what their money is being

21  used for.  I don't think anybody here has alleged that they

22  weren't actually submitting money for the purposes of

23  investing in cryptocurrencies, or that Voyager wasn't

24  actually buying cryptocurrencies, or that their account

25  statements were fictitious, or any of the kinds of things

Page 262

1      that would be characteristic of a Ponzi scheme.

2            And the reason for that particular ruling was that

3      you have to show that your loss is essentially a theft, that

4      the Ponzi scheme perpetrator has stolen, not just that you

5      didn't get all of your recoveries and that things went bad.

6      I didn't get a chance to look at the other ruling, but I

7      can't imagine anything that's been alleged, let alone any

8      evidence that I've offered, that would support a Ponzi

9      scheme finding in this case.  Mind you --

10            MS. PROVINO:  Well, that's my next --

11            THE COURT:  -- there are some people who allege

12      that cryptocurrencies, themselves, are Ponzi schemes because

13      they don't believe that cryptocurrencies are real, but

14      nobody here has asked me to rule that.

15            MS. PROVINO:  Correct, Your Honor.  So well, I

16      guess where we -- at least where we particularly stand, as

17      we have received phone calls all weekend here.  There have

18      been calls from people that said that even their money got

19      stolen through the Voyager platform, some Nigerian -- and

20      I'm not exactly sure how, but I was trying to understand the

21      details.

22            But my question to you, Your Honor, is going back

23      to those five points of criminal intent where it says -- I'm

24      just going to say they're points, 2, 3, and 4, which we

25      looked up on the internet, the defendant possesses

Page 263

1    knowledge, the statement is untrue, false statement intended

2    to deceive the intended victims, intended victim justifiably

3    relies in the statement, and that is what I have received

4    phone calls for this past weekend.

5          So my question to you, Your Honor, is because I

6    don't know if a pro seer can actually subpoena somebody.  If

7    there is a way, please tell me.  I will -- we will do that.

8    I guess it's a little late, but we just need to know if we

9    can.

10          And secondly, if we have an opportunity to prove

11   off the fraud and possibly put some witnesses on the stand.

12   Again, I know we're pro se, but please take this into

13   consideration because we have had significant losses, and I

14   honestly am begging you right now to please be openminded to

15   this.

16          THE COURT:  Yeah.  Did any of you who want to do,

17   did you file proofs of claim alleging that you were victims

18   of fraud?

19          MS. PROVINO:  I'm sorry, sir.  Could you explain

20   specifically what you're asking now?

21          THE COURT:  Yeah.

22          MS. PROVINO:  You mean, the claim that they didn't

23   allow me to -- for voting purposes claims, and then I had to

24   fight for that?  Which claim are you speaking of, sir?

25          THE COURT:  Well, you know, the Debtor filed

Page 264

1    schedules of people that thought that had -- you know,

2    accountholders, who would have thought their claims were.

3    Anybody who thought they had other claims should have filed

4    a proof of claim form.  So if you thought you were a fraud

5    victim, not just that you were an accountholder who just

6    happened to be owed money, but a fraud victim, you should

7    have filed a proof of claim saying that you believed you

8    were a fraud victim.

9            So to the extent that you did that, then you can

10   get a litigation.  You can get a ruling and a litigation of

11   your claim as to whether you were a fraud victim.  But if

12   you didn't, then being on the eve of confirmation, I don't

13   know how you're going to get that, at least in this

14   particular context, at least from me.  You would have to sue

15   the perpetrators of the fraud, who you think defrauded you,

16   and get a ruling in that context.

17           MS. PROVINO:  Well, lesson's learned.  These are

18   life lessons.  Is there a way, though, Your Honor, for pro

19   seers to subpoena someone?  Could you answer that for me,

20   please?

21           THE COURT:  Well --

22           MS. PROVINO:  Or do we need a (indiscernible -

23   5:57:37) for that.

24           THE COURT:  Yeah.  I'm not supposed to give you

25   legal advice.  I'm just supposed to rule on things.  There

Page 265

1   are procedures in the Code for subpoenaing people.  Usually,

2   if you want to subpoena somebody in connection with a motion

3   that's actually pending, you have to issue the subpoena in

4   accordance with requirements in the rules and have it served

5   on the recipient, and if there isn't a particular proceeding

6   pending for which the testimony is sought, you'd need

7   permission to issue a subpoena under Rule 2004.  That's

8   about as much as I, as the judge, should be giving you

9   advice about, okay?

10          MS. PROVINO:  That's fair.  I appreciate that.

11   I'll go back to the (indiscernible - 5:58:25) rules,

12   bankruptcy sections.  I've looked over, just it's a lot to

13   digest.  So I'll go back to that section.  You said Rule

14   2004, right, 2-0-0-4?

15          THE COURT:  That's the Rule if you don't have

16   something -- a motion pending to which the testimony really

17   relates.  If you have a contested matter or an adversary

18   proceeding where it's relevant, then the Bankruptcy Rule

19   is -- hang on one second.  Rule 9016, which simply

20   incorporates Rule 45 of the Federal Rules of Civil

21   Procedure.

22          MS. PROVINO:  And I will review that.  Thank you,

23   sir.

24          THE COURT:  Okay.

25          MS. PROVINO:  The only other question I have -- and

1    I'm sorry for the multiple questions here -- but in terms of

2    the for cause, if you will, if the Debtors are removed and

3    all the releases are voided, does that mean that we can't

4    still go on the Ponzi scheme issue?

5              THE COURT:  If the --

6              MS. PROVINO:  Or is that, like you said, you have

7    to sue them for fraud?

8              THE COURT:  I missed a part of your question.  If

9    what happens?

10             MS. PROVINO:  Oh, I'm sorry.  If the Debtors are

11   removed and their releases are voided, would that be a for

12   cause for the Ponzi scheme or it basically goes back to what

13   you had said before?

14             THE COURT:  I'm not sure I understand the question.

15   If the Debtors are what and the releases are voided?

16             MS. PROVINO:  If the Debtors are removed from the

17   releases.  You know how we've been talking all afternoon

18   about the releases?  So if they're just voided out, does

19   that mean we can't go after them for cause for the fraud,

20   for the Ponzi scheme?  I mean, we're concerned about tax

21   consequences.

22             THE COURT:  Well, when you say them, if you want to

23   go after individuals and you believe you have a fraud claim,

24   there's nothing in what we're doing here that would stop you

25   from doing that.  If you want to make a fraud claim against

Page 267

 1    the Debtors, it should have been in a proof of claim, and if

 2    it was not --

 3              MS. PROVINO:  And when would that have been done,

 4    by 10/3, or is that a different date, sir?

 5              THE COURT:  I think that was -- I'm getting a lot

 6    of headshakes, yes, back last October.  So if it's not in a

 7    proof claim --

 8              MS. PROVINO:  But --

 9              THE COURT:  If it was not in a proof of claim, you

10    would need to amend a claim that you filed or get permission

11    to file a late claim, and there are rules that govern that,

12    too.  I don't know what else to say.

13              MR. AZMAN:  Your Honor?

14              THE COURT:  Mr. Azman.

15              MR. AZMAN:  Darren Azman for the Committee.  If I

16    could just speak to Ms. Provino?

17              Ms. Provino, if there are things that we can do to

18    mitigate tax consequences or tax liabilities for what is

19    really going to be the bulk of the creditor body, that's

20    certainly something that either the committee or when the

21    plan goes effective, the plan administrator is happy to

22    consider.  I think what I would suggest is that it's not

23    necessarily something that needs to be decided today.

24              Certainly, somebody can come back to the Court and

25    file a motion seeking some type of declaratory judgment

Page 268

1     relief to contend that whatever this was it was.  And

2     whether it satisfies that tax provision, I don't know, but

3     that's certainly something that if it benefits the entire

4     creditor body, I'm sure that the plan administrator would

5     certainly want to consider.

6               MS. PROVINO:  Mr. Azman, I want to truly appreciate

7     you mentioning that.  I feel that that is what we need to

8     do, and I won't belabor this, but at the moment, I just

9     wanted to say thank you for that.  And thank you, Your

10    Honor, for allowing me to speak on this matter because it

11    does significantly affect us.

12              THE COURT:  Okay.

13              MS. PROVINO:  Thank you so much.

14              THE COURT:  Okay.  Let me hear from the Debtor on

15    this issue then.

16              MS. SMITH:  Thank you, Your Honor.  Allyson Smith,

17    Kirkland & Ellis, on behalf of the Debtors.

18              I'm sure you saw we did file an objection to these

19    motions.  That objection raised a number of the same points

20    that Your Honor has already --

21              THE COURT:  It didn't really address the charges.

22    It sort of gave them the back of your hand.

23              MS. SMITH:  Well, there's really no evidence or

24    anything other than just kind of assumptions and conclusory

25    statements.

Page 269

```
 1              THE COURT:  That's true, but I would have expected

 2     a little more explanation.  It seemed odd to me to just have

 3     none.

 4              MS. SMITH:  I mean, I think we -- you know, we have

 5     the special report out, we've done extensive disclosures and

 6     conversations about the special committee's investigation.

 7     I think from our view, they were unfounded statements that

 8     didn't necessarily warrant giving any weight to.

 9              THE COURT:  Okay.

10              MS. SMITH:  I did want to reiterate that the

11     Debtor's position has not changed.  There is no cause to

12     appoint a trustee under 1104(a)(1), and despite statements

13     that the movants say otherwise, any appointment to do so

14     would not be in the best interest of creditors, particularly

15     at this stage of the cases.  We're on day three of a

16     confirmation hearing, seeking authority to proceed with

17     implementation of the plan.  The plan overwhelmingly is

18     supported by voting creditors, and proceed with

19     distributions to customers.

20              These cases have obviously been difficult, and I do

21     understand the frustrations of customers, but no party has

22     offered any actual evidence of finding of fraud, and to

23     appoint a trustee at this point in time would essentially

24     put parties back at day one rather than accomplishing what

25     we understand customers' role is to be, the efficient return
```

Page 270

1    of assets and conclusion to this process.

2            And lastly, but importantly, I did want to

3    highlight that also appointment of a trustee or conversion

4    to a Chapter 7 is an APA termination event.

5            THE COURT:  Okay.  All right.  Is there anything

6    else?  Any other motions or any other issues that we need to

7    address today?

8            MS. SMITH:  No, Your Honor.

9            MS. DIRESTA:  Your Honor?

10           THE COURT:  Yeah.

11           MS. DIRESTA:  Your Honor, this is a pro se

12    creditor.  I have a question.

13           THE COURT:  Yes.  What is your name?

14           MS. DIRESTA:  My name is Gina DiResta.

15           THE COURT:  Okay.

16           MS. DIRESTA:  And I was not at the hearing when a

17    fee examiner was requested, but I heard through fellow

18    creditors that it was approved.  And so I wanted to confirm

19    with you that was indeed approved because I was also told

20    that there was no orders filed if that was approved.

21           THE COURT:  What I ruled at the time was while I'm

22    not a giant fan of fee examiners, and I did not want

23    somebody who was going to redo work that the U.S. Trustee

24    had already done or do what unfortunately my past experience

25    has been in the case of some fee examiners, which is simply

Page 271

1   try to blackmail fee reductions from Debtors.  And I asked

2   if the Debtors and the U.S. Trustee and the committee could

3   discuss and see if they could agree on something that would

4   work within that parameter, and I think they've been

5   discussing it.  Nobody has gotten back to me to say that

6   they can't reach an agreement, but it does seem to be taking

7   some time.

8           MS. DIRESTA:  Okay.  Thank you for the

9   clarification, Your Honor.

10          THE COURT:  I was in private practice once and

11  actually had a fee examiner say to us after raising a few

12  issues that look, all I want is five percent.  I don't care

13  how.  And I will never appoint anybody who does that.

14  That's just wrong.

15          MR. MORRISSEY:  Your Honor, Richard Morrissey for

16  the U.S. Trustee.

17          Actually, to add one party to the conversation in

18  addition to the committee and the Debtors, counsel, we also

19  circulated names to Mr. Kirpalani, if he's still here, but

20  because he had objected to the fee examiner as well.  So we

21  did pick someone, and I think I advised Your Honor at the

22  hearing on the Paul Hastings retention application that Lori

23  Lapin Jones was the person that had been --

24          THE COURT:  That's right.  You know, I forgot

25  entirely that you had said that.  I apologize.

Page 272

1          MR. MORRISSEY:  But the creditor on the phone is

2     correct, we have not yet submitted a proposed order.  Quite

3     frankly, Your Honor, the confirmation hearing has been all-

4     consuming, but as soon as --

5          THE COURT:  That's something you don't have to tell

6     me.

7          MR. MORRISSEY:  -- possible after it's over -- yes.

8     Thank you, Your Honor.

9          THE COURT:  All right.  Any other issues for today?

10         MR. WARREN:  Your Honor, this is pro se creditor

11    Jon Warren.  Can you hear me?

12         THE COURT:  I can.

13         MR. WARREN:  All right.  I had one quick question

14    to you, is there a way that we can request the transaction

15    history, including withdrawals of Voyager insiders and board

16    of directors?

17         THE COURT:  You would have had to make a discovery

18    request for that information, and Voyager would have had the

19    opportunity to object if it thought it was improper.  It

20    would be -- I can't say anymore than that.  I can't tell you

21    how to do it.  I can't give rulings and things that aren't

22    in front of me.  It's just not something I'm allowed to do

23    as the judge, okay?

24         MR. WARREN:  Thank you for the information.

25         THE COURT:  All right.  Anything else?  All

Page 273

1    right --

2           MS. DIVITA:  Your Honor, I'm sorry.  I was

3    struggling to get off mute, but this is Michelle DiVita.

4    I'm a pro se creditor, and I also filed a motion in regards

5    to appointing a trustee.

6           THE COURT:  Yes?

7           MS. DIVITA:  I just wanted to make maybe a few

8    quick clarifying statements, but I think this plan as it's

9    contemplated today does give the Debtors -- still, they

10   retain a great deal of business judgment, particularly in

11   regards to risk management and things of that nature.  I

12   will say that I was maybe surprised earlier when there was a

13   discussion surrounding the confirmation order and exactly

14   what conduct the special committee investigated.  It was my

15   understanding that that was a very limited investigation and

16   only pertained to the (indiscernible - 6:10:23).

17          And so I was surprised to hear that it also

18   included things such as wagers, communications to the

19   public, and then also decisions to extend loans beyond

20   (indiscernible - 6:10:32), particularly in regard to those

21   transactions that occurred shortly before bankruptcy and the

22   filing thereafter.

23          I just kind of maybe wanted to provide some context

24   in terms of why I filed a trustee motion.

25          Really, if the Court (indiscernible - 6:10:52) in

Page 274

1    the sense that it seeks to give creditors their money back

2    as quickly as possible, and that was really kind of the

3    premise of the FTX transaction.

4         I, you know, kind of bit my tongue back in October.

5    I think that I maybe I'm a little more risk-averse than

6    other people on the phone, and that's why my claim is much

7    lower just because I chose to diversify my cryptocurrency

8    holding.

9         But I will just say that I was a little surprised,

10   maybe back when the UTC filed one of their first objections

11   to say that really no wrongdoing outside of this 3AC loan

12   had occurred, and really my frustration stems from things I

13   found in the financial statements and just kind of this

14   general sense from the Debtors that, you know, these were

15   very experienced finance professionals, and, you know, they

16   had fees beyond cryptocurrency and asset management and

17   things of that nature.  And so kind of having to rely on

18   this very limited investigative report, just thinking, let's

19   get to plan to confirmation.

20        Now, today, it seems like we've had more time.

21   There is more that could be investigated, and it hasn't

22   been.  So really an examiner motion wasn't appropriate, but

23   I think that between the conduct leading up to the

24   bankruptcy, combined with, you know, this assurance that the

25   FTX transaction will be great, all in light of the fact

1    that -- you know, Alameda was an insider shortly before the

2    filing of bankruptcy petition, not to mention, I think that

3    under United States law, they're still technically

4    considered an insider.  It's just really this combination of

5    factors that really made me to distrust the debtors, and I

6    know a lot of the creditors on the phone maybe agree with

7    that assertion as well.

8            And so I certainly don't want to -- I do not envy

9    the position that you are in, whatsoever.  I certainly do

10    not have admittable evidence to any of these factors.  I,

11    personally, have spent a lot of time on this matter, and I

12    don't have a ton of time to dedicate to it in the future,

13    but really just trying to rely on the deference of the

14    bankruptcy professionals, and you, yourself, Your Honor, to

15    make a decision, and as we confirm this plan, with maybe

16    that context in mind.

17            And I think as you've heard from these pro se

18    creditors, we aren't bankruptcy professionals.  We're not

19    experts here, and we don't know I think the procedural part

20    of things I've seen has at least, for me, personally, have

21    one of the biggest learning curves.

22            THE COURT:  Right.

23            MS. DIVITA:  These are just things that I really --

24    the purpose of my motion was to just kind of paint that in a

25    context of distrust and their kind of (indiscernible -

Page 276

1   6:13:42) today or what actions that have led us to where we

2   are today.  That's all I have to say, Your Honor.  Thank

3   you.

4           THE COURT:  Okay.  In terms of just to correct one

5   thing you said --

6           MS. DIVITA:  Yes.

7           THE COURT:  When you said you were frustrated that

8   the committee found that there was nothing wrong, other than

9   the 3AC loan, I need to make clear, the special committee's

10  job really was to figure out what claims belonging to the

11  Debtor and the estate could be pursued, okay?

12          You mentioned specifically financial statements.

13  I, personally, have no idea if there was anything wrong with

14  the financial statements or not or whether there was any

15  fraud and whether that injured anybody.  But if a customer

16  or a shareholder was injured by a misstatement of financial

17  condition, that's not a claim that would belong to the

18  debtors.  That's a claim that would belong to the customers.

19  Okay?

20          And the debtors have no ability or right, let alone

21  ability, to pursue it for customers, nor does the committee.

22  The committee's job is to pursue creditors' interest not

23  with respect to individual claims, but as to the conduct of

24  the case, how the business will be handled, et cetera.

25          So I know probably many of you think that you're

Page 277

1   frustrated because neither the debtors, nor the special

2   committed, nor the unsecured creditors committee championed

3   your cause on allegations about, for example, whether

4   Voyager was on the brink of bankruptcy, but that's not

5   really their job.  I know you may have assumed it's their

6   job, but it's not.

7           Those are claims that belong to you individually

8   that if you believe you have them, you need to pursue.  And

9   they're not being released.  Nobody is purporting to release

10  them, nobody is purporting to express any view about whether

11  they're right wrong, but I just -- I hope -- I've tried many

12  times throughout the hearing here -- and it's resulted in

13  extending the hearing quite a bit -- to give you, all of

14  you, a lot of leeway as to the questions you can ask and to

15  try to explain things because I think it's important that

16  people understand and feel that their questions have been

17  heard and that the process is open and that they understand

18  it as much as possible, but I still think that on that

19  particular point, there's still some confusion, okay?

20          MS. DIVITA:  Yes.  And I'm sorry, Your Honor.  I

21  was referring to the creditor committee's findings.  I don't

22  think that that changes your statements by any means, but

23  just to clarify that point, and say subsequently, had it

24  been asked to customers to contribute their direct claims to

25  a wind-down or to the trust that would then prosecute those

1    claims so.

2          There were direct claims at least contemplating in

3    the beginning, and I think that the unsecured creditors

4    committee also previously referenced --

5          THE COURT:  Okay.

6          MS. DIVITA:  -- but only 60,000 people here have

7    voted.  So that's maybe a clarifying point.  And I think

8    that we're relying on these professionals to meet those

9    assertions in regard to those direct claims and/or other

10   claims.

11         THE COURT:  Okay.

12         MS. DIVITA:  That's all.  Thank you, Your Honor.

13         THE COURT:  All right.  Is there anybody else who

14   wants to be heard?  Okay.

15         I'm going to close the argument record then.  I'll

16   reserve decision.  I have a lot of homework and prep to do

17   to make rulings on these motions and to review the proposed

18   order.  It sounds like people are still reviewing, and I'm

19   trying to decide on certain provisions.

20         Whatever is the version of the order that was sent

21   to us this afternoon, I am going to work on.  So if you make

22   changes, make sure you are very clear as to which specific

23   provisions they relate to so I don't get lost in looking at

24   them tomorrow.  But I will be working and making my own

25   adjustments to kind of editorial provisions, and I may have

Page 279

1   other questions for you as I review the full scope of the

2   extended order.

3           And perhaps we should resume at 2 o'clock tomorrow,

4   at which point, I will read my rulings into the record and

5   ask any remaining questions that I have about the order.

6   Okay.  Does that work?

7           MR. SLADE:  Very good, Your Honor, thank you.

8           THE COURT:  Okay.

9           MR. GOLDBERG:  Your Honor, would you like us in

10  person or by phone?

11          THE COURT:  Let's do it by person for sure as to

12  the Debtors, Binance, and the committee.  Anybody else who

13  want to be over here in person can be here in person, but

14  has permission to be on the phone.  Okay?  I think the rest

15  of you, it's useful to have you in one place if an issue

16  comes up because you're already here, you can discuss it,

17  and we can resolve it more quickly.  When you're on the

18  phone, it takes forever.  Okay?

19          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

20      (Whereupon, the proceedings were concluded at 6:19

21  p.m.)

22

23

24

25

Page 280

1                           I N D E X

2                   W I T N E S S E S

3     WITNESS                  BY                        PAGE

4     None.

5

6                       R U L I N G S

7     ITEM                                              PAGE

8     None.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 281

1

CERTIFICATION

2

3        I, Sheila Orms, certify that the certify that the

4    foregoing is a correct transcript from the official

5    electronic sound recording of the proceedings in the above-

6    entitled matter.

7

8    Dated:  March 9, 2023

9

10

11    Signature of Approved Transcriber

12

13

14

15

16

17

18

19

20

21

22    Veritext Legal Solutions

23    330 Old Country Road, Suite 300

24    Mineola, NY 11501

25

| **&** | |
|---|---|
| **&** 5:19 7:1,8 | |
| 8:16 9:2,9,16 | |
| 10:1,10,18 | |
| 11:1,8,17 12:1 | |
| 12:8,15 13:16 | |
| 14:1,9 53:18 | |
| 85:14 86:21 | |
| 103:6 106:2 | |
| 111:21 115:20 | |
| 136:20 174:7 | |
| 202:8 211:10 | |
| 213:12 225:18 | |
| 268:17 | |

**0**

**05620** 15:4
**07102** 11:4
**07962** 10:21

**1**

**1** 76:3 96:9,10
201:24 237:9
247:6 251:20
269:12
**1.763** 85:22
**1.8** 195:14
**10** 85:24
148:14 218:15
225:3 235:17
**10,000** 158:5
**10/3** 267:4
**100** 6:11 87:3
90:5 91:11,19
259:11,16
**100,000** 250:4
**10004** 2:3 7:11
13:12 15:11

**10007** 5:15
14:20
**10010** 9:19
**10014** 13:4
**10017** 14:12
**10019** 5:22
7:19
**10022** 5:6 10:5
11:11
**10036** 12:4,18
**1006** 243:1
**1049** 79:21
**1061** 253:19
**10:08** 2:6
**10:25:44** 29:17
**10:26:06** 29:20
**10:26:13** 29:21
**10:29:10** 31:17
**10:30:37** 32:14
**10:50:23** 45:3
**10:50:39** 45:6
**10:53:35** 47:9
**10th** 73:8
248:23
**11** 3:2,6 64:11
64:14,23 65:5
156:12 178:8
183:2 191:9
193:14 242:10
**1100** 12:10
**1104** 237:9
247:6 251:20
258:11 269:12
**1112** 237:8
247:3
**1114** 12:3

**11166** 281:10
**1119** 220:2
**11206** 3:18
**11209** 3:18
**11213** 3:18
**1123** 134:2
183:17
**1125** 32:14
39:10 66:14
**1127** 85:19
**1129** 62:4
64:11,12,14,23
65:5 223:12
245:1
**1138** 17:18
18:12 50:16
203:7
**1139** 50:17
**114** 220:1
**1140** 209:2,20
209:21
**1142** 36:13
**1145** 24:20
37:15 40:20
41:7,7,16,21
41:24 42:6,11
43:1,7,11,25
44:1,5,13,16
44:25 45:3
47:16 48:17
52:13 53:1,6
236:18,24
**115** 220:1
**11501** 281:24
**11556** 8:12
**1180** 14:4

**11:01** 52:18
**11:16** 52:18
**12** 186:7
**12.54.** 155:8
**125** 7:10
**12548** 9:4
**12:42:38** 109:1
**12:51:41** 115:7
**12:52:17**
115:15
**12:53** 116:8
**12th** 8:4
**13** 41:11 42:20
219:21
**1300** 10:20
**1301** 7:17
**136** 174:19,20
**142** 203:23
207:7 211:19
**1425** 8:11
**143** 203:23
207:7 209:1
**149** 79:20
**15** 41:11 42:21
169:9 259:6
**158** 203:6
**15th** 242:25
**165** 79:20
**16th** 89:3
**180** 96:9
**184** 79:20
**1850** 8:3
**187** 79:20
**19** 29:19
**1900** 86:3
**1934** 41:11
42:21

**[19801 - 60654]**                                    Page 2

**19801**  8:19
**19th**  91:2
**1:40**  115:11
  116:8
**1st**  156:13

### 2

**2**  44:6 47:17
  235:19 262:24
  279:3
**2,000**  92:20
**2-0-0-4**  265:14
**2.00.**  144:10
**2.4**  87:24
**20**  54:4 58:19
  76:17,25
  101:12 103:12
  148:14 185:11
  253:18
**200**  235:4
**20036**  8:5
**2004**  265:7,14
**2009-14**  261:9
**2009-9**  253:10
  261:9,16
**201**  13:3
**2021**  48:13
**2022**  168:10,10
**2023**  2:5 89:3
  281:8
**20549**  6:12
**20580**  6:4
**2161**  10:12
**219**  79:20
**22**  156:7,9,10
**22-01133**  1:12
  3:20

**22-01170**  1:19
  3:25
**22-10943**  1:6
**22.5**  91:3
**225**  9:11
**22nd**  243:5
**23**  18:2
**230**  226:13
  230:4
**24**  96:21
  155:10 238:17
**25**  101:20
**2501**  13:19
**27777**  7:3
**27th**  228:10

### 3

**3**  18:2 183:17
  262:24
**3,000**  250:1,18
**30**  91:4 101:20
  144:2,3 149:6
  250:17
**300**  11:19
  281:23
**3016**  171:4
**30309**  12:11
  14:5
**30326**  6:20
**31**  17:19
**31,878**  163:5
**33**  144:2
**330**  281:23
**35**  55:1,4 76:17
  76:25 101:13
  141:21 148:16
**3506**  81:24

**359**  79:20,21
**36**  144:2
**380**  79:20
**381**  79:20
**382**  79:20
**39**  144:5,11
  146:5 153:6
  155:11,25
**3:06**  174:4
**3:23**  174:4
**3ac**  175:11
  181:12 183:5
  184:9,21 187:8
  187:16 188:10
  189:23 218:12
  218:17 219:12
  274:11 276:9
**3rd**  5:14 10:4

### 4

**4**  17:19 44:6
  47:17 134:2
  262:24
**40**  148:17
  156:21 158:7,9
  235:14 250:17
**40,112**  163:1
**400**  10:13
**42nd**  7:18
**43**  119:23
**45**  265:20
**47**  120:14
**48**  57:11 96:22
  122:12 157:12
**48034**  7:4
**497**  79:21

### 5

**5**  76:3 105:2
  223:12 248:20
**5,000**  86:1
**500,000**  177:12
  244:6
**502**  221:22
**51**  5:21 9:18
**52**  163:5
**523**  29:19
**52nd**  5:21
**534**  13:11
**541**  85:20
**541,000**  243:24
**550**  243:11
**55402**  9:12
**570**  11:3
**575**  5:5
**5:00**  260:23
**5:10**  245:24
**5:28**  258:24
**5:44**  258:24
**5:57:37**  264:23
**5:58:25**  265:11
**5th**  156:12

### 6

**6**  2:5 35:2
  201:22
**60**  214:18
**60,000**  243:10
  243:14,17
  244:10 278:6
**600**  6:3
**601**  11:10
**60654**  11:20

**607**  79:21
**65**  163:1 170:1
**66**  79:20
**69**  203:6
**6:00**  259:17
**6:10:23**  273:16
**6:10:32**  273:20
**6:10:52**  273:25
**6:13:42**  276:1
**6th**  9:11

**7**

**7**  3:9 97:10
  222:5 270:4
**70**  79:20
  157:13 169:10
  203:6
**700**  177:10
**726**  163:3
**73**  156:21
**75**  229:17,23
  235:13
**75201**  13:20
**765**  163:7
**78**  245:22
  259:18
**78213**  10:14
**78711**  9:5

**8**

**8**  105:6
**85**  163:3
**86**  5:13 14:19
**863**  80:24
  81:13
**885**  10:4
**89**  15:3

**9**

**9**  281:8
**9,000**  85:23
**90**  163:7
  176:23 177:2,3
  177:4,6,14
**900,000**  86:2
**9016**  265:19
**92**  159:9
**94**  78:10 81:23
**95.68**  117:11
**950**  6:19
**96.28**  117:13
**97**  20:10 28:20
  28:21 78:6
  209:3,13,17
  213:14 243:23
**98**  84:14
  243:24
**99**  28:20,21
  209:3,13,14
  213:14
**9th**  91:3
  248:23

**a**

**a.m.**  52:18,18
**abandoned**
  100:3
**abandonment**
  100:13 103:13
**abide**  223:17
**abigail**  9:7
  28:15 132:10
**abilities**  250:16
**ability**  19:20
  21:9 22:7

32:24 68:18
69:4 88:4 89:6
91:6 97:4
110:12 120:7
121:8 128:12
130:15 133:1
150:19 161:8
237:24 239:17
276:20,21
**able**  18:5 22:7
  56:8 80:1
  87:17 105:2,3
  107:17 109:6
  119:19 121:11
  122:10 131:16
  133:19 135:21
  139:10 143:4
  146:16 179:17
  222:24 248:23
  251:15 252:18
  253:11 259:6
  261:12
**aboard**  178:12
**above**  203:18
  207:21 281:5
**absence**  59:14
  59:25
**absolutely**
  33:21 39:15
  64:2 65:19,20
  105:18 124:12
  124:16 133:10
  212:8
**absurd**  39:8
**abundantly**
  17:20

**accept**  23:13
  243:25
**acceptable**
  43:22 219:7
**acceptance**
  20:11 125:13
**accepted**  63:15
  243:24
**access**  72:11
  105:6,20 107:7
  107:11,24
  108:4,17
  109:14 110:8
  110:12 111:11
  120:8
**accident**
  249:10
**accidentally**
  170:7
**accomplish**
  26:22 111:17
  186:15
**accomplishing**
  269:24
**accordance**
  55:24 106:8
  265:4
**account**  19:2
  21:11,12 22:8
  46:16 55:12
  57:22 68:21
  109:3 113:7,11
  114:3,13,16
  117:4,6 118:16
  120:3,6,11
  122:11,16
  123:6 126:14

126:23,24
127:3 130:1,3
130:5 132:4,15
133:3 134:3
135:4 141:19
142:20 143:7
147:9 148:10
150:5 153:12
157:10,13,18
167:9 176:12
176:18 190:16
204:7,8 215:16
250:25 261:24
**accountholder**
264:5
**accountholders**
55:24 57:4,8
57:12,18,20
58:3 68:17
97:25 98:2
101:23 264:2
**accounts**   21:10
22:15 45:15
46:9 79:1,2
99:23 114:22
129:15,15
134:19 149:7
173:9
**accumulated**
21:1
**accusations**
246:15
**accuse**   26:14
**achieve**   112:25
122:10
**acknowledge**
62:10 142:25

**acquire**   154:21
**acquired**
213:17 214:6
**acquiring**   24:2
**act**   41:11 42:21
45:8 46:16
121:5 205:18
231:16
**acted**   244:16
**acting**   47:14,24
48:8,10 120:23
183:23 196:17
196:22
**action**   32:6
59:16 68:10
69:6 71:6
72:13 147:1
175:16,19,22
178:15 182:19
190:3 204:19
214:5 217:3
226:10
**actions**   34:23
39:25 40:1
59:7 68:7,19
83:5 91:1
139:6 196:12
210:9 251:6
276:1
**active**   169:15
**actively**   135:19
**activities**   69:8
69:9,11 228:1
**activity**   89:7
175:4 238:13
**actors**   241:25

**acts**   187:18
188:5,8 203:14
257:8,13
**actual**   65:25
151:16 161:8
172:15 180:5
180:17,18
184:5 190:13
255:16 258:10
269:22
**actually**   30:1
30:15 36:19,22
50:12 62:24
68:15 69:5
78:15 92:19
97:5,24 98:12
101:8 111:2,4
111:18 123:11
130:20,24
138:1 139:5
141:15 146:5
153:2,5 170:11
173:1 188:25
189:1 193:20
194:24 197:8
201:19 205:22
217:22 243:16
247:11,18,19
249:24 251:14
254:1,4,4,8,18
261:22,24
263:6 265:3
271:11,17
**ad**   1:16 12:2,9
12:16 225:18
226:9 227:13
227:15,23

229:20 231:15
231:22 232:12
233:3 234:3
**adam**   10:8
18:16 85:14
103:5 106:1
111:20 115:19
213:11 259:2
260:17
**add**   21:8 132:8
140:9 154:8
195:12 201:16
212:20 220:24
271:17
**added**   17:11
25:2 35:2
43:16 71:2
96:2 97:17
98:13 201:25
210:7 232:22
**addition**   55:5
82:5 109:9
132:7 197:7
203:15 209:9,9
238:8 271:18
**additional**
17:17 21:24
22:2,5 44:10
72:24 73:2,6
96:1 140:9
211:16
**additionally**
209:1
**address**   18:18
53:20 82:20
92:4 94:16
98:22 99:5

105:24 113:10
222:8 232:14
233:2 268:21
270:7
**addressed**
108:15 217:9
225:21 245:22
249:24 255:8
258:10
**addressing**
111:1
**adds** 151:5
**adequacy** 64:9
**adequate**
56:20 61:22
66:15 78:14
**adequately**
98:22 242:20
**adjust** 25:14
**adjustment**
125:4
**adjustments**
24:9 278:25
**administrative**
22:1 89:21
185:12 187:2
242:5
**administrator**
21:17,19
177:18 181:17
181:18 183:17
217:7 222:24
223:4 224:9
225:22 228:7
228:14,18
229:3 231:5,12
231:16,18

233:1,16,17
237:18,24
238:1,8 239:12
239:18 240:1
240:15,24,25
242:9,25 243:2
243:8,8 244:2
244:5,9 247:25
267:21 268:4
**administrator's**
231:4
**admissible**
63:21
**admit** 124:10
159:19
**admittable**
275:10
**admitted** 61:12
61:24 140:6
167:22 220:4
**admittedly**
247:4
**adv** 1:12,19
3:20,25
**advance** 70:22
92:10
**advantage**
127:17 257:12
**adversary**
226:17 265:17
**advice** 249:3
264:25 265:9
**advised** 227:6
271:21
**advisement**
245:16

**advisors** 112:3
**advocate** 229:5
**advocated**
230:25
**advocating**
227:17
**aegean** 33:25
34:12 39:14
40:17 192:19
193:2,5,18
195:8 196:2
200:13 202:18
202:21 203:15
203:19,25
205:1,1 207:21
**affairs** 172:15
174:13 176:6
**affect** 66:16
69:3 98:25
268:11
**affected** 20:7
68:18 71:3
74:8
**affecting** 242:6
**affiliate** 235:5
**affiliates** 7:9
**affirmative**
30:17 36:17
40:6
**affirmatively**
30:10 44:3
162:12,17,23
163:15 166:7
**afield** 235:11
**afraid** 91:18
**afternoon**
48:23 116:10

