

The New York Times
Company

620 8th Avenue
New York, NY 10018
nytimes.com

# PROOF OF PUBLICATION

May 25, 2023

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

5/25/2023, NY & NATL, pg B7

Larnyce Tabron

JOHN MCGILL
Electronic Notary Public
Commonwealth of Virginia
Registration No. 8038092
My Commission Expires Dec 31, 2027

Digitally signed by John McGill
Date: 2023.05.25 09:54:49 -04'00'

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] | Chapter 11 |
| | Case No. 22-10943 (MEW) |
| Debtors. | (Jointly Administered) |

**NOTICE OF (I) ENTRY OF CORRECTED AND AMENDED ORDER (A) APPROVING THE SECOND AMENDED DISCLOSURE STATEMENT AND (B) CONFIRMINGTHE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE AND (II) OCCURRENCE OF EFFECTIVE DATE**

**PLEASE TAKE NOTICE** that on March 8, 2023, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered *the Amended Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1159].

**PLEASE TAKE FURTHER NOTICE** that on March 8, 2023, the United States of America, through the United States Attorney for the Southern District of New York and the United States Trustee for Region 2 filed an appeal of the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE** that on March 10, 2023, the Court entered the *Corrected and Amended Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1166] (the "Confirmation Order") whereby the Court approved the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1166-1] (the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE** that on March 27, 2023, the United States District Court for the Southern District of New York entered an order extending the stay of the Confirmation Order for the pendency of the appeal [District Court Docket No. 45].

**PLEASE TAKE FURTHER NOTICE** that on April 20, 2023, the United States District Court for the Southern District of New York entered an order approving the *Joint Stipulation and Order Regarding the Stay Pending Appeal* [District Court Docket No. 72] whereby the stay of the Confirmation Order was lifted except with respect to the exculpation provisions so that the Debtors may effectuate the Plan.

**PLEASE TAKE FURTHER NOTICE** that on May 18, 2023, the Court entered the *Order (I) Approving the Liquidation Procedures and (II) Granting Related Relief* [Docket No. 1398].

**PLEASE TAKE FURTHER NOTICE** that the Effective Date of the Plan occurred on May 19, 2023. Each of the conditions precedent to consummation of the Plan enumerated in Article IX of the Plan has been satisfied or waived in accordance with the Plan and the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE** that the terms of the Confirmation Order and the Plan (which, for the avoidance of doubt, includes the Plan Supplement and all exhibits and documents related thereto) are binding upon the Debtors, the Wind-Down Debtor, any and all Holders of Claims or Interests (irrespective of whether Holders of such Claims or Interests are deemed to have accepted the Plan); all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan; each Entity acquiring property under the Plan; and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

**PLEASE TAKE FURTHER NOTICE** that, in accordance with Article IV.B. of the Plan, on the Effective Date, certain of the Debtors and other applicable parties have commenced a series of Restructuring Transactions as set forth in the Restructuring Steps Memorandum.

**PLEASE TAKE FURTHER NOTICE THAT** all requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be filed no later than forty-five days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan, Confirmation Order and other papers filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/Voyager. You may also obtain copies of the Liquidation Procedures and other papers filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated: May 19, 2023, New York, New York

*/s/ Joshua A. Sussberg*, **KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP,** Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., Allyson B. Smith (admitted *pro hac vice*), 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: jsussberg@kirkland.com, cmarcus@kirkland.com, christine.okike@kirkland.com, allyson.smith@kirkland.com, *Counsel to the Debtors and Debtors in Possession*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Confirmation Order or Plan.

SOCIAL MEDIA

# *Emulating Climate Panel, a Global Group Takes On Misinformation*

FROM FIRST BUSINESS PAGE

ganization affiliated with the United States Institute of Peace in Washington.

The group, the International Panel on the Information Environment, has registered as a nongovernmental organization in Zurich at a time when the fight against misinformation has become increasingly mired in a broader erosion of trust in government, news organizations and other public institutions.

"Algorithmic bias, manipulation and misinformation has become a global and existential threat that exacerbates existing social problems, degrades public life, cripples humanitarian initiatives and prevents progress on other serious threats," the panel wrote in its inaugural announcement.