121:20 122:5
191:2 200:24
259:2,15
266:17 278:21
**agencies** 28:11
33:9 204:3,6
204:23 210:15
212:1 240:7
**agenda** 92:10
92:12
**agent** 34:25
55:23 195:21
195:24 196:1,3
196:9,11,11,17
196:22 197:7
197:19 201:23
201:25 202:5
**aggregate**
243:11 244:5
**aggressive**
238:20
**aggressively**
231:20
**ago** 27:20
34:19 90:19
197:14 227:6
234:5 246:6
249:24
**agree** 17:20
33:17 35:22
95:23 133:2
142:9,10,13
169:5 170:2
187:1 200:13
215:12 222:22
223:6 233:4
236:4 240:23

241:1 252:9
254:10 259:9
271:3 275:6
**agreed**  17:10
17:25 20:4
22:9 23:17
24:1,1 87:19
135:17 164:20
167:4 191:25
195:11 214:25
215:10 216:25
**agreeing**
169:23
**agreement**
18:10 20:3
56:14 59:7
73:9 77:3 92:7
93:2 112:5
115:21 132:24
133:5 185:3
187:12 190:4
193:20 195:7
215:11 216:5
224:9 233:16
238:1 271:6
**agreements**
34:2 112:2
117:20 118:14
185:5 198:11
198:18 215:7
215:18
**agrees**  208:25
**ahead**  32:22
82:17 104:21
120:1 140:2
145:4,5 147:24
165:9 173:25

182:1 202:6
206:13 214:15
235:13 239:3
239:25
**al**  1:21 11:9,18
13:18 14:3
**alah**  3:11
**alameda**  94:22
95:22 97:17
99:3 183:13
229:15 232:2,6
232:7,9 233:25
235:13,18
275:1
**alameda's**
74:11 95:7
**algorithm**
140:15
**aligned**  25:20
132:15
**allegations**
65:17 247:21
253:8,16 277:3
**allege**  117:3
126:2 204:3
262:11
**alleged**  125:23
261:19,21
262:7
**allegedly**  30:8
52:8
**alleging**  263:17
**alleviate**  182:4
**allocated**
150:18
**allow**  31:7 59:7
116:18,21,23

119:15 125:24
129:19 135:22
137:14 140:11
181:20 193:7
196:6 206:3
263:23
**allowable**
226:14,19,21
**allowed**  23:16
37:11 39:10
74:11 104:18
158:5 203:25
260:5 272:22
**allowing**  61:4
115:1 147:11
150:10 229:6
268:10
**allows**  130:4
139:15 229:17
230:1 253:10
**allyson**  11:15
268:16
**alter**  91:23
**alternative**
3:21 33:18
71:25 152:9
**alternatively**
231:19
**amazon**  75:18
**ambiguity**  50:2
**ambiguous**
212:15
**amend**  148:3
150:3 267:10
**amended**  73:10
74:6 75:6
80:22 117:21

122:20 216:17
217:1 228:11
228:20
**amendment**
128:10
**amendments**
24:18 122:22
**america**  5:12
14:18
**americas**  7:17
12:3
**amount**  58:4
66:9 76:17
88:10 137:25
148:11 149:7
152:23 157:11
157:17,20
181:2 243:24
246:14 250:17
**amounted**
177:12
**amounts**  40:11
91:4,5
**ample**  55:3
106:3
**analysis**  68:22
71:1 97:6,6
161:24 183:19
187:6 221:25
**analyze**  31:16
227:9
**andres**  16:4
**andrew**  15:24
**angela**  5:24
**announced**
155:18

**anonymous**
159:7
**answer**  58:12
69:11,16,19
100:20 111:16
114:23 122:8
131:3 133:12
148:20 157:8
192:21 234:4
243:16 259:22
264:19
**answered**
131:7
**answers**  74:7
**anti**  114:7
**anticipate**
157:12
**anticipated**
70:20 218:14
**antonio**  10:14
**anybody**  24:4
27:9 30:22
32:3 33:21
36:25 37:12
65:9 70:5
77:21 97:14
98:21 131:24
133:22 137:17
139:14 143:22
152:19 161:20
164:1 167:5
168:21,24
169:5 171:22
179:3,23
238:25 239:22
255:9 261:21
264:3 271:13

276:15 278:13
279:12
**anybody's**
153:4
**anymore**
131:18 272:20
**anyway**  176:19
245:2
**apa**  27:19 50:4
59:17,24 87:12
87:25 270:4
**apologies**  61:1
142:9
**apologize**
74:17 94:1
125:15 148:21
251:2 271:25
**app**  157:1
**apparent**
112:10 231:9
**apparently**
61:20 231:20
**appear**  67:4
173:5
**appearing**
15:15
**appears**  18:1
45:9 47:13
91:15 154:16
201:18 210:6
**appellate**
201:1
**applicable**
30:9 44:17
54:12 63:5
202:22

**application**
43:1,7,11
100:4 103:13
103:18,19
271:22
**applied**  192:5
203:18
**applies**  41:16
158:1
**apply**  42:11
52:25 190:8
196:2
**appoint**  3:5
229:2,7 239:17
247:14,16
248:5 251:11
251:13 269:12
269:23 271:13
**appointed**
228:7,14 230:6
231:6,7,10,14
238:2 247:8
**appointing**
239:11 273:5
**appointment**
239:1 245:6
248:9 251:8,9
269:13 270:3
**appreciate**
52:20 128:7
248:7 259:10
260:9,20
265:10 268:6
**approach**
71:19 86:15
147:21

**appropriate**
25:12 39:16
99:24 178:14
196:21 200:5
200:10 205:2
206:7 274:22
**appropriately**
213:9
**approval**  3:1
33:13 35:15
51:25 64:10
73:10 76:14
89:20,22 93:13
98:4 126:18
217:12
**approvals**
117:9 119:13
123:24 124:4
**approve**  20:8
26:11 31:3
32:20 36:10
39:17 163:10
205:5,15 210:9
224:4
**approved**
25:19 27:19,23
33:24 34:3
52:23 98:19
155:2 163:16
166:2 171:7,10
178:17 193:12
195:9 196:18
196:19 198:10
198:12,23
200:1 201:13
204:10 224:14
270:18,19,20

281:11
**approves**
195:3 210:9
**approving**
32:5 38:25
50:3 196:13
216:21 238:9
**approximately**
81:17 226:13
227:5
**april** 177:14
**area** 187:22
**arentfox** 7:15
**argue** 86:18
170:17
**argued** 221:17
**argument** 41:5
43:23 44:7,9
46:25 50:14
51:2,4 53:19
77:12 101:11
103:3 115:11
125:13 133:24
138:22 159:20
181:25 202:12
206:4,11
213:10 222:10
225:13 236:17
278:15
**arguments**
30:13 41:3
43:18 53:4
65:18 99:13
116:13 200:15
201:8 236:15
239:6

**arises** 231:2
**arising** 212:22
**arrangement**
168:5
**arrangements**
111:8
**array** 246:15
**arthur** 15:25
**article** 17:19
18:1 35:2 76:3
201:21
**articles** 67:4
**ascribed**
161:10
**ashwin** 186:2
**aside** 38:8
45:25 150:24
189:4
**asked** 17:21
18:4 20:6 69:4
92:22 115:21
143:24 165:19
182:13 200:8
232:19 239:10
243:12 244:24
255:2 262:14
271:1 277:24
**asking** 31:10
42:25 91:10
146:22 148:8
192:23 218:14
252:3 253:14
263:20
**asman** 232:17
232:17 233:13
234:2,9,15
235:9,11 236:4

236:9,13
240:18,19
241:21,21
244:22 245:3
**aspect** 20:17
98:23 103:11
**aspects** 72:5
136:14 218:24
218:25 219:18
220:5 244:12
**assert** 229:22
**asserted**
226:12,25
232:3
**assertion** 189:8
189:11 275:7
**assertions**
278:9
**asserts** 103:14
**assess** 24:17
190:9 204:13
**asset** 56:14
73:9 76:24
77:3 113:5,17
213:16 274:16
**assets** 19:21
21:11 45:4
55:10,16 56:5
56:7,7,9,10,20
61:8,13,19
62:12 63:23
66:19,21 76:15
76:18 84:18,19
88:20,20,23
97:14 105:3,5
105:8 106:22
107:11 108:17

109:7,22
110:17,20,23
112:12,15,22
112:23 113:17
155:3 172:16
175:18 176:22
177:2,5 184:1
186:16 188:15
188:17 198:1,9
213:17,18
214:6 218:21
219:15 242:18
270:1
**assign** 229:18
230:1
**assigned**
198:24 238:21
**assigning**
229:21
**assist** 61:15
**associated** 58:7
155:13
**association** 8:1
**assume** 28:10
95:18 109:20
145:7 155:11
**assumed**
228:24 277:5
**assuming**
55:21 147:15
186:18
**assumptions**
268:24
**assurance** 77:5
83:8 274:24
**assurances**
61:19 63:19,19

64:4 67:15
76:7 83:10,18
83:21 84:4,5
85:6
**assure** 25:17
77:2
**assured** 73:14
89:4
**atan** 185:21
**atlanta** 6:20
12:11 14:5
**attacks** 71:13
**attempt** 185:12
**attempted**
89:15 159:8
**attempting**
230:7
**attending** 93:1
**attention** 93:6
116:2 127:17
223:12
**attitude** 170:14
**attorney** 5:12
5:20 6:2,9,17
7:2,9 8:2,10
9:1,2,10 10:11
10:19 11:2,18
12:2,9,16 13:2
13:9 14:2,18
15:2,9 94:15
132:10
**attorney's** 5:11
14:17 35:14
199:20 203:21
207:5,8
**attorneys** 5:4
7:16 8:1,17

9:17 10:2 11:9
13:17 14:10
**attractive**
136:8
**attributes** 90:8
**audit** 68:1
**auditors** 56:19
**audits** 63:15
**august** 248:16
**austin** 9:5
**authorities**
35:24 63:6
72:4
**authority**
27:10 32:25
51:13 63:6
72:5,6 162:20
165:23 172:16
189:3 231:25
232:14 233:17
233:18,22
269:16
**authorize**
30:16 33:11
**authorized**
27:13,18 28:7
30:6 33:2,14
50:7 105:16
**authorizes**
39:1
**authorizing**
39:24
**automatic** 3:21
**automatically**
23:10 217:11
251:9 252:25

**available** 44:6
45:3 47:17,18
57:7 60:6 87:8
88:15 106:9
112:25 116:4
133:16 159:2,5
185:11
**avenue** 5:5 6:3
7:17 9:18 10:4
10:20 11:10
12:3 14:11
**average** 144:10
144:12
**averse** 274:5
**avoiding** 33:10
**aware** 19:12
62:20 65:17
152:5 159:23
226:7,25 243:7
258:7,7
**azman** 14:15
108:20,20
136:16,19
138:17 145:15
145:15 146:14
267:13,14,15
267:15 268:6
**azman's** 109:9
147:13

| **b** |
| --- |

**b** 2:8 10:2 76:3
76:3 183:17
201:22 221:22
237:9
**back** 19:14
26:24 28:20
33:1 77:5

82:10 87:9
91:22 100:12
100:23 103:9
104:13 132:19
134:24 156:12
158:23 161:4
168:20 169:24
172:2 177:1
181:16 205:23
207:2 209:3
210:4 217:20
220:21 221:13
246:9 248:16
248:17 251:19
255:23 259:7
260:8 261:2
262:22 265:11
265:13 266:12
267:6,24
268:22 269:24
271:5 274:1,4
274:10
**background**
82:25
**backing** 138:3
**bad** 241:25
262:5
**balancings**
141:3
**ballets** 162:14
**ballot** 81:18,21
82:1 243:18
**ballots** 78:1
171:7
**bam** 10:2
**ban** 25:3,7

**band** 220:16
**bank** 5:20 19:2
55:5 57:22
90:25 99:23
104:5 113:11
**banking** 9:3
100:4 132:12
**bankruptcy**
1:1 2:1,10 8:17
19:22 29:22
32:11 33:16
36:14,24 37:4
48:14 62:4
71:15 72:7,8
93:11 95:15,24
101:22 102:10
125:11 129:14
133:16 144:21
150:23 155:18
155:21 163:23
165:18 168:7
170:21 171:15
174:14 176:24
177:1 178:3,6
179:18 183:15
183:17 187:1
189:24 200:18
212:6 220:6
221:23 237:9
237:20 240:3
247:2 248:11
265:12,18
273:21 274:24
275:2,14,18
277:4
**bar** 37:7
210:15 211:1

211:14,22
212:4 213:1
**barnea** 5:17
35:10,13,13,19
38:7,18 39:9
39:23 40:12
199:19,19,23
202:1 203:20
203:20 206:9
**barred** 65:14
**barrier** 152:7
**barriers** 140:9
**base** 179:10
**based** 27:14,15
30:5 54:18
55:8,15 56:2
58:15 61:20
65:25 69:23
87:4 91:6,12
117:16,24
120:5 132:25
142:22 148:15
150:21 153:25
155:15 156:18
156:19 157:4
157:17 158:10
160:11 161:6
173:12 183:18
190:9 226:19
255:14 259:11
**basic** 257:20
**basically** 28:23
33:19 195:15
215:16 266:12
**basis** 20:10
38:2 56:6 57:3
87:20 88:19

103:11 104:6
112:4 123:3
140:20 152:17
**bear** 246:16
**bearing** 179:22
260:19
**befallen** 55:6
**befuddled**
119:6
**begging** 263:14
**beginning** 17:9
67:1 73:19
113:9 115:13
200:4 278:3
**behalf** 18:17
47:15,24 48:9
53:18 85:14
86:21 93:5
94:6 103:6
106:2 111:21
115:20 116:11
122:6 132:11
136:21 174:8
175:9 176:4
189:11 196:22
202:8 211:10
213:12 227:17
231:24 232:15
259:3 260:18
268:17
**behavior**
238:22
**belabor** 268:8
**believe** 24:8
51:7 54:10,20
56:23 58:6,20
60:3,15 80:23

86:10 87:8
90:4 92:12
96:16 97:16
99:16 109:22
110:10 112:8
118:15 134:9
135:2 136:3
143:2 144:3
146:25 148:14
148:16 149:6,7
153:14 161:5
161:13 163:14
178:25 179:9
182:3 191:17
192:4,6 195:22
202:1 210:14
215:11,21
221:12,15
222:3,6 228:6
232:12 236:18
237:19,22
238:2 239:15
245:19 247:5
250:14 262:13
266:23 277:8
**believed**
239:15 264:7
**believes** 56:19
62:14 69:23
227:15
**beller** 7:13
**belong** 165:5
168:19 276:17
276:18 277:7
**belonging**
276:10

| | | | |
|---|---|---|---|
| **belongs** 176:1 | **billion** 85:23 | 106:10 109:1 | 23:13 24:1 |
| **bench** 215:13 | **binance** 17:9 | 110:16,18 | 54:19,20,22,25 |
| **bene** 226:4 | 17:10,12,13,22 | 111:15 114:2,6 | 55:2,9,9,12,12 |
| **beneficial** | 17:25 18:6 | 114:9,16 | 55:14,16,21,22 |
| 107:14 112:1 | 19:4 21:4,6,6,8 | 119:10 121:10 | 56:2,3,4,6,8,9 |
| 249:24 | 21:10,12 22:14 | 121:11,23 | 56:11,16,19 |
| **beneficiaries** | 23:11 24:4 | 122:23 123:1,4 | 57:1,3,6,14,16 |
| 164:10 | 26:14 37:10 | 123:22,24 | 57:19,25 58:8 |
| **benefit** 23:24 | 45:15 46:4,9 | 125:19 126:4 | 58:12 62:14,16 |
| 57:17,23 165:8 | 46:15 47:14,21 | 126:17,21 | 62:16 69:25 |
| 183:19 237:25 | 47:22,23,25 | 129:19,25 | 70:1,2 73:25 |
| 249:22 251:14 | 48:8 49:9 | 130:3,7,11,21 | 76:20,21 77:4 |
| 253:3 | 58:22,23 59:2 | 131:11,15 | 83:7 87:13,14 |
| **benefits** 268:3 | 59:20,24 61:9 | 132:3,16,23 | 87:16 88:12,21 |
| **benjamin** 7:13 | 61:9,10,24 | 133:2 154:16 | 88:22 90:10,24 |
| **bernstein** 11:6 | 62:6,24 63:4 | 154:24 260:7 | 100:19 101:1 |
| **best** 54:13 60:5 | 63:16,17,22,23 | 260:18 279:12 | 103:6,14,21 |
| 60:13 87:8 | 64:21 65:19,22 | **binance's** 23:6 | 104:5,9,11 |
| 88:15 209:24 | 66:6,16,19,20 | 75:15 99:16 | 106:9 107:6,8 |
| 222:6 230:25 | 66:23 67:5,6 | 100:3,6 101:9 | 107:10,12,14 |
| 239:19 240:13 | 69:4,7,8 72:23 | 103:25 | 107:23 108:6,7 |
| 242:20 269:14 | 73:10,17,20,22 | **binance.com** | 108:17 109:10 |
| **better** 49:10,11 | 73:24 75:17,20 | 74:1 101:1 | 109:11,14,23 |
| 96:17 114:5 | 76:8 77:2 | 105:19 107:5,8 | 110:1,9,11,21 |
| 131:21,25 | 78:20,21,24 | 107:22 108:2,8 | 111:8,21 |
| 153:19 210:12 | 79:1,2,6,7 | 108:8,17 | 112:23,24 |
| **beyond** 39:12 | 83:11,12,17 | 109:16,21 | 116:15,25 |
| 112:13 161:14 | 84:14,15,16,17 | 110:2,8,21 | 117:8 135:16 |
| 172:20 177:3,4 | 84:20,24 87:2 | 111:8,25 | 135:16 149:22 |
| 177:14 197:23 | 87:5,6,7,19,21 | 112:22 | 260:21 |
| 203:25 205:1 | 87:22,23 88:3 | **binance.com.** | **binance.us's** |
| 207:21 254:12 | 88:9,14,16 | 110:13 | 18:20 21:25 |
| 273:19 274:16 | 90:10 99:17,19 | **binance.global** | 54:15 55:2,7 |
| **big** 81:7 101:19 | 99:20 100:3,24 | 74:1 88:20 | 55:15 56:7,22 |
| 212:6 243:19 | 101:5,12,22,25 | **binance.us** | 57:5 91:6 |
| **biggest** 170:4 | 102:8,9,10 | 10:3 19:7 20:5 | 101:5 103:15 |
| 275:21 | 103:18 104:23 | 21:14 22:22,24 | 111:25 119:15 |

**binance.us.**
18:17 22:9
54:17 76:22
85:14 87:15
89:7 105:21
106:2,6 108:2
108:9 115:20
259:3
**bind** 33:5
**biometric**
113:12
**bit** 137:5 148:8
201:7 210:12
226:24 243:16
274:4 277:13
**bitcoin** 41:1
55:11,12
135:25 136:6,9
138:6,7,8,9,21
139:2
**bizarre** 186:25
**black** 257:6,24
**black's** 257:21
**blackmail**
271:1
**blamed** 65:10
**blank** 31:11
**block** 26:8
**blockchain**
136:5 137:2
138:8,8,10,11
**blocked** 81:25
**blood** 244:20
244:23
**blown** 33:4
**board** 9:2
132:11 183:24

272:15
**boat** 44:18
**bodies** 82:4
163:20
**body** 78:18
83:24 150:8
242:20 267:19
268:4
**bolded** 171:1
**bonus** 176:7,9
**book** 187:15
**books** 117:25
**bosner** 233:3
**bother** 188:23
**bottom** 96:20
96:24 97:18
**bought** 18:8
99:20 134:17
134:17,23
160:24 161:1,4
225:4
**bowling** 2:2
13:10
**box** 9:4 169:22
170:8
**brach** 4:2
**brad** 16:5
**branch** 139:12
139:12
**brand** 25:3
**breach** 59:25
183:4,11 257:9
**breadth**
173:13 180:2
**break** 115:10
174:2 199:16
223:20 246:11

**breath** 209:14
**brett** 7:22
**brg** 88:14
**brief** 167:15
200:9,21
206:10
**briefly** 48:11
225:20
**bring** 89:20
204:6 240:17
242:2
**bringing** 28:24
113:4 212:23
246:17
**brink** 277:4
**broad** 7:10
11:3 28:18
167:20 172:8
172:18 173:3
180:4,12,13,20
187:12,13
191:10 192:15
209:4,5 214:10
236:8 238:10
**broader** 193:5
193:17
**broadly** 25:3
35:22 204:7
219:23
**broker** 26:15
47:14,24 48:5
48:8 69:7
**brosgol** 185:25
**brother** 256:10
256:13
**brought** 65:16
80:12 94:11

104:19 184:18
189:14,16
191:9 213:18
246:16 248:14
248:18,24
**buck** 185:15
217:24 218:7
**building** 12:17
**bulk** 22:5
76:19 84:19
267:19
**burden** 44:5,19
44:20 92:13
102:7 115:13
141:11 254:11
254:16
**burdensome**
152:18
**bureau** 10:19
11:2
**buried** 94:21
95:13
**busd** 90:18,21
90:23
**business** 20:22
20:22 32:21
55:7 57:10
58:24 60:12
62:20 63:4,8,9
63:11 64:5
66:10 67:23
72:5,20 97:13
102:8 104:4,6
104:10 108:12
175:19 176:9
177:23 183:22
187:9,10

218:25 219:18
256:10 273:10
276:24
**busy** 158:22
**buy** 137:7
253:6,7
**buyer** 62:12
112:12 147:2,3
151:16 209:8
**buyer's** 61:21
**buying** 151:19
261:24
**buyout** 156:7
**buys** 137:16

**c**

**c** 5:1 17:1,19
18:2,2 171:4
**cabined** 236:7
**calculated**
152:24
**calculation**
150:22 155:12
156:1 158:9
**calculations**
141:4 150:20
151:1,8 153:1
153:16,18
157:16
**call** 82:3 92:12
93:6 94:4
133:23 259:24
260:7
**called** 66:25
91:18 137:1
138:11 201:23
218:9 238:11

**calling** 136:19
**calls** 48:15
262:17,18
263:4
**candid** 197:11
**candidates**
242:15
**capacity** 56:5
57:17 174:25
175:2 196:16
**capital** 235:4
**capitalization**
177:10
**cappuccio**
10:10
**care** 29:2 51:20
99:6 169:5,7
180:13 183:4
271:12
**career** 258:4
**careers** 188:2
**carefully**
227:17
**cares** 252:8
**carpenter**
10:18 11:1
**carried** 36:18
**carrier** 185:13
**carriers** 187:4
**carry** 36:16
37:20 38:4
197:21 205:14
**carrying** 36:15
196:4 233:9
**carve** 148:1
181:16 200:6

**carved** 150:2
200:1
**carveout** 142:3
**case** 1:6,12,19
3:8 17:3 18:21
19:22 22:1,21
28:25 30:25
32:11 33:21,25
34:13 38:10
40:17 44:22
53:12 61:17
72:12 73:15
91:21 99:24
104:4,11
109:18 125:24
129:17 156:8
157:25 165:24
172:20 174:25
188:21 192:7
192:19 196:14
196:20,21
200:1,10,13,19
202:18 225:5
225:11 228:6
229:10 231:8
235:1 238:21
240:8 241:2
242:11 243:20
246:14 247:12
247:15,18,22
250:3,5 253:13
255:10 257:5,5
262:9 270:25
276:24
**cases** 29:22
33:16,24 52:24
73:20 76:10

163:23 166:2,2
171:13 191:9
193:14 224:17
242:10 269:15
269:20
**cash** 17:22
55:3,4 57:2,7
57:19 60:10
75:8 90:24
109:12 117:1,7
121:8 122:17
123:15 125:6
125:18 127:12
128:2 132:14
133:14 140:18
140:24,24
141:7,13 143:4
145:20 147:9
147:19 157:20
235:23
**cashed** 128:15
130:18
**cashing** 128:14
**cast** 78:15,16
**casting** 243:9
**catch** 215:15
215:21,25
**categorically**
197:3
**category**
103:23 248:20
**cathy** 4:2
**cause** 107:18
107:21 175:19
175:22 182:19
190:3 247:9,15
247:20,22,24

248:5 249:14
251:13 252:6
256:18,20
266:2,12,19
269:11 277:3
**caused**  188:8
251:6
**causes**  175:16
178:15 257:14
**caveats**  69:21
71:2
**cede**  53:8
**cent**  155:12
**cents**  144:2,2,3
144:5,11 146:5
153:6 155:10
156:1,7,9,10
158:7,9 159:9
**ceo**  164:8
166:15 217:25
**cepheus**  26:8,9
**certain**  3:22
30:6 59:6,13
74:7 98:14
129:11 165:9
184:9 193:21
196:12 197:19
214:17,20,24
216:15 218:23
219:17 226:4
278:19
**certainly**  22:13
26:5 38:3
40:16 51:10
67:11 94:4
125:24 129:13
147:18 153:5

153:22 163:22
167:7 172:22
180:16 181:19
190:19 191:22
216:10 219:4
229:20 231:15
232:15 234:5
238:6 246:22
249:11 267:20
267:24 268:3,5
275:8,9
**certificate**
61:24 104:23
109:5 111:23
**certificates**
215:19
**certification**
281:1
**certifications**
75:20
**certify**  281:3,3
**cetera**  85:10
184:24 190:11
205:18 276:24
**chain**  139:12
139:14
**chair**  244:14
**chairman**
89:23 185:20
238:9 249:2
256:10
**chairperson**
240:6
**challenging**
62:19 70:4
79:23

**chambers**  5:13
14:19
**championed**
277:2
**chance**  49:1
111:15 139:2
139:21 155:23
161:14 171:10
205:7,8 206:3
259:14 262:6
**chances**  33:20
40:5 123:22,23
130:23
**change**  18:6
21:3 26:24
28:5 49:11
51:6,6 60:8
89:11 98:18,22
132:13 150:17
151:25 170:10
217:5,5 224:6
225:1 238:5
251:20 259:9
**changed**  67:18
135:1 217:4
226:24 232:19
232:21,21
239:6 269:11
**changes**  17:10
18:11 21:21
28:16 228:12
230:22 245:23
250:7 277:22
278:22
**changing**
21:18 31:7
170:12

**chapter**  3:2,6,9
97:10 156:12
178:8 183:2
191:9 193:14
222:5 242:10
270:4
**characteristic**
262:1
**characterizat...**
103:15 146:13
**charge**  189:12
**charged**
204:17
**charges**  91:3
268:21
**charles**  13:22
13:23
**charter**  180:13
**check**  31:12
42:16 98:8
144:3
**checked**
169:22 170:7
**chicago**  11:20
**chief**  186:2
**chimed**  98:17
**china**  105:10
**choice**  39:7
65:24 123:23
169:6 245:10
**choices**  141:12
**choose**  19:14
53:22 87:22
91:19 132:16
143:5
**chose**  162:23
163:6 274:7

chosen 231:11
christine 11:14
  53:17 116:10
chunk 186:18
circuit 63:5
  165:25
circulated 70:8
  228:23 271:19
circumscribed
  191:18
circumstances
  59:13,19 60:8
  61:17 69:24
  97:12 247:17
cite 95:8
cited 207:6
citizens 132:13
  132:18
civil 36:6
  254:11,13,21
  257:5 265:20
civilly 204:17
  205:25
claim 3:18
  45:16 46:10,16
  47:6 74:11
  85:23 86:1,3
  107:9 122:18
  125:8 157:3,17
  158:5 164:23
  164:25,25
  165:16 167:2
  167:10,10,17
  177:20 179:23
  204:6 210:17
  210:20 211:3

211:11,15
212:3,22,23
213:2 217:1
218:5,10
221:19 229:17
232:2,8 234:16
235:13 250:24
251:10 252:25
255:1 258:4,5
263:17,22,24
264:4,7,11
266:23,25
267:1,7,9,10
267:11 274:6
276:17,18
claimants
  163:1,3,5
claimed 85:20
claiming
  204:23
claims 45:5,11
  57:8,13 85:25
  86:3 94:22,24
  95:7 97:24,25
  120:4,6 127:23
  129:16 157:14
  162:10,11,16
  162:17,21,24
  163:6,8,13,21
  164:19 165:1,3
  165:5,5 167:8
  167:25 168:1,3
  168:11,12
  169:23 172:12
  172:24 173:5,7
  179:3,7 180:17
  180:19 181:2

181:11 182:14
182:21,22,22
183:5,11,16,21
184:7,9,17,18
184:25 185:6
186:22 189:8
189:10,11,14
189:19 211:12
213:17 217:10
220:13 223:8
226:13,15,18
226:21 227:1,3
227:8,10,11,19
227:21 228:4
228:21,24,25
229:1,11,18,21
229:22 230:5,8
232:2,3,5,10
232:11,13,14
233:4 235:15
235:18,18,18
235:19,23
242:1,7 244:5
251:1 263:23
264:2,3 276:10
276:23 277:7
277:24 278:1,2
278:9,10
clarification
  29:9 34:17
  89:17 158:17
  236:17 271:9
clarified 249:3
clarify 28:5,16
  69:20 81:14
  89:15 202:13
  206:15 208:15

277:23
clarifying
  17:11 157:7
  251:3 273:8
  278:7
clarity 207:3
class 20:11
  85:21 125:12
  125:13,14,23
  134:24 140:16
  151:10 226:10
classes 163:2,3
  163:6,8
classified
  250:14
clause 150:2,3
  199:21 200:6
clayton 89:23
clear 17:17,20
  22:8 33:8 67:3
  71:2 78:17
  88:2 93:8
  111:24 115:7
  146:22 165:14
  165:25 170:11
  171:19 172:13
  176:16 178:3
  189:18 191:3
  194:17 198:21
  205:19 208:2
  213:16 217:11
  218:15 221:25
  229:10 234:22
  242:23 254:19
  259:11,16
  276:9 278:22

clearly 144:13 181:20 233:25 250:6

clears 21:11

clerk 258:20 258:25

client 24:7,11 106:6 115:21 116:4 173:22 226:5 246:13 259:24 260:8

client's 86:7 110:4

clients 195:13 226:12 232:16 240:6

close 54:21 90:24 91:6 114:3 144:10 278:15

closed 53:12,16 160:19

closely 243:20

closer 186:1 238:18 242:2

closes 64:25 101:22

closing 57:2,3 58:23 60:12 101:13 122:10 122:18,19 123:5,13 125:5 128:25 144:24

clue 66:7

code 36:14,24 37:4 44:5 62:4 62:23 71:16

72:8 93:11 95:24 125:20 140:14 150:23 165:18 174:15 177:1 183:17 200:18 212:5 220:6 221:23 222:20 237:8,9 247:3 249:13 257:2 265:1

codes 195:14

cognizable 183:12,21

coin 136:9 140:20,20 141:5,5,6,7 147:16,16,25 147:25 152:22 161:8

coins 119:16 146:4,7 152:23 158:11,12 161:16

collapse 73:12 138:21

collateral 32:18

colleague 50:14 69:5

collect 186:19

collectively 52:21 174:25

colorable 183:11

column 97:17

combination 75:23 275:4

combined 274:24

come 19:14 25:18 26:24 27:22,25 32:16 32:19 33:1 34:8 36:19 39:5 41:19 49:14 52:22 67:3 82:10 99:12 116:21 133:5 155:24 168:20 181:15 197:4 198:20 198:25 205:22 206:22 209:25 215:11 217:20 219:3 221:13 223:17 241:9 246:9 253:1 260:8 267:24

comes 83:7 95:8 229:12 235:13 239:11 241:18 258:16 279:16

comfort 174:18 175:5

comfortable 31:18 38:5 88:9

coming 99:4 103:9 168:9 176:14 258:20

comingle 105:17

comingling 110:22

commands 150:23

commenced 226:17

commencem... 178:8

comment 79:17 81:24 84:12 202:4

commenting 79:17

comments 82:9 92:4,5 93:13 96:3 98:13 169:16 196:15

commercial 5:20 112:1

commercially 57:10

commission 6:1,2,8,10,16 6:18 29:11 43:13 61:3 68:2 89:18,21 90:1 91:13 202:9 211:11

commission's 89:24

commissioner 89:22

commit 36:6 38:24 204:16 254:8

commits 204:13

**committed**
116:20 255:15
277:2
**committee**
3:13,17 8:17
9:17 13:17
14:2,10 53:21
83:17 86:17,18
86:21 87:1,6
87:10,11,18,19
88:8,11,12,16
90:21 91:24
108:21 112:16
115:4 136:21
145:16 151:15
167:21 172:12
172:22 173:1,7
174:8,22 175:1
175:2,5,7,8,9
177:24 183:8
183:10,22
186:13 187:6
187:17 189:13
192:14 194:22
194:24,25,25
199:14 218:20
219:14,24
223:20 228:15
228:16,17
229:2,3,4,7,16
231:3,6,7,7,8
231:12 232:18
241:22 242:8
242:13,16,17
242:24 244:1
244:15,16
246:8 260:24

267:15,20
271:2,18
273:14 276:8
276:21 277:2
278:4 279:12
**committee's**
86:24 89:11
112:9 175:11
229:10 245:10
269:6 276:9,22
277:21
**committees**
237:23
**committing**
257:13
**commodity**
41:4
**common** 25:20
112:1 226:11
242:10
**commonly**
226:8
**communicati...**
224:10 248:22
**communicati...**
83:16 218:22
219:16 273:18
**community**
169:15 188:18
**comp** 195:14
**companies**
55:6 105:17
108:8 155:17
**company** 88:19
88:22 100:11
100:22 105:1,3
109:6 111:24

112:2 151:14
157:14 178:11
180:18 183:14
184:24 185:1,3
185:5 189:2,24
190:2 218:24
233:8
**company's**
88:19 105:4,15
107:3 109:7
180:23
**compared**
58:17 149:12
**compel** 32:16
190:17
**compelled**
38:21
**compels** 32:25
**competence**
257:10
**competing**
72:3
**complain**
78:20
**complained**
47:2 82:2
98:21 130:15
**complaining**
63:12 192:13
**complaint**
93:14 125:9
**complaints**
82:8 93:17
171:18 254:2
**complete** 50:13
57:4 66:24

**completed** 57:9
**completely**
103:14 107:25
246:3
**completion**
71:7
**complex** 223:7
**compliance**
24:23 41:15
75:21 121:11
218:21 219:15
**compliant**
138:12
**complicating**
141:20
**complied** 42:13
62:5 210:15
**complies** 93:10
**comply** 121:3
147:3 209:7
**complying**
129:13
**component**
149:5
**comprehensive**
183:9
**comprised**
226:10 228:16
**compulsion**
206:5
**conaway** 8:16
**concealment**
257:9
**concede** 78:12
**concept** 208:2
**concern** 101:19
101:21 105:12

105:14 110:19
137:23 148:24
165:3 195:2
217:10 230:23
231:9 238:12
255:25
**concerned**
100:2 101:9
255:5,12
266:20
**concerning**
61:18 87:5
105:22 209:14
226:5 230:23
**concerns** 20:24
29:19 31:1,12
31:15 35:19
99:15 112:17
113:8 118:1
167:24 232:23
233:3
**concerted**
184:19
**conclude** 65:25
**concluded**
279:20
**conclusion**
41:19 52:22
160:15 190:12
190:17 246:17
270:1
**conclusions**
67:18 77:17
**conclusory**
30:3 65:18
179:5 268:24

**condition**
223:13 276:17
**conditional**
73:10
**conditions**
155:16
**conduct** 104:8
187:16 190:5
195:25 273:14
274:23 276:23
**conducted**
88:10 112:11
112:15
**conducting**
47:13,18
**conducts** 89:7
**confer** 173:15
223:19
**conference**
3:25 187:3
**confess** 155:4
**confidence**
239:18
**confidential**
112:4,6
**confine** 172:25
**confirm** 36:18
36:23 37:19
40:3,6 58:22
62:9,9 65:5
202:19 205:5
207:13 246:23
247:2 248:2,3
249:19,19
270:18 275:15
**confirmable**
178:17

**confirmation**
3:2 17:9 20:9
25:23 29:14
31:2 39:2,21
40:11 43:17
52:13,24 53:4
64:15,22 80:19
118:24 134:14
152:2 192:18
199:9 200:5
203:8,24 206:6
206:12 209:18
210:25 211:13
211:19,21
212:20 214:22
221:11 223:14
224:2,3 225:14
226:23 227:25
228:9 229:7,8
233:10,16
236:15 237:13
242:6 244:25
245:18,22
248:1,6 249:9
249:18 251:21
259:19 260:22
264:12 269:16
272:3 273:13
274:19
**confirmed** 26:7
117:15 226:6
**conflict** 129:17
231:2,3,5
234:1 236:8
239:14 241:9
256:14