The panel was introduced during a three-day meeting, organized by the Nobel Foundation and the National Academy of Sciences, devoted to the erosion of public understanding and trust in science.

Speaker after speaker at the meeting described an onslaught of disinformation that has become a dispiriting fact of public life across the globe and that, with the recent explosion of artificial intelligence, could soon become even worse.

Maria Ressa of the Philippines, a winner of the Nobel Peace Prize in 2021, issued a manifesto demanding that democratic governments and Big Tech companies become more transparent, do more to protect personal data and privacy and end practices that contribute to disinformation and other threats against independent journalism. It has 276 signatories representing more than 140 organizations.

One challenge facing these efforts is overcoming the increasingly fierce arguments over what exactly constitutes misinformation. In the United States, the efforts to combat it have run aground on First Amendment protections of free speech. The biggest companies have now shifted focus and resources away from the fight against misinformation, even as new platforms emerged promising to forgo policies that moderate content.

On Wednesday, the panel's researchers presented the summary of its first two studies, which reviewed 4,798 peer-reviewed publications examining misleading information on social media and aggregated the findings on the effectiveness of countermeasures to it.

The findings suggest that the most effective responses to false information online are labeling content as "disputed" or flagging sources of state media and publishing corrective information, typically in the form of debunking rumors and disinformation.

Far less certain, the reports argues, is the effectiveness of public and government efforts to pressure social media giants like Facebook and Twitter to take down content, as well as internal company algorithms that suspend or play down offending accounts. The same is true of media literacy programs that train people to identify sources of misinformation.

> ***'We're not saying that information literacy programs don't work. What we're saying is that we need more evidence.'***
>
> Sebastián Valenzuela, a professor at the Pontifical Catholic University of Chile who oversaw the study.

"We're not saying that information literacy programs don't work," said Sebastián Valenzuela, a professor at the Pontifical Catholic University of Chile who oversaw the study. "What we're saying is that we need more evidence that they work."

The panel's inspirational model, the Intergovernmental Panel on Climate Change, was founded in 1988, a time when climate change was equally contested. Its scientists, working under the auspices of the United Nations, toiled for decades before its assessments and recommendations came to be recognized as scientific consensus.

When it comes to the digital landscape, and the impact on society of its abuses, the science of disinformation could prove even harder to measure in concrete terms. Climate change is "hard science," said Young Mie Kim, a professor at the University of Wisconsin-Madison who serves as vice chair of a committee focused on research methodology.

"So, relatively speaking, it's easier to develop some common concepts and tool kits," Ms. Kim said. "It's hard to do that in social science or humanities."

The new panel eschews a governmental role — at least for now. It plans to issue regular reports, not fact-checking individual falsehoods but rather looking for deeper forces behind the spread of disinformation as a way to guide government policy.

"It'd be too hard to put a bunch of scientists on evaluating the truth claims in any particular piece of junk," said Philip N. Howard, director of Oxford University's Program on Democracy and Technology and chairman of the new panel.

"What we can do is look for infrastructural interference," he went on. "What we can do is audit an algorithmic system to see if it's got lousy or unintended outcomes. It's still hard, but I think that's within reach as a research objective."

# *For One Group of Teens, Social Media Is a Lifeline*

By CLAIRE CAIN MILLER

The surgeon general's warning Tuesday about social media's "profound risk of harm" to young people included a significant qualification. For some of them, the warning said, social media can be beneficial to health in important ways.

For one group in particular — the growing share of young people who identify as lesbian, gay, bisexual, transgender and queer — social media can be a lifeline, researchers and teenagers say. Especially for those growing up in unwelcoming families or communities, social media often provides a sense of identity and belonging at a crucial age.

"It's a lifeline for folks to receive information and to really see that they are not alone, and there are so many people like them," said Jessica Fish, who studies L.G.B.T.Q. youth and their families at the University of Maryland School of Public Health. "They can feel some sense of connection, and realize there is a place for them."

Growing up in a sheltered Mormon and Christian community in Kansas, Cassius O'Brien-Stiner, 19, said he had little exposure to L.G.B.T.Q. identities: "I was pretty unaware that even being gay was a thing."