**conflicts**
233:24 237:25
**confused**
169:18 171:24
**confusing**
169:9 170:18
**confusion**
277:19
**congress** 72:3
247:3,6 248:10
249:8
**congressional**
88:25
**conjured** 43:17
**connection**
19:20 25:23
31:8 35:25
75:7 80:19
86:25 90:23
112:4 135:16
183:23 184:20
187:7 193:12
193:13 196:12
196:23 218:18
219:12 265:2
**connections**
240:15
**consensual**
162:9 163:10
163:12,24
182:6
**consensually**
165:20 186:17
**consent** 162:23
165:25 166:3,6
**consents**
162:12 260:21

consequence
250:13
consequences
157:24 251:15
266:21 267:18
consider  52:11
53:15 65:15
78:13 90:5,22
133:4 151:3
164:2 234:5
248:3 256:3
267:22 268:5
considerable
247:19
consideration
55:1 93:7 94:7
126:1 168:16
168:17 176:10
177:21 180:18
184:13,15
191:12 247:1
263:13
considered
98:4 107:6,22
158:3 171:9
185:23 188:25
217:2 234:21
275:4
considering
58:11
consistent
40:18 56:17
124:1 193:2
200:17,18
202:17 225:3
constant
171:14

constituents
120:15 242:12
constitute
40:22 247:22
248:5
constitutes
247:20
constitutional
200:17
constraints
130:14 131:1
constructive
119:1
consult  24:7
221:12 231:17
consultant
62:7 63:14
consultation
242:9
consulting
215:7
consumer
95:15
consumers
94:20,23 95:14
95:18 96:17,19
96:23 97:24
consuming
272:4
consummate
54:24 55:17
77:3
consummated
60:4
consummating
142:18 196:23

consummation
145:13 159:25
contact  19:1
117:17 151:4
contacts
135:15
contained
77:24 87:24
contains  209:2
contemplate
72:8
contemplated
64:17 71:7
87:13 204:25
273:9
contemplates
36:25 39:4
40:7 47:5
contemplating
278:2
contend  41:3
268:1
contended
40:21
contending
25:4 69:6 70:7
205:13
contention
33:8 40:24
41:1
contested
265:17
context  37:17
214:21 220:25
247:21 257:17
258:1 264:14
264:16 273:23

275:16,25
contingencies
156:22
contingent
226:22 228:21
246:11
continue  17:3
67:5 69:11
115:11 119:11
135:23 143:23
144:15 146:23
150:11 173:21
174:5 181:24
202:4 214:14
220:19 221:20
223:4
continued
178:23 197:1
199:24
continues
103:21 112:18
115:8
continuing
116:20 221:5
231:23,24
contract  23:18
111:8 134:10
134:22 135:3,7
136:22,23
137:3,6,10,12
137:13,16,18
137:25 139:8
139:15,22
140:6,11
141:17 142:5
144:16,17
145:8,14

146:24 148:6
149:16 150:1
150:11,17
151:12,19
152:4 159:14
159:25 161:5
161:15
**contracts**
135:5,12,14,19
135:22 136:11
138:4,12
146:17 149:23
154:22 169:10
187:14
**contrary** 20:18
244:17
**contribute**
162:17,24
163:6 277:24
**contributed**
163:8
**contributions**
235:5
**control** 76:24
128:4 141:15
142:1,14
**controls** 72:24
**controverted**
190:13
**conventional**
76:13
**conversation**
67:6 223:3,22
255:23 271:17
**conversations**
116:16 119:2
132:22 269:6

**conversion**
270:3
**convert** 3:8
**convey** 116:5
**convince** 18:6
235:4
**convinced**
20:15 21:2
190:18,19
**convincing**
254:19
**coo** 217:25
**cooperative**
216:14
**copy** 113:11
**cordry** 8:7
**core** 18:20 20:3
23:3 103:10
**corners** 180:12
**corporation**
43:20
**correct** 27:8,12
27:17 43:2
54:3 65:1 79:8
101:15 102:18
104:11 108:18
110:14 119:12
121:2,13,16
124:12 136:7
140:21 143:18
148:18 150:12
151:20 158:14
179:14 206:18
213:24 216:4
216:22 217:8
220:7 222:14
234:15 235:9

236:25 237:1
254:14 257:22
257:25 262:15
272:2 276:4
281:4
**correctly** 82:2
104:2 110:7
146:10 184:3
236:19
**correspond**
126:10
**cost** 19:15 20:1
144:10,12
177:15 183:19
229:12
**costs** 58:18
188:13
**counsel** 8:17
23:8 86:17,18
92:5,9 167:21
173:16 183:24
185:25 193:21
196:6,8 201:17
214:10 215:12
216:4 221:12
225:18 227:5,6
227:14 231:15
231:24 238:9
239:10 271:18
**counter** 83:10
**counterargu...**
146:16
**country** 124:23
281:23
**couple** 17:7
78:19 104:24
104:25 111:22

140:8 154:15
202:13 214:25
216:9 219:11
219:21
**coupled** 34:18
**course** 93:11
113:8 122:21
127:25 129:11
129:23 130:7
132:3 140:17
172:19 175:25
176:8,25 180:8
242:4,22 243:6
253:4
**courses** 253:5
**court** 1:1 2:1
17:2,5,8,15,20
18:14,18,24
19:9,23 20:14
20:20 21:16
22:2,12,17
23:5,14,20
24:3,10,21
25:2,22 26:3
26:13,18,20
27:2,4,9,13
28:3,10 29:3
29:25 31:19
32:11,15 34:3
34:14 35:6,8
35:12,18 36:9
36:12 38:17,20
39:9,11,13
40:2,16 41:22
42:4,11,18,24
43:3,14,22
44:1,11 45:12

[court - court]                                                                    Page 21

| | | | |
|---|---|---|---|
| 45:14,21 46:4 | 101:12,16,18 | 142:7,11 143:6 | 193:15,23 |
| 46:6,8,14,22 | 102:3,5,12,16 | 143:10,14,16 | 194:1,3,6,9,14 |
| 47:20,22 48:1 | 102:24 103:1 | 143:22 146:1 | 195:2,3,9,10 |
| 48:5,17,25 | 104:16,21 | 146:19,21 | 195:16,18 |
| 49:10,23 50:8 | 105:24 106:7 | 147:15,24 | 196:2,7,25 |
| 50:11,19,23 | 106:11,15,20 | 148:11,19,25 | 197:22,24 |
| 51:11,15,20,24 | 107:10 108:4 | 149:3,9,13 | 198:6,20 199:5 |
| 52:5,17,19,23 | 108:23 109:6 | 150:15 151:11 | 199:12,17,22 |
| 53:7,11,15,25 | 109:13,19,24 | 151:17,24 | 201:6,9,13,15 |
| 54:4,6 58:21 | 110:5,10,25 | 152:12,19 | 202:2,6,10,16 |
| 59:2,9,19 60:2 | 111:7,15,24 | 154:4,6 155:7 | 202:24 203:1 |
| 60:18,21,25 | 113:2,22 | 155:11 156:9 | 203:22,25 |
| 62:2,4,18,22 | 114:17,20 | 156:14,16,18 | 205:3 206:11 |
| 64:12,14,20 | 115:2,9,13,24 | 157:16 158:4 | 206:13,18,23 |
| 65:2,4 66:18 | 116:5,9,14 | 158:15 159:16 | 207:24 208:1,5 |
| 68:6,24 69:1,3 | 117:22 118:3,5 | 160:4,7,19 | 208:11,16,23 |
| 69:19 70:5,12 | 118:7,10,12,18 | 161:18,25 | 209:11,16,18 |
| 70:16,19 71:4 | 119:5,13,17,24 | 162:2,4 163:17 | 209:21,23 |
| 71:12 73:3 | 120:1,19,21 | 164:4,10,14 | 210:21 211:4,6 |
| 74:2,13,19,22 | 121:7,14,17,21 | 165:14 166:10 | 213:3,6,8,20 |
| 75:9,17,25 | 122:24 123:18 | 166:19,21,23 | 213:22,25 |
| 76:4 77:11,19 | 124:9,13,18,20 | 166:25 168:18 | 214:3,7,12,15 |
| 77:21 78:19 | 125:9,16 126:8 | 168:20 169:1 | 215:2 216:3,7 |
| 79:6,10 80:2,4 | 126:16,24 | 170:21 171:4 | 216:10,11,12 |
| 80:6,8,15,18 | 127:5,14,16,20 | 173:20,23,25 | 216:20,23 |
| 81:1,3,7,12,15 | 128:1,9,12 | 174:2,5 176:11 | 217:4,9,16,18 |
| 81:21 82:7,14 | 129:1,4,6,21 | 176:16 177:18 | 218:11 219:8 |
| 82:17 83:1,14 | 130:9,12 | 178:1,18,21 | 220:4,21 221:6 |
| 84:2,7,10 | 131:15,21,24 | 179:2,20 180:2 | 222:9,12,15 |
| 85:11 86:16 | 132:5,7 133:6 | 180:9 181:7,9 | 223:11,16,23 |
| 88:14 91:10,25 | 133:13,22 | 181:23 182:1 | 224:8,16,21 |
| 93:8 94:13,17 | 134:4 135:5 | 184:2,5 185:17 | 225:9,13,16,24 |
| 95:4,6,21,23 | 136:5,8,18 | 186:11 187:3 | 226:7 230:9,11 |
| 97:1,20 98:3,7 | 137:15 138:3,6 | 188:21 189:18 | 230:13,15,20 |
| 98:10,18,21 | 138:13,25 | 190:6,25 191:6 | 232:4,7,25 |
| 99:1,3,25 | 139:20,24 | 192:2,8,12,23 | 233:12,22 |
| 100:7,9,16,18 | 140:3,17 141:1 | 192:25 193:4,8 | 234:6,10 235:4 |

235:7,10,25
236:6,10,14,22
237:1,5,12
238:3,25 239:3
239:17,22
240:18,21
241:14 244:18
245:2,5,10,12
245:15,20
246:10,22
247:11,14
248:8,11 249:1
249:11,13,17
250:8,11,19,21
251:4,8 252:10
252:12,19,21
253:15,20,23
253:25 254:15
256:7,21,23
257:8,15,23,25
258:1,17,22
259:1,8,25
260:3,6,10,13
260:16 261:2
261:14,16
262:11 263:16
263:21,25
264:21,24
265:15,24
266:5,8,14,22
267:5,9,14,24
268:12,14,21
269:1,9 270:5
270:10,13,15
270:21 271:10
271:24 272:5,9
272:12,17,25

273:6,25
275:22 276:4,7
278:5,11,13
279:8,11
**court's** 53:1
196:4 198:17
200:19 206:9
215:25 226:24
**courts** 163:10
**cover** 172:21
173:5 191:5,7
191:7 245:17
245:18
**coverage**
185:11 186:24
**covered** 34:23
34:24 182:2
189:20 191:14
192:9
**covers** 191:11
214:17 215:17
**cowden** 13:22
**cram** 125:12
**crater** 145:23
**cratering**
139:2
**crazy** 32:8
**create** 25:16
64:22 89:25
130:20 139:14
175:19
**created** 124:6
**creates** 121:22
**creating** 124:5
**creative** 119:4
119:19

**credence** 94:5
**credentials**
238:6 241:6,17
**credible** 61:7
**credit** 45:15
46:9,15 252:14
253:11
**creditor** 57:22
78:18 83:24
86:15 91:12
92:22 93:14
104:17,23
134:1 142:2
150:8 154:8
163:15 165:20
165:20 166:24
167:17 169:3
229:4 237:4,8
242:20 244:17
250:23 252:14
261:3 267:19
268:4 270:12
272:1,10 273:4
277:21
**creditor's**
175:5 183:10
228:17 231:6,7
231:8,12
**creditors** 3:18
13:17 14:2,10
57:4,21,24
58:5,9 60:11
68:23 72:9
73:12,16 78:7
78:8,9,11
86:24 87:14
88:15 92:7,13

92:17,20,24
93:4,18,20
94:3,6,25
108:24 112:16
127:8,10
129:16 134:24
140:16 141:25
142:5 143:2
151:10,15
154:11 163:20
165:25 168:17
170:11 172:22
178:16 182:7
222:2 227:17
229:5 234:24
236:1 238:15
239:18 240:2
240:10,13,23
242:2,12,17,19
242:24 243:6
243:10,12,14
243:20,23
244:4,5,8,10
249:6,23 250:7
252:2 256:15
269:14,18
270:18 274:1
275:6,18
276:22 277:2
278:3
**credits** 163:7
**crime** 204:13
**criminal** 36:6
254:12,21
257:5 262:23
**criminally**
205:25 261:11

**criteria** 247:9
**critical** 220:16
**criticisms** 66:9
  67:17 71:10,12
  96:2
**criticize** 63:3
  63:18 72:19
**criticized** 66:3
**criticizing** 64:3
**cromwell** 7:8
**cross** 62:1
  218:5
**crosshairs**
  73:22
**crypto** 19:13
  45:4 54:16
  56:1 61:13
  62:21 76:20,21
  76:22,23 83:20
  84:25 87:9,14
  87:16,20 88:2
  88:3,18,21
  89:5,6 91:1,22
  106:22 107:24
  108:23 109:2
  109:12 110:23
  111:11 113:5
  113:23 117:8
  122:15 123:21
  124:15 125:19
  128:13 130:15
  130:23 131:6,9
  131:17 132:19
  133:15 134:17
  134:25 138:3
  157:20,21
  176:22 177:2

**cryptocurren...**
  41:14 97:2
  109:14 140:19
  147:20 253:6
  261:23,24
  262:12,13
**cryptocurrency**
  17:12 27:2,24
  40:22 41:23
  43:7 54:24
  55:20,23 57:1
  57:2,6,16 58:2
  58:4,8 60:10
  73:25 77:8
  86:9 97:3
  104:14 106:5
  106:25 108:5
  110:12 112:25
  203:11,15
  218:20 219:15
  221:18,21
  222:5 274:7,16
**cryptos** 141:12
**curious** 261:14
  261:16
**currencies**
  138:3 157:20
  157:21
**currency** 106:5
  124:15 125:19
  129:3,9 130:16
  134:18,25
  139:11 161:9
  186:23
**current** 38:11
  127:9 143:25
  146:3,4 148:12

153:5,25
155:16 156:18
228:12 230:6
233:8
**currently**
  135:18 144:5
  158:24 159:2
  159:13 168:3
  208:8 223:2
**curves** 275:21
**custodial** 56:5
  57:17
**custody** 21:20
  66:19
**customer** 18:5
  18:9,10,22
  19:3,4,8,11,16
  21:3,4,9,10,20
  21:22 22:17
  23:2,13,15,17
  24:4 46:9
  55:11,13 56:7
  56:9,10,20,21
  61:8 63:23
  74:15,24 79:7
  79:7 82:22
  85:21 87:20
  88:2,3,20,21
  88:23 89:4,6
  90:5 91:20
  99:20 105:3
  107:11,18
  108:18 109:7
  109:11 113:23
  113:24,25
  114:2,7 122:25
  123:1,20,22

125:18 143:11
152:17,17
160:24 165:14
175:23 218:20
219:14 221:13
224:12 229:1
246:5,19
260:25 276:15
**customer's**
  46:15 114:4
  165:16
**customers**
  17:12,23,25
  18:25 19:2
  21:7,14 22:14
  22:22 23:9,11
  23:24 27:3,24
  45:15 47:4
  55:10,16,21
  56:1,5,15
  62:12 63:23
  64:1 66:16,18
  66:20,22 69:15
  73:21,24 74:3
  74:7,14,23
  75:4 76:11
  78:20,22,22,23
  79:1 86:9,10
  87:2,16,21,22
  88:4 91:22
  94:19,22 99:17
  104:14 108:5,6
  108:25 110:16
  113:1 116:18
  116:21,24
  117:1,11,12,13
  117:15 120:8

120:10,18
121:5,11,24
124:11,24
126:9,11,17
143:4,6 145:24
147:15 150:18
152:12 173:6
175:4,13,18
178:13 182:7
182:13,17
184:16 188:24
189:25 220:17
221:17 228:23
229:12 269:19
269:21,25
276:18,21
277:24
**cut** 95:19
**cyber** 129:11
**cz** 88:20 107:4
107:4,10,13,23
108:4,15,19

**d**

**d** 3:5 10:2 17:1
41:11 42:21
280:1
**d&o** 185:8
186:24 187:4
218:2,9
**dagnoli** 16:1
164:3,5,5,12
164:17,22
165:11 166:9
166:12,25
**dallas** 13:20
**damage** 257:14

**damages**
250:10,16
251:6
**dan** 15:19 16:2
133:25 166:22
167:13 239:4
**daniel** 14:7
**darren** 14:15
108:20 145:15
232:17 241:21
267:15
**data** 18:5,9,14
18:19 19:6,20
20:1 21:10,12
21:20 22:5,5,7
22:15,18 23:16
23:19,19 24:2
24:5 92:23
106:8,24
221:13 246:5
246:20 260:25
**date** 98:8,10
116:17 120:4
122:16,19
125:5,7 130:2
134:17 146:6
150:21 155:10
156:12 157:4,5
157:18 158:6,9
158:10 192:7,7
195:25 197:5,8
210:16 211:1
211:14,22
212:4 213:1
215:23 221:19
224:2,3,3,5
228:13 229:6

230:10 231:14
231:23 267:4
**dated** 281:8
**dates** 225:22
**dave** 185:25
**david** 3:14
5:17 12:6
**day** 18:25 38:3
44:15,19 48:23
60:8 78:8,13
104:12 114:1
143:24 177:5,6
177:14 187:3
200:7 238:7
246:4 269:15
269:24
**days** 20:23
57:10 74:2
78:5 87:23
140:8 152:6
176:23 177:2,3
243:13
**dc** 6:4,12 8:5
**de** 8:19
**deadline**
232:20 243:5
**deal** 18:21
20:17 23:3
24:8 34:19
35:4 36:12
58:22 59:2
64:7,21,24
66:24 67:22
73:12 78:24
86:25 87:2,5,7
87:13,18 88:9
88:15,15,16

90:24 91:6
101:14 103:11
108:13 116:18
118:18,21,25
124:7 130:8,11
131:15 145:13
172:10 179:8
205:15 234:13
273:10
**dealer** 26:15
37:12 69:7
**dealing** 187:7
196:14 253:4,5
**dealings**
189:25 190:1
**deals** 261:17
**dealt** 220:5
**dearest** 199:8
**debating** 72:17
**debias** 221:12
**debt** 235:7,12
**debtor** 1:8 5:4
36:14,21,22
41:9 42:6
44:21,21,23,24
45:11,21 46:5
47:4 62:11,11
68:14 70:7
76:6 78:24
82:5 94:23
96:2 140:3
148:11 154:14
162:19,20,25
163:7,9 172:16
172:22 175:17
175:17,20
176:17 179:23

| | | | |
|---|---|---|---|
| 182:22 191:4 | 46:7,8,13,14 | 164:18 165:1,2 | 249:14 278:19 |
| 191:16 192:4 | 47:2,17 50:4 | 166:1 167:8 | **decided**   30:20 |
| 199:14 209:8 | 51:7,18,22 | 168:23 172:7 | 180:3 183:22 |
| 213:5,23 | 53:11,18 54:12 | 172:14,19 | 186:13 188:20 |
| 216:24 220:12 | 54:23 55:1,4 | 174:8 178:12 | 200:12 267:23 |
| 227:25 228:14 | 55:19,20 56:4 | 183:25 187:14 | **deciding** |
| 228:15,19 | 57:1,7 58:6,14 | 189:11 191:25 | 247:20 |
| 230:6 236:22 | 58:20 60:6,10 | 195:2,11 | **decision**   39:13 |
| 258:17 263:25 | 60:11 61:14,22 | 196:23 201:2,2 | 78:2 91:18 |
| 268:14 276:11 | 63:1,2,7,15,19 | 201:25 205:23 | 115:15 126:25 |
| **debtor's**   44:11 | 64:4,6 65:1,23 | 207:14 210:18 | 130:19 141:5 |
| 44:19,20 62:3 | 66:15,18 67:3 | 212:24 214:24 | 151:9 153:23 |
| 66:10 73:8,10 | 67:11,18,21,24 | 225:1 226:25 | 167:4 177:19 |
| 75:7 76:21 | 67:25 68:7,16 | 227:7,9,20 | 183:5 200:13 |
| 84:22 86:8 | 69:13 71:17 | 228:11 229:18 | 200:19 275:15 |
| 102:7 104:4,8 | 74:11 77:2 | 233:24 234:1 | 278:16 |
| 104:10 108:10 | 83:9,12,13,16 | 236:3 237:21 | **decisions** |
| 112:8 130:24 | 84:25 85:7 | 239:9 241:4 | 273:19 |
| 142:7,8,10 | 88:11 90:22 | 242:10,25 | **declarant**   62:1 |
| 164:19 165:4 | 91:11 92:6,9 | 246:7 251:7 | **declaration** |
| 189:10 193:21 | 97:5 102:16,18 | 260:24 266:2 | 50:16,20 51:3 |
| 196:7 212:3,14 | 104:6 106:4 | 266:10,15,16 | 51:6 75:7 |
| 213:19,19 | 112:16 116:11 | 267:1 268:17 | 85:19 179:1,12 |
| 215:8 220:12 | 116:16 117:17 | 271:1,2,18 | 215:3 218:15 |
| 221:18 223:1 | 121:23 122:23 | 273:9 274:14 | 219:21 220:2,4 |
| 226:20 227:4,6 | 125:25 126:3 | 275:5 276:18 | 226:18 |
| 229:15,19 | 126:21 127:11 | 276:20 277:1 | **declarations** |
| 230:3 269:11 | 128:19 129:25 | 279:12 | 61:10 75:23 |
| **debtors**   3:23 | 130:7,10 | **deceive**   263:2 | 77:14,24 |
| 17:6 24:15,17 | 132:23 139:7 | **december** | **declaratory** |
| 25:15 29:13,24 | 139:22 141:3 | 248:22 | 267:25 |
| 30:4,6 31:4 | 142:13 146:23 | **decent**   185:12 | **declared** |
| 33:7 34:4 | 148:22 149:14 | **deceptive** | 253:12 261:10 |
| 35:23 37:6 | 150:10,16,18 | 170:19 | **decline**   134:14 |
| 39:2 40:17 | 153:24 158:25 | **decide**   22:25 | 137:25 138:2 |
| 43:18 44:2,4 | 159:23 162:11 | 64:7 68:10 | **declined** |
| 45:14,22 46:2 | 162:18 163:25 | 181:18 240:3 | 100:21 205:7 |

decrease
142:23
dedicate
275:12
dedicated
84:15
deeds 215:17
deemed 103:18
155:22 166:3,6
203:11
deep 112:9
default 59:14
defendant 1:14
262:25
defendants
1:22
defer 34:24
85:9 129:24
130:7,10
160:22 180:23
deference
275:13
defined 172:15
174:23 176:25
178:9 204:7
214:18 220:15
definitely
133:4 254:25
261:10
definition
174:12,14,19
215:15 257:24
definitive
114:23 214:17
215:24
defraud
251:23

defrauded
188:10 226:11
264:15
degree 67:15
delayed 127:13
delaying 117:5
delete 21:9,12
24:5 114:3,18
217:5
deleted 79:19
79:22,25 80:1
80:16
deletion 94:12
deliberately
33:10 205:21
231:20
deliver 46:4
86:8 104:13
demonstrable
184:12
demonstrated
184:15
demonstrating
44:5 61:8
demonstration
235:22
demonstrative
184:14
deny 124:14,23
department
15:1,8 29:7
92:16,18 93:2
94:5 100:4
122:6 132:12
depend 157:11
depending
37:15 136:1

depends 234:9
depletion
189:8
deposit 59:20
59:24 60:1
deposited
55:11
deposits 59:11
dept 9:2
derivative
165:4 168:12
describe 30:3
described 83:6
134:18 179:7
description
61:22 75:5,13
75:14 171:8
172:24
deserve 240:14
deserves 142:3
design 108:24
designed 56:24
91:16
desirable
239:8
desire 160:12
223:3
desousa 1:13
desperately
185:8
despite 227:20
255:24 269:12
detail 48:3
107:16 206:11
detailed 176:5
details 61:22
108:7 167:23

171:19 262:21
detected
172:25
determination
85:2,4 151:16
189:15
determine
60:11 63:7
135:12 174:14
189:13 227:11
determined
54:12 151:8
183:9,20
187:24 189:15
227:7
determining
143:3
detroit 240:5
deutsch 10:18
11:1
developments
226:4 228:5
dfr 15:2
dialog 259:4
dialogue 227:4
228:3
dictates 136:23
dictionary
257:6
differ 236:3
difference
120:10 123:18
125:22 128:4
130:12 137:5
147:7,14
150:20 164:12
167:17

**differences**
122:9 126:1
130:14
**different** 32:16
35:20 37:2
47:1 71:19
75:21 93:24
96:7 98:15
104:19 120:9
120:24 132:3
132:25 135:13
135:24 136:2
147:10 149:9
153:3 169:16
169:25 181:9
192:17 203:9
211:7 212:22
234:1,8 242:15
244:12 250:23
250:24 252:4
253:1,2 261:18
267:4
**differentiation**
130:20
**differently**
27:4 181:15
**difficult**
269:20
**dig** 40:17
**digest** 94:20
265:13
**digestible** 96:5
**digital** 1:6,10
1:20 7:16 9:17
11:9,18 13:18
14:3 55:10
56:4,7 140:14

225:19 226:7
**digital's**
187:11
**diligence** 54:18
55:2 56:3 63:2
67:12,14,17
71:13 76:22
84:22 87:4
88:10 89:1,3
91:7 101:5
104:8 106:3
108:11 112:4,8
112:9,11,18
115:7,8 187:16
218:18 219:12
**diligenced**
88:25
**diligently**
155:6 231:19
**direct** 141:15
162:10,11,17
162:24 163:6
164:23 167:1
167:17 174:18
182:19 205:23
212:2,13
228:18 277:24
278:2,9
**directed** 58:5
220:9
**directing** 114:9
**direction** 221:2
**directly** 106:7
165:5 225:5
**director**
175:20 178:4
185:17,22

190:3 223:6
227:14,16
228:12 229:8
231:10,21
233:5,6,12
236:5
**directors** 3:14
3:23 174:15
176:4,5,21
177:17 178:7
181:5,10,25
183:1 184:11
184:17,20
222:13,17,19
223:2 225:22
227:8 228:18
230:6 233:18
233:21 272:16
**diresta** 15:17
104:17,22,22
106:17,21
107:2,20
108:14 110:7
110:15 111:5,9
113:4 114:11
114:18,25
168:25 169:2,2
239:25 240:20
240:22,22
270:9,11,14,14
270:16 271:8
**disabuse**
250:21
**disagree** 63:13
**disagreed**
190:12

**disagreement**
36:4 197:6
**disagrees**
40:13 103:14
**disallowed**
74:12
**disappointm...**
190:15
**discharge**
29:21 182:23
213:5,7 221:9
221:10
**discharged**
228:13
**discharges**
238:11
**discharging**
231:21
**disclose** 70:16
100:25 148:23
216:18 222:23
223:21 236:10
**disclosed** 69:15
70:7,10,15
75:10 77:24
97:19 107:1
112:2,7 186:9
223:13
**disclosure** 3:1
31:2,13 64:10
66:25 67:2,7
67:13,16,19,23
68:2,9,22 70:8
71:14 72:18
73:7,11 74:5,6
75:2,6,13 76:1
76:2,4,7,8 77:5

77:10,13,14,19
77:22,25 80:8
80:13,18,22
81:15 83:6,7
84:1,3,7,15
85:6,22 93:13
93:14 94:3,15
94:18 95:8,9
95:10,11,13,17
95:25 96:6,21
96:24 98:4,15
99:9 107:1
142:3 148:3,7
159:24 165:7
179:2 186:9
189:25 214:21
216:17 223:25
227:1 242:23
243:6
**disclosures**
64:9 71:9
72:23 74:14
82:9 83:12
269:5
**discover** 75:3
**discovery**
104:9 227:5
272:17
**discretion**
242:8 247:20
**discriminate**
117:21
**discriminated**
135:4
**discriminates**
117:4 118:16
120:17

**discrimination**
116:13 121:22
122:3 123:16
123:20 124:5,6
125:10 133:24
161:21
**discriminatory**
134:16 138:24
161:6
**discuss** 43:19
51:5 52:21
191:22 228:8
271:3 279:16
**discussed**
62:13,18 75:22
98:18 202:22
215:13 252:15
**discussing**
271:5
**discussion**
184:8 233:13
248:16 249:7
258:15 273:13
**discussions**
133:5 173:22
174:3 186:14
199:13
**dishonesty**
237:11 247:9
251:23 252:6
256:18 258:14
**disposition**
172:16
**dispute** 120:7
**disputed** 217:2
226:22 228:21
259:18

**dissipation**
184:15
**distinction**
224:2
**distribute** 39:3
60:10 113:23
121:24 140:4
140:12 145:20
149:17 155:21
198:1 205:23
**distributed**
56:1 58:2
109:3 138:20
149:5,10
152:11
**distributing**
147:8
**distribution**
34:25 37:13
39:1 44:25
45:7,16,18
46:10,16 47:5
47:13,19 55:23
57:20 98:25
126:2 128:21
129:20 131:6,9
143:12 146:6
152:10 158:6
195:21,24
196:1,3,9,11
196:11,17,22
197:7,18,20
201:23,25
202:5 203:14
212:2,13
224:11 226:15

**distributions**
46:1 47:18
56:15 57:14
58:9 68:17
71:2,7 97:2
112:25 114:6
116:19,22
117:1,7 119:10
120:16 121:5,6
121:8 124:15
128:16,23
143:4,7 147:11
184:16 201:22
224:22 242:7
269:19
**distributive**
153:13
**district** 1:2
200:18
**distrust** 275:5
275:25
**distrusted**
104:7
**dive** 112:9
**diversify** 274:7
**dividend**
182:24
**division** 43:20
108:7
**divisions** 43:19
**divita** 3:5 9:14
273:2,3,7
275:23 276:6
277:20 278:6
278:12
**docket** 17:18
18:12 50:16,17

80:24 82:21
85:19 203:6
209:2,20 220:2
243:1
**docs** 79:20
**document**
80:22,24 81:8
81:13 93:17
227:5 253:19
**documented**
92:20
**documents**
79:18,18,21,25
80:14 82:16
92:15 94:11,12
100:6,24 101:4
102:21 169:10
214:18,20,24
215:17,25
216:3 241:14
256:4
**dogecoin** 136:1
**doing** 23:11
26:23 27:1,5
27:10 28:6
30:19 31:22,24
33:13 37:3,6
37:21 39:22
50:4 58:24
63:24 67:12
85:18 142:16
143:15,19
164:24 169:13
170:8 171:22
172:1 178:15
188:19 198:21
200:22 205:16

208:17 235:25
256:9 257:15
257:19 266:24
266:25
**doj** 92:3
**dollar** 157:17
157:17,20
176:12 243:11
243:24
**dollarization**
221:16,22
**dollarized**
120:4 122:17
125:8 150:7
157:3
**dollars** 113:21
152:10 183:14
226:14 235:20
243:25
**door** 18:22
23:2,5
**doubt** 66:5
254:13
**downloaded**
82:24
**dozen** 240:7
**drafting**
169:10
**drags** 124:22
**drastic** 95:19
**driver's** 113:12
**drop** 49:5,11
52:13 139:17
**dropped**
236:19
**drops** 64:21
141:23

**dubious**
252:23
**due** 24:23
54:18 55:2
56:3 58:17
63:2 67:12,14
67:17 71:12
76:21 84:21
88:10 101:5
123:4 132:19
187:16 226:13
228:9 238:13
260:22
**dump** 159:11
**duties** 198:11
198:24 231:4
231:21 233:7
**duty** 183:4,11
257:10

---

**e**

**e** 2:8,8 5:1,1
6:19 17:1,1
32:14 39:10
175:25 182:17
228:23 280:1,2
280:2
**earlier** 61:4
84:19 114:15
182:15 199:20
205:5 207:17
250:16 255:23
273:12
**early** 132:14
168:9 177:14
**easier** 19:24
158:7

**easily** 94:20
96:4 144:8
145:10 159:6
**easy** 95:16,16
96:13 125:4
**ecf** 80:22
**economic** 18:8
18:20 20:7
22:8 23:3 24:2
24:9 103:11
**editorial**
278:25
**effect** 37:21
39:20 62:20
93:18,19 95:6
96:18 145:22
146:6 197:4
203:10 221:11
253:8
**effecting**
131:19 132:2
**effective** 192:7
195:25 197:5,8
215:22 223:9
224:3,5 225:21
228:13 230:10
231:14,23
267:21
**effectively**
49:20 195:23
224:9
**effectiveness**
239:16,20
**effectuate**
26:23 27:2
168:15 197:8

**effectuating**
196:12
**efficient**
269:25
**effort** 103:16
103:21 157:22
172:25 180:20
184:19 246:5
256:6 259:5
**efforts** 26:11
57:11 116:3
159:7 179:19
224:18 260:21
**ehrlich** 164:23
167:2 172:10
175:24,25
183:3,21 184:2
184:10 185:14
185:18 186:3
186:14 188:14
188:22 190:7
217:25 244:15
255:2
**ehrlich's** 176:9
**either** 49:5
52:12 54:11
63:17 76:24
126:1 136:6
141:12 142:18
157:20 221:2
222:1 259:14
259:20 261:11
267:20
**elect** 21:3 22:6
22:15 23:6
79:2 113:1
116:25 123:14

125:5,17 127:6
162:17
**elected** 19:4
66:6 165:9,15
165:22 167:10
240:6 252:8
**election** 127:11
147:16
**electronic**
281:5
**elects** 125:18
**element** 18:20
254:17 255:1
258:5
**elements** 145:9
145:12 146:25
152:6 161:6
254:17
**eliminate**
71:17
**ellis** 11:8,17
53:18 116:11
268:17
**else's** 167:5
**elusory** 146:3
153:3,5,6,7
154:2 158:23
159:21
**email** 81:11,11
81:12,12,16
82:1 113:10,15
114:13
**emails** 99:21
**emanuel** 9:16
**embedded**
103:12

**emery** 13:16
14:1,9 86:21
136:20
**emmanuel**
174:7 217:20
**emphasize**
182:12
**employed**
172:19
**employee**
107:5,6,10
108:1,4,15
178:4 179:10
179:16 180:7
216:18
**employees** 56:8
105:1,2,15,18
107:3,22,23
108:16,17,18
109:6,13,15,25
110:1,8,11,13
173:6,8 178:22
181:1 183:2
191:16 215:8
219:3,23
220:14,15,20
**employment**
215:7
**encompassing**
173:4
**encourage**
133:19
**encouraged**
122:22
**encouraging**
178:12

**endless** 72:8
**ends** 101:22
110:18 256:14
**energy** 162:2,4
**enforceable**
90:1
**enforced** 165:6
204:5
**enforcement**
28:24 32:6
**engage** 38:21
39:16 55:14
119:1
**engaged**
227:10 228:3
**engaging** 36:6
46:13 227:4
**english** 171:16
171:18
**enjoin** 31:21
37:13 204:22
212:10,23
**enjoining** 3:22
29:17 37:8
**enjoyed** 187:13
**enormous**
190:15
**ensure** 56:20
150:4,10 243:6
**ensuring**
220:17
**entailed**
218:16
**enter** 73:9
207:13
**entered** 50:3
215:7