Then Mr. O'Brien-Stiner, who is transgender, started using Facebook and YouTube as an adolescent, and found a group for queer people. He has had some negative and even dangerous experiences online, he said, including cyberbullying. But it was also where he first learned the word "trans."

"It was weird, feeling completely alone and then, suddenly, there were thousands of people who felt the same way I felt, on a spectrum," said Mr. O'Brien-Stiner, who now attends the University of Kansas. "It was both eye-opening and really comforting."

The surgeon general's advisory focused on social media's effect on young people's mental health and well-being. It noted that its use is associated with problems like depression and eating disorders, and it can displace vital activities like sleeping, exercising and spending time with friends in person.

L.G.B.T.Q. teenagers may face additional risks related to their identities, including hateful language or sexual victimization. They are more susceptible to cyberbullying, research has shown, and it can have negative effects on their emotions, behavior and academics.

Yet a variety of research over the decade since social media became ubiquitous among teenagers has found that often, social media use has been more beneficial than not for L.G.B.T.Q. youth. This includes sites like TikTok, Tumblr, Discord and YouTube, as well as L.G.B.T.Q.-focused sites like Q Chat Space and TrevorSpace.

JOY ASICO/ASSOCIATED PRESS

**Daniel Trujillo, a 15-year-old transgender activist, spoke at a Human Rights Campaign rally in Washington in March.**

Young people use social media to explore their identities, research has found. It has probably contributed to the fact that L.G.B.T.Q. people have begun coming out earlier in their lives, which can have long-term positive effects on mental health.

L.G.B.T.Q. youth go online to find friends and seek emotional support, and to search for information about their identities and health. During pandemic lockdowns, when some were home with families who did not support them, online communities provided them with acceptance.

Though data shows that the mental health of L.G.B.T.Q. teens is worse than that of straight teens, it can be improved by being online, said Shelley L. Craig, a Canada Research Chair in sexual and gender minority youth at the University of Toronto. Her research has found that L.G.B.T.Q. youth find two things online that are known to reduce depression and suicidal thoughts: hope, and a sense of control over their actions and environment.

They often feel safer online, she said, because they can log off or remove their profile in a way they can't if a school bully is harassing them or a teacher or family member is saying something offensive.

"The language these kids are using to describe social media in my research is: 'It's my home,' 'It's my family,' 'It's kept me alive,'" she said. "We've found it has built L.G.B.T.Q. youth's resilience, and given them hope."

Professor Fish compared social media to gay bars — a place L.G.B.T.Q. people go "for community, to meet people, to be in safe spaces and to discover who they are." Just as drinking alcohol is not without risks, she said, neither is the internet. The challenge is to mitigate the harms, while enabling young people to experience the benefits — by teaching digital literacy, for instance, and making sites safer for young people.

At Roosevelt High School in Portland, Ore., members of the queer-straight alliance, a student group, said social media had accelerated their understanding of their identities, and their acceptance among peers.

"Representation on social media is a huge part of it," said Regan Palmer, 16. "It's more accessible to see the different variations you can be, and know that sexuality is not a binary, it's a spectrum."

Her classmate Jareth Leiker, 16, said seeing people come out online helped young people do it in their own lives: "To see someone else have the courage to do something, you have the courage."

Eleanor Woosley, 15, said: "More people who are gay came out on social media and then more people were like, 'Hey, you sound like how I feel,' and it just kept going like that."

# Unglue Children From Their Screens? Believe It or Not, Parents Have Some Options.

**Brian X. Chen**

TECH FIX

Attention, parents with "screenagers": The U.S. government has issued a public warning that scrolling through apps like TikTok, Instagram and Snapchat may pose serious risks to your child's mental health.

In a 19-page report, Surgeon General Vivek H. Murthy said on Tuesday that while social media offered some benefits to younger people, including the ability to connect with communities, it also exposed them to potential harms, such as cyberbullying and content that promotes eating disorders, self-harm and other destructive behavior. Social media also hurts exercise, sleep and other activities, he said.