**entering** 34:2
**enterprise**
  199:24
**enters** 201:9
  206:12
**entire** 67:8
  78:18 92:5
  143:10,11
  153:16 199:24
  241:2 242:20
  258:3 268:3
**entirely** 20:14
  43:8 163:12
  271:25
**entities** 28:3
  35:21 108:9
  135:13 138:1
  163:20 194:18
  196:15 206:16
  210:5 223:7,7
  228:15 234:8
  235:15
**entitle** 210:22
**entitled** 20:23
  31:20 44:25
  49:6 52:2
  59:25 167:7,11
  187:9,9 210:20
  221:10,17
  281:6
**entity** 36:14
  128:19 129:18
  137:20,24
  139:9 197:4
  211:25 228:19
  233:7

**entry** 50:4
  52:12 260:22
**environment**
  68:8,11 72:1
**environmental**
  204:18
**envy** 275:8
**equal** 124:21
  125:1,10
  128:13 148:10
  150:22 151:10
  152:21 153:1
  222:2
**equalized**
  121:8
**equally** 143:2
  226:6
**equate** 174:12
**equitable**
  23:23 159:21
  257:10
**equities** 168:5
**equity** 1:16
  3:13 12:2,9,16
  175:24 188:4
  225:18 226:11
  226:16 229:25
  230:2 232:23
  233:4 234:23
  234:25 235:2,6
  235:14 236:1
  257:8,25
**equivalent**
  76:16
**eradicate**
  91:11

**erase** 22:15
  91:19
**erc20** 137:1
  138:12 139:12
  139:15
**error** 49:23
**especially**
  20:23 73:16
  82:15 113:19
  257:5
**esq** 5:8,9,17,24
  6:6,14,22 7:6
  7:13,21,22 8:7
  8:14,21,22 9:7
  9:14,21,22
  10:7,8,16,23
  11:6,13,14,15
  11:22 12:6,13
  12:20 13:6,14
  13:22,23 14:7
  14:14,15,22
  15:6,13
**essence** 115:23
  115:24
**essentially**
  18:19 31:11
  32:21 55:22
  121:9 130:2
  139:3 144:19
  196:18 224:25
  231:12 262:3
  269:23
**estate** 20:12
  23:25 86:5
  88:4 145:19,21
  147:8 148:17
  150:6,7 167:19

  168:2,12,13,23
  177:11 182:11
  182:14,25
  183:2,3,13,20
  186:22 188:8,9
  190:2 197:17
  212:3,14
  213:19 220:17
  221:21 276:11
**estate's** 168:16
**estates** 54:13
  58:14 60:5
  178:6 188:18
  237:21 239:8
**estimated**
  85:22 97:18
**estimates**
  58:15
**estimation**
  141:21
**estopped**
  205:12
**estoppel** 32:18
**et** 1:21 11:9,18
  13:18 14:3
  85:10 184:24
  190:10 205:18
  276:24
**ethereum**
  138:9,11
**ethics** 65:14
**etrade** 160:24
  160:25
**evaluate** 252:3
**evaluation**
  237:10 251:22

evan  11:13
  186:4
evans  14:14
  86:20,20 115:3
  115:3 136:17
  136:20,20
  137:18 138:5,7
  138:16
eve  183:15
  186:25 226:23
  264:12
evening  199:9
  228:22
event  36:11
  134:10,12,21
  135:3 139:8
  140:5,10
  141:16 142:4
  145:8 148:5
  150:1 151:7
  159:14 160:5
  161:4,15 171:7
  229:24 232:8
  270:4
events  252:4
eventually
  31:22 72:16
eventuate  77:1
everybody
  96:10 124:22
  124:23 130:17
  130:19 147:18
  157:19 180:8
  236:11 258:22
everybody's
  21:5,5 93:11

everyone's
  260:20
evidence  18:13
  20:18 27:14
  30:5 32:17
  51:12 53:13
  61:8,10,23
  63:21 65:7,16
  65:20,25 83:10
  101:25 102:2,5
  102:16,23
  126:6 153:11
  155:25 159:16
  159:17,18
  160:15 173:11
  178:18,19,21
  178:23 179:8
  180:16 181:14
  181:20 187:7
  187:20 189:1
  190:11,13,16
  220:19 222:10
  244:23 246:16
  252:5 253:16
  253:17 254:19
  254:20 255:14
  255:16,24
  256:7 262:8
  268:23 269:22
  275:10
evidenced
  229:13
evidences
  20:11 106:4
evidentiary
  50:13 53:15
  61:25 111:1

160:20 255:3
exact  70:20
exactly  22:21
  26:3 37:3 38:6
  69:15 94:9
  121:24 128:2
  136:11 146:20
  152:24 197:12
  214:2 233:7
  254:23 262:20
  273:13
examination
  62:1
examine  168:2
examiner
  270:17 271:11
  271:20 274:22
examiners
  270:22,25
example  17:24
  26:7 27:18
  39:2 41:2
  62:25 67:25
  69:4 74:9 75:4
  87:12 90:18
  105:1 107:4
  108:16 136:25
  137:9 138:6,9
  164:22 168:5
  173:6 175:23
  181:18 191:14
  198:18 205:23
  214:22 228:7
  233:24 277:3
except  58:4
  77:20 102:22
  182:23

exception  53:1
  53:6
exceptions
  214:25 230:16
exchange  6:8,9
  6:16,17 29:11
  41:11 42:21
  43:13 45:5,11
  61:3 62:15
  70:1 90:11,13
  135:18 152:11
  154:25 178:23
  179:4,18
  191:12 202:8
  211:10 226:9
exchanged
  76:15
exchanges  91:2
excluded
  153:16
excludes  28:24
exclusive
  107:15
exculpated
  34:1 185:2
  194:12,16
  195:1,22
  197:17,17,18
  198:22 210:8
exculpating
  198:9
exculpation
  25:20 28:21,22
  29:4 33:15
  34:20,23 35:1
  37:17 39:10,14
  52:23 99:13

103:3 187:12
191:15,21
192:11,15
193:17,21
194:4,19 195:6
195:20 196:8
197:5,23 198:5
199:21 200:2,6
200:10,15
201:1,19 202:5
202:12,17
205:13 214:17
214:21 215:1
216:10 259:12
**exculpations**
85:10 198:7
**excuse** 29:20
80:3 81:12
112:23 139:12
145:2
**excused** 173:21
**execute** 131:14
155:6 198:23
**executing**
38:13 193:13
**executioner**
248:12
**executives**
88:12 164:8
165:16 166:15
**executors**
165:12
**exempt** 41:7,24
**exemption**
24:20 37:20
41:9 45:8
47:16

**exemptions**
44:6
**exercise** 45:6,9
45:20 46:12,21
47:15,25 59:6
59:13 81:20
**exercised** 63:7
66:11
**exercising** 59:8
**exhibited**
238:22
**exist** 78:23
145:12 162:11
182:5,9 194:18
**existing** 56:13
119:15 120:25
**exists** 124:7
253:13
**exit** 19:14
**expect** 92:13
103:19 241:23
253:2 260:23
**expected** 269:1
**expecting**
152:13
**expend** 177:11
**expense** 59:15
59:18 239:9
**expenses** 22:1
59:10 188:13
**expensive**
227:4
**experience**
21:15 22:23,25
73:15 112:14
159:20 169:10
238:7 239:8

241:7,7 244:24
270:24
**experienced**
237:20 238:19
274:15
**expert** 61:15
63:1 248:13
257:1
**expertise** 56:11
61:13
**experts** 83:20
84:25 87:2
88:14 247:5
257:4 275:19
**explain** 18:6
50:17 135:8
175:15 200:20
226:5,24
263:19 277:15
**explained**
187:18
**explains** 51:22
218:11
**explanation**
50:20 51:1,25
77:15 144:22
269:2
**explicit** 234:13
**explicitly**
59:17 166:7
211:2 236:7
**expose** 38:15
**exposed** 87:16
**exposure** 87:23
175:8
**expound** 134:7

**express** 112:17
277:10
**expressly**
19:21 215:22
**extend** 3:20
39:9 116:6
259:20 273:19
**extended** 279:2
**extending**
277:13
**extension**
115:22 239:21
246:20 260:21
**extensive**
238:10 269:5
**extent** 24:20
39:22 41:7,18
42:5,24 43:5,6
43:18 44:9
51:17 60:4
71:21 119:18
133:18 142:24
162:11,19
163:15,19
166:21,23,25
167:9 180:23
182:19,20,22
186:24 192:13
198:4,22
203:10 205:1
220:5 227:11
255:14 264:9
**extra** 127:2
**extraordinary**
112:12
**extreme** 82:3

**extremely** 68:11 97:4 112:10 115:16 204:7

**eyes** 112:3 241:9

**f**

**f** 2:8 6:11

**face** 29:18

**faced** 62:19 70:3

**facilitate** 58:9

**fact** 25:10,18 27:25 33:12 35:1 46:19 51:7,18 59:12 67:25 75:12 78:6,14 83:21 93:15 95:18 96:19 120:16 123:7 128:24 144:15 153:9 166:1 168:6 185:7 192:22 193:20 197:13 213:1 215:12 232:21 274:25

**factors** 71:1,3 136:2 157:12 159:12 247:23 275:5,10

**facts** 50:19,22 51:3,10 69:23

**fail** 127:17,22 147:5

**failed** 123:14 188:2

**failure** 62:21 100:5 145:13

**fair** 27:3 30:11 33:20,21 132:17 146:13 149:4 151:2,17 156:1 158:13 265:10

**fairly** 153:8 172:5

**fairness** 138:25 260:7

**fairway** 34:13 196:20 197:12

**faith** 25:17 59:24 60:1 203:13 207:20

**faithful** 198:11 218:9

**faithfully** 198:22 220:13

**false** 92:11 167:25 249:3 263:1

**faltischek** 8:9

**familiar** 195:16 237:21

**fan** 270:22

**far** 37:23 66:4 74:25 76:17 77:7 104:19 131:1 179:24 197:16 224:13 235:11 239:20

**fate** 149:21

**fault** 124:3

**faulty** 64:1

**favor** 85:21,24 86:6,11 117:12 117:14 163:13 164:15 166:3 175:17,22

**favoritism** 177:8

**fdic** 57:23 167:25 175:12 189:25

**feasibility** 54:8 54:9 56:25 60:20,22 64:11 64:14 71:15 73:7 100:1 103:25 104:3,3 221:1,4

**feasible** 54:10 60:16

**feature** 128:3

**february** 89:3 91:3 228:10 242:25 243:5

**federal** 6:1,2 25:3,6 250:15 265:20

**fee** 89:5,6 270:17,22,25 271:1,11,20

**feel** 38:5 152:14 170:18 241:5,10 256:11 268:7 277:16

**feeling** 151:25

**feels** 112:21

**fees** 137:8 224:1,5 274:16

**fell** 85:7

**fellow** 240:23 270:17

**felt** 170:13 242:19

**ferry** 6:19

**fewer** 157:23

**ficentive** 8:10 10:11

**fictitious** 261:25

**fiduciaries** 91:17 198:4

**fiduciary** 59:5 59:8,14 88:5 183:4,11 196:22 197:18 197:25 198:2 233:7

**fifth** 57:19

**fight** 241:8,10 241:17 263:24

**fighting** 94:23 241:11

**figure** 137:21 276:10

**figured** 194:23

**file** 41:10 42:20 50:16 117:25 134:1 210:17 210:20 211:3 213:1 259:14 263:17 267:11 267:25 268:18

**filed** 3:3,6,9,11
17:18 18:12
24:19 31:12
35:14 42:19
50:15 61:24
74:24 75:7
100:8 109:5
111:18,24
117:16 118:23
144:14 178:11
184:17 202:20
212:3 226:3
228:8,10,11
232:11 242:25
263:25 264:3,7
267:10 270:20
273:4,24
274:10
**files** 26:16
**filing** 24:21
27:20 103:19
211:11 215:18
225:4 273:22
275:2
**fill** 243:17
**final** 40:14,16
64:9,10 76:14
93:12 160:21
201:9,10
204:10 207:4
208:1
**finally** 100:1
112:20
**finance** 43:20
195:21 197:20
213:12 228:22
274:15

**finances**
100:20,21
**financial** 15:1
15:8 20:24
54:15,21 55:17
57:23 66:23
84:5 97:7
100:5,10,25
102:11,19
103:16 104:1
122:7 172:15
174:13 176:6
186:2 250:1,9
251:16 253:11
256:5,16
274:13 276:12
276:14,16
**financials** 55:3
101:9 102:2
**find** 24:11 41:6
74:7,12 75:5
95:17 96:13
99:9 105:22
133:2 209:5
211:17 214:11
224:12,18
250:6 253:3
254:6,7,8,12
255:4
**finding** 48:18
49:6 207:22
256:5 262:9
269:22
**findings** 33:5
236:23 237:9
237:10 277:21

**fine** 28:9,17
34:10 36:10
38:17 82:11
99:22 136:18
206:20 245:12
260:11
**fines** 39:6
**finger** 218:5
**finish** 82:8
258:23
**finishing**
245:25
**firm** 51:9 91:9
91:23 226:2
240:5
**firms** 240:9
**first** 17:8,10,11
37:25 52:5
56:25 74:2
79:17 86:18
103:8 124:9
134:9 154:20
168:9 169:11
174:21 186:15
194:23 200:3
229:15 232:24
234:2 235:3
239:24 258:18
274:10
**five** 57:9
224:25 259:24
262:23 271:12
**fix** 49:4 146:14
**flexibility**
248:10
**flood** 161:12

**flooded** 161:16
**floor** 5:14 7:18
8:4
**flow** 235:22
**fluctuate** 97:3
136:1
**focus** 34:10
45:25 46:1
47:1 155:4
175:10 189:23
219:11,24,25
**focused** 29:4
124:19 167:22
233:15 235:7
246:16
**fogelman**
14:22
**folks** 42:16
178:12 221:1
**follow** 76:22
168:6
**followed** 53:21
53:22 64:15
**following**
43:23 57:3,11
134:21
**footnote** 97:20
97:22 98:13
**forced** 79:6
123:20 164:21
222:4
**forces** 144:9
**forcing** 130:17
130:19
**foregoing**
281:4

forever  279:18
forfeit  224:22
forfeiting
  59:11
forget  143:25
  260:12
forgot  271:24
form  52:23
  96:5 97:2
  120:9 143:12
  143:21 172:9
  225:9 264:4
formation
  218:19 219:13
former  76:16
  183:1,1,1
forms  253:1
forth  32:22
  192:16 206:11
  210:4
forward  32:17
  32:19 33:12,12
  33:20,22 36:19
  37:11,22 40:9
  44:8 60:2,16
  64:7 91:17
  108:12 133:4
  135:23 142:17
  142:25 145:13
  151:22 205:9
  233:9 256:2
found  74:14
  79:16 103:17
  104:2 170:5
  241:1 247:9
  251:12,12
  274:13 276:8

foundation
  250:6
founders
  188:10
four  89:17
  151:7 258:20
fourth  57:16
  135:9 183:13
  235:16
frame  126:5
  151:6,11
  159:20 213:13
frank  233:15
franklin  7:3
frankly  97:11
  122:9 165:23
  221:3 239:13
  272:3
fraud  36:6,8
  38:24 113:19
  166:14 167:2
  167:10 168:2
  204:16 237:11
  247:9,18
  249:21 250:5,6
  250:15,22
  251:10,12,13
  252:6,24 253:5
  253:11,11,17
  254:6,7,8,17
  254:17,18,25
  255:1,4,15
  256:17,18,25
  257:2,3,4,15
  257:17 258:2,4
  258:5,9,10,14
  263:11,18

264:4,6,8,11
264:15 266:7
266:19,23,25
269:22 276:15
frauds  253:1
fraudulent
  167:25 168:1
  258:8 261:11
fraudulently
  257:13,15
free  36:5,7
  79:2 181:1,11
  213:16
freed  38:23
  213:25
freedom  71:21
fresh  241:8
friday  24:16,22
  48:19,22 70:6
  70:21 89:10,15
  122:22 226:2
  243:12
friendly
  244:15,16
frivolous
  184:18 189:8
  189:10,14,15
front  27:14
  30:10 31:19
  36:20 65:16
  153:11 203:2,4
  209:24 244:3
  272:22
frustrated
  256:2 276:7
  277:1

frustrating
  256:16
frustration
  274:12
frustrations
  269:21
ftc  146:24
  151:5 152:5
  167:24
ftc's  140:8
  149:24
ftx  7:9 8:17
  65:19 73:12,14
  102:1 154:15
  154:21 228:7
  229:17 230:1
  232:9 234:13
  238:21 274:3
  274:25
full  33:3 77:15
  130:1,4 171:19
  171:21 181:2
  185:10 200:21
  203:4 235:24
  279:1
fully  185:13
  200:9,15
  243:20
function  32:12
  218:19 219:13
functions
  242:5
fundamental
  21:13 23:3
  103:10
fundamentally
  135:1

**funds** 105:20
107:18 177:11
**further** 48:2
51:24 57:19
64:16 65:6
71:1 119:13
130:24 139:5
139:17 141:20
141:23 146:15
158:20 202:12
204:2 210:1
213:10 217:2
217:14 222:9
229:24 230:1
236:12,17
**furthermore**
144:10
**future** 19:11
19:15,24 21:3
21:21 22:6
153:25 154:1
195:24 242:6
275:12

**g**

**g** 17:1 215:4
280:6
**ga** 6:20 12:11
12:18 14:5
**gallagher** 4:1
**game** 248:5
**ge** 160:24
**general** 8:1 9:1
34:20 56:8
57:4,8,12,20
97:25 132:11
185:6,25
235:17 255:11

274:14
**general's** 94:15
**generally**
34:22 95:16
103:10 175:14
175:14 219:3
233:23
**generate**
135:14 136:12
**gentleman**
145:18
**gentleman's**
142:10
**george** 215:4
**gerard** 185:25
**getting** 18:22
23:2 138:18
148:20 169:23
177:21 178:5,9
181:3 197:8
217:23 234:25
267:5
**giant** 270:22
**gibbs** 13:23
**gift** 180:3
**gina** 15:17
104:22 169:2
240:22 270:14
**giugliano** 8:14
**give** 17:22
30:18 31:11
46:8,15,25
49:1 52:6,7,9
59:20 71:20
75:14 77:15
87:2 100:5,10
100:21 111:15

111:15 128:13
141:5 147:15
149:14 174:18
175:4,16,22
177:6,7 180:2
198:7 246:11
250:23 252:8
252:25 259:6
259:13 264:24
272:21 273:9
274:1 277:13
**given** 17:24
20:25 27:6
58:11 61:17
62:18 65:21,21
97:12,13,14,18
119:4 123:6
127:8,11,18
142:14 148:11
149:24 154:22
155:5 158:2
159:24 168:16
168:16 171:13
179:3 190:11
191:12 196:21
197:6 223:7
231:19 242:8
246:3 247:3
248:10 250:15
251:24
**gives** 233:16
238:12 251:9
**giving** 40:3
49:1 140:13
147:10 156:2
167:1 255:9
265:8 269:8

**gleit** 7:21
**global** 105:19
179:18
**gnats** 66:9
**go** 23:9 32:22
32:22 33:11,12
33:20,22 36:4
37:11 38:22
40:9 44:8 52:4
54:8 60:2
63:23 64:7
65:10 76:12
78:21 82:17
91:17 99:17,22
100:12,23
104:21,25
108:12,25
109:1 110:16
115:16 120:1
129:9 132:16
135:17 139:5
140:2 141:22
145:4,5 147:24
156:22 158:22
159:22 161:13
161:14 165:9
166:12 172:20
173:25 179:24
182:1 196:5
197:15 199:5,7
202:6 205:9,16
205:18 206:13
207:2,21
214:15 215:23
220:21 239:3
239:25 240:3
241:15 246:7

251:19 257:5
259:1,18
265:11,13
266:4,19,23
**goal** 86:7,8
91:21,24
129:15 186:20
186:21 240:11
**goals** 186:15
187:5 229:10
231:8
**goes** 21:13
22:21 56:24
64:8,20 71:14
76:21 81:22
88:2 130:24
144:18 197:23
203:13,24
204:25 215:19
255:23 266:12
267:21
**going** 23:5
25:17 30:20
31:23 32:4,20
33:19 34:19
37:6,7,18
39:12 42:2
48:25 49:1,3,4
49:12,12,18,19
50:13 52:6,7,9
52:24 53:5
54:7 61:6
63:21 65:6,10
67:11 68:13
70:22 71:5
72:7 91:20
92:8,20 96:11

102:10 104:13
115:10 120:3,5
122:10 127:22
134:24 135:23
139:10 141:5
142:17,24
143:7,11
145:12 148:23
151:22 153:6
153:10 154:21
156:4 158:6
164:13 165:11
169:24 170:12
172:2 178:13
180:4 186:1
188:23 189:10
190:15,17
196:5,11 198:7
198:13,14,17
201:11 202:3
205:3,3,20
207:12,13
208:17 209:7
215:5 218:8
222:16,16
223:9 225:3
230:24 235:22
235:23 238:12
241:8,23,24,24
243:21 245:24
246:11 250:4
251:19 255:19
256:2,12
258:17 259:13
262:22,24
264:13 267:19
270:23 278:15

278:21
**goldberg** 10:8
18:16,16 19:6
19:10,25 20:16
21:8,24 22:4
22:16,20 23:12
23:17,22 24:6
24:13 85:13,14
103:5,5 106:1
106:1,13,16,18
106:23 107:13
108:3,22 109:4
109:17,20
110:3,6,14
111:20,20
113:3 115:19
115:19 116:2,7
173:18,21,24
199:10,13
206:14 213:11
213:11,21,24
214:2,4 246:1
246:13 259:2,3
259:23 260:1
260:17,17
279:9
**good** 17:4,5,7
20:22 21:4
25:17 28:14
33:3 34:16
35:10 53:10,17
54:6 59:24
60:1 73:4
102:8 116:10
118:19,22
121:20 122:5
158:3 160:22

172:3 191:1
194:1 203:13
207:20 216:12
234:4 235:1
237:16 241:11
255:22 259:2
279:7
**goodman** 7:22
**gosh** 65:18
**gotten** 67:16
81:7,9 93:17
192:17 271:5
**govern** 267:11
**governance**
108:10
**governing**
201:22
**government**
32:9 35:17,24
36:7 38:7,8,8
38:16 40:13
73:23 200:2,6
200:11,16
201:4 211:14
212:4 228:9
232:2,11
235:18 259:14
**government's**
200:14
**governmental**
28:3 35:21
163:20 196:15
203:12 204:19
210:5,15
235:15
**governments**
25:4

governs 137:3
grace 12:17
grader 135:9
grant 153:21
 165:15,21
 177:24
granted 163:25
 164:16 165:19
 211:1,22
 231:25
granting 130:3
 164:18,20
 171:23,25
 172:1 177:22
grants 164:15
grateful 116:2
 246:2
gray 187:22
great 22:20
 65:23 162:5
 238:12 273:10
 274:25
greater 146:8
 222:3
greatest 86:5
 86:11
green 2:2
 13:10
gross 187:23
 188:7 237:11
 247:10 251:24
 252:7 256:19
grossly 187:19
 187:21 188:6
ground 74:25
 191:11,11

grounded
 123:7 128:24
grounds
 128:21 208:25
group 1:16
 12:2,9,16
 137:8 172:17
 185:18 225:18
 226:9 227:13
 227:15 229:20
 231:15,22
 232:12 233:4
 234:3
groups 159:7
 227:23
grow 175:18
guarantee 63:8
 71:24 144:18
 154:3 157:24
 229:22 232:2,6
guaranteed
 139:23 249:25
guess 25:13
 40:23 50:14
 52:3 140:11
 155:25 192:10
 207:24 223:10
 234:17 239:11
 254:23 262:16
 263:8
guidance
 238:22
guts 28:23

h

h 195:14 215:6
hacking
 113:20

hage 7:6
hague 231:1
 238:7,8,22
 239:7,21
 240:10,24
 241:6,22 242:4
 242:15,16
 243:2 244:2,4
 244:8,20
 245:10 256:2
 256:12
hague's 239:1
 245:6
half 126:9
 168:9,10
 235:19 255:8
hammer
 240:17
hand 19:17
 50:13 55:3
 171:15,17
 183:10,10
 205:4 268:22
handful 78:23
 92:24 177:4
 222:7
handle 231:25
 236:2
handled
 276:24
handling 63:25
hands 76:24
 145:24 204:22
 213:19
hang 199:6
 265:19

hanging 30:23
 32:3 33:22
hanshe 185:25
happen 28:2
 69:15 71:5,24
 94:22 127:23
 131:10,12
 145:19 152:2
 245:24 250:11
happened
 175:4 230:21
 254:4,5 255:10
 264:6
happening
 50:7 161:3
 215:5
happens 23:14
 58:21,22 59:2
 59:9 150:3
 266:9
happy 35:4
 121:24 132:13
 133:12 134:7
 160:17 185:10
 193:3 214:10
 222:7 236:11
 267:21
hard 38:1
 73:19 74:5
 95:2 155:19
 158:25 179:19
 256:5
harm 91:10
 251:16
harmful 112:7
harwood 13:19

hastings
  271:22
hawaii  118:24
head  158:7
heads  30:24
  32:3 33:23
headshakes
  267:6
health  246:10
hear  35:11
  60:19 77:6
  86:18 93:11
  110:7 114:23
  173:10 190:22
  193:9 196:7
  234:20 258:12
  258:17 260:10
  268:14 272:11
  273:17
heard  35:17,21
  37:15 41:1
  49:1,2,13
  60:23 74:2
  77:8 78:19
  85:13 88:14,18
  92:5,24 98:3
  123:8 133:23
  152:20 161:20
  167:7 168:22
  168:24 171:10
  208:22,25
  209:10 210:21
  225:20 236:19
  238:25 244:19
  252:10 261:4
  270:17 275:17
  277:17 278:14

hearing  3:1,5,8
  3:11,13,17,20
  3:25 17:9
  33:18 39:17,21
  61:5 62:14
  64:10 69:22
  73:8 74:3
  75:24 76:5
  92:6 113:9
  118:1,24
  145:20 200:5
  226:23 227:22
  228:2 232:25
  234:3 249:18
  254:3 269:16
  270:16 271:22
  272:3 277:12
  277:13
hearings  140:9
hearsay  51:16
  61:20 65:17
  101:7 102:20
  254:2
heart  199:8
  239:19
heaven  198:8
heaven's
  155:17
held  17:13
  45:21 57:16,22
  76:20 88:18
  92:21 105:9,10
  106:5,8,12,18
  106:21,24,25
  126:4 143:8
  149:7 158:11
  161:16

help  80:21
  136:14 241:19
helpful  28:17
  201:17
hendershott
  3:8 15:16
  86:14,15,16,19
  92:1,2 93:9
  94:1 237:3,4,5
  237:6,16 238:4
  246:23 247:13
  248:7 249:12
  249:16,21
  250:9,14,20
  251:1,5,11
  252:15 253:9,9
  253:18,21,24
  254:10 255:20
  255:22 256:22
  256:25 257:24
  258:13,19
hendershott's
  239:5
herndershott
  238:4 246:25
  257:21
herring  5:24
hesitate  201:20
heuer  7:1
hey  44:14
  169:22
hi  168:25
  240:20
hidden  98:14
  98:15
high  96:22
  147:3 154:2

155:8 238:18
  243:17,18
higher  139:1
highest  60:13
highlight  270:3
highlighted
  54:19 96:17
  99:8 170:22
  171:2
highlighting
  29:18 96:13,18
highly  62:19
  68:7 70:4
highway  10:12
hindsight  30:8
  33:1 212:9
hints  66:1
hire  231:15
hired  61:14
  63:14 240:7
hiring  239:10
historical
  184:22
historically
  155:7
history  76:9
  83:5 272:15
hit  250:1
hits  109:3
hoc  1:16 12:2,9
  12:16 225:18
  226:9 227:13
  227:15,23
  229:20 231:15
  231:22 232:12
  233:3 234:3

**hoisted** 163:21

**hold** 3:13 25:8
32:17 82:7,8
149:1 150:16
150:24 154:14
233:6

**holdco** 228:20
235:20

**holder** 120:6
122:11,16
127:3 154:9
167:9 175:24
250:25

**holders** 1:17
12:2,9,16 57:8
57:12 117:4,6
118:16 120:3
120:11 123:6
126:14,23,24
130:4 132:4,15
134:3 135:4
140:11,17
141:19 142:21
147:10 148:10
150:5 151:21
152:23 157:9
162:16 163:13
182:16 190:16
225:19 226:11
226:11,16
227:18 229:5
229:13 230:1

**holding** 84:17
123:12 128:20
149:8 159:13
259:10 274:8

**holdings** 1:6,10
1:20 7:16 11:9
11:18 13:18
14:3 157:23

**holds** 55:12
56:4 66:19,20
141:21 148:12

**homework**
77:16 278:16

**hon** 2:9

**honest** 42:16
164:13

**honestly** 98:6
263:14

**honor** 17:4,8
17:14,16,21,24
18:4,7,16,19
19:12,18,25
20:8,10,13
21:8,13 22:11
23:12,18,22
24:6,13,14
25:1,18 26:1
26:11 27:17,18
27:19 28:9,14
28:25 29:10,12
29:20 30:25
31:10 32:13
34:11,13,15,16
34:18,19 35:3
35:10,21 38:7
39:24 43:12,15
43:24 44:4,10
45:2,17 46:3
46:11,18 47:7
48:2,11 50:6,7
50:15 52:4,16

52:20 53:10,17
53:19,24 54:7
54:14,18 55:13
55:25 56:2,22
58:6,10,12,20
58:25 59:12,21
59:23 60:3,15
61:1,3,6,18,18
62:10,20 64:8
64:13,24 66:13
68:5,16 69:22
70:24 71:11
73:1,4 74:4,17
75:1,4,11,16
75:22 76:3,6
76:13 77:9
78:4,9,12,13
79:4,8,18
80:21 82:18,20
83:4,5,15 84:5
84:13,16,22
85:5,8,12,13
85:16 86:4,7
86:13,14,20
88:7 92:11,21
94:11,14 95:12
96:15 97:16,22
98:6,11,20,23
99:11 100:12
101:11,19
102:1,7,23
103:2,5,9
104:2,15,17
106:1,14,19
107:13 108:3
108:20 109:4
109:17,20

110:3,6,8,14
111:20 112:20
113:3,4 115:1
115:3,19 116:3
116:7,10,12,15
117:3,10,19
118:13,21
119:12 120:2,7
121:2,20 122:5
122:22 123:2
124:16 125:15
126:13,19
127:1,7,25
128:18 129:2,8
129:12,23
131:4,7 132:1
132:6,9 133:11
133:21,25
134:8,11
135:11,24
136:13,16,22
138:16,17
139:4,10,20
140:22 141:10
141:20 142:8
144:4,5,20
145:15 146:12
146:15 148:21
149:6,21 151:2
151:13,20
152:8 153:22
154:5,18 156:5
156:24 158:17
158:19 159:12
159:19 160:21
161:3,23 162:7
162:16,22

163:10 166:20
167:13 168:25
169:2 173:15
173:18 174:6
176:14,20
178:3 179:14
180:1 181:6,22
182:2 186:5,12
187:4 191:1,3
191:8,10,17,19
191:20,23
192:4,10,22
193:1,6,10,11
193:19 194:2
194:10,11,22
195:8 196:10
196:13,18
197:10,11,15
198:3,16 199:3
199:4,10
200:12 201:6
201:16,18
202:3,7,11,22
202:25 203:16
203:20 206:14
207:1,11,17,23
207:25 208:4
208:21,24
209:14,20
210:2,3,7,9,24
211:5,9 212:7
212:18 213:4
213:11,21
214:2,8,13,16
214:19,24
215:13,21
216:8,13,17,24

217:13,15,17
218:13,25
219:10,24
220:7,11,24
221:8,15,24
222:14,22
223:15,19
224:7,20 225:1
225:12,15
226:1 231:19
232:17,19
234:2,18 235:3
235:9 236:4,13
236:16 237:2,3
237:15 238:4
238:15 239:2,4
239:13,23
240:1,17,19,20
240:23 241:18
241:21,22
242:8 243:12
243:22 244:6
244:13 245:3,7
245:14,19
246:1,3,13
249:22 251:12
251:18 252:5
252:11 253:19
255:18,22
256:11,17
257:3 258:20
258:25 259:2,5
259:23 260:2
260:19,24
261:8 262:15
262:22 263:5
264:18 267:13

268:10,16,20
270:8,9,11
271:9,15,21
272:3,8,10
273:2 275:14
276:2 277:20
278:12 279:7,9
279:19
**honor's** 35:5
40:12 42:1
47:8 50:1,3
125:24 195:4
199:15 243:3
246:5,21
**honoring** 27:1
**hope** 17:6
33:17 80:24
118:13,21
126:4 133:19
135:21 147:5
186:14 208:2
241:18,19
242:1 260:14
260:25 277:11
**hoped** 227:21
**hopeful** 117:19
118:14 140:7
147:2 154:24
**hopefully**
17:20 157:23
199:16 236:11
**hopeless**
151:18 153:15
**hopes** 133:5
**hoping** 91:17
247:1

**host** 245:20,21
**hot** 163:22
**hour** 258:21
**hours** 57:11
**huh** 124:8
230:14
**humanly** 173:4
**hundred** 55:9
58:16 90:15
205:19
**hundreds**
250:2
**hurdles** 188:12
**hurricane**
248:21
**hurry** 206:13
**husband** 261:6
**hypothecate**
56:10 58:1,1
66:22 88:22

**i**

**idea** 32:9 45:24
72:2,6 96:19
123:12 126:6
143:22 195:15
212:8 252:24
276:13
**ideally** 223:1
**identifiable**
56:21 99:18,23
105:7
**identification**
243:4
**identified**
41:14 118:5,6
184:13

identifies
   243:2
identify   222:13
   223:8
identifying
   113:19
identities
   223:21
identity   113:19
ignore   127:22
il   11:20
illegal   25:5
   28:2 30:14
   34:9 36:22
   37:6 38:12
   114:9 205:9
imagine   33:6
   262:7
immediate
   125:3
immediately
   21:22 109:2
   110:17,20
   113:17 143:5
   145:24
immunize   31:4
immunizes
   35:22
impact   73:24
   91:5 150:8
   222:4
impacted
   62:17 70:2
   139:6 147:6
impacting   22:1
   141:18

impair   212:16
impaired
   182:10
impede   71:6
   237:23
impermissible
   122:3
impermissibly
   221:9
implement
   25:16 26:11
   205:15 213:16
implementati...
   218:9 269:17
implementing
   27:23 35:25
   193:13 204:13
implies   180:25
importance
   179:10
important
   19:18 79:15
   86:23 88:18
   89:2 96:8
   113:18 134:9
   134:11 144:6
   154:10 161:7
   164:17 240:2
   241:23 277:15
importantly
   55:13 235:16
   243:3 270:2
impose   32:7
imposed
   163:12
impossible
   141:9 150:25

153:18
impression
   50:6 252:5
improper
   195:23 204:1
   212:17 272:19
impropriety
   177:7
improvements
   137:21
inactions   139:6
inadequate
   74:15 96:12,25
   99:10
inadvertently
   111:13
inappropriate
   153:12
incapable
   175:3
inclined   20:10
include   53:5
   56:25 68:17
   164:7 237:7
   247:15
included   34:25
   41:17,21 59:17
   60:9 82:22
   154:23 162:14
   163:11 203:18
   221:10 228:11
   273:18
includes   41:8
   87:7 88:16
   184:6 212:24
   257:8

including
   19:21 35:23
   43:19 45:4
   47:17 56:14
   83:21 117:25
   157:15 182:14
   202:13 203:14
   211:25 220:14
   227:23 228:12
   232:1 242:15
   244:12 259:11
   272:15
inclusion
   214:20,23
income   36:2
incompetence
   237:11 247:10
   251:23 252:7
   256:19 258:14
inconsistent
   200:16 202:21
   249:17,19
incorporate
   77:14
incorporates
   265:20
increase
   238:17
increased
   144:14
incremental
   87:2
incur   36:2
   38:14
incurring
   188:13