What can parents do? One is to explore potential options to limit children's screen time. Let's go through them.

**What tools are available, and where do we get them?**

Google's and Apple's mobile operating systems offer free tools that can be effective for restricting screen time on smartphones and tablets.

These tools allow parents to monitor and set limits on their children's devices.

For Android devices, there's Family Link, an app that must be downloaded through the Google Play Store. From there, parents can set up a child's Google account to be monitored with the software. For parents who use iPhones and want to manage their children's Android phones, there is also a Family Link app for iOS.

For iPhones, Apple's iOS includes a tool called Screen Time, which can also limit the time that someone spends on the device. It can be activated inside the iPhone's settings app by following Apple's instructions.

**Are these tools any good?**

Both have pros and cons.

Google's Family Link has useful features, including the option to reject apps that a child is trying to download and the ability to lock down a device at specific times — between 9 p.m. and 7 a.m., for example, when the child is in bed.

But Family Link has a major limitation: When children turn 13, they can choose to "graduate," as Google calls it, or lift the restrictions. At that age, the child reaches the minimum age requirement in the United States to create a Google account without parental consent.

One workaround for parents who want to continue using the restrictions is to go into the child's Google account and modify the age to under 13.

We also tested Apple's Screen Time feature in a weekslong experiment when the tool was introduced. The feature lets parents create time limits for specific apps or categories of apps, like social networking or games, on their children's iPhones. When the child runs out of time with an app, it locks the child out. The parent can then have a conversation with the child and decide whether to allow additional time on an app.

The downside is that parents who are also using the tools to monitor their own phone use can easily bypass the restrictions using their passcode — and they may realize they are even more addicted to their screens than their children.

**Are there other options?**

Yes. There are also third-party Android and iOS apps that allow parents to manage screen time, though they should be used with caution. Some apps from unknown brands that are marketed as parental control apps have been used by stalkers to track the users' locations and even eavesdrop on them through their microphones — a type of malicious software that security researchers call "stalkerware."

Parents have plenty of resources to find reputable tools that can also work on personal computers, as well as on phones and tablets. Common Sense Media, a nonprofit that reviews products for families, found that Qustodio and NetNanny gave parents deep control of their children's devices.

**Do social media companies offer features to limit use of their apps?**

Social media companies also offer some features to remind people to stop scrolling. Instagram, for example, has a "Take a Break" reminder that can be turned on, and TikTok this year introduced its own tool for limiting time spent inside its app.

But many people, including teenagers, have found that these tools can be easily overridden.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1] Debtors. | Chapter 11<br>Case No. 22-10943 (MEW)<br>(Jointly Administered) |

**NOTICE OF (I) ENTRY OF CORRECTED AND AMENDED ORDER (A) APPROVING THE SECOND AMENDED DISCLOSURE STATEMENT AND (B) CONFIRMINGTHE THIRD AMENDED JOINT PLAN OF VOYAGER DIGITAL HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE AND (II) OCCURRENCE OF EFFECTIVE DATE**

**PLEASE TAKE NOTICE** that on March 8, 2023, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered *the Amended Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1159].

**PLEASE TAKE FURTHER NOTICE** that on March 8, 2023, the United States of America, through the United States Attorney for the Southern District of New York and the United States Trustee for Region 2 filed an appeal of the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE** that on March 10, 2023, the Court entered the *Corrected and Amended Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1166] (the "Confirmation Order") whereby the Court approved the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1166-1] (the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE** that on March 27, 2023, the United States District Court for the Southern District of New York entered an order extending the stay of the Confirmation Order for the pendency of the appeal [District Court Docket No. 45].

**PLEASE TAKE FURTHER NOTICE** that on April 20, 2023, the United States District Court for the Southern District of New York entered an order approving the *Joint Stipulation and Order Regarding the Stay Pending Appeal* [District Court Docket No. 72] whereby the stay of the Confirmation Order was lifted except with respect to the exculpation provisions so that the Debtors may effectuate the Plan.

**PLEASE TAKE FURTHER NOTICE** that on May 18, 2023, the Court entered the *Order (I) Approving the Liquidation Procedures and (II) Granting Related Relief* [Docket No. 1398].