**incurs** 204:11
**indemnificat...**
184:17 185:5
187:13
**indemnified**
185:2
**indemnity**
185:1 189:9
**independent**
56:19 63:1
65:13 68:1
73:25 83:22
85:2 107:8,25
108:1 173:1
183:23 222:18
223:2,6 225:22
227:8,14,16
228:12,18
229:7,8 230:6
230:24 231:10
231:13,16,21
233:5,6,17,21
236:1,5 239:17
241:5,16
**indicated** 30:2
**indicating**
90:20 151:19
**indication**
40:21
**indications**
188:9
**indirect** 212:2
212:7,12,13
**indirectly**
212:11
**indiscernible**
29:16,19,21

31:17 32:14
45:2,6 47:9
79:9,14,21
80:7 105:19
108:25 115:7
115:15 132:20
133:9 139:7,8
139:16,19,20
140:14 141:17
142:6 144:7,12
144:17 145:9
145:11 147:4,9
148:17 149:22
150:4 151:10
156:17 160:6
167:23,25
168:4,7,17
170:7 175:7
188:17 193:3
194:10 195:17
196:18 197:13
197:16 198:4,5
199:16 202:17
203:8,19
206:16,17
208:7,9,9,14
210:20 212:12
212:13,21
214:4 215:8
216:3 220:10
220:18 221:2,3
221:19 226:8
228:25 229:6
229:21,22
232:10,18
234:17,20
237:19 238:16

238:20,23
239:5,8,23
240:5,8,8,10
240:13,14,14
240:16 241:13
242:21 246:2
246:20 247:1,4
247:6 248:11
248:18,20
249:12 250:9
250:17,18,20
251:2,18
252:20 256:1
256:16 257:10
264:22 265:11
273:16,20,25
275:25
**indiscriminat...**
160:2
**indisputably**
173:3
**individual**
29:22 71:12
96:8 107:17
141:12 238:19
247:22 253:5
276:23
**individual's**
169:6 183:18
**individually**
112:21 205:25
277:7
**individuals**
27:5 37:5 38:4
107:21 152:3
176:1 177:5
178:2 182:21

184:1,25 185:7
185:14 186:6,7
186:17,22
187:12 188:12
189:17 194:19
205:6,14 206:5
206:15 217:23
218:6,10
219:20 220:13
221:5 266:23
**induced** 253:6
**industry** 55:6
56:18 60:7
**infancy** 168:8
**infinity** 139:16
**inflexible**
115:12
**influence** 71:6
**information**
19:1,15,17
20:25 21:1,5
22:19 48:13,14
48:16 56:16,21
65:13,15 66:15
73:18,18 77:4
77:24 83:7,23
83:25 84:2,23
87:5 92:21
93:15 94:19,21
95:4,6,8,9,11
99:5,18,21,23
100:2,5,15,21
100:25 101:10
102:11,20
103:8,16 104:7
105:7,8,20
106:5,12,22

107:24 108:5
108:18 110:18
110:24 111:12
113:6,12,19,25
114:4,7,8,21
117:17 136:17
148:23 171:12
171:21 181:12
272:18,24

**informative**
76:9

**informed**
68:23 78:2

**infrastructure**
56:13 119:15

**initial** 44:11
98:4 119:10
158:6 199:25
248:24

**initially** 87:13

**initiate** 89:21
137:13

**injunction**
24:24 25:1,12
28:25 58:23
207:10

**injunctions**
25:3 171:5

**injunctive** 3:21
24:22 206:20

**injured** 276:15
276:16

**injurious**
257:11

**insecurity**
112:7

**insider** 185:24
275:1,4

**insiders** 172:12
172:15,21,22
174:12,12,14
176:12,25
190:19 217:21
217:22 218:2
218:23 219:4
219:17 272:15

**insinuates**
210:19

**insofar** 52:8

**insolvency**
177:13

**instance**
123:15 210:17
247:17

**institution**
57:23

**instruments**
215:19

**insult** 257:6

**insurance**
183:14 184:9
185:8 218:24
224:23 225:2,4

**insured** 57:23

**insurmounta...**
234:25

**intend** 232:13

**intended** 42:5
77:16 94:2
213:15 238:6
263:1,2,2

**intends** 147:3

**intent** 94:2,4
247:6 254:5,8
254:17,25
255:16 257:7
257:13,18
258:3,5,11
262:23

**intention**
142:16 193:14

**intentional**
111:12

**intentionally**
249:10

**intercompany**
73:23 74:10
98:24 222:19
223:8 226:13
226:18,21
227:1,3,8,10
227:18,21,24
228:3,21,24
230:5 232:1,5
233:4,23
234:16 236:7

**interest** 1:16
12:2,9,16
20:12 57:13
75:3 86:5
151:19 162:16
187:25 222:6
225:18 226:16
227:18 229:5,5
229:13,25
230:2 231:11
240:16 241:9
256:14 269:14
276:22

**interested**
151:14,21
152:3

**interests** 54:13
60:5 86:12
165:4 213:18
236:3,3 239:14
239:19 244:17

**interfere** 71:23
71:24

**interject** 78:4

**intermediate**
147:21

**internet**
262:25

**interpretation**
25:13 248:8

**interpretations**
169:25

**interrupt**
230:9,11,13

**interrupting**
173:19

**interviewed**
88:12 186:7,8
186:8 189:7
242:14

**intimately**
237:20

**intimidate**
91:16

**invent** 38:22

**invest** 58:1
93:4

**invested** 72:11

**investigate**
167:23 168:1

227:9

**investigated**
90:20 180:14
183:24 219:6
273:14 274:21

**investigating**
242:1

**investigation**
167:20 179:24
180:5 181:2
183:9 184:19
190:21 194:25
195:5 218:16
219:2 269:6
273:15

**investigations**
62:17 68:19
70:3 73:23

**investigative**
274:18

**investigator**
65:12

**investing**
261:23

**investment**
261:11

**investments**
188:3,4

**investor**
169:14

**investors** 91:8
91:10

**invite** 112:16

**invited** 76:12

**inviting** 115:6

**invoke** 44:3
237:8

**invoking** 62:5

**involve** 45:10
257:9

**involved** 25:7
32:22 34:6
40:8 47:19
70:11,15
127:21 192:6

**involvement**
104:12

**involves** 76:19

**irs** 36:5 204:12
251:1 253:10
257:1,2 261:9

**issue** 18:8,18
21:23 30:3
32:1,2 33:11
35:4 36:13
37:15 40:20
44:1 48:18
49:14,20 50:25
52:13 54:1,1
64:23 66:25
67:2 68:3
93:12 98:5,12
99:12,13 103:9
114:17,20
132:8 133:17
163:22,22
183:6 193:25
194:3,21
195:19 199:4,5
199:7 200:9
202:12 206:22
213:13 214:16
217:20 225:21
227:19 232:1

232:16 234:21
236:12 237:14
246:20 259:17
265:3,7 266:4
268:15 279:15

**issued** 25:23
39:13 42:5,7
44:23 142:15

**issuer** 40:22,25
40:25 41:1,5,8
41:10,14,20
42:13,18,19,25
50:24 52:8

**issues** 18:3
19:6 20:17
34:20,22,24
43:24 53:4,20
54:4 62:18,19
66:13 67:16,23
68:22 70:4
71:14,16 85:8
88:13 93:9
99:4 103:22
104:18 106:4
111:5 112:10
112:17 115:14
170:5 173:22
191:22 196:5
205:10 216:9
222:19 227:21
227:24 230:17
233:23,23
236:2,7,8
259:4,11 270:6
271:12 272:9

**it'll** 179:17

**item** 146:5
153:13 280:7

**items** 155:22

**iterations**
192:17 226:25

**i'm** 164:13

**j**

**j.b.** 35:13

**j.d.** 199:19
203:20

**jaffe** 7:1

**jamie** 4:1

**january** 70:8
73:8 81:17
91:2 96:3 98:5
98:10 171:9
248:23

**japan** 107:1

**jason** 7:2 15:13
16:3 122:5
256:12

**jay** 89:23

**jean** 5:17

**jeff** 7:21

**jeffrey** 11:6

**jennifer** 15:6
15:18 119:21

**jensen** 186:3

**jersey** 10:19
11:2 122:11
127:3

**job** 63:6 65:5
83:12,13 167:5
213:10 240:12
241:11 276:10
276:22 277:5,6

**john** 15:13
121:20 122:5,6
123:2 124:8,12
124:16,19
125:3,15,21
126:12,19
127:1,7,15,19
127:25 128:7
128:10,18
129:2,8,23
130:10 131:4
131:19 132:1,6
**johnson** 6:6
**join** 137:8
**joinder** 3:14
**joins** 19:8,11
21:10
**jon** 15:23
272:11
**jones** 15:22,25
208:4,4,6,13
208:20 271:23
**joseph** 14:14
86:20 115:3
136:20
**jr** 8:22
**judge** 2:10
65:11 115:25
119:21 164:3
174:10 248:11
265:8 272:23
**judgment**
60:12 63:8,9,9
63:10,11 64:6
66:10 67:24
72:20 102:8,14
104:5,6,10

108:12 160:22
177:23 180:23
180:25 181:1
183:22 187:9
187:10 188:12
188:15 241:1
267:25 273:10
**judicata** 32:18
**judicial** 65:14
**july** 156:13
**june** 156:12
**jurisdiction**
99:17 103:24
120:12 121:12
127:4
**jurisdiction's**
120:13
**jurisdictions**
17:22 56:12
75:19 116:17
116:24 117:2,6
118:17 120:8
120:10,14,22
122:13,17
125:6 132:15
**jury** 248:11
**justice** 29:7
92:16,18 93:3
251:22
**justifiably**
263:2
**justification**
128:5 173:10
217:21

**k**

**k** 215:15
**karen** 8:7
**katherine** 6:6
9:21
**katten** 5:3
227:15,15
231:24
**katz** 5:19
**keen** 187:25
**keep** 21:20
44:19 79:24
113:4,16
114:13 208:13
225:1,6
**keeping** 179:11
220:16
**kelly** 12:20
225:17
**kemble** 10:20
**kept** 188:3
**kerp** 92:19
**kilpatrick** 12:1
12:8,15 225:17
**kind** 25:6
32:12 33:22
38:15 54:1
58:20 59:11
63:1,21 66:8
72:5,13 77:13
105:17 116:19
116:22 120:16
121:4,6,9
122:15 123:3
123:21 125:19
128:16,21,23
130:23,25

131:6,9 133:16
134:23 136:6
138:4,4 140:13
140:20 141:13
143:6 147:10
149:15 153:15
153:17 154:16
156:3 170:14
170:18 172:25
180:4,11 182:5
206:21 224:2
247:18 250:24
254:2 257:16
257:20 258:9
258:10 268:24
273:23 274:2,4
274:13,17
275:24,25
278:25
**kinds** 31:1
38:24 127:23
171:12,12
189:20 215:17
247:21 253:7
261:25
**kirkland** 11:8
11:17 53:18
116:11 268:17
**kirpalani** 9:22
174:6,7 176:14
176:20 177:23
178:2,19,25
179:9 180:1,6
181:5,8,22,24
182:2 184:4,14
185:20 186:12
189:12,22

**[kirpalani - language]** Page 48

190:24 194:22
217:17,19,19
218:13 219:10
220:9,11,23
271:19
**kleinbart** 4:2
**knew** 38:5
43:17 177:8
**knock** 235:13
235:14
**know** 22:1 24:6
25:16,18,21
29:14,15,17,19
30:1,12,18,19
30:20 31:6,17
31:20 32:5,8
33:21 34:5,8
35:3,25 37:18
38:25 40:20
42:6,9,17,23
44:8,9 45:25
47:1,12 49:6
51:25 52:21
55:15 62:22
64:3 65:5,11
66:3,5,8 67:10
67:20,24 68:11
68:20 69:12,20
69:22,23 70:17
71:1,5,8,18,25
72:15 73:13
74:13,23,25
78:10 80:2
82:12,13 86:24
90:16 92:11,13
92:14,15 95:23
97:14 98:3

99:3,7 101:20
105:9,15,16
107:2,3,7
110:25 111:7
111:10,12,13
113:14,16,18
113:25 114:7
115:24 121:21
122:11,14,21
122:22 123:4,8
123:9,13,14
124:1,2 125:22
126:5,7,8,13
126:20 127:5,8
127:10,10,12
127:21 128:8
128:19,20,20
129:9,10,12,12
129:15 131:4,5
131:6,10,11,13
141:11 142:23
144:21,23
149:10,15,21
149:22,22
150:16 152:10
152:16 153:9
153:17 154:11
155:3,4,5,15
156:9 157:12
157:14 158:5
158:22 159:6
160:18 164:12
165:19 166:14
166:16 167:9
167:24 169:19
170:6,8,9
171:14 172:7

172:14 176:25
179:17,21
181:10,12,14
192:16,18
193:11,12,15
196:14,16,19
198:13 202:4
202:21 203:9
203:17 204:24
206:19,21
207:22 208:2
209:7 211:14
212:12 216:10
219:19 222:10
223:9 224:14
230:17 238:6,9
238:10,11,15
238:16,18,20
238:23 239:13
239:14 240:3
241:8,13,14,15
242:10 244:25
245:13 246:13
247:4 248:8,10
248:12,14,15
248:18 249:25
250:2,3,4,19
250:22 251:18
251:19 252:21
253:7 254:2,10
254:11,24,25
255:5,24 256:3
256:8 257:17
258:1 261:19
263:6,8,12,25
264:1,13
266:17 267:12

268:2 269:4
271:24 274:4
274:14,15,24
275:1,6,19
276:25 277:5
**knowing**
238:20
**knowledge**
263:1
**known** 69:24
70:10,22
**knows** 38:21
42:2 120:23
129:12 144:21
204:21 243:22
**kraken** 91:4
**kramer** 186:3
**kyc** 19:16

**l**

**l** 280:6
**labeled** 252:24
**lack** 61:7 77:12
96:18,18 100:2
159:20 256:2
256:14
**ladies** 239:24
**laid** 94:20
**language** 17:11
17:17 18:1
25:15 26:6
28:4,4,11,16
28:16,18 29:2
29:5,13,24
31:5,17 32:13
33:24 34:11
35:16 37:16
40:14,16,18

| | | | |
|---|---|---|---|
| 41:17,21,22 | 111:20 115:19 | 191:25 | **level** 20:4 |
| 193:17 195:4 | 213:11 | **leaving** 39:21 | 112:11 185:4 |
| 196:25 197:12 | **laughter** 129:5 | **led** 100:11 | 250:15 254:16 |
| 198:20,25 | 131:23 138:15 | 239:15 276:1 | **lex** 257:8 |
| 201:12,18,19 | 162:6 | **ledger** 56:8 | **lexington** |
| 202:17,18 | **laundering** | **leeway** 247:3,7 | 11:10 |
| 203:1,7,15,22 | 114:8 | 277:14 | **liabilities** |
| 204:10,21 | **law** 20:18 33:9 | **left** 24:16 | 33:14 35:24 |
| 207:11,15,16 | 51:9 123:9 | 159:10,10 | 206:7 213:23 |
| 207:20 208:1 | 125:24 126:1 | **legal** 20:18 | 214:1 267:18 |
| 209:2,25 | 165:24 202:22 | 33:4 37:20 | **liability** 34:1,5 |
| 210:14 211:16 | 209:7 240:5 | 44:5 62:19 | 37:21 38:14,15 |
| 212:7,7,12,15 | 247:12,15,18 | 70:4 90:1 | 165:12 166:14 |
| 213:15 215:24 | 254:12,13 | 108:9 159:20 | 174:23 175:6 |
| 216:2,6 219:5 | 257:6,8,21,24 | 169:10 206:16 | 176:21 185:16 |
| 219:8 224:17 | 275:3 | 256:3,13 257:9 | 187:10 195:13 |
| 225:7,9 | **lawrence** 14:22 | 258:4 264:25 | 203:14 204:12 |
| **lantham** | 16:2 | 281:22 | 207:23 213:23 |
| 260:18 | **laws** 27:21 | **legally** 23:21 | 214:5 218:12 |
| **lapin** 271:23 | 30:9 31:8,11 | **lend** 56:10 58:1 | **liable** 3:14 25:9 |
| **large** 80:18 | 32:7 39:6,25 | 66:22 88:22 | 28:7 39:18 |
| 140:22 150:8,9 | 41:4 121:11 | **lending** 55:14 | 198:12 205:15 |
| 154:8,11 | 205:17,25 | **lengths** 82:3 | 210:8 213:22 |
| **larger** 155:5 | 208:9,18 | **lengthy** 93:16 | **license** 100:4 |
| **largest** 149:8 | 254:11 | 115:16 | 113:12 |
| 154:9 | **lawsuits** 89:20 | **lesson's** 264:17 | **licensed** 99:22 |
| **lasalle** 11:19 | **lawyer** 260:7 | **lessons** 264:18 | 100:14 101:2 |
| **lastly** 270:2 | **lawyers** 257:18 | **letter** 51:8,12 | 130:21 |
| **late** 49:15 | **laziness** 120:23 | 51:16 100:13 | **licenses** 56:12 |
| 217:10 226:17 | **leading** 56:18 | 200:8,8 224:10 | 119:8 120:25 |
| 249:7 263:8 | 274:23 | 224:21 248:24 | 122:2 |
| 267:11 | **learned** 84:22 | 248:25 | **licensing** |
| **latest** 127:2 | 264:17 | **letters** 88:25 | 128:19 129:3 |
| 203:23 | **learning** | 215:19 249:2 | 129:10,18,19 |
| **latham** 10:1 | 275:21 | 253:16 | **licensure** 123:4 |
| 18:16 85:14 | **leave** 32:3,24 | **letting** 49:13 | 123:10 126:4 |
| 103:5 106:1 | 45:25 114:14 | | 130:3,6 |

lie 38:24
lied 261:20
life 72:12
  264:18
lifetime 250:5
light 24:18
  131:1 212:25
  274:25
likelihood
  154:2 155:19
  190:10
likelihoods
  155:13
likely 41:19
  59:15 65:6,8
  118:25 129:12
  143:23 154:1
  254:13
likewise 101:4
limit 63:6
  191:9 193:10
  195:12
limitation
  57:18
limited 32:2
  35:14 38:2
  76:24 111:25
  130:5,5 167:21
  215:22 225:19
  226:7 233:22
  247:5 250:1
  273:15 274:18
limits 130:1
  189:2
linda 13:6
line 83:2
  148:16 171:11

191:18 199:18
lines 83:2
lipton 5:19
liquid 186:16
liquidate
  140:12 141:22
  145:19 151:9
liquidated
  109:12 141:12
  145:23,25
liquidating
  58:19 62:11
  142:18 147:8
  213:4
liquidation
  54:11 58:17
  59:1 60:9,17
  64:16,17 65:7
  68:22 71:1
  97:6 102:1
  161:24 221:4
  221:24 222:1,4
lisa 15:21 16:1
  79:11 94:9
  98:9 164:5
  252:13 255:18
  255:20 260:4
  261:5
list 28:12 99:20
  194:12,16
  215:19 241:12
listed 118:9
  135:19 176:12
  195:21 214:20
  215:3 219:20
  226:20

listen 40:2
listening 110:4
listing 135:17
  135:18 176:11
literally 114:15
  139:12 169:11
  169:20 170:15
  180:9 256:6
litigated
  185:13 258:4
litigation 3:22
  33:4 36:20
  74:9 98:24
  187:17 264:10
  264:10
little 29:4 66:8
  76:11 77:4
  85:23 86:1
  101:10 119:5
  120:21 132:25
  134:5 137:5
  148:8 201:7
  203:8 210:12
  226:24 263:8
  269:2 274:5,9
live 77:25
  179:12 214:11
lived 188:17
llc 9:17 11:9,18
  174:9
llc's 218:25
  219:13,14,15
  219:16,16,18
llp 5:3 7:8,15
  8:16 9:16 10:1
  10:10,18 11:1
  11:8,17 12:1,8

12:15
loan 175:11
  184:21 189:23
  229:21 233:25
  274:11 276:9
loans 181:13
  183:5 187:8,16
  218:16,17,19
  219:10,12,13
  273:19
located 75:18
  117:16 118:2
locked 144:7
  145:9 159:2
long 45:22 49:2
  52:22 72:2,6
  89:24 96:6
  129:1,4,7
  130:21,22
  133:13 180:23
  180:24 195:8
  216:3,11
  249:24 260:20
longer 60:13
  89:7 154:17
  236:20
look 23:1 26:20
  30:5 32:15
  47:11 59:4
  62:7 71:22
  91:1 95:19
  100:13 115:13
  117:10 175:8
  175:11,12,13
  176:4,21 177:1
  177:2 181:5,10
  181:12 184:23

186:1 187:2
188:16 190:1
209:19 213:8
220:21 224:23
225:6 241:12
262:6 271:12
**looked** 28:12
66:14 67:25
74:5 172:12
173:1 176:7
180:7 185:18
188:25 189:19
189:22 193:16
261:9,17
262:25 265:12
**looking** 34:12
85:18 132:23
238:15 240:16
278:23
**looks** 108:22
**lori** 271:22
**lose** 200:25
**losing** 243:13
**loss** 250:4
256:16 262:3
**losses** 188:8
252:25 253:1
261:13 263:13
**lost** 144:19
242:18 248:21
259:8 278:23
**lot** 33:16 59:17
61:6 76:10
77:23 83:1,15
83:18 84:16
88:6 105:17
115:14 141:11

142:1 163:18
169:16,16
170:2,13
191:11,20
239:7 242:2
243:19 247:3
253:16 265:12
267:5 275:6,11
277:14 278:16
**lots** 95:15
**love** 132:18
**low** 96:21
144:1 153:8
159:4
**lower** 222:5
274:7
**lucero** 16:4
**lunch** 115:11
116:4
**lunchtime**
115:10
**lunn** 8:21

---
**m**
---

**m** 8:3
**made** 17:8
18:11 24:19
43:4 54:19
56:3 57:14
61:16 63:10,11
67:3 69:14
85:16 87:6
88:2 92:4
98:19,22
103:15 110:16
111:2,4 116:3
116:23 133:14
151:15 158:9

158:11 167:4
170:10 173:8
175:12,13,14
176:5 179:5
180:25 181:1
182:15,16,16
189:14,18
217:10 221:25
229:3 231:8
240:11 242:23
243:4 248:15
248:16,17
252:1 275:5
**madison** 5:5
9:18
**magnitude**
184:22
**mail** 81:8,10
175:25 228:23
**mailed** 81:3
**mails** 182:17
**main** 15:3
**maintained**
75:18
**maintains** 55:9
56:16
**majority** 20:12
55:21 78:11
107:14 144:6
**make** 17:10,17
19:24 27:21
31:7,22 33:5
43:9,23 48:16
49:3,4,16 50:2
52:10 53:25
57:6 65:23
66:1 69:17

71:2 72:16,25
73:6 78:2,16
83:11 84:21
85:1,4 93:8
95:16 102:4,13
103:21,22
111:3,11,22
112:20 114:5,6
115:7 119:10
120:22 121:4
123:23 124:20
124:21 125:1
126:25 127:22
129:19 131:3
138:22 142:16
145:11 147:16
150:19,21
151:9 158:7
160:21 165:21
171:20 173:3
177:18 180:4
180:20,24
183:5 189:4,5
189:10 191:24
194:17 203:16
204:11 206:4
206:25 207:3
207:17,22
209:19 224:18
234:22 236:6
236:11,20
237:13 245:21
245:23 248:2
249:20 255:6
255:13,22
266:25 272:17
273:7 275:15

| | | | |
|---|---|---|---|
| 276:9 278:17 | **mark** 115:16 | 158:7 | **mcelroy** 10:18 |
| 278:21,22 | 226:21 258:21 | **mathematical** | 11:1 |
| **maker** 89:5 | **market** 19:14 | 153:19 | **mean** 20:21 |
| **makes** 17:19 | 45:10 89:5 | **matter** 1:4 | 23:21 28:21 |
| 37:4 39:18 | 99:21 112:7 | 32:18 34:7 | 30:22 31:5 |
| 53:23 63:4 | 113:10 141:23 | 35:1 40:15 | 32:15 38:12 |
| 71:21 111:24 | 144:8 145:11 | 47:16 63:5 | 41:25 48:12 |
| 132:16 181:19 | 146:3,4 147:12 | 64:5 65:14 | 51:10 63:20 |
| 198:21 250:23 | 148:12,24 | 75:11 76:23 | 65:9,19 67:5 |
| **making** 30:13 | 155:12,16 | 87:23 89:19 | 69:8,9 87:15 |
| 51:6,23 56:15 | 156:25 159:3 | 125:11 141:2 | 90:12 120:17 |
| 62:12 65:24 | 160:8,9,13,13 | 141:20 152:21 | 124:4,6 128:14 |
| 70:21 112:24 | 161:12,16 | 162:9 178:5 | 129:6 143:23 |
| 120:13 126:12 | 177:8,9 182:15 | 181:9 192:22 | 144:11,11 |
| 133:15 137:21 | **market's** | 193:20 215:12 | 146:16,18 |
| 141:5 143:19 | 155:12 | 234:7 239:16 | 152:15 158:4 |
| 150:25 153:18 | **marketed** | 247:16 265:17 | 164:10 170:5 |
| 187:8,16 | 137:11 | 268:10 275:11 | 180:10 189:12 |
| 258:13 278:24 | **marketing** | 281:6 | 205:16,17,19 |
| **man** 115:25 | 135:19 | **matters** 112:6 | 206:15 212:8 |
| **management** | **markets** 19:13 | 232:1,4,5 | 213:25 241:12 |
| 75:8 185:23 | **marshall** 15:20 | **matthew** 8:21 | 256:6,13 |
| 215:4 216:18 | 154:7 186:3 | **maximize** | 263:22 266:3 |
| 237:11 258:15 | **masquerading** | 178:13 229:11 | 266:19,20 |
| 273:11 274:16 | 67:2 | **maximizes** | 269:4 |
| **managers** | **match** 157:22 | 58:13 | **meaning** 80:7 |
| 185:4 | 225:10 | **maximizing** | 84:25 137:7 |
| **manipulate** | **material** | 60:6 | 178:14 |
| 145:10 160:12 | 142:23 215:6 | **maximum** | **meaningful** |
| **manipulated** | **materially** | 76:17 157:1,2 | 98:1 137:22 |
| 144:8 159:6 | 19:16 21:25 | 220:17 238:12 | 219:19 |
| 160:14 | 141:18 147:6 | 239:18 | **meaningfully** |
| **manner** 96:25 | 222:4 | **mcdermott** | 90:4 |
| 113:1 152:24 | **materials** | 13:16 14:1,9 | **meaningless** |
| 244:16 | 126:22 | 86:21 136:20 | 39:20 |
| **march** 2:5 | **math** 85:18,23 | 241:22 | **means** 55:11 |
| 177:14 281:8 | 85:25 86:4 | | 62:8 64:15 |

92:7 108:1
124:5 137:1
169:22,24
172:17 174:24
212:8 213:22
229:4 255:9
257:15 277:22
**meant**  28:1
34:10 109:21
109:24 156:9
174:15
**measuring**
149:10
**mechanisms**
77:7
**media**  159:7
169:22
**meet**  49:14
278:8
**meeting**  129:11
151:14
**meetings**  93:1
227:14
**member**  175:2
185:23 231:3
244:16
**members**
91:12 125:14
172:21 173:7
174:22 175:1,9
183:24 189:6
192:14 228:17
229:4,6
**memorandum**
123:9 125:25
**memorized**
33:25

**memory**  186:1
219:22
**men**  187:25
**mendell**  15:20
154:5,7,7
156:5,11,15,17
156:24 157:6
158:1,16,20
**mention**  44:13
81:6 101:5
104:25 179:15
275:2
**mentioned**
48:19 79:24
80:11,14 82:23
101:6 176:4
182:15,25
186:4,4 187:11
194:11 207:8
207:20 217:23
255:13 276:12
**mentioning**
202:15 268:7
**merely**  112:24
**merit**  89:4,5,7
244:7
**message**
169:21 175:23
175:24
**messages**
182:17
**messaging**
184:24
**met**  187:5
**metropolitan**
5:20

**mew**  1:6,12,19
3:20,25
**mi**  7:4
**michael**  2:9
11:22
**michelle**  3:5
9:14 273:3
**michigan**
240:5
**mid**  81:17
**middle**  208:8
**midnight**
259:19
**midst**  72:10
**mike**  17:6
24:14 148:21
**milani**  186:5
**milestone**  49:8
49:14,18,19
52:12 115:12
115:18,22
116:6 246:12
259:9 260:22
**military**  10:12
**million**  55:1,4
58:16 76:17,17
76:25 78:22
85:20,24 87:3
90:5 91:3,4,11
91:20 101:12
101:13,20
103:12 141:21
148:15,16,17
177:10 185:11
225:3 226:13
229:17,23
230:4 235:4,13

235:15,17,19
243:11
**millions**
183:14
**mind**  18:25
21:3,21 38:22
70:21 165:21
207:23 262:9
275:16
**minds**  31:23
72:16
**mineola**  281:24
**minimize**
56:24 186:21
**minimized**
55:7
**minimum**
156:20 157:8
157:10,11
**minneapolis**
9:12
**minor**  223:23
**minute**  86:16
165:2 228:8
**minutes**  52:17
174:2 234:5
259:6,24
**misconduct**
187:20,23
**misha**  186:5
**misleading**
139:10 167:24
**misled**  175:17
**mismanagem...**
247:10 251:24
252:7 256:19

| | | | |
|---|---|---|---|
| **misnomer** 258:9 | 182:4 219:3 252:17 268:8 | 73:1,4,5 74:17 74:20 75:1,11 | 92:17 245:17 246:23 249:1,4 |
| **missed** 215:16 266:8 | **moments** 34:19 **monday** 2:5 | 75:22 76:6 77:18,20,23 | 252:3,16 261:3 265:2,16 |
| **missing** 126:15 | **money** 23:25 | 79:4,8,13 80:3 | 267:25 273:4 |
| **misspoke** 94:1 | 59:10 114:7 | 80:12,21 81:23 | 273:24 274:22 |
| **misspoken** 109:22 | 145:11 155:16 155:22 169:24 | 82:4,18 83:4 83:15 84:4,8 | 275:24 **motions** 3:11 |
| **misstated** 130:8 | 261:20,22 262:18 264:6 | 84:11 85:12,15 92:3 93:16,22 | 73:9 171:9 268:19 270:6 |
| **misstatement** 276:16 | 274:1 **month** 27:19 | 94:5 98:11,11 98:20,23 99:2 | 278:17 **mount** 10:20 |
| **mistreating** 63:22 | 126:5 **months** 17:23 | 191:1,2,8 192:3,9,21,24 | **mountain** 253:21 |
| **misunderstand** 129:25 | 24:5 122:10,18 122:19,24 | 193:6,19,24 194:2,5,7,10 | **movants** 269:13 |
| **misundersta...** 163:18 | 123:4,13,21 125:4 127:2,15 | 194:15 195:11 195:17,19 | **move** 56:9 60:16 72:21,22 |
| **misunderstood** 130:11 | 128:25 130:18 132:14 151:3 | 197:1,3,10,10 197:23 198:3 | 105:3 109:7,15 109:22 116:12 |
| **misusing** 63:22 | 227:6 246:6 251:19,25 | 198:16 199:2 201:16 202:3 | 133:4 145:10 148:23 161:23 |
| **mitigate** 267:18 | **montpelier** 15:4 | 214:13,13,16 215:3 216:8,13 | 172:6 237:12 **moved** 118:11 |
| **mn** 9:12 | **morning** 17:4 | 216:22,24 | **moving** 261:16 |
| **model** 55:8 196:20 | 17:5 28:14 34:16 35:10 | 217:8,13 245:7 245:7,14 | **moynihan** 12:20 225:15 |
| **modeled** 70:25 | 52:11 53:10,17 | 271:15,15 272:1,7 | 225:17,17 226:1 230:10 |
| **modified** 222:18 | 73:4 89:10,12 198:13 199:20 | **morrissey's** 82:9 93:21 | 230:12,14,19 230:22 232:6,8 |
| **modify** 20:6 51:2 210:25 | 200:4,4 201:7 202:20,23 | **morristown** 10:21 | **muchin** 5:3 227:15 |
| 211:21 213:8 | 207:12 215:14 | **moscou** 8:9 | **multiple** 56:19 |
| **moelis** 88:14 | 236:18 261:1 | **motion** 3:5,8 | 79:24 80:14 |
| **moment** 40:21 75:16 89:8 | **morrissey** 13:14 34:14,15 | 3:13,14,20 31:3 75:8 | 140:22 159:12 169:12 266:1 |
| 149:1,18 152:13 173:16 | 34:16 35:7 | | |

multiples 91:5
mulvaney
  10:18 11:1
mute 23:7 83:2
  273:3
muted 61:2
mystery
  238:16

**n**

n 5:1 9:10 17:1
  280:1,2,6
n.w. 10:12
nacif 10:7
name 142:10
  186:10 270:13
  270:14
names 223:18
  271:19
narrative
  92:11
narrow 166:1
  172:17 193:24
  196:3
narrower
  192:19
national 8:1
nationally 51:9
natural 250:5
nature 20:25
  22:21 97:12,13
  97:14 145:8
  161:11 213:16
  273:11 274:17
ne 6:11,19
  12:10 14:4
nearest 199:8

nearly 25:21
  139:23 194:7
  234:25
necessarily
  96:6,6 150:19
  152:16 153:6
  200:13 267:23
  269:8
necessary
  100:5 117:8
  141:16 159:22
  168:15 201:1
  221:1
need 25:14
  29:12 35:8
  43:5 51:24
  53:1 72:20
  82:12 100:12
  101:18 114:21
  119:8 125:12
  136:13 141:4
  147:23,25
  160:14 164:2
  177:19 187:18
  188:7 211:23
  212:25 213:10
  221:12 222:9
  222:23 223:6
  223:21 224:6
  225:6 238:19
  241:5,17
  245:16,16,18
  245:22 252:22
  257:6 261:10
  261:10 263:8
  264:22 265:6
  267:10 268:7

270:6 276:9
  277:8
needed 62:24
  63:1 147:13
  212:15 236:20
needs 44:21,24
  69:7 72:20
  211:12 267:23
negative
  117:23
negligence
  166:14 187:23
  187:24 188:7
negligent
  187:19,20,21
  188:6
negotiate
  185:12 187:3
  230:7
negotiated
  22:22 87:12,19
  88:1
negotiating
  154:19 193:12
  210:4
negotiation
  126:4 130:6
  227:10
negotiations
  218:1
neither 47:16
  277:1
never 67:9
  82:23 94:2
  101:8 170:10
  179:7 224:14
  251:24 256:14

271:13
new 1:2 2:3,3
  5:6,15,22 7:11
  7:19 9:19 10:5
  10:19 11:2,11
  12:4,18 13:4
  13:12 14:12,20
  15:8,11 18:1
  24:22 25:1,1,3
  29:5 73:13
  103:19 111:18
  117:3,11,13,16
  118:2,25
  120:11 121:18
  121:24 122:1,2
  122:6,9,11,18
  122:25 123:12
  124:10,19,24
  125:5,18 126:9
  126:11,14,16
  126:23,24
  127:3 128:22
  129:2,18,22
  130:3,22,22
  137:13 195:13
  201:18 215:6
  228:18 229:7
  230:15
newark 11:4
newest 209:2
news 133:8
  216:12
newsom 15:19
  133:25,25
  134:7 139:4
  140:1,5,21
  141:10 142:11

142:12,13
144:5,25 145:2
145:4,6 146:2
146:11,12,22
147:18,23,25
148:14 149:6
149:13,20
151:2,25 152:1
153:21,22
154:10 158:19
158:21 159:19
160:5,17,21
161:19 166:20
166:22,22,24
167:13,13
168:19 172:8
239:2,4,4
**newspaper**
67:4
**nexo** 91:3
**nexus** 248:18
**nice** 41:24
**nigerian**
262:19
**night** 24:16
35:16 48:20
118:23
**nights** 92:14
**nine** 151:3
251:19,25
**nits** 66:8
**nj** 10:21 11:4
**nobody's** 30:12
37:23 38:1,22
123:20 164:21
255:1,2,7