**PLEASE TAKE FURTHER NOTICE** that the Effective Date of the Plan occurred on May 19, 2023. Each of the conditions precedent to consummation of the Plan enumerated in Article IX of the Plan has been satisfied or waived in accordance with the Plan and the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE** that the terms of the Confirmation Order and the Plan (which, for the avoidance of doubt, includes the Plan Supplement and all exhibits and documents related thereto) are binding upon the Debtors, the Wind-Down Debtor, any and all Holders of Claims or Interests (irrespective of whether Holders of such Claims or Interests are deemed to have accepted the Plan); all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan; each Entity acquiring property under the Plan; and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

**PLEASE TAKE FURTHER NOTICE** that, in accordance with Article IV.B. of the Plan, on the Effective Date, certain of the Debtors and other applicable parties have commenced a series of Restructuring Transactions as set forth in the Restructuring Steps Memorandum.

**PLEASE TAKE FURTHER NOTICE THAT** all requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be filed no later than forty-five days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan, Confirmation Order and other papers filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/Voyager. You may also obtain copies of the Liquidation Procedures and other papers filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated: May 19, 2023, New York, New York

*/s/ Joshua A. Sussberg* , **KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP,** Joshua A. Sussberg, P.C., Christopher Marcus, P.C., Christine A. Okike, P.C., Allyson B. Smith (admitted *pro hac vice*), 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: jsussberg@kirkland.com, cmarcus@kirkland.com, christine.okike@kirkland.com, allyson.smith@kirkland.com, *Counsel to the Debtors and Debtors in Possession*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Confirmation Order or Plan.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: TRITEK INTERNATIONAL INC., *et al.*,[1] Debtors. | Chapter 11<br>Case No. 23-10520 (TMH)<br>(Jointly Administered) |

**NOTICE OF AUCTION AND SALE HEARING**

**PLEASE TAKE NOTICE REGARDING THE FOLLOWING:**

1. On April 27, 2023, the above-captioned debtors and debtors in possession (collectively, "Debtors"), each filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

2. Debtors are soliciting offers for the purchase of substantially all of Debtors' assets and assumption of certain liabilities of Debtors consistent with the bidding procedures (the "Bidding Procedures") approved by the Court (the "Court") by entry of an order on May 19, 2023 [Docket No. 114] (the "Bidding Procedures Order"). **All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order**. To the extent that there are any inconsistencies between this notice and the Bidding Procedures or the Bidding Procedures Order, the Bidding Procedures or the Bidding Procedures Order, as applicable, shall govern in all respects.

3. The Bid Deadline is **May 25, 2023 at 4:00 p.m. (ET)**. Any person or entity that wishes to participate in the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bidding Procedures. Only Qualified Bidders that have submitted Qualified Bids by the **May 25, 2023, at 4:00 p.m. (ET)** Bid Deadline are eligible to participate in the Auction, subject to the terms of the Bidding Procedures and other limitations as may reasonably be imposed by Debtors. Qualified Bidders participating in the Auction must appear at the Auction in person or through a duly authorized representative.

4. Any party in interest may attend (but not participate in) the Auction if any such party in interest provides Debtors with written notice of its intention to attend the Auction on or before the Bid Deadline, which written notice shall be sent to proposed counsel for Debtors via electronic mail, to **Jerry Hall, Esq. and Michael Comerford, Esq. at jerry.hall@katten.com and michael.comerford@katten.com**, respectively.

5. Debtors may conduct the Auction, at which time they will consider proposals submitted to Debtors and their professionals, by and pursuant to the Bidding Procedures as set forth in the Bidding Procedures Order, on **May 26, 2023 at 9:00 a.m. (ET)**, via live auction and/or remote video.

6. A hearing to consider approval of the Successful Bid (or to approve the Stalking Horse APA, as applicable, if no Auction is held) (the "Sale Hearing") shall take place on **June 2, 2023 at 10:00 a.m. (ET)**, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Wilmington, Delaware 19801. At the Sale Hearing, Debtors will present such Successful Bid to the Court for approval.