**noise** 82:25
**non** 35:23
162:9,10,15
163:3,7,24,25
182:6,14
189:14,15
201:2 235:18
**nonbinding**
89:25
**norm** 112:13
**normal** 39:25
**north** 11:19
13:19
**nos** 3:18
**note** 19:19
29:14 79:19
122:21 176:6
199:23,25
237:18 239:9
**noted** 116:17
131:5 226:2
230:4
**notes** 98:9
220:21
**notice** 31:14
37:25 38:1
39:17 49:3
89:13 91:14
**noticed** 223:24
**notices** 162:14
**notification**
215:18
**noting** 43:16
**notion** 177:11
244:14 250:22
**notwithstand...**
56:22

**november**
248:21
**nowadays**
113:20
**nuance** 93:4
**number** 19:2
28:3 36:8 54:8
54:15 75:21
76:25 80:22,24
85:19 88:17,24
96:20 97:19
105:2,6 127:8
129:8 136:1
144:8 156:7,12
157:12 161:16
162:7,22 165:9
170:23 186:20
186:21 200:16
224:24 228:11
229:13 241:25
242:5 243:17
243:19,19,23
268:19
**numbers** 68:25
70:25 82:21
**numerous**
48:14 58:11
251:17
**nw** 6:3 8:3
**ny** 5:6,15,22
7:11,19 8:12
9:19 10:5
11:11 12:4
13:4,12 14:12
14:20 15:11
281:24

**o**

**o** 2:8 17:1
**o'clock** 279:3
**object** 28:11,15
92:19 96:16
167:3 200:25
209:9 216:2
217:7 229:21
232:13 233:1
272:19
**objected** 28:4
29:14 31:1,2,3
78:23 80:23
94:25 200:7
208:25 241:3
271:20
**objecting**
128:21 167:1
210:24 211:2,6
242:7
**objection** 3:9
3:11,17 29:1,9
31:13 35:14
43:4,10 49:13
67:2 74:24
89:16 92:17
93:21 94:16
98:22 99:6
105:25 111:3
123:3 124:17
126:13 131:5,5
134:1,4 139:1
146:1,11
152:25 164:1
197:1 199:24
202:20 207:9
211:7,8,19

214:19 221:15
232:20 233:1
234:14 244:13
245:8 268:18
268:19
**objectionable**
28:19 209:6
**objections** 3:3
3:6 40:15 54:8
72:23 96:2
111:1,4,17
117:16 118:1
161:21 162:8
163:18 190:22
201:13 207:7
210:1 214:23
221:8 222:7
226:3 228:9
234:11 236:14
237:7,18
238:24 241:13
241:13 244:3,6
244:11,18
245:21 274:10
**objective** 217:2
**objector** 60:22
**objectors**
53:20,23 54:15
55:25 83:9,11
117:22,24
**obligated** 37:3
54:25 190:8
**obligation**
36:17,24 37:1
38:4 39:3 40:6
59:3 83:11
198:15 205:6

**obligations**
56:13 90:1
185:1 201:3
205:14
**observed** 61:19
**obstacle**
234:25
**obtain** 175:18
179:18 188:12
**obtained** 87:12
**obvious** 52:1
229:11 234:6
256:3
**obviously** 46:6
46:8 85:4
131:11 142:15
154:22 170:2
189:22 221:9
236:1 269:20
**occasions**
88:13 89:17
**occurred**
251:16,24
252:6,6,6,7
273:21 274:12
**october** 248:17
248:21 267:6
274:4
**od** 153:13
**odd** 233:11
234:22 269:2
**odds** 129:14
**offense** 239:7
258:6
**offer** 18:13
41:8 50:15,18
51:11 53:13

97:5
**offered** 51:17
61:22 63:20
66:2 67:19
151:23 189:1
238:5 262:8
269:22
**office** 5:11 9:1
13:1,8 14:17
35:14 38:10
94:15 132:10
199:20 203:21
207:5,8
**officer** 61:24
109:5 175:20
178:4 185:17
185:22 186:2
190:3
**officer's**
104:23 111:23
**officers** 3:23
109:15,21,23
110:1,13
174:16 176:4,5
176:22 177:17
178:7 181:6,10
181:25 183:1
183:24 184:11
184:17,20
187:8 218:4
**official** 3:17
13:17 14:2,10
205:11 281:4
**officially**
217:13
**offshoots**
138:11

**oh** 28:1 148:25
156:14 170:14
192:24 222:11
222:14 240:21
240:22 266:10
**ohio** 17:25
124:11 127:3
**okay** 24:12
26:24 32:8,19
32:23 33:6
34:3 36:16
37:4,7 40:4,7,9
41:12 46:1
49:8,21 50:10
51:5 52:3,15
53:7,15 54:6
59:19 60:2,2
60:18 66:24
71:9 72:17,22
73:3 75:1 80:4
82:9,17 83:3
90:19,21 93:8
94:13 98:7
99:10,11,25
102:24 106:15
106:20 109:19
110:5,15 113:2
113:22 114:24
114:25 115:2
116:5,14
118:10,12
119:24 120:1
121:17 131:4
132:5 133:6
136:8 137:15
138:13 143:10
143:14 149:3

| | | | |
|---|---|---|---|
| 151:17 152:19 | **okike**  11:14 | 224:7,15,20 | 229:18,21 |
| 152:21 154:4 | 53:9,10,17,18 | 225:8,12 | 230:2 232:9 |
| 158:15 161:18 | 54:3,5,7 58:25 | 236:25 237:15 | **open**  33:18 |
| 161:22,23 | 59:4,12,21,23 | 237:17 245:19 | 83:1 107:16 |
| 162:5,7 165:11 | 60:3,19 61:7 | **old**  115:25 | 113:7 114:13 |
| 166:9,12,19 | 76:2 81:4,11 | 281:23 | 114:22 141:23 |
| 167:12 168:18 | 81:18,20 82:20 | **ombudsmen** | 147:11 159:3 |
| 172:6 174:3,5 | 116:10,11,15 | 92:24 | 245:21 251:21 |
| 181:23 186:11 | 117:24 118:4,6 | **omissions** | 277:17 |
| 190:6 191:8 | 118:8,11,13,21 | 187:19 188:6 | **openminded** |
| 192:2,8 193:4 | 119:12,14,18 | 257:9 | 263:14 |
| 193:15,23 | 120:1,2,20 | **onboard**  55:22 | **operating** |
| 194:6 195:10 | 121:2,13,16 | **onboarded** | 37:11 62:14 |
| 196:25 199:17 | 132:24 135:8 | 87:15,21 | 69:25 90:11,12 |
| 201:15 202:2 | 135:10 136:7 | **onboarding** | 185:3 187:12 |
| 206:8 208:13 | 136:13 142:8 | 19:16,24 20:2 | 190:4 |
| 209:23 210:1 | 142:12 143:9 | 56:15 57:5,9 | **operations** |
| 214:7,12,16 | 143:13,15,18 | **once**  25:16 | 26:15 |
| 216:7,8,13,23 | 144:2,20 145:1 | 36:17 39:7 | **opinion**  51:8 |
| 217:16 221:6 | 145:3,5 146:15 | 40:5 56:1 | 51:12,16 |
| 223:23 224:15 | 146:20 149:11 | 76:22 99:21 | **opportunities** |
| 235:10 236:14 | 151:13,20 | 101:23 198:14 | 130:25 161:7 |
| 238:3 240:18 | 152:8,15 | 209:6 271:10 | **opportunity** |
| 245:5,20 | 154:18 155:8 | **one's**  139:10 | 18:18 21:14 |
| 247:13 251:4 | 155:10 157:2 | **ones**  78:15 | 22:22 23:1 |
| 252:10 253:15 | 157:10 158:13 | 117:25 185:15 | 52:21 53:21 |
| 257:21 258:13 | 158:14 161:23 | 185:16 250:24 | 61:25 87:7 |
| 258:19,22,23 | 162:1,3,5,7 | **ongoing**  62:17 | 104:8 124:24 |
| 259:21 260:8 | 171:1 173:15 | 70:3 89:1 | 135:2 141:6,18 |
| 261:2 265:9,24 | 182:3 193:1,7 | 112:18 199:13 | 141:24 144:18 |
| 268:12,14 | 193:10 196:10 | 259:4 | 148:9 200:9,14 |
| 269:9 270:5,15 | 197:2,19 210:3 | **online**  106:9 | 200:25 201:8 |
| 271:8 272:23 | 210:23 212:18 | 169:15 170:15 | 201:12 206:10 |
| 276:4,11,19 | 213:7 216:5 | **oops**  170:14 | 223:10 246:8 |
| 277:19 278:5 | 221:7,8 222:11 | **opco**  57:4,8,12 | 251:25 263:10 |
| 278:11,14 | 222:14,22 | 57:20 226:14 | 272:19 |
| 279:6,8,14,18 | 223:15,19 | 228:3 229:12 | |

**opposed** 38:9
233:23
**opposes** 197:3
**opposite** 25:11
33:9 247:19
**opt** 22:18
**opted** 163:2,4
163:15 166:7
167:18 182:8
**opting** 162:13
**option** 17:23
17:24 40:4,7
60:6,14 87:8
114:2 123:3,5
123:17,19
126:23 128:22
132:14,21
133:14 149:17
155:13,20
156:1 170:11
229:19 230:3
252:14
**options** 108:25
155:15,21
**order** 24:22
25:2,11,23
26:4,11,21
27:2 28:22
33:12 35:15,22
37:3,23 43:17
44:24 50:3
52:13 53:1
106:6 114:6
115:16 175:18
192:18 197:21
197:25 198:14
199:9,25 200:3

201:9,10
203:18,24
204:10 206:5,6
206:23 207:4
209:1,4,19
210:16,19,25
211:1,13,19,21
211:22,23,24
212:20 213:1
214:22 221:11
223:24 224:24
225:5 243:3
245:23 248:9
254:7 259:19
260:22 261:12
272:2 273:13
278:18,20
279:2,5
**ordered** 37:19
39:7
**ordering** 37:21
**orders** 193:11
196:4 215:19
270:20
**ordinary** 176:8
254:21
**organization**
134:19 178:8
179:10
**organize**
259:17
**organized**
36:14,15
**original** 25:11
222:15
**originally**
161:1 194:8

**orms** 4:1 281:3
**ought** 30:16
205:12
**outcome** 27:3
120:11 142:2
**outset** 91:21
**outside** 62:7
63:14 88:21
232:24 233:14
274:11
**overall** 149:12
159:5 176:10
**overlap** 73:6
191:20
**overlapping**
35:20
**overly** 152:18
167:20 214:10
**overnight**
43:17
**overreaching**
238:10
**overrule** 49:12
**oversight**
228:16 229:3
231:3,6
**overwhelming**
78:7,10,17
**overwhelmin...**
86:11 269:17
**owe** 59:10
**owed** 264:6
**own** 31:15
60:11 68:2
75:10,13 85:4
108:9 120:13
124:3 137:3

138:12 141:22
163:21 164:19
165:1,21 167:4
167:8 168:7
182:9 190:3,3
206:5,5 214:1
226:20 231:15
278:24
**owned** 143:17
164:22 176:17
**owner** 107:14
107:15 112:1

**p**

**p** 5:1,1 17:1
**p.a.** 9:9
**p.c.** 8:9
**p.m.** 116:8,8
174:4,4 258:24
258:24 260:23
279:21
**p.o.** 9:4
**paces** 6:19
**package** 158:8
218:2
**page** 17:19
18:2 95:18
96:9,10 97:21
97:23 203:6
207:15 245:22
259:18 280:3,7
**pages** 84:14
96:9 253:18
**paid** 92:10
219:2
**painful** 73:14
**paint** 275:24

pam 186:3
papers 124:3
paperwork
253:22
paragraph
28:20 201:25
203:23 207:5
209:1,3 211:19
214:18 215:25
218:14 219:21
paragraphs
202:20 207:5,6
207:7 209:4,11
209:19 210:6
213:13 214:9
220:1
parallel 17:23
parameter
271:4
parcel 178:11
pardon 173:18
parent 100:11
100:22
parenthetically
211:23
parse 250:17
part 20:2,3,8,9
21:25 22:3
23:19 24:8
47:12 76:15
123:2 147:8
149:20 152:13
176:10 178:8
178:11 179:8
179:12 182:23
184:7,12 195:5
227:25 233:11

234:23 242:22
246:20 254:15
266:8 275:19
participants
35:23
participate
61:4
particular 69:9
94:21 111:2
130:14 141:6
142:22 157:1
165:20 209:11
209:13 219:11
220:8 229:24
247:21 252:16
262:2 264:14
265:5 277:19
particularly
20:25 66:1
89:11 130:5
196:14 202:18
209:14 221:3
242:11 262:16
269:14 273:10
273:20
parties 20:16
31:5,14,19
34:1 39:24
60:20 65:16
70:10,11,15
75:3 77:2
83:22,22 85:9
90:2 128:4,7
133:19 151:13
162:18,22
163:19 165:6
168:2,22

174:19,24
183:15 194:12
194:13,16
195:1,4,22
210:8 212:24
216:14 218:18
218:23 219:11
219:17 222:23
226:10 227:20
227:23 269:24
partner 256:10
parts 38:8
98:15 193:21
party 47:14,24
48:8 49:19
53:12 57:22
59:9 61:21
135:22 137:12
162:8,10,12,13
162:23 163:2,4
163:11,14,24
164:7 169:8
178:10 182:6
184:7 191:4,6
191:23 192:3
230:24 236:2
241:5 269:21
271:17
party's 162:10
pass 138:14
255:10
past 70:21
111:1 124:5
143:8 263:4
270:24
path 251:18

patience 259:8
paul 7:6 12:13
271:22
pause 59:22
60:24 69:18
70:18 72:14
82:19 155:9
171:3 173:17
174:1 260:15
paxos 90:20
pay 54:23 55:1
55:3 101:13,20
127:17 137:7
paying 217:22
223:12
payment 23:24
36:4
payments
176:7,11,12
218:23 219:2
219:17
pc 7:1
pdf 203:6
peace 179:18
peachtree
12:10 14:4
peak 89:4,5,7
peculiar 67:10
peep 173:10
pejoratively
120:21
penalize 30:14
penalized
27:15 30:7
penalties 27:7
30:8 32:7,23
33:14 206:24

penalty 34:10
pendency
76:10
pending 3:22
265:3,6,16
pennies 239:11
pennsylvania
6:3
penny 240:4
people 19:13
20:23 21:6
22:6 28:6 29:8
30:6,14 32:21
33:2,13 34:5
36:5,8,23 37:8
37:9,18,25
38:23 39:5,16
40:8 68:12
71:23 78:1
81:24,25 83:1
85:24 86:2,5
97:5 109:25
110:11 114:21
121:9 127:17
127:21 128:1
130:22 136:9
140:4 141:5
143:20 148:19
151:18 153:9
156:3 157:21
159:10 160:10
164:18,19,20
165:3,8,9
166:5 168:23
169:7,14,16,17
169:20,25
170:1,3,5,13

170:19 171:10
171:13,15,21
172:15 181:3
181:17 182:9
190:20 192:6
205:24 206:19
206:23 220:18
222:13 223:11
224:18 237:13
243:17 254:1
255:15 258:8
261:20 262:11
262:18 264:1
265:1 274:6
277:16 278:6
278:18
people's
160:12
perceive 24:25
percent 20:10
55:9 58:19
78:6,9,10
81:23 96:21,22
117:12,13
149:6 157:12
157:13 163:1,3
163:5,7 170:1
205:19 238:17
243:23,24
259:11,16
271:12
percentage
97:23 157:19
159:5 243:18
perdue 200:19
perfect 39:19
198:25 249:8

perfectly 34:20
perform 56:13
104:1 198:23
221:5
performance
198:10,11
performed
55:2 91:7
218:18 219:12
251:23
performing
34:2
period 58:3
72:8 87:17
177:1,5,6,13
177:14,15
215:23 248:19
permanently
182:8
permission
27:6 31:10
43:23 48:3
83:2 246:21
265:7 267:10
279:14
permit 27:11
121:1,4 249:13
permits 137:11
permitted
97:12 200:20
perpetrator
262:4
perpetrators
264:15
perpetuity
233:19

person 25:7
63:10 64:6
66:11 105:16
108:14 164:14
164:15 204:7
211:25 231:13
271:23 279:10
279:11,13,13
personal 20:24
34:5 73:18,18
93:1 103:8
105:7,8,20
106:22,24
107:24 108:5
110:18,23
111:11 113:6
113:18 114:4
114:21 164:23
186:16 188:3
188:15 242:18
256:13
personally
3:14 56:21
99:18,23
149:24 154:11
184:1 205:15
206:24 210:8
248:20 275:11
275:20 276:13
persons 172:18
172:19 206:16
223:9
perspective
18:20 84:13
92:22 105:23
126:7 136:2
142:9 143:1

195:23 201:1
213:15

**pertained**
273:16

**pertinent**
94:19

**petition**  120:4
134:17,21,23
144:15 155:10
157:4,4,18
158:6 175:4
192:7 215:22
220:14 221:19
275:2

**ph**  20:5 33:25
178:25 179:9
179:16 185:4
185:21,21
186:3,5,6
208:15 221:13
221:17 231:1

**phase**  31:3

**philip**  185:21

**phone**  23:7
28:12 60:25
61:2 108:24
145:18 190:16
236:19 261:3
262:17 263:4
272:1 274:6
275:6 279:10
279:14,18

**phonetic**
136:14

**photo**  113:12

**phrase**  126:20

**phrased**
125:10

**pick**  256:10,12
271:21

**picking**  63:2

**piece**  45:18

**piecemeal**
155:2

**pieces**  47:10

**pii**  82:22

**pinch**  239:11

**pinching**  240:4

**place**  52:25
99:8 159:14
225:1,6 233:6
233:8,20
247:25 248:1
279:15

**places**  68:8

**plain**  171:16
171:18

**plainly**  41:25
46:16 47:5

**plaintiff**  1:11
1:18 188:5,6
188:11

**plan**  3:2 17:11
17:18 18:1,2
18:12 21:17,19
24:19 25:21,23
26:7,23 27:22
28:20,22 29:15
31:2 35:2
36:15,16,18,18
36:21,23,25
37:19 38:5,21
39:1,2,4 40:3,6

40:7 41:8
43:16 44:3
45:1 47:5
50:15 51:2,23
53:5 54:9,10
55:24 60:15
62:9,9 64:11
64:15,17,21,22
68:23 76:15
78:7,9,18 79:5
80:20 84:15
85:21,25 86:6
86:7 87:1,7,10
88:16 91:17,24
93:10 97:8
100:2 116:23
117:4,13,14,20
118:15 120:17
121:21,22
122:4,20
123:10 124:4,6
126:22 127:9
127:16 132:17
134:2,15 142:4
142:20 148:4,6
148:7 152:13
153:18 161:6
162:9 163:11
163:14 166:3,6
168:4 174:19
174:20,23
177:18,25
178:17,20
181:17,18
182:11,24
183:17 185:11
187:2 193:4

194:17 195:12
196:13,17,20
196:24 197:21
200:1 201:21
202:14 203:4
204:25 207:20
210:10,25
211:21 212:20
214:19,22
215:5 216:18
216:19 217:1,6
221:1 222:15
222:18,24
223:4,9,25
224:5,8,9,13
225:14,22
226:3 227:24
228:6,11,14,17
229:2 230:22
231:4,5,11,16
231:17 232:20
233:1,16,17
236:15,19
237:18,24
238:1 239:12
239:17 240:1
240:15,24,25
242:9,23,24
243:1,2,7,8,9
243:10,25
244:2,4,9,10
244:12 246:24
247:2,25 248:2
248:3,6 249:19
249:20 267:21
267:21 268:4
269:17,17

273:8 274:19
275:15
**plans** 153:25
**platform** 19:11
21:11,15 22:23
22:25 54:24
55:20,22 56:2
56:9 57:15
58:18 61:9
62:21 66:17
76:20 84:18
105:4 106:10
107:12,19
108:6 109:2,8
109:10 112:24
112:24 113:6
113:21 116:25
131:16 144:7
149:8 161:17
168:6,7 176:23
177:3,6 188:3
208:10 221:18
221:21 242:18
262:19
**play** 197:7
**plaza** 8:11
**plea** 160:21
**pleadings**
215:18
**please** 17:2
23:8 52:19
60:2 79:19
81:14 83:2
116:5,9 150:12
154:13 156:8
157:8,9 173:23
199:12 219:9

257:19 261:8
263:7,12,14
264:20
**pledge** 57:25
57:25
**plethora** 92:7
**plus** 141:13,22
**podium** 50:14
53:8 69:5
86:15 193:9
**pohl** 172:11
174:12 175:15
179:15 182:12
183:8 187:11
187:15,24
188:9,16
189:23 217:24
**pohl's** 174:11
187:6 218:15
219:21,25
**point** 19:18
20:7 21:13
22:14 30:1
34:17 42:1
50:1 58:25
62:23 64:2,5
66:10 69:14,22
72:19 75:1
78:4 81:23,23
82:21 84:21
85:15 95:12
96:15 97:24
100:19,24
103:8,13 107:5
107:22 110:15
111:2 112:20
123:16 126:15

127:12 128:11
131:8 132:19
133:17 142:22
143:3 147:13
151:2 153:12
158:23 164:17
168:11 190:23
191:23 199:15
201:18 207:2
211:23 212:16
218:14 220:25
221:14 234:20
237:17 246:6
248:24 249:9
251:22 255:23
259:21 260:25
269:23 277:19
277:23 278:7
279:4
**pointed** 39:1
64:18 73:11
77:9 125:24,25
128:19 147:13
220:2
**pointing** 218:5
**pointless**
246:24
**points** 61:7
63:12 65:13,15
71:9,13 72:16
72:25 73:2,6
74:14 86:22
103:7 109:9
111:22 131:6
202:13 220:8
223:23 237:13
245:15,21

255:2 259:18
262:23,24
268:19
**police** 212:16
**policies** 56:17
225:2
**policy** 18:11
19:19 106:9,11
187:1,2 225:4
225:6
**ponzi** 261:11
261:17,18,19
262:1,4,8,12
266:4,12,20
**pool** 86:3
**poor** 143:11
**poppiti** 8:22
**portfolio**
149:12
**portion** 105:5
113:5
**portions** 28:19
74:6 202:19
**position** 20:18
24:18 26:6
30:2,17 32:1
33:11 40:12
44:12 47:8,9
48:23 49:7
51:19,21 54:2
70:23 74:16
89:9,11,16,24
91:9,12,23
101:24 106:7
140:12,23
144:13 154:9
156:2 159:1

176:17 205:11
206:9,22 207:3
221:20 231:3,5
231:23 239:6
245:6,9 269:11
275:9
**positions**
140:22,23
**positive** 36:24
37:1
**posner** 12:6
226:2
**possesses**
262:25
**possession**
92:6 209:8
251:7
**possibility** 21:2
71:18 122:14
123:11 190:10
**possible** 18:5
27:24 35:16,23
35:24 73:13
86:9 87:9
91:22 103:20
104:14 122:16
127:2 129:16
130:6 131:13
141:3 154:13
173:4 180:4,21
186:24 204:19
238:18 240:14
246:18 272:7
274:2 277:18
**possibly** 65:22
65:24 82:5
98:25 105:10

123:13 130:23
137:13 189:19
263:11
**post** 122:10,18
122:19 123:5
123:13 125:5
128:25 134:14
144:24 145:13
175:4 178:2,6
195:24,25
215:22 220:14
225:21 227:25
229:6,8 231:14
231:23 233:9
242:6
**potential** 32:2
68:19 172:12
175:6,8 176:21
179:3 184:16
184:21 185:16
186:8,13 206:7
218:5 220:12
238:13 242:1
**potentially**
19:24 47:21,23
48:8 117:5
119:3 138:19
138:22 157:13
187:22,22
204:11 212:10
225:3
**power** 26:10
39:15 109:15
109:25 201:23
**powers** 201:23
201:24 212:17

**practical** 62:13
62:19 70:4
97:4 141:2
145:17 147:17
147:21
**practically**
33:10
**practice** 95:25
271:10
**pre** 3:25
215:22
**precious** 77:4
**precipitates**
139:16
**precise** 29:13
97:4,15 174:9
254:22
**precisely** 29:23
97:11 155:23
**preclude**
210:14
**predict** 68:9
**prediction**
69:14
**prefer** 122:25
128:15 130:22
225:23
**preference**
35:5 173:5,7
174:22 175:3,6
176:21 179:7
181:11 244:7
**preferences**
176:3,18,19
181:18
**preferential**
176:8

**premise** 53:4
274:3
**prep** 278:16
**preparation**
76:5
**prepare** 115:15
**prepared**
34:21 36:9
41:13 44:8
53:2 188:19
200:23
**preparing**
51:11
**prepetition**
218:22 219:17
**preponderance**
254:20
**present** 112:19
225:25
**presented** 69:2
172:4,4
**preserve** 185:9
186:24 200:25
206:20
**preserved**
184:8 227:24
**press** 78:6
88:24 175:14
182:18 184:23
**presume**
124:13 231:4
**pretty** 52:1
75:25 129:2
138:13 146:12
191:18 231:9
241:4

**prevent** 184:15
**prevented**
 200:22
**prevents**
 123:15 189:8
**previous** 52:24
**previously**
 62:17 69:24
 112:2 211:1,22
 230:4 278:4
**price** 20:2,7
 22:10 103:12
 141:23 145:7
 145:10,22
 148:12 155:19
 157:4 158:10
 159:9 160:13
**prices** 150:17
**pricing** 20:4
**primarily**
 167:22
**primary** 19:25
 60:21 155:4
 189:23
**prior** 73:12
 100:19 134:17
 134:23 157:23
 176:24 197:7
 211:24 212:3
 215:16 223:9
 224:17 227:22
 234:10 237:23
 243:4
**prithipaul**
 186:2
**privacy** 18:10
 19:19 92:23

 106:9,11
**private** 271:10
**pro** 3:20,25
 15:16,17,18,19
 15:20 79:12
 86:15 94:9
 104:17,22
 120:5 133:25
 134:25 140:15
 142:21 143:20
 147:9 151:8,9
 154:7 166:22
 169:3 208:4
 237:4 252:13
 255:18 263:6
 263:12 264:18
 270:11 272:10
 273:4 275:17
**probably**
 44:12,13 45:23
 65:10 101:20
 114:8 131:21
 131:25 136:17
 141:11,13
 145:23 147:4
 148:16 149:24
 210:11 219:19
 225:9 235:16
 252:20 257:8
 276:25
**problem** 18:14
 25:24 28:8
 121:15 149:13
 149:20 159:17
 170:9 194:15
 198:6 205:22
 205:22 212:6

 218:12 223:11
 253:15
**problematic**
 203:22 207:11
 229:9
**problems**
 24:12 169:4
**procedural**
 275:19
**procedure**
 265:21
**procedures**
 23:9 24:23
 56:17 256:4
 265:1
**proceed** 31:20
 53:3,5 59:1
 154:21 269:16
 269:18
**proceeded**
 31:15
**proceeding**
 32:11 53:23
 89:22 107:16
 112:12 168:7
 226:18 265:5
 265:18
**proceedings**
 112:11 246:17
 279:20 281:5
**proceeds** 76:15
**process** 24:23
 67:8 104:13
 115:8 124:22
 135:17 170:13
 172:3 179:11
 216:15 220:14

 242:13,21
 243:7 260:20
 270:1 277:17
**proclaimed**
 253:12
**produce** 168:5
 234:8
**produced**
 83:10 126:6
**productive**
 116:16 119:3
**profess** 248:12
**professional**
 62:3 172:18
 224:1 237:20
 240:7
**professionals**
 61:11 83:20
 84:23 85:1
 88:11 90:21,22
 91:16 112:3
 153:24 191:14
 192:14 194:11
 195:13,17
 242:14 274:15
 275:14,18
 278:8
**prohibitive**
 177:16
**prohibits**
 29:20,20
**promote** 92:11
**promoting**
 137:24
**promptly**
 49:17

pronounce
184:3
proof 71:19
101:21 158:23
210:20 211:3
211:11 212:3
213:2 254:11
254:16,16,19
257:17 258:2
264:4,7 267:1
267:7,9
proofs 3:18
211:12 217:1
263:17
proper 29:6
50:24 241:17
property 72:11
88:3 176:17
188:18 209:6
212:2,14
221:21
proposal 51:23
78:24 130:24
246:6
propose 27:22
40:18 52:4
53:3,19 116:12
162:9
proposed
24:22 25:2
26:4 28:22
29:5 35:15
41:6,22 45:3
55:18 73:22
115:17 131:2
165:2,15 172:8
172:18 173:14

177:25 178:14
184:5 190:7
195:2 196:8
199:25 200:3,3
203:23,24
209:1,3 223:24
224:24 261:1
272:2 278:17
proposing
29:13 30:15
54:5 124:11
proposition
23:4
proprietary
112:6
prosecute
277:25
prosecuted
183:18 204:14
204:16
prosecution
3:22
prospect
151:18
prospective
194:18
prospectively
192:5
protect 38:18
73:19 77:7
91:8 92:23
213:17 214:4,5
protected
196:16
protecting
84:18

protection
95:15 150:4,10
protections
56:25 58:6
87:11 232:22
protocol 75:5
75:10,14,15
protocols
56:17 61:14,21
62:7,25 64:1
66:4,6 68:1
83:23 85:2
107:15
prove 44:21
102:8,13
177:13 187:18
188:5,7 263:10
proves 102:10
provide 58:16
100:15 103:16
120:15 136:17
160:17 165:10
223:10 273:23
provided 44:7
48:12 66:15
70:25 75:20
76:7 87:5
104:5 106:3
187:14 194:17
197:13 204:2
211:20 215:24
217:1
provides 19:19
21:9 54:10
142:20 229:17
238:1

providing
39:10 103:19
117:6 130:25
151:22 152:4
238:8
proving 211:14
provino 15:21
79:9,11,11,15
80:5,7,10,16
81:2,5,9,13,19
81:22 82:11,15
82:23 94:9,9
98:8,9 252:11
252:13,13,20
255:18,18,21
260:2,4,4,9,11
260:14 261:5,5
261:6,15
262:10,15
263:19,22
264:17,22
265:10,22,25
266:6,10,16
267:3,8,16,17
268:6,13
provision
28:21,22 34:23
35:1 41:15
62:2,23 170:24
171:5 191:21
192:15 193:22
194:19 195:6
195:12 197:13
200:2 202:14
203:5,9 205:13
211:13 212:10
212:15,19

215:1,21 217:6
221:10 224:13
233:25 234:7
268:2
**provisions**
28:25 43:16
59:5,17 87:24
88:1 103:4
179:21 191:21
200:17,20
201:22 209:25
210:5 224:8,23
278:19,23,25
**proviso** 210:6
210:23 211:2,7
212:19,25
213:8
**psaropoulos**
172:10 183:4
183:21 184:3
184:11 185:14
185:19 186:4
186:14 188:14
188:22 190:7
217:25
**public** 137:18
148:25 218:22
219:16 273:19
**publicly** 70:6
226:8
**pull** 109:2
171:14
**pullen** 10:10
**pulman** 10:10
10:16
**pump** 159:8,11

**pumped** 159:9
**punish** 33:2
**punished**
30:20 205:25
**punishment**
37:2
**punishments**
37:9
**purchase** 20:2
20:7 22:10
56:14 59:14
73:9 77:3
103:12 112:5
**purchased**
45:5
**purchaser**
53:21 61:16
73:13,22 209:5
209:6,8 213:17
214:5
**purchases**
45:10 209:6
**purchasing**
152:4
**purport**
164:24
**purported**
200:5
**purporting**
277:9,10
**purpose** 36:15
91:8 207:3
243:5 275:24
**purposefully**
206:21
**purposes** 49:24
61:25 62:13

121:22 251:2
261:22 263:23
**pursuant** 50:3
52:25 182:24
183:16 185:2
195:13
**pursue** 36:7
146:23 150:11
162:20 167:12
183:25 186:13
276:21,22
277:8
**pursued**
168:13 187:17
276:11
**pursuing**
175:20 177:20
180:19 186:19
222:19 241:25
**purview**
198:18 216:1
**push** 171:14
**pushed** 92:18
249:7
**put** 27:4 39:23
71:19 72:14
84:13 96:8
99:4 154:16
166:16 177:5
201:5 233:17
236:20 244:20
249:4 263:11
269:24
**putting** 38:7
68:21 120:21
126:20 151:6
246:14

**q**

**qualification**
100:14
**quality** 147:3
256:20
**quarter** 259:16
**question** 22:20
23:8 36:20
38:25 39:11,12
44:10,15 52:1
54:15 55:25
69:17 91:19
103:25 104:2,3
104:4 107:20
107:21 109:13
115:5,20
120:24 121:21
122:8 148:20
152:20 154:20
156:6 177:20
178:1 193:8
208:6 243:15
262:22 263:5
265:25 266:8
266:14 270:12
272:13
**questions**
43:24 67:3,5
67:23 73:21
74:3,8 85:16
98:13 100:20
133:11 182:13
229:20 244:24
245:4,11 261:7
266:1 277:14
277:16 279:1,5

**quick** 111:16
208:6 272:13
273:8
**quicker** 126:13
**quickly** 22:8
34:15 85:15
86:9 87:9
91:22 104:14
116:1 129:16
154:1 213:12
246:18 274:2
279:17
**quinn** 9:16
174:7 217:19
**quite** 33:9
79:13,15 97:3
115:13 165:23
165:25 176:16
215:11 233:15
243:15 261:18
272:2 277:13
**quote** 89:13,24
90:7 170:24
**quoted** 96:20
96:21 211:20
**quoting** 174:24

**r**

**r** 2:8 5:1 17:1
280:6
**raise** 31:1 98:5
99:12 194:23
214:23
**raised** 20:17
31:12 44:1
48:18 53:20
60:22 61:7
98:12 114:21

118:1 167:24
213:13 232:23
233:3 234:4
245:8 255:6
268:19
**raising** 66:14
271:11
**raitt** 7:1
**rampant**
113:20
**randall** 10:16
**range** 156:21
190:9
**rata** 120:5
134:25 140:15
142:21 143:20
147:9 151:8,9
**rather** 22:4
35:2 39:8 54:1
54:25 57:2
125:4 136:19
140:12,13
148:5 173:2
227:8 269:24
**ratio** 66:21
**rationale**
177:17
**rawe** 16:5
**ray** 227:16
231:20,22
238:21
**raznick** 7:2
16:3 68:20
**reach** 117:19
118:14 119:19
160:15 216:15
271:6

**reached** 77:17
116:18 118:19
118:22 228:4
**reaching** 128:8
238:10
**read** 28:17
70:21 93:20,22
93:24 94:3
95:16 96:4
104:23 144:25
169:11,12,18
171:24 172:21
180:9,10 193:4
203:21 212:16
219:8 248:8
257:7 279:4
**reading** 26:21
92:15 94:10,18
169:16 197:15
**reads** 203:10
**ready** 17:3
86:17 174:5
197:8
**real** 125:13
144:22 146:8
152:25 229:4
242:11 262:13
**realistic** 123:5
123:7,11,16,19
126:23 128:24
155:19
**reality** 142:17
144:20
**really** 25:22
40:21 51:3
63:13 72:18
77:12,19 93:19

93:21 96:23
119:1 120:24
126:3,6 131:2
133:16 137:20
137:24 139:18
139:18 155:2
156:2 163:23
164:12 169:12
170:19 182:13
189:3 198:21
201:7 231:10
234:22,23
241:7,9,17,18
243:17 247:7
248:2,9 252:1
255:3,7,8
258:9 265:16
267:19 268:21
268:23 273:25
274:2,11,12,22
275:4,5,13,23
276:10 277:5
**reason** 19:23
20:1,22 21:4
23:23,23 30:19
60:8 66:4,5
72:19 73:16
79:16 87:10
88:8 126:3
127:9 153:14
155:23 168:14
189:7,24
212:18 218:3
235:1 262:2
**reasonable**
57:10 63:7,8
63:10,11 64:6

66:11 180:17
180:24 224:18
254:13
**reasonableness**
190:9 224:4
**reasonably**
65:23 76:16
145:7
**reasons** 107:16
126:2 131:11
**rebalancing**
27:19 45:6,9
45:19,20,24
46:1,12,13,20
46:21,23 47:12
47:15,25 48:7
50:5 52:25
143:19
**recall** 100:18
100:18 118:2
**receipt** 57:10
57:11
**receive** 81:19
109:12 113:1
116:19,22
117:1,7 120:5
120:15 121:6
122:17 123:15
125:6,7 127:12
140:15 142:21
145:24 152:23
153:24 156:4
197:25 212:1
222:2 239:18
**received** 63:15
64:4 84:24
96:3 106:23