7. Objections, if any, to the Motion and the sale of the Assets to a Successful Bidder, must be filed with the Court and served upon counsel to Debtors so as to be actually received by **May 23, 2023 at 4:00 p.m. (ET)**. In each case, all objections must: (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Rules, the Local Rules, and any orders of the Court; (iii) state with particularity the legal and factual bases for the objection and the specific grounds therefor; and (iv) be filed with the Court no later than the applicable objection deadline and served on proposed counsel to Debtors. ***Any party who fails to timely file an objection to entry of the Sale Order (i) shall be forever barred from objecting thereto, (ii) shall be deemed to consent to the sale of the Assets as approved by any Sale Order, and (iii) shall be deemed to "consent" for purposes of Section 363(f)(2) of the Bankruptcy Code.***

8. Following service of the Notice of Auction Results, as defined in the Bidding Procedures Order, parties may object to the conduct of the Auction and/or the particular terms of any proposed Sale in a Successful Bid, other than with respect to the Stalking Horse Bid (each such objection, a "Final Sale Objection"). Any Final Sale Objection shall be (i) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, (ii) be filed with the Court, and (iii) served upon the Notice Parties by no later than the later of (a) **May 30, 2023, at 4:00 p.m. (ET)** and (b) **three days prior to the Sale Hearing** (the "Final Sale Objection Deadline").

9. This notice is subject to the fuller terms and conditions of the Motion, the Bidding Procedures, and the Bidding Procedures Order. In the event of any conflict, the Bidding Procedures Order shall control, and Debtors encourage parties in interest to review such documents in their entirety. Parties interested in receiving more information regarding the Sale and/or copies of any related document, including the Motion, or the Bidding Procedures Order, may make a written request to counsel for the proposed counsel for Debtors.

10. Copies of the Motion, the Bidding Procedures Order, and the Bidding Procedures may be obtained free of charge by visiting Debtors' Case Website (https://www.donlinrecano.com/tritek).

**FAILURE TO ABIDE BY THE BIDDING PROCEDURES, THE BIDDING PROCEDURES ORDER OR ANY OTHER APPLICABLE ORDER OF THE COURT ENTERED IN THESE CHAPTER 11 CASES MAY RESULT IN THE REJECTION OF YOUR BID AND YOUR DISQUALIFICATION FROM PARTICIPATING IN THE BIDDING FOR AND AUCTION OF ANY OF DEBTORS' ASSETS.**

**THE FAILURE OF ANY PERSON OR ENTITY TO FILE AND SERVE AN OBJECTION IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER, INCLUDING THE FAILURE TO FILE ANY SUCH OBJECTION BY THE APPLICABLE OBJECTION DEADLINE, SHALL FOREVER BAR SUCH PERSON OR ENTITY FROM ASSERTING, AT THE SALE HEARING OR THEREAFTER, ANY SUCH OBJECTION TO THE RELIEF REQUESTED IN THE MOTION, THE CONSUMMATION OF ANY APPLICABLE SALE TRANSACTION, INCLUDING THE SALE OF ANY ASSETS TO A SUCCESSFUL BIDDER FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES PURSUANT TO SECTION 363(F) OF THE BANKRUPTCY CODE OR THE TERMS OF ANY STALKING HORSE AGREEMENT OR OTHER ASSET PURCHASE AGREEMENT EXECUTED BY DEBTORS.**

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Tritek International Inc. (7919); HyLife Foods Windom, LLC (5391); and Canwin Farms, LLC (3973). Debtors' mailing address is 2850 Highway 60 East, Windom, MN 56101.