161:1 175:23
175:24 183:14
230:2 255:25
262:17 263:3
**receiving**
134:22 140:16
143:4 161:4
175:3 182:24
197:5
**recent** 91:1
117:17 201:21
228:5 256:1
**recently**
118:23
**recess** 52:15
246:7
**recessed** 52:18
116:8 174:4
258:24
**recharacteriz...**
227:3,12
228:25
**recipient** 265:5
**recognize** 60:7
79:5 132:3
197:19
**recognized**
51:9 240:8
**recognizing**
78:25
**recollection**
257:1
**recommenda...**
242:14
**reconnect**
248:23

**reconsider** 3:1
**reconvened**
52:18 116:8
174:4 258:24
**record** 50:13
53:16 79:19
82:6 94:12
101:10 132:9
160:20 166:13
173:12 174:7
199:23 201:5
206:15 220:19
254:6 255:3
256:7 259:3
260:17 278:15
279:4
**recording**
281:5
**records** 117:25
**recourse** 183:6
**recoveries** 74:8
97:7,8,9,17
117:5 143:20
153:2 222:3
228:24 230:2
262:5
**recovering**
242:2
**recovery** 91:12
91:20 120:5,9
120:9 122:15
123:4,12,15
126:14 127:13
135:2 141:18
141:24 142:2
142:21,21
144:19 146:7

148:10 156:8
156:20 157:1,3
157:9,13 160:6
161:7 190:10
222:5 232:16
235:1 238:13
240:13
**recuse** 237:25
**redo** 67:7,12
270:23
**reduce** 58:7
**reduced** 45:23
**reduces** 19:15
20:1
**reducing** 146:7
**reductions**
271:1
**refer** 111:23
206:15
**reference**
40:23 95:19
174:21
**referenced**
82:22 278:4
**references**
28:20 209:3
**referred** 226:8
**referring** 202:1
218:24 277:21
**refers** 175:1
**reflect** 153:9
228:21
**reflected** 93:15
162:13
**reflecting**
160:9

reflects 207:4
refusal 91:9,23
100:9,10
refuse 91:17
154:1
refused 87:18
101:2 158:25
refusing 48:23
regard 71:22
95:3 132:17
224:4 273:20
278:9
regarding
31:12 34:18
43:25 58:12
61:13 73:7
75:13 77:6
85:2 110:23
194:22 195:20
199:14 202:5
208:22
regardless 19:7
100:13 110:19
120:3
regards 158:23
273:4,11
regime 129:3
129:10
register 69:7
registration
26:16 69:10
regrouped
24:17
regulation
15:1 25:6
38:14

regulations
30:9 36:9
121:4 122:1
129:11 195:14
204:5
regulator
25:24,25 27:15
65:12
regulators
27:25 30:9
68:10,10 70:17
71:5,6,23
72:15 100:25
182:7 190:1
205:7
regulatory
27:10 28:23
29:18 31:14
32:25 33:9
34:7 39:21
59:6,16 62:17
68:6,8,18,19
70:3,9,14
71:16,21 72:1
72:3 82:4
89:13 91:14
117:9 120:24
124:2,22
126:10 129:13
130:13 131:1
131:11 132:20
147:4 163:20
212:17 218:21
219:15
reimbursement
59:15,18

reisman 5:8
reiterate
269:10
relate 24:19
111:3 204:24
278:23
related 111:5
112:5 182:14
196:3 225:20
relates 108:23
134:1,16
167:19 204:19
239:10 265:17
relating 183:5
189:20 204:8
relationship
111:25
relationships
92:25
relative 117:5
144:11 150:6
relatively
125:4 144:1
149:4,11 150:7
172:17 223:23
release 162:8
162:10,14,23
163:2,4,12,13
163:14 164:14
164:15,16,24
165:3,6,8,15
165:22 167:8
167:11 169:6,9
169:11 170:1
170:22 171:6
171:23,25
172:1 173:2

175:6 177:19
177:22 178:5
179:20,21
180:2,10,10,12
182:23 184:6,8
184:13 189:21
191:21 195:23
196:3 209:5
212:21 217:23
218:11 277:9
released
162:12 165:17
168:4 172:25
174:19,22,24
178:10 179:24
181:21 182:4
182:21,23
183:3,12
184:10 192:3
194:12 212:23
220:15 277:9
releasees
191:17
releases 85:10
88:24 99:13
103:3 161:25
162:1 163:11
163:21,24,25
164:7,11,18,20
165:12 166:1,4
166:6,13
167:19 168:22
169:4 171:8
172:4,6,9,18
172:20 173:13
175:14 177:24
178:9,13,22

180:20 181:3
181:13,25
182:6,8,10,18
184:24 189:5,7
189:16 190:18
190:20 191:4,4
191:6,8,13,23
192:5,13
194:18 196:8
208:22 209:4
217:21 219:5
220:12,16,20
266:3,11,15,17
266:18
**releasing**
163:19 168:11
175:10 176:1
179:6 183:1,6
183:13
**relevant**
265:18
**relied** 101:7
102:17,19,21
**relief** 3:21
49:18 50:25
52:12 115:12
115:17 140:1
167:14 211:1
211:22 268:1
**relies** 263:3
**relog** 258:22
**rely** 274:17
275:13
**relying** 51:18
51:21 278:8
**remain** 140:7
147:2 159:14

205:21
**remainder**
19:1 159:2
**remaining** 86:2
86:3 194:3
279:5
**remains** 19:7
88:3
**remarks** 179:5
**remember**
22:12 28:1
76:5 80:22
81:22 82:1
98:6,10,16
99:4 119:9
142:10 156:23
170:23 185:21
185:22 197:12
234:12
**remembering**
193:16
**remind** 58:21
108:23 170:23
**reminder**
243:23
**reminds** 186:6
**remove** 53:2
110:17,19
113:17 144:16
233:18
**removed** 29:1
82:22 233:21
266:2,11,16
**renzi** 50:17,18
51:5 178:25
179:9,15

**renzi's** 50:20
220:1,25
221:25
**reorganization**
64:16 65:6
204:25 225:14
**repeat** 67:1
70:13 86:22
**repeated** 73:15
78:5
**rephrase** 148:2
**reply** 123:9
125:25
**report** 89:2
108:3 259:7
269:5 274:18
**reported** 160:8
**reports** 41:10
42:20 61:23
110:4 254:2
256:6
**represent** 38:9
231:14 242:20
244:7
**representation**
237:23 255:25
256:13,15
**representations**
54:19 56:23
61:15 87:6
88:17
**representative**
92:3
**represented**
38:10 63:24
**representing**
94:6 121:17

241:11
**represents**
231:11
**request** 20:8
43:22 48:3,12
49:5 80:19
114:18 199:15
206:10 232:25
233:11 234:23
237:7,8 259:9
272:14,18
**requested**
48:13 103:16
212:19 270:17
**requests** 17:8
48:15 167:14
246:5
**require** 21:16
21:19 22:2,5
36:21 49:16,17
100:25 119:3
119:19 153:15
170:24 222:21
224:17,25
255:16
**required** 24:5
40:8 41:10
42:20 54:23
56:11 69:10
71:19 109:10
112:22 180:22
221:22 223:16
224:4 243:3
**requirement**
41:25 101:2
217:5 245:1

**requirements**
42:14 57:5,9
93:10 108:12
120:25 125:20
129:9,10,13,19
265:4
**requires** 21:24
95:24,25
184:23 254:18
257:17 258:2
258:11
**reread** 76:4
**res** 32:18
**reserve** 31:21
56:6 88:19
103:3 129:10
278:16
**reserves** 55:10
**reside** 120:3
121:12
**resident**
119:22,23
133:7
**residents**
124:14 133:8
**residual**
159:10
**resnick** 244:14
**resnick's**
256:12
**resolution**
119:19 228:4
230:7 261:1
**resolutions**
226:4
**resolve** 103:22
194:21 227:7

227:10 246:5
246:19 259:5
259:10 279:17
**resolved** 18:3
40:15 216:9,20
226:2,6 227:22
227:25 230:5
230:18 233:5
234:16,17,19
234:19
**resources**
21:25 22:3
66:23 177:16
246:14
**respect** 17:21
43:18 54:14
56:14 59:23
74:9 89:2,9,16
90:10 119:7
136:3,10,15
142:14 153:22
154:24 167:16
176:3 183:25
186:25 196:10
211:1 219:4,23
221:16,24
222:24 223:8
227:18 231:4
276:23
**respectfully**
20:8 40:13
181:8 206:10
**respects** 204:1
211:21
**respond** 48:11
80:1,12 85:15
103:6 106:7

127:8 193:7
196:6 260:24
**responded**
48:14
**response** 53:14
106:23 142:7
195:1 232:22
255:8 259:14
**responsibility**
142:5
**responsible**
36:3 241:25
242:4
**rest** 114:14
189:5 279:14
**restarting**
58:18
**restrictions**
124:2
**restructuring**
25:5 31:9
83:19 84:23
85:1 204:4,8
204:12,14,20
**rests** 244:14
**result** 130:13
148:6 222:4
226:15 227:22
250:13
**resulted**
277:12
**resulting** 36:4
**results** 117:10
130:13
**resume** 279:3
**retail** 18:21,21
22:21 91:10

**retain** 57:13
182:7 231:24
273:10
**retained**
183:16 191:13
**retaining** 58:4
**retains** 232:9
**retention**
271:22
**retroactively**
26:25
**return** 27:2,23
96:20,24 161:2
161:4 221:17
238:17 269:25
**returned**
224:11,21
**returning**
129:15
**returns** 95:20
242:6
**reuters** 89:2
**reveal** 159:1
**revealed**
208:19
**revenue** 253:10
256:24
**reversal** 176:9
**reversible**
49:23
**review** 43:20
52:11 61:15
66:3 100:24
180:5 224:1
265:22 278:17
279:1

**reviewed** 56:18
83:23 84:23
**reviewing**
278:18
**reviews** 61:21
**revised** 17:18
18:12 29:24
31:17 35:16
50:15 200:3
**revisions**
116:23
**rewards**
136:24 180:18
**richard** 13:14
34:15 73:4
80:12 98:11
191:2 197:10
214:13 245:7
271:15
**rid** 22:15
**riffkin** 13:6
**right** 17:2
18:10 20:21
21:19 22:15,18
23:11,12 24:10
29:3 31:21
35:8 38:9
41:12 42:4,14
43:8 45:22
47:6 50:11
51:25 57:13
65:4 79:3 80:9
81:3 83:1
85:11 91:25
95:12 98:19
99:17 100:22
101:14 102:9

104:16 105:24
106:13 107:4
108:24 111:6
115:9 119:9
121:7 123:1
124:10,14
125:21 126:17
127:6,14 128:1
128:2 131:10
133:22 140:18
140:20,20
141:1 146:21
147:16,19
156:22,23
157:6 161:11
161:18 163:17
169:23 179:25
192:25 194:9
198:8,15,24
199:22 203:2
208:12,15,20
209:19,23
213:3,20 214:2
215:2,12 217:4
217:16 224:19
233:8,20 234:4
234:12 236:24
245:15 248:6
249:16,20
250:12 251:5
251:10 254:1,9
255:13 256:24
260:10 261:2
263:14 265:14
270:5 271:24
272:9,13,25
273:1 275:22

276:20 277:11
278:13
**rights** 90:1
127:18,22
182:7,9 187:13
201:1,23
206:20 227:23
237:8
**rise** 175:16,22
177:7 252:25
**risen** 145:7
**rises** 146:18
**rising** 144:22
144:23
**risk** 31:15
33:22 40:10
55:5 56:24
66:15 67:12
68:4,6 71:1,3
138:18,19
142:23 146:8
218:19 219:14
258:15 273:11
274:5
**risks** 29:15
38:6 58:7
65:22 68:21
70:9,14 71:23
87:17 180:18
**rizk** 15:24
**road** 6:19 7:3
134:19 281:23
**robert** 8:22
**robustly**
227:17
**rochester** 5:9

**rodney** 8:18
**role** 43:20
65:21 86:24
236:5 237:19
240:2 241:23
242:15,16
269:25
**roles** 206:17
223:5
**rood** 15:6
**room** 131:24
148:20 187:3
211:11 257:18
**roseman** 5:3
**rosen** 5:19
**rosenblatt**
12:13
**round** 180:11
**route** 159:23
**routinely**
163:10 168:8
**rug** 255:7
**rule** 38:13
48:25 49:17
115:14 170:23
171:4 187:10
187:15 195:14
197:6 204:18
253:14 255:15
262:14 264:25
265:7,13,15,18
265:19,20
**ruled** 258:5
270:21
**rules** 26:24,25
28:1 36:8
39:25 132:25

170:21 204:5
204:18 212:5,6
265:4,11,20
267:11
**ruling** 52:6,7,9
208:11 252:9
253:10 256:24
258:14,15
259:17 261:9
262:2,6 264:10
264:16
**rulings** 245:20
251:20 255:14
272:21 278:17
279:4
**rumors** 58:11
159:17
**run** 54:1 55:5
**ruskin** 8:9
**rxr** 8:11
**ryan** 9:7 28:14
28:15 94:14,14
94:18 95:5,12
95:22 96:15
97:16,22 98:6
98:17 99:11
100:1,8,12,17
100:23 101:15
101:17,19
102:4,7,15,18
102:25 103:1,2
132:9,10
133:10,21
185:21 207:25
207:25 208:21
208:21,24
209:13,17,20

209:22 210:2
214:8,8
**ryan's** 98:14

**s**

**s** 5:1 17:1
280:2,2,2,6
**sacrifice** 93:1
**sacrificed**
92:25
**safe** 110:22
**safeguarding**
56:20
**safety** 61:13,19
**sake** 155:17
**sakes** 198:8
**salary** 153:25
**sale** 31:4,12,13
41:8 54:11,14
54:21,22 56:23
58:7,11,13,16
60:4,12,16
63:4 76:13,14
76:19 101:22
137:12 142:18
146:23 150:11
151:11 154:23
155:1 179:11
195:24,24
222:1
**sales** 45:10
213:16
**san** 10:14
**sat** 173:3 175:5
**satisfactory**
158:2
**satisfied** 66:23
72:24 85:3

112:19 115:6
188:15 222:6
231:22
**satisfies** 268:2
**satisfy** 41:25
108:11 235:23
**satisfying**
48:16
**save** 99:13
**savings** 72:12
**saw** 35:15 43:3
134:4 217:4,5
217:9 268:18
**saying** 22:14
26:1,9,10 27:5
27:13,15 28:6
29:25 30:4
34:4,6 37:8,17
40:9 44:14
46:22,23 49:10
63:13 64:5
66:10 67:20
70:19 71:25
75:12 79:13
91:13 93:22
102:13 113:16
123:19 128:13
139:1,3,25
140:3,5 145:6
164:6,7 169:23
182:20 186:12
206:19 212:11
216:20 234:20
234:21 237:6
256:8 264:7

**says** 25:24 26:4
26:8 32:21
93:16 105:1,14
105:16,18
109:6 171:25
171:25 204:2
210:24 211:17
212:20 223:13
244:23 247:8
247:12,19
257:7 262:23
**scenario** 123:5
128:24 132:4
156:8
**schedule**
228:20 246:10
**schedules**
176:11 226:20
264:1
**scheme** 159:11
261:18,20
262:1,4,9
266:4,12,20
**schemes**
261:17 262:12
**scherling** 9:21
**scheuer** 6:14
29:10,10 30:25
32:13 43:12,12
43:15 44:4
45:2,13,17
46:3,5,7,11,18
47:7,21,23
48:2,7 61:1,2
62:3,10 64:8
64:13,19,24
65:3 66:13

68:5,16,25
69:2,20 70:9
70:14,24 71:11
**schiff** 7:15
**schupato**
221:16
**scope** 29:6
167:21 174:18
179:20 190:18
190:20 205:4
279:1
**scores** 65:17
**scott** 261:6
**scurrying**
148:19
**se** 15:16,17,18
15:19,20 79:12
86:15 94:10
104:17,22
134:1 154:7
166:22 169:3
202:12 207:23
208:4 237:4
252:13 255:18
263:12 270:11
272:10 273:4
275:17
**sea** 185:4
**searched**
220:13
**seated** 17:2
52:19 116:9
**sec** 26:6,13
28:10 29:7
30:1 31:1 35:8
37:10,13 38:9
41:18 42:2

43:8 44:16
48:15,15,21
52:10 58:23
60:21,25 69:6
89:9,9,12,15
90:3 91:2,4,10
91:15 203:11
207:2,10 208:6
208:16 210:17
213:1 236:17
**sec's** 24:18
43:3 48:12
49:12 89:9
91:8,9,23
**second** 17:21
57:6 63:5 88:8
109:3 140:16
165:24 168:10
168:21 182:25
186:5 199:6,6
210:13 211:18
230:4 235:6,12
239:5 243:1
255:20 265:19
**secondarily**
100:17
**secondary**
156:5 170:9
**secondly**
263:10
**section** 29:19
36:13 41:11,24
42:20 44:16,25
62:4 87:24
97:25 105:16
134:2 174:19
183:16 221:22

236:18 258:11
265:13
**sections** 96:7
265:12
**secure** 61:8
110:22 111:13
**securing**
154:14
**securities** 6:8,9
6:16,17 9:2
10:19 11:2
27:21 29:11,21
31:8,11 32:7
39:6 41:4,11
42:21 43:13
45:7,7 46:24
61:2 62:15
70:1 90:8,11
90:13 132:11
152:6 168:1
182:16 202:8
204:18 205:24
208:18 211:10
**security** 19:2
29:16 40:23
41:8,10,18
42:5,7 44:12
44:23 48:22
50:24 51:8
54:16 56:1,16
61:13,21 62:7
62:7,25 63:14
64:1 66:4,5
68:1 75:5,10
75:14,15,21
83:23 85:2
90:9,14,15,16

90:19 99:15
104:18 105:15
105:22 106:4
107:15,16
111:5 113:8
129:11 147:1
203:11 208:7,9
228:10
**see** 27:20 29:12
40:14,16 50:19
50:25 64:22
67:24 68:2
82:6 94:20
95:1 102:9,12
117:11 119:17
122:25 123:25
125:18 126:17
128:16,23
132:13,18
147:22 149:16
150:16 151:24
155:19 159:16
168:14,21
171:22 178:17
181:2 184:24
188:18 201:12
203:6 208:1,3
209:25 210:1
223:11 224:13
224:16 235:21
245:24 248:9
254:24 271:3
**seeing** 76:5
157:3
**seek** 24:9 25:10
25:12 43:6
212:1,12

**seeking** 24:23
25:1,14 29:24
31:4 50:21
51:25 52:1
62:16 70:2
155:2 221:9
236:22 267:25
269:16
**seeks** 274:1
**seem** 72:16
128:3,4 249:20
271:6
**seemed** 163:17
193:4 269:2
**seemingly**
128:20
**seems** 36:10
74:18 93:24
126:11 130:19
130:24 131:7
131:12 141:8
149:13 150:9
152:17 153:8
159:23 160:2
176:16 177:15
179:21 180:3
225:5 239:7
247:23 248:4
249:17 252:23
274:20
**seen** 19:12
101:8,21
102:22 192:16
201:10 238:21
239:19 275:20
**seer** 263:6

**seers** 264:19
**segment** 94:21
**segregate** 18:5
**segregates** 56:6
88:19
**select** 231:16
242:9
**selected** 256:12
**selecting** 243:7
244:1 256:1
**selection** 244:4
**self** 187:7
253:12
**sell** 18:10
19:21 23:19
58:1 102:9
135:21 139:10
142:4 144:16
145:14 146:16
147:11 149:16
149:23 150:17
151:4 152:9
155:2,15 221:2
**seller** 59:25
112:15
**sellers** 112:3,4
**selling** 50:5
90:13,14,15
135:15 154:22
**sells** 155:18
**send** 21:4
**senior** 185:23
**sense** 27:22
32:2 37:4
38:11 39:19
53:24,25 63:4
69:17 71:15,22

180:24 181:19
181:21 189:5
206:25 248:2
248:15,16,17
249:20 274:1
274:14
**sensitive** 20:24
21:5 73:17
**sent** 17:12
81:16 178:20
200:8 246:6
278:20
**separate** 39:12
45:18 46:19
47:10 88:13
89:17 108:8,9
108:10 138:7
185:5 187:14
201:20 228:6
232:25
**separately**
38:10 166:7
**september**
248:21
**seriously** 24:21
31:25 176:2
242:13
**serve** 49:24
178:5 183:2
222:13 223:4
237:24 242:16
244:8
**served** 178:2
251:22 265:4
**service** 178:23
**services** 10:2
15:8 75:18

122:7 221:5
**serving** 55:23
223:2 237:19
**set** 78:25
104:12 132:19
153:16 178:16
189:4 192:16
**seth** 15:22
208:4 239:25
**setting** 206:11
**settle** 184:7
**settled** 91:2,4
**settlement**
172:9 176:10
182:10 183:25
184:5,12
185:13 186:13
188:22 189:4
190:7,14 195:3
195:4,9 218:2
218:9,10
**settlements**
91:2
**seven** 88:13
242:17,19
**several** 68:8
82:2 159:7
227:14
**share** 73:18
86:22 110:21
111:9,10
134:25 140:15
147:9 151:10
**shared** 196:25
**shareholder**
167:10 276:16

shareholders 226:10
shares 160:24
sharing 111:14
shark 238:16
shaya 5:9
shea 10:23
shehadeh 3:11
sheila 4:1 281:3
sherri 4:2
sheryl 8:14
shield 187:10
shields 195:23
short 85:7 90:3
shortly 75:23 225:4 273:21 275:1
shouldn't 213:9
show 41:15 42:12,19 44:24 51:18 55:3 123:11 126:6 205:8 252:22 262:3
showing 30:17 85:3,3 129:10
showings 43:5 43:9 129:12
shown 44:21 102:19 126:21
shows 85:20 86:4
shut 26:15
sic 128:10 135:15 139:13

140:13 163:21
side 83:16,17 99:16 187:1 200:14
sidelines 206:21
sign 23:6 109:10 112:22 113:16 114:15 116:25 118:25
signature 281:10,11
signed 198:18
significant 87:11 88:10 187:6 188:13 188:15 242:21 249:22 250:1 250:16 251:15 261:13 263:13
significantly 58:7 193:17 268:11
silent 205:21
similar 98:14 171:5 173:8 196:19 203:7 207:19 215:7 234:12
simon 14:7
simple 58:12 150:9,12,13,14 150:16 171:16 171:18
simpler 256:18
simplest 244:13

simply 27:13 113:10 125:7 129:18 152:1 166:3 170:12 171:24 188:14 204:23 244:7 265:19 270:25
single 67:6 74:15,24,25 92:17 238:7
singled 148:4,7
singling 211:13
singularly 139:6
sir 80:11 81:9 82:13 86:19 92:2 94:1 95:5 166:18 208:20 209:22 246:25 248:14 253:9 257:6 258:19 260:9 261:5 263:19,24 265:23 267:4
sit 72:2 91:15 205:20
sites 159:8
sitting 255:13
situation 69:16 124:7 246:4
six 24:4 70:22 78:9 101:21 122:9,19,24 123:4,13,21 126:5 128:24 224:25 227:13

sixth 57:25
sizeable 186:18
skewed 153:2
slade 11:22 17:4,6,6,16 24:14,15,25 25:13 26:1,5 26:17,19,22 27:8,12,17 28:9 34:11 41:17 42:1,9 42:15,23 43:2 48:11,21 49:8 49:22,25 50:10 50:12,22 51:5 51:13,17,22 52:3,15,20 53:8 148:21,21 149:2 220:2,7 220:24 279:7
slater 186:6
sleep 127:22
slightest 68:3 206:8,25
slightly 247:12
slowly 169:12
sluffing 242:24
small 84:11 149:4,11 150:7
smart 134:10 134:22 135:3,5 135:11,13,15 135:19,21 136:11,22,23 137:3,6,10,12 137:13,16,18 137:24 138:4

138:12 139:8
139:15,22
140:6,10
141:17 142:5
144:16,16
145:8,14
146:17,23
148:6 149:16
149:23 150:1
150:11,17
151:4,12 152:4
154:22 159:14
159:25 161:5
161:15
**smell** 139:22
140:6,10
**smith** 11:15
268:16,16,23
269:4,10 270:8
**social** 19:2
159:7 169:21
**software**
137:10
**sold** 45:5
131:16 134:10
134:13,22
135:3 139:9
145:8 148:6
150:2 159:15
160:1 161:5,9
161:15
**soldco** 226:14
**solely** 56:5
57:17,22,23
69:23 228:16
229:4

**solution** 24:11
119:4,20
129:21 130:1
130:17 131:2,3
139:24 143:1
147:17 148:1
150:13,15
152:16 153:20
**solutions**
116:21 119:2
151:23 281:22
**solve** 21:23
**solved** 130:16
**somebody**
21:21 37:5
39:5 40:3 42:8
42:13,18 118:3
121:17 127:21
143:24,24
153:19 167:1,9
170:23 173:3
180:3 233:18
254:8,22 263:6
265:2 267:24
270:23
**something's**
30:13
**somewhat**
35:19 158:2
**soon** 27:24
103:20 121:10
168:9 248:22
272:4
**sorry** 21:17
35:10 70:12
75:9 79:11
81:13 106:17

130:9 139:19
140:1 145:3,4
147:23 157:11
158:21 161:9
162:3 165:11
165:13 187:23
192:23 194:25
199:19 222:11
239:23 253:24
255:19 257:23
263:19 266:1
266:10 273:2
277:20
**sort** 30:2 33:10
72:4 132:23
141:5 159:10
207:19 246:24
261:12 268:22
**sorts** 201:3
**sought** 25:11
170:22 178:22
265:6
**sound** 62:22
120:22 281:5
**sounds** 121:23
133:13 150:12
278:18
**south** 9:11
**southern** 1:2
**southfield** 7:4
**space** 238:7
**spaces** 169:21
170:16
**spared** 239:9
**speak** 83:3
89:8 93:5
104:18 115:1

165:12 197:2
199:16 200:23
246:8 257:19
260:4,5 267:16
268:10
**speaker** 79:14
279:19
**speaking** 30:16
35:12 37:7
79:10 80:13
81:14 94:6
103:10 116:4
164:8 165:13
191:13 199:17
263:24
**special** 9:17
142:3 167:20
174:8 175:9,11
177:24 183:8
183:22 186:13
187:6,17
189:13 194:22
194:24,25
219:24 269:5,6
273:14 276:9
277:1
**specific** 38:11
43:24 44:10
48:17 59:4,12
61:17 62:23
119:16 140:1
143:3 150:2
151:16 167:14
172:9 179:15
207:10 210:23
219:20 224:2
236:23 254:3

278:22
**specifically**
22:13 35:3
83:20 92:22
97:6 99:5
134:2 148:1
163:1 170:25
185:22 186:25
191:13 211:13
216:21 241:24
249:9 251:21
253:10 257:2
263:20 276:12
**specifics**
203:22
**specify** 220:12
**speculation**
138:2 139:9,19
**speculatory**
145:8 161:11
**spend** 92:14
158:21
**spending**
184:23
**spent** 275:11
**spirit** 214:9
**spite** 120:23
**spoke** 119:22
194:23 199:20
**spoken** 201:6
**spot** 234:4
**square** 8:18
**squarely** 19:19
**squeeze** 49:19
**st** 8:3 15:13
121:20 122:5,6
123:2 124:8,12

124:16,19
125:3,15,21
126:12,19
127:1,7,15,19
127:25 128:7
128:10,18
129:2,8,23
130:10 131:4
131:19 132:1,6
**stable** 73:21
**stablecoin**
90:18 133:1
**stablecoins**
119:7,9
**staff** 62:14
69:22,24 89:9
89:12,18,20,21
89:25 90:3,7,8
91:10,12,15
146:25
**stage** 111:1
168:8 248:5
249:7 269:15
**stake** 58:1
133:1 141:15
**stakes** 154:12
**staking** 130:1
136:24 218:20
219:14
**stance** 208:7
208:14,14
**stand** 180:6
199:7 238:23
243:15 262:16
263:11
**standard** 33:15
125:16 195:8

196:2 202:18
202:21 203:19
205:2 254:20
254:21,22
**standards**
56:17,18 75:21
180:24 189:2
190:8
**standing** 50:12
69:5 74:13
86:17 89:24
122:1 167:3
**stands** 91:9
**stargatt** 8:16
**start** 27:18,23
54:7 67:7
**starting** 92:19
**state** 9:2 15:8
15:10 25:4,6
28:15 93:3
103:22 104:6
116:19 121:12
122:2,6 132:11
134:9 139:5
144:13 147:7
153:23 158:25
204:3,6 208:22
208:24 212:1
213:13 239:6
**stated** 69:21,25
80:3 89:24
90:7 91:8
113:8 114:15
146:25 160:23
191:11 228:23
**statement** 3:2
31:3,13 51:1

63:25 64:10
67:7,13,19
68:9 70:8,20
73:11 74:5,7
75:2,6,13 76:1
76:3,4,7,8 77:5
77:10,15,22
78:1 80:8,13
80:18,23 81:15
83:6,8,8 84:1,3
84:7,15 85:6,6
85:22 89:12,23
90:3,19 91:15
93:13,15 94:3
94:10,16,19
95:8,9,10,11
95:13,17 96:1
96:21,24 98:5
98:16 99:9
107:1 134:13
142:4 148:3,8
159:24 172:14
174:13 176:6
186:9 214:21
216:17 223:25
227:1 242:23
263:1,1,3
**statements**
55:8 56:3
89:10,18,25
96:6 100:10
104:5 123:9,10
140:8 149:25
152:5 175:12
175:13 182:15
182:16,16
226:20 261:25

268:25 269:7
269:12 273:8
274:13 276:12
276:14 277:22
**states** 1:1 5:11
5:12 6:8,16 8:2
13:2,9 14:17
14:18 62:15
70:1 106:19,25
106:25 116:20
116:22 117:5
117:20 118:15
118:20,22
120:15,20
121:14 122:12
124:14 134:13
188:17 202:8
204:2,5,22,22
211:10 212:1
212:21 251:20
254:18 257:8
275:3
**stating** 35:2
**status** 122:2
162:15 250:24
**statute** 40:5
**statutes** 37:2
**statutory**
36:17 39:3
108:11 183:10
198:15 205:6
205:14
**stay** 3:21 113:5
113:6 178:12
193:8 206:21
**steal** 198:9

**stems** 274:12
**step** 37:10,22
235:6 249:5
256:11
**stephen** 186:3
**stephenson**
3:15
**steps** 141:16
151:6
**steven** 5:8
**stick** 179:16
181:13
**stipulation**
228:8,10
229:15,16
230:1 232:9
**stock** 155:18
155:20 226:9
226:11
**stockton** 12:1,8
12:15 225:18
**stolen** 217:14
262:4,19
**stood** 30:10
**stop** 23:7 25:8
25:25 27:9
30:13 31:21,23
34:6 37:15
41:12 67:7,12
69:8,10 172:3
196:6 245:4
259:20 266:24
**stopped** 34:7
185:15 206:19
217:24
**stopping** 37:12

**stops** 218:7
**straight** 134:19
**strategy** 147:5
175:21
**stray** 235:11
**strayed** 111:16
**strays** 111:18
**streams** 147:1
**street** 5:13,21
6:11 7:10 9:11
11:3 12:10
13:3,19 14:4
14:19 15:3,10
**stretto** 79:18
79:22 80:16
82:21 94:12
**stricken** 196:2
202:21 207:16
**strict** 129:3
**striving** 216:15
**strong** 64:3
116:5 239:14
**structure**
56:23
**structures**
108:10
**struggling**
273:3
**stuck** 170:13
**stuff** 31:23
74:22 107:7
**stumped** 23:15
**subject** 27:6
32:6,6,22
33:14 34:9
37:2,9 39:6,25
40:1 42:6

46:12 69:21
88:6 138:14
171:8 173:7
189:9 190:21
206:4,6,24
214:17 216:5
217:12 224:1
233:13 246:15
**subjected** 30:8
**submission**
43:23 48:4
49:3,16 52:10
119:5,6 236:21
256:7
**submissions**
100:19
**submit** 48:3
135:17 200:15
200:21,23
201:8,13
206:10 238:5
244:6
**submitted**
20:18 61:10
75:23 80:19
192:18 252:2,4
252:5 253:19
255:24 256:5
272:2
**submitting**
261:22
**subordinate**
218:4
**subordinated**
227:2 229:1
**subparagraph**
201:24

**subparagraphs**
215:17
**subpoena**
63:17 263:6
264:19 265:2,3
265:7
**subpoenaing**
265:1
**subsection**
201:22 215:4,6
215:15
**subsequent**
226:3
**subsequently**
277:23
**substance**
83:25 84:3
**substantial**
87:4
**substantially**
55:19 227:2
**substantive**
67:2,17 71:13
93:9
**substantively**
233:2
**success** 188:1
190:10
**successful**
68:20 94:23
95:22 97:18
193:2 246:17
**successfully**
168:13
**successor**
62:13

**sue** 181:17
182:8,9 264:14
266:7
**suffered**
240:12
**suffice** 108:11
159:4
**sufficient**
71:10 99:9
103:17 171:11
187:16 235:22
**suggest** 36:25
114:6 125:2
139:25 147:24
173:2 205:8
267:22
**suggested**
130:17 205:10
208:17
**suggesting**
32:13 33:7
124:13 145:18
153:4,17
192:20 234:12
234:18
**suggestion**
32:12 177:7
179:6 234:11
**suggestions**
66:1
**suggests** 62:24
243:19
**suing** 25:7
**suite** 10:13
13:11 185:4
281:23

**sullivan** 7:8
9:16 174:8
**sum** 146:10
**sunset** 130:2
**super** 28:1
**supplement**
243:1
**supplemental**
43:3 50:16
126:22
**support** 78:8
78:14,18 79:12
80:2 82:12
91:13 93:21
94:10 101:4
136:12 173:11
173:13 262:8
**supported**
77:17 78:7
117:2,6 120:10
122:12,16
125:6 132:15
269:18
**supporting**
50:19,22 51:9
127:3
**supportive**
252:16
**supports** 87:1
87:6,10 88:16
91:24 190:14
**suppose** 144:8
155:13 192:14
**supposed** 28:2
30:22 65:21
68:14 101:13
107:25 149:19

180:22 181:3
222:13 264:24
264:25
**sure** 26:3 42:15
44:2,2 48:16
49:20,25 50:2
52:4 72:15
74:4 75:25
78:16 102:4
110:25 135:10
138:13 141:2
142:16,25
143:20 146:14
147:20 149:17
150:15,21,24
167:2 171:21
171:23 180:10
189:4 190:14
203:16 207:3
207:18,22
208:23 209:19
224:16 230:12
236:6,20
262:20 266:14
268:4,18
278:22 279:11
**surely** 198:20
198:25 234:6
**surpass** 188:11
**surprised**
273:12,17
274:9
**surprising**
244:11
**surrounding**
227:21 273:13

**susheel** 9:22
174:7 217:19
**suspect** 45:22
127:9
**suspicions**
159:18
**swager** 11:13
**sweeping**
255:6
**sword** 32:3
**sworn** 55:8
56:3 63:25
**system** 110:20
111:10 233:8,9
233:20
**systems** 110:22
111:9,14

**t**

**t** 280:2
**tactic** 229:24
**tag** 92:3
**take** 23:1 33:20
40:5,10 46:14
48:23 51:18,21
52:15,17 54:1
68:10,21 69:6
70:22 71:6
72:7,13 85:9
88:21 89:8
91:9,23 96:7
103:23 123:22
123:23 127:17
129:1,7,14
130:23 140:23
140:24 141:16
144:12 147:19
176:2 186:1