**UNITED STATES BANKRUPTCY COURT, DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: DAVID'S BRIDAL, LLC, *et al.*,[1] Debtors. | Chapter 11<br>Case No. 23-13131 (CMG)<br>(Jointly Administered) |

**NOTICE OF ENTRY OF BAR DATE ORDER FOR FILING CLAIMS AGAINST THE DEBTORS**

PLEASE TAKE NOTICE OF THE FOLLOWING:

**Entry of the Bar Date Order.** On May 18, 2023 the United States Bankruptcy Court for the District of New Jersey entered an order [Docket No. 237] (the "Bar Date Order") establishing the deadlines for the filing of claims (collectively, the "Bar Dates" and individually, a "Bar Date") in the Chapter 11 Cases of David's Bridal, LLC, *et al.* (collectively, the "Debtors") with the Debtors' court-appointed claims and noticing, Omni Agent Solutions, Inc. (the "Claims Agent"). A detailed explanation of the parties that are/are not required to file claims is available in the Bar Date Order, which is available as specified below. The deadlines established by the Court are as follows:

**General Bar Date. June 22, 2023** is the deadline for all persons and entities holding a claim against the Debtors **arising (or deemed to arise) before the April 17, 2023 Petition Date** (each, a "General Claim"), including any claim arising under Bankruptcy Code section 503(b)(9) for the value of goods received by the Debtors within twenty (20) days before April 17, 2023 (the "Petition Date").

**Administrative Bar Date. June 22, 2023** is the deadline for all persons and entities holding a right to payment constituting a cost or expense of administration of the Debtors' Chapter 11 Cases arising under Bankruptcy Code sections 503(b) (with the exception of any claims arising under Bankruptcy Code section 503(b)(9), which are considered General Claims subject to the General Bar Date above) and 507(a)(2) against the Debtors (each an "Administrative Claim") **arising from the Petition Date through May 22, 2023**, *provided, however*, that the Debtors' Utility Providers (as that term is defined in the *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Services, (II) Establishing Adequate Assurance of Payment for Future Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, (IV) Authorizing the Payment of Prepetition Administrative Fees Relating to Utility Services, and (V) Granting Related Relief* [Docket No. 10]) shall not be bound by the Administrative Bar Date and any Administrative Claims of the Debtors' Utility Providers shall be subject to further Order of the Court.

**Governmental Bar Date. October 16, 2023** is the date by which all governmental units holding claims against the Debtors arising (or deemed to arise) before the Petition Date (whether secured, unsecured priority, or unsecured non-priority) must file proofs of claim.

**Amended Schedules Bar Date.** In the event the Debtors amend their Schedules, holders of claims subject to such amendment are required to file a proof of claim by later of (i) the General Bar Date or (ii) thirty (30) days from the date on which the Debtors provided notice of the amendment to the Schedules (or another time period as may be fixed by the Court) as the date by which holders of claims affected by the amendment must file proofs of claim with respect to such claim.

**Rejection Bar Date.** The deadline to file a proof of claim for damages relating to the rejection of a contract or lease that has already been rejected as of the date hereof is the General Bar Date. If the Debtors reject a contract or lease subsequent to the date hereof, the deadline to file a proof of claim shall be the later of (i) the General Bar Date, (ii) thirty (30) days after the applicable lease rejection date pursuant to the Rejection Procedures Order,[2] and (iii) thirty (30) days from the date the rejection order is entered or notice is served on the affected claimant pursuant to the Rejection Procedures Order, if applicable. For the avoidance of doubt, the deadlines applicable to claims arising from the rejection of unexpired leases as of the Petition Date shall also apply to any claims under such unexpired leases of the Petition Date, such that parties holding such claims shall not be required to file Proofs of Claim with respect to prepetition amounts unless and until such unexpired lease has been rejected.

**Supplemental Bar Date.** Parties served with Supplemental Notice must file claims by thirty (30) days after the Supplemental Notice is served.

**EXCEPT AS TO CERTAIN EXCEPTIONS EXPLICITLY SET FORTH IN THE BAR DATE ORDER, ANY PERSON OR ENTITY WHO FAILS TO FILE A PROOF OF CLAIM OR ADMINISTRATIVE CLAIM, AS APPLICABLE, ON OR BEFORE THE BAR DATES SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR THE PURPOSES OF VOTING AND DISTRIBUTION.**

**Contents of Proofs of Claim.** Subject to the Bar Date Order, each General Claim Form or Administrative Claim Form, as applicable, must (i) be written in English; (ii) include a claim amount denominated in United States dollars;[3] (iii) conform substantially with the General Claim Form or Administrative Claim Form, as applicable; (iv) identify the Debtor against which the claim is asserted; and (v) be signed by the holder of the claim or by an authorized agent or legal representative of the holder of the claim. Each original claim form must be submitted prior to the applicable Bar Date (photocopies, telecopies, or facsimiles will not be accepted). A detailed explanation of the parties, the claims requirements and process is available in the Bar Date Order, which is available as specified below.