206:22 214:25
219:1 221:20
245:15 249:25
250:4,16
253:11 263:12
**taken** 29:2
30:1 52:25
71:18 74:15
94:7 112:9
153:12 176:17
205:10 208:6
255:1 257:12
**takes** 129:4
279:18
**talk** 24:10
52:15 75:19
105:6 115:6
182:3 203:13
207:14 233:14
246:22 252:17
255:19
**talked** 111:6
169:15 203:16
207:6,12
**talking** 23:7
41:20 42:2
74:4 80:11
81:16 191:3,15
203:5 207:18
208:13 238:17
252:17 257:3
258:10 266:17
**taousse** 10:7
**tap** 185:7
**task** 141:8
**tasked** 241:23

**tasks** 198:10
201:2
**tautology**
257:16
**tax** 36:4 38:14
38:24 157:24
204:11,13
205:17 242:6
251:15,15
252:14,21
253:1,3 266:20
267:18,18
268:2
**taxable** 36:2
**taylor** 8:16
**team** 61:12
**tease** 95:2
**technical** 56:11
136:14,17,25
137:10
**technically**
152:21 275:3
**technology**
134:12
**telephone**
35:11 258:23
**telephonically**
61:5
**tell** 20:14 27:16
32:4,16 34:8
37:22 41:13
42:10 48:21
51:21 67:11
68:13 90:17
97:23 111:19
149:18 165:23
167:5 174:10

174:17 180:7
216:4 252:22
254:3,23
257:16 259:20
263:7 272:5,20
**telling** 31:25
32:1 37:25
40:4 44:19
51:15 69:13
74:13 114:2
229:16 230:15
230:16 258:2
**tells** 129:4
**ten** 52:17 90:14
174:2
**tens** 250:2
**tension** 182:5
**term** 71:15
125:11 172:23
174:23 214:18
**terminate** 59:7
59:24 164:25
**terminated**
59:3
**termination**
59:5,10 270:4
**terminology**
107:3
**terms** 20:6
21:18 22:10
23:13,25 24:2
24:22 25:21
30:3 45:1
53:19,23 63:3
63:25 78:14
99:3 108:6
109:20 111:17

133:15 134:2
135:2,8 148:13
149:9 150:7
157:21 159:21
160:5 165:5
173:2,9 180:11
180:16 190:4
210:7,8 239:16
239:20 244:13
266:1 273:24
276:4
**territory**
111:19
**test** 138:14
**testified** 20:5
22:10 58:15
61:9,14 68:20
102:20,21
112:19 179:9
183:8 187:15
187:25 188:9
188:16 189:23
217:24 222:3
231:1 237:22
**testify** 62:6,24
220:8
**testifying**
22:12
**testimony**
22:13 51:3
54:20 61:11
77:6,25 88:6
93:12 96:22
101:7,7 148:15
156:16,18,20
160:23 172:11
174:11 175:15

179:12 219:6
219:25 220:1
220:11,25
221:25 254:1
255:2 265:6,16
**tests** 222:6
**texas** 9:1 28:15
94:15 99:15,16
99:22 100:2,9
100:14 101:2
103:14,17,17
103:22 104:7
117:3,11,12,16
118:2,7,8,9
119:2,5,6,18
119:22,23
120:11 132:7
132:10,12,20
133:7,8 208:22
213:13
**text** 175:23,24
182:17
**texts** 36:3
171:12
**thank** 18:17
24:13,14 35:7
52:20 61:4
82:18 83:4
85:12 86:13,19
91:25 92:2
94:8 102:25
103:4 104:15
110:6 113:3
114:25 116:7
119:24,25
132:6 133:9,10
133:21 137:15

138:16 139:4
157:6 158:16
158:16 161:19
166:18 173:24
174:6 176:14
190:24,25
191:1 199:2
208:20,24
213:21 214:6
216:24 217:15
220:23 225:12
226:1 236:13
237:2 238:24
240:17 241:19
245:4,14 246:1
258:19 260:1
260:12,19
265:22 268:9,9
268:13,16
271:8 272:8,24
276:2 278:12
279:7,19
**theft** 262:3
**theory** 42:7,9
42:12 165:18
**thereof** 175:1
**therese** 6:14
29:10 43:12
61:2
**thing** 22:23,25
25:10 26:17
28:5 33:19
49:22 50:1
59:11 89:19
108:22 115:5
121:25 143:16
150:9 170:17

194:20 198:13
207:18 209:24
210:13 215:10
222:12 232:21
234:22 276:5
**things** 18:8
19:2 29:1 30:6
36:13 37:1,8
37:19 38:2,25
46:4 47:1
58:18 67:14
72:9,20 82:6
86:22 95:16,24
96:1,7,9 98:15
104:24,24,25
105:22 109:4
113:13,16
127:22,23
133:2 137:7
147:14 150:18
156:22 158:2,8
160:8 180:15
180:19 182:14
189:16,20
197:20 198:14
198:19 204:21
206:6 207:20
207:22 212:9
212:22 226:19
228:24 241:3
247:15 253:7
254:3 255:5,12
258:7 259:5
261:25 262:5
264:25 267:17
272:21 273:11
273:18 274:12

| | | | |
|---|---|---|---|
| 274:17 275:20 | 124:9,20 125:3 | 203:2,3,4,5 | **thinks**   25:24 |
| 275:23 277:15 | 125:11,13 | 206:4 207:4,11 | 37:5 96:8 |
| **think**   17:13,19 | 126:21 128:22 | 207:16,16,19 | 146:2 |
| 19:18 20:3,5 | 130:12 131:2,3 | 208:2,16 209:1 | **third**   31:5 |
| 22:4 24:7,21 | 131:18,24 | 209:24 210:18 | 57:12,22 61:20 |
| 25:22 27:20 | 132:16 133:3 | 211:4,12,17,18 | 83:22,22 |
| 28:17 29:12,25 | 134:5 137:23 | 212:17,25 | 135:22 137:12 |
| 30:4,19 31:16 | 138:14,17,23 | 214:8,9 216:5 | 149:7 162:8,9 |
| 34:4 37:12,14 | 138:25 140:7 | 218:8 219:4,6 | 162:10,12,13 |
| 39:10,14,15 | 141:10 142:2 | 219:19 220:8,9 | 162:18,23 |
| 43:5,8,9 44:9 | 143:1 144:2,13 | 221:25 222:9 | 163:2,4,11,14 |
| 44:11,13,14,15 | 144:20,23,24 | 223:1,3,11,17 | 163:24 164:7 |
| 44:20,24 45:17 | 144:25 145:6 | 224:4,18 226:5 | 165:6 168:2,22 |
| 46:5,7,18 47:8 | 145:12,17,20 | 229:16 230:22 | 169:8 182:6 |
| 48:5 49:23 | 146:1,10,24 | 233:11 234:9 | 183:3,15 |
| 51:22,24 53:25 | 147:4,12,12,17 | 234:10,15 | 186:24 191:4,6 |
| 60:21 62:5,8 | 149:20,23,23 | 241:2 244:19 | 191:23 192:1 |
| 62:12 63:5 | 150:1,8,11,13 | 244:22 247:17 | 207:10 218:17 |
| 64:8,24 65:4 | 151:3,5 152:1 | 248:23 249:8 | 218:23 219:11 |
| 66:13 67:14,21 | 152:7,8,15,25 | 249:10 250:8 | 219:17 235:14 |
| 67:22,23 69:20 | 153:4,10,20,23 | 250:11,12 | **thorium**   137:2 |
| 70:9 71:4,9,14 | 154:1,18 | 251:9 252:8 | **thorough** |
| 71:17 72:18,19 | 156:11,24,25 | 253:13 255:6,9 | 148:5,9 |
| 72:22 74:24 | 157:2,3 158:3 | 256:25 257:2 | **thought**   18:24 |
| 75:9 85:7,19 | 159:22 160:8 | 257:18 259:5 | 48:22 119:9 |
| 86:23 90:18 | 161:23 168:14 | 260:6 261:21 | 145:17 156:19 |
| 93:15 94:25 | 168:19 170:4 | 264:15 267:5 | 171:22 193:16 |
| 96:12,13,18,24 | 171:1,4 172:4 | 267:22 269:4,7 | 193:19 201:17 |
| 97:11 98:1,21 | 172:6 179:14 | 271:4,21 273:8 | 211:6,7 230:17 |
| 99:8,24 103:10 | 179:19 181:16 | 274:5,23 275:2 | 233:15 243:15 |
| 104:1 105:6 | 189:18 190:11 | 275:17,19 | 256:4 264:1,2 |
| 106:3 108:6,10 | 190:14,16 | 276:25 277:15 | 264:3,4 272:19 |
| 108:22 110:21 | 192:14 193:24 | 277:18,22 | **thoughtful** |
| 111:16,18,22 | 195:7 196:14 | 278:3,7 279:14 | 148:5,9 |
| 112:10 114:22 | 196:21 197:2,3 | **thinking**   90:16 | **thoughtfully** |
| 115:10 118:23 | 197:5 199:10 | 128:5 153:20 | 227:16 |
| 119:3,6,7 | 201:21 202:13 | 248:4 274:18 | |

thoughts
259:17
thousands
78:21 92:15
93:3 113:21
250:3
three 17:8,23
18:11 29:1
84:14 112:1
116:20 122:18
125:4 127:2,15
130:18 132:14
151:7 187:5
202:19 207:6,9
223:7 242:14
269:15
threshold
162:8
throwaway
180:3
thunder
217:14
thursday 48:19
69:6 89:10
200:4 243:13
thursday's
156:19
tichner 20:5
22:10
ticker 240:15
tie 135:6
204:22
tied 195:8
221:4
tiffner 179:16
time 17:15,16
26:15 27:16

34:9 35:8 38:1
45:22 48:12
49:2 57:18
58:3 63:18
67:6 72:9
87:17 93:4
98:16 99:1
103:2 104:20
114:3 115:22
115:23 116:3
126:5 128:2
142:23 143:3
150:21 151:6
151:11 152:9
154:18 155:8
158:21 160:18
167:16 177:9
184:23 200:3
200:22 215:23
225:24 232:24
234:13 240:12
241:2 243:15
243:17 246:2
247:24 248:19
249:24 251:20
251:22 258:4,5
269:23 270:21
271:7 274:20
275:11,12
timeline 117:1
122:15 125:22
126:2,10 131:7
131:8
timeliness
249:8
times 57:21
78:5 79:24

169:12 251:17
277:12
timing 49:4
tired 259:21
tischner 58:15
61:12
tischner's
54:20
tishner 136:14
tishner's
148:15 160:23
title 57:13
today 26:12,13
30:5,17 33:4,5
36:20 44:9
49:9,14 60:6
61:5 76:14
93:9 111:17
115:18 122:9
145:25 161:15
164:24 179:5
185:10 233:21
244:19 255:13
255:15 259:13
267:23 270:7
272:9 273:9
274:20 276:1,2
together 68:21
154:16 179:11
192:12 220:16
toggle 60:9
64:21,25 79:5
87:8 131:12,14
toggled 97:8
token 30:4
42:17 78:19
90:13 135:12

135:13,14,18
135:20,22
136:22,23,24
136:25 137:1,1
137:4,6 138:9
138:18,20
139:15 141:14
141:24 142:15
146:17 151:22
154:17,25
157:9 159:6
tokens 58:19
90:14,15
135:25 137:3
138:10 141:22
142:22 148:17
159:1,5 161:12
told 24:16 38:3
66:18,20,22
143:25 178:22
179:16 249:2
270:19
tolerate 206:2
tomorrow 42:3
49:17 52:10
116:6 138:21
200:24 236:21
259:15 260:23
278:24 279:3
ton 275:12
tongue 274:4
tonight 245:24
261:1
took 95:11
99:6 117:10
208:14 215:13
225:10 242:13

243:17
top 98:1
topco 226:8,14
  226:15 227:18
  228:2,7 229:6
  229:8,12,23
  230:2,25
  231:10,14,17
  231:22 232:3
  232:10,11,13
  232:15 234:17
  234:24 235:15
  235:18 236:2
topco's 227:14
  229:25 231:11
  236:2
toronto 226:9
total 149:5
totally 204:1
  210:11
touches 108:2
touted 168:8
towards 155:3
  260:21
townsend 12:1
  12:8,15 225:17
toyed 259:21
tracey 4:1
track 243:13
tracked 219:5
tracy 3:8 15:16
  86:14 237:3
  238:4 252:15
  253:9 255:19
trade 6:1,2
  22:8 47:24
  62:16 68:18

69:4 70:2
119:11 144:24
155:7 159:6
186:23
traded 137:2
  137:19 161:9
  226:9
trades 47:15
  48:9
trading 7:9
  10:2 119:16
  130:1,4 133:1
  145:11 160:12
training
  240:13
trajectory
  134:20
transact
  160:10
transaction
  18:9 19:21
  20:4,9,11,13
  23:19,24 24:9
  25:16,17,19
  26:9 32:4,21
  36:10 38:11
  45:4,19 46:20
  47:10 48:7,9
  54:11,11,14,21
  54:22,25 55:18
  56:24 58:8,11
  58:13,16,17
  59:1 60:4,9,13
  60:16 73:17
  90:8 103:12
  104:1,11
  115:23 135:16

137:8 142:18
142:19 152:6
154:14,20
155:1,5 168:15
195:3,5,9
204:12,14
222:1,2 272:14
274:3,25
transactions
  25:5,5,8 29:16
  31:9 34:3 36:1
  36:2,7 38:13
  39:17 41:23
  43:21 46:24
  60:17 73:24
  74:10 97:7
  137:4 154:15
  154:19 184:22
  193:11,13
  196:13,23
  197:9 198:23
  204:4,9,20,24
  205:9 273:21
transcribed
  4:1
transcriber
  281:11
transcript
  281:4
transfer 18:15
  18:19,25 19:20
  22:5,18 55:19
  57:1 58:2,8
  66:16 76:19
  107:11,18,21
  110:12 131:17
  136:5

transferred
  19:3 21:22
  54:16 56:2
  57:2,7,19,21
  76:23 87:20
  99:19 101:23
transferring
  43:8 62:11
  84:19 87:13
  99:24 132:4
transfers 22:6
  41:24 98:24
  131:20 132:2
  176:5 177:12
  258:8
transition
  215:4 216:18
  216:19
translate
  148:12
treasury 90:22
  134:13
treated 125:14
  125:17 143:2
  152:22 217:10
treating 146:4
  250:22
treatment
  125:23 127:16
  128:14,17
  130:13 133:24
  134:3,6,16
  136:3 138:24
  150:4 152:22
  153:1 160:3
  161:21

| | | | u |
|---|---|---|---|
| **tremendous** | 202:14 203:4 | 126:13 130:21 | |
| 19:13 246:14 | 214:14 215:23 | 137:21 155:6 | **u**  280:6 |
| **trial**  3:25 92:5 | 222:16 237:7 | 185:8 210:12 | **u.s.**  2:1,10 6:9 |
| 92:18 93:5 | 242:19 245:5,8 | 210:13 219:22 | 6:17 13:1,8 |
| 208:8,11 | 245:8,9,17 | 225:11 262:20 | 29:11 34:16 |
| **tried**  71:17,20 | 246:23,24 | 275:13 278:19 | 35:13 72:22 |
| 71:20 78:25 | 247:8,14,16,24 | **turn**  45:14 | 73:5 98:12 |
| 173:3 193:1,10 | 247:25 248:6,9 | 92:1 119:16 | 105:9,9 106:21 |
| 196:20 229:22 | 250:12 251:8,9 | 153:7 | 107:18 190:22 |
| 277:11 | 251:12,14 | **turned**  47:4 | 191:2 195:2 |
| **trigger**  59:18 | 261:3 269:12 | **tweets**  88:25 | 197:11 199:20 |
| **triggered** | 269:23 270:3 | **twitter**  169:21 | 202:14 203:4 |
| 59:16 | 270:23 271:2 | 170:16 | 203:21 207:5,8 |
| **trouble**  21:18 | 271:16 273:5 | **two**  17:10 18:2 | 213:12 214:14 |
| 41:4 128:5 | 273:24 | 18:11 26:8,13 | 215:23 242:19 |
| 134:5 160:25 | **truth**  111:19 | 74:2 75:18 | 245:5,8,8,9 |
| 248:4 | 149:18 252:23 | 78:5 108:25 | 270:23 271:2 |
| **troubles** | **try**  24:17 31:21 | 109:4 122:8,15 | 271:16 |
| 222:12 | 37:13 40:18 | 131:5 147:14 | **ucc**  91:11 |
| **trove**  189:6 | 41:24 63:3 | 152:5 176:7 | 110:16 170:10 |
| **true**  65:20 | 86:22 92:23 | 186:21 207:6,8 | 238:9,23 |
| 160:13 175:10 | 116:21 123:10 | 207:19 211:16 | 239:20 240:6 |
| 176:20 180:1 | 171:17,20 | 214:9 218:6 | 240:24 241:1,2 |
| 254:15 269:1 | 177:11,13 | 223:23 227:5 | 241:10 249:2 |
| **truly**  73:25 | 180:11 182:4 | 241:3 | 256:1,8,11 |
| 231:10,13 | 210:7 224:12 | **tx**  9:2,2,5 10:14 | **ucc's**  167:21 |
| 249:21 268:6 | 238:17 249:4 | 13:20 | **ufc**  140:13,15 |
| **trust**  17:13 | 259:10 271:1 | **type**  28:23,24 | **uh**  124:8 |
| 57:17 102:14 | 277:15 | 97:23 126:1 | 230:14 |
| 102:22 198:1,1 | **trying**  25:15 | 161:8 240:15 | **ultimate** |
| 242:6 277:25 | 26:22 27:1,9 | 248:22 267:25 | 107:13 112:1 |
| **trustee**  3:6 | 29:5 30:12 | **types**  43:21 | 147:2 |
| 13:1,2,8,9 | 32:24 34:6 | 190:5 212:9 | **ultimately** |
| 21:16 34:16 | 36:12 37:14,14 | **typical**  242:5 | 41:19 227:2 |
| 72:22 73:5 | 38:18,23 47:1 | **typically** | 240:2 242:1 |
| 98:12 190:22 | 51:1 74:20 | 112:15 | 243:8 |
| 191:2 197:11 | 92:19 124:1 | | |

unable   85:1
unaffiliated
  162:18
unauthorized
  46:24
unavailable
  64:25
uncertain   68:7
  68:11
uncertainties
  97:13
uncertainty
  72:10
unclear   29:23
  230:20
uncomfortable
  112:21 113:14
unconscious
  257:11
uncontrovers...
  39:11
uncontrovert...
  22:11 220:5
undeliverable
  224:11
under   18:10
  34:2 36:13,24
  37:2 38:21
  39:3,6,10 40:5
  41:7,7,10,24
  42:20 45:1
  50:6 53:4
  54:22 56:13
  58:21,22 63:5
  64:11,12,14,23
  65:5 66:14
  97:7,9 122:19

127:16 131:11
168:4 170:21
174:14,19
182:8 190:4
196:13,17,24
197:25 206:5
206:23 210:9
212:22 221:22
222:1 227:24
232:9 237:8
245:1,16 247:2
255:7 256:24
256:25 265:7
269:12 275:3
underline
  135:20
underlying
  134:12 135:7
  146:17
underpinning
  136:25
understand
  20:16 23:22
  30:12 31:6
  36:9 40:12
  41:3 42:1
  46:22,25 47:7
  50:1,8,9 55:7
  56:4 66:20
  70:12 78:16
  81:25 82:14,21
  83:19 86:8
  92:9 96:15
  99:20 106:16
  106:24 110:3
  110:17 112:18
  114:1,11,12,14

115:9 121:7
133:14 134:11
135:9 138:14
141:7 144:6
146:1 164:6
167:16 169:7
169:13,18
170:3,19
171:16 181:7
181:22 184:6
188:21,23,24
189:2 195:18
200:12 201:6
201:11 202:16
207:2 210:11
219:1 222:10
223:20 225:2
228:2 231:1
236:22 243:21
246:3 247:2
248:25 249:1
251:17 254:7
262:20 266:14
269:21,25
277:16,17
understanding
  38:2 41:5
  46:11 55:8,13
  65:1 96:23
  99:6 107:17
  109:17 113:22
  118:24 119:14
  129:24 134:5
  135:11 216:16
  218:1 244:1
  247:5 256:17
  258:2 273:15

understood
  66:19 71:11
  174:11 223:15
  224:7 225:12
  235:12 236:9
  258:3
underwriter
  47:20,22 48:6
  48:10
underwriters
  47:19
undo   200:5
undoing   191:7
undoubtedly
  188:13
undue   92:13
  141:11 257:11
unequal
  125:23 127:16
  133:23 134:3,6
  136:3 161:21
unfair   80:2
  93:3 116:13
  123:16,19
  125:10 133:24
  138:23 156:3
  161:21
unfairly   33:1
  117:4,21
  118:15 120:17
  135:4
unfaithfully
  205:18
unfortunately
  118:25 248:19
  270:24

**unfounded**
269:7
**unidentifed**
240:1
**unidentified**
79:14 202:25
239:23 279:19
**uniondale** 8:12
**unique** 140:8
141:14 142:3
**uniquely** 139:6
**unit** 203:12
**united** 1:1 5:11
5:12 6:8,16
13:2,9 14:17
14:18 62:15
70:1 106:18,24
106:25 202:8
204:2,5,22
211:10,25
212:21 275:3
**unliquidated**
226:22 228:22
**unmoved**
89:12
**unmuted** 212:9
**unrealistic**
146:6
**unregistered**
26:14 37:12
62:15 69:25
90:11,12
**unrelated**
216:9
**unresolve**
230:21

**unsafe** 63:24
**unsecured** 3:17
13:17 14:2,10
57:4,8,13,20
185:6 235:17
235:19 242:12
277:2 278:3
**unspecified**
89:13
**unsupported**
17:22 56:12
58:19 99:16
103:23 116:17
116:24 117:20
118:15,16
120:8,12,12,14
**untethered**
180:4
**untimely**
211:12 233:2
**untrue** 263:1
**unusual**
243:14
**updates** 17:7
**uploaded**
101:4
**upset** 80:17
82:16 160:25
**upside** 156:21
**uptegrove** 6:22
202:7,7,11
203:3 207:1,1
211:5,9,9
213:4 236:16
236:16 237:2
**urge** 220:20

**urging** 116:6
**urquhart** 9:16
174:7
**usages** 137:14
**usd** 151:9
**use** 57:10 58:2
107:4 135:13
137:8,12,17,21
139:11,11
177:16 195:4
258:8
**used** 17:24
49:19 71:15
137:4,7,20
161:9 172:23
174:15 202:18
261:21
**useful** 279:15
**uses** 66:6
**using** 21:19
137:24 138:1
**usio** 8:10 10:11
**usually** 160:7
265:1
**utc** 274:10
**utilities** 134:12
**utility** 134:18
135:12,14,23
135:25 137:6,6
139:8 142:17
142:24 146:16
151:22 152:4
153:9 154:17
161:8

**v**

**v** 1:12,19
143:14
**vague** 28:1
219:19
**vaguely** 99:4
**valid** 226:19
232:12
**validity** 172:7
**valuable** 19:7
19:10 20:1
168:11
**valuation**
90:23
**value** 22:9 23:2
54:23 58:13,17
60:6 63:19
76:16,18 85:21
87:3 90:6
113:20 122:17
125:8 127:12
134:14,14,18
135:12 136:1
136:12 137:25
139:17,18,22
142:24 143:3
143:23,25
144:14,17
146:3,4,5,8,17
148:13 149:5
149:10,12
150:6,7,21
151:9 153:3,5
153:8,13
155:12,13,17
155:20,20,23
155:24 156:1,3

156:25 157:17
158:8,24
159:10,13,21
159:24,25
160:7,8,9
161:10,14
165:4 178:13
220:17 229:25
243:11
**values** 97:3
142:22 156:19
222:5 229:11
**vanderbilt**
14:11
**varick** 13:3
**variety** 35:25
138:10
**various** 23:6
74:6 75:19
151:23 154:19
156:22 193:12
203:14 210:4,5
224:23 226:25
247:15
**vary** 38:20
**vast** 55:21
76:19
**verbal** 53:14
**verbally**
170:15
**verbiage** 169:8
169:25 170:18
**verge** 248:1,6
**veritext** 281:22
**vermont** 15:1,2
103:24 116:18
118:19 119:4

129:21,25
130:11 132:24
**version** 201:21
203:23 209:2
209:16,18
211:18 278:20
**versus** 239:19
257:5
**vested** 162:20
**veto** 39:21,22
**vgx** 30:4 37:13
39:1,3 40:23
40:25 41:18
42:2,5,25
43:10,19 44:12
44:23,25 45:4
45:9,14,21,23
46:8,12,13,14
47:4,11,13
48:13 49:6,11
50:5,23,25
51:7 52:7,8,9
52:14 90:7,9
134:2,3,11,13
134:17 135:4,6
135:17,24
136:3,5,12
137:1,14,17,19
137:24,25
138:18 139:1,5
139:7,11,15,18
140:4,11,12,18
140:18,22,25
141:14,18,22
142:14,24
143:7,8,12,16
143:23 144:12

144:14,22,23
145:19,22,23
146:3,8 147:9
147:10 148:4,7
148:10,11
149:7,15,17,21
150:2,5,16,24
151:9,18,21
152:5,6,9,22
153:3,25 154:8
154:12,17,21
155:7,14 156:2
156:3,4,8
157:9,15 158:1
158:4,10,24
159:1,1,8,13
159:24 161:5,9
161:12,14
205:23
**vgx's** 158:10
**viable** 152:16
168:3 178:15
**victim** 251:10
263:2 264:5,6
264:8,11
**victims** 250:15
250:22 253:2
263:2,17
**view** 51:9
103:15 104:10
120:2 130:5
135:24 188:9
203:24 205:22
212:14 223:1
269:7 277:10
**violate** 27:21
29:16 31:11

36:8 38:13
125:20 201:3
204:18 205:17
**violated** 30:9
30:11 204:17
205:24
**violating** 26:25
208:8
**violation** 25:6
33:8 89:13
91:14 204:4
208:18
**violations**
29:22 31:8
**virginia** 10:23
**virtual** 129:3,9
**virtue** 250:25
**voice** 92:16
**voided** 266:3
266:11,15,18
**volatile** 60:7
**volatility** 19:13
**volumes**
160:12
**voluntarily**
164:20 165:17
172:1
**voluntary**
166:8,10 191:6
**volunteering**
165:7
**vote** 68:23
81:20,24 86:2
169:19 170:10
243:9
**voted** 78:9,22
85:17,21,24,25

86:1,5,10
117:12,12,13
117:14 127:9
163:13 166:5
169:20 170:2
240:25 242:16
243:10,14,23
243:25 244:10
278:7
**votes** 78:15
117:23 169:5
170:12
**voting** 78:2,3
81:25 85:16,18
117:10 162:15
163:2,3,5,8
166:3 169:8
170:3,6,12,20
243:4 263:23
269:18
**voy** 1:17
**voyage** 218:17
**voyager** 1:6,10
1:20 7:16 9:17
11:9,18 13:18
14:3 17:3 18:9
19:19,20 21:1
23:18,18 40:24
41:1,5,20
42:19,25 47:13
47:15,25 48:9
54:24 73:17,19
75:10,12,12
76:20 84:17,18
87:14,14,15
88:2,3 131:12
131:13 141:14

141:14,21
142:1,15
144:21 157:1
161:17 164:8
166:15 168:8
169:14 174:9
177:10 187:11
188:1,1,2
218:25 219:13
219:14,15,16
219:16,18
220:15 225:19
226:7 240:16
253:5 255:11
255:15 261:23
262:19 272:15
272:18 277:4
**voyager's**
18:10 61:11
73:12,21 74:3
74:9 75:5 76:9
76:23,24 77:8
83:5 208:17
218:17,20,21
218:21,22
219:10 242:18
**vt** 15:4

**w**

**w** 5:21 280:2
**wachtel** 5:19
**wagers** 273:18
**wait** 34:21
35:4,6 72:3
104:19 122:25
123:20 124:22
125:18 126:9
126:17 128:15

128:23 149:16
169:11 191:22
192:11 199:12
260:6,8
**waiting** 72:10
114:23 254:22
261:8
**waive** 129:18
229:17
**waiver** 186:21
**wake** 73:11
159:11
**walk** 188:20
**wall** 15:18
119:21,21,24
119:25 133:7
**walled** 83:24
**wallets** 75:18
**want** 19:23
21:6 22:24
23:16 26:8
27:5,23 30:14
31:21 32:15
33:6 37:22
40:10 42:4
46:25 49:3,22
50:6 52:5
66:12 78:16,20
79:1,7 80:1
82:5 92:3,12
96:10 100:24
109:11 111:7
113:7,10
114:12,22
115:7 116:24
117:11 119:8
121:9 122:21

123:21,22
126:16 128:15
130:18 132:8
140:18 149:14
149:15 153:21
154:8,21 164:5
166:13 167:12
167:15 168:21
174:10 178:3
181:24 182:3
184:6 189:4
197:2 198:7
200:24 202:13
207:21 208:15
218:11 225:20
233:14 234:22
237:13 238:25
240:3,10,11
249:1 250:12
252:3 253:7
255:6,9 259:12
259:21 260:11
263:16 265:2
266:22,25
268:5,6 269:10
270:2,22
271:12 275:8
279:13
**wanted** 17:16
35:3 43:6 50:2
63:16 67:20
73:13 74:23
79:12 81:5
82:11 93:6
99:12 140:23
141:7 166:12
166:17 182:12

191:24 194:16
199:23 200:14
201:5 202:4,19
203:16,21
206:14 207:13
207:17 217:20
232:4 236:20
237:17 245:12
256:23 268:9
270:18 273:7
273:23
**wanting** 241:7
**wants** 21:14
26:14 37:10,13
133:23 161:20
168:22,24
196:2 202:16
252:10 278:14
**warrant** 269:8
**warren** 15:23
272:10,11,13
272:24
**washington**
6:4,12 8:5
**watching**
243:20
**watkins** 10:1
18:17 85:14
103:6 106:2
111:21 115:20
213:12 260:18
**way** 25:8,9,12
27:15 32:5,16
32:20 33:1
36:10 39:4,23
53:11,23 74:10
98:3 120:15

121:25 122:1
124:20,21
125:1,1,10
126:19 130:25
133:2 137:22
139:11 155:16
155:22 157:16
172:3 174:21
180:8,13,14
191:14 197:24
204:20,24
205:16 234:11
234:16,19
236:23 241:19
244:20 263:7
264:18 272:14
**ways** 36:6
121:3 136:6
171:20 229:14
**we've** 19:12
30:20 31:12
52:22 78:25
86:16,25 87:4
88:17,25 89:3
91:7 92:4
101:8 111:16
116:17 125:23
133:13 151:3
154:15 160:19
168:15 171:13
173:22 187:24
189:18 203:8
222:6 226:2
227:25 233:15
233:15 239:19
240:11 246:15
251:24 252:8

256:15 266:17
269:5 274:20
**web** 75:18
**wednesday**
156:19 228:20
228:22
**week** 35:15
119:22 182:13
230:23 243:4
**week's** 256:6
**weekend** 17:7
24:17 34:12
48:20 49:21
243:16 262:17
263:4
**weekends**
92:15
**weekly** 48:15
57:3 87:20
**weeks** 26:8,13
70:22 90:19
101:22 151:8
227:13
**weigh** 53:22
**weighed** 29:8
189:1
**weighing** 90:5
**weight** 269:8
**weinstine** 9:9
**weiss** 7:1
**welcome**
255:21
**went** 74:10
78:1 81:5 82:3
262:5
**whatsoever**
108:19 161:14

183:23 275:9
**wherewithal**
54:16,21 55:17
77:3 84:6,9
100:3 101:6
104:1
**who've** 28:4
**whoever's** 23:6
**wholesale**
219:1
**wide** 246:15
**widely** 97:3
**wiles** 2:9
119:21
**wilhelm**
241:22
**willful** 187:20
187:23
**william** 6:22
202:7 207:1
211:9 236:16
**williams** 4:2
**willing** 36:19
37:24 90:9,17
100:20 160:9
160:10 231:16
231:17
**wilmington**
8:19
**wind** 21:16,17
192:4 228:13
277:25
**winddown**
36:22 162:19
162:20,24
163:7,8 227:25
238:13

winding
  142:19
winthrop  9:9
wise  177:16
wish  53:13
  60:22
wished  94:4
  261:4
wishes  105:24
withdraw
  87:22 88:4
  89:4,6 105:3
  109:7 137:13
withdrawal
  87:18 133:3
withdrawals
  173:9 176:13
  176:18,23
  177:2,4,9
  179:4 272:15
withdrawing
  176:22
withdrawn
  58:20 103:18
withdrew
  55:16
withstood
  154:25
witness  62:6
  63:16,17
  136:19 243:12
  280:3
witnesses  77:8
  254:3 263:11
woman  118:4
wonder  152:3

wonderful
  133:8
wondering
  58:10 154:13
wooley  185:21
word  257:12
  258:8
wording
  214:11
words  216:2
  245:2
wordsmithing
  208:3
work  26:5
  53:24 92:14,25
  95:15 103:22
  116:20 129:22
  133:18 136:23
  137:4,11
  140:14 157:16
  175:11 178:12
  179:19 214:10
  219:25 222:24
  229:25 234:11
  246:12 270:23
  271:4 278:21
  279:6
worked  45:24
  73:19 256:5
working  95:14
  103:9,18 106:6
  106:13 155:3
  200:23 201:11
  246:4 260:23
  278:24
works  174:23

world  18:21
  30:23 40:1
  72:20 137:19
worried  65:9
  65:18 128:3
worse  79:24
  126:11 131:3
worst  156:8
worth  136:24
  138:19 177:12
  177:20 179:17
  186:19 256:6
worthless
  153:11
would've
  181:15 248:15
  248:15,17
  249:23
wound  70:20
  189:24
wrinkle  151:5
write  223:16
  249:2 250:2
  251:5 252:18
  252:21 261:12
writing  201:8
written  43:23
  48:4 201:13
  244:18
wrong  19:4
  38:22 63:22
  64:20 65:11
  99:8 125:11
  148:18 150:12
  178:15 193:16
  247:12 257:18
  271:14 276:8

  276:13 277:11
wrongdoing
  186:8 274:11
wrongful
  27:16
wrongfully
  66:11
wrote  98:9
  170:15

––––––––– x –––––––––

x  1:3,9,15,23
  101:7,8 179:16
  280:1
xlt  208:15
xrp  208:7,9,17

––––––––– y –––––––––

y  101:7,8
yeah  28:1
  41:22 42:24
  43:14 52:17
  65:2 76:2
  84:10 128:9
  132:5 134:4
  140:3 158:4
  165:14 169:1,2
  181:7 186:6
  193:8 194:14
  198:7 208:5
  214:3 217:18
  234:6 246:10
  259:1 260:3
  261:14 263:16
  263:21 264:24
  270:10
year  19:12
  100:4 104:13

[year - zero]                                                          Page 94

|  | z |
|---|---|
| 126:9 177:1,3 | |
| 177:15 226:17 | **z**  101:8,8 |
| 248:17 250:2 | **zealously** |
| **years**  72:17 | 230:24 |
| 119:23 169:9 | **zero**  64:1 65:20 |
| 241:24 250:17 | 65:20 144:18 |
| **yep**  184:4 | 144:19 146:9 |
| **yesterday** | 161:13 178:23 |
| 24:19 79:16 | 240:15,16 |
| 238:5,24 | |
| **york**  1:2 2:3,3 | |
| 5:6,15,22 7:11 | |
| 7:19 9:19 10:5 | |
| 11:11 12:4,18 | |
| 13:4,12 14:12 | |
| 14:20 15:8,11 | |
| 117:3,11,13,16 | |
| 118:2 119:1 | |
| 120:11 121:18 | |
| 121:24 122:2,6 | |
| 122:18,25 | |
| 124:10,24 | |
| 125:18 126:9 | |
| 126:11,14,16 | |
| 126:23,24 | |
| 129:2,18,22 | |
| 130:3,22,22 | |
| 195:14 | |
| **york's**  122:1 | |
| **yorker**  122:9 | |
| **yorkers**  123:13 | |
| 124:19 125:5 | |
| 128:22 | |
| **young**  8:16 | |