**Submitting Claims and Timely Service.** Each Claim Form and Administrative Claim Form, as applicable, including supporting documentation, must be submitted: (i) on or before the applicable Bar Date, by completing the applicable form, copies of which can be accessed at the Claims Agent's website https://omniagentsolutions.com/DavidsBridal and following the directions given therein; or (ii) in person, by courier service, overnight delivery, hand delivery, or United States mail so as to be **actually received** by the Claims Agent on or before the applicable Bar Date at the following address: David's Bridal, LLC Claims Processing, c/o Omni Agent Solutions, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367.

Additionally, a General Claim Form may be submitted electronically using the interface available on the website maintained by the Claims Agent in these cases (https://omniagentsolutions.com/DavidsBridal) so as to be **actually received** by the Claims Agent on or before the applicable Bar Date.

**A PROOF OF CLAIM, OR ADMINISTRATIVE CLAIM, AS APPLICABLE, A CLAIM FORM OTHERWISE SUBMITTED BY FACSIMILE, TELECOPY, ELECTRONIC MAIL OR OTHER FORM OF ELECTRONIC SUBMISSION WILL NOT BE ACCEPTED.**

**Consequences of Failing to Timely Submit Your Proof of Claim.** Pursuant to the Bar Date Order and in accordance with Bankruptcy Rule 3003(c)(2), if you or any party or entity who is required, but fails, to file a proof of claim in accordance with the Bar Date Order on or before the applicable Bar Date, please be advised that you (a) shall, except as otherwise authorized by order of the Court, be forever barred, estopped and enjoined from asserting such claim against the Debtors (or filing a proof of claim with respect thereto) and, moreover, the Debtors shall be forever discharged from any and all indebtedness or liability with respect to or arising from such claim; (b) shall be prohibited from voting to accept or reject any chapter 11 plan filed in these Chapter 11 Cases; and (c) shall be prohibited from participating in any distribution in these Chapter 11 Cases on account of such claim.

**Reservation of Rights.** Nothing contained in this notice is intended to or should be construed as a waiver of the Debtors' or any successors' rights to: (a) dispute, or assert offsets or defenses against, any filed claim or any claim listed or reflected in the Schedules as to the nature, amount, liability, classification, characterization or validity thereof; (b) subsequently designate any scheduled claim as disputed, contingent or unliquidated; and (c) otherwise amend or supplement the Schedules.

**Access to Claim Forms and Additional Information.** If you have any questions regarding the claims process and/or if you wish to obtain a copy of the Bar Date Motion, the Bar Date Order (which contains a more detailed description of the requirements for filing proofs of claim), a General Claim Form, Administrative Claim Form, or related documents you may request them in writing from the Claims Agent. If you have any questions concerning the filing or processing of claims, you may contact the Claims Agent at 1-888-946-3502 (toll free) or via electronic mail at DavidsBridalInquiries@omniagnt.com.

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: David's Bridal, LLC (4563); DBI Midco, Inc. (7392); DBI Holdco II, Inc. (7512); DBI Investors, Inc. (3857); David's Bridal Canada, Inc. (N/A); and Blueprint Registry, LLC (2335). The location of debtor David's Bridal, LLC's principal place of business and the debtors' service address in these chapter 11 cases is 1001 Washington Street, Conshohocken, Pennsylvania 19428.

[2] "Rejection Procedures Order" means the any order granting the *Debtors' Motion Seeking Entry of an Order (I) Authorizing and Approving Procedures to Reject Executory Contracts and Unexpired Leases, (II) Authorizing the Removal or Abandonment of Personal Property Remaining at a Rejected Location, and (III) Granting Related Relief*, which motion was filed at Docket No. 131.

[3] For the avoidance of doubt, claims originally denominated in Canadian Dollars shall be filed in United States dollars using the FX rate as of the Petition Date.